```
  1                    UNITED STATES DISTRICT COURT

  2                     DISTRICT OF PUERTO RICO

  3
        In Re:                     )      Docket No. 3:17-BK-3283(LTS)
  4                                )
                                   )      PROMESA Title III
  5     The Financial Oversight and )
        Management Board for       )
  6     Puerto Rico,               )      (Jointly Administered)
                                   )
  7     as representative of       )
                                   )
  8     The Commonwealth of        )
        Puerto Rico, et al.,       )      December 11, 2019
  9                                )
                    Debtor,        )
 10
       _____
 11
        In Re:                     )      Docket No. 3:17-BK-3566(LTS)
 12                                )
                                   )      PROMESA Title III
 13     The Financial Oversight and )
        Management Board for       )
 14     Puerto Rico,               )      (Jointly Administered)
                                   )
 15     as representative of       )
                                   )
 16     Employees Retirement System )
        of the Government of the   )
 17     Commonwealth of Puerto Rico,)
                                   )
 18                 Debtor,        )
 19
       _____
 20

 21

 22

 23

 24

 25
```

```
1  _____

2
   In Re:                      )     Docket No. 3:17-BK-4780(LTS)
3                              )
                              )     PROMESA Title III
4  The Financial Oversight and )
   Management Board for        )
5  Puerto Rico,                )     (Jointly Administered)
                              )
6  as representative of        )
                              )
7  Puerto Rico Electric        )
   Power Authority,            )
8                              )
                   Debtor,     )
9
10 _____

11 Sciemus Limited, et al.,    )    Docket No. 3:19-AP-00369(LTS)
                              )
12              Plaintiffs,    )       in 3:17-BK-4780(LTS)
                              )
13 v.                          )
                              )
14 Financial Oversight and     )
   Management Board for        )
15 Puerto Rico, et al.,        )
                              )
16              Defendants.    )

17 _____

18                        OMNIBUS HEARING

19   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

20              UNITED STATES DISTRICT COURT JUDGE

21   AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

22              UNITED STATES DISTRICT COURT JUDGE

23 _____

24

25
```

```
 1         APPEARANCES:

 2
           For the Mediation Team:   Honorable Chief U.S. Bankruptcy Judge
 3                                   Barbara J. Houser

 4         For The Commonwealth
           of Puerto Rico, et al.:   Mr. Martin J. Bienenstock, PHV
 5                                   Ms. Laura Stafford, PHV
                                     Ms. Margaret A. Dale, PHV
 6                                   Mr. Michael A. Firestein, PHV
                                     Mr. Lary A. Rappaport, PHV

 7
           For the U.S. Trustee
 8         Region 21:                Ms. Monsita Lecaroz Arribas, AUST

 9         For the Official
           Committee of Unsecured
10         Creditors:                Mr. Luc A. Despins, PHV

11         For the Puerto Rico
           Fiscal Agency and
12         Financial Advisory
           Authority:                Mr. Peter Friedman, PHV
13                                   Mr. Luis C. Marini Biaggi, Esq.

14         For Financial Guaranty
           Insurance Company:        Mr. Martin A. Sosland, PHV
15
           For The Financial
16         Oversight and Management
           Board Special Counsel:    Ms. Sunni P. Beville, PHV
17
           For Ambac Assurance
18         Corporation:              Ms. Atara Miller, PHV

19         For MGIC Indemnity
           Corporation:              Ms. Monique Diaz Mayoral, Esq.
20
           For The Puerto Rico
21         Funds:                    Mr. John K. Cunningham, PHV

22         For the Fee Examiner:     Ms. Katherine Stadler, PHV

23         For the Official
           Committee of Retired
24         Employees of the
           Commonwealth of
25         Puerto Rico:              Mr. Landon Raiford, PHV
```

```
 1    APPEARANCES, Continued:

 2
      For UBS Financial
 3    Services Incorporated
      of Puerto Rico:          Mr. Paul Lockwood, PHV
 4
      For ERS Bondholders:     Mr. Benjamin Rosenblum, PHV
 5
      For Assured Guaranty
 6    Corporation:             Mr. Casey J. Servais, PHV

 7    For Cantor-Katz
      Collateral Monitor,
 8    LLC.:                    Mr. Douglas Mintz, PHV
                                    Appearing in New York
 9
      For Individual
10    Retirees:                Mr. Harold Vicente, Esq.

11    Appearing Pro Se:        Mr. Peter Hein, Esq.
                                    Appearing in New York
12
      For National Public
13    Finance Guarantee Corp.: Mr. Robert Berezin, PHV

14    For Sciemus Limited,
      et al.:                  Mr. James L. Warren, III, PHV
15

16

17

18

19

20

21

22

23

24    Proceedings recorded by stenography.  Transcript produced by
      CAT.
25
```

```
 1                        I N D E X

 2   WITNESSES:                                      PAGE

 3         None offered.

 4

 5   EXHIBITS:

 6         None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                San Juan, Puerto Rico

 2                                December 11, 2019

 3                                At or about 9:41 AM

 4                      *      *      *

 5          THE COURT:  Again, buenos dias.  Welcome counsel,

 6   parties in interest, and members of the public and press here

 7   in San Juan, those observing here and in New York and to the

 8   telephonic participants.  As always, it is good to be back

 9   here.

10          I'll start with my usual reminder to everyone that

11   consistent with court and judicial conference policies and the

12   Orders that have been issued, there is to be no use of any

13   electronic devices in the courtroom to communicate with any

14   person, source, or outside repository of information, nor to

15   record any part of the proceedings.  Thus, all electronic

16   devices must be turned off unless you are using a particular

17   device to take notes or to refer to notes or documents already

18   loaded on the device.  All audible signals, including

19   vibration features, must be turned off.

20          No recording or retransmission of the hearing is

21   permitted by any person, including but not limited to the

22   parties or the press in any location.  Anyone who is observed

23   or otherwise found to have been texting, e-mailing or

24   otherwise communicating with a device from a courtroom during

25   the court proceeding will be subject to sanctions, including
```

1   but not limited to confiscation of the device and denial of

2   future requests to bring devices into the courtroom.

3           Our timing today is from now until noon, and then

4   from 1:00 until 5:00 Atlantic Standard Time, if necessary.

5   We'll begin with the Oversight Board status report.

6           Mr. Bienenstock.

7           MR. BIENENSTOCK:  Thank you.  Good morning, Judge

8   Swain.

9           THE COURT:  Good morning.

10          MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

11  Rose, LLP, for the Oversight Board.

12          The first topic of the report was the general status

13  and activities of the Oversight Board.  The Board continues to

14  partake in substantive negotiations with individual creditors

15  and creditor groups regarding its proposed Plan of Adjustment.

16  The Oversight Board also continues its efforts to broaden

17  active public employee support for the proposed Plan.

18          In terms of mediation, after the October hearing, the

19  Oversight Board participated in mediation sessions through

20  November 7.  As the Court is aware, the mediation team filed

21  its interim report and recommendations on November 27.  The

22  Board has filed its statement on December 6 seeking certain

23  provisions.  The Oversight Board is anxious to continue the

24  mediation sessions, even as potential litigation may have to

25  commence.  The mediation team is scheduled to file an amended

1    report on January 10, 2020.

2         It's important to mention, Your Honor, that while the

3    mediation process has not progressed on a steady schedule, and

4    likely not nearly as quickly as the mediators and creditors

5    and the Board desired and may have expected, huge efforts are

6    being made to keep the Commonwealth and the Board in sync with

7    one another as new issues arise, and that is sometimes a slow

8    process.

9         The parties and professionals have differing views as

10   to whether the Oversight Board and the Court can procure

11   confirmation and implementation of a plan of adjustment the

12   Commonwealth does not support, but no one disagrees that huge

13   legal and financial uncertainty will be eliminated if the

14   Commonwealth and Oversight Board both support the same plan.

15        As creditors raise certain new issues, it is not

16   always possible to attain a joint response by the Commonwealth

17   and Oversight Board quickly.  Both the Commonwealth and

18   Oversight Board do hear the creditors and are trying to

19   respond constructively.

20        In terms of ERS, last week the Oversight Board, on

21   behalf of ERS and certain bondholder groups, participated in

22   oral argument in the First Circuit concerning the appeal of

23   the Section 552(a) ruling.  On a separate track, the

24   government parties, including ERS and the bondholder groups

25   exchanged discovery requests in connection with the agreed

1    upon Orders regarding resolution of bondholder claims against

2    ERS and against the Commonwealth, including the dispute

3    regarding the scope of the bondholders' lien against ERS

4    assets, as well as whether the issuance of ERS bonds was ultra

5    vires.

6          In addition, ERS is no longer making benefit payments

7    to beneficiaries, as the Court and the public knows, as those

8    functions have been transferred to the Commonwealth through

9    the PayGo measures.

10          The Board has been working with ten municipalities

11    and CRIM in connection with developing and certifying their

12    fiscal plans.

13          In respect of PREPA, the Board continues to monitor

14    and participate in the transformation process.  Your Honor

15    will shortly hear from Mr. Friedman, AAFAF's representative,

16    more about the PREPA transformation process.  The Board

17    believes serious bids have been received and looks forward to

18    proceeding towards a transaction.  The Board is also grateful

19    for the Governor of Puerto Rico for supporting the process

20    thus far.

21          The Board has also held public hearings on the status

22    of the implementation of fiscal plan measures for ease of

23    doing business and for the Department of Education, and will

24    hold another public hearing in the coming week on the

25    Department of Corrections.

1       As the Court may -- well, as the Court surely knows,

2  but I want to emphasize, the fiscal plans can only act towards

3  the Board's mission of restoring fiscal responsibility and

4  market access if the measures in the plans are implemented.

5  And that's why it's been so important for the Board to monitor

6  their implementation, to try to enforce their implementation

7  and to hold public hearings where everyone can hear about

8  implementation of these fiscal plans in different sectors of

9  the economy.

10      Your Honor, the next topic on the status report dealt

11 with the reformulation of the ADR proposal.  If it's okay, my

12 colleague, Laura Stafford, when I'm finished, will update the

13 Court about that.

14      THE COURT:  Yes.

15      MR. BIENENSTOCK:  My colleague, Brian Rosen, wanted

16 to do that, and he is in San Juan to do that, but he is also

17 ill and is probably doing us all a favor by not being in the

18 courtroom this morning.

19      THE COURT:  Well, please thank him for all of us and

20 give him our best wishes for a speedy recovery.

21      MR. BIENENSTOCK:  I will, Your Honor.  Thank you.

22      In terms of PRIDCO, PRIDCO has public bonds in the

23 outstanding amount of approximately 150 million in principal

24 and 15 million in accrued interest.  As AAFAF notified the

25 Court in the October hearing, AAFAF entered into a

1   Restructuring Support Agreement with over two-thirds of those

2   bondholders.

3         While the Oversight Board has not been formally asked

4   to approve the RSA as a qualifying modification, the Board's

5   professionals are working with AAFAF's professionals to

6   understand the implementation of the RSA, corresponding

7   economic measures and the proposed fiscal plan for PRIDCO.

8   Should the Oversight Board issue a voluntary agreement

9   certification relating to the PRIDCO RSA, the parties aim to

10  commence a Title VI qualifying modification for PRIDCO during

11  the first quarter of 2020.

12        In terms of relations among the Oversight Board, the

13  Commonwealth and the Federal Government, as always, the

14  relations among the government and its professionals and the

15  Oversight Board and its professionals are collaborative.

16  There is constant constructive communication, even as certain

17  differences exist, such as on Law 29.

18        In terms of the Federal Government, the Oversight

19  Board welcomes the legislation released on December 6, 2019,

20  by the United States Senate Finance Committee that will

21  provide 12 billion dollars in Medicaid funding over the next

22  four years to Puerto Rico.  The Board welcomes continued

23  federal support for Puerto Rico on the issue of Medicaid

24  funding.

25        Subject to any questions the Court has, that's the

1  end of my status report, Your Honor.

2      THE COURT:  Thank you, Mr. Bienenstock.

3      MR. BIENENSTOCK:  Thank you.

4      THE COURT:  Good morning, Ms. Stafford.

5      MS. STAFFORD:  Good morning, Your Honor.  Laura

6  Stafford of Proskauer Rose on behalf of the Oversight Board,

7  and I will attempt to fill Mr. Rosen's shoes this morning.

8      I'd like to start off by giving a very brief update

9  on the claims process to date thus far before moving into the

10  details of our reformulated ACR proposal.  As of today,

11  approximately 172,469 claims have been filed asserting 43.6

12  trillion dollars against the five debtors.  As a result of

13  objections ordered to date, approximately 9,887 claims have

14  been expunged, resulting in a total amount of expunged claims

15  of approximately 43.1 trillion dollars.

16      Today we have on the Agenda approximately 16,800

17  claims to be heard.  Flagged for future deficient objections,

18  we have an additional 77,000 deficient claims that we intend

19  to file objections to over the course of the next several

20  weeks to several months.

21      As a result of the ACR process that the Court

22  conditionally approved at the last Omnibus hearing, we have

23  approximately 21,000 claims that are ready for ACR at this

24  time, and we anticipate that of the 77,000 deficient

25  objections -- or deficient claims that we plan to file on

1    objections, some number of those will likely move into ACR,

2    including several of the claims that were scheduled for

3    hearing today but as to which responses or subsequent mailings

4    have been received.

5         Moving on to the ADR proposal itself, Your Honor.

6    Before the October Omnibus hearing, the debtors shared their

7    most recent draft of the ADR procedures motion with AAFAF and

8    with the Administrative Office of the Courts.  The debtors are

9    in the process of incorporating some of the feedback that we

10   have received from each of those parties, and we recently

11   shared with the Administrative Office some additional

12   refinements to that draft for consideration.

13        The Court's provisional approval of the debtor's

14   proposed administrative claims reconciliation procedures, as

15   well as the responses that the debtors have received to the

16   supplemental mailings that were sent to claimants have been

17   very helpful in this regard in helping us to refine the ADR

18   proposals in light of what we've learned about the claims

19   population thus far.

20        As a result of both of those procedures, the debtors

21   have been able to understand better the population of claims

22   that will need to proceed through the ADR process, and the ADR

23   procedures that will be most appropriate to those types of

24   claims.

25        It's now our understanding that the great majority of

1    claims that will need to go through ADR are litigation-related

2    claims.  As a result of that, we have shared further

3    refinements to the ADR procedures with the Administrative

4    Office most recently, as well as with AAFAF and with the UCC.

5    We look forward to receiving further guidance and feedback

6    from each of these different parties, and we intend to propose

7    a revised ADR procedures motion for the Court's consideration

8    at the January Omnibus hearing.

9           And that concludes this portion of the status report,

10   unless Your Honor has any questions.

11          THE COURT:  No.  Thank you for that update.

12          MS. STAFFORD:  Thank you.

13          THE COURT:  All right.  Just one moment.

14          And now the AAFAF report.

15          MR. MARINI BIAGGI:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MR. MARINI BIAGGI:  Luis Marini of Marini Pietrantoni

18   Muniz on behalf of AAFAF.

19          Foremost, Your Honor, I would like to thank you for

20   the opportunity to address the Court regarding the status of

21   post Hurricane Irma and Maria infrastructure repairs and

22   funding.  This is a topic that is of high importance to AAFAF,

23   Governor Wanda Vazquez and the people of Puerto Rico after the

24   devastation caused by the hurricanes over two years ago.

25          I will first provide the Court with a general

1    overview of the funding allocated to date to Puerto Rico, the

2    amounts obligated and disbursed and a brief overview of the

3    main funding sources and projects covered.  I will then

4    provide some additional detail on the funding granted and

5    projects undertaken by PREPA and HTA.

6           I note, Your Honor, that the data and information

7    provided today has been obtained by AAFAF directly from PREPA,

8    HTA, the Department of Housing, and Central Office of Recovery

9    Reconstruction and Resiliency, also known as COR3, and the

10   Department of Housing.

11          Your Honor, Congress has allocated approximately 48

12   billion to Puerto Rico for recovery efforts.  Of these

13   amounts, approximately 21 billion have been obligated and 14.8

14   billion has been disbursed.

15          There are two main categories of funding projects:

16   Those funded and approved for temporary and emergency repair

17   work, and those geared towards permanent projects.  To date,

18   the funding approved and disbursed has been geared in the

19   substantial majority to address temporary and emergency repair

20   work.  This year there has started to be a transition between

21   temporary work assistance and permanent work assistance.

22          Now, there are four main funding sources.  These

23   include FEMA's Public Assistance Program, FEMA's Individual

24   Assistance Program, Hazard Mitigation Assistance and other

25   recovery programs, such as funds through HUD's Community

1   Development Block Grant disaster recovery, or CDBG. I will

2   provide a brief update on each.

3         FEMA's Public Assistance Program provides funding for

4   emergency repairs and for permanent work.  To date,

5   approximately six billion have been obligated through public

6   assistance programs, and four billion has been disbursed.  The

7   majority of these funds are for temporary and repair work, for

8   PREPA, public buildings, housing and other areas.

9         Specifically, of these funds, approximately 5.1

10  billion has been obligated and 3.75 billion has been disbursed

11  for temporary repair work, and approximately 500 million has

12  been obligated and 40 million disbursed for permanent

13  projects.  Of the funds disbursed for permanent projects, most

14  have been for permanent projects of HTA, which I will address

15  soon.

16        FEMA also provides individual assistance, financial

17  help and direct services to individuals and households.  To

18  date, approximately 2.6 billion has been approved and 2.48

19  billion has been disbursed through these programs to

20  individuals and households.

21        Funding is also obtained through the Hazard

22  Mitigation Assistance program, which is geared to communities

23  and implementation of mitigation planning and projects aimed

24  at reducing losses from future disasters.  It is estimated

25  that the Commonwealth may receive up to three billion dollars

1    through these funds.

2            Finally, among other funding sources, the HUD CDBG

3    provides funds geared, among other purposes, to rebuild

4    communities, address damaged housing, business and

5    infrastructure.  To date, approximately 20 billion has been

6    allocated to Puerto Rico.  Of these amounts, 1.5 billion has

7    been obligated and less than 400,000 has been disbursed.

8            As to HTA, it has assessed an estimated funding

9    needed for emergency repairs in the amount of 150 million and

10   686 million for permanent repairs.  In sum, HTA has estimated

11   repair costs of approximately 836 million.  These funds are

12   destined for repairing roadways, bridges, signage and safety

13   issues, traffic signals, lighting, among others.

14           Now, HTA has received approximately 480 million from

15   the Federal Highway Administration's ER allocations and has

16   disbursed to contractors or transferred to the Eastern Federal

17   Lands Highway Division for the construction of permanent

18   repairs approximately 77 percent of this amount.

19           As to the emergency construction repairs to date, HTA

20   has completed a substantial majority of this.  Emergency

21   repairs relating to safety devices, modular bridge

22   installations, bridge repairs and traffic signals are

23   substantially and over 90 percent complete.

24           As to permanent construction, HTA has made progress

25   and completed approximately 75 percent of the permitting and

1    design of landslide permanent repairs, and 90 percent of the

2    permitting and design of signage and safety permanent repairs.

3    Eastern Federal Lands Highway Division is in the process of

4    procuring the construction projects for these permanent

5    repairs and has been assigned approximately 240 million for

6    the management and construction of the permanent repairs.  The

7    Federal Highway Administration is yet to assign approximately

8    355 million for the completion of these projects.

9         With regards to PREPA, as of the end of November, out

10   of the funding allocated to conduct emergency repairs,

11   approximately 2.1 billion dollars has been incurred by

12   contractors and PREPA, of which approximately 355 million has

13   not yet been disbursed by PREPA.  At a high level, these funds

14   were used to address the system collapse caused by the

15   hurricanes, through repairs to the whole transmission and

16   distribution system over a 12-month period in order to restore

17   power to customers.  These emergency and temporary repairs are

18   substantially complete.

19        With regard to restoration and permanent work and

20   efforts to improve the system for future events, PREPA has

21   performed and continues to perform analysis and submit

22   participation packages to FEMA for the formulation of project

23   worksheets.  These information packages have generally been

24   prepared on an asset or asset classification basis.

25        A total of 12 permanent project packages have already

been submitted to FEMA.  The submissions occurred between

April 2019 and September 2019, and include projects to address

the generation and transmission for Vieques and Culebra,

transmission lines, the assets in the Humacao Region, the

eastern pharmaceutical manufacturing corridor, the

north-to-south transmission backbone, street lights, 17 of the

most damaged substations, buildings island wide, the Watauga

Dam and power transmission lines island wide.  Although PREPA

estimates the cost of these projects to be more than 4.2

billion, and includes various sources of funding that PREPA

believes it is eligible to receive, review and validation of

eligibility of FEMA is required.

A total of ten permanent project packages are also

planned to be submitted to FEMA between now and the end of

March 2020.  This includes projects focusing on the

transmission lines island wide, vehicles, the remaining

substations, distribution feeders island wide, all dams, power

plants, irrigation channels and hydro plants, among other

projects.  As of last week, of the requested amounts, only 111

million has been obligated by FEMA for costs associated with

the architecture and engineering, design and construction

plans for these projects.

With regards to CDBG, Congress has specifically

appropriated two billion dollars through CDBG for improved

electrical power systems in areas impacted by the hurricane,

1    to be shared between Puerto Rico and the U.S. Virgin Islands.

2    Although these funds have been appropriated by Congress, at

3    this time no funds have been obligated or disbursed.

4          Before finishing this report, Your Honor, I would

5    also like to inform the Court that on December 7, 2019, the

6    Governor issued an executive order expanding AAFAF's reach in

7    implementing public policy on post hurricane recovery and

8    reconstruction efforts, with a focus on areas of critical

9    infrastructure, including energy, ports, water, education,

10   housing and health.

11         AAFAF, COR3, FEMA and others are working in

12   conjunction with the Government of Puerto Rico to seek ways to

13   optimize and improve the flow of funds and the legal

14   compliance required.  PREPA, COR3, FEMA and now AAFAF

15   generally have weekly meetings attended by representatives of

16   these entities to focus on permanent project formulation,

17   funding, and to provide status of the different matters being

18   handled.

19         Your Honor, unless Your Honor has any questions, I

20   will turn it over to my colleague, Mr. Friedman.

21         THE COURT:  Thank you very much, Mr. Marini.

22         MR. MARINI BIAGGI:  Thank you.

23         MR. FRIEDMAN:  Good morning, Your Honor.  Peter

24   Friedman of O'Melveny & Myers, just to provide a few other

25   updates on AAFAF activity and governmental activity.

1          The first thing I wanted to mention is to dispel

2    something that we saw actually in one of Mr. Hein's pleadings

3    and you sometimes see floating around the internet, which is

4    the idea that the government is not earning interest on its

5    treasury single account balances.  As AAFAF announced last

6    week, interest on Treasury single account balances is expected

7    to increase by 39 percent in fiscal year 2020 due to banking

8    moves the Treasury and AAFAF have undertaken.  This has

9    resulted so far in an accrual of nearly 49 million dollars

10   since the beginning of the year and is expected to lead to an

11   increase in balances by approximately 125 million dollars for

12   the entirety of the fiscal year.

13         The second thing I wanted to mention is an activity

14   press release that was just announced yesterday with respect

15   to the government's launching of the next phase of Act 106

16   implementation with regard to defined contribution plans for

17   public employees.  And in that regard, there will be a

18   launching of a new website, Plan106Info.com, and a toll free

19   number of 1-844-752-6106, starting on December 19th, next

20   week, which will allow public employees to decide how they

21   wish to invest their money and learn about financial matters

22   related to their Act 106 accounts.

23         The third thing I wanted to mention, as

24   Mr. Bienenstock referred to, is PREPA.  The government is

25   pleased to report that there are two significant milestones in

1    the effort to transform Puerto Rico's electric sector.  The

2    first is that bids have been received in the P3 process for

3    the operation and management of PREPA'S transmission and

4    distribution system.

5           The P3 authorities are working with proponents to

6    understand and analyze the bids and negotiate final terms.

7    The government and the Oversight Board have been working

8    together to move this process forward and look forward to

9    making the final selection of a proponent early next year.

10          Second, P3 commenced a process to solicit market

11   feedback in connection with a potential transaction or

12   transactions for the actual generation assets.  The market

13   sounding is a first step in a process towards a potential

14   generating transaction, which would further the work to

15   transform and improve the reliability of the electric sector.

16          The transformation of the electric sector is a top

17   priority to achieve economic growth in Puerto Rico.  PREPA'S

18   exit from Title III is another vital step in this process.

19   AAFAF and other governmental agencies are working through the

20   Puerto Rico legislative process for enabling legislation to

21   support PREPA's exit from Title III and the transactions in

22   the RSA.  That legislative process may have some impact on the

23   timing of the 9019 motion with respect to the RSA, and if it

24   does, we will certainly let the Court know.

25          The last thing we wanted to say, Your Honor, is I was

1   hoping to take a moment to recognize the retirement of my

2   friend, Mohammad Yassin, who is in the courtroom today.

3   Mr. Yassin will be retiring from AAFAF and COFINA at the end

4   of the year.  He is the fiscal agent at AAFAF.  I don't think

5   anybody knows what that actually means, but -- in terms of the

6   title, but in practical terms, Mr. Yassin has been, for the

7   last three years, the person who has gotten everything done.

8   You don't know his words, I don't think he's spoken in court,

9   but I think you know the fruit of his labors.

10          I think, to put it succinctly, he has worked to

11  ensure that Puerto Rico's restructuring has not happened to

12  Puerto Rico but with Puerto Rico.  He has earned the respect

13  of the Board, the mediation team and its adversaries, and has

14  always fought to make sure AAFAF has a place at the table.  He

15  was a forceful advocate for the governance structure at

16  COFINA, for provisions of the bonds, which now trade above

17  par.  He was instrumental in designing PayGo and strengthening

18  Puerto Rico's retirement program.

19          He's been an architect of enhanced reporting on bank

20  accounts and other financial information, and he's even

21  managed to break a nasty Diet Coke habit over the past three

22  years.  He will be ably replace by other people at AAFAF.

23  AAFAF has terrific people.  But I wanted to extend our client,

24  my firm's and my personal thanks for the hard work and

25  friendship of Mr. Yassin.  He will be missed.

1          THE COURT:  Thank you, Mr. Friedman.

2          And thank you, Mr. Yassin.

3          Is there anything else by way of status reports or

4    comments thereon?

5          (No response.)

6          THE COURT:  So the next item on the Agenda is II, the

7    fee application of the Fee Examiner and Godfrey & Kahn.  And I

8    understand someone is to speak on that by phone?  No?

9          Oh, I'm sorry.  Ms. Stadler is here.

10         MS. STADLER:  Good morning, Your Honor.

11         THE COURT:  Good morning, Ms. Stadler.

12         MS. STADLER:  Katherine Stadler of Godfrey & Kahn on

13   behalf of the Fee Examiner, Brady Williamson, who is on the

14   phone.

15         We noted the Court's entry of the Orders for Sixth

16   Interim Fee Applications based on our recent supplemental

17   report and appreciate that having been resolved prior to this

18   hearing.

19         We filed our Fourth Interim Fee Application, which

20   covers the six months from May -- I'm sorry, April through

21   September of this year on a 21-day notice.  And as far as I am

22   aware, there have been no objections received.  If the Court

23   has questions about our application, I'm happy to answer them.

24   Otherwise, we would ask that the Order allowing the

25   application be entered.

1          THE COURT:  I am not aware of any objections that

2    have been filed either.  And I have reviewed the application

3    and find it sufficiently informative.  And I thank the Fee

4    Examiner and your firm for the work that you continue to do

5    here, which is essential to my ability to stay on top of the

6    volume of service providers and applications as we proceed

7    through this case.

8          And so I thank you, and I grant the application and

9    will enter an appropriate order.

10         MS. STADLER:  Thank you, Your Honor.

11         THE COURT:  Thank you.

12         The next Agenda item is uncontested matters.  And so,

13   Ms. Stafford.

14         MS. STAFFORD:  Good morning again, Your Honor.

15         I'm happy to take the uncontested claim objections

16   however you'd like.  The 76th relates to a certain type of HTA

17   bonds as to which no objections were received.

18         With respect to the remaining uncontested claim

19   objections, each of these are deficient objections as to which

20   we received a number of supplemental mailings after the filing

21   of those deficient objections.  We adjourned a number of the

22   claims by a notice that was filed last Friday.  Between last

23   Friday and today, we received a handful of additional

24   supplemental mailings.  And so we'd like to adjourn a handful

25   of additional claims regarding these deficient objections to

1    the January Omnibus hearing so we'll have time to look at the

2    supplemental mailings that came in.

3         THE COURT:  And so in terms of logistics here, are

4    you planning to file revised proposed orders with revised --

5    I'm sorry, revised Exhibits A, listing the particular

6    uncontested claim objections that you are not adjourning, and

7    requesting that the Court approve those?

8         MS. STAFFORD:  That is correct, Your Honor.  And

9    we'll also file Notices of Adjournment and serve them on the

10   affected claimants who sent us supplemental mailings as of

11   today so that they're aware their objection has been adjourned

12   until January.

13        THE COURT:  All right.  So as to the claims objected

14   to in the following Omnibus Objections, as to which there has

15   been neither a response nor an adjournment request by the

16   Oversight Board, the objections are sustained, disallowing the

17   Proofs of Claim to be enumerated in revised Exhibits A to

18   appropriate orders.

19        These Omnibus Objections are as follows:  The 76th

20   Omnibus Objection, which is docket entry 8961 in 3283.  That's

21   Agenda Item III.1.  Then Agenda Item III.2 is the 78th Omnibus

22   Objection, which is docket entry 8964.  Agenda Item III.3 is

23   the 82nd Omnibus Objection, which is docket entry 8969.

24   Agenda Item III.4 is the 84th Omnibus Objection, which is

25   docket entry 8971.  Agenda Item III.5 is the 85th Omnibus

 1   Objection, which is docket entry 8973.  Agenda Item III.6,

 2   which is the 86th Omnibus Objection, which is docket entry

 3   8975.  Agenda Item III.7, which is the 87th Omnibus Objection,

 4   which is docket entry 8976.  Agenda Item III.8, which is the

 5   88th Omnibus Objection, and that is docket entry number 8977.

 6   Agenda Item III.9, which is the 90th Omnibus Objection, which

 7   is docket entry 8979.  Agenda Item III.10, the 91st Omnibus

 8   Objection, which is docket entry 8980.  Agenda Item III.11,

 9   which is docket entry 8981, the 92nd Omnibus Objection.

10   Agenda Item III.12, which is the 93rd Omnibus Objection at

11   docket entry 8982.  Agenda Item 13, which is the 95th Omnibus

12   Objection, which is docket entry 8984.

13          Now, actually as to that one, I did have an issue.

14   All of the other declarations in support of the Omnibus

15   Objections recited that letters requesting additional

16   information had first been sent to the appropriate claimants.

17   We do not see that representation in the declaration in

18   support of the 95th Omnibus Objection, and so I would ask

19   that, with the revised order, you file a supplemental

20   declaration making clear that that first step was taken before

21   the claim objection was served.

22          MS. STAFFORD:  We will certainly do that, Your Honor.

23          THE COURT:  Thank you.

24          So that takes care of Agenda Items III.1 through 13.

25          MS. STAFFORD:  Thank you, Your Honor.

```
1              THE COURT:  Thank you.

2              And then Agenda Item III.14 is PREPA's Motion for

3    Undisputed Payment and Release of Insurance Proceeds.

4              Good morning.

5              MS. DALE:  Good morning, Judge.  Margaret Dale from

6    Proskauer for the Oversight Board.

7              THE COURT:  Good morning, Ms. Dale.

8              MS. DALE:  Good morning.

9              THE COURT:  Give me just one --

10             MS. DALE:  PREPA is requesting authority via order to

11   accept a 1.726 million dollar payment for a loss that had been

12   suffered.  PREPA'S asking to be able to use that money at its

13   discretion and for no claims to be made against that money by

14   creditors.

15             The insurance counsel is here.  Counsel for the

16   insurers is here today if the Court would have any questions.

17             I notice a presentment was filed with a revised form

18   of order.  No objections have been received.  And we'd ask the

19   Court to enter that Order subject to any questions that the

20   Court has.

21             THE COURT:  The Court does have questions, but I'll

22   direct them to you at this point.  The Proposed Order, the

23   Notice of Presentment was filed in the adversary proceeding,

24   and we also had you file it on the 3283 docket.  The Proposed

25   Order seeks language that binds not only the parties to the
```

1   adversary, but indeed the whole world of potential existing

2   creditors and third parties, as to any dispute as to the

3   application of these funds.

4            I can understand why you would want that.  I can

5   understand why the insurance company would want that form of

6   peace.  But I don't understand how due process would let me do

7   that.  And so to bottom line it, I'm willing to sign an order

8   that says "payment of this undisputed payment will satisfy the

9   insurer's obligations under the property insurance with

10  respect to the amounts so paid," but the remaining language in

11  paragraph four of the Proposed Order and the language in

12  paragraph three, which, for example, says "no creditor of

13  PREPA or any other party shall interfere with the transfer of

14  the payment or PREPA'S use of the undisputed payment at its

15  discretion," I just don't see how that's a justiciable request

16  under the circumstances.

17           MS. DALE:  Your Honor, if it's all right with you, if

18  I could speak with the insurance counsel's -- lawyer, and then

19  we could address that proposed reformation of the order with

20  you or with your law clerk in a few minutes?

21           THE COURT:  That's fine.  So we'll put you for

22  another return to the podium, and you'll let us know when

23  you're ready for that.

24           MS. DALE:  Thank you very much, Your Honor.

25           THE COURT:  Thank you.  Apologies for the delay.

1          So the next item on the Agenda is the interim report

2   and recommendation of the mediation team, and the filings in

3   response to that interim report.  And I have received a very

4   helpful list of the parties' agreed allocations of time to

5   address that.

6          I would first invite Judge Houser, our mediation team

7   leader, to take the podium with any remarks she may wish to

8   make before we hear from the respondents.  And I thank you for

9   your work, Judge Houser.

10          HONORABLE CHIEF UNITED STATES BANKRUPTCY COURT

11   JUDGE HOUSER:  Good morning, Judge Swain.  Of course you're

12   welcome.

13          First, a point of personal privilege, and that is to

14   acknowledge that the work of Mr. Yassin has truly been

15   outstanding.  He knows that he will be greatly missed.  And

16   while there will be successors that will take over his

17   responsibilities, let me simply say they have big shoes to

18   fill, literally and figuratively.  And we wish Mohammad all

19   the best.  And some of us might actually be jealous that he is

20   escaping these proceedings.

21          Let me now turn, if I may, to the interim report.

22   And I would be remiss if I didn't start by thanking the

23   parties for their active and sometimes vigorous participation

24   with the mediation team in discussing both substantive issues

25   in these cases and the job of trying to manage the competing

1    views of scheduling of the issues that are critical to be

2    resolved ultimately if we are unable to be successful in

3    mediation of those issues.

4         The parties met with the mediation team, shared

5    views, were constructive in trying to find solutions.  And I'm

6    pleased to say that, for the most part, the scheduling orders

7    are not being objected to.  Now, that may be because I asked

8    the parties to be thoughtful in their responses and to

9    consider whether or not the scheduling issues, as finally

10   presented in the proposed orders, whether or not they were

11   good enough.

12        I do think it is fair to say that there is a delicate

13   balance that has to be drawn in trying to resolve the parties'

14   disparate views, both on the merits of the issues, but equally

15   importantly, on the timing of these schedules.  We had

16   significant disagreements among the parties at the outset, and

17   by working with them and having very constructive

18   conversations with them, we largely came to schedules that

19   most people find I think good enough.  Perhaps not their first

20   choice, but nevertheless, I think we are satisfied with the

21   schedules we have put forth.

22        The responses have been carefully reviewed by the

23   members of the mediation team, and from my perspective, I

24   suppose -- and I'd like to put Mr. Hein's response off to the

25   side for a moment.  I'll come back to it.  The responses were,

1   I guess, fortunately not surprising to the members of the

2   mediation team.  That reflects the fact that we did have

3   extensive conversations with parties about all of these

4   issues.

5          And from my perspective, you can put the responses

6   and the issues raised into two broad categories:  The first

7   are issues that, yes, are scheduling issues, but they have

8   substantial overlap with substantive issues.  And I feel that

9   while I am a judge, I am not the judge in these cases.  I am

10  leading the mediation team.  And the judge in these cases,

11  you, need to resolve issues that impact meaningfully on both

12  substance and schedule.

13         And so what we tried to do in the interim report is

14  simply identify areas where there was vigorous dispute between

15  the parties that was both substantive and scheduling, identify

16  that, and then simply leave a blank in the Proposed Order for

17  you to resolve the dispute.

18         The alternative, second category are issues that were

19  discussed with members of the mediation team, and our judgment

20  and the parties' judgment simply differ as to what is a

21  reasonable compromise with respect to an issue.  Again, we put

22  our recommendation in the proposed interim Orders, and

23  ultimately it will be your decision as to what judgment is

24  appropriate with respect to those issues.

25         To give you an example of each of those categories,

1    because it may be helpful, with respect to the first category,

2    it's a scheduling issue, but it also has substantial

3    substantive issues as well.  I'll point to the PRIFA Lift Stay

4    Motion.  There is disagreement between the Oversight Board on

5    the one hand and Ambac on the other hand with respect to the

6    timing of that and whether it should be the original motion

7    that is fully briefed that is heard, or whether Ambac will

8    file an amended motion and you'll proceed on a different

9    motion than the motion currently on file.

10          Yes, that's a scheduling issue, but it also has

11   significant substance attached to it.  And, therefore, in the

12   Proposed Interim Order, we simply leave a blank for the date

13   of the hearing on the lift stay motion.  And you will need to

14   decide the parties' disagreement on timing and scope, if you

15   will, of that lift stay hearing.

16          And again, we did not want to tilt the playing field.

17   We felt that was not appropriate, to take one party's side

18   over another party's side with respect to that issue.  So we

19   did the only thing I thought a prudent mediation team could

20   do, which is serve that ball up for you to decide on the

21   merits.  And obviously I believe the parties will live with

22   whatever your decision is.

23          With respect to the second category of issues, I will

24   point to the question of consolidated briefing.  And the

25   Oversight Board, in its response, has suggested that

1    consolidated briefing by defendants should be mandated.  I've

2    been working with these parties for the last two and a half

3    years.  The thought that they could come to an agreement

4    within the time frames that we set forth for briefing in our

5    proposed orders and be compelled to file a consolidated brief

6    seemed unrealistic to me after the last two and a half years

7    of dealing with all of the parties.

8         That's not a criticism.  It's just an acknowledgment

9    that we have very good lawyers.  They all feel very strongly.

10   And so we agree with the concept that minimizing the number of

11   briefs, and ideally the length of briefs is important, because

12   you are but one judge, and you have but one set of clerks

13   devoted to these Puerto Rico cases.  Mandating consolidated

14   briefing seemed, in our judgment, to be more than we should

15   go.  So what the proposed interim orders say instead is that

16   parties are encouraged to consult with each other and to try

17   to file coordinated briefing and, if possible, consolidated

18   briefing; but there is no mandatory requirement.

19        With respect to what we call secondary parties, we

20   have suggested that there be a requirement that they certify

21   that they've reviewed the primary party's briefs, and that

22   their briefs address issues not already addressed.  Again, the

23   goal of that recommendation is simply that we'd like to

24   minimize the number of briefs that the Court has to read, and

25   we suggest that you narrow the issues to issues that have not

1    been raised.

2        And the certification requirement is not to be

3    difficult, but simply to put the onus on the party to take the

4    time to read a primary party's brief and then focus on issues

5    that have not yet been raised.

6        THE COURT:  And do I correctly recall that your

7    proposed schedule provides a period of two weeks for that

8    review and formulation of any additional narrower submissions?

9        HONORABLE UNITED STATES DISTRICT COURT JUDGE HOUSER:

10   Indeed it does.

11       THE COURT:  So it's not a matter of having to do it

12   overnight?

13       HONORABLE UNITED STATES DISTRICT COURT JUDGE HOUSER:

14   Correct.

15       And equally importantly, there is an escape valve, as

16   at least in my view there should be, that the Court can always

17   order otherwise.  So if there is a unique situation that we

18   can't anticipate now where some party feels the need for more

19   than the seven pages we've recommended, the Court can always

20   grant an extension of that briefing limit in the Court's

21   discretion.

22       I'd like to now take Mr. Hein's Response and mention

23   just a couple of things.  First, he has concerns about the

24   delay of a notice going out, and certainly has concerns about

25   failing to serve the interim report.  I'll take responsibility

1    for those decisions because they rest with me.

2          Because we asked the Court for permission to go with

3    an interim report followed by a final report, it seemed to me

4    that the interim report did not need to be served out on all

5    parties, because certainly the amended report proposed to be

6    filed on January 10th is something that could be fully served

7    so that everyone can see it.  And obviously the interim report

8    is filed on the docket, and everyone has access to it at this

9    time there, although certainly it has not been served out.

10         So if the Court feels that service is appropriate, my

11   suggestion is --

12         THE COURT:  And I do.

13         HONORABLE UNITED STATES DISTRICT COURT JUDGE HOUSER:

14   -- that that happen with the amended report, not this interim

15   report.

16         Secondly, the timing of notice.  Mr. Hein would like

17   to see some changes to the proposed form of notice, which I'm

18   sure he will raise with you.  Those are easy changes, if the

19   Court believes changes to the notice are appropriate.  And

20   certainly adding the Wall Street Journal as a party to publish

21   notice is also an easy change to that, if the Court believes

22   that is appropriate.

23         The question of timing, though, I believe is slightly

24   more complicated.  And from my perspective, we have

25   recommended that the notice not be mailed until after the

1    first of the year for primarily two reasons.  Number one, the

2    claim objections have been pending for some time and notice

3    has not gone out yet with respect to certain of those.  To

4    send the notice out right before Christmas seems slightly

5    unseemly to me.  And that is why in our proposed version of

6    the interim orders, waiting until after the first of the year,

7    which is not a substantial delay, nor will it delay -- there

8    is adequate time in the schedule for the notice to go out and

9    for parties to have the opportunity to participate, even if

10   there is a delay until after the new year.

11        The second issue deals with the logistics that

12   perhaps --

13        THE COURT:  May we just go back for one moment --

14        HONORABLE CHIEF UNITED STATES BANKRUPTCY COURT

15   JUDGE HOUSER:  Please.

16        THE COURT:  -- to the publication issue?  Because I

17   wanted to float with you, and heads up for everyone else, an

18   idea that has occurred to me with respect to accessibility of

19   publication notices.  As everyone knows, no matter how many

20   publications something is published in, it typically happens

21   once or maybe twice, and so it's somewhat of a hit-or-miss

22   proposition as to whether readers of any given publication see

23   it.

24        It seems to me that it could be helpful here for

25   broader notice purposes for the -- well, the Oversight Board

1    is my most likely candidate for this, to create a page on its

2    website that would contain each notice relating to these cases

3    that is published in newspapers, so that it could be labeled

4    "litigation notices published," or something like that.

5         And if we manage to publicize that over time,

6    including perhaps in this notice that goes out regarding the

7    GO and PBA objections, or the amended report, to say that on

8    an ongoing basis bondholders and other interested members of

9    the public who wish to see whether there are published notices

10   can go to the website, that that would be very helpful to

11   preserving the availability, the easy availability of a

12   catalog of information.

13        Does that make sense to you, as you've thought about

14   notice in these cases?

15        HONORABLE CHIEF UNITED STATES BANKRUPTCY COURT

16   JUDGE HOUSER:  It does.  I think that is potentially a good

17   idea.  It's also possible that the Oversight Board is not a

18   party to all of the objections, the Official Committee of

19   Unsecured Creditors is.  So I think either party could host on

20   the website that notice area.

21        THE COURT:  I thought about the Oversight Board since

22   it is the debtors' representative and the manager of all of

23   these cases, and there are many different adversaries and

24   situations in which notices may be published in this broad

25   galaxy of litigation.  And so the Oversight Board's website

1   seemed to me to be the appropriate central place for that sort

2   of thing.

3           HONORABLE CHIEF UNITED STATES BANKRUPTCY COURT

4   JUDGE HOUSER:  And certainly I think that's a good idea.  I'll

5   look to Mr. Bienenstock to address it with the Court in his

6   response time, but I do think that's an added way to try to

7   ensure that people have access to the information that they

8   need.

9           So in addition to trying not to ruin individual

10  bondholders' holidays, when months and months have passed and

11  they have not yet been advised that their claims have been

12  objected to, it also seemed to me that from a court staff

13  perspective, which I'm including the Clerk's Office staff here

14  in the District of Puerto Rico --

15          THE COURT:  And they are grateful.

16          HONORABLE CHIEF UNITED STATES BANKRUPTCY COURT

17  JUDGE HOUSER:  -- we will have a large number, I assume, of

18  individual bondholders who will get these notices.  They don't

19  have counsel and they don't fully appreciate what's happened.

20  And we can work hard to make the notice as plain English as

21  possible or plain Spanish as possible.  These are complicated

22  issues that cannot easily be captured in a notice.

23          And so what happens, as we judges know, when

24  individual pro se parties don't understand something that they

25  get from the Court, they call the Clerk's Office and ask for

1   some guidance.  And the holiday season is a time when often

2   clerks' offices are not staffed as fully as they might be with

3   people taking leave and other things.  And so it was my view

4   that waiting until after the first of the year, when the

5   Clerk's Office staff was more robust and we were past the

6   holiday season, was an appropriate time for the notice to go

7   out, recognizing that there will likely be a lot of phone

8   calls in to the Clerk's Office asking questions about what

9   parties need to do or not do in response to the notice.

10          If I may, unless the Court has questions for me now,

11  I'll reserve just a few minutes if there's anything I feel

12  compelled to stand up and say following the responses that you

13  hear from the other parties.

14          THE COURT:  Yes.

15          HONORABLE CHIEF UNITED STATES BANKRUPTCY COURT

16  JUDGE HOUSER:  Thank you.

17          THE COURT:  Thank you.

18          And so now we'll turn to the Oversight Board's

19  representative, and 14 minutes have been requested and

20  allocated.

21          MR. FIRESTEIN:  Good morning, Your Honor.  If I could

22  reserve two minutes for rebuttal?

23          THE COURT:  Yes.

24          MR. FIRESTEIN:  Michael Firestein, not

25  Mr. Bienenstock, on behalf of the Oversight Board.

1        There's obviously a lot to discuss.  I hope to be

2   able to accomplish this in the 12 minutes that I have.

3   Included as part of these remarks, I will address in due

4   course a few of the observations that Judge Houser has made.

5        Obviously the Court has had an opportunity to

6   consider a number of the submissions regarding the interim

7   report from the mediation team, and everyone has taken steps

8   to thank the mediation team and all of the parties for their

9   efforts in connection with this process.  And while I don't

10  want to repeat what's in our papers, and our submissions

11  expressly detail the suggested revisions that we have, there

12  are a few items that I'd like to highlight because I believe

13  they're important and they are necessary to revise at this

14  time.

15       In addition to those observations, to the extent that

16  others have made some contrary views, as distinguished from a

17  conventional briefing opportunity related to a motion, no one

18  has had an opportunity yet to respond to the proposals of the

19  other side, and there are a few observations that we'd like to

20  make.

21       Footnote to that, to the extent the Court has any

22  questions or observations concerning the ERS addendum that was

23  stuck at the back of our interim report, I would yield to my

24  partner, Margaret Dale, who would address that.  I only note

25  for the Court's interest that it was consented to and no one

1   had any objection to it to the best of our knowledge.

2            THE COURT:  I'm sorry.  You're saying who's consented

3   to the ERS --

4            MR. FIRESTEIN:  I believe that all the bondholders,

5   and there was a footnote that we had consulted with all of the

6   bondholders relative to the suggested changes that would be

7   made relative to ERS, and that there were no objections to

8   that.

9            THE COURT:  Perhaps I missed that, but what I had in

10  mind -- I guess before you get into the depth of your remarks

11  --

12           MR. FIRESTEIN:  Of course.

13           THE COURT:  -- I think I should say two things.

14  First, as to ERS, it hadn't been clear to me whether any

15  disagreements or gaps had been bridged or fully processed, and

16  so my plan had been to instruct the relevant parties to meet

17  and confer and file a joint status report on Monday as to

18  whether everybody was on board.

19           If you're telling me everybody's on board now, then

20  perhaps that's not necessary.

21           MR. FIRESTEIN:  In fairness to the Court, I did not

22  participate in the conversations, but Ms. Dale did.  And I'm

23  happy to step aside for a moment and she can clarify that

24  single point.

25           THE COURT:  That's fine.  We can do that at the

1   end.

2         MR. FIRESTEIN:  Fine.

3         THE COURT:  Ms. Dale can let us know that.

4         And then more broadly, as I've reviewed the responses

5   and thought about what we can and should accomplish today, my

6   focus is on matters that would affect events between now and

7   the January Omni, and it seems to me that there are a number

8   of issues that would be much better considered and processed

9   in connection with reactions to the amended report of the

10   mediation team and additional submissions in advance of the

11   January Omni.

12         And so I would be grateful if you and everyone else

13   who speaks today would focus on things that you believe really

14   matter between now and the next time you have an opportunity

15   to speak to these issues.

16         MR. FIRESTEIN:  Indeed, Your Honor.  That is exactly

17   my point, because some of the -- my overarching observation

18   was in fact the notion that an amended report is intended to

19   be filed, and there are a number of deadlines that are coming

20   up and will need to be addressed, and ships will be launched

21   in the interim, that -- I think it would be helpful to have

22   the Court's guidance with respect to exactly the process that

23   is going to be undertaken.  And there are about four or five

24   subjects that relate to that, one of which Judge Houser

25   alluded to at the outset in one of her early examples, that

1    being the PRIFA Lift Stay Motion.

2           To be candid about this, of course always candid with

3    the Court, we've laid out our position time and again relative

4    to this issue.  The Court's June 13th Order set the issues of

5    standing and secured status as threshold gating issues.  We

6    noted this in our Response.

7           Frankly, whether there is an amendment or there isn't

8    an amendment to the motion, those issues are going to remain.

9    Whether they have standing in order to pursue the claim, and

10   whether -- what the nature and extent, if it exists, that the

11   lien actually is.  And our proposal is that those issues, much

12   like they were prepared to be addressed by the Court some

13   months ago before they were remitted into the stay protocol is

14   that those matters be decided.

15          Nothing has changed in the interim, and the Oversight

16   Board's position is that those matters need to be addressed.

17   And it doesn't matter what set of papers are going to be filed

18   relative to things that might go beyond those particular

19   issues.  They are primed and ready and ripe for determination.

20   And our hope is that it will be determined as expeditiously as

21   possible for the very reason the Court has articulated.

22          If the Court has a question, I'm happy to take one.

23          THE COURT:  I wanted to preview my inclination on

24   this, and this is also previewing for Ambac and anyone else

25   who had wanted to speak to PRIFA.  My inclination is not to

1   accelerate the oral argument on the papers as fully briefed so

2   that it occurs prior to the 16th, which is your complaint

3   filing deadline.

4        I realize there's some inefficiency potentially in

5   that, but that's part of our world here.  But instead, to

6   permit Ambac to make a motion for leave to amend its lift stay

7   on the same timetable as the mediation team's structure would

8   have additional lift stay motions filed.

9        The Motion for Leave to Amend would be considered

10  under Rule 15 standards in connection with the January Omni,

11  and I believe that the Oversight Board's suggestion of a

12  required meet and confer on timing and bifurcation immediately

13  after the filing of the new lift stay motions, and that would

14  include this Motion to Amend Ambac's Lift Stay, is a salutary

15  one so that I can get, in advance of the January Omni, a

16  better idea as to whether the proposed amendment would be a

17  game changer as to the propriety of the bifurcation that I

18  have established and whether the -- what the sense of the

19  group is, you know, frankly, on preliminary hearing or

20  consolidation and coordination of the lift stay litigation

21  with the Rule 12 litigation.

22        MR. FIRESTEIN:  Let me address if I could, Your

23  Honor, an aspect of the inefficiency that I think Your Honor

24  has pointed out.  What I don't understand is are you expecting

25  that the Motion for Leave to Amend, while filed on the 16th,

1    would be fully briefed and then heard at the time of the

2    January 29th Omnibus?

3              THE COURT:  That is one scenario.  Another scenario

4    could be that the Response to the Motion for Leave to Amend

5    would happen on the lift stay briefing timetable.  I think my

6    preference would be to have the Motion for Leave to Amend

7    decided more quickly.

8              I haven't, frankly, worked out a specific proposed

9    timetable for that.  But the key thing on that for me would be

10   my ability to evaluate whether the proposed amendment would

11   warrant any change in the plan to hear essentially the issues

12   that have already been briefed first before the full lift stay

13   hearing.

14             MR. FIRESTEIN:  Well, naturally, Your Honor, we'll do

15   what the Court directs us to do.  Let me make one observation

16   about that.  It could then involve, and I realize we all work

17   for a living, but it would mean potentially that we are

18   needing to potentially oppose the entirety of the lift stays

19   prior to the 30th.  The 30th is the due date.  The 29th is the

20   date of the Omnibus.

21             And I just -- if we are meeting and conferring within

22   a couple of days, as we suggested in our proposed revisions to

23   the Order, and then we don't have the -- I'm trying to

24   understand when that issue of -- whether there would be a

25   preliminary hearing decided upon, so we knew what it was that

1    we were doing before we have to engage in a full scale

2    opposition to the lift stays, which would otherwise be due the

3    day after the Omnibus.

4         I'm not sure if what I'm saying is making sense, but

5    I'm trying to understand.  There could be multiple oppositions

6    going on at the same time.

7         THE COURT:  Well, I think -- I read your proposal on

8    the meet and confer and preliminary hearing structure as a

9    fallback to an agreement -- failure of an agreement to put

10   everything off until after the Rule 12 motions --

11        MR. FIRESTEIN:  Correct.

12        THE COURT:  -- to contemplate the construction of a

13   modified briefing schedule for the preliminary hearing that

14   would be cued up for me to consider, along with other

15   proposals to modify these interim orders if indeed this

16   structure is still in play after the amended report.

17        And in order to give the movants some assurance that

18   this doesn't mean automatic limbo until the end of Rule 12

19   proceedings, I would put a -- we have to address 362(e).

20        MR. FIRESTEIN:  Correct.

21        THE COURT:  Even in the context of the mediation

22   team's proposals, which is a timetable that goes out beyond

23   362(e).  And so I would first of all expect that there would

24   be an appropriate proposal for briefing for the preliminary

25   hearing, and then I would provide that 362(e) is deemed waived

1   for let's call it 45 days after the hearing on the -- after

2   the preliminary hearing, which would give time for any

3   supplemental -- if I find that there isn't compelling reason

4   to put it off until the end of Rule 12, that would give time

5   for supplemental briefing to finish up the lift stay and a

6   final hearing and resolution of the lift stay.

7           MR. FIRESTEIN:  So there's an intermediate date,

8   which in the absence of compelling circumstances, the fuller

9   opposition to the lift stay would be due subsequent to the

10  resolution of the hearing issues as an alternative to putting

11  it off to the 12(b) resolution?

12          THE COURT:  Yes.

13          MR. FIRESTEIN:  Okay.  Understood.

14          THE COURT:  This is all complicated.

15          MR. FIRESTEIN:  It is.  And probably only known to

16  those of us who spent hours trying to navigate through the

17  language that we proposed.  And frankly, I appreciate the

18  Court's indulgence in having spent the quality time to

19  understand exactly what it is that we're trying to do.

20          THE COURT:  That's what I've certainly been trying to

21  do since Friday night.

22          MR. FIRESTEIN:  No, I totally understand that.  I'm

23  looking at the time and I --

24          THE COURT:  Go on.

25          MR. FIRESTEIN:  Let me just move on, if I could,

1    please --

2              THE COURT:  Yes.

3              MR. FIRESTEIN:  -- to the contemplated -- I

4    understand the Court's guidance with respect to PRIFA, and I

5    think you may have already addressed the issues as it pertains

6    to the other lift stay motions which are --

7              THE COURT:  Yes, that is going --

8              MR. FIRESTEIN:  -- an amendment to HTA and to the

9    CCDA.  And if that's the case, I'm happy to move off of that

10   because I think I understand what the Court's guidance is.

11             THE COURT:  That's my inclination, and I raise it now

12   and I was explicit about it now, so that others who want to --

13   will be speaking and may want to react to it, not as favorably

14   as you seem to be reacting to it, would know what's in play.

15             MR. FIRESTEIN:  I don't wish to show my cards quite

16   so overtly, Your Honor, but if I may reserve the opportunity

17   later to rebut whatever is said --

18             THE COURT:  Sure.

19             MR. FIRESTEIN:  Okay.  Another issue that I wanted to

20   focus on is the 305 waiver.  There was a lot of debate that

21   went on, and I'm not here to discuss anything that took place

22   during the mediation sessions obviously, but we want to be

23   very clear as to precisely what our consent is under 305 for

24   the waiver that is proposed.

25             The ambiguity was created by the use of this term

1   proper affirmative defense.  And what the Oversight Board

2   wanted to be very clear about is, look, we have no problem

3   with consenting to those things, which frankly the parties are

4   aware of, that we are intending to bring in these adversary

5   actions and didn't want to be waving into the darkness what we

6   might necessarily see in return, and didn't want to have

7   something jammed into a set of pleadings not knowing in

8   advance what that necessarily was.  So we have tried to be

9   very express in what our proposed waiver is.

10          I think the language speaks for itself and goes

11   directly to the nature of the claims and what would be the

12   anticipated defenses that can be expected to be raised to

13   various claims we intend to bring.

14          THE COURT:  And so what you're asking for is

15   inclusion in the Order of the full text of your block indented

16   language in I think it's paragraph 17 of your submission.  And

17   so the first part says, we consent to the relief that we are

18   requesting, but to the extent relief is requested in

19   counterclaims or otherwise that we would believe would

20   infringe on governmental prerogatives, we don't consent to

21   that for 305.  And so that leaves open the ability, as I read

22   it, for those sorts of counterclaims to be filed, but for you

23   to oppose them or seek to dismiss them on the basis that 305

24   precludes them and they don't state a claim.

25          MR. FIRESTEIN:  Precisely.

```
 1              THE COURT:  All right.  I understand you.
 2              MR. FIRESTEIN:  Okay.  The next issue I want to
 3    comment upon briefly relates to the briefing limitations and
 4    Judge Houser's observations here about the notion of the
 5    Oversight Board's suggestion that they be mandated in some
 6    way.
 7              Look, this is a circumstance in which we are
 8    endeavoring to impose gating or governance so to speak on all
 9    the parties.  And the Oversight Board and its relationship --
10              THE COURT:  Can't we discuss the briefing issue in
11    January?
12              MR. FIRESTEIN:  Of course.
13              THE COURT:  I don't think any opposition papers are
14    really due before January.
15              MR. FIRESTEIN:  Of course, Your Honor.  You might
16    also take the same view with respect to discovery.
17              THE COURT:  Yes, I do.
18              MR. FIRESTEIN:  If you'd like to put them off until
19    January, we have some observations, and we've made them about
20    that, but I don't think there's going to be any filings unless
21    the Court is thinking that somehow today magically discovery
22    is going to turn on relative to --
23              THE COURT:  My intention, everyone should know, is to
24    take up discovery issues in a more developed context in
25    January.
```

1          MR. FIRESTEIN:  All right.  So irrespective of the

2     stay expiring on 12-31, that issue is going to carry over

3     until the next Omnibus; is that how I understand it?

4          THE COURT:  That is my intention, yes.

5          MR. FIRESTEIN:  Okay.  If I can shift for a moment.

6     And I realize I'm over, but I only have a few other --

7          THE COURT:  Yes.

8          MR. FIRESTEIN:  I have a few other observations, some

9     of which are to the comments that were made by the UCC.  I

10    have three specific issues relative to that, one of which is

11    the notion of the resolution of priority.  If Your Honor would

12    like to put that over as well until the January Omnibus, I'm

13    happy to pass on that issue and move on.

14         Our view on that is that the mediation report was

15    silent on the issue for a reason, and maybe it will be

16    addressed in the amended report and maybe it will not, but

17    there is no pressing urgency today to have that matter

18    resolved.

19         THE COURT:  My expectation is that we'll revisit that

20    in January in the context of the amended report.

21         MR. FIRESTEIN:  Something that will be happening,

22    though, between now and the next Omnibus is the request of the

23    UCC to either allow the HTA adversary, or at least one of

24    them, to continue to go forward or to use that as the vehicle

25    for the adversary proceeding that is intended to be brought

1   relative to the HTA bondholders.

2          THE COURT:  My intention was to ask Mr. Despins why

3   we can't wait until January to discuss that, and so to the

4   extent you want to take a position or speak to that in that

5   context, knowing that that's the question I'm going to be

6   asking Mr. Despins, you should --

7          MR. FIRESTEIN:  The only thing I would say about

8   that, Your Honor, is we do have to file this by January 16.

9   If it turns out the Court makes a different view that somehow

10  the Oversight Board -- that it's not sufficient for the UCC to

11  simply make an effort to intervene in that action as the

12  provisions have been provided for in the interim order or

13  somehow be injected as a co-plaintiff at a later time, I mean,

14  obviously we are not in favor of that.  But we do have to file

15  it on the 16th of January, and our current intention is to do

16  so with the Oversight Board as the sole representative of the

17  relevant instrumentality or the government at that time.

18         THE COURT:  And so that Mr. Despins understands as

19  well, my inclination at this point is for the complaints to

20  be -- the actions to be filed by the Oversight Board and to

21  process issues of coordination or additional intervention as

22  additional parties after that Complaint is filed in connection

23  with January.

24         MR. FIRESTEIN:  I would have no further observation

25  on that point, Your Honor.  I am happy to deal with that the

1    next time, and Mr. Despins will make whatever observations he

2    thinks are appropriate when he has his time.

3              THE COURT:  Yes.  And you have your two minutes of

4    rebuttal reserved.  I used a lot of your time to --

5              MR. FIRESTEIN:  I only have --

6              THE COURT:  -- lay out the landscape.

7              MR. FIRESTEIN:  I only have one more issue.

8              THE COURT:  Okay.  But when we talk, only one of us

9    can talk at a time, and I always win.  Remember that.

10             MR. FIRESTEIN:  Your Honor, I can feel the tug on my

11   pant leg here, so go --

12             THE COURT:  All right.  I was just saying that I used

13   your time so I could set the table for everyone else.  You had

14   some concluding remarks.

15             MR. FIRESTEIN:  I do, Your Honor.  I have one other

16   issue which relates to the -- 12(b) and 12(c) get tossed

17   around a lot in relation to these Orders, but one particular

18   one is the 12(c) motion as relates to the PBA adversary.  I

19   believe the last three numbers are 149.  There is a difference

20   of opinion between the Oversight Board and some of the

21   creditors that filed, or at least Assured is the one that

22   filed and asked for that 12(c) to be reinstated.

23             I note, as a matter of interest, that none of the

24   other filing parties in connection with that adversary

25   advocated for it.  I also note that the mediation team

1    consciously made specific reference in the interim report that

2    that 12(c) motion should not be part of what this initial

3    volley is of motion practice that's going to go on.

4         I set the table not knowing what the Court's

5    observation is.  I don't know that that's essential to be

6    resolved before the January 29th Omnibus, but I don't know

7    what the Court's observation is going to be relative to that.

8         THE COURT:  My expectation is that that is something

9    that would be taken up in connection with the reactions to the

10   amended report in any tweaking that would need to be done to

11   this structure, if we are remaining in full tilt litigation

12   mode after the amended report.

13        MR. FIRESTEIN:  Very well, Your Honor.  I had some

14   additional observations with respect to Mr. Hein's points.

15   Judge Houser has addressed many of them.  And I'll simply

16   reserve a couple minutes to hear what the gentleman has to

17   say, and if I have further observations on that, I'll come

18   back.

19        THE COURT:  All right.  And do you have any

20   particular reaction to the publication notice on your website

21   idea?

22        MR. FIRESTEIN:  Thank you very much for that, Your

23   Honor.  Yes.  Not only -- yes, I believe that that's an

24   acceptable option, but let me make one other possible

25   recommendation.  And they need not be mutually exclusive.

1   Prime Clerk is also a place where those notices could be

2   identified, I presume as a subcategory, and people for no cost

3   can gain access to them.

4        So I merely raise that as something so that people

5   who are used to accessing materials through Prime Clerk can

6   gain access to them in that fashion.

7        THE COURT:  And Prime Clerk you've retained as a

8   service provider, and so I could -- if I wish to -- direct you

9   to organize for it to be on the Prime Clerk website, which is

10  a place people already know to go to for information --

11       MR. FIRESTEIN:  It does seem simpler that way, but

12  whatever the Court's directive is in that regard --

13       THE COURT:  I frankly hadn't thought of that.  I was

14  just trying to think of a very central location, and that's

15  already one where people interested in litigation go, so I

16  think that's a good idea.

17       Let me just think if there's anything else that I

18  wanted you to react to before I heard from everybody else.

19  And I think -- I guess the other sort of Mr. Hein-related

20  issue, and Judge Houser touched on this, is that currently the

21  GO/PBA bond proposal contemplates a narrower distribution of

22  the copy of the interim order than the distribution of the

23  notice document, which is proposed to be sent to everybody

24  who's filed a notice of participation for the 2012 bonds, as

25  well as the UCC-related objections.

1      Do you have any issue with having the same thing sent

2  to that whole universe of people who've -- I think the

3  proposal has been -- that's in the document, is for the notice

4  in an English and Spanish document to go to all bond

5  claimants, as well as all notice of participation filers who

6  are on record.  And then the interim order on the scheduling

7  was to go to a narrower group that was focused on the UCC

8  objection notice of participation.  And I don't see a reason

9  for there to be a difference on that.

10      MR. FIRESTEIN:  Two answers, one of which is one

11  word, no.  And the second one is no, because whatever the

12  Court wishes us to do relative to service and distribution of

13  materials, we'll follow the Court's directive relative to that

14  in order to have things be as efficient as we possibly can and

15  maximize the province of due process as we go through this

16  whole --

17      THE COURT:  Great.  So no objection to going broader?

18      MR. FIRESTEIN:  No.  It's just postage, right?

19      THE COURT:  Thank you.

20      MR. FIRESTEIN:  Thank you, Your Honor.

21      THE COURT:  Next up is Ambac.

22      Hello, Ms. Miller.  I have you down for seven

23  minutes.

24      MS. MILLER:  Good morning, Your Honor.

25      THE COURT:  Good morning.

1          MS. MILLER:  Atara Miller from Milbank on behalf of

2   Ambac.  Given Your Honor's remarks, I'm going to try to

3   address my comments to those issues that you've said you're

4   interested in having discussed and not touch on those that are

5   going to be deferred.  So I'm optimistic that I won't need all

6   seven of my minutes, although we had a good time negotiating

7   them yesterday.

8          I also am going to start specifically responding to a

9   number of the issues that the Oversight Board raised in their

10   response, because I think our affirmative points I will get to

11   but I think our positions on those are laid out in our papers.

12   And obviously we haven't had an opportunity to put forward our

13   position on some of the Oversight Board's suggestions, and the

14   first one is the one that Judge Houser addressed and that you

15   addressed and that Mr. Firestein addressed, which is the PRIFA

16   Stay Motion.

17          And I'd like to be clear to the Court, as we have

18   been with the Oversight Board, and I think we put this in our

19   Response, that the proposed amendment would do two principal

20   things:  One is join the Trustee, which was one of the core

21   bases for the Oversight Board's objection to Ambac's standing

22   with respect to the motion.

23          And second, it would address certain of the other

24   factual allegations that the First Circuit, in its recent

25   decision in *Gracia*, made clear, particularly with respect to

1     movants who are asserting trust-based claims, which is part of

2     the basis for the relief and assertion of secured status that

3     Ambac has asserted.

4            There needs to be a showing of traceability of the

5     trust res, and in particular -- including, in particular, a

6     showing of the lowest intermediate balance.  And that relates

7     to one of the other issues I'd like to address this morning,

8     which is some of the critical discovery, which is pretty

9     narrow and tailored, which has been continuously denied, and I

10    think, frankly, is just prejudicing us.

11           And I want to give just a couple of concrete examples

12    of information that has recently come out, which we think is,

13    you know, potentially determinative, but certainly relevant to

14    the motion.  One is you will recall on the record at the -- in

15    connection with the mediation stay and the scope of it, and

16    whether the PRIFA motion would go in there, is also the PRIFA

17    2004 discovery motion that was on the Agenda for that day,

18    that got put into mediation.

19           And I'm going to talk about what we think should

20    happen to that going forward, but one -- we were allowed one

21    question and one answer, which AAFAF and the Oversight Board

22    agreed that we could get.  And the question was -- that I put

23    on the record was, you know, will you tell us whether the

24    monies that are transferred from this collateral lockbox

25    account into the general fund have a particular designation

1    that says, "for deposit to the benefit of PRIFA," and the

2    answer that came back was yes.

3        We didn't know that.   We had no way of knowing it.

4    We suspected it.   But that's the kind of basic information

5    that clearly goes to whether or not there is a lien on these

6    assets and whether they're part of the secured res that the

7    Court should at least be allowed to have and consider in

8    connection with those motions.

9        Another example is the -- and I think Mr. Friedman

10   actually mentioned this, the Oversight Board -- sorry, AAFAF's

11   press release from last week talking about the general fund

12   and the fact that despite kind of what we've all understood it

13   to be, the single massive account where cash just sits.   In

14   fact, that's not true, but there are subinvestment accounts

15   where money, as one would expect, is actually moved into

16   investment accounts for I don't know how much or how long or

17   how those are designated or how the monies flow.   But it's

18   clear that basic account balances and flow of funds is

19   critical information that's necessary.

20       We would like to amend, to update with the public

21   information.   We also think that it's necessary and

22   appropriate for additional flow of funds and cash balance

23   information to be provided.

24       I want to address your proposal of having a

25   preliminary hearing that bifurcates the issues at least on a

1    preliminary basis and then considers whether there should be

2    further extension.

3         THE COURT:  And I had already set that structure

4    before the stay went on.

5         MS. MILLER:  So that structure had been set with

6    respect -- well, it wasn't -- not exactly that structure, but

7    a similar structure, yes, was set --

8         THE COURT:  It said that there would be a hearing on

9    what I think we characterized as standing and secured status

10   issues, and then the discovery and the remainder of the lift

11   stay issues would be addressed.

12        MS. MILLER:  Exactly.  And I think we objected to

13   that.  Now, we still think it is ill-advised, in particular

14   because, in the circumstance, we just don't think that there

15   would be or is any compelling reason to defer and further

16   extend the period on the lift stays.

17        You know, the cases that they cite, *San Bernardino*,

18   for example, where you're holding for determination -- and

19   this really goes to the question of are we bifurcating so that

20   we can consider consolidation, which is their position, and we

21   have a fundamental issue with consolidation.  It's not

22   appropriate.  Lift stays and the adversaries are different

23   procedures under the Bankruptcy Rules, and seeking to

24   consolidate would entirely abrogate creditors' rights to lift

25   the stay.  The First Circuit's cautioned against doing that.

```
 1              THE COURT:  I understand your point, and I'm afraid

 2    that I was unclear and I may not have fully, you know,

 3    connected all the dots here in thinking about what I'm going

 4    to do with these Orders in the short term.  There is a

 5    bifurcation decision with respect to your motion, what will be

 6    argued first, that I imposed over your objection.  Then the

 7    bifurcation issue in conjunction -- in connection with the

 8    proposal for consolidation of all of the litigation is

 9    different, and that would put on the Oversight Board the

10    obligation to show a compelling reason to put determination of

11    lift stay motions out very far.  And that is its own set of

12    arguments and standards.  So I understand.

13              MS. MILLER:  And we reserve.

14              THE COURT:  Yes.

15              MS. MILLER:  And I think in our papers we said we're

16    not going to fight that fight today.  We expect that the Court

17    will decide that on a full record.

18              THE COURT:  Yes.

19              MS. MILLER:  One other comment with respect to the

20    Court's proposal, which was that Ambac filed a Motion to Amend

21    the PRIFA Stay.  You know, we think that procedurally that is

22    not the proper mechanism with respect to a motion.  I think we

23    have a right to move Rule 7015 is not incorporated with

24    respect to contested matters.  There are cases --

25              THE COURT:  But I can incorporate it.
```

1          MS. MILLER:  You can use it.  You know, I think the

2    Courts -- the cases that hold that it can be used have

3    addressed the fact that the liberal pleading standard and --

4    the liberal standard applying to motions to amend could be and

5    should be applied to the extent there is a motion, but I don't

6    think there is any requirement that a Court has ever said a

7    party cannot amend unless they formally move to amend.  I

8    think we have a right to amend under the Rules, and I think if

9    the Oversight Board wants to object or wants to oppose it,

10   including on the basis that it's an improper amendment, they

11   have every opportunity to do that.

12          So I see that I'm now over, and I thought I would

13   have spare time.  I feel like there was one other issue that I

14   wanted to address.  Oh, just one word, if the Court will

15   indulge me.

16          THE COURT:  Yes.

17          MS. MILLER:  On the PRIFA 2004 motion, the mediator's

18   interim report would propose having the stay extended and

19   continue to apply to that.  You'll recall, perhaps, that that

20   PRIFA 2004 motion, at the Oversight Board's insistence, was

21   put into mediation in -- as a condition of their agreement

22   that the PRIFA Lift Stay Motion be allowed into mediation so

23   that all revenue, bond-related issues could be addressed

24   together.

25          With the stay being lifted with respect to the Stay

1    Motion, I haven't heard an articulated basis for the PRIFA

2    2004 motion continuing to be subject to the stay.  And the

3    Oversight Board's principal argument in objection to -- in

4    objecting to that motion was the pending proceeding doctrine,

5    which is one that the Oversight Board has raised over and

6    over, repeatedly, recently.  And in particular, most recently,

7    in connection with their motion to strike our cash -- 2004 and

8    motion for sanctions for filing it, where they have suggested

9    that the pending proceeding doctrine expressly precludes the

10   two -- application of 2004 to any matter related to any issue

11   implicated by the Plan.  And I think the creditors would

12   really benefit from clarity on that issue sooner rather than

13   later.

14         THE COURT:  Thank you.

15         MS. MILLER:  Thank you.

16         THE COURT:  Next is Assured, for seven minutes.

17         MR. SERVAIS:  Thank you, Your Honor.  Casey Servais

18   from Cadwalader, Wickersham & Taft, on behalf of Assured.

19         I had initially had three points that I wanted to

20   address.  First, Assured's proposed addition to the GO-PBA

21   Order; second, Assured's proposed addition to the revenue bond

22   Order; and third, at least some of the FOMB's proposed

23   revisions.

24         With respect to the GO-PBA Order, as Mr. Firestein

25   noted, we only proposed one addition.  We did not propose to

1   modify anything that the mediation team had proposed. Our

2   proposal was that in view of key overlapping issues between

3   the PBA adversary proceeding and the GO claim objections, the

4   PBA adversary proceeding should go forward on the same

5   schedule.

6          Your Honor has indicated that you would prefer to

7   consider that issue in January. That's fine with us. Under

8   our proposed schedule, the next thing that would have to occur

9   in the PBA adversary proceeding is that Assured would file its

10  Reply in support of the 12(c) motion. The rest of the 12(c)

11  motion is entirely briefed. The FOMB has already filed its

12  opposition. All that has to happen is we would file our

13  Reply.

14         We propose to do that on the same date that replies

15  are due with respect to the motions to dismiss the claims

16  objections, which is April 8th. The only thing we are

17  concerned about is if this issue is deferred to January, that

18  the FOMB at that point might argue that there are other things

19  that have to be done within that adversary proceeding that

20  cannot be done before April 8.

21         So as long as we are all agreed that the issue in

22  January will be whether Assured may file its Reply on April

23  8th or not, and that nothing else needs to happen in the

24  adversary proceeding prior to that deadline, then we don't

25  have any objection with moving that issue to January.

1          THE COURT:  Well, what would be the problem with my

2    hearing at the end of January arguments about, you know, God

3    knows what should happen between January and April, and making

4    a decision on that in proximity to the January Omni?

5          MR. SERVAIS:  Right.  That is absolutely acceptable.

6    Our only concern is that the FOMB could say there's something

7    else that needs to occur in the adversary that will require

8    four months.

9          It would have been possible to take those additional

10   steps as of this hearing in December, but because the hearing

11   was delayed until January, there is no longer time to complete

12   everything that needs to be completed in the adversary

13   proceeding.  I don't know what that would be as long -- our

14   point is simply by consenting to move the issue of our

15   proposed schedule to January, the FOMB is waiving any right to

16   say that something -- that somehow, because of that move to

17   January, the schedule would be too compressed for our proposed

18   schedule to be adhered to.

19         THE COURT:  And so in agreeing to move it to January,

20   you are making it clear that your position is that the 12(c)

21   motion should be fully briefed on that April 8th timetable and

22   you're not signaling a willingness to have that slide if

23   somebody else wants to do something else.

24         MR. SERVAIS:  Exactly.  Precisely.

25         THE COURT:  Thank you.

1          MR. SERVAIS:  Thank you very much, Your Honor.

2          With respect to the revenue bond orders, we also had

3     one proposed addition there which went to the issue of the

4     scheduling of the PRIFA Lift Stay Motion.  Our -- I mean, we

5     support Ambac's right to amend their Lift Stay Motion.  We

6     would probably join such an amended motion.

7          We reserve our rights on bifurcation.  We don't have

8     any particular view on that at this moment.  Our concerns

9     really went to something more fundamental, which is that there

10    should be clarity that all of the lift stay motions will be

11    heard on the same schedule.

12         To the extent Your Honor's inclined to impose meet

13    and confer obligations, we're obviously willing to meet and

14    confer, but we feel it should take place against a backdrop

15    where it's clear that whatever schedule is agreed to will

16    apply to all the lift stay motions.  And the reason for that

17    is, again, the lift stay motions also implicate overlapping

18    key issues:  The clawback Order, the moratorium Order, what

19    constitutes a valid clawback under the Puerto Rico

20    Constitution, various constitutional issues, Takings Clause,

21    Contracts Clause.

22         All of those issues are common to the lift stay

23    motions, and Assured could be prejudiced if one lift stay

24    motion were somehow considered in isolation, apart from the

25    others.  So we would request that there be clarity at this

1    time that whatever kind of process is mandated, it be

2    clarified that all the lift stay motions will be on the same

3    schedule ultimately.

4            THE COURT:  Well, it is clear to me that that is the

5    position that will be taken strongly by the creditors, and I'm

6    hoping that the Oversight Board is hearing that.  And the

7    Oversight Board, having heard that it's not getting a

8    pre-January 16 argument on the existing briefing on PRIFA, and

9    that it's going into this meet and confer in that kind of

10   context, I hope and trust will take it into account in

11   formulating its position on coordination, given the fact that

12   their plan A isn't working out, and will listen to and react

13   appropriately to the arguments that there are crosscutting

14   issues that would more efficiently be processed together.

15           I don't feel I'm in an appropriate position to impose

16   that structure today based on my reading of these position

17   statements over the past 72 hours or so.  That's why I'm

18   requiring the meet and confer.

19           MR. SERVAIS:  Thank you, Your Honor.

20           So very briefly, I would like to respond to some of

21   the FOMB's proposed revisions, specifically with respect to

22   Section 305.  We support the mediation team's interpretation

23   of Section 305, which is that if the FOMB chooses to file an

24   adversary proceeding, it is by definition consenting to the

25   defendants asserting, quote, any appropriate affirmative

1  defense.

2        I would point out in this context that no one is

3  forcing the FOMB to file any adversary proceedings.  If they

4  do not want defendants to be able to exercise their due

5  process rights to assert appropriate affirmative defenses,

6  they can simply refrain from filing an adversary proceeding in

7  the first instance.  We think that that is the correct

8  interpretation of Section 305.

9        What the FOMB has proposed is that they can

10  essentially micromanage what defenses a defendant is entitled

11  to assert.  They go through and list discreet issues that are

12  allowed to be addressed.  They specifically identify other

13  issues that cannot be addressed.  That does not constitute due

14  process.  And if that is the position adopted in the Order

15  with respect to Section 305, Assured would likely challenge

16  that on due process grounds.

17        THE COURT:  Well, what I'm hearing from you, and what

18  was suggested by the Oversight Board, is that there is an

19  issue as to legal interpretation of 305.  My inclination is to

20  -- in order to stake out the territory on whatever that legal

21  issue is going to be, I include in the revenue bond Order a

22  paragraph that says, "the Oversight Board takes the following

23  position as to 305," quotes the Oversight Board's paragraph,

24  and everybody can fight about what significance that has and

25  whether there's a waiver in filing the adversaries.  And that

 1  can be done in the context of more fully developed briefing.

 2          I am not prepared to take an interpretive position on

 3  305 now, and I'm also not prepared to undermine their ability

 4  to take their position as to what they think 305 means right

 5  now.

 6          MR. SERVAIS:  Thank you, Your Honor.  Would you

 7  consider also including in the Order the mediation team's

 8  proposed language regarding 305 as an alternative to the

 9  Oversight Board's?

10          THE COURT:  I'm not sure I quite envision what you --

11  what I had envisioned -- not really having been twigged to

12  this aspect of the controversy -- was to take the mediation

13  team's proposed order and bang onto the end of it a paragraph

14  that says the Oversight Board says this.

15          MR. SERVAIS:  Okay.  That would be acceptable.  We

16  just strongly support the mediation team's interpretation of

17  305 and would like to really see that reflected in the

18  Order.

19          THE COURT:  I hear you.

20          MR. SERVAIS:  Thank you very much, Your Honor.

21          THE COURT:  All right.  Next is FGIC.

22          Good morning, Mr. Sosland.

23          MR. SOSLAND:  Good morning, Your Honor.  Martin

24  Sosland for Financial Guaranty Insurance Company.

25          Having listened to Your Honor, I will jump into a

1    matter that relates to what will happen to one item between

2    now and January 30th, and if I have time, preview something

3    else.  But Your Honor, I want to go directly to the filing of

4    the adversary complaints by the Oversight Board, and start

5    with one piece of background on the mediator's Order and then

6    some of the provisions we are arguing about and that have been

7    addressed in the Responses that have been filed.

8         So the mediation team Order, the mediation team

9    recommendation, as well as the report and the proposed order

10   references the potential for four adversary complaints that

11   would be filed by the Oversight Board.  Three of those

12   adversary complaints relate to claims that have been filed

13   against the Commonwealth, to-wit, that relate to revenue bonds

14   and theories regarding misappropriation, et cetera.  We don't

15   need to go into the substance now, but the point is that there

16   are no -- there are no claim objections yet filed by the

17   Oversight Board against the various claimants who have filed

18   those claims.

19        And those three -- three of those adversary

20   proceedings are completely new, and there's no disagreement

21   that the adversary proceedings, in terms of procedures, should

22   be filed or will be filed, and that we'll litigate them,

23   although ultimately we may have some -- we have a lot of

24   disputes about the substance and maybe even about the

25   procedures.

1          One of the -- the fourth complaint that would be

2    filed, new complaint that would be filed relates to claims --

3    relates to Proofs of Claim filed by various claimants against

4    HTA, and as the mediation report explains, are already the

5    subject of four pending adversary proceedings.  Those are

6    19-362 through 365.  And one of the reasons the mediators

7    explain for a new adversary complaint is that there are over

8    100 claimants apparently that are defendants in the four -- in

9    the combined four adversary proceedings.

10          What we learned, however, when the -- when we saw

11    the -- all of the final mediator's report, and including the

12    exhibits and the procedures Order, is that the putative

13    defendants to the new adversary proceeding that would be

14    filed, there are five bullet points with -- actually, six

15    entities, because Assured is two different legal entities on

16    one of the bullet points.

17          All six of those entities are defendants in one

18    adversary proceeding.  That adversary proceeding is 19-363.

19    The 19-363 is an adversary proceeding in which not only has

20    the -- was it commenced by the Complaint filed by the

21    Oversight Board, but FGIC answered and filed counterclaims.

22    All of those have been served.  Both the original Complaint

23    and the counterclaims filed by FGIC have been served pursuant

24    to the provisions that the Court entered on July 24th.

25          And the mediator's report says, both in the report at

1   page six and in the Order -- in paragraph four of the proposed

2   Order, says that 363 would be stayed on the assumption that

3   all of the claims and all of the counterclaims that are

4   already raised in the adversary proceedings, in 363, are going

5   to go forward in the new complaint.

6        Now that we've seen that, really the only parties

7   that are going to be defendants in the proposed new adversary

8   proceeding are already defendants in 363.  And now that we've

9   seen the language that the Oversight Board is proposing in its

10  response that marks up what the content of the -- of the new

11  adversaries are, FGIC submits that there's no reason that

12  we've seen that -- there's no reason for 363 to remain stayed

13  or for the Oversight Board to file a new adversary proceeding

14  relating to HTA.

15       Those -- I don't know whether the Complaint that the

16  Oversight Board contemplates, by the language that it included

17  in its proposed revised language, is the same.  The mediators

18  propose that if they file something different, then I can

19  file, or one of the other defendants can file a motion with

20  you seeking appropriate relief.  As we said in our written

21  response, we don't think we should have to go through that

22  step.  We filed that before we saw the Oversight Board's

23  Response.

24       So our proposal would be that 363 simply goes forward

25  as is, and that if it's desirable or necessary, they can sever

1    the defendants that aren't listed on Exhibit A to the

2    mediator's report.  And, you know, this actually goes to the

3    305 issue.

4         So in one of the counts, I don't know, based on what

5    I just read, exactly what it is that the Oversight Board's

6    going to allege, but in the existing Complaint, 363, the

7    Oversight Board argues preemption, based among other things on

8    201 and 202 of PROMESA, and the powers that the Oversight

9    Board says it has, and why that means that we don't have

10   liens, not withstanding any other law to the contrary.

11        We disagree on the substance, but the Oversight Board

12   makes those allegations.  They also allege that that means

13   there's an actual justiciable controversy that's ripe for

14   determination by the Court.  We answered that.  We've teed it

15   up in our counterclaim.  We think it's ready to go forward.

16        If they want to argue somehow they haven't consented,

17   we'll have the substantive hearing before you on whether or

18   not that constitutes consent on the issues that we've raised

19   and that they've answered.  But it's already teed up, and

20   having to go through another round of adversary proceeding

21   complaint, answers, or other responsive pleadings, arguments

22   about 305, we actually think the proposal to leave 363 in

23   place will conserve resources because you've already got those

24   papers in front of you.  And at most, a motion or a severance

25   of the other defendants is all that's needed.

1         If I -- one more thing about Section 305.

2         THE COURT:  Briefly.

3         MR. SOSLAND:  Your Honor, we don't think -- if the

4    inclination of the Court is to adopt the language that's

5    proposed by the mediators, we don't think --

6         THE COURT:  The inclination is to say, as to what the

7    Board is saying, to simply record that the Board is saying

8    that.  So --

9         MR. SOSLAND:  But -- and Your Honor, my question

10   would be why.  Why say -- to adopt the mediator's paragraph

11   followed by something where the Court's saying, this is the

12   Board's position, is that a finding or a conclusion?  And if

13   neither, why is it in there?  Or wouldn't it be equally

14   appropriate to say, and the position of the bondholders or the

15   monolines is X?

16        I really don't think that would be an appropriate

17   provision in an order.

18        THE COURT:  Well, the Board has -- I don't want to

19   belabor this right now because I want to hear everybody, but

20   I'm going to try to give you a response that's meaningful to

21   me.  The Board, under 305, has a particular power to waive or

22   not waive, and that makes it different than other parties.

23   And I can't force the Board to waive anything.

24        And so if there is an issue as to whether the Board

25   is willing to waive something and there is a legal question of

1    whether by adopting an order or by filing a complaint in

2    accordance with an order I adopted, the Board has, you know,

3    nonetheless implicitly waived something that it doesn't intend

4    to waive, I think the position that the Board may believe

5    there is tension between the structure and its intended

6    exercise of the power of which it has control, it's better to

7    have that laid out.  And then we'll figure out what it all

8    means later.

9         But I can't make them waive something.  You can argue

10   that something they do waives it, but that's an issue for

11   adjudication later.  That's why I would include both.

12        MR. SOSLAND:  Thank you.  I'll reserve my other

13   points for January.

14        THE COURT:  You don't have to agree with that, but

15   that's my explanation.

16        MR. SOSLAND:  Understood, Your Honor.

17        THE COURT:  Thank you.

18        All right.  So Mr. Despins.

19        MR. DESPINS:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        MR. DESPINS:  Luc Despins with Paul Hastings on

22   behalf of the Committee.  So we heard you loud and clear about

23   moving most of what we raised to January, so our rights are

24   fully reserved on that.

25        I would just note for two seconds that this is

1  probably one of the first times in the case that the Committee

2  and Assured are actually in agreement on something, which is

3  that the 12(c) reply should be filed and the Court should rule

4  on that true lease litigation, but we're reserving that to

5  January.

6          So I'm left with two issues, therefore, and it's the

7  issue of the Committee's status as a co-plaintiff in the

8  pending HTA adversary proceedings.  So I heard what Your Honor

9  said.  The thing is that I want to be clear that we're not

10 writing on a clean slate here.  There was an extensive

11 stipulation that was Ordered by the Court which provides that

12 we are a co-plaintiff in the HTA litigation and eight claims

13 or nine claims that have been filed.  These are the claims

14 that they want to refile in a separate litigation.

15         That stipulation says that neither party can push the

16 other aside from that adversary proceeding unless they comply

17 with paragraph eight of that stipulation, and that paragraph

18 says that they have to establish that we have not prosecuted

19 the adversary proceeding in an adequate and timely fashion.

20 Well, they have not attempted to do that.  I don't think they

21 would ever say that, and, therefore, that's the issue, is that

22 -- and that stipulation has a no modification provision, Your

23 Honor.

24         Section 21 says that unless both parties consent,

25 that stipulation cannot be modified.  We bargained for that.

1   Remember, there were Section 546 statute of limitation issues

2   and the Supreme Court issue, et cetera, et cetera.  I'm not

3   going to belabor that, but it would be kind of a neat trick

4   where you can bypass all this by refiling the exact same

5   counts with naming the same parties, but with a narrow group

6   of people with additional claims, and then you completely

7   bypass that provision.  So that's really our argument, which

8   that -- that the Board should not be able to do.

9        And then my next issue is with the DRA motion to lift

10  the stay.  You know, we said that that Order provides that

11  only the Oversight Board and the government, AAFAF, can file

12  pleadings and opposition, and we are saying that the Committee

13  should be able to file pleadings on opposition as well.  I

14  believe the DRA folks filed some response saying that we need

15  to intervene to have that right.  This is not an adversary

16  proceeding.  This is a contested matter.  It's a motion to

17  lift the stay.  And I'm not aware of any requirement to file

18  an intervention motion to be heard in a contested matter by

19  the Committee.

20       So these are two points.  We understand that the

21  other issues, including briefing, the limitations on briefing,

22  are left for January.

23       THE COURT:  All right.  I think my inclination on the

24  DRA participation issue is that I want you to meet and confer

25  on that and see if you can work that out with them.  It didn't

1   seem to me clear from the papers that there had been an effort

2   to come to a place of agreement on that briefing issue and

3   that, in the worst case, it could be resolved in January

4   without doing violence to the lift stay briefing calendar.

5          MR. DESPINS:  Understood, Your Honor.  We'll do that.

6          THE COURT:  Thank you.

7          So on the co-plaintiff issue, I'm going to expect to

8   be hearing the Oversight Board's reaction to the argument

9   regarding the stipulation when Mr. Firestein comes back on the

10  reply.

11         MR. DESPINS:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         And I will also, just to keep the score card here,

14  expect to be hearing from the Oversight Board a response to

15  Mr. Sosland's argument that 363 already does everything that

16  the proposed complaint would do.

17         All right.  Next is Mr. Hein, who's speaking from New

18  York.

19         MR. HEIN:  Thank you.

20         THE COURT:  Good morning, Mr. Hein.

21         MR. HEIN:  Thank you, Your Honor.

22         I have several discrete points.  First, I wish to

23  respectfully reiterate my position that if FOMB and the UCC

24  seek to pursue issues as to the validity, priority and secured

25  status of Commonwealth bonds, there needs to be an

1   adjudication of those issues by the Court on a public record,

2   with appellate review as necessary.

3        I continue to object to the use of confidential

4   mediation that excludes individual investors from meaningful

5   and effective participation that leaves no contemporaneous --

6   that leaves no contemporaneous public record, that is done

7   behind closed doors.  Even the press cannot observe and report

8   on what occurs so that people can read about it in the press.

9        On the notice issue, Your Honor, my concern is that

10  you've had over 1,700 individuals submit Notices of

11  Participation, and even more submit Proofs of Claim.  Yet, in

12  the past six months, there have been a series of motions, and

13  indeed a number of urgent motions for relief with respect to

14  stay and mediation for which no notice has been given.

15       With respect to the 2011 claims objection, that was

16  filed, I believe, back in May.  And seven months later, still

17  no notice.

18       On the content of the notice, I have identified in my

19  Response, that's docket 9508, docket pages six and seven of

20  24, some of the points that I would urge be addressed in a

21  notice, which I think needs to be clear and needs to be

22  prepared in a way that is going to be comprehensible to

23  individuals who have not been participants in the mediation,

24  don't have the background and knowledge that participants in

25  the mediation have.

1          Fourth point.  In my view, there is no justification

2     for imposing on individual bondholders restrictions on content

3     of papers or page limits that do not apply across the board to

4     all parties.  However, I understood Your Honor to be saying

5     that that issue was being deferred to January and, therefore,

6     I will pass that for the moment.

7          Fifth point.  I believe measures do need to be taken

8     to level the playing field.  I realize, Your Honor, that I've

9     raised these points before, but if the Court is permitting

10    FOMB and UCC to proceed in an omnibus fashion in return, I

11    believe the Court should take steps to ensure that the

12    interests of individual bondholders are protected.

13         Electronic filing, which I've raised.  The District

14    of Puerto Rico CM/ECF Manual expressly provides on page six,

15    "the Court may also grant a pro se litigant access to file

16    electronically in a particular case."  I repeat my view that

17    the Court should do so here.

18         Transcripts.  Transcripts need to be made able to pro

19    se litigants on a timely basis.  And respectfully, if the

20    Court is willing to approve 500,000 dollars plus for Croma

21    advertising to help the Unsecured Creditors' Committee with

22    public relations and monitoring Puerto Rico media, and

23    literally tens of millions of dollars of fees to litigation

24    counsel for unsecured creditors, as well as the FOMB, the

25    modest cost to compensate court reporters so transcripts can

1 | go up on Prime Clerk as soon as they are available, I

2 | respectfully submit can likewise be approved by the Court.

3 | A bondholder committee.  I realize the Court has

4 | previously declined to appoint a bondholder committee that

5 | would represent individual bondholders, but if the Court is

6 | concerned about the practicalities of managing a case with

7 | 1,700 plus participants, I repeat my view that a bondholder

8 | committee could be a solution.

9 | And a final point concerning mediation

10 | confidentiality.  Respectfully, I believe there either has to

11 | be a strict observance of mediation confidentiality, meaning

12 | no one, including the FOMB or, respectfully, the mediation

13 | team, will reference what occurred in or resulted from

14 | mediation or will observe the robust nature of the mediation

15 | process in court papers or hearings, or alternatively, the

16 | confidentiality restrictions should be released.

17 | I believe that confidentiality is Ordered, and I

18 | object to it, but if it's Ordered, it must be consistently

19 | observed.  And confidentiality should not be used as both a

20 | sword and a shield.

21 | Thank you, Your Honor.

22 | THE COURT:  Thank you, Mr. Hein.

23 | Next is AAFAF.  Mr. Friedman.

24 | MR. FRIEDMAN:  Your Honor.

25 | THE COURT:  I need you at the podium.

1          It's Mr. Friedman.

2          MR. FRIEDMAN:  Peter Friedman.  I'm going to yield

3     virtually all my time to the Board.  I just want to say the

4     complaints about the mediation process, and how they were --

5     what they lead to in COFINA for Mr. Hein are just really

6     divorced from the realities of the situation.

7          The Court's approval of the COFINA deal after

8     mediation -- after the mediation session, and the idea that

9     anybody's being excluded from the mediation process or that

10    the mediation process isn't beneficial, I just could not

11    disagree more strongly.

12         And I'm just going to yield the rest of my time to

13    the Oversight Board to respond to some of the questions that

14    were raised.  I think it's most productive, because we're

15    aligned with the Oversight Board on these issues.

16         THE COURT:  Thank you, Mr. Friedman.

17         Next, the representative of National, speaking from

18    New York.  I think we may have an audio -- sir, would you say

19    testing one, two, three?

20         MR. BEREZIN:  Testing one, two, three.

21         THE COURT:  Okay.  That's fine.  There's no audio

22    problem.

23         MR. BEREZIN:  Okay.  Great.  Robert Berezin from

24    Weil, Gotshal & Manges on behalf of National Public Finance

25    Guarantee Corp.

1        Your Honor, National's view is that the Board's

2   position on 305 is incorrect.  And if it is correct, it raises

3   very serious due process issues.

4        And National certainly agrees with the Court that the

5   Scheduling Order should not decide substantive 305 issues.

6   That's entirely inappropriate.  But, you know, in light of

7   Your Honor's comments, we would have to note that there is

8   obviously going to be for some time continued uncertainty

9   about whether all of the HTA issues are going to be able to be

10  heard in this Court.  And that makes the HTA Lift Stay Motions

11  and hearing those motions on a final basis as quickly as

12  possible all the more important to preserve bondholder rights.

13  And for that reason, National strongly opposes any further

14  delay of the final lift stay hearing.

15       And not withstanding the Court's inclination in that

16  regard, because, as we view certainly the Oversight Board's

17  proposal, they really work in tandem and have to be viewed

18  that way.  It's under its 305 position.  It's essentially

19  going to bar the doors of this Court from hearing all of the

20  necessary 30 -- HTA issues, while also delaying and preventing

21  another Court from hearing those very same issues through

22  the -- by delaying the lift stay proceeding.

23       So for that reason, Your Honor, we would just urge

24  the Court to schedule the HTA lift stay hearings as soon as

25  possible.  And we also would state for the record that we

1    oppose all of the Board's proposed changes to the mediator's

2    Scheduling Order and just further reserve all of our rights.

3              THE COURT:  Thank you, sir.

4              MR. BEREZIN:  Thank you, Your Honor.

5              THE COURT:  And now the DRA parties, also speaking

6    from New York.

7              MR. MINTZ:  Thank you, Your Honor.  Good morning.

8              THE COURT:  Good morning.

9              MR. MINTZ:  Doug Mintz from Orrick on behalf of the

10   DRA parties and the collateral monitor, and joined here by our

11   co-counsel Nayuan Zouairabani of McConnell Valdes on behalf of

12   the DRA parties and the servicer.

13             THE COURT:  Sir, would you just say your name one

14   more time, please?

15             MR. MINTZ:  Doug Mintz of Orrick, Herrington &

16   Sutcliffe.

17             THE COURT:  It cut out.  So I heard Orrick,

18   Herrington & Sutcliffe, but your name?

19             MR. MINTZ:  Yes.  Can you hear me okay right now,

20   Your Honor?

21             THE COURT:  Now I can.

22             MR. MINTZ:  Thank you.  Doug Mintz from Orrick

23   Herrington & Sutcliffe.

24             THE COURT:  Thank you.

25             MR. MINTZ:  Thank you, Your Honor.

1          We are here regarding two discrete issues and filed

2     two separate reservations.  The first pertaining to a

3     potential conflict between the schedules detailed on Exhibit

4     Two to the report and Exhibit Three to the report; and the

5     second pertaining to the issue Mr. Despins referred to, which

6     I believe you've asked us to push over to next month,

7     regarding their ability to participate in the litigation

8     detailed in Exhibit Three to the report.

9          With respect to the first issue, we believe there is

10    a potential prejudicial conflict in the schedule attached as

11    Exhibit Two to the report, which is the interim schedule

12    proposed for the bond revenue litigation, and Exhibit Three to

13    the report, which is a stipulation the DRA parties reached

14    with AAFAF and the Oversight Board regarding an argument they

15    have raised regarding the DRA parties' standing to bring a

16    lift stay motion that the DRA parties have filed.

17         As you may recall, the DRA parties filed a lift stay

18    motion in June of this year pertaining to the diversion of

19    certain pledged revenues from HTA to the Commonwealth.

20    Assured and National filed a similar lift stay motion in

21    August.  Both of those lift stay motions address the diversion

22    of certain excise taxes, such as cigarette taxes, gas and

23    diesel taxes and registration fees from HTA to the

24    Commonwealth.

25         With respect to Exhibit Three, the DRA parties

1    negotiated a schedule regarding this potential standing issue

2    related to the DRA parties' ability to file a lift stay motion

3    and reach consensus with the Oversight Board and AAFAF to hold

4    briefings and hearings on this issue from February through

5    April.

6            At the same time, through the vagaries of the

7    mediation process, the mediators were working on Exhibit Two.

8    We weren't aware of this.  That would address the monolines'

9    lift stay motion, as well as the potential adversaries that

10   people have been discussing.  And as most noted, both of those

11   lift stay motions cover much the same territory, but the

12   schedule detailed in Exhibit Two begins with various filings

13   in January before we've had the chance to address our

14   standing.  So that could obviously potentially prejudice our

15   clients' rights.

16           Mr. Servais made a very pertinent point, which is

17   that we, too, believe that lift stay proceedings need to be

18   coordinated here.  There is potential -- significant potential

19   of overlapping issues, both among the different lift stay

20   motions and certainly here where they're covering the same

21   issues.

22           So as we note in our brief, we may seek to intervene

23   in the HTA Lift Stay Motion, and we're certainly prepared and

24   have reached out to mediators already and are certainly

25   prepared to meet and confer with parties to address this

1   issue.  We raise it now only to note the potential problems

2   that -- potential problems caused by deadlines that start

3   before the next hearing.

4          I have nothing further on that, Your Honor.

5          THE COURT:  Thank you.

6          Oh, one thing.  In the existing DRA stipulation, it

7   contemplates an argument on April 15, which is the date that

8   had been set for the April Omni, but because that is in the

9   week of Passover and Easter, I think, or something like that.

10  We have put the Omni over to April 22nd.  And so I think,

11  given the willingness to meet and confer and all the moving

12  pieces here, my inclination would be to approve a version of

13  the DRA stip that has the April 22nd date in it, and in

14  January have another go at the fine tuning of the motion

15  schedules after further input from the mediation team in the

16  amended report and the parties', you know, various

17  consultations before that.

18         So if you don't mind filing a revised version of the

19  DRA stip with April 22nd as the argument date for now, it

20  would be something I'd appreciate.

21         MR. MINTZ:  We can certainly do that subject to

22  obviously reserving all our rights on the issues we've just

23  identified.

24         THE COURT:  Yes.  Absolutely.  Thank you.

25         MR. MINTZ:  Thank you for your time, Your Honor.

1          THE COURT:  All right.  So I think that brings us

2     back to Mr. Firestein -- I'm sorry.  Ms. Miller.

3          MS. MILLER:  Your Honor, in an uncharacteristic way,

4     I'm rising entirely out of turn.  So I'll sit down if you tell

5     me to, but I wanted to respond to the Court's thinking on 305,

6     which was brought up in Assured's presentation, in just 45

7     seconds, because I think there's something that's quite

8     apparent to everybody on this side of the bench that is

9     probably not obvious to you.

10         And I was caught by -- in characterizing and

11    describing your thinking about including the Oversight Board's

12    proposed language, that it would be helpful because 305 is

13    expressly a consent issue, and it's helpful to describe the

14    contours of what they are agreeing to, lest there be dispute

15    about some unintentional waiver, if there's something that

16    happens in response to an order or something that they filed

17    that they didn't anticipate.

18         I want to be clear, and I'd like the Court to know

19    that everybody knows exactly what the issue is.  And the issue

20    is that in the adversary, the current, pending HTA adversary,

21    the Board directly put in issue, our position, they disagree,

22    Sections 201 and 202 of PROMESA, and in particular the

23    formulation and certification of fiscal plans and budgets,

24    arguing that those preempt all of the -- what they call

25    statutes that allocate various revenues and appropriation of

1  various excise taxes and key revenues to the Commonwealth of

2  Puerto Rico.

3         We think that the language and the narrowing and

4  specific exclusion of those issues in the Board's proposed

5  language is indeed using 305 inappropriately, and would

6  suggest that frankly, understanding of course that the Court

7  can't force the Oversight Board to consent to things that it

8  doesn't consent, that the proposed Order simply be silent on

9  305, both eliminating the mediation team's proposed language,

10  eliminating the need to put in the Oversight Board's

11  contention.  And it seems pretty clear that at some point down

12  the road we will be fighting about the scope of 305 and what

13  it means, whether there's consent if you put a particular

14  legal question at issue in your filing.

15         THE COURT:  Thank you, Ms. Miller.

16         MS. MILLER:  Thank you.

17         THE COURT:  All right.  Did Ms. Dale want to talk

18  about ERS before we go back for the reply?  Thank you.

19         MS. DALE:  Thank you, Your Honor.

20         Your Honor, in the Oversight Board's response to the

21  mediation report, at the end, there was a section that related

22  to a request to modify the ERS Scheduling Order to include

23  briefing that related to the administrative expense claims

24  that were filed by the fiscal agent and the bondholders.  And

25  there's substantial overlap between the administrative expense

1   claim issues and issues that are being stayed right now in the

2   ERS Scheduling Order.

3          So because of that overlap, we reached out to the

4   fiscal agent counsel and counsel for the bondholders and asked

5   whether they would be agreeable to putting the issues related

6   to the administrative expense claims into the Scheduling Order

7   in the same way that we're doing paragraphs four and five of

8   the Scheduling Order with respect to issues that are being

9   stayed right now, awaiting the outcome of the 552 decision

10  from the First Circuit.  And they are agreeable to that.

11         So, Your Honor, you had entered a scheduling order

12  relating to the administrative expense claims.  That was at

13  ECF 9322 in case 3283.  And we are asking the Court to vacate

14  that Scheduling Order and to modify the ERS Scheduling Order

15  to stay the administrative expense claim motions consistent

16  with paragraphs four and five of the Scheduling Order and

17  subject to further scheduling of those administrative expense

18  claim motions to the meet and confer process that's referred

19  to in paragraph six of the ERS Scheduling Order.

20         And I am happy to prepare an informative motion or a

21  stipulation that accomplishes all that for the Court.

22         THE COURT:  The filing either on presentment of the

23  stipulated order or informative motion, but a mechanism that

24  tells me this is what you've all agreed to and would

25  accomplish the changes that you've described would be helpful,

1  and I look forward to seeing that.

2          MS. DALE:  Thank you very much.

3          THE COURT:  Thank you.

4          Mr. Firestein.

5          MR. FIRESTEIN:  Thank you.  Thank you, Your Honor.

6  Michael Firestein of Proskauer on behalf of the Oversight

7  Board.

8          So a lot of things have gone on over the past 45

9  minutes or so.  I want to -- I'm going to directly address

10 Your Honor's comment and question regarding adversary 363 and

11 Mr. Despins' comment, but one, again, overarching observation

12 I just want to make, and I think the counsel for DRA -- the

13 DRA parties may have alluded to this, but I want to make sure

14 that the Court understands this.  The scheduling that occurred

15 was both on the GO side, as well as on the HTA side.

16         And I realize some of this is not going to be

17 addressed until January, but I want the Court to understand

18 that it's a delicate balance that was tried to be reached

19 between the various competing parties.  And shockingly, there

20 was -- lift stay issues aside, there was less disagreement

21 than one might have anticipated relative to that.  And that

22 was because it was designed to avoid mutually assured

23 destruction in terms of requiring people to be filing multiple

24 briefs at the same time.

25         And so there's a delicate feathering that -- there's

1  a delicate feathering that has occurred --

2          MR. SERVAIS:  Your Honor, we object.  Mr. Firestein

3  is violating mediation privilege.

4          THE COURT:  Let's get to a bottom line on what you do

5  or don't want me to do.

6          MR. FIRESTEIN:  The only thing I was saying is that I

7  want to be careful that we don't adjust briefing schedules in

8  advance of the 29th, so that the Court is aware, and I don't

9  think the Court is intending to do that.

10         THE COURT:  I think what I said I was going to do is

11  I would approve that stipulation.  I am not changing the

12  briefing -- aside from the lift stay stuff that we talked

13  about, I'm not changing the briefing schedules in the Stay

14  Order.

15         MR. FIRESTEIN:  That is the only point.

16         THE COURT:  And we'll deal with all of it in January

17  in context.

18         MR. FIRESTEIN:  Totally fine.  And I had absolutely

19  no intention of addressing matters that occurred in the

20  mediation, only to make sure that we were still within the

21  four corners of what the scheduling currently is,

22  notwithstanding what the DRA parties may have advanced.

23         THE COURT:  Good.  And you all can talk behind the

24  scenes.  You're going to be required to meet and confer before

25  January, so --

1        MR. FIRESTEIN:  That's fine.

2        THE COURT:  -- figure it out.

3        MR. FIRESTEIN:  Let me take them in the order that

4    are seemingly of importance to the Court, which relates to the

5    adversary number 363.  And I don't mean to conflate

6    Mr. Sosland's comments with Mr. Despins' comments, but the HTA

7    363 proceeding that was filed, that coincidentally happens to

8    include as defendants the various people against whom these

9    new adversaries are going to be brought, was filed at a time

10   that was intended to avoid the statute of limitations.

11        As the Court is well aware, there was a lot of

12   activity that occurred regarding that issue in order to avoid

13   that.  It does not include the full array of claims that are

14   intended to be made.  And everyone that is in this room knows

15   what the nature of those claims are going to be.  And there

16   is -- what would happen is we would end up with an amendment

17   of an existing pleading, a severance of dozens and dozens of

18   parties, for which participation notices are going to be

19   necessary and people are going to have the opportunity to make

20   observations.  And this was the path, as recommended in the

21   mediation report, that was agreed upon in terms of going

22   forward.

23        It is not efficient to be able to sort of carve off

24   one of the new adversaries and have it just go through its own

25   little procedural machinations concerning the one to which

1  Mr. Sosland refers or Mr. Despins refers.  There is a series

2  of them that are going to be filed, that are going to be on

3  the exact same time frame as one another.  And for efficiency

4  purposes, it was intended to allow them to be along that path.

5       I dare say, as intelligent and smart as all the

6  lawyers are, I'm not smart enough to have been able to have

7  figured out how to cleverly navigate, you know, how we were

8  going to carve away certain claims one way or another.  It was

9  all intended to be an efficient delivery of claims that could

10  be brought to Your Honor's attention to avoid such things as

11  advisory opinions or other matters, where the parties wanted

12  to have scope and validity of lien established by the Court

13  that would shape the --

14       MR. SOSLAND:  Your Honor, objection to any reference

15  to what the parties are doing.  Mr. Firestein's stating the

16  Oversight Board's position that -- anything, any reference to

17  what the parties discussed in mediation is inappropriate.

18  It's also mischaracterizing those discussions.

19       THE COURT:  The objection to referring to discussions

20  in mediation is sustained.

21       Again, I'm presented with particular scheduling

22  orders.  It is not appropriate to give me background color on

23  that out of mediation.

24       MR. FIRESTEIN:  Let me frame it this way, Your Honor.

25  If there had been an objection to the filing of the adversary

 1   proceedings, one would have expected to see it in the

 2   responses that were filed and that are a matter of record.

 3              THE COURT:  Well --

 4              MR. SERVAIS:  Your Honor, I'm happy to speak to that

 5   if you'd like, Your Honor.

 6              THE COURT:  Well, I've got a technological problem

 7   and a not wanting to get into these weeds problem.  The

 8   technological problem is that anybody who speaks from the back

 9   benches can't be heard by the people in New York or on the

10   telephone, so the objections and shouting from the back of the

11   room is really not working.

12              And what there were -- there have been positions

13   taken and objections raised to the structure, and specifically

14   now we're talking about Mr. Sosland advocating for just

15   tweaking 19-363 and not starting over again, and Mr. Despins

16   raising a somewhat different objection to not being included

17   as a plaintiff in whatever it is he's not being -- in HTA or

18   whatever, saying that that's a violation of a stipulation and

19   a Court Order.  And I do want you to address that point

20   separately.

21              So I think one of the things I'm hearing, and the

22   thing that I am most inclined to hear in what you said so far

23   is that the Oversight Board's position as to 363 versus new

24   adversary is that a new adversary is more efficient because

25   it's coordinated with this plan of new adversaries that will

1    be litigated together.  And there would have to be too much

2    tweaking, and there'd be transaction costs to putting a

3    revised 363 into that camp, so we should start with these new

4    ones.

5            And I will tell you and I will tell Mr. Sosland now

6    that my intention is to -- as to Mr. Sosland's objection to

7    the filing of a new adversary, let the new adversary be filed,

8    and then in January, you know, we can talk about whether there

9    is some insurmountable inefficiency with not adapting 363.

10            MR. FIRESTEIN:  Fine.

11            THE COURT:  So --

12            MR. FIRESTEIN:  That's good by me.

13            THE COURT:  -- now, Mr. Despins says that filing a

14    new adversary to replace one in which he's a co-plaintiff is a

15    violation of the prior stipulation and my Order.  Is that

16    something that you want to come back to in January, or is that

17    something that you have an answer, a response to that I can --

18    you think I can deal with efficiently today?

19            MR. FIRESTEIN:  I think it's going to end up being

20    both, Your Honor, but the response is quite short.  I believe

21    that the stipulation related to the initial adversaries, and

22    as I noted earlier, the new ones are going to contain

23    additional claims that were not included in the original

24    adversary.  And so that's the substantive response.  I don't

25    think it's a violation of the stipulation.

1          However, to the extent that we can meet and confer

2     with Mr. Despins over the coming weeks relative to that, he

3     certainly is within his rights to ask the Court, if we do not

4     reach agreement on that subject, to either have him be an

5     intervener or have him be inserted as a co-plaintiff at the

6     time of the January hearing, because nothing is going to have

7     occurred relative to briefing as of the time that we are

8     returning here for the next Omnibus hearing.

9          THE COURT:  Thank you.

10          MR. FIRESTEIN:  The only other thing that I wanted to

11     mention -- and by the way, let me just make one observation

12     here.  I'll move on to one of the issues that Ms. Miller

13     raised.  There was a whole lot of discussion about discovery

14     and other matters.  I don't think that that has impacted or

15     moved the needle one way or the other relative to what's going

16     on, but let me just make the following statement.  The issue

17     of whether Ambac has any security interest in Commonwealth

18     assets, particularly the rum taxes, which was the focus of her

19     comments, is not a function of the lowest intermediate

20     balances.  The documents don't provide Ambac a security

21     interest.

22          And I'm not here to argue the Lift Stay Motion.  I'm

23     just suggesting that Your Honor's comments that were made as

24     to the manner in which this should be addressed remain

25     consist -- is acceptable to the Oversight Board.  And we don't

1    see any reason to adjust that protocol prior to the time that

2    we have to file whatever it is that is going to get filed in

3    the middle of January, whether it's a motion for leave to

4    amend, or the meet and confer, or the amended motions relative

5    to HTA and CCDA.  And we think that protocol is acceptable and

6    don't see any reason to adjust that.

7            The only other observation that I wanted to make has

8    to do with a comment that was made relative to 305.  The

9    Oversight Board's view is whatever it decides to consent to

10   or, in the view of the Court, has waived, it is going to be a

11   determination made for another day.  That's not something

12   that's going to be decided today.

13           Claims have already been filed.  Claims are going to

14   be filed.  The Oversight Board's -- and whatever the outcome

15   of that is going to be, is going to be.  I think the simplest

16   way of phrasing it is that the Oversight Board didn't want to

17   be in a position where jammed into responsive pleadings

18   relative to the adversaries that come were requests for either

19   turnover orders or challenges to the Fiscal Plan.  And I think

20   that what we've heard is that there is going to be a

21   reservation of rights with respect to that issue.

22           And the Court's not going to decide that today, but

23   the Court will have whatever motions or issues that are

24   brought to the Court's attention and determine those matters

25   as, if and when those matters arise.  But placing into the

```
 1   interim Order what the position is, or what the articulation

 2   is of the Oversight Board's view, we don't believe, as putting

 3   either a thumb on the scale, much less a feather, as to what

 4   the Court's ultimate determination is going to be on how 305

 5   is going to be interpreted based upon actions or inactions

 6   that parties, including the Oversight Board, have taken in the

 7   past, in the present or in the future.

 8            THE COURT:  Thank you.

 9            All right.  It is lunch time.  I will make my ruling

10   on the mediation matters -- unless Judge Houser wants to speak

11   before we break?  Yes, she does.  No, she doesn't.

12            HONORABLE CHIEF UNITED STATES BANKRUPTCY COURT

13   JUDGE HOUSER:  I do not.

14            THE COURT:  Judge Houser does not need to speak

15   before we break, so I will come back with my news after lunch.

16            But Ms. Dale, did you want to speak about the

17   insurance proceeds?

18            MS. DALE:  Yes, I did.  Thank you, Your Honor.

19   Margaret Dale, and with me is counsel --

20            MR. WARREN:  Jim Warren, representing the insurers in

21   the adversary proceeding.

22            THE COURT:  Good afternoon, Mr. Warren.

23            MS. DALE:  Your Honor, we would appreciate it if we

24   could adjourn this motion to the January Omni, and Mr. Warren

25   and the Oversight Board will address the Court's comments
```

1    regarding the order and the way that we proceeded, and perhaps

2    submit to -- a reformed motion to address some of those

3    issues.

4         My understanding, by the way, Your Honor, is that the

5    Court has issued Orders relating to insurance proceeds before

6    in connection with the hurricane, and we will look to those,

7    how we proceeded in those to make sure that we are doing what

8    we did before.  I think there might have been a disconnect

9    there.

10        THE COURT:  Well, you -- I encourage you to look at

11   what you did before.  I am aware that certain things were

12   entered before those -- that methodology does not necessarily

13   bind the Court now.  Everybody has learning curves, and those

14   things were entered in the immediate aftermath of the

15   hurricane.

16        I have thought about this application in our present

17   context and in the context of my current concerns, and so I

18   just want you to be aware that saying you did it in 2017, you

19   should do it again, is not going to be the answer for me.

20        MS. DALE:  No.  Understood.  I didn't mean to suggest

21   that.  I wasn't sure whether we had actually done it in 2017

22   differently than we were doing it in 2019, so we want to go

23   back and review all that.  But we understand your concerns.

24        THE COURT:  I think there is language in 2017 that

25   may be substantially similar to this.  I don't remember what

1   the process was of getting there, but if the process was no

2   broader of notice than there has been now, it would be a

3   problem.

4          MS. DALE:  Understood, Your Honor, and thank you for

5   your time.

6          THE COURT:  Thank you all.  We will resume at 20 past

7   1:00.  It's now quarter after 12:00.  Have a good lunch

8   everyone, and thank you.

9          (At 12:14 PM, recess taken.)

10          (At 1:30 PM, proceedings reconvened.)

11          THE COURT:  Buenas tardes.  Please be seated.  I have

12   a little technological issue, so please bear with me.

13          MR. DESPINS:  Your Honor, just to give you a quick

14   update on the meet and confer regarding the role of the

15   Committee as co-plaintiff, we've started that.  No promises,

16   but we are making progress.  I just wanted to make sure the

17   Court is aware of that.

18          THE COURT:  I'm very pleased to hear that.  Thank you

19   for that update.

20          And now I am going to address orally and somewhat

21   conceptually my intention as to revisions of the Proposed

22   Orders and some revisions of the notice to bondholders that I

23   will be asking the UCC to be point on.  So I am addressing the

24   responses to the Interim Report and Recommendation of the

25   Mediation Team, which is docket entry 9365 in 3283, which I

1    refer to as the Interim Report.

2         The Court has considered carefully the Interim

3    Report, as well as the responses thereto, and the arguments

4    and statements made in court today.  The Court will be making

5    certain changes to the proposed Orders that focus principally,

6    as I indicated in my earlier remarks, on matters that may be

7    particularly significant in the period between now and the

8    January Omni.

9         At the January Omni, the Court will have an

10   opportunity to consider more fully the parties' concerns in

11   the context of a report and/or additional proposed Orders from

12   the mediation team reflecting further developments and the

13   written submissions in response to the further report from the

14   mediation team.  And so objections that are overruled or not

15   engaged today are, as a general matter, passed over without

16   prejudice to renewal and submissions prior to the January Omni

17   to the extent that they remain relevant.

18        The changes that I will make to the interim Orders at

19   this point are as follows:  First, with respect to the GO and

20   PBA bonds oriented Order, which was Exhibit One to the Interim

21   Report, my principal concerns with that Order go to the extent

22   and clarity of notice to the bondholders.

23        The proposed notice document's caption and most of

24   its text refer to the UCC objections, but the litigation

25   schedule encompasses the Oversight Board's objections to the

1    2012 to 2014 bonds as well.  And so I am directing the UCC's

2    counsel, which I understand had input into the formulation of

3    that proposed notice, to revise the notice documents, title

4    and text, to make it clear that it also covers litigation of

5    the Oversight Board objections, to include in the lists of

6    CUSIP numbers, CUSIP numbers for the 2012 to 2014 bonds, and

7    to take a further shot in this process at clarity and

8    accessibility of the information regarding the litigation to

9    come.

10         The revised notice should also flag the fact that the

11   schedule that is helpfully set forth in a table there could

12   change, and that changes will be reflected in further Court

13   Orders and notices as necessary.  And I will ask the UCC to

14   file an informative motion with the revised document in

15   English and Spanish as soon as possible, so that we can keep

16   to the proposed timetable for dissemination.

17         Mr. Hein's request for revisions of that notice

18   document to include basic explanations of the litigation and

19   procedural advice is denied.

20         The mediation team's provisions, as proposed, for the

21   timing of the distribution of the notices will be maintained.

22   Distribution shortly after the holidays will reduce the chance

23   of having the mailing overlooked in the flood of holiday mail

24   or during holiday travel, and it will also facilitate the

25   Court's management of responses.

1           The Court will revise the Order itself to require

2    service of a copy of the Order on the same bondholder

3    constituencies as the narrative notice.  The revised Order

4    will also direct the Oversight Board to post a copy of the

5    publication version of the notice on Prime Clerk or its own

6    website.

7           The Court suggests that the Oversight Board create a

8    website section for published litigation-related notices going

9    forward, and that steps be taken to notify bondholders that

10   such information is available on that website.  And you all

11   can figure out how best to accomplish that goal, but that is

12   the goal.  And that might even be something that is in process

13   enough to be mentioned in the notice that will be going out to

14   the bondholders.  So that is what's going to happen with

15   respect to the GO bond and PBA Order.

16           Now, as to Exhibit Two, which is the Revenue Bonds

17   Order, as to the timing and scope of the PRIFA lift stay

18   hearings, the Court will revise the Order to permit Ambac to

19   make a motion to amend its motion on the same schedule

20   provided for new lift stay motions in terms of initiation of

21   the motion.  And as to briefing, that amendment motion can be

22   briefed on the timetable for the lift stay motions, but I

23   would urge the parties to work together to propose a more

24   rapid schedule for the amendment motion to facilitate its

25   consideration in connection with the January Omni.

1            The motion to amend will be subject to Rule 15 of the

2     Federal Rules of Civil Procedure, and will be decided under

3     that standard.

4            The determination of the hearing date for the lift

5     stay motion, as it currently exists or as amended, and issues

6     as to discovery in connection with lift stay motions will be

7     addressed in connection with the January Omni.

8            The Oversight Board's suggested formula requiring a

9     meet and confer after the filing of the new lift stay motions

10    and complaints to consider the timing of lift stay motion

11    practice will be adopted in the revenue bond related Order,

12    including the preliminary hearing fallback formula.

13           To ensure that matters move along quickly, if we do

14    end up in a preliminary hearing mode, the Order will provide

15    that the movants are deemed to have waived the Bankruptcy Code

16    Section 362(e) timetable through the 45th day after the

17    preliminary hearing, if we end up going that route, and it

18    will also direct the parties to propose appropriate briefing

19    and hearing scheduling.

20           The Oversight Board's requested Section 305 language,

21    as set forth in paragraph 17 of the Oversight Board's

22    Response, will be added to the Order as a statement by the

23    Oversight Board, without prejudice to any party's position as

24    to how 305 works in this context.  And to the extent there are

25    blanks for hearing dates in these Orders relating to motion

1    practice, I will fill in hearing dates that are within a month

2    of the reply brief dates as holding dates, and we may end up

3    revisiting those in January.  Let's see.  So that covers

4    Exhibit Two.

5            And then as to the DRA party's stipulation, I have

6    asked the DRA parties to revise the joint stipulation to point

7    to the April 22nd, 2020, April Omni date as the hearing date.

8    And I will approve the stip as so revised subject to

9    revisitation in connection with the general scheduling

10   discussions at the January Omni.

11           And then Exhibit Four, which is the amended report

12   procedures.  I will direct the Oversight Board to have the

13   mediation team's amended report served on the broad bondholder

14   notice constituencies consistent with the modified service

15   requirements for the GO-PBA Order.

16           And in an effort to streamline the issues that will

17   need to be raised with the Court for the January Omnibus

18   hearing, that Proposed Order will also be modified to include

19   a requirement that the parties that have raised concerns

20   regarding the Interim Report meet and confer after the amended

21   report is filed, and before the deadline for filings in

22   response to that amended report, in an effort to streamline

23   the January proceedings and the issues that are raised in the

24   filings and response to that report.

25           And on the ERS schedule proposed modification, the

1    Court will await the filing of stipulated revisions.

2         So, Mr. Firestein.

3         MR. FIRESTEIN:  Thank you, Your Honor.  Good

4    afternoon.  Michael Firestein of Proskauer Rose on behalf of

5    the Oversight Board.

6         I just have a process question.  On Exhibit Four,

7    where you've directed -- this is the amended report procedures

8    where you've directed the Board to serve that Order.  Is the

9    Court going to enter an order relative to that from which we

10   are serving, or are you asking us to add whatever the

11   component is that you've added and then submit it to the

12   Court?  I just didn't quite understand what you wanted us to

13   do.

14        THE COURT:  I'm going to enter it with Exhibit Four,

15   with the text that's in Exhibit Four, with a paragraph that

16   says, the Oversight Board is directed to have this Order

17   served on everybody.

18        MR. FIRESTEIN:  That answers the question.  Thank

19   you, Your Honor.

20        THE COURT:  Thank you.  All right.  Thank you all.

21   The next Agenda item is the UBS Lift Stay Motion that is

22   Agenda Item V.1.  Give me just one moment to get there.

23        Yes.  All right.  So, good afternoon.

24        MR. LOCKWOOD:  Good afternoon.  Paul Lockwood from

25   Skadden, Arps on behalf of UBS Financial Services of Puerto

1    Rico, Incorporated.

2           So we're here on a lift stay motion, and, Your Honor,

3    the relief that we're seeking from the Court is fairly simple.

4    It's the consented to Order, it's consented to by the

5    Oversight Board, that we submitted.  That is a limited lift

6    stay.  We saw a broader lift stay when we first filed our

7    relief, because we are simultaneously defending cases in this

8    court in an adversary proceeding, and also defending a case

9    that's pending in the local court, in the Commonwealth court,

10   brought on behalf of the ERS.

11          And there we asserted a counterclaim based on the

12   same contract that they're suing us on.  So they're suing us

13   for breach of contract.  We counterclaimed breach of the same

14   contract.  We thought it would be a fairly easy ask to have

15   that stay lifted because it would be unfair to use the stay as

16   a sword and a shield.

17          We cite nine cases in our papers that support our

18   position of lifting the stay in these circumstances.  No one

19   has cited any contrary case law opposing it.  The reason why I

20   think we're here and the reason why it's much more complicated

21   than it should be is the ERS is really speaking through two

22   sets of lawyers who don't agree with each other.  We have the

23   Oversight Board who acts on behalf of ERS and this Court.  We

24   have the lawyers who are going to appear as objectors here who

25   represent the ERS in the local court.

```
1            Their arguments today, they clothe themselves as
2   lawyers for the beneficiaries of the ERS in terms of their
3   objection, but they actually represent the ERS in that case
4   there and their arguments that they're presenting here are on
5   behalf of the ERS.  And we also have a situation where --
6            THE COURT:  Okay.  I'm sorry.  Maybe I misread
7   things.  I'm a little confused.
8            MR. LOCKWOOD:  Sure.
9            THE COURT:  I thought that the outstanding objection
10  was one asserted solely on behalf of individual plaintiffs,
11  and that the stipulated Order was designed to preserve any
12  potential opposition to objections to whatever the
13  counterclaims, once filed.  And so frankly, what I've been
14  focusing on and thinking about this is whether there's any
15  prejudice to the individual plaintiffs in entering this Order.
16  So --
17           MR. LOCKWOOD:  Let me address that, Your Honor.  So
18  the lawyers who filed the objection represent both the ERS and
19  the individual plaintiffs.  Here they are on this motion
20  asking or opposing it just on behalf of the individual
21  plaintiffs.  We draft --
22           THE COURT:  But ERS has agreed to it, otherwise
23  wearing another hat you're saying?
24           MR. LOCKWOOD:  Well, the Oversight Board on behalf of
25  the ERS has agreed to it.
```

```
1              THE COURT:  Yes.

2              MR. LOCKWOOD:  We drafted the Order to make sure it

3    didn't affect their rights, because the counterclaims asserted

4    against the ERS, what we would be permitted to do is file the

5    claim, something we've been trying to do for seven months, and

6    then we would stay it.

7              THE COURT:  Ratchet yourself down to 75 miles an

8    hour.

9              MR. LOCKWOOD:  Sure.

10             THE COURT:  That would be helpful.  Thank you.

11             MR. LOCKWOOD:  So what we would do is we would -- the

12   federal bar that prevents us from filing the claim would be

13   lifted.  We would file it.  It then would be reinstated,

14   because that's what the Oversight Board asked us to agree to.

15             We may be back here in January asking for it to be

16   lifted again so we could pursue more, but for purposes of

17   today, we wanted to get it on file, because an argument has

18   been made that it's untimely.  So we didn't want to continue

19   not to have it on file.

20             THE COURT:  Yes.

21             MR. LOCKWOOD:  So we ask, let us file it, and after

22   we file it, you can put the stay back in place.  And then we

23   can all negotiate for the next six weeks or whatever it is

24   until the January Omni.  And we can decide whether the other

25   issues that are raised in the objection would come before Your
```

1    Honor or whether some further lifting of the stay is

2    appropriate.

3        None of that is before Your Honor today.  All we're

4    asking for is let us get this thing on file so that we aren't

5    subject to statute of limitations arguments and the like.  And

6    then once it's on file, the prosecution of that claim will

7    still be stayed and we'll negotiate.

8        We may come back in January asking for a complete

9    lifting of the stay or other relief.  We'll have some

10   discussions with the parties with respect to that.  And that

11   is how, I think, we'll come back to the Court.  But for today,

12   we just want to lift the stay so we can file this.  I don't

13   see how it affects the rights of the objectors.  They're not

14   defendants to the claims.  They submitted last night, in a

15   Surreply that had a revised Order -- and we do take issue with

16   the revised Order in certain respects.

17       First of all, it would have this Court direct the

18   local court, the Commonwealth court, how to proceed

19   procedurally within that court.  It says that we would have to

20   move it to seek leave from the Commonwealth Court to file the

21   proposed counterclaims.  We don't believe we have to do that.

22   But in any event, I don't think Your Honor needs to decide

23   that procedural question of local Puerto Rico law.  We can

24   leave that for that Court.

25       THE COURT:  And so by speaking in terms of filing of

1  counterclaims, you're not meaning to suggest that that would

2  be done in any way that would be inconsistent with whatever

3  procedures apply in Commonwealth court, so that if it turned

4  out the Commonwealth Court required an application to do it

5  and said it wasn't as of right, you would deal with that in

6  the Commonwealth court, correct?

7        MR. LOCKWOOD:  Correct, Your Honor.  We're not asking

8  you to tell the Commonwealth court how to conduct their

9  procedures.  We're just asking for the federal bar that

10  prevents us from moving forward in the Commonwealth court to

11  be lifted, and then we will act consistent with the procedures

12  as required in the Commonwealth court.

13        We may disagree with the objectors as to those

14  procedures, but we can present that issue to that Court.  All

15  we're asking for is the right to move forward as we've been

16  intending to since April, which is to be able to file this

17  matter, and the effect of that will be determined by that

18  Court.

19        THE COURT:  Yes.

20        MR. LOCKWOOD:  And then it's going to be stayed

21  immediately thereafter, because that's the deal that we struck

22  with the Oversight Board.  And as I said, we may be back in

23  January asking for the right to continue with it, but that's

24  where we are at the moment.

25        THE COURT:  And whenever the stay is again lifted,

1   then the plaintiffs would have the ability to assert their

2   timeliness objections and any other grounds for fighting the

3   counterclaims, correct?

4          MR. LOCKWOOD:  Yes.  And their objection suggests

5   that it's without merit, and all these other issues -- and

6   those are issues that that Court can deal with in due

7   course.

8          THE COURT:  Yes.  All right.  So last night's filing

9   also included proposed language that seems to me designed to

10  restrict the ability of the Oversight Board to litigate

11  further the proposition that the automatic stay would extend

12  to the entire state court action and carve out the claims and

13  causes of action of the individual plaintiffs, and perhaps

14  shift that whole issue of stay to the Commonwealth court.  Do

15  you have a position on that?

16         MR. LOCKWOOD:  We disagree with that, Your Honor.

17  One, I think that in effect delegates the authority of the

18  automatic stay to the local court, which I don't think is

19  consistent with federal law.  I also think the whole issue is

20  premature.  The point of this Order was just to allow us to

21  get our filings in place, so any arguments about timeliness we

22  address in that respect.

23         And all these other issues, we'll get together.

24  We'll speak with the objector's counsel.  We'll speak with the

25  Oversight Board.  We'll try to work this out.  If it doesn't,

1   we'll present papers to Your Honor that are much more fulsome

2   and orderly as to these issues, rather than dropping this kind

3   of question into a surreply the night before the hearing.  But

4   I think it is a significant issue that would require

5   significant briefing, rather than just to decide it on the fly

6   on the basis of a surreply.

7           THE COURT:  Thank you.

8           MR. LOCKWOOD:  Thank you, Your Honor.

9           THE COURT:  Good afternoon.

10          MR. VICENTE:  Good afternoon, Your Honor.  Harold

11  Vicente on behalf of the individual plaintiff retirees in the

12  Commonwealth action.  We represent the individual retirees in

13  the state court action, in the Commonwealth court action, as

14  well as the ERS.

15          This Complaint was filed more than eight years ago by

16  individual retirees, that the ERS subsequently joined that

17  action, and it pertains to a very limited claim regarding the

18  wrongful advice that UBS provided to the ERS in the issuance

19  of the bond.  It has nothing to do with the validity of the

20  bond.  It has nothing to do with the contractual obligations

21  between the ERS pertaining to the issuance of the bond.  It is

22  essentially a malpractice claim, which we filed and

23  interrupted the statute of limitations.

24          The Kobre & Kim report suggests that many of these

25  cases would have been prevented because of statute of

1    limitations problems.  The only exception is the case that my

2    clients filed against UBS.

3            Now, the procedural status of that case, after eight

4    years of litigation, is that it is at the summary judgment

5    stage.  The UBS defendants want to make issue that we are

6    raising contractual matters in that litigation and that we are

7    raising issues pertaining to the validity of the bond,

8    contrary -- similar to what the Oversight Board is alleging

9    here with respect to the bondholders.  That is incorrect.  And

10   casting accusations against counsel because we are assuming

11   conflicting positions is totally wrong.  As a matter of fact,

12   Rule 8 of the Federal Rules of Civil Procedure allows a party

13   to make inconsistent allegations.

14           And by the way, we are not making inconsistent

15   allegations, because we are representing the ERS in one claim

16   having to do exclusively with a malpractice case for the bad

17   advice, the terribly bad advice that UBS provided to the ERS

18   prior to the issuance of the bonds.  And what other lawyers in

19   these proceedings before this Court are alleging is -- has

20   nothing to do with what I, as a lawyer, am alleging.  I am not

21   asking for conflicting matters.

22           Now, I believe that this Order of the -- the proposed

23   Order by UBS should be denied in its entirety for a very

24   simple reason.  If the plaintiffs prevail in the state court

25   action and we are granted a remedy there, whatever remedy we

1    obtain against UBS will not have any kind of an impact upon

2    the proceedings in this PROMESA litigation.  Why do I say

3    that --

4            THE COURT:  But, sir, before you go on there, why

5    shouldn't the state Court, the Commonwealth Court have the

6    opportunity to decide whether it believes these counterclaims

7    should be entertained in that litigation, rather than me

8    taking a perspective on what is or isn't relevant to the state

9    court litigation?

10           All this proposed Order would do is allow UBS to go

11   to the state court, and in whatever way is procedurally

12   appropriate, say here are the counterclaims that I want to

13   assert here.  And you would be able to argue to the

14   Commonwealth Court that they are outside the scope of your

15   action or too late or whatever.

16           MR. VICENTE:  Your Honor, I have absolutely no

17   problem with that.  As a matter of fact, I agree that the

18   Commonwealth Court is the only Court that can decide whether

19   it is going to allow an untimely filing of a counterclaim.

20   Because, by the way, the Complaint in this case, the Third

21   Amended Complaint was filed a year ago or so, months ago.  And

22   UBS filed its Answer to that Complaint and did not file a

23   counterclaim.

24           When the Complaint was subsequently amended --

25           THE COURT:  And so they're asking me to let them cue

1  that issue up with the Commonwealth Court without prejudice to

2  all of your arguments.  So what's wrong with that?

3       MR. VICENTE:  That's -- nothing's wrong with that.

4  That's why I proposed last night the amendments to the Order

5  that UBS is proposing, because I respectfully submit, Your

6  Honor, that understanding the -- in bureaucracies of this

7  community, if the Order that UBS proposes comes to the state

8  court, it would contain language that seems to suggest that

9  this Court is ordering the Court of the Commonwealth to accept

10  the proposed counterclaim.  So what I proposed --

11       THE COURT:  So when I --

12       MR. VICENTE:  So what I proposed was, Your Honor --

13  I'm sorry.  I interrupted you.

14       THE COURT:  Yes.  I've seen your proposed Order, and

15  you're proposing that I say that they're allowed to seek leave

16  from the Commonwealth Court to file the proposed

17  counterclaims, and then a sentence that says that "the

18  Commonwealth Court may, at its sole discretion, grant or deny

19  the filing of the counterclaim."

20       What I'm going to ask you to consider and react to

21  here is this:  If I change the word "file" in the proposed

22  stipulation to "present," I think that more broadly embraces

23  the concept that they're going to offer it in the Commonwealth

24  court in accordance with the Commonwealth court's procedures.

25       And then the proposed Order already says, "without

1    waiver of and subject to any and all defenses," and that

2    preserves the plaintiff's ability to oppose that filing.  So I

3    don't think that -- I think it's a little bit presumptuous of

4    me to tell the Commonwealth Court, as you would have me do,

5    that it can, at its sole discretion, do this and that.  The

6    Commonwealth Court knows that.

7              MR. VICENTE:  May I explain?  May I explain?

8              THE COURT:  Yes.

9              MR. VICENTE:  Mr. Lockwood is totally unfamiliar with

10   the procedural rules in Puerto Rico.  The procedural rules in

11   Puerto Rico say precisely that.  And again, this is -- this

12   is, again, a mentality problem that I am envisioning.  If an

13   order from this Court, the Federal Court, is issued with the

14   language that UBS is proposing, I'm afraid that the Court in

15   state court may feel that you are directing it to accept this.

16             And I want to make that language abundantly clear,

17   Your Honor.  And I think that you agree with me that, for

18   reasons of comity, the Court of the Commonwealth is the only

19   one who can decide whether it is going to allow the

20   presentation of that counterclaim at this stage of the

21   proceedings.

22             And there's another factor.  Another factor that I

23   added to the amendment of the Order that I proposed is that we

24   add, in the fourth paragraph, "solely with respect to the

25   ERS."

1          Why am I saying this?  Because this counterclaim,

2    this counterclaim is only against the ERS.  It is not against

3    the individual plaintiff beneficiaries of the ERS.  They are

4    saying as much in their motions, but they're not saying it in

5    the Order.

6          And I believe, Your Honor, that this Order should be

7    pellucidly clear to the fact that if the Court were to allow,

8    the trial Court were to allow the presentation of that

9    counterclaim, it will have absolutely no effect upon my

10   clients, which are the individuals.  And that is exactly why

11   the Board has indicated that it has concerns, because if you

12   take a look at the motion that the Board filed regarding --

13   the informative motion regarding reservation of rights,

14   rather, it says that it has serious concerns, because it does

15   not want to affect the claims of the individual retirees.

16         The Governor of Puerto Rico told me this herself,

17   that she was going to instruct AAFAF not to affect the rights

18   of the individual retirees, and so did some members of the

19   Board tell me that.  And I have not seen a stipulation, even

20   though counsel says that they have a stipulation.  I would

21   like to see a stipulation written by lawyers telling this

22   Court that there is an agreement between the Board and UBS

23   authorizing the Board, sue me, go ahead and sue me.  There is

24   no such stipulation.  We only have here the representation of

25   Mr. Lockwood.

1          That's why, Your Honor, I would respectfully submit

2     that -- again, this is Puerto Rico.  This is not Texas.  We

3     are not a state.  People here think that everything that comes

4     from the United States and from this Federal Court is

5     superior.  I know what I'm talking about.

6          That's why I don't like this Order, because the

7     Order, as proposed by Mr. Lockwood and UBS, seems to suggest

8     that you are instructing the trial court to accept this

9     untimely pleading.  And I want to make it pellucidly clear

10    again that if you were to allow this to go forward, for the

11    presentation of that motion, the Court has -- it's a decision

12    for the Court of First Instance, the Court of the Commonwealth

13    to decide.  And if you want to change that language, letting

14    the Court know that it's her decision, that's fine.

15         I don't -- I'm not -- English is not my first

16    language.  Maybe my words when I say filing or presentation

17    are not the correct terms, but I want to send the right

18    message.  I don't want you to send the wrong message, a

19    message that can be misinterpreted by a trial court that gets

20    an order from a Federal Court and may be confused by what it

21    is getting.  So that's why we put this language in, Your

22    Honor.

23         So help me out here and, just by reasons of comity,

24    send the right message to the trial court, if the Court were

25    inclined to grant this remedy, which I believe -- and I'm

```
 1   prepared to argue it.  And perhaps this is not the right

 2   moment.

 3           I am prepared to argue why this should be denied in

 4   its entirety.

 5           THE COURT:  I'm not prepared to decide that --

 6           MR. VICENTE:  I understand.

 7           THE COURT:  -- on the basis of your arguments as to

 8   whether the counterclaim would have merit.  I continue to be

 9   uncomfortable with the additional sentence that you proposed

10   at the end of paragraph two.  This is a clause that I've

11   scribbled out here.  Let me read it to you so that you can

12   react to it.

13           MR. VICENTE:  Sure.

14           THE COURT:  And I will hear further from others, I'm

15   sure.

16           So it would say, "without waiver of and subject to

17   any and all defenses."  And then I would add, comma, "and the

18   Commonwealth Court shall have sole discretion as to whether to

19   permit the filing and litigation of the counterclaim."

20           Does that --

21           MR. VICENTE:  Would you repeat that again?

22           THE COURT:  And the Commonwealth --

23           MR. VICENTE:  Remember that English is not my first

24   language.

25           THE COURT:  But you're way ahead of my Spanish, so
```

1    thank you for bearing with me.

2            MR. VICENTE:  Thank you for that.  I try.

3            THE COURT:  I would add, "and the Commonwealth Court

4    shall have sole discretion as to whether to permit the filing

5    and litigation of the counterclaim."

6            MR. VICENTE:  Perfect.  Perfect.

7            THE COURT:  All right.

8            MR. VICENTE:  And one final thing.  How about at

9    paragraph five, the paragraph that starts, "any such motion

10   described in paragraph four of this Order," I added, "if

11   allowed by the Commonwealth Court, shall be heard," et cetera.

12   Because again, we are reassuring the Court that this is

13   subject to its allowance of the filing of that counterclaim.

14           THE COURT:  So it seemed to me that paragraph four

15   is -- paragraph five is not about the filing of the

16   counterclaim.  It is about the filing of a motion in this

17   court to have the automatic stay stop the entirety of the

18   Commonwealth case, to have this Court make a determination on

19   that.  And so it seems to me that your proposals for four and

20   five are inconsistent with the notion, practice and legal

21   structure that this Court would decide as to whether the

22   automatic stay applies.

23           But your understanding of what they were trying to do

24   in paragraph four is different from my reading of paragraph

25   four, and so I'm going to ask that someone who would speak for

1   the Oversight Board or ERS, you know, would explain what

2   paragraph four is about.

3           I see there's someone preparing to stand up.

4           MR. VICENTE:  If I may make one final point

5   explaining why I added that?

6           THE COURT:  Yes.

7           MR. VICENTE:  My understanding, and perhaps I'm

8   wrong, is that we would be back here if and only if the Court,

9   in Commonwealth court, would have allowed the counterclaim to

10  be filed.  If there is no counterclaim allowed by the

11  Commonwealth Court, we are not back here to discuss anything

12  having to do with a stay, right?

13          THE COURT:  Well, I think paragraph four proposes to

14  allow the Oversight Board to come here and raise another

15  issue, but let me -- instead of speculating, I will ask

16  counsel to come and make her statement, if you are finished

17  for the moment?

18          MR. VICENTE:  I am finished for the moment.

19          THE COURT:  Okay.

20          MR. VICENTE:  I would like to be heard after counsel

21  is heard, if necessary.

22          THE COURT:  Yes.  Thank you, Mr. Vicente.

23          Good afternoon.

24          MS. BEVILLE:  Good afternoon, Your Honor.  Sunni

25  Beville from Brown Rudnick on behalf of the Oversight Board,

1    acting through the Special Claims Committee.

2            There's been a lot of discussion here, so I'll just

3    try to focus on what seems to be the proposed modifications to

4    the Order.  The Oversight Board does not have any objection to

5    the proposed modifications regarding presentment of the

6    counterclaims to the state court with the language that you

7    had suggested.

8            I would defer to UBS as to whether it finds that

9    language acceptable.

10           THE COURT:  So both my changing of the word "filed"

11   to "present" and the additional clause that I had suggested

12   would be acceptable to the Oversight Board Special Claims

13   Committee?

14           MS. BEVILLE:  Exactly.

15           THE COURT:  Thank you.

16           MS. BEVILLE:  Your Honor, we are simply consenting to

17   the lifting of the stay for the purpose of presenting those

18   counterclaims to the Court.  We take no position how that

19   should be presented to the Court, what the language is,

20   whether the Court would permit it or not.  It's simply

21   removing the imposition of the automatic stay as applies to

22   those counterclaims to allow UBS to move forward however it

23   chooses to do so in the state court and without any direction

24   to the state Court that they must accept them or not.  That's

25   not a position that the Oversight Board is taking.

1    THE COURT:  Thank you.  Now, as to paragraph four --

2    MS. BEVILLE:  So moving on to paragraph four, this

3  does contemplate, Your Honor, I believe you are correct, that

4  with the counterclaims being filed or presented in the state

5  court action, the Oversight Board just wants to make it clear

6  that we've reserved our right to file a motion to seek

7  imposition of a stay or extension of the automatic stay to the

8  state court action.

9    I'm not suggesting today that that is what we are

10  going to do.  I think there is a lot of conversation that

11  needs to be had.  I think you can see there's some confusion,

12  if you will, among some of the parties as to who has standing

13  for what.  And so this is simply a reservation of our right in

14  this Order.  Maybe it doesn't need to be stated there, it's

15  implicit.  If we want to file a motion, we can file a motion

16  and have it be heard or not be heard by this Court.

17    And similarly, paragraph five is simply to modify

18  paragraph four, that if we were to file such a motion as

19  contemplated in this Order, that it would be heard at the next

20  Omnibus hearing or as otherwise may be agreed to by the

21  parties, and that would be governed by the Case Management

22  Order.  It was intended to be simply an expression of what we

23  believe the Oversight Board's rights are today.

24    THE COURT:  Well, do you want to take some time to

25  discuss with Mr. Lockwood and Mr. Vicente whether to exclude

1    paragraphs four and five from the proposal to the Court today,

2    and then I can hear a resumption of the motion after I deal

3    with the 926 motion?  Would that be helpful to you?

4              MS. BEVILLE:  Yes.  We can do that, Your Honor.

5              THE COURT:  Mr. Lockwood, would you agree with that?

6              MR. LOCKWOOD:  I'm certainly willing to have that

7    conversation, Your Honor.

8              THE COURT:  Mr. Vicente, does that work for you to

9    have that conversation?

10             MR. VICENTE:  Of course, Your Honor.

11             THE COURT:  All right, then.  You will come back

12   after I hear the next Agenda item.

13             MS. BEVILLE:  Thank you, Your Honor.

14             THE COURT:  Thank you.

15             So the next Agenda item is number V.2, which is the

16   Motion to Appoint an ERS Trustee Pursuant to Section 926, the

17   renewed motion, which was initiated by docket entry number

18   9260.  And I understand that, for the bondholders,

19   Mr. Cunningham is starting with 15 minutes?

20             MR. ROSENBLUM:  I'm sorry.  It's Mr. Rosenblum.

21             THE COURT:  I'm sorry.  My list had Mr. Cunningham

22   first.  So Mr. Rosenblum, are you taking the 15 minutes or the

23   five minutes?

24             MR. ROSENBLUM:  The 15 minutes.

25             THE COURT:  Okay.  Please begin.

1          MR. ROSENBLUM:  Good afternoon, Your Honor.  For the

2     record, Benjamin Rosenblum from Jones Day on behalf of the ERS

3     Secured Creditors Group.  I'm joined by my comovants, the

4     Puerto Rico Funds, represented by Mr. Cunningham, who will be

5     doing the five minutes.

6          I'm going to talk a little bit about why we're here,

7     Sections 303 and 305, a little bit about the claims, and then

8     I'm going to turn it over to Mr. Cunningham to talk about the

9     problems associated with the Board's dual role in these cases.

10         So in terms of how we got here, the ERS borrowed

11    three billion dollars in 2008.  Monies were used to invest in

12    system assets and to pay pensions.  May 2017, ERS became

13    subject to these proceedings.  And then in June, the following

14    month, and August of 2017, legislation was enacted that

15    transfers or purported to transfer all of the ERS assets and

16    revenues to the Commonwealth.

17         As part of that legislation, the government party's

18    position is that the Commonwealth assumed ERS' obligations to

19    pensioners.  The net result, according to the government

20    parties, is that the three billion dollars of bond debt is a

21    loan at ERS, a now defunct debtor with no assets and no

22    revenues and no other material obligations.

23         As Your Honor is well aware, we have been litigating

24    issues related to these events for some time, and we've been

25    doing it alone.  And by that I mean there hasn't been an

1   independent fiduciary or a debtor entity looking out for ERS,

2   as ERS, litigating along our side. And indeed, when we sought

3   ERS to pursue claims against the Commonwealth, they refused.

4   And this is a particularly extreme situation, because the

5   transfers or what occurred here happened during the pendency

6   of an insolvency proceeding, and the recipient of the

7   transfers is an undeniable insider of the debtor entity.

8   That's what brings us here today.

9        We made a motion under 926 which contemplates the

10  allowance of an avoidance action trustee in certain actions

11  where the debtor refused to bring certain avoidance claims,

12  including expressly Section 544 and 549 claims. The Oversight

13  Board and the other government parties take the position that

14  Sections 303 and 305, and I know Your Honor has a lot of

15  familiarity with those provisions --

16       THE COURT: I've heard of them.

17       MR. ROSENBLUM: -- probably more than you would care,

18  but they take the position that those provisions categorically

19  bar 926 relief. We disagree with that, and here's why.

20       So first, Section 303, one, we don't believe 303

21  operates as an independent substantive provision or even an

22  interpretive tool for any other provision of the Bankruptcy

23  Code or PROMESA. And the cases we cite as authority for that,

24  the *City of Vallejo* case, and the case is cited there in

25  Colliers for that proposition, and we also cite the cases that

1    you can't cherry-pick provisions of the Code.  So kind of

2    point one is we don't think 303 operates to do anything on its

3    own, let alone override 926.

4          Point two --

5          THE COURT:  But doesn't 303, by its terms, recognize

6    a preexisting authority and say that that preexisting

7    sovereign authority is not disturbed by Title III?

8          MR. ROSENBLUM:  It's merely declarative in nature in

9    that -- in the sense that it's recognizing certain sovereign

10    rights, but it's not an interpretive tool and it's not an

11    independent source.  This is our position.  It's not an

12    independent source of substantive import.  And that's what the

13    *City of Vallejo* case said, and we believe that that's correct.

14          Even if you did apply 303 as some sort of substantive

15    limitation on other provisions of the Code, it wouldn't apply

16    here because 303 deals with political or governmental powers

17    of the Commonwealth.  That's not what's going on here we can

18    submit.  The transactions that are at issue is the payment of

19    one debtor of cash and assets, or just cash to another debtor,

20    with the intent to pay one set of creditors and not another.

21    We believe these are purely debt adjustment type issues.

22          We cite the cases in our papers, and I would point to

23    *Stockton* as an example.  In that case, the Court said that the

24    avoidance action provisions of the Bankruptcy Code simply do

25    not implicate political or governmental powers, full stop.

1   That case actually addressed CalPERS, California's pension

2   system, and it dealt with an avoidance action relating to that

3   and about whether or not CalPERS statutory lien under

4   California law would be recognized.  And the Court had no

5   problem saying that that was not a political or governmental

6   power, and that those provisions were in no way limited by

7   903.

8        I would note that there's a dearth of authority in my

9   friends' briefs regarding 903.  I don't think they cite to a

10  single authority that said that 903 overrides any provision of

11  the Bankruptcy Code.

12       305.  So 305, two points I want to make on 305.

13  First, 305 can act as a categorical bar on 926.  The premise

14  behind 926 is the debtor has not consented.  The idea is the

15  debtor is refusing to bring those claims.  So to then impose a

16  consent requirement as the debtor is refusing to bring those

17  claims, but consents to the bringing of those claims, renders

18  926 surplusage or close to it.

19       And that's -- the *New York Off-Track Betting* case

20  gets a lot of play in the briefs, but that's precisely where

21  the Court landed.  It expressly rejects that argument and

22  says, hey, you've rendered 926 a nullity if that were the

23  case, interpreting 904.

24       I think that dovetails with the First Circuit's

25  reasoning in the PREPA receiver case, where the Court

1    cautioned against reading 305 as eliminating another Code

2    provision precisely when you need it.  And this is precisely

3    when you need 926, is where the debtor's refusing to consent,

4    refusing to take action.

5          The second point I want to make about 305 is that

6    even if you accept that 305 has a role to play here in terms

7    of the ERS property, it's not an interference of ERS' property

8    when you're dealing with an involuntary transfer, which is how

9    it's referred to in the briefing by my friends.  The notion

10   that 305 can act as an interference when somebody is coming in

11   and taking the debtor's property and -- I think can't be

12   squared with the statutory language.

13         Let me talk a little bit about the underlying claims

14   here.  And I think we've more than set out a colorable case

15   for them, but 549.  So 549 involves the invocation of an

16   unauthorized post petition transfer of an asset.  The post

17   petition transfer of an asset part I think is relatively easy.

18   Everybody acknowledges that whatever happened here happened

19   post petition.  There's a little bit of noise around whether

20   or not the parties agree about the extent of the transfer, but

21   everybody agrees that at least 190 million dollars was

22   transferred, and that's significant.  We also think much, much

23   more was transferred.

24         And I think the statutory provisions stand for

25   themselves.  Joint Resolution 188, Section 2 says all of ERS'

1  assets are transferred.  Act 106, Section 5.1 says the same

2  thing.  They're unqualified -- I take that back.  There is one

3  qualification in Act 106 with respect to the headquarters of

4  the Teachers Retirement System.  It's obviously not applicable

5  here, but I point that out just to say they didn't mean to

6  send me your cash.  Everything must go, including everything

7  that's nailed down.  Everything must be liquidated and sent to

8  the Commonwealth.

9        So I think we clearly have an unauthorized -- I'm

10  sorry.  We clearly have a transfer of post petition assets.

11  And then much of the briefing talks about whether or not it's

12  authorized, which I admit can be a little bit of a tricky

13  thing to think about in the context of the municipality, but

14  we think that the transfer is unauthorized for several

15  reasons.  And I would point out, under Bankruptcy Rule 6001,

16  it's their burden to show why the transfer wasn't authorized.

17  And they can't meet that burden.

18        First, PROMESA doesn't authorize it anywhere.

19  PROMESA actually expressly prohibits substantive

20  consolidation, and I would submit that includes a partial

21  substantive consolidation, including taking all of the

22  debtors' assets and most of the debtors' liabilities.

23        Two, I don't think it's authorized by state law, and

24  we have a whole litigation separate and apart from this about

25  challenges to the statute.  And we allege here that it's a

1   fraudulent transfer under Puerto Rico law, which I'll get to

2   in a moment.

3       And then third, I think this is the lowest hanging

4   fruit, is it's a violation of the automatic stay.  I am

5   cognizant of Your Honor's decision in the GDB stay relief

6   case, and at least, however that decision was, that when the

7   debtor voluntarily uses something, it's a 363 issue.  When

8   it's an involuntary use, it's a 362 issue.  And here we have

9   an involuntary use of the debtors' assets.

10      So there's not much debate that it's a violation of

11  the automatic stay under 362(a).  There's an argument that

12  there's an exception to the automatic stay, police and

13  regulatory power.  We submit that doesn't apply.  First, it's

14  not a police or regulatory power for substantially the same

15  reasons I just talked about.  This is a pecuniary focused

16  action.  But even more simply, 362(b)(4) only applies to an

17  action or proceeding by a governmental unit.  It doesn't apply

18  to legislation.  We've briefed that issue elsewhere.  There's

19  cases to that effect.

20      Just a word on 544.  There's a debate, and I will

21  concede that there is a split in the case law.  Some cases say

22  544 applies only to prepetition transfers, and some cases say

23  it applies to both prepetition and post petitions transfers.

24  I don't think that at this stage it makes sense to weigh in on

25  a disputed issue without full briefing, but what I would say

1   is it makes no sense that Congress would prohibit prepetition

2   fraudulent transfer but would allow a post petition fraudulent

3   transfer during the pendency of an insolvency case.  I think

4   whether you think of this as a 544 issue or a fraudulent

5   transfer under 549 is something that can be figured out in the

6   coming days.

7         Lastly, I just want to say a word about duplication.

8   They say, gee, there's a whole bunch of litigation.  We

9   shouldn't be doing this 926 thing because you have other

10  claims.  We do have other claims, but these are distinct.

11  They are different claims, different order of proofs,

12  different defenses.

13        We have a cause of action, for example, for a

14  declaratory judgment that there's been a violation of the

15  automatic stay by these legislative actions.  Their defense in

16  that case, their principal defense, is you don't have standing

17  to bring that claim.  That's an ERS 549 claim.

18        So here we are trying to get the ERS to bring a 549

19  claim, and their defense is, but you already have a stay

20  relief claim.  It's completely circular, and the net result is

21  they're trying to beat us on standing in one place and time

22  out these claims in another instance.

23        The statute of limitations for at least certain of

24  these claims expires on February 14, 2020, so they're hoping

25  to smother these claims with the statute of limitations.  I

1   submit that that's not an appropriate thing for a municipal

2   debtor to do.

3      I would also just make the point that they talk about

4   that this is duplicative with some of the actions that we're

5   taking to protect our lead and to prosecute our claims, that

6   we have a lien on certain aspects, and that there's a promise

7   by our litigant -- or our adversary that they'll give back

8   some money if we prove up we have a lien on it.  Again,

9   different claims, different proofs, different defenses.

10      549 is not -- there's no requirement under 549 that

11   we prove up a lien.  In fact, I would submit that whether

12   you're an unsecured creditor or a secured creditor, it is

13   simply wrong to completely hollow out a Title III debtor

14   during the pendency of its case, and there's remedies for

15   that.

16      With that, I would -- I would yield the rest of my

17   time to Mr. Cunningham.

18      THE COURT:  I have a question for you, and feel free

19   to tell me that Mr. Cunningham will address it if that's the

20   case, but in invoking Chapter 7 and Chapter 11 case law

21   concerning the fiduciary duties of trustees and debtors in

22   possession, you seem to be asserting that the Oversight Board,

23   as debtor representative in these Title III cases, has

24   fiduciary duties to the creditors of territorial

25   instrumentalities.

1          Have Courts treated Chapter 9 debtors in that fashion

2     in recognizing a fiduciary duty to creditors as opposed to a

3     more holistic duty to the living political entity that is the

4     municipality or, in this case, the territory?

5          MR. ROSENBLUM:  Well, I think there's a dearth of

6     case law on that, and there certainly is no case law in the

7     context of a municipal entity that's given the legislative

8     pen.  This is a brand new innovation, right, the idea that the

9     sovereign can change up the rules on you during the pendency

10    of a case.

11         I would say that there is precedent to say that you

12    can't -- the state can't prefer itself in a Chapter 9.  The

13    *Stockton* case talks about it.  There's a case in Texas that

14    overrides the Texas state Constitution that says the state's

15    debts always get paid first.

16         The state can't dictate how this Title III proceeding

17    goes.  And PROMESA overrides, you know, even state

18    constitutional provisions.  And I would say just I'll defer to

19    Mr. Cunningham on the conflict point, but we believe that

20    there are fiduciary duties.  But regardless of whether there

21    are fiduciary duties or whether they owe us fiduciary duties

22    or not, because they're holding our money and that's the basis

23    of a fiduciary duty, and ERS is a trust, but regardless of

24    whether there's fiduciary duties or not, they don't believe

25    that they owe us fiduciary duties.

1          And I think that's a really important point, and that

2     is what 926 is about.  926 is a creditor protection device.

3     And if they're saying we're not acting in your interest, I

4     think that's precisely why 926 is in the Code.

5          THE COURT:  Thank you.

6          MR. CUNNINGHAM:  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon.

8          MR. CUNNINGHAM:  John Cunningham of White & Case on

9     behalf of the Puerto Rico Funds.

10         As Mr. Rosenblum said, I'm going to address the

11    conflict of interest issue which we raised, and it's got a lot

12    of air time in the objections.  I do want to acknowledge one

13    thing on this topic, which is I recognize this is not a

14    technical requirement that's in 926.  Our view is it's

15    relevant in 926.

16         Certainly I recognize that the Oversight Board is the

17    statutory representative under PROMESA for all of these

18    debtors.  However, there's no question that the Oversight

19    Board's conflict of interest in wearing those multiple hats is

20    relevant to this Court's determination of whether to appoint a

21    926 trustee.  It's part of the totality of circumstances that

22    this Court would consider in the exercise of Your Honor's

23    discretion, and it goes to the heart of the 926 requirement of

24    refusal by the debtor.

25         And here we think that it's obvious and it is

1    irreconcilable that the Oversight Board can't pursue an

2    avoidance action against the Commonwealth on behalf of ERS

3    when it is the statutory representative of both debtors.

4         And so just taking the background facts here, which

5    are undisputed, so ERS is an independent trust created almost

6    70 years ago, quote, "separate and apart from the Commonwealth

7    Government and its instrumentalities."  That statement is

8    straight from the Board's Objection, paragraph two.

9         Both the Board and AAFAF executed a tolling

10   stipulation, so Ordered by this Court earlier this year, and

11   stipulated the following:  Commencement of ERS' Title III case

12   triggered the operation of the automatic stay, quote, "to

13   protect ERS' property wherever located."

14        While ERS' automatic stay was in place and is in

15   place, and at the time the post petition legislation was

16   enacted in June of 2017, the Commonwealth, at that time, was

17   the single largest obligor of employer obligations owed to

18   ERS.  And I'm reading a quote from AAFAF.  "Historically,

19   Commonwealth's contributions amounted to 59 percent of

20   employer contributions ERS received."  That's paragraph five

21   of AAFAF's Objection.

22        So at that time, Your Honor, at the time the post

23   petition legislation was enacted, there was a debtor-creditor

24   relationship already existing between the Commonwealth and ERS

25   that had long been established.  The Commonwealth was a debtor

1    owing employer contributions to ERS, and ERS was the creditor

2    who were owed those employer contributions.  But the post

3    petition legislation, Your Honor, flipped that debtor-creditor

4    relationship upside down.

5         Now the Commonwealth is the creditor and who's owed

6    all of ERS' assets.  In fact, much of it has already been

7    transferred to the Commonwealth.  And ERS is now the debtor

8    who's obligated by this legislation to turn over all of its

9    assets to the Commonwealth.

10        So how can that happen if the ERS automatic stay

11   enjoins any act to obtain possession of ERS' property or to

12   exercise control over ERS' property?  And the Board's answer

13   is PayGo.  They say that ERS' automatic stay is somehow

14   subservient to the Commonwealth's desire and also the Board's

15   desire to implement PayGo.  But the Board alleges it had

16   nothing to do with PayGo, and then it refers to the post

17   petition legislation as the PayGo measures.

18        And in paragraph 43 of their Objection they state,

19   "however, the Oversight Board did not compel the PayGo

20   measures, let alone control their enactment."  Yet the very

21   next statement the Board admits, the legislative assembly of

22   Puerto Rico and the Governor enacted the PayGo measures, which

23   were then presented to and approved by the Oversight Board as

24   consistent with the Certified Fiscal Plan.

25        Your Honor, that statement of that admitted approval

1  of the post petition legislation by the Board was effectively

2  signing a death warrant for ERS by the statutory

3  representative, the Oversight Board.

4       These facts, Your Honor, alone show there is an

5  irreconcilable conflict here, and it goes to the issue of why

6  the Board rejected our request to have a trustee appointed.

7  And we think this is precisely, as Mr. Rosenblum said, the one

8  avenue Congress and PROMESA made sure to leave this Court the

9  discretion to do, that Your Honor can view the totality of the

10  circumstances in this case to look at the fact that two and a

11  half years right now have gone by, and there's been a total

12  destruction of a Title III debtor, on this Court's watch, by

13  the Oversight Board.  And there needs to be some

14  answerability, at least by an unconflicted fiduciary, to bring

15  that to the Court's attention and to be able to investigate

16  and file those claims.

17       As Mr. Rosenblum said, we have an expiring statute of

18  limitations.  The letter Mr. Bienenstock sent us when we said

19  bring the claims, he said, well, I've already given you --

20  it's -- the paragraph says, you know, well, it's 270 days.

21  We've already agreed to that.

22       Well, that's expiring very soon here, Your Honor.  In

23  February, the 544 claims will expire pursuant to the Code.

24  And in March, the 549 claims would expire.  So we think a

25  limited trustee authorized under PROMESA, you know, to be

1    appointed under 926, can preserve those claims. All the

2    arguments of the 303, 305, the effect of all of this can all

3    be teed up in front of Your Honor, but at least they are

4    preserved.

5         This is an unprecedented circumstance in an already

6    unprecedented restructuring law of PROMESA. And I think what

7    they would have you do is deny our motion and have all this

8    swept under the rug, and we're going to have those deadlines

9    expire. That's the thing we're most worried about. And we

10   think it's time. It's time to drag the past out into the

11   light. It's -- two and a half years and counting with

12   expiring deadlines, Your Honor, we believe is untenable, and

13   that's why we would ask you to grant the motion.

14        THE COURT:  Thank you.

15        MR. CUNNINGHAM:  Thank you, Your Honor.

16        THE COURT:  Ms. Dale.

17        MS. DALE:  Good afternoon.  Thank you, Your Honor.

18   Margaret Dale for the Oversight Board.

19        Your Honor, the bondholders are requesting permission

20   to prosecute a Complaint with two causes of action. They seek

21   basically the same relief. One is under the bankruptcy law.

22   The other is under the Puerto Rico law. The actual relief

23   that is being requested is to return to the ERS all of the

24   assets that the PayGo legislation provides to transfer to the

25   Commonwealth, and secondly, to restore the making of employer

1    contributions to the ERS to which the bondholders' liens

2    attach, they claim.

3         The reasons to deny the motion include at least the

4    four following points:  First, appointment of a trustee would

5    impermissibly interfere with the Commonwealth's powers in

6    violation of PROMESA 303 and 305.  Your Honor I think cut to

7    the chase in terms of the holistic approach to the municipal

8    restructuring that's being sought here, and I will come back

9    to that in one minute.

10        The second point is that the Proposed Plan of

11   Adjustment for ERS will provide the bondholders the value of

12   their collateral.  In this regard, it is noteworthy that the

13   190 million dollars from the ERS is being held in escrow.  So

14   if the bondholders' claim is meritorious, they are protected.

15        Third --

16        THE COURT:  But they would not be protected by that

17   escrowing of the 190 million to the extent that their claim is

18   that the PayGo contributions are employer contributions in a

19   mask and they have a lien on employer contributions, correct?

20        MS. DALE:  That is correct, Your Honor, and that was

21   my third point, which is that whether the PayGo fees are

22   actually employer contributions is going to be litigated, if

23   necessary, in the objections to the Proofs of Claim.  And as I

24   said, it may not be necessary, because the First Circuit heard

25   argument on the 552 decision just last week, and if they

1    affirm that decision, then that claim will also go away.

2         And my last point relates to Mr. Cunningham's point

3    about some alleged conflict of interest here.  There is no

4    conflict of interest here, Your Honor.  They didn't raise it

5    in oral argument.

6         But the analogy that was provided in the papers

7    regarding COFINA and the Commonwealth is really not apt at

8    all.  There, as you recall, the Board retained its right to

9    impose its own Plan of Adjustment and voluntarily allowed

10   creditors of the Commonwealth and COFINA to try to work things

11   out.  That doesn't mean that the Board was conflicted from

12   representing both the Commonwealth and COFINA in that action.

13   And as Your Honor knows, we retained control over the entire

14   situation with the Court Ordered stipulation.

15        I just wanted to address one thing that -- also, it

16   is not our position that 305 and 303 are a per se bar to 926.

17   That's not our position.  But our position is here, there is

18   no -- they haven't met their burden of showing that they're

19   trustees to be appointed under 926.  The transfers are not

20   voidable and the transfers are not fraudulent.  And I think

21   our papers make those points, and unless the Court has any

22   other questions, I will cede my time to Mr. Friedman.

23        THE COURT:  Thank you.

24        MS. DALE:  Oh, I'm sorry.  Mr. Bienenstock is

25   reminding me to emphasize that the employer contribution issue

1   is raised in the bondholders' Proof of Claims against ERS, and

2   that is being litigated.  As the Court is aware, we have an

3   Order in place on those issues.

4            THE COURT:  Thank you.

5            MS. DALE:  Thanks.

6            MR. FRIEDMAN:  Good afternoon, Your Honor.  Peter

7   Friedman from O'Melveny & Myers on behalf of AAFAF.

8            THE COURT:  Good afternoon.

9            MR. FRIEDMAN:  Let me start with the conflicts issue

10  first.  I do think this pertains to one of Mr. Cunningham's

11  comments.  It is time to drag things out of the dark, into the

12  light, I think he said.  These issues could not have gotten

13  more light or time or exposure after the last several years,

14  including the issue of conflicts, which was extensively

15  litigated in front of Judge Dein.

16            And as we noted in our papers, she reached a

17  conclusion affirmed by this Court that I think is on point,

18  that there is a common interest between ERS and the

19  Commonwealth in dealing with pensions, in dealing with retiree

20  issues.  I don't think there is a conflict.

21            I also think the conflict point misapprehends two

22  things.  There may be a conflict of interest of the

23  bondholders and other people, but that's not the same as there

24  being a conflict of interest between ERS and the Commonwealth.

25  And that's what this Court and Judge Dein have found.  There

1     was no conflict as it relates to PayGo.

2          I'd also note that it's a little bit alliding things

3     to say that the Oversight Board was on both sides of this

4     issue.  The Commonwealth passed the relevant legislation and

5     exercised the relevant power with respect to Act 106 and Joint

6     Resolution 188, not the Oversight Board.

7          Now, they ultimately agreed with each other, but they

8     certainly -- there's one Board, one Commonwealth.  And in this

9     case, I think this is precisely what Congress intended, for

10    them to act together in implementing things with respect to a

11    fiscal plan, rather than having a conflict of interest between

12    the two.

13         And again, you know, I do think that the *Richmond*

14    *Unified School District* case is germane about -- even if there

15    is a conflict of interest, the conflicts of interest in

16    Chapter 9 that are problematic, or as that Court said,

17    impermissible conflicts of interest, and I don't see under any

18    law, whether it be PROMESA or Puerto Rico law, that there's

19    any impermissible conflict of interest between ERS and the

20    Commonwealth in how they've approached all of these issues.

21         On the substance of 303, I think Ms. Dale is correct.

22    I don't think that 303 creates a categorical bar to ever

23    exercising 926 against the state.  I just think it imposes one

24    in these circumstances.  303 is clear on its face that nothing

25    in the -- in Title III impairs a state's exercise of certain

1    kinds of powers.  I don't think that can be treated as

2    surplusage.

3         And to the extent that *Vallejo* suggests that it has

4    sort of no force or merit, that would render what the OTB

5    Court referred to as the constitutional moorings of Chapter 9

6    as surplusage -- I don't think that's an analytically sound

7    way to look at what is such an essential facet of Chapter 9

8    and PROMESA.

9         I also think, to be honest, that to suggest that

10   simply by filing a Title III, the Commonwealth has -- or

11   permitting ERS to file a Title III, the Commonwealth has

12   waived its powers, is inconsistent with the First Circuit's

13   analysis in *PREPA*, which said you certainly couldn't look at

14   305 that way.  The parties tried to argue, by filing 305, you

15   waived all the protections -- I'm sorry, by filing a Chapter 9

16   or a Title III, you waived all the protections of 305, and

17   certainly the First Circuit rejected that and took a different

18   opinion of the two California District Courts that had looked

19   at the issue that way.  And I submit, looking at -- saying

20   that a filing or permitting a filing waives the protections of

21   Title III would be equally inconsistent with the plain

22   language of that statute and the protections it's intended to

23   provide.

24        Now, the other issue in the case that the bondholders

25   cited in their Reply papers I think misconstrues the point

1    actually of *Stockton*, *Vallejo* and *Detroit*, which is that in

2    each one of those, the limitation that was struck down by the

3    Court was an attempt by a state to impose through statute a

4    substantive limitation on the Bankruptcy Court or the use of

5    the Bankruptcy Code.

6           Here, Puerto Rico did not put into the ERS statute

7    that said -- and no -- and ERS may not pursue that, a

8    fraudulent transfer claim here.  Our argument is the

9    limitation inheres in the Bankruptcy Code, and PROMESA, not

10   some external statute imposed by Puerto Rico attempting to

11   cherry-pick or limit application.  We just think that inheres

12   in the nature of Section 303.  So I think for that reason, the

13   relevant cases are distinguishable.

14          Another point that was made is with respect to 362

15   and the automatic stay.  We strongly contest the automatic

16   stay can trump 303 in this context either.  We briefed that

17   extensively, but I just want to be clear that that's why we

18   don't think the automatic stay applies.  Just as we think

19   540 -- 926 or 544 or 548 cannot overrule 303, we equally

20   believe 362 cannot overrule 303.

21          And at least my reading of the Court's Opinion with

22   respect to *GDB* is that the Court at least believes that's

23   certainly a colorable argument and may have, at least in part,

24   adopted that analysis.  But I don't want to overstate what the

25   Court was thinking, because it was not explicit in the Court's

1    determination.

2            There was language as to the structure of PROMESA and

3    Chapter 9 having respect for state control over its

4    instrumentalities. I wouldn't presume the Court was going so

5    far as to say that 303 blocked the application of 362, but

6    certainly our position is it does and it should.

7            So then the question becomes, is it simply a kind of

8    financial transaction that 303 doesn't protect? And I think

9    there's sort of two issues there. One is I'm actually not

10   sure that the financial transaction limitation is really the

11   right kind. When you look at 303, 303 really gets to

12   overriding only one kind of very specific statute, which is a

13   moratorium act. And I'm sure we'll have more to say about

14   what a moratorium act really is, but it doesn't seem to

15   necessarily limit a government's power in other respects in

16   terms of financial relationships.

17           But even if there is a financial relationship bar,

18   Joint Resolution 188 and Act 106 are not simply financial

19   transactions. They are a structuring of Puerto Rico's pension

20   system, which is something that -- and a modification of the

21   administration of the pension system. It, you know, simply

22   put, in addition to having financial components, removes

23   certain governmental functions from ERS and moves them to

24   AAFAF and the Commonwealth. That's a governmental exercise of

25   power.

1          And I note that 303 isn't just limited to exercises

2     of government and political control or power, but it includes

3     expenditures therefore.  So it's clear that you can't say,

4     well, if it has a monetary component, it falls outside the

5     structure and permissible reach of 303.  And our brief makes

6     clear what the other public policy and governmental powers in

7     terms of protecting Puerto Rico's retirees involved here are.

8     And for that reason, we think it's inappropriate to exercise

9     926 in this situation.

10         I did want to make a couple of -- one other point,

11    because I do think 549 is really important here.  549, as -- I

12    agree with Mr. Rosenblum, it is murky.  It is a little

13    complicated and confusing as to how it gets dealt with here,

14    but I think that ambiguity certainly heavily tilts in our

15    favor.

16         What's authorized?  Well, an authorized transfer in

17    the context of a Title III or municipal case, something that

18    has been approved by the Oversight Board for sure, and

19    something that is authorized by Puerto Rico statute.  They

20    want to presume the invalidity of the statute in order to get

21    to the issue of unauthorized, and I don't think our view would

22    make 549 a dead letter.

23         I actually have an example of what could be a 549

24    claim in a Title III.  All parties have submitted to the

25    Court, and the Oversight Board, I think, consented under 305

1  to having professional fees subject to Court Orders.  If, for

2  example, the Commonwealth paid a professional out of the

3  strictures of that Order, that could be an unauthorized

4  transfer, because the Oversight Board has said that transfers

5  must be made in accordance with a Court Order.

6      So my view of 549 is that it's not a dead letter,

7  because I've just postulated one way in which a Court could

8  clearly use it in a Chapter 9 or Title III case.  So I think

9  all these sections can be harmonized together in a way that

10 doesn't permit a 926 trustee to be appointed to gut one of the

11 most significant legislative accomplishments that Puerto Rico

12 has enacted since the onset of these Title III cases.

13     Thank you, Your Honor.

14     THE COURT:  Thank you, Mr. Friedman.

15     Mr. Raiford.

16     Mr. RAIFORD:  Good afternoon, Your Honor.  Landon

17 Raiford from Jenner & Block for the Retiree Committee.

18     I think, to the bondholders' credit, they are very

19 clear about what they hope to achieve.  In their motion, in

20 page four, they state their belief that 549(a) and 544(b),

21 quote, allow ERS to invalidate the Commonwealth's legislation

22 and recover ERS' transfer of property, end quote.

23     I think one way to resolve the motion is to ask

24 ourselves, can that proposition plausibly be true, and the

25 answer is no.  To be sure, the Bankruptcy Code is a powerful

 1   tool, but it's not all powerful.  And I'm not aware of any

 2   case law which suggests that the Code's avoidance action

 3   provisions can be used to invalidate or appeal a duly enacted

 4   law.

 5         In a very real sense, bondholders want to proceed

 6   with the complaint that seeks to extend the Code's avoidance

 7   action powers beyond anything any Court has found possible up

 8   until this point in time.  Their position, if accepted, would

 9   severely curtail the Commonwealth's ability to manage its

10   pension system.  And if these Code provisions can do that,

11   there's really no limit as to what they can undue.  Common

12   sense tells us that can't be true, and the opposition briefs

13   lay out in detail why it can't be true and why the motion

14   should be denied.

15         The Retiree Committee takes this position and objects

16   to the motion fully aware of its unique interest here.  To the

17   extent there is something to collect by ERS against the

18   Commonwealth, and again, we don't think there is, at least

19   some of those funds could belong to our members or could be

20   used to pay pensions.  But the Retiree Committee also

21   understands it is not in the best interest of ERS or its

22   constituents to pursue litigation just for the sake of

23   litigation.  Nor is it in the best interest of ERS or its

24   constituents for the bondholders to pursue what generously

25   might be classified as novel claims on ERS' dime and for the

1    benefit of the bondholders who view this as a way to put

2    litigation pressure on the Board by opening up yet another

3    front in their endless war over the PayGo legislation.

4          As we gather here today, the Court already has dozens

5    of pages supporting our position.  And you've heard from

6    others.  I won't belabor those points.  What I would like to

7    do with my remaining time is address a few points the

8    bondholders raise in their Reply Brief.

9          First, on their first claim, the 549(a) claim, the

10   oppositions note that one problem with that claim is when it

11   comes to seeking to invalidate the legislation, there are no

12   transfers to avoid.  All it did was affect property of other

13   entities, money and funds that never belonged to ERS.

14         Now, the bondholders don't actually provide any

15   rebuttal to that point.  In fact, in their Reply Brief, they

16   punt on the issue and simply say that this can be litigated at

17   a later stage, but that's incorrect.  As one Court put it,

18   Courts should be loathe to appoint a trustee, given the

19   Court's limited powers in a municipal case.

20         Consequently, bondholders are required to make, in

21   the words of Collier, a, quote, substantial showing, both

22   factual and legal, of the likelihood of the existence of

23   avoidable transfer.  Bondholders don't even attempt to do that

24   and, therefore, fail to meet their burden.

25         We've also heard a little bit today about this 190

1   million transfer from ERS to the Commonwealth, but the

2   bondholders provide no justification for why even if such a

3   claim did exist, it would not be futile.  The Court is

4   presented with two possible scenarios, and I think you went

5   over this a little bit with Ms. Dale.  In scenario one, the

6   bondholders prevail on their lien scope argument.  If so, the

7   Court can always hold the Board to its agreement to return

8   these funds to the bondholders.  We don't need yet another

9   lawsuit to just get to the exact same place.

10          The second scenario, the one we obviously think is

11   more likely, the bondholders do not prevail.  If so, the funds

12   stay with the Commonwealth anyway.  So why would we proceed

13   with an adversary proceeding before that determination is

14   made?

15          On their second claim, the 544(b) claim, it fares no

16   better.  Our bondholder friends do note that there is a split

17   in authority.  Well, that's true, but probably only in the

18   most technical sense.  The clear weight of the case law,

19   including the one reported decision in the First Circuit,

20   holds that 544(b) only applies to prepetition transfers.  In

21   fact, the legislative history of 549 also supports that

22   conclusion, because it states that 549 permits the trustee to

23   avoid transfers of property that occur after the commencement

24   of the case.  In other words, 549 was necessary to allow the

25   avoidance of post petition transfers because the other

1  avoidance action provisions don't apply.

2      I think the best case that addresses this is the

3  *Kenny G* case.  And I bring that up not only because I can

4  mention Kenny G, that easy listening musical genius, in open

5  court, but also because it actually does go into detail over

6  the numerous reasons why the only plausible interpretation of

7  544(b) is that it applies solely to prepetition transfers.

8      In rebuttal, the bondholders point us to two cases.

9  One, *Seminole Walls*, doesn't even address the issue.  The

10  second, a case out of Louisiana, is a 544(a) case, and it,

11  too, provides no substantive analysis.  The Court should treat

12  these two cases for what they are, incorrect outliers that cut

13  against the well-established rule that 544(b) only applies to

14  prepetition transfers.

15      And finally, even if we were to assume and look at

16  the merits of the 544(b) claim, it would still fail.  And this

17  gets a little murky, because the bondholders base their

18  fraudulent transfer claim on 31 L.P.R.A. 3028, which allows a

19  creditor to impugn the acts which the debtor may have

20  performed in fraud of their right.  But then they argue that

21  intent, which they implicitly concede they cannot show, is

22  irrelevant under Puerto Rico law, because courts actually

23  applied the standard of another statute, 31 L.P.R.A. 3492 in

24  fraudulent transfer actions.

25      And the Puerto Rico Supreme Court has held that that

1    provision, which on its face applies to the recission of

2    contracts, quote, does not require evidence of the purpose or

3    aim of the debtor to harm his creditors.  It suffices to show

4    that he knew about the result produced.

5           As a threshold matter, it is highly questionable that

6    3492 globally applies in all fraudulent transfer actions.

7    Every case the bondholders cite is a contract case, and

8    there's no compelling logic why a contract recission statute

9    will supply the test in a case like this one where no contract

10   is at issue.  But even if the bondholders are right and 3492

11   did apply, it doesn't help them.

12          The test of 3492 still requires an affirmative

13   voluntary act.  All the standard does is articulate the

14   traditional principle that when you act intentionally, you

15   intend the natural consequences of your action.  If the

16   natural consequence of an intentional act would be to defraud

17   a creditor, the law presumed you acted with that intent.  But

18   as the bondholders themselves note in their Reply Brief and

19   again today, every transfer they seek to avoid was

20   involuntary.  You cannot stretch the definition of fraud

21   beyond recognition and hold that someone can commit fraud

22   through a wholly involuntary action.

23          For all the reasons listed in the opposition papers

24   and discussed today, the bondholders have not asserted any

25   colorable claim, avoidance action claim that would justify the

1    appointment of a trustee and the motion should be denied.

2    Thank you.

3              THE COURT:  Thank you.

4              Mr. Rosenblum.

5              MR. ROSENBLUM:  Again, for the record, Ben Rosenblum

6    of Jones Day on behalf of the ERS Secured Creditors.

7              I'm going to be a little disjointed, but with respect

8    to the Oversight Board's contentions, I heard very little that

9    was not already in their brief.  And the points that they did

10   make, I think did not meet the argument.  Most of the points

11   related to whether or not the bondholders were successful in

12   their assertions regarding the lien and scope of the lien, but

13   that's besides the point for purposes of Section 549 and the

14   causes of action we're seeking appointment of a trustee for

15   here today.

16             So the fact that whatever their Plan of Adjustment

17   says, whatever happens in the other litigation is all

18   irrelevant to that.  Similarly, the litigation about whether

19   or not PayGo fees are the same as employer contributions,

20   which we are prosecuting that case elsewhere, is also not

21   material to the 549 claim.  It's black letter law under -- a

22   transfer in the Bankruptcy Code is a disposition of an asset,

23   including the elimination of an asset.  A release is a perfect

24   example.  Release is a transfer under the Bankruptcy Code.

25   What they have here is a release of ERS' rights to receive

1    revenue.

2         There was also mention about how COFINA's distinct,

3    how there was no concession that they couldn't represent both

4    the Commonwealth and COFINA in a lawsuit.  I would suggest

5    that it's an elementary principle, you can't be both plaintiff

6    and defendant, and that's precisely the problem here.

7    Precisely the problem is the mentality that the Oversight

8    Board believes that it can be both A and B, and that's wrong.

9         It's not a problem that they're appointed a

10   representative for all debtors.  That happens in a lot of

11   cases.  Trustees are appointed by Courts for multiple debtors.

12   Debtors in possession serve for multiple debtors.  But when it

13   comes time to litigate an interdebtor dispute, there's some

14   kind of special committee.  There's some kind of resolution

15   mechanism to avoid that conflict, to avoid the absurdity of A

16   and B being the same party.

17        You can't be the judge in your own case.  It's a

18   fundamental principle of law.  And that's what they did in

19   COFINA.  They created a structure to go litigate that where

20   they weren't involved.

21        I will also just speak briefly about the 303 point.

22   I said in my initial remarks that they had no authority, and

23   you didn't hear them come up and provide any or even try to

24   rebut that statement.  There is no 303 case that they can

25   point to to support their position.

1          Mr. Friedman pointed out that -- their contention

2     that it's a governmental or political power.  No authority

3     cited for that proposition.  This is purely a financial

4     transaction.  And, in fact, Mr. Friedman incorrectly said that

5     the Commonwealth of Puerto Rico enacted 188 and not the Board.

6     That's demonstrably false.  The Board did it pursuant to its

7     powers under PROMESA, under it's budgetary provisions.  The

8     Governor subsequently signed it after the Board enacted it

9     into law.  And just as a sequencing matter, it was the budget

10    starting on July 1, 2017, forward.  The Governor didn't sign

11    it until afterwards.  It was effective before the Governor

12    signed it.

13         I hesitate to go too far down this path, because Your

14    Honor may be aware, we have a Takings claim against the United

15    States Government, and this is an important issue in that case

16    about exactly the Oversight Board's role in this legislation.

17         I point out that Act 106 also, in its preamble, says

18    that it's doing this because it's been directed to do this

19    under the Fiscal Plan.  You don't need to reach those issues

20    today.  I would just point out that these are fiscal measures

21    that are happening.

22         There was a citation to the *Richmond* case, which is

23    discussed in the papers.  I think it's beside the point.  It

24    goes to the conflicts issue, if anything, but the whole point

25    is they're refusing to bring these claims.  And even the

1   *Richmond* case, when it goes through and catalogs the various

2   deferences to state law, it carves out 926, precisely the

3   relief here that we're seeking.

4           I would also note Mr. Friedman's acknowledgment that

5   this is a murky area of the law.  Well, I think all the more

6   reason that we've cited a colorable claim here and that these

7   cases should be allowed to proceed on full briefing rather

8   than having them snuffed out by the application of a statute

9   of limitations.

10          With respect to the Retirees' points, I don't think

11  it's the appropriate forum to litigate completely the merits

12  of all of these claims.  I think we've more than set out that

13  they're colorable.  I'm not going to engage in the argument

14  that ERS had no property.  Of course it had property.  The

15  issue of whether or not ERS had a property right in employer

16  contributions is the subject of other litigation.  ERS

17  clearly, by the Retiree Committee's own acknowledgment,

18  transferred assets to the Commonwealth post petition.  The

19  extent of those asset transfers is yet to be fully discovered,

20  but again, the statutes speak for themselves.

21          I would also note that in the Retiree Committee's

22  contentions around Puerto Rico law, they don't cite a single

23  Puerto Rico authority or case.  It's their reading of the

24  statute.  We come back with Puerto Rico authority on why the

25  fraudulent transfer claim is an appropriate claim and why it's

1    a constructive fraud statute.  They have nothing in response.

2            I'd also note that the idea that it's involuntary so

3    it can't be a fraudulent transfer, that's fine.  We're allowed

4    to plead in the alternative at this stage, and it's precisely

5    because our adversaries may shift their positions down the

6    road.

7            With that, I would -- I'm happy to answer any

8    questions that the Court has.

9            THE COURT:  No.  I have no further questions.  Thank

10   you.

11           MR. ROSENBLUM:  Thank you very much.

12           THE COURT:  I will take this matter under advisement

13   and issue my decision as promptly as possible.

14           MR. ROSENBLUM:  Thank you, Your Honor.

15           MR. DESPINS:  Your Honor, could we have a 45 second

16   reservation of rights on this issue, if I may be heard?

17           THE COURT:  Yes.  Mr. Despins is coming to the podium

18   to make a reservation of rights.

19           MR. DESPINS:  Good afternoon, Your Honor.  Luc

20   Despins for the Official Committee.  As you know, we are the

21   Official Committee for the Commonwealth and for ERS, so we're

22   staying out of the merits of this.

23           The reservation of rights is just as follows.  We

24   don't want the bondholders later to argue if -- and we're not

25   suggesting that, but if Your Honor were to grant the relief,

1    and if there were litigation brought, and if the litigation

2    were successful, I don't want my silence here to imply that we

3    agree that they would get the money on the ERS side because

4    there are tons of unsecured creditors on the ERS side.  These

5    guys are nonrecourse creditors.  Let's not forget that.

6            So I'm not saying that the Court has to decide that.

7    I just want to make sure my silence here today would not be,

8    under those circumstances, an acknowledgment that they are

9    entitled to get that money if it ever came back to that side

10   of the ledger.

11           Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. CUNNINGHAM:  Your Honor, just briefly.  John

14   Cunningham.

15           Your Honor, six months ago I sought to disband the

16   Committee.  As Your Honor knows, you denied that because it

17   wasn't a point in time where an actual conflict Your Honor

18   thought existed, and that's why -- I think is the reason he's

19   not objecting here today.  So we take that for its worth.  But

20   the point about where the money's going, that's the whole

21   point of our motion.  We want the money back in ERS.

22           We didn't ask how it would be directed.  That's the

23   whole point of 926, is to recover money into the estate.

24   We're not taking a position in this motion on where that money

25   goes.  We want to bring it into the estate.

1        Thank you.

2             THE COURT:  Thank you.

3             MR. CUNNINGHAM:  Or to the debtor.  Thanks.

4             THE COURT:  All right.  And so are the UBS parties

5    back and ready to report?

6             MS. BEVILLE:  Thank you, Your Honor.

7             THE COURT:  Good afternoon, Ms. Beville.

8             MS. BEVILLE:  Sunni Beville from Brown Rudnick on

9    behalf of the Special Claims Committee.

10            I want to report where we are, and then I'll turn the

11   podium over to Mr. Lockwood and Mr. Vicente.  I can tell you

12   what we have agreed to and what remains open for discussion.

13   With respect to paragraph two, Your Honor, of the proposed

14   Order --

15            THE COURT:  Yes.

16            MS. BEVILLE:  -- we would -- we all would agree that

17   the first sentence would read, "pursuant to Bankruptcy Code

18   Section 362, made applicable by PROMESA, Section 301(a), the

19   automatic stay is hereby lifted solely" -- we would insert the

20   word "solely" -- "to allow UBS Financial," and the rest of

21   that would remain.

22            Your Honor, the Special Claims Committee agrees to

23   the addition of a proviso at the end of that paragraph,

24   similar to the language that you had described to the court

25   earlier -- described to the parties earlier.  There does

1    remain dispute as to what precisely that language should say

2    at the end of paragraph two.

3          THE COURT:  So would you want an opportunity to

4    reformulate if I --

5          MS. BEVILLE:  Yeah.

6          THE COURT:  -- grant the motion --

7          MS. BEVILLE:  Yes.  I think you're going to hear

8    from Mr. Vicente and Mr. Lockwood, there is a very precise

9    issue as to leaving open to the Commonwealth what the

10   procedural mechanism is.  We're deciding whether or not to

11   permit the counterclaims to be presented by all or heard at

12   the Commonwealth level, so there's some discussion on that one

13   point.

14         THE COURT:  And so does that go to both the final

15   clause and to the word in the middle of that paragraph where I

16   had proposed to change the word "filed" to "present"?

17         MS. BEVILLE:   To "present," yes, Your Honor.  We all

18   accept that.

19         THE COURT:  You do accept that?

20         MS. BEVILLE:   We do accept that.

21         THE COURT:  Okay.  But there is a further nuance

22   issue as to the sentence regarding the powers of the

23   Commonwealth Court as to what happens to the counterclaim

24   there.

25         MS. BEVILLE:  Yes, Your Honor.  Yes.  And then we

1  have also agreed to strike paragraphs four and five from the

2  Order.

3          THE COURT:  Thank you.

4          MS. BEVILLE:  Thank you.

5          MR. LOCKWOOD:  Your Honor, it's Paul Lockwood again

6  on behalf of UBS Financial Services of Puerto Rico.

7          As was just described by counsel for the Oversight

8  Committee, we agree to present -- in paragraph two, we agree

9  to strike four and five.  I think six really covers four and

10  five.

11          And the final concern we have is I agree wholly with

12  Mr. Vicente with respect to comity, and that this Court

13  shouldn't be weighing in on the procedural dispute that we're

14  going to have in the local court.  With respect to -- and just

15  to lay it out there, the dispute we have is whether we have to

16  seek permission to file a counterclaim or whether we can just

17  file it as a matter of right pursuant to local procedure.  And

18  I don't think Your Honor should weigh in on that one way or

19  the other.

20          The concern that we have is that the proviso that

21  Your Honor dictated earlier states that in -- the Commonwealth

22  Court shall have the sole discretion as to whether to permit

23  the filing and litigation of the counterclaim.  And to me, I

24  think that Mr. Vicente is going to take that language into

25  that court and say the Federal Court has told you to decide

1    whether to permit the filing of the counterclaim.  We think we

2    have the ability to present that counterclaim as a matter of

3    right.

4            So what I would suggest, as an alternative language,

5    Your Honor, borrowing from your phrase, "the Commonwealth

6    Court shall have the sole discretion as to the procedural

7    requirements for presenting the counterclaim in the

8    Commonwealth court."  And that way this Court doesn't suggest

9    that either way, whether it gets filed as a matter of right or

10   whether we're required to seek leave and permission to file

11   it.  We would prefer that the language be as neutral as

12   possible in the Order for the reasons that Mr. Vicente has

13   already stated, which is that this Court should allow that

14   Court to decide its own rules.

15           Thank you, Your Honor.

16           THE COURT:  Thank you.  Just don't sit down yet,

17   because I just need to think about that for a minute.  And so

18   would you keep the remainder of my proposed insert as to the

19   Commonwealth Court also having discretion as to whether to

20   permit litigation of the counterclaim, or have you all agreed

21   that that's not necessary?

22           MR. LOCKWOOD:  I don't think it's necessary.  We

23   haven't agreed, but I don't think it's necessary because I

24   think that that's clearly implicit.  But I don't oppose

25   addressing it expressly.  We could add another phrase saying,

1    "and the litigation of the counterclaim in that court."  That

2    would be fine for me.

3              THE COURT:  So give me just one moment before you sit

4    down.  Would you repeat what you -- do you remember what you

5    just said as to the litigation end of it?  And repeat that to

6    me.

7              MR. LOCKWOOD:  Yes.

8              THE COURT:  Actually, I'm sorry.  I have the

9    transcript here.  So what you said was we could add another

10   phrase saying, "and the litigation of the counterclaim in that

11   court."

12             So if it says, "and the Commonwealth Court shall have

13   sole discretion as to any procedural requirements for

14   presenting the counterclaims and as to the litigation of the

15   counterclaim in that court," does that do it for you?

16             MR. LOCKWOOD:  That does it for us, Your Honor.

17             THE COURT:  All right.

18             MR. LOCKWOOD:  As I stated, Your Honor, that's

19   designed to be as neutral as possible.  If the counsel for the

20   objectors believes there's even more neutral language than

21   that, I'd be willing to undertake it.  But I think they wanted

22   the phrase, "permit the filing," and our concern is that that

23   suggests that permission of a filing is required.

24             THE COURT:  All right.  Thank you.

25             I'll ask Mr. Vicente to come up and tell me whether

1    this works for him.

2            MR. VICENTE:  Thank you once again, Your Honor.

3            THE COURT:  Good afternoon.

4            MR. VICENTE:  Harold Vicente for the individual

5    retirees.

6            I have a preference.  I preferred your original

7    language.  However, in an attempt to meet counsel halfway and

8    resolve this matter immediately, the only addition I would ask

9    that be incorporated into the language that you just read is,

10   "if allowed".

11           THE COURT:  So you would say "as to any" --

12   "discretion as to any requirements for presenting the

13   counterclaims and as to the litigation of the counterclaim,

14   comma, if allowed" --

15           MR. VICENTE:  If allowed.

16           THE COURT:  -- "comma, in that court"?

17           MR. VICENTE:  Yes.

18           THE COURT:  Okay.  Mr. Lockwood, can you live with

19   that?

20           MR. LOCKWOOD:  Your Honor, excuse me, it's Paul

21   Lockwood again.

22           I think it's more confusing than it is helpful to add

23   that, because I think it does create this implication that the

24   Court has to make a preliminary ruling, which we don't think

25   it does.  And that would be -- our preference is not to

1  include "if allowed" for that reason.

2  THE COURT:  How about, and as to -- let's see.  Any

3  procedural requirements for presenting the counterclaim, and

4  as to any litigation of the counterclaim in that court; would

5  that work for you?

6  MR. LOCKWOOD:  That would work for me, Your Honor.

7  THE COURT:  Mr. Vicente, would that work for you?

8  MR. VICENTE:  I prefer the original language, but

9  let's put an end to it.  I'll accept it.

10  THE COURT:  Thank you.

11  MR. LOCKWOOD:  Thank you, Your Honor.

12  THE COURT:  All right.  And so would you,

13  Mr. Lockwood, reformulate your Proposed Order, run it by Mr.

14  Vicente to make sure that you're agreed on the agreed language

15  and the excision of the paragraphs that are coming out, and

16  then file it with a -- I guess file it as an informative

17  motion as to the agreed formulation of the Order, rather than

18  as an Order -- a motion on presentment, because we've dealt

19  with it here.

20  MR. VICENTE:  Fine with me.

21  MR. LOCKWOOD:  We will undertake that, Your Honor.

22  THE COURT:  Thank you very much.  Thank you both.

23  MR. LOCKWOOD:  Your Honor, may we be excused from the

24  rest of the hearing then?

25  THE COURT:  Yes, you may.  Safe travels if you're

1   traveling.

2          MR. VICENTE:  Thank you very much, Your Honor.  It's

3   a privilege to be here for the first time before you.  I ask

4   to be excused.

5          THE COURT:  Thank you.  It's very good to see you.

6          MR. VICENTE:  Good afternoon.

7          THE COURT:  Have a good day.

8          I believe the final Agenda item is the Contested

9   Claim Objections that are Agenda Item V.4 through 11.

10  Ms. Stafford.

11         MS. STAFFORD:  Good afternoon, Your Honor.  Laura

12  Stafford of Proskauer Rose on behalf of the Oversight Board.

13         The first of the Contested Claim Objections is the

14  75th Omnibus Objection, and for the record, that is ECF number

15  8960.  This Objection seeks to disallow Proofs of Claim that

16  assert bonds as to which HTA is no longer liable because the

17  bonds the claimants purport to hold have already been refunded

18  either through redemption or defeasance.

19         Only one Response to this Objection was filed by MGIC

20  Indemnity Corporation.  That's ECF number 9326, Proof of Claim

21  number 16608 by MGIC Indemnity Corporation.  And I'm pleased

22  to report that I've, in the last 24 hours, had a number of

23  conversations with counsel for MGIC, and I believe we've

24  resolved any remaining issues as to this objection.

25         I think we both have -- we've come to the agreement

1  that in light of the fact that the debtor is currently not

2  liable for payment on the bonds asserted through the claim,

3  that we're comfortable -- that counsel is comfortable allowing

4  the objection to move forward and the claim to be disallowed.

5  And I will let her correct me if I said anything wrong.

6          THE COURT:  Thank you.  Good afternoon.

7          MS. DIAZ MAYORAL:  Good afternoon.  Monique Diaz

8  Mayoral for MGIC.

9          Yes, we have had various conversations.  What sister

10  counsel has said is correct.  We have different positions as

11  to debtor's liability before -- in the past, before payment,

12  but after that, we both agree that after the payment, debtor

13  is not liable.  So in order to not use the Court's valuable

14  time with a controversy over the debtor's liability before the

15  payment, we would not object to the claim being disallowed at

16  this time, because at this time, debtor is not liable.

17          That way both parties can preserve their positions as

18  to said controversy before payment and the effect is the same

19  -- sorry.  So in order not to use this Court's valuable time

20  with the controversy over debtors' liability before the

21  payment, we would not object to the claim being disallowed at

22  this time, because at this time, the debtor is not liable.

23          That way both parties can preserve their positions as

24  to said controversy before payment and the effect is the same.

25  The claim is removed from the Claims Registry at this time.

1          THE COURT:  Thank you, Ms. Diaz Mayoral.  It's good

2     to see you here in court.

3          MS. DIAZ MAYORAL:  Thank you.

4          MS. STAFFORD:  Thank you, Your Honor.  And so in

5     light of that, given that there have been no further

6     responses, we'd request the Court grant the objection and

7     disallow the claim subject to it.

8          THE COURT:  The objection is sustained and the

9     subject claims are disallowed.  And the Order will be entered.

10         Do you have to do a revised Proposed Order or no?

11         MS. STAFFORD:  I don't believe so, but we can confirm

12    that and let the Court know.

13         THE COURT:  Yes.  So just confirm that your Exhibit A

14    to the 75th Omnibus Order is sufficiently comprehensive and

15    accurate, and confirm that to us.  And if not, give us an

16    accurate one.

17         MS. STAFFORD:  We would be glad to do so.

18         THE COURT:  Thank you very much.

19         MS. STAFFORD:  The next Contested Claims Objection is

20    the 77th Omnibus Objection filed by the Commonwealth and ERS.

21    For the record, it's ECF number 8990.  This objection seeks to

22    disallow a number of Proofs of Claim that assert liabilities

23    associated with entities that are not Title III debtors, but

24    do not comply with applicable Rules by not providing a basis

25    for purporting to assert a claim against the Commonwealth or

1  ERS.

2          Only one Response was filed, and that is ECF number

3  9132, for the record.  Upon review of that Response, we've

4  withdrawn our objection to that claim and we've reached out to

5  that claimant in order to better understand the nature and

6  basis of that claim, so we can decide how best to move

7  forward.

8          In light of that, and no further responses having

9  been received, we'd request the Court grant the objection and

10  disallow those claims.

11          THE COURT:  And so does your Exhibit A filed at 9429

12  reflect the proper universe of disallowed claims?

13          MS. STAFFORD:  It does, Your Honor.

14          THE COURT:  The objection is sustained as to the

15  claims listed in Exhibit A to docket entry 9429, which will be

16  entered.

17          MS. STAFFORD:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          MS. STAFFORD:  And with respect to the remaining

20  contested claim objections, each of these are ones as to which

21  the Court had already entered an order adjourning remaining

22  responses -- or I believe there's one response that the Court

23  did not adjourn, but we filed a Notice of Adjournment with

24  respect to that claimant's claim, so I don't believe there's

25  any additional responses that need to be addressed today.

1    However, with respect to each of those objections, we

2    do have additional supplemental mailings that we received and

3    additional claims that we would like adjourned from the

4    remaining contested objections.

5         THE COURT:  And so does that mean you don't want me

6    to enter an Order at all, or that you're going to give me an

7    updated Exhibit A and Proposed Order for each of the remaining

8    Agenda items?

9         MS. STAFFORD:  The latter, Your Honor.  Precisely as

10   we did this morning with the Uncontested Claim Objections,

11   there's just additional claims that we'd like to adjourn for

12   the time being.  And we're happy to submit an additional

13   notice with a revised schedule.

14        THE COURT:  Very well then.  The objections reflected

15   in Agenda Items IV -- sorry, V.6, V.7, V.8, V.9, V.10 and V.11

16   are sustained, except insofar as claims are adjourned, and the

17   debtor is directed to file proposed orders accurately listing

18   the claims to be disallowed, with no other objections having

19   been interposed to the disallowance of the claims that will be

20   listed.

21        MS. STAFFORD:  That sounds great, Your Honor.  Thank

22   you so much.

23        THE COURT:  I'm glad that sounded like something to

24   you.  It sounded circular to me.

25        Thank you, Ms. Stafford.

1          MS. STAFFORD:  Thank you.

2          THE COURT:  All right.  And so that takes us to the

3   end of today's Agenda, unless I've missed anything else?  I

4   think I see some merciful relief on people's faces, so I think

5   that is the end of the Agenda.

6          The next scheduled hearing date is the hearing in

7   connection with the PREPA 9019 motion, which is currently

8   scheduled for January 14 and 15, 2020, here in San Juan with a

9   video connection to New York.  And I will continue to prepare

10  and anticipate that we're going forward with that unless

11  somebody gives me a good reason not to.

12         I would ask counsel to be mindful that the Court

13  staffing will be leaner during the upcoming holiday season,

14  and so plan appropriately and exercise discretion with filings

15  to avoid time sensitive urgent motion practice or other such

16  requests to the Court being dropped on us late at night, on

17  weekends and on court holidays.

18         And, in fact, it would really be a good idea and

19  courteous to follow that practice after the holidays as well.

20  I have to say, the ten o'clock Friday night urgent motions are

21  getting a little old.  And as you'll see, we basically deal

22  with them on Monday, but it would be nice to have those come

23  in in a more normal time frame.  So I thank you in advance for

24  any adjustment of your practices that may be necessary.

25         So as always, I thank the court staff here in Puerto

1   Rico, in Boston and New York for their work in connection with

2   these hearings and their superb ongoing support in the

3   administration of these cases.

4          I'm glad that Judge Houser is here so that we've all

5   been able to thank her in person for her extraordinary and

6   ongoing work as leader of the mediation team.  Thank you,

7   Counsel, for your advocacy and your work in aid of finding a

8   path forward for Puerto Rico.

9          Keep well, and happy holidays to all.  Safe travels.

10   We're adjourned.

11          (At 3:26 PM, proceedings concluded.)

12                          *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  U.S. DISTRICT COURT     )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 177 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain, and the

 8  Honorable United States Magistrate Judge Judith Gail Dein on

 9  December 11, 2019.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
April 15 88:7
April 2019 19:2
April 22nd 88:10,
   88:13, 88:19
April 22nd, 2020,
   april 107:7
April 8 65:20
April 8th 65:16,
   65:22, 66:21
December 11, 2019
   1:16, 6:2, 177:9
December 19th 21:19
December 6 7:22
December 6, 2019
   11:19
December 7, 2019
   20:5
February 14, 2020
   135:24
January 10, 2020 8:1
January 14 175:8
January 16 53:8
January 29th 46:2,
   55:6
July 1, 2017 159:10
July 24th 72:24
March 2020 19:15
May 2017 128:12
November 27 7:21
November 7 7:20
September 2019 19:2
.1. 26:21, 108:22


< 0 >
000 81:20


< 1 >
1,700 80:10, 82:7
1-844-752-6106 21:19
1.5 17:6
1.726 28:11
100 72:8
106 21:15, 21:22,
   133:1, 133:3,
   146:5, 149:18,
   159:17
10th 36:6

11 136:20
11. 170:9
111 19:19
12 11:21, 18:25,
   41:2, 45:21,
   47:10, 47:18, 48:4
12(b 48:11, 54:16
12(c 54:16, 54:18,
   54:22, 55:2,
   65:10, 66:20, 77:3
12-31 52:2
12-month 18:16
125 21:11
12:00. 102:7
12:14 102:9
13 27:11
13. 27:24
13th 44:4
14 40:19
14.8 15:13
149. 54:19
15 10:24, 45:10,
   106:1, 127:19,
   127:22, 127:24,
   175:8
150 10:23, 17:9
16 68:8
16,800 12:16
16608 170:21
16th 45:2, 45:25,
   53:15
17 19:6, 50:16,
   106:21
17-BK-3283(LTS 1:6
17-BK-3284(LTS 1:22
17-BK-3566(LTS 2:3
17-BK-4780(LTS 2:23
172,469 12:11
177 177:4
188 132:25, 146:6,
   149:18, 159:5
19-362 72:6
19-363 72:19, 96:15
19-363. 72:18
19-AP-00369(LTS 2:21
190 132:21, 143:13,
   143:17, 153:25
1:00 7:4
1:00. 102:7
1:30 102:10

< 2 >
2 132:25
2.1 18:11
2.48 16:18
2.6 16:18
20 17:5, 102:6
2004 59:17, 63:17,
   63:20, 64:2, 64:7,
   64:10
2008. 128:11
201 74:8, 89:22
2011 80:15
2012 56:24, 104:1,
   104:6
2014 104:1, 104:6
2017 101:18, 101:21,
   101:24, 128:14,
   139:16
2019 101:22
202 74:8, 89:22
2020 21:7, 175:8
2020. 11:11
21 15:13, 77:24
21,000 12:23
21-day 24:21
21: 3:15
24 80:20, 170:22
240 18:5
270 141:20
29. 11:17
29th 46:19, 93:8


< 3 >
3.75 16:10
30 84:20
301(a 163:18
3028 155:18
303 128:7, 129:14,
   129:20, 130:2,
   130:5, 130:14,
   130:16, 142:2,
   143:6, 144:16,
   146:21, 146:22,
   146:24, 148:16,
   148:19, 149:5,
   149:8, 149:11,
   150:1, 158:21,

158:24
303. 148:12, 148:20,
  150:5
305. 50:21, 68:22,
  69:8, 69:19, 75:1,
  99:8, 131:12,
  143:6
30th 46:19, 71:2
31 155:18, 155:23
3283 28:24, 102:25
3283. 26:20, 91:13
3492 155:23, 156:6,
  156:10, 156:12
355 18:8, 18:12
362 134:8, 148:14,
  148:20, 149:5,
  163:18
362(a 134:11
362(b)(4 134:16
362(e 47:19, 47:23,
  47:25, 106:16
363 73:2, 73:4,
  73:12, 73:24,
  74:6, 74:22,
  79:15, 92:10,
  94:7, 96:23, 97:3,
  134:7
363. 73:8, 94:5,
  97:9
365. 72:6
3799 177:14
39 21:7
3: 1:6, 1:22, 2:3,
  2:21, 2:23
3:26 176:11


< 4 >
4.2 19:9
40 16:12
400,000 17:7
43 140:18
43.1 12:15
43.6 12:11
45 48:1, 89:6, 92:8,
  161:15
45th 106:16
48 15:11
480 17:14
49 21:9

< 5 >
5.1 16:9, 133:1
500 16:11, 81:20
540 148:19
544 129:12, 134:22,
  135:4, 141:23,
  148:19
544(a 155:10
544(b 151:20,
  154:15, 154:20,
  155:7, 155:13,
  155:16
544. 134:20
546 78:1
548 148:19
549 129:12, 132:15,
  135:5, 135:17,
  135:18, 136:10,
  141:24, 150:11,
  150:22, 150:23,
  151:6, 154:21,
  154:22, 154:24,
  157:13, 157:21
549(a 151:20, 153:9
549. 132:15
552 91:9, 143:25
552(a 8:23
59 139:19
5:00 7:4


< 6 >
6001 133:15
686 17:10


< 7 >
7 136:20
70 139:6
7015 62:23
72 68:17
75 17:25, 111:7
75th 170:14, 172:14
76th 25:16, 26:19
77 17:18
77,000 12:18, 12:24
77th 172:20
78th 26:21

< 8 >
8 116:12
82nd 26:23
836 17:11
84th 26:24
85th 26:25
86th 27:2
87th 27:3
88th 27:5
8960. 170:15
8961 26:20
8964. 26:22
8969. 26:23
8971. 26:25
8973. 27:1
8975. 27:3
8976. 27:4
8977. 27:5
8979. 27:7
8980. 27:8
8981 27:9
8982. 27:11
8984. 27:12
8990. 172:21


< 9 >
9 137:1, 146:16,
  147:5, 147:7,
  147:15, 149:3,
  151:8
9,887 12:13
9. 137:12
90 17:23, 18:1
9019 22:23, 175:7
903 131:10
903. 131:7, 131:9
904. 131:23
90th 27:6
9132 173:3
91st 27:7
926 127:3, 127:16,
  129:9, 129:19,
  131:14, 131:18,
  131:22, 132:3,
  135:9, 138:2,
  138:4, 138:21,
  138:23, 142:1,

146:23, 148:19,
150:9, 151:10,
160:2, 162:23
926. 130:3, 131:13,
138:14, 138:15,
144:16, 144:19
9260. 127:18
92nd 27:9
9322 91:13
9326 170:20
9365 102:25
93rd 27:10
9429 173:11, 173:15
9508 80:19
95th 27:11, 27:18
9:41 6:3

< A >
A. 3:10, 3:11, 3:12,
3:19, 3:28
ability 25:5, 46:10,
50:21, 70:3, 86:7,
87:2, 114:1,
114:10, 119:2,
152:9, 166:2,
177:5
able 13:21, 28:12,
41:2, 69:4, 78:8,
78:13, 81:18,
84:9, 94:23, 95:6,
113:16, 117:13,
141:15, 176:5
ably 23:22
above 23:16
abrogate 61:24
absence 48:8
Absolutely 66:5,
88:24, 93:18,
117:16, 120:9
absurdity 158:15
abundantly 119:16
accelerate 45:1
accept 28:11, 118:9,
119:15, 121:8,
125:24, 132:6,
164:18, 164:19,
164:20, 169:9
acceptable 55:24,
66:5, 70:15,

98:25, 99:5,
125:9, 125:12
accepted 152:8
access 10:4, 36:8,
39:7, 56:3, 56:6,
81:15
accessibility 37:18,
104:8
accessing 56:5
accomplish 41:2,
43:5, 91:25,
105:11
accomplishes 91:21
accomplishments
151:11
accordance 76:2,
118:24, 151:5
according 128:19
account 21:5, 21:6,
59:25, 60:13,
60:18, 68:10
accounts 21:22,
23:20, 60:14,
60:16
accrual 21:9
accrued 10:24
accurate 172:15,
172:16, 177:5
accurately 174:17
accusations 116:10
achieve 22:17,
151:19
acknowledge 30:14,
138:12
acknowledges 132:18
acknowledgment 34:8,
160:4, 160:17,
162:8
ACR 12:10, 12:21,
12:23, 13:1
across 81:3
Act 10:2, 21:15,
21:22, 113:11,
131:13, 132:10,
133:1, 133:3,
140:11, 146:5,
146:10, 149:13,
149:14, 149:18,
156:13, 156:14,
156:16, 159:17

acted 156:17
acting 125:1, 138:3
action 53:11,
114:12, 114:13,
115:12, 115:13,
115:17, 116:25,
117:15, 126:5,
126:8, 129:10,
130:24, 131:2,
132:4, 134:16,
134:17, 135:13,
139:2, 142:20,
144:12, 152:2,
152:7, 155:1,
156:15, 156:22,
156:25, 157:14
actions 50:5, 53:20,
100:5, 129:10,
135:15, 136:4,
155:24, 156:6
active 7:17, 30:23
activities 7:13
activity 20:25,
21:13, 94:12
acts 109:23, 155:19
actual 22:12, 74:13,
142:22, 162:17
Actually 21:2, 23:5,
27:13, 30:19,
44:11, 60:10,
60:15, 72:14,
74:2, 74:22, 77:2,
101:21, 110:3,
131:1, 133:19,
143:22, 148:1,
149:9, 150:23,
153:14, 155:5,
155:22, 167:8
adapting 97:9
add 108:10, 119:24,
122:17, 123:3,
166:25, 167:9,
168:22
added 39:6, 106:22,
108:11, 119:23,
123:10, 124:5
addendum 41:22
adding 36:20
addition 9:6, 39:9,
41:15, 64:20,

64:21, 64:25,
67:3, 149:22,
163:23, 168:8
additional 12:18,
13:11, 15:4,
25:23, 25:25,
27:15, 35:8,
43:10, 45:8,
53:21, 53:22,
55:14, 60:22,
66:9, 78:6, 97:23,
103:11, 122:9,
125:11, 173:25,
174:2, 174:3,
174:11, 174:12
addressed 34:22,
43:20, 44:12,
44:16, 49:5,
52:16, 55:15,
58:14, 58:15,
61:11, 63:3,
63:23, 69:12,
69:13, 71:7,
80:20, 92:17,
98:24, 106:7,
131:1, 173:25
addresses 155:2
addressing 93:19,
102:23, 166:25
adequate 37:8, 77:19
adhered 66:18
adjourn 25:24,
100:24, 173:23,
174:11
adjourned 25:21,
26:11, 174:3,
174:16, 176:10
adjourning 26:6,
173:21
Adjournment 26:9,
26:15, 173:23
adjudication 76:11,
80:1
adjust 93:7, 99:1,
99:6
Adjustment 7:15,
8:11, 130:21,
143:11, 144:9,
157:16, 175:24
Administered 1:11,

1:27, 2:8
Administration
17:15, 18:7,
149:21, 176:3
Administrative 13:8,
13:11, 13:14,
14:3, 90:23,
90:25, 91:6,
91:12, 91:15,
91:17
admit 133:12
admits 140:21
admitted 140:25
adopt 75:4, 75:10
adopted 69:14, 76:2,
106:11, 148:24
adopting 76:1
ADR 10:11, 13:5,
13:7, 13:17,
13:22, 14:3, 14:7
advance 43:10,
45:15, 50:8, 93:8,
175:23
advanced 93:22
adversaries 23:13,
38:23, 61:22,
69:25, 73:11,
87:9, 94:9, 94:24,
96:25, 97:21,
99:18, 161:5
advertising 81:21
advice 104:19,
115:18, 116:17
advised 39:11
advisement 161:12
Advisory 3:23, 95:11
advocacy 176:7
advocate 23:15
advocated 54:25
advocating 96:14
affect 43:6, 111:3,
120:15, 120:17,
153:12
affected 26:10
affects 112:13
affirm 144:1
affirmative 50:1,
58:10, 68:25,
69:5, 156:12
affirmed 145:17

afraid 62:1, 119:14
aftermath 101:14
afternoon 100:22,
108:4, 108:23,
108:24, 115:9,
115:10, 124:23,
124:24, 128:1,
138:6, 138:7,
142:17, 145:6,
145:8, 151:16,
161:19, 163:7,
168:3, 170:6,
170:11, 171:6,
171:7
afterwards 159:11
agencies 22:19
Agency 3:22
Agenda 12:16, 24:6,
25:12, 26:21,
26:22, 26:24,
26:25, 27:1, 27:3,
27:4, 27:6, 27:7,
27:8, 27:10,
27:11, 27:24,
28:2, 30:1, 59:17,
108:21, 108:22,
127:12, 127:15,
170:8, 170:9,
174:8, 174:15,
175:3, 175:5
agent 23:4, 90:24,
91:4
ago 14:24, 44:13,
115:15, 117:21,
139:6, 162:15
agree 34:10, 76:14,
109:22, 111:14,
117:17, 119:17,
127:5, 132:20,
150:12, 162:3,
163:16, 165:8,
165:11, 171:12
agreeable 91:5,
91:10
agreed 8:25, 30:4,
59:22, 65:21,
67:15, 91:24,
94:21, 110:22,
110:25, 126:20,
141:21, 146:7,

163:12, 165:1,
166:20, 166:23,
169:14, 169:17
agreeing 66:19,
89:14
Agreement 11:1,
11:8, 34:3, 47:9,
63:21, 77:2, 79:2,
98:4, 120:22,
154:7, 170:25
agrees 84:4, 132:21,
163:22
ahead 120:23, 122:25
aid 176:7
aim 11:9, 156:3
aimed 16:23
air 138:12
al 1:16, 2:21, 2:29,
3:8, 4:28
aligned 83:15
allegations 58:24,
74:12, 116:13,
116:15
allege 74:6, 74:12,
133:25
alleged 144:3
alleges 140:15
alleging 116:8,
116:19, 116:20
alliding 146:2
allocate 89:25
allocated 15:1,
15:11, 17:6,
18:10, 40:20
allocations 17:15,
30:4
allow 21:20, 52:23,
95:4, 114:20,
117:10, 117:19,
119:19, 120:7,
120:8, 121:10,
124:14, 125:22,
135:2, 151:21,
154:24, 163:20,
166:13
allowance 123:13,
129:10
allowed 59:20, 60:7,
63:22, 69:12,
118:15, 123:11,

124:9, 124:10,
144:9, 160:7,
161:3, 168:10,
168:14, 168:15,
169:1
allowing 24:24,
171:3
allows 116:12,
155:18
alluded 43:25, 92:13
almost 139:5
alone 128:25, 130:3,
140:20, 141:4
already 6:17, 18:25,
34:22, 46:12,
49:5, 56:10,
56:15, 61:3,
65:11, 72:4, 73:4,
73:8, 74:19,
74:23, 79:15,
87:24, 99:13,
118:25, 135:19,
139:24, 140:6,
141:19, 141:21,
142:5, 153:4,
157:9, 166:13,
170:17, 173:21
alternative 32:18,
48:10, 70:8,
161:4, 166:4
alternatively 82:15
Although 19:8, 20:2,
36:9, 58:6, 71:23
Ambac 3:34, 33:5,
33:7, 44:24, 45:6,
45:14, 57:21,
58:2, 58:21, 59:3,
62:20, 67:5,
98:17, 98:20,
105:18
ambiguity 49:25,
150:14
Amend 45:6, 45:9,
45:14, 45:25,
46:4, 46:6, 60:20,
62:20, 63:4, 63:7,
63:8, 67:5, 99:4,
105:19, 106:1
Amended 7:25, 33:8,
36:5, 36:14, 38:7,

43:9, 43:18,
47:16, 52:16,
52:20, 55:10,
55:12, 67:6,
88:16, 99:4,
106:5, 107:11,
107:13, 107:20,
107:22, 108:7,
117:21, 117:24
amendment 44:7,
44:8, 45:16,
46:10, 49:8,
58:19, 63:10,
94:16, 105:21,
105:24, 119:23
amendments 118:4
among 11:12, 11:14,
17:2, 17:3, 17:13,
19:18, 31:16,
74:7, 87:19,
126:12
amount 10:23, 12:14,
17:9, 17:18
amounted 139:19
amounts 15:2, 15:13,
17:6, 19:19, 29:10
Amy 177:13, 177:14
analogy 144:6
analysis 18:21,
147:13, 148:24,
155:11
analytically 147:6
analyze 22:6
and/or 103:11
announced 21:5,
21:14
Answer 24:23, 59:21,
60:2, 97:17,
101:19, 117:22,
140:12, 151:25,
161:7
answerability 141:14
answered 72:21,
74:14, 74:19
answers 57:10,
74:21, 108:18
anticipate 12:24,
35:18, 89:17,
175:10
anticipated 50:12,

92:21
anxious 7:23
anybody 23:5, 83:9,
 96:8
anyway 154:12
apart 67:24, 133:24,
 139:6
Apologies 29:25
apparent 89:8
apparently 72:8
appeal 8:22, 152:3
appear 109:24
APPEARANCES 3:2, 4:2
Appearing 4:16,
 4:21, 4:22
appellate 80:2
applicable 133:4,
 163:18, 172:24
Application 24:7,
 24:19, 24:23,
 24:25, 25:2, 25:8,
 29:3, 64:10,
 101:16, 113:4,
 148:11, 149:5,
 160:8
Applications 24:16,
 25:6
applied 63:5, 155:23
applies 123:22,
 125:21, 134:16,
 134:22, 134:23,
 148:18, 154:20,
 155:7, 155:13,
 156:1, 156:6
apply 63:19, 67:16,
 81:3, 113:3,
 130:14, 130:15,
 134:13, 134:17,
 155:1, 156:11
applying 63:4
Appoint 82:4,
 127:16, 138:20,
 153:18
appointed 141:6,
 142:1, 144:19,
 151:10, 158:9,
 158:11
appointment 143:4,
 157:1, 157:14
appreciate 24:17,

39:19, 48:17,
 88:20, 100:23
approach 143:7
approached 146:20
appropriate 13:23,
 25:9, 26:18,
 27:16, 32:24,
 33:17, 36:10,
 36:19, 36:22,
 39:1, 40:6, 47:24,
 54:2, 60:22,
 61:22, 68:15,
 68:25, 69:5,
 73:20, 75:14,
 75:16, 95:22,
 106:18, 112:2,
 117:12, 136:1,
 160:11, 160:25
appropriated 19:24,
 20:2
appropriately 68:13,
 175:14
appropriation 89:25
approval 13:13,
 83:7, 140:25
approve 11:4, 26:7,
 81:20, 88:12,
 93:11, 107:8
approved 12:22,
 15:16, 15:18,
 16:18, 82:2,
 140:23, 150:18
approximately 10:23,
 12:11, 12:13,
 12:15, 12:16,
 12:23, 15:11,
 15:13, 16:5, 16:9,
 16:11, 16:18,
 17:5, 17:11,
 17:14, 17:18,
 17:25, 18:5, 18:7,
 18:11, 18:12,
 21:11
April 24:20, 66:3,
 87:5, 88:8, 113:16
apt 144:7
architect 23:19
architecture 19:21
area 38:20, 160:5
areas 16:8, 19:25,

20:8, 32:14
argue 65:18, 74:16,
 76:9, 98:22,
 117:13, 122:1,
 122:3, 147:14,
 155:20, 161:24
argued 62:6
argues 74:7
arguing 71:6, 89:24
argument 8:22, 45:1,
 64:3, 68:8, 78:7,
 79:8, 79:15,
 86:14, 88:7,
 88:19, 111:17,
 131:21, 134:11,
 143:25, 144:5,
 148:8, 148:23,
 154:6, 157:10,
 160:13
arguments 62:12,
 66:2, 68:13,
 74:21, 103:3,
 110:1, 110:4,
 112:5, 114:21,
 118:2, 122:7,
 142:2
arise 8:7, 99:25
around 21:3, 54:17,
 132:19, 160:22
Arps 108:25
array 94:13
Arribas 3:15
articulate 156:13
articulated 44:21,
 64:1
articulation 100:1
aside 42:23, 77:16,
 92:20, 93:12
aspect 45:23, 70:12
aspects 136:6
assembly 140:21
assert 69:5, 69:11,
 114:1, 117:13,
 170:16, 172:22,
 172:25
asserted 59:3,
 109:11, 110:10,
 111:3, 156:24,
 171:2
asserting 12:11,

59:1, 68:25,
    136:22
assertion 59:2
assertions 157:12
assessed 17:8
asset 18:24, 132:16,
    132:17, 157:22,
    157:23, 160:19
assets 9:4, 19:4,
    22:12, 60:6,
    98:18, 128:12,
    128:15, 128:21,
    130:19, 133:1,
    133:10, 133:22,
    134:9, 140:6,
    140:9, 142:24,
    160:18
assign 18:7
assigned 18:5
Assistance 15:21,
    15:23, 15:24,
    16:3, 16:6, 16:16,
    16:22
associated 19:20,
    128:9, 172:23
assume 39:17, 155:15
assumed 128:18
assuming 116:10
assumption 73:2
Assurance 3:34,
    47:17
Assured 4:10, 54:21,
    64:16, 64:18,
    64:20, 64:21,
    65:9, 65:22,
    67:23, 69:15,
    72:15, 77:2,
    86:20, 89:6, 92:22
Atara 3:35, 58:1
Atlantic 7:4
attach 143:2
attached 33:11,
    86:10
attain 8:16
attempt 12:7, 148:3,
    153:23, 168:7
attempted 77:20
attempting 148:10
attended 20:15
attention 95:10,

99:24, 141:15
audible 6:18
audio 83:18, 83:21
August 86:21, 128:14
AUST 3:15
authorities 22:5
Authority 3:24,
    28:10, 114:17,
    129:23, 130:6,
    130:7, 131:8,
    131:10, 154:17,
    158:22, 159:2,
    160:23, 160:24
authorize 133:18
authorized 133:12,
    133:16, 133:23,
    141:25, 150:16,
    150:19
authorizing 120:23
automatic 47:18,
    114:11, 114:18,
    123:17, 123:22,
    125:21, 126:7,
    134:4, 134:11,
    134:12, 135:15,
    139:12, 139:14,
    140:10, 140:13,
    148:15, 148:18,
    163:19
availability 38:11
available 82:1,
    105:10
avenue 141:8
avoid 92:22, 94:10,
    94:12, 95:10,
    153:12, 154:23,
    156:19, 158:15,
    175:15
avoidable 153:23
avoidance 129:10,
    129:11, 130:24,
    131:2, 139:2,
    152:2, 152:6,
    154:25, 155:1,
    156:25
await 108:1
awaiting 91:9
aware 7:20, 24:22,
    25:1, 26:11, 50:4,
    78:17, 87:8, 93:8,

94:11, 101:11,
    101:18, 102:17,
    128:23, 145:2,
    152:1, 152:16,
    159:14
away 95:8, 144:1


< B >
back 6:8, 31:25,
    37:13, 41:23,
    55:18, 60:2, 79:9,
    80:16, 89:2,
    90:18, 96:8,
    96:10, 97:16,
    100:15, 101:23,
    111:15, 111:22,
    112:8, 112:11,
    113:22, 124:8,
    124:11, 127:11,
    133:2, 136:7,
    143:8, 160:24,
    162:9, 162:21,
    163:5
backbone 19:6
backdrop 67:14
background 71:5,
    80:24, 95:22,
    139:4
bad 116:16, 116:17
balance 31:13, 59:6,
    60:22, 92:18
balances 21:5, 21:6,
    21:11, 60:18,
    98:20
ball 33:20
bang 70:13
bank 23:19
banking 21:7
Bankruptcy 3:4,
    30:10, 37:14,
    38:15, 39:3,
    39:16, 40:15,
    61:23, 100:12,
    106:15, 129:22,
    130:24, 131:11,
    133:15, 142:21,
    148:4, 148:5,
    148:9, 151:25,
    157:22, 157:24,

163:17
bar 84:19, 111:12,
  113:9, 129:19,
  131:13, 144:16,
  146:22, 149:17
Barbara 3:5
bargained 77:25
base 155:17
based 24:16, 68:16,
  74:4, 74:7, 100:5,
  109:11
bases 58:21
basic 60:4, 60:18,
  104:18
basically 142:21,
  175:21
basis 18:24, 38:8,
  50:23, 59:2, 61:1,
  63:10, 64:1,
  81:19, 84:11,
  115:6, 122:7,
  137:22, 172:24,
  173:6
bear 102:12
bearing 123:1
beat 135:21
became 128:12
becomes 149:7
begin 7:5, 127:25
beginning 21:10
begins 87:12
behalf 8:21, 12:6,
  14:18, 24:13,
  40:25, 58:1,
  64:18, 76:22,
  83:24, 85:9,
  85:11, 92:6,
  108:4, 108:25,
  109:10, 109:23,
  110:5, 110:10,
  110:20, 110:24,
  115:11, 124:25,
  128:2, 138:9,
  139:2, 145:7,
  157:6, 163:9,
  165:6, 170:12
behind 80:7, 93:23,
  131:14
belabor 75:19, 78:3,
  153:6

belief 151:20
believes 9:17,
  19:11, 36:19,
  36:21, 117:6,
  148:22, 158:8,
  167:20
belong 152:19
belonged 153:13
Ben 157:5
bench 89:8
benches 96:9
beneficial 83:10
beneficiaries 9:7,
  110:2, 120:3
benefit 9:6, 60:1,
  64:12, 153:1
Benjamin 4:8, 128:2
BEREZIN 4:25, 83:20,
  83:23, 85:4
Bernardino 61:17
beside 159:23
besides 157:13
best 10:20, 30:19,
  42:1, 105:11,
  152:21, 152:23,
  155:2, 173:6,
  177:5
better 13:21, 43:8,
  45:16, 76:6,
  154:16, 173:5
Betting 131:19
BEVILLE 3:32,
  124:24, 124:25,
  125:14, 125:16,
  126:2, 127:4,
  127:13, 163:6,
  163:7, 163:8,
  163:16, 164:5,
  164:7, 164:17,
  164:20, 164:25,
  165:4
beyond 44:18, 47:22,
  152:7, 156:21
BIAGGI 3:25, 14:15,
  14:17, 20:22
bids 9:17, 22:2,
  22:6
Bienenstock 3:8,
  7:6, 7:7, 7:10,
  10:15, 10:21,

12:2, 12:3, 21:24,
  39:5, 40:25,
  141:18, 144:24
bifurcates 60:25
bifurcating 61:19
bifurcation 45:12,
  45:17, 62:5, 62:7,
  67:7
big 30:17
billion 11:21,
  15:12, 15:13,
  15:14, 16:5, 16:6,
  16:10, 16:18,
  16:19, 16:25,
  17:5, 17:6, 18:11,
  19:10, 19:24,
  128:11, 128:20
bind 101:13
binds 28:25
bit 119:3, 128:6,
  128:7, 132:13,
  132:19, 133:12,
  146:2, 153:25,
  154:5
black 157:21
blank 32:16, 33:12
blanks 106:25
Block 16:1, 50:15,
  151:17
blocked 149:5
bond 56:21, 57:4,
  64:21, 67:2,
  69:21, 86:12,
  105:15, 106:11,
  115:19, 115:20,
  115:21, 116:7,
  128:20
bond-related 63:23
bondholder 8:21,
  8:24, 9:1, 82:3,
  82:4, 82:7, 84:12,
  105:2, 107:13,
  154:16
Bonds 9:4, 10:22,
  23:16, 25:17,
  56:24, 71:13,
  79:25, 103:20,
  104:1, 104:6,
  105:16, 116:18,
  170:16, 170:17,

171:2
borrowed 128:10
borrowing 166:5
Boston 176:1
bottom 29:7, 93:4
Brady 24:13
brand 137:8
breach 109:13
break 23:21, 100:11, 100:15
Brian 10:15
bridge 17:21, 17:22
bridged 42:15
bridges 17:12
Brief 12:8, 15:2, 16:2, 34:5, 35:4, 87:22, 107:2, 150:5, 153:8, 153:15, 156:18, 157:9
briefed 33:7, 45:1, 46:1, 46:12, 65:11, 66:21, 105:22, 134:18, 148:16
briefings 87:4
Briefly 51:3, 68:20, 75:2, 158:21, 162:13
briefs 34:11, 34:21, 34:22, 34:24, 92:24, 131:9, 131:20, 152:12
bring 7:2, 50:4, 50:13, 86:15, 129:11, 131:15, 131:16, 135:17, 135:18, 141:14, 141:19, 155:3, 159:25, 162:25
bringing 131:17
brings 89:1, 129:8
broad 32:6, 38:24, 107:13
broaden 7:16
broader 37:25, 57:17, 102:2, 109:6
broadly 43:4, 118:22
brought 52:25, 89:6,

94:9, 95:10, 99:24, 109:10, 162:1
Brown 124:25, 163:8
budget 159:9
budgetary 159:7
budgets 89:23
Buenas 102:11
buenos 6:5
buildings 16:8, 19:7
bullet 72:14, 72:16
bunch 135:8
burden 133:16, 133:17, 144:18, 153:24
bureaucracies 118:6
business 9:23, 17:4
bypass 78:4, 78:7


< C >
C. 3:25
Cadwalader 64:18
calendar 79:4
California 131:1, 131:4, 147:18
call 34:19, 39:25, 48:1, 89:24
calls 40:8
Calpers 131:1, 131:3
camp 97:3
candid 44:2
candidate 38:1
Cantor-katz 4:13
caption 103:23
captured 39:22
card 79:13
cards 49:15
care 27:24, 129:17
careful 93:7
carefully 31:22, 103:2
carry 52:2
carve 94:23, 95:8, 114:12
carves 160:2
case. 81:16
cases 30:25, 32:9, 32:10, 34:13, 38:2, 38:14,

38:23, 61:17, 62:24, 63:2, 109:7, 109:17, 115:25, 128:9, 129:23, 129:25, 130:22, 134:19, 134:21, 134:22, 136:23, 148:13, 151:12, 155:8, 155:12, 158:11, 160:7, 176:3
Casey 4:11, 64:17
cash 60:13, 60:22, 64:7, 130:19, 133:6
casting 116:10
CAT 4:48
catalog 38:12
catalogs 160:1
categorical 131:13, 146:22
categorically 129:18
categories 15:15, 32:6, 32:25
category 32:18, 33:1, 33:23
caught 89:10
cause 135:13
caused 14:24, 18:14, 88:2
causes 114:13, 142:20, 157:14
cautioned 61:25, 132:1
CCDA 49:9, 99:5
CDBG 16:1, 17:2, 19:23, 19:24
cede 144:22
Central 15:8, 39:1, 56:14
certain 7:22, 8:15, 8:21, 11:16, 25:16, 37:3, 58:23, 86:19, 86:22, 95:8, 101:11, 103:5, 112:16, 129:10, 129:11, 130:9, 135:23, 136:6, 146:25, 149:23

Certainly 22:24,
    27:22, 35:24,
    36:5, 36:9, 36:20,
    39:4, 48:20,
    59:13, 84:4,
    84:16, 87:20,
    87:23, 87:24,
    88:21, 98:3,
    127:6, 137:6,
    138:16, 146:8,
    147:13, 147:17,
    148:23, 149:6,
    150:14
certification 11:9,
    35:2, 89:23
Certified 140:24
certify 34:20, 177:4
certifying 9:11
cetera 71:14, 78:2,
    123:11
challenge 69:15
challenges 99:19,
    133:25
chance 87:13, 104:22
change 36:21, 46:11,
    104:12, 118:21,
    121:13, 137:9,
    164:16
changed 44:15
changer 45:17
changes 36:17,
    36:18, 36:19,
    42:6, 85:1, 91:25,
    103:5, 103:18,
    104:12
changing 93:11,
    93:13, 125:10
channels 19:18
Chapter 136:20,
    137:1, 137:12,
    146:16, 147:5,
    147:7, 147:15,
    149:3, 151:8
characterized 61:9
characterizing 89:10
chase 143:7
cherry-pick 130:1,
    148:11
CHIEF 3:4, 30:10,
    37:14, 38:15,

39:3, 39:16,
    40:15, 100:12
choice 31:20
chooses 68:23,
    125:23
Christmas 37:4
cigarette 86:22
Circuit 8:22, 58:24,
    61:25, 91:10,
    131:24, 143:24,
    147:12, 147:17,
    154:19
circular 135:20,
    174:24
circumstance 51:7,
    61:14, 142:5
circumstances 29:16,
    48:8, 109:18,
    138:21, 141:10,
    146:24, 162:8
citation 159:22
cite 61:17, 109:17,
    129:23, 129:25,
    130:22, 131:9,
    156:7, 160:22
cited 109:19,
    129:24, 147:25,
    159:3, 160:6
City 129:24, 130:13
Civil 106:2, 116:12
claimant 173:5,
    173:24
claimants 13:16,
    26:10, 27:16,
    57:5, 71:17, 72:3,
    72:8, 170:17
clarified 68:2
clarify 42:23
clarity 64:12,
    67:10, 67:25,
    103:22, 104:7
classification 18:24
classified 152:25
Clause 67:20, 67:21,
    122:10, 125:11,
    164:15
clawback 67:18,
    67:19
clean 77:10
clear 27:20, 42:14,

49:23, 50:2,
    58:17, 58:25,
    60:18, 66:20,
    67:15, 68:4,
    76:22, 77:9, 79:1,
    80:21, 89:18,
    90:11, 104:4,
    119:16, 120:7,
    121:9, 126:5,
    146:24, 148:17,
    150:3, 150:6,
    151:19, 154:18
clearly 60:5, 133:9,
    133:10, 151:8,
    160:17, 166:24
Clerk 29:20, 39:13,
    39:25, 40:5, 40:8,
    56:1, 56:5, 56:7,
    56:9, 82:1, 105:5
clerks 34:12, 40:2
cleverly 95:7
client 23:23
clients 87:15,
    116:2, 120:10
close 131:18
closed 80:7
clothe 110:1
CM/ECF 81:14
co-counsel 85:11
co-plaintiff 53:13,
    77:7, 77:12, 79:7,
    97:14, 98:5,
    102:15
Code 106:15, 129:23,
    130:1, 130:15,
    130:24, 131:11,
    132:1, 138:4,
    141:23, 148:5,
    148:9, 151:25,
    152:2, 152:6,
    152:10, 157:22,
    157:24, 163:17
COFINA 1:33, 23:3,
    23:16, 83:5, 83:7,
    144:7, 144:10,
    144:12, 158:2,
    158:4, 158:19
cognizant 134:5
coincidentally 94:7
Coke 23:21

collaborative 11:15
collapse 18:14
Collateral 4:14,
    59:24, 85:10,
    143:12
colleague 10:12,
    10:15, 20:20
collect 152:17
Collier 153:21
Colliers 129:25
color 95:22
colorable 132:14,
    148:23, 156:25,
    160:6, 160:13
combined 72:9
comes 79:9, 118:7,
    121:3, 153:11,
    158:13
comfortable 171:3
coming 9:24, 43:19,
    98:2, 132:10,
    135:6, 161:17,
    169:15
comity 119:18,
    121:23, 165:12
comma 122:17,
    168:14, 168:16
commence 7:25, 11:10
commenced 22:10,
    72:20
Commencement 139:11,
    154:23
comment 51:3, 62:19,
    92:10, 92:11, 99:8
comments 24:4, 52:9,
    58:3, 84:7, 94:6,
    98:19, 98:23,
    100:25, 145:11
commit 156:21
Committee 3:18,
    3:46, 11:20,
    38:18, 76:22,
    77:1, 77:7, 78:12,
    78:19, 81:21,
    82:3, 82:4, 82:8,
    102:15, 125:1,
    125:13, 151:17,
    152:15, 152:20,
    158:14, 160:17,
    160:21, 161:20,

161:21, 162:16,
    163:9, 163:22,
    165:8
Common 67:22,
    145:18, 152:11
communicate 6:13
communicating 6:24
communication 11:16
communities 16:22,
    17:4
Community 15:25,
    118:7
comovants 128:3
Company 3:28, 29:5,
    70:24
compel 140:19
compelled 34:5,
    40:12
compelling 48:3,
    48:8, 61:15,
    62:10, 156:8
compensate 81:25
competing 30:25,
    92:19
Complaint 45:2,
    53:22, 72:1, 72:2,
    72:7, 72:20,
    72:22, 73:5,
    73:15, 74:6,
    74:21, 76:1,
    79:16, 115:15,
    117:20, 117:21,
    117:22, 117:24,
    142:20, 152:6
complaints 53:19,
    71:4, 71:10,
    71:12, 83:4,
    106:10
complete 17:23,
    18:18, 66:11,
    112:8
completed 17:20,
    17:25, 66:12
completely 71:20,
    78:6, 135:20,
    136:13, 160:11
completion 18:8
compliance 20:14
complicated 36:24,
    39:21, 48:14,

109:20, 150:13
comply 77:16, 172:24
component 108:11,
    150:4
components 149:22
comprehensible 80:22
comprehensive 172:14
compressed 66:17
compromise 32:21
concede 134:21,
    155:21
concept 34:10,
    118:23
conceptually 102:21
concern 66:6, 80:9,
    165:11, 165:20,
    167:22
concerned 65:17,
    82:6
concerning 8:22,
    41:22, 82:9,
    94:25, 136:21
concerns 35:23,
    35:24, 67:8,
    101:17, 101:23,
    103:10, 103:21,
    107:19, 120:11,
    120:14
concession 158:3
concluded. 176:11
concludes 14:9
concluding 54:14
conclusion 75:12,
    145:17, 154:22
concrete 59:11
condition 63:21
conditionally 12:22
conduct 18:10, 113:8
confer 42:17, 45:12,
    47:8, 67:13,
    67:14, 68:9,
    68:18, 78:24,
    87:25, 88:11,
    91:18, 93:24,
    98:1, 99:4,
    102:14, 106:9,
    107:20
conference 6:11
conferring 46:21
confidential 80:3

confidentiality
82:10, 82:11,
82:16, 82:17,
82:19
confirm 172:11,
172:13, 172:15
confirmation 8:11
confiscation 7:1
conflate 94:5
conflict 86:3,
86:10, 137:19,
138:11, 138:19,
141:5, 144:3,
144:4, 145:20,
145:21, 145:22,
145:24, 146:1,
146:11, 146:15,
146:19, 158:15,
162:17
conflicted 144:11
conflicting 116:11,
116:21
conflicts 145:9,
145:14, 146:15,
146:17, 159:24
confused 110:7,
121:20
confusing 150:13,
168:22
confusion 126:11
Congress 15:11,
19:23, 20:2,
135:1, 141:8,
146:9
conjunction 20:12,
62:7
connected 62:3
connection 8:25,
9:11, 22:11, 41:9,
43:9, 45:10,
53:22, 54:24,
55:9, 59:15, 60:8,
62:7, 64:7, 101:6,
105:25, 106:6,
106:7, 107:9,
175:7, 175:9,
176:1
consciously 55:1
consensus 87:3
consent 49:23,

50:17, 50:20,
74:18, 77:24,
89:13, 90:7, 90:8,
90:13, 99:9,
131:16, 132:3
consented 41:25,
42:2, 74:16,
109:4, 131:14,
150:25
consenting 50:3,
66:14, 68:24,
125:16
consents 131:17
consequence 156:16
consequences 156:15
Consequently 153:20
conserve 74:23
consider 31:9, 41:6,
47:14, 60:7,
61:20, 65:7, 70:7,
103:10, 106:10,
118:20, 138:22
consideration 13:12,
14:7, 105:25
considered 43:8,
45:9, 67:24, 103:2
considers 61:1
consist 98:25
consistent 6:11,
91:15, 107:14,
113:11, 114:19,
140:24
consistently 82:18
consisting 177:4
consolidate 61:24
consolidated 33:24,
34:1, 34:5, 34:13,
34:17
consolidation 45:20,
61:20, 61:21,
62:8, 133:20,
133:21
constant 11:16
constituencies
105:3, 107:14
constituents 152:22,
152:24
constitute 69:13
constitutes 67:19,
74:18

Constitution 67:20,
137:14
constitutional
67:20, 137:18,
147:5
construction 17:17,
17:19, 17:24,
18:4, 18:6, 19:21,
47:12
constructive 11:16,
31:5, 31:17, 161:1
constructively 8:19
consult 34:16
consultations 88:17
consulted 42:5
contain 38:2, 97:22,
118:8
contemplate 47:12,
126:3
contemplated 49:3,
126:19
contemplates 56:21,
73:16, 88:7, 129:9
contemporaneous
80:5, 80:6
content 73:10,
80:18, 81:2
contention 90:11,
159:1
contentions 157:8,
160:22
contest 148:15
Contested 62:24,
78:16, 78:18,
170:8, 170:13,
172:19, 173:20,
174:4
context 47:21,
51:24, 52:20,
53:5, 68:10, 69:2,
70:1, 93:17,
101:17, 103:11,
106:24, 133:13,
137:7, 148:16,
150:17
continue 7:23, 25:4,
52:24, 63:19,
80:3, 111:18,
113:23, 122:8,
175:9

Continued 4:2,
 11:22, 84:8
continues 7:13,
 7:16, 9:13, 18:21
continuing 64:2
continuously 59:9
contours 89:14
contract 109:12,
 109:13, 109:14,
 156:7, 156:8,
 156:9
contractors 17:16,
 18:12
Contracts 67:21,
 156:2
contractual 115:20,
 116:6
contrary 41:16,
 74:10, 109:19,
 116:8
contribution 21:16,
 144:25
contributions
 139:19, 139:20,
 140:1, 140:2,
 143:1, 143:18,
 143:19, 143:22,
 157:19, 160:16
control 76:6,
 140:12, 140:20,
 144:13, 149:3,
 150:2
controversy 70:12,
 74:13, 171:14,
 171:18, 171:20,
 171:24
conventional 41:17
conversation 126:10,
 127:7, 127:9
conversations 31:18,
 32:3, 42:22,
 170:23, 171:9
coordinated 34:17,
 87:18, 96:25
coordination 45:20,
 53:21, 68:11
copy 56:22, 105:2,
 105:4
COR3 15:9, 20:11,
 20:14

core 58:20
corners 93:21
Corp. 4:25, 83:25
Corporation 1:32,
 3:35, 3:38, 4:11,
 170:20, 170:21
Correct 26:8, 35:14,
 47:11, 47:20,
 69:7, 84:2, 113:6,
 113:7, 114:3,
 121:17, 126:3,
 130:13, 143:19,
 143:20, 146:21,
 171:5, 171:10
Corrections 9:25
correctly 35:6
corresponding 11:6
corridor 19:5
cost 19:9, 56:2,
 81:25
costs 17:11, 19:20,
 97:2
Counsel 3:32, 6:5,
 28:15, 29:18,
 39:19, 81:24,
 91:4, 92:12,
 100:19, 104:2,
 114:24, 116:10,
 120:20, 124:16,
 124:20, 165:7,
 167:19, 168:7,
 170:23, 171:3,
 171:10, 175:12,
 176:7
counterclaim 74:15,
 109:11, 117:19,
 117:23, 118:10,
 119:20, 120:1,
 120:2, 120:9,
 122:8, 123:13,
 123:16, 124:9,
 124:10, 164:23,
 165:16, 165:23,
 166:1, 166:2,
 166:7, 166:20,
 167:1, 167:10,
 167:15, 168:13,
 169:3, 169:4
counterclaim.
 118:19, 122:19,

123:5
counterclaimed
 109:13
counterclaims 50:19,
 50:22, 72:21,
 72:23, 73:3,
 110:13, 111:3,
 112:21, 113:1,
 114:3, 117:6,
 117:12, 118:17,
 125:6, 125:18,
 125:22, 126:4,
 164:11, 167:14,
 168:13
counting 142:11
counts 74:4, 78:5
couple 35:23, 46:22,
 55:16, 59:11,
 150:10
course 12:19, 30:11,
 41:4, 42:12, 44:2,
 51:12, 51:15,
 90:6, 114:7,
 127:10, 160:14
court. 166:8, 167:1,
 167:11
courteous 175:19
courtroom 6:13,
 6:24, 7:2, 10:18,
 23:2
Courts 13:8, 63:2,
 137:1, 147:18,
 153:18, 155:22,
 158:11
cover 87:11
covered 15:3
covering 87:20
covers 24:20, 104:4,
 107:3, 165:9
create 38:1, 105:7,
 168:23
created 49:25,
 139:5, 158:19
creates 146:22
credit 151:18
creditor 7:15,
 29:12, 136:12,
 138:2, 140:1,
 140:5, 155:19,
 156:17

Creditors 3:19,
    7:14, 8:4, 8:15,
    8:18, 28:14, 29:2,
    38:19, 54:21,
    61:24, 64:11,
    68:5, 81:21,
    81:24, 128:3,
    130:20, 136:24,
    137:2, 144:10,
    156:3, 157:6,
    162:4, 162:5
CRIM 9:11
critical 20:8, 31:1,
    59:8, 60:19
criticism 34:8
Croma 81:20
crosscutting 68:13
CSR 177:14
cue 117:25
cued 47:14
Culebra 19:3
CUNNINGHAM 3:41,
    127:19, 127:21,
    128:4, 128:8,
    136:17, 136:19,
    137:19, 138:6,
    138:8, 142:15,
    144:2, 145:10,
    162:13, 162:14,
    163:3
current 53:15,
    89:20, 101:17
currently 33:9,
    56:20, 93:21,
    106:5, 171:1,
    175:7
curtail 152:9
curves 101:13
CUSIP 104:6
customers 18:17
cut 85:17, 143:6,
    155:12


< D >
Dale 3:10, 28:5,
    28:7, 28:8, 28:10,
    29:17, 29:24,
    41:24, 42:22,
    43:3, 90:17,

90:19, 92:2,
    100:16, 100:18,
    100:19, 100:23,
    101:20, 102:4,
    142:16, 142:17,
    142:18, 143:20,
    144:24, 145:5,
    146:21, 154:5
Dam 19:8
damaged 17:4, 19:7
dams 19:17
dare 95:5
dark 145:11
darkness 50:5
data 15:6
date 12:9, 12:13,
    15:1, 15:17, 16:4,
    16:18, 17:5,
    17:19, 33:12,
    46:19, 46:20,
    48:7, 65:14, 88:7,
    88:13, 88:19,
    106:4, 107:7,
    175:6
dates 106:25, 107:1,
    107:2
Day 47:3, 59:17,
    99:11, 106:16,
    128:2, 157:6,
    170:7
days 46:22, 48:1,
    135:6, 141:20
dead 150:22, 151:6
deadline 45:3,
    65:24, 107:21
deadlines 43:19,
    88:2, 142:8,
    142:12
deal 53:25, 83:7,
    93:16, 97:18,
    113:5, 113:21,
    114:6, 127:2,
    175:21
dealing 34:7, 132:8,
    145:19
deals 37:11, 130:16
dealt 10:10, 131:2,
    150:13, 169:18
dearth 131:8, 137:5
death 141:2

debate 49:20,
    134:10, 134:20
debt 128:20, 130:21
debtor-creditor
    139:23, 140:3
Debtors 12:12, 13:6,
    13:8, 13:15,
    13:20, 38:22,
    133:22, 134:9,
    136:21, 137:1,
    138:18, 139:3,
    158:10, 158:11,
    158:12, 171:20,
    172:23
debts 137:15
December 66:10
decide 21:20, 33:14,
    33:20, 62:17,
    84:5, 99:22,
    111:24, 112:22,
    115:5, 117:6,
    117:18, 119:19,
    121:13, 122:5,
    123:21, 162:6,
    165:25, 166:14,
    173:6
decided 44:14, 46:7,
    46:25, 99:12,
    106:2
decides 99:9
deciding 164:10
decision 32:23,
    33:22, 58:25,
    62:5, 66:4, 91:9,
    121:11, 121:14,
    134:5, 134:6,
    143:25, 144:1,
    154:19, 161:13
decisions 36:1
declaration 27:17,
    27:20
declarations 27:14
declarative 130:8
declaratory 135:14
declined 82:4
deemed 47:25, 106:15
defeasance 170:18
defendant 69:10,
    158:6
Defendants 2:31,

34:1, 68:25, 69:4,
   72:8, 72:13,
   72:17, 73:7, 73:8,
   73:19, 74:1,
   74:25, 94:8,
   112:14, 116:5
defending 109:7,
   109:8
defense 50:1, 69:1,
   135:15, 135:16,
   135:19
defenses 50:12,
   69:5, 69:10,
   119:1, 135:12,
   136:9
defenses. 122:17
defer 61:15, 125:8,
   137:18
deferences 160:2
deferred 58:5,
   65:17, 81:5
deficient 12:17,
   12:18, 12:24,
   12:25, 25:19,
   25:21, 25:25
defined 21:16
definition 68:24,
   156:20
defraud 156:16
defunct 128:21
Dein 2:38, 145:15,
   145:25, 177:8
delay 29:25, 35:24,
   37:7, 37:10, 84:14
delayed 66:11
delaying 84:20,
   84:22
delegates 114:17
delicate 31:12,
   92:18, 92:25, 93:1
delivery 95:9
demonstrably 159:6
denial 7:1
denied 59:9, 104:19,
   116:23, 122:3,
   152:14, 157:1,
   162:16
deny 118:18, 142:7,
   143:3
Department 9:23,

9:25, 15:8, 15:10
deposit 60:1
depth 42:10
describe 89:13
described 91:25,
   123:10, 163:24,
   163:25, 165:7
describing 89:11
design 18:1, 18:2,
   19:21
designated 60:17
designation 59:25
designed 92:22,
   110:11, 114:9,
   167:19
designing 23:17
desirable 73:25
desire 140:14,
   140:15
desired 8:5
Despins 3:19, 53:2,
   53:6, 53:18, 54:1,
   76:18, 76:19,
   76:21, 79:5,
   79:11, 86:5,
   92:11, 94:6, 95:1,
   96:15, 97:13,
   98:2, 102:13,
   161:15, 161:17,
   161:19, 161:20
despite 60:12
destined 17:12
destruction 92:23,
   141:12
detail 15:4, 41:11,
   152:13, 155:5
detailed 86:3, 86:8,
   87:12
details 12:10
determination 44:19,
   61:18, 62:10,
   74:14, 99:11,
   100:4, 106:4,
   123:18, 138:20,
   149:1, 154:13
determinative 59:13
determine 99:24
determined 44:20,
   113:17
Detroit 148:1

devastation 14:24
developed 51:24,
   70:1
developing 9:11
Development 16:1
developments 103:12
device 6:17, 6:18,
   6:24, 7:1, 138:2
devices 6:13, 6:16,
   7:2, 17:21
devoted 34:13
dias 6:5
DIAZ 3:38, 171:7,
   172:1, 172:3
dictate 137:16
dictated 165:21
diesel 86:23
Diet 23:21
differ 32:20
difference 54:19,
   57:9
differences 11:17
different 10:8,
   14:6, 20:17, 33:8,
   38:23, 53:9,
   61:22, 62:9,
   72:15, 73:18,
   75:22, 87:19,
   96:16, 123:24,
   135:11, 135:12,
   136:9, 147:17,
   171:10
differently 101:22
differing 8:9
difficult 35:3
dime 152:25
direct 16:17, 28:22,
   56:8, 105:4,
   106:18, 107:12,
   112:17
directed 108:7,
   108:8, 108:16,
   159:18, 162:22,
   174:17
directing 104:1,
   119:15
direction 125:23
directive 56:12,
   57:13
directly 15:7,

50:11, 71:3,
89:21, 92:9
directs 46:15
disagree 74:11,
83:11, 89:21,
113:13, 114:16,
129:19
disagreement 33:4,
33:14, 71:20,
92:20
disagreements 31:16,
42:15
disagrees 8:12
disallow 170:15,
172:7, 172:22,
173:10
disallowance 174:19
disallowed 171:4,
171:15, 171:21,
172:9, 173:12,
174:18
disallowing 26:16
disaster 16:1
disasters 16:24
disband 162:15
disbursed 15:2,
15:14, 15:18,
16:6, 16:10,
16:12, 16:13,
16:19, 17:7,
17:16, 18:13, 20:3
disconnect 101:8
discovered 160:19
discovery 8:25,
51:16, 51:21,
51:24, 59:8,
59:17, 61:10,
98:13, 106:6
discreet 69:11
discrete 79:22, 86:1
discretion 28:13,
29:15, 35:21,
118:18, 119:5,
122:18, 123:4,
138:23, 141:9,
165:22, 166:6,
166:19, 167:13,
168:12, 175:14
discuss 41:1, 49:21,
51:10, 53:3,

124:11, 126:25
discussed 32:19,
58:4, 95:17,
156:24, 159:23
discussing 30:24,
87:10
discussion 98:13,
125:2, 163:12,
164:12
discussions 95:18,
95:19, 107:10,
112:10
disjointed 157:7
dismiss 50:23, 65:15
disparate 31:14
dispel 21:1
disposition 157:22
dispute 9:2, 29:2,
32:14, 32:17,
89:14, 158:13,
164:1, 165:13,
165:15
disputed 134:25
disputes 71:24
dissemination 104:16
distinct 135:10,
158:2
distinguishable
148:13
distinguished 41:16
Distribution 18:16,
19:17, 22:4,
56:21, 56:22,
57:12, 104:21,
104:22
District 1:1, 1:3,
2:36, 2:37, 2:39,
35:9, 35:13,
36:13, 39:14,
81:13, 146:14,
147:18, 177:1,
177:2, 177:7
disturbed 130:7
diversion 86:18,
86:21
Division 17:17, 18:3
divorced 83:6
Docket 1:6, 1:22,
2:3, 2:21, 26:20,
26:22, 26:23,

26:25, 27:1, 27:2,
27:4, 27:5, 27:7,
27:8, 27:9, 27:11,
27:12, 28:24,
36:8, 80:19,
102:25, 127:17,
173:15
doctrine 64:4, 64:9
document 56:23,
57:3, 57:4,
103:23, 104:14,
104:18
documents 6:17,
98:20, 104:3
doing 9:23, 10:17,
47:1, 61:25, 79:4,
91:7, 95:15,
101:7, 101:22,
128:5, 128:25,
135:9, 159:18
dollar 28:11
dollars 11:21,
12:12, 12:15,
16:25, 18:11,
19:24, 21:9,
21:11, 81:20,
81:23, 128:11,
128:20, 132:21,
143:13
done 23:7, 55:10,
65:19, 65:20,
70:1, 80:6,
101:21, 113:2
doors 80:7, 84:19
dots 62:3
Doug 85:9, 85:15,
85:22
Douglas 4:15
dovetails 131:24
down 57:22, 89:4,
90:11, 111:7,
133:7, 140:4,
148:2, 159:13,
161:5, 166:16,
167:4
dozens 94:17, 153:4
DRA 78:9, 78:14,
78:24, 85:5,
85:10, 85:12,
86:13, 86:15,

86:16, 86:17,
86:25, 87:2, 88:6,
88:13, 88:19,
92:12, 92:13,
93:22, 107:5,
107:6
draft 13:7, 13:12,
110:21
drafted 111:2
drag 142:10, 145:11
drawn 31:13
dropped 175:16
dropping 115:2
dual 128:9
due 21:7, 29:6,
41:3, 46:19, 47:2,
48:9, 51:14,
57:15, 65:15,
69:4, 69:13,
69:16, 84:3, 114:6
duly 152:3
duplication 135:7
duplicative 136:4
during 6:24, 11:10,
49:22, 104:24,
129:5, 135:3,
136:14, 137:9,
175:13
duties 136:21,
136:23, 137:20,
137:21, 137:24,
137:25
duty 137:2, 137:3,
137:23


< E >
e-mailing 6:23
earlier 97:22,
103:6, 139:10,
163:25, 165:21
early 22:9, 43:25
earned 23:12
earning 21:4
ease 9:22
easily 39:22
Easter 88:9
Eastern 17:16, 18:3,
19:5
easy 36:18, 36:21,

38:11, 109:14,
132:17, 155:4
ECF 91:13, 170:14,
170:20, 172:21,
173:2
economic 11:7, 22:17
economy 10:9
Education 9:23, 20:9
effect 113:17,
114:17, 120:9,
134:19, 142:2,
171:18, 171:24
effective 80:5,
159:11
effectively 141:1
efficiency 95:3
efficient 57:14,
94:23, 95:9, 96:24
efficiently 68:14,
97:18
effort 22:1, 53:11,
79:1, 107:16,
107:22
efforts 7:16, 8:5,
15:12, 18:20,
20:8, 41:9
eight 77:12, 77:17,
115:15, 116:3
either 25:2, 38:19,
52:23, 82:10,
91:22, 98:4,
99:18, 100:3,
148:16, 166:9,
170:18
electric 22:1,
22:15, 22:16
electrical 19:25
Electronic 6:13,
6:15, 81:13
electronically 81:16
elementary 158:5
eligibility 19:12
eligible 19:11
eliminated 8:13
eliminating 90:9,
90:10, 132:1
elimination 157:23
elsewhere 134:18,
157:20
embraces 118:22

Emergency 15:16,
15:19, 16:4, 17:9,
17:19, 17:20,
18:10, 18:17
emphasize 10:2,
144:25
employee 7:17
Employees 2:12,
3:47, 21:17, 21:20
employer 139:17,
139:20, 140:1,
140:2, 142:25,
143:18, 143:19,
143:22, 144:25,
157:19, 160:15
enabling 22:20
enacted 128:14,
139:16, 139:23,
140:22, 151:12,
152:3, 159:5,
159:8
enactment. 140:20
encompasses 103:25
encourage 101:10
encouraged 34:16
end 12:1, 18:9,
19:14, 23:3, 43:1,
47:18, 48:4, 66:2,
70:13, 90:21,
94:16, 97:19,
106:14, 106:17,
107:2, 122:10,
151:22, 163:23,
164:2, 167:5,
169:9, 175:3,
175:5
endeavoring 51:8
endless 153:3
energy 20:9
enforce 10:6
engage 47:1, 160:13
engaged 103:15
engineering 19:21
English 39:20, 57:4,
104:15, 121:15,
122:23
enhanced 23:19
enjoins 140:11
enough 31:11, 31:19,
95:6, 105:13

ensure 23:11, 39:7,
   81:11, 106:13
enter 25:9, 28:19,
   108:9, 108:14,
   174:6
entered 10:25,
   24:25, 72:24,
   91:11, 101:12,
   101:14, 172:9,
   173:16, 173:21
entering 110:15
entertained 117:7
entire 114:12,
   144:13
entirely 61:24,
   65:11, 84:6, 89:4
entirety 21:12,
   46:18, 116:23,
   122:4, 123:17
entities 20:16,
   72:15, 72:17,
   153:13, 172:23
entitled 69:10,
   162:9
entity 129:1, 129:7,
   137:3, 137:7
entry 24:15, 26:20,
   26:22, 26:23,
   26:25, 27:1, 27:2,
   27:4, 27:5, 27:7,
   27:8, 27:9, 27:11,
   27:12, 102:25,
   127:17, 173:15
enumerated 26:17
envision 70:10
envisioned 70:11
envisioning 119:12
equally 31:14,
   35:15, 75:13,
   147:21, 148:19
ER 17:15
ERS. 119:25
escape 35:15
escaping 30:20
escrow 143:13
escrowing 143:17
Esq 3:25, 3:38,
   4:19, 4:21
essential 25:5,
   55:5, 147:7

essentially 46:11,
   69:10, 84:18,
   115:22
establish 77:18
established 45:18,
   95:12, 139:25
estate 162:23,
   162:25
estimated 16:24,
   17:8, 17:10
estimates 19:9
et 1:16, 2:21, 2:29,
   3:8, 4:28, 71:14,
   78:2, 123:11
evaluate 46:10
event 112:22
events 18:20, 43:6,
   128:24
Everybody 42:18,
   42:19, 56:18,
   56:23, 69:24,
   75:19, 89:8,
   89:19, 101:13,
   108:17, 132:18,
   132:21
everyone 6:10, 10:7,
   36:7, 36:8, 37:17,
   37:19, 41:7,
   43:12, 51:23,
   54:13, 94:14,
   102:8
Everything 23:7,
   47:10, 66:12,
   79:15, 121:3,
   133:6, 133:7
evidence 156:2
exact 78:4, 95:3,
   154:9
Exactly 43:16,
   43:22, 48:19,
   61:6, 61:12,
   66:24, 74:5,
   89:19, 120:10,
   125:14, 159:16
Examiner 3:43, 24:7,
   24:13, 25:4
example 29:12,
   32:25, 60:9,
   61:18, 130:23,
   135:13, 150:23,

151:2, 157:24
examples 43:25,
   59:11
except 174:16
exception 116:1,
   134:12
exchanged 8:25
excise 86:22, 90:1
excision 169:15
exclude 126:25
excluded 83:9
excludes 80:4
exclusion 90:4
exclusive 55:25
exclusively 116:16
excuse 168:20
excused 169:23,
   170:4
executed 139:9
executive 20:6
exercise 69:4, 76:6,
   138:22, 140:12,
   146:25, 149:24,
   150:8, 175:14
exercised 146:5
exercises 150:1
exercising 146:23
Exhibit 74:1, 86:3,
   86:4, 86:8, 86:11,
   86:12, 86:25,
   87:7, 87:12,
   103:20, 105:16,
   107:4, 107:11,
   108:6, 108:14,
   108:15, 172:13,
   173:11, 173:15,
   174:7
Exhibits 5:9, 26:5,
   26:17, 72:12
exist 11:17, 154:3
existed 162:18
existence 153:22
existing 29:1, 68:8,
   74:6, 88:6, 94:17,
   139:24
exists 44:10, 106:5
exit 22:18, 22:21
expanding 20:6
expect 47:23, 60:15,
   62:16, 79:7, 79:14

expectation 52:19,
  55:8
expected 8:5, 21:6,
  21:10, 50:12, 96:1
expecting 45:24
expeditiously 44:20
expenditures 150:3
expense 90:23,
  90:25, 91:6,
  91:12, 91:15,
  91:17
expire 141:23,
  141:24, 142:9
expires 135:24
expiring 52:2,
  141:17, 141:22,
  142:12
explain 72:7, 119:7,
  124:1
explaining 124:5
explains 72:4
explanation 76:15
explanations 104:18
explicit 49:12,
  148:25
exposure 145:13
express 50:9
expression 126:22
expressly 41:11,
  64:9, 81:14,
  89:13, 129:12,
  131:21, 133:19,
  166:25
expunged 12:14
extend 23:23, 61:16,
  114:11, 152:6
extended 63:18
extension 35:20,
  61:2, 126:7
extensive 32:3,
  77:10
extensively 145:14,
  148:17
extent 41:15, 41:21,
  44:10, 50:18,
  53:4, 63:5, 67:12,
  98:1, 103:17,
  103:21, 106:24,
  132:20, 143:17,
  147:3, 152:17,

160:19
external 148:10
extraordinary 176:5
extreme 129:4


< F >
face 146:24, 156:1
faces 175:4
facet 147:7
facilitate 104:24,
  105:24
fact 32:2, 43:18,
  60:12, 60:14,
  63:3, 68:11,
  104:10, 116:11,
  117:17, 120:7,
  136:11, 140:6,
  141:10, 153:15,
  154:21, 157:16,
  159:4, 171:1,
  175:18
factor 119:22
facts 139:4, 141:4
factual 58:24,
  153:22
fail 153:24, 155:16
failing 35:25
failure 47:9
fair 31:12
fairly 109:3, 109:14
fairness 42:21
fallback 47:9,
  106:12
falls 150:4
false 159:6
familiarity 129:15
far 9:20, 12:9,
  13:19, 21:9,
  24:21, 62:11,
  96:22, 149:5,
  159:13
fares 154:15
fashion 56:6, 77:19,
  81:10, 137:1
favor 10:17, 53:14,
  150:15
favorably 49:13
feather 100:3
feathering 92:25,

93:1
features 6:19
February 87:4,
  141:23
Federal 11:13,
  11:18, 11:23,
  17:15, 17:16,
  18:3, 18:7, 106:2,
  111:12, 113:9,
  114:19, 116:12,
  119:13, 121:4,
  121:20, 165:25
Fee 3:43, 24:7,
  24:13, 24:16,
  24:19, 25:3
feedback 13:9, 14:5,
  22:11
feeders 19:17
feel 32:8, 34:9,
  40:11, 54:10,
  63:13, 67:14,
  68:15, 119:15,
  136:18
feels 35:18, 36:10
fees 81:23, 86:23,
  143:21, 151:1,
  157:19
felt 33:17
FEMA 15:23, 16:3,
  16:16, 18:22,
  19:1, 19:12,
  19:14, 19:20,
  20:11, 20:14
few 20:24, 29:20,
  40:11, 41:4,
  41:12, 41:19,
  52:6, 52:8, 153:7
FGIC 70:21, 72:21,
  72:23, 73:11
fiduciary 129:1,
  136:21, 136:24,
  137:2, 137:20,
  137:21, 137:23,
  137:24, 137:25,
  141:14
field 33:16, 81:8
Fifth 81:7
fight 62:16, 69:24
fighting 90:12,
  114:2

figuratively 30:18
figure 76:7, 94:2,
    105:11
figured 95:7, 135:5
filers 57:5
filings 30:2, 51:20,
    87:12, 107:21,
    107:24, 114:21,
    175:14
fill 12:7, 30:18,
    107:1
final 22:6, 22:9,
    36:3, 48:6, 72:11,
    82:9, 84:11,
    84:14, 123:8,
    124:4, 164:14,
    165:11, 170:8
Finally 17:2, 31:9,
    155:15
Finance 4:25, 11:20,
    83:24
Financial 1:9, 1:25,
    2:6, 2:27, 3:23,
    3:27, 3:30, 4:4,
    8:13, 16:16,
    21:21, 23:20,
    70:24, 108:25,
    149:8, 149:10,
    149:16, 149:17,
    149:18, 149:22,
    159:3, 163:20,
    165:6
Financing 1:32
find 25:3, 31:5,
    31:19, 48:3
finding 75:12, 176:7
finds 125:8
Fine 29:21, 42:25,
    43:2, 65:7, 83:21,
    88:14, 93:18,
    94:1, 97:10,
    121:14, 161:3,
    167:2, 169:20
finish 48:5
finished 10:12,
    124:16, 124:18
finishing 20:4
firm 23:24, 25:4
Fiscal 3:22, 9:12,
    9:22, 10:2, 10:3,

10:8, 11:7, 21:7,
    21:12, 23:4,
    89:23, 90:24,
    91:4, 99:19,
    140:24, 146:11,
    159:19, 159:20
five 12:12, 43:23,
    72:14, 91:7,
    91:16, 123:9,
    123:15, 123:20,
    126:17, 127:1,
    127:23, 128:5,
    139:20, 165:1
five. 165:9, 165:10
flag 104:10
Flagged 12:17
flipped 140:3
float 37:17
floating 21:3
flood 104:23
flow 20:13, 60:17,
    60:18, 60:22
fly 115:5
focus 20:8, 20:16,
    35:4, 43:6, 43:13,
    49:20, 98:18,
    103:5, 125:3
focused 57:7, 134:15
focusing 19:15,
    110:14
folks 78:14
follow 57:13, 175:19
followed 36:3, 75:11
following 26:14,
    40:12, 69:22,
    98:16, 128:13,
    139:11, 143:4
follows 26:19,
    103:19, 161:23
FOMB 64:22, 65:11,
    65:18, 66:6,
    66:15, 68:21,
    68:23, 69:3, 69:9,
    79:23, 81:10,
    81:24, 82:12
Footnote 41:21, 42:5
force 75:23, 90:7,
    147:4
forceful 23:15
forcing 69:3

Foremost 14:19
forget 162:5
form 28:17, 29:5,
    36:17
formally 11:3, 63:7
formula 106:8,
    106:12
formulating 68:11
formulation 18:22,
    20:16, 35:8,
    89:23, 104:2,
    169:17
forth 31:21, 34:4,
    104:11, 106:21
fortunately 32:1
forum 160:11
forward 9:17, 14:5,
    22:8, 52:24,
    58:12, 59:20,
    65:4, 73:5, 73:24,
    74:15, 92:1,
    94:22, 105:9,
    113:10, 113:15,
    121:10, 125:22,
    159:10, 171:4,
    173:7, 175:10,
    176:8
fought 23:14
found 6:23, 145:25,
    152:7
Fourth 24:19, 72:1,
    81:1, 119:24
frame 95:3, 95:24,
    175:23
frames 34:4
Frankly 44:7, 45:19,
    46:8, 48:17, 50:3,
    56:13, 59:10,
    90:6, 110:13
fraud 155:20,
    156:20, 156:21,
    161:1
fraudulent 134:1,
    135:2, 135:4,
    144:20, 148:8,
    155:18, 155:24,
    156:6, 160:25,
    161:3
free 21:18, 136:18
Friday 25:22, 25:23,

48:21, 175:20
Friedman 3:24, 9:15,
    20:20, 20:23,
    20:24, 24:1, 60:9,
    82:23, 82:24,
    83:1, 83:2, 83:16,
    144:22, 145:6,
    145:7, 145:9,
    151:14, 159:1,
    159:4, 160:4
friend 23:2
friends 131:9,
    132:9, 154:16
friendship 23:25
front 74:24, 142:3,
    145:15, 153:3
fruit 23:9, 134:4
full 46:12, 47:1,
    50:15, 55:11,
    62:17, 94:13,
    130:25, 134:25,
    160:7
fuller 48:8
fully 33:7, 36:6,
    39:19, 40:2,
    42:15, 45:1, 46:1,
    62:2, 66:21, 70:1,
    76:24, 103:10,
    152:16, 160:19
fulsome 115:1
function 98:19
functions 9:8,
    149:23
fund 59:25, 60:11
fundamental 61:21,
    67:9, 158:18
funded 15:16
Funding 11:21,
    11:24, 14:22,
    15:1, 15:3, 15:4,
    15:15, 15:18,
    15:22, 16:3,
    16:21, 17:2, 17:8,
    18:10, 19:10,
    20:17
Funds 3:41, 15:25,
    16:7, 16:9, 16:13,
    17:1, 17:3, 17:11,
    18:13, 20:2, 20:3,
    20:13, 29:3,

60:18, 60:22,
    128:4, 138:9,
    152:19, 153:13,
    154:8, 154:11
futile 154:3
future 7:2, 12:17,
    16:24, 18:20,
    100:7


< G >
Gail 2:38, 177:8
gain 56:3, 56:6
galaxy 38:25
game 45:17
gaps 42:15
gas 86:22
gather 153:4
gating 44:5, 51:8
GDB 134:5, 148:22
geared 15:17, 15:18,
    16:22, 17:3
gee 135:8
general 7:12, 14:25,
    59:25, 60:11,
    103:15, 107:9
generally 18:23,
    20:15
generating 22:14
generation 19:3,
    22:12
generously 152:24
genius 155:4
gentleman 55:16
germane 146:14
gets 121:19, 131:20,
    149:11, 150:13,
    155:17, 166:9
getting 68:7, 102:1,
    121:21, 175:21
Give 10:20, 28:9,
    32:25, 47:17,
    48:2, 48:4, 59:11,
    75:20, 95:22,
    102:13, 108:22,
    136:7, 167:3,
    172:15, 174:6
Given 37:22, 58:2,
    68:11, 80:14,
    88:11, 137:7,

141:19, 153:18,
    172:5
gives 175:11
giving 12:8
glad 172:17, 174:23,
    176:4
globally 156:6
GO-PBA 64:20, 64:24,
    107:15
GO/PBA 56:21
goal 34:23, 105:11,
    105:12
God 66:2
Godfrey 24:7, 24:12
Gotshal 83:24
gotten 23:7, 145:12
governance 23:15,
    51:8
governed 126:21
Government 2:13,
    8:24, 11:13,
    11:14, 11:18,
    20:12, 21:4,
    21:15, 21:24,
    22:7, 53:17,
    78:11, 128:17,
    128:19, 129:13,
    139:7, 149:15,
    150:2, 159:15
governmental 20:25,
    22:19, 50:20,
    130:16, 130:25,
    131:5, 134:17,
    149:23, 149:24,
    150:6, 159:2
Governor 9:19,
    14:23, 20:6,
    120:16, 140:22,
    159:8, 159:10,
    159:11
Gracia 58:25
Grant 16:1, 25:8,
    35:20, 81:15,
    118:18, 121:25,
    142:13, 161:25,
    164:6, 172:6,
    173:9
granted 15:4, 116:25
grateful 9:18,
    39:15, 43:12

Great 13:25, 57:17,
    83:23, 174:21
greatly 30:15
grounds 69:16, 114:2
Group 45:19, 57:7,
    78:5, 128:3
groups 7:15, 8:21,
    8:24
growth 22:17
Guarantee 4:25,
    83:25
Guaranty 3:27, 4:10,
    70:24
guess 32:1, 42:10,
    56:19, 169:16
guidance 14:5, 40:1,
    43:22, 49:4, 49:10
gut 151:10
guys 162:5


< H >
habit 23:21
half 34:2, 34:6,
    141:11, 142:11
halfway 168:7
hand 33:5
handful 25:23, 25:24
handled 20:18
hanging 134:3
happen 36:14, 46:5,
    59:20, 65:12,
    65:23, 66:3, 71:1,
    94:16, 105:14,
    140:10
happened 23:11,
    39:19, 129:5,
    132:18
happening 52:21,
    159:21
happens 37:20,
    39:23, 89:16,
    94:7, 157:17,
    158:10, 164:23
happy 24:23, 25:15,
    42:23, 44:22,
    49:9, 52:13,
    53:25, 91:20,
    96:4, 161:7,
    174:12, 176:9

hard 23:24, 39:20
harm 156:3
harmonized 151:9
Harold 4:19, 115:10,
    168:4
Hastings 76:21
hat 110:23
hats 138:19
Hazard 15:24, 16:21
headquarters 133:3
heads 37:17
health 20:10
hear 8:18, 9:15,
    10:7, 30:8, 40:13,
    46:11, 55:16,
    70:19, 75:19,
    85:19, 96:22,
    102:18, 122:14,
    127:2, 127:12,
    158:23, 164:7
heard 12:17, 33:7,
    46:1, 56:18, 64:1,
    67:11, 68:7,
    76:22, 77:8,
    78:18, 84:10,
    85:17, 96:9,
    99:20, 123:11,
    124:20, 124:21,
    126:16, 126:19,
    129:16, 143:24,
    153:5, 153:25,
    157:8, 161:16,
    164:11
hearings 9:21, 10:7,
    82:15, 84:24,
    87:4, 105:18,
    176:2
heart 138:23
heavily 150:14
Hein 4:21, 21:2,
    31:24, 35:22,
    36:16, 55:14,
    79:17, 79:19,
    79:20, 79:21,
    82:22, 83:5,
    104:17
Hein-related 56:19
held 9:21, 143:13,
    155:25
Hello 57:22

help 16:17, 81:21,
    121:23, 156:11
helpful 13:17, 30:4,
    33:1, 37:24,
    38:10, 43:21,
    89:12, 89:13,
    91:25, 111:10,
    127:3, 168:22
helpfully 104:11
helping 13:17
hereby 163:19
Herrington 85:15,
    85:18, 85:23
herself 120:16
hesitate 159:13
high 14:22, 18:13
highlight 41:12
highly 156:5
Highway 17:15,
    17:17, 18:3, 18:7
Historically 139:18
history 154:21
hit-or-miss 37:21
hold 9:24, 10:7,
    63:2, 87:3, 154:7,
    156:21, 170:17
holding 61:18,
    107:2, 137:22
holds 154:20
holiday 40:1, 40:6,
    104:23, 104:24,
    175:13
holidays 39:10,
    104:22, 175:17,
    175:19, 176:9
holistic 137:3,
    143:7
hollow 136:13
honest 147:9
Honorable 2:36,
    2:38, 3:4, 30:10,
    35:9, 35:13,
    36:13, 37:14,
    38:15, 39:3,
    39:16, 40:15,
    100:12, 177:6,
    177:8
hope 41:1, 44:20,
    68:10, 151:19
hoping 23:1, 68:6,

135:24
host 38:19
hour 111:8
hours 48:16, 68:17,
 170:22
households 16:17,
 16:20
Houser 3:5, 30:6,
 30:9, 30:11, 35:9,
 35:13, 36:13,
 37:15, 38:16,
 39:4, 39:17,
 40:16, 41:4,
 43:24, 51:4,
 55:15, 56:20,
 58:14, 100:10,
 100:13, 100:14,
 176:4
Housing 15:8, 15:10,
 16:8, 17:4, 20:10
HTA 15:5, 15:8,
 16:14, 17:8,
 17:10, 17:14,
 17:19, 17:24,
 25:16, 49:8,
 52:23, 53:1, 72:4,
 73:14, 77:8,
 77:12, 84:9,
 84:10, 84:20,
 84:24, 86:19,
 86:23, 87:23,
 89:20, 92:15,
 94:6, 96:17, 99:5,
 170:16
HUD 15:25, 17:2
huge 8:5, 8:12
Humacao 19:4
Hurricane 14:21,
 19:25, 20:7,
 101:6, 101:15
hurricanes 14:24,
 18:15
hydro 19:18


< I >
idea 21:4, 37:18,
 38:17, 39:4,
 45:16, 55:21,
 56:16, 83:8,

131:14, 137:8,
 161:2, 175:18
ideally 34:11
identified 56:2,
 80:18, 88:23
identify 32:14,
 32:15, 69:12
II 24:6
III 1:8, 1:24, 2:5,
 4:28, 22:18,
 22:21, 26:21,
 130:7, 136:13,
 136:23, 137:16,
 139:11, 141:12,
 146:25, 147:10,
 147:11, 147:16,
 147:21, 150:17,
 150:24, 151:8,
 151:12, 172:23
III.1 27:24
III.10 27:7
III.11 27:8
III.12 27:10
III.14 28:2
III.2 26:21
III.3 26:22
III.4 26:24
III.5 26:25
III.6 27:1
III.7 27:3
III.8 27:4
III.9 27:6
ill 10:17
ill-advised 61:13
immediate 101:14
immediately 45:12,
 113:21, 168:8
impact 22:22, 32:11,
 117:1
impacted 19:25,
 98:14
impairs 146:25
impermissible
 146:17, 146:19
impermissibly 143:5
implement 140:15
implementation 8:11,
 9:22, 10:6, 10:8,
 11:6, 16:23, 21:16
implemented 10:4

implementing 20:7,
 146:10
implicate 67:17,
 130:25
implicated 64:11
implication 168:23
implicit 126:15,
 166:24
implicitly 76:3,
 155:21
imply 162:2
import 130:12
importance 14:22,
 94:4
important 8:2, 10:5,
 34:11, 41:13,
 84:12, 138:1,
 150:11, 159:15
importantly 31:15,
 35:15
impose 51:8, 67:12,
 68:15, 131:15,
 144:9, 148:3
imposed 62:6, 148:10
imposes 146:23
imposing 81:2
imposition 125:21,
 126:7
improper 63:10
improve 18:20,
 20:13, 22:15
improved 19:24
impugn 155:19
in. 26:2
inactions 100:5
inappropriate 84:6,
 95:17, 150:8
inappropriately 90:5
inclination 44:23,
 44:25, 49:11,
 53:19, 69:19,
 75:4, 75:6, 78:23,
 84:15, 88:12
inclined 67:12,
 96:22, 121:25
include 15:23, 19:2,
 45:14, 69:21,
 76:11, 90:22,
 94:8, 94:13,
 104:5, 104:18,

107:18, 143:3,
169:1
Included 41:3,
73:16, 96:16,
97:23, 114:9
includes 19:10,
19:15, 133:20,
150:2
including 6:18,
6:21, 6:25, 8:24,
9:2, 13:2, 20:9,
38:6, 39:13, 59:5,
63:10, 70:7,
72:11, 78:21,
82:12, 89:11,
100:6, 106:12,
129:12, 133:6,
133:21, 145:14,
154:19, 157:23
inclusion 50:15
inconsistent 113:2,
116:13, 116:14,
123:20, 147:12,
147:21
incorporate 62:25
Incorporated 4:5,
62:23, 109:1,
168:9
incorporating 13:9
incorrect 84:2,
116:9, 153:17,
155:12
incorrectly 159:4
increase 21:7, 21:11
incurred 18:11
Indemnity 3:37,
170:20, 170:21
indented 50:15
independent 129:1,
129:21, 130:11,
130:12, 139:5
indicated 65:6,
103:6, 120:11
Individual 4:18,
7:14, 15:23,
16:16, 39:9,
39:18, 39:24,
80:4, 81:2, 81:12,
82:5, 110:10,
110:15, 110:19,

110:20, 114:13,
115:11, 115:12,
115:16, 120:3,
120:15, 120:18,
168:4
individuals 16:17,
16:20, 80:10,
80:23, 120:10
indulge 63:15
indulgence 48:18
inefficiency 45:4,
45:23, 97:9
inform 20:5
information 6:14,
15:6, 18:23,
23:20, 27:16,
38:12, 39:7,
56:10, 59:12,
60:4, 60:19,
60:21, 60:23,
104:8, 105:10
informative 25:3,
91:20, 91:23,
104:14, 120:13,
169:16
infrastructure
14:21, 17:5, 20:9
infringe 50:20
inheres 148:9,
148:11
initial 55:2, 97:21,
158:22
initially 64:19
initiated 127:17
initiation 105:20
injected 53:13
innovation 137:8
input 88:15, 104:2
insert 163:19,
166:18
inserted 98:5
insider 129:7
insistence 63:20
insofar 174:16
insolvency 129:6,
135:3
installations 17:22
Instance 69:7,
121:12, 135:22
instead 34:15, 45:5,

124:15
instruct 42:16,
120:17
instructing 121:8
instrumental 23:17
instrumentalities
136:25, 149:4
instrumentalities.
139:7
instrumentality
53:17
Insurance 3:28,
28:3, 28:15, 29:5,
29:9, 29:18,
70:24, 100:17,
101:5
insurer 29:9
insurers 28:16,
100:20
insurmountable 97:9
intelligent 95:5
intend 12:18, 14:6,
50:13, 76:3,
156:15
intended 43:18,
52:25, 76:5,
94:10, 94:14,
95:4, 95:9,
126:22, 146:9,
147:22
intending 50:4,
93:9, 113:16
intent 130:20,
155:21, 156:17
intention 51:23,
52:4, 53:2, 53:15,
93:19, 97:6,
102:21
intentional 156:16
intentionally 156:14
interdebtor 158:13
interest 6:6, 10:24,
21:4, 21:6, 41:25,
54:23, 98:17,
98:21, 138:3,
138:11, 138:19,
144:3, 144:4,
145:18, 145:22,
145:24, 146:11,
146:15, 146:17,

146:19, 152:16, 152:21, 152:23
interested 38:8, 56:15, 58:4
interests 81:12
interfere 29:13, 143:5
interference 132:7, 132:10
intermediate 48:7, 59:6, 98:19
internet 21:3
interposed 174:19
interpretation 68:22, 69:8, 69:19, 70:16, 155:6
interpreted 100:5
interpreting 131:23
interpretive 70:2, 129:22, 130:10
interrupted 115:23, 118:13
intervene 53:11, 78:15, 87:22
intervener 98:5
intervention 53:21, 78:18
invalidate 151:21, 152:3, 153:11
invalidity 150:20
invest 21:21, 128:11
investigate 141:15
investment 60:16
investors 80:4
invite 30:6
invocation 132:15
invoking 136:20
involuntary 132:8, 134:8, 134:9, 156:20, 156:22, 161:2
involve 46:16
involved 150:7, 158:20
involves 132:15
Irma 14:21
irreconcilable 139:1, 141:5
irrelevant 155:22,

157:18
irrespective 52:1
irrigation 19:18
island 19:7, 19:8, 19:16, 19:17
Islands 20:1
isolation 67:24
issuance 9:4, 115:18, 115:21, 116:18
issued 6:12, 20:6, 101:5, 119:13
Item 24:6, 25:12, 26:21, 26:22, 26:24, 26:25, 27:1, 27:3, 27:4, 27:6, 27:7, 27:8, 27:10, 27:11, 28:2, 30:1, 71:1, 108:21, 108:22, 127:12, 127:15, 170:8, 170:9
Items 27:24, 41:12, 174:8, 174:15
itself 13:5, 50:10, 105:1, 137:12
IV 174:15

< J >
J. 3:5, 3:8, 4:11
James 4:28
jammed 50:7, 99:17
jealous 30:19
Jenner 151:17
Jim 100:20
job 30:25
John 3:41, 138:8, 162:13
join 58:20, 67:6
joined 85:10, 115:16, 128:3
Joint 8:16, 42:17, 107:6, 132:25, 146:5, 149:18
Jointly 1:11, 1:27, 2:8
Jones 128:2, 157:6
Journal 36:20
Juan 6:1, 6:7,

10:16, 175:8
judges 39:23
judgment 32:19, 32:20, 32:23, 34:14, 116:4, 135:14
judicial 6:11
Judith 2:38, 177:8
jump 70:25
June 44:4, 86:18, 128:13, 139:16
justiciable 29:15, 74:13
justification 81:1, 154:2
justify 156:25

< K >
K. 3:41
Kahn 24:7, 24:12
Katherine 3:43, 24:12
Keep 8:6, 79:13, 104:15, 166:18, 176:9
Kenny 155:3, 155:4
key 46:9, 65:2, 67:18, 90:1
Kim 115:24
kind 60:4, 60:12, 68:1, 68:9, 78:3, 115:2, 117:1, 130:1, 149:7, 149:11, 149:12, 158:14
kinds 147:1
knowing 50:7, 53:5, 55:4, 60:3
knowledge 42:1, 80:24
known 15:9, 48:15
knows 9:7, 10:1, 23:5, 30:15, 37:19, 66:3, 89:19, 94:14, 119:6, 144:13, 162:16
Kobre 115:24

< L >
L. 4:28
labeled 38:3
labors 23:9
laid 44:3, 58:11,
   76:7
landed 131:21
Landon 3:49, 151:16
Lands 17:17, 18:3
landscape 54:6
landslide 18:1
large 39:17
largely 31:18
largest 139:17
Lary 3:12
last 8:20, 12:22,
   19:19, 21:5,
   22:25, 23:7,
   25:22, 34:2, 34:6,
   54:19, 60:11,
   112:14, 114:8,
   118:4, 143:25,
   144:2, 145:13,
   170:22
Lastly 135:7
late 117:15, 175:16
later 49:17, 53:13,
   64:13, 76:8,
   76:11, 80:16,
   153:17, 161:24
latter 174:9
launched 43:20
launching 21:15,
   21:18
Laura 2:36, 3:9,
   10:12, 12:5,
   170:11, 177:7
Law 11:17, 29:20,
   74:10, 109:19,
   112:23, 114:19,
   131:4, 133:23,
   134:1, 134:21,
   136:20, 137:6,
   142:6, 142:21,
   142:22, 146:18,
   152:2, 152:4,
   154:18, 155:22,
   156:17, 157:21,
   158:18, 159:9,

160:2, 160:5,
   160:22
lawsuit 154:9, 158:4
lawyer 29:18, 116:20
lawyers 34:9, 95:6,
   109:22, 109:24,
   110:2, 110:18,
   116:18, 120:21
lay 54:6, 152:13,
   165:15
lead 21:10, 83:5,
   136:5
leader 30:7, 176:6
leading 32:10
leaner 175:13
learn 21:21
learned 13:18, 72:10
learning 101:13
lease 77:4
least 35:16, 52:23,
   54:21, 60:7,
   60:25, 64:22,
   132:21, 134:6,
   135:23, 141:14,
   142:3, 143:3,
   148:21, 148:22,
   148:23, 152:18
Leave 32:16, 33:12,
   40:3, 45:6, 45:9,
   45:25, 46:4, 46:6,
   74:22, 99:3,
   112:20, 112:24,
   118:15, 141:8,
   166:10
leaves 50:21, 80:5,
   80:6
leaving 164:9
Lecaroz 3:15
ledger 162:10
left 77:6, 78:22
leg 54:11
legal 8:13, 20:13,
   69:19, 69:20,
   72:15, 75:25,
   90:14, 123:20,
   153:22
legislation 11:19,
   22:20, 128:14,
   128:17, 134:18,
   139:15, 139:23,

140:3, 140:8,
   140:17, 141:1,
   142:24, 146:4,
   151:21, 153:3,
   153:11, 159:16
legislative 22:20,
   22:22, 135:15,
   137:7, 140:21,
   151:11, 154:21
length 34:11
less 17:7, 92:20,
   100:3
lest 89:14
letter 141:18,
   150:22, 151:6,
   157:21
letters 27:15
letting 121:13
level 18:13, 81:8,
   164:12
liabilities 133:22,
   172:22
liability 171:11,
   171:14, 171:20
liable 170:16,
   171:2, 171:13,
   171:16, 171:22
liberal 63:3, 63:4
lien 9:3, 44:11,
   60:5, 95:12,
   131:3, 136:6,
   136:8, 136:11,
   143:19, 154:6,
   157:12
liens 74:10, 143:1
lifted 63:25,
   109:15, 111:13,
   111:16, 113:11,
   113:25, 163:19
lifting 109:18,
   112:1, 112:9,
   125:17
light 13:18, 84:6,
   142:11, 145:12,
   145:13, 171:1,
   172:5, 173:8
lighting 17:13
lights 19:6
likelihood 153:22
likely 8:4, 13:1,

38:1, 40:7, 69:15,
  154:11
likewise 82:2
limbo 47:18
limit 35:20, 148:11,
  149:15, 152:11
limitation 78:1,
  130:15, 148:2,
  148:4, 148:9,
  149:10
limitations 51:3,
  78:21, 94:10,
  112:5, 115:23,
  116:1, 135:23,
  135:25, 141:18,
  160:9
Limited 2:21, 4:27,
  6:21, 7:1, 109:5,
  115:17, 131:6,
  141:25, 150:1,
  153:19
limits 81:3
line 29:7, 93:4
lines 19:4, 19:8,
  19:16
liquidated 133:7
list 30:4, 69:11,
  127:21
listed 74:1, 156:23,
  173:15, 174:20
listen 68:12
listened 70:25
listening 155:4
listing 26:5, 174:17
lists 104:5
literally 30:18,
  81:23
litigant 81:15,
  136:7
litigants 81:19
litigate 71:22,
  114:10, 158:13,
  158:19, 160:11
litigated 97:1,
  143:22, 145:2,
  145:15, 153:16
litigating 128:23,
  129:2
litigation-related
  14:1, 105:8

little 94:25,
  102:12, 110:7,
  119:3, 128:6,
  128:7, 132:13,
  132:19, 133:12,
  146:2, 150:12,
  153:25, 154:5,
  155:17, 157:7,
  157:8, 175:21
live 33:21, 168:18
living 46:17, 137:3
LLC 4:15
LLP 7:11
loaded 6:18
loan 128:21
loathe 153:18
local 109:9, 109:25,
  112:18, 112:23,
  114:18, 165:14,
  165:17
located. 139:13
location 6:22, 56:14
lockbox 59:24
logic 156:8
logistics 26:3,
  37:11
long 60:16, 65:21,
  66:13, 139:25
longer 9:6, 66:11,
  170:16
Look 14:5, 22:8,
  26:1, 39:5, 50:2,
  51:7, 92:1, 101:6,
  101:10, 120:12,
  141:10, 147:7,
  147:13, 149:11,
  155:15
looked 147:18
looking 48:23,
  129:1, 147:19
looks 9:17
loss 28:11
losses 16:24
lot 40:7, 41:1,
  49:20, 54:4,
  54:17, 71:23,
  92:8, 94:11,
  98:13, 125:2,
  126:10, 129:14,
  131:20, 138:11,

158:10
loud 76:22
Louisiana 155:10
lowest 59:6, 98:19,
  134:3
Luc 3:19, 76:21,
  161:19
Luis 3:25, 14:17
lunch 100:9, 100:15,
  102:7


< M >
machinations 94:25
magically 51:21
Magistrate 2:38,
  177:8
mail 104:23
mailed 36:25
mailing 104:23
mailings 13:3,
  13:16, 25:20,
  25:24, 26:2,
  26:10, 174:2
main 15:3, 15:15,
  15:22
maintained 104:21
majority 13:25,
  15:19, 16:7, 17:20
malpractice 115:22,
  116:16
manage 30:25, 38:5,
  152:9
managed 23:21
Management 1:10,
  1:26, 2:7, 2:28,
  3:31, 18:6, 22:3,
  104:25, 126:21
manager 38:22
managing 82:6
mandated 34:1, 51:5,
  68:1
Mandating 34:13
mandatory 34:18
Manges 83:24
manner 98:24
Manual 81:14
manufacturing 19:5
March 141:24
Margaret 3:10, 28:5,

41:24, 100:19,
142:18
Maria 14:21
MARINI 3:25, 14:15,
14:17, 20:21,
20:22
market 10:4, 22:10,
22:12
marks 73:10
Martin 3:8, 3:28,
7:10, 70:23
mask 143:19
massive 60:13
material 128:22,
157:21
materials 56:5,
57:13
matter 35:11, 37:19,
43:14, 44:17,
52:17, 54:23,
64:10, 71:1,
78:16, 78:18,
96:2, 103:15,
113:17, 116:11,
117:17, 156:5,
159:9, 161:12,
165:17, 166:2,
166:9, 168:8
matters 20:17,
21:21, 25:12,
43:6, 44:14,
44:16, 62:24,
93:19, 95:11,
98:14, 99:24,
99:25, 100:10,
103:6, 106:13,
116:6, 116:21
maximize 57:15
MAYORAL 3:38, 171:7,
171:8, 172:1,
172:3
Mcconnell 85:11
mean 46:17, 47:18,
53:13, 67:4, 94:5,
101:20, 128:25,
133:5, 144:11,
174:5
meaning 82:11, 113:1
meaningful 75:20,
80:4

meaningfully 32:11
means 23:5, 70:4,
74:9, 74:12, 76:8,
90:13
measures 9:9, 9:22,
10:4, 11:7, 81:7,
140:17, 140:20,
140:22, 159:20
mechanism 62:22,
91:23, 158:15,
164:10
media 81:22
mediator 63:17,
71:5, 72:11,
72:25, 74:2,
75:10, 85:1
mediators 8:4, 72:6,
73:17, 75:5, 87:7,
87:24
Medicaid 11:21,
11:23
meet 42:16, 45:12,
47:8, 67:12,
67:13, 68:9,
68:18, 78:24,
87:25, 88:11,
91:18, 93:24,
98:1, 99:4,
102:14, 106:9,
107:20, 133:17,
153:24, 157:10,
168:7
meeting 46:21
meetings 20:15
members 6:6, 31:23,
32:1, 32:19, 38:8,
120:18, 152:19
mentality 119:12,
158:7
mention 8:2, 21:1,
21:13, 21:23,
35:22, 98:11,
155:4, 158:2
mentioned 60:10,
105:13
merciful 175:4
merely 56:4, 130:8
merit 114:5, 122:8,
147:4
meritorious 143:14

merits 31:14, 33:21,
155:16, 160:11,
161:22
message 121:18,
121:19, 121:24
met 31:4, 144:18
methodology 101:12
MGIC 3:37, 170:19,
170:21, 170:23,
171:8
Michael 3:11, 40:24,
92:6, 108:4
micromanage 69:10
middle 99:3, 164:15
Milbank 58:1
miles 111:7
milestones 21:25
Miller 3:35, 57:22,
57:24, 58:1, 61:5,
61:12, 62:13,
62:15, 62:19,
63:1, 63:17,
64:15, 89:2, 89:3,
90:15, 90:16,
98:12
million 10:23,
10:24, 16:11,
16:12, 17:9,
17:10, 17:11,
17:14, 18:5, 18:8,
18:12, 19:20,
21:9, 21:11,
28:11, 132:21,
143:13, 143:17,
154:1
millions 81:23
mind 42:10, 88:18
mindful 175:12
minimize 34:24
minimizing 34:10
MINTZ 4:15, 85:7,
85:9, 85:15,
85:19, 85:22,
85:25, 88:21,
88:25
minute 143:9, 166:17
minutes 29:20,
40:11, 40:19,
40:22, 41:2, 54:3,
55:16, 57:23,

58:6, 64:16, 92:9,
    127:19, 127:22,
    127:23, 127:24,
    128:5
misapprehends 145:21
misappropriation
    71:14
mischaracterizing
    95:18
misconstrues 147:25
misinterpreted
    121:19
misread 110:6
missed 23:25, 30:15,
    42:9, 175:3
mission 10:3
Mitigation 15:24,
    16:22, 16:23
mode 55:12, 106:14
modest 81:25
modification 11:4,
    11:10, 77:22,
    107:25, 149:20
modifications 125:3,
    125:5
modified 47:13,
    77:25, 107:14,
    107:18
modify 47:15, 65:1,
    90:22, 91:14,
    126:17
modular 17:21
Mohammad 23:2, 30:18
moment 14:13, 23:1,
    31:25, 37:13,
    42:23, 52:5, 67:8,
    81:6, 108:22,
    113:24, 122:2,
    124:17, 124:18,
    134:2, 167:3
Monday 42:17, 175:22
monetary 150:4
money 21:21, 28:12,
    28:13, 60:15,
    136:8, 137:22,
    153:13, 162:3,
    162:9, 162:20,
    162:21, 162:23,
    162:24
Monies 59:24, 60:17,

128:11
Monique 3:38, 171:7
Monitor 4:14, 9:13,
    10:5, 85:10
monitoring 81:22
monolines 75:15,
    87:8
Monsita 3:15
month 86:6, 107:1,
    128:14
months 12:20, 24:20,
    39:10, 44:13,
    66:8, 80:12,
    80:16, 111:5,
    117:21, 162:15
moorings 147:5
moratorium 67:18,
    149:13, 149:14
morning 7:7, 7:9,
    10:18, 12:4, 12:5,
    12:7, 14:15,
    14:16, 20:23,
    24:10, 24:11,
    25:14, 28:4, 28:5,
    28:7, 28:8, 30:11,
    40:21, 57:24,
    57:25, 59:7,
    70:22, 70:23,
    76:19, 76:20,
    79:20, 85:7, 85:8,
    174:10
Motions 45:8, 45:13,
    47:10, 49:6, 60:8,
    62:11, 63:4,
    65:15, 67:10,
    67:16, 67:17,
    67:23, 68:2,
    80:12, 80:13,
    84:10, 84:11,
    86:21, 87:11,
    87:20, 91:15,
    91:18, 99:4,
    99:23, 105:20,
    105:22, 106:6,
    106:9, 120:4,
    175:20
movants 47:17, 59:1,
    106:15
move 13:1, 22:8,
    48:25, 49:9,

52:13, 62:23,
    63:7, 66:14,
    66:16, 66:19,
    98:12, 106:13,
    112:20, 113:15,
    125:22, 171:4,
    173:6
moved 60:15, 98:15
moves 21:8, 149:23
Moving 12:9, 13:5,
    65:25, 76:23,
    88:11, 113:10,
    126:2
multiple 47:5,
    92:23, 138:19,
    158:11, 158:12
municipal 136:1,
    137:7, 143:7,
    150:17, 153:19
municipalities 9:10
municipality 133:13,
    137:4
Muniz 14:18
murky 150:12,
    155:17, 160:5
musical 155:4
mutually 55:25,
    92:22
Myers 20:24, 145:7


< N >
nailed 133:7
name 85:13, 85:18
naming 78:5
narrative 105:3
narrow 34:25, 59:9,
    78:5
narrower 35:8,
    56:21, 57:7
narrowing 90:3
nasty 23:21
National 4:24,
    83:17, 83:24,
    84:1, 84:4, 84:13,
    86:20
natural 156:15,
    156:16
naturally 46:14
nature 44:10, 50:11,

82:14, 94:15,
130:8, 148:12,
173:5
navigate 48:16, 95:7
Nayuan 85:11
nearly 8:4, 21:9
neat 78:3
necessarily 50:6,
50:8, 101:12,
149:15
necessary 7:4,
41:13, 42:20,
60:19, 60:21,
73:25, 80:2,
84:20, 94:19,
104:13, 124:21,
143:23, 143:24,
154:24, 166:21,
166:22, 166:23,
175:24
need 13:22, 14:1,
32:11, 33:13,
35:18, 36:4, 39:8,
40:9, 43:20,
44:16, 55:10,
55:25, 58:5,
71:15, 78:14,
81:7, 81:18,
82:25, 87:17,
90:10, 100:14,
107:17, 126:14,
132:2, 132:3,
154:8, 159:19,
166:17, 173:25
needed 17:9, 74:25
needing 46:18
needle 98:15
needs 59:4, 65:23,
66:7, 66:12,
79:25, 80:21,
112:22, 126:11,
141:13
negotiate 22:6,
111:23, 112:7
negotiated 87:1
negotiating 58:6
negotiations 7:14
neither 26:15,
75:13, 77:15
net 128:19, 135:20

neutral 166:11,
167:19, 167:20
nevertheless 31:20
news 100:15
newspapers 38:3
nice 175:22
night 48:21, 112:14,
114:8, 115:3,
118:4, 175:16,
175:20
nine 77:13, 109:17
No. 1:6, 1:22, 2:3,
2:21, 14:11,
57:11, 57:18,
101:20, 151:25,
161:9
noise 132:19
None 5:5, 5:11,
54:23, 112:3
nonetheless 76:3
nonrecourse 162:5
noon 7:3
Nor 6:14, 26:15,
37:7, 152:23
normal 175:23
north-to-south 19:6
note 15:6, 41:24,
54:23, 54:25,
76:25, 84:7,
87:22, 88:1,
131:8, 146:2,
150:1, 153:10,
154:16, 156:18,
160:4, 160:21,
161:2
noted 24:15, 44:6,
64:25, 87:10,
97:22, 145:16
notes 6:17
noteworthy 143:12
Nothing 44:15,
65:23, 88:4, 98:6,
115:19, 115:20,
116:20, 118:3,
140:16, 146:24,
161:1
Notices 26:9, 37:19,
38:4, 38:9, 38:24,
39:18, 56:1,
80:10, 94:18,

104:13, 104:21,
105:8
notified 10:24
notify 105:9
notion 43:18, 51:4,
52:11, 123:20,
132:9
notwithstanding
93:22
novel 152:25
November 18:9
nuance 164:21
nullity 131:22
Number 13:1, 21:19,
25:20, 25:21,
27:5, 34:10,
34:24, 37:1,
39:17, 41:6, 43:7,
43:19, 58:9,
80:13, 94:5,
127:15, 127:17,
170:14, 170:20,
170:21, 170:22,
172:21, 172:22,
173:2
numbers 54:19, 104:6
numerous 155:6


< O >
o'clock 175:20
O'melveny 20:24,
145:7
object 63:9, 80:3,
82:18, 93:2,
171:15, 171:21
objected 26:13,
31:7, 39:12, 61:12
objecting 64:4,
162:19
objector 114:24
objectors 109:24,
112:13, 113:13,
167:20
objects 152:15
obligated 15:2,
15:13, 16:5,
16:10, 16:12,
17:7, 19:20, 20:3,
140:8

obligation 62:10
obligations 29:9,
    67:13, 115:20,
    128:18, 128:22,
    139:17
obligor 139:17
observance 82:11
observation 43:17,
    46:15, 53:24,
    55:5, 55:7, 92:11,
    98:11, 99:7
observations 41:4,
    41:15, 41:19,
    41:22, 51:4,
    51:19, 52:8, 54:1,
    55:14, 55:17,
    94:20
observe 80:7, 82:14
observed 6:22, 82:19
observing 6:7
obtain 117:1, 140:11
obtained 15:7, 16:21
obvious 89:9, 138:25
Obviously 33:21,
    36:7, 41:1, 41:5,
    49:22, 53:14,
    58:12, 67:13,
    84:8, 87:14,
    88:22, 133:4,
    154:10
occur 65:8, 66:7,
    154:23
occurred 19:1,
    37:18, 82:13,
    92:14, 93:1,
    93:19, 94:12,
    98:7, 129:5
occurs 45:2, 80:8
October 7:18, 10:25,
    13:6
Off-track 131:19
offer 118:23
offered 5:5, 5:11
Office 13:8, 13:11,
    14:4, 15:8, 39:13,
    39:25, 40:5, 40:8
offices 40:2
Official 3:17, 3:45,
    38:18, 161:20,
    161:21, 177:15

often 40:1
Okay 10:11, 48:13,
    49:19, 51:2, 52:5,
    54:8, 70:15,
    83:21, 83:23,
    85:19, 110:6,
    124:19, 127:25,
    164:21, 168:18
old 175:21
Omni 43:7, 43:11,
    45:10, 45:15,
    66:4, 88:8, 88:10,
    100:24, 103:8,
    103:9, 103:16,
    105:25, 106:7,
    107:7, 107:10,
    111:24
once 37:21, 110:13,
    112:6, 168:2
one. 172:16
ones 97:4, 97:22,
    173:20
ongoing 38:8, 176:2,
    176:6
onset 151:12
onus 35:3
open 50:21, 155:4,
    163:12, 164:9
opening 153:2
operates 129:21,
    130:2
operation 22:3,
    139:12
Opinion 54:20,
    147:18, 148:21
opinions 95:11
opportunity 14:20,
    37:9, 41:5, 41:17,
    41:18, 43:14,
    49:16, 58:12,
    63:11, 94:19,
    103:10, 117:6,
    164:3
oppose 46:18, 50:23,
    63:9, 85:1, 119:2,
    166:24
opposed 137:2
opposes 84:13
opposing 109:19,
    110:20

opposition 47:2,
    48:9, 51:13,
    65:12, 78:12,
    78:13, 110:12,
    152:12, 156:23
oppositions 47:5,
    153:10
optimistic 58:5
optimize 20:13
option 55:24
oral 8:22, 45:1,
    144:5
orally 102:20
Ordered 12:13,
    77:11, 82:17,
    82:18, 139:10,
    144:14
ordering 118:9
orderly 115:2
Orders 6:12, 9:1,
    24:15, 26:4,
    26:18, 31:6,
    31:10, 32:22,
    34:5, 34:15, 37:6,
    47:15, 54:17,
    62:4, 67:2, 95:22,
    99:19, 101:5,
    102:22, 103:5,
    103:11, 103:18,
    104:13, 106:25,
    151:1, 174:17
organize 56:9
oriented 103:20
original 33:6,
    72:22, 97:23,
    168:6, 169:8
Orrick 85:9, 85:15,
    85:17, 85:22
OTB 147:4
others 17:13, 20:11,
    41:16, 49:12,
    67:25, 122:14,
    153:6
Otherwise 6:23,
    6:24, 24:24,
    35:17, 47:2,
    50:19, 110:22,
    126:20
ourselves 151:24
outcome 91:9, 99:14

outliers 155:12
outset 31:16, 43:25
outside 6:14,
    117:14, 150:4
outstanding 10:23,
    30:15, 110:9
overarching 43:17,
    92:11
overlap 32:8, 90:25,
    91:3
overlapping 65:2,
    67:17, 87:19
overlooked 104:23
overnight 35:12
override 130:3
overrides 131:10,
    137:14, 137:17
overriding 149:12
overrule 148:19,
    148:20
overruled 103:14
overstate 148:24
overtly 49:16
overview 15:1, 15:2
owe 137:21, 137:25
owed 139:17, 140:2,
    140:5
owing 140:1
own 62:11, 94:24,
    105:5, 130:3,
    144:9, 158:17,
    160:17, 166:14


< P >
P. 3:32
P3 22:2, 22:5, 22:10
packages 18:22,
    18:23, 18:25,
    19:13
PAGE 5:3, 38:1,
    73:1, 81:3, 81:14,
    151:20
pages 35:19, 80:19,
    153:5, 177:4
paid 29:10, 137:15,
    151:2
pant 54:11
papers 41:10, 44:17,
    45:1, 51:13,

58:11, 62:15,
    74:24, 79:1, 81:3,
    82:15, 109:17,
    115:1, 130:22,
    144:6, 144:21,
    145:16, 147:25,
    156:23, 159:23
par 23:17
paragraphs 91:7,
    91:16, 127:1,
    165:1, 169:15
part 6:15, 31:6,
    41:3, 45:5, 50:17,
    55:2, 59:1, 60:6,
    128:17, 132:17,
    138:21, 148:23
partake 7:14
partial 133:20
participants 6:8,
    80:23, 80:24, 82:7
participate 9:14,
    37:9, 42:22, 86:7
participated 7:19,
    8:21
Participation 18:22,
    30:23, 56:24,
    57:5, 57:8, 78:24,
    80:5, 80:11, 94:18
particular 6:16,
    26:5, 44:18,
    54:17, 55:20,
    59:5, 59:25,
    61:13, 64:6, 67:8,
    75:21, 81:16,
    89:22, 90:13,
    95:21
particularly 58:25,
    98:18, 103:7,
    129:4
partner 41:24
party 29:13, 33:17,
    33:18, 34:21,
    35:3, 35:4, 35:18,
    36:20, 38:18,
    38:19, 63:7,
    77:15, 106:23,
    107:5, 116:12,
    128:17, 158:16
pass 52:13, 81:6
passed 39:10,

103:15, 146:4
Passover 88:9
past 23:21, 40:5,
    68:17, 80:12,
    92:8, 100:7,
    102:6, 142:10,
    171:11
path 94:20, 95:4,
    159:13, 176:8
Paul 4:6, 76:21,
    108:24, 165:5,
    168:20
pay 128:12, 130:20,
    152:20
Paygo 9:9, 23:17,
    140:13, 140:15,
    140:16, 140:17,
    140:19, 140:22,
    142:24, 143:18,
    143:21, 146:1,
    153:3, 157:19
Payment 28:3, 28:11,
    29:8, 29:14,
    130:18, 171:2,
    171:11, 171:12,
    171:15, 171:18,
    171:21, 171:24
payments 9:6
PBA 38:7, 54:18,
    65:3, 65:4, 65:9,
    103:20, 105:15
peace 29:6
pecuniary 134:15
pellucidly 120:7,
    121:9
pen 137:8
pendency 129:5,
    135:3, 136:14,
    137:9
pending 37:2, 64:4,
    64:9, 72:5, 77:8,
    89:20, 109:9
pension 131:1,
    149:19, 149:21,
    152:10
pensioners 128:19
pensions 128:12,
    145:19, 152:20
People 14:23, 23:22,
    23:23, 31:19,

39:7, 40:3, 56:2,
56:4, 56:10,
56:15, 57:2, 78:6,
80:8, 87:10,
92:23, 94:8,
94:19, 96:9,
121:3, 145:23,
175:4
per 144:16
percent 17:18,
17:23, 17:25,
18:1, 21:7, 139:19
Perfect 123:6,
157:23
perform 18:21
performed 18:21,
155:20
Perhaps 31:19,
37:12, 38:6, 42:9,
42:20, 63:19,
101:1, 114:13,
122:1, 124:7
period 18:16, 35:7,
61:16, 103:7
permanent 15:17,
15:21, 16:4,
16:12, 16:13,
16:14, 17:10,
17:17, 17:24,
18:1, 18:2, 18:4,
18:6, 18:19,
18:25, 19:13,
20:16
permissible 150:5
permission 36:2,
142:19, 165:16,
166:10, 167:23
permit 45:6, 105:18,
122:19, 123:4,
125:20, 151:10,
164:11, 165:22,
166:1, 166:20,
167:22
permits 154:22
permitted 6:21,
111:4
permitting 17:25,
18:2, 81:9,
147:11, 147:20
person 6:14, 6:21,

23:7, 176:5
personal 23:24,
30:13
perspective 31:23,
32:5, 36:24,
39:13, 117:8
pertaining 86:2,
86:5, 86:18,
115:21, 116:7
pertains 49:5,
115:17, 145:10
pertinent 87:16
Peter 3:24, 4:21,
20:23, 83:2, 145:6
petition 132:16,
132:17, 132:19,
133:10, 135:2,
139:15, 139:23,
140:3, 140:17,
141:1, 154:25,
160:18
petitions 134:23
pharmaceutical 19:5
phase 21:15
phone 24:8, 24:14,
40:7
phrase 166:5,
166:25, 167:10,
167:22
phrasing 99:16
PHV 3:8, 3:9, 3:10,
3:11, 3:12, 3:19,
3:24, 3:28, 3:32,
3:35, 3:41, 3:43,
3:49, 4:6, 4:8,
4:11, 4:15, 4:25,
4:28
piece 71:5
pieces 88:12
Pietrantoni 14:17
place 23:14, 39:1,
49:21, 56:1,
56:10, 67:14,
74:23, 79:2,
111:22, 114:21,
135:21, 139:14,
139:15, 145:3,
154:9
placing 99:25
plain 39:20, 39:21,

147:21
plaintiff 96:17,
115:11, 119:2,
120:3, 158:5
Plaintiffs 2:23,
110:10, 110:15,
110:19, 110:21,
114:1, 114:13,
116:24
Plan 7:15, 7:17,
8:11, 8:14, 9:22,
11:7, 12:25,
42:16, 46:11,
64:11, 68:12,
96:25, 99:19,
140:24, 143:10,
144:9, 146:11,
157:16, 159:19,
175:14
Plan106info.com
21:18
planned 19:14
planning 16:23, 26:4
plans 9:12, 10:2,
10:4, 10:8, 19:22,
21:16, 89:23
plants 19:18
plausible 155:6
plausibly 151:24
play 47:16, 49:14,
131:20, 132:6
playing 33:16, 81:8
plead 161:4
pleading 63:3,
94:17, 121:9
pleadings 21:2,
50:7, 74:21,
78:12, 78:13,
99:17
Please 10:19, 37:15,
49:1, 85:14,
102:11, 102:12,
127:25
pleased 21:25, 31:6,
102:18, 170:21
pledged 86:19
plus 81:20, 82:7
PM 102:9, 102:10,
176:11
podium 29:22, 30:7,

82:25, 161:17,
163:11
point. 28:22,
153:15, 159:23
pointed 45:24, 159:1
points 55:14, 58:10,
64:19, 72:14,
72:16, 76:13,
78:20, 79:22,
80:20, 81:9,
131:12, 143:4,
144:21, 153:6,
153:7, 157:9,
157:10, 160:10
police 134:12,
134:14
policies 6:11
policy 20:7, 150:6
political 130:16,
130:25, 131:5,
137:3, 150:2,
159:2
population 13:19,
13:21
portion 14:9
ports 20:9
positions 58:11,
96:12, 116:11,
161:5, 171:10,
171:17, 171:23
possession 136:22,
140:11, 158:12
possible 8:16,
34:17, 38:17,
39:21, 44:21,
55:24, 66:9,
84:12, 84:25,
104:15, 152:7,
154:4, 161:13,
166:12, 167:19
possibly 57:14
post 14:21, 20:7,
105:4, 132:16,
132:19, 133:10,
134:23, 135:2,
139:15, 139:22,
140:2, 140:16,
141:1, 154:25,
160:18
postage 57:18

postulated 151:7
potential 7:24,
22:11, 22:13,
29:1, 71:10, 86:3,
86:10, 87:1, 87:9,
87:18, 88:1, 88:2,
110:12
potentially 38:16,
45:4, 46:17,
46:18, 59:13,
87:14
power 18:17, 19:8,
19:17, 19:25,
75:21, 76:6,
131:6, 134:13,
134:14, 146:5,
149:15, 149:25,
150:2, 159:2
powerful 151:25,
152:1
powers 74:8, 130:16,
130:25, 143:5,
147:1, 147:12,
150:6, 152:7,
153:19, 159:7,
164:22
practical 23:6
practicalities 82:6
practice 55:3,
106:11, 107:1,
123:20, 175:15,
175:19
practices 175:24
pre-january 68:8
preamble 159:17
precedent 137:11
precise 164:8
Precisely 49:23,
50:25, 66:24,
119:11, 131:20,
132:2, 138:4,
141:7, 146:9,
158:6, 158:7,
160:2, 161:4,
164:1, 174:9
precludes 50:24,
64:9
preempt 89:24
preemption 74:7
preexisting 130:6

prefer 65:6, 137:12,
166:11, 169:8
preference 46:6,
168:6, 168:25
preferred 168:6
prejudice 87:14,
103:16, 106:23,
110:15, 118:1
prejudiced 67:23
prejudicial 86:10
prejudicing 59:10
preliminary 45:19,
46:25, 47:8,
47:13, 47:24,
48:2, 60:25, 61:1,
106:12, 106:14,
106:17, 168:24
premature 114:20
premise 131:13
PREPA 9:13, 9:16,
15:5, 15:7, 16:8,
18:9, 18:12,
18:13, 18:20,
19:8, 19:10,
20:14, 21:24,
22:21, 28:2,
28:10, 29:13,
131:25, 147:13,
175:7
PREPA'S 22:3, 22:17,
28:12, 29:14
prepare 91:20, 175:9
prepared 18:24,
44:12, 70:2, 70:3,
80:22, 87:23,
87:25, 122:1,
122:3, 122:5
preparing 124:3
prepetition 134:22,
134:23, 135:1,
154:20, 155:7,
155:14
prerogatives 50:20
present 100:7,
101:16, 113:14,
115:1, 118:22,
125:11, 164:16,
164:17, 165:8,
166:2
presentation 89:6,

119:20, 120:8,
121:11, 121:16
presented 31:10,
95:21, 125:19,
126:4, 140:23,
154:4, 164:11
presenting 110:4,
125:17, 166:7,
167:14, 168:12,
169:3
Presentment 28:17,
28:23, 91:22,
125:5, 169:18
preserve 84:12,
110:11, 142:1,
171:17, 171:23
preserved 142:4
preserves 119:2
preserving 38:11
press 6:6, 6:22,
21:14, 60:11,
80:7, 80:8
pressing 52:17
pressure 153:2
presume 56:2, 149:4,
150:20
presumed 156:17
presumptuous 119:3
pretty 59:8, 90:11
prevail 116:24,
154:6, 154:11
prevented 115:25
preventing 84:20
prevents 111:12,
113:10
preview 44:23, 71:2
previewing 44:24
previously 82:4
PRIDCO 10:22, 11:7,
11:9, 11:10
PRIFA 33:3, 44:1,
44:25, 49:4,
58:15, 59:16,
60:1, 62:21,
63:17, 63:20,
63:22, 64:1, 67:4,
68:8, 105:17
primarily 37:1
primary 34:21, 35:4
Prime 56:1, 56:5,

56:7, 56:9, 82:1,
105:5
primed 44:19
principal 10:23,
58:19, 64:3,
103:21, 135:16
principally 103:5
principle 156:14,
158:5, 158:18
prior 24:17, 45:2,
46:19, 65:24,
97:15, 99:1,
103:16, 116:18
priority 22:17,
52:11, 79:24
privilege 30:13,
93:3, 170:3
Pro 4:21, 39:24,
81:15, 81:18
probably 10:17,
48:15, 67:6, 77:1,
89:9, 129:17,
154:17
problem 50:2, 66:1,
83:22, 96:6, 96:7,
96:8, 102:3,
117:17, 119:12,
131:5, 153:10,
158:6, 158:7,
158:9
problematic 146:16
problems 88:1, 88:2,
116:1, 128:9
procedural 94:25,
104:19, 112:23,
116:3, 119:10,
164:10, 165:13,
166:6, 167:13,
169:3
procedurally 62:21,
112:19, 117:11
Procedure 106:2,
116:12, 165:17
procedures 13:7,
13:14, 13:20,
13:23, 14:3, 14:7,
61:23, 71:21,
71:25, 72:12,
107:12, 108:7,
113:3, 113:9,

113:11, 113:14,
118:24
proceed 13:22, 25:6,
33:8, 81:10,
112:18, 152:5,
154:12, 160:7
proceeded 101:1,
101:7
Proceedings 4:47,
6:15, 30:20,
47:19, 69:3,
71:20, 71:21,
72:5, 72:9, 73:4,
77:8, 87:17, 96:1,
102:10, 107:23,
116:19, 117:2,
119:21, 128:13,
176:11, 177:6
Proceeds 28:3,
100:17, 101:5
processed 42:15,
43:8, 68:14
procure 8:10
procuring 18:4
produced 4:47, 156:4
productive 83:14
professional 151:1,
151:2
professionals 8:9,
11:5, 11:14, 11:15
Program 15:23,
15:24, 16:3,
16:22, 23:18
programs 15:25,
16:6, 16:19
progress 17:24,
102:16
progressed 8:3
prohibit 135:1
prohibits 133:19
project 18:22,
18:25, 19:13,
20:16
projects 15:3, 15:5,
15:15, 15:17,
16:13, 16:14,
16:23, 18:4, 18:8,
19:2, 19:9, 19:15,
19:19, 19:22
PROMESA 1:8, 1:24,

2:5, 74:8, 89:22,
117:2, 129:23,
133:18, 133:19,
137:17, 138:17,
141:8, 141:25,
142:6, 143:6,
146:18, 147:8,
148:9, 149:2,
159:7, 163:18
promise 136:6
promises 102:15
promptly 161:13
Proof 145:1, 170:20
Proofs 26:17, 72:3,
80:11, 135:11,
136:9, 143:23,
170:15, 172:22
proper 50:1, 62:22,
173:12
property 29:9,
132:7, 132:11,
139:13, 140:11,
140:12, 151:22,
153:12, 154:23,
160:14, 160:15
proponent 22:9
proponents 22:5
proposal 10:11,
12:10, 13:5,
44:11, 47:7,
47:24, 56:21,
57:3, 60:24, 62:8,
62:20, 65:2,
73:24, 74:22,
84:17, 127:1
proposals 13:18,
41:18, 47:15,
47:22, 123:19
propose 14:6, 63:18,
64:25, 65:14,
73:18, 105:23,
106:18
proposes 118:7,
124:13
proposing 73:9,
118:5, 118:15,
119:14
proposition 37:22,
114:11, 129:25,
151:24, 159:3

propriety 45:17
prosecute 136:5,
142:20
prosecuted 77:18
prosecuting 157:20
prosecution 112:6
Proskauer 7:10,
12:6, 28:6, 92:6,
108:4, 170:12
protect 136:5,
139:13, 149:8
protected 81:12,
143:14, 143:16
protecting 150:7
protection 138:2
protections 147:15,
147:16, 147:20,
147:22
protocol 44:13,
99:1, 99:5
prove 136:8, 136:11
provide 11:21,
14:25, 15:4, 16:2,
20:17, 20:24,
47:25, 98:20,
106:14, 143:11,
147:23, 153:14,
154:2, 158:23
provided 15:7,
53:12, 60:23,
105:20, 115:18,
116:17, 144:6
provider 56:8
providers 25:6
provides 16:3,
16:16, 17:3, 35:7,
77:11, 78:10,
81:14, 142:24,
155:11
providing 172:24
province 57:15
provision 75:17,
77:22, 78:7,
129:21, 129:22,
131:10, 132:2,
156:1
provisional 13:13
provisions 7:23,
23:16, 53:12,
71:6, 72:24,

104:20, 129:15,
129:18, 130:1,
130:15, 130:24,
131:6, 132:24,
137:18, 152:3,
152:10, 155:1,
159:7
proviso 163:23,
165:20
proximity 66:4
prudent 33:19
Public 4:24, 6:6,
7:17, 9:7, 9:21,
9:24, 10:7, 10:22,
15:23, 16:3, 16:5,
16:8, 20:7, 21:17,
21:20, 38:9,
60:20, 80:1, 80:6,
81:22, 83:24,
150:6
publication 37:16,
37:19, 37:22,
55:20, 105:5
publications 37:20
publicize 38:5
publish 36:20
published 37:20,
38:3, 38:4, 38:9,
38:24, 105:8
punt 153:16
purely 130:21, 159:3
purport 170:17
purported 128:15
purporting 172:25
purpose 125:17,
156:2
purposes 17:3,
37:25, 95:4,
111:16, 157:13
Pursuant 72:23,
127:16, 141:23,
159:6, 163:17,
165:17
pursue 44:9, 79:24,
111:16, 129:3,
139:1, 148:7,
152:22, 152:24
push 77:15, 86:6
put 23:10, 29:21,
31:21, 31:24,

32:5, 32:21, 35:3,
47:9, 47:19, 48:4,
51:18, 52:12,
58:12, 58:18,
59:18, 59:22,
62:9, 62:10,
63:21, 88:10,
89:21, 90:10,
90:13, 111:22,
121:21, 148:6,
149:22, 153:1,
153:17, 169:9
putative 72:12
putting 48:10, 91:5,
97:2, 100:2


< Q >
qualification 133:3
qualifying 11:4,
11:10
quality 48:18
quarter 11:11, 102:7
question 33:24,
36:23, 44:22,
53:5, 59:21,
59:22, 61:19,
75:9, 75:25,
90:14, 92:10,
108:6, 108:18,
112:23, 115:3,
136:18, 138:18,
149:7
questionable 156:5
questions 11:25,
14:10, 20:19,
24:23, 28:16,
28:19, 28:21,
40:8, 40:10,
41:22, 83:13,
144:22, 161:8,
161:9
quick 102:13
quickly 8:4, 8:17,
46:7, 84:11,
106:13
quite 49:15, 70:10,
89:7, 97:20,
108:12
quote 68:25, 139:6,

139:12, 139:18,
151:21, 151:22,
153:21, 156:2
quotes 69:23


< R >
Raiford 3:49,
151:15, 151:16,
151:17
raise 8:15, 36:18,
49:11, 56:4, 88:1,
124:14, 144:4,
153:8
raised 32:6, 35:1,
35:5, 50:12, 58:9,
64:5, 73:4, 74:18,
76:23, 81:9,
81:13, 83:14,
86:15, 96:13,
98:13, 107:17,
107:19, 107:23,
111:25, 138:11,
145:1
raises 84:2
raising 96:16,
116:6, 116:7
rapid 105:24
Rappaport 3:12
Ratchet 111:7
rather 64:12, 115:2,
115:5, 117:7,
120:14, 146:11,
160:7, 169:17
Re 1:6, 1:22, 2:3
reach 20:6, 87:3,
98:4, 150:5,
159:19
reached 86:13,
87:24, 91:3,
92:18, 145:16,
173:4
react 49:13, 56:18,
68:12, 118:20,
122:12
reacting 49:14
reaction 55:20, 79:8
reactions 43:9, 55:9
read 34:24, 35:4,
47:7, 50:21, 74:5,

80:8, 122:11,
163:17, 168:9
readers 37:22
reading 68:16,
123:24, 132:1,
139:18, 148:21,
160:23
ready 12:23, 29:23,
44:19, 74:15,
163:5
real 152:5
realities 83:6
realize 45:4, 46:16,
52:6, 81:8, 82:3,
92:16
really 43:13, 51:14,
61:19, 64:12,
67:9, 70:11,
70:17, 73:6,
75:16, 78:7, 83:5,
84:17, 96:11,
109:21, 138:1,
144:7, 149:10,
149:11, 149:14,
150:11, 152:11,
165:9, 175:18
reason 44:21, 48:3,
52:15, 57:8,
61:15, 62:10,
67:16, 73:11,
73:12, 84:13,
84:23, 99:1, 99:6,
109:19, 109:20,
116:24, 148:12,
150:8, 160:6,
162:18, 169:1,
175:11
reasonable 32:21
reasoning 131:25
reasons 37:1, 72:6,
119:18, 121:23,
133:15, 134:15,
143:3, 155:6,
156:23, 166:12
reassuring 123:12
rebuild 17:3
rebut 49:17, 158:24
rebuttal 40:22,
54:4, 153:15,
155:8

recall 35:6, 59:14,
  63:19, 86:17,
  144:8
receive 16:25,
  19:11, 157:25
received 9:17, 13:4,
  13:10, 13:15,
  17:14, 22:2,
  24:22, 25:17,
  25:20, 25:23,
  28:18, 30:3,
  173:9, 174:2
received. 139:20
receiver 131:25
receiving 14:5
recent 13:7, 24:16,
  58:24
recently 13:10,
  14:4, 59:12, 64:6
recess 102:9
recipient 129:6
recission 156:1,
  156:8
recited 27:15
recognition 156:21
recognize 23:1,
  130:5, 138:13,
  138:16
recognized 131:4
recognizing 40:7,
  130:9, 137:2
Recommendation 30:2,
  32:22, 34:23,
  55:25, 71:9,
  102:24
recommendations 7:21
recommended 35:19,
  36:25, 94:20
reconciliation 13:14
Reconstruction 15:9,
  20:8
reconvened. 102:10
record 6:15, 57:6,
  59:14, 59:23,
  62:17, 75:7, 80:1,
  80:6, 84:25, 96:2,
  128:2, 157:5,
  170:14, 172:21,
  173:3
recorded 4:47

recording 6:20
recover 151:22,
  162:23
Recovery 10:20,
  15:8, 15:12,
  15:25, 16:1, 20:7
redemption 170:18
reduce 104:22
reducing 16:24
refer 6:17, 103:1,
  103:24
reference 55:1,
  82:13, 95:14,
  95:16
references 71:10
referred 21:24,
  86:5, 91:18,
  132:9, 147:5
referring 95:19
refers 95:1, 140:16
refile 77:14
refiling 78:4
refine 13:17
refinements 13:12,
  14:3
reflect 173:12
reflected 70:17,
  104:12, 174:14
reflecting 103:12
reflects 32:2
reformation 29:19
reformed 101:2
reformulate 164:4,
  169:13
reformulated 12:10
reformulation 10:11
refrain 69:6
refunded 170:17
refusal 138:24
refused 129:3,
  129:11
refusing 131:15,
  131:16, 132:3,
  132:4, 159:25
regard 13:17, 18:19,
  21:16, 21:17,
  56:12, 84:16,
  143:12
regarding 7:15, 9:1,
  9:3, 14:20, 25:25,

38:6, 41:6, 70:8,
  71:14, 79:9, 86:1,
  86:7, 86:14,
  86:15, 87:1,
  92:10, 94:12,
  101:1, 102:14,
  104:8, 107:20,
  115:17, 120:12,
  120:13, 125:5,
  131:9, 144:7,
  157:12, 164:22
regardless 137:20,
  137:23
regards 18:9, 19:23
Region 3:15, 19:4
registration 86:23
Registry 171:25
regulatory 134:13,
  134:14
reinstated 54:22,
  111:13
reiterate 79:23
rejected 141:6,
  147:17
rejects 131:21
relate 43:24, 71:12,
  71:13
related 21:22,
  41:17, 64:10,
  87:2, 90:21,
  90:23, 91:5,
  97:21, 106:11,
  128:24, 157:11
relates 25:16, 51:3,
  54:16, 54:18,
  59:6, 71:1, 72:2,
  72:3, 94:4, 144:2,
  146:1
relating 11:9,
  17:21, 38:2,
  73:14, 91:12,
  101:5, 106:25,
  131:2
relation 54:17
relations 11:12,
  11:14, 81:22
relationship 51:9,
  139:24, 140:4,
  149:17
relationships 149:16

relative 42:6, 42:7,
    44:3, 44:18,
    51:22, 52:10,
    53:1, 55:7, 57:12,
    57:13, 92:21,
    98:2, 98:7, 98:15,
    99:4, 99:8, 99:18,
    108:9
relatively 132:17
Release 21:14, 28:3,
    60:11, 157:23,
    157:24, 157:25
released 11:19,
    82:16
relevant 42:16,
    53:17, 59:13,
    103:17, 117:8,
    138:15, 138:20,
    146:4, 146:5,
    148:13
reliability 22:15
relief 50:17, 50:18,
    59:2, 73:20,
    80:13, 109:3,
    109:7, 112:9,
    129:19, 134:5,
    135:20, 142:21,
    142:22, 160:3,
    161:25, 175:4
remain 44:8, 73:12,
    98:24, 103:17,
    163:21, 164:1
remainder 61:10,
    166:18
remaining 19:16,
    25:18, 29:10,
    55:11, 153:7,
    170:24, 173:19,
    173:21, 174:4,
    174:7
remains 163:12
remarks 30:7, 41:3,
    42:10, 54:14,
    58:2, 103:6,
    158:22
remedies 136:14
remedy 116:25,
    121:25
Remember 54:9, 78:1,
    101:25, 122:23,

    167:4
reminder 6:10
reminding 144:25
remiss 30:22
remitted 44:13
removed 171:25
removes 149:22
removing 125:21
render 147:4
rendered 131:22
renders 131:17
renewal 103:16
renewed 127:17
repair 15:16, 15:19,
    16:7, 16:11, 17:11
repairing 17:12
repairs 14:21, 16:4,
    17:9, 17:10,
    17:18, 17:19,
    17:21, 17:22,
    18:1, 18:2, 18:5,
    18:6, 18:10,
    18:15, 18:17
repeat 41:10, 81:16,
    82:7, 122:21,
    167:4, 167:5
repeatedly 64:6
replace 23:22, 97:14
replies 65:14
Reply 65:10, 65:13,
    65:22, 77:3,
    79:10, 90:18,
    107:2, 147:25,
    153:8, 153:15,
    156:18
reported 154:19
Reporter 177:15
reporters 81:25
reporting 23:19
reports 24:3
repository 6:14
represent 82:5,
    109:25, 110:3,
    110:18, 115:12,
    158:3
representation
    27:17, 120:24
representative 1:13,
    1:29, 2:10, 9:15,
    38:22, 40:19,

    53:16, 83:17,
    136:23, 138:17,
    139:3, 141:3,
    158:10
representatives
    20:15
represented 128:4
representing 100:20,
    116:15, 144:12
request 26:15,
    29:15, 52:22,
    67:25, 90:22,
    104:17, 141:6,
    172:6, 173:9
requested 19:19,
    40:19, 50:18,
    106:20, 142:23
requesting 26:7,
    27:15, 28:10,
    50:18, 142:19
requests 7:2, 8:25,
    99:18, 175:16
require 66:7, 105:1,
    115:4, 156:2
required 19:12,
    20:14, 45:12,
    93:24, 113:4,
    113:12, 153:20,
    166:10, 167:23
requirement 34:18,
    34:20, 35:2, 63:6,
    78:17, 107:19,
    131:16, 136:10,
    138:14, 138:23
requirements 107:15,
    166:7, 167:13,
    168:12, 169:3
requires 156:12
requiring 68:18,
    92:23, 106:8
res 59:5, 60:6
reservation 99:21,
    120:13, 126:13,
    161:16, 161:18,
    161:23
reservations 86:2
reserve 40:11,
    40:22, 49:16,
    55:16, 62:13,
    67:7, 76:12, 85:2

reserved 54:4,
    76:24, 126:6
reserving 77:4,
    88:22
Resiliency 15:9
Resolution 9:1,
    48:6, 48:10,
    48:11, 52:11,
    132:25, 146:6,
    149:18, 158:14
resolve 31:13,
    32:11, 32:17,
    151:23, 168:8
resolved 24:17,
    31:2, 52:18, 55:6,
    79:3, 170:24
resources 74:23
Respectfully 79:23,
    81:19, 82:2,
    82:10, 82:12,
    118:5, 121:1
respects 112:16,
    149:15
respond 8:19, 41:18,
    68:20, 83:13, 89:5
respondents 30:8
responding 58:8
response. 24:5
Responses 13:3,
    13:15, 31:8,
    31:22, 31:25,
    32:5, 40:12, 43:4,
    71:7, 96:2,
    102:24, 103:3,
    104:25, 172:6,
    173:8, 173:22,
    173:25
responsibilities
    30:17
responsibility 10:3,
    35:25
responsive 74:21,
    99:17
rest 36:1, 65:10,
    83:12, 136:16,
    163:20, 169:24
restoration 18:19
restore 18:16,
    142:25
restoring 10:3

restrict 114:10
restrictions 81:2,
    82:16
Restructuring 11:1,
    23:11, 142:6,
    143:8
result 12:12, 12:21,
    13:20, 14:2,
    128:19, 135:20,
    156:4
resulted 21:9, 82:13
resulting 12:14
resume 102:6
resumption 127:2
retained 56:7,
    144:8, 144:13
Retired 3:46
Retiree 145:19,
    151:17, 152:15,
    152:20, 160:17,
    160:21
Retirees 4:19,
    115:11, 115:12,
    115:16, 120:15,
    120:18, 150:7,
    160:10, 168:5
Retirement 2:12,
    23:1, 23:18, 133:4
retiring 23:3
retransmission 6:20
return 29:22, 50:6,
    81:10, 142:23,
    154:7
returning 98:8
Revenue 63:23,
    64:21, 67:2,
    69:21, 71:13,
    86:12, 105:16,
    106:11, 158:1
revenues 86:19,
    89:25, 90:1,
    128:16, 128:22
review 19:11, 35:8,
    80:2, 101:23,
    173:3
reviewed 25:2,
    31:22, 34:21, 43:4
revise 41:13, 104:3,
    105:1, 105:18,
    107:6

revised 14:7, 26:4,
    26:5, 26:17,
    27:19, 28:17,
    73:17, 88:18,
    97:3, 104:10,
    104:14, 105:3,
    107:8, 112:15,
    112:16, 172:10,
    174:13
revisions 41:11,
    46:22, 64:23,
    68:21, 102:21,
    102:22, 104:17,
    108:1
revisit 52:19
revisitation 107:9
revisiting 107:3
Richmond 146:13,
    159:22, 160:1
rights 61:24, 67:7,
    69:5, 76:23,
    84:12, 85:2,
    87:15, 88:22,
    98:3, 99:21,
    111:3, 112:13,
    120:13, 120:17,
    126:23, 130:10,
    157:25, 161:16,
    161:18, 161:23
ripe 44:19, 74:13
rising 89:4
road 90:12, 161:6
roadways 17:12
Robert 4:25, 83:23
robust 40:5, 82:14
role 102:14, 128:9,
    132:6, 159:16
room 94:14, 96:11
Rose 7:11, 12:6,
    108:4, 170:12
Rosen 10:15, 12:7
ROSENBLUM 4:8,
    127:20, 127:22,
    127:24, 128:1,
    128:2, 129:17,
    130:8, 137:5,
    138:10, 141:7,
    141:17, 150:12,
    157:4, 157:5,
    161:11, 161:14

round 74:20
route 106:17
RSA 11:4, 11:6,
  11:9, 22:22, 22:23
Rudnick 124:25,
  163:8
rug 142:8
ruin 39:9
Rule 45:10, 45:21,
  47:10, 47:18,
  48:4, 62:23, 77:3,
  106:1, 116:12,
  133:15, 155:13
Rules 61:23, 63:8,
  106:2, 116:12,
  119:10, 137:9,
  166:14, 172:24
ruling 8:23, 100:9,
  168:24
rum 98:18
run 169:13

< S >
S/ 177:13
Safe 169:25, 176:9
safety 17:12, 17:21,
  18:2
sake 152:22
Sales 1:31
salutary 45:14
San 6:1, 6:7, 10:16,
  61:17, 175:8
sanctions 6:25, 64:8
satisfied 31:20
satisfy 29:8
saw 21:2, 72:10,
  73:22, 109:6
saying 42:2, 47:4,
  54:12, 75:7,
  75:11, 78:12,
  78:14, 81:4, 93:6,
  96:18, 101:18,
  110:23, 120:1,
  120:4, 131:5,
  138:3, 147:19,
  162:6, 166:25,
  167:10
says 29:8, 29:12,
  50:17, 60:1,

69:22, 70:14,
  72:25, 73:2, 74:9,
  77:15, 77:18,
  77:24, 97:13,
  108:16, 112:19,
  118:17, 118:25,
  120:14, 120:20,
  131:22, 132:25,
  133:1, 137:14,
  141:20, 157:17,
  159:17, 167:12
scale 47:1, 100:3
scenario 46:3,
  154:5, 154:10
scenarios 154:4
scenes 93:24
schedule 8:3, 32:12,
  35:7, 37:8, 47:13,
  65:5, 65:8, 66:15,
  66:17, 66:18,
  67:11, 67:15,
  68:3, 84:24,
  86:10, 86:11,
  87:1, 87:12,
  103:25, 104:11,
  105:19, 105:24,
  107:25, 174:13
scheduled 7:25,
  13:2, 175:6, 175:8
schedules 31:15,
  31:18, 31:21,
  86:3, 88:15, 93:7,
  93:13
Scheduling 31:1,
  31:6, 31:9, 32:7,
  32:15, 33:2,
  33:10, 57:6, 67:4,
  84:5, 85:2, 90:22,
  91:2, 91:6, 91:8,
  91:11, 91:14,
  91:16, 91:17,
  91:19, 92:14,
  93:21, 95:21,
  106:19, 107:9
School 146:14
Sciemus 2:21, 4:27
scope 9:3, 33:14,
  59:15, 90:12,
  95:12, 105:17,
  117:14, 154:6,

157:12
score 79:13
scribbled 122:11
Se 4:21, 39:24,
  81:15, 81:19,
  144:16
season 40:1, 40:6,
  175:13
seated 102:11
Second 21:13, 22:10,
  32:18, 33:23,
  37:11, 57:11,
  58:23, 64:21,
  86:5, 132:5,
  143:10, 154:10,
  154:15, 155:10,
  161:15
secondary 34:19
Secondly 36:16,
  142:25
seconds 76:25, 89:7
Section 8:23, 68:22,
  68:23, 69:8,
  69:15, 75:1,
  77:24, 78:1,
  90:21, 105:8,
  106:16, 106:20,
  127:16, 129:12,
  129:20, 132:25,
  133:1, 148:12,
  157:13, 163:18
Sections 89:22,
  128:7, 129:14,
  151:9
sector 22:1, 22:15,
  22:16
sectors 10:8
Secured 44:5, 59:2,
  60:6, 61:9, 79:24,
  128:3, 136:12,
  157:6
security 98:17,
  98:20
seeing 92:1
seek 20:12, 50:23,
  79:24, 87:22,
  112:20, 118:15,
  126:6, 142:20,
  156:19, 165:16,
  166:10

seeking 7:22, 61:23,
    73:20, 109:3,
    153:11, 157:14,
    160:3
seeks 28:25, 152:6,
    170:15, 172:21
seem 49:14, 56:11,
    79:1, 136:22,
    149:14
seemed 34:6, 34:14,
    36:3, 39:1, 39:12,
    123:14
seemingly 94:4
seems 37:4, 37:24,
    43:7, 90:11,
    114:9, 118:8,
    121:7, 123:19,
    125:3
seen 73:6, 73:9,
    73:12, 118:14,
    120:19
selection 22:9
Seminole 155:9
Senate 11:20
send 37:4, 121:17,
    121:18, 121:24,
    133:6
sense 38:13, 45:18,
    47:4, 130:9,
    134:24, 135:1,
    152:5, 152:12,
    154:18
sensitive 175:15
sent 13:16, 26:10,
    27:16, 56:23,
    57:1, 133:7,
    141:18
sentence 118:17,
    122:9, 163:17,
    164:22
separate 8:23,
    77:14, 86:2,
    133:24, 139:6
separately 96:20
September 24:21
sequencing 159:9
series 80:12, 95:1
serious 9:17, 84:3,
    120:14
SERVAIS 4:11, 64:17,

66:5, 66:24, 67:1,
    68:19, 70:6,
    70:15, 70:20,
    87:16, 93:2, 96:4
serve 26:9, 33:20,
    35:25, 108:8,
    158:12
served 27:21, 36:4,
    36:6, 36:9, 72:22,
    72:23, 107:13,
    108:17
service 25:6, 36:10,
    56:8, 57:12,
    105:2, 107:14
servicer 85:12
Services 4:5, 16:17,
    108:25, 165:6
serving 108:10
session 83:8
sessions 7:19, 7:24,
    49:22
set 34:4, 34:12,
    44:4, 44:17, 50:7,
    54:13, 55:4, 61:3,
    61:5, 61:7, 62:11,
    88:8, 104:11,
    106:21, 130:20,
    132:14, 160:12
sets 109:22
seven 35:19, 57:22,
    58:6, 64:16,
    80:16, 80:19,
    111:5
sever 73:25
several 12:19,
    12:20, 13:2,
    79:22, 133:14,
    145:13
severance 74:24,
    94:17
severely 152:9
shall 29:13, 122:18,
    123:4, 123:11,
    165:22, 166:6,
    167:12
shape 95:13
shared 13:6, 13:11,
    14:2, 20:1, 31:4
shield 82:20, 109:16
shift 52:5, 114:14,

161:5
ships 43:20
shockingly 92:19
shoes 12:7, 30:17
short 62:4, 97:20
shortly 9:15, 104:22
shot 104:7
shouldn't 117:5,
    135:9, 165:13
shouting 96:10
show 49:15, 62:10,
    133:16, 141:4,
    155:21, 156:3
showing 59:4, 59:6,
    144:18, 153:21
side 31:25, 33:17,
    33:18, 41:19,
    89:8, 92:15,
    129:2, 162:3,
    162:4, 162:9
sides 146:3
sign 29:7, 159:10
signage 17:12, 18:2
signaling 66:22
signals 6:18, 17:13,
    17:22
signed 159:8, 159:12
significance 69:24
significant 21:25,
    31:16, 33:11,
    87:18, 103:7,
    115:4, 115:5,
    132:22, 151:11
signing 141:2
silence 162:2, 162:7
silent 52:15, 90:8
similar 61:7, 86:20,
    101:25, 116:8,
    163:24
Similarly 126:17,
    157:18
simple 109:3, 116:24
simpler 56:11
simplest 99:15
simply 30:17, 32:14,
    32:16, 32:20,
    33:12, 34:23,
    35:3, 53:11,
    55:15, 66:14,
    69:6, 73:24, 75:7,

90:8, 125:16,
125:20, 126:13,
126:17, 126:22,
130:24, 134:16,
136:13, 147:10,
149:7, 149:18,
149:21, 153:16
simultaneously 109:7
single 21:5, 21:6,
42:24, 60:13,
131:10, 139:17,
160:22
Sir 83:18, 85:3,
85:13, 117:4
sister 171:9
sit 89:4, 166:16,
167:3
sits 60:13
situation 35:17,
83:6, 110:5,
129:4, 144:14,
150:9
situations 38:24
six 16:5, 24:20,
72:14, 72:17,
73:1, 80:12,
80:19, 81:14,
91:19, 111:23,
162:15, 165:9
Sixth 24:15
Skadden 108:25
slate 77:10
slide 66:22
slightly 36:23, 37:4
slow 8:7
smart 95:5, 95:6
smother 135:25
snuffed 160:8
sole 53:16, 118:18,
119:5, 122:18,
123:4, 165:22,
166:6, 167:13
solely 110:10,
119:24, 155:7,
163:19, 163:20
solicit 22:10
solution 82:8
solutions 31:5
somebody 66:23,
132:10, 175:11

somehow 51:21, 53:9,
53:13, 66:16,
67:24, 74:16,
140:13
someone 24:8,
123:25, 124:3,
156:21
sometimes 8:7, 21:3,
30:23
somewhat 37:21,
96:16, 102:20
soon 16:15, 82:1,
84:24, 104:15,
141:22
sooner 64:12
sorry 24:9, 24:20,
26:5, 42:2, 60:10,
89:2, 110:6,
118:13, 127:20,
127:21, 133:10,
144:24, 147:15,
167:8, 171:19,
174:15
sort 39:1, 56:19,
94:23, 130:14,
147:4, 149:9
sorts 50:22
Sosland 3:28, 70:22,
70:23, 70:24,
75:3, 75:9, 76:12,
76:16, 79:15,
94:6, 95:1, 95:14,
96:14, 97:5, 97:6
sought 129:2, 143:8,
162:15
sound 147:6
sounded 174:23,
174:24
sounding 22:13
sounds 174:21
source 6:14, 130:11,
130:12
sources 15:3, 15:22,
17:2, 19:10
sovereign 130:7,
130:9, 137:9
Spanish 39:21, 57:4,
104:15, 122:25
spare 63:13
speaking 49:13,

79:17, 83:17,
85:5, 109:21,
112:25
speaks 43:13, 50:10,
96:8
Special 3:32, 125:1,
125:12, 158:14,
163:9, 163:22
specific 46:8,
52:10, 55:1, 90:4,
149:12
Specifically 16:9,
19:23, 58:8,
68:21, 69:12,
96:13
speculating 124:15
speedy 10:20
spent 48:16, 48:18
split 134:21, 154:16
spoken 23:8
squared 132:12
STADLER 3:43, 24:9,
24:10, 24:11,
24:12, 25:10
staff 39:12, 39:13,
40:5, 175:25
staffed 40:2
staffing 175:13
STAFFORD 3:9, 10:12,
12:4, 12:5, 12:6,
14:12, 25:13,
25:14, 26:8,
27:22, 27:25,
170:10, 170:11,
170:12, 172:4,
172:11, 172:17,
172:19, 173:13,
173:17, 173:19,
174:9, 174:21,
174:25, 175:1
stage 116:5, 119:20,
134:24, 153:17,
161:4
stake 69:20
stand 40:12, 124:3,
132:24
Standard 7:4, 63:3,
63:4, 106:3,
155:23, 156:13
standards 45:10,

62:12
standing 44:5, 44:9,
  58:21, 61:9,
  86:15, 87:1,
  87:14, 126:12,
  135:16, 135:21
start 6:10, 12:8,
  30:22, 58:8, 71:4,
  88:2, 97:3, 145:9
started 15:20,
  102:15
starting 21:19,
  96:15, 127:19,
  159:10
starts 123:9
state 50:24, 84:25,
  114:12, 115:13,
  116:24, 117:5,
  117:8, 117:11,
  118:7, 119:15,
  121:3, 125:6,
  125:23, 125:24,
  126:4, 126:8,
  133:23, 137:12,
  137:14, 137:16,
  137:17, 140:18,
  146:23, 146:25,
  148:3, 149:3,
  151:20, 160:2
stated 126:14,
  166:13, 167:18
statement 7:22,
  98:16, 106:22,
  124:16, 139:7,
  140:21, 140:25,
  158:24
statements 68:17,
  103:4
States 1:1, 2:37,
  2:39, 11:20,
  30:10, 35:9,
  35:13, 36:13,
  37:14, 38:15,
  39:3, 39:16,
  40:15, 100:12,
  121:4, 154:22,
  159:15, 165:21,
  177:7, 177:8
stating 95:15
status 7:5, 7:12,

9:21, 10:10, 12:1,
  14:9, 14:20,
  20:17, 24:3,
  42:17, 44:5, 59:2,
  61:9, 77:7, 79:25,
  116:3
statute 78:1, 94:10,
  112:5, 115:23,
  115:25, 133:25,
  135:23, 135:25,
  141:17, 147:22,
  148:3, 148:6,
  148:10, 149:12,
  150:19, 150:20,
  155:23, 156:8,
  160:8, 160:24,
  161:1
statutes 89:25,
  160:20
statutory 131:3,
  132:12, 132:24,
  138:17, 139:3,
  141:2
stayed 73:2, 73:12,
  91:1, 91:9, 112:7,
  113:20
staying 161:22
stays 46:18, 47:2,
  61:16, 61:22
steady 8:3
stenography 4:47
step 22:13, 22:18,
  27:20, 42:23,
  73:22
steps 41:7, 66:10,
  81:11, 105:9
stip 88:13, 88:19,
  107:8
stipulated 91:23,
  108:1, 110:11,
  139:11
stipulation 77:11,
  77:15, 77:17,
  77:22, 77:25,
  79:9, 86:13, 88:6,
  91:21, 93:11,
  96:18, 97:15,
  97:21, 97:25,
  107:5, 107:6,
  118:22, 120:19,

120:20, 120:21,
  120:24, 139:10,
  144:14
Stockton 130:23,
  137:13, 148:1
stop 123:17, 130:25
straight 139:8
streamline 107:16,
  107:22
Street 19:6, 36:20
strengthening 23:17
stretch 156:20
strict 82:11
strictures 151:3
strike 64:7, 165:1,
  165:9
strongly 34:9, 68:5,
  70:16, 83:11,
  84:13, 148:15
struck 113:21, 148:2
structure 23:15,
  45:7, 47:8, 47:16,
  55:11, 61:3, 61:5,
  61:6, 61:7, 68:16,
  76:5, 96:13,
  123:21, 149:2,
  150:5, 158:19
structuring 149:19
stuck 41:23
stuff 93:12
subcategory 56:2
subinvestment 60:14
Subject 6:25, 11:25,
  28:19, 64:2, 72:5,
  88:21, 91:17,
  98:4, 106:1,
  107:8, 112:5,
  119:1, 122:16,
  123:13, 128:13,
  151:1, 160:16,
  172:7, 172:9
subjects 43:24
submission 50:16
submissions 19:1,
  35:8, 41:6, 41:10,
  43:10, 103:13,
  103:16
submit 18:21, 80:10,
  80:11, 82:2,
  101:2, 108:11,

118:5, 121:1,
130:18, 133:20,
134:13, 136:1,
136:11, 147:19,
174:12
submits 73:11
submitted 19:1,
19:14, 109:5,
112:14, 150:24
subsequent 13:3,
48:9
subsequently 115:16,
117:24, 159:8
subservient 140:14
substance 32:12,
33:11, 71:15,
71:24, 74:11,
146:21
substantial 15:19,
17:20, 32:8, 33:2,
37:7, 90:25,
153:21
substantially 17:23,
18:18, 101:25,
134:14
substantive 7:14,
30:24, 32:8,
32:15, 33:3,
74:17, 84:5,
97:24, 129:21,
130:12, 130:14,
133:19, 133:21,
148:4, 155:11
substations 19:7,
19:17
successful 31:2,
157:11, 162:2
successors 30:16
succinctly 23:10
sue 120:23
suffered 28:12
suffices 156:3
sufficient 53:10
sufficiently 25:3,
172:14
suggest 34:25, 90:6,
101:20, 113:1,
118:8, 121:7,
147:9, 158:4,
166:4, 166:8

suggested 33:25,
34:20, 41:11,
42:6, 46:22, 64:8,
69:18, 106:8,
125:7, 125:11
suggesting 98:23,
126:9, 161:25
suggestion 36:11,
45:11, 51:5
suggestions 58:13
suggests 105:7,
114:4, 115:24,
147:3, 152:2,
167:23
suing 109:12
sum 17:10
summary 116:4
Sunni 3:32, 124:24,
163:8
superb 176:2
superior 121:5
supplemental 13:16,
24:16, 25:20,
25:24, 26:2,
26:10, 27:19,
48:3, 48:5, 174:2
supply 156:9
Support 7:17, 8:12,
8:14, 11:1, 11:23,
22:21, 27:14,
27:18, 65:10,
67:5, 68:22,
70:16, 109:17,
158:25, 176:2
supporting 9:19,
153:5
supports 154:21
suppose 31:24
Supreme 78:2, 155:25
surely 10:1
surplusage 131:18,
147:2, 147:6
surprising 32:1
Surreply 112:15,
115:3, 115:6
suspected 60:4
sustained 26:16,
95:20, 172:8,
173:14, 174:16
Sutcliffe 85:16,

85:18, 85:23
Swain 2:36, 7:8,
30:11, 177:7
swept 142:8
sword 82:20, 109:16
sync 8:6
System 2:12, 18:14,
18:16, 18:20,
22:4, 128:12,
131:2, 133:4,
149:20, 149:21,
152:10
systems 19:25

< T >
table 23:14, 54:13,
55:4, 104:11
Taft 64:18
tailored 59:9
taken. 102:9
Takings 67:20,
159:14
talked 93:12, 134:15
talks 133:11, 137:13
tandem 84:17
tardes 102:11
Tax 1:31
taxes 86:22, 86:23,
90:1, 98:18
Taylor 2:36, 177:7
Teachers 133:4
technical 138:14,
154:18
technological 96:6,
96:8, 102:12
teed 74:14, 74:19,
142:3
telephone 96:10
telephonic 6:8
tells 91:24, 152:12
temporary 15:16,
15:19, 15:21,
16:7, 16:11, 18:17
ten 9:10, 19:13,
175:20
tens 81:23
tension 76:5
term 49:25, 62:4
terms 7:18, 8:20,

10:22, 11:12,
11:18, 22:6, 23:5,
23:6, 26:3, 71:21,
92:23, 94:21,
105:20, 110:2,
112:25, 121:17,
128:10, 130:5,
132:6, 143:7,
149:16, 150:7
terribly 116:17
terrific 23:23
territorial 136:24
territory 69:20,
87:11, 137:4
test 156:9, 156:12
Testing 83:19, 83:20
Texas 121:2, 137:13,
137:14
text 50:15, 103:24,
104:4, 108:15
texting 6:23
thanking 30:22
Thanks 23:24, 145:5,
163:3
themselves 110:1,
132:25, 156:18,
160:20
theories 71:14
there'd 97:2
thereafter 113:21
thereon 24:4
thereto 103:3
they'll 136:7
they've 34:21,
74:19, 146:20
thinking 51:21,
62:3, 89:5, 89:11,
110:14, 148:25
thinks 54:2
Third 21:23, 29:2,
64:22, 117:20,
134:3, 143:15,
143:21
though 36:23, 52:22,
120:20
thoughtful 31:8
Three 16:25, 23:7,
23:21, 29:12,
52:10, 54:19,
64:19, 71:11,

71:19, 83:19,
83:20, 86:4, 86:8,
86:12, 86:25,
128:11, 128:20
threshold 44:5,
156:5
thumb 100:3
tilt 33:16, 55:11
tilts 150:14
timeliness 114:2,
114:21
timely 77:19, 81:19
timetable 45:7,
46:5, 46:9, 47:22,
66:21, 104:16,
105:22, 106:16
timing 7:3, 22:23,
31:15, 33:6,
33:14, 36:16,
36:23, 45:12,
104:21, 105:17,
106:10
Title 1:8, 1:24,
2:5, 11:10, 22:18,
22:21, 23:6,
104:3, 130:7,
136:13, 136:23,
137:16, 139:11,
141:12, 146:25,
147:10, 147:11,
147:16, 147:21,
150:17, 150:24,
151:8, 151:12,
172:23
to-wit 71:13
together 22:8,
63:24, 68:14,
97:1, 105:23,
114:23, 146:10,
151:9
toll 21:18
tolling 139:9
tons 162:4
took 49:21, 147:17
tool 129:22, 130:10,
152:1
top 22:16, 25:5
topic 7:12, 10:10,
14:22, 138:13
tossed 54:16

total 12:14, 18:25,
19:13, 141:11
totality 138:21,
141:9
Totally 48:22,
93:18, 116:11,
119:9
touch 58:4
touched 56:20
towards 9:18, 10:2,
15:17, 22:13
traceability 59:4
track 8:23
trade 23:16
traditional 156:14
traffic 17:13, 17:22
transaction 9:18,
22:11, 22:14,
97:2, 149:8,
149:10, 159:4
transactions 22:12,
22:21, 130:18,
149:19
Transcript 4:47,
167:9, 177:4
transcription 177:5
Transcripts 81:18,
81:25
transfer 29:13,
128:15, 132:8,
132:16, 132:17,
132:20, 133:10,
133:14, 133:16,
134:1, 135:2,
135:3, 135:5,
142:24, 148:8,
150:16, 151:4,
151:22, 153:23,
154:1, 155:18,
155:24, 156:6,
156:19, 157:22,
157:24, 160:25,
161:3
transferred 9:8,
17:16, 59:24,
132:22, 132:23,
133:1, 140:7,
160:18
transfers 128:15,
129:5, 129:7,

134:22, 134:23,
144:19, 144:20,
151:4, 153:12,
154:20, 154:23,
154:25, 155:7,
155:14, 160:19
transform 22:1,
22:15
transformation 9:14,
9:16, 22:16
transition 15:20
transmission 18:15,
19:3, 19:4, 19:6,
19:8, 19:16, 22:3
travel 104:24
traveling 170:1
travels 169:25,
176:9
Treasury 21:5, 21:6,
21:8
treat 155:11
treated 137:1, 147:1
trial 120:8, 121:8,
121:19, 121:24
trick 78:3
tricky 133:12
tried 32:13, 50:8,
92:18, 147:14
triggered 139:12
trillion 12:12,
12:15
true 60:14, 77:4,
151:24, 152:12,
152:13, 154:17,
177:5
truly 30:14
trump 148:16
trust 59:5, 68:10,
137:23, 139:5
trust-based 59:1
Trustee 3:14, 58:20,
127:16, 129:10,
138:21, 141:6,
141:25, 143:4,
151:10, 153:18,
154:22, 157:1,
157:14
Trustees 136:21,
144:19, 158:11
try 10:6, 34:16,

39:6, 58:2, 75:20,
114:25, 123:2,
125:3, 144:10,
158:23
trying 8:18, 30:25,
31:5, 31:13, 39:9,
46:23, 47:5,
48:16, 48:19,
48:20, 56:14,
111:5, 123:23,
135:18, 135:21
tug 54:10
tuning 88:14
turn 20:20, 30:21,
40:18, 51:22,
89:4, 128:8,
140:8, 163:10
turned 6:16, 6:19,
113:3
turnover 99:19
turns 53:9
tweaking 55:10,
96:15, 97:2
twice 37:21
twigged 70:11
two-thirds 11:1
Two. 87:7, 107:4,
122:10, 139:8,
146:12
type 25:16, 130:21
types 13:23
typically 37:20


< U >
UBS 4:4, 108:21,
108:25, 115:18,
116:2, 116:5,
116:17, 116:23,
117:1, 117:10,
117:22, 118:5,
118:7, 119:14,
120:22, 121:7,
125:8, 125:22,
163:4, 163:20,
165:6
UCC 14:4, 52:9,
52:23, 53:10,
57:7, 79:23,
81:10, 102:23,

103:24, 104:1,
104:13
Ucc-related 56:25
ultimate 100:4
ultimately 31:2,
32:23, 68:3,
71:23, 146:7
ultra 9:4
unable 31:2
unauthorized 132:16,
133:9, 133:14,
150:21, 151:3
uncertainty 8:13,
84:8
uncharacteristic
89:3
unclear 62:2
uncomfortable 122:9
unconflicted 141:14
Uncontested 25:12,
25:15, 25:18,
26:6, 174:10
undeniable 129:7
underlying 132:13
undermine 70:3
understand 11:6,
13:21, 22:6, 24:8,
29:4, 29:5, 29:6,
39:24, 45:24,
46:24, 47:5,
48:19, 48:22,
49:4, 49:10, 51:1,
52:3, 62:1, 62:12,
78:20, 92:17,
101:23, 104:2,
108:12, 122:6,
127:18, 173:5
understanding 13:25,
90:6, 101:4,
118:6, 123:23,
124:7
understands 53:18,
92:14, 152:21
Understood 48:13,
60:12, 76:16,
79:5, 81:4,
101:20, 102:4
undertake 167:21,
169:21
undertaken 15:5,

21:8, 43:23
Undisputed 28:3,
    29:8, 29:14, 139:5
undue 152:11
unfair 109:15
unfamiliar 119:9
Unified 146:14
unintentional 89:15
unique 35:17, 152:16
unit 134:17
United 1:1, 2:37,
    2:39, 11:20,
    30:10, 35:9,
    35:13, 36:13,
    37:14, 38:15,
    39:3, 39:16,
    40:15, 100:12,
    121:4, 159:14,
    177:6, 177:8
universe 57:2,
    173:12
unless 6:16, 14:10,
    20:19, 40:10,
    51:20, 63:7,
    77:16, 77:24,
    100:14, 144:21,
    175:3, 175:10
unprecedented 142:5,
    142:6
unqualified 133:2
unrealistic 34:6
Unsecured 3:18,
    38:19, 81:21,
    81:24, 136:12,
    162:4
unseemly 37:5
untenable 142:12
until 7:3, 7:4,
    26:12, 36:25,
    37:6, 37:10, 40:4,
    47:10, 47:18,
    48:4, 51:18, 52:3,
    52:12, 53:3,
    66:11, 92:17,
    111:24, 152:8,
    159:11
untimely 111:18,
    117:19, 121:9
upcoming 175:13
update 10:12, 12:8,

14:11, 16:2,
    60:20, 102:14,
    102:19
updated 174:7
updates 20:25
upside 140:4
urge 80:20, 84:23,
    105:23
urgency 52:17
urgent 80:13,
    175:15, 175:20
uses 134:7
using 6:16, 90:5
usual 6:10


< V >
v. 2:25
V.10 174:15
V.11 174:15
V.2 127:15
V.4 170:9
V.6 174:15
V.7 174:15
V.8 174:15
V.9 174:15
vacate 91:13
vagaries 87:6
Valdes 85:11
valid 67:19
validation 19:11
validity 79:24,
    95:12, 115:19,
    116:7
Vallejo 129:24,
    130:13, 147:3,
    148:1
valuable 171:13,
    171:19
value 143:11
valve 35:15
various 19:10,
    50:13, 67:20,
    71:17, 72:3,
    87:12, 88:16,
    89:25, 90:1,
    92:19, 94:8,
    160:1, 171:9
Vazquez 14:23
vehicle 52:24

vehicles 19:16
version 37:5, 88:12,
    88:18, 105:5
versus 96:23
VI 11:10
via 28:10
vibration 6:19
video 175:9
Vieques 19:3
view 35:16, 40:3,
    51:16, 52:14,
    53:9, 65:2, 67:8,
    81:1, 81:16, 82:7,
    84:1, 84:16, 99:9,
    99:10, 100:2,
    138:14, 141:9,
    150:21, 151:6,
    153:1
viewed 84:17
views 8:9, 31:1,
    31:5, 31:14, 41:16
vigorous 30:23,
    32:14
violating 93:3
violation 96:18,
    97:15, 97:25,
    134:4, 134:10,
    135:14, 143:6
violence 79:4
vires 9:5
Virgin 20:1
virtually 83:3
vital 22:18
voidable 144:20
volley 55:3
volume 25:6
voluntarily 134:7,
    144:9
voluntary 11:8,
    156:13


< W >
wait 53:3
waiting 37:6, 40:4
waive 75:21, 75:22,
    75:23, 75:25,
    76:4, 76:9
waived 47:25, 76:3,
    99:10, 106:15,

147:12, 147:15,
   147:16
waiver 49:20, 49:24,
   50:9, 69:25,
   89:15, 119:1,
   122:16
waives 76:10, 147:20
waiving 66:15
Walker 177:13,
   177:14
Wall 36:20
Walls 155:9
Wanda 14:23
wanted 10:15, 21:1,
   21:13, 21:23,
   22:25, 23:23,
   37:17, 44:23,
   44:25, 49:19,
   50:2, 56:18,
   63:14, 64:19,
   89:5, 95:11,
   98:10, 99:7,
   102:16, 108:12,
   111:17, 144:15,
   167:21
wanting 96:7
wants 63:9, 66:23,
   100:10, 126:5
war 153:3
warrant 46:11, 141:2
Warren 4:28, 100:20,
   100:22, 100:24
Watauga 19:7
watch 141:12
water 20:9
waving 50:5
ways 20:12
wearing 110:23,
   138:19
website 21:18, 38:2,
   38:10, 38:20,
   38:25, 55:20,
   56:9, 105:6,
   105:8, 105:10
weeds 96:7
week 8:20, 9:24,
   19:19, 21:6,
   21:20, 60:11,
   88:9, 143:25
weekends 175:17

weekly 20:15
weeks 12:20, 35:7,
   98:2, 111:23
weigh 134:24, 165:18
weighing 165:13
weight 154:18
Weil 83:24
Welcome 6:5, 30:12
welcomes 11:19,
   11:22
well-established
   155:13
whatever 33:22,
   49:17, 54:1,
   56:12, 57:11,
   67:15, 68:1,
   69:20, 96:17,
   96:18, 99:2, 99:9,
   99:14, 99:23,
   108:10, 110:12,
   111:23, 113:2,
   116:25, 117:11,
   117:15, 132:18,
   157:16, 157:17
whenever 113:25
wherever 139:13
White 138:8
who've 57:2
whole 18:15, 29:1,
   57:2, 57:16,
   98:13, 114:14,
   114:19, 133:24,
   135:8, 159:24,
   162:20, 162:23
wholly 156:22,
   165:11
whom 94:8
Wickersham 64:18
wide 19:7, 19:8,
   19:16, 19:17
Williamson 24:13
willing 29:7, 67:13,
   75:25, 81:20,
   127:6, 167:21
willingness 66:22,
   88:11
win 54:9
wish 21:21, 30:7,
   30:18, 38:9,
   49:15, 56:8, 79:22

wishes 10:20, 57:12
withdrawn 173:4
within 34:4, 46:21,
   65:19, 93:20,
   98:3, 107:1,
   112:19
without 79:4,
   103:15, 106:23,
   114:5, 118:1,
   118:25, 122:16,
   125:23, 134:25
withstanding 74:10,
   84:15
WITNESSES 5:3
word 57:11, 63:14,
   118:21, 125:10,
   134:20, 135:7,
   163:20, 164:15,
   164:16
words 23:8, 121:16,
   153:21, 154:24
work 15:17, 15:20,
   15:21, 16:4, 16:7,
   16:11, 18:19,
   22:14, 23:24,
   25:4, 30:9, 30:14,
   39:20, 46:16,
   78:25, 84:17,
   105:23, 114:25,
   127:8, 144:10,
   169:5, 169:6,
   169:7, 176:1,
   176:6, 176:7
worked 23:10, 46:8
working 9:10, 11:5,
   20:11, 22:5, 22:7,
   22:19, 31:17,
   34:2, 68:12, 87:7,
   96:11
works 106:24, 168:1
worksheets 18:23
world 29:1, 45:5
worried 142:9
worst 79:3
worth 162:19
writing 77:10
written 73:20,
   103:13, 120:21
wrongful 115:18

< Y >

Yassin 23:2, 23:3,
  23:6, 23:25, 24:2,
  30:14
year 15:20, 21:7,
  21:10, 21:12,
  22:9, 23:4, 24:21,
  37:1, 37:6, 37:10,
  40:4, 86:18,
  117:21, 139:10
years 11:22, 14:24,
  23:7, 23:22, 34:3,
  34:6, 115:15,
  116:4, 139:6,
  141:11, 142:11,
  145:13
yesterday 21:14,
  58:7
yield 41:23, 83:2,
  83:12, 136:16
York 4:16, 4:22,
  6:7, 79:18, 83:18,
  85:6, 96:9,
  131:19, 175:9,
  176:1
yourself 111:7


< Z >

Zouairabani 85:11