UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>**Re: ECF Nos. 1063, 1150, 7419, 8993**<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA")<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>**This document relates to the COFINA Title III case only and will be filed in the main case and COFINA Title III case.** |

**COFINA'S REPLY TO THE UNITED STATES' RESPONSE TO COFINA'S
OBJECTION TO THE INTERNAL REVENUE SERVICE'S
PROOFS OF CLAIM [ECF NO. 8993]**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

**TABLE OF CONTENTS**

Page

ARGUMENT ........................................................................................................................... 1

    A.    COFINA Made All Postpetition Interest Payments Under the Bonds and Was Never In Payment Default ................................................................................ 1

    B.    Bankruptcy Code Section 502 Is Not Applicable for Federal Tax Purposes and It Did Not Prohibit COFINA From Paying Postpetition Interest ..................... 3

    C.    It Is Irrelevant When or Whether the Bondholders Received Interest Payments ............................................................................................................... 6

    D.    Even If COFINA Had Not Actually Paid Postpetition Interest, It Would Be Entitled to the Tax Credits ........................................................................................ 6

    E.    The Legislative History Should Not Be Read as Inconsistent with the Statute .................................................................................................................. 8

    F.    Congress Considered Similar Legislation Where it Used Specific Language ............................................................................................................. 9

    G.    The IRS Position is Inconsistent with Its Own Regulatory Guidance .................. 10

    H.    It is Patently Unfair for the IRS to Force a Constrained Interpretation of a Statute that It Was Given Broad Authority to Regulate and Has Failed to Act ..................................................................................................................... 10

    I.    The Underlying Purpose of the Statute Supports COFINA's Position ................. 11

    J.    Direct Subsidy Payments Are Not Required to Be Used to Pay Interest Under the Statutes .............................................................................................. 13

    K.    The IRS Interpretation of the Definition of "Payable" as "Legally Enforceable" is Incorrect ..................................................................................... 13

CONCLUSION ...................................................................................................................... 14

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hughes Aircraft Co. v. Jacobson*,
   525 U.S. 432 (1999) ................................................................................................................ 9

*In re Cajun Electric Power Coop., Inc.*,
   185 F.3d 446 (5th Cir. 1999) ................................................................................................... 5

*In re Dow Corning Corp.*,
   244 B.R. 678 (Bankr. E.D. Mich. 1999) ................................................................................. 5

*In re Dow Corning Corp.*,
   456 F.3d 668 (6th Cir. 2006) ................................................................................................... 4

*In re Energy Future Holdings Corp.*,
   540 B.R. 109 (Bankr. D. Del. 2015) ....................................................................................... 4

*In re Ultra Petroleum Corp.*,
   2019 U.S. App. LEXIS 35489 ................................................................................................ 4

*In Stiles v. Commissioner of Internal Revenue*,
   69 T.C. 558, 1978 WL 3396 (1978) ....................................................................................... 6

*Kellogg v. United States (In re West Tex. Marketing Corp.)*,
   54 F.3d 1194 (5th Cir.1995) .................................................................................................... 5

**Statutes**

*American Reinvestment and Recovery Act of 2009*, Pub. L. 111-5, Div. B, Part IV,
   Section 1531 .......................................................................................................................... 11

Bankr. Code § 502 ......................................................................................................................... 4

Bankr. Code § 506 ......................................................................................................................... 4

IRC § 54AA(a) .............................................................................................................................. 7

IRC § 54AA(b) .............................................................................................................................. 8

IRC § 54AA(e) .............................................................................................................................. 8

IRC § 54AA(h) ......................................................................................................................... 8, 10

IRC § 6431(a) ............................................................................................................................ 6, 7

IRC § 6431(b) ............................................................................................................................ 6, 7

# TABLE OF AUTHORITIES
(continued)

Page

IRC § 6431(d) .................................................................................................................. 6, 7

**Other Authorities**

H.R. Rep. No. 94-1016 (1976) ................................................................................................ 10

Municipal Taxable Bond Alternative Act of 1976, H.R. 12774, 94th Congress,
    2nd Session, § 3(a)(4) ..................................................................................................... 9

**Regulations**

Notice 2009-26, 2009-16 IRB 833 (April 20, 2009) ................................................................. 10

Notice 2009-50, 2009-26 IRB 1118 (June 29, 2009) ................................................................ 10

Revenue Ruling 70-367, 1970-2 C.B. 37 ..................................................................................... 5

Treas. Reg. § 1.1001-3(c)(6)(iii) ................................................................................................... 5

Treas. Reg. § 1.446-2 ................................................................................................................. 12

AAFAF,[2] on its own behalf and as the sole entity authorized to act on behalf of all of Puerto Rico's governmental entities, including COFINA,[3] by and through the AAFAF Enabling Act, Act 2-2017, files this reply ("Reply") to the IRS's response (17-03283-LTS, ECF No. 8993) ("Response") to COFINA's objection to the IRS's proofs of claim (17-03283-LTS, ECF No. 7419) ("Objection") with the United States District Court for the District of Puerto Rico (the "Court"). In further support of the Objection, AAFAF respectfully states as follows:

## ARGUMENT

1. As will be explained below, the IRS's arguments regarding Internal Revenue Code ("IRC") sections 6431(a) and (b) are meritless. But the Court need not even consider the IRS's arguments because those arguments rest on unwarranted assumptions: (1) that postpetition interest on the COFINA Bonds "was never paid," and COFINA "never intended to use the [tax credit] funds to make the interest payments called for by the COFINA Bonds," and (2) that "under § 502(b) of the Bankruptcy Code, COFINA was not legally required ever to make the interest payments," and "[i]ndeed, it *could not* legally pay them." Response at 5 and n.4 (emphasis in original). Each of these assumptions is false.

**A. COFINA Made All Postpetition Interest Payments Under the Bonds and Was Never In Payment Default**

2. Post petition COFINA continued to pay debt service to BNYM, as trustee.[4] This

---

[2] Capitalized terms used but not defined in this Reply shall have the meanings used in the Objection.
[3] The Financial Oversight and Management Board for Puerto Rico, as COFINA's representative pursuant to section 315(b) of PROMESA, has authorized AAFAF to file this Objection on behalf of COFINA.
[4] *See* Puerto Rico Sales Tax Financing Corporation, Basic Financial Statements and Required Supplementary Information, June 30, 2018 (With Independent Auditors' Report Thereon), at 3 ("the Corporation continued to make transfers to the trustee" post-petition); *Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, 17-03283-LTS, ECF No. 4364 (November 26, 2018) ("Disclosure Statement"), at 58 ("[T]he Title III Court . . . ordered BNYM to hold the Disputed Funds . . . on behalf of the party or parties ultimately determined by the Title III Court to be entitled to them," and defining "Disputed Funds" to "include the funds on deposit prior to July 1, 2018 in the debt service reserve and such other accounts and including earnings thereon held by BNYM, as the COFINA bond trustee, for the benefit of the bondholders.").

1

undisputed fact should resolve the instant dispute.[5] Even if the IRS's reading of IRC section 6431 is correct (which it is not, as explained below), and COFINA "is liable to the United States in the amount of all credit payments it received on account of interest that accrued postpetition *but was never paid*," Response at 2 (emphasis added), COFINA's postpetition principal and interest payments make clear that COFINA's liability to the IRS is zero.[6]

3. The Court's Interpleader Order[7] required that COFINA pay all debt service during the pendency of its Title III case. To ensure an orderly Title III process and that COFINA's principal and interest payments were held in trust "on behalf of the party or parties ultimately determined by the Court to be entitled to" those payments, the Court ordered that "BNYM shall interplead" the "Disputed Funds," defined as "the June 1 Payment (as defined in the Memorandum Opinion[8]) and any future payments of principal and interest[.]" Interpleader Order ¶ 2. The Court instructed BNYM to interplead the Disputed Funds "on a monthly basis until entry of a final order of this Court directing the timing and manner of the disbursement of such funds[.]" *Id*. At the May 30, 2017 hearing in the interpleader adversary proceeding (Adv. Proc. No. 17-00133-LTS) ("May 30, 2017 Hearing"), Judge Swain noted that COFINA would continue paying postpetition debt service to BNYM: "The Oversight Board has consented to interpleader of the June 1 and future payments." May 30, 2017 Hearing transcript 80:6-7.[9]

---

[5] The Response concedes that COFINA paid postpetition interest. The IRS "does not dispute the factual contentions in the 'Background' section of the Objection regarding the procedural history of these PROMESA cases or the general nature of the COFINA Bonds." Response at 2. Specifically, the IRS does not dispute COFINA's assertions in the background section of the Objection "that all credit payments it received were deposited with BNY Mellon ('BNYM') pursuant to a court order dated May 30, 2017 (the 'Interpleader Order')." Response at 3; *see also* Objection ¶ 15 ("Subsequent to entry of the Interpleader Order and throughout the pendency of COFINA's Title III Case, all required interest payments . . . were deposited into the appropriate accounts at BNYM.").
[6] It is debatable whether COFINA's intention is even pertinent to any issues in this dispute; in any case, because COFINA actually did pay postpetition interest, whether it intended to do so is irrelevant.
[7] *Order Granting Interpleader*, Adv. Proc. No. 17-00133-LTS, ECF No. 110 (May 30, 2017).
[8] The *Memorandum Opinion*, Adv. Proc. No. 17-00133-LTS, ECF No. 131 (June 1, 2017) defines the "June 1 Payment" as "certain funds due to be paid by BNYM to holders of COFINA bonds on June 1, 2017." *Id*. at 1.
[9] *See also id*. 81:10-16 ("The Court has determined that the funds at issue in this interpleader, namely, the June 1 and all subsequent payments to be made to the COFINA bondholders pending the resolution of the underlying disputes

2

4.  AAFAF raised the concern that holding the funds in the interpleader account at BNYM might be deemed a payment default, notwithstanding the full compliance by COFINA under the COFINA Bond Resolution (the "Resolution"). In its Memorandum Opinion, the Court explained that under the Interpleader Order's payment arrangement, whereby COFINA made all of its required monthly debt service payments to BNYM as trustee, COFINA would be deemed to have met all its payment obligations under the Resolution and not to be in payment default:

> COFINA, through AAFAF, asserted at the hearing that the Court should not grant interpleader because to do so would result in an Event of Default caused by COFINA's failure to make payments required under the Resolution. *To alleviate this concern*, the Court's order granting interpleader will state that the Disputed Funds are to be held in trust on behalf of the party or parties to whom the Court ultimately determines the Disputed Funds rightfully belong.

Memorandum Opinion at 4-5 (emphasis added).

5.  In short, under the Interpleader Order, once COFINA's payments were deposited with BNYM, COFINA had fulfilled its principal and interest payment obligations under the Resolution. Therefore, COFINA "paid" all postpetition interest on the COFINA Bonds and met the requirements of IRC section 6431, even under the IRS's incorrect reading of that section.[10]

**B.  Bankruptcy Code Section 502 Is Not Applicable for Federal Tax Purposes and It Did Not Prohibit COFINA From Paying Postpetition Interest**

6.  The IRS contends that under Bankruptcy Code section 502(b)(2), made applicable by PROMESA section 301(a), "COFINA was not legally required ever to make the interest

---

regarding rights and priorities of allocation of the funds, may be held by BNY during the pendency of the interpleader as BNY itself asserts no right to ownership of those funds[.]"); *id*. 82:9-14 ("BNY's proposed order will enjoin all parties to the interpleader proceeding from instituting or continuing to litigate any action related to or that may have an effect on the allocation or recovery of the June 1 payment and all subsequent payments to be made to the COFINA bondholders pending the resolution of the underlying dispute[.]")

[10] The IRS's construction contract analogy (Response at 7-8) fails because, unlike the IRS's builder A who "[a]fter nine months . . . has yet to break ground," COFINA performed under its contract (the Resolution) and met all its debt service obligations. The analogy actually supports COFINA's argument, since a contracting party who performs—whether a builder or COFINA—is entitled to payment/tax credits.

3

payments," and "[i]ndeed, it *could not* legally pay them." Response at 5 and n.4 (emphasis in original). This is incorrect. The relevant portions of section 502 state:

> (a) A claim or interest . . . is deemed allowed, unless a party in interest . . . objects.
> (b) . . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that—
> . . .
> (2) such claim is for unmatured interest[.]

The statute's plain language indicates that section 502(b)(2) simply prevents the Court from allowing a creditor's claim for postpetition interest when another party has objected to the claim. Absent an objection, the Court can allow a creditor's claim for postpetition interest; and even with an objection, nothing in section 502 prevents COFINA from making postpetition interest payments if it so chooses, or the Court so orders. The section deals with claim *allowance*; it does not prohibit *payment.* In *In re Energy Future Holdings Corp.*, the court noted that section 502(b) regulates how and for what purpose a claim can be allowed, but that an allowed claim for a particular amount is not co-extensive with an entitlement to that amount.[11] The inability to have an allowable claim for a particular amount does *not* mean that the claimant is not entitled, under contract, law, or otherwise, to such amount. Moreover, in this case the COFINA Bondholders' claims were settled and determined under the COFINA Plan of Adjustment that was confirmed on February 5, 2019. Had the Bondholders prevailed in all of their legal and factual arguments, they would have been entitled to postpetition interest under Bankruptcy Code section 506(b).[12]

---

[11] 540 B.R. 109, 111 (Bankr. D. Del. 2015) (holding that Section 502(b)(2) only prohibits postpetition interest **as an allowed claim** but does not prevent a creditor from being entitled to postpetition interest **on an allowed claim**.); *see also In re Dow Corning Corp.*, 456 F.3d 668, 680-681 (6th Cir. 2006) (holding that Section 502 does not prohibit the recovery of postpetition expenses, including interest, and thus a creditor may be entitled to postpetition interest.); *In re Ultra Petroleum Corp.*, 2019 U.S. App. LEXIS 35489 (finding that some of the creditors in the bankruptcy proceeding may be entitled to postpetition interest under the "solvent-debtor rule" and remanded the case to the Bankruptcy Court to make further determinations).

[12] The COFINA Bondholders asserted that they were oversecured and entitled to postpetition interest under section 506(b). *See, e.g.,* the COFINA Bondholders' Proofs of Claim, such as *Attachment to Proof of Claim of Decagon Holdings 7, L.L.C.*, Claim No. 100946, received by Prime Clerk LLC on June 28, 2018, ¶ 26 ("[U]nder section 506(b)

7. Courts have held that the section 502(b) does not have any effect on the accrual of interest expense for tax purposes—interest continues to accrue during a bankruptcy proceeding.[13] A debtor's obligation with respect to postpetition interest does not terminate simply because an unsecured creditor's claim for such interest will not be allowed under section 502(b).[14] Instead, a debtor's obligation to pay interest is fixed by a contract and deductible at the time of accrual; such obligation terminates only "if and when" the debt is discharged by the bankruptcy court.[15] Thus, section 502(b) is effectively irrelevant to the tax issues raised by the IRS.

8. The IRS applied similar principles in Revenue Ruling 70-367, 1970-2 C.B. 37, in which it held that interest on outstanding obligations of a railroad corporation involved in reorganization proceedings under the Bankruptcy Act was accruable and deductible until the plan was consummated and obligations of the reorganized corporation were exchanged for prior obligations of the corporation, even though it was unlikely that the full amount would ever be paid.[16] The holding in this Revenue Ruling supports COFINA's position that its bonds remained outstanding for federal tax purposes until the Effective Date.[17]

---

of the Bankruptcy Code, as incorporated into the COFINA Title III Case under PROMESA section 301(a), claimant is entitled to post-petition interest[.]").

[13] *In re Cajun Electric Power Coop., Inc.*, 185 F.3d 446, 451 (5th Cir. 1999).

[14] *Id.* at 455; *see Kellogg v. United States (In re West Tex. Marketing Corp.)*, 54 F.3d 1194, 1203 (5th Cir.1995) (Smith, J., dissenting); *see also In re Dow Corning Corp.*, 244 B.R. 678 (Bankr. E.D. Mich. 1999).

[15] Thus it is irrelevant that the payments the COFINA Bondholders eventually received under the COFINA Plan were characterized as "principal." It was only when the Plan became effective on February 12, 2019 (the "Effective Date") that the COFINA Bondholders relinquished their interest component, and that the payments they received under the Plan were characterized as principal. *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, 17-03283-LTS, ECF No. 4658, § 19.12. Prior to the Effective Date, COFINA made all interest payments to BNYM pursuant to the Interpleader Order.

[16] In so holding, the IRS stated: "Until the debt is extinguished by the exchange of the obligations of the debtor corporation for obligations of the reorganized corporation, the obligations of M continue to bear interest at the contract rate during the reorganization proceedings under section 77 of the Bankruptcy Act, as amended. The doubt as to the payment of such interest is not a contingency of a kind that postpones the accrual of liability until the contingency is resolved."

[17] The IRS's position is also inconsistent with tax rules applicable to when a taxable event results from modifications to the terms of bonds. Pursuant to Treasury Regulation Section 1.1001-3(c)(6)(iii), if a change in a term of a debt instrument occurs pursuant to a plan of reorganization in a title 11 or similar case, a modification occurs upon the effective date of the plan. Thus, unless the plan becomes effective, a taxable event does not occur. The impact of this Treasury Regulation is to acknowledge that even though parties may agree to the terms of a plan of adjustment, the

5

### C. It Is Irrelevant When or Whether the Bondholders Received Interest Payments

9. It is irrelevant when the Bondholders received interest payments, or whether they ever received such payments. *See* Objection ¶¶ 20, 25-26. IRC section 6431 requires that (i) the bond issuer "shall be allowed a credit with respect to each interest payment," IRC § 6431(a), and (ii) "[t]he Secretary [of the Treasury] shall pay . . . 35 percent of the interest payable under such bond on such date," IRC § 6431(b). Even under the IRS's broad and incorrect interpretation of "payment," the section only requires that COFINA paid the interest on its Bonds. COFINA easily satisfies this requirement because it actually made all postpetition interest payments. That the interest payments were being held by BNYM as trustee "for the benefit of the bondholders"[18] is not relevant for purposes of satisfaction of section 6431 and whether COFINA is entitled to a credit for each interest payment it makes. Nor does any other section or definition in the IRC, or applicable regulation, lead to a different conclusion. In a similar context, case law interpreting the IRC in the context of a sale deems payments into a trust as received by the seller.[19]

### D. Even If COFINA Had Not Actually Paid Postpetition Interest, It Would Be Entitled to the Tax Credits

10. The fundamental difference in the interpretation of IRC section 6431 is that the IRS believes an issuer is only entitled to an IRS direct subsidy payment to the extent it actually pays interest to bondholders. The IRS cites IRC section 6431(a) as support for its position. Section 6431(a) must, however, be read together with sections 6431(b) and 6431(d), as well as with section

---

plan is never final until it is approved by the Court. As a result, the debtors and creditors are not held to the terms of a plan and are not required to realize any tax consequences relating to changes to the bonds unless and until the plan is approved.

[18] Disclosure Statement at 58.

[19] *See In Stiles v. Commissioner of Internal Revenue*, 69 T.C. 558, 563, 1978 WL 3396 (1978) (noting that "[g]enerally, payments into trust, which are to be later used to meet the purchaser's obligations to the seller, are deemed to be received by the seller when paid into trust unless subject to substantial restrictions."). The only significant "restriction" in the Interpleader Order was the requirement that the Disputed Funds be held in trust for the benefit of "the party or parties ultimately determined by the Court to be entitled to [them]." Interpleader Order ¶ 2.

6

54AA, to obtain a complete understanding of the provision. While section 6431(a) states the general rule that the issuer shall be allowed a credit with respect to each interest payment under such bond, it also states that the credit shall be payable "*as provided in subsection (b).*" Section 6431(b) provides that the Secretary of the Treasury "shall pay (contemporaneously with each *interest payment date* under such bond) to the issuer of such bond … 35 percent of the interest *payable under such bond* on such date." Section 6431(d) defines the phrase "*interest payment date*" to mean "each date on which interest is *payable* by the issuer *under the terms of the bond*." By putting the general rule of section 6431(a) together with the definitions and rules applicable in sections 6431(b) and 6431(d), it becomes clear that Congress specified that the direct subsidy payments are to be made with respect to interest that is "*payable,*" regardless as to whether it is paid or not. Nowhere in the statute does it state that interest must be "paid by the issuer" for an issuer to receive the subsidy credit. As noted above, even if the statute did state "paid by the issuer," COFINA continued to make its interest payments to the trustee, who was prohibited from making payments to Bondholders as a result of the Interpleader Order.

11. The IRS also reads section 6431 in a vacuum without taking into consideration section 54AA, which also relates to IRS direct subsidy payments. There are two kinds of build America bonds ("BABs"): (i) bonds that entitle the bondholder to a payment of interest plus a tax credit taken against the holder's federal income tax liability with respect to each interest payment date under the bond ("Tax Credit BAB"), and (ii) bonds that entitle the bond issuer to receive a direct subsidy payment from the U.S. Treasury with respect to each interest payment date under the bond ("Direct-Pay BAB"). Section 54AA contains the requirements for both kinds of bonds.

12. Section 54AA has similar structure and language as section 6431. For a Tax Credit BAB, section 54AA(a) provides that if a taxpayer holds a Tax Credit BAB on one or more "interest

7

payment dates of the bond" during any taxable year, there shall be allowed a credit against the holder's federal income tax. Section 54AA(b) provides that the amount of credit with respect to any "interest payment date" is "35 percent of the amount of interest payable by the issuer with respect to such date." Section 54AA(e) defines "interest payment date" as "any date on which the holder of record of the build America bond is entitled to a payment of interest under such bond." Section 54AA(h) gave the Secretary of the Treasury authority to "prescribe such regulations and other guidance as may be necessary or appropriate to carry out this section and section 6431." Accordingly, these sections of the IRC must be read together and consistently with one another.

13. Similar to section 6431, section 54AA does not specifically state that interest must be "*paid*" for a holder of a Tax Credit BAB or issuer of a Direct-Pay BAB to be entitled to the subsidies that Congress provided for governmental issuers. In fact, section 54AA(e) clarifies that an "interest payment date" is any date on which a holder is "*entitled*" to a payment of interest under such bond, which language clearly contemplates that interest does not have to be paid for the tax credits or direct subsidy payments to be applicable.

E.   **The Legislative History Should Not Be Read as Inconsistent with the Statute**

14. The IRS cites legislative history in support of its position that interest must be "paid" for the issuer to be entitled to the direct subsidy payment. While the legislative history refers to an interest payment "*made*" by the issuer, this is not the language contained in the statute, as stated above. The IRS also relies on a single, one sentence example contained in the legislative history that states an issuer would receive a payment for interest "paid" to bondholders. This example is part of a longer paragraph where Congress is explaining the mechanics of direct subsidy bonds and should not be read to provide a substantive interpretation of "payable." In particular, while the legislative history discusses this provision and provides an example, the example is provided in the context of the typical situation for an issuer, i.e., that it would continue to make

8

payments on its obligations. The legislative history does not provide any guidance regarding a situation such as COFINA's where an issuer has been subjected to a bankruptcy proceeding and instructed by a federal court to make payments to the trustee that the trustee was not permitted to pay to Bondholders. Nevertheless, as the Supreme Court has repeatedly held, the plain meaning of a statute must be given primary weight in determining Congressional intent.[20]

**F.    Congress Considered Similar Legislation Where it Used Specific Language**

15.    Congress could easily have written sections 54AA and 6431 of the IRC to provide that the tax credits and direct subsidy payments are to be made only for interest that is "*paid*" by the issuer. In fact, Congress considered similar legislation where it did just that. The Municipal Taxable Bond Alternative Act of 1976, H.R. 12774, 94th Congress, 2nd Session ("Taxable Bond Act"), would have provided State and local governments with an election to issue taxable bonds for which the federal government would pay "35 percent of the interest yield." Notably, the statutory language provided that:

> Nothing in this section shall be deemed to be an assumption by the United States of any liability for the payment of any portion of the principal on any obligation, for the payment of any portion of the interest on any obligation payable by the issuer thereof, or *for the payment of any interest at a time when the issuer has not made the corresponding payment.*[21]

16.    Similarly, Congress could have specified in the legislative history the direct subsidy payment would only be paid by the federal government if issuers make a payment of interest. When the Taxable Bond Act was reported out of the Ways and Means Committee, the Committee Report accompanying the legislation explicitly stated:

---

[20]    *See, e.g., Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("As in any case of statutory construction, [the] analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well.").

[21]    Taxable Bond Act, Section 3(a)(4) (emphasis added); *see also* the Taxable Bond Alternative for State and Local Governments prepared by the Joint Committee on Internal Revenue Taxation, JCS-4-76 (March 29, 1976), p. 11; The President's 1978 Tax Reduction and Reform Proposals discussed in hearings before the Ways and Means Committee, p. 5067. H.R. 12774 was not enacted into law.

9

>The Federal Government is not to be liable for payment of its portion of the interest on the obligation at any time before the issuing government has made payment on its portion of the interest. Thus, if a State or local government defaults on its interest payment, the Federal Government is not required to pay its portion of the interest on the obligation. In addition, the Federal Government is never liable for payment of any portion of the principal of the obligation or *for payment of any portion of the interest on the obligation which is to be made by the issuing State or local government.*[22]

17. Congress did neither of these things when it enacted sections 54AA and 6431. The absence of direct language on this point clearly establishes that Congress did not intend that result. To read such a requirement into the statutes would permit the government to end-run the clear terms of the statutory framework provided in the IRC.

G. **The IRS Position is Inconsistent with Its Own Regulatory Guidance**

18. Shortly after 54AA and 6431 were enacted, the IRS issued regulatory guidance in the form of Notice 2009-26, 2009-16 IRB 833 (April 20, 2009) and Notice 2009-50, 2009-26 IRB 1118 (June 29, 2009) for Tax Credit BABs and Direct-Pay BABs. Both Notices explained the types of BABs available to issuers as providing a federal subsidy in an amount equal to 35 (or 45) percent "*of the total coupon interest payable*" by the issuer on the bonds (emphasis added). In describing the general requirements for the different types of BABs, the notices did not specifically state that interest must be paid by the issuer to receive the subsidy and, instead, referred to interest that is "*payable.*"

H. **It is Patently Unfair for the IRS to Force a Constrained Interpretation of a Statute that It Was Given Broad Authority to Regulate and Has Failed to Act**

19. The IRS was given broad regulatory authority under section 54AA(h) that it has failed to exercise. The IRS has failed to issue any regulations or other guidance that specifically imposes the requirement that interest be paid to receive the credit subsidy. As discussed above, in its published notices and even in its forms, the IRS never specifically requires that interest be paid

---

[22] H.R. Rep. No. 94-1016, at 22 (1976) (emphasis added).

10

to receive the direct payment subsidy. The IRS has had years to impose this interpretation of the statute and has failed to act. Contrary interpretations made by the IRS through audit activity or bankruptcy claims should not overrule the clear language of the statute.

I.  **The Underlying Purpose of the Statute Supports COFINA's Position**

20. The IRS contends that the statute must be construed consistent with its underlying purpose, which was to subsidize interest costs for governmental issuers. Response at 12. But that does not equate to a requirement that an issuer actually pay interest to bondholders for the interest subsidy to continue. Sections 54AA and 6431 were added to the IRC in February 2009, as part of the larger *American Reinvestment and Recovery Act of 2009* ("ARRA").[23] One of the purposes of ARRA was to stabilize state and local government budgets to minimize and avoid reductions in essential services and counterproductive state and local tax increases.[24] These provisions permitted an issuer to elect to have an otherwise tax-exempt bond issued under section 103 of the IRC ("Tax-Exempt Bond") treated as a "taxable governmental bond" that received "refundable tax credits" in which the federal government made direct subsidy payments to state and local governments for a portion of their borrowing costs.[25]

21. By providing issuers with the ability to elect to issue otherwise eligible Tax-Exempt Bonds as Tax Credit BABs or Direct-Pay BABs, Congress provided additional vehicles that issuers could choose as a substitute for Tax-Exempt Bonds. As a result, an issuer could choose to receive a federal subsidy for borrowing costs in three ways: (1) Tax-Exempt Bonds in which an issuer

---

[23] Pub. L. 111-5, Div. B, Part IV, Section 1531.
[24] ARRA, Section 3.
[25] Written Statement by Alan B. Krueger, Assistant Secretary for Economic Policy and Chief Economist, U.S. Department of Treasury, before the Subcommittee on Select Revenue Measures of the Committee on Ways and Means, U.S. House of Representatives, May 21, 2009 ("Krueger Statement"), also noting that Congress provided a "permanent, indefinite appropriation for the direct federal subsidy payments on Build America Bonds under 31 U.S.C. Section 1324(b)(2) comparable to the permanent, indefinite appropriation authorizing the Treasury Department to make outlays that refund overpayments of tax of certain programs conducted through the tax code."

pays a reduced interest rate and the bondholder excludes interest payments from gross income for federal tax purposes, (2) Tax Credit BABs in which an issuer pays a reduced interest rate and the bondholder takes a tax credit against its taxable income for federal tax purposes, and (3) Direct-Pay BABs in which an issuer pays a higher, taxable rate of interest and receives a direct payment from the IRS equal to 35% (or 45%) of the interest payable under the bonds.

22. In the case of Tax-Exempt Bonds, there is no requirement that the issuer actually pay interest on the bonds to be eligible for the interest subsidy that is provided indirectly through the IRC. If an issuer of a Tax-Exempt Bond fails to make an interest payment to bondholders on an interest payment date, accrual basis taxpayers nevertheless continue to accrue interest income (albeit income that is excluded from gross income for federal income tax purposes) and "conduit borrowers" continue to accrue interest expense that is deductible for tax purpose.[26] As a result, the subsidy provided through the issuance of Tax-Exempt Bonds continues to accrue for tax purposes even if there is no payment of interest by the issuer. Because Direct-Pay Bonds and Tax Credit Bonds were intended as a substitute for Tax-Exempt Bonds, the same rules should apply.

23. Moreover, if the subsidy payments were only made to the extent that Bondholders receive interest payments, issuers would be in a worse position than if they had issued Tax-Exempt Bonds. Given that the full amount of interest due and payable under the 2010 Bonds was paid by COFINA to BNYM as trustee when it was payable, COFINA should be entitled to the related direct subsidy payments. If this Court were to deny COFINA the direct subsidy payments on the COFINA Bonds when COFINA fully complied with its payment obligations under the Resolution and the Interpleader Order, it would render section 6431 meaningless. In short, under the clear

---

[26] *See* Treasury Regulation Section 1.446-2. Although issuers of Tax-Exempt Bonds do not ordinarily pay federal tax, there are often conduit borrowers of Tax-Exempt Bonds proceeds that do pay tax.

12

language and the policy rationale behind section 6431, COFINA was entitled to a credit with respect to each postpetition interest payment it made to BNYM, as trustee.

### J. Direct Subsidy Payments Are Not Required to Be Used to Pay Interest Under the Statutes

24. The IRS contends that COFINA used the subsidy credits to pay principal on its bonds instead of interest, which essentially turns an interest subsidy into a partial guaranty of principal. However, there is no requirement in the statutes that direct payments be used for any particular purpose.[27] In fact, Congress specifically contemplated that the direct payments could be used to pay principal on bonds when it provided an exception from the prohibition on federal guarantees of Tax-Exempt Bonds in section 54AA(d)(2)(A): "for purposes of section 149(b),[28] a build America bond shall not be treated as federally guaranteed by reason of the credit allowed under subsection (a) or section 6431…." If subsidy payments were only made when the issuer makes payments, there would be no need for an exception to the federal guaranty prohibition.

### K. The IRS Interpretation of the Definition of "Payable" as "Legally Enforceable" is Incorrect

25. The IRS contends that even if the proper interpretation of the statute is "*payable*," this term should be interpreted to mean "legally enforceable" as that reading would be consistent with the remainder of the statute. COFINA disagrees. The term "*payable*" could just as easily be interpreted to mean any of the other definitions used in legal dictionaries cited in the Objection (at 11-12). The better interpretation is one that is consistent with federal tax law as these are federal tax statutes that are being interpreted. In that regard, as discussed above, interest on the 2010 Bonds

---

[27] Many issuers of Direct-Pay BABs do not use the direct subsidy payments for either principal or interest.
[28] Section 149(b) provides that section 103 of the IRC shall not apply to any State or local bond if such bond is federally guaranteed.

13

continued to accrue for federal tax purposes until the debt was discharged on the Effective Date. Accordingly, "*payable*" in this context cannot mean "legally enforceable."

## **CONCLUSION**

26.    For the foregoing reasons COFINA requests that the Court grant the Objection in its entirety.

Dated: December 24, 2019
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Suzzanne Uhland*
John J. Rapisardi
Suzzanne Uhland
Peter Friedman
(Admitted *Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061

*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
**MARINI PIETRANTONI MUÑIZ LLC**
250 Ponce de León Ave.
Suite 900
San Juan, Puerto Rico 00918
Tel: (787) 705-2171
Fax: (787) 936-7494

*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority*