# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br>Case No. 17 BK 3283 (LTS)<br><br>(Jointly Administered) |

## OBJECTION, MOTION FOR RECONSIDERATION REGARDING ECF NO. 9639, AND RESERVATION OF RIGHTS OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION WITH RESPECT TO URGENT MOTION FOR EXTENSION OF FILING DEADLINE FOR MEDIATION TEAM AMENDED REPORT (ECF NO. 9638)

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................6

ARGUMENT ........................................................................................................10

I.     THE MEDIATION TEAM HAS FAILED TO CARRY ITS "HEAVY"
BURDEN OF JUSTIFYING A FURTHER EXTENSION OF THE STAY ...................10

     A.    The Burden Is On The Mediation Team To Demonstrate That
          "Extraordinary Circumstances" Justify A Stay......................................10

     B.    Any Further Extension Of The Stay Will Render It "Immoderate" And
          Therefore Impermissible.........................................................................13

II.    THE EQUITIES WEIGH AGAINST ANY FURTHER EXTENSION OF THE
STAY .................................................................................................................14

          1.    Interests of nonmovant in proceeding expeditiously with litigation
               or any aspect of it, and potential prejudice of a delay ..............................15

          2.    The burden which any aspect of the proceedings may impose on
               movant.....................................................................................................16

          3.    Convenience of the court in its management of cases, and judicial
               economy..................................................................................................17

          4.    Interests of nonparties to the litigation......................................................17

          5.    Public interest..........................................................................................18

RESERVATION OF RIGHTS ................................................................................18

CONCLUSION.....................................................................................................18

## TABLE OF AUTHORITIES

### CASES:

Ambac Assurance Corporation v. Commonwealth of Puerto Rico,
  927 F.3d  597 (1st Cir. 2019) ....................................................................................4

Anderson v. Air W., Inc.,
  542 F.2d 522, 524 (9th Cir. 1976) ..........................................................................13

Austin v. Unarco Indus., Inc.,
705 F.3d 1 (1st Cir. 1983) .........................................................................................10

Fed. Sav. & Loan Ins. Corp. v. Molinaro,
  889 F.2d 899 (9th Cir. 1989) ...................................................................................14

In re Atlantic Pipe Corp.,
304 F.3d 135 (1st Cir. 2002) ...............................................................................13, 15

In re ConAgra Foods, Inc.,
  No. CV-11-05379-MMM, 2014 WL 12580052 (C.D. Cal. Dec. 29, 2014) ...........17

In re Ellswick, No. 15-41196-JJR13,
  2016 WL 3582586 (Bankr. N.D. Ala. June 24, 2016), *aff'd sub nom.* Ellswick v.
  Quantum3 Grp., LLC,  No. 1:16-CV-01959-MHH, 2018 WL 1408536 (N.D. Ala.
  Mar. 21, 2018) .........................................................................................................15

In re Glen Eagle Square, Inc.,
  No. 91-0300S, 1991 WL 111486 (Bankr. E.D. Pa. June 20, 1991) ........................15

In re Phar-Mor, Inc. Securities Litigation,
  166 B.R. 57 (W.D. Pa. 1994) ..................................................................................12

In re S. Side House, LLC,
  470 B.R. 659 (Bankr. E.D.N.Y. 2012) ....................................................................11

Keystone Coke Co. v. Pasquale,
  No. CIV. A. 97-6074, 1999 WL 126917 (E.D. Pa. Mar. 9, 1999) ..........................12

Konopca v. Comcast Corp.,
  No. 15-6044, 2016 WL 1645157 (D.N.J. Apr. 26, 2016) .......................................13

Landis v. N. Am. Co.,
    299 U.S. 248 (1936) .........................................................................................10, 11, 13, 14

Microfinancial, Inc. v. Premier Holidays Intern., Inc.,
    385 F.3d 72 (1st Cir. 2004) ................................................................................10, 14

Ortega Trujilo v. Conover & Co. Communications, Inc.,
    221 F.3d 1262 (11th Cir. 2000) ...............................................................................13

PNC Bank v. GVTG, LLC,
    No. 1:13-cv-00634-RLV, 2014 WL 12524648 (N.D. Ga. Mar. 4, 2014) *aff'd*, 592 F.
    App'x 775 (11th Cir. 2014) .....................................................................................12

Rosco, Inc. v. Mirror Lite Co.,
    No. CV-96-5658(CPS), 2017 WL 2296827 (E.D.N.Y. Aug. 6, 2007) ...................................14

Salinas v. City of San Jose,
    No. 5:09-cv-04410-EJD, 2012 WL 2906052 (N.D. Cal. Jul. 13, 2012) ................................17

SEC v. Fraser,
    No. CV-09-00443-PHX-GMS, 2009 WL 1531854 (D. Ariz. June 1, 2009) .........................11

U.S. v. Eight Thousand Eight Hundred and Fifty Dollars,
    461 U.S. 555 (1983) ..............................................................................................14

U.S. v. One Parcel of Real Estate at 1303 Whitehead St. Key W., Fla.,
    729 F. Supp. 98 (S.D. Fla. 1990) .............................................................................14

Walsh Const. Co. P.R. v. United Sur. & Indem. Co.,
    No. Civ. 12-1401 (SEC), 2015 WL 13548470 (D.P.R. Sept. 28, 2015) ................................10

Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together, "Assured"), and National Public Finance Guarantee Corporation (collectively, the "Responding Parties") hereby submit this Objection, Motion for Reconsideration of ECF No. 9639, and Reservation of Rights (the "Objection and Reservation of Rights") with respect to the *Urgent Motion for Extension of Filing Deadline for Mediation Team Amended Report* (ECF No. 9638, the "Urgent Motion")[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1. On December 23, 2019, the Mediation Team filed the Urgent Motion (ECF No. 9638), which seeks to (i) adjourn the Mediation Team's deadline to file an Amended Report from January 10, 2020 to February 10, 2020, (ii) adjourn the hearing with respect to the Amended Report from January 29, 2020 to March 4, 2020, (iii) extend the stay for currently stayed proceedings through March 11, 2020, and (iv) retain the ongoing schedule for the resolution of certain limited issues identified in the Mediation Team's Interim Report. Later that same day, the Court granted the requested adjournments relating to the deadlines for the filing of the Amended Report and related hearing and sought any party input concerning the remaining portions of the Urgent Motion. Assured and National, if given the opportunity, would have objected to the granted adjournments. In addition, we now raise additional points regarding the remainder of the relief sought by the Urgent Motion.

2. As detailed below, the effect of the adjournments proposed by the Mediation Team and immediately granted by the Court is to extend the stay of the proceedings covered by the Amended Report (except to the limited extent that certain proceedings are permitted

---

[2] Unless otherwise indicated, references to ECF numbers herein refer to the docket in Case No. 17-3283-LTS. Capitalized terms used herein but not defined herein have the meanings ascribed to them in the Urgent Motion or in the Interim Orders, as applicable.

to go forward under the Interim Orders entered by the Court on December 19).  The Mediation Team, for the second time, premises the adjournment on the "possibility" that a "more consensual"—but not necessarily confirmable—plan of adjustment for the Commonwealth and other Debtors will emerge.  Respectfully, this speculation, based on discussions with a minority group of creditors, does not suffice to carry the "heavy" burden of justifying an extension of the stay.  Moreover, in light of the ongoing economic harm to the Responding Parties resulting from the stay, and the continuing harm to the Responding Parties' due process and other constitutional rights likewise resulting from the stay, the balance of equities should have tipped against any extension of the stay.

3.      Against this backdrop, the Responding Parties respectfully request that the Court consider—and mitigate—the significant, albeit unintended, adverse consequences of the requested stay.  The adjournments proposed by the Mediation Team (and now adopted by the Court) are unworkable.  The Interim Orders entered by the Court on December 19 incorporated certain scheduling proposals by the Financial Oversight and Management Board for Puerto Rico ("FOMB") that relate to events that will occur *prior to* the Mediation Team's proposed adjourned hearing date of March 4.  The Responding Parties had intended to object in their responses to the Amended Report on January 20.  Specifically, at FOMB's request, the Interim Order related to the revenue bonds (ECF No. 9620, the "Interim Revenue Bond Order") currently schedules a preliminary hearing on the Lift Stay Motions for **February 27, 2020,** *before* **the Mediation Team's proposed adjourned date for the hearing on the Amended Report.**   Absent modification, the preliminary hearing would be improperly limited (in deference to the Revenue Bond Adversary Proceedings) to the issues of "whether (i) there is a reasonable likelihood the debtors will prevail and (ii) there are compelling circumstances to justify (or consent to allow)

delaying the final hearing(s) through the Court's resolution of the 12(b) and/or Rule 12(c) motions

filed in connection with the Revenue Bond Adversary Proceedings."[3]

        4.    Because FOMB first proposed this preliminary hearing scope and

sequencing in its response (ECF No. 9493, the "FOMB Response") to the Mediation Team's

Interim Report, the Responding Parties have not yet had an opportunity to respond through briefing

to this proposal.[4]  However, the Responding Parties had intended and do intend to object.

Specifically, the proposed preliminary hearing scope and sequencing is prejudicial to the

Responding Parties in that it implicitly suggests that there might be grounds to delay a final hearing

on the Lift Stay Motions until after a decision on the 12(b) and/or 12(c) motions in the Revenue

Bond Adversary Proceedings.  For reasons that will become clear once the Responding Parties

---

[3]   The Interim Revenue Bond Order also mandates that the parties meet and confer with respect to a schedule for the Lift Stay Motions.  The Responding Parties have no objection to meeting and conferring on this topic, although, given the fundamental disagreement between the Responding Parties and FOMB as to the appropriate vehicle for litigating revenue bond issues, the Responding Parties are not optimistic that a meet and confer process will lead to consensus on this issue—which makes it all the more essential that this Court promptly hold a hearing on this issue as originally scheduled on January 29.

[4] Notably, while the Court's order with respect to the schedule for the Interim Report (ECF No. 9016) provided an opportunity for parties to respond to the Interim Report itself, it did not provide a schedule for parties to reply to *other parties'* responses.  In its response to the Interim Report, however, Assured reserved its right to respond to the Amended Report, and thereby preserved its ability to object in writing to FOMB's proposed preliminary hearing structure to the extent that structure is incorporated into the Amended Report.  See ECF No. 9501 ¶ 27.  National reserved its rights as well.  See ECF No. 9440, note 2.  Notably, the Court's December 19 order addressing the filing of the Amended Report expressly acknowledges that the Interim Orders might be "(i) modified following the hearing on the Amended Report" or even "(ii) set aside in their entirety following the hearing on the Amended Report," meaning that the December 19 order expressly contemplates that parties should be able to request modifications to the Interim Orders prior to, and/or in the context of, a hearing on the Amended Report on January 29.  See ECF No. 9618 ¶ 1.  At the December 11 hearing, the Court also expressly asked parties to limit their remarks to issues that could not wait until the January 29 hearing.  Tr. of Omnibus Hearing at 43:4-15, In re Fin. Oversight and Mgmt. Bd. for Puerto Rico, No. 3:17-BK-3283 (LTS) (D.P.R. Dec. 11, 2019) ("my focus is on matters that would affect events between now and the January Omni . . . [a]nd so I would be grateful if you and everyone else who speaks today would focus on things that you believe really matter between now and [the January Omni]"); see also Tr. of Omnibus Hearing at 45:4-12, 51:10-11, 51:23-25, 52:19-20, 53:2-6, 53:18-23, 66:1-4, 79:1-4, 93:16-17, 97:5-9, 103:2-17, 106:4-7.  The proposed February 27 hearing on the Lift Stay Motions falls into this category of issues that were to be addressed at the January 29 hearing—but it *cannot* wait until March 4, and the Responding Parties will therefore be prejudiced if the January 29 hearing does not in fact take place as previously directed.

have *filed* their Lift Stay Motions (or amendments thereto) on January 16, however, the Revenue

Bond Adversary Proceedings are not an appropriate vehicle for litigating revenue bond issues,

including, for example, the constitutional and statutory infirmities of the fiscal plans, moratorium

laws, and other devices that FOMB and the Commonwealth have attempted to use to impair

revenue bondholders' liens.  Revenue bondholders have already attempted to litigate these types

of revenue bond issues by adversary proceeding in the Title III Court, but in Ambac Assurance

Corporation v. Commonwealth of Puerto Rico et. al., 927 F.3d 597, 602-603 (1st Cir. 2019), the

First Circuit held that "the text of section 305 [of PROMESA] bars the Title III Court from

granting . . . relief [with respect to such issues] absent consent from the Oversight Board."  When

Ambac argued that this construction of Section 305 "would raise due process concerns," the First

Circuit emphasized that "nothing in our holding today suggests that Ambac cannot seek traditional

stay relief pursuant to 11 U.S.C. § 362 and raise its constitutional and statutory arguments in a

separate action."  Id. at 605.  The First Circuit's guidance in Ambac is therefore clear:[5]  Because

of Section 305, revenue bondholders cannot obtain due process in the Title III Court unless FOMB

consents to have all relevant statutory and constitutional issues litigated in the Title III Court.

Absent such consent from FOMB (which FOMB has withheld here),[6] the *only* way that revenue

---

[5]    For the avoidance of doubt, the Responding Parties reserve the right to argue that the First Circuit erred
in its interpretation of Section 305.

[6]    Indeed, far from granting consent for all relevant revenue bond issues to be litigated in the Title III
Court, FOMB, in its response (ECF No. 9493) to the Interim Report *rejected* the Mediation Team's
interpretation of Section 305, under which FOMB's filing of the Revenue Bond Complaints would be
deemed consent to the assertion of "any proper affirmative defense" by the defendants, and instead
proposed a construction of Section 305 that would entitle FOMB to dictate, on an *issue by issue basis*, what
defenses defendants in the Revenue Bond Adversary Proceedings would be permitted to assert.  See ECF
No. 9493 ¶ 17.  For the record, the Responding Parties' view is that even the Mediation Team's construction
of Section 305 is insufficient to provide due process, because, at a minimum, defendants in an adversary
proceeding must be permitted to assert counterclaims in addition to affirmative defenses, and revenue
bondholders must more generally be permitted to assert constitutional and statutory claims without FOMB's
consent and without being named as defendants in an adversary proceeding.  Regardless of whether the
Mediation Team's interpretation of Section 305 would be sufficient to provide due process, however, it is
absolutely clear that an adversary proceeding cannot provide due process if, as FOMB asserts, the plaintiff

bondholders can obtain due process is by seeking relief from the automatic stay to commence an action in a non-Title-III forum where Section 305 does not apply.

5.       In light of the First Circuit's <u>Ambac</u> decision, it is clear that Section 305 renders an adversary proceeding in the Title III Court (such as the Revenue Bond Adversary Proceedings) a defective and constitutionally infirm vehicle for litigating revenue bond issues, and that the *only* constitutionally viable vehicle for litigating these issues will be through a grant of stay relief (as requested in the Lift Stay Motions) followed by the commencement of enforcement actions with respect to the HTA, CCDA, and PRIFA bonds in a non-Title-III forum.

6.       For this reason alone, the hearing on the Amended Report cannot reasonably be adjourned as proposed by the Mediation Team, and the hearing on the Amended Report should take place on January 29 as originally scheduled so that the Court can hear the parties' objections to the proposed sequencing and scope of proceedings related to the Lift Stay Motions and the Revenue Bond Adversary Proceedings on a basis informed by the Court's review of the Lift Stay Motions filed on January 16.  Accordingly, the Responding Parties respectfully request that the Court reconsider its decision to delay the hearing on the Amended Report until March 4, and instead hold the hearing on January 29 as originally scheduled.

7.       If that relief is not granted, then in the alternative, at an absolute minimum, the Court should amend the Interim Revenue Bond Order as reflected in the proposed amended Interim Revenue Bond Order attached hereto as "<u>Exhibit A</u>" by striking (i) any reference to a hearing on February 27, (ii) any statement as to whether such a hearing would be a preliminary or a final hearing, and (iii) any reference to the Lift Stay Motions potentially being delayed in favor

---

is permitted to dictate unilaterally what defenses the defendant may assert.  In view of FOMB's refusal to consent to the litigation of all revenue bond issues—including relevant counterclaims and affirmative defenses—in the Title III Court, the Lift Stay Motions must take precedence over the Revenue Bond Adversary Proceedings as the preferred, and only constitutionally viable, vehicle for litigating revenue bond issues.

of the Revenue Bond Adversary Proceedings.[7]  In parallel, the dates in the Interim Revenue Bond

Order related to the Revenue Bond Adversary Proceedings should be suspended pending the

March 4 hearing on the Amended Report.  Otherwise, the Responding Parties will be significantly

prejudiced because the Revenue Bond Adversary Proceedings would be permitted to go forward

before the Responding Parties have been provided with an opportunity to voice their objections to

the procedures related to those adversary proceedings in their responses to the Amended Report.

### BACKGROUND

8.      The Responding Parties are creditors of the Commonwealth of Puerto Rico

with billions of dollars of claims arising from the securities issued by numerous Puerto Rico public

entities, including several or all of the following:  (i) general obligation bonds ("GO Bonds")

issued by the Commonwealth of Puerto Rico and (ii) secured revenue bonds issued by (a) HTA,

(b) PREPA, (c) PBA, (d) the Puerto Rico Convention Center District Authority ("PRCCDA"), and

(e) the Puerto Rico Infrastructure Financing Authority ("PRIFA").   As such, the Responding

Parties are parties to various proceedings in these Title III cases, including many of the

---

[7]     The Responding Parties find themselves materially disadvantaged vis-à-vis the Mediation Team,
because the Stay Order entered by the Court on July 24 appears to authorize the Mediation Team to make
certain disclosures regarding the status of mediation in support of its scheduling recommendations, but
grants the Responding Parties no similar exemption from mediation confidentiality.  See Stay Order ¶ A.6.
There is therefore a risk that the Mediation Team could attempt to characterize the Responding Parties'
positions taken within the mediation process without the Responding Parties having any ability to clarify
and respond. For that reason, without disclosing any details of discussions that took place during the
mediation process, the Responding Parties would like to state unequivocally, and based solely on the
Interim Orders entered to date on the public docket, that (i) the Responding Parties view the Revenue Bond
Adversary Proceedings as a defective and constitutionally infirm vehicle for litigating revenue bond issues
and (ii) the Responding Parties view the Lift Stay Motions, followed by the commencement of enforcement
actions in a non-Title-III forum, as the *only* appropriate and constitutionally viable vehicle for litigating
revenue bond issues.  Furthermore, in the event the Mediation Team were to attempt to characterize
discussions that took place in the mediation process and/or the Responding Parties' positions taken in the
context of such discussions, the Responding Parties respectfully request that the Court grant the Responding
Parties an exemption from mediation confidentiality to clarify and respond.

proceedings (the "Stayed Proceedings") subject to the stay first established by the Court's July 24, 2019 stay order (ECF No. 8244, the "Stay Order").

9.     In June 2019, FOMB filed a series of motions (the "Stay Motions") seeking to stay certain of the Stayed Proceedings, purportedly so that FOMB could "garner further support" for a "restructuring framework" set forth in a recently announced plan support agreement with a small minority of PBA and GO Bondholders.  See Adv. Proc. No. 18-149, ECF No. 99 ¶ 3; see also ECF No. 7640.  A number of creditors, including some of the Responding Parties, opposed these Stay Motions, noting that FOMB had failed to carry its burden of justifying a stay.

10.     Rather than grant the Stay Motions in the form — or on the grounds — proposed by FOMB, the Court issued its Stay Order at the July 24, 2019 omnibus hearing.  The purpose of the Stay Order was to "avoid piecemeal litigation of potentially overlapping key issues" and "to identify efficiently the issues that must be litigated or otherwise resolved to achieve confirmation of a plan of adjustment for the Commonwealth (and other debtors and potential debtors in Title III proceedings), as well as to prioritize such issues and develop efficient approaches to the resolution of such issues." Id.

11.     Given the volume of litigation that FOMB had commenced in the months leading up to the Stay Order, the Responding Parties understood and accepted the Court's determination to effect a pause and allow the Mediation Team to attempt to impose some kind of order on the resulting litigation chaos.  Towards that end, the Stay Order provided a generous, approximately four-month stay period, lasting until November 30, 2019, which the Responding Parties believe was more than adequate to achieve those objectives.

12.     On October 24, 2019, FOMB and AAFAF filed an urgent motion (ECF No. 8972, the "First Extension Motion") seeking to extend the stay by a further month, until December 31, 2019.  The Responding Parties objected to the First Extension Motion (see ECF

No. 9001), pointing out, among other things, (i) that FOMB and AAFAF had failed to identify "any need or basis for the requested extension" (see ECF No. 9001 ¶ 11); (ii) that any further extension of the stay would "raise serious due process concerns" (see ECF No. 9001 ¶ 12); and (iii) that in light of the ongoing harm being inflicted on the Responding Parties as a result of the stay—including the direct economic harm to the Responding Parties, who are financial guaranty insurers, and who are required to continue making payments under their applicable insurance policies for the duration of the stay—the equities weighed unequivocally against extending the stay.  See ECF No. 9001 ¶¶ 12-13.

13.    On October 28, 2019, the Court entered an order granting the First Extension Motion and extending the stay until December 31, 2019.  See ECF No. 9016 (the "First Stay Extension Order").  As a result of the First Stay Extension Order, FOMB and AAFAF enjoyed an additional month's stay of litigation on top of the four-month stay originally provided for under the Stay Order.

14.    The Stay Order authorized the Mediation Team Leader to "facilitate the filing of agreed or substantially agreed order(s) with respect to . . . the adversary proceedings and contested matters listed in Appendix I [to the Stay Order]."  See id. ¶ A.3.  In the event the parties to the Stayed Proceedings were unable to "agree or come to substantial agreement with respect to such scheduling orders," the Stay Order authorized the Mediation Team Leader to "file with the Court a report (the 'Report') . . . setting forth the procedural issues as to which substantial consensus has been achieved, any further procedural recommendation of the Mediation Team Leader relating to those issues, and any other recommendations of the Mediation Team Leader regarding an appropriate schedule for the disposition of these adversary proceedings and contested matters . . . ."  See id. ¶ A.4.

15.     On November 27, 2019 the Mediation Team filed its Interim Report and Recommendation of the Mediation Team (the "Interim Report") (ECF No. 9365).     On December 6, 2019, Assured filed a response to the Interim Report (ECF No. 9501, the "Assured Response"), requesting amendments to the Interim Orders attached to the Interim Report in order to fulfill the Stay Order's mandate to "avoid piecemeal litigation" of "overlapping key issues" by (i) allowing the Claim Objections and the PBA Adversary Proceeding to proceed on the same schedule, and (ii) allowing all Lift Stay Motions to be heard on the same schedule.  See Assured Response ¶ 13.  National filed a reservation of rights (ECF No. 9440) and raised several concerns regarding changes suggested by the FOMB at the December 11, 2019 hearing.

16.     Following the December 11, 2019 hearing, the Court entered an order (the "Bridge Order") (ECF No. 9618) on December 19, 2019, which adopted the Mediation Team's determination to address the scheduling and sequencing of specified disputes pending the filing of an amended report (the "Amended Report"), instead of submitting a comprehensive report and recommendation regarding scheduling and sequencing of all relevant issues in the Title III case.  This Bridge Order required the Mediation Team to file the Amended Report by January 10, 2020, deferred consideration of many of the objections to the Interim Report, and extended the stay with respect to certain matters not addressed in the Interim Orders attached to the Interim Report.

17.     On December 23, 2019, the Mediation Team filed the Urgent Motion.  The Urgent Motion seeks to extend the deadline to file the Amended Report from January 10, 2020 to February 10, 2020, and to extend the deadline to file responses in support of, or objections to, the Amended Report from January 20, 2020 to February 21, 2020.  See Urgent Motion.  The Urgent Motion also seeks to move the date of the hearing on the Amended Report from January 29, 2020 to March 4, 2020, and to extend the stay of stayed matters until March 11, 2020.  See id.

18.    Within hours of the Urgent Motion, the Court entered an order partially granting the Urgent Motion by granting the adjournments of the filing deadline and hearing on the Amended Report (ECF No. 9639, the "Second Stay Extension Order").    The Second Stay Extension Order nonetheless "invites any parties whose positions regarding the maintenance of the dates set forth in the Interim Orders and the continued stay of the Stayed Proceedings are not reflected in the Urgent Motion and who have views they want the Court to consider in connection with the resolution of the outstanding aspects of the Urgent Motion, to file position statements regarding those matters." See ECF No. 9639. As set forth herein, the Responding Parties object to the Urgent Motion in its entirety and, pursuant to FRCP 60 and Bankruptcy Rule 9024, request that the Second Stay Extension Order be reconsidered to deny the Urgent Motion in its entirety.

## ARGUMENT

### I.    The Mediation Team Has Failed To Carry Its "Heavy" Burden Of Justifying A Further Extension Of The Stay

#### A.    The Burden Is On The Mediation Team To Demonstrate That "Extraordinary Circumstances" Justify A Stay

19.    While it is true that a court has inherent authority to "control the disposition of the causes on its docket" (Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)), it is also true that "a stay should only be entered in extraordinary circumstances." Walsh Const. Co. P.R. v. United Sur. & Indem. Co., No. Civ. 12-1401 (SEC), 2015 WL 13548470 at *4 (D.P.R. Sept. 28, 2015). The burden of establishing that such "extraordinary circumstances" exist "[lies] heavily" on the movant. Landis, 299 U.S. 248, 256. Specifically, this heavy burden requires a movant to "demonstrate 'a clear case of hardship'" in order for the movant "to be entitled to a discretionary stay." Microfinancial, Inc. v. Premier Holidays Intern., Inc., 385 F.3d 72, 77 (1st Cir. 2004) (quoting Austin v. Unarco Indus., Inc., 705 F.3d 1, 5 (1st Cir. 1983) (confirming denial of stay

where nonmovant would have suffered from an uncertain and potentially lengthy delay before being able to collect from movant)).

20.     To meet this heavy burden, the movant must make a "specific showing of prejudice that cannot be remedied by anything other than a complete stay." SEC v. Fraser, No. CV-09-00443-PHX-GMS, 2009 WL 1531854, at *3 (D. Ariz. June 1, 2009).  This showing is balanced against other competing interests discussed in Section II, below.  Landis, 299 U.S. at 255 ("[the court] must weigh competing interests and maintain an even balance").  Here, the burden has not been met:  the Mediation Team has not shown "a clear case of hardship," either with respect to itself or with respect to any other party, that would justify further extending the stay of the proceedings to be covered by the Amended Report.  In re S. Side House, LLC, 470 B.R. 659, 687 (Bankr. E.D.N.Y. 2012) (finding that the possibility of prejudice was insufficient to justify a stay). Conversely, this stay and its continuation are in fact imposing a "clear hardship" on the Responding Parties.

21.     In support of a further stay, the Mediation Team refers to the existence of "mediation sessions in support of developing a **more consensual** plan of adjustment for the Commonwealth of Puerto Rico, among other Title III debtors."  See Urgent Motion at p. 4 (emphasis added).  Importantly, the Mediation Team never suggests that such a "more consensual" plan would be fully consensual, *or even that such a "more consensual" plan would have sufficient support to be confirmed*.  On the contrary, the Mediation Team strongly suggests that the current discussions it alludes to would *not*, in and of themselves, lead to a confirmable plan, because the Mediation Team states that "if the current negotiations are successful, **other parties will need to be included in the mediation process** in order to continue to ***attempt*** to build even broader consensus around a ***possible*** amended plan of adjustment."  See id. (emphasis added).  A non-inclusive process such as that described in the Urgent Motion does not present a realistic near-term

-11-

prospect of a confirmable, much less fully consensual, plan; rather it only offers "attempts" to realize the "possibility" of a "more consensual"—albeit still unconfirmable and not fully consensual—plan.   Such "attempts" to arrive at a "possible" plan settlement should <u>not</u> be sufficient to justify the extension of an already lengthy stay.   Parties are always free to "attempt" to arrive at a settlement, and such a settlement is always—in an abstract and theoretical sense— "possible."   However, "a potential settlement is ***not*** a legal basis for a stay," particularly where, as here, non-settling parties (such as the Responding Parties) do not consent.   <u>PNC Bank v. GVTG, LLC</u>, No. 1:13-cv-00634-RLV, 2014 WL 12524648, at *2 (N.D. Ga. Mar. 4, 2014) (emphasis added), <u>aff'd</u>, 592 F. App'x 775 (11th Cir. 2014); <u>see also</u> <u>In re Phar-Mor, Inc. Securities Litigation</u>, 166 B.R. 57, 63 (W.D. Pa. 1994) (denying stay on the basis that the possibility of settlement is mere speculation and, therefore, does not entitle movant to a stay).   If courts imposed a stay whenever settlement was merely possible, "litigation could be prolonged indefinitely . . . ." <u>Keystone Coke Co. v. Pasquale</u>, No. CIV. A. 97-6074, 1999 WL 126917, at *5 (E.D. Pa. Mar. 9, 1999).

22.   In particular, as the Responding Parties have previously noted, there is no evidence that proceeding with litigation will result in any harm whatsoever to whatever negotiations may be occurring among a subset of parties.   On the contrary, the risk imposed on the negotiating parties by pending litigation seems likely to facilitate, rather than discourage, settlement.   As the Responding Parties have already stated in response to the First Extension Motion, "[t]o the extent any ongoing discussions exist, . . . the Responding Parties suggest that the parties to such discussions already have had substantial time since the stay was entered and that further discussions would be encouraged by the entry of Scheduling Order deadlines set forth in the [Mediation Team's] report."   <u>See</u> ECF No. 9001 ¶ 11.   At a minimum, there has been no

demonstration that parties cannot negotiate and litigate at the same time, and therefore no showing has been made in support of a stay.

> **B.    Any Further Extension Of The Stay Will Render It "Immoderate" And Therefore Impermissible**

23.    Even when extraordinary circumstances exist to justify a stay—and no such circumstances exist here—a court may not impose a stay that is immoderate in length.  Rather, a court may only impose a stay that results in a "delay not immoderate in extent and not oppressive in its consequences . . . "  Landis, 299 U.S. at 256.  In considering whether a stay is "immoderate," courts also look to the scope and potential duration of the stay, as well as the reasons cited for granting the stay.  Ortega Trujillo v. Conover & Co. Communications, Inc., 221 F.3d 1262, 1264 (11th Cir. 2000) (internal citation omitted).

24.    The stay here threatens to become not only immoderate, but effectively indefinite.  Indefinite stays are disfavored because the "law presumes injury from unreasonable delay."  Anderson v. Air W., Inc., 542 F.2d 522, 524 (9th Cir. 1976); see also In re Atlantic Pipe Corp., 304 F.3d 135, 147 (1st Cir. 2002) ("justice delayed is justice denied"); Konopca v. Comcast Corp., No. 15-6044, 2016 WL 1645157, at *4 (D.N.J. Apr. 26, 2016) (explaining a request for an indefinite stay weighs against a stay).  That presumption of prejudice to the nonmovant is most poignant where FOMB and the Mediation Team have already sought previous extensions of the stay (see ECF Nos. 8972, 9014) and now seek to add delay on top of delay.

25.    Here, there is no "pressing need," or even a lesser justification, to continue the stay of the matters covered by the Amended Report.  The original goal of the stay was avoiding piecemeal litigation and the efficient identification and resolution of overlapping key issues.  The stay was specifically framed as a "short-term stay."  See July 24, 2019 Hr'g Tr. at 55:25-56:1-10.  Any further extension of the stay, particularly in view of the non-inclusive process described in

-13-

the Urgent Motion, would serve to prevent, rather than encourage, the efficient resolution of overlapping key issues.  Therefore, any further extension would serve to defeat, rather than fulfill, the goals of the Court's July 24 Stay Order.

## II.      The Equities Weigh Against Any Further Extension Of The Stay

26.      In deciding whether a stay is warranted, the court must balance the equities. Landis, 299 U.S. at 259 ("Benefit and hardship will be set off, the one against the other, and upon an ascertainment of the balance discretionary judgment will be exercised anew").  Courts have enumerated relevant factors that "typically bear on the decisional calculus:"  (1) interests of the nonmovant in proceeding expeditiously, and whether prejudice would ensue if there was a delay; (2) hardship on the movant if the stay is denied; (3) convenience of the court; (4) interest of nonparties to the litigation; and (5) public interest.  Microfinancial, 385 F.3d 72, 78 (citing Fed. Sav. & Loan Ins. Corp. v. Molinaro, 889 F.2d 899, 903 (9th Cir. 1989)).

27.      In weighing factors, it is important to "avoid hazards of unjustified indefinite delay, ensure that claimants receive due process of law, and generally assure the court of the propriety of a stay."  U.S. v. One Parcel of Real Estate at 1303 Whitehead St. Key W., Fla., 729 F. Supp. 98, 100 (S.D. Fla. 1990); see also U.S. v. Eight Thousand Eight Hundred and Fifty Dollars, 461 U.S. 555 (1983).  In particular, in considering a litigation stay request, a court must consider whether "a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party."  See Rosco, Inc. v. Mirror Lite Co., No. CV-96-5658(CPS), 2017 WL 2296827, at *3 (E.D.N.Y. Aug. 6, 2007).

28.     Each of the relevant factors weighs *against* any further extension of the stay, as set forth below:

**1.     Interests of nonmovant in proceeding expeditiously with litigation or any aspect of it, and potential prejudice of a delay**

29.     There is consensus among courts that delay in the context of bankruptcy harms creditors in that they are delayed in receiving their distribution from the debtor's estate.  In re Glen Eagle Square, Inc., No. 91-0300S, 1991 WL 111486, at *2 (Bankr. E.D. Pa. June 20, 1991) (denying stay); see also In re Ellswick, No. 15-41196-JJR13, 2016 WL 3582586, at *1 n.3 (Bankr. N.D. Ala. June 24, 2016), aff'd sub nom. Ellswick v. Quantum3 Grp., LLC, No. 1:16-CV-01959-MHH, 2018 WL 1408536 (N.D. Ala. Mar. 21, 2018) ("plan confirmation and [] distributions to creditors are interrelated with the allowance and disallowance of claims, and all should proceed with deliberate speed . . . "); In re Atlantic Pipe Corp., 304 F.3d at 147 ("justice delayed is justice denied").  Here, not only is recovery from the Debtors delayed, but the Responding Parties are also suffering from (i) concrete financial harm and (ii) deprivation of the opportunity to defend their property rights in the disputes over their various claims.

30.     With respect to the concrete financial harm, the Responding Parties are financial guaranty insurers who continue to make payments under their insurance policies on the Debtors' defaulted bonds, and will be required to continue doing so as long as the stay delays resolution of the Title III cases.

31.     Further prejudice ensues from the deprivation of the Responding Parties' ability to defend their constitutional and statutory rights and their property interests at issue in the many proceedings that will continue to be stayed if the filing of the Amended Report is delayed.

32.     These stayed proceedings include, for example, Assured's pending adversary proceeding (Adv. Proc. No. 18-59-LTS) seeking declarations that the Commonwealth's

fiscal plan violates both PROMESA and the U.S. Constitution.  While Assured agreed to submit that adversary proceeding to the mediation process for the purpose of rationally coordinating it with related matters, Assured did so based on the assumption that the Mediation Team would promptly be filing the Amended Report on the schedule that the Mediation Team itself had proposed.  Assured should not suffer continued deprivation of its ability to assert its statutory and constitutional rights.  Additionally, meanwhile, special revenues continue to be diverted.

33.     Moreover, as set forth above in Paragraphs 3-6, the current Interim Revenue Bond Order contemplates a hearing on February 27 to determine whether the Responding Parties' Lift Stay Motions should be delayed in favor of the Revenue Bond Adversary Proceedings, without the Responding Parties having been given an opportunity to object to the related procedures set forth in the Interim Revenue Bond Order through their responses to the Amended Report.  This is particularly prejudicial given that the February 27 hearing's ostensible purpose would be to potentially delay and defer the Lift Stay Motions in favor of constitutionally infirm Revenue Bond Adversary Proceedings.

**2.    The burden which any aspect of the proceedings may impose on movant**

34.     As noted above, the Mediation Team has not demonstrated any concrete burden resulting from the termination of the stay.  If anything, allowing the stay to be terminated will make the Mediation Team's task of attempting to broker a consensual plan easier, because all parties to the mediation will face an imminent risk of loss from the pending litigation and will therefore likely become more amenable to settlement.

35.     Moreover, FOMB will not be burdened by proceeding with any of the litigations that FOMB itself has initiated, because if FOMB does not wish to proceed with any of these litigations, it can simply withdraw them.  In any event, even where FOMB is a defendant,

the mere requirement to participate in litigation is *not* a burden justifying the extension of a stay. In re ConAgra Foods, Inc., No. CV-11-05379-MMM, 2014 WL 12580052, at *8 (C.D. Cal. Dec. 29, 2014) ("merely being required to defend the suit does not constitute hardship"); Salinas v. City of San Jose, No. 5:09-cv-04410 EJD 2012 WL 2906052 at *2 (N.D. Cal. Jul. 13, 2012) ("The moving party must cite to something more than the intrinsic inconvenience arising from involvement in litigation").

### 3. Convenience of the court in its management of cases, and judicial economy

36.     The Mediation Team has not demonstrated that extending the stay will promote the convenience of the Court or promote judicial economy.  On the contrary, FOMB and the Mediation Team's repeated requests for extensions of the stay, and the Mediation Team's repeated date extensions for filing the Report required by the July 24 Stay Order, have served to maintain or increase the mountain of backlogged existing litigation and will thus serve to increase the ultimate burden on the Court and parties.  Moreover,  the parties have had to engage in multiple rounds of briefing and argument related to scheduling issues—including the current round of briefing necessitated by the filing of the Urgent Motion itself.

### 4. Interests of nonparties to the litigation

37.     The Mediation Team does not make a sufficient showing that an extension of the stay would benefit nonparties to the various litigations covered by the Amended Report. The Responding Parties submit that any nonparties to the litigation who nonetheless have a stake in the outcome of these Title III cases—including, first and foremost, the people of Puerto Rico— would benefit from a prompt resolution of the Title III cases and the resulting clarity with respect to the future of Puerto Rico and its finances.  By contrast, nonparty stakeholders will be harmed by the continued uncertainty and delay that would result from any further extension of the stay.

**5.  Public interest**

38.    The stay and its repeated extension, particularly in the absence of a showing of likely positive resolutions, do not promote the public interest.  The existence of such a broad-based stay, especially for a period now exceeding five months, is to the Responding Parties' knowledge unprecedented in bankruptcy or federal court generally.  The public interest favors expedient resolution of disputes and the ability to exercise due process rights.  The longer major proceedings in these Title III cases are stayed, the greater the likelihood that the delay is violating due process rights.  Endless delays merely encourage more delays.  The time tested method to resolve complex cases is to put the parties' feet to the fire.  Due process demands that major parties be afforded both a seat at the table and their day in court.

*      *      *      *      *      *      *      *

39.    Overall, the equities here weigh against any further extension of the stay.

## RESERVATION OF RIGHTS

40.    The Responding Parties reserve all of their rights with respect to the Urgent Motion and any Amended Report, including specifically the right to join in any other responses or objections to the Urgent Motion or to any Amended Report.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Court should grant reconsideration of its order partially granting the Urgent Motion and should deny the Urgent Motion in its entirety.  In the event the Court does not deny the Urgent Motion in its entirety, then, in the alternative, the Court should, at a minimum, amend the Interim Revenue Bond Order as reflected in the proposed amended Interim Revenue Bond Order attached hereto as Exhibit A (i) to strike (a) any reference to a hearing on February 27, (b) any statement as to whether such a hearing would be a preliminary or a final hearing, and (c) any reference to the Lift Stay Motions potentially

being delayed in favor of the Revenue Bond Adversary Proceedings, and (ii) to suspend all dates

related to the Revenue Bond Adversary Proceedings pending a hearing on the Amended Report.

Dated:      December 26, 2019
            New York, New York

CASELLAS ALCOVER & BURGOS P.S.C.          CADWALADER, WICKERSHAM & TAFT LLP


_/s/ Heriberto Burgos Pérez_              _/s/ Howard R. Hawkins, Jr._
Heriberto Burgos Pérez                    Howard R. Hawkins, Jr.*
USDC-PR No. 204,809                       Mark C. Ellenberg*
Ricardo F. Casellas-Sánchez               William Natbony*
USDC-PR No. 203,114                       Ellen M. Halstead*
Diana Pérez-Seda                          Thomas J. Curtin*
USDC–PR No. 232,014                       Casey J. Servais*
E-mail:  hburgos@cabprlaw.com             200 Liberty Street
         rcasellas@cabprlaw.com           New York, New York 10281
         dperez@cabprlaw.com              Tel.:  (212) 504-6000
                                          Fax:  (212) 406-6666
P.O. Box 364924                           Email:  howard.hawkins@cwt.com
San Juan, PR 00936-4924                           mark.ellenberg@cwt.com
Tel.:  (787) 756-1400                             bill.natbony@cwt.com
Fax:  (787) 756-1401                              ellen.halstead@cwt.com
                                                  thomas.curtin@cwt.com
_Counsel for Assured Guaranty Corp. and_          casey.servais@cwt.com
_Assured Guaranty Municipal Corp._

                                          * admitted pro hac vice
                                          _Counsel for Assured Guaranty Corp. and Assured_
                                          _Guaranty Municipal Corp._

**ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC**

/s/ Eric Perez-Ochoa
ERIC PÉREZ-OCHOA
USDC-PR No. 206,314
E-mail:  epo@amgprlaw.com


/s/ Luis A. Oliver-Fraticelli
LUIS A. OLIVER-FRATICELLI
USDC-PR NO. 209,204
E-mail:  loliver@amgprlaw.com
208 Ponce de Leon Ave., Suite 1600
San Juan, PR 00936
Tel.:  (787) 756-9000
Fax:  (787) 756-9010

*Attorneys for National Public Finance
Guarantee Corp.*

**WEIL, GOTSHAL & MANGES LLP**

/s/ Robert Berezin
MARCIA GOLDSTEIN*
JONATHAN POLKES*
GREGORY SILBERT*
ROBERT BEREZIN*
767 Fifth Avenue
New York, New York 10153
Tel.:  (212) 310-8000
Fax:  (212) 310-8007
Email:  marcia.goldstein@weil.com
        jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com

*admitted pro hac vice

*Attorneys for National Public Finance
Guarantee Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court

using the CM/ECF System, which will send notification of such filing to all parties of record in

the captioned case.

At New York, New York, this 26th day of December, 2019.


By: _/s/ *Howard R. Hawkins, Jr.*
                 Howard R. Hawkins, Jr.*
                 * admitted pro hac vice