UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-----------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Debtors.[1]

-----------------------------------------------------------------x

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Objectant,

     v.

THE BANK OF NEW YORK MELLON, AS FISCAL
AGENT,

     Respondent.

-----------------------------------------------------------------x

|  |
|---|
| PROMESA<br>Title III |
| No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

PROMESA
Title III

**This filing relates to the
Commonwealth.**

**SUPPLEMENTAL OBJECTION OF FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD, PURSUANT TO BANKRUPTCY CODE
SECTION 502 AND BANKRUPTCY RULE 3007, TO PROOF OF CLAIM
AGAINST THE COMMONWEALTH BY THE
BANK OF NEW YORK MELLON, AS FISCAL AGENT (CLAIM NO. 16775)**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

JURISDICTION AND STATUTORY PREDICATES ................................................... 4

RELEVANT BACKGROUND ........................................................................................ 5

I.     ERS ........................................................................................................................ 5

II.    The ERS Bonds .................................................................................................... 7

III.   ERS Fiscal Crisis and Attempts at Reform ...................................................... 7

IV.    2017 Pension Reform ......................................................................................... 10

V.     The ERS Bonds Resolution, Offering Statement, and Security Agreement ..................... 13

VI.    The Pre-Petition Proceeding and Joint Stipulations ..................................... 18

VII.   The ERS Title III Case ...................................................................................... 20

VIII.  Fiscal Agent Claim ............................................................................................ 25

RELIEF REQUESTED .................................................................................................. 26

BASIS FOR RELIEF ..................................................................................................... 27

I.     The Post-Petition Legislation Does Not Give Rise to Secured Claims Against the
       Commonwealth. .................................................................................................. 27

       A.     The Fiscal Agent Has No Claim Based on a Transfer to the
              Commonwealth of ERS Funds Allegedly Subject to the Fiscal Agent's
              Security Interest. ...................................................................................... 27

       B.     The Fiscal Agent Has No Secured Claim Against the Commonwealth
              Arising from the Cessation of the Employers' Contributions and the
              Commencement of the Paygo Payments .................................................. 30

II.    The Post-Petition Legislation Does Not Give Rise to Any Constitutional Claims
       Against the Commonwealth. .............................................................................. 33

       A.     The Post-Petition Legislation Did Not Violate the Contracts Clause of the
              U.S. or Puerto Rico Constitutions. .......................................................... 33

       B.     The Post-Petition Legislation Did Not Violate the Takings Clause of the
              U.S. or Puerto Rico Constitutions. .......................................................... 43

III.   The Fiscal Agent's Remaining Assorted Claims Must Also Fail. ..................... 55

A.      The Transfer of the Pledged Property to the Commonwealth Did Not
Unjustly Enrich the Commonwealth.................................................................. 55

B.      The Commonwealth Did Not Violate Section 407 of PROMESA in
Enacting the Post-Petition Legislation.............................................................. 57

C.      The Fiscal Agent Fails to State A Claim with Regard to Its Other
Miscellaneous Theories of Recovery................................................................. 59

NATURE OF CLAIMS (IF ANY) ............................................................................................. 59

NOTICE........................................................................................................................................ 59

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

<small>CASES</small>

*A&D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014).................................................................49, 50

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978).......................................................................................34

*Altair Glob. Credit Opp. v. Employees Ret. Sys.*,
914 F.3d 694 (1st Cir. 2019)..........................................................................23

*Amalgamated Transit Union v. Commonwealth of Mass.*,
666 F.2d 618 (1st Cir. 1985)..........................................................................35

*Ambrose v. City of White Plains*,
No. 10-CV-4946 (CS), 2018 WL 1635498 (April 2, 2018 S.D.N.Y.)..............35, 43

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................59

*Ass'n of Mgmt. Emps. of State Ins. Fund Corp. v. State Ins. Fund Corp.*,
Case No. SJ2014CV00204 (907), 2015 WL 4075649 (P.R. Ct. App. May 29,
2015) ..............................................................................................................47

*Baltimore Teachers Union v. Mayor & City Council of Baltimore*,
6 F.3d 1012 (4th Cir. 1993) ...............................................................35, 38, 43

*Bank of N.Y. v. Treco (In re Treco)*,
240 F.3d 148 (2d Cir. 2001)...........................................................................45

*Bayron Toro v. Serra*,
19 P.R. Offic. Trans. 646 (P.R. 1987)............................................................37

*Brown v. Legal Found. of Wash.*,
538 U.S. 216 (2003).......................................................................................44

*Buffalo Teachers Fed'n v. Tobe*,
464 F.3d 362 (2d Cir. 2006)................................................................. passim

*Chrysler Corp. v. Kolosso Auto Sales, Inc.*,
148 F.3d 892 (7th Cir. 1998) .........................................................................37

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage,
Inc.*),
656 F.3d 82 (1st Cir. 2011).......................................................................55, 56

*Concrete Pipe and Prods of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993)................................................................................................49

*Connolly v. Pension Benefit Guar. Corp.*,
    475 U.S. 211 (1986)..........................................................................46, 48, 51, 52

*Diaz-Diaz v. Fortuño-Burset*,
    No. 11-1632 (JAF), 2012 WL 2498912 (D.P.R. June 27, 2012)............................35

*Domínguez Castro v. Commonwealth*,
    178 D.P.R. 1 (P.R. 2010)........................................................................................33

*Donohue v. New York*,
    347 F. Supp. 3d 110 (N.D.N.Y. 2018)....................................................................43

*Dowell v. D.R. Kincaid Chair Co.*,
    125 N.C. App. 557 (1997).......................................................................................32

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983).......................................................................................passim

*Faitoute Iron & Steel Co. v. City of Asbury Park*,
    316 U.S. 502 (1942)................................................................................................51

*Forest Props., Inc. v. United States*,
    177 F.3d 1360 (Fed. Cir. 1999).........................................................................44, 50

*Franklin Mem'l Hosp. v. Harvey*,
    575 F.3d 121 (1st Cir. 2009)...................................................................................51

*Hendler v. United States*,
    175 F.3d 1374 (Fed. Cir. 1999)..............................................................................49

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)....................................................................................34, 35, 51

*In re Delano Retail Partners, LLC*,
    No. 11-37711-B-7, 2017 WL 3500391 (Bankr. E.D. Cal. Aug. 14, 2017).............29

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    297 F. Supp. 3d 269 (D.P.R. 2018).........................................................................58

*In re Keene Corp.*,
    188 B.R. 881 (Bankr. S.D.N.Y. 1995).....................................................................32

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987)................................................................................................48

*Lingle v. Chevron U.S.A., Inc.*,
544 U.S. 528 (2005)............................................................................48

*Lynch v. United States*,
292 U.S. 571 (1934)............................................................................46

*McAndrews v. Fleet Bank of Mass., N.A.*,
989 F.2d 13 (1st Cir. 1993)............................................................48, 49

*Murr v. Wisconsin*,
137 S. Ct. 1933 (2017)........................................................................53

*Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight &
Mgmt. Bd. for Puerto Rico)*,
330 F. Supp. 3d 685 (D.P.R. 2018), *aff'd and remanded*, No. 18-2154, 2019
WL 6887258 (1st Cir. Dec. 18, 2019) ............................................54, 55

*Parella v. Ret. Bd. of the R.I. Emps.*,
173 F.3d 46 (1st Cir. 1999)..................................................................45

*Peaje Invs. LLC, v. Garcia-Padilla*,
845 F.3d 505 (1st Cir. 2017)............................................................18, 19

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978)..................................................................47, 48, 52

*Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty.*,
57 F.3d 505 (7th Cir. 1995) ...........................................................45, 46

*Ropico, Inc. v. City of New York*,
425 F. Supp. (S.D.N.Y. 1976)..............................................................53

*Sal Tinnerello & Sons, Inc. v. Town of Stonington*,
141 F.3d 46 (2d Cir. 1998)...................................................................34

*Stewart v. Husqvarna Constr. Prods. N. Am.*,
Civ. No. 11-1182, 2012 U.S. Dist. LEXIS 62585 (D.P.R. May 4, 2012)...............56

*Stierwalt v. Assoc. Third Party Adm'rs*,
No. 16-MC-80059-EMC, 2016 WL 2996936 (N.D. Cal. May 25, 2016) ..............29

*Trinidad Hernández v. E.L.A.*,
188 D.P.R. 828 (P.R. 2013) ........................................................37, 39, 40

*UAW v. Fortuño*,
633 F.3d 37 (1st Cir. 2011) ...................................................... passim

*United States v. Va. Elec. & Power Co.,*
    365 U.S. 624 (1961) ............................................................................................44

*Waldner v. Carr,*
    618 F.3d 838 (8th Cir. 2010) ...........................................................................57

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................................56

*Wright v. Union Cent. Life Ins. Co.,*
    311 U.S. 273 (1940) ............................................................................................45

**STATUTES**

PROMESA § 4 ..............................................................................................54, 55

PROMESA § 201 ...............................................................................................54

PROMESA § 202 ...............................................................................................54

PROMESA § 202(c)(3)(C) ................................................................................54

PROMESA § 301(a) ........................................................................................1, 4

PROMESA § 306(a) .............................................................................................4

PROMESA § 307(a) .............................................................................................4

PROMESA § 310 ...................................................................................................4

PROMESA § 315(b) .............................................................................................1

PROMESA § 407 ....................................................................................4, 57, 58

PROMESA § 407(a) ...........................................................................................57

PROMESA § 407(b) ...........................................................................................58

3 L.P.R.A. § 761 ....................................................................................................5

3 L.P.R.A. §§ 761–788 .........................................................................................5

3 L.P.R.A. § 770(d) ..............................................................................................7

3 L.P.R.A. § 775 ....................................................................................................5

3 L.P.R.A. § 779 ....................................................................................................6

3 L.P.R.A. § 780 ..................................................................................................31

3 L.P.R.A. § 781(g) ....................................................................................................53

3 L.P.R.A. § 786-5 .....................................................................................................30

3 L.P.R.A. § 787 ..........................................................................................................6

3 L.P.R.A. § 787f .............................................................................................6, 30, 32

3 L.P.R.A. § 787g .................................................................................................6, 30

3 L.P.R.A. § 787q(a) ....................................................................................................9

3 L.P.R.A. § 787q(b) ....................................................................................................9

19 L.P.R.A §§ 2001–2207 .........................................................................................12

11 U.S.C. § 362 ..........................................................................................................20

11 U.S.C. § 501 ....................................................................................................44, 55

11 U.S.C. § 502 ......................................................................................................1, 4

11 U.S.C. § 544(a) .....................................................................................................29

11 U.S.C. § 544(a)(1) .................................................................................................28

11 U.S.C. § 544(a)(2) .................................................................................................28

11 U.S.C. § 552 ................................................................................................3, 25, 45, 46

11 U.S.C. § 552(a) ............................................................................................. passim

11 U.S.C. § 922 ..........................................................................................................20

48 U.S.C. §§ 2101–2241 .............................................................................................1

48 U.S.C. § 2161(a) ...................................................................................................20

48 U.S.C. § 2195(a) ...................................................................................................58

48 U.S.C. § 2195(b) ...................................................................................................58

UCC § 8-115 ..............................................................................................................29

UCC § 8-115, Cmt. 5 .................................................................................................29

UCC § 9-102 ..............................................................................................................28

UCC § 9-203 ..............................................................................................................32

UCC § 9-315(d) .................................................................................................................28

UCC § 9-317(a)(2) .........................................................................................................28, 29

UCC § 9-332(b) ..................................................................................................3, 26, 29, 30

UCC § 9-332(b), Cmt. 4 ...................................................................................................29

UCC § 9-404(a) .................................................................................................................12

Cal. Comm. Code § 9332(b) ...........................................................................................29

**OTHER AUTHORITIES**

U.S. Const. art. I, § 10, cl. 1 ...........................................................................................33

U.S. Const. amend. V........................................................................................................43

P.R. Const. art. II ..............................................................................................................59

P.R. Const. art. II, § 8 ......................................................................................................51

P.R. Const. art. II, § 9 ......................................................................................................43

P.R. Const. art. II, § 19 ....................................................................................................51

Fed. R. Bankr. P. 3007......................................................................................................1, 4

114 Cong. Rec. H3601 (June 9, 2016)............................................................................58

Congressional Task Force on Economic Growth in Puerto Rico, Report to the
    House and Senate (Dec. 20, 2016)..............................................................................9

P.R. Senate Bill 1258 (May 17, 2019) ............................................................................32

Report from the House Committee on Natural Resources, H.R. Rep. No. 114-602,
    pt. 1 ................................................................................................................................58

**To the Honorable United States District Court Judge Laura Taylor Swain**:

The Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtor's sole representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] files this supplemental objection (the "Objection"), pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these Title III cases by sections 301(a) and 310 of PROMESA, and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), requesting entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), disallowing the proof of claim filed by The Bank of New York Mellon, as Fiscal Agent (the "Fiscal Agent"), as claim number 16775 (the "Fiscal Agent Claim"), filed on behalf of holders of ERS bonds ("ERS Bondholders"). In support of this Objection, the Oversight Board respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. To avoid the inability to pay pensions to public retirees, the Commonwealth enacted the Post-Petition Legislation[3] which implemented a revised retirement system in response to (i) the nearly completely unfunded status of the Puerto Rico's general governmental pension system (ERS)[4] and (ii) the resulting need for funding to pay benefits owed to pensioners so that many, if not most, of them would not lose their sole source of income and fall beneath the poverty level.

---

[1] PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

[2] The Oversight Board reserves its right to raise additional objections to the Fiscal Agent Claim, including on grounds other than those set forth in this Objection, and to amend or supplement this Objection for any other reason.

[3] All undefined terms shall have the respective meanings ascribed to them below.

[4] The Post-Petition Legislation also covers the Teachers' Retirement System and the Judges' Retirement System (together, with ERS, the "Retirement Systems"), neither of which are implicated in this dispute.

The Post-Petition Legislation created a "pay as you go" system whereby payments are made to the pensioners from the general funds of the Commonwealth (the "General Fund"), and authorized ERS, in exchange for the Commonwealth's undertaking to pay benefits and assume ERS's obligations, to transfer its remaining assets to the General Fund to provide funds for the Commonwealth to pay pensioners.  The full transfer did not occur.  $190 million of assets were transferred and are being held by the Commonwealth for the benefit of ERS bondholders in the event they hold valid liens against such assets.  The "pay as you go" system differed from the prior system under which the employers (the Commonwealth and public corporations and municipalities) were required to make contributions to ERS according to a statutory formula based on a percentage of payroll, and ERS, in turn, would make payments to the Fiscal Agent appointed under the Resolution, which would pay debt service on ERS's outstanding debt and transfer remaining funds to ERS for payment to pensioners or to invest.

2.      The Fiscal Agent has asserted three principal categories of claims against the Commonwealth related to the Post-Petition Legislation:  (1) secured claims resulting from the transfer of the Transferred Assets from ERS to the Commonwealth, which Transferred Assets were allegedly subject to the Fiscal Agent's security interest; (2) secured claims resulting from what the Fiscal Agent contends is the transfer to the Commonwealth of ERS's "right to receive" Employers' Contributions; and (3) constitutional claims based on the U.S. and Commonwealth Constitutions asserting that the Post-Petition Legislation violated the Contracts and Takings Clauses by taking Pledged Property and abrogating the Commonwealth's alleged obligation to continue making Employers' Contributions.

3.      None of these bases suffices to substantiate a claim.  First, ERS assets transferred to the Commonwealth pursuant to the Post-Petition Legislation (worth approximately $190

million) remain available pending resolution of the Post-Petition Legislation AP, and will be paid
to the Fiscal Agent if the ERS Bondholders were to prevail (i) in the adversary proceeding and
were to establish that those funds were subject to a valid, perfected security interest, and (ii) on
issues relating to UCC section 9-332(b).  The Fiscal Agent will either be paid the Transferred
Assets or have no entitlement thereto, so the transfer of assets cannot form the basis for any claim.

4.     Second, as this Court has ruled, Bankruptcy Code section 552 prevents the Fiscal
Agent's security interest from attaching to any interest of ERS in Employers' Contributions
generated after ERS's petition date. [5]  Thus, when the Post-Petition Legislation was enacted, and
the Paygo Payments were commenced, the Fiscal Agent did not obtain a security interest in any
assets acquired by the Commonwealth after the ERS petition date, including the proceeds of any
supposed "right to receive" Employers' Contributions.  And, even if section 552 did not prevent
the Fiscal Agent's security interest from attaching to assets generated post-petition, the enactment
of the Post-Petition Legislation did not transfer any "right to receive" Employers' Contributions
from ERS to the Commonwealth.  The Post-Petition Legislation implemented an entirely new
retirement system and permissibly repealed the prior statutes that created the revenue stream to
which the Fiscal Agent's alleged security interest attached.  Notably, the official statement for the
first series of the ERS Bonds (the "Offering Statement")[6] provided advance notice to the ERS
bondholders that new legislation could be adverse to them.  Offering Statement at 26.  Accordingly,
the Paygo Payments are not subject to the Fiscal Agent's security interests.

5.     Third, the Fiscal Agent's constitutional claims must fail, because no contracts were
impaired in violation of the Contracts Clause, as the Offering Statement explicitly provides the

---

[5] This ruling was appealed to the Court of Appeals for the First Circuit, which took the matter under advisement
following oral argument on December 4, 2019.

[6] The Offering Statement is available at www.gdb.pr.gov/pdfs/public_corp/PensionBondsOS-Jan08-final.pdf.

Commonwealth could reduce or even eliminate the Employers' Contributions to ERS in a way that adversely affects the Fiscal Agent's interests.  Moreover, even if contracts were impaired, the Legislature is entitled to meaningful deference in its legislative choices when making reasonable and necessary decisions to provide benefits to retirees in the face of a financial crisis.  Furthermore, there was no "Taking," because the Fiscal Agent had no property interest in future Employers' Contributions or the Transferred Assets, and, even if it did, any 'Taking' was for a public use and was a permissible regulatory taking under the Commonwealth's police power.

6.      Fourth, the Fiscal Agent's miscellaneous other allegations against the Commonwealth all likewise fail to support a claim.  The Fiscal Agent lacks standing to assert the Commonwealth was unjustly enriched by the transfer of Pledged Property under the Post-Petition Legislation, as only the party allegedly harmed—here, ERS—can bring that claim.  In any case, no party can establish such claim, as the Commonwealth assumed the obligation to pay pensioners as a result of the Post-Petition Legislation, and was not unjustly enriched.  Furthermore, PROMESA section 407 expressly bars creditor enforcement actions when, as here, a stay is in effect under Title III, and in any event is substantively inapplicable here.

7.      Based upon the foregoing, and for the reasons set forth below, the Fiscal Agent Claim should be disallowed in its entirety.

## JURISDICTION AND STATUTORY PREDICATES

8.      The United States District Court for the District of Puerto Rico (the "Court") has subject matter jurisdiction over this Objection pursuant to PROMESA section 306(a).

9.      Venue is proper pursuant to PROMESA section 307(a).

10.     The statutory predicate for the relief sought herein is section 502 of the Bankruptcy Code, as incorporated by section 301(a) of PROMESA, and Bankruptcy Rule 3007, as incorporated by section 310 of PROMESA.

## RELEVANT BACKGROUND

I.      **ERS**

11.      ERS is a trust established by the Commonwealth in 1951 for the economic well-being of public employees.  ERS is an agency of the government, separate and apart from the Commonwealth government and its other instrumentalities.  *See* 3 L.P.R.A. § 775.  ERS was established to administer the payment of pensions and other benefits to officers and employees of the Commonwealth government, members and employees of Puerto Rico's Legislative Assembly (the "Legislature"), and officers and employees of public corporations and municipalities.  *See* 3 L.P.R.A. § 761.

12.      More than 260,000 active retirees and employees participated in ERS and relied on it for retirement and other benefits.  Many of these beneficiaries relied on payments from ERS as their primary source of income.

13.      Under Act 447 of May 15, 1951 (codified, as amended, at 3 L.P.R.A. §§ 761–788) (the "Enabling Act"), all government employees whose retirement benefits were administered by ERS were to receive defined benefits calculated based on a statutory formula that considered factors including the employee's salary and years of service.  *See* 3 L.P.R.A. § 761, *et seq.*

14.      ERS was funded primarily by contributions from employers, the amount of which was determined by statute pursuant to a formula based on the amount of active employee payroll of participating public employers from time to time (and not based on payments made or to be made to retirees).  Employers covered by ERS included the Commonwealth, its instrumentalities, and municipalities, excluding, among others, the school system and the judiciary.  Historically, the Commonwealth's contributions amounted to 59% of the Employers' Contributions ERS received,

5

with municipalities and public corporations contributing the remaining 41%.  *See* Commonwealth

of Puerto Rico Financial Information and Operating Data Report at 228 (Dec. 18, 2016).[7]

15.     In the last fiscal year Employers' Contributions were made, fiscal year 2017,

employers were required to make periodic contributions to ERS on behalf of participating

employees of 15.525% of the compensation regularly received by eligible employees.  *See* 3

L.P.R.A. §§ 787f, 787g.  Such rate was set in 2013.  However, the rate of Employers' Contributions

was subject to change.  *See* 3 L.P.R.A. § 787.

16.     From the time the ERS Bonds were issued in 2008 until July 1, 2017, employees

also contributed to ERS.  Employee contributions were withheld from paychecks and deposited

into ERS's operating account, although they were supposed to be placed in segregated accounts.

17.     In addition to paying benefits, ERS was authorized to, and did, make personal and

home mortgage loans ("Employee Loans") to employee participants and retirees.  *See* 3 L.P.R.A.

§ 779.  As of May 21, 2017, the date of the filing of ERS's Title III Petition, ERS had

approximately 100,000 Employee Loans outstanding with a principal amount outstanding of

approximately $500 million.  Employee Loans were not made with proceeds of the ERS

Bondholders' collateral.  The Fiscal Agent never took possession of the notes evidencing

Employee Loans, nor did any financing statement cover Employee Loans.  ERS deposited such

notes from the repayment of Employee Loans in its operating account (such payments, "Employee

Loan Payments").[8]

18.     ERS stopped making Employee Loans in 2016.

---

[7] This report, as well as other information regarding the Commonwealth's financial data, can be found at
http://www.gdb.pr.gov/investors_resources/commonwealth-cfiodr.html (the "Investor Resources Website").

[8] Upon information and belief, certain repayments of Employee Loans were effectuated by offsetting ERS's payment
obligations to ERS retirees who had taken out Employee Loans, and by reducing compensation paid to active
employees who had taken out Employee Loans.

## II.     The ERS Bonds

19.     The Enabling Act authorized ERS to (i) "seek a loan from any financial institution of the Government of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts" if authorized by its Board of Trustees, and (ii) secure issued debt with the assets of the System.  3 L.P.R.A. § 770(d).  The Enabling Act does not create any debt or grant any liens or security interests.

20.     On January 24, 2008, ERS issued bonds (the "ERS Bonds") purportedly pursuant to that certain Pension Funding Bond Resolution, adopted January 24, 2008 (the "Resolution," attached as Appendix VI to the Offering Statement),[9] in the aggregate original principal amount of approximately $2.9 billion.

## III.     ERS Fiscal Crisis and Attempts at Reform

21.     As of June 30, 1998, ERS's defined benefit plan was in "critical condition with an actuarial deficit that exceed[ed] five point nine billion dollars, according to the projections of [ERS's] actuaries."  *See* Act 305 of September 24, 1999, Statement of Legislative Intent ("Act 305").  Act 305, passed in 1999, was one of the first attempts to reform Puerto Rico's retirement system.  Act 305 sought to address structural underfunding at ERS by establishing a hybrid defined contribution model for both (a) new employees hired on or after January 1, 2000 and (b) for then-current employees who elected to transfer from the existing defined benefit plan ("System 2000").  Act 305, Statement of Legislative Intent.  Under System 2000, a notional "savings account" was

---

[9] On March 12, 2019, the Official Committee of Unsecured Creditors filed an *Omnibus Objection to Claims Asserted by Holders of Bonds Issued by ERS*, [Case No. 17-3566, ECF No. 381], on the ground the bond issuance exceeded ERS's statutory authority and was thus *ultra vires,* rendering the ERS Bonds null and void.  On April 23, 2019, the Official Committee of Retired Employees of the Commonwealth of the Puerto Rico (the "Retiree Committee") filed an *Omnibus Objection Of The Official Committee Of Retired Employees Of The Commonwealth Of Puerto Rico, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of ERS Bonds Against ERS And The Commonwealth*, [Case No. 17-3283, ECF No. 6482], on the ground, among others, that the bond issuance was *ultra vires*.

established for each participant who enrolled in the retirement system on or after January 1, 2000.

Act 305, § 3-101(a).[10]  Each System 2000 participant was required to make contributions to ERS.

*Id.* § 3-104(a).

22.    Notwithstanding the System 2000 reforms, ERS's financial condition and the

health of Puerto Rico's public employee retirement and pension system continued to deteriorate.

Structural deficits led to further underfunding as "the annual benefit payments and administrative

expenses of [ERS] were significantly larger than the member and employer contributions made to

[ERS]."  Commonwealth of Puerto Rico Financial Information and Operating Data Report at 73–

74 (Nov. 6, 2015) ("2015 Commonwealth Report"), available on the Investor Resources Website.

For several fiscal years, actual contributions to ERS were less than ERS's basic benefit obligations

and administrative expenses.  *See* Commonwealth of Puerto Rico Financial Information and

Operating Data Report at 145 (Oct. 30, 2014), available on the Investor Resources Website.  The

deterioration in the value of ERS's invested assets resulting from the 2008 financial crisis also

contributed to ERS's current fiscal state.  *See id*. at 145–46.  Upon information and belief, ERS

used investment income and its assets to address negative cash flow resulting from obligations to

retirees, and, as a result, its "total (gross) assets were projected to be exhausted by fiscal year

2019."  2015 Commonwealth Report at 74.

23.    In 2013, additional measures were taken to address ERS's dire financial situation.

Act 3 of April 4, 2013, adopted a comprehensive reform of ERS, including, among other measures,

(i) increased retirement age; (ii) increased contributions to the system; and (iii) in the case of active

employees who were participants in the defined benefit plan, the freezing of all retirement benefits

---

[10] The Commonwealth does not take any position with respect to the rights of ERS participants and retirees in their contributions and retirement benefits.  Nothing herein should be deemed or construed as taking a position regarding the rights of ERS participants and retirees.

accrued through June 30, 2013, with the benefits thereafter to accrue under a hybrid defined contribution formula.  The Legislature further amended the Enabling Act to create the Additional Uniform Contributions (the "AUC"), which required all participating employers to make supplemental contributions to ERS to "make up the System's cash flow deficit."  3 L.P.R.A. § 787q(a).  The AUC was payable in an amount based "on the percentage of the total employer contributions corresponding to such employer during the current fiscal year."  *Id.* § 787q(b).

24.    Notwithstanding such efforts and measures, ERS's financial condition continued to worsen.  *See* 2015 Commonwealth Report at 159.  As the Congressional Task Force on Economic Growth in Puerto Rico ("Task Force") found in its report to Congress, ERS was "in a negative funded position" as of June 30, 2015, and "at risk of becoming insolvent."  *See* Congressional Task Force on Economic Growth in Puerto Rico, Report to the House and Senate at 12 (Dec. 20, 2016).[11] The Task Force further reported that, as of June 30, 2015, ERS had a "net pension liability of $33.2 billion with a funded ratio of [negative] 1.8 percent."  *Id.*; *see also* 2015 Commonwealth Report at 40 ("The assets of the Commonwealth's retirement systems will be completely depleted within the next few years unless the Commonwealth makes significant additional contributions to the retirement systems.").

25.    Responding to the imminent liquidity crisis at ERS and throughout the Commonwealth, Governor García Padilla signed the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act 21-2016 on April 6, 2016 (the "Moratorium Act").  The Moratorium Act authorized the Governor to prioritize essential government services over the financial obligations of the Commonwealth and its instrumentalities by imposing a moratorium on

---

[11] The Task Force report is available at:
https://www.finance.senate.gov/imo/media/doc/Bipartisan%20Congressional%20Task%20Force%20on%20Economic%20Growth%20in%20Puerto%20Rico%20Releases%20Final%20Report.pdf.

debt service payments.  Act 21-2016, §§ 108, 201(a).  Thereafter, on June 30, 2016, Governor

García Padilla signed an Executive Order (E.O. 2016-031) (the "ERS Executive Order"), declaring

a "state of emergency" at ERS and announcing the commencement of an emergency period for

ERS.  *See* ERS Executive Order at 2, attached hereto as **Exhibit B**.  The ERS Executive Order

suspended "any obligation of ERS pursuant to [the ERS Bond Resolution] to transfer contributions

made by employers that participate in ERS, and any assets in lieu thereof or derived thereunder

paid to ERS under [Act 447] to the [Fiscal Agent]."  *Id.* at 2–3.

**IV.    2017 Pension Reform**

26.     In 2017, the incoming Rosselló administration and the Oversight Board moved to

address the financial crisis at ERS in an effort to safeguard retirement benefits.  Specifically, on

March 13, 2017, the Oversight Board adopted a resolution certifying the Fiscal Plan for the

Commonwealth of Puerto Rico, dated that same day, including an amendment thereto providing

for "progressively reduced total pension outlays by 10% by fiscal year 2020."  *See* Board

Resolution      Adopted      on      March      13,      2017,      at      3–4,      available      at

https://oversightboard.pr.gov/documents/.  Additionally, on June 25, 2017 and August 23, 2017,

the Legislature passed the Joint Resolution for Other Allocations for Fiscal Year 2017-2018 ("Joint

Resolution 188"), and Governor Rosselló signed Act 106-2017 ("Act 106") into law.

27.     As described in the Statement of Legislative Intent accompanying Act 106:

> Despite the fact that the reforms implemented in the past have not
> been effective, doing nothing is not an option.  The wellbeing of
> public servants and our retirees is a priority for this Administration.
>
> . . .
>
> This being the case, all available viable options for dealing with the
> current crisis in the Retirement Systems have been carefully
> analyzed. . . .  [D]ue to the imminent insolvency of the Retirement
> Systems, this Legislative Assembly considers it reasonable and
> necessary that the General Fund would assume responsibility to

10

> cover the payments that the Retirement Systems are unable to make
> to our pensioners. . . .   This demonstrates the commitment of this
> Administration to our pensioners.  To do otherwise would deprive
> our retirees of their pensions, with all the consequences this would
> involve for them, as well as for the Government and society in
> general.

Act 106, Statement of Legislative Intent.

28.     Together, Act 106 and Joint Resolution 188 (collectively, the "Post-Petition Legislation") reformed Puerto Rico's retirement systems by (a) having the Commonwealth assume ERS's obligations to pay pensioners, (b) having employers reimburse the Commonwealth (the "Paygo Payments") for payments actually made by the Commonwealth to the employers' current pensioners, and (c) because ERS would no longer be responsible for paying benefits, eliminating employers' obligations to contribute to ERS.  *See* Act 106, §§ 2.1(b), 2.4(e); J.R. 188, § 4.  Both before and after the Post-Petition Legislation's enactment, ERS did not negotiate employer contribution rates.  Rather, the rates were set by the Legislature.  As a result of the Post-Petition Legislation, ERS stopped receiving Employers' Contributions as of July 1, 2017, and was relieved of the obligation to pay retiree benefits.

29.     As part of these reforms, and in partial exchange for the Commonwealth's assumption of ERS's obligation to pay retirement benefits, ERS was required to sell its assets and transfer the proceeds, in addition to any existing available funds, to the Puerto Rico Department of Treasury's general fund to offset a portion of the Commonwealth's assumed pension liabilities.  *See* Act 106, § 1.4; J.R. 188, § 2.  Consistent therewith, ERS transferred approximately $190 million of deposit account assets (the "Transferred Assets") to the Commonwealth.

30.     Prospective investors were expressly placed on notice that potential employer contributions to ERS were subject to change and there was no assurance that the employers would be obliged to continue making the contributions going forward.  For example, the Offering

Statement informed investors that "*[t]he Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions*."  Offering Statement at 26 (emphasis in original).  The Offering Statement for the first series of ERS Bonds further provides that there is no covenant by the Legislature "not to amend the [Enabling Act] in a way adverse to Bondholders."  *See id.* at 23–26.  Further, under the Puerto Rico Uniform Commercial Code ("UCC"),[12] any modification or elimination of obligations to make payments to ERS is enforceable against a secured party who claims a security interest in those obligations.  UCC § 9-404(a).  The Offering Statement further warned that the bonds are "limited, non-recourse obligations of the *System*" and "are not payable out of any moneys of the Commonwealth other than future Employer Contributions."  Offering Statement at 37 (emphasis in original).

31.    On November 8, 2017, and following the passage of the Post-Petition Legislation, the ERS Bondholders filed their *Amended and Supplemented Adversary Complaint* in the adversary proceeding styled *Altair Global Credit Opportunities Fund (A), LLC, et al., v. Commonwealth of P.R., et al.*, Adv. Proc. No. 17-00219 (LTS) (D.P.R. July 27, 2017) (the "Post-Petition Legislation AP"), alleging, among other things, that the Post-Petition Legislation violated the automatic stay by "stripping" ERS of assets and "diverting" employer contributions elsewhere to avoid paying the ERS Bondholders.  The ERS Bondholders alleged, in eight separate counts, that:  (i) the Post-Petition Legislation violated the ERS automatic stay and is void ab initio; (ii) they have perfected liens on assets of ERS; (iii) they have perfected liens on assets of the Commonwealth; the transfer of property from ERS to the Commonwealth mandated by the Post-Petition Legislation (iv) unjustly enriches the Commonwealth at Plaintiffs' expense, and (v) is not

---

[12] The UCC is codified at 19 L.P.R.A §§ 2001–2207.

a "public use" within the meaning of the United States and Puerto Rico Constitutions; and the Post-Petition Legislation is (vi) an unconstitutional taking of private property without just compensation, (vii) resulting in a claim that cannot be discharged or compromised by any Title III plan of adjustment, and (viii) a violation of the "Contracts Clauses" of the United States and Puerto Rican Constitutions.  Post-Petition Legislation AP [ECF No. 39].  ERS filed a motion to dismiss the ERS Bondholders' complaint [ECF No. 41], to which the bondholders responded [ECF No. 50], and ERS replied [ECF No. 62].[13]  The ERS Bondholders' allegations were incorporated by reference into the Fiscal Agent Claim.  The Court stayed the Post-Petition Legislation AP at the parties' request pending resolution of the Lien-Challenge AP, without prejudice to any party's moving for relief to vacate the stay, and, accordingly, has not yet ruled on any of the claims raised therein.  *See* Post-Petition Legislation AP [ECF Nos. 69 & 70].

### V.    The ERS Bonds Resolution, Offering Statement, and Security Agreement

32.    The Resolution contemplated that the ERS Bonds would be secured, nonrecourse obligations of ERS.  *See* Resolution § 201.  Specifically, the Resolution provided that the ERS Bonds are "special obligations of the System payable solely from the Pledged Property without recourse against other assets of the System," and no ERS Bond "shall . . . be payable out of any funds or assets other than the Pledged Property."  *Id.*  The Resolution further provided that:

> The pledge and assignment of, and the grant of a security interest in and over, the Pledged Property, subject to Section 804, in favor of the Fiscal Agent for the benefit of the Bondholders and for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds . . . is hereby authorized, created and granted in accordance with the terms and provisions of this Resolution and subject to the provisions of this Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in this Resolution . . . .

---

[13] The Official Committee of Retired Employees and AAFAF also filed joinders to ERS's motion to dismiss [ECF Nos. 43 & 44].

Resolution § 501.1.  The term "Pledged Property" is defined by the Resolution as:

i.   All Revenues.

ii.   All right, title and interest of the System in and to Revenues, and all rights to receive the same.

iii.   The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution . . . .

iv.   Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

v.   Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs [(i)] through [(iv)] above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Resolution at VI-36.  The Resolution has not been amended to add any additional property to the

definition of "Pledged Property."

33.   "Revenues," a significant portion of the Pledged Property, is defined as:

i.   All Employers' Contributions received by the System or the Fiscal Agent.

ii.   With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of this Resolution.

iii.   Net amounts received by the System pursuant to a Qualified Hedge.

iv.   Income and interest earned and gains realized in excess of losses suffered by any Fund Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution ....

v.   Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of this Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution . . . .

14

*Id.* at V-37.

34.     The term "Employers' Contributions" is defined by the Resolution as "contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the [Enabling] Act." *Id.* at VI-33. The term "Employers" means "pursuant to the [Enabling] Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth." *Id.*

35.     The definition of the term "Revenues" does not include "Employers' Contributions" or any other amounts *not yet received by ERS*. The term "Employers' Contributions" does not include amounts that have not already been paid by Employers. As such, the Resolution requires actual receipt of contributions before an Employers' Contribution comes into existence. Moreover, "Employers' Contributions" as defined are specifically tied only to contributions made pursuant to particular statutory sections (*i.e.*, Sections 2-116, 3-105 and 4-113 of the Enabling Act). Calculations under those sections were based on active employee payroll and had nothing to do with amounts paid to retirees.[14]

36.     As a result, the portion of Pledged Property that is attributable to Employers' Contributions is limited to those contributions that have actually been received by ERS pursuant to Sections 2-116, 3-105 and 4-113 of the Enabling Act. The express terms of the Resolution do not grant the Fiscal Agent any interest in (a) future Employers' Contributions that have not yet

---

[14] Issues discussed in paragraphs 34 and 35 have been addressed in connection with the appeal of the SJ Order (defined below).

been earned or been received by ERS or (b) any employer contributions made pursuant to any statute or program other Sections 2-116, 3-105 and 4-113 of the Enabling Act.[15]

37.     The Enabling Act was amended by Act 106 to repeal Sections 2-116, 3-105 and 4-113, and therefore eliminate any further Employers' Contributions to ERS.  The risk of amendments to the Enabling Act that might have an adverse effect on the amount of contributions available to the ERS Bondholders was fully disclosed to the ERS Bondholders in the Offering Statement, *see supra* ¶ 30 and was not prohibited by the Resolution.

38.     The Resolution establishes a "Project Fund" and certain accounts and subaccounts therein, including a "Revenue Account," "Debt Service Account," "Debt Service Reserve Account," "General Reserve Account," and "Redemption Account."  *Id.* § 502(1).  Subaccounts are established within the Revenue Account relating to the senior and subordinate ERS Bonds.  *Id.* § 504.  The Resolution provides that, on the last business day of each month, ERS "will transfer the Employers' Contributions to the Fiscal Agent," and "[i]mmediately thereafter . . . all Revenues shall be deposited into the Revenue Account . . . ."  *Id.* § 504.1.  The Resolution requires that amounts deposited into the Revenue Account "shall be withdrawn and deposited as follows in the following order of priority":

     a.     *First*, "to the Senior Bonds Debt Service Account . . . all amounts until the amount on deposit in the Senior Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations";

     b.     *Second*, "to the Senior Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Senior Bonds";

     c.     *Third*, "to the Subordinated Bonds Debt Service Account . . . all amounts until the amount on deposit in the Subordinated Bonds Debt Service Account shall

---

[15] While the Resolution does grant the Fiscal Agent a "right to receive" Employers' Contributions, that right doesn't create an interest in something that doesn't yet exist, *i.e.*, any "right to receive" Employers' Contributions arose from time to time only when an employee actually performed work for the relevant employer and only with respect to the Employers' Contributions related to that completed work.  *See infra* 77.

equal the Accrued Payment Obligation related to all Subordinated Bonds and Parity Obligations";

d.      *Fourth*, "to the Subordinate Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Subordinated Bonds";

e.      *Fifth*, "to the payment of Operating Expenses"; and

f.      *Sixth*, "to the General Reserve Account, subject to the requirements established in Section 509 below, the balance of the amount so withdrawn."

*Id.* § 504.

39.     If certain conditions are satisfied, the Resolution permits "[t]he Fiscal Agent [to] withdraw from the General Reserve Account and transfer to the System the amount in excess of ten percent (10%) of [the] Accrued Payment Obligation." *Id.* § 509.6.  Such conditions include, among other things, that (i) no withdrawals have been made from the Debt Service Reserve Account to fund debt service during the year, (ii) the balances in the Debt Service Accounts and Debt Service Reserve Accounts are not less than the requirements under the Resolution, (iii) no amounts are due to the Fiscal Agent under the Resolution, and (iv) "the balance in the General Reserve Account is not less than ten percent (10%)" of the next year's accrued payment obligations for all outstanding bonds.  *Id.*

40.     The Resolution also permits ERS to demand that the Fiscal Agent transfer funds to ERS if the balance in the General Reserve Fund exceeds fifty percent (50%) of the next year's accrued payment obligations, but no transfer is allowed if it would reduce the General Reserve Fund balance below twenty-five percent (25%) of such accrued payment obligations.  *Id.* § 509.8.

41.     ERS executed a Security Agreement, dated June 2, 2008 (the "<u>Security Agreement</u>," a copy of which is attached hereto as **<u>Exhibit C</u>**).  The Security Agreement grants to the Fiscal Agent, for the benefit of holders of ERS Bonds, "a security interest in (i) the Pledged

Property, and (ii) all proceeds thereof and all after-acquired property [of the types included as Pledged Property], subject to application as permitted by the Resolution."

## VI.    The Pre-Petition Proceeding and Joint Stipulations

42.    Before the filing of ERS's PROMESA Title III case, certain of the ERS Bondholders (the "Pre-Petition Plaintiffs"), and not the Fiscal Agent, which, if at all, possesses a lien or security interest, filed a motion (the "Section 405 Motion") with the United States District Court for the District of Puerto Rico (the "District Court") on September 21, 2016, seeking to lift the initial PROMESA stay (the "Section 405 Stay") and asserted that their alleged security interests in certain property of ERS lacked adequate protection. *Altair Global Credit Opportunities Fund (A), L.L.C. v. Garcia-Padilla*, No. 16-cv-2696, (Sept. 21, 2016) (J. Besosa) (the "Pre-Petition Proceeding"), [ECF No. 1].

43.    On November 2, 2016, Judge Besosa denied the Section 405 Motion, finding that a hearing was not required and that the Pre-Petition Plaintiffs did not lack adequate protection and, therefore, could not demonstrate cause to vacate the Section 405 Stay.  Pre-Petition Proceeding, [ECF No. 68 at 14].  Judge Besosa did not make any factual or legal findings with respect to (i) the attachment or perfection of the Pre-Petition Plaintiffs' alleged security interests, or (ii) the application of section 552(a) of the Bankruptcy Code to the Pre-Petition Plaintiffs' alleged security interests.  Indeed, section 552(a) was inapplicable at the time in the absence of a Title III case. The Pre-Petition Plaintiffs appealed.

44.    On January 11, 2017, the Court of Appeals for the First Circuit reversed the District Court, holding that the Pre-Petition Plaintiffs were entitled to a hearing to determine the scope, if any, of their entitlement to adequate protection. *Peaje Invs. LLC, v. Garcia-Padilla*, 845 F.3d 505, 514 (1st Cir. 2017).  Similar to Judge Besosa, the First Circuit did not make any holdings with respect to (i) the attachment or perfection of the Pre-Petition Plaintiffs' asserted security interests,

or (ii) the application of section 552(a) of the Bankruptcy Code to the Pre-Petition Plaintiffs'
asserted security interests.  *See id.* at 516.

45.     On January 17, 2017, certain parties (including ERS) entered into a joint stipulation
to resolve the Section 405 Motion (the "January Stipulation,"), and it was approved by the District
Court.  Pre-Petition Proceeding, [ECF No. 83].  In accordance with the January Stipulation,
"Employer Contributions" (as defined in the Resolution) received by ERS from employers other
than the Commonwealth (as Commonwealth contributions had been suspended since June 2016)
during the pendency of the Section 405 Stay would be transferred by ERS to a segregated account
for the benefit of the movants, but "[a]ll other rights, claims and remedies of the ERS Bondholders,
the Commonwealth and the ERS are expressly reserved."  *Id*. at 3.  Such transfers were to be made
on a monthly basis, no later than the last business day of the month for contributions received as
of such date during such month.  *Id.* at 3.[16]

46.     On April 11, 2017, the parties entered into a second joint stipulation (the "April
Stipulation," Pre-Petition Proceeding, [ECF No. 86 at 3], and together with the January Stipulation,
collectively, the "Joint Stipulations"), whereby ERS would transfer funds to the Fiscal Agent on a
monthly basis for the payment of interest on the ERS Bonds during the Section 405 Stay (unless
ERS provided written notice it would discontinue such transfers).  *Id.*  The April Stipulation also
provides that (i) "[a]ll other rights, claims and remedies of the ERS Bondholders, the
Commonwealth and the ERS are expressly reserved," and (ii) "[n]othing in this Joint Stipulation
and Order is intended to or shall prejudice whatever rights the Parties have pursuant to Title III of
PROMESA if a Title III proceeding is commenced."  *Id*. at 4.

---

[16] As this Court previously found, ERS complied with its obligations to deposit Employer Contributions received from
the date of the January Stipulation through May 21, 2017, the date ERS's Title III PROMESA proceeding was filed.
*See infra* ¶ 56.  This finding was affirmed by the First Circuit in the Lien-Challenge Opinion.  *See infra* ¶ 57.

## VII.    The ERS Title III Case

47.      The Section 405 Stay expired on May 1, 2017.

48.      On May 3, 2017, a petition under title III of PROMESA was filed on behalf of the

Commonwealth with the United States District Court for the District of Puerto Rico.

49.      On May 21, 2017 (the "ERS Petition Date"), a petition under title III of PROMESA

was filed on behalf of ERS with the United States District Court for the District of Puerto Rico

(the "ERS Title III Case").  The commencement of the ERS Title III Case triggered the automatic

stay of creditor remedies against ERS.  48 U.S.C. § 2161(a) (incorporating 11 U.S.C. §§ 362 and

922 into PROMESA).

50.      As of the ERS Petition Date, ERS had assets with a face value of over $2 billion,

consisting of (i) collections of Employers' Contributions (approximately $200 million), being held

in a segregated account pursuant to order of this Court, (ii) ERS's right to receive unpaid

Employers' Contributions owed by covered employers on account of pre-petition work already

performed by their employees to the extent any such right arose pre-petition (the "Accounts

Receivable") (approximately $105.5 million), (iii) collections of and amounts owed to ERS

respecting AUC (approximately $715 million), (iv) Employee Loans and Employee Loan

Payments (approximately $531.7 million), and (v) other cash and investments, including certain

assets held by ERS prior to the issuance of ERS Bonds or proceeds thereof ("Pre-2008 Assets"),

private equity investments, stocks, bonds, bond proceeds, employee contributions, and bonds

issued by other Puerto Rico instrumentalities, such as COFINA (approximately $958 million).

51.      On May 31, 2017, certain ERS Bondholders filed a motion (the "Adequate

Protection Motion") seeking relief from the Title III automatic stay.  ERS opposed the Adequate

Protection Motion, asserting, among other things, that: (i) the security interests in the Pledged

Property claimed by the ERS Bondholders were not properly perfected because the 2008 Financing

Statements were deficient; (ii) the submissions of the 2015 Amendments and the 2016 Amendments did not remedy the deficiency because the UCC requires the filing of a new UCC-1 financing statement and the filings did not have the correct name of the debtor; (iii) even if the ERS Bondholders' asserted prepetition security interests were perfected, section 552(a) of the Bankruptcy Code prevents any security interest from attaching to Revenues received by ERS from and after the ERS Petition Date; and (iv) the ERS Bondholders are not entitled to adequate protection.

52.     Following negotiations, ERS and the ERS Bondholders agreed to the terms of a stipulation (the "Adequate Protection Stipulation") [Case No. 17-bk-3566, ECF No. 170], which was so-ordered by the Court on July 17, 2019 [Case No. 17-bk-3566, ECF No. 171].  The Adequate Protection Stipulation provided for adequate protection of the ERS Bondholders' alleged security interests, established a post-petition segregated account, and contemplated that ERS would file an Adversary Complaint by July 21, 2017.  It also contemplated that interest on the ERS Bonds would be paid when due from the segregated account established in the January Stipulation and that no further transfers from ERS should be made to such account.  *Id.* at 4.  It further reserved all parties "respective rights and defenses concerning the validity, attachment, perfection, priority, and enforceability of the Creditors' liens and security interests to any payments, rights to payments, obligations or property affected by [Joint Resolution 188] or otherwise."  *Id.* at 6.

53.     ERS fully complied with the Adequate Protection Stipulation, making payment of approximately $200 million to the ERS Bondholders, subject to the aforementioned reservation of rights.  Additionally, ERS deposited approximately $92 million in the post-petition segregated account.

54.     On July 21, 2017, ERS commenced an adversary proceeding as contemplated by the Adequate Protection Stipulation, styled *Employees Ret. Sys. of the Gov't of the Commonwealth of P.R.* v. *Altair Global Credit Opportunities Fund (A), LLC, et al.*, Adv. Proc. No. 17-00213 (LTS) (D.P.R. July 21, 2017) (the "Lien-Challenge AP").  On November 3, 2017, ERS and the ERS Bondholders filed cross-motions for summary judgment in the Lien-Challenge AP [ECF Nos. 91 & 94] (the "Summary Judgment Motions").

55.     On July 3, 2018, and prior to the Court rendering its determination on the Summary Judgment Motions, the ERS Bondholders filed the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay* [Case No. 17-bk-03283, ECF No. 3418 and Case No. 17-bk-3566, ECF No. 289] (the "Second Adequate Protection Motion"), requesting relief from the automatic stay imposed pursuant to Title III of PROMESA or, in the alternative, for adequate protection of their liens on property of ERS, in which the Commonwealth claims an interest.

56.     On August 17, 2018, the Court issued its *Opinion and Order Granting and Denying in Part Cross Motions for Summary Judgment*, [ECF No. 215] (the "MSJ Order"), determining that the ERS Bondholders' liens were unperfected and that there had been no violation of the January Stipulation.  In light of the nature of its ruling, the Court did not determine other issues raised in the Lien-Challenge AP, including (i) whether the ERS Bondholders' asserted security interests with respect to the Employee Loans and post-petition collections are effective and enforceable and (ii) whether Section 552(a) of the Bankruptcy Code operates to prevent the attachment of ERS Bondholders' asserted security interest in post-petition employer contributions. Additionally, the Court did not address the nature or extent of the security interests alleged.

57.     On August 21, 2018, and based upon the MSJ Order, the Court denied the Second Adequate Protection Motion.  The ERS Bondholders appealed the MSJ Order, and, on January 30, 2019, the First Circuit issued an opinion affirming in part, reversing in part, and vacating in part the MSJ Order.  *Altair Global Credit Opp., et al. v. Employees Retirement System, et al.*, 914 F.3d 694 (1st Cir. 2019).  The First Circuit determined the ERS Bondholders met the requirements for perfection of the alleged security interests as of December 17, 2015 to the extent the financing statement describes collateral in which the ERS Bondholders have an attached security interest and with respect to which the filing of a financing statement is an approved method of perfection under the UCC with respect to collateral in which ERS Bondholders have an attached security interest, and it remanded to this Court for further consideration of certain of ERS Bondholders' counterclaims.  The First Circuit affirmed dismissal of the claims regarding the January Stipulation.  The First Circuit did not address the nature or extent of the security interests alleged, the proper method of perfection of any security interest, or whether Section 552(a) of the Bankruptcy Code operates to prevent the attachment of ERS Bondholders' asserted security interest on post-petition employer contributions.

58.     On April 2, 2019, ERS filed the *Motion of Debtor for Leave to File an Amended and Supplemented Adversary Complaint and Requesting Determination of Count Briefed But Not Decided By Title III Court's Order On Motions for Summary Judgment* (the "Motion to Amend"). Lien-Challenge AP, [ECF No. 236], requesting the Court grant ERS leave to file an amended adversary complaint to raise issues concerning the nature or extent of the security interests alleged and the proper method of perfection of any security interest, and that it determine whether section 552(a) of the Bankruptcy Code operates to prevent the ERS Bondholders' asserted lien from attaching to Employers' Contributions received post-petition (the "Undecided Issue").

59.     On May 6, 2019, the Court denied in part and granted in part the Motion to Amend, granting ERS's request to determine the Undecided Issue, but denying ERS's motion insofar as it sought leave to amend the complaint in the Lien-Challenge AP, without prejudice to the filing of a new adversary complaint.  In light thereof, on May 20, 2019, ERS and the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) (the "Creditors' Committee") filed a new adversary complaint, *The Financial Oversight and Management Board for Puerto Rico, as representative of Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Andalusian Global Designated Activity Company, et al.*, Adv. Proc. No. 19-00366 (LTS) (D.P.R. May 20, 2019) (the "Lien-Scope AP") [ECF No. 1], attached hereto as **Exhibit D**,[17] which alleges the ERS Bondholders do not hold valid and enforceable security interests in any of ERS's remaining assets or the proceeds thereof (other than the Accounts Receivable).[18]  Those remaining assets include, among other things, the (i) Pre-2008 Assets, (ii) AUC, and (iii) Employee Loans and Employee Loan Payments.  *Id.* ¶ 8.

60.     On May 22, 2019, the Oversight Board filed its original objection to the Fiscal Agent Claim.  [Case No. 17-bk-3283, ECF No. 7075].

61.     On June 27, 2019, the Court issued an order granting summary judgment (the "SJ Order") in favor of ERS on the Undecided Issue.  Lien-Challenge AP, [ECF No. 251].  Therein,

---

[17] The Committee serves as section 926 trustee and co-plaintiff in the prosecution of that adversary proceeding pursuant to that certain *Stipulation and Agreed Order by and Among Financial Oversight and Management Board, Its Special Claims Committee, and Official Committee of Unsecured Creditors Related to Joint Prosecution of Certain Causes of Action of Puerto Rico Highways and Transportation Authority and Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [ECF No. 6990] (the "926 Stipulation").  In order to account for conflicts that counsel for the Committee had with certain defendants in the Lien-Scope AP, a second, nearly identical adversary complaint was commenced contemporaneously therewith, with the primary difference being the naming of different defendants in the second complaint.  *The Financial Oversight and Management Board for Puerto Rico, as representative of Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Glendon Opportunities Fund LP, et al.*, Adv. Proc. No. 19-00367 (LTS) (D.P.R. May 20, 2019).

[18] In accordance with paragraph 13 of the 926 Stipulation, the Creditors' Committee exercised its right to allege that Pledged Property also does not include the Accounts Receivable.  Lien-Scope AP, [ECF No. 1 ¶ 156 n.13].

the Court held that "Section 552 prevents any security interest resulting from liens granted in [the

ERS Bondholders'] favor prior to the commencement of ERS's Title III case from attaching to

revenues received by ERS during the post-petition period." *Id.* at 26–27.  The ERS Bondholders

appealed from the SJ Order to the First Circuit, where the parties await determination following

oral argument, which argument occurred on December 4, 2019.

62.     Following this Court's decision on the Undecided Issue, the Fiscal Agent, certain

ERS Bondholders, the Oversight Board (and its special claims committee), AAFAF, the Creditors'

Committee, and the Retiree Committee reached agreement on procedures to resolve objections to

claims asserted against ERS and/or the Commonwealth by the Fiscal Agent and holders of ERS

Bonds on account of or related to the ERS Bonds, other than certain postpetition claims.  *See* [Case

No. 17-bk-3566, ECF No. 676-2 at 2–3].  Among other things, these procedures set January 6,

2020 as the deadline to file objections to claims asserted by the Fiscal Agent and certain ERS

Bondholders (again, excluding certain postpetition claims).  *Id.* at 6.

**VIII.  Fiscal Agent Claim**

63.     The Fiscal Agent filed a proof of claim against the Commonwealth, Claim No.

16775, seeking recovery for the ERS Bonds.  Therein, the Fiscal Agent alleges as follows:

> The Fiscal Agent has a contingent and unliquidated claim against the
> Commonwealth on account of any and all claims, causes of action, rights, and/or
> remedies that the Fiscal Agent or the Owners may have against the Commonwealth
> arising at law or in equity based upon or relating to the Resolution, the Bonds, or
> the Pledged Property, including , without limitation, violations of the United States
> Constitution and of the Puerto Rico Constitution, violations of The Puerto Rico
> Oversight, Management, and Economic Stability Act, 48 U.S.C. § 2101 *et seq.*,
> including, without limitation, section 407 thereof, tortious interference with
> contract, conversion, fraud, fraudulent inducement, fraudulent conveyance,
> misrepresentation, unjust enrichment, equitable or constructive trust, equitable
> subordination, breach of contract, indemnification, reimbursement, or contribution,
> that have been or may be asserted in present or future litigations by, among, or
> involving the Fiscal Agent, any Owners, ERS, and/or the Commonwealth,
> including, without limitation, the adversary proceeding captioned Altair Global
> Credit Opportunities Fund (A), LLC, *et al.* v. The Commonwealth of Puerto Rico,

25

*et al.*, Adv. Pro. Nos. 17-219-LTS (D.P.R.) and 17-220-LTS (D.P.R.) (the "Altair
Adversary Proceeding" [the Post-Petition Legislation AP]).

Any such claims arising after the commencement of the Commonwealth's title III
case are entitled to administrative expense priority. Any claims for damages and/or
just compensation for violations of the Fifth and Fourteenth Amendments to the
United States Constitution and Article II of the Puerto Rico Constitution are non-
dischargeable.

*See* Fiscal Agent Claim ¶¶ 16–17.

64.     In sum, the Fiscal Agent bases its claims on the Commonwealth's enactment of the

Post-Petition Legislation. However, none of the Fiscal Agent Claim is meritorious, because

(1) (a) secured claims resulting from the transfer of the Transferred Assets from ERS to the

Commonwealth, if any, will be determined through the resolution of the Lien-Challenge AP, and

(b) even if the Lien-Challenge AP does not resolve the secured claims, UCC section 9-332(b)

provides that the Commonwealth received the Transferred Assets free and clear of any such

security interest once ERS transferred them to the Commonwealth, (2) no secured claims result

from the cessation of the Employers' Contributions and commencement of the Paygo Payments,

as the Fiscal Agent does not have any security interest in the Paygo Payments, and

(3) constitutional claims based on the U.S. and Commonwealth Constitutions asserting that the

Post-Petition Legislation violated the Contracts and Takings Clauses by taking the Pledged

Property and abrogating the Commonwealth's alleged obligation to continue making Employers'

Contributions fail as a matter of law. Accordingly, and for the reasons set forth below, the Fiscal

Agent Claim should be disallowed in its entirety.

## **RELIEF REQUESTED**

65.     By this Objection, the Debtor seeks entry of an order, substantially in the form

attached hereto as **Exhibit A**, disallowing the Fiscal Agent Claim.

## BASIS FOR RELIEF[19]

### I. The Post-Petition Legislation Does Not Give Rise to Secured Claims Against the Commonwealth.

66.     The Fiscal Agent alleges the UCC provides that the Fiscal Agent's security interest in collateral continues notwithstanding any sale or disposition thereof and that a security interest attaches to any identifiable proceeds of collateral.  As a result, the Fiscal Agent asserts that Pledged Property purportedly was transferred to the Commonwealth—both the approximately $190 million in assets transferred pursuant to Joint Resolution 188 and "any future employer contributions" made to the Commonwealth's General Fund (*i.e.*, the Paygo Payments)—and remains subject to the Fiscal Agent's alleged security interest in the Pledged Property.  *See* Post-Petition Legislation AP [ECF No. 39 ¶¶ 118–131].  This argument falls short.

### A. The Fiscal Agent Has No Claim Based on a Transfer to the Commonwealth of ERS Funds Allegedly Subject to the Fiscal Agent's Security Interest.

#### i. The Funds Remitted By the Fiscal Agent to ERS Are Not Subject to the Fiscal Agent's Security Interest.

67.     The Transferred Assets were not Pledged Property subject to the Fiscal Agent's security interest.  As set forth in Counts IV and V of the Lien-Scope AP, the Fiscal Agent's asserted security interest (1) did not attach to funds released by the Fiscal Agent to ERS and (2) is unperfected, invalid, and unenforceable in funds released by the Fiscal Agent to ERS. Accordingly, any subsequent transfer of such funds from ERS to the Commonwealth also cannot be held to form the basis of any Fiscal Agent claim against the Commonwealth.

---

[19] The Fiscal Agent appears to have filed the same rider to the Fiscal Agent Claim as its claim filed against ERS.  *See* Proof of Claim No. 16777.  These riders include claims against both the Commonwealth and ERS.  For the avoidance of doubt, all claims against ERS filed in the instant Fiscal Agent Claim should be disallowed for being filed against the incorrect debtor.

        **a.**      **The Fiscal Agent's Asserted Security Interest Did Not Remain Attached to the Funds Remitted by the Fiscal Agent to ERS.**

68.     As discussed more fully in Count IV of the Lien-Scope AP (¶¶ 100–111), neither the Resolution nor the Security Agreement provides that funds transferred to ERS by the Fiscal Agent are subject to the Fiscal Agent's asserted security interest. Likewise, neither the Resolution nor the Security Agreement requires that such funds be segregated from ERS's other assets. Rather, funds remitted to ERS are deposited in ERS's operating account, where they are commingled with all other funds of ERS, including employee contributions, the AUC, and Employee Loan Payments, and are not subject to the Fiscal Agent's asserted security interest. Those remitted, commingled funds are not identifiable, and, thus, the Fiscal Agent has neither an effective nor a perfected security interest in such funds.

        **b.**      **The Fiscal Agent's Asserted Security Interest in Funds Remitted by the Fiscal Agent to ERS Is Unperfected, Invalid, and Unenforceable.**

69.     As discussed more fully in Count V of the Lien-Scope AP (¶¶ 112–126), the Fiscal Agent does not have an effective or perfected security interest in ERS's remaining assets, including Employee Loans or Employee Loan Payments, even if such assets constitute proceeds of Revenues. A perfected security interest in proceeds becomes unperfected after twenty (20) days under UCC § 9-315(d) unless at least one of three exceptions in §§ 9-315(d)(1)–(3) applies. None of the exceptions are applicable here.

70.     Further, pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code and, independently as provided in UCC § 9-102, ERS has the rights of a lien creditor and may avoid certain transfers of its property. In accordance with the purpose of UCC § 9-317(a)(2), an unperfected security interest is subordinate to the rights of ERS as a lien creditor. Accordingly, any purported security interest in funds remitted to ERS is unperfected and is ineffective and

unenforceable against ERS pursuant to section 544(a) of the Bankruptcy Code and UCC § 9-317(a)(2).

> ii.    **Even If the Funds Remitted by the Fiscal Agent to ERS Were
> Subject to the Fiscal Agent's Security Interest When Held By
> ERS, the Commonwealth Received Those Funds Free and Clear
> of Such Security Interest.**

71.    Even if, despite the foregoing, the Fiscal Agent had an effective security interest in funds remitted by the Fiscal Agent to ERS, the Commonwealth received the Transferred Assets free and clear of any such security interest once ERS transferred them to the Commonwealth. Specifically, UCC § 9-332(b) provides that "[a] transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party." Accordingly, the Commonwealth, as transferee of the Transferred Assets, took them free of any alleged security interest. *See Stierwalt v. Assoc. Third Party Adm'rs*, No. 16-MC-80059-EMC, 2016 WL 2996936, at *8 (N.D. Cal. May 25, 2016) (holding Cal. Comm. Code § 9332(b) (which is identical to UCC § 9-332(b)) allows transferee of deposit-account assets to take such assets free of a security interest); *In re Delano Retail Partners, LLC*, No. 11-37711-B-7, 2017 WL 3500391, at *9 (Bankr. E.D. Cal. Aug. 14, 2017) (same). "Collusion" applies only to egregious conduct and requires that the transferee engage in affirmative misconduct.[20] Here, where the actions the Commonwealth took—the enactment of the Post-Petition Legislation—served to salvage benefits to retirees, keep retirees off

---

[20] The "collusion" test in UCC § 9-332(b) is derived from UCC § 8-115. *See* UCC § 9-332(b), Cmt. 4 ("To deal with the question of the 'bad actor,' this section borrows 'collusion' language from Article 8. *See, e.g.*, Sections 8-115, 8-503(e)."). UCC § 8-115, in turn, explains that "[t]he collusion test is intended to adopt a standard akin to the tort rules that determine whether a person is liable as an aider or abettor for the tortious conduct of a third party" and that "collusion" occurs only in "egregious cases" and requires "affirmative misconduct." *See* UCC § 8-115, Comment 5.

the public dole, and provide them with barely enough to get them to the poverty level, those actions cannot be "collusion" to save the Fiscal Agent from the effect of UCC § 9-332(b).[21]

> **B.    The Fiscal Agent Has No Secured Claim Against the Commonwealth Arising from the Cessation of the Employers' Contributions and the Commencement of the Paygo Payments.**
>
> > **i.    The Paygo Payments Are Different From the Employers' Contributions and Are Not a Transfer of Assets Subject to the Bondholders' Security Interest.**

72.    Pursuant to the ERS structure, Employers' Contributions were made periodically on the basis of *current employees* working for Commonwealth entities participating in ERS.  *See* 3 L.P.R.A. § 786-5.[22]  For example, if HTA had 1,000 current employees in 2016, HTA made Employers' Contributions to ERS in 2016 on the basis of the compensation of those 1,000 employees.  These contributions were made pursuant Sections 2-116, 3-105 and 4-113 of the Enabling Act.  The Resolution provides that the Fiscal Agent is granted a security interest in the Employers' Contributions made under Sections 2-116, 3-105 and 4-113.  However, any contributions made pursuant to other statutes or programs (such as the AUC) were not, nor can they be construed to be, subject to the Fiscal Agent's asserted security interests.

73.    The Post-Petition Legislation eliminated the Employers' Contributions and implemented an entirely new retirement system, one which more fairly reflects the obligations of the various employers to contribute to their employees' retirement benefits.  The new statutory scheme is not a mere transfer of the Employers' Contributions, as employers were directed to stop paying Employers' Contributions to ERS, and such contributions were eliminated.  Instead,

---

[21] Such Transferred Assets are available for distribution after the resolution of the Lien-Scope AP.  Accordingly, if the ERS Bondholders prevail as to their claimed entitlement to the Transferred Assets in the Lien-Scope AP, and if the Court concludes that the application of UCC § 9-332(b) does not permit the Commonwealth to take the Transferred Assets free of any security interest, the Fiscal Agent will receive all of those assets.  That payment would extinguish any claim remaining against the Commonwealth.

[22] In 2017, that rate was 15.525% of the compensation regularly received by eligible employees.  *Id.* §§ 787f, 787g.

employers are now required to make the Paygo Payments to the Commonwealth, which assumed responsibility for disbursing accrued pension benefits to pension beneficiaries and relieved ERS of that obligation.

74.     The Paygo Payments are completely different from Employers' Contributions. Pursuant to the Post-Petition Legislation, employers now make contributions to the Commonwealth (not ERS) based on their *retired employees* receiving retirement benefits from the Commonwealth, *see* Act 106, § 2.1(b) ("The Pay-Go fee . . . shall be equal to the amount paid to Retirees and Beneficiaries of each covered entity."), rather than on a percentage of payroll of active employees.  For example, if HTA had 500 former employees receiving retirement benefits from the Commonwealth in 2018, HTA was required to make Paygo Payments to the Commonwealth based on the amounts paid to those beneficiaries in 2018, independent of how many employees were then employed by HTA.  This new payment system ties the employer's obligations to the monies that the Commonwealth must pay to the employer's former employees.[23]

75.     The Fiscal Agent has no interest in Paygo Payments.  Even if one assumes the Fiscal Agent has a security interest in ERS's "right to receive" "Employers' Contributions," Joint Resolution 188 does not transfer any "right to receive" those Employers' Contributions to the Commonwealth.  Instead, pursuant to section 4(3) of Joint Resolution 188, the municipalities' and public corporations' legal obligation to make Employers' Contributions is eliminated.[24]  And, under the new system, AAFAF was directed to establish a separate and different fee system

---

[23] The Post-Petition Legislation also terminated the obligation of employees to make contributions to pay retiree benefits.  *Compare* Act 106, § 2.1(d) ("Beginning on July 1, 2017, Participants shall make no individual contributions or payments to the Accumulated Pension Benefits Payment Account or additional contributions to their Retirement Systems") *with* Enabling Act § 2-115 (3 L.P.R.A. § 780) ("As of April 1, 1990, participants shall contribute the following amounts to the Retirement System . . .").

[24] The potential elimination of Employers' Contributions was contemplated by the original Resolution.  *See* Resolution at § 709(2)).

whereby employers contribute directly to the Commonwealth through Paygo Payments to finance the pay-as-you-go system. [25]

76.    Accordingly, the Paygo Payments are different from the Employers' Contributions that ERS previously received.  The legal obligation to make Employers' Contributions based on employees' ongoing work no longer exists.  *See* Joint Resolution 188, § 4(3).  Therefore, the Fiscal Agent does not have an attached security interest in the Paygo Payments and, accordingly, has no claims against the Commonwealth in connection with such payments.[26]  *See, e.g.*, *In re Keene Corp.*, 188 B.R. 881, 893 (Bankr. S.D.N.Y. 1995), *corrected* (Nov. 30, 1995) ("the security interest is limited to the property described in the security agreement."); *Dowell v. D.R. Kincaid Chair Co.*, 125 N.C. App. 557, 561 (1997) (security interest in collateral does not extend beyond the scope of what was set out in the security agreement).

### ii.    The Fiscal Agent Never Had a Security Interest in Future Employers' Contributions.

77.    The Fiscal Agent also has no security interest in future Employers' Contributions. The Fiscal Agent alleges rights to the future contributions were transferred to the Commonwealth. Pursuant to Puerto Rico law, a security interest can attach only to property the debtor itself "has rights in."  UCC § 9-203.  ERS did not have rights in Employers' Contributions extending indefinitely; any ERS "right to receive" Employers' Contributions arose from time to time only when an employee actually performed work for the relevant employer and only with respect to the Employers' Contributions related to that completed work.  *See* 3 L.P.R.A. § 787f.  ERS had no

---

[25] Senate Bill 1258, signed into law by Governor Rosselló on May 17, 2019, provides that the municipalities' obligation to make Paygo Payments to the Commonwealth has been eliminated.

[26] The Resolution recognizes that ERS—and not the Commonwealth—is responsible for paying the ERS Bondholders. *See* Resolution at VIII-2 ("The Bonds are limited, non-recourse obligations of [ERS] …. The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or instrumentalities (other than [ERS].))."

right to collect Employers' Contributions for unperformed, future work.  Accordingly, ERS itself

never had rights to receive future Employers' Contributions, so no security interest in favor of the

Fiscal Agent could have attached to them before the work is performed.[27]  The security interest

could attach only once ERS itself obtained such rights as employees performed work.

> ### iii.   Section 552(a) of the Bankruptcy Code Prevents the Security Interest from Attaching to Revenues Received by ERS During the Post-Petition Period.

78.     As mentioned above, pursuant to the SJ Order, the Court ruled in favor of ERS on

the Undecided Issue in the Lien-Challenge AP.  Accordingly, the Fiscal Agent has no security

interest in any Employers' Contributions that were made post-petition and on account of post-

petition work, or in the Paygo Payments, and, therefore, no claim arising from the

Commonwealth's cessation of the former and commencement of the latter.

## II.   The Post-Petition Legislation Does Not Give Rise to Any Constitutional Claims Against the Commonwealth.

### A.   The Post-Petition Legislation Did Not Violate the Contracts Clause of the U.S. or Puerto Rico Constitutions.

79.     The U.S. Constitution's Contracts Clause provides "[n]o State shall … pass any …

Law impairing the Obligation of Contracts…."  U.S. Const. art. I, § 10, cl. 1.  The Puerto Rico

Constitution's Contracts Clause is similar and is construed the same way as is the federal provision.

*Domínguez Castro v. Commonwealth*, 178 D.P.R. 1, 44–47 (P.R. 2010), a translated copy of which

is attached hereto as **Exhibit E**.

80.     Although the Contracts Clause's language "is facially absolute, its prohibition must

be accommodated to the inherent police power of the State to safeguard the vital interests of its

---

[27] The Offering Statement recognized that ERS did not have perpetual rights to Employers' Contributions.  *See* Offering Statement at 26 (*"[t]he Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions."*) (emphasis in original).

people." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotations omitted); *accord, e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) ("[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States."); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434–35 (1934) ("Not only is the [Contracts Clause] qualified by the measure of control which the State retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people…. [T]he reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."); *UAW v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011) ("Despite its unequivocal language, [the Contract Clause] does not make unlawful every state law that conflicts with any contract. . . .  Rather, [a] court's task is to reconcile the strictures of the Contract Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.") (internal citations and quotation marks omitted).

81.    To reconcile the Contracts Clause with a state's inherent police power, courts apply a two-pronged test. *UAW*, 633 F.3d at 41.  The first question is whether the state or Commonwealth law has in fact operated as substantial impairment of a contractual relationship. *Energy Reserves Grp.,* 459 U.S. at 411.  If so, the second question is whether the impairment was "reasonable and necessary" to serve an "important public purpose."  *UAW*, 633 F.3d at 41 (internal quotations omitted).  The party claiming a constitutional violation bears the burden to establish both prongs of the test.  *UAW*, 633 F.3d at 42–45 (granting motion to dismiss constitutional challenge); *see also, e.g., Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 55 (2d Cir. 1998) ("The Town need not prove its choice the best among the available alternatives; rather, [plaintiff] must prove that there is no rational relationship between the Town's ends and its means.  Merely contending there was a better way, [plaintiff] has not carried its burden.").

82.     When analyzing whether a state's impairment of a contract is justified under the police power, courts afford the legislature less deference where the state has an interest in the contract than where the state impairs a private contract. But, even where the state has an interest in the allegedly impaired contract, the legislature's choices are still entitled to "meaningful deference." *Id.* at 44; *accord, e.g.*, *Diaz-Diaz v. Fortuño-Burset*, No. 11-1632 (JAF), 2012 WL 2498912, at *3 (D.P.R. June 27, 2012) ("less deference does not imply no deference to the state's decision") (internal quotations omitted); *see also Baltimore Teachers Union v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993) (reversing ruling that salary reductions violated Contract Clause because "district court afforded essentially no deference whatsoever to [city's] determinations of the reasonableness and necessity of the salary reductions" in light of fiscal crisis).

83.     Meaningful deference to legislative decisions is necessary even where the state has an interest in the allegedly impaired contract because making the policy choices among legislative alternatives "is a task far better suited to legislators than to judges." *Amalgamated Transit Union v. Commonwealth of Mass.*, 666 F.2d 618, 643 (1st Cir. 1985); *see also Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 372 (2d Cir. 2006) ("we find no need to second-guess the wisdom of picking the wage freeze over other policy alternatives"); *Ambrose v. City of White Plains*, No. 10-CV-4946 (CS), 2018 WL 1635498, at *21 (April 2, 2018 S.D.N.Y.) (same); *cf. Blaisdell*, 290 U.S. at 447–48 (rejecting Contracts Clause challenge to legislation, and noting that "[w]hether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned").

84.     The Post-Petition Legislation does not violate the Contracts Clause (as alleged in the Post-Petition Legislation AP) because there has been no material impairment of the Fiscal Agent's contractual relationship relative to the Fiscal Agent's and the ERS Bondholders'

35

reasonable expectations. Additionally, even if a substantial impairment occurred, the Post-Petition Legislation serves an important public purpose—funding retirement benefits for public employees—and was a reasonable and necessary means to accomplish that purpose.

### i.   The Fiscal Agent's Contract Was Not Substantially Impaired.

85.     Not every contract impairment violates the Contracts Clause; the impairment must be "substantial"—and a "substantial impairment" of contractual rights cannot be assumed. *UAW*, 633 F.3d at 42. State action that merely "restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Energy Reserves Grp.*, 459 U.S. at 411 (citations omitted). Thus, the Fiscal Agent must plausibly allege that the challenged action substantially impairs its rights relative to the reasonable expectations of the ERS Bondholders when they entered into the debt agreements.

86.     The Fiscal Agent fails to allege any such substantial impairment. In fact, ERS Bondholders were on notice from the outset that employer contributions were subject to change. For example, the Offering Statement for the ERS Bonds warned that "*[t]he Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions*." Offering Statement at 26 (emphasis in original). The Offering Statement further cautioned that the Legislature did not covenant "not to amend the [ERS Enabling Act] in a way adverse to Bondholders." Offering Statement at 23–26. Similarly, the Resolution provided that "Employers' Contribution Rate shall mean the rate of contribution of each Employer to the System, *initially* 9.275% of the Covered Payroll"—thereby informing prospective investors that the stated contribution was only the "initial" one and was subject to change. Resolution at VI-33 (emphasis added).

87.     The permissibility of legislative changes to public retirement funds is long-settled

Commonwealth law and hard-wired into the nature of such funds.  Public-employee benefits and

municipal bonds are subject to extensive state regulation.    Three decades ago, the

Commonwealth's highest court rejected a Contracts Clause challenge by pensioners to changes in

system eligibility because "[c]hanging conditions and requirements, such as years of service,

*contributions to the fund*, and retirement age, are essential to preserve the solvency of the fund."

*Bayron Toro v. Serra*, 19 P.R. Offic. Trans. 646, 664 (P.R. 1987) (emphasis added).  *See also*

*Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828 (P.R. 2013) (upholding legislative changes to public

employees' pension plans).  The Fiscal Agent (and ERS Bondholders) presumably knew the risk

of these changes just as well as did the pensioners.  And, the case law is clear that contractual

rights subject to predictable risk of regulation can be altered without giving rise to a Contracts

Clause claim.  *See Energy Reserves Grp.*, 459 U.S. at 416 (rejecting Contracts Clause challenge

by claimant that "knew its contractual rights were subject to alteration by state price regulation");

*Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 895 (7th Cir. 1998) (rejecting Contracts

Clause challenge to regulation that was predictable in light of prior legislation in the same area).

88.     Accordingly, the Fiscal Agent cannot show a substantial impairment of contractual

obligations, because the ERS Bondholders were aware of the risks associated with the bond

issuance and nevertheless chose to assume them.

>        **ii.     Even If A Substantial Impairment Occurred, the Alleged
>                Impairment Was Reasonable and Necessary to Serve an
>                Important Public Purpose.**

89.     Even if the Post-Petition Legislation substantially impaired the Fiscal Agent's

contracts, the statute still did not violate the Contracts Clause because such legislation served an

important public purpose and was a reasonable and necessary means to do so.  *See UAW*, 633 F.3d

at 47.  "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests."  *Energy Reserves Grp.*, 459 U.S. at 412.  An effort to address a "general social or economic problem" is sufficient to meet that standard.  *Id*.

90.     The Post-Petition Legislation was enacted to serve legitimate public purposes:  to ensure benefits could be paid to retirees and to address the Commonwealth's fiscal crisis.  The Statement of Motives explains that Act 106 was an exercise of the "Police Power" to "safeguard the welfare of our retirees and public employees," "protect those who are most vulnerable," address "the serious and economic fiscal emergency situation of Puerto Rico," and "set Puerto Rico [o]nto a path of financial recovery."  Act 106, Statement of Motives at 9.  It further provides that "the implementation of this reform as part of the Fiscal Plan constitutes a compelling interest[] of the State in order to guarantee the public interest."  *Id.* at 12.  *See, e.g.*, *Buffalo Teachers Fed'n*, 464 F.3d at 369 ("the legislative interest in addressing a fiscal emergency is a legitimate public interest," and wage freeze to deal with fiscal crisis serves important public purpose); *see also Baltimore Teachers*, 6 F.3d at 1019 (noting that plaintiff employees did not dispute "that ensuring the financial integrity of the City is a significant public purpose"); *infra* ¶¶ 109–111.

91.     As the Legislature observed:  "If our pensioners are deprived of their pension benefits, not only they, but also the Government and the society in general would be facing serious consequences."  Act 106, Statement of Motives at 18.  Without adequate (or any) pensions, more pensioners would need welfare and other social services from the Commonwealth, whose resources would then become even further strained.  Accordingly, the Post-Petition Legislation serves important government purposes, and the Commonwealth is entitled to "meaningful

deference" as to the policy choices it made to provide retirement benefits for its public employees
and deal with the Commonwealth's overall fiscal situation.

92.    In addition to serving important public purposes, the Post-Petition Legislation was
"reasonable and necessary[,]" as is required to avoid triggering a Contracts Clause violation.  *See
UAW*, 633 F.3d at 47.  The Legislature itself determined that "the measures taken in this Act are
necessary and reasonable to properly address the fiscal crisis and the actuarial insolvency of the
Retirement System . . . ."  Act 106, Statement of Motives at 12.  The Legislature concluded that
Act 106 "provides the legal framework that would allow us to comply with the provisions and
achieve the goals set for the Retirement Systems under the [Oversight Board's] Fiscal Plan," which
"establishes fiscal adjustments to stabilize Government finances at a time where there is no access
to the financial market."  *Id.*  The Legislature added that, "[i]f these measures are not implemented,
the social and economic welfare of Puerto Rico shall suffer irreparable damages."  *Id.*

93.    The Legislature did not act unreasonably in not adopting the Fiscal Agent's
proffered alternative:  full payment of ERS's obligations pursuant to the Resolution, presumably
by increasing the Employers' Contributions (which are alleged to be subject to the Fiscal Agent's
security interest).  Unfortunately, wishing there were more money to pay creditors does not create
it.  "[I]t is always the case that to meet a fiscal emergency taxes conceivably may be raised.  It
cannot be the case, however, that the legislature's *only* response to a fiscal emergency is to raise
taxes."  *Buffalo Teachers*, 464 F.3d at 372 (emphasis in original).  Further, courts are hesitant to
"second-guess the wisdom" of the legislature's policy choices when a fiscal emergency means the
legislature is faced with options that are all unappealing for one reason or another.  *Id.*

94.    In *Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828 (P.R. 2013), a translated copy of
which is attached hereto as **Exhibit F**, plaintiff pensioners contended that, instead of impairing

pension benefits by reforming the pension system, the Legislature could have "increase[d] its revenues through other measures, such as increasing the Sales and Use Tax (SUT) capture rate, or raising taxes."  But, the Puerto Rico Supreme Court affirmed the dismissal of the case, holding that the plaintiffs had "failed to show that they have evidence to persuade the court at a trial that these alternatives are feasible and less burdensome."  Translation at 6.  The court also observed that the legislation's "Statement of Motives shows that the Legislature considered other types of measures to address the solvency crisis affecting the Retirement System, but concluded that these 'are not feasible and, in any case, neither can they alone solve the present actuarial crisis.'"  *Id.* (quoting Statement of Motives).

95.     The same is true here.  Simply raising Employers' Contributions was not feasible. The employers that contributed to ERS were public employers, all of which were suffering from the effects of the Commonwealth's financial crisis.  Had those public employers increased their contributions to ERS, they would not have had resources for other things, such as providing critical services to Puerto Rico's residents.  As the Court is well aware, municipalities and public corporations were not sitting on hordes of excess cash that they simply refused to use for any obligations to ERS.

96.     The Commonwealth had previously attempted countless reforms to support ERS, including increasing contributions to ERS.  *See* Act 106, Statement of Motives at 16.  The Legislature noted:

> Already in the past we attempted to reform the three retirement systems.  However, these measures did not work and were insufficient, which has led to their finding themselves without liquidity and insolvent.  In addition, due to the current profound and serious fiscal crisis we are undergoing, the Government finds itself impeded from making solvent the three Retirement Systems.  For this reason, this Joint Resolution promotes the pay as you go system as a new method to guarantee pensions to Government retirees.

40

Joint Resolution 188 at 2.  The past reforms had failed for many reasons, including "inadequate contributions, the passage of special laws, early retirement programs, changes in Participants' life expectancy, failed investments, mismanagement, bond issues that did not turn a profit . . . and were not sufficient to save the Retirement Systems [including ERS]." *Id.*  Therefore, in light of financial difficulties faced by the Commonwealth, and the "heavy impact and burden" caused by the commencement of the Commonwealth's obligation to use resources of the General Fund to make disbursements to current pensioners of the Retirement Systems (including ERS), it was "necessary and reasonable to eliminate the [Employers' Contributions.]"  *Id.* at 18.  The Legislature thus had considered (and attempted) some theoretically plausible alternatives to the Post-Petition Legislation, but nevertheless concluded that the Post-Petition Legislation was needed to address the Commonwealth's public pension systems.

97.     Further, the Post-Petition Legislation cannot be looked at in isolation.  It was but one part of a wide-ranging, comprehensive effort to attack the Commonwealth's fiscal crisis on multiple fronts and to avoid imposing all the burden on any one group by spreading any ensuing discomfort throughout all sectors of society.  *See* Act 106, Statement of Motives at 12 ("[The Fiscal] Plan establishes fiscal adjustments to stabilize Government finances at a time where there is no access to the financial market.").  For example, in 2016, the Commonwealth had passed the Moratorium Act, and the Governor had promulgated various Executive Orders, all of which suspended payment of principal and interest on public debt and had suspended payment of revenues to the so-called "clawback entities."  *See, e.g.*, Act 21-2016; E.O. 2016-31.  And, in 2017 alone, the Legislature exercised its police power to enact many other laws to promote Commonwealth-wide reforms and enable Puerto Rico to return to the path of fiscal responsibility, including:

- Law 3-2017 (enacted on January 23, 2017), which requires public employees to use or lose unused accumulated sick days within the first six months after the year of accrual.

- Law 4-2017 (enacted on January 26, 2017), which sought to stimulate economic growth in the private-sector labor market by adding flexibility to overtime regulations, increasing work requirements for severance-pay eligibility, authorizing longer probationary periods, increasing work requirements for Christmas bonuses, and reducing those bonuses by half during an employee's first year of employment;

- Law 5-2017 (enacted on January 29, 2017), which declared a financial emergency and authorized the Governor to determine the payment priority for the Commonwealth's available resources;

- Law 8-2017 (enacted on February 4, 2017), which created a unified system of government job classifications; authorized movement and transfer of employees among agencies and public corporations; instituted merit systems for employee promotion, transfer, retention, and the like; and prospectively capped accrual of public employees' vacation days at 60 and sick days at 90;

- Law 26-2017 (enacted on April 29, 2017), which addressed matters such as compulsory liability insurance and the Joint Underwriting Association, transfer of surplus funds from government instrumentalities to the Commonwealth's Treasury, disposal of government-owned real estate, government procurement reserves, new excise taxes on tobacco products, creation of an emergency fund, and public employees' fringe benefits; and

- Law 46-2017 (enacted on July 19, 2017), which amended Act 5-2017, authorized the Governor to continue the emergency-period declaration as long as the Oversight Board exists, and continued the effect of debt-moratorium orders issued under 2016 legislation (thereby generating bondholder litigation with which this Court is familiar).

Additional reform and austerity measures had been enacted in prior years.

98.     Courts have not hesitated to reject Contracts Clause challenges where, as here, the challenged legislation was only one of many measures adopted to address a fiscal crisis. *See, e.g.*, *Buffalo Teachers*, 464 F.3d at 371; *Baltimore Teachers*, 6 F.3d at 1020 n.12; *Donohue v. New York*, 347 F. Supp. 3d 110, 134 (N.D.N.Y. 2018) (upholding reduction in contributions to retirees' health insurance "[i]n light of the considerable cuts made across all aspects of the State's spending"); *Ambrose*, 2018 WL 1635498, at *8, *21.

99.     Accordingly, the Legislature could logically conclude that "that the measures taken in . . . Act [106] are necessary and reasonable to properly address the fiscal crisis and the actuarial insolvency of [ERS]. . . ."  Statement of Motives at 12.  The Fiscal Agent thus does not have a claim arising under the Contracts Clause.

**B.     The Post-Petition Legislation Did Not Violate the Takings Clause of the U.S. or Puerto Rico Constitutions.**

100.     The federal Takings Clause provides that private property shall not "be taken for public use, without just compensation," U.S. Const. amend. V.; art. II, § 9 of the Puerto Rico Constitution is similar.

101.     In the Post-Petition Legislation AP, incorporated into the Fiscal Agent Claim by reference, the ERS Bondholders generally allege that the Post-Petition Legislation "diver[ted] . . . assets to the General Fund so that the Commonwealth can use such assets for purposes specified

in the Fiscal Plan for Puerto Rico" and that such diversion does not serve a "public purpose."  Post-Petition Legislation AP, [ECF No. 39 ¶ 146].  The ERS Bondholders further allege that, to the extent the Post-Petition Legislation qualifies as a "public use," "the Post-Petition Legislation, on its face, constitutes an unconstitutional taking of their Pledged Property without just compensation in violation of the U.S. and P.R. Takings Clauses."  *Id.* ¶ 157.

### i.  The Fiscal Agent Lacks Standing to Assert A Takings Claim.

102.   A Takings claim is necessarily based on the loss each individual bondholder suffered.[28]  In other words, any Fiscal Agent claim arising from an alleged Takings is based on the price of the ERS Bonds prior to the governmental action allegedly constituting the Takings, minus the price of the ERS Bonds subsequent to such action.  Put into numbers, a distressed debt purchaser acquiring ERS Bonds at 50 cents, whose bonds drop to 30 cents after a Takings, may assert only a 20 cent Takings claim.  *See, e.g.*, *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (loss due to taking is measured by "the change, if any, in the fair market value caused by the regulatory imposition"); *see also United States v. Va. Elec.* & *Power Co.,* 365 U.S. 624, 633 (1961) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934) ("The guiding principle of just compensation is reimbursement to the owner for the property interest taken.  'He is entitled to be put in as good a position pecuniarily as if his property had not been taken.  He must be made whole but is not entitled to more.'")); *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235-36 (2003) ("[J]ust compensation required by the Fifth Amendment is measured by the property owner's loss rather than the government's gain.").

103.   The Fiscal Agent cannot assert Takings claims which depend on each bondholder's particular circumstances, because the Fiscal Agent acts on behalf of all ERS Bondholders.  *See*

---

[28] The ERS Bondholders have not alleged what loss they suffered as a result of any alleged taking.

Resolution § 501 (indicating that "the grant of a security interest in and over, the Pledged Property . . . [is] in favor of the Fiscal Agent for the benefit of the Bondholders"). This includes those ERS Bondholders who purchased debt after the implementation of the Post-Petition Legislation. Accordingly, any Takings claim would need to be asserted by individual bondholders; not the Fiscal Agent.

ii.    **The Post-Petition Legislation Did Not Impair Any Property Interests.**

104.   A "Takings Clause issue can arise only after a plaintiff's property right has been independently established." *Parella v. Ret. Bd. of the R.I. Emps.' Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999). Because the Fiscal Agent does not have a property interest in either the Paygo Payments or Transferred Assets that allegedly were taken, it has no Takings Clause claim. But, even if a cognizable property interest existed, an unconstitutional taking still would not have occurred.

a.    **The Fiscal Agent Has No Property Interest That Was Taken as a Result of the Cessation of the Employers' Contributions.**

105.   As discussed above, the Fiscal Agent has no property interest in the Employers' Contributions because section 552 provides that the Fiscal Agent's security interest does not attach to Employers' Contributions generated after the ERS Petition Date. *See supra* ¶ 78. Without a security interest, no property interest exists for Takings Clause purposes, because alleged impairments of unsecured contractual rights do not constitute a taking. *See Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940). Absent a lien, the bare right to be paid is not property under the Takings Clause. *See, e.g.*, *Bank of N.Y. v. Treco (In re Treco)*, 240 F.3d 148, 161 (2d Cir. 2001) ("If the claim is unsecured, it is not 'property' for purposes of the Takings Clause."); *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty.*, 57 F.3d 505, 510 (7th Cir. 1995) ("the property right

45

of a secured party to collateral is 'quite different in legal contemplation' from the creditor's contract right to repayment of the debt").[29]

106.    Even if section 552 did not prevent the Fiscal Agent's security interest from attaching to assets generated post-petition, as discussed above, (1) the enactment of the Post-Petition Legislation did not transfer any "right to receive" Employers' Contributions from ERS to the Commonwealth, but instead, implemented an entirely new retirement system and repealed the prior statutes that were the basis of the Fiscal Agent's alleged security interest, and (2) the Fiscal Agent never had a security interest in future Employers' Contributions.  *See supra* ¶¶ 69–74.

### b.    The Fiscal Agent Has No Property Interest in the Transferred Assets.

107.    As discussed above, the Fiscal Agent also lacks a security interest in Employers' Contributions remitted to ERS by the Fiscal Agent.  *See supra* ¶¶ 64–67.  Instead, the Fiscal Agent has only an unsecured contractual right against ERS to be repaid, which, as explained above, does not constitute a constitutionally protected property interest for Takings Clause purposes.[30]

### iii.    Even If the Fiscal Agent Had a Property Interest in Any "Taken" Assets, the "Takings" Was for a Public Use and Was a Permissible Regulatory Takings.

108.    Even if the Fiscal Agent maintained a property interest in any of the assets the Commonwealth allegedly took, the taking was for a public purpose and is the kind of regulatory

---

[29] Although the Supreme Court once referred to contracts as property under the Takings Clause, *see Lynch v. United States*, 292 U.S. 571, 579 (1934), the Supreme Court's later decision in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986) "effectively overrul[ed], if it had not already been overruled, *Lynch* … to the extent that it [*i.e.*, *Lynch*] flatly holds that contracts are property that the government may not take without compensation."  *Pro-Eco, Inc.* 57 F.3d at 510 n.2; *see also Buffalo Teachers Fed'n*, 464 F.3d at 374–75 (cases cited therein).  In the 85 years since *Lynch* was decided, the Supreme Court has never held that unsecured rights arising from contract are property under the Takings Clause.

[30] In any event, if the Court were to determine such property right does exist in the Transferred Assets, those assets would then be distributed to the Fiscal Agent, thereby extinguishing any possible claim resulting from the transfer.  *See supra* n.21.

46

taking allowed by *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978),
which ruling does not require payment of compensation where, as here, the challenged
governmental action was a permissible exercise of the Commonwealth's police power.

### a. The Post-Petition Legislation Was for a Public Use.

109.   In the Post-Petition Legislation AP, the ERS Bondholders allege "[t]he Post-
Petition Legislation [] was not enacted for a 'public purpose' within the meaning of the U.S. and
P.R. Takings Clauses.  Rather, the Post-Petition Legislation was enacted in order to divert assets
to the General Fund so that the Commonwealth can use such assets for purposes specified in the
Fiscal Plan for Puerto Rico."  Post-Petition Legislation AP, [ECF No. 39 ¶ 146].

110.   It is difficult to understand how legislation enacted to protect vulnerable members
of Puerto Rico society and to help address the Commonwealth's fiscal crisis pursuant to a Fiscal
Plan that covers virtually every aspect of financial and socio-economic life in Puerto Rico could
not have been enacted for a "public purpose."  As Act 106 itself states:  "Complying with this
[Fiscal] Plan constitutes a compelling interest of the State to maintain its operations and protect
the most vulnerable."  Act 106, Statement of Motives at 9.

111.   The Legislature expressly made such a finding in enacting Law 106:  it invoked the
police powers under the P.R. Constitution and concluded that the "serious economic and fiscal
emergency in Puerto Rico" necessitates the passage of Act 106 "in order to provide the
Government with the sufficient liquidity to pay the pension benefits of public employees who
already retired or who will do so in the future."  Act 106, Statement of Motives at 9.  Indeed, the
Puerto Rico Court of Appeals has already found that public pension reforms advance important
governmental purposes and serve the public good.  *See Ass'n of Mgmt. Emps. of State Ins. Fund
Corp. v. State Ins. Fund Corp.*, Case No. SJ2014CV00204 (907), 2015 WL 4075649, *14 (P.R.

Ct. App. May 29, 2015), a translated copy of which is attached hereto as **Exhibit G**. Accordingly, the Post-Petition Legislation was clearly for a public use.

### b.  Any "Taking" Was a Permissible Regulatory Taking.

112.  Courts have identified two classes of takings: *per se* takings and regulatory takings. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). *Per se* takings are limited to cases where the "government requires an owner to suffer a permanent physical invasion of her property," or its regulations "completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* (citation omitted; emphasis in original). Neither scenario applies here:  the Post-Petition Legislation does not require or contemplate any "physical invasion" of any property, and it does not completely deprive the Fiscal Agent of all of its allegedly relevant "property" interest. *See Connolly*, 475 U.S. at 224–25 (analyzing claim of "taking" of contractual right as a regulatory taking); *Buffalo Teachers Fed'n*, 464 F.3d at 374 (same).[31]

113.  The Takings Clause analysis therefore must proceed under the three-part *Penn Central* inquiry for regulatory takings, which requires consideration of (i) "the economic impact of the regulation on the claimant," (ii) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (iii) "the character of the governmental action." *Penn Cent.*, 438 U.S. at 124; *see also Lingle*, 544 U.S. at 538–39; *Connolly*, 475 U.S. at 225; *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 18–19 (1st Cir. 1993). The party alleging a regulatory taking bears a "heavy burden," *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987), and the Fiscal Agent cannot meet that burden.

---

[31] The Fiscal Agent retains both its claims against ERS, and any security interest the Court determines it has with regard to ERS's assets.

(A)        **Economic Impact on Property Owner**

114.    The Post-Petition Legislation's economic impact on the Fiscal Agent does not tend to establish a taking because—under the relevant inquiry, which is qualitative, not quantitative—many elements of the bundle of rights the Fiscal Agent possesses remain unimpaired.

115.    An "infringement that leaves virtually the whole of the owner's possessory rights intact does not constitute a taking." *McAndrews*, 989 F.2d at 18 (citing *Penn Central*, 438 U.S. at 130-31 and *Gilbert v. City of Cambridge*, 932 F.2d 51, 56 (1st Cir. 1991)).  The question is whether the regulation preserves an "economically viable property use" for the owner.  *Id.* (citing *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)).  "Put another way, 'where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety.'"  *Id.* (citing *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979)).  Accordingly, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe and Prods of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602,  645 (1993)  (citing *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (no taking despite 75% diminution in value), and *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (no taking despite 92.5% diminution)).

116.    Of course, while diminution of value is never *sufficient* to prove the "negative impact" element of the regulatory taking analysis, it is always *necessary*.  A takings claimant cannot prove its claim without demonstrating its economic loss (as well as the impact on the other strands of its bundle of rights).  *See, e.g.*, *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014) (citing *Penn Central*, 438 U.S. at 124).  "[I]f the regulatory action is not shown to have had a negative economic impact on the [claimant's] property, there is no regulatory taking." *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed. Cir. 1999).

117.    This principle poses a significant hurdle for the Fiscal Agent, because it requires the Fiscal Agent to show what the value of its property interest would have been "but for the government action." *A&D*, 748 F.3d at 1157.  Such proof necessarily requires a realistic determination of the property's value of the asset immediately *before* the government action.  *See, e.g.*, *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (loss due to taking is measured by "the change, if any, in the fair market value caused by the regulatory imposition").

118.    Thus, the Fiscal Agent needs to prove an actual loss due to enactment of the Post-Petition Legislation at a time when market expectations already took into account the well-known disarray of the Commonwealth's finances.

119.    Here, the Fiscal Agent still owns a significant part of the bundle of rights it possessed before the Post-Petition Legislation; *i.e.*, the right to be paid pursuant to the Resolution, subject to the Commonwealth's ability to reduce or even eliminate the Employers' Contributions. ERS does not contest the Fiscal Agent's (i) interest in ERS's collections of Employers' Contributions (approximately \$200 million), which have been distributed to the ERS Bondholders, (ii) interest in ERS's Accounts Receivable (approximately \$105.5 million), and (iii) right to assert a claim against ERS and receive treatment in accordance with the terms of the Resolution as determined by the Court in the Lien-Scope AP.  The Fiscal Agent simply faces diminished payments pursuant to the Resolution, but any such reduction would amount only to a quantitative diminution of contractual expectations (if the Fiscal Agent can show that those expectations were diminished at all as of the enactment of the Post-Petition Legislation).  Such conduct does not constitute a wholesale destruction of the bundle of rights constituting the alleged property interest.

**(B)     Extent of Interference with Investment-Backed Expectations**

120.    Nor do the Fiscal Agent's "distinct investment-backed expectations" support a finding of a taking.  "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."  *Connolly*, 475 U.S. at 227 (citation omitted).

121.    The same is true for investors in government debt:  such investments are necessarily made with the awareness that a state's obligation to protect the safety and welfare of its citizenry is fundamental and inalienable, and may from time to time affect its ability to find additional resources to service its debt as well.  *See Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 514 (1942); *Blaisdell*, 290 U.S. at 435; *see also, e.g.*, *Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 128 (1st Cir. 2009) (plaintiff's "investment-backed expectations are tempered by the fact that it operates in [a] highly regulated . . . industry").  Indeed, the Puerto Rico Constitution expressly warned prospective investors and others that all alleged constitutional rights were subject to the Commonwealth's police power.  P.R. Const. art. II, §§ 8, 19.

122.    Particularly in this case, the "investment-backed expectations" of holders of Puerto Rican debt have been formed for years in the awareness of the Commonwealth's increasing inability to pay as scheduled.  ERS's own financial difficulties had been amply documented and publicized, well before the ERS Bonds were issued, with a major pension reform (Act 305) occurring in 1999, nine years before the current bonds were issued.  *See supra* ¶ 21.  Among other things, Act 305 had warned that ERS was "in critical condition with an actuarial deficit that exceed[ed] five point nine billion dollars, according to the projections of [ERS's] actuaries."  *See* Act 305, Statement of Legislative Intent.

123.    Furthermore, as discussed above, the Fiscal Agent and ERS Bondholders had notice that (1) the amount of Employers' Contributions was subject to legislative change, *see supra*

51

¶ 106, (2) the Offering Statement warned that the Resolution contained no non-impairment covenant preventing the Commonwealth from decreasing or even eliminating the Employers' Contributions, *see supra* ¶ 30, and (3) Commonwealth courts had a long history of upholding changes to the pension system to promote its solvency. *See, e.g.*, *supra* ¶ 96. Accordingly, the Fiscal Agent's and ERS Bondholders' investment-backed expectations have not been interfered with substantially enough to give rise to a Takings Clause claim.

### (C)      Character of Interference

124.    The third *Penn Central* factor—the nature of the governmental action—also militates against a finding of a taking. "A 'taking' may more readily be found when the interference with property had to be characterized as a physical invasion by the government, and when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.

125.    This case, of course, does not involve a physical invasion or even a permanent appropriation of the Fiscal Agent's alleged property for the government's own use. Rather, it involves an adjustment of "the benefits and burdens of economic life to promote the common good [, which] does not constitute a taking requiring Government compensation." *Connolly*, 475 U.S. at 225.

126.    The Post-Petition Legislation is clearly designed to "obtain fiscal stability" in response to an economic crisis. *Buffalo Teachers*, 464 F.3d at 375. In that circumstance, even if the necessary measures may "take from Peter to pay Paul, . . . such burden shifting does not, without more, amount to a regulatory taking." *Id.* at 376.

127.    Here, every interested constituency in the Commonwealth's future—public employees, consumers of public services, taxpayers, pensioners, and bondholders—faces diminished expectations in a joint effort to keep the lights on, the schools open, the justice system

functioning, and the streets safe while respecting investor expectations to the extent feasible. *See, e.g.*, *Ropico, Inc. v. City of New York*, 425 F. Supp. at 970, 977 (S.D.N.Y. 1976) ("Even if [the Moratorium Act] provides for a taking of some contractual rights of the [bondholders], given the pressing public emergency which the legislature found, such a limited taking of plaintiffs' rights without compensation or judicial review is a permissible exercise of the state's police power").

128.     The Supreme Court has made clear that, "[i]n all instances, the [takings] analysis must be driven by the purpose of the Takings Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (internal quotations omitted).   In the circumstances here, the Post-Petition Legislation was designed to protect the retirement benefits of employees who provided service to all residents of the Commonwealth.  And particularly in light of all the other measures the Commonwealth has taken and is still taking to address its disastrous financial condition, the Fiscal Agent and ERS Bondholders are not the only ones being forced to bear the burdens rising from that fiscal crisis and the bankruptcy of the old ERS pension system.

### iv.      In Title III, the Commonwealth and ERS Can Breach Obligations and Contracts.  Breaches Are Not Takings.

129.     Even if the Commonwealth had an obligation, under a contract or otherwise, to maintain legislation requiring employers to make Employers' Contributions to ERS (which it did not have), that obligation would yield, at most, a general unsecured claim to ERS and/or its bondholders.  Rejecting or breaching obligations are what debtors must do.  They are not takings. The Enabling Act makes explicit that Employers' Contributions are subject to annual appropriation by the Commonwealth.  *See* 3 L.P.R.A. § 781(g).  The expectation that future Employers' Contributions will be required from the employers to be contributed to ERS is nothing

more than a forward-looking projection based on a budget preempted by PROMESA.  Congress

gave the Oversight Board extensive powers to develop and certify fiscal plans and budgets for the

Commonwealth and its instrumentalities, *see* PROMESA §§ 201, 202, and provided that "the

provisions of [PROMESA] shall prevail over any general or specific provisions of territory law,

State law, or regulation that is inconsistent with [PROMESA]."  PROMESA § 4.

130.    Fiscal plans for the Commonwealth and Commonwealth budgets from April 2017

through 2019 were certified by the Oversight Board, pursuant to its federal statutory powers

granted under, and authorized by, PROMESA.  None provide for Employers' Contributions past

2017.[32]  *See* Certified Commonwealth Fiscal Plan With Corrections, Apr. 18, 2017, at 14,

available at oversightboard.pr.gov/documents/ (providing that the "Paygo program for ERS . . . is

initiated in 2018").

131.    Moreover, on June 30, 2018, the Oversight Board certified a budget for the

Commonwealth for the Fiscal Year 2018–19 (the "Certified FY19 Budget").  Under PROMESA,

the Certified FY19 Budget is deemed to be "in full force and effect," PROMESA § 202(c)(3)(C).

Indeed, this Court has already ruled, "a budget approved and adopted by the Oversight Board as

compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are

preempted."  *Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight &*

*Mgmt. Bd. for Puerto Rico)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018), *aff'd and remanded*, No.

18-2154, 2019 WL 6887258 (1st Cir. Dec. 18, 2019).  The First Circuit agreed:

> A prior year authorization for spending that is not covered by the budget is
> inconsistent with PROMESA's declaration that the Oversight Board-certified
> budget for the fiscal year is in full force and effect, and is therefore preempted by
> that statutory provision by force of Section 4 of PROMESA.

2019 WL 6887258, at *3 (citing 330 F. Supp. 3d 685) (emphasis original)

---

[32] The Fiscal Plans for ERS were included in the Commonwealth Fiscal Plans.

132.     Further, "PROMESA subsection 202(e)(4)(C) itself precludes the territorial

government from reprogramming funds from prior fiscal years . . . and any Puerto Rico law to the

contrary is preempted by virtue of PROMESA section 4. . . .  Simply put, there can be no spending

from sources not listed in [a certified] budget, regardless of what any territorial law says." *Id.* at

*3.

133.     Moreover, if any Takings Claim does arise in ERS *vis-à-vis* the Commonwealth as

a result of the Post-Petition Legislation, such rights would belong only to ERS, and not the Fiscal

Agent.  Bankruptcy Code section 501, which authorizes the filing of proofs of claim, does not

authorize a creditor of a creditor to file a proof of claim.  Parties that are creditors of a creditor,

without more, have no claim against a debtor.  And in any event, the Fiscal Agent lacks derivative

standing to assert any claims against the Commonwealth for its implementation of the Post-

Petition Legislation.

**III.    The Fiscal Agent's Remaining Assorted Claims Must Also Fail.**

**A.    The Transfer of the Pledged Property to the Commonwealth Did Not Unjustly
Enrich the Commonwealth.**

134.     The Fiscal Agent alleges the Commonwealth may have been unjustly enriched at

ERS's expense.  *See* Fiscal Agent Claim ¶ 17.  The Fiscal Agent, however, does not have standing

to raise that claim.  Aside from lack of standing, as explained above, to the extent the Fiscal Agent

held valid, unavoidable security interests in any assets to be transferred from ERS to the

Commonwealth, the Oversight Board plans to distribute that property's value to the Fiscal Agent

pursuant to a plan of adjustment or earlier.

135.     Only the entity that allegedly has been harmed has standing to pursue an action.

*See City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d

82, 90 (1st Cir. 2011) ("A court tasked with determining who can pursue a particular claim must

look to the kind of harm alleged."); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) (plaintiffs must assert their own legal rights and interests, and cannot rest their claims to relief on the legal rights or interests of third parties).   To the extent ERS was allegedly harmed by losing unencumbered assets, only ERS, not the Fiscal Agent, can assert claims against the Commonwealth.   The Fiscal Agent does not represent ERS's interests; it represents the bondholders' interest. *See In re Am. Cartage, Inc.*, 656 F.3d at 90 (holding only the trustee had standing to pursue actions against debtor's former manager, as debtor's estate suffered the direct harm; any resulting harm to the value of secured creditor's collateral is "derivative and indirect" and not sufficient to confer standing on a third party).

136.   But, even if the Fiscal Agent could directly assert a claim against the Commonwealth for unjust enrichment, it cannot establish the claim.   Pursuant to Puerto Rico law, the Fiscal Agent must establish the following five elements to prevail on a claim for unjust enrichment:  (1) an enrichment, (2) a corresponding impoverishment, (3) a connection between the enrichment and the impoverishment, (4) lack of justification for enrichment, and (5) non-existence of a legal principle that would prohibit application of unjust enrichment. *Stewart v. Husqvarna Constr. Prods. N. Am.*, Civ. No. 11-1182, 2012 U.S. Dist. LEXIS 62585, at *21 (D.P.R. May 4, 2012).

137.   The Fiscal Agent Claim and the incorporated Post-Petition Legislation AP filings fail to allege facts sufficient to satisfy the standard for unjust enrichment.   The Post-Petition Legislation was enacted because ERS had almost completely run out of money to pay pensioners, and a new funding mechanism for this critical function had to be established.   The Commonwealth is hardly being unjustly enriched.   As the text of Joint Resolution 188 makes clear, the Commonwealth has assumed ERS's obligation to pay pension and other retirement benefits not

only to the Commonwealth's own retirees, but also, to those of the other public employers who participated in ERS. Thus, ERS was relieved of an obligation, which conferred significant value on ERS. All assets transferred from ERS to the Commonwealth are to be used for the purpose of paying pensions. Pursuant to Joint Resolution 188, the Commonwealth will use these funds for their intended purpose: to pay pensions to retirees of the Commonwealth and non-Commonwealth public employers. *See* Joint Resolution 188, § 3.

138.    The Fiscal Agent has not alleged that the additional burdens the Commonwealth is assuming—taking responsibility for all of ERS's pension payments—are worth less than the benefits the Commonwealth is allegedly receiving. Indeed, the Commonwealth will simply use any assets of ERS transferred to it for their intended purpose: to pay public pension obligations. Accordingly, the Commonwealth is not being unjustly enriched, and ERS is not being unjustly impoverished on account of any Commonwealth action. Indeed, courts have denied claims for unjust enrichment in similar situations. *See, e.g.*, *Waldner v. Carr*, 618 F.3d 838, 848 (8th Cir. 2010) (defendants were not unjustly enriched by plaintiff's assumption of defendants' withdrawal liability where plaintiff also obtained stock and control of defendants' company).

## B.    The Commonwealth Did Not Violate Section 407 of PROMESA in Enacting the Post-Petition Legislation.

139.    The Fiscal Agent Claim mentions, but does not explain in any detail, that the Fiscal Agent may have a claim arising under PROMESA section 407. However, by its terms, PROMESA section 407 precludes recovery under this theory.

140.    Section 407(a) of PROMESA provides that:

> While an Oversight Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to

57

such territorial instrumentality for the benefit of its creditors, then the transferee
shall be liable for the value of such property.

48 U.S.C. § 2195(a). Section 407(b), in turn, provides creditors with a mechanism to enforce rights

under Section 407—but only *after the Title III stay has been lifted*:

A creditor may enforce rights under this section by bringing an action in the
United States District Court for the District of Puerto Rico after the expiration
or lifting of the stay of section 405, unless a stay under title III is in effect.

48 U.S.C. § 2195(b).

141.     Thus, on its face, Section 407(b) expressly bars creditor enforcement actions when,

as here, a stay is in effect under Title III. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 297 F. Supp.

3d 269, 293 (D.P.R. 2018). Section 407 is not intended to be used in the context of a Title III case,

where the automatic stay remains in effect until a plan of adjustment is confirmed.[33]

142.     Further, Section 407 bars only inter-debtor transfers that already violate applicable

law; it does not create new causes of action where none previously existed. *See* 114 Cong. Rec.

H3601 (June 9, 2016) (remarks of Rep. Grijalva) ("The current text [of PROMESA] provides a

cause of action for creditors that—at the time of the alleged unlawful transfer—in fact have 'a

pledge of, security interest in, or lien on' the transferred property. Contrary to the suggestion of

the, Committee Report, the provision does not permit such a cause of action if the plaintiff only

'would have' in some future circumstance such an interest."). As discussed above, the

Commonwealth has not acquired any property subject to the Fiscal Agent's security interest.

Accordingly, any Fiscal Agent Section 407 claim must fail.

---

[33] *Cf.* Report from the House Committee on Natural Resources, H.R. Rep. No. 114-602, pt. 1, at 52 (2016) ("Sec. 407:
Protection from Inter-Debtor Transfers . . . This section grants creditors the right to sue **upon the conclusion of the
stay**, if the government of Puerto Rico transfers property between instrumentalities during the tenure of the Oversight
Board in violation of any agreement, or applicable law that a creditor has or would have a pledge of, security interest
in, or lien on such property.") (emphasis added).

C.    **The Fiscal Agent Fails to State A Claim with Regard to Its Other Miscellaneous Theories of Recovery.**

143.    Without further explanation, the Fiscal Agent alleges it may have a claim based on various legal theories, including tortious interference with contract, conversion, fraud, and misrepresentation.  Fiscal Agent Claim ¶ 17.  In addition to failing on the merits for the reasons stated above, these "bare assertions" are conclusory and fail to state a claim against the Commonwealth.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).  Accordingly, the Fiscal Agent Claim must be dismissed.

## NATURE OF CLAIMS (IF ANY)

144.    The Fiscal Agent alleges that "[a]ny such claims arising after the commencement of the Commonwealth's title III case are entitled to administrative expense priority[, and a]ny claims for damages and/or just compensation for violations of the Fifth and Fourteenth Amendments to the United States Constitution and Article II of the Puerto Rico Constitution are non-dischargeable."  *See* Fiscal Agent Claim ¶ 18.  While the Oversight Board believes the Fiscal Agent has no valid claims, such claims—even if some of them were valid—would not be afforded the status asserted by the Fiscal Agent.  As provided by the Court's orders, the automatic stay on litigation has been lifted only to certain matters [Case No. 17-3566, ECF No. 687].  Other issues, such as whether the Fiscal Agent's claims (if any) are entitled to administrative expenses status or are nondischargeable, will be addressed in subsequent briefing.  [Case No. 17-3566, ECF No. 676-2 at 2–3].

## NOTICE

145.    The Debtor has provided notice of this Objection to: (a) the Office of the United States Trustee for the District of Puerto Rico; (b) Fiscal Agent; (c) counsel to certain ad hoc groups of holders of bonds issued by ERS; (d) the statutory committees appointed in these Title III Cases;

(e) the Office of the United States Attorney for the District of Puerto Rico; (f) counsel to the Puerto

Rico Fiscal Agency and Financial Advisory Authority; (g) the Puerto Rico Department of Justice;

and (h) all parties filing a notice of appearance in these Title III Cases.  The Debtor submits that,

in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE the Debtor respectfully requests the Court to enter an order, substantially in the form attached hereto as **Exhibit A**, (a) granting the Objection and disallowing Claim No. 16775, and (b) granting the Debtor such other relief as is just and proper.

Dated: January 6, 2020
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock
Brian S. Rosen
Jeffrey W. Levitan
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial*
*Oversight and Management Board*
*as representative for the Debtors*

*/s/ Luis F. del Valle*
Luis F. del Valle-Emmanuelli USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax.787.722.1932
dvelawoffices@gmail.com

OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
434 Avenida Hostos San Juan, PR 00918
Tel: (787) 751-6764/ 763-0565
Fax: (787) 763-8260

*Attorneys for the Financial Oversight and*
*Management Board for Puerto Rico, as*
*representative of the*
*Commonwealth of Puerto Rico*