# EXHIBIT E

*CERTIFIED TRANSLATION*                               BY: OLGA M. ALICEA, FCCI, NJITCE-S

178 D.P.R. 1, 2010 WL 395760 (P.R.), 2010 T.S.P.R. 11

OLGA DOMÍNGUEZ CASTRO, SANDRA J. GUZMÁN HERNÁNDEZ, MILITZA LÓPEZ
MATEO, and CARLOS RIVERA FIGUEROA, *ET AL.*,
Respondents,
v.
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, SECRETARY OF
JUSTICE, HONORABLE LUIS FORTUÑO, GOVERNOR OF THE COMMONWEALTH
OF PUERTO RICO, DEPARTMENT OF JUSTICE, DEPARTMENT OF THE FAMILY,
AND FISCAL RESTRUCTURING AND STABILIZATION BOARD, Petitioners

In the Puerto Rico Supreme Court
*Numbers:* CT-2009-4 CT-2009-5 CT-2009-6 CT-2009-9

REQUEST FOR CERTIFICATION requested by the Commonwealth of Puerto Rico to declare
the constitutionality of Law No. 7 of March 9, 2009. *Judgment is entered declaring that
Law No. 7 of March 9, 2009, known as the Special Law Declaring a State of Fiscal Emergency
and Establishing an Integral Fiscal Stabilization Plan to Save the Credit of Puerto Rico, is
constitutional in all of its aspects covered by this opinion. As a result, and given that the
respondents do not have a legal right that requires making it effective, the request for permanent
injunction is "denied." Appeal CT-2009-09 is remanded to the Court of First Instance, San
Juan Court, for the continuation of the proceedings in a manner that is compatible with this
opinion.*

*Eliezer Aldarondo Ortiz, Rosa Campos Silva, Simone Cataldi Malpica, and Eliezer A. Aldarondo
López,* of *Aldarondo & López Brás,* attorneys for the Commonwealth of Puerto Rico, petitioner;
*David Noriega Rodríguez* and *Frank Zorrilla Maldonado,* attorneys for the respondents; *Myrna
E. Cruz Colón, Vivian Negrón Rodríguez, Jeannette Rodríguez Claudio,* and *José R. Pérez
Ayala,* from the Office of Legal Affairs of the Comm. of P.R. Employees Association, *Sylvia M.
Soto Matos,* from the *Soto Matos Law Firm, Jinellys Laureano Vázquez* and *Arcelio A.
Maldonado Avilés,* attorneys for the respondents.

ASSOCIATE JUSTICE MISTER KOLTHOFF CARABALLO issued the opinion of the Court.

*The Law does not create social interest, it recognizes and delimits it.* A civilized society
imposes certain commitments between an individual's freedom and social interest. *In the
foreground is the social interest in general security*; the claim, the desire, or the demand to feel
free from those acts and conduct that threaten the very existence of society. When society
develops its economy, born is the individual interest in securing what is acquired and the
certainty of transactions, *moderated by the general interest in progress, in continued
improvement, and advancement in social engineering that is the protection of the State.
(Emphasis ours.)[1]*

---

[1] *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903, 907 (1975), citing with approval Pound, Jurisprudence, T. III,
p. 235, *et seq.*

Our Country, and we could affirm that the rest of the world, is living very convulsive moments in the economic and financial aspect. It would seem that the economies of the countries of the world are intertwined and tied to the tail of a kite that cannot finally rise.

On September 25, 2009, and pursuant to Law No. 7 of March 9, 2009, the government of Puerto Rico announced the dismissal of almost 17,000 public employees. Unfortunately, these dismissals are added to the approximately more than 120,000 employees in private enterprise who during the past three years have also lost their jobs on our Island. One way or another we have all been affected by these layoffs. We all have some member of our intimate family, some close relative, some good friend, some coworker, or some good neighbor who has lost his job during these so difficult times.

Very aware of this harsh reality, we are confronted with another equally harsh and unpleasant one. Unpleasant because it appears to be insensitive or unfeeling to those coworkers in public service who suffer the loss of their jobs. The reality is that it is up to the State to ensure the collective economic wellbeing, at the expense of the individual wellbeing. And the reality is that it is up to this Curia — since we judges cannot be dominated by the fear of deciding – ultimately determining whether or not the law that authorizes such dismissal is constitutional, in light of a rational scrutiny and the balance of interests.

## I

Respondents[2] are career employees, some union members, of the Government of Puerto Rico, to whom it was announced by letter that on November 6, 2009, or on January 8, 2010, they would be laid off from their positions.[3] The layoffs of all of these employees come about pursuant to

---

[2] During the procedural stages of cases CT-2009-5 and CT-2009-6 we were asked to consolidate the same with case CT-2009-4. This Court denied the request because we understood that it would delay the resolution of the case. However, given the expedited process following in the other appeals and for the sake of procedural economy, we consolidate in this opinion appeals CT-2009-4, CT-2009-5, CT-2009-6, and CT-2009-9.

[3] In case CT-2009-4: Ms. Olga Domínguez Castro worked as an Office Systems Technician at the Department of Justice for ten years and some months; Ms. Sandra J. Guzmán also worked for the Department of Justice but as a Data Entry Clerk, for ten years; Ms. Militza López Mateo has served as an Accountant IV at the Department of the Family for seven years, and Mr. Carlos R. Rivera Figueroa also works for the Department of the Family, but as Budget Technician III, for eight years.

In case CT-2009-5: During the processing of the case before this Forum respondents filed a Motion for Partial Dismissal without Prejudice. They argued that the circumstances of several of the respondents had changed and that they had been informed that they were in the group that would continue working. Consequently, they requested the dismissal without prejudice of those employees. The petitioner filed an opposition. We "Granted" the petition of the respondents in question.

To those effects, the respondents who remained in the action are: Mr. Luis Ramos Comas, Store Inspector of the Penal Institutions of the Corrections Administration for nine years and two months; Ms. Ivelisse Marrero Marcano, Human Resources Specialist for more than eight years working for the Mental Health and Addiction Services Administration; Ms. Mirys Rodríguez Jiménez, Office Systems Assistant II of the Department of Sports and Recreation since November 6, 2003; Ms. Leemaris Rodríguez Aponte, Human Administrative Specialist I for more than seven years for the Corrections Administration; Ms. Yarigna Leslie Osorio Santiago, Budget Analyst II at the Department of Sports and Recreation for more than six years; Ms. Ruth Daisy Fontanez Sánchez, Office Systems Administrator for the Corrections Administration since June 8, 2002; Ms. Ruth Evelyn Rivera Rosario,

*Continued...*

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

the enactment of Law No. 7 of March 9, 2009, Special Law Declaring a State of Fiscal Emergency and Establishing an Integral Plan of Fiscal Stabilization to Save the Credit of Puerto Rico (Law No. 7).

With the enactment of Law No. 7, the Puerto Rico Fiscal Restructuring and Stabilization Board (F.R.S.B.) was created to implement, to the full extent, said Layoffs Plan.[4]   As part of the preparation of the Layoffs Plan, and according to the statutory criterion of seniority, each government employee – including respondents herein – was asked to remit their seniority status to the agency for which they work, that is, the number of years worked in government.[5]   In view of the foregoing, on September 25, 2009, and as we have already indicated, each of the respondents herein was notified that they would be laid off from their positions.

In the layoff letters given to each of the respondents they were informed, among other things, the reason for their dismissal.  In addition, they were clearly notified about their right to request a review of the agency's decision before the Appellate Commission of the Human Resources Management System (CASARH, by its Spanish acronym), or, in the case of unionized employees, before the Labor Relations in Public Service Commission.  To accomplish the foregoing, the respondents would have a period of thirty days, counted from receipt of the letter.

Once notified of their layoffs, the respondents filed with the Court of First Instance complaints against the Government of Puerto Rico (Government)[6] requesting a preliminary and permanent injunction, as well as a request for declaratory judgment, in which they requested, among other things, that Law No. 7 be declared unconstitutional, and as a result, their layoffs be declared null

---

*Continued...*

Administrative Assistant I at the Department of Human Resources for more than twelve years; Mr. Nelson Guzmán Algarín, Office Clerk at the Department of Housing for more than six years; Ms. Luz C. León Rivera, Administrative Assistant I for the Department of Education for more than thirteen years; Oscar E. Luna Ugarte, Janitor at the Department of Education more than seven years; Biterbo Caldero Pérez, Custodial Employee I (Janitor) at the Department of Education; Ms. Mireille Rodríguez Rodríguez, Administrative Assistant I of the Department of Education for more than five years.

In case CT-2009-6: Ms. Zoraida Martínez Román, Ms. Saudy Leilany Hernández Colón, and Ms. Jesenia Ayala Maldonado, employees of the Child Support Administration for more than six, twelve, and seven years, respectively. These employees are members of the union.

In case CT-2009-9: Ms. Erika Vispo Figueroa, Office Systems Technician for the Office of Compensation to Victims of Crime, ascribed to the Department of Justice, for seven years and seven months.

[4]  Art. 37.03(b)(5) of Law No. 7 establishes that the FRSB will be comprised of the President of the G.D.B. (who will preside the Board), the Secretary of Labor, the Secretary of the Department of Economic Development and Commerce of Puerto Rico, the Secretary of the Department of the Treasury, and the Executive Director of the OMB. Its members, in fulfilling their duties, will not receive any remuneration in addition to that received for fulfilling their duties in their agencies or departments.

[5]  Art. 37.04(b)(4) of Law No. 7 indicates that, "[f]or purposes of determining the seniority of affected employees all of the services rendered by the affected employees in public service will be considered, regardless of the provisions of the collective bargaining agreements, circulars, and other normative documents."

[6]  In case CT2009-4 the complaint was filed on October 9, 2009; in case CT-2009-5, on October 13, 2009, in case CT-2009-6, on October 21, 2009, and in case CT-2009-9, on November 6, 2009.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

and void.[7]   Thus, in all of these cases the Government filed, among other motions, requests for certification.  Having considered the matter, we issued the writs, staying the proceedings before the Court of First Instance, ordering that the record be presented to this Court, and granting the parties time to file their briefs.[8]

In the interim, and in case CT-2009-4, on October 19, 2009, the respondents requested of us, in aid of jurisdiction, that we issue a provisional order to stay the layoffs decreed by the State.   On October 26, 2009, we entered a resolution in which we "denied" said request.[9]

*Arguments of the Respondents*

In appeals CT-2009-4 and CT-2009-5 the respondents argue that they have a right or proprietary interest in their positions as career employees, which is protected by due process of law that stems from both the Constitution of the Commonwealth of Puerto Rico and the U.S. Constitution.   They also argue that said due process of law has been affected by Law No. 7, both in its substantive and procedural aspects.

The respondents indicate in CT-2009-4 that a layoff is the last recourse to follow, that other measures could be taken such as reducing the work hours and, even, the employee's salary, and that such measures were not taken.   In other words, they claim that the economic reasons were not specified nor was evidence presented regarding the pressing need to dismiss personnel and not take other measures.   In addition, the respondents argue in CT-2009-4 that the application of Law No. 7 eliminates retroactively rights acquired by them, in contravention of Art. 3 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3.

On the other hand, in both appeals (CT-2009-4 and CT-2009-5) the respondents argue that Law No. 7 violates their due process of law by exempting from strict adherence certain processes prior to a layoff, established in Law No. 184,[10] as are: that the layoffs plans was not published nor were the seniority lists by occupational classification published.   Also, they claim that the Layoffs Plan of Law No. 7 does not follow due process of law in its implementation, since neither the methodology nor the lists were published, nor were they provided with a hearing prior to their layoffs.

---

[7] The complaint in CT-2009-4 includes as defendants the Governor of Puerto Rico, the Hon. Luis G. Fortuño, the Department of Justice, the Department of the Family, and the Fiscal Restructuring and Stabilization Board; in CT-2009-5 the defendant is the Governor de Puerto Rico, Hon. Luis G. Fortuño, and the Commonwealth, and in CT-2009-6 the defendants are the Commonwealth, the Department of the Family, and the Child Support Administration.   In CT-2009-9 the defendants are the Government of the Commonwealth of Puerto Rico, the Fiscal Restructuring and Fiscal *[sic]* Stabilization Board, and the Department of Justice.

[8] In CT-2009-6 the petitioner requested an extension of time to submit a motion in reply to the brief, which, for purposes of procedural economy, we "Denied."

[9] Due to the effect of what was being requested, we adopted said request for provisional order in aid of jurisdiction as if it were a request for preliminary injunction, "denying" the same as it did not meet the requirements for such an extraordinary recourse.

[10] Law No. 184 of August 3, 2004, as amended, known as the Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service, 3 L.P.R.A. § 1461, *et seq.*

*CERTIFIED TRANSLATION*                              BY: OLGA M. ALICEA, FCCI, NJITCE-S

On their part, in CT-2009-6 they argue before us, among others, that the notification of layoff was contrary to the Collective Bargaining Agreement subscribed between the parties, according to Law No. 45 of February 25, 1998, known as the Labor Relations for Public Service Act, thus it violates the respondents' due process of law.   They argue that they have a proprietary right to their job and that Law No. 7 vacates those rights, as well as the ones negotiated collectively, in detriment to the contractual obligations.

Finally, in CT-2009-9 the same arguments outlined in the aforestated appeals are essentially reproduced.   However, the respondents also indicate that Art. 37.04(b)(5),(6) and (7) of Law No. 7 delegates to the F.R.S.B. certain powers without clear guidelines that cause an undue concentration of powers in said organism.[11]   Having perfected all of the cases consolidated herein, we proceed to decide.

## II

*Law No. 7 of March 9, 2009*

Law No. 7 is an extensive statute that establishes a three-phase plan for the reduction of Government expenses.[12]   Included among these expenses are those directly related to the payroll of public employees.[13]   The reduction in government payroll expenses is configures specifically in the "Layoffs Plan" which is detailed in Chap. III of the law, titled "Cost Reduction Measures." In turn, this layoffs plan is governed by the criterion of seniority in public service, that is, those employees with career or permanent appointment of less seniority must be laid off, regardless of the agency or dependency to which they are assigned.[14]   The only exception to the use of this criterion is for those employees who render essential services to the citizens, and who are necessary to maintain the continuity of these services.

---

[11] In CT-2009-09 the respondent also alleged that the Office of Compensation to Victims of Crimes ascribed to the Department of Justice, which is where she works, is excluded from the application of Law No. 7.   However, the merits of said argument must be argued in the lower forum.   Note that this Court adopted the request for certification to resolve the challenges relative to the constitutionality of said law.   Therefore, all issues that do not comprise the constitutionality of Law No. 7 must be addressed by the Court of First Instance unless they have to do with the seniority of the public employee affected, in which case the CASARH or the Labor Relations of Public Service Commission will be the forums with jurisdiction to address such claim as the primary forum.

[12] This law has an extensive Joint Report, issued by the House of Representatives' Commissions on Treasury and on Government.   The Commissions on Treasury and on Government held public hearings on the bill on March 5, 2009, at which participated the President of the Government Development Bank, the Director of the Office of Management and Budget, the Secretary of the Treasury, the Secretary of Labor and Human Resources, the Assistant Secretary of the Department of Justice, economists Juan Lara and Vicente Feliciano, and representation from the country's unions.

[13] Art. 37.02 of this Law excludes from its application the following public employees: police and firefighters; corrections officers and juvenile officers; teachers assigned to the classroom; school librarians; health professionals (doctors, paramedics, nurses, pharmacists, and laboratory technicians); social workers; operators of the 911 emergency call system; and pathologists of the Forensic Sciences Institute.   In addition, it appears from its Preamble that exempt from the plan for the reduction of government payroll is the Judiciary, the public corporations, the University of Puerto Rico, the State Elections Commission, and the Office of Government Ethics.

[14] See:   Preamble and Art. 37.03(b)(3) of Law No. 7.

*CERTIFIED TRANSLATION*                              BY: OLGA M. ALICEA, FCCI, NJITCE-S

From an analysis of Law No. 7 six main objectives that is pursues stand out: (1) addressing in an integrated and responsible manner the fiscal crisis the Government of Puerto Rico is undergoing; (2) protecting Puerto Rico's credit in conformity with Sec. 8 of Art. VI of the Constitution;[15] (3) providing for a fiscal stabilization plan; (4) eliminating the structural deficit in compliance with the mandate of Sec. 7 of Art. VI of the Constitution;[16] (5) returning the Government to its fiscal health; and (6) establishing the bases for the Government to be able to promote the economic development of Puerto Rico, through an *integrated plan that consists in Revenue Measures and Better Control, Measures for Reducing Expenses, and Financial Measures.*

Law No. 7 is a statute of economic regulation that entails a socioeconomic impact, not only in the context of the layoffs it authorizes, but also due to the measures for government collections (collections for the public treasury) and measures for control and reduction in government spending that it imposes.[17]   It is convenient then to mention with some detail what this statute comprises in its more pertinent parts.

This law covers five chapters, some of them subdivided, in turn, into subchapters, which establish 72 articles in total.   Chap. I establishes the "Initial Provisions," and it consists of just three articles.   Art. 2 (Declaration of Purpose and Public Policy) specifically declares a state of economic and fiscal emergency in the Government, given the Island's current economic and fiscal situation.   As a result of the foregoing, established as a public policy of the government is "*the urgent need to establish an integrated and coherent fiscal stabilization plan, the elimination of the structural deficit, the amortization of the public debt, the restoration of fiscal health, and the bases for the Government to be able to boost Puerto Rico's economic.*"   (Emphasis ours.)[18]

Art. 3 establishes the supremacy of this law because it is a special law, indicating, in turn, that it is enacted through the exercise of the *power of reason of the State*, as well as by the constitutional authority that the Legislature has, recognized in Sections 18 and 19 of Art. II of

---

[15]  Art. VI, Sec. 8 of our Constitution establishes the following:

"Section 8.   Priority of disbursements when there are insufficient collections.

"When the available collections for a fiscal year are not sufficient to cover the appropriations approved for that year, interest on the public debt and amortization thereof will be paid first, and the other disbursements will be made thereafter according to the order of priorities established by law." Art. VI, Sec. 8, Const. of the Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 428.

[16]  Art. VI, Sec. 7 of our Constitution establishes the following:

"Section 7.   Appropriations may not exceed collections.

"The appropriations made for a fiscal year may not exceed the total collections calculated for said fiscal year, unless the law provides for the imposition of sufficient taxes to cover such appropriations." Art. VI, Sec. 7, Const. of the Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 428.

[17]  This law not only provides for the reduction of government spending, but it establishes a series of taxes and/or credits to individuals (Art. 4), taxes on products (cigarettes, Art. 5); on motor vehicles (Art. 6); and on liquors, wines, and beer (Art.  14).

[18]  Art. 2 of Law No. 7.

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

our Constitution,[19] and under Secs. 7 and 8 of Art. VI of the Constitution of the Commonwealth of Puerto Rico cited above.

Chap. II consists in three subchapters which establish the "Measures for Revenues and Better Control." Subchapter I provides the "Permanent Measures" and Subchapter II the "Temporary Measures." Subchap. III is titled "Effect on Other Laws" and it provides amendments to two different statutes that have to do with transfers of funds: an amendment having to do with the University of Puerto Rico and another that has to do with transfers of municipal funds.

Chap. III, the main axis of the dispute at issue, establishes the "Expense Reduction Measures." Art. 33 of this chapter establishes the "Definitions" that are to be applied to the text of the law, in which we emphasize Art. 33(g). This article indicates that the "*Objective" of this law is the establishment of an emergency plan aimed at reducing by two billion dollars the operating expenses and payroll payable from the General Fund for fiscal year 2009-2010*, after excluding the debt service, the appropriations by formulas of the University of Puerto Rico, the Judiciary, and the Municipalities, and the appropriation to the Legislature, consonant with the government's interest in assuring quality and continuity in the offering of services to the citizens. Art. 34 establishes the applicability thereof.

Arts. 35 to 37 establish what the Law calls "Emergency Expense Reduction Measures Plan." This plan consists of three phases, one of which, Phase II, will enter into effect progressively, until the Objective established as public policy in Art. 33(g) of the Law is reached. Art. 36 comprises Phase I, which establishes a "Voluntary Permanent Workday Reduction Program" and a "Voluntary Incentivized Resignations Program," available for eligible employees in the affected agencies.[20]

---

[19] Sections 18 and 19 of Art. II of the Constitution of the Commonwealth of Puerto Rico, in pertinent part, indicate:

"Section 18.   Right to strike, to establish pickets, etc.

"... Nothing contained in this section will impair the Legislature's authority to enact laws for cases of serious emergency when the public health or safety, or the essential public services are clearly in danger.   Art. II, Sec. 18, Const. Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 377.

"Section 19.   Liberal interpretation of human rights and authorities of the Legislature.

"The preceding list of rights must not be deemed restrictive or assumed to exclude other rights pertaining to the people in a democracy, and not specifically mentioned.   Nor must they be deemed to be restrictive of the authority of the Legislature to enact laws in protection of the people's life, health, and wellbeing."   Art. II, Sec. 19, Const. Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 379.

[20] Specifically, Art. 36.01 indicates that all employees of the agencies to which Chap. III applies and who have been employed for twenty years or more in public service will be eligible for the program, which would consist in the reduction of one regular daily workday of the employee every fifteen days, that is, one day every fifteen days.   (Art. 36.01(a) and (b) of Law No. 7).   Said article also advises that the reduction in workday provided, as well as the resulting reduction in pay, will be of a permanent nature.   (Art. 36.01(e) of Law No. 7.)

Art. 36.02 establishes the Voluntary Incentivized Resignations Program, whose implementation and notification process will be carried out by the Office of Management and Budget (OMB).   The same welcomes all employees of the agencies to which Chapter III is applicable, but it indicates a non-extendable term of 30 days to be able to accept it, counted as of the notification from the OMB.   This article establishes an economic incentive that consists in the payment of a monetary sum, based on the employee's employment time in public service.   This incentive is free

*Continued...*

*CERTIFIED TRANSLATION*                                  by: Olga M. Alicea, fcci, njitce-s

Art. 36.04 (Certification) is of particular importance.   This article establishes that upon conclusion of the 30 days term to accept the Voluntary Incentivized Resignations Program and the Permanent Workday Reduction Program, the agencies will have a period of not more than seven days to file with the OMB a report indicating the amount of savings achieved.   It is as of the date on which the submission of these reports by the different agencies is due and within a term of not more than ten days that the OMB must certify to the F.R.S.B. and to the Presidents of the Legislature Bodies the savings projected as a result of the implementation of Phase I and the certification of the savings projected of Art. 38.02, Phase III.   It is based on the analysis of those results that the OMB must announce whether the objective has been achieved and, if not, recommend putting Phase II into effect.

Art. 37.01 establishes that one the OMB issues the certification (Art. 36.04) in which it concludes that the objective established a public policy (Art. 2) has not been achieve, the layoffs plan will enter into effect.   Art. 37.02 lists the employees of the different agencies who, to avoid a negative impact on the services rendered by the Government, are excluded from the application of Phase II.[21]   Art. 37.03 indicates that if the OMB's certification concludes that the objective established in Phase I was not achieve, Phase II will be put into effect immediately.

Once Phase II begins, Art. 37.04 becomes of primary importance.   This article establishes the parameters and the procedure to be carried out during that phase.   Because it is of particular pertinence to the arguments of the respondents herein, we will quote it almost in its entirety:

*Article 37.04.-Procedure.*

The procedure to carry out Phase II will be the one provided in this Article.

(a)      Temporary Suspension. With the immediate commencement of Phase II, all clauses, precepts, and/or provisions applicable to employees and/or positions subject to the provisions of this Chapter III, contained in laws, collective bargaining agreements, agreements, supplementary agreements, policies, employment handbooks, circulars, contractual letters, addenda, certifications, employment regulations, rules, and conditions, normative letters, classification plans and/or compensation plans regarding: promotions, demotions, relocations, and/or transfers;

(1)      retentions and layoffs that conflict with what is adopted in this Law;

---

*Continued...*

from the payment of income taxes, and from discounts for savings and contributions to the government employees' retirement systems.   In addition, the employee receives, together with the payment of his vacation days to be liquidated within a period of 30 days, the payment of the health coverage premium for a maximum period of twelve months or until he is eligible for health insurance coverage in another job.   (Art. 36.03(a), (b) and (c) of Law No. 7.)

[21] This article also excludes, among others, employees in a position of trust.   Art. 37.02 of Law No. 7.

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

(2)      reduction of the workforce or layoffs, as well as any other provision that requires compliance with certain necessary measures prior to the implementation of any reduction of the workforce or layoffs;

(3)      reinstatement and adoption of record of eligible persons;

(4)      any provision that prevents assigning tasks corresponding to a group of employees, employment classifications, levels, labor union, or appropriate union;

(5)      any provision that prevents the subcontracting of tasks assigned to a group of employees, employment classifications, levels, labor union, or appropriate union;

(6)      any provision that prevents the consolidation of tasks in positions, employment classifications, or levels;

(7)      provisions as to the limitations of the Agencies' management or administrative rights; except for that which is not in conflict with this Chapter III;

(8)      provisions or clauses whereby the Agency is required to faithfully comply with what is agreed upon or covenanted, with respect to issues that are in conflict with the provisions of this Chapter III;

(9)      requirements on the use of seniority, to the extent that the seniority provisions are contrary to the provisions of this Chapter III or that they constitute a limitation to make changes in the duties, promotions, demotions, relocations, transfers, assignments, or other transactions that are necessary to avoid affecting the services; and

(10)      dispute resolution, review, and/or appeal procedures that are in conflict with the provisions that, with respect to such areas, are provided in this Chapter III.

The suspension of the clauses and provisions described in subsection (a) of this Section shall be for a term of two (2) years, and the Governor will be able to reduce this period through Executive Order, should the OMB certify that the savings resulting from the implementation of the mechanisms provided in this Section are sufficient to cover the objectives.

*(b) Layoffs.*

(1) In view of the state of fiscal emergency, the scarcity of fiscal resources, the seriousness of the problems we face, and the urgency required to correct the fiscal problems, the agencies are exempted from exhausting measures such as relocation of personnel, retraining employees, enjoyment of accrued vacation, enjoyment of unpaid leave, the reduction or working hours, or demotions, prior to the implementing layoffs.

CERTIFIED TRANSLATION                                    BY: OLGA M. ALICEA, FCCI, NJITCE-S

(2) The agencies shall notify the termination to all employees who on the date this Law enters into effect have a temporary or irregular appointment; therefore it will not be necessary to observe, with respect to them, the criteria of seniority.   The written notification that the Agencies send to those effects must advise the employees of their right to request review of the Agency's decision before CASARH, pursuant to the provisions of Article 13, Section 13.14 of Law No. 184 of August 3, 2008, and its regulations.   The notification must be hand delivered or sent by certified mail, return receipt requested, to the address that appears in the Agency's records.

(3) The layoffs of employees with a permanent or career appointment will be carried out observing exclusively the criterion of seniority, so that those with the least seniority are the first to be laid off.

........

(4) The FRSB is created, which will be comprised by the President of the GDB, who will direct the Board, the Secretary of Labor, the Secretary of the Department of Economic Development and Commerce of Puerto Rico, the Secretary of the Department of the Treasury, and the Executive Director of the OMB. Its members, in the performance of this task, will not receive remuneration in addition to that received for the performance of their duties in their agencies or departments.

(5) In addition to the authorities granted by this Chapter III, the FRSB will have all the authorities necessary and convenient to discharge the task assigned to it hereby, including but without limitation, carrying out or entrusting to the agencies or departments under its charge that they conduct the studies that may be necessary; request from the Agencies the information needed to carry out the task entrusted to them; advise the Governor and the Agencies in everything pertaining to the employees to be laid off; evaluate, approve, or reject requests from employees to reduce the working hours of the positions they hold; carry out meetings among themselves and with the Agency Heads; and recruit temporarily, through detachment, the personnel needed to carry out its task. Its President will also be empowered to assign and/or make available to the FRSB all of the resources of the GDB that may be necessary to discharge its obligations under this Chapter III. The task of the FRSB and its duration will conclude once the objective of the Law is achieved.

(6) The FRSB will determine the total number of employees to be laid off, pursuant to the provisions of Article 2 of this Law, and consonant with the need to assure the continuity and quality of government services, within a term of not more than five (5) calendar days after Phase II has commenced.

(7) *The agencies will identify and certify to the FRSB the seniority of each of its employees within a term of not more than fifteen (15) calendar days after Phase II has commenced.*

*Within that same term, the agencies must certify, in writing to their affected employees, individually, their seniority date as it appears in their records.  In the case of employees who are members of an appropriate unit represented by a labor union, the latter will also be notified.  Such certification will be notified to the employees, and, also, as the case may be, to the labor union, through hand delivery or by certified mail, return receipt requested, to the address that appears in the records of the Agencies and advising the employees of their right to state and substantiate in writing their version as to their seniority date.  The date of notification would be that of its delivery or remittance.*

(8) *The employee, and, as the case may be, through his labor union, will have a term of not more than thirty (30) calendar days, as of the date of notification, to file in writing with the agency, official documentary evidence issued by the competent authority or government entity ("verifiable documentary evidence") that refutes the seniority that has been certified.  For this, the form provided for such purposes by the respective Agency must be used, which must be filed out and submitted to the Agency with a copy of the verifiable documentary evidence that refutes the seniority date notified by the Agency.*

(9) In the event that the affected employee does not refute or does not file, within the term provided herein, verifiable documentary evidence that supports his position, the seniority to be used will be that which was notified by the Agency. Such seniority will be conclusive for all purposes pertaining to this Chapter III.

(10) *In the event that the affected employee files, within the term provided herein, verifiable documentary evidence that disputes the seniority that has been notified to him, the Agency will not make a final decision as to the seniority without first granting him the opportunity of having a prior hearing.*

(11) *The agency will notify the employee its final decision regarding the seniority and, as the case may be, the labor union, within a term of not more than thirty (30) calendar days, advising him of his right to request a review of said decision in accordance with the provisions therefor in clauses (13) and (14) of Article 37.04 of this Law.  Such notification will be made to the employees, and also, as the case may be, to the labor union, delivered by hand or by certified mail, return receipt requested, to the address that appears in the records of the Agencies.* The date of the notification will be the date of delivery or remittance.  However, the filing of a request for review will not stay the layoffs; provided however, that in the vent that the employee prevails, he will be reinstated to his position, effective s of the date of his layoff.

(12) *The affected employee may request review before CASARH of the final decision made by the Agency, solely as to his seniority, in accordance with the provisions of Article 13, Section 13.14 of Law No. 184 of August 3, 2004, and its regulations.*

(13) Those employees who are members of an appropriate unit, whether or not affiliated with a labor union, may review the final decision made by the agency,

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

solely as to their seniority, through a petition filed to those ends with the arbitrators of the Commission created under Law No. 45 of February 25, 1998, within a term of not more than thirty (30) calendar days from receipt of the Agency's notification.

(14) *The agency will notify the layoffs at least thirty (30) calendar days prior to their effective date through written communication addressed to the employee, and, also, as the case may be, to the labor union, indicating the date of effectiveness thereof.  The notification will be carried out in accordance with Section 37.04(b), subparagraph (12) of this Chapter III.*   (Emphasis ours.)

On the other hand, Art. 37.05 establishes the benefits that the laid off employees would receive.[22] Art. 37.06 provides that upon conclusion of Phase II the agencies must file with the OMB a report that reflects the savings achieve by the layoffs carried out.  With that information, the OMB will certify to the F.R.S.B. and to the Presidents of the Legislature Bodies, the savings projected as a result of the implementation of Phase II, indicating, also, their conclusions as to whether the objective was achieved.  The OMB and the Department of the Treasury will submit to the Presidents of the Legislative Bodies a joint report every ninety (90) days on the progress of the collections and the reduction in spending as a result of the implementation of Phase II.

With Art. 38, Phase III is established, which entered into effect immediately after the current law entered into effect (Art. 38.01).   Phase III establishes a temporary suspension plan, for a term of two year (Art. 38.02(b)), *of laws, collective bargaining agreements, precepts, and agreements, as well as all clauses, precepts, or provisions contained in laws, collective bargaining agreements, agreements, supplementary agreements, employee handbooks, circulars, contractual letters, addenda, certifications, regulations, employment rules and conditions, normative letters, classification plans or compensation plans, applicable to employees subject to the provisions of Chapter III of that very Law, and regarding twenty-seven issues listed in that very article.*

In addition, this Art. 38 suspends the efficacy of all regulatory provisions, or contained in documents such as policies, certifications, circulars, addenda, employment rules and conditions, or employee handbooks, of any kind, that provide for a paid leave, that is not one established by statute.   Art. 39 establishes the Alternatives for Public Employees Program.   This program consists in providing the employee laid off under Art. 37, as an additional benefit and with pre-eminence, choosing one of three alternatives.[23]

---

[22] This, in addition to the liquidation of regular vacation.  Likewise, for those employees eligible therefor, they are also entitled to liquidation of sick leave and of extraordinary time accrued.  Such benefits are summarized as follows: payment of the health coverage premium for an uninterrupted term of six months or until the employee is eligible for health insurance coverage at another job; they will be considered eligible for the Alternatives for Public Employees Program as provided in Art. 39 of that very law, and they may choose to have liquidated what is accrued as a retirement benefit, or have transferred to them or adopted any other alternative of the ones provided by, and in accordance with, the law that regulates their retirement, their regulation, and/or the corresponding plan.

[23] These alternatives do not consist in direct payments or benefits to the employee, rather that they are processed or channeled to the educational, technical vocational institution, or to the employee's new employer, subject to the

*Continued...*

*CERTIFIED TRANSLATION*                    by: Olga M. Alicea, fcci, njitce-s

Art. 40 ("Negotiation of Expired Agreements") indicates that collective bargaining agreements expired as of the date the law enters into effect or that expire during the term hereof, may not be extended or negotiated.   This prohibition will extend for a term of two years, as of the date the law enters into effect.

Art. 41 ("Transfers") establishes that

> [d]uring Phases I, II, and III, and in order to ensure the continuity and quality of government services, the FRSB may authorize transfers of employee among positions, classes, and levels of positions, groups of employees, appropriate units; transfers of union units to nonunion ones and vice versa, in the same Agency or among Agencies; provided, that the transferred employee must meet the minimum requirements of academic background and experience necessary to hold the position.   The transferred employee will be subject to the probationary period for the position. [In addition, during the term of Phases I, II, and III, all provisions of law, regulation, covenant, agreement, or precept that is contrary to what is indicated in Chapter III will be suspended; provided, that there will be total flexibility to carry out the transfers.

Art. 42 ("Subcontracting") establishes that

> [d]uring Phases I, II, and III, ... and [again] in order to ensure the continuity and quality of government services, the FRSB may authorize the transfer and subcontracting of work done by employees, appropriate units, or union units, ... all those provisions of law, regulation, covenant, or precept contrary to what is indicated [in Chapter III of the law] will be suspended.

It is also provided that in

> [a]ll contracts executed by the Agencies according to said [Art. 42], the contractor will be required, in the rendering of the services contracted, to employ available laid off employees, who have the necessary background and experience to render the service contracted, according to the list of candidates for rehire that will be prepared by the [Commonwealth's Office of Human Resources] (ORHELA, by its Spanish acronym), pursuant to the provisions of Article 43 [of] Chapter III.

---

*Continued...*

norms established by the F.R.S.B. therefor.   The alternatives are the following: an educational voucher in the sum of $5,000 dollars *[sic]*; a vocational/technical or relocation voucher in a total sum of $2,500, or a subsidy of 50% of the salary of transition to a job in the Private Sector or in the Third Sector applicable to a gross salary of up to a maximum of $30,000.   Therefore, the maximum benefit to be granted pursuant to this subparagraph is $15,000.

*CERTIFIED TRANSLATION*                      by: Olga M. Alicea, fcci, njitce-s

Art. 43 ("Rules for reentry and hiring of laid off employees") implements a record of eligibility for a term of one year, of laid off employees.   This record must be prepared by ORHELA.[24]

Art. 44 ("Illicit Practices") provides that

> [t]he adoption of any measure authorized (by) Chapter III, either by the FRSB, OMB, the GDB, the ORHELA, the Agencies, their Nominating Authorities, the Governor, or by any of the representatives thereof, will not constitute a violation of the collective bargaining agreements[, or an illicit practice].

Art. 46 ("Public interest and forum to address disputes") establishes the importance of the matters contained in the Law, as they are vested with great public interest.   In turn, it emphasizes the importance of ensure the rights of the affected employees, with respect to the actions to be taken according to the provisions of Chapter III.   In that context, the article provides that CASARH will have jurisdiction to address appeals that arise as a result of the actions or decision made according to Chapter III, in everything that does not conflict with the same, of those employees not covered by the provisions of the Labor Relations for Public Service Act, Law No. 45 of February 25, 1998, as amended (Law No. 45).

CASARH will also have voluntary appellate jurisdiction over employees not organized in a union of those agencies excluded from the application of the provisions of the Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service of 2004 (Law No. 184), with respect to appeals that arise as a result of actions or decision made according to Chapter III, in everything that does not conflict with the latter.   It also provides that the Labor Relations in Public Service Commission (Commission) will maintain jurisdiction to address charges of illicit practice and to render arbitration services, with respect to actions or decisions covered by Law No. 45, as amended, consonant with the provisions of Law No. 7.

Finally, given the possibility of an increase in the number of claims filed with the Commission, and to ensure due process of law and a fair and speedy solution to the proceedings before those organisms, this Art. 46 increases the composition of the Commission to one President and five associate members, and it authorizes the President of the Commission to appoint the arbitrators that may be necessary to carry out the work entrusted by Chapter III of the law.   Likewise, the President of CASARH is authorized to appoint and designate the Hearing Examiners that may be necessary.   Arts. 47 through 67 make up the "Financial Measures" (Chap. IV) and Art. 68 through 72 establish the "Final Provisions" (Chap. V).

**III**

---

[24]  The application of such record occurs in the circumstance that, "[i]f upon implementing Phase II there is a need to fill a vacancy, and this cannot be achieved through transfer, those who appear in the record of eligible and who at the time of their dismissal were performing work equal or similar to the vacant position can be rehired, following therefor the criterion of seniority.   In these cases, these employees will be rehired giving preference to those with the most seniority."   Art. 44(b) of Law No. 7, *supra.*

*CERTIFIED TRANSLATION*                                         by: Olga M. Alicea, fcci, njitce-s

The Bill of Rights of the Constitution of the Commonwealth of Puerto Rico establishes, insofar as is pertinent to us, that

> [n]o person *shall be deprived of his freedom or property without due process of law*, nor will any person in Puerto Rico be denied equal protection under the laws. (Emphasis ours.)[25]

On its part, the Fifth Amendment of the United States Constitution, in pertinent part, indicates: "... nor [shall any person] be deprived of life, liberty, *or property, without due process of law.*" (Emphasis ours.)[26]

In turn, the Fourteenth Amendment of the United States Constitution reads:

> ... nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.[27]

As can be appreciated, both our Constitution and the federal Constitution recognize due process of law as a fundamental right.  Due process of law is manifested in two dimensions: substantive and procedural.[28]  We will analyze both doctrines in the context of the claims outlined by the respondents.

All of the respondents in the consolidated cases herein claim to have, as career public employees, a proprietary interest in their positions.  They are right.  Since *Lupiáñez v. Srio. de Instrucción*, 105 D.P.R. 696 (1977), we recognized that right for the first time, at that time based on a legitimate expectation that a position would become permanent.  One year later, in *Pierson Muller I v. Feijoó*, 106 D.P.R. 838 (1978), we expressly recognized such right to career public employees, as are the respondents herein.  *That proprietary right guarantees, upon being affected by a State Action, the concurrence of due process of law.*[29]

On the other hand, and as indicated by the ever appreciated Prof. Miguel Velázquez Rivera, "the constant jurisprudence of the Supreme Court of the United States and that of Puerto Rico is clear in the sense that the exercise of *proprietary right is not absolute.*  It is subordinated to social interests that are grouped in the concept of *'power or reason of the state' or 'police power.'*"[30]

A.      *Doctrine of Power of Reason of State ("Police Power")*

---

[25]  Art. II, Sec. 7, Const. Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 296.

[26]  See, Fifth Amendment, U.S. Const., L.P.R.A., Tome 1, 2008 Ed., p. 189.

[27]  See, Fourteenth Amendment, U.S. Const., L.P.R.A., Tome 1, 2008 Ed., p. 206.

[28]  *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 273 (1987).

[29]  *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990).

[30]  M. Velázquez Rivera, *Validez legal de la reglamentación por la Legislatura de la importación, venta and posesión en Puerto Rico de perros de la raza Pit Bull*, 63 (No. 1) Rev. Jur. U.P.R. 1, 15 (1994).

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

[A]ll politically organized communities have what we have called police power to safeguard the security, health, and wellbeing of its inhabitants."[31]   Since early last century we have interpreted the implication that this police power entails.  Since then we have also recognized the difficulty involved in a "satisfactory definition" of such concept.[32]   However, and through this opinion, we adopt the following as the definition of "police power," as it is one that specifies the concept practically and simply and in a manner that is very pertinent to the issue at hand:

> That power *inherent to the State that is used by the Legislature* to prohibit or regulate certain activities with the purpose of encouraging or protecting the public peace, morals, health, and *general wellbeing of the community*, which can be delegated to the municipalities.[33]   (Emphasis ours.)

Now then, as Professor Serrano Geyls indicates:

> The [United States Supreme] Court has consequently refused to offer an exact definition *of the de frontiers of the power or regulation* ["police power"].  It has preferred, when faced with constitutional objections to its use, to decide each case according to their facts.  Originally such power comprised the authority to dictate rules to protect the public health, safety, and morals, according to the traditions of "common law." [*Later,*] *the even broader phrase "general wellbeing" was added to it.   It has kept that meaning until now.* (Cites omitted and emphasis ours.)[34]

In that context, we have already ruled that police power is broad.  That is why, when trying to delimit its framework of inherence this must be done according to the circumstances and particular facts of each case.[35]   Among these circumstances, we have acknowledged the precariousness of the economy as a reality that necessarily weighs on the definition of the scope of government action under police power.[36]

Moreover, in the past we have even acknowledged "esthetics" as a sole and valid foundation for the exercise of police power by the Legislature, specifically in the procurement of the general wellbeing.[37]   In fact, since early last century, the United States Supreme Court has recognized that, under this power, and under certain circumstances, the number of people who can occupy a

---

[31] *Bordas & Co. v. Srio. de Agricultura*, 87 D.P.R. 534, 547–548 (1963), citing *Barbier v. Connolly*, 113 U.S. 27, 31 (1885); *Brown v. Maryland*, 12 *Wheaton* 419, 442 (1827); Weaver, *Constitutional Law* (1946), p. 491.

[32] See, *El Pueblo v. López*, 28 D.P.R. 377, 380 (1920).

[33] (Reiterating the criterion stated in the Opinion of the Secretary of Justice No. 1966–40.) Op. Sec. Just. No. 33 of 1984.

[34] R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, p. 923.

[35] *Vélez v. Municipio de Toa Baja*, 109 D.P.R. 369 (1980).

[36] See, *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993).

[37] *Cervecería Corona, Inc. v. Srio. Obras Públicas*, 97 D.P.R. 44 (1969).  This in the context of the power of the Legislature to summarily eliminate signs and billboards installed in violation of the zoning laws and regulations.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

residence and the relationship between them can be limited.[38]   And it is that in the exercise of its police power, the Legislature "enjoys ample authority to approve economic regulations aimed at promoting the wellbeing of the community.   *The only limitation it has is the one provided by the guarantee of due process of law.*"[39]

B.   *Due Process of Substantive Law*

The issue in connection with the constitutionality of Law No. 7, in the context of the layoffs it authorizes, as well as the elimination of certain processes prior to those layoffs – established through Law No. 184 – is one strictly of due process of substantive law.   On the other hand, the absence or inadequacy – if that were the case – of another process that substitutes the one set aside by Law No. 7 is an issue of due process of law in its procedural aspect.   It is convenient, then, to revisit both doctrines, especially the one connected with due process of substantive law and its close relationship with the issue concerning the regulation of the economic rate.

"The term due process of law entails an exclusively procedural connotation.   However, for a long time it has been accepted that a law or government act can violate process of law through its content or consequence, regardless of the process used to apply them."[40]   To understand correctly the concept "substantive procedural law" and its relationship to economic type regulations it is convenient to consider its background in the history of the United States of America.   Professor Serrano Geyls indicates to us the following:

> The years that followed the enactment of the Fourteenth Amendment until 1934 were distinguished by three fundamental developments: ... the accelerated growth of North American capitalism with its sequel of abuses against economically weak individuals and groups;; ... intervention in economic activities, gradually more accentuated, of the governments of the states and then of the federal government to eliminate or reduce those abuses; and... the frequent use by the courts of a constitutional doctrine that extensively limited the power of economic regulation of those governments.

> In the *Slaughter-House Cases*, 83 U.S. 36 (187[2]), the Supreme Court rejected (5–4) the idea... that the citizens' privileges and immunities clause contained in the Fourteenth Amendment includes the rights comprised within the first ten amendments.   This was a Louisiana law that granted a monopoly to slaughter cattle in New Orleans to a corporation.   The plaintiffs also alleged that the law violated due process of law....

> ........

---

[38] *Village of Belle Terre v. Boraas*, 416 U.S. 1 (1974). See, also, *Penna. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922).

[39] *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28, 74 (1993). See, also, *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 80 (1983); *E.L.A. v. Márquez*, 93 D.P.R. 393, 402 (1966).

[40] J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, p. 629.

It was up to Judge Bradley ... to discuss, in his dissenting opinion, due process. He stated that, "the rights to life, liberty, and property are fundamental rights which may only be disposed of through due process of law."

........

That is how the concept of due process of "substantive" law made its appearance, in the jurisprudence of the United States Supreme Court ... as a brake to the economic regulations.  Isolated expressions included in the Court's opinions confirmed the gradual acceptance of the doctrine....

........

Later, in *Holden v. Hardy* ... the validity of a state law that limited to eight hours the work day of employees of mines and foundries was upheld, because it constituted a "reasonable" exercise of the legislative power in view of the unhealthy working conditions that prevailed in the industry ...  Some years later, *Lochner v. New York* entered ... [and] the definitive consecration of due process of substantive law was produced, while there was an intense debate regarding its scopes.

........

From 1905 to 1934 [starting with *Lochner* in 1905], the Supreme Court invalidated some [200] laws of economic regulation, federal and state, based mainly on due process of substantive law.   A lager number was enacted. ...

........

The very serious economic situation that afflicted the United States from 1930-1933 ... the fair claims of the individuals and groups most affected by it, the sympathy of the governments toward those claims and the criticisms within and outside the Court of the applications of substantive due process cause a change in interpretation. *Nebbia v. New York*, 291 U.S. 502 (1934), constituted the first step.

Nebbia, a small shopkeeper [small businessman], was convicted of violating a New York law that authorized fixing minimum and maximum prices of milk.  He alleged that the law violated due process and equal protection guaranteed by the Fourteenth Amendment.  The Court upheld the validity of the law by a vote of 5-4. ...

........

*West Coast Hotel v. Parrish* ... marks the definitive acceptance of a new application of due process of substantive law to economic regulation. The

Supreme Court's jurisprudence up until out times has reaffirmed, in even more emphatic terms, that new position.   (Cites omitted.)[41]

As Professor Serrano Geyls points out, "the definitive consecration of due process of substantive law" comes about with the case of *Lochner v. New York*, 198 U.S. 45 (1905). *Lochner* and its progeny mark a period in which any law that attempted to regulate private property was presumed to be unconstitutional, forcing the State to prove that the law had some type of reasonable relationship with its legitimate purpose.   However, this judicial criterion was not upheld for much time.   The decline of the so-called "*Lochner era*" stated with the case of *Nebbia v. New York*, 291 U.S. 502 (1934).   It is as of that moment that the strict control that *Lochner* imposed on the economic laws began to deteriorate, finding its end after 1937, with the case of *West Coast Hotel Co. v. Parrish*, *supra*.   In *West Cost*, the United States Supreme Court upheld the validity of Washington State law that established a minimum wage for women, thereby revoking the decision in *Adkin v. Children's Hospital*, 261 U.S. 525 (1923), which had declared unconstitutional a law that established exactly the same thing, as it constituted an impairment of contractual obligations.   In fact, since *West Coast Hotel Co. v. Parrish*, *supra*, practically every judicial review in cases having to do with the "Police Power" of the State according to the Fourteenth Amendment of the United States Constitution has been done under the due process of law and the equal protection of the laws clauses.   When a law regulates a right or a freedom that affects the all citizens in general, it is submitted to the scrutiny of due process of substantive law; when the law establishes classifications that regulate the exercise of a specific right or freedom in a different way to different groups or persons, then the scrutiny ("test") of equal protection of the laws is applied.

*Development in Puerto Rico*

With respect to the historical development of the doctrine of due process of substantive law in our Island, we cite much of what was stated by Professor Álvarez González in his recent work:

> The Puerto Rico Supreme Court was confronted for the first time with the application of *Lochner v. New York* ... in *Pueblo v. García & García* .... A company was accused of violating Art. 553 of the Penal Code of 1902 for having had open to the public his provisions establishment at eight fifteen at night.   Both parties filed briefs on the application of *Lochner* to that situation.

---

[41] Serrano Geyls, *op. cit.*, pp. 915–916, 925–926 and 930.   In the case of *Lochner v. New York*, 198 U.S. 45 (1905), the New York Court of Appeals had affirmed the conviction of the plaintiff (Lochner), who had violated a law of that state that prohibited the use of bakers for more than seventy hours a week or ten hours a day.   The United States Supreme Court declared that law unconstitutional when considering that it was unreasonable, unnecessary, and arbitration, and that it interfered with freedom to contract, without the government having a legitimate purpose to regulate working conditions and practices.   This case marked a period of almost thirty years that is known as the "*Lochner era.*"

On the other hand, in *West Coast Hotel Co. v. Parrish, et al.*, 300 U.S. 379, 398 (1937), the United States Supreme Court applied the jurisprudential doctrine established in *Nebbia*, *supra*, and held that: "[if t]he regulations of ... private property ... have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied ... the courts are incompetent to control it if it is adequate and practical ... it may not be annulled unless palpably in excess of legislative power." (Translation ours.)

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

The Court in *García* refused to apply *Lochner*, after differentiating the facts of both cases.   It concluded that the New York statute challenged in *Lochner* established a limit on the number of hours that a worker could work, which Art. 553 established a time limit for closing commercial establishments, six in the evening.   In the Court's opinion, Art. 553 did not imposed a limit on the total work hours a worker could contract, thus the situation was distinguishable from that of *Lochner*.

What is curious about *García* is not so much the manner in which it evaded the application of *Lochner*, rather that the Court gave signs of leaning toward the position opposite to that case, even though in effect it was interpreting the States Constitution, on which the accused entity based its defense.   The Court emphasized its duty to uphold the constitutionality of a law unless it clearly turns out to be the contrary and it was reluctant to scrutinize the legislative interest or purpose:

> "[T]he courts will not investigate with respect to the reasons the legislators may have had in mind when approving such regulations as long as the regulations themselves are not contrary to reason."

> Immediately thereafter, the Court adopted a scrutiny of reasonableness to adjudicate the constitutional validity of the Closing Law.   It held that the fact that a regulation can erect an obstacle to free trade will only provoke its invalidation when no reason whatsoever can be found to justify it.   In the last sentence of its opinion, the Court used a technique that the United States Supreme Court did not come to popularize until after the collapse of the *Lochner* building: to conjecture about the legislative purpose and about the framework of facts that the legislator had before him.

> ........

> However, some years later the Court, which now interpreted the due process of law clause in the Jones Act, felt obligated by the federal jurisprudence and it invalidated a law that authorized the municipalities to create monopolies for the sale of meat, thereby displacing the butchers from the exercise of their occupation, *Pueblo v. Correa* ... and it also invalidated the minimum wage act, *Pueblo v. Laurnaga & Co., Sucs., S en C ....*

In 1937, the same year of the decisions in *West Coast Hotel Co. v. Parish* ... *M. Taboada & Co. v. Rivera Martínez, Comisionado* (1937) came up in Puerto Rico. This case presented a second opportunity for the Court to express itself regarding the type of scrutiny to be used when facing an attack to the constitutional validity of an economic regulatory measure.   In *Taboada*, the Court was asked to invalidate Law 49 of 1935, which regulated the working hours of employees in commercial and industrial establishments.   That was a controversy very similar to the one in *Lochner*, thus, the Court could not evade discussing in depth that case, whose force as a precedent was already in rapid decline in 1937.   The Court summarized the position of the judges in *Lochner* and concluded that the minority postulated the correct principle.   It added that in *Bunting v. Oregon*, (1917), the United States Supreme Court recognized as much implicitly, when refusing to

inquire about the legislative motive of an economic regulation.  That is why, it concluded, *Bunting* revoked *sub silentio Lochner*. ...

........

In 1940, *García v. Municipio de Humacao*, (1940) argued against the validity of the Closing Law, as amended in 1917 and 1925.  Those amendments authorized the municipalities to apply said law to the pharmacies.  The Court reaffirmed *García & García* and expressly upheld that the opinion of Judge Holmes in *Lochner* had become the governing norm.

Since then, the Court has passed lightly over requests to inquire about the legislative motivation and the constitutionality of economic regulatory measures.  In cases such as *Montaner v. Commission Industrial* ... (1940); *Hilton Hotels v. Junta de Salario Mínimo* ... (1953); *A. Roig, Sucr. v. Junta Azucarera* ... (1954), it held that it is not its function to judge the wisdom or political convenience of a law, rather only if it is unreasonable, arbitrary, or capricious, which is the only thing that due process [of law] requires. (Cites omitted.)[42]

As Professor Álvarez González well states, since 1915, in *El Pueblo v. García & García*, 22 D.P.R. 817 (1915), we adopted a scrutiny of reasonableness (rational nexus) in connection with attacks on socioeconomic regulatory measures, according to the due process of law clause in its substantive modality.  This, moreover and as reflected in the case of *El Pueblo v. García & García*, *supra*, even before the United States Supreme Court embraced such criterion.

Since then, and throughout the entire last century, we upheld the validity of multiple socioeconomic regulatory laws supported on the criterion of reasonableness.  Thus, for example, in *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 80 (1983), we held that the Legislature, in the exercise of its police power, has ample authority for economic regulation, subject only to the limitations imposed by the guarantee of due process of law.  We specifically held that "[t]hese limitations only require that the regulation not be unreasonable, arbitrary, or capricious, and that the means chosen have a genuine and substantial relationship to the objective pursued."[43]

Ten years after *Marina Ind., Inc. v. Brown Bovery Corp.*, *supra*, and through the voice of Associate Justice Naveira, we issued two opinions with certain guidelines that must be cited.   In *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28, 74 (1993), we reiterated that due process of substantive law impedes a person from being arbitrarily deprived of an interest of freedom or property.   However, we also held that "*[a] law will not be declared unconstitutional for violating this provision as long as the same has a genuine and substantial relationship to the state interest pursued*" and it meets the requirements of legislative reasonableness and

---

[42] Álvarez González, *op. cit.*, pp. 631–632.

[43] *Marina Ind., Inc. v. Brown Boveri Corp.*, *supra*, p. 80. See, also, *Morales v. Lizarribar*, 100 D.P.R. 717 (1972); *Central San Vicente v. Junta Azucarera*, 78 D.P.R. 799 (1955); *A. Roig, Sucrs. v. Junta Azucarera*, 77 D.P.R. 342, 357 (1954).

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

non-arbitrariness or capriciousness.  There, citing expressly *Morales v. Lizarribar*, 100 D.P.R. 717 (1972), we reiterated that

> [t]he courts when examining a dispute relative to this constitutional guarantee "*shall not enter into considerations regarding the wisdom of the legislative measures, rather they will uphold their constitutionality unless they do not have a legitimate public purpose, or they are clearly arbitrary, or that they do not have a reasonable relationship with the public purpose they pursue.*"   (Emphasis ours.)[44]

As can be seen, the guarantee of due process of law demands that a statute of a socioeconomic nature not be unreasonable, arbitrary, capricious, and that the means chosen have a rational relationship with the interest it pursues.[45]   That is, to determine the constitutionality of an economic law, under the melting pot of due process of substantive law, a scrutiny of reasonableness is applicable.[46]   This analysis is essentially similar to that of equal protection of the laws through the scrutiny of rational nexus.[47]

Finally, in *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 405, 431 (1993), we held that when using the scrutiny of rational nexus, "the court must adopt an *attitude of great deference to the legislative action* that is challenged.   The basis for this norm of deference resides in the constitutional principle of separation of powers." (Emphasis ours.)[48]   For this reason, the statute or regulation, as the case may be, is presumed constitutional and the burden of proof lies on the one questioning its validity.[49]

*In conclusion, it is clear that in connection with claims under the due process of law clause in its substantive modality, and in connection with measures of a socioeconomic nature, this Court has followed, up until now, the guidelines established by the United States Supreme Court of scrutiny or rational nexus; we see no reason why we should department from this now.*

C.   *Due process of law in its procedural aspect*

"Due process of law" is one, but it is one by virtue of its circumstances.   In the procedural aspect and in its literal sense it means "a fair process."   That is why we point out that it is only one, without further acceptations; because it is simply a process from which justice emanates, although not all of us notice justice the same way.

---

[44] *Defendini Collazo et al. v. E.L.A., Cotto, supra,* p. 74.

[45] *Salas v. Municipio de Moca*, 119 D.P.R. 625, 633 (1987); *Morales v. Lizarribar, supra*.

[46] *Defendini Collazo et al. v. E.L.A., Cotto, supra,* p. 74.

[47] *Marina Ind., Inc. v. Brown Boveri Corp., supra*, p. 81. See, also,: *Hermina González v. Srio. del Trabajo*, 107 D.P.R. 667, 673 (1978); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975).

[48] See, also, *Berberena v. Echegoyen*, 128 D.P.R. 864, 881–882 (1991); *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Schweiker v. Wilson*, 450 U.S. 221 (1981); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981).

[49] *Marina Ind., Inc. v. Brown Boveri Corp., supra*, p. 80.

The philosopher and the moralist see justice abstract.   Man, be he an attorney, be he a politician, has tried to identify it with the individual interest of his own class, of his own nation.   For the jurist, justice is a concrete reality.   It is the synthesis of real life.   It is a heterogeneous entity comprised, like man, of opportunity and of morals, that are not excluded, rather are balanced, with reason and usefulness, of past and future, of tradition and renovation, that coexist just as the brake and the motor coexist in the machine.[50]   (Emphasis omitted.)

As we have stated, "[d]ue process of law is one of those elastic formulas of substantial justice that is not susceptible to generic definition.   It is not an invariable norm that can be applied by its own virtuality regardless of the circumstances of the case."[51]

When considering the doctrine of due process of law in its procedural aspect, it is necessary to confirm, in the first place, the existence of an interest of freedom or property protected by this constitutional clause and that this interest is affected by a State Action.   Second, it is necessary to determine the minimum characteristics that the procedure must meet whereby the State purports to negatively affect that constitutionally protected right.

As we have already pointed out, since *Pierson Muller I v. Feijoó*, *supra*, this Court recognized that career employees such as the respondents herein have a clear proprietary interest that, as such, is protected by the Puerto Rican Constitution, as well as the Constitution of the United States of America.   We have also pointed out that such protection is limited in that the proprietary right in question cannot be affected by the State without the respondents being guaranteed due process of law.

As to the proper proceeding or process that must be granted to a career employee when he is deprived of his job, in *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, 133 D.P.R. 881, 888 (1993), we held that, "[d]*epending on the circumstances, different situations can require different types of proceeding, but the general requirement that the government process must be fair and impartial always persists*." (Emphasis ours and in original.)   What follows, following the norm established by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), we establish that

> ... the United States Supreme Court established the three (3) criteria that must be weighed when determine what is due process to deprive an individual of any protected right.   These are: (1) we must determine which are the individual interests affected by the official act; (2) the risk of an erroneous decision that deprives the person of the interest protected through the process used and the probable value of additional or different guarantees, and (3) the government interest protected with the summary action and the possibility of using alternate

---

[50] B. Biondi, *La ciencia del Derecho como arte de lo justo*, 9 Anales de la Academia Matritense 323, 352 (1957), cited by Associate Justice Mr. Negrón García in his concurring opinion in *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703, 748 (1988).

[51] *Santiago v. Jones*, 74 D.P.R. 617, 621–622 (1953).

methods. (Emphasis omitted.) *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, *supra*, p. 888.

Likewise, given the criteria enunciated in *Mathews v. Eldridge*, *supra*, and the subsequent jurisprudence, various requirements have been established which all adversarial proceedings must meet to satisfy the minimum requirements of a procedural due process, to wit:

> (1) adequate notification of the process; (2) process before an impartial judge; (3) opportunity to be heard [; (4) right to cross-examine witnesses and to examine evidence presented against you]; (5) be assisted by counsel, and (6) that the decision be based on the record. *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, *supra*, p. 889.

In *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 (1987), we noted that the final decision must be explained or substantiated.  It is in light of these parameters that we must decide, subject to the circumstances of these particular cases, the claims of the respondents with respect to the procedural aspect of due process of law.

On the other hand, in *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 730–731 (1982) – a case relative to the area of public employment – we held that the factors recognized by the United States Supreme Court in *Mathews v. Eldridge*, *supra*, are the ones that should be considered to determine whether as a minimum requirement of due process of law the public employee is entitled to an informal hearing prior to his dismissal.[52]   In light of such requirements, this Court has held that due process of law, in its procedural modality, guarantees government workers an informal hearing prior to dismissal, when they prove they have a proprietary interest recognized by the State.[53]

## IV

A.   *The state of "fiscal emergency"*

Law No. 7 repeatedly declares a "*state of fiscal emergency*" in Puerto Rico.[54]   This constitutes the first time in history that our Legislature uses the term "state of emergency," in the context of an economic situation throughout the entire Country.[55]   Now then, even before this Court has

---

[52]  See, *Torres Solano v. P.R.T.C.*, *supra*, p. 519 (1990).

[53]  *A.E.E. v. U.T.I.E.R.*, 153 D.P.R. 623, 630 (2001); *Marrero Caratini v. Rodríguez Rodríguez*, 138 D.P.R. 215, 221 (1995); *Torres Solano v. P.R.T.C., supra*.

[54]  In addition to its title, the Special Law Declaring a State of Fiscal Emergency and Establishing an Integral Fiscal Stabilization Plan to Save the Credit of Puerto Rico, Law No. 7, declares the existence of a "state of fiscal emergency" in its Preamble; a "state of economic and fiscal emergency" in Art. 2 ("Declaration of Purpose of Public Policy"), and, again, a "state of fiscal emergency" in Art. 37.04(b) ("Layoffs").

[55]  We could find a type of exception to this assertion in two laws that were enacted in the 1940s, as a result of the world situation caused by the Second World War.  However, none of these laws encompasses the magnitude – both in the areas affected and in their implications – of Law No. 7.

What follows is a very brief summary of the laws in which previously the Legislature has declared "states of emergency."  The Preamble of the Puerto Rico Lands Act, Law No. 26 of April 12, 1941, as amended, consigned for history the fact that the Puerto Rico Legislature declared a State of Emergency by reason of the development of

*Continued...*

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

recognized the possibility that, under *emergency circumstances connected with economic aspects*, the Legislature can make use of its ample powers.[56]  In fact, in the past we have even taken *judicial notice* of the "country's precarious economic situation," and of how such economic situation is reflected, producing a "serious crisis" in the Government's finances.[57]

This declaration of "state of fiscal emergency" that Law No. 7 enunciates is issued as a result, in turn, of the determination of the existence of a "serious fiscal emergency" that justifies – according to the text of the very Law – the use of "police power" on the part of the Legislature. It is then necessary to examine what are the circumstances that motivate the Legislature to declare a state of fiscal emergency, thereby invoking its ample police power and, through it, enacting a measure that affects the proprietary interests of the respondents herein.

B.   *The fiscal situation of the Government of Puerto Rico, in light of the legislation enacted*

To dramatize the difficult situation the Country is facing, Law No. 7 commences its Preamble stating that

---

*Continued...*

the corporate *latifundium* in Puerto Rico at that time.  The action that our Legislature required at that time, and pursuant to the "state of emergency" that it had declared, was the immediate rescue of the lands from the hands of those legal persons (corporations) that monopolized them, and demanding the end of the dominion, possession, or control of the lands by such persons.  Since then, and pursuant to those articles of the Puerto Rico Lands Act (28 L.P.R.A. secs. 268–273), the Lands Authority can expropriate any lands belonging to a corporation with more than 500 acres.

On November 27, 1942, the Puerto Rico Legislature enacted Law No. 16, whose essential purpose, just as it appears stated in its title and in the Preamble, was: to declare the existence in Puerto Rico of a serious state of emergency caused by the Second World Ward.  This law authorized emergency works programs, to give work to the unemployed; it authorized unemployment compensation, assistance, lowering prices, and the planting and distribution of food, among others.

Another pre-Constitution statute in which the Legislature decreed a state of emergency is Law No. 464, enacted on April 25, 1946, known as the Reasonable Rents Act, this too in the context of the Second World War.

Likewise, Arts. 1 through 6 of Law No. 3 of December 16, 1946 (3 L.P.R.A. secs. 487-492) establish a series of measures that also precede the enactment of our Constitution.  Through such articles the Governor, with the advice and approval of the "Council of Secretaries," can determine an emergency in the rendering of public services and declare a "state of emergency" in a "department, dependency, or agency."  According to the text of Sec. 487, this declaration of emergency would be given in the context of abandoning service or threat of abandonment of service, in a concerted act, by a number of officials or employees, either salaries or hourly, of departments, dependencies, or agencies of the Government of Puerto Rico.

Finally, Art. 48 of the Banks Act, Law No. 55 of May 12, 1933, as amended, 7 L.P.R.A. sec. 204(a), provides that in the event of "recessionary periods or of depression that affect to a high degree the economic and monetary structure of the country with its well-known unfavorable effect on the banking industry, the Governor may proclaim a state of emergency and take emergency measures in connection with the banks for the protection of the public and the best interests of Puerto Rico."

[56] *Warner Lambert Co. v. Tribunal Superior,* 101 D.P.R. 378, 396 (1973).  See, also, *Aponte v. Srio. de Hacienda, E.L.A.*, 125 D.P.R. 610, 634 (1990), concurring opinion of Associate Justice Mr. Negrón García.

[57] *Aponte v. Srio. de Hacienda, E.L.A., supra*, p. 625 scholium 11.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

Puerto Rico is undergoing the *most serious fiscal crisis in our history.* [Finding itself in] an economic recession that is in its fourth consecutive year and that is *on the verge of becoming a depression* – the first in Puerto Rico since the 1930s. (Emphasis ours.)[58]

*The reasons for the crisis*

The Preamble of Law No. 7 states that the Government of Puerto Rico faces a recurring structural deficit of approximately $3,200 million, which is equivalent to 42% of the collections estimated for this fiscal year. The Government does not have the recourses to cover its operating expenses.[59]   As of the first semester of 2006, Puerto Rico has suffered three consecutive years of negative economic growth. From July 2007 to June 2009, the Country's economy would have contracted at a rate of 2.6% *per annum,* projecting an economic downturn that will continue during the next fiscal year; it is estimated that the economy will decline by at least an additional 2% in fiscal year 2010.[60]

The problem is that "[c]umulatively, Puerto Rico will have experienced four steady years of recession," which will constitute "an economic depression that basically would annul all growth experienced in the six years from 2000 to 2006."[61]   This situation is aggravated by the fact that, as warned in the Preamble of Law No. 7, as of the first semester of 2006 and until the promulgation of the law, in Puerto Rico there was an overestimation of economic growth, which, in turn, produced an overestimation in collections of the Department of the Treasury's General Fund during that same period.[62]

From fiscal year 2006 to the present, all of the annual budgets overestimated the collections by an average of $919 million *per annum* or approximately 10% of the budget. Cumulatively, during that period of four fiscal years, the Government's annual budgets overestimated the collections in an amount of not less than $3,675 million.[63]   The Preamble warns that the most serious consequence of this pattern of overestimating collections was "the preparation of operating expenses that substantially exceeded collections and that ignored the recessionary condition of our economy."[64]   The Preamble continues stating that

> [a]ccording to the most recent Department of the Treasury projection of collections, the estimated difference between collections and the expense budget for the year 2009 totals $1,888 million, or approximately 20% of the expenditures budget. *During the period of fiscal years 2006 to 2009, the budgeted operating expenses had exceeded collections by not less than $4,637 million.  This amount*

---

[58] Preamble, Law No. 7 of March 9, 2009.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

> *is equivalent to more than half the average annual revenues during the last four fiscal years.* (Emphasis ours.)[65]

The seriousness of this gap between collections and budgeted expenses is compounded when considering the Government's current expenses. From fiscal year 2006 to 2009, the Government incurred expenses that exceeded by $5,817 million the recurring collections."[66] Finally, the net result is

> ... a total gap between the Government's revenues and its recurring expenses and the *relationship of a structural deficit that for the fiscal year in course approximates $3,200 million and that is projected to continue above $3,000 million annually for the next fiscal years if immediate steps are not taken to stabilize our fiscal situation and develop our economy.* (Emphasis ours.)

*Consequences of the crisis*

In 2004, Puerto Rico's general obligations were classified at the level of Baa1/A- by the credit rating firms of Moody's and Standard & Poor's.[67] While the Government's fiscal and economic situation has been worsening, the credit classification has been dropping. In 2005, both credit rating firms degraded the credit to Baa2/BBB; in 2006, Moody's lowered the classification to Baa3, followed by Standard & Poor's to BBB in 2007. *At present, our classification is at Baa3/BBB-, one step from falling to junk level and losing our investment grade.*[68]

According to the Preamble of Law No. 7, *"the degrading of our credit to 'junk' would be catastrophic for Puerto Rico."* (Emphasis ours.)[69] All of the individual retirement accounts, the retirement plans, both public and private, and the savings and investment accounts that are invested in Government bonds would be seriously affected, by being strongly devalued.[70] This devaluation would be accompanied by the immediate need for the holders of these obligations to have to provide additional collateral to guarantee their obligations to their creditors.[71]

In the Government's case, the G.D.B.'s estimate is that the Government would have to put, immediately, more than $900 million in collateral. On the other hand, all of the individuals, enterprises, and other entities that have loans or other credit facilities guaranteed by Government of Puerto Rico bonds would have to post additional collateral to compensate for the loss in value of such bonds. The G.D.B. estimates that these additional collateral requirements might total up

---

[65] *Id.*

[66] *Id.*

[67] Moody's and Standard & Poor's are two of the three most important companies in the world, engaged in the periodic publication of financial analyses that fix the solvency position of stocks and bonds, in their corresponding markets.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

*CERTIFIED TRANSLATION*                              BY: OLGA M. ALICEA, FCCI, NJITCE-S

to $1,680 million.  In total, the Government, individuals, enterprises, and other entities would have to put up approximately $2,580 million in additional collateral as a result of the degrading.[72]   The confluence of these and other adverse effects that are mentioned in the Preamble

> ... would worsen our economic recession and *would result in the loss*, according to econometric models of the Planning Board, *of approximately 130,000 jobs* for an additional impact on our economy of approximately $3,250 million. *The total impact of the degrading to "junk" would be catastrophic. According to previous estimated, the total impact would not be less than $10,000 million*; this would be equivalent to approximately 17% of the Gross National product of Puerto Rico or 1.3 times the Government's projected collections for the current fiscal year. (Emphasis ours.)[73]

To conclude, with respect to the effects of this devaluation, and the consequences it would bring to the Island, the Preamble mentions that "*the degrading would take Puerto Rico to a deep economic depression never before seen in our history*," whose impact "*would be unimaginable*." (Emphasis ours.)[74]   It adds that

> [t]here would be an abrupt reduction in collections and an impossibility to resort to financing to supply budgetary insufficiencies.  The Government's operating deficit would rise to proportions never before seen [and] ... *simply it would not have the resources to continue operating: it could not pay the salaries of all of its employees; it could not meet the obligations incurred* with all of its service and materials providers; *it could not provide all of the services and benefits ... to the citizens*; and it would be at risk of defaulting on its obligations with the bondholders.  The Government would have to drastically reduce its operations, , ... it would have to temporarily or permanently close some of its dependencies; and it would have to concentrate its limited resources on those minimum essential services that the citizens need most.
>
> *This scenario would post a manifest risk to the health, safety, and wellbeing of the People of Puerto Rico.* (Emphasis ours.)[75]

*The alternatives given the crisis*

The Preamble of Law No. 7 warns of an absence of easy solutions, indicating that the Governor of Puerto Rico has taken immediate steps to control expenses, including: freezing vacant positions; prohibiting the creation of new positions; eliminating 30% of the positions of trust in the agencies; reducing operating expenses equivalent to 10% of half of the operating expenses

---

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

budgeted for fiscal year 2008-2009; prohibiting the use of credit cards; limiting the use of official vehicles; and prohibiting the use of public funds to pay expenses connected with the use of cellphones, among other measures.[76]

Now then, the Preamble adds that "a structural deficit of [the magnitude such as the one the Island faces] cannot be eliminated only by reducing expenses or only with tax measures."[77] It also states the following:

> The tax measures necessary to close a gap of $3,200 million *would drown the citizens and sink Puerto Rico into a catastrophic depression.* It would require a total increase in taxes of not less than 42% ($3,200 million in addition to the projected collections of $7,400 million) to be able to raise this amount of money. *It would require drastic increases in the Sales and Use Tax ("IVU" by its Spanish acronym) rates, the income tax rates, and the excise taxes on automobiles, gasoline, oil, and other articles.* Imposing burdens of this magnitude no a recessionary economy would be devastating for Puerto Rico. (Emphasis ours.)[78]

On the other hand, covering this structural deficit only with reductions in government spending could have a devastating effect on the Government's operation, services to the citizens, and the economy in general.[79]   It indicates that

> [a]s an example, *a reduction of $3,200 million would require laying off approximately 110,000 employees of the Central Government (estimating a cost of $30,000 per employee). In a Central Government of approximately 190,000 employees, this reduction would represent 58% of the government's personnel.* This type of action would convert the Government into inoperative and would seriously affect services to the citizens, placing at risk the health and safety of our People.   *Our Government would be practically incapable of helping this large number of laid off employees, added to a recession that certainly would become worse by such action, nor could all of these employees be absorbed in other sectors.*   (Emphasis ours.)

In addition, the Preamble of Law No. 7 clearly explains that *a general reduction in working hours, as a viable alternative for reducing the structural deficit and maintaining the Government's operations, is not possible for two reasons.*[80]   In the first place, the magnitude of the reduction in working hours on all of the public employees that would be needed to obtain the necessary cuts would require a reduction of approximately 2 to 3 days a week.   *This would be equivalent to a reduction of 40% to 60% in the salaries of all public employees.*[81]   In addition to

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

*CERTIFIED TRANSLATION*                          BY: OLGA M. ALICEA, FCCI, NJITCE-S

greatly impacting the income of these employees and creating a general uneasiness inside and outside of the Government, "*[a] reduction in working hours from 2 to 3 days per week would leave the Government practically inoperative.*"  (Emphasis ours.)[82]

Second, even if we were to consider some combination of a transition of a lesser number of employees with a reduction in general working hours for the remaining employees who do not render essential services, the reduction in working hours would have to be considerable to achieve the necessary savings.  This reduction would have to be of at least 20% of the salary or one day a week, and *it would have to be indefinite.*  That is, the reduction in working hours would last a minimum of three fiscal years, and it may be more depending on the recessionary condition of Puerto Rico's economy.[83]

*The solution implemented by the Legislature*

Given the economic and fiscal situation that the Country is facing, the Legislature decided that the way to close the structural deficit is to create a balance between control measures and a reduction in spending and revenue measures.  In that sense, a plan was established whereby not more than 40% of the estimated structural deficit of $3,200 million should be covered with new revenues measures or improved monitoring and financial measures.[84]  As to the remaining 60% of this plan, the Preamble of Law No. 7 indicates the following:

> After implementing the tax measures, the remaining 60% of the structural deficit, approximately $2,000 million, must be addressed through control and a reduction in spending.  Approximately 27% of the government's expenses budget is committed to the Government's debt service ....  The remainder, approximately 73%, is the expense base subject to discretionary control.  [That is, ] ... (a) operating expenses that do not constitute payroll, and (b) payroll operating expenses.  *In the budget for fiscal year 2009, the proportion between these two items is 33% in operating expenses that do not constitute payroll, $2,700 million, and 67% in payroll operating expenses, $4,700 million.*
>
> In view of this distribution of expenses, it is practically impossible to achieve the necessary reduction without affecting the government's payroll.  If the savings were to be captured only in operating expenses (that do not include payroll) and assuming that these expenses come to $2,700 million ... we would have to cut approximately 74% of these expenses.  At this time, this is impossibility.  It is unfortunate, but necessary, to contemplate a substantial reduction in the government's payroll.  (Emphasis ours.)[85]

**V**

---

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

As we have already pointed out, a law of a socioeconomic nature – as is Law No. 7  requires that when evaluating its constitutionality in light of the due process of law clause in its substantive aspect we apply a rational scrutiny.   This scrutiny implies, in the first place, the need to evaluate whether the *action of the State*, in this case Law No. 7 – as a law that affects proprietary rights protected by the Constitution – *bears a genuine and substantial relationship to the state interest pursued.*   In other words, whether a nexus exists, a connection between what is done and what is intended, and whether such action is somehow significant.   Second, we must discern whether that genuine and substantial nexus is also *reasonable, and therefore, not arbitrary or capricious.*

*Genuine and substantial relationship with the interest pursued*

Law No. 7 is very clear in connection with the interest it pursues.   Its declaration of purpose in Art. 2 establishes as much:[86]

> ... the *urgent* need *to establish an integrated and coherent fiscal stabilization plan, the elimination of the structural deficit, the amortization of the public debt, the restoration of the fiscal health, and the bases for the Government to be able to promote the economic development of Puerto Ric*o.   (Emphasis ours.)

As is evident from Art. 2 of Law No. 7, the State's interest in promulgating such law is not only legitimate but is pressing.   Thus, although the interest that the State is required to demonstrate under rational scrutiny is a legitimate one, according to Law No. 7 it shows itself to be a pressing interest.

In the instant cases, the actions on the part of the State that we must submit to rational scrutiny are the layoffs of the respondents, as well as the elimination of certain processes prior to such layoffs, established through Law No. 184, this pursuant to Law No. 7.   *We hold that in this case there is a clear genuine and substantial relationship between the action of the State and the interest it pursues.*

Respondents' layoffs, together with the layoffs of the other thousands of employees, although unfortunate, will cause, without a doubt, a *genuine and substantial savings* in the government's coffers.[87]   On the other hand, the elimination by Law No. 7 of all of the processes prior to a layoff established in Law No. 184 respond to the need that the purpose of the law be achieved *urgently.*   As stated in Art. 37.04(b)(1) of the very Law, there is an *urgency* in correcting the fiscal problems that we face.   The process of layoffs established by Law No. 184 is one based on the principle of merits, which is incompatible with the purpose of Art. 2 of Law No. 7.[88] This process would entail that, before decreeing a layoff, all of the resources available and within

---

[86] See, also, Art. 33(g) of Law No. 7, which establishes that the objective thereof is the establishment of an emergency plan aimed at reducing by $2,000 million the operating expenses and the payroll payable from the General Fund for fiscal year 2009-2010.

[87] As respondents themselves estimate in their brief, the government would save $510 million annually with the dismissals announced.   See, Respondent's Brief, p. 12.

[88] See, Art. 2, Sec. 2.1 of Law No. 184 (3 L.P.R.A. sec. 1461 n.).

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

reach of the agency would have to be exhausted.[89]   This would deprive the Government of the agility it needs to achieve its goals, urgently.

In addition, the law in question presents a fiscal picture of a Government that is on the verge of chaos.   This conclusion is not based on mere unfounded speculations, rather on authorized sources, such as: the Planning Board, the G.D.B., and the 2008 Transition Reports, of Government of Puerto Rico Budgets, of the OMB, and of the Department of the Treasury.   Such situation, we conclude, justifies the *state of fiscal emergency declared by the Legislature and, therefore, the need to use procedures that genuinely respond to such urgency.*   Without a doubt, there is a genuine and substantial relationship between the elimination of those proceeding and the interest or goal sought by the State.

*The reasonableness of the State's action*

Having determined the existence of a genuine and substantial relationship between the State's action and the interest it pursues, it is up to us to establish whether such action is reasonable. We have already determined that the Government's fiscal situation and the consequences of not achieving the objective established for the Country's economy justify the state of fiscal emergency declared by the Legislature.   Now then, given that state of fiscal emergency, is the action of the Legislature justified?   Is the manner in which it has intended to resolve such emergency reasonable?   The answer is in the affirmative.

In *Bayrón Toro v. Serra*, 119 D.P.R. 605, 623 (1987), we recognized that given a serious fiscal crisis, the State must have the capacity and the flexibility to make reasonable changes and amendments that are necessary to advance its interests; of course, as long as these are legitimate. *Given the picture that the very law presents, and our obligation to adopt an attitude of great deference toward legislative action, we must conclude that the State acted reasonably.*   As is clearly explained in the Preamble:

> All of the alternatives typically used as steps prior to a reduction in personnel
> [that is] transfers, relocations, retrainings, unpaid leaves, and *reduction in working
> hours*, among others are not viable within the context of the magnitude of the
> Government's structural deficit and the precariousness of the situation.   *It is
> necessary to drastically and expeditiously reduce government spending.   In view
> of the size of the payroll and of the size of the deficit, none of the other
> alternatives is compatible with this objective or is viable given their impact on the
> Government's operation.*   The transfers, relocations, and retrainings merely
> transfer the employee and, consequently, the expenses from one side to another.
> *A general reduction in working hours and much less unpaid leaves, are not viable*

---

[89] The mentioned process would include actions such as: relocating personnel in positions of equal or similar classification in departments, offices, or programs where there is a need for personnel; retraining the employee to relocated him in another position, when this can be done reasonable before the deadline to decree such layoffs; enjoying accrued vacations; unpaid leave until the budgetary crisis ceases, when the agency makes the decision due to temporary budgetary insufficiency that does not require the permanent elimination of the position.   In those cases, one must observe the order of preference previously established in the method of decreeing layoffs, reduction in working hours, and demoting employees as a last recourse to avoid layoffs.

*alternatives since they would have to be of such magnitude and duration that they would seriously impact the governability of the Executive Branch.* (Emphasis ours.)[90]

On the other hand, and as is also explained in the Preamble of the law, *establishing tax measures only is not a viable alternative either.*   So that the Legislature, as elected officials and legitimate representatives of the People of Puerto Rico, decided that the imposition on the taxpayer of the collections necessary to close the $3,200 million gap in the deficit would drown the citizens and sink Puerto Rico into a catastrophic depression.   Without a doubt, it is not up to us to intervene with such decision.

We conclude, then, that the Government's action in promulgating Law No. 7, in the context of the layoffs it authorizes and promotes, as well as the elimination of certain processes prior to such layoffs, constitutes a reasonable act aimed at saving the solvency of the treasury, given the circumstances the Country is experiencing.

*Since, given a legal analysis of rational scrutiny, the action of the Legislature is clearly sustained, we resolve that Law No. 7, in the context of the layoffs that it authorizes and promotes, as well as the elimination of certain processes prior to such layoffs, does not violate due process of substantive law.*

## VI

Having resolved the substantive procedural aspect, it is up to us to analyze whether the layoffs announced violate due process of law in its procedural aspect.   We must determine, then, whether Law No. 7, within the circumstances that have been described, provides the parties an "opportunity to be heard," that is, a fair process.   In addition, we must determine whether, contrary to what is outlined, Law No. 7 grants the employees to be laid off a prior informal hearing before being laid off.

As we have advised, the layoffs that Law No. 7 authorizes are governed *solely and exclusively by the criterion of seniority*.[91]   It should be noted that the procedure that the law establishes is quite similar to the one established in Law No. 184 for this type of dismissal.   Sec. 6.6(9)(a) of Law No. 184,[92] in pertinent part, provides the following:

> *In order to determine seniority, all service rendered in positions of the agencies comprised within the System will be considered.   The appointing authority of each agency will notify in writing all employees who have been laid off at least thirty (30) days in advance of the date on which he/she will laid off.   No employee layoffs will be effective unless the notification requirement has been met.*   (Emphasis ours.)

---

[90] See, Preamble Law No. 7.

[91] See, Art. 37.04(b)(3) of Law No. 7.

[92] 3 L.P.R.A. sec. 1462e(9)(a).

*CERTIFIED TRANSLATION*                                        by: Olga M. Alicea, fcci, njitce-s

From a reading of the pertinent provisions in both statutes we can conclude, in the first place, that both require, to determine seniority, considering all service rendered in public service by the affected employees.[93]   In addition, both laws require that the appointing authority of each agency notify in writing all employees who will be laid off.[94]   Both laws require that the layoff notification be done not less than thirty days in advance.[95]

Moreover, both statutes grant the employees an opportunity to question the decisions, not only before the very agency, but before CASARH or before the Commission created under Art. 11 of Law No. 45 (3 L.P.R.A. sec. 1452f).   *In other words, Law No. 7 contains the procedures that govern according to Law No. 184, and it adapts them in order to expedite the process to decree layoffs through a more agile mechanism.*

On the other hand, Law No. 7 grants the employee, even before being finally notified of his layoff, that he question the certification of seniority issued by the agency, granting him thirty days to present evidence that refutes it.[96]   Also and in the event that the employee presents such evidence within the time granted, the agency will be required to hold a hearing where the latter can be heard.[97]

In the event that his layoff is finally decided, Arts. 37.04(b)(12), 37.04(b)(13), and 37.04(b)(14) of Law No. 7 establish that the employee will have to be notified personally or by certified mail, and if he belongs to a union, the union must also be notified.   In addition, such notification must advise that the person laid off has thirty days to appeal on review to CASARH or to the Appellate Commission created under Law No. 45, *supra*, as the case may be.[98]

*In evaluating the layoffs procedure established by Law No. 7 given the criteria established in Rivera Rodríguez & Co. v. Lee Stowell, supra, it is clear that the latter surpasses the expected requirements.*   Note that the layoffs under this statute occur pursuant to the criterion of seniority only, thus, a review of the Agency's decision would occur, as Art. 37.04(b)(13) of Law No. 7 indicates, only with respect to such criterion.   That redounds in that the dispute, as meritorious as it may be, will always be relatively simple: if the employee has evidence of the years worked.

In the cases before our consideration, the respondents were notified of their layoffs, in writing, and much before the thirty days required by Law No. 7, as set forth in Art. 37.04(b)(15).   Noting in the files of this case indicates that those letters were not notified in accordance with Art. 37.04(b)(12) of the laws, that is, personally or by certified mail.   The layoff letters clearly

---

[93]  See, Art. 37.04(b)(4) of Law No. 7.

[94]  See, Art. 37.04(b)(15) of Law No. 7.

[95]  *Id.*

[96]  See, Art. 37.04(b)(9).

[97]  See, Art. 37.04(b)(11).

[98]  In fact, Art. 46 of Law No. 7, pursuant to the fact that the persons laid off have the opportunity to achieve a speedy and fair solution to their claims before CASARH or the Commission created under Law No. 45, increases the number of members to one President and five associate members in the case of CASARH and it authorizes the President of the Commission to appoint the arbitrators deemed necessary to carry out the work entrusted by Chap. III of Law No. 7.

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

indicated the reason for their dismissals and their right to request review of the agency's decision before CASARH or before the Commission, within the term of thirty days, counted as of receipt of the letter.   Without a doubt, the respondents had adequate notification.

On the other hand, Law No. 7 provides for a competent and impartial mechanism to address their claims and to weigh the evidence that they can present, in the event that they decide to ultimately appeal the agency's decision.   So that it is clear that Law No. 7 guarantees respondents herein a genuine and fair opportunity to be heard.

It is clear, then, that given the circumstances, the process established by Chapter III of Law No. 7 is one that surpasses the minimum required by the jurisprudential norm with respect to due process of law in its procedural aspect.   Therefore, *in evaluating the layoffs procedure established by Law No. 7 in light of the criteria set forth in Rivera Rodríguez & Co. v. Lee Stowell, it is clear that the same surpasses the requirements expected.*

On the other hand, and as we advanced, both in appeals CT-2009-4 and CT-2009-5, and in CT-2009-9, the respondents have argued that the State violated their due process of law by not granting them an informal hearing prior to the layoffs.   They are wrong.   Law No. 7 clearly grants the public employee laid off under said law the opportunity of a hearing prior to announcing his layoff, *if he requests it.*

As we have stated, the layoffs authorized by Law No. 7 occur solely and exclusively under the framework or criterion of the public employee's seniority.   In that context, once the F.R.S.B. provided the global number of employees to be paid off – Art. 37.04(b)(7) – Art. 37.04(b)(8) provides that each agency will notify both the F.R.S.B. and *the employee himself* – and the union organization, if that were the case – "his date of seniority as is evident from his records ... advising him of the right he has ... to state ... in writing his version with respect to his date of seniority."[99]   Art. 37.04(b)(9) provides that the employee will have a period of thirty days, counted as of the date of notification by the agency of his date of seniority as appears in his record, to "present in writing ... documentary evidence ... that refutes the seniority that has been certified to him."[100]

If the employee does not present the documentary evidence required to refute the agency's certification within the time provided, "the seniority to be used will be that which was notified to him by the agency," which seniority will then be conclusive for purposes of Chapter III of Law No. 7.   *A contrario sensu,*

> [i]n the event that the affected employee *presents, within the term provided herein, verifiable documentary evidence that controverts the seniority that has been notified to him, the Agency will not make a final decision regarding the seniority without first giving him the opportunity to have a prior hearing.* (Emphasis ours.)   Art. 37.04(b)(11).

---

[99] See, Art. 37.04(b)(8).

[100] See, Art. 37.04(b)(9).

*CERTIFIED TRANSLATION*                                      by: Olga M. Alicea, fcci, njitce-s

Nothing in the records of the instant cases shows that any of the respondents had not been certified their seniority and they had been denied the opportunity to refute it at a hearing prior to the announcement of their layoffs, had they requested it.   Therefore, it is clear that they are also wrong on this point.

## VII

*Vested rights*

In their brief, the respondents in case CT-2009-4 argue that "[A]rt. 3 of the Puerto Rico Civil Code ... provides that, '[t]he laws will not have a retroactive effect, if they do not expressly provide the contrary, and, in any event, the retroactive effect of a law can be prejudicial to vested rights under a prior law,' as set forth in the doctrine of vested rights."[101]    In that context, they indicated that the application of Law No. 7 eliminates labor rights guaranteed through protective labor legislation that was in effect prior to the enactment of said law, therefore it violates the principle of the retroactive application of laws, as is the right to retention and the proprietary right over one's job guaranteed in the Constitution.[102]   Specifically, the respondents argue that:

> The proprietary right that the public employee has over his job cannot [sic] be eliminated unless he has an active and conscious participation in the method to be used for the elimination of such right.  Our highest forum has held that no new law promulgated by the legislature can have [sic] set aside and de facto repeal provisions that were in effect before the same enters into effect and that results in eliminating vested rights.[103]

In addition, citing what was recently decided by this Curia in *Hernández, Romero v. Pol. de P.R.*, 177 D.P.R. 121, 146 (2009), and in connection with vested rights, the respondents indicate that "nor can the Legislature when promulgating a new law, nor the Governor through executive order, can harm or ignore them."[104]

These arguments clearly depart from the premise that the respondents have a vested right. However, and as we also pointed out in *Hernández, Romero v. Pol. de P.R.*, *supra*, "the protected vested rights can be conceived as a suitable fact, when produced pursuant to *a law in effect at the time when the act has been performed*, and that they have been incorporated to a person.'" (Emphasis ours.)[105]   That is not the case with career employees in public service.

Undoubtedly, a vested right, as a sequel to a proprietary right, is covered by the protection that Sec. 7 of our Bill of Rights provides.  *However, not all rights or proprietary interests are in turn*

---

[101]  See, Brief of the respondents in case CT-2009-4, p. 27.

[102]  *Id.* In connection with the immunity for non-retroactivity that vested rights have and the is provided in Art. 3 of the Civil Code, *supra*, we will not express ourselves as it is not necessary.

[103]  *Id.*

[104]  *Id.*

[105]  *Hernández, Romero v. Pol. de P.R.*, 177 D.P.R. 121, 147 (2009), citing *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101 (2006). See, also, *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984).

*CERTIFIED TRANSLATION*                                          by: Olga M. Alicea, fcci, njitce-s

*a vested right.*[106]   Similarly, "not all legal situations that arise under a prior law are a vested right covered by the principle of non-retroactivity versus another subsequent law."[107]

As Noguera Barreneche states, a vested right implies

> ... the conjunction of *an existing legal norm* (abstract situation of law) and the execution of a fact provided thereby (concrete situation); but that, by reason of the importance of the right from the point of view of social interest, *it has received a durable life from the law that generated it*." (Emphasis ours.)[108]

Similarly, in *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101, 109 (2006), we held that "[t]he vested right ... is a consummated situation, in which the affected parties relied on the state of law that governed *under the previous law*." (Emphasis ours.)

As we have stated, an employee in public service has a recognized interest in retaining his job, if such interest is protected by law or when the circumstances create an expectation of continuity. The presence of those factors is what determines the existence of a proprietary interest.[109] Similarly, a public employee has a clear interest in retaining his job, as long as such interest is protected by a law, as in the case of a career employee, or when the circumstances create a reasonable expectation of continuity.[110]

*However, no law at this moment acknowledges a public employee's right to retention without limitations, or a right to not be laid off.*   On the contrary, all of the laws concerning this issue acknowledge as a reality the possibility that the public employee will not be retained or will be laid off from his position, if certain conditions occur and certain processes are met.[111]   In that sense, there is no need to talk about an employee in public service's vested right to retention or to not be laid off, since the element of the *protection of a prior law* that would have granted such right is absent.

## VIII

*Equal protection of the laws*

A.      Sec. 7 of Art. ii of the Constitution of the Commonwealth of Puerto Rico consecrates the right to equal protection of the law.   In pertinent part, it provides that "[n]o one shall be

---

[106] *Vélez v. Srio. de Justicia, supra.*

[107] *Asoc. Maestros v. Depto. Educación*, 171 D.P.R. 640, 665 (2007), dissenting opinion of Associates Justice Mrs. Fiol Matta.

[108] R. Noguera Barreneche, *De la no retroactividad de las leyes civiles*, 3rd Ed., Bogotá, Fondo de Publicacions Institución Universitaria Sergio Arboleda, 1995, pp. 73–74.

[109] *Pierson Muller I v. Feijoó, supra*.   See, also, *Perry v. Sinderman*, 408 U.S. 593 (1972); *Board of Regents v. Roth*, 408 U.S. 564 (1972).

[110] *Lebrón Bonilla v. E.L.A.*, 155 D.P.R. 475 (2001); *Orta v. Padilla Ayala*, 131 D.P.R. 227, 241 (1992); *Torres Solano v. P.R.T.C., supra*.

[111] See, Law No. 184 of August 3, 2004, as amended.

*CERTIFIED TRANSLATION*                                              by: Olga M. Alicea, fcci, njitce-s

deprived of his freedom or property without due process of law, *nor shall anyone in Puerto Rico de denied equal protection of the laws*." (Emphasis ours.)[112]

*Equal protection of the laws* is based on the cardinal principle of similar treatment for persons similarly situated.[113]   This means that the government can make classifications among the people for any legitimate purposes as long as it observes that basic norm.[114]   "The basis of this precept stems from the basic concept that to govern such a complex and varied society, in which there are different individual and group interests, and diverse social relations, it is necessary to establish classifications."[115]   That is, governing any society and especially a modern society without instituting classifications among people, without building inequalities that favor some and harm others, is impossible.[116]

As a corollary of the foregoing, we have held that the constitutional principle of *equal protection of the laws* does not require that equal treatment always be given to all of the citizens rather that it prohibits unequal and unjustified treatment.[117]   The State can make classifications among the people without violating the well-known principle as long as the classification is reasonable and with a view toward attaining or protecting a legitimate public interest.[118]   That is, the inequality that infringes the Constitution is the one that reflects a preference based on prejudice, not the one that relies on a public interest.[119]

Hence, the main problem that the application of equal protection of the laws argues is that of designing norms that allow the government to establish classifications, but that at the same time protect the people against undue, unreasonable, and odious inequalities.[120]   That is why, carrying out such task requires analyzing the relationship between the purpose one wishes to achieve and the means or classification that is used to achieve it; also, one must examine the effect that such relationship has on the right or interest of which the persons affected will be deprived.[121]

This Forum has reiterated that under equal protection of the laws, when a court in Puerto Rico faces a constitutional analysis regarding the reasonableness of a legislative classification, the

---

[112]  Art. II, Sec. 7, Const. Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 296.

[113]  Serrano Geyls, *op. cit.*, p. 1082.

[114]  *Id.*

[115]  *López v. E.L.A.*, 165 D.P.R. 280, 297 (2005).

[116]  *Id.*

[117]  *Alicea v. Córdova*, 117 D.P.R. 676, 696 (1986); *Pueblo v. Matías Castro*, 90 D.P.R. 528, 531 (1964).

[118]  *Zachry International v. Tribunal Superior, supra*, p. 277.

[119]  *Vda. de Miranda v. Srio. de Hacienda*, 114 D.P.R. 11, 14 (1983).

[120]  Serrano Geyls, *op. cit.*, p. 1081.

[121]  *Id.*

*CERTIFIED TRANSLATION*                                        by: Olga M. Alicea, fcci, njitce-s

criterion or scrutiny that it is to use must be the minimum traditional scrutiny or rational nexus or strict scrutiny.[122]

As we indicated, rational scrutiny is used in cases where an economic and social type of regulation is challenged.  When applying it, the constitutionality of the classification is presumed.[123]  In addition, the court must adopt an attitude of great deference toward the legislative action that is challenged.  Even if the classification does not appear to be the most suitable, adequate, wise, and efficient for advancing the legislative purpose, the court must maintain its constitutionality once it is proven that a rational relationship exists between it and the purpose outlined.  Judicial intervention should be very limited.[124]

Regarding this analysis, we have stated that pursuant to the axiom of separation of powers, it is the Legislature and not the Judiciary which has the authority to design the classifications of a socioeconomic nature.[125]  Consequently, the court cannot adjudicate to itself the authorities of the legislature when examining the constitutionality of a statute according to the guarantee of equal protection of the laws.[126]

According to this scrutiny, it is up to the party that submits the unconstitutionality of the classification to prove that no rational nexus whatsoever exists between the classification challenged and a legitimate interest of the State.  *San Miguel Lorenzana v. E.L.A.*, *supra*.  The court will only declare the classification unconstitutional if it discriminates arbitrarily and irrationally.[127]  Arbitrary and irrational discrimination exists when the difference that the classification establishes is totally irrelevant to the purpose intended to be achieved thereby.[128]

As can be seen, the enunciation regarding the standard of adjudication of minimum rationality under this clause is very similar to that of due process of law in the matter of economic regulations.  The difference consists in that according to equal protection of the laws what is judged is the reasonableness of the discriminatory classification, in light of the objective or purposes one wishes to achieve, in that pursuant to due process of law the question is whether the government's measure, regardless of whether it contains any classification, is reasonable given its purpose.[129]

On its part, strict scrutiny is used to analyze classifications that are suspect or when the classification affects a fundamental right.  *San Miguel Lorenzana v. E.L.A.*, *supra*, p. 425.  Suspect classifications are those that are established by reason of race, color, sex, birth, social

---

[122] *López v. E.L.A.*, *supra*, p. 298; *Vélez v. Srio. de Justicia*, *supra*, p. 537; *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980).

[123] *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562, 582 (1992).

[124] San Miguel Lorenzana v. E.L.A., supra, pp. 431–432.

[125] *Id.*, p. 432.

[126] *Id.*

[127] *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 83 (1988).

[128] *San Miguel Lorenzana v. E.L.A., supra*, p. 433.

[129] Álvarez González, *op. cit.*, p. 826.

*CERTIFIED TRANSLATION*                                   by: Olga M. Alicea, fcci, njitce-s

origin or condition, political or religious ideas, or nationality.[130]   As to the fundamental rights, the right to vote, freedom of religion, freedom of speech, to life, protection of law against abusive attacks to one's honor, and the right to privacy.[131]

Under the protection of this scrutiny, the unconstitutionality of the challenged provisions is presumed.[132]   The State has the burden of proof to show that the classification responds to a pressing state interest and that the same is necessary to promote such interest, that is, that there is no less onerous means to advance or achieve such interest.[133]

Having considered all of the foregoing, we proceed to resolve the issue presented on this matter in case CT-2009-06.

B      In case CT-2009-06, the appellee alleges that Law No. 7 creates certain suspect classifications among public employees without a rational justification therefor because it exempts from its application the employees of the judiciary and the legislative branch.   It is wrong.

As we have already mentioned, in Puerto Rico suspect classifications are expressly listed in Sec. 1 of Art. II of our Constitution, Tome 1, L.P.R.A.   That is, they must be classifications by reason of race, color, sex, birth, social origin or condition, political ideas, religious ideas, or nationality.   Prima facie, the classification that the respondent alleges is not based on any of the prohibitions comprised in the aforementioned section.   Therefore, we are not confronted with a suspect classification.   Now then, we must determine whether the classification challenged dodges some fundamental right of the respondent.   Specifically, the right to work.

The respondent notes and insists that the right to work is a fundamental right and that the same was violated with the State's decision to lay him off.   It is true and undisputed that the employees affected by Law No. 7 have the right to work and that such right is a very important one in our society and jurisdiction.   We recognized this in *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414, 421 (1985), when we held that:

> The right to a job, that is, to earn income and to have a fair and decent life, is a principle inalienable to man, pre-existing the oldest of the known constitutions. The uncertain destiny of the frustrated Sec. 20 of our Constitution beats among those rights that although not expressly mentioned in the text, the people reserve before the political power created.[134]

Certainly, such expressions show that need to pay careful attention to those situations in which a person's job and his basic needs are at stake.   However, this does not connote, *per se,* that we

---

[130]   *Defendini Collazo et al. v. E.L.A.*, *supra*, p. 61; Art. II, Sec. 1, Const. of the Comm. of P.R., L.P.R.A., Tome 1

[131]   *San Miguel Lorenzana v. E.L.A.*, *supra*, p. 425.

[132]   *Soto v. Adm. Inst. Juveniles*, 148 D.P.R. 810, 831 (1999); *San Miguel Lorenzana v. E.L.A.*, *supra*, p. 425; *Berberena v. Echegoyen*, *supra*, p. 879.

[133]   *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102, 133 (1991). See, also, Serrano Geyls, *op. cit.*, p. 1086.

[134]   See, also, *In re Colton Fontán I*, 154 D.P.R. 466, 472–473 (2001).

*CERTIFIED TRANSLATION*                        by: Olga M. Alicea, fcci, njitce-s

have recognized as a fundamental right the right to work.[135]   In fact, in *García v. Aljoma*, 162 D.P.R. 572, 596 (2004), this Court, through Presiding Justice Mr. Hernández Denton, submitted that Sec. 20 of the Constitution of the Commonwealth of Puerto Rico "only listed aspirations that depended for their compliance on the economic development of the Country.   This is a provision that recognized, although it did not guarantee, certain human rights and suggested the best effort of the State to take them to a practical level."   (Cites omitted.)   Those rights are of an *economic and social nature.*[136]

With more reason, in *García v. Aljoma*, *supra*, p. 596, this Court stated clearly that

> [i]n view of such a clear legislative history, we cannot endorse the judicial decision of the Court of Appeals that installs a right expressly excluded from the scope of the constitutional guarantees of the Bill of Rights, through the interpretation of another constitutional right.   The consequence of the Congress' veto of Sec. 20 of Art. II of the Constitution and of the corresponding acceptance of the Constitutional Convention was *to exclude the right to obtain a job as a constitutional guarantee.*   (Emphasis ours.)[137]

Similarly, in *San Miguel Lorenzana v. E.L.A.*, *supra*, p. 430, citing the commentators of constitutional law, Rotunda, Nowak, and Young, we indicated that "a fundamental federal right to acquire or keep a job in the public sector does not exist."

In the light of the foregoing, we can conclude that the right to work is not a fundamental right guaranteed by our Constitution.   Of course, that does not mean that the aspirations embodied in the aforementioned Section 20 cannot be pursued by the Puerto Rican people.   However, this objective is not a task for the Judiciary, rather it is up to the Legislature.[138]

On the other hand, in *San Miguel Lorenzana v. E.L.A.*, *supra*, pp. 428-429, we recognized that "the right to a job is closely related to the guarantee that no person will be deprived of his freedom or property without due process of law." "[T]he right to a job is mainly aimed at guaranteeing that when deprived of the same, the requirements of due process of law be met." *Id.* p. 429.   There, too, citing with approval commentator Lawrence H. Tribe, we held, *ad verbatim*:

> Although we have argued ... that among the rights to bodily integrity are rights to at least minimal subsistence and that such rights give rise to affirmative governmental duties, we could not deduce from such duties a judicially cognizable remedy for every instance of unmet needs; as we saw, government's affirmative duties must ordinarily be translated into doctrine somewhat more obliquely— through a variety of procedural, structural, and other protections designed, in their cumulative effect, to minimize the risk that someone will in fact suffer extreme deprivation. Among those protections has been a revitalized

---

[135] See, J.J. Álvarez, *Derecho Constitucional*, 74 (No. 3) Rev. Jur. U.P.R. 597, 615 (2005).

[136] Serrano Geyls, *op. cit.*, p. 1192.

[137] See, also, Álvarez González, *op. cit.*, p. 935.

[138] *Id.*

*CERTIFIED TRANSLATION*                           by: Olga M. Alicea, fcci, njitce-s

concern to prevent at least procedurally unfair exclusions from the occupation or vocation of one's choice.

........

[J]ust as we have seen that a claim of unmet needs does not automatically give rise to a judicially cognizable basis for insisting that government step in with specific services, so it must be the case that, even with respect to employment, not every frustrated wish creates a constitutional cause of action against the state. As Justice Douglas said in his *Barsky* dissent, '[c]ertainly a man has no affirmative right to any particular job or skill or occupation. The Bill of Rights does not say who shall be doctors or lawyers or policemen. But it does say that certain rights are protected, that certain things shall not be done. And so the question here is not what government must give, but rather what it may not take away.' What it may not take away without clear and focused justification is a fair opportunity for an individual to realize her identity in a chosen vocation. *San Miguel Lorenzana v. E.L.A.*, *supra*, pp. 429-430.

Thus, in that case we acknowledged that the right to work, that is, being deprived thereof, both in our jurisdiction and in the federal jurisdiction, is an issue that should be examined under the clause on due process of law.

Given the foregoing discussion, and in connection with the clause on equal protection of the laws, we conclude that the classification created by the application of Law No. 7, as alleged by the respondent, is not suspect nor does it violate or interfere with a fundamental right. Consequently, the analysis of such classification must be done under the scrutiny of rational nexus and not of strict scrutiny.   That is, we must determine whether the State has a legitimate interest in promoting the classification challenged and if that interest is connected rationally to the classification.

As we have already discussed previously, it is indubitable that from Law No. 7 it appears that the State has a more than legitimate interest in correcting the fiscal crisis that the Government of Puerto Rico is undergoing.   In that context, the classification established by the State and that the respondent objects to responds to the need to tackle that fiscal problem.   Thus, the expense relative to the payroll is so substantial that it the reduction of said item is necessary to attack the budgetary deficit that is announced in the very law.   That appears clearly, and as we have already stated, in its Preamble.[139]

It is clear that the Preamble of Law No. 7 shows the existence of a rational relationship between the classification challenged (layoff of public employees of the executive branch) and the legitimate interest pursued by the State in order to correct the fiscal crisis described in said law.

---

[139]  It should be pointed out that in *Vélez v. Srio. de Justicia*, *supra*, p. 538, this Court recognized the intrinsic value of the Preamble of a law when determining the interest of the State under the analysis of equal protection of the laws.

*CERTIFIED TRANSLATION*                                          by: Olga M. Alicea, fcci, njitce-s

Similarly, we must point out that the classification challenged by the respondent applies to a group of people similarly situated. It is limited to public employees who work in different agencies of the Government ascribed to the executive branch.[140]   In fact, the criterion predicated by the mentioned laws to layoff the employees in question is seniority.   See Art. 37.04(b)(2),(9),(13) and (14).   That is, the application of Law No. 7 is general and is based on a neutral criterion which is seniority.   In that sense, although the classification challenged does not extend to the Judiciary and Legislative Branch, nor does it promote an unequal and unjustified treatment among those employees to whom Law No. 7 does indeed apply.

*A fortiori*, the Legislature's decision to promulgate a law that applies only to the Executive Branch and not to the Legislative Branch or the Judiciary, with respect to the cardinal principle of separation of powers that our Constitution consecrates.   It should be noted that both the Judiciary and the legislative [branch] have budgetary autonomy.[141]   Hence, these branches are the ones that mange the funds that are allocated to them and the ones that determine, if necessary, when to cut expenses, including the payroll.   Allowing, through legislation, the Executive Power to be able to make decisions regarding the other branches of the Government would definitely violate the separation of powers.[142]

On the basis of the foregoing, we submit that the difference in treatment that the application of Law No. 7 promotes among the three branches of the Government does not offend or violate the clause on equal protection of the laws.   Thus, the classification challenged, as created by Law No. 7, does not reflect a preference based on prejudice.   It deals with a reasonable classification, based on a legitimate public interest.   We must not forget what the United States Supreme Court has held regarding equal protection of the laws: "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all.   It is enough that the State's action be rationally based and free from invidious discrimination." (Cites omitted.) *Dandridge v. Williams*, 397 U.S. 471, 486–487 (1970).[143]

---

[140] We must point out that Art. 37.02 of Law No. 7, *supra*, establishes certain exclusions in its application in order to avoid a negative impact on the services that the Government offers.

[141] See Law No. 147 of June 18, 1980, as amended, 23 L.P.R.A. sec. 104, and Law No. 258 of July 30, 1974, as amended, 2 L.P.R.A. sec. 553.

[142] See, *Watkins v. New York State Ethics Com.*, 554 N.Y.S.2d 955, 965 (1990).

[143] The respondents in CT-2009-06 allege that the implementation of Law No. 7 violates their constitutional rights because it establishes a pattern of discrimination by reason of political ideas, as well as by reason of age and of sex. Howeve, considering, as we have resolved, that Law No. 7 uses only seniority as criterion for the dismissals, we believe that such allegations are totally without merit.   However, if in the interpretation or implementation of said sold criterion of seniority there is on the part of the agency involved any discrimination that might be categorized witin the classifications alleged, it is a matter of proof that in due course must be weighed by the Court of First Instance.

*CERTIFIED TRANSLATION*                                   by: Olga M. Alicea, fcci, njitce-s

## IX

*Impairment of contractual obligations*

A.    The Constitution of the Commonwealth of Puerto Rico prohibits the promulgation of laws that impair contractual obligations.[144]    Similarly, the United States Constitution contains an analogous clause that prohibits the stage from promulgating laws that impair contractual obligations stemming from public contracts or private contracts.[145]    According to the foregoing, when interpreting our constitutional provision we must refer to the decisions of the United States Supreme Court that evaluate said clause since they constitute the minimum protection that we are obligation to recognize in our legal system.[146]

The guarantee against impairment of contractual obligations limits the government's power to interfere with contractual obligations among private parties, as well as contractual obligations contracted by the State.[147]    When considering the validity of statutes under said clause, the applicable scrutiny depends on the type of contract in question, whether it is a private contract or a public one.   This difference responds to when the modification occurs in the context of public contracts the judicial scrutiny must be more careful "to ensure the State's action is not only for its own benefit."[148]

When evaluating the Government's interference in the context of private contracts, the first thing to inquire about is whether a contractual relationship exists and if the modification of the obligation constitutes a substantial or severe impairment.[149]    After determining that a substantial or severe impairment of a contractual obligation exists, one must evaluate whether the government interference responds to a legitimate purpose of interest of the State and whether it is rationally related to the attainment of such objective.[150]    As we can see, when inquiring about the validity of a law in light of the contractual obligations impairment clause the applicable criterion is that of reasonableness.[151]    The reasonableness of the legislation will be determined taking into consideration the substantiality of the public interest promoted and the dimension of the impairment caused.[152]

---

[144]  Art. II, Sec. 7, Const. of the Comm. of P.R., L.P.R.A., Tome 1.

[145]  Art. 1, Sec. 10, Const. E.E. U.U., L.P.R.A., Tome 1. See, also, *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977).

[146]  *Bayrón Toro v. Serra*, 119 D.P.R. 605, 619 (1987).

[147]  *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400 (1983); *United States Trust Co. v. New Jersey, supra*.

[148]  *Bayrón Toro v. Serra, supra*, p. 620; *United States Trust Co. v. New Jersey, supra*, p. 17.

[149]  See, *Warner Lambert Co. v. Tribunal Superior, supra*.  See, also: *General Motors Corp. v. Romein*, 503 U.S. 181, 187 (1992); *Energy Reserves Group v. Kansas Power & Light, supra*, p. 411.

[150]  *Warner Lambert Co. v. Tribunal Superior, supra; General Motors Corp. v. Romein, supra*; *Nowak and Rotunda Constitutional Law*, Sec. 11.8, pp. 416–417 (1995).

[151]  *Warner Lambert Co. v. Tribunal Superior, supra*.

[152]  *Id.*   See, *Home Bldg. & L. Assn. v. Blaisdell*, 290 U.S. 398 (1934).

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

Now then, when the State modifies its own obligation the judicial scrutiny is more careful.[153] Of course, even when the scrutiny in the context of public contracts is more severe, that does not mean that there is an absolute prohibition that impedes the power to regulate of the State to the benefit of the public interest.[154]   Therefore, the function of the judicial forum when evaluating the validity of a law according to the impairment of contractual obligations clause consists in establishing a balance between the power of the State ("*police power*") to safeguard the wellbeing of the citizens and the interest in protecting the contractual relations.[155]   To those ends, in *United States Trust Co. v. New Jersey, supra*, p. 21, the United States Supreme Court enunciated the following:

> Although the Contract Clause appears literally to proscribe "any" impairment, this Court observed in [*Home Building & Loan Association v. Blaisdell, supra*] that "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution. In the instant case, as in *Blaisdell*, we must attempt to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power," necessarily reserved by the States to safeguard the welfare of their citizens. (Cites omitted.)

Pursuant to the foregoing, when exercising judicial review on the constitutionality of laws according to the contractual obligations impairment clause of the State, various U.S. Appellate Circuit Courts have emphasized the need to evaluate whether the purpose or interest of the State in promulgating the challenged legislation responds to the exercise of their police power to protect and maintain the general wellbeing, which includes the economic wellbeing of the society.   To those ends, it has held as follows:

> [T]he Supreme Court has defined "police power" for Contract Clause purposes, "as an exercise of the sovereign right of the Government to protect the lives, health, morals, comforts, and general welfare of the people ...." The state's paramount authority ... is not limited to health, morals and safety. It extends to economic needs as well." *Veix v. Sixth Ward Ass'n*, 310 U.S. 32, 39, 60 S. Ct. 792, 795, 84 L. Ed. 1061 81940). *This doctrine reflects the importance of allowing states to legislate freely on social and economic matters of importance to their citizens, modifying the law to meet changing needs and conditions.* [156] (Cites omitted and emphasis ours.)

---

[153] *Bayrón Toro v. Serra, supra*.

[154] *Warner Lambert Co. v. Tribunal Superior, supra*, p. 394; *Bayrón Toro v. Serra, supra*. Véanse, además: *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978); R. Epstein, *Toward a Revitalization of the Contract Clause*, 51 (No. 3) U. Chi. L. Rev. 703, 717 (1984).

[155] *Warner Lambert Co. v. Tribunal Superior, supra*.

[156] *Local Div. 589, etc. v. Comm. of Mass.*, 666 F.2d 618, 639 (1st Cir. 1981).   See, also: *Buffalo Teachers Federation v. Tobe*, 464 F.3d. 362, 367 (2nd Cir. 2006); *Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore*, 6 F.3d. 1012, 1018 (4th Cir. 1993).

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

Under this conceptual framework, in cases of public contracts one should evaluate, as a threshold issue, whether a contractual obligation exists and whether modification of the obligation constitutes a substantial or severe impairment.   With respect to the analysis of the substantiality or severity of the impairment of the obligation, the United States Supreme Court has held as follows:

> The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

> The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978).

According to the foregoing, the constitutional guarantee against impairment of contractual obligations is activated when the modification adversely affects the essential terms or conditions of the contract that mainly gave rise to the execution thereof so that the parties' reasonable expectations are frustrated.[157]   Pursuant to this definition, the United States Court of Appeals for the Fourth Circuit has held that: "*While the court has not refined the analysis for assessing the substantiality of an impairment, it has appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place.*" (Emphasis ours.)[158]   On its part the United States Court of Appeals for the Second Circuit has held as follows: "*To assess whether an impairment is substantial, we look at 'the extent to which reasonable expectations under the contract have been disrupted.'*"   (Emphasis ours.)[159]

Once it is determined that the impairment is substantial, one must inquire whether the modification sought advances an important interest for the benefit of the general wellbeing. Finally, it must be argued whether the modification, in addition to being reasonable, is necessary to advance that important government purpose.[160]   If the modification is reasonable and necessary to advance the public interest, we will uphold the validity of the challenged law.[161]

It should be noted that with respect to the criterion of reasonableness and necessity, the United States Supreme Court has manifested that the impairment of the contractual obligation  of the State will not be upheld if there are alternate means that are less drastic or severe than the one

---

[157] *Allied Structural Steel Co. v. Spannaus*, *supra*, pp. 245–246; *El Paso v. Simmons*, 379 U.S. 497 (1965).

[158] *Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore*, *supra*, p. 1017.

[159] *Buffalo Teachers Federation v. Tobe*, *supra*, p. 368.

[160] *Bayrón Toro v. Serra*, *supra*; *United States Trust Co. v. New Jersey*, *supra*.

[161] *Bayrón Toro v. Serra*, *supra*.

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

exercised by the State to achieve its objective.[162]   When evaluating the reasonableness and necessity of the measure in the context of public contracts, the United States Supreme Court held that, contrary to cases regarding private contracts, it is not appropriate to give complete deference to the legislative decision regarding the necessity or reasonableness of the legislation. *United States Trust Co. v. New Jersey*, *supra*, pp. 22–26 ("*As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.... [But, as to public contracts], complete deference to a legislative assessment of reasonableness and necessity is not appropriate ...*"). However, this does not mean that the judicial forum should not give any deference to the determination of necessity and reasonableness that the legislator made in the exercise of his constitutional power, especially when dealing with socioeconomic regulations.

As an example, it is meritorious to refer to the interpretation that has been made in the appellate circuits with respect to the degree of deference that should be given to the legislative determination regarding the necessity and reasonableness of the measure.   In *Local Div. 589, etc. v. Comm. of Mass.*, *supra*, p. 643, the United States Court of Appeals for the First Circuit held as follows:

> [D]etermining the "reasonableness and necessity" of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before us, where economic or social legislation is at issue, some deference to the legislature's judgment is surely called for.

Similarly, the United States Court of Appeals for the Second Circuit manifested itself, in *Buffalo Teachers Federation v. Tobe*, 464 F.3d. 362, 370 (2nd Cir. 2006), when enunciating the following:

> We hasten to point out that less deference does not imply no deference. ... Relatedly, we agree with the First Circuit that *U.S. Trust Co.* does not require courts to reexamine all of the factors underlying the legislation at issue to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem.

In sum, when facing the challenge of the law according to the contractual obligations impairment clause of the State, we must give some deference to the legislator's determination with respect to the necessity and reasonableness of the measure.   When carrying out such task, relevant, and contributing to the final determination of the reasonableness of the measure, is the fact that the legislation is in response to an emergency situation and that its application is temporary or transitory.[163]   According to the foregoing, in *Buffalo Teachers Federation v. Tobe*, *supra*, pp. 373–372, the United States Court [of Appeals] for the Second Circuit considered the city of Buffalo's fiscal emergency situation and the limited duration of the measure on the freezing of public employee salaries to determine the criterion of reasonableness and it upheld the constitutionality of the measure.   In that same vein, the United States Court of Appeals for the

---

[162]   *United States Trust Co. v. New Jersey, supra*, pp. 29–31.

[163]   *Home Bldg. & L. Assn. v. Blaisdell, supra*, p. 447.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

Fourth Circuit, in upholding the constitutionality of a wage reduction measure of unionized public employees, it found that the government's action was reasonable given the budgetary crisis of the city of Baltimore and the limited duration of the measure.[164]

According to the doctrine stated, we proceed to argue whether the legislation before our consideration contravenes the clause that prohibits the impairment of contractual obligations in the context of public contracts.

B.      The respondents in case CT-2009-6 are unionized public employees of the Department of the Family and the Child Support Administration.  They allege, succinctly, that Law No. 7 of March 9, 2009, impairs the obligations contracted by the State through the collective bargaining agreement in effect between the parties as of July 20, 2017.  Specifically, they indicate that the challenged law "violates the principle of merit" recognized in the collective bargaining agreement as well as other procedures to carry out the layoffs.[165]

As we discussed above, in cases of public contracts one must evaluate, as a threshold issue, whether a contractual obligation exists and whether the modification of the obligation constitutes a substantial or severe impairment.  In effect, a contractual relationship exists between the State and the unionized employees whose obligations are specified in the collective bargaining agreement.  In that sense, the contracting parties established the terms that would regulate the manner in which the State could dispense with the services of the unionized employees.

As is evident from the record, the Declaration of Principles of the Collective Bargaining Agreement established as one of the bases to carry out the agreement establishing a personnel system based on the principle of merit.  Pursuant to the foregoing, Article II establishes the following: "The parties intend in this agreement to harmonize the practice of collective bargaining with the personnel system based on merit to comply with this wise public policy that reaffirms the Labor Relations for the Public Sector Act ...." See, Appendix, Collective Bargaining Agreement, p. 8. According to the foregoing, the parties agreed to follow a layoff procedure based on the principle of merit provided in Article XXVII of the Collective Bargaining Agreement. [166]   According to the foregoing, in this case there was substantial impairment of the contractual obligation since the layoffs process based on the principle of merit, as established in the collective bargaining agreement was modified.  Such obligation was essential for the execution of the agreement, as is evident from the declaration of principles of the Collective Bargaining Agreement.

Now then, the fact that there is substantial impairment of a contractual obligation does not dispose of the controversy.  It is, then, necessary to evaluate whether the modification seeks to advance an important interest and whether the modification, in addition to being reasonable, is necessary to advance that important government purpose.[167]

---

[164] *Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore, supra*, pp. 1023–1026.

[165] See, Brief of Respondents, pp. 4-5.

[166] See, Appendix, Collective Bargaining Agreement, p. 30.

[167] *Bayrón Toro v. Serra, supra; United States Trust Co. v. New Jersey, supra*.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

As the aforestated doctrine provides, the constitutional validity of a law that substantially impairs a contractual obligation of the State will be upheld if such measure responds to an important public interest, and it is reasonable and necessary to advance such government purpose or interest.  From the extensive Preamble of Law No. 7 it appears that the Government of the Commonwealth of Puerto Rico is in an emergency situation due to the serious fiscal crisis.  To address such crisis, the State exercised certain measure to provoke substantial and genuine savings in the government's coffers, which include among them the layoffs of the respondents.

Under this state of emergency, the legislator determined that it was necessary and reasonable to establish an alternate procedure to carry out the layoffs and eliminate the procedures prior thereto to then be able to expeditiously achieve the pressing purpose of the law.  In addition, the legislator decided to use exclusively the criterion of seniority to carry out the layoffs so as to guarantee an equitable application of the objective criterion of seniority throughout the entire government.  As provided in Article 37.04(b)(1) of Law 7, *supra*, there is an urgency in addressing and correcting the fiscal problems faced by the State expeditiously.  To those ends, and as we cited previously, the Preamble explains that

> [a]ll of the alternatives typically used as steps prior to a reduction in personnel [that is] transfers, relocations, retrainings, unpaid leaves, and reductions in working hours, among others, are not viable within the context of the magnitude of the government's structural deficit and the precariousness of the situation.  It is necessary to drastically and expeditiously reduce government spending.  In view of the size of the payroll and of the size of the deficit, none of the other alternatives is compatible with this objective or is viable given their impact on the Government's operation.

As we can see, the State showed that it had an important public interest in adopting corrective measures expeditiously to address the fiscal crisis in protecting the society's general wellbeing.  The challenged law was adopted as a result of the exercise of the power of reason of the State to address a fiscal emergency that undermines the socioeconomic wellbeing of the Puerto Rican society.

In evaluating the necessity or reasonableness of the measure for purposes of the contractual obligations impairment clause, although it is not warranted to give complete deference to the legislator, we must indeed give some deference to the legislator's determination of necessity, thus, it is not up to us to make a determination *do novo* as to the existence of other alternatives to solve the problem.[168]

The legislator understood that it necessary and reasonable, and it justified this extensively in the Preamble of the aforementioned Law No. 7, to temporarily suspend those contractual, regulatory, or statutory provisions that establish procedures and criteria to carry out employee layoffs that contravene the provisions of Law No. 7.  The Legislature reached this conclusion because "the alternatives typically used as steps prior to a reduction in personnel" entail "transfers, relocations, retrainings, unpaid leaves, and a reduction in working hours, among others, that are not viable within the context of the magnitude of the government's structural deficit and the

---

[168] *Buffalo Teachers Federation v. Tobe*, *supra*.

*CERTIFIED TRANSLATION*                    BY: OLGA M. ALICEA, FCCI, NJITCE-S

precariousness of the situation." It was necessary to establish a layoffs procedure that would reduce government spending drastically and expeditiously, in order to achieve the public interest of the State of urgently addressing the fiscal crisis.

Similarly, it is totally reasonable and necessary for the legislator to establish an objective criterion as is that of seniority in employment, so as to guarantee an equitable application of the layoffs procedure throughout the entire government.   In addition, it is worth pointing out that the challenged law is a product of an emergency situation and the suspension of the provisions of the agreements that are not in accordance with said Law No. 7 is temporary.   See Arts. 37.04(a) and 38.02(b) of Law No. 7, *supra*.   These factors contribute to the determination of reasonableness of the measure.

Finally, and as we have already determined, we must remember that the respondents were not deprives of a layoffs procedure that guaranteed them due process of law.   Although, in effect there was a modification of the obligation, the State provided them with a layoffs and review procedure, thereby guaranteeing them due process of law.

Pursuant to the foregoing, we hold that the layoffs and the procedure established by Law No. 7 do not violate the clause that prohibits the impairment of contractual obligations.

## X

*Undue delegation of power*

A.      As we mentioned in appeal CT-2009-09, the respondent argues that Art. 37.04(b)(5),(6) and (7) of Law No. 7, *supra*, delegates to the F.R.S.B. certain powers without clear guidelines that cause an undue concentration of powers in said organism.   It submits that Law No. 7 confers on the F.R.S.B. the authority to take whatever actions may be necessary to enforce the law without establishing norms that limit such authority.   It also adduces that Art. 41 and 42 of the aforementioned law grants to the F.R.S.B. the authority to carry out transfers and subcontract work without certain guidelines that guide the use of such delegated power.   In turn, the respondent points out that Art. 68 of Law No. 7 unduly delegates power to the Governor that violates the separation of powers.   It is wrong.

Puerto Rico has a republican system of government that consists of three branches of government: the Legislative, the Judiciary, and the Executive.[169]   Thus, the powers delegated by the people to the Government, through the Constitution, are distributed in a tripartite manner. That separation of powers is the safeguard that our Constitution consecrates to preserve the freedoms of the People and a democratic system of Government.[170]   However, each of these powers, although sovereign and independent with respect to the exercise of the power conferred, interrelates with the others keeping each one's authority intact.[171]

---

[169] See, Art. I, Sec. 2, Const. of the Comm. of P.R., L.P.R.A., Tome 1.

[170] *Colón Cortés v. Pesquera*, 150 D.P.R. 724, 752 (2000).

[171] *Pueblo v. Santiago Feliciano*, 139 D.P.R. 361, 420 (1995).

*CERTIFIED TRANSLATION*                                    BY: OLGA M. ALICEA, FCCI, NJITCE-S

The doctrine of separation of powers is based on the principle that the power is delegated in the three branches of government to avoid the concentration of powers in a single branch, or abuse of power by another.[172]   Thus, one branch of government cannot usurp or appropriate the authorities of another branch without causing harm.[173]   "The existence of the three coequal powers necessarily generates tension and friction among the branches, which is diminished through a system of weights and counterweights, which makes possible gauging the fine balance in the exercise of power, as ordered by the Constitution."[174]

The axiomatic principle of separation of powers represents the framework of the purist constitutional concept that predicates that the power that the Constitution recognizes of the Government's Branches is exclusive to them and, therefore, it cannot be delegated to other administrative entities.   "The fundamental aspect of this position is the exclusive nature that is ascribed to the powers conferred on each branch of government."[175]   Under this philosophy, the doctrine of separation of powers denies constitutional validity to the administrative agencies or entities, since these exercise exclusive powers of the Branches of the Government.[176]   In short, this vision does not endorse the delegation of legislative, judicial, or executive powers to an administrative body.

That constitutional fundamentalism was the one that prevailed in the United States during its historical beginning.[177]   Thus, given the interest in delegating powers to the administrative agencies, the first judicial reaction was to deny the possibility that the U.S. Congress might delegate its legislative power.[178]   However, the development of the modern industrial economy and the period of the Great Economic Depression crisis revealed the need to delegate power to the administrative agencies – whose creation became increasingly necessary – to combat the economic crisis that affected the United States of America.[179]   That juncture required using a more agile form of establish sufficient parameters and norms.   Thus, by 1928 the new judicial position regarding the doctrine of delegation of powers in the United States was already emerging.   So, in the case of *Hampton Co. v. United States*, 276 U.S. 394 (1928), a transmutation occurred in the puritanical constitutional concept, when the maximum federal Forum upheld that the delegation of powers is permissible if it is done through an intelligible principle that guides the agency's authority.[180]

---

[172] *Santana v. Governora*, 165 D.P.R. 28, 45 (2005).

[173] *Colón Cortés v. Pesquera, supra*; *Sinking-Fund Cases*, 99 U.S. 700, 718 (1878).

[174] *Santana v. Governora, supra*, pp. 45–46; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982).

[175] D. Fernández Quiñones, *Derecho administrativo y ley de procedimiento administrativo uniforme*, 2nd Ed., Bogotá, Ed. Forum, 2001, Sec. 2.2, p. 35.

[176] *Id.*

[177] See, *Field v. Clark*, 143 U.S. 649, 692 (1892).

[178] J.A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, 1st Ed, Revused, San Juan, Ed. Situm, 2009, p. 8.

[179] *Id.*, p. 9.

[180] *Id.*

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

At present both in the federal jurisdiction and in our state jurisdiction, the validity of the delegation is unquestionable as long as the organic act that creates the agency or administrative body establishes adequate norms, guidelines, standards, criteria, or intelligible principles or those procedural and substantive guarantees or safeguards that serve as a guide to the delegation and that delimit their authorities, to prevent the actions of the administrative entities from becoming arbitrary or capricious.[181]    Such criteria need not be express; they can even stem from the legislative history and can be broad and general; *if it has a public goal or purpose*, in general it is sufficient justification to uphold the delegations.[182]    Since *Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1943), "[e]vidences ... the need that officials and administrative boards be delegated great part of the power that the legislature could exercise ...."[183]    As to that need to delegate, this Court has held:

> [T]he modern world is characterized by the great complexity in social and economic relations of people, together with the progressive governmental supervision of an individual's conduct, and that implies that it is impossible for the legislature to legislatively anticipate, in detail, meticulously, or specifically, the multiplicity of situations that might arise from those complex relations, it being sufficient that the law in question indicate or establish broad and general norms that serve as a guide or direction to expert administrative entities, so that they, with their experience and special knowledge, can apply those norms concretely to the facts that may arise and finalize the details that implement the general legislative policy.[184]

This way, nothing impedes the Legislature from establishing general norms that are broad and leave the administrative with an adequate margin of freedom to complement the legislative norms through the use of specialized judgment that can be developed according to an analysis, appreciation, and administrative discretion based on reasonableness.[185]

With the normative framework outlined, we proceed to resolve the arguments regarding delegation of powers stated by the respondent in appeal CT-2009-9.

B.    The F.R.S.B. is defined in Art. 33(f) of Law No. 7, *supra*, as the Fiscal Restructuring and Stabilization Board.   It was created under Art. 37.04(b)(5) of the well-known laws to enforce the objectives of Chapter 3 thereof.[186]   In addition, said board is entrusted with taking all   necessary

---

[181] *Rodríguez v. Bco. Gub. de Fom. P.R.*, 151 D.P.R. 383, 400 (2000).

[182] *Viajes Gallardo v. Clavell*, 131 D.P.R. 275 (1992); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Hernández Montero v. Cuevas*, 88 D.P.R. 785 (1963); *López v. Junta Planificación*, 80 D.P.R. 646 (1958); *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670 (1953); *Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1944).

[183] Fernández Quiñones, *op. cit.*, Sec. 2.3, p. 48.

[184] *Hilton Hotels v. Junta Salario Mínimo, supra*, pp. 692–693.

[185] *Debién v. Junta de Contabilidad*, 76 D.P.R. 96, 104 (1954).

[186] Art. 33(f) of Law No. 7, *supra*.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

action to endorse said law.[187]    It appears, then, from Law No. 7 that the F.R.S.B. is a board that was created to facilitate compliance with said law.   In that sense, the Legislature delegated to is part of the most elementary power that the Constitution of the Commonwealth of Puerto Rico recognizes of the Executive Branch: enforcing the law.[188]

On its part, Art. 37.04(b), cited above, clearly establishes that the authorities that are delegated to the F.R.S.B. and that are connected with the layoffs of public employees must be guided and governed by the criterion of seniority.   That is, the F.R.S.B. will have the necessary and convenient authorities aimed at compliance with Law No. 7, but in the matter of layoffs it will always be required to respect the criterion of seniority.   In that sense, the very law establishes a limitation on the powers that the F.R.S.B. can have when discharging its duties.

In turn, Law No. 7 provides certain illustrative guidelines that frame the prerogatives of said board.   Thus, for example, subparagraph sixth of Art. 37.04(b) establishes that the F.R.S.B. may carry out necessary studies or entrust them to the agencies that are under its charge, request information necessary to carry out its mission, advise the Governor and the agencies with respect to the laid off employees, approve, reject, and evaluate request from the employees to reduce their working hours, meet with agency heads, etc.   Even if we were to conclude that the criteria that Law No. 7 recognizes of the F.R.S.B. are broad and general, there is no doubt that such criteria have a much delimited purpose or public interest.[189]   As we already mentioned, that public interest is sufficient to uphold the delegation.[190]

Likewise and as we have already stated, the Law does not deprive the public employee as he has a procedure to his credit to challenge the decision of the F.R.S.B. or of the pertinent agency. For this reason, the decisions that the F.R.S.B. makes are not infallible and can be the object of challenge by an employee who feels that his dismissal was not in accordance with the criterion of seniority.   Such authority that is acknowledged of the employee, correlatively, guides the F.R.S.B.'s discretion since it imposes on it as a duty to properly exercise the authorities that the law delegates to it to prevent its actions from being challenged and invalidated by a court.

On the other hand, Arts. 41 and 42 of Law No. 7, *supra*, grant the F.R.S.B. the authority to carry out transfers and subcontract employees flexibly:

> *Article 41—Transfers*
>
> During Phases I, II, and III, and *in order to ensure the continuity and quality of government services*, the FRSB may authorize transfers of employee among positions, classes, and levels of positions, groups of employees, appropriate units; transfers of union units to nonunion ones and vice versa, in the same Agency or among Agencies; provided, that the transferred employee must meet the minimum requirements of academic background and experience necessary to hold the

---

[187] *Id.*

[188] See, Art. IV, Sec. 4, Const. of the Comm. of P.R.., L.P.R.A., Tome 1.

[189] See, Arts. 33(g), 37.04(b)(1).

[190] *Viajes Gallardo v. Clavell*, *supra*, pp. 284–286.

<u>CERTIFIED TRANSLATION</u>                                          BY: OLGA M. ALICEA, FCCI, NJITCE-S

position.   The transferred employee will be subject to the probationary period for the position. [In addition, during the term of Phases I, II, and III, all provisions of law, regulation, covenant, agreement, or precept that is contrary to what is indicated in Chapter III will be suspended; provided, that there will be total flexibility to carry out the transfers.

*Article 42—Subcontracting*

During Phases I, II, and III, of this Chapter III, and *in order to ensure the continuity and quality of government services*, the FRSB may authorize the transfer and subcontracting of work done by employees, appropriate units, or union units.

During the term of Phases I, II, and III, any provision of law, regulation, agreement, or precept contrary to what is indicated in this Chapter III will be suspended.

In all contracts executed by the Agencies according to this Article, the contractor will be required, in the rendering of the services contracted, to employ available laid off employees, *who have the necessary background and experience to render the service contracted*, according to the list of candidates for rehire that will be prepared by the ORHELA, pursuant to the provisions of Article 43 of this Chapter III.   (Emphasis ours.)

It appears from both articles that the employees must have the background and experience necessary to hold the position, if it is a transfer, or to render the service contracted in cases of subcontracts.   Also, both provisions establish as parameters that the authority that is delegated to the F.R.S.B. is subordinated to the objective of ensuring the continuity and qualify of government services.   This way, the F.R.S.B. will always have to justify the transfer or subcontract.   That is, the F.R.S.B. is limited to subcontracting or transferring the employee who has the background and experience necessary to hold the position or to render the service required, and who also helps avoid an interruption or cessation of services.

Again, the F.R.S.B.'s discretion must be guided by the main public purpose and interest of Law No. 7, which is to address the fiscal emergency and crisis that prevails over the Government of Puerto Rico.   Thus, the F.R.S.B.'s mail mission is to find the way to reduce the structural deficit and, at the same time, ensure that the rendering of government services is not affected.   To achieve such objective, Law No. 7 allows the transfer of public employees and subcontracting.

*On the basis of all of the foregoing, we conclude that the delegation of power that the Legislature makes to the F.R.S.B. – with respect to subcontracting and transfers – is constitutionally valid and does not violate the principle of separation of powers by providing certain adequate guidelines that guide the use of such power.*

Finally, respondent alleges that Art. 68 of Law No. 7, *supra*, unduly delegates power to the Governor of Puerto Rico in violation of the principal of separation of powers.   Said article provides:

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

> The Governor is empowered to take any measure that is necessary and convenient, in addition to those provided by this Law, so that through Executive Order expenses can be reduced; promote the savings of the Executive Branch to the maximum compatible with the efficient operation of the Government; maintain the efficiency of the operations of the Executive Branch to the highest degree possible; and group, coordinate, and consolidate duties in each Agency; all according to the objectives of this Law.  Provided, however, that the Governor may not create, consolidate, or reorganize executive departments, or suppress organisms created by Law.  Those reorganizations that require legislation or amendments to statutes in effect must be presented to the Legislature for its consideration.

> The authorities granted under this Law do not limit any other that the Governor may have and take, if the objective fixed by Article 33(g) is not achieved. Art. 68 of Law No. 7, *supra.*

In the first place, we must point out that the Constitution of the Commonwealth of Puerto Rico establishes that included among the duties, powers, and functions of the Governor are: "[t]o comply with and enforce the laws"; "[t]o exercise the other authorities and powers and to comply with the other duties that are pointed out by this Constitution o by law."[191]   As a corollary of the foregoing, it has been interpreted that an executive order finds legal support in the general authority of the Chief Executive to comply with and enforce the laws.[192]   Thus, the Governor's authority to issue executive orders stems from the powers conferred to him by the laws or the powers inherent to his position.[193]   Similarly, all executive orders contain a mandate that is directed at the government bodies of the Executive Branch.

That is why, by allowing the Governor to issue executive orders, Art. 68 of Law No. 7, *supra*, does not do anything but confer to him the prerogative of exercising a constitutionally valid power.  It should be noted that the Governor de Puerto Rico has the authority to exercise the general direction of the public administration with the clear understanding that it comprises the supervision and inspection of the government's departments and agencies of the Executive Branch as well as of the public corporations and of certain autonomous entities created by law.[194]   In addition, "[o]ur Constitution ... adopted a unitary Executive Power by vesting a single official ... with the supreme authority in the Executive Branch 'without any kind of limitations,'"[195] that are not the ones provided by the Constitution itself and the laws enacted thereunder.

On the other hand, Art. 68 of Law No. 7, *supra*, allows the Head of State to issue executive orders leading to: reduce expenses, promote as much as possible savings in the Executive Branch *without affecting the Government's efficient operation,* maintain the efficiency of the operations

---

[191]  Art. IV, Sec. 4, Const. of the Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., pp. 403–404.

[192]  Op. Sec. Just. No. 5 of 1985.

[193]  Op. Sec. Just. No. 24 of 1986; Op. Sec. Just. No. 31 of 1984.

[194]  4 Diary of Sessions 2606 (1961).

[195]  *Santana v. Governora, supra*, p. 47.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

of the Executive Branch to the highest degree possible, and group, coordinate, and consolidate duties in each Agency *according to the objectives of the law.*   From the aforementioned article it clearly appears that the authorities of the Head of State must be governed under two essential principles: (1) they must promote the objectives of Law No. 7; (2) and consonant with that parameter, they must not affect the efficient operation of the Government.   That is, the delegation of power that is displayed to the Executive is governed by clearly established principles.   In turn, Art. 68 itself of Law No. 7, *supra*, recognizes an additional limitation to the Governor's power.   He cannot create, consolidate, or reorganize executive departments, or suppress organisms created by Law; reorganizations that require legislation or amendments to statutes in effect must be presented to the Legislature for its consideration.[196]   The foregoing is a clear example that the powers of the Chief Executive under the aforementioned law are limited to the prerogatives of the Legislature of formulating and creating the laws.

*In conclusion, the authorities recognized of the Governor under Art. 68 of Law No. 7, supra, are not an impermissible or undue delegation of power.   Such authorities are confined to the Executive Branch and at no time do they reveal the legislative intention of giving up its constitutional powers to legislate.*   Therefore, we cannot endorse the arguments of the respondent to the effects that Law No. 7 unduly delegates power to the Governor.

## XI

*On the basis of the foregoing, we hold that Law No. 7 of March 9, 2009, known as the Special Law Declaring a State of Fiscal Emergency and Establishing an Integral Fiscal Stabilization Plan to Save the Credit of Puerto Rico, is constitutional, in all aspects covered by this opinion. Consequently, and given that the respondents do not have a legal right that requires enforcing it,[197]   the request for permanent injunction is "Denied.*

*"Appeal CT-2009-09 is remanded to the Court of First Instance, San Juan Court, for the continuation of the proceedings in a manner that is compatible with this opinion.*

*Judgment will be entered accordingly.*

Associate Justice Mr. Martínez Torres and Associate Justice Ms. Pabón Charneco adopted the regulatory term of ten days provided in Rule 5 of our Rules, 4 L.P.R.A. App. XXI-A, to reserve the right to issue an opinion accordingly, after examining the dissenting position papers that were not circulated, in violation of our Rules.   Presiding Justice Mr. Hernández Denton, Associate Justice Ms. Fiol Matta, and Associate Justice Ms. Rodríguez Rodríguez issued separate dissenting opinions.   Associate Justice Mr. Rivera Pérez issues an individual vote.

---

[196]  Art. 68 of Law No. 7, *supra*.

[197]  *Abella v. Fernández et al.*, 17 D.P.R. 1063 (1911).

*CERTIFIED TRANSLATION*                                     BY: OLGA M. ALICEA, FCCI, NJITCE-S

--O--

Dissenting opinion issued by Presiding Justice Mr. Hernández Denton.

We dissent from the course of action that a majority of the Court has today followed, since the same, after a hurried judicial process that is contrary to due process of law, eliminates the vested rights over their jobs of thousands of public servants, in violation of the constitutional prohibition against impairment of contractual obligations established both in the Constitution of the Commonwealth of Puerto Rico and in the Constitution of the United States.   Art. II, Sec. 7, Const. of the Comm. of P.R., L.P.R.A., Tome 1; Art. I, Sec. 10, Const. of the U.S.A., L.P.R.A. Tome 1.   Specifically, the Opinion that the Court issues to declare the constitutionality of Law No. 7 of March 9, 2009, is based on a judicial record devoid of evidence necessary to adequately and reasonably resolve the controversy.

Worse yet, the same does not even comply with the minimum scope of protection established by the United States Constitution, placing us outside the norm formulated by the United States Supreme Court regarding such constitutional prohibition in *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977), and which this Court adopted in *Bayrón Toro v. Serra*, 119 D.P.R. 605 (1987).   The need for a complete judicial record that contains evidence to adequately evaluate the criteria set forth in such jurisprudence is even more compelling when considering the magnitude of the impact of Law No. 7, *supra*, on the public employees affected and the effect that the Court's decision will have on the country.

In our opinion, the decision that the Court issues in the instant case is made based solely on the actual text of Law No. 7, *supra*, and its Preamble, without having presented to the courts the necessary evidence to establish that the layoffs plan decreed was the less onerous alternative according to the fiscal situation, as required by the doctrine established by the United States Supreme Court, and without allowing the laid off employees to refute it. With the Court's Opinion in this case, we stand outside the United States Constitution and it would then be up to the United States Supreme Court to rectify such decision.   Therefore, we are forced to dissent.

# I

A.     As is deduced from the Court's Opinion, each of the captioned appeals came before this Forum's consideration a few days after the corresponding complaints were filed before the Court of First Instance and the summonses were served.   In all of the appeals the State appeared before us through their respective requests for certification, without arguing the controversy before the lower court.   In these, the State asked us to ignore the ordinary process on the grounds that this Curia should adjudicate the controversy in the first instance, as provided in Art. 69 of Law No. 7, *supra*, which provides that, at the request of a party, this Court

> ... shall issue a writ of certification ... to immediately bring before it and resolve any issue pending before the Court of First Instance or before the Court of Appeals when the validity or constitutionality of [t]he Law... or any challenge to the same of any kind is argued.

Despite the discretionary and exceptional nature that characterizes a request for certification, this Court did not hesitate to issue such remedies.   In circumventing the ordinary proceedings in the instant cases, the Court did not have a record to elucidate the allegations of the parties.   In

essence, each of the records before our consideration consists solely of the request for certification, the complaint, and the briefs of the parties. Even so, the Court did not require additional motions or, much less, did it hold an oral hearing to offer the parties their day in court and so that, as an exception, this Forum could receive the evidence that none of them had the opportunity to present before the lower forum, in a very complex controversy involving various arguments and that, undoubtedly, is of great public transcendence.

As a result of the untimely intervention by this Court, in its Opinion it relied exclusively on the text of Law No. 7, *supra*, and on its Preamble to elucidate and declare the constitutionality of the statute. In other words, *given the absence of a complete judicial record on which the parties had based their positions, the Court opted to take as facts the allegations of the State and the data contained in the Preamble of Law No. 7, supra, to address the validity thereof. That, without the laid off employees having had the opportunity to present evidence to the contrary.* Such conduct, in addition to giving rise to a circular reasoning, is contrary to what is established by the United States Supreme Court in *United States Trust Co. v. New Jersey*, *supra*.

In *United States Trust Co. v. New Jersey*, *supra*, said forum formulated the scrutiny of adjudication to be followed in cases where an impairment of contractual obligations of the State is alleged. In essence, for the State to prevail in these cases it is required that the impairment of the contractual obligation respond to an important government interest and that it be *reasonable and necessary* to achieve the government interest involved. *United States Trust Co. v. New Jersey*, *supra*, p. 25.

To those ends, in *Bayrón Toro v. Serra*, *supra*, pp. 620–621, we addressed a claim under the clause against impairment of contractual obligations set forth in Art. II, Sec. 7 of our Constitution, *supra*, and we adopted the scrutiny of adjudication formulated by the United States Supreme Court in *United States Trust Co. v. New Jersey*, *supra*. In fact, at that time we upheld the action of the State as we believed that the latter had been reasonable and necessary. *Bayrón Toro v. Serra*, *supra*, p. 623.

Of course, that case elucidated the validity of the action questioned before the lower forum, which had a complete record that included, among other things, stipulations of facts, memoranda of law, and an actuarial report. *Bayrón Toro v. Serra*, *supra*, pp. 609 and 622. With that, the State fulfilled its obligation to prove that there was no impairment of contractual obligations that violated our Constitution. *Id.* See, also, individual vote of Associate Justice Mr. Alonso Alonso.

With respect to the valuation of the elements of reasonableness and necessity of a measure challenged in cases such as this case, *the maximum federal forum held that it is not warranted to grant absolute deference to the legislative judgment when the very interest of the State is in play. United States Trust Co. v. New Jersey, supra, p. 26; Bayrón Toro v. Serra, supra, p. 620. The contrary, reasoned the United States Supreme Court, would imply that the constitutional clause against the impairment of contractual obligations would not provide any protection and, in essence, would be dead letter. United States Trust Co. v. New Jersey, supra, p. 26. Therefore, the State must prove in the courts that the measure is reasonable and necessary. United States Trust Co. v. New Jersey, supra*, p. 30.

In this sense, in the mentioned precedent, the United States Supreme Court left clear that "[a] a State is not completely free to consider impairing the obligations of its own contracts on a par

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

with other policy alternatives.   Similarly, *a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.*" (Translation and emphasis ours.)   *United States Trust Co. v. New Jersey*, *supra*, p. 30.   That is, in these cases the State is required to prove that less drastic measures do not exist.   *Id.* In so holding, the United States Supreme Court discarded the State's allegation that the selection of available alternatives is an issue of absolute legislative discretion.   *Id.*

It is our opinion that this norm is more relevant when the measure adopted by the State is intended to resolve a fiscal crisis relative to the administration of its finances and its effect is the same as severely impairing the vested rights of thousands of employees appointed according to the legal system established by the Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service, Law No. 184 of August 3, 2004 (3 L.P.R.A. sec. 1461, *et seq.*), and its predecessor laws.   *In moments of fiscal crisis, the State has the authority and the duty to design and adopt mechanisms to solve its economic problems.   Such authority, however, is not unlimited.   Precisely, the constitutional clause against the impairment of contractual obligations imposes a limit on such power.*

In the instant case, the State, as part of the measures adopted in Law No. 7, *supra*, opted to implement a layoff plan of thousands of public employees who have vested rights over their positions.   The fact that they – as Government Employees – have a contractual relationship with their employer – the State – established under the applicable law, and that it was severely impaired is not at issue.   The same occurs with public employees who are members of unions, since they, represented by their unions, established a contractual relationship with the State provided in the collective bargaining agreements subscribed according to the Puerto Rico Labor Relations for Public Service Act, Law No. 45 of February 25, 1998 (3 L.P.R.A. sec. 1451, *et seq.*).

However, the expedited judicial process requested by the State and authorized by this Court redounded in the sparse files before our consideration, which impedes us from adequately evaluating the constitutionality of said layoffs plan of Law No. 7, *supra*, according to the criteria established by the United States Supreme Court and by this Forum.

The impediment is even more serious when considering the fact that an evidentiary hearing was never held before a judicial forum that would allow the State to prove, as required by *United States Trust Co. v. New Jersey*, *supra*, that its action is necessary and it meets the parameters required to validate this type of legislation.   It is for that reason, precisely, that the majority of the Court is obligated to rely solely on the Preamble of Law No. 7 and accept as fact the data contained therein which, after all, only constitutes the State's allegations.   This way, the Court actually grants total deference to the text of the law, it abdicates its judicial function, and, therefore, it deprives the parties of due process of law, in clear contravention of the holding in *United States Trust Co. v. New Jersey*, *supra*.

In accordance with our role as the highest judicial forum of Puerto Rico, we must ensure respect for, at least, the minimum scope of protection granted by the clause against the impairment of contractual obligations of the United States Constitution, as delimited in *United States Trust Co. v. New Jersey*, *supra*.   *Contrary to that, this Court departs from those minimum criteria and it incurs, unjustly, in what such jurisprudence seeks to avoid: blindly relying on the Preamble of the law when the State's very interest is at stake.*

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

In our opinion, the Opinion of the Court constitutes an invitation to the United States Supreme Court to correct this Forum's errors, just as it did in *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147 (1993). On that occasion, the United States Supreme Court revoked the majority decision issues in that case and reached the same conclusions upheld by both Associate Justice Mr. Negrón García and me, who dissented then.  See, *El Vocero de P.R. v. E.L.A.*, 131 D.P.R. 356, 436 and 440 (1992).  The procedural tract followed in this case opens the doors so that the only forum now available to the laid off employees can intervene in the dispute and follow a course of action equal to that in *El Vocero de Puerto Rico v. Puerto Rico*, *supra*.

B.      On the other hand, we find incomprehensible the distinction that the majority attempts to make in their decision to grant lifetime police escorts to the former governors in *Hernández, Romero v. Pol. de P.R.*, 177 D.P.R. 121 (2009).  On that occasion, the former governors claimed to have a lifetime vested right to police escort service, of which they alleged they could not be deprived without the holding of a hearing that complied with the guarantees of due process of law.  This Court agreed with them and found that the former governors have a vested right that enjoys the same protection as a constitutional right.  More important yet, it held that a vested right "*is constitutionally protected against any government endeavor that purports to intervene with it.*"  (Emphasis ours.)  *Hernández, Romero v. Pol. de P.R.*, *supra*, p. 146, Subheading V.

In the instant case, however, this Court holds that career public employees do not have a vested right to their jobs.  The reason outlined to reach such conclusion seems to us, at the very least, surprising: "absent is the element of *protection of a prior law* that would have granted such right."  (Emphasis in the original.)  Opinion of the Court, p. 70.  Unfortunately, by proceeding in this manner the Court sidesteps the provisions of the Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service, the laws prior to this one, and the norms developed in this Forum's jurisprudence.  The laws relative to personnel in public service recognize, for more than half a century, the principle of merit as the fundamental pillar that governs the system of career public employees in matters such as their retention in employment.  However, the Court ignores the foregoing, as well as the rights contained in the collective bargaining agreements subscribed under Law No. 45, *supra*.

On the contrary, in the case of the former governors' escorts *no legal provision whatsoever existed that expressly recognized the right that they claimed.  Precisely, for that reason, they requested that they be permitted to show, through a hearing, that throughout the years they had acquired that right through the custom of the Police providing them the service at issue.*  Given that reality, this Court, without receiving any evidence from the parties, relied solely on the allegations of the former governors and on the questioned doctrine of *re-enactment* to acknowledge the existence of the lifetime right to escorts as a vested right.  That is, even facing legislative silence, the same majority that today issues the Opinion of the Court concluded that the former governors had a vested right.

Certainly, the decision in the case of the escorts drastically contrasts with the course of action that the Court adopts in the instant case.  Contrary to the former governors' claim, the claim of the laid off public employees is based on the express provisions of a legal system that guarantees them the principle of merit in public service and grants them proprietary rights.  We cannot guarantee that given the claim of their rights, not only vested, rather expressly conferred by law, a criterion is adopted that is different from the one established in the case of the former governors' escorts.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

According to our holding in that case, this Court should have denied the issuance of writs of certification requested by the State and have allowed the parties to have an opportunity to prove their allegations in the judicial forum.  Just as we mentioned then, the fact that the issue is elucidated before the lower forum will not impede the latter from addressing it with the urgency and priority nature required by an issue of such high public interest as is the instant issue.  Be advised, also, that such ordinary process would not have affected the Government's interest in validating the dismissals, since these were never stayed.  However, this Court chose a precipitated course of action that eliminated the vested rights of the public servants who knocked on the doors of the judicial forum in search of our protection.

## II

Finally, although we are aware of the fiscal crisis that affects the State's coffers and of the efforts that the constitutional powers are making to address this situation, the Opinion that the Court issues in the captioned cases departs from the minimum guidelines recognized by the United States Supreme Court with respect to the constitutional clause against the impairment of contractual obligations.  Due to the procedural process followed in the instant case – where not even an evidentiary hearing was held – the parties did not have a forum where, through economic reports, testimonies or contributions by experts or specialists in the matter, or any other mechanism of evidence, they could state their positions.  That way a clear picture would have been formed, before an impartial third party, of the fiscal situation that the country was undergoing and an adequate evaluation could have been made as to whether, in the face of such situation, the decision made by the State is the least onerous alternative, according to the parameters set forth in the federal and state jurisprudence.

Not having provided the parties with an adequate opportunity to prove their points of view and to dispose of the case without the rigor required of us by a controversy such as the one at issue herein is clearly contrary to the principle of procedural equity that must govern all judicial processes.  Thus, then, the decision of this Court deprives the affected public employees of their vested rights without even having provided them with a complete and transparent judicial process. , which unfortunately will have the effect of undermining the legitimacy of this Court's decision and will contribute to creating even more distrust of the wisdom and validity of the action taken by the State to resolve its fiscal problems.

*The magnitude of the impact of Law No. 7, supra, on the public employees, the economy, and the social situation of Puerto Rico requires that we be extremely rigorous and careful when adjudicating the issue before us.  The decision of the majority of the Court today not only sets aside the rights of the public employees, but that in doing so it ignores the adequate proceeding and the applicable norms established both by the United States Supreme Court and by this Court.  Since this deals with the sustenance of thousands of Puerto Rican families, and having dedicated much of our professional life to public service, we cannot take so lightly our responsibility to vindicate the constitutional rights of the citizens.  Therefore, we dissent.*

### --O--

Dissenting opinion issued by Associate Justice Ms. Fiol Matta.

... There is no doubt that the proprietary interests of a public employee are substantially affected by a dismissal.   *The salary of a public employee constitutes, in most situations, his sole source of income.   He depends on that for the sustenance, roof, and support of his family.   Depriving the public employees of the income significantly disarticulates the economic and emotional stability of those families that are deprived of that source of income. (Emphasis ours.) J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, p. 598.

In the opinion that is certified today, the majority of the Court endeavors to elaborate a logical legal reasoning, capable of sustaining the constitutionality of Law No. 7 of March 9, 2009, as amended.[1]   However, its methodology, hermeneutics, and constitutional premises are, in my opinion, totally unacceptable and the result of its effort is a faulty building in its foundation, as fragile as a house of cards.

The majority has decided to address the issue of the constitutionality of Chapter III of Law No. 7 of 2009, consolidating dissimilar cases and certifying them prematurely to harry to resolve the constitutional issue.   Without having evidence in the record, it has been inclined to affect the jobs of public employees, which constitute a constitutionally protected vested right.   This is done based exclusively on the preamble of the law or, what is the same, on the State's allegations.   Such action causes this Court to not comply, in this case, with its constitutional judicial duty to adjudicate disputes in a restrained manner and with legal justification.

The majority is wrong.   Chapter III of Law No. 7 de 2009 is unconstitutional, not only from its face, but also in its application.   It violates the constitutional clause of due process of law and the clause on impairment of contractual obligations.   Definitely, not only does it affect the public employees' vested rights to their jobs but it belies our labor laws and half a century of constitutional interpretation.   For that, respectfully, I dissent.

## I

*Errors of method in the adjudication*

*The genesis of the problem was the decision to certify these cases, before receiving evidence of developing the parties' theories at the lower court's level.*   Article 69 of Law No. 7 of 2009 purports to compel this forum to exclude from the Courts of First Instance of from the Appellate Court any case in which the constitutionality of this statute is questioned, regardless of the stage it is in, with the mere filing of a request to those effects by one of the parties.[2]   The majority of

---

[1] Special Law Declaring a State of Fiscal Emergency and Establishing an Integral Plan of Fiscal Stabilization to Save the Credit of Puerto Rico.

[2] Article 69 of the Special Law Declaring a State of Fiscal Emergency and Establishing an Integral Fiscal Stabilization Plan to Save the Credit of Puerto Rico, Law No. 7 of March 9, 2009, provides the following:

"The Supreme Court of the Commonwealth of Puerto Rico shall issue a writ of certification at the request of a party to immediately bring before it and resolve any issue pending before the Court of First Instance or before the Court of Appeals when the validity or constitutionality of this special Law or any challenge to the same of any kind is argued."

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

the Court seems to have understood that this impedes or annuls the exercise of our discretion to evaluate the request. *The truth is that this precept affects the balance of powers and has a bearing on our judicial function and, for that reason, we cannot interpret it by abstracting ourselves from the discretionary nature of the request for certification.* In weighing whether a writ of this kind should be issued it is necessary to consider the complexity of the issue, its urgency, the need to receive and argue the evidence, and the procedural stage the case is in.[3]

Likewise, before making the decision to consolidate several cases, one must evaluate whether the facts of the cases and the issues, which require adjudication, are common.[4] The opinion does not indicate whether these factors were pondered before consolidated the cases we have before our consideration, which we would have expected, especially when in two of the consolidated cases (CT-2009-5 and CT-2009-6) various resolutions had already been issue to deny their consolidation. Moreover, these cases were assigned to different judges and it is not known when the decision was made to consolidate them and assign all of them to the Judge who wrote the opinion, Associate Justice Mr. Kolthoff Caraballo, or who made it.[5] The much checkered consolidation, so to speak, of these cases is the second factor that proves that the method and legal grounds of the majority opinion are inconsistent and illogical.[6]

A brief analysis of the records of the consolidated appeals allows us to perceive that the issues that are presented are not only complex but multiple and diverse. Among these, some cases allege discrimination by reason of political affiliations, others discrimination due to pregnancy. There are also allegations of discrimination by reason of age, breach in the application of the law with respect to seniority and to the principle of merit, as well as allegations of exclusion from the application of the law, based on Article 37.02, among others. In addition, the unconstitutionality of Law No. 7 of 2009 is argued for violation of due process of law in its procedural and substantive aspect, the impairment of contractual obligations, and the unconstitutional delegation of powers by the Legislature to the Executive Branch.

*Each of these issues could require the initial intervention of the administrative forum or of the Court of First Instance to discuss the evidence and create a record that would allow the effective*

---

[3] Rule 23 of the Rules of the Supreme Court, 4 L.P.R.A. App. XXI-A. See, also, J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. II, pp. 836–838 and 890–892.

[4] Rule 38 of Civil Procedure, 32 L.P.R.A. App. III.

[5] According to the Rules of the Supreme Court, the assignment of cases is incumbent upon the Presiding Justice of the Court and, in the alternative, to the Associate Justice with the highest seniority. Rule 5 of the Rules of the Supreme Court, 4 L.P.R.A. App. XXI-A.

[6] For example, in one of the consolidated cases (CT-2009-5), on November 16, 2009, the legal representative of the employees filed a motion for partial voluntary dismissal without prejudice, because the Puerto Rico Fiscal Restructuring and Stabilization Board (F.R.S.B.) had postponed the dismissals of a group of employees. In due course, the State opposed, because it understood that the proposed dismissals did not make the issue moot because the determination of the State had no signs of permanence. These motions were never resolved by this Court and in the majority opinion, the voluntary dismissal was "granted." However, the same was not done with respect to CT-2009-06. In this last case, the dismissal of the plaintiffs was also postponed and, inexplicably, the majority did not dismiss the claim. I understand that the position of the State is correct, because the aforementioned exception to the doctrine of mootness was established. Consequently, the complaint of the employees who requested it should not have been dismissed.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

work of the appellate forums, including that of this Supreme Court.   It is axiomatic that the Law does not apply in a vacuum, it requires facts that serve as the basis to apply the norms.   On this issue, author Casimiro A. Varela warns about the following:

> ... [J]udicial decisions must not be self-reliant ... it is not enough that a decision have grounds, it is necessary that these be, in turn, well founded..
>
> ........
>
> [T]he one corresponding to the law and the one that requires proven circumstances of the cause.[7]   (Emphasis ours.)

In that same line of analysis, Varela explains that the absence of evidence, on which to base a decision,

> ... can also give rise to the apparent grounds of fact or of law.
>
> In such cases ... the judges considered themselves exempted from reasonably grounding their decision, *substituting the reasons with dogmatic affirmations or only apparent grounds.*   (Emphasis ours.)[8]

*Despite all of these considerations, these appeals were certified in an expeditious and untimely fashion. That led to: (1) not providing the parties with a forum in which to present and argue their discrepancies with respect to the evidence; (2) the records with which we should work at this appellate stage lacks evidence and findings of facts; (3) this Court's decision be based, therefore, on mere allegations; and, in short, (4) this Court was not able to adequately exercise its adjudicative duty.   Definitely, the foregoing has caused the violation of the constitutional and labor rights of these public employees of the central government.*

*Since the only thing that is in the records of the cases is the complaint, the request for certification, and the interlocutory motions, the majority opinion uses, exclusively, the text of Law No. 7 and, particularly, the facts stated in its preamble, to justify the legislative action.*   For adjudicated purposes, then, deemed true and sufficient were facts such as: (1) the absence of alternatives of actions that could have prevented the dismissals; (2) the alleged structural deficit of $3,200 million; (3) the layoff plan designed by the Puerto Rico Reconstruction and Stabilization Board (F.R.S.B.), according to the parameters of Law No. 7; (4) the list by seniority of all of the employees of the central government; (5) studies and reports that justify opting for a new layoffs plan instead of the plan provided in Law No. 184 of August 3, 2004, as amended (Law No. 184), 2004 (Part 1) Laws of Puerto Rico 1128–1209, known as the Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service; (6) the savings obtained as a result of the dismissals, this in connection with the number and cost of subcontracts; and (7) the alleged government gigantism.   All of that without the possibility of questioning by those who challenged the action of the State or offering evidence to the contrary.

---

[7] C.A. Varela, *Valoración de la Prueba*, 2nd Ed., Buenos Aires, Ed. Astrea 1999, p. 53.

[8] *Id.*

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

This way, the premature certification of the appeals propitiated a structurally defective adjudicative method.  In short, the procedure that was followed to adjudicate the issue that is before our consideration resulted in a decision that lacks valid justification.[9]  For writer C.A. Varela, this situation is problematic because*,*

> ... within a rational concept of justice, the condition that motivates the decision must be the logical conclusion of an analytical examination of the facts and of a critical appreciation of the elements of proof.

> The existence of a method makes possible that a simple subjective belief acquires an impersonal character that is imposed on all, not only on the issues of law, but also on the issues of fact.[10]

Certainly, the key to imparting justice is the congruence between the recognized norms and principles of Law and the concrete facts of the case.   In this regard, commentator M.C. Redondo tells us:

> Judges must decide conflicts through justified decisions.  It is understood that a legal judgment must be a decision based on general norms.  This means that it has to be able to be reconstructed according to the structure of a valid argument. The general statement of legal duty (norms or principles) constitutes the major premise, the description of the facts that occurred constitutes the minor premise, and the content of the judge's individual decision forms the conclusion.[11]

This author adds the following:

> ... [T]he legal argument must be supported on guaranteed premises.  In turn, this idea constitutes the corollary of a more general principle of rationality, according to which all justification must be based on justified reasons, in turn .... The practical argument in the logical sense only serves a formal concept of justification and does not guarantee that the premises constitute substantive reasons for the action .... *By definition, the conclusion will only be justified if the premises are too.*[12]  (Emphasis ours and scholium omitted.)

In short, all our analytical efforts must be aimed at shedding the premises of our reasonings, so that, fed by the knowledge acquired, we can honestly discard those that are not based on substantive reasons.  This was not what happened when the majority opinion was prepared.  On the contrary, when analyzing it in light of the elements listed by Redondo we find that *the opinion is wrong in elaborating the major premises of its reasoning; that is, the applicable norms of law, as we will discuss below, but more dangerously.  It is wrong insofar as the*

---

[9] See, R. Badenes Gasset, *Metodología del Derecho*, Barcelona, Ed. Bosch, 1959, p. 17.

[10] Varela, *op. cit.*, p. 86.

[11] M.C. Redondo, *La noción de razón para la acción en el análisis jurídico*, Madrid, Centro de Estudios Constitucionales, 1996, p. 118.

[12] *Id.*, pp. 230-231.

*CERTIFIED TRANSLATION*                           by: Olga M. Alicea, fcci, njitce-s

*judicial function is concerned, since it lacks a valid minor premise, since it relies on the facts stated in the Preamble of the law which are, in short, the facts alleged by the State.*   The union of both errors of method can only lead us to the error in the decision.   Let us see some specific instances.

First, as we already explained, to determine the relevant facts, the majority opinion relies exclusively on the Preamble and it accepts, without evidence, that a fiscal crisis exists and a problem of government gigantism, and also that there is no other option to correct the structural deficit of the central government other than the dismissal of public employees and the suspension of labor rights.   This, even though there are various reports or documents that question these hypotheses.   *In other words, the majority of this Court did not take into consideration positions different from the one adopted by the Legislature, because there was no opportunity to receive and argue evidence in a Forum of First Instance or administrative forum.*

Specifically, in part IV(B) of its opinion, *the majority summarizes and paraphrases the parts of the Preamble of Law No. 7 that allude to the fiscal crisis.*   Specifically, it breaks down the data on the alleged structural deficit into four sub-themes, to wit: the reasons for the crisis, the consequences of the crisis, the alternatives to the crisis, and the solution implemented by the Legislature.   *Finally, it applies that data, whose only source if the Preamble, and that also turn out to be the allegations of the State, without examining evidence that supports or contradicts them.*   This process of analysis and reasoning leads to expressions such as the following:

> Respondents' layoffs, together with the layoffs of the other thousands of employees, although unfortunate, will cause, without a doubt, a genuine and substantial savings in the government's coffers. (Emphasis suppressed.)[13]

In addition, the law in question presents a fiscal picture of a Government that is on the verge of chaos.[14]

> ... On the other hand, the elimination by Law No. 7 of all of the processes prior to a layoff established in Law No. 184 respond to the need that the purpose of the law be achieved urgently.   As stated in Art. 37.04(b)(1) of the very Law, there is an urgency in correcting the fiscal problems that we face.   The process of layoffs established by Law No. 184 is one based on the principle of merits, which is incompatible with the purpose of Art. 2 of Law No. 7.   (Emphasis suppressed.)[15]

> ... Given the picture that the very law presents, and our obligation to adopt an attitude of great deference toward legislative action, we must conclude that the State acted reasonably.   (Emphasis in the original suppressed and emphasis ours.)[16]

---

[13] Opinion of the Court, p. 59.

[14] *Id.*, p. 50.

[15] *Id.*, pp. 59-60.

[16] *Id.*, p. 61.

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

> On the other hand, and as is also explained in the Preamble of the law, establishing tax measures only is not a viable alternative either. (Emphasis ours.)[17]

Second, too often the opinion resorts to generalities to shore up its reasoning. For example, expressions such as:

> Our country, and *we could affirm* the rest of the world, lives very convulsive moments in the economic and financial aspect. (Emphasis ours.)[18]

> ... Unfortunately, *such dismissals are added to the approximately more than 120,000 employees in private enterprises who during the past three years have also lost their jobs* on our Island. (Emphasis ours.)[19]

> Law No. 7 repeatedly declares a "state of fiscal emergency" in Puerto Rico. *It constitutes the first time in history that our Legislature uses the term "state of emergency,"* in the context of an economic situation throughout the entire Country. (Emphasis in the original suppressed, emphasis ours, and scholium omitted.)[20]

I should point out that also cited out of context are certain expressions of mine in a dissenting opinion in the case of *Asoc. Maestros v. Depto. Educación*, 171 D.P.R. 640 (2007), to support the conclusion that having a proprietary interest in a position does not entail having a vested right. Specifically, it is cited that "not all legal situations arising under a prior law is a vested right protected by the principle of non-retroactivity in relation to another subsequent law." *Id.*, p. 665. The opinion disregards the fact that a proprietary interest in an employment position is something very different from what is considered in that case, which was an exemption from the payment of fees for services that some employees not affiliated with a union enjoyed, under a subsequently repealed law.[21]

---

[17] *Id.,* pp. 61-62.

[18] *Id.*, p. 15.

[19] *Id.*

[20] *Id.*, pp. 48-49. On occasion, we overlook that some articles of Law No. 7 to which the opinion refers, were amended. For example, Article 37.02, which in its amended version excludes from its application numerous employees, in addition to those mentioned in scholium 13, p. 21 of the opinion, according to Law No. 37 of July 10, 2009. On the other hand, the text of the opinion mentions Article 40 of Law No. 7 to establish that it provides that "the collective bargaining agreements that expired on the date the law entered into effect or that expire during the term of this law cannot be extended or negotiated"and that "[t]his prohibition will extend for a period of two years, as of the effectiveness of the very law." *Id.*, p. 31. This article also was amended by Law No. 37 of 2009, to the effects of extending the collective bargaining agreements that expired, or that would expire during the term of Law No. 7, until March 9, 2011, and prohibit union organization during that same period. *There is no dobut that these errors are the product of haste in deciding the appeal.*

[21] The issue in this case was whether Law No. 96 of August 7, 2001 (Law No. 96), which authorized the collection for service from employees who opted to not be affiliated with the union organization, should apply retroactively to these workers who did not become affiliated when Section 4.2 of Law No. 45 of February 25, 1998 (Law No. 45), known as the Puerto Rico Labor Relations for Public Service Act, 3 L.P.R.A. sec. 1451c (2000 Ed.), was in effect,

*Continued...*

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

*Third, and more troubling yet, the majority opinion takes out of context an entire section of our Constitution by basing the exercise of police power in this case on the provisions of Article II, Section 18, L.P.R.A., Tome 1. This section refers, concretely, to the right of workers to strike, to establish pickets, and to carry out concerted activities and it does not have anything to do with the Legislature's authority to enact laws to address a fiscal crisis.*   It is in connection with the possibility of limiting these labor rights that our Constitution acknowledges the Legislature's authority to enact laws in cases of serious emergency.   This section, of which the majority opinion cites just the last sentence, states the following:

> *Section 18: Right to Strike*
>
> In order to assure their right to organize and to bargain collectively, persons employed by private enterprises, businesses, and individual employers, and by government agencies or instrumentalities operating as private enterprises or businesses, in their direct relations with their own employers shall have the right to strike, to picket, and to engage in other legal concerted activities.
>
> Nothing contained in this section shall impair the authority of the Legislature to enact laws in cases of serious emergency when the public health or safety or the essential public services are at risk.[22]

Clearly, the intention of the constituents when approving this section was, first, to acknowledge the right to collective bargaining and, second, to acknowledge the Legislature's authority to enact the laws that may be necessary to protect the public health, safety, and wellbeing when an emergency arises as a result of a strike.[23]   Specifically, the emergency situations that concerned the constituents were the deprivation of food, medicines, and adequate hospital services, the suspension of electric light and transportation and other serious harms that might be the result of a strike.[24]

*Fourth, the majority opted to address the constitutional argument of these cases, against the criteria of self-limitation that the United States Supreme Court established in the case of Ashwander v. Valley Authority*, 297 U.S. 288, 346 (1936), and that this Court adopted in the case of *E.L.A. v. Aguayo*, 80 D.P.R. 552, 566 (1958).   In pertinent part, this doctrine of self-limitation provides:

---

*Continued...*

and that to exercise such right they did not have to pay the service fees.   I concluded that the fact that Law No. 45 exempted from the payment of service fees the employees who did not become affiliated with the union prior to the enactment of Law No. 86 did not constitute a vested right, especially when those employees also enjoy benefits that can be obtained through collective bargaining.   Therefore, Law NO. 96 of 2001 could apply retroactively to these workers.

[22]  Art. II, Sec. 18, Const. of the Comm. of P.R. E.L.A., L.P.R.A., Tome 1, 2008 Ed.

[23]  3 Diary of Session of the Constitutional Convention 2265 (1952).   See, also, *A.A.A v. Unión Empleados A.A.A.*, 105 D.P.R. 437, 452–454 (1976).

[24]  Diary of Sessions, *supra*, p. 2266.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

> ... The Court will not "anticipate a question of constitutional law in advance of the necessity of deciding it."
>
> ... The Court will not "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."
>
> ... The Court will not pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.
>
> "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.   (Emphasis suppressed.)[25]

In addition, both the United States Supreme Court and this Court have emphatically held that "*the Court will not address a constitutional issue if the records are not adequate to make a determination of that nature.*"[26]

Finally, *the majority also decided to shorten the 30 days term that our Rules provide for each Judge to calmly consider the opinions circulated.  Moreover, the majority did not allow the Justices, who wanted to write their own opinion, to use the authority provided to them by the Rules to take additional time for that purpose.*[27]

I disagree with this course of action.  In doing so, I do not purport to deny the importance that this appeal has and the kindness to the country that it be resolved on a priority basis.  However, precisely because it is a case of high public interest that has a transcendental bearing on the labor and constitutional right of the affected employees, it was necessary to evaluate it carefully and to analyze it from different viewpoints.  Doing so would not have affected the existing situation at all, since the respondent employees were already dismissed from their jobs.[28]  However, since the majority of this Court decided to certify and consolidate these cases to address the

---

[25] *Sánchez, et al. v. Srio. de Justicia, et al.*, 157 D.P.R. 360, 387 (2002); *E.L.A. v. Aguayo*, 596, citing *Ashwander v. Valley Authority*, 297 U.S. 288, 346 (1936).

[26] *Sánchez, et al. v. Srio. de Justicia, et al.*, *supra*, p. 387; *E.L.A. v. Aguayo*, *supra*, p. 596.  See: *Sánchez et al. v. Srio. de Justicia, et al.*, *supra*; *Rescue Army v. Municipal Court*, 331 U.S. 549, 575 (1946); *Brotherhood of Teamsters v. Denver Milk Producers*, 334 U.S. 809 (1948); *Parker v. Los Angeles*, 338 U.S. 327, 329 (1949).

[27] It should be noted that Rule 5 of the Rules allows shortening the terms.  4 L.P.R.A. App. XXI-A, R. 23.

[28] Contrary to the last time the terms were shortened, in deciding the cases of *Suárez v. C.E.E. I*, 163 D.P.R. 347 (2004), and *Suárez v. C.E.E. II*, 163 D.P.R. 374 (2004), when it was urgent to decide the case in order to certify the governor who prevailed in the general elections and he could swear his position in little more than one month.  Then, just as now, it dealt with an issue of high public interest.  Hoswever, the issue presented in *Suárez* was just of Law and not of facts.  In addition, in *Suárez*, the State Elections Commission was a party in the case.  Also, this case dealt with the fundamental right to vote granted by our Constitution to all Puerto Ricans and, consequently, this Court was the one called upon to initially address this issue.  Finally, when entering the *per curiam* judgment in *Suárez* we had the benefit of a decision that the lower court had made in open court.

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

constitutional issue, despite the consideration that we have stated and the absence of evidence in the record, we are forced to discuss the constitutional aspects of this issue.

## II

*Law No. 7 of March 9, 2009, unconstitutional in its application*

A.      *Proprietary interest is a form of vested right*

Career public employees of the central government have a proprietary interest in their positions, as a result of various laws that the Legislature has enacted to govern the system of managing human resources in Puerto Rico.[29]   Usually, workers acquire this proprietary interest when they comply with the principle of merit at the time of their recruitment; that is, when they are chosen as the most suitable persons for the position and when once recruited, they favorably complete the probationary period.[30]

Once the career public employee obtains a proprietary interest over his position "he enjoys job security and can only be dismissed for just cause and after certain procedures *de rigeur*."[31] (Emphasis suppressed.)   Thus, any government action that intervenes with this proprietary interest must comply with the parameters established by the due process of law clause of our Constitution, which has its counterparts in the United States Constitution.[32]

Having addressed the foregoing, the majority opinion argues that "not all proprietary rights or interests are in turn a vested right." (Emphasis suppressed.)[33]   It sustains these expressions in a

---

[29]  In a period of 103 years, 5 personnel laws have been enacted until we get to the statute that Law No. 7 purports to suspend, the Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service, Law No. 184 of August 3, 2004 (Law No. 184), 2004 (Part 1) Laws of Puerto Rico 1122 (3 L.P.R.A. sec. 1462(e)(9)(a)). See, also, D. Fernández Quiñones, *Derecho administrativo y Law de Procedimiento Administrativo Uniforme*, 2nd Ed., Bogotá, Ed. Forum, 2001, pp. 375–376.

[30]  Sec. 6.6 of the Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service, Laws of  Puerto Rico of 2004, *supra*, pp. 1159-1160; 3 L.P.R.A. ant. sec. 1350 (1992 and 1999 Supp.). See, also: Fernández Quiñones, *op. cit.*, pp. 388-389; M.A. Velázquez Rivera, *Derecho Administrativo*, 70 Rev. Jur. U.P.R. 271, 279 (2001).

Another way to acquire a proprietary interest in a position, other than through a statute, is when the employment circumstances create a reasonable expectation of continuity so that the worker has a legitimate, not unilateral, claim of ownership over the benefit. *S.L.G. Giovanetti v. E.L.A.*, 161 D.P.R. 492, 506 (2004); *Lebrón Bonilla v. E.L.A.*, 155 D.P.R. 475, 489-490 (2001); *Orta v. Padilla Ayala*, 131 D.P.R. 227, 241 (1992); *Pierson Muller I v. Feijoó*, 106 D.P.R. 838, 846 (1978); *Lupiáñez v. Srio. de Instrucción*, 105 D.P.R. 696, 700-701 (1977).   As to the legal concept of "reasonable expectation of continuity," as modality of proprietary interest, the United States Supreme Court has established the norm that it is not necessary to have a written contract, or permanence based on a statute, to have a proprietary interest over the position.  That proprietary right can be the result of an implicit contract.  However, there must be a legitimate claim of ownership and not a mere unilateral expectation to remain in the position. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). See, D. Fernández Quiñones, *op. cit.*, p. 528.

[31]  *Camacho Torres v. AAFET*, 168 D.P.R. 66, 81 (2006); *S.L.G. Giovanetti v. E.L.A., supra*, p. 507.

[32]  *Orta v. Padilla*, *supra*, p. 241; *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499, 520, 523 (1990).

[33]  Opinion of the Court, p. 68.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

case that is totally distinguishable from the issue that is before our consideration due to the nature of the rights violated.  I refer to the case, cited by the majority of the Court, *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984).

In that case, Mr. José Vélez Reboyras had in the town of Utuado a business dedicated exclusively to electronic videogame machines.  The Legislature enacted Law No. 45 of June 4, 1982 (Law No. 45).  The same provided that any establishment that was dedicated exclusively to electronic games machines or pinball machines would have to be located at a distance of two hundred meters from public or private schools.  Also, it provided that the business of this nature that were already located at less than two hundred meters from schools would have to remain closed during school hours.  The purpose of the measure was to ensure the safety and academic achievement of children and young people.

When evaluating the issue, this Court found that the new law did not remove from Mr. Vélez Reboyras his proprietary interest or vested right over the property, rather it only limited the hours during which he could operate his business.  In addition, the opinion emphasized that, prior to the enactment of Law No. 45, specific legislation did not exist that conferred the "right" to operate on an unlimited basis an establishment dedicated exclusively to the operation of pinball machines.

This Court recently reiterated that a "'vested right ... is a consummated situation, in which the affected parties relied on the state of law that prevailed under the previous law.'" (Emphasis suppressed.)[34]   As Albaladejo points out, these are not "mere authorities, expectations, interests, or hopes."[35]   Nor are they authorities that the prior legislation consented to being exercised by the citizens, because they can be altered or changed by subsequent legislation.[36]

The legal term "vested right," as defined by commentator Suárez Collía, means:

> ... those that are *the result of a suitable fact, when produced pursuant to the law in effect in the time when the fact has been realized, and that have been incorporated into the patrimony of the person* even when the occasion to exercise them presents itself only under the new law.   (Emphasis ours.)[37]

More concretely, author Santos Briz explains which acts or legal enterprises originate a vested right.   In this regard, he states that

---

[34] *Hernández, Romero v. Pol. de P.R.*, 177 D.P.R. 121, 147 (2009). See, *Consejo Titulares v. Williams Hospitality,* 168 D.P.R. 101, 109 (2006).

[35] M. Albaladejo, *Derecho Civil*, 11th Ed., Barcelona, Ed. Bosch, 1989, T. 1, Vol. I, p. 204.

[36] *Consejo Titulares v. Williams Hospitality, supra*, p. 109.

[37] J.M. Suárez Collía, *El principio de la irretroactividad de las normas jurídicas*, 2nd Ed, Madrid, Ed. Actas, 1994, p. 55.   See, also, L. Díez-Picazo and A. Gullón Ballesteros, *Sistema de Derecho Civil*, 9th Ed., Madrid, Ed. Tecnos, 1997, Vol. I, p. 108; J. Castán Tobeñas, *Derecho Civil español, común and foral*, 12th Ed., Madrid, Ed. Reus, 1982, T. I, Vol. I, p. 616.

*CERTIFIED TRANSLATION*                                                           by: Olga M. Alicea, fcci, njitce-s

> ... to be able to properly speak of vested rights it is necessary that it deal with subjective situations, whose extent and scope are determined by a legal act or enterprise, not directly by the law, which is limited to making possible the conclusion of that act or enterprise (a contract, for example).  This singular or individual enterprise cannot be affected by the subsequent norm.  On the other hand, objective legal situations (for examine, property regime) can be modified by subsequent laws.[38]

In addition, this commentator emphasizes that once a right is acquired, it is never lost.  Only "the powers and authorities stemming from it, as well as the form and mode of its exercise" can be submitted to the new law.[39]  *That, and not the purported distinction between proprietary interest and vested right, was what happened in Vélez v. Srio. de Justicia, supra.*

In the particular case of career public employees, their proprietary interest over their position was granted, in principle, by some public service personnel law in effect at the time they began working for the Government.  However, this proprietary interest came into effect through an individual work contract when the employee complied with the principle of merit and concluded the probationary period, because ones the employee meets these two requirements he become a regular career worker in public service.  It is at that moment that all labor laws, regulations, and manuals are made part of the employment contract which is the legal agreement between the State, which is the employer, and the employee.

Since the proprietary interest that a regular career worker has in his position stems from a law that forms part of the labor contract, it can be established that such interest meets the requirements necessary to be a vested right.   In effect, *the proprietary interest over the position is a modality of vested right.*[40]   Professor Miguel Velázquez, cited to other effects in the majority opinion, states this principle in the following manner:

> *In general terms, the difference between a career employee and a trust employee is that the former has a vested right.   That is, a proprietary interest in permanent performance of his position.*  He cannot be dismissed, except for the causes indicated by law, and after proving charges against him.   (Emphasis ours.)[41]

Notwithstanding all of these legal considerations, the majority has remained in the position that the proprietary interest in the position that career employees have is not a vested right.  *This*

---

[38] J. Santos Briz, *et al.*, *Tratado de Derecho Civil: teoría y práctica*, Barcelona, Ed. Bosch, 2004, T. 1, p. 294. See, also: *Hernández, Romero v. Pol. de P.R., supra; Consejo Titulares v. Williams Hospitality, supra*, p. 109 (where reference is made to this same cite).

[39] Santos Briz, *op. cit.*, p. 294.

[40] The analysis made in this section of the opinion also applies to collective bargaining agreements.   The members of a union have a proprietary interest, or vested right, over their positions as a dual result of their individual employment contract and of the collective bargaining agreement.

[41] Velázquez Rivera, *supra*, p. 279.   Some examples of the jurisprudence that has recognized vested rights of workers and retirees from public service are: *Rodríguez v. Retiro*, 159 D.P.R. 467, 475 (2003); *Lebrón Bonilla v. E.L.A.*, *supra*, p. 490; *Sucn. Alvarez v. Srio. de Justicia*, 150 D.P.R. 252, 285 (2000); *Rodríguez v. Aut. de Tel. de P.R.*, 145 D.P.R. 595, 599 (1998).

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

*interpretation falls flat on its face with what this court decided in the case of Hernández, Romero v. Pol. de P.R.*, 177 D.P.R. 121 (2009).   At that time, it was established that the vested right of former governors Hernández Colón and Romero Barceló to have lifetime escorts was produced because the interpretation done for years by the Puerto Rico Police of Art. 3 of Law No. 77 of June 22, 1956 (25 L.P.R.A. ant. sec. 221b), known as the Puerto Rico Police Act, was endorsed by the Legislature when the latter did not materially amend said precept.   To support that result, the majority distinguished between an expectation and a vested right.   The former is an authority that was not exercised before the law was amended or repealed; it is more a hope or probability that can be modified.   However, a vested right is that authority that is exercised before the change in statute and through that exercise it became a right that was incorporated into the owner's patrimony, thus it is constitutionally protected from any government action, including executive orders.

The majority opinion then argues that since the employee's right over his position is subject to the possibility of being laid off, "if certain conditions are met and certain processes fulfilled," it is not a vested right.   This argument has no legal basis whatsoever.   Moreover, it contradicts everything we have explained regarding the figure of vested right.   *How is it possible that the interpretation of an article of the Puerto Rico Police Act produces a vested right to escorts, while, given the existence of all of our labor laws and the individual employment contract, it is argued that only a proprietary interest is produced, but not a vested right?*   We have explained that a law can limit the form and mode of exercising a vested right.   What our legal system does not permit is eliminating it without due process of law.   Consequently, *the majority's foundation is wrong and career public employees have a vested right over their positions.*

The question that remains to be addressed is whether Law No. 7, which turns out to be a law subsequent to the labor laws and to the individual and collective employment contracts, can be applied retroactively to undermine the vested right that career employees have to their position.

As a general rule, the principle of non-retroactivity of the laws prevails in our legal system. This is of a civil law origin and is governed by the following parameters:

> *Law will not have a retroactive effect, if they do not expressly provide otherwise.*
>
> *In no case can the retroactive effect of a law be prejudicial to the rights acquired under a prior law.*   (Emphasis ours.)[42]

According to Suárez Collía, retroactivity implies the "application of the legal norm to assumptions of facts, acts, legal relations, and/or situations constituted prior to the start of its formal effectiveness." (Scholium omitted.)[43]   The purpose of this principle is to provide, first, legal security and trust in the effectiveness of the laws in effect and,[44] second, acknowledge a justification of human morals based on the principles of individual freedom that guarantees to the

---

[42]  Art. 3 of the Civil Code, 31 L.P.R.A. sec. 3.

[43]  Suárez Collia, *op. cit.*, p. 10.

[44]  *Vázquez v. Morales*, 114 D.P.R. 822, 826 (1983), citing M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. EDERSA, 1978, T. I, p. 75.   See, also, Suárez Collia, *op. cit.*, pp. 42–57.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

citizens being able to act without obstacles at the margin of the law.[45]   Finally, the principle of non-retroactivity of laws responds to the collective psychology that proclaims that laws must look to the future and not to the past.[46]

Notwithstanding the foregoing, this non-retroactivity rule is not absolute.[47]   This can be perceived from the very precept, when it provides that, for a subsequent law to apply retroactively, the legislator must have established such fact expressly in its text.  However, in addition to the exception that the clause provides, it has been established that the retroactivity of a law can also arise implicitly, by studying the legislative intent.[48]   Of course, as long as such intent stems clearly and definitively from the text and the legislative history of the statute.[49]

However, a specific and significant limitation to the retroactive effect of a law, which originates expressly or tacitly, is that the retroactivity cannot affect the rights that the parties acquired as a result of a previous statute.[50]   In other words, *given a vested right, the retroactivity of laws exception cannot be activated.*

*As it has been established that employees have a vested right over their position, Law No. 7 cannot be applied retroactively.  Its effects can only be prospective.  To hold otherwise would be to suddenly eliminate all of the vested rights that the career public employees have obtained through the law, the individual employment contract, and the collective bargaining agreements.*

B.      Impairment of contractual obligations

Our supreme law contains a clause that limits the Legislature's authority to enact statutes that impair existing contractual obligations.  The text of that precept provides that "no laws shall be enacted that impair contractual obligations."[51]   Also, the United States Constitution contains an analogous provision that establishes the following: "No state shall ... pass any ... law impairing the obligations of contracts."[52]

The origin of our clause was Art. 2 of the Jones Act of 1917, specifically its paragraphs first and fifth.[53]   It was decided to incorporate this norm to our Constitution, without amendments,

---

[45]  *Vázquez v. Morales*, *supra*, p. 826, citing F. Puig Peña, *Compendio de Derecho Civil español*, 3rd Ed., Madrid, Ed. Pirámide, 1976, T. I, p. 125.

[46]  *Id.*

[47]  *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 386 (1973).

[48]  *Consejo Titulares v. Williams Hospitality*, *supra*, p. 168; *Rodríguez v. Retiro*, *supra*, 476; *Nieves Cruz v. U.P.R.*, 151 D.P.R. 150, 158–159 (2000); *Vélez Reboyras v. Srio. de Justicia*, *supra*, p. 542; *Warner v. Tribunal Superior*, *supra*, p. 386.

[49]  *Asociación Maestros v. Educación*, *supra*; *Vargas v. Retiro*, 159 D.P.R. 248, 263–264 (2003).

[50]  *Consejo Titulares v. Williams Hospitality, supra*, pp. 108–109.

[51]  Art. II, Sec. 7, Const. of the Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 296.

[52]  Art. I, Sec. 10, U.S. Const., U.S.C.A. Const.; L.P.R.A., Tome 1.

[53]  J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pp. 187; R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pp. 858–859.

*CERTIFIED TRANSLATION*                              BY: OLGA M. ALICEA, FCCI, NJITCE-S

because the advisors of the Constitutional Convention recommended it to prevent misinterpretations from being formed that would be prejudicial to "the measures aimed at bring investments and encouraging production in all aspects."[54]

*The purpose of this provision is to ensure stability in contractual relations, because they are considered an important social value that requires the protection of our legal system.*   Impairing contractual obligations would imply modifying the legal consequences of what was covenanted, in detriment to one of the contracting parties.   In other words, there would be no certainty to what was covenanted, nor would there be rational grounds for legal acts or enterprises.   Such situation, caused by legislative action, would result in the distrust of the contracting parties and in the destabilization of society.[55]

However, this principle of protection of contractual obligations is not absolute, because it must be balanced with the power to regulate of the State.[56]   That is, there must be a consistent relationship between the search for certainty in contracts that seek the constitutional limitation and the exception to the rule, based on the power of the State to regulate measures that safeguard society's wellbeing.[57]   Otherwise, the objective of the constitutional guarantees of protecting the citizen against arbitrary and unreasonable acts sustained under the mantle of the sovereign power of the State would be lost.

It is imperative to acknowledge that not all contractual impairments violate the constitutional guarantee.[58]   When analyzing whether a statute violates the impairment of contractual obligations clause it is necessary to refer to the interpretation that the United States Supreme Court has made of this precept, since it represents the minimum protection that our legal system can provide to the citizens.[59]   Of course, always considering that "our Constitution has a broader

---

[54] Serrano Geyls, *op. cit.*, pp. 858–859.

[55] *Warner Lambert Co. v. Tribunal Superior, supra*, p. 395.   The counterpart clause in the U.S. Constitutional had a similar purpose:

"In the construction of the contract clause, the debates in the Constitutional Convention are of little aid. But the reasons which led to the adoption of the clause, and of the other prohibitions of Section 10 of Article I, are not left in doubt .... The widespread distress following the revolutionary period, and the plight of debtors, had called forth in the States an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations. Legislative interferences had been so numerous and extreme that the confidence essential to prosperous trade had been undermined and the utter destruction of credit was threatened .... It was necessary to interpose the restraining power of a central authority in order to secure the foundations even of 'private faith.' " (Scholium omitted.)  *Home Bldg. & L. Assn. Blaisdell*, 290 U.S. 398, 427 (1937).

[56] See: *Beer Co. v. Massachusetts*, 97 U.S. 25 (1877); *Louisville Gas Co. v. Citizen's Gas Co.*, 115 U.S. 685 (1883); *Pennsylvania Hospital v. Philadelphia*, 245 U.S. 20 (1917); *Treigle v. Acme Homestead Ass'n.*, 297 U.S. 189 (1936).

[57] *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977); *Home Building & Loan Assn. Blaisdell, supra*, p. 439.

[58] *Bayrón Toro v. Serra*, 119 D.P.R. 605, 619 (1987); *United States Trust Co. v. New Jersey, supra*, p. 16; *El Paso v. Simmons., 379 U.S. 497, 506–507 (1965).

[59] *Bayrón Toro v. Serra, supra.*

*CERTIFIED TRANSLATION*                                              by: Olga M. Alicea, fcci, njitce-s

bill than the United States Constitution with respect to rights such as the prohibition to impair contractual obligations." (Emphasis suppressed.)[60]

The jurisprudence has produced an analysis to determine whether a law is unconstitutional, in light of the impairment of contractual obligations clause. The first step in this analysis entails identifying the type of contractual relationship affected, in terms of whether the contract is strictly between private parties or whether the State is one of the contracting parties.[61] The second step is to evaluate whether the modification that the legislative measure provoked in the contract is substantial or severe.[62]

In the case of private contracts, the third step requires examining whether the interest sought by the government with the statute is legitimate, as it would be if the measure was intended to resolve an economic or general social problem.[63] Finally, a criterion of reasonableness is used to evaluate whether there is a reasonable relationship between the State's interest and the means selected to achieve it. It has to do with "'a reasonable balance between the social interest of promoting the common good and the interest, also social, of protecting contractual transactions from the arbitrary and unreasonable application of the laws.'"[64] With respect to the evaluation of reasonableness of a law, the United States Supreme Court has granted deference to legislative judgment.[65] As can be seen, the analytical rigor in private contracts is similar to the rational scrutiny of due process of law and equal protection of the laws.[66]

*However, the scrutiny adopted by our jurisprudence, following the guidelines of federal jurisprudence, to verify the constitutionality of the statute that modifies a public contract, in which the State is one of the contracting parties, is of another type.* In those cases, in the United States they use a criterion of intermediate analysis that our jurisprudence has called "cautious."[67] *The idea is that in these cases it is not enough to rely on the criterion of reasonableness, since one must prevent the action of the State from being for its own benefit.*[68] Once the type of contractual relationship is identified as government, the second step is to evaluate the severity of the impairment. When the damage produced by the impairment of contractual relations is severe, the level of scrutiny is raised to a careful examination of the nature and purpose of the state

---

[60] *Emp. Pur. Des., Inc. v. H.I.E.T.E.L.*, 150 D.P.R. 924, 948 (2000).

[61] *Bayrón Toro v. Serra, supra*, p. 620; *United States Trust Co. v. New Jersey, supra*, p. 17.

[62] *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983); *Warner Lambert Co. v. Tribunal Superior, supra*, p. 401.

[63] *United States Trust Co. v. New Jersey, supra*, p. 22; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247, 249 (1978).

[64] Bayrón Toro v. Serra, supra, p. 620; Warner Lambert Co. v. Tribunal Superior, supra, p. 395.

[65] *East New York Bank v. Hahn.*, 326 U.S. 230, 232 (1945), cited in *United States Trust Co. v. New Jersey, supra*, pp. 22–23.

[66] *Warner Lambert Co. v. Tribunal Superior, supra*, p. 395.

[67] This analysis is similar to the intermediate scrutiny used in federal jurisprudence for semisuspicious classifications, such as discrimination due to gender. See, *Craig v. Boren*, 429 U.S. 190 (1976).

[68] *Bayrón Toro v. Serra, supra*, p. 620; *United States Trust Co. v. New Jersey, supra*, pp. 25–26.

*CERTIFIED TRANSLATION*                                                    by: Olga M. Alicea, fcci, njitce-s

law.[69]   The third step is to determine whether an important government interest exists.[70]   It has been established that this determination cannot be made by the states, because if they could justify the impairment of their contractual obligations as of their own determination of what is important, then the constitutional clause would have no value whatsoever.[71]

Contrary to private contracts, *modification in public contracts must be necessary, in additional to reasonable*.[72]   To determine the reasonableness of a law one must consider "the substantiality of the public interest promoted by the same and the dimension of impairment caused by its retroactive application."[73]   A factor to determine this reasonableness is the extent of the impairment and the existence of a declared emergency.[74]   On the other hand, the necessity is established taking into consideration two criteria: (1) whether the legislative measure was essential, and (2) whether there were no other less onerous and damaging alternatives to achieve the objective of the statute.   Using this analysis, *the federal jurisprudence has determined that the State cannot impose drastic measures when there is evidence of other more moderate courses of action and that, likewise, they can satisfy the State's interest.*   Specifically, in the fundamental case on this issue, the United States Supreme Court concluded:

> The determination of necessity can be considered on two levels. First, it cannot be said that total repeal of the covenant was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitations on the use of Port Authority collections and reserves to subsidize commuter railroads. Second, without modifying the covenant at all, the States could have adopted alternative means of achieving their twin goals of discouraging automobile use and improving mass transit. Appellees contend. however [sic], that choosing among these alternatives is a matter for legislative discretion. *But a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.*   (Emphasis ours.)[75]

The United States Supreme Court has also held that, contrary to the impairment of private contracts, *when a public agreement is broken complete deference is not granted to the analysis of reasonableness and necessity that the Legislature may have done.   The reason is clear: there is*

---

[69] *Energy Reserves Group v. Kansas Power & Light, supra*, p. 411; *Allied Structural Steel Co. v. Spannaus, supra*, p. 261.

[70] *Bayrón Toro v. Serra, supra*, p. 621; *United States Trust Co. v. New Jersey, supra*, p. 21.

[71] *United States Trust Co. v. New Jersey, supra*, p. 26.

[72] *Bayrón Toro v. Serra, supra*, p. 620.

[73] *Warner Lambert Co. v. Tribunal Superior, supra*, p. 396.

[74] *United States Trust Co. v. New Jersey, supra*, pp. 15 and 23.

[75] *United States Trust Co. v. New Jersey, supra*, pp. 29–31.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

a conflict of interest, since if deference is granted to the Legislature in this context the State would end up being judge and party.[76]

Notwithstanding this clear directive from the Highest U.S. Forum, the majority opinion tries to justify the contrary, based on jurisprudence of the federal appellate courts.  This, without a doubt, is a methodological error, because the decisions of those courts are merely persuasive, while the interpretations of the United States Constitution made by the United States Supreme Court are binding on us.

In addition, the decisions of the federal circuit courts that the majority uses do not support their conclusions.  These cases affirm that the State must be granted "some deference," while the majority opinion grants it full deference and it totally ignores the possible conflict of interest.  We already explained that the opinion of this Court bases its finding, exclusively on the Preamble of Law No. 7 without there being any evidence in the record that proves the content therein.   This Court has had an occasion to express itself before on this:

> The legislative declarations regarding the social evils that the legislator intends to remedy deserve our profound respect.  *But such expressions must be based on facts of general knowledge and not constitute a mere legislative fiat.* (Emphasis ours.)[77]

Certainly, the State must have the freedom to exercise its power of regulation and this way protect the interests of the citizens and safeguard the common good.  *Such power, however, it not absolute.  Nor can it be arbitrary or unreasonable.  The contractual obligations impairment clause limits that legitimate exercise of Legislative Power, especially in public contracts.* The inherent power of the State to protect the public wellbeing allows the government to break a public contractual obligation, as long as it does not destroy it or affect it severely.[78]  When the latter occurs, and the reasonableness and necessity of the statute cannot be established, the constitutional limitation of the contractual obligations impairment clause can overcome the authority to legislative that the Legislature has, regardless of whether what is sought is protecting a public interest that the State has determined is important.[79]

One of the issues presented before this Court is that Law No. 7 is unconstitutional, because it violates the contractual obligations impairment clause.  From the outset it must be established that the scrutiny that must be used to evaluate this argument is the most careful one, because it deals with contracts where the government is a party.  *Contrary to the majority, which evaluates this issue from the viewpoint of collective bargaining agreements, that is, the agreements, I understand that the analysis on the impairment must include, also, individual contracts.*

---

[76] *Energy Reserves Group v. Kansas Power & Light, supra*, pp. 412–413; *United States Trust Co. v. New Jersey, supra*, p. 26.

[77] *Warner Lambert Co. v. Tribunal Superior, supra*, p. 398.

[78] *United States Trust Co. v. New Jersey, supra*, p. 22.

[79] "Yet the *Contract Clause* limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation." *United States Trust Co. v. New Jersey, supra*, p. 21. See, *Home Bldg. & L. Assn. Blaisdell, supra*, p. 439.

*CERTIFIED TRANSLATION*                                        by: Olga M. Alicea, fcci, njitce-s

Without a doubt, *a contractual obligation exists between the respective agencies of the central government and their employees.*  One need only review the definition of "employment contract" to reach this conclusion.  That is how Cabanellas de Torres states it when referring to the employment contract as that "which has as its objective the continued rendering of private services with an economic nature, and for which one of the parties – the boss, entrepreneur, or employer – gives remuneration or compensates in exchange for enjoying or serving itself, under its dependency or direction, with the professional activity of another, called the worker."[80] *There is also a public contract between the agencies and the unions that represent the workers.* In both cases there are signed contracts, either individual or collective, where the working conditions, salaries, and rights and obligations of each party are established.  Before the enactment of Law No. 7 these contracts were protected by the personnel in public service laws, Law No. 184 and the Labor Relations Act, Law No. 45, among the country's other labor laws.

*In the case of individual employment contracts, the impairment that Law No. 7 caused was severe.  In particular, this legislation ended totally and indefinitely the contractual obligations existing with the employees.  As a result of the massive layoffs, thousands of employees were left without jobs.*  In addition, the law limited the appellate jurisdiction of the Appellate Commission of the Human Resources Management System (CASARH, by its Spanish acronym), so that it could only review cases that presented issues of.[81]  *More particularly, the principle of merit was left inoperative and the operation of the Public Service Personnel Management System was affected.*[82]

*With respect to the impairment that this law causes in collective bargaining agreements, it can be established that it is also severe* because[83] (1) it affects the integrity of the collective bargaining agreement; (2) it limits the mechanisms to protect the members and resolve the

---

[80] G. Caballenas de Torres, *Diccionario de Derecho Laboral*, Buenos Aires, Ed. Heliasta S.R.L., 2001, pp. 139–140. See, also, *Soc. de Gananciales v. Vélez & Asoc.*, 145 D.P.R. 508, 517 (1998).

[81] Arts. 37.04(b) and 46 of Law No. 7.

[82] Art. 37.04 of Law No. 7.

[83] Art. 37.04(a)(2),(5),(6),(8),(9),(10) and (11) of Law No. 7. The impact of this article, in terms of the labor laws, is extremely broad, because it provides that "all clauses, *precepts,* and/or provisions applicable to the employees and/or positions subject to the provisions of this Chapter III, contained in the laws, collective bargaining agreements shall be suspended."  (Emphasis ours.)  With respect to the term "precept," this same law defines it, in its Article 33, as:

"'*Precept*' means laws, article, or section of law; collective bargaining agreement or provisions contained in collective bargaining agreements, agreements, supplementary agreements, policies, employment handbooks, circulars, contractual letters, certifications, addenda, regulations, rules, and employment conditions, normative letters, classification plans and/or compensation plans."  (Emphasis ours.)  Art. 33(k) of Law No. 7.

To see a concrete example of the impact that Law No. 7 has, we detail some of the sections of the Collective Bargaining Agreement Department of the Family and United Public Servants of Puerto Rico, Unit A, 2007-010, which have been suspended: Article II: Declaration of Principles; Article III: Preamble; Article VII: Maintaining Employment Conditions; Article VIII: Subcontracting; Article IX: Non-discrimination Agreement; Article XII: Complaints and Grievance Procedure; Article XIX: Classification and Compensation of Positions; Article XX: Recruiting and Selection; Article XXII: Promotions; Article XXIV: Transfers; Article XXVII: Layoffs.  Collective Bargaining Agreement Department of the Family and United Public Servants of Puerto Rico, Unit A, 2007-2010, Writs of Request CT-2009-6, Exhibit 4, pp. 5–6, 9–10, 12–16, 22–24, 26, and 28–33.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

issues, in order to be able to provide the fair representation which unions are required to provide; (3) it does not recognize what is collectively bargained; (4) they cannot bargain collectively; (5) they cannot organize under a union;[84] (6) the jurisdiction of the administrative forums in charge of processing the workers' complaints is limited to resolving issues of;[85] the scope of the Labor Relations for the Public Sector Act, Law No. 45, is limited, which affects the Labor Relations in the Central Government System; (8) it suspends the legal and normative controls over layoffs established by Law No. 184 and it is substituted by the one developed in Law No. 7[86]; and (9) it allows and promotes altering the employment conditions and economic benefits without negotiating, including the transfer of employees and the subcontracting of services.[87]

The government's administration has justified the enactment of Law No. 7, which includes measures as drastic as massive dismissal of public employees with contracts in force, based on the fact that Puerto Rico's economy is undergoing a serious fiscal crisis.  According to the administration, there is a recurring structural deficit of $3,200 million in the Government's finances, which does not allow it to cover its operating expenses and which, in turn, keeps Puerto Rico's credit at junk status.[88]  Given this picture, the Government opted to approve a stabilization plan, the so-called Law No. 7, which incorporates and justifies measures for revenues and better oversight, control, and reduction in spending and other fiscal mechanisms.

The Government's interest in restoring the finances is important, because it makes possible providing the public services necessary to all of society.  However, when applying the analysis that our jurisprudence has called "cautious," we cannot but question the reasonableness of the massive layoffs measure adopted by the law.  *It goes without saying that the State has not proven the emergency situation, in which it supports the enactment of Law No. 7, beyond the information included in its Preamble, and the presentation of evidence to the contrary has not been permitted.  Second, nor is it reasonable to try to address the alleged fiscal crisis in the short period of one year.  Third, it is not reasonable to think that, in terms of the persons laid off, the damage is not permanent, when it is also alleged and there are studies that recommend other more moderate options.[89]*

*Notwithstanding the foregoing, the majority intends to justify the massive layoff of public employees and the duration of the impact of Law No. 7 alluding to cases from the second and*

---

[84] Section 44 of Law No. 37, which amends Article 40 of Law No. 7.

[85] Arts. 37.04b(13)(14) and 46a and b of Law No. 7.

[86] Art. 38.02a(16) of Law No. 7.

[87] Art. 38.02a(16) of Law No. 7.

[88] Preamble of Law No. 7, p. 3.

[89] See, for example: J.E. Rivera Santana, *Análisis de la situación económica fiscal*, Sindicato Puertorriqueño de Trabajadores (SPT), 2009; presentation: *Ante la Crisis Presupuestaria*, Central Puertorriqueña de Trabajadores, January 2, 2009; presentation: *Propuestas sector sindical: medidas ante la crisis fiscal*, January 7, 2009; Proposal to the Department of Education, Puerto Rican Workers Union – Local 1996, February 2007; *Nuevo Modelo Organizativo para la Rama Ejecutiva: Proyecto de Reforma Gubernamental*, Graduate School of Public Administration of the University of Puerto Rico, July 2009; *Sindicatos 2009. Estrategias frente a la crisis mundial, el multilateralismo y los acuerdos comerciales y de inversión*, Brasil, Museo Amano, 2009. http://www.ituc-csi.org/sindicatos-2009-estategias-frente.html?lang=en.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

*fourth federal circuit that are not persuasive, because they address facts different from the ones arising from this controversy.* First, in the case of *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2nd Cir. 2006), the city's fiscal emergency was address, freezing positions and not granting raises. This means that the contractual relationship existing between the public employees and the employer was not severely modified and, certainly, not totally eliminated. The worker's salaries were not affected by the fiscal measure. Nor were they left jobless, that is, without their sole means of support. In addition, the actions taken were temporary and prospective.[90]

The other case that the majority cites to validate its appreciation that Law No. 7 is reasonable is the case of *Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore*, 6 F.3d 1012 (4th Cir. 1993). The issue that the appellate court of the 4th Circuit resolves is also different from our case. In *Baltimore,* the city's fiscal deficit was confronted by reducing by 1% the salaries of the police and teachers. The result of this administrative action was to reduce the working hours by 2.5 days. Clearly, this action is less onerous than the one taken by the Government of Puerto Rico. In pondering the facts, the appellate circuit court had before its consideration a record with sufficient evidence to be able to evaluate the correlation of the reasonableness between the measures taken and the fiscal necessity. This in order to determine whether there was a violation of the contractual obligations impairment clause. In particular, the appellate court held:

> Nor ... can we conclude that the City chose a drastic impairment over an equally acceptable, more moderate course. First, the amount of the reduction was no greater than that necessary to meet the anticipated shortfall. Second, the city discontinued the plan immediately upon recognition that the budgetary shortfall would not be as great as anticipated. Finally, the plan did not alter pay-dependent benefits, overtime pay, hourly rates of pay, or the orientation of pay scales. Indeed, the plan was less drastic than at least one alternative, additional layoffs, which could have been more detrimental to appellees. In short, the City clearly sought to tailor the plan as narrowly as possible to meet its unforeseen shortfalls. (Cites omitted.)[91]

*When applying the criteria of the "cautious" or intermediate scrutiny, which is the correct one in this case, it is clear that, in effect, Law No. 7 impaired the individual contracts of the workers and the collective bargaining agreements agreed upon with the exclusive representative.* This statute suspended the entire public service personnel management system, established by Law No. 184 and its predecessors, and the labor relations in the public sector norms, protected by Law No. 45.

No other determination can be reached, because the State did not prove the existence of the crisis or the reasonableness of the measure, even though the majority tries to do so through their extensive reference to the preamble. Nor did the Government validate the need for the measure in relation to other less drastic options. *In short, all of this is the inevitable and direct result of*

---

[90] *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 871 (2do Cir. 2006),

[91] *Baltimore Tchrs. Un. v. Mayor, etc., of Baltimore*, 6 F.3d 1012, 1020–1021 (4th Cir. 1993).

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

certifying cases without having presented evidence before the lower court, or the administrative forums, in support of the parties' allegations.

C.      Due process of procedural law

As was established in part III(A) of this opinion, regular career employees of the public sector have a proprietary interest, that is, a vested right, over their positions.   Given that fact, and given the action of the government entity to affect such proprietary right, the due process of law clause is activated.   In particular, this Court has established that "[t]he due process of law has effect in situations where the employee enjoys a proprietary interest or has a reasonable expectation of ownership of property."[92]   *Therefore, visualizing layoff as a modality of dismissal, if an employee is laid off without giving him the opportunity to be heard, the right to due process of law is violated.*[93]

This guarantee of due process of law when a person is deprived of his property or freedom is included in the Bill of Rights of our Constitution and it is an integral part of our system of government.   In this regard, the constitutional precept establishes:

> Recognized as a fundamental right of human beings is the right to life, to freedom, and to the enjoyment of property.   The death penalty shall not exist. *No person shall be deprived of his freedom or property without due process of law*, nor will any person in Puerto Rico be denied equal protection of the laws. No laws will be enacted that impair contractual obligations.   The laws will determine a minimum of property and belongings not subject to attachment. (Emphasis ours.)[94]

This clause includes the most important principle of North American constitutional law, a principle that has formed part of the history of human rights since its initial incorporation into the Magna Carta.   Its objective has always been to ensure that the procedures are respected and the "basic guarantees of personal rights in their broadest, most general form" are provided.[95]   In short, this constitutional norm symbolizes the essence of our system of justice and reflects our life in society and the degree of civilization achieved.[96]

The constitutional guarantee to due process of law has two considerations in its analysis and application.   These have been characterizes as two aspects, procedural on the one hand, and substantive on the other.[97]   The first one is intended to guarantee a fair and equitable process when facing state actions that interfere with private interests.   That is, it refers to the "procedural

---

[92] *Garriga Villanueva v. Mun. de San Juan*, 176 D.P.R. 182 (2009); Fernández Quiñones, *op. cit.*, p. 375.

[93] *Lupiáñez v. Srio. de Instrucción*, 105 D.P.R. 696, 701 (1977).

[94] Art. II, Sec. 7, Const. of the Comm. of P.R., L.P.R.A., Tome 1, 2008 Ed., p. 296.   This clause has its counterpart in the United States Constitution, specifically in the Fifth and Fourteenth Amendments.

[95] 2 Diary of Sessions, *supra*, p. 1104.

[96] *López, et al. v. Asoc. de Taxis de Cayey*, 142 D.P.R. 109, 113 (1996).

[97] *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, 133 D.P.R. 881, 888 (1993).

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

guidelines that the public entity must acknowledge of persons, regardless of whether those guidelines are acknowledged by law or by regulation."[98]   Meanwhile, the second one refers to the validity of the laws that the State implements with respect to their protection of the citizens' rights.[99]   This means that the State cannot arbitrarily, unreasonably, or capriciously affect, through statutes or administrative actions, a person's proprietary interest or freedom.[100]   None of these modalities of the due process of law clause can be invoked if the requirements of state action is not met.[101]

According to the procedural aspect of due process of law, which is the one pertinent to this case, there are three considerations that are examined to determine whether, in effect, this constitutional clause has been violated.   These can be summarized in three questions: (1) what interests of freedom or property are protected by the precept; (2) at what stage must due process be granted; and (3) which characteristics must the procedure that is used to somehow affect that interest have so that it can be the proper one?[102]   If the first question cannot be passed, then the State does not have the obligation to guarantee due process of law.[103]

As a general rule, due process of law must be granted before the administrative decision is effective.   However, there are particular circumstances, such as emergency situations where a community's health and safety are at risk, that justify that the government agency first make the administrative decision and grant the due process within a reasonable time frame.[104]

The procedure that must be granted depends on the issue and the facts surrounding it, since procedural due process of law is not technical or inflexible, rather circumstantial and pragmatic.   What is required, ultimately, is that it be coherent with the principle that all processes must be fair, impartial, and not arbitrary.[105]   This deliberation is achieved by weighing three crucial criteria:

> (1) determine which are the individual interests affected by the official action;
> (2) the risk of a wrong determination that deprives the person of the protected

---

[98] *Bd. Regents v. Roth, supra*, p. 576; J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales*, Bogotá, Ed. Temis, 2009, p. 608.

[99] *Garriga Villanueva v. Mun. San Juan, supra*; *Almonte, et al. v. Brito*, 156 D.P.R. 475, 481 (2002); *U. Ind. Emp. A.E.P. v. A.E.P.*, 146 D.P.R. 611, 616 (1998).

[100] *Hernández v. Secretario*, 164 D.P.R. 390, 394–395 (2005); *McConell v. Paláu*, 161 D.P.R. 734, 757–758 (2004); *Rivera Rodríguez & Co. v. Lee Stowell, etc., supra*, p. 887; *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265, 273–274 (1987).

[101] Fernández Quiñones, *op. cit.*, p. 315.

[102] *Rivera Rodríguez & Co. v. Lee Stowell, etc., supra*, pp. 888–899; *Morales Narváez v. Governor*, 112 D.P.R. 761, 766–768 (1982); *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 730–731 (1982); *Lupiáñez v. Srio. de Instrucción, supra*, p. 700-701; Álvarez González, *op. cit.*, p. 591; Fernández Quiñones, *op. cit.*, p. 317.

[103] *Rivera Santiago v. Srio. de Hacienda, supra*, p. 273–274; Fernández Quiñones, *op. cit.*, p. 316.

[104] Fernández Quiñones, *op. cit.*, p. 317.

[105] *Almonte et al. v. Brito, supra*, p. 481; *P.A.C. v. E.L.A. I*, 150 D.P.R. 359, 376 (2000); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521, 542 (1993); *Domínguez Talavera v. Tribunal Superior*, 102 D.P.R. 423, 428 (1974).

_CERTIFIED TRANSLATION_                                      by: Olga M. Alicea, fcci, njitce-s

interest through the process used and the probable value of additional or different guarantees; and (3) the government's interest protected with a summary action and the possibility of using alternate methods.[106]

It is on the basis of these considerations that this Court has recognized certain basic requirements that must form part of the adversarial procedure. These are: (1) adequate notification of the process; (2) that the institutional process is done before an impartial judge; (3) the opportunity to be heard; (4) the right to cross-examine witnesses and to present oral and written evidence in one's favor; (5) be assisted by counsel; (6) that the decision be based on the record; and (7) that the decision be well-grounded or explained.[107]

In the area of public employment, we have held that the workers, who are dismissed from their positions, have the right to an informal hearing prior to their dismissal.[108]  Of course, before that prior informal hearing, the "appointing authority" must send a notification to the employee where it adequately informs him of the administrative charges and the time, date, and place where the hearing will be held and describes to him the evidence that the employer has.[109] Without that adequate notification, the informal hearing does not meet the requirements of due process of law.[110]   In addition, without that notification the worker will be divested of his job without being prepared to refute the employer's arguments.

When what occurs is a layoff, which is nothing more than a modality of dismissal, we have determined that, prior to such action, the employee must be notified of the layoff plan and informed of the method on which it is based. This, before he is separated from his position.[111] Moreover, _we have concluded that the fact that there is a fiscal crisis is not sufficient, by itself, to conclude that the layoff was done following the statues or norms in effect_.[112]   More particularly, we have stated the following:

> ... Regardless of how justified certain layoffs could have been from an economic point of view, the public policy in favor of the implementation of the merit system demands that there be evidence that when one or more position in a class are eliminated the persons indicated will be laid off and will be retained according to the objective criteria that the system of merit embodies. _It is equally vital that all_

---

[106] _Rivera Rodríguez & Co. v. Lee Stowell, etc._, _supra_, pp. 888–889; _P.A.C. v. E.L.A. I_, _supra_, p. 376; _Vélez Ramírez v. Romero Barceló_, _supra_, pp. 723–724; _Mathews v. Eldridge_, 424 U.S. 319, 334–335 (1976)**.**

[107] _Almonte et al. v. Brito_, _supra_, p. 482; _Rivera Rodríguez & Co. v. Lee Stowell, etc.,_ _supra_, pp. 888–889; _Rivera Santiago v. Srio. de Hacienda_, _supra_, pp. 277–278; _Cleveland Bd. of Educ. v. Loudermill_, 470 U.S. 532, 546 (1985).

[108] _A.E.E. v. U.T.I.E.R._, 153 D.P.R. 623, 630 (2000); _U. Ind. Emp. A.E.P. v. A.E.P._, _supra_, p. 617; _Marrero Caratini v. Rodríguez Rodríguez_, 138 D.P.R. 215, 220 (1995); _Torres Solano v. P.R.T.C._, _supra_, p. 520.

[109] _Garriga Villanueva v. Mun. San Juan_, _supra_; _Torres Solano v. P.R.T.C._, _supra_, pp. 520–521 and 523. See, also, _U. Ind. Emp. A.E.P. v. A.E.P, supra._

[110] _U. Ind. Emp. A.E.P. v. A.E.P._, _supra_, p. 622.

[111] _Olivieri Morales v. Pierluisi_, 113 D.P.R. 790, 796 (1983); _Pizarro v. Municipio de Carolina_, 112 D.P.R. 822, 828–829 (1982).

[112] _Calzada Quiñones v. D.A.C.O._, 114 D.P.R. 757, 760 (1983).

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

> *public employees have prior knowledge of the method to be followed so that they can adequately defend their rights, which are relative to the rights of the others. The absence of clear, objective, and widespread evidence of the criteria to determine who will be laid off creates insecurities and sows doubts not only as to the legitimacy of each particular layoff, but as to the validity and necessity of the decision to decree layoffs in general.* (Emphasis ours.)[113]

It is true that this interpretation was based, not on the Constitution, rather on the provisions of the Personnel in Public Service Act, Law No. 5, substituted by Law No. 184.   But it is that said law incorporated the constitutional due process of law with respect to retention of workers; which is why, at that moment it was not necessary to resort to the Constitution to uphold our decision. However, that does not meant that we must accept that another statute undermine with impunity the constitutional due process of law, in effect in the current Commonwealth of Puerto Rico Human Resources Management Act and contained in the collective bargaining agreements, according to the mandate of the Labor Relations in Public Service Act.

*The majority argues that Law No. 7 grants to the laid off employees a due process of law "quite similar to the on established in Law No. 184 ...."* (Emphasis ours.)[114]   In sum, the majority states that what Law No. 7 does is gather the "governing proceedings according to Law No. 184, and adapt them ...." (Emphasis suppressed.)[115]   *Nothing is further from the truth. To confirm this, suffice it to ask why, if both retention procedures are similar, the procedure of Law No. 184 is not used.* This question is answered by the majority opinion, stating that it was necessary to make more expeditious the dismissal procedure to "decree layoffs through a more agile mechanism." (Emphasis suppressed.)[116]   However, there is no evidence in the record to prove this affirmation. What has indeed been evident is that the Law No. 7 layoff process has been complicated and extended due to the violations of due process involved therein, defeating the sensitivity built into the retention process established in Law No. 184, *which always considered layoffs as the last resort and not as public policy*.

How did the application of the retention plan contained in Law No. 184 affect in terms of time? This plan provides that positions can be eliminated for lack of work or of funds, subject to the following:

> In these cases, the layoffs will be decreed within the groups of employees whose positions have the same classification title and considering within each group the status of the employees, their productivity, habits, and attitudes reflected in their evaluations and their seniority in service.   In order to determine seniority, all of the service rendered in positions in the agencies comprised within the System will be considered.   Each agency's appointing authority will notify in writing all employees who have been laid off not less than thirty (30) days prior to the date

---

[113] *Olivieri Morales v. Pierluisi, supra*, p. 796.

[114] Opinion of the Court, p. 63.

[115] *Id.*

[116] *Id.*

on which he will be laid off.  No employee layoffs will be effective unless the notification requirement has been met.  Each agency will proceed to establish a written procedure in order to decree layoffs should these be necessary, the same must be disclosed to [sic] will be available for the knowledge of any interested employees.

*Prior to decreeing the layoff due to the elimination of positions for lack of work or funds, all of the resources available must be exhausted to avoid such layoffs with actions such as:*

(A) Relocation of personnel in positions of equal or similar classification in departments, offices, or programs where there is a need for personnel.

(B) Retraining of the employee to relocate him in another position, *when this can be reasonably done prior to the deadline for decreeing such layoffs*.

(C) Enjoyment of accrued vacations.

(D) Unpaid leave until the budgetary crisis ceases, when the agency makes the decision for temporary budgetary insufficiency that does not require the permanent elimination of the position.  In such cases, the order of preference previously established in the method for decreeing layoffs must be observed.

(E) Reduction in working hours.

(F) *Demotion of employees as a last resort to avoid layoffs.* (Emphasis ours.)[117]

Obviously, this plan does not affect the objective of addressing the government's alleged fiscal crisis.  On the contrary, it creates a fair procedure based on the principle of merit, which avoids not only doubts about the legitimacy of layoffs and the insecurity of those affected, but also potential legal disputes.

*The layoffs plan according to Law No. 184 provided a constitutional due process of law, because it allows the employees to be informed about the layoffs process, so that they could properly defend themselves if they were not in agreement with the administrative decision.   Distinctly, the Law No. 7 retention plan is contrary to due process of law, because it does not provide the laid off employees the opportunity to be heard or a prior informal hearing.*

With respect to the absence of the opportunity to be heard, it is evident, as an initial consideration, that *the notification of layoff sent to the workers was defective*.  Let us see a model of the letters whereby the workers were notified of the layoff:

*According to the provisions of Law No. 7 of March 9, 2009, known as the "Special Law Declaring a State of Fiscal Emergency and Establishing an Integral Fiscal Stabilization Plan to Save the Credit of Puerto Rico" (hereinafter,*

---

[117] Art. 6, Sec. 6.6(9)(a) of Law No. 184 de 2004 (3 L.P.R.A. sec. 1462e(9)(a)).

*Law 7), and to the order of seniority established by the Fiscal Restructuring and Stabilization Board (FRSB), I inform you that effective November 6, 2009, you are laid off from the classification position ....* (Emphasis ours.)[118]

Without a doubt, *this notification does not inform the cause of justification of the layoff.*   It only mentions that the dismissal is based on Law No. 7 and to the order of seniority designed by the F.R.S.B.   *Nor does it describe the evidence the employer has;* specifically, *it does not describe the layoff plan or the method on which it was based*, not *the seniority corresponding to the laid off employees in relation to others.*   That is, *the notification does not allude to the list of seniority of all public service.*   Consequently, *the employees who received it were not in a position to defend themselves and to challenge the allegations of the State.*   As we have stated, *under those circumstances a prior hearing is futile.*

Even if the description of the evidence of the mentioned employer were included as part of the adequate notification, the prior hearing to which the majority refers is insufficient.   This hearing is limited to questioning the employee's seniority, as affirmed by the majority opinion when it states that "the issue, as meritorious as it may be, will always be relatively simple: whether the employee has evidence of years worked."[119]   That is, the issue is limited to the employee proving, or example, that instead of twelve years of service he actually served thirteen and a half years.   However, *the employee cannot challenge his layoff in relation to that of other employees not laid off, nor can he question is by reason of other issues, such as political discrimination, pregnancy, or age, among others.   That is why this prior informal hearing constitutes a totally pro forma procedure.*

Given this background, *it can be affirmed that Law No. 7 violates the constitutional procedural due process.*   Having limited the issue to the aspect of seniority and without even notifying the issue pertinent to that criterion with respect to the other employees, the prior informal hearing was a mere formality.   *Even knowing that they had grounds different from that of seniority to prove that they were violating the law, for the public employees the administrative forum was forbidden.   We are not going to find a greater violation of constitutional procedural due process of law.*

### III

*Law No. 7 of March 9, 2009, unconstitutional on its face*

The Constitution of the Commonwealth, enacted on July 25, 1952, includes a provision that prohibits the Legislature from enacting statutes that incorporate more than one issue or that do not state the issue in the title of the bill.   On this issue, the Supreme Law establishes:

*... No bill shall be enacted,* with the exception of those concerning the general budget, *that contains more than one issue, which must be clearly stated in its title,*

---

[118]  Writ of the Court CT-2009-6, Exhibit 6.

[119]  Opinion of the Court, p. 64.

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

*and any part of a law whose issue has not been stated in the title shall be null and void ....* (Emphasis ours.)[120]

Such limitation of the legislative process was adopted, for the first time, in the Jones Act of March 2, 1917, and was maintained by the constituents when enacting our constitution.[121]

This provision is clear. It requires, on the one hand, that all laws, except for the one concerning the budget, be aimed at a single objective or issue. This provision is clear. It requires, on the one hand, that all laws, except for the one concerning the budget, be aimed at a single objective or issue. In addition, all laws must include in their title the issue or purpose that the Legislature intends to address and if any subject matter is included in the body of the law, but not in its title, this portion of the bill will be null and void.

Since its origin in the Jones Act, we have had several opportunities to interpret this precept. We have stated the need for the title of a law to reflect, in general, its content. We clarified that the title need not include a meticulous description or a table of the contents of the law.[122]  *Of course, the generality of the title cannot induce to error the parties affected by the law or the legislative whose duty is to evaluate it, study it, and enact it.[123]  One must always ensure that the only issue or subject matter that the law deals with appears clearly in its title.[124]*

This constitutional principle seeks three main purposes: (1) to impede including in the statute "incongruous and strange subject matters";[125]  (2) to avoid "inadvertence, concealment, and fraud in the legislation,"[126] and (3) to inform society and the legislator the purpose of the bill, so that "the former can oppose its enactment if it considers it injurious to its interests and the latter

---

[120]  Art. III, Sec. 17, Const. of the Comm. of P.R., *supra*, p. 327.

[121]  The precept contained the following mandate:

"No bill shall be enacted, with the exception of those concerning the general budget, that contains more than one issue, which must be clearly stated in its title; but if any issue that is not stated in the title were included in any law, said law shall be null and void only in the part thereof that has not been stated in its title."   Sec. 34 of the Jones Act, Organic Act of 1917, L.P.R.A., Tome 1, 2008 Ed., p. 105.

The Organic Act of April 12, 1900, known as the Foraker Act, did not include this prohibition.   R.E. Bernier and J.A. Cuevas Segarra, *Aprobación e interpretación de las Laws of  Puerto Rico*, 2ⁿᵈ Ed., San Juan, Pubs. JTS, 1987, p. 79.   See, also, Trías Monge, *op. cit.*, pp. 159–160.

[122]  *Dorante v. Wrangler of P.R.*, 145 D.P.R. 408, 428 (1998); *Cervecería Corona, Inc. v. J.S.M.*, 98 D.P.R. 801, 812 (1970); *Pueblo v. Vázquez Bruno*, 93 D.P.R. 540, 542–543 (1966); *Pueblo v. Díaz Torres*, 89 D.P.R. 720, 724–725 (1963); *Rodríguez v. P.R. Ry., Lt. & Power Co.*, 30 D.P.R. 931, 932 (1922).

[123]  *Laboy v. Corp. Azucarera Saurí & Subirá*, 65 D.P.R. 422, 426 (1945); *Rodríguez v. Corte*, 60 D.P.R. 919, 922 (1942); *Pueblo v. Arocho*, 34 D.P.R. 847, 855–856 (1926).

[124]  *Pueblo v. Vázquez Bruno*, 93 D.P.R. 540, 542–543 (1966); *Pueblo v. Díaz Torres*, 89 D.P.R. 720, 724–725 (1963).

[125]  *Dorante v. Wrangler of P.R.*, *supra*, p. 428; *Cervecería Corona, Inc. v. J.S.M.*, *supra*, p. 812; *Laboy v. Sauri*, *supra*, p. 426, citing, *Posados v. Warner, B. & Co.*, 279 U.S. 340 (1929); *Rodríguez v. Corte*, *supra*, p. 922.

[126]  *Dorante v. Wrangler of P.R., supra,* p. 428; *Laboy v. Corp. Azucarera Saurí & Subirá*, p. 426, citing, *Posados v. Warner, B. & Co., supra; Rodríguez v. Corte, supra*, p. 922.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

are in a condition to issue their vote conscious of the issue that is the object of legislation."[127]   In sum, the objective is that the legislature and the people can deduce that only matters germane to those stated in the title will be enacted.[128]   All of these considerations were analyzed and argued by the constituents.[129]

At this moment, the forced question is whether the title of Law No. 7 meets the requirements that our Constitution establishes.   Let us see.

A cursory reading of Law No. 7 confirms that is regulates more than one issue.  This statute imposes new taxes, as in the case of motorcycles, and it increases others, as in the case of cigarettes and alcoholic beverages.   In addition, it allows the Public Buildings Authority and the Sales Tax Financing Corporation can issue bond and use other financing mechanisms and that the municipalities can take money on loan from the Government Development Bank.   As we can see, it has to do with creating these mechanisms to bring money into the State's coffers.  These measures, clearly, comprise, among them, a single issue.  However, *in Chap. III of the very statute a new law is created regarding dismissals, which, without a doubt, constitutes a different issue, contrary to the constitutional provision.*

On the other hand, the title of Law No. 7 occupies two and a half pages of the statute's text, which are dedicated almost entirely to describing in detail all of the amendments on measures for revenues and better monitoring that are included in Chap. II and those in connection with fiscal measures that are incorporated into Chap. IV.   However, the portion that refers to the measures on control and reduction of operating expenses and on payroll provided in Chap. III is extremely scant and generalized.   *In other words, the title of the law does not inform all of the issues or subject matters that form part of Chap. III of the statute and it does not announce to the legislators and to the citizens what Chapter III deals with.*

Contrary to the highly detailed description of the issues addressed in Chaps. II and IV, in the portion that refers to the measures of control and reduction of operating expenses and of payroll included in Chap. III, the title of Law No. 7 merely mentions

> ... with respect to the reduction of expenses, establish a three phase plan for the reduction of government payroll ....

---

[127] *Dorante v. Wrangler of P.R., supra*, p. 428.  See: *Laboy v. Corp. Azucarera Saurí & Subirá, supra*, p. 425; *Rodríguez v. Corte, supra*, pp. 922–923.

[128] *Cervecería Corona, Inc. v. J.S.M., supra*, p. 812.

[129] To those ends, the following statements were consigned:

"*Mr. Negrón López*: ... This sentence 'no bill shall be enacted with the exception of those concerning the general budget that contains more than one issue, which muyst be clearly stated in its title' is a provision aimed at preventing *riders*, at preventing strange amendments from being made to the purpose of the bills and that the purpose of a bill be altered surreptitiously enacting something that the Legislature did not allow to be enacted, should not have permitted to be enacted had the intention been known."   2 Diary of Sessions, *supra*, p. 896.

"The provisions regarding title and issue "[*sic]* impede fraudulent practices, facilitate the legislative work, and make it impoissible for minority groups to incorporate their favorite propositions into a single piece of legislation and that they join to obtain an artificial majority, which would not exist if the different propositions were considered separately."   4 Diary of Sessions, *supra*, p. 2584.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

The foregoing does not describe, nor even plainly, the content of Chap. III of Law No. 7. First, *this chapter contains more than one issue different from the reduction in government payroll.* For example, Chap. III suspends the system of labor relations in the public sector, which includes collective bargaining and collective bargaining agreements; it suspends the application of the principle of merit; it limits the system of personnel management, and a reorganization of the central government is implicit.   Second, *even if it were accepted, for purposes of the analysis, that Chap. III deals with only one issue, the same is not clearly announced in the title.*   In other words, when reading the title of the law, the people or entities affected do not find out about the implication of the bill.

It could be stated that the phrase "for other purposes," included in the legislation resolve the constitutional problem.   However, this Court has already expressed itself on that issue:

> "Although terms such as 'et cetera' and 'for other purposes' are frequently used in the titles of the laws, such phrases have very little effect on the validity of the statutes.   Although these terms can serve to warn that subject matters in addition to those specified in the title appear in the law, such terms cannot validate the inclusion of incongruent provisions."[130]   [130]

Given this background, and given that the law includes a severability clause, [131] *what is warranted is to declare null and void Chap. III and maintain in effect the rest of the content of Law No. 7.*

## IV

*Conclusion*

The analysis that I have stated in these hurried pages leads me to strongly disagree with the decision to which the majority of the Court has today adhered.   *I see with much sadness the position assumed by the majority in this decision on issues to heartbreakingly complex for the history of our people.*   This is an uninformed decision, the result of an improvised and poorly applied process of certification.   In the absence of evidence, the majority ends up undoing the methodological foundations of the best constitutional hermeneutics and finishes off in the land of unscientific speculation.

*The Constitution is something more than a word depository*; it is a mature social pact between the State and the citizens, which has been slowly embroidered and has been strengthened in decades of consensus.   Central to this pact is the value that we have given to work in our country's social structure.   Our courts have endorsed this appreciation for many decades. Today, with this decision, this Court's majority breaks this social pact and abandons to helplessness thousands of citizens who have lost their way of life and keeps in legal insecurity those who still retain their positions.

---

[130] *Laboy v. Corp. Azucarera Saurí & Subirá, supra*, p. 428.

[131]   Art. 71 of Law No. 7.

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

Chap. III of Law No. 7 eliminates by a stroke of the pen the public employees' right to retain their jobs, while repealing or suspending rights that were part of their employment contracts. *Thus, the human effort that the work represents, that important property, that makes possible social reproduction and the integrity of the contracts that contained it, have been thrown overboard, together with half a century of democratic and advanced constitutional interpretation.  In sum, everything that Chap. III means, from its face to its application, is unconstitutional.*

Social pacts between the different components of a people must not be undone without expanding toward new frontiers of social justice.  *The development of societies cannot be based on inequality or on institutional violence, annihilating the dreams that work provides to the weakest.  Our economic challenges cannot be solved by crushing the dignity of our public servants.*  Given the new challenges, new pacts and social consensus are needed.  We will not be able to achieve these by cultivating the citizens' distrust of the institutions.

Unfortunately, after this decision, constitutional law will be taught in Law Schools "before" and "after" Law No. 7, but not as the right of affiliation before and after our honorable decision in *Ocasio v. Díaz*, 88 D.P.R. 676 (1963), or as the divorce law before and after *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978), cases that expanded and fortified the rights of the individual versus the State.   On the contrary, *this decision will be studied as that which enthroned the State as the main protagonist of the system before the citizens.  Give this, I dissent.  I cannot remain silent or be an accomplice to this alienated viewpoint.*

**--O--**

Dissenting opinion issued by Associate Justice Ms. Rodríguez Rodríguez.

I dissent.  I cannot endorse with my vote a decision such as the one issued today, that disrupts the lives of thousands of public servants without granting them their true day in court.  The majority Opinion shows itself to be constitutional gibberish, status thus, without a rigorous legal analysis that accompanies the extensive and unnecessary dissertation, also lacking in evidence on which to base their conclusions.  The sustenance of thousands of public servants deserved a Court that would fully examine their arguments according to the evidence that in due course would be presented, and not that their claims be addressed through a decision that validates, with a rubber stamp, the arguments of the State.

The accelerated certification process adopted by this Court to hurriedly resolve the issues presented made that be possible.  Thus, the record in these cases is devoid of evidence that supports the "conclusions" reached by the majority with respect to Law No. 7 of March 9, 2009, as amended (Law 7).  That denotes the fatality of the adjudicative process followed by this Court, since the cases before our consideration present not only issues strictly of Law, rather they present issues whose resolution is not feasible without receiving any evidence.

For example, through the appeals filed the constitutional validity of Law 7 was questioned, with various arguments concerning: discrimination by political affiliation, discrimination by reason of age, impairment of contractual obligations, and violation of the principle of merit and the employee's seniority, among others.  Allegations such as these required, at the very least, that a hearing be held where evidence was presented on the constitutional violations invoked.  How is

*CERTIFIED TRANSLATION*                           BY: OLGA M. ALICEA, FCCI, NJITCE-S

it possible that we can address arguments such as these and make a decision in this regard if we have not given the employee the opportunity to present his case?

The lack of concern shows by the majority of the members of this Court – in certifying these cases in a *fast track* process or "by discharge" – and its decision to resolve the issues presented without the benefit of the required evidence shows the triviality with which the claims of these public employees have been dispose of.   That, in my opinion, violates the most elementary values of due process of law and of a fair proceeding.

On the other hand, the failed attempt of the majority to distinguish their recent decision in *Hernández, Romero v. Pol. de P.R.*, 177 D.P.R. 121 (2009), regarding vested rights, is a vivid example of the lack of rigor of the majority Opinion.   In *Hernández, Romero,* it was stated that vested rights "are the legal authorities regularly exercised [while] expectations [are] those authorities not exercised at the time of the change in legislation" (*Id.*, p. 146) and that the former are "'a consummated situation, in which the affected parties relied on the state of law that prevailed under the prior law.'"   (Emphasis suppressed.)   *Id.*, p. 147, citing, *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101, 109 (2006).   It was even pointed out that those rights are of such a nature that "neither the Legislature when promulgating a new law, nor the Governor through an executive order can harm or ignore them.   [These] is/are incorporated within the patrimony of the owner of the right and is constitutionally protected against any government action that purports to intervene with it."   *Id.*, p. 146.   Hence it was concluded that the petitioner former governors "did not have a mere expectation regarding the right to protection [through escorts], rather that they had a vested right [as a result] of their respective retirements as chief executives of the country, under a state of specific law."   *Id.*, p. 148.

The Opinion that this Court issues today provides that the public employees who were laid off under Law 7 do not enjoy vested rights over their jobs "since absent is the element of *protection under a prior law* which would have granted such right."   (Emphasis in the original.)   Opinion of the Court, pp. 69-70.   I confess that it was difficult for me to understand this reasoning and I consider that the legal juggling that the majority does to conclude the foregoing is totally unwarranted.   Rather, the distinction made in the Court's Opinion raises numerous questions. How can vested rights be created through administrative practices and in the absence of statutory provisions but not through extension legislative that, protecting the principle of merit, regulate everything relative to: recruiting and selection; promotions and demotions; transfers; trainings; compensation; work day; fringe benefits; retention, suspensions, and layoffs of the thousands of employees who work in public service.[1]

Similarly, one would have to ask how is it possible that the collective bargaining agreements subscribed by the unions and the State, under the Puerto Rico Labor Relations in Public Service Act, Law No. 45 of February 25, 1998, do not establish a "consummated situation, in which the affected parties relied on the state of law that was in effect under the previous law.'"   (Emphasis suppressed.)   *Hernández, Romero v. Pol. de P.R.*, *supra*, p. 147. Why the protections contained in those collective bargaining agreements are not the "'consequence of a suitable fact, by

---

[1]   See, Commonwealth of Puerto Rico Commonwealth of Puerto Rico Law for the Management of Human Resources in Public Service, Law No. 184 of August 3, 2004 (3 L.P.R.A. sec. 1461, *et seq.*).

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

producing them pursuant to a law in effect at the time the fact was carried out, and that they have been incorporated to a person.'" *Id.*, citing, *Consejo Titulares v. Williams Hospitality*, *supra*, pp. 108–109, which cites, in turn, J.M. Suárez Collía, *El principio de irretroactividad de las normas jurídicas*, 2nd Ed. Rev., Madrid, Actas, 1994, p. 55. The truth is that, strictly speaking, the very reasoning that the majority used to conclude that the former governors had a vested right to the use of police escorts demanded, at that time, that it be concluded that the public employees dismissed also had a vested right to their job. The incompatibility between both decisions is clear and irrefutable. Nothing, that this lack of constancy can only be understood – perhaps – when, from the shore we see the ebb and flow of the tide.

In sum, the majority's effort to distinguish the undistinguishable and its zeal to dispose of the issues before our consideration without having the necessary elements of judgment for me to dissent from the course of action taken today by this Court.

## --O--

Individual vote of Associate Justice Mr. Rivera Pérez.

Associate Justice Ms. Fiol Matta mentions in her dissenting opinion that "the majority also decided to shorten the 30 days term provided by our Rules so that each Justice could calmly consider all of the opinions circulated. Moreover, the majority did not allow the Justices, who wanted to write their own opinions, the use of the authority provided to them by the Rules of availing themselves of additional time for that purpose." (Emphasis suppressed.) The dissenting opinion of Associate Justice Ms. Fiol Matta fails to state that Associate Justice Mr. Kolthoff Caraballo circulated his position paper as Opinion of the Court on January 4, 2010, that is, twenty-nine days ago. The term was shortened for each of the justices to be able to state their criterion due to the high public interest vested in this issue and the urgency that the resolution of this issue warrants. However, all of the justices have had one month to consider and evaluate the opinion circulated as majority.

With much respect I must remind my fellow colleagues that on November 20, 2004, in *Suárez v. C.E.E. I*, 163 D.P.R. 347 (2004), the majority at that time decided to shorten the same term alluded to by Associate Justice Ms. Fiol Matta, not to twenty-nine days but to three hours for each justice "*to calmly consider the opinions circulated and to cast their criterion*." *Id.* They did not take into consideration – in any way – that the then Associate Justices Messrs. Rebollo López and Corrada del Río were away from Puerto Rico. The undersigned, who was present in Court, was granted three hours to "*calmly consider the opinion circulated as the majority opinion, which already had the majority required before being circulated to all of the justices*." *Id.* They reduced the regulatory thirty days term therefor to three hours, and they reduced the additional thirty days term to write our opinion to zero days or hours. However, in this case, the twenty-nine days granted by agreement of the Puerto Rico Supreme Court is not enough.

Issuing a similar criterion is Presiding Justice Mr. Hernández Denton, who stated that the majority of the Court "after a hurried judicial process that is contrary to due process of law, eliminates the vested rights over their jobs of thousands of public servants ...." Dissenting Opinion of Presiding Justice Mr. Hernández Denton, p. 101. However, reducing the same terms, not to twenty-nine days but to three hours, did not violate due process of law. Such

*CERTIFIED TRANSLATION*                                   by: Olga M. Alicea, fcci, njitce-s

course of action, according to Presiding Justice Mr., was not hurried when he was discussing the practical effect on the general election of the right to vote of hundreds of thousands of voters.

For the reasons stated above, this case should be certified today.  However, Associate Justice Ms. Fiol Matta has sent us her dissenting opinion today at 2:45 p.m., and Presiding Justice Mr. Hernández Denton circulated his to us at 3:00 p.m.   Associate Justice Ms. Rodríguez Rodríguez circulated hers at 4:18 p.m.   We have barely had some minutes to write these thoughts regrading some of the inconsistencies that belong to our historical record.   We have not been allowed to calmly consider the dissenting opinions circulated, thus, we avail ourselves of the ten days term provided in Rule 5 of our Rules, 4 L.P.R.A. App. XXI, to consider and evaluate all of the dissenting opinions and to determine whether any additional statement is necessary on our part.

**CERTIFICATION**
I, Olga M. Alicea, an English-Spanish Interpreter and Translator certified to that effect by the Administrative Office of the U.S. Courts and by the National Association of Judiciary Interpreters & Translators (NAJIT), do hereby certify that I have personally translated the foregoing document from Spanish to English and that the translation is true and accurate to the best of my knowledge and abilities.

S/     Olga M. Alicea                                                    August  21, 2017
Olga M. Alicea, fcci, njitce-s,     Fed. Cert. No. 98-005                              date