# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>    Debtor | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS<br><br>Re: Adv. Pro. 19-366;<br>Adv. Pro 19-367 |

## THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO'S URGENT MOTION FOR A PROTECTIVE ORDER QUASHING THE DEPOSITION SUBPOENA SERVED ON RETIREE COMMITTEE'S COUNSEL

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "**Title III Cases**"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "**Retiree Committee**"), respectfully requests, pursuant Rules 45(d)(3) and 26(c) of the Federal Rules of Civil Procedure, that the Court enter a protective order quashing the deposition subpoena that certain ERS Bondholders served on one of the Retiree Committee's counsel of record, and states:

## PRELIMINARY STATEMENT

On October 24, 2019, the District Court lifted the litigation stay to allow two matters in the ERS title III case to proceed: (i) the objections to the ERS Bondholders' claims on the basis that they were illegally issued and thus unenforceable (the "*Ultra Vires* **Objections**"*)*; and (ii) the adversary proceedings seeking to determine the extent of the ERS bondholders' liens in the funds ERS is currently holding (the "**Tracing Adversaries**"). (17-3283, Dkt.8962.) On December 30, 2019, certain of the ERS bondholders, represented by Jones Day, served a subpoena upon Hector Mayol Kauffmann, one of the attorneys of record for the Retiree Committee, requesting that he appear for a deposition on January 17, 2020 (the "**Subpoena**"). (*See* Ex. A.) Neither the Retiree Committee nor any of the other parties objecting to the ERS Bondholders' claims have identified Mr. Mayol as a witness whom they intend to call in connection with either the *Ultra Vires* Objections or the Tracing Adversaries.

On January 6, 2020, counsel for all parties met and conferred about the Subpoena, but were unable to reach an agreement about the Subpoena. As a result, the Retiree Committee moves for a protective order quashing the Subpoena. As the First Circuit has held, requiring opposing counsel to testify "is generally disfavored." *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 66 (1st Cir. 2003). Every Circuit that has considered the issue is in accord with the First Circuit: "The practice of forcing trial counsel to testify as a witness, however, has long been discouraged … and

recognized as disrupting the adversarial nature of our judicial system. ... Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986); *see also Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002); *Thiessen v. Gen. Elect. Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001); *Theriot v. Parish of Jefferson*, 185 F.3d 477, 490 (5th Cir. 1999), *cert. denied*, 529 U.S. 1129 (2000); *Boughton v. Cotter Corp.*, 65 F.3d 823, 829 (10th Cir. 1995); *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (2d Cir. 1991).

In this Circuit, before a party may take opposing counsel's deposition, the moving party must, at a minimum show: (1) that the subpoena's primary purpose is not harassment; (2) that there are no other viable means to obtain the same evidence; and (3) that the information sought is relevant, non-privileged, and crucial to their case. *Bogosian*, 323 F.3d at 66. For at least the following reasons, the ERS Bondholders cannot carry their burden and the Subpoena should be quashed:

- *First*, Mr. Mayol is the only non-party individual that the ERS Bondholders have noticed for a deposition despite there being numerous other individuals and entities who would have knowledge of the exact same information as Mr. Mayol and in most circumstances more knowledge.
- *Second*, the ERS Bondholders have refused to provide anything other than a generalized description about why they want to depose Mr. Mayol and have refused to explain why the information they seek from Mr. Mayol cannot be obtained from another less burdensome source.
- *Third*, Mr. Mayol's testimony cannot be relevant to the *Ultra Vires* Objections because the question of whether ERS had the legal authority to issue the ERS bonds is a legal question that will be resolved based on the Court's plain reading of the operative bond documents and the ERS Enabling Act and whether the ERS

3

        Bondholders can trace their collateral will be determined by analyzing financial records.

- *Fourth*, it is highly likely that many of the questions that the ERS Bondholders might ask would be subject to privilege objections, as their own counsel acknowledged during the parties' meet and confer.

## FACTUAL BACKGROUND

During the January 6, 2020 meet and confer, the ERS Bondholders argued that Mr. Mayol's testimony was relevant to whether ERS had the legal authority to issue the ERS bonds in 2008. Counsel stated that Mr. Mayol was "a source" of information because: (1) he served as the Administrator of ERS from 2009 through 2013 and information about ERS's operations during those years would be relevant, even though ERS issued the bonds *before* Mr. Mayol's tenure at ERS; (2) Mr. Mayol worked from 2005 through 2009 at the San Juan office of Samuel A. Ramirez & Co., Inc., which as one of several underwriters subscribed and sold approximately $200,000 of the approximately $3 billion in bonds (or less than .01% of the issue); and (3) Mr. Mayol was one of several lawyers listed as counsel on the Retiree Committee's Objection to the ERS Bonds. As to this last topic, counsel acknowledged that the Retiree Committee would likely claim attorney-client or work product privilege as to many questions that might be asked about Mr. Mayol's work on the Objection. Counsel declined to elaborate on why these topics were relevant to whether the ERS Enabling Act authorized ERS to issue the bonds in 2008 or why the information the ERS Bondholders were seeking could not be obtained from any other person or entity besides counsel for the Retiree Committee.

The Subpoena must be viewed against the backdrop of the other depositions that the ERS Bondholders have sought. Mr. Mayol is the only named individual from whom testimony is sought. The other examinations that the ERS Bondholders have noticed are all Rule 30(b)(6) notices directed to ERS, AAFAF, and the Commonwealth. (Exs. B-E). The ERS Bondholders have not

issued deposition subpoenas for anyone besides Mr. Mayol, even though there have been at least four other ERS Administrators between 2008 and the present, including Mr. Juan A. Cancel-Alegria who was the Administrator when the 2008 bonds were issued. The ERS Bondholders also have not sought to examine any other individuals who worked for any of the eleven other firms that underwrote the ERS bonds. If information from the underwriters were relevant, one would have expected the ERS Bondholders to seek the deposition of individuals who worked at UBS, which underwrote the vast majority of the ERS bonds. Indeed, even as to Mr. Mayol's prior employer, there were other individuals who were more directly involved in the underwriting—for example, Mr. Fernando Vinas who was the municipal finance banker at the time (and still works at Rameriz & Co.) or Mr. Stuart Bromberg who was the deal analyst for the ERS Bond issuance. Finally, neither the Retiree Committee nor anyone else opposing the ERS Bondholders' claims has offered Mr. Mayol's testimony or intends to do so in connection with the *Ultra Vires* Objections or the Tracing Adversaries.

## ARGUMENT

"[F]ederal courts have not looked with favor upon attempts to depose opposing counsel." *Dunkin' Donuts, Inc. v. Mandorico Inc.*, 181 F.R.D. 208, 209 (D.P.R. 1998). Every Circuit to address the question, including the First Circuit, has held that such depositions should occur only under very limited circumstances. *Bogosian*, 323 F.3d at 66; *accord Shelton*, 805 F.2d at 1327; *Nationwide Mut. Ins.*, 278 F.3d at 628; *Thiessen*, 267 F.3d at 1112; *Theriot,* 185 F.3d at 490; *Boughton,* 65 F.3d at 829; *Yonkers Bd. of Educ.*, 946 F.2d at 185. Given this disfavored status, the First Circuit holds that when considering such requests, the trial courts must weigh:

> whether (i) the subpoena was issued primarily for purposes of harassment, (ii) there are other viable means to obtain the same evidence, and (iii) to what extent the information sought is relevant, nonprivileged, and crucial to the moving party's case.

5

*Bogosian*, 323 F.3d at 66. The lower courts in this Circuit have employed the test set forth in *Bogosian* when litigants ask to depose opposing counsel. *See, e.g.*, *Emhart Indus., Inc. v. New England Container Co.*, Nos. 06-218, 11-023, 2013 WL 6001076, at *3 (D.R.I. Nov. 12, 2013) (quashing deposition of opposing counsel); *Angela Adams Licensing, LLC v. Wal-Mart Stores, Inc.*, No. 2:11-cv-05, 2012 WL 752356, at *1 (D. Me. Mar. 7, 2012) (same); *accord Shelton*, 805 F.2d at 1327 (holding that in order to depose opposing counsel, a party must show that: "(1) no other means exists to obtain the information other than to depose opposing counsel; (2) the information sought is relevant and non-privileged; and (3) the information sought is crucial to the preparation of the case.") (internal citations omitted); *Nationwide*, 278 F.3d at 628; *Thiessen*, 267 F.3d at 1112 (same); *Theriot*, 185 F.3d at 491 (citing *Shelton* with approval and noting that "federal courts have disfavored the practice of taking the deposition of a party's attorney" and that "the practice should be employed only in limited circumstances").

The clear rule is that an opposing attorney's deposition will be allowed only where the party asking for that deposition shows a clear need for the deposition because it is necessary to obtain information vital to their case that cannot be reasonably obtained elsewhere. In fact, as one court in this district held, "[t]he mere request to depose an opposing counsel constitutes 'good cause' for obtaining a protective order, 'unless the party seeking the deposition can show both the propriety and need for the deposing.'" *Dunkin' Donuts*, 181 F.R.D. at 210 (internal citations omitted). For the reasons discussed below, the ERS Bondholders cannot meet that standard.

### A. The Discovery Sought To Date Demonstrates That The ERS Bondholders' Primary Purpose In Issuing The Subpoena Is Harassment.

As an initial matter, the Subpoena's primary purpose is harassment. The other discovery the ERS Bondholders have sought demonstrates that this is so. If the ERS Bondholders' true

6

motivation was to obtain information about what the underwriters knew with regard to the ERS bonds (assuming such information is even remotely relevant, and it is not), it is implausible that they would limit their non-party depositions to an individual who was employed by the underwriter that subscribed and sold the *smallest* amount of ERS bonds—approximately $200,000 of the roughly $3 billion in bonds issued—and then to choose to examine an employee of that underwriter with less knowledge than others employed at that firm. It is equally inconceivable that if the ERS Bondholders wanted to know something about the operations of ERS that they would have chosen to examine only Mr. Mayol, who did not work at ERS when the bonds were issued. The ERS Bondholders' tactical decision not to pursue any testimony other than Mr. Mayol and to instead issue their one and only non-party deposition subpoena to counsel for the Retiree Committee is telling and only makes sense if the ERS Bondholders' primary goal is not the procurement of relevant facts, but the harassment of Mr. Mayol.

Further evidence of the ERS Bondholders' true motive is their refusal to provide the Retiree Committee with information regarding the topics the ERS Bondholders plan to address at the deposition. This refusal is problematic for a couple of reasons. *First*, it is required for the Court to ascertain whether the proffered deposition meets the standards for opposing party depositions in this Circuit. For example, how can it be determined whether there are other viable means to obtain the same evidence if the ERS Bondholders will not disclose what evidence they wish to obtain? Likewise, how can anyone determine if the information the ERS Bondholders seek is relevant or crucial to their case without some insight into what information the Bondholders are seeking? These are not idle questions but necessary information that courts require deposing parties to produce. *See Emhart Indus.*, 2013 WL 6001076, at *3.

7

*Second*, the ERS Bondholders' approach towards Mr. Mayol is dramatically different from how they viewed the recently attempted deposition of their own counsel. Last year, and in connection with their efforts to obtain stay relief, the ERS Bondholders brought a motion to compel discovery from ERS, AAFAF, Commonwealth and the Oversight Board. (17-bk-3283, Dkt. 5972). In support of that motion, the ERS Bondholders relied, in part, on a sworn declaration by one of their attorneys, Bruce Bennett, that described a meeting Mr. Bennett had attended. (*Id*. at ¶¶ 22, 46; Ex. A.) In other words, they put their counsel of record's testimony directly at issue—something no one has done here with respect to Mr. Mayol. When the government parties sought to take Mr. Bennett's deposition, a request that was made only because Mr. Bennett had put himself forth as one of two pertinent fact witnesses for the ERS Bondholders, the ERS Bondholders objected "because of the very reason that it seeks to take the deposition of opposing counsel." (17-bk-3283, Dkt. 6829 at ¶8.) In doing so, the ERS Bondholders sought "strict limits" on any deposition of Mr. Bennett based on the fact that such "limitations will substantially reduce the burden on Mr. Bennett and Movants' other counsel, because Mr. Bennett and counsel will know what to expect at the deposition." (*Id*. at ¶¶ 12-13.) In light of this argument, the ERS Bondholders' refusal to provide anything other than the most general description of why they want to depose Mr. Mayol removes any suggestion that the ERS Bondholders issued the Subpoena for a legitimate purpose.

**B. The ERS Bondholders Can Obtain The Discovery They Seek From Other Witnesses.**

During the January 6, 2020 meet-and-confer, the ERS Bondholders refused to explain why the questions they want to ask Mr. Mayol cannot be asked of another witness. All ERS Bondholders' counsel would state is that Mr. Mayol was "a source" of the unspecified information they are seeking discover. That is plainly insufficient given that to take the deposition the ERS

8

Bondholders "[have] to demonstrate that [Mr. Mayol's] deposition is the only practical means available for obtaining the information. If there are other persons who have the information, they should be deposed." *Dunkin' Donuts*, 181 F.R.D. at 211.

The ERS Bondholders' silence on this issue is most likely due to the fact that there clearly are other viable means to obtain the same evidence even if one is left to speculate about what that evidence may be. To the extent the ERS Bondholders want Mr. Mayol's perspective as someone who was employed by one of the underwriters of the ERS Bonds, they could have sought the depositions of individuals working for any of the other eleven firms (besides Mr. Mayol's firm) that acted as underwriters for the ERS Bonds: UBS Financial Services Incorporated of Puerto Rico, Popular Securities, BBVAPR MSD, Merrill Lynch & Co., Scotia Capital, Citigroup Global Markets Inc., Oriental Financial Services Corporation, TCM Capital, Santander Securities, Lehman Brothers, Wachovia Capital Markets LLC. Moreover, to the extent the ERS Bondholders wish to obtain information from ERS individuals who were at ERS in 2008 when the bonds were issued, the Offering Statements to the ERS Bonds provide the names of the Administrator and the ERS Board at that time.

**C. The Information The ERS Bondholders Seek Is Neither Relevant Nor Crucial Their Case And Potentially Could Seek Discovery Of Privileged Information.**

The ERS Bondholders also cannot establish that the information sought is "relevant, nonprivileged, and crucial to [their] case." *Bogosian*, 323 F.3d at 66. *First*, none of the information the ERS Bondholders might seek is relevant and therefore it cannot be crucial to their case. The issue of whether the ERS Bonds were issued *ultra vires* is a purely legal question. No one disputes that ERS could incur debt only to the extent allowed by the ERS Enabling Act. Consequently, the resolution of the *ultra vires* issue will be decided solely by comparing the structure of the bonds (as detailed in the operative documents) to what was permissible under the ERS Enabling Act as

9

it existed in 2008. What any given person at ERS or at an underwriter thought about the legality of the bonds is irrelevant—the bonds either did or did not comply with the ERS Enabling Act. No one's testimony, and certainly not Mr. Mayol's, will change or influence that answer.

*Second*, and for similar reasons, the ERS Bondholders would be unable to procure any testimony from Mr. Mayol that would be "crucial" to their position in this action. And the fact that the ERS Bondholders have not sought the deposition of individuals with more knowledge of the ERS Bond issuance than Mr. Mayol is evidence that they do not believe Mr. Mayol (or any non-party) can provide truly important information to them.

*Third*, there is the possibility that a significant number of questions ERS Bondholders may ask could be protected by the attorney-client or other privilege. As noted above, the Bondholders have stated that they intend to ask Mr. Mayol questions about the fact that he is listed as counsel of record on the Retiree Committee's Objection. They also acknowledge that any such questions will likely draw privilege objections, thus conceding that they intend to explore privileged matters.

## CONCLUSION

For all of the foregoing reasons, the Retiree Committee requests that the Court enter the Proposed Order attached hereto as Exhibit F quashing the Subpoena and granting such other relief as may be just.

## CERTIFICATION PURSUANT TO FED. R. CIV. P. 37(a)(1)

Pursuant to Rule 37(a)(1) of the Federal Rules of Civil Procedure, I hereby certify that on January 6, 2019, counsel for the Retiree Committee, the Board, AAFAF and the Unsecured Creditors' Committee conferred in good faith with counsel for the ERS Bondholders via telephone. After conferring about the subject of this motion, the parties have not been able to agree on a resolution as of the date of this filing.

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 9013-1 AND THE TENTH AMENDED CASE MANAGEMENT PROCEDURES PURSUANT TO LOCAL RULE 9013-1 AND ¶ 1.H OF THE TENTH AMENDED CASE MANAGEMENT ORDER**

The Retiree Committee hereby certifies that it has (a) carefully examined the matter and concluded that there is a true need for an urgent hearing; (b) not created the urgency through any lack of due diligence; (c) made a bona fide effort to resolve the matter without a hearing; (d) made reasonable, good-faith communications in an effort to resolve or narrow the issues that are being brought to the Court; and (e) contacted counsel for Bondholders, who have agreed to have this matter (and other discovery disputes that have arisen in connection with the litigation over the ERS Bonds) heard on an expedited basis. (17-3283, Dkt. 9717; 17-3566, Dtk. 765).

Dated: January 7, 2020

| | |
|---|---|
| JENNER & BLOCK LLP | BENNAZAR, GARCÍA & MILIÁN, C.S.P. |
| By: | By: |
| */s/ Robert Gordon* | */s/ A.J. Bennazar-Zequeira* |
| Robert Gordon (admitted *pro hac vice*) | A.J. Bennazar-Zequeira |
| Richard Levin (admitted *pro hac vice*) | Edificio Union Plaza |
| 919 Third Ave | Office 1701 |
| New York, NY 10022-3908 | 416 Avenida Ponce de León |
| rgordon@jenner.com | Hato Rey, San Juan |
| rlevin@jenner.com | Puerto Rico 00918 |
| 212-891-1600 (telephone) | ajb@bennazar.org |
| 212-891-1699 (facsimile) | 787-754-9191 (telephone) |
| | 787-764-3101 (facsimile) |
| Catherine Steege (admitted *pro hac vice*) | |
| Melissa Root (admitted *pro hac vice*) | *Counsel for The Official Committee of Retired Employees of Puerto Rico* |
| Landon Raiford (admitted *pro hac vice*) | |
| 353 N. Clark Street | |
| Chicago, IL 60654 | |
| csteege@jenner.com | |
| mroot@jenner.com | |
| lraiford@jenner.com | |
| 312-222-9350 (telephone) | |