## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>      as representative of<br><br>The Commonwealth of Puerto Rico, et al.,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**OMNIBUS OBJECTION OF THE LAWFUL CONSTITUTIONAL DEBT COALITION, PURSUANT TO BANKRUPTCY CODE SECTION 502 AND BANKRUPTCY RULE 3007, TO CLAIMS FILED OR ASSERTED BY HOLDERS OF CERTAIN BONDS <u>ISSUED OR GUARANTEED BY THE COMMONWEALTH</u>**

---

[1]  The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801).  (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

IMPORTANCE OF OBJECTION TO PLAN OF ADJUSTMENT PROCESS ...........................5

BACKGROUND ...................................................................................................................5

I.      THE CONSTITUTIONAL DEBT LIMIT.................................................................5

II.     THE ISSUANCE OF GO BONDS.............................................................................6

III.    THE LATE VINTAGE GO ISSUANCES .................................................................7

IV.     THE PBA AND ITS LAWFUL RELATIONSHIP WITH THE
        COMMONWEALTH....................................................................................................8

V.      THE INVALID COMMONWEALTH GUARANTEES - 2012 PBA BONDS,
        PRIFA BANS AND PORTS BONDS.......................................................................11

VI.     THE CLAIM OBJECTION LITIGATION SCHEDULE ...........................................12

JURISDICTION AND STATUTORY PREDICATE ............................................................13

RELIEF REQUESTED.......................................................................................................13

BASIS FOR RELIEF .........................................................................................................14

I.      PBA BONDS ARE NOT DIRECT OBLIGATIONS OF THE
        COMMONWEALTH, BUT GO BONDS AND COMMONWEALTH
        GUARANTEES ISSUED IN 2012 AND 2014 STILL VIOLATED THE
        EXPRESS LANGUAGE OF THE CONSTITUTIONAL DEBT LIMIT. .......................14

II.     BONDS AND GUARANTEES ISSUED IN CONTRAVENTION OF THE
        CONSTITUTIONAL DEBT LIMIT .........................................................................16

RESERVATION OF RIGHTS .............................................................................................19

NOTICE.............................................................................................................................20

CONCLUSION...................................................................................................................21

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Partido Independentista Puertorriqueño v. CEE*,
   20 P.R. Offic. Trans. 607 (P.R. 1988) ...................................................................... 8

*Soto-Padro v. Pub. Bldg. Auth.*,
   747 F. Supp. 2d 319 (D.P.R. 2010) ......................................................................... 8

*Soto-Padro v. Pub. Bldgs. Auth.*,
   675 F.3d 1 (1st Cir. 2012) ...................................................................................... 8

### **Statutory Authorities**

48 U.S.C. §§ 2101-2241 ............................................................................................ 1

### **Rules and Regulations**

22 L.P.R.A. § 901 .................................................................................................... 7

22 L.P.R.A. § 906 .................................................................................................... 7

22 L.P.R.A. § 916 .................................................................................................... 9

### **Constitutional Provisions**

P.R. Const.art. VI, § 2 ....................................................................................... 2, 4, 6

P.R. Const.art. VI, § 8 ............................................................................................. 5

### **Additional Authorities**

*Gloria Ruiz Kuilan, Edificios Públicos comienza la operación para remozar las
   escuelas,* EL NUEVO DIA *(June 17, 2017), available (in Spanish only) at
   https://www.elnuevodia.com/noticias/locales/nota/edificiospublicos
   comienzalaoperacionpararemozarlasescuelas-2332034/* ............................................. 8

To the Honorable United States District Court Judge Laura Taylor Swain:

The Lawful Constitutional Debt Coalition (the "LCDC"),[2] hereby files this omnibus objection (the "Objection") pursuant to section 502 of Title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these Title III cases by section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA")[3] and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to these Title III cases by section 310 of PROMESA, requesting entry of an order, substantially in the form attached hereto as **Exhibit A**, finding that the following bonds were issued in excess of the debt limit set forth the Puerto Rico Constitution (the "Constitutional Debt Limit"):  (i) Commonwealth of Puerto Rico general obligation ("GO") bonds issued in or after March of 2012 ("2012-2014 GO Bonds"); (ii) Public Buildings Authority ("PBA") bonds issued in or after March of 2012 ("2012 PBA Bonds"); (iii) Puerto Rico Infrastructure Financing Authority ("PRIFA") bond anticipation notes ("BANs") issued in March of 2015; and (iv) Ports of Americas Authority ("PAA") bonds issued in December of 2014 ("Ports Bonds" and collectively with the 2012-2014 GO Bonds, 2012 PBA Bonds, and PRIFA BANs, the "Late Vintage Bonds").  In support of this Objection, the LCDC respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Constitutional Debt Limit prohibits the Commonwealth of Puerto Rico (the "Commonwealth") from directly issuing bonds or guaranteeing bonds backed by its full faith, credit, and taxing power if the sum of (i) the amount of principal and interest due on the bonds

---

[2]   The members of the LCDC and their respective holdings are set forth in the *Third Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Dkt. 8639).

[3]   Codified at 48 U.S.C. §§ 2101-2241.

proposed to be issued together with all similar "*direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds*" previously issued by the Commonwealth and still outstanding, payable in any fiscal year (the "<u>First Prong</u>"), plus (ii) any amounts *paid by the Commonwealth* in the fiscal year immediately preceding the then current fiscal year "*for principal and interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth*," (the "<u>Second Prong</u>"), exceeds 15 percent of the average annual revenues deposited into the Treasury of Puerto Rico over the two previous years.[4]  In other words, the Constitutional Debt Limit applies both to direct obligations for bonds issued by the Commonwealth and to obligations for bonds guaranteed by the Commonwealth provided that the Commonwealth made debt service payments on account of such guaranteed obligations.

2.    Numerous claim objections filed in these Title III cases assert that certain bonds issued or guaranteed by the Commonwealth breached the Constitutional Debt Limit.[5]  Some of these objections attack the same bonds that are the subject of this Objection.[6]  But each of those objections is based on the central theory that, for various reasons, the bonds issued by the PBA

---

[4]  P.R. CONST. art. VI, § 2 (emphasis added).

[5]  *See e.g.*, *Omnibus Objection of (I) Financial Oversight and Management Board, Acting Through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted By Holders of Certain Commonwealth General Obligation Bonds* (Dkt. No. 4784) (the "<u>2012-2014 GO Bond Objection</u>"); *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rules 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds* (Dkt. No. 7057) (the "<u>2011 GO Bond Objection</u>"); *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth By Holders of Certain Puerto Rico Public Buildings Authority Bonds* (Dkt. No. 8141) (the "<u>PBA Bond Objection</u>"); .

[6]  The 2012-2014 GO Bond Objection objects to the same GO bonds that are the subject of this Objection, and the PBA Bond Objection objects to, *inter alia*, the 2012 PBA Bonds that are subject of this Objection.

and guaranteed by the Commonwealth constitute "direct obligations of the Commonwealth" and thus should have been included in the First Prong of the Constitutional Debt Limit.[7]  The LCDC respectfully submits, however, that such theory expands the First Prong beyond its plain meaning (*i.e.,* "direct obligations of the Commonwealth for money borrowed directly by the Commonwealth").  By definition, bonds issued by the PBA, an independent instrumentality of the Commonwealth, are neither "*direct* obligations of the Commonwealth nor money borrowed *directly* by the Commonwealth, under any meaning of the word "direct."

3.      In contrast to a theory that is at odds with the plain meaning of the Constitutional Debt Limit, the LCDC brings this Objection based upon a faithful reading of both prongs of the Constitutional Debt Limit.  The LCDC submits that even though the PBA is a lawful and valid structure, the rental payments made by the Commonwealth to the PBA that were then used to pay debt service on bonds the Commonwealth guaranteed fall squarely within the Second Prong of the Constitutional Debt Limit.

4.      Once these payments are accurately accounted for within the Second Prong of the Constitutional Debt Limit, it is clear that the Commonwealth breached the Constitutional Debt Limit beginning on March 29, 2012, when it issued the series 2012 B GO Bonds followed by the 2012 A GO Bonds (each defined below) pursuant to a bond resolution adopted on March 7, 2012. The Commonwealth surpassed the Constitutional Debt Limit in 2012 and has remained in breach

---

[7]    For instance, the 2012-2014 GO Bond Objection and PBA Bond Objection assert that the PBA is a sham entity and the PBA's bonds should be considered direct obligations of the Commonwealth.  *See* 2012-2014 GO Bond Objection ¶¶ 63-86; PBA Bond Objection ¶ 19.  In contrast, Ambac Assurance Corporation has taken the position that even though the PBA is a validly created separate instrumentality of the Commonwealth, the rental payments made by the Commonwealth to the PBA should be counted in the First Prong.  *See Ambac Assurance Corporation's Statement of Position in Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* (Dkt. No. 6171) ¶¶ 5-11.

ever since.  Therefore, every issuance of GO bonds or Commonwealth-guaranteed bonds issued on or after March 29, 2012 were issued in excess of the Constitutional Debt Limit.  The following table illustrates that each of the Late Vintage Bonds violates the Constitutional Debt Limit:

| Credit Series | GO 2011 A | GO 2011 C | GO 2011 D/E | PBA R | PBA S | PBA T | GO 2012 A/B | PBA U | GO 2014 A | PAA 2014 | PRIFA BANs 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Issuance Date | 2/17/11 | 3/17/11 | 7/12/11 | 8/24/11 | 8/24/11 | 12/22/11 | 3/29/12 | 6/21/12 | 3/17/14 | 12/31/14 | 3/17/15 |
| Issuance Amount | $357 | $442 | $602 | $756 | $304 | $122 | $2,733 | $582 | $3,500 | $234 | $246 |
| Previous Fiscal Year | 2010 | 2010 | 2011 | 2011 | 2011 | 2011 | 2011 | 2011 | 2013 | 2014 | 2014 |
| **Max GO Debt Service Calculation** | | | | | | | | | | | |
| (i) Future Max GO Debt Service[1] | $839 | $866 | $884 | $884 | $884 | $884 | $1,044 | $1,044 | $1,238 | $1,238 | $1,238 |
| **Prior FY CW Guaranteed P&I Calculation** | | | | | | | | | | | |
| CW Payment on PAA Bonds[1] | $10 | $10 | $17 | $17 | $17 | $17 | $17 | $17 | $17 | $19 | $19 |
| CW Payment on PBA Bonds[2] | 153 | 153 | 116 | 116 | 116 | 116 | 116 | 116 | 76 | 273 | 273 |
| (ii) Total Guaranteed P&I Paid by CW | $163 | $163 | $133 | $133 | $133 | $133 | $133 | $133 | $93 | $291 | $291 |
| **Debt Service Limit Calculation** | | | | | | | | | | | |
| Avg Rev. in Preceding Two FY[3] | $7,333 | $7,333 | $7,596 | $7,596 | $7,596 | $7,596 | $7,596 | $7,596 | $8,336 | $8,552 | $8,552 |
| Debt Service Limit (%) | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% |
| (iii) Debt Service Limit | $1,100 | $1,100 | $1,139 | $1,139 | $1,139 | $1,139 | $1,139 | $1,139 | $1,250 | $1,283 | $1,283 |
| Debt Breach? (i + ii > iii) | NO | NO | NO | NO | NO | NO | YES | YES | YES | YES | YES |
| *Memo:* | | | | | | | | | | | |
| Year of Max Debt Service | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2013 | 2013 | 2015 | 2015 | 2015 |

Note: PAA Bonds are Ports of the Americas Bonds.
(1) Based on the Official Statement of the respective issue. FY2014 CW payments on PAA Bonds per October 30, 2014 Financial Information and Operating Data Report.
(2) Per Commonwealth CAFRs for the relevant year.
(3) Per Commonwealth of Puerto Rico Fiscal Year 2012 CAFR, page 298/305 and General Fund Net Revenues per Hacienda
(http://www.hacienda.pr.gov/sites/default/files/ingresos_netos_fondo_general_2009-2018_0.pdf).

5.    The LCDC submits that disputes concerning whether and to what extent claims based on Late Vintage Bonds are disallowed should be deferred until after an appropriate court determines whether and when the Late Vintage Bonds breached the Constitutional Debt Limit.  However, the LCDC submits that, regardless of whether such GO bonds and Commonwealth-guaranteed bonds have any allowable claim, they are not entitled to the same relative lawful priority under the Puerto Rico Constitution and applicable Commonwealth law as the Commonwealth's full faith and credit bonds that did not violate the Constitutional Debt Limit.

## IMPORTANCE OF OBJECTION TO PLAN OF ADJUSTMENT PROCESS

6.      This Objection raises a gating issue for the Commonwealth's plan of adjustment: whether more than $6 billion of GO and GO Guarantee bondholder claims are based on bonds that were issued in violation of the Puerto Rico Constitution.[8]

## BACKGROUND

I.   **THE CONSTITUTIONAL DEBT LIMIT**

7.      The Constitution of the Commonwealth of Puerto Rico became effective in 1952.

8.      In 1961, the Constitution was amended to include the Constitutional Debt Limit.

9.      The Constitutional Debt Limit provides that:

> no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year.[9]

10.     The Constitutional Debt Limit also applies to any guarantee given by the Commonwealth.[10]

---

[8]    The Commonwealth Title III Plan of Adjustment, dated September 27, 2019, as may be amended, proposes to compromise the issues of relative priority to be litigated herein.  While members of the LCDC predominantly hold bonds issued or guaranteed by the Commonwealth prior to March 2012, certain members of the LCDC also hold Late Vintage Bonds.

[9]    P.R. CONST. art. VI, § 2

[10]    *Id.* ("the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the

## II.   THE ISSUANCE OF GO BONDS

11.     From time to time, the Commonwealth has raised funds through the issuance of GO bonds.  All validly-issued GO bonds are backed by the Commonwealth's good faith, credit and taxing power.[11]   The Puerto Rico Constitution provides that obligations backed by the Commonwealth's full faith, credit, and taxing power (such as GO bonds) enjoy a first claim or priority on the Commonwealth's "available resources" (the "Constitutional Priority").[12]  Under the Puerto Rico Constitution, if "available resources" are insufficient to fund all of the desired spending, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."[13]  Puerto Rico statutory law establishes the same priority.[14]  In essence, this gives holders of GO bonds and other Commonwealth-guaranteed obligations (*i.e.*, PBA bonds) a payment priority over other obligations of the Commonwealth.

12.     The source of the GO bonds' repayment is the Treasury, and GO bondholders' remedies are likewise directed to the Treasury if the Commonwealth does not make payments. The Puerto Rico Constitution allows holders of Constitutional debt to compel the Secretary of the Treasury to "apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof …."[15]

---

amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.").

[11]   *See* e.g., Official Statement, dated April 25, 2008, for Series 2008 A & B GO Bonds at cover page; Official Statement, dated February 10, 2011, for Series 2011 A GO Bonds at cover page.

[12]   P.R. CONST. art. VI, § 8.

[13]   *Id*.

[14]   The Office of Management and Budget Organic Act, 23 P.R. LAWS ANN. § 104(c)(1).

[15]   P.R. CONST. art. VI, § 2.

6

13.     Approximately $13 billion of GO bonds remained outstanding as of the Commonwealth's May 3, 2017 petition date (the "Petition Date").[16]  An additional approximate $4.7 billion of bonds guaranteed by the Commonwealth also remained outstanding as of the Petition Date.

## III.     THE LATE VINTAGE GO ISSUANCES

14.     On March 29, 2012, the Commonwealth issued $415,270,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2012 B (General Obligation Bonds) (the "2012 B GO Bonds").[17]

15.     On April 3, 2012, the Commonwealth issued $2,318,190,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2012 A (General Obligation Bonds) (the "2012 A GO Bonds").[18]  The 2012 A GO Bonds and 2012 B GO Bonds were both issued pursuant to a bond resolution adopted on March 7, 2012.

16.     On March 17, 2014, the Commonwealth issued $3,500,000,000 in aggregate principal amount of General Obligation Bonds of 2014, Series A (the "2014 GO Bonds" and collectively with the 2012 A GO Bonds and 2012 B GO Bonds, the "Late Vintage GO Bonds").[19]

17.     Numerous holders and insurers of Late Vintage GO Bonds have purportedly filed proofs of claim against the Commonwealth.[20]

---

[16]   *See* Certified Fiscal Plan for Puerto Rico, dated March 13, 2017, at 27.

[17]   *See* Official Statement, dated March 7, 2012, for Series 2012 B GO Bonds.

[18]   *See* Official Statement, dated March 7, 2012, for Series 2012 A GO Bonds (the "2012 A Official Statement").

[19]   *See* Official Statement, dated March 11, 2014, for Series 2014 GO Bonds.

[20]   *See* 2012-2014 GO Bond Objection ¶ 37.

## IV.   THE PBA AND ITS LAWFUL RELATIONSHIP WITH THE COMMONWEALTH

18.     In 1958, three years before the addition of the Constitutional Debt Limit, the Legislative Assembly of Puerto Rico by statute created the PBA as a public corporation charged with constructing, maintaining, and operating public facilities including schools, police and fire stations, and courthouses.[21]  The PBA holds title to a large number of the properties in its portfolio, which it leases to tenants that include the Puerto Rico Department of Education, the Department of Public Safety, Puerto Rico's Judicial Branch, and Puerto Rico's 78 Municipalities.[22]  For those properties it does not own outright, the PBA holds rights or easements that allow it to lease or sub-lease premises consistent with the Enabling Act.[23]  In total, the PBA reports 615 properties under its jurisdiction[24] and capital assets totaling $3.7 billion.[25]  Over 1,000 PBA employees provide maintenance, administrative, and operational services to its sizeable portfolio of buildings across the island.[26]

---

[21] 22 L.P.R.A. § 901, 902 (the "Enabling Act").  As a public corporation, the PBA is entirely separate from the Commonwealth government, with its own legal personality.  Enabling Act § 902 (PBA constituted as a public "instrumentality" that is a "body corporate and politic with corporate franchise"); Complaint., *Fin. Oversight and Mgmt. Board for Puerto Rico v. Puerto Rico Pub. Build. Auth.*, Adv. Proc. 18-149 (Dkt. 1) ("Compl."), ¶ 21 ("instrumentalities" and "public corporations" are "not part of the Commonwealth's central government").  Consistent with this, the Legislative Assembly endowed the PBA with powers and capacities typical of independent, public entities, including the capacity to sue and be sued, to enter into and execute contracts, the power to acquire and dispose of property, and the authority to issue bonds to finance its activities.  22 L.P.R.A. § 906.

[22] List of PBA properties and their respective tenants available at: https://data.pr.gov/Desarrollo-e-Infraestructura/Edificios-de-la-Autoridad-de-Edificios-P-blicos-AE/sw8z-xj2x.

[23] *See* Puerto Rico Public Buildings Authority, Resolution No. 468, Authorizing and Securing Government Facilities Revenue Bonds Guaranteed by the Commonwealth of Puerto Rico, adopted June 22, 1995 (the "1995 Resolution").

[24] *See* note 21, *supra*.

[25]  *See* 22 L.P.R.A. § 906; *see also* 1995 Resolution § 707; Public Buildings Authority, Basic Financial Statements for Fiscal Years Ended June 30, 2014 and 2013 and Independent Auditors' Report at 8, 15, *available* at http://www.gdb.pr.gov/investors_resources/documents/PBABasicFS-6-30-2014.pdf.

[26]  *See* Gloria Ruiz Kuilan, *Edificios Públicos comienza la operación para remozar las escuelas*, EL NUEVO DIA (June 17, 2017), *available (in Spanish only) at*

19.     The PBA's Enabling Act is presumptively constitutional under the law of Puerto Rico.[27]  Since its creation by the Legislative Assembly, no Court has ever suggested that the PBA was unlawfully created, or that it is a "sham" or an *alter ego* of the Commonwealth government. In fact, courts have concluded the opposite.[28]

20.     Consistent with its authority, PBA issued bonds to finance the construction and maintenance of its buildings, and the Commonwealth guaranteed the payment of principal and interest on PBA bonds through guarantees issued in favor of holders of PBA bonds.  The practice of guaranteeing PBA bonds began in 1968, ten years after the PBA's creation.[29]

21.     The PBA derives its revenues from the rent paid by its tenants.  Numerous government facilities owned by the PBA are leased to the Commonwealth and various divisions, departments, and instrumentalities of the Commonwealth government for essential government functions.[30]  The rental payments under the PBA leases are expressly intended to be used to pay principal and interest on the PBA bonds and to cover other specified expenses of the landlord.

---

https://www.elnuevodia.com/noticias/locales/nota/edificiospublicos
comienzalaoperacionpararemozarlasescuelas-2332034/.

[27]  *E.g.*, *Brau v. ELA de Puerto Rico*, 2014 TSPR 26, 190 P.R. Dec. 315, 337, (P.R. 2014); *Partido Socialista Puertorriqueño v. ELA de Puerto Rico*, 7 P.R. Offic. Trans. 653, 727, (P.R. 1978), *modified Partido Independentista Puertorriqueño v. CEE*, 20 P.R. Offic. Trans. 607,  (P.R. 1988) ("To begin with, laws are presumed to be constitutional and the movant [objector] should place the courts in a position to decide by introducing evidence to sustain the facts alleged, and then stating the legal arguments on which its assignment of unconstitutionality is based, specifically mentioning the constitutional provisions involved and the legal precedents supporting its assignment.").

[28]   *See, e.g., Soto-Padro v. Pub. Bldg. Auth.*, 747 F. Supp. 2d 319, 329 (D.P.R. 2010), *aff'd sub nom. Soto-Padro v. Pub. Bldgs. Auth.*, 675 F.3d 1 (1st Cir. 2012) (holding that the PBA was not an arm of the state entitled to immunity under the Eleventh Amendment to the U.S. Constitution).

[29]   Act No. 17-1968; Compl. ¶ 16 n.7.

[30]   *Id.*; *see, e.g.*, Official Statement, dated June 8, 2012, for Series U Bonds (the "Series U Official Statement") at 15 ("[T]he [PBA] enters into lease agreements . . . with various departments . . . of the Commonwealth . . . .").  Third parties, including the federal government, also lease property from the PBA.

Indeed, the leases openly and appropriately define a portion of the rental payments as "Debt Service Rent."

22.     Accordingly, each fiscal year, the Commonwealth pays rent to the PBA in an amount sufficient to cover certain of the PBA's expenses, including the amounts necessary to pay the principal and interest owed on the PBA bonds.[31]  These rent payments fluctuate from year to year based on the amount of principal and interest that is owed on the PBA bonds, and all rent received by the PBA in any fiscal year is allocated first to pay PBA bond debt service.[32]  In fiscal year 2011 (ending June 30, 2011), the PBA owed in excess of $250 million for principal and interest on its bonds, and the Commonwealth paid a portion of this principal and interest as Debt Service Rent.[33]

---

[31]     *See, e.g.*, *id.* at 17 ("The reduction in the [PBA's] debt service payment requirements for fiscal year 2012 will result in a commensurate decrease in the required rental payments for such fiscal year."); December 22, 2011 Master Sublease Agreement between PBA and Puerto Rico Department of Education at 2 (describing rentals as including "such annual amount or amounts . . . necessary to pay the principal of . . . and the interest on all Bonds under the Bond Resolution as the same become due and payable").

[32]     *See* 22 L.P.R.A. § 916 ("[R]ent payable to the Authority . . . shall be reasonable and sufficient, taking into consideration the amounts needed by the Authority to . . . pay the interest, principal, and amortization requirements of the bonds issued by the Authority for financing such a building"; "All or any part of the rents payable to the Authority under any such contracts may be committed by the Authority for the payment of the principal and interest of any bonds issued by the Authority."); 1995 Bond Resolution at 4 ("The term "Debt Service Rentals" shall mean the rentals required to be paid by the lessees of the government facilities under Lease Agreements on account of the principal of (including the Amortization Requirements for term bonds and the premiums, if any, for the redemption of bonds) and interest on all bonds."); *id.* § 502 ("[N]otwithstanding any contrary provision in any Lease Agreement or any contrary designation or instruction from any lessee, all rentals received by the Authority pursuant to any Lease Agreement shall be deemed to be Debt Service Rentals to the extent of the amounts then due and payable as Debt Service Rentals under such Lease Agreement . . . .").

[33]     *See* 2014 Financial Information and Operating Data Report, Oct. 30, 2014, at 104 ("General Fund budgetary expenditures for fiscal year 2011 were $10.065 billion, consisting of $9.075 billion of budgetary operating expenditures, $267 million in PBA rental payments and $722 million of transfers out for debt service payments on general obligation bonds.")

## V.    THE INVALID COMMONWEALTH GUARANTEES - 2012 PBA BONDS, PRIFA BANS AND PORTS BONDS

23.    On June 21, 2012, the PBA issued $582,345,000 in aggregate principal amount of 2012 PBA Bonds.[34]  The 2012 PBA Bonds are guaranteed by the Commonwealth.

24.    PRIFA is a public corporation and government instrumentality of the Commonwealth that provides assistance, financial and otherwise, "to political subdivisions, public corporations, instrumentalities, and municipalities of the Commonwealth that develop and operate infrastructure facilities."[35]  PRIFA also provides "alternative means for directly financing those facilities."[36]

25.    On March 17, 2015, PRIFA issued $245,955,000 in aggregate principal amount of Commonwealth-guaranteed Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 2015.[37]  There were approximately $78,145,000 in outstanding PRIFA BANs as of the Petition Date.[38]  The PRIFA BANs are guaranteed by the Commonwealth.

26.    The PAA is a public corporation and government instrumentality of the Commonwealth that coordinates and oversees the "design, development, construction, financing, operation, maintenance and administration of the Port of the Americas."[39]  The PAA is empowered

---

[34]   Series U Official Statement at cover page.

[35]   Commonwealth of Puerto Rico Fiscal Plan Appendix, dated Oct. 14, 2016 at 19.

[36]   *Id.*

[37]   *See* Official Statement, dated March 17, 2015, for Series 2015 BANs (the "PRIFA BAN Official Statement").

[38]   *Disclosure Statement for the Joint Plan of Adjustment for the Commonwealth, the Employees Retirement System of the Government of the Commonwealth, and the PBA* (Dkt. 8766) (the "Disclosure Statement") at 266.

[39]   Act 409-2004 at Statement of Motives.

to issue bonds that it deems "necessary obtain funds to comply with its objectives."[40]  Bonds issued by the PAA are guaranteed by the Commonwealth.[41]

27.    On December 31, 2014 the PAA issued approximately $233,630,826.29 in aggregate principal amount of Commonwealth-guaranteed Ports Bonds.[42]    There were approximately $225,543,000 in outstanding Ports Bonds as of the Petition Date.[43]

## VI.    THE CLAIM OBJECTION LITIGATION SCHEDULE

28.    On January 14, 2019, the Official Committee of Unsecured Creditors (the "UCC") and the Financial Oversight and Management Board for Puerto Rico (the "FOMB") filed the 2012-2014 GO Bond Objection.  The Court entered the *Order Establishing Initial Procedures With Respect to the 2012-2014 GO Bond Objection* (Dkt. No. 5143) (the "Procedures Order"), which set forth comprehensive procedures with respect to the 2012-2014 GO Bond Objection.  Among other things, the Procedures Order required holders of 2012-2014 GO Bonds that wished to participate in the litigation of the 2012-2014 GO Bond Objection to submit a notice of participation by April 16, 2019.

29.    On April 16, 2019 the LCDC filed its *Notice of Participation* (Dkt. No. 6179) and supporting *Statement of Position* (Dkt. No. 6180).

30.    On July 18, 2019, the UCC filed the PBA Bond Objection.

31.    On July 24, 2019, the Court entered its *Order Regarding Stay Period and Mandatory Mediation* (Dkt. No. 8244) (the "Stay Order"), which stayed, among other things, all litigation concerning the 2012-2014 GO Bond Objection and the PBA Bond Objection.  On

---

[40]    *Id.*

[41]    *Id.* § 1.

[42]    Bond Purchase Agreement, Port of Americas Authority 2014 Bond at 1.

[43]    Disclosure Statement at 266.

October 28, 2019, the Court entered its *Order Granting Urgent Joint Motion of Oversight Board and AAFAF for Order Extending (A) Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto* (Dkt. No. 9016), pursuant to which the stay provided for in the Stay Order was extended until December 31, 2019.

32.     On November 27, 2019, the Mediation Team appointed by the Court in these Title III Cases (the "Mediation Team") filed its *Interim Report and Recommendation of the Mediation Team* (Dkt. No. 9365) (the "Interim Report").  In connection with the Interim Report, the Court entered the *Interim Case Management Order* (Dkt. No. 9619) (the "Interim Order").  The Interim Order set forth an omnibus claim objections schedule whereby any additional omnibus claim objections disputing the validity of claims related to general obligation bonds issued by the Commonwealth, bonds guaranteed by the Commonwealth, or bonds issued by the PBA ("Future Claim Objections") must be filed by January 8, 2020.

33.     The LCDC files this Objection in accordance with the Interim Order.

## JURISDICTION AND STATUTORY PREDICATE

34.     The Court has jurisdiction over this Objection pursuant to section 306(a) of PROMESA.  Venue is proper in this district pursuant to section 307(a) of PROMESA.

35.     The statutory predicate for the relief sought herein is section 502 of the Bankruptcy Code, as incorporated by section 301(a) of PROMESA, and Bankruptcy Rule 3007, as incorporated by section 310 of PROMESA.

36.     The LCDC is a "party in interest" pursuant to section 1109(b) of the Bankruptcy Code, as incorporated by section 301(a) of PROMESA.

## RELIEF REQUESTED

37.     The LCDC respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, declaring that all Late Vintage Bonds were issued in excess of the

Constitutional Debt Limit and all claims based on Late Vintage Bonds are, therefore, not entitled to Constitutional Priority.

## BASIS FOR RELIEF

38.    All claims based on Late Vintage Bonds should be stripped of any Constitutional Priority because those bonds were issued in violation of the Constitutional Debt Limit.[44]

## I.    PBA BONDS ARE NOT DIRECT OBLIGATIONS OF THE COMMONWEALTH, BUT GO BONDS AND COMMONWEALTH GUARANTEES ISSUED IN 2012 AND 2014 STILL VIOLATED THE EXPRESS LANGUAGE OF THE CONSTITUTIONAL DEBT LIMIT.

39.    The PBA was validly created and the PBA's bonds are undeniably constitutional, serving important public purposes over the past 60 years.  Although PBA bonds are not "direct obligations of the Commonwealth for money borrowed directly by the Commonwealth," and therefore do not count under the First Prong of the Constitutional Debt Limit, they are bonds guaranteed by the Commonwealth; accordingly, they count under the Second Prong with respect to Commonwealth payments made on account of the PBA's debt service in the fiscal year preceding a proposed Commonwealth bond issuance or guarantee.

40.    The Commonwealth was able to issue GO bonds and guarantee bonds through and after 2012 only because it did not include the payments that the Commonwealth made to the PBA in the prior fiscal year for principal or interest on PBA bonds when determining whether it had debt capacity.  However, the plain language (in both English and Spanish) of the Constitutional Debt Limit makes clear, that any payments made in the preceding fiscal year by the Commonwealth for debt service on PBA bonds should have been included under the Second Prong.  These payments were indisputably "paid by the Commonwealth for principal and interest

---

[44]    As noted above, the LCDC submits that disputes concerning whether and to what extent claims based on Late Vintage Bonds are disallowed should be deferred until after an appropriate court determines the proper construction of the Puerto Rico Constitution.

on account of outstanding obligations evidenced by bonds guaranteed by the Commonwealth."
The Commonwealth paid its "debt service rent" to the PBA, a portion of which was used as
expressly required to service the principal and interest owed on the PBA bonds—bonds that were
guaranteed by the Commonwealth.

41.     A portion of the payments made by the Commonwealth to the PBA in the fiscal
year prior to each of the Late Vintage Bond issuances were indisputably made "on account of"
principal and interest then owing on the PBA bonds.  Thus, under the plain language of Puerto
Rico's Constitution, because the Commonwealth guaranteed the PBA bonds, the Commonwealth's
payments in the prior fiscal year for principal or interest on PBA bonds should have been included
in the determination of the Constitutional Debt Limit.

42.     The text chosen by the framers of the 1961 amendment makes perfect sense in
determining how much full faith and credit debt the island can issue.  The First Prong takes into
account future payments on all "direct obligations" bonds (which are knowable based on a
projected debt schedule), and the Second Prong requires the Commonwealth to consider amounts
it actually paid for debt service on account of outstanding obligations evidenced by bonds it
guaranteed with its full faith and credit since it was obligated to pay from its general fund revenues
one way or another.

43.     It would make no sense to consider payments made for debt service on the PBA
bonds only in the event that the Commonwealth failed to pay its rent and thus "voluntarily
triggered" its guarantee.  Not only would that be inconsistent with the text of the Constitutional
Debt Limit, it is illogical and contrary to the purpose of the limit to begin with, which was to
appropriately stress test the ability to issue additional direct obligations bonds in light of the
financial reality at the time.   Whether a public corporation's debt service is paid by the

15

Commonwealth on account of guaranteed bonds because the issuer had insufficient own-source revenues, or whether it was paid because the Commonwealth had obligated itself to provide a portion of the required revenues to the public corporation for that purpose, the Second Prong of the Constitutional Debt Limit is implicated.[45]

44.     The Commonwealth's failure to comply with this Constitutional mandate resulted in the issuance of approximately $6.8 billion of purported full faith and credit GO and Commonwealth guaranteed bonds in and after 2012 that violated the express terms of the Constitutional Debt Limit.  Whether or not such bond have any allowable claim, they clearly are not entitled to any lawful priority under Commonwealth law on the same level as full faith and credit GO and Commonwealth guaranteed bonds that did not breach the Constitutional Debt Limit.[46]

## II.   BONDS AND GUARANTEES ISSUED IN CONTRAVENTION OF THE CONSTITUTIONAL DEBT LIMIT

45.     When the Constitutional Debt Limit is applied plainly as written, it is clear that the Constitutional Debt Limit was breached when the Commonwealth issued the 2012 A and 2012 B GO Bonds on April 3, 2012 and March 29, 2012, respectively.

---

[45]   This is also true with respect to the funds made available to PBA through a line of credit provided by the Government Development Bank for Puerto Rico ("GDB").  These funds were structured as an extension of credit, but were actually draws on the Commonwealth's guaranty.  As explained in greater detail in *Ambac Assurance Corporation's Statement of Position in Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* (Dkt. No. 6171), any funds made available to the PBA that are not rent payments must necessarily be "funds provided by the Commonwealth of Puerto Rico in compliance with its guaranty."  From 2011 through 2013, rent payments were suspended, thus, the monies received from the GDB and used by PBA to make payment on the bonds were necessarily on account of the Commonwealth guaranty.

[46]   *See* PROMESA § 201(b)(1)(N) (requiring only that a certified fiscal plan "respect the relative ***lawful priorities*** or lawful liens, as may be applicable, ***in the constitution***, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016") (emphasis added).

46.     In fiscal year 2013, the maximum GO debt service was $1,044 million.[47]  In fiscal

year 2011, the Commonwealth made payments of $17 million on the Ports Bonds[48] and $116

million to the PBA which was used to cover debt service obligations of PBA bonds.[49]

47.     When the maximum GO debt service is combined with the Commonwealth's

payments on the Ports Bonds and to the PBA, the sum is $1,176 million.  This total exceeds the

debt service limit of 15% of the average revenue in the preceding two years of $1,139 million.

Thus the GO 2012 Series A and B issuances on April 3, 2012 and March 29, 2012, respectively,

breached the debt limit.[50]

48.     Based on the foregoing, the Commonwealth lacked constitutional authority to issue

the following GO bonds:

| Public Improvement Refunding Bonds, Series 2012 B | | | |
|---|---|---|---|
| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
| 2013 | $55,605,000 | 2.25% | 74514LZS9 |
| 2014 | 69,990,000 | 2.95% | 74514LZT7 |
| 2015 | 67,300,000 | 3.25% | 74514LZU4 |
| 2016 | 56,170,000 | 3.65% | 74514LZV2 |
| 2017 | 27,385,000 | 3.90% | 74514LZW0 |
| 2018 | 51,925,000 | 4.10% | 74514LZX8 |
| 2019 | 20,160,000 | 4.25% | 74514LZY6 |
| 2020 | 17,125,000 | 4.40% | 74514LZZ3 |
| 2033 | 49,610,000 | 5.30% | 74514LA23 |
| Total | $415,270,000 | | |

---

[47]   *See* 2012 A Official Statement at 20 & n.3.

[48]   *See* Official Statement, dated Dec. 19, 2011, for Series T Bonds (the "Series T Official Statement"), at 27.

[49]   Commonwealth of Puerto Rico Comprehensive Annual Financial Report, Year Ended June 30, 2011 at 187.

[50]   The issuance immediately preceding the 2012 A and B GO Bonds was that of the PBA Series T bonds.  When those bonds were issued, the maximum GO debt service was $884 MM in fiscal year 2020. When added to the figures from paragraph 45, the total is $1,016 million, which does not exceed the debt service limit of 15% of the average revenue in the preceding two years of $1,139 million.  Thus the Commonwealth did not breach the Constitutional Debt Limit until it issued the 2012 A and B GO Bonds on April 3, 2012 and March 29, 2012, respectively.

use

| Public Improvement Refunding Bonds, Series 2012 A | | | |
|---|---|---|---|
| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
| 2020 | $10,000,000 | 4.00% | 74514LA31 |
| 2020 | 35,345,000 | 5.00% | 74514LC47 |
| 2021 | 49,400,000 | 4.00% | 74514LA49 |
| 2021 | 52,895,000 | 5.00% | 74514LC54 |
| 2022 | 32,110,000 | 4.13% | 74514LA56 |
| 2022 | 21,285,000 | 5.00% | 74514LC62 |
| 2022 | 20,000,000 | 4.00% | 74514LD46 |
| 2023 | 7,290,000 | 4.38% | 74514LC70 |
| 2023 | 68,500,000 | 5.25% | 74514LA64 |
| 2023 | 5,000,000 | 4.13% | 74514LD53 |
| 2024 | 10,000,000 | 4.00% | 74514LC88 |
| 2024 | 11,050,000 | 5.25% | 74514LA72 |
| 2024 | 5,000,000 | 4.13% | 74514LD61 |
| 2025 | 22,030,000 | 4.50% | 74514LA80 |
| 2025 | 5,000,000 | 4.25% | 74514LD79 |
| 2026 | 60,000,000 | 5.50% | 74514LD38 |
| 2026 | 4,455,000 | 4.50% | 74514LC96 |
| 2026 | 69,740,000 | 5.50% | 74514LA98 |
| 2027 | 17,945,000 | 5.50% | 74514LB 22 |
| 2027 | 11,520,000 | 4.25% | 74514LD87 |
| 2028 | 64,795,000 | 5.75% | 74514LB30 |
| 2029 | 6,665,000 | 5.00% | 74514LB48 |
| 2030 | 7,000,000 | 4.75% | 74514LB97 |
| 2031 | 7,335,000 | 4.75% | 74514LB55 |
| 2032 | 7,685,000 | 5.00% | 74514LC21 |
| 2033 | 27,400,000 | 5.00% | 74514LC39 |
| 2035 | 322,925,000 | 5.00% | 74514LD20 |
| 2037 | 263,540,000 | 5.13% | 74514LB63 |
| 2039 | 459,305,000 | 5.50% | 74514LB71 |
| 2041 | 632,975,000 | 5.00% | 74514LB89 |
| Total | $2,318,190,000 | | |

| General Obligation Bonds of 2014, Series A | | | |
|---|---|---|---|
| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
| 2035 | $3,500,000,000 | 8.00% | 745 I 4LE86 |
| Total | $3,500,000,000 | | |

49.    The Commonwealth also lacked constitutional authority to guarantee the following

PBA bonds:

| Government Facilities Revenue Refunding Bonds, Series U | | | |
|---|---|---|---|
| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
| 2014 | $460,000 | 4.00% | 745235S51 |
| 2015 | 1,760,000 | 4.00% | 745235R45 |
| 2016 | 4,830,000 | 5.00% | 745235R52 |
| 2017 | 4,920,000 | 5.00% | 745235R60 |
| 2018 | 5,020,000 | 5.00% | 745235R78 |
| 2019 | 2,605,000 | 3.89% | 745235S69 |
| 2019 | 2,120,000 | 5.00% | 745235R86 |
| 2020 | 10,225,000 | 5.00% | 745235R94 |
| 2021 | 4,800,000 | 5.00% | 745235S28 |
| 2022 | 4,850,000 | 5.00% | 745235S36 |
| 2023 | 2,080,000 | 5.25% | 745235S44 |
| 2042 | 538,675,000 | 5.25% | 745235R37 |
| Total | $582,345,000 | | |

50.     Similarly, the Commonwealth lacked constitutional authority to guarantee the following obligations:

| Other Commonwealth Guaranteed Debt Issued after March 2012 | | | |
|---|---|---|---|
| Issuing Entity | CUSIP | Principal Amount ($MM) | Original Issuance Date |
| PRIFA BANs | 745223AA5 | $78.1 | 3/17/2015 |
| Port of the Americas Authority | N/A | 225.5 | 12/31/2014 |
| Total | | $303.7 | |

Source: Principal amounts per Commonwealth's Disclosure Statement filed September 27, 2019.

## **RESERVATION OF RIGHTS**

51.     The LCDC reserves its rights to raise additional objections to the validity of other bonds issued by or guaranteed by the Commonwealth, including on the basis that such bonds were issued in violation of the Constitutional Debt Limit, whether because certain other debt was not properly included in the Constitutional Debt Limit calculation or otherwise.  In addition, the LCDC reserves the right to object to the Late Vintage Bonds on grounds other than those set forth in this Objection.

## NOTICE

52.     Notice of this Late Vintage Claim Objection has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (iv) the Official Committee of Retirees; (v) the insurers of the bonds issued or guaranteed by the Debtors; (viii) all individuals and entities who filed proofs of claim that are reflected on Prime Clerk's database as "bond claims" against the Commonwealth; (viii) all individuals and entities who submitted Notices of Participation in accordance with the Procedures Order; (ix) all individuals and entities who are beneficial holders of the Late Vintage Bonds (in the manner described in the *Declaration of Christina Pullo of Prime Clerk LLC Regarding Service of Objection Notice Upon Beneficial Holders of Challenged GO Bonds*, annexed as Exhibit A to the *Informative Motion of (I) Financial Oversight and Management Board, Acting Through the Special Claims Committee, and (II) The Official Committee of Unsecured Creditors Regarding Service of Objection Notice and Procedures Upon Beneficial Holders of Challenged GO Bonds* (Dkt. No. 5049)); (x) U.S. Bank Trust National Association and U.S. Bank National Association, as Fiscal Agent for the 2012 PBA Bonds; (xi) Cede & Co., as depository for the 2012-2014 GO Bonds; and (xii) all parties that have filed a notice of appearance in the above-captioned Title III cases.

## <u>CONCLUSION</u>

53.     WHEREFORE, the LCDC respectfully requests that the Court enter an order,

substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein and

granting such other and further relief as the Court deems just and proper.

DATED:  January 8, 2020

 Respectfully submitted,

REICHARD & ESCALERA

**By :**   <u>*/s/ Rafael Escalera*          </u>
       **Rafael Escalera**
       USDC No. 122609
       escalera@reichardescalera.com

       **Sylvia M. Arizmendi**
       USDC-PR 210714
       arizmendis@reichardescalera.com

       **Carlos R. Rivera-Ortiz**
       USDC-PR 303409
       riverac@reichardescalera.com

       255 Ponce de León Avenue
       MCS Plaza, 10th Floor
       San Juan, Puerto Rico 00917-1913

QUINN    EMANUEL    URQUHART    &
SULLIVAN, LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**K. John Shaffer** (*pro hac vice*)
johnshaffer@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Matthew Scheck** (*pro hac vice*)
matthewscheck@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Zachary Russell** (*pro hac vice*)
zacharyrussell@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for the Lawful Constitutional Debt Coalition*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record.

<u>/s/*Carlos R. Rivera-Ortiz*</u>
USDC-PR 303409
