## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>               Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>               Debtor | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS<br><br>Re: Adv. Pro. 19-366;<br>Adv. Pro 19-367 |

## REPLY IN SUPPORT OF THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO'S URGENT MOTION FOR A PROTECTIVE ORDER QUASHING THE <u>DEPOSITION SUBPOENA SERVED ON RETIREE COMMITTEE'S COUNSEL</u>

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "**Title III Cases**"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority  (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

I.   Mr. Mayol's Testimony Is Neither Unique Nor Necessary. .......................................1

    A.   Alleged Ambiguity Defense. .................................................................................1

    B.   Alleged UCC §8-202(b) Defense ..........................................................................4

II.   Any Proffered Deposition Of Opposing Counsel Is Evaluated Under *Bogosian*. ...................8

III.   The ERS Bondholders Cannot Satisfy The *Bogosian* Factors. ..............................13

    A.   Harassment Is The Primary Purpose Of The Subpoena. .............................13

    B.   There Are Other Viable Means To Obtain The Information. ......................14

    C.   The Information Sought Is Neither Relevant Nor Crucial To The Bondholders And The Bondholders Have Not Resolved All Privilege Issues. ...............................16

CONCLUSION ..........................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Cas. Co. of Reading, Penn. V. Krieger*,
  160 F.R.D. 582 (S.D. Cal. 1995) ...........................................................................18

*Angela Adams Licensing, LLC v. Wal-Mart Stores, Inc.*,
  2012 WL 752356 (D. Me. Mar. 7, 2012) ...............................................................20

*Bell v. Taylor*,
  No. 1:13-cv-00798-TWP-DKL, 2016 WL 7972882 (S.D. Ind. Aug. 26, 2016)....................21

*Bingham v. Supervalue Inc.*,
  No. 13-11690-FDS, 2014 WL 12792917 (D. Mass. May 18, 2014) .....................................20

*Bogosian v. Woloohojian Realty Corp.*,
  323 F.3d 55 (1st Cir. 2003).................................................................................. passim

*Bradley v. Wells Fargo Bank, N.A.*,
  No. 120cv-127-PB, 2015 WL 12856553 (D.N.H. Sept. 21, 2015)..........................................20

*Carl E. Woodward, LLC v. Acceptance Indem. Ins. Co.*,
  2011 WL 13127850 (S.D. Miss. Dec. 7, 2011) .......................................................20

*Confederate Motors, Inc. v. Terny*,
  No. 11-10213-JGD, 2012 WL 612506 (D. Mass Feb. 24, 2012) .....................................15, 16

*Cont'l Coal, Inc. v. Cunningham*,
  No. 06-2122-KHV, 2008 WL 145245 (D. Kan. Jan. 14, 2008)............................................18

*Egan by Egan v. U.S.*,
  732 S.Supp1248, 1252 (E.D.N.Y. 1990) ...............................................................7

*Fish v. Kobach*,
  320 F.R.D. 566 (D. Kan. 2017)..............................................................................17

*Gonzàlez Segarra v. CFSE*,
  188 D.P.R. 252 (P.R. 2013) ....................................................................................8

*Goss, Inc. v. Cycrex Const. & Co., S.E.*,
  141 D.P.R. 342 (P.R. 1996) ...................................................................................7

*In re Sinclair*,
  870 F.2d 1340 (7th Cir. 1989) ...............................................................................7

*Mancini v. Ticketmaster*,
No. M-8-85, 2008 WL 506264 (S.D.N.Y. Feb. 21, 2008) .....................................................20

*Nat'l Academy of Recording Arts & Sciences, Inc. v. On Point Events, LP*,
256 F.R.D. 678 (C.D. Cal. 2009) .............................................................................................10

*Oregon v. Ashcroft*,
192 F.Supp.2d 1077 (D. Or. 2002) ..............................................................................................7

*Orlowski v. Dominick's Finder Foods, Inc.*,
937 F.Supp.723 (N.D. Ill. 1996) ..................................................................................................9

*Pamida, Inc. v. E.S. Originals*,
281 F.3d 726 (8th Cir. 2002) .....................................................................................................16

*Partido Nuevo Progresista v. Comité Local PNP Gurabo*,
197 D.P.R. 541, 547 (P.R. 2017) .................................................................................................7

*S.E.C. v. Present*,
No. 14-14692-LTS, 2016 WL 10998439 (D. Mass. May 12, 2016) .........................................9

*Teksystems, Inc. v. Siminipour*,
No. CV 07-3129-VBF(CTx), 2008 WL 11343027 (C.D. Cal. July 1, 2008) .........................21

*U.S.I. Props. Corp. v. M.D. Constr. Co.*,
860 F.2d 1 (1st Cir. 1988) ............................................................................................................8

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
164 F.R.D. 245 (D. Kan. 1995) ..................................................................................................17

*United. Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988) ......................................................................................................................7

*United States v. Philip Morris Inc.*,
209 F.R.D. 13 (D.D.C. 2002) .....................................................................................................17

**STATUTES**

3 L.P.R.A. §779(d) .....................................................................................................................8, 9

ERS Enabling Act ......................................................................................................................6, 8

UCC §8-202(b) ................................................................................................................................9

**OTHER AUTHORITIES**

Fed. R. Civ. P. 30(b)(6) ...................................................................................................9, 12, 19

In the face of well-established case law holding that examinations of opposing counsel are "generally disfavored," *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 66 (1st Cir. 2003), certain of the ERS Bondholders argue that: (1) an examination of Mr. Mayol is necessary because he is a "unique witness" (Resp. ¶¶17-21); (2) the case law holding that opposing counsel depositions should be the rare exception does not apply to this Subpoena (*id.* ¶¶23-26); and (3) even if it did, the Subpoena satisfies *Bogosian's* factors (*id.* ¶¶27-31). All three propositions are incorrect.

## I.      Mr. Mayol's Testimony Is Neither Unique Nor Necessary.

Mr. Mayol's testimony is not "unique" and it is not necessary. During the parties' meet and confer about the Subpoena, the ERS Bondholders refused to provide any detail about why they need Mr. Mayol's deposition. Their Response is only slightly more informative. But a careful examination of the two sketchy areas of inquiry that the ERS Bondholders now identify demonstrates that Mr. Mayol is not a witness that the ERS Bondholders need depose.

### A.      Alleged Ambiguity Defense.

The ERS Bondholders argue that if the language of the ERS Enabling Act is ambiguous, Mr. Mayol's understanding of the statute is relevant to resolving that ambiguity. (Resp. ¶4.) It is worth noting that no one, including the ERS Bondholders, actually takes the position that the ERS Enabling Act is ambiguous. Indeed, the ERS Bondholders' first argument in response to the Retiree Committee and UCC's objections to their claims is entitled, "The *Plain Text* of ERS Enabling Act Authorized ERS to Issue the ERS Bonds." (17-3566, Dtk. 688 ¶¶ 10-27) (emphasis added).

But even if ambiguity were an issue here, under Puerto Rican law, if a statute is ambiguous, courts look to other provisions in the same statute and legislative intent to find "the solution which best captures the impact of the statute in terms of the general welfare, and which best perceives

the legislative intent of adopting the rule which best promotes the public interest." *Goss, Inc. v. Cycrex Const. & Co., S.E.*, 141 D.P.R. 342 (P.R. 1996) [2]; *Partido Nuevo Progresista v. Comité Local PNP Gurabo*, 197 D.P.R. 541, 547 (P.R. 2017) (holding that when a statute is ambiguous courts may consult "legislative history, commission reports, and the legislative debates."); *see also United. Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear … or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law…") (internal citations omitted). What courts do *not* do is look to the subjective understanding of that law held by one of the Commonwealth's many former employees; indeed, the subjective understanding of members of the legislature that enacted a statute is not even relevant. *See In re Sinclair*, 870 F.2d 1340, 1343-44 (7th Cir. 1989) (explaining the dangers of attempting to discern the legislator's subjective intent in order to interpret a statute); *Egan by Egan v. U.S.*, 732 S.Supp1248, 1252 (E.D.N.Y. 1990) ("[t]here is manifestly no such thing" as "legislative intent." "No one knows, or can know, what the mental state of each of the legislators was…."). Simply put, the "subjective beliefs of individual members" of a legislature are "an extremely unreliable approach to statutory interpretation." *Oregon v. Ashcroft*, 192 F.Supp.2d 1077, 1090 (D. Or. 2002).

Tacitly recognizing that their argument falls far outside of the bounds of any accepted means of construing ambiguous statutes, the ERS Bondholders do not cite to a single case where a court has resolved a statutory ambiguity by looking to the testimony of a former Commonwealth employee about what he thought the statute meant. Instead, they try to squeeze their argument into

---

[2] The Retiree Committee attaches Westlaw's English translation as <u>Exhibit 1</u>. The pin-cite is to page 5 of 7 of the translation.

the concept of administrative agency deference. Quoting *Gonzàlez Segarra v. CFSE*, 188 D.P.R. 252 (P.R. 2013), the ERS Bondholders argue that Mr. Mayol's "understanding of the ERS Enabling Act is relevant" because "'if the agency's interpretation of the statute is reasonable, even if it is not the only reasonable one, the courts must defer to it.'" (Resp. ¶20.) The Bondholders ignore that (in the very next paragraph) *Gonzàlez* instructs: "[s]uch judicial deference to administrative expertise, however, *yields in the face of an unreasonable or illegal action*." *Gonzàlez*, 188 D.P.R. at 8 (quoting *Pacheco v. Estancias*, 160 D.P.R. 409, 533 (P.R. 2003) (emphasis added)).[3] *Gonzàlez* further explains that judicial deference to an administrative agency should yield in any of three circumstances: "'(1) [w]hen [the agency decision] is not supported by substantial evidence;      (2) when the administrative body has erred in the application of the law; and (3) when there has been an unreasonable or illegal action.'" *Id.* (*quoting Otero v. Toyota*, 163 D.P.R. 716, 729 (P.R. 2005)). Circumstances 2 and 3 are front and center in the *Ultra Vires* Objections. Thus, the "understanding" of Mr. Mayol, who was not even at ERS at the time ERS's Board authorized the issuance of the bonds, is plainly irrelevant to whether the ERS Board had the authority to issue the board.

The Bondholders' citation to *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1 (1st Cir. 1988) also does not help their argument. In that 1988 decision, the First Circuit stated that "great deference is due to an agency's construction of its power pursuant to its organic act." *Id*. at 8. But Mr. Mayol is not the "agency." He was not the ERS Administrator when the bonds were issued. In fact, he did not even serve on its Board of Trustees, which was the ERS governing body that had the *sole* authority to authorize administrators of ERS to incur debt. *See* 3 L.P.R.A. §779(d)

---

[3] The Retiree Committee attaches Westlaw's English translation of *Gonzàlez* as <u>Exhibit 2</u>. The pin-cite is to page 8 of 23 of the translation.

(Act 46-1988 at §7(d)).[4] And Mr. Mayol has not worked for ERS for more than six years. Simply put, it is inconceivable that the Court's resolution of whether the ERS Bonds were issued *ultra vires* will rest in any way upon Mr. Mayol's opinion about the legal validity of the ERS Bonds.

But to the extent that ERS's official agency position is at issue, the Bondholders can obtain that information by asking ERS for its position at a Rule 30(b)(6) examination. The ERS Bondholders have in fact issued such a deposition notice to ERS, which can designate a person to answer that question and that answer, unlike any answers Mr. Mayol might give, will actually bind ERS. *Compare Orlowski v. Dominick's Finder Foods, Inc.*, 937 F.Supp.723, 728 (N.D. Ill. 1996) (holding that former employees … cannot bind the corporation in the sense that an agent binds a principal.") (internal quotations omitted) *with S.E.C. v. Present*, No. 14-14692-LTS, 2016 WL 10998439 at *2 (D. Mass. May 12, 2016) ("The testimony provided by the representative at a Rule 30(b)(6) deposition binds the organization").

### B.   Alleged UCC §8-202(b) Defense

The ERS Bondholders also argue that Mr. Mayol is "an appropriate witness" regarding the elements of their UCC §8-202(b) defense. (Resp. ¶¶4, 21.) While the Retiree Committee disputes that this defense applies as a matter of law (*see* Dkt. 17-3566, Dkt. 469, ¶¶83-89), even if the defense applies, Mr. Mayol's testimony is not crucial to the development of that defense. The Bondholders argue that there are three areas of inquiry related to the defense.

---

[4] Specifically, §7(d) states:

> *The Board of Trustees may authorize the Administrator* [of ERS] to seek a loan from any financial institution of the Government[, from] the Commonwealth of Puerto Rico or [from] the Federal Government of the United States of America[,] or through the direct placement of debts, securing said debt with the assets of the System. The interest accrued by these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico.

3 L.P.R.A. §779(d) (Act 46-1988 at §7(d)) (emphasis added).

*First*, they claim Mr. Mayol can testify "whether he provided notice to anyone of any 'particular defect' in the ERS bonds." (Resp. ¶21.) The Bondholders' position appears to be that they were not on notice of any defects. Logically, their only reason for wanting to examine Mr. Mayol (or anyone else on this point) is to lock down whether he personally gave anyone such notice. But an examination of Mr. Mayol to establish that point is not necessary because the Retiree Committee and the other parties advancing the *Ultra Vires* Objections have no plans to call Mr. Mayol as a witness. Thus, he will not be testifying at trial that he gave anyone any such notice. In short, given that stipulation, the ERS Bondholders have absolutely no need to examine Mr. Mayol on the question of whether he gave notice to any particular bondholder. To the extent the ERS Bondholders need information regarding what notice ERS as an organization gave to ERS Bondholders, that is a question best directed at ERS during its 30(b)(6) deposition.[5]

*Second*, the ERS Bondholders also argue that "Mr. Mayol knows whether ERS received 'substantial consideration' for selling the bonds" but that truly is a red herring as no one disputes that ERS received the proceeds of the bond issue. (Resp. ¶21.) The first request for admission that the ERS Bondholders served states: "Admit that in exchange for issuing the ERS Bonds, ERS received nearly $3 billion from purchasers of those bonds." All of the parties advancing the *Ultra Vires* Objections admitted that ERS received $3 billion. (*See* Exhibits 3-5). Thus, like the "notice" line of inquiry there is no need to take Mr. Mayol's deposition to confirm this fact again.

---

[5] In an aside, the Bondholders complain that representatives from their organizations have been noticed for examination and so the Retiree Committee should not complain that the ERS Bondholders want to depose its counsel. (Resp. ¶17.) "Tit for tat" arguments like this are disfavored, and this one fails because the entities that own the bonds are plainly the best source of information about what notice (a question the ERS Bondholders have put at issue) these organizations had about the illegality of the bonds. *See, e.g., Nat'l Academy of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) ("discovery is not conducted on a 'tit-for-tat' basis").

*Third*, the ERS Bondholders claim that Mr. Mayol can testify about "why the money was borrowed and what it was used for." (Resp. ¶21.) But again, these matters are not in dispute and even if they were, Mr. Mayol is not the best source of information about these topics. As to why the money was borrowed, the individuals with the best information on this topic would be the trustees serving on ERS's Board of Trustees that approved the bonds. Mr. Mayol was never on that Board (or any other ERS Board for that matter) and thus anything he would know about why the trustees approved the bonds would arguably be hearsay. (Declaration of Hector Mayol Kauffman at ¶5, attached hereto as Exhibit 6.) Similarly, how ERS used the bond proceeds can be determined by examining ERS's financial records. Mr. Mayol, who has not had access to those records in more than six years and was not the chief financial officer of ERS in any event, is highly unlikely to have any specific knowledge on the subject of the exact use of the bond proceeds.

*Finally*, the ERS Bondholders point out that Mr. Mayol worked for an underwriter for the ERS bonds but never explain how that fact, which is undisputed, addresses any issue in the case. In any event, as set forth in Mr. Mayol's Declaration, he did not make the decision to underwrite the ERS bonds. The analysis of the bonds and the decision to underwrite an extremely small amount (less than .01%) of the bonds was all done in Samuel A. Ramirez & Co.'s New York office by others. Mr. Mayol was at the closing and signed documents only because he was located in Puerto Rico where the documents were being signed and it was more convenient to have him sign the paper-work, not because he was involved in the investment analysis or decision. (*See* Mayol Declaration at ¶¶3-4.)

***

In short, the ERS Bondholders have not identified any area of inquiry where Mr. Mayol's testimony would be necessary or unique. Given that fact, there will be no prejudice to the ERS

Bondholders if the Court grants the Motion to Quash. Indeed, if these just-identified areas of inquiry were so crucial, why did the ERS Bondholders initially only seek this information from Mr. Mayol? If being employed by one of the investment banks that underwrote the ERS Bonds is so important, certainly the ERS Bondholders would have sought out the testimony of someone at UBS, which served as the lead underwriter that underwrote the vast majority of the ERS Bonds or any of the other ten investment banks that underwrote *more* of the ERS Bonds than the less than the .01% underwritten by Mr. Mayol's employer in 2008.

The ERS Bondholders' response that "it would be difficult to find anyone else with more direct and personal knowledge of the facts relevant to this proceeding" (Resp. ¶12) strains credulity given that the ERS Bondholders did issue document subpoenas to the underwriters and thus could have easily issued Rule 30(b)(6) deposition notices to these parties, and that Kobre & Kim (the Independent Investigator) had no problem finding fact witnesses from the underwriters; particularly UBS. (*See, e.g.*, Final Investigative Report at 212, 214, 341 n.26, 348, 350-51, 357, 359-61, 364 (all referencing "UBS witness" and "UBS witnesses" and "multiple UBS witnesses"); *id* at 209, 212 (referencing a "Merrill witness").) The ERS Bondholders easily could have found individuals with better knowledge than Mr. Mayol, but instead chose to only subpoena him, without providing any credible explanation for why they selected him as the deponent.

And if Mr. Mayol's personal opinions about the ERS Bonds matter because he was the ERS Administrator *after* the bonds were issued, how much more relevant would the opinion of a trustee on the Board that actually approved the bonds or the ERS Administrator working for ERS at that time? But up until the day their response was due to the Motion to Quash, the ERS Bondholders had not issued a single subpoena to any other individual despite there being many other individuals with more knowledge on these subjects that Mr. Mayol. Rather than assist in the defense of their

Subpoena, the ERS Bondholders' decision to manufacture a defense to the Motion to Quash by issuing deposition subpoenas to four other former ERS Administrators actually undermines their arguments. These new subpoenas (issued less than an hour before the ERS Bondholders' filed their Response) demonstrate that there are in fact other fact witnesses that can answer the same questions that would be posed to Mr. Mayol and thus a deposition of the Retiree Committee's counsel could never be crucial to the ERS Bondholders' case.

When the ERS Bondholders' actions in discovery to date are viewed in their totality and when one considers that all of the information sought from Mr. Mayol could come from other more knowledgeable sources, it becomes clear that the ERS Bondholders' primary motivation in issuing the Subpoena was not to obtain crucial information for their case, but it was instead to harass the Retiree Committee by deposing its counsel with the hope that Mr. Mayol would testify to his personal beliefs about the bonds (again, legally irrelevant) in a manner that would contradict the position of his client in this litigation. There is no basis to allow for a Subpoena under these circumstances.[6]

## II.   Any Proffered Deposition Of Opposing Counsel Is Evaluated Under *Bogosian*.

For the reasons articulated above, whatever the standard the Court adopts to address this Subpoena, the Subpoena should be quashed. But the standard the Court should adopt is the First Circuit test laid out in *Bogosian*, which provides that when dealing with the testimony of opposing counsel, the court must weigh, "whether (i) the subpoena was issued primarily for purposes of harassment, (ii) there are other viable means to obtain the same evidence, and (iii) to what extent the information sought is relevant, non-privileged, and crucial to the moving party's case."

---

[6] If this were a basis to obtain testimony from an opposing counsel, all counsel would be subject to a grilling about all of their thoughts about any aspect of their clients' cases with the hopes of obtaining a concession that counsel thinks some argument is weaker than others.

*Bogosian*, 323 F.3d at 66. The ERS Bondholders argue that *Bogosian* does not apply here because the facts the ERS Bondholders seek to question Mr. Mayol about occurred prior to his representation of the Retiree Committee. (Resp. ¶26). That fact does not render *Bogosian* inapplicable.

As an initial matter, the ERS Bondholders suggest that the Retiree Committee's position is that *Bogosian* establishes an absolute bar to opposing counsel ever being deposed. (Resp. ¶22 ("The Retiree Committee cannot prevent the Bondholders from deposing a key fact witness just because they have retained him as counsel"); ¶23 (quoting caselaw for proposition that opposing counsel is "not exempt" from discovery because he is opposing counsel); ¶24 (quoting caselaw that the Eight Circuit's test for deposing opposing counsel "does not bar" all opposing counsel depositions).) That, of course, is not the Retiree Committee's position. Instead, the Retiree Committee's argument is that, in the First Circuit, *Bogosian's* heightened standard applies whenever opposing counsel's deposition is sought.

For the ERS Bondholders to argue that is not true is surprising given that only last year they too shared the Retiree Committee's understanding of the law. As noted in the Motion, last spring the ERS Bondholders put forth their own counsel as the key fact witness in a dispute with the Oversight Board. (17-3283, Dkt. 5972.) When ERS (not the Retiree Committee) subpoenaed Mr. Bennett, the ERS Bondholders asked for a protective order and argued that the deposition subpoena "should be strictly limited in scope…" (17-3283, Dkt. 6829 at ¶8.) And why did the ERS Bondholders believe that to be true? "[B]ecause of the very reason that it seeks to take the deposition of opposing counsel." (*Id.*). And what case did the ERS Bondholders cite to support that proposition? *Bogosian*. (*Id.*) In fact, the ERS Bondholders could not have been more plain in their belief that *Bogosian* applies to *all* opposing counsel subpoenas when they argued that

"[c]ourts therefore *are required* to consider [*Bogosian's*] three factors in determine whether to allow the deposition of opposing counsel…." (*Id.* (emphasis added).)

In making this argument, the ERS Bondholders did not draw the distinction that they are arguing should be applied here even though it was equally applicable. When it comes to Mr. Mayol, the argument seems to be that because the Retiree Committee's *Ultra Vires* Objection was not pending during the time period that will be the subject of his deposition, he could not have been representing the Retiree Committee, and thus *Bogasian* does not apply. But at the time Mr. Bennett allegedly had the conversation his clients placed in issue in the lift stay motion litigation, the Title III cases had not been filed. Thus, Mr. Bennett was in the exact same position as Mr. Mayol and he could not have been representing his clients at the time of the conversation in question in connection with the litigation where his testimony was sought. Moreover, it also is important to note that Mr. Bennett's clients have changed since the conversation in question and thus he was not representing all of the same clients at the time of the conversation in question. Specifically, it appears that Pentwater Capital Management LP and Redwood Capital management LLC (current members of the ERS Bondholder group) were not clients of Jones Day when ERS filed its petition. (*Compare* 17-3566, Dkt. 194 *with* 652.) Consequently, the ERS Bondholders' alleged distinction is no distinction at all.

The ERS Bondholders' about-face is also unsupported by the law. *First*, the ERS Bondholders argue that "[b]efore reaching the *Bogosian* factors, a party moving to quash a deposition subpoena on an attorney must at least establish that the deponent was 'acting in the capacity of a legal advisor with regard to all matters at issue in [the] litigation' and that the subpoena seeks privileged information" and quote *Confederate Motors, Inc. v. Terny*, No. 11-10213-JGD, 2012 WL 612506, at *2 (D. Mass Feb. 24, 2012)—a decision by this Court. That is a

misrepresentation of what *Confederate Motors* holds as there is no suggestion in the case that in

the context of an opposing counsel deposition subpoena there is any threshold analysis to see

whether the *Bogosian* factors should be used. In fact, the Court begins the "Analysis" section of

its opinion as follows:

> In relevant part, Fed. R. Civ. P. 45(c)(3)(A) provides that a deposition subpoena
> must be quashed or modified if the subpoena "fails to allow a reasonable time to
> comply[,]" "requires disclosure of privileged or other protected matter" or "subjects
> a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(i), (iii) & (iv). In considering
> whether testimony from opposing counsel is warranted, courts can consider various
> factors, including "whether (i) the subpoena was issued primarily for purposes of
> harassment, (ii) [whether] there are other viable means to obtain the same evidence,
> and (iii) to what extent the information sought is relevant, nonprivileged, and
> crucial to the moving party's case." *Bogosian v. Woloohojian Realty Corp.,* 323
> F.3d 55, 66 (1st Cir.2003).

*Id*. at *1.

Indeed, the portion of *Confederate Motors* that the ERS Bondholders quote is not about

determining whether the Court should apply *Bogosian* in the first instance, but rather it was made

during the course of this Court actually applying *Bogosian* and the "privileged" component of its

test. As the Court explained,

> [t]he inquiry into whether a communication is privileged is a fact-specific one—a
> blanket assertion of privilege is generally insufficient. Here, [attorney being
> deposed] has made no effort to identify or describe any specific information or
> documents that would be privileged, and has not established that he was acting in
> the capacity of a legal advisor with regard to all the matters at issue in this litigation.

*Id*. at *2 (internal quotations and citations omitted).

Having identified no case law in the First Circuit where a court has declined to apply

*Bogosian*, the ERS Bondholders cite a handful of cases from other Circuits where, in certain

situations, courts decided not to apply a heightened standard to an opposing counsel's deposition

in certain easily distinguishable situations:

- *Pamida, Inc. v. E.S. Originals*, 281 F.3d 726, 730 (8th Cir. 2002). The Eighth
  Circuit held that its heightened standard for opposing counsel depositions did not

apply "to attorneys who represented a client in a completed case and then also
happened to represent that same client in a pending case where the information
known only by the attorneys regarding the prior concluded case was *crucial*" and
where "deposing opposing counsel may not only be the *most expedient approach,
but the only realistically available approach*" because the information sought was
"uniquely known by [plaintiff's] attorneys [and] the substance of which is central
to the pending case." (emphasis added).

- *United States v. Philip Morris Inc.*, 209 F.R.D. 13, 17 (D.D.C. 2002). A district
  court held that heightened standard for opposing counsel deposition did not apply
  where "[f]irst, and most significantly, deponents are employees to whom
  Defendants have knowingly assigned substantial non-legal, non-litigation
  responsibilities, including corporate, business, managerial, public relations,
  advertising, scientific, and research and development responsibilities" and where
  "the proposed deponents here are not litigation or trial counsel."

- *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 164 F.R.D. 245, 249 (D. Kan.
  1995). A district court held that heightened standard for opposing counsel
  deposition did not apply where opposing counsel had already agreed to be deposed
  on certain topics relevant to the case.

- *Fish v. Kobach*, 320 F.R.D. 566, 578 (D. Kan. 2017). Holding that "when the
  attorney whose deposition is sought is a *named party* in the lawsuit with personal
  knowledge of relevant facts underlying the cases, courts have found the [heightened
  standard] inapplicable…" and allowing the deposition "[b]ecause the court finds
  defendant is the *only* person with direct knowledge to answer certain questions"
  regarding matters central to the case. (emphasis added).[7]

In contrast to the facts of each of these cases, (i) Mr. Mayol is not the sole depository of

crucial information that is central to the ERS Bondholders' case; (ii) he has not agreed to have his

deposition taken; (iii) he is not a named party in this action; and (iv) this is not a case where the

Retiree Committee knowingly assigned Mr. Mayol non-legal tasks and then used his status as

attorney as a shield. At most, Mr. Mayol is one of many individuals who possess some knowledge

about ERS. The ERS Bondholders have not cited a single case where that fact supports not

---

[7] In one of the cases the ERS Bondholders cite, *Alomari v. Ohio Dep. Of Public Safety*, the court held that
a heightened standard did apply and quashed the subpoena of in-house counsel. No. 1:11-cv-00613, 2013
WL 5180811, at *5 (S.D. Ohio Sept. 13, 2013).

applying the more exacting standard otherwise applied when a party wants to depose his opponent's counsel.

In contrast, barring the type of peculiar factual circumstances like those found in the ERS Bondholders' cases,

> [m]ost courts which have addressed these issues have held that the taking of opposing counsel's deposition should be permitted only in limited circumstances and that, because of the potential for abuse inherent in deposing an opponent's attorney, the party seeking the deposition must demonstrate its propriety and need before the deposition may go forward. Courts have reached this conclusion even where it is clear that the attorney is a witness to relevant, nonprivileged events and/or conversations.

*American Cas. Co. of Reading, Penn. V. Krieger*, 160 F.R.D. 582, 588 (S.D. Cal. 1995) (internal citations omitted); *see also Cont'l Coal, Inc. v. Cunningham*, No. 06-2122-KHV, 2008 WL 145245, at *3 (D. Kan. Jan. 14, 2008) (quashing deposition of opposing counsel where opposing counsel were fact witnesses).

### III.   The ERS Bondholders Cannot Satisfy The *Bogosian* Factors.

Applying the *Bogosian* factors requires the Subpoena to be quashed.

#### A.   Harassment Is The Primary Purpose Of The Subpoena.

The primary purpose of the Subpoena is the harassment of the Retiree Committee and Mr. Mayol. That conclusion is supported by the fact that the ERS Bondholders: (i) seek Mr. Mayol's testimony on his personal views on the ERS Bond issuance despite those views being irrelevant to the resolution of the dispute over the legality of the ERS Bonds or any defense the ERS Bondholders assert; and (ii) targeted only Mr. Mayol for a personal deposition despite the fact that there were numerous other individuals with greater knowledge concerning the ERS Bonds than Mr. Mayol. That fact is not changed by the ERS Bondholders' last minute issuance of subpoenas to other ERS Administrators. Indeed, the fact that the ERS Bondholders issued these subpoenas only after the Retiree Committee moved to quash Mr. Mayol's Subpoena and less than an hour

before filing their Response suggests that those subpoenas may not have been issued in good faith either.

What is plain from the ERS Bondholders' Response is that the only reason they have sought Mr. Mayol's testimony is to elicit an admission that at certain points in the past he may have held a view regarding the ERS Bonds that contradicts his client's position in this case. Time and time again, the ERS Bondholders note their focus on obtaining such an admission (which would have no probative value) and not on procuring relevant factual information. For example, the ERS Bondholders' first statement as to why they want Mr. Mayol's deposition is that: "Mr. Mayol is a unique witness, with a set of experiences that make him particularly well-positioned to know whether the Employee Retirement System ("ERS") Bonds are valid. *He clearly thinks that they are.*" (Resp. ¶2 (emphasis added)). Later, they state that, "[d]uring his tenure as [ERS] Administrator, Mr. Mr. Mayol did nothing to indicate that ERS bonds were anything other than perfectly legal and valid" and that "there is no evidence Mr. Mayol believed they have been issued *ultra vires*." (Resp. ¶10; *see also id.* at ¶¶11-12, 19.) This is not a valid use of a subpoena and accordingly, this Court should quash the Subpoena.

### B.    There Are Other Viable Means To Obtain The Information.

To the extent the ERS Bondholders did wish to obtain relevant factual information, there are numerous other means to do so as explained above, through the use of interrogatories, requests for admission, and Rule 30(b)(6) depositions.  This is the reason the Retiree Committee asked the ERS Bondholders to specifically identify why they needed Mr. Mayol's deposition. The Retiree Committee hoped to work with the ERS Bondholders to limit or even eliminate the proffered need for a deposition through stipulations. But the ERS Bondholders declined to provide the information and have only done so in a sketchy matter here.

The ERS Bondholders' position is inconsistent with the well-established rule that the deposition of opposing counsel should not be the first line of discovery, but instead should be a matter of last resort. In *Bradley v. Wells Fargo Bank, N.A.*, No. 120cv-127-PB, 2015 WL 12856553, at *2 (D.N.H. Sept. 21, 2015), for example, the court granted a motion to quash the deposition of opposing counsel where the requested "information is reasonably discoverable elsewhere." Similarly, in *Bingham v. Supervalue Inc.*, No. 13-11690-FDS, 2014 WL 12792917, at *7 (D. Mass. May 18, 2014), the court quashed the deposition subpoena because the party seeking the deposition "has not shown that [the attorneys] possess discoverable information … that is unobtainable from other sources." In *Angela Adams Licensing, LLC v. Wal-Mart Stores, Inc.*, 2012 WL 752356, at *1 (D. Me. Mar. 7, 2012), the court quashed the deposition of opposing counsel because the "defendants have failed to make a persuasive argument that there are not other available means to obtain the same evidence or that the information sought is relevant, nonprivileged, and crucial to their case."[8]

Here, the ERS Bondholders simply decree Mr. Mayol's deposition is necessary. (Resp. ¶¶29-30.) They do not explain what facts, if any, they have not already learned or cannot learn through other means. Before the ERS Bondholders are allowed to take Mr. Mayol's deposition, they were required to explain what facts they cannot answer through the discovery they already have taken (or could have taken but have chosen not to take) or what facts they do not believe they will learn through the discovery they intend to take. Simply put, a party's choice not to seek discovery from other avenues, "is not a justification for deposing opposing counsel." *See*

---

[8] *Accord Mancini v. Ticketmaster*, No. M-8-85, 2008 WL 506264, at *1 (S.D.N.Y. Feb. 21, 2008) (denying deposition of opposing counsel where information sought "can be obtained by document discovery or interrogatories"); *Carl E. Woodward, LLC v. Acceptance Indem. Ins. Co.*, 2011 WL 13127850, at *2 (S.D. Miss. Dec. 7, 2011) (granting motion to quash where party seeking deposition of opposing counsel "failed to demonstrate" that the requested information could not be obtained elsewhere).

*Teksystems, Inc. v. Siminipour*, No. CV 07-3129-VBF(CTx), 2008 WL 11343027, at *3 (C.D. Cal.

July 1, 2008). This failure is a sufficient basis alone to quash the Subpoena, particularly given the

ERS Bondholders' refusal to engage in any substantive dialogue about proposed deposition topics

during the meet-and-confer process. *See, e.g.*, *Bell v. Taylor*, No. 1:13-cv-00798-TWP-DKL, 2016

WL 7972882, at *3 (S.D. Ind. Aug. 26, 2016) (granting motion to quash where party seeking

deposition did not meaningfully engage in meet and confer to determine whether information could

be obtained through other means).

> ### C.  The Information Sought Is Neither Relevant Nor Crucial To The Bondholders And The Bondholders Have Not Resolved All Privilege Issues.

As laid out in the Motion and herein, the information the ERS Bondholders seek is neither

relevant nor crucial to their case. And while the Retiree Committee appreciates the ERS

Bondholders agreeing not ask Mr. Mayol any questions concerning his representation of the

Retiree Committee, that does not resolve all the privilege issues their Subpoena raises.

As their Response makes clear, the ERS Bondholders plan to ask Mr. Mayol about his

impressions concerning the legal validity of the ERS Bonds both during his time at Ramirez & Co.

and while at ERS. It seems likely that any communications Mr. Mayol would have had on these

subjects would have been made with counsel for Ramirez & Co. or ERS. If so, both those entities

would have grounds to raise privilege objections. Consequently, the ERS Bondholders are

incorrect that limiting their questions to time periods prior to Mr. Mayol's representation of the

Retiree Committee would resolve any privilege issues and this risk is another reason why the

Subpoena should be quashed.

### CONCLUSION

For all of the foregoing reasons and those set forth in the Motion, the Retiree Committee

requests that the Court grant its Motion and grant such other relief as may be just.

Dated: January 14, 2020

JENNER & BLOCK LLP

By:

*/s/ Robert Gordon*
_____

Robert Gordon (admitted *pro hac vice*)
Richard Levin (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)

BENNAZAR, GARCÍA & MILIÁN, C.S.P.

By:

*/s/ A.J. Bennazar-Zequeira*
_____

A.J. Bennazar-Zequeira
Edificio Union Plaza
Office 1701
416 Avenida Ponce de León
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired
Employees of Puerto Rico*