# $2,318,190,000
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2012 A
## (General Obligation Bonds)

| Maturity Date July 1 | Principal Amount | Interest Rate | Price or Yield (%) | CUSIP[*] |
|---|---|---|---|---|
| 2020 | $10,000,000 | 4.000% | 100.00 | 74514LA31 |
| 2020 | 35,345,000 | 5.000% | 4.00 | 74514LC47 |
| 2021 | 49,400,000 | 4.000% | 4.24 | 74514LA49 |
| 2021 | 52,895,000 | 5.000% | 4.24 | 74514LC54 |
| 2022 | 32,110,000 | 4.125% | 4.39 | 74514LA56 |
| 2022 | 21,285,000 | 5.000% | 4.39 | 74514LC62 |
| 2022[†] | 20,000,000 | 4.000% | 4.14 | 74514LD46 |
| 2023 | 7,290,000 | 4.375% | 4.51 | 74514LC70 |
| 2023 | 68,500,000 | 5.250% | 4.51[‡] | 74514LA64 |
| 2023[†] | 5,000,000 | 4.125% | 4.26 | 74514LD53 |
| 2024 | 10,000,000 | 4.000% | 4.60 | 74514LC88 |
| 2024 | 11,050,000 | 5.250% | 4.60[‡] | 74514LA72 |
| 2024[†] | 5,000,000 | 4.125% | 4.35 | 74514LD61 |
| 2025 | 22,030,000 | 4.500% | 4.65 | 74514LA80 |
| 2025[†] | 5,000,000 | 4.250% | 4.42 | 74514LD79 |
| 2026 | 60,000,000 | 5.500% | 4.50[§] | 74514LD38 |
| 2026 | 4,455,000 | 4.500% | 4.70 | 74514LC96 |
| 2026 | 69,740,000 | 5.500% | 4.67[‡] | 74514LA98 |
| 2027 | 17,945,000 | 5.500% | 4.76[‡] | 74514LB22 |
| 2027[†] | 11,520,000 | 4.250% | 4.50 | 74514LD87 |
| 2028 | 64,795,000 | 5.750% | 4.79[‡] | 74514LB30 |
| 2029 | 6,665,000 | 5.000% | 4.85[‡] | 74514LB48 |
| 2030 | 7,000,000 | 4.750% | 4.90 | 74514LB97 |
| 2031 | 7,335,000 | 4.750% | 4.95 | 74514LB55 |
| 2032 | 7,685,000 | 5.000% | 100.00 | 74514LC21 |
| 2033 | 27,400,000 | 5.000% | 5.06 | 74514LC39 |

$322,925,000[†]  5.000% Term Bonds due July 1, 2035   Price 100.00   CUSIP  74514LD20
$263,540,000     5.125% Term Bonds due July 1, 2037   Yield 5.250%   CUSIP  74514LB63
$459,305,000     5.500% Term Bonds due July 1, 2039   Yield 5.250%[‡]  CUSIP  74514LB71
$632,975,000     5.000% Term Bonds due July 1, 2041   Yield 5.320%   CUSIP  74514LB89

---

[*]   Copyright, American Bankers Association.  CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc.  This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services.  CUSIP numbers are provided for convenience of reference only.  Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy of such numbers.

[†]   Insured by Assured Guaranty Municipal Corp.

[‡]   Priced at the stated yield to the July 1, 2022 optional redemption date at a redemption price of 100%. See "Redemption" under THE BONDS.

[§]   Priced at the stated yield to the July 1, 2018 optional redemption date at a redemption price of 100%. See "Redemption" under THE BONDS.

# Government of Puerto Rico

### Governor

LUIS G. FORTUÑO

### Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

| KENNETH D. MCCLINTOCK | GUILLERMO SOMOZA COLOMBANI | JESÚS F. MÉNDEZ RODRÍGUEZ |
|---|---|---|
| *Secretary of State* | *Secretary of Justice* | *Secretary of the Treasury* |

EDWARD MORENO ALONSO
*Secretary of Education*

MIGUEL ROMERO LUGO
*Secretary of Labor and Human Resources*

DR. LORENZO GONZÁLEZ
*Secretary of Health*

MIGUEL SANTIAGO CÓRDOVA
*Acting Secretary of Agriculture*

RUBÉN A. HERNÁNDEZ GREGORAT
*Secretary of Transportation and Public Works*

JOSÉ R. PÉREZ-RIERA
*Secretary of Economic Development and Commerce*

YANITSIA IRIZARRY MÉNDEZ
*Secretary of Family Affairs*

MIGUEL HERNÁNDEZ VIVONI
*Secretary of Housing*

DANIEL J. GALÁN KERCADÓ
*Secretary of Natural and Environmental Resources*

LUIS G. RIVERA MARÍN
*Secretary of Consumer Affairs*

HENRY NEUMANN ZAYAS
*Secretary of Sports and Recreation*

JESÚS GONZÁLEZ CRUZ
*Secretary of Corrections and Rehabilitation*

---

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of Representatives

*Fiscal Officers*

JUAN CARLOS PAVÍA
Director, Office of Management and Budget

JUAN CARLOS BATLLE
President, Government Development Bank for Puerto Rico

**TABLE OF CONTENTS**

**Page**

INTRODUCTORY STATEMENT ........................................................................................................... 1
OVERVIEW ....................................................................................................................................... 3
RECENT DEVELOPMENTS ................................................................................................................. 4
    Preliminary Results for the First Six Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit ............ 4
    Preliminary Revenues for the First Seven Months of Fiscal Year 2012 ............................................ 5
    Preliminary Results for Fiscal Year 2011 ...................................................................................... 5
    Financial Condition of Retirement Systems .................................................................................. 5
    Economy .................................................................................................................................... 6
PLAN OF FINANCING ........................................................................................................................ 7
    Sources and Uses of Funds ......................................................................................................... 7
THE BONDS ...................................................................................................................................... 8
    General ..................................................................................................................................... 8
    Book-Entry Only System ............................................................................................................. 8
    Discontinuance of the Book-Entry Only System ........................................................................... 10
    Authorization ........................................................................................................................... 10
    Redemption .............................................................................................................................. 11
    Notice of Redemption; Effect of Redemption .............................................................................. 12
    Security ................................................................................................................................... 12
    Payment Record ....................................................................................................................... 14
    Debt Limitation ........................................................................................................................ 14
    Maturity Limitation ................................................................................................................... 16
BOND INSURANCE .......................................................................................................................... 16
    Bond Insurance Policy ............................................................................................................... 16
    Assured Guaranty Municipal Corp. ............................................................................................. 17
    Bond Insurance Provisions under the Bond Resolution .................................................................. 18
PUBLIC SECTOR DEBT OF THE COMMONWEALTH ............................................................................. 18
    Public Sector Debt .................................................................................................................... 18
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ......... 20
LITIGATION ................................................................................................................................... 21
TAX MATTERS ............................................................................................................................... 21
    Discount Bonds ........................................................................................................................ 22
    Premium Bonds ........................................................................................................................ 22
LEGAL MATTERS ........................................................................................................................... 23
LEGAL INVESTMENT ...................................................................................................................... 23
VERIFICATION OF MATHEMATICAL COMPUTATIONS ......................................................................... 23
UNDERWRITING ............................................................................................................................. 23
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ................................................................... 25
RATINGS ....................................................................................................................................... 25
CONTINUING DISCLOSURE .............................................................................................................. 26
    Continuing Disclosure Undertaking ............................................................................................ 26
    Prior Continuing Disclosure Non-Compliance .............................................................................. 28
MISCELLANEOUS ........................................................................................................................... 29

Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
        dated December 6, 2011 ................................................................................................ I-1

Appendix II – Proposed Form of Opinion of Bond Counsel .................................................................. II-1

Appendix III – Specimen Municipal Bond Insurance Policy ................................................................. III-1

Appendix IV – Table of Refunded Bonds ......................................................................................... IV-1

## $2,318,190,000
## COMMONWEALTH OF PUERTO RICO
### Public Improvement Refunding Bonds, Series 2012 A
### (General Obligation Bonds)

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, and the appendices, provides certain information in connection with the sale of $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012A (the "Bonds"). The Commonwealth expects to issue, on or about March 29, 2012, its $415,270,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012B (the "Series B Bonds"). The Series B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series B Bonds.

The Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on March 7, 2012.

The scheduled payment of principal and interest on the Bonds maturing July 1, 2022 bearing interest at a rate of 4.000%, July 1, 2023 bearing interest at a rate of 4.125%, July 1, 2024 bearing interest at a rate of 4.125%, July 1, 2025 bearing interest at a rate of 4.250%, July 1, 2027 bearing interest at a rate of 4.250%, and July 1, 2035 bearing interest at a rate of 5.000% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. ("AGM").

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated December 6, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein.

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the projected fiscal year 2012 deficit, the budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report was filed on December 6, 2011 by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of   matter

paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on April 29, 2011 by the Commonwealth with the MSRB through EMMA (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. Pursuant to these continuing disclosure undertakings, the Commonwealth files annual updates of the Commonwealth Report and files the Commonwealth's Annual Financial Report. Although the Commonwealth has filed all such reports, these filings were made after the May 1 deadline between 2006 and 2010 (and also in certain years before that period), and therefore did not comply with the undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertakings relating to fiscal year 2010 by filing the Commonwealth Report and the Commonwealth's Annual Financial Report before the filing deadline. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at http://www.gdbpr.com. No additional

information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## OVERVIEW

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2010 (which ended on June 30, 2010), the Commonwealth's gross national product (preliminary, in current dollars) was $63.3 billion, and personal income per capita (preliminary, in current dollars) was $15,203.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the budget and projected deficit for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS below.

If the amount of the Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such Bonds for such fiscal year, the amortization requirement for such Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

**Security**

*Provision for Payment of Public Debt*

In accordance with the Act, the Commonwealth has pledged the good faith, credit and taxing power of the Commonwealth for the prompt payment of the principal of and interest on the Bonds. Pursuant to the Act, the Bonds constitute general obligations of the Commonwealth, payable with any funds available to the Commonwealth, which funds are appropriated as continuous appropriations, without the need to make specific appropriations for such purposes.

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and the Commonwealth sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39 of 1976"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its good faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 of 1976 provides that the obligation of the Secretary of the Treasury to

make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010, 2011 and 2012 the Commonwealth entered into loan agreements with Government Development Bank the proceeds of which were used to refinance deposits to the Redemption Fund. The Commonwealth expects to enter into a loan agreement with Government Development Bank the proceeds of which would be used to refinance deposits to the Redemption Fund during fiscal year 2013. Unless authorizing legislation permitting borrowings to finance debt service is extended, the Commonwealth will not be able to borrow from Government Development Bank to refinance deposits to the Redemption Fund after June 30, 2013. On February 15, 2012, the Redemption Fund was fully funded.

Act No. 39 of 1976 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by good faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum

interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.   Upon the issuance of the Bonds, the Series 2004A Bonds and the Series 2004B Bonds will no longer be outstanding. The interest rate exchange agreements entered into in connection with the Series 2004A Bonds and the Series 2004B Bonds will be terminated in connection with the issuance of the Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations.  The Secretary is also authorized to pledge the good faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index.  In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into interest rate exchange agreements, the effect of which economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements (the "Series 2003 Swaps"), the effect of which economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds. Upon the issuance of the Bonds, approximately $431,000,000 of the 2003C Swap Bonds will remain outstanding.   A portion of the Series 2003 Swaps will be terminated in connection with the issuance of the Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into interest rate exchange agreements (the "Series 2007A Swaps"), the effect of which economically enables the Commonwealth to pay a fixed rate of interest in respect thereof. Upon the issuance of the Bonds, approximately $29,840,000 of the 2007 Swap Bonds will remain outstanding.   A portion of the Series 2007A Swaps will be terminated in connection with the issuance of the Bonds.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds (the "Series 2004B Swap").

In March 2011, the Commonwealth issued its $274,550,000 Public Improvement Refunding Bonds, Series 2011 (the "2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds. Upon the issuance of the Bonds, the 2011 Swap Bonds will no longer be outstanding.  The Series 2004B Swap will be terminated in connection with the issuance of the Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on

$1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in the Commonwealth Report for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of September 30, 2011.

After giving effect to the issuance of the Bonds and the Series B Bonds (including the repayment of the GDB Lines of Credit, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series B Bonds), future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $989,231,968 in the fiscal year ending June 30, 2016, based on the assumption that (i) the outstanding 2003C Swap Bonds, 2006 CPI Bonds, and 2007 Swap Bonds bear interest at the maximum rate of 12% per annum (rather than the lower rate that the Commonwealth is required to pay under the applicable interest rate exchange agreements as permitted by law) and (ii) the public improvement bonds to which the basis swap relates bear interest at their stated interest rates, rather than the rates set forth in the basis swap. This amount ($989,231,968) plus the amount paid by the Commonwealth in fiscal year 2011 on account of bonds or notes guaranteed by the Commonwealth ($16,520,000), for a total of $1,005,751,968, is equal to 13.2% of $7,600,369,500, which is the average of the adjusted preliminary internal revenues for the fiscal year ended June 30, 2010 and preliminary internal revenues for the fiscal year ended June 30, 2011. If the interest on the outstanding bonds described in clause (i) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, as permitted by law, the percentage referred to in the preceding sentence would be 12.7%. Any potential termination payment (which is a good faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the applicable interest rate exchange agreements is not included in the calculation of the 15% constitutional debt limitation.

As of December 31, 2011, Port of the Americas Authority had issued bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), in the amount of $250 million, of which $213.2 million is currently outstanding. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to continue to make all payments on the POA Guaranteed Bonds under the good faith and credit guarantee of the Commonwealth. During fiscal year 2011 and fiscal year 2012, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $16.5 million and $17.3 million, respectively.

**Maturity Limitation**

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

## BOND INSURANCE

**Bond Insurance Policy**

Concurrently with the issuance of the Insured Bonds, AGM will issue its Municipal Bond Insurance Policy (the "Policy") for the Insured Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as *Appendix III* to this Official Statement.

http://www.assuredguaranty.com, are incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

*Incorporation of Certain Documents by Reference*

Portions of the following document filed by AGL with the Securities and Exchange Commission (the "SEC") that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i)     the Annual Report on Form 10-K for the fiscal year ended December 31, 2011 (filed by AGL with the SEC on February 29, 2012).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp.: 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption "BOND INSURANCE – Assured Guaranty Municipal Corp." or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

*Miscellaneous Matters*

AGM or one of its affiliates may purchase a portion of the Insured Bonds or any uninsured bonds offered under this Official Statement and may hold such Insured Bonds or uninsured bonds for investment or may sell or otherwise dispose of such Insured Bonds or uninsured bonds at any time or from time to time.

AGM makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE".

**Bond Insurance Provisions under the Bond Resolution**

Under the Bond Resolution, AGM shall be deemed to be the sole holder of the Insured Bonds for the purpose of giving any consent or direction or taking any other action that the holders of the Insured Bonds are entitled to take pursuant to the provisions of the Bond Resolution.

## PUBLIC SECTOR DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The table on the following page presents a summary of the public sector debt of the Commonwealth outstanding as of December 31, 2011. The table also shows the public sector debt as adjusted for the effects of the issuance of the Bonds and the Series B Bonds, including the repayment of the GDB Lines of Credit, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series B

Bonds.  The table should be read in conjunction with the information set forth under DEBT in the Commonwealth Report.

**Commonwealth of Puerto Rico**
**Public Sector Debt***
**(in millions)**

| | December 31, 2011 | As Adjusted by the issuance of the Bonds and the Series B Bonds |
|---|---|---|
| **GENERAL FUND RELATED DEBT** | | |
| Direct good faith and credit obligations | $ 9,772 | $10,793[1] |
| Puerto Rico guaranteed debt [2] | 5,466 | 5,466 |
| Debt supported by Puerto Rico appropriations or taxes [3] | 3,727 | 3,727 |
| Tax and Revenue Anticipation Notes [4] | 900 | 900 |
| Pension Obligation Bonds [5] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $22,813 | $23,834 |
| Sales and Use Tax (COFINA) debt | $15,224 | $15,224 |
| Public corporations and agencies [6] | 23,641 | 23,641 |
| Municipal Debt | 3,498 | 3,498 |
| Limited Obligations/non-recourse debt [7] | 2,263 | 2,263 |
| | 44,626 | 44,626 |
| TOTAL PUBLIC SECTOR DEBT | $67,439 | $68,460 |

* Totals may not add due to rounding.

(1) Includes $75 million in Commonwealth bond anticipation notes issued in January 2012.  Excludes approximately $227 million of principal due July 1, 2012 that will be paid through the proceeds of the GDB Lines of Credit, which in turn will be refinanced through the issuance of the Bonds and the Series B Bonds.

(2) Consists of $666 million of bonds issued by Aqueduct and Sewer Authority, $423 million of State Revolving Fund Loans incurred under various federal water laws, $213 million of bonds issued by Port of the Americas Authority, and $4.012 billion of Public Building Authority bonds.  Excludes $267 million of GDB bonds payable from available moneys of GDB.

(3) Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

(4) Includes related short-term financings.

(5) Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

(6) Excludes $5.4 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities.  Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included the table. Excludes $1,800,450,000 of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series 2012A (Senior Lien) and $295,245,000 of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series 2012B (Senior Lien) issued on February 29, 2012.  Also excludes $1,000,000,000 of Puerto Rico Government Development Bank for Puerto Rico, Senior Notes, 2012 Series A issued on February 7, 2012.

(7) Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $343.8 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008, and $100 million of Housing Revenue Bonds, Series 2008, issued the Puerto Rico Housing Finance Authority; $149.1 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $74.6 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $73.5 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico.

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on December 31, 2011 (after giving effect to the issuance of $75 million of Commonwealth general obligation bond anticipation notes in January 2012, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series B Bonds); (ii) the Bonds; (iii) the Series B Bonds; and (iv) total debt service on Commonwealth general obligation bonds. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements\***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service [1] | The Bonds | | Series B Bonds Debt Service [3] | Grand Total [3] |
|---|---|---|---|---|---|
| | | Principal | Interest [3] | | |
| 2012 [2] | $ 144,464 | - | - | $ 3,159 | $ 147,623 |
| 2013 | 817,647 | - | $ 29,809 | 67,966 | 915,421 |
| 2014 | 722,581 | - | 23,954 | 81,099 | 827,634 |
| 2015 | 741,401 | - | 47,030 | 76,345 | 864,776 |
| 2016 | 754,573 | - | 118,359 | 65,657 | 938,588 |
| 2017 | 711,001 | - | 118,359 | 34,822 | 864,181 |
| 2018 | 625,329 | - | 118,359 | 58,294 | 801,982 |
| 2019 | 776,849 | - | 118,359 | 24,400 | 919,608 |
| 2020 | 763,684 | $ 45,345 | 118,359 | 20,508 | 947,896 |
| 2021 | 569,328 | 102,295 | 116,191 | 2,629 | 790,444 |
| 2022 | 532,097 | 73,395 | 111,571 | 2,629 | 719,692 |
| 2023 | 434,361 | 80,790 | 108,382 | 2,629 | 626,162 |
| 2024 | 478,896 | 26,050 | 104,260 | 2,629 | 611,836 |
| 2025 | 484,692 | 27,030 | 103,074 | 2,629 | 617,425 |
| 2026 | 438,682 | 134,195 | 101,870 | 2,629 | 677,377 |
| 2027 | 472,550 | 29,465 | 94,534 | 2,629 | 599,178 |
| 2028 | 443,315 | 64,795 | 93,057 | 2,629 | 603,796 |
| 2029 | 462,535 | 6,665 | 89,332 | 2,629 | 561,161 |
| 2030 | 457,805 | 7,000 | 88,998 | 2,629 | 556,432 |
| 2031 | 443,439 | 7,335 | 88,666 | 2,629 | 542,069 |
| 2032 | 339,126 | 7,685 | 88,317 | 2,629 | 437,758 |
| 2033 | 266,743 | 132,400 | 87,933 | 52,239 | 539,315 |
| 2034 | 199,490 | 188,545 | 81,313 | - | 469,348 |
| 2035 | 321,993 | 142,275 | 71,785 | - | 536,053 |
| 2036 | 321,989 | 71,030 | 64,631 | - | 457,650 |
| 2037 | 317,047 | 79,615 | 60,991 | - | 457,653 |
| 2038 | 220,404 | 223,505 | 56,911 | - | 500,820 |
| 2039 | 220,403 | 235,800 | 44,618 | - | 500,821 |
| 2040 | 220,401 | 308,770 | 31,649 | - | 560,820 |
| 2041 | 220,404 | 324,205 | 16,210 | - | 560,819 |
| Total | $13,923,229 | $2,318,190 | $2,396,879 | $516,039 | $19,154,337 |

\*   Totals may not add due to rounding. Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[1]   The amounts shown on this column (i) include $75 million in Commonwealth bond anticipation notes issued in January 2012, and (ii) exclude debt service on PRASA's bonds guaranteed by the Commonwealth, which have been paid by PRASA since 2006. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund. The amounts shown in this column also do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit. See THE BONDS – Debt Limitation.

[2]   Excludes approximately $685 million of principal and interest due in fiscal year 2012 paid and to be paid from the proceeds of the GDB Lines of Credit, which in turn will be refinanced through the issuance of the Bonds and the Series B Bonds.

[3]   The figures for interest on the Bonds have been reduced by the interest that was capitalized through the issuance of the Bonds in the following amounts: approximately $117.5 million due during fiscal year 2013, $94.4 million due during fiscal year 2014 and $71.3 million due during fiscal year 2015. The figures for Series B Bonds debt service have been reduced by the interest that was capitalized through the issuance of the Series B Bonds in the following amounts: approximately $672 thousand in fiscal year 2012 and $2.6 million in each of fiscal years 2013, 2014 and 2015.

Sources: Government Development Bank and Department of the Treasury

## LITIGATION

As of the date hereof, to the knowledge of the officers of the Department of the Treasury with responsibility over the issuance of the Bonds, there is no litigation of any nature pending or threatened against the Commonwealth to restrain or enjoin the issuance, sale, execution or delivery of the Bonds or the application of the proceeds thereof as described in this Official Statement, or in any way contesting or affecting the validity of the Bonds or any proceedings of the Commonwealth taken with respect to the issuance or sale of the Bonds.

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

other disposition of Premium Bonds and with respect to the state and local tax consequences of owning and disposing of Premium Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix II* to this Official Statement.  Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges LLC, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey, Demgen & Moore, Inc., will verify, from the information provided to them, the mathematical accuracy as of the date of the delivery of the Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, if any, to be held in escrow, will be sufficient to pay, when due, the principal and interest on the Refunded Bonds, and (2) the computations of yield on both the securities, if any, and the Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Commonwealth at an aggregate discount of $14,723,016 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover hereof.  The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased.  The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices.  The offering prices may be changed from time to time by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities,  which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities.  Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments.  Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

The Commonwealth intends to use a portion of the proceeds of the Bonds to pay the costs of terminating an investment agreement and certain interest exchange agreements.  Affiliates of Morgan Stanley, RBC Capital Markets, and UBS Financial Services Incorporated of Puerto Rico, underwriters for

the Bonds, are the counterparties to some of the interest rate exchange agreements being terminated. As a result, the affiliate of Morgan Stanley, the affiliate of RBC Capital Markets, and the affiliate of UBS Financial Services Puerto Rico will receive a portion of the proceeds of the Bonds in connection with the termination of such interest rate exchange agreements.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Barclays Capital Inc. and Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of BMO Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have entered into an agreement relating to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets for the Commonwealth's governmental entities and other municipal bond issuers. For each issuance of municipal securities for which both parties act as managers, the parties will be entitled to receive a portion of each other's revenues from the underwriting in consideration for their professional services.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advice to each other related to the

structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets, LLC ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds are rated "Baa1" by Moody's, "BBB+" by Fitch, and "BBB" by S&P. For more information regarding rating action affecting the Commonwealth, see "Ratings of Commonwealth General Obligation Bonds" in "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in the Commonwealth Report. The Insured Bonds are expected to be assigned insured ratings of "AA-" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies, if in the judgment of any or all, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or any of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

### Continuing Disclosure Undertaking

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1.      to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2011, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2.      to file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of the occurrence of any of the following events with respect to the Bonds:

   a.      principal and interest payment delinquencies;

   b.      non-payment related defaults, if material;

   c.      unscheduled draws on debt service reserves reflecting financial difficulties;

   d.      unscheduled draws on credit enhancements reflecting financial difficulties;

   e.      substitution of credit or liquidity facility providers, or their failure to perform;

   f.      adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

   g.      modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

   h.      Bond calls, if material;

   i.      defeasances;

**APPENDIX I**

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**December 6, 2011**

exception, the electing Puerto Rico corporations would not consider as part of their gross income for federal income tax purposes income derived from sources within Puerto Rico.

## DEBT

**Public Sector Debt**

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the Sales Tax (as defined under "Major Sources of General Fund Revenues—Sales and Use Taxes" under "Puerto Rico Taxes, Other Revenues, and Expenditures" below) allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the Sales Tax to COFINA and provided that such portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

As of September 30, 2011, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $981,295,893 in the fiscal year ending June 30, 2015 (based on the assumption that the (i) Public Improvement Refunding Bonds, Series 2004A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) Public Improvement Refunding Bonds, Series 2004B, which are variable rate bonds, bear interest at 12% per annum, and (iii) the outstanding Public Improvement Refunding Bonds, Series 2003 C, Public Improvement Bonds of 2006, Series A, Public Improvement Refunding Bonds, Series 2007A and Public Improvement Refunding Bonds, Series 2011B that are variable rate bonds, bear interest at 12% per annum). This amount ($981,295,893) *plus* the amount paid by the Commonwealth in fiscal year 2011 on account of bonds or notes guaranteed by the Commonwealth ($16,520,000), for a total of $997,815,893, is equal to 13.13% of $7,600,369,000, which is the average of the adjusted internal revenues for the

fiscal years ended June 30, 2010 and the preliminary internal revenues for the fiscal year ended June 30, 2011. If the interest on the outstanding bonds described in items (ii) through (iii) above was calculated using the effective fixed interest rate payable by the Commonwealth under the interest rate exchange agreements entered into in respect thereof, the future maximum annual debt service for the Commonwealth outstanding general obligations debt would be $883,909,051 in fiscal year 2020 and the percentage referred to in the preceding sentence would be 11.85%. The potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation. For a discussion of the Commonwealth's obligations under its interest rate exchange agreements, see "Interest Rate Exchange Agreements" under DEBT.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

As of June 30, 2011, Port of the Americas Authority ("PAA") had outstanding bonds guaranteed by the Commonwealth (the "PAA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $214.5 million. The Commonwealth has begun to make payments of debt service on the PAA Guaranteed Bonds and expects to make all payment on the PAA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2011, the Commonwealth made payments under its guaranty of the PAA Guaranteed Bonds of $16.5 million. In addition, the Commonwealth had made special budgetary appropriations to Puerto Rico Aqueduct and Sewer Authority ("PRASA") to provide a subsidy for its operational expenses. See "Commonwealth Guaranteed Debt" below.

The Commonwealth's policy has been and continues to be to prudently manage such debt within the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See "Public Corporations." However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of June 30, 2011. This table includes debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products,

some of which debt is set forth in footnote 6 below. Excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.1 billion of outstanding bonds (as of June 30, 2011) issued by Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.6 billion of obligations of Public Finance Corporation issued to purchase certain Commonwealth public sector debt.

**Commonwealth of Puerto Rico**
**Public Sector Debt***
**(in millions)**

|  | June 30, 2011 | September 30, 2011 |
|---|---|---|
| GENERAL FUND RELATED DEBT |  |  |
| Direct full faith and credit obligations | $ 9,682 | $ 9,772 |
| Puerto Rico guaranteed debt[1] | 4,296 | 5,312 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,840 | 3,880 |
| Tax and Revenue Anticipation Notes[3] | - | 650 |
| Pension Obligation Bonds[4] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $20,766 | $22,562 |
|  |  |  |
| Sales Tax debt | $13,765 | $13,765 |
| Public corporations and agencies[5] | 24,064 | 23,151 |
| Municipal debt | 3,537 | 3,400 |
| Limited obligations/non-recourse debt[6] | 2,389 | 2,384 |
| TOTAL PUBLIC SECTOR DEBT | $64,521 | $65,262 |

* Totals may not add due to rounding.

[1] Consists of $598 million of bonds issued by Aqueduct and Sewer Authority (September 30 - $666 million), $413 million of State Revolving Fund Loans incurred under various federal water laws (September 30 - $423 million), $214.5 million of bonds issued by Port of the Americas Authority (September 30 - $212 million) and $3.070 billion of PBA bonds (September 30 - $4.012 billion). Excludes $267 million of GDB bonds payable from available moneys of GDB.

[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

[3] Includes related short-term financings.

[4] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

[5] Excludes $5.4 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities. Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included the table.

[6] Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $343.8 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008, and $100 million of Housing Revenue Bonds, Series 2008, issued the Puerto Rico Housing Finance Authority; $151.0 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge (September 30 - $149.1 million); $155 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico (September 30- $74.6 million); and approximately $74.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities (September 30 - $73.5 million).

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the table above for deposits on hand in debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

**Debt Service Requirements for Commonwealth General Obligation Bonds**

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding on September 30, 2011. This table, however, does not include payments made by the Commonwealth on the PAA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the PAA Guaranteed Bonds. The amounts paid by the Commonwealth under the PAA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

In addition, in respect of certain variable rate general obligation bonds, as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements.

Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

### Puerto Rico General Obligation Debt Service Requirements*
### (In thousands)

| Fiscal Year Ending June 30 | Outstanding Bonds | | |
|---|---|---|---|
| | Principal | Interest | Total |
| 2012 | $ 362,335 | $ 485,097 | $ 847,432 |
| 2013 | 387,005 | 463,523 | 850,528 |
| 2014 | 374,613 | 463,433 | 838,045 |
| 2015 | 406,765 | 445,356 | 852,120 |
| 2016 | 426,790 | 425,183 | 851,974 |
| 2017 | 373,392 | 404,247 | 777,638 |
| 2018 | 376,110 | 385,632 | 761,742 |
| 2019 | 479,356 | 351,250 | 830,606 |
| 2020 | 546,400 | 319,314 | 865,714 |
| 2021 | 421,540 | 292,069 | 713,609 |
| 2022 | 351,420 | 272,147 | 623,567 |
| 2023 | 321,255 | 255,411 | 576,666 |
| 2024 | 336,215 | 240,754 | 576,969 |
| 2025 | 340,610 | 224,910 | 565,520 |
| 2026 | 349,280 | 207,339 | 556,619 |
| 2027 | 367,005 | 189,618 | 556,623 |
| 2028 | 386,340 | 170,197 | 556,537 |
| 2029 | 339,095 | 150,748 | 489,843 |
| 2030 | 352,240 | 134,726 | 486,966 |
| 2031 | 371,395 | 117,908 | 489,303 |
| 2032 | 224,545 | 99,992 | 324,537 |
| 2033 | 163,245 | 87,491 | 250,736 |
| 2034 | 172,615 | 79,028 | 251,643 |
| 2035 | 233,700 | 70,813 | 304,513 |
| 2036 | 247,115 | 57,394 | 304,509 |
| 2037 | 256,790 | 42,777 | 299,567 |
| 2038 | 160,675 | 27,854 | 188,529 |
| 2039 | 170,105 | 18,421 | 188,526 |
| 2040 | 130,450 | 8,215 | 138,665 |
| | $9,428,400 | $6,490,846 | $15,919,246 |

---

\*   Totals may not add due to rounding.  Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

*Sources:*  Government Development Bank for Puerto Rico and Treasury Department

### Interest Rate Exchange Agreements

*General.*   The Commonwealth and various public corporations are party to various interest rate exchange agreements or swaps.  Except for the basis swaps discussed below, the purpose of all of the interest rate exchange agreements currently in place is to hedge the Commonwealth's variable rate debt exposure and the interest rate risks associated therewith.  When the Commonwealth or a public corporation has issued variable rate bonds, it has entered into an interest rate exchange agreement with a counterparty pursuant to which the Commonwealth or the public corporation agrees to pay the counterparty a fixed rate and the counterparty agrees to pay the Commonwealth or public corporation a variable rate intended to match the variable rate payable on the bonds (a "synthetic fixed rate swap").  In theory, the variable rate payments received by the Commonwealth under the swap off-set the variable rate

**APPENDIX II**

PROPOSED FORM OF OPINION OF BOND COUNSEL

**GT** GreenbergTraurig

[Closing Date]

Secretary of the Treasury of the
    Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:   $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
      Series 2012 A (General Obligation Bonds)

Dear Mr. Secretary:

We have acted as bond counsel to the Commonwealth of Puerto Rico (the "Commonwealth") in connection with the issuance of $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012 A (the "Bonds"). In such capacity we have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended (the "Act"), and such other law and such certified proceedings and other documents as we have deemed necessary to render this opinion, including a resolution adopted by the Secretary of the Treasury of the Commonwealth (the "Secretary") and approved by the Governor of the Commonwealth on March 7, 2012 (the "Bond Resolution"). We also have examined one of the Bonds of each series as executed and authenticated.

The Bonds are issued pursuant to the Act and the Bond Resolution. The Bonds mature on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set forth in the Bond Resolution. The Bonds are issuable as registered Bonds without coupons in the manner and in accordance with the terms and conditions of the Bond Resolution.

Regarding questions of fact material to our opinion, we have relied on representations of the Secretary contained in the Bond Resolution, and the certified proceedings and other certifications of public officials and others furnished to us without undertaking to verify the same by independent investigation.

Based on the foregoing, we are of opinion that, under existing law:

1.   The Act is valid.

2.   Said proceedings have been validly and legally taken.

3.   The Act and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth for the payment of the principal of and the interest on the Bonds, to which the good faith, credit and taxing power of the Commonwealth are pledged.

Secretary of the Treasury
_____, 2012
Page 2

4.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Bond Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth, and local income taxation.

Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations.  However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

The Commonwealth has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent.  The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof.  Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof.  We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

Respectfully submitted,

Greenberg Traurig, LLP