# EXHIBIT C

**NEW ISSUE**
**Book-Entry Only**



**$469,770,000**
# Puerto Rico Infrastructure Financing Authority
## Special Tax Revenue Bonds, Series 2006

The Special Tax Revenue Bonds, Series 2006, are being issued by Puerto Rico Infrastructure Financing Authority pursuant to a Trust Agreement, dated as of October 1, 1988, as amended, with U.S. Bank Trust National Association, successor trustee.

The Series 2006 Bonds, together with any outstanding bonds that the Authority has issued and may issue from time to time under said Trust Agreement, are payable solely from and secured by a pledge of the revenues of the Authority, consisting of a specified amount of the first proceeds received by the Commonwealth of Puerto Rico of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth, and other moneys deposited in the Sinking Fund established under the Trust Agreement. If the federal excise taxes returned to the Commonwealth in any fiscal year fall below such specified amount, the deficiency shall be payable from appropriations which the Legislature of Puerto Rico may, but is not legally required to, make upon request by the Authority. Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor.

The Series 2006 Bonds will have the following characteristics:

- The Series 2006 Bonds will be dated their date of delivery.

- The Series 2006 Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Series 2006 Bonds will not receive definitive Series 2006 Bonds.

- Interest on the Series 2006 Bonds will be payable on January 1 and July 1 of each year, commencing January 1, 2007.

- The Series 2006 Bonds are subject to redemption as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates, and yields of the Series 2006 Bonds.

- The issuance of the Series 2006 Bonds and the purchase of the Series 2006 Bonds by the Underwriters are subject to approval and legality by Winston & Strawn LLP, New York, New York, Bond Counsel, and certain conditions.

- In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2006 Bonds will not be includable in gross income for federal income tax purposes and the Series 2006 Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Matters*, beginning on page 23 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2006 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

- McConnell Valdés, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Series 2006 Bonds will occur on or about September 28, 2006.

| | | |
|---|---|---|
| **UBS INVESTMENT BANK** | **MERRILL LYNCH & CO.** | **WACHOVIA BANK, NATIONAL ASSOCIATION** |
| **Banc of America Securities LLC** | **Citigroup** | **Goldman, Sachs & Co.** |
| **JPMorgan** | **Lehman Brothers** | **Morgan Stanley** |
| **Popular Securities** | **Raymond James & Associates, Inc.** | **Samuel A. Ramirez & Co.** |

September 19, 2006

**$469,770,000**
**Special Tax Revenue Bonds, Series 2006**

$101,520,000 Serial Bonds

| Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2010 | $4,655,000 | 4.500% | 3.790% |
| 2011 | 3,770,000 | 4.500% | 3.830% |
| 2012 | 3,940,000 | 5.000% | 3.920% |
| 2013 | 4,135,000 | 5.000% | 3.960% |
| 2014 | 4,340,000 | 5.000% | 4.010% |
| 2015 | 4,555,000 | 5.000% | 4.060% |
| 2016 | 4,785,000 | 5.000% | 4.110% |
| 2017 | 5,025,000 | 5.000% | 4.160% |
| 2018 | 5,275,000 | 5.000% | 4.200% |
| 2019 | 4,935,000 | 5.000% | 4.240% |
| 2019 | 605,000 | 4.250% | 4.260% |
| 2020 | 5,810,000 | 5.000% | 4.300% |
| 2021 | 6,105,000 | 5.000% | 4.340% |
| 2022 | 6,410,000 | 5.000% | 4.390% |
| 2023 | 6,730,000 | 5.000% | 4.420% |
| 2024 | 7,065,000 | 5.000% | 4.440% |
| 2025 | 7,415,000 | 5.000% | 4.460% |
| 2026 | 7,790,000 | 5.000% | 4.480% |
| 2027 | 8,175,000 | 5.000% | 4.500% |

$37,015,000 – 5.000% Term Bonds due July 1, 2031 – Yield 4.570% (approx. price to call 103.347)
$71,010,000 – 5.000% Term Bonds due July 1, 2037 – Yield 4.600% (approx. price to call 103.109)
$260,225,000 – 5.000% Term Bonds due July 1, 2046 – Yield 4.700% (approx. price to call 102.319)

No dealer, broker, sales representative or other person has been authorized by the Authority, the Commonwealth or the Underwriters to give any information or to make any representations other than those contained or incorporated by reference herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority, the Commonwealth or the Underwriters.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Series 2006 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.  The information set forth or incorporated by reference herein has been obtained from the Authority, the Commonwealth and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter.  The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof.  This Official Statement is submitted in connection with the sale of the Series 2006 Bonds and may not be reproduced or used, in whole or in part, for any other purpose.  The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement.  The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES 2006 BONDS AND THE OTHER OUTSTANDING SPECIAL TAX REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET.  SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

### TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY STATEMENT | S-1 |
| INTRODUCTORY STATEMENT | 1 |
| THE AUTHORITY | 2 |
| PLAN OF FINANCING | 4 |
| THE SERIES 2006 BONDS | 5 |
| SECURITY FOR THE BONDS | 9 |
| FEDERAL EXCISE TAXES | 13 |
| THE PUERTO RICO RUM INDUSTRY | 17 |
| ADDITIONAL COMMONWEALTH APPROPRIATIONS | 19 |
| AUTHORITY DEBT | 21 |
| FINANCIAL ASSISTANCE TO BENEFITED ENTITIES | 22 |
| TAX MATTERS | 23 |
| ELIGIBILITY OF SERIES 2006 BONDS | 25 |

| | Page |
|---|---|
| UNDERWRITING | 25 |
| COMMONWEALTH COVENANT | 25 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 25 |
| LEGAL MATTERS | 25 |
| RATINGS | 26 |
| CONTINUING DISCLOSURE | 26 |
| MISCELLANEOUS | 28 |
| | |
| Appendix I  - Summary of the Trust Agreement | I-1 |
| Appendix II - Proposed Form of Opinion of Bond Counsel | II-1 |

[This page intentionally left blank]

## SUMMARY STATEMENT

*The following is subject in all respects to the additional information contained in this Official Statement including the Appendices attached hereto. Certain capitalized terms used in this Summary Statement and elsewhere in this Official Statement are defined in "Definitions of Certain Terms" in the Summary of the Trust Agreement in Appendix I. Certain other capitalized terms are used in this Official Statement as defined in this Summary Statement.*

**The Authority** . . . . . . . . . . . . . . .   Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), was created on June 21, 1988, for the purpose of providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth that develop and operate infrastructure facilities.

**Plan of Financing** . . . . . . . . . . . .   The bonds offered hereby, when and if issued (collectively, the "Series 2006 Bonds"), will be issued to finance (i) certain capital projects for the XXI Central American and Caribbean Games to be hosted by the municipality of Mayagüez, Puerto Rico in the summer of 2010; (ii) certain capital projects for Commonwealth instrumentalities and municipalities; and (iii) the payment of capitalized interest and costs of issuance of the Series 2006 Bonds. See *Plan of Financing*.

**Security for the Bonds** . . . . . . . .   The Authority's Special Tax Revenue Bonds, Series 1998A, Series 2005A, and Series 2005B, in the aggregate principal amount of $751,182,577.35, and the Authority's Special Tax Revenue Refunding Bonds, Series 2005C, in the aggregate principal amount of $699,235,338.80, which remain outstanding (collectively, the "Remaining Bonds"), the Series 2006 Bonds, and any additional bonds that the Authority may from time to time issue under the Trust Agreement (collectively, the "Bonds") are payable solely from and secured by a pledge of Federal Excise Taxes (as defined below) and other moneys deposited to the credit of the Sinking Fund.

**Federal Excise Taxes** . . . . . . . . .   Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), requires that in each fiscal year after fiscal 1998, through fiscal 2006, the first $70 million, and in each fiscal year thereafter through fiscal 2009, the first $90 million, and in each fiscal year thereafter through fiscal 2057, the first $117 million, of certain federal excise taxes received by the Commonwealth be deposited in the Authority's Infrastructure Fund. Such taxes consist of the federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth (the "Federal Excise Taxes"). Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Commonwealth. The Trust Agreement requires the Authority to deposit in the Sinking Fund the Federal Excise Taxes and other moneys deposited in the Infrastructure Fund in such amounts as are required to meet the debt service requirement for all Bonds issued under the Trust Agreement.

Federal Excise Taxes have been transferred to the Commonwealth since 1917 in accordance with certain Acts of Congress. The amount of Federal Excise Taxes transferred to the Commonwealth was $13.25 per proof gallon during the

period after June 30, 1999 through December 31, 2005. As of January 1, 2006, such amount decreased by operation of law to the lesser of $10.50 per proof gallon or the actual excise tax imposed, which is currently $13.50 per proof gallon. See "Pledged Revenues" under *Security for the Bonds* and "Imposition of Tax" under *Federal Excise Taxes.*

The table below shows the Federal Excise Taxes received by the Commonwealth in each of the last six fiscal years, net of the operational expenses incurred by the United States Department of the Treasury, Commonwealth transfers to the Conservation Trust Fund and the Science and Technology Trust Fund, and collections received from rum produced in other countries:

| Fiscal Year | Federal Excise Taxes (in thousands) |
|---|---|
| 2001 | $285,168 |
| 2002 | 307,907 |
| 2003 | 291,973 |
| 2004 | 301,638 |
| 2005 | 335,619 |
| 2006 | 334,154 |

As provided under Puerto Rico law, the required annual Infrastructure Fund deposit of Federal Excise Taxes received by the Commonwealth in each fiscal year has and will continue to be made prior to any transfer to the Conservation Trust Fund and the Science and Technology Trust Fund in the event that the Federal Excise Taxes, net of such transfers, are insufficient to cover such annual deposit.

The maximum Principal and Interest Requirements (net of capitalized interest) on the Series 2006 Bonds and the Remaining Bonds in any fiscal year is $113 million. During each of the last five fiscal years, the Commonwealth has received at least $117 million of Federal Excise Taxes by the end of the sixth month of each fiscal year.

The Federal Excise Taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance by the United States of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry.*

**Additional Commonwealth Appropriations** . . . . . . . . . . . . . .    If the Federal Excise Taxes received by the Commonwealth in any fiscal year are insufficient to deposit $90 million ($117 million after fiscal 2009) in the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget, upon the Authority's request, to include in the recommended budget of the Commonwealth for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not

legally obligated to make any appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. See *Additional Commonwealth Appropriations*.

**Additional Bonds** . . . . . . . . . . .
Additional Bonds secured on a parity with the Bonds may be issued for any purpose authorized by the Enabling Act, subject to compliance with certain coverage tests provided in the Trust Agreement. See *Additional and Refunding Bonds*.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth** . . . . . . . .
The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor. The Commonwealth has never used Federal Excise Taxes for the payment of its general obligation debt or its guaranteed debt. The incurrence by the Commonwealth of general obligation debt is subject to a constitutional debt limit described herein.

Maximum annual debt service for the Commonwealth's outstanding general obligation debt is $768,843,249.58 in fiscal 2020. This amount is equal to 9.48% of $8,113,386,000, which is the average of the adjusted annual internal revenues of the Commonwealth (which excludes Federal Excise Taxes) for fiscal 2005 and the currently estimated adjusted internal revenues for fiscal 2006. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security for the Bonds*.

**Interest** . . . . . . . . . . . . . . . . . . .
Interest on the Series 2006 Bonds will be payable on January 1 and July 1 of each year, commencing January 1, 2007.

**Optional Redemption** . . . . . . . . .
The Series 2006 Bonds maturing after July 1, 2016 may be redeemed by the Authority prior to maturity, upon not less than 30 days' prior notice, either in whole or in part, and if in part, as directed by the Authority, on any date not earlier than July 1, 2016. See "Optional Redemption" under *Redemption Provisions*.

**Trustee** . . . . . . . . . . . . . . . . . . . . .
U.S. Bank Trust National Association, successor trustee.

**Ratings** . . . . . . . . . . . . . . . . . . . .
Standard & Poor's: "BBB+;" Moody's: "Baa3." See *Ratings*.

**Tax Matters** . . . . . . . . . . . . . . . . .
In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2006 Bonds will not be includable in gross income for federal income tax purposes and the Series 2006 Bonds and interest thereon will be exempt from all state, Commonwealth and local income taxes. However, see *Tax Matters* beginning on page 23 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2006 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

[This page intentionally left blank]

$469,770,000
**Puerto Rico Infrastructure Financing Authority**
**Special Tax Revenue Bonds, Series 2006**

### INTRODUCTORY STATEMENT

The purpose of this Official Statement is to provide certain information in connection with the issuance and sale by Puerto Rico Infrastructure Financing Authority (the "Authority") of its Special Tax Revenue Bonds, Series 2006, in the aggregate principal amount of $469,770,000 (the "Series 2006 Bonds").

The Series 2006 Bonds are being issued pursuant to Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), a Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and a resolution of the Board of Directors of the Authority adopted on September 14, 2006 (the "Bond Resolution"). The Series 2006 Bonds are expected to be delivered on or about September 28, 2006.

This Official Statement includes brief descriptions of the Enabling Act, the Series 2006 Bonds (and the other outstanding Bonds of the Authority secured on a parity with the Series 2006 Bonds), the Bond Resolution and the Trust Agreement. Such descriptions do not purport to be complete and are qualified in their entirety by reference to such documents. All references to the Series 2006 Bonds are qualified in their entirety by reference to the definitive forms thereof contained in the Bond Resolution. Copies of all such documents and agreements are available for inspection during regular business hours at the offices of Government Development Bank for Puerto Rico ("Government Development Bank"), located at 666 Fifth Avenue, 15th Floor, New York, New York 10103 and at the Government Development Bank for Puerto Rico Building, located at the Roberto Sánchez Vilella Government Center, San Juan, Puerto Rico 00940, or at the corporate trust office of the Trustee at 100 Wall Street, Suite 1600, New York, New York 10005.

This Official Statement, which includes the cover page and the Appendices hereto, incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2005, together with the independent auditor's report thereon, dated March 14, 2006, of KPMG LLP ("KPMG"), certified public accountants (collectively, the "CAFR"). The CAFR has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). KPMG did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units separately identified in their report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG, and their opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The report by KPMG contains an emphasis paragraph for the adoption of Governmental Accounting Standards Board (GASB) Statement No. 40, *Deposits and Investment Risk Disclosures*, as of June 30, 2005. This Official Statement also incorporates by reference the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated as of July 1, 2006 (the "Commonwealth Report"), which has been filed by the Commonwealth with each NRMSIR and with the Municipal Securities Rulemaking Board ("MSRB"). This Official Statement further incorporates by reference the audited financial statements of the Authority for the fiscal year ended June 30, 2005, together with the independent auditor's report thereon, dated December 30, 2005, of RSM ROC & Company, certified public accountants, which have been filed by the Commonwealth with each NRMSIR.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the CAFR that is filed with each NRMSIR and the MSRB, or any new or revised Commonwealth Report or CAFR, or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the CAFR that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Series 2006 Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the CAFR shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed

document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 666 Fifth Avenue, 15th Floor, New York, New York 10103, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the CAFR may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below. The address of the MSRB is 1900 Duke Street, Suite 600, Alexandria, Virginia 22314, telephone number (703) 797-6600.

Certain capitalized terms used in this Official Statement are defined in "Definition of Certain Terms" in *Summary of Trust Agreement* in Appendix I. Certain other capitalized terms are defined in the Summary Statement.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Authority's and the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## THE AUTHORITY

### General

The Commonwealth recognizes the importance of developing, maintaining and improving its infrastructure to promote Puerto Rico's economic development. Accordingly, the Commonwealth has established the Authority as a public corporation and instrumentality with two principal functions: (i) providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth responsible for developing and operating infrastructure facilities, and (ii) providing an alternative means for directly financing those facilities.

The Enabling Act defines "infrastructure" to include public works and facilities of a substantial public interest, such as aqueduct and sewer systems including water supply systems, waste water treatment and disposal systems, improvements financed under the provisions of the Federal Clean Water Act and the Federal Safe Drinking Water Act, solid and hazardous waste disposal systems, resource recovery systems, electric power systems, highways, roads, pedestrian walkways, parking facilities, airports, convention centers, bridges, maritime ports, tunnels, transportation systems including mass transportation, communication systems including telephones, industrial facilities, land and natural resources, public housing projects, and tourist, medical and agro-industrial infrastructure facilities.

The Authority has all the necessary and convenient powers to accomplish and effectuate the purposes and provisions of the Enabling Act, including the power to negotiate and enter into assistance agreements with political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth authorized to provide infrastructure for the purpose of carrying out necessary financing programs for the development of infrastructure and providing consulting, technical, administrative, advisory, and other assistance in all matters related to such facilities. Any such entity receiving assistance from the Authority (a "Benefited Entity") may be required to comply with all operational, administrative and budgetary requirements that the Authority considers pertinent to achieve the purposes of said assistance.

2

At its creation in 1988, the Authority's principal undertaking was to provide financial and other assistance to Puerto Rico Aqueduct and Sewer Authority ("PRASA") pursuant to the terms of an assistance agreement, as amended, between PRASA and the Authority. In recent years, however, the Authority has signed assistance agreements with other Commonwealth instrumentalities and municipalities involved in infrastructure projects, including, among others, the Municipality of Carolina, the Department of Health, the Department of Education, the Department of Transportation and Public Works, the Department of Environmental and Natural Resources, the Public Buildings Authority, the Highway and Transportation Authority, the Lands Authority, the Courts Administration Office, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Puerto Rico State Historic Preservation Office, the Fine Arts Center Corporation, the Public Schools Improvement Office, the Puerto Rico Science, Research and Technology Trust Fund, the Special Communities Perpetual Trust, and the University of Puerto Rico. See *Plan of Financing* and *Financial Assistance to Benefited Entities.*

The executive offices of the Authority are located at the Capital Center Building II, 235 Arterial Hostos Avenue, Suite 1601, San Juan, Puerto Rico 00918. Its telephone number is (787) 763-5757.

**Powers**

The Authority has broad powers under the Enabling Act, including, among others, the power to: sue and be sued; make contracts; acquire properties by eminent domain or otherwise; borrow money and issue bonds for any of its corporate purposes, including the financing of the construction, rehabilitation, acquisition, repair, preservation and replacement of portions of the infrastructure of Puerto Rico; mortgage or pledge any property and pledge all or a portion of the Authority's revenues, including Federal Excise Taxes (see "Pledged Revenues" under *Security for the Bonds*) or other funds transferred by the Commonwealth to the Authority for the payment of the principal of and interest on any bonds issued by the Authority or bonds issued by a Benefited Entity; provide assistance to Benefited Entities as permitted by and consistent with the purposes of the Enabling Act; and fix, impose and collect rents, fees, rates and other charges for the use of any of its properties.

**Management**

The Enabling Act provides that the Board of Directors of the Authority (the "Board") shall be composed of the Board of Directors of Government Development Bank and the Secretary of the Treasury of Puerto Rico (in the event the Secretary of the Treasury is not a member of Government Development Bank's Board of Directors). Members of the boards or officers of any Benefited Entity are specifically excluded from serving on the Board. The Secretary of the Treasury is the Chairman of the Board. The Board currently has two vacancies. The members of the Board are:

| Name | Term Ends | Occupation |
|------|-----------|------------|
| Juan C. Méndez | Indefinite | Secretary of the Treasury |
| Alfredo Salazar | September 22, 2008 | Chairman of the Board of Directors of Government Development Bank |
| Jorge P. Silva-Puras | September 22, 2008 | Chief of Staff of the Governor |
| José F. Rodríguez | September 20, 2008 | Businessman |
| Rafael Martínez | September 22, 2008 | Certified Public Accountant |

The Board appoints officers and employs agents and employees who are responsible for the general operation of the Authority. Set forth below is a brief biographical description of the Executive Director and certain officers of the Authority.

Guillermo M. Riera, D. Sc., P.E., was appointed Executive Director effective July 7, 2005. He has a doctoral degree in Electrical Engineering and over twelve years of experience working with federal and state government

3

institutions, and in universities. Mr. Riera was Executive Director of the Puerto Rico Solid Waste Management Authority from December 2002 until the beginning of July 2005, when he was appointed to head the Authority.

Lisa M. Gautier, Esq., was appointed Deputy Executive Director effective January 3, 2006. She has a Juris Doctor degree and over six years of experience working with state government institutions and in the private sector. Ms. Gautier was Director of the Legislative Division of the Office of Management and Budget and Legal Director of the Puerto Rico Solid Waste Management Authority. She also worked as head of the Examiners' Office of the Puerto Rico Department of Natural and Environmental Resources.

José R. Negrón-Vives was appointed Finance and Administration Director effective August 1, 2005. Since 1980 he has been in charge of private business and public affairs projects, mainly as Bid Board Chairman, for the acquisition of goods and services while occupying high management positions at the University of Puerto Rico and the Puerto Rico Solid Waste Management Authority until 2005.

José A. García-Pérez, P.E., was appointed Engineering Director at the Authority effective August 1, 2005. He has a Master of Science degree in Electrical Engineering with eleven years of experience in academics at several universities in Puerto Rico. Mr. García also has worked with private and public institutions in research and development, and project management. When appointed, Mr. García Pérez was in charge of the Operation and Engineering Division of the Puerto Rico Solid Waste Management Authority.

Brenda L. Huertas, Esq. was appointed Legal Area Director at the Authority effective August 1, 2005. She has a Juris Doctor degree and twelve years of experience in training, supervision, and legal investigation and advice at the Occupational Safety and Health Office and as a law clerk at the Puerto Rico Court of First Instance. Prior to her appointment at the Authority, she was the Director of the Legal Division of the Puerto Rico Solid Waste Management Authority.

## PLAN OF FINANCING

**Series 2006 Bonds**

On May 15, 2004, the Central American and Caribbean Sports Organization announced the selection of the municipality of Mayagüez, Puerto Rico to host the XXI Central American and Caribbean Games (the "Games") to be held in the summer of 2010. The Authority has been designated as the entity responsible for developing the infrastructure necessary for the Games, which entails long-term capital investments in the municipalities where the sports venues for the Games will be located. The Authority is issuing the Series 2006 Bonds to provide approximately $470 million for (i) the acquisition, improvement and construction of sports and other facilities necessary for the Games; (ii) the construction of certain capital projects for Commonwealth instrumentalities and municipalities; and (iii) the payment of capitalized interest and costs of issuance of the Series 2006 Bonds. The Series 2006 Bond proceeds will be deposited into a special construction fund administered by the Authority on behalf of the applicable Benefited Entities.

4

**Use of Proceeds**

Sources:

| | |
|---|---:|
| Principal Amount of Series 2006 Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $469,770,000.00 |
| Net Original Issue Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,587,337.00 |
| Total  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $484,357,337.00 |

Uses:

| | |
|---|---:|
| Deposit to Special Construction Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $421,943,538.61 |
| Deposit to Special Construction Fund (capitalized interest) . . . . . . . . . . . . . . . . . | 58,435,537.99 |
| Underwriters' Discount, Legal, Printing and Other Issuance Expenses . . . . . . . . . . | 3,978,260.40 |
| Total  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $484,357,337.00 |

A portion ($58,435,537.99) of the proceeds of the Series 2006 Bonds, as set forth in the table above, will be allocated to capitalized interest. This amount of capitalized interest, which will be irrevocably set aside for this purpose, will have the effect, by virtue of the definition of Principal and Interest Requirements (see paragraph (g) of said definition in *Summary of the Trust Agreement* in Appendix I), of reducing debt service requirements in fiscal years 2007, 2008 and 2009 to $86 million per fiscal year, which is lower than the annual amounts of Special Tax Revenues deposited in the Infrastructure Fund, as described in "Pledged Revenues" under *Security for the Bonds*, during the three-year period ending June 30, 2009, thereby enabling the Authority to satisfy the coverage tests for the issuance of additional Bonds. See "Additional and Refunding Bonds" under *Security for the Bonds*.

## THE SERIES 2006 BONDS

**General**

The Series 2006 Bonds will bear interest at the rates, payable on January 1 and July 1 in each year, beginning January 1, 2007. The Series 2006 Bonds mature on the dates and in the principal amounts set forth on the inside cover. The Series 2006 Bonds will be dated the date of their delivery, which is expected to be on or about September 28, 2006. The Series 2006 Bonds will be issued in fully registered form, will be in denominations of $5,000 and any multiple thereof.

**Book-Entry Only System**

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority and the Underwriters believe to be reliable, but the Authority and the Underwriters take no responsibility for the accuracy thereof.

DTC will act as securities depository for the Series 2006 Bonds. The Series 2006 Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully-registered Series 2006 Bonds will be issued in the aggregate principal amount of each maturity and series, and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants (the "Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions, in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants'

accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (the "Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission (the "SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Series 2006 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2006 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2006 Bond (a "Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2006 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive definitive Series 2006 Bonds, except in the event that use of the book-entry system for the Series 2006 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2006 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Series 2006 Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2006 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2006 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (or such other DTC nominee) will consent or vote with respect to the Series 2006 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2006 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, interest and other principal payments on the Series 2006 Bonds will be made to Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the Authority on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, interest and other principal payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Trustee or the Authority, disbursement of such payments to Direct Participants is the responsibility of DTC, and disbursement of such payments to the Beneficial Owners is the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Series 2006 Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Series 2006 Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, also definitive Series 2006 Bonds will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued, the following provisions will apply: principal of and interest on the Series 2006 Bonds will be payable at maturity in lawful money of the United States of America upon presentation and surrender of Series 2006 Bonds at the principal office of the Trustee in New York, New York. The Series 2006 Bonds will be issued only as registered bonds without coupons in denominations of $5,000 and any multiple thereof. The transfer of the Series 2006 Bonds will be registrable and they may be exchanged at the principal office of the Trustee in New York, New York, upon the payment of any taxes or other governmental charges required to be paid with respect to such registration of transfer or exchange.

**Redemption Provisions**

*Optional Redemption.* The Series 2006 Bonds maturing after July 1, 2016 may be redeemed without premium at the option of the Authority prior to maturity, upon not less than thirty (30) days' prior notice, either in whole or in part, and if in part, as directed by the Authority, on any date not earlier than July 1, 2016, from any moneys available therefor (other than moneys held by the Trustee in respect of an Amortization Requirement), at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date.

*Amortization Requirements.* The Series 2006 Bonds maturing July 1, 2031 shall be redeemed in part on July 1, 2028, and each July 1 thereafter in the principal amounts equal to the Amortization Requirements (less the principal amount of any Series 2006 Bonds retired by purchase) from moneys in the Redemption Account at par plus accrued interest as follows:

| Fiscal Year ending June 30, | Amortization Requirements for Series 2006 Bonds due July 1, 2031 |
|---|---|
| 2028 | $8,590,000 |
| 2029 | 9,015,000 |
| 2030 | 9,470,000 |
| 2031 | 9,940,000* |
| Average life (years) | 23.32 |

* Final maturity.

The Series 2006 Bonds maturing July 1, 2037 shall be redeemed in part on July 1, 2032, and each July 1 thereafter in the principal amounts equal to the Amortization Requirements (less the principal amount of any Series 2006 Bonds retired by purchase) from moneys in the Redemption Account at par plus accrued interest as follows:

7

| Fiscal Year ending June 30, | Amortization Requirements for Series 2006 Bonds due July 1, 2037 |
|---|---|
| 2032 | $10,440,000 |
| 2033 | 10,960,000 |
| 2034 | 11,510,000 |
| 2035 | 12,085,000 |
| 2036 | 12,690,000 |
| 2037 | 13,325,000* |
| Average life (years) | 28.40 |

* Final maturity.

The Series 2006 Bonds maturing July 1, 2046 shall be redeemed in part on July 1, 2038, and each July 1 thereafter in the principal amounts equal to the Amortization Requirements (less the principal amount of any Series 2006 Bonds retired by purchase) from moneys in the Redemption Account at par plus accrued interest as follows:

| Fiscal Year ending June 30, | Amortization Requirements for Series 2006 Bonds due July 1, 2046 |
|---|---|
| 2038 | $ 17,450,000 |
| 2039 | 18,060,000 |
| 2040 | 18,535,000 |
| 2041 | 19,740,000 |
| 2042 | 17,675,000 |
| 2043 | 18,560,000 |
| 2044 | 19,485,000 |
| 2045 | 23,105,000 |
| 2046 | 107,615,000* |
| Average life (years) | 37.21 |

* Final maturity.

*Notice of Redemption.* At least thirty (30) days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or, if the book-entry only system is discontinued as described above, by first class mail, postage prepaid to the registered owners of the Series 2006 Bonds to be redeemed and to the national information services whose names and addresses are included in the most recent list thereof furnished to the Trustee by the Authority, as set forth in the Trust Agreement. Each notice of redemption shall contain, among other things, the CUSIP identification number and the numbers of the Series 2006 Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which Series 2006 Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Series 2006 Bond will not affect the validity of the proceedings for the redemption of any other Series 2006 Bond. Any defect in such notice or the failure so to mail any such notice to any such national information service will not affect the effectiveness of a call for redemption.

8

*Selection of Series 2006 Bonds to be Redeemed.* If less than all of the Series 2006 Bonds of any one maturity and series are called for redemption, the particular Series 2006 Bonds or portions thereof to be redeemed will be selected by the Trustee by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Series 2006 Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion deems fair and appropriate.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and redemption premium, if any, and accrued interest on the Series 2006 Bonds or portions thereof so called for redemption being held by the Trustee, interest on the Series 2006 Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the Trust Agreement, Series 2006 Bonds and portions of Series 2006 Bonds which have been duly called for redemption under the provisions of the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or to pay at maturity have been given, and for the payment of the principal of and redemption premium, if any, and the accrued interest on which sufficient moneys or investments permitted by law shall be held in separate trust for the owners of the Series 2006 Bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under the Trust Agreement, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the redemption premium, if any, and the accrued interest thereon from said separate trust.

## SECURITY FOR THE BONDS

The Bonds (including the Series 2006 Bonds) are payable solely from, and secured by a pledge of, the revenues and other moneys deposited in the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund (the "Sinking Fund") established under the Trust Agreement (the "Pledged Revenues"). The Sinking Fund includes the Bond Service Account, the Redemption Account and the Reserve Account. The last remaining outstanding Bonds secured by a pledge of the moneys on deposit in the Reserve Account matured on July 1, 2005. Consequently, the Reserve Account no longer applies to the Bonds and no further reference thereto is made in this Official Statement.

**Pledged Revenues**

Pledged Revenues consist of: (i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

Under the provisions of Section 9 of the Puerto Rican Federal Relations Act and Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended (the "Code"), any excise tax imposed and collected by the United States on articles produced in the Commonwealth and transported to the United States (less the estimated amount necessary for payments of refunds and drawbacks) is required to be transferred to the Commonwealth. Rum is the only article currently produced in Puerto Rico that is subject to the Federal Excise Taxes. The United States Treasury is required by federal law to transfer to the Commonwealth the lesser of $10.50 per proof gallon and the excise tax imposed on each proof gallon of rum produced in Puerto Rico and sold in the United States, currently set at the rate of $13.50 per proof gallon. For fiscal year 2006, the amount of Federal Excise Taxes transferred to the Commonwealth, net of the operational expenses incurred by the United States Department of the Treasury was $351,964,222.53. See *Federal Excise Taxes*.

The Enabling Act requires the Secretary of the Treasury of the Commonwealth to transfer to the Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Infrastructure Fund"), a special fund created by the Enabling Act to be maintained by or on behalf of the Authority, the first $70 million of Federal Excise Taxes received

9

by the Commonwealth in each fiscal year after fiscal 1998 through fiscal 2006, the first $90 million of Federal Excise Taxes received by the Commonwealth in each fiscal year after fiscal 2006 through fiscal 2009, and the first $117 million received in each fiscal year thereafter through fiscal 2057 (the Federal Excise Taxes deposited to the credit of the Infrastructure Fund are referred to as the "Special Tax Revenues"). During each of the last five fiscal years, the Commonwealth has received the first $117 million of Federal Excise Taxes by the end of the sixth month of each fiscal year. See "Federal Excise Taxes Revenues" under *Federal Excise Taxes*.

If the Federal Excise Taxes received in any fiscal year are insufficient to make the required deposit to the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget to include, upon the Authority's request, in the recommended budget for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make the necessary appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. For more information on the budgetary process of the Commonwealth, see *Additional Commonwealth Appropriations*.

Federal Excise Taxes have represented a stable source of revenues for the Commonwealth. The federal law requiring the transfer of Federal Excise Taxes to the Commonwealth has been in effect since 1917. In addition, since fiscal year 1988 Federal Excise Taxes have been no less than $166 million ($180 million if adjusted to take into account a change made by the Puerto Rico Department of the Treasury in June 1993 in the method used to report the collection of Federal Excise Taxes from an accrual to a cash basis). The level of Federal Excise Taxes transferred in the future may be affected by factors beyond the control of the Commonwealth, such as changes in federal legislation affecting the imposition or transfer of such taxes and conditions in the Puerto Rico rum industry.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments that are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has never used Federal Excise Taxes for the payment of debt service on its public debt.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act 39"), the Secretary of the Treasury is obligated to transfer each month from available funds of the Commonwealth to the Commonwealth Redemption Fund (the "Redemption Fund") such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. There is currently no deficiency in the Redemption Fund.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years. The Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues (revenues raised under the provisions of Commonwealth legislation) consist principally of income, excise and sales taxes. Certain revenues, such as Federal Excise Taxes and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes, taxes on crude oil, unfinished oils or end products derived from oil and any other hydrocarbon mixture, and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they are available for the payment of debt service.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth were invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's and S&P), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments"). Since bonds refunded with proceeds invested in non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Joint Resolution No. 2104 of September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004 B (the "Series 2004 B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004 B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004 A (the "Series 2004 A Bonds") and any Series 2004 B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004 B Bonds.

Maximum annual debt service for the Commonwealth's outstanding general obligation debt is $768,843,249.58 in the fiscal year ending June 30, 2020 (based on the assumption that (i) the bonds refunded with non-eligible investments are treated as being outstanding, (ii) the Series 2004 A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, and (iii) the Series 2004 B Bonds and the variable rate bonds issued as part of the Commonwealth's Public Improvement Bonds of 2006, Series A (the "CPI Bonds"), bear interest at 12% per annum). This amount ($768,843,249.58) is equal to 9.48% of $8,113,386,000, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2005 and the currently estimated adjusted internal revenues for the fiscal year ended June 30, 2006. If the bonds refunded with non-eligible investments were treated as not being outstanding, and the interest on the Series 2004 B Bonds and the CPI Bonds is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 8.38%. See "Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt" under *Debt* in the Commonwealth Report.

Debt Service for the PRASA guaranteed bonds of $30,120,768 was paid by PRASA during fiscal 2006 (including, for this purpose, debt service payments due and paid on July 1, 2006) and, thus, is not included in the calculation of the 15% debt limitation. See "Other Public Corporations — Aqueduct and Sewer Authority" under *Public Corporations* in the Commonwealth Report. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would be included in the calculation of the 15% debt limitation.

**Flow of Funds**

Under the Trust Agreement, the Authority must withdraw Special Tax Revenues and other moneys from the Infrastructure Fund and make the following deposits:

(a)      first, to the credit of the Bond Service Account, such amount as may be required to make the total amount to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)      second, to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Infrastructure Fund to make (i) any payment necessary to satisfy then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components and (ii) any required deposit into an Arbitrage Rebate Fund or comparable fund for a Debt Service Component. After making the foregoing applications, the Authority may apply any moneys to the credit of the Infrastructure Fund to any lawful purpose. See *Summary of the Trust Agreement* in Appendix I.

**Additional and Refunding Bonds**

Under the Trust Agreement, the Authority may issue additional bonds for any lawful purpose of the Authority, provided that, among other things, the following coverage tests are met:

(a)      the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of issuance of such additional Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years, shall not be less than 200% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding, and the additional Bonds to be issued; and

(b)      the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that requires such increased amount, if received from the federal government, to be deposited to the credit of the Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding, shall not be less than 100% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding, and the additional Bonds to be issued.

The average annual Federal Excise Taxes for the two Fiscal Years in the period ended June 30, 2006, computed on the basis of $13.25 per proof gallon and net of operational expenses incurred by the United States Department of the Treasury in processing and accounting for Federal Excise Taxes, is equal to $351 million. That amount is more than 200% of $113 million, which is the maximum aggregate Principal and Interest Requirements for any Fiscal Year on the

Remaining Bonds and the Series 2006 Bonds after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*. In addition, the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two Fiscal Years in the period ended June 30, 2006 is $117 million adjusted as permitted by the Trust Agreement to reflect the increase of Special Tax Revenues deposited to the Infrastructure Fund that will occur beginning in fiscal 2010. That amount is more than 100% of $113 million, which is the maximum aggregate Principal and Interest Requirements on the Remaining Bonds and the Series 2006 Bonds after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*.

Additional Bonds may also be issued for the purpose of refunding all or a portion of any series of Bonds then Outstanding by meeting the coverage tests described in paragraphs (a) and (b) above, or if (i) the Principal and Interest Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of such refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

## FEDERAL EXCISE TAXES

### Background

The imposition of excise taxes has a long history under United States law, as does the transfer of Federal Excise Taxes to Puerto Rico. Such transfer is required under certain Acts of Congress that establish the unique political and legal relationship between Puerto Rico and the United States.

Excise taxes were first imposed in the United States in 1790 and have remained in force since then except for a short period in the early part of the 19th century. The transfer of Federal Excise Taxes to Puerto Rico began with the Organic Act of 1917, popularly known as the Jones Act, passed by Congress on March 2, 1917. Section 9 of the Jones Act provided that "all taxes collected under the revenue laws of the United States on articles produced in Puerto Rico and transported to the United States, or consumed in the Island shall be covered into the Treasury of Puerto Rico." This transfer was intended to provide revenues for Puerto Rico government expenditures.

In 1950, when Congress enacted legislation providing for the establishment of a constitutional government in Puerto Rico, Section 9 of the Jones Act was incorporated as Section 9 of the Puerto Rican Federal Relations Act. The Puerto Rican Federal Relations Act is one of the federal statutes in force that defines the nature of the political and legal relationship between Puerto Rico and the United States.

A provision similar to Section 9 of the Puerto Rican Federal Relations Act also appears in Section 7652(a)(3) of the Code and currently reads as follows: "[a]ll taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States (less the estimated amount necessary for payment of refunds and drawbacks), or consumed in the island, shall be covered into the treasury of Puerto Rico."

### Imposition of Tax

Section 7652(a)(1) of the Code provides that "articles of merchandise of Puerto Rican manufacture coming into the United States and withdrawn for consumption or sale shall be subject to a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture." Rum is the only article currently produced in Puerto Rico subject to federal excise tax.

Section 5001(a)(1) of the Code currently imposes a tax on all distilled spirits produced in or imported into the United States at the rate of $13.50 per proof gallon. A "proof gallon" is a liquid gallon consisting of 50% alcohol. Section 5001(a)(10) of the Code provides that, with certain exceptions, the tax upon any article containing distilled spirits brought from Puerto Rico into the United States for consumption or sale shall be at the same rate as the rate imposed on distilled spirits produced in the United States.

From 1951 until the enactment of the Deficit Reduction Act of 1984 (the "DRA"), the federal excise tax on distilled spirits produced in or imported into the United States was $10.50 per proof gallon. The DRA increased the tax to $12.50 per proof gallon, and amended Section 7652 of the Code to limit the amount of Federal Excise Taxes transferred to Puerto Rico to the lesser of $10.50 per proof gallon and the actual excise tax imposed under Section 5001 of the Code. Effective January 1, 1991, Section 5001(a)(l) was amended to increase the tax to $13.50 per proof gallon. The amount of Federal Excise Taxes transferred to Puerto Rico remained at $10.50 per proof gallon. In 1993, however, Section 7652 was amended to increase the amount of Federal Excise Taxes transferred to Puerto Rico to $11.30 per proof gallon during the five fiscal year period ended September 30,1998. In 1999, 2002 and 2004, Section 7652 was further amended to raise the amount of Federal Excise Taxes transferred to Puerto Rico to $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. As of January 1, 2006, the amount of Federal Excise Taxes transferred to Puerto Rico decreased by operation of law to the lesser of $10.50 per proof gallon or the actual excise tax imposed, which is currently $13.50 per proof gallon. Although federal legislation has been recently proposed to increase to $13.25 per proof gallon, as of January 1, 2006, the amount of Federal Excise Taxes transferred to Puerto Rico, to date no such legislation has been approved by Congress and there are no assurances that it will be approved. However, in 1999, 2002 and 2004, the amount transferred had reverted to $10.50 per proof gallon and legislation was subsequently enacted to increase the amount to $13.25 retroactively.

The United States has never reduced the amount of Federal Excise Taxes transferred to Puerto Rico below $10.50 per proof gallon. For a five-month period in 1986, however, Federal Excise Taxes were subject to sequestration under the Gramm-Rudman-Hollings Act ("GRH"). This sequestration ended when Congress enacted a law requiring that, notwithstanding GRH or any other provision of law, amounts required to be transferred to Puerto Rico under the Puerto Rican Federal Relations Act be paid in full to Puerto Rico.

There can be no assurance that the excise tax rate on distilled spirits will not be reduced or that such taxes will not be eliminated in the future or that there will not be a reduction in the amounts transferred to the Commonwealth.

**Collection of Taxes**

In the case of rum shipped in bulk to the United States, Federal Excise Taxes are paid by distributors and importers on a semi-monthly basis, each payment representing the taxes on rum withdrawn from bonded warehouses during the immediately preceding two-week period for consumption in the United States. In the case of rum bottled in Puerto Rico and shipped to the United States, Federal Excise Taxes are paid by producers in Puerto Rico when the rum is shipped to the United States.

The United States Department of the Treasury makes monthly transfers of Federal Excise Taxes to Government Development Bank for the account of the Puerto Rico Department of the Treasury consisting of: (i) excise taxes paid on rum bottled in Puerto Rico and shipped to the United States during the immediately preceding month, and (ii) excise taxes paid on rum shipped in bulk to the United States and retired for consumption two months prior to the date of such transfer.

The period elapsed between the time that a producer, distributor or importer pays the excise tax and the time that the United States Department of the Treasury remits such taxes to the Puerto Rico Department of the Treasury ranges between 30 and 90 days.

**Conservation Trust Fund**

The Puerto Rico Conservation Trust Fund (the "Conservation Trust Fund") is a Puerto Rico charitable trust established pursuant to a Memorandum of Understanding, dated December 24, 1968, between the U.S. Department of the Interior and the Commonwealth to protect and enhance the natural resources and beauty of Puerto Rico through the acquisition and active management of lands possessing great ecological, aesthetic or historical value in Puerto Rico. Under a policy to protect and enhance the natural resources of Puerto Rico, the Commonwealth has transferred annually since 1999 to the Conservation Trust Fund an amount of Federal Excise Taxes equal to approximately 45 cents per proof gallon. During fiscal 2006, approximately $12.8 million was so transferred. Notwithstanding such Commonwealth policy and in light of the requirements of the Enabling Act, the deposit to the Infrastructure Fund has and will continue to be made prior to any transfer to the Conservation Trust Fund in the event that the Federal Excise Taxes, net of such transfer, are insufficient to cover the required annual Infrastructure Fund deposit.

**Science and Technology Trust Fund**

The Puerto Rico Science, Research and Technology Trust Fund (the "Science and Technology Trust Fund") is a government-sponsored trust created pursuant to Act No. 214 of August 18, 2004 ("Act 214") to set and implement the public policy of the Commonwealth for technological and scientific research and development through the collaboration of the governmental, academic and private sectors. The Science and Technology Trust Fund serves as an agent for the promotion, investment and financing of such research and development activities in Puerto Rico. It is managed by a committee of eleven trustees, including the Secretary of Commerce and Economic Development, the President of the University of Puerto Rico, the President of the Government Development Bank, the Executive Director of the Puerto Rico Industrial Development Company, the Executive Director of the Office of Management and Budget, and six private citizens. Pursuant to Act 214, starting in fiscal 2006, $5 million in Federal Excise Taxes must be transferred annually to the Science and Technology Trust Fund, provided that the required annual Infrastructure Fund deposit has been made in accordance with the Enabling Act.

**Federal Excise Tax Revenues**

Throughout the 1950's and 1960's Federal Excise Taxes consisted principally of excise taxes on rum and tobacco. Since 1986, however, with the phasing out of the manufacture of tobacco products in Puerto Rico, all Federal Excise Taxes have consisted of taxes imposed on rum produced in Puerto Rico.

The table below shows the Federal Excise Taxes received by the Commonwealth with respect to rum during each of the six fiscal years in the period ended June 30, 2006. In each case, the amounts shown are net of (i) operational expenses incurred by the United States Department of the Treasury in processing and accounting for Federal Excise Taxes (approximately $2.3 million in fiscal 2006); (ii) amounts transferred by the Puerto Rico Department of the Treasury to the Conservation Trust Fund (approximately $12.8 million in fiscal 2006); (iii) amounts transferred by the Puerto Rico Department of the Treasury to the Science and Technology Trust Fund ($5 million in fiscal 2006); and (iv) federal rum excise tax collections received by the Puerto Rico Department of the Treasury from rum produced in other countries (approximately $40.9 million in fiscal 2006).

The compilation and recording of such Federal Excise Tax information by the Commonwealth is made by two offices within the Puerto Rico Department of the Treasury: the Treasury Division and the Office of Economic and Financial Affairs. Recently, the Office of Economic Analysis of Government Development Bank detected certain discrepancies in the information provided by such offices in connection with the actual amounts of Federal Excise Taxes received by the Commonwealth during each of the five fiscal years in the period ended June 30, 2005. Such discrepancies led to involuntary errors in the Federal Excise Tax information previously disclosed by the Authority for such fiscal years. Such information has been adjusted in the table below. Both Government Development Bank and the Puerto Rico Department of the Treasury have agreed on new procedures for the sharing of such information on a monthly basis. These procedures are expected to result in monthly interagency monitoring of Federal Excise Tax information so as to avoid any future discrepancies.

**Federal Excise Tax Revenues per Fiscal Year**[1]
($ thousands)

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| July . . . . . . . . . . | $ 19,337 | $ 36,178 | $ 22,344 | $ 26,854 | $ 20,822 | $ 31,469 |
| August . . . . . . . | 25,018 | 23,583 | 27,167 | 21,897 | 18,535 | 27,609 |
| September . . . . . | 31,148 | 26,291 | 23,017 | 27,259 | 17,831 | 24,936 |
| October . . . . . . . | 23,841 | 26,850 | 24,660 | 28,679 | 19,253 | 29,238 |
| November . . . . . | 24,460 | 23,632 | 26,408 | 23,221 | 39,610 | 27,788 |
| December . . . . . | 37,266 | 34,071 | 28,671 | 36,532 | 26,470 | 32,090 |
| January . . . . . . . | 24,490 | 19,242 | 24,262 | 25,039 | 31,386 | 33,592 |
| February . . . . . . | 20,308 | 21,086 | 22,219 | 22,241 | 23,590 | 26,159 |
| March . . . . . . . . | 20,728 | 24,265 | 14,258 | 18,682 | 9,792 | 24,945 |
| April . . . . . . . . . | 19,131 | 25,883 | 25,337 | 20,537 | 31,790 | 21,339 |
| May . . . . . . . . . | 14,936 | 23,839 | 31,417 | 23,060 | 63,727 | 36,580 |
| June . . . . . . . . . | 24,507 | 22,986 | 22,212 | 27,638 | 32,813 | 18,409 |
| Total[2] . . . . | $ 285,168 | $307,907 | $291,973 | $301,638 | $335,619 | $334,154 |

(1)    If the excise tax transfer rate had been $10.50 per proof gallon, it is estimated that the total Federal Excise Taxes (in thousands) received would have been $251,424, $275,782, $276,346, $293,487, $273,616 and $320,107 in fiscal years 2001, 2002, 2003, 2004, 2005 and 2006, respectively.

(2)    Totals may not add due to rounding. As explained above, such amounts are presented herein as adjusted. The total Federal Excise Taxes (in thousands) disclosed in the Authority's Official Statement, dated June 2, 2005, for fiscal years 2001, 2002, 2003, 2004 and 2005 were respectively $296,473, $307,907, $299,046, $302,785 and $302,873 (excluding the amount for June 2006, which was not available at that time).

Source: *Puerto Rico Department of the Treasury, Office of Economic and Financial Affairs*

As a result of administrative delays in the monthly reporting and payment of Federal Excise Taxes to the United States Department of the Treasury, the corresponding transfers to the Commonwealth from this tax have fluctuated in recent years. Particularly in fiscal 2005, due to substantial decreases in the monthly revenues of Federal Excise Taxes, the Puerto Rico government performed an investigation and discovered an unintentional error by one of the major distributors of Puerto Rican rum. This error underestimated the amount of sales in the reports submitted to the federal government, which caused the March 2005 Federal Excise Tax transfer to be less than the transfers for the same month in the previous fiscal years. As a result thereof, during April and May 2005, the amount transferred was significantly higher than the amounts transferred for the same months in previous years. Thus, Federal Excise Tax transfers to the Commonwealth in fiscal 2005 surpassed the transfers for fiscal 2004.

As discussed above in "Imposition of Tax" under *Federal Excise Taxes*, the amount of Federal Excise Taxes transferred to the Commonwealth as of January 1, 2006, decreased by operation of law to $10.50 per proof gallon. However, most of the amount of Federal Excise Taxes transferred to the Commonwealth by the United States Department of the Treasury in the first five months of 2006 were collected on rum that entered the United States on or before December 31, 2006, and thus were transferred at the rate of $13.25 per proof gallon, which was the transfer rate then in effect. The reduction in the amount of such transfers in June 2006 is the result of the application of the transfer rate of $10.50 per proof gallon.

## THE PUERTO RICO RUM INDUSTRY

**United States Rum Market**

Rums produced in Puerto Rico dominate the United States rum market according to data collected by the Distilled Spirits Council of the United States. In 2005, Puerto Rico rums accounted for over 68.7% of total rum shipments to the United States.

The following table shows the consumption of Puerto Rico rums in the United States relative to total consumption of rum in calendar 1995 and from calendar 2001 to 2005:

| | United States Rum Consumption by Brands (in thousands of gallons) | | | | | |
|---|---|---|---|---|---|---|
| | 1995 | 2001 | 2002 | 2003 | 2004 | 2005 |
| Bacardí . . . . . . . . . . . . . . . . . . | 15,097 | 18,212 | 18,545 | 19,353 | 20,090 | 20,780 |
| Castillo . . . . . . . . . . . . . . . . . . | 2,164 | 2,734 | 2,775 | 2,841 | 2,853 | 2,794 |
| Captain Morgan . . . . . . . . . . . | 2,496 | 7,446 | 8,281 | 9,439 | 9,874 | 11,201 |
| Ron Rico . . . . . . . . . . . . . . . . | 1,438 | 1,270 | 1,331 | 1,331 | 1,272 | 1,229 |
| Other P.R. Brands[1] . . . . . . . . | 413 | — | 12 | 19 | 19 | 19 |
| Total P.R. Brands . . . . . . . . . . | 21,610 | 29,662 | 30,944 | 32,984 | 34,108 | 36,022 |
| Percent . . . . . . . . . . . | 75.2% | 69.8% | 70.1% | 71.1% | 69.0% | 68.7% |
| Other Brands . . . . . . . | 7,142 | 12,824 | 13,188 | 13,400 | 15,345 | 16,379 |
| Total Rum Consumption . . . . | 28,752 | 42,487 | 44,132 | 46,384 | 49,453 | 52,401 |

(1) Includes Don Q, Palo Viejo and Matusalem rums.

*Source: Adams Media Liquor Handbook 1995 and 2006.*

One of the factors that has contributed to the success of Puerto Rico rums in maintaining their market share in the United States market is the strong advertising effort carried out by the Government of Puerto Rico directed at promoting the high quality of Puerto Rico rums. Pursuant to legislation adopted in 1971 and incorporated into the Puerto Rico Internal Revenue Code of 1994, up to ten percent (10%) of the Federal Excise Taxes attributable to bulk shipments of rum is deposited in a special fund (after the deposit to the Infrastructure Fund required by the Enabling Act) and used to promote the sale and consumer recognition of Puerto Rico rums in the United States. Also, for three decades Commonwealth law has imposed strict standards on production and aging requirements as a means of assuring the high quality of Puerto Rico rums.

Most rums that compete with Puerto Rico rums in the United States are produced in the United States Virgin Islands and other Caribbean countries. Some of these rums enjoy duty-free access to the United States under the Caribbean Basin Trade Partnership Act. To date such duty-free access has not had a significant impact on the market share enjoyed by Puerto Rico rums.

According to information obtained from Adams Media Liquor Handbook 2006, during the period from 1990 to 2006, rum's share of the distilled spirits market in the United States increased from 8.5% to 13.3%. One factor that accounts for the increase in market share of rum is the overall shift in consumer preference from heavier brown spirits, such as whiskey and bourbon, to white spirits, such as gin, vodka and rum. The following table shows this shift in consumer preference on a calendar year basis:

| | Distilled Spirits Market Share[1] | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 1995 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006[2] |
| Brown Spirits ........ | 35.2% | 28.9% | 28.4% | 27.5% | 26.8% | 26.1% | 25.5% |
| American Whiskies | 15.1 | 12.4 | 12.1 | 11.8 | 11.6 | 11.4 | 11.3 |
| Imported Whiskies .. | 20.0 | 16.5 | 16.2 | 15.7 | 15.2 | 14.7 | 14.3 |
| White Spirits ........ | 64.9 | 71.1 | 71.6 | 72.5 | 73.2 | 73.9 | 74.5 |
| Rums ........... | 8.7 | 11.9 | 12.1 | 12.3 | 12.6 | 12.9 | 13.3 |
| Tequila .......... | 3.6 | 4.4 | 4.7 | 4.8 | 5.0 | 5.3 | 5.6 |
| Vodka ............ | 22.9 | 25.1 | 25.7 | 26.2 | 26.7 | 27.1 | 27.5 |
| Gin ............. | 8.6 | 7.4 | 7.2 | 6.9 | 6.6 | 6.4 | 6.2 |
| Others[3] ......... | 21.0 | 22.4 | 21.9 | 22.4 | 22.3 | 22.1 | 21.9 |

(1) Totals may not add due to rounding.
(2) Estimated by Government Development Bank based on preliminary figures.
(3) Includes brandies, cordials, liqueurs, and prepared cocktails.

*Source: Adams Media Liquor Handbook 1995 and 2006.*

Sales of distilled spirits in the United States have increased from 326.7 million gallons in 1995 to 404.9 million gallons in 2005. This increase is attributable to new brands and subsegments within the industry and increases in consumer spending and in the drinking age population. In 2005, the consumption of distilled spirits increased by 2.3%, whereas, rum consumption increased by 6.0%. The Commonwealth attributes this growth to new product flavors introduced into the United States market.

It is expected that Puerto Rico rums will continue to play a dominant role in the United States market. According to Adams Media Liquor Handbook 2006, it is expected that rum consumption in the United States will continue to increase in the period from 2005 through 2010 at an annual compound growth rate of 5% in comparison with the projected 2.8% increase for consumption of distilled spirits.

**Puerto Rico Rum Distillers**

The two Puerto Rico distillers that produce rum for sale in the United States are Bacardí Corporation ("Bacardí") and Destilería Serrallés, Inc. ("Serrallés"). Serrallés has been producing rum in Puerto Rico since the mid 1800's and Bacardí since the 1930's. Bacardí has the largest operation, accounting for more than 60% of the total Puerto Rico rums sold in the United States. During the last decade, Bacardí has been the top selling brand of distilled spirits in the United States. Serrallés is the manufacturer of Captain Morgan, which has shown considerable growth in the last five years. See table labeled United States Rum Consumption by Brand.

The distilling operations of Bacardí and Serrallés in Puerto Rico are affected by various economic, regulatory and other factors that are beyond the control of the Commonwealth and that could influence their decision to maintain or expand these operations, which in turn could affect the level of Federal Excise Taxes transferred to Puerto Rico. For example, labor and environmental compliance costs are higher in Puerto Rico than in neighboring Caribbean countries. Distilling operations in Puerto Rico, however, enjoy federal and Puerto Rico income tax benefits and benefit from the goodwill associated with rum produced in Puerto Rico.

18

## ADDITIONAL COMMONWEALTH APPROPRIATIONS

Under the Enabling Act the Authority may request appropriations from the Commonwealth if Federal Excise Taxes in the amounts authorized by the Enabling Act are not received by the Commonwealth for deposit in the Infrastructure Fund, as described above, and the Director of the Office of Management and Budget is required, upon the Authority's request, to include such appropriations in the recommended budget for the corresponding fiscal year. The Commonwealth Legislature, however, is not legally obligated to make such appropriations. Since the enactment of the Enabling Act, the full amount of the Federal Excise Taxes required to be deposited in the Infrastructure Fund has been so deposited and no such appropriations have been requested by the Authority. Following is a brief description of the budgetary process of the Commonwealth.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by the Office of Management and Budget, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other sources for the ensuing fiscal year under (i) laws existing at the time the budget is estimated, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any item so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of a fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue to make payments of its operating and other expenses until a new budget is approved.

### Financial Control and Adjustment Procedures

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by the Office of Management and Budget based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of the Office of Management and Budget, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditures in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, make recommendations to the Legislature for new taxes, authorize borrowings under provisions of existing legislation, or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and

19

guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended, the Budgetary Fund may only be used to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, and to secure the payment of public debt.  Pursuant to Act No. 103 of May 25, 2006, known as the Commonwealth Fiscal Reform Act of 2006 (the "Fiscal Reform Act"), the Budgetary Fund may not be used to cover expenditures of any Commonwealth agency in excess of appropriations, unless otherwise provided by law or joint resolution of the Commonwealth Legislature and the Governor. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Budgetary Fund.  In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund.  The maximum balance of the Budgetary Fund may not exceed six percent of the total appropriations included in the budget for the preceding fiscal year.  As of June 30, 2006, the balance in the Budgetary Fund was less than $10 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966, as amended, to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. Pursuant to the Fiscal Reform Act, the Emergency Fund may not be used to cover recurring operational expenses, unless authorized by joint resolution of the Commonwealth Legislature and the Governor.  The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year, provided that the balance of the Emergency Fund may not exceed $150 million at the beginning of any fiscal year.  As of June 30, 2006, the balance in the Emergency Fund was less than $1 million.

A Financial Assistance Fund was created by Act No. 91 of May 13, 2006, to cover certain debts and obligations of the Commonwealth.  The Financial Assistance Fund is capitalized by (i) an amount equal to 1% of the monthly 7% sales tax revenues (the "Monthly Assistance Fund Revenues"), and (ii) the excess, if any, of the annual 7% sales tax collections over the estimated amount of such revenues in each fiscal year (the "Excess Assistance Fund Revenues"). The Monthly Assistance Fund Revenues may only be used to pay certain advances by Government Development Bank and the Commonwealth's appropriation debt outstanding as of June 30, 2006.  The Excess Assistance Fund Revenues may only be used to cover the costs associated with the early retirement plans of the Commonwealth's retirement systems for employees, and to amortize the debt of the Teachers Retirement System, the Employees Retirement System, and the Judiciary Retirement System, in this specific order, outstanding as of June 30, 2006.

20

## AUTHORITY DEBT

The following table sets forth the bond and note obligations of the Authority as of June 30, 2006, and as adjusted for the issuance of the Series 2006 Bonds.

| | Outstanding as of June 30, 2006[1] | As Adjusted |
|---|---|---|
| Series 1998A Bonds . . . . . . . . . . . . | $ 117,455,000 | $ 117,455,000 |
| Series 2005A, Series 2005B and Series 2005C . . . . . . . . . . . . . . . | 1,332,962,916 | 1,332,962,916 |
| Series 2006 Bonds . . . . . . . . . . . . . | 0 | 469,770,000 |
| Total . . . . . . . . . . . . . . . . | $ 1,450,417,916 | $ 1,920,187,916 |

(1)   Excludes $1.049 billion of the Authority's Series 2000A and 2000B Bonds, which are payable solely from the investment income of funds on deposit in the Authority's Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

### Debt Service Requirements

The following table sets forth the Principal and Interest Requirements on the Bonds for each fiscal year. Principal and Interest Requirements for any fiscal year comprise the sum of principal, including Amortization Requirements, and interest that is payable on January 1 in such fiscal year and on July 1 in the next fiscal year.

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2006 Bonds | | | Total Debt Service Requirements |
|---|---|---|---|---|---|
| | | Principal | Interest[1] | Total Debt Service | |
| 2007 | $ 85,391,869 | $  – | $ 17,776,727 | $17,776,727 | $ 103,168,596 |
| 2008 | 85,392,019 | – | 23,441,838 | 23,441,838 | 108,833,857 |
| 2009 | 85,389,794 | – | 23,441,838 | 23,441,838 | 108,831,632 |
| 2010 | 84,899,563 | 4,655,000 | 23,441,838 | 28,096,838 | 112,996,401 |
| 2011 | 85,997,400 | 3,770,000 | 23,232,363 | 27,002,363 | 112,999,763 |
| 2012 | 85,993,950 | 3,940,000 | 23,062,713 | 27,002,713 | 112,996,663 |
| 2013 | 85,995,850 | 4,135,000 | 22,865,713 | 27,000,713 | 112,996,563 |
| 2014 | 85,998,575 | 4,340,000 | 22,658,963 | 26,998,963 | 112,997,538 |
| 2015 | 85,998,150 | 4,555,000 | 22,441,963 | 26,996,963 | 112,995,113 |
| 2016 | 85,997,675 | 4,785,000 | 22,214,213 | 26,999,213 | 112,996,888 |
| 2017 | 85,998,200 | 5,025,000 | 21,974,963 | 26,999,963 | 112,998,163 |
| 2018 | 85,999,850 | 5,275,000 | 21,723,713 | 26,998,713 | 112,998,563 |
| 2019 | 85,997,075 | 5,540,000 | 21,459,963 | 26,999,963 | 112,997,038 |
| 2020 | 85,999,025 | 5,810,000 | 21,187,500 | 26,997,500 | 112,996,525 |
| 2021 | 85,994,700 | 6,105,000 | 20,897,000 | 27,002,000 | 112,996,700 |
| 2022 | 85,995,350 | 6,410,000 | 20,591,750 | 27,001,750 | 112,997,100 |
| 2023 | 85,998,275 | 6,730,000 | 20,271,250 | 27,001,250 | 112,999,525 |

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2006 Bonds | | | Total Debt Service Requirements |
| | | Principal | Interest[1] | Total Debt Service | |
|---|---|---|---|---|---|
| 2024 | 85,995,500 | 7,065,000 | 19,934,750 | 26,999,750 | 112,995,250 |
| 2025 | 85,999,050 | 7,415,000 | 19,581,500 | 26,996,500 | 112,995,550 |
| 2026 | 85,994,850 | 7,790,000 | 19,210,750 | 27,000,750 | 112,995,600 |
| 2027 | 85,999,100 | 8,175,000 | 18,821,250 | 26,996,250 | 112,995,350 |
| 2028 | 85,996,625 | 8,590,000 | 18,412,500 | 27,002,500 | 112,999,125 |
| 2029 | 85,997,250 | 9,015,000 | 17,983,000 | 26,998,000 | 112,995,250 |
| 2030 | 85,997,250 | 9,470,000 | 17,532,250 | 27,002,250 | 112,999,500 |
| 2031 | 85,997,250 | 9,940,000 | 17,058,750 | 26,998,750 | 112,996,000 |
| 2032 | 85,997,250 | 10,440,000 | 16,561,750 | 27,001,750 | 112,999,000 |
| 2033 | 85,997,250 | 10,960,000 | 16,039,750 | 26,999,750 | 112,997,000 |
| 2034 | 85,997,250 | 11,510,000 | 15,491,750 | 27,001,750 | 112,999,000 |
| 2035 | 85,997,250 | 12,085,000 | 14,916,250 | 27,001,250 | 112,998,500 |
| 2036 | 85,997,250 | 12,690,000 | 14,312,000 | 27,002,000 | 112,999,250 |
| 2037 | 85,997,250 | 13,325,000 | 13,677,500 | 27,002,500 | 112,999,750 |
| 2038 | 82,537,250 | 17,450,000 | 13,011,250 | 30,461,250 | 112,998,500 |
| 2039 | 82,800,000 | 18,060,000 | 12,138,750 | 30,198,750 | 112,998,750 |
| 2040 | 83,225,000 | 18,535,000 | 11,235,750 | 29,770,750 | 112,995,750 |
| 2041 | 82,950,000 | 19,740,000 | 10,309,000 | 30,049,000 | 112,999,000 |
| 2042 | 86,000,000 | 17,675,000 | 9,322,000 | 26,997,000 | 112,997,000 |
| 2043 | 86,000,000 | 18,560,000 | 8,438,250 | 26,998,250 | 112,998,250 |
| 2044 | 86,000,000 | 19,485,000 | 7,510,250 | 26,995,250 | 112,995,250 |
| 2045 | 83,355,000 | 23,105,000 | 6,536,000 | 29,641,000 | 112,996,000 |
| 2046 | – | 107,615,000 | 5,380,750 | 112,995,750 | 112,995,750 |
| Total[2] . . . . | $3,335,864,945 | $469,770,000 | $696,100,052 | $1,165,870,052 | $4,501,734,997 |

(1)  $62,834,084 of the interest shown in fiscal years 2007, 2008 and 2009 will be paid from the portion of Series 2006 Bond proceeds deposited to the capitalized interest account, which amount is irrevocably set aside for the payment of interest on the Series 2006 Bonds, plus earnings thereon. See " Use of Proceeds" under *Plan of Financing*.

(2)  Totals may not add due to rounding.

## FINANCIAL ASSISTANCE TO BENEFITED ENTITIES

The Enabling Act empowers the Authority to provide financial, administrative, consulting, advisory, and other assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth. In connection therewith, the Authority has executed assistance agreements with several Benefited Entities, including the Municipality of Carolina, PRASA, the Department of Health, the Department of Education, the Department of Transportation and Public Works, the Department of Environmental and Natural Resources, the Public Buildings Authority, the Highway and Transportation Authority, the Lands Authority, the Courts Administration Office, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Puerto Rico State Historic Preservation

Office, the Fine Arts Center Corporation, the Public Schools Improvement Office, the Science and Technology Trust Fund, the Special Communities Perpetual Trust, and the University of Puerto Rico (collectively, the "Assistance Agreements"). The Authority has agreed to provide additional assistance to some of such Benefited Entities, among others, by issuing the Series 2006 Bonds and utilizing the net proceeds as described under *Plan of Financing*.

The Assistance Agreements provide a contractual framework for the Authority to provide financial and other assistance to the Benefited Entities in connection with their respective capital projects and working capital needs. In general, under the Assistance Agreements with Benefited Entities other than PRASA, the Benefited Entity assumes responsibility for the development of its capital project and agrees to indemnify and hold harmless the Authority in connection with the design, engineering and construction thereof.

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Commonwealth, the Authority, and the Benefited Entities receiving proceeds of the Series 2006 Bonds must continue to meet after the issuance of the Series 2006 Bonds in order that interest on the Series 2006 Bonds is not included in gross income for federal income tax purposes. The failure of any of the foregoing entities to meet these requirements may cause interest on the Series 2006 Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. Each of the Authority and the other entities mentioned above has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and the laws of the Commonwealth, so that interest on the Series 2006 Bonds will remain excluded from gross income for federal income tax purposes. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent any of the foregoing entities from complying with the requirements of the Code.

In the opinion of Winston & Strawn LLP, Bond Counsel, subject to continuing compliance by the Authority and the other entities mentioned above with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Series 2006 Bonds will not be includable in gross income for federal income tax purposes. Interest on the Series 2006 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Series 2006 Bonds will be includable in the computation of the alternative minimum tax on corporations imposed by the Code. No opinion is rendered by Winston & Strawn LLP on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as is otherwise provided for in the documents pertaining to the Series 2006 Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the Series 2006 Bonds for federal income tax purposes. Bond Counsel is further of the opinion that, under the provisions of the Acts of Congress now in force, the Series 2006 Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in the Commonwealth.

Prospective purchasers of the Series 2006 Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Series 2006 Bonds will not have an adverse effect on the tax-exempt status of the Series 2006 Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the Series 2006 Bonds.

**Discount Bonds**

The excess, if any, of the amount payable at maturity of any maturity of the Series 2006 Bonds over the issue price corresponding thereto constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity of the Series 2006 Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2006 Bonds. In general, the issue price of a maturity of the Series 2006 Bonds is the first price at which a substantial amount of Series 2006 Bonds of that maturity was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bond for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed above. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bonds of that maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult with his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount relating to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess, if any, of the tax basis of a Series 2006 Bond to a purchaser (other than a purchaser who holds such Bond as inventory, stock in trade or for sale to customers in the ordinary course of business) who purchases such Bond as part of the initial offering and at the applicable initial offering price as set forth on the inside cover page of this Official Statement over the amount payable at maturity of such Bond is "Bond Premium." Bond Premium is amortized over the term of such Bond for federal income tax purposes (or in the case of a Series 2006 Bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on a basis of a call date that results in the lowest yield on such Bond). No deduction is allowed for such amortization of Bond Premium; however, United States Treasury regulations provide that Bond Premium is treated as an offset to qualified stated interest received on the Series 2006 Bonds. An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable Bond Premium attributable to each taxable year such Bond is held. An owner of such Bond should consult with his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such Bond and with respect to the state, Commonwealth and local tax consequences of owning and disposing of such Bond.

## ELIGIBILITY OF SERIES 2006 BONDS

The Series 2006 Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2006 Bonds from the Authority at an aggregate discount of $2,986,016.90 from the initial public offering prices for such Bonds, set forth (or derived from information set forth) on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent. The Underwriters will be obligated to purchase all Series 2006 Bonds if any such Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) and institutional purchasers at prices lower than the public offering prices which may be changed, from time to time, by the Underwriters.

Morgan Stanley & Co. Incorporated has entered into a joint venture agreement (the "JV Agreement") with Popular Securities, Inc. ("Popular"), under which Popular provides specific professional services related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, Popular will be entitled to receive a portion of Morgan Stanley's net profits from the underwriting of the Series 2006 Bonds as consideration for its professional services.

The Authority has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the federal securities laws.

## COMMONWEALTH COVENANT

Pursuant to the Enabling Act, the Commonwealth has pledged to all holders of the Series 2006 Bonds that it will not limit or alter the rights or powers vested in the Authority by the Enabling Act so as to impair the rights of such holders until the Series 2006 Bonds and the interest thereon are fully met and discharged.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the offering of the Series 2006 Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2006 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance, sale and delivery of the Series 2006 Bonds are subject to the unqualified approving legal opinion of Winston & Strawn LLP, New York, New York, Bond Counsel. The form of the proposed opinion of Bond Counsel is set forth in Appendix II. Certain legal matters will be passed upon for the Underwriters by McConnell Valdés, San Juan, Puerto Rico.

## RATINGS

The Series 2006 Bonds have been assigned a rating of "Baa3," with a negative credit outlook, by Moody's Investors Services, Inc., and a rating of "BBB+," with a negative credit outlook, by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

Any explanation regarding the reasons for and the significance of such ratings must be obtained only from the respective rating agency furnishing the same. The ratings reflect only the respective opinions of such rating agencies. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by either or both of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Series 2006 Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Commonwealth and the Authority, as specifically stated herein below, have agreed to the following for the benefit of the Beneficial Owners (generally the tax owners of the Series 2006 Bonds):

(a)  The Commonwealth has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2006, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth (including such data concerning the Authority and any other entity to the extent it has a material impact on the Commonwealth) and revenues, expenditures, operations and indebtedness generally found in the Commonwealth Report;

(b)  The Authority has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2006, with each NRMSIR and with any Commonwealth SID, the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time together with data of the type presented in this Official Statement under *Federal Excise Taxes*, *The Puerto Rico Rum Industry,* and *Authority Debt* for the preceding fiscal year; and

(c)  The Authority has agreed to file in a timely manner, with each NRMSIR or with the MSRB, and with any Commonwealth SID, notice of failure of the Commonwealth to comply with clause (a) above and of the Authority to comply with clause (b) above and notice of any of the following events with respect to the Series 2006 Bonds, if material:

| | |
|---|---|
| (i) | principal and interest payment delinquencies; |
| (ii) | non-payment related defaults; |
| (iii) | unscheduled draws on debt service reserves reflecting financial difficulties; |
| (iv) | unscheduled draws on credit enhancements reflecting financial difficulties; |
| (v) | substitution of credit or liquidity providers, or their failure to perform; |
| (vi) | adverse tax opinions or events affecting the tax-exempt status of Series 2006 Bonds; |
| (vii) | modifications to rights of security holders; |
| (viii) | Series 2006 Bonds' calls; |
| (ix) | defeasances; |
| (x) | release, substitution, or sale of property securing repayment of the Series 2006 Bonds; and |
| (xi) | rating changes. |

Event (iii) may not be applicable, since the terms of the Series 2006 Bonds do not provide for "debt service reserves." For a description of the Series 2006 Bonds, see *The Series 2006 Bonds*.

In addition, with respect to the following events:

Events (iv) and (v).  The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2006 Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (vi).  For information on the tax status of the Series 2006 Bonds, see *Tax Matters*.

Event (viii).  The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under *The Series 2006 Bonds*, the only open issue is which Series 2006 Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Series 2006 Bonds, and public notice of the redemption is given pursuant to Exchange Act Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Commonwealth expects to provide the information described in clause (a) above by delivering its first bond official statement that includes its financial statements for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by delivering its Comprehensive Annual Financial Report by such deadline.

The Authority and the Commonwealth have made similar continuing disclosure covenants in connection with prior bond issuances, and each has complied with all such covenants in the last five years, except as hereinafter noted. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002, were filed after the filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of Government Accounting Standards Board Statement No. 34 ("GASB 34").  The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34.  The Commonwealth's audited financial statements for the fiscal year ended June 30, 2004 and the Commonwealth Report for such fiscal year were also filed after the Commonwealth's filing deadline of May 1, 2005, because of delays in the preparation of such documents.

The Authority's continuing disclosure report for the fiscal year ended June 30, 2001, was inadvertently filed two days after the Authority's filing deadline of May 1, 2002.

As of the date of this Official Statement, there is no Commonwealth SID, and the name and address of each NRMSIR is:  Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's J.J. Kenny Repository, 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn: NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Series 2006 Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Series 2006 Bonds, and shall be enforceable by any such Beneficial Owner, provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants in paragraphs (a), (b) or (c) above (the "Covenants") or for any remedy for

breach thereof, unless such Beneficial Owner shall have filed with the Authority or the Commonwealth, as applicable, written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Series 2006 Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Notwithstanding the foregoing, no challenge to the adequacy of the information provided in accordance with the filings mentioned in paragraphs (a), (b) or (c) above may be prosecuted by any Beneficial Owner except in compliance with the remedial and enforcement provisions contained in Article VII of the Trust Agreement. See "Remedies of Bondholders" under *Summary of the Trust Agreement* in Appendix I. Moreover, proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. § 3077 and § 3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Series 2006 Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such resolution, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenant shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

These Covenants have been made in order to assist the Underwriters to comply with the Rule.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the Trust Agreement, the Bond Resolution, the Assistance Agreements, the Enabling Act, the Constitution of Puerto Rico and the Series 2006 Bonds are subject to all the detailed provisions thereof. Such references and summaries do not purport to be complete and are qualified in their entirety by reference to such acts, laws, documents, agreements or decisions. Copies of the Trust Agreement and the Bond Resolution are available for inspection during regular business hours at the offices of Government Development Bank or at the principal corporate trust office of the Trustee.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

There is appended to this Official Statement a summary of the Trust Agreement (Appendix I), the proposed form of opinion of Winston & Strawn LLP, Bond Counsel (Appendix II).

The information set forth in this Official Statement, except the information appearing in *Underwriting* and the information pertaining to DTC, was supplied by the Executive Director of the Authority in his official capacity as such and is included in this Official Statement on his authority.  The information pertaining to DTC was supplied by

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

By:_____/s/ Guillermo M. Riera_____
Guillermo M. Riera
Executive Director

[This page intentionally left blank]

APPENDIX I

## SUMMARY OF THE TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement. This summary does not purport to be complete and is qualified in its entirety by reference to the Trust Agreement. Inasmuch as the last remaining outstanding Bonds having the benefit of the Reserve Account matured on July 1, 2005, the summary below no longer makes reference to the Reserve Account in the Sinking Fund.

**Definitions of Certain Terms**

The following words and terms shall have the following meanings, unless the context otherwise requires. Words importing the singular number shall include the plural number in each case and vice versa, and words importing persons shall include firms and corporations, including public bodies.

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond on its date of original issuance plus the interest accrued on such Capital Appreciation Bond from such original issue date to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the term Bonds of any series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of term Bonds in such Fiscal Year. If at or prior to the close of any Fiscal Year the total amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys exceeds the Amortization Requirement for such term Bonds for such Fiscal Year, then future Amortization Requirements for such term Bonds shall be reduced for subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director of the Authority in an order filed with the Trustee on or before the 10th day following the close of such Fiscal Year. If at the close of any Fiscal Year the total principal amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys is less than the Amortization Requirement for such term Bonds for such Fiscal Year, then the Amortization Requirement for such term Bonds for the next Fiscal Year shall be increased by the amount of such deficiency.

"Appreciated Value" shall mean, (i) with respect to any Capital Appreciation and Income Bond until the Interest Commencement Date, an amount equal to the Accreted Value of such Bond and, (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

"Arbitrage Rebate Fund" shall mean a fund or funds established by the Authority with a Qualified Depositary for the deposit of moneys necessary for payments required to be made to the United States of America in connection with any series of Bonds subject to arbitrage rebate requirements under the Code. The moneys in such fund or funds shall be applied only for the purposes for which such fund or funds are established and shall not be subject to a lien or charge in favor of the holders of any Bonds and shall not be pledged as security for the payment of any Bonds.

"Balloon Bonds" shall mean any Bonds, interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded on each of the dates designated for compounding and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by the resolution authorizing said Bonds.

"Capital Appreciation and Income Bonds" shall mean any Bonds as to which accruing interest is not paid prior to the Interest Commencement Date and the Appreciated Value for which is compounded periodically on the specified dates prior to the Interest Commencement Date for such Bonds, all as provided in the resolution authorizing such Bonds.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Credit Facility" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of and premium, if any and interest on Bonds to which such Credit Facility relates.

"Debt Service Component" shall mean indebtedness incurred by the Authority which complies with the tests for the issuance of additional series of Bonds in the Trust Agreement and which is payable from moneys withdrawn from the Puerto Rico Infrastructure Fund on a pro rata basis with the deposits required to be made to the credit of the Bond Service Account and Redemption Account of the Sinking Fund under the Trust Agreement.

"Extendible Maturity Bonds" shall mean Bonds the maturities of which, by their terms, may be extended at the option of the holders of the Bonds or the Authority.

"Federal Excise Taxes" shall mean the federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"Fiscal Year" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve consecutive month period designated by the Board.

"Government Obligations" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) qualifying evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above; (iii) municipal obligations whose payment is irrevocably secured by non-callable and non-prepayable obligations described in clause (i) or (ii) above deposited in an escrow account irrevocably pledged to the payment of such municipal obligations; and (iv) qualifying evidences of ownership of proportionate interests in fixture interest or principal payments on obligations specified in clause (in) above.

"Interest Commencement Date" shall mean, with respect to any Capital Appreciation and Income Bond, the specified date after which interest accruing on such Bond shall be payable periodically, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" shall mean any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)      Government Obligations;

(ii)     obligations issued or guaranteed by an agency of the United States of America or person controlled by or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by Congress, whether now existing or hereafter organized, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, Farm Credit System, Student Loan Marketing Association and Federal National Mortgage Association and qualifying evidences of

I-2

ownership of proportionate interests in future interest or principal payments in obligations specified in this clause (ii);

(iii)   bankers acceptances, certificates of deposit or time deposits of any bank (including the Trustee), trust company or savings and loan association (including any investment in pools of such obligations), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a depository institution having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by obligations described in clauses (i) or (ii) above held free and clear of claims by third parties, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured), provided that the Trustee has a perfected security interest in the collateral;

(iv)   obligations issued by any state or territory of the United States of America or any political subdivision or instrumentality thereof, which are rated on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

(v)   any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee) or trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any of the obligations described in (i) or (ii) above, provided that the Trustee has a perfected security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vi)   commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

(vii)   any other obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the holders of Put Bonds.

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds authenticated and delivered except:

(i)   Bonds cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)   Bonds that are deemed paid and no longer Outstanding under the Trust Agreement;

(iii)   Destroyed, mutilated, stolen or lost Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser, and

(iv)   for purposes of any consent or other action to be taken under the Trust Agreement by the holders of a specified percentage of principal amount of Bonds, Bonds held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

"Principal and Interest Requirements" for any Fiscal Year, as applied to the Bonds of any series, shall mean the sum of:

(i)      the amount required to pay the interest on all Bonds of such series then Outstanding that is payable on each interest payment date in such Fiscal Year,

(ii)     the amount required to pay the principal of all serial Bonds of such series then Outstanding that is payable upon the maturity of such serial Bonds in such Fiscal Year, and

(iii)    the Amortization Requirement for the Outstanding term Bonds of such series for such Fiscal Year.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of this definition as if occurring on the last day of the preceding Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements:

(a)      The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that (1) for purposes of determining the maximum Principal and Interest Requirements under the projected tests for the issuance of additional series of Bonds, the interest on Variable Rate Bonds shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been Outstanding, and (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and if a series of Variable Rate Bonds had not been Outstanding prior to the date of computation, the test set forth in clause (A) above shall be calculated as though said Variable Rate Bonds had been Outstanding for the twelve-month period by using the average interest rate for comparable securities for such period as certified by an underwriting or investment banking firm experienced in marketing such securities;

(b)      In the case of Put Bonds, the "put" date shall be ignored if a source for payment of said "put" is a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility shall be ignored, unless the issuer of the Credit Facility or the Liquidity Facility has advanced funds thereunder and such amount has not been repaid, in which case the repayment obligation shall be used rather than the stated terms of the Bonds, if the repayment obligation is secured on a parity with Bonds;

(c)      In the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(d)      In the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value payable in any year shall be included in the year in which said payment is due;

(e)      In the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value shall be included in the year in which said principal and interest portions are due;

(f)      In the case of Balloon Bonds or Interim Bonds, the debt service requirements may be excluded and instead such Bonds may be treated as debt securities having a comparable federal tax status as such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not

I-4

more than 30 years (as determined in the certificate described below), bearing a fixed interest rate equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds rated by Moody's Investors Services, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto comparably to that of the Authority, all as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)     If all or a portion of a series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and to the extent applicable, shall be determined in accordance with the foregoing rules.

"Put Bonds" shall mean Bonds that by their terms may be tendered at the option of the holder thereof for payment prior to maturity.

"Qualified Depositary or Depositories" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depository for public funds, which institutions have been designated as depositories of the Authority by resolution.

"Special Tax Revenues" shall mean the Federal Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Variable Rate Bonds" shall mean Bonds issued with an interest rate that is not fixed in percentage at the date of issue for the term thereof.

**Puerto Rico Infrastructure Fund**

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund. All moneys deposited to the credit of the Puerto Rico Infrastructure Fund will be applied for the purposes and in the order set forth in the Trust Agreement.

**Sinking Fund and Accounts**

A special fund is created under the Trust Agreement and designated the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (the "Sinking Fund") to be held by the Trustee. Two separate accounts are created in the Sinking Fund and designated "Bond Service Account" and "Redemption Account." Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys sufficient to make the following deposits in the following order:

(a)     to the Bond Service Account, the amount required to make the total amount then in the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)    to the Redemption Account, the amount required to make the total amount deposited in the then current Fiscal Year in the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding plus the premium, if any, payable on such Bonds if such Bonds were to be redeemed in such Fiscal Year from moneys held in the Sinking Fund.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make any payment or deposit necessary to satisfy the then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components.

After making the foregoing required applications and subject to the Authority's obligation to repay issuers of any Credit Facility any amounts owed to them, the Authority may apply any balance remaining to the credit of the Puerto Rico Infrastructure Fund for any lawful purpose.

**Withdrawals from Bond Service Account**

The Trustee shall on each date for the payment of principal of or interest on Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due.

**Withdrawals from Redemption Account**

Moneys held for the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)    subject to the provisions of paragraph (c) below, by purchase at a price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account. No such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part except from moneys other than the moneys set aside or deposited for the redemption of Bonds; or

(b)    subject to the provisions of paragraph (C) below, by redemption pursuant to the redemption provisions of the Trust Agreement from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then in the Redemption Account as nearly as may be; provided, however, that not less than One Hundred Thousand Dollars ($100,000) principal amount of Bonds shall be called for redemption at any one time.

(c)    Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each series then Outstanding in the following order:

*first,* the term Bonds of each such series to the extent of the related Amortization Requirement, if any, for such Fiscal Year, plus the applicable premium, if any, and, if the amount available in such Fiscal Year shall not be equal thereto, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding plus the applicable premium, if any;

I-6

*second*, any balance then remaining shall be applied to the purchase in accordance with paragraph (a) above of any Outstanding term Bonds whether or not they are then subject to redemption;

*third*, any balance then remaining shall be applied to the redemption of the term Bonds of each such series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding, plus the applicable premium, if any; and

*fourth*, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of each such series originally issued under the provisions of the Trust Agreement.

## Additional and Refunding Bonds

Bonds may be issued and secured by the Trust Agreement, subject to certain conditions, for any lawful purpose of the Authority, including paying any costs of issuance of such Bonds.

Among such conditions are the delivery to the Trustee of

(a)    a certificate of the Secretary of the Treasury of the Commonwealth setting forth:

(i)    the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the Bonds to be issued; and

(iii) the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 200%; and

(b)    a certificate of the Executive Director of the Authority setting forth:

(i)    the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Puerto Rico Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that required such increased amount, if received from the federal government, to be deposited to the credit of the Puerto Rico Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of Bonds then Outstanding, Debt Service Components then Outstanding, and the Bonds to be issued; and

(iii) the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 100%.

The above certificates need not be delivered for the issuance of refunding Bonds if the Executive Director of the Authority certifies that (i) the Principal and Interest Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding Bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service

I-7

Components Outstanding immediately prior to such issuance of refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

**Investment of Moneys**

Moneys in the Bond Service Account and the Redemption Account shall, to the extent possible, be continuously invested at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption at the option of the holder thereof, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended.

Any investment earnings and profit or loss realized on the sale or maturity of such Obligations shall be credited or debited to the holding fund or account. If the required deposit to any account in the Sinking Fund has been made for the current Fiscal Year, investment earnings on moneys in such account shall be deposited to any other account of the Sinking Fund for which a required deposit has not been made, in the order provided above (see "Sinking Fund and Accounts"), and thereafter shall be credited to the Puerto Rico Infrastructure Fund.

**No Impairment**

So long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the holders to such Pledged Revenues might be impaired or diminished.

**Inclusion of Shortfall in Budget; Request for Advances**

If the amount of projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the maximum amount required to be so deposited under the Act, the Authority shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency. If in any fiscal year the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund are insufficient to permit the Authority to make the required deposits into the Sinking Fund, the Authority shall immediately notify the Secretary of the Treasury of the amount of such insufficiency and shall request said Secretary to make in accordance with the Act one or more advances to the Authority aggregating the amount of such insufficiency from and to the extent of any available funds under the control of said Secretary. The Authority shall deposit all such advances as and if received to the credit of the appropriate accounts in the Sinking Fund.

**Enforcement of Remedies**

There are no events of default under the Trust Agreement and the principal of the Bonds Outstanding is not subject to acceleration. At the request of the holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed to protect and enforce its rights and the rights of the holders under the laws of the Commonwealth or under the Trust Agreement.

**Supplemental Agreements Without Bondholder's Consent**

The Authority and the Trustee may from time to time and at any time, enter into agreements supplemental to the Trust Agreement, as shall not be inconsistent with the terms and provisions thereof, for the following purposes, among others:

(a)      to cure any ambiguity or formal defect or omission in the Trust Agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

(b)     to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

(c)     to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d)     to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power therein reserved to or conferred upon the Authority, or

(e)     to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(f)     to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(g)     to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any series of Bonds.

**Modification with Consent of Holders of Majority of Bonds**

All other modifications to the Trust Agreement may be made only upon obtaining the consent and approval of the holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several series of Bonds then Outstanding are affected by the proposed supplemental agreement, the holders of not less than a majority in principal amount of the Bonds of each series so affected and Outstanding at the time the consent is given). Nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the holders of 100% of the Bonds Outstanding (a) an extension of the maturity of any Bond issued under the Trust Agreement (other than as provided by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (d) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement. In lieu of the holders of Bonds secured by a Credit Facility or a Liquidity Facility, the provider thereof shall be viewed as the holder of such Bonds for purposes of consents to modifications.

**Defeasance**

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility or a Liquidity Facility shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement. In such event, the Trustee shall transfer and assign to the Authority all property then held by the Trustee, shall execute such documents as may be reasonably required by the Authority to evidence such transfer and assignment and shall turn over to the Authority any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond either moneys in an amount which shall be sufficient, or sufficient Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Home Loan Banks or Student Loan Marketing Association, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may

be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or sufficient Government Obligations or other obligations mentioned in clause (a) of this paragraph has been made for the holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

APPENDIX II

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement'), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2006 Bonds"):

$
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BONDS, SERIES 2006
Dated: September _____, 2006.**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2006 Bonds.

We have also examined one of the Series 2006 Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.      The Puerto Rico Infrastructure Financing Authority Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Series 2006 Bonds have been duly authorized and issued to provide funds to (i) provide financial assistance to Commonwealth instrumentalities or municipalities in connection with certain capital projects, (ii) pay capitalized interest and (iii) to pay costs of issuance of the Series 2006 Bonds.

4.      As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2006 Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2006 Bonds) issued thereunder.

5.      The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

6.      The Series 2006 Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement). Under the Trust Agreement, the Authority has agreed to

deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2006 Bonds, as the same become due and payable.

7.       The bonds issued under the provisions of the Trust Agreement, including the Series 2006 Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefore, and such bonds, including the Series 2006 Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.       Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2006 Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2006 Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2006 Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2006 Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2006 Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority and certain other benefited entities receiving proceeds of the Series 2006 Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2006 Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2006 Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,


[To be signed "Winston & Strawn LLP"]

Recycled Paper – Printed by
IMAGEMASTER 800.452.5152