# EXHIBIT D

# FIRST SUPPLEMENTAL TRUST AGREEMENT

between

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

and

## JPMORGAN CHASE BANK, N.A., AS TRUSTEE

Dated March 24, 2006

$468,800,000

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY
HOTEL OCCUPANCY TAX
REVENUE BONDS, SERIES A

DM3\937331.6

## FIRST SUPPLEMENTAL TRUST AGREEMENT

THIS FIRST SUPPLEMENTAL TRUST AGREEMENT ("First Supplemental Trust Agreement") is made and entered into as of on the date set forth on the cover page hereof, by and between the Puerto Rico Convention Center District Authority (the "Authority"), San Juan, Puerto Rico, a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") and JPMorgan Chase Bank, N.A., New York, New York, as trustee, a national banking association duly organized, existing and authorized to accept and execute trusts of the character herein set out, and it successors and assigns (the "Trustee")

WHEREAS, the Authority and the Trustee have entered into a Trust Agreement dated the date hereof (the "Master Trust Agreement" and together with the First Supplemental Trust Agreement, the "Trust Agreement"), which authorizes the issuance of Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds; and

WHEREAS, pursuant to the Master Trust Agreement, certain terms of and other matters relating to each series of Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds are to be specified in a Supplemental Trust Agreement (defined in the Master Trust Agreement); and

WHEREAS, this supplemental trust agreement and any amendment hereto is a Supplemental Trust Agreement that is being entered into to authorize and to set forth certain terms of and other matters relating to the Series A Bonds (defined herein); now, therefore,

Section 1.    Unless the context shall clearly indicate some other meaning, all words and terms used in this First Supplemental Trust Agreement which are defined in the Master Trust Agreement shall have for all purposes of this First Supplemental Trust Agreement the respective meanings given to them in the Master Trust Agreement.

Section 2.    For the purpose of providing funds to finance the costs of the Construction Projects listed in Schedule A attached hereto (the "Series A Projects") and to pay the Loans set forth in Schedule B attached hereto (the "Series A Loans"), Bonds of the Authority in the aggregate principal amount of Four Hundred and Sixty Eight Million, Eight Hundred Thousand Dollars ($468,800,000) are hereby authorized to be issued pursuant to the provisions of Section 3.01 of the Master Trust Agreement.  Said Bonds shall be designated "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A)" (hereinafter called the "Series A Bonds"), shall be dated their date of delivery, shall be issuable as registered bonds without coupons in denominations of $5,000 and any multiple thereof (the "Authorized Denomination"), shall be numbered from RA-1 upwards, shall mature as set forth below and shall bear interest as set forth below from their date until their payment, payable semi-annually on January 1 and July 1 of each year, commencing July 1, 2006 (the "Interest Payment Dates").

The Series A Bonds shall be stated to mature in annual installments on July 1 in the years and amounts, to bear interest at the rates, to have the CUSIP numbers and be secured by the bond insurance as follows:

| Maturity (July 1) | Principal Amount | Interest Rate | CUSIP NO. |
|---|---|---|---|
| 2007 | $ 3,000,000 | 4.000% | 745266AA4 |
| 2008 | 4,000,000 | 4.000% | 745266AB2 |
| 2009 | 6,000,000 | 4.000% | 745266AC0 |
| 2010 | 3,130,000 | 4.000% | 745266AD8 |
| 2010 | 5,510,000 | 5.000% | 745266AE6 |
| 2011 | 2,390,000 | 4.000% | 745266AF3 |
| 2011 | 6,650,000 | 5.000% | 745266AG1 |
| 2012 | 9,470,000 ± | 4.000% | 745266AH9 |
| 2013 | 6,465,000 ± | 4.000% | 745266AJ5 |
| 2013 | 3,380,000 ± | 5.000% | 745266AK2 |
| 2014 | 10,275,000 ± | 5.000% | 745266AL0 |
| 2015 | 10,790,000 ± | 5.000% | 745266AM8 |
| 2016 | 11,325,000 ± | 4.000% | 745266AN6 |
| 2017 | 11,780,000 § | 5.000% | 745266AP1 |
| 2018 | 12,370,000 § | 5.000% | 745266AQ9 |
| 2019 | 12,985,000 § | 5.000% | 745266AR7 |
| 2020 | 13,635,000 § | 5.000% | 745266AS5 |
| 2021 | 3,330,000 † | 4.125% | 745266AT3 |
| 2021 | 10,990,000 † | 5.000% | 745266AU0 |
| 2022 | 15,005,000 † | 4.750% | 745266AV8 |
| 2023 | 15,720,000 † | 5.000% | 745266AW6 |
| 2024 | 16,505,000 † | 5.000% | 745266AX4 |
| 2025 | 17,330,000 † | 5.000% | 745266AY2 |
| 2026 | 4,255,000 † | 4.250% | 745266AZ9 |
| 2026 | 13,940,000 † | 5.000% | 745266BA3 |
| 2027 | 19,075,000 ± | 5.000% | 745266BB1 |
| 2031 | $86,320,000 §* | 5.000% | 745266BC9 |
| 2036 | $133,175,000 ±* | 4.500% | 745266BD7 |

§  Insured by Ambac Assurance Company.
±  Insured by CDC IXIS Financial Guaranty North America, Inc.
†  Insured by Financial Guaranty Insurance Company.
*  Term Bond

2

Section 3.     The Bonds maturing after July 1, 2016, may be redeemed, at the option of the Authority, upon not less than 30 days' prior notice by mail to the Depository Trust Company, New York, New York or, if the book-entry system is discontinued, to the registered owners thereof from any available moneys (other than moneys deposited in the Bond Payment Fund under the Master Trust Agreement required to pay principal and interest due in such fiscal year on Bonds that are not being redeemed) either in whole or in part, as directed by the Authority, on any date not earlier than July 1, 2016, at a redemption price equal to 100% of the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

The Bonds maturing on July 1, 2031 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Master Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

| Year | Principal Amount |
|-------|------------------|
| 2028  | $20,025,000      |
| 2029  | 21,030,000       |
| 2030  | 22,080,000       |
| 2031* | 23,185,000       |

*Maturity

The Bonds maturing on July 1, 2036 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Master Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

| Year | Principal Amount |
|-------|------------------|
| 2032  | $24,345,000      |
| 2033  | 25,440,000       |
| 2034  | 26,585,000       |
| 2035  | 27,780,000       |
| 2036* | 29,025,000       |

*Maturity

Section 4.     The Series A Bonds shall bear the facsimile signature of the Executive Director of the Authority and a facsimile of the corporate seal of the Authority shall be imprinted on each Series A Bond.  Said Series A Bonds and the certificate of authentication to be endorsed therein shall be, respectively, substantially in the following forms:

3

[FORM OF SERIES A BOND]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

$

No. RA-

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY HOTEL OCCUPANCY
TAX REVENUE BONDS (SERIES A)

| INTEREST RATE: | MATURITY DATE: | [ORIGINAL DATED DATE]: | CUSIP: |
|---|---|---|---|
| % | July 1, 20__ | _____, 2006 | |

REGISTERED OWNER:          Cede & Co.

PRINCIPAL AMOUNT:                                         DOLLARS

The Puerto Rico Convention Center District Authority (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), for value received, hereby promises to pay to the order of the registered owner named above, or registered assigns, the principal sum stated above on the maturity date stated above, with interest on such principal sum from the original dated date stated above at the interest rate per annum stated above (calculated based on a 360-day year of twelve 30-day months), payable on January 1 and July 1 of each year, commencing July 1, 2006. The principal and Redemption Price of this Hotel Occupancy Tax Revenue Bond, Series A (this "Bond") are payable to the registered owner hereof upon maturity or prior redemption hereof and upon presentation and surrender of this Bond at the operations center of JPMorgan Chase Bank, N.A., (the "Trustee"). Interest on this Bond (other than interest paid as part of the Redemption Price of this Bond) shall be paid by check or draft of the Trustee mailed, on or before each Interest Payment Date, to the registered owner hereof at such registered owner's address as it appears on the Trustee's registration records on the Record Date for such Interest Payment Date. Notwithstanding the foregoing, so long as Cede & Co is the registered owner of this Bond, the Bond Payments on and Redemption Price of this Bond shall be paid by wire transfer to Cede & Co. Any payment of Bond Payments on or Redemption Price of this Bond that is due on a day that is not a Business Day (as defined in the Master Trust Agreement, defined below) shall be made on the next succeeding day that is a Business Day with the same effect as if made on the day on which it was originally scheduled to be made and no interest shall accrue for the period after such originally scheduled day for payment.

This Bond is part of a series of revenue bonds of the Authority designated as "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A)," issued in the aggregate principal amount of Four Hundred and Sixty Eight Million, Eight Hundred Thousand Dollars ($468,800,000) (the "Bonds") for the purpose of financing the Series

4

PRNM31L6

Projects and Series A Loans.  The Bonds have been issued pursuant to, under the authority of, and in full conformity with, the Constitution and the laws of the Commonwealth, including Act No. 351 of September 2, 2000 of the Legislature of Puerto Rico, creating the Authority, as the same shall be amended from time to time (the "Act"), and the Trust Agreement entered into by the Authority and the Trustee on March 24, 2006 (the "Master Trust Agreement"), as supplemented by the First Supplemental Trust Agreement entered into by the Authority and the Trustee on March 24, 2006 (the "First Supplemental Trust Agreement," and together with the Master Trust Agreement, the "Trust Agreement").  The Bonds are secured by funds received under the Commonwealth's Room Occupancy Rate Tax ("Hotel Occupancy Tax") as set forth in Article 31 of the Occupancy Tax Act (13 L.P.R.A. Section 2271(o)) (the "Occupancy Tax Act"). Capitalized terms used but not defined in this Bond have the meaning assigned to them in the Trust Agreement.

The Bonds maturing after July 1, 2016, may be redeemed, at the option of the Authority, upon not less than 30 days' prior notice by mail to the Depository Trust Company, New York, New York or, if the book-entry system is discontinued, to the registered owners thereof from any available moneys (other than moneys deposited in the Bond Payment Fund under the Trust Agreement required to pay principal and interest due in such fiscal year on Bonds that are not being redeemed) either in whole or in part, as directed by the Authority, on any date not earlier than July 1, 2016, at a redemption price equal to 100% of the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

The Bonds maturing on July 1, 2031 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

| Year | Principal Amount |
|-------|------------------|
| 2028 | $20,025,000 |
| 2029 | 21,030,000 |
| 2030 | 22,080,000 |
| 2031* | 23,185,000 |

*Maturity

The Bonds maturing on July 1, 2036 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

DM3\3373331.6

5

| Year | Principal Amount |
|---|---|
| 2032 | $24,345,000 |
| 2033 | 25,440,000 |
| 2034 | 26,585,000 |
| 2035 | 27,780,000 |
| 2036* | 29,025,000 |

*Maturity

In connection with the issuance of the Bonds, the Commonwealth of Puerto Rico hereby agrees and makes a commitment with any person, firm or corporation or with any agency of the United States of America or of any state or the Commonwealth who subscribes or acquires Bonds or enters into bond related financing agreements for the payment of which the product of the Hotel Occupancy Tax is pledged, that it will:

(1)     not reduce the Hotel Occupancy Tax and not decrease its rates, as fixed in the Occupancy Tax Act;

(2)     not eliminate or reduce the Hotel Occupancy Tax to an amount lower than that established in the Occupancy Tax Act, or eliminate or reduce the rates of the tax fixed in the Hotel Occupancy Tax;

(3)     make sure that the amounts that must be deposited in the Pledge Account as set forth in the Trust Agreement, are deposited in the accounts as provided in the Trust Agreement, and

(4)     not alter or limit the rights acquired by the Authority under the Occupancy Tax Act to encumber or pledge the collections from the Hotel Occupancy Tax required to be deposited in the accounts set forth in the Trust Agreement and comply with the terms of any agreement entered into with, or for the benefit of the bondholders (including the holder of this Bond), noteholders or holders of other obligations of the Authority or the other subscribing parties under any bond related financing agreement, until such time as such bonds (including this Bond), notes or other obligations issued, assumed or incurred at any time, including the interest thereon and any obligation under any bond related financing agreement, have been paid in full. For purposes of this Bond, a "bond related financing agreement" means any interest rate exchange agreement or similar agreement, any bond insurance policy, letter of credit or other credit enhancement, liquidity agreement or similar agreements, arrangements or contracts.

The Commonwealth pledges and agrees with the holders of the Series A Bonds, and with those persons or entities that enter into contracts with the Authority pursuant to the Act, that it shall not limit nor alter the rights conferred to the Authority under the Act until the Series A Bonds and the interest thereon are paid in full and said contracts are fully executed and honored by the Authority; provided, however, that nothing provided in the Act shall affect or alter said limitation if adequate measures are provided by law for the protection of the holders of the Series A Bonds, or of those who have entered into contracts with the Authority.

DM3\337331.6

*THE TRUST AGREEMENT CONSTITUTES THE CONTRACT BETWEEN THE REGISTERED OWNER OF THIS BOND AND THE AUTHORITY. THIS BOND IS ONLY EVIDENCE OF SUCH CONTRACT AND, AS SUCH, IS SUBJECT IN ALL RESPECTS TO THE TERMS OF THE TRUST AGREEMENT, WHICH SUPERSEDES ANY INCONSISTENT STATEMENT IN THIS BOND.*

The Bond Payments shall be payable solely from the Trust Estate, including moneys held in the Bond Payment Fund, subject to Section 8 of Article VI of the Constitution of the Commonwealth. The registered owners and holders of the Bonds may not look to any other revenues of the Authority for the payment of the Bonds.

This Bond shall not be deemed to constitute a debt of the Commonwealth of Puerto Rico or of any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any such political subdivisions shall be liable thereon, nor shall this Bond or the interest thereon be payable out of any funds of the Authority other than those pledged for the payment thereof pursuant to the Trust Agreement.

All financial obligations of the Authority under the Trust Agreement, every Supplemental Trust Agreement, the Bonds and any other contract entered into pursuant to the Trust Agreement, any Supplemental Trust Agreement or the Bonds (i) are special, limited obligations of the Authority payable solely from the Trust Estate and shall not constitute nor give rise to a pecuniary liability or a charge against the general credit of the Authority or the Commonwealth and (ii) shall not be deemed or construed as creating a debt, liability or obligation of the Commonwealth, or any political subdivision of the Commonwealth, nor a pledge of the faith and credit of the Commonwealth or any political subdivision or municipality of the Commonwealth within the meaning of the Constitution of the Commonwealth or the laws of the Commonwealth concerning or limiting the creation of indebtedness by the Commonwealth or any political subdivision of the Commonwealth.

The Trustee shall keep, on behalf of the Authority, the records for the registration and transfer of the Bonds, and shall transfer the Bonds in authorized denominations of $5,000 in amount or any integral multiples thereof as provided in the Trust Agreement. The Trustee may require the payment, by the registered owner of any Bond requesting exchange or transfer, of any reasonable charges as well as any taxes, transfer fees or other governmental charges required to be paid with respect to such exchange or transfer. The Trustee shall not be required to transfer or exchange (i) all or any portion of any Bond during the period beginning at the opening of business 15 days before the day of the mailing by the Trustee of notice calling any the Bonds for prior redemption and ending at the close of business on the day of such mailing, or (ii) all or any portion of a Bond after the mailing of notice calling such Bond or any portion thereof for prior redemption.

Additional Hotel Occupancy Tax Revenue Bonds that are payable from the Trust Estate on a parity with the Bonds may be issued without the consent of the registered owners of the Bonds as provided in the Trust Agreement. Also, the Trust Agreement may be amended or supplemented from time-to-time with or without the consent of the registered owners of the Bonds as provided in the Trust Agreement.

DM3\337331.6

7

All acts and conditions required by the Constitution and laws of the Commonwealth of Puerto Rico, including the Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the issuance of this Bond and the adoption of the Trust Agreement have happened, exist and have been performed as so required.

This Bond is issued with the intent that the laws of the Commonwealth of Puerto Rico shall govern its construction.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any lien, benefit or security under the Trust Agreement until the certificate of authentication endorsed hereon shall have been duly executed by the Trustee.

IN WITNESS WHEREOF, Puerto Rico Convention Center District Authority has caused this Bond to be signed by or bear the facsimile signature of its Executive Director and a facsimile of its corporate seal to be imprinted hereon, all as of the   day of March __, 2006.

PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY

By: _____
Executive Director

(SEAL)

9

[Form of Certificate of Authentication to be endorsed on all bonds]

## CERTIFICATE OF AUTHENTICATION

This Bond is one of the Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) described in the within-mentioned Trust Agreement.

JPMorgan Chase Bank, N.A., as Trustee

By: _____

Authorized Signatory

Date of authentication:

10

DM3\037331.6

[Form of Assignment]

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned sells, assigns and transfers unto:

_____

(Please print or type name and address of assignee)


_____

(Insert social security number or tax identification number of assignee)

the   within   Bond   and   does   hereby   irrevocably   constitute   and   appoint
_____ Attorney, to transfer said Bond on the books kept for registration
thereof, with full power of substitution in the premises.

Dated:_____

Signature: _____

_____

Notice:  This signature on this assignment
must correspond with the name as it appears
on the face of the within bond in every
particular, without alteration or enlargement
or any change whatever and such signature
must be guaranteed by a member firm of the
New York Stock Exchange or a commercial
bank or a trust company.

Social Security Number or Employer
Identification Number of Transferee:

_____

SIGNATURE GUARANTEED BY:

DM3\037331.6

Section 5.    There is hereby created a separate sub-account in the Capitalized Interest Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Capitalized Interest Sub-Account" (the "Series A Capitalized Interest Sub-Account").   Amounts shall be deposited into the Series A Capitalized Interest Sub-Account in the amounts set forth on Schedule C attached hereto. Funds held in the Series A Capitalized Interest Sub-Account shall be transferred to the Bond Payment Fund established under the Master Trust Agreement in the amounts set forth, and on the dates set forth, in Schedule D attached hereto.

Section 6.    There is hereby created a separate sub-account in the Construction Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Construction Sub-Account" (the "Series A Construction Sub-Account"). Funds held in the Series A Construction Sub-Account will be used for the projects set forth in Exhibit A to the Master Trust Agreement. Amounts shall be deposited into the Series A Construction Sub-Account in the amounts set forth on Schedule C, attached hereto.

Section 7.    There is hereby created a separate sub-account in the Loan Payment Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Loan Payment Sub-Account" (the "Series A Loan Payment Sub-Account"). Amounts shall be deposited into the Series A Loan Payment Sub-Account to repay the Loans in the amounts as set forth in Schedule B.

Section 8.    There is hereby created a separate sub-account in the Earnings Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Earnings Sub-Account" (the "Series A Earnings Account"). Funds held in the Series A Earnings Sub-Account shall be used as set forth in the Master Trust Agreement.

Section 9.    There is hereby created a separate account in the Debt Service Reserve Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Debt Service Reserve Account" (the "Series A Debt Service Reserve Account"). A portion of the proceeds from the sale of the Series A Bonds equal to the Series A Debt Service Reserve Requirement (as defined below) shall be deposited into the Series A Debt Service Reserve Account of the Debt Service Reserve Fund. The Series Debt Service Reserve Requirement for the Series A Bonds (the "Series A Debt Service Reserve Requirement") shall be the greatest total amount of principal and interest due on the Series A Bonds in any Fiscal Year. The amount of $30,338,962.50 shall be deposited into the Series A Debt Service Reserve Account to satisfy the Debt Service Reserve Requirement.

Section 10.    If the Series A Bonds are issued as other than book-entry only bonds through DTC or the book-entry-only system is terminated as to the Series A Bonds and definitive bonds are issued, there may be included on each of said definitive bonds the legal opinion of Duane Morris LLP respecting the validity of said bonds and, immediately following such legal

opinion, a certificate executed with the facsimile signature of the Executive Director of the Authority, said certificate to be in substantially the following form:

"I HEREBY CERTIFY that the foregoing is true and correct copy of the legal opinion upon the bonds therein described which was manually signed by Duane Morris LLP, New York, New York, and was dated the date of delivery of and payment of the bonds therein described.

[Facsimile Signature]
Executive Director, Puerto Rico
Convention Center District Authority"

Section 11.    The Authority hereby finds, determines and certifies that:

(a)    As of the date of issuance of the Series A Bonds, the Series A Bonds will be the only Bonds Outstanding.

(b)    This First Supplemental Trust Agreement contains all information required to be included in a Supplemental Trust Agreement authorizing a Series of Bonds under the Master Trust Agreement.

(c)    The Series A Bonds will not be issued until Bond Counsel has delivered a written opinion to the effect (which may be subject to customary assumptions and limitations) that (i) the Series A Bonds have been duly authorized, executed and delivered by the Authority and are valid and binding limited obligations of the Authority, payable from the sources provided in the Master Trust Agreement and this First Supplemental Trust Agreement; (ii) the Trust Agreement create a valid pledge of and lien on the Trust Estate, subject to the terms thereof, and subject to Section 8 of Article VI of the Constitution of Commonwealth; (iii) the interest on the Series A Bonds is excluded from gross income for federal income tax purposes; and (iv) the income from the Series A Bonds is exempt from all state, Commonwealth and local income taxation.

(d)    Except for actions to be taken pursuant to the terms hereof, all conditions to the execution and delivery of this First Supplemental Trust Agreement and the issuance of the Series A Bonds have been satisfied.

Section 12.    The Authority agrees that so long as this First Supplemental Trust Agreement is in full force and effect, the Authority shall have full power to carry out the acts and agreements provided herein, and will from time to time, execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such supplements hereto and such further instruments as may be required for correcting any inadequate or incorrect description of the Trust Estate, or for otherwise carrying out the intention of or facilitating the performance of this First Supplemental Trust Agreement.

Section 13.    The officers and employees of the Authority are hereby authorized and directed to take all actions that are necessary, convenient and in conformity with the Act, federal

law, the Master Trust Agreement and this First Supplemental Trust Agreement, to carry out the provisions of this First Supplemental Trust Agreement, and all such action previously taken by them is hereby ratified and approved. Such actions include, but shall not be limited to (a) execution and delivery of the Series A Bonds; (b) execution, delivery and compliance with the terms of the Bond Purchase Agreement; (c) execution, delivery and compliance with the terms of the Tax Certificate for the Series A Bonds, (d) preparation and authorization of the use of a Preliminary Official Statement and preparation, authorization of the use and execution of an Official Statement relating to the Series A Bonds, and amendments and supplements thereto; and (e) execution, delivery and compliance with the terms of documents and instruments regarding the investment of proceeds of the Series A Bonds and other moneys relating to the Series A Bonds or the Construction Projects

Section 14. This First Supplemental Trust Agreement is being entered into pursuant to and in accordance with Section 9.01 of the Master Trust Agreement for the purpose of authorizing the issuance of the Series A Bonds in accordance with Article III of the Master Trust Agreement and will, as provided in Section 9.03 of Master Trust Agreement, become effective when (i) the Authority and the Trustee have received the written consent of the Tourism Company and GDB to enter into this First Supplemental Trust Agreement; it has been executed and delivered by the Authority and the Trustee and (ii) Bond Counsel has delivered a written opinion to the effect that it complies with the provisions of Article IX of the Master Trust Agreement and will not adversely affect the exclusion from gross income for federal income tax purposes of interest on, or the exemption from state, Commonwealth and local income taxation of, any Outstanding Bonds.

Section 15. Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance company ("Ambac Assurance"), is providing insurance for the Series A Bonds maturing in 2017, 2018, 2019, 2020, and 2031 (the "Ambac Insured Bonds" ) pursuant to an insurance policy (the "Ambac Policy"). The following provisions are hereby made applicable with respect to the Ambac Insured Bonds:

(a) Any provision of this First Supplemental Trust Agreement expressly recognizing or granting rights in or to Ambac Assurance may not be amended in any manner which affects the rights of Ambac Assurance hereunder without the prior written consent of Ambac Assurance. Ambac Assurance reserves the right to charge the Authority a fee for any consent or amendment to this First Supplemental Trust Agreement while the Ambac Policy is outstanding.

(b) Unless otherwise provided in this Section, Ambac Assurance's consent shall be required in lieu of Owner consent of the registered owners of Ambac Insured Bonds ("Ambac Owners"), when required, for the following purposes: (i) execution and delivery of any additional Supplemental Trust Agreement or any amendment, supplement or change to or modification of the Master Trust Agreement (ii) removal of the Trustee and selection and appointment of any successor trustee required in those transactions in which the Financing Document provides for a trustee; and (iii) initiation or approval of any action not described in (i) or (ii) above which requires Ambac Owner consent.

(c)     Any reorganization or liquidation plan with respect to the Authority must be acceptable to Ambac Assurance. In the event of any reorganization or liquidation, Ambac Assurance shall have the right to vote on behalf of all Ambac Owners absent a default by Ambac Assurance under the applicable Ambac Policy insuring such Series A Bonds.

(d)     Anything in the Trust Agreement to the contrary notwithstanding, upon the occurrence and continuance of an Event of Default, Ambac Assurance shall be entitled to control and direct the enforcement of all rights and remedies granted to the Ambac Owners or the Trustee for the benefit of the Ambac Owners under this First Supplemental Trust Agreement.

(e)     Anything in the Trust Agreement to the contrary notwithstanding, upon the occurrence and continuance of an Event of Default, Ambac Assurance shall be entitled to control and direct the enforcement of all rights and remedies granted to the Ambac Owners or the Trustee for the benefit of the Ambac Owners under this First Supplemental Trust Agreement, including, without limitation: (i) the right to accelerate the principal of the Ambac Insured Bonds as described in this First Supplemental Trust Agreement, and (ii) the right to annul any declaration of acceleration, and Ambac Assurance shall also be entitled to approve all waivers of events of default.

(f)     Upon the occurrence of an Event of Default, the Trustee may, with the consent of Ambac Assurance, and shall, at the direction of Ambac Assurance, by written notice to the Authority and Ambac Assurance, declare the principal of the Ambac Insured Bonds to be immediately due and payable, whereupon that portion of the principal of the Ambac Insured Bonds thereby coming due and the interest thereon accrued to the date of payment shall, without further action, become and be immediately due and payable, anything in this First Supplemental Trust Agreement or in the Ambac Insured Bonds to the contrary notwithstanding.

(g)     While the Ambac Policy is in effect, the Authority shall furnish to Ambac Assurance, to the attention of the Ambac Assurance Surveillance Department, upon request, the following:

    (1)     a copy of any financial statement, audit and/or annual report of the Authority.

    (2)     such additional information it may reasonably request.

Upon request, such information shall be delivered at the Authority's expense to the attention of the Surveillance Department, unless otherwise indicated.

(h)     a copy of any notice to be given to Ambac Owners, including, without limitation, notice of any redemption of or defeasance of the Ambac Insured Bonds, and any certificate rendered pursuant to this First Supplemental Trust Agreement relating to the security for the Ambac Insured Bonds.

(i)     To the extent that the Authority has entered into a continuing disclosure agreement with respect to the Series A Bonds, Ambac Assurance shall be included as party to be notified.

15

DM3\037331.6

(j)     The Authority shall notify the General Counsel Office of Ambac Assurance of any failure of the Authority to provide relevant notices, certificates, etc.

(k)     Notwithstanding any other provision of this First Supplemental Trust Agreement, the Authority shall immediately notify the General Counsel Office of Ambac Assurance if at any time there are insufficient moneys to make any payments of principal and/or interest as required and immediately upon the occurrence of any event of default hereunder.

(l)     The Authority will permit Ambac Assurance to discuss the affairs, finances and accounts of the Authority or any information Ambac Assurance may reasonably request regarding the security for the Series A Bonds with appropriate officers of the Authority. The Authority will permit Ambac Assurance to have access to the Puerto Rico Convention Center and have access to and to make copies of all books and records relating to the Series A Bonds at any reasonable time.

(m)     Ambac Assurance shall have the right to direct an accounting at the Authority's expense, and the Authority's failure to comply with such direction within thirty (30) days after receipt of written notice of the direction from Ambac Assurance shall be deemed a default hereunder; provided, however, that if compliance cannot occur within such period, then such period will be extended so long as compliance is begun within such period and diligently pursued, but only if such extension would not materially adversely affect the interests of any Ambac Owners.

(n)     Ambac Assurance will allow the following obligations to be used as Permitted Investments, with respect to the Ambac Insured Bonds, for all purposes, including defeasance investments in refunding escrow accounts.

(Ambac Assurance does not give a premium credit for the investment of accrued and/or capitalized interest).

(1)     Cash (insured at all times by the Federal Deposit Insurance Corporation).

(2)     Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

        a.     U.S. treasury obligations

        b.     All direct or fully guaranteed obligations

        c.     Farmers Home Administration

        d.     General Services Administration

        e.     Guaranteed Title XI financing

        f.     Government National Mortgage Association (GNMA)

16

g.  State and Local Government Series

Any security used for defeasance must provide for the timely payment of principal and interest and cannot be callable or prepayable prior to maturity or earlier redemption of the rated debt (excluding securities that do not have a fixed par value and/or whose terms do not promise a fixed dollar amount at maturity or call date).

(o)  Ambac will allow the following obligations to be used as Permitted Investments for all purposes other than defeasance investments in refunding escrow accounts, with respect to the Ambac Insured Bonds:

(1)  Obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

a.  Export-Import Bank

b.  Rural Economic Community Development Administration

c.  U.S. Maritime Administration

d.  Small Business Administration

e.  U.S. Department of Housing & Urban Development (PHAs)

f.  Federal Housing Administration

g.  Federal Financing Bank

(2)  Direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

a.  Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC).

b.  Obligations of the Resolution Funding Corporation (REFCORP)

c.  Senior debt obligations of the Federal Home Loan Bank System

DM3\337331.6

    d.      Senior debt obligations of other Government Sponsored Agencies approved by Ambac

(3)    U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of "P-1" by Moody's and "A-1" or "A-1+" by S&P and maturing not more than 360 calendar days after the date of purchase. (Ratings on holding companies are not considered as the rating of the bank);

(4)    Commercial paper which is rated at the time of purchase in the single highest classification, "P-1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(5)    Investments in a money market fund rated "AAAm" or "AAAm-G" or better by S&P;

(6)    Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

    a.      which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of Moody's or S&P or any successors thereto; or

    b.      (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph A(2) above, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(7)    Municipal Obligations rated "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P.

18

(8)     Investment Agreements approved in writing by Ambac Assurance Corporation (supported by appropriate opinions of counsel); and

(9)     other forms of investments (including repurchase agreements) approved in writing by Ambac.

(10)    The value of the above investments in this Section 15(o) shall be determined as follows:

   a.     For the purpose of determining the amount in any fund, all Permitted Investments credited to such fund shall be valued at fair market value.  The Trustee shall determine the fair market value based on accepted industry standards and from accepted industry providers.  Accepted industry providers shall include but are not limited to pricing services provided by Financial Times Interactive Data Corporation, Merrill Lynch, Citigroup Global Markets Inc., Bear Stearns, or Lehman Brothers.

   b.     As to certificates of deposit and bankers' acceptances: the face amount thereof, plus accrued interest thereon; and

   c.     As to any investment not specified above: the value thereof established by prior agreement among the Authority, the Trustee, and Ambac.

(p)     The definition of "Outstanding" Obligations or obligations, with respect to the Ambac Insured Bonds, or any like concept, should specifically include Obligations or obligations which fall into the category described below.

(1)     Notwithstanding anything herein to the contrary, in the event that the principal and/or interest due on the Ambac Insured Bonds shall be paid by Ambac Assurance Corporation pursuant to the Ambac Policy, the Ambac Insured Bonds shall remain Outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Authority, and the assignment and pledge of the Trust Estate and all covenants, agreements and other obligations of the Authority to the Ambac Owners shall continue to exist and shall run to the benefit of Ambac Assurance, and Ambac Assurance shall be subrogated to the rights of such Ambac Owners.

(q)     As long as the Ambac Insurance Policy shall be in full force and effect, the Authority and the Trustee agree to comply with the following provisions:

(1)     At least one (1) business day prior to all Interest Payment Dates the Trustee will determine whether there will be sufficient funds in the Funds and Accounts to pay the principal of or interest on the Ambac Insured

Bonds on such Interest Payment Date. If the Trustee determines that there will be insufficient funds in such Funds or Accounts, the Trustee shall notify Ambac Assurance. Such notice shall specify the amount of the anticipated deficiency, the Ambac Insured Bonds to which such deficiency is applicable and whether such Ambac Insured Bonds will be deficient as to principal or interest, or both. If the Trustee has not so notified Ambac Assurance at least one (1) business day prior to an Interest Payment Date, Ambac Assurance will make payments of principal or interest due on the Ambac Insured Bonds on or before the first (1st) business day next following the date on which Ambac Assurance shall have received notice of nonpayment from the Trustee.

(2)    the Trustee shall, after giving notice to Ambac Assurance as provided in (a) above, make available to Ambac Assurance and, at Ambac Assurance's direction, to The Bank of New York, in New York, New York, as insurance trustee for Ambac Assurance or any successor insurance trustee (the "Insurance Trustee"), the registration books of the Authority maintained by the Trustee and all records relating to the Funds and Accounts maintained under this First Supplemental Trust Agreement and the Master Trust Agreement.

(3)    the Trustee shall provide Ambac Assurance and the Insurance Trustee with a list of Ambac Owners entitled to receive principal or interest payments from Ambac Assurance under the terms of the Ambac Policy, and shall make arrangements with the Insurance Trustee (i) to mail checks or drafts to the Ambac Owners entitled to receive full or partial interest payments from Ambac Assurance and (ii) to pay principal upon Ambac Insured Bonds surrendered to the Insurance Trustee by the Ambac Owners entitled to receive full or partial principal payments from Ambac Assurance.

(4)    the Trustee shall, at the time it provides notice to Ambac Assurance pursuant to (a) above, notify Ambac Owners entitled to receive the payment of principal or interest thereon from Ambac Assurance (i) as to the fact of such entitlement, (ii) that Ambac Assurance will remit to them all or a part of the interest payments next coming due upon proof of Ambac Owner entitlement to interest payments and delivery to the Insurance Trustee, in form satisfactory to the Insurance Trustee, of an appropriate assignment of the Ambac Owner's right to payment, (iii) that should they be entitled to receive full payment of principal from Ambac Assurance, they must surrender their Ambac Insured Bonds (along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac Assurance) for payment to the Insurance Trustee, and not the Trustee, and (iv) that should they be entitled to receive partial payment of principal from Ambac Assurance, they must surrender their Ambac Insured Bonds for payment thereon first to the

DM3\037331.6

Trustee, who shall note on such Ambac Insured Bonds the portion of the principal paid by the Trustee and then, along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee, to the Insurance Trustee, which will then pay the unpaid portion of principal.

(5) in the event that the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond which has become Due for Payment and which is made to an Ambac Owner by or on behalf of the Authority has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Trustee shall, at the time Ambac Assurance is notified pursuant to (a) above, notify all Ambac Owners that in the event that any Ambac Owner's payment is so recovered, such Ambac Owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available, and the Trustee shall furnish to Ambac Assurance its records evidencing the payments of principal of and interest on the Ambac Insured Bonds which have been made by the Trustee and subsequently recovered from Ambac Owners and the dates on which such payments were made.

(6) in addition to those rights granted Ambac Assurance under this First Supplemental Trust Agreement, Ambac Assurance shall, to the extent it makes payment of principal of or interest on Ambac Insured Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Ambac Insurance Policy, and to evidence such subrogation (i) in the case of subrogation as to claims for past due interest, the Trustee shall note Ambac Assurance's rights as subrogee on the registration books of the Authority maintained by the Trustee, upon receipt from Ambac Assurance of proof of the payment of interest thereon to the Ambac Owners of the Ambac Insured Bonds, and (ii) in the case of subrogation as to claims for past due principal, the Trustee shall note Ambac Assurance's rights as subrogee on the registration books of the Authority maintained by the Trustee upon surrender of the Ambac Insured Bonds by the Ambac Owners thereof together with proof of the payment of principal thereof.

(r) The following terms of the First Supplemental Trust Agreement are made with respect to the Trustee in connection with the Ambac Insured Bonds:

(1) The Trustee may be removed at any time, at the request of Ambac Assurance, for any breach of the Trust Agreement.

(2) Ambac Assurance shall receive prior written notice of any Trustee resignation.

21

DM3\3373331.6

(3)     Every successor Trustee appointed pursuant to this Section shall be a trust company or bank in good standing located in or incorporated under the laws of the State, duly authorized to exercise trust powers and subject to examination by federal or state authority, having a reported capital and surplus of not less than $75,000,000 and acceptable to Ambac Assurance.

(4)     Notwithstanding any other provision of this First Supplemental Trust Agreement, in determining whether the rights of the Ambac Owners will be adversely affected by any action taken pursuant to the terms and provisions of this First Supplemental Trust Agreement, the Trustee shall consider the effect on the Ambac Owners as if there were no Ambac Policy.

(5)     Notwithstanding any other provision of this First Supplemental Trust Agreement, no removal, resignation or termination of the Trustee shall take effect until a successor, acceptable to Ambac, shall be appointed.

(s)     To the extent that this First Supplemental Trust Agreement confers upon or gives or grants to Ambac any right, remedy or claim under or by reason of this First Supplemental Trust Agreement, Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.

(t)     Nothing in this First Supplemental Trust Agreement expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or entity, other than the Authority, the Trustee, Ambac Assurance, and the Ambac Owners, any right, remedy or claim under or by reason of this First Supplemental Trust Agreement or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this First Supplemental Trust Agreement contained by and on behalf of the Authority shall be for the sole and exclusive benefit of the Authority, the Trustee, Ambac Assurance and the Ambac Owners.

(u)     The following statement will be attached to the Ambac Insured Bonds:

Financial Guaranty Insurance Policy No. 25142BE (the "Policy") with respect to payments due for principal of and interest on this Bond has been issued by Ambac Assurance Corporation ("Ambac Assurance"). The Policy has been delivered to The Bank of New York, New York, New York, as the Insurance Trustee under said Policy and will be held by such Insurance Trustee or any successor insurance trustee. The Policy is on file and available for inspection at the principal office of the Insurance Trustee and a copy thereof may be secured from Ambac Assurance or the Insurance Trustee. All payments required to be made under the Policy shall be made in accordance with the provisions thereof. The owner of this Bond acknowledges and consents to the subrogation rights of Ambac Assurance as more fully set forth in the Policy.

Section 16.    CDC IXIS Financial Guaranty North America, Inc. ("CIFG"), is providing insurance for the Series A Bonds maturing in 2012, 2013, 2014, 2015, 2016, 2027, and 2036 (the "CIFG Insured Bonds") pursuant to an insurance policy (the "CIFG Policy").  The following provisions are hereby made applicable with respect to the CIFG Insured Bonds:

(a)    Any notice that is required to be given to the registered owners of CIFG Insured Bonds ("CIFG Owners"), nationally recognized municipal securities information repositories or state information depositories pursuant to Rule 15c2-12(b)(5) adopted by the Securities and Exchange Commission or to the Trustee pursuant to the financing documents shall also be provided to CIFG. All notices required to be given to CIFG shall be in writing and shall be sent by registered or certified mail addressed to CDC IXIS Financial Guaranty North America, Inc., 825 Third Avenue, 6th Floor, New York, New York 10022, Attn: General Counsel; all electronic mail sent to CIFG shall be addressed both to surveillance@cifg.com and to general.counsel@cifg.com.

(b)    Within ninety (90) days of the end of the Authority's fiscal year, a copy of the audited financial statements of the Authority and a copy of the annual budget of the Authority and within forty-five (45) days after the close of each quarter of the Authority's fiscal year, a copy of the unaudited financial statements of the Authority shall be sent to CDC IXIS Financial Guaranty North America, Inc., 825 Third Avenue, 6th Floor, New York, New York 10022, Attn: Surveillance.

(c)    CIFG shall have the right to receive such additional information as it may reasonably request.

(d)    The Authority will permit CIFG to discuss the affairs, finances and accounts of the Authority or any information CIFG may reasonably request regarding the security for the Series A Bonds with appropriate officers of the Authority, and will grant CIFG access to the facilities, books and records of the Authority on any business day upon reasonable prior notice.

(e)    CIFG shall have the right to direct an accounting at the Authority's expense and the Authority's failure to comply with such direction within thirty (30) days after written notice of the direction from CIFG shall be deemed a default hereunder.

(f)    In the event that the principal and/or interest due on the CIFG Insured Bonds shall be paid by CIFG pursuant to the CIFG Policy, the CIFG Insured Bonds shall remain outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Authority, and the assignment and pledge of the trust estate and all covenants, agreements and other obligations of the Authority to the CIFG Owners shall continue to exist and shall run to the benefit of CIFG, and CIFG shall be subrogated to the rights of such CIFG Owners including, without limitation, any rights that such CIFG Owners may have in respect of securities law violations arising from the offer and sale of the CIFG Insured Bonds.

In addition, in the event of a defeasance CIFG shall be provided with the following items:

DM3\337331.6

(1)     An opinion that refunding and defeasance will not adversely impact the exclusion from gross income for federal income tax purposes of interest on the CIFG Insured Bonds or refunded bonds.

(2)     The escrow agreement in connection with a defeasance which shall provide that:

    a.     Any substitution of securities shall require a CPA verification and the prior written consent of CIFG.

    b.     The Authority will not exercise any optional redemption of CIFG Insured Bonds secured by the escrow agreement or any other redemption other than mandatory sinking fund redemptions unless (i) the right to make any such redemption has been expressly reserved in the escrow agreement and such reservation has been disclosed in detail in the official statement for the refunding bonds, and (ii) as a condition of any such redemption there shall be provided to CIFG a CPA verification as to the sufficiency of escrow receipts without reinvestment to meet the escrow requirements remaining following such redemption.

    c.     The Authority shall not amend the escrow agreement or enter into a forward purchase agreement or other agreement with respect to rights in the escrow without the prior written consent of CIFG.

In addition, all of the documents and requirements set forth in this Section 16(f) as a condition of future defeasance of the CIFG Insured Bonds.

(g)     CIFG shall receive prior written notice of any name change of the trustee (the "Trustee") for the CIFG Insured Bonds or the resignation or removal of the Trustee.

(h)     No removal, resignation or termination of the Trustee shall take effect until a successor, acceptable to CIFG, shall be appointed.

(i)     With respect to amendments or supplements to the financing documents which do not require the consent of the CIFG Owners, CIFG must be given notice of any such amendments or supplements. With respect to amendments or supplements to the financing documents which require the consent of the CIFG Owners, CIFG's prior written consent is required. All financing documents must contain a provision that requires copies of any amendments or supplements to such documents which are consented to by CIFG shall be sent to the rating agencies which have assigned a rating to the Series A Bonds. Notwithstanding any other provision of the financing documents, in determining whether the rights of the CIFG Owners, will be adversely affected by any action taken pursuant to the terms and provisions of any financing document, the Trustee shall consider the effect on the CIFG Owners, as if there were no CIFG Policy.

(j)     To the extent that this First Supplemental Trust Agreement confers upon or gives or grants to CIFG any right, remedy or claim, CIFG is explicitly recognized as being a

24

third party beneficiary thereunder and may enforce any such right, remedy or claim conferred, given or granted thereunder.

(k)     Any provision set forth herein expressly recognizing or granting rights in or to CIFG may not be amended in any manner which affects the rights of CIFG thereunder without the prior written consent of CIFG.

(l)     Any provision of the Master Trust Agreement or the First Supplemental Trust Agreement requiring the consent of the Owners, shall also require CIFG's consent.

(m)     Any reorganization or liquidation plan with respect to the Authority must be acceptable to CIFG. In the event of any reorganization or liquidation, CIFG shall have the right to vote on behalf of all CIFG Owners absent a default by CIFG under the CIFG Policy.

(n)     Anything in a financing document to the contrary notwithstanding, upon the occurrence and continuance of an event of default as defined therein, CIFG shall be entitled to control and direct the enforcement of all rights and remedies granted to the CIFG Owners or the Trustee for the benefit of the CIFG Owners under any financing document.

(o)     With respect to the payment procedure under the CIFG Policy:

(1)     In the event that on the second (2nd) business day prior to the payment date on the CIFG Insured Bonds, the Trustee has not received sufficient moneys to pay all principal of and interest on the CIFG Insured Bonds due on the second (2nd) following business day, the Trustee shall immediately notify CIFG or its designee on the same business day by telephone or electronic mail, confirmed in writing by registered or certified mail, of the amount of the deficiency.

(2)     If any deficiency is made up in whole or in part prior to or on the payment date, the Trustee shall so notify CIFG or its designee.

(3)     In addition, if the Trustee has notice that any CIFG Owners has been required to disgorge payments of principal or interest on the CIFG Insured Bonds pursuant to a final non-appealable order by a court of competent jurisdiction that such payment constitutes an avoidable preference to such CIFG Owners within the meaning of any applicable bankruptcy laws, then the Trustee shall notify CIFG or its designee of such fact by telephone or electronic mail, confirmed in writing by registered or certified mail.

(4)     The Trustee shall irrevocably be designated, appointed, directed and authorized to act as attorney-in-fact for CIFG Owners, as follows:

a.     If there is a deficiency in amounts required to pay interest on the CIFG Insured Bonds, the Trustee shall (i) execute and deliver to CIFG, in form satisfactory to CIFG, an instrument appointing CIFG as agent for such CIFG Owners in any legal proceeding related to the payment of and an assignment to CIFG of the claims for interest on the

CIFG Insured Bonds, (ii) receive as designee of the respective CIFG Owners in accordance with the tenor of the CIFG Policy payment from CIFG with respect to the claims for interest so assigned, and (iii) disburse the same to such respective CIFG Owners; and

b.       If there is a deficiency in amounts required to pay principal of the CIFG Insured Bonds, the Trustee shall (i) execute and deliver to CIFG, in form satisfactory to CIFG, an instrument appointing CIFG as agent for such CIFG Owner in any legal proceeding related to the payment of such principal and an assignment to CIFG of the CIFG Insured Bond surrendered to CIFG (but such assignment shall be delivered only if payment from CIFG is received), (ii) receive as designee of the respective CIFG Owners in accordance with the tenor of the CIFG Policy payment therefor from CIFG, and (iii) disburse the same to such CIFG Owners.

(5)    Payments with respect to claims for interest on and principal of the CIFG Insured Bonds disbursed by the Trustee from proceeds of the CIFG Policy shall not be considered to discharge the obligation of the Authority with respect to such CIFG Insured Bonds, and CIFG shall become the owner of such unpaid CIFG Insured Bond and claims for the interest in accordance with the tenor of the assignment made to it under the provisions of this subsection or otherwise.

(6)    Irrespective of whether any such assignment is executed and delivered, the Authority and the Trustee shall agree for the benefit of CIFG that:

a.       They recognize that to the extent CIFG makes payments directly or indirectly, on account of principal of or interest on the CIFG Insured Bonds, CIFG will be subrogated to the rights of such CIFG Owners to receive the amount of such principal and interest from the Authority, with interest thereon as provided and solely from the sources stated in the financing documents and the CIFG Insured Bonds; and

b.       They will accordingly pay to CIFG the amount of such principal and interest, with interest thereon as provided in the financing documents and the CIFG Insured Bonds, but only from the sources and in the manner provided herein for the payment of principal of and interest on the CIFG Insured Bonds to Owners thereof, and will otherwise treat CIFG as the owner of such rights to the amount of such principal and interest.

(7)    The Authority shall agree to pay or reimburse CIFG any and all charges, fees, costs and expenses which CIFG may reasonably pay or incur, including, but not limited to, fees and expenses of attorneys, accountants, consultants and auditors and reasonable costs of investigations, in connection with (i) any accounts established to facilitate payments under the CIFG Policy, (ii) the administration, enforcement, defense or preservation of any rights in respect of the Master Trust Agreement, this

DM3\337331.6

First Supplemental Trust Agreement or any other financing document including defending, monitoring or participating in any litigation or proceeding (including any bankruptcy proceeding in respect of the Authority or any affiliate thereof) relating to this First Supplemental Trust Agreement or any other financing document, any party to this agreement or any other financing document or the transaction contemplated by the financing documents (the "Transaction"), (iii) the foreclosure against, sale or other disposition of any collateral securing any obligations under this agreement or any other financing document, or the pursuit of any remedies under the trust agreement or any other financing document, to the extent such costs and expenses are not recovered from such foreclosure, sale or other disposition, or (iv) any amendment, waiver or other action with respect to, or related to, this agreement or any other financing document whether or not executed or completed; costs and expenses shall include a reasonable allocation of compensation and overhead attributable to the time of employees of CIFG spent in connection with the actions described in clauses (ii) - (iv) above; and CIFG shall reserve the right to charge a reasonable fee as a condition to executing any amendment, waiver or consent proposed in respect of this agreement or any other financing document.

(8)     In addition to any and all rights of reimbursement, subrogation and any other rights pursuant hereto or under law or in equity, the Authority shall agree to pay or reimburse CIFG any and all charges, fees, costs, claims, losses, liabilities (including penalties), judgments, demands, damages, and expenses which CIFG or its officers, directors, shareholders, employees, agents and each Person, if any, who controls CIFG within the meaning of either Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934 may reasonably pay or incur, including, but not limited to, fees and expenses of attorneys, accountants, consultants and auditors and reasonable costs of investigations, of any nature in connection with, in respect of or relating to the transactions contemplated by this agreement or any other financing document by reason of:

    a.     any omission or action (other than of or by CIFG) in connection with the offering, issuance, sale, remarketing or delivery of the CIFG Insured Bonds;

    b.     the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of the Authority in connection with any transaction arising from or relating to this agreement or any other financing document;

    c.     the violation by the Authority of any law, rule or regulation, or any judgment, order or decree applicable to it;

27

DMJ037331.6

d.       the breach by the Authority of any representation, warranty or covenant under this agreement or any other financing document or the occurrence, in respect of the Authority, under this agreement or any other financing document of any "event of default" or any event which, with the giving of notice or lapse of time or both, would constitute any "event of default"; or

e.       any untrue statement or alleged untrue statement of a material fact contained in any official statement or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such claims arise out of or are based upon any untrue statement or omission in information included in an official statement and furnished by CIFG in writing expressly for use therein.

(9)      CIFG shall be entitled to pay any amount payable under the CIFG Policy in respect of Regular Payments (as defined in the CIFG Policy) on the CIFG Insured Bonds, including any amount payable upon its election on the CIFG Insured Bonds on an accelerated basis, whether or not any notice and certificate shall have been Received (as defined in the CIFG Policy) by CIFG as provided in the CIFG Policy.

(p)      The following statement will be attached to the CIFG Insured Bonds:

CDC IXIS Financial Guaranty North America, Inc. ("CIFG NA"), New York, New York, has delivered its financial guaranty insurance policy (the "Policy") with respect to the scheduled payments of principal of and interest on this Bond as described hereinbelow to Trustee or its successor, as trustee (the "Trustee") for the Puerto Rico Convention District Authority. Said Policy is on file and available for inspection at the principal office of the Trustee and a copy thereof may be obtained from CIFG NA or the Trustee.

Section 17.      The Financial Guaranty Insurance Company, a New York stock insurance company, or any successor thereto ("FGIC"), is providing insurance for the Series A Bonds maturing in 2021, 2022, 2023, 2024, 2025 and 2026 (the "FGIC Insured Bonds" ) pursuant to the municipal bond new issue insurance policy issued by FGIC that guarantees payment of principal and interest on the FGIC Insured Bonds (the "FGIC Policy"). The following provisions are hereby made applicable with respect to the FGIC Insured Bonds:

(a)      In determining whether a payment default has occurred or whether a payment on the FGIC Insured Bonds has been made under the Trust Agreement, no effect shall be given to payments made under the FGIC Policy.

DM3\837331.6

28

(b)     Any acceleration of the Bonds or any annulment thereof shall be subject to the prior written consent of FGIC (if it has not failed to comply with its payment obligations under the FGIC Policy).

(c)     FGIC shall receive immediate notice of any payment default and notice of any other default known to the Trustee or the Authority within 30 days of the Trustee's or the Authority's knowledge thereof.

(d)     For all purposes of the Trust Agreement provisions governing events of default and remedies, except the giving of notice of default to Owners of FGIC Insured Bonds, FGIC shall be deemed to be the sole holder of the FGIC Insured Bonds for so long as it has not failed to comply with its payment obligations under the FGIC Policy.

(e)     The provisions of the Trust Agreement permitting the Trustee to waive any event of default with respect to the FGIC Insured Bonds, shall be subject to the prior written consent of FGIC.

(f)     FGIC shall be included as a party in interest and as a party entitled to (i) notify the Authority, the Trustee, or any applicable receiver of the occurrence of an event of default and (ii) request the Trustee or receiver to intervene in judicial proceedings that affect the Bonds or the security therefor. The Trustee or receiver shall be required to accept notice of default from FGIC.

(g)     Any amendment or supplement to the Trust Agreement or any other principal financing documents shall be subject to the prior written consent of FGIC. Any rating agency rating the FGIC Insured Bonds must receive notice of each amendment and a copy thereof at least 15 days in advance of its execution or adoption. FGIC shall be provided with a full transcript of all proceedings relating to the execution of any such amendment or supplement.

(h)     No resignation or removal of the Trustee shall become effective until a successor has been appointed and has accepted the duties of Trustee. FGIC shall be furnished with written notice of the resignation or removal of the Trustee and the appointment of any successor thereto.

(i)     Only cash, direct non-callable obligations of the United States of America and securities fully and unconditionally guaranteed as to the timely payment of principal and interest by the United States of America, to which direct obligation or guarantee the full faith and credit of the United States of America has been pledged, Refcorp interest strips, CATS, TIGRS, STRPS, or defeased municipal bonds rated AAA by S&P or Aaa by Moody's (or any combination of the foregoing) shall be used to effect defeasance of the FGIC Insured Bonds unless FGIC otherwise approves. In the event of an advance refunding, the Authority shall cause to be delivered a verification report of an independent nationally recognized certified public accountant. If a forward supply contract is employed in connection with the refunding, (i) such verification report shall expressly state that the adequacy of the escrow to accomplish the refunding relies solely on the initial escrowed investments and the maturing principal thereof and interest income thereon and does not assume performance under or compliance with the forward supply contract, and (ii) the applicable escrow agreement shall provide that in the event of any

29

crepancy or difference between the terms of the forward supply contract and the escrow agreement (or the authorizing document, if no separate escrow agreement is utilized), the terms of the escrow agreement or authorizing document, if applicable, shall be controlling.

(j) Any Swap provider with respect to the FGIC Insured Bonds must be rated at least A-/A3 or better by Standard & Poor's and Moody's (the "Initial Rating Requirement"). Assuming satisfaction of the Initial Rating Requirement, and thereafter as long as the long term indebtedness of the Swap provider or the claims paying ability of the Swap provider does not fall below Baa2 or BBB by either Standard & Poor's or Moody's (the "Minimum Rating Requirement"), all interest rate assumptions for purposes of establishing or demonstrating compliance with a financial covenant (e.g., rate covenant, reserve requirement, additional bonds test, asset transfer test, etc.) may be based upon the synthetic fixed interest rate under the Swap.

(k) FGIC shall be provided with the following:

(1) Notice of the redemption, other than mandatory sinking fund redemption, of any of the FGIC Insured Bonds, or of any advance refunding of the FGIC Insured Bonds, including the principal amount, maturities and CUSIP numbers thereof;

(2) Notice of the downgrading by any rating agency of the Authority's underlying public rating, or the underlying rating on the Bonds or any parity obligations, to "noninvestment grade";

(3) Notice of any drawing on any debt service reserve fund securing the FGIC Insured Bonds;

(4) Notice of any material events pursuant to Rule 15c2-12 under the Securities Exchange Act of 1934, as amended; and

(5) Such additional information as FGIC may reasonably request from time to time.

(l) The Authority shall pay or reimburse FGIC for any and all charges, fees, costs, and expenses that FGIC may reasonably pay or incur in connection with the following: (i) the administration, enforcement, defense, or preservation of any rights or security under the Trust Agreement or under any other transaction document; (ii) the pursuit of any remedies under the Trust Agreement, under any other transaction document, or otherwise afforded by law or equity, (iii) any amendment, waiver, or other action with respect to or related to this agreement or any other transaction document whether or not executed or completed; (iv) the violation by the Authority of any law, rule, or regulation or any judgment, order or decree applicable to it; (v) any advances or payments made by FGIC to cure defaults of the Authority under the transaction documents; or (vi) any litigation or other dispute in connection with this agreement, any other transaction document, or the transactions contemplated hereby or thereby, other than amounts resulting from the failure of FGIC to honor its payment obligations under the FGIC Policy. FGIC reserves the right to charge a reasonable fee as a condition to executing any amendment, waiver, or consent proposed in respect of this agreement or any other transaction document. The obligations of the Authority to FGIC shall survive discharge and termination of this agreement.

30

(m)    The following claim procedures shall be followed with respect to the FGIC Insured Bonds:

(1)    If, on the third day preceding any interest payment date for the Bonds there is not on deposit with the Trustee sufficient moneys available to pay all principal of and interest on the Bonds due on such date, the Trustee shall immediately notify FGIC and U.S. Bank Trust National Association, New York, New York or its successor as its Fiscal Agent (the "Fiscal Agent") of the amount of such deficiency. If, by said interest payment date, the Issuer has not provided the amount of such deficiency, the Trustee shall simultaneously make available to FGIC and to the Fiscal Agent the registration books for the Bonds maintained by the Trustee. In addition:

a.    The Trustee shall provide FGIC with a list of the Bondholders entitled to receive principal or interest payments from FGIC under the terms of the FGIC Policy and shall make arrangements for FGIC and its Fiscal Agent (1) to mail checks or drafts to Bondholders entitled to receive full or partial interest payments from FGIC and (2) to pay principal of the Bonds surrendered to the Fiscal Agent by the Bondholders entitled to receive full or partial principal payments from FGIC; and

b.    The Trustee shall, at the time it makes the registration books available to FGIC pursuant to (i) above, notify Bondholders entitled to receive the payment of principal of or interest on the Bonds from FGIC (1) as to the fact of such entitlement, (2) that FGIC will remit to them all or part of the interest payments coming due subject to the terms of the FGIC Policy, (3) that, except as provided in paragraph (b) below, in the event that any Bondholder is entitled to receive full payment of principal from FGIC, such Bondholder must tender his Bond with the instrument of transfer in the form provided on the Bond executed in the name of FGIC, and (4) that, except as provided in paragraph (b) below, in the event that such Bondholder is entitled to receive partial payment of principal from FGIC, such Bondholder must tender his Bond for payment first to the Trustee, which shall note on such Bond the portion of principal paid by the Trustee, and then, with all acceptable form of assignment executed in the name of FGIC, to the Fiscal Agent, which will then pay the unpaid portion of principal to the Bondholder subject to the terms of the FGIC Policy.

(2)    In the event that the Trustee has notice that any payment of principal of or interest on a Bond has been recovered from a Bondholder holding a FGIC Insured Bond pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Trustee shall, at the time it provides notice to FGIC, notify all Bondholders holding FGIC Insured Bonds that in the event that any Bondholder's payment is so recovered, such Bondholder will be entitled to payment from FGIC to the extent of such

31

recovery, and the Trustee shall furnish to FGIC its records evidencing the payments of principal of and interest on the Bonds which have been made by the Trustee and subsequently recovered from Bondholders, and the dates on which such payments were made.

(3)     FGIC shall, to the extent it makes payment of principal of or interest on the Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the FGIC Policy and, to evidence such subrogation, (i) in the case of subrogation as to claims for past due interest, the Trustee shall note FGIC's rights as subrogee on the registration books maintained by the Trustee upon receipt from FGIC of proof of the payment of interest thereon to the Bondholders of such Bonds and (ii) in the case of subrogation as to claims for past due principal, the Trustee shall note FGIC's rights as subrogee on the registration books for the Bonds maintained by the Trustee upon receipt of proof of the payment of principal thereof to the Bondholders of such Bonds. Notwithstanding anything in this authorizing document or the Bonds to the contrary, the Trustee shall make payment of such past due interest and past due principal directly to FGIC to the extent that FGIC is a subrogee with respect thereto.

(n)     The Authority may not purchase the FGIC Bonds, either outright or in lieu of redemption, for purposes other than retiring the FGIC Bonds. Notwithstanding any other provision in the Trust Agreement, this covenant shall survive the expiration of this commitment and shall be applicable so long as the FGIC Bonds remain Outstanding.

(o)     Any Credit Facility provided in lieu of a cash deposit into the Debt Service Reserve Fund, other than one provided by FGIC, shall conform to the provisions required by FGIC.

(p)     Notice of any redemption of FGIC Insured Bonds shall either (i) explicitly state that the proposed redemption is conditioned on there being on deposit in the applicable fund or account on the redemption date sufficient money to pay the full redemption price of the Bonds to be redeemed, or (ii) be sent only if sufficient money to pay the full redemption price of the FGIC Insured Bonds to be redeemed is on deposit in the applicable fund or account.

(q)     The notice addresses for FGIC are as follows: Financial Guaranty Insurance Company, 125 Park Avenue, New York, New York 10017, Attention: Risk Management; and U.S. Bank Trust National Association, 100 Wall Street, 19th Floor, New York, New York 10005, Attention: Corporate Trust Department.

(r)     The following statement will be attached to the FGIC Insured Bonds:

Financial Guaranty Insurance Company ("Financial Guaranty") has issued a policy containing the following provisions with respect to the FGIC Insured Bonds maturing in the years 2021 to and including 2026 (the "FGIC Insured Bonds"), such policy being

on file at the principal office of Trustee, as Paying Agent (the "Trustee"):

Financial Guaranty hereby unconditionally and irrevocably agrees to pay for disbursement to the Bondholders that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which is then due for payment and which the issuer of the FGIC Insured Bonds (the "Issuer") shall have failed to provide. Due for payment means, with respect to principal or accreted value (if applicable), the stated maturity date thereof, or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which the payment of principal or accreted value (if applicable) of the FGIC Insured Bonds is due by reason of call for redemption (other than mandatory sinking fund redemption), acceleration or other advancement of maturity, and with respect to interest, the stated date for payment of such interest.

Upon receipt of telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or the Trustee to Financial Guaranty that the required payment of principal, accreted value or interest (as applicable) has not been made by the Issuer to the Trustee, Financial Guaranty on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), sufficient to make the portion of such payment not paid by the Issuer. Upon presentation to the Fiscal Agent of evidence satisfactory to it of the Bondholder's right to receive such payment and any appropriate instruments of assignment required to vest all of such Bondholder's right to such payment in Financial Guaranty, the Fiscal Agent will disburse such amount to the Bondholder.

As used herein the term "Bondholder" means the person other than the Issuer or the borrower(s) of bond proceeds who at the time of nonpayment of an FGIC Insured Bond is entitled under the terms of such FGIC Insured Bond to payment thereof.

The policy is non-cancellable for any reason.

FINANCIAL GUARANTY INSURANCE COMPANY

IN WITNESS WHEREOF, the Authority and the Trustee have caused this First Supplemental Trust Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY

By: _____
Name: Manuel Sánchez Biscombe
Title: Executive Director

JPMORGAN CHASE BANK, N.A.

By: _____
Name: Joanne Adamis
Title: Vice President

[Signature Page to First Supplemental Trust Agreement]

DM3\037331.6

34

## SCHEDULE A

## LIST OF SERIES A PROJECTS

1. Completion of the Puerto Rico Convention Center ($44,050,000). To finance the completion of the Puerto Rico Convention Center.

2. Aquarium ($2,500,000). To finance the Authority's planning activities to study, to determine the feasibility of and, if justified, to promote the development of an aquarium within the District (as defined in the Authority Act).

3. Land Acquisition ($5,600,000). To finance additional land acquisition cost for the Eyebrow (land area within Manuel Fernandez Juncos Avenue and Luis Munoz Rivera Expressway) ($4,200,000) and acquisition of Villa Verde Street from the Municipality of San Juan, in order to consolidate parcels within the District ($800,000).

4. Construction of Authority's Administration Offices' ($1,000,000). To finance infrastructure improvements for administrative offices of the Authority next to the administration offices of the Puerto Rico Convention Center's Operator within the Puerto Rico Convention Center building.

5. District Development Planning and Implementation Efforts ($2,500,000). To finance the Authority's RFP processes in order to complete the development and implementation process of the District's mixed uses parcels, including assessing (and updating) the District's Master Plan, develop/modify design guidelines, coordinate contract negotiation, implement a development program, and refine permits, studies, as well as conduct other development related efforts for Parcels D, E, F, G, I and J of the District.

6. District Art Work ($200,000). To finance a portion of the placement of two (2) sculptures within the District.

7. Former Juvenile Reformatory Center ($1,000,000). To finance the planning initiatives to investigate potential uses for the property identified as the Former Juvenile Reformatory Center and the possible demolition of existing facilities which are extremely deteriorated and constitute a safety hazard.

8. District Operation/Maintenance during the next three years of the Development Period ($2,100,000). To finance a portion of the maintenance during the next three years, ending March 24, 2009, of the Urban Park and the other district common areas.

9. Other District Enhancing Efforts ($1,500,000). To finance the study and evaluation of the feasibility and potential value to the District of other initiatives in the District such as, but not limited to,

- The development by private investors of a District cooling system.
- Construction of additional parking,
- Offsite signage

DM_DS\037331.6

## SCHEDULE B

## LOAN REPAYMENT SCHEDULE

|  | | Amount |
|---|---|---|
| Loan | | |
| GDB Taxable Loan | | $ 191,540.72 |
| GDB Tax-Exempt Loan | | 371,458,984.85 |
| | Total | $371,650,525.57 |

## SCHEDULE C

## SERIES A ACCOUNT DEPOSITS

| | |
|---|---|
| Series A Capitalized Interest Sub-Account | $5,548,947.40 |
| Series A Construction Sub-Account | $58,021,047.67 |
| Series A Loan Payment Sub-Account | $371,650,525.57 |
| Series A Debt Service Reserve Account | $30,338,962.50 |

## SCHEDULE D

### CAPITALIZED INTEREST DEPOSITS

June 25, 2006                    $5,986,452.67

DMCU037331.6