**Opposition Deadline: January 30, 2020 5:00 PM AST**
**Reply Deadline: February 13, 2020 5:00 PM AST**
**Hearing Date: February 27, 2020 10:00 AM AST**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>　　　　as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>　　　　　　　　　　Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>　　　　as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA"),<br><br>　　　　　　　　　　Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**MOTION OF ASSURED GUARANTY CORP.,
ASSURED GUARANTY MUNICIPAL CORP.,
AMBAC ASSURANCE CORPORATION, NATIONAL
PUBLIC FINANCE GUARANTEE CORPORATION, AND
FINANCIAL GUARANTY INSURANCE COMPANY FOR RELIEF FROM THE
<u>AUTOMATIC STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION</u>**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................1

JURISDICTION AND VENUE ..................................................................3

LEGAL AND FACTUAL BACKGROUND ................................................3

    I.    MOVANTS INSURE SECURED BONDS ISSUED BY HTA..............................3

    II.    THE COMMONWEALTH'S DIVERSION AND DISSIPATION OF
THE PLEDGED REVENUES...............................................................10

    III.    PROMESA........................................................................................11

    IV.    PRE-TITLE III LIFT-STAY MOTIONS (ASSURED, NATIONAL, AND
PEAJE)..........................................................................................12

    V.    THE FISCAL PLANS AND COMPLIANCE LAW............................................14

    VI.    THE TITLE III FILINGS.......................................................................15

ARGUMENT ......................................................................................17

    I.    THE "COLORABLE CLAIM" STANDARD GOVERNING THIS
MOTION..........................................................................................17

    II.    MOVANTS HAVE MORE THAN A "COLORABLE CLAIM" TO THE
PLEDGED REVENUES. .......................................................................19

        A.    HTA, Not The Commonwealth, Is The Beneficial Owner Of The
Pledged Revenues. .........................................................................19

            1.    Movants Have A Statutory Entitlement To Receive The
Excise Taxes. ......................................................................19

            2.    The Commonwealth, At Most, Holds The Excise Taxes In
"Trust" For HTA And Bondholders. ..............................................24

            3.    In The Alternative, The Excise Taxes Constitute
"Restricted Funds" That The Commonwealth Must
Transfer To HTA. ...................................................................28

        B.    Movants Have A Lien On The Pledged Revenues. .................................29

            1.    Movants Have Security Interests In All Pledged Revenues. .........29

            2.    Movants Have Statutory Liens On The Excise Taxes. .................32

## TABLE OF CONTENTS (cont'd)

**Page**

|  |  |  |  |  |
|--|--|--|--|--|
| | | 3. | Movants' Liens Are Not Subject To Section 552(a) Or Section 928(b). | 34 |
| III. | | MOVANTS ARE ENTITLED TO STAY RELIEF UNDER SECTION 362(D)(2). | | 38 |
| | A. | The Commonwealth And HTA Lack Equity In The Pledged Revenues. | | 39 |
| | B. | The Pledged Revenues Are Not Necessary To Debtors' Reorganization. | | 39 |
| IV. | | CAUSE EXISTS FOR RELIEF FROM STAY UNDER SECTION 362(D)(1), OR AN ADEQUATE PROTECTION ORDER IS REQUIRED. | | 40 |
| | A. | The Movants' Property Interests Are Not Adequately Protected. | | 41 |
| | B. | If The Court Declines To Lift The Stay For Lack Of Adequate Protection, The Court Must Order Adequate Protection. | | 49 |
| | C. | Lack Of Due Process In The Title III Court Constitutes Cause To Lift The Stay. | | 49 |
| | D. | The Sonnax Factors Weigh In Favor Of Lifting The Automatic Stay Under 362(d)(1). | | 53 |
| CERTIFICATION | | | | 58 |
| CERTIFICATE OF SERVICE | | | | 1 |

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

Alliance Capital Mgmt. L.P. v. Cty. Of Orange (In re. Cty. of Orange),
    189 B.R. 499 (C.D. Cal. 1995) ................................................................................34

Alternative Sys. Concepts. Inc. v. Synopsys, Inc.,
    374 F.3d 23  (1st Cir. 2004) ...................................................................................31

Ambac Assurance Corporation v. Commonwealth of Puerto Rico et. al.,
    927 F.3d 597 (1st Cir. 2019) ............................................................................51, 54

Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v.
    Flores Galarza, 484 F.3d 1 (1st Cir. 2007)  ...............................................20, 22, 24

Assured Guaranty Corp. v. Commonwealth of Puerto Rico,
    582 B.R. 579 (D.P.R. 2018), aff'd, 919 F.3d 121 (1st Cir. 2019)  .........................17

Assured Guaranty Corp. v. García-Padilla,
    214 F. Supp. 3d 117 (D.P.R. 2016) ...........................................................................7

Bartlett v. Bowen,
    816 F.2d 695 (D.C. Cir. 1987) ................................................................................50

Bexar County Hosp. Dist. v. Crosby,
    160 Tex. 116 (1959) ................................................................................................25

Bowen v. Michigan Academy of Family Physicians,
    476 U.S. 667 (1986) ................................................................................................50

Boyd v. Martin Expl. Co.,
    56 B.R. 776 (E.D. La. 1986) ...................................................................................40

Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla,
    217 F. Supp. 3d 508 (D.P.R. 2016) ...................................................................12, 13

City of Winter Haven v. Summerlin,
    114 Fla. 727 (1934) ................................................................................................25

Colón-Rivera v. Asociación de Suscripción,
    665 F. Supp. 2d 88 (D.P.R. 2009) ..........................................................................21

Commolco de Caguas Inc. v. Benitez Diaz,

## TABLE OF AUTHORITIES

**PAGE(S)**

126 D.P.R. 478 (1990) ...................................................................................56

Cortuk v. Banco Turco Romana (In re Cortuk),
   No. 18-2766, 2019 WL 2171481 (D.N.J. May 20, 2019) ......................................19

Davis v. Cox,
   356 F.3d 76  (1st Cir. 2004) ...........................................................................26

Ecker v. Sw. Tampa Storm Sewer Drainage Dist.,
   75 F.2d 870 (5th Cir. 1938) ............................................................................24

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council,
   485 U.S. 568 (1988) ......................................................................................52

Fed. Deposit Ins. Corp. v. Casady,
   106 F.2d 784 (10th Cir. 1939) .........................................................................24

Fernandez v. Laloma,
   56 D.P.R. 367 (1940) ....................................................................................27

Fin. Oversight Mgmt. Bd. v. Ad Hoc Group of PREPA Bondholders,
   899 F.3d 13 (1st Cir. 2018) ............................................................................48

García-Rubiera v. Calderón,
   570 F.3d 443 (1st Cir. 2009) ...............................................................22, 24, 25

Garcia-Rubiera v. Fortuño,
   665 F.3d 261 (1st Cir. 2011) ...................................................................21, 24

Gracia-Gracia v. Fin. Oversight Mgmt. Bd. (In re Fin. Oversight Mgmt. Bd.),
   939 F.3d 347 (1st Cir. 2019) ................................................................. *passim*

Grella v. Salem Five Cent Sav. Bank,
   42 F.3d 26 (1st Cir. 1994) .............................................................................18

Hays v. Isaacs,
   120 S.W.2d 737 (Ky. Ct. App. 1938) ...............................................................25

In re Bake-Line Group, LLC,
   359 B.R. 566 (Bankr. D. Del. 2007) ................................................................27

In re Balco Equities Ltd.,
   312 B.R. 734 (Bankr. S.D.N.Y. 2004) ..............................................................48

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

In re Blair,
     534 B.R. 787 (Bankr. D. N.M. 2015) ..................................................................55

In re Bldrs. Grp. & Dev. Corp.,
     502 B.R. 95 (Bankr. D.P.R. 2013) .....................................................................49

In re Bologna,
     206 B.R. 628 (Bankr. D. Mass. 1997) ..........................................................25, 26

In re Breitburn Energy Partners LP,
     571 B.R. 59 (Bankr. S.D.N.Y. 2017) ...................................................................55

In re Briggs Transp. Co.,
     780 F.2d 1339 (8th Cir. 1985) ..............................................................................41

In re Brown,
     2008 WL 2115200 (Bankr. D.N.H. May 19, 2008) .............................................26

In re Cicale,
     2007 WL 1893301 (Bankr. S.D.N.Y. 2007) ........................................................57

In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25,
     143 B.R. 750 (Bankr. D. Mont. 1992) ......................................................25, 26, 40

In re Coast Caribbean Recycling, Inc.,
     2014 WL 7359405 (Bankr. D.P.R. 2014) ............................................................56

In re Fonseca,
     542 B.R. 628 (B.A.P. 1st Cir. 2015) ..............................................................33, 34

In re Garcia,
     484 B.R. 1, 16 (Bankr. D.P.R. 2012), *rev'd* on other grounds, 507 B.R. 32 (1st Cir.
     BAP 2014) .............................................................................................................27

In re Jefferson Cty.,
     482 B.R. 404 (Bankr. N.D. Ala. 2012) ...........................................................37, 38

In re Johnson,
     215 B.R. 381 (Bankr. N.D. Ill. 1997) ..................................................................29

In re Lally,
     38 B.R. 622 (Bankr. N.D. Iowa 1984) .................................................................39

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

<u>In re Lan Tamers, Inc.</u>,
  281 B.R. 782 (Bankr. D. Mass. 2002), *aff'd*, 329 F.3d 204 (1st Cir. 2003) ..........................25

<u>In re Mason</u>,
  514 B.R. 852 (Bankr. E.D. Ky. 2014) ..................................................................55

<u>In re Mullock</u>,
  404 B.R. 800 (Bankr. E.D. Pa. 2009) ..................................................................38

<u>In re Sandoval</u>,
  78 F. Supp. 135 (D.P.R. 1948) ...........................................................................29

<u>In re Schick</u>,
  418 F.3d 321 (3d Cir. 2005) ...............................................................................33

<u>In re Shaffer</u>,
  563 B.R. 301 (Bankr. D. Ariz. 2016) ..................................................................55

<u>In re Spencer</u>,
  115 B.R. 471 (D. Del. 1990) ..............................................................................40

<u>In re Tap, Inc.</u>,
  52 B.R. 271 (Bankr. D. Mass. 1985) ..................................................................26

<u>In re Valente</u>,
  360 F.3d 256 (1st Cir. 2004) ..............................................................................28

<u>Jin Qing Li v. Rosen (In re Jin Qing Li)</u>,
  No. 12-33630, 2018 WL 1354548 (B.A.P. 9th Cir. Mar. 12, 2018) .....................................19

<u>JK Mullen Inv. Co. v. Town of Arvada</u>,
  261 P.2d 714 (Colo. 1953) .................................................................................33

<u>Keyes v. City of Tacoma</u>,
  12 Wash. 2d 54 (Wash. 1941) ...........................................................................25

<u>Matter of Sutton</u>,
  904 F.2d 327 (5th Cir. 1995) ..............................................................................39

<u>Matter of Vitreous Steel Prods. Co.</u>,
  911 F.2d 1223 (7th Cir. 1990) ............................................................................18

<u>Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C.</u>

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

<u>(In re Old Cold, LLC)</u>, 602 B.R. 798 (B.A.P. 1st Cir. 2019) ...................................................18

<u>Mitsui Manufacturers Bank v. Unicom Computer Corporation (In re Unicom Computer
Corp.)</u>, 13 F.3d 321 (9th Cir. 1994) ...........................................................................27

<u>N.H. v. Me.</u>,
532 U.S. 742 (2001) .............................................................................................31

<u>Peaje Invs. LLC v. Fin. Oversight Mgmt. Bd.</u>,
899 F.3d 1 (1st Cir. 2018) .....................................................................................37

<u>Peaje Invs. LLC v. García-Padilla</u>,
845 F.3d 505 (1st Cir. 2017) .........................................................................12, 32,4

<u>Peaje Invs. LLC v. García-Padilla, No. 16-2365</u>,
2016 WL 6562426 (D.P.R. Nov. 2, 2016), *aff'd* in part, vacated in part, 845 F.3d 505
(1st Cir. 2017) ...............................................................................................12, 32, 43

<u>Peaje Invs. v. P.R. Highways & Transp. Auth.</u>,
301 F. Supp.3d 290 (D.P.R. 2017) ......................................................................33, 34

<u>Porrata Doria v. Fajardo Sugar Company of P.R.</u>,
57 D.P.R. 628 (1940) ...........................................................................................27

<u>Reading Co. v. Brown</u>,
391 U.S. 471 (1968) .............................................................................................49

<u>Román v. S.L.G. Ruiz</u>,
160 D.P.R. 116 (2003) .........................................................................................56

<u>Sonnax Industries v. Tri Components Products Corp. (In re Sonnax Industries)</u>,
907 F.2d 1280 (2d Cir. 1990) .......................................................................... *passim*

<u>State v. City of Lakeland</u>,
154 Fla. 137 (Fla. 1943) .......................................................................................29

<u>Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd of Educ.</u>,
763 S.E.2d 288 (N.C. Ct. App. 2015).................................................................19, 28

<u>Town of Shattuck v. Barcafer</u>,
137 P.2d 238 (Okla. 1943) ....................................................................................25

<u>U.S. v. Fleet Bank (In re Calore Exp. Co., Inc.)</u>,

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

288 F.3d 22 (1st Cir. 2002) ..................................................................................18

<u>United States v. Dwinells,</u>
508 F.3d 63 (1st Cir. 2007) ..................................................................................52

<u>United States v. Sec. Indus. Bank,</u>
459 U.S. 70 (1982) ..................................................................................36

<u>Vickrey v. City of Sioux City,</u>
104 F. 164 (Cir. Western Div. 1900) ..................................................................................24

<u>Webster v. Doe,</u>
486 U.S. 592 (1988) ..................................................................................50

<u>Zimmerman v. Epstein Becker and Green, P.C.,</u>
657 F.3d 80 (1st Cir. 2011) ..................................................................................27

## <u>STATUTES:</u>

PROMESA:

§ 3(a) ..................................................................................52
§ 206(a) ..................................................................................12
§ 301(a) ..................................................................................1, 17, 35
§ 303(1) ..................................................................................12
§ 303(3) ..................................................................................12
§ 405 ..................................................................................44
§ 407 ..................................................................................49, 54, 67

11 U.S.C.:

§ 101(37) ..................................................................................29, 32
§ 101(50) ..................................................................................29
§ 101(51) ..................................................................................29
§ 101(53) ..................................................................................32
§ 361(1) ..................................................................................4
§ 361(2) ..................................................................................4
§ 361(3) ..................................................................................4, 41
§ 362(1) ..................................................................................17
§ 362(d) ..................................................................................1, 17, 18, 38, 40, 48
§ 362(d)(1) ..................................................................................40, 48
§ 362(d)(2) ..................................................................................38, 40
§ 362(g) ..................................................................................38, 40, 41, 43
§ 362(g)(2) ..................................................................................43

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

§ 361(3) ..................................................................................................................41
§ 362(a) ..................................................................................................................17
§ 503(b) ..................................................................................................................49
§ 552(a) ............................................................................................................34, 35
§ 902(2)(A) ............................................................................................................35
§ 902(2)(B) ......................................................................................................35, 36
§ 902(2)(D) ............................................................................................................35
§ 902(2)(E) ......................................................................................................35, 36
§ 922(a) ..................................................................................................................17
§ 922(b) ..........................................................................................................18, 40
§ 928(a) ............................................................................................................34, 35
§ 928(b) ..........................................................................................................*passim*

3 L.P.R.A.:

§ 863d .....................................................................................................................33
§ 9102 .....................................................................................................................56
§ 9142 .....................................................................................................................56

9 L.P.R.A.:

§ 2004(1) .....................................................................................................3, 19, 29
§ 2004b ...................................................................................................................28
§ 2013(a)(2) ..................................................................................................4, 20, 28
§ 2019 .......................................................................................................................5
§ 2021 .............................................................................................................*passim*
§ 5681 .............................................................................................................*passim*
§ 5682 .....................................................................................................................28

13 L.P.R.A.:

§ 31751..................................................................................................5, 14, 24, 32
§ 31751(a) ................................................................................................................4
§ 31751(a)(1) ..................................................................................................4, 20, 28
§ 31751(a)(1)(C) ...............................................................................................7, 28
§ 31751(a)(1)(D) .................................................................................................5, 6
§ 31751(a)(1)(F) .....................................................................................................8
§ 31751(a)(3)(C) ...............................................................................................7, 28

26 L.P.R.A. § 8053(a) ..................................................................................20, 23

48 U.S.C. § 2161(a) .................................................................................................49

48 U.S.C. § 2165 ....................................................................................................50

## **TABLE OF AUTHORITIES**

**PAGE(S)**

**OTHER AUTHORITIES:**

Act No. 1-2015 (H. B. 2212) (Puerto Rico 2015) ...........................................................35

Black's Law Dictionary, 580 (11th ed. 2019) .................................................................39

Collier on Bankruptcy ¶ 552.01 (16th ed. 2017) ...........................................................34

H.R. Rep. No. 95-595 (1977) .........................................................................................41

H.R. Rep. No. 100-1011 (1988) .....................................................................................38

P.R. Const. art. VI, § 8 .....................................................................................................7

S. Rep. No. 95-989 (1978) .......................................................................................41, 56

S. Rep. No. 100-506 (1988) .....................................................................................35, 37

U.S. Const. amend. V .....................................................................................................36

U.S. Const. amend. XIV, § 1 ..........................................................................................36

Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. (together with AGC, "Assured"), Ambac Assurance Corporation ("Ambac"), National Public Finance Guarantee Corporation ("National"), and Financial Guaranty Insurance Company ("FGIC", and, together with Assured, Ambac, and National, the "Movants"), by and through their undersigned counsel, respectfully move, pursuant to 11 U.S.C. § 362(d), for relief from the automatic stay imposed pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), or, in the alternative, adequate protection for their property interests in the Pledged Revenues, as defined below.  See PROMESA § 301(a) (incorporating 11 U.S.C. §§ 362 and 922).  In support of this motion (the "Motion"),[2] Movants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Movants insure bonds issued by Debtor Puerto Rico Highways and Transportation Authority ("HTA").  The bonds are secured by two categories of collateral pledged to HTA's bondholders (the "Bondholders").  Those two categories of collateral are:  (i) toll revenues collected directly by HTA, which are subject to a perfected security interest granted under HTA's resolutions; and (ii) excise taxes collected on behalf of HTA and Bondholders by the Commonwealth of Puerto Rico (the "Commonwealth"), which, subject only to the Commonwealth's narrowly-defined "clawback" rights, as described below, are subject to both (a) perfected security interests granted under HTA's resolutions and (b) statutory liens arising under the applicable statutes, which require the Commonwealth to apply the excise taxes "solely" to the payment of bonds issued by HTA.  Although PROMESA both expressly preserves liens securing bonds and provides that the collateral must remain subject to the liens throughout the Title III

---

[2] This Motion amends and supersedes the Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation for Adequate Protection or, in the Alternative, for Relief from the Automatic Stay (ECF No. 8536).

cases, millions of dollars of collateral are unlawfully diverted away from the payment of the bonds every day.  The toll revenues are diverted to HTA, including to fund expenses wholly unrelated to the toll roads that actually generate the toll revenues.  The excise tax revenues are diverted to the Commonwealth, where they sit in designated accounts, are improperly commingled in the Commonwealth treasury, or are applied to expenses of the Commonwealth that are totally unrelated to HTA.  In all cases, the Commonwealth wrongfully asserts ownership over, and the right to spend, these funds.  Moreover, this misappropriation and diversion continues with the encouragement and tacit approval of HTA and its deeply conflicted representative, the Financial Oversight and Management Board for Puerto Rico ("FOMB"), even though the revenues are the exclusive property of HTA and Bondholders and the statutes creating the excise taxes restrict their use to payment of HTA's bonds.  Once these dollars are diverted and spent, they cannot be recovered, thus creating a permanent loss of collateral.  Movants' interest in repayment has been and is directly threatened by HTA and the Commonwealth's actions, abetted and enabled by FOMB, which continue to prevent this Title III Court from fully and fairly adjudicating these issues.  The Commonwealth's wrongful control and assertion of ownership over these funds cannot continue.  Movants are entitled to obtain relief under Section 362(d) in both the HTA and Commonwealth Title III cases.

2.      Movants are entitled to entry of an order, substantially in the form attached hereto as Exhibit A, (i) lifting the automatic stay in both the HTA and Commonwealth Title III cases to permit Movants to enforce the application of the pledged revenues to the payment of the bonds, including by permitting Movants to enforce their liens on the pledged revenues, or, in the alternative, (ii) ordering adequate protection of Movants' interests in the pledged revenues and in the repayment of the bonds.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a).   Venue is proper pursuant to 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a).

## LEGAL AND FACTUAL BACKGROUND

### I.      Movants Insure Secured Bonds Issued By HTA.

4.      Movants are providers of financial guaranty insurance.  Movants insure scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings, including bonds issued by HTA.

5.      HTA is a public corporation created by Act No. 74-1965 (the "Enabling Act", Exhibit B)[3] to assume responsibility for the construction of highways and other transportation systems in Puerto Rico.  The Enabling Act authorized HTA to borrow money, issue bonds, and secure its bonds with pledges of revenues.  9 L.P.R.A. § 2004(1).  HTA's bonds are secured by pledged revenues, including:  (i) revenues derived from HTA's toll facilities (the "Toll Revenues"); (ii) special excise taxes consisting, among other things, of taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes collected by the Commonwealth (the "Tax Revenues"); and (iii) special excise taxes consisting of motor vehicle license fees collected by the Commonwealth (the "Vehicle Fees"; together with the Tax Revenues, the "Excise Taxes"; and together with the Toll Revenues and the Tax Revenues, the "Pledged Revenues").  By granting HTA rights in the Excise Taxes for the benefit of Bondholders, the Commonwealth alienated all beneficial ownership and equity in those revenues.

---

[3] With the exception of Exhibit A, which is attached to this Motion, all other references to Exhibits in this Motion refer to the Exhibits attached to the *Declaration of William J. Natbony in Support of Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* (the "Declaration"), filed contemporaneously with this Motion.

6.      Pursuant to the Enabling Act, HTA has issued certain bonds (the "<u>Bonds</u>") under general bond resolutions (the "<u>Resolutions</u>") adopted in 1968 (the "<u>1968 Resolution</u>," Exhibit C) and 1998 (the "<u>1998 Resolution</u>," Exhibit D).  In the Resolutions, HTA pledged all equity in the Pledged Revenues to Bondholders and secured the Bonds by a gross lien consisting of a perfected security interest in the Pledged Revenues.

7.      The Toll Revenues derive from tolls directly imposed and collected by HTA and held by HTA on behalf of the Bondholders, and therefore constitute property of HTA and its Bondholders and not property of the Commonwealth.  <u>See</u> 9 L.P.R.A. § 2013(a)(2).

8.      In connection with the Excise Taxes, the Commonwealth's Secretary of Treasury acts as a mere collection agent on behalf of the Bondholders.  Upon collection, the Secretary of Treasury is not permitted to deposit the Excise Taxes in the Commonwealth's general fund.  <u>See</u>, <u>e.g.</u>, 13 L.P.R.A. § 31751(a).  Instead, the Secretary of Treasury is required by statute to hold the Excise Taxes in a segregated account for the benefit of HTA and its Bondholders and to transfer the Excise Taxes each month to the fiscal agent for the Bonds (the "<u>Fiscal Agent</u>") for the benefit of Bondholders.  From the time of their collection, the Excise Taxes constitute trust funds that are property of HTA held in trust for its Bondholders, and are not property of the Commonwealth.  <u>See</u>, <u>e.g.</u>, 13 L.P.R.A. § 31751(a)(1) (transferring gasoline, gas oil or diesel oil, and crude oil tax to HTA); 9 L.P.R.A. § 2013(a)(2) (requiring HTA to account to Bondholders "as if it were the trustee of an express trust"), <u>id.</u> § 2021 (transferring the first $15 of motor vehicle license fees to HTA), <u>id.</u> § 5681 (transferring the entirety of motor vehicle license fee to HTA) (collectively, and including any related statutes, the "<u>Excise Tax Statutes</u>").  In the alternative, the Excise Taxes are special restricted funds that can only be used to pay Bondholders.

9.      The Commonwealth further covenanted with the Bondholders in the Enabling Act that it would "not limit or restrict the rights or powers . . . vested in [HTA] by the

[Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 9 L.P.R.A. § 2019.  The Commonwealth in the Excise Tax Statutes also committed to the Bondholders not to reduce or impair the Tax Revenues (see 13 L.P.R.A. § 31751(a)(1)(D)[4]) or the Vehicle Fees (see 9 L.P.R.A. §§ 2021, 5681) as set forth in Paragraphs 10-11 below:

10.   **Fuel Taxes.**  Commonwealth law provided that the fuel taxes "shall be covered into a special deposit in favor of the Highways and Transportation Authority for its corporate purposes." 13 L.P.R.A. § 31751.  The Commonwealth covenanted directly that this special deposit would not be impaired:

> The Government of Puerto Rico hereby agrees and is committed to any person, firm, or corporation, or any agency of the United States of America, or of any state or of the Government of Puerto Rico, that subscribes or acquires bonds of the Highways and Transportation Authority of Puerto Rico for the payment of which the proceeds of the tax on gasoline, gas oil, or diesel oil and the amount appropriated of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07 are thus pledged, as authorized by this section, to not reduce the tax on gasoline, gas oil, or diesel oil fixed in Section 3020.06, to an amount of less than sixteen cents (16¢) per gallon of gasoline or of four cents (4¢) per gallon of gas oil or diesel oil, respectively, and to not reduce the rates fixed in Section 3020.07 in effect by the date of approval of this Code. It also agrees and is committed to not eliminate or reduce the tax to an amount less than sixteen cents (16¢) per gallon of gasoline or of four cents (4¢) per gallon of gas oil or diesel oil fixed in Section 3020.06 of this Subtitle, nor reduce or eliminate the rates of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbon fixed in Section 3020.07. ***It also agrees and is committed to ensure that said amounts shall be covered into a special deposit in the name and for the benefit of the Highways***

---

[4] The version of 13 L.P.R.A § 31751 published on Westlaw and Lexis is not current. Citation is made to the section as amended by session laws through 2015. A consolidated version of the Puerto Rico Internal Revenue Code, which contains § 31751, is available in Spanish at http://www.bvirtual.ogp.pr.gov/ogp/ Bvirtual/leyesreferencia/PDF/C%C3%B3digos/1-2011/1-2011.pdf. For the Court's convenience, a consolidated English-language version of § 31751, based on the relevant session laws translated by the Puerto Rico Office of Legislative Services, is attached to the Declaration as Exhibit E.

> ***and Transportation Authority of Puerto Rico, as provided in this
> Section, until said bonds issued at any time, including their
> interest, have been paid in full.***

13 L.P.R.A. § 31751(a)(1)(D) (emphasis added).

11.     **Motor Vehicle License Fees.**  The Commonwealth also agreed not to
reduce the motor vehicle license fees pledged to the payment of HTA's debt:

> The Commonwealth of Puerto Rico hereby agrees and makes a
> commitment to any person or agency of the United States of
> America, of any state or of the Government of Puerto Rico that sell
> or acquire bonds of the Authority for the payment of which the
> proceeds of the fees paid for motor vehicle and trailer licenses and
> others is pledged, as authorized by this section, ***not to reduce the
> license fees or the amount collected from the same that the
> Authority <u>must</u> receive***.

9 L.P.R.A. § 5681 (emphasis added).

12.     Each of these covenants with the Commonwealth transferred specific
property rights in the Excise Taxes to HTA and the Bondholders.

13.     In addition, on February 7, 2002, HTA entered into a security agreement
(the "<u>2002 Security Agreement</u>," Exhibit F) with Movants and other holders of Bonds issued under
the 1998 Resolution, under which HTA granted these Bondholders "a security interest in the Puerto
Rico Highway and Transportation Authority Transportation Revenue Bonds Interest and Sinking
Fund (and all accounts therein) maintained under the [1998] Resolution, ***and all amounts required
to be on deposit therein by the terms of the Resolution***, including all proceeds and after-acquired
property, subject to application as permitted by the Resolution."  Ex. F (emphasis added).  This
agreement provides a lien on the Pledged Revenues whether held by the Commonwealth or HTA.

14.     At any time that the Commonwealth or HTA is in possession of Pledged
Revenues, the Commonwealth or HTA holds possession of such Pledged Revenues for the

Bondholders' benefit, subject only, in the case of the Excise Taxes, to a valid "clawback," as described below.

15.     The Excise Tax Statutes grant Bondholders the most senior possible lien on the Excise Taxes consistent with Article VI, Section 8 of the Commonwealth Constitution ("Article VI, Section 8").[5]   To this end, these statutes grant Bondholders first-priority liens on the Excise Taxes, subject only to the conditions that, in a fiscal year in which available resources, including surplus, are insufficient to meet appropriations made for that year, the Excise Taxes may (i) be used *solely* to pay the public debt, but (ii) *only if the public debt remains unpaid after a first application of all other available resources to the payment of public debt*.   See 13 L.P.R.A. § 31751(a)(1)(C), (3)(C); 9 L.P.R.A. §§ 2021, 5681; Assured Guaranty Corp. v. García-Padilla, 214 F. Supp. 3d 117, 121 (D.P.R. 2016) ("The funds from these taxes and tax liens may be used to pay the public debt if no other Commonwealth resources are available.").The preconditions to a "clawback" of the Excise Taxes have never been satisfied, because the Commonwealth has at all relevant times had sufficient available resources to pay the public debt on a first-priority basis in accordance with Article VI, Section 8.[6]   In any event, the Commonwealth ceased paying the public

---

[5] Article VI, Section 8 provides: "In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.  In addition, certain statutory priorities are established by the Commonwealth's Management and Budget Office Organic Act (Act No. 147-1980 (June 1980) (Exhibit G, the "OMB Act")).

[6] For example, the Commonwealth's general fund budgets estimated the Commonwealth's resources were sufficient to cover total expenditures of $8.78 billion in fiscal year 2017, $9.562 billion in fiscal year 2018, $8.757 billion in fiscal year 2019, and $9.1 billion in fiscal year 2020.  See, e.g., Reorg Research, "Puerto Rico Legislature Passes $8.78B Fiscal 2017 General Fund Budget" (July 1, 2016) (Exhibit H); FOMB, "FY18 Budget" (June 30, 2017) (Exhibit I); FOMB, "Press Release: Oversight Board Submits FY19 Commonwealth Compliant Budget Certified by Unanimous Written Consent" (June 30, 2018) (Exhibit J); FOMB, "FY20 Certified Budget for the Commonwealth of Puerto Rico" (June 30, 2019) (Exhibit K).  Meanwhile, total debt service on the public debt in each of these fiscal years was anticipated to be far less than total estimated resources in each of these years—$1.128 billion, $1.065 billion, $1.090 billion, and $1.118 billion, respectively.  See Exhibit L and Exhibit M.  Even if the Commonwealth had not suspended public debt service payments, there would have been or would be sufficient available resources in each of these fiscal years to make such payments.

debt as of July 1, 2016, and no valid "clawback" can exist during any period in which the public debt is not being paid.

16.     Even when Article VI, Section 8 is properly triggered, the Commonwealth is required to reimburse HTA from gas tax or excise tax revenue received in subsequent fiscal years. 13 L.P.R.A. § 31751(a)(1)(F) ("In the event the [Commonwealth] uses any portion of the revenues derived from the tax on gasoline, […] the tax on gas oil or diesel oil […] or the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend […] for the payment of interest on and the amortization of the public debt as provided in Section 8 of Article VI of the Constitution, the amount used by the [Commonwealth] […] shall be reimbursed to the [HTA] from the revenues collected by the [Commonwealth] in the following fiscal year or, if such reimbursement is not possible in the following fiscal year, in subsequent fiscal years.").

17.     The Bondholders' security interests in the Pledged Revenues are perfected, including by the filing of the financing statements included in <u>Exhibit N</u>.

18.     Because the Bonds are secured by a "gross lien" on all of the Pledged Revenues, the Resolutions are clear that operating expenses of HTA may only be paid *after* HTA satisfies its debt service and reserve fund requirements with respect to the Bonds.  Specifically, these operating expenses are paid either from the Construction Fund pursuant to the terms of the Resolutions or otherwise after amounts then due and owing on the Bonds have been paid.  <u>See</u>, <u>e.g.</u>, Ex. C §§ 405, 409; Ex. D §§ 409, 414.

19.     Movants insure approximately $[2,918,341,000] billion gross par of HTA Bonds currently outstanding.  Under their insurance agreements and/or insurance policies, Movants are deemed to be the sole holders of the Bonds that they insure for purposes of, or otherwise have control rights over, consents and other Bondholder actions, including exercising

rights and remedies of Bondholders.[7]   Under the HTA Resolutions and/or their insurance

agreements or policies, Movants are also recognized as third-party beneficiaries.[8]   To date,

Movants other than FGIC have paid approximately $638,505,955 million in aggregate claims by

Bondholders.  FGIC has received approximately $119 million in claims under its policies insuring

HTA Bonds and has made payments to Bondholders in respect of such claims in accordance with

---

[7] See, e.g., Assured Insurance Agreement for Series AA Bonds (Exhibit O) § 1(g) ("For all purposes of rights of giving notice, making a request, granting consent and giving direction and exercising remedies under the Authorizing Resolution and the Resolution, [Assured] shall be deemed to be the sole owner of the [Assured] Insured Bonds"); Assured Insurance Agreement for Series L Bonds (Exhibit P) § 9(b) ("So long as the [Assured] Policy is in full force and effect and [Assured] has not failed to perform any of its obligations thereunder, [Assured] shall be deemed the sole owner of the [Assured] Insured Bonds for purposes of giving any consent that may be required under the 1998 Resolution"); Assured Insurance Agreement for Series N Bonds (Exhibit Q) § 5 ("Assured Guaranty shall be deemed to be the holder of all of the Assured Insured Bonds for purposes of (i) exercising all remedies and directing the Fiscal Agent to take actions or for any other purposes following an event of default under the 1998 Resolution and (ii) granting any consent, direction, or approval or taking any action permitted by or required under the indenture, resolution or ordinance, as the case may be, to be granted or taken by the holders of such Assured Insured Bonds"); MBIA Insurance Agreement for Series AA Bonds (Exhibit R) § 1(vii) ("[National] shall be recognized as the registered owner of each Insured Bond for the purposes of exercising all rights and privileges available to bondholders under the Resolution. [National] shall have the right to institute any suit, action, or proceeding at law or in equity under the same terms as a holder of an Insured Bond in accordance with applicable provisions of the Resolution."); Ambac Insurance Agreement for Series AA Bonds (Exhibit S) § 3 ("Any reorganization or liquidation plan with respect to the Authority must be acceptable to Ambac. In the event of any such reorganization or liquidation, Ambac shall have the right to vote on behalf and in lieu of all holders of the Insured Bonds absent a default by Ambac under the Ambac Bond Insurance Policy insuring such Obligations."); Ambac Insurance Agreement for Series L Bonds (Exhibit T) § 3(d) ("Anything in the 1968 Resolution and/or the 1998 Resolution to the contrary notwithstanding, upon the occurrence and continuance of an event of default as defined herein, Ambac Assurance shall be entitled to exercise all rights and remedies granted to the Holders of the AMBAC Insured Bonds, or the Fiscal Agent for the benefit of the Holders of the AMBAC Insured Bonds under the 1968 Resolution and/or 1998 Resolution, as if it were a Holder of AMBAC Insured Bonds."); FGIC Agreement Regarding Bond Insurance for Series AA Bonds (Exhibit U) § 2(c) ("FGIC shall have the right to institute any suit, action, or proceeding at law or in equity under the same terms as a holder of an Insured Bond in accordance with applicable provisions of the Resolution."); FGIC Insurance Agreement for Series I and J Bonds (Exhibit V) § 2(c) ("FGIC shall be recognized as the registered owner of each Insured Bond for purposes of exercising all rights and privileges available to bondholders under the Resolution. FGIC shall have the right to institute any suit, action, or proceeding at law or in equity under the same terms as a holder of an Insured Bond in accordance with applicable provisions of the Resolution."); FGIC Insurance Agreements for Series L Bonds and Series N Bonds (Exhibits W and X) § 4(c) ("For all purposes of the 1998 Resolution governing events of default and remedies, except the giving of notice of default to Bondholders, the Bond Insurer shall be deemed to be the sole holder of the FGIC Insured Bonds for so long as it has not failed to comply with its payment obligations under the Bond Insurance Policy."); Id. § 5 ("FIGC shall be recognized as the registered owner of each FIGC Insured Bond for purposes of exercising all rights and privileges available to the registered owners of the FIGC Insured Bonds. With respect to any FIGC Insured Bonds, FIGC shall have the right to institute any suit, action or proceeding at law or in equity under the same terms as a bondholder in accordance with the applicable provisions of the 1998 Resolution.").

[8] See, e.g., Assured Insurance Agreement for Series AA Bonds (Exhibit O) § 1(k); Insurance Agreement for Series L Bonds (Exhibit P) § 6; Assured Insurance Agreement for Series N Bonds (Exhibit Q) § 9.

its respective policies.  Movants are now fully subrogated to the rights of Bondholders for the claims they paid.

## II.   The Commonwealth's Diversion And Dissipation Of The Pledged Revenues.

20.   Beginning in 2015, the Commonwealth has engaged in a series of actions that have served to divert the Pledged Revenues from the payment of the Bonds and to destroy the value of these revenues to Bondholders.

21.   First, on November 30, 2015, former Puerto Rico Governor García Padilla issued Administrative Bulletin No. EO-2015-46 (the "Clawback Order", Exhibit Y), which directed the Puerto Rico Secretary of Treasury to withhold the Excise Taxes, purportedly for application to the public debt, instead of applying the Excise Taxes to the payment of the Bonds as required by the Excise Tax Statutes.

22.   Next, on April 6, 2016, the Commonwealth enacted a moratorium law (Act No. 21-2016, the "First Moratorium Law," Exhibit Z) that purported to authorize the Governor to declare states of emergency with respect to a number of Puerto Rico public entities, including HTA, and to prohibit the payment of principal or interest by such entities, including by suspending the obligations of such entities to transfer funds to the relevant bond trustees or fiscal agents.  See Ex. Z § 201(d)(ii).

23.   Beginning on April 30, 2016, pursuant to the First Moratorium Law, the Governor issued a series of orders (including any future orders under a Moratorium Law, the "Moratorium Orders")[9] that prohibited payments of principal and interest on the Bonds, including by diverting the Pledged Revenues from the payment of the Bonds to other, unauthorized purposes. Since the enactment of the First Moratorium Law and the issuance of these initial Moratorium

---

[9] The relevant Moratorium Orders include those attached to the Declaration as Exhibit BB.

Orders, the Commonwealth has enacted additional moratorium laws (collectively, including the First Moratorium Law and any future moratorium laws, the "Moratorium Laws")[10] and Puerto Rico Governors have issued additional Moratorium Orders, which have continued in effect the prohibition of payment of principal and interest on the Bonds, including by diverting the Pledged Revenues from the payment of the Bonds and dissipating them for unauthorized purposes.

24.    To the extent any Pledged Revenues have been commingled with other funds in the Commonwealth's Treasury Single Account (the "TSA") or any other account, Movants have been able to trace the Pledged Revenues, and the amounts on deposit in the relevant accounts (including the TSA) have at all relevant times equaled or exceeded the amount of the Pledged Revenues.  For example, as of the most recent report released by AAFAF prior to the filing of this Motion, the balance of the TSA stood at $8.701 billion, which vastly exceeds the total amount of Pledged Revenues diverted by the Commonwealth to the TSA.[11]

## III.    PROMESA.

25.    Enacted on June 30, 2016, PROMESA sought to remedy, among other things, what Congress viewed as abuses of creditor rights committed by the Commonwealth prior to PROMESA's enactment, including through the passage of the First Moratorium Law and the issuance of the Clawback and Moratorium Orders.  For that reason, PROMESA expressly preempts (i) any moratorium law (including the Moratorium Laws) and (ii) any "unlawful executive orders" (including the Clawback Order and the Moratorium Orders) that alter the rights

---

[10] The Moratorium Laws include those attached to the Declaration as Exhibit AA.

[11] See AAFAF, Puerto Rico Department of Treasury Single Account FY 2020 Cash Flow As of December 27, 2019, attached to the Declaration as "Exhibit CC".  Alternatively, to the extent that the amounts on deposit in the relevant accounts have been reduced below the amount of the Pledged Revenues deposited therein, Movants are entitled to the lowest intermediate balance in the relevant accounts.  See Gracia-Gracia v. Fin. Oversight Mgmt. Bd. (In re Fin. Oversight Mgmt. Bd.), 939 F.3d 347, 350-51 (1st Cir. 2019).

of holders of any debt of a territorial instrumentality or divert funds from one instrumentality to another or to the Commonwealth.  PROMESA § 303(1), (3).

26.     In addition, PROMESA (i) created FOMB; (ii) requires FOMB to develop or approve fiscal plans governing the finances and budgets of the Commonwealth and its instrumentalities, including HTA (Title II); and (iii) in the event that a series of statutory predicates are satisfied (PROMESA § 206(a)), authorizes, but does not require, FOMB to file a petition on behalf of the Commonwealth or its instrumentalities, including HTA, to commence a court-supervised debt adjustment proceeding (Title III).

27.     Finally, upon the enactment of PROMESA on June 30, 2016, Section 405 of PROMESA gave rise to a temporary automatic stay (the "Section 405 Stay") of litigation against the Commonwealth and its instrumentalities, as well as certain other actions to collect pre-PROMESA debts.  See PROMESA § 405.  As the First Circuit later observed, however, Section 405 did not "leave creditors entirely without recourse" during the temporary stay period.  Peaje Invs. v. García-Padilla, 845 F.3d 505, 509 (1st Cir. 2017).  Rather, subsection 405(e) of Section 405 allowed creditors to move for relief from the Section 405 Stay and directed district courts to grant such relief "after notice and a hearing . . . for cause shown."  Id.

## IV.     Pre-Title III Lift-Stay Motions (Assured, National, And Peaje).

28.     Following the enactment of PROMESA, and in light of the Commonwealth government's ongoing diversion and dissipation of the Pledged Revenues, Assured, National, and Bondholder Peaje Investments LLC ("Peaje") brought various motions for relief from the Section 405 Stay for lack of adequate protection.  Judge Besosa of this Court denied those motions for relief from the Section 405 Stay.  See Peaje Invs. LLC v. García-Padilla, No. 16-2365, 2016 WL 6562426 (D.P.R. Nov. 2, 2016), aff'd in part, rev'd in part, 845 F.3d 505 (1st Cir. 2017); Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla, 217 F. Supp. 3d 508 (D.P.R. 2016).

29.     In Assured's case, Judge Besosa ruled that Assured had failed to establish an "injury in fact," and therefore lacked standing, because it was undisputed that during the Section 405 Stay period insured Bondholders would continue to receive payments from reserve funds held by the Fiscal Agent.  Peaje, 2016 WL 6562426, at *5.  As a result, the Court concluded, Assured would not need to make any payments under its policies during the period the Section 405 Stay was in effect.  Id.

30.     In Peaje's case, Judge Besosa ruled that Peaje was adequately protected because, notwithstanding what Judge Besosa justifiably but mistakenly took to be a short-term moratorium under the First Moratorium Law, Peaje "continue[d] to hold a security interest in a stable, recurring source of income that will eventually provide funds for the repayment of the PRHTA Bonds."  Id.

31.     Separately, in National's case, Judge Besosa ruled that National did not carry its "burden of showing adequate 'cause' for relief from the automatic stay pursuant to section 405(e)(2) of PROMESA."  Brigade, 217 F. Supp. 3d at 525.  The Court reasoned that because Section 407(a) of PROMESA empowers creditors to enforce their rights "by bringing an action in the U.S. District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 405," there existed a "mechanism for the negation and recovery of any improper transfer that harms a creditor's interests while the Oversight Board is in existence."  Brigade, 217 F. Supp. 3d at 527.

32.     On or around May 1, 2017, the Section 405 Stay expired by its terms.  As set forth below, on May 21, 2017, FOMB filed a petition on HTA's behalf commencing a proceeding for HTA under Title III of PROMESA.

-13-

V.    **The Fiscal Plans And Compliance Law.**

33.    Following its appointment in August 2016, FOMB developed a series of fiscal plans for the Commonwealth and HTA, each of which has, as applicable, provided that (i) the Toll Revenues will continue to be used for purposes other than payment of the Bonds, including to fund HTA expenses unrelated to the toll highways that generate the Toll Revenues, and (ii) the Excise Taxes will continue to be diverted from HTA to the Commonwealth and consumed for purposes other than payment of the Bonds, including purposes wholly unrelated to HTA.

34.    In an effort to comply with these fiscal plans, the Commonwealth, on or about April 29, 2017, enacted a "Fiscal Plan Compliance Law" (Act No. 26-2017, including as amended or superseded, the "Compliance Law," Exhibit DD).

35.    Article 4.01 of Chapter 4 of the Compliance Law provides for the Commonwealth to expropriate property, in the form of "surplus" revenues, from its public corporations and their bondholders.  Chapter 4 purports to authorize the Commonwealth to expropriate the Pledged Revenues from HTA, and makes no provision for payment by HTA of its secured debt.

36.    Chapter 6 of the Compliance Law provides that "any special State fund and any other income of the agencies and public corporations [including HTA] shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate."  Ex. DD.  Funds held in special funds in the Commonwealth treasury include Excise Taxes constituting trust funds held by the Department of Treasury on behalf of HTA for the benefit of Bondholders. See, e.g., 13 L.P.R.A. § 31751; 9 L.P.R.A. §§ 2021, 5681.

37.    Chapter 6 also conditions the use of the Excise Taxes on such use being "in accordance with the Recommended Budget of the Office of Management and Budget and the Fiscal Plan."  Chapter 6 therefore authorizes the continued diversion and dissipation of Pledged

Revenues to the extent such diversion is provided for in a "Recommended Budget" or in a fiscal plan.

## VI.   The Title III Filings.

38.    On May 3, 2017, FOMB filed a petition commencing a proceeding under Title III of PROMESA on the Commonwealth's behalf.  On May 21, 2017, FOMB filed a petition commencing a proceeding for HTA under Title III of PROMESA.

39.    During the pendency of the Title III cases, the unlawful diversion and misappropriation of Toll Revenues and Excise Taxes has continued.  Funds have been spent by HTA or improperly commingled in the Commonwealth treasury.

40.    Moreover, the Commonwealth now claims to own funds held in trust for Bondholders.  In its proposed joint plan of adjustment (ECF No. 8765, the "Plan of Adjustment"), the Commonwealth fails to acknowledge that the Excise Taxes it collects must be held in trust for Bondholders and must not be wrongfully withheld.  Instead, the Commonwealth treats the Excise Taxes as its own and treats HTA and its Bondholders as if they have a mere claim for damages worth cents on the dollar.  Specifically, for its "retention of certain funds historically transferred to HTA," the Commonwealth offers a mere 3.1% recovery on the estimated claim amount.  See Plan of Adjustment, Art. 1.112; see also ECF No. 8766 (the "Disclosure Statement") at pp. 278-79 (describing proposed treatment for "Class 28:   CW/HTA Constitutional Claims").   If Bondholders reject this treatment, the plan proposes to treat them as unsecured creditors.  See Disclosure Statement at p. 279.  The Plan of Adjustment and Disclosure Statement therefore imply that the Commonwealth will permanently retain the Excise Taxes for itself going forward.  See Disclosure Statement at p. 39 (arguing that Section 202 of PROMESA preempts "laws enacted prior to PROMESA that conditionally allocate Commonwealth revenues to its instrumentalities").

41.     In the face of the Commonwealth's long-standing misappropriation of Excise Taxes and assertion of outright ownership of them, HTA has only been complicit. Meanwhile, FOMB, as the concurrent representative of both HTA and the Commonwealth, who are adverse to each other in the Title III proceedings, has a disabling conflict of interest and therefore cannot be relied upon to pursue HTA's legitimate interests, much less those of its creditors.   FOMB has not taken any steps to resolve the conflict—such as appointing an unconflicted trustee under Section 926 of the Bankruptcy Code.

42.     Most recently, FOMB advanced a plan to prevent the full and fair adjudication of Bondholders' claims.   In December 2019, the mediation team proposed a dual litigation track to allow FOMB and Bondholders to pursue a comprehensive resolution of HTA-related issues.   Under the proposal, FOMB could elect to bring adversary complaints testing, among other things, the validity and scope of Bondholders' liens (the "<u>Revenue Bond Complaints</u>" initiating "<u>Revenue Bond Adversary Proceedings</u>"), while the Bondholders would have an opportunity to move for stay relief to protect their interests.   <u>See</u> ECF No. 9365-2 at 4–6.   FOMB responded that lift-stay motions should be stayed pending resolution of motions to dismiss the Revenue Bond Complaints.   <u>See</u> ECF No. 9493 at 6–11.   At the same time, however, FOMB asserted that it would not consent to the full adjudication of HTA-related issues in the Revenue Bond Adversary Proceedings. <u>Id.</u> at 11–12. Invoking Section 305 of PROMESA, FOMB specified that it would not consent "to orders interfering with the validity of fiscal plans or budgets certified by [FOMB] . . . , the validity of Commonwealth statutes or executive orders (including the Moratorium Laws and the Fiscal Compliance Act), and orders interfering with or ordering the turnover of revenue or other property." <u>Id.</u>  FOMB thus invokes Section 305 to restrict litigation of Bondholders' claims while simultaneously seeking to block Bondholders' access to stay relief,

which is the only avenue to litigate their claims in light of recent First Circuit precedent.  See infra
IV.C.

## ARGUMENT

### I.    The "Colorable Claim" Standard Governing This Motion.

43.    Title III of PROMESA, which incorporates Sections 362 and 922(a) of the
Bankruptcy Code, provides that the filing of a Title III petition operates as a stay on certain creditor
remedies against the debtor.  See 11 U.S.C. §§ 362(a) and 922(a); PROMESA § 301(a).  However,
these stay provisions are not absolute.

44.    As the Court is aware, Movants contend that Section 922(d) of the
Bankruptcy Code creates an exception from the automatic stay permitting Movants to enforce the
application of the Pledged Revenues to the payment of the Bonds without moving to lift the stay,
including through enforcement of Movants' liens on the Pledged Revenues.  This Court has taken
a different view.  Assured Guaranty Corp. v. Commonwealth of Puerto Rico, 582 B.R. 579 (D.P.R.
2018), aff'd, 919 F.3d 121 (1st Cir. 2019); cert. denied, No. 19-301, 2020 WL 129573 (U.S. Jan.
12, 2020).  In light of this Court's holding, and given the ongoing diminution in the value of
Movants' property interests, Movants have no alternative but to bring this Motion.  Movants do
not, however, waive their argument that Section 922(d) already provides advanced relief from the
automatic stay with respect to actions to enforce the application of pledged special revenues.

45.    In any event, PROMESA recognizes that courts must condition or lift the
stay under certain circumstances to protect creditors.  Section 362(d) of the Bankruptcy Code states
that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief
from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay."  11

U.S.C. § 362(d); <u>see</u> <u>also</u> 11 U.S.C. § 922(b) (incorporating same).  That section provides two

pertinent avenues for relief, as detailed in Sections III and IV below.

    46.    Both avenues require a claim to property being held by the debtor, but under

either avenue the standard for granting stay relief is not demanding.  Movants do not need to

persuade this Court that they "can ultimately recover in light of all relevant legal issues," but only

that their "claim to the estate's property is ***colorable***."  <u>U.S. v. Fleet Bank (In re Calore Exp. Co.),</u>

288 F.3d 22, 35 (1st Cir. 2002); <u>Grella v. Salem Five Cent Sav. Bank</u>, 42 F.3d 26, 33 (1st Cir.

1994) (the court "seek[s] only to determine whether the party seeking relief has a ***colorable claim***

to property of the estate") (emphasis added); <u>see also</u> <u>In re Vitreous Steel Prods. Co.</u>, 911 F.2d

1223, 1234 (7th Cir. 1990) ("Questions of the validity of liens are not generally at issue in a § 362

hearing, but only whether there is a *colorable* claim of a lien on property of the estate.")  (emphasis

in original).  This is a low threshold.

    47.    As the First Circuit has explained,

> [T]he hearing on a motion to lift the stay is ***not a proceeding for
> determining the merits of the underlying substantive claims***,
> defenses, or counterclaims.  Rather, it is analogous to a preliminary
> injunction hearing, requiring a speedy and necessarily cursory
> determination of the reasonable likelihood that a creditor has a
> legitimate claim or lien as to a debtor's property.
>
> . . . . ***[A] decision to lift the stay is*** not an adjudication of the validity
> or avoidability of the claim, but ***only a determination that the
> creditor's claim is sufficiently plausible to allow its prosecution
> elsewhere***.

<u>Grella</u>, 42 F.3d at 33, 34.

    48.    "[A] colorable claim is one that is legitimate and that may reasonably be

asserted, given the facts presented and the current law."  <u>Mission Prod. Holdings, Inc. v. Schleicher</u>

<u>& Stebbins Hotels, L.L.C. (In re Old Cold, LLC)</u>, 602 B.R. 798, 825 (B.A.P. 1st Cir. 2019) (citation

and internal quotation omitted).  "A colorable claim (one seemingly valid and genuine) is not a

difficult standard to meet.'" Id. (citation omitted); see also Cortuk v. Banco Turco Romana (In re

Cortuk), No. 18-2766, 2019 WL 2171481, at *4 (D.N.J. May 20, 2019) ("In other words, a claim

need not necessarily be successful in order to be colorable."); Jin Qing Li v. Rosen (In re Jin Qing

Li), No. 12-33630, 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018) ("We similarly have

defined the term 'colorable claim' in this context to mean 'a plausible legal claim.'").

        49.    Movants clearly meet the "colorable claim" standard and deserve stay relief

(see infra Sections III-IV).

## II.    <u>Movants Have More Than A "Colorable Claim" To The Pledged Revenues.</u>

### A.    <u>HTA, Not The Commonwealth, Is The Beneficial Owner Of The Pledged Revenues.</u>

#### 1.    Movants Have A Statutory Entitlement To Receive The Excise Taxes.

        50.    The Commonwealth never had, or it relinquished, beneficial ownership of

and all equity in, the Pledged Revenues when it either authorized HTA to impose and collect those

revenues for its own benefit and the benefit of Bondholders (in the case of the Toll Revenues) or

assigned those revenues to HTA for the benefit of Bondholders (in the case of the Excise Taxes).

        51.    There is no question that the Commonwealth exercises no lawful control

over the Toll Revenues.  The Commonwealth by statute granted to HTA the power to impose,

collect, or otherwise control those revenues, and the Toll Revenues are never transferred into the

general fund or any other Commonwealth owned or controlled account.  Instead, the Toll Revenues

are imposed and collected by HTA, and only ever pass through accounts held and controlled by

HTA or Bondholders.  There is simply no opportunity for the Commonwealth to exercise any

control over the Toll Revenues.  See, e.g., Thomas Jefferson Classical Acad. Charter Sch. v.

Cleveland Cty. Bd of Educ., 763 S.E.2d 288, 293 (N.C. Ct. App. 2014) ("restricted funds" are

those with "a limited use and specific purpose, such as to fund a special program").  Moreover,

HTA pledged the Toll Revenues to Bondholders, 9 L.P.R.A. § 2004(l); 1998 Resolution § 601; 1968 Resolution § 601, and has no equity in the funds pledged.

52.     Although the Commonwealth does act as a collection agent with respect to the Excise Taxes, it has assigned all beneficial ownership of those revenues to HTA for the benefit of its Bondholders.  As noted above, the Secretary of Treasury is required by statute to deposit the Excise Taxes into a special fund in favor and for the benefit of HTA, and then transfer the Excise Taxes to HTA each month.  Thus, there is no question that the Excise Taxes constitute property of HTA, not the Commonwealth.  <u>See</u>, <u>e.g.</u>, 13 L.R.P.A. § 31751(a)(1); 9 L.P.R.A. §§ 2013(a)(2), 2021, 5681.

53.     In an analogous context, the First Circuit found that certain insurance premiums collected by the Commonwealth were the property of a private association because the governing statute provided that the association "shall receive," and the Commonwealth shall transfer," the premiums.   <u>See</u> <u>Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza</u>, 484 F.3d 1, 29 (1st Cir. 2007); <u>Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight Mgmt. Bd. for P.R.)</u>, 939 F.3d 340, 345 (1st Cir. 2019) ("<u>Gracia-Gracia</u>"), 939 F.3d 340, 345 (1st Cir. 2019).   <u>Flores Galarza</u> and the September 25, 2019 decision in <u>Gracia-Gracia</u> both involved the Commonwealth's diversion of premiums paid by motor-vehicle owners and operators under the Commonwealth's compulsory automobile-insurance law ("<u>Law 253</u>").

54.     Law 253 required motor vehicle owners to pay to the Secretary of Treasury a compulsory insurance premium when they acquired or renewed a vehicle license. <u>Flores Galarza</u>, 484 F.3d at 7; <u>see</u> 26 L.P.R.A. § 8053(a).  Law 253 then required the Secretary of Treasury to transfer these premiums to a government-created association of private insurers (the

"Association")[12] that was required by law to provide insurance to motor vehicle owners who were unable to obtain private insurance.  Id.  To the extent the Association provided insurance to motor vehicle owners, Law 253 provided that the Association was entitled to keep the premiums (the "Earned Premiums").  Id.  By contrast, if motor vehicle owners who had paid the compulsory premiums were able to show that they had obtained private insurance, then Law 253 required the Association to reimburse the compulsory premiums (the "Duplicate Premiums") to such motor vehicle owners.  Id.  As an alternative to seeking reimbursement of the Duplicate Premiums directly from the Association, privately-insured motor vehicle owners could also seek reimbursement from their private insurers, in which case Law 253 required the Secretary of Treasury to reimburse the insurers.  Id.

55.    Beginning in 2000, the Secretary of Treasury discontinued the statutorily mandated transfer of insurance premiums to the Association in an attempt to ease cash-flow problems.  Id. at 9.  The Association brought a claim against the Secretary of Treasury under the Takings Clause of the United States Constitution.  Id. at 6.  The First Circuit ruled that the Association had "successfully alleged *an entitlement* to the Earned Premiums under Law 253, *and therefore a property interest in those funds*."  Id. at 29 (emphasis added).  The First Circuit also held that the Duplicate Premiums owed to privately-insured motor vehicle owners or to their insurers, but withheld by the Secretary of Treasury, "*belong[ed] to* [the] privately insured motorists or their insurers who are entitled to reimbursement."  Id. at 30 (emphasis added); see also Garcia-Rubiera v. Fortuño, 665 F.3d 261, 263 (1st Cir. 2011) (holding there was "*no doubt*" that motor vehicle owners entitled to Duplicate Premiums under Law 253 "have a *property interest* in the duplicate payments") (emphasis added); Colón-Rivera v. Asociación de Suscripción, 665 F. Supp.

---

[12] Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, or Compulsory Liability Joint Underwriting Association of Puerto Rico.

2d 88, 93 (D.P.R. 2009) (holding it was **"crystal clear"** that privately-insured motor vehicle owners "do have a **property interest** in the duplicate premiums.") (emphasis added).

56.     In defining the nature of the Secretary of Treasury's interest in the funds that he was required by statute to transfer to other parties, the First Circuit in Flores Galarza held that the Secretary of Treasury (*i.e.,* the Commonwealth) was a mere "custodian" with "no entitlement" to the funds.  Flores Galarza, 484 F.3d at 29.  Similarly, in a subsequent decision again dealing with the Secretary of Treasury's withholding of the Duplicate Premiums, the First Circuit held that these funds were held *in trust* for the benefit of their true beneficial owners, *i.e.,* the privately-insured motorists entitled by statute to receive them, whether in the hands of the Secretary of Treasury (*i.e.,* Commonwealth) or of the Association:  "[L]ike funds held *in trus*t in an IOLTA account or an interpleader account, the funds held by [the Association] or the Secretary [of Treasury] are clearly **the 'private property'** of [the privately-insured motor vehicle owners] for purposes of the Takings Clause."  García-Rubiera v. Calderón, 570 F.3d 443, 452 (1st Cir. 2009) (emphasis added).

57.     Like the Association, the privately-insured motor vehicle owners, and the insurers in Flores Galarza, all of whom the First Circuit found to have a "property interest" in funds withheld by the Secretary of Treasury, Movants and other Bondholders are the beneficiaries of "state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Flores Galarza, 484 F.3d at 27.  In particular, the Excise Tax Statutes, which require the Secretary of Treasury to collect the Excise Taxes on behalf of HTA for the benefit of the Bondholders, are virtually identical to Law 253.  In holding that the Association, motor vehicle owners, and insurers had property interests in the funds withheld by the Secretary of Treasury, the First Circuit relied on the following language from Law 253:

Any person who obtains a motor vehicle license for the first time, or who renews it, as required by §§ 5001 et seq. of Title 9, shall be bound to pay the corresponding premium for the compulsory insurance together with the payment of the amount of the fees for the issuing or renewing said license, to the Secretary of Treasury. The Secretary of Treasury ***shall transfer*** the total amount of the premiums collected to the [Association].

Id. at 29 (quoting 26 L.P.R.A. § 8053(a)) (emphasis added). The following language of the Excise

Tax Statutes is either identical or extremely similar to the "shall transfer" language that the First

Circuit held gave rise to a property interest in Flores Galarza:

### § 31751.  Disposition of funds

**(a)**  The revenues derived from taxes and license fees collected by virtue of this Subtitle shall be deposited in the General Fund of the Treasury of Puerto Rico **except as provided below** . . .

**(1)** The sum of the tax collected on gasoline and four cents (4¢) of the gas oil or diesel oil tax established by Section 3020.06 of this Subtitle, and the total amount per fiscal year of the excise tax collected for crude oil, partially finished and finished oil by-products, and any other hydrocarbon mixtures established in Section 3020.07 of this Subtitle, ***shall be covered*** into a special deposit in favor of the Highways and Transportation Authority for its corporate purposes.

**(A)** The Secretary ***shall transfer*** every month, or as agreed on with the Highways and Transportation Authority, the amounts covered into said special deposit, deducting from these the amounts reimbursed according to the provisions of Section 3030.19 and 3030.20 of this Subtitle . . .

**(C)** . . . The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, until the other resources available to which reference is made in said section are insufficient for such purposes. Otherwise, the proceeds of said collection, in the amount that may be necessary, ***shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority*** and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations.

13 L.P.R.A. § 31751 (emphasis added).[13]

58.    As detailed above, under the controlling Law 253 cases, Movants' statutory entitlement to receive the Excise Taxes also constitutes a property interest constitutionally protected under the Takings Clause and therefore entitled to adequate protection. See Flores Galarza, 484 F.3d at 27; see also Calderón, 570 F.3d at 452; and Fortuño, 665 F.3d at 263.

### 2.    The Commonwealth, At Most, Holds The Excise Taxes In "Trust" For HTA And Bondholders.

59.    Any Excise Taxes in the custody of the Commonwealth are, at most, held in "trust" for the benefit of HTA and Bondholders.  There is a well-settled body of case law holding that where, as here, a state statute restricts the use of taxes or other revenues for the payment of bonds, the taxing entity holds the taxes in trust for the bondholders.  See, e.g., Fed. Deposit Ins. Corp. v. Casady, 106 F.2d 784, 788 (10th Cir. 1939) (where state law required town treasurer to deposit assessments in a separate special fund, "[t]he relation . . . thus created is that of an express trust created by law in which the city is the trustee and the bondholder the cestui que trustent."); Ecker v. Sw. Tampa Storm Sewer Drainage Dist., 75 F.2d 870, 872-73 (5th Cir. 1938) (pledged assessments were trust funds that could not otherwise be applied by the municipality); Vickrey v. City of Sioux City, 104 F. 164, 166 (Cir. Western Div. 1900) ("[U]nder the provisions of the act . . . authorizing the issuance of the bonds, the city assumed the duty of creating and properly applying the sinking fund provided for in the act, and to that end was charged with the duty of levying the special assessments called for by the act, collecting the same, and making proper payment thereof

---

[13] Equivalent language exists restricting the Commonwealth's ability to use the Vehicle Fees for any other purpose except subject to the conditions set forth in the Article VI, Section 8.  See 9 L.P.R.A. § 2021 ("otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations"); id. § 5681 ("Otherwise, the proceeds of said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed upon by the Authority to the holders of its bonds and other obligations.").

to the bondholders. In these particulars the city is charged with a duty amounting to a trust."); In re City of Columbia Falls, 143 B.R. 750, 762 (Bankr. D. Mont. 1992) (funds pledged to the payment of bonds "are trust funds under state law" and that taxing authority merely acts as a custodian with respect to such funds); Bexar Cty. Hosp. Dist. v. Crosby, 160 Tex. 116, 122 (1959) (taxes levied specifically to retire certain bonded indebtedness were held by the city and county in trust for the bondholders, and cannot be applied to any purpose except the bond indebtedness); Hays v. Isaacs, 120 S.W.2d 737 (Ky. Ct. App. 1938) (fund held by County for repayment of bonds "is a trust for the benefit of the holders of the bonds" and cannot be diverted to another purpose).[14]

60.     Even a statute that does not explicitly use the word "trust" creates a trust if it manifests a legislative intent to impose a trust-type relationship. See Calderón, 570 F.3d at 457; City of Springfield v. Lan Tamers, Inc. (In re Lan Tamers, Inc.), 281 B.R. 782, 792 (Bankr. D. Mass. 2002), aff'd, 329 F.3d 204 (1st Cir. 2003), cert. denied, 540 U.S. 1047 (2003);[15] Stowe v.

---

[14] Courts have also held that a municipality becomes a trustee of funds resulting from the collection of special taxes and assessments, and thus is charged with all related fiduciary duties. See, e.g., Town of Shattuck v. Barcafer, 137 P.2d 238, 240 (Okla. 1943) (holding that in the collection of money paid in by property owners for the retirement of the bonds, the municipality stands in relation to agent to the bondholders); Keyes v. City of Tacoma, 120 P.2d 533, 534-35 (Wash. 1941) (funds collected to pay off local improvement bonds constituted trust fund, even after being commingled with general funds, and even if not an express trust "in the strict sense of the word" had the characteristics of a trust); City of Winter Haven v. Summerlin, 154 So. 863, 865(Fla. 1934) ("It is well settled that, where a municipal corporation is charged by law with the duty of collecting special assessments and making proper payment thereof to bondholders to whom the assessments have been pledged as party of their security, the duty amounts to a trust that is cognizable in equity for the purpose of calling into account the municipality and its officers for the manner in which that trust has been performed.").

[15] The Commonwealth previously sought to distinguish In re Lan Tamers principally on the grounds that the Commonwealth, unlike the debtor in In re Lan Tamers, has exercised a measure of control over the funds at issue, control the Commonwealth claims it is afforded under Section 8 of Article VI and its ill-defined police powers. (See ECF 7827, ¶100.)  The Commonwealth's claims miss the mark.  As explained herein, other than certainly narrowly drawn exceptions, subject to conditions which have *never* been satisfied, the Commonwealth was *required* to transmit the Pledged Revenues to HTA.  The Commonwealth's position is, in effect, that because they have exercised *unlawful* control over the Pledged Revenues, they have somehow improved their lawful claim over the funds.  But, as recognized by the court in In re Lan Tamers, the relevant question is what control is afforded to the party holding the funds by the terms of the statutes and contracts giving rise to the relationship at issue. See In re Lan Tamers, 281 B.R. at 792-93, 796 (citing the "language of the Act and its underlying regulations[,] . . . the FCC forms and USAC procedures[,]" and "the language in the USAC Service Provider Manual" in finding a resulting trust, and in the alternative citing the requirements of the "BEAR payment method" and the statutory language, procedures, and forms used to effect those payments as guiding its decision to find a constructive trust).  In contrast, Commonwealth would

Bologna (In re Bologna), 206 B.R. 628, 632 (Bankr. D. Mass. 1997); Columbia Falls, 143 B.R. at

762.  Here, the Excise Tax Statutes indicate a clear legislative intent that the Commonwealth holds

the Excise Taxes (a clearly defined trust res) for the benefit of HTA and Bondholders.  By

mandating the transfer of the Excise Taxes to HTA, through a special fund segregated from the

Commonwealth's general fund, and covenanting in the Excise Tax Statutes and the HTA Enabling

Act not to impair that fund flow, the Commonwealth intended to, and did, create a series of trust

relationships in which it and HTA act as mere conduits for the transfer of the Excise Taxes.

Columbia Falls, 143 B.R. at 762; see also In re Tap, Inc., 52 B.R. 271, 275 (Bankr. D. Mass. 1985)

("Where the owner of property transfers it to another with a direction to transfer it to . . . a third

person, this may be a sufficient manifestation of an intention to create a trust"; "Every person who

receives money to be paid to another, or to be applied to a particular purpose . . . is a trustee"); In

re Bologna, 206 B.R. at 632 (statutes do not need to use the magic word "trust" if the statute

manifests a legislative intent to impose a trust-type relationship).

61.     Even if (contrary to statutory language and the manifest intent of the

drafters) the Court does not find that an express trust has been created for the benefit of HTA, it

should find that a constructive trust or, in the alternative, a resulting trust, has arisen as a result of

the Debtors' diversion of the Pledged Revenues for improper purposes.  "Constructive and

resulting trusts are traditional constructs utilized by courts . . . to avoid unjust enrichment and other

forms of injustice that would result from allowing the legal owner to benefit from the property."

In re Brown, 2008 WL 2115200, at *7 (Bankr. D.N.H. May 19, 2008) (quoting Davis v. Cox, 356

F.3d 76, 90 (1st Cir.2004)).

---

have this Court believe that because it exercises *unlawful* control over the Pledged Revenues, in violation of the terms
of the relevant statutes and agreements, it has somehow strengthened its lawful claim.

62.     A constructive trust achieves equitable restitution "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." See Zimmermann v. Epstein Becker & Green, P.C., 657 F.3d 80, 83 (1st Cir. 2011).  Courts have imposed constructive trusts where, as here, there has been some wrongdoing or breach of fiduciary duties. See Rentas v. Claudio (In re Garcia), 484 B.R. 1, 16 (Bankr. D.P.R. 2012), rev'd on other grounds, 507 B.R. 32 (B.A.P. 1st Cir. 2014).[16] Among other things, a constructive trust may be imposed to prevent unjust enrichment.  Id.; see also Fernandez v. Laloma, 56 D.P.R. 367 (1940) (imposing a constructive trust where evidence demonstrated that defendant was holding the property for plaintiff's benefit, defendant had knowledge of her obligation to transfer title to the plaintiff upon the occurrence of an event, and defendant's failure to transfer title resulted in unjust enrichment at the expense of another, thereby offending general principles of law); Porrata Doria v. Fajardo Sugar Co. of P.R., 57 D.P.R. 628 (1940) (explaining that constructive trusts are a tool designed to effectuate transfer of property where the person holding bare legal title would be unjustly enriched if he were allowed to retain it as his own and imposing a constructive trust in favor of plaintiff where defendant represented that it was merely holding legal title to property for plaintiff's benefit, because failure to do so would result in unjust enrichment).

63.     Here, the Commonwealth and HTA would clearly be unjustly enriched if they were permitted to retain funds that they are required under the Excise Tax Statutes and Resolutions to collect, hold, and transfer for the benefit of the Bondholders.  Therefore, recognition of a constructive trust is appropriate.

---

[16] Courts, in the context of bankruptcies, have recognized the existence of constructive trusts which properly arose under state law. See e.g., Mitsui Mfrs. Bank v. Unicom Computer Corp. (In re Unicom Computer Corp.), 13 F.3d 321, 325 (9th Cir. 1994); Claybrook v. Consol. Foods, Inc., (In re Bake-Line Grp. LLC), 359 B.R. 566, 576 (Bankr. D. Del. 2007).

64.      A resulting trust is intended to provide equitable relief where "a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein . . . ."  Fleet Nat'l Bank v. Valente (In re Valente), 360 F.3d 256, 263 (1st Cir. 2004) (quoting Restatement (Second) Trusts, § 404).  The facts here fit squarely within this approach:  the statutory framework unambiguously requires the Secretary of the Treasury to deposit the Excise Taxes into a special, segregated fund in favor and for the benefit of HTA.  See, e.g., 13 L.R.P.A. § 31751(a)(1); 9 L.P.R.A. §§ 2013(a)(2), 2021, 5681.  And it is evident that, regardless of the fact that the Commonwealth "held" the Excise Taxes for some period of time before transferring those funds to HTA, there was no intention that the Commonwealth would or should have a beneficial interest in those funds.

### 3.      In The Alternative, The Excise Taxes Constitute "Restricted Funds" That The Commonwealth Must Transfer To HTA.

65.      Finally, any Excise Taxes in the possession of the Commonwealth are "restricted funds" that the Commonwealth cannot lawfully use or dispose of, except by transferring them to HTA.  The Excise Tax Statutes transferred ownership of the Excise Taxes to HTA and the Enabling Act expressly contemplated that HTA would pledge these revenue streams to Bondholders and authorized HTA to do so.  See 9 L.P.R.A. § 5682 (motor vehicle fees); 9 L.P.R.A. § 2004b (toll revenues); 13 L.P.R.A. § 31751(a)(1)(C) (gas tax); 13 L.P.R.A. § 31751(a)(1)(C) (gas oil, diesel oil, and petroleum products tax); 13 L.P.R.A. § 31751(a)(3)(C) (cigarette tax).  The Commonwealth therefore relinquished all discretion over how the funds are applied—the hallmark of "restricted funds" in which the debtor has no property interest.  See, e.g., Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ., 763 S.E.2d 288, 293 (N.C. Ct. App.

2014) ("restricted funds" are those with "a limited use and specific purpose, such as to fund a special program").

**B.     Movants Have A Lien On The Pledged Revenues.**

**1.     Movants Have Security Interests In All Pledged Revenues.**

66.     As an initial matter, the Resolutions grant Movants a lien and a security interest in all of the Pledged Revenues (including both the Toll Revenues and the Excise Taxes).[17] The Bankruptcy Code defines "lien" to mean a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). A "security agreement" is defined as "[an] agreement that creates or provides for a security interest." Id. § 101(50). A "security interest" means a "lien created by an agreement." Id. § 101(51).

67.     The pledges effectuated pursuant to the Resolutions are "liens," because the Enabling Act treats a "pledge" as a "lien." See 9 L.P.R.A. § 2004(l) (authorizing HTA to secure bonds "***by pledge of, or other lien on***, all or any of its properties, revenues or other income . . . .") (emphasis added). Moreover, the pledges grant an interest in and charge against the Pledged Revenues in favor of the Bondholders. See In re Sandoval, 78 F. Supp. 135, 136 (D.P.R. 1948) (finding that a pledge fell squarely within the definition of a lien because it was "a hold or claim which one person has upon the property of another as a security for some debt or charge") (internal citation omitted); In re Johnson, 215 B.R. 381, 384 (Bankr. N.D. Ill. 1997) (finding that an interest in a security deposit was "akin to a pledge and hence a 'lien' for purposes of § 101(37)"); State v. City of Lakeland, 16 So. 2d 924, 925-26 (Fla. 1943) ("[A]n express pledge of revenues to be

---

[17] In addition, the 2002 Security Agreement grants Movants an additional security interest with respect to the Pledged Revenues pledged to the payment of Bonds issued under the 1998 Resolution. See Ex. F (granting "a security interest in the Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund (and all accounts therein) . . . maintained under the [1998] Resolution, ***and all amounts required to be on deposit therein by the terms of the Resolution***, including all proceeds and after-acquired property, subject to application as permitted by the Resolution.").

derived from a particular source . . . creates a lien or charge upon the specific revenues designated, *whether then or thereafter collected*.") (emphasis added).

68.     The Resolutions themselves also qualify as "security agreements," because they create the interest (*i.e.,* the pledge) in the Pledged Revenues.  Both Resolutions expressly state that the Pledged Revenues "are hereby pledged" to the payment of the Bonds.  Ex. C § 601; Ex. D § 601.  Further evidencing the creation of liens in favor of the Bondholders, the Resolutions prohibit HTA from incurring debt "having a priority to or being on a parity ***with the lien on Revenues on the Bonds***"  (Ex. C § 602) (emphasis added) or "ranking equally with or prior to the senior bonds, except ***the lien and charge of the senior bonds secured hereby upon the Revenues*** . . ." Ex. D § 602 (emphasis added).  Moreover, the Resolutions prohibit amendments that would result in "the creation of a lien upon or pledge of Revenues ***other than the lien and pledge created by this Resolution***."  Id., Ex. C § 802; id., Ex. D § 802 (emphasis added).

69.     In addition, the offering documents for the Bonds confirm that the Bondholders' lien extends to the ongoing stream of current and future Pledged Revenues.  See, e.g., Official Statement for Series AA Bonds issued pursuant to 1968 Resolution (Exhibit EE), at 14 (providing that the Bonds "are payable solely from, and ***secured by a pledge of***, the 1968 Resolution Revenues and all other moneys held for the credit of the 1968 Bond Sinking Fund . . . ") (emphasis added), at 11 (defining the "1968 Resolution Revenues" to include the Toll Revenues and Excise Taxes); Official Statement for Series M and N Transportation Revenue Bonds issued pursuant to 1998 Resolution (Exhibit FF), at 27 (providing that Senior Transportation Revenue Bonds issued under the 1998 Resolution "are payable solely from, and ***secured by a pledge of***, the 1998 Resolution Revenues and all other moneys held for the credit of the 1998 Senior Bond Sinking Fund . . .") (emphasis added), at 28 (defining the "1998 Resolution Revenues" to include the Toll Revenues and Excise Taxes).

70.     This accords with prior judicial admissions of FOMB and HTA, as well as with prior findings from this Court and the First Circuit.  For example, in the 2016 Peaje proceedings before this Court and the First Circuit, FOMB and HTA repeatedly admitted that the Bonds were "secured by a pledge of revenues generated by highway tolls, excise taxes on gasoline, vehicle license fees, and investment earnings."   See, e.g., Peaje Invs LLC v. García-Padilla, No. 16-2377 (1st Cir.), ECF No. 64 at 10.[18]  Relying on these admissions, Judge Besosa found:  "***Peaje Investments continues to hold a security interest in a stable, recurring source of income that will eventually provide funds for the repayment of the HTA bonds***.  Though it will not receive the pledged revenues during the stay period, ***this enduring security interest*** means that it faces only a delay in recouping such funds, not a permanent loss of them."  Peaje Invs. LLC v. García-Padilla, No. 16-2365, 2016 WL 6562426, at *5-6 (D.P.R. Nov. 2, 2016), aff'd in part, vacated in part, 845 F.3d 505 (1st Cir. 2017) (emphasis added).  On appeal, the First Circuit likewise found that "[t]he [Bonds] are secured by a lien on toll revenues, among other things."  Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 510 (1st Cir. 2017).  As a result, HTA and FOMB are now judicially estopped from taking a position inconsistent with their prior admissions—which were the basis for decisions rendered by two different courts.  See N.H. v. Mn., 532 U.S. 742, 749 (2001), reh'd denied, 533 U.S. 968 (2001) (holding that judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase'") (citation omitted); Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33-36 (1st Cir. 2004) (holding that litigant was judicially estopped

---

[18] See also Peaje Invs. LLC v. García Padilla, Case No. 16-2365-FAB (D.P.R. Oct. 28, 2016), ECF No. 67 at 12 (filing by FOMB that contended that "the perpetual revenue streams that secure their claims would still be available for future payments . . . in future proceedings under PROMESA"); Peaje Invs LLC v. García Padilla, Case No. 16-2377 (1st Cir. Dec. 23, 2016) at 18 (amicus brief by FOMB contending that "perpetual revenue streams that secure [HTA Bondholders'] claims . . . are continually replenished.").

from advancing new arguments where the party's new argument was inconsistent with its original arguments and a court accepted the original position).

71.     For these reasons, Bondholders' rights plainly constitute a "security interest" under the Bankruptcy Code.  But, in the alternative, even assuming *arguendo* that Bondholders' rights did not constitute a "lien" under Commonwealth law or a "security interest" under the Bankruptcy Code, Movants nevertheless would be entitled to stay relief or adequate protection because Commonwealth law and the Resolutions gave Bondholders a constitutionally protected property interest in the Pledged Revenues under the Takings Clause.  Any impairment or rescission of Bondholders' rights to the Pledged Revenues, including contractual rights, would be an unconstitutional "taking" of their property rights.  See, e.g., U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 19 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); Franklin Cal. Tax-Free Tr. v. Puerto Rico, 85 F. Supp. 3d 577, 612 (D.P.R. 2015), aff'd, 805 F.3d 322 (1st Cir. 2015), cert. granted, 136 S.Ct. 582 (2015) ("Contracts are a form of property for purposes of the Takings Clause.").

### 2.     Movants Have Statutory Liens On The Excise Taxes.

72.     The Excise Tax Statutes grant Movants statutory liens on the Excise Taxes against both HTA and the Commonwealth by providing that the Commonwealth must collect the Excise Taxes on behalf of HTA *solely* for payment of the Bonds.  See, e.g., 13 L.P.R.A. § 31751; 9 L.P.R.A. §§ 2021, 5681.  These statutes create "liens" as defined in the Bankruptcy Code because they give rise to a "charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37) (defining "lien").  The liens are *statutory* liens because they "aris[e] solely by force" of the Excise Tax Statutes (see id. § 101(53)), which contain mandatory, self-executing "shall" language.  Moreover, the Excise Tax Statutes identify the

specific taxes that serve as collateral and contain nondiscretionary language requiring that such taxes be used to pay for debt service on the Bonds. See, e.g., JK Mullen Inv. Co. v. Town of Arvada, 261 P.2d 714, 718 (Colo. 1953) (where a statute provides that special taxes "shall be applied to the payment of all bonds," the "statute unequivocally gives the bondholders a prior lien on any and all proceeds received from the assessments").

73.    As this Court has previously recognized, a statute does not need to expressly use the word "lien" in order to create a statutory lien. See Peaje Invs. v. P.R. Highways & Transp. Auth., 301 F. Supp.3d 290 (D.P.R. 2017) (citing In re Fonseca, 542 B.R. 628, 637 (B.A.P. 1st Cir. 2015) ("Fonseca")); see also In re Schick, 418 F.3d 321, 328-29 (3d Cir. 2005) (finding statutory lien where the relevant statute "lack[ed] explicit lien-creating language."). In Fonseca, particularly on point here, the debtor was a government employee who obtained a loan from a non-profit savings and loan association (the "Savings and Loan") established by Puerto Rico Law No. 133. Fonseca, 542 B.R. at 630. The Savings and Loan claimed a statutory lien on the liquidated value of the vacation and sick leave the employee-debtor had accumulated as an employee of the Commonwealth, and the Court concluded that the Savings and Loan in fact held such a statutory lien arising by force of the following statute:

> Any credit, deposit or surplus, for any reason, in the Commonwealth Government, or in any dependency or instrumentality thereof, [o]n behalf of a member who, having ceased in office, is in debt with the [Savings and Loan], **shall be retained by the Secretary of the Treasury of Puerto Rico** or the competent officer, if not alienated in the corresponding retirement system, **and covered into the funds of the [Savings and Loan], partially or fully to pay the debt pending therewith.**

See id. at 636 (citing 3 L.P.R.A. § 863d) (emphasis added).

74.    This operative statute in Fonseca is indistinguishable from the Excise Tax Statutes, as both use mandatory "shall" language to require the Secretary of Treasury to deposit or

"cover" funds into particular accounts to be used for the satisfaction of a debt.  See ¶ [57] infra.

Even though the statute in Fonseca did not use the word "lien," the Fonseca panel held "[i]t is

evident . . . that this section establishes a statutory lien on 'any credit, deposit, or surplus' held by

the government[.]" 542 B.R. at 636.  Therefore, under the test this Court adopted from Fonseca in

the Peaje case, the Excise Tax Statutes give rise to a statutory lien, because they "define[] with

specificity the nature of the collateral and require[] no further discretionary action for a lien to

come into force."  See Peaje, 301 F. Supp.3d at 298 (citing Fonseca, 542 B.R. at 637).

**3.      Movants' Liens Are Not Subject To Section 552(a) Or Section 928(b).**

75.      Neither  Section  552(a)  nor  Section  928(b)  of  the  Bankruptcy  Code,

incorporated into Title III of PROMESA, prevents the relief requested herein.

76.      Section 552(a) provides that, with certain exceptions, "property acquired by

the . . . debtor after the commencement of the case is not subject to any lien resulting from any

security agreement entered into by the debtor before the commencement of the case."  11 U.S.C.

§ 552(a).  Therefore, except where an exception applies, Section 552(a) generally cuts off liens on

property acquired by the debtor after the petition date of a bankruptcy case.

77.      However, Section 552(a) is plainly inapplicable to Movants' liens here.  To

the extent that Movants have a statutory lien, Section 552(a) is inapplicable because it "only applies

to  liens  resulting  from  security  agreements,  not  other  types  of  liens  such  as  statutory  liens."

Alliance Capital Mgmt. L.P. v. Cty. of Orange (In re. Cty. of Orange), 189 B.R. 499, 502 (C.D.

Cal. 1995); see also Collier on Bankruptcy ¶ 552.01 (16th ed. 2017) ("subsection [552](a) is

confined to consensual liens and does not extend to nonconsensual or statutory liens").  Thus,

552(a) cannot cut off Movants' statutory lien in the Excise Taxes.

78.     In any event, Section 928(a) of the Bankruptcy Code specifically exempts from Section 552(a) what it calls "special revenues."  Specifically, Section 928(a) provides that "[n]*otwithstanding section 552(a)* of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a) (emphasis added); PROMESA § 301(a). Section 928(a) therefore "negate[s] Section 552(a) in the municipal context."  See S. Rep. No. 100-506, at 12-13 (1988).

79.     Because the Pledged Revenues constitute "special revenues" as defined in Section 902(2) of the Bankruptcy Code, Movants' security interests in the Pledged Revenues fall within the Section 928(a) exception and therefore are not subject to Section 552(a).  Specifically, the Toll Revenues qualify as "special revenues" because they constitute "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used to provide transportation[.]" 11 U.S.C. § 902(2)(A).  The Toll Revenues also constitute "other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions."  Id. § 902(2)(D).  The Excise Taxes are "special excise taxes imposed on particular activities or transactions,"  id. § 902(2)(B), and are also "taxes specifically levied to finance one or more projects or systems."  Id. § 902(2)(E); see also Act No. 1-2015 Act No. 1-2015 (H. B. 2212) (Puerto Rico 2015).

80.     Section 928(b), providing that "[a]ny . . . lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be" (see 11 U.S.C. § 928(b)), similarly **does not apply to Movants' liens on the Pledged Revenues**.

81.     First, the Excise Taxes are not revenues generated from a project or a system; rather, they are special excise taxes pledged solely for the payment of the Bonds.  See 11

U.S.C. § 902(2)(B), (E).  Moreover, the application of Section 928(b) is limited to liens "resulting

from any security agreement entered into by the debtor before the commencement of the case,"

see 11 U.S.C. § 928(a).  Because Movants have *statutory* liens on the Excise Taxes, Section 928(b)

does not apply.

82.     Further, the application of Section 928(b) to the Bonds would be

unconstitutional, because the liens securing the Bonds predate the provisions of PROMESA that

make Section 928(b) applicable to Puerto Rico instrumentalities such as HTA.  As set forth above,

the Bondholders are the beneficiaries of a "gross" lien on the Toll Revenues and other Pledged

Revenues.  In accordance with the terms of that lien, HTA must *first* deposit sufficient funds with

the Fiscal Agent to meet the debt service and reserve requirements under the Resolutions ***before***

HTA can apply the funds to other purposes.  Movants have held these gross liens since the Bonds

were issued, years before PROMESA was enacted.  Subordinating the Bondholders' lien to the

"necessary operating expenses" of HTA would effectively convert Bondholders' lien from a

"gross" lien into a "net" lien, thereby drastically and retroactively changing the nature of their

security.  Such an application of Section 928(b) would violate the Takings and Due Process

Clauses of the U.S. Constitution[19] by depriving Bondholders of their gross lien without just

compensation or due process of law.  See United States v. Sec. Indus. Bank, 459 U.S. 70, 75-76,

82 (1982) (interpreting a provision of the Bankruptcy Code to apply prospectively to avoid the

destruction of pre-existing liens and eliminating the need to consider the statute's constitutionality

under the Takings Clause).

---

[19] The Takings Clause of the Fifth Amendment to the U.S. Constitution provides that "private property [shall not] be
taken for public use, without just compensation." U.S. Const. amend. V. The Due Process Clause of the Fourteenth
Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of
law[.]"  U.S. Const. amend. XIV, § 1.

83.     However, even if Section 928(b) did apply, it does not give the Debtors license to spend the Pledged Revenues on all of HTA's expenses during the pendency of these Title III cases.  Rather, as the plain language suggests, Section 928(b) provides that liens on special revenues derived from a project or system are subject only to the necessary operating expenses of such project or system.  11 U.S.C. § 928(b).  Here, the First Circuit has already suggested that the relevant project or system consists only of the "toll highways" that will "generate future revenues" pledged to the Bonds.  Peaje Invs. LLC v. Fin. Oversight Mgmt. Bd., 899 F.3d 1, 13 (1st Cir. 2018);  accord S. Rep. No. 100-506 at 23 (1998) (the relevant "project or system" for purposes of Section 928(b) is only that which "generate[s] the special revenues."); In re Jefferson Cty., 482 B.R. 404, 437 (Bankr. N.D. Ala. 2012) ("Jefferson County") (necessary operating expenses are those that are "directly related to the project or system *generating the special revenues* and are not the expenses of the municipality generally or for other systems or projects") (emphasis added). Therefore, even if Section 928(b) were to apply, only the necessary operating expenses of the toll highways that generate the Toll Revenues would fall within its scope, and not the expenses of any other HTA project or system (such as non-toll roads or Tren Urbano), or other Commonwealth assets, projects, or systems.

84.     Consistent with the plain language of Section 928, and as Judge Bennett recognized in Jefferson County, the special revenue amendments "were designed to keep the framework of special revenue financing unaltered" and to "keep such special revenue financing transactions unaffected by" a bankruptcy filing. Jefferson Cty., 482 B.R. at 434-36.  Thus, Judge Bennett held that Section 928(b) was never intended to provide a debtor with the ability "to significantly restructure agreements for the lien against special revenues or the distribution of monies to secured creditors.  *Quite the contrary is the case*." Id. at 436(emphasis added).

85.     To that end, Section 928(b) is a provision of limited scope, which permits the limited use of special revenues to cover only certain operating expenses that are "necessary to keep the project or system going . . . so that the project or system can be maintained in good condition to generate the revednue [*sic*] to repay bondholders . . . ." H.R. Rep. No. 100-1011, at 8 (1988).  Section 928(b) covers no other expenses.  Section 928(b) therefore does not subject any lien to capital improvements or enhancements.    See Jefferson Cty., 482 B.R. at 439 ("[E]xpenditures for items that are capitalized are not included within the scope of 'necessary operating expenses.'").

## III.   Movants Are Entitled To Stay Relief Under Section 362(d)(2).

86.     Section 362(d)(2) requires that stay relief be granted where "the debtor does not have an equity in [the] property" and "[the] property is not necessary to an effective reorganization."  See 11 U.S.C. § 362(d)(2); Gracia-Gracia, 939 F.3d at 349 ("Congress thought that stay relief should be granted under PROMESA upon a showing that the debtor lacks equity in disputed property[.]").While the moving party bears the burden of showing that the debtor lacks equity in the property, it is the debtor's burden to prove that the property in question is necessary for its reorganization.  11 U.S.C. § 362(g); see Gracia-Gracia, 939 F.3d at 347; In re Mullock, 404 B.R. 800, 805 (Bankr. E.D. Pa. 2009).

87.     In its recent Gracia-Gracia decision, the First Circuit made clear that the court's analysis under Section 362(d)(2) is less "arduous" than the "cause" standard under Section 362(d)(1).  Id. at 349–50 (quoting 11 U.S.C. § 362(d)).  This is so, the First Circuit explained, because a court evaluating stay relief under Section 362(d)(2) need not undertake the additional consideration of the factors set forth in Sonnax Industries v. Tri Components Products Corp. *(In re Sonnax)*, 907 F.2d 1280, 1286 (2d Cir. 1990), as it generally would when engaging in an analysis to determine whether "cause" (other than a lack of adequate protection) exists for purposes of

-38-

section 362(d)(1).  Id.  Instead, the court need only consider whether the prerequisites for stay

relief under Section 362(d)(2) have been met.  See id. n.2.  Accordingly, the First Circuit noted

that the Gracia-Gracia movants would have had an easier path to securing stay relief had they

sought stay relief under Section 362(d)(2) of the Bankruptcy Code.  Gracia-Gracia, 939 F.3d at

349–50.

88.     Relief from the automatic stay is appropriate here under Section 362(d)(2)

because (a) the Commonwealth and HTA "do[] not have any equity" in the Pledged Revenues,

and (b) the Pledged Revenues are therefore unnecessary to an effective reorganization of the

Commonwealth.

### A.     The Commonwealth And HTA Lack Equity In The Pledged Revenues.

89.     As detailed above, the Commonwealth never had any ownership interest in

the Toll Revenues, and it assigned ownership of, and equity in, the Excise Taxes to HTA.  HTA,

in turn, pledged the Pledged Revenues to the Bondholders, retaining no equity in those funds to

the extent of the pledge.  See Black's Law Dictionary (11th ed. 2019) ("Equity" is defined as "[t]he

amount by which the value of or an interest in property exceeds secured claims or liens; the

difference between the value of the property and all encumbrances upon it."); Matter of Sutton,

904 F.2d 327, 329 (5th Cir. 1995) (stating "'[e]quity' as used in Section 362(d) portends the

difference between the value of the subject property and the encumbrances against it" and

affirming lift-stay order where lien on tangible property was greater than the purposed value of the

property).

### B.     The Pledged Revenues Are Not Necessary To Debtors' Reorganization.

90.     Given the Debtors' lack of equity in the funds, it is "difficult to imagine"

how the Debtors could meet their burden to demonstrate that the Pledged Revenues are necessary

to reorganization.  In re Lally, 38 B.R. 622, 626 (Bankr. N.D. Iowa 1984) ("cause exist[ed] to

justify termination of the stay" because debtors lacked "equity" in the property.), aff'd, 51 B.R.
204 (N.D. Iowa 1985).  In fact, where the property at issue is cash, if it is determined that the
debtor lacks equity under the first prong, the property is not necessary, and indeed cannot be used
at all, in a reorganization of the debtor.  A municipal debtor cannot use property in which it holds
no equitable title to effectuate any plan.  See Columbia Falls, 143 B.R. at 762; In re Spencer, 115
B.R. 471, 485 (D. Del. 1990) (where the debtor does not hold equitable title, stay should be lifted
so that "equitable title [can] be united with legal title"); Boyd v. Martin Expl. Co., 56 B.R. 776,
779, 781 (E.D. La. 1986) (where employees, not debtor, were the equitable and beneficial owners
of the property, the property can be returned to the beneficial owners).

91.      As detailed above, the Commonwealth assigned ownership of the Pledged
Revenues to HTA, and HTA then pledged its equity in the Pledged Revenues to the HTA
Bondholders.  Therefore, it is the Bondholders and Movants that have equity in the Pledged
Revenues.  Thus, the Pledged Revenues will have no bearing on any Commonwealth plan of
reorganization, and because they are pledged to Bondholders, they also are of no consequence to
any HTA plan.  In all cases, the Pledged Revenues must be returned (or released) to the
Bondholders.

**IV.    Cause Exists For Relief From Stay Under Section 362(d)(1), Or An Adequate
Protection Order Is Required.**

92.      Section 362(d)(1) separately allows a court to lift or condition the stay "for
cause, including the lack of adequate protection of an interest in property of such party in interest."
11 U.S.C. § 362(d)(1); see also 11 U.S.C. § 922(b) (incorporating same).  The adequate protection
requirement was added to the Bankruptcy Code for both constitutional and policy reasons. H. R.
Rep. No. 95-595, at 338-40 (1977), S. Rep. No. 95-989, at , 53-54 (1978) ("adequate protection
[is] based as much on policy grounds as on constitutional grounds"); see also Peaje Invs., 845 F.3d

at 511 ("In the bankruptcy context, Congress's explicit designation of lack of adequate protection as cause to lift a stay was based, at least in part, on constitutional concerns.").  Adequate protection is a constitutional imperative, because it ensures that no uncompensated "taking" of a creditor's property occurs in contravention of the Takings Clause of the Fifth Amendment.  See Peaje Invs., 845 F.3d at 511 ("[P]rior to the enactment of the current bankruptcy stay provision, the Supreme Court had recognized that creditors are constitutionally entitled to protection 'to the extent of the value of the[ir] property.') (citing Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940)); see also In re Briggs Transp. Co., 780 F.2d 1339, 1342 (8th Cir. 1985).

93.    In a hearing on relief from the automatic stay, the Commonwealth and HTA, as debtors, bear the burden of proof on the question of adequate protection.  Peaje Invs., 845 F.3d at 513 (" . . . movant 'has the burden of proof on the issue of the debtor's equity in property,' but the debtor 'has the burden of proof on all other issues.'") (quoting 11 U.S.C. § 362(g)).

A.    **The Movants' Property Interests Are Not Adequately Protected.**

94.    The Commonwealth and HTA cannot carry their burden of showing that Movants have or will be provided with "the indubitable equivalent" of the value of their property rights (11 U.S.C. § 361(3)), because the Debtors have clearly stated their intention to continue indefinitely diverting the Pledged Revenues from the payment of the HTA Bonds.  In order to establish that Movants are adequately protected by an "equity cushion" in future Pledged Revenues, FOMB and the Debtors would, at a minimum, need to demonstrate that they will restore the Pledged Revenues to the payment of the HTA Bonds at some reasonable point in the future— including by modifying or repealing all fiscal plans and other Moratorium Laws that currently prohibit the use of the Pledged Revenues to pay the HTA Bonds.  No such commitment exists. Absent an express commitment by FOMB and the Debtors to restore the Pledged Revenues to the

payment of the HTA Bonds, they have failed to carry their burden of proving that Movants are adequately protected.

95.     In addition, the Debtors' ongoing consumption of the Pledged Revenues is destroying the value of Movants' property interests in those revenues, and this diminution in the value of Movants' property interests is putting Movants' right to repayment at serious risk. Specifically, the Commonwealth and HTA are not using the Pledged Revenues to make payments on the Bonds, nor are they segregating and preserving the Pledged Revenues for the benefit of Bondholders.  Instead, since 2015, they have been continuously diverting and dissipating the Pledged Revenues for unauthorized and unlawful purposes, thereby permanently making a portion of the Pledged Revenues unavailable to pay debt service.

96.     In particular, following the filing of the Commonwealth's and HTA's Title III petitions near the end of Fiscal Year 2017 (in May 2017), all of the Pledged Revenues for Fiscal Years 2018 and 2019 have been diverted.  According to FOMB's own fiscal plans, the diverted Pledged Revenues for these two fiscal years total approximately $251 million in Toll Revenues ($117 for FY2018 and $134 for FY2019) and $1.114 billion in Excise Taxes ($535 million in FY2018 and $579 million in FY2019), meaning that Movants' collateral, if not recovered, has diminished in value by at least $1.397 billion since the Commonwealth and HTA commenced Title III cases.  Additional Pledged Revenues were diverted at the end of Fiscal Year 2017 following the Title III filings, and additional Pledged Revenues continue to be diverted, now, in Fiscal Year 2020.  Movants will require discovery in order to ascertain with certainty the amounts of these additional diversions and of the resulting diminution in the value of their property interests.

97.     As noted above, in 2016, prior to FOMB's development of its first fiscal plans and the commencement of the Title III cases, Movants brought motions for relief from the

Section 405 Stay for lack of adequate protection, and Judge Besosa denied these motions.
Circumstances have changed dramatically, however, since Judge Besosa made his pre-Title III
rulings.

98.     First, the pre-Title III lift-stay motions were decided under the Section 405
Stay, which did not incorporate Section 362(g) of the Bankruptcy Code, and thus placed the burden
on the moving party to demonstrate that it lacks adequate protection.  Here, by contrast, the Debtors
bear the burden of proving that Movants' interests are adequately protected. See 11 U.S.C. §
362(g)(2).

99.     Second, Judge Besosa denied Assured's motion for relief from the Section
405 Stay on the grounds that Assured had not yet suffered an "injury in fact" as Bondholders whose
Bonds were insured by Assured were continuing to receive payments from the reserve funds held
by the Fiscal Agent.  These reserve funds have since been substantially depleted, however, and to
the extent they were not depleted, they have been withheld as a result of the Commonwealth's
instructions to the Fiscal Agent not to pay Bondholders.  As a result of the depletion and/or
withholding of the reserve funds, Movants have now indisputably suffered an "injury in fact" in
the form of the hundreds of millions of dollars in claims Movants have been required to pay to
insured Bondholders, and there can no longer be any question as to Movants' standing.
Furthermore, Judge Besosa's finding that Assured had not suffered an injury in fact was premised
on the assumption that the moratorium under the Moratorium Laws would be short-lived, as Judge
Besosa expressly noted that the first principal and interest payment date on which Assured might
face a risk of nonpayment by HTA would occur "well after the termination of both the [First
Moratorium Law]'s 'emergency period' and the [Section 405 Stay]."   See Peaje Invs. LLC v.
García-Padilla, No. 16-2365, 2016 WL 6562426, at *5 (D.P.R. Nov. 2, 2016), aff'd in part, vacated
in part, 845 F.3d 505 (1st Cir. 2017).  Judge Besosa's assumption that the moratorium would be

short-lived and not cause any lasting harm to Assured has since been disproven (i) by the serial

extensions of the Moratorium Laws and Moratorium Orders by the Commonwealth government

and (ii) by the incorporation of the diversion of the Pledged Revenues into FOMB's fiscal plans,

the Compliance Law, and the Plan of Adjustment.

100.   Third, as noted above, Judge Besosa in 2016 found Peaje to be adequately

protected because it "continue[d] to hold a security interest in a stable, recurring source of income

that," it appeared at that time, would "eventually provide funds for the repayment of the PRHTA

Bonds."  Id.  Judge Besosa's ruling with respect to Peaje, like his ruling with respect to Assured,

relied centrally on what Judge Besosa reasonably understood at that time to be the *temporary*,

*short-term* nature of the First Moratorium Law and the Moratorium Orders thereunder.   For

example, Judge Besosa emphasized the existence of "provisions of both the [First Moratorium

Law] and PROMESA that effectively preserve [Peaje's] contractual security interest in PRHTA's

pledged revenues."  Id.

101.   Since that time, however, the provision of the First Moratorium Law that

Judge Besosa identified as preserving Peaje's security interest (§ 204(a)) has been repealed by

subsequent Moratorium Laws, and the provisions of PROMESA that Judge Besosa pointed to as

preserving Peaje's security interest for the period after the Section 405 Stay expired (PROMESA

§ 405(k)) is no longer in effect.  Moreover, since the time of Judge Besosa's Peaje decision, (i) the

moratorium has been repeatedly extended through the enactment of additional Moratorium Laws

and the issuance of additional Moratorium Orders, with no end in sight, and (ii) FOMB and the

Debtors have made clear their intention to continue the diversion and dissipation of the Pledged

Revenues indefinitely, and have conceded that this indefinite—and likely permanent—diversion

and dissipation of collateral endangers Movants' "interest in repayment."  See Peaje Invs., 845

F.3d at 513.  In fact, the Commonwealth, aided and abetted by FOMB, and without a whimper of

protest from HTA, claims to own and have a right to withhold and spend both the unspent Excise Taxes that have accumulated over time and the Excise Taxes to be collected in the future. The source of income flowing from the Excise Taxes is thus anything but "stable." The resulting "uncertainty" about the availability of future Pledged Revenues to pay debt service does "affect the 'repayment of [HTA's] bond payable,'" meaning that Movants are entitled to adequate protection. See id. at 514.

102.     For example, the most recent HTA Fiscal Plan (Exhibit HH) acknowledges that HTA has not made debt service payments "since July 2017." Ex. HH at 112. Moreover, the HTA Fiscal Plan projects that HTA will have a *total* of only $493 million of cash flow available for debt service during the *entirety* of the five-year period covered by the HTA Fiscal Plan (Fiscal Years 2019-24), which will be grossly insufficient to pay the approximately $1.812 billion in debt service coming due on the Bonds during this period. Id.

103.     The HTA Fiscal Plan also requires Toll Revenues to be used first to fund all of HTA operations, which turns HTA's gross pledge to Bondholders on its head and puts Movants' interest in having their debt repaid at risk. See, e.g., Ex. HH at 51 (referring to "Toll revenues" as "Operating Revenue"). This misappropriation of Toll Revenues to fund operations cannot be justified under Section 928(b), even if it applied (which it does not), because the HTA Fiscal Plan subordinates debt service even to expenses of HTA that are unrelated to the assets that generate the Toll Revenues or not necessary to keep such assets operating. For example, the HTA Fiscal Plan projects "Toll fares" ranging from approximately $133.7 to approximately $184.9 million a year for fiscal years 2019-24, but projects expenses for toll highway maintenance and administration of only approximately $40.8 million to $50.2 million annually. Ex. HH at 62-63. Therefore, even under Section 928(b), at most a modest percentage of the Toll Revenues collected each year would be eligible for use to pay the necessary operating expenses of the toll roads, and

the remainder would be available for debt service.  However, the HTA Fiscal Plan subordinates

debt service not only to the necessary operating expenses of the toll roads (which would be

permitted if Section 928(b) applied), but also to HTA's "total expenses," which range from a

staggering $532.6 million to $871.5 million annually.  Id. at 60, 63.  Moreover, the HTA Fiscal

Plan provides for a **$2.7 billion dollar** "capital improvement plan" (CIP) for Fiscal Years 2019-

24 (see id. at 32, 52.), even though the debtor cannot deduct pledged revenues to fund capital

improvements pursuant to Section 928(b) of the bankruptcy code.  By its plain terms, Section

928(b) covers only "necessary *operating expenses*"—it includes no other expenses of the debtor.

104.    The HTA Fiscal Plan also requires the Commonwealth to "clawback", *i.e.,*

confiscate, all Excise Taxes for the foreseeable future, expressly claiming that "[Tax and Fee

Revenue] is subject to clawback by the Commonwealth . . . "  Ex. HH at 50.

105.    The most recent Commonwealth Fiscal Plan likewise indicates that FOMB

intends for the Commonwealth's misappropriation and dissipation of the Excise Taxes to be

permanent.  For example, the Commonwealth Fiscal Plan mandates the creation of an "Office of

the Chief Financial Officer for Puerto Rico" ("OCFO"), one of the functions of which will be to

"[e]nforce and manage a consolidated treasury single account for the Government; this involves

consolidating visibility and control of all Government bank accounts . . . and creating a true

Treasury Single Account."  Ex. M at 78.  Therefore, the Commonwealth Fiscal Plan mandates that

the Commonwealth, through the OCFO, illegally transfer the Pledged Revenues to a consolidated

"Treasury Single Account," where the Pledged Revenues will be commingled with general

Commonwealth revenues and expended and dissipated for purposes other than payment of the

Bonds.  Id.

106.    Furthermore, HTA's 2016 audited financial statements (Exhibit II),

expressly acknowledge that the diversion of the Pledged Revenues, beginning with the Clawback

Order, "diminished" HTA's ability to pay its debts, stating:  "[The Clawback Order] had a significant negative effect on [HTA's] liquidity . . . [W]ithout the taxes and other revenues allocated by the Commonwealth . . . , [HTA] is unable to deposit additional monies in the bond payment reserve accounts and without additional deposits *the ability to continue making the schedule [sic] payments on the bonds issued is diminished.*"  Ex. II at 28-29 (emphasis added). FOMB similarly acknowledged in HTA's April 28, 2017 fiscal plan (Exhibit GG) that HTA's fiscal situation "was recently aggravated" by the diversion of the Excise Taxes, calling into question HTA's ability to repay the Bonds.  See Ex. GG at 16.

107.    HTA's most recent audited financial statements, from fiscal year 2018 (the "2018 Financial Statements", Exhibit JJ) similarly admit that HTA "does not have sufficient funds available to fully repay its various obligations as they come due" and expressed "substantial doubt about [HTA's] ability to continue as a going concern."  Ex. JJ at 3. The 2018 Financial Statements also concede that "the [First Moratorium Law], the related executive orders, and subsequent to the enactment of PROMESA certain developments in connection with actions of the Oversight Board . . . have had a significant negative effect on [HTA's] liquidity . . . There is no indication that the conditional allocation of gasoline, oil, diesel, and petroleum taxes to [HTA] will resume . . .  Without the taxes and other revenues conditionally allocated by the Commonwealth . . . , [HTA] has been unable to make the scheduled payments on its outstanding bonds and fund its reserve accounts accordingly."  Id. at 34. [20]

---

[20] No doubt strategically, HTA's most recent financial statements refer to the Excise Taxes as being "conditionally allocated" to HTA. However, the right of HTA and Bondholders to the Excise Taxes is not conditional; rather the Commonwealth's right to "claw back" the Excise Taxes for the benefit of its public debtholders is conditional on the two conditions to a valid clawback being satisfied, which they are not and have never been. Notably, HTA's financial statements from the period before the Commonwealth started misappropriating the Excise Taxes do not use this "conditional allocation" language and instead state explicitly that the Excise Taxes were "assigned" to HTA, demonstrating that the "conditional allocation" language is an attempt to re-write history and retroactively legitimize the Commonwealth's confiscation of property to which it lacks any entitlement.  See, e.g., HTA 2015 Financial Statement (Exhibit KK) at 21, 80, 89, 90.

108.     In view of these admissions about HTA's diminishing ability to repay its debts, "cause" exists to lift the stay to allow Movants to protect their rights.  Where the Court cannot order the Debtors to provide adequate protection in the form of cash payments, substitute collateral, or some other "indubitable equivalent" for the value of the Pledged Revenues, the Court is required, as both a statutory and a constitutional matter, to lift the stay to "allow[] the processes of state or territorial law to operate in the normal course as if there were no bankruptcy."  Fin. Oversight Mgmt. Bd. v. Ad Hoc Grp of PREPA Bondholders, 899 F.3d 13, 21 (1st Cir. 2018) ("FOMB"); see also 11 U.S.C. § 362(d)(1) ("the court shall grant relief from the stay . . . for cause, including the lack of adequate protection"); In re Balco Equities Ltd., 312 B.R. 734, 753 (Bankr. S.D.N.Y. 2004) ("Where . . . the Debtor cannot provide adequate protection, the stay must be lifted.").  Specifically, the Court should lift the stay to permit Movants to bring actions against HTA, the Commonwealth, and other appropriate defendants in a forum other than the Title III Court seeking, among other things, (i) enforcement of the Commonwealth's and HTA's obligations to apply the Pledged Revenues to the payment of the Bonds, including through (ii) enforcement of Movants' liens on the Pledged Revenues and any related contractual, statutory, and constitutional rights.  Because the automatic stay, as interpreted by this Court, currently prevents Movants from taking these actions to halt the ongoing diminution in the value of their property, the automatic stay is the cause of that ongoing diminution.  See, e.g., FOMB, 899 F.3d at 20 (the automatic stay "deprive[s] a creditor of its property interest" where it "preclud[es] the creditor from exercising any rights it possesses to protect that interest from destruction").

109.     In addition, although an unsecured litigation claim alone does not constitute adequate protection of a secured claim, in order to further protect Movants' property interests, the Court should also lift the stay to permit Movants to bring an action under PROMESA § 407 in this Court.  That action would seek to hold the Commonwealth and HTA liable for their transfers of

the Pledged Revenues in violation of the applicable laws under which Movants have a valid pledge of, security interest in, and liens on the Pledged Revenues and in violation of the Excise Tax Statutes, which assure the transfer of the Excise Taxes to HTA for the benefit of the Bondholders. See PROMESA § 407.

**B.    If The Court Declines To Lift The Stay For Lack Of Adequate Protection, The Court Must Order Adequate Protection.**

110.    As set forth above, Movants are entitled to adequate protection.  Under Section 361, a debtor may provide adequate protection in one of three ways:  (1) by making cash payments or periodic cash payments in an amount equal to the decrease in the value of the secured creditor's interest in property, (2) by providing an additional or replacement lien to replace the property, or (3) by providing such other relief "as will result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361(1)-(3); see 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 361 into PROMESA); see also In re Bldrs. Grp. & Dev. Corp., 502 B.R. 95, 122-23 (Bankr. D.P.R. 2013).[21]

**C.    Lack Of Due Process In The Title III Court Constitutes Cause To Lift The Stay.**

111.    "Lack of adequate protection is the most common basis for finding cause to grant relief [from the automatic stay]," but "it is not the only reason a court might grant such relief."  Gracia-Gracia, 939 F.3d at 346-47(1st Cir. 2019).  Here, additional "cause" exists to lift the stay because, in the absence of stay relief, Section 305 of PROMESA,[22] as interpreted by the

---

[21] Additionally, absent adequate protection, Movants would be entitled to an administrative expense priority claim under 11 U.S.C. § 503(b) for any postpetition diversion of Pledged Revenues.  See, e.g., Reading Co. v. Brown, 391 U.S. 471, 485 (1968) (liabilities incurred postpetition give rise to administrative expense priority claims).

[22] Section 305 of PROMESA states that "unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property."  48 U.S.C. § 2165.

First Circuit and contorted by the FOMB to date, would potentially deprive Movants of due process within the Title III Court, and therefore have to be stricken down as unconstitutional.

112.    Due process requires that the Movants be able to litigate their constitutional claims and enforce their rights in some forum.  It likewise requires courts to strike down as unconstitutional laws that would "deny any judicial forum for a colorable constitutional claim." See Webster v. Doe, 486 U.S. 592, 603 (1988) (citing Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 681 n.12 (1986)); Bartlett v. Bowen, 816 F.2d 695, 707 (D.C. Cir. 1987).

113.    As it recently made clear, FOMB intends to restrict the scope of HTA-related Title III proceedings to a limited number of cherry-picked issues.  See ECF No. 9493 at 11–12.  For example, as part of the Revenue Bond Adversary Proceedings, FOMB will seek a ruling on the validity and scope of Bondholders' liens.  Id.  But FOMB wants to prevent the Court from determining—even in the context of an affirmative defense raised by the Bondholders—any challenge to "the validity" of the primary devices FOMB and the Commonwealth have attempted to use to impair those liens, such as "fiscal plans or budgets certified by the Oversight Board" and "Commonwealth statutes or executive orders (including the Moratorium Laws and the Fiscal Compliance Act)."  Id. at 12.  If FOMB is permitted to pick and choose the claims and defenses that the various parties can assert to arrive at a preordained outcome—one that is favorable to the Commonwealth at the expense of HTA and its creditors—then due process will not be afforded to Bondholders in the Title III Court.

114.    In previous litigation, creditors were confronted with a similar attempt by FOMB to curtail litigation in the Title III court.  Specifically, Ambac, Assured, and other creditors previously brought adversary proceedings in the Title III Court seeking relief necessary to vindicate their statutory and *constitutional* rights, including (i) declarations that the Moratorium Laws and Moratorium Orders are preempted by Section 303 of PROMESA and (ii) declarations

that the Moratorium Laws, Moratorium Orders, and fiscal plans violate the Contracts and Takings

Clauses of the U.S. Constitution.  See, e.g., Adv. Proc. Nos. 17-159-LTS, 18-59-LTS.

115.   In Ambac Assurance Corporation v. Commonwealth of Puerto Rico, 927

F.3d 597, 602-03 (1st Cir. 2019), the First Circuit held that "the text of section 305 bars the Title

III Court from granting" creditors precisely the relief Movants now seek to pursue in another

forum, including enforcement of their constitutional rights under the Contracts and Takings

Clauses, absent consent from the FOMB.[23]Id.  In response to Ambac's argument that the First

Circuit's interpretation of Section 305 "would raise due process concerns because Ambac would

be left without a venue in which to bring constitutional claims," the First Circuit emphasized that

"nothing in our holding today suggests that Ambac cannot seek traditional stay relief pursuant to

11 U.S.C. § 362 and raise its constitutional and statutory arguments in a separate action."  Id. at

605.

116.   Movants have now followed the First Circuit's guidance and sought stay

relief to litigate outside of the Title III Court.  Were this Court to now deny stay relief, however,

Movants would be left without a forum in which to adequately vindicate their rights as a result of

Section 305's bar.  In addition to using Section 305 as a sword to select issues for litigation, FOMB

has indicated that it would ask this Court to delay consideration of the present lift-stay motion until

resolution of motions to dismiss in the Revenue Bond Adversary Proceedings.  ECF No. 9365-2

at 6–11.  This approach would effectively foreclose the only avenue for relief identified by the

First Circuit.  As a result, creditors would be denied due process twice—first, by being prevented

from raising claims and defenses in the Title III proceedings, and second, by being prevented from

pursuing remedies outside of the Title III court.  This untenable situation is compounded by

---

[23] For the avoidance of doubt, Movants reserve the right to argue that the First Circuit erred in its interpretation of
Section 305.

FOMB's conflict of interest, which makes it unable and unwilling to defend the interests of HTA. The very approach that FOMB advocates—allowing a conflicted debtor representative to control the course and substance of litigation, including by deferring creditors' access to courts that can provide relief—violates basic constitutional principles of due process and fundamental fairness. In these circumstances, there is plainly "cause" to lift the stay.

117.    In the event the Court declines to lift the stay, due process requires a different approach than the one advanced by FOMB.  First, it is an elementary principle of due process that a party seeking affirmative relief cannot restrict the claims and defenses that its adversary chooses to assert.  FOMB's decision to bring an adversary proceeding seeking a determination of certain HTA-related issues opens the door to all claims, defenses, and types of relief that may be asserted or sought in connection with such proceeding.  In other words, the Court should deem FOMB's filing of the HTA Revenue Bond Complaint to constitute its consent to litigating all HTA-related issues.  Otherwise, due process would require the Court to sever and hold invalid Section 305 of PROMESA, so as to permit Movants to raise their constitutional and statutory claims in the Title III Court.[24]   The Supreme Court has cautioned courts to do whatever they can to avoid such a result.  Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575 (1988) ("[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality") (internal citation omitted); United States v. Dwinells, 508 F.3d 63, 70 (1st Cir. 2007) (articulating doctrine of constitutional avoidance).  Thus, to afford Movants due process and to save PROMESA from unconstitutionality, the stay should be lifted for "cause," or the FOMB must be deemed to have

---

[24] See PROMESA § 3(a) ("[I]f any provision of this Act or the application thereof to any person or circumstance is held invalid, the remainder of this Act, or the application of that provision to persons or circumstances other than those as to which it is held invalid, is not affected thereby, provided that title III is not severable from titles I and II, and titles I and II are not severable from title III.").

consented so as to permit Movants to raise their constitutional and statutory claims in the Title III Court.

**D.     The Sonnax Factors Weigh In Favor Of Lifting The Automatic Stay Under 362(d)(1).**

118.   In its recent decision in <u>Gracia-Gracia</u> the First Circuit held that, outside of the adequate protection context, the factors identified in <u>Sonnax Industries v. Tri Components Products Corp.</u> ("<u>Sonnax</u>"), 907 F.2d 1280 (2d Cir. 1990), "'provide a helpful framework' for determining whether stay relief should ***otherwise*** be granted 'for cause'." 939 F.3d at 347 (emphasis added).  Movants submit that there is no need to apply the <u>Sonnax</u> factors to Movants' request for stay relief based on lack of adequate protection (<u>see</u> Section IV.A <u>supra</u>), because the <u>Sonnax</u> factors do not apply to requests for stay relief based on a lack of adequate protection, and instead apply only where a movant "otherwise" seeks stay relief based on some other form of "cause."  <u>See</u> <u>Gracia-Gracia</u>, 939 F.3d at 347.  Moreover, to the extent due process requires the Court to lift the stay (<u>see</u> Section IV.C <u>supra</u>), discretionary factors like those set forth in <u>Sonnax</u> are inapplicable, because under such circumstances stay relief is a constitutional imperative.  To the extent the Court finds it necessary or desirable to consider the <u>Sonnax</u> factors, however, these factors significantly weigh in favor of granting stay relief.

119.   As a preliminary matter, the First Circuit in <u>Gracia-Gracia</u> noted that "in order to properly weigh the <u>Sonnax</u> factors," a court should first "make at least a preliminary determination of the parties' respective property interests in the disputed funds." <u>Id.</u> at 348.  Here, HTA and the Commonwealth do not hold an equitable interest in the Pledged Revenues up to the amount needed to satisfy outstanding obligations on the Bonds.  Rather, at all times when the Commonwealth or HTA is in possession of the Pledged Revenues, such revenues up to the amount necessary to satisfy the Bonds are being held for the Bondholders' benefit.  The Commonwealth

and HTA hold at best legal title (to the extent they are complying with the Excise Tax Statutes).

Alternatively, to the extent the Commonwealth and HTA are disregarding the Excise Tax Statutes,

they are behaving lawlessly and have no legitimate interest at all in the Pledged Revenues (not

even bare legal title).

120.   With the threshold issue of property interests in mind, nearly all of the

relevant <u>Sonnax</u> factors weigh in favor of lifting the automatic stay in this case:[25]

- **<u>Whether relief would result in a partial or complete resolution of the issues</u>:**  Lifting the stay would lead to resolution of the issues described in this Motion.  As stated above, rather than being used to satisfy outstanding obligations on the Bonds, the Pledged Revenues are being diverted and dissipated.  Lifting the stay will permit the Movants to bring an action outside the Title III Court to enforce the Movants' constitutional rights, as well as Movants' security interests, statutory liens, and other property interests in the Pledged Revenues.   In that action, HTA and the Commonwealth will be permitted to assert any defenses they deem appropriate, thus fully resolving the issues described in this Motion. Similarly, issues relating to any illegal transfers of the Pledged Revenues would be resolved in the context of the PROMESA § 407 action.  Perhaps most importantly, lifting the stay to permit Movants to bring an action in another forum would permit Movants to assert claims that the First Circuit in <u>Ambac Assurance Corporation v. Commonwealth of Puerto Rico (In re the Financial Oversight and Management Board for Puerto Rico)</u>, 927 F.3d 597, 603-05 (1st Cir. 2019) held, as a result of Section 305 of PROMESA, could not be brought in the Title III Court without FOMB's consent, including (i) claims under Section 303 of PROMESA that the Moratorium Laws and Moratorium Orders are preempted and (ii) claims under the Contracts and Takings Clauses of the U.S. Constitution that the Moratorium Laws, Moratorium Orders, fiscal plans, and Compliance Law are unconstitutional.  The Moratorium Laws, Moratorium Orders, fiscal plans, and Compliance Law are the primary tools that the Commonwealth and FOMB have used to try to destroy Movants' property interests.  Because Section 305 supposedly bars Movants from bringing claims in the Title III Court challenging the Moratorium Laws, Moratorium Orders, fiscal plans, and Compliance Law absent FOMB's consent, a "complete resolution" of the issues related to Movants' property interests cannot be achieved in the Title III Court and can *only* be achieved if the stay is lifted so that Movants can access a different forum.

---

[25] <u>See</u> <u>Gracia-Gracia</u>, 939 F.3d at 347 (identifying <u>Sonnax</u> factors). The fifth <u>Sonnax</u> factor, i.e. "whether the debtor's insurer has assumed full responsibility for defending it," appears to be inapplicable in this case.

- **Lack of any connection with or interference with the bankruptcy case**:
  Lifting the stay and permitting the Movants to enforce their constitutional,
  property, and contractual rights outside of the Title III proceedings or in a
  PROMESA § 407 suit would not interfere with the restructuring but would
  instead promote the efficient resolution of issues that must be resolved yet
  cannot be litigated in the Title III court absent FOMB consent under Section
  305. Whether the Excise Taxes and Toll Revenues have been wrongfully
  diverted and misappropriated and must be used consistently with
  Commonwealth law and the HTA Resolutions must be decided before
  confirmation of an HTA or Commonwealth plan of adjustment. Bankruptcy
  courts routinely find "cause" to lift the stay when a nonbankruptcy court is
  better suited to resolve the dispute—whether the reason is that the
  bankruptcy court has limited adjudicatory authority, the issues presented
  fall outside of the bankruptcy court's domain of expertise, or the dispute
  could be resolved more efficiently outside bankruptcy. See, e.g., In re
  Shaffer, 563 B.R. 301 (Bankr. D. Ariz. 2016) , 306 (Bankr. D. Ariz. 2016)
  ("[W]here a bankruptcy court may abstain from deciding issues in favor of
  an imminent state court trial involving the same issues, cause may exist for
  lifting the stay as to the state court trial."); In re Mason, 514 B.R. 852
  (Bankr. E.D. Ky. 2014) (finding that "cause" existed to lift the stay to allow
  former employees to liquidate their employment discrimination claims
  against debtor in district court where civil rights action was pending
  because, among other reasons, there were no preliminary bankruptcy issues
  to be determined and the bankruptcy court was without authority to liquidate
  or even estimate amount of employees' claims); In re Blair, 534 B.R. 787,
  792-93 (Bankr. D. N.M. 2015) (finding "cause" to modify automatic stay to
  allow landlords to prosecute their prepetition eviction proceeding against
  Chapter 7 debtor-tenant and exercise their state-law rights and remedies
  under the residential lease); In re Breitburn Energy Partners LP, 571 B.R.
  59, 68-69 (Bankr. S.D.N.Y. 2017) (finding "cause" to lift the stay because
  preexisting action pending in state court would not interfere with the
  bankruptcy cases and the dispute presented questions of unsettled state law
  better left to the state court to resolve). Further, as suggested in Gracia-
  Gracia, where a debtor holds no equitable interest in the subject disputed
  funds but, rather, is holding the funds in a fiduciary capacity as a trustee or
  mere custodian, this factor weighs in favor of lifting the stay. 939 F.3d at
  348. Here, neither HTA nor the Commonwealth holds any equitable interest
  in the Pledged Revenues up to the amount needed to pay the Bonds in
  accordance with the applicable waterfall.

- **Whether the other proceeding involves the debtor as a fiduciary**: The
  actions that Movants will bring outside the Title III Court involve HTA and
  the Commonwealth in their capacity as agents or trustees, and thus as
  fiduciaries of the Bondholders. Proceedings in which the debtor is a
  fiduciary "need not be stayed because they bear no relationship to the
  purpose of the automatic stay, which is protection of the debtor and his

estate from his creditors" S.Rep. No. 95-989.  Here, HTA needs no protection from Bondholders because it acts as a fiduciary with no equitable stake in the Pledged Revenues.  See Gracia-Gracia, 939 F.3d at 348.

- **Whether a specialized tribunal with the necessary expertise has been established to hear the cause of action:**  Either the Puerto Rico courts or the federal judges of the District of Puerto Rico are well equipped  to interpret the Puerto Rico laws and agreements that create Movants' liens and other property interests, such as the Excise Tax Statutes and the Resolutions.  See In re Coast Caribbean Recycling, Inc., 2014 WL 7359405, at *2 (Bankr. D.P.R. Dec. 23, 2014) (holding that Puerto Rican local courts were better suited to resolve dismissal claims and actions to pierce the corporate veil under Puerto Rico law, in applying the Sonnax factors).  Further, this factor must be considered in light of FOMB's position on Section 305 and the Title III Court's inability to fully and fairly hear and decide the relevant issues.  Whether local or federal, any non-Title III court sitting in Puerto Rico is, in these circumstances, better placed to provide relief to Movants.  Therefore, Movants should have the opportunity to raise their Puerto Rico law claims before a non-Title III court.

- **Whether the action primarily involves third parties:**  While the actions brought by Movants in a non-Title-III forum will not primarily involve third parties, the other applicable Sonnax factors weigh in favor of granting relief from the stay.

- **Whether the judgment claim arising from the other action is subject to equitable subordination:**  Any judgment based on Movants' claims under the Bonds would not be subject to equitable subordination.

- **Whether movants' success in the other proceeding would result in a judicial lien avoidable by the debtor:**  Movants' success in a proceeding outside of the Title III Court would not result in a judicial lien avoidable by the debtor, because Movants' Bonds are already secured by statutory liens and security interests and no judicial lien would be necessary to secure Movants' claims.  In any event, FOMB has no ability to avoid judicial liens, because the ability to avoid liens under Section 544(a) of the Bankruptcy Code is dependent on FOMB's ability to step into the shoes of a hypothetical judicial lien creditor, and in Puerto Rico no judicial lien creditor can exist with respect to public funds.  See, e.g., Román v. S.L.G. Ruiz, 160 D.P.R. 116, 116 (2003); Commolco de Caguas Inc. v. Benitez Diaz, 126 D.P.R. 478, 493 (June 8, 1990); 3 L.P.R.A. §§ 9102, 9142.

- **Whether litigation in another forum would prejudice the interests of other creditors:**  Litigation of the issues described in this Motion would not prejudice creditors in the Title III proceedings. Much like the Sonnax factor regarding interference with the Title III restructuring, Gracia-Gracia suggested that where a debtor only holds legal title to the subject property,

lifting the stay to enforce rights on such property would not prejudice creditors in a restructuring.  See 939 F.3d at 348.  Further, even if the issues raised in the Motion are of interest to other creditors, First Circuit precedent and due process requires their adjudication in a non-Title III court.

- **The interests of judicial economy and the expeditious and economical resolution of litigation:**  Judicial economy would best be served by lifting the stay.  The interests of judicial economy are served by lifting the stay where permitting an action to proceed may alleviate the need for further proceedings in the bankruptcy court on the subject issues, assuming that lifting the stay would not result in unreasonable delay of resolution of such issues.  See In re Cicale, 2007 WL 1893301, at *4 (Bankr. S.D.N.Y. June 29, 2007).  Here, lifting the stay to allow the Movants to file actions to assert their rights in the Pledged Revenues would fully resolve the issues discussed in this Motion and there would be no need for further proceedings in the Title III Court.  Additionally, if the stay is lifted, actions regarding the Pledged Revenues can and will be filed promptly so as to not cause any unreasonable delay.  Resolution of these issues will permit plans of adjustment to proceed with the proper treatment of accrued and future Excise Taxes and Toll Revenues.

- **Impact of the stay on the parties and the balance of harms:**  Finally, the impact of the stay on the parties and the balance of harms weigh in favor of lifting the stay.  Much as with the interference and prejudice factors of the Sonnax analysis, Gracia-Gracia suggested that where a debtor holds only legal title to property, the balance of harms factor weighs in favor of lifting the stay.  See 939 F.3d at 348.  Given that HTA and the Commonwealth do not hold an equitable interest in the Pledged Revenues up to the amount necessary to pay the Bonds, the Debtors will suffer no harm if the stay is lifted to allow the Movants to assert their rights in such revenues.  In contrast, the Movants would be harmed by the continuation of the stay, which would allow the Debtors to continue diverting and dissipating the Pledged Revenues, thereby destroying the value of Movants' property.

WHEREFORE, Movants request that the Court enter an order, substantially in the form attached hereto as Exhibit A, (i) lifting the automatic stay to permit Movants to enforce the application of the Pledged Revenues to the payment of the Bonds, including by permitting Movants to enforce their liens on the Pledged Revenues; or, in the alternative, (ii) ordering adequate protection of Movants' interests in the Pledged Revenues and in the repayment of the Bonds.[26]

---

[26] Movants intend to respond in due course to the contemplated structure of the revenue bond lift stay litigation per paragraph 7 of the *Amended and Restated Order Addressing the Filing of an Amended Report by the Mediation Team and Extending (a) Stay Period, (b) Mandatory Mediation, and (c) Certain Deadlines Related Thereto* (ECF No. 9661),

## <u>CERTIFICATION</u>

In accordance with paragraph 7 of the *Interim Case Management Order for Revenue Bonds* (ECF No. 9620), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

---

and otherwise reserve all rights under Section 362(e), including, without limitation, the right to a final hearing on that date, or in any event, the right to a final hearing within 30 days of any preliminary hearing.  Movants object to the application here of any provision of the *Tenth Amended Notice, Case Management And Administrative Procedures* (ECF No. 8027-1) to the extent that it purports to limit or abrogate Movants' statutory rights.

Dated:    New York, New York
          January 16, 2020

CASELLAS ALCOVER & BURGOS P.S.C.    CADWALADER, WICKERSHAM & TAFT LLP

By: _/s/ Heriberto Burgos Pérez_        By: _/s/ Mark C. Ellenberg_
    Heriberto Burgos Pérez          Howard R. Hawkins, Jr.*
    USDC-PR 204809             Mark C. Ellenberg*
    Ricardo F. Casellas-Sánchez       William J. Natbony*
    USDC-PR 203114             Ellen M. Halstead*
    Diana Pérez-Seda            Thomas J. Curtin*
    USDC-PR 232014             Casey J. Servais*
    P.O. Box 364924             200 Liberty Street
    San Juan, PR 00936-4924       New York, NY 10281
    Telephone:  (787) 756-1400      Telephone:  (212) 504-6000
    Facsimile:  (787) 756-1401       Facsimile:  (212) 504-6666
    Email:      hburgos@cabprlaw.com    Email:      howard.hawkins@cwt.com
             rcasellas@cabprlaw.com            mark.ellenberg@cwt.com
             dperez@cabprlaw.com             bill.natbony@cwt.com
                                ellen.halstead@cwt.com

_Attorneys for Assured Guaranty Corp._              thomas.curtin@cwt.com
_and Assured Guaranty Municipal Corp._           casey.servais@cwt.com

                                   * Admitted _pro hac vice_

                                   _Attorneys for Assured Guaranty Corp. and_
                                   _Assured Guaranty Municipal Corp._

ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC

WEIL, GOTSHAL & MANGES LLP


By:/s/ *Eric Perez-Ochoa*
    Eric Pérez-Ochoa
    USDC-PR No. 206,314
    E-mail:    epo@amgprlaw.com


By:/s/*Luis A. Oliver-Fraticelli*
    Luis A.  Oliver-Fraticelli
    USDC-PR NO. 209,204
    E-mail:    loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Tel.:         (787) 756-9000
    Fax:          (787) 756-9010

*Attorneys for National Public Finance
Guarantee Corp.*

By:/s/ *Robert Berezin*
    Jonathan Polkes*
    Gregory Silbert*
    Robert Berezin*
    Kelly Diblasi*
    Gabriel A. Morgan*
    767 Fifth Avenue
    New York, New York 10153
    Tel.:         (212) 310-8000
    Fax:          (212) 310-8007
    Email:        jonathan.polkes@weil.com
                  gregory.silbert@weil.com
                  robert.berezin@weil.com
                  kelly.diblasi@weil.com
                  gabriel.morgan@weil.com

* admitted *pro hac vice*


*Attorneys for National Public Finance
Guarantee Corp.*

FERRAIUOLI LLC

MILBANK LLP

By: /s/ *Roberto Cámara-Fuertes*
    ROBERTO CÁMARA-FUERTES
    USDC-PR NO. 219,002
    E-mail:    rcamara@ferraiuoli.com

By: /s/ *Sonia Colón*
    SONIA COLÓN
    USDC-PR NO. 213809
    E-mail:    scolon@ferraiuoli.com

    221 Ponce de Leon Ave., 5th Floor
    San Juan, PR 00917
    Tel.:    (787) 766-7000
    Fax:    (787) 766-7001

*Counsel for Ambac Assurance Corporation*

By: /s/ *Atara Miller*
    DENNIS F. DUNNE*
    ATARA MILLER*
    GRANT R. MAINLAND*
    JOHN J. HUGHES*
    55 Hudson Yards
    New York, New York 10001
    Tel.:    (212) 530-5000
    Fax:    (212) 530-5219
    Email:    ddunne@milbank.com
              amiller@milbank.com
              gmainland@milbank.com
              jhughes2@milbank.com

*admitted *pro hac vice*

*Counsel for Ambac Assurance Corporation*

ARENT FOX LLP


By:/s/ *David L. Dubrow*
    DAVID L. DUBROW*
    MARK A. ANGELOV*
    1301 Avenue of the Americas
    New York, New York 10019
    Tel.:      (212) 484-3900
    Fax:      (212) 484-3990
    Email:    david.dubrow@arentfox.com
            mark.angelov@arentfox.com


By:/s/ *Randall A. Brater*
    RANDALL A. BRATER*
    1717 K Street, NW
    Washington, DC 20006
    Tel.:      (202) 857-6000
    Fax:      (202) 857-6395
    Email:    randall.brater@arentfox.com

    *admitted pro hac vice

*Counsel for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

BUTLER SNOW LLP

By:/s/ *María E. Picó*

María E. Picó
USDC-PR 123214
802 Ave. Fernández Juncos
San Juan PR 00907-4315
Telephone:  (787) 723-8520
Facsimile:  (787) 724-7844
E-mail:     mpico@rexachpico.com

*Attorney for Financial Guaranty
Insurance Company*

By:/s/ *Martin A. Sosland*

Martin A. Sosland (*pro hac vice*)
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240
Telephone:  (469) 680-5502
Facsimile:  (469) 680-5501
E-mail:     martin.sosland@butlersnow.com

*\*Admitted pro hac vice in Case No. 17-BK-03283-LTS and Case No. 17-BK-03567-LTS*

Jason W. Callen
150 3rd Ave., S., Suite 1600
Nashville, TN 37201
Telephone:  615-651-6774
Facsimile:  615-651-6701
Email:      jason.callen@butlersnow.com

*\*Admitted pro hac vice in Case No. 17-BK-03283-LTS and Case No. 17-BK-03567-LTS*

*Attorneys for Financial Guaranty Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, the 16th day of January, 2020.

By: _/s/ Howard R. Hawkins, Jr._
Howard R. Hawkins, Jr.
* admitted _pro hac vice_

**<u>EXHIBIT A</u>**

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND<br>TRANSPORTATION AUTHORITY ("HTA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

## [PROPOSED] ORDER GRANTING MOTION OF
## ASSURED GUARANTY CORP., ASSURED GUARANTY
## MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION,
## NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND
## FINANCIAL GUARANTY INSURANCE COMPANY FOR RELIEF FROM THE
## AUTOMATIC STAY OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Upon consideration of the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* (the "Motion"),[2] and upon consideration of the hearing record on the Motion, and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

1.      The Motion is GRANTED as set forth herein.

2.      The automatic stays of sections 362 and 922 of the Bankruptcy Code, as incorporated into PROMESA, are hereby lifted to permit Movants to bring one or more actions, other than in a case under Title III of PROMESA before a presiding judge sitting by designation pursuant to PROMESA § 308 (48 U.S.C. § 2168), seeking application of the Pledged Revenues to the payment of the Bonds, including by enforcing their liens on the Pledged Revenues and pursuing all related contractual, statutory, constitutional, or other claims, or by pursuing any other relevant claim or remedy at law or in equity.

3.      The automatic stays of sections 362 and 922 of the Bankruptcy Code, as incorporated into PROMESA, are hereby lifted to permit Movants to bring one or more actions under PROMESA § 407 in the United States District Court for the District of Puerto Rico (other than in a case under Title III of PROMESA before a presiding judge sitting by designation pursuant to PROMESA § 308 (48 U.S.C. § 2168)) with respect to the Pledged Revenues. [and/or]

---

[2] Capitalized terms used, but not defined, in this order shall have the meanings ascribed to such terms in the Motion.

       4.     [The Debtors are ordered to provide adequate protection to the Movants by remitting the Pledged Revenues to the Fiscal Agent in accordance with the Resolutions and the Excise Tax Statutes.]

Dated: _____

_____