Opposition Deadline: January 30, 2020 5:00 PM AST
Reply Deadline: February 13, 2020 5:00 PM AST
Hearing Date: February 27, 2020 10:00 AM AST

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND THE BANK OF NEW YORK MELLON'S MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING THE CCDA BONDS

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**PRELIMINARY STATEMENT** ........................................................................... 1

**BACKGROUND** ............................................................................................ 4

    I.    The Hotel Occupancy Tax Act Irrevocably Transferred Equitable
Ownership of the Pledged Hotel Taxes to the CCDA Bondholders. ..................... 6

        A.    The Commonwealth Authorized the Tourism Company to Levy
and Collect the Pledged Hotel Taxes for the Benefit of CCDA
Bondholders. ................................................................................... 6

        B.    The Commonwealth Provided that Legal Title in the Pledged Hotel
Taxes Would Move on a Monthly Basis from the Tourism
Company to GDB. ............................................................................ 7

        C.    GDB Is Required to Transfer Legal Title to the Pledged Hotel
Taxes to the CCDA Bond Trustee for Payment of CCDA Bonds. ............. 8

        D.    The Commonwealth Covenant with CCDA Bondholders. ......................... 9

        E.    The Commonwealth Entrusted Legal Title to the Pledged Hotel
Taxes to the Tourism Company and GDB for the Benefit of CCDA
Bondholders. ................................................................................. 10

    II.    The Tourism Company and GDB Irrevocably Transferred Their
Temporary Legal Rights In the Pledged Hotel Taxes to CCDA
Bondholders Through the Assignment Agreement, Pledge Agreement, and
Trust Agreement. ..................................................................................... 11

        A.    The Tourism Company Irrevocably Transferred All Rights in the
Pledged Hotel Taxes to GDB. .......................................................... 12

        B.    GDB Irrevocably Transferred All Property Rights in the Pledged
Hotel Taxes to the CCDA Bond Trustee. ............................................ 15

        C.    CCDA Bondholders Have a Statutory Lien on the Pledged Hotel
Taxes. .......................................................................................... 17

        D.    The Pledged Hotel Taxes Are Subject to Article VI, Section 8 of
the Puerto Rico Constitution, Which Has Not Been Triggered. ............... 19

    III.    The Commonwealth Unlawfully Blocked Transfers of the Pledged Hotel
Taxes to CCDA Bondholders. .................................................................... 20

    IV.    The Title III Filings. ................................................................................ 23

**JURISDICTION AND VENUE** ...................................................................... 24

**RELIEF REQUESTED** ................................................................................. 24

**ARGUMENT** .............................................................................................. 25

I.    The Automatic Stay Does Not Apply to Movants' Proposed CCDA
      Enforcement Action. ................................................................................. 25

      A.    The CCDA Bondholders Are the Equitable Owners of the Pledged
            Hotel Taxes. .................................................................................... 26

      B.    Neither the Commonwealth's Bankruptcy Nor PROMESA
            Diminish or Limit the CCDA Bondholders' Ownership of the
            Pledged Hotel Taxes. ...................................................................... 31

      C.    Article VI, Section 8 of the Puerto Rico Constitution Does Not
            Give the Commonwealth a Reversionary Interest in the Pledged
            Hotel Taxes. .................................................................................... 33

II.   THE COURT SHOULD LIFT ANY APPLICABLE AUTOMATIC
      STAY TO PERMIT MOVANTS TO PURSUE THEIR REMEDIES. ................ 36

      A.    The Court Should Lift the Automatic Stay Under Bankruptcy Code
            Section 362(d)(2) Because the Commonwealth Has No Equity in
            the Pledged Hotel Taxes, and They Are Unnecessary to an
            Effective Reorganization. ................................................................ 37

            1.    The Commonwealth Has No Equity in the Pledged Hotel
                  Taxes. ................................................................................... 38

            2.    The Pledged Hotel Taxes are Not Necessary for an
                  Effective Reorganization. ..................................................... 39

      B.    Alternatively, the Court Should Lift the Stay for "Cause" Pursuant
            to Bankruptcy Code Section 362(d)(1). ........................................... 40

            1.    There Is Cause to Lift the Stay Due to the Lack of
                  Adequate Protection for CCDA Bondholders............................ 41

            2.    Lack of Due Process in the Title III Court Constitutes
                  Cause to Lift the Stay............................................................. 44

            3.    There Is Cause to Lift the Stay Based on the Totality of
                  Circumstances. ...................................................................... 46

III.  THE COURT SHOULD MANDATE ADEQUATE PROTECTION. ................. 53

**CONCLUSION** ........................................................................................... 54

**CERTIFICATION** ....................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ambac Assurance Corp. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    927 F.3d 597 (1st Cir. 2019) ................................................................41, 46, 47, 49

*Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio
    v. Flores Galarza*,
    484 F.3d 1 (1st Cir. 2007) ...........................................................................27, 28, 29

*Aurelius Capital Master, Ltd. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    919 F.3d 638 (1st Cir. 2019) ...............................................................................49

*Austin v. Unarco Indus., Inc.*,
    705 F.2d 1 (1st Cir. 1983) ....................................................................................26

*Boyd v. Martin Expl. Co.*,
    56 B.R. 776 (E.D. La. 1986) ................................................................................40

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*,
    217 F. Supp. 3d 508 (D.P.R. 2016) .....................................................................43

*Butner v. United States*,
    440 U.S. 48 (1979) ...............................................................................................33

*City & Cty. of Dallas Levee Imp. Dist. ex rel. Simond v. Indus. Props. Corp.*,
    89 F.2d 731 (5th Cir. 1937) .................................................................................32

*City of Springfield v. Lan Tamers, Inc. (In re Lan Tamers, Inc.)*,
    281 B.R. 782 (Bankr. D. Mass. 2002) .................................................................31

*City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*,
    329 F.3d 204 (1st Cir. 2003) ...............................................................................30

*Commolco de Caguas Inc. v. Benitez Diaz*, 126 D.P.R. 478 (P.R. 1990) .....................53

*Cortuk v. Banco Turco Romana (In re Cortuk)*,
    2019 WL 2171481 (D.N.J. May 20, 2019) ..........................................................37

*Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) .............................................................................................47

*FDIC v. Casady*,
    106 F.2d 784 (10th Cir. 1939) .............................................................................31

*García-Rubiera v. Calderón,*
   570 F.3d 443 (1st Cir. 2009) ....................................................................28, 32

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
   Mgmt. Bd. for P.R.),*
   939 F.3d 340 (1st Cir. 2019) ......................................................... *passim*

*In re Blair,*
   534 B.R. 787 (Bankr. D.N.M. 2015) ...................................................51

*In re Breitburn Energy Partners LP,*
   571 B.R. 59 (Bankr. S.D.N.Y. 2017) ..................................................51

*In re Builders Grp. & Dev. Corp.,*
   502 B.R. 95 (Bankr. D.P.R. 2013) ......................................................55

*In re City of Columbia Falls,*
   143 B.R. 750 (Bankr. D. Mont. 1992) ............................................28, 31, 40

*In re J&M Salupo Dev. Co.,*
   388 B.R. 809 (Bankr. N.D. Ohio 2009) ...............................................43

*In re Keene Corp.,*
   171 B.R. 180 (Bankr. S.D.N.Y. 1994) ..................................................48

*In re Lally,*
   38 B.R. 622 (Bankr. N.D. Iowa 1984) ..................................................40

*In re Mason,*
   514 B.R. 852 (Bankr. E.D. Ky. 2014) ...................................................51

*In re Mullock,*
   404 B.R. 800 (Bankr. E.D. Pa. 2009) ..................................................38

*In re RNI Wind Down Corp.,*
   348 B.R. 286 (Bankr. D. Del. 2006) ...................................................42

*In re Satcon Tech. Corp.,*
   2012 WL 6091160 (Bankr. D. Del. Dec. 7, 2012) ..................................54

*In re Scarborough-St. James Corp.,*
   535 B.R. 60 (Bankr. D. Del. 2015) .....................................................47

*In re Schick,*
   418 F.3d 321 (3d Cir. 2005) ..............................................................19

*In re Shaffer,*
   563 B.R. 301 (Bankr. D. Ariz. 2016) ...................................................51

*In re SCO Grp., Inc.*,
    395 B.R. 852, 856 (Bankr. D. Del. 2007) ...................................................................48

*In re Taub*,
    438 B.R. 39 (Bankr. E.D.N.Y. 2010) ............................................................48, 49

*In re Tellier*,
    125 B.R. 348 (Bankr. D.R.I. 1991) .......................................................................54

*Jin Qing Li v. Rosen (In re Jin Qing Li)*,
    2018 WL 1354548 (B.A.P. 9th Cir. Mar. 12, 2018) ............................................37

*JK Mullen Inv. Co. v. Town of Arvada*,
    261 P.2d 714 (Colo. 1953) ....................................................................................18

*Keach v. Wheeling & Lake Erie Railway Co. (In re Montreal, Maine & Atl. Ry., Ltd.)*,
    888 F.3d 1 (1st Cir. 2018) .....................................................................................30

*Martin v. United States (In re Martin)*,
    761 F.2d 472 (8th Cir. 1985) ................................................................................44

*Mazzeo v. Lenhart (In re Mazzeo)*,
    167 F.3d 139 (2d Cir.1999) ..................................................................................48

*Metro. Life Ins. Co. v. Murel Holding Corp. (In re Mural Holding Corp.)*,
    75 F.2d 941 (2d Cir. 1935) ...................................................................................43

*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*,
    602 B.R. 798 (B.A.P. 1st Cir. 2019) .....................................................................37

*Paccom Leasing Corp. v. Deico Elecs., Inc. (In re Deico Elecs., Inc.)*,
    139 B.R. 945 (B.A.P. 9th Cir. 1992) ....................................................................43

*Peaje Invs., LLC v. P.R. Highways & Transp. Auth. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    301 F. Supp. 3d 290 (D.P.R. 2017) ................................................................18, 19

*Peaje Invs. v. García-Padilla*,
    845 F.3d 505 (1st Cir. 2017) ...........................................................................43, 45

*Reading Co. v. Brown*,
    391 U.S. 471 (1968) ..............................................................................................53

*Resolution Tr. Corp.v. Swedeland Dev. Grp., Inc.(In re Swedeland Dev. Grp., Inc.)*,
    16 F.3d 552 (3d Cir. 1994) ...................................................................................54

*Román v. S.L.G. Ruiz*, 160 D.P.R. 116 (P.R. 2003)................................................53

*Shipley Co., Inc. v. Darr (In re Tap, Inc.)*,
    52 B.R. 271 (Bankr. D. Mass. 1985) ...........................................31, 51

*Soliman v. Spencer (In re Spencer)*,
    115 B.R. 471 (D. Del. 1990)......................................................40

*Sonnax Industries v. Tri Components Prods. Corp. (In re Sonnax)*,
    907 F.2d 1280 (2d Cir. 1990)............................................... *passim*

*Stowe v. Bologna (In re Bologna)*,
    206 B.R. 628 (Bankr. D. Mass. 1997) ..........................................31

*Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*,
    763 S.E.2d 288 (N.C. Ct. App. 2014) ......................................26, 31

*U.S. Fidelity & Guar. Co. v. Maxon Eng'g Servs., Inc. (In re Maxon Eng'g Servs., Inc.)*,
    332 B.R. 495 (Bankr. D.P.R. 2005) ............................................43

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988)...............................................................43

*U.S. v. Dwinells*,
    508 F.3d 63 (1st Cir. 2007).......................................................47

*Webster v. Doe*,
    486 U.S. 592 (1988)...............................................................46

## Statutes and Rules

11 U.S.C. § 101 ...............................................................................18

11 U.S.C. § 361 ...............................................................42, 43, 44, 54

11 U.S.C. § 362 .......................................................................*passim*

11 U.S.C. § 503 ...............................................................................55

28 U.S.C. § 1331 .............................................................................24

28 U.S.C. § 1391 .............................................................................24

48 U.S.C. § 2141 .......................................................................33, 34

48 U.S.C. § 2144 .............................................................................33

48 U.S.C. § 2161 .............................................................................53

48 U.S.C. § 2163 .................................................................................................22, 33

48 U.S.C. § 2165 .................................................................................................44, 48

48 U.S.C. § 2166 .........................................................................................................24

48 U.S.C. § 2167 .........................................................................................................24

P.R. CONST. art. VI, § 8 ..............................................................................................34

3 L.P.R.A. § 9102 .......................................................................................................53

3 L.P.R.A. § 9142 .......................................................................................................53

13 L.P.R.A. § 2271a ......................................................................................................6

13 L.P.R.A. § 2271*o* .............................................................................................5, 6, 29

13 L.P.R.A. § 2271v ............................................................................................*passim*

23 L.P.R.A. § 671d ........................................................................................................4

23 L.P.R.A. § 6402 ........................................................................................................5

23 L.P.R.A. § 6404 ........................................................................................................5

23 L.P.R.A. § 6441(d) .................................................................................................17

23 L.P.R.A. § 6450 .............................................................................................*passim*

Amended Moratorium Act .................................................................................*passim*

Moratorium Act ...........................................................................................................21

**Other Authorities**

Collier on Bankruptcy ¶ 362.07[3][b] (16th ed. 2019) ..............................................42

Collier on Bankruptcy ¶ 506.03[7][a] n.163 (16th ed. 2019) .....................................43

Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Corp. ("AGC"), and Assured Guaranty Municipal Corp. (together with AGC, "Assured") (collectively, the "Monoline Movants") together insure 100% of the outstanding bonds issued by the Puerto Rico Convention Center District Authority ("CCDA"). The Monoline Movants and The Bank of New York Mellon, in its capacity as CCDA bondholder trustee (the "CCDA Bond Trustee") (collectively, the "Movants"), move for an order, substantially in the form attached hereto as **Exhibit 1**, declaring that the automatic stay does not apply to an anticipated lawsuit relating to revenue bonds issued by CCDA (the "CCDA bonds").  In the alternative, Movants move for relief from the automatic stay to pursue that lawsuit.  Further in the alternative, Movants move for an order requiring the Commonwealth of Puerto Rico (the "Commonwealth") to provide adequate protection for Movants' collateral.  In support of their motion (the "Motion"), Movants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Movants seek to initiate an action to enforce their property rights in certain hotel occupancy tax revenues that belong to CCDA bondholders.

2.      The Commonwealth does not own the hotel occupancy tax revenues at issue and has no other property rights in those revenues.  Pursuant to Act 272-2003 (the "Hotel Occupancy Tax Act"), the Commonwealth expressly and irrevocably (i) granted to the Puerto Rico Tourism Company (the "Tourism Company") the right to impose and collect hotel occupancy taxes generated under the Hotel Occupancy Tax Act (the "Hotel Taxes"), and (ii) vested all equitable rights in a portion of the Hotel Taxes to the CCDA bondholders.

3.      Specifically, the Hotel Occupancy Tax Act: (i) transferred the power to impose, collect, and distribute Hotel Taxes to the Tourism Company; (ii) transferred to CCDA bondholders

all equitable ownership over the portion of Hotel Taxes pledged to the repayment of CCDA bonds (the "Pledged Hotel Taxes"); (iii) required the Pledged Hotel Taxes to be transferred from the Tourism Company to the Puerto Rico Government Development Bank ("GDB") to the CCDA Bond Trustee, who receives and holds them for the benefit of the CCDA bondholders;[2] (iv) limited the rights of the Tourism Company and GDB to temporarily holding bare legal title to the Pledged Hotel Taxes, reserving all equitable rights for the exclusive benefit of CCDA bondholders; and (v) prohibited the use of the Pledged Hotel Taxes, other than for payment to the CCDA bondholders.

4.     The Commonwealth also affirmatively covenanted, both in the Hotel Occupancy Tax Act and the Trust Agreement (as defined herein) executed by CCDA, that it (i) would ensure the Pledged Hotel Taxes were always transferred to CCDA bondholders, (ii) would not interfere with CCDA bondholders' equitable ownership of those funds until the CCDA bonds are repaid in full, and (iii) would comply with any agreements with or for the benefit of CCDA bondholders. Additionally, separate agreements implementing the Hotel Occupancy Tax Act's requirements provide that legal title to the Pledged Hotel Taxes will pass from the Tourism Company to GDB to the CCDA Bond Trustee to the CCDA bondholders, and that the CCDA Bond Trustee (for its own benefit and the benefit of the CCDA bondholders) was granted a first-priority security interest in the legal title to the Pledged Hotel Taxes when they are held by third parties. The CCDA bondholders' lien on the bare legal title further protects their entitlement to the Pledged Hotel Taxes until the Pledged Hotel Taxes are paid over to the bondholders.

---

[2] The rights, remedies, and obligations of the CCDA Bond Trustee, and other Movants, are set forth more fully in the Bond Documents (as defined herein). No reference herein to a specific provision of a Bond Document shall be construed as a waiver of any rights, remedies, or other provisions affecting or relating to the CCDA Bond Trustee or any other Movant.

5.     Despite CCDA bondholders' equitable ownership of the Pledged Hotel Taxes, the requirement that legal title pass to the CCDA bondholders, and their security interest in the legal title, the Tourism Company and GDB have not made the required transfers of the Pledged Hotel Taxes since at least July 2017.  This has deprived the CCDA bondholders of the collateral pledged to payment of their bonds, and required Monoline Movants to make payments on the financial guaranty insurance policies that exist on these bonds.

6.     Movants have the right, under the Hotel Occupancy Tax Act and related agreements, to enforce their rights and CCDA bondholders' rights to the Pledged Hotel Taxes. Accordingly, Movants seek to file an action against the Tourism Company, GDB, CCDA, and the principal officers of each of those entities (the "Proposed Defendants"), to enforce CCDA bondholders' rights to the Pledged Hotel Taxes (the "CCDA Enforcement Action" or the "Action").  The Action would seek, in particular, (i) a writ of mandamus compelling the Tourism Company, GDB, and CCDA to perform their legal duties under the Hotel Occupancy Tax Act and the agreements governing the CCDA Bonds, (ii) declaratory and injunctive relief, (iii) monetary damages for breach of contract, unjust enrichment, and/or conversion by the Tourism Company, GDB, and CCDA, (iv) monetary damages for violation of PROMESA § 407, and (v) any other relief the Court deems appropriate.   Movants expect that the Action would not name the Commonwealth as a party (unless the Proposed Defendants contend that the Commonwealth is a necessary party) because the Action does not implicate any property interest of the Commonwealth.  A copy of the draft complaint for the CCDA Enforcement Action is attached hereto as **Exhibit 2**.

7.     As set forth below, in order to pursue the CCDA Enforcement Action, Movants seek three forms of relief from this Court, in the alternative:

8.      *First*, Movants seek an order confirming that the automatic stay in the Commonwealth's Title III case pursuant to the Puerto Rico Oversight, Management, and Stability Act ("PROMESA") does not apply to the CCDA Enforcement Action.  The Commonwealth lacks any property rights whatsoever in the Pledged Hotel Taxes, both because it does not levy or collect the Hotel Taxes and because it expressly alienated any rights it might have had in the Pledged Hotel Taxes through the Hotel Occupancy Tax Act.  Nonetheless, because of the consequences of stay violations, Movants proactively seek a declaration that the automatic stay does not apply to the CCDA Enforcement Action.

9.      *Second*, in the alternative, assuming *arguendo* that the automatic stay applies to the CCDA Enforcement Action, the Court should lift the stay under Section 362(d) of the Bankruptcy Code so that Movants can pursue the CCDA Enforcement Action and protect their interests in the Pledged Hotel Taxes.  The Commonwealth does not have any equity in the Pledged Hotel Taxes, and those funds are not necessary for the Commonwealth's Title III reorganization, thus providing a sufficient basis for granting stay relief.  In addition, there is "cause" to lift the stay under Section 362(d)(1) because (i) Movants' property rights in the Pledged Hotel Taxes are not adequately protected, (ii) due process considerations and principles of constitutional avoidance further call for stay relief; and (iii) cause to lift the stay exists based on the totality of circumstances.

10.     *Third*, and further in the alternative, in the absence of stay relief, the Court should order adequate protection for Movants' property rights in the Pledged Hotel Taxes.

### **BACKGROUND**

11.     The Commonwealth created the Tourism Company in June 1970 for the purpose of "promot[ing], develop[ing], and improv[ing] [Puerto Rico's] tourist industry."  23 L.P.R.A. § 671d.  The Tourism Company became "responsible for stimulating, promoting, and regulating

the development of Puerto Rico's tourism industry." *See* PUERTO RICO TOURISM COMPANY: ABOUT US, https://puertoricotourism.pr.gov/dnn/About-Us.

12.     The Commonwealth created CCDA in September 2000, through Act 351-2000 (the "CCDA Enabling Act"), in order to develop and operate a convention center district in San Juan, Puerto Rico.  *See* 23 L.P.R.A. §§ 6402, 6404.

13.     To facilitate financing for the convention center, the Commonwealth enacted the Hotel Occupancy Tax Act in September 2003, pursuant to Act 272 (approved September 9, 2003). The Hotel Occupancy Tax Act authorizes the Tourism Company to levy taxes on the room rates charged to guests of hotels, motels, casinos, inns, and other lodgings (*i.e.*, the Hotel Taxes).  *See, e.g.*, 13 L.P.R.A. § 2271*o*.  The Hotel Occupancy Tax Act expressly authorized CCDA to issue bonds backed by the Pledged Hotel Taxes in order to build the convention center and other facilities.

14.     On March 24, 2006, CCDA issued the CCDA bonds, in principal amount of approximately $469 million.  A series of interrelated agreements were executed to give effect to the Hotel Occupancy Tax Act by acknowledging CCDA bondholders' equitable ownership of the Pledged Hotel Taxes under the Act, providing for the regular transfer of legal title from the Tourism Company to GDB to the CCDA Bond Trustee to the CCDA bondholders, and pledging the Pledged Hotel Taxes to payment of the CCDA bonds.

15.     In particular, the agreements were: (i) the Assignment and Coordination Agreement between the Tourism Company and GDB ("Assignment Agreement" (attached hereto as **Exhibit 3**)); (ii) the Pledge Agreement ("Pledge Agreement" (attached hereto as **Exhibit 4**)) between GDB, CCDA, and The Bank of New York Mellon, acting in its capacity as the CCDA Bond Trustee; and (iii) the Trust Agreement between CCDA and the CCDA Bond Trustee ("Trust Agreement"

(attached hereto as **Exhibit 5**).)   These three agreements, together with the Hotel Occupancy Tax

Act and the CCDA Enabling Act (which contain covenants of the Commonwealth with CCDA

bondholders), are referred to collectively as the "Bond Documents."

**I.      THE HOTEL OCCUPANCY TAX ACT IRREVOCABLY TRANSFERRED
EQUITABLE OWNERSHIP OF THE PLEDGED HOTEL TAXES TO THE
CCDA BONDHOLDERS.**

**A.      The Commonwealth Authorized the Tourism Company to Levy and Collect
the Pledged Hotel Taxes for the Benefit of CCDA Bondholders.**

16.     The Hotel Occupancy Tax Act expressly authorized the Tourism Company to

impose and collect the Hotel Taxes.  The Hotel Occupancy Tax Act provides: "The Company shall

levy, charge, and collect a general tax of nine percent (9%) over the room occupancy rate."

13 L.P.R.A. § 2271*o*(b).   The Commonwealth gave the Tourism Company the power to

"[d]etermine, assess, impose, collect, enforce, regulate and distribute" the Hotel Taxes.  *See* 13

L.P.R.A. § 2271a(a).

17.     In other words, rather than imposing or collecting the Hotel Taxes itself, the

Commonwealth gave power to the Tourism Company to do so—recognizing that the Tourism

Company is "responsible for tourism development in Puerto Rico" and is therefore "the entity that

can more efficiently assign the moneys generated by the [Hotel] Tax."  The Commonwealth of

Puerto Rico Room Occupancy Rate Tax Act No. 272-2003, Statement of Motives (2003).

18.     Critically, the Hotel Occupancy Tax Act expressly provides that CCDA

bondholders have equitable ownership of the Pledged Hotel Taxes.  *See* 13 L.P.R.A. § 2271v(a)(4)

("The [Pledged Hotel Taxes] shall be deposited in a special account to be maintained by the Bank

in the name of the Authority ***for the benefit of the bondholders,*** noteholders or the holders of other

obligations of the Authority or for the benefit of the other contracting parties under any bond

related financing agreement." (emphasis added)).  As described below, *legal* title to the Pledged

Hotel Taxes moves from the Tourism Company to GDB to the CCDA Bond Trustee, but as the

Hotel Occupancy Tax Act expressly provides, the Pledged Hotel Taxes are at all relevant times

held *for the benefit of bondholders*, meaning they always retain equitable ownership of the funds.

**B.**  **The Commonwealth Provided that Legal Title in the Pledged Hotel Taxes Would Move on a Monthly Basis from the Tourism Company to GDB.**

19.    To protect CCDA bondholders' equitable ownership of the Pledged Hotel Taxes,

the Hotel Occupancy Tax Act expressly prohibits the Tourism Company from distributing or using

any of the Hotel Taxes until the full amount of Pledged Hotel Taxes are provided to GDB and

placed in trust for the benefit of CCDA bondholders.

20.    The Hotel Occupancy Tax Act required the Tourism Company to set aside each

fiscal year "the amount necessary for [CCDA] to make, during such fiscal year and the first day of

the following fiscal year," all debt service payments and other required payments on the CCDA

bonds (*i.e.*, the Pledged Hotel Taxes).  *See* 13 L.P.R.A. § 2271v(a)(1).  GDB is responsible for

"determin[ing] and certify[ing]" the amount of Hotel Taxes needed to pay the CCDA bonds in

each fiscal year (the "Debt Service Amount"); it must make its certification on an annual basis no

later than May 30 in a given fiscal year for the next fiscal year beginning on July 1.  *Id.*; (*see also*

Ex. 5, at 7, 22-23 (Trust Agreement §§ 1.01, 5.01).)  The Tourism Company is required to deposit,

each month, ten percent of the Debt Service Amount into a specially segregated and restricted trust

account at GDB, which was statutorily mandated to be created in CCDA's name and held for the

exclusive benefit of the CCDA bondholders (the "GDB Special Trust Account").  *See* 13 L.P.R.A.

§ 2271v(a)(4) ("the [Tourism] Company shall transfer to [GDB], for deposit in [the GDB Special

Trust Account], the [Debt Service Amount] established in the immediately preceding paragraph

through monthly transfers").  This effectuates the transfer of legal title to the Pledged Hotel Taxes

from the Tourism Company to GDB.

21.     Thus, the Commonwealth mandated that the first revenues of the Hotel Taxes were for the benefit of CCDA bondholders, up to the amount of the Pledged Hotel Taxes, with any remaining revenues being allocated to other uses established by law.  *See id.*

22.     The Commonwealth expressly prohibited the Tourism Company from any other use or transfer of ***any*** Hotel Taxes until the Tourism Company had deposited that month's required Debt Service Amount payment into the GDB Special Trust Account.  *See id.* ("Each month, ***after making the transfer of monies to [GDB]*** as provided in this subsection, the [Tourism] Company shall distribute any remaining amount as established in subsection (b) of this section.") (emphasis added); *id.* § 2271v(b) (authorizing the Tourism "Company [to] make monthly distributions of the ***excess over the [Debt Service Amount]***") (emphasis added); *id.* § 2271v(a)(4) ("[T]he [Pledged Hotel Taxes] shall be used solely for the payment of the principal and interest on the [CCDA] bonds.").  In the event that the Hotel Taxes collected in a given month are ever insufficient to cover the Debt Service Amount for that month, the Tourism Company is required to "correct such a deficiency by transferring" any excess Hotel Taxes collected in future months to the GDB Special Trust Account until the deficiency is covered in full.  *Id.*

23.     In other words, the Tourism Company's transfer of the Pledged Hotel Taxes to the GDB Special Trust Account is an explicit condition precedent to the Tourism Company transferring, using, or allowing other parties to use the collections of Hotel Taxes for any purpose other than transferring it to the CCDA Bond Trustee for payment of principal and interest on CCDA bonds.  *See id.*

**C.     GDB Is Required to Transfer Legal Title to the Pledged Hotel Taxes to the CCDA Bond Trustee for Payment of CCDA Bonds.**

24.     The Hotel Occupancy Tax Act requires GDB, which holds bare legal title to the Pledged Hotel Taxes in the GDB Special Trust Account, to transfer that legal title to the CCDA

Bond Trustee so that the Pledged Hotel Taxes can be distributed to the CCDA bondholders. *Id.*
(GDB "shall transfer the amounts deposited in such [GDB Special Trust Account] to the trustee[]
of the [CCDA] bondholders").

25.     The Hotel Occupancy Tax Act also makes clear that the Tourism Company and
GDB cannot use the Pledged Hotel Taxes for any other purpose, or otherwise impede the flow of
the Pledged Hotel Taxes to CCDA bondholders. *See id.* (the Pledged Hotel Taxes "shall be used
solely for the payment of the principal and interest on the [CCDA] bonds").

26.     The CCDA Bond Trustee distributes funds to the CCDA bondholders when funds
are received from GDB, pursuant to the terms of the Trust Agreement. (Ex. 5, at 22-23 (Trust
Agreement § 5.01).)

        **D.      The Commonwealth Covenant with CCDA Bondholders.**

27.     The Commonwealth affirmatively covenanted with CCDA bondholders that it
would never impair the CCDA bondholders' rights in the Pledged Hotel Taxes and would ensure
that the Pledged Hotel Taxes were deposited by the Tourism Company into the GDB Special Trust
Account, thereby ensuring that legal and equitable ownership of the Pledged Hotel Taxes would
flow to the CCDA bondholders. *See* 13 L.P.R.A. § 2271v(a); 23 L.P.R.A. § 6450.

28.     Specifically, the Hotel Occupancy Tax Act contains covenants of the
Commonwealth—to the CCDA bondholders—that the Commonwealth: (i) will never eliminate or
reduce the Hotel Taxes; (ii) will "make sure that the amounts that must be deposited in the [GDB
Special Trust Account] as provided in this subsection are deposited in the [GDB Special Trust
Account]"; (iii) will "not alter or limit the rights" of CCDA "to encumber or pledge the collections
from the tax required to be deposited in the special account"; and (iv) "comply with the terms of
any agreement entered into with, or for the benefit of the bondholders." 13 L.P.R.A. § 2271v(a).
The CCDA Enabling Act also contains an agreement between the Commonwealth and the CCDA

bondholders whereby the Commonwealth "pledges and agrees" with the CCDA bondholders that "it shall not limit nor alter the rights hereby conferred" to CCDA until the CCDA bonds are "paid in full and said contracts are fully executed and honored" by CCDA.  23 L.P.R.A. § 6450.  The Commonwealth must provide by law "adequate measures" for "protection" of the CCDA bonds and those who enter into contracts with CCDA.  *Id.*

> **E.  The Commonwealth Entrusted Legal Title to the Pledged Hotel Taxes to the Tourism Company and GDB for the Benefit of CCDA Bondholders.**

29.     The plain effect of the Hotel Occupancy Tax Act is to make the CCDA bondholders the equitable owners of the Pledged Hotel Taxes.  The Act expressly provides that the Pledged Hotel Taxes, from the moment they are collected, are held "for the benefit of" the CCDA bondholders and are committed for their exclusive benefit and use.  *Id.*  The Tourism Company only temporarily holds legal title and is statutorily required to transfer the funds to GDB—which holds them in trust for the benefit of the CCDA bondholders.

30.     The Hotel Occupancy Tax Act uses unmistakable trust language and vests equitable ownership of the Pledged Hotel Taxes in the CCDA bondholders, and just as unambiguously mandates that legal title to the Pledged Hotel Taxes be transferred to the bondholders.  *See id.* (the Pledged Hotel Taxes "***shall*** be deposited in a ***special account*** to be maintained by [GDB] ***in the name of [CCDA] for the benefit of the [CCDA] bondholders*** . . . [and GDB] ***shall*** transfer the amounts deposited in such ***special account*** to the trustees of the [CCDA] bondholders"); *id.* (emphasis added) (the Pledged Hotel Taxes "shall be used ***solely*** for the payment of the principal and interest on the bonds") (emphasis added).

31.     Notably, in its opposition to Ambac's prior PRIFA stay motion, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") pointed to the Hotel Occupancy Tax Act as an example of how a statute can require that funds be held "for the benefit

of the bondholders." *See Opposition of the Commonwealth of Puerto Rico to Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay [ECF No. 7176]*, at 39 n.24, Case No. 17-03283, ECF No. 7827.[3]

32.     Thus, the Hotel Occupancy Tax Act memorializes the Commonwealth's unambiguous intent that the Tourism Company and GDB hold every dollar of the Pledged Hotel Taxes in their temporary possession ***in trust*** for the CCDA bondholders. The Hotel Occupancy Tax Act also makes the Pledged Hotel Taxes into special restricted funds, and transforms the Tourism Company into a collection agent for CCDA bondholders by requiring the Tourism Company to hold the Pledged Hotel Taxes in trust for CCDA bondholders until it transfers the Pledged Hotel Taxes to GDB, which also holds the Pledged Hotel Taxes in trust for CCDA bondholders until it transfers the monies to the CCDA Bond Trustee. *See* 13 L.P.R.A. § 2271v(a). The Tourism Company and GDB are thus mere conduits for the Pledged Hotel Taxes, who hold only temporary legal title to the Pledged Hotel Taxes, with no equitable ownership of those funds and no discretion in whether to transfer them to their equitable owners. *See id*.

## II.     THE TOURISM COMPANY AND GDB IRREVOCABLY TRANSFERRED THEIR TEMPORARY LEGAL RIGHTS IN THE PLEDGED HOTEL TAXES TO CCDA BONDHOLDERS THROUGH THE ASSIGNMENT AGREEMENT, PLEDGE AGREEMENT, AND TRUST AGREEMENT.

33.     As described above, in order to implement the Hotel Occupancy Tax Act and issue the CCDA bonds, the Tourism Company, GDB, CCDA, and the CCDA Bond Trustee entered into a series of simultaneously executed and interrelated agreements, specifically: (i) the Assignment Agreement, which transfers and assigns all of the Tourism Company's rights in the Pledged Hotel Taxes to GDB, and provides that the Pledged Hotel Taxes will be pledged to CCDA bondholders,

---

[3] Movants' discussion of the Oversight Board's contention in the CCDA context is without prejudice to Ambac, FGIC, and Assured's view that the Oversight Board's argument in the PRIFA context is meritless.

(Ex. 3, at 2 (Assignment Agreement § 5)); (ii) the Pledge Agreement, in which GDB and CCDA agreed that the Pledged Hotel Taxes would be held in trust and pledged to CCDA bondholders, (*see* Ex. 4, at 2-3 (Pledge Agreement § 2(b))); and (iii) the Trust Agreement, pursuant to which CCDA pledged and assigned the Pledged Hotel Taxes to the CCDA Bond Trustee, such pledge and assignment being for the benefit of the CCDA bondholders and constituting a first-priority lien on the Pledged Hotel Taxes.  (Ex. 5, at 22-23 (Trust Agreement § 5.01).)

> **A.** **The Tourism Company Irrevocably Transferred All Rights in the Pledged Hotel Taxes to GDB.**

34.    The Assignment Agreement—entered into between the Tourism Company and GDB—explicitly stated that it was made "pursuant to the [Hotel Occupancy] Tax Act" and "for the benefit of the Owners of the [CCDA] Bonds."  (*See* Ex. 3, at 1, 3 (Assignment Agreement Introduction; *id.* § 15)) (this agreement is "made for the benefit of the Owners of the [CCDA] Bonds"); (*id.* at 2 (*Id.*  § 7)) ("[T]he [Pledged Hotel Taxes] transferred to GDB hereunder will be . . . transferred from GDB to the [CCDA Bond] Trustee for the benefit of the Owners of the [CCDA] Bonds."); (*see also id.* at 3, (*Id.* § 17)) ("Should any discrepancies between this Assignment Agreement and the [Hotel Occupancy] Tax Act arise, the provisions of the [Hotel Occupancy] Tax Act shall prevail.").

35.    Under the Assignment Agreement, the Tourism Company expressly:

> (i)    Acknowledged its mandatory obligation to transfer the Pledged Hotel Taxes to the GDB Special Trust Account, (*see id.* at 2 (*Id.* §§ 4-5)) ("The Tourism Company hereby acknowledges, and agrees to comply with, its obligations under the [Hotel Occupancy] Tax Act to transfer to GDB the monthly amounts required [by] the [Hotel Occupancy] Tax Act");

(ii)     Created a specially segregated and restricted "Transfer Account" to temporarily hold the entrusted Pledged Hotel Taxes until they are transferred monthly to the GDB Special Trust Account, (*see id.* at 1 (*Id.* §§ 1-2));

(iii)    Agreed that ***every dollar of Hotel Taxes would be deposited "as collected" into the Transfer Account until the amount need to pay the debt was reached***; (*see id.* (emphasis added)) (requiring deposit "as collected"), (*id.* at 2 (*Id.* § 4)) ("[A]ll Hotel [Taxes] received by the Tourism Company shall be deposited into the Transfer Account until [the monthly required payment] has been met and [any arrears from] prior payment periods have been met.");

(iv)     Agreed that no Hotel Taxes could be used for any other purpose, or transferred to any other account, until the monthly required payment had been collected and deposited into the Transfer Account, (*see id.*) ("[O]nly when the Transfer Account contains all moneys necessary to pay the Bonds in accordance with the GDB Certificate, [can] the Tourism Company . . . deposit any excess funds into the Surplus Account.");

(v)      ***"[I]rrevocably assign[ed]" and "transfer[red]" "all rights it may legally have [had]" in the Pledged Hotel Taxes to GDB***,[4] (*see id.* (*Id.* § 6) (emphasis added)); and

---

[4] Specifically, Section 6 states that "[t]he Tourism Company hereby irrevocably pledges, assigns, transfers, conveys, grants and sets over to GDB all rights it may legally have ***in amounts deposited in the Transfer Account*** collected by the Tourism Company ***as required under the provisions of [the Hotel Occupancy] Tax Act*** up to the [Debt Service Amount] (including any amounts as may be necessary to pay any previously unpaid amounts)."   (*Id.* at 2 (*Id.* § 6)) (emphasis added).   This provision acknowledges the Tourism Company's duty to transfer legal title to every dollar of the Debt Service Amount it collects to GDB.

(vi)   "[A]cknowledge[d] and consent[ed] to GDB entering into [the] Pledge Agreement . . . of even date herewith." (*See id.* (*Id.* § 7).)

36.     Thus, the Assignment Agreement confirms that the Tourism Company immediately holds legal title to each dollar of the Pledged Hotel Taxes, as they are collected, in the specially segregated Transfer Account until it is transferred to the GDB Special Trust Account.

37.     Moreover, the Tourism Company explicitly confirmed its role as a mere collection agent for CCDA bondholders with respect to the Pledged Hotel Taxes by irrevocably assigning all rights it ever had in the Pledged Hotel Taxes (bare legal title) to GDB—which, in turn, must transfer the Pledged Hotel Taxes "to the [CCDA Bond] Trustee for the benefit of the Owners of the [CCDA] Bonds[.]" (*See id.*)

38.     Further, the Tourism Company "expressly acknowledge[d] and consent[ed] to GDB entering into [the] Pledge Agreement"—executed contemporaneously with the Assignment Agreement—that granted to the CCDA bondholders a security interest in the legal title to the Pledged Hotel Taxes, while they are held by the Tourism Company or GDB before the funds are paid over to the CCDA bondholders. (*See id.*)

39.     In sum, the Tourism Company, in order to give effect to the entrustment of the Pledged Hotel Taxes to CCDA bondholders under the Hotel Occupancy Tax Act, created a security interest in favor of CCDA bondholders on legal title to the Pledged Hotel Taxes and consolidated all legal rights to the Pledged Hotel Taxes in GDB, in its capacity as trustee of the Pledged Hotel Taxes and the GDB Special Trust Account, for the express and exclusive benefit of CCDA bondholders.  GDB, in turn, expressly accepted these rights; acknowledged that it accepted them for the exclusive benefit of CCDA bondholders; reaffirmed its unambiguous obligation to transfer every dollar of the Pledged Hotel Taxes collected by the Tourism Company to the CCDA Bond

Trustee for payment of CCDA bonds; and granted a security interest in the legal title to the GDB
Special Trust Account.

### B. GDB Irrevocably Transferred All Property Rights in the Pledged Hotel Taxes to the CCDA Bond Trustee.

40.     To further implement its obligations under the Hotel Occupancy Tax Act and the
Assignment Agreement, GDB executed the Pledge Agreement in conjunction with the Assignment
Agreement.

41.     In the Pledge Agreement—entered into between GDB, CCDA, and the CCDA
Bond Trustee—GDB created the GDB Special Trust Account, which it described as "a **special and
irrevocable** account . . . held **in trust** by GDB on behalf of the Authority for the benefit of the
Owners of the Bonds, **separate and apart from other funds of GDB**[.]"   (Ex. 4, at 2 (Pledge
Agreement § 2(a) (emphasis added).)   This further confirms that GDB receives and holds the
Pledged Hotel Taxes **in trust** and for the exclusive benefit of CCDA bondholders.  GDB thus holds
only legal title to the Pledged Hotel Taxes until they are transferred to the CCDA Bond Trustee.
GDB never obtains any equitable ownership over the Pledged Hotel Taxes because the CCDA
bondholders are the equitable owners from the outset.

42.     As an additional layer of security for the CCDA bondholders, the Pledge
Agreement also granted a security interest in the legal title to the Pledged Hotel Taxes to the CCDA
Bond Trustee (and thus the CCDA bondholders).  (*See id.* (*Id.* §2(b))) ("GDB and [CCDA] does
hereby grant, bargain, convey, assign, mortgage and pledge a security interest to the [CCDA Bond]
Trustee . . . for the benefit of the Owners of the [CCDA] Bonds . . . ."); (*see also* Ex. 5, at 1-3, 22-
23 (Trust Agreement, Granting Clauses and § 5.01).)

43.     Importantly, the scope of the security interest incorporates: "(i) all [Pledged Hotel
Taxes] received from the Tourism Company, (ii) all moneys deposited in or **required to be**

*deposited in the [GDB Special Trust Account]* pursuant to the provisions of this Pledge
Agreement, and (iii) ***all right title and interest of GDB in the Assignment Agreement***." (*See* Ex.
4, at 2-3 (Pledge Agreement § 2(b)) (emphasis added).)

44.     To confirm that the entire panoply of potential property rights in the Pledged Hotel
Taxes had been transferred to CCDA bondholders, GDB further agreed that the Pledge Agreement
itself "shall be part of the Trust Estate under the Trust Agreement, pledged to the Owners of the
Bonds and any credit or liquidity provider" thereunder. (*See id.* at 6 (*Id.* § 14).)

45.     The Tourism Company expressly consented to the security interest established in
the Pledge Agreement granting CCDA bondholders a property right in all funds that are deposited
in—***or are required to be deposited in***—the GDB Special Trust Account. (*See* Ex. 3, at 2
(Assignment Agreement § 7).) Thus, legal and equitable title to the Pledged Hotel Taxes are united
with the CCDA bondholders.

46.     The security interest was automatically perfected by law. 23 L.P.R.A. § 6441(d)
("Any pledge of the Authority shall be binding from the moment that it was made, and any funds
or property thus pledged shall be subject to the lien of the pledge without the need of its actual
delivery."). In addition, for the avoidance of doubt, a UCC Financing Statement was filed. (*See*
Declaración 2016001827 (attached hereto as **Exhibit 6**).)

47.     The security interest also sweeps in GDB's covenants in the Pledge Agreement that
it: (i) would "deposit or cause to be deposited into the [GDB Special Trust Account], all [Pledged
Hotel Taxes] received from the Tourism Company ***as received***"; and (ii) "would diligently enforce
its rights under the Assignment Agreement including its enforcement of the [Pledged Hotel Taxes]
transfer obligation of the [Tourism] Company." (Ex. 4, at 3-4 (Pledge Agreement §§ 3(a), 5(b))
(emphasis added).)

48.     As noted earlier, the Commonwealth expressly covenanted with CCDA bondholders that it would "comply with the terms of *any* agreement entered into with, or for the benefit of the bondholders" of CCDA.  13 L.P.R.A. § 2271v(a)(4) (emphasis added).  Thus, the Commonwealth itself agreed to be bound by the Assignment Agreement, Pledge Agreement, and Trust Agreement—such that the security interest granted in the Pledge Agreement to all Pledged Hotel Taxes that were deposited or should have been deposited into the GDB Special Trust Account is binding against both the Commonwealth and the Tourism Company (which expressly consented to the Pledge Agreement in the Assignment Agreement).

49.     The Hotel Occupancy Tax Act vests the CCDA bondholders with equitable ownership of the Pledged Hotel Taxes.  The Act and related agreements mandate the flow of funds to pay the CCDA bondholders from the Pledged Hotel Taxes from the Tourism Company to GDB to the CCDA Bond Trustee to the CCDA bondholders.  To ensure that all rights to the Pledged Hotel Taxes flowed to the CCDA bondholders, they were also granted a consensual security interest over legal title to the Pledged Hotel Taxes when they are temporarily held by third parties. In sum, the Act and related agreements ensure the equitable and legal ownership of the Pledged Hotel Taxes flow to the CCDA bondholders.

### C.     CCDA Bondholders Have a Statutory Lien on the Pledged Hotel Taxes.

50.     In addition to Movants' security interests in the Pledged Hotel Taxes under the Pledge Agreement, the Hotel Occupancy Tax Act also gives rise to a statutory lien in favor of CCDA bondholders by providing that the Pledged Hotel Taxes "shall be used ***solely*** for the payment of the principal and interest on the bonds."  *See* 13 L.P.R.A. § 2271v(a)(4) (emphasis added).  This provision creates a "lien" as defined in the Bankruptcy Code because it gives rise to a "charge against or interest in property [*i.e.* the Pledged Hotel Taxes] to secure payment of a debt or performance of an obligation [*i.e.* the CCDA bonds]."  11 U.S.C. § 101(37) (defining "lien").

17

The lien is a *statutory* lien because it "aris[es] solely by force" of the Hotel Occupancy Tax Act (*see id.* § 101(53)), which contains mandatory, self-executing "shall" language.  Moreover, the Hotel Tax Act identifies the specific taxes that serve as collateral and contains nondiscretionary language requiring that such taxes be used to pay for debt service on the CCDA bonds.  *See, e.g.*, *JK Mullen Inv. Co. v. Town of Arvada*, 261 P.2d 714, 718 (Colo. 1953) (where a statute provides that special taxes "shall be applied to the payment of all bonds," the "statute unequivocally gives the bondholders [a] prior lien on any and all proceeds received from the assessments").

51.    As this Court has previously recognized, a statute does not need to expressly use the word "lien" in order to create a statutory lien.  *See Peaje Invs., LLC v. P.R. Highways & Transp. Auth. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 290, 298 (D.P.R. 2017), *aff'd in part, vacated in part*, 899 F.3d 1 (1st Cir. 2018), *cert. denied*, 139 S. Ct. 1169 (mem.) (2019) (citing *Fonseca v. Gov't Emps. Ass'n (In re Fonseca)*, 542 B.R. 628, 637 (B.A.P. 1st Cir. 2015)); *see also In re Schick*, 418 F.3d 321, 328-29 (3d Cir. 2005) (finding a statutory lien where the relevant statute "lack[ed] explicit lien-creating language").  In its *Peaje* decision, this Court relied on the decision by the First Circuit Bankruptcy Appellate Panel in *Fonseca*, where the debtor was a government employee who obtained a loan from a non-profit savings and loan association (the "Savings and Loan") established by Puerto Rico Law No. 133.  *Fonseca*, 542 B.R. at 630.  The Savings and Loan claimed a statutory lien on the liquidated value of the vacation and sick leave the employee-debtor had accumulated as an employee of the Commonwealth, and the Court held that the Savings and Loan in fact held such a statutory lien, arising by force of the following statute requiring application of the value of the employee's vacation and sick leave to the payment of his debt:

18

> Any credit, deposit or surplus, for any reason, in the Commonwealth
> Government, or in any dependency or instrumentality thereof, [o]n
> behalf of a member who, having ceased in office, is in debt with the
> [Savings and Loan], shall be retained by the Secretary of the
> Treasury of Puerto Rico or the competent officer, if not alienated in
> the corresponding retirement system, and covered into the funds of
> the [Savings and Loan], ***partially or fully to pay the debt pending
> therewith.***

*See id.* at 636 (quoting 3 L.P.R.A. § 863d) (emphasis added).  Even though this statute did not use

the word "lien," the court held "[i]t is evident . . . that this section establishes a statutory lien on

'any credit, deposit, or surplus' held by the government."  *Id.*  Therefore, under the test this Court

adopted from *Fonseca* in the *Peaje* case, the Hotel Occupancy Tax Act gives rise to a statutory

lien, because it "define[s] with specificity the nature of the collateral and require[s] no further

discretionary action for a lien to come into force."  *See Peaje*, 301 F. Supp. 3d at 298 (quoting 11

U.S.C. § 101(53)).

> **D.    The Pledged Hotel Taxes Are Subject to Article VI, Section 8 of the Puerto
> Rico Constitution, Which Has Not Been Triggered.**

52.    The Hotel Occupancy Tax Act provides that CCDA's "pledge or obligation [of the

Pledged Hotel Taxes] shall be subject to the provisions of Section 8 of Article VI of the

Constitution of the Commonwealth of Puerto Rico."  13 L.P.R.A. § 2271v(a)(4)*.*  Under Article

VI, Section 8 of the Puerto Rico Constitution ("Article VI, Section 8"), the Pledged Hotel Taxes

can "be used solely for the payment of the interest and the amortization of the public debt . . . [and]

only to the degree to which other available resources . . . are insufficient for such purposes."  *Id.*

"Otherwise, the [Pledged Hotel Taxes] shall be used solely for the payment of the principal and

interest on the [CCDA] bonds."  *Id.*

53.    The condition precedent for allowing the use of the Pledged Hotel Taxes for the

payment of general obligation ("GO") debt—lack of "other available resources"—has not

19

occurred. *See id.* The Hotel Occupancy Tax Act makes clear that until the condition is triggered, *i.e.* until the Commonwealth has applied all other available resources of the Commonwealth to the public debt, Pledged Hotel Taxes must be transferred to the CCDA bondholders. *Id.* The Hotel Occupancy Tax Act is also unambiguous that the Pledged Hotel Taxes may not be used by the Commonwealth or any other party for any other purpose. *Id.* However, the Commonwealth has not paid its GO debt since 2016 and has not used the Pledged Hotel Taxes for that purpose. Consequently, it is clear that the Commonwealth is not diverting the Pledged Hotel Taxes pursuant to Article VI, Section 8.

54.     Even when Article VI, Section 8 is properly triggered, the Commonwealth is required to reimburse CCDA from the "first revenues" of the excess Hotel Taxes in subsequent years. *Id.* (if any Pledged Hotel Taxes are "used to service payments of the public debt . . . the amounts . . . used to cover said deficiency shall be reimbursed to [CCDA] out of the first revenues received in the next fiscal year or subsequent fiscal years . . . from any remaining portion of the tax then in effect"). Therefore, to the extent the Commonwealth has any right to the Pledged Hotel Taxes, that right is merely to temporarily redirect those funds to pay the public debt in the limited circumstances detailed above. *See id.*

## III.   THE COMMONWEALTH UNLAWFULLY BLOCKED TRANSFERS OF THE PLEDGED HOTEL TAXES TO CCDA BONDHOLDERS.

55.     Despite the requirements of the Hotel Occupancy Tax Act, the Assignment Agreement, the Pledge Agreement, and the Trust Agreement, the Tourism Company, GDB, and CCDA have violated the requirements of law by failing to make the required transfers of the Pledged Hotel Taxes.

56.     On November 30, 2015, then-Governor Alejandro García-Padilla issued Administrative Bulletin OE-2015-046 (the "First Clawback Order") (attached hereto as **Exhibit**

**7**), which declared that the then-current fiscal year cash flow projection was insufficient to pay GO debt and ordinary course appropriation payments.  On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Rehabilitation Act (the "**Moratorium Act**"), which authorized the Governor to declare a "state of emergency" over the Commonwealth or any Commonwealth entity (including CCDA).  (Moratorium Act § 201(a) (attached hereto as **Exhibit 8**).)

57.     Under color of the Moratorium Act, the Governor, *inter alia*, (i) declared a state of emergency over CCDA; (ii) halted the Tourism Company's obligation to transfer the Pledged Hotel Taxes to GDB; (iii) froze GDB's obligation to transfer the Pledged Hotel Taxes to the bond trustee; (iv) halted any potential obligation of CCDA to transfer the Pledged Hotel Taxes to the CCDA Bond Trustee; and (v) indefinitely suspended all CCDA bond payments.  (*See* Administrative Bulletin EO-2016-31 (June 30, 2016) (attached hereto as **Exhibit 9**).)

58.     The Commonwealth has no legal right to halt the transfer of the Pledged Hotel Taxes.  The Commonwealth lacks any property interest in the Pledged Hotel Taxes, and is precluded by Commonwealth law from possessing or controlling the Pledged Hotel Taxes, particularly as the Commonwealth specifically covenanted that it would ensure that the Pledged Hotel Taxes are transferred to the CCDA Bond Trustee.

59.     PROMESA, signed into law on June 30, 2016, preempted the Moratorium Act.  *See* 48 U.S.C. § 2163(1) ("[A] territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in section 109(b)(2) of Title 11, may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium.").

60.     Despite the express intent of Congress to preempt all Commonwealth moratorium laws and to halt the illegal sweeping of cash by the Commonwealth from its instrumentalities, including CCDA, on January 29, 2017, the Governor signed into law the Amended Moratorium Act which, while repealing certain sections of the Moratorium Act, replaced them with functionally identical provisions.  (*See* Amended Moratorium Act §§ 201-203, 206, 208, 211, 301 (attached hereto as **Exhibit 10**).)  The Amended Moratorium Act expressly prohibits the payment of principal and interest and is thus preempted by PROMESA Section 303.  *See* 48 U.S.C. § 2163(1).

61.     On April 29, 2017, the Governor signed into law the Fiscal Plan Compliance Act, which operationalized the requirements of the current Commonwealth fiscal plan.  (*See* Act 26-2017 (attached hereto as **Exhibit 11**).)  Chapter 4 purports to require public corporations to transfer any "surpluses" to the Commonwealth's general fund, and Chapter 6 requires all "special funds created by Law for specific purposes" to be deposited in the Commonwealth general fund, to be allocated "in the order of priority determined by the Secretary [of Treasury]."  (*See generally id.*) The Commonwealth has not made any payment on its public debt since 2016.

62.     To date, there have been multiple payment defaults on the CCDA bonds, which have resulted in Monoline Movants having to pay approximately $81.3 million in claims to CCDA bondholders.  The Monoline Movants are subrogated to, and have been assigned, the rights of CCDA bondholders with respect to such payments.  The Monoline Movants collectively insure 100% of the outstanding CCDA bonds, totaling approximately $349 million in gross par, guaranteeing payment of scheduled principal and interest should CCDA default on any such payment.

63.     The Tourism Company currently is in possession of approximately $135 million. As a public corporation that is not receiving general funds, the Oversight Board treats these monies as "Restricted Cash," which is not available to the Commonwealth.  *See Summary of Cash Restriction Analysis*, dated October 2, 2019, at Appendix C, *available at* https://emma.msrb.org/IssuerHomePage/Issuer?id=C01A91AB36C51F21D8E7238D88E63740.   With the benefit of discovery in the litigation that Movants seek to bring, Movants will be able to demonstrate that some or all of the funds in the possession of the Tourism Company are rightfully owned by the CCDA bondholders, held in trust for the sole benefit of CCDA bondholders, and subject to a lien in favor of CCDA bondholders.

## IV.     THE TITLE III FILINGS.

64.     On May 3, 2017, the Oversight Board filed a petition commencing a proceeding under Title III of PROMESA on the Commonwealth's behalf.  The Oversight Board has not filed a petition commencing a proceeding for CCDA under Title III of PROMESA.

65.     During the pendency of the Commonwealth's Title III case, the unlawful diversion and misappropriation of the Pledged Hotel Taxes has continued.  Funds have been spent or improperly commingled in the Commonwealth's Treasury Single Account ("TSA").  (*See, e.g.*, Press Release, Puerto Rico Fiscal Agency and Financial Advisory Authority, Government Has Earned $49 Million in Interest Fiscal Year-to-Date (Dec. 5, 2019) (attached hereto as **Exhibit 12**).)

66.     The Commonwealth now claims to own funds that are never transferred into the general fund or any other Commonwealth-owned or -controlled account.  In its proposed joint plan of adjustment (the "Plan of Adjustment"), the Commonwealth fails to acknowledge that Pledged Hotel Taxes are not owned or controlled by the Commonwealth.  Instead, the Commonwealth treats the Pledged Hotel Taxes as its own and treats CCDA bondholders as if they have a mere claim, worth cents on the dollar, to their collateral.  *See Title III Joint Plan of Adjustment of the*

*Commonwealth of Puerto Rico*, art. I, §§ 1.110, 1.111, art. XXXIII, § 33.1, Case No. 17-03283, ECF No. 8765.  Specifically, for its "retention of certain funds historically transferred to [CCDA,]" the Commonwealth offers a mere 0.4% recovery on the estimated claim amount.  *Id.* art. I, §§ 1.110, 1.111.  If CCDA bondholders reject this treatment, the Plan of Adjustment proposes to treat them as unsecured creditors.  *Id.* art. XXXIII, § 33.1.  The Plan of Adjustment implies that the Commonwealth will permanently retain the Pledged Hotel Taxes.  *See Disclosure Statement for the Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Buildings Authority*, at 39, Case No. 17-03283, ECF No. 8766 (arguing that Section 202 of PROMESA preempts "laws enacted prior to PROMESA that conditionally allocate Commonwealth revenues to its instrumentalities").  CCDA and the Tourism Company have been complicit in the face of the Commonwealth's long-standing misappropriation and assertion of ownership over the Pledged Hotel Taxes.

## JURISDICTION AND VENUE

67.   This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a).

68.   Venue is proper pursuant to 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a).

## RELIEF REQUESTED

69.   Movants seek an order of this Court, substantially in the form attached hereto as Exhibit 1, holding that the CCDA Enforcement Action is not subject to the automatic stay associated with the Commonwealth's Title III petition.  In the alternative, Movants seek an order lifting the automatic stay under Section 362(d)(1) and/or (d)(2) so that Movants may pursue the CCDA Enforcement Action (attached hereto as Exhibit 2).  Further in the alternative, if the Court

finds the automatic stay applicable and does not lift the stay, the Court should order the Commonwealth to provide adequate protection for Movants' lien on the Pledged Hotel Taxes.

## **ARGUMENT**

### I.   **THE AUTOMATIC STAY DOES NOT APPLY TO MOVANTS' PROPOSED CCDA ENFORCEMENT ACTION.**

70.   The proposed CCDA Enforcement Action—which is not expected to name the Commonwealth as a defendant—is not subject to the automatic stay.  The automatic stay in effect in the Commonwealth's Title III case covers only proceedings that involve property of the Commonwealth, such as "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate"; "any act to create, perfect, or enforce any lien against property of the estate"; and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title."  11 U.S.C. §§ 362(a)(3)-(5); *see Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 4 (1st Cir. 1983) ("[T]he automatic stay provisions of 11 U.S.C. § 362(a) apply only to the bankrupt debtor.").

71.   Neither the Hotel Taxes nor the Pledged Hotel Taxes are property of the Commonwealth.  To put it another way, the Commonwealth lacks both legal and equitable title to the Pledged Hotel Taxes.  Moreover, none of the Proposed Defendants (the Tourism Company, GDB, CCDA, and their principal officers) are Title III debtors; accordingly, their interest (if any) in the Pledged Hotel Taxes does not bear on the applicability of the stay.

72.   The Commonwealth does not even exercise any control over the Pledged Hotel Taxes because it transferred its power to impose, collect, or otherwise control the Hotel Taxes to the Tourism Company, and the Pledged Hotel Taxes are never transferred into the general fund or any other Commonwealth-owned or -controlled account.  The Pledged Hotel Taxes move

exclusively from a restricted trust account at the Tourism Company (the Transfer Account) to a restricted special trust account at GDB (the GDB Special Trust Account), to the CCDA Bond Trustee's accounts, until the Pledged Hotel Taxes reach CCDA bondholders.  There is simply no opportunity for the Commonwealth to exercise any control over the Pledged Hotel Taxes.  *See, e.g.*, *Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*, 763 S.E.2d 288, 293 (N.C. Ct. App. 2014) (citation omitted) ("restricted funds" are those with "a limited use and specific purpose, such as to fund a special program").  Consistent with this, as detailed above, the legal title to the Pledged Hotel Taxes passes from the Tourism Company to GDB, from GDB to CCDA, and from CCDA to the CCDA Bond Trustee.

73.     The Commonwealth also has no equitable property rights in the Pledged Hotel Taxes.  The Hotel Occupancy Tax Act and the Bond Documents unambiguously establish that the CCDA bondholders are the equitable owners—with full equitable title—of the Pledged Hotel Taxes.   CCDA bondholders' equitable ownership is not affected by PROMESA or the Commonwealth's bankruptcy proceedings.   And Article VI, Section 8 does not vest the Commonwealth with any equitable ownership of the Pledged Hotel Taxes.

## A.     The CCDA Bondholders Are the Equitable Owners of the Pledged Hotel Taxes.

74.     The Hotel Occupancy Tax Act unambiguously establishes that the CCDA bondholders are the owners of the Pledged Hotel Taxes.  It does so by (i) mandating the transfer of the Pledged Hotel Taxes to the GDB Special Trust Account "for the benefit of" the CCDA bondholders and (ii) restricting all use and benefit of the Pledged Hotel Taxes solely to the CCDA bondholders.

75.     That is all that is required for a statute to create a property interest, as the First Circuit recently confirmed in appeals arising out of the Commonwealth's bankruptcy.  *See Gracia-*

*Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340, 345 (1st Cir. 2019); *Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza,* 484 F.3d 1, 29 (1st Cir. 2007). *Flores Galarza* and the September 25, 2019 decision in *Gracia-Gracia* both involved the Commonwealth's diversion of premiums paid by motor-vehicle owners and operators under the Commonwealth's compulsory automobile-insurance law ("Law 253"). *See Flores Galarza*, 484 F.3d at 7–8; *Gracia-Gracia*, 939 F.3d at 344–45. To fund an association of insurance companies that provide coverage under the law (the Compulsory Liability Joint Underwriting Association of Puerto Rico ("JUA")), Law 253 required motor vehicle owners to pay liability insurance premiums to the Commonwealth upon license renewal. *See Flores Galarza*, 484 F.3d at 7–8; *Gracia-Gracia*, 939 F.3d at 344–45. The Treasury, in turn, was required to transfer the premiums to JUA to obtain the minimum required insurance coverage. *See Flores Galarza*, 484 F.3d at 7–8; *Gracia-Gracia*, 939 F.3d at 344–45. The Commonwealth, however, diverted the premiums to itself in order to "alleviate the cash-flow problems of the Commonwealth." *Flores Galarza*, 484 F.3d at 6.

76. In *Flores Galarza*, the First Circuit determined that JUA, and not the Commonwealth, was the owner of the diverted premiums. *Id.* at 29. It looked to the mandatory language and mechanics of Law 253. *Id.* The statute provided that JUA "*shall receive*" the premiums and the Commonwealth "*shall transfer*" the premiums. *Id. (emphasis added).* The Commonwealth thus had "no entitlement to the premiums" and assumed no ownership interest in the premiums because the Commonwealth held the premiums exclusively "for the benefit of" JUA. *Id.* In other words, the statute conferred ownership of the premiums to JUA by mandating transfer to JUA and expressly stating that the premiums were for the benefit of JUA. *Id.*; *see also García-Rubiera v. Calderón,* 570 F.3d 443, 457 (1st Cir. 2009); *In re City of Columbia Falls*, 143 B.R.

27

750, 762 (Bankr. D. Mont. 1992) (public entities in possession of specific funds pledged for the benefit of another entity act as "merely a custodian, and its duties relative to such funds are purely ministerial.  It may not use or divert them.").  And in a series of decisions leading up to and including *Gracia-Gracia*, the First Circuit—relying on *Flores Galarza* and the mandatory language of Law 253 (and its amendments)—held that certain motorists had property interests in duplicate premiums that they had paid under Law 253.  *See Gracia-Gracia*, 939 F.3d at 345; *García-Rubiera,* 570 F.3d at 452 ("like funds held in trust . . . , the funds held by JUA or the Secretary are clearly the 'private property' of Plaintiffs . . . .") (citations omitted).

77.   The Hotel Occupancy Tax Act even more explicitly than Law 253 establishes that the CCDA bondholders—not the Commonwealth—are the owners of the Pledged Hotel Taxes.

78.   *First*, instead of merely *implying* that the Pledged Hotel Taxes are for the CCDA bondholders, the Hotel Occupancy Tax Act says it explicitly: it states that the Pledged Hotel Taxes are "*for the benefit of*" the CCDA bondholders and "*shall be used solely for the payment of the principal and interest on the [CCDA] bonds*."  13 L.P.R.A. § 2271v(a)(4) (emphasis added).  The Commonwealth disavowed any ownership interest in the Hotel Taxes by granting the Tourism Company the power to "levy, charge, and collect" the Hotel Taxes, as well as the power to "determine, assess, impose, collect, enforce, regulate and distribute" them.  *Id.* §§ 2271a(a), 2271*o*(b).

79.   *Second*, the Commonwealth covenanted that it would (i) not alter or limit CCDA bondholders' rights to the Pledged Hotel Taxes, (ii) ensure that the funds are transferred to the CCDA bondholders, and (iii) comply with the terms of any agreement entered into with or for the benefit of bondholders.  *Id.* § 2271v(a)(4); 23 L.P.R.A. § 6450.  Moreover, unlike in *Flores Galarza*, the Pledged Hotel Taxes never touch a single Commonwealth account.  Instead, the only

accounts the Pledged Hotel Taxes ever pass through are trust accounts for the benefit of CCDA bondholders.

80.      *Third*, the agreements that implement the Hotel Occupancy Tax Act require that the Tourism Company and GDB collect and hold the Pledged Hotel Taxes *in trust* for the benefit of CCDA bondholders, thus confirming that the CCDA bondholders are the sole equitable owners of the Pledged Hotel Taxes from the moment the underlying Hotel Taxes are collected.  (*See* Ex. 3, at 1–2 (Assignment Agreement, §§ 1, 4, 5)); (Ex. 4, at 2–3 (Pledge Agreement, § 2(a), 3(a)).)  The Commonwealth, by transferring its rights in the Pledged Hotel Taxes to the Tourism Company, and requiring its subsequent transfer to GDB and the CCDA Bond Trustee for payment of CCDA bonds, intended to, and did, create a series of trust relationships in which the Tourism Company and GDB held only legal title to Pledged Hotel Taxes and were mere conduits for the transfer of the Pledged Hotel Taxes to the CCDA bondholders.  (*See* Ex. 3, at 1–2 (Assignment Agreement, §§ 1, 4, 5)); (Ex. 4, at 2–3 (Pledge Agreement, §§ 2(a), 3(a))); *City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*, 329 F.3d 204, 206, 210 (1st Cir. 2003) ("[P]roperty is excluded from the estate where the debtor merely receives property in order to deliver it to its intended recipient without any control or ownership over it"; the debtor holds no ownership when it must pass the funds through to its intended recipient); *Keach v. Wheeling & Lake Erie Railway Co. (In re Montreal, Maine & Atl. Ry., Ltd.)*, 888 F.3d 1, 10 (1st Cir. 2018) (where "the debtor [is] a mere 'transfer station along the road to payment' . . . it lack[s] a cognizable property interest") (citation omitted).  Indeed, the Commonwealth itself covenanted that it would comply with the Bond Documents, which includes the provisions thereof entrusting the Pledged Hotel Taxes for the benefit of CCDA bondholders and granting them a lien on the legal title, thus expressly confirming

CCDA bondholders equitable ownership, as granted in the Hotel Occupancy Tax Act and the CCDA Enabling Act.

81.     Those agreements, in conjunction with the Hotel Occupancy Tax Act, conclusively establish that the Tourism Company and GDB are trustees of (i) an express trust created by the unambiguous trust language in the Hotel Occupancy Tax Act and the Assignment Agreement and Pledge Agreement, and/or (ii) a resultant trust, which "arises where a transfer of property is made under circumstances which raise an inference that the person making the transfer or causing it to be made [*i.e.*, the Commonwealth, Tourism Company, or GDB] did not intend the transferee [the Tourism Company or GDB] to have the beneficial interest in the property transferred."  *City of Springfield v. Lan Tamers, Inc. (In re Lan Tamers, Inc.)*, 281 B.R. 782, 792 (Bankr. D. Mass. 2002), *aff'd*, 329 F.3d 204 (1st Cir. 2003); *see also Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997) (statutes do not need to use the magic word "trust" if the statute manifests a legislative intent to impose a trust-type relationship); *Shipley Co., Inc. v. Darr (In re Tap, Inc.)*, 52 B.R. 271, 275 (Bankr. D. Mass. 1985) ("[W]here the owner of property transfers it to another with a direction to transfer it to . . . a third person, this may be a sufficient manifestation of an intention to create a trust"; "when money [is] left with the bank for the payment of a debt to a designated person: '[T]he money does not become the property of the bank. The fund is merely intrusted to the bank as a trustee[.]'"; "Every person who receives money to be paid to another, or to be applied to a particular purpose . . . is a trustee."); *see also Columbia Falls*, 143 B.R. at 762.

82.     Further evidencing the equitable ownership of the Pledged Hotel Taxes in the hands of CCDA bondholders, the Hotel Occupancy Tax Act also makes clear that the Pledged Hotel Taxes are "restricted funds" that cannot lawfully be used or disposed of except by transferring them to CCDA bondholders.  *See* 13 L.P.R.A. § 2271v (prohibiting the Tourism Company from

making any use of Hotel Taxes until "after making the transfer of monies to the [GDB]" for the benefit of CCDA bondholders); *see also Thomas Jefferson Classical Acad. Charter Sch.*, 763 S.E.2d at 293 ("restricted funds" are those with "a limited use and specific purpose, such as to fund a special program.").

83.     The Tourism Company is "merely a custodian, and its duties relative to such funds are purely ministerial.  It may not use or divert them." *Columbia Falls*, 143 B.R. at 762 (quoting *State ex rel. Clark v. Bailey*, 44 P.2d 740, 746 (Mont. 1935)); *see also FDIC v. Casady*, 106 F.2d 784, 788 (10th Cir. 1939) (finding that a structure whereby the city holds a sinking fund for bondholders creates relationship where the city is the trustee and bondholders are cestui que trustents); *City & Cty. of Dallas Levee Imp. Dist. ex rel. Simond v. Indus. Props. Corp.*, 89 F.2d 731, 733 (5th Cir. 1937) (finding that the statute under consideration requires that funds be held in trust for the purposes of paying the principal and interest of the bond indebtedness).

84.     As a result, the CCDA bondholders, not the Commonwealth or the Tourism Company and GDB as trustees, own the Pledged Hotel Taxes.  *García-Rubiera*, 570 F.3d at 452 (holding that funds being held in trust for the benefit of plaintiffs were plaintiffs' property).

**B.      Neither the Commonwealth's Bankruptcy Nor PROMESA Diminish or Limit the CCDA Bondholders' Ownership of the Pledged Hotel Taxes.**

85.     The Commonwealth cannot, through subsequent legislation, rescind its alienation of the Pledged Hotel Taxes to the CCDA bondholders without providing just compensation, because the Hotel Occupancy Tax Act, CCDA Enabling Act, and the Bond Documents grant CCDA bondholders property rights in the Pledged Hotel Taxes.  *E.g.*, 13 L.P.R.A. § 2271v(a); 23 L.P.R.A. § 6450.  Any impairment or rescission of bondholders' rights to the Pledged Hotel Taxes, including contractual rights, would be an unconstitutional "taking" of this property right.  *See U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1977) ("Contract rights are a form of property and

31

as such may be taken for a public purpose provided that just compensation is paid."); *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 612 (D.P.R. 2015) ("Contracts are a form of property for purposes of the Takings Clause."), *aff'd*, 805 F.3d 322, *cert. granted*, 136 S. Ct. 582 (2015).

86.     The fact that Pledged Hotel Taxes are currently being prevented from being transferred to the CCDA bondholders, purportedly under color of the Moratorium Act and other laws and Executive Orders, does not convert them into Commonwealth property.  The Moratorium Act, Amended Moratorium Act, and Executive Orders were all expressly preempted in PROMESA.  *See* 48 U.S.C. § 2163(1) ("[A] territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in section 109(b)(2) of Title 11,  may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium.").

87.     PROMESA in no way diminishes or eliminates the CCDA bondholders' ownership rights in the Pledged Hotel Taxes.  Quite the contrary, PROMESA requires the Oversight Board to respect all preexisting property rights, including in all fiscal plans, budgets, and plans of adjustment.[5]  The "basic federal rule" in bankruptcy is that "[p]roperty interests are created and

---

[5] *See, e.g.*, 48 U.S.C. § 2141(b)(1)(M) (requiring that any fiscal plan "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of" the Commonwealth or another instrumentality "unless permitted by the constitution of the [Commonwealth], an approved plan of adjustment . . . or a Qualifying Modification."); *id.* § 2141(b)(1)(N) (requiring that any fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016."); *id.* § 2144(c)(3)(A) (prohibiting "new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of June 30, 2016."); *id.* § 2163(3) ("[U]nlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this chapter."); *id.* § 2195(a) (providing

defined by **state law**," not federal laws like PROMESA.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) (emphasis added).

88.    PROMESA is replete with references to the basic federal rule and the protection of property interests created and defined by Commonwealth law.  Congress explicitly mandated that the Oversight Board "shall" only develop, approve, and certify Fiscal Plans that:  (i) are "based on [all] applicable laws"; (ii) ensure the assets, funds, or resources of an instrumentality are used exclusively for the benefit of that instrumentality and are never "loaned to, transferred to, or otherwise used for the benefit of the covered territory"; and (iii) "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to [the date of enactment of PROMESA]."  48 U.S.C. § 2141(b)(1)(A)(i), (M), and (N).  Thus, Congress has expressed its clear and unambiguous intent that PROMESA and Title III honor all preexisting property rights, liens, and priorities.

### C.    Article VI, Section 8 of the Puerto Rico Constitution Does Not Give the Commonwealth a Reversionary Interest in the Pledged Hotel Taxes.

89.    In the context of other revenue bonds, the Oversight Board has argued that the Commonwealth retains a reversionary interest in pledged revenues because they are subject to Article VI, Section 8.[6]  This argument is entirely unavailing here.

90.    As an initial matter, the Pledged Hotel Taxes are never property of the Commonwealth because the Hotel Taxes are levied and collected by the Tourism Company,

---

remedies for the transfer of "any property of any territorial instrumentality of Puerto Rico . . . in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property.").

[6] Article VI, Section 8 provides, "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. CONST. art. VI, § 8.  In addition, certain statutory priorities are

pursuant to a transfer of power made from the Commonwealth to the Tourism Company.  This transfer cannot be rescinded until the CCDA bonds are repaid, pursuant to the express covenant between the Commonwealth and CCDA bondholders.  13 L.P.R.A. § 2271v; 23 L.P.R.A. § 6450. The Pledged Hotel Taxes can be used to pay public debts only if ***no other monies are available***— a situation that has never occurred.  13 L.P.R.A. § 2271v(a)(4) (emphasis added).  Even if this had occurred, moreover, Article VI, Section 8 at most benefits the *general obligation bondholders* until such time as the Commonwealth has sufficient available resources.  Either the Pledged Hotel Taxes must be provided to CCDA bondholders, or, in limited circumstances in which there are no other available resources, the GO bondholders may receive them (and even then, subject to the CCDA bondholders' entitlement to a reimbursement in the next fiscal year).  In no case does the Commonwealth receive any property rights in the Pledged Hotel Taxes by virtue of Article VI, Section 8.

91.     The automatic stay also does not apply to the CCDA Enforcement Action because the Action does not seek possession of, enforce against, or otherwise interfere with any "contingent reversionary interest" the Commonwealth might hold.  11 U.S.C. § 362(a)(1)–(7).  The necessary conditions plainly have not been satisfied given that (i) the surplus in the general fund for fiscal year 2019 (as of June 2019) was over $2.9 billion[7]; (ii) there have at all times been sufficient available resources to meet appropriations;[8] and (iii) even if there were not, the Pledged Hotel

---

established by the Commonwealth's Management and Budget Office Organic Act, Act No. 147-1980 (June 1980).

[7]  *See* Government of Puerto Rico General Fund & Special Revenue: Budget to Recorded Revenue and Expenditure Variance Reporting for the Fourth Quarter and YTD 2019, at 8, *available at* http://www.aafaf.pr.gov/assets/general-fund-special-revenue-budget-4q-fy2019.pdf.

[8]  For example, the Commonwealth's general fund budgets estimated that the Commonwealth's resources were sufficient to cover total expenditures of $8.78 billion in fiscal year 2017, $9.562 billion in fiscal year 2018, $8.757 billion in fiscal year 2019, and $9.1 billion in fiscal year 2020. (*See, e.g.*, Reorg Research,

Taxes diverted from CCDA bondholders have **not** been used to make payments on general obligation debt, but rather have been used for the Commonwealth's ordinary expenses in violation of Puerto Rico law.

92.     Accordingly, the Commonwealth has no present possessory interest in any Pledged Hotel Taxes.  To the extent that the Commonwealth holds a contingent reversionary interest that could be triggered in some hypothetical future year, the CCDA Enforcement Action will not impair, modify, or in any way interfere with that contingent reversionary interest.  The Action instead simply seeks to enforce CCDA bondholders' present possessory rights to the already collected Pledged Hotel Taxes.  The Commonwealth's ability to assert, in future years, any contingent reversionary interest it holds will remain intact and unimpaired, particularly given that Movants do not even intend to name the Commonwealth as a party to the Action.[9]

---

"Puerto Rico Legislature Passes $8.78B Fiscal 2017 General Fund Budget" (July 1, 2016) (attached hereto as **Exhibit 13**)); FOMB, "FY18 Budget" (June 30, 2017)) (attached hereto as **Exhibit 14**)); (FOMB, "Press Release: Oversight Board Submits FY19 Commonwealth Compliant Budget Certified by Unanimous Written Consent" (June 30, 2018)) (attached hereto as **Exhibit 15**)); (FOMB, "FY20 Certified Budget for the Commonwealth of Puerto Rico" (June 30, 2019) (attached hereto as **Exhibit 16**).)  Meanwhile, total debt service on the public debt in each of these fiscal years was anticipated to be far less than total estimated resources in each of these years—$1.128 billion, $1.065 billion, $1.090 billion, and $1.118 billion, respectively.  (*See* Fiscal Plan for Puerto Rico: March 13, 2017 (attached hereto as **Exhibit 17**)); (2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity, as certified by the Financial Oversight and Management Board for Puerto Rico (May 9, 2019) (attached hereto as **Exhibit 18**).)  Even if the Commonwealth had not suspended public debt service payments, there would have been or would be sufficient available resources in each of these fiscal years to make such payments.  (*See* Puerto Rico Department of Treasury: Treasury Single Account ("TSA") FY 2020 Cash Flow, as of Dec. 27, 2019, at 5 (attached hereto as **Exhibit 19**)) (showing that the Commonwealth currently has available resources of at least $8.7 billion in the Treasury Single Account).

[9]  Movants will not name the Commonwealth because the information currently available to Movants does not indicate that Pledged Hotel Taxes have been transferred to the Commonwealth.  In the event that Movants subsequently discover any unlawful transfers of Pledged Hotel Taxes to the Commonwealth, Movants reserve the right to amend this Motion (if still pending) or to file a separate motion seeking stay relief with respect to the Commonwealth.

## II.   THE COURT SHOULD LIFT ANY APPLICABLE AUTOMATIC STAY TO PERMIT MOVANTS TO PURSUE THEIR REMEDIES.

93.     In the event the Court finds that the automatic stay somehow applies to the CCDA Enforcement Action, the Court should lift the stay pursuant to Section 362(d) of the Bankruptcy Code in order to permit Movants to protect their property rights in the Pledged Hotel Taxes. Section 362(d) requires the stay to be lifted here for two reasons.  First, the Commonwealth has no equity in the Pledged Hotel Taxes, and thus those funds are not necessary to the Commonwealth's reorganization, warranting stay relief under Section 362(d)(2).  Second, there is cause to lift the stay under Section 362(d)(1) because Movants lack adequate protection and have suffered and continue to suffer the consequences of the Commonwealth's bad-faith obstruction of Defendants' obligation to transfer the Pledged Hotel Taxes in compliance with their statutory and contractual obligations.

94.     As the First Circuit has recently reaffirmed, it is not the responsibility of the Title III Court, in the context of a lift-stay motion, to make final determinations on disputed issues of ownership, secured status, or the scope of property rights; those issues are to be decided in the subsequently-filed litigation.  *Gracia-Gracia*, 939 F.3d at 349 (emphasis added) (quoting *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994)).  Rather, in ruling on this Motion, "the bankruptcy court [must] decide only 'whether the party seeking relief has a *colorable* claim to [the] property.'"  *Id.* (emphasis added).

95.     "[A] colorable claim is one that is legitimate and that may reasonably be asserted, given the facts presented and the current law."  *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*, 602 B.R. 798, 825 (B.A.P. 1st Cir. 2019) (internal quotations and citation omitted).  "A colorable claim (one seemingly valid and genuine) is not a difficult standard to meet."  *Id.* (citation omitted); *see also Cortuk v. Banco Turco Romana (In re*

*Cortuk)*, 2019 WL 2171481, at \*4 (D.N.J. May 20, 2019) ("In other words, a claim need not necessarily be successful in order to be colorable."); *Jin Qing Li v. Rosen (In re Jin Qing Li)*, 2018 WL 1354548, at \*4 (B.A.P. 9th Cir. Mar. 12, 2018) ("We similarly have defined the term 'colorable claim' in this context to mean 'a plausible legal claim.'").

96.     As set forth below, Movants can easily carry their burden of showing "a colorable claim" that the CCDA bondholders are the equitable owners of the Pledged Hotel Taxes or have other property rights in them, which is sufficient to require stay relief.

**A.     The Court Should Lift the Automatic Stay Under Bankruptcy Code Section 362(d)(2) Because the Commonwealth Has No Equity in the Pledged Hotel Taxes, and They Are Unnecessary to an Effective Reorganization.**

97.     Section 362(d)(2) provides that stay relief shall be granted where "the debtor does not have an equity in [the] property" and "[the] property is not necessary to an effective reorganization."  *See* 11 U.S.C. § 362(d)(2); *Gracia-Gracia*, 939 F.3d at 349 ("Congress thought that stay relief should be granted under PROMESA upon a showing that the debtor lacks equity in disputed property.").  While the moving party bears the burden of showing that the debtor lacks equity in the property, it is the debtor's burden to prove that the property in question is necessary for its reorganization.  11 U.S.C. § 362(g); *see Gracia-Gracia*, 939 F.3d at 347; *In re Mullock*, 404 B.R. 800, 805 (Bankr. E.D. Pa. 2009).

98.     In its recent *Gracia-Gracia* decision, the First Circuit indicated that the court's analysis under Section 362(d)(2) is less "arduous" than the "cause" standard under Section 362(d)(1).  *Id.* at 350 (quoting 11 U.S.C. § 362(d)).  This is so, the First Circuit explained, because a court evaluating stay relief under Section 362(d)(2) need not undertake the additional consideration of the factors set forth in *Sonnax Industries v. Tri Components Prods. Corp. (In re Sonnax)*, 907 F.2d 1280, 1286 (2d Cir. 1990), as it would when engaging in an analysis to determine whether "cause" (other than a lack of adequate protection) exists for purposes of Section

362(d)(1).  *Id.*  Instead, the court need only consider whether the prerequisites for stay relief under

Section 362(d)(2) have been met.  *See id.* n.2.  Accordingly, the First Circuit noted that the *Gracia-*

*Gracia* movants would have had an easier path to securing stay relief had they sought stay relief

under Section 362(d)(2) of the Bankruptcy Code.  *Id.* at 350.

99.     Relief from the automatic stay is appropriate here under Section 362(d)(2) because

the Commonwealth "does not have any equity" in the Pledged Hotel Taxes, and thus, the Pledged

Hotel Taxes are unnecessary to an effective reorganization of the Commonwealth.

### 1.     The Commonwealth Has No Equity in the Pledged Hotel Taxes.

100.    As set forth above, the Commonwealth has no property interests whatsoever in the

Pledged Hotel Taxes—meaning that granting relief from the stay would have no effect on the

Commonwealth or its reorganization.  Because the Commonwealth lacks any right, title, or interest

in the Pledged Hotel Taxes, the Commonwealth also lacks any equity in it.

101.    Even assuming *arguendo* that the Commonwealth has some property interest in the

Pledged Hotel Taxes as a result of Article VI, Section 8, the Commonwealth has no equity in the

funds.  The First Circuit found that the *Gracia-Gracia* movants had made a *prima facie* showing

of the Commonwealth's lack of equity by establishing that certain funds at issue were held in trust

for their benefit and segregated from non-entrusted funds.  *See Gracia-Gracia*, 939 F.3d at 351.

Here, Movants have established not only that the Pledged Hotel Taxes are held in trust for the sole

benefit of CCDA bondholders, but also that CCDA bondholders are the true equitable owners of

the Pledged Hotel Taxes.  Indeed, the Commonwealth's lack of equity is confirmed by the plain

language of the Hotel Occupancy Tax Act establishing the CCDA bondholders as the equitable

owners and by the fact that the Pledged Hotel Taxes are collected by, and transferred exclusively

from, the Tourism Company, to GDB, and ultimately to the CCDA Bond Trustee.  All of these

intermediaries hold the Pledged Hotel Taxes in trust (meaning that they, too, lack any equity in

CCDA bondholders' property and instead hold bare legal title).  *See, e.g.*, *Gracia-Gracia*, 939 F.3d at 351 ("trust beneficiaries . . . [are] the true equitable owners" of entrusted funds).

102.    Article VI, Section 8 does not create equity in the funds in favor of the Commonwealth for the reasons detailed above.  First, the conditions for triggering Article VI, Section 8 have not occurred.  Second, even if they occurred, the Commonwealth would receive no right to retain the Pledged Hotel Taxes.  Therefore, under the plain language of all of the applicable agreements and statutes, equity in Pledged Hotel Taxes belongs solely to the CCDA bondholders.

### 2.    The Pledged Hotel Taxes are Not Necessary for an Effective Reorganization.

103.    Given the Commonwealth's lack of equity in the funds, it is "difficult to imagine" how the Commonwealth could meet its burden to demonstrate that it requires the Pledged Hotel Taxes for an effective reorganization.  *In re Lally*, 38 B.R. 622, 626 (Bankr. N.D. Iowa 1984) ("cause exist[ed] to justify termination of the stay" because debtors lacked "equity" in the property), *aff'd*, 51 B.R. 204 (N.D. Iowa 1985).  In fact, where the property at issue is cash, if it is determined that the debtor lacks equity under the first prong, the property is not necessary, and indeed cannot be used at all, in a reorganization of the debtor.  A municipal debtor cannot use property in which it holds no equitable title to effectuate any plan.  *See Columbia Falls*, 143 B.R. at 762; *Soliman v. Spencer (In re Spencer)*, 115 B.R. 471, 485 (D. Del. 1990) (where the debtor does not hold equitable title, stay should be lifted so that "equitable title [can] be united with legal title"); *Boyd v. Martin Expl. Co.*, 56 B.R. 776, 779, 781 (E.D. La. 1986) (where employees, not debtor, were the equitable owners of the property, the property could be returned to the equitable owners).

104.    Indeed, the Oversight Board has concluded that funds held by the Tourism Company are "Restricted Cash," which cannot be accessed or used in connection with the

Commonwealth's plan of adjustment.  *See Summary of Cash Restriction Analysis*, dated October

2, 2019, Appendix C, *available at* https://emma.msrb.org/IssuerHomePage/Issuer?id=

C01A91AB36C51F21D8E7238D88E63740.  Instead, it is the CCDA bondholders and Movants

that have equity in the Pledged Hotel Taxes, including full and exclusive equitable ownership of

the Pledged Hotel Taxes.  Thus, the Pledged Hotel Taxes will have no bearing on any plan of

reorganization, and they must be returned (or released) to the CCDA bondholders.

**B.      Alternatively, the Court Should Lift the Stay for "Cause" Pursuant to Bankruptcy Code Section 362(d)(1).**

105.     Section 362(d)(1) provides that stay relief shall be granted "for cause, including the

lack of adequate protection of an interest in property."  11 U.S.C. § 362(d)(1).  The Bankruptcy

Code explicitly enumerates the "lack of adequate protection" as sufficient "cause" to lift the stay.

11 U.S.C. § 362(d)(1).  Accordingly, the Court considers the *Sonnax* factors only to decide

"whether stay relief should *otherwise* be granted," *Gracia-Gracia*, 939 F.3d at 347—*i.e.*, whether

there is "cause" for stay relief, *other than* the "lack of adequate protection." *Id.* (emphasis added).

If the Court finds that Movants' property rights are not adequately protected, it does not need to

consider the *Sonnax* factors.

106.     As set forth below, cause exists to lift the stay because (1) Movants have a lien on

the Pledged Hotel Taxes; and (2) the lien is not adequately protected, as the Commonwealth has

diminished (and continues to diminish) the value of the lien.  There is further cause for stay relief

in light of the First Circuit's holding in *Ambac Assurance Corp. v. P.R.*, *(In re Fin. Oversight &*

*Mgmt. Bd. for P.R.)*, 927 F.3d 597, 605 (1st Cir. 2019), that Section 305 of PROMESA bars the

Title III Court from putting a halt to the ongoing impairment of Movants' lien, raising significant

due process concerns if stay relief were denied.  Finally, the relevant factors articulated by the

Court in *In re Sonnax*, adverted to by the First Circuit, also favor lifting the stay.  *Gracia-Gracia*, 939 F.3d at 347.

> **1.    There Is Cause to Lift the Stay Due to the Lack of Adequate Protection for CCDA Bondholders.**

107.    The stay must be lifted "for cause" because of a "lack of adequate protection of an interest in property."  11 U.S.C. § 362(d)(1); *Gracia-Gracia*, 939 F.3d at 346 ("Lack of adequate protection is the most common basis for finding cause to grant relief.").  Here, neither Movants' equitable ownership of the Pledged Hotel Taxes nor their security interest in GDB's and CCDA's rights is adequately protected.

108.    The Commonwealth bears the burden to prove that Movants' property rights are adequately protected.  11 U.S.C. § 362(g)(1), (2); *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006), *aff'd*, 359 F. App'x 352 (3d Cir. 2010).  The Bankruptcy Code does not define the term "adequate protection," but indicates that "adequate protection may be provided by" (i) requiring a cash payment or series of cash payments, (ii) providing an additional or replacement lien, or (iii) granting other relief (besides administrative expense priority) that will "result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361(1)–(3); 3 Collier on Bankruptcy ¶ 362.07[3][b] (16th ed. 2019).

109.    The Commonwealth has not made any cash payments or provided any additional or replacement lien or collateral to Movants or the CCDA bondholders, so the only basis on which the Commonwealth could argue that Movants are adequately protected is by proving that Movants have received "the indubitable equivalent" of the value of their property rights.  11 U.S.C. § 361(3).

110.   Adequate protection is an important aspect of protecting property rights in bankruptcy to bring the bankruptcy regime in compliance with the Takings Clause. "The concept of 'adequate protection' has constitutional roots, not just statutory ones." *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 519 (D.P.R. 2016) (citing legislative history and explaining that "the concept of adequate protection is derived from the Fifth Amendment protection of property interests."); *Peaje Invs. v. García-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017) ("In the bankruptcy context, Congress's explicit designation of lack of adequate protection as cause to lift a stay was based, at least in part, on constitutional concerns.");. Equitable interests in property warrant adequate protection. *U.S. Fidelity & Guar. Co. v. Maxon Eng'g Servs., Inc. (In re Maxon Eng'g Servs., Inc.)*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005) (ordering adequate protection to protect equitable interest in property).

111.   Liens are similarly protected; as the Supreme Court has explained, adequate protection is required to safeguard "the right of a secured creditor to have the security applied in payment of the debt." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988). Regardless of the type of property right involved, "[i]t is plain that 'adequate protection' must be completely compensatory," that it not only protects the right to be paid, but also recognizes that "payment ten years hence is not generally the equivalent of payment now." *Metro. Life Ins. Co. v. Murel Holding Corp. (In re Mural Holding Corp.)*, 75 F.2d 941, 942 (2d Cir. 1935) (Hand, J.); *see* 4 Collier on Bankruptcy ¶ 506.03[7][a] n.163 (16th ed. 2019); *Paccom Leasing Corp. v. Deico Elecs., Inc. (In re Deico Elecs., Inc.)*, 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992) ("Adequate protection prevents creditors from becoming more undersecured[.]"). Thus, "a proposal of adequate protection for a secured creditor[] should as nearly as possible under the circumstances of the case provide the creditor with the value of his

bargained for rights." *Martin v. United States (In re Martin)*, 761 F.2d 472, 476 (8th Cir. 1985) (internal quotation marks omitted); *see also In re J&M Salupo Dev. Co.*, 388 B.R. 809, 812 (Bankr. N.D. Ohio 2009) (finding that lack of adequate protection may be shown by "erosion of the creditor's position or of a threatened erosion").

112.     The Commonwealth cannot carry its burden of showing that Movants enjoy "the indubitable equivalent" of the value of its property rights. 11 U.S.C. § 361(3). Movants are injured by the failure to provide the Pledged Hotel Taxes to CCDA bondholders because the Commonwealth appears to intend to continue its diversion and dissipation of the Pledged Hotel Taxes indefinitely, and there is no assurance that the Pledged Hotel Taxes will ever be restored to their proper purpose as a source of payment for the CCDA bonds, or that, in the event they are restored, the future Pledged Hotel Taxes will be sufficient to repay the CCDA bonds.  Indeed, the amount of Hotel Taxes that the Tourism Company ultimately collects depends on a variety of factors that cannot be controlled or predicted even by the Commonwealth, such as (i) the continued use of Puerto Rico hotels by tourists at levels sufficient to support future debt service on the CCDA bonds; (ii) continued hotel rates high enough to lead to sufficient taxes to cover debt service on the CCDA bonds; and (iii) continued tax compliance sufficient to result in receipts adequate to cover the debt service.  All of these factors are subject to change over time.  The Tourism Company's, GDB's, and CCDA's continuing failure to comply with the Hotel Occupancy Tax Act by not transferring the Pledged Hotel Taxes to their rightful owner, the CCDA bondholders, diminishes the value of Movants' property rights by materially and substantially increasing the risk that the Pledged Hotel Taxes will not be sufficient to repay the CCDA bonds in full (or by increasing the magnitude of any deficiency).

113.    The fact that Movants' property interests in the Pledged Hotel Taxes are not adequately protected distinguishes this case from the First Circuit's decision denying adequate protection in *Peaje Investments LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017).  That case was decided under the PROMESA stay, which does not incorporate section 362(g) of the Bankruptcy Code, and thus placed the burden on the moving party to demonstrate that it lacks adequate protection—and the First Circuit concluded that the movants there did not even claim that the diversion of pledged revenues would leave their interest in repayment in the bonds inadequately protected.  *Id.* at 514.  Here, by contrast, Movants have shown that the indefinite and apparently permanent diversion of the Pledged Hotel Taxes will leave their interest inadequately protected—and can demonstrate at a hearing that there is no equity cushion in the Pledged Hotel Taxes, such that Movants' property rights will be negatively impacted absent adequate protection.

### 2.    Lack of Due Process in the Title III Court Constitutes Cause to Lift the Stay

114.    "Lack of adequate protection is the most common basis for finding cause to grant relief [from the automatic stay]," but "it is not the only reason a court might grant such relief." *Gracia-Gracia*, 939 F.3d at 346–47.  Here, additional "cause" exists to lift the stay because, in the absence of stay relief, Section 305 of PROMESA,[10] as interpreted to date, would potentially deprive Movants of due process within the Title III court, and therefore have to be stricken down as unconstitutional.

115.    Due process requires that Movants be able to litigate their constitutional claims and enforce their rights in some forum.  It likewise requires courts to strike down as unconstitutional

---

[10] Section 305 of PROMESA states that "unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property."  48 U.S.C. § 2165.

laws that would "deny any judicial forum for a colorable constitutional claim." *See Webster v. Doe*, 486 U.S. 592, 603 (1988) (citing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)).

116.   As it recently made clear, the Oversight Board intends to restrict the scope of CCDA-related litigation to a limited number of cherry-picked issues.  *See Response of the Financial Oversight and Management Board for Puerto Rico to Interim Report and Recommendation of the Mediation Team*, at 11–12, Case No. 17-03283, ECF No. 9493.  For example, as part of the Revenue Bond Adversary Proceedings, the Oversight Board will seek a ruling on the validity and scope of CCDA bondholders' liens.  *Id.*  But the Oversight Board wants to prevent the Court from determining—even in the context of an affirmative defense raised by CCDA bondholders—any challenge to the "validity" of the primary devices the Oversight Board and the Commonwealth have attempted to use to impair those liens, such as the fiscal plans or budgets certified by the Oversight Board and Commonwealth statutes or executive orders (including the Moratorium Laws and the Fiscal Compliance Act).  *Id.* at 12.  If the Oversight Board is permitted to pick and choose the claims and defenses that the various parties can assert to arrive at a preordained outcome—one that is favorable to the Commonwealth at the expense of CCDA and its creditors—then due process will not be afforded to bondholders in the Title III court.

117.   The First Circuit has already indicated that Section 305 would limit Movants' ability to fully and fairly litigate their rights in the Title III court.  In *Ambac*, 927 F.3d at 602–03, the First Circuit held that "the text of section 305 bars the Title III court from granting" creditors precisely the relief Movants now seek to pursue in another forum, including enforcement of their constitutional rights under the Contracts and Takings Clauses, absent consent from the Oversight Board.  *Id.*  In response to Ambac's argument that the First Circuit's interpretation of Section 305

"would raise due process concerns because Ambac would be left without a venue in which to bring constitutional claims," the First Circuit emphasized that "nothing in our holding today suggests that Ambac cannot seek traditional stay relief pursuant to 11 U.S.C. § 362 and raise its constitutional and statutory arguments in a separate action." *Id.* at 605.

118.    Movants have now followed the First Circuit's guidance and sought stay relief to litigate outside of the Title III court.  Were this Court to now deny stay relief, however, Movants would be left without a forum in which to adequately vindicate their rights as a result of Section 305's bar.  In such circumstances, due process would require the Court to sever and hold invalid Section 305 of PROMESA.  The Supreme Court has cautioned courts to avoid such a result. *Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."); *U.S. v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) (articulating doctrine of constitutional avoidance).  Thus, to afford Movants due process and to save PROMESA from unconstitutionality, the stay should be lifted for "cause."

### 3.    There Is Cause to Lift the Stay Based on the Totality of Circumstances.

119.    The Court may find additional "cause" for lifting the stay based on the "totality of the circumstances." *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67–68 (Bankr. D. Del. 2015) (citing *Tribune Media Serv., Inc. v. Beatty (In re Tribune)*, 418 B.R. 116, 126 (Bankr. D. Del. 2009)); *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).  Here, an analysis of the *Sonnax* factors weigh in favor of stay relief on this basis.

120.    As the First Circuit recently explained, the *Sonnax* factors "'provide a helpful framework' for determining whether stay relief should otherwise be granted 'for cause.'" *See*, *e.g.*, *Gracia-Gracia*, 939 F.3d at 347.  The *Sonnax* factors are:

(1) whether relief would result in a partial or complete resolution of the
issues; (2) lack of any connection with or interference with the bankruptcy
case; (3) whether the other proceeding involves the debtor as a fiduciary;
(4) whether a specialized tribunal with the necessary expertise has been
established to hear the cause of action; (5) whether the debtor's insurer has
assumed full responsibility for defending it; (6) whether the action primarily
involves third parties; (7) whether litigation in another forum would
prejudice the interests of other creditors; (8) whether the judgment claim
arising from the other action is subject to equitable subordination; (9)
whether movant's success in the other proceeding would result in a judicial
lien avoidable by the debtor; (10) the interests of judicial economy and the
expeditious and economical resolution of litigation; (11) whether the parties
are ready for trial in the other proceeding; and (12) impact of the stay on the
parties and the balance of harms.

*Sonnax Indus., Inc.,* 907 F.2d at 1286.

121.    "Not all of these factors will be relevant in every case," *Mazzeo v. Lenhart (In re*

*Mazzeo)*, 167 F.3d 139, 143 (2d Cir.1999), "[a]nd the court need not give equal weight to each

factor." *In re Taub*, 438 B.R. 39, 45 (Bankr. E.D.N.Y. 2010). Rather, as courts have repeatedly

noted, "[w]hen applying these factors and considering whether to modify the automatic stay, the

Court should take into account the particular circumstances of the case, and ascertain what is just

to the claimants, the debtor and the estate." *In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y.

1994).

122.    Under the particular circumstances of this case, the relevant *Sonnax* factors (1, 2,

3, 4, 6, 7, 8, 9, 10, and 12) all counsel in favor of lifting the automatic stay.[11]  *See Sonnax*, 907

F.2d at 1286 (acknowledging that only some of the factors "are relevant" in a given case).

123.    ***Factor 1: Lifting the stay "would result in a partial or complete resolution of the***

***issues."***  Factor 1 is satisfied when lifting the stay can resolve "significant open issues in the

---

[11] The fifth *Sonnax* factor, *i.e.*, "whether the debtor's insurer has assumed full responsibility for defending
it," as well as the eleventh *Sonnax* factor, *i.e.*, "whether the parties are ready for trial in the other
proceeding," appear inapplicable in this case. Further, any judgment arising from the CCDA Enforcement
Action would not be subject to equitable subordination, and thus the eighth *Sonnax* factor weighs in favor
of stay relief.

Debtor's bankruptcy case." *In re Taub*, 413 B.R. at 62.  As discussed above, relief from the stay

would allow the Court to resolve a longstanding legal issue:  the property rights of CCDA

bondholders in the Pledged Hotel Taxes and the application of Article VI, Section 8 to the Pledged

Hotel Taxes.  There is no other proceeding currently pending that would resolve these issues—and

these issues likely cannot be addressed in the Title III proceedings because litigation over these

issues would be either impermissibly "advisory," or barred by PROMESA § 305, 48 U.S.C.

§ 2165, or both.  *See Ambac Assurance Corp.*, 927 F.3d at 605; *Aurelius Capital Master, Ltd. v.*

*P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 638, 646–47 (1st Cir. 2019).  Indeed,

for this reason, the First Circuit has suggested that stay relief is the appropriate procedure for

litigating critical issues affecting revenue bonds.  *See Ambac*, 927 F.3d at 605.  Therefore, most

importantly, lifting the stay to permit Movants to bring an action in another forum would permit

Movants to assert claims that the First Circuit barred under by PROMESA § 305.  *Id.*  These claims

include (i) claims under PROMESA Section 303 that the Moratorium Act, Amended Moratorium

Act, and Moratorium Orders are preempted and (ii) claims under the Contracts and Takings

Clauses of the U.S. Constitution that the Moratorium Act, Amended Moratorium Act, Moratorium

Orders, and fiscal plans are unconstitutional.  The Moratorium Act, Amended Moratorium Act,

Moratorium Orders, and fiscal plans are the primary methods that the Commonwealth and

Oversight Board have used to try to destroy Movants' liens.  Because PROMESA Section 305

allegedly bars Movants from bringing claims in the Title III Court challenging the Moratorium

Act, Amended Moratorium Act, Moratorium Orders, and fiscal plans absent the Oversight Board's

consent, a "complete resolution" of the issues related to Movants' liens can only be achieved if the

stay is lifted so that Movants can access a different forum.  Thus, this factor strongly supports

lifting the stay.

124. ***Factor 2: Lifting the stay would not "interfere[] with the bankruptcy case."*** As set forth above, the Commonwealth has no equity in the Pledged Hotel Taxes, and has no temporary right of possession because Article VI, Section 8 has never been triggered. *See supra* Background II.D. Thus, adjudication of the CCDA Enforcement Action could not interfere with the Commonwealth's Title III case. *See Sonnax Indus., Inc*, 907 F.2d at 1285–86 ("[P]roceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the . . . protection of the debtor and his estate from his creditors."). Indeed, the Oversight Board has concluded that the funds at the Tourism Company are "Restricted Cash" that are not available to be used in connection with the Commonwealth's plan of adjustment. *See Summary of Cash Restriction Analysis*, dated October 2, 2019, at Appendix C, *available at* https://emma.msrb.org/IssuerHomePage/Issuer?id=_C01A91AB36C51F21D8E7238D88E63740. Moreover, the Commonwealth would not even be a party to the CCDA Enforcement Action. Further, permitting Movants to enforce their rights in another forum would not interfere with the restructuring, mainly because CCDA is not a Title III debtor. Instead, it would promote the efficient resolution of issues that must be resolved yet cannot be litigated in the Title III court absent the Oversight Board's consent under PROMESA Section 305. Whether the Pledged Hotel Taxes have been wrongly diverted and misappropriated must be resolved before confirmation of a Commonwealth plan of adjustment. Bankruptcy courts routinely find cause to lift the stay when a non-bankruptcy court is better suited to resolve the dispute—whether it be that the bankruptcy court has limited adjudicatory authority, the issues presented fall outside of the bankruptcy court's

49

expertise, or the dispute could be resolved more efficiently outside of the bankruptcy court.[12]

Factor 2 therefore weighs heavily in favor of lifting the stay.

125.     *Factor 3*: *The CCDA Enforcement Actions would involve the Commonwealth as a fiduciary.* As discussed in Factor 2, the Commonwealth has no equity or other property rights in the Pledged Hotel Taxes, which are statutorily earmarked "for the benefit of" the CCDA bondholders.  Because the Commonwealth lacks any equitable ownership in the Pledged Hotel Taxes, its rights in them, at most, are akin to bare legal title held by a fiduciary.  *See e.g.*, *Shipley*, 52 B.R. at 275 ("Every person who receives money to be paid to another [*i.e.*, the Commonwealth receiving Pledged Hotel Taxes to be paid to the general obligation bondholders], or to be applied to a particular purpose [*i.e.*, the payment of the general obligation bondholders] . . . is a trustee.").  The CCDA Enforcement Action would not be brought against the Commonwealth at all but rather would be brought against the Proposed Defendants, who hold the Pledged Hotel Taxes in trust for the sole benefit of CCDA bondholders.  Thus, Factor 3 counsels in favor of lifting the stay.

126.     *Factor 4: The federal judges of the District of Puerto Rico have the "necessary expertise" and are not constrained by PROMESA Section 305.*  This factor must be considered in light of the Oversight Board's position on PROMESA Section 305 and the Title III Court's

---

[12] *See, e.g.*, *In re Breitburn Energy Partners LP*, 571 B.R. 59, 67-68 (Bankr. S.D.N.Y. 2017) (citations omitted) (finding cause to lift the stay where a preexisting action pending in state court would not interfere with the bankruptcy cases and the dispute presented questions of unsettled state law that were better left to the state court to resolve); *In re Shaffer*, 563 B.R. 301, 306 (Bankr. D. Ariz. 2016) (citations omitted) ("[W]here a bankruptcy court may abstain from deciding issues in favor of an imminent state court trial involving the same issues, cause may exist for lifting the stay as to the state court trial"); *In re Blair*, 534 B.R. 787, 792–93 (Bankr. D.N.M. 2015) (citations omitted) (finding cause to modify automatic stay to allow landlords to a prosecute prepetition evening proceeding against debtor-tenant including the exercise of state-law rights under the lease); *In re Mason*, 514 B.R. 852, 855, 860 (Bankr. E.D. Ky. 2014) (citations omitted) (finding that cause existed to lift the stay to allow former employees to liquidate claims against debtor in district court where civil rights action was pending because there were no preliminary bankruptcy issues to be determined and the bankruptcy court was without authority to liquidate the amount of the claims).

inability to fully and fairly hear and decide the relevant issues.  Therefore, Factor 4 supports lifting

the stay for Movants to pursue litigation in a different forum.

127.     ***Factor 6: The CCDA Enforcement Action "primarily involves third parties."***  As

noted above, the Commonwealth would not be a party to the CCDA Enforcement Action.  The

CCDA Enforcement Action is exclusively brought against the Proposed Defendants and therefore

involves only third parties.  Because the CCDA Enforcement Action would not involve any

litigation against the Commonwealth itself, Factor 6 strongly supports lifting the stay.

128.     ***Factor 7: The CCDA Enforcement Actions would not "prejudice the interests of***

***other creditors."***   Other Commonwealth creditors will not be prejudiced by the CCDA

Enforcement Action because, like the Commonwealth, they have no property rights in the Pledged

Hotel Taxes.  For the reasons articulated earlier, Article VI, Section 8 has never been triggered in

this or any prior fiscal year, so general obligation creditors of the Commonwealth have no interest

in the Hotel Taxes.  Nevertheless, First Circuit precedent and due process require adjudication in

a non-Title III court.  Thus, Factor 7 weighs heavily in favor of lifting the stay.

129.     ***Factor 9: Movants' success in the CCDA Enforcement Actions would <u>not</u> result***

***in a judicial lien avoidable by the Commonwealth.***   Movants' success in a proceeding outside of

the Title III court would not result in a judicial lien because Movants' bonds are already secured

by security interests and no judicial lien would be necessary to secure Movants' liens.  In any

event, the Oversight Board has no ability to avoid judicial liens, because the ability to do so under

Section 544(a) of the Bankruptcy Code is dependent on the Oversight Board's ability to step into

the shoes of a hypothetical judicial lien creditor, and in Puerto Rico no judicial lien creditor can

exist with respect to public funds.  *See, e.g.*, *Román v. S.L.G. Ruiz*, 160 D.P.R. 116 (P.R. 2003);

*Commolco de Caguas Inc. v. Benitez Diaz*, 126 D.P.R. 478, 493 (1990); 3 L.P.R.A. §§ 9102, 9142.

130. ***Factor 10 counsels for lifting the stay because allowing the CCDA Enforcement Action to proceed serves "the interests of judicial economy and the expeditious and economical resolution of the litigation."*** The determination that all Pledged Hotel Taxes belong exclusively to the CCDA bondholders would preclude future post-plan-of-adjustment and post-confirmation litigation and allow the Commonwealth and all parties to the Title III action to more efficiently create, approve, and implement a viable plan of adjustment. Waiting to address these issues only makes those issues thornier and more difficult to resolve. Factor 10 therefore counsels in favor of lifting the stay.

131. ***Factor 12 supports lifting the stay because allowing the CCDA Enforcement Action to proceed cannot harm the Commonwealth but can alleviate a longstanding and serious harm to Movants and CCDA bondholders.*** If the CCDA Enforcement Action is resolved against Movants and the CCDA bondholders, there will be no harm to the Commonwealth. Conversely, if the CCDA Enforcement Action is resolved in Movants' favor, it will be because the CCDA bondholders are the rightful equitable owners of the Pledged Hotel Taxes and neither the Commonwealth, nor the Tourism Company, nor GDB, nor CCDA ever had an equitable property interest in the Pledged Hotel Taxes. Moreover, from Movants' perspective, a favorable adjudication of the CCDA Enforcement Action could prevent future withholding of the Pledged Hotel Taxes from the rightful owners (the CCDA bondholders), which would prevent defaults and stop Monoline Movants from having to unnecessarily pay claims due to those defaults. Thus, Factor 12 strongly supports lifting the stay.

132. Accordingly, all applicable *Sonnax* factors favor lifting the stay.

## III.     THE COURT SHOULD MANDATE ADEQUATE PROTECTION.

133.     In the event that the Court finds that the automatic stay applies and declines to lift the stay, it should require the Commonwealth to provide adequate protection for the Pledged Hotel Taxes.

134.     Adequate protection must be provided "to insure that the creditor receives the value for which [it] bargained prebankruptcy." *Resolution Tr. Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citation and internal quotation marks omitted). "[A]dequate protection . . . is a flexible concept to be tailored to the individual facts and circumstances of each case." *In re Tellier*, 125 B.R. 348, 349 (Bankr. D.R.I. 1991) (citations omitted). In the case of a lien, "[t]he focus of [the adequate protection] requirement is to protect a secured creditor from diminution in the value of its interest in [its] particular collateral during the period of use by the debtor." *In re Satcon Tech. Corp.*, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012).

135.     Both the Movants' equitable ownership of the Pledged Hotel Taxes and the lien on GDB's and CCDA's interest in the Pledged Hotel Taxes are entitled to protection under the Bankruptcy Code. Such protection can be provided in the form of (i) cash payments equal to the decrease in the value of the secured creditor's interest, (ii) an additional or replacement lien, or (iii) other relief "as will result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(1)–(3); *see* 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 361 into PROMESA); *see also In re Builders Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013).[13]

---

[13] Additionally, absent adequate protection, Movants would be entitled to an administrative expense priority claim under 11 U.S.C. § 503(b) for any postpetition diversion of Pledged Hotel Taxes. *See, e.g., Reading*

## **CONCLUSION**

136.     Congress specifically included protections for revenue bonds in the Bankruptcy Code and PROMESA because of the importance of revenue bonds to municipal finance.  Allowing the Commonwealth or related entities, for the exigencies of this particular case, to disavow those statutory protections and the property rights created by statute will upend the revenue bond market and do serious, long-lasting damage to state and municipal governments' legitimate efforts to borrow and fund capital investments at reasonable rates.  This is particularly true here, where it is the restructuring of *the Commonwealth* (which has no right whatsoever to the Hotel Taxes) that is assertedly allowing Movants' and CCDA bondholders' property to be taken.

137.     For the foregoing reasons, the Court should enter an order, substantially in the form attached hereto as Exhibit 1, finding that the CCDA Enforcement Action is not subject to the automatic stay associated with the filing of the Commonwealth's Title III petition.[14]   In the alternative, the Court should lift the automatic stay under Sections 362(d)(1) and/or (d)(2) so that Movants may pursue the CCDA Enforcement Action.  Further in the alternative, the Court should order the Commonwealth to provide adequate protection for Movants' property rights in the Pledged Hotel Taxes.

---

*Co. v. Brown*, 391 U.S. 471, 485 (1968) (liabilities incurred postpetition give rise to administrative expense priority claims).

[14] Movants intend to respond in due course to the contemplated structure of the revenue bond lift stay litigation per paragraph 7 of the *Amended and Restated Order Addressing the Filing of an Amended Report by the Mediation Team and Extending (a) Stay Period, (b) Mandatory Mediation, and (c) Certain Deadlines Related Thereto*, Case No. 17-03283 (ECF. No. 9661), and otherwise reserve all rights under Section 362(e), including, without limitation, the, right to a final hearing on that date, or in any event, the right to a final hearing within 30 days of any preliminary hearing.  Movants object to the application here of any provision of the *Tenth Amended Notice, Case Management And Administrative Procedures*, Case No. 17-03283 (ECF. No. 8027-1) to the extent that it purports to limit or abrogate Movants' statutory rights.

## <u>CERTIFICATION</u>

In accordance with paragraph 7 of the *Interim Case Management Order for Revenue Bonds* (ECF No. 9620), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

Dated:  January 16, 2020
San Juan, Puerto Rico


**FERRAIUOLI LLC**

By: */s/ Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email:  rcamara@ferraiuoli.com
scolon@ferraiuoli.com


**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
María E. Picó
(USDC-PR No. 123214)
802 Ave. Fernández Juncos
San Juan, PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
Email: mpico@rexachpico.com


**MILBANK LLP**

By: */s/ Atara Miller*
Dennis F. Dunne (admitted *pro hac vice*)
Atara Miller (admitted *pro hac vice*)
Grant R. Mainland (admitted *pro hac vice*)
John J. Hughes, III (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email: ddunne@milbank.com
amiller@milbank.com
gmainland@milbank.com
jhughes2@milbank.com


**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
Martin A. Sosland (admitted *pro hac vice*)
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
Email: martin.sosland@butlersnow.com
Jason W. Callen (admitted *pro hac vice*)
150 3rd Ave., S., Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6774
Facsimile: (615) 651-6701
Email: jason.callen@butlersnow.com


*Attorneys for Financial Guaranty Insurance Company*

**ARENT FOX LLP**

By: */s/ David L. Dubrow*
    David L. Dubrow (admitted *pro hac vice*)
    Mark A. Angelov (admitted *pro hac vice*)
    1301 Avenue of the Americas
    New York, NY 10019
    Telephone: (212) 484-3900
    Facsimile: (212) 484-3990
    Email: david.dubrow@arentfox.com
           mark.angelov@arentfox.com
    Randall A. Brater (admitted *pro hac vice*)
    1717 K Street, NW
    Washington, DC  20006
    Telephone: (202) 857-6000
    Facsimile: (202) 857-6395
    Email:randall.brater@arentfox.com

*Attorneys for Ambac Assurance Corporation*

**SEPULVADO, MALDONADO & COURET**

By: */s/ Albéniz Couret Fuentes*
    Albéniz Couret Fuentes
    (USDC-PR No. 222207)
    304 Ponce de León Ave. Suite 990
    San Juan, PR 00918
    Telephone: (787) 765-5656
    Facsimile: (787) 294-0073
    Email: acouret@smclawpr.com

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
           rcasellas@cabprlaw.com
           dperez@cabprlaw.com

**REED SMITH LLP**

By: */s/ Eric A. Schaffer*
    Eric A. Schaffer (admitted *pro hac vice*)
    Luke A. Sizemore (admitted *pro hac vice*)
    Jared S. Roach (admitted *pro hac vice*)
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222
    Telephone: (412) 288-3131
    Facsimile: (412) 288-3063
    Email: eschaffer@reedsmith.com
           lsizemore@reedsmith.com
           jroach@reedsmith.com

*Attorneys for The Bank of New York Mellon*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr. (admitted *pro
    hac vice*)
    Mark C. Ellenberg (admitted *pro hac
    vice*)
    William J. Natbony (admitted *pro hac
    vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
          mark.ellenberg@cwt.com
          bill.natbony@cwt.com
          ellen.halstead@cwt.com
          thomas.curtin@cwt.com
          casey.servais@cwt.com

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuentes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com