# **<u>EXHIBIT 2</u>**

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION; FINANCIAL GUARANTY INSURANCE COMPANY; ASSURED GUARANTY CORP.; ASSURED GUARANTY MUNICIPAL CORP.; THE BANK OF NEW YORK MELLON;<br><br>                          Plaintiffs,<br><br>-against-<br><br>PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY; PUERTO RICO TOURISM COMPANY; GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO; GDB RECOVERY AUTHORITY; GDB PUBLIC ENTITY TRUST; OMAR MARRERO; CARLA G. CAMPOS VIDAL; JULIAN BAYNE HERNANDEZ;<br><br>                          Defendants. | No. _____ |

## <u>COMPLAINT</u>

Plaintiffs Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and The Bank of New York Mellon (collectively, "<u>Plaintiffs</u>"), by and through their undersigned counsel, bring this action against defendants Puerto Rico Convention Center District Authority ("<u>CCDA</u>"), Puerto Rico Tourism Company ("<u>Tourism Company</u>"), the Government Development Bank for Puerto Rico ("<u>GDB</u>"), GDB Debt Recovery Authority, GDB Public Entity Trust, Omar Marrero, in his capacity as the Executive Director of CCDA, Carla G. Campos Vidal, in her capacity as the Executive Director of the Tourism Company, and Julian Bayne Hernandez, in his capacity as the CFO of GDB (collectively, "<u>Defendants</u>"), and allege as follows:

## **NATURE OF THIS ACTION**

1.     Revenue bonds are critical to the municipal finance market.  They allow state and local governments to borrow funds based on a pledge of revenue streams dedicated to repayment of the bonds.  This case concerns revenue bonds that CCDA issued in March 2006, in principal amount of approximately $469 million (the "CCDA bonds"), to finance the construction of a convention center in the Commonwealth of Puerto Rico (the "Commonwealth").

2.     To support the issuance of the CCDA bonds, the Commonwealth legislature adopted legislation that allows the Tourism Company to levy and collect hotel occupancy taxes, which conveyed equitable ownership of the hotel occupancy taxes to the bondholders and provided that the hotel occupancy taxes would be irrevocably pledged to payment of the CCDA bonds.  *See* 13 L.P.R.A. §§ 2271, 2271a, 2271v.  Pursuant to the enabling legislation, on the date that the CCDA bonds were issued, CCDA, the Tourism Company, and GDB executed a series of agreements that (i) pledged the hotel occupancy taxes necessary to pay the CCDA bonds to the bondholders, (ii) created an express trust structure in which the Pledged Hotel Taxes (as defined herein) would be held for the benefit of CCDA bondholders, (iii) ensured that legal title to the Pledged Hotel Taxes passed to the bondholders, and (iv) granted CCDA bondholders a lien on legal title to the Pledged Hotel Taxes to the extent they were held by third parties.[1]

3.     Defendants made payments on the CCDA bonds using the Pledged Hotel Taxes until July 2017.  At that point, Defendants failed to comply with their obligations under Commonwealth law and under the contractual agreements to ensure that Pledged Hotel Taxes were

---

[1] The rights, remedies, and obligations of The Bank of New York Mellon, as CCDA Bond Trustee (as defined herein), and other Plaintiffs are set forth more fully in the Bond Documents, as defined herein.  No reference herein to a specific provision of a Bond Document shall be construed as a waiver of any rights, remedies, or other provisions affecting or relating to the CCDA Bond Trustee or any other Plaintiff.

transferred to the rightful owner, the CCDA bondholders, and used to make payments on the CCDA bonds.

4.      Defendants' unlawful conduct and their breach of statutory and contractual commitments have harmed Plaintiffs by depriving them of their property interest in the Pledged Hotel Taxes.  Through this lawsuit, Plaintiffs seek an order of mandamus directing Defendants to comply with their obligations, declaratory and injunctive relief, and remedies for breach of contract, conversion, unjust enrichment, and violations of PROMESA § 407.

## THE PARTIES

### I.      Plaintiffs

5.      Plaintiff Ambac Assurance Corporation ("Ambac") is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One World Trade Center, 41st Floor, New York, NY 10007.  Ambac is a monoline insurer that provides financial guarantees to the United States and global public finance, infrastructure, and structured finance markets.  Ambac insures approximately $99.955 million in gross par of CCDA bonds currently outstanding.

6.      Plaintiff Financial Guaranty Insurance Company ("FGIC") is a New York stock insurance corporation with its principal place of business at 463 Seventh Avenue, 16th Floor, New York, New York 10018.  FGIC insures approximately $97.075 million in gross par of CCDA bonds currently outstanding.

7.      Plaintiffs Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") are, respectively, Maryland and New York insurance companies with their principal place of business at 1633 Broadway, New York, New York 10019.  Assured is the successor in interest to CDC IXIS Financial Guaranty North America, Inc. ("CIFG").  As successor

in interest to CIFG, Assured insures approximately $152 million in gross par of CCDA bonds currently outstanding.

8.     Plaintiffs Ambac, FGIC, and Assured are collectively referred to as the "Monoline Plaintiffs."

9.     Plaintiff The Bank of New York Mellon (the "CCDA Bond Trustee") is successor trustee to JPMorgan Chase Bank, N.A, as the original trustee under the Trust Agreement (as defined herein).  The Bank of New York Mellon is a New York banking corporation and its principal place of business is located at 240 Greenwich Street, New York, New York 10286.

## II.     CCDA Bond Defendants

10.     Defendant CCDA is a public corporation organized in Puerto Rico, created by Act No. 351 of September 2, 2000 (the "CCDA Enabling Act") for the purpose of developing and operating a convention center located in San Juan, Puerto Rico, and related improvements and facilities.  *See* 23 L.P.R.A. §§ 6402, 6404.  CCDA's principal place of business is located at 100 Convention Boulevard, San Juan, Puerto Rico 00907.  Under the CCDA Enabling Act, CCDA has the power to sue and be sued, to enter into contracts, and to issue bonds.  *See id.* §§ 6412(b), (e), (h).  On March 24, 2006, CCDA issued the CCDA bonds for approximately $469 million in principal amount.  Approximately $349 million of CCDA bonds remain outstanding as of the date of this filing.  CCDA has not filed a petition for restructuring under Title III of the Puerto Rico Oversight, Management, and Stability Act ("PROMESA").  CCDA is not funded by Commonwealth appropriations, and any judgment against the CCDA in this case would not be paid out of general Commonwealth appropriations.

11.     Defendant Omar Marrero is the Executive Director of CCDA ("CCDA Executive Director") and a Commonwealth domiciliary.  The CCDA Executive Director is responsible for directing, and seeking investments in, projects and development opportunities designed to bolster

the financial health of the Puerto Rico Convention District.  *See* 23 L.P.R.A. § 6411(e).  He has control over the activities of CCDA, including the power to cause CCDA to comply or to fail to comply with its obligations under the Bond Documents (as defined herein).  Plaintiffs sue the CCDA Executive Director in his official capacity.

12.     Defendant Tourism Company is a public corporation organized in Puerto Rico, created by Act 10-1970 in order to "promote, develop, and improve [Puerto Rico's] tourist industry."  23 L.P.R.A. § 671d.  The Tourism Company's principal place of business is located at 2 Paseo La Princesa, San Juan, Puerto Rico 00902.  Under the Tourism Company's Enabling Act, the Tourism Company has the power to sue and be sued and to enter into contracts.  *See id.* §§ 671d(e), (g).  The Tourism Company has not filed a petition for restructuring under Title III of PROMESA.

13.     The Tourism Company's budget is primarily derived from hotel tax and slot machine revenues.  Upon information and belief, the Tourism Company's hotel tax revenues in fiscal years 2014, 2015, and 2016 were more than $70 million per fiscal year, and slot machine revenues were more than $150 million per fiscal year.   *See* Commonwealth of Puerto Rico: Financial Information and Operating Data Report, at 131–32 (Dec. 18, 2016), *available at* http://www.gdb.pr.gov/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf.  The Tourism Company is not funded by Commonwealth appropriations, and any judgment against the Tourism Company in this case would not be paid out of general Commonwealth appropriations.

14.     Defendant Carla G. Campos Vidal is the Executive Director of the Tourism Company ("Tourism Company Executive Director") and a Commonwealth domiciliary.  The Tourism Company Executive Director is responsible for destination planning, development,

policy, management, and collaborating with Discover Puerto Rico, the newly created destination marketing organization tasked with sales and marketing of Puerto Rico.  She has control over the activities of the Tourism Company, including the power to cause the Tourism Company to comply or to fail to comply with its obligations under the Bond Documents (as defined herein).  Plaintiffs sue the Tourism Company Executive Director in her official capacity.

15.     Defendant GDB is a public corporation of the Commonwealth and maintains its principal executive offices within the Roberto Sánchez Vilella Government Center on De Diego Avenue in San Juan, Puerto Rico.  GDB was organized under Act 17-1948 (the "GDB Enabling Act"), under which GDB had the power to sue and be sued and to enter into contracts.  *See* 7 L.P.R.A. § 552(4)(F).  Historically, GDB has served two roles: (1) GDB was a banking institution and depositary of funds for the Commonwealth and its instrumentalities, and (2) GDB acted as fiscal agent, paying agent, and financial advisor to the Commonwealth and its instrumentalities. In April 2016, many of GDB's fiscal agent responsibilities were transferred to the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), but not GDB's obligations under the Bond Documents (as defined herein).

16.     Defendant Julian Bayne Hernandez (the "GDB CFO") is the Chief Financial Officer of GDB.  The GDB CFO is empowered to direct officials at the Tourism Company to comply with (i) the Assignment Agreement; and (ii) the Pledge Agreement.  Plaintiffs sue the GDB CFO in his official capacity.

## III.     GDB Restructuring Defendants

17.     In July 2017, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") authorized GDB to restructure its debts under Title VI of PROMESA.  The Commonwealth passed Act 109-2017 (the "GDB Restructuring Act") in August 2017, which established the legislative framework for the restructuring of GDB's obligations under a Title VI

Qualifying Modification.  The Qualifying Modification was certified by the United States District Court for the District of Puerto Rico on November 7, 2018, as required under PROMESA.

18.     Defendant GDB Debt Recovery Authority is a statutory public trust and governmental instrumentality of the Commonwealth created pursuant to the GDB Restructuring Act in August 2017, for the purpose of receiving property transferred from GDB and issuing new bonds.  Under the GDB Restructuring Act, the GDB Debt Recovery Authority has the power to sue and be sued.  *See* 7 L.P.R.A. § 3175(a).

19.     Defendant GDB Public Entity Trust was created pursuant to the GDB Restructuring Act for the benefit of GDB's former depositors, including the Tourism Company, and received certain assets—including approximately $22 million in cash plus $890 million in loans to the Commonwealth—in light of depositors' claims against GDB.  Upon information and belief, GDB is the trustee of the GDB Public Entity Trust.  *See Fourth Amendment to Restructuring Support Agreement: Exhibit A Restructuring Term Sheet*, at 8 n.4, Case No. 3:18-cv-01561, ECF No. 5-7; *see also Application of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority, Pursuant to Section 601(M)(1)(D) of [PROMESA], for Approval of the Qualifying Modification for GDB*, ¶¶ 35–39, Case No. 3:18-cv-01561, ECF No. 1; 7 L.P.R.A. § 3184.

20.     On the closing date of the restructuring, GDB transferred all of its assets as of July 1, 2018 (other than certain enumerated assets that were excluded) to the GDB Debt Recovery Authority.  *See Findings of Fact, Conclusions of Law, and Order Approving Qualifying Modification for the Government Development Bank for Puerto Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act*, at 11, Case

No. 18-01561, ECF No. 270.  GDB's obligations under the Bond Documents (as defined herein) remain with GDB.

21.     Plaintiffs name the GDB Debt Recovery Authority and Public Entity Trust to the extent that these entities might assert any interest in the subject matter of this litigation.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

23.     Plaintiffs seek a declaration and related relief pursuant to 28 U.S.C. §§ 2201 and 2202.  An actual and justiciable controversy has arisen and exists between the parties with respect to the issues and claims alleged herein.

24.     Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to these claims occurred in this District.  The CCDA bonds were issued in this District, and Defendants undertook unlawful efforts to attempt to divert pledged revenues in this District.

## FACTUAL BACKGROUND

**I.      The Hotel Occupancy Tax Act.**

25.     In September 2003, the Commonwealth enacted Act 272-2003, (the "Hotel Occupancy Tax Act"), which authorizes the Tourism Company to levy, charge, and collect taxes on the room rates of hotels, motels, casinos, inns, and other lodgings (the "Hotel Taxes").  *See, e.g.*, 13 L.P.R.A. § 2271*o*.  The Commonwealth gave the Tourism Company the power to "determine, assess, impose, collect, enforce, regulate and distribute" the Hotel Taxes.  *See id.* § 2271a(a).

26.     The tax rates range from 5% to 11%, depending on the type of lodging.  *Id.* § 2271*o*(b).  For example, most hotels and motels are taxed at a 9% rate; inns are taxed at 7%; hotels that operate casinos are taxed at 11%.  *Id.*

27.     The Tourism Company establishes, by regulation, "the place and procedures" for hotels to make payment of the Hotel Taxes.  *Id.* § 2271t(b).  Hotels and lodgings subject to the tax can make payment through, *inter alia*, a Scotiabank lockbox at the Scotiabank Puerto Rico branch; through Banco Popular automated teller machines; or by electronic debit authorized through a website maintained by the Tourism Company.

28.     Payments of Hotel Taxes are collected directly into bank accounts controlled by the Tourism Company.

29.     A portion of the Hotel Taxes that the Tourism Company collects each year are pledged to repayment of the CCDA bonds (the "Pledged Hotel Taxes").  *See id.* § 2271v.

30.     The Hotel Occupancy Tax Act requires GDB to calculate, each fiscal year, "the amount necessary for [CCDA] to make, during such fiscal year and the first day of the following fiscal year," all debt service payments and other required payments on any bonds issued by CCDA (the "Debt Service Amount").  *See id.* § 2271v(a).  GDB certifies the Debt Service Amount, including any arrears, annually by May 30 for the fiscal year starting on July 1.

31.     The Tourism Company must transfer the Debt Service Amount through monthly installments to GDB, for deposit in a special account in the name of CCDA for the benefit of bondholders.  *Id.*  GDB must then transfer the Debt Service Amount to the CCDA Bond Trustee for payment of regularly scheduled payment of principal amount on the CCDA bonds.  *Id.*

32.     The Tourism Company is prohibited from any use or transfer of any Hotel Taxes until the Tourism Company has made that month's required Debt Service Amount payment.  *See*

*id.* § 2271(a)(4) ("Each month, ***after making the transfer of monies to [GDB]*** as provided in this subsection, the [Tourism] Company shall distribute any remaining amount as established in subsection (b) of this section.") (emphasis added); *id.* § 2271v(b) (authorizing the Tourism "Company [to] make monthly distributions of the ***excess over the [Debt Service Amount]***") (emphasis added); *id.* § 2271v(a)(4) ("[T]he [Pledged Hotel Taxes] shall be used solely for the payment of the principal and interest on the [CCDA] bonds.").

33.     In the event that the Hotel Taxes collected in a given month are ever insufficient to cover the Debt Service Amount for that month, the Tourism Company is required to "correct such a deficiency by transferring" any excess Hotel Taxes collected in future months to GDB until the deficiency is covered in full. *Id.*

34.     The Hotel Occupancy Tax Act expressly provides that CCDA bondholders have equitable ownership of the Pledged Hotel Taxes. *See id.* ("The [Pledged Hotel Taxes] shall be deposited in a special account to be maintained by the Bank in the name of the Authority *for the benefit of the bondholders,* noteholders or the holders of other obligations of the Authority or for the benefit of the other contracting parties under any bond related financing agreement." (emphasis added)).  As described herein, legal title to the Pledged Hotel Taxes moves from the Tourism Company to GDB to the CCDA Bond Trustee, but as the Hotel Occupancy Tax Act expressly provides, the Pledged Hotel Taxes are at all relevant times held *for the benefit of bondholders*, meaning those bondholders have equitable ownership of the funds.

## II.     The CCDA Bonds.

35.     On March 24, 2006, CCDA issued approximately $469 million in principal amount of the CCDA bonds.  According to the official statement, the bonds were to be used, *inter alia*, to finance "the development and construction of a convention center."  *See* Puerto Rico Convention

Center District Authority Hotel Occupancy Tax Revenue Bonds, Series A Official Statement, *available at* http://www.gdb.pr.gov/investors_resources/prccda.html.

36.     A series of interrelated agreements were executed to implement the requirements of the Hotel Occupancy Tax Act and to pledge the Pledged Hotel Taxes to payment of the CCDA bonds, in particular: (i) the Assignment and Coordination Agreement, dated March 24, 2006, by and between the Tourism Company and GDB (the "Assignment Agreement"); (ii) the Pledge and Assignment Agreement, dated March 24, 2006, by and among CCDA, GDB, and the CCDA Bond Trustee (the "Pledge Agreement"); and (iii) the Trust Agreement between CCDA and the CCDA Bond Trustee, dated as of March 24, 2006 (the "Trust Agreement"), as supplemented by the First Supplemental Trust Agreement of the same parties and date (collectively, the "Bond Documents").

37.     **Assignment Agreement.**   Under the Hotel Occupancy Tax Act, the Tourism Company has the power to levy and collect Hotel Taxes.  On the date of CCDA's debt issuance, the Tourism Company entered into the Assignment Agreement with the GDB.  The Assignment Agreement, which was made "for the benefit of the Owners of the [CCDA bonds]," created a special restricted fund into which all Hotel Taxes are collected.   Assignment Agreement Introduction and § 1.  The Tourism Company transferred and assigned ownership of the Pledged Hotel Taxes to GDB, which agreed to hold them in trust for CCDA bondholders.  Assignment Agreement §§ 6, 7.

38.     **Pledge Agreement.**  Simultaneously, GDB, CCDA, and the CCDA Bond Trustee entered into the Pledge Agreement.  The Pledge Agreement created a special trust account at GDB in the name of CCDA to hold the Pledged Hotel Taxes for the benefit of CCDA bondholders.  Pledge Agreement § 2(a).  GDB agreed that it would deposit, and hold in trust, *inter alia*, the Pledged Hotel Taxes as and when received from the Tourism Company.  Pledge Agreement § 3.

Further, GDB pledged the Pledged Hotel Taxes to secure the repayment of the CCDA bonds and granted the bondholders a lien on the Pledged Hotel Taxes.  Pledge Agreement §§ 2(b), 3.

39.     **Trust Agreement.**  On March 24, 2006, CCDA and JPMorgan Chase Bank, N.A., as CCDA Bond Trustee, entered into the Trust Agreement, pursuant to which CCDA pledged the Pledged Hotel Taxes to secure repayment of the CCDA bonds.  Trust Agreement, Granting Clauses and § 5.01.  The assignment and pledge of the Pledged Hotel Taxes to the Trustee are "for the benefit of" the CCDA bondholders, and "are intended to and shall constitute a first priority lien on such Hotel Occupancy Tax Funds."  *Id.* § 5.01.  The Tourism Company provided its express approval to the Trust Agreement.  *See* Assignment Agreement § 10; *see also* Board of Directors of the Tourism Company Resolution No. 06-47 (Feb. 24, 2006).

40.     The flow of funds pursuant to these agreements is described in greater detail below. At all relevant stages, CCDA bondholders are the equitable owners of the Pledged Hotel Taxes, with legal title moving as described below.

> **A.      Step One: Hotel Taxes Collected by the Tourism Company Become, Upon Receipt, Part of the Holding Fund, a Restricted Special Fund, Part of Which is Held in Trust for Bondholders.**

41.     Pursuant to the Assignment Agreement, the Tourism Company transferred its rights to the Pledged Hotel Taxes to CCDA bondholders.  It accomplished this by assigning all of its rights in the Pledged Hotel Taxes to GDB, and consenting to the Pledge Agreement that GDB executed, pledging all of GDB's rights in the Pledged Hotel Taxes to CCDA bondholders.

> **1.      Hotel Taxes Become Part of the Holding Fund Upon Receipt.**

42.     The Assignment Agreement created a special restricted fund called the Assignment and Coordination Agreement Holding Fund ("Holding Fund"), into which all Hotel Taxes are

collected. Assignment Agreement § 1. Both the Pledged Hotel Taxes and any excess Hotel Taxes

that the Tourism Company collects become part of the Holding Fund upon their collection.

43. The Holding Fund monies are accounted for through two accounts: "the Transfer

Account and the Surplus Account." Assignment Agreement § 2. The Transfer Account accounts

for the Pledged Hotel Taxes, and the Surplus Account accounts for any excess Hotel Taxes that

are not needed for payment of the CCDA bonds.

44. The Hotel Taxes that the Tourism Company collects each month are allocated to

the Transfer Account until, in a given month, the Debt Service Amount has been paid and "any

deficiencies in prior payment periods have been met." Assignment Agreement § 4. After the

Transfer Account contains the amounts needed to pay the CCDA bonds, the Tourism Company

"deposit[s] any excess funds into the Surplus Account." *Id.* The Surplus Account funds are then

distributed to CCDA and the Tourism Company, pursuant to a formula established in the Hotel

Occupancy Tax Act. *See* 13 L.P.R.A. § 2271v.

45. In the Assignment Agreement, the Tourism Company acknowledged its legal duty

to transfer the Pledged Hotel Taxes to GDB. *See* Assignment Agreement §§ 4–5 ("The Tourism

Company hereby acknowledges, and agrees to comply with, its obligations under the [Hotel]

Occupancy Tax Act to transfer to GDB the monthly amounts required [by] the [Hotel Occupancy]

Tax Act.").

46. Moreover, the Tourism Company acknowledged, as the Hotel Occupancy Tax Act

makes clear, that no Hotel Taxes may be used for any other purpose, or transferred to any other

account, until the monthly required payment has been collected and deposited into the Transfer

Account. *See id.* § 4 ("[O]nly when the Transfer Account contains all moneys necessary to pay

the Bonds in accordance with the GDB Certificate, [can] the Tourism Company . . . deposit any excess funds into the Surplus Account.").

> ### 2. The Tourism Company Transferred its Interest in the Portion of the Holding Fund Needed to Pay CCDA Bondholders to GDB, in Trust for the CCDA Bondholders.

47. Through the Assignment Agreement, the Tourism Company acknowledged and effectuated CCDA bondholders' property rights in the Pledged Hotel Taxes. The Tourism Company "irrevocably . . . assign[ed]" and "transfer[red] . . . all rights it may legally have [had]" in the Transfer Account to GDB. *Id.* § 6.

48. The Tourism Company acknowledged and consented that GDB, in turn, would pledge and transfer the funds in the Transfer Account to CCDA's bondholders through the Pledge Agreement. *Id.* § 7 (acknowledging and consenting to "GDB entering into [the Pledge Agreement] under which the Hotel Occupancy Tax Funds transferred to GDB [under the Assignment Agreement] will be further pledged by [CCDA] and transferred from GDB to the Trustee for the benefit of the [CCDA bondholders]."). The Assignment Agreement expressly acknowledges that CCDA bondholders (and the Monoline Plaintiffs, as insurers of the CCDA bonds) are third-party beneficiaries. *Id.* § 15 (acknowledging that the Assignment Agreement is "made for the benefit of the Owners of the Bonds and the parties to any Credit Facilities or Interest Rate Exchange Agreements.").

49. The Assignment Agreement cannot be modified in any respect without the consent of a majority of CCDA bondholders. *See id.* § 14 ("This Assignment Agreement may not be modified, amended, or superseded, for as long as any Bonds remain outstanding under the Trust Agreement except in accordance with the provisions of Section 9.04 thereof."); *see* Trust Agreement § 9.04 ("No amendment, change or modification of the Pledge Agreement or the Assignment Agreement shall be effected without mailing of notice and written approval or consent

of (i) the holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding, (ii) GDB, and (iii) the Tourism Company and (iv) an opinion of counsel to the effect that amendment is authorized by governing documents and that all conditions precedent have been complied with.").  The CCDA bondholders have not consented to any amendments.

**B.     Step Two: The Pledged Hotel Taxes are Held in Trust at GDB.**

50.     Pursuant to the Hotel Occupancy Tax Act and the Assignment Agreement, the Tourism Company must periodically move funds from the Transfer Account to a special trust account at GDB, created in CCDA's name for the benefit of the CCDA bondholders (the "GDB Special Trust Account").

51.     Specifically, the Hotel Occupancy Tax Act regulates the manner in which the Tourism Company is to "distribute all funds collected from the [Hotel Tax] imposed under § 2271*o* of this title."  13 L.P.R.A. § 2271v.  The Pledged Hotel Taxes must be "deposited in a special account [] maintained by [GDB] in the name of [CCDA] for the benefit of the [CCDA] bondholders."  *See id.* § 2271v(a)(4) ("[T]he product of said collection, in the amount necessary, [*i.e.*, the Debt Service Amount] shall be used solely for the payment of the principal and interest on the bonds."); *see also* Assignment Agreement § 4.  By providing that the Pledged Hotel Taxes "shall be used solely for the payment of the principal and interest on the bonds," the Hotel Occupancy Tax Act gives rise to a statutory lien in favor of the CCDA bondholders.

52.     In the Pledge Agreement, GDB expressly creates, "[i]n furtherance of the pledges set forth in the Assignment Agreement and [Hotel] Occupancy Tax Act," the GDB Special Trust Account as "a special and irrevocable account . . . held in trust by GDB on behalf of the Authority

for the benefit of the Owners of the Bonds, separate and apart from other funds of GDB[.]"  Pledge
Agreement § 2(a).

53.     In short, under the Hotel Occupancy Tax Act and the Assignment Agreement, the
Tourism Company is a mere conduit or collection agent with respect to the Pledged Hotel Taxes.
The Tourism Company must transfer legal ownership of the Pledged Hotel Taxes to GDB, which
holds them in trust for the benefit of the CCDA Bond Trustee and CCDA bondholders.

### C.   Step Three: GDB is Required to Transfer the Pledged Hotel Taxes From the GDB Special Trust Account to the CCDA Bond Trustee for Distribution to the CCDA Bondholders.

54.     The Hotel Occupancy Tax Act requires GDB—in its capacity as depositary trustee
of the Pledged Hotel Taxes it receives and holds—to transfer the Pledged Hotel Taxes from the
GDB Special Trust Account to the CCDA Bond Trustee for distribution to the CCDA bondholders.
13 L.P.R.A. § 2271v(a)(4) (GDB "shall transfer the amounts deposited in such [GDB Special Trust
Account] to the trustees of the [CCDA] bondholders.").

55.     Under the Pledge Agreement, GDB and CCDA each also grant a lien to the CCDA
Bond Trustee on their interest in the Pledged Hotel Taxes—including the rights that the Tourism
Company has assigned and transferred to GDB under the Assignment Agreement.  *See* Pledge
Agreement § 2(b) ("Each of GDB and [CCDA] does hereby grant, bargain, convey, assign,
mortgage and pledge a security interest to the [CCDA Bond] Trustee . . . for the benefit of the
Owners of the [CCDA] Bonds."); *see also* Trust Agreement, Granting Clauses and § 5.01.

56.     The security interest granted to the CCDA Bond Trustee for its benefit and the
benefit of CCDA bondholders attaches to "(i) all [Pledged Hotel Taxes] received from the Tourism
Company, (ii) all moneys deposited in ***or required to be deposited in*** the [GDB Special Trust
Account] pursuant to the provisions of this Pledge Agreement, and (iii) all right title and interest

-16-

of GDB in the Assignment Agreement" and the Pledge Agreement.  Pledge Agreement §§ 2(b), 14 (emphasis added).

57.     GDB also covenants in the Pledge Agreement that it would: (i) "deposit or cause to be deposited into the [GDB Special Trust Account], all [Pledged Hotel Taxes] Funds received from the Tourism Company *as received*"; and (ii) "diligently enforce its rights under the Assignment Agreement including its enforcement of the [Pledged Hotel Taxes] transfer obligation of the [Tourism] Company."  Pledge Agreement §§ 3(a), 5(b) (emphasis added).  The CCDA bondholders therefore have a lien on all rights and interests granted to the Tourism Company, GDB, and CCDA in the Pledged Hotel Taxes.

58.     The CCDA Bond Trustee distributes funds to the CCDA bondholders when funds are received from GDB, pursuant to the terms of the Trust Agreement.  Trust Agreement § 5.01.

### D.     The Commonwealth Covenants With CCDA Bondholders.

59.     To protect the property rights of CCDA bondholders, the Commonwealth covenanted with CCDA bondholders that their rights to the Pledged Hotel Taxes would not be impaired, thereby ensuring CCDA bondholders' equitable ownership of the Pledged Hotel Taxes. The Commonwealth legislature approved statutory covenants, and also authorized CCDA to act as "an agent of the Commonwealth of Puerto Rico" and to make the covenants part of the Trust Agreement with CCDA bondholders.  13 L.P.R.A. § 2271v(a); 23 L.P.R.A. § 6450.

60.     **Statutory Covenants.**  The Hotel Occupancy Tax Act contains covenants of the Commonwealth to the CCDA bondholders that the Commonwealth: (i) will never eliminate or reduce the Hotel Taxes; (ii) will "make sure that the amounts that must be deposited in the [GDB Special Trust Account] as provided in this subsection are deposited in the [GDB Special Trust Account]"; (iii) will "not alter or limit the rights" of CCDA "to encumber or pledge the collections

from the tax required to deposited in the special account"; and (iv) will "comply with the terms of any agreement entered into with, or for the benefit of the bondholders." *Id.*

61.     The CCDA Enabling Act also contains an agreement between the Commonwealth and the CCDA bondholders whereby the Commonwealth "pledges and agrees" with the CCDA bondholders that "it shall not limit nor alter the rights hereby conferred" to CCDA until the CCDA bonds are "paid in full and said contracts are fully executed and honored" by CCDA. 23 L.P.R.A. § 6450. The Commonwealth must provide by law "adequate measures" for "protection" of the CCDA bonds and those who enter into contracts with CCDA. *Id*.

62.     Thus, the Commonwealth itself agreed that it would be bound by *any* agreement made with or for the benefit of CCDA bondholders—including the Bond Documents, which grant CCDA bondholders a lien on all Pledged Hotel Taxes that should have been deposited into the GDB Special Trust Account—and would adequately protect CCDA bondholders' rights to the Pledged Hotel Taxes.

63.     **Covenant in Trust Agreement.**  Acting as agent for the Commonwealth, pursuant to the express delegations of authority in the Hotel Occupancy Tax Act and the CCDA Enabling Act, CCDA covenanted in the Trust Agreement that the Commonwealth, *inter alia*, (i) will "not reduce the Hotel Occupancy Tax and not decrease its rates," (ii) will "make sure that the amounts [of the Pledged Hotel Taxes] must be deposited in the accounts as provided in the Trust Agreement," and (iii) will "not alter or limit the rights" of CCDA "to encumber or pledge the collections from the Hotel Occupancy Tax required to be deposited" for the benefit of bondholders. *See* Trust Agreement §§ 6.01(n)(i), (iii), (iv), (o).

64.     CCDA likewise covenanted in the Trust Agreement that it will, *inter alia*, (i) "enforce all terms and conditions of the Pledge Agreement and adhere to all applicable provisions"

required under the CCDA Enabling Act and Hotel Occupancy Tax Act, and (ii) subject to the provisions of Article VI, Section 8 of the Puerto Rico Constitution, "defend, preserve and protect its title to the Trust Estate, the grant of the Trust Estate to the Trustee under this Trust Agreement and all the rights of the [CCDA bondholders] under this Trust Agreement against all claims and demands of all Persons whomsoever." *See* Trust Agreement §§ 6.01(k), 6.07. The Commonwealth agreed to "comply with the terms of" these covenants of CCDA. *See* 13 L.P.R.A. § 2271v; 23 L.P.R.A. § 6450.

65.     In light of these covenants, neither the Hotel Taxes nor the Pledged Hotel Taxes are property of the Commonwealth. Through the Hotel Occupancy Tax Act and the Trust Agreement, the Commonwealth transferred the power to impose and collect the Hotel Taxes to the Tourism Company. The Pledged Hotel Taxes are never transferred into any Commonwealth-owned or -controlled account. Thus, the Commonwealth exercises no control over the Pledged Hotel Taxes.

66.     Upon information and belief, there are other relevant documents that support Plaintiffs' claims. Plaintiffs and other creditors have specifically sought, and thus far have not received, documents relating to the Commonwealth's cash restriction analysis, Commonwealth assets, and transaction documents relevant to the Bond Documents and the Hotel Occupancy Tax Act. With a reasonable opportunity for discovery, Plaintiffs expect to uncover additional documents that will further support and bolster Plaintiffs' claims and allegations.

## III.     The Commonwealth's Failure to Comply With the Obligations of the Puerto Rico Constitution and PROMESA.

67.     The Tourism Company, GDB, and CCDA have violated their obligations under the Hotel Occupancy Tax Act and the Bond Documents. Although the CCDA bonds are subject to a provision of the Puerto Rico Constitution that allows the Pledged Hotel Taxes to be transferred to

holders of general obligation ("GO") bonds of the Commonwealth in certain limited circumstances, the circumstances that allow such transfers have never occurred.

68.     Nonetheless, acting pursuant to the Commonwealth's so-called police powers, Defendants have stopped the required transfers of Pledged Hotel Taxes under the Hotel Occupancy Tax Act and the Bond Documents.  Notably, the Oversight Board has never identified any valid basis, under the Puerto Rico Constitution or otherwise, for its invocation of the Commonwealth's police powers, and in any event governments cannot take private property, even pursuant to the police power, unless just compensation is paid.

### A.     The Pledged Hotel Taxes are Subject to Article VI, Section 8 of the Puerto Rico Constitution, Which Has Never Been Triggered.

69.     The Hotel Occupancy Tax Act and the Bond Documents provide that the assignment, transfer, and pledge of the Hotel Occupancy Tax Funds are made subject to the rights of the Commonwealth of Puerto Rico under Article VI, Section 8 of the Constitution of the Commonwealth of Puerto Rico ("Article VI, Section 8").  *See* 13 L.P.R.A. § 2271v(a)(4); *see also* Assignment Agreement § 11; Pledge Agreement § 2(b); Trust Agreement, Granting Clauses and § 5.01.

70.     Article VI, Section 8 provides that "[i]n case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. CONST. art. VI, § 8.

71.     The Hotel Occupancy Tax Act regulates the application of Article VI, Section 8 to the Pledged Hotel Taxes by specifying that the Commonwealth must first use any other "available resources" to pay GO bonds.  13 L.P.R.A. § 2271v(a)(4).  The Pledged Hotel Taxes can be used

*only* when all other "available resources" have been exhausted.  *Id.* (the Pledged Hotel Taxes can "be used solely for the payment of the interest and the amortization of the public debt . . . [and] only to the degree to which other available resources . . . are insufficient for such purposes."). "Otherwise, the [Pledged Hotel Taxes] shall be used solely for the payment of the principal and interest on the [CCDA] bonds."  *Id.*

72.     Thus, Pledged Hotel Taxes must be transferred to the CCDA bondholders unless the Commonwealth has applied every other available resource of the Commonwealth to the public debt, yet a portion of the public debt that has come due still remains unpaid.  *Id.*  Moreover, if Article VI, Section 8 is properly triggered, the Pledged Hotel Taxes may not be used for any purpose other than payment of GO bond debt.  *Id.*  However, the Commonwealth has not paid its GO debt since 2016 and has not used the Pledged Hotel Taxes for that purpose.  Consequently, it is clear that the Commonwealth is not diverting the Pledged Hotel Taxes pursuant to Article VI, Section 8.

73.     Furthermore, even if Article VI, Section 8 is properly triggered, the Commonwealth is required to reimburse CCDA bondholders for the unpaid Pledged Hotel Taxes from the "first revenues" of the excess Hotel Taxes collected in subsequent years.  *See id.* (if any Pledged Hotel Taxes are "used to service payments of the public debt . . . the amounts . . . used to cover said deficiency shall be reimbursed to [CCDA] out of the first revenues received in the next fiscal year or subsequent fiscal years . . . from any remaining portion of the tax then in effect").

74.     Therefore, to the extent the Commonwealth has any right to the Pledged Hotel Taxes, it is merely a contingent right to temporarily redirect those funds to pay the public debt in the limited circumstances detailed above.

### B.    The Commonwealth Enacts Unconstitutional Legislation and Issues Unconstitutional Executive Orders.

75.     In late 2015, the Governor of the Commonwealth issued a series of executive orders (the "Clawback Orders") mandating the "clawback" of revenues pledged to secure the bonds of certain Puerto Rico public corporations, including CCDA bonds.

76.     After the Clawback Orders were issued, Puerto Rico's Legislative Assembly passed the Puerto Rico Emergency Moratorium and Rehabilitation Act (the "Moratorium Act"), which declared a state of emergency for the Commonwealth and its instrumentalities, and purported to authorize the Governor to default on certain bond obligations and to reorder constitutional and statutory payment priorities.  The Governor then issued a new series of executive orders (the "Moratorium Orders") that suspended the flow of funds and stayed all creditor remedies.

77.     On January 29, 2017, two days before the Moratorium Act was set to expire, the legislature passed the Puerto Rico Financial Emergency and Fiscal Responsibility Act (the "Amended Moratorium Act," and together with the Moratorium Act and the Moratorium Orders, the "Moratorium Legislation").  *See* Amended Moratorium Act, Statement of Motives.

78.     The Amended Moratorium Act superseded any laws that were inconsistent with it. *Id.* § 203(a).  It also explicitly repealed certain sections of the Moratorium Act—but then replaced them with functionally identical provisions.  *See id.* §§ 201–03, 206, 208, 211, 301.  Further, the Amended Moratorium Act expressly declared that the Moratorium Orders  "shall continue in full force and effect until amended, rescinded or superseded [by the Governor]." *Id.* § 208(e).

79.     Unlike the Clawback Orders, the Moratorium Legislation did not even purport to be authorized under Article VI, Section 8.  In any event, the Clawback Orders and Moratorium Legislation did not comply with the requirements of Article VI, Section 8 for at least two independent reasons:

80.  *First*, at the time of the Clawback Orders and Moratorium Legislation (and at all times before and thereafter), there have been sufficient "available resources" to pay the "interest on the public debt and amortization thereof." Because other available resources were sufficient to pay the GO bondholders, the Pledged Hotel Taxes could not lawfully be used for this purpose.

81.  Upon information and belief, the Commonwealth currently has available resources of at least $8.7 billion in cash in the Treasury Single Account. *See* Puerto Rico Department of Treasury: Treasury Single Account ("TSA") FY 2020 Cash Flow, as of Dec. 27, 2019, at 5, available at http://www.aafaf.pr.gov/reports.html.  Upon information and belief, this is sufficient to pay the amount currently owed on the GO bonds in full. Accordingly, there is no deficiency in the amount of available resources today, nor has there ever been any deficiency in the amount needed to pay GO bondholders. *See* 2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity, at 25-26 (May 9, 2019), *available at* https://oversightboard.pr.gov/documents/. Indeed, the Commonwealth is currently operating with a budgetary surplus, not a shortfall, underscoring that Defendants cannot show that Article VI, Section 8 has been triggered. Furthermore, the Commonwealth has not paid its GO debt since 2016 and has not used the Pledged Hotel Taxes for that purpose. Consequently, it is clear that the Commonwealth is not diverting the Pledged Hotel Taxes pursuant to Article VI, Section 8.

82.  *Second*, at least one of the Clawback Orders (OE-2015-046) and one of the Moratorium Orders (EO-2016-31) purported to require the Tourism Company to transfer the Pledged Hotel Taxes to the Commonwealth Treasury—but the Pledged Hotel Taxes were not then paid to GO bondholders, which is the only circumstance in which Article VI, Section 8 would allow Pledged Hotel Taxes to be diverted from CCDA bondholders. The Commonwealth instead either simply retained the funds or allowed the funds to be used for junior unsecured debts and

general expenses of the Commonwealth. *See* Administrative Bulletin OE-2015-046; Administrative Bulletin EO-2016-31.

### C.   PROMESA Becomes Law.

83.   On June 30, 2016, President Obama signed PROMESA into law. PROMESA established the Oversight Board, which is intended "to provide a method for a covered territory [including the Commonwealth] to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. §§ 2121(a), (b)(1). PROMESA also provided for an optional court-supervised restructuring process modeled loosely on Chapter 9 of the Bankruptcy Code in Title III of PROMESA ("Title III").

84.   The Oversight Board has not commenced Title III proceedings on behalf of CCDA or the Tourism Company. Thus, neither CCDA nor the Tourism Company is a Title III debtor.

85.   In addition to establishing the Oversight Board and providing an optional restructuring process for the Commonwealth and its instrumentalities, PROMESA also expressly preempted certain laws and executive orders. Specifically, Section 303 of PROMESA provided that no territory moratorium law nor other territory law "prescribing a method of composition of indebtedness" may bind non-consenting creditors. 48 U.S.C. § 2163(1). PROMESA further preempted "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality or that divert funds from one territorial instrumentality to another or to the territory." *Id.* § 2163(3).

86.   Section 303 of PROMESA expressly preempted the Clawback Orders and the Moratorium Legislation.

87.   *First*, Section 303(3) of PROMESA expressly preempted the Clawback Orders and Moratorium Orders. The Clawback Orders are executive orders that modify the rights of bondholders, including CCDA bondholders, by unlawfully diverting funds from one territorial

instrumentality to the Commonwealth.  The Clawback Orders are unlawful because they violate Article VI, Section 8, enabling statutes such as the Hotel Occupancy Tax Act, and/or the Bond Documents.  The Clawback Orders also violate the Contracts, Takings, and Due Process Clauses of the U.S. Constitution.

88.     *Second*, Section 303(1) expressly preempted the Moratorium Legislation.  The Moratorium Legislation suspended the payment of certain debt obligations and effectively authorized a postponement of the deadline for payment of principal and interest on a debt, which "bind" the Commonwealth's creditors by making it impossible for them to recover monies owed to them during the period of the moratorium.

89.     Finally, Section 407 of PROMESA made transferees of the pledged revenues liable for the value of that transfer, providing that "if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property."  *Id.* § 2195(a).

90.     Beginning on July 3, 2017, under color of the unlawful Moratorium Orders and the Moratorium Legislation, payments on the CCDA bonds to CCDA bondholders were not made as required under the Hotel Occupancy Tax Act and Bond Documents.  Only a portion of the required payment was made on that date, and no payments have been made since then.

**IV.     Defendants Have Violated the Applicable Agreements and Statutes.**

    **A.     An Event of Default Has Occurred.**

91.     The Trust Agreement defines an Event of Default as, among other things, "[a]ny breach of covenants or requirements described in the Assignment Agreement or the Pledge Agreement." *See id.* § 7.01(c).

92.     An Event of Default under Section 7.01(c) of the Trust Agreement has occurred. The Tourism Company, GDB, and/or CCDA have failed to comply with their obligations to complete all of the transfers required under the Hotel Occupancy Tax Act and the Bond Documents.

93.     The Tourism Company has failed to comply with the Assignment Agreement by failing to transfer to GDB the Pledged Hotel Taxes, in contravention of its obligations under the Hotel Occupancy Tax Act and the Bond Documents. *See* Assignment Agreement § 5; 13 L.P.R.A. § 2271v(a)(4) ("[T]he product of said collection, in the amount necessary, [*i.e.*, the Debt Service Amount] shall be used solely for the payment of the principal and interest on the bonds.").

94.     The Tourism Company has failed to comply with its obligation under the Hotel Occupancy Tax Act to "distribute all funds collected from the [Hotel Tax] imposed under § 2271*o* of this title," by having the Debt Service Amount "deposited in a special account [] maintained by [GDB] in the name of [CCDA] for the benefit of the [CCDA] bondholders." *See* 13 L.P.R.A. § 2271v(a)(4) ("[T]he product of said collection, in the amount necessary, [*i.e.*, the Debt Service Amount] shall be used solely for the payment of the principal and interest on the bonds.").

95.     GDB has failed to comply with its obligation under the Pledge Agreement, "to deposit or cause to be deposited into the [GDB Special Trust Account], all Hotel Occupancy Tax Funds received from the Tourism Company as received." Pledge Agreement § 3(a).

96. GDB has failed to comply with its obligation under the Pledge Agreement to "diligently enforce its rights under the Assignment Agreement including its enforcement of the [Pledged Hotel Taxes] transfer obligation of the [Tourism] Company." *Id.* § 5(b).

97. GDB has failed to comply with its obligation under the Hotel Occupancy Tax Act to transfer the Debt Service Amount from the GDB Special Trust Account to the CCDA Bond Trustee for distribution to the CCDA bondholders. 13 L.P.R.A. § 2271v(a)(4) (GDB "shall transfer the amounts deposited in such [GDB Special Trust Account] to the trustees of the [CCDA] bondholders.").

98. CCDA has failed to comply with its obligations under the Trust Agreement to (i) "enforce all terms and conditions of the Pledge Agreement and adhere to all applicable provisions" required under the CCDA Enabling Act and Hotel Occupancy Tax Act, and (ii) "defend, preserve and protect its title to the Trust Estate, the grant of the Trust Estate to the Trustee under this Trust Agreement and all the rights of the [CCDA bondholders] under this Trust Agreement against all claims and demands of all Persons whomsoever." *See* Trust Agreement §§ 6.01(k), 6.07.

99. Defendants Omar Marrero, in his capacity as the Executive Director of CCDA, Carla G. Campos Vidal, in her capacity as the Executive Director of the Tourism Company, and Julian Bayne Hernandez, in his capacity as GDB CFO ("Individual Defendants") caused the Tourism Company, GDB, and CCDA to breach the Hotel Occupancy Tax Act and the Bond Documents, as set forth above.

100. Finally, any purported modification of the Assignment Agreement, under which the flow of funds described herein was changed, was not approved by CCDA bondholders, and

therefore, would constitute a breach of the Assignment Agreement and Trust Agreement.  *See* Assignment Agreement § 14; Trust Agreement § 9.04.

101.    The Trust Agreement further defines as an Event of Default a "[d]efault in the payment of any portion of the Bond Payments on, or Redemption Price of, any Bond when due." *See* Trust Agreement § 7.01(a).

102.    An Event of Default under Section 7.01(a) of the Trust Agreement has occurred. Bond payments were not made as required on July 3, 2017, January 2, 2018, July 2, 2018, January 2, 2019, July 1, 2019, and January 1, 2020.

103.    Ambac insures approximately $99.955 million in gross par of CCDA bonds currently outstanding.  As a result of these defaults, Ambac has been required to pay out claims totaling approximately $51.7 million in accordance with its respective policies.

104.    FGIC insures approximately $97.075 million in gross par of CCDA bonds currently outstanding.  FGIC has received approximately $12 million in claims under its policies insuring CCDA bonds and has made payments to CCDA bondholders in respect of such claims in accordance with its respective policies.[2]

105.    Assured insures approximately $152 million in gross par of CCDA bonds currently outstanding.  As a result of defaults on the CCDA bonds, Assured has been required to pay out claims totaling approximately $17.6 million in accordance with its respective policies.

---

[2] Unless the context otherwise requires, references herein to FGIC's policies or insurance policies means those policies as modified by the First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013 (together with the Plan Supplement (as defined therein) and all exhibits thereto, including the Restructured Policy Terms (as defined therein), as approved by the Supreme Court of the State of New York in connection with the rehabilitation proceeding captioned *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012.

**B.      Plaintiffs are Entitled to a Writ of Mandamus and Other Remedies Upon Default.**

106.    The Trust Agreement explicitly authorizes several remedies following an Event of Default, including permitting the Trustee, "by mandamus or other action or proceeding or suit at law or in equity," to enforce any of its rights under the Trust Agreement, Assignment Agreement, and/or Pledge Agreement, against CCDA, the Tourism Company, or GDB, and to compel CCDA, the Tourism Company, or GDB to perform or carry out its duties under the law and the agreements and covenants required to be performed by it under the Trust Agreement, Assignment Agreement, and/or Pledge Agreement.  *See id.* §§ 7.02(b)–(d).

107.    Under the First Supplemental Trust Agreement, Ambac is deemed to be a third-party beneficiary of the Bond Documents and may enforce any right, remedy, or claim granted under the Trust Agreement.  *See* First Supplemental Trust Agreement § 15(s).  Pursuant to the First Supplemental Trust Agreement, Ambac is entitled to "control and direct the enforcement of all rights and remedies granted to the Ambac Owners or the Trustee for the benefit of the Ambac Owners" under the Trust Agreement.  *See* First Supplemental Trust Agreement § 15(d).

108.    The First Supplemental Trust Agreement deems FGIC to be "the sole holder of the FGIC Insured Bonds" for "all purposes of the Trust Agreement provisions governing events of default and remedies[.]"  *See* First Supplemental Trust Agreement § 17(d).  FGIC, as the sole holder of the FGIC Insured Bonds, has the right to institute any action permitted under Commonwealth law to enforce payments as provided in the Trust Agreement.  Trust Agreement § 7.02(a)(ii).  FGIC is also subrogated to the rights of the CCDA bonds it insures to the extent it makes payment on the CCDA bonds.  *Id.* § 17(m)(3).  FGIC is entitled to be reimbursed by CCDA for any and all charges, fees, costs, and expenses that it reasonably incurs in connection with the following, among other circumstances: (i) the administration, enforcement, defense, preservation

or any rights or security under the Bond Documents, (ii) the pursuit of its remedies under the Bond Documents, (iii) the violation by CCDA of any law, rule, regulation, or judgment, (iv) any advances or payments made by FGIC to cure defaults of CCDA, and (v) any litigation or other dispute related to the Bond Documents.  *Id*. § 17(l).

109.    Under the First Supplemental Trust Agreement, Assured is deemed to be a third-party beneficiary and may enforce any right, remedy, or claim granted under the Trust Agreement.  *See* First Supplemental Trust Agreement § 16(j).  Pursuant to the First Supplemental Trust Agreement, Assured is entitled to "control and direct the enforcement of all rights and remedies granted to the [Assured] Owners or the Trustee for the benefit of the [Assured] Owners" under the Trust Agreement.  *See* First Supplemental Trust Agreement § 16(n).

### C.    Any Demand for Compliance With the Hotel Occupancy Tax Act and the Bond Documents Would be Futile.

110.    Any requirement of a pre-suit demand is excused, as any demand on Defendants to comply with the Hotel Occupancy Tax Act or the Bond Documents would be futile, vain, and useless.  Defendants have willfully, knowingly, and intentionally violated their legal duties under the Hotel Occupancy Tax Act and the Bond Documents, and have shown that they will not comply with them absent judicial intervention.

111.    Defendants are biased and have predetermined the disputed issues, such that any pre-suit demand would be futile, as is clearly shown in the following ways:

112.    *First*, the Fiscal Plan developed by the Oversight Board does not allow for payments on the CCDA bonds.  This means that the Oversight Board has effectively taken the position that CCDA is prohibited from paying its debts, even if CCDA were inclined to do so (which it plainly is not).  The recently filed Plan of Adjustment, which does not provide for payment of the CCDA bonds from the Pledged Hotel Taxes diverted from CCDA bondholders,

further illustrates that Defendants have no intentions to comply with the requirements under the Hotel Occupancy Tax Act or the Bond Documents at any point in the future, unless ordered to do so by the Court.

113.    *Second,* Defendants have been on notice of Plaintiffs' allegations concerning the unlawfulness of their conduct for many years, and have shown no inclination to alter their conduct in any way.   On January 7, 2016, Ambac and Assured filed a lawsuit against officials at the Tourism Company and GDB, among others, alleging that the Clawback Orders constituted a misappropriation and diversion of the Pledged Hotel Taxes, and seeking to enjoin the defendants from taking any actions pursuant to the Clawback Orders.  *See Assured Guaranty Corp., et al. v. Garcia Padilla, et al.*, No. 16-cv-1037-FAB (D.P.R.).  The defendants in that matter opposed the lawsuit by filing a motion to dismiss based exclusively on sovereign immunity, which was denied by the court on October 4, 2016.   The matter was stayed upon the filing of the enactment of PROMESA on June 30, 2016.

114.    *Third*, the proofs of claim filed by Plaintiffs, including by the CCDA Bond Trustee, in the Commonwealth's Title III proceeding further establish that Defendants have been on notice of Plaintiffs' allegations that the CCDA bondholders were deprived of their rights under the Bond Documents and the Hotel Occupancy Tax Act.  *See* Proofs of Claim Nos. 37319, 50420, 83010, 122277.  The Oversight Board, which has oversight of the finances of the Tourism Company, GDB, and CCDA, has indicated that it plans to object to those Proofs of Claim.

**D.    There is No Defense to the Default.**

115.    There is no constitutional or statutory authority that excuses Defendants' failure to make payments on the CCDA bonds.

116.    As discussed above, the Clawback Orders and Moratorium Orders are unlawful executive orders that alter, amend, or modify rights of debtholders.  For example, the Clawback

Orders and Moratorium Orders effectively destroy the rights of CCDA bondholders by diverting the Pledged Hotel Taxes from the Tourism Company to the Department of Treasury.  These executive orders are expressly preempted by Section 303 of PROMESA, and therefore provide no excuse for Defendants' failure to comply with their obligations under the Hotel Occupancy Tax Act and the Bond Documents.

117.    Further, the Moratorium Legislation consists of moratorium laws that purport to establish a period of delay in the payment of debt and "bind" the Commonwealth's creditors by making it impossible for them to recover monies owed to them during the period of the moratorium.  These moratorium laws are expressly preempted by Section 303 of PROMESA, and therefore provide no excuse for Defendants' failure to comply with their obligations under the Hotel Occupancy Tax Act and the Bond Documents.

118.    In addition, Article VI, Section 8 does not provide any basis for Defendants to cease making payments on the CCDA bonds, as alleged above.  *See supra* Section III.A.

119.    Further, the Tourism Company is reportedly in possession of $135 million.  *See* Summary of Cash Restriction Analysis, dated October 2, 2019, at Appendix C, *available at* https://emma.msrb.org/MarketActivity/ContinuingDisclosureDetails/ES1009622. Upon information and belief, some or all of these funds are equitably owned by the CCDA bondholders, and are held in trust for them, but have not been transferred to the CCDA Bond Trustee, as required by the Hotel Occupancy Tax Act and the Bond Documents.

120.    Thus, Defendants' failure to repay the CCDA bonds is in clear violation of their obligations under the Bond Documents and the Hotel Occupancy Tax Act.

## FIRST CLAIM FOR RELIEF

**(For Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202
Against All Defendants)**

121.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 120 hereof, as if fully set forth herein.

122.    The CCDA bondholders are the equitable owners of the Pledged Hotel Taxes and have a lien on the legal title granted to the Tourism Company, GDB, and CCDA in the Pledged Hotel Taxes.

123.    The CCDA Bond Trustee, on behalf of the CCDA bondholders, has a lien on the legal title granted to the Tourism Company, GDB, and CCDA in the Pledged Hotel Taxes.

124.    By covenanting that CCDA bondholders' rights to the Pledged Hotel Taxes would not be impaired, the Commonwealth agreed that it would be bound by the Bond Documents, which grant the CCDA Bond Trustee, on behalf of the CCDA bondholders, a lien on all Pledged Hotel Taxes that should have been deposited into the GDB Special Trust Account.

125.    Accordingly, the CCDA Bond Trustee, on behalf of the CCDA bondholders, has a lien on the legal title to the Pledged Hotel Taxes that should have been deposited into the Transfer Account and GDB Special Trust Account.

126.    The Tourism Company, GDB, CCDA, and the Individual Defendants have failed to comply with their obligations under the Hotel Occupancy Tax Act and the Bond Documents, and in particular, have failed to make the required transfers of Pledged Hotel Taxes as set forth therein.

127.    If the Tourism Company, GDB, CCDA, and the Individual Defendants continue to fail to comply with the Hotel Occupancy Tax Act and the Bond Documents, then such continued violations of law and contract will result in imminent and irreparable harm to Plaintiffs by reducing

the amount of collateral securing the CCDA bonds and causing continued payment defaults on the CCDA bonds.

128.    Accordingly, Plaintiffs are entitled to injunctive relief preventing all Defendants from depleting the amount of collateral securing the CCDA bonds in their possession and causing payment defaults on the CCDA bonds.

129.    In addition or in the alternative, Plaintiffs are entitled to a declaration as follows:

    a.    The Tourism Company and the Tourism Company Executive Director are required to (i) deposit the Debt Service Amount as received into the Transfer Account; and (ii) transfer the Debt Service Amount to the GDB Special Trust Account, as provided in the Hotel Occupancy Tax Act and Assignment Agreement.

    b.    The GDB and the GDB CFO are required to (i) deposit or cause to be deposited into the GDB Special Trust Account all Hotel Occupancy Tax Funds, as provided in the Pledge Agreement; (ii) diligently enforce its rights under the Assignment Agreement, including its enforcement of the Pledged Hotel Taxes transfer obligation of the Tourism Company, as provided in the Pledge Agreement; and (iii) transfer the Debt Service Amount from the GDB Special Trust Account to the CCDA Bond Trustee for distribution to the CCDA bondholders, as provided in the Hotel Occupancy Tax Act and Trust Agreement.

    c.    CCDA and the CCDA Executive Director are required to make sure that the Pledged Hotel Taxes are deposited in the Transfer Account and the GDB Special Trust Account, as provided in the Hotel Occupancy Tax Act and Trust Agreement.

## SECOND CLAIM FOR RELIEF

### (For Breach of Contract Against the Tourism Company, GDB, and CCDA)

130.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 120 hereof, as if fully set forth herein.

131.    A series of interrelated agreements were executed to implement the requirements of the Hotel Occupancy Tax Act and to transfer and pledge the Hotel Taxes to payment of the CCDA bonds, specifically, (i) the Assignment Agreement, (ii) the Pledge Agreement, and (iii) the Trust Agreement.

132.    By failing to comply with its obligations under the Hotel Occupancy Tax Act to transfer to GDB the monthly Debt Service Amount, the Tourism Company has breached the Bond Documents. *See* Assignment Agreement § 5.

133.    By failing to "deposit or cause to be deposited into the Pledge Account, all Hotel Occupancy Tax Funds received from the Tourism Company as received," GDB has breached the Bond Documents. *See* Pledge Agreement §3(a).

134.    By failing to "diligently enforce its rights under the Assignment Agreement including its enforcement of the [Pledged Hotel Taxes] transfer obligation of the [Tourism] Company," GDB has breached the Bond Documents. *See id.* §5(b).

135.    By violating its assignment and pledge of the Pledged Hotel Taxes to CCDA Bond Trustee for the benefit of the CCDA bondholders, CCDA has breached the Bond Documents. Trust Agreement, Granting Clauses and § 5.01.

136.    By violating its covenant to (i) "enforce all terms and conditions of the Pledge Agreement and adhere to all applicable provisions" required under the CCDA Enabling Act and Hotel Occupancy Tax Act, and (ii) "defend, preserve and protect its title to the Trust Estate, the grant of the Trust Estate to the Trustee under this Trust Agreement and all the rights of the [CCDA bondholders] under this Trust Agreement against all claims and demands of all Persons whomsoever," CCDA has breached the Bond Documents. *See id.* §§ 6.01(k), 6.07.

137.    The breaches of the Hotel Occupancy Tax Act and the Bond Documents have injured Plaintiffs by reducing the amount of collateral securing the CCDA bonds and causing payment defaults on the CCDA bonds, requiring Monoline Plaintiffs to pay at least $81.3 million in claims to CCDA bondholders on the governing financial guaranty insurance policies.

138.    Plaintiffs are entitled to damages resulting from these breaches in an amount equal to at least $81.3 million.

### THIRD CLAIM FOR RELIEF

**(For Order of Mandamus, as provided in Section 7.02(d) of the Trust Agreement, Against the Tourism Company, GDB, CCDA, and the Individual Defendants)**

139.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 120 hereof, as if fully set forth herein.

140.    The CCDA bondholders are the equitable owners of the Pledged Hotel Taxes and have a lien on the legal title granted to the Tourism Company, GDB, and CCDA in the Pledged Hotel Taxes.

141.    The Tourism Company, GDB, and CCDA have failed to comply with their obligations under the Hotel Occupancy Tax Act and the Bond Documents.

142.    In addition, the Tourism Company Executive Director, the GDB CFO, and the CCDA Executive Director each have the authority and obligation to direct officials at the Tourism Company, GDB, and CCDA, respectively, to comply with the requirements of the Hotel Occupancy Tax and the Bond Documents.  These Individual Defendants have failed to carry out their legal duties under the Hotel Occupancy Tax Act and the Bond Documents and have caused the respective entities they control to violate their obligations.

143.    There is no other remedy of law adequate to redress Defendants' unlawful conduct.

144.    Any attempt to make a pre-suit demand on the Individual Defendants to comply with the Bond Documents and the Hotel Occupancy Tax Act would be futile, and any requirement of demand, therefore, is excused as a matter of law.

145.    Plaintiffs are entitled to an order of mandamus as follows:

a.         Directing the Tourism Company and the Tourism Company Executive

Director to (i) deposit the Debt Service Amount as received into the Transfer Account; and (ii) transfer the Debt Service Amount to the GDB Special Trust Account, as provided in the Hotel Occupancy Tax Act and Assignment Agreement;

b.      Directing GDB and the GDB CFO to (i) deposit or cause to be deposited into the GDB Special Trust Account all Hotel Occupancy Tax Funds, as provided in the Hotel Occupancy Tax Act and the Pledge Agreement; (ii) diligently enforce its rights under the Assignment Agreement, including its enforcement of the Pledged Hotel Taxes transfer obligation of the Tourism Company, as provided in the Pledge Agreement; and (iii) transfer the Debt Service Amount from the GDB Special Trust Account to the CCDA Bond Trustee for distribution to the CCDA bondholders, as provided in the Hotel Occupancy Tax Act, the Trust Agreement, and the Pledge Agreement.

c.      Directing CCDA and the CCDA Executive Director to make sure that the Pledged Hotel Taxes are deposited in the Transfer Account and the GDB Special Trust Account, as provided in the Hotel Occupancy Tax Act and Trust Agreement.

## FOURTH CLAIM FOR RELIEF

### (For Unjust Enrichment Against the Tourism Company, GDB, and CCDA)

146.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 120 hereof, as if fully set forth herein.

147.    The Tourism Company has failed to transfer to GDB the monthly amounts required to make all debt service payments and other required payments on the CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

148.    In addition or in the alternative, GDB has failed to transfer to the CCDA Bond Trustee the monthly amounts required to make all debt service payments and other required payments on the CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

149.    In addition or in the alternative, CCDA has failed to ensure the transfer of the monthly amounts required to make all debt service payments and other required payments on the

CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

150.     As a result of the foregoing conduct, the Tourism Company, GDB, and/or CCDA have received millions of dollars, and have been unjustly enriched at the expense of Plaintiffs.

151.     As alleged above, the Tourism Company, GDB, and/or CCDA are not entitled to any benefits at the expense of Plaintiffs.

152.     As a direct and proximate result of the Tourism Company's, GDB's, and/or CCDA's actions, Plaintiffs have been damaged in the sum of at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

## FIFTH CLAIM FOR RELIEF

### (For Conversion Against the Tourism Company, GDB, and CCDA)

153.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 120 hereof, as if fully set forth herein.

154.     The Tourism Company has knowingly and intentionally failed to transfer to GDB the monthly amounts required to make all debt service payments and other required payments on the CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

155.     In addition or in the alternative, GDB has knowingly and intentionally failed to transfer to the CCDA Bond Trustee the monthly amounts required to make all debt service payments and other required payments on the CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

156.     In addition or in the alternative, CCDA has knowingly and intentionally failed to ensure the transfer of the monthly amounts required to make all debt service payments and other

required payments on the CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

157.    The Tourism Company, GDB, and/or CCDA have knowingly and intentionally asserted dominion and control over the monthly amounts required to make all debt service payments and other required payments on the CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

158.    The Tourism Company, GDB, and/or CCDA have converted the monthly amounts required to make all debt service payments and other required payments on the CCDA bonds, including at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs, without authorization from Plaintiffs and without any valid claim of title or right.   Upon information and belief, the Tourism Company, GDB, and/or CCDA are now in knowing and intentional possession of said amounts.

159.    The actions of the Tourism Company, GDB, and/or CCDA in improperly seizing said amounts is an actionable tort under 31 L.P.R.A. § 5141, and Plaintiffs are entitled to damages against the Tourism Company, GDB, and/or CCDA for at least $81.3 million in claims to CCDA bondholders insured by Monoline Plaintiffs.

160.    The Tourism Company, GDB, and/or CCDA have damaged Plaintiffs in the total amount of at least $81.3 million for its unlawful seizure of the amounts and is liable to Plaintiffs for that amount under Puerto Rico law.

## SIXTH CLAIM FOR RELIEF

### (For Violation of PROMESA § 407 Against the Tourism Company, GDB, and CCDA)

161.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 hereof, as if fully set forth herein.

162.   The CCDA bondholders have a lien on the legal title granted to the Tourism Company, GDB, and CCDA in the Pledged Hotel Taxes.

163.   The Pledged Hotel Taxes have been transferred to the Tourism Company in violation of applicable law, including Article VI, Section 8, the CCDA Enabling Act, the Hotel Occupancy Tax Act, and 31 L.P.R.A. § 5141.

164.   In addition or in the alternative, the Tourism Company has diverted and transferred the Pledged Hotel Taxes, in violation of applicable law, including Article VI, Section 8, the CCDA Enabling Act, the Hotel Occupancy Tax Act, and 31 L.P.R.A. § 5141.

165.   In addition or in the alternative, GDB has diverted and transferred the Pledged Hotel Taxes, in violation of applicable law, including Article VI, Section 8, the CCDA Enabling Act, the Hotel Occupancy Tax Act, and 31 L.P.R.A. § 5141.

166.   In addition or in the alternative, CCDA has diverted and transferred the Pledged Hotel Taxes, in violation of applicable law, including Article VI, Section 8, the CCDA Enabling Act, the Hotel Occupancy Tax Act, and 31 L.P.R.A. § 5141.

167.   Pursuant to Section 407 of PROMESA, the Tourism Company, GDB, and/or CCDA are liable for the value of the Pledged Hotel Taxes transferred to the Tourism Company, GDB, and/or CCDA.

## **RELIEF DEMANDED**

WHEREFORE Plaintiffs respectfully requests that the Court enter judgment against Defendants as follows:

1.   A Declaration that the Defendants are required to comply with their obligations under the Hotel Occupancy Tax Act and the Bond Documents, as set forth above;

2.   An Injunction precluding the Defendants from taking any action that would violate Defendants' obligations under the Hotel Occupancy Tax Act and the Bond Documents, as set forth above;

3.      An award to Plaintiffs of damages resulting from the breaches of the Bond
        Documents by the Tourism Company, GDB, and CCDA;

4.      A Writ of Mandamus ordering the Defendants to comply with their obligations
        under the Hotel Occupancy Tax Act and the Bond Documents, as set forth above;

5.      An award to Plaintiffs of damages resulting from the unjust enrichment of the
        Tourism Company, GDB, and/or CCDA;

6.      An award to Plaintiffs of damages resulting from the conversion of the monthly
        amounts required to make all debt service payments and other required payments
        on the CCDA bonds by the Tourism Company, GDB, and/or CCDA;

7.      An award to Plaintiffs of damages in an amount equal to the value of the Pledged
        Hotel Taxes resulting from the Tourism Company's, GDB's, and/or CCDA's
        violations of Section 407 of PROMESA; and

8.      Such other and further relief as this Court may deem just and proper.

Dated:  January 16, 2020
          San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ DRAFT
     Roberto Cámara-Fuertes (USDC-PR No.
     219002)
     Sonia Colón (USDC-PR No. 213809)
     221 Ponce de León Avenue, 5th Floor
     San Juan, PR 00917
     Telephone: (787) 766-7000
     Facsimile: (787) 766-7001
     Email: rcamara@ferraiuoli.com
         scolon@ferraiuoli.com

**REXACH & PICÓ, CSP**

By: /s/ DRAFT
     María E. Picó
     (USDC-PR No. 123214)
     802 Ave. Fernández Juncos
     San Juan, PR 00907-4315
     Telephone: (787) 723-8520
     Facsimile: (787) 724-7844
     Email: mpico@rexachpico.com

**MILBANK LLP**

By: /s/ DRAFT
     Dennis F. Dunne (admitted *pro hac vice*)
     Atara Miller (admitted *pro hac vice*)
     Grant R. Mainland (admitted *pro hac vice*)
     John J. Hughes, III (admitted *pro hac vice*)
     55 Hudson Yards
     New York, NY 10001
     Telephone: (212) 530-5000
     Facsimile: (212) 530-5219
     Email: ddunne@milbank.com
         amiller@milbank.com
         gmainland@milbank.com
         jhughes2@milbank.com

**BUTLER SNOW LLP**

By: /s/ DRAFT
     Martin A. Sosland (admitted *pro hac vice*)
     5430 LBJ Freeway, Suite 1200
     Dallas, TX 75240
     Telephone: (469) 680-5502
     Facsimile: (469) 680-5501
     Email: martin.sosland@butlersnow.com
     Jason W. Callen (admitted *pro hac vice*)
     150 3rd Ave., S., Suite 1600
     Nashville, TN 37201
     Telephone: (615) 651-6774
     Facsimile: (615) 651-6701
     Email: jason.callen@butlersnow.com

*Attorneys for Ambac Assurance Corporation*

*Attorneys for Financial Guaranty Insurance Company*

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ DRAFT
    Heriberto Burgos Pérez
    USDC-PR 204809
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**SEPULVADO, MALDONADO & COURET**

By: /s/ DRAFT
    Albéniz Couret Fuentes
    (USDC-PR No. 222207)
    304 Ponce de León Ave. Suite 990
    San Juan, PR 00918
    Telephone:  (787) 765-5656
    Facsimile: (787) 294-0073
    Email: acouret@smclawpr.com

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ DRAFT
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted pro hac vice)
    William J. Natbony (admitted *pro hac vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.comp

***Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.***

**REED SMITH LLP**

By: /s/ DRAFT
    Eric A. Schaffer (admitted *pro hac vice*)
    Luke A. Sizemore (admitted *pro hac vice*)
    Jared S. Roach (admitted *pro hac vice*)
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222
    Telephone:  (412) 288-3131
    Facsimile:   (412) 288-3063
    Email: eschaffer@reedsmith.com
        lsizemore@reedsmith.com
        jroach@reedsmith.com

***Attorneys for The Bank of New York Mellon***