# EXHIBIT 8

# *"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico"*

Ley Núm. 21 de 6 de Abril de 2016, según enmendada

(Contiene enmiendas incorporadas por las siguientes leyes:
Ley Núm. 40 de 5 de Mayo de 2016
Ley Núm. 68 de 12 de Julio de 2016
Ley Núm. 2 de 18 de Enero de 2017
Ley Núm. 5 de 29 de Enero de 2017)

Para crear la "Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico"; para disponer la declaración de un estado de emergencia fiscal por la Asamblea Legislativa; para instaurar los procesos de declaración, establecimiento y condiciones del periodo de emergencia, según definido por esta Ley, para el Banco o cualquier otra entidad gubernamental, según definidos ambos términos por esta Ley, y disponer las facultades del Gobernador del Estado Libre Asociado de Puerto Rico; para realizar enmiendas a la Ley Orgánica del Banco Gubernamental de Fomento para Puerto Rico, Ley Núm. 17 de 23 de septiembre de 1948, según enmendada, a los fines de reenumerar los Artículos 12 al 21 como Artículos 15 al 24, y añadir nuevos Artículos 12 y 13, para modificar el proceso de nombramiento de un síndico; para añadir un nuevo Artículo 14 a la Ley Núm. 17 de 23 de septiembre de 1948, supra, a los fines de permitir la organización y operación de un banco puente; para enmendar la Cuarta Parte del Artículo 2 de la Ley Núm. 17 de 23 de septiembre de 1948, supra, para modificar las disposiciones en torno a las subsidiarias del Banco Gubernamental de Fomento para Puerto Rico para crear la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, una nueva corporación pública e instrumentalidad pública del Estado Libre Asociado de Puerto Rico, que actuará como agente fiscal, asesor financiero y agente informativo del Estado Libre Asociado de Puerto Rico, sus corporaciones públicas, instrumentalidades y municipios; para enmendar el Artículo 11 de la Ley Núm. 22 de 24 de julio de 1985, según enmendada, correspondiente a la Ley Orgánica del Banco de Desarrollo Económico para Puerto Rico, a los fines de modificar las disposiciones sobre el nombramiento de un síndico; y para otros fines relacionados.

Parte I –

EXPOSICIÓN DE MOTIVOS

## A. Introducción

La crisis fiscal del Gobierno de Puerto Rico ha llegado al momento más crítico en la historia. No obstante las medidas abarcadoras y sin precedente que ha puesto en vigor esta Administración en los pasados tres (3) años para reencaminar al Estado Libre Asociado de Puerto Rico (el "ELA" o "Puerto Rico") hacia la recuperación económica y la sostenibilidad fiscal, la falta de acceso a los mercados de capital, el elevado nivel de deuda, y el deteriorado clima económico que persiste, han

llevado a las finanzas del Gobierno de Puerto Rico a un punto de inflexión. Esta Administración ha realizado múltiples esfuerzos para continuar con el pago de las obligaciones generales del ELA, así como del pago de las deudas de otras instrumentalidades, mientras se continuaban brindando servicios esenciales.  Sin embargo, la escasez en los recursos y la limitada liquidez, amenazan con obligar al Gobierno de Puerto Rico a tener que escoger entre honrar compromisos con nuestros acreedores o continuar proveyendo servicios básicos y esenciales al pueblo de Puerto Rico.

La obligación primordial de todo gobierno es, en primer lugar, su deber para con el pueblo a quien sirve y a quien responde.  Por ende, la obligación legal y moral del ELA de proveer para el bienestar del pueblo de Puerto Rico, es, necesariamente, de primer rango y superior a cualquier otra.  Según se ha divulgado en numerosos informes, en los próximos meses vencen obligaciones de pago sustanciales y onerosas, tanto para el ELA como para el Banco Gubernamental de Fomento para Puerto Rico ("BGF"). Ante esta coyuntura histórica, en la cual el Gobierno del Estado Libre Asociado no cuenta con recursos suficientes para cumplir con el servicio de la deuda tal y como está pactado y, además, continuar proveyendo servicios esenciales a la ciudadanía, el ELA necesita herramientas para ejercer su poder de razón de estado para proteger la vida, salud, y el bienestar del Pueblo de Puerto Rico.

## B.  Medidas de Reforma Fiscal

La prioridad de esta Administración ha sido atender la crisis fiscal y económica de Puerto Rico. Una vez da inicio el cuatrienio, tomamos medidas contundentes para, corregir problemas estructurales que drenaban las finanzas del ELA, detener las prácticas fiscales erradas del pasado; y allegar el financiamiento necesario para lograr la sostenibilidad fiscal del ELA. Hemos emprendido estos esfuerzos trabajando de cerca con la gerencia del BGF; agente fiscal, ente depositario y financiero del ELA, que también ha implantado varias medidas importantes para paliar sus propios problemas de liquidez.

Ante la necesidad inminente de una fuente de financiamiento, en marzo del 2014 el ELA emitió $3.5 mil millones en bonos de obligación general.  No obstante, plenamente conscientes de que para lograr una solución sostenible y permanente a los problemas financieros del Gobierno de Puerto Rico se tenía que dejar atrás el financiamiento de déficits recurrentes, el producto de esta emisión se utilizó para el pago de ciertas obligaciones ya comprometidas, y para proveerle al ELA una fuente de financiamiento interino mientras nos dábamos a la tarea de implementar una serie de reformas fiscales, mientras, a su vez, otras medidas estructurales ya instauradas generaban resultados.

Igualmente, y con el fin de aumentar los recaudos del fisco, aumentamos la tasa del Impuesto Sobre Ventas y Uso de un siete por ciento (7%) a un once punto cinco por ciento (11.5%) a través de la aprobación de la Ley 72-2015. Por otra parte, y con el fin de encontrar una solución a uno de los problemas más apremiantes del BGF, y que más entorpecen su gestión como proveedor de financiamiento al ELA, aprobamos un aumento al arbitrio sobre el crudo a través de la implementación de la Ley 1-2015. La medida cedió estos nuevos recaudos a la Autoridad para el Financiamiento de la Infraestructura del Estado Libre Asociado de Puerto Rico ("AFI"), y autorizó a ésta a emitir bonos con el fin de utilizar el producto de la venta de dichos bonos para asumir y repagar la deuda de $2.2 mil millones de la Autoridad de Carreteras y Transportación ("ACT") con el BGF, y para la cual no existía una fuente de pago.

Vale la pena recalcar que la deuda de la ACT con el BGF es el resultado de prácticas irresponsables del pasado - particularmente durante el periodo comprendido entre el 2009 y el 2012 - cuando el BGF otorgaba financiamientos al ELA y sus instrumentalidades, sin fuentes de repago fijas y comprometidas.

Además, la derogación de la Sección 936 dio paso a la pérdida de una de las fuentes de financiamiento más importantes para el BGF dado a que las empresas elegibles bajo la Sección 936 tenían que mantener cierto porcentaje de sus depósitos con el Banco. La conclusión de su eliminación gradual durante un periodo de diez (10) años resultó en una profunda trasformación en la estructura de financiamiento del BGF. Asimismo, contribuyó a la pérdida de miles de empleos en la manufactura, provocando efectos catastróficos a la economía del ELA. Consecuentemente, el BGF se vio obligado a buscar a otras fuentes de fondos para continuar proveyendo financiamiento al ELA y sus instrumentalidades. Más aun, durante la segunda fase de la eliminación gradual durante diez (10) años de la Sección 936 (2001-2006), el BGF comenzó a depender cada vez más de un robusto programa de pagarés (promissory notes) como una fuente clave de financiación, habilitado por la excelente calificación crediticia del BGF y del ELA. A medida que el ELA y, posteriormente, el BGF, comenzaron a experimentar las primeras degradaciones de la calificación de su crédito entre los años 2004 y 2006, la viabilidad del programa de pagarés del BGF peligró, por lo tanto, dejando a este una vez más sin una fuente clave de financiación para continuar ejerciendo su rol de agente financiero del ELA. Así las cosas, en el 2006, el BGF emitió su primera serie de notas cuya cantidad entonces aumentó drásticamente durante los años 2009 al 2012. La administración de turno durante ese cuatrienio aumentó la deuda pendiente del BGF a un total de $5.6 mil millones para el 30 de junio de 2012. Para agravar el cuadro del agente fiscal, la hoja de balance del BGF durante ese período quedó seriamente comprometida, pues el Banco dio un sinnúmero de préstamos a largo plazo – con términos de vencimiento de más de veinte (20) años - mientras que las notas emitidas durante ese mismo período todas cuentan con vencimientos de entre cinco (5) a quince (15) años. En otras palabras, el BGF asumió, del 2009 al 2012 una serie de obligaciones a mediano plazo, pero postergó el recibo de sus ingresos para el futuro lejano, creando un desbalance dramático entre sus activos y pasivos.

No obstante ya la incertidumbre en los mercados, y la degradación de varios créditos del ELA por parte de Moody's Investor Services, aumentaron drásticamente la prima de riesgo de la transacción y provocó que los inversores que potencialmente hubieran comprado notas exigieran condiciones sumamente onerosas e irrazonables como condición para participar de la transacción. En fin, no obstante el repago de la deuda de la ACT con BGF hubiera fortalecido la situación financiera y la liquidez del BGF, las condiciones del mercado no eran favorables y el ELA tomó la decisión responsable de no acceder a una transacción de financiamiento irrazonable que hubiera resultado excesivamente onerosa para Puerto Rico.

Además de ésta y las otras medidas de recaudos implantadas, y del intento de acceder a los mercados de financiamiento, con la aprobación de las Leyes 3-2013 y 160-2013, esta Administración ya había encaminado reformas estructurales comprensivas para atender los déficits actuariales históricos de los sistemas de retiro de nuestros empleados públicos y de los maestros del sistema de educación pública. Esta Asamblea Legislativa aprobó, además, la Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico - Ley 66-2014 – a través de la cual se introdujeron recortes profundos y abarcadores en el gasto público

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

del ELA y todas sus instrumentalidades, y logró  ahorros para el erario, sin recurrir al despido de empleados públicos. Poco después, y conscientes del impacto que podría tener sobre el gobierno central y la capacidad del Gobierno de Puerto Rico de brindar servicios esenciales la onerosa y sustancial deuda de nuestras corporaciones públicas, aprobamos la Ley 71-2014, conocida como la Ley para el Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico. La Ley para el Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico provee un andamiaje jurídico para la reestructuración de las deudas de nuestras corporaciones públicas, donde se respetan los derechos de nuestros acreedores, y se garantiza que los servicios esenciales que proveen nuestras corporaciones públicas - algunos tan vitales como el agua y la luz eléctrica - no queden interrumpidos.

## C.   El Informe Krueger, el Plan de Ajuste Fiscal y Crecimiento Económico, y la Reestructuración de la Deuda

Tomada la decisión de terminar con la práctica errada e insostenible de financiar déficits recurrentemente, el ELA le encomendó a la ex Economista Jefa del Banco Mundial y Sub-Directora del Fondo Monetario Internacional, la Dra. Anne Krueger, que llevara a cabo un estudio abarcador sobre la situación fiscal y económica de Puerto Rico. La Dra. Krueger y su equipo de economistas de renombre mundial produjeron su informe, Puerto Rico: A Way Forward ("Informe Krueger"), que retrata el alcance de los problemas fiscales y económicos de Puerto Rico y traza un camino hacia adelante.

El Informe Krueger sostiene tres conclusiones fundamentales. En primer lugar, concluyó que los problemas fiscales y económicos de Puerto Rico son de naturaleza estructural - y no cíclica - y por ende, solo lograremos corregirlos con medidas estructurales abarcadoras. En segundo lugar, concluyó que el Gobierno de Puerto Rico históricamente subestimaba el verdadero déficit del Fondo General, pues no tomaba en cuenta las inversiones de mejoras capitales, y los déficits de otras entidades del Gobierno que, aunque debieran ser independientes en términos fiscales, el ELA las sostiene con sus recaudos.  Por ende, el verdadero déficit del ELA es mucho mayor al que históricamente se estimaba. En tercer lugar, y más importante aún, el Informe Krueger concluye que la deuda de Puerto Rico es insostenible sin un crecimiento económico robusto. El Informe Krueger además contiene los lineamientos generales de las reformas que el ELA debería implementar para encaminar a Puerto Rico hacia la recuperación económica.

Ante los hallazgos y recomendaciones plasmadas en el Informe Krueger, el 29 de junio de 2015, el Gobernador, Hon. Alejandro García Padilla, declaró que la deuda de Puerto Rico es impagable y que esta Administración emprendería la reestructuración de nuestra deuda a través de un proceso de intercambio consensuado con nuestros acreedores. Poco después, el Gobernador creó el Grupo de Trabajo Para la Recuperación Fiscal y Económica de Puerto Rico (el "Grupo de Trabajo") a través de la Orden Ejecutiva OE 2015-022, y les ordenó componer el Plan de Ajuste Fiscal y Crecimiento Económico de Puerto Rico, con las medidas económicas y fiscales indicadas para devolver a Puerto Rico a la sustentabilidad fiscal y al crecimiento económico ("Plan").

Así las cosas, el 9 de septiembre de 2015, el Grupo de Trabajo publicó el Plan. El Plan proveyó un programa comprensivo, con reformas fiscales y económicas abarcadoras diseñadas para despertar y avivar el crecimiento económico, institucionalizar la disciplina fiscal a través del ELA y sus instrumentalidades, y recuperar la credibilidad financiera del ELA.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

El Grupo de Trabajo comenzó poco después con la implantación de las medidas del Plan, y contamos con que la iniciativa rinda frutos en el futuro.  Por otro lado, las conversaciones con nuestros acreedores han comenzado, propuestas en camino a reestructurar la deuda del Estado Libre Asociado han sido presentadas, y las negociaciones continúan.

## D. Medidas Extraordinarias y de Emergencia

A través de los últimos tres (3) años, y además de reformas estructurales, el ELA también ha recurrido a un sinnúmero de medidas extraordinarias de preservación de liquidez y manejo de efectivo con el fin de asegurar la provisión de servicios a la ciudadanía y de proveer tiempo para que las reformas estructurales ya encaminadas rindan fruto. Entre estas medidas extraordinarias, están: 1) financiamientos a corto plazo (Tax and Revenue Anticipation Notes o TRANs, por sus siglas en inglés) de entidades del sector público (de parte de la Corporación del Fondo del Seguro del Estado ("Fondo"), la Administración de Compensaciones por Accidentes de Automóviles y el Seguro de Incapacidad No Ocupacional Temporero); 2) el recibo de dividendos especiales de entidades del sector público de parte del Fondo; 3) que el Departamento de Hacienda exigiera al Sistema de Retiro de los Empleados del ELA y al Sistema de Retiro para Maestros el adelanto de los fondos necesarios para el pago de pensiones, en lugar de los reembolsos habituales realizados por los Sistemas de Retiro a Hacienda; 4) la suspensión durante el año fiscal 2016 del envío de fondos al Fondo de Redención de la Deuda Estatal, según exige la Ley Núm. 39 de 13 de mayo de 1976, según enmendada, para el pago de los bonos de obligaciones generales; 5) el retraso en el pago de las deudas de suplidores y de las cantidades adeudadas a las corporaciones públicas; 6) el aplazamiento en el desembolso de ciertas asignaciones presupuestarias; 7) el retraso en el pago de reintegros a contribuyentes; por mencionar algunas.

Además, y entre las medidas extraordinarias más contundentes que ha tomado esta Administración, el 30 de noviembre de 2015, el Gobernador emitió la Orden Ejecutiva OE-2015-046 conforme a la Sección 8 del Artículo VI de la Constitución del ELA.  Dicha orden redirigió ciertas fuentes de recaudos asignadas para el pago de las obligaciones de AFI, ACT, la Autoridad Metropolitana de Autobuses y la Autoridad del Distrito del Centro de Convenciones, ya que dichos recursos son "recursos disponibles" conforme a la Sección 8 del Artículo VI de la Constitución del ELA, hacia el pago de obligaciones generales.

Por su parte, el BGF también ha tomado medidas extraordinarias con el fin de preservar sus activos, optimizar el manejo de efectivo, continuar con sus funciones y cumplir con sus propias obligaciones. No obstante, estas medidas de emergencia que han implantado el ELA y el BGF son de carácter extraordinario, no recurrentes, insostenibles a largo plazo, y sus efectos han llegado al límite.

## E. La Necesidad de Una Moratoria

Las conversaciones con nuestros acreedores continúan. Por su parte, el BGF también negocia con sus propios acreedores la posibilidad de llegar a un acuerdo sobre el pago de sus notas. Guardamos la esperanza de que llegaremos a un acuerdo que salvaguarde los derechos de nuestros acreedores, y reduzca el pago del servicio de la deuda del ELA a una cantidad sostenible.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

Por otro lado, hemos litigado con esmero y hasta el Tribunal Supremo de los Estados Unidos, la constitucionalidad de la Quiebra Criolla. El caso está sometido, y confiamos en que el Tribunal fallará a favor nuestro y encontrará que la Quiebra Criolla no es contraria a la Constitución de Estados Unidos, y que el Congreso no pudo haberle arrebatado a Puerto Rico los beneficios del Capítulo 9 del Código de Quiebras y, a la vez, prohibirnos disponer sobre nuestro propio régimen de reestructuración de las deudas de nuestras corporaciones públicas para así garantizar que el Gobierno pueda continuar brindado servicios esenciales a la ciudadanía.

Además, estamos inmersos en el proceso político federal, trabajando de cerca con nuestros aliados en el Congreso y en la Casa Blanca con la meta de que el gobierno federal provea a Puerto Rico un mecanismo de reestructuración de deuda por vía de legislación federal. Han surgido varias propuestas, y no obstante que nuestros acreedores cabildean activamente por sus propios intereses, esperamos que el Congreso atienda la crisis fiscal de Puerto Rico con templanza y equidad.

No obstante el progreso realizado en nuestros esfuerzos, se trata de procesos inherentemente lentos, y Puerto Rico necesita remedios contundentes e inmediatos. Tanto el ELA como el BGF, enfrentarán pagos de servicio de deuda sustanciales en el futuro cercano. Para el 1 de mayo de 2016, el BGF debe responder por un pago de principal de $400 millones de notas del BGF. No obstante, para el 1 de abril de 2016 el BGF solo contaba con $562 millones. Pero más importante aún, poco después, el 1 de julio de 2016 el ELA enfrenta un pago de $780 millones de obligaciones generales. El Gobierno de Puerto Rico y el BGF probablemente no contarán con los recursos suficientes como para responder con sus respectivos pagos sin poner en riesgo la habilidad del Gobierno de Puerto Rico de proveer servicios esenciales a la ciudadanía. Los salarios de nuestros policías, bomberos y otros trabajadores de auxilio; los fondos necesarios para operar nuestras facilidades de salud pública y para proveer instrucción y alimento a nuestros niños; y la habilidad de nuestras corporaciones públicas de proveer servicios esenciales tan vitales como agua y luz eléctrica, quedarían comprometidas.

El momento histórico exige de esta Asamblea Legislativa que actuemos para proteger la vida, la salud y el bienestar del pueblo de Puerto Rico, y otorguemos al Ejecutivo el poder de declarar una moratoria sobre las deudas del ELA y sus instrumentalidades, como ejercicio del poder de razón de estado del ELA.

## F.  El Poder de Razón de Estado del ELA, y Base Legal para la Moratoria

El poder de razón de estado del ELA emana directamente de la Sección 19, del Artículo II de la Constitución del ELA, que provee sobre la "facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo." Ciertamente, el poder inherente del ELA de legislar para la protección y el bienestar de la ciudadanía es abarcador. Domínguez Castro v. E.L.A., 178 D.P.R. 1 (2010). Y entre los poderes inherentes del estado de legislar para el bienestar general de sus ciudadanos, está el poder de suspender pagos y extender el vencimiento de las obligaciones del gobierno y sus instrumentalidades, con el fin de aliviar una crisis fiscal o financiera, y evitar una crisis humanitaria. Ropico, Inc. v. City of New York, 425 F. Supp. 970 (S.D.N.Y 1976).

Por tanto, y conforme al poder de razón de estado del ELA, esta Asamblea Legislativa ha resuelto otorgar al Gobernador el poder de declarar una situación de emergencia para el ELA y sus instrumentalidades, y declarar una moratoria sobre el pago de sus respectivas obligaciones. La Ley

de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico ("Ley"), le brinda al gobernador las herramientas necesarias dentro de los límites de nuestro marco legal y nuestra Constitución, para permitirle al ELA y sus instrumentalidades continuar brindando servicios esenciales a los residentes de Puerto Rico mientras se atiende la necesidad critica de implementar reformas estructurales, reformas fiscales y reestructurar la deuda.

Las medidas establecidas en esta Ley son estrictamente limitadas para cumplir con el propósito público primordial de asegurar la salud, la seguridad y el bienestar del pueblo de Puerto Rico; evitar un mayor deterioro de la crisis humanitaria en Puerto Rico; y son las alternativas menos onerosas para lograr este propósito. La Ley provee medidas de moratoria que son de naturaleza temporera y sólo aplican si hay una determinación por el Gobernador que justifican la invocación de las disposiciones de la Ley a los fines de proteger la salud, la seguridad y el bienestar de los residentes del ELA. Además, tales medidas (incluyendo la suspensión de pleitos de los acreedores) se invocan de manera individual, es decir, entidad-por-entidad y, salvo una especificación por el Gobernador mediante Orden Ejecutiva de obligaciones categorizadas como obligaciones enumeradas, según definidas por esta Ley, se afectaría solamente a ciertas obligaciones de deuda financiera que advengan pagaderas durante un período temporero.

Además, las medidas establecidas en la Ley se hacen con el debido respeto a los derechos de los acreedores de Puerto Rico. La Ley no provee una composición o liquidación de las deudas; al contrario, todos los derechos y prioridades se conservan, y cualquier cantidad no pagada de las obligaciones del ELA y sus instrumentalidades no se perdonan y continúan siendo pagaderas al final de cualquier periodo de moratoria, como se establece en la Ley y en la manera permitida por otra ley aplicable. Además, la Ley respeta las prioridades constitucionales mediante el establecimiento de criterios mínimos para el pago de la deuda pública del ELA que pueda convertirse pagadera durante la moratoria temporera. La Ley también provee el reconocimiento bona fide de los derechos de propiedad y permite el acceso a los acreedores a protecciones adecuadas o, en el caso de una expropiación, un mecanismo de justa compensación y reparación. Esta Asamblea Legislativa reconoce, además, que las medidas establecidas en esta Ley, al concederle al ELA la capacidad de estabilizar y hacer crecer la economía de Puerto Rico, evitando al mismo tiempo el cúmulo desmesurado de litigios, representan la mejor oportunidad para que los acreedores del ELA puedan recuperar sus inversiones. Por ende, la Ley sólo pretende capacitar al ELA para retrasar el pago de ciertas obligaciones al mismo tiempo que protege los derechos de los acreedores, y ejerce su deber ineludible de proteger a los ciudadanos de Puerto Rico.

Por otro lado, además de autorizar la declaración de una moratoria, y según detalla el resumen a continuación, la Ley provee remedios para atender la situación crítica del BGF.  En términos generales, la Ley moderniza las disposiciones de sindicatura de su ley orgánica, y autoriza la creación de un banco puente, cuyo fin sería preservar la liquidez y activos para el beneficio del ELA, mientras facilita la transformación del BGF en una entidad más moderna y especializada en agencia fiscal. Finalmente, la Ley provee para la creación de una subsidiaria del BGF específicamente diseñada para tomar mando de los esfuerzos de restructuración.

Esta Ley es la culminación de años de intentos por parte de esta Administración para evitar una catástrofe económica y humanitaria. Pese a que tales intentos han contribuido de manera significativa a los esfuerzos de recuperación fiscal del ELA  y a retrasar sus nocivos efectos en nuestra ciudadanía, es evidente para esta Asamblea Legislativa que tales medidas ya no son suficientes. Al mismo tiempo, el ELA y sus instrumentalidades, incluyendo el BGF, encaran pagos

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

del servicio de la deuda en el futuro inmediato y Puerto Rico no será capaz de hacer dichos pagos sin dejar de ofrecer servicios esenciales. Como consecuencia, Puerto Rico se sitúa en el precipicio de una fase desastrosa de impagos desordenados, múltiples litigios, y mayor declive económico, ya que nuestros recursos cada vez se dedican en mayor proporción a la defensa de litigios en lugar de pagar por los servicios públicos esenciales. A tales efectos, es de suma importancia proveer al Gobierno el marco legal para superar este periodo de emergencia fiscal, por lo cual somos del entendimiento que esta Ley establece dicho marco legal comprensivo de medidas  razonables, necesarias y estrictamente adaptadas para atajar la emergencia fiscal y humanitaria que Puerto Rico enfrenta.

## G.  Resumen de la Ley

La Ley tiene tres objetivos principales.  El primer objetivo se atiende en el Capítulo 2 de la Ley, el cual autoriza al Gobernador a: (i) declarar—en algún momento en el futuro—una moratoria temporera para los pagos del servicio de deuda del Estado Libre Asociado, el BGF, el Banco de Desarrollo Económico para Puerto Rico ("BDE"), o cualquiera de las demás instrumentalidades gubernamentales de Puerto Rico; y (ii) suspender los remedios de los acreedores que pudiesen surgir como resultado de la moratoria.  El segundo objetivo se atiende en los Capítulos 3 y 4 de la Ley, los cuales enmiendan a la Ley Orgánica del BGF para proporcionarle al BGF opciones y herramientas que pudiese necesitar—en algún momento en el futuro—para enfrentar una sindicatura.  Estas enmiendas: (a) modernizan las disposiciones de la Ley Orgánica del BGF sobre el nombramiento de un síndico para el BGF, (b) autorizan la creación de un banco "puente" temporero para llevar a cabo ciertas funciones del BGF y para honrar depósitos,  y (c) permiten que el BGF cree una nueva subsidiaria que pueda asumir las funciones de agente fiscal, asesor financiero y agente informativo del BGF, así como facilitar el esfuerzo de reestructuración.  El tercer objetivo se atiende en el Capítulo 6 de la Ley, lo cual enmienda a la Ley Orgánica del BDE para proporcionarle una modernización a las disposiciones sobre el nombramiento de un síndico.

Resumen del Capítulo 1 de la Ley

El Capítulo 1 de la Ley establece las disposiciones generales de la Ley. Entre estas disposiciones están aquellas relacionadas con la declaración de un periodo de emergencia, definiciones, así como la autorización para la contratación de empleados por varias entidades gubernamentales. El Capítulo 1 también establece inmunidades para aquellas personas que actúen de conformidad con la Ley, al estipular que ninguna persona (incluyendo cualquier, director, funcionario, empleado, contratista, agente o representante) estará sujeto a responsabilidad alguna por aquellas acciones u omisiones de buena fe de acuerdo con esta Ley.

Resumen del Capítulo 2 de la Ley

El Capítulo 2 autoriza al Gobernador a declarar una moratoria y suspender los remedios de los acreedores con respecto a las obligaciones de las entidades gubernamentales sujetas a dicha moratoria. También establece condiciones para la declaración de una moratoria por parte del

Gobierno y establece protecciones para los acreedores, tales como la preservación de garantías y colateral utilizados para garantizar diversas obligaciones.

Las disposiciones de la Ley que autorizan al Gobernador a declarar una moratoria entran en vigor inmediatamente después de la aprobación de la Ley y vencen el 31 de enero de 2017. El periodo durante el cual se puede declarar una moratoria se define como el "periodo cubierto" y está sujeto a una prórroga de dos meses a discreción del Gobernador. Las disposiciones sobre moratoria clasifican a las diversas entidades de Puerto Rico (incluyendo al mismo Estado Libre Asociado) en dos categorías, debido a que la Ley trata a éstas de manera distinta:  (i) el "Banco", el cual se define como BGF y/o el BDE; y (ii) "entidades gubernamentales", lo que incluye al mismo Estado Libre Asociado, así como a las demás entidades gubernamentales de Puerto Rico con endeudamiento significativo (estén o no cubiertas por el Plan de Crecimiento Económico y Fiscal preparado por el Grupo de Trabajo para la Recuperación Fiscal y Económica de Puerto Rico).

El Gobernador tiene el poder de declarar, mediante una orden ejecutiva, cuya orden puede ser cancelada por el Gobernador, emergencias con respecto a cualquier entidad gubernamental durante el "periodo cubierto", según definido por esta Ley.  El periodo después de que se haya hecho tal declaración con respecto a una entidad gubernamental, se le conoce como el "periodo de emergencia", según definido por esta Ley, el cual, con respecto a todas las entidades, termina el último día del periodo cubierto. La declaración del Gobernador de un periodo de emergencia convierte las obligaciones de servicio de deuda de dicha entidad gubernamental en "obligaciones cubiertas", según definidas por esta Ley. La orden ejecutiva del Gobernador también puede identificar obligaciones adicionales, ya sea específicamente o por categoría, tal como aquellas obligaciones de instrumentos derivativos (derivatives) como obligaciones cubiertas. Si lo dispone una orden ejecutiva, no podrán hacerse pagos de obligaciones cubiertas durante el periodo de emergencia y las obligaciones cubiertas serán pagaderas el último día del periodo cubierto en la medida en que, de otro modo, hubiesen sido pagaderas antes o durante el periodo cubierto.

Durante el periodo de emergencia para el Banco, según este término se define en la Ley, se suspenderán los pleitos contra el Banco relacionados con las obligaciones cubiertas, y, en cualquier momento durante el periodo cubierto, el Gobernador tendrá potestad para adoptar cualquier y toda medida razonable y necesaria para permitirle al Banco continuar realizando sus operaciones. La definición de la frase "razonable y necesaria" incluye, entre otras cosas, la exención de requisitos sobre reservas de depósito, la suspensión de pagos de cartas de crédito y extensión de crédito, la prohibición de desembolsos de préstamos, así como la facultad para restringir solicitudes de retiro de depósitos a menos que dichos fondos vayan a ser utilizados para brindar servicios esenciales. Durante el periodo de emergencia para una entidad gubernamental, incluyendo el mismo Estado Libre Asociado, se suspenden los pleitos contra dicha entidad gubernamental y el Gobernador podrá tomar cualquier y toda acción que sea: (a) razonable y necesaria para preservar la capacidad del Estado Libre Asociado de continuar brindando servicios esenciales, o (b) razonable y necesaria para proteger la salud, la seguridad y el bienestar de los residentes del Estado Libre Asociado. Estas acciones incluyen la posibilidad de expropiar propiedad de manera permitida constitucionalmente.

La Ley también contempla que las obligaciones cubiertas recibirán pagos de intereses o devengarán intereses durante el periodo cubierto de la siguiente manera:

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

| | |
|---|---|
| "Deuda pública" (buena fe y crédito, protegida por la Constitución) | Si una obligación de intereses del Banco o de una entidad gubernamental está garantizada por el Estado Libre Asociado, o si es una obligación de intereses del Estado Libre Asociado para la cual la buena fe y el crédito del Estado Libre Asociado está pignorada, se pagará dicha obligación en su totalidad hasta el 1 de julio de 2016 si adviene pagadera. Comenzando el 1 de julio de 2016, obligaciones de intereses que constituyan deuda pública se pagarán en la cantidad determinada por el Gobernador, luego de consultar con el Secretario de Hacienda, cuya cantidad debe ser consistente con la Constitución. No se pagarán obligaciones de deuda pública que consistan en obligaciones de principal (asumiendo que no hayan recursos disponibles para cubrir dichos pagos) u obligaciones enumeradas pagaderas en o antes del 1 de julio de 2016, según definidas en esta Ley. |
| Depósitos del Banco | Los depósitos del Banco devengarán intereses de la siguiente manera: los depósitos a plazo fijo devengarán intereses a la tasa contractual hasta su vencimiento y los depósitos que podrían retirarse en cualquier momento, y los de plazo fijo después de su vencimiento, devengarán intereses a una tasa equivalente a la tasa de interés promedio que reciban los tenedores de las obligaciones de principal del Banco que no se hayan pagado. |
| Obligaciones de Principal e Intereses (excepto deuda pública) | No se harán pagos de principal durante el periodo de emergencia a menos que el emisor ya tenga fondos depositados con un fiduciario (o agente de pago) para hacer dicho pago; el principal que esté vencido y exigible devengará intereses a la tasa contractual. El principal y los intereses devengados sobre principal serán pagaderos, en la medida que sea permitido bajo la ley aplicable, al final del periodo de emergencia para el Banco o la entidad gubernamental, si dichos pagos vencen durante el periodo de emergencia, a menos que ocurra una reestructuración voluntaria o se adopte otra ley. Si no se pagan intereses durante el periodo cubierto, dichos intereses se acumularán a la tasa contractual. Los intereses acumulados serán pagados al final del periodo de emergencia para el Banco o la entidad gubernamental si dicho pago vence durante el periodo de emergencia, a menos que una reestructuración voluntaria se haya concretado o se adopte otra ley. |
| Obligaciones enumeradas (excluyendo deuda pública) | Las obligaciones enumeradas devengarán intereses sólo si tienen derecho al mismo bajo sus respectivos acuerdos. |

Bajo ciertas circunstancias, la Ley dispone para que se provea lo que se conoce como "protección adecuada", a aquellos acreedores que tengan algún derecho real o garantía con respecto a algún pago atrasado del servicio de deuda.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

<u>Resumen de los Capítulos 3 y 4 de la Ley</u>

Los Capítulos 3 y 4 de la Ley contienen enmiendas a la Ley Orgánica del BGF que consisten en actualizar las disposiciones relacionadas al nombramiento de un síndico (Capítulo 3), así como disposiciones sobre la creación de un banco puente y procedimientos relacionados a esto (Capítulo 4), cuyo propósito es proporcionar una alternativa a la liquidación del BGF y a una sindicatura según las leyes existentes. Con respecto a las disposiciones sobre sindicatura, el Capítulo 3 de la Ley reemplazaría las disposiciones obsoletas sobre sindicatura que se encuentran actualmente en la Ley Orgánica del BGF mediante el establecimiento de una serie de reglas más adecuadas para afrontar los retos que actualmente enfrenta el BGF por medio de la modificación del proceso del nombramiento de un síndico, la clarificación de las facultades de la sindicatura y el establecimiento de prioridades de gastos y reclamaciones no garantizadas en una sindicatura. La prioridad de los bonistas y los depositantes permanecerá igual que bajo las leyes existentes. Con respecto a las disposiciones sobre el banco puente, el Capítulo 4 de la Ley permite la creación de un banco puente, el cual podría asumir ciertas responsabilidades del Banco, incluyendo depósitos, y continuar determinadas funciones existentes del BGF. Aquellas obligaciones que el banco puente no asuma permanecerán en el antiguo BGF, pero todos los acreedores tendrán derecho a recibir la cantidad que dichos acreedores hubiesen recibido si se hubiese liquidado el BGF en la fecha del nombramiento del síndico.

<u>Resumen del Capítulo 5</u>

El Capítulo 5 reemplazaría disposiciones obsoletas sobre sindicatura que se encuentran actualmente en la Ley Orgánica del BDE mediante la modificación del proceso de nombramiento de un síndico, la clarificación de las facultades de la sindicatura y el establecimiento de prioridades de gastos y reclamaciones no garantizadas en una sindicatura. Las enmiendas propuestas son consistentes con las enmiendas propuestas para el BGF.

<u>Resumen del Capítulo 6</u>

El Capítulo 6 de la Ley crea una nueva instrumentalidad llamada la "Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico", la cual estará estructurada como una corporación pública e instrumentalidad pública independiente del Estado Libre Asociado con una junta de directores compuesta de un miembro nombrado por el Gobernador. La Autoridad se crea con el propósito de actuar como agente fiscal, asesor financiero y agente informativo del Estado Libre Asociado y sus corporaciones públicas, instrumentalidades, comisiones, autoridades, municipios y subdivisiones políticas y para asistir a dichas entidades a enfrentar la grave emergencia fiscal por la que atraviesa el Estado Libre Asociado. La Autoridad también supervisará los asuntos relacionados a la reestructuración o el ajuste de una obligación cubierta y coordinará e implantará medidas de contingencia para dichas obligaciones cubiertas.

*Decrétase por la Asamblea Legislativa de Puerto Rico:*

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

## CAPÍTULO 1. — ENMIENDAS A LA LEY ORGÁNICA DEL BGF RELACIONADAS A LA SINDICATURA

*[Nota: El Art. 301 de la Ley 5-2017, derogó el anterior Cap. 1 y renumeró el existente Cap. 3 como el 1]*

**Artículo 101. — Enmiendas al Artículo 11 de la Ley Núm. 17**

Se enmienda el Artículo 11 de la Ley Núm. 17 de 23 de septiembre de 1948, supra, para que lea como sigue:

"Artículo 11. — Nombramiento y poderes de un síndico.

(A) La Junta de Directores del Banco o el Secretario de Hacienda de Puerto Rico tendrán autoridad para recomendarle al Gobernador la designación de un síndico para el Banco si la Junta de Directores del Banco o el Secretario de Hacienda de Puerto Rico determina que (1) los activos del Banco son menores que sus obligaciones a sus acreedores; (2) el Banco es incapaz de pagar sus deudas a su vencimiento en el curso ordinario de los negocios (3) el Banco está operando de manera insegura o inapropiada para desempeñar sus funciones estatutarias; o (4) el Banco ha incurrido o es probable que incurra en pérdidas que agotarán todo o sustancialmente todo su capital, y no hay una expectativa razonable de que el Banco llegue a estar adecuadamente capitalizado.

(B) Tras recibir una recomendación conforme al inciso (A), el Gobernador podrá (1) designar, o solicitarle al Secretario de Hacienda de Puerto Rico que designe, un síndico para el Banco; (2) designar a otra entidad, ya sea una entidad privada o instrumentalidad gubernamental existente o nueva, después de consultar con el Secretario de Justicia, para que asuma las responsabilidades de pago y funciones depositarias del Banco; y (3) designar Juntas de Directores nuevas, y si es necesario, de cualquiera de las subsidiarias directas o indirectas o afiliadas que podrán haber tenido la misma Junta de Directores del Banco. En el ejercicio de la discreción del Gobernador o del Secretario de Hacienda de Puerto Rico, cualquier persona podrá ser nombrada síndico.

(C) Excepto en la medida que se pruebe mediante sentencia final y firme que la persona haya incurrido en conducta dolosa para beneficio propio o en negligencia crasa que conlleve una indiferencia temeraria de sus deberes y la omisión de llevarlos a cabo, los miembros de la Junta de Directores y los funcionarios del Banco, el banco puente y cualquier subsidiaria del Banco, cualquier empleado, agente del Banco, el banco puente o cualquier subsidiaria del Banco, cualquier síndico o aquellas personas privadas o entidades contratadas, designadas o empleadas por dicho síndico no tendrán responsabilidad personal hacia ninguna entidad y, sin necesidad de notificación u orden adicional, serán exonerados de responsabilidad por acciones u omisiones de buena fe en su capacidad, y dentro de su autoridad bajo esta Ley. Cualquier reclamación contra una persona o entidad enumerada en este inciso con relación a sus actos u omisiones relacionados a, o que surjan de, esta Ley deberá presentarse en el Tribunal de Primera Instancia de Puerto Rico, Sala Superior de San Juan.

(D) Inmediatamente después de la designación de un síndico, dicho síndico adquirirá (1) todos los derechos, títulos, poderes y privilegios del Banco y de cualquier titular de cuenta, depositante, oficial o director del Banco con relación al Banco y a los activos del Banco, con

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

poder absoluto para realizar todos los actos y ejecutar en nombre y en representación del Banco todas las funciones, incluyendo, sin limitación, otorgar escrituras, recibos y otros documentos; y (2) título sobre los libros, récords y activos de cualquier síndico anterior o cualquier otro custodio legal del Banco.

(E) Inmediatamente después de la designación de un síndico, dicho síndico podrá (1) hacerse cargo de y operar los activos del Banco con todos los poderes de los directores y oficiales del Banco, incluyendo el poder de emplear y utilizar el sello del Banco y llevar a cabo todo negocio del Banco; (2) recaudar todas las obligaciones y dinero adeudado al Banco, incluyendo, sin limitación, llevar a cabo todos los actos necesarios para obtener pago de cualquier dinero adeudado por cualquier deudor del Banco o su patrimonio, para evidenciar, establecer prioridad y reclamar en la quiebra, insolvencia o embargo de cualquier deudor del Banco cualquier balance contra cualquier patrimonio y para recibir pagos en cualquier procedimiento por dinero adeudado al Banco; (3) vender, transferir y comprometer cualquier activo, pasivo, derecho, poder u obligación del Banco, a través de subasta pública o contrato privado, sin necesidad de aprobación alguna, cesión o consentimiento con relación a dicha transferencia y sin pago de ninguna tarifa, cargo, sello, comprobante de inscripción u otro comprobante; (4) elaborar, aceptar, realizar, comprometer, terminar y endosar cualquier letra de cambio, pagaré u otro documento u obligación del Banco en nombre y en representación del Banco; (5) proveer o facilitar a través de garantías o de otra manera el financiamiento necesario para cumplir los propósitos y ejercer los poderes autorizados por esta Ley; (6) retener, nombrar y contratar los servicios de personas y entidades privadas, bajo aquellos términos y condiciones que el síndico apruebe, para ayudar al  síndico en el desempeño de las responsabilidades bajo esta Ley, y dichas personas o entidades privadas tendrán el pleno recurso de los poderes y derechos del síndico, según sea el caso, en la manera en que lo ordene, limite o dirija el síndico; (7) demandar y ser demandado, salvo en la medida en la que esto se limite en esta Ley, y realizar en nombre del Banco todas las funciones de éste que sean consistentes con la designación del síndico; (8) según sea apropiado, preservar y conservar los activos y la propiedad del Banco; (9) pagar todas las reclamaciones y obligaciones válidas del Banco de acuerdo con las disposiciones y limitaciones de esta Ley; (10) investigar e instar toda reclamación o acción judicial y cobrar las sentencias de las reclamaciones en contra de personas que puedan ser responsables por los daños y las pérdidas del Banco por negligencia o alguna otra falta; (11) ejercer todos los derechos y autorizaciones expresamente concedidos bajo esta Ley al síndico, respectivamente, y aquellos poderes incidentales que sean necesarios para llevar a cabo los poderes concedidos; y (12) tomar cualquier acción autorizada por esta Sección que el síndico entienda está en los mejores intereses del Banco o sus depositantes y acreedores.

(F) El síndico:

(1) podrá colocar al Banco en liquidación y proceder a vender los activos del Banco, teniendo en cuenta las funciones y responsabilidades del Banco.

(2) podrá permitir, rechazar o de alguna otra manera hacer determinaciones sobre reclamaciones conforme a los requisitos de este Artículo.

(3) deberá (i) publicar sin demora en un periódico de circulación nacional, en un periódico de circulación local y en el portal electrónico del Banco un aviso general a los acreedores del Banco y enviará por correo una notificación a los acreedores que aparezcan en los récords del Banco para que presenten sus reclamaciones al síndico, junto con evidencia de

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

éstas, en o antes de la fecha especificada en la notificación, la cual deberá ser al menos noventa (90) días después de la publicación de dicha notificación; (ii) publicar otra notificación aproximadamente treinta (30) días después de la publicación bajo la cláusula (i); y (iii) si se descubriese el nombre y la dirección de un acreedor que no esté identificado en los récords del Banco, se deberá enviar notificación a dicho acreedor dentro de los treinta (30) días de dicho descubrimiento.

(4) determinará si permitirá o no la reclamación y notificará al reclamante, por correo a la dirección identificada en la reclamación, de cualquier decisión del síndico sobre dicha reclamación, estableciendo las razones para cualquier denegatoria de la reclamación y los procedimientos disponibles para revisión adicional, no más de ciento ochenta (180) días después de la fecha en la que se presentó la reclamación al síndico. Dicho periodo podrá extenderse a través de un acuerdo escrito entre el reclamante y el síndico.

(5) podrá solicitarle al Secretario de Hacienda de Puerto Rico que organice  un banco puente conforme al Artículo 14 de esta Ley.

(6) podrá crear una o más subsidiarias de conformidad con el Artículo 2 de esta Ley, a asumir cualquiera de las funciones del Banco, fuera de las responsabilidades de pago y funciones depositarias del Banco.

(7) no tendrá que prestar fianza y podrá designar a un agente o agentes para asistirle en sus deberes como síndico. El síndico fijará los honorarios, la compensación y los gastos de liquidación, los cuales podrán ser pagados por éste de los fondos que estén en su posesión como síndico.

(G)  Si el síndico deniega una reclamación o parte de ella, o si el síndico no toma una decisión dentro de los ciento ochenta (180) días desde que se presenta cualquier reclamación y no ha habido una extensión de dicho término, el reclamante podrá presentar una acción judicial con relación a dicha reclamación (o continuar una acción iniciada antes de la designación del síndico) en la Sala de Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas creada por la Ley 71-2014, y si dicha Sala no está operando, el Tribunal de Primera Instancia, Sala Superior de San Juan, dentro de los sesenta (60) días de la desestimación de toda o cualquier parte de la reclamación o la expiración del término de ciento ochenta (180) días para la determinación de las reclamaciones. Si el reclamante no presenta una acción judicial sobre su reclamación (o no continúa una acción iniciada antes de la designación del síndico) dentro de dicho término, se entenderá abandonada la reclamación (salvo cualquier parte de la reclamación que haya sido permitida por el síndico), y tal abandono será final y el reclamante no tendrá derechos o remedios adicionales con relación a dicha reclamación. Ningún tribunal tendrá jurisdicción para tomar alguna acción, y ningún reclamante podrá continuar alguna acción judicial pendiente contra el Banco en sindicatura, hasta que el reclamante haya agotado todos los remedios especificados en esta Sección. Una vez se hayan agotado todos los remedios antes mencionados, cualquier acción judicial con relación a dicho reclamo debe radicarse o continuarse dentro de sesenta (60) días y, de no radicarse dentro de dicho periodo, el reclamante no tendrá más derechos o remedios con relación a dicha reclamación y ningún tribunal tendrá jurisdicción.

(H) Cada persona que tenga una reclamación contra el Banco o la sindicatura no deberá recibir, en ningún caso, pago o propiedad con un valor menor a la cantidad que el acreedor hubiese tenido derecho a recibir si el Banco se hubiese liquidado en la fecha de la designación del

síndico, y la máxima responsabilidad a cualquier persona que tenga una reclamación contra el Banco o el síndico o la sindicatura deberá ser igual que la cantidad que dicho acreedor hubiese recibido si el Banco se hubiese liquidado en la fecha de la designación del síndico.

(I) El síndico deberá pagar todas las obligaciones válidas del Banco de acuerdo con las disposiciones y limitaciones de esta Ley.

(J) El derecho a ceder o transferir conferido en los Artículos 11 al 14 de esta Ley reemplazará todos los demás derechos e intereses, incluyendo, sin limitación, los derechos a consentir u objetar a dicha transferencia o cesión que pudieran tener otras partes bajo contratos de empleo, arrendamientos, cobros, hipotecas, "indentures" u otros acuerdos en los que el Banco pueda haber participado previo a la designación del síndico. Todo funcionario público que tenga el poder de aceptar y registrar o modificar cualquier entrada en cualquier registro relacionado a la transferencia o cesión de un activo o pasivo debe, previa solicitud del síndico, cesionario u otra persona, hacer todo lo necesario bajo las leyes para completar el registro de la cesión o transferencia.

(K) Una vez designado un síndico para el Banco, dicho síndico podrá solicitar una paralización de cualquier acción o procedimiento judicial o administrativo en el que el Banco sea o se convierta en parte por un periodo que no excederá noventa (90) días. El tribunal o ente administrativo que reciba una solicitud de cualquier síndico para la paralización de cualquier acción o procedimiento judicial o administrativo de conformidad con este párrafo deberá conceder dicha paralización con relación a todas las partes.

(L) Salvo lo que se dispone en esta Ley, ningún tribunal, funcionario, empleado o departamento del Estado Libre Asociado de Puerto Rico podrá tomar acción alguna, excepto a solicitud del síndico, para restringir o afectar el ejercicio de los poderes y funciones del síndico. Salvo lo que se dispone en esta Ley, el remedio exclusivo en cualquier acción judicial en contra de la sindicatura o el Banco bajo sindicatura, será daños compensatorios, los cuales no incluirán daños punitivos o ejemplares, daños por pérdida de oportunidad o ganancia o daños por sufrimiento o angustias.

(M) Una vez designado un síndico para el Banco, éste tendrá discreción para utilizar los servicios de aquellos empleados del Banco que sean necesarios para llevar a cabo sus funciones y facultades autorizadas por esta Ley y, en ese sentido, podrá suspender temporeramente toda cláusula, precepto y/o disposición aplicable a dichos empleados y/o puestos del Banco contenidas en leyes, convenios colectivos, acuerdos, acuerdos suplementarios, políticas, manuales de empleo, cartas circulares, cartas contractuales, addenda, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación y/o planes de retribución, referentes a toda y cualquier condición de empleo, siempre y cuando a dichos empleados no se le reduzca el sueldo o sus beneficios marginales. El síndico también podrá ordenar, efectuar o solicitar destaques y/o traslados de los empleados del Banco a otras agencias o entidades existentes o creadas por ésta y/o cualquier legislación, incluyendo a cualquier subsidiaria del Banco o a un banco puente creado al amparo del Artículo 14 de esta Ley. En el caso de liquidación del Banco, el síndico también podrá efectuar cesantías. De los empleados del Banco ser permanentemente transferidos a una agencia existente, sus términos y condiciones de empleo quedarán modificados para ajustarse a cualquier ley, reglamento y/o convenio que atienda la retribución y clasificación de los empleados de la agencia a la cual ha sido trasferido. En todo caso, se respetarán los términos y condiciones de empleo vigentes al

momento de la designación del síndico, incluyendo, los derechos, privilegios, obligaciones y antigüedad, adquiridos bajo las leyes, convenios de negociación colectiva y reglamentos de personal en vigor, sujeto a las modificaciones contenidas en la Ley 66-2014 mientras ésta continúe en vigor.  También en todo caso se garantizará que se satisfaga a todos los empleados cualesquiera salarios, sueldos o comisiones, incluyendo pago por concepto de vacaciones, mesada y licencia por enfermedad u otros beneficios de empleo similares adquiridos previo a la designación del síndico, conforme a las políticas de empleo del Banco o las leyes aplicables. La transferencia de empleados a un banco puente se regirá, además, por las disposiciones incluidas en el Artículo 14 de esta Ley.

(N) Para propósitos de interpretar los Artículos 11 al 14 de esta Ley, un tribunal debe considerar, en la medida en que sea aplicable, jurisprudencia interpretativa del Título 12 del Código de los Estados Unidos."

## Artículo 102. — Nuevos Artículos 12 a 21 de la Ley Núm. 17

Se reenumeran los Artículos 12 al 21 de la Ley Núm. 17 de 23 de septiembre de 1948, supra, como Artículos 15 al 24, y se añaden nuevos Artículos 12 al 13, que leerán como sigue:

"Artículo 12. — Prioridad de gastos y reclamaciones no garantizadas en sindicatura.

(A) Las reclamaciones no garantizadas contra el Banco o el síndico del Banco bajo esta Ley que hayan sido debidamente evidenciadas a satisfacción del síndico deberán ser pagadas en el siguiente orden de prioridad:

(1) Gastos administrativos del síndico.

(2) Salarios, sueldos o comisiones, incluyendo pago por concepto de vacaciones, mesada y licencia por enfermedad u otros beneficios de empleo similares adquiridos por un individuo previo a la designación del síndico, conforme a las políticas de empleo del Banco o las leyes aplicables.

(3) Contribuciones adeudadas a planes de beneficio de empleados relacionadas a servicios prestados previo a la fecha de la designación del síndico.

(4) Cualquier saldo pendiente de pago por dinero en posesión del Banco en sus cuentas de depósito para crédito del depositante y cualquier otra obligación general o preferente del Banco (que no sea una de las obligaciones que se describen en el inciso (5)).

(5) Cualquier obligación que sea subordinada a los acreedores generales por medio de ley o contrato.

(B) Este Artículo no afectará los créditos colateralizados o gravámenes sobre activos o bienes en posesión del Banco, y dichos créditos colateralizados o gravámenes sobre activos o bienes deberán ser pagados de la colateral o del valor realizado de la colateral. En la medida en que la colateral sea insuficiente para satisfacer la reclamación, la diferencia entre la reclamación y el valor realizado de la colateral deberá ser pagada de acuerdo con este Artículo.

(C) No obstante cualquier otra disposición de esta Ley o de la Ley de Moratoria de Emergencia y la Rehabilitación Financiera de Puerto Rico, cualquier obligación o compromiso de prestar o proveer dinero o crédito, un depositante o síndico puede compensar o canjear el monto de su

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

depósito contra cualquier saldo pendiente de un préstamo con el Banco como pago completo y final de tal obligación hasta la cantidad del depósito.

(D) La prioridad por gastos administrativos, según esta frase se utiliza en el inciso (A), incluirá, (i) aquellas obligaciones incurridas por el Banco previo a la designación del síndico relacionadas a bienes y servicios provistos al Banco previo a dicha designación, con excepción de reclamaciones individuales en exceso de una cantidad a ser determinada por el síndico en su discreción razonable; (ii) aquellas obligaciones incurridas por el Banco luego de la designación del síndico relacionadas a bienes y servicios provistos al Banco luego de dicha designación; y (iii) cualquier otra obligación que el síndico determine sea apropiada para facilitar la resolución ordenada del Banco.

(E) El Secretario de Hacienda, luego de haber consultado con el síndico y el Gobernador, tendrá el poder de renunciar a, reducir, subordinar, o asignar cualquier reclamación de una unidad gubernamental excepto si dicha unidad gubernamental es un municipio, sin embargo, cualquier porción de la reclamación que ha sido asignada de acuerdo con esta subsección no podrá ser compensada por el cesionario según dispuesto en la subsección (C) de esta Sección.

Artículo 13. — Disposiciones Relacionadas a Contratos Celebrados antes del Nombramiento del Síndico.

A. Salvo por lo que se dispone en este Artículo, el síndico podrá exigir el cumplimiento de cualquier contrato o acuerdo celebrado por el Banco a pesar de que el mismo contenga alguna disposición contractual que provea para la terminación, incumplimiento, aceleración o ejercicio de algún otro derecho como resultado de, o por razón de, la insolvencia o la designación de un síndico a medida que sea necesario para una administración ordenada y/o una liquidación de los asuntos del Banco.

B. Además de cualquier otro derecho que el síndico pueda tener, el síndico, en el ejercicio de sus poderes de administrar y liquidar el Banco, puede anular o repudiar cualquier contrato o arrendamiento (1) del cual el Banco sea una parte; (2) si, a discreción del síndico, sería oneroso continuar el cumplimiento de dicho contrato; y (3) si, a discreción del síndico, la anulación o repudiación de dicho contrato o arrendamiento fomentaría la administración ordenada y/o una liquidación de los asuntos del Banco.

C. El síndico designado debe determinar si ejercerá o no los derechos de repudiación bajo esta Sección dentro de los ciento ochenta (180) días de su designación.

D. La responsabilidad de la sindicatura por la anulación o repudiación de cualquier contrato bajo el inciso (B) debe estar (1) limitada a daños compensatorios directos reales, y (2) determinada a la fecha de la designación del síndico. Para propósitos de este inciso, la frase "daños compensatorios directos reales" no incluye daños punitivos o ejemplares, daños por pérdida de oportunidad o ganancia o daños por sufrimiento o angustias.

E. Ninguna persona podrá ejercer un derecho o poder para terminar, acelerar o declarar un incumplimiento bajo un contrato del cual el Banco sea parte (y no exigible será disposición alguna de cualquiera de dichos contratos que provea para dicho incumplimiento, terminación o ejecución) o para obtener la posesión o ejercer control sobre una propiedad del Banco o afectar algún derecho contractual del Banco y el síndico podrá exigir el cumplimiento de cualquier contrato a pesar de cualquier disposición del contrato que provea para la terminación,

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

incumplimiento, aceleración o ejercicio de derechos por, o exclusivamente por razón de la insolvencia, la condición financiera, la designación o el ejercicio de los derechos o poderes de un síndico, o la transferencia de cualquier operación, activo o pasivo del Banco a un banco puente o a cualquier otra persona o entidad; disponiéndose, sin embargo, que ninguna disposición de esta Sección deberá interpretarse como que impide o afecta cualquier derecho del síndico a exigir el cumplimiento de, o a recuperar bajo, un contrato de seguro de responsabilidad de un director o funcionario o una fianza de una institución financiera bajo alguna otra ley aplicable.

F. Ninguna persona podrá ejercer ningún derecho o poder para terminar, acelerar o declarar un incumplimiento bajo cualquier contrato del cual el Banco sea parte (y no será exigible disposición alguna de cualquiera de dichos contratos que provea para dicho incumplimiento, terminación o ejecución) o para obtener posesión o ejercer control sobre cualquier propiedad del Banco o afectar cualquier derecho contractual del Banco, sin el consentimiento del síndico del Banco dentro de los primeros noventa (90) días de la designación de dicho síndico; disponiéndose, sin embargo, que ninguna disposición de este párrafo será aplicable a un contrato de seguro de responsabilidad de directores o funcionarios o a una fianza de una institución financiera ni se interpretará como que le permite al síndico incumplir con alguna disposición de alguno de dichos contratos que de otra manera fuese válida."

## CAPÍTULO 2. — ENMIENDAS A LA LEY ORGÁNICA DEL BGF RELACIONADAS AL PODER DE ORGANIZAR Y OPERAR UN BANCO PUENTE

*[Nota: El Art. 301 de la Ley 5-2017, derogó el anterior Cap. 2 y renumeró el existente Cap. 4 como el 2]*

### Artículo 201. — Nuevo Artículo 14 de la Ley Núm. 17

Se añade un Artículo 14 a la Ley Núm. 17 de 23 de septiembre de 1948, según enmendada, que leerá como sigue:

"Artículo 14. — Poder para organizar y operar un Banco Puente.

A. Una vez se designe un síndico para el Banco, el Secretario de Hacienda de Puerto Rico tendrá facultad para, a su discreción, organizar un banco temporero, al cual se le referirá como "Banco Puente", para asistir al síndico a llevar a cabo sus funciones y obligaciones. Dicho banco se organizará conforme a una Resolución de Constitución aprobada por el Secretario de Hacienda de Puerto Rico, la cual deberá radicarse en el Departamento de Estado. El banco puente se organizará en la fecha que se presente la Resolución de Constitución en el Departamento de Estado. El Departamento de Estado procederá a registrar el banco puente como una institución bancaria. Cualquier enmienda a la Resolución de Constitución será también presentada en el Departamento de Estado. La fecha de vigencia será la fecha de presentación.

B. Un banco puente organizado bajo este Artículo tendrá (1) los poderes, beneficios y atributos establecidos en el Artículo 2 de esta Ley y las exenciones contributivas que contempla el Artículo 5 de esta Ley, y (2) aquellos poderes, derechos, funciones y responsabilidades conferidos, y las limitaciones impuestas, al Banco por esta Ley, y por cualquier otra ley federal

o del Estado Libre Asociado, salvo en la medida en la que el Secretario de Hacienda de Puerto Rico, en la Resolución de Constitución del banco puente, limite los poderes, beneficios, atributos, derechos, funciones, responsabilidades y limitaciones establecidos en los subincisos (1) y (2). Las disposiciones de la Ley Núm. 55 de 12 de mayo de 1933, según enmendada, conocida como "Ley de Bancos de Puerto Rico", no aplicarán al banco puente. Dicho banco puente estará bajo la administración de una junta de directores, que inicialmente será la Junta de Directores del Banco y posteriormente, o luego de producirse una vacante, será nombrada de la misma manera que los miembros de la Junta de Directores del Banco eran nombrados de acuerdo a esta Ley. En la medida que el síndico le transfiera al banco puente cualquiera de las subsidiarias del Banco cuya Junta de Directores es la misma que la del Banco, la Junta de Directores de dicha subsidiaria será, luego de dicha transferencia, la misma que la del banco puente.  Si el banco puente dejase de existir, los miembros de la Junta de Directores de cualquier subsidiaria sobreviviente serán nombrados de la misma manera que los miembros de la Junta de Directores del Banco eran nombrados de acuerdo a esta Ley. El nombre del banco puente se especificará en la Resolución de Constitución.  Para evitar cualquier duda, se aclara que cuando se organice un banco puente, cualquier referencia al Banco en cualquier ley del Estado Libre Asociado, se entenderá que se refiere o aplica a dicho banco puente, según sea el caso, pero en ninguna circunstancia el banco puente será responsable por cualquier responsabilidad del Banco a menos que el banco puente expresamente asuma dicha obligación. El Secretario de Hacienda podrá incluir en la Resolución de Constitución una disposición donde cualquiera de todas de las subsidiarias y afiliadas del Banco se convertirá en una subsidiaria o una afiliada del banco puente.

C.  El síndico podrá transferir cualquier o todo de los poderes, derechos, funciones y deberes del Banco y cualquier propiedad, intereses contractuales u operacionales o relaciones entre el Banco y sus subsidiarias y afiliadas del banco puente, según se determine que sea apropiado.

D.  Al transferir activos y pasivos a un banco puente y llevar a cabo sus operaciones, el síndico podrá ejercer todos los derechos otorgados al síndico y no estará sujeto a limitación alguna sobre la transferencia de activos o deberes establecidos en esta Ley al hacerse tal transferencia.

E.   El banco puente podrá (1) asumir aquellas responsabilidades del Banco, incluyendo depósitos, que el síndico pueda, a su discreción, determinar sean apropiados; (2) adquirir aquellos activos incluyendo activos asociados con fideicomisos del Banco que el síndico, a su discreción, determine sean apropiados; (3) asumir dichos derechos, títulos, poderes, privilegios, intereses o autoridades del Banco con respecto a sus subsidiarias o afiliadas cuyas subsidiarias o afiliadas tendrán a partir de ese momento todos los derechos, títulos, poderes, privilegios, intereses o autoridades que ellos gozaban el día que fueron transferidos al banco puente, y (4) realizar cualquier otra acción temporera que el Secretario de Hacienda, a su discreción, recomiende de acuerdo con esta Sección. Dicho banco puente no estará sujeto a cualquier requisito que le requiera mantener reservas de depósitos sobre cierto nivel según lo disponga alguna ley aplicable y, en la medida que un requisito de reserva podría aplicarse al banco puente, el Secretario de Hacienda tendrá potestad para renunciar a este requisito cuando conceda permiso para organizar dicho banco puente.

F.   El síndico ordenará la transferencia de todo el personal de carrera, transitorio y/o de confianza que trabaje en el Banco al banco puente y dichos empleados se convertirán en empleados del banco puente. Esta trasferencia de empleados se hará respetando los términos y

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

condiciones de empleo vigentes al momento de la designación del síndico, incluyendo, los derechos, privilegios, obligaciones y antigüedad, adquiridos bajo las leyes, convenios de negociación colectiva y reglamentos de personal en vigor, sujeto a las modificaciones contenidas en la Ley 66-2014, según enmendada, mientras ésta continúe en vigor. Ninguna de las disposiciones de esta Ley afectará el derecho constitucional a la negociación colectiva que han disfrutado los empleados del Banco, ni los derechos, beneficios y privilegios adquiridos por virtud de los convenios colectivos. El banco puente reconocerá las uniones que representan a los empleados unionados del Banco transferidos a un banco puente y asumirá los convenios de negociación colectiva aplicables vigentes a la fecha. Se garantizarán también aquellos derechos relacionados a pensiones o a un sistema de retiro al cual puedan estar afiliados o del cual sean miembros a la fecha de efectividad de esta Ley. El banco puente vendrá obligado a satisfacer a todos los empleados cualesquiera salarios, sueldos o comisiones, incluyendo pago por concepto de vacaciones, mesada y licencia por enfermedad u otros beneficios de empleo similares adquiridos previo a la designación del síndico, conforme a las políticas de empleo del Banco o las leyes aplicables.

G.  El banco puente, y cada una de sus subsidiarias, será una instrumentalidad pública y corporación pública independiente del Estado Libre Asociado de Puerto Rico, con existencia legal separada, autonomía fiscal y administrativa, e independencia del Estado Libre Asociado.

H.  Un banco puente se tratará como un banco en incumplimiento en aquellas ocasiones y para aquellos propósitos que el síndico del Banco, a su discreción, determine, y no será tratado como si estuviera insolvente o en un estado de impago.

I.  El Secretario de Hacienda de Puerto Rico podrá proveer fondos en nombre del Estado Libre Asociado de Puerto Rico, garantías bajo la Ley Núm. 12 de 9 de mayo de 1975, según enmendada, o cualquier otro apoyo adecuado para facilitar el funcionamiento y los negocios del banco puente y cualquier de sus subsidiarias de conformidad con las facultades provistas en esta Ley, y facilitar cualquier transacción del banco puente descrita en este Artículo o facilitar la adquisición o transferencia de cualquier función o activo, o la asunción de cualquier pasivo, del Banco o del banco puente, según se dispone en esta Ley.

J.  El síndico del Banco puede transferir cualquier operación, activo o pasivo del Banco incluyendo cualquier operación, activo o pasivo asociado con fideicomisos al banco puente de acuerdo con, y sujeto a, las restricciones de los incisos (A) al (D) de este Artículo 14. En cualquier momento después del establecimiento del banco puente, el síndico podrá  transferir cualquier operación, activo o pasivo del Banco o del banco puente y tomar cualquier otra acción que entienda, a su discreción, apropiada, de acuerdo con, y sujeto a, las restricciones de los incisos (A) al (D) de este Artículo 14. La transferencia de cualquier operación, activo o pasivo a un banco puente será efectiva sin necesidad de ninguna aprobación adicional bajo las leyes del Estado Libre Asociado, cesión o consentimiento con respecto a éstas. Se podrán transferir activos a un banco puente a cambio de la obligación de dicho banco de pagar, a través de un periodo de tiempo, con intereses a la tasa de interés legal aplicable, una cantidad determinada por el síndico, cuya cantidad no podrá ser menor a la cantidad que los acreedores del Banco, cuyas obligaciones no fueron asumidas por el banco puente, hubieran recibido por el valor de los activos transferidos al banco puente, luego de tomar en consideración el beneficio que reciban los acreedores del Banco tras la asunción por el banco puente de las obligaciones del Banco, como si el Banco se hubiese liquidado en la fecha de la designación

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

del síndico ("Valor de Liquidación Neto"). A petición del banco puente, cualquier acción judicial de la cual un banco puente advenga parte en virtud de la adquisición de cualquier activo o asunción de cualquier pasivo del Banco se paralizará por un periodo de no más de noventa (90) días (o un periodo más corto o largo con el consentimiento de todas las partes). El síndico determinará el Valor de Liquidación Neto tomando el promedio de dos estimados de dicho valor preparados por dos expertos en valoración a los que se les haya provisto acceso completo a los récords del Banco y tiempo razonable para determinar el Valor de Liquidación Neto probable, neto de gastos, que se pudiera obtener de los activos del Banco si estos se vendieran con una cantidad razonable de mercadeo dentro de noventa (90) días del comienzo de la sindicatura; disponiéndose, sin embargo, que si el estimado más alto del Valor de Liquidación Neto es más de veinte porciento (20%) más alto que el estimado más bajo, el síndico debe contratar a un tercer experto en valoración independiente para que prepare un estimado adicional, teniendo acceso a los récords del Banco por un periodo de tiempo razonable, y el Valor de Liquidación Neto debe ser el promedio de los dos estimados más altos. Si un acreedor cuestiona el Valor de Liquidación Neto en un procedimiento judicial, se creará una presunción rebatible de que el Valor de Liquidación Neto es correcto.

K. Ningún banco puente que el Secretario de Hacienda organice como parte de la resolución o reestructuración del Banco, y ningún cesionario ulterior de todas o parte de las operaciones, activos o pasivos del Banco, será una entidad sucesora del Banco ni estará sujeto a ninguna responsabilidad derivada de las operaciones del Banco antes de la designación del síndico, salvo por lo acordado contractualmente entre el banco puente y el síndico, según sea el caso.

L. Sujeto a los incisos (M) y (P), la carta constitucional de un banco puente expirará dos (2) años después de su aprobación o en cualquier fecha anterior que el Secretario de Hacienda establezca. El Secretario de Hacienda puede, a su discreción, extender la condición de un banco puente como tal por no más de tres (3) periodos adicionales de un (1) año cada uno. La terminación de la carta constitucional para el banco puente no afectará ninguna de sus subsidiarias y afiliadas, y cada una permanecerá como corporación pública e independientes, salvo que se establezca lo contrario por el Secretario de Hacienda, cuyas juntas de directores serán nombradas de la misma manera que la junta de directores del Banco fue nombrada.

M. El Secretario de Hacienda podrá modificar la carta constitucional del banco puente para reflejar la terminación de la condición del banco puente como tal y proveer que el banco puente deberá ser un banco nuevo, tras lo cual el banco puente tendrá todos los derechos, poderes o privilegios aplicables bajo sus documentos constitutivos y las leyes del Estado Libre Asociado. Con relación a esto, el Secretario de Hacienda de Puerto Rico podrá tomar aquellos pasos que sean necesarios y convenientes para reincorporar al banco puente bajo las leyes del Estado Libre Asociado de Puerto Rico e, independientemente de lo que disponga cualquier otra ley del Estado Libre Asociado, tal entidad se considerará que adquiere por operación de ley todos aquellos derechos, títulos, poderes e intereses del banco puente establecidos en su carta constitucional.

N. El banco puente podrá tomar cualquier y toda acción que sea razonable y necesaria para permitir que el banco puente continúe realizando sus operaciones regulares y cumpla con sus deberes legales, incluyendo, pero sin limitarse a, lo siguiente—

  (1) estableciendo condiciones o restricciones sobre las operaciones del banco puente, incluyendo eximir del cumplimiento con requisitos establecidos por otras leyes aplicables,

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

en todo o en parte, incluyendo los que requieren que el banco puente mantenga una reserva de depósitos por encima de cierto límite;

(2) limitando o condicionando el desembolso de préstamos;

(3) limitando o condicionando retiros o transferencias de depósitos según los términos que disponga el banco puente para atender las necesidades de liquidez del banco puente y facilitar la habilidad del banco puente a realizar sus operaciones normalmente; y

(4) limitando o suspendiendo

pagos de cualquier obligación;

pagos sobre cualquier carta de crédito (letter of credit); y

cualquier obligación o compromiso de prestar o proveer dinero o crédito.

O.   No obstante cualquier disposición en esta Ley a lo contrario, el banco puente no tendrá la autoridad de exigir depósitos de entidades gubernamentales conforme a los requisitos del Artículo 1, de la Ley 24-2014.

P.   No obstante cualquier otra disposición de las leyes del Estado Libre Asociado, si la condición del banco puente como tal no ha terminado de conformidad con la subsección (L) o (M), (1) la Junta de Directores, con la aprobación del Secretario de Hacienda de Puerto Rico podrá disolver el banco puente conforme a este inciso en cualquier momento y (2) la junta de directores del banco puente, con la autorización del Secretario de Hacienda deberá comenzar inmediatamente procedimientos de liquidación de conformidad con este párrafo tras la expiración del periodo de dos (2) años a partir de la fecha de la organización del banco puente, o cualquier extensión de este término de conformidad con el inciso (M). El Secretario de Hacienda podrá designar un síndico para un banco puente si determina que dicha acción facilita la liquidación final del banco puente o del banco bajo sindicatura. El síndico de un banco puente deberá liquidar los asuntos del banco puente de conformidad con las disposiciones aplicables a la resolución del Banco bajo esta Ley. Con relación a cualquier banco puente, el síndico tendrá todos los derechos, poderes y privilegios y llevará a cabo las responsabilidades relacionadas al ejercicio de dichos derechos, deberes, poderes o privilegios otorgados por la ley al síndico del Banco bajo esta Ley e, independientemente de cualquier otra disposición de ley del Estado Libre Asociado, en el ejercicio de dichos derechos, poderes y privilegios, el síndico no estará sujeto a la dirección o supervisión de ninguna agencia del Estado Libre Asociado, con excepción de lo que se provee para un síndico del Banco en esta Ley."

## CAPÍTULO 3. — ENMIENDAS A LA LEY ORGÁNICA DEL BDE RELACIONADAS A LA SINDICATURA

*[Nota: El Art. 301 de la Ley 5-2017, derogó los anteriores Capítulos 1 y 2, y renumeró el existente Cap. 5 como 3]*

**Artículo 301. — Enmiendas al Artículo 11 de la Ley Núm. 22 del 24 de julio de 1985**

Se enmienda el Artículo 11 de la Ley Núm. 22 del 24 de julio de 1985, según enmendada, para que lea en su totalidad como sigue:

"Artículo 11. — Nombramiento y poderes de un síndico.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

A.  La Junta de Directores del Banco o el Secretario de Hacienda de Puerto Rico tendrán autoridad para recomendarle al Gobernador la designación de un síndico para el Banco si la Junta de Directores del Banco o el Secretario de Hacienda de Puerto Rico determina que (1) los activos del Banco son menores que sus obligaciones a sus acreedores; (2) el Banco es incapaz de pagar sus deudas a su vencimiento en el curso ordinario de los negocios; (3) el Banco está operando de manera insegura o inapropiada para desempeñar sus funciones estatutarias; o (4) el Banco ha incurrido o es probable que incurra en pérdidas que agotarán todo o sustancialmente todo su capital, y no hay una expectativa razonable de que el Banco llegue a estar adecuadamente capitalizado.

B.  Tras recibir una recomendación conforme al inciso (A), el Gobernador podrá (1) designar, o solicitarle al Secretario de Hacienda de Puerto Rico que designe, un síndico para el Banco; (2) designar a otra entidad, ya sea una entidad privada o instrumentalidad gubernamental existente o nueva, después de consultar con el Secretario de Justicia, para asumir las responsabilidades de pago y funciones depositarias del Banco; y (3) designar Juntas de Directores nuevas, y si es necesario, de cualquiera de las subsidiarias directas o indirectas o afiliadas que podrán haber tenido la misma Junta de Directores del Banco. En el ejercicio de la discreción del Gobernador o del Secretario de Hacienda de Puerto Rico, cualquier persona podrá ser nombrada síndico.

C.  Excepto en la medida que se pruebe mediante sentencia final y firme que la persona haya incurrido en conducta dolosa para beneficio propio o en negligencia crasa que conlleve una indiferencia temeraria de sus deberes y la omisión de llevarlos a cabo, los miembros de la Junta de Directores y los funcionarios del Banco y cualquier subsidiaria del Banco, cualquier empleado, agente del Banco o cualquier subsidiaria del Banco, cualquier síndico o aquellas personas privadas o entidades contratadas, designadas o empleadas por dicho síndico no tendrán responsabilidad personal hacia ninguna entidad y, sin necesidad de notificación u orden adicional, serán exonerados de responsabilidad por acciones u omisiones de buena fe en su capacidad, y dentro de su autoridad bajo esta Ley. Cualquier reclamación contra una persona o entidad enumerada en este inciso con relación a sus actos u omisiones relacionados a, o que surjan de, esta Ley deberá presentarse en el Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan.

D.  Inmediatamente después de la designación de un síndico, dicho síndico adquirirá (1) todos los derechos, títulos, poderes y privilegios del Banco y de cualquier titular de cuenta, depositante, oficial o director del Banco con relación al Banco y a los activos del Banco, con poder absoluto para realizar todos los actos y ejecutar en nombre y en representación del Banco todas las funciones, incluyendo, sin limitación, otorgar escrituras, recibos y otros documentos; y (2) título sobre los libros, récords y activos de cualquier sindico anterior o cualquier otro custodio legal del Banco.

E.  Inmediatamente después de la designación de un síndico, dicho síndico podrá (1) hacerse cargo de y operar los activos del Banco con todos los poderes de los directores y oficiales del Banco, incluyendo el poder de emplear y utilizar el sello del Banco y llevar a cabo todo negocio del Banco; (2) recaudar todas las obligaciones y dinero adeudado al Banco, incluyendo, sin limitación, llevar a cabo todos los actos necesarios para obtener pago de cualquier dinero adeudado por cualquier deudor del Banco o su patrimonio, para evidenciar, establecer prioridad y reclamar en la quiebra, insolvencia o embargo de cualquier deudor del Banco

cualquier balance contra cualquier patrimonio y para recibir pagos en cualquier procedimiento por dinero adeudado al Banco; (3) vender, transferir y comprometer cualquier activo, pasivo, derecho, poder u obligación del Banco, a través de subasta pública o contrato privado, sin necesidad de aprobación alguna, cesión o consentimiento con relación a dicha transferencia y sin pago de ninguna tarifa, cargo, sello, comprobante de inscripción u otro comprobante; (4) elaborar, aceptar, realizar, comprometer, terminar y endosar cualquier letra de cambio, pagaré u otro documento u obligación del Banco en nombre y en representación del Banco; (5) proveer o facilitar a través de garantías o de otra manera el financiamiento necesario para cumplir los propósitos y ejercer los poderes autorizados por esta Ley; (6) retener, nombrar y contratar los servicios de personas y entidades privadas, bajo aquellos términos y condiciones que el síndico apruebe, para ayudar al  síndico en el desempeño de las responsabilidades bajo esta Ley, y dichas personas o entidades privadas tendrán el pleno recurso de los poderes y derechos del síndico, según sea el caso, en la manera en que lo ordene, limite o dirija el síndico; (7) demandar y ser demandado, salvo en la medida en la que esto se limite en esta Ley, y realizar en nombre del Banco todas las funciones de éste que sean consistentes con la designación del síndico; (8) según sea apropiado, preservar y conservar los activos y la propiedad del Banco; (9) pagar todas las reclamaciones y obligaciones válidas del Banco de acuerdo con las disposiciones y limitaciones de esta Ley; (10) investigar e instar toda reclamación o acción judicial y cobrar las sentencias de las reclamaciones en contra de personas que puedan ser responsables por los daños y las pérdidas del Banco por negligencia o alguna otra falta; (11) ejercer todos los derechos y autorizaciones expresamente concedidos bajo esta Ley al síndico, respectivamente, y aquellos poderes incidentales que sean necesarios para llevar a cabo los poderes concedidos; y (12) tomar cualquier acción autorizada por esta Sección que el síndico entienda está en los mejores intereses del Banco o sus depositantes y acreedores.

F.  El síndico:

(1) podrá colocar al Banco en liquidación y proceder a vender los activos del Banco, teniendo en cuenta las funciones y responsabilidades del Banco.

(2) podrá permitir, rechazar o de alguna otra manera hacer determinaciones sobre reclamaciones conforme a los requisitos de este Artículo.

(3) deberá (i) publicar sin demora en un periódico de circulación nacional, en un periódico de circulación local y en el portal electrónico del Banco un aviso general a los acreedores del Banco y enviará por correo una notificación a los acreedores que aparezcan en los récords del Banco para que presenten sus reclamaciones al síndico, junto con evidencia de éstas, en o antes de la fecha especificada en la notificación, la cual deberá ser al menos noventa (90) días después de la publicación de dicha notificación; (ii) publicar otra notificación aproximadamente treinta (30) días después de la publicación bajo la cláusula (i); y (iii) si se descubriese el nombre y la dirección de un acreedor que no esté identificado en los récords del Banco, se deberá enviar notificación a dicho acreedor dentro de los treinta (30) días de dicho descubrimiento.

(4) determinará si permitirá o no la reclamación y notificará al reclamante, por correo a la dirección identificada en la reclamación, de cualquier decisión del síndico sobre dicha reclamación, estableciendo las razones para cualquier denegatoria de la reclamación y los procedimientos disponibles para revisión adicional, no más de ciento ochenta (180) días

después de la fecha en la que se presentó la reclamación al síndico. Dicho periodo podrá extenderse a través de un acuerdo escrito entre el reclamante y el síndico.

(5) no tendrá que prestar fianza y podrá designar a un agente o agentes para asistirle en sus deberes como síndico. El síndico fijará los honorarios, la compensación y los gastos de liquidación, los cuales podrán ser pagados por éste de los fondos que estén en su posesión como síndico.

G. Si el síndico deniega una reclamación o parte de ella, o si el síndico no toma una decisión dentro de los ciento ochenta (180) días desde que se presenta cualquier reclamación y no ha habido una extensión de dicho término, el reclamante podrá presentar una acción judicial con relación a dicha reclamación (o continuar una acción iniciada antes de la designación del síndico) en la Sala de Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas creada por la Ley 71-2014, y si dicha sala no está operando, el Tribunal de Primera Instancia, Sala de San Juan, dentro de los sesenta (60) días de la desestimación de toda o cualquier parte de la reclamación o la expiración del término de ciento ochenta (180) días para la determinación de las reclamaciones. Si el reclamante no presenta una acción judicial sobre su reclamación (o no continúa una acción iniciada antes de la designación del síndico) dentro de dicho término, se entenderá abandonada la reclamación (salvo cualquier parte de la reclamación que haya sido permitida por el síndico), y tal abandono será final y el reclamante no tendrá derechos o remedios adicionales con relación a dicha reclamación. Ningún tribunal tendrá jurisdicción para tomar alguna acción, y ningún reclamante podrá continuar alguna acción judicial pendiente contra el Banco en sindicatura, hasta que el reclamante haya agotado todos los remedios especificados en esta Sección. Una vez se hayan agotado todos los remedios antes mencionados, cualquier acción judicial con relación a dicho reclamo debe radicarse o continuarse dentro de sesenta (60) días y, de no radicarse dentro de dicho periodo, el reclamante no tendrá más derechos o remedios con relación a dicha reclamación y ningún tribunal tendrá jurisdicción.

H. Cada persona que tenga una reclamación contra el Banco o la sindicatura no deberá recibir, en ningún caso, pago o propiedad con un valor menor a la cantidad que el acreedor hubiese tenido derecho a recibir si el Banco se hubiese liquidado en la fecha de la designación del síndico, y la máxima responsabilidad a cualquier persona que tenga una reclamación contra el Banco o el síndico o la sindicatura deberá ser igual que la cantidad que dicho acreedor hubiese recibido si el Banco se hubiese liquidado en la fecha de la designación del síndico.

I. El síndico deberá pagar todas las obligaciones válidas del Banco de acuerdo con las disposiciones y limitaciones de esta Ley.

J. El derecho a ceder o transferir conferido en los Artículos 11 al 13 de esta Ley reemplazará todos los demás derechos e intereses, incluyendo, sin limitación, los derechos a consentir u objetar a dicha transferencia o cesión que pudieran tener otras partes bajo contratos de empleo, arrendamientos, cobros, hipotecas, "indentures" u otros acuerdos en los que el Banco pueda haber participado previo a la designación del síndico. Todo funcionario público que tenga el poder de aceptar y registrar o modificar cualquier entrada en cualquier registro relacionado a la transferencia o cesión de un activo o pasivo debe, previa solicitud del síndico, cesionario u otra persona, hacer todo lo necesario bajo las leyes para completar el registro de la cesión o transferencia.

K.  Una vez designado un síndico para el Banco, dicho síndico podrá solicitar una paralización de cualquier acción o procedimiento judicial o administrativo en el que el Banco sea o se convierta en parte por un periodo que no excederá noventa (90) días. El tribunal o ente administrativo que reciba una solicitud de cualquier  síndico para la paralización de cualquier acción o procedimiento judicial o administrativo de conformidad con este párrafo deberá conceder dicha paralización con relación a todas las partes.

L.  Salvo lo que se dispone en esta Ley, ningún tribunal, funcionario, empleado o departamento del Estado Libre Asociado de Puerto Rico podrá tomar acción alguna, excepto a solicitud del síndico, para restringir o afectar el ejercicio de los poderes y funciones del  síndico. Salvo lo que se dispone en esta Ley, el remedio exclusivo en cualquier acción judicial en contra de la sindicatura o el Banco bajo sindicatura, será daños compensatorios, los cuales no incluirán daños punitivos o ejemplares, daños por pérdida de oportunidad o ganancia o daños por sufrimiento o angustias.

M.   Una vez designado un síndico para el Banco, éste tendrá discreción para utilizar los servicios de aquellos empleados del Banco que sean necesarios para llevar a cabo sus funciones y facultades autorizadas por esta Ley y, en ese sentido, podrá suspender temporeramente toda cláusula, precepto y/o disposición aplicable a dichos empleados y/o puestos del Banco contenidas en leyes, convenios colectivos, acuerdos, acuerdos suplementarios, políticas, manuales de empleo, cartas circulares, cartas contractuales, addenda, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación y/o planes de retribución, referentes a toda y cualquier condición de empleo, siempre y cuando a dichos empleados no se le reduzca el sueldo o sus beneficios marginales.  El síndico también podrá ordenar, efectuar o solicitar destaques y/o traslados de los empleados del Banco a otras agencias o entidades existentes o creadas por ésta y/o cualquier legislación, incluyendo a cualquier subsidiaria del Banco.  En el caso de liquidación del Banco, el síndico también podrá efectuar cesantías.   De los empleados del Banco ser permanentemente transferidos a una agencia existente, sus términos y condiciones de empleo quedarán modificados para ajustarse a cualquier ley, reglamento y/o convenio que atienda la retribución y clasificación de los empleados de la agencia a la cual ha sido trasferido. En todo caso, se respetarán los términos y condiciones de empleo vigentes al momento de la designación del síndico, incluyendo, los derechos, privilegios, obligaciones y antigüedad, adquiridos bajo las leyes, convenios de negociación colectiva y reglamentos de personal en vigor, sujeto a las modificaciones contenidas en la Ley 66-2014 mientras ésta continúe en vigor.  También en todo caso se garantizará que se satisfaga a todos los empleados cualesquiera salarios, sueldos o comisiones, incluyendo pago por concepto de vacaciones, mesada y licencia por enfermedad u otros beneficios de empleo similares adquiridos previo a la designación del síndico, conforme a las políticas de empleo del Banco o las leyes aplicables.

N.   Para propósitos de interpretar los Artículos 11 al 13 de esta Ley, un tribunal debe considerar, en la medida en que sea aplicable, jurisprudencia interpretativa del Título 12 del Código de los Estados Unidos."

**Artículo 302. — Nuevos Artículos 12 al 25 de la Ley Núm. 22 de 24 de julio de 1985**

Se reenumeran los Artículos 12 al 23 de la Ley Núm. 22 de 24 de julio de 1985, según enmendadas, como Artículos 14 al 25, y se añaden nuevos Artículos 12 al 13, que leerán en su totalidad como sigue:

"Artículo 12. — Prioridad de gastos y reclamaciones no garantizadas en sindicatura.

A.  Las reclamaciones no garantizadas contra el Banco o el síndico del Banco bajo esta Ley que hayan sido debidamente evidenciadas a satisfacción del síndico deberán ser pagadas en el siguiente orden de prioridad:
　　(1) Gastos administrativos del síndico.
　　(2) Salarios, sueldos o comisiones, incluyendo pago por concepto de vacaciones, mesada y licencia por enfermedad u otros beneficios de empleo similares adquiridos por un individuo previo a la designación del síndico, conforme a las políticas de empleo del Banco o las leyes aplicables.
　　(3) Contribuciones adeudadas a planes de beneficio de empleados relacionadas a servicios prestados previo a la fecha la designación del síndico.
　　(4) Cualquier saldo pendiente de pago por dinero en posesión del Banco en sus cuentas de depósito para crédito del depositante y cualquier otra obligación general o preferente del Banco (que no sea una de las obligaciones que se describen en el inciso (5)).
　　(5) Cualquier obligación que sea subordinada a los acreedores generales por medio de ley o contrato.
B.  Este Artículo no afectará los créditos colateralizados o gravámenes sobre activos o bienes en posesión del Banco, y dichos créditos colateralizados o gravámenes sobre activos o bienes deberán ser pagados de la colateral o del valor realizado de la colateral. En la medida en la que la colateral sea insuficiente para satisfacer la reclamación, la diferencia entre la reclamación y el valor realizado de la colateral deberá ser pagada de acuerdo con este Artículo.
C.  No obstante cualquier otra disposición de esta Ley o de la Ley de Moratoria de Emergencia y la Rehabilitación Financiera de Puerto Rico, cualquier obligación o compromiso de prestar o proveer dinero o crédito, un depositante o síndico puede compensar o canjear el monto de su depósito contra cualquier saldo pendiente de un préstamo con el Banco como pago completo y final de tal obligación hasta la cantidad del depósito.
D.  La prioridad por gastos administrativos, según esta frase se utiliza en el inciso (A), incluirá, (i) aquellas obligaciones incurridas por el Banco previo a la designación del síndico relacionadas a bienes y servicios provistos al Banco previo a dicha designación, con excepción de reclamaciones individuales en exceso de una cantidad a ser determinada por el síndico a su discreción razonable, (ii) aquellas obligaciones incurridas por el Banco luego de la designación del síndico relacionadas a bienes y servicios provistos al Banco luego de dicha designación y (iii) cualquier otra obligación que el síndico determine sea apropiada para facilitar la resolución ordenada del Banco.
E.  El Secretario de Hacienda, luego de haber consultado con el síndico y el Gobernador, tendrá el poder de renunciar a, reducir, subordinar, o asignar cualquier reclamación de una unidad gubernamental excepto si dicha unidad gubernamental es un municipio, sin embargo,

cualquier porción de la reclamación que ha sido asignada de acuerdo con esta subsección no podrá ser compensada por el cesionario según dispuesto en la subsección (C) de esta Sección.

Artículo 13. — Disposiciones Relacionadas a Contratos Celebrados antes del Nombramiento del Síndico.

A.  Salvo por lo que se dispone en este Artículo, el síndico podrá exigir el cumplimiento de cualquier contrato o acuerdo celebrado por el Banco a pesar de que el mismo contenga alguna disposición contractual que provea para la terminación, incumplimiento, aceleración o ejercicio de algún otro derecho como resultado de, o por razón de, la insolvencia o la designación de un síndico a medida que sea necesario para una administración ordenada y/o una liquidación de los asuntos del Banco.

B.  Además de cualquier otro derecho que el síndico pueda tener, el síndico, en el ejercicio de sus poderes de administrar y liquidar el Banco, puede anular o repudiar cualquier contrato o arrendamiento (1) del cual el Banco sea una parte; (2) si, a discreción del síndico, sería oneroso continuar el cumplimiento de dicho contrato; y (3) si, a discreción del síndico, la anulación o repudiación de dicho contrato o arrendamiento fomentaría la administración ordenada y/o una liquidación de los asuntos del Banco

C.  El síndico designado debe determinar si ejercerá o no los derechos de repudiación bajo esta Sección dentro de los ciento ochenta (180) días de su designación.

D.  La responsabilidad de la sindicatura por la anulación o repudiación de cualquier contrato bajo el inciso (B) debe estar (1) limitada a daños compensatorios directos reales y (2) determinada a la fecha de la designación del síndico. Para propósitos de este inciso, la frase "daños compensatorios directos reales" no incluye daños punitivos o ejemplares, daños por pérdida de oportunidad o ganancia o daños por sufrimiento o angustias.

E.  Ninguna persona podrá ejercer un derecho o poder para terminar, acelerar o declarar un incumplimiento bajo un contrato del cual el Banco sea parte (y no exigible será disposición alguna de cualquiera de dichos contratos que provea para dicho incumplimiento, terminación o ejecución) o para obtener la posesión o ejercer control sobre una propiedad del Banco o afectar algún derecho contractual del Banco y el síndico podrá exigir el cumplimiento de cualquier contrato a pesar de cualquier disposición del contrato que provea para la terminación, incumplimiento, aceleración o ejercicio de derechos por, o exclusivamente por razón de la insolvencia, la condición financiera, la designación o el ejercicio de los derechos o poderes de un síndico, o la transferencia de cualquier operación, activo o pasivo del Banco a cualquier otra persona o entidad; disponiéndose, sin embargo, que ninguna disposición de esta sección deberá interpretarse como que impide o afecta cualquier derecho del síndico a exigir el cumplimiento de, o a recuperar bajo, un contrato de seguro de responsabilidad de un director o funcionario o una fianza de una institución financiera bajo alguna otra ley aplicable.

F.  Ninguna persona podrá ejercer ningún derecho o poder para terminar, acelerar o declarar un incumplimiento bajo cualquier contrato del cual el Banco sea parte (y no será exigible disposición alguna de cualquiera de dichos contratos que provea para dicho incumplimiento, terminación o ejecución) o para obtener posesión o ejercer control sobre cualquier propiedad del Banco o afectar cualquier derecho contractual del Banco, sin el consentimiento del síndico del Banco dentro de los primeros noventa (90) días de la designación de dicho síndico;

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

disponiéndose, sin embargo, que ninguna disposición de este párrafo será aplicable a un contrato de seguro de responsabilidad de directores o funcionarios o a una fianza de una institución financiera ni se interpretará como que le permite al síndico incumplir con alguna disposición de alguno de dichos contratos que de otra manera fuese válida.

CAPITULOS 4 y 5. — *[Nota: El Art. 301 de la Ley 5-2017, derogó los Capítulos 1 y 2 de la Ley 21-2016, según enmendada y renumeró los existentes Capítulos 3, 4 y 5 como 1, 2 y 3; por lo que estos Capítulos se quedaron en blanco]*

CAPÍTULO 6. — Derogado. [Ley 2-2017, Art. 19]

CAPÍTULO 7. — Separabilidad y Vigencia

**Artículo 701. — Separabilidad**

Esta Ley deberá ser interpretada de forma tal que pueda mantener su validez, en la medida en que esto sea posible, conforme a la Constitución del Estado Libre Asociado y la Constitución de los Estados Unidos. Si cualquier cláusula, párrafo, subpárrafo, Artículo, disposición, sección, inciso, o parte de esta Ley fuese declarado inconstitucional por un tribunal con jurisdicción, la orden emitida por dicho tribunal a esos efectos no afectará ni invalidará el resto de esta Ley. El efecto de dicha orden estará limitado a la cláusula, párrafo, subpárrafo, Artículo, disposición, sección, inciso o parte de esta Ley declarada inconstitucional y solamente con respecto a la aplicación del mismo o la misma sobre la obligación cubierta sujeta a dicha controversia.

**Artículo 702. — Vigencia**

Esta Ley entrará en vigor inmediatamente después de su aprobación.

**Part II – English Version of the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act**

(Contains amendments incorporated by:
Act No. 40 of May 5, 2016
Act No. 68 of July 12, 2016
Act No. 2 of January 18, 2017
Act No. 5 of January 29, 2017)

**A. Introduction**

The fiscal situation of the Government of Puerto Rico is more dire than at any other point in its history.   Notwithstanding bold, unprecedented and comprehensive efforts that this Administration has put in place during the last three years to return the Commonwealth of Puerto

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

Rico ("Commonwealth") to a path of economic recovery and fiscal sustainability, the lack of access to the capital markets, high levels of indebtedness and relentless economic headwinds have brought the Government of Puerto Rico's fiscal crisis to a perilous tipping point. This Administration has endeavored to marshal the means to meet debt service payments on its General Obligation bonds (as well as the obligations of other Commonwealth instrumentalities), while providing essential services. However, depleted resources and strained liquidity threaten to bind the Commonwealth to a choice between honoring its commitments to bondholders or continuing to provide the residents of Puerto Rico with essential services.

All governments are morally and legally indebted, first and foremost, to the people they serve and to whom they are accountable. The Commonwealth's obligation to the well-being of its people thus, necessarily, takes precedence over all others. Substantial payment obligations of the Commonwealth and the Government Development Bank for Puerto Rico ("GDB") will come due in the following months, as has been made public before. In light of this juncture, in which the Government of Puerto Rico does not have sufficient resources to comply with debt service obligations as originally scheduled and, additionally, to continue providing essential services to the people, the Commonwealth needs tools to exercise its police powers in order to protect the health, safety and welfare of the people of Puerto Rico.

## B.  Fiscal Reform Efforts

The priority of this Administration has been to address Puerto Rico's fiscal and economic crisis. From inauguration day, this Administration has taken robust measures to correct decades-old problems that had been draining the Commonwealth's finances, to phase out deeply flawed historical fiscal practices, and to secure the necessary financing needs for Puerto Rico's fiscal sustainability. These efforts have been undertaken hand-in-hand with the management of GDB, the Commonwealth's fiscal agent, depositor, and historically, its lender of last resort, which has also adamantly endeavored to manage its own liquidity constraints.

In March of 2014, the Commonwealth issued $3.5 billion in General Obligation bonds due to a pressing need to secure financing. The proceeds of this issuance would provide the Commonwealth with financing as much-needed structural efforts at fiscal reform took place. Well aware that, in order to achieve a sustainable, long-term solution to the Government of Puerto Rico's financial problems, we had to abandon the recurring practice of deficit financing, the proceeds of this issuance were nonetheless used to pay several outstanding obligations and to provide financing while the Administration implemented several fiscal reform measures, and while a number of other structural changes already in place generated results.

Likewise, in order to bolster central government revenues, this government passed Act 72-2015, which increased the Sales and Use Tax from 7% to 11.5%. Additionally on the revenue side, and in order to tackle one of the more pressing issues facing GDB, Act 1-2015 increased the crude oil excise tax. The new revenues were assigned to the Puerto Rico Infrastructure Financing Authority ("PRIFA"), allowing it market access, and the proceeds were pledged to a future bond issuance towards the payment of the Puerto Rico Highways and Transportation Authority's ("HTA") outstanding debt of $2.2 billion held by GDB, for which there was no payment source. HTA's indebtedness to GDB originated as a result of the unsound past practice – particularly from

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

2009 to 2012 – of GDB providing financing to the Commonwealth's instrumentalities without securing a clear and dependable source of repayment.

Additionally, the repeal of Section 936 led to a significant loss of a key funding source for GDB since depositaries of Section 936-funds were required to keep a certain percentage of their Section 936 deposits in GDB. The completion of the 10-year phase out period of Section 936 led to a profound transformation in GDB's funding structure. It likewise to the loss of thousands of manufacturing jobs with catastrophic effects to the Commonwealth's economy. Consequently, GDB was forced to turn to other sources of funds in order to continue providing financing to the Commonwealth and its instrumentalities. Throughout the second-half of the Section 936 phase-out period (2001-2006), GDB relied on a robust commercial paper program as a key source of financing, enabled by the Commonwealth's and GDB's excellent credit rating. As the Commonwealth and, subsequently the GDB, began experiencing the first credit rating downgrades between 2004 and 2006, the viability of the Bank's commercial paper program was put in jeopardy, hence leaving the Bank, once again, without a key source of funding to continue acting as financing agent of the Commonwealth. Therefore, in 2006, GDB issued its first series of notes, which then increased dramatically thereafter from 2009 to 2012. The administration in office during that four-year period brought GDB's outstanding debt to $5.6 billion by June 30, 2012. To make matters worse, GDB's balance sheet was severely compromised during that period, since GDB made a series of long-term loans – including some with maturities over 20 years – while the notes issued during the same period had short-term bullet maturities of between 5 and 15 years. In other words, between 2009 and 2012, GDB incurred a series of medium-term debt obligations but set the receipt of income on its loans to long-term maturities, therefore creating a dramatic imbalance between its assets and liabilities.

Notwithstanding the Legislative Assembly's approval of the measure, and PRIFA's and GDB's attempt to place an issuance of PRIFA bonds, by that time market uncertainty and Moody's Investor Service's downgrading of several of the Commonwealth's outstanding credits had dramatically increased the risk premium on the issuance of PRIFA bonds, and led potential investors to require burdensome and unreasonable concessions as a condition to participate in the deal. Consequently, notwithstanding the fact that the repayment of HTA's debt would have dramatically strengthened GDB's balance sheet and liquidity, market conditions were simply not favorable, and the Commonwealth made the responsible decision to forego what would have been an extremely onerous transaction.

In addition to these and other revenue measures already put in place, through Acts 3-2013 and 160-2013, and an attempt to access the capital markets, this Administration has also begun to implement comprehensive structural reforms to address and stabilize the historic actuarial deficits of Puerto Rico's public employee and teacher's pension systems, respectively. This Legislative Assembly also enacted the Puerto Rico Special Fiscal and Operational Sustainability Act – Act 66-2014 – which introduced profound cuts in central government and public corporation expenditures, and resulted in hundreds of millions of dollars in savings for the Commonwealth without resorting to laying off public employees. Shortly thereafter, and wary of the effect that the debt load of the Commonwealth's public corporations would have on the central government, and on the Government of Puerto Rico's ability to provide essential services, this Legislative Assembly enacted Act 71-2014, the Puerto Rico Public Corporation Debt Enforcement and Recovery Act. Act 71-2014, known as the "Recovery Act," provides a legal framework for

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

restructuring the debts of our public corporations – with due regard to the rights of creditors – while also ensuring that vital public services, such as clean water and electricity, are not interrupted due to debilitating debt loads.

**C. The Krueger Report, the Fiscal and Economic Growth Plan, and Debt Restructuring Efforts**

Having made the responsible decision to cease the flawed and unsustainable practice of deficit financing, the Commonwealth commissioned former World Bank Chief Economist and former deputy director of the International Monetary Fund, Dr. Anne Krueger, to conduct a comprehensive study of Puerto Rico's fiscal and economic outlook.  Dr. Krueger and her team of renowned economists produced their report, Puerto Rico: A Way Forward (the "Krueger Report"), which laid bare the extent of the Commonwealth's fiscal and economic problems, and traced a path to recovery.

The Krueger Report arrived at a number of fundamental conclusions.  First, it concluded that Puerto Rico's fiscal and economic problems are structural in nature, and can thus only be meaningfully addressed by further comprehensive structural reforms.  Second, it concluded that the Government of Puerto Rico had historically underestimated General Fund deficits by leaving out capital expenditures as well as the deficits of other government component units that are regularly and ultimately financed by the central government. Accordingly, the true General Fund deficit was in fact much greater than had been estimated before.  Third, and most importantly, the Krueger Report concluded that the Commonwealth's debt load is unsustainable without significant economic growth.

Based in part on the findings and recommendations of the Krueger Report, on June 29, 2015 Governor García Padilla publicly declared that the Commonwealth's debt is unpayable, and that our Administration would seek to restructure the Commonwealth's debt by way of a voluntary exchange process with our creditors.  Accordingly, shortly thereafter, Governor García Padilla issued Executive Order OE–2015-022, creating the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group"), and ordered the drafting of the Puerto Rico Fiscal and Economic Growth Plan (the "Plan"), which would outline the structural measures needed for Puerto Rico to return to a path of economic growth and fiscal sustainability.

Thereafter, the Working Group published the Plan on September 9, 2015. The Plan set forth a comprehensive program with fiscal and economic measures designed to ignite growth, implement sound fiscal policy throughout the Commonwealth, and restore financial credibility to Puerto Rico.  Also, as an important negotiation tool, it provides our creditors with assurances that the Commonwealth will be able to meet its debt service commitments in the future.

Implementation of many of the measures in the Plan has begun and are projected to bear fruit in the future.  Likewise, discussions with our creditors are also well underway, proposals toward restructuring the Commonwealth's debt have been presented, and negotiations are active and ongoing.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

## D. Extraordinary and Emergency Financial Management Measures

Throughout the last three years, the Commonwealth has implemented several additional extraordinary liquidity preservation and cash management measures with the aim of preserving the government's ability to render essential services, while allowing time for both the fiscal reforms already implemented and the Plan measures to take effect, and also time for negotiations with our creditors to bear fruit.  These extraordinary measures include the following: (1) the Commonwealth received short-term financing from Tax and Revenue Anticipation Notes issued by three public corporations; (2) the Commonwealth received special dividends from public sector entities; (3) the Department of the Treasury required the public employees' and teachers' retirement systems to advance the amounts due to pensioners, as opposed to the traditional payment mechanism whereby Treasury would advance pension payments and have the retirement systems reimburse the central government at a later date; (4) set asides for the payment of general obligation bonds were suspended during fiscal year 2016; (5) payments due to private sector providers were delayed; (6) the disbursement of certain budgetary appropriations was delayed; and (7) tax refunds owed to citizens were delayed, to mention a few.

Furthermore, and notable amongst the extraordinary measures employed by the Commonwealth, the Governor issued Executive Order OE-2015-046 on November 30, 2015, pursuant to Section 8, Article VI of the Commonwealth's Constitution.  This order redirected revenue streams pledged to the payment of debts of PRIFA, HTA, the Puerto Rico Convention Center District Authority, and the Metropolitan Bus Authority which are "available resources" for purposes of Section 8, Article VI, towards the payment of general obligation debt.

Concurrently, GDB has taken its own set of extraordinary cash management measures in order to preserve and maximize liquidity for the central government, and to preserve its own functions and meet its own obligations.  Nonetheless, the measures employed by both GDB and the Commonwealth are temporary, one-off and extraordinary in nature, and not sustainable in the long term, and their effects are quickly waning.

## E.  Need for a Moratorium

Restructuring negotiations are ongoing with our creditors.  GDB has also engaged its own noteholders over the possibility of reaching an agreement in the near future.  We are hopeful that an agreement will be reached that will bring the Commonwealth's debt service within reasonable and sustainable bounds, and with due regard to the rights of our creditors.

We are also actively engaged in litigation over the constitutionality of the Recovery Act before the United States Supreme Court.  The case has been argued and submitted, and we are confident the Court will find our arguments persuasive, that the Recovery Act is within the limits of the U.S. Constitution, and that Congress could not have intended to strip Puerto Rico of the benefits of Chapter 9 of the U.S. Bankruptcy Code, while also prohibiting Puerto Rico from passing the Recovery Act pursuant to its police powers to keep and maintain its fiscal house in order, and to preserve its ability to continue providing essential services to the people.

We are also actively engaged in the federal political process, working together closely with our allies in the U.S. Congress and the White House in the hopes that the U.S. government will provide Puerto Rico with a debt restructuring mechanism by way of federal legislation.  A number

of draft bills have been proposed, and though our creditors are lobbying for their own interests, we are hopeful that Congress will address our debt crisis in a fair and equitable manner.

Notwithstanding progress on many fronts, Puerto Rico is in need of immediate relief. The Commonwealth and GDB face formidable debt-service obligations in the very near future.  On May 1, 2016, GDB is due to make a principal payment of $400 million on GDB notes, but as of April 1, 2016, GDB's liquidity nevertheless stood at only $562 million.  More importantly, the Commonwealth faces its own debt service payment on its general obligation debt of $780 million shortly thereafter on July 1, 2016.  Neither the Government of Puerto Rico nor GDB may have sufficient resources to make their respective payments without potentially jeopardizing the Commonwealth's ability to provide essential services.  The wages of police officers, firemen and other emergency management workers, the funds needed to operate our public health facilities and to provide our schoolchildren with meals during the school day, and our public utilities' ability to provide power and water, all hang in the balance.

The time has come for this Legislative Assembly to act to protect the safety and welfare of the people of Puerto Rico, and empower the executive to declare a moratorium on the government's debts, should the Governor deem it a necessary exercise of this Government's police powers.

## F. The Commonwealth's Police Powers and Legal Basis for a Moratorium

The Commonwealth's police powers derive directly from Article II, Section 19 of the Constitution of the Commonwealth of Puerto Rico, which states that "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health, and general welfare of the people shall likewise not be construed restrictively."  Thus, the Commonwealth wields inherent and broad powers to legislate for the protection of the general welfare of its citizens.  Domínguez Castro v. E.L.A., 178 D.P.R. 1 (2010).  Amongst the inherent powers of a sovereign to legislate for the general welfare of its citizens lies the power to suspend payments and extend due dates and maturities on the obligations of the state and its instrumentalities, in order to address a fiscal or financial crisis or avert a humanitarian disaster.  Ropico, Inc. v. City of New York, 425 F. Supp. 970 (S.D.N.Y. 1976).

Accordingly, pursuant to the Commonwealth's police powers, we the Legislative Assembly of the Commonwealth of Puerto Rico have resolved to provide the Governor with powers to declare a state of emergency for the Commonwealth and its instrumentalities, including GDB, and declare a moratorium on the payment of certain obligations of those entities.  Known as the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (the "Act"), it empowers the Governor with narrowly tailored authority, within the bounds of our body of laws and our Constitution, to enable the Commonwealth and its instrumentalities to continue providing essential services to Puerto Rico's residents while addressing the critical need for structural and fiscal reform and debt restructuring.

The measures prescribed herein are narrowly tailored to meet the paramount public purpose of securing the health, safety and welfare of the people of Puerto Rico and averting the further deterioration of the humanitarian crisis in Puerto Rico, and are the least burdensome of alternatives to accomplish this purpose.   The Act provides for moratorium measures that are temporary in nature and only apply upon a finding by the Governor that invoking the provisions of the Act is necessary to provide for the health, safety and welfare of the residents of the Commonwealth.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

Further, such measures (including the stay on creditor actions) are invoked on an entity-by-entity basis and, without a specification by the Governor of further enumerated obligations, only affect limited financial indebtedness obligations coming due during a temporary period.

In addition, the measures set forth in the Act are crafted with due regard to the rights of Puerto Rico's creditors. The Act does not provide for a composition or discharge of debts; instead, all claims and priorities are preserved, and any unpaid amounts on the obligations of the Commonwealth and its instrumentalities are not forgiven and instead are payable, as set forth in the Act, at the end of any moratorium period to the extent permitted by otherwise applicable law. Further, the Act respects Constitutional priorities by establishing minimum criteria for the payment of the Commonwealth's public debt that may come due during the temporary moratorium period. The Act also provides for the recognition of bona fides property rights and allows creditors access to adequate protection or, in the event of an expropriation, a mechanism to seek just compensation and redress. This Legislative Assembly further recognizes that the measures set forth in this Act, by affording the Commonwealth the ability to stabilize and grow the Puerto Rican economy while avoiding a morass of litigation, represent the best chance for the Commonwealth's creditors to recover their investments. Accordingly, the Act seeks only to empower the Commonwealth to delay payment on certain obligations while protecting creditor rights, and serves its utmost duty to protect the citizens of Puerto Rico.

Additionally, beyond providing for a moratorium alone, and as described in the summary below, the Act addresses GDB's critical situation by modernizing the receivership provisions of its organic act and providing for the authorization to create a bridge bank for GDB, in order to preserve liquidity and valuable assets for the benefit of the Commonwealth and to ease the transition of GDB into a more modern entity. Finally, the Act provides for the creation of an authority specifically designed to take charge of the Commonwealth's restructuring efforts.

This Act is the culmination of years of attempts by this Administration to forestall an economic and humanitarian catastrophe; while such attempts have contributed meaningfully to improving the fiscal position of the Commonwealth, it has become evident to this Legislative Assembly that such measures are no longer sufficient. At the same time, the Commonwealth and its instrumentalities, including GDB, face looming debt service payments in the immediate future, payments that Puerto Rico will not be able to make while still providing for essential services. As a consequence, Puerto Rico stands at the precipice of a disastrous phase of disorderly payment defaults, multiple litigations, and further economic decline as our dwindling resources are devoted to litigation defense instead of paying for essential public services. It is therefore of utmost importance to provide the government with the legal framework to weather this extremely difficult period, and this Act establishes a comprehensive framework of measures that this Legislative Assembly deems reasonable, necessary and narrowly tailored in light of the fiscal and humanitarian emergency that Puerto Rico faces.

## G.  Summary of the Act

The Act's has four primary objectives. The first objective is contained in Chapter 2 of the Act, which authorizes the Governor to (i) declare—at some point in the future—a moratorium on debt service payments for a temporary period for the Commonwealth, GDB, the Economic Development Bank for Puerto Rico ("EDB"), or any of the remaining government

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

instrumentalities of Puerto Rico, and (ii) stay creditor remedies that may result from the moratorium. The second objective is contained in Chapters 3 and 4 of the Act, which amend GDB's Enabling Act to give GDB options and tools that it may need—at some point in the future—to address its own resolution. These amendments (a) modernize GDB's Organic Act related to a receivership for GDB, and (b) authorize the creation of a temporary "bridge" bank to carry on certain of GDB's functions and honor deposits. The third objective is contained in Chapter 5 of the Act, which amends the Enabling Act of the EDB to modernize its receivership provisions. The fourth objective is contained in Chapter 6 to create a new fiscal agency and financial authority.

Summary of Chapter 1 of the Act

Chapter 1 of the Act establishes the general provisions of the law. These provisions include those related to a declaration of a state of emergency, key definitions, and authorization for certain governmental units to hire employees. Chapter 1 also establishes immunities for persons acting in furtherance of this Act by providing that no person (including any person, director, officer, employee, contractor, agent, or representatives) shall have any liability for actions taken, or not taken, in good faith in furtherance of this Act.

Summary of Chapter 2 of the Act

Chapter 2 authorizes the Governor to declare a moratorium and stay creditor remedies with respect to obligations of the government entities covered by the moratorium. It also provides conditions on the government's use of a moratorium and provides protections for creditors, such as preserving security interests and collateral used to secure various obligations.

The provisions of the Act authorizing the Governor to declare a moratorium go into effect immediately upon its enactment, and they generally expire on January 31, 2017. The period during which a moratorium may be declared is defined as the "covered period," and it is subject to a two-month extension by the Governor. The moratorium provisions classify the various Puerto Rico entities (including the Commonwealth itself) into the following two categories because the Act treats the creditors thereof slightly differently: (i) the "Bank," which is defined as GDB and/or the EDB, and (ii) "government entities," which includes the Commonwealth itself and the remaining government entities and public corporations with significant indebtedness in Puerto Rico (regardless of whether they are covered by the Fiscal and Economic Growth Plan issued by the Working Group of the Fiscal and Economic Recovery of Puerto Rico).

The Governor has the power to declare, by executive order, which order may be terminated by the Governor, an emergency with respect to the Bank and/or any government entity during the covered period. The period after such a declaration has been made is known as, with respect to such Bank or government entity, the "emergency period," and the emergency period for all entities ends on the last day of the covered period. The Governor's declaration of an emergency can render the debt service obligations of the Bank or such government entity, as applicable, as "covered obligations." The Governor's declaration can also identify additional obligations specifically or by category—such as obligations related to derivatives—to be "covered obligations." If so provided in an executive order, payments on covered obligations may not be made during the

emergency period, and covered obligations will be due on the last day of the covered period to the extent they are otherwise due before or during the covered period.

During the emergency period for the Bank, legal actions in respect of covered obligations are stayed, and at any time during the covered period, the Governor may take any and all actions reasonable and necessary to allow the Bank to continue performing its operations. The term "reasonable and necessary" is defined to include, among other things, easing restrictions on deposit reserves, suspending payments on letters of credit and extending credit, prohibiting disbursements of loans, and refusing to honor withdrawal requests unless the funds will be used for essential services. During the emergency period for a government entity, including the Commonwealth itself, legal actions in respect of covered obligations are stayed, and the Governor may take any and all actions that are (i) reasonable and necessary to preserve the Commonwealth's ability to continue providing essential public services, or (ii) necessary to provide for the health, safety and welfare of the residents of the Commonwealth. These actions include the ability to expropriate property in a constitutionally permitted manner through eminent domain.

The Act also contemplates that covered obligations (whether of the Bank or other government entities) will either be paid interest or accrue interest during the covered period as follows:

| "Public Debt" (full faith and credit debt protected by the Constitution) | If an interest obligation of the Bank or a government entity is guaranteed by the Commonwealth, or if the interest obligation is a full faith and credit obligation of the Commonwealth, then such interest obligation will be paid in full if due prior to July 1, 2016. Starting July 1, 2016, interest obligations that are public debt will be paid at an amount determined by the Governor after consultation with the Secretary of the Treasury that is consistent with the Constitution. There is no payment if the public debt obligation is for principal or if it is an enumerated obligation and it became due on or after July 1, 2016. |
|---|---|
| Bank Deposits | For deposits of the Bank, interest will accrue based on the nature of the deposits as follows: for time deposits, interest will accrue at the contractual rate until maturity and for deposits that could otherwise be withdrawn at any time, and after maturity for time deposits, interest will accrue at a rate that is the average rate of interest received by holders of the Bank's unpaid principal obligations. |
| Principal and Interest obligations (excluding public debt) | There will be no payment of principal during the emergency period unless the issuer already has funds on deposit with a trustee (or paying agent) to make such payment; unpaid principal will accrue interest at the contractual rate. Payment of principal and accrued interest on principal will be paid, to the extent permitted by applicable law, at the end of the emergency period for the Bank or government entity, if such payments become due during the emergency period, unless a voluntary restructuring or other statute is enacted. If interest is not paid during the covered period, it will accrue at the contractual rate. Payment of accrued interest will be paid, to the extent permitted by applicable law, at the end of the emergency period for the Bank or government entity if such payments |

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

|  | become due during the emergency period unless a voluntary restructuring has occurred or another statute is enacted. |
|---|---|
| Enumerated obligations (excluding public debt) | Enumerated obligations may accrue interest if entitled to under any applicable agreement. |

Under certain circumstances, the Act provides something called "adequate protection" to creditors that have a legitimate security or property interest with respect to any delayed debt service payment.

Summary of Chapters 3 and 4 of the Act

Chapters 3 and 4 of the Act contain amendments to GDB's Enabling Act consisting of updated receivership provisions (Chapter 3) and bridge bank provisions and related procedures (Chapter 4) that are intended to provide an alternative to GDB's liquidation and resolution under existing law. With respect to the receivership provisions, Chapter 3 of the Act would replace the outdated receivership provisions currently found in GDB's Enabling Act by establishing a set of rules better suited to confront the challenges currently faced by GDB by modifying the process for the appointment of a receiver, clarifying the receiver's powers, and establishing priorities of expenses and unsecured claims in a receivership. The priority of bondholders and depositors will remain the same as they do under existing law. With respect to the bridge bank provisions, Chapter 4 of the Act allows for the creation of a bridge bank, which could assume certain liabilities of the Bank, including deposits, and continue certain of the existing functions of GDB. Creditor claims that are not assumed by the bridge bank would remain at the old GDB, but all creditors shall be entitled to receive something known as a "net liquidation amount," which is the amount such creditors would have received if GDB were liquidated.

Summary of Chapter 5

Chapter 5 of the Act would replace the outdated receivership provisions currently found in the EDB Enabling Act by modifying the process for the appointment of a receiver, clarifying the receiver's powers, and establishing priority of expenses and unsecured claims in a receivership. The amendments are intended to bring EDB's receivership provisions closer in line to the substantially similar amendments being proposed for GDB.

Summary of Chapter 6

Chapter 6 of the Act creates a new instrumentality called the "Puerto Rico Fiscal Agency and Financial Advisory Authority," and it will be structured as an independent public corporation and public instrumentality of the Commonwealth with a board of directors composed of one appointed by the Governor. The Authority is created for the purpose of acting as fiscal agent, financial

advisor and reporting agent of the Commonwealth and its public corporations, instrumentalities, commissions, authorities, municipalities and political subdivisions and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing.  The Authority will also oversee all matters related to the restructuring or adjustment of any covered obligation, or otherwise coordinate and implement liability management transactions for any covered obligation.

TABLE OF CONTENTS

CHAPTER 1   AMENDMENTS TO GDB ORGANIC ACT RELATED TO RECEIVERS
    SECTION 101.  AMENDMENTS TO ARTICLE 11 OF ACT NO. 17
    SECTION 102.  NEW ARTICLES 12 THROUGH 21 OF ACT NO. 17
CHAPTER 2   AMENDMENTS TO GDB ORGANIC ACT RELATED TO THE POWER TO ORGANIZE AND OPERATE A BRIDGE BANK
    SECTION 201.  NEW ARTICLE 14 OF ACT NO. 17
CHAPTERS 4 - 5. — [Blank. Act No. 5-2017. Sec. 301]
CHAPTER 6. — [Repealed. Act 2-2017, Art. 19]
CHAPTER 7   Severability and Effectiveness
    SECTION 701.  SEVERABILITY
    SECTION 702.  EFFECTIVENESS

BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:

CHAPTER 1. — AMENDMENTS TO GDB ORGANIC ACT RELATED TO RECEIVERS

**SECTION 101. — AMENDMENTS TO ARTICLE 11 OF ACT NO. 17**

Article 11 of Act No. 17 of September 23, 1948, as amended, is hereby amended to read in its entirety as follows:

"Article 11. Appointment of and powers of a receiver.

A.  The Board of Directors of the Bank or the Secretary of the Treasury of Puerto Rico shall have the power to recommend to the Governor the appointment of a receiver for the Bank if the Board of Directors of the Bank or the Secretary of the Treasury of Puerto Rico determines that: (1) the Bank's assets are less than its obligations to its creditors; (2) the Bank is unable to pay valid debts or obligations as they mature in the normal course of business; (3) the Bank is operating in an unsafe or unsound condition to perform its statutory functions; or (4) the Bank has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for the Bank to become adequately capitalized.

B.  Following a recommendation pursuant to subsection (A) above, the Governor may then (1) appoint, or direct the Secretary of the Treasury of Puerto Rico to appoint, a receiver for the Bank, (2) designate another entity, whether a privately owned entity or an existing or new government instrumentality, after consultation with the Secretary of Justice, to assume the Bank's payment and depositary functions, and (3) appoint new Boards of Directors, if necessary, of any of the Bank's direct or indirect subsidiaries or affiliates that may have had the same Board of Directors of the Bank.  In the exercise of discretion by the Governor or the Secretary of the Treasury of Puerto Rico, any person may be appointed receiver.

C.  Except to the extent proven by final and unappealable judgment to have engaged in willful misconduct for personal gain or gross negligence comprising reckless disregard of and failure to perform applicable duties, the Board of Directors and officers of the Bank, the bridge bank and any subsidiary of the Bank, any employee, agent of the Bank, the bridge bank or of any subsidiary of the Bank, any receiver, or such private persons or entities retained, appointed or employed by such receiver, shall not have any personal liability to any person for, and without further notice or order shall be exonerated from liability for, actions taken or not taken in good faith in their capacity, and within their authority under this Act.  No action shall be brought against a person or entity concerning its acts or omissions in connection with, related to, or arising under this Act, except in the Commonwealth Court of First Instance for the Judicial Region of San Juan.

D.  Immediately upon the appointment of a receiver, the receiver shall succeed to (1) all rights, titles, powers, and privileges of the Bank, and of any accountholder, depositor, officer, or director of the Bank with respect to the Bank and the assets of the Bank, with full power to do all acts and to execute in the name and on behalf of the Bank all functions, including without limitation all deeds, receipts, and other documents; and (2) title to the books, records, and assets of any previous legal custodian of the Bank.

E.  Immediately upon the appointment of a receiver, the receiver may (1) take over the assets of and operate the Bank with all the powers of the directors and the officers of the Bank, including the power to employ and utilize the seal of the Bank, and conduct all business of the Bank; (2) collect all obligations and money due to the Bank, including without limitation to take all acts necessary for obtaining payment of any money due from a debtor of the Bank or his estate, to prove, rank and claim in the bankruptcy, insolvency, or sequestration of any debtor of the Bank for any balance against any estate, and to receive dividends in any proceeding for monies due to the Bank; (3) sell, transfer and compromise any asset, liability, right, power, or obligation of the Bank, by public auction or private contract, without any approval, assignment, or consent with respect to such transfer and without payment of any registration or other fee, charge, stamp or duty; (4) draw, accept, make, compromise, terminate, and endorse any bill of exchange, promissory note, or other document or obligation in the name and on behalf of the Bank; (5) provide or facilitate through guarantees or other support such funding as may be necessary to accomplish the purposes and exercise the powers authorized by this Act; (6) retain, appoint, and employ the services of private persons and entities, on such terms and conditions as the receiver may approve, to assist the receiver in fulfilling the duties under this Act and such private persons and entities shall have full recourse to the powers and rights of the receiver, as appropriate, as directed, limited and managed by the  receiver; (7) sue and be sued in the name of the Bank, except as otherwise limited in this Act, and perform all

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

functions of the Bank in the name of the Bank that are consistent with the appointment as receiver; (8) as appropriate, preserve and conserve the assets and property of the Bank; (9) pay all valid claims and obligations of the Bank in accordance with the prescriptions and limitations of this Act; (10) investigate, pursue all claims or lawsuits, and collect all claims against persons who may be liable for injuries or losses of the Bank through negligence or other wrongdoing; (11) exercise all powers and authorities specifically granted to receivers, respectively, under this Act and such incidental powers as shall be necessary to carry out such powers; and (12) take any action authorized by this Section, which the receiver determines is in the best interests of the Bank or its depositors and obligees.

F.  The receiver:

(1) may place the Bank in resolution and proceed to realize upon the assets of the Bank, having due regard to the functions and responsibilities of the Bank.

(2) may allow or disallow and otherwise determine claims in accordance with the requirements of this Section.

(3) shall (i) promptly publish in a newspaper of national circulation and a newspaper of local circulation and in the Bank's website, a general notice to the Bank's creditors, and mail notice to any creditor shown in the Bank's records, to present their claims, together with proof, to the receiver by a date specified in the notice which shall be not less than ninety (90) days after the publication of such notice; (ii) republish such notice approximately thirty (30) days after publication under clause (i); and (iii) upon discovery of the name and address of a claimant not identified in the Bank's records, mail notice to such claimant within thirty (30) days of such discovery.

(4) shall determine whether to allow or disallow the claim and shall notify the claimant, by mail at the address identified in the claim, of any decision by the receiver on such claim, stating the reasons for any denial of the claim and the procedures available for further review, not later than one hundred eighty (180) days after the date the claim is presented to the receiver. Such period may be extended by a written agreement between the claimant and the receiver.

(5) may petition the Secretary of the Treasury of Puerto Rico to organize a bridge bank pursuant to Article 14 of this Act.

(6) may create one or more subsidiaries pursuant to Article 2 of this Act, to assume any of the functions of the Bank, other than the lending and depositary functions.

(7) shall not be required to furnish bond and may appoint an agent or agents to assist in its duties as receiver.  All fees, compensation, and expenses of resolution and administration shall be fixed by the receiver, and may be paid by it out of funds coming into its possession as receiver.

G.  If the receiver disallows all or any portion of a claim, or if no decision has been made by the receiver within one hundred eighty (180) days following the presentment of any claim and there has been no extension of that time, the claimant may file a judicial action on such claim (or continue an action commenced before the appointment of the receiver) in the Public Corporations Debt Enforcement and Recovery Act Courtroom created by Act 71-2014, and if such courtroom is not operative, then in the Court of First Instance of Puerto Rico, San Juan Part, not later than sixty (60) days after disallowance of all or any portion of the claim or the expiration of the 180-day period for determination of claims.  If any claimant fails to file a

judicial action on such claim (or continue an action commenced before the appointment of the receiver), within such time, the claim shall be deemed to be disallowed (other than any portion of such claim which was allowed by the receiver), such disallowance shall be final, and the claimant shall have no further rights or remedies on such claim. No court shall have any jurisdiction to take any action, and no pending judicial action against the Bank in receivership by any claimant may be continued, until the claimant has exhausted all remedies available under the claims procedures specified in this Section. After all remedies under the foregoing claims procedures are exhausted, any judicial action concerning such claim must be filed or continued within sixty (60) days or the claimant shall have no further rights or remedies on such claim and no court shall have further jurisdiction.

H.  Each person having a claim against the Bank or against the receivership shall, in no event, receive in payments and/or property less than the amount the creditor would have been entitled to receive if the Bank had been liquidated on the date of the appointment of the receiver, and the maximum liability to any person having a claim against the Bank or against the receiver or receivership shall equal the amount such creditor would have received if the Bank had been liquidated on the date of the appointment of the receiver.

I.  The receiver shall pay all valid obligations of the Bank in accordance with the prescriptions and limitations of this Act.

J.  The right of transfer or assignment conferred by Articles 11 to 14 of this Act shall override all other rights and interests, including but not limited to rights to consent or object to such transfer or assignment, of parties under indentures, contracts of employment, leases, charges, mortgages, or any other agreements the Bank may have entered into before the appointment of the receiver. Every public officer having the power or duty to accept and register or amend any entry in any register relating to a transfer or assignment of an asset or liability shall, upon request made by the receiver, transferee, or other person, do all such things as are by law necessary to complete the registration of the transfer or assignment.

K.  After the appointment of a receiver for the Bank, the receiver may request a stay for a period not to exceed ninety (90) days in any judicial or administrative action or proceeding to which the Bank is or becomes a party.  Upon receipt of a request by any receiver pursuant to this paragraph for a stay of any judicial or administrative action or proceeding in any court or administrative body with jurisdiction of such action or proceeding, the court or administrative body shall grant such stay as to all parties.

L.  Except as provided in this Act, no court, officer, employee, agency, or department of the Commonwealth of Puerto Rico may take any action, except at the request of the receiver, to restrain or affect the exercise of the powers and functions of the receiver.  Except as permitted in this Act, the exclusive remedy in any judicial action against the receivership, or the Bank in receivership, shall be compensatory monetary damages, which shall not include any punitive or other non-compensatory damages.

M.  Once a receiver for the Bank has been appointed, the receiver shall have the discretion to use the services of those employees of the Bank that are necessary to exercise its function and powers pursuant to this Act, and in that sense, it may temporarily suspend every clause, precept and/or provision applicable to such employees and/or positions of the Bank contained in applicable laws, collective agreements, supplemental agreements, policies, employment manuals, circular letters, contractual letters, addenda, certifications, rules, regulations and

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

employment conditions, regulation letters, classification plans and/or remuneration plans, referring to all and any employment condition, provided that the salary and marginal benefits of such employees are not reduced. The receiver may also order, effectuate or request the detachment and/or transfer of the Bank's employees to other agencies or existing entities or new entities created by this Act and/or any other legislation, including to any subsidiary of the Bank or to a bridge bank created pursuant to Article 14 of this Act. In the case the Bank is liquidated, the receiver may also effectuate dismissals. If the employees of the Bank are permanently transferred to an existing agency, the terms and conditions of their employment shall be modified to comply with any law, regulation and/or agreement that addresses the remuneration and classification of the employees of the agency to which they have been transferred. In every case, the terms and conditions of employment effective as of the time the receiver is appointed shall be honored, including the rights, privileges, obligations and seniority, acquired pursuant to applicable laws, collective bargaining agreements and current personnel regulations, subject to the modifications contained in Act 66-2014 while it remains effective. In addition, the salaries, wages or commissions of every employee shall be guaranteed in every case, including payments related to paid vacations, allowances and sick leaves or other similar employment benefits acquired prior to the appointment of a receiver, in accordance with the employment policies of the Bank or applicable laws. The transfer of employees to a bridge bank shall also be governed by the provisions included in Article 14 of this Act.

N.  For purposes of interpreting Articles 11 to 14 of this Act, a court shall consider, to the extent applicable, jurisprudence interpreting Title 12 of the United States Code."

## SECTION 102. — NEW ARTICLES 12 THROUGH 21 OF ACT NO. 17

Articles 12 through 21 of Act No. 17 of September 23, 1948, as amended, are hereby renumbered as Articles 15 through 24, and new Articles 12 and 13 are hereby added, to read in their entirety as follows:

"Article 12. — Priority of expenses and unsecured claims in a receivership

A.  Unsecured claims against the Bank, or the receiver for the Bank under this Act, that are proven to the satisfaction of the receiver, shall have priority in the following order:
(1) Administrative expenses of the receiver.
(2) Wages, salaries, or commissions, including vacation, severance, and sick leave pay, or other similar employee benefits, earned by an individual prior to the appointment of the receiver in accordance with the Bank's employment policies or by applicable law.
(3) Contributions owed to employee benefit plans arising from services rendered before the date of appointment of the receiver.
(4) Any unpaid balance of money held by the Bank in its depository accounts for the credit of a depositor and any other general or senior liability of the Bank (which is not a liability described in clause (5)).
(5) Any obligation that is statutorily or contractually subordinated to general unsecured creditors.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

B.  This Article shall not affect secured claims or security entitlements in respect of assets or property held by the Bank, and all such secured claims or security entitlements shall be paid from the security or from the realized value of the security.  To the extent that the security is insufficient to satisfy the claim, then the difference between the claim and the realized value of the security shall be paid in accordance with this Section.

C.  Notwithstanding any other provision of this Act or the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, a depositor or receiver may offset the amount of its deposit against any outstanding balance of a loan from the Bank as full and final payment up to the amount of the deposit.

D.  The priority for administrative expenses, as that term is used in subsection (A), shall include (i) those obligations incurred by the Bank before the appointment of the receiver relating to goods and services provided to the Bank before such appointment, other than individual claims in excess of a threshold to be determined by the receiver in its reasonable discretion; (ii) those obligations incurred by the Bank after the appointment of the receiver relating to goods and services provided to the Bank after such appointment; and (iii) any other obligations that the receiver determines are appropriate to facilitate the orderly resolution of the Bank.

E.  The Secretary of the Treasury, after consultation with the receiver and the Governor, shall have the power to waive, reduce, subordinate or assign any claim of a governmental unit except if such governmental unit is a municipality, provided, however, that any portion of a claim that has been assigned pursuant to this subsection may not be setoff by the assignee as provided for in subsection (C) of this Section.

Article 13. — Provisions relating to contracts entered into before appointment of receiver

A.  Except as otherwise provided by this Article, the receiver may enforce any contract or agreement entered into by the Bank notwithstanding any provision of a contract providing for termination, default, acceleration, or exercise of rights upon, or by reason of, insolvency or the appointment of a receiver to the extent necessary for the orderly administration and/or winding up of the Bank's affairs.

B.  In addition to any other rights a receiver may have, the receiver, in the exercise of his power to administer and wind up the Bank, may disaffirm or repudiate any contract or lease (1) to which the Bank is a party; (2) if, in the receiver's discretion, its continued performance will be burdensome; and (3) if, in the discretion of the receiver, the disaffirmance or repudiation of the contract or lease will promote the orderly administration and/or winding up of the Bank's affairs.

C.  The receiver appointed shall determine whether or not to exercise the rights of repudiation under this Section within one hundred eighty (180) days following such appointment.

D.  The liability of the receivership for the disaffirmance or repudiation of any contract pursuant to subsection (B) shall be (1) limited to actual direct compensatory damages; and (2) determined as of the date of the appointment of the receiver.

For purposes of this subsection, the term "actual direct compensatory damages" does not include punitive or exemplary damages, damages for lost profits or opportunity, or damages for pain and suffering.

E.  No person may exercise any right or power to terminate, accelerate, or declare a default under any contract to which the Bank is a party (and no provision in any such contract providing for such default, termination, or acceleration shall be enforceable), or to obtain possession of or exercise control over any property of the Bank or affect any contractual rights of the Bank, in reliance on, and the receiver may enforce any contract notwithstanding, any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency, financial condition, the appointment of or the exercise of rights or powers by a receiver, or the transfer of any operations, assets or liabilities of the Bank to a bridge bank pursuant to Article 14 of this Act or to any other person or entity, provided, however, no provision of this Section may be construed as impairing or affecting any right of the receiver to enforce or recover under a liability insurance contract of a director or officer or financial institution bond under other applicable law.

F.  No person may exercise any right or power to terminate, accelerate, or declare a default under any contract to which the Bank is a party (and no provision in any such contract providing for such default, termination, or acceleration shall be enforceable), or to obtain possession of or exercise control over any property of the Bank or affect any contractual rights of the Bank, without the consent of the receiver for the Bank during the 90-day period beginning from the appointment of the receiver, provided, however, no provision of this paragraph shall apply to a director or officer liability insurance contract or a financial institution bond, or shall be construed as permitting the receiver to fail to comply with otherwise enforceable provisions of such contract."

## CHAPTER 2. — AMENDMENTS TO GDB ORGANIC ACT RELATED TO THE POWER TO ORGANIZE AND OPERATE A BRIDGE BANK

## SECTION 201. — NEW ARTICLE 14 OF ACT NO. 17

A new Article 14 of Act No. 17 of September 23, 1948, as amended, is hereby added to read in its entirety as follows:

"Article 14. —  Power to organize and operate a bridge bank

A.  When a receiver has been appointed for the Bank, the Secretary of the Treasury of Puerto Rico shall have the power, in his/her discretion, to organize and charter a temporary bank to be referred to as a bridge bank to assist the receiver in fulfilling its powers and duties. Such bank shall be organized and chartered pursuant to a Charter Resolution adopted by the Secretary of the Treasury of Puerto Rico and filed in the Department of State. The bridge bank shall be chartered on the date the Charter Resolution is filed in the Department of State. The Department of State shall proceed to register the bridge bank as a banking institution. Any amendment to the Charter Resolution shall also be filed in the Department of State. The effective date shall be the date of filing.

B.  A bridge bank so organized shall have (1) the powers, benefits and attributes set forth in Article 2 of this Act and the tax exemptions set forth in Article 5 of this Act; and (2) those powers, rights, functions and duties conferred to the Bank and such limitations as are imposed

on the Bank by this Act and by any other Commonwealth or federal statute, except to the extent that any powers, benefits, attributes, rights, functions and duties provided in clauses (1) and (2) are limited or otherwise modified by the Secretary of the Treasury of Puerto Rico in the bridge bank's Charter Resolution, subject to and in accordance with the provisions of this Article. The provisions of Act No. 55 of May 12, 1933, as amended, known as the Puerto Rico Banking Act, shall not apply to the bridge bank. Such bridge bank shall be under the management of a board of directors, which initially shall be the Board of Directors of the Bank and shall thereafter, or upon the occurrence of a vacancy, be appointed in the same manner as the members of the Board of Directors of the Bank were appointed pursuant to this Act. To the extent the receiver transfers to the bridge bank any of the subsidiaries of the Bank whose Board of Directors is the same as that of the Bank, the Board of Directors of such subsidiary shall upon such transfer be the same as that of the bridge bank. If the bridge bank ceases to exist, the members of the Board of Directors of any surviving subsidiary shall be appointed in the same manner as the members of the Board of Directors of the Bank were appointed pursuant to this Act. The name of the bridge bank shall be set forth in its Charter Resolution. For the avoidance of doubt, upon the charter of a bridge bank, any reference to the Bank in any Commonwealth law shall be understood to refer and apply to such bridge bank, as applicable, but in no case shall the bridge bank be responsible for any liabilities of the Bank unless such liabilities are expressly assumed by the bridge bank. The Secretary of the Treasury may include in the Charter Resolution a provision whereby any or all of the Bank's subsidiaries and affiliates shall become subsidiaries or affiliates of the bridge bank.

C. The receiver may transfer any or all of the Bank's powers, rights, functions and duties, and any ownership, contractual or operational interests or relationships between the Bank and its subsidiaries and affiliates to the bridge bank, as is determined to be appropriate.

D. In transferring assets and liabilities to a bridge bank, and otherwise conducting its operations, the receiver may exercise all powers granted to the receiver and shall not be subject to any limitation on the transfer of assets or liabilities contained in this Act when making such transfer.

E. The bridge bank may (1) assume such liabilities of the Bank, including deposits, as the receiver may, in its discretion, determine to be appropriate; (2) purchase such assets (including assets associated with any trust business); of the Bank as the receiver may, in its discretion, determine to be appropriate; (3) assume such rights, titles, powers, privileges, interests or authorities of the Bank relating to its subsidiaries or affiliates (which subsidiaries or affiliates shall thereafter have all rights, titles, powers, privileges, interests, or authorities as they enjoyed on the date they were transferred to the bridge bank); and (4) perform any other function that the Secretary of the Treasury may, in its discretion, prescribe in accordance with this Section. Such bridge bank shall not be subject to any requirement to maintain deposit reserves above a certain threshold pursuant to applicable law and, to the extent a reserve requirement may be deemed to apply to such bridge bank, the Secretary of the Treasury may waive this requirement upon the granting of a charter to such bridge bank.

F. The receiver shall order the transfer of all permanent, temporary and/or non-union employees, that work for the Bank to the bridge bank and said employees shall become employees of the bridge bank. This transfer of employees shall be effectuated while honoring the terms and conditions of employment effective as of the appointment of the receiver,

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

including the rights, privileges, obligations and seniority, acquired pursuant to applicable laws, collective bargaining agreements and current personnel regulations, subject to the modifications contained in Act 66-2014 while it remains effective. None of the provisions of this Act shall affect the constitutional right to collective bargaining enjoyed by the employees of the Bank, nor the vested rights, benefits and privileges, by virtue of any collective bargaining agreements. The bridge bank shall recognize the unions that represent the unionized workers of the Bank transferred to the bridge bank and shall assume the applicable collective bargaining agreements in effect on such date. Rights with regard to any pension or retirement system to which they may be affiliated or members of on the effective date of this Act shall also be guaranteed. The bridge bank shall be obligated to satisfy to all employees any of their salaries, wages, commissions, including payments related to vacations, allowances and sick leaves or other employment benefits acquired prior to the appointment of the receiver, in accordance with the Bank's employment policies or applicable law.

G.   The bridge bank, and each of its subsidiaries, shall be an independent public corporation and a public instrumentality of the Commonwealth of Puerto Rico with separate legal existence, fiscal and administrative autonomy, and independence from the Commonwealth.

H.   A bridge bank shall be treated as the Bank in default at such times and for such purposes as the receiver for the Bank may, in its discretion, determine, and shall not otherwise be treated as in default or insolvent.

I.   The Secretary of the Treasury of Puerto Rico may provide funding on behalf of the Commonwealth of Puerto Rico and provide such guarantees under Act No. 12 of May 9, 1975, as amended, or other support appropriate to facilitate the operation and conduct of the business of the bridge bank and any of its subsidiaries consistent with the authorities provided by this Article, and to facilitate any transaction described in this Section by the bridge bank or facilitate the acquisition or transfer of any functions or assets, or the assumption of any liabilities, of the Bank or of the bridge bank as provided in this Section.

J.   The receiver for the Bank may transfer any operations, assets, and liabilities of the Bank (including any operations, assets or liabilities associated with any trust or custody business) to the bridge bank, in accordance with subsections (A)-(D). At any time after the establishment of the bridge bank with respect to the Bank, the receiver may transfer any operations, assets and liabilities of the Bank or the bridge bank and take any other action as it determines, in his discretion, to be appropriate in accordance with subsections (A)-(D). The transfer of any operations, assets or liabilities to a bridge bank shall be effective without any further approval under Commonwealth law, assignment, or consent with respect thereto. Assets may be transferred to a bridge bank in exchange for such bank's obligation to pay, over time, with interest at the then applicable judgment rate of interest, an amount determined by the receiver, which amount shall be at least the amount that the Bank's creditors whose debt is not assumed by the bridge bank would have received for the value of the assets transferred to the bridge bank, after taking into account the benefit to creditors of the Bank of the bridge bank's assumption of liabilities of the Bank, as if the Bank had been liquidated on the date of the appointment of the receiver (the "Net Liquidation Amount"). Any judicial action to which a bridge bank becomes a party by virtue of its acquisition of any assets or assumption of any liabilities of the Bank shall be stayed from further proceedings for a period of not longer than ninety (90) days (or such longer or shorter period as may be agreed to upon the consent of all

parties) at the request of the bridge bank. The receiver shall determine the Net Liquidation Amount by taking the average of two assessments of such amount by two independent valuation experts provided full access to the Bank's records and sufficient time to determine the likely liquidation value, net of expenses, that could be obtained for the Bank's assets if sold with a reasonable amount of marketing within ninety (90) days of the date the receivership commenced, provided, however, that if the higher assessment is more than 20% higher than the lower assessment of the Net Liquidation Value, the receiver shall retain a third independent valuation experts that shall prepare its assessment after having access to the Bank's records for a sufficient time, and the Net Liquidation Value shall be the average of the two highest assessments. If a creditor challenges the Net Liquidation Value in a judicial proceeding, there shall be a rebuttable presumption that the Net Liquidation Value is correct.

K.  Any bridge bank that the Secretary of the Treasury of Puerto Rico charters in relation to the resolution or restructuring of the Bank, and any subsequent transferee of all or any part of the operations, assets, or liabilities of the Bank, shall not be a successor entity to the Bank and shall not be subject to any liability arising from the operations of the Bank before the appointment of the receiver, except as contractually agreed by the bridge bank and the receiver, as applicable.

L.  Subject to subsections (M) and (P), the charter of a bridge bank as such shall terminate two (2) years after the date it was granted or at such earlier time as determined by the Secretary of the Treasury of Puerto Rico.  The Secretary of the Treasury of Puerto Rico may, in his discretion, extend the status of the bridge bank as such for no more than 3 additional 1-year periods. The termination of the charter for the bridge bank shall not affect any of its subsidiaries and affiliates, and each shall remain as independent public corporations, unless otherwise provided by the Secretary of the Treasury, whose board of directors shall be appointed in the same way the board of directors of the Bank was appointed.

M.  The Secretary of the Treasury of Puerto Rico may amend the charter of the bridge bank to reflect the termination of the status of the bridge bank as such and provide that the bridge bank shall be a new bank, whereupon the bridge bank shall have all of the rights, powers, and privileges under its constituent documents and applicable Commonwealth law. In connection therewith, the bridge bank may be deemed to succeed by operation of law to such rights, titles, powers, and interests of the bridge bank provided by its charter.

N.  The bridge bank may take any and all actions that are reasonable and necessary to allow the bridge bank to operate normally and fulfill its statutory obligations, including without limitation—

(1) prescribing such conditions or restrictions for the conduct of the business of the bridge bank;

(2) limiting or conditioning the disbursement of any loans;

(3) limiting or conditioning any withdrawals or transfers of deposits pursuant to terms the bridge bank prescribes to address the bridge bank's liquidity needs or facilitate the bridge bank's ability to perform its normal operations; and

(4) limiting or suspending —

(A)  payments on any obligation;

(B)  payments on any letter of credit; and

(C) any obligation or commitment to lend or extend money or credit.

O.  Notwithstanding anything to the contrary in this law, the bridge bank shall not have the authority to require government entities to deposit in the bridge bank pursuant to Article 1 of Act 24-2014.

P.  Notwithstanding any other provision of Commonwealth law, if the status of a bridge bank as such has not previously been terminated pursuant to subsection (L) or (M), (1) the Board of Directors, with the approval of the of the Secretary of Treasury of Puerto Rico, shall dissolve the bridge bank in accordance with this subsection at any time; and (2) the board of directors of the bridge bank with the approval of the Secretary of Treasury shall promptly commence dissolution proceedings in accordance with this paragraph upon the expiration of the 2-year period following the date on which the bridge bank was chartered, or any extension thereof, as provided in subsection (M). The Secretary of the Treasury of Puerto Rico may appoint a receiver for a bridge bank if it determines that such action will facilitate the winding up and final resolution of the bridge bank or the Bank in receivership.  The receiver for a bridge bank shall wind up the affairs of the bridge bank in conformity with the provisions of law relating to the resolution of the Bank under this Act.  With respect to any such bridge bank, the receiver shall have all the rights, powers, and privileges and shall perform the duties related to the exercise of such rights, powers, or privileges, granted by law to the receiver for the Bank under this Act and, notwithstanding any other provision of Commonwealth law, in the exercise of such rights, powers, and privileges, the receiver shall not be subject to the direction or supervision of any agency of the Commonwealth of Puerto Rico, except as provided for a receiver for the Bank in this Act."

CHAPTER 3. — AMENDMENTS TO EDB ORGANIC ACT RELATED TO RECEIVERS

## SECTION 301. — AMENDMENTS TO ARTICLE 11 OF ACT NO. 22 OF JULY 24, 1985

Article 11 of Act No. 22 of July 24, 1985, as amended, is hereby amended to read in its entirety as follows:

"Article 11. — Appointment of and powers of a receiver.

A.  The Board of Directors of the Bank or the Secretary of the Treasury of Puerto Rico shall have the power to recommend to the Governor the appointment of a receiver for the Bank if the Board of Directors of the Bank or the Secretary of the Treasury of Puerto Rico determines that: (1) the Bank's assets are less than its obligations to its creditors; (2) the Bank is unable to pay valid debts or obligations as they mature in the normal course of business; (3) the Bank is operating in an unsafe or unsound condition to perform its statutory functions; or (4) the Bank has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for the Bank to become adequately capitalized.

B.  Following a recommendation pursuant to subsection (A) above, the Governor may then (1) appoint, or direct the Secretary of the Treasury of Puerto Rico to appoint, a receiver for the Bank; (2) designate another entity, whether a privately owned entity or an existing or new government instrumentality, after consultation with the Secretary of Justice, to assume the Bank's payment and depositary functions; and (3) appoint new Boards of Directors, if

necessary, of any of the Bank's direct or indirect subsidiaries or affiliates that may have had the same Board of Directors of the Bank.  In the exercise of discretion by the Governor or the Secretary of the Treasury of Puerto Rico, any person may be appointed receiver.

C.  Except to the extent proven by final and unappealable judgment to have engaged in willful misconduct for personal gain or gross negligence comprising reckless disregard of and failure to perform applicable duties, the Board of Directors and officers of the Bank and any subsidiary of the Bank, any employee, agent of the Bank or of any subsidiary of the Bank, any receiver, or such private persons or entities retained, appointed or employed by such receiver, shall not have any personal liability to any person for, and without further notice or order shall be exonerated from liability for, actions taken or not taken in good faith in their capacity, and within their authority under this Act.  No action shall be brought against a person or entity concerning its acts or omissions in connection with, related to, or arising under this Act, except in the Commonwealth Court of First Instance for the Judicial Region of San Juan.

D.  Immediately upon the appointment of a receiver, the receiver shall succeed to (1) all rights, titles, powers, and privileges of the Bank, and of any accountholder, depositor, officer, or director of the Bank with respect to the Bank and the assets of the Bank, with full power to do all acts and to execute in the name and on behalf of the Bank all functions, including without limitation all deeds, receipts, and other documents; and (2) title to the books, records, and assets of any previous legal custodian of the Bank.

E.  Immediately upon the appointment of a receiver, the receiver may (1) take over the assets of and operate the Bank with all the powers of the directors and the officers of the Bank, including the power to employ and utilize the seal of the Bank, and conduct all business of the Bank; (2) collect all obligations and money due to the Bank, including without limitation to take all acts necessary for obtaining payment of any money due from a debtor of the Bank or his estate, to prove, rank and claim in the bankruptcy, insolvency, or sequestration of any debtor of the Bank for any balance against any estate, and to receive dividends in any proceeding for monies due to the Bank; (3) sell, transfer and compromise any asset, liability, right, power, or obligation of the Bank, by public auction or private contract, without any approval, assignment, or consent with respect to such transfer and without payment of any registration or other fee, charge, stamp or duty; (4) draw, accept, make, compromise, terminate, and endorse any bill of exchange, promissory note, or other document or obligation in the name and on behalf of the Bank; (5) provide or facilitate through guarantees or other support such funding as may be necessary to accomplish the purposes and exercise the powers authorized by this Act; (6) retain, appoint, and employ the services of private persons and entities, on such terms and conditions as the receiver may approve, to assist the receiver in fulfilling the duties under this Act and such private persons and entities shall have full recourse to the powers and rights of the  receiver, as appropriate, as directed, limited and managed by the  receiver; (7) sue and be sued in the name of the Bank, except as otherwise limited in this Act, and perform all functions of the Bank in the name of the Bank that are consistent with the appointment as receiver; (8) as appropriate, preserve and conserve the assets and property of the Bank; (9) pay all valid claims and obligations of the Bank in accordance with the prescriptions and limitations of this Act; (10) investigate, pursue all claims or lawsuits, and collect all claims against persons who may be liable for injuries or losses of the Bank through negligence or other wrongdoing; (11) exercise all powers and authorities specifically granted to receivers, respectively, under

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

this Act and such incidental powers as shall be necessary to carry out such powers; and (12) take any action authorized by this section, which the receiver determines is in the best interests of the Bank or its depositors and obligees.

F.  The receiver:

(1) may place the Bank in resolution and proceed to realize upon the assets of the Bank, having due regard to the functions and responsibilities of the Bank.

(2) may allow or disallow and otherwise determine claims in accordance with the requirements of this Section.

(3) shall (i) promptly publish in a newspaper of national circulation and a newspaper of local circulation and in the Bank's website, a general notice to the Bank's creditors, and mail notice to any creditor shown in the Bank's records, to present their claims, together with proof, to the receiver by a date specified in the notice which shall be not less than 90 days after the publication of such notice; (ii) republish such notice approximately thirty (30) days after publication under clause (i); and (iii) upon discovery of the name and address of a claimant not identified in the Bank's records, mail notice to such claimant within thirty (30)  days of such discovery.

(4) shall determine whether to allow or disallow the claim and shall notify the claimant, by mail at the address identified in the claim, of any decision by the receiver on such claim, stating the reasons for any denial of the claim and the procedures available for further review, not later than one hundred eighty (180) days after the date the claim is presented to the receiver. Such period may be extended by a written agreement between the claimant and the receiver.

(5) shall not be required to furnish bond and may appoint an agent or agents to assist in its duties as receiver.  All fees, compensation, and expenses of resolution and administration shall be fixed by the receiver, and may be paid by it out of funds coming into its possession as receiver.

G.  If the receiver disallows all or any portion of a claim, or if no decision has been made by the receiver within one hundred eighty (180) days following the presentment of any claim and there has been no extension of that time, the claimant may file a judicial action on such claim (or continue an action commenced before the appointment of the receiver) in the Public Corporations Debt Enforcement and Recovery Act Courtroom created by Act 71-2014, and if such courtroom is not operative, then in the Court of First Instance of Puerto Rico, San Juan Part, not later than sixty (60) days after disallowance of all or any portion of the claim or the expiration of the 180-day period for determination of claims.  If any claimant fails to file a judicial action on such claim (or continue an action commenced before the appointment of the receiver), within such time, the claim shall be deemed to be disallowed (other than any portion of such claim which was allowed by the receiver), such disallowance shall be final, and the claimant shall have no further rights or remedies on such claim. No court shall have any jurisdiction to take any action, and no pending judicial action against the Bank in receivership by any claimant may be continued, until the claimant has exhausted all remedies available under the claims procedures specified in this Section. After all remedies under the foregoing claims procedures are exhausted, any judicial action concerning such claim must be filed or continued within sixty (60)  days or the claimant shall have no further rights or remedies on such claim and no court shall have further jurisdiction.

H.  Each person having a claim against the Bank or against the receivership shall, in no event, receive in payments and/or property less than the amount the creditor would have been entitled to receive if the Bank had been liquidated on the date of the appointment of the receiver, and the maximum liability to any person having a claim against the Bank or against the receiver or receivership shall equal the amount such creditor would have received if the Bank had been liquidated on the date of the appointment of the receiver.

I.  The receiver shall pay all valid obligations of the Bank in accordance with the prescriptions and limitations of this Act.

J.  The right of transfer or assignment conferred by Articles 11 to 13 of this Act shall override all other rights and interests, including but not limited to rights to consent or object to such transfer or assignment, of parties under indentures, contracts of employment, leases, charges, mortgages, or any other agreements the Bank may have entered into before the appointment of the receiver.  Every public officer having the power or duty to accept and register or amend any entry in any register relating to a transfer or assignment of an asset or liability shall, upon request made by the receiver, transferee, or other person, do all such things as are by law necessary to complete the registration of the transfer or assignment.

K.  After the appointment of a receiver for the Bank, the receiver may request a stay for a period not to exceed ninety (90) days in any judicial or administrative action or proceeding to which the Bank is or becomes a party.  Upon receipt of a request by any receiver pursuant to this paragraph for a stay of any judicial or administrative action or proceeding in any court or administrative body with jurisdiction of such action or proceeding, the court or administrative body shall grant such stay as to all parties.

L.  Except as provided in this Act, no court, officer, employee, agency, or department of the Commonwealth of Puerto Rico may take any action, except at the request of the receiver, to restrain or affect the exercise of the powers and functions of the receiver.  Except as permitted in this Act, the exclusive remedy in any judicial action against the receivership, or the Bank in receivership, shall be compensatory monetary damages, which shall not include any punitive or other non-compensatory damages.

M.  Once a receiver for the Bank has been appointed, the receiver shall have the discretion to use the services of those employees of the Bank that are necessary to exercise its function and powers pursuant to this Act, in that sense, it may temporarily suspend every clause, precept and/or applicable provision to such employees and/or positions of the Bank contained in applicable laws, collective agreements, supplemental agreements, policies, employment manuals, circular letters, contractual letters, addenda, certifications, rules, regulations and employment conditions, regulation letters, classification plans and/or remuneration plans, referring to all and any employment condition, provided that the salary and marginal benefits of such employees are not reduced. The receiver may also order, effectuate or request the detachment and/or transfer of the Bank's employees to other agencies or existing entities or new entities created by this Act and/or any other legislation, including to any subsidiary of the Bank. In the case the Bank is liquidated, the receiver may also effectuate dismissals. If the employees of the Bank are permanently transferred to an existing agency, the terms and conditions of their employment shall be modified to comply with any law, regulation and/or agreement that addresses the remuneration and classification of the employees of the agency to which they have been transferred. In every case, the terms and conditions of employment

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

effective as of the time the receiver is appointed shall be honored, including the rights, privileges, obligations and seniority, acquired pursuant to applicable laws, collective bargaining agreements and current personnel regulations, subject to the modifications contained in Act 66-2014 while it remains effective. In addition, the salaries, wages or commissions of every employees shall be guaranteed in every case, including payments related to paid vacations, allowances and sick leaves or other similar employment benefits acquired prior to the appointment of a receiver, in accordance with the employment policies of the Bank or applicable laws.

N.  For purposes of interpreting Articles 11 to 13 of this Act, a court shall consider, to the extent applicable, jurisprudence interpreting Title 12 of the United States Code."

## SECTION 302. — NEW ARTICLES 12 THROUGH 25 OF ACT NO. 22 OF JULY 24, 1985

Articles 12 through 23 of Act No. 22 of July 24, 1985, as amended, are hereby renumbered as Articles 14 through 25, and new Articles 12 and 13 are hereby added, to read in their entirety as follows:

"Article 12. — Priority of expenses and unsecured claims in a receivership

A.  Unsecured claims against the Bank, or the receiver for the Bank under this Act, that are proven to the satisfaction of the receiver, shall have priority in the following order:
(1) Administrative expenses of the receiver.
(2) Wages, salaries, or commissions, including vacation, severance, and sick leave pay, or other similar employee benefits, earned by an individual prior to the appointment of the receiver in accordance with the Bank's employment policies or by applicable law.
(3) Contributions owed to employee benefit plans arising from services rendered before the date of appointment of the receiver.
(4) Any unpaid balance of money held by the Bank in its depository accounts for the credit of a depositor and any other general or senior liability of the Bank (which is not a liability described in clause (5)).
(5) Any obligation that is statutorily or contractually subordinated to general unsecured creditors.
B.  This Article shall not affect secured claims or security entitlements in respect of assets or property held by the Bank, and all such secured claims or security entitlements shall be paid from the security or from the realized value of the security.  To the extent that the security is insufficient to satisfy the claim, then the difference between the claim and the realized value of the security shall be paid in accordance with this Section.
C.  Notwithstanding any other provision of this Act or the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, a depositor or receiver may offset the amount of its deposit against any outstanding balance of a loan from the Bank as full and final payment up to the amount of the deposit.
D.  The priority for administrative expenses, as that term is used in subsection (A), shall include (i) those obligations incurred by the Bank before the appointment of the receiver relating to goods and services provided to the Bank before such appointment, other than individual claims

in excess of a threshold to be determined by the receiver in its reasonable discretion; (ii) those obligations incurred by the Bank after the appointment of the receiver relating to goods and services provided to the Bank after such appointment; and (iii) any other obligations that the receiver determines are appropriate to facilitate the orderly resolution of the Bank.

E.  The Secretary of the Treasury, after consultation with the receiver and the Governor, shall have the power to waive, reduce, subordinate, or assign any claim of a governmental unit except if such governmental unit is a municipality, provided, however, that any portion of a claim that has been assigned pursuant to this subsection may not be setoff by the assignee as provided for in subsection (C) of this Section.

Article 13. — Provisions relating to contracts entered into before appointment of receiver

A.  Except as otherwise provided by this Article, the receiver may enforce any contract or agreement entered into by the Bank notwithstanding any provision of a contract providing for termination, default, acceleration, or exercise of rights upon, or by reason of, insolvency or the appointment of a receiver to the extent necessary for the orderly administration and/or winding up of the Bank's affairs.

B.  In addition to any other rights a receiver may have, the receiver, in the exercise of his power to administer and wind up the Bank, may disaffirm or repudiate any contract or lease (1) to which the Bank is a party; (2) if, in the receiver's discretion, its continued performance will be burdensome; and (3) if, in the discretion of the receiver, the disaffirmance or repudiation of the contract or lease will promote the orderly administration and/or winding up of the Bank's affairs.

C.  The receiver appointed shall determine whether or not to exercise the rights of repudiation under this Section within one hundred eighty (180)  days following such appointment.

D.  The liability of the receivership for the disaffirmance or repudiation of any contract pursuant to subsection (B) shall be (1) limited to actual direct compensatory damages; and (2) determined as of the date of the appointment of the receiver.  For purposes of this subsection, the term "actual direct compensatory damages" does not include punitive or exemplary damages, damages for lost profits or opportunity, or damages for pain and suffering.

E.  No person may exercise any right or power to terminate, accelerate, or declare a default under any contract to which the Bank is a party (and no provision in any such contract providing for such default, termination, or acceleration shall be enforceable), or to obtain possession of or exercise control over any property of the Bank or affect any contractual rights of the Bank, in reliance on, and the receiver may enforce any contract notwithstanding, any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency, financial condition, the appointment of or the exercise of rights or powers by a receiver, or the transfer of any operations, assets or liabilities of the Bank to any other person or entity, provided, however, no provision of this Section may be construed as impairing or affecting any right of the receiver to enforce or recover under a liability insurance contract of a director or officer or financial institution bond under other applicable law.

F.  No person may exercise any right or power to terminate, accelerate, or declare a default under any contract to which the Bank is a party (and no provision in any such contract

providing for such default, termination, or acceleration shall be enforceable), or to obtain possession of or exercise control over any property of the Bank or affect any contractual rights of the Bank, without the consent of the receiver for the Bank during the 90-day period beginning from the appointment of the receiver, provided, however, no provision of this paragraph shall apply to a director or officer liability insurance contract or a financial institution bond, or shall be construed as permitting the receiver to fail to comply with otherwise enforceable provisions of such contract."

CHAPTERS 4 - 5. — [Blank. Act No. 5-2017. Sec. 301]

CHAPTER 6. — [Repealed. Act 2-2017, Art. 19]

CHAPTER 7. — SEVERABILITY AND EFFECTIVENESS

**SECTION 701. — SEVERABILITY**

This Act shall be interpreted in a manner to render it valid to the extent practicable in accordance with the Commonwealth Constitution and the U.S. Constitution. If any clause, paragraph, subparagraph, article, provision, section, subsection, or part of this Act, were to be declared unconstitutional by a competent court, the order to such effect issued by such court will neither affect nor invalidate the remainder of this Act. The effect of such an order shall be limited to the clause, paragraph, subparagraph, article, provision, section, subsection, or part of this Act declared unconstitutional and only with respect to the application thereof to the particular covered obligation subject to such challenge.

**SECTION 702. — EFFECTIVENESS**

This Act shall take effect immediately upon enactment.

Note.  This compilation was prepared by the Puerto Rico Office of Management and Budget staff who have striven to ensure it is complete and accurate.  However, this is not an official compilation and may not be completely free of error.  It contains all amendments incorporated for reading purposes only.  For accuracy and exactitude please refer to the act original text and the collection of Laws of Puerto Rico Annotated LPRA.  The state links acts are property of Legislative Services Office of Puerto Rico web page.  The federal links acts are property of US Government Publishing Office GPO  web page.  Compiled by the Office of Management and Budget Library.

See also the **Original version Act**, as approved by the Puerto Rico Legislature.

"Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" [Ley 21-2016, según enmendada]
"Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" [Act No. 21-2016, as amended]

Nota. Este documento fue compilado por personal de la **Oficina de Gerencia y Presupuesto** del Gobierno de Puerto Rico, como un medio de alertar a los usuarios de nuestra Biblioteca de las últimas enmiendas aprobadas para esta Ley. Aunque hemos puesto todo nuestro esfuerzo en la preparación del mismo, este no es una compilación oficial y podría no estar completamente libre de errores inadvertidos; los cuales al ser tomados en conocimiento son corregidos de inmediato. En el mismo se han incorporado todas las enmiendas hechas a la Ley a fin de facilitar su consulta. Para exactitud y precisión, refiérase a los textos originales de dicha ley y a la colección de Leyes de Puerto Rico Anotadas L.P.R.A.. Las anotaciones en letra cursiva y entre corchetes añadidas al texto, no forman parte de la Ley; las mismas solo se incluyen para el caso en que alguna ley fue derogada y ha sido sustituida por otra que está vigente. Los enlaces al Internet solo se dirigen a fuentes gubernamentales. Los enlaces a las leyes enmendatorias pertenecen a la página web de la **Oficina de Servicios Legislativos** de la Asamblea Legislativa de Puerto Rico. Los enlaces a las leyes federales pertenecen a la página web de la **US Government Publishing Office GPO** de los Estados Unidos de Norteamérica. Los enlaces a los Reglamentos y Ordenes Ejecutivas del Gobernador, pertenecen a la página web del **Departamento de Estado** del Gobierno de Puerto Rico. Compilado por la Biblioteca de la Oficina de Gerencia y Presupuesto.

Véase además la **Versión Original de esta Ley**, tal como fue aprobada por la Legislatura de Puerto Rico.

⇒ ⇒ ⇒ Verifique en la Biblioteca Virtual de OGP la **Última Copia Revisada** (Rev.) para esta compilación.

Ir a: www.ogp.pr.gov ⇒ Biblioteca Virtual ⇒ Leyes de Referencia—EMERGENCIA FISCAL.