*Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company,
Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National
Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA
Rum Tax Bonds*

# **EXHIBIT 12**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---

ASSURED GUARANTY CORP., ASSURED
GUARANTY MUNICIPAL CORP., and
AMBAC ASSURANCE CORPORATION,

                      Plaintiffs,

             -against-

ALEJANDRO GARCÍA PADILLA, JUAN C.
ZARAGOZA GÓMEZ, INGRID RIVERA ROCAFORT,
MELBA ACOSTA FEBO, LUIS F. CRUZ BATISTA,
VÍCTOR A. SUÁREZ MELÉNDEZ, CÉSAR A.
MIRANDA RODRÍGUEZ, JUAN FLORES GALARZA,
and JOHN DOES 1-40,

                    Defendants.

No. 16-cv-1037

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp.,

f/k/a Financial Security Assurance Inc. ("AGM" and, together with AGC, "Assured"), and

Ambac Assurance Corporation ("Ambac" and, together with Assured, "Plaintiffs"), by their

attorneys Casellas Alcover & Burgos P.S.C., Cadwalader, Wickersham & Taft LLP, Ferraiuoli

LLC, and Milbank, Tweed, Hadley & McCloy LLP, for their Complaint against defendants Hon.

Alejandro García Padilla, Hon. Juan C. Zaragoza Gómez, Hon. Ingrid Rivera Rocafort, Hon.

Melba Acosta Febo, Hon. Luis F. Cruz Batista, Hon. Víctor A. Suárez Meléndez, Hon. César A.

Miranda Rodríguez, Hon. Juan Flores Galarza, and John Does 1-40 (collectively, "Defendants"),

allege as follows:

## NATURE OF THIS ACTION

1.      The executive orders (the "Executive Orders") issued on November 30, 2015 and December 8, 2015 by The Honorable Governor García Padilla are unconstitutional. Through this action, Plaintiffs seek a declaratory judgment that the Executive Orders violate the Constitution of the United States of America (the "United States Constitution") and are without force or effect. Plaintiffs also seek an injunction enjoining Defendants from taking or causing to be taken any and all actions pursuant to the Executive Orders because such actions will constitute violations of Plaintiffs' constitutionally-protected property interests and contractual rights.

2.      The Executive Orders direct the Secretary of Treasury of the Commonwealth of Puerto Rico and the Puerto Rico Tourism Company to retain or transfer certain taxes and revenues (the "Pledged Funds") pledged to secure the payment of bonds (the "Authority Bonds") issued by the Puerto Rico Highways and Transportation Authority ("PRHTA"), the Puerto Rico Convention Center District Authority ("PRCCDA"), and the Puerto Rico Infrastructure Financing Authority ("PRIFA", and together with PRHTA and PRCCDA, the "Authorities"). The Authority Bonds are secured by liens on the Pledged Funds.

3.      Plaintiffs and their affiliates insure or reinsure approximately $7.994 billion of the indebtedness of the Commonwealth of Puerto Rico (the "Commonwealth") and its public corporations, including the Authorities. Defendants have injured Plaintiffs by causing at least $163 million to date of the Pledged Funds to be diverted from the security and payment of the Authority Bonds to other, unconstitutional uses.

4.      The Executive Orders are unconstitutional because they substantially and unjustifiably impair the contractual rights of Plaintiffs and of the holders of the Authority Bonds (the "Authority Bondholders"). This impairment violates the contracts clause (the "Contracts Clause") of Article I, Section 10, Clause 1 of the United States Constitution. Although the liens

granted to the Authority Bondholders are subject to payment first of public debt, that does not authorize the Defendants to "claw back" or divert the Pledged Funds under the circumstances described in the Executive Orders, namely, where other available resources exist from which the public debt could be paid.

5.    The Executive Orders are also unconstitutional because they constitute a misappropriation and diversion of secured bondholder collateral that has and will deprive Plaintiffs and the Authority Bondholders of their lawful property interests in and due process rights with respect to the Pledged Funds in violation of the takings clause (the "Takings Clause") of the Fifth Amendment of the United States Constitution and the due process clauses (the "Due Process Clauses") of the Fifth and Fourteenth Amendments of the United States Constitution.

## THE PARTIES

6.    Plaintiff Assured Guaranty Corp. or AGC is a Maryland insurance company with its principal place of business at 31 West 52nd Street, New York, New York 10019.

7.    Plaintiff Assured Guaranty Municipal Corp. or AGM is a New York insurance company with its principal place of business at 31 West 52nd Street, New York, New York 10019.

8.    Plaintiff Ambac Assurance Corporation is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York, 10004.

9.    Plaintiffs are monoline insurers that provide financial guarantees to the United States and global public finance, infrastructure, and structured finance markets.

10.    Plaintiffs bring this action to protect and enforce their rights under the United States Constitution, as described below.

11.    Defendant Hon. Alejandro García Padilla (the "Governor") is the Governor of the Commonwealth and issued the Executive Orders.  Plaintiffs sue the Governor in his official capacity.

12.    Defendant Hon. Juan C. Zaragoza Gómez (the "Secretary of Treasury") is the Secretary of Treasury of the Commonwealth and is empowered to implement the Executive Orders.  Plaintiffs sue the Secretary of Treasury in his official capacity.

13.    Defendant Hon. Ingrid Rivera Rocafort (the "Executive Director") is the Executive Director of the Puerto Rico Tourism Company (the "Puerto Rico Tourism Company") and is empowered to implement the Executive Orders.  Plaintiffs sue the Executive Director in her official capacity.

14.    Defendant Hon. Melba Acosta Febo (the "GDB President") is the President of the Government Development Bank for Puerto Rico (the "GDB") and a member of the Working Group For The Fiscal and Economic Restoration of Puerto Rico created pursuant to Administrative Bulletin Number OE-2015-22 (the "Working Group") and is empowered to implement the Executive Orders.  Plaintiffs sue the GDB President in her official capacity as the GDB President and in her official capacity as a member of the Working Group.

15.    Defendant Hon. Luis F. Cruz Batista (the "OMB Director") is the Director of the Commonwealth's Office of Management and Budget (the "OMB") and is empowered to implement the Executive Orders.  Plaintiffs sue the OMB Director in his official capacity.

16.    Defendant Hon. Víctor A. Suárez Meléndez (the "Secretary of State") is the Secretary of State of the Commonwealth and a member of the Working Group and is empowered to implement the Executive Orders.  Plaintiffs sue the Secretary of State in his official capacity as a member of the Working Group.

17.     Defendant Hon. César A. Miranda Rodríguez (the "Secretary of Justice", and together with the GDB President and the Secretary of State, the "Working Group Members") is the Secretary of Justice of the Commonwealth and a member of the Working Group and is empowered to implement the Executive Orders.  Plaintiffs sue the Secretary of Justice in his official capacity as a member of the Working Group.

18.     Defendant Hon. Juan Flores Galarza is the Sub-Secretary (the "Sub-Secretary") of the Treasury of the Commonwealth and is empowered to implement the Executive Orders. Plaintiffs sue the Sub-Secretary in his official capacity.

19.     Defendant John Doe 1 is any successor to Hon. Alejandro García Padilla as Governor of the Commonwealth.  Plaintiffs sue John Doe 1 in his or her official capacity.

20.     Defendant John Doe 2 is any successor to Hon. Juan C. Zaragoza Gómez as Secretary of Treasury of the Commonwealth who is empowered to implement the Executive Orders.  Plaintiffs sue John Doe 2 in his or her official capacity.

21.     Defendant John Doe 3 is any successor to Hon. Ingrid Rivera Rocafort as Executive Director of the Puerto Rico Tourism Company who is empowered to implement the Executive Orders.  Plaintiffs sue John Doe 3 in his or her official capacity.

22.     Defendant John Doe 4 is any successor to Hon. Melba Acosta Febo as President of the GDB who is empowered to implement the Executive Orders.  Plaintiffs sue John Doe 4 in his or her official capacity.

23.     John Doe 5 is any successor to Hon. Luis F. Cruz Batista as Director of the OMB who is empowered to implement the Executive Orders.  Plaintiffs sue John Doe 5 in his or her official capacity.

24.     Defendant John Doe 6 is any successor to Hon. Juan Flores Galarza as the Sub-Secretary of Treasury of the Commonwealth who is empowered to implement the Executive Orders. Plaintiffs sue John Doe 6 in his or her official capacity.

25.     Defendants John Does 7-9 are any successors to the Working Group Members as members of the Working Group who are empowered to implement the Executive Orders. Plaintiffs sue John Does 7-9 in their official capacities as members of the Working Group.

26.     Defendants John Does 10-20 are any heads of Commonwealth governmental agencies (collectively, the "Agency Heads") who are empowered to implement the Executive Orders. Plaintiffs sue the Agency Heads in their respective official capacities.

27.     Defendants John Does 21-30 are any other secretaries of the Commonwealth government, directors of Commonwealth dependencies, or directors of public corporations to whom the Sub-Secretary addressed Circular Letter No. 1300-15-16 (the "Circular Letter"). Plaintiffs sue John Does 21-30 in their respective official capacities.

28.     Defendants John Does 31-40 are any employees or other agents of the Commonwealth or of its public corporations or instrumentalities, including the Authorities, the Puerto Rico Tourism Company, or the GDB, who are empowered to implement the Executive Orders. Plaintiffs sue John Does 31-40 in their respective official capacities.

**JURISDICTION AND VENUE**

29.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000. Plaintiffs seek a declaration and related relief in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202.

30.     This complaint presents an actual controversy that is ripe for adjudication.  As described below, pursuant to the Executive Orders, Defendants have already caused injury in fact to Plaintiffs by causing Pledged Funds to be diverted from the security and payment of the Authority Bonds to other, unconstitutional uses.  On January 1, 2016, the Defendants' diversion of Pledged Funds resulted in a payment default with respect to an approximately $35.941 million interest payment due on bonds issued by PRIFA, as a result of which default the Plaintiffs were required to make payments of at least $10,750,625 under insurance policies insuring certain of the defaulted bonds.  These payments by Plaintiffs would not have been necessary but for the Defendants' diversion of the Pledged Funds, and the Defendants' continued diversion of the Pledged Funds will result in similar defaults on other Authority Bonds.

31.     Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to these claims occurred in this District.

## I.     Plaintiffs Insure Bonds Issued By The Authorities

32.     Plaintiffs are providers of financial guaranty insurance, which is a type of insurance whereby an insurer guarantees scheduled payments of interest and principal as and when due on a bond or other obligation.  Plaintiffs insure scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and around the world.  Under relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Plaintiffs neither satisfies nor discharges an issuer's obligation to pay and, to the extent Plaintiffs make such payments, they obtain assignments of rights from the bondholders, become owners of the bonds, and/or become subrogated to the rights of bondholders and effectively step into the shoes of such bondholders.

33.     One reason governments and municipalities, including the Authorities, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds.  Such insurance is especially important for issuers such as the Commonwealth and Authorities who have—and will have—significant borrowing needs, notwithstanding their lower credit rating.  Among other projects, the proceeds of Authority Bonds have been used to finance the construction of the Puerto Rico Convention Center; the construction of and necessary repairs to numerous toll highways and connecting roads, including PR-20, PR-22, PR-52, and PR-53; and the construction, operation, and maintenance of Tren Urbano, a rapid transit system in the San Juan metropolitan area.

### A.     **PRHTA**

34.     PRHTA is a public corporation created by Act 74-1965 (the "PRHTA Enabling Act") to assume responsibility for the construction of highways and other transportation systems in Puerto Rico.  See 9 L.P.R.A. § 2002.  Under the PRHTA Enabling Act, PRHTA has the power to "sue and be sued," to "make contracts and to execute all instruments necessary or incidental in the exercise of any of its powers," and to issue bonds.  9 L.P.R.A. § 2004(g), (h), (*l*).  Pursuant to the PRHTA Enabling Act, PRHTA has issued certain bonds (the "PRHTA Bonds") under resolutions (the "PRHTA Resolutions") executed in 1968 and 1998.  The PRHTA Bonds have an outstanding principal amount of $4.6 billion.

35.     Pursuant to the PRHTA Enabling Act and the PRHTA Resolutions, the PRHTA Bonds are secured by PRHTA's property and revenues, as well as by any tax "made available to [PRHTA] by the Commonwealth."  9 L.P.R.A. § 2004(*l*).  More specifically, the PRHTA Bonds are secured by a lien on (i) revenues derived from PRHTA's toll facilities; (ii) gasoline, diesel,

crude oil, and other excise taxes levied by the Commonwealth pursuant to Act 34-1997, Act 1-2011, and Act 1-2015 (the "Excise Taxes"); and (iii) motor vehicle license fees imposed under Act 22-2000 (the "Vehicle Fees", and together with the Excise Taxes, the "PRHTA Pledged Funds"). The Commonwealth covenanted with the holders of the PRHTA Bonds in the PRHTA Enabling Act that it would "not limit or restrict the rights or powers . . . vested in [PRHTA by the PRHTA Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 9 L.P.R.A. § 2019. PRHTA's rights and powers under the PRHTA Enabling Act include the right and the power to secure the PRHTA Bonds through a pledge of the PRHTA Pledged Funds. See 9 L.P.R.A. § 2004(*l*).

36.     Assured has insured over $1.3 billion (net of reinsurance) of PRHTA Bonds currently outstanding. Under its insurance agreements and policies insuring payment of principal of and interest on the PRHTA Bonds, Assured is deemed to be the sole holder of the PRHTA Bonds that it insures for the purposes of exercising all remedies and controlling and enforcing all rights and remedies of the holders of the PRHTA Bonds. See, e.g., Insurance Agreement for PRHTA Series AA Bonds § 1(g); Insurance Agreement for PRHTA Series N Bonds § 5; Insurance Agreement for Series L Bonds § 4. In addition, Assured is recognized as a third-party beneficiary under the PRHTA Resolutions. See, e.g., id. § 6; Insurance Agreement for PRHTA Series AA Bonds § 1(k).

37.     Ambac has insured over $471.4 million (net of reinsurance) of PRHTA Bonds currently outstanding. Under insurance agreements related to the PRHTA Bonds that it insures (other than PRHTA Bonds insured in the secondary market), Ambac is a third-party beneficiary of the PRHTA Resolutions and may enforce all rights, remedies, or claims thereunder. See, e.g., Series AA Ambac Agreement § 10; Series H Ambac Agreement § 10. In addition, Ambac will be assigned registered bondholders' rights, become the owner of any PRHTA Bonds for which it

pays a claim, and/or become fully subrogated to the payment rights of the prior PRHTA Bondholders.  See Series AA Ambac Agreement § 8; Series H Ambac Agreement § 8.

## B.    PRCCDA

38.    PRCCDA is a public corporation that was created by Act No. 351 of September 2, 2000 (the "PRCCDA Enabling Act") for the purpose of developing and operating a convention center located in San Juan, Puerto Rico, and related improvements and facilities. See 23 L.P.R.A. §§ 6402, 6404.  Under the PRCCDA Enabling Act, PRCCDA has the power to sue and be sued, to enter into contracts, and to issue bonds.  See 23 L.P.R.A. § 6412(b), (e), (h). Pursuant to the PRCCDA Enabling Act,  PRCCDA has issued approximately $468 million of revenue bonds (the "PRCCDA Bonds") under a Trust Agreement dated as of March 24, 2006 (the "PRCCDA Trust Agreement").   According to PRCCDA's most recent financial statements—which were published more than two years ago—approximately $436 million of PRCCDA Bonds remain outstanding.

39.    Pursuant to the PRCCDA Enabling Act, Act 272-2003 (the "Hotel Tax Act"), and the PRCCDA Trust Agreement, the PRCCDA Bonds are secured by a lien on certain hotel occupancy taxes (the "PRCCDA Pledged Funds") imposed by the Commonwealth and collected by the Puerto Rico Tourism Company pursuant to the Hotel Tax Act.  The Commonwealth covenanted in the Hotel Tax Act that it (i) would ensure that each month, the PRCCDA Pledged Funds would be deposited in certain accounts with the trustee for the PRCCDA Bonds to pay principal of and interest on the PRCCDA Bonds, and (ii) would not limit or alter the rights of PRCCDA to comply with its obligations to the holders of the PRCCDA Bonds.  Moreover, under the PRCCDA Trust Agreement, PRCCDA, as an agent of the Commonwealth, covenanted that the Commonwealth (i) will "make sure that the amounts [of the PRCCDA Pledged Funds] must

be deposited in the accounts as provided in the Trust Agreement" and (ii) will not limit or impair the rights of PRCCDA to comply with its obligations to repay the PRCCDA Bonds in full. See PRCCDA Trust Agreement § 6.01(n), (o).

40. Assured has insured approximately $164 million (net of reinsurance) of the outstanding PRCCDA Bonds. Certain of Assured's rights as an insurer are set forth in a First Supplemental Trust Agreement (the "First Supplemental Trust Agreement") to the PRCCDA Trust Agreement, dated as of March 24, 2006. Under the First Supplemental Trust Agreement, Assured is deemed to be a third-party beneficiary and may enforce any right, remedy, or claim. See First Supplemental Trust Agreement § 16(j).

41. Ambac has insured approximately $137.1 million (net of reinsurance) of the outstanding PRCCDA Bonds. Certain of Ambac's rights as an insurer are set forth in the First Supplemental Trust Agreement. Under the First Supplemental Trust Agreement, Ambac is deemed to be a third-party beneficiary and may enforce any right, remedy, or claim. See First Supplemental Trust Agreement § 15(s).

**C. PRIFA**

42. PRIFA is a public corporation created by Act 44-1988 (the "PRIFA Enabling Act") for the purpose of providing financial and other types of assistance to political subdivisions, public agencies, and instrumentalities of the Commonwealth. Under the PRIFA Enabling Act, PRIFA has the power to "sue and be sued," to execute contracts in carrying out its powers and functions, and to issue bonds. See 3 L.P.R.A. §§ 1906(d), (g), (l), 1907. Pursuant to the PRIFA Enabling Act, PRIFA has issued certain special tax revenue bonds (the "PRIFA Bonds") under a Trust Agreement (the "PRIFA Trust Agreement") dated as of October 1, 1988. The aggregate principal amount of PRIFA Bonds outstanding is approximately $1.621 billion.

43.    Pursuant to the PRIFA Enabling Act and the PRIFA Trust Agreement, the PRIFA Bonds are secured by a portion of a federal excise tax imposed on rum and other items produced in the Commonwealth and sold in the United States (the "PRIFA Pledged Funds").   In the PRIFA Enabling Act, the Commonwealth covenanted that it would "not limit or alter the rights [conferred to PRIFA by the PRIFA Enabling Act] until such bonds and the interest thereon are paid in full."  3 L.P.R.A. § 1913.  PRIFA's rights under the PRIFA Enabling Act include the right to pledge the PRIFA Pledged Funds to the payment of the PRIFA Bonds.  See, e.g., 3 L.P.R.A. §§ 1906(k), (m), 1907(a).

44.    Assured insures approximately $18.025 million of the outstanding PRIFA Bonds through secondary market insurance policies, either through policies issued directly by AGC or through arrangements with another primary insurer.   Pursuant to a January 21, 2009 administrative services agreement (the "Administrative Services Agreement") between AGC and the primary insurer, AGC has power of attorney to act on behalf of that other primary insurer, including by initiating litigation with respect to subrogation or recovery rights.   See Administrative Services Agreement §§ 2.5, 6.5.  Following PRIFA's default with respect to a $35.941 million interest payment due on PRIFA Bonds on January 1, 2016, Assured paid $450,625 in claims by PRIFA Bondholders on behalf of the primary insurer and is now fully subrogated to the rights of the PRIFA Bondholders whose claims it paid.

45.    Ambac insures approximately $502.8 million (net of reinsurance) of the outstanding PRIFA Bonds.  Following PRIFA's default with respect to a $35.941 million interest payment due on PRIFA Bonds on January 1, 2016, Ambac paid approximately $10.3 million in claims by PRIFA Bondholders.  Accordingly, Ambac was assigned the registered Bondholders' rights in respect of such payment and is now fully subrogated to the payment rights of such prior PRIFA Bondholders.

## II.    **Commonwealth Debt Priority Provisions**

### A.    **The Commonwealth Constitution**

46.    Article VI ("Article VI") of the Constitution of the Commonwealth of Puerto Rico (the "Commonwealth Constitution") contains several provisions dealing with appropriations and the payment of debt and expenses, which together demonstrate the clear public policy in favor of paying public debt before making other disbursements.

47.    First, Section 6 of Article VI provides:

> If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the [G]overnment and for the payment of interest on and amortization of the public debt for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and the Governor shall authorize the payments necessary for such purposes until corresponding appropriations are made.

> Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos, en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes.

P.R. Const. art. VI, § 6.

48.    Accordingly, if the appropriations needed for a fiscal year ("FY2") to cover public debt and ordinary expenses are not made, then the appropriations therefor from the prior fiscal year ("FY1") will be continued.  This provision establishes the public policy importance of paying both public debt and ordinary expenses.

49. Next, Section 7 of Article VI provides:

> The appropriations made for any fiscal year shall not exceed the total resources, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law.
>
> Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones.

P.R. Const. art. VI, § 7.

50. Accordingly, if the appropriations for a given fiscal year (i.e., FY2) exceed *estimated* revenues, then taxes must be raised. This provision demonstrates the public policy of trying to maintain a balanced budget by keeping expenditures in line with estimated revenues.

51. However, Section 8 of Article VI (the "Constitutional Debt Priority Provision") then provides:

> In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.
>
> Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley.

P.R. Const. art. VI, § 8.

52. Thus, if *actual* revenues are insufficient in a fiscal year (i.e., FY2), then "public debt" must be paid first. Having expressed the importance of (i) paying both public debt and expenses and (ii) keeping all expenses in line with revenues, the Commonwealth Constitution makes clear that if there is an actual shortfall for a fiscal year, public debt enjoys a priority (the "Public Debt Priority") over all other disbursements.

-14-

53.     The Constitutional Debt Priority Provision further requires all other disbursements to be paid "in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8. The Commonwealth's Legislative Assembly (the "Legislative Assembly") has implemented the priorities established by this provision of the Commonwealth Constitution in several laws that, as set forth below, expressly grant the Authority Bonds a priority that is second only to the public debt.

**B.      The OMB Act**

54.     In a year in which there are insufficient funds to pay all appropriations, Section 4(c) of the Management and Budget Office Organic Act (Act No. 147 of June 18, 1980, the "OMB Act") sets certain "priority guidelines" for the disbursement of public funds in furtherance of the Constitutional Debt Priority Provision.

55.     The priorities set by the Legislative Assembly in these circumstances first require "payment of interest and amortizations corresponding to the public debt."  23 L.P.R.A. § 104(c)(1).

56.     The "priority guidelines" next assign a second-priority status to "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico."  23 L.P.R.A. § 104(c)(2).

57.     "Regular expenses" related to government operations receive a third-priority status under Section 4(c) of the OMB Act, with priority within this group given to expenses related to "[c]onservation of public health," "[p]rotection of persons and property," "[p]ublic education programs," and "[p]ublic welfare programs." 23 L.P.R.A. § 104(c)(3)(A)-(D).

58.     Finally, the OMB Act's "priority guidelines" assign the lowest priorities to "construction of capital works or improvements" (fourth priority) (23 L.P.R.A. § 104(c)(4)) and "contracts and commitments contracted under special appropriations" (fifth priority) (23 L.P.R.A. § 104(c)(5)).

59.     The OMB Act thus implements the Constitutional Debt Priority Provision by giving secured debt such as the Authority Bonds and other obligations affecting the Commonwealth's "credit, reputation and good name" a priority senior to the payment of other expenses in a fiscal year in which available resources are not sufficient to pay all appropriations. The rule of law is clear that, as required by the Commonwealth Constitution and the OMB Act, the public policy of the Commonwealth requires payments to bondholders, including the Authority Bondholders, prior to payment of all Commonwealth general expenditures.[1]

**C.      Puerto Rico Statutes Clearly Limit When And How Pledged Funds May Be Used To Pay Public Debt**

60.     In furtherance of the Constitutional Debt Priority Provision, the Legislative Assembly also placed clear limitations on *when* and *how* certain funds could be used to pay public debt.

61.     Specifically, the laws under which the Authority Bonds have been issued (the "Authority Bond Priority Provisions" and, together with the Constitutional Debt Priority Provision, the "Debt Priority Provisions") permit the Pledged Funds to be "clawed back" to pay the public debt in a fiscal year in which the Public Debt Priority is in effect, but *only* when a particular precondition is satisfied, namely only when *all other* available resources for the

---

[1]     The clear public policy importance of paying public debt ahead of general expenditures is further evidenced by an amendment to Section 2 of Article VI of the Commonwealth Constitution, which was passed by a popular referendum in Puerto Rico (and a joint resolution adopted with the unanimous approval of the U.S. Congress) and which gives each holder of such debt the constitutional right to enforce such priority.

relevant fiscal year are insufficient to pay the public debt (such a use of Pledged Funds to pay the public debt, a "Clawback").

62.    The laws under which the Authority Bonds were issued also place a precondition on *how* Pledged Funds that are subject to Clawback may be used.  Specifically, Pledged Funds that are clawed back may be used solely to pay "public debt," and may not be used to pay other expenses.

63.    Together, these two preconditions to any Clawback establish the priority (the "Authority Bond Priority") of the Authority Bonds over *all* disbursements other than public debt that might be made during a fiscal year in which the Public Debt Priority is in effect.

64.    The Authority Bond Priority, including these two preconditions to any Clawback, is expressly set forth in each of the statutes under which the Authority Bonds were issued, as follows:

(a)    **Excise Taxes Pledged to Payment of PRHTA Bonds**: "The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, to the extent that all other resources available to which reference is made in said section are insufficient for such purposes**. Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations." 13 L.P.R.A. § 31751(a)(1)(B) (emphasis added).

(b)    **Vehicle Fees Pledged to Payment of PRHTA Bonds**: "[S]aid pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; **Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, to the extent that all other resources available, referred to in said section, are insufficient for such purposes**, otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority

and the holders of said bonds or other obligations." 9 L.P.R.A. § 2021 (emphasis added); see also 9 L.P.R.A. § 5681.

(c) **PRCCDA Pledged Funds Pledged to Payment of PRCCDA Bonds**: **"The product of the collection of the tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes**. Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any bond related financing agreement contemplated herein, and to comply with with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under bond related financing agreements." 13 L.P.R.A. § 2271v (emphasis added).

(d) **PRIFA Pledged Funds Pledged to Payment of PRIFA Bonds**: "[PRIFA] is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. **The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes**." 3 L.P.R.A. § 1914 (emphasis added).

65.     The Authority Bond Priority is also clearly stated in disclosure documents issued by the Authorities and used to publicly offer their debt securities to investors and on which Plaintiffs relied when they issued each of the insurance policies for the Authority Bonds. For example, the following disclosure documents clearly state the Authority Bond Priority:

(a) **Official Statement for PRHTA Series AA Refunding Bonds (July 1, 2010), at 19**: "The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle fees allocated to [PRHTA] by the Puerto Rico Internal Revenue Code and Act No. 9 are available Commonwealth resources under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. However, under the Puerto Rico Internal Revenue Code and Act No. 9, **such taxes and license**

fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose."

(b)     **Official Statement for PRCCDA Hotel Occupancy Tax Revenue Bonds, Series A, at 22:** "Hotel Occupancy Tax revenues are available revenues under the Constitution.  Accordingly, if needed, they may be applied first to the payment of debt service on the public debt of the Commonwealth. Under the [PRCCDA] Enabling Act, the Hotel Occupancy Tax Act and the Constitution of the Commonwealth, however, **such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose.**"

(c)     **Official Statement for PRIFA Special Tax Revenue Bonds, Series 2005A-C, at 10:** "Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution.  Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth.  Under the [PRIFA] Enabling Act, however, **such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose.**"

66.     Notably, the offering documents for the Commonwealth's "public debt" also acknowledge and disclose the Authority Bond Priority:

(a)     **Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at 16:** "[A]lthough certain revenues assigned to [PRHTA], Puerto Rico Infrastructure Financing Authority ('PRIFA') and Puerto Rico Convention Center District Authority ('PRCCDA') are stated by existing law to be available Commonwealth resources for purposes of the payment of public debt, their availability for such purpose is **subject to there being no other available Commonwealth resources.**"

(b)     **Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at 29-30:**  "The Commonwealth has also assigned certain revenues to [PRHTA], PRIFA, and PRCCDA. These consist of (i) motor vehicle fuel taxes, crude oil and derivative products excise taxes, cigarette excise taxes and license fees allocated to [PRHTA]; (ii) federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned by the federal government to the Commonwealth and allocated to PRIFA; and (iii) hotel occupancy taxes imposed by hotels on paying guests, which are allocated to PRCCDA. Although the legislation

provides that the assigned taxes and fees are subject to first being applied to the payment of the principal of and interest on the Commonwealth public debt, **their application to the payment of public debt is effective only if and to the extent that all other available Commonwealth resources are insufficient for that purpose.**"

67.     Accordingly, the plain language of both the Constitutional Debt Priority Provision and the Authority Bond Priority Provisions demonstrates that the purpose of the Clawback is to provide an additional source of payment for the public debt only when all other available resources for an entire fiscal year are insufficient for that purpose and *not* to provide an additional source from which the Commonwealth can fund government operations or other expenditures.  See, e.g., 13 L.P.R.A. § 31751(a)(1)(B) (cited above); 9 L.P.R.A. § 2021 (cited above); 9 L.P.R.A. § 5681; 13 L.P.R.A. § 2271v (cited above).

68.     In the Commonwealth's quarterly financial report dated November 6, 2015, the Commonwealth stated, and thus admitted, that the Authority Bonds are subject to Clawback only when and if there are no other available resources, thus re-affirming the validity of the Authority Bond Priority:

> Certain revenues assigned to Puerto Rico Highways and Transportation Authority, Puerto Rico Infrastructure Financing Authority and Puerto Rico Convention Center District Authority are stated by existing law to be available Commonwealth resources for purposes of the payment of public debt. **However, their availability for such purpose is subject to there being no other available Commonwealth resources**.

Commonwealth of Puerto Rico, Financial Information and Operating Data Report, Nov. 6, 2015, at 45 (emphasis added).

## III.     **The Executive Orders Impair The Authority Bond Priority**

### A.     **The First Executive Order**

69.     The Governor issued Administrative Bulletin No. OE-2015-046 (the "First Executive Order") on November 30, 2015, the day before a debt service payment was due on

-20-

public debt. A true and correct copy of the First Executive Order is attached hereto as Exhibit A. The First Executive Order directs the Puerto Rico Department of Treasury (the "Department of Treasury") to withhold the PRHTA Pledged Funds and the PRIFA Pledged Funds for application to the public debt instead of releasing such Pledged Funds to PRHTA and to PRIFA for application to the PRHTA Bonds and the PRIFA Bonds. The First Executive Order also directs the Puerto Rico Tourism Company to transfer the PRCCDA Pledged Funds to the Department of Treasury for application to the public debt instead of releasing the PRCCDA Pledged Funds for application to the PRCCDA Bonds.

70. According to the First Executive Order, the Public Debt Priority is in effect for Fiscal Year 2016 because there are insufficient funds to pay all appropriations and so public debt must be given priority pursuant to the Constitutional Debt Priority Provision. However, the First Executive Order impairs the Public Debt Priority, because the First Executive Order expressly provides for other expenses to be paid "at the same time" ("a su vez") as the public debt. See Exhibit A at 2. By contrast, the Public Debt Priority requires the public debt to be paid "first," and not at the same time as other expenses. See P.R. Const. art. VI, § 8.

71. The First Executive Order also impairs the Authority Bond Priority, because the "Whereas" clauses in the First Executive Order indicate that the Commonwealth has funded and continues to fund general "expenses" ("los gastos") *other* than payments on the Authority Bonds. See Exhibit A at 2. Pursuant to the Authority Bond Priority, the Authority Bonds enjoy priority over these other expenses. Accordingly, the public debt could (and should) be paid from the resources used to pay these other "expenses," not from the Pledged Funds.

72. The First Executive Order attempts to disguise its obvious impairment of the Authority Bond Priority by providing that the Pledged Funds will be "remitted" to the Authorities for the payment of the Authority Bonds to the extent it is "not necessary" to use all of

the clawed-back funds to pay the public debt:  "If it is not necessary to use all the funds withheld, they will be remitted to the corresponding public corporations [including the Authorities] for the payment of their respective obligations." ("Si no fuera necesario utilizar todos los fondos retenidos, se remitirán a la corporación pública applicable para el pago de sus respectivas obligaciones.").  See Exhibit A at 3.  Through this statement in the First Executive Order, the Governor acknowledges the validity of the Authority Bond Priority by providing that the Pledged Funds may not be used to pay any expenses subordinate to the Authority Bonds, and instead may only be used to pay the public debt.  However, this provision of the First Executive Order assumes that the determination of whether it is "necessary" to use Pledged Funds to pay the public debt will be made only *after* certain expenditures *other than payment of the public debt* have been made.  Accordingly, the First Executive Order effectively authorizes the Defendants to *first* make these other general expenditures, and only then to consider whether sufficient resources remain to pay the public debt without clawing back the Pledged Funds.  The effect of the First Executive Order is thus to elevate all these general expenditures to a priority position *ahead of* the Authority Bonds, which again is an impairment of the Authority Bond Priority.  Moreover, this elevation of general expenditures permits use of the Clawback—which is available *solely* for payment of public debt—for the payment of other expenditures.

### B.    The Second Executive Order

73.    On December 8, 2015, the Governor issued Administrative Bulletin OE-2015-49 (the "Second Executive Order"), which seeks to implement the First Executive Order.  A true and correct copy of the Second Executive Order is attached hereto as Exhibit B.

74.    Purportedly pursuant to the OMB Act, the Second Executive Order first authorizes the OMB Director to adjust the allocations in the Commonwealth's Fiscal Year 2016 budget to the Commonwealth's "available resources," including the Pledged Funds withheld

pursuant to the First Executive Order.  See Exhibit B at 3.  Permitting the OMB Director to include Pledged Funds in these budgetary adjustments (the "Budgetary Adjustments") constitutes an impairment of the Authority Bond Priority, because the preconditions to a Clawback have not been satisfied and Pledged Funds should thus not be available for any purpose other than payment of the Authority Bonds.

75.     Furthermore, in making the Budgetary Adjustments, the Second Executive Order requires the OMB Director to be guided by the "priority guidelines" set forth in Section 4(c) of the OMB Act, but "*with the purpose of maintaining essential services and to ensure the good operation of the Government of the Commonwealth of Puerto Rico*."  Exhibit B at 3 (emphasis added).  This stated purpose of the Budgetary Adjustments in fact constitutes a modification of the OMB Act's "priority guidelines," which require payment of public debt and of other obligations affecting the "credit, reputation and good name of the Government of the Commonwealth of Puerto Rico" *prior to* the funding of general expenditures.  The Budgetary Adjustments thus impair the Authority Bond Priority.

76.     Next, the Second Executive Order authorizes the Working Group to establish guidelines (the "Working Group Guidelines") in consultation with the Secretary of Treasury to manage the Commonwealth's cash flow and to make disbursements of the funds available for Fiscal Year 2016, including the Pledged Funds.  See Exhibit B at 3.  The Working Group Guidelines are to take into consideration, among other things, the Budgetary Adjustments made by the OMB Director, which Budgetary Adjustments, as described above, assume (i) the availability of the Pledged Funds, notwithstanding the fact that the preconditions to a Clawback have not been satisfied, and (ii) the priority of general expenditures over payment of the public debt, notwithstanding the Public Debt Priority.  See id.

77.     The Second Executive Order next authorizes the Secretary of Treasury to manage the Commonwealth's cash flow and to make disbursements from the Commonwealth's available resources for Fiscal Year 2016, which available resources are assumed to include the Pledged Funds withheld pursuant to the First Executive Order, in accordance with the Working Group Guidelines.  See id.

78.     Finally, the Second Executive Order instructs the Agency Heads to prioritize spending in their agencies in accordance with the Budgetary Adjustments and the Working Group Guidelines.  See id.

79.     On December 17, 2015, the Sub-Secretary partially implemented the Second Executive Order by issuing the Circular Letter, which sets forth the Working Group Guidelines. A true and correct copy of the Circular Letter is attached hereto as Exhibit C.  After excluding certain federal funds, the Working Group Guidelines as set forth in the Circular Letter provide for the public funds of the Commonwealth central government (including the Pledged Funds withheld pursuant to the First Executive Order) to be disbursed in the following order of priority:

a.  Interest and amortization of the public debt under the Constitution, according to the due date.

b.  Final and unappealable judgments issued by courts in cases of eminent domain, for which an appropriation was made during Fiscal Year 2016.

c.  Expenses necessary to guarantee the following essential services:

i.  Public Health

ii.  Safety

iii.  Education

iv.  Public welfare

d.  Payroll and pension expenses, including all related contributions and retentions.

-24-

e. Income under government custody belonging to external entities, such as, but without limitation to, the Compulsory Insurance, the Administration for the Compensation of Automobile Accidents ("ACAA"), refunds, among others.

f. Any other expense previously contemplated that in the discretion of the Secretary of the Treasury is necessary to guarantee the operation, continuity and stability of the central Government of the Commonwealth of Puerto Rico, such as those necessary to guarantee the well-being of the citizens.

g. In case there is an emergency caused by a catastrophe, acts of nature, fortuitous accidents, or that in any way impact the security, health, education, and well-being of the citizenry, priority will be given to the expenditures necessary for the execution of that which better responds to the return to normal life and economy of the Commonwealth.

80. The Working Group Guidelines as set forth in the Circular Letter do not provide for application of the Pledged Funds to the Authority Bonds, notwithstanding the fact that the preconditions to a Clawback have not been satisfied. In fact, the Working Group Guidelines omit entirely the payment of "commitments entered into by virtue of legal contracts in force" and the payment of "binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico," notwithstanding the fact that such commitments and obligations are entitled to a priority second only to the public debt under Section 4(c) of the OMB Act. See 23 L.P.R.A. § 104(c)(2).

81. In sum, the Second Executive Order, including as partially implemented through the Circular Letter, impairs the Authority Bond Priority by authorizing the OMB Director, the Working Group Members, the Secretary of Treasury, the Sub-Secretary, and the Agency Heads to prioritize general expenditures over payment of other obligations affecting the "credit, reputation and good name of the Commonwealth of Puerto Rico" (including the Authority Bonds).

82.     Accordingly, the Second Executive Order impairs the Authority Bond Priority by (i) assuming a Clawback of Pledged Funds notwithstanding the fact that the preconditions to a Clawback have not been satisfied and (ii) authorizing the OMB Director, the Working Group Members, the Secretary of Treasury, the Sub-Secretary, and the Agency Heads to prioritize general expenditures over payment of the Authority Bonds.

## IV.    The Executive Orders Have Injured Plaintiffs

83.     The Defendants' diversion of the Pledged Funds from the payment of the Authority Bonds has caused and will cause further injury to Plaintiffs and to the Authority Bondholders, because it reduces the amount of Pledged Funds securing the payment of the Authority Bonds.  This unconstitutional diversion of Pledged Funds has already caused a default with respect to a $35.941 million interest payment due on PRIFA Bonds on January 1, 2016, requiring the Plaintiffs to pay at least $10,750,625 in claims to PRIFA Bondholders.  If the unconstitutional diversion of Pledged Funds is permitted to continue without the replenishment of the diverted funds, the inevitable result will be further defaults on the Authority Bonds.

84.     Furthermore, whether as a result of claims of sovereign immunity[2] or an alleged inability to pay any award of damages, Plaintiffs and the Authority Bondholders have no adequate remedy at law against the Defendants in the event that the Defendants' unconstitutional diversion of the Pledged Funds results in further payment defaults on the Authority Bonds. Accordingly, the only recourse that is available to the Plaintiffs and to the Authority Bondholders in order to prevent an irreparable injury is to obtain injunctive relief enjoining the

---

[2]    The question of the Commonwealth's constitutional status as a sovereign is currently pending before the United States Supreme Court.  See Puerto Rico v. Sanchez Valle, 136 S. Ct. 28 (2015) (No. 15-108). Accordingly, Plaintiffs expressly reserve the right to assert additional rights, claims, and remedies, whether under federal or Commonwealth law, as a result of the Supreme Court's ruling in Sanchez Valle.

Defendants' unconstitutional diversion of the Pledged Funds *prior* to the time that this unconstitutional diversion results in further defaults.

85.     The Governor himself has acknowledged that the "clawback" of Pledged Funds pursuant to the First Executive Order is tantamount to a default on the Authority Bonds and that the "clawback" was instituted to pay expenses that are expressly subordinated by law to the Authority Bonds.  In his December 1, 2015 "Written Testimony" to the U.S. Senate Committee on the Judiciary, the Governor made the following statement regarding the First Executive Order:

> In light of the rapidly deteriorating revenue situation, in accordance with Article 6, Section 8 of the Constitution of the Commonwealth of Puerto Rico, I ordered the "clawback" of revenues assigned to certain instrumentalities of the Commonwealth for the repayment of their debts.  Together these instrumentalities have approximately $7 billion in bonds outstanding.  **In simple terms, we have begun to default on our debt** in an effort to attempt to repay bonds issued with the full faith and credit of the Commonwealth and **secure sufficient resources to protect the life, health, safety and welfare of the people of Puerto Rico**.

Puerto Rico's Fiscal Problems: Examining the Source and Exploring the Solution: Hearing Before the S. Comm. on the Judiciary, Dec. 1, 2015 (Written Testimony of Alejandro J. García Padilla) (emphasis added).  By the Governor's own admission, the issuance of the First Executive Order has caused a "default" on the Authority Bonds and present injury to Authority Bondholders and to Plaintiffs as insurers of those bonds.  The issuance of the Second Executive Order, which implements the First Executive Order, has only exacerbated that injury.

## V.     **The Executive Orders Violate The Contracts Clause**

86.     The Contracts Clause of Article I of the United States Constitution provides, in pertinent part, "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

U.S. Const., art. I, § 10, cl. 1. The primary purpose behind the enactment of the Contracts Clause was to prevent States from adopting laws that would permit borrowers (including the States) to abrogate their debts at the expense of creditors. See, e.g., Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 427-28 (1934); Antoni v. Greenhow, 107 U.S. 769, 795 (1883).

87. The Executive Orders substantially impair the contractual rights of the Authority Bondholders and of Plaintiffs. The Authority Bondholders purchased the Authority Bonds (and Plaintiffs issued their insurance policies for those bonds) in reliance on the Authorities' promise to pledge certain funds exclusively to the payment of the Authority Bonds, subject only to the Debt Priority Provisions. These priorities were incorporated into the Authorities' contracts with the Authority Bondholders and with Plaintiffs. However, by (i) altering these priorities and (ii) diverting Pledged Funds from their contractually agreed upon purposes, the Executive Orders substantially impair the contractual rights of the Authority Bondholders and Plaintiffs to be secured by, and ultimately paid from, the Pledged Funds.

88. In issuing the Executive Orders, the Governor purported to be exercising the Commonwealth's police power. See, e.g., Exhibit A at 2 ("The Commonwealth of Puerto Rico has the responsibility and the duty to ensure the health, safety, education and public welfare of its people through the exercise of its police power.").

89. The police power to "enact laws for the protection of the life, health and general welfare of the people" is a legislative power. See, e.g., P.R. Const. art. II, § 19 ("The power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively."). In issuing the Executive Orders, the Governor was exercising a legislative power, and the Executive Orders constitute legislative acts that modify existing Commonwealth law, including the Debt Priority Provisions.

90.     The Executive Orders cannot be justified as a valid exercise of the Commonwealth's police power, because the police power cannot override constitutional limitations.  See, e.g., Flushing Nat'l Bank v. Mun. Assistance Corp. for N.Y., 358 N.E.2d 848, 852 (N.Y. 1976) (holding that a "fugitive recourse to the police power" may not be used to "displace inconvenient but intentionally protective constitutional limitations").

91.     In addition, the power to establish a budget is among the most important functions of the Legislative Assembly.

92.     Through the OMB Act, however, the Legislative Assembly delegated to the Governor the power to make adjustments to the Commonwealth's budget by acting "according to [specific] priority guidelines for the disbursement of public funds" when there are insufficient funds to pay all appropriations for a particular fiscal year.  See 23 L.P.R.A. § 104(c).

93.     The Governor's issuance of the Executive Orders thus constitutes the exercise of a legislative power delegated to the Governor by the Legislative Assembly.

94.     The Defendants' confiscation and diversion of Pledged Funds pursuant to the Executive Orders is not a necessary or reasonable means of serving an important public purpose, because less drastic alternatives were available that would not have entailed an impairment of the Authority Bond Priority.

95.     As revealed in recent Congressional testimony, the Commonwealth has many more reasonable tools at its disposal to address its fiscal and economic challenges, rendering the "clawback" unnecessary.   See Puerto Rico's Fiscal Problems: Examining the Source and Exploring the Solution: Hearing Before the S. Comm. on the Judiciary, Dec. 1, 2015 (Written Testimony of Stephen J. Spencer) ("Spencer Written Testimony").

96.     Specifically, the Commonwealth still has significant capacity to raise revenues. In a comprehensive analysis of the Commonwealth's tax structure, KPMG, the Commonwealth's

own outside tax consultant, found that Puerto Rico's tax as a percent of GDP burden was far lower than comparable U.S. States.  See Spencer Written Testimony at 9.  Further analysis also reveals that the Commonwealth's tax burden as a percent of GDP is far lower than all U.S. States.  Id.  Additionally, as noted above, the Commonwealth Constitution actually requires the Legislative Assembly to raise taxes in the event appropriations for a given fiscal year exceed estimated resources, as the First Executive Order states is now the case.  See P.R. Const. art. VI, § 7.

97.     The Commonwealth can significantly improve revenue collections.  See Spencer Written Testimony at 10.  The analysis undertaken by the Commonwealth's tax consultant, KPMG, concluded that by improving tax collections and simplifying the Commonwealth's tax structure, net revenue collections could be improved by more than $3.6 billion annually.  Id.  The size of the incremental revenue collections opportunity stems from a system of taxation that KPMG found is plagued by "structural complexity, instability, internal inconsistency, inefficient administration and inadequate enforcement."  Id.  KPMG also noted that revenue collections were hindered by a "culture of tax evasion."  Id.  Further highlighting the extent of the incremental revenue opportunity, the Commonwealth was found to collect less than 60% of sales taxes owed, to have a large number of high income filers who pay no income tax at all, and to be collecting property taxes off a base that was in some cases last assessed in the 1950s.  Id.

98.     Perhaps most importantly, the Commonwealth can reduce costs.  See Spencer Written Testimony at 10.  Although the Commonwealth has recently attempted to limit the growth in government spending, consolidated government expenditures have still increased 47% over the past 10 years.  Id.  The Governor's recent Fiscal and Economic Growth Plan identifies a number of sensible cost reduction opportunities.  Id.

99.     Indeed, the Second Executive Order illustrates precisely the types of measures the Governor could have taken—and was *required by law* to take—in response to any alleged shortfall of "available resources" during Fiscal Year 2016.  Specifically, the Governor, assisted as needed by the OMB Director, the Working Group, and the Secretary of Treasury, should have adjusted budgeted allocations downward in order to bring them in line with actual available resources, just as the Second Executive Order purports to authorize the OMB Director to do.  In making these budgetary adjustments, however, the Governor should have complied with the "priority guidelines" set forth in Section 4(c) of the OMB Act by first reducing the amounts allocated to the lowest priority items, such as commitments contracted by the Commonwealth under special appropriations and the construction of capital works.    See  23  L.P.R.A. § 104(c)(4)-(5).

100.     Notably, even excluding the Pledged Funds, the projected resources available to the Commonwealth for Fiscal Year 2016 (approximately $9.0 billion) vastly exceed debt service on the public debt ($1.85 billion).  The Governor had significant room to reduce lower-priority expenditures without significantly impacting high-priority items such as public health and safety, and without resorting to a "clawback" of Pledged Funds.  See 23 L.P.R.A. § 104(c)(3)(A)-(B).  Given the clarity with which the Legislative Assembly has set forth the procedure that the Governor should follow in a year in which available resources fall short of appropriations, the Governor and the other Defendants cannot demonstrate that any other means of addressing an alleged budget shortfall was "necessary" and "reasonable" to serve an important public purpose.

101.     In short, the Executive Orders constitute neither a reasonable nor a necessary means of serving an important public purpose, because many less drastic alternatives existed, and the ultimate effect of the Executive Orders will only be to impede a consensual resolution to the Commonwealth's debt problems, to limit the Commonwealth's access to the capital markets,

to deepen the Commonwealth's long-term financial difficulties, and to endanger the long-term health and safety of the people of Puerto Rico.

**VI.  The Executive Orders Violate The Takings And Due Process Clauses**

102.  The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.  The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the United States Constitution.  U.S. Const. amend. XIV, § 1.

103.  The Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution forbid the Commonwealth from depriving "any person . . . of life, liberty, or property, without due process of law."  U.S. Const. amends. V, XIV, § 1.

104.  The Executive Orders violate the Takings and Due Process Clauses by depriving the Plaintiffs and Authority Bondholders of their senior secured property interests in the Pledged Funds without providing the Plaintiffs and Authority Bondholders with due process or with just compensation.  Because the Debt Priority Provisions provide no legal basis for the Governor or the other Defendants to deprive the Authority Bondholders of their property interests in the Pledged Funds, the Executive Orders constitute an unconstitutional taking and a violation of the Plaintiffs' and Authority Bondholders' due process rights.

**FIRST CLAIM FOR RELIEF**
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of The Contracts Clause Against All Defendants)**

105.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 104 hereof, as if fully set forth herein.

106. The issuance and implementation of the Executive Orders has harmed Plaintiffs and the Authority Bondholders by diverting funds contractually pledged to secure the payment of the Authority Bonds to other purposes.

107. An actual justiciable controversy exists between the parties.

108. Plaintiffs are entitled to an order declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Contracts Clause of Article I of the United States Constitution; (ii) that the Executive Orders unlawfully interfere with and impede Plaintiffs' contractual rights; and (iii) that the Executive Orders are invalid, null, and void.

## SECOND CLAIM FOR RELIEF
### (Injunctive Relief For Violations Of The Contracts Clause Against All Defendants)

109. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 108 hereof, as if fully set forth herein.

110. The issuance and implementation of the Executive Orders has harmed Plaintiffs and the Authority Bondholders by diverting funds contractually pledged to secure the payment of the Authority Bonds to other purposes.

111. An actual justiciable controversy exists between the parties.

112. If the Executive Orders are enforced and Defendants act pursuant to the Executive Orders to divert Pledged Funds from payment of the Authority Bonds to other purposes, then such diversion will result in imminent and irreparable harm to Plaintiffs and the Authority Bondholders by reducing the amount of collateral securing the Authority Bonds and causing a payment default on the Authority Bonds.

113.    In addition, enforcement of the Executive Orders will cause immediate and irreparable harm by substantially impairing Plaintiffs' and the Authority Bondholders' contractual interests in a manner that violates the Contracts Clause of Article I of the United States Constitution.

114.    Plaintiffs are entitled to an injunction prohibiting Defendants from taking or causing to be taken any action pursuant to the Executive Orders.

## THIRD CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of The Takings And Due Process Clauses Against All Defendants)

115.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 114 hereof, as if fully set forth herein.

116.    The issuance and implementation of the Executive Orders has harmed Plaintiffs and the Authority Bondholders by (i) taking funds in which Plaintiffs and the Authority Bondholders hold a property interest without providing Plaintiffs and the Authority Bondholders with just compensation and (ii) depriving Plaintiffs and the Authority Bondholders of funds in which Plaintiffs and the Authority Bondholders hold a property interest without due process of law.

117.    An actual, justiciable controversy exists between the parties.

118.    Plaintiffs are entitled to an order declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Fifth and Fourteenth Amendments of the United States Constitution; and (ii) that the Executive Orders are invalid, null, and void.

## FOURTH CLAIM FOR RELIEF

### (Injunctive Relief For Violations Of The Takings And Due Process Clauses Against All Defendants)

119.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 118 hereof, as if fully set forth herein.

120.    The issuance and implementation of the Executive Orders has harmed Plaintiffs and the Authority Bondholders by (i) taking funds in which Plaintiffs and the Authority Bondholders hold a property interest without providing Plaintiffs and the Authority Bondholders with just compensation and (ii) depriving Plaintiffs and the Authority Bondholders of funds in which Plaintiffs and the Authority Bondholders hold a property interest without due process of law.

121.    If the Executive Orders are enforced and Defendants act pursuant to the Executive Orders to take Pledged Funds in which Plaintiffs and the Authority Bondholders hold a property interest and to deprive Plaintiffs and the Authority Bondholders of access to such Pledged Funds, then such taking will result in imminent and irreparable harm to Plaintiffs and the Authority Bondholders by reducing the amount of collateral securing the Authority Bonds and causing a payment default on the Authority Bonds.

122.    In addition, enforcement of the Executive Orders will cause immediate and irreparable harm by depriving Plaintiffs and the Authority Bondholders of their property rights in a manner that violates the Takings and Due Process Clauses of the United States Constitution.

123.    Plaintiffs are entitled to an injunction prohibiting the Defendants from taking or causing to be taken any action pursuant to the Executive Orders.

## **RELIEF DEMANDED**

WHEREFORE Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

(a)    Declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Contracts Clause of Article I of the United States Constitution; (ii) that the Executive Orders unlawfully interfere with and impede the Plaintiffs' contractual rights; and (iii) that the Executive Orders are invalid, null, and void;

(b)    Declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Fifth and Fourteenth Amendments of the United States Constitution; and (ii) that the Executive Orders are invalid, null, and void;

(c)    Enjoining Defendants from taking or causing to be taken any action pursuant to the Executive Orders;

(d)    Granting Plaintiffs such other and further relief as this Court may deem just and proper.

Dated:  San Juan, Puerto Rico
        January 7, 2016

CASELLAS ALCOVER & BURGOS P.S.C.                    FERRAIUOLI LLC


By: /s/ *Heriberto Burgos Pérez*                    By: /s/ *Roberto Cámara Fuertes*
    Heriberto Burgos Pérez                               Roberto Cámara Fuertes
    USDC-PR 204809                                       USDC-PR No. 219002
    Ricardo F. Casellas-Sánchez                          Jenyfer García-Soto
    USDC-PR 203114                                       USDC-PR No. 222209
    Diana Pérez-Seda                                     221 Ponce de León Avenue, 5th Floor
    USDC-PR 232014                                       San Juan, PR 00917
    P.O. Box 364924                                      Telephone: (787) 766-7000
    San Juan, PR 00936-4924                              Facsimile: (787) 766-7001
    Telephone: (787) 756-1400                            Email:  rcamara@ferraiuoli.com
    Facsimile: (787) 756-1401                                    jgarcia@ferraiuoli.com
    Email:  hburgos@cabprlaw.com
            dperez@cabprlaw.com

CADWALADER, WICKERSHAM & TAFT                        MILBANK, TWEED, HADLEY &
LLP                                                 McCLOY LLP


By: /s/ *Howard R. Hawkins, Jr.*                    By: /s/ *Dennis F. Dunne*
    Howard R. Hawkins, Jr. (admission pending)           Dennis F. Dunne (admission pending)
    Lary Stromfeld (admission pending)                   Evan R. Fleck (admission pending)
    Ellen M. Halstead (admission pending)                Atara Miller (admission pending)
    200 Liberty Street                                   Grant R. Mainland (admission pending)
    New York, NY 10281                                   28 Liberty Street
    Telephone: (212) 504-6000                            New York, NY 10005
    Facsimile:  (212) 406-6666                           Telephone: (212) 530-5770
    Email:  howard.hawkins@cwt.com                       Facsimile:  (212) 822-5770
            lary.stromfeld@cwt.com                       Email:  ddunne@milbank.com
            ellen.halstead@cwt.com                               efleck@milbank.com
                                                                 amiller@milbank.com
    Mark C. Ellenberg (admission pending)                        gmainland@milbank.com
    700 Sixth Street
    Washington, D.C. 20001                          *Attorneys for Ambac Assurance Corporation*
    Telephone: (202) 862-2200
    Facsimile: (202) 862-2400
    Email:  mark.ellenberg@cwt.com


*Attorneys for Assured Guaranty Corp. and*
*Assured Guaranty Municipal Corp.*