*Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company,
Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National
Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA
Rum Tax Bonds*

# EXHIBIT 13

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION,<br><br>                Plaintiff,<br><br>-against-<br><br>COMMONWEALTH OF PUERTO RICO, RICARDO ROSSELLÓ NEVARES, RAÚL MALDONADO, JOSÉ IVÁN MARRERO ROSADO, GERARDO JOSÉ PORTELA FRANCO, JOSÉ B. CARRIÓN III, ANDREW G. BIGGS, CARLOS M. GARCÍA, ARTHUR J. GONZALEZ, JOSÉ R. GONZÁLEZ, ANA J. MATOSANTOS, DAVID A. SKEEL, JR., ELÍAS SÁNCHEZ, JOHN DOES 1-12, and the FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>                Defendants. | Civil No. 17-cv-1568 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF RELATED TO CLAWBACK

Plaintiff Ambac Assurance Corporation ("Ambac"), by its attorneys Ferraiuoli LLC, and

Milbank, Tweed, Hadley & McCloy LLP, for its Complaint against defendants the Commonwealth

of Puerto Rico (the "Commonwealth"), Ricardo Rosselló Nevares, Raúl Maldonado, José Iván

Marrero Rosado, Gerardo José Portela Franco, José B. Carrión III, Andrew G. Biggs, Carlos M.

García, Arthur J. Gonzalez, José R. González, Ana J. Matosantos, David A. Skeel, Jr., Elías

Sánchez, John Does 1-12, and the Financial Oversight and Management Board for Puerto Rico

(the "Oversight Board") (collectively, "Defendants"), alleges as follows:

## NATURE OF THIS ACTION

1.      Sovereignty confers great power, but it does not authorize lawlessness. This action

seeks to halt the latest in a series of unconstitutional and unlawful acts that have been the

unfortunate *modus operandi* of the Commonwealth government in seeking to manage its financial and economic distress. Instead of rectifying these abuses, the Oversight Board created by Congress to restore fiscal responsibility to the Commonwealth has affirmatively **exacerbated** them, giving its imprimatur to an ongoing scheme of constitutional and statutory violations that can only be called theft.

2.      The Commonwealth's asset grabs began on November 30, 2015, when then-Governor Alejandro García Padilla unilaterally issued the first in a series of executive orders mandating the "clawback" of revenues pledged to secure the bonds of certain Puerto Rico public corporations (the "Clawback Orders")—specifically, the Puerto Rico Infrastructure Financing Authority ("PRIFA"), the Puerto Rico Highways and Transportation Authority ("PRHTA"), and the Puerto Rico Convention Center District Authority ("PRCCDA") (together, the "Authorities")—notwithstanding the fact that the constitutional preconditions for such clawback were nowhere near satisfied, and indisputably junior obligations were being protected and paid. Ambac has issued financial guaranty insurance policies covering payment of principal and interest on approximately $1.2 billion in current net accreted value of the Authorities' bonds.

3.      The Clawback Orders were just the beginning. Months after they were issued, Puerto Rico's Legislative Assembly passed various forms of moratorium legislation authorizing the Governor to default on various bond obligations and to reorder constitutional and statutory payment priorities as he saw fit.

4.      The first piece of moratorium legislation passed by the Commonwealth was the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (the "Moratorium Act"), which, among other things, conferred upon the Governor unilateral discretion to: (i) enact moratoriums on the payment of virtually any debt owed by the Commonwealth and its

instrumentalities; (ii) suspend the transfer of monies pledged to the repayment of those debts; and (iii) re-order the preexisting constitutional and statutory order of debt payment priorities.

5.     After enactment of the Moratorium Act, the Governor flexed his newfound power and issued a series of executive orders (the "Moratorium Orders") that, in relevant part, declared moratoriums on various debt obligations (including obligations of the Authorities), suspended the transfer of funds pledged to the repayment of the debts affected by the moratoriums, and elevated the payment of junior unsecured debts over senior secured debts.

6.     The Commonwealth then partially replaced the Moratorium Act with the Puerto Rico Financial Emergency and Fiscal Responsibility Act (the "Amended Moratorium Act"; and together with the Moratorium Act, the "Moratorium Legislation"), which attempted to conceal, but functionally preserved, the unlawful elements of the Moratorium Act.  It also extended— unaltered—the life of the Moratorium Orders that implement the Moratorium Legislation.

7.     The Commonwealth's flagrant repudiation of the constitutional and statutory protections to the bonds issued by the Authorities (the "Revenue Bonds") should have been halted after the passing of the Puerto Rico Oversight, Management, and Stability Act ("PROMESA").  A key feature of PROMESA was the creation of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), which was designed to put the Commonwealth's fiscal house in order while respecting bondholders' relative lawful priorities and liens, thereby facilitating Puerto Rico's reentry into the capital markets.  The capital markets have been closed to the Commonwealth since 2014.

8.     Instead, under the guise of fiscal discipline, the Oversight Board has certified a fiscal plan (the "Fiscal Plan," attached hereto as Exhibit A) that *escalates* and entrenches as the foundation of Puerto Rico's future the ongoing lawlessness.  Among other objectionable features,

the Fiscal Plan turns Puerto Rico's constitutional and statutory law on its head, downgrading the most senior debt obligations of the Commonwealth and its instrumentalities (including general obligation ("GO") and Revenue Bond debt) to the very bottom of the payment priority waterfall, despite Puerto Rico law requiring the exact opposite; and in the process, imposes a ***77.4% haircut on debt obligations*** while actually ***increasing the Commonwealth's spending*** during the Fiscal Plan's ten-year span.

9.     The Fiscal Plan is the centerpiece of the PROMESA framework—not only must all Commonwealth budgets and laws adhere to it, but any consensual "Title VI" restructuring or involuntary "Title III" restructuring under PROMESA must also be premised on it.  Thus, a Fiscal Plan that flouts constitutional and statutory rights will require continued constitutional breaches and illegal acts by the Commonwealth to adhere to it.  That is exactly what is happening now in Puerto Rico.

10.     First, on Friday, April 28, 2017, the Legislative Assembly passed a purported "Fiscal Plan Compliance Law" (attached hereto as Exhibit B),[1] which, as its name indicates, further implements the expropriation of protected assets mandated by the Fiscal Plan.  The Fiscal Plan Compliance Law purportedly requires that all funds belonging to Commonwealth public corporations, including the funds belonging to the Authorities, must first flow through the general fund of the Commonwealth (the "General Fund") to be used for general Commonwealth needs at the discretion of the Secretary of the Treasury, as opposed to in the limited and temporary "clawback" circumstances provided for by the Puerto Rico Constitution.

---

[1] The official English translation of the Fiscal Plan Compliance Law is not yet available.  Accordingly, only the Spanish version is attached as an exhibit to this Complaint.  Pursuant to Local Rule 5(g), Ambac has moved separately to file a certified English translation at a later date.

11.     Late in the evening that same day, the Commonwealth publicly disclosed a purported Title VI "proposal" that, far from offering a path to conciliation, opportunistically sought to "check the box" on a consensual restructuring process in order to smooth the road to bankruptcy. The proposal essentially wipes out the Revenues Bonds (notwithstanding Puerto Rico law putting those funds out of the reach of the Commonwealth except in highly limited circumstances and even then only temporarily). And it did so in brazen disregard for Ambac's contractual consent rights, which require Ambac's consent for the initiation of any restructuring proposal. The proposal was the antithesis of good faith.

12.     As a result of this conduct, there will further payment defaults by each of the Authorities (in addition to prior payment defaults by PRIFA and PRHTA as a result of the Commonwealth's violations of their debt priority protections). For example, the Commonwealth covenanted, both in the Authorities' bond resolutions and their enabling statutes, not to take any actions that would interfere with the rights of the Authorities' creditors. The Fiscal Plan and Fiscal Plan Compliance Law flagrantly violate that contractual and statutory covenant.

13.     More fundamentally, by engaging in the foregoing acts, the Commonwealth and Oversight Board have violated Ambac's constitutional and statutory rights as insurer of the Revenue Bonds. Specifically, through the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law, Defendants have:

- substantially impaired Ambac's contract rights in violation of Article I, Section 10, Clause 1 (the "Contracts Clause") of the United States Constitution (the "U.S. Constitution");

- taken Ambac's property without just compensation or due process of law in violation of the Takings Clause (the "Takings Clause") of the Fifth Amendment to the U.S. Constitution and Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution (the "Due Process Clauses");

- enacted and issued laws and executive orders preempted by Section 303 of PROMESA;

-5-

- transferred the Authorities' property to the Commonwealth in violation of Section 407 of PROMESA; and

- unconstitutionally limited Ambac's and others' access to Article III courts.

14.     As the insurer of a wide variety of Commonwealth debt across numerous structures, many with maturities extending out decades, Ambac is committed to Puerto Rico's long-term success.  But that success—and any sustainable restructuring—can be achieved only by an approach that respects lawful priorities and liens, as Congress required in extending Puerto Rico the PROMESA lifeline.  *See* 48 U.S.C. § 2141(b)(1)(N) (requiring that any fiscal plan "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements" of the Commonwealth).

15.     Instead, the Commonwealth, egged on by the Oversight Board, continues to flagrantly disregard the rule of law.  Accordingly, Ambac seeks (1) a declaratory judgment that the Fiscal Plan and Fiscal Plan Compliance Law are unconstitutional and illegal; and (2) an injunction against the filing of any Title III petitions or any future legislation, rules, budgets, or restructuring plans premised on the illegal Fiscal Plan.

## THE PARTIES

16.     Ambac Assurance Corporation is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York, 10004.

17.     Ambac is a monoline insurer that provides financial guarantees to the United States and global public finance, infrastructure, and structured finance markets.

18.     Ambac brings this action to protect and enforce its rights under the U.S. Constitution and duly enacted federal law, as described below.

19.     Defendant Ricardo Rosselló Nevares is the current Governor of the Commonwealth. He took office on January 2, 2017.[2] Among other things, the Governor signed into law the Amended Moratorium Act and Fiscal Plan Compliance Law. The Governor also possessed the ultimate authority to develop and submit the Fiscal Plan. Ambac sues the Governor in his official capacity.

20.     Defendant Raúl Maldonado (the "Secretary of Treasury") is the Secretary of Treasury of the Commonwealth. The Secretary of the Treasury participated in the development and submission of the Fiscal Plan. The Secretary of Treasury is also empowered by the Fiscal Plan Compliance Law to receive and/or disburse funds on behalf of the Commonwealth, including monies transferred to the Commonwealth or its instrumentalities purportedly pursuant to Clawback, in any order he sees fit. Ambac sues the Secretary of Treasury in his official capacity.

21.     Defendant José Iván Marrero Rosado (the "OMB Director") is the Director of the Office of Management and Budget ("OMB"). The OMB Director participated in the development and submission of the Fiscal Plan. The OMB Director has also been delegated certain powers relating to the implementation of Clawback and the Fiscal Plan Compliance Law. Ambac sues the OMB Director in his official capacity.

22.     Defendant Gerardo José Portela Franco is the Executive Director of the Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("AAFAF"). Subject to the Governor's ultimate authority, Portela oversaw and directed the development and submission of the Fiscal Plan, and has been delegated certain powers relating to the implementation of the Fiscal Plan Compliance Law. Ambac sues Portela in his official capacity.

---

[2] References to "Governor" prior to this date refer to the former Governor of the Commonwealth, Alejandro García Padilla, who signed into law, or issued, the Clawback Orders, Moratorium Act, and Moratorium Orders.

23.     Defendant José B. Carrión III is the Chairman of the Oversight Board.  Carrión participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Carrión in his official capacity.

24.     Defendant Andrew G. Biggs is a member of the Oversight Board.  Biggs participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Biggs in his official capacity.

25.     Defendant Carlos M. García is a member of the Oversight Board.  García participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues García in his official capacity.

26.     Defendant Arthur J. González is a member of the Oversight Board.  Arthur González participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Arthur González in his official capacity.

27.     Defendant José R. González is a member of the Oversight Board.  José González participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by

the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues José González in his official capacity.

28.     Defendant Ana J. Matosantos is a member of the Oversight Board.  Matosantos participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Matosantos in her official capacity.

29.     Defendant David A. Skeel, Jr. is a member of the Oversight Board.  Skeel participated in the Oversight Board's certification of the Fiscal Plan and has responsibility, together with the other members of the Oversight Board, for approval of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Skeel in his official capacity.

30.     Defendant Elías Sánchez is an *ex officio* member of the Oversight Board.  Sánchez was appointed to the board by the Governor.  Sánchez participated in the Oversight Board's certification of the Fiscal Plan and will participate, together with the other members of the Oversight Board, in the Oversight Board's consideration of any budgets submitted by the Commonwealth to the Oversight Board pursuant to PROMESA.  Ambac sues Sánchez in his official capacity.

31.     Defendants John Does 1-12 are any successors to the Defendants listed above in paragraphs 19-30.  Ambac sues John Does 1-12 in their official capacities.

32.     Defendant the Oversight Board is an entity within the Commonwealth government established pursuant to PROMESA.  The Oversight Board certified the Fiscal Plan, and has

ongoing responsibility for the review and approval of any budgets proposed by the Commonwealth, and laws or regulations concerning the Commonwealth's finances.

## JURISDICTION AND VENUE

33. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal statutes. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000. Ambac seeks a declaration and related relief in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202.

34. Section 106(e) of PROMESA does not deprive the Court of jurisdiction over Ambac's challenge to the Oversight Board's certification of the Fiscal Plan because that challenge arises under the U.S. Constitution. *See, e.g.*, *Johnson v. Robison*, 415 U.S. 361 (1974).

35. This complaint presents an actual controversy that is ripe for adjudication. As described below, pursuant to the Moratorium Legislation and Moratorium Orders, Defendants have already caused injury-in-fact to Plaintiff by causing funds pledged to the Revenue Bonds (the "Pledged Revenues"), including clawed back Pledged Revenues, to uses other than those contemplated in the Revenue Bond contracts and the constitutional, statutory, and contractual debt payment priority scheme governing the Revenue Bonds. These unconstitutional and unlawful diversions have resulted in the prioritization of junior unsecured debts over senior secured debts, and caused unnecessary payment defaults on the Revenue Bonds. Further, pursuant to the Fiscal Plan and Fiscal Plan Compliance Law, Defendants will continue these improper diversions, causing additional defaults and injuries to Ambac and the Revenue Bondholders.

36. Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to these claims occurred in this District.

I.     **Ambac Insures the Revenue Bonds**

37.     Ambac is a provider of financial guaranty insurance, whereby an insurer guarantees scheduled payments of principal and interest as and when due on a bond or other obligation. Ambac insures scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and around the world.  Under relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Ambac neither satisfies nor discharges an issuer's obligation to pay and, to the extent Ambac makes such payments, it obtains assignments of rights from the bondholders, becomes an owner of the bonds, and/or becomes subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

38.     One reason governments and municipalities, including the Authorities, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds.  Such insurance is especially important for issuers such as the Commonwealth and Authorities who have—and will have—significant borrowing needs, notwithstanding their lower credit ratings.

A.     **PRIFA**

39.     PRIFA is a public corporation created by Act 44-1988 (the "PRIFA Enabling Act") for the purpose of providing financial and other types of assistance to political subdivisions, public agencies, and instrumentalities of the Commonwealth.  PRIFA's rights under the PRIFA Enabling Act include the right to pledge the PRIFA Pledged Rum Revenues to the payment of certain special tax revenue bonds (the "PRIFA Rum Bonds").  *See, e.g.*, 3 L.P.R.A. §§ 1906(k), (m), 1907(a). Pursuant to the PRIFA Enabling Act, PRIFA has issued PRIFA Rum Bonds under a Trust

Agreement (the "PRIFA Trust Agreement") dated as of October 1, 1988.  The aggregate principal amount of PRIFA Rum Bonds outstanding is approximately $1.6 billion.

40.     The PRIFA Rum Bonds are secured by a portion of a federal excise tax imposed on rum and other items produced in the Commonwealth and sold in the United States (the "PRIFA Pledged Rum Revenues").

41.     In the PRIFA Enabling Act, the Commonwealth covenanted that it would "not limit or alter the rights [conferred to PRIFA by the PRIFA Enabling Act] until such bonds and the interest thereon are paid in full."  3 L.P.R.A. § 1913.

42.     Ambac insures approximately $471 million (net par accreted) of the outstanding PRIFA Rum Bonds.  Since Clawback began, PRIFA has defaulted on approximately $147 million of PRIFA Rum Bond payments, and Ambac has paid approximately $62 million (net of reinsurance) in claims.  After paying the claims of the insured PRIFA Rum Bondholders, Ambac was assigned the registered PRIFA Rum Bondholders' rights with respect to such payment, and is now fully subrogated to the payment rights of such prior PRIFA Rum Bondholders.

**B.      PRHTA**

43.     PRHTA is a public corporation created by Act 74-1965 (the "PRHTA Enabling Act") to assume responsibility for the construction of highways and other transportation systems in Puerto Rico.  *See* 9 L.P.R.A. § 2002.  PRHTA's rights and powers under the PRHTA Enabling Act include the right and the power to secure the PRHTA Bonds through a pledge of the PRHTA Pledged Revenues.  *See* 9 L.P.R.A. § 2004(*l*).  Pursuant to the PRHTA Enabling Act, PRHTA has issued certain bonds (the "PRHTA Bonds") under resolutions (the "PRHTA Resolutions") executed in 1968 and 1998.   The PRHTA Bonds have an outstanding principal amount of approximately $4.1 billion.

44.    The PRHTA Bonds are secured by PRHTA's property and revenues, as well as by any tax "made available to [PRHTA] by the Commonwealth."  9 L.P.R.A. § 2004(*l*).  More specifically, the PRHTA Bonds are secured by a lien on (i) revenues derived from PRHTA's toll facilities; (ii) gasoline, diesel, crude oil, and other excise taxes levied by the Commonwealth pursuant to Act 34-1997, Act 1-2011, and Act 1-2015 (the "Excise Taxes"); and (iii) motor vehicle license fees imposed under Act 22-2000 (the "Vehicle Fees", and together with the Excise Taxes, the "PRHTA Pledged Revenues").

45.    The Commonwealth covenanted with the holders of the PRHTA Bonds in the PRHTA Enabling Act that it would "not limit or restrict the rights or powers . . . vested in [PRHTA by the PRHTA Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  9 L.P.R.A. § 2019.

46.    Ambac has insured approximately $457 million (net par accreted) of the PRHTA Bonds currently outstanding.  Under insurance agreements related to the PRHTA Bonds that it insures (other than PRHTA Bonds insured in the secondary market), Ambac is a third-party beneficiary of the PRHTA Resolutions and may enforce all rights, remedies, or claims thereunder. *See, e.g.*, Series AA Ambac Agreement § 10; Series H Ambac Agreement § 10.  In addition, Ambac will be assigned registered bondholders' rights, become the owner of any PRHTA Bonds for which it pays a claim, and/or become fully subrogated to the payment rights of the prior PRHTA Bondholders.  *See* Series AA Ambac Agreement § 8; Series H Ambac Agreement § 8.

47.    As of February 2017, PRHTA had defaulted on approximately $6.0 million in PRHTA Bonds not insured by Ambac, and has been paying the bonds insured by Ambac out of debt service reserves which will soon be depleted.

### C.   PRCCDA

48.     PRCCDA is a public corporation that was created by Act No. 351 of September 2, 2000 (the "PRCCDA Enabling Act") for the purpose of developing and operating a convention center located in San Juan, Puerto Rico, and related improvements and facilities. *See* 23 L.P.R.A. §§ 6402, 6404.  Pursuant to the PRCCDA Enabling Act, Act 272-2003 (the "Hotel Tax Act"), and a Trust Agreement dated as of March 24, 2006 (the "PRCCDA Trust Agreement"), the PRCCDA Bonds are secured by a lien on certain hotel occupancy taxes (the "PRCCDA Pledged Revenues") imposed by the Commonwealth and collected by the Puerto Rico Tourism Company pursuant to the Hotel Tax Act.  PRCCDA has issued approximately $468 million of revenue bonds (the "PRCCDA Bonds") under the PRCCDA Trust Agreement.  According to PRCCDA's most recent financial statements—which were last published June 30, 2015—approximately $386 million of PRCCDA Bonds remain outstanding.

49.     The Commonwealth covenanted in the Hotel Tax Act that it (i) would ensure that each month, the PRCCDA Pledged Revenues would be deposited in certain accounts with the trustee for the PRCCDA Bonds to pay principal of and interest on the PRCCDA Bonds, and (ii) would not limit or alter the rights of PRCCDA to comply with its obligations to the holders of the PRCCDA Bonds.  Moreover, under the PRCCDA Trust Agreement, PRCCDA, as an agent of the Commonwealth, covenanted that the Commonwealth (i) will "make sure that the amounts [of the PRCCDA Pledged Revenues] must be deposited in the accounts as provided in the Trust Agreement" and (ii) will not limit or impair the rights of PRCCDA to comply with its obligations to repay the PRCCDA Bonds in full. *See* PRCCDA Trust Agreement § 6.01(n), (o).

50.     Ambac has insured approximately $137 million (net par accreted) of the outstanding PRCCDA Bonds.  Certain of Ambac's rights as an insurer are set forth in the First Supplemental Trust Agreement.  Under the First Supplemental Trust Agreement, Ambac is

deemed to be a third-party beneficiary and may enforce any right, remedy, or claim. *See* First

Supplemental Trust Agreement § 15(s).

51.     Like PRHTA, PRCCDA has been paying its debt obligations out of debt service

reserves which will soon be depleted.

II.     **The Puerto Rico Constitution And Statutes Protect the Revenue
        Bonds**

        A.      **The Puerto Rico Constitution Limits Clawback**

52.     The Constitution of the Commonwealth of Puerto Rico (the "Puerto Rico

Constitution") contains several provisions dealing with appropriations and the payment of debt

and expenses.  When read together, these provisions place clear limitations on when and how

Clawback may be employed.

53.     First, Article VI, Section 7 ("Section 7") provides:

> The appropriations made for any fiscal year shall not exceed the total
> revenues, including available surplus, estimated for said fiscal Year unless
> the imposition of taxes sufficient to cover said appropriations is provided
> by law.

P.R. Const. art. VI, § 7.

54.     Accordingly, if the appropriations for a given fiscal year exceed *estimated*

revenues, then taxes must be raised to cover the shortfall.  This provision ensures the

Commonwealth maintains a balanced budget each fiscal year by ensuring that revenues for the

fiscal year are sufficient to cover operating expenses and GO debt ("GO Debt") service.  It also

ensures that budget shortfalls cannot be rolled over from one fiscal year to the next.

55.     However, Article VI, Section 8 ("Section 8") then provides:

> In case the available revenues including surplus for any fiscal year are
> insufficient to meet the appropriations made for that year, interest on the
> public debt and amortization thereof shall first be paid, and other
> disbursements shall thereafter be made in accordance with the order of
> priorities established by law.

P.R. Const. art. VI, § 8.

56.     Thus, if the mandatory tax increases compelled by Section 7 fail to produce sufficient revenues to cover all remaining expenses for the fiscal year, Section 8 requires GO Debt to be paid from those remaining available revenues.  Thus, the Puerto Rico Constitution makes clear that if there is an actual shortfall for a fiscal year, GO Debt enjoys a first priority to the revenues available to the Commonwealth (the "GO Priority").

57.     Section 8 also makes clear that the use of Pledged Revenues to pay GO Debt is limited to the *current fiscal year*.  *See* P.R. Const. art. VI, 8 (the GO Priority is triggered when "available revenues including surplus for any fiscal year are insufficient to meet the appropriations made *for that year*") (emphasis added).  This concept is supported by Section 7, which ensures that budgetary shortfalls cannot be rolled into the next fiscal year.

58.     Because Clawback is limited to the current fiscal year, the authority of the Commonwealth to claw back any funds necessarily evaporates at the end of the fiscal year, as does the Commonwealth's authority to retain such funds (the "Fiscal Year Cutoff").  In short, under the Fiscal Year Cutoff, clawed back funds must be: (i) clawed back for the purposes of addressing a current fiscal year GO Debt shortfall, and (ii) actually applied to the GO Debt shortfall in the current fiscal year, or returned to their original lienholders.

59.     Section 8 further requires all other disbursements to be paid "in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8. Thus, a violation of said order of priorities is also a violation of both the law and the Puerto Rico Constitution.  The Commonwealth's Legislative Assembly (the "Legislative Assembly") has implemented the priorities established by this provision of the Puerto Rico Constitution in several laws that, as set

forth below, expressly grant the Revenue Bonds a priority to resources available to the Commonwealth *second only to GO Debt*.

### B.  The OMB Act Creates the Order of Payment Priority

60.     Section 4(c) of the Management and Budget Office Organic Act (Act No. 147 of June 18, 1980, the "OMB Act," codified as 23 L.P.R.A. 104(c)) creates a priority waterfall for the disbursement of public funds in a fiscal year in which there are insufficient funds to pay all appropriations.

61.     The priorities set by the Legislative Assembly in these circumstances first require "payment of interest and amortizations corresponding to the public debt." 23 L.P.R.A. § 104(c)(1).

62.     A second priority status is then given to "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico[.]"  23 L.P.R.A. § 104(c)(2).

63.     "Regular expenses" related to government operations receive a third-priority status under Section 4(c) of the OMB Act, with priority within this group given to expenses related to "[c]onservation of public health," "[p]rotection of persons and property," "[p]ublic education programs," and "[p]ublic welfare programs."  23 L.P.R.A. § 104(c)(3)(A)-(D).  Following such regular expenses are pension obligations and any "remaining public services."  *Id.* § 104(c)(3)(E).

64.     Finally, the OMB Act assigns the lowest priorities to "construction of capital works or improvements" (fourth priority) (23 L.P.R.A. § 104(c)(4)) and "contracts and commitments contracted under special appropriations" (fifth priority) (23 L.P.R.A. § 104(c)(5)).

65.     The OMB Act thus implements Article VI, Section 8 by giving debt such as the Revenue Bonds and other obligations affecting the Commonwealth's "credit, reputation and good name" a priority senior to the payment of any other expenses in a fiscal year in which available

resources are not sufficient to pay all appropriations.  Thus, the Puerto Rico Constitution and OMB Act work together to require payments *first* to the holders of GO Debt, and *second* to the holders of the Revenue Bonds (the "Revenue Bondholders"), before the Commonwealth can pay any other expenses.

### C.   The Revenue Bonds Have Statutory Clawback Protections

66.   In furtherance of Article VI, Section 8, the Legislative Assembly carefully defined the rare and exceptional instances in which Pledged Revenues set aside to secure the payment of Revenue Bonds could be used to pay GO Debt, and precisely specified the purposes to which such Pledged Revenues could be applied.

67.   Specifically, the laws under which the Revenue Bonds were issued (the "Revenue Bond Priority Provisions" and, together with Section 8, the "Debt Priority Provisions") permit the Pledged Revenues to be "clawed back" to pay the GO Debt in a *fiscal year* in which the GO Priority is in effect, but *only* when a particular precondition is satisfied—namely, only when *all other* available resources for the fiscal year are insufficient to pay the public debt.

68.   Thus, the Revenue Bonds have priority to available resources over *all* disbursements besides GO Debt, even during a fiscal year in which the GO Priority is in effect (the "Revenue Bond Priority").

69.   The Revenue Bond Priority is expressly set forth (in bold below) in each of the statutes under which the Revenue Bonds were issued.  These statutes also make clear (in italics below) that clawed back funds cannot be used for Commonwealth expenses.

> (a)   **Excise Taxes Pledged to Payment of PRHTA Bonds: "The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, until the other resources available to which reference is made in said section are insufficient for such purposes**. *Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest*

*on bonds and other obligations of the Authority* and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations." 13 L.P.R.A. § 31751(a)(1)(C) (emphasis added).

(b)   **Vehicle Fees Pledged to Payment of PRHTA Bonds:** "[S]aid pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; **Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, until the other resources available, referred to in said section, are insufficient for such purposes**, *otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority*, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations." 9 L.P.R.A. § 2021 (emphasis added); *see also* 9 L.P.R.A. § 5681.

(c)   **PRCCDA Pledged Revenues Pledged to Payment of PRCCDA Bonds:** **"The product of the collection of the tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes**. *Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any bond related [f]inancing agreement contemplated herein*, and to comply with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under bond related financing agreements." 13 L.P.R.A. § 2271v (emphasis added).

(d)   **PRIFA Pledged Rum Revenues Pledged to Payment of PRIFA Rum Bonds:** "[PRIFA] is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico *for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority*. **The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes.**" 3 L.P.R.A. § 1914 (emphasis added).

70.   The Revenue Bond Priority is also clearly stated in disclosure documents issued by the Authorities and used to publicly offer their debt securities to investors and on which Ambac

relied when it issued each of the insurance policies for the Revenue Bonds. For example, the

following disclosure documents clearly state the Revenue Bond Priority:

(a) **Official Statement for PRHTA Series AA Refunding Bonds (July 1, 2010), at 19**: "The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle fees allocated to [PRHTA] by the Puerto Rico Internal Revenue Code and Act No. 9 are available Commonwealth resources under the Constitution. Accordingly, *if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth*. However, under the Puerto Rico Internal Revenue Code and Act No. 9, **such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose.**"

(b) **Official Statement for PRCCDA Hotel Occupancy Tax Revenue Bonds, Series A, at 22**: "Hotel Occupancy Tax revenues are available revenues under the Constitution. Accordingly, *if needed, they may be applied first to the payment of debt service on the public debt of the Commonwealth*. Under the [PRCCDA] Enabling Act, the Hotel Occupancy Tax Act and the Constitution of the Commonwealth, however, **such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose.**"

(c) **Official Statement for PRIFA Special Tax Revenue Bonds, Series 2005A-C, at 10**: "Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution. *Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth*. Under the [PRIFA] Enabling Act, however, **such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose.**"

71.     Notably, the offering documents for the Commonwealth's GO debt also

acknowledge and disclose the Revenue Bond Priority:

(a) **Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at 16**: "[A]lthough certain revenues assigned to [PRHTA], Puerto Rico Infrastructure Financing Authority ('PRIFA') and Puerto Rico Convention Center District Authority ('PRCCDA') are stated by existing law to be available Commonwealth resources *for purposes of the payment of public debt*, their availability for such purpose is **subject to there being no other available Commonwealth resources.**"

(b)     **Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at 29-30**:  "The Commonwealth has also assigned certain revenues to [PRHTA], PRIFA, and PRCCDA. These consist of (i) motor vehicle fuel taxes, crude oil and derivative products excise taxes, cigarette excise taxes and license fees allocated to [PRHTA]; (ii) federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned by the federal government to the Commonwealth and allocated to PRIFA; and (iii) hotel occupancy taxes imposed by hotels on paying guests, which are allocated to PRCCDA. Although the legislation provides that the assigned taxes and fees *are subject to first being applied to the payment of the principal of and interest on the Commonwealth public debt*, **their application to the payment of public debt is effective only if and to the extent that all other available Commonwealth resources are insufficient for that purpose.**"

72.     The PRHTA and PRCCDA bonds further benefit from explicit statutory protections that require any clawed back funds to be reimbursed.  9 L.P.R.A. § 5681 (PRHTA; funds used to "service payments of the public debt . . . shall be reimbursed to the Authority out of the first revenues received in the next fiscal year or subsequent fiscal years"); 13 L.P.R.A. § 2271v (PRCCDA; same).  These protections also expressly contemplate that clawed back funds must be used to make GO debt payments.  *Id.*

73.     Accordingly, the plain language of both Section 8 and the Revenue Bond Priority Provisions demonstrates that the purpose of clawback is to provide an additional source of payment *solely* for GO Debt and *only* when, after starting the fiscal year with a balanced budget, all other available resources for an entire fiscal year are insufficient to satisfy all GO Debts.  Clawback was not intended to—and does *not* provide—a source of revenues from which the Commonwealth can fund government operations or any other expenditures.  *See, e.g.*, 13 L.P.R.A. § 31751(a)(1)(B); 9 L.P.R.A. § 2021; 9 L.P.R.A. § 5681; 13 L.P.R.A. § 2271v.

74.     Moreover, in quarterly financial reports from both before and after clawback was implemented, the Commonwealth explicitly acknowledges the existence of the Revenue Bond Priority.  *See e.g.*, Commonwealth of Puerto Rico, *Financial Information and Operating Data*

*Report*, Dec. 18, 2016, at 179 (stating that funds pledged to the Revenue Bonds are "available for the payment of debt service on the public debt to the extent no other resources are available for such purpose"); Commonwealth of Puerto Rico, *Financial Information and Operating Data Report*, Nov. 6, 2015, at 45 (Revenue bonds are subject to clawback "for purposes of the payment of public debt. However, their availability for such purpose is subject to there being no other available Commonwealth resources.").

### III. The Commonwealth's Response to Its Financial and Economic Difficulties

#### A. The Commonwealth's Financial State

75.     On June 28, 2015, the Governor publicly stated that the Commonwealth was in a "death spiral" and that it and its municipalities could not pay their roughly $72 billion in debts. Michael Corkery and Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts are 'Not Payable'*, N.Y. TIMES, June 28, 2015, at A1. Officers and representatives of the Commonwealth, as well as the Legislative Assembly, have since repeatedly stated that the Commonwealth is in a state of fiscal emergency.

#### B. The Commonwealth Attempts to Deal With Its Financial and Economic Difficulties Using Unconstitutional Legislation and Executive Orders

76.     Instead of addressing the underlying causes of its fiscal problems, the Legislative Assembly and Governor are, under cover of a state of emergency, engaging in a pattern of obstructive and destructive behavior: obfuscating the Commonwealth's true financial condition; attempting to unconstitutionally restructure its debts; and preferentially and illegally transferring funds in violation of, among other laws, the U.S. Constitution and PROMESA.

1. **The Commonwealth Begins Using Unconstitutional Clawback**

   a. **The First Unconstitutional Clawback Order**

77.     On November 30, 2015, the day before a large GO Debt payment came due, the Governor issued Administrative Bulletin OE-2015-046 (the "First Clawback Order").  The First Clawback Order directed the Puerto Rico Department of Treasury (the "Department of Treasury") to claw back all funds pledged to the Revenue Bonds through June 30, 2016 (the end of fiscal year 2016).

78.     According to the First Clawback Order, the GO Priority was triggered for fiscal year 2016 because there were insufficient funds to pay all appropriations.  Thus, GO Debt had to be given priority to available resources under Article VI, Section 8.

79.     The First Clawback Order, however, instead *impaired* the GO Priority, because it failed to require the funds to be applied "first" to the GO Debt.  It expressly allowed junior unsecured debts and other general expenses to be paid on equal footing (at the same time) as GO Debt, in clear contravention of the GO Priority.  *See* P.R. Const. art. VI, § 8.  This also violated the Revenue Bond Priority, which provides an additional legal guarantee that the Commonwealth will never use clawed back funds to pay anything except GO Debt.

80.     The First Clawback Order attempted to disguise this violation by providing that the clawed back Pledged Revenues would be "remitted" to their respective Authorities—where they would be protected from clawback by flowing into trustee-controlled accounts—if they were later deemed "not necessary" to completely satisfy all GO Debt payments for fiscal year 2016.  Through this statement, the Governor acknowledged the validity of both the Revenue Bond Priority and Fiscal Year Cutoff, which *require* all clawed back funds not used to pay solely GO Debt, be returned to the Authorities to cover debt service for the Revenue Bonds.

81.    This provision of the First Clawback Order also improperly assumed that the determination of whether it is "necessary" to use clawed back Pledged Revenues to pay the public debt can be made *after* expenditures *other than payment of the GO Debt* have been made.  Thus, the First Clawback Order effectively authorizes the Defendants to *first* pay their other general expenditures, and only *then* consider whether sufficient resources remain to pay the GO Debt without clawing back the Pledged Revenues.  This inverts the Debt Priority Provisions, elevates all general expenditures to a priority position *ahead of* the Revenue Bonds, and allows clawed back Pledged Revenues to subsidize general Commonwealth expenditures—all in violation of the Revenue Bond Priority.

### b.    The Second Unconstitutional Clawback Order

82.    On December 8, 2015, the Governor issued Administrative Bulletin OE-2015-49 (the "Second Clawback Order"), which sought to implement the First Clawback Order.  The Second Clawback Order, and the steps taken to implement it, further violated the Revenue Bond Priority by allowing the Commonwealth to pay virtually any obligation ahead of GO Debt, and to use unlawfully clawed back Pledged Revenues to do so.

83.    To implement these violations, the Second Clawback Order first removed all requirements to make any Revenue Bond payments.  *See* Circular Letter No. 1300-15-16 (removing from the payment waterfall any requirement to pay "commitments entered into by virtue of legal contracts in force" and "binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico").

84.    Next, the Second Clawback Order authorized the Commonwealth to include all funds illegally clawed back from the Revenue Bonds in the Commonwealth's fiscal year 2016 budget as revenues available for general Commonwealth expenditures.  This clearly impaired the

Revenue Bond Priority. Moreover, their actual application to the general expenditures instead of GO Debt violated the GO Priority.

c. **The Commonwealth Unconstitutionally Retains The Clawed back Funds**

85. Despite the Fiscal Year Cutoff and the Clawback Orders' explicit requirement to remit all clawed back funds to their respective Authorities, the Commonwealth clawed back, did not use, but nevertheless retained—and continues to retain—approximately $300 million in Pledged Revenues clawed back from the Revenue Bonds. *See* Commonwealth of Puerto Rico, *Financial Information and Operating Data Report*, Dec. 18, 2016, at 179.

86. Even assuming (counterfactually) that clawback was ever justified, the Commonwealth's ongoing retention of funds in fiscal year 2017 *that were clawed back to satisfy GO Debt payments due and owing in fiscal year 2016*, is unquestionably illegal.

2. **The Commonwealth Intensifies and Expands Its Unconstitutional Clawback**

a. **The Moratorium Act**

87. On April 6, 2016, after a mere 48 hours of consideration by both chambers of the Legislative Assembly, the Governor signed into law the Moratorium Act. The Moratorium Act authorized the Governor of Puerto Rico to declare a "state of emergency" over the Commonwealth or any Commonwealth entity (including for the Authorities). Moratorium Act § 201(a). Upon the declaration of a state of emergency, the Moratorium Act directed or empowered the Governor to take numerous actions that violated Ambac's constitutional rights.

88. First, the Moratorium Act "direct[ed] the Governor to prioritize payment of 'essential services' over 'covered obligations.'" Moratorium Act § 201(a).

89. "Essential services" were not defined under the Moratorium Act, giving the Governor *carte blanche* to declare any category of expenditure "essential" and therefore senior to

payment of the Revenue Bonds, despite the Revenue Bonds' protected status under the Puerto Rico Constitution and the Revenue Bonds' enabling statutes.

90.     A "[c]overed obligation" ("Covered Obligation") included, in relevant part, "any interest obligation [or] principal obligation . . . of a government entity"—including the Authorities—that became due before the Moratorium Act expired.  Moratorium Act § 103(*l*).  If a state of emergency was declared with respect to a government entity, the Covered Obligations of such government entity could be suspended.  Moratorium Act §§ 103(*l*), 201(b).

91.     Section 201(b) of the Moratorium Act granted the Governor the power to impose a stay on creditor remedies during the Covered Period.  What the Moratorium Act explicitly did ***not*** suspend, however, was the "obligation of an insurer to pay on any policy" insuring payments of principal and interest on government entity bonds.  *Id.* § 103(l)(i).  At the same time, the Moratorium Act stripped such insurers of any power to dispute or "exercise any remedy" relating to claims it had to pay after a default on a Covered Obligation.  *Id.* § 201(b)(ii).

92.     As a result of the foregoing scheme, the Moratorium Act effectively coopted insurance policy proceeds to subsidize general Commonwealth expenses and debt service payments on bonds not insured by Ambac—while not paying the bonds that Ambac does insure.

93.     The Moratorium Act was enacted because there were allegedly insufficient resources available to the Commonwealth to fully satisfy all essential service payments and all debt service payments for the debts of the Commonwealth and its instrumentalities.  *See* Moratorium Act § 102.

94.     The Moratorium Act declared the Commonwealth to be in a "fiscal emergency," noting that "the grave public emergency identified and declared to exist by the Legislative

Assembly on numerous occasions has worsened dramatically, requiring [passage of the Moratorium Act]." Moratorium Act § 102.

95.    The Legislative Assembly stated that the Moratorium Act was an "exercise of its police powers" and that the Legislative Assembly had delegated "emergency police powers" to the Governor to effectuate the Moratorium Act. Moratorium Act § 102.

96.    By delegating police power to the Governor, the Legislative Assembly delegates its legislative power to the Governor. When the Governor uses that delegated power to modify or supersede established law, he performs a legislative act for the Legislative Assembly. *See infra* ¶¶ 115-117.

97.    The extraordinary degree of power conferred upon the Governor by the Moratorium Act confirms this delegation of legislative power. For instance, the Legislative Assembly delegated to the Governor:

(a)    The power to unilaterally suspend or modify—"without the need for further legislation"—any "statutory or other obligation to appropriate money to pay or secure any covered obligation . . . ." *Id.* § 201(d);

(b)    The ability to reprioritize the statutory payment priority established by the OMB Act (and mandated to be followed by Section 8). *Id.* § 201(e);

(c)    The power to suspend principal payments on GO Debt. *Id.* § 202(a)(i)(A)-(C); and

(d)    Unlimited authority to "take any and all actions" in furtherance of the Moratorium Act, including "without limitation," the power to "expropriat[e] property or rights in property interests related to a covered obligation" bounded only be the limits of the Constitution. *Id.* § 201(b)(iv).

b.    **The Moratorium Orders**

98.    Under color of the Moratorium Act, the Governor issued, among others, the following Moratorium Orders:

(a)    **Moratorium Order 14**. On April 30, 2016, the Governor issued Administrative Bulletin OE-2016-14, which in relevant part declares a state

of emergency over PRIFA and stayed all litigation arising from nonpayment of PRIFA Covered Obligations. Ex. A.

(b) **Moratorium Order 18**. On May 17, 2016, the Governor issued Administrative Bulletin OE-2016-18. Among other things, this executive order declared a state of emergency over PRHTA until June 30, 2016; stopped the flow of all Toll and non-Toll Revenues to the PRHTA Bonds; and stayed all litigation arising from nonpayment of PRHTA Covered Obligations. Ex. B.

(c) **Moratorium Order 30**. On June 30, 2016, the Governor issued Administrative Bulletin EO-2016-30, which superseded all conflicts with prior executive orders. In relevant part, it declared a state of emergency over the Commonwealth; placed a moratorium on all Commonwealth debt payments (except GDB loan payments to be applied to "essential services"); extended the PRHTA state of emergency until January 31, 2017; halted all PRHTA debt payments; suspended all PRIFA bond payments; and stayed all creditor lawsuits against PRHTA and PRIFA. Ex C.

(d) **Moratorium Order 31**. Also on June 30, 2016, the Governor issued Administrative Bulletin EO-2016-31, which superseded all conflicts with prior executive orders. Among other things, the executive order placed PRCCDA into a state of emergency and suspended PRCCDA's obligation to make debt payments or transfer hotel taxes pledged to bond payments; halted transfers of PRHTA Toll and non-Toll Revenues to PRHTA's fiscal agent; suspended PRHTA's obligation to repay debts (except GDB loan payments to be applied to "essential services"); suspended the Commonwealth's obligation to transfer revenues to PRHTA (unless necessary to pay PRHTA operating expenses or "essential services"); halted the Commonwealth's obligation to transfer revenues to PRIFA; suspended all PRIFA debt payments; and stayed litigation arising from nonpayment of PRHTA, PRIFA, and PRCCDA debts. Ex. D.

## IV.   **PROMESA Becomes Law**

99.   On June 30, 2016—the same day the Governor issued Moratorium Orders 30 and 31—President Obama signed PROMESA into law. PROMESA establishes a Fiscal Management and Oversight Board (the "Oversight Board") for the Commonwealth, which is intended "to provide a method for a covered territory [including the Commonwealth] to achieve fiscal responsibility and access to the capital markets." 48 U.S.C.A. §§ 2121(a), (b)(1).

100.    PROMESA also provides for an out-of-court, voluntary restructuring process in Title VI of PROMESA ("Title VI"), and a court-supervised restructuring process akin to Chapter 9 of the Bankruptcy Code in Title III of PROMESA ("Title III").

**A.    The Oversight Board**

101.    The Oversight Board consists of seven members, all of whom were appointed by the President of the United States on August 31, 2016.  "The purpose of the Oversight Board is to provide a method for [the Commonwealth] to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a).  To effect these purposes, the Oversight Board is charged with approving and certifying nearly all actions of the Commonwealth government that relate to its finances.

**B.    Title VI**

102.    Title VI of PROMESA, entitled "Creditor Collective Action," allows municipal issuers of debt to restructure those debts through a largely out-of-court process requiring the consent of most of the issuer's creditors.  The Title VI process requires a municipal issuer of debt to submit proposed modifications to the terms of its debt to holders of that debt for a vote of approval.  The voting process involves the classification of the issuer's debt into "pools" of similar debt.  Although all pools must consent to the proposed modification for it to become binding, unanimous approval within each pool is not required.  In this way, Title VI allows an issuer to bind holdout creditors if a significant majority of its creditors have consented to modify their debt, all without having to participate in a court-supervised restructuring process.

**C.    Title III**

103.    Title III of PROMESA, entitled "Adjustments of Debts," enables the Oversight Board to file a petition to restructure its debts in a court-supervised process similar to Chapter 9 of the Bankruptcy Code.  Several key differences separate Title III from Chapter 9.  Chief among

them is the prominent role of the Oversight Board, which performs many of the key functions of

a Chapter 9 debtor.  Whereas in Chapter 9, a debtor may file its own restructuring petition and

submit its own plans of adjustment, only the Oversight Board may file a Title III petition (48

U.S.C. § 2164(a)), a plan of adjustment (*id.* § 2172), or any modification thereto (*id.* § 2173).

    **D.**    **PROMESA Preemption**

    104.    In addition to the establishment of the Oversight Board, PROMESA expressly

preempts certain territory-level legislative and executive acts.  Modeled on Section 903 of the

Bankruptcy Code, Section 303 of PROMESA first provides that no territory moratorium law nor

other territory law "prescribing a method of composition of indebtedness" may bind non-

consenting creditors to the extent that such laws "prohibit payment of principal or interest."  48

U.S.C.A. § 2163(1).  PROMESA further preempts "unlawful executive orders that alter, amend,

or modify rights of holders of any debt of the territory or territorial instrumentality or that divert

funds from one territorial instrumentality to another or to the territory."  *Id.* § 2163(3).  Finally,

Section 407 of PROMESA makes transferees of the Revenue Bonds' Pledged Revenues liable for

the value of that transfer.  *Id.* § 2195(a).

    **1.**    **The Commonwealth Responds to PROMESA By**
                  **Repackaging The Moratorium Act**

    105.    Recognizing that PROMESA "preempt[ed] and supersede[d] provisions of the

[Old] Moratorium Act," such as those sections that created an explicit moratorium on debt

payments, the Governor signed into law the Amended Moratorium Act on January 29, 2017, two

days before the Moratorium Act was set to expire.  *See* Amended Moratorium Act at Statement of

Motives.

    106.    The Amended Moratorium Act supersedes any laws that are inconsistent with it.

*Id.* § 203(a).  It also explicitly repeals certain sections of the Moratorium Act—*but then replaces*

them with *functionally identical provisions*. *See* Amended Moratorium Act §§ 201-203, 206, 208,

211, 301. It also makes no attempt to repeal other sections of the Moratorium Act that violated

the Debt Priority Provisions. *See id.*

107.     For example, the Amended Moratorium Act:

(a)     Removes the power of the Governor to declare states of emergency over the Commonwealth or its instrumentalities—but then makes an explicit legislative declaration that the Commonwealth and its instrumentalities are in states of emergency. *Compare* Moratorium Act § 201(a) *with* Amended Moratorium Act §§ 102, 103(q), 201-203.

(b)     Still orders the Governor to prioritize essential services over any debt obligations. *See* Moratorium Act § 201(a); Amended Moratorium Act §§ 201-203.

(c)     Maintains the moratorium on the transfer of Pledged Revenues to, and payment on, the Revenue Bonds by continuing the Moratorium Orders in full force in effect. *See* Amended Moratorium Act § 208(e); Moratorium Orders, *supra* ¶ 97(a)-(d).

(d)     Creates a *de facto* moratorium on certain debt payments by making them subordinate to essential services despite there being insufficient funds to make debt service payments after paying essential services. *Compare* Moratorium Act § 201(a) *with* Amended Moratorium Act §§ 201-203; *see also infra*, ¶ 107(e), (f).

(e)     Preserves the Governor's unfettered discretion to declare any government service an "essential service" purportedly required to be paid ahead of any debt service. *See generally* Moratorium Act (allowing Governor to define what services are essential); Amended Moratorium Act §§ 103(s), 201-203 (explicitly granting same).

(f)     Retains the Governor's power to take "any and all actions [he] deems reasonabl[e] and necessary to . . . continue providing essential services." *See* Moratorium Act § 201(b)(iv); Amended Moratorium Act § 203(b).

(g)     Similarly does not relieve insurers of their obligation to pay when their insured bonds enter default as a result of the Commonwealth's unconstitutional and unlawful actions. *See* Moratorium Act §§ 103(l)(i), 201(b); *see generally* Amended Moratorium Act.

(h)     States that it is purportedly constitutional and lawful because it is an exercise of the Legislative Assembly's police power. *See* Moratorium Act § 102; Amended Moratorium Act §§ 102, 104-105, 206.

108.    Further, the Amended Moratorium Act also expressly declares that the Moratorium Orders "shall continue in full force and effect until amended, rescinded or superseded [by the Governor]." Amended Moratorium Act § 208(e). Because the Moratorium Orders were explicitly ratified and readopted by the Legislative Assembly, they remain in full force and effect *as an express exercise of legislative power*.

109.    The continuation of the Moratorium Orders, in their full force and effect, necessarily means that all the legislative powers conferred upon the Governor by the Legislative Assembly under the Moratorium Act were either: (i) *not* actually repealed by the Amended Moratorium Act; or (ii) repealed, but replaced by new provisions that purport to give the Governor the same (or greater) legislative powers.

## V.    The Moratorium Legislation And Moratorium Orders Are Unconstitutional and Unlawful

### A.    The Moratorium Legislation and Moratorium Orders Have Injured Ambac

110.    On July 1, 2016, the first day of fiscal year 2017, large principal and interest payments came due on the GO Debt and Revenue Bonds. Despite possessing approximately $300 million in Pledged Revenues clawed back from the Revenue Bonds for the express purpose of paying the GO Debt, the Commonwealth has consistently failed to apply those clawed back funds to GO debt service, or return them to the Revenue Bonds so those payments could be made. This required the PRHTA and PRCCDA Bonds to make the payments using funds in their debt service reserve accounts. It also forced the PRIFA Rum Bonds into multiple payment defaults, which caused Ambac to pay over $52 million in insurance claims as a result.

111.    Since clawback began in November 2015, the trustees for PRHTA and PRCCDA have been able to make payments of principal and interest owing on their bonds solely by resort to debt service reserves maintained for each entity beyond the reach of clawback. On information

and belief, debt service reserves will prove insufficient to make payment of interest and principal on the PRHTA and PRCCDA Bonds scheduled for July 1, 2017, including with respect to bonds insured by Ambac.  Unless Defendants' unlawful conduct is halted, Ambac will be required to pay out claims totaling tens of millions of dollars on or about that date.

**B.      The Moratorium Legislation and Moratorium Orders Violate the Contracts Clause**

112.      The Contracts Clause provides, in pertinent part, that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  U.S. Const., art. I, § 10, cl. 1.  The primary purpose behind the enactment of the Contracts Clause was to prevent States from adopting laws that would permit borrowers (including the States themselves) to abrogate their debts at the expense of creditors.  *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427-28 (1934); *Antoni v. Greenhow*, 107 U.S. 769, 795 (1883).

113.      The Moratorium Legislation and Moratorium Orders substantially impair the contractual rights of the Revenue Bondholders and Ambac.  The Revenue Bondholders purchased the Revenue Bonds—and Ambac issued its Financial Guaranty Insurance Policies for such bonds—in explicit reliance on the Authorities' and the Commonwealth's promises to honor the Debt Priority Provisions and Fiscal Year Cutoff.  These promises are expressly incorporated into the Authorities' contracts with the Revenue Bondholders and Ambac.

114.      By (i) altering these priorities, (ii) diverting the Revenue Bonds' Pledged Revenues in violation of the Revenue Bond contracts, and (iii) continuing to claw back and retain Pledged Revenues in violation of the Debt Priority Provisions and Fiscal Year Cutoff, the Moratorium Legislation and Moratorium Orders substantially impair the contractual rights of the Revenue Bondholders and Ambac.

115.    The Moratorium Legislation purported to confer the Legislative Assembly's police powers to the Governor, and when issuing the Moratorium Orders, the Governor purported to be exercising that police power.  *See supra*, ¶¶ 95-98.

116.    The police power is the power to "enact laws for the protection of the life, health and general welfare of the people" and is thus a legislative power.  *See, e.g.*, P.R. Const. art. II, § 19 ("The power *of the Legislative Assembly* to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively.") (emphasis added). In issuing the Clawback Orders, the Governor was exercising a legislative power, and the Clawback Orders constitute legislative acts that modify existing Commonwealth law, including the Debt Priority Provisions.  *See supra*, ¶¶ 95-98.

117.    The Clawback Orders cannot be justified as a valid exercise of the Legislative Assembly's police power—delegated or otherwise—because the police power cannot override constitutional limitations.  *See, e.g.*, *Flushing Nat'l Bank v. Mun. Assistance Corp. for N.Y.*, 358 N.E.2d 848, 852 (N.Y. 1976) (holding that a "fugitive recourse to the police power" may not be used to "displace inconvenient but intentionally protective constitutional limitations").

118.    The Defendants' confiscation and diversion of Pledged Revenues pursuant to the Moratorium Legislation and Moratorium Orders is not a necessary or reasonable means of serving an important public purpose, because less drastic alternatives were available that would not have entailed an impairment of the Debt Priority Provision or Fiscal Year Cutoff.

119.    First, the Commonwealth has many more reasonable tools at its disposal to address its fiscal and economic challenges, such as raising revenues, improving revenue collections, and reducing costs.

120.    Notably, the projected resources available to the Commonwealth (approximately
$18-20 billion per year between FY2018 and FY2026) vastly exceeds debt service on GO Debt
and the Revenue Bonds (approximately $1.5 billion per year over same period) in the Fiscal Plan
(Ex. E).  Ex. E at 10.  Thus, there is no legitimate reason GO Debt and the Revenue Bonds could
not be paid—with truly essential services being paid immediately after as the preexisting order of
priorities required—without significantly impacting high-priority "essential" items such as public
health and safety.  *See* 23 L.P.R.A. § 104(c)(3)(A)-(B).  Thus, the Defendants cannot demonstrate
that any other means of addressing an alleged budget shortfall was "necessary" and "reasonable"
to serve an important public purpose.

121.    Moreover, the fact that the Commonwealth is steadfastly refusing to apply the
clawed back Pledged Revenues to the Public Debt confirms that clawback is neither necessary nor
reasonable: (i) the failure to use clawed back Pledged Revenues to prevent or mitigate GO default
shows that the Commonwealth was not actually seeking to prevent GO defaults—and thus
clawback could not have been necessary to a (non-existent) Commonwealth "plan" to prevent
those defaults, and (ii) it is completely *unreasonable* to claw back funds under the false pretense
of preventing a GO default, *only to allow those exact defaults to occur*, along with *additional*
defaults on the Revenue Bonds that never would have occurred had the illegal clawback never
been implemented.

122.    The Moratorium Legislation and Moratorium Orders are also not narrowly tailored.
Far from identifying select public corporations and discrete amounts of funds tied to specified debt
relief goals, the Moratorium Legislation and Moratorium Orders sweep in vast sums from across
the Commonwealth, reprioritizing debt-related payments and transfers across the entire
Commonwealth.  Moreover, the Commonwealth has repeatedly failed to apply the clawed back

funds to its GO Debt, thus rendering the resulting Revenue Bond defaults—paid by Ambac's insurance proceeds—completely unnecessary.  Not returning the Pledged Revenues to the Authorities to prevent such defaults is especially egregious in light of the fact that GO Debt defaults are now, upon information and believe, approximately $1 billion, and transfers of funds destined for payment of GO Debt have been officially halted since April 6, 2016. *See supra*, ¶¶ 87-97.

123.    Additionally, the Moratorium Legislation and Moratorium Orders are not narrowly tailored in their temporal scope.

124.    In short, the Moratorium Legislation and Moratorium Orders constitute neither a reasonable nor necessary means of serving an important public purpose, because many less drastic alternatives existed, and the ultimate effect of the Moratorium Legislation and Moratorium Orders will only be to impede a consensual resolution to the Commonwealth's debt problems, to limit the Commonwealth's access to the capital markets, to deepen the Commonwealth's long-term financial difficulties, and to endanger the long-term health and safety of the people of Puerto Rico. These unjustified—and unjustifiable—impairments of Ambac's and the Revenue Bondholders' unambiguous contract rights constitute clear violations of the Contracts Clause.

C.    **The Moratorium Legislation and Moratorium Orders Violate the Takings and Due Process Clauses**

125.    The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.  The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the U.S. Constitution.  U.S. Const. amend. XIV, § 1.

126.    Furthermore, the Due Process Clauses forbid the Commonwealth from depriving "any person . . . of life, liberty, or property, without due process of law."  U.S. Const. amends. V, XIV, § 1.

127.    The Moratorium Legislation and Moratorium Orders violate the Takings and Due Process Clauses by depriving Ambac and the Revenue Bondholders of their senior secured property interests in the Pledged Revenues without providing Ambac and the Revenue Bondholders with due process or just compensation.  Because the Debt Priority Provisions provide no legal basis for the Governor or the other Defendants to deprive the Revenue Bondholders of their property interests in the Pledged Revenues, the Moratorium Legislation and Moratorium Orders constitute an unconstitutional taking and a violation of Ambac's and the Revenue Bondholders' due process rights.

### D.    The Moratorium Orders Deny Access to Article III Courts

128.    The Moratorium Orders each also purport to bar litigants from bringing suit in federal court.  Moratorium Orders 14 and 18 state that "***no action whatsoever*** shall be taken and ***no claim or proceeding whatsoever*** shall commence or continue in ***any court of any jurisdiction*** that is related to or arises under a Covered Obligation . . . ."  Ex. A, ¶¶ 2, 7 (emphasis added); Ex. B, ¶ 4 (same).  Moratorium Orders 30 and 31 contain substantially similar language, providing that "no act shall be done, and no action or proceeding shall be commenced or continued in ***any court of any jurisdiction*** that is related to or arises under any Covered Obligation . . . ."  Ex. C, ¶ 7 (emphasis added); Ex. D, ¶ 12 (same).[3]

---

[3] The Moratorium Legislation also expressly stayed creditor remedies in Article III courts between April 6, 2017 and May 1, 2017.  Moratorium Act § 201(b); Amended Moratorium Act § 211.

129.    The United States Supreme Court has clearly established that neither the States nor the Commonwealth have the power to enjoin proceedings in federal court.  *See Donovan v. City of Dallas*, 377 U.S. 408, 411-13 (1964).

130.    The Moratorium Orders thus unconstitutionally deny Ambac and the Revenue Bondholders access to Article III courts.

**E.    The Moratorium Legislation and Moratorium Orders Are Expressly Preempted by Section 303 of PROMESA**

**1.    The Moratorium Legislation and Moratorium Orders Are Expressly Preempted by Section 303(1) Of PROMESA**

131.    Under Section 303(1) of PROMESA, the Commonwealth cannot enact "a territory law prescribing a method of composition of indebtedness" that "prohibits the payment of principal or interest by an entity" such as the Authorities.   Specifically, Section 303(1) of PROMESA provides that:

> a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in section 109(b)(2) of title 11, United States Code, may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium[.]

48 U.S.C. § 2163(1).

132.    The Moratorium Legislation and Moratorium Orders are Commonwealth laws that provide for a *de facto* composition of indebtedness and prohibit payment of principal and interest on the Revenue Bonds.  This fact is reflected throughout the text of the Moratorium Legislation and the Moratorium Orders.  For example:

(a)    The Moratorium Legislation explicitly notes that it was enacted to address an imminent "disorderly default" on the "outstanding obligations" of GDB and other Commonwealth instrumentalities.  Moratorium Act § 102.  The

-38-

Moratorium Orders, which were issued based on this justification and continue today in full force and effect, expressly declare a moratorium on the payment of debt service on Revenue Bonds and prohibit any transfer of the Pledged Revenues to their respective bond accounts.  *See* Ex. C; Ex. D; Amended Moratorium Act § 208(e).

(b)     The Moratorium Legislation explains that a "disorderly default" was imminent because: (1) the Commonwealth's attempt to create a local "orderly debt restructuring mechanism" had been ruled preempted by Section 903(1) of the Bankruptcy Code; and (2) "the United States Congress [had failed] to provide Puerto Rico with an orderly regime to restructure the outstanding debt of the Commonwealth and its instrumentalities . . . ." Moratorium Act § 102.  Moreover, as a result of the imminent disorderly default, "allowing creditors to exercise their enforcement remedies" against the Commonwealth and its instrumentalities could have "catastrophic effects" on the Commonwealth—because it is "unsustainable" for the Commonwealth and its instrumentalities to continue "shouldering [their debt payments] by themselves."  *Id*.  In other words, at least a portion of these debts need to be "shoulder[ed]" by other parties, including Ambac and the Revenue Bondholders.  These justifications were incorporated into the Moratorium Orders, which were then extended in full force and effect by the Amended Moratorium Act.  *See* Ex. C; Ex. D; Amended Moratorium Act § 208(e).

(c)    The Moratorium Legislation also empowers the Governor to selectively suspend numerous statutes in order to make it easier to hire persons into positions "related to the restructuring of any debt obligation or adjusting of any debt obligation."  Amended Moratorium Act § 210; Moratorium Act § 106 (same, but "relating to the restructuring of [] covered obligation[s] or adjusting [] covered obligation[s.]").

(d)    The Moratorium Legislation further created a new Fiscal Agency and Financial Advisory Authority for the Commonwealth, tasked with the explicit obligation to, for example, "oversee all matters related to the restructuring or adjustment" of the debts of the Commonwealth and its instrumentalities.  *See* Moratorium Act §§ 601, 602(a)-(b); Amended Moratorium Act §§ 105, 206-207, 209; *see also* Act 2-2017.

133.    The Moratorium Legislation and Moratorium Orders also coopt key aspects of the Bankruptcy Code related to compositions of indebtedness.  For instance:

(a)    The enactment of an involuntary stay against creditor payments and remedies.  *See, e.g.*, 11 U.S.C. §§ 362, 922; Amended Moratorium Act § 211; Moratorium Act §§ 201, 202; Exs. A-D (staying the commencement or continuation of any action or proceeding in any court); Amended Moratorium Act § 208(e) (extending Moratorium Orders' litigation stay in full force and effect).

(b)    Non-consensual impairment of secured debts.  *See, e.g.*, 11 U.S.C. § 1129(a)-(b) (establishing the order of priority of debts, providing that a plan may impair non-accepting classes if the classes receive fair and equitable

treatment); Amended Moratorium Act §§ 201-203; 206; 208 (authorizing

impairment of Revenue Bond debt); Moratorium Act §§ 102, 201 (same);

Exs. A-D (same).

    (c)    The discharge of collateral. *See, e.g.*, 11 U.S.C. §§ 524; *supra* ¶¶ 96-97.

134.    As further evidence they create a composition of indebtedness, the Moratorium

Legislation and Moratorium Orders provide for a composition structure ***beyond*** those permitted

under the Bankruptcy Code.  Specifically, the Moratorium Legislation and Moratorium Orders

allow for non-consensual re-prioritization of secured debts—namely, the prioritization of junior

unsecured debt above senior secured debt.  *See* 11 U.S.C. §§ 1129(a)(7) (providing that each

impaired class must receive under a plan at least as much as it would receive in a liquidation,

thereby ***ensuring that the pre-existing order of priorities is respected***); Amended Moratorium Act

§§ 201-203; 206; 208 (prioritizing essential services over GO Debt and Revenue Bond debt);

Moratorium Act §§ 102,  108, 201, 202 (same); Moratorium Orders OE-2016-014, OE-2016-018,

EO-2016-30, EO-2016-31 (same).

135.    The Moratorium Legislation and Moratorium Orders also have the ***actual effect*** of

a composition of indebtedness.  For example:

    (a)    The Moratorium Legislation allows the Governor to effectively—and

unilaterally—select which creditors will or will not be paid, including the

order in which they are paid—except that essential services ***must*** be paid

***ahead*** of general obligation debt, in direct violation of Section 8 and

Revenue Bond Priority.  *See, e.g.*, Amended Moratorium Act §§ 201-203;

206; 208; Moratorium Act §§ 201(a), (d), (e); *id.* §§ 202(a)(i)(A)-(C) (same).

The Commonwealth is actively using this power to prioritize

constitutionally, statutorily, and contractually junior unsecured debt (*e.g.*, payment of essential services provided under government contracts) above the Commonwealth's utmost senior secured debt (*e.g.*, GO Debt and Revenue Bonds).  *See generally* Moratorium Orders OE-2016-014, OE-2016-018, EO-2016-30, EO-2016-31.

(b)     Further, the Moratorium Orders make clear that this *post-hoc* inversion of the Commonwealth's payment priorities is necessary because there are (allegedly) insufficient funds to pay for even a fraction of the total debt.  *See, e.g.*, Moratorium Order EO-2016-31 ("after paying for [essential services], the Commonwealth [] will have insufficient funds to make the total debt service payments on the GO Debt").  This wholesale restructuring thus affects not only the ***order*** in which debts are paid—but whether (and which) debts ***get paid at all***.  This is a *de facto* composition of indebtedness unilaterally imposed upon Ambac and the Revenue Bondholders.

136.   By ignoring the Revenue Bond Priority and applying resources available to Commonwealth to non-GO obligations, the Commonwealth has itself ***created*** the purported "need" to claw back funds from the Revenue Bonds to pay the GO Debt.  The resulting clawback has led to multiple defaults on the Revenue Bonds and has forced Ambac's insurance proceeds to replace the Revenue Bonds' collateral.  In other words, the Commonwealth's restructuring scheme compels Ambac to subsidize junior unsecured obligations it never insured in direct violation of the

constitutional, statutory, and contractual covenants it relied upon when deciding whether to insure the Revenue Bonds.[4]

137.   In addition to violating Section 303(1) of PROMESA by establishing a method of composition of indebtedness, the Moratorium Legislation and Moratorium Orders also constitute an impermissible "moratorium law" under the same provision.

138.   Section 303(1) of PROMESA forbids any local "moratorium law" that "prohibits the payment of principal or interest by an entity" such as the Authorities.

139.   The Moratorium Legislation and Moratorium Orders are Commonwealth moratorium laws (*see supra* ¶¶ 87-98, 105-109) that prohibit payment of principal and interest on the Revenue Bonds.

140.   Accordingly, the Moratorium Legislation and Moratorium Orders violate Section 303(1) of PROMESA for this additional reason.

141.   Left unchecked, the Commonwealth's illegal and unconstitutional restructuring scheme will continue to force needless defaults the Revenue Bonds, forcing Ambac to make continued payments on the applicable financial guaranty insurance policies.

### 2.   The Moratorium Orders Are Expressly Preempted by Section 303(3) Of PROMESA

142.   Section 303(3) of PROMESA preempts unlawful executive orders.  Specifically, Section 303(3) of PROMESA provides that:

> unlawful executive orders that alter, amend, or modify rights of holder of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this Act.

_____

[4] For the above reasons, even absent PROMESA, the Moratorium Act and Moratorium Orders would still be preempted by the Bankruptcy Code because, both individually and collectively, they create a composition of indebtedness.  Such compositions are expressly preempted by the Bankruptcy Code.  *See infra* ¶ 135.

48 U.S.C. § 2163(3).

143. For the reasons stated above, *see supra* ¶¶ 110-141, the Moratorium Orders are illegal and unconstitutional.  Thus, they are preempted by Section 303(3) of PROMESA.

**F.   The Moratorium Legislation and Moratorium Orders Violate Section 407 of PROMESA**

144. Section 407 of PROMESA, entitled "Protection From Inter-Debtor Transfers," provides:

> (a) Protection of Creditors.—While an Oversight Board for Puerto Rico is in existence, **if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property**, or which **deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors**, then the transferee shall be liable for the value of such property.

48 U.S.C. § 2195(a) (emphasis added).

145. An Oversight Board is currently in existence for Puerto Rico.

146. The Moratorium Legislation and Moratorium Orders violate *both* of Section 407's tests.

147. First, the Moratorium Legislation and Moratorium Orders transfer the Pledged Revenues belonging to the Authorities to providers of "essential services," and/or the Commonwealth and other Commonwealth instrumentalities.  Such transfers are in violation of applicable law under which the Revenue Bondholders have a valid pledge of, security interest in, and lien on those assets—*i.e.*, the PRHTA, PRCCDA, and PRIFA Enabling Acts.  Pursuant to those statutes, Pledged Revenues are *never* allowed to pay "essential services," because Pledged Revenues are transferrable exclusively through clawback—and clawback is justified solely for payment of GO Debt, and only if *no other revenues* are available to the Commonwealth.

148.     Second, the Moratorium Legislation and Moratorium Orders deprive the Authorities of property in violation of the PRHTA, PRCCDA, and PRIFA Enabling Acts, which assure the transfer of such property to the Authorities for the benefit of their creditors.

149.     Because the Moratorium Legislation and Moratorium Orders violate Section 407, any transferee of the Pledged Revenues is liable for the full value of the funds transferred to them.

150.     Section 407 of PROMESA also creates both a private right of action against the Commonwealth for any transfers it receives, and concurrently waives the Commonwealth's sovereign immunity with respect to such transfers.  This is evident from the face of Section 407, which does not exclude the Commonwealth from liability under it, despite the fact that clawback by definition diverts money to the Commonwealth and indeed was well underway when PROMESA was being debated and signed into law.  Congress has the power to implicitly or explicitly waive the Commonwealth's ability to raise the defense of sovereign immunity under its plenary Territorial Clause powers.  *See* U.S. Const. Art. IV, Sec. 3; 48 U.S.C.A. § 2121(b)(2) ("Congress enacts this chapter pursuant to article IV, section 3 of the Constitution of the United States, which provides Congress the power to dispose of and make all needful rules and regulations for territories.").  Moreover, if the Commonwealth's sovereign immunity was not waived, then Section 407 would be rendered meaningless—because the Commonwealth could receive an unlimited amount of illegal transfers with absolute impunity.

## VI.     The Commonwealth's Fiscal Plan and Fiscal Plan Compliance Law

151.     Since the passage of PROMESA and the installment of the Oversight Board, the Commonwealth's unlawful and unconstitutional conduct has only intensified, now enabled by the Oversight Board itself.

A.    **The Basis and Effect of a Fiscal Plan**

152.    Section 201 of PROMESA requires that the Commonwealth submit to the Oversight Board a fiscal plan.

153.    PROMESA provides that a fiscal plan "shall . . . provide a method to achieve fiscal responsibility and access to the capital markets," and shall satisfy fourteen additional requirements. 48 U.S.C. § 2141(b)(1).

154.    These additional requirements include, as are relevant here, that a fiscal plan shall:

> (M) ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI; and

> (N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.

*Id.* § 2141(b)(1)(M), (N).

155.    The Oversight Board may not certify a fiscal plan unless it meets all the requirements laid out in the statute. *See id.* § 2141(c)(3)(A).

156.    Once certified, the fiscal plan forms the basis for all actions taken and all determinations made by the Oversight Board, including certifications and actions related to restructuring in both Title VI and Title III.  Compliance with the fiscal plan is the overarching guidepost governing the Oversight Board's responsibilities under PROMESA.

- ***Budgeting***.  All budgets must be approved by the Oversight Board.  One criterion for the Oversight Board's approval is the budget's compliance with the fiscal plan.  *See* 48 U.S.C. § 2104(6)(B) (definition of "compliant budget").

- ***Title VI***.  The Oversight Board generally must certify that all proposed modifications are consistent with the fiscal plan before the modifications

may be submitted to the pools for voting. *See id.* §§ 2124(i), 2231(g). The Oversight Board must also certify that an approved modification is consistent with the fiscal plan before it may become binding. *See id.* §§ 2124(i), 2231(m)(1)(B)(ii).

- ***Title III***. In order for the Oversight Board to file a restructuring petition for any entity, the Oversight Board must certify that there is a fiscal plan in place. *See id.* §§ 2146(a)(3), 2162(2). The Oversight Board must also certify that any plan of adjustment it submits, and any modifications it makes thereto, are consistent with the fiscal plan. *See id.* § 2124(j). Consistency with the fiscal plan is also an independent confirmation requirement: In order for the plan to be confirmed, the United States District Court for the District of Puerto Rico must make a finding that the plan of adjustment is consistent with the fiscal plan. *See id.* § 2174(b)(7).

- ***Review of newly enacted laws***. The Oversight Board may review (and, unless the Board requires otherwise, the Governor is required to submit to the Oversight Board) all laws enacted for consistency with the fiscal plan. If the Oversight Board is not satisfied that the law is consistent with the fiscal plan, the Oversight Board may prevent the enforcement or application of the law. *See id.* § 2144(a).

- ***Review of newly issued executive orders, rules, and regulations.*** The Oversight Board may review any proposed rules, regulations, or executive orders of the Governor for consistency with the fiscal plan. If the government fails to adopt the Oversight Board's recommendations concerning changes to ensure consistency with the fiscal plan, the Oversight Board may prevent enforcement or execution of the executive order, rule, or regulation. *See id.* § 2144(b)(4).

- ***Review of proposed government contracts***. The Oversight Board may review certain contracts the government proposes to execute for consistency with the fiscal plan. If the government fails to adopt the Oversight Board's recommendations concerning changes to ensure consistency with the fiscal plan, the Board may prevent enforcement or execution of the contract. *See id.* § 2144(b).

- ***Recommendations to the Commonwealth government***. The Oversight Board may, at any time, make recommendations to the government to ensure compliance with the fiscal plan. In the event the government refuses to adopt the recommendations, the government must submit its reasons for refusing the recommendation to the President and Congress. *See id.* § 2145.

B.    **The Government of Puerto Rico Proposes, and the Oversight Board Certifies, a Fiscal Plan**

157.    On January 2, 2017, Governor Rosselló was sworn in as the 12th Governor of Puerto Rico.

158.    On January 18, 2017, AAFAF, a Commonwealth agency created by the Puerto Rico Legislative Assembly in April 2016 to act as the Commonwealth's fiscal agent, financial advisor, and reporting agent, was assigned responsibility for representing the Commonwealth in any restructuring discussions with creditors of the Commonwealth and/or its instrumentalities and with the Oversight Board.

159.    On February 28, 2017, the Rosselló administration and AAFAF submitted an initial fiscal plan (the "February 28 Fiscal Plan") to the Oversight Board.

160.    On March 9, 2017, the Oversight Board rejected the February 28 Fiscal Plan on the ground that it understated the Commonwealth's expenditures.

161.    On March 11, 2017, the Rosselló administration and AAFAF submitted a revised fiscal plan (the Fiscal Plan).  As compared to the February 28 Fiscal Plan, the revised version increased payroll expenses by more than $1.5 billion and operational expenses by more than $400 million.  *See* Ex. E at 12.  The Fiscal Plan devotes $7.87 billion to debt service over the ten-year period from 2017 through 2026—an average of $787 million per year.  *Id.* at 28.

162.    In total, the Commonwealth or the instrumentalities covered by the Fiscal Plan owe bondholders just over $30.0 billion between FY2018 and FY2026.  *Id.* at 27.  Accordingly, the total of $6.79 billion allocated in the Fiscal Plan to debt service across the same period represents a ***77.4% impairment of the applicable debt obligations***.  *Id.* at 27-28.

163.    On March 13, 2017, two days after the Fiscal Plan was submitted, the Oversight Board certified the Fiscal Plan.

C.    **The Commonwealth Passes, and the Governor Signs, the Fiscal
Plan Compliance Law**

164.    Late in the evening on April 27, 2017, Puerto Rico's House of Representatives and

Senate passed identical version of the Fiscal Plan Compliance Law (Ex. F).[5]  The Governor signed

the legislation into law on April 29, 2017.

165.    As indicated by its title, the Fiscal Plan Compliance Law purports to operationalize

the mandate set forth in the Fiscal Plan.  Indeed, following passage of the Fiscal Plan Compliance

Law, Defendant Sánchez, the Governor's representative on the Oversight Board, stated that the

statute was "very consistent" with the Fiscal Plan.  And at the center of the statute are provisions

that—like those found in the Clawback Orders, Moratorium Legislation, and Moratorium Orders

before it—unlawfully appropriate Pledged Revenues belonging to the Revenue Bonds, and apply

them to general Commonwealth expenses.  *See id.*

166.    Specifically, Chapter 4 of the Fiscal Plan Compliance Law provides that all public

corporations, including the Authorities, shall transfer any revenue "surpluses" (defined as any

funds above those needed to pay the Authorities' operational expenses, and thus all funds pledged

to the Revenue Bonds) to the Commonwealth Treasury.  *Id.* at 4.01.  Chapter 4 designates these

surpluses as "available resources" for the Commonwealth under Article VI, Section 8, and requires

them to be deposited directly into the General Fund to meet the liquidity requirements

contemplated in the Fiscal Plan.  *Id.*

167.    Chapter 6 of the Fiscal Plan Compliance Law further requires that all "special funds

created by law for specific purposes" be deposited in the Commonwealth Treasury and credited to

---

[5] The official English translation of the Fiscal Plan Compliance Law is not yet available.  Accordingly, only
the Spanish version is attached as an exhibit to this Complaint.  Pursuant to Local Rule 5(g), Ambac has
moved separately to file a certified English translation at a later date.

the General Fund.  *Id.* at 6.02.  Such "special funds" included the Pledged Revenues.  *Id.*  Together, Chapters 4 and 6—in conjunction with the Fiscal Plan—effectuate a "<u>Super Clawback</u>" that, like the previous iterations of clawback, is both unconstitutional and unlawful.  While Chapter 6 pays lip service to lawful priorities, stating that "[s]aid funds will continue to be used for those purposes for which they were assigned by Law or in the Fiscal Plan," the Fiscal Plan itself completely disregards every lawful priority (prioritizing and paying all Commonwealth general expenses ahead of all debt service, and then applying the leftover crumbs to debt service in an as-yet-to-be-determined order).  More importantly, Chapter 6 specifically provides that any funds deposited in the General Fund will be allocated "in the order of priority determined by the Secretary [of Treasury]."  *Id.*  Implicitly acknowledging the inconsistency of these provisions with Debt Priority Provisions and Fiscal Year Cutoff, Chapter 6 further provides that "[i]f there is any inconsistency between the law or a contract with the Fiscal Plan, the purpose set forth in the Fiscal Plan approved in accordance with the provisions of the PROMESA Federal Law will prevail."  *See id.*

168.    In short, the Super Clawback created by the Fiscal Plan Compliance Law merely continues—and in fact amplifies—the Commonwealth's existing violations of the Revenue Bond Priority and Fiscal Year Cutoff.

## VII.    The Commonwealth's Fiscal Plan and Fiscal Plan Compliance Law are Unconstitutional and Unlawful

### A.    The Commonwealth's Fiscal Plan and Fiscal Plan Compliance Law Impair the Revenue Bonds

169.    In addition to imposing draconian, unilateral cuts to the debt obligations of the Commonwealth and its instrumentalities, including the Authorities, the Fiscal Plan and the Fiscal Plan Compliance Law fundamentally impair the Revenue Bonds.

170.    First, the Fiscal Plan and Fiscal Plan Compliance Law ***guarantee*** a violation of the Revenue Bond Priority.  For example, in fiscal year 2018, the Fiscal Plan allocates $404 million

to all debt service.   Ex. E at 28.   But the total debt service owing on GO Debt alone is $1.07 billion—meaning that over $600 million in constitutionally junior debt or expenses is being paid ahead of GO Debt.  *Id.* at 27.   Thus, even if the entirety of the Revenue Bonds' Pledged Revenues were applied to GO Debt (satisfying the first half of the Revenue Bond Priority), Pledged Revenues will nevertheless be clawed back from the Revenue Bonds while the Commonwealth possesses other available resources it could apply to the GO Debt (violating the second half of the Revenue Bond Priority).   Together, the Fiscal Plan and Fiscal Plan Compliance Act also violate the Fiscal Year Cutoff by requiring a continuous state of Super Clawback that rolls across ten fiscal years.

171.    Moreover, the Fiscal Plan and Fiscal Plan Compliance Law compound this error by making the Revenue Bonds (and all other debt obligations) *junior to all other Commonwealth expenses*.  The Fiscal Plan's purported "debt sustainability" analysis reduces to an unsubstantiated enumeration of its ***non-debt related*** expenses, an equally unsubstantiated projection of revenues, and a conclusion that whatever money is left over should be devoted to debt service.  *Id.* at 28. Indeed, the Oversight Board has expressly admitted in a letter to Congress dated April 25, 2017 that the Fiscal Plan's purported debt sustainability analysis starts by computing all revenues and expenditures "and then computes the funds available for debt service."  This approach turns Puerto Rico law on its head.

172.    Under the Revenue Bonds' enabling legislation, their Pledged Revenues are not allowed to be used for any purpose whatsoever other than to repay GO Debt.  And under the Puerto Rico Constitution and OMB Act, the GO Bonds and Revenues Bonds receive first and second priority, respectively, to the resources available to the Commonwealth.  But under the logic of the Fiscal Plan, all of the affected debt, including that issued by the Commonwealth and the

Authorities, is treated as subordinate to each and every expense expected to be incurred by the Commonwealth over the next ten years.

173.    Finally, the Fiscal Plan and Fiscal Plan Compliance Law accomplish this inversion of the priority scheme established by Puerto Rico law without even purporting to rely on the Commonwealth's police power or to define what would constitute "essential services."  Indeed, the Fiscal Plan expressly **disclaims** any attempt to advance such a definition (*id.* at 6), taking either the untenable position that **all expenses** are for essential services, or the equally untenable position that the Revenue Bonds' Pledged Revenues (which cannot be used for **any** Commonwealth expenses) and monies necessary to repay GO Debt (both of which have constitutional and statutory priority) can apply to non-essential services.  Setting aside whether invocation of the police power can be used to justify impairment of the debt obligations of the Commonwealth or the Authorities (a point Ambac does not accept or concede), Defendants have not even **attempted** to advance such a justification.  They have simply taken the Authorities' (and other issuers') money.

### B.    The Commonwealth's Fiscal Plan and Fiscal Plan Compliance Law Have Injured Ambac

174.    In addition to violating the Revenue Bond Priority and Fiscal Year Cutoff, the Fiscal Plan and Fiscal Plan Compliance Law also force a complete default on each debt service payment owed to the Revenue Bonds over the next decade, in direct violation of Ambac's contractual, legal, and constitutional rights.

175.    Defendants' diversion of the Pledged Revenues from the payment of the Revenue Bonds has caused, and will further cause, injury to Ambac because it eliminates the sole source of revenue securing payment of the Revenue Bonds.  By effectively confiscating the Authorities' property and Revenue Bondholders' collateral, Defendants' actions have guaranteed defaults on

the Revenue Bonds in the short- and long-term, including the Revenue Bonds insured by Ambac, resulting in inevitable payments on Ambac's insurance policy.

176.    Furthermore, whether as a result of claims of sovereign immunity or an alleged inability to pay any award of damages, Ambac and the Revenue Bondholders have no adequate remedy at law against Defendants in the event that Defendants' unconstitutional diversion of the Pledged Revenues results in payment defaults on the Revenue Bonds. Accordingly, the only recourse available to Ambac and to the Revenue Bondholders in order to prevent an irreparable injury is to obtain injunctive relief enjoining Defendants' unconstitutional diversion of the Pledged Revenues prior to the time these unconstitutional diversions trigger such defaults.

C.    **The Fiscal Plan and Fiscal Plan Compliance Law Violate the Contracts Clause**

177.    The Contracts Clause provides, in pertinent part, that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  U.S. Const., art. I, § 10, cl. 1.

178.    As shown *supra*, ¶¶ 167-168, the Super Clawback created by the Fiscal Plan and Fiscal Plan Compliance Law substantially impairs the contractual rights of the Revenue Bondholders and Ambac.  The Revenue Bondholders purchased their bonds, and Ambac insured the bonds, based on ironclad contractual agreements that incorporated the Debt Priority Provisions and Fiscal Year Cutoff.  Super Clawback, however, eliminates these constitutional and statutory protections, and vitiates the contractual protections that flow from them.

179.    All of the foregoing unlawful conduct was accomplished through either a direct or delegated exercise of legislative power:

- in submitting the Fiscal Plan, the Governor, the Secretary of the Treasury, and AAFAF exercised the powers delegated to them by Act No. 21 of 2016, Act No. 2 of 2017, and Act No. 5 of 2017;

- in certifying the Fiscal Plan, the Oversight Board exercised the powers delegated to it by Section 201 of PROMESA; and

     •   in passing the Fiscal Plan Compliance Law, the Commonwealth's Legislative Assembly directly exercised its legislative power.

180.   The Defendants' diversion of the Revenue Bonds' Pledged Revenues pursuant to the Fiscal Plan and Fiscal Plan Compliance Law is not a necessary or reasonable means of serving an important public purpose, because less drastic alternatives were available that would not have entailed an impairment of the Revenue Bond Priority or Fiscal Year Cutoff.

181.   First, the Fiscal Plan dramatically understates the resources available to the Commonwealth. The Commonwealth's tax collections and other government revenues have been rising steadily since 2011, and are at all-time highs.[6] Notwithstanding this steady growth in the revenue base, the Fiscal Plan takes the fiscal year 2017 projections, *not* actual revenues, as the base metric for all future years through 2026 (*see* Ex. E at 28)—projections which have already been shown to understate the resources available to the Commonwealth.

182.   Second, the Fiscal Plan, while failing to engage in any substantive debt sustainability analysis, only allocates $787 million in average annual debt service across all obligors, which amounts to 4.3% of the average Commonwealth revenues in the same period. *Id.* at 28. This ratio is not only substantially below debt service levels in other states, cities, and countries (including countries whose economies are less developed than Puerto Rico's), but also less than half of what the framers of the Puerto Rico Constitution deemed sustainable *for GO debt alone*. *See* P.R. Const. art. VI, § 2 (imposing ceiling for debt backed by the "full faith, credit, and taxing power of the Commonwealth" of 15% of average amounts "covered into the Treasury of Puerto Rico" in two preceding fiscal years). For example, debt service amounts to 14.5% of net revenues in Illinois, 16.8% in New Hampshire, 18.9% in Massachusetts, and 20.8% in Rhode

---

[6] *See* Commonwealth Financial Information and Operating Data Report, December 18, 2016, at 160.

Island.[7]   This level of debt service is also sustained in large cities:  A recent report found that

"major rating agencies have advised that [New York City] should devote no more than 17 percent

of its tax revenue . . . to debt service.  Generally, the City's debt service takes up around 15 percent

of tax revenue, but it is projected to take up an increasing share in the coming years."[8]   Debt

service levels for sovereign borrowers fall in similar or higher ranges, with recent statistics

showing 14.6% of total revenues devoted to debt service in the Bahamas, 14.4% in Grenada,

and 26.2% in Jamaica.[9]   Further, World Bank and International Monetary Fund guidelines provide

that 18% to 22% of government revenues is a sustainable debt service ratio level even for "low

income countries."  In fact, the guidelines conclude that a debt service ratio of 22% is "strong

policy" for a low income country.[10]

183.    Third, although the Oversight Board has suggested that the Fiscal Plan will

create 34% in overall savings after five years,[11] these purported "savings" are calculated by

reference to the Fiscal Plan's projected spending levels, which are well above current levels—an

accounting sleight of hand designed to mask that the Commonwealth's expenditures actually

*increase* over the ten-year period covered by the Fiscal Plan.  *See* Ex. E at 12.

184.    Fourth, and most egregious of all, the Fiscal Plan includes a "reconciliation

adjustment"—in truth, a cash cushion—totaling $6.2 billion over the decade covered by the Fiscal

---

[7]  *See CivicDashboards*, OpenGov (last visited April 29, 2017), http://www.civicdashboards.com /state/rhode-island-04000US44/debt_service_ratio.

[8] See How to Save New York City's Infrastructure: Dedicate Revenues, New York Building Congress (November 2013), https://www.buildingcongress.com/research/infrastructure/01.html.

[9]  *See Interest payments (% of revenue)*, The World Bank (last visited April 29, 2017), http://data.worldbank.org/indicator/GC.XPN.INTP.RV.ZS.

[10] *See Factsheet: The Joint World Bank-IMF Debt Sustainability Framework for Low-Income Countries*, International Monetary Fund (March 2016), http://www.imf.org/external/np/exr/facts/pdf/jdsf.pdf.

[11] *See* Oversight Board Letter to Sens. Tillis and Cotton, April 25, 2017, at 8.

Plan, or approximately $620 million per year.  *Id.* at 12, 14.  The Fiscal Plan does not attempt to explain what this annual $620 million cushion would be allocated to.  Rather, the Oversight Board justifies the cushion on the theory that actual expenditures in the past were understated by the Commonwealth, and thus will continue to be understated over the next ten years.  Indeed, the Fiscal Plan assumes that this supposed understatement of expenditures not only will continue over the next ten years, but that the amount of the understatement will ***grow*** by approximately 12% from $585 million to $657 million during that period.  *Id.*  This "reconciliation adjustment" represents a complete abdication of the Oversight Board's primary mandate—to restore fiscal responsibility and thereby facilitate access to the capital markets—by assuming ongoing unaccounted-for expenditures and implicitly acknowledging that the Oversight Board will never succeed in getting a handle on such expenditures.  Rather, the Fiscal Plan requires the Commonwealth's creditors to fund a $6.2 billion cushion to enable those expenditures.

185.    In short, the Fiscal Plan and the Fiscal Plan Compliance Act constitute neither a reasonable nor a necessary means of serving an important public purpose, because those acts subvert important public interests, many less drastic alternatives existed that would actually benefit the public, and their ultimate effect will be only to impede a consensual resolution to the Commonwealth's debt problems, to limit the Commonwealth's access to the capital markets, to deepen the Commonwealth's long-term financial difficulties, and to endanger the long-term health and safety of the people of Puerto Rico.

D.    **The Fiscal Plan and Fiscal Plan Compliance Law Violate the Takings and Due Process Clauses**

186.    The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The Takings Clause applies to the States,

and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the U.S. Constitution.  U.S. Const. amend. XIV, § 1.

187.    The Due Process Clauses further forbids the Commonwealth from depriving "any person . . . of life, liberty, or property, without due process of law."  U.S. Const. amends. V, XIV, § 1.

188.    The Fiscal Plan and Fiscal Plan Compliance Law both violate the Takings and Due Process Clauses by depriving Ambac and the Revenue Bondholders of their senior secured property interests in the Pledged Revenues without providing Ambac and the Revenue Bondholders with just compensation or due process.  The Pledged Revenues may legally be clawed back only to pay GO Debt and only when *no other resources* are available.  Accordingly, the Fiscal Plan and Fiscal Plan Compliance Law—which purport to expand the pool of available resources while at the same time continuing to claw back from the Revenue Bonds *indefinitely*—constitute an unconstitutional taking and a violation of Ambac's and the Revenue Bondholders' due process rights.

### E.    **The Fiscal Plan and Fiscal Plan Compliance Law Are Expressly Preempted by Section 303 of PROMESA**

189.    Under Section 303(3) of PROMESA, Congress expressly preempts (i) all "unlawful executive orders" enacted by the Commonwealth that (ii) "divert funds from one territorial instrumentality to another or to the territory . . . ."  48 U.S.C. § 2163(3).  Any executive order meeting both Section 303(3) requirements is preempted by PROMESA and void *ab initio*.

190.    The Fiscal Plan constitutes an executive order because it was developed and submitted by AAFAF at the direction and with the oversight of the Governor.

191.     As demonstrated above (*see supra* ¶¶ 177-188), the Fiscal Plan violates the Contracts Clause and the Takings and Due Process Clauses of the U.S. Constitution, and is accordingly an unlawful executive order.

192.     The Fiscal Plan is therefore preempted by Section 303(3) of PROMESA.

193.     Section 303(1) of PROMESA preempts laws of the Commonwealth that prescribe methods of composition of indebtedness.

194.     The Fiscal Plan Compliance Law diverts the Pledged Revenues of the Revenue Bonds to the Commonwealth and prescribes a method of composition for the Authorities' indebtedness without the Revenue Bondholders' consent.  Specifically, the Fiscal Plan Compliance Law allows the Secretary of Treasury to use the Revenue Bonds' Pledged Revenues without regard for the liens held by the Revenue Bondholders or the Authorities' ability to continue to make debt service payments on their bonds.  And the Secretary of Treasury is purportedly authorized to use the Pledged Revenues to pay other, junior obligations before the Revenue Bondholders, without the consent of those bondholders.

195.     The Fiscal Plan Compliance Law is therefore preempted by Section 303(1) of PROMESA.

**F.     The Fiscal Plan and Fiscal Plan Compliance Law Violate
Section 407 of PROMESA**

196.     As discussed *supra*, ¶¶ 104, 144, Section 407 of PROMESA protects the Revenue Bondholders by forbidding, so long as the Oversight Board is in place, (i) any transfer of the Revenue Bonds' Pledged Revenues in violation of their Enabling Acts, and (ii) any transfer of Pledged Revenues from the Authorities.

197.     The Oversight Board is currently in existence for Puerto Rico.

198.    First, the Fiscal Plan and Fiscal Plan Compliance Law effect a transfer of Pledged Revenues belonging to the Authorities to the Commonwealth.  As set forth above, that transfer violates applicable law under which the Revenue Bondholders have a valid property interest and pledge—namely, the Revenue Bonds' enabling legislation.  Pursuant to those statutes, the Pledged Revenues cannot be clawed back for any purpose other than to pay GO Debt, and cannot be clawed back unless the Commonwealth possesses no other revenues that are considered "available" under Section 8.  But the Fiscal Plan and Fiscal Plan Compliance Law transfer all Pledged Revenues to the Commonwealth to pay junior obligations in violation of the Revenue Bond Priority and Ambac's and the Revenue Bondholders' lien.

199.    Second, the Fiscal Plan and Fiscal Plan Compliance Law deprive the Authorities of property in violation of the Revenue Bonds' enabling legislation, which assures the transfer of such property directly to the Authorities for the benefit of their creditors.  Thus, the Super Clawback created by the Fiscal Plan and Fiscal Plan Compliance Law violates both aspects of Section 407.

200.    As transferee of funds unlawfully transferred in connection with the Fiscal Plan and Fiscal Plan Compliance Law, the Commonwealth is liable to Ambac and the Revenue Bondholders for the full value of the funds transferred to it.

### FIRST CLAIM FOR RELIEF

**(For Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 For Violations of the Contracts Clause Against All Defendants)**

201.    Ambac repeats and realleges the allegations contained in paragraphs 1 through 200 hereof, as if fully set forth herein.

202.    The certification of the Fiscal Plan and the enactment, issuance, and implementation of the Moratorium Legislation, Moratorium Orders, and Fiscal Plan Compliance

Law have harmed Ambac and the Revenue Bondholders by diverting funds contractually pledged to secure the payment of the Revenue Bonds to other purposes.

203. An actual justiciable controversy exists between the parties.

204. Ambac is entitled to an order declaring: (i) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are unconstitutional on the grounds that the each violates the Contracts Clause of Article I of the U.S. Constitution; (ii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law each unlawfully interfere with and impede Ambac's contractual rights; and (iii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan and Fiscal Plan Compliance Law are unlawful, invalid, null, and void.

205. If the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are enforced, and Defendants act pursuant to each to divert Pledged Revenues from payment of the Revenue Bonds to other purposes, then such diversion will result in imminent and irreparable harm to Ambac and the Revenue Bondholders by reducing the amount of collateral securing the Revenue Bonds and causing payment defaults on the Revenue Bonds.

206. In addition, enforcement of the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law will cause immediate and irreparable harm by substantially impairing Ambac's and the Revenue Bondholders' contractual interests in a manner that violates the Contracts Clause of Article I of the U.S. Constitution.

207. Ambac is entitled to an injunction prohibiting Defendants from taking or causing to be taken any action pursuant to the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law.

## SECOND CLAIM FOR RELIEF

**(For Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 For Violations of the Takings and Due Process Clauses Against All Defendants)**

208.     Ambac repeats and realleges the allegations contained in paragraphs 1 through 207 hereof, as if fully set forth herein.

209.     The certification of the Fiscal Plan and the enactment, issuance, and implementation of the Moratorium Legislation, Moratorium Orders, and Fiscal Plan Compliance Law have harmed Ambac and the Revenue Bondholders by (i) taking or causing to be taken funds in which Ambac and the Revenue Bondholders hold a property interest without providing Ambac and the Revenue Bondholders with just compensation and (ii) depriving Ambac and the Revenue Bondholders of funds in which Ambac and the Revenue Bondholders hold a property interest without due process of law.

210.     An actual, justiciable controversy exists between the parties.

211.     Ambac is entitled to an order declaring (i) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are unconstitutional on the grounds that each violates the Fifth and Fourteenth Amendments of the U.S. Constitution; and (ii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are unlawful, invalid, null, and void.

212.     If the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are enforced, and Defendants act pursuant to each to take or cause to be taken Pledged Revenues in which Ambac and the Revenue Bondholders hold a property interest and deprive Ambac and the Revenue Bondholders of access to such Pledged Revenues, then such taking will result in imminent and irreparable harm to Ambac and the Revenue Bondholders by

reducing the amount of collateral securing the Revenue Bonds and causing payment defaults on the Revenue Bonds.

213.    In addition, enforcement of the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law will cause immediate and irreparable harm by depriving Ambac and the Revenue Bondholders of their property rights in a manner that violates the Takings and Due Process Clauses of the U.S. Constitution.

214.    Ambac is entitled to an injunction prohibiting the Defendants from taking or causing to be taken any action pursuant to the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law.

## THIRD CLAIM FOR RELIEF

**(For Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 For Denial of Access to Article III Courts Against the Commonwealth Defendants)**

215.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 214 hereof, as if fully set forth herein.

216.    The Moratorium Orders have harmed Ambac by purporting to deprive it of access to Article III courts.

217.    An actual, justiciable controversy exists between the parties.

218.    The United States Supreme Court has clearly established that neither the States nor the Commonwealth have the power to enjoin proceedings in federal court. *See Donovan v. City of Dallas*, 377 U.S. 408, 411-13 (1964).

219.    Ambac is entitled to a declaratory judgment that the Moratorium Orders' purported deprivation of litigants' (including Ambac's) access to the federal courts is unconstitutional and therefore void, and an injunction prohibiting enforcement of any such limitation.

## FOURTH CLAIM FOR RELIEF

**(For Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 For Violations of Section 303 of PROMESA Against All Defendants)**

220.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 219 hereof, as if fully set forth herein.

221.     The certification of the Fiscal Plan and the enactment, issuance, and implementation of the Moratorium Legislation, Moratorium Orders, and Fiscal Plan Compliance Law have harmed Ambac by implementing and enforcing local laws and executive orders that are expressly preempted by Sections 303(1) and 303(3) of PROMESA.

222.     An actual, justiciable controversy exists between the parties.

223.     Ambac is entitled to an order declaring (i) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are preempted by Section 303 of PROMESA; and (ii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are unlawful, invalid, null, and void.

224.     If the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are enforced, and Defendants act pursuant to each to take or cause to be taken Pledged Revenues in which Ambac and the Revenue Bondholders hold a property interest and deprive Ambac and the Revenue Bondholders of access to such Pledged Revenues, then such taking will result in imminent and irreparable harm to Ambac and the Revenue Bondholders by reducing the amount of collateral securing the Revenue Bonds and causing payment defaults on the Revenue Bonds.

225.     In addition, enforcement of the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law will cause immediate and irreparable harm by depriving

Ambac and the Revenue Bondholders of their property rights despite being preempted by Section 303 of PROMESA.

226.    Ambac is entitled to an injunction prohibiting the Defendants from taking or causing to be taken any action pursuant to the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law.

## FIFTH CLAIM FOR RELIEF

### (For Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 For Violations of Section 407 of PROMESA Against All Defendants)

227.    Ambac repeats and realleges the allegations contained in paragraphs 1 through 226 hereof, as if fully set forth herein

228.    The Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are harming, and will continue to harm Ambac and the Revenue Bondholders by causing, in violation of Section 407 of PROMESA, the transfer of funds, including the Pledged Revenues, in a manner contrary to (i) applicable laws under which Ambac and the Revenue Bondholders are granted valid pledges of, security interests in, and liens on the Pledged Revenues; and (ii) applicable laws ensuring the Pledged Revenues are transferred for the benefit of their respective Authorities' creditors.

229.    An actual, justiciable controversy exists between the parties.

230.    Ambac is entitled to an order declaring that any transferee of property transferred as a result of the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law is liable for the value of such transfers under Section 407 of PROMESA.

## RELIEF DEMANDED

WHEREFORE Ambac respectfully requests that the Court enter judgment against Defendants as follows:

(a)      Declaring (i) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are unconstitutional on the grounds that each violates the Contracts Clause of Article I of the U.S. Constitution; (ii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law each unlawfully interferes with and impedes the Ambac's contractual rights; and (iii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are each unlawful, invalid, null, and void;

(b)      Declaring (i) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are unconstitutional on the grounds that each violates the Fifth and Fourteenth Amendments of the U.S. Constitution; and (ii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are each unlawful, invalid, null, and void;

(c)      Declaring (i) that the Moratorium Orders unconstitutionally deprive litigants, including Ambac, of access to Article III courts; and (ii) that the Moratorium Orders are unlawful, invalid, null, and void;

(d)      Declaring (i) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are unconstitutional on the grounds that each is preempted by Section 303 of PROMESA; and (ii) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are each unlawful, invalid, null, and void

(e)      Declaring (i) that the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law each violate Section 407 of PROMESA; and that each is unlawful, invalid, null, and void;

(f)      Enjoining Defendants from taking or causing to be taken any action pursuant to the Moratorium Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law;

(g)     Declaring that any transferee of property transferred as a result of the Moratorium

Legislation, Moratorium Orders, Fiscal Plan, and Fiscal Plan Compliance Law are each liable for

the value of such transfers under PROMESA; and

(h)     Granting Ambac such other and further relief as this Court may deem just and

proper.

Dated:  San Juan, Puerto Rico
        May 2, 2017

FERRAIUOLI LLC

By: /s/ *Roberto Cámara Fuertes*
        Roberto Cámara Fuertes
        USDC-PR No. 219002
        221 Ponce de León Avenue, 5th Floor
        San Juan, PR 00917
        Telephone: (787) 766-7000
        Facsimile:  (787) 766-7001
        Email:  rcamara@ferraiuoli.com

MILBANK, TWEED, HADLEY & McCLOY LLP

By: /s/ *Andrew M. Leblanc*
        Dennis F. Dunne (*pro hac vice forthcoming*)
        Andrew M. Leblanc (*pro hac vice forthcoming*)
        Atara Miller (*pro hac vice forthcoming*)
        Grant R. Mainland (*pro hac vice forthcoming*)
        28 Liberty Street
        New York, NY 10005
        Telephone: (212) 530-5770
        Facsimile:  (212) 822-5770
        Email: ddunne@milbank.com
                aleblanc@milbank.com
                amiller@milbank.com
                gmainland@milbank.com

*Attorneys for Ambac Assurance Corporation*