# **<u>EXHIBIT C</u>**

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**AMENDED MOTION OF AMBAC ASSURANCE ~~CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION~~ CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND U.S. BANK TRUST NATIONAL ASSOCIATION, CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); ~~and~~ (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747)**; and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5233-LTS) (Last Four Digits of Federal Tax ID: 3801)**.

42455.00200

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** .................................................................. 1

**BACKGROUND** ............................................................................... ~~7~~6

    ~~A~~**I**.    **The** PRIFA ~~Issues Bonds Secured by~~**Enabling Act Irrevocably Transferred Equitable Ownership of** the Pledged Rum Taxes ~~7~~ **to PRIFA.** .................................................................... **6**

    **II.**    **PRIFA Pledges the Pledged Rum Taxes to the PRIFA Bondholders, and Thereby Grants the Bondholders a Lien Thereon.** ................ **8**

    ~~B~~**III**.    The Commonwealth Confiscates the Pledged Rum Taxes. ............. 9

    ~~C~~**IV**.    Upon the Filing of a Commonwealth Title III Petition, the Oversight Board Files Notices of Stay ~~With~~**with** Respect to the Ambac Actions Challenging the Dissipation of the Pledged Rum Taxes. ........... ~~11~~**14**

~~**JURISDICTION AND VENUE**~~ ......................................................... ~~12~~

**JURISDICTION AND VENUE** .......................................................... **16**

**RELIEF REQUESTED** ..................................................................... ~~13~~**16**

**ARGUMENT** ................................................................................. ~~13~~**17**

    I.    The ~~Automatic Stay Does Not Preclude Ambac from Pursuing the U.S. Treasury Action and PRIFA Clawback Action 13~~**"Colorable Claim" Standard Governs This Motion.** ................................................ **17**

        ~~A.~~    ~~The Automatic Stay Does Not Apply to the U.S. Treasury Action~~ ......... ~~13~~

    **II.**    **The Court Should Lift the Automatic Stay Under Bankruptcy Code Section 362(d)(2)** Because the Commonwealth Has No Equity in the Pledged Rum Taxes, and They Are Unnecessary to an Effective Reorganization. ................................................................ **18**

        ~~1~~**A**.    The Commonwealth Has No ~~Property Interest~~**Equity** in the Pledged Rum Taxes. ....................................................... ~~14~~**20**

            ~~2.~~    ~~If PRIFA Has No Property Rights in the Pledged Rum Taxes Prior to their Delivery to PRIFA, then the Commonwealth Has No Property Rights in the Pledged Rum Tax Prior to their Delivery to the Commonwealth~~ ......... ~~15~~

            **1.**    **The Commonwealth Transferred All Equitable Ownership Over, and All Equity in, the Pledged Rum Taxes to PRIFA.** ........................................ **20**

            **2.**    The Pledged Rum Taxes Are **"Restricted Funds"** that the Commonwealth Must Transfer to HTA, and Thus Lacks Equity in. ........................................... **25**

3.      The Commonwealth, at Most, Holds the Pledged Rum
        Taxes in Trust for PRIFA and Its Bondholders.                    26

B.      The Automatic Stay Does Not Apply to the PRIFA Clawback
        Action 16Pledged Revenues Are Not Necessary for an Effective
        Reorganization.                                                  31

IIIII.  TheAlternatively, the Court Should Lift Any Applicable Automatic Stay
        to Permit Ambac to Pursue its Remedies 17the Stay for "Cause"
        Pursuant to Bankruptcy Code Section 362(d)(1).                   32

A.      There Is"Cause" Exists to Lift the Automatic Stay for Lack of
        Adequate Protection 19Because Movants' Lien on the Pledged
        Rum Taxes Is Not Adequately Protected.                           33

        1.      Ambac HasMovants Have a Lien on the Pledged Rum
                Taxes.                                                 2033

                a.      The Trust Agreement for the Bonds, and the
                        PRIFA Enabling Act, Create a Consensual Lien.   33

                b.      PRIFA Bondholders Also Have an Equitable
                        Lien on the Pledged Rum Taxes.                  34

                c.      Section 552(a) Does Not Apply to Movants' Lien. 36

        2.      Neither the Commonwealth's Bankruptcy nor
                PROMESA Diminish PRIFA's Ownership of the
                Pledged Rum Taxes, or PRIFA's Pledge of Them to Its
                Bondholders.                                             39

        3.      Article VI, Section 8 of the Puerto Rico Constitution
                Does Not Give the Commonwealth Any Equity in the
                Pledged Revenues.                                        41

        24.     The Lien isIs Not Adequately Protected, and the
                Commonwealth's Conduct Continues to Diminish the
                Value of the Lien.                                    2643

B.      The Commonwealth Is Abusing the Automatic Stay to Strip
        Ambac and PRIFA Bondholders of Their Constitutionally-
        Protected Property Rights in Violation of PROMESA 29Lack of
        Due Process in the Title III Court Constitutes Additional
        Cause to Lift the Stay.                                          46

C.      The Stay Should Be Lifted Because the Commonwealth Has No
        Equity in the Pledged Rum Taxes, and They Are Unnecessary to
        an Effective Reorganization 30There Is Cause to Lift the Stay
        Based on the Totality of Circumstances.                         48

        1.      Even Assuming the Commonwealth Has Some Interest in
                the Pledged Rum Taxes, that Interest Would Be at Most

ii

Bare Legal Title in Which the Commonwealth Has No Equity .......... 31

2.  The Pledged Rum Taxes Are Not Necessary for an Effective Reorganization .......... 33

III IV.  The In the Alternative, the Court Should Mandate Adequate Protection. .......... 33 53

**CONCLUSION** .......... 34 54

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ambac Assurance Corp. v. Commonwealth of Puerto Rico,*
927 F.3d 597 (1st Cir. 2019) .................................................. …32, 47, 50

*Ambac Assurance Corp. v. Rosselló Nevares,*
No. 3:17-cv-01568 (D.P.R., filed May 2, 2017) ................................. …14

*Ambac Assurance Corp. v. U.S. Dep't of Treasury,*
No. 1:17-cv-00809 (D.D.C., filed May 2, 2017) ...................... 3, …14, …15

*Asociacion Asociación de Subscipcion Subscripción Conjunta Del del Seguro De Responsabilidad de Responsabilidad Obligatorio v. Flores Galarza,*
484 F.3d 1 (1st Cir. 2007) ...................................... 14…20, 3221, 22, 29

*Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
919 F.3d 121 (1st Cir. 2019) ...................................................... …37, 38

*Austin Assured Guar. Corp. v. Unarco Indus. García-Padilla, Inc.,*
No. 3:16-cv-01037 (D.P.R., filed Jan. 7, 2016) ............................. 1, …14

*Assured Guaranty Corp. v. Garcia Padilla,*
No. 1:17-cv-01037 (D.P.R. May 17, 2017) ...................................... …15

*Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
705 919 F.23d 1638 (1st Cir. 1983 2019) .............................. 14…50

*In re Blair,*
534 B.R. 787 (Bankr. D.N.M. 2015) .................................................. 51

*In re Bldrs. Grp. & Dev. Corp.,*
502 B.R. 95 (Bankr. D.P.R. 2013) .............................................. …34 54

*In re Bologna,*
206 B.R. 628 (Bankr. D. Mass. 1997) ............................................... 32

*Boyd v. Martin Expl. Co.,*
56 B.R. 776 (E.D. La. 1986) .................................................... …33 32

*In re Breitburn Energy Partners LP,*
571 B.R. 59 (Bankr. S.D.N.Y. 2017) ................................................ …51

iv

*In re Brown,*
   2008 WL 2115200 (Bankr. D.N.H. May 19, 2008) ...................................... ...27

*~~Cienega Gardens~~Butner* v. United States,
   ~~331 F.3d 1319 (Fed. Cir. 2003~~440 U.S. 48 (1979) .................................. ~~22~~40

City & Cty. of Dallas Levee Imp. Dist. ex rel. Simond Indus. Props. Corp.,
   89 F.2d 731, 733 (5th Cir. 1937) ......................................................... ...~~32~~29

In re City of Columbia Falls,
   143 B.R. 750 (Bankr. D. Mont. 1992) ............................. ~~32~~...21, ~~33~~26, 29, 32

*~~Cournoyer v. Town of Lincoln,~~*
   *City of Springfield v. LAN Tamers, Inc. (In re LAN Tamers, Inc.),*
   ~~790 F.2d 971 (1st Cir. 1986~~281 B.R. 782 (Bankr. D. Mass. 2002) .........~~6~~26, 29, 30

*~~In re Deico Elecs.~~Claybrook v. Consol. Foods*, Inc. *(In re Bake-Line Grp., LLC),*
   ~~139~~359 B.R. ~~945~~566 (~~B~~Bankr. ~~A~~ ~~D~~Del. ~~9th Cir. 1992~~2007) .................................. ...~~27~~28

*Commolco de Caguas Inc. v. Benitez Diaz,*
   126 D.P.R. 478 (1990) ................................................................... ...52

*Cortuk v. Banco Turco Romana (In re Cortuk),*
   2019 WL 2171481 (D.N.J. May 20, 2019) .............................................. ...18

Den Norske Bank AS v. First Nat'l Bank of Bos.,
   75 F.3d 49 (1st Cir. 1996) ............................................................ ...~~8,~~ 25

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,*
   485 U.S. 568 (1988) ..................................................................... ...47

FDIC v. Casady,
   106 F.2d 784 (10th Cir. 1939) ....................................................... ~~32~~29

*Fernandez v. Laloma,*
   56 D.P.R. 367 (1940) ..................................................................... 28

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders*
   *(In re Fin. Oversight & Mgmt. Bd. for ~~Puerto Rico~~P.R.),*
   899 F.3d 13 (1st Cir. 2018) ....................................................... 0, ...~~1~~2

*Fleet Nat'l Bank v. Valente (In re ~~Fin. Oversight & Mgmt. Bd. for Puerto*
   *Rico~~Valente),*
   ~~919~~360 F.3d ~~121~~256 (1st Cir. ~~2019~~2004) ..................... ~~17,~~...~~22, ...23, 24~~28

Franklin ~~California~~Cal. Tax-Free ~~Trust~~Tr. v. Puerto Rico,
   85 F. Supp. 3d 577 (D.P.R. 2015) .................................................. ~~22~~...39

*García-Rubiera v. Calderón*,
  570 F.3d 443 (1st Cir. 2009) ........................................................ ~~32~~...21, 26, 29

*García-Rubiera v. Fortuño*,
  665 F.3d 261 (1st Cir. 2011) ........................................................ ~~32~~...29

***Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt.
  Bd. for P.R.),
  939 F.3d 340 (1st Cir. 2019)*** ........................................................ ...passim

***Grella v. Salem Five Cent Sav. Bank*,
  42 F.3d 26 (1st Cir. 1994)** ........................................................ ...17

*Hanson v. W.L. Blake & Co.*,
  155 F. 342 (D. Me. 1907) ........................................................ ...~~26~~35

*In re Heffernan Mem'l Hosp. Dist.*,
  202 B.R. 147 (Bankr. S.D. Cal. 1996) ........................................................ ~~23~~...38

*In re J&M Salupo Dev. Co.*,
  388 B.R. 809 (Bankr. N.D. Ohio 2009) ........................................................ ~~27~~...44

~~*In re JE Livestock, Inc.*,~~
  ***Jin Qing Li v. Rosen (In re Jin Qing Li),***
  ~~375 B.R. 892~~**2018 WL 1354548** (B.A.P. ~~10~~9th Cir. ~~2007~~**Mar. 12, 2018**) ........................................................ ~~17~~...18

***In re Keene Corp.*,
  171 B.R. 180 (Bankr. S.D.N.Y. 1994)** ........................................................ ...49

*In re Lally*,
  38 B.R 622 (Bankr. N.D. Iowa 1984) ........................................................ ~~33~~...31

***Martin v. United States* (In re ~~*LAN Tamers, Inc.,*~~*Martin),***
  ~~329~~**761** F.~~3~~2d ~~204~~**472** (1st**8th** Cir. ~~2003~~**1985**) ........................................................ ~~15~~...44

~~*LNC Invs., Inc. v. First Fid. Bank N.A.*,~~
  ~~247 B.R. 38 (S.D.N.Y. 2000)~~ ........................................................ ~~33~~

*In re ~~Lopez~~Mason*,
  ~~446~~**514** B.R. ~~12~~**852** (Bankr. **E.**D. ~~Mass~~**Ky.** ~~2011~~**2014**) ........................................................ ~~18~~51

***Mazzeo v. Lenhart* (In re ~~*Mack*~~*Mazzeo*)**,
  ~~347 B.R. 911 (Bankr. M.D. Fla. 2006)~~ ........................................................ ~~18~~

~~*In re Mammoth Mart, Inc.*,~~
  ~~536~~**167** F.**3d 139 (**2d ~~950~~ (1st Cir. ~~1976~~**1999**) ........................................................ ~~34~~...49

vi

*Martin v. United States*,
*Metro. Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*,
~~76~~175 F.2d ~~472~~941 (~~8th~~2d Cir. ~~1985~~1935) ............................................. ~~27~~...44

*In re Maxon Eng'g Servs., Inc.*,
*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*,
~~332~~602 B.R. ~~495~~798 (~~Bankr~~B. ~~D~~A.P.~~R. 2005~~ 1st Cir. 2019) ............................. ~~26~~...17, 18

*Mitsui Mfrs. Bank v. Unicom Computer Corp. (In re Unicom Computer Corp.)*,
13 F.3d 321 (9th Cir. 1994) ........................................................................ ...27

*In re Montreal*, ~~Maine~~Me. *& Atl. Ry., Ltd.*,
888 F.3d 1 (1st Cir. 2018) ........................................................................... ...~~15~~30

*In re Mullock*,
404 B.R. 800 (Bankr. E.D. Pa. 2009) .......................................................... ~~31~~19

*Paccom Leasing Corp. v. Deico Elecs, Inc. (In re Deico Elecs., Inc.)*,
*Mun. of Metro. Seattle v. O'Brien*,
544 P.2d 729 (Wash. 1976) .......................................................................... 25

*In re Mural Holding Corp.*,
~~75 F.2d 941 (2d~~139 B.R. 945 (B.A.P. 9th Cir. ~~1935~~1992) ............................... ...~~27~~44

*Pare v. Natale (In re Natale)*,
174 B.R. 362 (Bankr. D.R.I. 1994) ............................................................. ~~26~~...35

*Peaje Investments LLC v. García-Padilla*,
845 F.3d 505 (1st Cir. 2017) ................................................................ ...~~28~~45, 46

*Penobscot Nation v. Mills*,
861 F.3d 324 (1st Cir. 2017) ....................................................................... ~~22~~...37

*Porrata Doria v. Fajardo Sugar Co. of P.R.*,
57 D.P.R. 628, 643-44 (P.R. 1940) ............................................................. ...28

*Reading Co. v. Brown*,
391 U.S. 471 (1968) ...................................................................................... ~~34~~54

*Rentas v. Claudio (In re Garcia)*,
484 B.R. 1 (Bankr. D.P.R. 2012) ................................................................ ...27, 28

*In re Residential Capital*,
LLC, 2012 WL 3423285 (Bankr. S.D.N.Y. Aug. 12, 2012) ........................ ...51

*In re River Hills Aparts. Fund,*
  **813 F.2d 702 (5th Cir. 1987)** ......................................................................**...55**

*In re RNI Wind Down Corp.*,
  348 B.R. 286 (Bankr. D. Del. 2006) ............................................................26**...43**

*Román v. S.L.G. Ruiz,*
  **160 D.P.R. 116 (2003)** ..................................................................................**52**

*In re Satcon Tech. Corp.*,
  2012 WL 6091160 (Bankr. D. Del. **Dec. 7,** 2012) ....................................34**...54**

*In re Scarborough-St. James Corp.*,
  535 B.R. 60 (Bankr. D. Del. 2015) ..............................................................17**...48**

*In re ~~Shaughnessy~~Shaffer*,
  ~~BAP No. MW 06-068, 2007 WL 2403280 (B.A.P. 1st Cir. Aug. 17, 2007)~~ **...19**

  **563 B.R. 301 (Bankr. D. Ariz. 2016)** ..........................................................**50**

*Soliman v. Spencer* (*In re Spencer*),
  **115 B.R. 471 (D. Del. 1990)** ......................................................................**...32**

*Sonnax Industries v. Tri Components Prods. Corp.* (*In re Sonnax ~~Indus.~~*), ~~*Inc.*,~~
  907 F.2d 1280 (2d Cir. 1990) ....................................................................26**...passim**

~~*Matter of Spencer*,~~
  *Stowe v. Bologna (In re Bologna),*
  ~~115~~**206** B.R. ~~471~~**628** (**Bankr.** D. ~~Del~~**Mass**. ~~1990~~**1997**) .............................33**...26, 27**

*In re ~~Swedeland Dev. Group~~Tap, Inc.*,
  ~~16 F.3d 552 (3d Cir. 1994)~~ .......................................................................34

  **52 B.R. 271 (Bankr. D. Mass. 1985)** ..........................................................**27**

*In re ~~Technologies Int'l Holdings, Inc.,~~Taub*,
  ~~234~~**413** B.R. ~~699~~**55** (**Bankr.** E.D. ~~Ky~~**N**. ~~1999~~**Y. 2009**) ..........................22**49**

*In re ~~Tellier~~Taub*,
  ~~125~~**438** B.R. ~~34~~**39** (Bankr. **E.**D. ~~RN.I~~**Y**. ~~1991~~**2010**) ..............................34**49**

*Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*,
  763 S.E.2d 288 (N.C. Ct. App. 2014) ........................................................31**...26**

*U.S. Fid. Guar. Co. v. Maxon Eng'g Servs., Inc.* (*In re Maxon Eng'g Servs., Inc.*),
  **332 B.R. 495 (Bankr. D.P.R. 2005)** ..........................................................**...35**

*U.S. Tr. Co. of N.Y. v. New Jersey,*
**431 U.S. 1 (1977)** .................................................................................. **39**

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
484 U.S. 365 (~~1992~~1988) .................................................. ~~27~~...**43**

*United States v. Dwinells,*
**508 F.3d 63 (1st Cir. 2007)** .................................................................. **48**

*United States v. Espinal-Mieses,*
313 F. Supp. 3d 376 (D.P.R. 2018) ...........................................…~~23~~**38**

*United States v. Fleet Bank (In re Calore Exp. Co.),*
**288 F.3d 22 (1st Cir. 2002)** ......................................................…**17**

*United States v. Friedman,*
143 F.3d 18 (1st Cir. 1998) ..................................~~25~~**34, 35, 36**

*United States v. La Luz-Jimenez,*
**226 F. Supp. 3d 79 (D.P.R. 2017)** ............................................…**23**

*United States v. President & Fellows of Harvard Coll.,*
**323 F. Supp. 2d 151 (D. Mass. 2004)** .......................................…**23**

*United States v. Sec. Indus. Bank,*
459 U.S. 70 (1982) .........................................................~~22~~**37**

*In re Vitreous Steel Prods. Co.,*
**911 F.2d 1223 (7th Cir. 1990)** ..................................................…**17**

*Webster v. Doe,*
**486 U.S. 592 (1988)** .................................................................. **46**

*Wertheim, LLC v. Currency Corp., Inc.,*
**2017 WL 3668985 (Cal. Ct. App. Aug. 25, 2017)** ....................…**22**

*Zimmermann v. Epstein Becker & Green,*
**657 F.3d 80 (1st Cir. 2011)** ..............................................…**27**

**Statutes**

~~3 L.P.R.A. § 1901~~ .................................................................. ~~7~~

~~3 L.P.R.A. § 1903~~ .................................................................. ~~7~~

~~3 L.P.R.A. § 1906~~ .............................................................. ~~20, 23~~

~~3 L.P.R.A. § 1907~~ .............................................................. ~~20, 21~~

3 L.P.R.A. § 1914 ....................................................................................................... *passim*

13 L.P.R.A. § 2271v ....................................................................................................... 8

13 L.P.R.A. § 10042 ....................................................................................................... 8

13 L.P.R.A. § 317518 .......................................................................................................

15 L.P.R.A § 75 ....................................................................................................... 7

23 L.P.R.A. § 1049 .......................................................................................................

11 U.S.C. § 361 ....................................................................................................... 7 3443, 44, 54

11 U.S.C. § 362 ....................................................................................................... *passim*

11 U.S.C. § 503 ....................................................................................................... 3454

**11 U.S.C. § 552** ....................................................................................................... **36**

11 U.S.C. § 902 ....................................................................................................... 2337

11 U.S.C. § 922 ....................................................................................................... 17, 2238

26 U.S.C. § 7652 ....................................................................................................... 76, 1613, 2337

28 U.S.C. § 1331 ....................................................................................................... 1216

28 U.S.C. § 1391 ....................................................................................................... 1216

**48 U.S.C. § 2141** ....................................................................................................... **4, 40**

**48 U.S.C. § 2144** ....................................................................................................... **4, 40**

48 U.S.C. § 2161 ....................................................................................................... 3454

48 U.S.C. § 2163 ....................................................................................................... 10, 11*passim*

**48 U.S.C. § 2165** ....................................................................................................... **46, 50**

48 U.S.C. § 2166 ....................................................................................................... 1216

48 U.S.C. § 2167 ....................................................................................................... 1216

48 U.S.C. § 2195 ....................................................................................................... 294, 40

Amended Moratorium Act ....................................................................................................... 11

Moratorium Act ....................................................................................................... 9

3 L.P.R.A. § 1901 .................................................................................... 6

3 L.P.R.A. § 1903 .................................................................................... 6

3 L.P.R.A. § 1906 ........................................................................ 6, 7, 33, 37

3 L.P.R.A. § 1907 ........................................................................ 6, 7, 33, 34

3 L.P.R.A. § 1913 ............................................................................ 7, 36, 39

3 L.P.R.A. § 1914 ............................................................................. *passim*

3 L.P.R.A. § 1922 ................................................................................... 24

3 L.P.R.A. § 9102 ................................................................................... 52

3 L.P.R.A. § 9142 ................................................................................... 52

13 L.P.R.A. § 4 ...................................................................................... 24

13 L.P.R.A. § 10042 ............................................................................... 25

15 L.P.R.A. § 75 .................................................................................... 25

18 L.P.R.A. § 1026 ................................................................................. 24

23 L.P.R.A. § 104 .................................................................................. 41

31 L.P.R.A. § 3478 ................................................................................. 23

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................... 22

Collier on Bankruptcy .................................................................. 37, 43, 44

H.R. Rep. No. 100-1011 (1988) .................................................. 2337, 2438

P.R. Const. ..................................................................................... *passim*

S. Rep. No. 100-506 (1988) ....................................................... 2437, 2538

Collier on Bankruptcy ¶ 362.07 .................................................................. 27

Collier on Bankruptcy ¶ 506.03 .................................................................. 27

Collier on Bankruptcy ¶ 927.02 .................................................................. 24

Collier on Bankruptcy ¶ 944.03 .................................................................. 34

Michael Corkery and Mary Williams Walsh, *Puerto Rico's Governor Says Island's
Debts are 'Not Payable'*, N.Y. TIMES, June 28, 2015 ....................................................... 9

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2019) ..................... ...22

1. Ambac Assurance Corporation ("Ambac"), an insurer and/or holder of **Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Corp. ("AGC"), and Assured Guaranty Municipal Corp. (together with AGC, "Assured," and together with Ambac, FGIC, and AGC, the "Insurers"), all insurers and/or holders of a combined** more than $529**829** million in bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA") moves for an order finding that the automatic stay does not apply to certain anticipated lawsuits relating to PRIFA bonds.  In the alternative, Ambac moves for**, and U.S. Bank Trust National Association, in its capacity as the successor trustee ("U.S. Bank" or the "Trustee," and together with Ambac, FGIC, and Assured, "Movants"), file this amended motion (the "Motion") for an order, substantially in the form attached hereto as Exhibit 1, granting Movants** relief from the automatic stay to pursue those lawsuits **to enforce their property rights** in alternative fora.  Further in**In** the alternative, Ambac moves for an**Movants seek an** order requiring the Commonwealth to provide adequate protection for Ambac's**Movants'** collateral.  In support of its**their amended** motion, Ambac**Movants** respectfully states**state** as follows:

## PRELIMINARY STATEMENT

1. **Movants seek to pursue actions to enforce their property rights in certain rum tax revenues that have been pledged to secure PRIFA's bondholders.**

2. **The Commonwealth formed PRIFA to fund and develop Puerto Rico's infrastructure.  The Commonwealth authorized PRIFA to borrow money, issue bonds, and secure its bonds with pledges of revenues.  To secure certain of PRIFA's bonds, the Commonwealth transferred to PRIFA ownership of** the first $117 million in each fiscal year

of **certain excise taxes on Puerto Rican rum, which are imposed by the U.S. government and required by federal statute to be remitted** to the Commonwealth (the "Rum Taxes"). **PRIFA in turn pledged that annual $117 million in Rum Taxes to the Trustee for the benefit of bondholders (the "Pledged Rum Taxes").[2]  The Commonwealth also affirmatively covenanted with PRIFA bondholders not to limit or impair PRIFA's rights to the Pledged Rum Taxes.  In doing so, the Commonwealth alienated all of its ownership rights over those revenues, while at the same time disclaiming any liability for PRIFA's debts.  As the *quid pro quo* for the non-recourse nature of the debt, PRIFA bondholders were granted an immediate, perfected lien on the tax-revenue stream until the bonds are paid in full.  In other words, PRIFA is the equitable owner of the Rum Taxes, and its bondholders have a perfected lien on them.**

**3.**     ~~2. The automatic stay is designed to provide debtors with a breathing spell, not to authorize lawlessness in the form of wholesale collateral grabs.   And yet it is precisely such lawlessness that has characterized the Commonwealth's treatment of PRIFA and its creditors, both prior to and during the Title III proceedings.  The Commonwealth transferred~~ the first $117 million in each fiscal year of rum taxes to PRIFA, and authorized PRIFA to pledge those funds to bondholders to support borrowings to shore up and develop Puerto Rico's infrastructure. PRIFA did just that, raising over $1.6 billion in bond proceeds. Yet, the Commonwealth and **the**

---

[2] *See* **Trust Agreement dated October 1, 1988**, between PRIFA and U.S. Bank Trust National Association, successor trustee (the "Trust Agreement") (attached hereto as Exhibit 2), at 9:

> **[I]n order to secure the payment of the Bonds at any time issued and outstanding hereunder and the interest and premium, if any, thereon according to their tenor, purpose, and effect, and in order to secure the performance and observance of all the covenants, agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein) and as security for the payment of the Bonds and the interest and premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such bonds . . . .**

2

Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), through legal artifice, contend that the ~~monies~~**Pledged Rum Taxes** are not PRIFA's, that PRIFA bondholders have no rights in such ~~monies~~**moneys**, and that the Commonwealth's taking and use of the property is shielded from scrutiny by the automatic stay and ~~section~~**Section** 305[23] of the Puerto Rico Oversight, Management, and Stability Act ("PROMESA").  The ~~Oversight Board and the Commonwealth~~ ~~are not above the law.  Ambac seeks a declaration that the automatic stay does not preclude it from enforcing its rights.~~

~~The need for stay relief is particularly acute here.   The~~ Commonwealth's position (articulated by the Oversight Board) appears to be that ~~Ambac's~~**Movants'** lien is limited to **any** Pledged Rum Taxes that the Commonwealth actually deposits into ~~the~~**a "**Special Fund**"** account.[34]  Thus, by willfully violating contractual, statutory, and constitutional requirements and diverting the Pledged Rum Taxes, as it has been doing for the past four years, the Commonwealth believes it can strip ~~Ambac of its~~**Movants of their** property rights and the entire value of ~~its~~**their** lien—eviscerating ~~Ambac's~~**Movants'** property interest.  **To make matters worse, at the same time as it has been confiscating PRIFA's property, the Commonwealth has also been transferring hundreds of millions of dollars in Rum Taxes to private rum producers based in Puerto Rico, such as Bacardí, Club Caribe, Séralles, and others (the**

---

[23] Section 305 ~~limits only the jurisdiction of the Title III court and~~ has no application to this ~~motion~~**Motion**.  *See Fin. Oversight & Mgmt. Bd. for P.R.  v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for ~~Puerto Rico~~P.R.)*, 899 F.3d 13, 18-19 (1st Cir. 2018) (~~finding that creditors should not be required to stand by and watch their collateral be dissipated, and holding that section~~**Section** 305 does not bar the Title III ~~court~~**Court** from lifting the automatic stay).

[34]  *See Brief of Defendants-Appellees Financial Oversight and Management Board for Puerto Rico, for Itself and as Representative for the Commonwealth of Puerto Rico and Puerto Rico Highways & Transportation Authority, Jose B. Carrion, III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos and David A. Skeel, Jr.*, **at 47-48,** *Ambac Assurance ~~Corporation~~Corp. v. Commonwealth of ~~Puerto Rico~~, Case**P.R.,** No. 18-1214 (1st Cir. Aug. 20, 2018)~~, at 47-48~~ (where the Oversight Board has made similar arguments as related to HTA special revenues).

"Rum Companies"), in brazen violation of the federal cover-over statute and Puerto Rico statutory and contractual provisions making express that any right the Rum Companies may have to such moneys is subordinate to PRIFA's interest.

4.      To avoid this outcome, Movants must be permitted to proceed immediately with two lawsuits:  (1) a pending action filed by Ambac against the U.S. Department of Treasury (the "U.S. Treasury") and U.S. Secretary of the Treasury, Steven Mnuchin, for an equitable lien on and escrowing of the Pledged Rum Taxes before they are transferred to the Commonwealth (the "U.S. Treasury Action"); and (2) an action against the Commonwealth and the Rum Companies[5] to enforce Movants' lien and halt the ongoing appropriation of the Pledged Rum Taxes (the "PRIFA Clawback Action," and together with the U.S. Treasury Action, the "PRIFA Enforcement Actions").

3. The need for stay relief is particularly acute here.  This Court cannotshould not allow the automatic stay to be used as part of a scheme to deprive Ambac of itsMovants of their property without just compensation, in violation of the Fifth Amendment, and thus mustshould grant stay relief to permit meaningful judicial recourse for these violations.

5.      4.  In the absence of the requested relief, the Commonwealth's taking of PRIFA's and its creditors' property will remain an affront to the rule of law, leaving the Commonwealth (and other municipal debtors) with the dangerous misperception that they are free to confiscate and dissipate collateral during the bankruptcyrestructuring proceedings, implement a scheme for the ongoing diversion of pledged property, and leave nothing to give back at the plan of adjustmentplan-of-adjustment stage, all while preventing creditors from challenging theirthis

---

[5] At present, Insurers seek to bring claims concerning transfers to the Rum Companies individually and not for any remedy provided under the Trust Agreement, while at the same time working with the Trustee to enforce rights under the Trust Agreement for the return of Pledged Rum Taxes. (*See infra* n.15.)

conduct.  Such actions are expressly contrary to PROMESA, which requires that the Oversight Board respect ~~Commonwealth law~~**lawful** liens at every stage, including in any fiscal plans, budgets, and plans of adjustment.[46]  **In fact, the Oversight Board has filed a proposed plan of adjustment for the Commonwealth that proposes a distribution of *3.4%* on the claims arising from the Commonwealth's diversion of the Pledged Rum Taxes.  *See Disclosure Statement for the Title III Joint Plan of Adjustment* *for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, ECF No. 8766 at 280 (describing proposed treatment for "Class 30: CW/PRIFA Rum Tax Constitutional Claims").**

~~5. Revenue bonds lie at the heart of the municipal finance market.  They allow municipal borrowers to raise funds by pledging dedicated revenue streams, including excise taxes—in the case of the PRIFA bonds, the rum excise tax.  The pledge and restrictions on the revenue stream from the rum excise tax (i) divest the Commonwealth of ownership in the pledged rum taxes in all future years; (ii) transfer the ownership of such pledged excise taxes to PRIFA; and (iii) subject such rum taxes to the liens of PRIFA's bondholders even when not yet transferred to~~

---

[46] *See, e.g.*, 48 U.S.C. § 2141(b)(1)(M) (requiring that any fiscal plan "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of" the Commonwealth or another instrumentality "unless permitted by the constitution"); *id.* § 2141(b)(1)(N) (requiring that any fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016"); *id.* § 2144(c)(3)(A) (prohibiting "new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of June 30, 2016"); *id.* § 2163(c) ("[U]nlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this chapter."); *id.* § 2195(a) (providing remedies for the transfer of "any property of any territorial instrumentality of Puerto Rico . . . in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property")**; *id.* § 2195(b) (providing that "[a] creditor may enforce rights under this [S]ection by bringing an action in the United States District Court for the District of Puerto Rico after the expiration or lifting of the stay of [S]ection 2194 of this title, unless a stay under subchapter III is in effect")**.

PRIFA.  As set forth below, the Court should lift the stay under Section 362(d) of the Bankruptcy Code so that Movants can pursue the PRIFA Enforcement Actions and protect their interests in the Pledged Rum Taxes.  The Commonwealth lacks any ownership interest in the Pledged Rum Taxes:  (a) it does not levy the Rum Taxes; (b) it expressly transferred ownership of them to PRIFA in the PRIFA Enabling Act (as defined below); and (c) it covenanted with bondholders not to impair PRIFA's rights with respect to the Pledged Rum Taxes.  The Commonwealth acts only as a collection agent and custodian with respect to these revenues, or at most holds bare legal title to the revenues while they are in its possession.  *See Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340 (1st Cir. 2019) ("*Gracia-Gracia*").  Because the Commonwealth does not own the Pledged Rum Taxes, it lacks any equity in them, and those funds are therefore not necessary or even available for the Commonwealth's Title III reorganization. That alone is sufficient to require stay relief under Section 362(d)(2).

6.     In addition, there is "cause" to lift the stay under Section 362(d)(1) because: (i) Movants' property rights in the Pledged Rum Taxes are not adequately protected; (ii) due process and principles of constitutional avoidance further call for stay relief; and (iii) cause to lift the stay exists based on the totality of circumstances.

7.     In the alternative, in the absence of stay relief, the Court should order adequate protection for Movants' property rights in the Pledged Rum Taxes.

6. PRIFA bonds are quintessential revenue bonds.  They are secured by a pledged special revenue stream (excise taxes on the sale of Puerto Rico rum on the mainland) and the bonds they secure are non-recourse to the Commonwealth.

7.  The U.S. government imposes an excise tax on the import of Puerto Rico rum, and remits the revenues collected from that tax to the Commonwealth (the "Rum Taxes").  In 1988, to fund infrastructure improvements, the Commonwealth transferred its rights in these Rum Taxes to PRIFA (up to a maximum of $117 million per fiscal year), and granted PRIFA authority to issue bonds secured by its portion of the Rum Taxes (the "Pledged Rum Taxes").  PRIFA subsequently issued bonds and granted creditors a lien on the Pledged Rum Taxes.  Beginning in 2015, the Commonwealth decided to ignore the applicable legal constructs and instead simply take PRIFA's money and spend it on ordinary Commonwealth expenses, causing hundreds of millions of dollars in defaults by PRIFA.

8.  This illegal diversion of revenue bond collateral continues unabated, and is referred to colloquially in these Title III cases (and elsewhere) as "clawback"—a term which aptly describes what the Commonwealth is doing—clawing back for itself property that belongs to PRIFA and its bondholders.

9.  The Commonwealth has resisted accountability for its illegal clawback scheme at every turn.  Before the Title III cases, the Commonwealth attempted (and failed) to secure dismissal of Ambac's legal challenges to clawback on the ground that the claims were barred by sovereign immunity.  *See Assured Guaranty Corp. v. García-Padilla*, Civ. No. 3:16-cv-01037 (D.P.R. Oct. 4, 2016) (Dkt. No. 58) (denying motion to dismiss complaint challenging diversion of collateral from PRIFA, HTA, and the Puerto Rico Convention Center District Authority).  Within the Title III process, the Commonwealth and Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") have invoked concepts of ripeness and finality to defer any reckoning, arguing that secured creditors must stand aside and observe the ongoing dissipation of their collateral until the plan of adjustment stage.  According to the

7

Commonwealth and Oversight Board, Ambac's *only* remedy to prevent the taking of its property is to move for relief from the automatic stay for lack of adequate protection.[5]

10. Setting aside whether that position is true in the context of HTA,[6] it plainly is not the case with PRIFA. Ambac seeks to proceed with two lawsuits: (1) an already-filed action against the U.S. Department of Treasury and Treasury Secretary Steven Mnuchin for an equitable lien on and escrowing of the Pledged Rum Taxes before they are transferred to the Commonwealth (the "U.S. Treasury Action"); and (2) an action against the Commonwealth to enforce Ambac's lien and halt the ongoing appropriation of the Pledged Rum Taxes (the "PRIFA Clawback Action").

11. The stay does not apply to either the U.S. Treasury Action or the PRIFA Clawback Action because the Commonwealth has no property interest in the Pledged Rum Taxes—either they are PRIFA's revenues or they are federal monies, generated by the federal government and beyond the control of the Commonwealth. The stay does not apply to the PRIFA Clawback Action for the additional reason that the Pledged Rum Taxes are "pledged special revenues" within the meaning of Section 922(d) of the Bankruptcy Code; application of those monies is thus exempt from the stay. Nonetheless, because the consequences of stay violations are severe,

---

[5] *See* Brief of Defendants-Appellees Financial Oversight and Management Board for Puerto Rico, for Itself and as Representative for the Commonwealth of Puerto Rico and Puerto Rico Highways & Transportation Authority, Jose B. Carrion, III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos and David A. Skeel, Jr., *Ambac Assurance Corporation v. Commonwealth of Puerto Rico*, Case No. 18-1214 (1st Cir. Aug. 20, 2018), at 40 ("To the extent Ambac alleges it has a lien secured by collateral that is diminishing in value, its remedy is to move for stay relief for lack of adequate protection, as other parties have done.").

[6] This Court's opinion and order granting defendants' motion to dismiss in *Ambac Assurance Corporation v. Commonwealth of Puerto Rico*, No. 3:17-ap-00159-LTS (D.P.R. Feb. 27, 2018) (Dkt. No. 156), is presently on appeal to the U.S. Court of Appeals for the First Circuit.

Ambac seeks by this motion a declaration that the automatic stay does not apply to either of the contemplated actions.

12. In the alternative, if the Court were to find that the stay does apply, the Court should lift the stay for three independent reasons. First, there is cause to lift the stay under Section 362(d)(1) because Ambac lacks adequate protection; far from enjoying an "equity cushion," Ambac lacks any cushion at all because PRIFA's accounts have been emptied and any future replenishment of such funds is entirely speculative and contingent, in part, on forces outside the Commonwealth's or the Oversight Board's control, including the continued rum production in Puerto Rico and transfer of rum excise taxes from the federal government. Second, there is cause to lift the stay for the additional reason that the dissipation of Ambac's collateral is the result of the Commonwealth's brazen violation of PROMESA and Puerto Rico law, to say nothing of the United States Constitution, and the Oversight Board's apparent intention to continue taking PRIFA's property and to present a Commonwealth plan of adjustment premised on such taking.[7] *See, e.g.*, *Cournoyer v. Town of Lincoln*, 790 F.2d 971, 977 (1st Cir. 1986) ("[T]he automatic stay should not be used as a shield against the application and enforcement of valid state and local laws."). Third, the stay should be lifted under Section 362(d)(2) because the Commonwealth lacks any equity whatsoever in the Pledged Rum Taxes, and under the law, cash funds in which there is no equity interest are deemed entirely unnecessary to an effective reorganization.

---

[7] Indeed, the recently filed complaint against HTA bondholders and insurers makes plain the Oversight Board's intention to continue to divert pledged special revenues and impermissibly use them for general Commonwealth purposes. *See* Complaint ¶¶ 1, 2, 17, 24, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Ambac Assurance Corp.*, No. 19-363 (May 20, 2019 D.P.R.) (Dkt. 1). This position is not surprising given that the three certified fiscal plans of the Commonwealth each included all of the rum excise taxes, without regard to PRIFA and its bondholders' rights in the first $117 million of rum taxes each year.

13. Finally, and further in the alternative, the Court should require that the Commonwealth provide adequate protection for Ambac's collateral under Section 361 of the Bankruptcy Code, to ensure that Ambac receives the "indubitable equivalent" and is not further harmed by the Commonwealth's diversion of its pledged revenues. *See* 11 U.S.C. 361(1)-(3).

## BACKGROUND

**I.**     A.  **THE** **PRIFA** ~~Issues Bonds Secured by~~**ENABLING ACT IRREVOCABLY TRANSFERRED EQUITABLE OWNERSHIP OF** THE PLEDGED RUM TAXES TO PRIFA.

**8.**     14. PRIFA was**The Commonwealth** created **PRIFA** in June 1988, by Act 44-1988 (the "**PRIFA** Enabling Act" or the "Act"), to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions**,** and municipalities authorized to develop infrastructure facilities**,** and to establish alternate means for financing infrastructure facilities.  *See* 3 L.P.R.A. §§ 1901, 1903.  **The PRIFA Enabling Act authorized PRIFA to borrow money, issue bonds, and secure its bonds with pledges of revenues.  *Id.* §§ 1906(l), 1906(m), 1907(a).**

**9.**     15. PRIFA receives funding from, among other sources, a portion of certain excise taxes **on Puerto Rico rum** imposed by the federal government ~~on imports of Puerto Rico rum.  26 U.S.C. § 7652.  Under the~~**and required, by** statute, **to be remitted to the Commonwealth.  That statute provides that** "[a]ll taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States . . . shall be covered into the treasury of Puerto Rico." *Id***26 U.S.C**. § 7652(a)(3).

**10.**     16. By virtue of precisely the same language in**In turn,** the PRIFA Enabling Act~~,~~ **uses exactly the same language to require** the Commonwealth ~~is legally obligated~~ to transfer the first $117 million in Rum Taxes each fiscal year to the Puerto Rico Infrastructure Fund **(the**

**"Infrastructure Fund")**, for the benefit of PRIFA.  3 L.P.R.A. § 1914~~; Trust Agreement dated~~ ~~October 1, 1998, between PRIFA and U.S. Bank Trust National Association, successor trustee~~ ~~(the "Trust Agreement"), Section 601.  The~~.  **The PRIFA** Enabling Act states:

> the **first proceeds of the federal excise taxes** remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, . . . in the case of fiscal years 2006-07 to 2008-09, and in subsequent years until fiscal year 2056-57, **the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000),** which **when received by the Department of the Treasury of Puerto Rico, shall be covered into** a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', and be used by the Authority for its corporate purposes . . . .

*Id.* **(emphasis added).**

    **11.**  ~~3 L.P.R.A. § 1914 (emphasis added).~~  Both federal and Commonwealth statutes effect a statutory transfer of ownership ~~(to the Commonwealth and PRIFA, respectively)~~**of the Pledged Rum Taxes to PRIFA** that is mandatory, immediate, and self-effectuating.[8]   The immediacy of the required transfer— **"***when received***"**— ~~is unique~~ to the PRIFA Enabling Act[9]

---

[8]  ~~PRIFA's ownership in the Pledged Rum Taxes is further evidenced by the Enabling Act's description of PRIFA's right as a "participation," which equates to ownership under Puerto Rico law.  *See* 15 L.P.R.A § 75 (prohibiting the transfer of ownership and control, including any "share or participation" in the ultimate controlling person of a gambling room without prior regulatory approval); 13 L.P.R.A. § 10042(i)(3) (exempting certain ownership transfers from taxation, including "participations" in partnerships, joint ventures and corporations); *see also Den Norske Bank AS v. First Nat'l Bank of Bos.*, 75 F.3d 49, 51 (1st Cir. 1996) ("participation" indicative of ownership in commercial lending transactions).  Notably, no other revenue bond statute describes the interest provided to the borrower in the excise taxes as a participation.~~

[9]  ~~Other excise taxes are required to be transferred monthly or as otherwise agreed.  *See, e.g.*, 13 L.P.R.A. § 31751(a)(1)(A), (B) (requiring excise tax on crude oil to be transferred to HTA monthly); 13 L.P.R.A. 2271v(a)(4) (hotel occupancy taxes, pledged for payment to Convention Center District Authority bonds, paid "through monthly transfers" from the Puerto Rico Tourism Company).~~

and highlights the Commonwealth's position as a mere conduit in the transfer of the ~~pledged rum taxes~~**Pledged Rum Taxes** to PRIFA.

**12.**   ~~17. In turn, PRIFA is~~**The Commonwealth** empowered **PRIFA to decide whether** to pledge **revenues as security for bonds it issues.  But when PRIFA chooses to pledge revenues, including** the Pledged Rum Taxes ~~as security for bonds~~.  *See* ~~3 L.P.R.A. §§ 1906(m), 1907(a).  Any lien granted by PRIFA is automatically perfected, and attaches to the Pledged Rum Taxes immediately~~ "**, the PRIFA Enabling Act mandates that those revenues "shall immediately be subject to said lien** without the need of the physical delivery thereof or any other act.~~ . . .~~" 3 ~~LPRA~~**L.P.R.A.** § 1907(a).~~ This provision is unique to PRIFA among the relevant bond issues and~~**; *see also id.* § 1906(m).  The PRIFA Enabling Act also confirms that the lien created by PRIFA's pledge "*shall be valid and binding from the time it is made* without the need for a public notarized instrument."  *Id.* § 1907(a) (emphasis added).  This provision** statutorily cements PRIFA bondholders' lien on the Pledged Rum Taxes retained by the Commonwealth and not deposited in PRIFA's account.

**13.   Moreover, in the PRIFA Enabling Act, the Commonwealth expressly covenanted with PRIFA's bondholders:  "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter . . . that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full . . . ."  3 L.P.R.A. § 1913.  The same statute further provides that PRIFA, "as an agent of the Commonwealth, is hereby authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts."  *Id.***

**II.   PRIFA PLEDGES THE PLEDGED RUM TAXES TO THE PRIFA BONDHOLDERS, AND THEREBY GRANTS THE BONDHOLDERS A LIEN THEREON.**

12

14. ~~18.~~ PRIFA has issued ~~debt with an outstanding principal amount of~~ approximately $~~1.6~~1.8 billion ~~secured~~in bonds (the "Bonds") backed by the Pledged Rum Taxes. pursuant to the Trust Agreement.[7] The Trust Agreement, through a series of defined terms and provisions working in unison and alongside the federal and Commonwealth statutes referenced above, establishes conclusively that PRIFA—not the Commonwealth—is the equitable owner of the Pledged Rum Taxes, and establishes the bondholders' lien thereon.

15. Section 601 of the Trust Agreement provides that the principal, interest, and premium on the Bonds are to be paid from "Pledged Revenues." (Ex. 2, at 42 (Trust Agreement § 601).) "Pledged Revenues" are defined in Section 101 of the Trust Agreement as "Special Tax Revenues *and* any other moneys that have been deposited to the credit of the Sinking Fund." (*Id.*, § 101 (emphasis added).) "Special Tax Revenues" are in turn defined as the "Offshore Excise Taxes *deposited* to the credit of the Puerto Rico Infrastructure Fund *pursuant to the Act*." (*Id.* (emphasis added)). "The Act" is plainly a reference to the PRIFA Enabling Act and particularly Section 1914 thereof, which established the Infrastructure Fund. As mentioned earlier, Section 1914 provides that the first $117 million of rum proceeds in each fiscal year that the federal government remits to the Puerto Rico Treasury Department (the "P.R. Treasury Department") "*shall be covered into*" the Infrastructure Fund. 3 L.P.R.A. § 1914 (emphasis added).[8]

---

[7] Under the Trust Agreement, the Pledged Rum Taxes are pledged to the Trustee for the benefit of PRIFA bondholders. Citibank N.A. was designated as the original trustee. U.S. Bank Trust National Association has since been named as successor trustee.

[8] *See also* (Ex. 2, at 2 (Trust Agreement)) ("WHEREAS, the Authority has determined to provide for such defeasance of the Outstanding PRASA Bonds . . . through the issuance of bonds payable from certain federal excise taxes deposited in a separate, segregated account of the Puerto Rico Infrastructure Fund exclusively for the purpose of paying principal of and interest on such bonds." (emphasis added)).

16. In other words, as soon as the Rum Taxes are received and accepted by the P.R. Treasury Department, the first $117 million are "deposited" with the P.R. Treasury Department "to the credit of the Puerto Rico Infrastructure Fund"—and therefore to the credit of PRIFA.[9]

17. The distinction that the Trust Agreement makes between "Offshore Excise Taxes" and the "Special Tax Revenues" underscores this reading. The PRIFA Enabling Act grants PRIFA ownership of only the first $117 million of the Rum Taxes; the residual is Commonwealth property. The Trust Agreement reflects this distinction by defining "Offshore Excise Taxes" as *all* of the Rum Taxes remitted to the P.R. Treasury Department in each fiscal year. The "Special Tax Revenues," which are pledged to bondholders, are the subset of the "Offshore Excise Taxes" that are "*deposited to the credit of*" the Infrastructure Fund—specifically, the first $117 million, which is to the credit of the Infrastructure Fund pursuant to the PRIFA Enabling Act. (Ex. 2, at 18 (Trust Agreement) (emphasis added).) By law, the Pledged Rum Taxes are credited to the Infrastructure Fund—and hence become PRIFA's property the moment the Commonwealth receives them.

III. ~~B.~~ THE COMMONWEALTH CONFISCATES THE PLEDGED RUM TAXES.

18. Despite the requirements of the PRIFA Enabling Act and the Trust Agreement, the Commonwealth is diminishing the value of the bondholders' lien by

---

[9] Notably, following briefing on Ambac's initial stay motion, counsel to the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") confirmed that the funds transferred from the Secretary of Treasury's lockbox account to the Commonwealth's general fund contain transmittal information. (*See* Email from Joseph A. Spina, Counsel to AAFAF (Sept. 12, 2019, 08:05PM) (attached hereto as Exhibit 3).) Movants suspect, but would require discovery to confirm, that the transmittal information associated with such deposits designates PRIFA and/or the Infrastructure Fund as the intended recipient.

**unlawfully diverting and spending the Pledged Rum Taxes, including by transferring the Pledged Rum Taxes to third-party Rum Companies whose contractual right to a portion of the Rum Taxes is expressly subordinate to bondholders' lien.**

19.     On June 28, 2015, then-Governor Alejandro García-Padilla stated that the Commonwealth ~~was in a "death spiral" and~~ could not pay its debts.[10]   Ever since, the Commonwealth has been improperly siphoning hundreds of millions of dollars from Commonwealth instrumentalities to **allegedly** fund its general expenses—including the Pledged Rum Taxes.

20.     On November 30, 2015, the Governor issued Administrative Bulletin OE-2015-046 (the "First Clawback Order") **(attached hereto as Exhibit 4)**, which declared that **the** cash flow projection for the then-current fiscal year was insufficient to **simultaneously** pay general obligation ~~("GO")~~ debt and to continue ~~making~~**paying** ordinary course ~~appropriation payments~~**government expenses**.  The Commonwealth had already started taking PRIFA's property.  The First Clawback Order ordered the **Puerto Rico** Secretary of the Treasury not to transfer ~~revenues theoretically subject to clawback,[11] presumably to pay Commonwealth general operating expenses.  The monies clawed back~~**the Pledged Rum Taxes to PRIFA.  The moneys diverted** from PRIFA beginning in July 2015 have not been applied to public debt, nor have they been returned to PRIFA.

---

[10] Michael Corkery ~~and~~**&** Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts ~~are~~Are 'Not Payable'*, N.Y. ~~TIMES~~**TIMES**, June 29, 2015, at A1.

~~[11] It has never been established—and there is substantial reason to doubt—that the Treasury Department only retained clawback revenues necessary for payment of GO debt obligations. Indeed, approximately one month after the issuance of this order, and while still retaining clawback funds, the Commonwealth defaulted on GO obligations.~~

21.     On April 6, 2016, the Governor of Puerto Rico signed into law ~~the~~**Act 21-2016, the Puerto Rico Emergency Moratorium and Rehabilitation Act (the "**Moratorium Act~~,~~**"),** which authorized the Governor to declare a "state of emergency" over the Commonwealth or any Commonwealth ~~entity~~**instrumentality** (including PRIFA).  Moratorium Act § 201(a) **(attached hereto as Exhibit 5)**.  Under color of the Moratorium Act, the Governor ~~(i) declared~~**prohibited the payment of principal and interest on the PRIFA bonds by, among other things: (i) declaring** a state of emergency over PRIFA and ~~stayed~~**staying** all litigation arising from nonpayment of PRIFA bonds~~,~~ **(***see* Administrative Bulletin OE-2016-14 (Apr. 30, 2016)~~, (ii)~~ ~~suspended~~ **(official Spanish version and unofficial English translation attached hereto as Exhibit 6)); (ii) expressly suspending** all PRIFA bond payments~~,~~ **(***see* Administrative Bulletin EO-2016-30 (June 30, 2016)~~,~~ **(attached hereto as Exhibit 7));** and (iii) ~~halted~~**halting** the Commonwealth's obligation to transfer revenues to PRIFA~~,~~ **(***see* Administrative Bulletin EO-2016-31 (June 30, 2016) **(attached hereto as Exhibit 8))**.

22.     The Commonwealth had no legal right to halt the transfer of ~~monies~~**moneys** to PRIFA.  The **PRIFA** Enabling Act requires~~,~~ without exception~~,~~ that the first $117 million of rum taxes in each fiscal year be immediately deposited in **the Infrastructure Fund, for further delivery to** PRIFA's accounts.  Thereafter, the ~~monies~~**moneys** need to be used to pay PRIFA bondholders subject only to the provision in the **PRIFA** Enabling Act that ~~monies~~**moneys** already deposited in the ~~PRIFA Special~~**Infrastructure** Fund *may* be used for payment of public debt, if the Commonwealth has insufficient available resources and other requirements are met. 3 L.P.R.A. § 1914.  This additional conditional permitted use of the funds does not limit or alter PRIFA's ownership interest in, or entitlement to receive, the revenues**, and the predicates for diversion of these pledged revenues have never been satisfied**.

23.     PROMESA, signed into law on June 30, 2016, preempted the Moratorium Act, including sections that created an explicit moratorium on debt payments.  *See* 48 U.S.C. § 2163(1) ("a**[A]** territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest ~~. . .~~**by an entity not described in [S]ection 109(b)(2) of [the Bankruptcy Code]** may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium~~,~~**.**")**.**[11]

24.     Despite the express intent of Congress to preempt all Commonwealth moratorium laws and to halt the illegal sweeping of cash by the Commonwealth from its instrumentalities, including PRIFA, on January 29, 2017, the Governor signed into law the Amended Moratorium Act which, while repealing certain sections of the Moratorium Act, replaced them with functionally identical provisions.  *See* Amended Moratorium Act §§ 201-203, 206, 208, 211, 301 **(attached hereto as Exhibit 9)**.[12]  The Amended Moratorium Act ~~expressly~~ prohibits the payment of principal and interest and is ~~thus~~ preempted by PROMESA ~~section~~**Section** 303.  *See* 48 U.S.C. § 2163(1).

25.     The Commonwealth has not made any payment on its public debt since 2016.  On information and belief, the Commonwealth has been using the Pledged Rum Taxes (and other

---

[11] **Section 303(1) of PROMESA contains an exception from preemption solely to the extent that a moratorium law places a moratorium on debt payments by an "entity . . . described in [S]ection 109(b)(2)" of the Bankruptcy Code.  PROMESA § 303(1).  The types of entities described in [S]ection 109(b)(2) of the Bankruptcy Code include "bank[s]," and this exception was specifically created so that the Moratorium Act would not be preempted solely to the extent it imposed a moratorium on debt payments by the Government Development Bank to its bondholders.**

[12] The Amended Moratorium Act acknowledged that PROMESA had "preempt[ed] and supersede[d] provisions of the [prior] Moratorium Act."  ~~*See*~~ Amended Moratorium Act, Statement of Intent.  **(Ex. 9 (Amended Moratorium Act).)**

pledged revenues) to fund ~~general Commonwealth~~the Commonwealth's ordinary expenses~~, including making payments to rum producers~~.

26.     Worse yet, before implementing its "clawback" scheme in 2015, and as an essential ingredient of that scheme, the Commonwealth carefully negotiated a "lockbox agreement" with a third-party bank whereby the annual $117 million in Pledged Rum Taxes would be sent to the P.R. Treasury Department, but the remaining Rum Taxes received from the federal government (totaling hundreds of millions of dollars) would evade the P.R. Treasury Department altogether and be sent directly to the Rum Companies.  (*See Opposition to Ambac's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning PRIFA Rum Taxes*, ECF No. 7891-1 (attached hereto as Exhibit 10) (the "Lockbox Agreement").)  The Commonwealth entered into the Lockbox Agreement on May 5, 2015, at approximately the same time as the Pledged Rum Taxes stopped flowing to PRIFA, and a few months before the first Moratorium Order.  It thus evinced a concerted strategy to ensure that PRIFA—the beneficial owner of the "first proceeds" of the Rum Taxes—would be deprived of the Pledged Rum Taxes, while the statutorily and contractually subordinate Rum Companies (a politically favored constituency) would continue to enjoy hundreds of millions in Rum Tax subsidies.  And the Rum Companies gladly received (and continue to receive) these moneys, notwithstanding their express understanding that any entitlement they might have to receive Rum Taxes was legally subordinate to PRIFA's right to receive the Pledged Rum Taxes in the first instance.  (*See Agreement Between Bacardí Int'l Ltd., et al. and the Government of Puerto Rico, et al.*, ECF No. 8029-1 (attached hereto as Exhibit 11) (the "Bacardí Agreement"), §

**4.6.1 (providing that payment of Rum Tax subsidies to Bacardí may occur only after transfer of Rum Taxes to PRIFA).)**

**27.     The diversion of Rum Taxes to the Rum Companies through the Lockbox Agreement is a further taking of PRIFA's (and its bondholders') property without just compensation, in violation of the Fifth Amendment, as well as a violation of the federal cover-over statute, which requires that "[a]ll taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States . . . _shall be covered into_ _the treasury of Puerto Rico_."   26 U.S.C. § 7652(a)(3) (emphasis added).[13]   These violations of federal law have also unjustly enriched the Rum Companies to the tune of hundreds of millions of dollars, subjecting them to claims for damages as well as injunctive relief halting the ongoing conversion of PRIFA's (and its bondholders') property.**

**28.**   ~~26.~~ To date, the ~~Commonwealth has diverted~~**Commonwealth's diversion of** hundreds of millions of dollars in Pledged Rum Taxes from PRIFA. ~~This~~ has caused multiple payment defaults and forced ~~Ambac~~**Insurers** to pay **over** $~~167~~**300** million in claims to PRIFA bondholders.   ~~Ambac is~~**Insurers are** subrogated to, and ~~has~~**have** been assigned, the rights of PRIFA bondholders with respect to such payments.   ~~Ambac insures or is~~**Insurers insure, or are** subrogated to the rights **of bondholders** with respect to**,** approximately $~~529~~**829** million of the ~~rum tax bonds~~**Bonds**, guaranteeing payment of scheduled principal and interest should PRIFA

---

[13] **Even if the Lockbox Agreement itself were lawful, the Commonwealth's evasive and improper conduct is further underscored by the fact that, immediately after entering into that agreement, which provided for the transfer of the Pledged Rum Taxes to the Secretary of the Treasury "for deposit to the credit of PRIFA," the Commonwealth intentionally violated that provision by taking the Pledged Rum Taxes for itself.**

default on any such payment.  Ambac directly owns ~~$136~~**approximately $308** million of those ~~rum tax bonds~~**Bonds**.

**IV.**   ~~C.~~ **UPON THE FILING OF A COMMONWEALTH TITLE III PETITION, THE OVERSIGHT BOARD FILES NOTICES OF STAY ~~With~~WITH RESPECT TO THE AMBAC ACTIONS CHALLENGING THE DISSIPATION OF THE PLEDGED RUM TAXES.**

**29.**   ~~27.~~ At the time of the Commonwealth's Title III filing, Ambac ~~had~~**and Assured were part of** three pending lawsuits challenging the Commonwealth's ongoing ~~clawback~~**revenue diversion** scheme as it related to the Pledged Rum Taxes (among other pledged revenues).  The first two of these lawsuits were brought against various Commonwealth officials and sought injunctive and declaratory relief to halt the diversion of the Pledged Rum Taxes and other pledged revenues.  (*See Assured Guar. Corp. v. García-Padilla*, No. 3:16-cv-01037 (D.P.R., filed Jan. 7, 2016) **(complaint attached hereto as Exhibit 12)**; *Ambac Assurance Corp. v. Rosselló Nevares*, No. 3:17-cv-01568 (D.P.R., filed May 2, 2017)~~.~~ **(complaint attached hereto as Exhibit 13).)**  The third was the U.S. Treasury Action, which named as defendants the U.S. Department of the Treasury, Steven Mnuchin in his official capacity as ~~Treasury~~**U.S.** Secretary **of Treasury**, and any successor to Secretary Mnuchin, and sought an equitable lien against the Pledged Rum Taxes and an injunction precluding the defendants from transferring any Rum Taxes to the Commonwealth until the other actions were resolved.  (*See Ambac Assurance Corp. v. U.S. Dep't of Treasury*, No. 1:17-cv-00809 (D.D.C., filed May 2, 2017)~~.~~

~~28.~~ **(complaint attached hereto as Exhibit 14).)**   After filing a Title III petition on behalf of the Commonwealth, the ~~Oversight Board filed purported automatic stay notices in connection with each of these actions.  The U.S. District Court for the District of Puerto Rico granted the stays of the two actions against the Commonwealth and/or its officials without~~

comment.  *See Ambac Assurance Corp. v. Rosselló Nevares*, No. 3:17-cv-01568 (D.P.R., May 17, 2017) (Dkt.7);**respective courts stayed the pending PRIFA Enforcement Actions.  *See Assured Guaranty Corp. v. Garcia Padilla*, No. 1:17-cv-01037 (D.P.R., May 17, 2017) (Dkt**ECF No**. 82)**. The U.S. District Court for the District of Columbia, expressly relying on the Oversight Board's "representations" that the U.S. Treasury Action was "automatically stayed in its entirety," entered a minute order staying the U.S. Treasury Action pending resolution of the Commonwealth's bankruptcy proceedings.; *Ambac Assurance Corp. v. U.S. Dep't of Treasury*, No. 1:17-cv-00809 (D.D.C., May 25, 2017) (Dkt.**ECF** No. 8).

**30.**    **During the pendency of** the Title III cases, the Commonwealth **has continued its unlawful diversion and misappropriation of Pledged Rum Taxes.  (*See infra* ¶ 97.) Meanwhile, the Oversight Board, as the concurrent representative of both PRIFA and the Commonwealth, which are adverse to each other in the Title III proceedings, has a disabling conflict of interest and therefore cannot be relied upon to pursue PRIFA's legitimate interests, much less those of its creditors.**

**31.**    **Most recently, the Oversight Board advanced a plan for the adjudication of PRIFA bondholders' claims in the Title III Court.  In December 2019, the Mediation Team appointed for the Title III cases (the "Mediation Team") proposed a dual litigation track to allow the Oversight Board and PRIFA bondholders to pursue a comprehensive resolution of PRIFA-related issues.  Under the proposal, the Oversight Board could elect to bring adversary complaints testing, among other things, the validity and scope of bondholders' liens (the "Revenue Bond Complaints" initiating "Revenue Bond Adversary Proceedings"), while the bondholders would have an opportunity to move for stay relief to protect their interests.  (ECF No. 9365-2 at 4-6.)  The Oversight Board responded that lift-stay motions**

should be stayed pending resolution of motions to dismiss the Revenue Bond Complaints. (ECF No. 9493 at 6-11.)  At the same time, however, the Oversight Board asserted that it would not consent to the full adjudication of PRIFA-related issues in the Revenue Bond Adversary Proceedings.  (*Id.* at 11-12.)  Invoking Section 305 of PROMESA, the Oversight Board specified that it would not consent "to orders interfering with the validity of fiscal plans or budgets certified by [the Oversight Board] . . . the validity of Commonwealth statutes or executive orders (including the Moratorium Laws and the Fiscal Compliance Act), and orders interfering with or ordering the turnover of revenue or other property." (*Id.*)  The Oversight Board thus invokes Section 305 to restrict litigation of PRIFA bondholders' (and Movants') claims while simultaneously seeking to block bondholders' access to stay relief, which is the only avenue to litigate their claims in light of recent First Circuit precedent.  (*See infra* Section III.C.)

### ~~JURISDICTION AND VENUE~~JURISDICTION AND VENUE

**32.**  ~~29.~~This Court has jurisdiction over this ~~motion~~**Motion** pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a).

**33.**  ~~30.~~Venue is proper pursuant to 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a).

### RELIEF REQUESTED

**34.**  ~~31. Ambac seeks~~**Movants seek** an order of this Court, substantially in the form attached hereto as Exhibit **A**, ~~finding that the U.S. Treasury Action and PRIFA Clawback Action are not subject to the automatic stay that went into effect upon the filing of the Commonwealth's Title III petition.  In the alternative, Ambac seeks an order~~**1,** lifting the automatic stay under Section 362(d) **of the Bankruptcy Code** so that ~~Ambac~~**Movants** may pursue the ~~U.S. Treasury Action and~~ PRIFA ~~Clawback Action~~**Enforcement Actions** in alternative for~~a.  Further in~~a.[14]

---

[14] **Ambac and FGIC previously argued that the automatic** stay does not apply to **the Pledged Rum Taxes.  *See Ambac Assurance Corporation's Motion and Memorandum of Law in Support of Its***

35.   **In** the alternative, ~~Ambac seeks~~**Movants seek** an order that the Commonwealth provide adequate protection for ~~Ambac's~~**Movants'** lien on the Pledged Rum Taxes.

**ARGUMENT**

~~**I. THE AUTOMATIC STAY DOES NOT PRECLUDE AMBAC FROM PURSUING THE U.S. TREASURY ACTION AND PRIFA CLAWBACK ACTION**~~

~~32. In advising the courts that the U.S. Treasury Action and clawback litigation were automatically stayed, the Oversight Board and the Commonwealth used the automatic stay as a sword to stave off creditors and preclude review of their illegal actions.  Notwithstanding the representation to the contrary, the U.S. Treasury Litigation is not subject to the automatic stay, nor is the contemplated PRIFA Clawback Action.~~

~~33. PRIFA itself is not a Title III debtor; as a result, the only stay that could conceivably apply would be the one arising from the Commonwealth's Title III proceedings.  As explained below, however, that stay has no application to the U.S. Treasury Action or the PRIFA Clawback Action.~~

~~**A. The Automatic Stay Does Not Apply to the U.S. Treasury Action**~~

~~34. The automatic stay in effect in the Commonwealth's Title III case covers only certain enumerated proceedings, including, as asserted by the Oversight Board to be relevant here, "any~~

*Taxes.  See Ambac Assurance Corporation's Motion and Memorandum of Law in Support of Its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds,* ECF No. 7176, ¶¶ 32-39; *Ambac Assurance Corporation and Financial Guaranty Insurance Company's Reply Memorandum of Law in Support of Their Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds,* ECF No. 8022, ¶¶ 9, 27 n.8. Movants recognize, however, that the First Circuit's recent articulation of the scope of the automatic stay in *Gracia-Gracia,* 939 F.3d at 349, may limit this Court's ability to address that argument, in the absence of further guidance from the First Circuit.  Accordingly, Movants respectfully preserve for appeal their contention that <ins>the automatic stay does not apply to the</ins> Pledged Rum Taxes for the reasons set forth in their original motion.  *See* ECF Nos. 7176 & 8022.  As set forth herein, even if the automatic stay applies to the PRIFA Enforcement Actions, the stay must be lifted.

act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," "any act to create, perfect, or enforce any lien against property of the estate," and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C. § 362(a). In other words, by its express terms, Section 362 precludes only certain acts that implicate the property of a *debtor*. *See Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 4 (1st Cir. 1983) ("[T]he automatic stay provisions of 11 U.S.C. § 362(a) apply only to the bankrupt debtor."). Because the Pledged Rum Taxes are property of PRIFA, not the Commonwealth, the automatic stay arising from the Commonwealth's Title III filing does not apply.

## I.    THE "COLORABLE CLAIM" STANDARD GOVERNS THIS MOTION.

36.    The standard for granting stay relief is not demanding. Movants do not need to persuade this Court that they "can ultimately recover in light of all relevant legal issues," but only that their "claim to the estate's property is *colorable*." *United States v. Fleet Bank (In re Calore Exp. Co.)*, 288 F.3d 22, 35 (1st Cir. 2002) (emphasis added); *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994) (the court "seek[s] only to determine whether the party seeking relief has a *colorable claim* to property of the estate") (emphasis added); *see also In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1234 (7th Cir. 1990) ("Questions of the validity of liens are not generally at issue in a § 362 hearing, but only whether there is a *colorable* claim of a lien on property of the estate.") (emphasis in original). This is a low threshold.

37.    As the First Circuit has explained,

> [T]he hearing on a motion to lift the stay is *not a proceeding for determining the merits of the underlying substantive claims, defenses, or counterclaims. Rather, it is analogous to a*

preliminary injunction hearing, requiring a speedy and necessarily cursory determination of the reasonable likelihood that a creditor has a legitimate claim or lien as to a debtor's property.

. . . . *[A] decision to lift the stay is* not an adjudication of the validity or avoidability of the claim, but *only a determination that the creditor's claim is sufficiently plausible to allow its prosecution elsewhere.*

*Grella*, 42 F.3d at 33, 34 (emphasis added).

38.    "[A] colorable claim is one that is legitimate and that may reasonably be asserted, given the facts presented and the current law."  *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*, 602 B.R. 798, 825 (B.A.P. 1st Cir. 2019) (internal quotations and citation omitted).  "A colorable claim (one seemingly valid and genuine) is not a difficult standard to meet."  *Id.* (internal quotations and citation omitted); *see also Cortuk v. Banco Turco Romana (In re Cortuk)*, 2019 WL 2171481, at *4 (D.N.J. May 20, 2019) ("In other words, a claim need not necessarily be successful in order to be colorable."); *Jin Qing Li v. Rosen (In re Jin Qing Li)*, 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018) ("We similarly have defined the term 'colorable claim' in this context to mean 'a plausible legal claim.'").

39.    Movants clearly meet the "colorable claim" standard and deserve stay relief.[15]

---

[15] As the Court is aware, Ambac and FGIC previously argued, and continue to believe, that they have standing to bring this Motion, even without the joinder of the Trustee, for the reasons stated in their prior briefing on the issue.  *See Ambac Assurance Corporation and Financial Guaranty Insurance Company's Reply Memorandum of Law in Support of Their Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds*, ECF No. 8022, ¶¶ 12-27 and nn.3-8.  Nevertheless, the issue is now moot.  To avoid unnecessary litigation over procedural formalities, Ambac and FGIC, which together control the voting rights on a majority of the PRIFA bonds, have exercised their authority under Section 704 of the Trust Agreement to direct and control the enforcement of bondholders' rights under the Trust Agreement.  (Ex. 2, at 44-45 (Trust Agreement § 704).)  The Trustee has now joined this Motion, and seeks to enforce the

II.  **THE COURT SHOULD LIFT THE AUTOMATIC STAY UNDER BANKRUPTCY CODE SECTION 362(d)(2) BECAUSE THE COMMONWEALTH HAS NO EQUITY IN THE PLEDGED RUM TAXES, AND THEY ARE UNNECESSARY TO AN EFFECTIVE REORGANIZATION.**

40.  Section 362(d)(2) provides that stay relief shall be granted where "the debtor does not have an equity in [the] property" and "[the] property is not necessary to an effective reorganization."  11 U.S.C. § 362(d)(2); *see Gracia-Gracia*, 939 F.3d at 349 ("Congress thought that stay relief should be granted under PROMESA upon a showing that the debtor lacks equity in disputed property.").  While the moving party bears the burden of showing that the debtor lacks equity in the property, it is the debtor's burden to prove that the property in question is necessary for its reorganization.  11 U.S.C. § 362(g); *see Gracia-Gracia*, 939 F.3d at 347; *In re Mullock*, 404 B.R. 800, 805 (Bankr. E.D. Pa. 2009).

41.  In its recent *Gracia-Gracia* decision, the First Circuit observed that the court's analysis under Section 362(d)(2) is less "arduous" than the "cause" standard under Section 362(d)(1).  939 F.3d at 349-50 (quoting 11 U.S.C. § 362(d)).  This is so, the First Circuit explained, because a court evaluating stay relief under Section 362(d)(2) need not undertake the additional consideration of the factors set forth in *Sonnax Industries v. Tri Components Prods. Corp. (In re Sonnax*), 907 F.2d 1280, 1286 (2d Cir. 1990), as it would when determining whether "cause" (other than lack of adequate protection) exists under

_____

Trust Agreement to obtain the recovery and turnover of any Pledged Rum Taxes to the Trustee for the benefit of all PRIFA bondholders.

Insurers have the right to assert their own constitutional and individual legal rights in addition to the remedies available under the Trust Agreement.  (Any recoveries Insurers obtain on account of their constitutional or individual legal rights need not be paid to the Trustee.)  At present, Insurers are seeking to assert claims against the Rum Companies (*see supra* ¶ 4 n.5, ¶¶ 27-28) in their individual capacity, not for any remedy provided under the Trust Agreement.  Insurers reserve their rights under the Trust Agreement, including the right to direct the Trustee to enforce rights and remedies under the Trust Agreement in accordance with its terms.

26

Section 362(d)(1). *Id.* at 349-50. Instead, the court need only consider whether the prerequisites for stay relief under Section 362(d)(2) have been met. *See id.* at 350 n.2. Accordingly, the First Circuit noted that the *Gracia-Gracia* movants would have had an easier path to securing stay relief had they sought stay relief under Section 362(d)(2) of the Bankruptcy Code. *Id.* at 349-50.

42.    Relief from the automatic stay is appropriate here under Section 362(d)(2) because (a) the Commonwealth "does not have any equity" in the Pledged Rum Taxes, (b) the Commonwealth's misappropriation of the Pledged Rum Taxes does not change that fact, and (c) the Commonwealth cannot establish that the Pledged Rum Taxes are necessary to an effective reorganization of the Commonwealth.

A.    ~~1.~~ The Commonwealth Has No ~~Property Interest~~Equity in the Pledged Rum Taxes.

1.    The Commonwealth Transferred All Equitable Ownership Over, and All Equity in, the Pledged Rum Taxes to PRIFA.

43.    ~~35. The U.S. Treasury Action—a lawsuit against the federal government seeking to freeze or escrow PRIFA's property—is not barred by the automatic stay because~~As detailed above, the Commonwealth ~~has no property interest in~~transferred all equitable ownership over the Pledged Rum Taxes. to PRIFA (which has pledged those revenues to bondholders).

44.    The PRIFA Enabling Act expressly provides that the Pledged Rum Taxes, "when received by the Department of the Treasury of Puerto Rico, ***shall*** be covered into a Special Fund to be *maintained by or on behalf of [PRIFA]*." 3 L.P.R.A. § 1914 (emphasis added). The transfer of the Pledged Rum Taxes to PRIFA is mandatory ("shall be covered into"), immediate, and automatic ("when received"). *Id.* The Commonwealth acts as a ~~pure~~ pass-through ~~for funds~~

to PRIFA; the Commonwealth is—a "mere conduit" or "delivery vehicle"—of the funds **to PRIFA,** and lacks ownership **of them**.

**45.** 36. In an analogous ~~context~~**contexts**, the First Circuit ~~found~~**has concluded** that certain insurance premiums collected by the Commonwealth were the property of a private association because the governing statute provided that the association "shall receive," and the Commonwealth ~~"shall transfer," the premiums. *Asociacion de Subscipcion Conjunta Del Seguro De Responsibilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 6, 29 (1st Cir. 2007); *see id.* at 29 ("While the Secretary collects [liability insurance premiums] and holds them for some unspecified amount of time before relinquishing them . . . he is merely the custodian of these funds."); *see also Mun. of Metro. Seattle v. O'Brien*, 544 P.2d 729, 732, 733 (Wash. 1976) (noting "commonsense interpretation" that motor vehicle taxes raised by state legislation could be held by treasurer in purely custodial capacity; "[t]he mere fact that the state treasurer may be made the custodian of a particular fund . . . does not of itself make the moneys so received and held by him state funds in the state treasury").~~ **"shall transfer," the premiums. *See Asociación de Subscripción Conjunta del Seguro de Responsabilidad* *Obligatorio v. Flores Galarza*, 484 F.3d 1, 29 (1st Cir. 2007); *Gracia-Gracia*, 939 F.3d at 345. *Flores Galarza* and the September 25, 2019 decision in *Gracia-Gracia* both involved the Commonwealth's diversion of premiums paid by motor-vehicle owners and operators under the Commonwealth's compulsory automobile-insurance law ("Law 253"). *Flores Galarza*, 484 F.3d at 7-8; *Gracia-Gracia*, 939 F.3d at 344-45. To fund an association of insurance companies that provide coverage under the law (the Compulsory Liability Joint Underwriting Association of Puerto Rico ("JUA")), Law 253 required motor-vehicle owners to pay liability insurance premiums to the Commonwealth upon license renewal.**

28

The P.R. Treasury Department, in turn, was required to transfer the premiums to JUA to obtain the minimum required insurance coverage.  *See Flores Galarza*, 484 F.3d at 7-8; *Gracia-Gracia*, 939 F.3d at 344-45.  The Commonwealth, however, diverted the premiums to itself in order to "alleviate the cash-flow problems of the Commonwealth."  *Flores Galarza*, 484 F.3d at 6.

46.     In *Flores Galarza*, the First Circuit determined that JUA, and not the Commonwealth, was the owner of the diverted premiums.  484 F.3d at 29.  It looked to the mandatory language and mechanics of Law 253.  *Id.*  The statute provided that JUA "*shall receive*" the premiums and the Commonwealth "*shall transfer*" the premiums.  *Id.*  The Commonwealth thus had "no entitlement to the premiums" and assumed no ownership interest in the premiums because the Commonwealth held the premiums exclusively "for the benefit of" JUA.  *Id.*  In other words, the statute conferred ownership of the premiums on JUA by mandating transfer to JUA and expressly stating that the premiums were for the benefit of JUA.  *Id.*; *see also* *García-Rubiera v. Calderón*, 570 F.3d 443, 457 (1st Cir. 2009); *In re City of Columbia Falls*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992) (A public entity in possession of specific funds pledged for the benefit of another entity acts as "merely a custodian, and its duties relative to such funds are purely ministerial.  It may not use or divert them.").  And in a series of decisions leading up to and including *Gracia-Gracia*, the First Circuit—relying on *Flores Galarza* and the mandatory language of Law 253—held that certain motorists had property interests in duplicate premiums that they had paid under Law 253.  *See Gracia-Gracia*, 939 F.3d at 345; *García-Rubiera*, 570 F.3d at 452 ("[L]ike funds held in trust . . . , the funds held by JUA or the Secretary are clearly the 'private property' of Plaintiffs . . . ." (internal citations omitted)).

47.     Like JUA, the privately-insured motor-vehicle owners, and the insurers in those cases, all of whom the First Circuit found to have a property interest in the withheld funds notwithstanding the Commonwealth's collection of them, PRIFA is the owner of the Pledged Rum Taxes (which are pledged to the PRIFA bondholders).  The statutes and related agreements make that clear for several reasons:

48.     As with Law 253, the PRIFA Enabling Act requires the Puerto Rico Secretary of Treasury to collect the Pledged Rum Taxes for the benefit of PRIFA.  Indeed, the language of the PRIFA Enabling Act is nearly identical to the "shall transfer" language of Law 253 that the First Circuit held gave rise to a property interest in *Flores Galarza*. The Pledged Rum Taxes, "*when received* by the Department of the Treasury of Puerto Rico, *shall be covered* into a Special Fund maintained by or on behalf of [PRIFA]."  3 L.P.R.A. § 1914 (emphasis added).  The statute requires the immediate transfer of the Pledged Rum Taxes to the Infrastructure Fund, and makes plain that the Commonwealth serves only as a middleman for the Pledged Rum Taxes en route to their rightful owner—PRIFA.

49.     As detailed above (*supra* ¶¶ 16-18), this is further confirmed by the language of the Trust Agreement.  The first proceeds of the Rum Taxes are "deposited" with the P.R. Treasury Department, "to the credit of the Puerto Rico Infrastructure Fund"—thus making them "Special Tax Revenues" pledged under the Trust Agreement—as soon as the Rum Taxes are received and accepted by the P.R. Treasury Department.  (Ex. 2, at 42, 18 (Trust Agreement §§ 601, 101).)

50.     The word "deposit" simply means placing or giving property to someone who is responsible for preserving it.  *See* BLACK'S LAW DICTIONARY (11th ed. 2019), *deposit*

30

("act of giving money or other property to another who promises to preserve it or to use it and return it in kind"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2019), *deposit* ("to place, cache, or entrust especially seriously and carefully . . . to place in deposit in a bank or similar institution").  Neither the Trust Agreement nor any other applicable legal principle requires more than that the funds be "deposited."  *See Wertheim, LLC v. Currency Corp., Inc.*, 2017 WL 3668985, at *7 (Cal. Ct. App. Aug. 25, 2017) (finding that a check to pay a judgment was "deposited" when it was delivered, and therefore entrusted, to the trial court, given that "deposit" is defined as "to place, cache, or entrust especially seriously and carefully" (internal citation and alteration omitted)).  Because the Commonwealth has transferred ownership of the Pledged Rum Taxes to PRIFA, those funds are "deposited to the credit of the Infrastructure Fund" as a matter of law as soon as the Commonwealth receives them.[16]

51.     Indeed, any other reading would render nugatory the words "deposited *to the credit of*."  (Ex. 2, at 18 (Trust Agreement) (emphasis added).)  This language connotes funds that are intended to benefit or earmarked (by law or otherwise) for the Infrastructure Fund.  By law, the P.R. Treasury Department is entrusted with receiving

---

[16]  While these provisions of the Trust Agreement make unambiguously clear that the PRIFA bondholders' lien extends to funds held by the Commonwealth Treasury, to the extent that the Court perceives any ambiguity, the ambiguity must be construed against PRIFA and the Commonwealth, which drafted the statutory non-interference covenant and the other agreements.  *See* 31 L.P.R.A. § 3478 ("The interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity."); *United States v. La Luz-Jimenez*, 226 F. Supp. 3d 79, 83 (D.P.R. 2017); *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 163 (D. Mass. 2004) ("In construing the agreements, the rule of *contra proferentem* requires that latent ambiguity in a government agreement be construed against the government as the drafter.").

To the extent that the Commonwealth attempts to create ambiguity by advancing factual arguments based on the manner in which funds flow through specific accounts, Movants must have an opportunity to obtain discovery on those issues and make a full evidentiary presentation to the Court.

the Pledged Rum Taxes—and when it receives them from the U.S. Treasury, those funds have been "deposited" with the P.R. Treasury and, by operation of law, are to the credit of the Infrastructure Fund. *See Opposition of the Commonwealth of Puerto Rico to Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay*, ECF No. 7827, ¶ 13 ("[T]he first $117 million remitted to the Commonwealth is transferred to the Commonwealth Treasury and *deposited* into the Treasury Single Account.") (emphasis added). That is all that is required to subject these funds to the lien as set out in the Trust Agreement.

52. This reading of the language "to the credit of" is consistent with the operation of other provisions of Commonwealth law. There are multiple examples of "special funds" created by statute and held *at the P.R. Treasury Department*—"to the credit of" a particular identified special fund.[17] This clearly illustrates that funds held at the P.R. Treasury Department can be held to the credit of the Infrastructure Fund, as the P.R. Treasury Department holds other moneys to the credit of specific funds.

53. Notably, while the legislature has required, for some funds, that moneys "be deposited in an account denominated" in a specific manner, there is no requirement in the PRIFA Enabling Act that funds be denominated or recorded in any particular way. *Cf.* 13 L.P.R.A. § 32126(b) (funds "shall be deposited in an account denominated the 'Puerto Rico

---

[17] *See, e.g.*, 18 L.P.R.A. § 1026 ("[S]aid sum shall be transferred to a special fund to be known as 'Special Fund of the Public Corporation, Industries for the Blind, for the Mentally Retarded and Other Disabled Persons of Puerto Rico' . . . *All moneys under the control of the corporation shall be covered into the Treasury of Puerto Rico, to the credit of said Fund, to be drawn upon by the corporation against vouchers therefor*." (emphasis added)); 13 L.P.R.A. § 4(b) ("Any balances to the credit of the special fund previously created for the institution named in subsection (a) of this section, shown on the books of the Secretary of the Treasury at the time this section becomes effective, shall be transferred to the new revolving fund hereby created, and shall be used for the same purposes of supporting and operating the said institution, any surplus resulting from its operation to be deposited in the Commonwealth Treasury as miscellaneous receipts.").

Motion Picture Arts, Sciences, and Industry Development Fund,' in the books of the Department of the Treasury"). Nor did the legislature mandate, as it has for other PRIFA funds, that the Infrastructure Fund "be kept in separate accounts." *See* 3 L.P.R.A. § 1922(f). It simply gave PRIFA a "participation" in (*i.e.*, "ownership of") the Pledged Rum Taxes—and assigned the Pledged Rum Taxes received by the Commonwealth to the Infrastructure Fund, no matter how those funds may be held, accounted for, or denominated.

54.     The fact that PRIFA's "participation" under Section 1914 is limited to the first $117 million of the Rum Taxes helps to explain how the definitions in the Trust Agreement fit together to define the pledged collateral. The term "Offshore Excise Taxes" refers to all of the "federal excise taxes on rum . . . remitted to the Puerto Rico Treasury Department" (Ex. 2, at 14 (Trust Agreement § 101))—which generally is far in excess of $117 million. The "Special Tax Revenues" are a subset of the Offshore Excise Taxes, specifically, the portion of the "Offshore Excise Taxes *deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act*" (*id.* at 18 (emphasis added))—meaning the portion of the "Offshore Excise Taxes" owned by PRIFA and required to be transferred to the Infrastructure Fund by law, *i.e.*, the first $117 million of the Offshore Excise Taxes each year. Any Offshore Excise Taxes in excess of $117 million remain property of and available to the Commonwealth.

55.     The PRIFA Enabling Act's description of PRIFA's right as a "participation" further evidences that PRIFA, not the Commonwealth, owns the Pledged Rum Taxes. Under Puerto Rico law, "participation" equates to ownership. *See* 15 L.P.R.A. § 75 (prohibiting the transfer of ownership and control, including any "share or participation" in the

33

ultimate controlling person of a gambling room without prior regulatory approval); 13 L.P.R.A.

§ 10042(i)(3) (exempting certain ownership transfers from taxation, including "participations" in

partnerships, joint ventures, and corporations); *see also Den Norske Bank AS v. First Nat'l Bank*

*of Bos.*, 75 F.3d 49, 51 (1st Cir. 1996) ("participation" indicative of ownership in commercial

lending transactions).

> **2.    The Pledged Rum Taxes Are "Restricted Funds" that the Commonwealth Must Transfer to HTA, and Thus Lacks Equity in.**

**56.**    **Any** Pledged Rum Taxes in the possession of the Commonwealth are "restricted

funds" that the Commonwealth cannot lawfully use or dispose of, except by transferring them to

PRIFA.  The Commonwealth has no discretion over how the funds are applied—the hallmark of

"restricted funds" in which the debtor effectively has no property interest.  *See, e.g., Thomas*

*Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*, 763 S.E.2d 288, 293

(N.C. Ct. App. 2014) (**noting that** "restricted funds" are those with "a limited use and specific

purpose, such as to fund a special program").  **The PRIFA** Enabling Act requires that the funds

"when received" by the Commonwealth "shall" be covered into the designated PRIFA account**;**

**it effectively prohibits the Commonwealth from using those funds for any other purpose**

**than transferring them to PRIFA**.  Thus, PRIFA, not the Commonwealth, is the **equitable**

**owner of these funds.**

> **3.    The Commonwealth, at Most, Holds the Pledged Rum Taxes in Trust for PRIFA and Its Bondholders.**

**57.**    **In any event, Pledged Rum Taxes in the custody of the Commonwealth are,**

**at most, held in "trust" for the benefit of PRIFA (which has, in turn, pledged those**

**revenues to the Trustee on behalf of bondholders)**.  Even a statute that does not explicitly use

the word "trust" creates a trust if it manifests a legislative intent to impose a trust-type

34

relationship. *See Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997); *Columbia Falls*, 143 B.R. at 762. Here, the **PRIFA** Enabling Act indicates a clear legislative intent that the Commonwealth holds the Pledged Rum Taxes (a clearly defined trust *res*) for the benefit of PRIFA. **By mandating the transfer of the Pledged Rum Taxes to PRIFA, through a special fund segregated from the Commonwealth's general fund, and covenanting not to impair that fund flow, the Commonwealth intended to, and did, create a series of trust relationships in which it and PRIFA act as mere conduits for the transfer of the Pledged Rum Taxes. *See García-Rubiera*, 570 F.3d at 457 (holding that funds being held in trust for the benefit of plaintiffs were plaintiffs' property); *Columbia Falls*, 143 B.R. at 762 (Columbia Falls had no authority to use designated water and sewer district funds to pay delinquent property taxes, because they were trust funds under state law); *City of Springfield v. LAN Tamers, Inc. (In re LAN Tamers, Inc.)*, 281 B.R. 782, 792 (Bankr. D. Mass. 2002) (debtor did not have equitable title in promised federal reimbursement funds for work performed on the City of Springfield's behalf, because it held the funds in a resulting trust for the city), *aff'd*, 329 F.3d 204 (1st Cir. 2003).[18]**

58. **Even if the Court does not conclude that the manifest written intent of the parties was sufficient to find that a trust has been created for the benefit of PRIFA, it should find that a constructive trust or, in the alternative, a resulting trust, has arisen as a result of the diversion of the Pledged Rum Taxes for improper purposes. "Constructive and resulting trusts are traditional constructs utilized by courts . . . to avoid unjust**

---

[18] ***See also In re Tap, Inc.*, 52 B.R. 271, 275 (Bankr. D. Mass. 1985) ("[W]here the owner of property transfers it to another with a direction to transfer it to . . . a third person, this may be a sufficient manifestation of an intention to create a trust"; "Every person who receives money to be paid to another, or to be applied to a particular purpose . . . is a trustee[.]"); *In re Bologna*, 206 B.R. at 632 (statutes do not need to use the magic word "trust" if the statute manifests a legislative intent to impose a trust-type relationship).**

enrichment and other forms of injustice that would result from allowing the legal owner to benefit from the property." *In re Brown*, 2008 WL 2115200, at *7 (Bankr. D.N.H. May 19, 2008) (quoting *Davis v. Cox*, 356 F.3d 76, 90 (1st Cir. 2004)).

59.     A constructive trust achieves equitable restitution "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Zimmermann v. Epstein Becker & Green*, 657 F.3d 80, 83 (1st Cir. 2011).  Courts have imposed constructive trusts where, as here, there has been some wrongdoing or breach of fiduciary duties.  *See Rentas v. Claudio (In re Garcia)*, 484 B.R. 1, 16 (Bankr. D.P.R. 2012), *rev'd on other grounds*, 507 B.R. 32 (B.A.P. 1st Cir. 2014).[19]  Among other things, a constructive trust may be imposed to prevent unjust enrichment.  *Id.*; *see also Fernandez v. Laloma*, 56 D.P.R. 367, 378-80 (1940) (imposing a constructive trust where evidence demonstrated that defendant was holding the property for plaintiff's benefit, defendant had knowledge of her obligation to transfer title to the plaintiff upon the occurrence of an event, and defendant's failure to transfer title resulted in unjust enrichment at the expense of another, thereby offending general principles of law); *Porrata Doria v. Fajardo Sugar Co. of P.R.*, 57 D.P.R. 628, 643-44 (P.R. 1940) (explaining that constructive trusts are a tool designed to effectuate transfer of property where the person holding bare legal title would be unjustly enriched if he were allowed to retain it as his own and imposing a constructive trust in favor of plaintiff where defendant represented that it was merely holding legal title to property for plaintiff's benefit, because failure to do so would result in unjust enrichment).

---

[19] Courts, in the context of bankruptcies, have recognized the existence of constructive trusts that properly arose under state law. *See, e.g.*, *Mitsui Mfrs. Bank v. Unicom Computer Corp. (In re Unicom Computer Corp.)*, 13 F.3d 321, 325 (9th Cir. 1994); *Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC)*, 359 B.R. 566, 576 (Bankr. D. Del. 2007).

60.     Here, the Commonwealth would clearly be unjustly enriched if it were permitted to retain funds that it is required to collect, hold, and transfer for the benefit of the PRIFA bondholders.  Therefore, recognition of a constructive trust is appropriate.

61.     Relatedly, a resulting trust is intended to provide equitable relief where "a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein . . . ."  *Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 263 (1st Cir. 2004) (quoting Restatement (Second) Trusts, § 404).  The PRIFA Enabling Act clearly requires the Commonwealth to transfer the Pledged Rum Taxes into a special, segregated fund in favor and for the benefit of PRIFA.  *See* 3 L.P.R.A. § 1914 ("*when received* by the Department of the Treasury of Puerto Rico, [the Pledged Rum Taxes] *shall be covered* into a Special Fund maintained by or on behalf of [PRIFA].").  And it is evident that, regardless whether the Commonwealth "held" the Pledged Rum Taxes for some period of time before transferring those funds to PRIFA, there was no intention that the Commonwealth would or should have a beneficial interest in those funds.

\*     \*     \*

62.     ~~37.~~ At bottom, when the Commonwealth holds the Pledged Rum Taxes, it does so as "merely a custodian, and its duties relative to such funds are purely ministerial.  It may not use or divert them."  *Columbia Falls*, 143 B.R. at 762 (quoting *State ex rel. Clark v. Bailey*, 44 P.2d 740, 746 (Mont. 1935)); *see also FDIC v. Casady*, 106 F.2d 784, 788 (10th Cir. 1939) (finding that structure whereby city holds sinking fund for bondholders creates relationship where city is the trustee and bondholders are *cestui que trustents*); *City & Cty. of Dallas Levee Imp. Dist. ex rel. Simond Indus. Props. Corp.*, 89 F.2d 731, 733 (5th Cir. 1937)

(finding that the statute under consideration requires that funds be held in trust for the purposes of paying the principal and interest of the bond indebtedness); *cf. Flores Galarza*, 484 F.3d at 30 (finding that Law 253 recognizes a *lack* of JUA's property right to those duplicate premiums paid by those already covered by privately obtained insurance policies); *García-Rubiera v. Fortuño*, 665 F.3d 261, 266 (1st Cir. 2011) (same); *Calderón*, 570 F.3d at 457 (**motor-vehicle owners, as opposed to the JUA, had a property interest in those duplicate premiums paid by those already covered by privately obtained insurance policies for purposes of Takings and Due Process claims).  Under these circumstances, the debtor has no ownership interest in the property.  *See In re LAN Tamers*, 329 F.3d at 206 (**"[P]roperty is excluded from the estate where the debtor merely receives property in order to deliver it to its intended recipient without any control or ownership over it."** ~~*In re LAN Tamers, Inc.*, 329 F.3d 204, 210 (1st Cir. 2003);~~ ~~*see id.*~~ ~~at 206 (stating~~**; the** debtor holds no ownership when it "must pass the funds[22] through**"** to its intended recipient)**[20]**; ~~*see also*~~ In re Montreal, ~~*Maine*~~**Me.** *& Atl. Ry., Ltd.*, 888 F.3d 1, 10 (1st

---

**[20]**  **The Commonwealth previously sought to distinguish *In re LAN Tamers* principally on the grounds that the Commonwealth, unlike the debtor in *In re LAN Tamers*, has exercised a measure of control over the funds at issue—control the Commonwealth claims it is afforded by Article VI, Section 8, and its ill-defined police powers.  (*See* ECF No. 7827, ¶100.)  The Commonwealth's claims miss the mark.  As explained herein, other than certain narrowly drawn exceptions, subject to conditions which have never been satisfied, the Commonwealth was required to transmit the Pledged Rum Taxes to PRIFA.**

**    As recognized by the court in *In re LAN Tamers*, the relevant question is what control is afforded to the party holdings the funds by the terms of the statutes and contracts giving rise to the relationship at issue. *See In re LAN Tamers*, 281 B.R. at 792-93, 796 (citing the "language of the Act and its underlying regulations[,] . . . the FCC forms and USAC procedures[,]" and "the language in the USAC Service Provider Manual" in finding a resulting trust, and in the alternative citing the requirements of the "BEAR payment method" and the statutory language, procedures, and forms used to effect those payments as guiding its decision to find a constructive trust).  In contrast, the Commonwealth would have this Court believe that because it exercises *unlawful* control over the Pledged Rum Taxes, in violation of the terms of the relevant statutes and agreements, it has somehow strengthened its *lawful* claim to them.**

Cir. 2018). Because the Commonwealth acts as nothing more than a pass-through or "delivery vehicle" for the Pledged Rum Taxes, and does not itself obtain any ownership interest in the funds, the Pledged Rum Taxes are not Commonwealth property and are not subject to the automatic stay. As the First Circuit recently explained, where**(Where** "the debtor was**[is]** a mere 'transfer station along the road to payment' . . . it lack[s] a cognizable property interest." *In re Montreal, Maine & Atl. Ry., Ltd.*, 888 F.3d at 10 (citation omitted).

### 2. If PRIFA Has No Property Rights in the Pledged Rum Taxes Prior to their Delivery to PRIFA, then the Commonwealth Has No Property Rights in the Pledged Rum Tax Prior to their Delivery to the Commonwealth

38.  Throughout these Title III cases, the Oversight Board and Unsecured Creditors Committee have taken the position, with respect to HTA, that the pledged excise taxes do not become HTA property, and remain property of the Commonwealth, until they are actually transferred to HTA and deposited in the HTA account.[13]  Ambac expects they will make the same argument here with respect to PRIFA.  While Ambac strenuously disagrees with their position as a matter of law (particularly in light of the PRIFA statutory language), applying their logic to the Pledged Rum Taxes leads to the conclusion that rum excise taxes collected and still held by the federal government are not property of the Commonwealth.  The federal statute and the Commonwealth statute include exactly the same mandate—requiring that the rum excise taxes and the Pledged Rum Taxes "***shall be covered into***" the treasury of Puerto Rico or the

[13]  *See* Brief of Defendants-Appellees Financial Oversight and Management Board for Puerto Rico, for Itself and as Representative for the Commonwealth of Puerto Rico and Puerto Rico Highways & Transportation Authority, Jose B. Carrion, III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos and David A. Skeel, Jr., *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Case No. 18-1214 (1st Cir. Aug. 20, 2018), at 47-48, 58; Brief of the Official Committee of Unsecured Creditors of All Puerto Rico Title III Debtors (Other than COFINA) in Support of Affirmance, *Ambac Assurance Corp.*, Case No. 18-1214, at 1-2, 3, 5-8, 22-23; *see also* Complaint, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Ambac Assurance Corp.*, Case No. 19-363 (D.P.R. May 20, 2019) (Dkt. 1), ¶¶ 1, 2, 17, 24.

PRIFA account, as applicable.  *Compare* 26 U.S.C. § 7652(a)(3) *with* 3 L.P.R.A. § 1914.  This language must be interpreted and applied consistently.  Accepting the Oversight Board's argument that the Pledged Rum Taxes only become PRIFA's property when deposited into PRIFA's account, the U.S. Treasury Litigation, which seeks only to escrow funds in the possession of U.S. Treasury ***before*** they are transferred to the Commonwealth, would have no impact on any property of the Commonwealth.

63.     For each of those reasons, there can be no doubt that PRIFA, not the Commonwealth, owns the Pledged Rum Taxes, and that the Commonwealth therefore lacks any equity in them.

64.      To the extent required, Movants can easily "trace the property or funds" to which they are entitled here.  *Gracia-Gracia*, 939 F.3d at 350-51.  Movants seek stay relief to enforce their rights not only to previously collected Pledged Rum Taxes, but also to any Pledged Rum Taxes that the Commonwealth may receive in the future.  Future receipts of Pledged Rum Taxes plainly can be traced, because these funds are received in segregated accounts pursuant to the Lockbox Agreement.  That is sufficient to satisfy any applicable traceability requirement of *Gracia-Gracia*.

65.     Further, although it is not necessary for Movants to prevail on this Motion, discovery would likely show that the Pledged Rum Taxes have at all relevant times been held in segregated accounts, or transferred with transmittal designations, such that there is an identifiable trust *res* that the Commonwealth has received but failed to turn over to PRIFA.  (*See* Puerto Rico Fiscal Agency and Financial Advisory Authority, Press Release, Government Has Earned $49 Million in Interest Fiscal Year-to-Date (Dec. 5, 2019), *available      at*      http://www.aafaf.pr.gov/assets/pr-gov-has-earned-49m-in-interest-fy-to-

date.pdf (indicating that funds deposited in the Treasury Single Account are held in various sub-accounts subject to differing financial terms) (attached hereto as Exhibit 15); *see also supra*, n.8.)

66.     Even to the extent that any previously collected Pledged Rum Taxes may have been commingled with other Commonwealth property, Movants can demonstrate at an evidentiary hearing that the Commonwealth has, at all applicable times, held funds in the Treasury Single Account well in excess of the amount of Pledged Rum Taxes owed to Movants; accordingly, the "lowest intermediate balance" test is satisfied with respect to the entire amount of Pledged Rum Taxes owed.  *See Gracia-Gracia*, 939 F.3d at 351 (noting that, in cases where claimants' property is commingled with the debtor's other property, the First Circuit "appl[ies] the 'lowest intermediate balance rule,' which requires [the Court] to 'follow the trust fund and decree restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund.'" (citation omitted)).

     B.     The ~~Automatic Stay Does Not Apply to the PRIFA Clawback Action~~Pledged Revenues Are Not Necessary for an Effective Reorganization.

67.     Given the Commonwealth's lack of equity in the funds, it is "difficult to imagine" how the Commonwealth could meet its burden to demonstrate that the Pledged Rum Taxes are necessary for reorganization.  *See In re Lally*, 38 B.R 622, 626 (Bankr. N.D. Iowa 1984) ("[C]ause exist[ed] to justify termination of the stay" because debtors lacked "equity" in the property), *aff'd*, 51 B.R. 204 (N.D. Iowa 1985).  In fact, where the property at issue is cash, if it is determined that the debtor lacks equity under the first prong, the property is not necessary, and indeed cannot be used at all, in a reorganization of the debtor.  A municipal debtor cannot use property in which it holds no equitable title to effectuate any plan.  *See*

41

*Columbia Falls*, 143 B.R. at 762; *Soliman v. Spencer* (*In re Spencer*), 115 B.R. 471, 485 (D. Del. 1990) (recognizing that, where the debtor does not hold equitable title, the stay should be lifted so that "equitable title [can] be united with legal title"); *Boyd v. Martin Expl. Co.*, 56 B.R. 776, 779, 781 (E.D. La. 1986) (where **employees, not debtor,** were the equitable and beneficial owners of the property, the property can be returned to the beneficial owners).

### III.   ALTERNATIVELY, THE COURT SHOULD LIFT THE STAY FOR "CAUSE" PURSUANT TO BANKRUPTCY CODE SECTION 362(d)(1).

39. The PRIFA Clawback Action, whereby Ambac would pursue its rights to enforce its lien on the Pledged Rum Taxes and halt the continued impairment of its lien, is likewise inoffensive to the automatic stay. For the reasons set forth above, the Pledged Rum Taxes do not belong to the Commonwealth. And although the PRIFA Clawback Action (unlike the U.S. Treasury Action) would assert a claim against the Commonwealth—and thus can be argued to be an action "to recover a claim against the debtor," 11 U.S.C. § 362(a)(1)—a bankruptcy filing "does not operate as a stay of application of pledged special revenues . . . to payment of indebtedness secured by such revenues." 11 U.S.C. § 922. As shown below, *see infra* Section II.A.1.a, the Pledged Rum Taxes are such "pledged special revenues."[14]

---

[14] The First Circuit's decision in *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 919 F.3d 121 (1st Cir. 2019), does not resolve this issue. While the First Circuit found that Section 922(d) does not empower the Title III court to mandate the application of pledged special revenues, *id.* at 130 (a ruling on which appellants are seeking *en banc* review), that appeal did not directly address whether creditors could pursue claims for the application of pledged special revenues in another forum. That question is pending before the First Circuit in *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, No. 18-1214 (1st Cir., appeal filed Mar. 9, 2018, argued Jan. 15, 2019). *See* Jan. 15, 2019 Hr'g Tr. at 7:21-8:15.

## II. THE COURT SHOULD LIFT ANY APPLICABLE AUTOMATIC STAY TO PERMIT AMBAC TO PURSUE ITS REMEDIES

40. In the event the Court finds that the automatic stay precludes the U.S. Treasury Action or the PRIFA Clawback Action, the Court should lift the stay to permit Ambac to protect its interest in the Pledged Rum Taxes.

**68.** 41. Section 362(d)(1) of the Bankruptcy Code provides: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . **provides that stay relief shall be granted "**for cause, including the lack of adequate protection of an interest in property of such party in interest." Whether "cause" exists for lifting the stay is determined based on the "totality of the circumstances." *In re Scarborough-St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015) (citing *In re Tribune*, 418 B.R. 116, 126 (Bankr. D. Del. 2009); *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)). "The totality of the circumstances of a case encompasses, among other things, how the parties have conducted themselves, their good or bad faith, and their motives. Good faith is an intrinsic and integral component of the bankruptcy process." *See In re JE Livestock, Inc.*, 375 B.R. 892, 897 (10th Cir. B.A.P. 2007); *In re Mack*, 347 B.R. 911, 915, 916 (Bankr. M.D. Fl. 2006) (finding cause to lift the stay where debtor filed for bankruptcy to thwart ongoing litigation). In considering the totality of the circumstances, courts should consider both prepetition and postpetition conduct. *Id.* at 916 (citing *In re Trident Assoc. Ltd. P'ship*, 52 F.3d 127, 131 (6th Cir.1995))." 11 U.S.C. § 362(d)(1). **The Bankruptcy Code explicitly enumerates the "lack of adequate protection" as sufficient "cause" to lift the stay. 11 U.S.C. § 362(d)(1). Accordingly, the Court considers the *Sonnax* factors only to decide "whether stay relief should *otherwise* be granted," *Gracia-Gracia*, 939 F.3d at 347—*i.e.*, whether there is "cause" for stay relief,**

*other than* the "lack of adequate protection." If the Court finds that Movants' property rights are not adequately protected, it does not need to consider the *Sonnax* factors.

69. As set forth below, cause exists to lift the stay because (a) bondholders have a lien on the Pledged Rum Taxes; and (b) the lien is not adequately protected, as the Commonwealth has diminished (and continues to diminish) the value of the lien. There is further cause for stay relief in light of the First Circuit's holding in *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, 927 F.3d 597, 602-03 (1st Cir. 2019), that Section 305 of PROMESA bars the Title III Court from putting a halt to the ongoing impairment of Movants' lien, raising significant due process concerns if stay relief were denied. Finally, the relevant factors articulated by the Court in *In re Sonnax*, adverted to by the First Circuit, also favor lifting the stay. *Gracia-Gracia*, 939 F.3d at 347.

42. The Commonwealth's bad faith in dealing with PRIFA bondholders, perpetuated by the Oversight Board, warrants a lifting of the stay. As detailed above, the Commonwealth began taking PRIFA's property even before the First Clawback Order purportedly authorizing the diversion. The taking continued even after PROMESA clearly preempted the executive order and Moratorium Act that the Commonwealth was relying on to purportedly validate its illegal acts. Throughout, the Commonwealth and Oversight Board have used statutory litigation stays in the Moratorium Act, PROMESA, and now the automatic stay in bankruptcy and procedural arguments to bar all challenges to and any judicial review of their unlawful conduct. The litigation stay is being used as to stave off creditors, as the Commonwealth and Oversight Board implement a scheme to permanently dissipate PRIFA bondholders' collateral, presumably with the intention of using those revenues to support a Commonwealth plan of adjustment, as contemplated by the certified Commonwealth fiscal plan. The misappropriation of these funds is

in clear violation of the provisions of PROMESA, which expressly prohibits the transfer of property of one instrumentality to another, or to the Commonwealth, at any time (and which even provides creditors with a direct right of action to recover improperly transferred monies). *See, e.g.*, 48 U.S.C. §§ 2141(b)(1)(M), 2144(c)(3)(A), 2195.

43. "Cause" for granting relief from the stay can also be found where a secured creditor's collateral is diminishing in value during the pendency of the case. *See, e.g.*, *In re Lopez*, 446 B.R. 12, 20 (Bankr. D. Mass. 2011). Ambac's liens remain intact, but the value of the liens is being materially diminished. Indeed, if the Oversight Board is allowed to continue to confiscate PRIFA's property and press forward with a plan of adjustment premised on the diversion of the Pledged Rum Taxes as reflected in the certified fiscal plan, Ambac's collateral risks being reduced to nothing.

44. Section 362(d)(2) provides that stay relief shall be granted where "the debtor does not have an equity in [the] property" and "[the] property is not necessary to an effective reorganization." When the property is cash, it cannot be necessary to an effective restructuring if the debtor lacks equity in the cash. In general, "cause exists when the harm that would result from a continuation of the stay would outweigh any harm that might be suffered by the debtor or the debtor's estate if the stay is lifted." *In re Shaughnessy*, BAP No. MW-06-068, 2007 WL 2403280, at *3 (B.A.P. 1st Cir. Aug. 17, 2007).

45. Because the Commonwealth is abusing the automatic stay to violate Puerto Rico and federal law with impunity in an attempt to strip Ambac of its statutorily and constitutionally protected property rights, the stay should be lifted to allow Ambac to stop the continued taking of its property and erosion of its collateral.

A.   ~~There Is~~ "Cause" Exists to Lift the Automatic Stay ~~for Lack of Adequate Protection~~Because Movants' Lien on the Pledged Rum Taxes Is Not Adequately Protected.

~~46. If the Court finds that the stay applies to the PRIFA Clawback or the U.S. Treasury Action, the stay should be lifted "for cause" because of a "lack of adequate protection of an interest in property," 11 U.S.C. § 362(d)(1).   As shown below, (1) Ambac has a lien on the Pledged Rum Taxes; and (2) the lien is not adequately protected, as the Commonwealth has (and continues to) diminish the value of the lien.   Upon information and belief, the Commonwealth is diminishing the value of the lien by diverting the Pledged Rum Taxes, spending the Pledged Rum Taxes, and transferring the Pledged Rum Taxes to third parties, including rum producers whose contractual right to a portion of the rum taxes is expressly subordinate to Ambac's.~~

~~1. Ambac Has~~ a Lien on the Pledged Rum Taxes

**70.**   ~~47. Ambac has~~**Movants have** a lien on the Pledged Rum Taxes that either must be enforced pursuant to its terms, or adequately protected, during the ~~bankruptcy~~**restructuring** proceedings.

**1.**   **Movants Have a Lien on the Pledged Rum Taxes.**

a.   The Trust Agreement for the ~~Rum Tax~~ Bonds, and the PRIFA Enabling Act, Create a Consensual Lien.

**71.**   ~~48.~~ The Trust Agreement and the PRIFA Enabling Act create a lien enforceable against all of the first $117 million of rum taxes in each fiscal year, regardless of whether ~~or not~~ received by PRIFA or deposited into the bondholder trust account.   The Trust Agreement grants a lien on **the** Pledged Rum Taxes, which attaches **both** to the ~~monies~~**moneys** deposited with the ~~trustee~~**Trustee**, and pursuant to the PRIFA Enabling Act, to ~~monies~~**moneys** not yet made available to PRIFA.   **(**_See_ **Ex. 2, at 42 (**Trust Agreement~~, Section~~ **§** 601**).)**

**72.** ~~49.~~ This lien is specifically authorized under the **PRIFA** Enabling Act, which allows PRIFA to grant a lien on the proceeds of any taxes ~~which pursuant to the Enabling Act are~~ "made available to [it] by the Commonwealth~~,~~" **pursuant** to the PRIFA Enabling Act, including the ~~Pledged~~ Rum Taxes.  3 L.P.R.A. § 1907(a).  By its express terms, this statutory authorization extends beyond funds actually transferred to PRIFA.  Indeed, the lien extends to "all or any portion of the federal excise taxes or other funds ***which should have been transferred by the Commonwealth to [PRIFA]***," whether or not the funds actually are transferred.  ~~3 L.P.R.A~~*Id*. § 1906(m) (emphasis added).  Thus, the lien extends **even** to revenues that were not "received by [PRIFA]," because the statute states that all of the Pledged Rum Taxes—"including" (and therefore not limited to) the taxes actually "received by [PRIFA]"—are subject to the lien.  ~~3 L.P.R.A~~*Id*. § 1907(a).

**73.** ~~50.~~ The **PRIFA** Enabling Act further dictates that whenever PRIFA pledges revenues to secure bonds, a lien automatically attaches to the pledged revenues "immediately" and regardless of whether the funds are delivered to PRIFA.  The Act provides:

> The revenues so pledged, including those subsequently received by [PRIFA], shall immediately be subject to said lien **without the need of the physical delivery thereof or any other act** . . . .

~~3 L.P.R.A. § 1907(a)~~*Id.* (emphasis added). This provision ~~of the Act~~ mandates that, with respect to any revenues PRIFA pledges to bondholders, the revenues "***shall immediately*** be subject" to a lien, whether or not the revenues have actually been delivered to PRIFA.  *Id.* (emphasis added~~.~~)**.**

**74.** ~~51. This statutory language~~**By its terms, the statute therefore** confirms that the lien on the Pledged Rum Taxes extends beyond revenues actually deposited in PRIFA's accounts, and includes revenues received by the Commonwealth that should have been, but were not, transferred to PRIFA (such as the diverted Pledged Rum Taxes).  Thus, the **PRIFA**

Enabling Act mandates that any pledge by PRIFA results in a lien with a defined scope for the benefit of ~~PRIFA~~the bondholders.~~[15]~~  ~~This language is unique to PRIFA.  No other Commonwealth revenue bond statute provides for the automatic perfection of the lien, or is express that the lien extends to monies not yet received by the borrower.~~ [21]

### b. PRIFA Bondholders Also Have an Equitable Lien on the Pledged Rum Taxes.

75. **Movants also have** an equitable lien on the Pledged Rum Taxes because Puerto Rico law imposes an equitable lien on any funds that are earmarked for the purpose of paying a particular debt.  *See generally United States v. Friedman*, 143 F.3d 18, 23 (1st Cir. 1998) (**defining "equitable lien" as** "[a] right, not existing at law, to have specific property applied in whole or in part to payment of a particular debt or class of debts.  An equitable lien arises . . . from . . . a written contract which shows an intention to charge some particular property with a debt or obligation . . . ." (quoting BLACK'S LAW DICTIONARY 539 (6th ed. 1990))).

76. Under Puerto Rico law, an agreement to apply specific property to the repayment of an obligation gives rise to an equitable lien.  *See U.S. Fid. Guar. Co. v. Maxon Eng'g Servs., Inc. (In re Maxon Eng'g Servs., Inc.)*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005).  In *Maxon*, a surety company issued payment and performance bonds on various construction projects that

---

~~[15]~~  ~~The Enabling Act also provides that any pledge by PRIFA results in a lien that is automatically perfected, without the need for any separate UCC filing.  *See* 3 L.P.R.A. § 1907(a) ("Neither the trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's rights on any revenues are pledged or assigned shall have to be presented or recorded in order to perfect the lien thereon against any third party except in the records of the Authority.").~~

[21] **The PRIFA** Enabling Act also provides that any pledge by PRIFA results in a lien that is automatically perfected, without the need for any separate UCC filing.  *See* 3 L.P.R.A. § 1907(a) ("Neither the trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's rights on any revenues are pledged or assigned shall have to be presented or recorded in order to perfect the lien thereon against any third party except in the records of the Authority.").  **In any event, the Trustee  filed a UCC-1 regarding its lien in favor** of the Pledged Rum Taxes **in 2015, in light of a change in law at the time.  *See* UCC-1, dated September 18, 2015 (attached hereto as Exhibit 16).**

had been awarded to a contractor. *Id.* at 497. The contractor entered into an indemnity agreement that provided that payments the contractor received under the bonded contracts would be deemed held in a trust for the surety's benefit, in the event that the surety incurred any liability or loss under the bonds. *Id.* at 499. The court found that this arrangement not only vested the surety with an equitable interest in the receivables but also created an equitable lien in the receivables for the benefit of the surety. *Id.* at 500.

77.     Even absent an express trust, an agreement to pay an obligation from specific funds creates an equitable lien. *See Friedman*, 143 F.3d at 23 (**where** a promise to repay a claim from the proceeds of a sale of real estate owned by the debtor gave rise to an equitable lien on the sale proceeds**.); *Pare v. Natale (In re Natale)***, 174 B.R. 362, 364-65 (Bankr. D.R.I. 1994) (where a debtor-mortgagor was contractually required to name the mortgagee as an insurance policy beneficiary but failed to do so, the insurance proceeds were impressed with an equitable lien for the benefit of the mortgagee); *Hanson v. W.L. Blake & Co.*, 155 F. 342, 357-58 (D. Me. 1907) (same).

78.     **Here, the PRIFA** Enabling Act creates a contract whereby the Commonwealth "shows an intention" that the Pledged Rum Taxes will be available for and used to pay debt service on PRIFA's bonds. *See Friedman*, **143 F.3d at 23. Indeed, the PRIFA Enabling Act is not ordinary legislation but also a contract between the Commonwealth and the bondholders. It contains a covenant between the Commonwealth and PRIFA's bondholders stating: "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter . . . that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full . . . ." 3 L.P.R.A. § 1913. The same statute further provides that PRIFA, "as an agent of the**

Commonwealth, is hereby authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts." *Id.*

**c.** **Section 552(a) Does Not Apply to Movants' Lien.**

**79.** ~~52.~~ The lien on the Pledged Rum Taxes to be received by PRIFA in the future is not cut off by Section 552(a) ~~for two reasons:~~.

**80.** **Section 552(a) provides that, with certain exceptions, "property acquired by the . . . debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Therefore, except where an exception applies, Section 552(a) generally cuts off liens on property acquired by the debtor after the petition date of a bankruptcy case.**

**81.** **However, Section 552(a) is plainly inapplicable to Movants' liens.**

**82.** ~~53. *First*, Section 552(a) does not apply to Ambac's lien because the~~**As an initial matter, Movants'** lien did not "result[] from any security agreement entered into by the [Commonwealth~~.~~]." *See id.* The lien arose based on the Trust Agreement, which is a contract between PRIFA and its **Trustee on behalf of the** bondholders, and the **PRIFA** Enabling Act. PRIFA is not a debtor, and the Commonwealth is not a party to the Trust Agreement. In addition, for the reasons detailed above~~,~~ (*see supra* Section ~~I.A.1,~~**II.A)** the Commonwealth lacks **a** property ~~interests~~**interest** in such future revenues and, therefore, they are not "property acquired by the . . . debtor."

**83.** ~~54. *Second*~~**In any event**, even if Section 552(a) were found to apply through the Commonwealth or if ~~the Oversight Board~~**PRIFA** were to file ~~PRIFA~~ for **bankruptcy under**

50

Title III, that ~~section~~Section would not cut off ~~Ambac's~~Movants' liens because the Pledged

Rum Taxes are "pledged special revenues" under Section 922(d).~~16~~22

### i) The Rum Taxes Are "Pledged Special Revenues" Under the Plain Language of the Statute

84.   ~~55.~~ "It is elementary that in resolving a dispute over the meaning of a statute we

begin with the language of the statute itself." *Assured Guar. Corp. v. Fin. Oversight & Mgmt.*

*Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for ~~Puerto Rico~~P.R.)*, 919 F.3d 121, 128 (1st Cir.

2019); *see also Penobscot Nation v. Mills*, 861 F.3d 324, 330 (1st Cir. 2017) (quoting *Sebelius v.*

*Cloer*, 569 U.S. 369, 376 (2013)).   The Bankruptcy Code defines "special revenues" as, inter

alia, "special excise taxes imposed on particular activities or transactions."   11 U.S.C. §

902(2)(B).   The Rum Taxes fit squarely within this statutory definition:   The Rum Taxes are

"excise taxes."   *See, e.g.*, 3 L.P.R.A. § 1906(m) (describing the pledged revenues as "federal

excise taxes"); *id.* § 1914 (same).   The Rum Taxes also are imposed on particular transactions,

---

~~16~~ ~~If~~22 Even if they were not, applying Section 552 ~~were used by the Oversight Board to~~ cut ~~of~~off
PRIFA ~~bondholder liens, it~~bondholders' liens, which existed years before PROMESA was enacted,
would give rise to a "takings" claim under the U.S. ~~constitution.   The Enabling Act transfers an~~
~~enforceable property interest in the Pledged Rum Taxes that cannot be taken by the~~
~~Commonwealth.   See In re Techns. Int'l Holdings, Inc., 234 B.R. 699, 714-16 (Bankr. E.D. Ky.~~
~~1999) (enjoining post-petition enforcement of statute diverting statutory payments from debtor~~
~~directly to its creditors, essentially bypassing bankruptcy; court held plaintiff had demonstrated~~
~~substantial likelihood of success on the merits where statute deprived it of contractually earned~~
~~payments under prior statutory scheme); Franklin Cal. Tax-Free Trust v. Puerto Rico, 85 F.~~
~~Supp. 3d 577, 612 (D.P.R. 2015) (statute repealing bondholders' statutory right to have receiver~~
~~appointed in event of issuer's default constituted taking in violation of Fifth Amendment);~~
~~Cienega Gardens v. United States, 331 F.3d 1319, 1330-31 (Fed. Cir. 2003) (federal statutes~~
~~abrogating real estate developers' contractual rights to prepay mortgages under regulatory~~
~~agreements with HUD constituted taking in violation of Fifth Amendment; developers had~~
~~property right in contractual agreements with HUD; rejecting government position that no~~
~~property right vested because the rights arose from a regulatory and statutory scheme that HUD~~
~~and Congress could amend at any time).   See generally~~Constitution.   See United States v. Sec.
Indus. Bank, 459 U.S. 70, 75 (1982) (~~"The bankruptcy power is subject to the Fifth Amendment's~~
~~prohibition against taking private property without compensation.")~~interpreting Bankruptcy
Code provision to apply prospectively to avoid destroying pre-existing liens and eliminating the
need to consider the statute's constitutionality under the Takings Clause).

specifically, the sale of imported Puerto Rico rum on the mainland United States.  *See* 26 U.S.C. § 7652.[23]

85.   56.  As revenues that are **not derived from a general sales tax, but that are instead derived from taxes imposed on particular activities,** pledged for a particular use, and not available to general creditors, they are "special," as that term is used in 11 U.S.C. § 922**(d)**. Nothing in the plain language of the statute can be read to impose any limitation on the ~~nature or~~ source of the excise tax.  There is also no distinction in the statutory text between an excise tax levied by the Commonwealth and an excise tax levied by the federal government.  Both, if pledged ~~to~~**for the benefit of** bondholders in a non-recourse borrowing, would be pledged special revenues under the Code.[17]

[23] **Were the Court to find the statute ambiguous, the PRIFA Enabling Act's legislative history uniformly confirms that the Pledged Rum Taxes are pledged special revenues. The "pledged special revenues" provisions of the Bankruptcy Code were added to the Code in 1988. The congressional reports concerning the legislation noted that these provisions "provide protection for the holders of the revenue bonds."  S. Rep. No. 100-506, at 2 (1988);** *see also* **6 Collier on Bankruptcy ¶ 927.02 (16th ed. 2019);** H.R. Rep. No. 100-1011, at 4-5 (1988); *id.* at 6 ("The intent is to define special revenues to include the revenue derived from . . . a specific tax levy, where such revenues are meant to serve as security to the bondholders.")**;** *id.* **at 4 (noting that the** purpose of the special revenue provisions was to "mak[e] special revenues still subject to a post-petition lien in a chapter 9 bankruptcy, **notwithstanding [S]ection 552(a),"** because revenue bonds depend on a continuing lien on future revenue streams**); S. Rep. No. 100-506, at 4-5 (1988) (noting that, if revenue bonds are not protected in bankruptcy, the municipality might "prohibit the specified payment of pledged revenues to the bondholders," which could "effectively destroy the distinction between general obligation debt and limited revenue obligation debt").  Indeed, the Senate's view was that then-existing law should be interpreted to "prohibit the interpretation that pledges of revenues granted pursuant to state statutory or constitutional provision to bondholders can be terminated by the filing of a chapter 9 case." S. Rep. No. 100-506, at 6 (1988).** The House and Senate Reports further eliminate any ambiguity with respect to the rum taxes, as each expressly identifies "the sale of alcoholic beverages" as an example of "special activity" that would be covered by Section 902(2)(B).  *See* H.R. Rep. No. 100-1011, at 6 (1988); S. Rep. No. 100-506, at 21 (1988) ("An excise tax on hotel and motel rooms or the sale of alcoholic beverages would be a special excise tax under clause (B).").

[17] ~~Indeed, it is not uncommon for one governmental unit to impose the tax while another receives the revenue and pledges it to bondholders.~~ *~~See, e.g., in re Heffernan Mem'l Hosp. Dist.~~*~~, 202 B.R. 147, 149 (Bankr. S.D. Cal. 1996) (tax revenues deemed special revenues under § 922 where~~

57. [24] *See Assured*, **919 F.3d at 128 (Where** Because "the language at issue has a plain and unambiguous meaning," the interpretive inquiry ends with the plain text. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 919 F.3d at 128. **);** *United States v. Espinal-Mieses*, 313 F. Supp. 3d 376, 381 (D.P.R. 2018**) (**Where, as here, "'the meaning of the text is unambiguous' the Court's interpretive task ends, and the Court must apply the statute's plain meaning." *United States v. Espinal Mieses*, 313 F. Supp. 3d 376, 381 (D.P.R. 2018) (quoting *Correa-Ruiz v. Fortuño*, 573 F.3d 1, 9 (1st Cir. 2009)). The Pledged Rum Taxes are **plainly** "pledged special revenues.**"**

### ii) If the Court Finds the Statute Ambiguous, the Legislative History Makes Plain that the Pledged Rum Taxes Are Pledged Special Revenues

58. If the Court finds the statute ambiguous, it should consider "other tools of statutory construction, such as legislative history." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 919 F.3d at 128. Here, the legislative history uniformly confirms that the Pledged Rum Taxes are pledged special revenues. The "pledged special revenues" provisions of the Bankruptcy Code were added to the Code in 1988. The congressional reports concerning the legislation noted that these provisions "provide[d] protection for the holders of the revenue bonds." S. Rep. No. 100-506, at 2, 3 (1988); *see also* Collier on Bankruptcy ¶ 927.02 (16th ed. 2019). Both the House and Senate reports so confirm.

---

the California legislature authorized a special sales tax, the city imposed the tax, and the revenue stream was pledged to a hospital that in turn pledged the revenues to bondholders).

[24] Indeed, it is not uncommon for one governmental unit to impose the tax while another receives the revenue and pledges it to bondholders. *See, e.g.*, *In re Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147, 149 (Bankr. S.D. Cal. 1996) (tax revenues deemed special revenues under § 922 where the California legislature authorized a special sales tax, the city imposed the tax, and the revenue stream was pledged to a hospital that in turn pledged the revenues to bondholders).

59. The House Report on the amendments explain that municipalities finance public works with either general obligation bonds or revenue bonds—noting that revenue bonds may be backed by a specific excise tax. H.R. Rep. No. 100-1011, at 4 (1988); *id.* at 6 ("The intent is to define special revenues to include the revenue derived from . . . a specific tax levy, where such revenues are meant to serve as security to the bondholders."). The purpose of the special revenue provisions was to "mak[e] special revenues still subject to a post-petition lien in a chapter 9 bankruptcy," *id.*, because revenue bonds depend on a continuing lien on future revenue streams.

60. The Senate Report likewise noted that, if revenue bonds are not protected in bankruptcy, the municipality might "prohibit the specified payment of pledged revenues to the bondholders," which could "effectively destroy the distinction between general obligation debt and limited revenue obligation debt." S. Rep. No. 100-506, at 4-5 (1988). Noting the constitutional concerns involved in destroying a lien in bankruptcy, the Senate's view was that then-existing law should be interpreted to "prohibit the interpretation that pledges of revenues granted pursuant to state statutory or constitutional provision to bondholders can be terminated by the filing of a chapter 9 case." *Id.* at 6. In the Senate's view, the special revenues provisions clarified the law to remove any uncertainty concerning the enforceability of revenue bonds after a bankruptcy filing.

61. This legislative history confirms that the congressional intent of the "special revenues" provisions specifically is to protect the holders of revenue bonds, such as the rum tax bonds. To allow the Commonwealth to avoid the lien on the rum tax revenues plainly would be inconsistent with the express congressional intent to ensure that revenue bonds maintain a lien

on the pledged revenues. PRIFA bonds are non-recourse to the Commonwealth and rely exclusively on the first $117 million in annual rum taxes for repayment.

62. The House and Senate Reports further eliminate any ambiguity with respect to the rum taxes, as each expressly identifies "the sale of alcoholic beverages" as an example of "special activity" that would be covered by Section 902(2)(B). *See* H.R. Rep. No. 100-1011, at 6 (1988); S. Rep. No. 100-506, at 21 (1988) ("An excise tax on hotel and motel rooms or the sale of alcoholic beverages would be a special excise tax under clause (B)."). Thus, the legislative history confirms that the Rum Taxes are special revenues under Section 902(2)(B), and the Pledged Rum Taxes are "pledged special revenues" under Section 922(d).

### b. PRIFA Bondholders Have an Equitable Lien on the Pledged Rum Taxes

63. Ambac also has an equitable lien on the Pledged Rum Taxes because Puerto Rico law imposes an equitable lien on any funds that are earmarked for the purpose of paying a particular debt. *See generally United States v. Friedman*, 143 F.3d 18, 23 (1st Cir. 1998) (equitable lien is "[a] right, not existing at law, to have specific property applied in whole or in part to payment of a particular debt or class of debts. An equitable lien arises . . . from . . . a written contract which shows an intention to charge some particular property with a debt or obligation . . . ." (quoting Black's Law Dictionary 539 (6th ed. 1990))).

64. Under Puerto Rico law, an agreement to apply specific property to the repayment of an obligation gives rise to an equitable lien. *See In re Maxon Eng'g Servs., Inc.*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005). In *Maxon*, a surety company issued payment and performance bonds on various construction projects that had been awarded to a contractor. *Id.* at 497. The contractor entered into an indemnity agreement that provided that payments the contractor received under the bonded contracts would be deemed held in a trust for the surety's benefit, in

the event that the surety incurred any liability or loss under the bonds. *Id.* at 499. The court found that this arrangement not only vested the surety with an equitable interest in the receivables but also created an equitable lien in the receivables for the benefit of the surety. *Id.* at 500.

65. Even absent an express trust, an agreement to pay an obligation from specific funds creates an equitable lien. *See Friedman*, 143 F.3d at 23 (a promise to repay a claim from the proceeds of a sale of real estate owned by the debtor gave rise to an equitable lien on the sale proceeds); *In re Natale*, 174 B.R. 362, 364-65 (Bankr. D.R.I. 1994) (where a debtor mortgagor was contractually required to name the mortgagee as an insurance policy beneficiary but failed to do so, the insurance proceeds were impressed with an equitable lien for the benefit of the mortgagee); *Hanson v. W.L. Blake & Co.*, 155 F. 342, 357-58 (D. Me. 1907) (same). Here the Enabling Act creates a contract whereby the Commonwealth "shows an intention" that the Pledged Rum Taxes will be available for and used to pay debt service on PRIFA's bonds.

> ### 2. Neither the Commonwealth's Bankruptcy nor PROMESA Diminish PRIFA's Ownership of the Pledged Rum Taxes, or PRIFA's Pledge of Them to Its Bondholders.

86. The Commonwealth cannot, through subsequent legislation, rescind its alienation of the Pledged Rum Taxes to PRIFA without providing just compensation, because the PRIFA Enabling Act and the Trust Agreement granted PRIFA and its bondholders property rights in the Pledged Rum Taxes. *E.g.*, 3 L.P.R.A. § 1913. Any impairment or rescission of bondholders' rights to the Pledged Rum Taxes, including contractual rights, would be an unconstitutional "taking" of this property right. *See U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.");

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 611-12 (D.P.R. 2015) ("Contracts are a form of property for purposes of the Takings Clause."), *aff'd*, 805 F.3d 322, *cert. granted*, 136 S.Ct. 582 (2015).

87.     The fact that the Commonwealth is currently diverting the Pledged Rum Taxes from PRIFA, purportedly under color of the Moratorium Act and other laws and Executive Orders, does not convert them into Commonwealth property.  The Moratorium Act, Amended Moratorium Act, and Executive Orders were all expressly preempted by PROMESA.  *See* 48 U.S.C. § 2163(1) ("[A] territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest . . . may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium"); *id.* § 2163(3) (preempting "unlawful executive orders").

88.     PROMESA in no way diminishes or eliminates PRIFA's ownership rights in the Pledged Rum Taxes (or the PRIFA bondholders' lien thereon).  Quite the contrary, PROMESA requires the Oversight Board to respect all preexisting property rights, including in all fiscal plans, budgets, and plans of adjustment.[25]  The "basic federal rule" in

---

[25] *See, e.g.*, 48 U.S.C. § 2141(b)(1)(M) (requiring that any fiscal plan "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of" the Commonwealth or another instrumentality "unless permitted by the constitution of the [Commonwealth], an approved plan of adjustment . . . or a Qualifying Modification"); *id.* § 2141(b)(1)(N) (requiring that any fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016"); *id.* § 2144(c)(3)(A) (prohibiting "new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of June 30, 2016"); *id.* § 2163(c) ("[U]nlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this chapter."); *id.* § 2195(a) (providing remedies for the transfer of "any property of any territorial instrumentality of Puerto Rico . . . in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property").

restructuring proceedings is that "[p]roperty interests are created and defined by *state law*," not federal laws like PROMESA.  *See Butner v. United States*, 440 U.S. 48, 55, 56 (1979) (emphasis added).

89.    PROMESA is replete with references to the basic federal rule and the protection of property interests created and defined by Commonwealth law.  Congress explicitly mandated that the Oversight Board "shall" only develop, approve, and certify Fiscal Plans that:  (i) are "based on [all] applicable laws"; (ii) ensure the assets, funds, or resources of an instrumentality are used exclusively for the benefit of that instrumentality and are never "loaned to, transferred to, or otherwise used for the benefit of a covered territory"; and (iii) "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to" the date of enactment of PROMESA.  *Id.* § 2141(b)(1)(A)(i), (M), and (N).  Thus, Congress expressed its clear and unambiguous intent that PROMESA and Title III honor, not abrogate, all preexisting property rights, liens, and priorities.

3.    Article VI, Section 8 of the Puerto Rico Constitution Does Not Give the Commonwealth Any Equity in the Pledged Revenues.

90.    The Commonwealth also does not have any equity in the Excise Taxes because the conditions necessary to trigger Article VI, Section 8 of the Puerto Rico Constitution ("Article VI, Section 8") have not been satisfied.  Article VI, Section 8 provides:  "In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. CONST., art. VI, § 8.  As

the constitutional language makes clear, this provision is triggered only if "available resources" *in a given fiscal year* prove to be insufficient to meet appropriations set out in *that fiscal year's* budget. *See id.* Even where this occurs, Article VI, Section 8 requires only that available resources first be used to fully satisfy payments due and owing on general obligation debt—and only general obligation debt—and then be applied in the order required by law, meaning that revenue bonds are paid in that fiscal year second only to general obligation debt. Furthermore, the PRIFA Enabling Act specifies that the Pledged Revenues "may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in [Article VI, Section 8], only when the other resources available referred to in [Article VI, Section 8] are insufficient for such purposes." 3 L.P.R.A. § 1914.[26] Put differently, and as made clear by Commonwealth statute and the official statements marketing the PRIFA bonds, the Pledged Rum Taxes may be applied to general obligation debt if, and only if, *all other resources* available to the Commonwealth are insufficient to make whatever payments are due and owing on general obligation debt within the fiscal year in question. *Id.*; Official Statement, Puerto Rico Infrastructure Financing Authority Series 2005 Bonds (attached hereto as Exhibit 17).

91. These conditions plainly have not been satisfied given that (i) the surplus in the general fund for fiscal year 2019 (as of June 2019) was over $2.9 billion[27]; (ii) there

---

[26] Puerto Rico's Management and Budget Office Organic Act the ("OMB Act"), 23 L.P.R.A. § 104(c) creates a priority waterfall for the disbursement of public funds pursuant to Article VI, Section 8, and gives first priority to prioritizes the payment of public debt over "regular expenses" related to government operations. Though the Moratorium Act and various laws and orders purported to rescind the OMB Act, as noted above, those territory laws are expressly preempted by Section 303(1) of PROMESA, and thus the priority waterfall set forth in the OMB Act remains in effect.

[27] *See, e.g.*, Puerto Rico Fiscal Agency & Financing Advisory Authority, *General Fund & Special Revenue Budget to Recorded Revenue and Expenditure Variance Reporting for the Fourth Quarter*

have at all times been sufficient available resources to meet appropriations;[28] and (iii) even if there were not, the Pledged Rum Taxes diverted from PRIFA and its bondholders have *not* been used to make payments on general obligation debt, but rather have been either retained unused in the Commonwealth treasury or used for the Commonwealth's ordinary expenses in violation of Puerto Rico law.

92.    In any event, the Article VI, Section 8 means, at most, that the *general obligation bondholders* have a contingent interest in the Pledged Rum Taxes—and can obtain them until the Commonwealth has sufficient available resources.  Either the Pledged Rum Taxes must be provided to PRIFA bondholders, or, in limited circumstances in which there are no other available resources, the general obligation bondholders may receive them.  In no case does the Commonwealth have a right to retain the Pledged Rum Taxes for other uses.

---

*Revenue Budget to Recorded Revenue and Expenditure Variance Reporting for the Fourth Quarter and YTD FY 2019*, at 8, *available at* http://aafaf.pr.gov/assets/general-fund-special-revenue-budget-4q-fy2019.pdf.

[28] For example, the Commonwealth's general fund budgets estimated that the Commonwealth's resources were sufficient to cover total expenditures of $8.78 billion in fiscal year 2017, $9.562 billion in fiscal year 2018, $8.757 billion in fiscal year 2019, and $9.1 billion in fiscal year 2020. *See, e.g.*, Reorg Research, "Puerto Rico Legislature Passes $8.78B Fiscal 2017 General Fund Budget" (July 1, 2016)) (attached hereto as Exhibit 18); FOMB, "FY18 Budget" (June 30, 2017)) (attached hereto as Exhibit 19); FOMB, "Press Release: Oversight Board Submits FY19 Commonwealth Compliant Budget Certified by Unanimous Written Consent" (June 30, 2018)) (attached hereto as Exhibit 20); and FOMB, "FY20 Certified Budget for the Commonwealth of Puerto Rico" (June 30, 2019)) (attached hereto as Exhibit 21).  Meanwhile, total debt service on the public debt in each of these fiscal years was anticipated to be far less than total estimated resources in each of these years—$1.128 billion, $1.065 billion, $1.090 billion, and $1.118 billion, respectively.  *See* Fiscal Plan for Puerto Rico, as of March 13, 2017 (attached hereto as Exhibit 22) and 2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity (May 9, 2019) ("2019 Fiscal Plan") (attached hereto as Exhibit 23).  Even if the Commonwealth had not suspended public debt service payments, there would have been or would be sufficient available resources in each of these fiscal years to make such payments.  *See, e.g.*, Puerto Rico Department of Treasury, *Treasury Single Account ("TSA") FY 2020 Cash Flow*, as of Dec. 27, 2019, at 5,  *available at*  http://www.aafaf.pr.gov/assets/fy20-weeklytsacashflow-12-27-19.pdf (showing that the Commonwealth currently has available resources of at least $8.7 billion in cash in the Treasury Single Account).

### **4.** ~~2.~~ The Lien ~~is~~**Is** Not Adequately Protected, and the Commonwealth's Conduct Continues to Diminish the Value of the Lien**.**

**93.** ~~66.~~ The Commonwealth bears the burden to prove that ~~Ambac's~~**Movants'** lien is adequately protected.  11 U.S.C. § 362(g)(1), (2); *In re Sonnax* ~~*Indus., Inc.*~~, 907 F.2d ~~1280,~~**at** 1285 ~~(2d Cir. 1990)~~; *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006), *aff'd*, 359 F. App'x 352 (3d Cir. 2010).  The Bankruptcy Code does not define the term "adequate protection," but indicates that "adequate protection may be provided by" (1) requiring a cash payment or series of cash payments, (2) providing an additional or replacement lien, or (3) granting other relief (besides administrative expense priority) that will "result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361; **3** Collier on Bankruptcy ¶ 362.07[3][b] **(16th ed. 2019)**.  The Commonwealth has not made any cash payments or provided any additional or replacement lien or collateral to ~~Ambac~~**Movants** or PRIFA bondholders, so the only basis on which the Commonwealth could argue that ~~Ambac is~~**Movants are** adequately protected is by proving that ~~Ambac has~~**Movants have** received "the indubitable equivalent" of the dissipation in value of the lien.

**94.** ~~67.~~ As the Supreme Court has explained, adequate protection is required to safeguard "the right of a secured creditor to have the security applied in payment of the debt." *United Sav. Ass'n of* ~~*Texas*~~**Tex.** *v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988). "It is plain that 'adequate protection' must be completely compensatory," that it protects not merely the right to be paid, but also "the safety of [the lienholder's] principal," and that it recognizes that "payment ten years hence is not generally the equivalent of payment now." *~~In re Mural~~**Metro. Life Ins. Co. v. Murel** Holding Corp. **(In re Murel Holding Corp.)**, 75 F.2d 941, 942 (2d Cir. 1935) (~~Learned~~ Hand, J.); see **4** Collier on Bankruptcy ¶ 506.03[7][a]**,** 506-51 n.163~~;~~ **(16th ed. 2019); *Paccom Leasing Corp. v. Deico Elecs, Inc. (*** *In re Deico Elecs., Inc.**)***,

61

139 B.R. 945, 947 (B.A.P. 9th Cir. 1992) ("Adequate protection prevents creditors from becoming more undersecured[.]").  Thus, "a proposal of adequate protection for a secured creditor[] should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *Martin v. United States (In re Martin)*, 761 F.2d 472, 476 (8th Cir. 1985) (internal quotation marks ~~excluded~~**omitted**); *see also In re J&M Salupo Dev. Co.*, 388 B.R. 809, 812 (Bankr. N.D. Ohio 2009) (finding that lack of adequate protection may be shown by "erosion of **the** creditor's position or of **a** threatened erosion" **(internal citation omitted)**).

**95.**  ~~68.~~The Commonwealth and the Oversight Board cannot carry their burden of showing that ~~Ambac enjoys~~**Movants enjoy** "the indubitable equivalent" of ~~its~~**their** collateral. 11 U.S.C. § 361(3).  ~~Ambac is~~**Movants are** injured by the dissipation of the Pledged Rum Taxes because the amount of Rum Taxes that the Commonwealth (and PRIFA) ultimately will receive depends on a variety of factors that cannot be controlled or predicted even by the Commonwealth, such as (i) determinations made by the U.S. government as to the level of customs duties to impose on rum imports and the formula for allocating such duties to the Commonwealth, (ii) the amount of rum produced in Puerto Rico in the future, and (iii) the amount of Puerto Rico-origin rum that is exported to the mainland United States for consumption there.  All of these factors are subject to change over time, and thus—even absent the Commonwealth's unlawful conduct—~~Ambac~~**Movants** would have no assurance that the Pledged Rum Taxes will be sufficient to repay the ~~rum tax bonds~~**Bonds**.  The Commonwealth's unlawful "clawback" diminishes the value of the lien even further by materially and substantially increasing the risk that the Pledged Rum Taxes will not be sufficient to repay the ~~rum tax bonds~~**Bonds** in full (or by increasing the magnitude of any deficiency).

96.    The illegality of the Commonwealth's actions **is** particularly flagrant under the current circumstances where the Commonwealth is running a budgetary surplus, not a shortfall, and there can be no suggestion that the clawback conditions have been met.  (*See* **Ex. 20, at 24-25 (2019 Fiscal Plan).).  And to make matters worse, while refusing to make payments to PRIFA bondholders—who invested substantial sums in the expectation of repayment—the Commonwealth has continued to divert Rum Taxes to pay subsidies to Rum Companies, including huge business organizations such as Bacardí.  OVERVIEW OF FY20 CERTIFIED BUDGET FOR THE COMMONWEALTH OF PUERTO RICO at 9 (July 1, 2019) (indicating a budget of $179 million in rum cover-over payments to rum producers for Fiscal Year 2020) (attached hereto as Exhibit 24);  (*see also* Ex. 11, at 23 (Bacardí Agreement § 7.2.2).)  And it has done so notwithstanding the fact that Puerto Rico law ensures that *PRIFA*, not the Rum Companies, is entitled to the "first proceeds" of the Rum Taxes up to $117 million—a fact that PRIFA's contract with Bacardí expressly recognizes.  (*Id.*, § 4.6.1.)**

97.    69. This case is distinguishable**The fact that Movants' property interests in the Pledged Rum Taxes are not adequately protected distinguishes this case** from the First Circuit's decision **denying adequate protection** in *Peaje Investments LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017), because (1) that**.  That** case was decided under the PROMESA stay, which does not incorporate section**Section** 362(g) of the Bankruptcy Code, and thus places**placed** the burden on the moving party to demonstrate that it lacks adequate protection; (2) the nature of the revenue stream here is different, principally insofar as it is not generated by, and therefore not controlled by, the debtor; and (3) this motion comes more than two years later, after the Commonwealth's taking has continued unabated and after the Commonwealth has clearly articulated its view that revenue bondholders have no rights in the **—and the First**

63

**Circuit concluded that the movants there did not even claim that the diversion of** pledged revenues. ~~*See id.* at 512.~~ **would leave their interest in repayment in the bonds inadequately protected.  *Id.* at 514.  Here, by contrast, Movants have shown that the diversion will leave their interest inadequately protected.**

~~70. In *Peaje*, the First Circuit held that a creditor seeking relief from the PROMESA stay bears the burden to prove it is not adequately protected, and that Peaje failed to show that it was under-collateralized.  *Id.* at 513-14.  While Peaje had shown that the Commonwealth was diverting certain special revenues, it did not show that the diversion would leave insufficient funds to adequately protect the amount of debt it was owed.~~

~~71. Here, unlike under the PROMESA stay, the Commonwealth will have to prove that Ambac's lien is adequately protected.  Because the Commonwealth has provided no value to Ambac, it will have to demonstrate that Ambac is adequately protected by virtue of its lien on a perpetual revenue stream.  The Commonwealth will be able to make no such showing.  First, the certified fiscal plan assumes that all of the Pledged Rum Taxes are used for general Commonwealth expenses at least for the entire period covered by the fiscal plan.  *See* 2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity 24-25 (May 9, 2019).  Second, unlike other revenue streams, including the HTA toll revenues considered by the First Circuit in *Peaje*, the Commonwealth does not control the rum excise taxes, and cannot guarantee whether and in what amount it will be maintained.~~

~~**B. The Commonwealth Is Abusing the Automatic Stay to Strip Ambac and PRIFA Bondholders of Their Constitutionally-Protected Property Rights in Violation of PROMESA**~~

~~72. That the Commonwealth is abusing the automatic stay to violate PROMESA is additional cause to grant relief from the stay.  PROMESA requires the Commonwealth to~~

comply with applicable law by imposing transferee liability under Section 407 of PROMESA for any transfers made in violation of applicable law. *See* 48 U.S.C. § 2195. This reflects a more basic policy of the Bankruptcy Code "that the automatic stay should not be used as a shield against the application and enforcement of valid state and local laws." *Cournoyer*, 790 F.2d at 977.

73. Here, the Commonwealth is abusing the stay in an attempt to inoculate itself against applicable law—which PROMESA requires the Commonwealth to respect. As shown above, even if the Commonwealth had a property interest in the Pledged Rum Taxes, those funds are, at a minimum, restricted funds or funds held in trust to be used only as statutorily prescribed. *See infra* Section II.C.1. There is no legal basis for the Commonwealth to invoke "clawback," or to redefine it as allowing the diversion of the Rum Taxes away from the PRIFA account entirely.

74. The illegality of the Commonwealth's actions are particularly flagrant under the current circumstances where the Commonwealth is running a budgetary surplus, not a shortfall, and there can be no suggestion that the clawback conditions have been met. *See* 2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity 24-25 (May 9, 2019).

75. Even if the conditions for triggering clawback were present, the Commonwealth still would be obligated to transfer the Pledged Rum Taxes to PRIFA, and only then may the funds be used to make payment on outstanding public debt, if no other funds are available during that fiscal year. Critically, the clawback analysis must be conducted annually, with reference to the applicable budget and revenues for that year. There is no legal authority for a perpetual clawback. Yet, through the fiscal plan and budgeting process, the Oversight Board is mandating the continued stripping of revenues from PRIFA, even in years where the fiscal plan shows a surplus. And as the Oversight Board and the Commonwealth implement the perpetual taking of

PRIFA property, they weaponize PROMESA and the automatic stay and claim immunity from challenge. The brazen and ongoing disregard for property rights must be stopped.

### C. The Stay Should Be Lifted Because the Commonwealth Has No Equity in the Pledged Rum Taxes, and They Are Unnecessary to an Effective Reorganization

76. Relief from the stay is also appropriate because the Commonwealth "does not have an equity" in the Pledged Rum Taxes, rendering them unnecessary to an effective reorganization. *See* 11 U.S.C. § 362(d)(2). While the moving party bears the burden of demonstrating that the debtor lacks equity in the property, it is the debtor's burden to prove that the property in question is necessary for its plan. 11 U.S.C. § 362(g); *see In re Mullock*, 404 B.R. 800, 805 (Bankr. E.D. Pa. 2009).

#### 1. Even Assuming the Commonwealth Has Some Interest in the Pledged Rum Taxes, that Interest Would Be at Most Bare Legal Title in Which the Commonwealth Has No Equity

77. As shown above, the Commonwealth has no property interest in the Pledged Rum Taxes, and thus the requested stay relief would have no effect on the Commonwealth or its reorganization. *See supra* Section I.A.1.

78. Even if the Court were to conclude that the Commonwealth has some ownership interest in the funds, PRIFA is the beneficial owner of the Pledged Rum Taxes, and the Commonwealth holds at most bare legal title, for at least two reasons:

79. *First*, any Pledged Rum Taxes in the possession of the Commonwealth are "restricted funds" that the Commonwealth cannot lawfully use or dispose of, except by transferring them to PRIFA. The Enabling Act requires that the funds "when received" by the Commonwealth "shall" be covered into the designated PRIFA account. There is no other permissible use of the Pledged Rum Taxes. Thus, PRIFA, not the Commonwealth, is the beneficial owner of these

funds.  The Enabling Act prohibits the Commonwealth from using the Pledged Rum Taxes for any purpose other than turning them over to PRIFA.  The Commonwealth has no discretion over how the funds are applied—the hallmark of "restricted funds" in which the debtor effectively has no property interest.  *See, e.g.*, *Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*, 763 S.E.2d 288, 293 (N.C. Ct. App. 2014) ("restricted funds" are those with "a limited use and specific purpose, such as to fund a special program").

80. *Second*, any Pledged Rum Taxes in the custody of the Commonwealth are held in "trust" for the benefit of PRIFA.  *See García Rubiera v. Calderón,* 570 F.3d 443, 457 (1st Cir. 2009); *In re City of Columbia Falls*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992).  Even a statute that does not explicitly use the word "trust" creates a trust if it manifests a legislative intent to impose a trust-type relationship.  *In re Bologna*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997); *Columbia Falls*, 143 B.R. at 762.  Here, the Enabling Act indicates a clear legislative intent that the Commonwealth holds the Pledged Rum Taxes (a clearly defined trust *res*) for the benefit of PRIFA.

81. The Commonwealth is "merely a custodian, and its duties relative to such funds are purely ministerial.  It may not use or divert them."  *Columbia Falls*, 143 B.R. at 762 (quoting *State ex rel. Clark v. Bailey*, 44 P.2d 740, 746 (Mont. 1935)); *see also FDIC v. Casady*, 106 F.2d 784, 788 (10th Cir. 1939) (finding that structure whereby city holds sinking fund for bondholders creates relationship where city is the trustee and bondholders are cestui que trustents); *City & Cty. of Dallas Levee Imp. Dist. Ex rel. Simond Indus. Props. Corp.*, 89 F.2d 731, 733 (5th Cir. 1937) (finding that the statute under consideration requires that funds be held in trust for the purposes of paying the principal and interest of the bond indebtedness); *cf. Flores Galarza*, 484 F.3d at 30 (finding that Law 253 recognizes a *lack* of JUA's property right to those duplicate

premiums paid by those already covered by privately obtained insurance policies); *García-Rubiera v. Fortuño*, 665 F.3d 261, 266 (1st Cir. 2011) (same); *Calderón,* 570 F.3d at 457 (motor vehicle owners, as opposed to the JUA, had a property interest in those duplicate premiums paid by those already covered by privately obtained insurance policies for purposes of Takings and Due Process claims).  Because PRIFA is the beneficial owner of the Pledged Rum Taxes, the Commonwealth lacks any equity in the Pledged Rum Taxes.

### 2. The Pledged Rum Taxes Are Not Necessary for an Effective Reorganization

82.  Given the Commonwealth's lack of equity in the funds, it is "difficult to imagine" how the Commonwealth could meet its burden to demonstrate that it requires the Pledged Rum Taxes in which it holds only "naked legal title" to effectuate any plan.  *In re Lally*, 38 B.R. at 622, 626 (Bankr. N.D. Iowa 1984) ("cause exist[ed] to justify the termination of the stay" because debtors "armed with only naked legal title" lacked "equity" in the property).  Indeed, where the property at issue is cash, if it is determined that the debtor lacks equity under the first prong, the property is not necessary, and indeed cannot be used at all, in a reorganization of the debtor.

83.  A municipal debtor cannot use property in which the debtor holds, at best, bare legal title, to effectuate any plan.  *See Columbia Falls*, 143 B.R. at 762.  Thus the Pledged Rum Taxes will have no bearing on any plan of reorganization, as they must be returned to PRIFA bondholders.  *See also, e.g.*, *Matter of Spencer*, 115 B.R. 471, 485 (D. Del. 1990) (where the debtor holds bare legal title but not equitable title, stay should be lifted so that "equitable title [can] be united with legal title."); *Boyd v. Martin Expl. Co.*, 56 B.R. 776, 779, 781 (E.D. La. 1986) (where debtor held "bare legal title," and the employees were the equitable and beneficial owners of the property, the property can be returned to the beneficial owners).

  **B.**  **Lack of Due Process in the Title III Court Constitutes Additional Cause to Lift the Stay.**

  **98.**  **"Lack of adequate protection is the most common basis for finding cause to grant relief [from the automatic stay]," but "it is not the only reason a court might grant such relief." *Gracia-Gracia*, 939 F.3d at 346-47.  Here, additional "cause" exists to lift the stay because, in the absence of stay relief, Section 305 of PROMESA,[29] as interpreted to date, would potentially  deprive Movants of due process within the Title III Court, and therefore have to be stricken down as unconstitutional.**

  **99.**  **Due process requires that Movants be able to litigate their constitutional claims and enforce their rights in some forum.  It likewise requires courts to strike down as unconstitutional laws that would "deny any judicial forum for a colorable constitutional claim." *See Webster v. Doe*, 486 U.S. 592, 603 (1988) (citing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)).**

  **100.**  **As it recently made clear, the Oversight Board intends to restrict the scope of PRIFA-related litigation to a limited number of cherry-picked issues.  (*See* ECF No. 9493 at 11–12.)  For example, as part of the Revenue Bond Adversary Proceedings, the Oversight Board will seek a ruling on the validity and scope of PRIFA bondholders' liens. *Id.*  But the Oversight Board wants to prevent the Court from determining—even in the context of an affirmative defense raised by PRIFA bondholders—any challenge to the validity of the primary devices the Oversight Board and the Commonwealth have attempted to use to impair those liens, such as "fiscal plans or budgets certified by the Oversight**

---

**[29] Section 305 of PROMESA states that "unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property."  48 U.S.C. § 2165.**

Board" and "Commonwealth statutes or executive orders (including the Moratorium Laws and the Fiscal Compliance Act)." *Id.* at 12.  If the Oversight Board is permitted to pick and choose the claims and defenses that the various parties can assert to arrive at a preordained outcome—one that is favorable  to the Commonwealth at the expense of PRIFA and its creditors—then due process will not be afforded to bondholders in the Title III Court.

101.    The First Circuit has already indicated that Section 305 would limit Movants' ability to fully and fairly litigate their rights in the Title III Court.  In *Ambac*, the First Circuit held that "the text of [S]ection 305 bars the Title III [C]ourt from granting" creditors precisely the relief Movants now seek to pursue in another forum, including enforcement of their constitutional rights under the Contracts and Takings Clauses, absent consent from the Oversight Board.  927 F.3d at 602-03.  In response to Ambac's argument that the First Circuit's interpretation of Section 305 "would raise due process concerns because Ambac would be left without a venue in which to bring constitutional claims," the First Circuit emphasized that "nothing in our holding today suggests that Ambac cannot seek traditional stay relief pursuant to 11 U.S.C. § 362 and raise its constitutional and statutory arguments in a separate action."  *Id.* at 605.

102.    Movants have now followed the First Circuit's guidance and sought stay relief to litigate outside of the Title III Court.  Were this Court to now deny stay relief, however, Movants would be left without a forum in which to adequately vindicate their rights as a result of Section 305's bar.  In such circumstances, due process would require the Court to sever and hold invalid Section 305 of PROMESA, so as to permit Movants to raise their constitutional and statutory claims in the Title III Court.  The Supreme Court

has cautioned courts to avoid such a result.  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."); *United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) (articulating doctrine of constitutional avoidance).  Thus, to afford Movants due process and to save PROMESA from unconstitutionality, the stay should be lifted for "cause."

      **C.**    **There Is Cause to Lift the Stay Based on the Totality of Circumstances.**

    **103.**    **In addition to a "lack of adequate protection," the court may find "cause" for lifting the stay** based on the "totality of the circumstances."  *In re Scarborough-St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015) (citing *Tribune Media Servs., Inc. v. Beatty (In re Tribune)*, 418 B.R. 116, 126 (Bankr. D. Del. 2009); *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)).  Here, the *Sonnax* factors weigh in favor of stay relief on this basis.[30]

    **104.**    **As the First Circuit recently explained, the *Sonnax* factors "'provide a helpful framework' for determining whether stay relief should otherwise be granted 'for cause.'"** *See, e.g.*, *Gracia-Gracia*, 939 F.3d at 347.  The *Sonnax* factors are:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether

---

[30] As noted above, the Bankruptcy Code explicitly enumerates the "lack of adequate protection" as sufficient "cause" to lift the stay.  11 U.S.C. § 362(d)(1).  Accordingly, the Court considers the *Sonnax* factors only to decide "whether stay relief should *otherwise* be granted," *Gracia-Gracia*, 939 F.3d at 347—*i.e.*, whether there is "cause" for stay relief, *other than* "lack of adequate protection." If the Court finds that Movants' property rights are not adequately protected, it does not need to consider the *Sonnax* factors.

movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*In re Sonnax*, 907 F.2d at 1286.

105.    "Not all of these factors will be relevant in every case," *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir.1999), "[a]nd the court need not give equal weight to each factor," *In re Taub*, 438 B.R. 39, 45 (Bankr. E.D.N.Y. 2010).  Rather, as courts have repeatedly noted, "[w]hen applying these factors and considering whether to modify the automatic stay, the Court should take into account the particular circumstances of the case, and ascertain what is just to the claimants, the debtor and the estate." *In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).

106.    Under the particular circumstances of this case, the relevant *Sonnax* factors (1, 2, 3, 4, 7, 8, 9, 10, and 12) all counsel in favor of lifting the automatic stay.[31]  *See In re Sonnax*, 907 F.2d at 1286 (acknowledging that only some of the factors "are relevant" in a given case).

107.    *Factor 1: Lifting the stay "would result in a partial or complete resolution of the issues."*  Factor 1 is satisfied when lifting the stay can resolve "significant open issues in the [debtors'] bankruptcy case." *In re Taub*, 413 B.R. 55, 62 (Bankr. E.D.N.Y. 2009).  As

---

[31]    The fifth *Sonnax* factor, *i.e.*, "whether the debtor's insurer has assumed full responsibility for defending it," as well as the eleventh *Sonnax* factor, *i.e.*, "whether the parties are ready for trial in the other proceeding," appear inapplicable in this case.  While the PRIFA Enforcement Actions will not primarily involve third parties (Factor 6), the other applicable factors weigh in favor of stay relief, and this factor is inconsequential.  Further, any judgment arising from the PRIFA Enforcement Actions would not be subject to equitable subordination, and thus Factor 8 weighs in favor of stay relief.

discussed *supra*, relief from the stay would allow the Court to resolve a longstanding legal issue:  the property rights of PRIFA in the Pledged Rum Taxes (and Movants' lien thereon) and the application of Article VI, Section 8 of the Puerto Rico Constitution to the Pledged Rum Taxes.  There is no other proceeding currently pending that would resolve these issues—and these issues likely cannot be addressed in the Title III proceedings because litigation over these issues would be either impermissibly "advisory," or barred by PROMESA § 305, 48 U.S.C. § 2165, or both.  *See Ambac*, 927 F.3d at 605; *Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 638, 646-47 (1st Cir. 2019).  Indeed, for this reason, the First Circuit has indicated that seeking stay relief is the appropriate procedure for litigating critical issues affecting revenue bonds.  *See Ambac*, 927 F.3d at 605.  Thus, this factor strongly supports lifting the stay.

108.    *Factor 2: Lifting the stay would not "interfere[] with the bankruptcy case."*  As set forth above, the Commonwealth has no equity in the Pledged Rum Taxes and has no temporary right of possession because the Article VI, Section 8 has never been triggered.  (*See supra* Section III.A.3.)  Thus, adjudication of the PRIFA Enforcement Actions could not interfere with the Commonwealth's Title III case.  *See In re Sonnax*, 907 F.2d at 1285-86 ("[P]roceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the . . . protection of the debtor and his estate from his creditors.").  Importantly, adjudication of the PRIFA Enforcement Actions would promote the efficient resolution of issues that must be resolved yet cannot be litigated in the Title III Court absent consent by the Oversight Board under Section 305 (which consent the Oversight Board has refused to give).  Whether the Pledged Rum Taxes have been wrongfully diverted and misappropriated must be decided before confirmation of a Commonwealth

plan of adjustment.  Moreover, bankruptcy courts routinely find cause to lift the stay when a nonbankruptcy court is better suited to resolve the dispute—whether the reason is that the bankruptcy court has limited adjudicatory authority, the issues presented fall outside of the bankruptcy court's domain of expertise, or the dispute could be resolved more efficiently outside bankruptcy.  *See, e.g., In re Shaffer*, 563 B.R. 301, 306-08 (Bankr. D. Ariz. 2016) (observing that, "where a bankruptcy court may abstain from deciding issues in favor of an imminent state court trial involving the same issues, cause"); *In re Mason*, 514 B.R. 852, 860 (Bankr. E.D. Ky. 2014) (finding that "cause" existed to lift the stay to allow former employees to liquidate their employment discrimination claims against debtor in district court where civil rights action was pending because, among other reasons, there were no preliminary bankruptcy issues to be determined and the bankruptcy court was without authority to liquidate or even estimate amount of employees' claims); *In re Blair*, 534 B.R. 787, 792-93 (Bankr. D.N.M. 2015) (finding "cause" to modify automatic stay to allow landlords to prosecute their pre-petition eviction proceeding against Chapter 7 debtor-tenant and exercise their state-law rights and remedies under the residential lease); *In re Breitburn Energy Partners LP*, 571 B.R. 59 (Bankr. S.D.N.Y. 2017) (finding "cause" to lift the stay because preexisting action pending in state court would not interfere with the bankruptcy cases and the dispute presented questions of unsettled state law better left to the state court to resolve).  Factor 2 therefore weighs heavily in favor of lifting the stay.

109.   *Factor 3*: *The PRIFA Enforcement Actions would involve the Commonwealth as a fiduciary.*  The actions Movants plan to bring outside the Title III Court involve the Commonwealth in its capacity as trustee, and thus as fiduciary of the bondholders.

74

Proceedings in which the debtor is a fiduciary "need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors."  *See In re Residential Capital*, LLC, 2012 WL 3423285, at \*6 (Bankr. S.D.N.Y. Aug. 12, 2012) (quoting *In re Curtis*, 40 B.R. 795, 799 (Bankr. D. Utah 1984)).

110.    *Factor 4: The district courts in which the PRIFA Enforcement Actions would proceed can and should resolve these claims.*  There is no need for a specialized tribunal to adjudicate Movants' rights, since the federal district courts in which the PRIFA Enforcement Actions would proceed are well-equipped to do so.  In any case, given the Oversight Board's position on Section 305 and the Title III Court's inability to full and fairly hear and decide the relevant issues, any non-Title III Court, local or federal, is better situated to provide meaningful relief to Movants.

111.    *Factor 7: The PRIFA Enforcement Actions would not "prejudice the interests of other creditors."*  Other Commonwealth creditors will not be prejudiced by the PRIFA Enforcement Actions because, like the Commonwealth, they have no property rights in the Pledged Rum Taxes.  For the reasons articulated earlier, Article VI, Section 8 has never been triggered in this or any prior fiscal year, so general obligation creditors of the Commonwealth have no interest in the Pledged Rum Taxes.  Further, even if the issues raised in the Motion are of interest to other creditors, First Circuit precedent and due process require their adjudication in a non-Title III Court. Thus, Factor 7 weighs heavily in favor of lifting the stay.

112.    *Factor 9: Movants' success in the PRIFA Enforcement Actions would not result in a judicial lien avoidable by the Commonwealth.*  Movants' success in a proceeding outside of the Title III Court would not result in a judicial lien because Movants' bonds are

already secured by security interests and no judicial lien would be necessary to secure Movants' liens. In any event, the Oversight Board has no ability to avoid judicial liens, because the ability to do so under Section 544(a) of the Bankruptcy Code is dependent on the Oversight Board's ability to step into the shoes of a hypothetical judicial lien creditor, and in Puerto Rico no judicial lien creditor can exist with respect to public funds. *See, e.g.*, *Román v. S.L.G. Ruiz*, 160 D.P.R. 116, 121-22 (2003); *Commolco de Caguas Inc. v. Benitez Diaz*, 126 D.P.R. 478, 493 (1990); 3 L.P.R.A. §§ 9102, 9142.

113.    *Factor 10: Allowing the PRIFA Enforcement Actions to proceed serves "the interests of judicial economy and the expeditious and economical resolution of the litigation."* The determination that all Pledged Rum Taxes belong exclusively to PRIFA (subject to bondholders' liens) would preclude future post-plan-of-adjustment and post-confirmation litigation and allow the Commonwealth and all parties to the Title III action to more efficiently create, approve, and implement a viable plan of adjustment. Waiting to address these issues only makes them thornier, more difficult to resolve, and correspondingly impactful on any plan. Indeed, resolution of these issues will permit plans of adjustment to proceed with the proper treatment of (accrued and future Pledged Rum Taxes). Factor 10 therefore counsels in favor of lifting the stay.

114.    *Factor 12: Allowing the PRIFA Enforcement Actions to proceed cannot harm the Commonwealth but can alleviate a longstanding and serious harm to Movants and PRIFA bondholders more generally.* If the stay is lifted to allow the PRIFA Enforcement Actions to proceed, and they are resolved against Movants, there will be no harm to the Commonwealth. Conversely, if the PRIFA Enforcement Actions are resolved in Movants' favor, it will be because PRIFA (and its bondholders) are the rightful equitable owners of

the Pledged Rum Taxes and the Commonwealth never had a genuine property interest in them. Moreover, from Movants' perspective, a favorable adjudication of the PRIFA Enforcement Actions could prevent future withholding of the Pledged Rum Taxes from the rightful owners (the PRIFA bondholders), which would prevent the Commonwealth from wrongfully withholding the Pledged Rum Taxes and unnecessarily forcing Insurers to make the bond payments. Thus, Factor 12 strongly supports lifting the stay.

115.    Accordingly, all applicable *Sonnax* factors favor lifting the stay.

IV.    III. THEIN THE ALTERNATIVE, THE COURT SHOULD MANDATE ADEQUATE PROTECTION.

116.    84. In the event that the Court does not find the automatic stay inapplicable ordeclines to lift the stay, it should require the Commonwealth to provide adequate protection for the Pledged Rum Taxes. "The concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court." *LNC Invs., Inc. v. First Fid. Bank N.A.*, 247 B.R. 38, 44 (S.D.N.Y. 2000) (citation omitted). "TheIn the case of a lien, "[t]he focus of theth[e] [adequate protection] requirement is to protect a secured creditor from diminution in the value of its interest in [its] particular collateral during the period of use by the debtor." *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012). Adequate protection must be provided "to insure that the creditor receives the value for which [it] bargained prebankruptcy." *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citation omitted). "[A]dequate protection . . . is a flexible concept to be tailored to the individual facts and circumstances of each case." *In re Tellier*, 125 B.R. 348, 349 (Bankr. D. R.I. 1991) (citations omitted).

117.    85. Ambac has a lien onBoth PRIFA's equitable ownership of the Pledged Rum Taxes and the bondholders' lien on them are entitled to protection under the Bankruptcy

Code.  *See supra* Section II.A.1.  Such protection can be provided in the form of (i) cash payments equal to the decrease in the value of the secured creditor's interest, (ii) an additional or replacement lien, or (iii) other relief "as will result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(1)-(3); *see* 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 361 into PROMESA); *see also In re Bldrs. Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013).[1832]

## CONCLUSION

**118.**  86. Congress specifically included protections for revenue bonds in the Bankruptcy Code and PROMESA because of the importance of revenue bonds to municipal finance.  Allowing the Commonwealth, for the exigencies of this particular case, to disavow those statutory protections and the property rights created by statute will upend the revenue bond market and do serious, long-lasting damage to state and municipal governments' legitimate **and necessary** efforts to borrow and fund capital investments at reasonable rates.  This is particularly true here, where it is the restructuring of ***the Commonwealth*** that the Oversight Board contends—without any legal support—allows PRIFA's and PRIFA bondholders' property to be taken.

---

[1832]  Additionally, absent adequate protection, Ambac**Movants** would be entitled to an administrative expense priority claim under 11 U.S.C. § 503(b)(1)(A) for each postpetition **for any post-petition** diversion of Pledged Rum Taxes.  The Commonwealth has repeatedly insisted that the clawback of revenue bond collateral is "necessary" to fund its ongoing operations — which brings these expenses within the ambit of section 503(b) — and postpetition liabilities incurred by the debtor are accorded administrative expense priority.  *See, e.g., Reading Co. v. Brown*, 391 U.S. 471, 485 (1968) (tort liabilities incurred postpetition**post-petition** give rise to administrative expense priority claims); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (liabilities arising under postpetition contractual arrangements with debtor give rise to administrative expense priority claims).  At a minimum, the Commonwealth's postpetition liability for clawbacks cannot be discharged as part of the Commonwealth's plan of adjustment, which adjusts only prepetition liabilities.  *See* 6 Collier on Bankruptcy ¶ 944.03 (16th ed. 2018) (Section 944 (incorporated into PROMESA) discharges only prepetition debts of a municipal debtor).

119. 87. For the foregoing reasons, the Court should enter an order, substantially in the form attached hereto as Exhibit A, finding that the U.S. Treasury Action and PRIFA Clawback Action are not subject to the automatic stay that went into effect upon the filing of the Commonwealth's Title III petition. In the alternative, the Court should lift1, lifting the automatic stay under Sections 362(d)(1) and/or (d)(2) so that AmbacMovants may pursue the U.S. Treasury Action and PRIFA Clawback Action. Further inPRIFA Enforcement Actions.[33] In the alternative, the Court should order that the Commonwealth provide adequate protection for Ambac'sMovants' lien on the Pledged Rum Taxes.

## CERTIFICATION

In accordance with paragraph 7 of the *Interim Case Management Order for Revenue Bonds* (ECF No. 9620), Movants certify that (i) they have taken reasonable efforts to avoid

---

[33] **Movants intend to respond in due course to the contemplated structure of the revenue bond lift-stay litigation per paragraph 7 of the *Amended and Restated Order Addressing the Filing of an Amended Report by the Mediation Team and Extending (a) Stay Period, (b) Mandatory Mediation, and (c) Certain Deadlines Related Thereto* (ECF No. 9661), and otherwise reserve all rights under Section 362(e), including, without limitation, the right to a final hearing on that date, or in any event, the right to a final hearing within 30 days of any preliminary hearing (to the extent that the automatic stay has not already terminated by operation of law). Movants object to the application here of any provision of the *Tenth Amended Notice, Case Management and Administrative Procedures* (ECF No. 8027-1) to the extent that it purports to limit or abrogate Movants' statutory rights. Movants note their position that the stay terminated by operation of law 30 days after November, 30, 2019, because (i) *Ambac Assurance Corporation's Motion and Memorandum of Law in Support of Its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* (ECF No. 7176) was pending as of that date (joined by all Monoline Movants), (ii) Movants did not consent to any extension of the preliminary hearing beyond November 30, 2019, and (iii) the Debtor did not request that the Court extend the time for a preliminary hearing in accordance with the requirements of Section 362(e). *See Movants' Obj. to Stay Extension Mot.* (ECF No. 9001); *Stay Extension Order* (ECF No. 9016) (overruling *Movants' Obj. to Stay Extension Mot.*); *see also In re River Hills Apts. Fund*, 813 F.2d 702, 707 (5th Cir. 1987) ("[D]ebtor must, through 'aggressive litigation management,' obtain a timely hearing if it wants to ensure the continued protection of the automatic stay . . . [and] it is the *debtor's burden* to call the issue to the court's attention if it desires that the stay be continued") (emphasis added).**

duplication and submit a brief that is no longer than necessary, and (ii) they have used

reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

~~Dated:  May 30, 2019
          San Juan, Puerto Rico~~

**FERRAIUOLI LLC**

By: */s/ Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile: (787) 766-7001
    Email:  rcamara@ferraiuoli.com
            scolon@ferraiuoli.com

**MILBANK LLP**

By: */s/* ~~Andrew M. Leblanc~~*Atara Miller*
    Dennis F. Dunne **(admitted *pro hac vice*)**

    ~~Andrew M. Leblanc~~
    Atara Miller **(admitted *pro hac vice*)**

    Grant R. Mainland
    (admitted *pro hac vice*)
    **John J. Hughes, III** (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email: ddunne@milbank.com

    ~~aleblanc@milbank.com~~
    amiller@milbank.com
    gmainland@milbank.com

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
    **María E. Picó**
    **(USDC-PR No. 123214)**
    **802 Ave. Fernández Juncos**
    **San Juan, PR 00907-4315**
    **Telephone: (787) 723-8520**
    **Facsimile: (787) 724-7844**
    **Email: mpico@rexachpico.com**

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
    **Martin A. Sosland (admitted *pro** 
    **5430 LBJ Freeway, Suite 1200**
    **Dallas, TX 75240**
    **Telephone: (469) 680-5502**
    **Facsimile: (469) 680-5501**
    **Email: martin.sosland@butlersn**
    **Jason W. Callen (admitted *pro h***
    **150 3rd Ave., S., Suite 1600**
    **Nashville, TN 37201**
    **Telephone: (615) 651-6774**
    **Facsimile: (615) 651-6701**
    **Email: jason.callen@butlersnow**

*Attorneys for Financial Guaranty Ins*

ARENT FOX LLP

By: /s/ David L. Dubrow
    David L. Dubrow
    Mark A. Angelov
    (admitted *pro hac vice*)
    1301 Avenue of the Americas
    New York, NY  10019
    Telephone:  (212) 484-3900
    Facsimile: (212) 484-3990
    Email:
    david.dubrow@arentfox.com

mark.angelov@arentfox**jhughes2@milbank**.com

[*Remainder of Page Intentionally Omitted*]

ARENT FOX LLP

By: */s/ David L. Dubrow*
    David L. Dubrow (admitted *pro hac vice*)
    Mark A. Angelov (admitted *pro hac vice*)
    1301 Avenue of the Americas
    New York, NY 10019
    Telephone: (212) 484-3900
    Facsimile: (212) 484-3990
    Email: david.dubrow@arentfox.com
        mark.angelov@arentfox.com
    Randall A. Brater (admitted *pro hac vice*)
    1717 K Street, NW
    Washington, DC  20006
    Telephone: (202) 857-6000
    Facsimile: (202) 857-6395
    Email:randall.brater@arentfox.com

*Attorneys for Ambac Assurance Corporation*

RIVERA, TULLA, AND FERRER LLC

By: */s/ Eric A. Tulla*
    Eric A. Tulla
    USDC-DPR No. 118313
    Email: etulla@
    riveratulla.com
    Iris J. Cabrera-Gómez
    USDC-DPR No. 221101
    Email: icabrera@
    riveratulla.com
    Rivera Tulla & Ferrer Building
    50 Quisqueya Street
    San Juan, PR 00917-1212
    Telephone: (787) 753-0438
    Facsimile: (787) 767-5784

CASELLAS ALCOVER & BURGOS P.S.C.

By: */s/ Heriberto Burgo Pérez*
    Heriberto Burgos Pérez
    USDC-PR No. 204809
    Ricardo F. Casellas-Sánchez
    USDC-PR No. 203114
    Diana Pérez-Seda
    USDC-PR No. 232014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

HOGAN LOVELLS US LLP

By: */s/ Robin E. Keller*
    Robin E. Keller, Esq.
    Ronald Silverman, Esq.
    390 Madison Avenue
    New York, NY 10017
    Telephone: (212) 918-3000
    Facsimile: (212) 918-3100
    robin.keller@hoganlovells.com
    ronald.silverman@hoganlovells.com

*Attorneys for U.S. Bank National Association, in its Capacity as Trustee*

[*Remainder of Page Intentionally Omitted*]

Cadwalader, Wickersham & Taft LLP

By: */s/ Mark C. Ellenberg*_____
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to

all CM/ECF participants in this case.

/s/ Roberto Cámara-Fuertes
Roberto Cámara-Fuertes (USDC-PR No. 219002)

221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com