**Reply Deadline: January 27, 2020 5:00 PM AST**
**Hearing Date: January 29, 2020 9:30 AM AST**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br>Case No. 17 BK 3283 (LTS)<br><br>(Jointly Administered) |

### OBJECTION OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AMBAC ASSURANCE CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY TO (I) RESPONSE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO TO INTERIM REPORT AND RECOMMENDATION OF THE MEDIATION TEAM (ECF NO. 9493), AS INCORPORATED IN (II) INTERIM CASE MANAGEMENT ORDER FOR REVENUE BONDS (ECF NO. 9620)

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .................................................................................................................... 5

ARGUMENT ...................................................................................................................... 12

I. THE COURT SHOULD HOLD A FINAL HEARING ON THE LIFT STAY
MOTIONS, AND THE REVENUE BOND ADVERSARY PROCEEDINGS
SHOULD BE STAYED PENDING RESOLUTION OF THE LIFT STAY
MOTIONS AND THE ENFORCEMENT ACTIONS....................................................... 12

II. BY DEPRIVING THE REVENUE BONDHOLDERS OF THE ABILITY TO
RAISE "ANY PROPER AFFIRMATIVE DEFENSE," FOMB'S
INTERPRETATION OF SECTION 305 VIOLATES DUE PROCESS AND
MUST BE REJECTED IN FAVOR OF FULL AND FAIR ADJUDICATION OF
REVENUE BOND ISSUES ......................................................................................... 19

III. THE COURT SHOULD PERMIT REASONABLE DISCOVERY IN
CONNECTION WITH THE LIFT STAY MOTIONS .................................................... 24

CONCLUSION ................................................................................................................... 27

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

641 Ave. of Americas Ltd. Partnership v. 641 Assoc., Ltd.,
  189 B.R. 583 (S.D.N.Y. 1995) ................................................................. 18

Ambac Assurance Corp. v. Commonwealth of P.R. et. al.,
  927 F.3d 597 (1st Cir. 2019) ................................................................ *passim*

Ambac Assurance Corp. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),
  297 F.Supp.3d 269 (D.P.R. 2018) ............................................................. 6

Cadle Co. v. Schlichtmann,
  267 F.3d 14 (1st Cir. 2001) ................................................................... 18

Concepción Chaparro v. Ruiz-Hernández,
  607 F.3d 261 (1st Cir. 2010) ................................................................. 21

Daniels v. Williams,
  474 U.S. 327 (1986) .......................................................................... 22

Franklin Cal. Tax-Free Tr. v. P.R.,
  805 F.3d 322 (1st Cir. 2015) ................................................................. 19

Gracia-Gracia v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin. Oversight and Mgmt.
  Bd. for P.R.),
  939 F.3d 340 (1st Cir. 2019) ................................................................. 25

Grella v. Salem Five Cent Sav. Bank,
  42 F.3d 26 (1st Cir. 1994) ..................................................................... 2

Grundy Nat. Bank v. Harman Investments, Inc.,
  1989 WL 117725, No. 88-1310 (4th Cir. Sept. 27 1989) ....................................... 16

In re Marine Power & Equipment Co., Inc.,
  71 B.R. 925 (W.D.Wash. 1987) .............................................................. 16

In re Nelson,
  437 P.2d 1008 (N.M. 1968) .................................................................. 21

In re Orsa Assoc.,
  99 B.R. 609 (Bankr. E.D. Pa. 1989) ......................................................... 21

## TABLE OF AUTHORITIES

**PAGE(S)**

In re River Hills Apartments Fund,
    813 F.2d 702 (5th Cir. 1987) ................................................................. 15

In re Wood,
    33 B.R. 320 (Bankr. D.Id. 1983) ........................................................... 16

Int'l Bhd. of Teamsters v. United States,
    431 U.S. 324 (1977) ............................................................................. 23

Jett v. Lawyers Title Ins. Corp.,
    985 So.2d 434 (Ala. Civ. App. 2007) .................................................... 18

Jiminez v. Allstate Ins. Co.,
    765 F.3d 1161 (9th Cir. 2014) .............................................................. 23

Logan v. Zimmerman Brush Co.,
    455 U.S. 422 (1981) ............................................................................. 22

Makaeff v. Trump Univ., LLC,
    309 F.R.D. 631 (S.D. Cal. 2015) .......................................................... 23

Matter of Boomgarden,
    780 F.2d 657 (7th Cir. 1985) ............................................................... 16

Mullane v. Central Hanover Bank & Trust Co.,
    339 U.S. 306 (1950) ............................................................................. 21

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.,
    28 F.3d 376 (3d Cir. 1994) ................................................................... 22

Pavilion Hotel, Inc. v. Valley Nat. Bank of Ariz.,
    885 P.2d 186 (Ariz. Ct. App. 1994) ...................................................... 18

Resolution Trust Corp. v. Love,
    36 F.3d 972 (10th Cir. 1994) ................................................................ 22

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011) ............................................................................. 23

**STATUTES:**

PROMESA § 3a .................................................................................... 19

iii

# TABLE OF AUTHORITIES

**PAGE(S)**

**OTHER AUTHORITIES:**

BLACK'S LAW DICTIONARY 1083; (5th ed. 1979) .........................................................................21

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured"), National Public Finance Guarantee Corporation ("National"), Ambac Assurance Corporation ("Ambac"), and Financial Guaranty Insurance Company ("FGIC", and collectively with Assured, National, and Ambac, the "Revenue Bondholders") hereby submit this Objection (the "Objection") to (I) the *Response of the Financial Oversight and Management Board for Puerto Rico to Interim Report and Recommendation of the Mediation Team* (ECF No. 9493, the "FOMB Response"), as incorporated in (II) the *Interim Case Management Order for Revenue Bonds* (ECF No. 9620, the "Interim Revenue Bonds Order"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.     In the *Interim Report and Recommendation of the Mediation Team* (ECF No. 9365, the "Interim Report") filed on November 27, 2019, the Mediation Team identified, as one of the "disputed issues that the Mediation Team believes should be allowed to proceed forward in the near-term," "the rights, as against the Commonwealth, of holders of 'revenue bonds' and other debt issued by certain Puerto Rico instrumentalities." See Interim Report at 4-5. Based on documents publicly filed on the docket to date, both the Revenue Bondholders and the Financial Oversight and Management Board for Puerto Rico ("FOMB") appear to agree with the Mediation Team that revenue bondholders' rights should be adjudicated in the near-term. However, there is disagreement between the Revenue Bondholders and FOMB about what the appropriate vehicle for addressing these revenue-bond issues is.

2.     Specifically, on January 16, 2020, the Revenue Bondholders filed the Lift Stay Motions, which seek, among other things, relief from the automatic stay so that revenue-bond

---

[2] Unless otherwise indicated, references to ECF numbers herein refer to the docket in Case No. 17-3283-LTS. Capitalized terms used herein but not defined herein have the meanings ascribed to them in the FOMB Response or in the Interim Revenue Bonds Order, as applicable.

issues can be addressed by way of one or more actions (the "Enforcement Actions") to enforce the Revenue Bondholders' rights under the revenue bonds in a forum other than the Title III Court. The Revenue Bondholders believe that the Lift Stay Motions and Enforcement Actions are the *only* appropriate vehicle for adjudicating the Revenue Bondholders' rights. This belief is grounded in the First Circuit's decision in Ambac Assurance Corporation v. Commonwealth of P.R. et. al., 927 F.3d 597, 605 (1st Cir. 2019), where the First Circuit effectively acknowledged that Section 305 of PROMESA renders it impossible for the Revenue Bondholders to obtain due process and an opportunity to assert their statutory and constitutional claims in the Title III Court, and instead instructed the Revenue Bondholders to "seek traditional stay relief pursuant to 11 U.S.C. § 362 and raise [their] constitutional and statutory arguments in a separate action" outside of the Title III Court. Id. at 605. In filing the Lift Stay Motions and pursuing the associated Enforcement Actions as the appropriate vehicle for addressing revenue-bond issues, the Revenue Bondholders are simply following the First Circuit's instructions.

3.     In contrast, FOMB, in the FOMB Response, has taken a series of inconsistent positions on the use of the Lift Stay Motions and the Revenue Bond Adversary Proceedings as potential vehicles for litigating revenue-bond issues. First, solely in the case of the PRIFA Lift Stay Motion, FOMB contends that "**the briefing in the pending PRIFA Lift Stay Motion . . . provides an adequate vehicle through which to determine the nature and scope of any lien held by [the Revenue Bondholders]**." See FOMB Response at 7 n.8 (emphasis added).[3] With respect to the HTA and CCDA Lift Stay Motions, however, FOMB argues the

---

[3] For the avoidance of doubt, the Revenue Bondholders note that the Court's ruling on the PRIFA Lift Stay Motion will not itself "involve a full adjudication on the merits of claims, defenses, or counterclaims [related to the PRIFA Bonds], but simply a determination as to whether a creditor has a *colorable claim* to property of the [Debtor]." Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 32 (1st Cir. 1994) (emphasis added). A full adjudication on "the merits of claims, defenses, [and] counterclaims" related to the PRIFA Bonds will need to take place, as contemplated by the First Circuit, in the context of an Enforcement Action

opposite—that the HTA and CCDA Lift Stay Motions, uniquely and unlike the PRIFA Lift Stay

Motion, are *not* appropriate vehicles for litigating revenue-bond issues, and that the Revenue Bond

Adversary Proceedings are the "better" vehicle for deciding HTA and CCDA issues.  See FOMB

Response ¶ 14.  Whether this inconsistency in FOMB's positions is due to tactical maneuvering

or otherwise, FOMB's position on the HTA and CCDA Lift Stay Motions fails to take into account

the First Circuit's guidance in Ambac that an adversary proceeding in the Title III Court *cannot*

provide due process or an adequate opportunity for the Revenue Bondholders to raise their

statutory and constitutional issues, and therefore is not a constitutionally viable vehicle for

litigating revenue-bond issues.  Nor does FOMB's position take into account the First Circuit's

instructions that these issues should instead be addressed by way of (i) a lift-stay motion followed

by (ii) "a separate action" (i.e. the Enforcement Actions) in a non–Title III forum.

4.    Through the proposed interim scheduling order applicable to revenue bonds

attached by the Mediation Team as Exhibit 2 to the Interim Report (ECF No. 9365-2, the

"Mediation Team Proposed Order"), the Mediation Team proposed what amounts to a compromise

between the Revenue Bondholders and FOMB on whether (i) the Lift Stay Motions and

Enforcement Actions or (ii) the Revenue Bond Adversary Proceedings constitute the more

appropriate vehicle for litigating revenue-bond issues.  The implied compromise proposed by the

Mediation Team has two basic elements.  First, given the Revenue Bondholders' need to pursue

the Lift Stay Motions and Enforcement Actions and FOMB's competing preference for the

Revenue Bond Adversary Proceedings, the Mediation Team Proposed Order permitted both the

Lift Stay Motions and the Revenue Bond Adversary Proceedings to move forward unimpeded.

Second, to at least partially mitigate the constitutional infirmities that Section 305 would otherwise

---

commenced with respect to the PRIFA Bonds in a non-Title-III forum following any necessary relief from
the automatic stay.

entail for the Revenue Bondholders' due process rights in the Revenue Bond Adversary Proceedings, the Mediation Team proposed that the Interim Revenue Bonds Order should clarify in advance that FOMB's filing of the Revenue Bond Complaints would be deemed consent, under Section 305 of PROMESA, to "the Court's jurisdiction over and determination of any claim, issue, or argument raised in the Revenue Bond Complaints and **any proper affirmative defense raised by [the Revenue Bondholders]**." <u>See</u> Mediation Team Proposed Order ¶ 2 (emphasis added). That language was critical to achieving any semblance of fairness in the Revenue Bond Adversary Proceedings; without it, the Revenue Bondholders would be left with no assurance that they can raise proper defenses to the FOMB's claims, as due process requires.

5.        In their responses to the Interim Report, the Revenue Bondholders accepted the implied compromise proposed by the Mediation Team, requesting no substantive changes to the provisions of the Mediation Team Proposed Order setting forth the proposed compromise. FOMB, however, rejected the Mediation Team's proposed compromise by requesting modifications to both of its basic elements.

6.        Specifically, rather than permitting both the Lift Stay Motions and the Revenue Bond Adversary Proceedings to move forward unimpeded, FOMB has sought to limit the hearing on the Lift Stay Motions to a *preliminary* hearing on "whether (i) there is a reasonable likelihood the debtors will prevail and (ii) there are compelling circumstances to justify (or consent to allow) delaying the final hearing(s) through the Court's resolution of the Rule 12(b) and/or 12(c) motions filed in connection with the Revenue Bond Adversary Proceedings." <u>See</u> FOMB Response ¶ 10.  By these means, FOMB has effectively sought to stay the Lift Stay Motions— which the Revenue Bondholders filed based on the First Circuit's instructions—in favor of the Revenue Bond Adversary Proceedings.

7.       In addition, rather than accepting the Mediation Team's conclusion that FOMB's filing of the Revenue Bond Complaints should be deemed consent to "the Court's jurisdiction over and determination of any claim, issue, or argument raised in the Revenue Bond Complaints and **any proper affirmative defense raised by [the Revenue Bondholders],**" FOMB proposed an interpretation of Section 305 that would limit (or effectively eliminate) the Revenue Bondholders' ability to raise proper affirmative defenses.

8.       Given FOMB's rejection of the Mediation Team's proposed compromise, the Revenue Bondholders have no choice but to seek relief using the procedure laid out by the First Circuit in Ambac.  Thus, the Revenue Bondholders request that the Court revise the Interim Revenue Bonds Order to (i) allow the Lift Stay Motions to proceed promptly to a *final* hearing so that the stay can be lifted to permit the Revenue Bondholders to "raise [their] constitutional and statutory arguments in a separate action" (i.e. the Enforcement Actions) in a non–Title III forum (see Ambac, 927 F.3d at 605), and (ii) stay the Revenue Bond Adversary Proceedings pending resolution of the relevant revenue-bond issues in the context of the Enforcement Actions.

## **BACKGROUND**

9.       The Revenue Bondholders are creditors of the Commonwealth of Puerto Rico and its public corporations with billions of dollars of claims arising from the securities issued by numerous Puerto Rico public entities, including several or all of the following: (i) general obligation bonds ("GO Bonds") issued by the Commonwealth of Puerto Rico and (ii) secured revenue bonds issued by (a) HTA, (b) PREPA, (c) PBA, (d) the Puerto Rico Convention Center District Authority ("CCDA"), and (e) the Puerto Rico Infrastructure Financing Authority ("PRIFA").

10.     Of particular relevance to this Objection, (i) the Revenue Bondholders collectively insure approximately $2.9 billion gross par of bonds issued by Debtor HTA ("HTA Bonds"); (ii) Revenue Bondholders Assured, Ambac, and FGIC collectively insure approximately $349 million gross par of bonds issued by CCDA ("CCDA Bonds"); and (iii) Revenue Bondholders Assured, Ambac, and FGIC collectively insure or hold approximately $829 million gross par of bonds issued by PRIFA ("PRIFA Bonds", and together with HTA Bonds and CCDA Bonds, the "Revenue Bonds").[4]

11.     On May 3, 2017, FOMB commenced a case under Title III of PROMESA on behalf of the Commonwealth.  On May 21, 2017, FOMB commenced a case under Title III of PROMESA on behalf of HTA.

12.     Shortly after the commencement of HTA's Title III case, on June 8, 2017, Ambac commenced an adversary proceeding in the Title III Court seeking, among other things, to enforce its liens on the revenues securing the HTA Bonds and assert related statutory and constitutional claims.  See Adv. Proc. No. 17-159-LTS (the "Ambac Adversary Proceeding").  On February 27, 2018, this Court entered an order dismissing the Ambac Adversary Proceeding, partly on jurisdictional grounds, and partly on the merits.  See Ambac Assurance Corp. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 297 F.Supp.3d 269 (D.P.R. 2018).

13.     On June 24, 2019, the First Circuit issued a decision affirming the dismissal of the Ambac Adversary Proceeding, but *not* on the grounds adduced by this Court.  Ambac

---

[4] Under the applicable insurance agreements and insurance policies, the Revenue Bondholders are deemed to be the sole holders of the Revenue Bonds that they insure for purposes of, or otherwise have control rights over, consents and other bondholder actions.  Under the applicable bond resolutions, trust agreements, insurance agreements, and/or insurance policies, the Revenue Bondholders are also recognized as third-party beneficiaries.  In addition, the Revenue Bondholders have also collectively paid hundreds of millions of dollars in claims under their policies insuring the Revenue Bonds.  The Revenue Bondholders are now fully subrogated to the rights of the insured holders of the Revenue Bonds for the claims they have paid.

Assurance Corporation v. Commonwealth of Puerto Rico et. al., 927 F.3d 597, 605 (1st Cir. 2019).

Specifically, the First Circuit refrained from addressing either (i) jurisdictional arguments or (ii) the merits of Ambac's claims, and instead affirmed the dismissal of the Ambac Adversary Proceeding based *solely* on Section 305 of PROMESA.  The First Circuit acknowledged that Section 305 of PROMESA rendered it impossible for the Revenue Bondholders to obtain due process in the Title III Court and instructed the Revenue Bondholders to "seek traditional stay relief pursuant to 11 U.S.C. § 362 and raise [their] constitutional and statutory arguments in a separate action" outside of the Title III Court.  Id.

14.     Also in June 2019, FOMB filed a series of motions (the "Stay Motions") seeking to stay certain of the Title III proceedings, purportedly so that FOMB could "garner further support" for a "restructuring framework" set forth in a recently announced plan support agreement with certain bondholders.  See Adv. Proc. No. 18-149, ECF No. 99 ¶ 3; see also ECF No. 7640.[5]

15.     Rather than grant the Stay Motions in the form or on the grounds proposed by FOMB, the Court on July 24, 2019 issued an order (the "Stay Order") temporarily staying certain proceedings (the "Stayed Proceedings") in order to "avoid piecemeal litigation of potentially overlapping key issues" and "to identify efficiently the issues that must be litigated or otherwise resolved to achieve confirmation of a plan of adjustment for the Commonwealth (and other debtors and potential debtors in Title III proceedings), as well as to prioritize such issues and develop efficient approaches to the resolution of such issues."  See ECF No. 8244.

16.     The Stay Order authorized the Mediation Team Leader to "facilitate the filing of agreed or substantially agreed order(s) with respect to . . . the adversary proceedings and contested matters listed in Appendix I [to the Stay Order]."  See id. ¶ A.3.  In the event the parties

---

[5]  A number of parties in interest, including some of the Revenue Bondholders, opposed these Stay Motions, noting that FOMB had failed to carry its burden of justifying a stay.

to the Stayed Proceedings were unable to "agree or come to substantial agreement with respect to such scheduling orders," the Stay Order required the Mediation Team Leader to "file with the Court a report (the 'Report') . . . setting forth the procedural issues as to which substantial consensus has been achieved, any further procedural recommendation of the Mediation Team Leader relating to those issues, and any other recommendations of the Mediation Team Leader regarding an appropriate schedule for the disposition of these adversary proceedings and contested matters. . . ." See id. ¶ A.4.

17.     The Stay Order set October 28, 2019 as the deadline for the Mediation Team Leader to file the Report.  However, on October 24, 2019, FOMB and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") filed an urgent motion (ECF No. 8972, the "First Stay Extension Motion") seeking to extend the deadline to file the Report until November 27, 2019.  The Revenue Bondholders objected to the First Stay Extension Motion (see ECF No. 9001, the "First Stay Extension Objection").

18.     On October 28, 2019, the Court entered an order granting the First Stay Extension Motion and extending the deadline to file the Report until November 27, 2019.  See ECF No. 9016 (the "First Stay Extension Order").

19.     On November 27, 2019, the Mediation Team filed the Interim Report. Assured, National, and funds managed by Invesco Advisers, Inc. filed a response on December 5, 2019 reserving their right to object to the proposed scheduling orders attached to the Mediation Team's Interim Report (ECF No. 9440, at 2 n.2).

20.     On December 6, 2019, Assured filed a response to the Interim Report (ECF No. 9501) in which it expressed support for the Mediation Team's scheduling proposals as reflected in the Mediation Team Proposed Order.  Assured requested no modifications to the Mediation Team's revenue-bond-related scheduling recommendations, although Assured did

express its views with respect to the timing of the hearing on the Lift Stay Motions—an issue that the Mediation Team had expressly left open for the Court to decide based on "the parties' competing positions."  See Mediation Team Proposed Order ¶ 1.a.

21.     On December 6, 2019, Ambac filed a response and reservation of rights (ECF 9504), expressing general support for the Interim Report, but also concern that the Interim Report contemplated that no discovery would take place until after a ruling on any Rule 12(b) and Rule 12(c) motions in the Revenue Bond Adversary Proceedings.

22.     Also on December 6, 2019, FGIC filed a response, limited objection, and reservation of rights to the Interim Report.  (ECF No. 9485).  FGIC similarly requested no change to the Mediation Team's scheduling recommendations.  Instead, FGIC filed its response to oppose FOMB's expressed intent to move to consolidate the Lift Stay Motions with the Revenue Bond Adversary Proceedings and to emphasize FGIC's view that, per the Mediation Team's recommendation, the issues raised in FGIC's counterclaim in Adv. Proc. No. 19-363 are gating issues that should be addressed in the Revenue Bond Adversary Proceedings or should otherwise proceed.

23.     In contrast to the Revenue Bondholders' general support for the Mediation Team's recommendations as reflected in the Mediation Team Proposed Order, FOMB submitted a Response rejecting many of the Mediation Team's recommendations and requesting what amounted to a re-write of the Mediation Team Proposed Order.  In particular, rather than supporting the Mediation Team's recommendation that both the Lift Stay Motions and the Revenue Bond Adversary Proceedings move forward, FOMB sought to privilege the Revenue Bond Adversary Proceedings at the expense of the Lift Stay Motions and Enforcement Actions by seeking to limit the hearing on the Lift Stay Motions to a *preliminary* hearing on the issues of "whether (i) there is a reasonable likelihood the debtors will prevail and (ii) there are compelling

circumstances to justify (or consent to allow) delaying the final hearing(s) through the Court's resolution of the 12(b) and/or Rule 12(c) motions filed in connection with the Revenue Bond Adversary Proceedings."  See FOMB Response ¶ 10.  Furthermore, rather than supporting the Mediation Team's conclusion that FOMB's filing of the Revenue Bond Complaints should be deemed consent to "the Court's jurisdiction over and determination of any claim, issue, or argument raised in the Revenue Bond Complaints and **any proper affirmative defense raised by [the Revenue Bondholders]**," FOMB proposed alternative language interpreting Section 305 to bar the Revenue Bondholders from raising proper defenses.  See FOMB Response ¶¶ 17-18.

24.     Following a December 11, 2019 hearing on the Interim Report, the Court entered the Interim Revenue Bonds Order.  The Court also entered an order (ECF No. 9618, the "Bridge Order") requiring the Mediation Team to file, by January 10, 2020, an amended report (the "Amended Report").

25.     On December 23, 2019, the Mediation Team filed an Urgent Motion (ECF No. 9638, the "Second Stay Extension Motion") seeking to (i) extend the deadline to file the Amended Report from January 10, 2020 to February 10, 2020 and (ii) move the date of the hearing on the Amended Report from January 29, 2020 to March 4, 2020.

26.     On December 23, 2019, the Court entered an order (ECF No. 9639, the "Second Stay Extension Order") partially granting the Second Stay Extension Motion by adjourning the filing deadline and hearing on the Amended Report.  The Second Stay Extension Order nonetheless "invite[d] any parties whose positions regarding the maintenance of the dates set forth in the Interim Orders and the continued stay of the Stayed Proceedings are not reflected in the [Second Stay Extension Motion] and who have views they want the Court to consider in connection with the resolution of the outstanding aspects of the [Second Stay Extension Motion], to file position statements regarding those matters."  See ECF No. 9639.

27.     On December 26, 2019, Revenue Bondholders Assured and National filed an objection to the Second Stay Extension Motion and a motion for reconsideration with respect to the Second Stay Extension Order.  (ECF No. 9655, the "Second Stay Extension Objection").

28.     On December 27, 2019, the Court entered an order (ECF No. 9661, the "Third Stay Extension Order") denying the Second Stay Extension Objection to the extent it sought reconsideration of the Second Stay Extension Order.  However, the Third Stay Extension Order set a hearing for January 29, 2020 to address any arguments concerning the continuation of the provisions of, and proposed amendments to, the Interim Revenue Bonds Order pending the March 4, 2020 hearing on the Amended Report.  See Third Stay Extension Order ¶ 7.  The Third Stay Extension Order also set a deadline of January 21, 2020 to file objections.  See id.

29.     On January 16, 2020, the Revenue Bondholders filed the Lift Stay Motions. See ECF Nos. 10102 (the "HTA Lift Stay Motion"), 10104 (the "CCDA Lift Stay Motion"), and 10109-2 (the "PRIFA Lift Stay Motion").  The Lift Stay Motions seek, among other things, relief from the stay for "cause" based on the lack of due process and of an adequate opportunity to raise statutory and constitutional issues in the Title III Court resulting from the applicability of Section 305 of PROMESA in that court.  The Lift Stay Motions note that the First Circuit held in Ambac that Section 305 bars the Revenue Bondholders from raising, in the Title III Court, their constitutional and statutory challenges to the various devices—such as fiscal plans and other moratorium laws—that the Commonwealth and FOMB have attempted to use to impair the Revenue Bondholders' liens and other property interests, holding that "the text of section 305 bars the Title III Court from granting . . . such relief absent consent from the Oversight Board."  See HTA Lift Stay Motion ¶ 115; CCDA Lift Stay Motion ¶ 117; PRIFA Lift Stay Motion ¶ 102 (citing Ambac, 927 F.3d at 602-603).  The Lift Stay Motions further note that, in response to Ambac's argument that the First Circuit's interpretation of Section 305 "would raise due process concerns

11

because Ambac would be left without a venue in which to bring constitutional claims," the First Circuit emphasized that "nothing in our holding today suggests that Ambac cannot seek traditional stay relief pursuant to 11 U.S.C. § 362 and raise its constitutional and statutory arguments in a separate action" in a non-Title-III forum.  See id.  Accordingly, the Lift Stay Motions argue that the First Circuit effectively held in Ambac that Section 305's bar on bringing statutory and constitutional claims in the Title III Court *would* constitute a violation of due process and of the right to access some judicial forum in which to assert constitutional claims *if not* for this Court's ability to lift the automatic stay to permit such claims to be brought in another forum.

30.     Also on January 16, 2020, FOMB filed the Revenue Bond Complaints.  See Adv. Proc. Nos. 20-3-LTS, 20-4-LTS, 20-5-LTS, 20-7-LTS.

31.     The Revenue Bondholders now file this Objection in accordance with the schedule set forth in the Third Stay Extension Order.

## **ARGUMENT**

I.     **The Court Should Hold A Final Hearing On The Lift Stay Motions, And The Revenue Bond Adversary Proceedings Should Be Stayed Pending Resolution Of The Lift Stay Motions And The Enforcement Actions**

32.     FOMB has sought to privilege the Revenue Bond Adversary Proceedings over the Lift Stay Motions and Enforcement Actions by modifying the Mediation Team Proposed Order to (1) specify that the hearing on the Lift Stay Motions will be a preliminary hearing rather than a final hearing, and (2) limit the scope of this preliminary hearing to the issues of "whether (i) there is a reasonable likelihood the debtors will prevail and (ii) there are compelling circumstances to justify (or consent to allow) delaying the final hearing(s) through the Court's resolution of the 12(b) and/or Rule 12(c) motions filed in connection with the Revenue Bond Adversary Proceedings."  See FOMB Response ¶ 10.  This proposed hearing scope and sequencing

is prejudicial to the Revenue Bondholders to the extent that it suggests a final hearing on the Lift

Stay Motions should be delayed until after a decision on the Rule 12(b) and/or Rule 12(c) motions

in the Revenue Bond Adversary Proceedings.  Such a final hearing delay would favor the Revenue

Bond Adversary Proceedings over the Lift Stay Motions and the Enforcement Actions as the

primary vehicles for litigating revenue bond issues.

33.     For reasons that have become clear now that the Revenue Bondholders have

filed their Lift Stay Motions and FOMB has filed the Revenue Bond Complaints, the Revenue

Bond Adversary Proceedings are not an appropriate vehicle for litigating revenue-bond issues,

including, for example, issues related to the constitutional and statutory infirmities of the fiscal

plans, moratorium laws, and other devices that FOMB and the Commonwealth have attempted to

use to impair the Revenue Bondholders' liens.  As noted in the Lift Stay Motions, Revenue

Bondholders have already attempted to litigate these types of issues in the context of an adversary

proceeding in the Title III Court, but such efforts were rejected in the Ambac case. The First

Circuit's guidance in Ambac was clear:[6]  Because of Section 305, the Revenue Bondholders cannot

obtain due process in the Title III Court unless FOMB consents to have all relevant statutory and

constitutional issues litigated in the Title III Court.  See Ambac, 927 F.3d at 605.  Given that

FOMB has withheld that consent here, as reflected in the FOMB Response, the *only* remaining

way that the Revenue Bondholders can obtain due process is by seeking relief from the automatic

stay to commence an action in a non–Title III forum where Section 305 does not apply.

34.     Moreover, this recognition that the Revenue Bond Adversary Proceedings

are not a viable vehicle for litigating revenue-bond issues reverses the implications of FOMB's

argument that "two separate briefing tracks on [threshold issues regarding the existence and scope

---

[6]     For the avoidance of doubt, the Revenue Bondholders reserve the right to argue that the First Circuit
erred in its interpretation of Section 305.

of the Revenue Bondholders' liens]—Rule 12(b)(6) and Rule 12(c) motions on the one hand, and Lift Stay Motions, on the other hand—would be unnecessary, wasteful, burdensome and a drain on available resources of the Debtors and the parties filing the Lift Stay Motions, in addition to the Court." See FOMB Response ¶ 10. The Revenue Bondholders agree with FOMB that two separate briefing tracks are probably unnecessary; the Revenue Bondholders were willing to let the Revenue Bond Adversary Proceedings go forward in parallel with the Lift Stay Motions as part of the implied compromise proposed by the Mediation Team. Given that FOMB has now rejected the Mediation Team's proposed compromise, however, and given the constitutional infirmities of the Revenue Bond Adversary Proceedings, the solution to the waste and duplication that FOMB complains of in the FOMB Response should *not* be to delay a final hearing on the Lift Stay Motions in favor of the Revenue Bond Adversary Proceedings, but rather to stay the Revenue Bond Adversary Proceedings while the Lift Stay Motions and the Enforcement Actions move forward. That process will allow revenue-bond issues to be adjudicated in a forum where Section 305 does not apply and all parties' due process rights are fully respected.

35.    Similarly, in view of the constitutional infirmities of the Revenue Bond Adversary Proceedings, FOMB's arguments on the need for "a speedy, efficient mechanism for parties to determine the dispositive legal issues of the existence and scope of the bondholders' liens" (see FOMB Response ¶ 14) likewise weigh in favor of promptly holding a *final* rather than preliminary hearing on the Lift Stay Motions. Specifically, in light of FOMB's rejection of the compromise proposed by the Mediation Team, it is now clear that the Revenue Bond Adversary Proceedings will not be able to provide a "speedy," "efficient," or *complete* mechanism for litigating all relevant revenue-bond issues—in part because, contrary to the Mediation Team's recommendations, FOMB intends to use Section 305 in an attempt to artificially limit the scope of the issues that can be addressed in the context of the Revenue Bond Adversary Proceedings (see

FOMB Response ¶ 17 and Section II of this Objection below).  Under the FOMB's proposed procedure, the Revenue Bondholders would be forced to challenge any purported resolution of revenue-bond issues in the Revenue Bond Adversary Proceedings on constitutional grounds, leaving a cloud of constitutional uncertainty over any ruling in those proceedings.

36.     Given the Revenue Bond Adversary Proceedings' deficiencies, it is essential for the Revenue Bondholders to commence as soon as possible the Enforcement Actions, which can function as the speedy, efficient, complete, and, above all, *constitutional* vehicles for the resolution of revenue-bond issues that the Revenue Bond Adversary Proceedings are not.  For that reason, the Revenue Bondholders submit that the Court should not expend time or resources on a preliminary hearing on the Lift Stay Motions and should proceed to schedule a final hearing.  Provided that such a final hearing is not unduly delayed and is set for a date acceptable to the Revenue Bondholders, the Revenue Bondholders are willing to waive the 30-day deadline of Section 362(e)(1) to the extent necessary to allow the Lift Stay Motions to be set for a final rather than a preliminary hearing.

37.     Generally speaking, a preliminary hearing under Section 362(e) is only necessary where "because of exigent circumstances or for any other reason, *the final hearing cannot be held when the matter is first heard*."  See In re River Hills Apartments Fund, 813 F.2d 702, 708 (5th Cir. 1987) (emphasis added).  Here, given the Revenue Bondholders' willingness to waive the 30-day deadline under Section 362(e)(1) for a limited acceptable period, there is no statutory deadline or other exigency that would force the Court to hold a hearing before the Court and the parties are prepared for a final hearing.  Furthermore, the purpose of the statutory deadlines in Section 362(e)(1) is to protect secured creditors by providing a speedy resolution to lift-stay

motions.[7]  Here, however, the Revenue Bondholders are the secured creditors that Section 362(e) is intended to protect, and given that the Revenue Bondholders are willing to waive Section 362(e)'s timing protections for a reasonable amount of time so the Court can hold a final hearing, there is no reason to hold a preliminary hearing.  In this context, FOMB's request completely subverts Section 362(e)'s creditor-protective timing requirements. Its proposed preliminary hearing, limited to FOMB's cherry-picked issues, is designed to deprive the Revenue Bondholders of the only correct litigation vehicle (the Lift Stay Motions and Enforcement Actions) that can result in the adjudication of all necessary issues, in favor of FOMB's proposed and Section 305 limited litigation vehicle (the Revenue Bond Adversary Proceedings).

38.    To prevent duplication and waste of resources while the Revenue Bondholders attempt to achieve a constitutionally viable resolution of the revenue-bond issues through the Lift Stay Motions and the Enforcement Actions, the Revenue Bondholders further propose that the Revenue Bond Adversary Proceedings be stayed until either (i) the revenue-bond issues have been successfully resolved through entry of final, non-appealable judgments in the Enforcement Actions, or (ii) it has proven impossible to resolve the revenue-bond issues through the Enforcement Actions because, for whatever reason, the Lift Stay Motions have been denied and that denial has not been reversed on appeal.  To that end, the Revenue Bondholders propose that paragraph 2 of the Interim Revenue Bonds Order be revised to read as follows:

---

[7] See, e.g., In re Marine Power & Equipment Co., Inc., 71 B.R. 925, 929 (W.D.Wash. 1987) (quoting In re Wood, 33 B.R. 320, 322 (Bankr. D.Id. 1983)); see also Grundy Nat. Bank v. Harman Investments, Inc., 1989 WL 117725, at *1, No. 88-1310 (4th Cir. Sept. 27 1989) (noting that the purpose of section 362(e) is "to avert delaying the final ruling on a party's motion to lift the automatic stay"); Matter of Boomgarden, 780 F.2d 657, 661-62 (7th Cir. 1985) ("[t]he rationale behind § 362(e) was to provide more protection for secured creditors").

**2. Revenue Bond Complaints** Each Revenue Bond Adversary Proceeding commenced by the filing of a Revenue Bond Complaint shall be stayed until the latest to occur of the following:

- In the event the Corresponding Lift Stay Motion is granted in whole or in part, each judgment entered in any action(s) (each such action, an "<u>Enforcement Action</u>") commenced by the Claimants following a grant of relief from the stay (or determination that the stay does not apply) becomes final and not appealable.

- In the event the Corresponding Lift Stay Motion is denied in whole or in part, the order denying the Corresponding Lift Stay Motion becomes final and not appealable.

    - The term "<u>Corresponding Lift Stay Motion</u>" shall be defined to mean, as applicable:  (i) in the case of the HTA Adversary Proceedings, the HTA Lift Stay Motion; (ii) in the case of the PRIFA Adversary Proceeding, the PRIFA Lift Stay Motion; and (iii) in the case of the CCDA Adversary Proceeding, the CCDA Lift Stay Motion.

39.     The Revenue Bondholders anticipate that FOMB may attempt to oppose the Revenue Bondholders' proposed revisions to the Interim Revenue Bonds Order on the grounds that all relevant issues cannot be resolved through the Enforcement Actions because there are issues that, in FOMB's view, can only be heard by the Title III Court.  As an initial matter, the Revenue Bondholders would note that this problem, to the extent it exists, is entirely of FOMB's own making. The need to prioritize the Enforcement Actions as the only viable vehicle for litigating revenue-bond issues directly results from FOMB's refusal to expressly and unequivocally consent, for purposes of Section 305, to the adjudication of all relevant issues in and by the Title III Court.  If FOMB wants to achieve certainty that all relevant issues can be litigated in a single forum, it can consent, for purposes of Section 305, to the adjudication of all relevant issues—including all proper defenses and counterclaims by the Revenue Bondholders— by way of the Revenue Bond Adversary Proceedings in the Title III Court.  By withholding such

consent to a complete adjudication of the issues, FOMB alone is responsible for preventing all

relevant issues from being heard in a single forum.[8]

        40.    However, to address any concerns by FOMB that certain substantive issues

cannot be addressed within the Enforcement Actions and can only be addressed by the Title III

Court, the Revenue Bondholders also propose to add to paragraph 2 of the Interim Revenue Bonds

Order a mechanism to permit FOMB to seek relief from the stay imposed by the Interim Revenue

Bonds Order on the Revenue Bond Adversary Proceedings:

> Notwithstanding the foregoing provisions of this paragraph 2, in the
> event the Oversight Board believes, after filing its answers and
> counterclaims in the Enforcement Actions, that there exist claims,
> issues, or arguments related to the Revenue Bonds that cannot be
> addressed in the context of the Enforcement Actions, the Oversight
> Board may move for relief from the stay of the Revenue Bond
> Adversary Proceedings imposed pursuant to this paragraph 2 for the
> purpose of raising such claims, issues, or arguments in the context
> of the Revenue Bond Adversary Proceedings. The Claimants shall
> be afforded an opportunity, on not less than 30 days' notice, to
> oppose or otherwise respond to any such motion for stay relief by
> the Oversight Board, including, without limitation, by opposing
> such a motion for stay relief on the grounds that the Revenue Bond
> Adversary Proceedings violate due process and are unconstitutional.

---

[8] In any event, the Revenue Bondholders believe that any concerns by FOMB that all relevant issues cannot
be litigated by way of the Enforcement Actions are likely to be overstated. As just one example, FOMB
may attempt to argue that its claims in the Revenue Bond Complaints to the effect that Section 552 of the
Bankruptcy Code cuts off the Revenue Bondholders' liens can only be heard in the Title III Court. In
reality, however, non-bankruptcy courts routinely interpret and give effect to Section 552 in the context of
proceedings that are not themselves bankruptcy proceedings. See, e.g., Cadle Co. v. Schlichtmann, 267
F.3d 14, 19-20 (1st Cir. 2001) (reversing a district court in a conversion action, partly by applying
Section 552(b)(1)'s exception to Section 552(a)'s cut-off, and determining that a security interest in a
contingency fee agreement attached to proceeds from that agreement); 641 Ave. of Americas Ltd.
Partnership v. 641 Assoc., Ltd., 189 B.R. 583, 589 (S.D.N.Y. 1995) (district court, outside the relevant
bankruptcy case, applying Section 552(b)'s exception to 552(a)'s cut-off to determine whether there was a
security interest in rents); Pavilion Hotel, Inc. v. Valley Nat. Bank of Ariz., 885 P.2d 186, 192-94 (Ariz.
Ct. App. 1994) (state appellate court applying Section 552 to determine whether a lien on certain accounts
was cut-off by a bankruptcy proceeding); Jett v. Lawyers Title Ins. Corp., 985 So.2d 434, 439 (Ala. Civ.
App. 2007) (state appellate court concluding, in an action to foreclose on a mortgage, that pursuant to
Section 552(a), property acquired after the commencement of a bankruptcy proceeding was not subject to
a mortgage that preceded the bankruptcy).

41.     The inclusion of this mechanism in the Interim Revenue Bonds Order should sufficiently address any concerns FOMB may have about its ability to address all relevant issues in the Enforcement Actions.  Moreover, if the Court were to conclude, in considering a motion for stay relief by FOMB and the Revenue Bondholders' objection thereto, that (i) there are in fact issues that can only be litigated in the Title III Court, but (ii) Section 305 prevents the Title III Court from providing due process to the Revenue Bondholders with respect to those issues, the Court would have the option, in the absence of consent by the FOMB, of severing Section 305 from the rest of PROMESA and declaring Section 305 invalid.  See PROMESA § 3(a).[9]  Accordingly, the Revenue Bondholders respectfully request that the Court amend the Interim Revenue Bonds Order as reflected in the proposed order attached hereto as Exhibit A.[10]

## II.    **By Depriving The Revenue Bondholders Of The Ability To Raise "Any Proper Affirmative Defense," FOMB's Interpretation Of Section 305 Violates Due Process And Must Be Rejected In Favor Of Full And Fair Adjudication Of Revenue Bond Issues**

42.     In addition to rejecting the Mediation Team's recommendation that both the Lift Stay Motions and the Revenue Bond Adversary Proceedings be permitted to move forward, FOMB also rejected the Mediation Team's proposed language concerning Section 305.  See

---

[9] "[I]f any provision of this Act or the application thereof to any person or circumstance is held invalid, the remainder of this Act, or the application of that provision to persons or circumstances other than those as to which it is held invalid, is not affected thereby, provided that title III is not severable from titles I and II, and titles I and II are not severable from title III."  PROMESA § 3(a).  Importantly, unlike Section 904 of the Bankruptcy Code, Section 305 of PROMESA has no constitutional significance. Section 904 was included in the Bankruptcy Code out of respect for the Tenth Amendment, but the "limits of the Tenth Amendment do not apply to Puerto Rico, which is '*constitutionally* a territory;' because Puerto Rico's powers are not 'those reserved to the States,' but those specifically granted to it by Congress under its constitution."  Franklin Cal. Tax-Free Tr. v. P.R., 805 F.3d 322, 344-45 (1st Cir. 2015).  FOMB has acknowledged this distinction between Section 904 and Section 305.  See May 30, 2017 Tr. 34:8-13 ("Section 305 of PROMESA . . . was carried over from Chapter 9 into PROMESA, notwithstanding that COFINA and the Commonwealth are either instrumentalities . . . or territories and not states. **It was in chapter 9 because of 10th Amendment reasons**. . . .") (emphasis added).  Therefore, if necessary to preserve due process and the right of Revenue Bondholders to assert constitutional claims, the Court need not hesitate to sever and hold invalid Section 305.

[10] Exhibit B is a comparison of the proposed order to the existing Interim Revenue Bonds Order.

FOMB Response ¶¶ 17-18.  FOMB's rejection of the Mediation Team's efforts to preserve due

process makes even more pertinent the First Circuit's acknowledgement, in <u>Ambac</u>, that Section

305 likely deprives Revenue Bondholders of due process.  Specifically, in contrast with the

Mediation Team's proposed language on Section 305, which at least preserved some ability by the

Revenue Bondholders to defend themselves in the Revenue Bond Adversary Proceedings by

providing that FOMB's filing of the Revenue Bond Complaints should be deemed consent, for

purposes of Section 305, to the Court's determination of "any proper affirmative defense,"

FOMB's interpretation of Section 305 clearly violates due process and thereby undermines any

legitimacy the Revenue Bond Adversary Proceedings might otherwise have had as a litigation

vehicle.  Specifically, FOMB's proposed language contains the following provision purporting to

strip the Revenue Bondholders of the ability to raise, *even as defenses*, what the First Circuit

referred to in <u>Ambac</u> as the Revenue Bondholders' "constitutional and statutory arguments"[11]

about the invalidity of the fiscal plans, Moratorium Laws, Fiscal Plan Compliance Act, and other

devices used by FOMB and the Commonwealth to attempt to impair the Revenue Bondholders'

liens:

> The Oversight Board expressly does not consent pursuant to Section
> 305, to orders interfering with the validity of fiscal plans or budgets
> certified by the Oversight Board for the Commonwealth and/or its
> territorial instrumentalities, the validity of Commonwealth statutes
> or executive orders (including the Moratorium Laws and the Fiscal
> Compliance Act), and orders interfering with or ordering the
> turnover of revenue or other property to Claimants or any other
> party.

FOMB Response ¶ 17.[12]    Indeed, FOMB has made explicit its intent to bar the Revenue

Bondholders from raising their "constitutional and statutory arguments" regarding the invalidity

---

[11] <u>Ambac</u>, 927 F.3d at 605.

[12] Importantly, although the Court quoted FOMB's proposed language in the Interim Revenue Bonds Order,
it did so only as a record of "[FOMB]'s position with respect to Section 305 of PROMESA."  <u>See</u> Interim

of the fiscal plans, Moratorium Laws, Fiscal Plan Compliance Act, and other laws even as defenses, stating that "[FOMB] does not consent to the resolution of counterclaims (whether denominated as counterclaims **or affirmative defenses**) requesting interference with assets, revenues, or political or governmental powers."  FOMB Response ¶ 18 (emphasis added).

43.    FOMB's proposed interpretation of Section 305 would violate the Revenue Bondholders' procedural due process rights.  Embodied in the fundamental principle of procedural due process is "reasonable notice and opportunity to be heard and present **any claim _or defense_**." BLACK'S LAW DICTIONARY 1083; (5th ed. 1979) (quoting In re Nelson, 437 P.2d 1008, 1009 (N.M. 1968); see also Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (due process requires a hearing sufficient to "afford [parties] **an opportunity to present their objections.**") (emphasis added); Concepción Chaparro v. Ruiz-Hernández, 607 F.3d 261 (1st Cir. 2010) (termination of a property right without notice or hearing was a violation of due process); In re Orsa Assoc., 99 B.R. 609, 619 (Bankr. E.D. Pa. 1989) ("the most significant aspect of procedural due process is that, before a judgment is entered, the party against whom a claim is made is entitled to an opportunity to _**raise any defenses**_ that the party has to the claim.") (emphasis added).  These due process requirements are not satisfied if, as FOMB proposes, a defendant is muzzled at the behest of the party who filed the complaint and forbidden to assert and litigate proper defenses.

---

Revenue Bonds Order ¶ 2.  This summary of FOMB's position is not legally operative, and the Court expressly indicated on the record that the Court's inclusion of this language in the order was merely intended to "stake out the territory" of the parties' positions with respect to Section 305 and did not constitute an adjudication of the meaning of the Section 305.  See, e.g., Dec. 11, 2017 Tr. 69:20-21; see also id. 70:2-3 ("I am not prepared to take an interpretive position on 305 now.").  As indicated elsewhere in this Objection, however, the Court can avoid entirely the need ever to "take an interpretive position on 305" by simply allowing the Enforcement Actions to go forward in a forum where Section 305 is not an issue.

44.     Given these due process requirements, courts have declined to interpret statutes in a manner that would prevent the assertion of defenses.  For example, a similar situation arose in connection with a section of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") that provides:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over – (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such a receiver; or (ii) any claim relating to any act or omission of such institution or the Corporation as the receiver.[13]

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B., 28 F.3d 376, 394 (3d Cir. 1994). In analyzing this statute, the Third Circuit stated that "**even if it could be argued that the jurisdictional bar of § 1821(d)(13)(D) could be fairly interpreted to bar jurisdiction over defenses or affirmative defenses, we would not adopt this position.**" Id. (emphasis added).  As the Third Circuit explained, "[t]his is because interpreting the jurisdictional bar in such a manner would, in a substantial number of cases . . . result in an unconstitutional deprivation of due process." Id.; see also, Logan v. Zimmerman Brush Co., 455 U.S. 422, 429 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986).  Congruently, the Tenth Circuit in Resolution Trust Corp. v. Love determined that jurisdiction over affirmative defenses was proper by interpreting § 1821(d)(13)(D)'s language of "claims" or "actions" as not encompassing affirmative defenses.  36 F.3d 972, 977-78 (10th Cir. 1994) (citing Nat'l Union Fire Ins., 28 F.3d at 394).

45.     Similarly, courts faced with the challenge of certifying a large class in a class action suit have avoided depriving defendants of the right to raise defenses, as doing so would

---

[13] 12 U.S.C. § 1821(d)(13)(D).

violate due process.  See e.g., Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 367 (2011); Makaeff

v. Trump Univ., LLC, 309 F.R.D. 631, 642 (S.D. Cal. 2015).  For example, where a district court

had certified a class on the premise that the defendant would be prevented from litigating statutory

defenses to individual claims, the Supreme Court found that certification was improper.  Wal-Mart,

564 U.S. at 367.  The Supreme Court rejected the lower court's certification because it excluded

the "right to raise any affirmative defenses [the defendant] may have.'"  Id. (quoting Int'l Bhd. of

Teamsters v. United States, 431 U.S. 324, 362 (1977)).  Courts have followed Wal-Mart and

confirmed that "ultimately, to comport with due process, the court must 'preserve' the defendant's

right 'to raise any individual defenses it might have.'"  Makaeff v. Trump Univ., LLC, 309 F.R.D.

at 642 (quoting Jiminez v. Allstate Ins. Co., 765 F.3d 1161, 1168 (9th Cir. 2014).  Accordingly, in

class action suits where individual damage issues would prevent class certification, the federal

courts—instead of limiting defendants' due process rights—have bifurcated the liability and

damages portions of the litigation; class certification is granted on liability issues, but damages

issues are dealt with separately so as to preserve defendants' right to present defenses on an

individual basis.  Makaeff, 309 F.R.D. at 643; Jiminez, 765 F.3d at 1168.  Such an approach

demonstrates the lengths courts must go to preserve defenses in order to respect due process rights.

46.     FOMB's interpretation of Section 305 is patently untenable and would

deprive the Revenue Bondholders of due process.  There is no need for this Court to face the

constitutional issues that would be raised by Section 305 in the context of the Revenue Bond

Adversary Proceedings; a feasible alternative vehicle exists in the form of the Lift Stay Motions

and Enforcement Actions, which would permit revenue-bond issues to be litigated in an

unquestionably constitutional forum without the overhang of constitutional uncertainty created by

Section 305 (as interpreted by FOMB).  But if the Revenue Bond Adversary Proceedings are

allowed to move forward before the Lift Stay Motions and Enforcement Actions have been fully

resolved, then at the very least, the Court should deem that FOMB, by filing the Revenue Bond

Complaints, consented under Section 305 to the Court's adjudication of all claims, counterclaims,

and defenses in the context of the Revenue Bond Adversary Proceedings, as is necessary for a full

and fair adjudication of revenue-bond issues.

47.     In the context of this Objection, the Court does not now need to decide

whether, as argued in the Lift Stay Motions, lack of due process and of an opportunity to assert

constitutional claims in the Title III Court constitutes "cause" to lift the stay, but the Court should

at least hold a final hearing on that issue as soon as possible so as to preserve the possibility of

using the Enforcement Actions as a "speedy,"  "efficient," and above all constitutional vehicle for

promptly adjudicating revenue-bond issues.  In addition, the hearing on the Lift Stay Motions

should be a final one so that, in the event stay relief is denied, the Revenue Bondholders can

promptly seek further guidance and review on appeal.

## III.     The Court Should Permit Reasonable Discovery In Connection With The Lift Stay Motions

48.     In view of the reasons set forth above for proceeding promptly to a final

hearing on the Lift Stay Motions, the Revenue Bondholders also request that the Court amend the

provisions of the Interim Revenue Bonds Order that stay all discovery in connection with those

motions.  Specifically, in its current form, paragraph 2 of the Interim Revenue Bonds Order

appears to contemplate that no discovery will take place until after a ruling on any Rule 12(b) and

Rule 12(c) Motions in the Revenue Bond Adversary Proceedings.  However, if the Revenue Bond

Adversary Proceedings are to be stayed pending resolution of the Lift Stay Motions (and any

resulting Enforcement Actions), as requested above, then basing the timing of discovery with

respect to the Lift Stay Motions on the 12(b) and/or 12(c) motions in those adversary proceedings

would not make sense.

49.     The Revenue Bondholders currently do not intend to seek broad-based discovery.  Indeed, it is already demonstrable that (i) given the applicable statutes and agreements, the Debtors have no equity in the relevant property; (ii) given certain public documents, the Debtors and FOMB are engaged in conduct intended to diminish the value of the Revenue Bondholders' tax revenue collateral by 100%; and (iii) lack of due process and of the ability to assert constitutional claims in the Title III Court independently constitutes "cause" to lift the stay regardless of what additional bases discovery might reveal.  However, there are certain discrete items of discovery that would facilitate a final hearing on the Lift Stay Motions, and additional discovery may become necessary depending on what arguments (if any) FOMB raises in opposition to the Lift Stay Motions.

50.     For example, as Ambac noted in its response to the Interim Report (ECF No. 9504), the First Circuit recently indicated in <u>Gracia-Gracia v. Fin. Oversight and Mgmt. Bd. for Puerto Rico (In re Fin. Oversight and Mgmt. Bd. for Puerto Rico)</u>, 939 F.3d 340, 351 (1st Cir. 2019), that a movant asserting a right as a trust beneficiary (as the Revenue Bondholders do) to monies held in a commingled account must be able to trace the funds, including by application of the "lowest intermediate balance rule."  In this instance, FOMB has already admitted that the HTA and PRIFA funds it has diverted are held in the Treasury Single Account, or "TSA."  Public records reveal the balance of the TSA to vastly exceed the amounts of pledged revenues the Commonwealth has diverted, so the Revenue Bondholders should have no difficulty satisfying any "tracing" requirement based on publicly available TSA reports and other public documents. However, to the extent FOMB shifts or walks away from its position and contends that the Revenue Bondholders' collateral was diverted into some commingled account or sub-account *other than* the TSA, the Revenue Bondholders should be permitted to obtain discovery regarding any relevant accounts and their balances over the relevant time period.

51.    Further, as noted in the Lift Stay Motions, the Commonwealth's so-called "Summary of Cash Restriction Analysis," dated October 2, 2019, identifies certain of the funds of the relevant Revenue Bond issuers (HTA, CCDA, and PRIFA) as "restricted," yet the  Revenue Bondholders who insure CCDA Bonds do not have access to the relevant bank and other documentation confirming such restrictions.  See, e.g., CCDA Lift Stay Motion ¶ 63.  Permitting discovery of such documents would help to further corroborate the fact that the relevant funds constitute Revenue Bondholder collateral in which the Debtors lack any equity.[14]

52.    Similarly, as detailed in the amended PRIFA Lift Stay Motion, counsel to PRIFA, with the consent of AAFAF and the FOMB, recently confirmed that funds transferred from the Secretary of Treasury's PRIFA lockbox account to the Commonwealth's general fund contain a transmittal memorandum.   See PRIFA Lift Stay Motion at 9 n.9.   The Revenue Bondholders suspect, but would require discovery to confirm, that the transmittal memorandum designates PRIFA and/or the Infrastructure Fund as the intended recipient, confirming that such

_____

[14] In addition, as noted in the proposed complaint attached to the CCDA Lift Stay Motion, there appear to be additional CCDA transaction documents not currently in the relevant Revenue Bondholders' possession that would further clarify the Revenue Bondholders' rights.  See CCDA Lift Stay Motion, Exhibit 2 (ECF No. 10104-2) ¶ 66.  Furthermore, the Revenue Bondholders' understanding, based on the text of the current fiscal plans and Moratorium Laws, is that those fiscal plans and Moratorium Laws do not purport to have been developed or enacted in accordance with Article VI, Section 8 of the Puerto Rico constitution. However, in the event FOMB or the Debtors were to oppose the Lift Stay Motions on the theory that any of their challenged actions were authorized under Article VI, Section 8, the Revenue Bondholders might require discovery relevant to the application of Article VI, Section, including, for example, with respect to (i) the value of the Commonwealth's "available resources" during the relevant fiscal years and (ii) the motives and intent of the government officials and advisors who first instituted, and have continued, the diversion of the Revenue Bondholders' collateral.  Similarly, in the event FOMB were to oppose the Lift Stay Motions on the theory that the diversion of the Revenue Bondholders' collateral was justified by the Commonwealth's so-called "police power," the Revenue Bondholders would likely require discovery with respect to the issues of (i) whether the diversion of the collateral was reasonable and necessary to serve a legitimate public purpose and (ii) whether more reasonable alternatives existed.  The Revenue Bondholders reserve the right to articulate additional discovery requests once they receive notice of the basis, if any, on which FOMB or other parties intend to oppose the Lift Stay Motions.

26

funds constitute PRIFA property on which PRIFA Bondholders (including Revenue Bondholders Assured, Ambac, and FGIC) have a lien.

53.     Finally, as noted in the HTA Lift Stay Motion, the Revenue Bondholders are not currently aware of public documents that accurately reflect the exact amounts of pledged revenues that were diverted from HTA Bondholders (i) at the end of Fiscal Year 2017 following the commencement of the Title III cases for the Commonwealth and HTA, or (ii) to date, and on an ongoing basis, in Fiscal Year 2020.  See HTA Lift Stay Motion ¶ 96.  To the extent the Court finds it necessary or desirable to quantify exactly the amount of diverted collateral for these time periods in connection with a hearing on the HTA Lift Stay Motion, the Revenue Bondholders will require discovery in order to ascertain with certainty the amounts of the revenues diverted during these time periods and of the resulting diminution in the value of their property interests.

54.     Given the relevance of at least certain, targeted discovery in the context of a final hearing on the Lift Stay Motions, the Interim Revenue Bonds Order's general prohibition of discovery related to the Revenue Bonds should be lifted, and the Revenue Bondholders should be permitted to seek, at minimum, such limited needed discovery through normal channels.  To that end, the Revenue Bondholders request that the Court remove the last bullet point from paragraph 2 and the entirety of paragraph 3 of the Interim Revenue Bonds Order, as reflected in the proposed order attached as Exhibit A hereto.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, the Court should enter an amended Interim Revenue Bonds Order substantially in the form attached hereto as Exhibit A.

27

Dated:      January 21, 2020
            New York, New York


CASELLAS ALCOVER & BURGOS P.S.C.       CADWALADER, WICKERSHAM & TAFT LLP


*/s/ Heriberto Burgos Pérez*                */s/ Howard R. Hawkins, Jr.*
Heriberto Burgos Pérez                      Howard R. Hawkins, Jr.*
USDC-PR No. 204,809                         Mark C. Ellenberg*
Ricardo F. Casellas-Sánchez                 William Natbony*
USDC-PR No. 203,114                         Ellen M. Halstead*
Diana Pérez-Seda                            Thomas J. Curtin*
USDC–PR No. 232,014                         Casey J. Servais*
E-mail:  hburgos@cabprlaw.com               200 Liberty Street
         rcasellas@cabprlaw.com             New York, New York 10281
         dperez@cabprlaw.com                Tel.:  (212) 504-6000
                                            Fax:  (212) 406-6666
P.O. Box 364924                             Email:   howard.hawkins@cwt.com
San Juan, PR 00936-4924                              mark.ellenberg@cwt.com
Tel.:  (787) 756-1400                                bill.natbony@cwt.com
Fax:  (787) 756-1401                                 ellen.halstead@cwt.com
                                                     thomas.curtin@cwt.com
*Counsel for Assured Guaranty Corp. and*             casey.servais@cwt.com
*Assured Guaranty Municipal Corp.*

                                            * admitted pro hac vice
                                            *Counsel for Assured Guaranty Corp. and Assured*
                                            *Guaranty Municipal Corp.*

**ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC**

*/s/ Eric Perez-Ochoa*
Eric Pérez-Ochoa
USDC-PR No. 206,314
Email:   epo@amgprlaw.com


*/s/ Luis A. Oliver Fraticelli*
Luis A. Oliver-Fraticelli
USDC-PR No. 209,204
Email:    loliver@amgprlaw.com
208 Ponce de León Ave., Suite 1600
San Juan, PR 00936
Tel.:  (787) 756-9000
Fax:  (787) 756-9010

*Attorneys for National Public Finance
Guarantee Corp.*

**WEIL, GOTSHAL & MANGES LLP**

*/s/ Robert Berezin*
Jonathan D. Polkes*
Gregory Silbert*
Robert S. Berezin*
Kelly DiBlasi*
Gabriel A. Morgan*
767 Fifth Avenue
New York, NY 10153
Tel.:   (212) 310-8000
Fax:   (212) 310-8007
Email:  jonathan.polkes@weil.com
            gregory.silbert@weil.com
            robert.berezin@weil.com
            kelly.diblasi@weil.com
            gabriel.morgan@weil.com

*admitted pro hac vice

*Attorneys for National Public Finance
Guarantee Corp.*

FERRAIUOLI LLC

By:*/s/ Roberto Cámara-Fuertes*
    ROBERTO CÁMARA-FUERTES
    USDC-PR NO. 219,002
    E-mail:  rcamara@ferraiuoli.com

By:*/s/ Sonia Colón*
    SONIA COLÓN
    USDC-PR NO. 213809
    E-mail:  scolon@ferraiuoli.com

    221 Ponce de Leon Ave., 5th Floor
    San Juan, PR 00917
    Tel.:    (787) 766-7000
    Fax:    (787) 766-7001

*Counsel for Ambac Assurance Corporation*


MILBANK LLP

By:*/s/ Atara Miller*
    DENNIS F. DUNNE*
    ATARA MILLER*
    GRANT R. MAINLAND*
    JOHN J. HUGHES*
    55 Hudson Yards
    New York, New York 10001
    Tel.:    (212) 530-5000
    Fax:    (212) 530-5219
    Email:  ddunne@milbank.com
          amiller@milbank.com
          gmainland@milbank.com
          jhughes2@milbank.com

*admitted *pro hac vice*

*Counsel for Ambac Assurance Corporation*

ARENT FOX LLP


By:/s/ *David L. Dubrow*
     DAVID L. DUBROW*
     MARK A. ANGELOV*
     1301 Avenue of the Americas
     New York, New York 10019
     Tel.:     (212) 484-3900
     Fax:     (212) 484-3990
     Email:    david.dubrow@arentfox.com
             mark.angelov@arentfox.com


By:/s/ *Randall A. Brater*
     RANDALL A. BRATER*
     1717 K Street, NW
     Washington, DC 20006
     Tel.:     (202) 857-6000
     Fax:     (202) 857-6395
     Email:    randall.brater@arentfox.com

*admitted pro hac vice

*Counsel for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

BUTLER SNOW LLP


By: */s/ María E. Picó*
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone:  (787) 723-8520
    Facsimile:   (787) 724-7844
    E-mail:      mpico@rexachpico.com

    *Attorney for Financial Guaranty
    Insurance Company*

By: */s/ Martin A. Sosland*
    Martin A. Sosland (*pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone:  (469) 680-5502
    Facsimile:   (469) 680-5501
    E-mail:      martin.sosland@butlersnow.com

    *Admitted pro hac vice in Case No. 17-BK-
    03283-LTS and Case No. 17-BK-03567-LTS

    Jason W. Callen
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone:  615-651-6774
    Facsimile:   615-651-6701
    Email:       jason.callen@butlersnow.com

    *Admitted pro hac vice in Case No. 17-BK-
    03283-LTS and Case No. 17-BK-03567-LTS

    *Attorneys for Financial Guaranty Insurance
    Company*

32

## **CERTIFICATE OF SERVICE**

       I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, this 21st day of January, 2020.


By: _/s/ Howard R. Hawkins, Jr._
                     Howard R. Hawkins, Jr.*
                     * admitted pro hac vice