**EXHIBIT B**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

_____x
In re:

THE FINANCIAL OVERSIGHT AND      PROMESA
MANAGEMENT BOARD FOR PUERTO
RICO,      Title III
    as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,
    Debtors.
_____x
In re:
      PROMESA
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD OF PUERTO RICO,    Case No.

      17 BK 4780-LTS

    as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY,
    Debtor.
_____x
(Caption continued on following page.)

\* P R O F E S S I O N A L   E Y E S   O N L Y \*

VIDEOTAPED DEPOSITION

OF

FREDERIC CHAPADOS

New York, New York

Monday, October 7, 2019


Reported by:
ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
JOB NO. 169099

TSG Reporting - Worldwide - 877-702-9580

Page 106

F. Chapados - Professional Eyes Only
Q. Was that a meeting about the RSA?
A. I think it was a broader meeting about the RSA.
Q. Okay. What did you talk about?
MR. HAMERMAN: Objection. Insofar as it may call for disclosure of common interest communications, can we get a little bit more specific here in terms of time frame and --
MR. NATBONY: Same objection.
MR. HAMERMAN: -- things like that?
BY MR. ARASTIA:
Q. When did you talk to him?
A. I can recall a meeting. I do not recall the specific date.
Q. Okay. Do you recall a general date?
A. I believe it was earlier this year.
Q. Where was it?
A. I believe that it was at Proskauer's offices.
Q. What did you talk about?

Page 107

F. Chapados - Professional Eyes Only
MR. HAMERMAN: Objection.
MR. NATBONY: Same objection.
MR. HAMERMAN: You need to be a little more specific. If you want to test the privilege, that's fine. If you want to ask general subjects, that's fine. But what did you talk about seems to be potentially broaching into privileged topics, so I'd ask for further clarity on this.
BY MR. ARASTIA:
Q. Do you know what you talked about?
A. I think it was the broad RSA.
Q. Anything else?
A. I believe there were specific questions as to the servicing of the RSA.
Q. Okay. Anything other than the RSA?
A. I cannot recall specifically.
Q. But you do recall discussing the RSA?
A. I believe there was a discussion about the RSA, yes.

Page 108

F. Chapados - Professional Eyes Only
Q. Did you talk about the RSA with Mr. Gana?
A. Can you clarify who Mr. Gana is?
Q. He's an individual at Assured? Are you familiar with Assured?
A. I have not had any discussions with anyone at Assured.
Q. How about with anyone at National?
A. I have not.
Q. Syncora?
A. I have not.
Q. Going back to your declaration, Exhibit 1, do you know who drafted that?
A. Exhibit 1 is the RFQ, right?
Q. No. Exhibit 1 is your declaration. The RFQ is attached to it.
A. Can you clarify which is Exhibit 1? Sorry about that.
Q. It's got the little sticker. Looks like this (indicating) --
A. Oh, yes.
Q. -- and it says 1.
A. Who drafted it? Yeah, I was

Page 109

F. Chapados - Professional Eyes Only
involved in drafting it.
Q. Okay. Aside from your attorneys, did you talk to anyone else about that declaration?
A. I believe I spoke primarily with Goodwin, and I believe Proskauer also looked at it.
Q. Do you disagree with anything today that's in that declaration?
A. I believe it is still accurate.
Q. So you still believe that the RSA is beneficial to the proposed transformation?
A. That is my belief.
Q. Would it be fair to say that based on your declaration, you think that there's three ways that the RSA will help with the proposed transformation?
MR. MASHBERG: Objection to form.
A. I believe that is correct.
Q. And that's resolving legacy bond debt, one? Resolving receivership litigation is two? And facilitating PREPA's emergence from Title III is the

Page 110

F. Chapados - Professional Eyes Only

1 third?
2 A. I believe those are them.
3 Q. Is there any other benefit that
4 you perceive to the RSA -- that you
5 perceive that the RSA provides to the
6 proposed transformation?
7 A. I think those are the three
8 primary ones.
9 Q. And you believe the RSA is
10 beneficial for the transformation, both the
11 T&D operation, as well as the privatization
12 of the generation assets?
13 A. It is broadly helpful for the
14 transformation.
15 Q. Is it broadly helpful to each of
16 those two aspects of the proposed
17 transformation?
18 A. Yes, it would impact both
19 aspects.
20 Q. How would it impact the
21 privatization of generation assets?
22 A. I believe the legacy PREPA debt
23 was raised on the entirety of the system,
24 not just the T&D portion. And so the same

Page 111

F. Chapados - Professional Eyes Only

1 concerns apply to both the T&D and the
2 generation assets.
3 Q. So the legacy debt, you
4 understand that to be raised on the
5 generation assets?
6 A. It was raised --
7 MR. MASHBERG: Objection to form.
8 A. Can you clarify --
9 Q. I'm trying to understand what you
10 said.
11 A. It was raised on behalf of the
12 entire electric system, which would
13 comprise both the T&D and the generation
14 assets.
15 Q. Where did you get that
16 understanding?
17 A. In my discussions with Citi team
18 members.
19 Q. If you look at paragraph 17,
20 which is page 5.
21 (Witness complies.)
22 Q. It says here, "Based on my
23 experience..."
24 What experience did you rely on

Page 112

F. Chapados - Professional Eyes Only

1 in formulating this statement in paragraph
2 17?
3 A. It is my broad transaction
4 experience.
5 Q. So your broad transactional
6 experience assists you in determining what
7 a potential operator would want?
8 A. That is correct.
9 Q. Okay. Did you ask any potential
10 operator what they wanted?
11 MR. MASHBERG: Objection to form.
12 A. Can you clarify that question?
13 Q. Well, you say in your
14 declaration, "Any potential operator
15 performing the risk-benefit analysis to
16 determine whether to undertake this project
17 would look for a clear picture of the
18 legal, financial, operational,
19 and regulatory environments in which it
20 would be operating should its proposal be
21 successful."
22 What I'm asking is, did you ask
23 any potential operator: What are you
24 looking for?

Page 113

F. Chapados - Professional Eyes Only

1 A. Those statements, those
2 conditions are typical for any sort of
3 transaction broadly. My statement is
4 correct that we believe that any operator
5 in any sort of M&A transaction, it is
6 common sense that people are looking to
7 understand the legal, financial, regulatory
8 and operational environment --
9 Q. Okay.
10 A. -- that they're entering into a
11 major transaction.
12 Q. Okay. And that is a broad
13 understanding?
14 A. Yes.
15 Q. Okay. But then you go on, "In
16 particular, a potential operator would want
17 to understand the legal and financial
18 challenges facing PREPA, including but not
19 limited to an understanding regarding
20 projected costs that will need to be
21 included in PREPA's rates to customers
22 post-closing, including any additional
23 charges to satisfy restructured legacy debt
24 and ultimately PREPA's prospects and timing

Page 114

1  F. Chapados - Professional Eyes Only
2  for exiting Title 13."
3      Where did you get that
4  understanding that a potential operator
5  would want to understand those aspects?
6      MS. SPILLANE: Objection to form.
7      MR. MASHBERG: Objection. Asked
8    and answered.
9      A. In my work advising utilities,
10 they are very clearly always concerned
11 about customer rates. Any aspect, you know
12 -- any circumstance impacting rates would
13 be of concern to them.
14     Q. Okay. So this is based on
15 basically your training and your education
16 in this particular area?
17     A. And the transactions that I have
18 worked on, yes.
19     MR. NATBONY: Objection.
20 BY MR. ARASTIA:

Page 115

[redacted]

Page 116

[redacted]

16     Q. Now would a potential operator
17 want to understand the legal and financial
18 challenges, is that to -- in order to price
19 its bid or would that be to whether or not
20 to accept the project?
21     A. I think it goes into both.
22     Q. Why would -- can you explain to
23 me why PREPA's rates to customers post
24 closing would be important to an operator
25 of the T&D assets?

Page 117

1  F. Chapados - Professional Eyes Only
2      A. I mean, ultimately the customers
3  of the electric system are the ratepayers
4  and the operator will care about the rates
5  that are being charged to its customers.
6  It impacts are they able to pay for their
7  service on time.
8      MR. ARASTIA: Let's take a quick
9    five-minute break, please.
10     THE VIDEOGRAPHER: The time is
11   11:44 a.m. We are going off the record.
12   (Recess is taken.)
13     THE VIDEOGRAPHER: The time is
14   12:03 p.m. We are going back on the
15   record.
16 BY MR. ARASTIA:
17     Q. Mr. Chapados, I thought I heard
18 you testify that the legacy debt that's
19 referenced in paragraph 17 arises from or
20 is related to generation assets and T&D
21 assets.
22     Did I understand you correctly?
23     MS. SPILLANE: Objection to form.
24     A. I believe it's part -- the debt
25 was raised against the whole system.



Page 118

1     F. Chapados - Professional Eyes Only
2     Q. Okay. Do you know if the debt is
3 secured by T&D assets?
4     MR. HAMERMAN: Objection. Calls
5 for a legal conclusion.
6     MR. MASHBERG: Objection to form.
7 BY MR. ARASTIA:
8     Q. Do you know what a security
9 interest is?
10     A. I do know what a security
11 interest is.
12     Q. Do you deal with security
13 interest every week in your business?
14     MS. SPILLANE: Objection to form.
15 BY MR. ARASTIA:
16     Q. I'm sorry?
17     A. I deal with some, yes.
18     Q. Okay. Do you know -- have you
19 ever seen any document entitled Security
20 Interest that you believe relates to a T&D
21 asset?
22     A. In specific to this Puerto Rico
23 transaction --
24     Q. Yes.
25     A. -- or more broadly.

Page 119

1     F. Chapados - Professional Eyes Only
2     Q. This specific Puerto Rico
3 transaction.
4     A. I do not believe I have.
5     Q. We talked a little bit about in
6 that paragraph, PREPA's rates to customers
7 post closing.
8     So there is a further discussion
9 in paragraph 23 on the next page. If we
10 could turn to paragraph 23, I'd appreciate
11 that.
12     A. Okay.
13     (Witness complies.)
14     Q. There, you say, "In finalizing
15 their proposals, potential operators will
16 want to understand the electricity rates."
17     Is your statement based on your
18 general training and experience?
19     A. Yes.
20     Q. It says, "Operators will
21 understand the electricity rates they would
22 need to charge customers to satisfy
23 operating costs, operator compensation, and
24 other financial obligations of the system,
25 including the new bonds under a plan of

Page 120

1     F. Chapados - Professional Eyes Only
2 adjustment."
3     Why do you believe that a
4 potential operator would want to understand
5 the electricity rates they'd need to
6 charge?
7     MS. SPILLANE: Objection to form.
8     A. It's a core component of being an
9 operator of an electric system. The rates
10 that you charge your customers are like the
11 prices you charge for any sale. I mean,
12 it's a key part of any business.
13     Q. Okay. If the -- well, would it
14 be fair to say that operating cost could be
15 a variable?
16     A. Operating cost will be variable.
17     MR. MASHBERG: Objection to form.
18 BY MR. ARASTIA:
19     Q. Okay. Is your belief, when you
20 put this paragraph together, that operator
21 compensation would be a variable?
22     A. It will be a variable.
23     Q. Okay. The final obligations --
24 financial obligations of the system
25 including the new bonds under a plan of

Page 121

1     F. Chapados - Professional Eyes Only
2 adjustment, is that variable or fixed?
3     MS. SPILLANE: Objection to form.
4     MR. MASHBERG: Objection to form.
5     A. Could you be more specific?
6     Q. Sure.
7     Do you know if there's -- in the
8 RSA, does it provide that there's going to
9 be a certain payment to satisfy the
10 financial obligations of the bonds?
11     A. There is a charge and it
12 escalates over time.
13     Q. Okay. Is that a fixed charge for
14 any specific period in time?
15     A. It is a fixed charge initially,
16 yes, and then it escalates.
17     Q. Would that fixed charge be the
18 same for any potential operator?
19     A. It would, yes.
20     Q. Okay. So other than operating
21 cost and operator compensation, are there
22 any other variables over which you believe
23 a potential bidder, potential operator,
24 would have control?
25     MS. SPILLANE: Objection to form.

Page 122

1  F. Chapados - Professional Eyes Only
2      MR. MASHBERG: Objection to form.
3      MR. NATBONY: Objection.
4      MR. HAMERMAN: Objection.
5   A. Can you restate your question?
6   Q. Sure.
7      You say potential operators want
8  to understand electricity rates.
9      What can a potential operator, in
10 your view, control with respect to the
11 electricity rates that it would need to
12 charge?
13  A. They would primarily control the
14 operating costs of the utility.
15  Q. And when you say "operating
16 costs," is that different than the
17 financial obligations with respect to the
18 new bonds under a plan of adjustment?
19  A. They are.
20  Q. So why does the financial
21 obligations and -- those financial
22 obligations for the new bonds would be the
23 same for any operator?
24  A. I believe I said that, yes.
25      MR. MASHBERG: Objection to form.

Page 123

1  F. Chapados - Professional Eyes Only
2  BY MR. ARASTIA:
3   Q. Right.
4      So then why would a potential
5  operator care about the financial
6  obligations with respect to new bonds under
7  a plan of adjustment if it's something that
8  all of them have to pay and it's a fixed
9  charge?
10      MS. SPILLANE: Objection to form.
11      MR. HAMERMAN: Objection to the
12  form.
13      MR. NATBONY: Objection.
14   A. They will care about the overall
15  rates that are being charged to consumers
16  with any charge related to the existing
17  bonds as an important point of it.
18   Q. Okay. Why would they care about
19  the overall rates?
20   A. I think, as I've stated, the
21  rates charged to customers are a key
22  concern of any potential operator in Puerto
23  Rico or anywhere across the United States.
24   Q. Okay. What's the basis of the
25  concern?

Page 124

1  F. Chapados - Professional Eyes Only
2   A. Ultimately, you want to ensure
3  that the ratepayers can afford the rates
4  and that they can pay.
5   Q. So in this paragraph 23, that's
6  the basis of saying that a potential
7  operator will want to understand the
8  electricity rates they would need to charge
9  customers so that they could ensure that
10 the ratepayers can afford the rates?
11   A. At the end --
12      MR. NATBONY: Objection.
13   A. At the end of the day, the single
14 source of revenue for a utility is
15 collection from ratepayers. At the end of
16 the day, you would want to make sure the
17 ratepayers can pay. It would be typical of
18 any business running an operation.
19   Q. And would it be fair to say that
20 if the rate is too high, there's a concern
21 that the consumers of electricity can't
22 pay?
23   A. At a certain point, yes, you
24 would be concerned about that.
25   Q. Do you know if the cost of

Page 125

1  F. Chapados - Professional Eyes Only
2  electricity would in any way help or hinder
3  the economic stimulus of Puerto Rico?
4      MS. SPILLANE: Objection to form.
5      MR. HAMERMAN: Objection.
6  Outside of the scope of the 9019
7  hearings.
8      MR. NATBONY: Objection.
9      MR. MASHBERG: Objection to form.
10 BY MR. ARASTIA:
11  Q. Go ahead.
12  A. Can you clarify your question or
13 restate?
14  Q. Sure.
15     Do you know whether or not the
16 cost of electricity has any impact on the
17 potential for economic stimulus in Puerto
18 Rico?
19     MS. SPILLANE: Same objection.
20     MR. NATBONY: Same objection and
21 objection to form.
22     MR. HAMERMAN: Objection.
23     MR. MASHBERG: Objection.
24  A. Lawyers are advising me not to
25 answer that question. It's outside the

Page 126

1  F. Chapados - Professional Eyes Only
2  scope.
3      Q. No, no. No one has instructed
4  you not to answer. If they have, I
5  apologize, but I didn't hear that. I heard
6  an objection that could be resolved later.
7      A. In general, there is a linkage
8  between the overall price of electricity
9  and economic indicators. Generally lower
10 the cost of electricity is better.
11     Q. Did you understand from Governor
12 Rosselló when he put together the program
13 for transformation that one of his goals
14 with transformation was greater economic
15 development, revitalization, and growth of
16 Puerto Rico as set forth in paragraph 16 of
17 your declaration?
18     A. I believe that was an objective.
19     Q. Okay. So if the transformation
20 was bad for economic development, that
21 wouldn't contribute to the goals of the
22 transformation, would it?
23        MS. SPILLANE: Objection to form.
24        MR. MASHBERG: Objection to form.
25        MR. HAMERMAN: Objection.

Page 127

1  F. Chapados - Professional Eyes Only
2      A. Can you clarify your statement?
3      Q. Okay. Would it be fair to say
4  that the setting of the rates for
5  electricity relate to the contribution to
6  greater economic development,
7  revitalization and growth of Puerto Rico?
8        MS. SPILLANE: Objection to form.
9      A. There is a link between
10 electricity rates and economic development.
11     Q. You used the word "link."
12        Would you categorize that as a
13 strong link?
14     A. There is a link. I am not
15 certain as to how strong it is.
16     Q. If we could go back to paragraph
17 20, on page 6. There you indicate that,
18 "In particular, when preparing the
19 proposals, I anticipate potential operators
20 will want to understand..." and then you
21 set forth some items.
22        You used a term "anticipate."
23        What is the basis for you
24 anticipating what potential operators will
25 want to understand?

Page 128

1  F. Chapados - Professional Eyes Only
2      A. As I've previously stated,
3  operators will need to know the rates that
4  are charged back to consumers.
5      Q. Okay. But where did you get that
6  from?
7      A. That is ten years of utility
8  experience.
9      Q. And you've been trained in the
10 utilities financial transactions, correct?
11     A. I have worked with utilities over
12 the past ten years on a variety of
13 financial transactions.
14     Q. Okay. Would you consider
15 yourself a specialist in utility financial
16 transactions?
17     A. I have worked for ten years. I
18 don't know if that makes me a specialist or
19 not. That's my work experience.
20     Q. No, that's fine. I'm just
21 wondering if you had an opinion --
22        MS. SPILLANE: Objection to form.
23 BY MR. ARASTIA:
24     Q. -- on that. If you don't, that's
25 okay.

Page 129

1  F. Chapados - Professional Eyes Only
2      A. I don't have an opinion on that.
3      Q. Is there any training at Citi
4  with respect to your job functions over
5  your career, or was it all just informal on
6  the job?
7        MS. SPILLANE: Objection to form.
8      A. I have attended various trainings
9  throughout my career.
10     Q. And it was all related to the job
11 you're currently doing?
12     A. Correct.
13     Q. So here you say that "A potential
14 operator will want to know the..." at the
15 end, "...the role of the operator, if any,
16 with respect to servicing restructured debt
17 obligations."
18        What do you mean by that?
19     A. At the end of the day, somebody
20 needs to collect payment for the customers
21 to pay for the restructured debt
22 obligations.
23     Q. Okay. Is that a ministerial task
24 of just tacking on a number on the bill or
25 does it involve more in your estimation?

Page 130

F. Chapados - Professional Eyes Only
2  A. I believe it involves more than
3  just simply that.
4  Q. Okay. What does it involve in
5  your view?
6  A. There will need to be a charge
7  placed on customer bills. Those dollars
8  would then need to be put into -- revenues
9  will be collected from customers. The
10 dollars will go into a trust and be split
11 up to the various different accounts at the
12 end of the day.
13 Q. Okay. And is that something that
14 the trust will do or the potential operator
15 will do?
16 A. There will be a servicing
17 agreement that will kind of walk through
18 the roles and responsibilities of the
19 servicer tied to exactly this overall
20 process.
21 Q. Okay. And has that been defined
22 yet or is it still a work in progress?
23 A. I believe the servicing agreement
24 is still a work in progress.
25 Q. Okay. The next paragraph,

Page 131

F. Chapados - Professional Eyes Only
2  paragraph 21 starts off, "I am advised..."
3  and then it has a statement.
4  By whom were you advised?
5  A. Citi colleagues.
6  Q. Non-lawyers?
7  A. Other Citi colleagues.
8  Q. Do you consider counsel at Citi
9  to be your colleagues or is that a
10 different function?
11 A. I do not believe Citi's counsel
12 has been -- Citi internal legal counsel has
13 been involved in any of this.
14 Q. Now you then say it's your
15 understanding that the "RSA contemplates
16 confirmation order to provide the operator
17 protection against legacy liabilities of
18 PREPA."
19 What is your understanding as to
20 how a confirmation order will provide the
21 operator protection?
22 A. Well, as part of a plan of
23 reorganization, there will be a
24 confirmation order that sets out how legacy
25 liabilities have been resolved and if there

Page 132

F. Chapados - Professional Eyes Only
2  is anything tied to the future potential
3  operator.
4  Q. Do you have an expectation that
5  the payment of this legacy debt would be
6  tied to a T&D operator?
7  MS. SPILLANE: Objection to form.
8  MR. HAMERMAN: Objection to form.
9  MR. MASHBERG: Objection to form.
10 A. Can you clarify your question?
11 Q. Okay. Why would, as you
12 understand it, PREPA's prepetition debt
13 obligations, all right, be important to a
14 T&D operator?
15 A. At the end of the day, as I've
16 stated, it all ties back to rates charged
17 to customers.
18 Q. And what protection would a
19 confirmation order, as you understand it,
20 provide an operator against the legacy
21 liabilities of PREPA?
22 A. I believe the confirmation order
23 will make it clear that the operator is not
24 liable itself for those payments.
25 Q. Do you believe that there is a

Page 133

F. Chapados - Professional Eyes Only
2  concern that an operator could be liable
3  for legacy liabilities with PREPA?
4  MS. SPILLANE: Objection to form.
5  MR. HAMERMAN: Objection insofar
6  as it calls for a legal conclusion, the
7  same thing as the last question.
8  A. Can you clarify your question?
9  Q. Sure.
10 You indicate that the "RSA
11 contemplates confirmation order to provide
12 the operator protection."
13 Is there, in your view, your
14 understanding that the operator requires
15 such protection?
16 MR. NATBONY: Objection. Is
17 there a question?
18 MR. ARASTIA: Is it his
19 understanding --
20 MR. NATBONY: Oh, I'm sorry.
21 MR. ARASTIA: -- that the
22 operator require such protection?
23 A. It is my belief that any operator
24 in the circumstances would want to have
25 those types of protection.

Page 134

F. Chapados - Professional Eyes Only
2  Q. Do you know if the RSA is the only way to take this significant step towards resolving uncertainty regarding PREPA's prepetition debt?
  MS. SPILLANE: Objection to form.
  MR. MASHBERG: Objection to form.
  A. Can you clarify your question?
  MR. HAMERMAN: Objection.
BY MR. ARASTIA:
  Q. Sure.
  You see where it says, "I'm advised the RSA would be a significant step towards the resolution of uncertainty regarding PREPA's prepetition debt obligations"?
  A. Yes.
  Q. Okay. I'm asking that you're advised, is it your understanding that the RSA is the only way --
  MR. HAMERMAN: Same objection.
BY MR. ARASTIA:
  Q. -- to take a significant step towards resolving uncertainty?
  A. I'm advised it is a significant

Page 135

F. Chapados - Professional Eyes Only
step.
  Q. What I'm asking is, have you ever been advised that there are other ways to take a significant step?
  A. I do not believe I have had those discussions.
  Q. Have you sought to have those discussions?
  A. I have not sought to have those discussions.
  Q. Have you sought to investigate alternatives to the RSA as a significant step towards a resolution of uncertainty regarding PREPA's prepetition debt obligations?
  MS. SPILLANE: Objection to form.
  A. I would focus you back on I am leading the transformation in the selection of a T&D operator. There are other Citi colleagues that have more thoroughly evaluated potential alternatives --
  Q. Okay.
  A. -- regarding PREPA's legacy obligations.

Page 136

F. Chapados - Professional Eyes Only
  Q. Would that be Mr. Brownstein that you talked about earlier or someone on your team?
  A. It would be Mr. Brownstein and his colleagues.
  Q. Is it your understanding that absent an RSA, that any potential operator would have liability for legacy bond debt?
  MS. SPILLANE: Objection. Calls for a legal conclusion.
  MR. MASHBERG: Objection.
  MR. HAMERMAN: Objection.
  MR. NATBONY: Objection.
  A. Can you clarify your question?
BY MR. ARASTIA:
  Q. Okay. You indicate that the RSA contemplates confirmation order to provide operator protection against legacy liabilities. Absent the RSA, if you didn't have the RSA in that equation, is it also your understanding that the potential operator would have some liability for legacy liabilities of PREPA?

Page 137

F. Chapados - Professional Eyes Only
  MR. MASHBERG: Objection to form.
  MR. NATBONY: Objection.
  MR. HAMERMAN: Objection.
  A. Can you restate your question?
  Q. Sure.
  Would it be fair to say that in this paragraph 21, you're saying that the RSA contemplates a confirmation order and that confirmation order is going to provide an operator protection against legacy liabilities of PREPA?
  A. I believe that is correct.
  Q. Okay. So is it also your understanding that without that RSA, the operator wouldn't have that protection?
  A. The operator will need some sort of protection at the end of the day to know that it is not responsible for the legacy obligations of PREPA.
  Q. Okay. And that would be a confirmation order?
  A. Yes.
  Q. Let's look at paragraph 22. In here, we talk about that kilowatt-hour

Page 138

```
 1      F. Chapados - Professional Eyes Only
 2   usage that would be added to customer
 3   invoices.
 4          That's that rate that we talked
 5   about before that would change over time?
 6      A.  Yes.
 7      Q.  Are you aware of the demand,
 8   something called the Demand Protection Term
 9   Sheet?
10      A.  I am aware of it, yes.
11      Q.  Are you familiar with it?
12      A.  To a certain extent, yes.
13      Q.  Are you familiar with a document
14   entitled "Recovery Plan Term Sheet"?
15      A.  I do not know which document
16   you're referring to.
17      Q.  Okay.  Going back to the Demand
18   Protection Term Sheet, is it your
19   understanding that -- well, let me back up.
20          You recall how we talked about
21   overall rates become an issue or an item
22   because ratepayers have to be able to
23   afford to pay the rates?  That is a
24   paraphrase.
25      A.  Yes.
```

Page 139

```
 1      F. Chapados - Professional Eyes Only
 2          MS. SPILLANE:  Objection to form.
 3   BY MR. ARASTIA:
 4      Q.  If that rate that we talked
 5   about, this kilowatt-hour usage transition
 6   charge, if there is a deficiency in that,
 7   do you know if the Demand Protection Term
 8   Sheet allows for that charge to increase to
 9   make up for any past deficiencies?
10      A.  It is my understanding that the
11   RSA does not contemplate a specific linkage
12   between the amount of kilowatt hours used.
13   It is a fixed charge per kilowatt-hour.
14      Q.  If you can turn to paragraph 24.
15   I don't think you need to turn it.  It's on
16   page 7.
17          (Document review.)
18      Q.  Here you say in the second
19   sentence, "This pending litigation
20   introduces uncertainty and potential
21   disruption into the transformation
22   process."
23          Do you see that?
24      A.  Yes.
25      Q.  You used the word "potential."
```

Page 140

```
 1      F. Chapados - Professional Eyes Only
 2      Have you evaluated what that
 3   potential is?
 4      A.  I have not evaluated what it is.
 5      Q.  Has the uncertainty and potential
 6   disruption, has that been valued?
 7          MS. SPILLANE:  Objection.
 8      A.  Can you clarify "valued"?
 9      Q.  Sure.
10          Have you put -- have you engaged
11   in any analysis that would put a dollar
12   value on uncertainty and potential
13   disruption based on pending litigation?
14      A.  I have not.
15      Q.  So this uncertainty of potential
16   disruption in the transformation process,
17   what do you believe that would be?  What
18   would be the uncertainty, and what would be
19   the potential disruption?
20      A.  Well, this is regarding the
21   receivership motion which would -- the
22   monoline insurers would seek a
23   court-approved appointed receiver over
24   PREPA's operations.  The introduction of a
25   new third party into PREPA's operations
```

Page 141

```
 1      F. Chapados - Professional Eyes Only
 2   would likely introduce uncertainty and
 3   potential disruption.
 4      Q.  And where do you base that, that
 5   belief?
 6      A.  It is based upon my experience.
 7      Q.  I thought that you had said you
 8   never operated or worked in circumstance
 9   where there was a receiver appointed.
10          MS. SPILLANE:  Objection to form.
11      A.  I believe that is correct, but in
12   my experience advising utilities on
13   transactions, if there is a third party
14   appointed to interject in a process, that
15   would disrupt the current flow of
16   information and the course of operations.
17      Q.  Is it your understanding that if
18   a receiver was appointed, that AAFAF would
19   still have a right of approval over any
20   potential transformation?
21      A.  I do not know.
22      Q.  Do you know whether or not if a
23   receiver was appointed, whether PREPA would
24   have any right of approval over any
25   potential operation?
```

Page 142

F. Chapados - Professional Eyes Only

A. I do not personally know.

Q. Okay. Do you know if the PREB would have any right of approval or disapproval over a transformation if a receiver was appointed?

A. I do not know if a receiver being appointed would change the approvals you have mentioned.

Q. So currently you have several interested parties that have a right of approval over a transformation; is that accurate?

A. That is correct.

Q. And then potentially if there was a receiver, it would just be one party?

MS. SPILLANE: Objection to form.
MR. MASHBERG: Objection to form.

A. Can you clarify your question?

Q. Well, you don't know if any of the current parties with the right of approval or disapproval over transformation would be able to have a right of approval or disapproval if a receiver is appointed?

A. I do not know how a receiver

Page 143

F. Chapados - Professional Eyes Only

being appointed would change the approvals required for this transformation.

Q. Have you asked anyone?

A. I have not asked that question.

Q. The next paragraph, paragraph 25, and, again, just slightly different, but here, at the end, you say, "I believe this resolution will be an additional benefit to the transformation process by eliminating uncertainty inherent in litigation" and this is the part I want to focus on, "and with the appointment of a receiver in particular."

Is this statement based on any training or skill or education that you have that led you to make that same conclusion in paragraph 24, or is there something different?

MS. SPILLANE: Objection to form.

A. It's the same transactional experience.

Q. And paragraph 26, when you say "It's my understanding the RSA is an important step in facilitating PREPA's exit

Page 144

F. Chapados - Professional Eyes Only

from Title III and, in my view, PREPA's emergence from Title III would be important to any potential operators," is -- does that have to do with the operator protection that we talked about a few moments ago in paragraph 21, or is there another basis that emergence from Title III will be important to any potential operators?

MS. SPILLANE: Objection to form.

A. I think exit from Title III is important to any potential operator, whether -- for a variety of reasons.

Q. Okay. Well, what reasons -- other than the operator protection that you had in paragraph 21, what other reason is there that you can think of that would make emergence from Title III important for any potential operator?

A. At the end of the day, there's inherent costs of being in a Title III process and, therefore, it does have an impact on rates as well.

Q. Okay. Anything else?

Page 145

F. Chapados - Professional Eyes Only

A. There could be a variety of reasons. I think in the normal course, any, you know, normal course business, electric utility, would have a preference for not being in a bankruptcy-type proceeding.

Q. Okay. Paragraph 27, you're talking about, "The RSA eliminates uncertainty regarding PREPA's legacy debt liabilities and future financial challenges which will be important to potential operators in formulating their responses to the RFP."

So when you refer to PREPA's legacy debt liabilities, is that the same operator protection against legacy liabilities with PREPA that you referred to in paragraph 21 or is that a different legacy debt liability?

MS. SPILLANE: Objection to form.
MR. NATBONY: Objection to form.

A. It's broadly the same legacy debt liabilities.

Q. And future financial challenges,

Page 146

1    F. Chapados - Professional Eyes Only
2  what do you mean when you say "future
3  financial challenges"?
4        A.  A utility in the normal course
5  will need to raise capital in order to
6  reinvest in its system for the benefit of
7  its ratepayers.
8        Q.  And the T&D operators are
9  expected to raise capital and invest in
10 their capacity as operators?
11       A.  The operators will not be
12 investing their own capital into the
13 system, but PREPA will need to raise
14 capital in order to invest in the system.
15       Q.  Okay.  Because in the next
16 clause, it says, "...which will be
17 important to potential operators in
18 formulating their responses to the RFP."
19            Is the future financial
20 challenges, is that important to PREPA, or
21 how is that important to potential
22 operators?
23       MS. SPILLANE:  Objection to form.
24       A.  Potential operators will need to
25 know that the utility has access to capital

Page 147

1    F. Chapados - Professional Eyes Only
2  to invest in its system, like any utility
3  would across the United States.
4        Q.  Okay.  And what is the basis of
5  that statement?
6        A.  Ten years of utility industry
7  expertise.
8        Q.  Okay.  Did you talk to anybody
9  about this specifically, any potential
10 operators?
11       A.  It is my understanding in having
12 worked in this industry for ten years.
13 It's based on that statement.

24       MR. MASHBERG:  Let me interrupt
25 here.

Page 148

1    F. Chapados - Professional Eyes Only
2         Have we designated the
3  transcript?  If not, we should, for
4  professional eyes only.  We have
5  sensitive information here.  I don't
6  know that everything in here would be
7  professional eyes only, but at least
8  for now, until we work out any issues,
9  I request that we do that so that we
10 don't inadvertently get any information
11 out that would be harmful to this
12 process.
13       MR. ARASTIA:  So what I'm hearing
14 you say, correct me if I'm wrong, is,
15 as a prophylactic measure, designate it
16 all "professional eyes only" and then
17 in good faith, we'll sit down and we're
18 more accurately designate specific --
19 that's a reasonable request.
20       MR. MASHBERG:  I think that's
21 correct.  Nobody is waiving any rights
22 at all.  We just want to make sure that
23 for the interim --
24       MR. ARASTIA:  Okay.
25       MR. MASHBERG:  -- that we have

Page 149

1    F. Chapados - Professional Eyes Only
2  the protections, and then we'll sit
3  together and work it out.
4        MR. ARASTIA:  Yeah.  I would just
5  ask we do it in a reasonable time after
6  we get the transcript.  That's all.
7  Okay?  Is that fair?
8        MR. MASHBERG:  Thank you.
9        MR. ARASTIA:  Thank you.
10 BY MR. ARASTIA:
11       Q.  I'm not sure if I asked you on
12 26.  It says -- because you say in the
13 beginning "it's my understanding," and I
14 think I asked you about that.
15            But then you say, "In my view,
16 PREPA's emergence from Title III would be
17 important to any potential operators."
18            What's the basis of your view?
19       A.  My expertise, my experience.
20       Q.  Okay.  Let me ask you, if the
21 RSA, if that was approved and in effect
22 tomorrow, would you still need confirmation
23 in order for the transformation to work as
24 you envision it?
25       MR. MASHBERG:  Objection to form.

Page 150

```
 1        F. Chapados - Professional Eyes Only
 2            MS. SPILLANE:  Objection to form.
 3        A.  Can you clarify your question?
 4        Q.  Well, you say, "To the extent the
 5   RSA will lead towards confirmation of a
 6   plan of adjustment and emergence from Title
 7   III, which would be an important step
 8   leading to transformation."  That is the
 9   last sentence of paragraph 27.
10            So what I'm asking you is, if the
11   RSA is approved and goes into effect, is
12   that enough for transformation or do you
13   still need a plan of adjustment?
14            MR. NATBONY:  Objection.  Lack of
15        foundation.
16            MR. MASHBERG:  Objection to form.
17            MR. ARASTIA:  I'm sorry.  What
18        was that one?
19            MR. MASHBERG:  Objection to form.
20            MR. ARASTIA:  Oh.
21        A.  I believe as I have previously
22   stated, any operator would be interested in
23   having the protections that would come
24   through a confirmation order.
25        Q.  Okay.
```

Page 151

```
 1        F. Chapados - Professional Eyes Only
 2            MR. ARASTIA:  Do you want to take
 3        lunch now?  Do you want -- do you want
 4        to eat something now?
 5            THE WITNESS:  I can do whatever.
 6            MR. ARASTIA:  Okay.  We'll go for
 7        a few more minutes then and break at 1.
 8        Is that all right?  1 o'clock for
 9        lunch?
10   BY MR. ARASTIA:
11        Q.  Are you familiar with the
12   definitive RSA?
13        A.  I am broadly aware of it.
14        Q.  Do you know if there is anything
15   in there that references potential
16   operators of T&D assets?
17        A.  I do not know for certain.
18        Q.  Do you know whether or not full
19   approval of the RSA at this time is being
20   sought or partial approval?
21            MS. SPILLANE:  Objection to form.
22        A.  I am not aware of what form of
23   approval is being sought.
```

Page 152



```
19        Q.  Now you said you're generally, I
20   believe, generally aware of the terms of
21   the RSA?
22        A.  Yes.
23        Q.  Is there someone on your team or
24   at Citi that is more involved with the
25   specifics of the RSA?
```

Page 153

```
 1        F. Chapados - Professional Eyes Only
 2        A.  David Brownstein from the Citi
 3   team would be more involved.
 4        Q.  Are you familiar with how the RSA
 5   would impact transformation if at all?
 6            MS. SPILLANE:  Objection to form.
 7            MR. MASHBERG:  Objection to form.
 8        A.  Can you clarify your statement?
 9   It was rather broad.
10        Q.  Are you familiar with how the
11   economics of the RSA work?
12        A.  I am broadly familiar with them.
13        Q.  Okay.  And would it be fair to
14   say that that includes -- one aspect would
15   be that charge per kilowatt-hour that we
16   discussed earlier?
17        A.  That is a key aspect.
18        Q.  Okay.  Do you have any
19   understanding how that key aspect of the
20   RSA impacts transformation?
21        A.  As I've stated, it is a component
22   of rates to be charged to ratepayers at the
23   end of the day, and operators will be
24   interested in knowing the full rate picture
25   that is being charged to customers.  So,
```