**Exhibit C**

Page 42

1      F. Chapados - Professional Eyes Only
2    understanding?
3      A.  Yes.
4      Q.  Okay.  Do you know how many of
5    these transactions were for transmission
6    and distribution utilities?
7      A.  A number of them specifically
8    were.
9      Q.  I'm sorry, specifically?
10     A.  A number were.  I've never
11   counted them.
12     Q.  Okay.  Would it be fair to say
13   more than a dozen or less than a dozen?
14     A.  I have not specifically counted.
15     Q.  Okay.  Of the mergers and
16   acquisitions that you did, is it your
17   belief that the majority had to do with
18   transmission and distribution utilities?
19     A.  I've worked on a number of
20   transmission distribution utilities, as
21   well as generation assets.
22     Q.  Okay.  Of those transmission and
23   distribution utilities, can you identify
24   any of those?
25     A.  I believe one that I have listed

Page 43

1      F. Chapados - Professional Eyes Only
2    on my resumé is Berkshire Hathaway's
3    potential acquisition of Oncore Electric in
4    Texas.
5      Q.  Can you recall any others?
6      A.  I have worked on other
7    transactions that are not listed on my
8    resumé as they remain confidential.
9      Q.  I understand.
10       Are there any others that you can
11   remember that are not listed as
12   confidential?
13     A.  I do not specifically have my
14   resumé in front of me, so there could be
15   some.
16     Q.  Okay.  And you also indicate in
17   that same paragraph that you worked on debt
18   and equity financing transactions.
19       What kind of transactions do you
20   mean?
21     A.  Well, if the utility wants to go
22   and raise debt financing, that would be
23   included.  So bonds, as well as if a client
24   wanted to raise equity capital selling
25   shares on the market.

Page 44

1      F. Chapados - Professional Eyes Only
2      Q.  And so for the last ten years of
3    your career, that would all have to do with
4    power industry-type clients?
5      A.  Yes, broad power industry.
6      Q.  And in what capacity were you
7    involved?
8      A.  In varying --
9        MR. MASHBERG:  Objection to form.
10       MS. SPILLANE:  Objection to form.
11     A.  Can you clarify that?
12     Q.  Sure.
13       So would it be fair to say that
14   first you started off analyzing these
15   projects and then you, as your -- during
16   the course of your career, you got in a
17   position that was more interacting with the
18   clients and overseeing other individuals
19   that were involved in these transactions on
20   behalf of Citi?
21       MS. SPILLANE:  Objection to form.
22       MR. MASHBERG:  Objection.
23     A.  That is broadly, correct.
24     Q.  Okay.  Well, was there anything
25   that's wrong about that statement?

Page 45

1      F. Chapados - Professional Eyes Only
2      A.  I believe it was correct.
3      Q.  Okay.  In the course of your
4    experience, do you have any experience with
5    public utilities on any islands in the
6    Caribbean?
7      A.  I do not.
8      Q.  Do you know if there are industry
9    professionals with that experience?
10       MR. MASHBERG:  Objection to form.
11     A.  Can you clarify that?
12     Q.  Sure.
13       Do you know if there are any
14   investment bankers that have experience
15   with public utilities on islands in the
16   Caribbean?
17     A.  That is a broad question.  I
18   would assume that there are some, yes.
19     Q.  But you don't know for a fact?
20     A.  I would assume that there are
21   some.
22     Q.  Okay.  Do you have any experience
23   working in Puerto Rico other than the work
24   that you've done on this transformation?
25     A.  I do not.

12 (Pages 42 to 45)

TSG Reporting - Worldwide - 877-702-9580

Page 46

1        F. Chapados - Professional Eyes Only
2        Q.   Do you have any experience in --
3    without being physically in Puerto Rico, do
4    you have any experience in any of the other
5    Puerto Rico Title III and VI cases like,
6    for example, the Commonwealth, COFINA, HTA,
7    ERS?
8             MS. SPILLANE:  Objection to form.
9        A.   Can you clarify that?
10       Q.   Sure.
11            Have you worked on -- with
12   respect to broadly PROMESA, have you done
13   any work other than on the PREPA
14   transformation?
15       A.   I have focused on the PREPA
16   transformation.
17       Q.   Okay.  So while you might have
18   focused on the PREPA transformation, does
19   that mean that you've given any attention
20   to any other aspect of PROMESA broadly that
21   is not the PREPA transformation?
22            MS. SPILLANE:  Objection to form.
23       A.   Can you clarify that?
24       Q.   Well, you used the word "I have
25   focused on," okay?  That indicates to me

Page 47

1        F. Chapados - Professional Eyes Only
2    that you might have focused on something,
3    but you might have still paid attention to
4    other aspects, so I just want it clear.
5             Have you done any work other than
6    the PREPA transformation with respect to
7    the Puerto Rico Title III cases?
8             MS. SPILLANE:  Objection to form.
9        A.   Can you clarify your question?
10       Q.   Okay.
11            Have you worked on anything in
12   Puerto Rico or with respect to PROMESA
13   other than the PREPA transformation?
14       A.   I have not.
15       Q.   Have you done any work on any
16   other United States territories?
17            MR. MASHBERG:  Objection to form.
18       A.   I have not.
19       Q.   Have you done any work on any
20   municipal bankruptcies?
21       A.   I have not.
22       Q.   Have you ever worked with
23   distressed municipal debt?
24       A.   I have not.
25       Q.   Do you have any experience in

Page 48

1        F. Chapados - Professional Eyes Only
2    municipal debt?
3        A.   I do not.
4        Q.   Do you have any experience
5    relating to public utilities in any Chapter
6    11 or Chapter 9 context?
7        A.   With regards to the Berkshire
8    Hathaway acquisition of Oncore Electric,
9    Oncore's parent was in bankruptcy.
10       Q.   Was that acquisition completed?
11       A.   It was terminated.
12       Q.   By whom?
13       A.   Ultimately there was another
14   buyer of that utility.
15       Q.   Aside from Chapter 11 or Chapter
16   9, have you engaged or worked on any
17   transactions relating to public utilities
18   in any sort of distressed context?
19            MS. SPILLANE:  Objection to form.
20   BY MR. ARASTIA:
21       Q.   Such as assignment for the
22   benefit of creditors, receiverships?
23       A.   Can you clarify your question?
24       Q.   Okay.  I'll break it down.
25            Do you know what assignment for

Page 49

1        F. Chapados - Professional Eyes Only
2    the benefit of creditors is?
3        A.   I am not specific with that term.
4        Q.   Have you ever heard of it?
5        A.   I believe so, yes.
6        Q.   Okay.  Have you ever done any
7    transaction relating to public utilities in
8    the context of assignment for the benefit
9    of creditors?
10       A.   I have not.
11       Q.   Okay.  Have you ever done any
12   transaction relating to public utilities in
13   the context of a receivership?
14       A.   I have not.
15       Q.   Does your experience include
16   transactions involving the operation of a
17   public utility?
18       A.   Our clients are broadly operators
19   of utilities.
20       Q.   Okay.  Your clients are broadly
21   operators, but are you performing functions
22   for clients that are purchasing assets or
23   simply entering into a management agreement
24   to operate a utility?
25            MR. MASHBERG:  Objection to form.

13 (Pages 46 to 49)

Page 50

1        F. Chapados - Professional Eyes Only
2          A.   Can you clarify your question?
3          Q.   Sure.
4              I believe that you said that you
5     have engaged in transactions on behalf of
6     clients that are broadly operators?
7          A.   Correct.
8          Q.   Despite the fact that they might
9     be broadly operators, have those
10    transactions been for the acquisition of
11    assets?
12         A.   They have generally been for the
13    acquisition of utilities or assets, yes.
14         Q.   Okay.  Have they ever been, these
15    transactions, solely for the purpose of
16    operating a utility?
17         A.   They have not.
18         Q.   Let me shift gears for a moment.
19             Do you know when Citi began
20    providing services to the FOMB?
21             MS. SPILLANE:  Objection to form.
22         A.   Can you clarify your question?
23         Q.   Well, first of all, let me back
24    up.
25             By FOMB, can we agree that's the

Page 51

1        F. Chapados - Professional Eyes Only
2     Financial Oversight Management Board?
3          A.   Correct.
4          Q.   Okay.  Do you know -- at some
5     point in time, Citi began providing
6     services to the FOMB, did it not?
7          A.   It did.
8          Q.   Okay.  And do you know when that
9     was?
10         A.   I believe our first engagement
11    letter was in 2017.
12         Q.   You say "first engagement
13    letter."  That presupposes there is more
14    than one.
15             Are there more than one?
16         A.   There are more than one.
17         Q.   How many are there?
18         A.   I believe the engagement letter
19    has been revised three times.
20         Q.   Do you know why it's been
21    revised?
22         A.   The scope of services and/or
23    compensation has changed.
24             (Chapados Exhibit 2, Letter dated
25             2/13/18 from Citi to FOMB,

Page 52

1        F. Chapados - Professional Eyes Only
2          Bates-stamped CGMI00000005 through 14,
3          marked for identification, as of this
4          date.)
5     BY MR. ARASTIA:
6          Q.   I show you what is marked as No.
7     2.  If you take a look at this while copies
8     are being passed out.
9             (Witness complies.)
10         Q.   Do you recognize that document in
11    front of you?
12         A.   I do.
13         Q.   Do you know whether or not that
14    is the first engagement letter between Citi
15    and FOMB?
16         A.   I believe it is the second
17    engagement letter.
18         Q.   Do you know how it's different
19    than the first?
20         A.   I believe the scope of services
21    has been expanded.
22         Q.   And would that be, in the first
23    paragraph, "To serve as an investment
24    banker and financial adviser to the board
25    in connection with the board statutory

Page 53

1        F. Chapados - Professional Eyes Only
2     duties under PROMESA and its task of
3     working with the people and government of
4     Puerto Rico to create the necessary
5     foundation for economic growth and restore
6     opportunity to the people of Puerto Rico
7     including working on the board's exclusive
8     strategic mergers and acquisition adviser
9     to render certain strategic advisory and
10    investment banking services related to the
11    potential sale or restructuring of Puerto
12    Rico Electric Power Authority."
13             That is as you understand the
14    scope to be?
15         A.   That is correct.
16         Q.   And this engagement letter
17    accurately encapsulates the scope of work
18    of Citi at that point in time?
19         A.   That is correct.
20         Q.   And this changed later?
21         A.   I believe it has been further
22    revised.
23         Q.   In what way?
24         A.   I believe the compensation has
25    changed.

14 (Pages 50 to 53)



Page 86

1        F. Chapados - Professional Eyes Only

Page 87

Page 88

4        Q.  If you can look at No. 2 off to
5    your right.  I forgot to ask you a question
6    about that.
7         (Document review.)
8        Q.  I think that you had said that in
9    the third version of what's marked as
10   Exhibit 2, there is a change in the
11   compensation.
12       A.  That is correct.
13       Q.  Okay.  Are you familiar with
14   success fees in mergers and acquisition
15   transactions?
16       A.  I am.
17       Q.  Does the next version of this
18   include any sort of success fee for
19   transformation of T&D assets?
20       A.  It has a success fee for the
21   broad transformation, yes.
22       Q.  So that -- by "broad
23   transformation," does that include the
24   private ownership or operation of the power
25   utility by a private property or/and the

Page 89

1        F. Chapados - Professional Eyes Only
2    privatization involving the company's
3    power-generation assets?
4        MS. SPILLANE:  Objection to form.
5        A.  Our scope of work covers both the
6    T&D system and the generation assets, yes.
7        Q.  Okay.  I'm sorry, are you done?
8        A.  Our fees are for both.
9        Q.  Okay.  I just wanted to make sure
10   that there is nothing else that you include
11   in the definition of transformation.
12       A.  I do not.
13       Q.  Okay.  If we could look back at
14   your declaration, which is in front of you,
15   on page 3, I would just like a little
16   clarification.
17       You say that your
18   responsibilities reflect the transformation
19   to include leading the day-to-day
20   transaction execution, but I thought I
21   heard you tell me earlier that the P3
22   Authority is leading the transaction.
23       Can you help --
24       A.  There are multiple parties
25   involved in the transaction.  I am

23 (Pages 86 to 89)

TSG Reporting - Worldwide - 877-702-9580

Page 90

1      F. Chapados - Professional Eyes Only
2    day-to-day lead on the transaction
3    execution.  There are other parties as
4    well.
5        Q.   Okay.  Who are the other parties?
6        A.   At the end of the day, there are
7    a number of approvals required for the
8    transformation and, therefore, they're all
9    involved broadly.
10       Q.   Would it be fair to say that
11   you're leading the day-to-day transaction
12   execution with the FOMB, or do you mean the
13   entire transaction execution?
14       A.   As previously --
15         MS. SPILLANE:  Objection to form.
16       A.   As previously stated, we are
17   working together, the Oversight Board, the
18   P3 Authority, other Puerto Rico entities,
19   to effect the transformation.  I am leading
20   the overall transformation.
21       Q.   And then you say you're serving
22   as a primary point of contact for the
23   Oversight Board, the government, and
24   potential operators.
25         Can you explain what you mean by

Page 91

1      F. Chapados - Professional Eyes Only
2    that?
3        A.   On a day-to-day basis, I speak to
4    members of the Oversight Board and the
5    Puerto Rico government and its various
6    offices and entities, as well as the
7    potential operators of the T&D system.
8        Q.   Would it be more accurate to say
9    that you're the liaison for those entities?
10       A.   That could be another word, yes.
11       Q.   Okay.  But certainly you don't
12   represent the government or the potential
13   operators?
14       A.   I do not represent either of
15   those.
16       Q.   Which operators have you
17   communicated with, potential operators?
18       A.   I have communicated with all
19   potential operators in the process.
20       Q.   Okay.  How many are there?
21       A.   Could you clarify?
22       Q.   How many potential operators are
23   there?
24       A.   As was released by the decision
25   to go forth with the RFP, there are four

Page 92

1      F. Chapados - Professional Eyes Only
2    short-listed parties in the Request for
3    Proposal stage.
4        Q.   And you speak with all four?
5        A.   I have spoken with all four.
6        Q.   Okay.  And what's the sorts of
7    things that you discuss with those
8    potential operators?
9        A.   A lot of things.  I primarily do
10   due diligence requirements, scheduling
11   matters, and other types of clarifications
12   regarding the transformation.
13       Q.   Are some of these communications
14   in person?
15       A.   They are in person.
16       Q.   Okay.  Are some by email?
17       A.   They are by email.
18       Q.   Do the operators ask you any
19   questions about the scope, nature, vision,
20   or your understanding of the transformation
21   process?
22       A.   The operators have asked a number
23   of questions regarding the transformation
24   and the potential transaction here.
25       Q.   And have you relied on any of

Page 93

1      F. Chapados - Professional Eyes Only
2    those communications in putting together
3    this declaration?
4        A.   I believe they form my broad
5    knowledge base of the overall
6    transformation efforts.
7        Q.   Earlier we talked about advisers
8    for PREPA and P3.
9          Speaking with advisers, have you
10   interacted with an entity called
11   Rothschild?
12       A.   I have.
13       Q.   And do you know what role they
14   performed?
15       A.   Rothschild was an adviser to
16   AAFAF.
17       Q.   Okay.  Did they perform, to the
18   best of your knowledge, the same services
19   to AAFAF that you and Citi performed on
20   behalf of the FOMB?
21       A.   In the earlier stages of the
22   project, yes, they were providing a similar
23   type of service.
24       Q.   And when did that change, do you
25   know?

24 (Pages 90 to 93)

Page 94

1      F. Chapados - Professional Eyes Only
2          A.   I believe it was September of
3    2018.
4          Q.   And do you know why there was a
5    divergence in roles?
6              MS. SPILLANE:  Objection to form.
7          A.   Can you clarify your question?
8          Q.   Sure.
9              You indicated that at the early
10   stages, Rothschild and Citi performed the
11   same roles.
12             Is that a fair statement?
13         A.   Correct.
14         Q.   That indicates that or insinuates
15   that at some point other than the early
16   stages, the roles changed.
17             Did that happen?
18             MS. SPILLANE:  Objection to form.
19         A.   I don't believe the roles
20   changed.  I believe the government of
21   Puerto Rico made a decision to not continue
22   with Rothschild providing it financial
23   advisory services.
24         Q.   Are you aware that the FOMB has
25   ongoing litigation against Citi?

Page 95

1      F. Chapados - Professional Eyes Only
2              MS. SPILLANE:  Objection.
3              MR. MASHBERG:  Object to the
4        form.
5          A.   Can you clarify your question?
6          Q.   Sure.
7              Do you have any knowledge as to
8    whether or not the FOMB is a plaintiff in
9    any litigation in which Citi is named as a
10   defendant in the PROMESA matter?
11         A.   I am broadly aware of that, but
12   not at the specific level.
13         Q.   Do you know what the claims are?
14         A.   I said I was not aware of the
15   specific, you know, items.
16         Q.   Well, even broadly.
17         A.   I believe that Citi served as an
18   underwriter of certain debt securities in
19   the past.
20         Q.   And do you know the amount of the
21   claim?
22         A.   I do not.
23         Q.   Are you aware of -- do you know
24   what a preference action is in bankruptcy?
25         A.   I am not.

Page 96

1      F. Chapados - Professional Eyes Only
2          Q.   Okay.  Do you know what a
3    fraudulent transfer action is in
4    bankruptcy?
5          A.   I am broadly aware of that term.
6          Q.   Okay.  Are you -- do you know
7    whether or not Citi is a defendant in a
8    fraudulent transfer action that was brought
9    in part by the FOMB?
10         A.   I believe Citi is part of
11   litigation with the Oversight Board.  If it
12   is specifically involves fraudulent
13   transfers, I am not specifically aware.
14         Q.   Okay.  Do you personally perceive
15   any conflicts and being sued by your client
16   in the same general proceedings in which
17   you're providing advice?
18             MS. SPILLANE:  Objection to form.
19             MR. MASHBERG:  Objection to form.
20         A.   Can you clarify your question.
21         Q.   Sure.
22             Does it matter to you that your
23   client is suing Citi?
24             MS. SPILLANE:  Objection to form.
25             MR. MASHBERG:  Objection to form.

Page 97

1      F. Chapados - Professional Eyes Only
2          A.   Can you clarify your question?
3          Q.   Sure.
4              Okay.  So are you familiar with
5    conflicts of interest?
6          A.   I am.
7              MR. MASHBERG:  Objection to form.
8    BY MR. ARASTIA:
9          Q.   Are you familiar with -- can you
10   remember any instance in which you were
11   providing advice to a client actively at
12   the same time that they were suing your
13   employer?
14             MS. SPILLANE:  Objection to form.
15         A.   Can you clarify your question?
16         Q.   Okay.  What part of my question
17   don't you understand?  Is it a specific
18   word or concept?  I want to ask it
19   accurately.
20         A.   What type of transaction are you
21   specifically referring to?
22         Q.   Well, what -- well, you're
23   advising the FOMB on the transformation?
24         A.   Yes.
25         Q.   At the same time that you're

25 (Pages 94 to 97)