IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**MOTION HEARING**

BEFORE MAGISTRATE JUDGE JUDITH G. DEIN

United States District Court
1 Courthouse Way, Courtroom 8
Boston, Massachusetts  02210
January 15, 2020, 2:36 p.m.

In Re:                                     )
                                           )
The Financial Oversight and Management ) 3:17-BK-3283 (LTS)
Board for Puerto Rico                      ) PROMESA Title III
                                           )
as representative of                       )
                                           ) (Jointly Administered)
The Commonwealth of Puerto Rico, et al.)
                                           )
Debtors                                    )

In Re:                                     )
                                           )
The Financial Oversight and Management ) 3:17-BK-3566 (LTS)
Board for Puerto Rico                      ) PROMESA Title III
                                           )
as representative of                       )
                                           )
Employees Retirement System of the        ) (Jointly Administered)
Government of the Commonwealth of          )
Puerto Rico                                )
                                           )
Debtors.                                   )

```
 1   THE SPECIAL CLAIMS COMMITTEE OF      )
     THE FINANCIAL OVERSIGHT AND          )
 2   MANAGEMENT BOARD FOR PUERTO RICO,    ) 3:19-AP-356 (LTS)
     ACTING BY AND THROUGH ITS MEMBERS,   )
 3                                        )
     And                                  )
 4                                        )
     THE OFFICIAL COMMITTEE OF UNSECURED  )
 5   CREDITORS OF ALL TITLE III DEBTORS   )
     (OTHER THAN COFINA),                 )
 6                                        )
     as co-trustees of                    )
 7                                        )
     THE EMPLOYEES RETIREMENT SYSTEM OF   )
 8   THE GOVERNMENT OF PUERTO RICO,       )
                                          )
 9   Plaintiff,                           )
                                          )
10   v.                                   )
                                          )
11   DEFENDANT 1M, et al.,                )
                                          )
12   Defendants.                          )

13
     THE SPECIAL CLAIMS COMMITTEE OF THE  )
14   FINANCIAL OVERSIGHT AND MANAGEMENT   )
     BOARD FOR PUERTO RICO, ACTING BY AND ) 3:19-AP-357 (LTS)
15   THROUGH ITS MEMBERS,                 )
                                          )
16   And                                  )
                                          )
17   THE OFFICIAL COMMITTEE OF UNSECURED  )
     CREDITORS OF ALL TITLE III DEBTORS:  )
18   (OTHER THAN COFINA),                 )
                                          )
19   as co-trustees of                    )
                                          )
20   THE EMPLOYEES RETIREMENT SYSTEM OF   )
     THE GOVERNMENT OF PUERTO RICO,       )
21                                        )
     Plaintiff,                           )
22                                        )
     v.                                   )
23                                        )
     STOEVER GLASS & CO., et al.,         )
24                                        )
     Defendants.                          )

25
```

```
 1    THE SPECIAL CLAIMS COMMITTEE OF THE     )
      FINANCIAL OVERSIGHT AND MANAGEMENT      )
 2    BOARD FOR PUERTO RICO, ACTING BY AND    ) 3:19-AP-359 (LTS)
      THROUGH ITS MEMBERS,                    )
 3                                            )
      And                                     )
 4                                            )
      THE OFFICIAL COMMITTEE OF UNSECURED     )
 5    CREDITORS OF ALL TITLE III DEBTORS:     )
      (OTHER THAN COFINA),                    )
 6                                            )
      as co-trustees of                       )
 7                                            )
      THE EMPLOYEES RETIREMENT SYSTEM OF      )
 8    THE GOVERNMENT OF PUERTO RICO,          )
                                              )
 9    Plaintiff,                              )
                                              )
10    v.                                      )
                                              )
11    DEFENDANTS 1H - 78H, et al.,            )
                                              )
12    Defendants.                             )
                                              )
13
      THE SPECIAL CLAIMS COMMITTEE OF THE     )
14    FINANCIAL OVERSIGHT AND MANAGEMENT      )
      BOARD FOR PUERTO RICO, ACTING BY AND    ) 3:19-AP-361 (LTS)
15    THROUGH ITS MEMBERS,                    )
                                              )
16    And                                     )
                                              )
17    THE OFFICIAL COMMITTEE OF UNSECURED     )
      CREDITORS OF ALL TITLE III DEBTORS:     )
18    (OTHER THAN COFINA),                    )
                                              )
19    as co-trustees of                       )
                                              )
20    THE EMPLOYEES RETIREMENT SYSTEM OF      )
      THE GOVERNMENT OF PUERTO RICO,          )
21                                            )
      Plaintiff,                              )
22                                            )
      v.                                      )
23                                            )
      DEFENDANT 1G-50G, et al.,               )
24                                            )
      Defendant.                              )
25
```

```
 1   A P P E A R A N C E S:

 2
         GEOFFREY S. STEWART, ESQ., DAVID R. FOX, ESQ.,
 3   SARAH PODMANICZKY McGONIGLE, ESQ., and MATTHEW E. PAPEZ, ESQ.,
     Jones Day, 51 Louisiana Avenue, N.W., Washington, DC,
 4   20001-2113, appearing for the Movants.

 5        JESSE GREEN, ESQ., White & Case, LLP, Southeast Financial
     Center, 200 South Biscayne Boulevard, Miami, Florida,
 6   33131-2362, appearing for the Puerto Rico Funds.

 7        WILLIAM D. DALSEN, ESQ. and MARGARET DALE, ESQ.,
     Proskauer Rose LLC, One International Place, Boston,
 8   Massachusetts, 02110-2600, appearing for the Oversight Board.

 9        IRENA GOLDSTEIN, ESQ., Paul Hastngs LLP,
     875 15th Street, N.W., Washington, DC, 20005, appearing
10   for the Official Committee of Unsecured Creditors.

11        LANDON RAIFORD, ESQ. and MELISSA ROOT, ESQ.,
     Jenner & Block LLP, 353 N. Clark Street, Chicago, Illinois,
12   60664-3456, appearing for the Retiree Committee.

13

14

15

16

17

18

19

20

21
                         LEE A. MARZILLI
22                    OFFICIAL COURT REPORTER
                   United States District Court
23                 1 Courthouse Way, Room 7200
                       Boston, MA  02210
24                       (617)345-6787

25
```

P R O C E E D I N G S

1
2 THE CLERK:  You may be seated.  The United States for
3 the District of Puerto Rico is now in session, the Honorable
4 Judge Dein presiding.  Today is Wednesday, January 15, 2020.
5 The matter of In Re:  The Financial Oversight and Management
6 Board for Puerto Rico as representative of the Employees'
7 Retirement System of the Government of the Commonwealth of
8 Puerto Rico, Case No. 17-BK-3566 will now be heard.  Will the
9 parties please identify themselves for the record.

10 MS. DALE:  Good afternoon, your Honor.  Margaret Dale
11 from Proskauer Rose for the Financial Oversight Management
12 Board for Puerto Rico.

13 THE COURT:  Thank you.

14 MR. DALSEN:  Good afternoon, your Honor.  William
15 Dalsen from Proskauer Rose, also on behalf of the Oversight
16 Board.

17 MR. FOX:  Good afternoon, your Honor.  David Fox from
18 Jones Day on behalf of the ERS Bondholder Group.

19 MR. PAPEZ:  Good afternoon, your Honor.  Matthew Papez
20 from Jones Day, also on behalf of the ERS Bondholder Group.

21 MS. McGONIGLE:  Good afternoon, your Honor.  Sarah
22 Podmaniczky McGonigle, also from Jones Day, also on behalf of
23 the ERS Bondholders.

24 MR. STEWART:  Good afternoon, your Honor.  Jeffrey
25 Stewart of Jones Day, also on behalf of the ERS Bondholders.

1            MR. GREEN:  Good afternoon, your Honor.  Jesse Green

2     of White & Case on behalf of the Puerto Rico Funds.

3            MR. RAIFORD:  Good afternoon, your Honor.  Landon

4     Raiford, Jenner & Block, for the Retiree Committee.

5            MS. ROOT:  Good afternoon, your Honor.  Melissa Root,

6     Jenner & Block, also on behalf of the Retiree Committee.

7            MS. GOLDSTEIN:  Good afternoon.  Irena Goldstein, Paul

8     Hastings, for the Official Committee of Unsecured Creditors.

9            THE COURT:  Welcome, everyone.  For those who are not

10    here, it's hot enough here that we seem to be emulating

11    Puerto Rico.  It's quite warm in this courtroom.  But welcome

12    everybody here, welcome to whoever is in New York.  And for our

13    colleagues and the audience in Puerto Rico, we certainly send

14    our heartfelt good wishes and hope that you're all safe.

15           We have three motions on for today, but I understand

16    there's an update on the motion for the deposition of

17    Attorney Mayol.  Is that correct?

18           MS. ROOT:  Yes, your Honor.

19           THE COURT:  I think you need to talk at the podium.

20           MS. ROOT:  Yes, your Honor, again, Melissa Root from

21    Jenner & Block on behalf of the Official Committee of Retired

22    Employees for the Commonwealth of Puerto Rico.

23           We are here today, your Honor, on the Retiree

24    Committee's motion to quash the deposition subpoena of Hector

25    Mayol Kauffmann that was served by the ERS bondholders.  In

1    conversations leading up to the hearing today, we believe that

2    we may be able to reach agreement with the bondholders that

3    would resolve this discovery dispute.  We're not there yet, but

4    we have agreed both to continue the return date for the

5    subpoena that the bondholders had served on Mr. Mayol and

6    continue, with your Honor's permission, the motion to quash to

7    give the parties a chance to try to reach resolution.

8           THE COURT:  So while I certainly advocate for a mutual

9    resolution, I am not going to reconvene on this motion.  So if

10   you want a continuance with the understanding that if you need

11   a resolution, I'll do it on the papers, that would be okay.  If

12   not, I would prefer to hear argument today.  You can decide.

13          MS. ROOT:  Yes, your Honor, I think that a continuance

14   with resolution on the papers would be acceptable, but if I may

15   just confer with my colleague, your Honor, and give you an

16   answer perhaps after your Honor hears the other two motions to

17   compel.

18          THE COURT:  Okay.

19          MS. ROOT:  Thank you.

20          MR. STEWART:  Your Honor, Jeffrey Stewart of Jones Day

21   for the bondholders.  I think we would resolve this by

22   accepting a declaration from Mr. Mayol instead of a deposition,

23   so it needs to be worked out as the wording of a declaration.

24   I'm confident we'll be able to do that.  If not, we will come

25   back to your Honor, and papers are fine, whatever resolution

1    your Honor would like.

2         THE COURT:  Can we set an outside date so this doesn't

3    just float forever?

4         MR. STEWART:  That's fine.  I would say a week would

5    be plenty, but let me defer to Ms. Root.

6         MS. ROOT:  Yes, your Honor, I think we could advise

7    the Court in a week if we have been able to reach an agreement

8    or if we want to go forward with a motion to quash at that

9    point.

10        THE COURT:  Okay, let's do it that way then.  All

11   right, so that motion is continued.  The parties will file a

12   joint status report within a week, and if there's anything for

13   the Court to decide, I'll decide it on the papers.

14        MR. STEWART:  Yes.  Thank you, your Honor.

15        THE COURT:  All right, so I have I guess next motion

16   to compel answers to interrogatories.

17        MR. FOX:  Yes, your Honor.

18        THE COURT:  If you haven't worked it out.

19        MR. FOX:  Unfortunately not, your Honor.

20        THE COURT:  All right.

21        MR. FOX:  Again, David Fox from Jones Day on behalf of

22   the ERS Bondholder Group.

23        Your Honor, before I get into the interrogatories,

24   just a brief bit of background on the issues that are at stake

25   which are the foundation for why we need the interrogatories

 1   answered.  I know your Honor reads the briefs, so I will keep

 2   it short.

 3          We're here related to the ultra vires proceedings in

 4   which the committees and government parties, which in essence

 5   is the Oversight Board as well as the Retiree Committee and the

 6   Unsecured Creditors Committee, contend that the $3 million in

 7   bonds that ERS issued in 2008 do not need to be paid back

 8   because ERS supposedly lacked statutory authority to issue

 9   them, and indeed they contend that they can claw back payments

10   previously made on those bonds for the same reason.

11          Our position in response to that, in brief, is, number

12   one, we don't think it's true that ERS lacked the statutory

13   authority to issue the bonds.  We think the statute did

14   authorize the issuance of the bonds.  Number two, if that's not

15   the case, we think that the bonds are still enforceable under

16   UCC 8-202, which provides that an otherwise invalid security

17   can be enforced by a purchaser without notice of the particular

18   defect.  And, number three, there are equitable issues,

19   including issues of unjust enrichment, laches, unclean hands,

20   in pari delicto that we think would preclude the Board from

21   either contesting the enforceability --

22          THE COURT:  You need to stop.  Apparently the

23   microphone is not working in New York.

24          MR. FOX:  Yes, your Honor.

25          (Pause.)

```
 1              THE COURT:  Can New York hear me now?  I feel like
 2    that telephone commercial.
 3              (Pause.)
 4              THE COURT:  So my microphone is not going through to
 5    New York?
 6              (Discussion between the Court and Clerk.)
 7              THE COURT:  I'm afraid we need to take a few-minute
 8    break.
 9              (A recess was taken, 2:44 p.m.)
10              (Resumed, 3:01 p.m.)
11              THE CLERK:  All rise.
12              THE COURT:  So did you resolve it?
13              MR. FOX:  We did not, your Honor.
14              (Laughter.)
15              THE COURT:  I gave you at least 15 minutes.
16              All right, my apologies to New York.  I hope you can
17    hear me at least somewhat, and we will continue to work on
18    trying to improve this streaming.
19              Go ahead, Mr. Fox.
20              MR. FOX:  Your Honor, so we are here about four
21    interrogatories that the Board in two cases did not answer at
22    all, in two cases did not answer completely.  And the
23    information that they withheld comes down basically into two
24    buckets:  The first bucket is information about persons with
25    knowledge of particular contentions that the Oversight Board is
```

```
 1    making, and that is Interrogatory 1.  It's persons with
 2    knowledge of the factual basis for the contention that the
 3    bonds were ultra vires.  So that is the central contention in
 4    these cases, and we just want to know who the persons with
 5    knowledge that they know of are.  And what they responded to in
 6    that one is, they said "on information and belief," and they
 7    listed a few categories of people.  They said former ERS
 8    officials, they said Puerto Rico legislators, they said ERS
 9    bondholders, but they did not identify anyone by name; and I
10    don't understand them now to defend this sort of vague
11    recitation of groups of people that they think might have
12    knowledge as adequate.
13            Instead what they seem to be saying now are some
14    combination of two things:  One, it's not relevant who has
15    knowledge of the factual basis for their contention.  And we
16    think that just cannot be right.  We're entitled to know what
17    the sources of information are for what is the basis for their
18    contention.  What they say about that is, they say, well, it's
19    a legal contention; it's a pure legal issue of whether the
20    bonds are valid.  But even on their account of what the statute
21    says and what the statute requires, it still authorizes ERS to
22    borrow in some ways and not to borrow in other ways.  And so
23    there still is a factual basis for the contention that the
24    bonds are void, which is that the form that they took was not
25    authorized by the statute.  And so there is the factual basis
```

1    there, and we are entitled to know who are the individuals who

2    have information about that factual basis.

3          The second thing they say is, they say they're not

4    withholding any responsive information, and that's also what

5    they said during the meet-and-confer.  We, to be honest, find

6    that a little puzzling.  It's hard to understand how there can

7    be no one with information about the factual basis for their

8    assertions; but if that's the answer, then we would just like

9    them to say so under oath so that we have that as a response

10   from them ERS under oath.  Of course, if it changes, if they

11   come up with someone later, they can supplement their answer

12   just like any party can always supplement an interrogatory

13   answer, but we don't think it's sufficient for them just to say

14   in their brief and in an email that they don't have anyone,

15   particularly given that it's a bit of a surprising answer.

16         For Interrogatory No. 2, sticking with for now the

17   "persons with knowledge" bucket of information, for

18   Interrogatory No. 2, it's persons with knowledge of the

19   contention that they can claw back payments.  It's relevant for

20   the same reason.  They're seeking to claw back these payments.

21   We want to know who has knowledge for the factual basis of

22   that.

23         For Interrogatory No. 8, which is persons with

24   knowledge that the statement in the ERS bond resolution that

25   these bonds were authorized under the ERS Enabling Act is

1    false, again, that's a central piece of their case, and we

2    think we're entitled to know who they know of who has personal

3    knowledge of that contention.

4         THE COURT:  So I have to admit I have a question about

5    No. 8 --

6         MR. FOX:  Okay.

7         THE COURT:  -- and whether or not it's really

8    duplicative in a sense of Interrogatory No. 1, or are you

9    asking actually who looked at the resolution, the bond

10   resolution and said the bond resolution is false?

11        MR. FOX:  So I think for purposes of the "person with

12   knowledge" piece of these interrogatories, there is substantial

13   overlap, but it's not quite duplicative because the

14   Interrogatory No. 8 includes what your Honor just said:  It's

15   people who were involved in the drafting of the bond

16   resolution, the approval of the bond resolution.  I mean, to

17   the extent that those people have knowledge of what makes it

18   false, it would include them.  It's specifically focused on the

19   bond resolution.  But otherwise, yes, I mean, I think also

20   responsive to 8 would be anyone probably responsive to No. 1,

21   which is people who have knowledge related to whether the bonds

22   are valid or not.

23        THE COURT:  And I'm wondering, as part of the

24   contention that things are difficult to ascertain and the like,

25   whether that distinction is something that is really relevant

1    for the arguments that you're making; in other words, if you

2    get the people who have knowledge that the bonds were issued

3    ultra vires or otherwise were null and void, whether that's

4    sufficient without asking them to then make that a more minute

5    analysis as to a specific document.

6              MR. FOX:  What I would say, your Honor, is it would go

7    a long way.  I think we still would like and think we're

8    entitled to as well this focus on this document.  It's a very

9    important document, and it sort of is the piece of paper that

10   authorized these bonds, and they're saying that it contained

11   this false representation.  And so if they have knowledge

12   specifically related or if they know of people specifically

13   related to that document, we think we are entitled to know who

14   it is.

15             The other thing I would say is, for purposes of the

16   other aspect of this interrogatory, which is when they first

17   learned, I think Interrogatory 8 and 1 at that point don't

18   really overlap at all.  They're asking two different questions

19   in terms of when they first learned.  But for persons with

20   knowledge, I do agree with your Honor:  It would go a long way.

21   Like I said, I think, you know, we'd like the further

22   information, but certainly getting the answer to Interrogatory

23   No. 1 would help a great deal.

24             Interrogatory No. 11 on persons with knowledge, it's

25   different.  It's related but it's different.  It's we want the

1    names of anyone that they think broke a law or violated a rule

2    in connection with the ERS bonds.

3          THE COURT:  I have to tell you, I'm not happy about

4    No. 11 and whether you're entitled to that, so that one you're

5    going to have to convince me of.  It sounds to me that you're

6    asking ERS to make a determination about legality that's not

7    their role to make.

8          MR. FOX:  So, your Honor, I think No. 11 is a

9    contention interrogatory, and so in a sense they either are or

10   are not going to be contending that someone violated the law or

11   violated a rule.  If they're not contending that anyone did,

12   then they're not contending that anyone did.  The answer is

13   "no."

14         THE COURT:  To your knowledge, is that an issue in

15   this litigation that's going forward at this time?

16         MR. FOX:  It's an issue in that, you know, they are

17   making this allegation that this massive amount of money was

18   raised without statutory authorization, and we want to be able

19   to talk to the people that were sort of central to that, and we

20   think that this interrogatory gets at that information.  I

21   mean, if there is someone that they think broke the law as part

22   of this issuance, we want to be able to depose that person, and

23   we want to know upfront who that is.  And so we do think it's

24   relevant.  It's not directly relevant in the sense that we're

25   not saying, like, whether someone broke the law is going to be,

1   you know, a count of a complaint at this point, but it is, we

2   think, a source of discoverable information because those are

3   key people.

4        And whether ERS thinks that someone broke the law or

5   whether they think that sort of this was just all a

6   misunderstanding is also relevant.  It's relevant to the notice

7   issue, and it's relevant to also understanding, what is their

8   theory under which these bonds were invalidly issued?  And it's

9   not clear at this point, because of what they haven't answered,

10  exactly what their position is in terms of when it became clear

11  to ERS, supposedly, that the bonds were illegal.  And so if

12  they think ERS should have known, if they think ERS officials

13  should have known, and that they broke the law when they issued

14  the bonds, that's a little bit of a different claim that

15  they're making than if what they're saying is, "Well, it was a

16  misunderstanding at the time, and now in retrospect we think

17  this was unauthorized."  And so we're trying to clear up which

18  of those is what they're doing.

19        THE COURT:  We'll see.

20        MR. FOX:  So that's the "persons with knowledge"

21  element, your Honor.

22        The other big bucket relates --

23        THE COURT:  I think you need to address, though, their

24  fundamental argument that what they knew or who knew is

25  irrelevant, and that it's really I need to focus on what the

1    bondholders knew.

2         MR. FOX:  Yes, your Honor.  And so certainly we agree

3    that what the bondholders knew is relevant.  And my colleague

4    Sarah will be up here in a little while addressing their other

5    motion, but we're not taking the position that what the

6    bondholders knew is not relevant, but we just don't agree that

7    that's the only thing that's relevant.  And the reason is that

8    they are going to be arguing -- they've made clear that they

9    are going to be arguing that sort of the bondholders were on

10   notice because of the existence of information in the world;

11   and the biggest piece of information is the ERS Enabling Act

12   itself, which they say in their opposition to this motion, they

13   are going to say the Enabling Act itself served as notice to

14   the bondholders that these bonds were invalid.  And I guess

15   there are a couple of things that they might mean by that.  One

16   thing they might mean is sort of, as a matter of law, just the

17   fact that the bonds are illegal means the bondholders were on

18   notice.  That I guess ultimately is a merits question.  We

19   don't think that can stand.  It would be inconsistent with

20   Section 8-202.  It would effectively read it out of the

21   statute, that anytime the security was invalid because of a

22   statute, that 8-202 wouldn't apply because automatically

23   everyone would be on notice.  We think that can't be the law,

24   but, in any event, it certainly is not indisputably the law.

25         So we think what they have to be saying about notice

1    and the statute is that the bondholders knew about the statute,

2    and therefore sort of constructively were on notice from the

3    existence of the statute that these bonds were invalid.  We

4    don't think that's right, but one thing we want to know is, if

5    the statute really had that effect, then did anyone else come

6    to the conclusion from the statute that the bonds were invalid

7    before this issue was first raised at the earliest in 2017?

8    And we think the answer is "no," but that's relevant to our

9    case because we think they're saying that we should have known

10   from the statute that these bonds were invalid at a point when

11   even ERS had not come to that conclusion.  And so that goes to

12   whether in fact the statute provided notice, and that's why ERS

13   is particularly relevant in terms of what they believe because

14   they are most familiar of anyone with the statute and with the

15   bonds.  And so if they didn't reach that conclusion, that would

16   go a long way towards showing what is, in our view, correct,

17   that the statute did not provide the required notice.  So

18   that's why we think that's relevant.

19          That also gets into the "first discovered" piece of

20   this because we think for that reason, when ERS first

21   discovered that anyone had made this contention is relevant

22   because they seem to be saying that the bondholders should have

23   concluded that the ERS bonds were invalid before anyone that

24   they're aware of reached that conclusion, and we think that's

25   inconsistent with the UCC, and we think it's inconsistent with

1    sort of just reason because if they didn't reach the

2    conclusion, then how can they say the bondholders should have

3    reached the conclusion?

4           It's also relevant to validity because, like I said

5    before, we aren't sure if their position is ERS knew at the

6    time that these were invalid and proceeded anyway, or if their

7    position is, ERS discovered later that they were invalid.  And

8    what ERS thought is relevant to the construction of the statute

9    under the *USI Properties* case.  The Court will defer ultimately

10   to some extent to ERS's construction of its own Enabling Act,

11   and so we need to know if they're going to contend that ERS was

12   not in fact construing its Enabling Act as authorized in the

13   bonds.  We think ERS was doing that, but if they're going to

14   contend that ERS knew about this beforehand, we have to know

15   that.

16          On Interrogatory No. 2 for the "first discovered"

17   issue, Interrogatory No. 2 is really tailored specifically at

18   laches for the clawback actions.  We're arguing that they

19   waited too long to claw back payments from the bondholders, and

20   so an element of that is that they unreasonably delayed seeking

21   their relief.  So we need to know when they thought they could

22   seek the relief, so it goes directly to that issue.

23          This is where Interrogatory No. 8 is a little bit

24   different.  Interrogatory No. 1 is asking when they first

25   learned that anyone had made the contention that the ERS bonds

1   are invalid.  Interrogatory No. 8 is asking when they first

2   concluded that the statement in the bond resolution that

3   they're authorized is false, so that goes to sort of when ERS

4   itself reached that conclusion.  So it's a little bit

5   different.  It's not duplicative of Interrogatory No. 1.

6          THE COURT:  But are you asking when somebody focused

7   on the bond resolution itself or focused on whether the bonds

8   were issued appropriately?

9          MR. FOX:  So I think it amounts to the same thing,

10  your Honor, because the statement that we're talking about in

11  the bond resolution is a statement that simply says that these

12  bonds were authorized under the ERS Enabling Act.  And so at

13  the point when they concluded, if they concluded, that the ERS

14  bonds are invalid, they necessarily would have at that same

15  point have concluded that the statement in the bond resolution

16  was false.

17         THE COURT:  But they could have not thought about the

18  bond resolution, right?  They could have come to this decision

19  in connection, let's say, with the litigation, and not focused

20  on where have they made statements that might be inconsistent

21  with that conclusion?

22         MR. FOX:  I suppose that's possible, your Honor.  It

23  strikes me as unlikely because by issuing the bonds, ERS was

24  sort of -- I mean, it's not as though it wouldn't have occurred

25  to them that by issuing the bonds, they would have represented

1    that the bonds were valid.  It sort of is a necessary part of a

2    bond issuance.  And so I think at the point when they concluded

3    that the bonds were invalid, they necessarily would have

4    concluded we were wrong before, and it's not as though it would

5    shock them that that contradicted a representation they'd made

6    before.

7            But, I mean, I do understand the distinction your

8    Honor is drawing, and I recognize that Interrogatory 8 asks

9    specifically about the bond resolution.  We still think that's

10   an important point.  For one thing, we think the bondholders

11   are entitled to rely on the statement in the bond resolution

12   about what the Enabling Act authorized, and whether and when

13   ERS concluded that that was false I think is important, in part

14   because ERS doesn't seem to have said anything to anyone about

15   it until this litigation, so we think that as well goes to

16   notice.  And if they think they did say something about it to

17   someone, you know, we need to know that too because I'm sure

18   we'll hear it once we get into the merits.

19           THE COURT:  Okay.

20           MR. FOX:  And then Interrogatory No. 11, again, here

21   we're talking about individuals who violated the law in

22   connection with the U.S. bond issuance.  In addition to the

23   contention of who, we asked when ERS found out and what ERS did

24   about it.  That is directly relevant to notice, your Honor,

25   because one of the things under the UCC in terms of what counts

1    as notice, one of the things is, did the bondholders receive a

2    notice?  And so we need to know if they're going to contend

3    that they provided a notice of someone's violation of law in

4    connection with the bond issuance.  So we do think Interrogatory

5    No. 11, all of it is relevant.  It's not just the identification

6    of people.

7           A quick word about privilege.  They argue that 2, 8,

8    and 11 ask for privileged information.  We think that's just

9    not correct.  We're asking for a fact, which is when they

10   learned about a particular contention or when they came to a

11   particular conclusion.  We're not asking about the

12   communications that led them to that.  We're not asking about

13   the content of the communications.  It's analogous I think

14   to -- you know, it's often relevant or it might often be

15   relevant to sort of when someone received notice of a complaint

16   filed against them.  And they may have heard about it from

17   their lawyer, but that doesn't mean that they don't have to say

18   when they received notice that the complaint was filed.  We're

19   not asking for what their lawyers told them, but if they first

20   heard about these contentions from their lawyers, yes, we want

21   the date that they heard about them, and that's the extent of

22   what we're asking for.

23          THE COURT:  Thank you.

24          MR. FOX:  Unless your Honor has further questions

25   about this, we'll rest on the arguments.

1          THE COURT:  Not right yet.  I'll hear the other side.

2          MR. DALSEN:  Good afternoon, your Honor.  William

3    Dalsen from Proskauer Rose for the Oversight Board as

4    Representative of the Debtor in the Title III cases.

5          I think it makes sense to start with Interrogatory

6    No. 11.  Interrogatory No. 11, as the Court pointed out, is

7    asking us to make legal determinations about whether specific

8    persons broke the law.  Aside from the fact that, as the Court

9    has already pointed out, that would be improper, the contention

10   ERS has made, and I'll come back to this more in a second, is

11   that the reason the bonds were issued ultra vires is because

12   the ERS Enabling Act does not authorize their issuance.  This

13   is not a case that is about some individual breaking the law,

14   and, as a result of breaking the law, the bonds were ultra vires.

15   Instead the case is about the lack of authority, the lack of

16   delegated authority from the legislature to allow that to

17   happen in the first place.

18         Maybe more importantly, as we've already told the

19   bondholders, Interrogatory No. 11 asks:  If you contend, that

20   is, if ERS contends that someone has broken the law, that

21   that's the information they want to know.  And as we told the

22   ERS bondholders, we've told you what we can tell you.  If we

23   find something else, maybe we could supplement it.  We shouldn't

24   be compelled to do so because of our other objections, but, as

25   we told them, we're not withholding some piece of information

 1   because it asks us what we're contending, and so that's not

 2   even an issue.

 3        THE COURT:  So is it appropriate to say that in this

 4   litigation, there is not an issue, from your point of view,

 5   that somebody broke the law?

 6        MR. DALSEN:  That's correct, your Honor.  We're

 7   looking at the ERS Enabling Act and the lack of authority.

 8   Mr. Fox actually began his presentation, before we had to take

 9   a break for technical reasons, speaking to how this case is

10   about why ERS lacks statutory authority.  That's what the case

11   is about.

12        Now, if the parties through discovery end up finding

13   something else, maybe the case evolves with it, but at this

14   point in time, ERS's contention is tied to the ERS Enabling Act

15   and what it does not say.  So Interrogatory No. 11 is not

16   relevant to any contentions in the case.  It's something we

17   shouldn't have to answer anyway because, as the Court pointed

18   out, it's really seeking information that's a legal

19   determination about individuals who broke the law.

20        Moving back to Interrogatory No. 1, there's a few

21   problems with Interrogatory No. 1.  They're asking us for the

22   factual basis for our contention that the bonds were

23   ultra vires and void ab initio.  As we already said, though,

24   the reason the bonds were ultra vires and void ab initio is

25   because the ERS Enabling Act, as a matter of law, does not

1    authorize ERS to issue bonds.  This is not a factual issue, at

2    least not from our perspective.

3         Now, the bondholders tried to make this into a factual

4    issue by I think making two general arguments.  One is that it

5    relates somehow to notice under UCC 8-202, and, number two,

6    that it relates to the construction of the Enabling Act, and

7    neither of those is correct.  For their notice argument -- and,

8    by the way, this is an argument that the bondholders have

9    raised, not us, not ERS, not the Board.  The premise of the

10   notice argument is that even if a security is invalid and

11   unenforceable, the UCC under Section 8-202 provides for an

12   argument you can make based on the notice that you had.  And

13   what it provides, and we'll get to this more with our

14   affirmative motion to compel, more into the meat of this, but

15   what it speaks to is whether a purchaser for value was without

16   notice of a particular defect.

17        ERS is not a purchaser for value, right?  This UCC

18   notice argument that they keep making over and over again is

19   directly tied to what a purchaser has notice of, not to what

20   ERS had notice of, not to what the Commonwealth had notice of,

21   not anybody.  The question is, if you are a purchaser for value

22   and without notice of a particular defect, which I'm reading

23   directly from -- this is Title 19 of the laws of Puerto Rico,

24   Section 1752, Sub (b)(1) -- that's the defense that they're

25   talking about, whether the purchaser had notice.  And notice is

1   defined as actual notice, receipt of a notice, or knowledge

2   under all facts and circumstances.

3          THE COURT:  So, I'm sorry, are you saying that the

4   bondholders are not purchasers?

5          MR. DALSEN:  No, your Honor, I'm not contending that.

6   What I'm saying is that the bondholders are trying to say that

7   ERS needs to answer these interrogatories because it would bear

8   on their notice defense under UCC 8-202.  It's one of the

9   arguments they made in their brief, and Mr. Fox just made it

10  again.  What I'm saying is that that argument has zero merit,

11  and the reason it has zero merit is because asking ERS what it

12  knew, asking ERS when it first knew it, asking ERS who knew it

13  has no bearing on whether the purchasers, the bondholders, were

14  without notice that the bonds were ultra vires.  So the argument

15  they're making doesn't make any sense.  It's backwards.

16         THE COURT:  Well, certainly if you in your knowledge

17  of the issuance of the bond being ultra vires, that you issued

18  a proclamation to that effect, that would be relevant to the

19  bondholders' argument as to whether or not they had knowledge

20  of something amiss.  If you had the same documents that the

21  bondholders had and reached a different conclusion, isn't that

22  circumstantial evidence that the bondholders should have

23  reached the same conclusion that you reached?  I mean, it seems

24  to me that ERS is the entity that's living with these bonds,

25  making the decisions whether or not to issue them, and is

```
 1    assessing their validity.  So to the extent that the bondholders

 2    want to explore what is known out there, it seems to me that

 3    what ERS knows is relevant.  And if you know it and you don't

 4    disclose it, isn't that relevant to their claim of laches and

 5    unjust enrichment?  I mean, I have no idea whether those are

 6    actually viable legal claims, and we're not at that stage now,

 7    and I understand that you're arguing that they're not.

 8              MR. DALSEN:  Correct.

 9              THE COURT:  But it is part of the case as of now,

10    right?  So if their argument is, "Look, you're allowing all of

11    this to go forward, all these payments to be made, the bonds to

12    be bought and sold while you know that they're not valid,"

13    isn't that facts that they are entitled to explore for their

14    defenses?

15              MR. DALSEN:  Your Honor, it depends on which defenses

16    they're talking about.  If they're making a generalized claim

17    that just because those things could be relevant, they need to

18    be discoverable, that's not what the law is going to provide.

19    It's that we have to say, well, what defenses are they

20    asserting, and does it matter for them?  And the one they rely

21    on primarily is this UCC notice defense.

22              THE COURT:  But you've interpreted the UCC notice as

23    what they know or should have known.  I mean, that's how you've

24    interpreted the requirement of a purchaser in good faith, and

25    isn't what they should have known -- isn't what ERS knew some
```

1    information that can be relevant to what the bondholders should

2    have known?

3           MR. DALSEN:  So actually I would say "no," and the

4    reason is that because under the UCC statute that defines

5    notice, it's actually not what they should have known.  That's

6    not actually the standard.  What it says is that what's

7    relevant to notice is all the facts and circumstances that the

8    purchaser knew at the time that they made the purchase.  It's

9    not about if ERS knew it, then maybe the bondholders should

10   have known it.  It's about, under all facts and circumstances

11   at the relevant time, which is here the purchase or acquisition

12   of the bonds, under all the facts and circumstances known to

13   the purchaser, the person who's claiming to be without notice,

14   was there reason to know that the bonds had been issued

15   ultra vires?  That is a perspective that is entirely from the

16   perspective of the purchaser.  It's actually not from the

17   perspective of ERS.  And so it's different, I would say, than a

18   "should have known" standard, or to say that knowledge out in

19   the world is what affects what the purchaser has notice of as

20   defined in the UCC as enacted in Puerto Rico.

21          THE COURT:  I'm not following the distinction.  It

22   seems to me your arguments have been that a relevant inquiry is

23   what the bondholders knew or had reason to know.

24          MR. DALSEN:  Right.

25          THE COURT:  I mean, that's your argument.

1        MR. DALSEN:  The second part of it is the important

2   part.  When we say they had reason to know, the question is, on

3   the basis of what?  What is it that would have given them

4   reason to know?  And what the UCC provides in Section 451,

5   Sub (25) which defines notice, it says, "A person has notice of

6   a fact when," and the one we're talking about is Sub (c) --

7   "from all of the facts and circumstances known to him at the

8   time in question, he has reason to know that it exists."

9        So, yes, the argument is that they had reason to know,

10  but then the question is, why would they have reason to know?

11  What does the law say matters?  What the law says is from all

12  the facts and circumstances known to him, known to the

13  purchaser; not the facts and circumstances known in the world,

14  not the facts and circumstances known to anybody else.  The

15  question is, did they, the bondholders, have notice?  Because

16  if they had notice, including under all the facts and

17  circumstances known to them, that gave them a reason to know

18  that the bonds were ultra vires and void, then their notice

19  arguments fail.  That's why it doesn't matter what ERS thinks.

20  Instead what matters is known to him, known to the purchaser.

21  That's what the inquiry is under the UCC.

22        THE COURT:  But you're saying that they should have

23  been on notice because of the Enabling Act.

24        MR. DALSEN:  That's one reason they should have been

25  on notice.  What we suspect is, there's going to be a lot more

1    reasons they should have been on notice:  their own analysis,

2    their own papers, the Investment Committee memoranda that we

3    have requested that they've refused to provide.  We don't know,

4    obviously, the extent of documents they have.  I don't know how

5    many responsive documents could come back, and we'll talk about

6    our motion later, but the Enabling Act is the first line of

7    defense.  It's a very good line of defense because it's public

8    legislation.  But it's not the only thing that's going to be

9    out there, and if there's more out there that was known to him,

10   known to the purchaser at the time of purchase, it's that set

11   of information that indicates what they had reason to know.

12   That's exactly what the UCC says notice is.  And that's why

13   what ERS thinks about anything does not bear on this notice

14   argument they're making under the UCC, and that's why we should

15   not have to answer these interrogatories if that's what they're

16   relying on.

17            I'll move on to Interrogatory No. 2.

18            THE COURT:  Okay.

19            MR. DALSEN:  Well, one other note actually about

20   Interrogatory No. 1.  Even putting aside the fact that the UCC

21   would put everything ERS knew to the side as irrelevant,

22   Interrogatory No. 1 also is -- it's so broad that it's

23   impossible to answer realistically.

24            THE COURT:  So I'm reading No. 1 -- maybe I'm wrong,

25   but I'm reading Interrogatory No. 1 as that there's no

1    objection to Part 1, that that's been answered by you by

2    reference to documents?

3              MR. DALSEN:  That's correct, your Honor.

4              THE COURT:  Right, so they're not moving to compel

5    that, right?  So now we're just up to Subpart 2.

6              MR. DALSEN:  (2) and (b) (a)(2) and (b), your Honor,

7    that's correct.

8              THE COURT:  Okay.

9              MR. DALSEN:  And the problem with (a)(2), aside from

10   what we've already discussed, is that it's asking when ERS

11   first learned anyone had made that contention.  There's two

12   problems with that.  One is that when anyone had made that

13   contention doesn't matter.  It doesn't matter when anyone had

14   made that contention.  It matters maybe who made the contention,

15   but it's asking for anyone.

16             Number two, there's a practical problem, which is that

17   if they're asking us to look back to 2008 or before to say when

18   we first learned, "we" being ERS in this instance, not the

19   Board, when ERS first learned that anybody had made this

20   contention, that is searching for a needle in a very large

21   haystack.  And even if the Court compels us to answer, which,

22   again, it should not, but if it did, this is why we said we

23   don't believe we have responsive information we're withholding.

24   That is not something that we're in a position to answer.

25   Maybe at some point through discovery we are in a position to

1   answer it.

2        THE COURT:  Wouldn't you be in a position to determine

3   if ERS as either the Board or its administrator, I mean,

4   someone in authority was assessing the validity of the bonds,

5   wouldn't that be reflected in minutes, in Committee meetings,

6   in something like that that -- this is not -- I'm not reading

7   this as asking for any person related to ERS.  I'm reading this

8   as saying, when did ERS as an entity have this knowledge?  And

9   it seems to me that that requires some sort of formal

10  acknowledgement or formal inquiry, as opposed to whether one of

11  the employees of ERS happened to get an email.  And it seems to

12  me it would be appropriate for you to limit your search to more

13  formal records of official acts, whether -- I don't know if you

14  operate by committee or by board meetings.  I don't know the

15  structure, so I don't know what the documents are, but I'm not

16  reading this interrogatory as asking you to look through every

17  person's mailbox.

18       MR. DALSEN:  No, that is how we read the interrogatory,

19  your Honor, because it just asked on its face for when we first

20  learned anybody out in the world had said these things, which

21  is not particularly relevant to anything.  The limitation the

22  Court is proposing is at least more workable than going through

23  and finding the needle in a very large haystack.  Nevertheless,

24  as I already said, we shouldn't be compelled to answer this

25  anyway because it doesn't bear on the arguments that they're

1    raising, and it doesn't bear on -- you know, when somebody knew

2    something doesn't bear on the arguments we're raising.  We're

3    talking about the Enabling Act.

4           And the same with Part (B).  As far as individuals who

5    know, again, ERS does not at this point have somebody to

6    identify.  If we had somebody to identify, maybe it would be a

7    different story, but we're not at this point -- the Court can't

8    compel blood out of a turnip on this.  If we discover something

9    through discovery, if the Court does order us to proceed with

10   that limitation, then that's more workable.

11          THE COURT:  So I don't understand how you can know

12   something and have nobody know it.

13          MR. DALSEN:  Well, sure.  So the issue, your Honor, is

14   that if ERS first learned of something, let's say in 2008, the

15   personnel at ERS today -- and we're being asked to answer

16   interrogatories, we're being asked that somebody from ERS must

17   verify the responses under oath as being true, and part of the

18   problem is that the staff at ERS today is not in a position to

19   verify a lot of information about things that occurred so long

20   ago.

21          THE COURT:  If it's reflected in a Board minute,

22   totally hypothetical, that "The bonds we just issued are

23   invalid," it seems to me that the persons at the meeting would

24   be persons you could identify.  And I think that you could sign

25   that interrogatory today based on the official records of ERS,

1    if they exist, without having the people who attended that

2    meeting still be employees of ERS.

3            MR. DALSEN:  Yes, your Honor.  Yes, no, I think that's

4    right.  Our concern walking in -- the Court's limitation I

5    think is something that is actually potentially workable.  What

6    we came understanding walking in the door was, they were asking

7    for literally anyone, and that's an impossible inquiry to

8    answer, not only under the expedited current schedule but under

9    any reasonable schedule.

10           THE COURT:  Okay.  Well, I agree.  I agree on both

11   counts, that what I'm suggesting is reasonable and what you

12   were thinking was an impossible search.

13           MR. DALSEN:  Okay.  Well, in that case, I think we can

14   move on Interrogatory No. 2.

15           One problem with Interrogatory No. 2, Interrogatory

16   No. 2 really does request something that could only go to legal

17   determinations again.  And specifically what it's asking is,

18   just reading the words that are written, it's asking when ERS

19   first determined that if something were true, that ERS would

20   then allegedly have grounds to take certain actions.  It's

21   asking us to say, when we first posited a hypothetical, that if

22   we reached a conclusion, then we would have certain remedies,

23   which is itself -- I suppose it's possible that there's some

24   nonprivileged substantiation of that, but when we're looking at

25   the subject here, if we determine that the issuance of bonds

1   were ultra vires, that we would have grounds to avoid and

2   recover payments with respect to those bonds, the idea that

3   there would be some nonprivileged way to answer that question

4   is puzzling to me.

5          For example, even if -- and I think Mr. Fox said, you

6   know, "Why is it that they can't just give us the date?"  And

7   the problem with giving the date is that Interrogatory No. 2,

8   the way I see Interrogatory No. 2 is that it's effectively like

9   a privilege log entry but with the privileged material in

10  there, to say that on such and such date this person or ERS

11  reached this legal conclusion, a conclusion that almost

12  certainly would have been made in consultation with counsel.

13  And I don't know of a nonprivileged way to answer Interrogatory

14  No. 2.  I mean, again, it's a hypothetical question.  The

15  answer --

16         THE COURT:  It's not a hypothetical question.  ERS has

17  made a determination, I'm assuming, that the bonds were issued

18  ultra vires, right?

19         MR. DALSEN:  Correct.

20         THE COURT:  I mean, that's your position.

21         MR. DALSEN:  Yes.

22         THE COURT:  So somebody adopted that on the part of

23  ERS.  ERS adopted it in some form at some point in time.

24  Somebody determined, somebody from ERS or some entity, part of

25  ERS, made a decision to authorize their attorneys to file

1    papers that say "claw back these payments."  That had to have

2    happened at some time.  I think they're entitled to find out

3    whether five years ago somebody suggested this, the Board voted

4    on it and voted it down -- again, totally hypothetically -- or

5    whether this all happened in 2017, and I think that's what

6    they're asking.  And I think you need to figure out how to

7    answer these in a manageable form, and you're putting up

8    roadblocks that are making it not manageable but I think

9    unfairly, to be honest, okay?

10        MR. DALSEN:  Okay, your Honor.  In that case, if

11   it's -- I understand what the Court is saying.  If they're

12   looking for a date and that's what they want is an answer to

13   the interrogatory, if we can determine a date, then that's an

14   answer we can provide.

15        THE COURT:  And I don't think it has to be Monday,

16   July 2nd.  I mean, I think that you can give a range.  You can

17   say, you know, 2017, 2011, 2008.  You can tie it to an event,

18   whatever makes sense, but I don't think that you need -- don't

19   come back and say, "I couldn't figure out which day of the week

20   we made this decision," because that's not what they're asking.

21        MR. DALSEN:  Of course, your Honor, yes.  Okay.

22        Interrogatory No. 8, ERS answered the main part of the

23   question, which is, "Do you contend that a statement in the

24   bond resolution is false?"  ERS answered that it was incorrect.

25   It sounds like from Mr. Fox's argument that the reason they

1    think this matters is because the bond resolution somehow

2    matters when it comes to the ultra vires argument, but the bond

3    resolution is not the basis for the ultra vires argument, and

4    instead, as we said, it's the Enabling Act.  It's the

5    legislation, not the resolution, that's the indenture for the

6    bonds.  And the reason that that's important is because what

7    the resolution says -- no matter what the resolution says, it's

8    not going to trump whether the legislature authorized a

9    governmental entity to engage in certain acts.  And so we've

10   answered that we believe the statement in Interrogatory No. 7

11   was incorrect.  And then the question is, well, why does it

12   matter?  And the statement in the resolution, it sounds like

13   they think we're relying on the resolution somehow, but we're

14   relying on the Enabling Act, which, again, the resolution can't

15   modify; the resolution can't trump.  If we were making

16   contentions based on the resolution, I could understand this a

17   little bit better, but we're not.

18          And as for the relevance to their other affirmative

19   defenses, we already talked about notice, and that doesn't

20   matter.  You know, this is one where they try to say it would

21   matter for unjust enrichment.  They cite a case *Wiley v. Stipes*

22   in their reply, which is a case that actually cites a Delaware

23   Chancery decision, not Puerto Rico law.  The Delaware Chancery

24   decision is speaking to Delaware law, not Puerto Rico law.  And

25   the *Medina* case they cite is only for a general proposition

1    about unjust enrichment.  So I don't, again, see the bearing

2    that the resolution would have where the argument we're making

3    is based on the legislation, and that's the problem with

4    Interrogatory No. 8.

5            I'll just check my notes, your Honor.  I think that

6    we've covered all of the interrogatories.

7            Oh, one other thing, your Honor.  There's another

8    argument I'd like to address, which is the argument that ERS's

9    answers to the interrogatories would affect the construction of

10   the Enabling Act.  That's completely wrong.  The *USI* case, the

11   First Circuit decision by Judge Torruella does not endorse that

12   point of view.  The *USI* case is talking about a different

13   issue, which in that case it's completely factually

14   distinguishable, first of all.  The ultra vires argument there

15   is not like the one here.  The accusation there was that a

16   different agency had exclusive authority to act, and on that

17   basis, the government entity that did act was without authority.

18   It's not our situation.

19           But beyond that, there's a fundamental problem, and

20   the fundamental problem is that the contention that Puerto Rico

21   law or that any law will defer to an agency's construction of

22   its own statute, that might be true up to a point, but it's

23   never going to be true to the point where it will trump or

24   overcome what enabling legislation actually says.  There's no

25   way, and there's no authority in Puerto Rico either, and *USI*

1    does not stand for this proposition, nor does the Puerto Rico

2    case that it cites.  There is no authority to suggest that an

3    agency can take unto itself greater powers than what the

4    legislature authorized initially.  That is not a proposition of

5    law that has any support.  And so the idea that ERS, if ERS,

6    again hypothetically, said, "Well, this is how we interpret the

7    law," that's not going to matter one way or the other when

8    Judge Swain rules whether the Enabling Act by its plain

9    language means what it says.  Agency interpretations are not

10   going to overcome the enabling legislation, and so we strongly

11   disagree with that point.  And I think that --

12           THE COURT:  At this point the issues are live, right?

13   I mean, these are going to be the issues that are going to be

14   decided in the context of the summary judgment motion?

15           MR. DALSEN:  Yes, that's correct, your Honor.  That's

16   correct.  I believe, your Honor, those address all the points

17   in the interrogatories, unless the Court has other questions.

18           THE COURT:  No.

19           MR. DALSEN:  Thank you.

20           THE COURT:  Mr. Fox.

21           MR. FOX:  Your Honor, I will go I think in reverse

22   order, so I'll start with Interrogatory 8.  They may not be

23   relying on the bond resolution, but we are relying on the bond

24   resolution, which is why we asked this interrogatory about it.

25   We think under *USI* the bond resolution is directly relevant.

1    It's a resolution of ERS's Board that says that the Enabling

2    Act authorized the bonds.  Opposing counsel, Mr. Dalsen's

3    argument assumes that the ERS Enabling Act is unambiguously

4    preclusive of the bond issuance.  We disagree with that.  I

5    guess we'll have a fight about that in front of Judge Swain,

6    but certainly at least a possibility in this case is that the

7    ERS Enabling Act is ambiguous.

8           Evidence of that is that we disagree with them, and we

9    each have a different construction of what that Act means.  If

10   it's ambiguous, then *USI* says what the ERS Board said about it

11   is relevant.  And so since they're now saying what the ERS

12   Board said about it was incorrect, we want to know when they

13   reached that conclusion and who has knowledge about them

14   reaching that conclusion.  So we think that's appropriate.  We

15   think the fact that the Oversight Board may not be relying on

16   the bond resolution is quite beside the point, since we are

17   relying on the bond resolution.

18          I don't think I need to say anything about

19   Interrogatory 2 unless your Honor has questions about that.

20          THE COURT:  Let me just tell you where I am, and we'll

21   move forward from there.  Do you agree, though, that you're not

22   looking for every thought of every employee, and that it is

23   appropriate for them to answer these interrogatories on the

24   basis of what ERS as an entity knew, when it knew it, and who

25   in that entity?

1          MR. FOX:  Your Honor, I'm happy with that with a

2     condition, and the condition is, I'm worried that they're going

3     to come back later, in summary judgment or elsewhere, and say,

4     "We got this email in 2009, and you were on notice because you

5     could have gotten that email too."

6          THE COURT:  Well, I think that there is a strong

7     argument that if it is not identified in the answers to

8     interrogatories, that it cannot be used in the summary judgment

9     in that fashion, so I'm not particularly concerned about that.

10         MR. FOX:  And as long as that's clear, then we're

11    happy with that limitation, absolutely.

12         THE COURT:  All right.  So it seems to me that with

13    that understanding of what the answer is to reflect, that it is

14    relevant.  I'm not going to rule on whether or not ultra vires

15    involves outside information or is limited to the words of the

16    Enabling Act.  It's not my role to do that in the context of a

17    discovery dispute.  It is, though, part of the dispute, and,

18    more importantly, it does seem to me that the requested

19    information is relevant to at least test the argument of

20    whether the bondholders had reason to know that the bonds were

21    inappropriately issued.

22         All right, so I think the information requested in

23    No. 1 and No. 2 does need to be supplemented.  I think they're

24    relevant, and I don't think it's unduly burdensome to do that.

25         I think 8 is subsumed by 1 and 2, and I think it's not

1   worth the time and energy to try to carve out that issue.  And

2   that puts an undue burden on ERS, so there is no need to

3   supplement the answer to 8.

4        And also 11 I don't think is -- they have told you

5   that's not their contention at this juncture.

6        MR. FOX:  Your Honor, if I could be heard very briefly

7   on that.  That's fine.  I mean, it's a conditional interrogatory.

8   It says, "If you contend, please provide this information."  We

9   would like, if they're not making that contention, for them to

10  say so under oath, but --

11       THE COURT:  Is that a problem to say, "This is not an

12  issue"?  I think it's appropriate to say, "This is not an issue

13  in the pending litigation."

14       MR. DALSEN:  Your Honor, I think what we can do is, we

15  can say that it's not an issue at this time.

16       THE COURT:  That's sufficient.

17       MR. DALSEN:  Right, so, yes.

18       THE COURT:  And if you change your mind, then you'll

19  supplement your answer.

20       MR. DALSEN:  That's correct.

21       THE COURT:  Okay.  So I think that covers the

22  interrogatories?

23       MR. FOX:  Yes, your Honor.  Thank you.

24       THE COURT:  Okay.  Do you need to talk about timing on

25  that, or can you work that out?

 1              (Discussion off the record between attorneys.)

 2              MR. DALSEN:  Your Honor, I just spoke with Mr. Fox.  I

 3    believe that we can work out the timing on that.

 4              THE COURT:  Okay.  All right, unless I hear from you,

 5    I'm not going to issue an order on timing.  If you have a

 6    problem, let me know.

 7              MR. FOX:  Yes, your Honor.

 8              THE COURT:  Okay.

 9              MR. DALSEN:  Okay.

10              THE COURT:  So then the next motion that we have on is

11    the motion to compel the bondholders to produce documents.

12              MR. DALSEN:  That's correct, your Honor, and, again,

13    William Dalsen from Proskauer for the Oversight Board as

14    Representative of the Debtor.

15              So, your Honor, this case largely turns on the plain

16    language of statutes, and the disputes in the case largely turn

17    on the bondholders' consternation with the plain language of

18    statutes, the ERS Enabling Act being one of them, and now we

19    have another one at issue, which is the plain language of the

20    Uniform Commercial Code.  The bondholders are contending in the

21    case, and they're very clear about this -- we just discussed it

22    in part -- that if the bonds were issued ultra vires, they say

23    that there's still an escape hatch for them.  And the escape

24    hatch is under UCC 8-202(b), which is codified at again

25    Title 19, Section 1752(b) in Puerto Rico.  And what that notice

1    exception says is that an invalid security can still be valid

2    if it's in the hands of a purchaser for value who is without

3    notice of the particular defect.  And so then the question is:

4    Okay, that's what they're contending.  They're saying they're a

5    purchaser for value without notice of the defect, the defect

6    being that the bonds were ultra vires.  Okay, fine, so what

7    does that mean?

8         Well, they have to show, if they're going to be

9    asserting this, they have to show that they were without

10   notice.  They need to be a purchaser for value without notice.

11   What does notice mean?  We look again to the UCC, which seems

12   to define just about everything but it certainly defines notice

13   under Section 451, and notice means three things:  It means

14   actual knowledge.  It means that the person claiming notice has

15   received notice or notification.  And then Part (c), which is

16   really the part that's at issue here, the person has notice if,

17   from all the facts and circumstances known to him at the time

18   in question, he has reason to know that it -- in this case, the

19   defect -- exists.  And the dispute is that we have requested

20   from the bondholders documents that will show all of the facts

21   and circumstances known to them at the time that they purchased

22   or acquired ERS bonds.  And the reason we're asking for it is

23   because of the statutes that I just read into record.  It's for

24   that reason.  This is their notice defense.  This is their

25   argument.  It's what they are raising to say that if we are

1   correct about the bonds being ultra vires, they have this

2   escape hatch, and so they've opened the door to this discovery.

3        THE COURT:  So what I'm trying to figure out is what

4   kinds of information you think is relevant that could have put

5   them on notice because this doesn't seem to be a situation, for

6   example, like Madoff:  If the returns are so great, then

7   somebody should have had notice that things are not kosher.  It

8   seems to me that your argument is simply the language of the

9   bonds and other information relating to the authority of ERS,

10  right?  So information about what ERS was authorized to do it

11  seems to me would be relevant, but what could possibly be --

12  what other types of information could have put them on notice

13  that something was unlawfully issued, that these bonds were

14  unlawfully issued?

15       MR. DALSEN:  Your Honor, it's hard to say in the

16  abstract.  I have a particular example in mind, but I'll just

17  say, first, that it's very hard to say in the abstract.  What

18  the law says is that we need to look to all facts and

19  circumstances, and the reason it probably says that is because

20  there could be an awful lot of different types of facts and an

21  awful lot of different circumstances that could put somebody on

22  notice.  And so it's really impossible for me to give any kind

23  of comprehensive answer to what those documents could be.  I

24  don't know what documents they have.

25           A specific example of something I'm very sure that

1    they have, or at least many entities that are organized in the

2    fashion that these bondholders are would have, are things like

3    Investment Committee memoranda, which private funds investment

4    managers frequently have prepared.  They're sent to investment

5    committees where the principals of the funds, managers for

6    investment funds, would then make a decision one way or another

7    to invest in a security.  There will also be supporting

8    analysis, generally speaking, that is created with those

9    documents, usually analyses of the economics but also analyses

10   that underlie the decision, the recommendation of the person in

11   charge of the deal whether or not the investment manager should

12   decide to purchase.

13         So that's a specific example.  They have refused to

14   produce those documents.  Those documents as well, I would say,

15   as we said in the brief, are only the tip of the iceberg.

16   Those documents could show actual knowledge.  That's important.

17         THE COURT:  But what's important, if I understand your

18   argument, is the actual knowledge about whether or not the

19   bonds were appropriately issued by ERS, whether ERS had the

20   authority to issue those bonds; and my understanding of their

21   proposal is that they would produce that information if it's in

22   this investment report.  The problem is all the other types of

23   information that's included.

24         MR. DALSEN:  I'm not sure that's exactly correct.  I

25   don't believe they've agreed to produce the Investment

1    Committee memoranda.  They say that they're so highly

2    sensitive, they're not going to give them to us.  I don't

3    believe that that's the case.  Maybe we'll hear differently.

4         THE COURT:  No, I think what they're saying is, if

5    there is a section of that memoranda that says, "We have

6    evaluated the authority of ERS to issue these bonds and

7    concluded whatever," or, "We have the following opinion letters

8    from counsel that says they're valid," or, "We don't have the

9    opinions from counsel that are raising our concerns," or

10   whatever it is.  But to the extent that these reports contain

11   information about the authority of ERS to issue these bonds and

12   whether or not these bonds are valid, that will be produced in

13   a redacted form.  So I don't think they've -- well, let me just

14   ask.  Am I right?

15        MS. McGONIGLE:  You are right, your Honor.

16        THE COURT:  Okay.

17        MR. DALSEN:  Okay, so in that case, that's helpful

18   because it resolves a piece of the dispute.

19        THE COURT:  All right.

20        MR. DALSEN:  The piece of the dispute that it resolves

21   are documents that go to actual knowledge because that's what

22   it would show, right?  If documents address it or, as they say,

23   if they assess validity, they use different words, but they're

24   all getting at the same thing, which is what your Honor I

25   believe is also talking about.  That does not resolve the other

1   part of the dispute, and the other part of the dispute is UCC.

2   There's a Section 451 in the Puerto Rico code at Sub (c) under

3   "Notice," which speaks to whether all facts and circumstances

4   known to the bondholders, to them as purchasers, would give

5   them reason to know that the bonds were issued ultra vires; not

6   whether they had assessed it directly, not whether they reached

7   a specific conclusion, not whether they had actual knowledge.

8   That's part of what constitutes notice under the UCC.  But the

9   UCC also says that we need to look at all of the facts and

10  circumstances known to them at the time of purchase.

11          THE COURT:  That would lead to this issue, right?  You

12  don't care that they knew that the weather was sunny in

13  Puerto Rico or it wasn't sunny in Puerto Rico and that's why

14  they want to invest in Puerto Rico, right?  So it has to have

15  something to do with the validity of the bonds because that's

16  the defect, right?  They have to have reason to know of the

17  defect, and the defect that you're arguing is that the bonds

18  were issued ultra vires.

19          MR. DALSEN:  I think, your Honor, that if we're

20  looking to all facts and circumstances known to them at the

21  time of purchase, it shouldn't just relate to ultra vires.  It

22  should relate to ERS.  It needs to be broader than just the

23  specific issue that would be identified to show what they had

24  actual knowledge about.  What Sub (c) says -- 25(a) says actual

25  knowledge.  We already talked about that with the Investment

1    Committee memoranda.  It sounds like they're going to give

2    those to us.  But then we have to say, well, (c) is broader.

3    And it's disjunctive.  (a), (b), and (c) are listed with an

4    "or" after (b).  We know it's disjunctive.  It's not all three

5    of these things.  So what does (c) mean?  It means all facts

6    and circumstances, but it can't just be limited to discussions

7    of ultra vires.  It has to be broader than that.  I can agree

8    that it has to somehow relate to ERS because --

9         THE COURT:  Well, it has to relate to the defect that

10   you've claimed, right?

11        MR. DALSEN:  It has to -- it's actually tricky, your

12   Honor, because what the law says is that -- and it's written

13   very broadly, and I think it's written broadly for a reason,

14   which is that it's hard to predict what this looks like, but it

15   says "all facts and circumstances known to the purchaser that

16   would give them a reason to know."

17        So, yes, in a sense, it relates to the defect, but the

18   kinds of documents that we look for, it's not going to be

19   sufficient to limit their search to documents that concern the

20   defect because the question is, what would give them reason to

21   know that the bonds were ultra vires?  And it's very hard for

22   me in the abstract without the documents to, you know, just put

23   guardrails on what that would mean, and it really matters from

24   our perspective as far as -- it's really hard for us to limit

25   it, first of all, because we don't know their documents.  It's

 1   also very important not to limit it because if all the facts

 2   and circumstances gave them reason to know, then their argument

 3   falls apart.  That's why the breadth of discovery is, first of

 4   all, something they took on because they've raised this

 5   defense, but, second of all, why it's critical to have a

 6   broader search for this part of notice so that we can

 7   determine -- and ultimately it will be Judge Swain's decision.

 8   We have to look at all the facts and circumstances, and then

 9   they need to show that they would have no reason to know that

10   the bonds were issued ultra vires.

11         Now, I agree it's not going to include what the

12   weather was like in Puerto Rico.  There's going to be some

13   limitations to this.  We don't know any proposed limitations.

14   They just refused to give us these documents beyond the

15   Investment Committee memoranda that we've discussed.  But this

16   has to be a broad search because we don't know what the facts

17   will look like that gave them reason to know.  I can't predict

18   that standing here today, and that's why it's really hard, and

19   in fact probably impossible, for me to say that it can be

20   limited just to documents that assess validity, or documents

21   that discuss the defect, or even documents that relate to the

22   defect.  If they had reason to know, that means they don't have

23   a notice defense.

24         THE COURT:  The problem is that your definition is

25   every piece of paper that anybody ever had for you to go

1     through, and your theory of the defect seems to be pretty

2     limited to the enabling legislation.  So if you said to me, for

3     example, the terms are such that it would cause an investor

4     pause, that's one thing, but that's not what you're saying.

5     You're saying it's only as a matter -- the defect they needed

6     to know was that ERS did not have the authority to issue these

7     bonds.  I mean, that's the fact that you're saying they need to

8     know, right?  So would the rate of return have anything to do

9     with them coming to a conclusion that ERS -- or questioning

10    ERS's authority to issue the bonds?

11          And the problem I'm having is that it seems that you

12    were able, from ERS's point of view, to reach a definition that

13    enabled you to do a word search for these documents.  I mean,

14    you agreed to produce documents that concern the legality or

15    illegality of the ERS bond issuance or ERS's authority to

16    engage in borrowing.  That's how you defined the search, and

17    I'm having trouble figuring out why that's not good enough for

18    the bondholders to do.

19          MR. DALSEN:  Sure, your Honor.  The reason -- I think

20    we can -- I mean, let's just begin with that.  The reason that

21    limiting it to legality or illegality of the bonds is because

22    what I think that means is that they're going to run a search

23    however they run it, and if they find a document that speaks to

24    validity or legality or illegality, they'll say that that's

25    responsive.  The problem is, the law says more than that is

1    responsive.  And regardless of what the Board agreed to, the

2    Oversight Board, I should say, in response to a subpoena, and

3    regardless of what ERS agreed to, this is not a situation where

4    there is parity; and the reason there isn't is because this

5    notice defense is, again, it's not about what everybody knew.

6    It's about what the purchaser knew, and it's about what the

7    purchaser knew based on all the facts and circumstances.

8          Now, I agree, it's not unlimited for all paper that

9    anybody had at all time.  There's actually inherent guardrails

10   built into the request.  We're only asking for what they knew

11   at the time of purchase.  That is a date certain.  That would

12   be the endpoint of any search.  And then prior to that --

13         THE COURT:  Well, is it everybody's purchase?  Do you

14   mean one issuance, just the 2008 initial purchase?  Is that

15   what you're talking about?

16         MR. DALSEN:  No, your Honor.  These bondholders for

17   themselves are claiming that they were purchasers for value

18   without notice.  And so the question is, when they purchased

19   the bonds, which may or may not have been in 2008, what did

20   they know at that time?  And that determination is -- so that

21   question, right --

22         THE COURT:  Was this bought and sold throughout a

23   period?

24         MR. DALSEN:  Yes.

25         THE COURT:  So it's not a date certain.

1          MR. DALSEN:  Well, it is for these bondholders unless

2     they can show -- this goes to burden issues that have never

3     been raised, your Honor --

4          THE COURT:  I'm just trying to understand what you're

5     asking.

6          MR. DALSEN:  Right.  So these bondholders purchased

7     ERS bonds at some point.  When they purchased those bonds, they

8     had some state of knowledge.  What they knew at the time that

9     they purchased is what I need to know because then I can argue

10    to Judge Swain, did they have reason to know the bonds were

11    invalid?

12         THE COURT:  All right, so they have agreed to search

13    their documents throughout the period, right?  They haven't

14    come back and said, "I'm only searching in January, 2008."  So

15    let's assume they're going to search this whole period of time

16    when bonds were bought and sold, and I don't really -- I don't

17    know when they were bought and sold.  I am assuming it's

18    varying among the various bondholders.

19         MR. DALSEN:  Correct.

20         THE COURT:  If they're searching throughout that

21    period, they still need to be coming up with reasons, with

22    topics dealing with the authority of ERS.  I mean, that still

23    is the defect that you're concerned about.

24         MR. DALSEN:  Well, I would say it's two things.  One

25    is that the documents that we're looking for will concern ERS.

 1    But even if the documents don't say anything about this issue,

 2    that would perhaps support their argument that they were

 3    without notice.  And that's why it can't just be limited to

 4    documents that show a discussion about this issue or documents

 5    that relate to this issue.  Instead the question is, they say

 6    they were without notice under all the facts and circumstances.

 7    If there's no discussion at all about any of this stuff, then

 8    maybe that supports their argument.  If that's the case, I'm

 9    entitled to know what that is because they claim, of course,

10    that they had no knowledge that the bonds were ultra vires.

11    They're going to claim that they have been blindsided in the

12    case.  I need to know whether that's true, and the reason I

13    need to know is not abstract.  It's tied directly to the UCC

14    defense they are raising.  That's why it can't be limited in

15    the fashion we're talking about.

16            THE COURT:  All right, have you made any efforts to

17    work on search terms or custodians or anything like that?  Has

18    that been a subject of discussion?

19            MR. DALSEN:  We have, your Honor, and I think

20    Ms. McGonigle maybe wants to speak to it too, but we have.  I

21    don't know that they would cover these specific issues.  And

22    obviously there's a question of regardless of what the search

23    terms return, at present the bondholders would not identify

24    these documents we're looking for as responsive.

25            THE COURT:  Say that again.

1           MR. DALSEN:  The problem we have right now, your

2   Honor, yes, we have discussed search terms, and, yes, we have

3   discussed custodians.  We received a letter last night from --

4   I believe it was last night from Jones Day identifying the

5   search terms they intend to run and identifying the custodians

6   that they intend to use, so that's good so far as it goes.  The

7   question, though, is, do those search terms -- and I got the

8   letter last night -- we were preparing for today -- I don't

9   know the answer to this right now -- do those search terms what

10  we're looking for?  And more importantly, because we're here on

11  a motion to compel, the search terms are just to identify the

12  documents for review.  They'll get that set of documents.

13  Right now, under the current state of affairs, the bondholders

14  will review whatever comes back; and if they don't find

15  documents that speak to the facts and circumstances that they

16  knew at the time of purchase, they'll throw them to the side

17  because they believe they don't need to produce them as

18  responsive in this case.

19          So the search terms are important.  The search terms

20  are a way to limit the burden upon anybody who needs to perform

21  a search.  Right now I have zero information about what that

22  burden would be, and I also cannot speak to whether the search

23  terms, and I certainly cannot agree standing here right now,

24  that the search terms that they have proposed that we have not

25  yet written back about would cover what we're seeking here,

 1    okay?

 2              THE COURT:  All right, thank you.

 3              MR. DALSEN:  Thank you.

 4              MS. McGONIGLE:  Good afternoon, your Honor.  Again,

 5    Sarah Podmaniczky McGonigle from Jones Day on behalf of the

 6    bondholders.

 7              We agree with much of what you've said, so I won't

 8    bore you with reiterating comments you've already made.  It's

 9    late in the afternoon.

10              THE COURT:  Well, I'm just making comments, so you

11    can --

12              MS. McGONIGLE:  Fair enough.  I do think that it's

13    important to emphasize the narrowness of the dispute that we

14    are dealing with right now.  The question, as Mr. Dalsen noted,

15    of bondholders' actual knowledge isn't in dispute.  We're going

16    to be producing nonprivileged documents concerning actual

17    knowledge.  We've also offered, however, to produce

18    nonprivileged documents that we believe would give the reader

19    reason to know, assuming that the government parties' argument

20    is correct, reason to know of the validity or invalidity of

21    these bonds.  We believe that we have identified appropriate

22    limits for doing so and appropriate guardrails, and those

23    guardrails are not anything and everything concerning ERS.

24              And I will make one clarification about the scope of

25    the requests themselves.  They are not only about documents

1    relating to the purchase of each of these bonds.  They're about

2    documents relating to the purchase, sale, or decision to hold

3    these bonds.  So we're not looking just at this much smaller

4    moment in time.  We're looking at a much broader time period.

5            Now, Mr. Dalsen was not able to really explain how a

6    document that doesn't relate in some way or another to the

7    authority to issue these bonds could create facts and

8    circumstances that would in turn give us notice of the lack of

9    authority to issue the bonds, and that's where we are getting

10   stuck.  And that's why we've made this proposal that is very

11   similar but is the same -- we're happy to take the same

12   language that the Oversight Board, as you noted, accepted to

13   define these terms.  So to us, this is really exclusively

14   seeking documents that are not relevant to any claims or

15   defenses.

16           THE COURT:  Can I ask you, there seems to be a strong

17   interest in the Investment Committee memoranda.  I'm not quite

18   sure if that's a defined term among you or not.  Your response

19   was:  Some people have them and some people don't.

20           MS. McGONIGLE:  Right.

21           THE COURT:  But is it a defined term?

22           MS. McGONIGLE:  I think it's a term that the parties

23   understand the meaning of.  I'm not sure that it is a formal

24   term of art that every client is going to use, but I don't

25   think there has been disagreement among the parties as to what

1    we're talking about with respect to Investment Committee

2    memoranda.

3            THE COURT:   Okay.  So would it be possible to produce

4    the Investment Committee memoranda with the substance redacted,

5    the headings kept in of the categories of information that you

6    considered, and obviously unredacted to the extent that it

7    dealt in any way with the authority to issue the bonds or the

8    legality of the bonds, or whatever words those come?

9            MS. McGONIGLE:   So I would need to double-check and

10   confirm, but I suspect something to that effect would be

11   manageable.  So you're saying we would not redact anything that

12   we considered in choosing to purchase, or that we would not

13   redact the headers with our considerations, and then not redact

14   substance that goes to the authority to issue the bonds, the

15   validity, et cetera?

16           THE COURT:   Correct.

17           MS. McGONIGLE:   Okay, I would have to double-check.

18           THE COURT:   So I would be talking about purchasers.

19           MS. McGONIGLE:   Sure.

20           THE COURT:   I would be talking about -- obviously, if

21   it's responsive and everybody agrees it's responsive, it would

22   not be redacted.

23           MS. McGONIGLE:   Right.

24           THE COURT:   But there seems to be a concern -- I'm

25   trying to balance the two concerns, and what I'm hearing from

1      the bondholders is that there are a lot of factors that go into

2      the decision to buy the bonds that are financial and that are

3      competitive, and that you don't want to produce them.

4              MS. McGONIGLE:  Correct.

5              THE COURT:  What ERS is saying is:  But maybe we don't

6      know.  I mean, maybe some of those factors are things that

7      should have put you on notice or could have put you on notice.

8      And I'm trying to figure out whether there is a way to at least

9      initially clear the air on that one to establish the categories

10     that you look at.

11             MS. McGONIGLE:  I think that would probably be doable.

12     I would need to confer with my cocounsel to make sure, but --

13             THE COURT:  Right.  Before you go any further, is that

14     something that ERS would consider?

15             MR. DALSEN:  One moment, your Honor.

16             (Discussion off the record between attorneys.)

17             MR. DALSEN:  Your Honor, I think the suggestion is --

18     again, this is only addressing part of the dispute because

19     we're still talking about memoranda and what to produce in

20     those memoranda, right?  So I --

21             THE COURT:  You seem to think that the Investment

22     Committee memoranda were critical to understanding what general

23     factors were considered by the bondholders in deciding to buy

24     the bonds.

25             MR. DALSEN:  It's one piece of information that

1    frequently we use, yes.

2         THE COURT:  It seems to me that the definition that

3    the bondholders is given of the other documents, of the

4    information that's going to be disclosed regardless of what

5    form it's in, is sufficient.  You can play with the words and

6    you can play with search terms and all of those things, but the

7    concept being the same as what ERS had agreed to produce, which

8    deals with the legality or illegality of the bond issuance and

9    ERS's authority to engage in borrowing.  I think actually the

10   bondholders had more words to accomplish the same thing, so I

11   don't want to limit them to your words.  I think their words

12   are good if you add "authority to engage in borrowing," which

13   is not in the bondholders' words.

14        MR. DALSEN:  I mean, I don't mean to --

15        THE COURT:  But we can talk about that in a minute.

16        MR. DALSEN:  Sure.

17        THE COURT:  I think that concept, though, is an

18   appropriate limit.  What I'm trying to do is because -- and I,

19   frankly, don't understand what else could be relevant here, all

20   right?  Given that you have a very limited defect -- well, it's

21   kind of major, but it's finite what the defect is -- I'm having

22   a hard time visualizing what other kind of search would be

23   appropriate.  But you are saying that these memoranda are the

24   ones that would lay out all the critical factors for the

25   bondholders, so I am trying to figure out if there's a way to

 1   give you a comfort level that they're actually producing all

 2   the relevant information without disclosing the information

 3   that I think is irrelevant.

 4        MR. DALSEN:  I mean, I think a few things, your Honor.

 5   One is that the Investment Committee memoranda are important

 6   for the bondholders that have them.  It sounds like they don't

 7   all have them.  So if they don't have them, that's going to

 8   require a search for something beyond what the Investment

 9   Committee memoranda have because they don't exist for certain

10   of these bondholders, but all of them are making the notice

11   argument.  So there's --

12        THE COURT:  Yes, but you're getting the documents from

13   everybody that relate to the claimed defect.

14        MR. DALSEN:  You know, I think the fundamental problem

15   we have, your Honor -- and I understand the framing.  The

16   framing at a high level does make sense, but the problem is

17   that if, for example, there's no discussion, or if there's a

18   comparison of ERS bonds to other types of bonds, or anything

19   else that Judge Swain may feel supports the argument that they

20   had reason to know, and it's impossible for me to know what

21   that looks like.  I mean, I --

22        THE COURT:  Well, it's impossible to have a document

23   request that way, all right?  It is impossible for you to say,

24   "Anything that can conceivably have crossed somebody's desk may

25   possibly give me an argument to make in my summary judgment."

1    I can't function like that.  Discovery doesn't work that way.

2              MR. DALSEN:  Sure.

3              THE COURT:  And the bondholders can't respond to a

4    statement like that.

5              MR. DALSEN:  In that case, I think the first thing is

6    to limit for time, right?  There's a date certain they

7    purchased, and so it's going to be -- I don't know if they have

8    multiple purchases.  We have an interrogatory to them asking

9    for dates of purchase.  I don't believe they've answered it

10   yet, but they've committed to doing so.  When they identify

11   those purchase dates, that's one end of the search.  And the

12   reason we keep coming back to Investment Committee memoranda is

13   because it is conceptually helpful because the point of those

14   memoranda, generally speaking, is to aggregate the information,

15   present it to a committee to principals who make decisions

16   whether to buy a security.  So it's a helpful device to

17   understand the kind of document we're looking for, but it's

18   also important what that document does not say, right?  If the

19   Investment Committee memoranda says nothing about the validity

20   or legality of the bonds, that's evidence that they may say

21   shows that they had no notice of the defect, right?  Because

22   they'll say, "Here's our Investment Committee memoranda.

23   You'll notice that we had no concerns about this at the time of

24   purchase, and that shows that we were not on notice."

25             THE COURT:  Let me make it clear to everybody here:

1    If the documents are not exchanged, you cannot use them in your

2    summary judgments, and you cannot use them in your

3    presentations.  So if these are going to be your smoking-gun

4    documents, you'd better figure out what category they fit into

5    and produce them.

6          MR. DALSEN:  Absolutely, and that's exactly the

7    problem, right?  Because they're the ones saying that they were

8    without notice, right?  And so if they're not given to me, then

9    I can't show that they actually had notice.  It's not about me

10   having a position and then not exchanging some document that I

11   then surprise them with later.  It's that the documents that I

12   need to defeat their notice arguments may never be given to me

13   because I don't know what Judge Swain is going to find useful

14   to determine whether they had reason to know.  The UCC is

15   written very broadly.

16         And so we can talk about ways to cabin it, if there's

17   even a burden.  We still have not heard -- and maybe my

18   opposing counsel is going to address this -- we still haven't

19   heard that what we're asking them to do is a huge lift.

20   Usually investments, investments are made at a specific point

21   in time.  There's usually some start to the process where they

22   start examining an investment.  There's going to be time

23   limitations here that are going to be reasonable.  And that's

24   that aggregated information, and a lot of investment clients

25   keep everything related to an investment in one place.  And

1    they do that not just for SEC compliance and a bunch of other

2    reasons but because it's easy to understand.

3          And so I can understand the Court's concern if there

4    were burden problems here, but we have no information about

5    that.  And at least generally speaking, if we're talking about

6    a decision to make an investment, which is a time certain, a

7    point in time where they began to consider that, those are two

8    time periods.  It could be a week long.  It could be a month

9    long.  Maybe there will be an unusual situation where they

10   thought about it for two years.  I don't know.  But those are

11   inherent limitations of what we're talking about, and we have

12   no information that this is going to be burdensome.  For all we

13   know, this is an easy thing for them to do.

14         And that's why it's dangerous, in my view, to just say

15   that it has to concern, it has to mention legality or

16   illegality or assess the validity because Judge Swain may

17   look -- she may conclude, for example, if they produce all

18   these materials and none of them indicate that they even

19   considered this issue, then the bondholders will argue that

20   supports the fact they had no notice.  The fact that it's not

21   mentioned at all, their Investment Committee memoranda, their

22   emails, everything that went into their decision to purchase,

23   what they knew at the time of purchase they'll say shows, "We

24   had no idea that this was a problem.  Therefore, we could not

25   have been on notice."  But I cannot know that that's true

1     unless I have discovery into all the facts and circumstances

2     known to them at the time, and that's the problem.  That's why

3     the conceptual limitation I empathize with.

4          I also empathize with burden issues if they're real,

5     but we don't have a burden issue that's real here.  We don't

6     have a burden argument.  We don't have information that shows

7     it's burdensome.  But we have a real concern.  As you said, in

8     summary judgment, I can't use documents that aren't exchanged.

9     And the problem is, if the documents say nothing, that would

10    affect, it will be probative of, it would bear on a fact of

11    consequence in the case for their notice argument, and that's

12    why we need them; so we can negotiate some way, we can try to

13    find some way we can work with present counsel to find some

14    way, if there are burden problems, to cabin the search.  But

15    it's not a matter of redacting the information that doesn't

16    reference validity of the bonds.  It's about what the documents

17    say and don't say because all of that could go to say whether

18    they had reason to know, and I have no idea what Judge Swain

19    will find convincing on that point.

20          THE COURT:  Okay.  Counsel?

21          MS. McGONIGLE:  Two quick points.  The first is that

22    to your question initially, which it sounds like may not be on

23    the table anymore, but to the extent the proposal to produce

24    Investment Committee memos in whatever form our clients keep

25    them, redacting substance other than -- however we formulate

1    the language, substance concerning the legality or illegality

2    of the ERS bonds or the ERS's authority to borrow, that's in

3    concept fine with us subject to also redacting privileged

4    information.

5         Secondly, Mr. Dalsen spent a while talking about

6    essentially the diligence files that our clients had on these

7    purchases in advance of purchase.  We've already produced the

8    due diligence files for these purchases, so that material is

9    already in the government parties' and Committee's --

10        THE COURT:  So that's what I thought, and explain to

11   me where that fits into this fight.

12        MS. McGONIGLE:  Well, we don't think it does, in the

13   sense that we see this issue going to documents that would give

14   our clients reason to know of the validity or invalidity, and

15   we see that as cabined by the limitations that we've already

16   given.  The due diligence file, if the government parties and

17   committees are looking for what the investors held in their

18   file on these bonds, that's what they've got.  And I guess if

19   there's silence there, that supports the point that Mr. Dalsen

20   was just making.

21        THE COURT:  Mr. Dalsen, is that what you're looking

22   for, the diligence file?

23        MR. DALSEN:  Your Honor, it is part of what we are

24   looking for.  And, again, what we've tried to do to express

25   what we're looking for is to give the bondholders examples.

1    The diligence file was one example.  They say they produced

2    that, so that's good.  The Investment Committee memoranda is

3    another example.  They say they're going to produce that.

4         THE COURT:  But is the diligence file the file that

5    you're saying will have the information in it that says what

6    they considered when they decided to buy the bond?

7         MR. DALSEN:  It will have some of it.  I cannot say

8    that it would have all of it.  Usually email communications are

9    not going to be, generally speaking, in a diligence file.  So

10   it is part of what we are looking for.  It cannot be everything

11   we are looking for, especially for what the law says is notice.

12        THE COURT:  Okay.

13        MS. McGONIGLE:  I would just reiterate that we believe

14   we've already agreed to everything that the law says would be

15   notice or reason to know under the UCC's definition.

16        THE COURT:  All right, this is where I am:  If you've

17   produced the diligence files, your description of what you're

18   going to do the broader search on, and you cited in a couple of

19   places in your memoranda, but you've agreed to produce

20   nonprivileged documents, if any, regarding the validity or

21   invalidity of the bonds, the legality of their issuance,

22   allegations about the validity or legality of the bonds, and

23   any other issues relating to the claims in the ultra vires

24   proceedings.

25        MS. McGONIGLE:  Yes.

1          THE COURT:  I want you to add to that documents

2     concerning in any way the scope of the grant of authority to

3     ERS to engage in borrowing.

4          MS. McGONIGLE:  That's fine, your Honor.

5          THE COURT:  I'm also ordering you to produce your

6     Investment Committee memoranda relating to the purchase of the

7     bonds, which can be redacted to exclude irrelevant material,

8     except that you need to keep the headings in so that in some

9     form ERS can determine what general factors were considered.

10    All right?

11         MS. McGONIGLE:  Yes, as long as we can also, you know,

12    redact privileged material as we would otherwise.

13         THE COURT:  Right, but that needs to show up on a

14    privilege log.

15         MS. McGONIGLE:  Of course, absolutely.

16         MR. GREEN:  Jesse Green from White & Case for the

17    Puerto Rico Funds.  Your Honor, I just wanted to state for the

18    record that the Puerto Rican Funds were closed-ended and

19    open-ended mutual funds and not hedge fund or private equity

20    funds, so the work product we generate in a purchase will be

21    different from some of the clients of Jones Day, for example.

22    So I'm not sure if we quite have Investment Committee

23    memoranda, but to the extent they exist, we'll --

24         THE COURT:  So what I'm assuming those include are

25    summary memoranda identifying the factors considered in making

1   the decision to buy the bonds.

2          MR. GREEN:  To the extent we have documents like that,

3   we will look for them.

4          THE COURT:  Okay.

5          MR. GREEN:  Thank you.

6          THE COURT:  That's going to be the scope of the

7   production now.  If ERS can, having obtained that material,

8   convince me at another time that there are other specific types

9   of information that may be relevant to the decision, you can

10  come back.  But right now, the way I'm seeing it, frankly, is,

11  ERS is on a fishing expedition, and it's just not appropriate,

12  given the very limited scope of the issue that knowledge is

13  relevant to.  Reason to know has to do with the defect relating

14  to the issuance of the bonds, and I view that as a fairly

15  limited inquiry, recognizing that it's a significant inquiry.

16  And, again, I don't think I need to tell all of you, if the

17  documents haven't been produced, you can't use them.

18         MS. McGONIGLE:  Thank you, your Honor.

19         THE COURT:  Okay?  And I think that covers the motion

20  to compel.  All right, should I ask is there anything else?  I

21  should never ask that question.  All right, it's 4:30.

22  Good-bye.  Thank you.

23         (Adjourned, 4:30 p.m.)

24

25

1                          C E R T I F I C A T E

2

3
UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5

6

7            I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 69 inclusive, PROMESA Litigtation, Docket

10   Nos. 3:17-BK-3283(LTS), 3:17-BK-3566(LTS), 3:19-AP-356(LTS),

11   3:19-AP-357(LTS), 3:19-AP-359(LTS), and 3:19-AP-361(LTS), was

12   recorded by me stenographically at the time and place

13   aforesaid, and thereafter by me reduced to typewriting and is a

14   true and accurate record of the proceedings.

15           Dated this 22nd day of January, 2020.

16

17

18

19

20

21           /s/ Lee A. Marzilli
                 _____
22           LEE A. MARZILLI, CRR
             OFFICIAL COURT REPORTER
23

24

25