# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AMBAC ASSURANCE CORPORATION, and FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>Movants,<br><br>-v-<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Respondents. | No. 17-BK-3283-LTS<br><br>**Re: ECF No. 9620, 10249, 10251** |

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**RESPONSE OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD TO (A)
OBJECTION OF ASSURED GUARANTY CORP., ASSURED GUARANTY
MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,
AMBAC ASSURANCE CORPORATION, AND FINANCIAL GUARANTY INSURANCE
COMPANY TO (I) RESPONSE OF THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO TO INTERIM REPORT AND
RECOMMENDATION OF THE MEDIATION TEAM (ECF NO. 9493), AS
INCORPORATED IN (II) INTERIM CASE MANAGEMENT ORDER FOR REVENUE
BONDS (ECF NO. 9620), AND (B) LIMITED RESPONSE OF OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO INTERIM CASE MANAGEMENT ORDER FOR
<u>REVENUE BONDS</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 4

ARGUMENT ......................................................................................................................... 7

I.    The Monolines' Proposal to Stay the Adversaries and Proceed to a Final Hearing on the
Lift Stay Motions Risks Further Delay and Incomplete Resolution of Key Threshold
Issues................................................................................................................................ 7

II.    The Oversight Board Agrees The Revenue Bond CMO Should Not Include Any
Reference to Section 305. ............................................................................................. 12

III.   No Discovery Should Be Permitted Until the Gating Issues on the Monolines' Security
Interests or Other Liens Are Determined. .................................................................... 14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ambac Assurance Corp. v. Commonwealth of P.R.*,
  927 F.3d 597 (1st Cir. 2019) ................................................................................13, 14

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
  Mgmt. Bd. for P.R.),*
  939 F.3d 340 (1st Cir. 2019) ................................................................................9, 10

**STATUTES**

11 U.S.C. § 362(e) .....................................................................................................2

48 U.S.C. §§ 2101-2241 .............................................................................................1

PROMESA § 106(e) ..................................................................................................14

PROMESA § 305 ................................................................................................ passim

PROMESA § 315(b) ....................................................................................................1

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 7001(2) ...........................................................................................9

Fed. R. Civ. P. 12(b) ..................................................................................................2

Fed. R. Civ. P. 12(c) ..................................................................................................2

ii

To the Honorable United States District Judge Laura Taylor Swain:

      The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole representative of the Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this response ("Response") to (*i*) the *Objection of Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, Ambac Assurance Corporation, and Financial Guaranty Insurance Company to (I) Response of the Financial Oversight and Management Board for Puerto Rico to Interim Report and Recommendation of the Mediation Team (ECF No. 9493), as Incorporated in (II) Interim Case Management Order for Revenue Bonds (ECF No. 9620)* [ECF No. 10251] (the "Monolines' Objection"), filed by Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "Assured"), National Public Finance Guarantee Corporation ("National"), Ambac Assurance Corporation ("Ambac"), and Financial Guaranty Insurance Company ("FGIC," and together with Assured, National, and Ambac, the "Monolines"), and (*ii*) the *Limited Response of Official Committee of Unsecured Creditors to Interim Case Management Order for Revenue Bonds* [ECF No. 10249] (the "UCC Response"), filed by the Official Committee of Unsecured Creditors ("UCC"):

## PRELIMINARY STATEMENT

      1.    At this juncture in these Title III cases, two issues present material impediments to further consensual restructuring agreements and to confirmation of the pending proposed plan of adjustment because creditors of HTA, PRIFA, and CCDA contend Commonwealth revenues must be transferred to those entities, while the Commonwealth and its creditors disagree and

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

contemplate using those revenues for other purposes. The two issues are: (i) the effectiveness, scope, and perfection of the alleged security interest or other property interests in Commonwealth revenues held by the Monolines as holders and insurers of bonds issued by HTA, PRIFA and CCDA; and (ii) whether the Monolines have standing to assert claims against the Commonwealth in respect of HTA, PRIFA, or CCDA bonds.

2. The Revenue Bond CMO, as defined below, provides two separate paths for the speedy resolution of these critical issues: adversary proceedings and lift stay motions. Specifically, in accordance with the Revenue Bond CMO, the Oversight Board filed four Adversaries, as defined below, which, *inter alia*, challenge the allowance, effectiveness, scope, and perfection of the Monolines' asserted claims and liens against revenues appropriated by the Commonwealth to HTA, PRIFA, and CCDA, as well as the Monolines' standing to assert certain claims against the Commonwealth. On the same day, the Monolines filed Lift Stay Motions, as defined below, seeking adequate protection or relief from the automatic stay to file actions to enforce their alleged security interests and other liens against such revenue in a forum other than the Title III Court.

3. The Revenue Bond CMO further provides a schedule by which parties can proceed to Federal Rule of Civil Procedure 12(b) and 12(c) motion practice regarding the Adversaries, with discovery awaiting disposition thereof. At the same time, the Revenue Bond CMO permits the Lift Stay Motions to proceed, presumably due to the time limits in Bankruptcy Code section 362(e).

4. This Court should reject the modifications to the Revenue Bond CMO proposed by the Monolines and the UCC, respectively. *First*, this Court should deny the Monolines' request to stay the Adversaries while permitting the Lift Stay Motions to proceed to final determination. The reason is simple. While the Lift Stay Motions can and may produce rulings on the secured status

and standing issues, there is no guarantee they will unless they are all treated like the PRIFA Lift Stay Motion. In respect of the PRIFA Lift Stay Motion, by its June 13, 2019 *Order regarding Argument and Discovery in Connection with Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay* [ECF No. 7420] (the "June 13 Order"), this Court has already bifurcated issues of standing and secured status from other issues including adequate protection. As a result, the Court's decision on the PRIFA Lift Stay Motion will likely provide the parties with the clarity they need on those issues and the Court should proceed with adjudicating the two issues it scheduled in the PRIFA Lift Stay Motion in accordance with the June 13 Order.

5.      With respect to the HTA and CCDA Lift Stay Motions, the Monolines' proposal risks delaying further progress in these Title III cases for many months, if not longer. The Oversight Board filed the Adversaries precisely to avoid this potential delay by providing an efficient and time-sensitive vehicle for resolving the gating issues. As mentioned, this Court can bifurcate and prioritize issues of standing and secured status for the HTA and CCDA Lift Stay Motions, as the Court did with respect to the PRIFA Lift Stay Motion. In that case, the Lift Stay Motions and the Adversaries would tee up the same issues of standing and property interests, both of which are determinable based on the same documents and statutes. If for some reason the Court determines in the context of the Lift Stay Motions to issue a preliminary ruling on the issues of secured status and property interests, it would be able to issue final rulings in the context of the Adversaries either pursuant to Rule 12 motions or summary judgment motions.

6.      *Second*, there is no merit to the Monolines' objections to the statements in the Revenue Bond CMO regarding the Oversight Board's limited waiver of PROMESA section 305. As a practical matter, the Oversight Board's Adversaries, objecting to the allowance, priorities, extent, and security interests of claims, do not invoke section 305. In the context of the Lift Stay

3

Motions, section 305 becomes relevant only if the Court determines adequate protection is required, and in that instance the Oversight Board may consent to the Court ordering adequate protection, in any event.

7.    *Third*, this Court should deny the Monolines' request to modify the Revenue Bond CMO so they can seek immediate discovery in furtherance of their Lift Stay Motions.   The discovery the Monolines seek—including documents related to the identification of alleged trust property and the quantification of alleged diminution of collateral value—presumes the Monolines have a property interest in the revenues appropriated and to be appropriated by pre-PROMESA statutes to PRIFA, HTA and CCDA.   Before discovery occurs, the Court can determine based on the documents and statutes whether the Monolines have secured interests or other property interests in those revenues for which stay relief could be ordered.   The Court should continue to stay such discovery until determination of the issues identified in the June 13 Order regarding all of the Lift Stay Motions.   Permitting discovery related to these issues before the Monolines establish they even have a property interest is unnecessary, inefficient, and risks wasting valuable time and resources.[3]

## **BACKGROUND**

8.    On July 24, 2019, the Court entered an order staying multiple pending adversary proceedings and contested matters in the Commonwealth's Title III case.   *See Order Regarding Stay Period and Mandatory Mediation* [ECF No. 8244] (the "Stay Order").   The Stay Order also directed a Court-appointed team of mediators (the "Mediation Team"), led by Chief Judge Barbara J. Houser (the "Mediation Team Leader"), to facilitate mediation on a range of topics, including

---

[3] As described *infra*, the UCC's request to file briefs of greater length than currently contemplated by the Revenue Bond CMO should be denied without prejudice as premature.

4

procedures for resolving disputed issues in connection with proceedings for approval of a disclosure statement and plan confirmation.

9.      Following a period of several months, the Mediation Team filed the Interim Report and Recommendation of the Mediation Team [ECF No. 9365] (the "Interim Report"), which "addresse[d] the scheduling and sequencing of disputed issues that the Mediation Team believes should be allowed to proceed forward in the near-term." Interim Report at 4. The Mediation Team also indicated it would later file an amended report (the "Amended Report") addressing its "assessment regarding scheduling and sequencing of issues not addressed in this Interim Report." *Id.* at 7. The Mediation Team attached several exhibits to the Interim Report, including a "proposed interim scheduling order applicable to certain contested matters and adversary proceedings addressing . . . the rights of holders of revenue bonds issued by HTA, PRIFA, and CCDA against the Commonwealth." *Id.* at 5; *see also id.* Ex. 2. The Interim Report's proposal provided for the Oversight Board to file four new adversary proceedings (the "Adversaries") "which will be objections to claims of some of the largest holders of the relevant revenue bonds," including the Monolines. Interim Report at 6; *see also id.* Ex. 2 ¶ 2. The Interim Report's proposal also provided a schedule for two pending motions for relief from the automatic stay as to PRIFA and HTA (the "PRIFA Lift Stay Motion" and the "HTA Lift Stay Motion," respectively), and a new motion for relief from the automatic stay as to CCDA (the "CCDA Lift Stay Motion," and collectively with the PRIFA Lift Stay Motion and HTA Lift Stay Motion, the "Lift Stay Motions"). Interim Report at 6-7; *see also* Proposed Interim Revenue Bond CMO ¶ 1.

10.      After multiple parties provided responses to the Interim Report and proposed interim orders, the Court held a hearing to consider the Interim Report. *See* Dec. 11, 2019 Hr'g Tr. at 30:1. Several parties addressed the Court—including the Monolines and the UCC—

regarding the Interim Report's scheduling proposals.  The Court stated it would make certain changes to the proposed interim orders attached to the Interim Report "on matters that may be particularly significant in the period between now and the January [29, 2020 omnibus hearing]." *Id.* at 103:2-8.  The Court also noted it would include the language proposed by the Oversight Board regarding the areas for which it was expressly granting its consent pursuant to PROMESA section 305 "as a statement by the Oversight Board, without prejudice to any party's position as to how 305 works in this context." *Id.* at 106:20-24.

11.    On December 19, 2019, the Court entered two interim case management orders, including the Interim Case Management Order for Revenue Bonds [ECF No. 9620] (the "<u>Revenue Bonds CMO</u>"), which included the changes described by the Court at the December 11 hearing. Shortly thereafter, in response to a request by the Mediation Team, the Court entered an order postponing the prior January 10, 2020 deadline for the Mediation Team to file the Amended Report to February 10, 2020. *See Order Partially Amending Order Addressing the Filing of an Amended Report by the Mediation Team and Extending (a) Stay Period, (b) Mandatory Mediation, and (c) Certain Deadlines Related Thereto (Docket Entry No. 9618), and Setting Deadline for Further Reponses to Urgent Motion for Extension of Filing Deadline for Mediation Team Amended Report (Docket Entry No. 9638)* [ECF No. 9639] (the "<u>December 23 Order</u>").  The December 23 Order also adjourned the hearing on the Amended Report to March 4, 2020.

12.    On December 26, 2019, certain of the Monolines filed an *Objection, Motion for Reconsideration Regarding ECF No. 9636, and Reservation of Rights of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation with Respect to Urgent Motion for Extension of Filing Deadline for Mediation Team Amended Report (ECF No. 9638)* [ECF No. 9655] (the "<u>Assured Objection</u>").  The next day, the Court entered an

order partially amending and restating the December 23 Order, and denying the Assured Objection "insofar as it seeks reconsideration of the December 23 Order." *Amended and Restated Order Addressing the Filing of an Amended Report by the Mediation Team and Extending (a) Stay Period, (b) Mandatory Mediation, and (c) Certain Deadlines Related Thereto* [ECF No. 9661] (the "December 27 Order") ¶ 7.  The December 27 Order further provided the court would hold "a hearing to address any arguments concerning the continuation of the provisions of, and proposed amendments to, the [Interim Revenue Bonds CMO] pending the March 4, 2020, hearing" on January 29, 2020.  *Id.*  The Court overruled the Assured Objection in all other respects.  *Id.*

## ARGUMENT

### I.   The Monolines' Proposal to Stay the Adversaries and Proceed to a Final Hearing on the Lift Stay Motions Risks Further Delay and Incomplete Resolution of Key Threshold Issues.

13.     As the Monolines know, it is possible for all the Lift Stay Motions to be litigated to finality without producing final orders on whether the Monolines hold secured claims against or property interests in Commonwealth assets.  That is why the Adversaries should not be stayed, and that is why each of the Lift Stay Motions should be treated like the Court treated the PRIFA Lift Stay Motion, whereby the gating issues of standing and secured interest would be considered up front and prior to discovery.  The Monolines contend the Revenue Bond CMO unfairly "privileges" the Adversaries because it permits those proceedings to move forward while the Lift Stay Motions proceed to a preliminary hearing only.  To remedy this alleged defect, they propose modifying the Revenue Bond CMO to stay the Adversaries and permit the Lift Stay Motions to proceed to final hearings after discovery.  The Monolines' proposal should be rejected because it would result in an unacceptable delay in the resolution of the key gating issues of standing and secured status.

7

14.     The parties need clarity regarding (*i*) the allowance, existence, effectiveness, scope, and perfection of the Monolines' asserted security interests or other liens on the Commonwealth's revenues; (*ii*) if existent and valid, what type of security interest or other lien do the Monolines possess and on what property does it attach; and (*iii*) whether the Monolines have standing to assert any claims against the Commonwealth with respect to any such security interests or other liens. To date, the Monolines have resisted resolution of these issues and refused to set hearings of any kind.

15.     This Court provided an appropriate avenue to achieve potentially a speedy resolution of these issues with respect to holders or insurers of PRIFA bonds through the June 13 Order entered with regard to the PRIFA Lift Stay Motion.  Pursuant to the June 13 Order, any hearing on the PRIFA Lift Stay Motion is limited to "the legal issues of standing and secured status only," and factual submissions are limited to "legal documents (statutes, agreements and the like) relevant to the parties' standing and collateral security arguments."   June 13 Order at 1. "Automatic stay motion-related discovery," including discovery related to adequate protection and whether the stay should be lifted, is reserved for after "the Court's decision on the legal issues argued" on the PRIFA Lift Stay Motion.  *Id.* at 2.

16.     The Adversaries filed by the Oversight Board were designed to provide a path to address issues efficiently.[4]  To avoid advisory opinion issues and the like, the Adversaries are simple claims objections the Court clearly has subject matter jurisdiction to determine immediately.  The Adversaries were filed as complaints rather than motions objecting to claims to

---

[4] The complaint in the Adversary filed regarding certain bonds issued by PRIFA states it "is being filed by the Oversight Board and the Commonwealth to comply with paragraph 2 of the Interim Order, and is without prejudice to the Oversight Board's and the Commonwealth's rights under the [June 13 Order], all of which are expressly reserved."  *See* Adv. Proc. No. 20-003 [ECF No 1], at 2.

take into account Bankruptcy Rule 7001(2) providing for complaints when the validity, priority, or extent of a lien is contested. Targeted summary judgment motions, motions to dismiss, or other similar vehicles within the Adversaries would produce rulings on these issues on the merits in relatively short order because they are purely legal issues that turn entirely upon the statutes authorizing the bonds to be issued, their governing resolutions and/or trust agreements executed by the bonds' respective fiscal agents or trustees (collectively, the "Bond Materials").

17. With respect to the Monolines' asserted secured status against assets of the Commonwealth, in each instance, the Lift Stay Motions are based solely on novel legal theories advanced by the Monolines against the Commonwealth, which assert the Bond Materials purport to grant property interests in Commonwealth revenues appropriated to PRIFA, HTA and CCDA bondholders by pre-PROMESA statutes. These creative theories must be resolved first. If the Monolines' theories fail, there is nothing else to resolve, because it will be clear the Monolines have no security interest or other liens against or entitlement to the Commonwealth's property. And, although the statutes and documents relating to PRIFA, HTA, and CCDA are different, in each instance, these threshold issues are purely legal in nature and can be determined solely on the basis of the applicable statutes and the operative bond documents that create the alleged liens or other property interests. Discovery is not needed to address these issues (indeed, with respect to the PRIFA Lift Stay Motion, the June 13 Order does not permit discovery), and all the documents needed to adjudicate these threshold issues are either cited in or attached to the Lift Stay Motions.

18. Conversely, modifying the Revenue Bond CMO as the Monolines suggest—such that the Lift Stay Motions proceed to final hearings as to all issues—is contrary to First Circuit precedent and, as described below, could result in no resolution of the gating issues if the Court resolves the motions on other issues. As the First Circuit explained in *Gracia-Gracia v. Financial*

9

*Oversight & Management Board for Puerto Rico (In re Financial Oversight & Management Board for Puerto Rico)*, 939 F.3d 340 (1st Cir. 2019), when the nature of the creditor's property interest impacts the decision as to whether the automatic stay should be modified, the Court should make "at least a preliminary determination of the parties' respective property interests in the disputed funds." *Id. at* 348.  Proceeding to a speedy determination of the allowability, effectiveness, scope, and perfection of the Monolines' alleged claims and security interests or other liens—whether through the bifurcated PRIFA Lift Stay Motion or the Adversaries—is consistent with the First Circuit's instruction.  If the Oversight Board is correct, and the Monolines have neither a property interest in the Commonwealth revenues nor standing to bring any claims against the Commonwealth, then there is no need for discovery and further stay hearings.

19.    Moreover, litigating the Lift Stay Motions to a final hearing without first resolving the Monolines' standing and the allowability, effectiveness, scope, and perfection of their purported claims and property interests (similar to the bifurcated proceeding on the PRIFA Lift Stay Motion) would also risk bogging the parties (and the Court) down in expensive and time-consuming litigation over issues that *presume* allowability of claims and the nature and scope of a lien, such as adequate protection and the need to lift the stay.  The Court need look no further than the parties' past experience with stay relief motions to see why this is so.  Stay relief motions in both the ERS and PREPA Title III cases have taken many months to litigate, while the parties engaged in extensive discovery regarding adequate protection and issues relating to the *Sonnax* factors, such as the interests of judicial economy or the impact of the stay on the parties and the balance of harms.  None of those issues is relevant, however, if the Monolines have neither standing nor any allowable claim or property interest in the first place.  And, if the Lift Stay Motions are litigated to final hearings without first determining these issues, the Lift Stay Motions

could well be determined on grounds that do not ultimately reach the merits of the Monolines'
standing and secured status.  It is entirely possible the parties could spend months mired in
litigation on the Lift Stay Motions, only for those motions to do nothing to meaningfully advance
the Commonwealth's or HTA's Title III Cases.

20.     For instance, the Lift Stay Motions admit the Commonwealth holds over $8 billion
cash, which easily exceeds the total amount of clawback revenues for the last three years.  If the
Court denies stay relief simply because the Monolines and bondholders are adequately protected
whether they have allowable secured claims or not against the clawback revenues, the key question
as to whether they have allowable claims against those revenues will remain undecided.

21.     Importantly, the sole basis for the Monolines' argument that the Lift Stay Motions
should proceed prior to the Adversaries or any component thereof is their insistence the so-called
"Enforcement Actions" (defined by the Monolines as the actions they wish to pursue after they
obtain stay relief in non-Title III courts, *see* Monolines' Obj. ¶ 2) are the only "constitutional
vehicle" for resolution of the parties' disputes.  That is flatly wrong for multiple reasons.  First,
there is no constitutional impairment to this Court's resolution of the Adversaries which are simply
objections to proofs of claims.  Second, the issues the Monolines intend to raise through the
Enforcement Actions—constitutional and statutory issues related to the fiscal plan and various
Commonwealth statutes—run into subject matter jurisdiction issues and assume the Monolines
have property interests in Commonwealth assets in the first place.  Those constitutional and
statutory issues are of no moment if the Monolines do not, in fact, have an interest in the
Commonwealth's property.

22.     While the Oversight Board is of the view that the Adversaries provide the best path
to final resolution of these issues on the merits, the Oversight Board alternatively supports

11

resolution of the HTA and CCDA Lift Stay Motions in the same manner as the Court directed in

its June 13 Order regarding the PRIFA Lift Stay Motion, where the Court bifurcated such motions

to resolve first the threshold issues of standing and secured status.

## II.    The Oversight Board Agrees The Revenue Bond CMO Should Not Include Any Reference to Section 305.

23.     The Monolines also object to the Revenue Bond CMO's inclusion of the Oversight

Board's position as to the scope of its consent to certain issues pursuant to PROMESA section

305.  Because the Monolines view the inclusion of this position in the Revenue Bond CMO as

impinging on their due process, they seek to remove all reference to PROMESA section 305

whatsoever.  The Oversight Board agrees to the deletion of all references to section 305.  The

Monolines' allegation that the Oversight Board's filing of complaints objecting to their claims

entitles them to the Oversight Board's waiver of section 305 is erroneous.  The notion that the

Oversight Board must consent to the Court's interference with the Commonwealth's property

because the Oversight Board contends the Monolines' filed proofs of claim are not allowable has

no valid basis whatsoever.

24.     The fact is that nothing in the Adversaries objecting to the Monolines' proofs of

claim requires consent under section 305.  Likewise, the Monolines' contentions that their proofs

of claim should be allowed does not require Oversight Board consent under section 305.  The

Monolines have overlooked that their proofs of claim are, in reality, complaints.  The Oversight

Board's complaints are, in reality, defenses to the Monolines' proofs of claim.  Accordingly, if the

Monolines answer the complaints by alleging new claims requiring the Court to interfere with the

Commonwealth's property and governmental powers, they would be requesting something other

than the allowances of their claims, which is outside the scope of the complaints.

25.     The Monolines request stay relief to do in another court what Section 305 does not

allow—based on the Oversight Board's lack of consent—in the Title III Court.  The Oversight

Board may consent pursuant to section 305 for the Title III Court to order adequate protection

payments if the Court determines it must otherwise grant stay relief.

26.     The Monolines' reading of the First Circuit's decision in *Ambac Assurance Corp.*

*v. Commonwealth of Puerto Rico*, 927 F.3d 597 (1st Cir. 2019), and specifically their reading of

the Court's view of section 305, is mistaken.  It did not, as the Monolines suggest, "render[] it

impossible for the [Monolines] to obtain due process in the Title III Court" (Monolines' Obj. ¶ 13)

or "bar[] the [Monolines] from raising, in the Title III Court, their constitutional and statutory

challenges" (*id.* ¶ 29).  Rather, the First Circuit expressly tied its ruling respecting section 305 to

Ambac's requests for turnovers of revenues (and corresponding declaratory judgments stating such

revenues must be turned over):

> Specifically, Ambac requests injunctive relief that would compel the
> Commonwealth's remittance of toll revenues, vehicle fees, and
> excise taxes to HTA and then to the Bank of New York Mellon for
> payment to bondholders.  Ambac hopes to achieve much the same
> end by obtaining a declaration that the Commonwealth's continued
> divergence of these funds pursuant to the Moratorium Laws and
> Orders and the Fiscal Plan is unconstitutional, preempted under
> section 303 of PROMESA, and in violation of sections 922(d) and
> 928(a) of the municipal-bankruptcy code (as incorporated into
> PROMESA via 48 U.S.C. § 2161(a)).

*Ambac*, 927 F.3d at 602.   Because Ambac was seeking the turnover of funds from the

Commonwealth, the First Circuit found Section 305 was implicated:

> Here, by contrast, Ambac's requested relief would require the Title
> III court itself to *direct the Commonwealth's use of its revenues and
> property* in a manner that contravenes the expressed will of the
> Commonwealth legislature, the Governor of Puerto Rico, and the
> Oversight Board. On its face, the text of section 305 bars the Title
> III court from granting Ambac such relief absent consent from the
> Oversight  Board or unless the Fiscal Plan so provides.

*Id.* at 602-03 (emphasis added). The opinion expressly did not suggest, as the Monolines claim, that, "[b]ecause of Section 305, the [Monolines] cannot obtain due process in the Title III Court unless [the Oversight Board] consents to have all relevant statutory and constitutional issues litigated in the Title III Court." Monolines' Obj. ¶ 33.

27.     The Court recognized at the December omnibus hearing that requiring advance waivers of section 305 is both outside the Court's power and does not make any sense before the facts are known:

> The [Oversight] Board, under 305, has a particular power to waive or not waive, and that makes it different than other parties. And I can't force the Board to waive anything. . . . [The Monolines] can argue that something they do waives it, *but that's an issue for adjudication later*. That's why I would include both [provisions relating to PROMESA section 305].

Dec. 11, 2019 Hr'g Tr. 75:19-76-11 (emphasis added).

28.     Indeed, the Monolines have already indicated (*see, e.g.*, Monolines' Obj. ¶ 33) their intent to challenge the legality of the fiscal plans, which the Oversight Board has stated it does not consent to pursuant to section 305 (Revenue Bond CMO ¶ 2), and moreover is improper in any forum due to PROMESA § 106(e). The allowance of Monoline claims is not dependent on challenging a certified fiscal plan. If the Monolines hold unavoidable property interests in certain revenues, they will have claims and those claims will be addressed in the context of a plan of adjustment in any event.

### III.     No Discovery Should Be Permitted Until the Gating Issues on the Monolines' Security Interests or Other Liens Are Determined.

29.     If the Lift Stay Motions proceed to a final hearing, the Monolines contend they would require "certain discrete items of discovery that would facilitate a final hearing on the Lift Stay Motions." Monolines' Obj. ¶ 49. With respect to the PRIFA Lift Stay Motion, any such requests are expressly prohibited by the June 13 Order, which reserved all discovery until after the

Court ruled on the Monolines' standing and secured status.  The discovery sought has no bearing

on the core gating issues outlined above, the effectiveness, scope, and perfection of the Monolines'

alleged liens.

30.     That is apparent from the Monolines' own descriptions of the discovery they seek.

With respect to the revenues allegedly appropriated to PRIFA, HTA and CCDA bondholders, the

Monolines claim that, to perform the tracing analysis they contend *Gracia* requires, they must

obtain discovery regarding any alleged collateral that "was diverted into some commingled

account or sub-account other than the [Treasury Single Account]."  *Id.* ¶ 50.  But, the tracing

analysis they seek to perform would only be potentially relevant if the Monolines first establish

that the Bond Materials grant them a property interest in the revenues they want to trace.  If they

cannot do so, any discovery regarding the "flow of funds" is irrelevant.

31.     Likewise, with respect to the CCDA revenues, the Monolines allege they require

"relevant bank and other documentation" confirming whether certain of CCDA's funds are

restricted.  *Id.* ¶ 51.  "Restricted" is not a recognized term in the Bankruptcy Code.  Either the

Monolines have an allowable secured claim, or an ownership interest, or not.  If they have an

ownership interest, whether legal or equitable, is determined by the statutes and documents.  Only

if they have such an interest would tracing possibly become relevant.  And, given the Monolines'

assertions in their Lift Stay Motions that the Commonwealth holds more funds than all the

clawback revenues, it is unlikely tracing will ever be required.

32.     With respect to the PRIFA revenues, the Monolines claim to seek discovery only

regarding a transmittal memorandum allegedly "confirming that [certain] funds constitute PRIFA

property on which PRIFA Bondholders . . . have a lien."  *Id.* ¶ 52.  Transmittal memoranda do not

create property interests.  The debt documents and statutes are the only operative documents.

Moreover, as noted above, this Court has already decided "[a]ny automatic stay motion-related discovery will be addressed in connection with the Court's decision on the legal issues" of standing and secured status.  June 13 Order at 2.  The information the Monolines request is plainly relevant only to the identification of alleged trust property.  But this Court has already held that any determinations regarding the identification of the Monolines' alleged property interests should be made only *after* the Court determines whether the Monolines have both standing to bring claims against the Commonwealth and a security interest in revenues appropriated to PRIFA bondholders.  Granting the Monolines' request for discovery before those determinations are made would, as to the PRIFA Lift Stay Motion, directly contravene the June 13 Order, and would create expense and delay for no purpose.

33.    Lastly, the Monolines themselves admit the discovery they seek regarding HTA—documents "that accurately reflect the exact amounts of" revenues allegedly diverted from HTA bondholders at certain specific times—is relevant only to "the amounts of the revenues diverted . . . and of the resulting diminution in the value of their property interests."  Monolines' Obj. ¶ 53.  This discovery is relevant only to a determination of the value of the Monolines' secured claim or other property interest if they have one in the first place.  Furthermore, the Monolines have already asserted in the Lift Stay Motions that the Commonwealth's Treasury Secretary Account (the "TSA") contains $8.7 billion, which vastly exceeds the total amounts claimed by the Monolines in the Lift Stay Motions collectively.  PRIFA Lift Stay Motion [Case No. 17-3283, ECF No. 10109-2] at 42 n.28; HTA Lift Stay Motion [Case No. 17-3567, ECF No. 673] at 7 n.6; CCDA Lift Stay Motion [Case No. 17-3283, ECF No. 10104] at 34 n.8.  Accordingly, there is no need for the Monolines to obtain any discovery whatsoever regarding the TSA for purposes of their Lift Stay Motions.

34.     The discovery the Monolines request now would not promote resolution of the threshold issues of standing and secured status, and would instead be no more than delay and an unnecessary distraction from resolving gating issues.  That is not surprising, because as explained above, those gating issues are legal in nature, and no discovery is necessary to resolve them.  The Revenue Bonds CMO should not be modified to permit the Monolines access to discovery that may well become irrelevant once determinations on their standing and secured status have been reached.[5]

Dated: January 27, 2019                         Respectfully submitted,
San Juan, Puerto Rico

                                                */s/ Hermann D. Bauer*
                                                Hermann D. Bauer
                                                USDC No. 215205
                                                Carla García Benítez
                                                USDC No. 203708
                                                **O'NEILL & BORGES LLC**
                                                250 Muñoz Rivera Ave., Suite 800
                                                San Juan, PR 00918-1813
                                                Tel: (787) 764-8181
                                                Fax: (787) 753-8944
                                                Email: hermann.bauer@oneillborges.com
                                                Email: carla.garcia@oneillborges.com

                                                Martin J. Bienenstock (*pro hac vice*)
                                                Brian S. Rosen (*pro hac vice*)
                                                Michael T. Mervis (*pro hac vice*)
                                                Timothy W. Mungovan (*pro hac vice*)
                                                Chantel L. Febus (*pro hac vice*)
                                                Julia D. Alonzo (*pro hac vice*)
                                                Laura Stafford (*pro hac vice*)

---

[5] Additionally, the Court should deny without prejudice the UCC's request for exemption from the page limits for intervenors in the Adversaries as premature.  At this point, the UCC has not sought to intervene in the Adversaries (beyond the Adversary in which they are already a partial co-plaintiff—and that adversary is not directly relevant to the issue described herein), and there are no currently pending deadlines by which the UCC must respond prior to the March 4, 2020 omnibus hearing.  At that time, if the UCC needs additional pages, the Revenue Bond CMO already contains a procedure by which the UCC can seek leave to file an oversized brief.  There is no reason to adopt the blanket modification the UCC proposes.

17

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email: mbienenstock@proskauer.com
Email: brosen@proskauer.com
Email: tmungovan@proskauer.com
Email: cfebus@proskauer.com
Email: jalonzo@proskauer.com
Email: lstafford@proskauer.com


Michael A. Firestein (*pro hac vice*)
Lary A. Rappaport (*pro hac vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Tel:     (310) 557-2900
Fax:     (310) 557-2193
Email: mfirestein@proskauer.com
Email: lrappaport@proskauer.com


*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Commonwealth of Puerto
Rico*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

<u>*/s/ Hermann D. Bauer*</u>
Hermann D. Bauer