1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF PUERTO RICO

3
     In Re:                    )        Docket No. 3:17-BK-3283(LTS)
4                              )
                               )        PROMESA Title III
5    The Financial Oversight and )
     Management Board for       )
6    Puerto Rico,              )        (Jointly Administered)
                               )
7    *as representative of*     )
                               )
8    The Commonwealth of        )
     Puerto Rico *et al.*,       )        January 29, 2020
9                              )
                  Debtors,     )
10
     _____
11

12
     In Re:                    )        Docket No. 3:17-BK-4780(LTS)
13                             )
                               )        PROMESA Title III
14   The Financial Oversight and )
     Management Board for       )
15   Puerto Rico,              )        (Jointly Administered)
                               )
16   *as representative of*     )
                               )
17   Puerto Rico Electric       )
     Power Authority,          )
18                             )
                  Debtor,      )
19
     _____
20

21

22

23

24

25

```
 1  _____

 2

 3  Sciemus Limited, et al.,     )    Docket No. 3:19-AP-00369(LTS)
                                 )
 4                  Plaintiffs,  )      in 3:17-BK-4780(LTS)
                                 )
 5  v.                           )
                                 )
 6  Financial Oversight and      )
    Management Board for         )
 7  Puerto Rico, et al.,         )
                                 )
 8                  Defendants.  )

 9  _____

10                       OMNIBUS HEARING

11    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

12                 UNITED STATES DISTRICT COURT JUDGE

13    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

14                 UNITED STATES DISTRICT COURT JUDGE

15  _____

16
    APPEARANCES:
17
    For the Mediation Team:  Honorable Chief U.S. Bankruptcy Judge
18                           Barbara J. Houser

19  For The Commonwealth
    of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
20                           Ms. Laura Stafford, PHV
                             Mr. Michael A. Firestein, PHV
21                           Mr. Lary A. Rappaport, PHV

22  For the U.S. Trustee
    Region 21:               Ms. Monsita Lecaroz Arribas, AUST
23
    For the Official
24  Committee of Unsecured
    Creditors:               Mr. Luc A. Despins, PHV
25                           Mr. G. Alexander Bongartz, PHV
```

```
 1 ‖ APPEARANCES, Continued:
   ‖
 2 ‖
   ‖ For the Puerto Rico
 3 ‖ Fiscal Agency and
   ‖ Financial Advisory
 4 ‖ Authority:               Mr. Peter Friedman, PHV
   ‖                          Mr. Luis C. Marini Biaggi, Esq.
 5 ‖
   ‖ For Assured Guaranty
 6 ‖ Corp. and Assured
   ‖ Guaranty Municipal Corp: Mr. William J. Natbony, PHV
 7 ‖                          Mr. Casey J. Servais, PHV
   ‖
 8 ‖ For Financial Guaranty
   ‖ Insurance Company:       Mr. Martin A. Sosland, PHV
 9 ‖
   ‖
10 ‖ For Ambac Assurance
   ‖ Corporation:             Ms. Atara Miller, PHV
11 ‖
   ‖ For Salud Integral
12 ‖ en la Montana:           Mr. John E. Mudd, Esq.
   ‖
13 ‖ For National Public
   ‖ Finance Guarantee Corp.: Mr. Robert Berezin, PHV
14 ‖
   ‖ For Cobra Acquisitions
15 ‖ LLC:                     Mr. Thomas P. McLish, PHV
   ‖                            Appearing from New York
16 ‖                          Mr. Fernando Van Derdys, Esq.
   ‖
17 ‖ For AmeriNational
   ‖ Community Services,
18 ‖ LLC, as servicer for
   ‖ the GDB Debt Recovery
19 ‖ Authority:               Mr. Nayuan Zouairabani, PHV
   ‖
20 ‖ For Puerto Rico
   ‖ Electric Power
21 ‖ Authority:               Mr. Joseph Davis, PHV
   ‖
22 ‖
   ‖
23 ‖
   ‖
24 ‖
   ‖ Proceedings recorded by stenography.  Transcript produced by
25 ‖ CAT.
```

```
 1                           I N D E X

 2    WITNESSES:                                      PAGE

 3         None offered.

 4

 5    EXHIBITS:

 6         None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    January 29, 2020

 3                                    At or about 9:38 AM

 4                          *      *      *

 5          THE COURT:  Again, buenos dias.  Welcome counsel,

 6   parties in interest, and members of the press and public here

 7   in San Juan, those observing here and in New York and

 8   telephonic participants.  As always, it is good to be back

 9   here.  This has been a very challenging month for Puerto Rico,

10   and we have in mind the people who have been severely effected

11   by the earthquakes.

12          I remind those present in the courtrooms and

13   listening on the phone line that, consistent with court and

14   judicial conference policies and the Orders that have been

15   issued, there is to be no use of any electronic devices in the

16   courtroom to communicate with any person, source, or outside

17   repository of information, nor to record any part of the

18   proceedings.  Thus, all electronic devices must be turned off

19   unless you are using a particular device to take notes or to

20   refer to notes or documents already loaded on the device.  All

21   audible signals, including vibration features, must be turned

22   off.

23          No recording or retransmission of the hearing is

24   permitted by any person, including but not limited to the

25   parties or the press.  Anyone who is observed or otherwise
```

1    found to have been texting, e-mailing or otherwise

2    communicating with a device from a courtroom during the court

3    proceeding will be subject to sanctions, including but not

4    limited to confiscation of the device and denial of future

5    requests to bring devices into the courtroom.

6          Our timing this morning is from 9:30 to noon, and

7    then from 1:00 to five o'clock, if necessary.  And we'll begin

8    with the Oversight Board's status report.

9          MR. BIENENSTOCK:  Thank you, Judge Swain.  Good

10   morning.

11         THE COURT:  Good morning, Mr. Bienenstock.

12         MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

13   Rose for the Oversight Board, for itself and as representative

14   of the Title III debtors.

15         In respect of Your Honor's first topic for the status

16   report, the general status and activities of the Oversight

17   Board, especially since the December hearing, the Oversight

18   Board's attention and activities have centered on, among many

19   subjects, monitoring fiscal plan implementation, mediation,

20   plans of adjustment and litigation.

21         We know the Court is very aware of the

22   confidentiality restrictions concerning mediation, so in that

23   respect, I simply want to emphasize what I'm allowed to say,

24   which is the mediation is very much in progress.  It is

25   possible, but I can't promise, that during the next month

1    there will be some public announcements that would manifest

2    that progress.

3         With respect to the earthquake and earthquake swarm,

4    the Board immediately made available the budgetary reserves

5    established in the certified budgets for fiscal years '19 and

6    '20, totaling 260 million dollars, for use in the emergency

7    situation.  As the Court may recall, our budgets have a

8    growing emergency reserve, so it's cumulative, and that's why

9    I'm mentioning the two budgets.

10        The chairman and executive director of the Oversight

11   Board together have made three visits to the south of Puerto

12   Rico, including some six municipalities.  The Governor

13   provided immediate support of two million dollars to the

14   hardest hit municipalities and 250,000 dollars to others with

15   damage.

16        President Trump has made the disaster declaration,

17   enabling FEMA individual and public assistance to those in

18   need who qualify.  There are 16 municipalities included in the

19   disaster declaration.

20        Earthquakes continue.  Recently, we had about 17 over

21   2.5, including one that registered 5.0 and rocked many homes,

22   including the Oversight Board's offices in San Juan.  There is

23   no end in sight, though they have slowed and are reduced in

24   number since the peak.

25        Thousands remain in tents constructed by the National

1    Guard and other shelters, some facing new flooding given the

2    weather over the last weekend.   Schools in the southwest

3    remain closed, with many structurally uninhabitable.   Other

4    schools in the north, which have been deemed structurally

5    safe, are beginning to reopen.   Hundreds of homes and public

6    buildings have been damaged, including prisons, schools,

7    bridges and roads.   There are hundreds of millions of dollars

8    of damage.

9         In respect of ERS, Your Honor, discovery is

10    continuing, and the disputes regarding the scope of the

11    bondholders' lien and ERS assets and whether the issuance of

12    ERS bonds was ultra vires.   The Oversight Board and the

13    bondholders groups are discussing a modified discovery

14    schedule.

15        The Oversight Board is also awaiting decision from

16    the First Circuit concerning the bondholders' appeal of this

17    Court's Section 552(a) ruling.   In addition, briefing is

18    ongoing and the bondholders' appeal of the Court's Order

19    denying appointment of the bondholders as trustees of ERS

20    under Section 926(a) of the Bankruptcy Code, with oral

21    arguments scheduled for the beginning of March.

22        In respect of PRIDCO's RSA and anticipated Title VI,

23    as the Oversight Board informed the Court at the December

24    hearing, PRIDCO has public bonds in the outstanding amount of

25    approximately 150 million dollars in principal and 15 million

1  dollars in accrued interest.

2       As AAFAF notified the Court in the October hearing,

3  AAFAF entered into a Restructuring Support Agreement with over

4  two-thirds of those bondholders.  While the Oversight Board

5  has not been formally asked to approve the RSA as a qualifying

6  modification, the Board's professionals are working with

7  AAFAF's professionals to understand the implementation of the

8  RSA, corresponding economic measures and the proposed fiscal

9  plan for PRIDCO, which is currently being revised based on

10  comments provided by the Oversight Board.  Should the revised

11  fiscal plan meet the Oversight Board's requirements and the

12  Oversight Board issue a voluntary agreement certification

13  relating to the PRIDCO RSA, the parties aim to commence a

14  Title VI qualifying modification for PRIDCO, not before the

15  end of the first quarter of 2020.

16       In respect of relations among the Oversight Board and

17  the Commonwealth and Federal Government, in respect to the

18  Commonwealth relations, our relationship with the Governor and

19  government remains collaborative, though they have been

20  overwhelmed in the response to earthquakes in the south, thus

21  delaying much other routine work.

22       In terms of the Federal Government relations with

23  Federal Government, obviously having many different speaking

24  parts, our relationship with the Federal Government is status

25  quo.  The Federal Government, in this case HUD, inserted the

1   Oversight Board into the disaster funds process to ensure the

2   use of the funds is consistent with both the certified fiscal

3   plan and certified budget in recognition of the Oversight

4   Board's oversight role.

5          Moreover, many congressional representatives signed

6   one or more public letters expressing concern the agreements

7   reached prior to the earthquakes must be reviewed in light of

8   the major cost to the island and the clear lack of resiliency

9   of the infrastructure.  The Board will not tell the Court any

10  proposed plan of adjustment is feasible if it believes to the

11  contrary, but so far it has not determined there is sufficient

12  basis to change course.

13         In terms of disaster funding, in response to the

14  recent earthquakes, President Trump has signed a major

15  disaster declaration making federal funding available, and the

16  U.S. House Appropriation Subcommittee announced the

17  introduction of a supplemental spending bill that will provide

18  an additional 3.35 billion dollars in disaster relief.  In

19  addition, the Federal Government has indicated it will impose

20  new requirements related to 8.2 billion dollars in HUD

21  Community Development Block Grant disaster relief funds.

22         In respect to FEMA, FEMA has agreed to allow the

23  Commonwealth to use the procedure under Section 406 of the

24  Stafford Act for noncritical infrastructure projects, which

25  does not require preapproval and, therefore, enables projects

1    to get under way more quickly.  FEMA has also responded to

2    the recent earthquakes.  The Oversight Board welcomes

3    continued communication and collaboration with FEMA to

4    facilitate effective post-hurricane and post-earthquake

5    recovery.

6              In terms of the PREPA RSA, the Oversight Board

7    received a letter from several members of Congress dated

8    January 23, 2020, regarding the terms of PREPA's proposed RSA.

9    The Oversight Board is reviewing the letter and welcomes

10   continued communication with the Federal Government regarding

11   the RSA.

12             Your Honor also put the pro se claim response

13   methodology on the list, and if it's okay with the Court, I

14   will defer that to Ms. Stafford, my colleague, because

15   otherwise I'll just duplicate and steal her thunder, which I'm

16   not good at doing.

17             THE COURT:  Very well.

18             MR. BIENENSTOCK:  So if I can move on to the last

19   topic, Your Honor asked for a report on the anticipated timing

20   for legislative approval of the policies embodied in the PREPA

21   9019 motion.  Your Honor's placement of this topic on the

22   report list was prescient, as the Board and government have

23   been engaged in constructive discussions.  And the Governor

24   and AAFAF met last week with Puerto Rico legislative leaders

25   to discuss, among other things, PREPA'S debt restructuring.

1           The government parties and the supporting holders

2   have worked on draft legislation with the intent that it be

3   presented to the legislature for consideration during the

4   current session, which began on January 14, 2020, and ends

5   June 30, 2020.  We remain hopeful the legislation will be

6   submitted in the coming weeks.

7           As the Court knows, the legislative process is an

8   iterative one, and predicting legislative timing and outcomes

9   is far from an exact science.  Based on this uncertainty, the

10  Oversight Board will seek an extension of the briefing

11  schedule and then adjournment of the March 31 hearing on the

12  PREPA RSA to allow time for the parties to make progress with

13  respect to the legislation.  We are in discussions with the

14  supporting parties on this schedule, and we'll file an urgent

15  motion as soon as we can.

16          THE COURT:  And since you do see this coming and

17  there's at least a month between now and the March target

18  date, when you file the urgent motion, please don't make it

19  one on which I have to declare a briefing schedule that's 72

20  hours, and 48 hours, over a weekend.  People get really

21  annoyed about that, and me, too.  So please do it with

22  sufficient lead time to do this in a civilized way.

23          MR. BIENENSTOCK:  Absolutely, Your Honor.  And

24  hopefully we haven't been guilty of that, but we don't like it

25  either.

1          THE COURT:  I'm not tagging anybody in particular,

2     but there are a whole lot of urgent motions whose urgency

3     seems to arise from the date on which they were filed as

4     opposed to context, so I'd be grateful if everybody would be

5     mindful of that.

6          MR. BIENENSTOCK:  Thank you, Your Honor.  And

7     although Your Honor asked for the report, so we would have

8     said anyway, part of the reason for wanting to raise that is

9     we know the Court put aside time March 31, and better to have

10    more notice than less for our request.

11         THE COURT:  I do very much appreciate that.  As you

12    know, there are logistics all around, including with all of

13    the Court personnel, and so I appreciate the advanced

14    notice.

15         MR. BIENENSTOCK:  Unless the Court has other

16    questions, that is the end of our report for this morning.

17         THE COURT:  Thank you.  Except for Ms. Stafford.

18         MR. BIENENSTOCK:  Right.

19         THE COURT:  Thank you, Mr. Bienenstock.

20         MS. STAFFORD:  Good morning, Your Honor.

21         THE COURT:  Good morning, Ms. Stafford.

22         MS. STAFFORD:  Good morning.  Laura Stafford from

23    Proskauer on behalf of the Financial Oversight and Management

24    Board.  Thank you, Your Honor, for the opportunity to address

25    the Court regarding the pro se responses to the Omnibus claim

1    objections that have been received by the Court.

2          As Your Honor is aware, hundreds of responses to

3    these claim objections were filed by pro se parties just in

4    the past month.  We are in the process of reviewing those

5    responses that have been received to date.

6          Currently, upon entry of the Order regarding

7    administrative claims reconciliation procedures which the

8    Court approved at the October Omnibus hearing, we anticipate

9    that the great majority of those claimants, at least 80

10   percent, and likely far more than that, will be referred to

11   the Commonwealth's administrative claims reconciliation

12   processes, or to the alternative dispute resolution

13   procedures, in the event that Your Honor approves the motion

14   that's set for hearing later today.

15         We're continuing to review the responses that are

16   currently on file, and if it is determined that any of these

17   responses either do not contain sufficient information for or

18   are otherwise inappropriate for either of those two

19   procedures, or if they cannot be resolved in some other

20   manner, we intend to proceed with our objections to those

21   claims at the March 4th, 2020, Omnibus hearing.

22         With respect to the process going forward, I'm happy

23   to report that we are nearing the end of our high volume set

24   of Omnibus objections to deficient claims that assert

25   liabilities based on unspecified Commonwealth laws or salary

1   demands, services provided and pensions accrued, the type of

2   Omnibus objections that have taken up the bulk of the

3   objections set for today and for the December Omnibus.

4          As Your Honor is no doubt aware, earlier this month

5   we filed an additional 30 Omnibus Objections to Deficient

6   Claims, which are currently set for hearing on March 4th.   In

7   the coming weeks, we anticipate filing an additional

8   approximately 13 Omnibus Objections to Deficient Claims, which

9   will be scheduled for hearing on April 22.

10         We are continuing to review additional claims that

11  may fall into these buckets as well of deficient claims, and

12  we may need to file additional deficient Omnis beyond those 13

13  that we're expecting.  However, we do expect that the number

14  of deficient Omnibus objections, as well as the number of

15  claims scheduled on each objection, will start to decrease

16  over the coming months.  Each of these objections have been

17  and will be filed, of course, in accordance with the

18  procedures approved by the Court at the November 2018 and the

19  June 2019 Omnibus hearings.

20         We also appreciate Your Honor's suggestion that a

21  response form be developed to help streamline and focus the

22  processing of pro se responses.  In that regard, we would note

23  that the mailing that was sent to each of the claimants last

24  summer and over the course of the fall requests the

25  information that the debtors need from these parties in order

1    to be able to reconcile these claims.  And we would be happy

2    to include a simplified version of that mailing with any

3    future claim objections, which may help focus claimants'

4    responses so that they can provide the information we actually

5    need in order to determine what procedure may or may not be

6    appropriate for their claim.  In addition, we're happy to

7    revise our noticing procedures, however, as necessary, to

8    reduce the number of defective filings which we understand

9    present a burden to the Court and the court clerks.

10         For example, we noticed that a number of defective

11   filings -- or defective pleadings that were filed over the

12   next few weeks lacked signatures, and both the claim objection

13   notices and the proposed simplified form can reinforce the

14   requirement that claimants must sign their responses before

15   they can be accepted for filing.  And of course we're happy to

16   take direction from the Court if there are any further

17   revisions to the notices or to the objections that the Court

18   would like us to make.

19         THE COURT:  Well, I appreciate this report in all of

20   its aspects and your agreement that some attention to the form

21   in which information is elicited can be helpful.  I think you

22   may see hitting the docket an Order that I prepared relating

23   to the responses that we've gotten from people whose claims

24   haven't been objected to yet, which is an interesting

25   development.  There are a number of those.  And for what it's

1    worth, our suspicion is that people are seeing their neighbors

2    getting some notice and deciding that they're going to

3    volunteer some information and copying information from their

4    neighbors' responses.

5         And so our Order is going to ask you to file an

6    informative statement by the middle of February indicating

7    generally what you're intending to do with those.  And I was

8    comforted to hear that you have a plan for some 80 percent of

9    these pro se responses.  And I think it's in all of our

10   interests that, to the extent the responses are not being

11   channeled into other mechanisms, that the number of truly

12   disputed ones that need to be heard in any given Omni is kept

13   to a manageable amount of traffic, so that if further

14   adjournments are required to do that, I'm obviously open to

15   having you do that.

16         MS. STAFFORD:  Okay.

17         THE COURT:  And then in a few minutes, before we talk

18   about -- actually, I guess I can do it now.  The other big

19   problem is the inclusion of sensitive personal identifiers in

20   filings.  People seem to get the objections and then, you

21   know, open up the drawers with the driving licenses and

22   everything else and start copying things and sending them to

23   the Court.  And we are not in the position, as a court, to

24   start redacting things.  And many of these filings are

25   voluminous.

1          And so I will state for the record and for the

2     purpose of finding on the right of access issues, that given

3     the large volume of responses and the Court's limited

4     personnel resources, we have determined to seal pro se

5     submissions that contain sensitive personal information, and

6     give access to those sealed filings to designated attorneys

7     representing the Oversight Board in the first instance.  And

8     we also give notice to the filer of that.  And the docket will

9     reflect that there is a sealed exhibit containing sensitive

10    personal information, which is sometimes pervasive through a

11    200 page filing.

12          This is the most narrowly tailored means available to

13    the Court to ensure that the pro se claimants' responses will

14    be filed in a timely manner, while protecting the sensitive

15    personal information.  And we do give them advice in our

16    Notice of Deficiency that they should redact and refile, but

17    sometimes they just send us more, which doesn't help because

18    then that gets --

19          MS. STAFFORD:  Right.

20          THE COURT:  -- sealed as well.  So we do have a

21    suggestion for some potential amelioration of these issues,

22    which is to include language along the following lines in the

23    claim objection notice:

24          All materials submitted to the Court in response to

25    claim objections may be publicly filed and accessible to any

1    member of the public.  Therefore, in your submissions to the

2    Court, do not include sensitive documents or information, like

3    driver's licenses, passports, birth certificates, Social

4    Security cards, sensitive medical information or confidential

5    business information.  Social Security numbers and taxpayer

6    identification numbers should be redacted, that is, blacked

7    out, except for their last four digits.  Birthdays should be

8    redacted, except for the year of an individual's birth.

9    Minors' names should be redacted, except for their initials.

10   And financial account numbers should be redacted, except for

11   their last four digits.  Any such sensitive or confidential

12   information that you rely on in support of your claim must be

13   provided directly to the debtors' counsel and will be kept

14   confidential.  And then give contact information for debtors'

15   counsel so that that communication can take place off-line.

16          So that builds on information that you already had

17   there, but it's an effort to make it a little bit more

18   accessible to the lay people who are responding to the notice.

19   So that is our suggestion and request, that you consider

20   incorporating that kind of language.

21          MS. STAFFORD:  That process makes a lot of sense to

22   us, Your Honor.  Thank you.

23          THE COURT:  Thank you.  So I have -- yes.  I have no

24   further questions for the Oversight Board.

25          MS. STAFFORD:  Thank you, Your Honor.

1          THE COURT:  Mr. Bienenstock.

2          MR. BIENENSTOCK:  Your Honor, thank you.

3          I'm grateful to Mr. Despins for bringing something to

4    my attention that -- I mentioned that in terms of the PREPA

5    hearing, we would be filing a motion to change the hearing

6    date and the briefing schedule, and Mr. Despins reminded me

7    that our next brief is due February 3.  So to avoid exactly

8    what Your Honor said about a last minute, urgent motion, I

9    wonder if we could have an adjournment for, say, three weeks?

10   And it might be further changed based on whether there is an

11   adjournment of the hearing or not and how long it is, but that

12   would still have our pleading on file well before the

13   currently scheduled hearing of March 31st.

14          THE COURT:  So this is a reply that is due February

15   3rd?

16          MR. BIENENSTOCK:  Our response to the objections to

17   the RSA is due February 3.

18          THE COURT:  And so that is basically the nature of

19   the reply.  But then, as I recall, there are further filings

20   in the schedule after that filing -- so of course my concern

21   will be that I don't end up with hundreds or thousands of

22   pages of filings completed only a week before the hearing

23   date.  So if you are going to take that filing deadline out

24   three weeks now, that's certainly going to require moving the

25   hearing date.

1          And I have been trying in all of these adjournments

2   to keep and maintain space for the Court to give necessary,

3   thorough, and fair consideration of everything, and as we're

4   moving into the schedule under the interim orders, as they may

5   be adjusted -- as you know, my major issue processing load on

6   these cases is increasing exponentially for the spring, so

7   we'll need to keep that in mind in revised scheduling.

8          MR. BIENENSTOCK:  I think for now, perhaps I should

9   change it to two weeks or even one week so that there's time

10  to file a motion that the Court doesn't have to deal with over

11  the weekend, and the parties don't have to deal with it.

12         THE COURT:  All right.  So let's make it two weeks

13  now.  So that would be until February 17 --

14         MR. BIENENSTOCK:  Okay.

15         THE COURT:  -- for the response to the objections to

16  the RSA.

17         MR. BIENENSTOCK:  Thank you.

18         THE COURT:  Is there any major panicky objection to

19  my extending that two weeks?  Mr. Natbony.

20         MR. NATBONY:  Excuse me, Your Honor.

21         MR. BIENENSTOCK:  Okay.  Two things, Your Honor, that

22  we agreed to:  The other replies due should also have the same

23  adjournment, and when we do move to change the hearing date,

24  we will not use this extension as a basis to support our

25  request.

22

1           THE COURT:  Very well then.  That -- I'm sorry.

2           MR. MOERS MAYER:  One second, Your Honor.

3           MR. BIENENSTOCK:  Your Honor, Mr. Moers' point is

4    that -- I should just clarify.  I was only talking about the

5    pleadings responding to the objections to the RSA and then

6    follow-up pleadings after that.  I was not referring to a

7    Motion to Dismiss that Mr. Moers' client is involved with.  So

8    they still have a February 3rd date.  We have not asked to

9    move that and Mr. Moers has not asked to move it.

10          THE COURT:  Very good.  So that this can be clear to

11   everyone, will you file I guess you'd call it an informative

12   motion, a proposed order, confirming the two-week adjournments

13   of these two deadlines that I've granted --

14          MR. BIENENSTOCK:  Sure.

15          THE COURT:  -- on the record that I can then so order

16   and enter into the docket?

17          MR. BIENENSTOCK:  Yes.  Thank you, Your Honor.  We'll

18   do that.

19          THE COURT:  Thank you.

20          Mr. Moers is getting up again.

21          MR. MOERS MAYER:  I don't think we have an issue,

22   Your Honor.

23          MR. BIENENSTOCK:  No.  I assured Mr. Moers that our

24   reply in the other matter he's referring to is also not being

25   deferred.  So we still have a February 3rd deadline for a

1   pleading, but it's not to reply to the objections.  That's

2   all.

3           THE COURT:  Thank you for that clarity.

4           Mr. Despins.

5           MR. DESPINS:  Just two minutes on PREPA.  So

6   obviously we consent to this short extension, and we consent

7   to if the Board wants to adjourn the March 31st hearing,

8   that's fine.

9           The only thing we want to raise with the Court, not

10  asking for any ruling today, the litigators will discuss this,

11  but we have to remember that the initial date was December 11,

12  or something like that.  The hearing date was supposed to be

13  in December.  The whole discovery was done on a fairly

14  compressed schedule based on that hearing date, and everything

15  was locked down, meaning no more declarations, nothing, based

16  on that.  Then it was adjourned to the end of January, then to

17  March.

18          So, as I said, we have no problems with them pushing

19  the dates out, but, you know, there are things that will be

20  stale.  I'll give you an example.  We have declarations that

21  assume a hearing in January, so of course those declarations

22  are -- from a timing point of view, won't be accurate in

23  whatever date is ultimately scheduled.  So that's one example.

24          And so I want to make sure that -- and we will

25  discuss that, and all that, so we're not asking the Court to

 1   opine on that; but I just want to make sure that that's on

 2   your radar screen, because not everything will be stale, but

 3   some things are.  Discovery that was taken in August or

 4   September, in May or June of this year may be still timely or

 5   not.  It's unclear.

 6          The other point I want to make, though, is that this

 7   issue of getting legislation to implement the RSA is not a

 8   novel issue.  They've known about that for at least two years,

 9   when they signed the current RSA.  And if you read the

10   declarations, the main point is, assuming the Committee has

11   great claims -- they don't say we have great claims, but

12   assuming we did, there is just no time left to do this,

13   because Judge Swain would have to rule.  It would go to the

14   First Circuit.  It would take a year to do that.

15          I don't think they should be able to, and I'm not

16   asking for a ruling on that, but to run the clock essentially

17   for getting that legislation for more than a year now when

18   they knew before they signed the RSA that they needed that

19   legislation, and then to say, oh, by the way, we're out of

20   time, this alternative does not make sense because there's no

21   time left.

22          So to be continued, but I want to make sure that the

23   Court has that also on your radar screen because we believe

24   that that would be unfair, because this is something they've

25   known about from the beginning, that they needed that

1    legislation.  Why they have not sought that or obtained that

2    before, I don't know.  But clearly we cannot be in a position

3    where they're arguing in June of this year that, well, if we

4    had to litigate these issues, it would take six, seven months

5    to get a decision from Your Honor, and to go to the First

6    Circuit, when we could have done that starting in May of last

7    year.  So that's the point.

8          THE COURT:  And I have been aware that one of the

9    arguments has been that the -- that some of the argumentation

10   in favor of the utility and necessity of settlement has been

11   the time issue of being able to move forward quickly and not

12   having litigation going on.  And I know that your counter

13   argument to that includes that that urgency is self-created to

14   a certain extent.  And so I assume that that argument will

15   kind of get louder and more elaborated as we get later in

16   time.

17         MR. DESPINS:  That's all I wanted to mention.

18         THE COURT:  So as to the heads up about potential

19   requests for further discovery, Judge Dein and I will expect

20   that both your direct discussions with other parties and any

21   request to the Court will be clear, narrowly tailored and

22   raised in a timely fashion.

23         Judge Dein, should I say anything else on that at

24   this point?

25         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  You

1    can emphasize that --

2            THE COURT:  I emphasize that.   There's three lines

3    drawn underneath that.

4            MR. DESPINS:  Okay.  And as I said, many of the

5    information may not be stale.  Some categories may have

6    changed over time.

7            That's all.  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            Mr. Natbony.

10           MR. NATBONY:  Thank you, Your Honor.  I appreciate

11   Your Honor's granting of the short period of time and the

12   caution about not having the urgent motions, because Assured

13   will be in a position where we will be objecting to the moving

14   of the hearing date, and we appreciate that opportunity to do

15   so in a fulsome manner without having the rush of a 48-hour,

16   72-hour period.

17           With respect to Mr. Despins' argument about

18   potentially the need for other declarations or discovery, I

19   realize there is no formal motion before Your Honor, but

20   obviously we take the position that there is no need for

21   further discovery.  There is no need for further declarations.

22   We'll address that in any motion that's made.

23           And I also appreciate Mr. Bienenstock's

24   representation that they won't use the short extension for

25   their brief as a justification for the potential moving of an

 1   adjournment date for the hearing.

 2          Thank you, Your Honor.

 3          THE COURT:  Thank you.

 4          Okay.  My name generator just failed me, so please --

 5          MR. BEREZIN:  I will name myself, Your Honor.  Robert

 6   Berezin of Weil Gotshal & Manges on behalf of National Public

 7   Finance Guarantee Corp.

 8          THE COURT:  Good morning, Mr. Berezin.

 9          MR. BEREZIN:  Thank you, Your Honor.  National is a

10   signatory to the PREPA RSA and, like Assured, doesn't support

11   delay.

12          We would just point out that legislation is not

13   required as a prerequisite to approve the RSA.  It's not part

14   of the RSA.  It doesn't require legislative approval prior to

15   the 9019 hearings.  That is not something that is baked into

16   the agreement between the parties, nor do we believe it's

17   necessary.  And that -- getting to a hearing as soon as

18   possible is incredibly beneficial, we believe for PREPA, we

19   believe for its Title III case -- its Title III case, as well

20   as the other cases.

21          And we, too, appreciate the extra time and certainly

22   do consent to the modification of the schedule to allow for

23   briefing on that issue.  And we certainly also oppose

24   discovery, further discovery.

25          Thank you.

1          THE COURT:  Thank you.

2          MR. DESPINS:  Your Honor, there is a clarification

3    here.  I do not understand that the adjournment of the March

4    31st hearing could be contested, because if it is contested --

5    and the Court could decide, no, I'm sticking to March 31st,

6    I've lost -- as to their reply, I've just lost two weeks

7    because we have a reply to that as well.

8          I thought that maybe perhaps the selection of the

9    date might be in limbo, but not that they would be opposing

10   the adjournment, because then we are going to get prejudiced

11   by the extension of their reply.

12         THE COURT:  So Mr. Bienenstock, you started this by

13   saying you discussed this concept with the supporting parties,

14   and I also had the impression that there was some general

15   recognition or agreement to an adjournment of the date of the

16   30th.  If it's going to be fought, it will be fought, but tell

17   me what your understanding is and what your expectation is.

18         MR. BIENENSTOCK:  Okay.  Our understanding was the

19   bondholders' supporting parties are working with us on this.

20   The monolines, as you've heard this morning, may oppose or may

21   not.  We need to have further discussions with them.

22         THE COURT:  All right.  Then for now -- it's January

23   29th today.  Let's make this extension a one-week extension to

24   February 10th.

25         MR. BIENENSTOCK:  Okay.

1          THE COURT:  And get your discussions done.  And if

2    you expect that there's going to be vigorous opposition, you

3    know, get your urgent motion in sooner rather than later.  And

4    you can keep talking while that's pending, but if there's

5    going to be, you know, serious issues raised about whether we

6    can and should stay in March, then I'll need to engage those

7    quite quickly.

8          MR. BIENENSTOCK:   Thank you, Your Honor.

9          THE COURT:  Thank you.  Give me just one moment.

10   Yes, February 10th, because you're adjourning the February 3rd

11   deadline for a week?

12         MR. BIENENSTOCK:  Yes, Your Honor.

13         THE COURT:  So it's February 10th.  And then the

14   corresponding deadline would also go out another week.  And

15   you'll give me a proposed order.

16         MR. BIENENSTOCK:  Yes, Your Honor.

17         THE COURT:  Okay.  So since we're discussing calendar

18   issues right now, we did move around the date of the April

19   Omni, and I believe it is now the 22nd.  And I think someone

20   mentioned in other remarks the Omni being the 27th, but I

21   might just have misheard that.

22         So I'm just going to ask Ms. Selden to give me the

23   definitive word on when the April Omni is.  I think we had

24   moved it from the 15th to the 22nd, or something like that.

25         So it's the 22nd?  I don't have my calender.

1          We'll provide that word as soon as we have it.

2          MR. BIENENSTOCK:  All right.  Thank you.

3          THE COURT:  Thank you.

4          So let's go on to the AAFAF report.

5          MR. FRIEDMAN:  Good morning, Your Honor.  Peter

6     Friedman from O'Melveny & Myers.  The AAFAF report will

7     largely be handled by my colleague, Mr. Marini, in terms of

8     the disaster relief update.

9          AAFAF is working on fiscal plan issues, working on

10    PRIDCO issues.  And one of the major things AAFAF is working

11    on and we think is appropriate dovetails with the last sort of

12    colloquy that went back and forth, which was AAFAF and the

13    Governor are working with the legislature and doing something

14    we think is extremely important, and our client thinks is

15    extremely important to PREPA and the transformation process,

16    which is paying due respect to the legislature's prerogatives

17    in connection with approval of important legislation.

18         Those are the key issues on AAFAF's agenda right now.

19    Other than that, we agree with, in terms of status issues, the

20    things going on that Mr. Bienenstock referenced.  And beyond

21    that, I'll turn it over to Mr. Marini for the comprehensive

22    report on the issues you specifically asked AAFAF to address

23    with respect to disaster relief and reconstruction post-Maria

24    and the earthquakes.

25         Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Friedman.

2          The date of the April Omni is April 22nd.  And

3   perhaps no one else was confused, but now it's clear.  Thank

4   you.

5          MR. MARINI BIAGGI:  Good morning, Your Honor.

6          THE COURT:  Good morning, Mr. Marini.

7          MR. MARINI BIAGGI:  Luis Marini of Marini Pietrantoni

8   Muniz on behalf of AAFAF.

9          First, Your Honor, I'd like to thank the Court for

10  the opportunity to address again regarding the status of post

11  hurricanes Irma and Maria infrastructure repairs and funding,

12  as well as initial assessments after recent and continuing

13  earthquakes.  This is a topic that is of high importance to

14  AAFAF, to Governor Wanda Vazquez, the people of Puerto Rico,

15  after the devastation caused by the hurricanes over two years

16  ago, and that suffered more recently through the numerous

17  earthquakes that have affected the southern part of Puerto

18  Rico since December 28, 2019.

19         Your Honor, the Oversight Board covered some of the

20  aspects of the funding for the earthquakes.  I'll try not to

21  repeat myself, but I'll get into more detail in some of the

22  areas.  I'll first provide an overview of the initial damage

23  assessments done to date as a result of the recent and ongoing

24  earthquakes, as well as repair efforts.  I'll then provide

25  some additional detail on the damage assessments and projects

1   undertaken by PREPA, HTA and the Department of Education with

2   the Commonwealth.

3       Finally, Your Honor will recall that AAFAF provided a

4   detailed report on the status of post hurricanes Irma and

5   Maria infrastructure repairs and funding during the last

6   Omnibus hearing, so I'll limit my presentation only to new

7   developments since then.  Finally, Your Honor, I know that the

8   date and information that I provide today has been obtained by

9   AAFAF directly from PREPA, HTA, Department of Housing,

10  Department of Education, and COR3.

11      Your Honor, since December 28, 2019, hundreds of

12  earthquakes and aftershocks have been recorded in Puerto Rico,

13  with the largest one of a magnitude of 6.4 occurring on

14  January 7, 2020.  These earthquakes and aftershocks have been

15  concentrated in the southern part of Puerto Rico.  Damage

16  assessments are at a preliminary stage and are ongoing.  As of

17  January 15, there were a total of approximately 4,575 reported

18  refugees, approximately 790 damaged houses, and more than 460

19  million dollars in preliminary and partial estimates of

20  initial mitigation and emergency repair damages.

21      Funding and reconstruction efforts for the damages

22  related to the earthquakes are at an early stage.  The

23  Governor has requested and the President has approved, as

24  detailed by the Oversight Board, a declaration of -- major

25  disaster declarations for 16 municipalities, which include

1    Adjuntas, Cabo Rojo, Corozal, Jayuya, Lajas, Lares, Maricao,

2    San German, San Sebastian, Villalba, Ponce, Guanica,

3    Guayanilla, Yauco, Utuado and Pinuelas.  As the Oversight

4    Board mentioned, this allows FEMA's public and private

5    assistance programs to become available to these

6    municipalities.

7            As to the school system, the Commonwealth has

8    approximately 856 public schools.  Inspections for these

9    schools are ongoing.  As of January 29, as of today, the last

10   information that we have from the Department of Education is

11   that approximately 383 schools have been deemed apt to reopen.

12   And out of these, 228 schools have been inspected, evaluated,

13   and certified by licensed engineers and are reopening.  These

14   schools are in the regions of Arecibo, Humacoa, San Juan,

15   Bayamon and Caguas.

16           THE COURT:  I'm sorry.  Can you just explain again,

17   the 386 number is what?

18           MR. MARINI BIAGGI:  Three hundred and eighty-three

19   are schools that, from initial inspections, they could

20   potentially reopen soon; but out of those 383, 228 have been

21   certified and are available to open immediately.

22           THE COURT:  Thank you.

23           MR. MARINI BIAGGI:  Inspections and evaluations for

24   the remaining schools continue, and as of January 17th,

25   approximately 668 schools have been inspected, with

1   assessments underway.  The Department of Education expects to

2   announce additional school openings soon.

3        While the inspections have not yet been completed,

4   the Department of Education estimates that, as of now,

5   approximately 212 schools may reopen partially, and 57 schools

6   will need repairs prior to reopening.  Current --

7        THE COURT:  I'm sorry.  Are you going on to a

8   different topic or still on education?

9        MR. MARINI BIAGGI:  I'm still on education, Your

10  Honor.

11       Current inspections to the schools are being

12  performed by licensed engineers and consist of visual

13  inspections of structural and other defects.  Estimates of

14  damages as to the school system are preliminary, and range

15  from 40 to 50 million for emergency and mitigation repairs,

16  and in the range of 1.5 to 2 million for more permanent

17  repairs.  As of today, repairs have not yet started for the

18  most part.

19       As to the schools in the southern part of Puerto

20  Rico, and most affected by the recent earthquakes, the

21  Department of Education is evaluating alternatives to serve

22  the affected students and expects announcements to be made

23  soon.  Among the alternatives being considered are the use of

24  mobile classrooms, tents, or renting temporary locations that

25  comply with FEMA's requirements to accommodate the students

1  temporarily.

2      I'll move on.  Unless Your Honor has any questions on

3  education, I'll move on to PREPA.

4      THE COURT:  I do have a follow-up.  I'm glad you did

5  speak a minute ago about the evaluation of alternatives to

6  serve students.  You know, it has been some time --

7      MR. MARINI BIAGGI:  Right.

8      THE COURT:  -- since the schools were supposed to

9  reopen.  And so am I correct in understanding that, as of now,

10 there's not in place any sort of internet-based, camp-based or

11 distance programming or curriculum being delivered to students

12 by the faculty of these various schools?

13     MR. MARINI BIAGGI:  Speaking as to the southern part

14 of Puerto Rico only, because the schools that are reopened are

15 not in the southern part of Puerto Rico.  They are in the

16 regions that I mentioned.

17     THE COURT:  When did the schools in the north reopen?

18     MR. MARINI BIAGGI:  Some were programmed to reopen

19 last week, and I think there was an announcement yesterday.

20 So they're in the process of reopening in the next few days.

21 And there's some reopening at different stages as additional

22 schools are announced.

23     THE COURT:  And there hasn't been any alternative

24 reprogramming in the north either as till now?

25     MR. MARINI BIAGGI:  Right.  And as to the south, the

1    last information I had as of yesterday are that, among the

2    alternatives being considered are those I mentioned of

3    bringing mobile classrooms, putting in tents, but those are

4    not in place as of today.

5           THE COURT:  And is there any timing expectation for

6    delivery of any sort of instruction to these children in the

7    south?

8           MR. MARINI BIAGGI:  Your Honor, I can come back with

9    more detail.  The last that I have is that announcement should

10   be made within the next one to two weeks in terms of how this

11   will be structured for the south.

12          This is developing daily.  There were schools

13   announced yesterday that could open.  There were another set

14   that will announced today.  So information is changing on a

15   daily basis.

16          THE COURT:  I understand that it's a very demanding

17   situation, not only in education but in many, many aspects of

18   human services.  But, you know, I can tell you, I have a deep

19   concern as a person and for the people --

20          MR. MARINI BIAGGI:  Sure.

21          THE COURT:  -- of Puerto Rico about the loss of

22   education opportunities for the children.  And then also

23   particularly for just the displaced children in the camps

24   having, you know, something to do in this stressful time.  So

25   if there is anything more that you can say in the near term

1  than you have said now, if you can file an informative motion,

2  I would be grateful.

3  　　　　MR. MARINI BIAGGI:  I will.  And AAFAF and the

4  government obviously share the Court's concern and are doing

5  everything they can to remedy the situation.  But I'll provide

6  an update when new information becomes available as to the

7  school systems.

8  　　　　THE COURT:  Thank you.  I'm grateful.

9  　　　　MR. MARINI BIAGGI:  But I'll move on to PREPA, if

10 that's okay.

11 　　　　THE COURT:  Yes.  Oh, do you have anything to say

12 about relief to the people who are in the camps?  Are they

13 getting -- is there some sort of shelter?  Are they getting

14 food and sanitary supplies?  I'd heard in the beginning that

15 there was a real concern about people camping in places that

16 don't have proper sanitary facilities and a risk of disease.

17 　　　　MR. MARINI BIAGGI:  Sure.  I can speak high level,

18 and I'd be happy to provide more detail as well in our

19 reports.

20 　　　　There are camps run by PREPA -- I'm sorry, by FEMA

21 and by the National Guard.  Our understanding is that they are

22 fully serviced.  Supplies are reaching the south.  And I can

23 provide more detail if Your Honor wants, but my understanding

24 is that they are fully serviced either camps provided by FEMA

25 or by the National Guard.  National Guard --

1          THE COURT:  Well, if you could provide any further

2     detail you have in confirmation of this assurance --

3          MR. MARINI BIAGGI:  Sure.

4          THE COURT:  -- I'd be grateful.

5          MR. MARINI BIAGGI:  I will.

6          THE COURT:  Thank you.

7          MR. MARINI BIAGGI:  As to PREPA, the Costa Sur power

8     generation unit suffered damage to its infrastructure and

9     damage assessments are ongoing.  These damage assessments are

10    divided in two tiers.  First, PREPA is assessing visible

11    damages to, for example, tanks, boilers, structures.  A

12    completion of that assessment is due within the next two to

13    three weeks.  Thereafter, PREPA will undertake a further

14    assessment for nonvisible damages to infrastructure to better

15    assess the cost of damages, insurance coverage, claims and

16    determine any need to rebuild.

17         To address the generation affected through the Costa

18    Sur Power Plant, PREPA is drafting an RFP to solicit up to 500

19    megawatts of emergency and new generation to help make up for

20    the approximately 800 million -- megawatts currently lost from

21    Costa Sur.  The current goal is to have an RFP completed and

22    issued during February.

23         As to HTA, as a result of the earthquakes, a few

24    segments of roads have been closed, including a road closing

25    at short segments of two major roads.  The major road segments

1    closed include Highway 52 at kilometer 156 in Ponce, Highway 2

2    at kilometer 218 in Pinuelas, and Highway 2 at kilometer 153.9

3    in Mayaguez, all already reopened.  Emergency repairs to

4    reopen these segments were implemented using the Federal

5    Highway Administration's ER funds, including an initial five

6    million allocation of quick release from these funds.

7            HTA has estimated emergency repair costs of

8    approximately 16.2 million and permanent repairs of 19

9    million.  Of these amounts, about 12 million are estimated to

10   require state funds, mostly for permanent repairs matching and

11   engineering services.  HTA has requested the Commonwealth to

12   assign these funds not covered by the Federal Highway's ER

13   program.  Damage estimates are based on events to date, and as

14   with other areas, they may continue to increase as assessments

15   are done.

16           As to post hurricanes Maria and Irma efforts, since

17   our last presentation, three new developments have occurred.

18   The Oversight Board already addressed two, HUD's requirements

19   to access additional funding and FEMA's flexibility on some

20   areas to request funding for permanent projects.  So I'll

21   focus just on one additional new development.

22           In terms of additional funding since our last report,

23   over 46 million -- 47 million has been obligated for about 145

24   new projects related to the recovery and reconstruction of

25   Puerto Rico.  These funds were obligated between December 10

1   and January 16th of this year.

2          These latest grants are obligated, among other areas,

3   as follows:  About 16.7 for debris and waste removal; about

4   14.3 million for repairs to roads and bridges; about 11.8

5   million for emergency protective measures; about 3.8 million

6   for repairs to parks and recreational facilities; about 1.9

7   million for repairs to public utilities; and about 1.3 million

8   for repairs to public buildings and equipment.

9          Before finishing this report, I would just like to

10  inform the Court that AAFAF, COR3, FEMA and others continue

11  working in conjunction with the Government of Puerto Rico to

12  seek ways to optimize and improve the flow of funds and legal

13  compliance with the Federal Government's requirements.  PREPA,

14  COR3, FEMA and AAFAF generally have weekly meetings attended

15  by representatives of these entities to focus on permanent

16  project formulation and funding, provide status and progress

17  updates, and to deal with and manage the current damages

18  relating to the earthquakes.

19         Unless Your Honor has any other questions, I will

20  supplement the matters that Your Honor asked in writing and

21  answer any questions that Your Honor may have.

22         THE COURT:  Thank you, Mr. Marini.

23         MR. MARINI BIAGGI:  Thank you, Your Honor.

24         THE COURT:  Are there any other comments by way of

25  status reports?

```
 1            (No response.)

 2            THE COURT:  We'll move to the next Agenda item, which

 3   is II, the uncontested matters.

 4            So I gather that the renewed Motion for Undisputed

 5   Payment is not going forward here, because there has been an

 6   order filed on presentment.  And so now we will go to the

 7   Omnibus claim objection items.

 8            MS. STAFFORD:  Good morning again, Your Honor.  Laura

 9   Stafford of Proskauer Rose.

10            THE COURT:  Good morning again.

11            MS. STAFFORD:  I will begin with the 76th Omnibus

12   Objection to Claims.  This objection seeks to disallow proofs

13   of claim that assert, in part, bonds that are duplicative of a

14   master proof of claim and/or amounts for which HTA is not

15   liable because the bonds the claimants purport to hold have

16   already been refunded either through redemption or defeasance.

17            THE COURT:  I need you to talk a little louder and a

18   lot slower.

19            MS. STAFFORD:  Yes.  Thank you.

20            This objection was heard and granted at the last

21   Omnibus hearing as to all but this one claim, which was filed

22   by Cigna Health and Life Insurance Company, and that's claim

23   number 19617.  This claimant had reached out to us and asked

24   for an adjournment in order to have more time to evaluate the

25   objection and determine whether to file a response, which we
```

1    agreed to, which is why it's still on the Agenda.

2            In light of the fact that no objection was received,

3    we would request that the Court grant the 76th Omnibus

4    Objection as to Proof of Claim number 19617 as well.

5            THE COURT:  The Board's request is granted.  The 76th

6    Omnibus Objection is sustained with respect to the Proof of

7    Claim of Cigna Health and Life Insurance Company, which is

8    number 19617, did you say?

9            MS. STAFFORD:  That's correct, Your Honor.

10           THE COURT:  And you'll submit a proposed form of

11   order?

12           MS. STAFFORD:  Correct, Your Honor.

13           THE COURT:  And this relates to docket entry 8961 in

14   case 17-3283?

15           MS. STAFFORD:  That's correct, Your Honor.

16           THE COURT:  Very well.  So now we can move to Agenda

17   Item II.3.

18           MS. STAFFORD:  Correct.  As to the next several

19   uncontested items on the Agenda, which are Omnibus Objections

20   96 through, I believe on the Agenda it's 122 -- there was

21   actually the 123rd Omnibus Objection that was also noticed for

22   hearing today, but it was inadvertently left off of the

23   Agenda.  But as to each of these, 96 through 123, we received

24   a number of responses, each of which were adjourned to the

25   March 4th Omnibus hearing either by Order of the Court or by

1    notices of adjournment filed by the debtors last Wednesday and

2    last Friday.

3         In the intervening period between last Friday and

4    today, we've continued to receive responses on the docket, as

5    well as mailing responses that were sent either to Prime

6    Clerk, to the debtors, or to the UCC.  As we did at the

7    December hearing, we would like to adjourn the hearings as to

8    those claimants who have submitted responses either on the

9    docket or by mailing in the last few days until the March 4th

10   hearing.  And we would request that the Court grant the

11   objections as to those claimants who have not submitted

12   responses for each of these Omnibus Objections.

13        THE COURT:  And so you're cueing up these motions on

14   these Omnibus Objections as uncontested solely to the extent

15   of claimants who have not responded at all, and you will

16   provide proposed orders listing those specific claimants, with

17   the implicit or explicit representation that these were

18   noticed, it's been checked in all the technical respects --

19        MS. STAFFORD:  Yes.

20        THE COURT:  -- and there have not been responses.

21        MS. STAFFORD:  That is correct, Your Honor.

22        THE COURT:  On those terms, the motions are granted

23   as to the Agenda items listed as II.3 to II.28, which covers

24   the 96th through 122nd Omnibus Objections, and the docket

25   numbers are listed in the Agenda.

 1            And then also the 123rd Omnibus Objection, what is

 2   the docket entry number for that, Ms. Stafford?

 3            MS. STAFFORD:  It is 9576.

 4            THE COURT:  And so also as to docket entry 9576, the

 5   123rd Omnibus Objection, and the debtor's directed to submit

 6   proposed orders listing the affected claims.

 7            MS. STAFFORD:  Thank you, Your Honor.

 8            THE COURT:  Thank you.

 9            The next item on the Agenda is the status conference

10   on the Cobra Acquisition Motion for Allowance and Payment of

11   Administrative Expense Claims.

12            MR. VAN DERDYS:  Good morning, Your Honor.  Fernando

13   Van Derdys for Cobra Acquisition.

14            Your Honor, in this matter, Mr. Thomas McLish,

15   co-counsel from Akin Gump, was going to address the Court

16   through teleconference means.

17            THE COURT:  So Mr. McLish has requested to address by

18   telephone?

19            MR. VAN DERDYS:  Yes.  Yes, Your Honor, by motion.

20            THE COURT:  Oh, he's in New York.

21            MR. VAN DERDYS:  Okay.  He's in New York.  Right.

22            THE COURT:  Thank you.

23            MR. VAN DERDYS:  We're ready to answer any question

24   the Court may have.

25            THE COURT:  All right.  So should I -- Mr. McLish

1 ‖ will make a presentation and answer questions?

2 ‖         MR. VAN DERDYS:  Yes, Your Honor.

3 ‖         THE COURT:  Thank you very much.

4 ‖         Mr. McLish, good morning.

5 ‖         MR. MCLISH:  Good morning, Your Honor.  Tom McLish

6 ‖ from Akin Gump Strauss Hauer & Feld on behalf of Cobra

7 ‖ Acquisitions, LLC.  I'm happy to answer the Court's questions.

8 ‖         Cobra's position, as we set forth in the filing that

9 ‖ the parties made jointly pursuant to Your Honor's Order, is

10 ‖ that it is not in the interests of justice to continue the

11 ‖ stay of Cobra's claims in excess of 200 million dollars.

12 ‖ Cobra's entitled to be paid contractually for that money, and

13 ‖ it is prejudiced by having to wait further.

14 ‖         Regardless of the parties' differing views of the

15 ‖ criminal proceeding and the FEMA analysis that is under way,

16 ‖ we believe it's quite clear that significant progress could

17 ‖ be made on discovery and otherwise toward resolution of

18 ‖ Cobra's administrative claims while those matters proceed.

19 ‖ We believe that neither the criminal proceeding nor the FEMA

20 ‖ analysis are likely to have any significant or possibly any

21 ‖ effect at all on Cobra's claims, but even if you agree with

22 ‖ the -- with PREPA and the government parties that there is a

23 ‖ possibility that those items may eventually have some impact

24 ‖ on Cobra's claims, that doesn't justify staying the claims

25 ‖ indefinitely.  We should proceed now, make as much progress as

1  we can.

2        The Court does not have to decide now whether final

3  resolution of Cobra's claims must await the final outcome of

4  the criminal proceeding or the FEMA analysis.  The goal should

5  be -- in our view, respectfully, Your Honor, is to get our

6  claims as fully litigated and resolved as possible so that

7  when a plan is approved, we're not starting from scratch.

8  It's -- the payment can be made and Cobra can begin to be made

9  whole.

10        I would point out that the parties listed various

11  factual issues that they think require discovery in their

12  joint filing.  You can read those and see that they do not

13  overlap in any significant way with any of the issues that are

14  part of the criminal proceeding.  All those issues that the

15  parties have listed are things that can be addressed without

16  interfering with the criminal case and in no sense need to

17  await the outcome of the criminal case before the parties

18  should address them.

19        The suggestion has been made that perhaps witnesses

20  will want to take the Fifth Amendment as a result of ongoing

21  criminal proceedings, but we submit that that's conjecture.

22  There's no actual evidence to believe that that's going to be

23  the case.

24        Similarly, with the FEMA analysis that's going on,

25  that is not going to resolve any of the issues that the

1    parties have listed as needed discovery.  And the conduct of

2    discovery into those issues is not going to interfere with the

3    FEMA analysis.  Again, the FEMA analysis, just like the

4    indictment issue, is just something that PREPA is speculating

5    may give them some new arguments as to why Cobra shouldn't be

6    paid in full for the work that it indisputably completed to

7    restore Puerto Rico's electrical grid.

8           So in our view, Your Honor, it is not only not in the

9    interest of justice to continue the stay, it is manifestly

10   unjust to do so in this situation where a company the size of

11   Cobra is out in excess of 200 million dollars.  And much of

12   that money, Your Honor, is disputed, by which I mean -- and

13   I'll give an example.

14          One of the issues in the -- that PREPA has raised is

15   over the head count.  So when Cobra would submit an invoice,

16   say for -- hypothetically speaking here, for 50 workers on a

17   given day, they worked on the lines and submitted an invoice

18   to be paid for those 50 people.  If there was some piece of

19   paper in the file, in PREPA'S file, or someone reported there

20   were 49 people, 49 Cobra workers on site that day, then PREPA

21   would reject the entire invoice.

22          So in those instances, Cobra has been paid nothing,

23   even though, in that example, it's agreed that Cobra had at

24   least 49 workers on site that day.  Cobra paid those people,

25   is out that money, but has been paid zero because there's a

1  dispute over one or two or however many employees were in

2  dispute.

3        So the -- vast sums are owed to Cobra, and Cobra's

4  entitled to be paid and is prejudiced by not being paid.  And

5  it's, respectfully, not in the interest of justice to continue

6  delay towards resolution of those issues.  I'm happy to answer

7  any of Your Honor's questions.

8        THE COURT:  Thank you.  I do have a primary question

9  here, which is, as I read PREPA's part of the submission,

10 PREPA is contending that an adverse outcome on the criminal

11 case, or rejection of bills by FEMA, would eliminate liability

12 for some significant portion, if not all of the outstanding

13 liability.  Are you questioning PREPA's risk assessment as to

14 the likelihood of an adverse outcome, or do you read the

15 contractual documents differently from PREPA?

16       MR. MCLISH:  Both, I believe, Your Honor.  We do read

17 the contractual documents differently.  The contractual

18 documents are quite clear that PREPA owes COBRA the money,

19 regardless of whether it is paid by FEMA -- whether PREPA is

20 reimbursed by FEMA, unless there's something that Cobra did

21 that prevented FEMA from reimbursing PREPA.

22       But here, we don't think there is any such thing, and

23 PREPA hasn't raised anything that would qualify for that.  But

24 we also believe that there is no reason to think that the

25 criminal case could result in an outcome based on what's been

1   alleged in the indictment where PREPA would be absolved of

2   paying COBRA for any of the work that it's done.

3          We think the only real issue is how much is Cobra

4   entitled to be paid, and it's certainly in the neighborhood of

5   200 million dollars, if not more.

6          THE COURT:  Thank you.  I will hear from PREPA at

7   this point.

8          MR. MCLISH:  Thank you, Your Honor.

9          MR. VAN DERDYS:  Thank you.

10         MR. DAVIS:  Good morning, Your Honor.  Joseph Davis

11  of Greenberg Traurig on behalf of PREPA.

12         THE COURT:  Good morning.

13         MR. DAVIS:  It is a pleasure to be back in your

14  courtroom.  I have been nominated by the government parties to

15  speak this morning.  Assisting me will be Attorney Hadassa

16  Waxman from Proskauer, to the extent the Court has questions

17  about the pending criminal proceedings and how that might have

18  some impact on some of the issues here.  Ms. Waxman is in New

19  York, and her smiling face at some point will probably appear

20  on the screen.

21         Your Honor, I'd like to address this in several

22  parts, and actually, I'd like to start with the question you

23  raised.  Cobra has been paid in excess of a billion dollars,

24  so this is not a contractor who's gone without payment.  It

25  has actually been paid in large part.

50

1         The pending criminal proceedings, as Your Honor is

2    well aware, could have a material impact on the enforceability

3    and the voidability of, in particular, the fourth and fifth

4    amendments to the first Cobra contract and the entire second

5    contract.  The reason for that is there are not, surprisingly,

6    certifications mandated under law signed by Cobra certifying

7    that there was no illegal criminal activity in connection with

8    obtaining a public contract.

9         So if, in fact, a guilty verdict were to be rendered

10   against, in particular, Mr. Ellison, the former chief

11   executive officer of Cobra during the time period in question,

12   there is a distinct issue of this coming back to you as to

13   whether the impact of that creates a voidable or void

14   contractual amendment.  These amendments are approximately,

15   what, 900 million dollars -- well, excuse me, that -- 745

16   million dollars are the two contract amendments at issue under

17   the first contract, and then the entire second contract would

18   also be deemed void, which is where many of the disputed

19   issues arise.

20        So the criminal proceedings are anything but

21   extraneous or irrelevant.  And frankly, I've never seen a

22   situation like this before, but like much of what goes on in

23   these restructuring proceedings, we're tackling issues we've

24   never seen before.

25        All of us have had cases where an issue has popped up

1    or a certain party may have a related criminal proceeding

2    pending.  I've never seen it before where the plaintiff is the

3    party who has this issue, and now we're going to have to deal

4    with the discovery and legal consequences of that in the event

5    that it should not go well for the plaintiff.

6          That gets to my second point.  This is being posited

7    to you as if it were a complaint.  Everything we're talking

8    about is in complaint speak.  Even the proposed schedules that

9    have been attached to the status report, Cobra's makes

10   reference to the government parties, PREPA, within 24 hours

11   serving an answer.

12         Typically an answer requires a complaint.  And a

13   complaint is required under Rule 7001 of the Bankruptcy Code,

14   which is applicable here, in the event that the party is

15   seeking to recover money or property of the debtor, or to

16   obtain an injunction or other equitable relief, or to obtain a

17   declaratory judgment relating to the above.

18         Now, I confess we have not put this in our papers up

19   until now because I think all the parties are trying to come

20   to grips with what this motion is, but I would put it to the

21   Court that this motion is seeking property of the debtor to

22   repay alleged obligations by way of injunctive relief, which

23   is to say to force PREPA to make payment now in the absence of

24   any statutory authority otherwise, which is the classic

25   definition of equitable relief.  And of course, it's seeking

1   declaratory relief that some of these contracts are not void

2   and that PREPA is obligated to make payment immediately.

3        While I certainly understand Cobra's concerns about

4   getting paid soon for the stated reasons that they have put in

5   the status report, it doesn't change the fact that under the

6   law, they don't get paid until exit.  And they have to

7   demonstrate that they're deserving of payment in the first

8   place, that payment is obligated.

9        As we put forth in the status report, this is not a

10   matter that can be dealt with on the papers in the absence of

11   significant discovery and significant factual testimony.  Any

12   time you're dealing with a dispute over hundreds of invoices,

13   by definition, you're now digging into the facts.  Your hands

14   are going to get dirty to dig through all of those details.

15       There are head count issues that amount to over 80

16   million dollars.  And it's not as simple as some sort of a

17   supporting declaration being sent to the Court saying, well,

18   there's substantial compliance in the following 22 invoices

19   and there's partial compliance under these ones.  It's not

20   going to work that way.

21       People are going to have to testify as to what

22   happened, what the bonafides are of an invoice for which

23   payment is seeking, whether appropriate support is there for

24   payment, and whether PREPA is justified in not paying, or that

25   PREPA is obligated to pay.  This is a detailed analysis and

1    one that is --

2             THE COURT:  So are you --

3             MR. DAVIS:  -- going to put a burden on the parties,

4    in particular PREPA right now, to even address these issues

5    when it's not ripe for adjudication.

6             And I'm sorry.  I don't mean to cut you off.

7             THE COURT:  Just going to that detailed point for a

8    minute, it's your representation that under these contracts,

9    if, as Mr. McLish represents, it's undisputed there were 49

10   people there, they're not entitled to 49, 50 -- 98 percent of

11   the money, with only the other two percent being in play?

12            Your representation would be that if the count is

13   allegedly off by one, you don't have to pay anything until

14   there is a granular examination of how many people were

15   actually on site?

16            MR. DAVIS:  Your Honor, I think that a granular head

17   count examination is going to be necessary for the

18   overwhelming majority of these invoices.  The way these

19   contracts are set up is there's a per diem, if you will, on

20   the cost of every worker who is alleged to have performed

21   certain duties on a given date.  An analysis of the invoices

22   is the first step in figuring out how many people were

23   supposed to be there.  Then you go to the inspection reports

24   to find out whether it has been certified that those people

25   were, in fact, there.

1          So if we're talking about the difference, this ends

2    up being a fight over -- his example was 49 people were

3    certified to have been there or confirmed to have been there

4    and the invoice said 51 or 52.  I can't imagine we're going to

5    be burdening the Court for a long period of time --

6          THE COURT:  I sure hope not.

7          MR. DAVIS:  -- but my concern is the ones where

8    you're going to see the opposite, where it says 62 people

9    showed up and they only confirmed eight, or where an invoice

10   for work performed on one line is identical to an invoice that

11   was submitted for, performed on a different line.

12         THE COURT:  Okay.

13         MR. DAVIS:  That's the stuff I'm worried about,

14   because I think that's going to be the meat of it.  And this

15   is just one of the subject areas.  If this were the only one,

16   that would be one thing.  I mean, this is only one of the

17   discrepancies, if you will.  We gave you the laundry list

18   of --

19         THE COURT:  Yes.

20         MR. DAVIS:  -- issues.  I could repeat them, but I'm

21   not sure --

22         THE COURT:  You don't need to.

23         MR. DAVIS:  -- it's worthwhile right now.

24         THE COURT:  In the interest of time, let me ask you a

25   couple of direct questions here.

 1              MR. DAVIS:  Certainly.

 2              THE COURT:  First, you gave us an overview of your

 3     theory on the potential impact of a conviction in the criminal

 4     case --

 5              MR. DAVIS:  Yes, Your Honor.

 6              THE COURT:  -- on the representation that's in the

 7     contract and liability under the contract.  Is it your

 8     interpretation of the FEMA arrangements that if FEMA declines

 9     to pay something, then PREPA has no obligation to pay it?

10              MR. DAVIS:  I think we need to see the basis of

11     FEMA's determination before I can report that to you.  There

12     is a difference between what is FEMA compliant, if you will,

13     and susceptible to reimbursement by FEMA and what a contract

14     would say -- what a contract would obligate.

15              THE COURT:  So it could be --

16              MR. DAVIS:  I acknowledge that.  It could be that

17     there is a delta problem, if you want to think of it that way,

18     between what FEMA would pay and what PREPA may be obligated to

19     pay.  This is one of the reasons why, under the law, payment

20     isn't due until exit, because if it turns out PREPA has to go

21     forth and raise enough money to pay off administrative

22     obligations that are different from what the expectation was

23     from FEMA, the parties need time to prepare that.

24              But there is, however, in the contract a provision

25     that says if the failure of FEMA to obligate certain funds is

1    the sole responsibility of Cobra, then PREPA does not have to

2    pay.  So that's why I say you have to see what FEMA says

3    before we can get to the level of detail that Your Honor is

4    looking for, which is whether PREPA automatically has a

5    financial obligation to pay under its contracts if FEMA is not

6    reimbursing for certain proceeds.

7         THE COURT:  Okay.  So it's not a zero sum issue as to

8    any refusal by FEMA means PREPA is off the hook.  It's

9    factually sensitive and sensitive to contract language?

10        MR. DAVIS:  Yes, Your Honor.

11        THE COURT:  So it's a possibility that has a range?

12        MR. DAVIS:  Yes, Your Honor.  And FEMA has been

13   undergoing this analysis since roughly September, August,

14   probably August, and it's due May 29.

15        THE COURT:  And as to Mr. McLish's or Cobra's concern

16   that we could get to a point where a PREPA plan is being

17   confirmed and all of the Cobra issues are still in play, am I

18   correct in understanding that in order to get confirmed, PREPA

19   would have to be paying or otherwise satisfactorily providing

20   for the contingency of having to pay these outstanding

21   disputed amounts to Cobra to be able to get confirmed?

22        I realize that's a very sort of high level conceptual

23   summary, but --

24        MR. DAVIS:  It --

25        THE COURT:  -- is there a scenario where you can get

1    confirmed and not have anything aside to pay these disputed --

2           MR. DAVIS:  Your Honor, I need to defer to

3    Mr. Bienenstock on that one, because that's a plan of

4    arrangement issue and not a Cobra, if you will, issue.

5           THE COURT:  Mr. Bienenstock, what kind of assurance

6    can you give Mr. McLish that you're not going to take all the

7    money away and leave his contested claim unaddressed?

8           MR. BIENENSTOCK:  Your Honor, pursuant to Title III,

9    which incorporates 1129 of the Bankruptcy Code, a plan can't

10   be confirmed unless, among other things, all administrative --

11   all allowable administrative expenses are paid in full in

12   cash, and usually it's either on the effective date or on

13   the -- so many days after the claim is finally allowed and

14   there is no further appeal necessary.

15          So as a matter of the confirmation statute and

16   jurisprudence, we would have to show the Court that it's

17   feasible that if and when Cobra's claim is allowed in the

18   amount they say it will be allowed, that we would be able to

19   pay it in cash, in full, under the terms of the plan.  We

20   would not have to show, for instance, that we have the money

21   sitting there in some sort of escrow account, but we'd have

22   to show Your Honor that it's feasible, which is basically

23   commercially reasonable, that if and when their claim is

24   allowed, we would be able to pay it in full, as we pay our

25   other expenses and obligations under the Plan.

1          THE COURT:  Thank you.

2          MR. BIENENSTOCK:   Yes.

3          THE COURT:  All right.  So if you want to sum up,

4  I'll hear anything further briefly that Mr. McLish wants to

5  say.  And then I think I know what I want to do.

6          MR. DAVIS:  Okay.  Quickly, Your Honor, as we have

7  put forth in the status report, it would be the position of

8  the government parties, particularly PREPA, that this be

9  delayed at least until the June Omnibus, at which point we

10  will know what FEMA has done with the FEMA analysis.

11          There's a higher likelihood that there may be some

12  determination, verdict in the criminal matter.  And the

13  parties will be in a better position to understand what the

14  plan process is going to be given the discussion we had

15  earlier today and how the true timing is for purposes of

16  getting PREPA out of the Title III proceedings.

17          THE COURT:  Thank you.

18          MR. DAVIS:  Thank you.

19          THE COURT:  Mr. McLish, did you wish to say anything

20  further?

21          I think we need to turn a microphone on in New York.

22  Would you say testing, testing?

23          MR. MCLISH:  Testing, testing.

24          THE COURT:  Okay.  You're on.

25          MR. MCLISH:  Okay.  Sorry about that.  Yes, Your

1    Honor.  Thank you.

2         On that last point, I -- FEMA estimated that it would

3    complete its analysis that it was directed to do by the OIG by

4    the end of May.  There's no reason to think that -- well, I

5    guess they predicted that, but it's easily conceivable that

6    they will miss that day.  Obviously FEMA has tons of things

7    going on, including lately in Puerto Rico.

8         So there is no hard deadline for FEMA's analysis, and

9    Cobra has no ability to control or influence when that

10   happens.  FEMA's not a party here.  So we don't think it makes

11   any sense to just stay things indefinitely waiting for FEMA to

12   do something that it may or may not do.

13        Same thing with the indictment.  It's important to

14   remember that Cobra is not indicted.  Cobra has not been

15   charged with anything.  Cobra is not a party to the criminal

16   proceeding in any way and has no control over or influence on

17   when the criminal proceeding might get resolved or how it

18   might get resolved.  So it's manifestly unfair, in our

19   opinion, to allow this case to stagnate while things that we

20   have no control over go on potentially indefinitely.

21        With respect to the argument about whether a criminal

22   conviction could result in Cobra not being entitled to any

23   money, as we've explained in our papers, the contracts address

24   when rescission is appropriate in a criminal context.  The

25   first contract says that rescission -- PREPA can rescind the

1  contract if Cobra is convicted of one of a list of enumerated

2  crimes. Well, Cobra hasn't been charged with any, so that's

3  not a possibility.

4        Under the second contract, the similar clause doesn't

5  call for rescission at all in the event of criminality.  So we

6  think the contract makes clear that Cobra is entitled to

7  payment.

8        One other point I wanted to address.  There was a

9  discussion about, well, we have to dig through all these

10  issues on head count, et cetera, and dig down into the facts

11  about every invoice, but the contracts unsurprisingly say what

12  Cobra has to do to get paid.  And it has to prepare an

13  invoice.  It has to submit the invoice.  It has to submit a

14  certification with that invoice.  It has prescribed language

15  that says this is what we're owed.  The contract says, unless

16  there are specific reasons, PREPA has to pay that invoice.

17        Now, if PREPA wants to now come and say, well, we

18  don't believe your certification anymore, or we think you

19  submitted a certification that was wrong, or your invoice was

20  wrong, they can make that as an affirmative claim and ask for

21  the money back.  But under the contract, Cobra is entitled to

22  be paid.

23        Bottom line though, Your Honor, is to the extent

24  there are these disputes, let's start resolving them.  Let's

25  get going on it.  As was said, the plan, the ultimate

1  reorganization plan can't be approved until this claim is

2  resolved.  So why are we waiting?  Let's get started.  Let's

3  do it.

4          If aspects of the criminal proceeding become

5  problematic, we can come to the Court.  If the prosecutors,

6  which they haven't yet, if the prosecutors have a problem with

7  the parties conducting discovery into these areas, I am sure

8  they'll inform the Court.  But there's simply no reason to

9  continue to delay at this time.

10         Thank you, Your Honor.

11         THE COURT:  Thank you.  Thank you both.

12         Given that there is at least one conference and

13  further developments in the criminal case to be expected in

14  the near term, and there is a target date for a report from

15  FEMA, and in light of what appear to be very substantial

16  transaction costs to discovery in preparation for resolution

17  of the factual disputes that might or might not be mitigated

18  by results in the criminal case and the FEMA review, the

19  current stay on this administrative expense claim is

20  continued.

21         And I will put this on for a further status report at

22  the June Omni, and require the parties to submit a joint

23  status report in writing a week before the June Omni, and

24  we'll see whether either of those other matters is moot and

25  whether the parties have either gotten any closer together or

1    made clear their positions as to the extent to which FEMA

2    decisions and results in the criminal case could affect the

3    obligation of PREPA to pay the outstanding Cobra invoices.

4    Thank you.

5         So that takes care of Agenda Item III.1.  And the

6    next Agenda item is the amended motion regarding alternative

7    dispute resolution procedures.  And I am inviting Judge Dein

8    to join me on the bench for that.  And this relates to docket

9    entry 9718.

10        Good morning again, Ms. Stafford.

11        MS. STAFFORD:  Good morning again, Your Honor.  Laura

12   Stafford of Proskauer Rose for the Financial Oversight and

13   Management Board.

14        I'd like to initially reserve a couple of minutes for

15   rebuttal after we hear from the objectors later.

16        THE COURT:  Thank you.

17        MS. STAFFORD:  So over the past several months, the

18   debtors have engaged in productive conversations regarding

19   these alternative dispute resolution procedures with a number

20   of parties, including AAFAF; the UCC; Mr. Mudd, who is counsel

21   for Salud Integral en la Montana, one of the objectors here;

22   as well as the Administrative Office of the Courts.

23        Those conversations yielded the ADR framework we

24   proposed in this motion where, first, debtors and claimants

25   exchange offers to settle.  Second, the parties participate in

1    evaluative mediation.  And if neither of these processes

2    result in any resolution of claims, claimants have three

3    options where they may either liquidate their claim before the

4    Commonwealth courts; proceed before the Title III Court; or

5    upon their consent, liquidate claims using binding

6    arbitration.

7          The proposed procedures incorporate not only the

8    invaluable input we've received from AAFAF and the

9    Administrative Office of the U.S. Courts, but also elements

10   requested by both the UCC and SIM, the only two objectors to

11   the motion.

12         The UCC has long advocated the use of binding

13   arbitration to resolve unsecured claims, much like the ADR

14   procedure that was utilized in Detroit.  The debtors' proposed

15   ADR procedure incorporated that suggestion by including

16   binding arbitration, which offers an efficient and practical

17   means for resolving general unsecured claims.  The proposed

18   ADR procedures also reflect Mr. Mudd's suggestion that

19   Commonwealth judges assist in the resolution of these claims

20   in that they encourage the use of the Commonwealth court

21   system to liquidate unsecured claims.

22         We view that approach as particularly appropriate

23   here, in light of the fact that the vast majority of the

24   claims that may be referred to ADR arise out of litigations in

25   Commonwealth courts.  And we think the Commonwealth courts

1   are, of course, uniquely suited to resolving the issues that

2   those claims might raise.

3        Before filing this motion, as I noted, we had a

4   number of comments and edits to our proposal from the UCC, and

5   we accepted the bulk of those suggestions which are reflected

6   in the proposed procedures before the Court.  Notwithstanding

7   these efforts and the fact that both of the objecting parties

8   are broadly supportive of the ADR motion, we do have a few

9   limited objections that remain before the Court today.

10       There's three primary issues that are raised, and the

11  first of those relates to the selection of claims to be

12  included in the ADR process.  We understand that the UCC wants

13  as many claimants as possible to have the opportunity to

14  consider a settlement offer from the debtor, and accordingly,

15  they've suggested that any claimant be permitted to seek to

16  participate in the first two phases of the procedure, which is

17  the offer exchange and the evaluative mediation.

18       We understand the UCC wants this and we think it's a

19  very laudable goal, but we think it's simply impractical.

20  This process was designed for an expected volume of 10 to

21  15,000 claims.  To make it available to virtually the entire

22  claims registry, which consisted of well over a hundred

23  thousand claims, would impose significant burdens on the

24  debtors and on the Court, which, under the procedures, would

25  select the mediators who would participate in that process.

1          More importantly, we don't think there is any real

2    benefit to the changes that the UCC proposes because the

3    debtors are always happy to engage in settlement discussions

4    with willing claimants, but we think those discussions are

5    more appropriately handled in the context of ordinary claims

6    reconciliation processes.  And there's no need for them to be

7    involved in the formal ADR process in order to have those

8    conversations.

9          The second objection -- the second major issue that

10   the objections raise related to the evaluative mediation

11   procedures.  First, the same request, that Commonwealth court

12   judges be utilized as mediators.  The debtors very much

13   appreciate both the generous offer of the Commonwealth court

14   judges to serve in that role and Mr. Mudd's efforts to secure

15   mediators.

16         However, as noted earlier, the procedures already

17   are making ample use of the Commonwealth court's resources,

18   and its expertise, by providing an avenue for claimants to

19   resolve and liquidate their claims before those Commonwealth

20   courts.  And we think it's most appropriate for the Court, in

21   its discretion, to select the mediators who will resolve these

22   claims as the proposed procedures currently provide.

23         We would note that the UCC also requests that

24   evaluative mediation procedures be modified to provide that

25   the parties submit mediation statements, and we think that

1    prescription will prove to be unnecessary because of the

2    amount of information that we anticipate will be exchanged

3    during the offer and exchange process.

4         We anticipate that all the information that would be

5    needed to evaluate a claim would be exchanged during that

6    process.  And we think that in light of that, requiring the

7    parties to additionally provide mediation statements is likely

8    to be burdensome without a real additional benefit.

9         THE COURT:  May I just say something about that?

10        MS. STAFFORD:  Yes.

11        THE COURT:  And in the interest of efficiency, I know

12   I tend to front issues --

13        MS. STAFFORD:  Yes.

14        THE COURT:  -- and my intentions.  Judge Dein and I

15   both feel that having a mediation statement from each side of

16   no more than, I think we're targeting it at seven pages,

17   double spaced, will be very helpful to the mediator, because

18   otherwise the mediator is going to have to marshal and find a

19   road map through correspondence and submissions.

20        And so for each side to be able to bottom line its

21   view of the issues, and if it's a confidential mediation

22   statement, its parameters is something that can help make the

23   evaluator's work much more efficient.  So frankly, it's my

24   intention to add that to the process.

25        MS. STAFFORD:  Understood, Your Honor.  And we

1    appreciate that.  If it's helpful, then we're happy to include

2    it.

3         THE COURT:  Thank you.

4         MS. STAFFORD:  The last set of objections are related

5    to binding arbitration.  The first of those objections relates

6    to the requirement that claimants who elect to participate in

7    binding arbitration pay 50 percent of the cost for that

8    arbitration.

9         It's our strong view that modification of this

10   provision is not warranted for at least two reasons.  Most

11   importantly, no claimant is obligated to participate in

12   binding arbitration.  It's entirely optional.

13        If they do not wish to or cannot afford to pay for

14   binding arbitration at the rates that will be determined once

15   we have selected an ADR provider, they have two other paths

16   available for them to resolve their claim, either at the

17   Commonwealth courts or before the Title III Court.  And in

18   each instance, they would be expected to shoulder the burden

19   of their own expenses to present their case in those two

20   forums.  Claimants' due process rights are, therefore, not

21   impacted by the requirement of cost sharing.

22        Requiring parties to share in the cost of binding

23   arbitration is also consistent with procedures that have been

24   followed by other large municipal debtors, including the City

25   of Detroit, and there's no reason to treat the debtors here

1  any differently by asking them to shoulder more of the cost

2  than was asked of other municipal debtors.

3  And given the sheer volume of claims that have been

4  filed against the debtors, and the number that may ultimately

5  proceed through arbitration, forcing them to shoulder either

6  the entire burden or even a significant share of the burden

7  could render the cost of arbitration prohibitively expensive

8  for the debtors.

9  The remaining two objections that the UCC raised are

10  with respect to binding arbitration, are both easily disposed

11  of.  The first, because it's facially improper.  The UCC is

12  asking the Court to provide that -- the Court to Order the

13  debtors to participate in binding arbitration, even when they

14  have expressly refused to consent to same.  And that

15  modification would violate due process, and we think it should

16  be rejected.

17  And the third objection related to consultation

18  rights regarding the selection of an ADR provider, which we've

19  already included in our revised proposed procedures.  So we

20  don't think there is any further dispute between the parties

21  on that.  Unless the Court has any questions --

22  THE COURT:  Just one moment.  This is fronting an

23  administrative concern that we have.

24  Your Section One in the procedures, when it speaks of

25  transferring claims in, is unclear to us as to whether you

1    just plan to file, say, a hundred ADR notices with your

2    initial offer in them on the docket and walk away from that,

3    and later give some status reports that may or may not map

4    back to that, or whether at the time you are initiating this,

5    you will file a notice saying you are initiating this with a

6    table that marshals core information about the claimants.

7         You can probably guess from my tone of voice which

8    one I would prefer.  And we have some thoughts about data

9    points that we'd like included in that table because, of

10   course, once they get to the evaluative mediation, we're going

11   to need to be able to track.  And we also want to have the

12   ability to see what's in the pipeline and see what trends are

13   as the status reports come in as to the things that are being

14   resolved and not.

15        MS. STAFFORD:  Completely understood.  And happily,

16   the second option was the one we had in mind, and it sounds

17   like that's the one that the Court would like.

18        So we had in mind to provide a notice on the docket

19   that was a table of claims that we intend to send in to the

20   ADR procedures.  We're happy to take any instruction from the

21   Court as to what should be included in that notice.

22        And then the notice that we will send to claimants is

23   the one that was attached to the motion, and that would

24   include the specifics of the offer that was being made to

25   them.

1          THE COURT:  Very good.  And can I also assume that

2     you don't intend to take things that are currently in claim

3     objection response mode and put them into the ADR process

4     before this hundred day initial period?

5          We are counting on some time to be able to build our

6     machine and develop operational principles and staff it before

7     things start coming through the pipeline.  So will the hundred

8     day mark be the mark for the first time anything is designated

9     to go into --

10         MS. STAFFORD:  We're happy to proceed that way.  And

11    we do have a handful of claims that we've identified as

12    potentially suitable for these procedures that came up in the

13    December and the January Omnibus Objections, but we're happy

14    to adjourn their hearings for a sufficient period of time so

15    that we're able to meet the 100-day requirement and not

16    overburden the Court by sending things in before things are

17    ready, if that makes sense.

18         THE COURT:  That would be helpful to us.

19         MS. STAFFORD:  That's great.

20         THE COURT:  And as to the number of 10 to 15,000, are

21    these claims that have already been filtered through Omnibus

22    objections, or do you expect to try to filter them out further

23    through Omnibus objections before cueing them up for ADR, or

24    are these -- is this a hard number that you expect to take

25    into ADR?

1          MS. STAFFORD:  I think that is a hard number that we

2     expect to take into ADR.  Those are, for the most part, ones

3     that have not been Omnibus objections and instead have

4     provided enough information to suggest that they are suitable

5     for these procedures at this moment.

6          THE COURT:  And as you can imagine, we keep trying to

7     figure out what's going to come in.  So we ask you questions

8     and you say "I don't know yet", and so --

9          MS. STAFFORD:  Right.

10         THE COURT:  But here's another question, trying to

11    get a hint here:  Are you selecting these things, these

12    claims, having in mind that the plan that has been proposed

13    now -- and typically a plan would have a convenience class, so

14    that we might be able to expect that claims that would fall

15    into a convenience class would not be the sort that would be

16    coming through this process?

17         MS. STAFFORD:  We've had conversations about whether

18    it makes -- whether that convenience class may affect the body

19    of claims -- the convenience class in the currently proposed

20    plan may affect the body of claims that would go into ADR, but

21    I don't think we have clarity on that yet.

22         THE COURT:  Thank you for your candor about the lack

23    of clarity on that at this point.

24         Also, on the initial offer and counter offer in the

25    first phase of it, you have deadlines for the first exchange,

1    but after that, no particular deadlines.  And so we were

2    wondering whether it would be helpful to you and to the

3    claimants to have some more deadlines built in so that people

4    are not waiting forever to hear.

5           MS. STAFFORD:  Understood.  And I think that does

6    make sense.  I may want to confer with our other claims

7    reconciliation -- or other folks involved in claims

8    reconciliation to figure out what exactly those should be, but

9    I think it makes sense to include something like that.

10          THE COURT:  And I'll come back to this when I have

11   heard everybody and give you my editorial shopping list, but

12   as a head's up, I think there's also missing from our

13   operational perspective some clear marker for the termination

14   of the offer exchange procedure and initiation of the

15   evaluation phase.  And so you might want to think about some

16   certification that gives us a clue that it's about to come

17   across our doorstep.

18          MS. STAFFORD:  We would be happy to make sure that we

19   have some notice to make sure that you are ready for them when

20   they come in.

21          THE COURT:  Okay.  Great.  That is it for my

22   questions at this point.

23          Oh, I'm sorry.  One more.  The current procedures

24   seem to indicate that if a claimant -- say that a claimant is

25   only supposed to pick Commonwealth adjudication or

1  arbitration, if they're not opting to go to Title III

2  litigation, but if they happen to tick off both boxes, the

3  default result will be going into arbitration, which is the

4  higher up-front cost option.

5       And so, one, is that really what you intend, and can

6  you give me a little insight as to why?  And two, if it is

7  what you intend, the paperwork will need to be really clear to

8  the claimants that that will happen.

9       MS. STAFFORD:  That was our intention, to have

10  claimants be automatically shunted into binding arbitration,

11  to the extent they had selected that they were -- selected

12  both, because we believed that we had an indication that they

13  had, in fact, consented to binding arbitration.

14       If the Court would prefer that the default go the

15  other way, I don't think we have a strong view on that.

16       THE COURT:  Well, my preference is that there be

17  clarity.  And to the extent it would be useful to you all to

18  rethink what that looks like, I invite you to do that.  But it

19  should be clear that, to somebody who checks both boxes, that

20  the next voice they hear will be from the arbitration process

21  and it will have a bill for half the invoice with it.

22       MS. STAFFORD:  Okay.  Understood, Your Honor.

23       THE COURT:  Okay.  Thank you.

24       MS. STAFFORD:  Thank you.

25       THE COURT:  Who's next?

1              Mr. Despins.  I'm sorry.  You didn't have any more --

2              MR. DESPINS:  I can see Mr. Mudd is hiding in the

3     back of the courtroom.

4              THE COURT:  He's not hiding.  He's waiting from the

5     back row, but he's graciously letting you go first.

6              MR. DESPINS:  Yes. I appreciate that very much, Your

7     Honor.  For the record, Luc Despins with Paul Hastings for the

8     Committee.

9              Very briefly, because I know you've read the

10    objections, these are proposed improvements.  And the first

11    one is allowing more people into this exchange of information,

12    evaluation process.  We set -- we knew that there would be a

13    flood gate argument there, so we said, as a fallback, could we

14    at least provide that the people who have litigation pending

15    are automatically allowed to participate in just that aspect

16    of the ADR?

17             And the reason we're raising these issues, Your

18    Honor, is we're not riding on a clean slate here.  There has

19    been a history of delayed payment and delayed determination of

20    claims.  We know -- I know personally of stories involving

21    more than ten years of such, you know, horror stories.  And,

22    therefore, this is not the run-of-the-mill case.

23             And I think that this type of thing, this type of

24    suggestion allows people to feel that they will be included in

25    the process, even though there are no guarantees they will be

1    successful.  So that's our proposed improvement number one,

2    which is fine.  If we can't have everyone, because we don't

3    want -- I understand the point, we don't want the trillion

4    dollar claim to go into that kind of process.  I will use that

5    as an example.  Or claims that have really no basis

6    whatsoever.

7         But the people who have litigation claims already

8    pending, it doesn't mean that they are necessarily

9    meritorious, but they have invested enough to start that, or

10   to have that.  So, therefore, we would say that there should

11   be that small modification.

12        The next one on arbitration, I want to be clear, we

13   are not asking for the Court today to put a provision in

14   saying that anyone who raises their hand will get arbitration.

15   We want Your Honor to have the discretion to entertain such

16   request in the future, both as to cost and as to arbitration,

17   if -- in your discretion.

18        So I don't see how that could be wrong, because there

19   may be cases where you look at this and say, my God, these

20   people are entitled, or it may be one claimant, it may be ten

21   claimants, you may not grant that request at all, ever.  But

22   why close that door today?  Because there may be compelling

23   circumstances where you believe the arbitration is -- is

24   appropriate under the circumstance of that claimant.

25        Now --

1          THE COURT:  Under PROMESA, how would I have the power

2     to make a debtor pay a penny more than the debtor declares

3     itself willing to pay toward arbitration, or force the debtor

4     to arbitrate?

5          MR. DESPINS:  That's called the power of the pen,

6     meaning that you have the ability to say you want this type of

7     procedure, I've considered all this, and I will condition my

8     approval on you agreeing to those provisions.  And again, I

9     want to be very clear, you would not be declaring today that

10    everyone gets in, but you reserve the discretion to order

11    that.

12         And again, we believe that that may be very useful.

13    And it's hard to discuss this in the abstract, because you

14    don't know what compelling case could be -- and I'm sure that,

15    you know, you'll exercise discretion and that not everyone

16    will go through that.

17         And you may say, I'm not shifting the cost at all.

18    And by the way, today you could decide, I hear your two

19    proposals; I'm rejecting the cost shifting one, but I will

20    consider future requests for arbitration.  They're not tied

21    together necessarily.  So if you think that there's a real

22    problem with the shifting of the cost issue, I think you

23    still should say, I want to reserve discretion to allow some

24    people to go to arbitration, even though the debtor doesn't

25    agree.

1          And it's not a due process issue in the sense that

2    the debtor is seeking modification of the normal rules to

3    allow this process to go forward.  We believe they're

4    beneficial because we don't want Your Honor to be dealing with

5    claims like this on a daily basis.  We get that.  But there's

6    nothing wrong with saying, okay, I want to reserve discretion

7    for that.

8          That's really our request, Your Honor.  Thank you

9    very much.

10          THE COURT:  Thank you.

11          Mr. Mudd.

12          MR. MUDD:  Thank you, Your Honor.  John Mudd for

13    Salud Integral en la Montana.  I was not hiding in the back.

14    It's just that my father once told me, stay near a door just

15    in case you have to run, so --

16          THE COURT:  I will always try not to give you

17    occasion to feel you need to flee.

18          MR. MUDD:  I was thinking, Your Honor, mostly with

19    the tremors we've been having.  Unfortunately, sometimes they

20    are very scary.

21          So I wanted Your Honor to deal with this from a

22    practical point of view.  From what the Board tells us, there

23    is a group of cases, which I don't think they get to a

24    thousand, which have not been filed.  They're not in court,

25    federal court or the state court.  And there's a group, the

1  majority of them, which are in court.  Most of them, of

2  course, in state court, but not all of them are in state

3  court.  Okay.

4         So we have an offer from the Government of Puerto

5  Rico, the court systems, in which they have mediation.  They

6  call it mediation in Spanish.  That's why I'm using the word,

7  although we're talking about alternate dispute resolution.

8  And they can deal with those cases, there's an office for

9  that, which have not been filed.

10        As to the court cases that have been filed, it seems

11 to me that it makes more sense to have the Court, the judges,

12 start dealing with it from the minute of the mediation, you

13 know, the exchange, et cetera.  I'll explain why.

14        You have -- you can appoint somebody else, but we're

15 talking about 10 to 15,000 cases.  And who are the "somebody

16 else's"?  Who's going to pay them?  That's number one.

17        Number two, they make an evaluation of the case, good

18 or bad.  The parties decide no, we're going to go to court.

19 We're going to try this case.  Then you go to the judge, and

20 the judge in state court -- and I'm the only one here who's

21 arguing this who goes to state court -- they take the pretrial

22 and they write right next to it, settlement conference.  All

23 cases that I remember in my 37 years as a lawyer, state court

24 wants to settle cases.

25        And then you have the mediator, whoever it was, in

1   good faith made a number.  And then a judge has an awkward

2   moment.  He may not agree or disagree with that.  That creates

3   problems.  It seems to me more logical, and cheaper, to have

4   the state court, where there is a case file, dealing with it

5   from the beginning.

6        Also, Your Honor, the evaluation of a case depends on

7   liability and damages.  How probable is it that you're going

8   to win the case, basically?

9        And that is something that the Judge -- because, for

10  example, I have four cases that are stayed.  One of them was

11  dismissed, so it was in the process of appeal.  Another one,

12  summary judgments had been filed.  Another one was starting

13  out.  And another one is also on appeal.

14       So there are different instances in which the judge

15  who has the case knows what's going on, knows if there is

16  summary judgment, knows if there was a trial starting, because

17  some of them may have had that.  And it makes more sense for

18  him to start from the beginning instead of having the mediator

19  and then going to state court.

20       Also, little footnote, there are cases that are in

21  federal court.  It makes no sense to send them to state court.

22  Federal courts have their flagging -- obligation to, when the

23  case is filed and jurisdiction is properly invoked, to see the

24  case.  So those cases, if -- the few that exist, I have three

25  of them, would have to go to the magistrate, which makes more

1  sense.  And they would be able to deal with the case from the

2  beginning again, instead of having to go to the mediator and

3  then to the trial.

4         And finally, only one other point, Your Honor,

5  arbitration.  As long as it's voluntary arbitration, I have no

6  problem with that, or our client has no problem with that.  So

7  if the Court has any questions --

8         THE COURT:  No.  Thank you.

9         MR. MUDD:  Okay.

10        THE COURT:  Ms. Stafford.

11        MS. STAFFORD:  Good morning, Your Honor.

12        I just wanted to quickly respond to a couple of the

13  points that were made by the UCC and by Mr. Mudd.  With

14  respect to Mr. Despins' point about the litigation claims

15  potentially being permitted to participate in at least the

16  first two pieces of ADR, unfortunately, the number of

17  litigation claims is the vast majority of the ones that we

18  currently anticipate sending through ADR.  It's roughly 10 or

19  11,000.

20        So I don't know that there's any kind of floodgate

21  issue.  And we do intend to send almost all of those through

22  ADR, so I don't know that it solves the floodgate issue that

23  he's mentioning to take the modification that Mr. Despins had

24  proposed.

25        With respect to the arbitration piece, as I

1   understood what Mr. Despins was asking for, it was exactly

2   what we had already mentioned was -- would be a violation of

3   due process, which would be to obligate the debtors to

4   participate in arbitration, even when they have expressly not

5   consented to it.

6        And with respect to Mr. Mudd's point regarding the

7   mediation and the potential use of Commonwealth Court judges,

8   we do continue to believe that it makes more sense for the

9   mediators to be separate from the Commonwealth Court judges.

10  And I think our current procedures already suggest that there

11  be a separation between those magistrate judges who are used

12  as mediators and those magistrate judges who may participate

13  in the resolution of a claim later on.

14       We think that just makes more sense and preserves the

15  Judge's ability to both mediate and resolve a case in good

16  order.  And so we think it still makes sense that the

17  Commonwealth court system be reserved for resolving those

18  types of claims that -- for claimants who elect to participate

19  in that portion of the system.

20       THE COURT:  And so, for clarity, where the current

21  procedures say that an evaluating mediator can't get a

22  reference, you mean in the particular case that that

23  magistrate judge may have evaluated, not that a magistrate

24  judge who happens to be among the ranks of the evaluating

25  mediators --

1          MS. STAFFORD:  Correct.

2          THE COURT:  -- can't be in the Title III adjudicative

3     pool at all?  Because that would make life very complicated.

4          MS. STAFFORD:  I don't want to make your life that

5     much more complicated, Your Honor.  Thank you.  That is what

6     we mean.  That if you mediate one claim, you should also have

7     it --

8          THE COURT:  Thank you for clarifying that.

9          MS. STAFFORD:  Thank you, Your Honor.

10         THE COURT:  Okay.  I'm sorry.  Judge Dein, did you

11    want to --

12         Okay.  Before I formally make my decision, we jointly

13    encourage you to continue to consider whether you need to put

14    convenience class claims through this process.

15         MS. STAFFORD:  Understood, Your Honor.  Thank you.

16         THE COURT:  Thank you.

17         All right.  So Judge Dein and I have reviewed

18    carefully the amended ADR Motion, which is docket entry number

19    9718, and have carefully reviewed it and considered the

20    responsive submissions of the Unsecured Creditors Committee,

21    of SIM, and the Board's reply papers.  And I think we all

22    know what the background is, so I won't go over that.  I've

23    also considered carefully the remarks here in court today, and

24    we know what the outstanding issues are that are in

25    contention.  So I will go straight to addressing those and the

1    revision -- further revision concerns that the Court has.

2         So as -- let's see.  Just one moment.  There's

3    agreement as to consultation in the selection of the

4    arbitration service provider, so I won't address that.

5         I will turn first then to the comments regarding

6    enhancement of the record basis for the evaluative mediation

7    aspect of the ADR process.  And as I indicated before, the

8    Court is persuaded that the submission of short mediation

9    statements, in connection with the evaluative mediation stage,

10   would likely prove useful, both to the parties and to the

11   mediators.  And so I request that the Oversight Board revise

12   the procedures to permit, but not require, claimants to submit

13   mediation statements of no more than seven pages in length,

14   double-spaced.

15        And the Court will be developing operational

16   procedures for the evaluative mediation phase that will

17   include provisions for the transmission of such statements to

18   the mediators, as well as addressing other operational and

19   procedural issues.  And we will share those appropriately once

20   we have those developed.

21        SIM'S submission proffers that Mr. Mudd has elicited

22   the generous offer of the Commonwealth Court's mediation

23   system and sitting Commonwealth judges to serve as mediators,

24   and the Court very much appreciates that offer.  But at least

25   for the first stages of implementation of this ADR program,

1    the Court has determined that using members of the federal

2    judiciary as evaluative mediators will be efficient, and,

3    frankly, preferable from the administrative point of view.

4         And I also note it has been discussed here that the

5    litigation aspect of the proposal contemplates consensual

6    lifting of the automatic stay to permit adjudication of claim

7    amounts in Commonwealth courts.  So the Commonwealth's

8    judiciary will play an important role in the claims

9    reconciliation process, whether or not its judges also

10   ultimately serve in the mediation phase.

11        And I am assuming, and I hope the Board can confirm

12   this, that once the stay is lifted and litigation is returned

13   to the Commonwealth court, there is no -- nothing that would

14   preclude the negotiation of a settlement in the context of

15   that litigation phase.

16        Is that correct Ms. Stafford?

17        MS. STAFFORD:  That's correct, Your Honor.

18        THE COURT:  Ms. Stafford has said that's correct.  So

19   to the extent that Mr. Mudd has indicated that a Commonwealth

20   judge presented with parties seeking to litigate something is

21   going to focus on seeing whether it can be settled, there is

22   nothing here that would impede that process, and it would be

23   very much appreciated.

24        So I will now outline a number of additional

25   modifications to the ADR procedures that we believe are

1    necessary.  I've mentioned a couple of them.  I'll go through

2    them in order with reference to the proposed procedures and

3    the Notice Form, which have been filed at docket entry number

4    10295-1.

5         First, in Section One, as we've discussed earlier,

6    clarify that there will be a schedule filed of the affected

7    claims.  And in a few minutes, I will talk about the data

8    points that I would like to see in that schedule and in the

9    subsequent status reports.

10        And in Section 2(b), please make clear that no claim

11   objection response will be put into ADR before the first

12   hundred day tranche.  Or if you just want to promise me you

13   won't do it, I'll take that promise.  But that will be my

14   expectation.

15        In Section 2(d), which is the consent to binding

16   arbitration, I'm assuming, but asking you to clarify, that

17   consent to binding arbitration, once given, can't be

18   subsequently withdrawn by either party.  So if the debtor

19   consents, the debtor can't say at the last minute, I'm not

20   consenting anymore.  So that could be made clearer in the

21   document.

22        In Section 2(f), I'd ask that you make a clear

23   mechanism for marking the termination of the offer exchange

24   phase as we discussed earlier.

25        In Section 3(a), which deals with evaluative

1    mediation, please replace the reference to, "United States

2    Magistrate Judge" with "Federal Judge," because we may be able

3    to call more broadly on our federal judicial ranks for that

4    phase than we can for the Title III adjudication phase.

5         In Section 3(c), the deadline for the mediator to

6    provide an estimate -- I'm sorry.  I'm hesitating here because

7    I think I brought up here a copy that -- anyway, I had some

8    notes and I think I remember what they were, so I'm going to

9    incorporate them in my remarks.

10        We're concerned about the 21-day turnaround for the

11   mediator's estimate.  We're obviously going to try to get this

12   done as quickly as possible, but we'll be using people who

13   also have other caseloads.  And so I think there might have

14   been a discussion of 14 at some point.  We'd like it to be 28,

15   with a provision for the mediator to be able to extend by up

16   to 14 days.  And we will always try to stay on the short end

17   of that range, but especially since we don't know what it's

18   going to look like yet, we would like that additional room.

19        MS. STAFFORD:  That makes sense, Your Honor.

20        THE COURT:  Thank you.  And I did mean to say that we

21   really do appreciate the consultation with the Administrative

22   Office, as well as with other interested parties, in

23   developing these proposals.

24        Then to perhaps save a little time and keep parties

25   focused, we'd suggest that in 3(d), the time to respond to the

1    mediator's estimate be actually shortened by a week to 21

2    days.

3              MS. STAFFORD:  That sounds perfect to us.

4              THE COURT:  And on the mechanism and period for

5    termination of the evaluative mediation, again to make sure

6    people can manage their calendars, I'd ask that the 50-day

7    period be extended to 75 days.

8              MS. STAFFORD:  Sure.

9              THE COURT:  Then in 5(d), which is the arbitration

10   provision, it seems to us that it's important that if anyone

11   is going to have an objection to the qualification or

12   independence of the proposed mediation service provider, there

13   be a mechanism to -- I'm sorry -- arbitration service

14   provider, there be a mechanism to front and deal with that.

15             So what I'd ask is that the section be modified to

16   provide for the filing of an informative motion identifying

17   the arbitration providers from which the proposals have been

18   solicited, or at least the top two, whoever the finalists are,

19   before deciding on a provider.  And then that permits any

20   party that objects to the independence or qualifications of

21   the providers to file a written notice of that within 14 days,

22   with a provision for a reply by the debtors within seven days.

23   And then the Court will determine whether any further action

24   on the objection is required.

25             MS. STAFFORD:  Understood, Your Honor.

1          THE COURT:  Section 5(e) deals with video

2    conferencing in connection with the arbitration.  I would just

3    ask that you indicate how the costs of any necessary video

4    conference services are to be allocated or dealt with, if

5    that's not somehow completely bundled up in the arbitrator's

6    fee.

7          MS. STAFFORD:  Understood, Your Honor.

8          THE COURT:  And 6(d), which is the modification of

9    the stay for Commonwealth Court litigation, I'd just ask you

10   to clarify whether the modifications contemplated by this

11   section would be self-effectuating or whether they would be

12   documented with the entry of an order by this Court.

13         I, of course, vote for the latter, as in what we do

14   with the AAFAF negotiated stay relief that are filed in

15   periodic bundles.  I think that would make the record clearer

16   and make the statutory compliance clearer.

17         MS. STAFFORD:  That makes sense to us, Your Honor.

18   We are happy to use a similar mechanism.

19         THE COURT:  Thank you.

20         And in 6(d) where you say that there's no --

21   everybody bears their own cost for Commonwealth litigation

22   unless local procedural rules dictate otherwise, I think you

23   should also be referring to statutory fee shifting provisions

24   there, because there may be some.

25         MS. STAFFORD:  Understood, Your Honor.

1          THE COURT:  Section D, this is the information to be

2     included in the status report.  I'm going to read out now the

3     types of data points that we would want included, but I also

4     plan after this conference to file a notice that gives an

5     exemplar of what the headings would be in the table that I'd

6     really like to see, which may help you.

7          MS. STAFFORD:  That would be very helpful, Your

8     Honor.  Thank you.

9          THE COURT:  So just so that everybody knows, we'd be

10    asking for the Proof of Claim number, a code indicating the

11    claim amount by reference to brackets.  So there would be, you

12    know, unspecified number, then a 1 to 10,000 dollar bracket,

13    an 11 to 100,000 dollar bracket, and a couple of additional

14    brackets, so that we can get a sense of what's being resolved

15    and what's coming through.

16         Then some general characterization of the type of

17    claim.  So, for instance, business contract, personal injury,

18    if it's one of the claims related to a Commonwealth law, the

19    specific number of the law.

20         And then finally, if this is feasible for you, we'd

21    really appreciate it, if the claim is relating to a pending

22    litigation, an indication of the forum in which the action is

23    currently pending and the case number, if it's something with

24    a docket that we could look up publicly.

25         MS. STAFFORD:  I believe that will be feasible in the

1     majority of cases, and we can indicate if, for whatever

2     reason, we're not able to provide that.

3          THE COURT:  You can put not available, if it's not

4     available?

5          MS. STAFFORD:  Yes.

6          THE COURT:  And we'd also like to set up a system

7     where at each omnibus hearing going forward from now, the

8     Oversight Board provides an oral status report that, at a

9     minimum, addresses the number and types of claims that have

10    been and are anticipated to be transferred into the ADR

11    procedures.  And again, this will help us in making our

12    staffing and structural decisions.

13         MS. STAFFORD:  Understood, Your Honor.

14         THE COURT:  In 7(e), there seems to be a little bit

15    of ambiguity between 7(d) and 7(e) as to how inclusive the

16    term "resolved claims" is.  It's a little unclear whether that

17    includes arbitration resolved claims or not.  So that's just a

18    little clean-up thing.

19         MS. STAFFORD:  We'll clarify that.

20         THE COURT:  Great.  And a typo in Section 8(a),

21    there's a reference to 4(B) that we think should be 4(a).  You

22    can look at that.

23          A little more substantively, in 8(d) where you recite

24    the rules that will be applicable in litigation before the

25    Title III Court, please add an indication that Title 28,

1    Section 636, and Federal Rule of Civil Procedure 72 will also

2    apply in litigation before claims adjudication judges.

3            MS. STAFFORD:  Certainly, Your Honor.

4            THE COURT:  And then with the ADR notice, there are a

5    couple of strong suggestions that I want to make to try to

6    make it a little bit more accessible and contextualized for

7    the recipient.  So -- and we'll also include a blackline of

8    the notice in the follow-up notice that I'm going to file.

9    But what I'm suggesting is that on the second page of the

10   notice, immediately after the blackout line text box, you

11   insert a heading that says, "Why am I receiving this notice?"

12           Followed by language to the effect of, "You filed the

13   claims referenced above in the debtors' Title III case.  The

14   debtor believes that the claim is invalid or overstated, in

15   whole or in part, and is prepared to offer to agree with you

16   to a lower stated claim amount instead of starting proceedings

17   asking the Court to reduce or eliminate your claim."

18           And then your existing paragraph saying, "By this ADR

19   notice, this is how we're doing it" would follow that, but I

20   think that might be a somewhat more reader-friendly

21   introduction.

22           MS. STAFFORD:  That makes sense to us, Your Honor.

23           THE COURT:  And then you -- let's see.  When we

24   characterize what's going to result from this, the notice at

25   some points uses the term, "liquidation of a claim," and I

1    think we also need to have a distinction between what's going

2    to result as, you know, the stated amount of a claim is how

3    I'm thinking of it, as opposed to what a person will actually

4    get.

5         And so if you could either consistently use "stated

6    amount" for that, or define "liquidated" as "stated amount,"

7    that would be helpful.

8         And at the end of the paragraph that says,

9    "settlement offer," the final sentence says, "The treatment of

10   your claim will be determined by the Plan of Adjustment."  I

11   think an additional clause should be added that says, "It will

12   likely -- the payment will likely be a small proportion of the

13   agreed stated amount of your claim."

14        MS. STAFFORD:  We can add that, Your Honor.

15        THE COURT:  So that people again know what this

16   process is really pointing toward.

17        MS. STAFFORD:  Understood, Your Honor.

18        MR. DESPINS:  Your Honor, I'm not sure on -- the

19   amount to be the full amount.  I don't understand why you said

20   a small proportion of the claim.

21        THE COURT:  Well, that's why I'm asking them to

22   consider --

23        MR. DESPINS:  Okay.

24        THE COURT: -- how they're dealing with convenience

25   class, whether that's going to be put through this process or

 1  not.

 2         And so you can think about it, I don't want to

 3  overstate the warning, but if, for the bulk of these claims,

 4  they're going to be negotiating a big stated amount.  And it's

 5  going to be run through, at the end of the day, through a

 6  formula that's going to produce what we call teeny tiny

 7  bankruptcy dollars.  I --

 8         MR. DESPINS:  Your Honor --

 9         THE COURT:  I want people to be forewarned.

10         MS. STAFFORD:  Right.

11         MR. DESPINS:  Your Honor, that's the problem, is we

12  don't know if it's going to be tiny bankruptcy dollars or not.

13  That hasn't been decided yet.  The Plan will decide that.  It

14  could be full dollars.  That's not what they're proposing, but

15  we haven't seen the end of that movie yet.

16         So that's why we're concerned about telling people

17  -- if you're telling you're going to get tiny bankruptcy

18  dollars when, in fact, we don't know what the answer to that

19  is today.

20         THE COURT:  Well, maybe call it a significant

21  possibility that it will be a small -- a significant potential

22  or something --

23         MS. STAFFORD:  Right.  At a minimum, I think we can

24  make clear that there may be a distinction between the amount

25  that's settled and the amount that's ultimately paid.  And we

1  can finesse the language around that.

2         THE COURT:  Yes.  Be as clear, but as appropriate in

3  that warning, but I think there needs to be something there.

4         MS. STAFFORD:  Understood.

5         THE COURT:  And that will also help people make their

6  determinations as to whether to do this through a settlement

7  process or, you know, fight over the difference between 50,000

8  and 60,000, or something like that.

9         MS. STAFFORD:  Right.

10         THE COURT:  Okay.  So on the second page of the

11  Notice, the last sentence of the paragraph that begins with,

12  binding arbitration or Commonwealth Court litigation should

13  include, in addition to the reference to the payment amount

14  for the arbitrator's services, a statement that they'll also

15  have to pay the fees of their own lawyer, if any, and any

16  incidental costs that they incur.

17         MS. STAFFORD:  Understood.

18         THE COURT:  So that they don't think the arbitrator's

19  fee is the only thing.

20         And then on page 15 -- sorry, the third page of the

21  notice where it discusses Commonwealth Court litigation and

22  says, the debtors will consent to liquidate your claim before

23  the Commonwealth courts, if you've made -- given a definition

24  of liquidation before, then that works.  Otherwise, saying

25  something like, "having the stated amount of your claim

1    determined by the Commonwealth Court," might make that

2    paragraph a little bit more accessible in the instances where

3    the term "liquidation" is used.

4          MS. STAFFORD:  That makes sense, Your Honor.

5          THE COURT:  Okay.  So those are the line edits.

6          Just a couple of additional comments.  Judge Dein and

7    I would encourage you to make the first tranche of transfers

8    similar claims in some way.  If it's, you know, certain types

9    of litigation, or accounts payable, or something, just that,

10   again, will help us with foresight and planning and staffing,

11   because the first tranche is going to be a little bit of a

12   pilot program for the parties and for the Court.

13         We will also include in the Order a notation that

14   these ADR procedures are exempted from Local Rule 83(j), which

15   is the court-based ADR program.  And that's just important so

16   that the powers that be know what's going on here.

17         MS. STAFFORD:  Understood.

18         THE COURT:  And as I said, I'll post something on the

19   docket.

20         So with respect to the rest of the requests, I find

21   either unwarranted or unnecessary the further modifications

22   requested by SIM and the Committee that I haven't yet

23   addressed.

24         As to permitting all claimants or certain types of

25   additional claimants to voluntarily bring themselves into the

1  offer exchange and mediation phases, I find that the benefit

2  that might accrue from building that into the structure would

3  be outweighed by burdens that allowing such participation

4  would impose on the debtors, the Court and the mediators.

5      For example, the debtors would have to formulate,

6  communicate and potentially negotiate settlement offers for

7  claims that they might otherwise be seeking to expunge or that

8  they believe require litigation modalities that are not

9  contemplated by these procedures.

10      But Mr. Despins, I would invite you, if you know

11  of -- you're going to have to see, first of all, what they

12  start putting in, what cases they start putting in.  But if it

13  occurs to you at some point, or you know of certain litigants

14  who are just dying to get some sort of offer or would like to

15  engage in this process, please give the case numbers and the

16  names to Ms. Stafford.  And maybe they'll go in, or, as

17  Ms. Stafford had said, the Board is open to informal

18  negotiations.

19      So I'm not trying to shut anybody out.  I'm just

20  trying to have a closed capsule procedure of this sort to

21  begin with.

22      And with respect to the cost-sharing objection and on

23  the binding arbitration, I'm satisfied that these procedures

24  offer claimants adequate alternative avenues for liquidating

25  their claims, so that a provision permitting requests for

1   modification of the arbitration cost-sharing arrangements is

2   not necessary.

3        And the Court can't require the debtors to submit to

4   arbitration with respect to particular claims where the

5   debtors have not consented.  The Court legally can't make that

6   direct request, and the Court determines not to use its

7   indirect leverage of withholding approval of these procedures

8   in order to make that a price of getting these procedures

9   started.

10       And so are there any further comments, Judge Dein?

11   You have to lean over.

12       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I'm

13   sorry.  You indicated that there were a handful that you

14   thought might be ready to go into the process.  Could you just

15   describe what status those are at?

16       MS. STAFFORD:  So there are a number that are -- that

17   were part of the Omnibus Objections that we filed either in

18   December or January, and the responses that we received

19   provided us with a case number or other information that

20   suggested they are ready to -- they are suitable for these

21   procedures.

22       Others are ones through either accounts payable

23   claims or litigation claims, with respect to which we've had

24   some communications with the government officials and have an

25   understanding of what an initial offer might be.  And so we're

1    ready to send those through.

2          I don't know that there's a huge number at this

3    point, but I know we are actively working to make sure we have

4    as many as we can, as ready as we can, once we have the

5    procedures Orders entered.

6          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

7    right.  One of the things that you can think about, it seems

8    to me, is if there are exemplar packages where you finish the

9    exchange, so that we can at least think about the

10   administrative parts of how to docket things and things like

11   that, it might be worthy of discussion with the Administrative

12   Office once you have a package together.

13         MS. STAFFORD:  We'd be happy to do that.  And I think

14   we -- I'll let Jay Harriman, who is here in the courtroom,

15   tell me if I'm wrong, but I think we have at least some that

16   we can send over in short order.

17         THE COURT:  Thank you.  And so for all of these

18   reasons, the Amended Motion is granted subject to the

19   revisions that I have detailed.  And I will file tomorrow, or

20   at the latest by Friday, an exemplar of the template for the

21   reporting, and also a black-lined version with the suggested

22   language changes for the notice, unless you feel you've got a

23   good enough handle on what I'm asking that I don't need to do

24   that, because I've given you some options on how to deal with

25   the liquidation nomenclature and that sort of thing.

1        MS. STAFFORD:  I think it would be helpful if you

2   were to provide us with the order just so we make sure there's

3   no miscommunications.  So --

4        THE COURT:  We'll do that.  And so then once that's

5   on file, the Oversight Board is directed to file on

6   presentment a proposed Order attaching a revised version of

7   the ADR procedures and notice that incorporates the additional

8   modifications.

9        And so we'll also give you the additional language

10  about Local Civil Rule 83(j) for inclusion in the adopting

11  order.

12       So thank you all for your collaboration, your

13  patience with me and getting us to this phase.  So speaking of

14  phases, it's now five past 12:00.  So we will take a lunch

15  break now and resume at five past 1:00 to address the revenue

16  bond related issues, starting with the PRIFA Motion to Amend

17  the Lift Stay and going into the conference on the Interim

18  Order.  And then we'll finish up with the other one or two

19  contested matters, I'm not sure which.

20       So thank you all.  Have a good lunch.  See you at

21  five past 1:00.

22            (At 12:04 PM, recess taken.)

23            (At 1:14 PM, proceedings reconvened.)

24       THE COURT:  Buenas tardes.  Please be seated.  I

25  apologize for the delay in resumption.

1          So we are now at Item III -- sorry, III.3 of our

2    Agenda, which is Ambac's Motion for Leave to Amend the PRIFA

3    Lift Stay Motion.

4          Hello, Ms. Miller.

5          MS. MILLER:  Good afternoon, Your Honor.  For the

6    record, Atara Miller for Milbank on behalf of Ambac.

7          Your Honor, Rule 15, which you indicated will govern

8    this motion, provides as a general matter that leave to amend

9    shall be freely granted.  The Oversight Board and AAFAF

10   apparently ignore the standard, citing it nowhere in their

11   papers, and arguing instead for denial based on the fact that,

12   and I'm going to quote them, "movants have not demonstrated

13   why their proposed amendments would change the calculus."

14   That's not the Rule 15 standard.

15         The Oversight Board and AAFAF rely on the limited

16   exceptions to the broad right to amend based on futility and

17   undue prejudice.  So I want to start by talking about the

18   proposed amendments and then addressing their specific

19   arguments.

20         So the proposed amendments do four things.  First,

21   they address the intervening First Circuit precedent.  And as

22   I was reading over and preparing for today, I realize that one

23   intervening First Circuit precedent which we failed to

24   mention, maybe shockingly, was the *Ambac* decision from the

25   First Circuit which --

1          THE COURT:  I've looked at that.

2          MS. MILLER:  Right.  And I'm sure you know that many

3     of the proposed amendments, in fact, the entire last section

4     related to 305 comes directly out of the guidance and

5     instruction that the First Circuit gave in that decision,

6     which, frankly, I think was quite a different way of looking

7     at how constitutional issues and claims should be addressed in

8     the context of these Title III proceedings, as well as the

9     First Circuit's decision in *Gracia-Gracia*.

10          Second, it joins the Trustee and makes changes

11     requested by the Trustee that in their view were necessary to

12     ensure that the broader interests of bondholders were

13     reflected.  And in that regard, it also joins the other

14     monoline -- interested monolines.

15          And on that, I think it's -- I note it more because

16     it consolidates arguments that had separately been raised in

17     joinders, but it also, in our view, is sort of -- and this is

18     going to be the fourth goal of the amendment, but it's an

19     attempt and an effort to really streamline the cases.

20          And as the Interim Order assumes and expects, there

21     will be coordination on the bondholder side.  And so part of

22     our attempt in the intervening time was to make sure that all

23     of the bondholders and the Trustee were all on board with

24     making the same arguments in advance and the same ideas.

25          The third set of amendments address and incorporate

1    new factual information that was revealed since the filing of

2    the motion.

3           And fourth, as I mentioned, it was aligning the

4    interests, both in terms of collaborating among the PRIFA

5    bondholders, but also aligning the arguments in the

6    presentation of the arguments to the other revenue

7    bond-related stay motions, so that the Court could have sort

8    of the comprehensive package and could more easily think about

9    where the issues are squarely overlapping and what the

10   differences are between the various issuances.

11          The Oversight Board complains that this resulted in a

12   wholesale redrafting of the motion.  We disagree with that.

13   And with the exception of two new substantive arguments

14   related to 305 and the trust res, which come directly out of

15   the intervening First Circuit decisions, as well as the

16   withdrawal of certain arguments, also as a result of the

17   *Gracia* decision, everything else is a reorganization or

18   reordering and amplification of already existing arguments.

19          But even if it were a wholesale rewrite, we believe

20   that the amendments further this Court's goal that was imposed

21   on the parties through the mediation process.  It allows for a

22   more complete and streamlined presentation of the revenue bond

23   issues, and ensures that overlapping issues are presented to

24   Your Honor in a coordinated fashion.

25          The Oversight Board notably does not object to the

1    Trustee's addition to the motion, but seeks to impose what we

2    believe are unreasonable conditions to such joinder.  Namely,

3    they say that if you want the Trustee to be part of it, the

4    Trustee should just file a simple joinder that says, we're in

5    the party.  That's not how it works.  And the Trustee views

6    itself as having its own duties and responsibilities, and the

7    Trustee has the right to bring its own motion on behalf of

8    bondholders.

9        And I suspect, given the holdings in this case, that

10   if the Trustee were forced to do that, the motion that they

11   filed would look a whole lot like the proposed amended motion

12   here.  So we're trying to cut through some of the

13   inefficiencies by pulling it all together in a single,

14   proposed amended motion.

15       So the Oversight Board focuses its argument on the

16   limited futility exception in Rule 15, but as I said, the

17   Oversight Board acknowledges that many of the proposed changes

18   are appropriate and relevant.  And that alone is sufficient to

19   satisfy Rule 15.

20       Turning to futility, the Oversight Board's arguments

21   on futility are -- and I thought a lot about how to

22   characterize it, and if I were talking to my nine-year-old, I

23   would characterize it as "because I say so," but in this

24   Court, I'll say that it's what I would call the ultimate ipse

25   dixit.  In plain terms, the Oversight Board is asking this

1   Court to deny the Motion to Amend on their say so that the

2   entire statutory scheme and all of the attendant property

3   rights and transfers have been preempted.

4        This position, and I'm sure now that I've said it

5   we'll hear from the other side that that is not core, but this

6   position is so fundamental to their motion that they say it no

7   fewer than 18 times in their opposition brief.  Notably,

8   that's an argument that even AAFAF won't join, and yet it

9   somehow demonstrates how futile any of the proposed amendments

10  would be.

11       These questions, including whether, in fact, the

12  relevant statutes have been or even could be preempted in the

13  manner suggested by the Oversight Board, and whether

14  bondholders and the Trustee are a mere creditor of a creditor

15  as against the Commonwealth, strike at the core of the

16  underlying stay motions.  They are the substantive issues that

17  this Court is being asked to address on these motions.  And

18  frankly, we think that it is procedurally improper to tee them

19  up and present them to the Court under the guise of a futility

20  argument on proposed amendments.

21       We think that the briefing should more forward on

22  those, and the Court should hear them on -- I don't even know

23  if we're at the -- I think we're at like 30-hour notice to

24  consider those issues.  Not surprisingly, none of the futility

25  cases that were cited by the Oversight Board come close to

1    suggesting that futility is evaluated based on whether the

2    opposing party believes that their untested assertions have

3    been rebutted or not.  If that were the case, then the

4    standard for whether leave to amend would be granted wouldn't

5    be that it would be freely granted, but instead it would be

6    whether the proposed amendments result in immediate

7    capitulation by the opposing party.

8           The cases cited by the Oversight Board highlight how

9    inappropriate their futility argument is, as framed here.  In

10   each of those cases, futility was being assessed after a

11   ruling by the Court on the Complaint and was testing whether

12   the amendments cured the deficiencies identified by the Court.

13   That makes sense, right?

14          So once the Court defines the bar, a proposed

15   amendment then gets measured against that bar, and if it

16   doesn't clear the bar, then you can determine the proposed

17   amendments are futile.  But here the Oversight Board is urging

18   Your Honor to assess the proposed amendments against the bar

19   that they've unilaterally said applies, without giving Your

20   Honor the opportunity to determine whether they're right or

21   wrong.  And they don't think it requires saying it, but I'll

22   say it anyway.  We disagree with where the Oversight Board

23   purports to set the bar here.

24          The Oversight Board also argues that the motion

25   should be denied because the proposed amendments go beyond the

1    scope of the February 27 hearing.  And this issue, frankly, is

2    less important for purposes of this motion, but carries over

3    to the next one.  And so I think there is an aspect of it that

4    is clearly presented here that I think I have time to address,

5    so I'm going to take two minutes on that.

6         So first, we disagree with the Oversight Board's

7    characterization of the amendments in this regard, and in

8    particular with *Gracia*, which clearly held that trust res held

9    in a commingled account needs to be traced through the lowest

10   intermediate balance test to make a prima facie showing for

11   lift stay purposes.

12        So we would say in that case that our view of *Gracia*

13   is plainly different than the Oversight Board's, but our read

14   is that that aspect of the case actually spoke to what is the

15   prima facie showing that you need to make to establish that

16   you have a property interest in particular property.  And that

17   is within the scope no matter how you define the scope of the

18   February 27 hearing.

19        But second, it would be inefficient to limit

20   amendments, as the Oversight Board seems to be proposing, to

21   only a core set of preliminary issues.  Let's call it that.

22   Whatever you want to call it, but some limited set.  All that

23   means is that the next time, you know, if we get past that, we

24   are just going to be back before the Court arguing a motion to

25   amend again.

1          If the Court's considering now whether an amendment

2     is appropriate, there should be an amendment to the entire

3     motion rather than having it piecemeal.  I mean, ERS comes to

4     mind in terms of thinking about, you know, how awkward

5     procedurally things become when you move forward on a motion;

6     changes want to be made; it goes up to the Circuit; it comes

7     back down; changes are then made.

8          You know, there are motions whether -- can we allow

9     it; can we not; how do we define what the record is.  We're

10    here now, and all of the amendments should come in.

11         But most fundamentally, we continue to object to any

12    proposed bifurcation of the Stay Motion to separate out

13    standing and secured status from any of the other issues.  Our

14    position is that there's no authority for such bifurcation

15    under 362(e).

16         And frankly, we read Your Honor's -- and I'm sure

17    you'll tell us if we're wrong, but we read Your Honor's

18    December 19th Order as superseding the June 23rd PRIFA Order

19    in this regard, providing for supplemental briefing on

20    standing, secured status and any other issue relevant to a

21    preliminary hearing.

22         And so we read that Order as saying we're not hearing

23    until the June 23rd scope secured status, but we're going to

24    put PRIFA in the same preliminary hearing sort of box that

25    CCDA and HTA are in.

 1           THE COURT:  I included in that box "secured status

 2    and standing."  So I'm not --

 3           MS. MILLER:  Right.  So to me --

 4           THE COURT:  -- sure what point it is you're making

 5    here about my having backed off the notion that fronting of

 6    those issues is appropriate.

 7           MS. MILLER:  Well, I don't think that there is a

 8    basis to say if there is a stay motion, that some issues get

 9    teed up on day one and the rest gets teed up on -- at some

10    later date that we haven't consented to.  I think, under the

11    statutes, there's authority at least to say that a preliminary

12    hearing can be set, and then you can have a final hearing

13    within -- you know, as long as the final hearing is within a

14    reasonable time, absent exigent circumstances being

15    demonstrated.

16           THE COURT:  The statute requires me to find

17    compelling circumstances to have anything other than a final

18    hearing the first time, but I don't read it to have such

19    limited circumstances it is impossible for me to decide that

20    dealing with certain gating issues before dealing with the

21    full scope of evidentiary issues, some of which could

22    conceivably be mooted by the way, the gating issues, are

23    precluded by 362(e).

24           MS. MILLER:  So our position is that it is precluded,

25    and I understand that at least in the June hearing you held

1    that you were going to proceed only on scope and secured

2    status.  We read the December Order as expanding the scope of

3    what was to be presented at the February -- now February 27

4    hearing.

5         And, frankly, I'll put our view also on the record

6    that we don't think that an intermediate preliminary hearing

7    at this point is appropriate.  We think we should just go to

8    final hearing.  And I don't know what process is being served

9    or what exigent circumstances warrant not just moving to a

10   final hearing.

11        So I understand you may view that differently, but

12   that's certainly --

13        THE COURT:  And I hear you.

14        MS. MILLER:  So that's our position.

15        And then I just want to take my last minute to

16   address prejudice.  So the Oversight Board also argues for

17   denial of the motion based on prejudice, essentially arguing

18   that the amendment would require them to do more work.  That's

19   always true with post briefing amendments and is not itself a

20   basis for denial.

21        And I would also say that the argument smacks of

22   disingenuousness.  You know, after 22 pages of arguing how

23   absolutely irrelevant and futile all of the proposed changes

24   are, it's hard to take seriously the suggestion that they're

25   going to be so prejudiced by the additional briefing that they

1    don't even think they need because nothing changes anything in

2    the calculus.

3         I'm not suggesting that they're not entitled to

4    supplemental briefing, but I would also note that Your Honor's

5    Order, in terms of timing, which they complain about, set

6    tomorrow as the deadline for that, but also provided, unless

7    the Court Ordered otherwise or unless the parties so

8    stipulated.  And they never even so much as asked us to extend

9    that, which I'm sure, had we gotten the request, we would have

10   entertained.

11        So just the last point on prejudice, they argue that

12   these gating issues would delay the resolution -- sorry, that

13   delay in the resolution of these issues is prejudicial to

14   formulation of the Commonwealth's Plan.  So on that, I would

15   note first, the Commonwealth has already formulated and filed

16   a plan, so I'm not sure what that's a reference to.

17        And while we agree that these are gating issues that

18   have to be decided before any disclosure statement could be

19   approved, and certainly before Plan confirmation, right now

20   they're set for hearing on February 27, which is before the

21   hearing is even going to be set on the mediator's proposed

22   schedule on a plan and confirmation.  So with that, unless

23   Your Honor has questions --

24        THE COURT:  Just one.  So you're telling me that you

25   read my December 27 Interim Revenue Bond Order to set the

1  February 27 hearing as one on the full scope of factual and

2  legal issues relevant to the Lift Stay Motions, plus the

3  question of whether focus on those issues should be delayed

4  and joined up schedule wise with the dispositive motion

5  practice on the adversaries?  I'm still trying to understand

6  --

7          MS. MILLER:  No, I didn't -- in terms of the

8  scheduling piece of it --

9          THE COURT:  Well, you said two things that I didn't

10  quite follow, just to be honest, and I'm sure it's me and not

11  you.

12          MS. MILLER:  Could be me.

13          THE COURT:  But you said that you read the Interim

14  Revenue Bond Order to supersede and somehow expand the

15  allowable scope of whatever a first stage PRIFA hearing is

16  going to be.  And then just now, in closing, you said

17  something to the effect of now February 27th is cued up as the

18  final hearing on everything in the Lift Stay Motions.  And

19  that was news to me.

20          MS. MILLER:  Oh, no.  That's not what I intended at

21  the end.  That -- no, I do not see that as -- I don't see

22  February 27th as a final hearing as currently set, although we

23  would suggest that either February 27 or some date shortly

24  thereafter, if the parties need more time, should be set as

25  the final hearing.

1          But we view that as the preliminary hearing, which we

2     think potentially would give -- if what the debtors need is

3     guidance from this Court on -- that they can use in

4     formulating a plan, because we would agree with them that

5     their current plan is patently unconfirmable, and so it will

6     be revised.

7          And so if that's what they need, I suspect they may

8     get that at the preliminary hearing, which is currently set

9     for February 27.  So in terms of timing --

10         THE COURT:  Right.

11         MS. MILLER:  -- there's plenty of time to have this,

12    whether it's in a preliminary and final hearing construct, or,

13    as we would advocate, just in a final hearing construct, to

14    have that issue teed up and heard long before we get to any

15    disclosure statement, the schedule for which isn't even going

16    to be out until -- or isn't even going to be argued before

17    Your Honor until March.

18         THE COURT:  Yes.  Thank you.

19         MS. MILLER:  Thank you.

20         THE COURT:  Mr. Bienenstock.

21         MR. BIENENSTOCK:   Thank you, Your Honor.  Martin

22    Bienenstock of Proskauer Rose, LLP, for the Oversight Board as

23    Title III representative of the Commonwealth.

24         Your Honor, I'm going to go to the end of Ambac's

25    Reply Brief to start off with a few points as to why we think

1    the motion should be denied.  But I realized, as I said that,

2    that I should first advise the Court basically where we're

3    coming from on this.

4         The Court's June 13 Order, as followed up by, I

5    guess, the December Order, which sets up the February 27

6    hearing, most specifically identifies standing and secured

7    status as issues that the Court wants heard on those dates.

8    To us, that is critical, because depending on how it's

9    resolved, there's certainly a possibility, if the Court finds

10   lack of standing or no secured status or other property

11   interest that is entitled to adequate protection, then all of

12   the discovery and everything else that would be involved in a

13   final stay hearing would be unnecessary.

14        And I would think that was probably at least one of

15   the considerations that caused the Court to identify those

16   issues at its June 13, 2019, Order and to follow through on

17   them.  And the rationale for doing it then -- is as good then

18   as it is now and vice versa.  And that's our main were

19   concern, whether or not the Court ends up allowing the

20   amendment.

21        As far as prejudice --

22        THE COURT:  Well, let me ask you this:  You asked me

23   late Friday night for a page extension on each of the Lift

24   Stay Motions, which I gather includes the PRIFA related one,

25   of 65 pages to address all of the issues that have been

1   raised.  And so if I grant this motion today, are you filing

2   your opposition tomorrow, and is it going to address these

3   amendments in the 65 pages that I gave you?  What are you

4   planning to do?

5        MR. BIENENSTOCK:  Well, absent the Court telling me

6   that we have a few more days for the Amended Complaint, yes,

7   of course we are going to comply with the Court's Order and

8   file our responses to the HTA Stay Motion, the PRIFA Stay

9   Motion that's really -- well, they're all against the

10  Commonwealth, and the Stay Motion that relates to CCDA and the

11  Tourism Company.

12        It hasn't been easy, and a few extra days would be

13  appreciated.  But we're going to comply.  And in terms of the

14  content of our response to the -- Ambac's PRIFA Stay Motion at

15  the Commonwealth level, the bulk, the vast bulk of the

16  response goes to the issues of property interest and standing.

17  We also cover the issues the Court identified in the December

18  Order.

19        At the end, we explain why things we've said

20  previously in the brief establish compelling circumstances, if

21  necessary, for the Court to have as long as it wants for the

22  final hearing, but primarily, the briefs cover secured status.

23  And by any measure, the bulk of the pages is all the reasons

24  why they don't have a property interest to protect.

25        Their lien -- you know, in the PRIFA situation, their

1   security interest comes from PRIFA taking money and putting it

2   into a sinking fund for them.  And the whole motion is about

3   how to get the Court to somehow say that the Commonwealth

4   either doesn't have a property interest in their revenues it

5   collects and is supposed to appropriate to PRIFA, or if it

6   does, it's already given it to PRIFA, so it doesn't have it

7   anymore.

8          I mean, they came up with a lot of theories that we

9   conceive of as Hail Mary passes, which is understandable

10  because the money they were counting on isn't down at PRIFA.

11  But it's all about property interest.

12         THE COURT:  You don't seriously expect me to reject

13  all of their arguments regarding security interests on this

14  Motion to Amend, given that I said we're under Rule 15 --

15         MR. BIENENSTOCK:  No.  No.  Not on the Motion to

16  Amend, no.

17         THE COURT:  Okay.

18         MR. BIENENSTOCK:  No.  I was just explaining the

19  content of our brief that we'd file tomorrow.

20         THE COURT:  And while we're on the brief that you're

21  filing tomorrow, and this gets a little bit into issues for

22  the next conference, it seemed to me that on the Reply that

23  was filed most recently, and I can't remember whether it was

24  this one or the one regarding the conference, that you seem to

25  have backed off the issue framed in the Revenue Bond Order of

1    seeking that I find there are compelling circumstances to join

2    up this lift stay litigation with the Rule 12 motion practice

3    and the adversaries, and instead, subject to bifurcation of

4    lift stay -- I'm sorry, standing and security interest issues,

5    are willing to engage in a lift stay oriented litigation

6    process?

7            MR. BIENENSTOCK:  Okay.  Here's our thinking on this.

8    And, Your Honor, I too am confusing which pleading contained

9    which analysis, but they're all interwoven.  As the First

10   Circuit pointed out in the *Gracia* decision, which we think the

11   Court already -- it was no profound new development.  We think

12   that the Court already took it into account when it said it

13   wanted to hear about secured status.  But what the First

14   Circuit said is, at the preliminary hearing, the Court can at

15   least look at the property interest on a preliminary basis.

16           And then in the *Grella* case that Ambac relies on,

17   where it says it only has to make a colorable claim to a

18   property interest, the First Circuit explains what it means by

19   a colorable claim is that, in the context of a preliminary

20   injunction hearing, when you find they have a likelihood of

21   success, so more than 50 percent chance of success.

22           So here is our thinking on what -- the question Your

23   Honor just asked.  At the stay hearing, at the preliminary --

24   at the first hearing, let me not call it preliminary hearing,

25   but at the first hearing, Your Honor has a lot of options.

1    Your Honor can say, I have all of the documents and laws

2    applicable to the alleged property interest or security

3    interest.  I can make a final decision.  If the Court does

4    that, then there's no need in our adversary proceeding to do

5    it under 12(b) or anything else.  The decision is made.

6    There's no security interest.  There's no property interest.

7          But the Court, Your Honor, also has the option at

8    the first stay hearing to say, I think it's going to -- it's

9    going to come out this way, but I'm not making a final ruling.

10   I want to have a subsequent -- a final hearing or a second

11   hearing.  Well, if the Court does that, then our adversary

12   proceeding serves a purpose, because we can bring on a 12(b)

13   or summary judgment motion and get a final ruling on the

14   property interest.

15         Now, as I've signaled, I think, since it's all based

16   on documents -- just what grants of security interest or

17   property interest do the documents provide and the statutes

18   provide?  And they're not going to change.  They're documents.

19         We think it's likely the Court can reach a final

20   determination, but you never know.  And so the adversary

21   proceeding is really only there if the Court can't or doesn't

22   get to a final determination of the property interest issue.

23   The Court has a lot of options, therefore, for how it wants to

24   proceed and track the Stay Motion, on the one hand, and the

25   adversary proceeding on the other hand.

1          THE COURT:  Thank you.

2          MR. BIENENSTOCK:  And that's a discretion that Your

3    Honor has that we, you know, can't take away.  And as I said,

4    we think you'd be able to decide it and want to decide it at

5    the first hearing on the stay, but we may be wrong.  And maybe

6    the Court will see things or things will come up that will

7    change that.  I can't tell.

8          Okay.  In terms of getting back to the amendment

9    motion --

10         THE COURT:  Why I should deny this amendment motion,

11   since we agree that those core substantive issues are for

12   later litigation on something other than this particular

13   motion?

14         MR. BIENENSTOCK:  Right.  Right.  So at the end of

15   Ambac's reply in footnote eight, it says, oh, by the way, even

16   if we waived the 30-day limit in 362(e) with our first motion,

17   we're not waiving it in this amended motion.

18         Well, that's prejudice right there.  I mean, we

19   shouldn't have to give up the waiver that we already have.

20   Frankly, neither the litigants nor the Court should have to

21   give that away, if that's the price of letting them amend

22   their motion.  They've actually supplied a prejudice that we

23   hadn't even known about until they filed their Reply.

24         The other prejudice, and it really goes to the

25   futility as well, is that we don't agree with the way Ambac

1  today or in its Reply described our opposition.  We're not --

2  not saying look at the merits and then figure out futility.

3  What we're saying is on the gating issues of property

4  interests, security interests, and standing, none of their

5  amendments go to that.

6       Adding the Trustee, as we said, that can happen by

7  joinder.  They said, well, the Trustee gets to file their own

8  brief, but they control the Trustee.  So we think that's a

9  false thing, that that's what requires a rewrite of a 60-page

10 brief.

11      Then they want to drop one of their arguments.

12 Obviously, that's fine.  They don't need an amendment to do

13 it.

14      Then they argue that they got in discovery from AAFAF

15 wiring instructions.  And our point is wiring instructions

16 that one part of the government says, we're putting the money

17 here and we want to send it over here has nothing to do with

18 property interest.  That's the mechanics of how they move

19 their money around, doesn't affect whether they were granted a

20 property interest, either as a security interest or an

21 ownership interest.  So that's our point of futility.

22      Nothing they're amending helps them on the gating

23 issues Your Honor said would be decided in the June 13 Order.

24 And at the least, we think the June 13 Order should be carried

25 out.  And if we lose it, then the Court can say, okay, you can

1    amend, for what it's worth, but it's unnecessary to do that

2    now.

3            THE COURT:  Well, as we see often in pleadings in

4    civil litigation, and we've seen at stages in this case, there

5    are pleadings seeking to frame positions as to issues that may

6    or may not be mooted out by the decision of other issues, but

7    to put the full set of claims or propositions to be asserted

8    on the table to be dealt with as appropriate under the Rules

9    of Procedure.

10           And so it seems that having gone through this

11   exercise in which Ambac has offered something that it says is

12   comprehensive of its theories, to say, well, no thank you now,

13   but maybe you can do that again later, strikes me as terribly

14   inefficient.  So I guess I'm asking if you have anything to

15   say to help me understand that a little bit better, to feel

16   that I haven't wasted a whole lot of time reading a brief that

17   you're telling me I should perhaps maybe read again in four

18   months.  Help me with that.

19           MR. BIENENSTOCK:  Well, largely it goes back to the

20   very first thing I said.  Our first priority is to ask the

21   Court to have a hearing on the gating issues, standing, and

22   security interests and property interests.

23           Standing, I want to just point out is really a

24   two-part or it has two -- there are two different standings

25   involved when we say standing.  One standing, which was

1    prominent initially, was whether they had standing to make a

2    motion given the terms of their Trust Agreement that said that

3    only the Trustee could sue on the bonds.  And that would

4    likely be cured by joining the Trustee.

5         And we -- frankly, that's why we don't object to the

6    Trustee joining.  We want them to have standing because we

7    want the decision made.

8         But the second part of standing is if they identify a

9    property interest of PRIFA -- I mean, their contention is

10   PRIFA has a right to appropriations from the Commonwealth;

11   that is PRIFA's right, not the bondholders' right.  So that's

12   a second issue as to whether a creditor of a creditor can have

13   standing.

14        They have to pass both of those tests, but in the

15   second standing test, the Court would end up determining the

16   property issue.  So that's good, whether the Court does it on

17   a preliminary basis or a final basis.

18        And I was just saying that we think we've

19   demonstrated, but they don't have grounds to amend.  But if

20   the Court was concerned that we might be wrong, it can still

21   go ahead and hear the gating issues, whether the amendments

22   are made now or later.

23        Now, I also want to mention, Your Honor, that in

24   their motion, in their amended motion, they refer to the other

25   rum producers who are getting some of the Rum Tax remittances.

1    And when we file a motion, I'm sure the Court has noticed

2    this, even when we reply to a motion, we add a box to the

3    caption showing who the moving party is and who the

4    respondents are.  Ambac doesn't do that.

5         So it's like, well, anyone who shows up who replies

6    might be a respondent.  And that's what most people do, in

7    fairness, so they're not out of the mainstream.  But here,

8    since they didn't identify, at least some of the other rum

9    producers are concerned, and now they're wondering are they

10   targets.

11        And one of them filed a pleading.  And I had asked if

12   they could have a minute or two to argue, and with the Court's

13   permission, I'd like to let them do that.  They have a

14   response on file for this hearing.

15        THE COURT:  Yes.  That's Serralles I think it is?

16        MR. BIENENSTOCK:   Pardon me?

17        THE COURT:  I was trying to remember the name of the

18   firm, but the answer is yes.

19        MR. BIENENSTOCK:   Thank you, Your Honor.  It was

20   joinder by Serralles.  That's the client presumably to the

21   Oversight Board's opposition.

22        THE COURT:  Thank you.

23        MR. ZOUAIRABANI:  Good afternoon, Your Honor.

24        THE COURT:  Good afternoon.

25        MR. ZOUAIRABANI:  Nayuan Zouairabani from the firm of

1   McConnell Valdes.

2           Your Honor, in terms of the Amended Motion -- or the

3   Proposed Amended Motion, and going to the topic of prejudice,

4   their Amended Motion, Your Honor, unlike their first motion,

5   on paragraph four specifically mentions that among the relief

6   the movants wants to seek would be an action against the rum

7   companies and to halt the Rum Tax remittances.

8           Now, this was not envisioned in the original Lift

9   Stay Motion.  This is new.  As we've mentioned in our previous

10  pleadings, specifically at docket 7912, we explained how the

11  waterfall of these Rum Tax remittances are shared between the

12  Commonwealth and other parties.  And we specifically highlight

13  how the appropriations or the part of that money that is being

14  held for the benefit of the Rum Tax companies, they do not

15  enter in the Commonwealth coffers.  We're talking about a

16  different pot.

17          So this amended motion, which identifies the rum

18  companies 14 times, indicates that they're subordinate.

19  They're basically -- the movants are bringing us into the

20  fight.

21          And the reason we're standing here today and we join

22  with the Oversight Board is we have serious concerns as to the

23  implications of what these amended motions would have on the

24  rum companies, and the prejudice this would create, as it was

25  not originally envisioned in the first motion.

1    I would be remiss not to remind that the rum industry

2  is one of the biggest and largest industries, not just in

3  Puerto Rico, but in the whole Caribbean.  It employs hundreds

4  of people, and the repercussions of what the decision may be

5  could have disastrous results along the island.

6    So we just want to bring to the Court's attention

7  that by adding the rum companies into the mix, that does

8  create or could create a big prejudice, and that's one of the

9  serious concerns we have with the Motion to Amend.

10    THE COURT:  Thank you.

11    MS. MILLER:  I'm going to resist, despite all of the

12  litigation urges that live deep inside of me, from engaging on

13  the substance of a lot of Mr. Bienenstock's presentation.  Let

14  me start quickly with the rum producers.  They are squarely at

15  issue and implicated in this litigation.

16    The Commonwealth, in 2015, on the verge of financial

17  crisis, decided to subvert the existing scheme and to enter

18  into --

19    THE COURT:  I've read your bifurcation of the lock

20  box argument.

21    MS. MILLER:  But the notion that they're new and that

22  they're implicated by amendment is absolutely false.  The

23  enforcement -- one of the actions that we're seeking to lift

24  the stay to have continue -- I don't need to lift the stay to

25  sue the rum producers.  I can go ahead and do that if I have

125

1    standing and if I have a claim.

2         But one of the underlying actions is the one against

3    the Federal Treasury seeking to impose a trust account on the

4    mainland to all of the excise taxes, so that they won't be

5    improperly diverted downstream, and so all the rum stream --

6    Rum Tax, Excise Tax stream -- sorry.  The entire Excise Rum

7    Tax stream has always been implicated in the underlying

8    action.  And to the extent that the rum producers believe that

9    they are entitled to portions of that money, that's been at

10   issue from long before these cases ever started.

11        So there's certainly no prejudice there and nothing

12   in the Amended Motion, other than making that clear.  And

13   frankly, given the statements in court today, I'm glad that I

14   did so, that we're all on the same page about it, changes the

15   status quo on that.

16        Just a couple of points responding more on the

17   procedural angle, and one relates to the scope and nature.

18   And we're sort of hybriding between this motion and the next

19   motion, and so I was going to reserve some discussion about

20   what I think, you know -- their comments on scope is kind of

21   for the second one, so I'm going to --

22        THE COURT:  So let me say this.  I would like to

23   finish this argument with a focus on amendment, but there is

24   very much in play, for the overall strategizing and

25   structuring of revenue bond litigation, the question of

1   whether and how, if I say yes, gating issues would be

2   addressed in relation to the full scope of issues, including

3   any factual issues upon which the tracing and transmittal memo

4   arguments may -- I've totally lost myself grammatically, but I

5   think I've made my point from the way you're nodding.

6          MS. MILLER:  Yes.  I've got it.

7          So that's how I've been thinking about them.  So I'm

8   going to hold my comments on discovery and what I think the

9   scope is.  And so some of Mr. Bienenstock's comments will go

10  unresponded to on this motion.

11         THE COURT:  Yes.

12         MS. MILLER:  I'll respond to them on the next motion.

13         One point, though, is an important one I think for us

14  all to have in mind as we think through these issues.  And

15  Mr. Bienenstock suggested that there may be circumstances

16  where this Court could finally decide issues on a Lift Stay

17  such that they wouldn't have to be decided at the end -- such

18  that they wouldn't have to be decided in the adversaries and

19  essentially moot at the adversaries.

20         That's not how lift stays work, and that's not the

21  goal of lift stays.  Lift stays aren't -- even a final lift

22  stay hearing doesn't finally determine the rights of the

23  parties, much like you could win a preliminary injunction on

24  failure to show a likelihood of success on the merits and you

25  would still then have to move.  Now, your motion could be very

1    simple at the end of that, but you would still have to move

2    for summary judgment on the substantive underlying complaint.

3    That preliminary --

4            THE COURT:  I register Mr. Bienenstock's point more

5    as to an issue preclusion or collateral estoppel argument than

6    a direct applicability argument, but maybe I'm wrong.

7            MS. MILLER:  So that's why I want to be clear.  From

8    an issue preclusion, collateral estoppel standpoint, the

9    standards are different.  So I don't think it can carry over

10   from a -- it's the same judge, and you're going to make the

11   same arguments, and she's clearly giving you a really good

12   sense of how she views the issues and what your likelihood of

13   success on them is.

14           So maybe when you think about what your next move is

15   and how strongly you want to be advancing that argument, or

16   how you want to be assessing your likelihood of success on the

17   final, you know, actual substantive question, there's no doubt

18   that that's a relevant piece.  But from a technical -- can you

19   be collaterally estopped, can it be law of the case, it's just

20   a preliminary determination on the likelihood of success.

21           Our objection to proceeding with the adversary,

22   frankly, is that that's not the right forum.  And Mr. Servais

23   is going to address this in the next motion.  But it's not the

24   suggestion that lift stays are a more efficient, or fast,

25   shortcut way to get to a final determination on any of these

1    issues.  That's not the purpose of a lift stay.

2         The lift stay is to just say, can I get into another

3    court that has proper jurisdiction to make that final

4    determination on the substantive issue so that we can get

5    final clarity on the issues presented.

6         So from a procedural standpoint, I thought that point

7    needed clarification.  Thank you.

8         THE COURT:  Yes.  Thank you.

9         Thank you all for your arguments and your

10   submissions.

11        Rule 15 is a liberal standard.  The rule itself

12   instructs that the Court should freely give leave to amend

13   where justice so requires.  And the First Circuit has

14   characterized the standard as liberal, and stated that there

15   are only limited reasons for denying a prejudgment motion to

16   amend, including undue delay, bad faith, futility, and the

17   absence of due diligence on the movant's part.

18        I find that the movant has demonstrated that the

19   proposed amendments to the PRIFA Lift Stay Motion would

20   potentially resolve at least one aspect of the standing

21   dispute, would streamline the issues before the Court, and

22   would eliminate the possibility of an inefficient scenario

23   whereby the Trustee files a separate lift stay motion related

24   to PRIFA.

25        Thus, the amendments proposed are not futile.  None

1    of the other grounds for denying leave to amend has been

2    established, and the Motion to Amend is, therefore, granted.

3    And the Court will file a short order stating that.  And this

4    relates to the Motion to Amend at docket entry 10109.

5             Thank you.

6             And now we will turn to the objections and conference

7    with respect to the Interim Revenue Bonds Order.  And I

8    understand that you have a lineup of speakers.  Are we

9    starting with the Oversight Board?

10            MR. FIRESTEIN:  Your Honor, good afternoon.  Michael

11   Firestein of Proskauer on behalf of the Board.

12            THE COURT:  Good afternoon.

13            MR. FIRESTEIN:  I think it's up to the Court, but

14   given the sequence of filing, if you'd prefer the Board to

15   make its observations first, as distinguished from the

16   objectors, we're sort of getting a little lost in the shuffle

17   with all the papers that have been filed, but I'm happy to

18   indulge the Court in whichever order you would prefer.

19            THE COURT:  Well, since the Board seems to have

20   shifted its position on a couple of the issues that are raised

21   in the objections, specifically the, you know, target date and

22   context for a final hearing and a new -- what seems to me a

23   new approach to the 305 argument in relation to the

24   adversaries, and it seems to me, you know, an argument that 30

25   -- well, I guess it's the argument that 305 would -- sorry.

1   Let me put it another way.

2        The Board has said that if the Court were to find

3   that there is a property interest of the bondholders and

4   monolines as their subrogees in this money, then the Board may

5   consider consenting to adequate protection.  It seems to me

6   that the Board is trying to drive this toward bifurcation of

7   standing in terms of creditor of a creditor and security

8   interest.  And then, to the extent those are established, to a

9   litigation strategy that would, through adequate protection,

10  keep issues here and try to convince people that they don't

11  have a 305 problem.

12       And that is a different state of play from what we

13  were working with in December, so I would like you to be clear

14  on where the Board is on these issues now so that the

15  objections can be presented in the context of what seems to me

16  a shifting landscape.

17       MR. FIRESTEIN:  I'd be happy to do so.  If I can just

18  grab my papers then, Your Honor --

19       THE COURT:  Yes.

20       MR. FIRESTEIN:  -- because not realizing I was going

21  first, but I'm happy to do so --

22       THE COURT:  Thank you.  And of course, if I am

23  reading you wrong, you will let me know.

24       MR. FIRESTEIN:  I don't think you are.

25       Once again, good afternoon, Your Honor.  Michael

1    Firestein of Proskauer on behalf of the Board.

2         Given the last argument, I am of the feeling that the

3    coming attractions may have actually been a viewing of the

4    feature film, but nonetheless, let me see if I can't proceed

5    to address the issues in some orderly way for the Court's

6    consideration.

7         Pursuant to paragraph seven of the Court's Order that

8    was dated December 27, the purpose of this hearing is to

9    determine whether anything needs to change in the Interim

10   Order regarding revenue bonds prior to the March 4th hearing

11   relating to the amended report of the mediators, which we

12   expect to be filed on or about February 10th, unless some

13   other intervening act occurs.  I don't have one in mind, but

14   that's the current date set for its filing.

15        I don't want to bury the lead in connection with

16   this.  The answer is largely now, and I use the word largely

17   on purpose, most assuredly not the suggestions of the

18   revisions that the monolines propose.

19        That said, as we noted in our papers that we filed on

20   Monday, which I think might be the papers that the Court was

21   actually referring to, which was in response to the objections

22   that were filed by the monolines last week, there are certain

23   key gating issues that do need to be addressed.

24        And to echo Mr. Bienenstock, and I don't mean to be

25   redundant, but in the context of this conference, I want to

1    make sure that we get our exact position directly on the

2    record.  The sooner that we can get those determined by the

3    Court, the better off all parties are going to be in terms of

4    knowledge and a path forward.

5          As we frequently pointed out, most assuredly lately,

6    the goal is to quickly and efficiently, to put it in

7    shorthand, address the issues of standing and secured status

8    or other property interests, if any, of the monolines as it

9    relates to certain Commonwealth revenues retained by the

10   Commonwealth and historically appropriated to PRIFA, HTA and

11   CCDA.

12         While there may be other matters of import to

13   address, be it a plan confirmation, or sooner, those gating

14   impediments -- or those are gating impediments to advancing

15   consensual restructuring agreements and plan confirmation.

16   There are two current paths forward to obtain these rulings

17   under the existing Order.

18         The Lift Stay Motions -- and I'll address

19   Ms. Miller's comment as to the finality or lack thereof in

20   connection with any determination relative to lift stay that

21   the Court might make.  To some extent, I actually think that

22   makes our point with respect to the adversaries, unless and

23   until there is some exacting bifurcation that occurs, but the

24   Lift Stay Motions that were filed by the monolines and the

25   adversaries that were filed by the Board -- or at least three

1    of them which relate to the claims of the Commonwealth on the

2    monies in question.

3           And within the adversary context, there are actually

4    two subpaths that could be used to accomplish the goal.  One

5    is the 12(b) and 12(c) motion practice that is already

6    established in the current Order, or perhaps on an expedited

7    basis and not currently in the Revenue Bond Order, but

8    alluded to in the papers that we filed, Rule 56 motions on

9    discrete claims alleged in those adversaries.  Mind you, Your

10   Honor, not all of the claims.  Those are comprehensive

11   complaints that were filed.  But certain ones that can and

12   will address most easily the gating issues that we're focused

13   on here.

14          And that's the last I'm going to speak about Rule 56,

15   because it is not here, but it is something that is in our

16   minds about a means to get to the place where we need to be.

17          As the Board noted in its filing on Monday, even

18   though the adversary complaints are the preferred manner to

19   obtain these merits-based rulings, and, if needed, the

20   expeditious schedule that I spoke about a moment ago, the lift

21   stay could serve as an alternative.  And the PRIFA model, if I

22   can use that term, could be the basis for doing so on those

23   gating issues.

24          As everyone knows, lift stay motions, and I know

25   Mr. Bienenstock spoke to this issue, and of course this Court

1    is well aware, can be decided on many grounds unrelated to the

2    gating issues that I've described, and can consume

3    considerable time and resources.  If the Court -- but if the

4    Court were inclined to bifurcate, much like PRIFA, the HTA and

5    CCDA Lift Stay Motions, and I use the word bifurcate in the

6    vernacular or in the common sense of the word as opposed to

7    its legal terminology -- because the preliminary hearing which

8    is set for February 27, or whatever date the Court ultimately

9    picks for that, could serve that very purpose.

10           And so in response directly to your question, Your

11   Honor, we invite the Court to treat that hearing for exactly

12   that purpose if the Court can and will do so.  The briefing

13   will be complete.  The very legal, gating issues we're

14   discussing will be before the Court, including the enabling

15   acts, the resolutions, contracts, and related materials.  And

16   the Court can make a legal decision on those issues in

17   addition to whatever other issues the Court believes are

18   necessary to address at that time.

19           And that's the goal.  The monoline suggested

20   revisions to the Revenue Bond Order would not accomplish that.

21   We explained the reasons for that in the brief that we filed

22   the other day, and that I know the Court has reviewed

23   carefully given the Court's comments.  But I want to highlight

24   a couple of important points.

25           The notion of staying the adversaries, as the

1   monolines suggest, is antithetical to the notion of

2   expeditious resolution.  The notion to proceeding to a final

3   hearing on the Lift Stays without knowing for certain that the

4   gating issues are to be resolved is, and I don't mean this in

5   a pejorative sense, but it's deceptively designed to

6   potentially accomplish the same thing, which is delay.

7         Simply put, if the lift stay path is pursued, there

8   is no benefit to going through the entirety of the lift stay

9   process.  And the Court commented earlier about all these

10  other evidentiary issues that might occur, including a

11  hearing, much less discovery, that would be associated with

12  that, which I'll comment upon in a couple of moments.

13        If there is no property interest to protect, that's

14  what we understand the purpose of the February 27 hearing to

15  be, among other things, and I think the language of the Order

16  is pretty clear with respect to that -- I think in each

17  instance, the Court noted that the February 27 hearing would

18  be limited to the items identified in Section 1(d) of the

19  Order, which talk about these various components in the

20  Court's own words, not necessarily the ones that I've

21  characterized here.

22        In our mind, it's baffling to understand why the

23  monolines simply don't want those issues to be determined as

24  soon as we possibly can.

25        THE COURT:  Okay.  Just to be clear, the December

1    Order uses standing and secured status specifically in

2    relation to the PRIFA Motion.

3              MR. FIRESTEIN:  Correct.

4              THE COURT:  And all those other words about that are

5    in 1(d) as the subject matter for the preliminary hearing were

6    words that were offered up by the Oversight Board --

7              MR. FIRESTEIN:  Correct.

8              THE COURT:  -- that I adopted and put into that Order

9    in the context of the Oversight Board taking the position that

10   essentially nothing should happen on the Lift Stays until the

11   dispositive motion practice in the adversaries was completed.

12   And you don't seem to be saying that anymore.

13             MR. FIRESTEIN:  Well, I am, Your Honor, in the

14   following sense.  It has always been the goal of the Oversight

15   Board to get a determination on the issues that we've

16   described.

17             THE COURT:  But all a 12(c) motion is going to do is

18   say whether he's stated a claim.

19             MR. FIRESTEIN:  Well, perhaps, but in addition to

20   that, as thinking has evolved, it is entirely possible that on

21   a small handful of claims, a Rule 56 motion could also be

22   brought that would provide further guidance, maybe the

23   ultimate guidance, on whether there is, in fact, a property

24   interest.

25             THE COURT:  That's not in the current Interim

1    Order.

2            MR. FIRESTEIN:  That's correct.  That's correct.

3            THE COURT:  And you're not telling me everybody in

4    here has agreed to that, so --

5            MR. FIRESTEIN:  Well, no, but subject to the stay

6    being altered relative to that, if that were the path that we

7    were permitted the opportunity to pursue, we would likely do

8    that.  But you're right, it's not currently in the Order here

9    today.

10           If there is another motion that's brought -- this is

11   an issue, Your Honor, as I understand this hearing, what has

12   to be done to these Orders, if anything, prior to anything

13   occurring on March the 4th.  And that's the limited scope that

14   we're talking about.

15           What they have come in and suggested is that they

16   want the adversaries to be stayed.  If the Court is prepared

17   to make some kind of determination relative to the gating

18   issues on the 27th of February, in conjunction with the

19   accumulation of briefing material that the Court will have, we

20   are agnostic to the notion of which process is necessary to

21   get there.  Our goal is to simply achieve the ruling.

22           While we think we're right, and I'm sure the

23   monolines believe that they're correct with respect to that,

24   the answer is what's going to matter.  It's going to inform

25   people relative to how they choose to act in further steps

1  relative to the litigation.

2        At long last, Your Honor, isn't this what the purpose

3  of what the original stay and directive to the parties to go

4  to mediation was all about?  Figure out a way, not the Court's

5  obligation, but just generically, try to figure out a way

6  pursuant to which significant issues can be resolved that

7  would allow these cases to merge out of Title III.

8        We don't -- we don't necessarily have a preference

9  whether that occurs in the context of gating issues pertaining

10 to lift stay determination in the preliminary hearing or

11 otherwise, or in the context of the adversaries, but we want

12 it to happen in one way or the other.

13       THE COURT:  Well, can you -- is there any reason you

14 can't live with a gating issue oral argument date that I might

15 call a preliminary hearing on the Lift Stays on the current

16 schedule, which is February 27, with the supplemental briefing

17 attendant thereto?  And the motions to dismiss the adversaries

18 still being due I think on February 27, if I don't stay the

19 adversary aspect of the Order?

20       MR. FIRESTEIN:  I'm trying to think of a one-word

21 answer, but correct.

22       THE COURT:  You don't have to write those motions to

23 dismiss.  You get time later to respond.

24       MR. FIRESTEIN:  Well, Your Honor, in all fairness,

25 we've had plenty of things to write over the past several

1  days.  And unfortunately, the Court is then burdened with the

2  obligation to read them.

3          THE COURT:  And I've been doing some composing

4  myself.

5          MR. FIRESTEIN:  Right.  And worse yet, make

6  determinations relative to that.  But those will all be

7  informative.

8          But of course if the Court's inclination is to use

9  the February 27 hearing as a means to an end to resolve those

10  issues, to the extent the Court is able to, on the briefing

11  that comes forward -- I mean, look.  The Court -- we know what

12  we are writing in the briefs that are being filed tomorrow,

13  for the most part.  The Court is unaware, and certainly our

14  adversaries haven't seen it yet, but I think the way the

15  briefing has been currently staged to the Court and what you

16  can anticipate coming from the Oversight Board in its timely

17  filings tomorrow is exactly that, to enable the Court to make

18  that precise determination.

19          And that's why I started this by saying largely, no,

20  we don't believe any change is necessary.  And really, I think

21  I could even take away the word largely relative to that.  If

22  the Court is able to conduct that hearing on the 27th, and

23  with all deliberate speed be able to guide the parties

24  regarding what the answer is going to be on these complicated

25  but discrete issues of secured status.

1          And by the way, if you do, if the Court does do that

2     on the 27th, we certainly don't have to talk about 305,

3     although I'm prepared to do that, because the Court did

4     correctly note that that seems to be something that is in the

5     air relative to concern that a number of parties have had

6     regarding its implication.

7          But in the context of the very motions or complaint

8     or whatever one wishes to call it that the monolines have

9     filed for this preliminary hearing relative to the 27th, 305

10    doesn't become an issue.  But we still need the Court's answer

11    to the question regarding standing and secured status.

12         THE COURT:  Let me jump ahead a little bit to the

13    discovery issue.  It seemed to me, reading at least the

14    amended PRIFA papers, that there are arguments about the

15    transmittal memorandum and subaccount facts being ones

16    relevant to the stay relief went certainly to the

17    quantification and tracing of a res but also it wasn't clear

18    to me, but maybe was part of their argument for the existence

19    of a security interest.

20         So to the extent you are arguing that there should be

21    no further discovery pending a determination on the gating

22    issues, and they're saying, we need to pin down the

23    transmittal memorandum and the existence of designated

24    subaccounts as a core factual component of our argument that

25    we have a security interest, would you be willing to stipulate

1    to those facts for purposes of that preliminary hearing, or

2    make rapid fire, focused discovery on those particular issues?

3              MR. FIRESTEIN:  Well, two points:  One, we'd be happy

4    to consider stipulation with respect to things in particular.

5    I can't really do this standing at the podium.

6              THE COURT:  Yes.  But I'm floating the idea.

7              MR. FIRESTEIN:  And we'd be happy to consider that

8    issue.  But the notion of rapid fire discovery has something

9    that -- has not been something that the parties have been able

10   to come to grips with collectively, as the Court is well aware

11   given the Court's Order last week.

12             So I don't -- you know, I always like to be

13   cautiously optimistic that old dogs can learn new tricks, but

14   I also am pragmatic about the parties' ability to actually

15   come to grips with what would be a narrowly focused discovery.

16             And I don't know whether that discovery is something

17   that is actually directed to us as the Board.  It's probably

18   more likely directed to AAFAF under the circumstances, so we

19   would need to consult with AAFAF on that point.

20             THE COURT:  AAFAF is generally a fellow traveler on

21   these positions, except for the preemption argument, yes?

22             MR. FIRESTEIN:  Correct.  And they have not joined

23   the preemption argument, my suspicions is, for reasons other

24   than Ms. Miller has articulated.  They have their own reasons

25   for perhaps doing so, but I'm not here to speak for

1  Mr. Friedman.  And what I really want to do is not be in a

2  position where I'm committing AAFAF to something standing at

3  the podium without having had an opportunity to discuss it

4  with them in advance.

5          THE COURT:  Just hear what I just said as a warning

6  that if I'm going to go with this bifurcated process, and

7  they're going to say they'd be hobbled on their security

8  interest claim if I bifurcated it that way without giving them

9  discovery, I'm going to need you to respond to that in some

10 procedurally meaningful way and factually meaningful way.  So

11 it's something you would need to work on.

12         MR. FIRESTEIN:  Your Honor, it's no different than

13 what would come up in the context, by analogy, of Rule 56(f),

14 right, where someone says, I need discovery in order to defeat

15 this claim, and you have to make a showing as to why it is

16 that that discovery is necessary and meaningful to the issue

17 that's being addressed.

18         And I'm not saying that Rule 56 applies here, but

19 what I'm trying to communicate is that I don't understand the

20 point, and if there is something --

21         THE COURT:  What I'm saying is I'm trying to hold the

22 February 27 argument schedule.  There are briefing deadlines,

23 so somebody has to get practical on both sides around here if

24 we're going to do at least a gating issues hearing on the 27th

25 to move forward.

1          MR. FIRESTEIN:  I understand.  May I?  May I have

2     just one second, Your Honor?

3          THE COURT:  Yes.  You may or may not be broadcasting

4     through that microphone.

5          MR. FIRESTEIN:  I think what he said would not have

6     mattered if it had been generally understood.

7          So I think the notion of the stipulation that Your

8     Honor commented upon is something that I'm loathe to do in

9     open court without having had the opportunity to think about

10    it, but I believe that there is traction that could be

11    achieved on that score in order to be able to accomplish it.

12         And in the absence of a stipulation, I hear the Court

13    loud and clear relative to the procedural aspect of needing to

14    get to a place where if the Court's prepared to do it, that

15    the resolution would be meaningful on the 27th.

16         THE COURT:  Thank you.

17         MR. FIRESTEIN:  Okay.  Well --

18         THE COURT:  Mr. Friedman.

19         MR. FRIEDMAN:  Your Honor.

20         THE COURT:  You need to be near a microphone, and I

21    think that may be the only one that broadcasts to everyone.

22         MR. FRIEDMAN:  Just we can agree, for AAFAF's

23    perspective, that we will meet and confer as part of this

24    process, as fellow travelers as it were, with the monolines

25    with respect to a stipulation, or, if necessary, some form of

1    limited discovery.  We'll certainly commit to that.

2            THE COURT:  Thank you.

3            MR. FIRESTEIN:  And Your Honor, even though the

4    hearing is currently set for the 27th, if because of the

5    accumulation of material or whatever needs to happen in the

6    interim -- we're not particularly interested in prejudicing

7    one side or the other on that score.

8            I recognize that it's the Court's Orders and the

9    Court's directives.  And there is an Omnibus that is set the

10   next week or -- you know, to us, it's cast in stone on the

11   27th because that's how the Court has directed it.  But from

12   the Board's perspective, it would be fine from our point of

13   view, in fact, it might be preferable to achieve the very

14   objective that Your Honor's thinking about to move that

15   hearing, although I don't particularly have a date in mind

16   under the circumstances.

17           But I merely offer that as something that -- in order

18   to accomplish the objectives the Court has laid out.

19           THE COURT:  Well, I invite you all to meet and

20   confer.  And if there is a joint proposal for revision of the

21   briefing and/or hearing schedule for these issues that can

22   work with my calendar, I'm quite happy to consider it.

23           MR. FIRESTEIN:  We'll put that on the list of things

24   we need to do.

25           THE COURT:  Thank you.

1          MR. FIRESTEIN:  But given the way that this has

2     become focused, I had remarks relative to 305 that I was

3     prepared to address to the Court, but if we're going to

4     proceed down this hopeful path of trying to have it done in

5     conjunction with however we wish to call the hearing regarding

6     the Lift Stay Motions, I don't know that they are particularly

7     pertinent, but I'm more than happy to simply note that we

8     meant what we said in the papers, pursuant to which the

9     monolines requested that the 305 references be discarded from

10    the Revenue Bond Order.

11         And Your Honor included that at admittedly our

12    request, and it was merely a provision of what our position

13    is, but 305 is what it is.  And whether there is a waiver or

14    impediment that 305 produces is irrespective to a recitation

15    in a Court Order as to what our position is on that issue.

16    And if that solves that particular issue, we're happy to have

17    that modification made to the Revenue Bond Order.

18         THE COURT:  So that's the excision both of the

19    paragraph that I've been told originated with the mediation

20    team, and the paragraph that I added that recites the position

21    that was taken by the Oversight Board in December?

22         MR. FIRESTEIN:  I believe that that's true, Your

23    Honor.

24         THE COURT:  All right.

25         MR. FIRESTEIN:  And so again, I put to the -- well, I

 1  respectfully ask the Court, if you want me to discuss 305 in

 2  the context of the adversaries -- but I'm not sure that's

 3  currently the path we're heading down under the

 4  circumstances.

 5       THE COURT:  I think in the interest of time and

 6  efficiency, I will not ask you for presentation on 305.  I'll

 7  let you rely on your papers here.  If in any of the comments

 8  by the bondholders or the monolines that becomes an issue, I'm

 9  reserving your right to come back and talk about that some

10  more in reply.

11       MR. FIRESTEIN:  Thank you.

12       THE COURT:  Thank you.

13       MR. FIRESTEIN:  Thank you, Your Honor.

14       THE COURT:  Thank you very much, Mr. Firestein.

15       All right.  So I understand that first up will be

16  Assured.

17       MR. SERVAIS:  Thank you, Your Honor.  Casey Servais

18  from Cadwalader Wickersham & Taft on behalf of Assured.

19       We also had a game plan which has potentially shifted

20  somewhat in view of your remarks and the remarks from

21  Mr. Firestein.  So I'm not sure exactly what order we'll be

22  speaking in, but I guess I am, in fact, going first.

23       THE COURT:  Good afternoon, Mr. Servais.

24       MR. SERVAIS:  Good afternoon.

25       So the main focus of my remarks had been on our

1   objection to the language inserted into the Interim Revenue

2   Bonds Order characterizing the hearing on the Lift Stay Motion

3   as a preliminary rather than a final hearing and limiting the

4   scope of the issues.  We still have that objection.  We do not

5   see any need for a preliminary hearing.

6         Generally, a preliminary hearing is only necessary

7   where there are exigent circumstances that do not permit a

8   final hearing within the timelines established under Section

9   362.  That doesn't exist here, because those timing

10  protections are intended to protect us as secured creditors.

11        We are willing to waive those timing requirements in

12  a limited way, to a limited extent, for the purpose of having

13  a final rather than a preliminary hearing, but our goal is

14  really to not have the issues restricted certainly in the way

15  currently reflected in the Interim Revenue Bonds Order and to

16  have a hearing that will result in a final Order that could be

17  appealed immediately if necessary.

18        And so it's not entirely clear to me to what extent

19  Your Honor's thinking has shifted in terms of the way that

20  you've characterized the preliminary status of the hearing in

21  the current Order, but we do not want a preliminary hearing in

22  the sense of Section 362(e).  We think there should just be a

23  final hearing under 362(d).

24        THE COURT:  Well, let me try to put it this way.  It

25  does seem to me to make sense, and I can give you within the

 1   month a hearing and my best effort at a determination on these

 2   gating issues.  You know, I could probably do it based on the

 3   papers, but I would prefer not to, and I would benefit from an

 4   oral argument.  And then depending on the outcome of that,

 5   maybe I do a, you know, 54(d) type certification of it as a

 6   final and appealable order if you all ask me to.

 7          To have a final final hearing including addressing

 8   factual issues of tracing and subaccounts and everything else,

 9   it isn't in any world that I see practicable for February 27.

10   And so we'd be talking a longer schedule.

11          Now, if what you want is a longer schedule where I

12   say nothing about gating issues and nothing happens until this

13   bigger hearing that may include detailed presentations and

14   arguments on issues that I ultimately won't get to, I'm not

15   excited about that as a good use of my time or anybody else's.

16   So it seems to me, inconsistent with your desire to have this

17   moved, and moved as promptly as possible along a line that can

18   lead to that final hearing, if that's necessary, that

19   consenting to time for the briefing and the holding of the

20   February 27 session -- and what I was thinking about in terms

21   of logistics would be something like a meet and confer within

22   two weeks after my decision on standing and security

23   interests, with the filing of a joint proposed litigation and

24   discovery schedule within a week after that.  And a

25   stipulation as to the stay going forward after that, or

1    positions on the stay going forward after that.

2         And I think for this all to be practicable, I would

3    need today a consent to the continuation of the stay until

4    call it -- you know, three weeks after the Joint Status Report

5    is submitted, just so that there's room for me to decide, room

6    for you all to meet, room for you all to develop and me to

7    consider the structure for how we get to the final final

8    hearing.

9         I'm not in a position to state a specific date for

10   the final hearing today, and that's the whole point of looking

11   at gating issues first.  But if you're going to tell me, you

12   know, you're not going to consent to waive 362(e) past, you

13   know, February 12, I frankly don't know what you want me to

14   do, because you're telling me that you don't have the record

15   you need for a final hearing.  And we're certainly not going

16   to have a final hearing tomorrow or tonight or February 12.

17        So February 27th is the earliest date I can give you

18   where I'm committing to you to try to make the kind of

19   progress that you want toward your goal of a final hearing if

20   necessary.  So you tell me what you want.

21        MR. SERVAIS:  We would prefer to have a single final

22   hearing and not a bifurcation of issues.

23        And I would actually point out that the Court did set

24   a schedule for proposing modifications to the Interim Revenue

25   Bonds Order.  The Oversight Board did not comply with that

1    schedule in making this bifurcation request.  The first time

2    they raised this was in the Reply a couple of days ago.

3         And the whole purpose of this hearing was when the

4    Oversight Board made its initial response to the mediation

5    team's report, we did not have an opportunity to respond with

6    briefing to that.  At our request, Your Honor did provide us

7    with an opportunity to respond in briefing, but the Oversight

8    Board has now simply recreated the same problem because

9    they've sprung on us a new proposal that we again have not had

10   an opportunity to respond to.

11        So our request, as reflected in our January 21st

12   Objection, is that there be, in compliance with Section

13   362(d), a final hearing on our Lift Stay Motion, where a stay

14   of relief will be granted or denied.  We are willing to waive

15   Section 362(e) to the extent necessary to make that happen

16   in as expeditious a manner as possible, but the goal of the

17   final hearing is ultimately probably more important than any

18   kind of extreme expedition.

19        And the purpose of that is the Oversight Board has

20   stated the goal of getting to merits rulings on these

21   important issues.  As Ms. Miller already noted, a ruling on a

22   lift stay motion will not be a merits determination, so the

23   question becomes what is the correct vehicle for a merits

24   determination.

25        In the Title III context, the only vehicle, as the

1   Oversight Board has acknowledged in its papers, would be an

2   adversary proceeding.  However, we've already attempted to

3   litigate these revenue bond issues in an adversary proceeding,

4   and the response from the First Circuit was, well, the Title

5   III Court can't hear your issues because of Section 305.  Yes,

6   that may violate due process, the fact that you're not able to

7   raise either your constitutional or your statutory issues in

8   the Title III Court.  What you should do is seek stay relief

9   and then bring an action in another court.

10          That is what we see as the ultimate vehicle for a

11  merits determination, and that's what we're trying to get to

12  as quickly as possible.

13          THE COURT:  So --

14          MR. SERVAIS:  So the end goal is not --

15          THE COURT:  May I interrupt you?

16          MR. SERVAIS:  I'm sorry, Your Honor.  Yes.

17          THE COURT:  And I asked Mr. Firestein not to talk

18  about his 305 position, but as best I can read the new

19  choreography on 305, and he'll tell me if I'm wrong on this,

20  but I think the Oversight Board is saying, see our adversary

21  as an objection to your claim.  If we can't succeed in

22  expunging your claim as unsecured because you have a property

23  interest, then all the constitutional arguments attached to

24  disposition or treatment of that property interest, including

25  a Takings claim or a contracts claim, whatever else, will have

1    to be dealt with in the context of the Plan.

2            And so in that way, it would end up getting litigated

3    in the Title III.

4            MR. BIENENSTOCK:  (Nodding head up and down.)

5            THE COURT:  Now, I see Mr. Bienenstock nodding a

6    little bit.  I see Mr. Firestein perhaps looking a little

7    perhaps "I'm not sure she's got it."  Did I get it?

8            MR. FIRESTEIN:  I think so.

9            MR. SERVAIS:  So we have the statements from them in

10   their Response on December 6.  They stated their position on

11   305, which you subsequently took note of in the Interim

12   Revenue Bonds Order, which is --

13           THE COURT:  They seemed to say forget about that; now

14   we have a new way of thinking about it.

15           MR. SERVAIS:  Okay.  So to be clear, what they said

16   in that position statement that was concerning was that they

17   did not consent to challenges to the validity of fiscal plans,

18   moratorium laws, or any other -- any of the other devices that

19   have been used to impair the property interest of the revenue

20   bond holders.  But all of those issues of the validity of

21   those different instruments are integral to the issue of what

22   property rights we have, because if the only reason they

23   allege we don't have a property right is because they

24   destroyed our property interest using these fiscal plans,

25   moratorium laws, and other devices, then really the central

1   issue in the litigation is the validity of -- or in our view,

2   invalidity, of those devices that they've used to attempt to

3   destroy our property interest.

4         So those are really going to be the central issues,

5   either in the lift stay context, or in the adversary, or

6   hopefully, in our view, an enforcement action outside of the

7   Title III court.  So if their position is that those

8   invalidity issues can't be litigated, then that's a major

9   problem and that prevents really an effective adjudication

10  within the Title III court because of 305.

11        THE COURT:  Would you indulge me in letting

12  Mr. Bienenstock or Mr. Firestein pop up to clarify what

13  they're saying, especially as to that aspect of 305?

14        MR. SERVAIS:  (Nodding head up and down.)

15        MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

16  Bienenstock of Proskauer Rose for the Oversight Board.

17        Number one, we think that the First Circuit rulings

18  on 305 each responded to requests by Ambac or other insurers

19  or bondholders for Orders ordering turn overs of property of

20  the Commonwealth, or of another instrumentality of the

21  Commonwealth, or declaring that they should be turned over.

22        We do not think that the First Circuit in any way

23  said that Section 305 gets in the way of determining whether

24  there's been a taking of property.  Those types of issues,

25  which were raised by some of the GO bondholders and probably

1    the monolines, were lure -- to the extent they were dismissed,

2    they were dismissed because they were requests for advisory

3    opinions.

4         So our position now on 305 is very simple.  As Your

5    Honor just stated a moment ago, in the context of our

6    adversary proceedings, it's nothing but an objection to their

7    claim.  The reason it was done by complaint instead of by

8    motion is that their claims include claims to security

9    interests, priorities, et cetera.  And Bankruptcy Rule 7001(2)

10   says, if you're doing that, you need an adversary proceeding.

11        So we did it by Complaint, but, in essence, their

12   Proofs of Claim are the complaints.  Our complaints are the

13   reasons why their Proofs of Claim should not be allowed.

14        In terms of what they can do without any relief

15   from -- without any relief from the Board in terms of

16   consenting to 305, if they think that as a result of the

17   Fiscal Plan or anything else, if there has been a taking of

18   their collateral, or their property interests -- no one has

19   ever said they can't come to this Court and get a ruling and

20   have a claim that their property interest has been taken and

21   the entity owes them something back as a general unsecured

22   claim, a secured claim or something else.

23        What they cannot do, and it's not a function of 305,

24   it's a function of 106(e), is challenge our Fiscal Plan or

25   budget or anything else that the Oversight Board certifies

1    under PROMESA.  I realize that they say to the contrary, but

2    we frankly think that, for a number of reasons, and I won't

3    even speculate because it will be -- it will just provoke a

4    lot more argument today that won't help get Your Honor to a

5    schedule.  But we think they're just dead wrong when they

6    contend that their inability -- they have to be able to

7    challenge the Fiscal Plan to establish a taking claim or any

8    other type of claim.  All they have to show is they had

9    collateral; it was taken.

10        What we're here for is to say they never had the

11   collateral at the Commonwealth level, so it couldn't have been

12   taken.  When that issue gets resolved, it will make a lot of

13   this other stuff go away.

14        THE COURT:  Thank you.

15        MR. BIENENSTOCK:  Thanks.

16        And my colleague asked me to say that in the -- I

17   guess the Order, the timetable was set to be 45 days after the

18   preliminary hearing, there would be a final in the interim

19   case management --

20        THE COURT:  Well, I said it's extended for 45 days.

21   I just tried to make that a little bit more concrete in terms

22   of mechanics to --

23        MR. FIRESTEIN:  It's three sentences, Your Honor.

24   Michael Firestein of Proskauer.

25        362(e) was already deemed to have been -- the time

1   was deemed to have been waived to a point 45 days after the

2   preliminary hearing that is currently set for February 27th or

3   whatever date it ends up being.  That's on page six of the

4   Order.  So we don't have to debate.

5        I think Your Honor was struggling with when one gets

6   a final hearing and whether there's a waiver or not a waiver

7   under the circumstances, and the conclusion has already been

8   reached in the existing Order.  And I think it would be

9   difficult to seek to modify the Revenue Bond Order to somehow

10   retract the waiver that has already been determined pursuant

11   to the Court's Order under the circumstances.

12        THE COURT:  Okay.  I don't want to, you know, go down

13   a spiral drain.  I will just note that I think it was in a

14   footnote in their Reply on the Motion to Amend that Ambac at

15   least said something like, well, deemed waiver doesn't work;

16   we didn't agree to that; we have a position that the whole

17   stay expired in November, but we'd be willing to agree to

18   something else.

19        And, you know, I don't want to take the time to try

20   to adjudicate whether that particular Order binds them forever

21   if they're willing to agree to something that will, as a

22   practical matter, let us get somewhere today.  That's why I

23   raised that.

24        MR. FIRESTEIN:  Happy to accomplish it.  I'm just

25   raising it, that that had been the Order.

1      And I recognize the distinction between PRIFA on the

2   one hand and perhaps HTA and perhaps CCDA on the other.  Of

3   course the Court has now ruled already on the Motion for Leave

4   to Amend, and so we find ourselves in this current

5   circumstance.

6           THE COURT:  Yes.  Thank you.

7           MR. FIRESTEIN:  Thank you.

8           THE COURT:  Mr. Servais.

9           MR. SERVAIS:  So with respect to Section 305, and

10  this is primarily relevant because it explains why the lift

11  stays and the subsequent enforcement action in a non-Title III

12  forum is the best route to a merits ruling, the Oversight

13  Board has mischaracterized the *Ambac* decision.  Ambac was

14  seeking to recover special revenues, but in addition, they

15  specifically sought a declaration as null of the moratorium

16  laws and orders in the Fiscal Plan.  And they sought that

17  declaration based, for example, on Section 303 of PROMESA,

18  which expressly, in Ambac's view, preempted the moratorium

19  laws and is based on the Contracts Clause and the Takings

20  Clause.

21          And I don't think the Oversight Board has previously

22  ever taken the position, if they're taking it today, it's news

23  to me, that that Section 106(e) bars constitutional challenges

24  to a fiscal plan.  So all of those issues that were already

25  raised in the Ambac adversary proceeding as to whether the

1   moratorium laws are null under Section 303, whether the fiscal

2   plans and moratorium laws are null and void under the U.S.

3   Constitution, all of those are already raised within the new

4   adversary complaints, because those complaints specifically --

5   I mean, the Oversight Board has tried to analogize our Proofs

6   of Claim to complaints.  We don't think that's exactly right

7   as a procedural matter, but nonetheless, all those issues that

8   were in the *Ambac* Complaint that the First Circuit said this

9   Court could not rule on, are raised in our Proofs of Claim and

10  they're raised in the objections to the Proof of Claim.

11          Even if that were not the case, the current Interim

12  Revenue Bonds Order schedules the filing of counterclaims

13  within those adversary proceedings.  When we file those

14  counterclaims, they are going to very closely resemble the

15  *Ambac* Complaint.  We will challenge the validity of the Fiscal

16  Plan under the Constitution.  We will challenge moratorium

17  laws under Section 303.  And basically these adversary

18  proceedings will just become a replay of the Ambac adversary

19  proceeding.

20          The Ambac adversary proceeding did not lead to the

21  types of merits rulings that the Oversight Board is looking

22  for because of Section 305, and it also did not provide due

23  process as the First Circuit seemed to acknowledge when it

24  advised revenue bondholders that the way to obtain due process

25  was to bring an action in a forum where Section 305 does not

1    apply.

2          So we do not view the adversary proceedings as a

3    viable vehicle for achieving what all of us would like, which

4    would be merits rulings.  We think the steps have to be an

5    initial lift stay -- well, not an initial.  A final lift stay

6    hearing on the issue of whether we have a colorable claim or

7    another basis for lifting the stay, leading to enforcement

8    actions in another forum.

9          And that's really our goal, is to have that final

10   hearing.  And so whatever timing or logistics are needed to

11   get there, that is what we -- that is what we would like.

12         We do not think that the proposals by the Oversight

13   Board today were timely.  We think they needed to propose

14   amendments to the Interim Revenue Bonds Order by January 21st.

15   They didn't do that.  We shouldn't have to respond to these

16   new proposals on two days notice with no opportunity to submit

17   briefing and response.

18         THE COURT:  Anything further?  Did you want to say

19   anything further?

20         MR. SERVAIS:  No.  Thank you.  Unless you have

21   anything else for me?

22         THE COURT:  I want to hear everybody else.

23         MR. SERVAIS:  Okay.  Thank you.

24         THE COURT:  Thank you.

25         Okay.  Who else wants to be heard?

1           Hi again, Ms. Miller.

2           MS. MILLER:  Good afternoon again.  Atara Miller from

3    Milbank on behalf of Ambac.

4           Just quickly, to close the loop on 305, I don't think

5    this is an issue that needs to be decided today given where it

6    seems the Court's leading on the adversary, but I do believe

7    that whether or not you strike the language, leave the

8    language in in the Interim Order, I think the Board's position

9    on 305 is critical for purposes of the Lift Stay.

10          And I'm hopeful that there will be a clear statement

11   of the Oversight Board's position on 305 with respect to what

12   it is or is not waiving or consenting to in the papers that it

13   files tomorrow, because I think one of the things that Your

14   Honor's going to have to consider, and one of the core

15   considerations and arguments that we've raised in our stay

16   motions -- in our Lift Stay Motions, is the fact that you have

17   to consider that there is no alternative venue.  And that's

18   exactly what the First Circuit said.

19          So in case there's any doubt that the First Circuit

20   wasn't merely addressing the turnover, actually, if you read

21   through the decision, you know, the First Circuit starts by

22   saying turnover, well, you don't get that.  We decided that in

23   the *Assured* case.  And you know, to the extent Ambac suggests

24   declaratory relief doesn't violate 305, we address that in the

25   *Aurelias* action.

1           And then they go on and say, and everything else is

2    still barred by 305.  And then they say, to the extent that

3    Ambac's counsel argued that our interpretation of Section 305

4    raises due process concerns because Ambac would be left

5    without a venue in which to bring its constitutional claims,

6    nothing precludes Ambac from using the mechanisms provided for

7    through lift stay in the Bankruptcy Code.

8           And then I believe the colloquy at oral argument was,

9    and then if that's denied, you'll come to us and you'll

10   complain about it.  And we'll fix it for you if we have to.

11          So there's no question that 305 I think is going to

12   be an important component of this Court's ability to evaluate

13   the appropriate forum and whether the stay should be lifted.

14   So I want to get back -- I know we've moved sort of deep down

15   the complicated 305 rabbit hole, but I want to get back to

16   just sort of the nuts and bolts of what I think we have before

17   us between now and the next Omnibus, which is really what was

18   at issue.

19          And some of your comments sort of -- I'm happy for

20   myself, are reflected directly in my notes, including the

21   suggestion that I do believe that we could stipulate or should

22   be able to stipulate to a lot of the facts.  You know, I'm

23   reminded, as we're going down this path, that it's not

24   dissimilar from the Commonwealth-COFINA dispute and the COFINA

25   interpleader action where they were similarly very narrowly

1   construed and limited to, A, in that case, a sole, single

2   legal issue of who owns the SUT.

3           And there was discovery that was provided for.  And I

4   thankfully was spared this, but Mr. Friedman probably

5   remembers it well, when the question was, do we stay in Puerto

6   Rico through the hurricanes to allow depositions to continue

7   or do we come to agreement on a set of stipulated facts.  We

8   were able to come to agreement on a set of stipulated facts,

9   and so I'm optimistic that we'll be able to do the same thing

10  here.

11          I am a little bit concerned, though, that Your

12  Honor's comments -- and I'm concerned about how they're going

13  to be reflected back to us in the meet and confer process --

14  focus singularly on the two facts that have already been

15  disclosed, and saying, well, they need more information about

16  those two pinpoint issues.  And what to me that highlights is

17  the relative positions of the parties here and the information

18  asymmetry.

19          And so we're in a position now where precluding us

20  from taking basic discovery on the flow of funds, the use of

21  the funds, account ownership, balance information, which we've

22  been asking for for a long time, as Your Honor is aware, puts

23  them in a position where they can selectively reveal

24  information that they think might help them shield from

25  discovery any information that we have, force us to guess what

1    information might be there.

2          Listen, kudos to me.  I guessed right the last time

3    and I asked the right question.  But I could have asked the

4    wrong question also, and then we would have never discovered

5    information that we think is relevant.

6          We're not asking for broad based discovery, but I'm

7    fairly confident that despite the repeated statements by the

8    Oversight Board that this is a simple case that can be decided

9    on the Statute, the resolution, the agreements and other

10   documents -- I don't know what the other documents is a

11   reference to -- that you're not getting a 65-page opposition

12   brief that tells you how to read the statute and the

13   resolution.

14         And I'm confident, as we predicted back in the

15   summer, that what we're going to see tomorrow, and as

16   reflected in their opposition to the Motion to Amend, are

17   broad arguments that sweep across a number of factual issues

18   that go directly to the question of secured status and

19   standing, including, for example, clawback, and, you know,

20   what they refer to in their amended motion as the retention

21   right.

22         There are factual questions about whether it was

23   triggered, whether it was appropriately applied if it was

24   properly triggered, preemption issues, which, as Mr. Servais

25   indicated, implicate all sorts of questions about the Fiscal

1   Plan and other claims.  This is not, even if you limit it to

2   standing and secured status, a question where Your Honor's

3   going to be asked to simply look at the documents, because

4   frankly, if you look at the documents, they know that we

5   clearly carry the burden of demonstrating a prima facie case.

6   Otherwise, they wouldn't be fighting so hard.

7          I'm not suggesting that the Court preclude them from

8   making those arguments however they want to, but I think we

9   should see these motions for what they are.  And if they're

10  going to expand the scope to include every potential legal

11  theory that cuts us down, then we need discovery into those

12  issues as raised.

13         And frankly, I wish I could come with a concrete

14  proposal and have you, you know, rubber stamp it and say, I

15  agree that's a reasonable scope, because it would make our

16  life so much easier.  But I think, honestly, we probably need

17  to see what they put in their papers tomorrow before we can

18  come to you with a proposal, or Judge Dein, or maybe just

19  through meet and confer.

20         I just didn't want it to be -- your comments to be

21  construed as saying, the only thing we get discovery in is

22  PRIFA, and the only thing we got discovery on with respect to

23  PRIFA are the notations and the, you know, particular, you

24  know, segregation of accounts within the TSA.

25         THE COURT:  Understood.  And I thank you for that.

1   And it may be that you're not in a position to speak

2   definitively to this today, but I'm just going to put the

3   question out.  Are the monolines or the bondholders taking the

4   position that there are factual issues that are material to

5   the basic question of whether there is a security interest at

6   all letting -- putting aside quantification and/or whether

7   there is a way to get -- overcome the creditor of a creditor

8   lack of standing argument?

9           Because my inclination still is, so as not to lose a

10  briefing schedule and a date, in an atmosphere in which I

11  suspect that my calender is more and more going to be filled

12  with briefing schedules and dates as we go deeper into the

13  spring, my inclination is still to keep this February 27th

14  date and briefing schedule on this narrower set of issues;

15  have you all work together on a broader schedule toward a

16  final hearing date that will be done, if necessary, with

17  stipulations and/or discovery provisions going toward that.

18          And, you know, and that would take us -- that sort of

19  schedule would take us to the March 4th discussion at the next

20  Omni anyway, and we can see where things stand.  But that

21  would be something happening.  So that's what I am inclined to

22  do.  And it doesn't seem completely inconsistent with, you

23  know, your request that you ultimately get queued up for a

24  final hearing.  And it gives me the opportunity to think about

25  these other issues earlier, when I have relatively a little

1    more time.  Not a lot more, but relatively.

2         MS. MILLER:  I'm not -- I guess I'm not opposed to

3    holding the February 27th date for a hearing.  The question,

4    frankly, is can we get the information that we need.

5         So to answer your initial question quite directly,

6    yes, I think there are facts that go directly to certain

7    arguments.  I think Your Honor correctly noted that, you know,

8    as reflected in the Proposed Amended PRIFA Lift Stay Motion,

9    we think that the notation isn't, and I wrote it down, just a

10   cash management mechanics statement, but that under the law,

11   if there's a specific notation, that a special fund can be

12   created within a Treasury account by notation.

13        And so if that's a special fund as provided by the

14   statute, then the minute it goes into the TSA with the

15   notation, it's in the special fund and it's part of my

16   collateral.  That's one of the alternative arguments that we

17   have that goes directly to whose property is it and who has a

18   security interest in it.

19        So yes, unfortunately, I think the answer is that

20   there is, and I think it does go to these threshold issues,

21   you know, whether you bifurcate or not, preliminary or final.

22   I think some amount of discovery is necessary on those.

23        And then I think they're going to raise all sorts of

24   defenses.  I mean, I think if you wanted to really narrow it

25   and do something rational and say, okay, all the bondholders

1   need to do is demonstrate -- make a prima facie showing that

2   they have a security interest, and therefore, I'm going to let

3   them affirmatively make that showing and I'm not going to

4   consider all of the broad swath of defenses, and those will be

5   litigated somewhere else at some other forum -- which is

6   essentially what the First Circuit said, move to lift the stay

7   and then the other Court will determine preemption issues, for

8   example, that I was pressing this Court and that Court to rule

9   on.

10          THE COURT:  Unless the Board gets religion and

11   decides to consent on 305.

12          MS. MILLER:  Right.  Right.  Which, I mean, honestly

13   --

14          THE COURT:  Strategically or spiritually or whatever,

15   but --

16          MS. MILLER:  Whatever.  You know, I almost laughed

17   because time flies when you're having fun, but I've been

18   arguing for resolution of these issues and a determination

19   since 2015, long before you or the Oversight Board were on the

20   scene.  And in the notion that someone would stand up and say

21   the bondholders just want delay -- and we're advocating.  We

22   are the ones who have paid out at this point hundreds of

23   millions of dollars out of our pocket on claims on behalf of

24   the Commonwealth, who hasn't been making those payments.

25   Nobody wants a determination on these issues more than our

1  clients.

2        So, you know, I think we're it seems like for the

3  first time maybe mutually aligned on trying to get to

4  resolution.  Unfortunately, I think there is some amount of

5  discovery that goes directly to these issues, and I just don't

6  know how to get around it.

7        THE COURT:  All right.  Well, just for what it's

8  worth, and I realize there may be other people on your side of

9  the table that want to be heard, and I told Mr. Firestein he

10  could have a reply, but my inclination at this point is to

11  hold the briefing schedule and argument timing for February

12  27th on my books as limited -- as argument limited to standing

13  and security interest; and at the same time, direct you all to

14  meet and confer in good faith, candor, realism, and every

15  other constructive factor you can bring to it, on proposing a

16  schedule that efficiently and appropriately gets us to a final

17  hearing on the Lift Stay issues, or a different litigation

18  modality that can promptly deal with these issues if -- and

19  we'll set a date for a status report and the proposed Order.

20        And you can think about how that would relate to

21  Judge Houser's upcoming report, and if at any point in the arc

22  of the development of that you all jointly say to me, we don't

23  think we can constructively use February 27th and/or we want

24  to short circuit the supplemental briefing that's currently in

25  the schedule because we don't think that can be sufficiently

1    comprehensive or whatever, I'll take it off.  But I don't want

2    to take it off now with no other consensus on or vision of a

3    mechanism.

4         And I need to set a date for -- you know, unless

5    you're -- okay.  I either need to have the bondholders and

6    monolines say on the record you waive 362(e) pending the

7    development of this schedule and/or some terminal date that's

8    realistic, or, you know, give me a terminal date for a waiver

9    of the extension -- of the 362(e) periods now that can be

10   revisited.  But I need to get something on the record with you

11   all having an opportunity to have objected to it or consent to

12   it so that I don't see another footnote like the one that I

13   saw in the other brief.

14        MS. MILLER:  So I would agree with Mr. Firestein's

15   comment that we have already, I think at the last hearing,

16   agreed on the record.  I think that footnote was actually not

17   suggesting that the amendment started a new clock, nor was it

18   addressing the current waiver.  I think there was an interim

19   period where we objected to an extension and the stay was

20   extended over our objection, including an extension of the

21   stay.

22        But I think at this point we would consent or hold by

23   our consent to 45 days from February 27.

24        THE COURT:  That's good.

25        MS. MILLER:  I don't know if the others --

1          THE COURT:  Is there anybody who would raise

2     objection to that?

3          (No response.)

4          THE COURT:  We're firm on the existing 45 days past

5     February 27?

6          MS. MILLER:  Yes.

7          THE COURT:  Thank you.

8          MS. MILLER:  Right.

9          THE COURT:  Sorry if I panicked unduly about that or

10    not unduly --

11         MS. MILLER:  No.  I mean, I feel like I should put on

12    the record, as we did in the footnote, without prejudice to

13    arguing, that the extension over our objection previously was

14    improper.  But that's not for you to decide today.  We've got

15    -- we certainly won't argue that this has any impact on that.

16    We are consenting to 45 days from February 27th.

17         THE COURT:  Thank you.  All right.

18         MS. MILLER:  So I don't know, Your Honor, if you're

19    finished with your remarks, and I always hesitate to ask a

20    question after the Court's issued remarks, but the only thing

21    that's not clear in my mind is whether you're contemplating

22    any meet and confer and discussion of potential stipulation or

23    relevant factual inquiries before the February 27 hearing?

24         THE COURT:  I think there needs to be --

25         MS. MILLER:  Okay.

1          THE COURT:  -- because as I said, I'll be open to a

2    proposal to take that one off track in favor of something

3    else.

4          So there's opposition papers due tomorrow, and then I

5    think there are some supplemental briefing dates in that

6    February 27 schedule.  So we'll want to get the meet and

7    confer in before that, so meet and confer by February 7th.

8    That would be a week from Friday.

9          MS. MILLER:  I think that's fine.  We can talk.  I

10   think we have a meet and confer on the existing 2004 Monday,

11   so maybe it makes sense to role it into that.  But we'll

12   confer with AAFAF and the Oversight Board.

13         THE COURT:  Great.  So just as the bidding stands

14   right now, I am going to revise the Interim Order, and this is

15   subject to Mr. Firestein being heard, but I think where I am

16   now is that I'll revise the Interim Order to take out the

17   references to considering whether there are compelling

18   circumstances to put the merits off to coincide with the Rule

19   12 proceedings on the adversaries.

20         I'm going to say that the preliminary hearing for the

21   27th is limited to standing and security interest issues,

22   crossing out all other references to 1(d).  Hold on a second.

23   I'm going to delete all of those two paragraphs about 305.  I

24   am leaving in the 45 days stuff.

25         It seems to me that right now, since we do -- are

1  going to move forward and meet and confer and specifically

2  address discovery in connection with the Lift Stays, I don't

3  have to do anything right now to those paragraphs about

4  discovery and applications to amend the schedule.

5         Let me just see if there's anything else that I

6  flagged on here.

7         So I think that that would be it.  And I'm leaving

8  all of the adversary proceedings scheduling stuff in place as

9  written right now.

10        MS. MILLER:  Your Honor, if we're going to proceed, I

11 think that sounds right based on the conversations subject to

12 Mr. Firestein's comments.  The only thing that I would

13 request, quite respectfully, is that if we're going to stick

14 with the preliminary hearing structure, that Your Honor write

15 in I guess a willingness to issue a certification of any

16 ruling coming out of the preliminary hearing on standing and

17 secured status under Rule 54(d).

18        I don't think that hubbub was related to my last

19 comment.

20        MR. FIRESTEIN:  No.  No.

21        THE COURT:  Okay.  So something -- I'm trying to even

22 think of where -- to see where I would put that.  There must

23 be a paragraph where I talk about the February 27th hearing --

24 yes.  This is paragraph (d), that's on the bottom of page

25 five.  So this isn't -- 1(d) was the paragraph that had the

 1   February 27th hearing, so I would edit it to say that there'll

 2   be a preliminary hearing to determine standing and secured

 3   status.

 4         And just one second.  Okay.  I propose to put in a

 5   sentence, the Court will entertain applications to certify for

 6   appeal the Court's decision with respect to those issues.

 7         MS. MILLER:  Thank you, Your Honor.

 8         MR. FIRESTEIN:  I have a preview --

 9         THE COURT:  So Judge Dein has pointed out that it

10   might be better to have an earlier deadline for the meet and

11   confer than the 7th, because if you are going to be brewing up

12   any discovery issues that you need her to hear in relation to

13   the February 27th proceedings, you're going to have to ask her

14   for a hearing the week of the 10th.  And so Judge Dein needs

15   to reserve time; she needs to have fair notice of what the

16   issues are; and you need to prepare for that.

17         MR. FIRESTEIN:  Got it.  One moment, Your Honor.

18         THE COURT:  Excuse me, folks.  Before you all finish

19   your confab and before I call on Mr. Firestein, Judge Houser,

20   who's been listening, has requested to be heard.  And so if

21   you don't mind, I would like to invite Judge Houser to speak

22   now and then you may want to confer further after that.

23         MR. FIRESTEIN:  Okay.  I'll be seated.

24         THE COURT:  Yes.  Thank you, Mr. Firestein.

25         Welcome, Judge Houser.

1          I think you have to open her line.

2          COURTROOM DEPUTY:  It's open.

3          THE COURT:  Judge Houser, would you say something?

4   Because we're not hearing you.

5          All right.  Hang on there.  We're trying to make sure

6   your line is open.

7          All right.  The machine is telling us it's live, but

8   we're not hearing you, so we're attending to that.  Just hold

9   on.  In the worst case, I'll dial you up on my cell phone and

10  hold that up to the microphone, but we're trying to avoid

11  having to do that.  I don't want to have to cut off everybody

12  and have everybody dial back in, so thank you all for your

13  patience.  We're working on this.

14         Okay.  Judge Houser, I'm going to call the mobile

15  number that you provided and hold it up against my microphone,

16  and we'll hope that works.

17         RECORDED MESSAGE:  You have reached XXX-XXX-XXXX.  I

18  can't come to the phone right now.  If you'll leave your name

19  and number, I'll return your call.

20         THE COURT:  Tell her we got voicemail.

21         Judge Houser, try speaking, please.

22         HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

23  HOUSER:  Hello.

24         THE COURT:  Okay.  We've got her.  Thank you so much.

25         All right.  Judge Houser, you'll need to speak up a

1  little bit.  You're a little bit faint.

2          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

3  HOUSER:  All right.  Let me do that.  Can you hear me now,

4  Judge Swain?

5          THE COURT:  Yes, I can.  And if you could project

6  even a little more, I think that would be helpful to

7  everybody.

8          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

9  HOUSER:  All right.  How's that?  Is that better?

10          THE COURT:  Perfect.

11          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

12  HOUSER:  Okay.  First, sorry for any inconvenience.  I don't

13  know why we were having difficulty unmuting the line, but I

14  guess we got that solved.

15          So I have two observations, and some, Judge Swain, of

16  what I wanted to make you aware of, has been mooted by the

17  course and direction that the hearing has taken.  But one of

18  my purposes of wanting to be heard today was to alert you to

19  the fact that the amended report that the mediation team will

20  be filing no later than February 10th will be addressing what

21  the mediation team believes needs to be done with respect to

22  the Revenue Bond Order.

23          THE COURT:  I'm sorry.  Judge Houser, would you hold

24  on just one second?  We seem to have a problem with everybody

25  else on Court Solutions just now.  So just hang on.

 1          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

 2   HOUSER:  Oh, dear.

 3          THE COURT:  Okay.  I'm sorry.  You just have to sit

 4   tight, because we need to have everybody here.

 5          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

 6   HOUSER:  Okay.  No problem.

 7          THE COURT:  All right.  So this is a test.  First,

 8   Judge Houser, are you still there?

 9          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

10   HOUSER:  I am still here.

11          THE COURT:  Okay.  Great.

12          And now we're going to wait for word from our test

13   remote listeners as to whether they're hearing this colloquy.

14          COURTROOM DEPUTY:  Yes.

15          THE COURT:  Okay.  Sounds like everybody can hear,

16   everybody's on board.  Thank you all for your patience.

17          Judge Houser.

18          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

19   HOUSER:  Thank you very much.  And I'll start over just to

20   facilitate everyone being able to hear.

21          First, thank you very much for allowing me to

22   participate in this conversation.  Secondly, part of the

23   reason why I wanted to be heard today has really been mooted

24   by the direction that the Court has indicated to the parties

25   it intends to go, which of course is quite helpful.  But I do

1    have a couple of observations that I wanted to be sure the

2    Court was aware of.  These observations will not come as a

3    surprise to any of the parties that have been speaking with

4    respect to this issue.

5           The mediation team intends to file its amended report

6    to the Court on or before February 10th.  And in that amended

7    report, we will be making very specific recommendations with

8    respect to what we think needs to happen as it relates to the

9    Revenue Bond Interim Order.

10          Again, this is no surprise to the parties you've been

11   speaking with today, Judge, because in fact, although I will

12   be very careful here, we met with those parties just last week

13   to begin to have that dialogue.

14          I believe that the Court's tentative rulings at this

15   point will be helpful to the process, but there is more work

16   that needs to be done in hopes that what we report on February

17   10th may have the support of as many people as possible.  In

18   that regard, your tentative rulings or the inclination that

19   you've identified as to where you're going I think will be

20   helpful to the mediation team.

21          So I have two observations.  First, we would be happy

22   to facilitate the meet and confer that the Court is going to

23   require, because, frankly, we will be continuing to have meet

24   and confers with the parties as part of our discussion of the

25   February 10th amended report, and what the recommendations of

 1   the mediation team will be with respect to the Revenue Bond

 2   Interim Order, and further processes that should be undertaken

 3   by the Court then.

 4           So I think it would be helpful if we participated in

 5   that meet and confer, because again, it gets very intertwined

 6   in what the amended report will likely say with respect to the

 7   Revenue Bond Interim Order.

 8           Secondly, we are also very happy to participate in

 9   the work that will be required to try to get to either factual

10   stipulations or limited discovery.  And at this point, we

11   are -- I hesitate to say it, but sadly, it's probably true, we

12   are about as familiar with these issues as any other of the

13   parties are.  So my hope is that we could be helpful to that

14   process and perhaps, with some luck, avoid the necessity for

15   Judge Dein getting involved on an emergency kind of basis.  So

16   we volunteer our services to Judge Swain, you and Judge Dein,

17   to see if we can't be of assistance there as part of that

18   process.

19           Point three, I agree that leaving a hearing on

20   February 27th will be very helpful.  And frankly, I agree that

21   there are gating issues that are extremely important for the

22   parties to get a sense of this Court's view of those issues

23   on.  That will not only facilitate the litigation process in

24   these cases but I am actually hopeful that it could be very

25   meaningful to us having the opportunity to make more progress

1   with these particular claimants and the Oversight Board with

2   respect to the treatment of claims under a plan.

3         So I am very encouraged by what -- the course these

4   hearings have taken, and I really think it's important that

5   the meet and confers occur.  And in hopes that they will be

6   even more productive, the mediation team is happy to

7   participate in that process to see if we can't help streamline

8   these issues and bring them back to the Court both on February

9   27th and, ultimately, in our amended report that will be filed

10  even before that hearing.

11        So those are the only comments that I had, Judge.

12  I'm obviously happy to answer any of your questions.

13        THE COURT:  Thank you, Judge Houser.  I don't have a

14  question for you now.  I guess what I would do is invite the

15  parties to resume their huddle, and then -- no, Mr. Firestein

16  wants to speak?

17        MR. FIRESTEIN:  (Nodding head up and down.)

18        THE COURT:  All right.  So, Mr. Firestein.

19        MR. FIRESTEIN:  Thank you, Your Honor.  And thank

20  you, Judge Houser.  Michael Firestein of Proskauer on behalf

21  of the Board.

22        So there is one thing that we might want to huddle

23  about, but before we get to that point, we actually do have

24  some consensus relative to a couple of scheduling issues that

25  we think will be instructive both to Magistrate Judge Dein, as

1   well as to Your Honor, and perhaps as well to Judge Houser.

2   And then I'll cobble on at the end the one sort of huddle

3   issue that we can sort of lay out for the folks.  It's in

4   response to what Judge Houser just said.

5           There is consensus amongst the parties that are in

6   the room representing the monolines that we'd like to tinker a

7   little bit with the briefing deadlines and the hearing dates,

8   which we think are not going to make any difference to the

9   Court we hope.  All right?

10          Currently, and this will also facilitate the meet and

11  confer that we need to have, and, with some benefit, maybe

12  release a little bit of the pressure that Judge Dein might

13  experience --

14          HONORABLE UNITED STATE MAGISTRATE JUDGE DEIN:

15  (Shaking head from side to side.)

16          MR. FIRESTEIN:  She's shaking her head.  But just

17  hear me out.  With respect to the calendar, we'd like to push

18  the filing date for our oppositions from tomorrow until

19  Monday.  I'm going to give the Court a break, too, on the back

20  end of this, I assure you.

21          THE COURT:  All right.

22          MR. FIRESTEIN:  And the reply that would be due to

23  those oppositions relating to the Lift Stays be pushed a

24  comparable number of days.  I don't have the date in my mind,

25  what it is, off the top of my head.  Hold on.  I actually have

1        the Order in front of me.

2                The replies are February 13, so that would be pushed

3        the comparable number of days.

4                Is the 17th a holiday?  Okay.  So I'm happy to extend

5        it to the Tuesday, if it's satisfactory to the Court when you

6        hear the other shoe.

7                THE COURT:  All right.  So that would be oppositions

8        on February 3rd instead of January 31, right?

9                MR. FIRESTEIN:  Correct.

10               THE COURT:  And then the replies, February 18th,

11       which is a Tuesday, instead of February 13?

12               MR. FIRESTEIN:  Correct.  And at the same time, we

13       would suggest, and this is a collective suggestion, that

14       instead of the 27th, that we block the second day of the Omni,

15       on the 5th, for the hearing on the issues that are raised by

16       those papers.

17               It may or may not mean a short day on the 4th, but

18       there are a number of First Circuit arguments that are

19       sandwiched in and around that, so it gets a little tricky.

20       But another day in Puerto Rico might be helpful.

21               THE COURT:  All right.  Do you think we would be

22       able, and this is, frankly, for travel logistics, to cover --

23       it will be oral arguments still?

24               MR. FIRESTEIN:  Yes.

25               THE COURT:  So we should be able to cover that all

1   well before noon, so that if people want to get afternoon

2   planes, they can get afternoon planes?

3          MR. FIRESTEIN:  Goodness knows, Your Honor.  I would

4   hope that in three hours we could address oral argument as it

5   relates to the narrow issues that are here.  I know there's a

6   lot of people that would like to speak, but I suspect much

7   like the way the First Circuit does it, when you find out that

8   you have 20 minutes or 15, you say what you need to say within

9   the parameters that you've been given.  So it shall be

10  written, you know.

11         THE COURT:  Yes.  I would find it hard to imagine

12  that there would be a need to go past, I'll be generous, two

13  hours on this; but if anybody has a different view, stand up

14  now and waive your hands like a helicopter.  Ms. Miller.

15         MR. FIRESTEIN:  I still have the filler for the

16  comment that Judge Houser made.  That's all.

17         MS. MILLER:  I don't necessarily have an objection.

18  I guess it raised in my mind the question of procedurally how

19  you're envisioning the hearing proceeding and whether we're

20  imagining, you know, we're going to call CCDA; we're going to

21  argue that; then we're going to close it; call HTA; argue

22  that.  It's just what the presentation is.

23         So I'm just trying to think that on the HTA clawback,

24  I think we probably -- I believe we had 40 minutes a side.

25         THE COURT:  Well, I guess what I typically do is say

1    each interest block has -- and if it's going to be two hours,

2    I'll say one hour, and leave it to you all to arrange between

3    yourselves how you would present non-duplicative arguments and

4    reserving time for reply for the movants.

5          MS. MILLER:  So there are different movants on

6    different motions here.

7          THE COURT:  Yes.

8          MS. MILLER:  And there are three separate motions.

9    So I guess you're imagining one big argument addressing all

10   three of them, and not slicing it and hearing it sort of CCDA,

11   the CCDA box, HTA in a separate argument --

12         THE COURT:  I was thinking not, because there are

13   some overarching conceptual --

14         MS. MILLER:  Right.

15         THE COURT:  -- aspects to these issues.

16         And then I understand that the security interest

17   arguments will be peculiar to the documents governing each

18   bond issue.  And so I'm kind of imagining this on the fly, but

19   I would imagine that there would be a principal person or

20   people to speak to major conceptual issues, and that those

21   people and others would also have a portion of their allotted

22   argument time that would go to issues that are specific to

23   their security interest claim on their bond issues; but that

24   everybody would be speaking sequentially.  So that I'd have a

25   block of presentations by movants, a block of opposition

1    argument that would engage both the major conceptual issues

2    and the specific distinctions for the different bond issues,

3    and then the replies split up in whatever way you all feel is

4    appropriate, conceptual and specific.

5         And as I say, I would like to think we could get that

6    done in two hours.  You know, please get it done in three.

7    But, you know, I would give an allocation and let you all

8    split it up in there.

9         MS. MILLER:  Okay.  I think that makes sense, and I

10   agree.  The timing wasn't an issue.  It just raised in my

11   mind, I have no idea how we're doing it.  I wonder if -- and

12   I'm also thinking on the fly, but since you often issue orders

13   that are very helpful in terms of directing us how the hearing

14   is going to proceed, one way of thinking about it is maybe to

15   have the conceptual issues argued, and then break out the

16   specific ones where we're going to be looking at language and

17   tracking and have that -- instead of everything getting mushed

18   together, have the response broken out and have the argument,

19   opposition and reply.  So a block --

20        THE COURT:  How about this.  You meet and confer.

21        MS. MILLER:  We'll meet and confer.

22        THE COURT:  I'll look forward to a suggestion in your

23   report.

24        MS. MILLER:  Okay.  I have no objection to the three

25   hours.

1          MR. FIRESTEIN:  And, Your Honor, to take even

2    pressure off the Court for this, if this is helpful, frankly,

3    in the absence of having consensus, if the allocation between

4    the two sides is 50/50, we are all grown-ups and we should be

5    able to figure out how we're going to divide up our time to

6    address the issues that we think are important to the Court.

7          We'll do our best to reach consensus, but I don't

8    think it's necessary for the Court to line the desks up in a

9    row and to worry about that.  But of course the Court will

10   have the final say relative to that.

11         THE COURT:  Thank you.  I will look forward in the

12   first instance to hearing whatever requests are made in terms

13   of the structure of the argument --

14         MR. FIRESTEIN:  We'll do our darndest.

15         THE COURT:  -- which will be on the morning of March

16   5th here in Puerto Rico.

17         MR. FIRESTEIN:  Correct.

18         And the follow-up that relates to the issue that was

19   raised by Judge Houser concerning the mediator's participation

20   in the meet and confer, the meet and confer is sort of

21   ubiquitous terms.  There are a few things that are going on

22   here.

23         And we're quite sensitive to the scheduling

24   requirements that Judge Houser and her team are obliged to

25   place into the amended report.  I think, and this is just

1    speaking for the Board, and a momentary conversation that I

2    had with representatives of AAFAF, I think on the scheduling

3    issues that are necessary for the amended report, that that's

4    certainly workable and we would welcome it.

5         And the reason why I'm hesitating even slightly is

6    because sometimes it's difficult to get everybody's time

7    together here, and a lot of us have to fly to a lot of

8    different places.  And I'm thinking in the first instance, as

9    it relates to the discovery itself, that we ought to at least

10   be afforded the time to speak with our adversaries, and they

11   with us, to see if we can't try to work something out relative

12   to the discrete issues.  That's sort of the reason why we have

13   moved the filing dates out and the hearing date out, so we can

14   try to do that.  And perhaps in the second instance, right, to

15   try to relieve some pressure that might be on Judge Dein to

16   have to deal with this in the first instance.

17        We're happy to engage the mediation team for things

18   that we can't work out.

19        THE COURT:  And so, Judge Houser, is it all right

20   with you if the parties reach out to you at the time they

21   believe is appropriate, and if they've decided they're good on

22   their own, they'll reach out to you and tell you that, too?

23        HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

24   HOUSER:  Look, if they -- my experience has been they've got

25   difficulty coming to agreement with each other.

1          THE COURT:  Oh, don't be such a pessimist.

2          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

3    HOUSER:  If they can do it on their own, terrific, but if they

4    can't, then I'm going to push to make them try to find

5    solutions.  So I'm perfectly fine them trying to do this on

6    their own in the first instance, but if history is a predictor

7    of the future, they will not make progress without someone

8    else in the room helping.

9          THE COURT:  So I think I'm hearing --

10          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

11    HOUSER:  I hope I'm wrong.

12          THE COURT:  I think I'm hearing you saying something

13    like if you have not heard anything from somebody by the end

14    of next week, you're probably going to start checking in?

15          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

16    HOUSER:  If not sooner, yes.

17          THE COURT:  Okay.

18          MR. FIRESTEIN:  Well, it's easy to do, Your Honor,

19    because we already have the initial meet and confer set

20    pursuant to the Court's Order that was issued last week.  So

21    there is a timeline that we're quite cognizant of.

22          And we welcome Judge Houser's check-ins at any time

23    that she wishes to do so to help us along the path, but I do

24    believe that --

25          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

1    HOUSER:  And, frankly, just let me be clear, my report's due

2    February 10th.  I'm going to be addressing schedules, so we

3    don't have until the end of next week to see if they can come

4    to agreement among themselves in my opinion.

5         MR. FIRESTEIN:  I made a different observation.  I'm

6    talking about -- I'm separating discovery and schedule.

7         I think in terms of the scheduling of this stuff, I

8    don't -- this, again, speaking for myself on behalf of my

9    client, I don't have a problem with trying to understand what

10   the schedule is that Judge Houser was thinking of and her

11   facilitating that, because that for sure is going to be

12   inclusive in her amended report which is due on the 10th.  And

13   we might as well all get on the same page, if we can, well in

14   advance of that.

15        HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

16   HOUSER:  Exactly.

17        THE COURT:  Okay.  Just one thing.  Thinking about

18   the next Omni and the 5th, I talked about the morning thinking

19   it would be great for everybody to feel pretty comfortable

20   they can leave in the afternoon if that's what they want to

21   do, but I am reminding myself I think that we certainly will

22   have the discussion regarding the mediation team's interim

23   report scheduled for the 4th.  And in December that took a

24   long time.

25        I think we also have scheduled oral arguments on the

```
1   fuel line lenders and the unions, priority arguments in

2   connection with PREPA.  There are objections to claims, and,

3   you know, who knows what else is going to be hung on the tree

4   in advance of the Omni.  So I wouldn't buy any

5   non-refundable -- run out and buy non-refundable tickets for

6   the three o'clock flight on the afternoon of the 5th.

7        My team and I will do what it takes to hear

8   everything that needs to be heard on the 5th, but I'm no

9   longer as excited about the two o'clock plane.

10       MR. FIRESTEIN:  At long last, after a few years of

11  these Omnibus hearings, one will go the second day.  So I

12  don't know that that's --

13       THE COURT:  I think we have had another one go the

14  second day, but it's been rare.

15       MR. FIRESTEIN:  That's all I have, Your Honor.

16  Otherwise, the comments that the Court made of its inclination

17  about the modifications to the Order are acceptable to the

18  Board.

19       THE COURT:  Thank you.

20       Judge Houser, anything further?

21       HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

22  HOUSER:  No, ma'am.  Thank you.

23       THE COURT:  All right.  Thank you.

24       And thank you, everyone.  And I will do that interim

25  revision of the Interim Order.  We'll get that filed by the
```

1    end of the week, but you all know what it says.  And you've

2    got your meet and confer obligations.  So I'll look forward to

3    hearing from you out of that.

4            All right.  I think we had --

5            MR. FIRESTEIN:  Your Honor.

6            THE COURT:  Yes.

7            MR. FIRESTEIN:  This is not a merits based

8    observation, but somebody noted to me in the courtroom that

9    when you initially called Judge Houser, her -- the voicemail

10   that came on recited her cell phone into the record.  And if

11   there's a way I just think for public -- we've never had a

12   redaction, but if there's a way to just not necessarily

13   transcribe her cell phone number into the record, it might be

14   useful.

15           THE COURT:  Yes.  I direct the court reporter not to

16   reflect the cell phone number in the record.

17           And thank you for noticing that.  I was focused on

18   the fact it was voicemail, and I wasn't listening to what it

19   was saying.

20           MR. FIRESTEIN:  I can't take credit for noticing it,

21   but the person who did will.

22           THE COURT:  I'm sure that Judge Houser's grateful for

23   that, too.

24           HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

25   HOUSER:  Thank you very much.  Although so many of you already

1    have that number.

2         THE COURT:  Okay.  So I have lost my Agenda script,

3    but I think that there was one contested Lift Stay on it.

4         All right.  So that's item III.6.  And Ms. Stafford,

5    are you taking care of that?

6         MS. STAFFORD:  Good afternoon, Your Honor.

7         THE COURT:  Good afternoon.

8         MS. STAFFORD:  Laura Stafford from Proskauer on

9    behalf of the Financial Oversight and Management Board of

10   Puerto Rico.

11        This is the 102nd Omnibus Objection to Claims, which

12   seeks to disallow in their entirety a number of Proofs of

13   Claim that failed to provide a basis for asserting liability

14   against the debtors.  A number of responses to this --

15        THE COURT:  Just one second.

16        Mr. Firestein and Mr. Bienenstock, I'm not picking up

17   your words, but I'm getting a lot of rumbling from your table.

18   Thank you.

19        Ms. Stafford.

20        MS. STAFFORD:  So a number of Responses to this

21   Objection were filed, all but one of which were adjourned to

22   the March 24th Omnibus Hearing.  With respect to the one

23   remaining response which was filed by Aracelis Nazario Torres,

24   and it's Proof of Claim number 11823 at ECF number 9963.

25        In her Response, Ms. Nazario Torres provided

1    documentation that indicated ownership of a bond bearing a

2    CUSIP number that is associated with a pension funding bond,

3    Series A 2008 bond, which is covered by a Master Proof of

4    Claim filed by Bank of New York Mellon on behalf of the

5    holders of Series A 2008 bonds.  And so we'd request that the

6    Court grant the objection and disallow Ms. Nazario Torres'

7    claim notwithstanding the Response.

8            THE COURT:  And is Ms. Nazario Torres here to be

9    heard?

10           (No response.)

11           THE COURT:  All right.  Based on the duplication of

12    the CUSIP number with the Master Proof of Claim, the objection

13    to the Nazario Torres claim is sustained.  And you will submit

14    an Order reflecting that?

15           MS. STAFFORD:  We will do so, Your Honor.

16           And just for clarity of the record, this Omnibus

17    Objection, like the earlier ones, also had additional

18    Responses that came in between the last adjournment and this

19    adjournment that we would like to adjourn.  So as we are doing

20    with the ones from this morning, we will provide updated

21    schedules and a revised Proposed Order for the Court.

22           THE COURT:  And so the 102nd Omnibus Objection is

23    sustained as to all of the non-responding claimants and

24    Ms. Nazario Torres, and the Oversight Board, with its Proposed

25    Order, will provide a schedule specifying the claims that are

1   affected by that Order.

2            MS. STAFFORD:  We will do so.  Thank you so much,

3   Your Honor.

4            THE COURT:  Thank you, Ms. Stafford.

5            So that brings me to the end of the prepared Agenda,

6   and I thank you all.  The next scheduled hearing date is the

7   March 4th Omni, to be followed by or to include the revenue

8   bond lift stay hearing on March 5th.

9            And as always, my deepest thanks go out to the court

10  staff in Puerto Rico, Boston and New York for all of their

11  work in enabling us to do all of this work, and their superb

12  ongoing support of these complex cases.  And my thoughts are

13  with the people of this island as they continue to cope with

14  life that includes earthquakes.

15           So thank you all.  Safe travels, and keep well.  We

16  are adjourned.

17           (At 3:53 PM, proceedings concluded.)

18                    *     *     *

19

20

21

22

23

24

25

1  U.S. DISTRICT COURT    )

2  DISTRICT OF PUERTO RICO)

3

4      I certify that this transcript consisting of 194 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Laura Taylor Swain, and the

8  Honorable United States Magistrate Judge Judith Gail Dein on

9  January 29, 2020.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25

< Dates >
April 22 15:9
April 22nd 31:2
December 10 39:25
December 11 23:11
December 19th 107:18
December 27 110:25,
   131:8
December 28, 2019
   31:18, 32:11
December 6 152:10
February 12 149:13,
   149:16
February 13 181:2,
   181:11
February 17 21:13
February 18th 181:10
February 27 106:1,
   106:18, 109:3,
   110:20, 111:1,
   111:23, 112:9,
   113:5, 134:8,
   135:14, 135:17,
   138:16, 138:18,
   139:9, 142:22,
   148:9, 148:20,
   169:23, 170:5,
   170:23, 171:6
February 27th
   111:17, 111:22,
   149:17, 156:2,
   165:13, 166:3,
   168:11, 168:23,
   172:23, 173:1,
   173:13, 178:20,
   179:8
February 27th.
   170:16
February 3 20:7,
   20:17
February 3rd 20:14,
   22:8, 22:25,
   29:10, 181:8
February 7th 171:7
January 14, 2020
   12:4
January 15 32:17
January 16th 40:1
January 17th 33:24
January 21st 150:11,

159:14
January 23, 2020
   11:8
January 29 33:9
January 29, 2020
   1:16, 5:2, 194:9
January 29th 28:22
January 31 181:8
January 7, 2020
   32:14
June 13 113:4,
   119:23, 119:24
June 13, 2019 113:16
June 2019 15:19
June 23rd 107:18,
   107:23
June 30, 2020 12:5
March 24th 191:22
March 31 12:11, 13:9
March 31st 20:13,
   23:7, 28:3, 28:5
March 4th 15:6,
   42:25, 43:9,
   131:10, 165:19,
   193:7
March 4th, 2020
   14:21
March 5th 185:15,
   193:8
May 29 56:14
November 2018 15:18
September, august
   56:13
'19 7:5
'20 7:6
.1. 62:5
.3. 42:17
.6. 191:4


< 0 >
000 7:14, 89:12,
   89:13


< 1 >
1 89:12
1(d 135:18, 136:5,
   171:22, 172:25
1.3 40:7

1.5 34:16
1.9 40:6
10 64:20, 70:20,
   78:15, 80:18,
   89:12
100 89:13
100-day 70:15
10109 129:4
10295-1. 85:4
102nd 191:11, 192:22
106(e 154:24, 157:23
10th 28:24, 29:10,
   29:13, 131:12,
   173:14, 175:20,
   177:6, 177:17,
   177:25, 188:2,
   188:12
11 89:13
11,000. 80:19
11.8 40:4
1129 57:9
11823 191:24
12 39:9, 116:2,
   171:19
12(b 117:5, 117:12,
   133:5
12(c 133:5, 136:17
122 42:20
122nd 43:24
123 42:23
123rd 42:21, 44:1,
   44:5
12:00. 99:14
12:04 99:22
13 15:8, 15:12
14 86:14, 86:16,
   87:21, 123:18
14.3 40:4
145 39:23
15 8:25, 94:20,
   100:7, 100:14,
   103:16, 103:19,
   115:14, 128:11,
   182:8
15,000 64:21, 70:20,
   78:15
150 8:25
153.9 39:2
156 39:1
15th 29:24

16 7:18, 32:25
16.2 39:8
16.7 40:3
17 7:20
17-3283 42:14
17-BK-3283(LTS 1:6
17-BK-4780(LTS 1:24,
   2:7
17th 181:4
18 104:7
19 39:8
19-AP-00369(LTS 2:5
194 194:4
19617 42:4, 42:8
19617. 41:23
1:00 6:7, 99:15
1:00. 99:21
1:14 99:23


< 2 >
2 34:16, 39:1, 39:2
2(b 85:10
2(d 85:15
2(f 85:22
2.5 7:21
20 182:8
200 18:11, 45:11,
   47:11, 49:5
2004 171:10
2008 192:3, 192:5
2015 124:16, 167:19
2020. 9:15
21 87:1
21-day 86:10
212 34:5
218 39:2
21: 2:38
22 52:18, 109:22
228 33:12, 33:20
22nd 29:19, 29:24,
   29:25
24 51:10
250 7:14
260 7:6
27th 29:20, 137:18,
   139:22, 140:2,
   140:9, 142:24,
   143:15, 144:4,
   144:11, 171:21,

181:14
28 86:14, 90:25


< 3 >
3(a 85:25
3(c 86:5
3(d 86:25
3.35 10:18
3.8 40:5
30 15:5, 129:24
30-day 118:16
30-hour 104:23
303 157:17, 158:1
303. 158:17
305. 146:6, 151:5,
   161:2, 167:11,
   171:23
30th 28:16
362(d 147:23, 150:13
362(e 107:15,
   108:23, 118:16,
   147:22, 149:12,
   150:15, 155:25,
   169:6, 169:9
362. 147:9
37 78:23
3799 194:14
383 33:11, 33:20
386 33:17
3: 1:6, 1:24, 2:5,
   2:7
3:53 193:17


< 4 >
4(a 90:21
4(B 90:21
4,575 32:17
40 34:15, 182:24
406 10:23
45 155:17, 155:20,
   156:1, 169:23,
   170:4, 170:16,
   171:24
46 39:23
460 32:18
47 39:23
48 12:20
48-hour 26:15

49 47:20, 47:24,
   53:9, 53:10, 54:2
4th 137:13, 181:17,
   188:23


< 5 >
5(d 87:9
5(e 88:1
5.0 7:21
50 34:15, 47:16,
   47:18, 53:10,
   67:7, 116:21
50,000 94:7
50-day 87:6
50/50 185:4
500 38:18
51 54:4
52 39:1
52. 54:4
54(d 148:5, 172:17
552(a 8:17
56 133:8, 133:14,
   136:21, 142:18
56(f 142:13
57 34:5
5th 181:15, 188:18,
   189:6, 189:8


< 6 >
6(d 88:8, 88:20
6.4 32:13
60,000 94:8
60-page 119:9
62 54:8
636 91:1
65 113:25, 114:3
65-page 163:11
668 33:25


< 7 >
7(d 90:15
7(e 90:14, 90:15
7001 51:13
7001(2) 154:9
72 12:19, 91:1
72-hour 26:16
745 50:15

75 87:7
76th 41:11, 42:3,
   42:5
790 32:18
7912 123:10
7th 173:11

< 8 >
8(a 90:20
8(d 90:23
8.2 10:20
80 14:9, 17:8, 52:15
800 38:20
83(j 95:14, 99:10
856 33:8
8961 42:13

< 9 >
900 50:15
9019 11:21, 27:15
926(a 8:20
9576 44:4
9576. 44:3
96 42:20, 42:23
96th 43:24
9718 82:19
9718. 62:9
98 53:10
9963. 191:24
9:30 6:6
9:38 5:3

< A >
A. 2:34, 2:35, 2:42,
   3:16
ability 59:9, 69:12,
   76:6, 81:15,
   141:14, 161:12,
   194:5
able 16:1, 24:15,
   25:11, 56:21,
   57:18, 57:24,
   66:20, 69:11,
   70:5, 70:15,
   71:14, 80:1, 86:2,
   86:15, 90:2,
   118:4, 139:10,

139:22, 139:23,
   141:9, 143:11,
   151:6, 155:6,
   161:22, 162:8,
   162:9, 176:20,
   181:22, 181:25,
   185:5
above 51:17, 91:13
absence 51:23,
   52:10, 128:17,
   143:12, 185:3
absent 108:14, 114:5
Absolutely 12:23,
   109:23, 124:22
absolved 49:1
abstract 76:13
acceptable 189:17
accepted 16:15, 64:5
access 18:2, 18:6,
   39:19
accessible 18:25,
   19:18, 91:6, 95:2
accommodate 34:25
accomplish 133:4,
   134:20, 135:6,
   143:11, 144:18,
   156:24
accordance 15:17
accordingly 64:14
account 19:10,
   57:21, 106:9,
   116:12, 125:3,
   162:21, 166:12
accounts 95:9,
   97:22, 164:24
accrue 96:2
accrued 9:1, 15:1
accumulation 137:19,
   144:5
accurate 23:22,
   194:5
achieve 137:21,
   144:13
achieved 143:11
achieving 159:3
acknowledge 55:16,
   158:23
acknowledged 151:1
acknowledges 103:17
Acquisition 44:10,

44:13
Acquisitions 3:28,
   45:7
across 72:17, 163:17
Act 10:24, 131:13,
   137:25
action 87:23, 89:22,
   123:6, 125:8,
   151:9, 153:6,
   157:11, 158:25,
   160:25, 161:25
actions 124:23,
   125:2, 159:8
actively 98:3
activities 6:16,
   6:18
activity 50:7
acts 134:15
actual 46:22, 127:17
actually 16:4,
   17:18, 42:21,
   49:22, 49:25,
   53:15, 87:1, 92:3,
   106:14, 118:22,
   131:3, 131:21,
   132:21, 133:3,
   141:14, 141:17,
   149:23, 160:20,
   169:16, 178:24,
   179:23, 180:25
add 66:24, 90:25,
   92:14, 122:2
added 92:11, 145:20
Adding 119:6, 124:7
addition 8:17,
   10:19, 16:6,
   94:13, 103:1,
   134:17, 136:19,
   157:14
additional 10:18,
   15:5, 15:7, 15:10,
   15:12, 31:25,
   34:2, 35:21,
   39:19, 39:21,
   39:22, 66:8,
   84:24, 86:18,
   89:13, 92:11,
   95:6, 95:25, 99:7,
   99:9, 109:25,
   192:17

additionally 66:7
addressed 39:18,
    46:15, 95:23,
    101:7, 126:2,
    131:23, 142:17
addresses 90:9
addressing 82:25,
    83:18, 100:18,
    148:7, 160:20,
    169:18, 175:20,
    183:9, 188:2
adequate 96:24,
    113:11, 130:5,
    130:9
adjourn 23:7, 43:7,
    70:14, 192:19
adjourned 23:16,
    42:24, 191:21,
    193:16
adjourning 29:10
adjournment 12:11,
    20:9, 20:11,
    21:23, 27:1, 28:3,
    28:10, 28:15,
    41:24, 43:1,
    192:18, 192:19
adjournments 17:14,
    21:1, 22:12
adjudicate 156:20
adjudication 53:5,
    72:25, 84:6, 86:4,
    91:2, 153:9
adjudicative 82:2
Adjuntas 33:1
adjusted 21:5
adjustment 6:20,
    10:10
Adjustment. 92:10
Administered 1:11,
    1:29
Administration 39:5
Administrative 14:7,
    14:11, 44:11,
    45:18, 55:21,
    57:10, 57:11,
    61:19, 62:22,
    63:9, 68:23, 84:3,
    86:21, 98:10,
    98:11
admittedly 145:11

adopted 136:8
adopting 99:10
advance 101:24,
    142:4, 188:14,
    189:4
advanced 13:13
advancing 127:15,
    132:14
adversaries 111:5,
    116:3, 126:18,
    126:19, 129:24,
    132:22, 132:25,
    133:9, 134:25,
    136:11, 137:16,
    138:11, 138:17,
    139:14, 146:2,
    171:19, 186:10
adversary 117:4,
    117:11, 117:20,
    117:25, 127:21,
    133:3, 133:18,
    138:19, 151:2,
    151:3, 151:20,
    153:5, 154:6,
    154:10, 157:25,
    158:4, 158:13,
    158:17, 158:18,
    158:20, 159:2,
    160:6, 172:8
adverse 48:10, 48:14
advice 18:15
advise 113:2
advised 158:24
Advisory 3:6, 154:2
advocate 112:13
advocated 63:12
advocating 167:21
affect 62:2, 71:18,
    71:20, 119:19
affected 31:17,
    34:20, 34:22,
    38:17, 44:6, 85:6,
    193:1
affirmative 60:20
affirmatively 167:3
afford 67:13
afforded 186:10
afternoon 100:5,
    122:23, 122:24,
    129:10, 129:12,

    130:25, 146:23,
    146:24, 160:2,
    182:1, 182:2,
    188:20, 189:6,
    191:6, 191:7
aftershocks 32:12,
    32:14
Agency 3:5
Agenda 30:18, 41:2,
    42:1, 42:16,
    42:19, 42:20,
    42:23, 43:23,
    43:25, 44:9, 62:5,
    62:6, 100:2,
    191:2, 193:5
agnostic 137:20
ago 31:16, 35:5,
    133:20, 150:2,
    154:5
agree 30:19, 45:21,
    76:25, 79:2,
    91:15, 110:17,
    112:4, 118:11,
    118:25, 143:22,
    156:16, 156:17,
    156:21, 164:15,
    169:14, 178:19,
    178:20, 184:10
agreed 10:22, 21:22,
    42:1, 47:23,
    92:13, 137:4,
    169:16
agreeing 76:8
Agreement 9:3, 9:12,
    16:20, 27:16,
    28:15, 83:3,
    121:2, 162:7,
    162:8, 186:25,
    188:4
agreements 10:6,
    132:15, 163:9
ahead 121:21,
    124:25, 140:12
aim 9:13
air 140:5
Akin 44:15, 45:6
al 1:16, 2:5, 2:13,
    2:32
alert 175:18
Alexander 2:43

aligned 168:3
aligning 102:3,
    102:5
allege 152:23
alleged 49:1, 51:22,
    53:20, 117:2,
    133:9
allegedly 53:13
allocated 88:4
allocation 39:6,
    184:7, 185:3
allotted 183:21
allow 10:22, 12:12,
    27:22, 59:19,
    76:23, 77:3,
    107:8, 138:7,
    162:6
allowable 57:11,
    111:15
Allowance 44:10
allowed 6:23, 57:13,
    57:17, 57:18,
    57:24, 74:15,
    154:13
allowing 74:11,
    96:3, 113:19,
    176:21
allows 33:4, 74:24,
    102:21
alluded 133:8
almost 80:21, 167:16
alone 103:18
already 5:20, 19:16,
    39:3, 39:18,
    41:16, 65:16,
    68:19, 70:21,
    75:7, 81:2, 81:10,
    102:18, 110:15,
    115:6, 116:11,
    116:12, 118:19,
    133:5, 150:21,
    151:2, 155:25,
    156:7, 156:10,
    157:3, 157:24,
    158:3, 162:14,
    169:15, 187:19,
    190:25
altered 137:6
alternate 78:7
alternative 14:12,

24:20, 35:23,
    62:6, 62:19,
    96:24, 133:21,
    160:17, 166:16
alternatives 34:21,
    34:23, 35:5, 36:2
Although 13:7, 78:7,
    111:22, 140:3,
    144:15, 177:11,
    190:25
Ambac 3:19, 100:2,
    100:6, 100:24,
    112:24, 114:14,
    116:16, 118:15,
    118:25, 120:11,
    122:4, 153:18,
    156:14, 157:13,
    157:18, 157:25,
    158:8, 158:15,
    158:18, 158:20,
    160:3, 160:23,
    161:3, 161:4,
    161:6
ambiguity 90:15
amelioration 18:21
Amend 99:16, 100:2,
    100:8, 100:16,
    104:1, 105:4,
    106:25, 115:14,
    115:16, 118:21,
    120:1, 121:19,
    124:9, 128:12,
    128:16, 129:1,
    129:2, 129:4,
    156:14, 157:4,
    163:16, 172:4
Amended 62:6, 82:18,
    98:18, 103:11,
    103:14, 114:6,
    118:17, 121:24,
    123:2, 123:3,
    123:4, 123:17,
    123:23, 125:12,
    131:11, 140:14,
    163:20, 166:8,
    175:19, 177:5,
    177:6, 177:25,
    178:6, 179:9,
    185:25, 186:3,
    188:12

amending 119:22
Amendment 46:20,
    50:14, 101:18,
    105:15, 107:1,
    107:2, 109:18,
    113:20, 118:8,
    118:10, 119:12,
    124:22, 125:23,
    169:17
amendments 50:4,
    50:14, 50:16,
    100:13, 100:18,
    100:20, 101:3,
    101:25, 102:20,
    104:9, 104:20,
    105:6, 105:12,
    105:17, 105:18,
    105:25, 106:7,
    106:20, 107:10,
    109:19, 114:3,
    119:5, 121:21,
    128:19, 128:25,
    159:14
Amerinational 3:33
Among 6:18, 9:16,
    11:25, 34:23,
    36:1, 40:2, 57:10,
    81:24, 102:4,
    123:5, 135:15,
    188:4
amongst 180:5
amount 8:24, 17:13,
    52:15, 57:18,
    66:2, 89:11,
    91:16, 92:2, 92:6,
    92:13, 92:19,
    93:4, 93:24,
    93:25, 94:13,
    94:25, 166:22,
    168:4
amounts 39:9, 41:14,
    56:21, 84:7
ample 65:17
amplification 102:18
Amy 194:13, 194:14
analogize 158:5
analogy 142:13
analysis 45:15,
    45:20, 46:4,
    46:24, 47:3,

52:25, 53:21,
56:13, 58:10,
59:3, 59:8, 116:9
and/or 41:14,
144:21, 165:6,
165:17, 168:23,
169:7
angle 125:17
announce 34:2
announced 10:16,
35:22, 36:13,
36:14
announcement 35:19,
36:9
announcements 7:1,
34:22
annoyed 12:21
answer 40:21, 44:23,
45:1, 45:7, 48:6,
51:11, 51:12,
93:18, 122:18,
131:16, 137:24,
138:21, 139:24,
140:10, 166:5,
166:19, 179:12
anticipate 14:8,
15:7, 66:2, 66:4,
80:18, 139:16
anticipated 8:22,
11:19, 90:10
antithetical 135:1
anybody 13:1, 96:19,
148:15, 170:1,
182:13
anyway 13:8, 86:7,
105:22, 165:20
apologize 99:25
apparently 100:10
appeal 8:16, 8:18,
57:14, 79:11,
79:13, 173:6
appealable 148:6
appealed 147:17
appear 49:19, 61:15
APPEARANCES 2:26,
3:2
Appearing 3:30
applicability 127:6
applicable 51:14,
90:24, 117:2

applications 172:4,
173:5
applied 163:23
applies 105:19,
142:18
apply 91:2, 159:1
appoint 78:14
appointment 8:19
appreciate 13:11,
13:13, 15:20,
16:19, 26:10,
26:14, 26:23,
27:21, 65:13,
67:1, 74:6, 86:21,
89:21
appreciated 84:23,
114:13
appreciates 83:24
approach 63:22,
129:23
appropriate 16:6,
30:11, 52:23,
59:24, 63:22,
65:20, 75:24,
94:2, 103:18,
107:2, 108:6,
109:7, 115:5,
120:8, 161:13,
184:4, 186:21
appropriated 132:10
appropriately 65:5,
83:19, 163:23,
168:16
Appropriation 10:16
appropriations
121:10, 123:13
approval 11:20,
27:14, 30:17,
76:8, 97:7
approve 9:5, 27:13
approved 14:8,
15:18, 32:23,
46:7, 61:1, 110:19
approves 14:13
approximately 8:25,
15:8, 32:17,
32:18, 33:8,
33:11, 33:25,
34:5, 38:20, 39:8,
50:14

April 29:18, 29:23,
31:2
apt 33:11
Aracelis 191:23
arbitrate 76:4
arbitrator 88:5,
94:14, 94:18
arc 168:21
areas 31:22, 39:14,
39:20, 40:2,
54:15, 61:7
Arecibo 33:14
argue 110:11,
119:14, 122:12,
170:15, 182:21
argued 112:16,
161:3, 184:15
argues 105:24,
109:16
arguing 25:3, 78:21,
100:11, 106:24,
109:17, 109:22,
140:20, 167:18,
170:13
argumentation 25:9
arise 13:3, 50:19,
63:24
around 13:12, 29:18,
94:1, 119:19,
142:23, 168:6,
181:19
arrange 183:2
arrangement 57:4
arrangements 55:8,
97:1
Arribas 2:38
articulated 141:24
aside 13:9, 57:1,
165:6
aspect 74:15, 83:7,
84:5, 106:3,
106:14, 128:20,
138:19, 143:13,
153:13
aspects 16:20,
31:20, 36:17,
61:4, 183:15
assert 14:24, 41:13
asserted 120:7
asserting 191:13

assertions 105:2
assess 38:15, 105:18
assessed 105:10
assessing 38:10,
    127:16
assessment 38:12,
    38:14, 48:13
assessments 31:12,
    31:23, 31:25,
    32:16, 34:1, 38:9,
    39:14
assets 8:11
assign 39:12
assist 63:19
assistance 7:17,
    33:5, 178:17
Assisting 49:15
associated 135:11,
    192:2
assume 23:21, 25:14,
    70:1
assumes 101:20
assuming 24:10,
    24:12, 84:11,
    85:16
Assurance 3:19,
    38:2, 57:5
assure 180:20
Assured 3:10, 3:11,
    22:23, 26:12,
    27:10, 146:16,
    146:18, 160:23
assuredly 131:17,
    132:5
asymmetry 162:18
Atara 3:20, 100:6,
    160:2
atmosphere 165:10
attached 51:9,
    69:23, 151:23
attaching 99:6
attempt 101:19,
    101:22, 153:2
attempted 151:2
attendant 104:2,
    138:17
attended 40:14
attending 174:8
attention 6:18,
    16:20, 20:4, 124:6

Attorney 49:15
attorneys 18:6
attractions 131:3
audible 5:21
August 24:3, 56:14
Aurelias 160:25
AUST 2:38
Authority 1:34, 3:7,
    3:37, 3:41, 51:24,
    107:14, 108:11
automatic 84:6
automatically 56:4,
    73:10, 74:15
available 7:4,
    10:15, 18:12,
    33:5, 33:21, 37:6,
    64:21, 67:16,
    90:3, 90:4
avenue 65:18
avenues 96:24
avoid 20:7, 174:10,
    178:14
await 46:3, 46:17
awaiting 8:15
aware 6:21, 14:2,
    15:4, 25:8, 50:2,
    134:1, 141:10,
    162:22, 175:16,
    177:2
away 57:7, 69:2,
    118:3, 118:21,
    139:21, 155:13
awkward 79:1, 107:4


< B >
back 5:8, 30:12,
    36:8, 49:13,
    50:12, 60:21,
    69:4, 72:10, 74:3,
    74:5, 77:13,
    106:24, 107:7,
    118:8, 120:19,
    146:9, 154:21,
    161:14, 161:15,
    162:13, 163:14,
    174:12, 179:8,
    180:19
backed 108:5, 115:25
background 82:22

bad 78:18, 128:16
baffling 135:22
baked 27:15
balance 106:10,
    162:21
Bank 192:4
BANKRUPTCY 2:28,
    8:20, 51:13, 57:9,
    93:7, 93:12,
    93:17, 154:9,
    161:7, 174:22,
    175:2, 175:8,
    175:11, 176:1,
    176:5, 176:9,
    176:18, 186:23,
    187:2, 187:10,
    187:15, 187:25,
    188:15, 189:21,
    190:24
bar 105:14, 105:15,
    105:16, 105:18,
    105:23
Barbara 2:29
barred 161:2
bars 157:23
Based 9:9, 12:9,
    14:25, 20:10,
    23:14, 23:15,
    39:13, 48:25,
    100:11, 100:16,
    105:1, 109:17,
    117:15, 148:2,
    157:17, 157:19,
    163:6, 172:11,
    190:7, 192:11
basic 162:20, 165:5
basically 20:18,
    57:22, 79:8,
    113:2, 123:19,
    158:17
basis 10:12, 21:24,
    36:15, 55:10,
    75:5, 77:5, 83:6,
    108:8, 109:20,
    116:15, 121:17,
    133:7, 133:22,
    159:7, 178:15,
    191:13
Bayamon 33:15
bearing 192:1

bears 88:21
become 33:5, 61:4,
    107:5, 140:10,
    145:2, 158:18
becomes 37:6, 146:8,
    150:23
began 12:4
begin 6:7, 41:11,
    46:8, 96:21,
    177:13
beginning 8:5, 8:21,
    24:25, 37:14,
    79:5, 79:18, 80:2
begins 94:11
behalf 13:23, 27:6,
    31:8, 45:6, 49:11,
    100:6, 103:7,
    129:11, 131:1,
    146:18, 160:3,
    167:23, 179:20,
    188:8, 191:9,
    192:4
believed 73:12
believes 10:10,
    91:14, 105:2,
    134:17, 175:21
bench 62:8
beneficial 27:18,
    77:4
benefit 65:2, 66:8,
    96:1, 123:14,
    135:8, 148:3,
    180:11
BEREZIN 3:26, 27:5,
    27:6, 27:8, 27:9
best 148:1, 151:18,
    157:12, 185:7,
    194:5
better 13:9, 38:14,
    58:13, 120:15,
    132:3, 173:10,
    175:9
beyond 15:12, 30:20,
    105:25
BIAGGI 3:8, 31:5,
    31:7, 33:18,
    33:23, 34:9, 35:7,
    35:13, 35:18,
    35:25, 36:8,
    36:20, 37:3, 37:9,

37:17, 38:3, 38:5,
    38:7, 40:23
bidding 171:13
bifurcate 134:4,
    134:5, 166:21
bifurcated 142:6,
    142:8
bifurcation 107:12,
    107:14, 116:3,
    124:19, 130:6,
    132:23, 149:22,
    150:1
big 17:18, 93:4,
    124:8, 183:9
bigger 148:13
biggest 124:2
bill 10:17, 73:21
billion 10:18,
    10:20, 49:23
bills 48:11
binding 63:5, 63:12,
    63:16, 67:5, 67:7,
    67:12, 67:14,
    67:22, 68:10,
    68:13, 73:10,
    73:13, 85:15,
    85:17, 94:12,
    96:23
binds 156:20
birth 19:3, 19:8
Birthdays 19:7
bit 19:17, 90:14,
    91:6, 95:2, 95:11,
    115:21, 120:15,
    140:12, 152:6,
    155:21, 162:11,
    175:1, 180:7,
    180:12
black-lined 98:21
blacked 19:6
blackline 91:7
blackout 91:10
Block 10:21, 181:14,
    183:1, 183:25,
    184:19
body 71:18, 71:20
boilers 38:11
bolts 161:16
bonafides 52:22
Bond 99:16, 102:22,

110:25, 111:14,
    115:25, 125:25,
    133:7, 134:20,
    145:10, 145:17,
    151:3, 152:20,
    156:9, 175:22,
    177:9, 178:1,
    178:7, 183:18,
    183:23, 184:2,
    192:1, 192:2,
    192:3, 193:8
bond-related 102:7
bondholder 101:21
bondholders 8:11,
    8:13, 8:16, 8:18,
    8:19, 9:4, 28:19,
    101:12, 101:23,
    102:5, 103:8,
    104:14, 121:11,
    130:3, 146:8,
    153:19, 153:25,
    158:24, 165:3,
    166:25, 167:21,
    169:5
Bonds 8:12, 8:24,
    41:13, 41:15,
    121:3, 129:7,
    131:10, 147:2,
    147:15, 149:25,
    152:12, 158:12,
    159:14, 192:5
Bongartz 2:43
books 168:12
Boston 193:10
Bottom 60:23, 66:20,
    172:24
box 91:10, 107:24,
    108:1, 122:2,
    124:20, 183:11
boxes 73:2, 73:19
bracket 89:12, 89:13
brackets 89:11,
    89:14
break 99:15, 180:19,
    184:15
brewing 173:11
bridges 8:7, 40:4
Brief 20:7, 26:25,
    104:7, 112:25,
    114:20, 115:19,

115:20, 119:8,
119:10, 120:16,
134:21, 163:12,
169:13
briefing 8:17,
12:10, 12:19,
20:6, 27:23,
104:21, 107:19,
109:19, 109:25,
110:4, 134:12,
137:19, 138:16,
139:10, 139:15,
142:22, 144:21,
148:19, 150:6,
150:7, 159:17,
165:10, 165:12,
165:14, 168:11,
168:24, 171:5,
180:7
briefly 58:4, 74:9
briefs 114:22,
139:12
bring 6:5, 95:25,
103:7, 117:12,
124:6, 151:9,
158:25, 161:5,
168:15, 179:8
bringing 20:3, 36:3,
123:19
brings 193:5
broad 100:16, 163:6,
163:17, 167:4
broadcasting 143:3
broadcasts 143:21
broader 101:12,
165:15
broadly 64:8, 86:3
broken 184:18
brought 86:7,
136:22, 137:10
buckets 15:11
budget 10:3, 154:25
budgetary 7:4
budgets 7:5, 7:7,
7:9
Buenas 99:24
buenos 5:5
build 70:5
building 96:2
buildings 8:6, 40:8

builds 19:16
built 72:3
bulk 15:2, 64:5,
93:3, 114:15,
114:23
bundled 88:5
bundles 88:15
burden 16:9, 53:3,
67:18, 68:6, 164:5
burdened 139:1
burdening 54:5
burdens 64:23, 96:3
burdensome 66:8
bury 131:15
business 19:5, 89:17
buy 189:4, 189:5

< C >
C. 3:8
Cabo 33:1
Cadwalader 146:18
Caguas 33:15
calculus 110:2
calculus. 100:13
calendar 29:17,
144:22, 180:17
calendars 87:6
calender 29:25,
165:11
call 22:11, 60:5,
78:6, 86:3, 93:6,
93:20, 103:24,
106:21, 106:22,
116:24, 138:15,
140:8, 145:5,
149:4, 173:19,
174:14, 174:19,
182:20, 182:21
called 76:5, 190:9
camp-based 35:10
camping 37:15
camps 36:23, 37:12,
37:20, 37:24
candor 71:22, 168:14
capitulation 105:7
capsule 96:20
caption 122:3
cards 19:4
care 62:5, 191:5

careful 177:12
carefully 82:18,
82:19, 82:23,
134:23
Caribbean 124:3
carried 119:24
carries 106:2
carry 127:9, 164:5
caseloads 86:13
cases 21:6, 27:20,
50:25, 75:19,
77:23, 78:8,
78:10, 78:15,
78:23, 78:24,
79:10, 79:20,
79:24, 90:1,
96:12, 101:19,
104:25, 105:8,
105:10, 125:10,
138:7, 178:24,
193:12
Casey 3:13, 146:17
cash 57:12, 57:19,
166:10
cast 144:10
CAT 3:49
categories 26:5
caused 31:15, 113:15
caution 26:12
cautiously 141:13
CCDA 107:25, 114:10,
132:11, 134:5,
157:2, 182:20,
183:10, 183:11
cell 174:9, 190:10,
190:13, 190:16
centered 6:18
central 152:25,
153:4
certain 25:14, 51:1,
53:21, 55:25,
56:6, 95:8, 95:24,
96:13, 102:16,
108:20, 131:22,
132:9, 133:11,
135:3, 166:6
Certainly 20:24,
27:21, 27:23,
49:4, 52:3, 55:1,
91:3, 109:12,

110:19, 113:9,
125:11, 139:13,
140:2, 140:16,
144:1, 147:14,
149:15, 170:15,
186:4, 188:21
certificates 19:3
certification 9:12,
60:14, 60:18,
60:19, 72:16,
148:5, 172:15
certifications 50:6
certified 7:5, 10:2,
10:3, 33:13,
33:21, 53:24, 54:3
certifies 154:25
certify 173:5, 194:4
certifying 50:6
cetera 60:10, 78:13,
154:9
chairman 7:10
challenge 154:24,
155:7, 158:15,
158:16
challenges 152:17,
157:23
challenging 5:9
chance 116:21
change 10:12, 20:5,
21:9, 21:23, 52:5,
100:13, 117:18,
118:7, 131:9,
139:20
changed 20:10, 26:6
changes 65:2, 98:22,
101:10, 103:17,
107:6, 107:7,
109:23, 110:1,
125:14
changing 36:14
channeled 17:11
characterization
89:16, 106:7
characterize 91:24,
103:22, 103:23
characterized
128:14, 135:21,
147:20
characterizing 147:2
charged 59:15, 60:2

cheaper 79:3
check-ins 187:22
checked 43:18
checking 187:14
checks 73:19
CHIEF 2:28, 50:10,
174:22, 175:2,
175:8, 175:11,
176:1, 176:5,
176:9, 176:18,
186:23, 187:2,
187:10, 187:15,
187:25, 188:15,
189:21, 190:24
children 36:6,
36:22, 36:23
choose 137:25
choreography 151:19
Cigna 41:22, 42:7
Circuit 8:16, 24:14,
25:6, 100:21,
100:23, 100:25,
101:5, 101:9,
102:15, 107:6,
116:10, 116:14,
116:18, 128:13,
151:4, 153:17,
153:22, 158:8,
158:23, 160:18,
160:19, 160:21,
167:6, 168:24,
181:18, 182:7
circumstance 75:24,
157:5
circumstances 75:23,
108:14, 108:17,
108:19, 109:9,
114:20, 116:1,
126:15, 141:18,
144:16, 146:4,
147:7, 156:7,
156:11, 171:18
cited 104:25, 105:8
citing 100:10
City 67:24
Civil 91:1, 99:10,
120:4
civilized 12:22
claim. 91:17, 92:13
claimant 41:23,

64:15, 67:11,
72:24, 75:20,
75:24
Claimants 14:9,
15:23, 16:3,
16:14, 18:13,
41:15, 43:8,
43:11, 43:15,
43:16, 62:24,
63:2, 64:13, 65:4,
65:18, 67:6,
67:20, 69:6,
69:22, 72:3, 73:8,
73:10, 75:21,
81:18, 83:12,
95:24, 95:25,
96:24, 179:1,
192:23
clarification 28:2,
128:7
clarify 22:4, 85:6,
85:16, 88:10,
90:19, 153:12
clarifying 82:8
clarity 23:3, 71:21,
71:23, 73:17,
81:20, 128:5,
192:16
class 71:13, 71:15,
71:18, 71:19,
82:14, 92:25
classic 51:24
classrooms 34:24,
36:3
Clause 60:4, 92:11,
157:19, 157:20
clawback 163:19,
182:23
clean 74:18
clean-up 90:18
clear 10:8, 22:10,
25:21, 31:3,
45:16, 48:18,
60:6, 62:1, 72:13,
73:7, 73:19,
75:12, 76:9,
85:10, 85:22,
93:24, 94:2,
105:16, 125:12,
127:7, 130:13,

135:16, 135:25,
140:17, 143:13,
147:18, 152:15,
160:10, 170:21,
188:1
clearer 85:20,
88:15, 88:16
clearly 25:2, 106:4,
106:8, 127:11,
164:5
Clerk 43:6
clerks 16:9
client 22:7, 30:14,
80:6, 122:20,
188:9
clients 168:1
clock 24:16, 169:17
close 75:22, 104:25,
160:4, 182:21
closed 8:3, 38:24,
39:1, 96:20
closely 158:14
closer 61:25
closing 38:24,
111:16
clue 72:16
co-counsel 44:15
cobble 180:2
Code 8:20, 51:13,
57:9, 89:10, 161:7
coffers 123:15
COFINA 161:24
cognizant 187:21
coincide 171:18
collaborating 102:4
collaboration 11:3,
99:12
collaborative 9:19
collateral 127:5,
127:8, 154:18,
155:9, 155:11,
166:16
collaterally 127:19
colleague 11:14,
30:7, 155:16
collective 181:13
collectively 141:10
collects 115:5
colloquy 30:12,
161:8, 176:13

colorable 116:17,
116:19, 159:6
comes 101:4, 107:3,
107:6, 115:1,
139:11
comfortable 188:19
comforted 17:8
coming 12:6, 12:16,
15:7, 15:16,
50:12, 70:7,
71:16, 89:15,
113:3, 131:3,
139:16, 172:16,
186:25
commence 9:13
comment 132:19,
135:12, 169:15,
172:19, 182:16
commented 135:9,
143:8
comments 9:10,
40:24, 64:4, 83:5,
95:6, 97:10,
125:20, 126:8,
126:9, 134:23,
146:7, 161:19,
162:12, 164:20,
172:12, 179:11,
189:16
commercially 57:23
commingled 106:9
commit 144:1
Committee 2:41,
24:10, 74:8,
82:20, 95:22
committing 142:2,
149:18
common 134:6
Commonwealth-cofina
161:24
communicate 5:16,
96:6, 142:19
communicating 6:2
communication 11:3,
11:10, 19:15
communications 97:24
Community 3:34,
10:21
companies 123:7,
123:14, 123:18,

123:24, 124:7
Company 3:16, 41:22,
42:7, 47:10,
114:11
comparable 180:24,
181:3
compelling 75:22,
76:14, 108:17,
114:20, 116:1,
171:17
complain 110:5,
161:10
complains 102:11
Complaint 51:7,
51:8, 51:12,
51:13, 105:11,
114:6, 127:2,
140:7, 154:7,
154:11, 158:8,
158:15
complaints 133:11,
133:18, 154:12,
158:4, 158:6
complete 59:3,
102:22, 134:13
completed 20:22,
34:3, 38:21, 47:6,
136:11
Completely 69:15,
88:5, 165:22
completion 38:12
complex 193:12
compliance 40:13,
52:18, 52:19,
88:16, 150:12
compliant 55:12
complicated 82:3,
82:5, 139:24,
161:15
comply 34:25, 114:7,
114:13, 149:25
component 140:24,
161:12
components 135:19
composing 139:3
comprehensive 30:21,
102:8, 120:12,
133:10, 169:1
compressed 23:14
conceivable 59:5

conceivably 108:22
conceive 115:9
concentrated 32:15
concept 28:13
conceptual 56:22,
    183:13, 183:20,
    184:1, 184:4,
    184:15
concern 10:6, 20:20,
    36:19, 37:4,
    37:15, 54:7,
    56:15, 68:23,
    113:19, 140:5
concerned 86:10,
    93:16, 121:20,
    122:9, 162:11,
    162:12
concerning 6:22,
    8:16, 152:16,
    185:19
concerns 52:3, 83:1,
    123:22, 124:9,
    161:4
concluded. 193:17
conclusion 156:7
concrete 155:21,
    164:13
condition 76:7
conditions 103:2
conduct 47:1, 139:22
conducting 61:7
confab 173:19
confer 72:6, 143:23,
    144:20, 148:21,
    162:13, 164:19,
    168:14, 170:22,
    171:7, 171:10,
    171:12, 172:1,
    173:11, 173:22,
    177:22, 178:5,
    180:11, 184:20,
    184:21, 185:20,
    187:19, 190:2
conference 5:14,
    44:9, 61:12,
    78:22, 88:4, 89:4,
    99:17, 115:22,
    115:24, 129:6,
    131:25
conferencing 88:2

confers 177:24,
    179:5
confess 51:18
confident 163:7,
    163:14
confidential 19:4,
    19:11, 19:14,
    66:21
confidentiality 6:22
confirm 84:11
confirmation 38:2,
    57:15, 110:19,
    110:22, 132:13,
    132:15
confirmed 54:3,
    54:9, 56:17,
    56:18, 56:21,
    57:1, 57:10
confirming 22:12
confiscation 6:4
confused 31:3
confusing 116:8
Congress 11:7
congressional 10:5
conjecture 46:21
conjunction 40:11,
    137:18, 145:5
connection 30:17,
    50:7, 83:9, 88:2,
    131:15, 132:20,
    172:2, 189:2
consensual 84:5,
    132:15
consensus 169:2,
    179:24, 180:5,
    185:3, 185:7
consent 23:6, 27:22,
    63:5, 68:14,
    85:15, 85:17,
    94:22, 149:3,
    149:12, 152:17,
    167:11, 169:11,
    169:22, 169:23
consented 73:13,
    81:5, 97:5, 108:10
consenting 85:20,
    130:5, 148:19,
    154:16, 160:12,
    170:16
consents 85:19

consequences 51:4
consider 19:19,
    64:14, 76:20,
    82:13, 92:22,
    104:24, 130:5,
    141:4, 141:7,
    144:22, 149:7,
    160:14, 160:17,
    167:4
considerable 134:3
consideration 12:3,
    21:3, 131:6
considerations
    113:15, 160:15
considered 34:23,
    36:2, 76:7, 82:19,
    82:23
considering 107:1,
    171:17
consist 34:12
consisted 64:22
consistent 5:13,
    10:2, 67:23
consistently 92:5
consisting 194:4
consolidates 101:16
Constitution 158:3,
    158:16
constitutional
    101:7, 151:7,
    151:23, 157:23,
    161:5
construct 112:12,
    112:13
constructed 7:25
constructive 11:23,
    168:15
constructively
    168:23
construed 162:1,
    164:21
consult 141:19
consultation 68:17,
    83:3, 86:21
consume 134:2
contact 19:14
contain 14:17, 18:5
contained 116:8
containing 18:9
contemplated 88:10,

96:9
contemplates 84:5
contemplating 170:21
contend 155:6
contending 48:10
content 114:14,
  115:19
contention 82:25,
  121:9
contested 28:4,
  57:7, 99:19, 191:3
context 13:4, 59:24,
  65:5, 84:14,
  101:8, 116:19,
  129:22, 130:15,
  131:25, 133:3,
  136:9, 138:9,
  138:11, 140:7,
  142:13, 146:2,
  150:25, 152:1,
  153:5, 154:5
contextualized 91:6
contingency 56:20
continuation 149:3
continue 7:20,
  33:24, 39:14,
  40:10, 45:10,
  47:9, 48:5, 61:9,
  81:8, 82:13,
  107:11, 124:24,
  162:6, 193:13
Continued 3:2, 11:3,
  11:10, 24:22,
  43:4, 61:20
continuing 8:10,
  14:15, 15:10,
  31:12, 177:23
contract 50:4, 50:5,
  50:8, 50:16,
  50:17, 55:7,
  55:13, 55:14,
  55:24, 56:9,
  59:25, 60:1, 60:4,
  60:6, 60:15,
  60:21, 89:17
contractor 49:24
Contracts 52:1,
  53:8, 53:19, 56:5,
  59:23, 60:11,
  134:15, 151:25,

157:19
contractual 48:15,
  48:17, 50:14
contractually 45:12
contrary 10:11,
  155:1
control 59:9, 59:16,
  59:20, 119:8
convenience 71:13,
  71:15, 71:18,
  71:19, 82:14,
  92:24
conversation 176:22,
  186:1
conversations 62:18,
  62:23, 65:8,
  71:17, 172:11
convicted 60:1
conviction 55:3,
  59:22
convince 130:10
coordinated 102:24
coordination 101:21
cope 193:13
copy 86:7
copying 17:3, 17:22
COR3 32:10, 40:10,
  40:14
core 69:6, 104:5,
  104:15, 106:21,
  118:11, 140:24,
  160:14
Corozal 33:1
Corp 3:12, 27:7
Corp. 3:11, 3:26
Corporation 3:20
Correct 35:9, 42:9,
  42:12, 42:15,
  42:18, 43:21,
  56:18, 82:1,
  84:16, 84:17,
  84:18, 136:3,
  136:7, 137:2,
  137:23, 138:21,
  141:22, 150:23,
  181:9, 181:12,
  185:17
correctly 140:4,
  166:7
correspondence 66:19

corresponding 9:8,
  29:14
cost 10:8, 38:15,
  53:20, 67:7,
  67:21, 67:22,
  68:1, 68:7, 73:4,
  75:16, 76:17,
  76:19, 76:22,
  88:21
cost-sharing 96:22,
  97:1
Costa 38:7, 38:17,
  38:21
costs 39:7, 61:16,
  88:3, 94:16
counsel 5:5, 19:13,
  19:15, 62:20,
  161:3
count 47:15, 52:15,
  53:12, 53:17,
  60:10
counter 25:12, 71:24
counterclaims
  158:12, 158:14
counting 70:5,
  115:10
couple 54:25, 62:14,
  80:12, 85:1,
  89:13, 91:5, 95:6,
  125:16, 129:20,
  134:24, 135:12,
  150:2, 177:1,
  179:24
course 10:12, 15:17,
  15:24, 16:15,
  20:20, 23:21,
  51:25, 64:1,
  69:10, 78:2,
  88:13, 114:7,
  130:22, 133:25,
  139:8, 157:3,
  175:17, 176:25,
  179:3, 185:9
court-based 95:15
COURTROOM 5:16, 6:2,
  6:5, 49:14, 74:3,
  98:14, 174:2,
  176:14, 190:8
courtrooms 5:12
Courts 62:22, 63:4,

63:9, 63:25,
65:20, 67:17,
79:22, 84:7, 94:23
cover 114:17,
114:22, 181:22,
181:25
coverage 38:15
covered 31:19,
39:12, 192:3
covers 43:23
create 123:24, 124:8
created 166:12
creates 50:13, 79:2
credit 190:20
creditor 104:14,
121:12, 130:7,
165:7
Creditors 2:42,
82:20, 147:10
crimes 60:2
criminal 45:15,
45:19, 46:4,
46:14, 46:16,
46:17, 46:21,
48:10, 48:25,
49:17, 50:1, 50:7,
50:20, 51:1, 55:3,
58:12, 59:15,
59:17, 59:21,
59:24, 61:4,
61:13, 61:18, 62:2
criminality 60:5
crisis 124:17
critical 113:8,
160:9
crossing 171:22
CSR 194:14
cued 111:17
cueing 43:13, 70:23
cumulative 7:8
cured 105:12, 121:4
Current 12:4, 24:9,
34:6, 34:11,
38:21, 40:17,
61:19, 72:23,
81:10, 81:20,
112:5, 131:14,
132:16, 133:6,
136:25, 138:15,
147:21, 157:4,

158:11, 169:18
Currently 9:9, 14:6,
14:16, 15:6,
20:13, 38:20,
65:22, 70:2,
71:19, 80:18,
89:23, 111:22,
112:8, 133:7,
137:8, 139:15,
144:4, 146:3,
147:15, 156:2,
168:24, 180:10
curriculum 35:11
CUSIP 192:2, 192:12
cut 53:6, 103:12,
174:11
cuts 164:11


< D >
daily 36:12, 36:15,
77:5
Damage 7:15, 8:8,
31:22, 31:25,
32:15, 38:8, 38:9,
39:13
damaged 8:6, 32:18
damages 32:20,
32:21, 34:14,
38:11, 38:14,
38:15, 40:17, 79:7
darndest 185:14
data 69:8, 85:7,
89:3
dated 11:7, 131:8
dates 23:19, 113:7,
165:12, 171:5,
180:7, 186:13
DAVIS 3:41, 49:10,
49:13, 53:3,
53:16, 54:7,
54:13, 54:20,
54:23, 55:1, 55:5,
55:10, 55:16,
56:10, 56:12,
56:24, 57:2, 58:6,
58:18
day 47:17, 47:20,
47:24, 59:6, 70:4,
70:8, 85:12, 93:5,

108:9, 134:22,
181:14, 181:17,
181:20, 189:11,
189:14
days 35:20, 43:9,
57:13, 86:16,
87:2, 87:7, 87:21,
87:22, 114:6,
114:12, 139:1,
150:2, 155:17,
155:20, 156:1,
159:16, 169:23,
170:4, 170:16,
171:24, 180:24,
181:3
dead 155:5
deadline 20:23,
22:25, 29:11,
29:14, 59:8, 86:5,
110:6, 173:10
deadlines 22:13,
71:25, 72:1, 72:3,
142:22, 180:7
deal 21:10, 21:11,
40:17, 51:3,
77:21, 78:8, 80:1,
87:14, 98:24,
168:18, 186:16
dealing 52:12, 77:4,
78:12, 79:4,
92:24, 108:20
deals 85:25, 88:1
dealt 52:10, 88:4,
120:8, 152:1
dear 176:2
debate 156:4
debris 40:3
Debt 3:36, 11:25
Debtor 1:36, 44:5,
51:15, 51:21,
64:14, 76:2, 76:3,
76:24, 77:2,
85:18, 85:19,
91:14
Debtors 1:18, 6:14,
15:25, 19:13,
19:14, 43:1, 43:6,
62:18, 62:24,
63:14, 64:24,
65:3, 65:12,

67:24, 67:25,
68:2, 68:4, 68:8,
68:13, 81:3,
87:22, 91:13,
94:22, 96:4, 96:5,
97:3, 97:5, 112:2,
191:14
December 6:17, 8:23,
15:3, 23:13, 43:7,
70:13, 97:18,
109:2, 113:5,
114:17, 130:13,
135:25, 145:21,
188:23
deceptively 135:5
decide 28:5, 46:2,
76:18, 78:18,
93:13, 108:19,
118:4, 126:16,
149:5, 170:14
decided 93:13,
110:18, 119:23,
124:17, 126:17,
126:18, 134:1,
160:5, 160:22,
163:8, 186:21
decides 167:11
deciding 17:2, 87:19
decision 8:15, 25:5,
82:12, 100:24,
101:5, 101:9,
102:17, 116:10,
117:3, 117:5,
120:6, 121:7,
124:4, 134:16,
148:22, 157:13,
160:21, 173:6
decisions 62:2,
90:12, 102:15
declaration 7:16,
7:19, 10:15,
32:24, 52:17,
157:15, 157:17
declarations 23:15,
23:20, 23:21,
24:10, 26:18,
26:21, 32:25
declaratory 51:17,
52:1, 160:24
declare 12:19

declares 76:2
declaring 76:9,
153:21
declines 55:8
decrease 15:15
deemed 8:4, 33:11,
50:18, 155:25,
156:1, 156:15
deep 36:18, 124:12,
161:14
deeper 165:12
deepest 193:9
default 73:3, 73:14
defeasance 41:16
defeat 142:14
defective 16:8,
16:10, 16:11
defects 34:13
Defendants 2:15
defenses 166:24,
167:4
defer 11:14, 57:2
deferred 22:25
deficiencies 105:12
Deficiency 18:16
Deficient 14:24,
15:5, 15:8, 15:11,
15:12, 15:14
define 92:6, 106:17,
107:9
defines 105:14
definition 51:25,
52:13, 94:23
definitive 29:23
definitively 165:2
Dein 2:22, 25:19,
25:23, 25:25,
62:7, 66:14,
82:10, 82:17,
95:6, 97:10,
97:12, 98:6,
164:18, 173:9,
173:14, 178:15,
178:16, 179:25,
180:12, 180:14,
186:15, 194:8
delay 27:11, 48:6,
61:9, 99:25,
110:12, 110:13,
128:16, 135:6,

167:21
delayed 58:9, 74:19,
111:3
delaying 9:21
delete 171:23
deliberate 139:23
delivered 35:11
delivery 36:6
delta 55:17
demanding 36:16
demands 15:1
demonstrate 52:7,
167:1
demonstrated 100:12,
108:15, 121:19,
128:18
demonstrates 104:9
demonstrating 164:5
denial 6:4, 100:11,
109:17, 109:20
denied 105:25,
113:1, 150:14,
161:9
deny 104:1, 118:10
denying 8:19,
128:15, 129:1
Department 32:1,
32:9, 32:10,
33:10, 34:1, 34:4,
34:21
depending 113:8,
148:4
depends 79:6
depositions 162:6
DEPUTY 174:2, 176:14
DERDYS 3:31, 44:12,
44:13, 44:19,
44:21, 44:23,
45:2, 49:9
describe 97:15
described 119:1,
134:2, 136:16
deserving 52:7
designated 18:6,
70:8, 140:23
designed 64:20,
135:5
desire 148:16
desks 185:8
Despins 2:42, 20:3,

20:6, 23:4, 23:5,
25:17, 26:4,
26:17, 28:2, 74:1,
74:2, 74:6, 74:7,
76:5, 80:14,
80:23, 81:1,
92:18, 92:23,
93:8, 93:11, 96:10
despite 124:11,
163:7
destroy 153:3
destroyed 152:24
detail 31:21, 31:25,
36:9, 37:18,
37:23, 38:2, 56:3
detailed 32:4,
32:24, 52:25,
53:7, 98:19,
148:13
details 52:14
determination 55:11,
58:12, 74:19,
117:20, 117:22,
127:20, 127:25,
128:4, 132:20,
136:15, 137:17,
138:10, 139:18,
140:21, 148:1,
150:22, 150:24,
151:11, 167:18,
167:25
determinations 94:6,
139:6
determine 16:5,
38:16, 41:25,
87:23, 105:16,
105:20, 126:22,
131:9, 167:7,
173:2
determined 10:11,
14:16, 18:4,
67:14, 84:1,
92:10, 95:1,
132:2, 135:23,
156:10
determines 97:6
determining 121:15,
153:23
Detroit 63:14, 67:25
devastation 31:15

develop 70:6, 149:6
developed 15:21,
83:20
developing 36:12,
83:15, 86:23
Development 10:21,
16:25, 39:21,
116:11, 168:22,
169:7
developments 32:7,
39:17, 61:13
device 5:19, 5:20,
6:2, 6:4
devices 5:15, 5:18,
6:5, 152:18,
152:25, 153:2
dial 174:9, 174:12
dialogue 177:13
dias 5:5
dictate 88:22
diem 53:19
difference 54:1,
55:12, 94:7, 180:8
differences 102:10
different 9:23,
34:8, 35:21,
54:11, 55:22,
79:14, 101:6,
106:13, 120:24,
123:16, 127:9,
130:12, 142:12,
152:21, 168:17,
182:13, 183:5,
183:6, 184:2,
186:8, 188:5
differently 48:15,
48:17, 68:1,
109:11
differing 45:14
difficult 156:9,
186:6
difficulty 175:13,
186:25
dig 52:14, 60:9,
60:10
digging 52:13
digits 19:7, 19:11
diligence 128:17
direct 25:20, 54:25,
97:6, 127:6,

168:13, 190:15
directed 44:5, 59:3,
99:5, 141:17,
141:18, 144:11
directing 184:13
direction 16:16,
175:17, 176:24
directive 138:3
directives 144:9
directly 19:13,
32:9, 101:4,
102:14, 132:1,
134:10, 161:20,
163:18, 166:5,
166:6, 166:17,
168:5
director 7:10
dirty 52:14
disagree 79:2,
102:12, 105:22,
106:6
disallow 41:12,
191:12, 192:6
disaster 7:16, 7:19,
10:1, 10:13,
10:15, 10:18,
10:21, 30:8,
30:23, 32:25
disastrous 124:5
discarded 145:9
disclosed 162:15
disclosure 110:18,
112:15
discovered 163:4
discrepancies 54:17
discrete 133:9,
139:25, 186:12
discretion 65:21,
75:15, 75:17,
76:10, 76:15,
76:23, 77:6, 118:2
discuss 11:25,
23:10, 23:25,
76:13, 142:3,
146:1
discussed 28:13,
84:4, 85:5, 85:24
discusses 94:21
discussing 8:13,
29:17, 134:14

discussion 58:14,
    60:9, 86:14,
    98:11, 125:19,
    165:19, 170:22,
    177:24, 188:22
discussions 11:23,
    12:13, 25:20,
    28:21, 29:1, 65:3,
    65:4
disease 37:16
disingenuousness
    109:22
Dismiss 22:7,
    138:17, 138:23
dismissed 79:11,
    154:1, 154:2
displaced 36:23
disposed 68:10
disposition 151:24
dispositive 111:4,
    136:11
dispute 14:12, 48:1,
    48:2, 52:12, 62:7,
    62:19, 68:20,
    78:7, 128:21,
    161:24
disputed 17:12,
    47:12, 50:18,
    56:21, 57:1
disputes 8:10,
    60:24, 61:17
dissimilar 161:24
distance 35:11
distinct 50:12
distinction 92:1,
    93:24, 157:1
distinctions 184:2
distinguished 129:15
District 1:1, 1:3,
    2:20, 2:21, 2:23,
    194:1, 194:2,
    194:7
diverted 125:5
divide 185:5
divided 38:10
dixit 103:25
Docket 1:6, 1:24,
    2:5, 16:22, 18:8,
    22:16, 42:13,
    43:4, 43:9, 43:24,

44:2, 44:4, 62:8,
    69:2, 69:18,
    82:18, 85:3,
    89:24, 95:19,
    98:10, 123:10,
    129:4
document 85:21
documentation 192:1
documented 88:12
documents 5:20,
    19:2, 48:15,
    48:17, 48:18,
    117:1, 117:16,
    117:17, 117:18,
    163:10, 164:3,
    164:4, 183:17
dogs 141:13
doing 11:16, 30:13,
    37:4, 91:19,
    113:17, 133:22,
    139:3, 141:25,
    154:10, 184:11,
    192:19
dollar 75:4, 89:12,
    89:13
dollars 7:6, 7:13,
    7:14, 8:7, 8:25,
    9:1, 10:18, 10:20,
    32:19, 45:11,
    47:11, 49:5,
    49:23, 50:15,
    50:16, 52:16,
    93:12, 93:18,
    167:23
dollars. 93:7, 93:14
done 23:13, 25:6,
    29:1, 31:23,
    39:15, 49:2,
    58:10, 86:12,
    137:12, 145:4,
    154:7, 165:16,
    175:21, 177:16,
    184:6
door 75:22, 77:14
doorstep 72:17
double 66:17
double-spaced 83:14
doubt 15:4, 127:17,
    160:19
dovetails 30:11

down 23:15, 60:10,
    107:7, 115:10,
    140:22, 145:4,
    146:3, 156:12,
    161:14, 161:23,
    164:11, 166:9
down. 152:4, 153:14,
    179:17
downstream 125:5
draft 12:2
drafting 38:18
drain 156:13
drawers 17:21
drawn 26:3
drive 130:6
driver 19:3
driving 17:21
drop 119:11
due 20:7, 20:14,
    20:17, 21:22,
    30:16, 38:12,
    55:20, 56:14,
    67:20, 68:15,
    77:1, 81:3,
    128:17, 138:18,
    151:6, 158:22,
    158:24, 161:4,
    171:4, 180:22,
    188:1, 188:12
duplicate 11:15
duplication 192:11
duplicative 41:13
during 6:2, 6:25,
    12:3, 32:5, 38:22,
    50:11, 66:3, 66:5
duties 53:21, 103:6
dying 96:14


< E >
e-mailing 6:1
E. 3:23
earlier 15:4, 58:15,
    65:16, 85:5,
    85:24, 135:9,
    165:25, 173:10,
    192:17
earliest 149:17
early 32:22
earthquake 7:3

Earthquakes 5:11,
    7:20, 9:20, 10:7,
    10:14, 11:2,
    30:24, 31:13,
    31:17, 31:20,
    31:24, 32:12,
    32:14, 32:22,
    34:20, 38:23,
    40:18, 193:14
easier 164:16
easily 59:5, 68:10,
    102:8, 133:12
easy 114:12, 187:18
ECF 191:24
echo 131:24
economic 9:8
edit 173:1
editorial 72:11
edits 64:4, 95:5
Education 32:1,
    32:10, 33:10,
    34:1, 34:4, 34:8,
    34:9, 34:21, 35:3,
    36:17, 36:22
effect 45:21, 91:12,
    111:17
effected 5:10
effective 11:4,
    57:12, 153:9
efficiency 66:11,
    146:6
efficient 63:16,
    66:23, 84:2,
    127:24
efficiently 132:6,
    168:16
effort 19:17,
    101:19, 148:1
efforts 31:24,
    32:21, 39:16,
    64:7, 65:14
eight 54:9, 118:15
eighty-three 33:18
either 12:25, 14:17,
    14:18, 35:24,
    37:24, 41:16,
    42:25, 43:5, 43:8,
    57:12, 61:24,
    61:25, 63:3,
    67:16, 68:5,

85:18, 92:5,
    95:21, 97:17,
    97:22, 111:23,
    115:4, 119:20,
    151:7, 153:5,
    169:5, 178:9
elaborated 25:15
elect 67:6, 81:18
Electric 1:33, 3:40
electrical 47:7
electronic 5:15,
    5:18
elements 63:9
elicited 16:21,
    83:21
eliminate 48:11,
    91:17, 128:22
Ellison 50:10
embodied 11:20
Emergency 7:6, 7:8,
    32:20, 34:15,
    38:19, 39:3, 39:7,
    40:5, 178:15
emphasize 6:23,
    26:1, 26:2
employees 48:1
employs 124:3
en 3:23, 62:21,
    77:13
enable 139:17
enables 10:25
enabling 7:17,
    134:14, 193:11
encourage 63:20,
    82:13, 95:7
encouraged 179:3
end 7:23, 9:15,
    13:16, 14:23,
    20:21, 23:16,
    59:4, 86:16, 92:8,
    93:5, 93:15,
    111:21, 112:24,
    114:19, 118:14,
    121:15, 126:17,
    127:1, 139:9,
    151:14, 152:2,
    180:2, 180:20,
    187:13, 188:3,
    190:1, 193:5
ends 12:4, 54:1,

113:19, 156:3
enforceability 50:2
enforcement 124:23,
    153:6, 157:11,
    159:7
engage 29:6, 65:3,
    96:15, 116:5,
    184:1, 186:17
engaged 11:23, 62:18
engaging 124:12
engineering 39:11
engineers 33:13,
    34:12
enhancement 83:6
enough 55:21, 71:4,
    75:9, 98:23
ensure 10:1, 18:13,
    101:12
ensures 102:23
enter 22:16, 123:15,
    124:17
entered 9:3, 98:5
entertain 75:15,
    173:5
entertained 110:10
entire 47:21, 50:4,
    50:17, 64:21,
    68:6, 101:3,
    104:2, 107:2,
    125:6
entirely 67:12,
    136:20, 147:18
entirety 135:8,
    191:12
entities 40:15
entitled 45:12,
    48:4, 49:4, 53:10,
    59:22, 60:6,
    60:21, 75:20,
    110:3, 113:11,
    125:9
entity 154:21
entry 14:6, 42:13,
    44:2, 44:4, 62:9,
    82:18, 85:3,
    88:12, 129:4
enumerated 60:1
envisioned 123:8,
    123:25
envisioning 182:19

equipment 40:8
equitable 51:16,
   51:25
ER 39:5, 39:12
ERS 8:9, 8:11, 8:12,
   8:19, 107:3
escrow 57:21
especially 6:17,
   86:17, 153:13
Esq 3:8, 3:23, 3:31
essence 154:11
essentially 24:16,
   109:17, 126:19,
   136:10, 167:6
establish 106:15,
   114:20, 155:7
established 7:5,
   129:2, 130:8,
   133:6, 147:8
estimate 86:6,
   86:11, 87:1
estimated 39:7,
   39:9, 59:2
Estimates 32:19,
   34:4, 34:13, 39:13
estopped 127:19
estoppel 127:5,
   127:8
et 1:16, 2:5, 2:13,
   2:32, 60:10,
   78:13, 154:9
evaluate 41:24,
   66:5, 161:12
evaluated 33:12,
   81:23, 105:1
evaluating 34:21,
   81:20, 81:24
evaluation 35:5,
   72:15, 74:12,
   78:17, 79:6
evaluations 33:23
evaluative 63:1,
   64:17, 65:10,
   65:24, 69:10,
   83:6, 83:9, 83:16,
   84:2, 85:25, 87:5
evaluator 66:23
event 14:13, 51:4,
   51:14, 60:5
events 39:13

eventually 45:23
everybody 13:4,
   72:11, 88:21,
   89:9, 137:3,
   159:22, 174:11,
   174:12, 175:7,
   175:24, 176:4,
   176:15, 176:16,
   183:24, 186:6,
   188:19
everyone 22:11,
   75:2, 76:10,
   76:15, 133:24,
   143:21, 176:20,
   189:24
Everything 17:22,
   21:3, 23:14, 24:2,
   37:5, 51:7,
   102:17, 111:18,
   113:12, 148:8,
   161:1, 184:17,
   189:8
evidence 46:22
evidentiary 108:21,
   135:10
evolved 136:20
exact 12:9, 132:1
exacting 132:23
Exactly 20:7, 72:8,
   81:1, 134:11,
   139:17, 146:21,
   158:6, 160:18,
   188:16
examination 53:14,
   53:17
example 16:10,
   23:20, 23:23,
   38:11, 47:13,
   47:23, 54:2, 75:5,
   79:10, 96:5,
   157:17, 163:19,
   167:8
Except 13:17, 19:7,
   19:8, 19:9, 19:10,
   141:21
exception 102:13,
   103:16
exceptions 100:16
excess 45:11, 47:11,
   49:23

exchange 62:25,
   64:17, 66:3,
   71:25, 72:14,
   74:11, 78:13,
   85:23, 96:1, 98:9
exchanged 66:2, 66:5
Excise 125:4, 125:6
excision 145:18
excited 148:15,
   189:9
Excuse 21:20, 50:15,
   173:18
executive 7:10,
   50:11
exemplar 89:5, 98:8,
   98:20
exempted 95:14
exercise 76:15,
   120:11
exhibit 18:9
EXHIBITS 4:9
exigent 108:14,
   109:9, 147:7
exist 79:24, 147:9
existence 140:18,
   140:23
existing 91:18,
   102:18, 124:17,
   132:17, 156:8,
   170:4, 171:10
exit 52:6, 55:20
expand 111:14,
   164:10
expanding 109:2
expect 15:13, 25:19,
   29:2, 70:22,
   70:24, 71:2,
   71:14, 115:12,
   131:12
expectation 28:17,
   36:5, 55:22, 85:14
expected 61:13,
   64:20, 67:18
expecting 15:13
expects 34:1, 34:22,
   101:20
expedited 133:6
expedition 150:18
expeditious 133:20,
   135:2, 150:16

Expense 44:11, 61:19
expenses 57:11,
  57:25, 67:19
expensive 68:7
experience 180:13,
  186:24
expertise 65:18
expired 156:17
explain 33:16,
  78:13, 114:19
explained 59:23,
  123:10, 134:21
explaining 115:18
explains 116:18,
  157:10
explicit 43:17
exponentially 21:6
expressing 10:6
expressly 68:14,
  81:4, 157:18
expunge 96:7
expunging 151:22
extend 86:15, 110:8,
  181:4
extended 87:7,
  155:20, 169:20
extending 21:19
extension 12:10,
  21:24, 23:6,
  26:24, 28:11,
  28:23, 113:23,
  169:9, 169:19,
  169:20, 170:13
extent 17:10, 25:14,
  43:14, 49:16,
  60:23, 62:1,
  73:11, 73:17,
  84:19, 125:8,
  130:8, 132:21,
  139:10, 140:20,
  147:12, 147:18,
  150:15, 154:1,
  160:23, 161:2
extra 27:21, 114:12
extraneous 50:21
extreme 150:18
extremely 30:14,
  30:15, 178:21

< F >
face 49:19
facially 68:11
facie 106:10,
  106:15, 164:5,
  167:1
facilitate 11:4,
  176:20, 177:22,
  178:23, 180:10
facilitating 188:11
facilities 37:16,
  40:6
facing 8:1
fact 42:2, 50:9,
  52:5, 53:25,
  63:23, 64:7,
  73:13, 93:18,
  100:11, 101:3,
  104:11, 136:23,
  144:13, 146:22,
  151:6, 160:16,
  175:19, 177:11,
  190:18
factor 168:15
facts 52:13, 60:10,
  140:15, 141:1,
  161:22, 162:7,
  162:8, 162:14,
  166:6
factual 46:11,
  52:11, 61:17,
  102:1, 111:1,
  126:3, 140:24,
  148:8, 163:17,
  163:22, 165:4,
  170:23, 178:9
factually 56:9,
  142:10
faculty 35:12
failed 27:4, 100:23,
  191:13
failure 55:25,
  126:24
faint 175:1
fair 21:3, 173:15
fairly 23:13, 163:7
fairness 122:7,
  138:24
faith 79:1, 128:16,
  168:14

fall 15:11, 15:24,
  71:14
fallback 74:13
false 119:9, 124:22
familiar 178:12
far 10:11, 12:9,
  14:10, 113:21
fashion 25:22,
  102:24
fast 127:24
father 77:14
favor 25:10, 171:2
feasible 10:10,
  57:17, 57:22,
  89:20, 89:25
feature 131:4
features 5:21
February 17:6,
  28:24, 29:10,
  29:13, 38:22,
  109:3, 131:12,
  137:18, 175:20,
  177:6, 177:16,
  177:25, 188:2
Federal 9:17, 9:22,
  9:23, 9:24, 9:25,
  10:15, 10:19,
  11:10, 39:4,
  39:12, 40:13,
  77:25, 79:21,
  79:22, 84:1, 86:2,
  86:3, 91:1, 125:3
fee 88:6, 88:23,
  94:19
feel 66:15, 74:24,
  77:17, 98:22,
  120:15, 170:11,
  184:3, 188:19
feeling 131:2
fees 94:15
Feld 45:6
fellow 141:20,
  143:24
Fernando 3:31, 44:12
few 16:12, 17:17,
  35:20, 38:23,
  43:9, 64:8, 79:24,
  85:7, 112:25,
  114:6, 114:12,
  185:21, 189:10

fewer 104:7
Fifth 46:20, 50:3
fight 54:2, 94:7,
   123:20
fighting 164:6
Figure 71:7, 72:8,
   119:2, 138:4,
   138:5, 185:5
figuring 53:22
file 12:14, 12:18,
   14:16, 15:12,
   17:5, 20:12,
   21:10, 22:11,
   37:1, 41:25,
   47:19, 69:1, 69:5,
   79:4, 87:21, 89:4,
   91:8, 98:19, 99:5,
   103:4, 114:8,
   115:19, 119:7,
   122:1, 122:14,
   129:3, 158:13,
   177:5
filer 18:8
files 128:23, 160:13
filing 15:7, 16:15,
   18:11, 20:5,
   20:20, 20:23,
   45:8, 46:12, 64:3,
   87:16, 102:1,
   114:1, 115:21,
   129:14, 131:14,
   133:17, 148:23,
   158:12, 175:20,
   180:18, 186:13
filings 16:8, 16:11,
   17:20, 17:24,
   18:6, 20:19,
   20:22, 139:17
filled 165:11
filler 182:15
film 131:4
filter 70:22
filtered 70:21
finalists 87:18
finality 132:19
Finally 32:3, 32:7,
   57:13, 80:4,
   89:20, 126:16,
   126:22
Finance 3:26, 27:7

Financial 1:9, 1:27,
   2:11, 3:6, 3:15,
   13:23, 19:10,
   56:5, 62:12,
   124:16, 191:9
find 53:24, 66:18,
   95:20, 96:1,
   108:16, 116:1,
   116:20, 128:18,
   130:2, 157:4,
   182:7, 182:11,
   187:4
finding 18:2
finds 113:9
fine 23:8, 75:2,
   119:12, 144:12,
   171:9, 187:5
finesse 94:1
finish 98:8, 99:18,
   125:23, 173:18
finished 170:19
finishing 40:9
fire 141:2, 141:8
firm 122:18, 122:25,
   170:4
Fiscal 3:5, 6:19,
   7:5, 9:8, 9:11,
   10:2, 30:9,
   152:17, 152:24,
   154:17, 154:24,
   155:7, 157:16,
   157:24, 158:1,
   158:15, 163:25
five 6:7, 39:5,
   99:14, 99:15,
   99:21
five. 172:25
fix 161:10
flagged 172:6
flagging 79:22
flee 77:17
flexibility 39:19
flies 167:17
flight 189:6
floating 141:6
flood 74:13
floodgate 80:20,
   80:22
flooding 8:1
flow 40:12, 162:20

fly 183:18, 184:12,
   186:7
focus 15:21, 16:3,
   39:21, 40:15,
   84:21, 111:3,
   125:23, 146:25,
   162:14
focused 86:25,
   133:12, 141:2,
   141:15, 145:2,
   190:17
focuses 103:15
folks 72:7, 173:18,
   180:3
follow 91:19,
   111:10, 113:16
follow-up 22:6,
   35:4, 91:8, 185:18
Followed 67:24,
   91:12, 113:4,
   193:7
following 18:22,
   52:18, 136:14
follows 40:3
food 37:14
footnote 79:20,
   118:15, 156:14,
   169:12, 169:16,
   170:12
force 51:23, 76:3,
   162:25
forced 103:10
forcing 68:5
foresight 95:10
forever 72:4, 156:20
forewarned 93:9
forget 152:13
Form 15:21, 16:13,
   16:20, 42:10,
   85:3, 143:25
formal 26:19, 65:7
formally 9:5, 82:12
former 50:10
formula 93:6
formulate 96:5
formulated 110:15
formulating 112:4
formulation 40:16,
   110:14
forth 30:12, 45:8,

52:9, 55:21, 58:7
forum 89:22, 127:22,
   157:12, 158:25,
   159:8, 161:13,
   167:5
forums 67:20
forward 14:22,
   25:11, 41:5, 77:3,
   90:7, 104:21,
   107:5, 132:4,
   132:16, 139:11,
   142:25, 148:25,
   149:1, 172:1,
   184:22, 185:11,
   190:2
fought 28:16
found 6:1
four 19:7, 19:11,
   79:10, 100:20,
   120:17, 123:5
fourth 50:3, 101:18,
   102:3
frame 120:5
framed 105:9, 115:25
framework 62:23
Frankly 50:21,
   66:23, 84:3,
   101:6, 104:18,
   106:1, 107:16,
   109:5, 118:20,
   121:5, 125:13,
   127:22, 149:13,
   155:2, 164:4,
   164:13, 166:4,
   177:23, 178:20,
   181:22, 185:2,
   188:1
freely 100:9, 105:5,
   128:12
frequently 132:5
Friday 43:2, 43:3,
   98:20, 113:23,
   171:8
Friedman 3:7, 30:5,
   30:6, 31:1, 142:1,
   143:18, 143:19,
   143:22, 162:4
front 66:12, 87:14,
   181:1
fronting 68:22,

108:5
fuel 189:1
full 47:6, 57:11,
   57:19, 57:24,
   92:19, 93:14,
   108:21, 111:1,
   120:7, 126:2
fully 37:22, 37:24,
   46:6
fulsome 26:15
fun 167:17
function 154:23,
   154:24
fund 115:2, 166:11,
   166:13, 166:15
fundamental 104:6
fundamentally 107:11
Funding 10:13,
   10:15, 31:11,
   31:20, 32:5,
   32:21, 39:19,
   39:20, 39:22,
   40:16, 192:2
funds 10:1, 10:2,
   10:21, 39:5, 39:6,
   39:10, 39:12,
   39:25, 40:12,
   55:25, 162:20,
   162:21
futile 104:9,
   105:17, 109:23,
   128:25
futility 100:16,
   103:16, 103:20,
   103:21, 104:19,
   104:24, 105:1,
   105:9, 105:10,
   118:25, 119:2,
   119:21, 128:16
future 6:4, 16:3,
   75:16, 76:20,
   187:7


< G >
G. 2:43
Gail 2:22, 194:8
game 146:19
gate 74:13
gather 41:4, 113:24

gating 108:20,
   108:22, 110:12,
   110:17, 119:3,
   119:22, 120:21,
   121:21, 126:1,
   131:23, 132:13,
   132:14, 133:12,
   133:23, 134:2,
   134:13, 135:4,
   137:17, 138:9,
   138:14, 140:21,
   142:24, 148:2,
   148:12, 149:11,
   178:21
gave 54:17, 55:2,
   101:5, 114:3
GDB 3:36
general 6:16, 28:14,
   63:17, 89:16,
   100:8, 154:21
Generally 17:7,
   40:14, 141:20,
   143:6, 147:6
generation 38:8,
   38:17, 38:19
generator 27:4
generically 138:5
generous 65:13,
   83:22, 182:12
German 33:2
gets 18:18, 51:6,
   76:10, 105:15,
   108:9, 115:21,
   119:7, 153:23,
   155:12, 156:5,
   167:10, 168:16,
   178:5, 181:19
getting 17:2, 22:20,
   24:7, 24:17,
   27:17, 37:13,
   52:4, 58:16, 97:8,
   99:13, 118:8,
   121:25, 129:16,
   150:20, 152:2,
   163:11, 178:15,
   184:17, 191:17
Give 18:6, 18:8,
   18:15, 19:14,
   21:2, 23:20, 29:9,
   29:15, 29:22,

47:5, 47:13, 57:6,
  69:3, 72:11, 73:6,
  77:16, 96:15,
  99:9, 112:2,
  118:19, 118:21,
  128:12, 147:25,
  149:17, 169:8,
  180:19, 184:7
Given 8:1, 17:12,
  18:2, 47:17,
  53:21, 58:14,
  61:12, 68:3,
  85:17, 94:23,
  98:24, 103:9,
  115:6, 115:14,
  121:2, 125:13,
  129:14, 131:2,
  134:23, 141:11,
  145:1, 160:5,
  182:9
gives 72:16, 89:4,
  165:24
giving 105:19,
  127:11, 142:8
glad 35:4, 125:13
goal 38:21, 46:4,
  64:19, 101:18,
  102:20, 126:21,
  132:6, 133:4,
  134:19, 136:14,
  137:21, 147:13,
  149:19, 150:16,
  150:20, 151:14,
  159:9
God 75:19
Goodness 182:3
Gotshal 27:6
gotten 16:23, 61:25,
  110:9
govern 100:7
governing 183:17
Government 9:17,
  9:19, 9:22, 9:23,
  9:24, 9:25, 10:19,
  11:10, 11:22,
  12:1, 37:4, 40:11,
  40:13, 45:22,
  49:14, 51:10,
  58:8, 78:4, 97:24,
  119:16

Governor 7:12, 9:18,
  11:23, 30:13,
  31:14, 32:23
grab 130:18
Gracia 102:17,
  106:8, 106:12,
  116:10
Gracia-gracia 101:9
graciously 74:5
grammatically 126:4
Grant 10:21, 42:3,
  43:10, 75:21,
  114:1, 192:6
granted 22:13,
  41:20, 42:5,
  43:22, 98:18,
  100:9, 105:4,
  105:5, 119:19,
  129:2, 150:14
granting 26:11
grants 40:2, 117:16
granular 53:14,
  53:16
grateful 13:4, 20:3,
  37:2, 37:8, 38:4,
  190:22
Great 14:9, 24:11,
  70:19, 72:21,
  90:20, 171:13,
  176:11, 188:19
Greenberg 49:11
Grella 116:16
grid 47:7
grips 51:20, 141:10,
  141:15
grounds 121:19,
  129:1, 134:1
group 77:23, 77:25
groups 8:13
growing 7:8
grown-ups 185:4
Guanica 33:2
Guarantee 3:26, 27:7
guarantees 74:25
Guaranty 3:10, 3:12,
  3:15
Guard 8:1, 37:21,
  37:25
Guayanilla 33:3
guess 17:18, 22:11,

59:5, 69:7, 113:5,
  120:14, 129:25,
  146:22, 155:17,
  162:25, 166:2,
  172:15, 175:14,
  179:14, 182:18,
  182:25, 183:9
guessed 163:2
guidance 101:4,
  112:3, 136:22,
  136:23
guide 139:23
guilty 12:24, 50:9
guise 104:19
Gump 44:15, 45:6


< H >
Hadassa 49:15
Hail 115:9
half 73:21
halt 123:7
hand 75:14, 117:24,
  117:25, 157:2
handful 70:11,
  97:13, 136:21
handle 98:23
handled 30:7, 65:5
hands 52:13, 182:14
Hang 174:5, 175:25
happen 73:2, 73:8,
  119:6, 136:10,
  138:12, 144:5,
  150:15, 177:8
happened 52:22
happening 165:21
happens 59:10,
  81:24, 148:12
happily 69:15
hard 59:8, 70:24,
  71:1, 76:13,
  109:24, 164:6,
  182:11
hardest 7:14
Harriman 98:14
Hastings 74:7
Hauer 45:6
he'll 151:19
head 47:15, 52:15,
  53:16, 60:10,

72:12, 152:4,
153:14, 179:17,
180:15, 180:16,
180:25
heading 91:11, 146:3
headings 89:5
heads 25:18
Health 41:22, 42:7
hear 17:8, 49:6,
58:4, 62:15, 72:4,
73:20, 76:18,
104:5, 104:22,
109:13, 116:13,
121:21, 142:5,
143:12, 151:5,
159:22, 173:12,
175:3, 176:15,
176:20, 180:17,
181:6, 189:7
heard 17:12, 28:20,
37:14, 41:20,
72:11, 112:14,
113:7, 159:25,
168:9, 171:15,
173:20, 175:18,
176:23, 187:13,
189:8, 192:9
hearings 15:19,
27:15, 43:7,
70:14, 179:4,
189:11
held 106:8, 108:25,
123:14
helicopter 182:14
Hello 100:4, 174:23
Help 15:21, 16:3,
18:17, 38:19,
66:22, 89:6,
90:11, 94:5,
95:10, 120:15,
120:18, 155:4,
162:24, 179:7,
187:23
helpful 16:21,
66:17, 67:1,
70:18, 72:2, 89:7,
92:7, 99:1, 175:6,
176:25, 177:15,
177:20, 178:4,
178:13, 178:20,

181:20, 184:13,
185:2
helping 187:8
helps 119:22
hesitate 170:19,
178:11
hesitating 86:6,
186:5
hiding 74:2, 74:4,
77:13
high 14:23, 31:13,
37:17, 56:22
higher 58:11, 73:4
highlight 105:8,
123:12, 134:23
highlights 162:16
Highway 39:1, 39:2,
39:5, 39:12
hint 71:11
historically 132:10
history 74:19, 187:6
hit 7:14
hitting 16:22
hobbled 142:7
Hold 41:15, 126:8,
142:21, 168:11,
169:22, 171:22,
174:8, 174:10,
174:15, 175:23,
180:25
holders 12:1,
152:20, 192:5
holding 148:19,
166:3
holdings 103:9
hole 161:15
holiday 181:4
homes 7:21, 8:5
honest 111:10
honestly 164:16,
167:12
Honorable 2:20,
2:22, 2:28, 25:25,
97:12, 98:6,
174:22, 175:2,
175:8, 175:11,
176:1, 176:5,
176:9, 176:18,
180:14, 186:23,
187:2, 187:10,

187:15, 187:25,
188:15, 189:21,
190:24, 194:6,
194:8
hook 56:8
hope 54:6, 84:11,
174:16, 178:13,
180:9, 182:4,
187:11
hopeful 12:5, 145:4,
160:10, 178:24
hopefully 12:24,
153:6
hopes 177:16, 179:5
horror 74:21
hour 183:2
hours 12:20, 51:10,
182:4, 182:13,
183:1, 184:6,
184:25
House 10:16
houses 32:18
Housing 32:9
HTA 32:1, 32:9,
38:23, 39:7,
39:11, 41:14,
107:25, 114:8,
132:10, 134:4,
157:2, 182:21,
182:23, 183:11
hubbub 172:18
HUD 9:25, 10:20,
39:18
huddle 179:15,
179:22, 180:2
huge 98:2
Humacoa 33:14
human 36:18
hundred 33:18,
64:22, 69:1, 70:4,
70:7, 85:12
Hundreds 8:5, 8:7,
14:2, 20:21,
32:11, 52:12,
124:3, 167:22
hung 189:3
hurricanes 31:11,
31:15, 32:4,
39:16, 162:6
hybriding 125:18

hypothetically 47:16

< I >
idea 141:6, 184:11
ideas 101:24
identical 54:10
identification 19:6
identified 70:11,
  105:12, 114:17,
  135:18, 177:19
identifiers 17:19
identifies 113:6,
  123:17
identify 113:15,
  121:8, 122:8
identifying 87:16
ignore 100:10
II 41:3, 42:17
II.28 43:23
II.3 43:23
III 1:8, 1:26, 6:14,
  27:19, 57:8,
  58:16, 62:5, 63:4,
  67:17, 73:1, 82:2,
  86:4, 90:25,
  91:13, 100:1,
  101:8, 112:23,
  138:7, 150:25,
  151:5, 151:8,
  152:3, 153:7,
  153:10, 157:11,
  191:4
III.3 100:1
illegal 50:7
imagine 54:4, 71:6,
  182:11, 183:19
imagining 182:20,
  183:9, 183:18
immediate 7:13,
  105:6
immediately 7:4,
  33:21, 52:2,
  91:10, 147:17
impact 45:23, 49:18,
  50:2, 50:13, 55:3,
  170:15
impacted 67:21
impair 152:19
impede 84:22

impediment 145:14
impediments 132:14
implement 24:7
implementation 6:19,
  9:7, 83:25
implemented 39:4
implicate 163:25
implicated 124:15,
  124:22, 125:7
implication 140:6
implications 123:23
implicit 43:17
import 132:12
importance 31:13
important 30:14,
  30:15, 30:17,
  59:13, 84:8,
  87:10, 95:15,
  106:2, 126:13,
  134:24, 150:17,
  150:21, 161:12,
  178:21, 179:4,
  185:6
importantly 65:1,
  67:11
impose 10:19, 64:23,
  96:4, 103:1, 125:3
imposed 102:20
impossible 108:19
impractical 64:19
impression 28:14
improper 68:11,
  104:18, 170:14
improperly 125:5
improve 40:12
improvement 75:1
improvements 74:10
in. 71:7, 96:12,
  107:10
inability 155:6
inadvertently 42:22
inappropriate 14:18,
  105:9
incidental 94:16
inclination 139:8,
  165:9, 165:13,
  168:10, 177:18,
  189:16
inclined 134:4,
  165:21

include 16:2, 18:22,
  19:2, 32:25, 39:1,
  67:1, 69:24, 72:9,
  83:17, 91:7,
  94:13, 95:13,
  148:13, 154:8,
  164:10, 193:7
included 7:18,
  64:12, 68:19,
  69:9, 69:21,
  74:24, 89:2, 89:3,
  108:1, 145:11
includes 25:13,
  90:17, 113:24,
  193:14
including 5:21,
  5:24, 6:3, 7:12,
  7:21, 7:22, 8:6,
  13:12, 38:24,
  39:5, 59:7, 62:20,
  63:15, 67:24,
  104:11, 126:2,
  128:16, 134:14,
  135:10, 148:7,
  151:24, 161:20,
  163:19, 169:20
inclusion 17:19,
  99:10
inclusive 90:15,
  188:12
inconsistent 148:16,
  165:22
inconvenience 175:12
incorporate 63:7,
  86:9, 101:25
incorporated 63:15
incorporates 57:9,
  99:7
incorporating 19:20
increase 39:14
increasing 21:6
incredibly 27:18
incur 94:16
indefinitely 45:25,
  59:11, 59:20
independence 87:12,
  87:20
indicate 72:24,
  88:3, 90:1
indicated 10:19,

83:7, 84:19,
97:13, 100:7,
163:25, 176:24,
192:1
indicates 123:18
indicating 17:6,
89:10
indication 73:12,
89:22, 90:25
indicted 59:14
indictment 47:4,
49:1, 59:13
indirect 97:7
indisputably 47:6
individual 7:17,
19:8
indulge 129:18,
153:11
industries 124:2
industry 124:1
inefficiencies
103:13
inefficient 106:19,
120:14, 128:22
influence 59:9,
59:16
inform 40:10, 61:8,
137:24
informal 96:17
informative 17:6,
22:11, 37:1,
87:16, 139:7
informed 8:23
infrastructure 10:9,
10:24, 31:11,
32:5, 38:8, 38:14
initial 23:11,
31:12, 31:22,
32:20, 33:19,
39:5, 69:2, 70:4,
71:24, 97:25,
150:4, 159:5,
166:5, 187:19
initially 62:14,
121:1, 190:9
initials 19:9
initiating 69:4,
69:5
initiation 72:14
injunction 51:16,

116:20, 126:23
injunctive 51:22
injury 89:17
input 63:8
inquiries 170:23
insert 91:11
inserted 9:25, 147:1
inside 124:12
insight 73:6
inspected 33:12,
33:25
inspection 53:23
Inspections 33:8,
33:19, 33:23,
34:3, 34:11, 34:13
instance 18:7,
57:20, 67:18,
89:17, 135:17,
185:12, 186:8,
186:14, 186:16,
187:6
instances 47:22,
79:14, 95:2
instead 71:3, 79:18,
80:2, 91:16,
100:11, 105:5,
116:3, 154:7,
181:8, 181:11,
181:14, 184:17
instruction 36:6,
69:20, 101:5
instructions 119:15
instructive 179:25
instructs 128:12
instrumentality
153:20
instruments 152:21
Insurance 3:16,
38:15, 41:22, 42:7
insurers 153:18
Integral 3:22,
62:21, 77:13,
152:21
intend 14:20, 69:19,
70:2, 73:5, 73:7,
80:21
intended 111:20,
147:10
intending 17:7
intends 176:25,

177:5
intent 12:2
intention 66:24,
73:9
intentions 66:14
interested 86:22,
101:14, 144:6
interesting 16:24
interests 17:10,
45:10, 101:12,
102:4, 115:13,
119:4, 120:22,
132:8, 148:23,
154:9, 154:18
interfere 47:2
interfering 46:16
Interim 21:4, 99:17,
101:20, 110:25,
111:13, 129:7,
131:9, 136:25,
144:6, 147:1,
147:15, 149:24,
152:11, 155:18,
158:11, 159:14,
160:8, 169:18,
171:14, 171:16,
177:9, 178:2,
178:7, 188:22,
189:24, 189:25
intermediate 106:10,
109:6
internet-based 35:10
interpleader 161:25
interpretation 55:8,
161:3
interrupt 151:15
intertwined 178:5
intervening 43:3,
100:21, 100:23,
101:22, 102:15,
131:13
interwoven 116:9
introduction 10:17,
91:21
invalid 91:14
invalidity 153:2,
153:8
invaluable 63:8
invested 75:9
invite 73:18, 96:10,

134:11, 144:19,
173:21, 179:14
inviting 62:7
invoice 47:15,
47:17, 47:21,
52:22, 54:4, 54:9,
54:10, 60:11,
60:13, 60:14,
60:16, 60:19,
73:21
invoices 52:12,
52:18, 53:18,
53:21, 62:3
invoked 79:23
involved 22:7, 65:7,
72:7, 113:12,
120:25, 178:15
involving 74:20
ipse 103:24
Irma 31:11, 32:4,
39:16
irrelevant 50:21,
109:23
irrespective 145:14
island 10:8, 124:5,
193:13
issuance 8:11
issuances 102:10
issued 5:15, 38:22,
170:20, 187:20
it. 152:7
Item 41:2, 42:17,
44:9, 62:5, 62:6,
100:1, 191:4
items 41:7, 42:19,
43:23, 45:23,
135:18
iterative 12:8
itself 6:13, 76:3,
103:6, 109:19,
128:11, 186:9


< J >
J. 2:29, 2:32, 3:12,
3:13
January 23:16,
23:21, 70:13,
97:18
Jay 98:14

Jayuya 33:1
John 3:23, 77:12
join 62:8, 104:8,
116:1, 123:21
joinder 103:2,
103:4, 119:7,
122:20
joinders 101:17
joined 111:4, 141:22
joining 121:4, 121:6
joins 101:10, 101:13
Joint 46:12, 61:22,
144:20, 148:23,
149:4
Jointly 1:11, 1:29,
45:9, 82:12,
168:22
Joseph 3:41, 49:10
Juan 5:1, 5:7, 7:22,
33:14
judges 63:19, 65:12,
65:14, 78:11,
81:7, 81:9, 81:11,
81:12, 83:23,
84:9, 91:2
judgment 51:17,
79:16, 117:13,
127:2
judgments 79:12
judicial 5:14, 86:3
judiciary 84:2, 84:8
Judith 2:22, 194:8
jump 140:12
June 24:4, 25:3,
58:9, 61:22,
61:23, 108:25
jurisdiction 79:23,
128:3
jurisprudence 57:16
justice 45:10, 47:9,
48:5, 128:13
justification 26:25
justified 52:24
justify 45:24


< K >
keep 21:2, 21:7,
29:4, 71:6, 86:24,
130:10, 165:13,

193:15
kept 17:12, 19:13
key 30:18, 131:23
kilometer 39:1, 39:2
kind 19:20, 25:15,
57:5, 75:4, 80:20,
125:20, 137:17,
149:18, 150:18,
178:15, 183:18
knowing 135:3
knowledge 132:4
known 24:8, 24:25,
118:23
knows 12:7, 79:15,
79:16, 89:9,
133:24, 182:3,
189:3
kudos 163:2


< L >
la 3:23, 62:21,
77:13
lack 10:8, 71:22,
113:10, 132:19,
165:8
lacked 16:12
laid 144:18
Lajas 33:1
landscape 130:16
language 18:22,
19:20, 56:9,
60:14, 91:12,
94:1, 98:22, 99:9,
135:15, 147:1,
160:7, 160:8,
184:16
Lares 33:1
large 18:3, 49:25,
67:24
largely 30:7,
120:19, 131:16,
139:19, 139:21
largest 32:13, 124:2
Lary 2:35
late 113:23
lately 59:7, 132:5
later 14:14, 25:15,
29:3, 62:15, 69:3,
81:13, 108:10,

118:12, 120:13,
121:22, 138:23,
175:20
latest 40:2, 98:20
latter 88:13
laudable 64:19
laughed 167:16
laundry 54:17
Laura 2:20, 2:33,
13:22, 41:8,
62:11, 191:8,
194:7
law 50:6, 52:6,
55:19, 89:18,
89:19, 127:19,
166:10
laws 14:25, 117:1,
152:18, 152:25,
157:16, 157:19,
158:1, 158:2,
158:17
lawyer 78:23, 94:15
lay 19:18, 180:3
lead 12:22, 131:15,
148:18, 158:20
leaders 11:24
leading 159:7, 160:6
lean 97:11
learn 141:13
least 12:17, 14:9,
24:8, 47:24, 58:9,
61:12, 67:10,
74:14, 80:15,
83:24, 87:18,
98:9, 98:15,
108:11, 108:25,
113:14, 116:15,
119:24, 122:8,
128:20, 132:25,
140:13, 142:24,
156:15, 186:9
Leave 57:7, 100:2,
100:8, 105:4,
128:12, 129:1,
157:3, 160:7,
174:18, 183:2,
188:20
leaving 171:24,
172:7, 178:19
Lecaroz 2:38

left 24:12, 24:21,
42:22, 161:4
legal 40:12, 51:4,
111:2, 134:7,
134:13, 134:16,
162:2, 164:10
legally 97:5
legislation 12:2,
12:5, 12:13, 24:7,
24:17, 24:19,
25:1, 27:12, 30:17
legislative 11:20,
11:24, 12:7, 12:8,
27:14
legislature 12:3,
30:13, 30:16
lenders 189:1
length 83:13
less 13:10, 106:2,
135:11
letter 11:7, 11:9
letters 10:6
letting 74:5,
118:21, 153:11,
165:6
level 37:17, 56:3,
56:22, 114:15,
155:11
leverage 97:7
liabilities 14:25
liability 48:11,
48:13, 55:7, 79:7,
191:13
liable 41:15
liberal 128:11,
128:14
licensed 33:13,
34:12
licenses 17:21, 19:3
lien 8:11, 114:25
Life 41:22, 42:7,
82:3, 82:4,
164:16, 193:14
lifted 84:12, 161:13
lifting 84:6, 159:7
light 10:7, 42:2,
61:15, 63:23, 66:6
likelihood 48:14,
58:11, 116:20,
126:24, 127:12,

127:16, 127:20
likely 14:10, 45:20,
66:7, 83:10,
92:12, 117:19,
121:4, 137:7,
141:18, 178:6
limbo 28:9
limit 32:6, 106:19,
118:16, 164:1
Limited 2:5, 5:24,
6:4, 18:3, 64:9,
100:15, 103:16,
106:22, 108:19,
128:15, 135:18,
137:13, 144:1,
147:12, 162:1,
168:12, 171:21,
178:10
limiting 147:3
line 5:13, 54:10,
54:11, 60:23,
66:20, 91:10,
95:5, 148:17,
174:1, 174:6,
175:13, 185:8,
189:1
lines 18:22, 26:2,
47:17
lineup 129:8
liquidate 63:3,
63:5, 63:21,
65:19, 94:22
liquidated 92:6
liquidating 96:24
liquidation 91:25,
94:24, 95:3, 98:25
list 11:13, 11:22,
54:17, 60:1,
72:11, 144:23
listed 43:23, 43:25,
46:10, 46:15, 47:1
Listen 163:2
listeners 176:13
listening 5:13,
173:20, 190:18
listing 43:16, 44:6
litigants 96:13,
118:20
litigate 25:4,
84:20, 151:3

litigated 46:6,
   152:2, 153:8,
   167:5
litigations 63:24
litigators 23:10
little 19:17, 41:17,
   73:6, 79:20,
   86:24, 90:14,
   90:16, 90:18,
   90:23, 91:6, 95:2,
   95:11, 115:21,
   120:15, 129:16,
   140:12, 152:6,
   155:21, 162:11,
   165:25, 175:1,
   175:6, 180:7,
   180:12, 181:19
live 124:12, 138:14,
   174:7
LLC 3:29, 3:35, 45:7
LLP 112:22
load 21:5
loaded 5:20
loathe 143:8
Local 88:22, 95:14,
   99:10
locations 34:24
lock 124:19
locked 23:15
logical 79:3
logistics 13:12,
   148:21, 159:10,
   181:22
long 20:11, 54:5,
   63:12, 80:5,
   108:13, 112:14,
   114:21, 125:10,
   138:2, 162:22,
   167:19, 188:24,
   189:10
longer 148:10,
   148:11, 189:9
Look 75:19, 86:18,
   89:24, 90:22,
   103:11, 116:15,
   119:2, 139:11,
   164:3, 164:4,
   184:22, 185:11,
   186:24, 190:2
looked 101:1

looking 56:4, 101:6,
   149:10, 152:6,
   158:21, 184:16
looks 73:18
loop 160:4
lose 119:25, 165:9
loss 36:21
lost 28:6, 38:20,
   126:4, 129:16,
   191:2
lot 13:2, 19:21,
   41:18, 103:11,
   103:21, 115:8,
   116:25, 117:23,
   120:16, 124:13,
   155:4, 155:12,
   161:22, 166:1,
   182:6, 186:7,
   191:17
loud 143:13
louder 25:15, 41:17
lower 91:16
lowest 106:9
Luc 2:42, 74:7
luck 178:14
Luis 3:8, 31:7
lunch 99:14, 99:20
lure 154:1


< M >
ma'am 189:22
machine 70:6, 174:7
Magistrate 2:22,
   25:25, 79:25,
   81:11, 81:12,
   81:23, 86:2,
   97:12, 98:6,
   179:25, 180:14,
   194:8
magnitude 32:13
mailing 15:23, 16:2,
   43:5, 43:9
main 24:10, 113:18,
   146:25
mainland 125:4
mainstream 122:7
maintain 21:2
major 10:8, 10:14,
   21:5, 21:18,

30:10, 32:24,
   38:25, 65:9,
   153:8, 183:20,
   184:1
majority 14:9,
   53:18, 63:23,
   78:1, 80:17, 90:1
manage 40:17, 87:6
manageable 17:13
Management 1:10,
   1:28, 2:12, 13:23,
   62:13, 155:19,
   166:10, 191:9
mandated 50:6
Manges 27:6
manifest 7:1
manifestly 47:9,
   59:18
manner 14:20, 18:14,
   26:15, 104:13,
   133:18, 150:16
map 66:19, 69:3
March 8:21, 12:17,
   23:17, 29:6,
   112:17, 137:13
Maria 31:11, 32:5,
   39:16
Maricao 33:1
MARINI 3:8, 30:7,
   30:21, 31:5, 31:6,
   31:7, 33:18,
   33:23, 34:9, 35:7,
   35:13, 35:18,
   35:25, 36:8,
   36:20, 37:3, 37:9,
   37:17, 38:3, 38:5,
   38:7, 40:22, 40:23
mark 70:8
marker 72:13
marking 85:23
marshal 66:18
marshals 69:6
Martin 2:32, 3:16,
   6:12, 112:21,
   153:15
Mary 115:9
Master 41:14, 192:3,
   192:12
matching 39:10
material 50:2,

137:19, 144:5,
165:4
materials 18:24,
134:15
matter 22:24, 44:14,
52:10, 57:15,
58:12, 100:8,
106:17, 136:5,
137:24, 156:22,
158:7
mattered 143:6
matters 40:20, 41:3,
45:18, 61:24,
99:19, 132:12
Mayaguez 39:3
MAYER 22:2, 22:21
Mcconnell 123:1
MCLISH 3:29, 44:14,
44:17, 44:25,
45:4, 45:5, 48:16,
49:8, 53:9, 56:15,
57:6, 58:4, 58:19,
58:23, 58:25
mean 47:12, 53:6,
54:16, 75:8,
81:22, 82:6,
86:20, 107:3,
115:8, 118:18,
121:9, 131:24,
135:4, 139:11,
158:5, 166:24,
167:12, 170:11,
181:17
meaning 23:15, 76:6
meaningful 142:10,
142:16, 143:15,
178:25
means 18:12, 44:16,
56:8, 63:17,
106:23, 116:18,
133:16, 139:9
meant 145:8
measure 114:23
measured 105:15
measures 9:8, 40:5
meat 54:14
mechanics 119:18,
155:22, 166:10
mechanism 85:23,
87:4, 87:13,

87:14, 88:18,
169:3
mechanisms 17:11,
161:6
mediate 81:15, 82:6
mediator 66:17,
66:18, 78:25,
79:18, 80:2,
81:21, 86:5,
86:11, 86:15,
87:1, 110:21,
185:19
mediators 64:25,
65:12, 65:15,
65:21, 81:9,
81:12, 81:25,
83:11, 83:18,
83:23, 84:2, 96:4,
131:11
medical 19:4
meet 9:11, 70:15,
143:23, 144:19,
148:21, 149:6,
162:13, 164:19,
168:14, 170:22,
171:6, 171:7,
171:10, 172:1,
173:10, 177:22,
177:23, 178:5,
179:5, 180:10,
184:20, 184:21,
185:20, 187:19,
190:2
meetings 40:14
megawatts 38:19,
38:20
Mellon 192:4
member 19:1
members 5:6, 11:7,
84:1
memo 126:3
memorandum 140:15,
140:23
mention 25:17,
100:24, 121:23
mentioned 20:4,
29:20, 33:4,
35:16, 36:2, 81:2,
85:1, 102:3, 123:9
mentioning 7:9,

80:23
mentions 123:5
mere 104:14
merely 144:17,
145:12, 160:20
merge 138:7
meritorious 75:9
merits 119:2,
126:24, 150:20,
150:22, 150:23,
151:11, 157:12,
158:21, 159:4,
171:18, 190:7
merits-based 133:19
MESSAGE 174:17
met 11:24, 177:12
methodology 11:13
Michael 2:34,
129:10, 130:25,
155:24, 179:20
microphone 58:21,
143:4, 143:20,
174:10, 174:15
middle 17:6
Milbank 100:6, 160:3
million 7:6, 7:13,
8:25, 32:19,
34:15, 34:16,
38:20, 39:6, 39:8,
39:9, 39:23, 40:4,
40:5, 40:7, 45:11,
47:11, 49:5,
50:15, 50:16,
52:16
millions 8:7, 167:23
Mind 5:10, 21:7,
69:16, 69:18,
71:12, 107:4,
126:14, 131:13,
133:9, 135:22,
144:15, 170:21,
173:21, 180:24,
182:18, 184:11
mindful 13:5
minds 133:16
minimum 90:9, 93:23
Minors 19:9
minute 20:8, 35:5,
53:8, 78:12,
85:19, 109:15,

122:12, 166:14
minutes 17:17, 23:5,
   62:14, 85:7,
   106:5, 182:8,
   182:24
mischaracterized
   157:13
miscommunications
   99:3
misheard 29:21
missing 72:12
mitigated 61:17
mitigation 32:20,
   34:15
mix 124:7
mobile 34:24, 36:3,
   174:14
modalities 96:8
modality 168:18
mode 70:3
model 133:21
modification 9:6,
   9:14, 27:22, 67:9,
   68:15, 75:11,
   77:2, 80:23, 88:8,
   97:1, 145:17
modifications 84:25,
   88:10, 95:21,
   99:8, 149:24,
   189:17
modified 8:13,
   65:24, 87:15
modify 156:9
Moers 22:2, 22:3,
   22:7, 22:9, 22:20,
   22:21, 22:23
moment 29:9, 68:22,
   71:5, 79:2, 83:2,
   133:20, 154:5,
   173:17
momentary 186:1
moments 135:12
Monday 131:20,
   133:17, 171:10,
   180:19
money 45:12, 47:12,
   47:25, 48:18,
   51:15, 53:11,
   55:21, 57:7,
   57:20, 59:23,

60:21, 115:1,
   115:10, 119:16,
   119:19, 123:13,
   125:9, 130:4
monies 133:2
monitoring 6:19
monoline 101:14,
   134:19
monolines 28:20,
   101:14, 130:4,
   131:18, 131:22,
   132:8, 132:24,
   135:1, 135:23,
   137:23, 140:8,
   143:24, 145:9,
   146:8, 154:1,
   165:3, 169:6,
   180:6
Monsita 2:38
Montana 3:23, 62:21,
   77:13
month 5:9, 6:25,
   12:17, 14:4, 15:4,
   148:1
months 15:16, 25:4,
   62:17, 120:18
moot 61:24, 126:19
mooted 108:22,
   120:6, 175:16,
   176:23
moratorium 152:18,
   152:25, 157:15,
   157:18, 158:1,
   158:2, 158:16
morning 6:6, 6:10,
   6:11, 13:16,
   13:20, 13:21,
   13:22, 27:8,
   28:20, 30:5, 31:5,
   31:6, 41:8, 41:10,
   44:12, 45:4, 45:5,
   49:10, 49:12,
   49:15, 62:10,
   62:11, 80:11,
   185:15, 188:18,
   192:20
mostly 39:10, 77:18
Motions 13:2, 26:12,
   43:13, 43:22,
   102:7, 104:16,

104:17, 107:8,
   111:2, 111:18,
   113:24, 123:23,
   132:18, 132:24,
   133:8, 133:24,
   134:5, 138:17,
   138:22, 140:7,
   145:6, 160:16,
   164:9, 183:6,
   183:8
movant 128:17,
   128:18
movants 100:12,
   123:6, 123:19,
   183:4, 183:5,
   183:25
move 11:18, 21:23,
   22:9, 25:11,
   29:18, 35:2, 35:3,
   37:9, 41:2, 42:16,
   107:5, 119:18,
   126:25, 127:1,
   127:14, 142:25,
   144:14, 167:6,
   172:1
moved 29:24, 148:17,
   161:14, 186:13
movie 93:15
moving 20:24, 21:4,
   26:13, 26:25,
   109:9, 122:3
Mudd 3:23, 62:20,
   63:18, 65:14,
   74:2, 77:11,
   77:12, 77:18,
   80:9, 80:13, 81:6,
   83:21, 84:19
Municipal 3:12,
   67:24, 68:2
municipalities 7:12,
   7:14, 7:18, 32:25,
   33:6
Muniz 31:8
mushed 184:17
mutually 168:3
Myers 30:6
myself 27:5, 31:21,
   126:4, 139:4,
   161:20, 188:8,
   188:21

< N >
name 27:4, 27:5,
    122:17, 174:18
Namely 103:2
names 19:9, 96:16
narrow 166:24, 182:5
narrower 165:14
narrowly 18:12,
    25:21, 141:15,
    161:25
NATBONY 3:12, 21:19,
    21:20, 26:9, 26:10
National 3:25, 7:25,
    27:6, 27:9, 37:21,
    37:25
nature 20:18, 125:17
Nayuan 3:37, 122:25
Nazario 191:23,
    191:25, 192:6,
    192:8, 192:13,
    192:24
near 36:25, 61:14,
    77:14, 143:20
nearing 14:23
necessarily 75:8,
    76:21, 135:20,
    138:8, 182:17,
    190:12
necessary 6:7, 16:7,
    21:2, 27:17,
    53:17, 57:14,
    85:1, 88:3, 97:2,
    101:11, 114:21,
    134:18, 137:20,
    139:20, 142:16,
    143:25, 147:6,
    147:17, 148:18,
    149:20, 150:15,
    165:16, 166:22,
    185:8, 186:3
necessity 25:10,
    178:14
needed 24:18, 24:25,
    47:1, 66:5, 128:7,
    133:19, 159:10,
    159:13
needing 143:13
needs 94:3, 106:9,

131:9, 144:5,
    160:5, 170:24,
    173:14, 173:15,
    175:21, 177:8,
    177:16, 189:8
negotiate 96:6
negotiated 88:14
negotiating 93:4
negotiation 84:14
negotiations 96:18
neighborhood 49:4
neighbors 17:1, 17:4
neither 45:19, 63:1,
    118:20
news 111:19, 157:22
next 6:25, 16:12,
    20:7, 35:20,
    36:10, 38:12,
    41:2, 42:18, 44:9,
    62:6, 73:20,
    73:25, 75:12,
    78:22, 106:3,
    106:23, 115:22,
    125:18, 126:12,
    127:14, 127:23,
    144:10, 161:17,
    165:19, 187:14,
    188:3, 188:18,
    193:6
night 113:23
nine-year-old 103:22
No. 1:6, 1:24, 2:5,
    22:23, 80:8,
    111:20, 115:15,
    115:18, 159:20,
    170:11, 172:20
Nobody 167:25
Nodding 126:5,
    152:4, 152:5,
    153:14, 179:17
nomenclature 98:25
nominated 49:14
non-duplicative
    183:3
non-refundable 189:5
non-responding
    192:23
non-title 157:11
noncritical 10:24
None 4:5, 4:11,

104:24, 119:4,
    128:25
nonetheless 131:4,
    158:7
nonvisible 38:14
noon 6:6, 182:1
nor 5:17, 27:16,
    45:19, 118:20,
    169:17
normal 77:2
north 8:4, 35:17,
    35:24
Notably 102:25,
    104:7
notation 95:13,
    166:9, 166:11,
    166:12, 166:15
notations 164:23
note 15:22, 65:23,
    84:4, 101:15,
    110:4, 110:15,
    140:4, 145:7,
    152:11, 156:13
noted 64:3, 65:16,
    131:19, 133:17,
    135:17, 150:21,
    166:7, 190:8
notes 5:19, 5:20,
    86:8, 161:20
Nothing 23:15,
    47:22, 77:6,
    84:13, 84:22,
    110:1, 119:17,
    119:22, 125:11,
    136:10, 148:12,
    154:6, 161:6
Notice 13:10, 13:14,
    17:2, 18:8, 18:16,
    18:23, 19:18,
    69:5, 69:18,
    69:21, 69:22,
    72:19, 85:3,
    87:21, 89:4, 91:4,
    91:8, 91:10,
    91:11, 91:19,
    91:24, 94:11,
    94:21, 98:22,
    99:7, 104:23,
    159:16, 173:15
noticed 16:10,

42:21, 43:18,
    122:1
notices 16:13,
    16:17, 43:1, 69:1
noticing 16:7,
    190:17, 190:20
notified 9:2
notion 108:5,
    124:21, 134:25,
    135:1, 135:2,
    137:20, 141:8,
    143:7, 167:20
Notwithstanding
    64:6, 192:7
novel 24:8
November 156:17
nowhere 100:10
null 157:15, 158:1,
    158:2
numbers 19:5, 19:6,
    19:10, 43:25,
    96:15
numerous 31:16
nuts 161:16


< O >
o'clock 6:7, 189:6,
    189:9
O'melveny 30:6
object 102:25,
    107:11, 121:5
objected 16:24,
    169:11, 169:19
objecting 26:13,
    64:7
objective 144:14
objectives 144:18
objectors 62:15,
    62:21, 63:10,
    129:16
objects 87:20
obligate 55:14,
    55:25, 81:3
obligated 39:23,
    39:25, 40:2, 52:2,
    52:8, 52:25,
    55:18, 67:11
obligation 55:9,
    56:5, 62:3, 79:22,

138:5, 139:2
obligations 51:22,
    55:22, 57:25,
    190:2
obliged 185:24
observation 188:5,
    190:8
observations 129:15,
    175:15, 177:1,
    177:2, 177:21
observed 5:25
observing 5:7
obtain 51:16,
    132:16, 133:19,
    158:24
obtained 25:1, 32:8
obtaining 50:8
Obviously 9:23,
    17:14, 23:6,
    26:20, 37:4, 59:6,
    86:11, 119:12,
    179:12
occasion 77:17
occur 135:10, 179:5
occurred 39:17
occurring 32:13,
    137:13
occurs 96:13,
    131:13, 132:23,
    138:9
October 9:2, 14:8
off-line 19:15
offer 64:14, 64:17,
    65:13, 66:3, 69:2,
    69:24, 71:24,
    72:14, 78:4,
    83:22, 83:24,
    85:23, 91:15,
    92:9, 96:1, 96:14,
    96:24, 97:25,
    144:17
offered 4:5, 4:11,
    120:11, 136:6
offers 62:25, 63:16,
    96:6
Office 62:22, 63:9,
    78:8, 86:22, 98:12
officer 50:11
offices 7:22
Official 2:40,

194:15
officials 97:24
often 120:3, 184:12
OIG 59:3
old 141:13
Omni 17:12, 29:19,
    29:20, 29:23,
    31:2, 61:22,
    61:23, 165:20,
    181:14, 188:18,
    189:4, 193:7
Omnis 15:12
Once 67:14, 69:10,
    77:14, 83:19,
    84:12, 85:17,
    98:4, 98:12, 99:4,
    105:14, 130:25
one-week 28:23
one-word 138:20
one. 78:16, 106:3,
    110:24
ones 17:12, 52:19,
    54:7, 71:2, 80:17,
    97:22, 133:11,
    135:20, 140:15,
    167:22, 184:16,
    192:17, 192:20
ongoing 8:18, 31:23,
    32:16, 33:9, 38:9,
    46:20, 193:12
open 17:14, 17:21,
    33:21, 36:13,
    96:17, 143:9,
    171:1, 174:1,
    174:2, 174:6
openings 34:2
operational 70:6,
    72:13, 83:15,
    83:18
opine 24:1
opinion 59:19, 188:4
opinions 154:3
opportunities 36:22
opportunity 13:24,
    26:14, 31:10,
    64:13, 105:20,
    137:7, 142:3,
    143:9, 150:5,
    150:7, 150:10,
    159:16, 165:24,

169:11, 178:25
oppose 27:23, 28:20
opposed 13:4, 92:3,
  134:6, 166:2
opposing 28:9,
  105:2, 105:7
opposite 54:8
opposition 29:2,
  104:7, 114:2,
  119:1, 122:21,
  163:11, 163:16,
  171:4, 183:25,
  184:19
oppositions 180:18,
  180:23, 181:7
optimistic 141:13,
  162:9
optimize 40:12
opting 73:1
option 69:16, 73:4,
  117:7
optional 67:12
options 63:3, 98:24,
  116:25, 117:23
oral 8:20, 90:8,
  138:14, 148:4,
  161:8, 181:23,
  182:4, 188:25
Ordered 110:7
ordering 153:19
orderly 131:5
Orders 5:14, 21:4,
  43:16, 44:6, 98:5,
  137:12, 144:8,
  153:19, 157:16,
  184:12
ordinary 65:5
oriented 116:5
original 123:8,
  138:3
originally 123:25
originated 145:19
Others 7:14, 40:10,
  97:22, 169:25,
  183:21
Otherwise 5:25, 6:1,
  11:15, 14:18,
  45:17, 51:24,
  56:19, 66:18,
  88:22, 94:24,

96:7, 110:7,
  138:11, 164:6,
  189:16
ought 186:9
ourselves 157:4
outcome 46:3, 46:17,
  48:10, 48:14,
  48:25, 148:4
outcomes 12:8
outline 84:24
outside 5:16, 153:6
outstanding 8:24,
  48:12, 56:20,
  62:3, 82:24
outweighed 96:3
overall 125:24
overarching 183:13
overburden 70:16
overcome 165:7
overlap 46:13
overlapping 102:9,
  102:23
overs 153:19
overstate 93:3
overstated 91:14
overview 31:22, 55:2
overwhelmed 9:20
overwhelming 53:18
owed 48:3, 60:15
owes 48:18, 154:21
own 67:19, 88:21,
  94:15, 103:6,
  103:7, 119:7,
  135:20, 141:24,
  186:22, 187:3,
  187:6
ownership 119:21,
  162:21, 192:1
owns 162:2


< P >
P. 3:29
package 98:12, 102:8
packages 98:8
PAGE 4:3, 18:11,
  91:9, 94:10,
  94:20, 113:23,
  125:14, 156:3,
  172:24, 188:13

pages 20:22, 66:16,
  83:13, 109:22,
  113:25, 114:3,
  114:23, 194:4
paid 45:12, 47:6,
  47:18, 47:22,
  47:24, 47:25,
  48:4, 48:19, 49:4,
  49:23, 49:25,
  52:4, 52:6, 57:11,
  60:12, 60:22,
  93:25, 167:22
panicked 170:9
panicky 21:18
paper 47:19
papers 51:18, 52:10,
  59:23, 82:21,
  100:11, 129:17,
  130:18, 131:19,
  131:20, 133:8,
  140:14, 145:8,
  146:7, 148:3,
  151:1, 160:12,
  164:17, 171:4,
  181:16
paperwork 73:7
paragraph 91:18,
  92:8, 94:11, 95:2,
  123:5, 131:7,
  145:19, 145:20,
  172:23, 172:24,
  172:25
paragraphs 171:23,
  172:3
parameters 66:22,
  182:9
Pardon 122:16
parks 40:6
part 5:17, 13:8,
  27:13, 31:17,
  32:15, 34:18,
  34:19, 35:13,
  35:15, 41:13,
  46:14, 48:9,
  49:25, 71:2,
  91:15, 97:17,
  101:21, 103:3,
  119:16, 121:8,
  123:13, 128:17,
  139:13, 140:18,

143:23, 166:15,
176:22, 177:24,
178:17
partial 32:19, 52:19
partially 34:5
participants 5:8
participate 62:25,
64:16, 64:25,
67:6, 67:11,
68:13, 74:15,
80:15, 81:4,
81:12, 81:18,
176:22, 178:8,
179:7
participated 178:4
participation 96:3,
185:19
particular 5:19,
13:1, 50:3, 50:10,
53:4, 72:1, 81:22,
97:4, 106:8,
106:16, 118:12,
141:2, 141:4,
145:16, 156:20,
164:23, 179:1
particularly 36:23,
58:8, 63:22,
144:6, 144:15,
145:6
parts 9:24, 49:22,
98:10
party 51:1, 51:3,
51:14, 59:10,
59:15, 85:18,
87:20, 103:5,
105:2, 105:7,
122:3
pass 121:14
passes 115:9
passports 19:3
past 14:4, 62:17,
99:14, 99:15,
99:21, 106:23,
138:25, 149:12,
170:4, 182:12
patently 112:5
path 132:4, 135:7,
137:6, 145:4,
146:3, 161:23,
187:23

paths 67:15, 132:16
patience 99:13,
174:13, 176:16
Paul 74:7
pay 52:25, 53:13,
55:9, 55:18,
55:19, 55:21,
56:2, 56:5, 56:20,
57:1, 57:19,
57:24, 60:16,
62:3, 67:7, 67:13,
76:2, 76:3, 78:16,
94:15
payable 95:9, 97:22
paying 30:16, 49:2,
52:24, 56:19
Payment 41:5, 44:10,
46:8, 49:24,
51:23, 52:2, 52:7,
52:8, 52:23,
52:24, 55:19,
60:7, 74:19,
92:12, 94:13
payments 167:24
peak 7:24
peculiar 183:17
pejorative 135:5
pen 76:5
pending 29:4, 49:17,
50:1, 51:2, 74:14,
75:8, 89:21,
89:23, 140:21,
169:6
penny 76:2
pension 192:2
pensions 15:1
per 53:19
percent 14:10, 17:8,
53:10, 53:11,
67:7, 116:21
Perfect 87:3, 175:10
perfectly 187:5
performed 34:12,
53:20, 54:10,
54:11
perhaps 21:8, 28:8,
31:3, 46:19,
86:24, 120:17,
133:6, 136:19,
141:25, 152:6,

152:7, 157:2,
178:14, 180:1,
186:14
period 26:11, 26:16,
43:3, 50:11, 54:5,
70:4, 70:14, 87:4,
87:7, 169:19
periodic 88:15
periods 169:9
permanent 34:16,
39:8, 39:10,
39:20, 40:15
permission 122:13
permit 83:12, 84:6,
147:7
permits 87:19
permitted 5:24,
64:15, 80:15,
137:7
permitting 95:24,
96:25
person 5:16, 5:24,
36:19, 92:3,
183:19, 190:21
personal 17:19,
18:5, 18:10,
18:15, 89:17
personally 74:20
personnel 13:13,
18:4
perspective 72:13,
143:23, 144:12
persuaded 83:8
pertaining 138:9
pertinent 145:7
pervasive 18:10
pessimist 187:1
Peter 3:7, 30:5
phase 71:25, 72:15,
83:16, 84:10,
84:15, 85:24,
86:4, 99:13
phases 64:16, 96:1,
99:14
phone 5:13, 174:9,
174:18, 190:10,
190:13, 190:16
PHV 2:32, 2:33,
2:34, 2:35, 2:42,
2:43, 3:7, 3:12,

3:13, 3:16, 3:20, 3:26, 3:29, 3:37, 3:41
pick 72:25
picking 191:16
picks 134:9
piece 47:18, 80:25, 111:8, 127:18
piecemeal 107:3
pieces 80:16
Pietrantoni 31:7
pilot 95:12
pin 140:22
pinpoint 162:16
Pinuelas 33:3, 39:2
pipeline 69:12, 70:7
place 19:15, 35:10, 36:4, 52:8, 133:16, 143:14, 172:8, 185:25
placement 11:21
places 37:15, 186:8
plain 103:25
plainly 106:13
plaintiff 51:2, 51:5
Plaintiffs 2:7
plane 189:9
planes 182:2
planning 95:10, 114:4
plans 6:20, 152:17, 152:24, 158:2
Plant 38:18
play 53:11, 56:17, 84:8, 125:24, 130:12
pleading 20:12, 23:1, 116:8, 122:11
pleadings 16:11, 22:5, 22:6, 120:3, 120:5, 123:10
Please 12:18, 12:21, 27:4, 85:10, 86:1, 90:25, 96:15, 99:24, 174:21, 184:6
pleasure 49:13
plenty 112:11, 138:25

plus 111:2
PM 99:22, 99:23, 193:17
pocket 167:23
podium 141:5, 142:3
point. 25:7, 49:7, 71:23, 72:22, 86:14
pointed 116:10, 132:5, 173:9
pointing 92:16
points 69:9, 80:13, 85:8, 89:3, 91:25, 112:25, 125:16, 134:24, 141:3
policies 5:14, 11:20
Ponce 33:2, 39:1
pool 82:3
pop 153:12
popped 50:25
portion 48:12, 81:19, 183:21
portions 125:9
posited 51:6
positions 62:1, 120:5, 141:21, 149:1, 162:17
possibility 45:23, 56:11, 60:3, 93:21, 113:9, 128:22
possible 6:25, 27:18, 46:6, 64:13, 86:12, 136:20, 148:17, 150:16, 151:12, 177:17
possibly 45:20, 135:24
post 31:10, 32:4, 39:16, 95:18, 109:19
post-earthquake 11:4
post-hurricane 11:4
post-maria 30:23
pot 123:16
potential 18:21, 25:18, 26:25, 55:3, 81:7, 93:21, 164:10, 170:22

potentially 26:18, 33:20, 59:20, 70:12, 80:15, 96:6, 112:2, 128:20, 135:6, 146:19
Power 1:34, 3:40, 38:7, 38:18, 76:1, 76:5
powers 95:16
practicable 148:9, 149:2
practical 63:16, 77:22, 142:23, 156:22
practice 111:5, 116:2, 133:5, 136:11
pragmatic 141:14
preapproval 10:25
precedent 100:21, 100:23
precise 139:18
preclude 84:14, 164:7
precluded 108:23, 108:24
precludes 161:6
precluding 162:19
preclusion 127:5, 127:8
predicted 59:5, 163:14
predicting 12:8
predictor 187:6
preempted 104:3, 104:12, 157:18
preemption 141:21, 141:23, 163:24, 167:7
prefer 69:8, 73:14, 129:14, 129:18, 148:3, 149:21
preferable 84:3, 144:13
preference 73:16, 138:8
preferred 133:18
prejudgment 128:15
prejudice 100:17,

109:16, 109:17,
110:11, 113:21,
118:18, 118:22,
118:24, 123:3,
123:24, 124:8,
125:11, 170:12
prejudiced 28:10,
45:13, 48:4,
109:25
prejudicial 110:13
prejudicing 144:6
PREPA'S 11:25, 47:19
preparation 61:16
prepare 55:23,
60:12, 173:16
prepared 16:22,
91:15, 137:16,
140:3, 143:14,
145:3, 193:5
preparing 100:22
prerequisite 27:13
prerogatives 30:16
prescient 11:22
prescribed 60:14
prescription 66:1
present 5:12, 16:9,
67:19, 104:19,
183:3
presentation 32:6,
39:17, 45:1,
102:6, 102:22,
124:13, 146:6,
182:22
presentations
148:13, 183:25
presented 12:3,
84:20, 102:23,
106:4, 109:3,
128:5, 130:15
presentment 41:6,
99:6
preserves 81:14
President 7:16,
10:14, 32:23
press 5:6, 5:25
pressing 167:8
pressure 180:12,
185:2, 186:15
presumably 122:20
pretrial 78:21

pretty 135:16,
188:19
prevented 48:21
prevents 153:9
preview 173:8
previous 123:9
previously 114:20,
157:21, 170:13
price 97:8, 118:21
PRIDCO 8:22, 8:24,
9:9, 9:13, 9:14,
30:10
PRIFA 99:16, 100:2,
102:4, 107:18,
107:24, 111:15,
113:24, 114:8,
114:14, 114:25,
115:1, 115:5,
115:6, 115:10,
121:9, 121:10,
121:11, 128:19,
128:24, 132:10,
133:21, 134:4,
136:2, 140:14,
157:1, 164:22,
164:23, 166:8
prima 106:10,
106:15, 164:5,
167:1
primarily 114:22,
157:10
primary 48:8, 64:10
Prime 43:5
principal 8:25,
183:19
principles 70:6
prior 10:7, 27:14,
34:6, 131:10,
137:12
priorities 154:9
priority 120:20,
189:1
prisons 8:6
private 33:4
pro 11:12, 13:25,
14:3, 15:22, 17:9,
18:4, 18:13
probable 79:7
probably 49:19,
56:14, 69:7,

113:14, 141:17,
148:2, 150:17,
153:25, 162:4,
164:16, 178:11,
182:24, 187:14
problem 17:19,
55:17, 61:6,
76:22, 80:6,
93:11, 130:11,
150:8, 153:9,
175:24, 176:6,
188:9
problematic 61:5
problems 23:18, 79:3
procedural 83:19,
88:22, 125:17,
128:6, 143:13,
158:7
procedurally 104:18,
107:5, 142:10,
182:18
Procedure 10:23,
16:5, 63:14,
63:15, 64:16,
72:14, 76:7, 91:1,
96:20, 120:9
proceed 14:20,
45:18, 45:25,
63:4, 68:5, 70:10,
109:1, 117:24,
131:4, 145:4,
172:10, 184:14
proceeding 6:3,
45:15, 45:19,
46:4, 46:14, 51:1,
59:16, 59:17,
61:4, 117:4,
117:12, 117:21,
117:25, 127:21,
135:2, 151:2,
151:3, 154:10,
157:25, 158:19,
158:20, 182:19
Proceedings 3:48,
5:18, 46:21,
49:17, 50:1,
50:20, 50:23,
58:16, 91:16,
99:23, 101:8,
154:6, 158:13,

158:18, 159:2,
171:19, 172:8,
173:13, 193:17,
194:6
proceeds 56:6
processes 14:12,
63:1, 65:6, 178:2
processing 15:22,
21:5
produce 93:6
produced 3:48
producers 121:25,
122:9, 124:14,
124:25, 125:8
produces 145:14
productive 62:18,
179:6
professionals 9:6,
9:7
proffers 83:21
profound 116:11
program 39:13,
83:25, 95:12,
95:15
programmed 35:18
programming 35:11
programs 33:5
progress 6:24, 7:2,
12:12, 40:16,
45:16, 45:25,
149:19, 178:25,
187:7
prohibitively 68:7
project 40:16, 175:5
projects 10:24,
10:25, 31:25,
39:20, 39:24
PROMESA 1:8, 1:26,
76:1, 155:1,
157:17
prominent 121:1
promise 6:25, 85:12,
85:13
promptly 148:17,
168:18
Proof 41:14, 42:4,
42:6, 89:10,
158:10, 191:24,
192:3, 192:12
Proofs 41:12,

154:12, 154:13,
158:5, 158:9,
191:12
proper 37:16, 128:3
properly 79:23,
163:24
proportion 92:12,
92:20
proposal 64:4, 84:5,
144:20, 150:9,
164:14, 164:18,
171:2
proposals 76:19,
86:23, 87:17,
159:12, 159:16
propose 131:18,
159:13, 173:4
proposes 65:2
proposing 93:14,
106:20, 149:24,
168:15
propositions 120:7
prosecutors 61:5,
61:6
Proskauer 6:12,
13:23, 41:9,
49:16, 62:12,
112:22, 129:11,
131:1, 153:16,
155:24, 179:20,
191:8
protect 114:24,
135:13, 147:10
protecting 18:14
protection 113:11,
130:5, 130:9
protections 147:10
protective 40:5
prove 66:1, 83:10
provide 10:17, 16:4,
30:1, 31:22,
31:24, 32:8, 37:5,
37:18, 37:23,
38:1, 40:16,
43:16, 65:22,
65:24, 66:7,
68:12, 69:18,
74:14, 86:6,
87:16, 90:2, 99:2,
117:17, 117:18,

136:22, 150:6,
158:22, 191:13,
192:20, 192:25
provided 7:13, 9:10,
15:1, 19:13, 32:3,
37:24, 71:4,
97:19, 110:6,
161:6, 162:3,
166:13, 174:15,
191:25
provider 67:15,
68:18, 83:4,
87:12, 87:14,
87:19
providers 87:17,
87:21
provides 90:8, 100:8
providing 56:19,
65:18, 107:19
provision 55:24,
67:10, 75:13,
86:15, 87:10,
87:22, 96:25,
145:12
provisions 76:8,
83:17, 88:23,
165:17
provoke 155:3
Public 3:25, 5:6,
7:1, 7:17, 8:5,
8:24, 10:6, 19:1,
27:6, 33:4, 33:8,
40:7, 40:8, 50:8,
190:11
publicly 18:25,
89:24
pulling 103:13
purport 41:15
purports 105:23
purpose 18:2,
117:12, 128:1,
131:8, 131:17,
134:9, 134:12,
135:14, 138:2,
147:12, 150:3,
150:19
purposes 58:15,
106:2, 106:11,
141:1, 160:9,
175:18

Pursuant 45:9, 57:8,
 131:7, 138:6,
 145:8, 156:10,
 187:20
pursue 137:7
pursued 135:7
push 180:17, 187:4
pushed 180:23, 181:2
pushing 23:18
puts 162:22
putting 36:3, 96:12,
 115:1, 119:16,
 165:6

< Q >
qualification 87:11
qualifications 87:20
qualify 7:18, 48:23
qualifying 9:5, 9:14
quantification
 140:17, 165:6
quarter 9:15
question 44:23,
 48:8, 49:22,
 50:11, 71:10,
 111:3, 116:22,
 125:25, 127:17,
 133:2, 134:10,
 140:11, 150:23,
 161:11, 162:5,
 163:3, 163:4,
 163:18, 164:2,
 165:3, 165:5,
 166:3, 166:5,
 170:20, 179:14,
 182:18
questioning 48:13
questions 13:16,
 19:24, 35:2,
 40:19, 40:21,
 45:1, 45:7, 48:7,
 49:16, 54:25,
 68:21, 71:7,
 72:22, 80:7,
 104:11, 110:23,
 163:22, 163:25,
 179:12
queued 165:23
quick 39:6

Quickly 11:1, 25:11,
 29:7, 58:6, 80:12,
 86:12, 124:14,
 132:6, 151:12,
 160:4
quite 29:7, 45:16,
 48:18, 101:6,
 111:10, 144:22,
 166:5, 172:13,
 176:25, 185:23,
 187:21
quo 9:25, 125:15
quote 100:12

< R >
rabbit 161:15
radar 24:2, 24:23
raise 13:8, 23:9,
 55:21, 64:2,
 65:10, 151:7,
 166:23, 170:1
raised 25:22, 29:5,
 47:14, 48:23,
 49:23, 64:10,
 68:9, 101:16,
 114:1, 129:20,
 150:2, 153:25,
 156:23, 157:25,
 158:3, 158:9,
 158:10, 160:15,
 164:12, 181:15,
 182:18, 184:10,
 185:19
raises 75:14, 161:4
raising 74:17,
 156:25
range 34:14, 34:16,
 56:11, 86:17
ranks 81:24, 86:3
rapid 141:2, 141:8
Rappaport 2:35
rare 189:14
rates 67:14
rather 29:3, 107:3,
 147:3, 147:13
rational 166:25
rationale 113:17
Re 1:6, 1:24
reach 117:19, 185:7,

186:20, 186:22
reached 10:7, 41:23,
 156:8, 174:17
reaching 37:22
read 24:9, 46:12,
 48:9, 48:14,
 48:16, 74:9, 89:2,
 106:13, 107:16,
 107:17, 107:22,
 108:18, 109:2,
 110:25, 111:13,
 120:17, 124:19,
 139:2, 151:18,
 160:20, 163:12
reader-friendly
 91:20
reading 100:22,
 120:16, 130:23,
 140:13
ready 44:23, 70:17,
 72:19, 97:14,
 97:20, 98:1, 98:4
real 37:15, 49:3,
 65:1, 66:8, 76:21
realism 168:14
realistic 169:8
realize 26:19,
 56:22, 100:22,
 155:1, 168:8
realized 113:1
realizing 130:20
really 12:20, 73:5,
 73:7, 75:5, 77:8,
 86:21, 89:6,
 89:21, 92:16,
 101:19, 114:9,
 117:21, 118:24,
 120:23, 127:11,
 139:20, 141:5,
 142:1, 147:14,
 152:25, 153:4,
 153:9, 159:9,
 161:17, 166:24,
 176:23, 179:4
reason 13:8, 48:24,
 50:5, 59:4, 61:8,
 67:25, 74:17,
 90:2, 123:21,
 138:13, 152:22,
 154:7, 176:23,

186:5, 186:12
reasonable 57:23,
    108:14, 164:15
reasons 52:4, 55:19,
    60:16, 67:10,
    98:18, 114:23,
    128:15, 134:21,
    141:23, 141:24,
    154:13, 155:2
rebuild 38:16
rebuttal 62:15
rebutted 105:3
recall 7:7, 20:19,
    32:3
receive 43:4
received 11:7, 14:1,
    14:5, 42:2, 42:23,
    63:8, 97:18
receiving 91:11
recent 10:14, 11:2,
    31:12, 31:23,
    34:20
Recently 7:20,
    31:16, 115:23
recess 99:22
recipient 91:7
recitation 145:14
recite 90:23
recited 190:10
recites 145:20
recognition 10:3,
    28:15
recognize 144:8,
    157:1
recommendations
    177:7, 177:25
reconcile 16:1
reconciliation 14:7,
    14:11, 65:6, 72:7,
    72:8, 84:9
reconstruction
    30:23, 32:21,
    39:24
reconvened. 99:23
record 5:17, 18:1,
    22:15, 74:7, 83:6,
    88:15, 100:6,
    107:9, 109:5,
    132:2, 149:14,
    169:6, 169:10,

169:16, 170:12,
    190:10, 190:13,
    190:16, 192:16
RECORDED 3:48,
    32:12, 174:17
recording 5:23
recover 51:15,
    157:14
Recovery 3:36, 11:5,
    39:24
recreated 150:8
recreational 40:6
redact 18:16
redacted 19:6, 19:8,
    19:9, 19:10
redacting 17:24
redaction 190:12
redemption 41:16
redrafting 102:12
reduce 16:8, 91:17
reduced 7:23
redundant 131:25
refer 5:20, 121:24,
    163:20
reference 51:10,
    81:22, 85:2, 86:1,
    89:11, 90:21,
    94:13, 110:16,
    163:11
referenced 30:20,
    91:13
references 145:9,
    171:17, 171:22
referred 14:10,
    63:24
referring 22:6,
    22:24, 88:23,
    131:21
refile 18:16
reflect 18:9, 63:18,
    190:16
reflected 64:5,
    101:13, 147:15,
    150:11, 161:20,
    162:13, 163:16,
    166:8
reflecting 192:14
refugees 32:18
refunded 41:16
refusal 56:8

refused 68:14
regard 15:22,
    101:13, 106:7,
    107:19, 177:18
regarding 8:10,
    11:8, 11:10,
    13:25, 14:6,
    31:10, 62:6,
    62:18, 68:18,
    81:6, 83:5,
    115:13, 115:24,
    131:10, 139:24,
    140:6, 140:11,
    145:5, 188:22
Regardless 45:14,
    48:19
Region 2:38
regions 33:14, 35:16
register 127:4
registered 7:21
registry 64:22
reimbursed 48:20
reimbursement 55:13
reimbursing 48:21,
    56:6
reinforce 16:13
reject 47:21, 115:12
rejected 68:16
rejecting 76:19
rejection 48:11
relate 133:1, 168:20
related 10:20,
    32:22, 39:24,
    51:1, 65:10, 67:4,
    68:17, 89:18,
    99:16, 101:4,
    102:14, 113:24,
    128:23, 134:15,
    172:18
relates 42:13, 62:8,
    64:11, 67:5,
    114:10, 125:17,
    129:4, 132:9,
    177:8, 182:5,
    185:18, 186:9
relating 9:13,
    16:22, 40:18,
    51:17, 89:21,
    131:11, 180:23
relation 126:2,

129:23, 136:2,
173:12
relations 9:16,
9:18, 9:22
relationship 9:18,
9:24
relative 132:20,
137:6, 137:17,
137:25, 138:1,
139:6, 139:21,
140:5, 140:9,
143:13, 145:2,
162:17, 179:24,
185:10, 186:11
relatively 165:25,
166:1
release 39:6, 180:12
relevant 103:18,
104:12, 107:20,
111:2, 127:18,
140:16, 157:10,
163:5, 170:23
relief 10:18, 10:21,
30:8, 30:23,
37:12, 51:16,
51:22, 51:25,
52:1, 88:14,
123:5, 140:16,
150:14, 151:8,
154:14, 154:15,
160:24
relies 116:16
relieve 186:15
religion 167:10
rely 19:12, 100:15,
146:7
remain 7:25, 8:3,
12:5, 64:9
remaining 33:24,
68:9, 191:23
remains 9:19
remarks 29:20,
82:23, 86:9,
145:2, 146:20,
146:25, 170:19,
170:20
remedy 37:5
remember 23:11,
59:14, 78:23,
86:8, 115:23,

122:17
remembers 162:5
remind 5:12, 124:1
reminded 20:6,
161:23
reminding 188:21
remiss 124:1
remittances 121:25,
123:7, 123:11
remote 176:13
removal 40:3
render 68:7
rendered 50:9
renewed 41:4
renting 34:24
reopen 8:5, 33:11,
33:20, 34:5, 35:9,
35:17, 35:18, 39:4
reopened 35:14, 39:3
reopening 33:13,
34:6, 35:20, 35:21
reordering 102:18
reorganization 61:1,
102:17
repair 31:24, 32:20,
39:7
repairs 31:11, 32:5,
34:6, 34:15,
34:17, 39:3, 39:8,
39:10, 40:4, 40:6,
40:7, 40:8
repay 51:22
repeat 31:21, 54:20
repeated 163:7
repercussions 124:4
replace 86:1
replay 158:18
replies 21:22,
122:5, 181:2,
181:10, 184:3
Reply 20:14, 20:19,
22:24, 23:1, 28:6,
28:7, 28:11,
82:21, 87:22,
112:25, 115:22,
118:15, 118:23,
119:1, 122:2,
146:10, 150:2,
156:14, 168:10,
180:22, 183:4,

184:19
reported 32:17,
47:19
Reporter 190:15,
194:15
reporting 98:21
reports 37:19,
40:25, 53:23,
69:3, 69:13, 85:9
repository 5:17
representation
26:24, 43:17,
53:8, 53:12, 55:6
representative 1:13,
1:31, 6:13, 112:23
representatives
10:5, 40:15, 186:2
representing 18:7,
180:6
represents 53:9
reprogramming 35:24
request 13:10,
19:19, 21:25,
25:21, 39:20,
42:3, 42:5, 43:10,
65:11, 75:16,
75:21, 77:8,
83:11, 97:6,
110:9, 145:12,
150:1, 150:6,
150:11, 165:23,
172:13, 192:5
requested 32:23,
39:11, 44:17,
63:10, 95:22,
101:11, 145:9,
173:20
requests 6:5, 15:24,
25:19, 65:23,
76:20, 95:20,
96:25, 153:18,
154:2, 185:12
require 10:25,
20:24, 27:14,
39:10, 46:11,
61:22, 83:12,
96:8, 97:3,
109:18, 177:23
required 17:14,
27:13, 51:13,

87:24, 178:9
requirement 16:14,
  67:6, 67:21, 70:15
requirements 9:11,
  10:20, 34:25,
  39:18, 40:13,
  147:11, 185:24
requires 51:12,
  105:21, 108:16,
  119:9, 128:13
Requiring 66:6,
  67:22
res 102:14, 106:8,
  140:17
rescind 59:25
rescission 59:24,
  59:25, 60:5
resemble 158:14
reserve 7:8, 62:14,
  76:10, 76:23,
  77:6, 125:19,
  173:15
reserved 81:17
reserves 7:4
reserving 146:9,
  183:4
resiliency 10:8
resist 124:11
resolution 14:12,
  45:17, 46:3, 48:6,
  61:16, 62:7,
  62:19, 63:2,
  63:19, 78:7,
  81:13, 110:12,
  110:13, 135:2,
  143:15, 163:9,
  163:13, 167:18,
  168:4
resolutions 134:15
resolve 46:25,
  63:13, 65:19,
  65:21, 67:16,
  81:15, 128:20,
  139:9
resolved 14:19,
  46:6, 59:17,
  59:18, 61:2,
  69:14, 89:14,
  90:16, 90:17,
  113:9, 135:4,

138:6, 155:12
resolving 60:24,
  63:17, 64:1, 81:17
resources 18:4,
  65:17, 134:3
respectfully 46:5,
  48:5, 146:1,
  172:13
respects 43:18
respond 80:12,
  86:25, 126:12,
  138:23, 142:9,
  150:5, 150:7,
  150:10, 159:15
responded 11:1,
  43:15, 153:18
respondent 122:6
respondents 122:4
responding 19:18,
  22:5, 125:16
Response 9:20,
  10:13, 11:12,
  15:21, 18:24,
  20:16, 21:15,
  41:25, 70:3,
  85:11, 114:14,
  114:16, 122:14,
  131:21, 134:10,
  150:4, 151:4,
  152:10, 159:17,
  180:4, 184:18,
  191:23, 191:25,
  192:7
response. 41:1,
  170:3, 192:10
Responses 13:25,
  14:2, 14:5, 14:15,
  14:17, 15:22,
  16:4, 16:14,
  16:23, 17:4, 17:9,
  17:10, 18:3,
  18:13, 42:24,
  43:4, 43:5, 43:8,
  43:12, 43:20,
  97:18, 114:8,
  191:14, 191:20,
  192:18
responsibilities
  103:6
responsibility 56:1

responsive 82:20
rest 95:20, 108:9
restore 47:7
restricted 147:14
restrictions 6:22
Restructuring 9:3,
  11:25, 50:23,
  132:15
result 31:23, 38:23,
  46:20, 48:25,
  59:22, 63:2, 73:3,
  91:24, 92:2,
  102:16, 105:6,
  147:16, 154:16
resulted 102:11
results 61:18, 62:2,
  124:5
resume 99:15, 179:15
resumption 99:25
retained 132:9
retention 163:20
rethink 73:18
retract 156:10
retransmission 5:23
return 174:19
returned 84:12
reveal 162:23
revealed 102:1
Revenue 99:15,
  102:6, 102:22,
  110:25, 111:14,
  115:25, 125:25,
  129:7, 131:10,
  133:7, 134:20,
  145:10, 145:17,
  147:1, 147:15,
  149:24, 151:3,
  152:12, 152:19,
  156:9, 158:12,
  158:24, 159:14,
  175:22, 177:9,
  178:1, 178:7,
  193:7
revenues 115:4,
  132:9, 157:14
review 14:15, 15:10,
  61:18
reviewed 10:7,
  82:17, 82:19,
  134:22

reviewing 11:9, 14:4
revise 16:7, 83:11,
  171:14, 171:16
revised 9:9, 9:10,
  21:7, 68:19, 99:6,
  112:6, 192:21
revision 83:1,
  144:20, 189:25
revisions 16:17,
  98:19, 131:18,
  134:20
revisited 169:10
rewrite 102:19,
  119:9
RFP 38:18, 38:21
riding 74:18
rights 67:20, 68:18,
  104:3, 126:22,
  152:22
ripe 53:5
risk 37:16, 48:13
road 38:24, 38:25,
  66:19
roads 8:7, 38:24,
  38:25, 40:4
Robert 3:26, 27:5
rocked 7:21
Rojo 33:1
role 10:4, 65:14,
  84:8, 171:11
room 86:18, 149:5,
  149:6, 180:6,
  187:8
Rose 6:13, 41:9,
  62:12, 112:22,
  153:16
roughly 56:13, 80:18
route 157:12
routine 9:21
row 74:5, 185:9
RSA 8:22, 9:5, 9:8,
  9:13, 11:6, 11:8,
  11:11, 12:12,
  20:17, 21:16,
  22:5, 24:7, 24:9,
  24:18, 27:10,
  27:13, 27:14
rubber 164:14
Rule 24:13, 51:13,
  91:1, 95:14,

99:10, 100:7,
  100:14, 103:16,
  103:19, 115:14,
  116:2, 128:11,
  133:8, 133:14,
  136:21, 142:13,
  142:18, 154:9,
  158:9, 167:8,
  171:18, 172:17
ruled 157:3
Rules 77:2, 88:22,
  90:24, 120:8
ruling 8:17, 23:10,
  24:16, 105:11,
  117:9, 117:13,
  137:21, 150:21,
  154:19, 157:12,
  172:16
rulings 132:16,
  133:19, 150:20,
  153:17, 158:21,
  159:4, 177:14,
  177:18
Rum 121:25, 122:8,
  123:6, 123:7,
  123:11, 123:14,
  123:17, 123:24,
  124:1, 124:7,
  124:14, 124:25,
  125:5, 125:6,
  125:8
rumbling 191:17
run 24:16, 37:20,
  77:15, 93:5, 189:5
run-of-the-mill
  74:22
rush 26:15


< S >
S/ 194:13
sadly 178:11
Safe 8:5, 193:15
salary 14:25
Salud 3:22, 62:21,
  77:13
San 5:1, 5:7, 7:22,
  33:2, 33:14
sanctions 6:3
sandwiched 181:19

sanitary 37:14,
  37:16
satisfactorily 56:19
satisfactory 181:5
satisfied 96:23
satisfy 103:19
save 86:24
saw 169:13
saying 28:13, 52:17,
  69:5, 75:14, 77:6,
  91:18, 94:24,
  105:21, 107:22,
  119:2, 119:3,
  121:18, 136:12,
  139:19, 140:22,
  142:18, 142:21,
  151:20, 153:13,
  160:22, 162:15,
  164:21, 187:12,
  190:19
says 54:8, 55:25,
  56:2, 59:25,
  60:15, 91:11,
  92:8, 92:9, 92:11,
  94:22, 103:4,
  116:17, 118:15,
  119:16, 120:11,
  142:14, 154:10,
  190:1
scary 77:20
scenario 56:25,
  128:22
scene 167:20
scheduled 8:21,
  15:9, 15:15,
  20:13, 23:23,
  188:23, 188:25,
  193:6
schedules 51:8,
  158:12, 165:12,
  188:2, 192:21
scheduling 21:7,
  111:8, 172:8,
  179:24, 185:23,
  186:2, 188:7
scheme 104:2, 124:17
school 33:7, 34:2,
  34:14, 37:7
Schools 8:2, 8:4,
  8:6, 33:8, 33:9,

33:11, 33:12,
33:14, 33:19,
33:24, 33:25,
34:5, 34:11,
34:19, 35:8,
35:12, 35:14,
35:17, 35:22,
36:12
Sciemus 2:5
science 12:9
scope 8:10, 106:1,
106:17, 107:23,
108:21, 109:1,
109:2, 111:1,
111:15, 125:17,
125:20, 126:2,
126:9, 137:13,
147:4, 164:10,
164:15
score 143:11, 144:7
scratch 46:7
screen 24:2, 24:23,
49:20
script 191:2
se 11:12, 13:25,
14:3, 15:22, 17:9,
18:4, 18:13
seal 18:4
sealed 18:6, 18:9,
18:20
seated 99:24, 173:23
Sebastian 33:2
Second 22:2, 50:4,
50:17, 51:6, 60:4,
62:25, 65:9,
69:16, 91:9,
94:10, 101:10,
106:19, 117:10,
121:8, 121:12,
121:15, 125:21,
143:2, 171:22,
173:4, 175:24,
181:14, 186:14,
189:11, 189:14,
191:15
Secondly 176:22,
178:8
secure 65:14
secured 107:13,
107:20, 107:23,

108:1, 109:1,
113:6, 113:10,
114:22, 116:13,
132:7, 136:1,
139:25, 140:11,
147:10, 154:22,
163:18, 164:2,
172:17, 173:2
Security 19:4, 19:5,
115:1, 115:13,
116:4, 117:2,
117:6, 117:16,
119:4, 119:20,
120:22, 130:7,
140:19, 140:25,
142:7, 148:22,
154:8, 165:5,
166:18, 167:2,
168:13, 171:21,
183:16, 183:23
seeing 17:1, 84:21
seek 12:10, 40:12,
64:15, 123:6,
151:8, 156:9
seeking 51:15,
51:21, 51:25,
52:23, 77:2,
84:20, 96:7,
116:1, 120:5,
124:23, 125:3,
157:14
seeks 41:12, 103:1,
191:12
seem 17:20, 72:24,
115:24, 136:12,
147:25, 165:22,
175:24
seemed 115:22,
140:13, 152:13,
158:23
seems 13:3, 78:10,
79:3, 87:10,
90:14, 98:7,
106:20, 120:10,
129:19, 129:22,
129:24, 130:5,
130:15, 140:4,
148:16, 160:6,
168:2, 171:25
seen 50:21, 50:24,

51:2, 93:15,
120:4, 139:14
segments 38:24,
38:25, 39:4
segregation 164:24
Selden 29:22
select 64:25, 65:21
selected 67:15,
73:11
selecting 71:11
selection 28:8,
64:11, 68:18, 83:3
selectively 162:23
self-created 25:13
self-effectuating
88:11
send 18:17, 69:19,
69:22, 79:21,
80:21, 98:1,
98:16, 119:17
sending 17:22,
70:16, 80:18
sense 19:21, 24:20,
46:16, 59:11,
70:17, 72:6, 72:9,
77:1, 78:11,
79:17, 79:21,
80:1, 81:8, 81:14,
81:16, 86:19,
88:17, 89:14,
91:22, 95:4,
105:13, 127:12,
134:6, 135:5,
136:14, 147:22,
147:25, 171:11,
178:22, 184:9
sensitive 17:19,
18:5, 18:9, 18:14,
19:2, 19:4, 19:11,
56:9, 185:23
sent 15:23, 43:5,
52:17
sentence 92:9,
94:11, 173:5
sentences 155:23
separate 81:9,
107:12, 128:23,
183:8, 183:11
separately 101:16
separating 188:6

separation 81:11
September 24:4
sequence 129:14
sequentially 183:24
Series 192:3, 192:5
serious 29:5,
    123:22, 124:9
seriously 109:24,
    115:12
Serralles 122:15,
    122:20
Servais 3:13,
    127:22, 146:17,
    146:23, 146:24,
    149:21, 151:14,
    151:16, 152:9,
    152:15, 153:14,
    157:8, 157:9,
    159:20, 159:23,
    163:24
serve 34:21, 35:6,
    65:14, 83:23,
    84:10, 133:21,
    134:9
served 109:8
serves 117:12
service 83:4, 87:12,
    87:13
serviced 37:22,
    37:24
servicer 3:35
Services 3:34, 15:1,
    36:18, 39:11,
    88:4, 94:14,
    178:16
serving 51:11
session 12:4, 148:20
sets 113:5
settle 62:25, 78:24
settled 84:21, 93:25
settlement 25:10,
    64:14, 65:3,
    78:22, 84:14,
    92:9, 94:6, 96:6
seven 25:4, 66:16,
    83:13, 87:22,
    131:7
several 11:7, 42:18,
    49:21, 62:17,
    138:25

severely 5:10
Shaking 180:15,
    180:16
shall 100:9, 182:9
share 37:4, 67:22,
    68:6, 83:19
shared 123:11
sharing 67:21
sheer 68:3
shelter 37:13
shelters 8:1
shield 162:24
shifted 129:20,
    146:19, 147:19
shifting 76:17,
    76:19, 76:22,
    88:23, 130:16
shockingly 100:24
shoe 181:6
shopping 72:11
short 23:6, 26:11,
    26:24, 38:25,
    83:8, 86:16,
    98:16, 129:3,
    168:24, 181:17
shortcut 127:25
shortened 87:1
shorthand 132:7
shortly 111:23
shoulder 67:18,
    68:1, 68:5
shouldn't 47:5,
    118:19, 159:15
show 57:16, 57:20,
    57:22, 126:24,
    155:8
showed 54:9
showing 106:10,
    106:15, 122:3,
    142:15, 167:1,
    167:3
shows 122:5
shuffle 129:16
shunted 73:10
shut 96:19
side 66:15, 66:20,
    101:21, 104:5,
    144:7, 168:8,
    180:15, 182:24
side. 180:15

sides 142:23, 185:4
sight 7:23
sign 16:14
signaled 117:15
signals 5:21
signatory 27:10
signatures 16:12
signed 10:5, 10:14,
    24:9, 24:18, 50:6
significant 45:16,
    45:20, 46:13,
    48:12, 52:11,
    64:23, 68:6,
    93:20, 93:21,
    138:6
SIM 63:10, 82:21,
    95:22
SIM'S 83:21
similar 60:4, 88:18,
    95:8
Similarly 46:24,
    161:25
simple 52:16, 103:4,
    127:1, 154:4,
    163:8
simplified 16:2,
    16:13
Simply 6:23, 61:8,
    64:19, 135:7,
    135:23, 137:21,
    145:7, 150:8,
    164:3
single 103:13,
    149:21, 162:1
singularly 162:14
sinking 115:2
sit 176:3
site 47:20, 47:24,
    53:15
sitting 57:21, 83:23
situation 7:7,
    36:17, 37:5,
    47:10, 50:22,
    114:25
six 7:12, 25:4,
    156:3
size 47:10
slate 74:18
slicing 183:10
slightly 186:5

slowed 7:23
slower 41:18
smacks 109:21
small 75:11, 92:12,
   92:20, 93:21,
   136:21
smiling 49:19
Social 19:3, 19:5
sole 56:1, 162:1
solely 43:14
solicit 38:18
solicited 87:18
Solutions 175:25,
   187:5
solved 175:14
solves 80:22, 145:16
somebody 73:19,
   78:14, 78:15,
   142:23, 187:13,
   190:8
somehow 88:5, 104:9,
   111:14, 115:3,
   156:9
someone 29:19,
   47:19, 142:14,
   167:20, 187:7
sometimes 18:10,
   18:17, 77:19,
   186:6
somewhat 91:20,
   146:20
somewhere 156:22,
   167:5
soon 12:15, 27:17,
   30:1, 33:20, 34:2,
   34:23, 52:4,
   135:24
sooner 29:3, 132:2,
   132:13, 187:16
Sorry 22:1, 33:16,
   34:7, 37:20, 53:6,
   58:25, 72:23,
   74:1, 82:10, 86:6,
   87:13, 94:20,
   97:13, 100:1,
   110:12, 116:4,
   125:6, 129:25,
   151:16, 170:9,
   175:12, 175:23,
   176:3

sort 30:11, 35:10,
   36:6, 37:13,
   52:16, 56:22,
   57:21, 71:15,
   96:14, 96:20,
   98:25, 101:17,
   102:7, 107:24,
   125:18, 129:16,
   161:14, 161:16,
   161:19, 165:18,
   180:2, 180:3,
   183:10, 185:20,
   186:12
sorts 163:25, 166:23
Sosland 3:16
sought 25:1, 157:15,
   157:16
Sounds 69:16, 87:3,
   172:11, 176:15
source 5:16
south 7:11, 9:20,
   35:25, 36:7,
   36:11, 37:22
southern 31:17,
   32:15, 34:19,
   35:13, 35:15
southwest 8:2
space 21:2
spaced 66:17
Spanish 78:6
spared 162:4
speakers 129:8
Speaking 9:23,
   35:13, 47:16,
   99:13, 146:22,
   174:21, 177:3,
   177:11, 183:24,
   186:1, 188:8
speaks 68:24
special 157:14,
   166:11, 166:13,
   166:15
specific 43:16,
   60:16, 89:19,
   100:18, 149:9,
   166:11, 177:7,
   183:22, 184:2,
   184:4, 184:16
specifically 30:22,
   113:6, 123:5,

   123:10, 123:12,
   129:21, 136:1,
   157:15, 158:4,
   172:1
specifics 69:24
specifying 192:25
speculate 155:3
speculating 47:4
speed 139:23
spending 10:17
spiral 156:13
spiritually 167:14
split 184:3, 184:8
spoke 106:14,
   133:20, 133:25
spring 21:6, 165:13
sprung 150:9
squarely 102:9,
   124:14
staff 70:6, 193:10
staffing 90:12,
   95:10
stage 32:16, 32:22,
   83:9, 111:15
staged 139:15
stages 35:21, 83:25,
   120:4
stagnate 59:19
stale 23:20, 24:2,
   26:5
stamp 164:14
stand 165:20,
   167:20, 182:13
standard 100:10,
   100:14, 105:4,
   128:11, 128:14
standards 127:9
standing. 108:2
standings 120:24
standpoint 127:8,
   128:6
stands 171:13
start 15:15, 17:22,
   17:24, 49:22,
   60:24, 70:7, 75:9,
   78:12, 79:18,
   96:12, 100:17,
   112:25, 124:14,
   176:19, 187:14
started 28:12,

34:17, 61:2, 97:9,
  125:10, 139:19,
  169:17
starting 25:6, 46:7,
  79:12, 79:16,
  91:16, 99:16,
  129:9
starts 160:21
STATE 18:1, 39:10,
  77:25, 78:2,
  78:20, 78:21,
  78:23, 79:4,
  79:19, 79:21,
  130:12, 149:9,
  180:14
stated 52:4, 91:16,
  92:2, 92:5, 92:6,
  92:13, 93:4,
  94:25, 128:14,
  136:18, 150:20,
  152:10, 154:5
statement 17:6,
  66:15, 66:22,
  94:14, 110:18,
  112:15, 152:16,
  160:10, 166:10
statements 65:25,
  66:7, 83:9, 83:13,
  83:17, 125:13,
  152:9, 163:7
States 1:1, 2:21,
  2:23, 25:25, 86:1,
  97:12, 98:6,
  174:22, 175:2,
  175:8, 175:11,
  176:1, 176:5,
  176:9, 176:18,
  186:23, 187:2,
  187:10, 187:15,
  187:25, 188:15,
  189:21, 190:24,
  194:7, 194:8
stating 129:3
Statute 57:15,
  108:16, 163:9,
  163:12, 166:14
statutes 104:12,
  108:11, 117:17
statutory 51:14,
  88:16, 88:23,

104:2, 151:7
stayed 79:10, 137:16
staying 45:24,
  134:25
Stays 126:20,
  126:21, 127:24,
  135:3, 136:10,
  138:15, 157:11,
  172:2, 180:23
steal 11:15
stenography 3:48
step 53:22
steps 137:25, 159:4
stick 172:13
sticking 28:5
stipulate 140:25,
  161:21, 161:22
stipulated 110:8,
  162:7, 162:8
stipulation 141:4,
  143:7, 143:12,
  143:25, 148:25,
  170:22
stipulations 165:17,
  178:10
stone 144:10
stories 74:20, 74:21
straight 82:25
Strategically 167:14
strategizing 125:24
strategy 130:9
Strauss 45:6
stream 125:5, 125:6,
  125:7
streamline 15:21,
  101:19, 128:21,
  179:7
streamlined 102:22
stressful 36:24
strike 104:15, 160:7
strikes 120:13
strong 67:9, 73:15,
  91:5
strongly 127:15
structural 34:13,
  90:12
structurally 8:3,
  8:4
structure 96:2,
  149:7, 172:14,

185:13
structured 36:11
structures 38:11
structuring 125:25
struggling 156:5
students 34:22,
  34:25, 35:6, 35:11
stuff 54:13, 155:13,
  171:24, 172:8,
  188:7
subaccount 140:15
subaccounts 140:24,
  148:8
Subcommittee 10:16
subject 6:3, 54:15,
  98:18, 116:3,
  136:5, 137:5,
  171:15, 172:11
subjects 6:19
submission 48:9,
  83:8, 83:21
submissions 18:5,
  19:1, 66:19,
  82:20, 128:10
submit 42:10, 44:5,
  46:21, 47:15,
  60:13, 61:22,
  65:25, 83:12,
  97:3, 159:16,
  192:13
submitted 12:6,
  18:24, 43:8,
  43:11, 47:17,
  54:11, 60:19,
  149:5
subordinate 123:18
subpaths 133:4
subrogees 130:4
subsequent 85:9,
  117:10, 157:11
subsequently 85:18,
  152:11
substance 124:13
substantial 52:18,
  61:15
substantive 102:13,
  104:16, 118:11,
  127:2, 127:17,
  128:4
substantively 90:23

subvert 124:17
succeed 151:21
success 116:21,
  126:24, 127:13,
  127:16, 127:20
successful 75:1
sue 121:3, 124:25
suffered 31:16, 38:8
sufficient 10:11,
  12:22, 14:17,
  70:14, 103:18
sufficiently 168:25
suggest 71:4, 81:10,
  86:25, 111:23,
  135:1, 181:13
suggested 64:15,
  97:20, 98:21,
  104:13, 126:15,
  134:19, 137:15
suggesting 91:9,
  105:1, 110:3,
  164:7, 169:17
suggestion 15:20,
  18:21, 19:19,
  46:19, 63:15,
  63:18, 74:24,
  109:24, 127:24,
  161:21, 181:13,
  184:22
suggestions 64:5,
  91:5, 131:17
suggests 160:23
suitable 70:12,
  71:4, 97:20
suited 64:1
sum 56:7, 58:3
summary 56:23,
  79:12, 79:16,
  117:13, 127:2
summer 15:24, 163:15
sums 48:3
superb 193:11
supersede 111:14
superseding 107:18
supplement 40:20
supplemental 10:17,
  107:19, 110:4,
  138:16, 168:24,
  171:5
supplied 118:22

Supplies 37:14,
  37:22
Support 7:13, 9:3,
  19:12, 21:24,
  27:10, 52:23,
  177:17, 193:12
supporting 12:1,
  12:14, 28:13,
  28:19, 52:17
supportive 64:8
supposed 23:12,
  35:8, 53:23,
  72:25, 115:5
Sur 38:7, 38:18,
  38:21
surprise 177:3,
  177:10
surprisingly 50:5,
  104:24
susceptible 55:13
suspect 103:9,
  112:7, 165:11,
  182:6
suspicion 17:1
suspicions 141:23
sustained 42:6,
  192:13, 192:23
SUT 162:2
Swain 2:20, 6:9,
  24:13, 175:4,
  175:15, 178:16,
  194:7
swarm 7:3
swath 167:4
sweep 163:17
system 33:7, 34:14,
  63:21, 81:17,
  81:19, 83:23, 90:6
systems 37:7, 78:5


< T >
table 69:6, 69:9,
  69:19, 89:5,
  120:8, 168:9,
  191:17
tackling 50:23
Taft 146:18
tagging 13:1
tailored 18:12,

25:21
taken. 99:22
Takings 151:25,
  157:19
talked 188:18
tanks 38:11
tardes 99:24
target 12:17, 61:14,
  129:21
targeting 66:16
targets 122:10
Tax 121:25, 123:7,
  123:11, 123:14,
  125:6, 125:7
taxes 125:4
taxpayer 19:5
Taylor 2:20, 194:7
Team 2:28, 145:20,
  150:5, 175:19,
  175:21, 177:5,
  177:20, 178:1,
  179:6, 185:24,
  186:17, 188:22,
  189:7
technical 43:18,
  127:18
tee 104:18
teed 108:9, 112:14
teeny 93:6
teleconference 44:16
telephone 44:18
telephonic 5:8
tells 77:22, 163:12
template 98:20
temporarily 35:1
temporary 34:24
ten 74:21, 75:20
tend 66:12
tentative 177:14,
  177:18
tents 7:25, 34:24,
  36:3
term 36:25, 61:14,
  90:16, 91:25,
  95:3, 133:22
terminal 169:7,
  169:8
termination 72:13,
  85:23, 87:5
terminology 134:7

terribly 120:13
terrific 187:3
test 106:10, 121:15,
   176:7, 176:12
testify 52:21
testimony 52:11
Testing 58:22,
   58:23, 105:11
tests 121:14
text 91:10
texting 6:1
thankfully 162:4
Thanks 155:15, 193:9
themselves 95:25,
   188:4
theories 115:8,
   120:12
theory 55:3, 164:11
there'll 173:1
Thereafter 38:13,
   111:24
thereof 132:19
thereto 138:17
they'll 61:8, 94:14,
   96:16, 186:22
They've 24:8, 24:24,
   64:15, 105:19,
   118:22, 150:9,
   153:2, 186:21,
   186:24
Thinking 77:18,
   92:3, 107:4,
   116:7, 116:22,
   126:7, 136:20,
   144:14, 147:19,
   148:20, 152:14,
   183:12, 184:12,
   184:14, 186:8,
   188:10, 188:17,
   188:18
thinks 30:14
third 68:17, 94:20,
   101:25
Thomas 3:29, 44:14
thorough 21:3
though 7:23, 9:19,
   24:6, 47:23,
   60:23, 74:25,
   76:24, 126:13,
   133:18, 144:3,

162:11
thoughts 69:8,
   193:12
thousand 64:23,
   77:24
Thousands 7:25,
   20:21
Three 7:11, 20:9,
   20:24, 26:2,
   33:18, 38:13,
   39:17, 63:2,
   64:10, 79:24,
   132:25, 149:4,
   155:23, 178:19,
   182:4, 183:8,
   183:10, 184:24,
   189:6
three. 184:6
threshold 166:20
thunder 11:15
tick 73:2
tickets 189:5
tied 76:20
tiers 38:10
tight 176:4
till 35:24
timeline 187:21
timelines 147:8
timely 18:14, 24:4,
   25:22, 139:16,
   159:13
timetable 155:17
timing 6:6, 11:19,
   12:8, 23:22, 36:5,
   58:15, 110:5,
   112:9, 147:9,
   147:11, 159:10,
   168:11, 184:10
tinker 180:6
tiny 93:6, 93:12,
   93:17
Title 1:8, 1:26,
   6:14, 8:22, 9:14,
   27:19, 57:8,
   58:16, 63:4,
   67:17, 73:1, 82:2,
   86:4, 90:25,
   91:13, 101:8,
   112:23, 138:7,
   150:25, 151:4,

151:8, 152:3,
   153:7, 153:10
together 7:11,
   61:25, 76:21,
   98:12, 103:13,
   165:15, 184:18,
   186:7
Tom 45:5
tomorrow 98:19,
   110:6, 114:2,
   115:19, 115:21,
   139:12, 139:17,
   149:16, 160:13,
   163:15, 164:17,
   171:4, 180:18
tone 69:7
tonight 149:16
tons 59:6
took 116:12, 152:11,
   188:23
top 87:18, 180:25
topic 6:15, 11:19,
   11:21, 31:13,
   34:8, 123:3
Torres 191:23,
   191:25, 192:6,
   192:8, 192:13,
   192:24
total 32:17
totaling 7:6
totally 126:4
Tourism 114:11
toward 45:17, 76:3,
   92:16, 130:6,
   149:19, 165:15,
   165:17
towards 48:6
traced 106:9
tracing 126:3,
   140:17, 148:8
track 69:11, 117:24,
   171:2
tracking 184:17
traction 143:10
traffic 17:13
tranche 85:12, 95:7,
   95:11
transaction 61:16
transcribe 190:13
Transcript 3:48,

194:4
transcription 194:5
transferred 90:10
transferring 68:25
transfers 95:7,
    104:3
transformation 30:15
transmission 83:17
transmittal 126:3,
    140:15, 140:23
Traurig 49:11
travel 181:22
traveler 141:20
travelers 143:24
travels 193:15
Treasury 125:3,
    166:12
treat 67:25, 134:11
treatment 92:9,
    151:24, 179:2
tree 189:3
tremors 77:19
trends 69:12
trial 79:16, 80:3
tricks 141:13
tricky 181:19
tried 155:21, 158:5
triggered 163:23,
    163:24
trillion 75:3
true 58:15, 109:19,
    145:22, 178:11,
    194:5
truly 17:11
Trump 7:16, 10:14
Trust 102:14, 106:8,
    121:2, 125:3
Trustee 2:37,
    101:10, 101:11,
    101:23, 103:1,
    103:3, 103:4,
    103:5, 103:7,
    103:10, 104:14,
    119:6, 119:7,
    119:8, 121:3,
    121:4, 121:6,
    128:23
trustees 8:19
try 31:20, 70:22,
    77:16, 78:19,

86:11, 86:16,
    91:5, 130:10,
    138:5, 147:24,
    149:18, 156:19,
    174:21, 178:9,
    186:11, 186:14,
    186:15, 187:4
trying 21:1, 51:19,
    71:6, 71:10,
    96:19, 96:20,
    103:12, 111:5,
    122:17, 130:6,
    138:20, 142:19,
    142:21, 145:4,
    151:11, 168:3,
    172:21, 174:5,
    174:10, 182:23,
    187:5, 188:9
TSA 164:24, 166:14
Tuesday 181:5,
    181:11
turn 30:21, 58:21,
    83:5, 129:6,
    153:19
turnaround 86:10
turned 5:18, 5:21,
    153:21
Turning 103:20
turnover 160:20,
    160:22
turns 55:20
two-part 120:24
two-thirds 9:4
two-week 22:12
type 15:1, 74:23,
    76:6, 89:16,
    148:5, 155:8
types 81:18, 89:3,
    90:9, 95:8, 95:24,
    153:24, 158:21
Typically 51:12,
    71:13, 182:25
typo 90:20


< U >
ubiquitous 185:21
UCC 43:6, 62:20,
    63:10, 63:12,
    64:4, 64:12,

64:18, 65:2,
    65:23, 68:9,
    68:11, 80:13
ultimate 60:25,
    103:24, 136:23,
    151:10
ultimately 23:23,
    68:4, 84:10,
    93:25, 134:8,
    148:14, 150:17,
    165:23, 179:9
ultra 8:12
unaddressed 57:7
unaware 139:13
uncertainty 12:9
unclear 24:5, 68:25,
    90:16
unconfirmable 112:5
uncontested 41:3,
    42:19, 43:14
undergoing 56:13
underlying 104:16,
    125:2, 125:7,
    127:2
underneath 26:3
understand 9:7,
    16:8, 28:3, 36:16,
    52:3, 58:13,
    64:12, 64:18,
    75:3, 92:19,
    108:25, 109:11,
    111:5, 120:15,
    129:8, 135:14,
    135:22, 137:11,
    142:19, 143:1,
    146:15, 183:16,
    188:9
understandable 115:9
understanding 28:17,
    28:18, 35:9,
    37:21, 37:23,
    56:18, 97:25
Understood 66:25,
    69:15, 72:5,
    73:22, 81:1,
    82:15, 87:25,
    88:7, 88:25,
    90:13, 92:17,
    94:4, 94:17,
    95:17, 143:6,

164:25
undertake 38:13
undertaken 32:1,
   178:2
underway 34:1
Undisputed 41:4,
   53:9
undue 100:17, 128:16
unduly 170:9, 170:10
unfair 24:24, 59:18
Unfortunately 77:19,
   80:16, 139:1,
   166:19, 168:4
unilaterally 105:19
uninhabitable 8:3
unions 189:1
uniquely 64:1
unit 38:8
United 1:1, 2:21,
   2:23, 25:25, 86:1,
   97:12, 98:6,
   174:22, 175:2,
   175:8, 175:11,
   176:1, 176:5,
   176:9, 176:18,
   180:14, 186:23,
   187:2, 187:10,
   187:15, 187:25,
   188:15, 189:21,
   190:24, 194:6,
   194:8
unjust 47:10
Unless 5:19, 13:15,
   35:2, 40:19,
   48:20, 57:10,
   60:15, 68:21,
   88:22, 98:22,
   110:6, 110:7,
   110:22, 131:12,
   132:22, 159:20,
   167:10, 169:4
unlike 123:4
unmuting 175:13
unnecessary 66:1,
   95:21, 113:13,
   120:1
unreasonable 103:2
unrelated 134:1
unresponded 126:10
Unsecured 2:41,

63:13, 63:17,
   63:21, 82:20,
   151:22, 154:21
unspecified 14:25,
   89:12
unsurprisingly 60:11
untested 105:2
until 21:13, 43:9,
   51:19, 52:6,
   53:13, 55:20,
   58:9, 61:1,
   107:23, 112:16,
   112:17, 118:23,
   132:23, 136:10,
   148:12, 149:3,
   180:18, 188:3
unwarranted 95:21
up-front 73:4
upcoming 168:21
update 30:8, 37:6
updated 192:20
updates 40:17
urgency 13:2, 25:13
urgent 12:14, 12:18,
   13:2, 20:8, 26:12,
   29:3
urges 124:12
urging 105:17
useful 73:17, 76:12,
   83:10, 190:14
uses 91:25, 136:1
using 5:19, 39:4,
   63:5, 78:6, 84:1,
   86:12, 152:24,
   161:6
utilities 40:7
utility 25:10
utilized 63:14,
   65:12
Utuado 33:3


< V >
v. 2:9
Valdes 123:1
validity 152:17,
   152:20, 153:1,
   158:15
VAN 3:31, 44:12,
   44:13, 44:19,

44:21, 44:23,
   45:2, 49:9
various 35:12,
   46:10, 102:10,
   135:19
vast 48:3, 63:23,
   80:17, 114:15
Vazquez 31:14
vehicle 150:23,
   150:25, 151:10,
   159:3
venue 160:17, 161:5
verdict 50:9, 58:12
verge 124:16
vernacular 134:6
versa 113:18
version 16:2, 98:21,
   99:6
VI 8:22, 9:14
viable 159:3
vibration 5:21
vice 113:18
video 88:1, 88:3
view 23:22, 46:5,
   47:8, 63:22,
   66:21, 67:9,
   73:15, 77:22,
   84:3, 101:11,
   101:17, 106:12,
   109:5, 109:11,
   112:1, 144:13,
   146:20, 153:1,
   153:6, 157:18,
   159:2, 178:22,
   182:13
viewing 131:3
views 45:14, 103:5,
   127:12
vigorous 29:2
Villalba 33:2
violate 68:15,
   151:6, 160:24
violation 81:2
vires 8:12
virtually 64:21
visible 38:10
vision 169:2
visits 7:11
visual 34:12
voice 69:7, 73:20

voicemail 174:20,
    190:9, 190:18
void 50:13, 50:18,
    52:1, 158:2
voidability 50:3
voidable 50:13
volume 14:23, 18:3,
    64:20, 68:3
voluminous 17:25
voluntarily 95:25
voluntary 9:12, 80:5
volunteer 17:3,
    178:16
vote 88:13


< W >
wait 45:13, 176:12
waiting 59:11, 61:2,
    72:4, 74:4
waive 147:11,
    149:12, 150:14,
    169:6, 182:14
waived 118:16, 156:1
waiver 118:19,
    145:13, 156:6,
    156:10, 156:15,
    169:8, 169:18
waiving 118:17,
    160:12
walk 69:2
Walker 194:13,
    194:14
Wanda 31:14
wanted 25:17, 60:8,
    77:21, 80:12,
    116:13, 166:24,
    175:16, 176:23,
    177:1
wanting 13:8, 175:18
wants 23:7, 37:23,
    58:4, 60:17,
    64:12, 64:18,
    78:24, 113:7,
    114:21, 117:23,
    123:6, 159:25,
    167:25, 179:16
warning 93:3, 94:3,
    142:5
warrant 109:9

warranted 67:10
waste 40:3
wasted 120:16
waterfall 123:11
Waxman 49:16, 49:18
ways 40:12
weather 8:2
Wednesday 43:1
week 11:24, 20:22,
    21:9, 29:11,
    29:14, 35:19,
    61:23, 87:1,
    131:22, 141:11,
    144:10, 148:24,
    171:8, 173:14,
    177:12, 187:14,
    187:20, 188:3,
    190:1
weekend 8:2, 12:20,
    21:11
weekly 40:14
weeks 12:6, 15:7,
    16:12, 20:9,
    20:24, 21:9,
    21:12, 21:19,
    28:6, 36:10,
    38:13, 148:22,
    149:4
Weil 27:6
Welcome 5:5, 173:25,
    186:4, 187:22
welcomes 11:2, 11:9
Whatever 23:23,
    90:1, 106:22,
    111:15, 134:8,
    134:17, 140:8,
    144:5, 151:25,
    156:3, 159:10,
    167:14, 167:16,
    169:1, 184:3,
    185:12
whatsoever 75:6
whereby 128:23
whichever 129:18
whoever 78:25, 87:18
whole 13:2, 23:13,
    46:9, 91:15,
    103:11, 115:2,
    120:16, 124:3,
    149:10, 150:3,

156:16
wholesale 102:12,
    102:19
Wickersham 146:18
William 3:12
willing 65:4, 76:3,
    116:5, 140:25,
    147:11, 150:14,
    156:17, 156:21
willingness 172:15
win 79:8, 126:23
wiring 119:15
wise 111:4
wish 58:19, 67:13,
    145:5, 164:13
wishes 140:8, 187:23
withdrawal 102:16
withdrawn 85:18
withholding 97:7
within 36:10, 38:12,
    51:10, 87:21,
    87:22, 106:17,
    108:13, 133:3,
    147:8, 147:25,
    148:21, 148:24,
    153:10, 158:3,
    158:13, 164:24,
    166:12, 182:8
without 26:15,
    46:15, 49:24,
    66:8, 105:19,
    135:3, 142:3,
    142:8, 143:9,
    154:14, 154:15,
    161:5, 170:12,
    187:7
WITNESSES 4:3, 46:19
wonder 20:9, 184:11
wondering 72:2,
    122:9
word 29:23, 30:1,
    78:6, 131:16,
    134:5, 134:6,
    139:21, 176:12
words 135:20, 136:4,
    136:6, 191:17
work 9:21, 47:6,
    49:2, 52:20,
    54:10, 66:23,
    109:18, 126:20,

142:11, 144:22,
156:15, 165:15,
177:15, 178:9,
186:11, 186:18,
193:11
workable 186:4
worked 12:2, 47:17
worker 53:20
workers 47:16,
47:20, 47:24
working 9:6, 28:19,
30:9, 30:10,
30:13, 40:11,
98:3, 130:13,
174:13
works 94:24, 103:5,
174:16
world 148:9
worried 54:13
worry 185:9
worse 139:5
worst 174:9
worth 17:1, 120:1,
168:8
worthwhile 54:23
worthy 98:11
write 78:22, 138:22,
138:25, 172:14
writing 40:20,
61:23, 139:12
written 87:21,
172:9, 182:10
wrote 166:9


< X >
XXX-XXX-XXXX 174:17


< Y >
Yauco 33:3
year 19:8, 24:4,
24:14, 24:17,
25:3, 25:7, 40:1
years 7:5, 24:8,
31:15, 74:21,
78:23, 189:10
yesterday 35:19,
36:1, 36:13
yielded 62:23

York 3:30, 5:7,
44:20, 44:21,
49:19, 58:21,
192:4, 193:10
yourselves 183:3


< Z >
zero 47:25, 56:7
Zouairabani 3:37,
122:23, 122:25