UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of,<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br><br><br>NO. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**BACARDI INTERNATIONAL LIMITED'S AND BACARDI CORPORATION'S OPPOSITION TO AMENDED MOTION OF AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND U.S. BANK TRUST NATIONAL ASSOCIATION, CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) and (vi) Puerto Rico Building Authority ("PBA") Bankruptcy Case No.: 19-BK-5523 (LTS) (Last Four Digits of Federal Tax ID: 3801).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ................................................................................................. 3

BACKGROUND .......................................................................................................................... 3

    A.     Offshore Excise Taxes ................................................................................................ 3

    B.     Bacardi Agreement ..................................................................................................... 4

    C.     Amendment of Bacardi Agreement ........................................................................... 5

ARGUMENT ................................................................................................................................. 8

    A.     Legal Standard Under Section 362(d) ...................................................................... 9

    B.     Movants Cannot Establish A Colorable Claim to Offshore Excise Taxes
          Beyond the Funds Deposited in the Sinking Fund ................................................ 10

         a.     Conversion/Unjust Enrichment ................................................................ 12

         b.     Subordination ............................................................................................. 13

         c.     Violation of Federal Cover-Over Statute ................................................. 14

CONCLUSION ........................................................................................................................... 16

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
    939 F.3d 340 (1st Cir. 2019) .................................................................................................10

*Grella v. Salem Five Cent Sav. Bank,*
    42 F.3d 26 (1st Cir. 1994) .................................................................................................9, 10

*Mission Prod. Holdings v. Schleicher & Stebbins Hotels, L.L.C.(In re Old Cold, LLC),*
    602 B.R. 798 (B.A.P. 1st Cir. 2019) .........................................................................................9

**Statutes**

11 U.S.C. 362(d) ...............................................................................................................................9

26 U.S.C. § 7652 ....................................................................................................................*passim*

28 U.S.C. § 1331 ..............................................................................................................................3

28 U.S.C. § 1391(b) .........................................................................................................................3

48 U.S.C. § 2166(a) (PROMESA § 306(a)) ....................................................................................3

48 U.S.C. § 2167(a) (PROMESA § 307(a)) ....................................................................................3

Law No. 178 of 2010 (13 L.P.R.A. § 33231(l)(2)) ...................................................................3, 4, 5

**Other Authorities**

Fed. R. Civ. P. 11 ............................................................................................................................13

Bacardi International Limited ("**BIL**") and Bacardi Corporation (together with BIL, "**Bacardi**"), by and through their undersigned counsel, hereby file this opposition ("**Opposition**") to the *Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 10602] ("**Lift Stay Motion**").[2] In support of this Opposition, Bacardi represents and states as follows:

## PRELIMINARY STATEMENT

Ambac Assurance Corporation ("**Ambac**"), Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp. and U.S. Bank Trust National Association in its capacity as successor trustee (collectively, "**Movants**") brought the Lift Stay Motion to pursue not only claims against the Commonwealth for the first $117 million of Offshore Excise Taxes (defined below) received by the Commonwealth each year, but also claims against the Commonwealth, Bacardi and other rum producers (collectively, "**Rum Producers**") related to contractual payments made by the Commonwealth to Rum Producers from the remainder of Offshore Excise Taxes received by the Commonwealth.

The Financial Oversight and Management Board for Puerto Rico ("**FOMB**") has thoroughly addressed Movants' lack of a property interest in the first $117 million of Offshore Excise Taxes received by the Commonwealth annually and lack of standing to assert contractual

---

[2] Capitalized terms used, but not defined, herein shall have the meanings given to them in the Lift Stay Motion.

or other claims allegedly held by PRIFA against the Commonwealth,[3] and Bacardi will not duplicate those arguments here. Therefore, Bacardi will address only Movants' unsubstantiated and incorrect allegation that the contractual payments made by the Commonwealth to Rum Producers from Offshore Excise Taxes (in excess of the first $117 million) gives rise to claims against the Commonwealth and Rum Producers.

As set forth below, although Movants superficially refer to claims of conversion, unjust enrichment and subordination, they provide no discussion in support of such legal theories. First, Movants articulate no basis for their conversion claim. Indeed, Movants repeatedly admit that they have no claim to any funds beyond the first $117 million of Offshore Excise Taxes received by the Commonwealth each fiscal year, which remain the property of the Commonwealth.[4] Given that repeated admission, Movants cannot state a colorable claim that the Commonwealth and Rum Producers have converted property in which they have an interest. Similarly, Movants assert, without support, that payments to the Rum Producers are subordinated to their right to payment, but fail to discuss any statutory or contractual basis for this alleged subordination right. Lastly, Movants provide no explanation, much less support, for their blanket assertion that the deposit and subsequent payments of Offshore Excise Taxes pursuant to a distribution sequence in the Lockbox Agreement (defined below) violates the Federal Cover-Over Statute (defined below).

Movants have not (and cannot) meet their burden of demonstrating that they hold colorable or plausible claims to the Offshore Excise Taxes necessary to lift the stay. The Lift Stay Motion should be denied.

---

[3] *See Opposition of the Financial Oversight and Management Board for Puerto Rico to Ambac Assurance Corporation's Motion and Memorandum of Law in Support of Its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds*, dated February 3, 2020 [ECF No. [__]] ("**FOMB Opposition**").

[4] *See* Lift Stay Motion, ¶¶ 18, 55.

2

## JURISDICTION AND VENUE

1. The United States District Court for the District of Puerto Rico ("**Court**") has jurisdiction over the Lift Stay Motion and this Opposition pursuant to 28 U.S.C. § 1331 and PROMESA § 306(a).[5] Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and PROMESA § 307(a).

## BACKGROUND

### A. Offshore Excise Taxes

2. The local rum industry has been one of Puerto Rico's most important industries for over a century. The industry has made, and continues to make, significant contributions to the Commonwealth's socioeconomic development and is responsible for the direct and indirect employment of thousands of citizens as well as the generation of significant offshore and local tax-related revenues.[6]

3. Rum produced in Puerto Rico and shipped to the United States for sale is subject to certain excise taxes which must be paid by Rum Producers to the National Revenue Center of the U.S. Treasury's Alcohol and Tobacco Tax and Trade Bureau ("**TTB**"). Pursuant to federal statute, a portion of the excise taxes ("**Offshore Excise Taxes**") collected on rum produced in the Commonwealth and the United States Virgin Islands ("**the USVI**") and shipped to the United States are "covered-over" or transferred by the TTB to the Commonwealth and the USVI. *See* 26 U.S.C. § 7652 (2018) ("**Federal Cover-Over Statute**"). The goal of this U.S. subsidy was to foster and support the economic development of the Commonwealth and the USVI. The

---

[5] 48 U.S.C. § 2101, *et seq.*

[6] *See, generally*, Statement of Motives of Law No. 178, approved December 1, 2010 ("**Law No. 178**"), a copy of which is annexed as **Exhibit "A"** hereto.

Commonwealth, in turn, used a portion of the Offshore Excise Taxes for marketing and promotion of the rum industry and related products. *See* Ex. A (Law No. 178).

4. In 2007, in an effort to persuade Rum Producers to move their rum production facilities to the USVI, the USVI began offering Rum Producers significant tax and other incentives, including the return of approximately 46% of the Offshore Excise Taxes received by the USVI on account of taxes paid by the Rum Producers to the U.S. Treasury. As a result, in 2008, Diageo—the world's largest spirits company—entered into an agreement with the USVI to relocate its rum production operations from Puerto Rico to the USVI.

5. In an effort to stem the migration of its rum companies to the USVI and prevent the collapse of this industry and the resulting loss of hundreds of millions of dollars of revenues for Puerto Rico, the Commonwealth's legislature ("**Legislature**") enacted Law No. 178. Law No. 178, while requiring the Commonwealth to retain the majority of Offshore Excise Taxes received from the TTB, "directed" the Secretary of the Treasury of Puerto Rico ("**Commonwealth Treasury**") to segregate in a Special Account up to 25% of the Offshore Excise Taxes remitted by the TTB for payment to Rum Producers for the sole purpose of marketing, advertising and promoting Puerto Rico rum.[7] As authorized by Law No. 178, the percentage of Offshore Excise Taxes paid to Rum Producers was increased to 46% under an implementing Executive Order (Administrative Bulletin No. OE-2012-30). Law No. 178 reflects the Legislature's recognition that to "incent[ivize] the production and promotion of Puerto Rico rum" it had to "promote the leveling of opportunities and fair competition for" its Rum Producers. *See* Ex. A (Law No. 178).

B. Bacardi Agreement

6. As the largest producer of rum in Puerto Rico, Bacardi was critical to the

---

[7] 13 L.P.R.A. § 33231(l)(2).

4

Commonwealth's plan to use tax and other incentives to retain and promote the rum industry in Puerto Rico. In 2010, following passage of Law No. 178, Bacardi and the Commonwealth entered into a mutually beneficial incentive agreement (as amended, "**Bacardi Agreement**").[8] Under the Bacardi Agreement, in exchange for the return of certain Offshore Excise Taxes paid by Bacardi, Bacardi, among other things, agreed to continue production of large volumes of rum in Puerto Rico for a period of 20 years, to collaborate with the Commonwealth in the marketing and promotion of its rum and Puerto Rico rums generally in the U.S. market and to use the Offshore Excise Taxes returned to it to market and promote Puerto Rico rum products. *See* Ex. B (Bacardi Agreement), Art. IV.

7. Under the terms of the Bacardi Agreement, the Commonwealth retains the first $117 million in Offshore Excise Taxes received annually by the Commonwealth Treasury from the TTB for deposit to the credit of the Puerto Rico Infrastructure Fund ("**PRIFA**"), which it has consistently done since entering into the Bacardi Agreement in 2010. *See* Ex. B (Bacardi Agreement), § 4.6.1.

C. Amendment of Bacardi Agreement

8. The Commonwealth and Bacardi supplemented and amended the Bacardi Agreement three times. On or about May 5, 2015, Bacardi International Limited, Bacardi Limited, Bacardi Corporation and the Government of Puerto Rico entered into Supplemental Agreement No. 2 ("**Supplemental Agreement No. 2**").[9] Among other things, Supplemental Agreement No. 2 (and related transaction documents): (a) relieved the Commonwealth of certain obligations

---

[8] *See* Agreement between Bacardi International Limited, Bacardi Limited, Bacardi Corporation and the Government of Puerto Rico, dated December 31, 2010 ("**Bacardi Agreement**"), a copy of which is annexed as **Exhibit "B"** hereto.

[9] Supplemental Agreement No. 2 is annexed as **Exhibit "C"** hereto.

5

arising under the Bacardi Agreement to make marketing payments to Bacardi from Offshore Excise Taxes, (b) relieved the Commonwealth of certain obligations to make payments to fund capital expenditures relating to waste treatment and other facilities, (c) provided for payment to Bacardi of certain amounts owed under the Bacardi Agreement, (d) implemented the Lockbox Agreement to assure the future flow of Offshore Excise Taxes to and from the Lockbox Account in accordance with all existing contractual and legal commitments and (e) made numerous technical changes and corrections to the Bacardi Agreement. *See, e.g.*, Ex. C (Supplemental Agreement No. 2), §§ 1.3.2, 2.3, and 3.1. A condition precedent to entry into Supplemental Agreement No. 2 was the execution and effectiveness of a Lockbox Agreement, dated as of May 5, 2015, entered into by and among Citibank, N.A., as lockbox bank ("**Lockbox Bank**"), Banco Popular, as trustee under a related trust agreement, Citibank, N.A., as paying agent, and the Government of Puerto Rico ("**Lockbox Agreement**") and related agreements.[10] *See* Ex. C (Supplemental Agreement No. 2), §§ 1.3.2 and 5.2.1.

9. The lockbox account ("**Lockbox Account**") is an account owned by the Secretary of the Treasury of the Commonwealth and maintained at Citibank, N.A. (the Lockbox Bank). *See* Ex. D (Lockbox Agreement), § 2(a). The Lockbox Bank administers the Lockbox Account as directed by the Commonwealth in accordance with the Lockbox Agreement. Pursuant to the Lockbox Agreement, payments are made from the Lockbox Account in accordance with a stipulated payment sequence. In each fiscal year, the Lockbox Bank is obligated to make distributions in the following order:

    a. the first $117 million of Offshore Excise Taxes received in the Lockbox Account is transferred to the Commonwealth's Treasury Single Account ("**TSA**") for deposit to the credit of PRIFA;

---

[10] The Lockbox Agreement is annexed as **Exhibit "D"** hereto.

6

  b. the next $5 million of Offshore Excise Taxes received in the Lockbox Account is transferred to the TSA "for deposit to the credit of the [Puerto Rico Science and Technology Trust]";

  c. next, certain amounts of Offshore Excise Taxes are distributed to the Puerto Rico Conservation Trust Fund in accordance with a formula prescribed by Law No. 108 of 2002;

  d. next, Offshore Excise Taxes due to Rum Producers in accordance with incentive agreements with the Commonwealth are distributed to the Rum Producers; and

  e. any remaining Offshore Excise Taxes are then transferred to the TSA.

*See* Ex. D (Lockbox Agreement), § 5.

 10. Thus, the Lockbox Bank is obligated to (and does each year) transfer the first $117 million of Offshore Excise Taxes to the TSA "for deposit to the credit of PRIFA." It is not until after the Commonwealth receives this and other payments (which are made for the credit of the Puerto Rico Science and Technology Trust and to the Puerto Rico Conservation Trust Fund) that Bacardi and other Rum Producers begin to receive the portion of the Offshore Excise Taxes contractually owed to them. The first $117 million of the Offshore Excise Taxes to which the Movants claim a prior right has never been paid to the Rum Producers. The distribution mechanics in the Lockbox Agreement ensure that.

 11. The 2015 amendments to the Bacardi Agreement, including the Lockbox Agreement, did nothing to alter the Commonwealth's prior practice of retaining the first $117 million of Offshore Excise Taxes received each fiscal year from the TTB. The funds are deposited into the Lockbox Account owned by the Commonwealth Treasury and thereafter transferred to the TSA, another account owned by the Commonwealth Treasury. Movants' unsupported (and unsupportable) allegation that the Commonwealth and the Rum Producers colluded in 2015 to deny them their alleged right to the first $117 million of Offshore Excise Taxes received by the

7

Commonwealth each year[11] is not credible and is directly contradicted by the terms of the Lockbox Agreement (attached to Movants' Lift Stay Motion and repeatedly cited in a manner apparently intended to mislead the court). *See* Ex. D (Lockbox Agreement), § 5(a). Indeed, the Lockbox Agreement evidences the care taken to assure the retention by the Commonwealth of the first $117 million of Offshore Excise Taxes through the administration by a leading financial institution of the account into which the U.S. government remits the Offshore Excise Taxes.

## ARGUMENT

12. Movants ask the Court to lift the automatic stay to allow them to prosecute two actions outside this Court: (1) a pending action filed by Ambac against the U.S. Treasury and Steven Mnuchin, the U.S. Secretary of the Treasury, to impose "an equitable lien on and escrowing of the Pledged Rum Taxes"[12] before they are transferred to the Commonwealth; and (2) an action against the Commonwealth and the Rum Companies to enforce Movants' alleged lien and halt an alleged "ongoing appropriation of the Pledged Rum Taxes" (together, "**PRIFA Bondholder Actions**"). *See* Lift Stay Motion, ☐ 4. In support of this request, without any basis in law or fact, Movants obliquely allege that the payments of Offshore Excise Taxes to the Rum Producers (after the Commonwealth's retention of the first $117 million) (a) amounts to a conversion of PRIFA's and its bondholders' property and has unjustly enriched the Rum Producers; (b) violates alleged subordination rights held by PRIFA and the PRIFA bondholders; and (c) somehow violates the Federal Cover-Over Statute.

13. Movants allege no factual or legal bases whatsoever for the assertion of these

---

[11]  *See* Lift Stay Motion, ¶ 27.

[12]  Movants define the term "Pledged Rum Taxes" to include only the first $117 million in Offshore Excise Taxes covered over by the U.S. Treasury to the Commonwealth (*see* Lift Stay Motion, ¶ 2), but the scope of the claims they intend to bring is less than clear.

8

frivolous claims against the Commonwealth and the Rum Producers with respect to the distribution of Offshore Excise Taxes to the Rum Producers. Nowhere in the Lift Stay Motion do Movants even allege that PRIFA or the PRIFA bondholders own, or hold a lien on, the Offshore Excise Taxes in excess of the first $117 million received by the Commonwealth each year. To the contrary, Movants repeatedly concede, and it is undisputed that, any Offshore Excise Taxes received by the Commonwealth each year in excess of the first $117 million belong and are available to the Commonwealth. *See* Lift Stay Motion, ¶¶ 18,55.

14. Moreover, the Lockbox Agreement (which Movants possess and attach to the Lift Stay Motion) makes clear that the Rum Producers are paid what they are contractually owed only after the first $117 million is transferred "to the Secretary of Treasury [of the Commonwealth] for deposit to the credit of PRIFA." *See* Ex. D (Lockbox Agreement), § 5(a). Because Movants have not (and cannot) state a claim, much less a plausible claim to, the Offshore Excise Taxes paid by the Commonwealth to the Rum Producers, there is no basis for allowing Movants to bring actions to interfere with the revenue stream that the Commonwealth uses to satisfy its contractual obligations to Rum Producers as well as legal obligations to the Puerto Rico Conservation Trust Fund and the Puerto Rico Science and Technology Trust. The Lift Stay Motion should be denied.

A. Legal Standard Under Section 362(d)

15. Movants argue that the "colorable claim" standard is not demanding.[13] They are wrong. Under controlling First Circuit law, Movants must meet a standard that is akin to a preliminary injunction standard. *See Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33, 35 (1st Cir. 1994). Under that standard, a colorable claim is "one that is legitimate and that may reasonably be asserted given the facts present and the current law." *See Mission Prod. Holdings*

---

[13] *See* Lift Stay Motion, ¶ 37.

9

*v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*, 602 B.R. 798, 825 (B.A.P. 1st Cir. 2019). Movants must demonstrate, as a threshold matter, that their claims are "sufficiently plausible to allow [their] prosecution elsewhere." *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d at 34. In determining plausibility, "the court may consider any defenses or counterclaims that bear on whether" the creditor has demonstrated a reasonable likelihood that it has a meritorious claim. *Id.* Moreover, the First Circuit has made clear that a court must "make at least a preliminary determination of the parties' respective property interests in the [] funds" that are the subject of the lift stay motion. *See Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340, 352 (1st Cir. 2019). Under this standard, Movants have failed to meet that burden.

B. Movants Cannot Establish A Colorable Claim to Offshore Excise Taxes Beyond the Funds Deposited in the Sinking Fund.

16. As noted earlier, the FOMB has addressed Movants' lack of a property interest in the first $117 million of Offshore Excise Taxes received by the Commonwealth and lack of standing to assert contractual or other claims allegedly held by PRIFA against the Commonwealth, and Bacardi will not duplicate those arguments here. Bacardi therefore addresses only Movants' baseless claims that the payment of Offshore Excise Taxes to Rum Producers is (a) a conversion of the property interests held by PRIFA or PRIFA bondholders and unjustly enriches Rum Producers, (b) violates alleged subordination rights of PRIFA or the PRIFA bondholders, and (c) somehow violates the Federal Cover-Over Statute.[14]

17. The Motion to Lift Stay on its face demonstrates that Movants cannot allege, much less prove, that they have a colorable claim to the amounts paid to Bacardi and other Rum

---

[14] *See* Lift Stay Motion, ¶¶ 3, 27, and 28.

10

Producers in satisfaction of the Commonwealth's contractual obligations. Movants have not articulated any legal theory or other basis for assertion of a claim, much less a plausible or colorable claim, against the Commonwealth and Rum Producers that would support interference with Commonwealth's Offshore Excise Tax revenue stream or the Commonwealth's discharge of its contractual obligations to the Rum Producers pursuant to the distributions under the Lockbox Agreement. *See* Ex. D (Lockbox Agreement), § 5(a).

18. To the contrary, Movants repeatedly admit that to the extent that PRIFA or its bondholders have any rights at all to the Offshore Excise Taxes, such rights are limited to the first $117 million of such taxes paid to the Commonwealth, and any Offshore Excise Taxes received by the Commonwealth from TTB thereafter belong to the Commonwealth. By way of example, Movants state as follows:

   a. "To secure certain of PRIFA's bonds, the Commonwealth *transferred to PRIFA ownership of the first $117 million in each fiscal year* of certain excise taxes on Puerto Rican rum, which are imposed by the U.S. government and required by federal statute to be remitted to the Commonwealth (the "**Rum Taxes**"). PRIFA in turn pledged *that annual $117 million in Rum Taxes to the Trustee* for the benefit of bondholders." *See* Lift Stay Motion, ☐ 2. (Emphasis added.)

   b. "The PRIFA Enabling Act grants PRIFA ownership of *only the first $117 million of the Rum Taxes; the residual is Commonwealth property.*" *See* Lift Stay Motion, ☐ 18. (Emphasis added.)

   c. "The fact that *PRIFA's "participation" under Section 1914 is limited to the first $117 million of the Rum Taxes* helps to explain how the definitions in the Trust Agreement fit together to define the pledged collateral. The term "Offshore Excise Taxes" refers to all of the "federal excise taxes on rum …remitted to the Puerto Rico Treasury Department" (Ex. 2, at 14 (Trust Agreement § 101))—which generally is far in excess of $117 million. The "Special Tax Revenues" are a subset of the Offshore Excise Taxes, specifically, the portion of the "Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act" (id. at 18 (emphasis added))—meaning the portion of the "Offshore Excise Taxes" owned by PRIFA and required to be transferred to the Infrastructure Fund by law, *i.e.*, the first $117 million of the Offshore Excise Taxes each year. *Any Offshore Excise Taxes in excess of $117 million remain property of*

11

*and available to the Commonwealth.*" Lift Stay Motion, ¶ 55. (Emphasis added.)

Notwithstanding the foregoing, Movants assert that they have claims against the Commonwealth and the Rum Producers arising out of the payment to Rum Producers of Offshore Excise Taxes in excess of the first $117 million (funds they acknowledge are property of the Commonwealth), and refer fleetingly and without explanation or discussion to conversion, unjust enrichment and subordination theories for recovery. These legal theories are predicated on Movants or PRIFA having an ownership or security interest in the Offshore Excise Taxes. Because the scope of the claims Movants intend to bring (and whether they intend to bring them against the Rum Producers only or the Commonwealth and the Rum Producers) is unclear, Bacardi briefly addresses each of these theories below.

        *a.    Conversion/Unjust Enrichment*

19.    Movants allege that the payment of Offshore Excise Taxes to the Rum Producers from the Lockbox Account has "unjustly enriched the Rum Companies to the tune of hundreds of millions of dollars, subjecting them to claims for damages as well as injunctive relief halting the ongoing conversion of PRIFA's (and its bondholders') property,"[15] but Movants do not elaborate further or provide any discussion of the legal basis for, or evidence in support of, these unfounded claims. Given Movants' repeated admissions that neither PRIFA nor the PRIFA bondholders hold any interest in or have any have any right to Offshore Excise Taxes beyond the first $117 million of such funds, and that the Offshore Excise Taxes subsequently received by the Commonwealth remain the Commonwealth's property, the allegation that payments made by the Commonwealth in satisfaction of its contractual obligations to Rum Producers are a conversion of PRIFA property

---

[15]    *See* Lift Stay Motion, ¶ 28.

12

that unjustly enriches the Rum Producers not only fails to state a colorable claim but borders on violating Rule 11. Neither PRIFA nor any PRIFA bondholders have any rights whatsoever to these funds. There is no basis for a conversion or unjust enrichment claim, and Movants do not even try to support these spurious allegations.

                        *b.*     *Subordination*

20. Movants also allege, again without support, that any right the Rum Producers have to payment of Offshore Excise Taxes is subordinate to the right of PRIFA's (or PRIFA bondholders') interest in such funds.[16] There is no statutory or contractual basis for this assertion, and Movants do not (and cannot) point to any statute or contract that creates a subordination agreement between Bacardi and the other Rum Producers, on the one hand, and PRIFA or the PRIFA bondholders, on the other. Instead, Movants imply that Section 4.6.1 of the Bacardi Agreement is a subordination provision rendering Bacardi's right to payment of Offshore Excise Taxes subordinate to PRIFA's right to receive the first $117 million of such taxes. Section 4.6.1 of the Bacardi Agreement does no such thing.

21. The Bacardi Agreement is an agreement between Bacardi and the Commonwealth. Neither PRIFA nor the PRIFA Trustee is a party to the Bacardi Agreement. (Nor is Bacardi a party to any of the PRIFA bondholder transaction agreements.) Section 4.6.1 of the Bacardi Agreement does not subordinate Bacardi's right to payment to either PRIFA or PRIFA bondholders or impose any obligations on Bacardi with respect to amounts allegedly due PRIFA (or PRIFA bondholders). Section 4.6.1 of the Bacardi Agreement simply governs the sequence of payment of Offshore Excise Taxes to Bacardi—*i.e.*, after the first $117 million of Offshore Excise Taxes is received by the Commonwealth.

---

[16]    *See* Lift Stay Motion, ¶¶ 3, 27.

13

22. In any event, Section 4.6.1 of the Bacardi Agreement was superseded by the Lockbox Agreement, whose effectiveness was a condition to Supplemental Agreement No. 2 memorializing agreements between Bacardi and the Commonwealth relating to the Offshore Excise Taxes and other commercial arrangements designed to promote the production of Puerto Rico rum. Movants well know that the Rum Producers do not receive any payments under the Lockbox Agreement until the first $117 million in Offshore Excise Taxes each fiscal year are paid to the Commonwealth "for deposit to the credit of PRIFA." Ex. D (Lockbox Agreement), § 5(a). The Lockbox Agreement assures that the historical practice whereby the Commonwealth retained the first $117 million of Offshore Excise Taxes before any payment was made to the Rum Producers and others with legal interests in the Offshore Excise Taxes would be assured through the administration by a major financial institution of the account receiving the Offshore Excise Taxes from the U.S. Government. None of the agreements between Bacardi and the Commonwealth, or any related agreement, subordinates Bacardi's contractual right to receive payments of Offshore Excise Taxes to PRIFA or its bondholders or in any way provides a guaranty that the Commonwealth will forward the first $117 million of Offshore Excise Taxes to PRIFA after the Commonwealth receives these funds. These documents simply state that payments to Bacardi will not start until the Commonwealth receives the first $117 million.

    *c.*    *Violation of Federal Cover-Over Statute*

23. Finally, Movants allege that the payments by the Commonwealth of Offshore Excise Taxes violates the Federal Cover-Over Statute. In addition to lacking standing to assert such a claim, Movants are simply wrong.

24. The Federal Cover-Over Statute states as follows:

> All taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States (less

14

> the estimated amount necessary for payment of refunds and drawbacks), or consumed in the island, shall be covered into the treasury of Puerto Rico.

*See* 26 U.S.C. § 7652(a)(3). Movants do not say why the Commonwealth's payment of the Offshore Excise Taxes to the Rum Producers violates this statute. Rather, they bold and italicize the phrase *"shall be covered into the treasury of Puerto Rico." See* Lift Stay Motion, ☐ 16. Presumably, Movants mistakenly believe that payment of Offshore Excise Taxes by the U.S. Department of the Treasury into the Lockbox Account is not payment to the "treasury of Puerto Rico." If that is the case, Movants have failed to read the Lockbox Agreement.

25. The Federal Cover-Over Statute does not dictate the account into which the Offshore Excise Taxes are deposited. In any event, the Lockbox Account was established, and is owned, by the Commonwealth Treasury. *See* Ex. D (Lockbox Agreement), § 2(a) ("The Secretary of the Treasury has established at the Lockbox Bank, and the Lockbox Bank has established, an account at its Puerto Rico branch in the name of the Secretary of the Treasury of Puerto Rico. . . ."). When the U.S. Department of Treasury remits payment of the Offshore Excise Taxes to the Commonwealth, these funds are covered into the Commonwealth Treasury. The Commonwealth has contracted with Citibank, N.A., to administer its account, which obviously does not violate federal law. Therefore, there is no basis for the allegation that the Lockbox Agreement violates the Federal Cover-Over Statute.

26. Movants have not (and cannot) meet their burden of demonstrating that either PRIFA or Movants have a plausible or colorable claim to the Offshore Excise Taxes paid by the Commonwealth to the Rum Producers. Movants' request to lift the stay to prosecute the PRIFA Bondholder Actions is nothing more than an effort by Movants to threaten and interfere with the Commonwealth's tax revenue stream and the contractual rights of the Rum Producers in an attempt to try to gain leverage in the plan process. The Lift Stay Motion should be denied.

15

## CONCLUSION

**WHEREFORE**, for the reasons stated above, Bacardi respectfully requests that the Court deny the Lift Stay Motion.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 3rd day of February 2020.

**WE HEREBY CERTIFY** that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the parties appearing in said system including the US Trustee and to all those parties registered to receive notice within the electronic notification service.

> **C. CONDE & ASSOCIATES**
> By: */s/ Carmen D. Conde-Torres*
> Carmen D. Conde-Torres
> USDC NO.: 207312
> s/Luisa S. Valle Castro
> Luisa S. Valle Castro
> USDC NO.: 215611
> 254 San José Street
> 5th Floor
> San Juan, PR 00901
> Telephone: (787) 729-2900
> Email: condecarmen@condelaw.com,
> ls.valle@condelaw.com
>
> -and-
>
> **COVINGTON & BURLING LLP**
>
> Dianne Coffino
> R. Alexander Clark
> 620 Eighth Avenue
> New York, NY 10018
> Telephone No.: 212-841-1023
> Email: dcoffino@cov.com,
> aclark@cov.com
>
> *Co-Counsel for Bacardi International Limited and Bacardi Corporation*

16