# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AMBAC ASSURANCE CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>    Movants,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Respondent. | Case No. 17-BK-3283-LTS<br><br>**Re: ECF Nos. 717, 8022, and 10602** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last  Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**SUPPLEMENTAL OPPOSITION OF
COMMONWEALTH OF PUERTO RICO
TO AMENDED PRIFA BONDHOLDER MOTION
<u>TO LIFT AUTOMATIC STAY [ECF NO. 10602]</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 15

    A.   Rum Taxes are Collected by the Federal Government, Remitted to the Commonwealth Treasury, and Appropriated by the Commonwealth. ............................................................. 15

    B.   The Commonwealth Historically Appropriated (Subject to Retention) a Portion of the Rum Tax Remittances to PRIFA and Authorized PRIFA to Issue Bonds and Pledge the Rum Tax Remittances it Received to Payment of the Bonds. .......................................................... 17

    C.   PRIFA Issued Bonds Pursuant to a Trust Agreement That Limited the Pledged Collateral to Money Deposited in Its Sinking Fund. ............................................................... 20

    D.   As the Financial Crisis Hit, the Commonwealth Exercised its Retention Powers, and the Oversight Board Exercised Its Authority Under PROMESA Over the Rum Tax Remittances. 22

PROCEDURAL HISTORY ............................................................................................... 24

LEGAL STANDARDS .................................................................................................... 25

    **I.**    **THE STAY PROVIDES FUNDAMENTAL PROTECTIONS, AND LIFTING IT IS AN EXTRAORDINARY REMEDY.** ................................................................................25

    **II.**   THE "COLORABLE CLAIM" STANDARD DOES NOT APPLY. ..................................26

ARGUMENT ............................................................................................................... 29

    I.    NONE OF THE GOVERNING LEGAL DOCUMENTS PROVIDE MOVANTS AN INTEREST IN THE RUM TAX REMITTANCES. ..................................................................29

    A.   The Enabling Act is an Appropriation Statute, Nothing More; It Does Not Pass Title or Turn the Commonwealth Into a "Mere Conduit." .................................................................. 29

    B.   The Appropriations to PRIFA in the Enabling Act Are Preempted by PROMESA. ....... 34

    C.   The Commonwealth's Retention Powers Confirm Movants' Lack of Property Interest in the Rum Tax Remittances. ....................................................................................................... 39

    D.   The Trust Agreement Limits Movants' Lien to Monies Deposited in PRIFA's Sinking Fund. .............................................................................................................................. 41

    E.   The Enabling Act Does Not Create a Trust for PRIFA's Benefit.................................... 47

    F.   Movants Have No Claim to a Constructive or Resulting Trust, or an Equitable Lien. .... 52

    G.   The Commonwealth's Retention of the Rum Tax Remittances Gives Rise to, at Most, a Dischargeable, Unsecured Claim in Favor of PRIFA. ............................................................. 56

    II.   SECTION 362(d)(2) DOES NOT APPLY BECAUSE THE COMMONWEALTH HAS EQUITY IN THE RUM TAX REMITTANCES AND THEY ARE NECESSARY TO THE PLAN OF ADJUSTMENT .............................................................................................59

A.    The Commonwealth Has Equity in the Rum Tax Remittances. ....................................... 59

III.   **SECTION 362(d)(1) DOES NOT APPLY BECAUSE THE MOVANTS' INTERESTS, IF ANY, ARE "ADEQUATELY PROTECTED" AND THERE IS NO CAUSE TO LIFT THE STAY.** .................................................................................................................59

A.    Movants Do Not Have a Security Interest in the Retained Rum Tax Remittances. ......... 60

IV.   MOVANTS, AS CREDITORS OF A CREDITOR, LACK STANDING TO SEEK STAY RELIEF. ...............................................................................................................................62

CONCLUSION ................................................................................................................ 64

iv

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Arevalo v. Ashcroft*,
    344 F.3d 1 (1st Cir. 2003)....................................................................................31

*Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio*
    *v. Flores Galarza*,
    484 F.3d 1 (1st Cir. 2007)....................................................................................33

*Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*,
    682 F.2d 446 (3d Cir. 1982)................................................................................26

*Bargas v. Rice (In re Rice)*,
    82 B.R. 623 (Bankr.S.D.Ga.1987) ......................................................................28

*Begier v. IRS*,
    496 U.S. 53 (1990)...............................................................................................6

*BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    301 F. Supp. 3d 312 (D.P.R. 2017).....................................................................13

*Den Norske Bank AS v. First National Bank of Boston*,
    75 F.3d 49 (1st Cir. 1996)...................................................................................32

*Drake v. Franklin Equip. Co. (In re Franklin Equipment Co.)*,
    416 B.R. 483 (Bankr. E.D. Va. 2009)..................................................................28

*Fazio v. Growth Dev. Corp. (In re Growth Dev. Corp.)*,
    168 B.R. 1009 (Bankr. N.D. Ga. 1994) ................................................................7

*First Nat'l Bank v. Turley*,
    705 F.2d 1024 (8th Cir. 1983) ............................................................................27

*García-Rubiera v. Calderón*,
    570 F.3d 443 (1st Cir. 2009)...............................................................................33

*Garcia-Rubiera v. Fortuño*,
    665 F.3d 261 (1st Cir. 2011)...............................................................................33

*Gracia-Gracia v. Financial Oversight & Management Board for Puerto Rico (In re*
    *Fin. Oversight & Mgmt. Bd. for P.R.)*,
    939 F.3d 340 (1st Cir. 2019).............................................................7, 26, 27, 33

*Grant, Konvalinka & Harrison, P.C. v. Still (In re McKenzie)*,
  737 F.3d 1034 (6th Cir. 2013) ........................................................................27

*Grella v. Salem Five Cent Sav. Bank*,
  42 F.3d 26 (1st Cir. 1994) ........................................................................27, 28

*Howard Delivery Serv. v. Zurich Am. Ins. Co.*,
  547 U.S. 651 (2006) ........................................................................6

*In re 234-6 West 22nd St. Corp.*,
  214 B.R. 751 (Bankr. S.D.N.Y. 1997) ........................................................................26

*In re Breitburn Energy Partners LP*,
  No. 16-10992, 2017 WL 1379363 (Bankr.Apr. 14, S.D.N.Y. 2017) ...........................................7

*In re Cabrillo*,
  101 B.R. 443 (Bankr. E.D. Pa. 1989) ........................................................................27

*In re Dahlquist*,
  34 B.R. 476 (Bankr. D.S.D. 1983) ........................................................................27

*In re Irving A. Horns Farms Inc.*,
  42 B.R. 832 (Bankr. N.D. Iowa 1984) ........................................................................27

*In re Jefferson Cnty.*,
  491 B.R. 277 (Bankr. N.D. Ala. 2013) ........................................................................26

*In re Las Vegas Monorail Co.*,
  429 B.R. 317 (Bankr. D. Nev. 2010) ........................................................................3

*In re Playa Dev. Corp.*,
  68 B.R. 549 (Bankr. W.D. Tex. 1986) ........................................................................27

*In re T. Brady Mech. Servs., Inc.*,
  129 B.R. 559 (Bankr. N.D. Ill. 1991) ........................................................................6

*In re Veal*,
  450 B.R. 897 (B.A.P. 9th Cir. 2011) ........................................................................27

*In Vitreous Steel Products Co.*,
  911 F.2d 1233 (7th Cir. 1990) ........................................................................28

*Jin Qing Li v. Rosen (In re Jin Qing Li)*,
  No. 3:12-BK-33630, 2018 WL 1354548 (B.A.P. 9th Cir. Mar. 12, 2018) ...................................29

*Kane v. Coulson (In re Price)*,
  575 B.R. 461 (Bankr. D. Haw. 2017) ........................................................................5

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2002) ........................................................................13

*Kothe v. R.C. Taylor Trust*,
   280 U.S. 224 (1930) ......................................................................................6

*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old
   Cold, LLC)*,
   602 B.R. 798 (B.A.P. 1st Cir. 2019) ...........................................................29

*Municipality of San Juan v. Commonwealth of P.R.*,
   919 F 3d. 565 (1st Cir. 2019) ......................................................................25

*Omega Envt'l. Inc. v. Valley Bank NA (In re Omega Envtl., Inc.)*,
   219 F.3d 984 (9th Cir. 2000) (per curiam) .................................................27

*P.R. v. Blumenthal*,
   642 F.2d 622 (D.C. Cir. 1980) ....................................................................31

*Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re
   Fin. Oversight & Mgmt. Bd. for Puerto Rico)*,
   899 F.3d 1 (1st Cir. 2018) .....................................................................27, 30

*Peralta v. Gonzales*,
   441 F.3d 23 (1st Cir. 2006) .........................................................................31

*Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*,
   698 F.2d 571 (2d Cir. 1983) ........................................................................13

*Ross v. Thousand Adventures*,
   675 N.W.2d 812 (Iowa 2004) ......................................................................32

*Soares v. Brockton Credit Union (In re Soares)*,
   107 F. 3d 969 (1st Cir. 1997) ......................................................................25

*Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*,
   225 B.R. 883 (Bankr E.D. Pa. 1998) ............................................................5

*Tringali v. Hathaway Mach. Co.*,
   796 F.2d 553 (1st Cir. 1986) .......................................................................26

*Unisys Corp. v. Dataware Prods., Inc.*,
   848 F.2d 311 (1st Cir. 1988) .......................................................................25

*United Cos. Fin. Corp. v. Brantley*,
   6 B.R. 178 (Bankr. N.D. Fla. 1980) ............................................................27

vii

*United States v. Nason*,
   269 F.3d 10 (1st Cir. 2001) ..................................................................................31

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
   *Mgmt. Bd. for P.R.)*,
   945 F.3d 3 (1st Cir. 2019) .............................................................................1, 7, 35

*Yashouafar v. Elkwood Assocs., LLC*,
   No. 17-ap-01404-MT, 2019 Bankr. LEXIS 255 (Bankr. C.D. Cal. Jan. 25, 2019) ....................32

**STATUTES**

3 L.P.R.A. §§ 1901, 1902, 1903 .................................................................................17

3 L.P.R.A. § 1906(m) ...............................................................................................19

3 L.P.R.A. § 1907 ...............................................................................................19, 30

3 L.P.R.A. § 1910 ................................................................................................5, 20

3 L.P.R.A. § 1914 .......................................................................................... *passim*

3 L.P.R.A. § 1923 ...................................................................................................11

13 L.P.R.A. § 10042(i)(3) ...........................................................................................32

15 L.P.R.A. § 75 ....................................................................................................32

31 L.P.R.A. § 13 ....................................................................................................33

11 U.S.C. § 362 ............................................................................................. *passim*

11 U.S.C. § 502(a) ..................................................................................................26

26 U.S.C. § 7652 ...............................................................................................15, 30

48 U.S.C. §§ 2101-2241 ..............................................................................................1

PROMESA § 201 ....................................................................................................23

PROMESA § 202(e)(3)(C) ...........................................................................................23

PROMESA § 312 ....................................................................................................23

PROMESA § 315(b) ...................................................................................................1

PROMESA § 4 .......................................................................................................23

PROMESA § 405 ....................................................................................................23

UCC § 9–101, Comment 1.................................................................................................3

UCC § 9–203, Comment 5................................................................................................3

**OTHER AUTHORITIES**

H.R. REP. No. 64-77 (1916)...........................................................................................31

H.R. REP. No. 115-466 (2017)........................................................................................31

To the Honorable United States District Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "FOMB"), as sole representative of Debtor and Respondent the Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this supplemental opposition (the "Opposition") to the *Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 10602] (the "Motion" or "Mtn.") of Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Corp. ("AGC"), and Assured Guaranty Municipal Corp. (together with AGC, "Assured," and together with Ambac, FGIC, and AGC, the "Insurers"), and U.S. Bank Trust National Association, in its capacity as the successor trustee ("U.S. Bank" or the "Trustee," and together with Ambac, FGIC, and Assured, "Movants").  Because, as discussed below, Movants lack standing and have no property or security interest in the monies the federal government collects from federal excise taxes on rum produced in Puerto Rico and remits to the Commonwealth treasury—the Rum Tax Remittances—the Motion should be denied.

## PRELIMINARY STATEMENT

1.      For reasons explained in the following paragraphs, based on this Court's affirmed ruling that pre-PROMESA appropriations are preempted,[3] the instant Motion and its two

---

[2]  PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3]  *See Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019).

companion motions must be denied because pre-PROMESA appropriations form the underpinnings of all the moving parties' alleged security interests and property interests in Commonwealth assets, for which they claim entitlement to adequate protection.  Moreover, even without consideration of preemption, none of the moving parties has an interest in Commonwealth assets entitled to adequate protection.  That is a second ground for denial of the motions, and many more are set forth below.  But, those two grounds are each independently sufficient to resolve the motions, without more.

2.     The Commonwealth owes tens of billions of dollars to retirees, general obligation bondholders, and others.  It became obligated to pay in full its different unsecured debts based on written agreements, Commonwealth statutes, and/or the Puerto Rico Constitution.   In each instance, the written agreement or law obligated the Commonwealth to pay the debtholders in full. In Title III, however, because all nonbankruptcy law requiring full payment of prepetition obligations is preempted by bankruptcy law, the debtholders are all sharing losses arising from the Commonwealth's fiscal emergency, consistent with the equality policy underlying all bankruptcy law that creditors of equal rank share the losses.

3.     Prior to the instant Motion and its two companion motions, creditors did not generally challenge these bedrock principles of preemption and equality.  Indeed, this Court and the First Circuit have each ruled Commonwealth appropriations by budget or statute are preempted by PROMESA, and the equality policy is routinely reaffirmed by the Supreme Court.   Here, however, Movants deploy Commonwealth laws requiring debt payments or appropriations as the nonpreemptable foundations for their purported security interests or other property interests against the Commonwealth, and then request full payment of such amounts as if the Commonwealth laws are both nondischargeable and specifically enforceable.  If they are right,

2

they receive full payment while all the Commonwealth's other creditors share all the losses. And, this occurs even though, pursuant to a statute, the Commonwealth owes Movants nothing in the first place.

4.      When viewed from the perspectives of public policy, PROMESA Titles II and III, and logic and common sense, it is apparent that Movants' requested relief is contrary to all of them. First, the proposition that the Commonwealth must pay PRIFA Bondholders[4] in full while the Commonwealth's own creditors absorb all the losses violates the equality policy. PRIFA Bondholders do not even hold claims against the Commonwealth, let alone secured claims. Second, the lynchpin of Movants' case, the Commonwealth statute requiring the Commonwealth to transfer money to PRIFA, is a pre-PROMESA appropriation. Both this Court and the First Circuit Court of Appeals have ruled all such appropriations are preempted by PROMESA section 202 because they are not certified by the Oversight Board. And, even without preemption, no appropriation of future years' revenues can bind future legislatures. Third, the appropriation is separately preempted by Title III because it requires payment of an obligation that Title III does not render a priority claim. The Commonwealth cannot insert priority claims into Title III. Fourth, Movants' kitchen sink of property law theories – equitable ownership, trust fund, and equitable lien – are each refuted by the Uniform Commercial Code which would be totally vitiated if it could be circumvented by such theories.[5]   Fifth, logic and common sense reinforce that PRIFA Bonds

---

[4]  Unless otherwise noted, capitalized terms are the same as defined in the Oversight Board's prior briefs, which are hereby incorporated by reference. [*E.g.*, ECF Nos. 7827, 8164].

[5]  The Uniform Commercial Code eliminates most equitable theories. *See* former UCC § 9–203, Comment 5 ("Since this Article reduces formal requisites to a minimum, the doctrine [of equitable mortgage] is no longer necessary or useful.") and current UCC § 9–101, Comment 1 (explaining comments to former UCC remain the rule of law); *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 339 n.39 (Bankr. D. Nev. 2010) (stating trustee's equitable arguments to establish by operation of law what it failed to obtain by contract and practice failed because "[t]hese

3

sold on the basis of collateral consisting of funds in the Sinking Fund would not be further secured by Commonwealth assets the Commonwealth nowhere pledged.

5.       No one disputes that where a debtor promises to pay a debt on an unsecured basis, the promisee has nothing more than an unsecured claim.  Here, the Commonwealth has not promised to pay PRIFA Bondholders.  It has done something less.  It has, by statute, obligated itself to appropriate up to $117 million in rum taxes it receives in each fiscal year from the federal government—the Rum Tax Remittances—to PRIFA, and not PRIFA's bondholders.  *See* 3 L.P.R.A. § 1914.[6]  An annotated diagram showing the flow of funds is attached hereto as **Exhibit A**.  Once appropriated, the money historically was then "covered into" (*i.e.*, deposited in) the PRIFA Infrastructure Fund by the Commonwealth for PRIFA's "corporate purposes," and *not* for the benefit of the Bondholders.  *Id.*  Pursuant to the Trust Agreement, PRIFA then covenanted to

_____

theories are . . . contrary to the general notion that Article 9 generally supplanted such theories in favor of one simple system.").

[6]   3 L.P.R.A. § 1914 provides, in relevant part:

"[T]he first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, for up to a maximum amount of thirty million dollars ($30,000,000),…in the case of Fiscal Years 2006-07 to 2008-09, and in subsequent years until Fiscal Year 2056-57, **the participation shall be for an amount of up to one hundred and seventeen million dollars** ($117,000,000), which **when received by the Department of the Treasury of Puerto Rico**, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', **and be used by the Authority for its corporate purposes**, which shall include the development of the infrastructure necessary and convenient for holding the Mayaguez 2010 Central American and Caribbean Games. In case the funds collected from said federal excise taxes are insufficient to cover **the amounts herein appropriated**, the Secretary of the Treasury is authorized to cover said deficiency with any funds available and the Director of the Office of Management and Budget, at the request of the Puerto Rico Infrastructure Financing Authority shall include for the budget recommended for the corresponding fiscal year the appropriations needed to cover said deficiencies.

The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, **subject to the provisions of** Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, **or for any other legal purpose of the Authority**. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes."

3 L.P.R.A. § 1914 (emphasis added).

transfer a certain amount of monies from the Infrastructure Fund to the Sinking Fund.  The Sinking

Fund is then pledged to Bondholders, and is the *sole* source of payment for the Bonds.  Trust

Agreement §§ 101, 601.

6.    Promises to appropriate money for general corporate purposes convey fewer

contract rights than an unsecured promise to pay, and they do not give rise to a security or property

interest.  *See Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (holding a

promise to pay a debt from a particular fund does not create a contractual lien in the fund nor an

equitable lien);  *Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*, 225 B.R. 883, 886 n.4 (Bankr

E.D. Pa. 1998) ("[a] covenant without a pledge granting additional security is simply a promise,

not a security interest)."  A promise by the Commonwealth to appropriate money into an account

for PRIFA's corporate purposes—and not even for Bondholders' benefit—cannot possibly make

PRIFA's bondholders better off than if they had an unsecured promise from the Commonwealth

to pay the Bonds.   And far from making any promise to pay PRIFA Bondholders, the

Commonwealth expressly disclaimed liability:  "The Bonds issued by [PRIFA] shall not constitute

an indebtedness of the Commonwealth nor any of its political subdivisions, and neither the

Commonwealth nor any of its political subdivisions shall be liable therefor, and such bonds shall

be payable solely out of those funds pledged for the payment thereof." 3 L.P.R.A. § 1910; *see also*

Trust Agreement § 601 ("Nothing in the Bonds or in this Agreement shall be deemed to constitute

… a debt or obligation of the Commonwealth … and neither the Commonwealth of Puerto Rico

nor any of its political subdivisions shall be liable for the payment of the principal of or the interest

on the Bonds.").

7.    Nevertheless, Movants attempt to convince the Court that somehow the

Commonwealth's promise to appropriate monies into a PRIFA account is not only superior to an

5

unsecured promise to pay, it is the equivalent of a nondischargable, specifically enforceable obligation to transfer money until the Bonds are paid in full.  In doing so, Movants are attempting to undermine the fundamental bankruptcy policy of equality whereby creditors of equal rank share losses.[7]  As one court aptly explained: "[i]n a bankruptcy case, there is nothing equitable about taking money away from unsecured creditors and giving it to a creditor that failed to protect its own interests when it had a chance to do so."  *In re T. Brady Mech. Servs., Inc.*, 129 B.R. 559, 563 (Bankr. N.D. Ill. 1991) (citation omitted).

8.      Dissatisfied that the Enabling Act does not provide PRIFA, and Trust Agreement does not provide Bondholders, with the rights they wish they had, Movants propound multiple theories designed to get them paid in full while other unsecured claimholders share the losses, even though Movants have no claims against the Commonwealth (and certainly not a secured claim). Their Motion consists of a number of "Hail Mary" passes that the Commonwealth's lesser obligation to appropriate money into an account somehow morphs into one or all of (i) a perfected security interest, (ii) equitable ownership, (iii) total ownership, (iv) an equitable lien, (v) a trust interest, or (vi) a constructive trust interest in the entire stream of Rum Tax Remittances.  In their desperation, Movants even resort to making allegations about wiring instructions that contain "transmittal information" to try and convince the Court that the Commonwealth's cash management system can provide an ownership interest where the statutes and agreements fall short.  But PRIFA's only "right" to the Rum Tax Remittances is the Commonwealth's conditional

---

[7]  *See, e.g.*, *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) ("we are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed"); *Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive *pro rata* shares of the debtor's property."); *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227 (1930) ("The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate . . . .").

appropriation under the Enabling Act.  And Bondholders' only security interest is to the monies

that PRIFA actually receives from the Commonwealth and subsequently deposits in the Sinking

Fund.  No greater rights can be found..

9.      Movants ask the Court to lift the stay so they can prosecute two lawsuits: one

against the United States so it can attempt to impose an equitable lien against the Rum Taxes before

they are remitted to the Commonwealth on the theory the PRIFA bondholders or PRIFA, as

opposed to the Commonwealth, is somehow entitled to them; and another against the

Commonwealth to compel a turnover to PRIFA or to PRIFA bondholders of the Rum Tax

Remittances.  In the alternative, Movants seek adequate protection.  For Movants to procure the

desired relief, they must show (1) the PRIFA bondholders hold a lien against the Commonwealth's

interest in the rum excise taxes in the hands of the Commonwealth and the United States, and (2)

even if they do, the Commonwealth has no equity in the taxes.[8]  Movants fail on both counts.

10.      **The Commonwealth Retains All Rights in the Rum Tax Remittances**.  The

Court need look no further than the First Circuit's recent decision, affirming this Court, to entirely

dispose of this Motion.    While Movants rewrote their entire motion based on their

misunderstanding of *Gracia-Gracia v. Financial Oversight & Management Board for Puerto Rico*

*(In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340 (1st Cir. 2019) – which does not require

any change to the Court's original June 13, 2019 Order providing for an initial hearing on Movants'

standing and alleged property interests – Movants omit any mention of *Vázquez-Garced v.*

---

[8]  Under section 362(d)(2), Movants have the burden of proving the debtor lacks equity in the property and that they have
a valid security interest in the property.  *See Fazio v. Growth Dev. Corp. (In re Growth Dev. Corp.)*, 168 B.R. 1009,
1017 (Bankr. N.D. Ga. 1994) (an unsecured claimholder has "no interest in property to be protected, so relief provided
for by § 362(d)(2) is not applicable"); *In re Breitburn Energy Partners LP*, No. 16-10992, 2017 WL 1379363, at *4
(Bankr.Apr. 14, S.D.N.Y. 2017) ("[T]he general rule is that claims that are not viewed as secured in the context of §
362(d)(1) should not be granted relief from the stay….") (citation omitted).

*Financial Oversight & Management Board for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for*

*P.R.)*, 945 F.3d 3 (1st Cir. 2019).  There the First Circuit confirmed,

> "that PROMESA subsection 202(e)(4)(C) itself precludes the territorial
> government from reprogramming funds from prior fiscal years except to the extent
> such reprogrammed expenditures are authorized in a subsequent budget approved
> by the Board, ***and any Puerto Rico law to the contrary is preempted by virtue of
> PROMESA section 4***…. Simply put, if a certified budget is to have 'full force and
> effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed
> in that budget, ***regardless of what any territorial laws say***."

*Id.* at 8 (emphasis added).

11.    The consequence of *Vázquez-Garced* is clear: the purported requirements of 3
L.P.R.A. § 1914 that the Commonwealth transfer the Rum Tax Remittances to PRIFA's
Infrastructure Fund once received[9] are preempted because it is inconsistent with PROMESA's
requirement that appropriations can only be made pursuant to sections 201 and 202 of PROMESA,
and the Oversight Board has not certified a budget that made such appropriations for PRIFA.  The
Rum Taxes, when received by the Commonwealth, are the Commonwealth's property to be used
in accordance with its certified fiscal plan and budget.

12.    This is not just binding First Circuit law, it is logical.  Outside of bankruptcy, debts
are to be paid in full.  But the whole purpose of bankruptcy, and PROMESA, is to preempt and
restructure those obligations.  If statutes purporting to appropriate moneys to instrumentalities are
not preempted, they would make restructuring impossible and would preclude the Oversight Board
from balancing the Commonwealth's budget.  It would also create the absurd result of placing

---

[9] The Enabling Act does not mandate any appropriation of Rum Tax Remittances.  Instead it makes clear that the Rum Tax Remittances are at all times available resources of the Commonwealth, that the Commonwealth may "*appropriate*" in an amount up to $117 million in each fiscal year, and that, if any appropriation is made, it is always conditional and subject to the Commonwealth's Retention Powers pursuant to Puerto Rico Constitution, Article VI, § 8. *See* 3 L.P.R.A. § 1914.

8

creditors of an instrumentality—who can point to nothing more than the Commonwealth's promise to appropriate money to the instrumentality—ahead of creditors of the Commonwealth who actually hold the Commonwealth's direct promise to pay.  Just as a prepetition promise to pay is preempted under PROMESA, so too is a prepetition appropriation.

13.     Moreover, any Commonwealth appropriation of Rum Tax Remittances to PRIFA under the Enabling Act is always subject to the Commonwealth's powers under "Section 8 of Article VI of the Constitution," which allow the Commonwealth to retain or claw back appropriations to pay public debt when its "available revenues" are insufficient (the "Retention Powers"). 3 L.P.R.A. § 1914; P.R. Const., art. VI, § 8.  The Commonwealth's reversionary interest in any Rum Tax Remittances has priority over any pledge of the Rum Tax Remittances to Bondholders and is a standalone proof of equity.  The Commonwealth also has equity by the simple fact the Puerto Rico Legislature can repeal or amend § 1914 at any time.  If an appropriation were the eternal obligation Movants wish it were, or if the Commonwealth were just a mere conduit as Movants claim, it would be impossible for the Commonwealth to have asserted its Retention Powers over the Rum Tax Remittances in the first instance, and it would violate the principle that past legislatures cannot bind future legislatures.

14.     ***Movants' Have No Security Interest Beyond Monies in the Sinking Fund***. Even if 3 L.P.R.A. § 1914 were not preempted and Movants could show that PRIFA has a property right in the Rum Tax Remittances, Movants still have no property or security interest in the Rum Tax Remittances retained by the Commonwealth.  The Trust Agreement is the only document pledging assets to secure PRIFA bonds.  It pledges only the "Pledged Revenues," defined to mean monies deposited into the "Sinking Fund."  Trust Agreement § 101.  It further provides the "principal, interest and premium, if any, are payable ***solely*** from the Pledged Revenues." *Id.* § 601 (emphasis

9

added).  These two simple, straight-forward provisions of the Trust Agreement delineate the entire scope of Movants' alleged security interest and are dispositive as to the lack of Movants' security interest in the Rum Tax Remittances.

15.    No contractual or statutory authority extends Movants' interest beyond the Sinking Fund.  *See Id*.  Movants' interest simply does not reach the Commonwealth's accounts (and certainly not to Rum Taxes not in existence).  Indeed, if the Trust Agreement intended to grant a security interest on monies sitting with the Commonwealth, the Commonwealth would have needed to be a party to the Trust Agreement (or to have entered into a separate security agreement for the benefit of the Bondholders).  In addition, that security interest would have been disclosed in the Offering Statement, which are tellingly silent.[10]

16.    Nor does their purported security interest extend to Rum Tax Remittances the Commonwealth may appropriate to PRIFA by transfer to the PRIFA Infrastructure Fund.  The Trust Agreement is unequivocal that "[t]he Authority [PRIFA] shall not pledge or create *any* liens upon *any moneys* in the Puerto Rico Infrastructure Fund."  *Id.* § 401 (emphasis added).  "*Any*" means *any*.  Thus, Movants' theory that their security interest somehow travels up from the Sinking Fund to the PRIFA Infrastructure Fund, and then to the Commonwealth TSA, suffers from breaks at every point in the chain.  Their lack of a security interest in the Rum Tax Remittances conclusively resolves Movants' efforts to seek relief from the automatic stay irrespective of whether they are moving under Bankruptcy Code section 362(d)(1) or (d)(2).  That was the case

---

[10] Available at https://emma.msrb.org/MD410020.pdf and https://emma.msrb.org/MD501151.pdf. (the "2005 Official Statement" and "2006 Official Statement," collectively "Offering Statements").

with the original PRIFA Lift Stay Motion [ECF No. 7176], and it is the case now.

17.     ***The Rum Tax Remittances are Not Held in Trust for the Benefit of PRIFA or its
Bondholders***.  Unable to locate a lien or property interest to PRIFA in the Enabling Act, or a
security interest beyond that of the Sinking Fund in the Trust Agreement, Movants concoct from
whole cloth a theory that the Rum Tax Remittances are held in trust by the Commonwealth for the
benefit of PRIFA or its Bondholders (Movants do not make their mind up as to which).  Nothing
in the Enabling Act purports to create any trust relationship between the Commonwealth and
PRIFA or its Bondholders.  In fact, where the Enabling Act does endeavor to establish certain
trusts (*see, e.g.*, 3 L.P.R.A. § 1923) it clearly identifies a trustee, beneficiary, a segregated trust
*res*, and repeatedly uses language such as "to be held in trust" – all of which are glaringly absent
from descriptions of the TSA and the PRIFA Infrastructure Fund.[11]

18.     Even if Movants could establish a property interest of PRIFA's in the Rum Tax
Remittances under the Enabling Act, PRIFA never pledged such interest to Bondholders in the
Trust Agreement.  The only monies "held in trust" under the Trust Agreement are those in the
Sinking Fund.  There, the characteristics of a trust are present: the powers, duties, and
responsibilities of the Trustee are clearly defined, the trust *res* is clearly identified, and the funds
are not commingled with other monies.  There is no equivalent language that PRIFA holds the
monies in the PRIFA Infrastructure Fund in trust for the Bondholders' benefit.  And the Trust
Agreement certainly cannot establish a trust relationship between the Commonwealth and PRIFA
Bondholders because no language even suggests that the Legislature was attempting to create a
trust, on the one hand, and "[n]othing in the Bonds or in this Agreement shall be deemed to

---

[11] Even in this example, it is not clear that under Puerto Rico law a trust was created.

constitute … a debt or obligation of the Commonwealth …" (Trust Agreement § 601), on the other hand.

19.      If Bondholders held a rational belief that the Rum Tax Remittances were held in trust by the Commonwealth or PRIFA for their benefit, one would expect this trust to be disclosed prominently in the Bond Offering Statements to help sell Bonds to the market.[12]   The only reference in the Offering Statements to any monies held in trust are those held by the Trustee in the Sinking Fund for the benefit of Bondholders.  Like the Enabling Act and Trust Agreement, the Offering Statements are completely silent as to any other trust relationship because no such relationship exists.

20.      ***Movants Cannot Resort to "Equity" to Expand Their Security Interest.***  Unhappy with the deal they bargained for, Movants ask the Court to exercise equitable remedies to plug up the myriad holes in their ownership theories.  Movants argue the unfairness of the law provides them an "equitable lien" on the Rum Taxes.  But equitable liens are not recognized under Puerto Rico law.  Even if they were, an equitable lien cannot remedy the effects of a statute.  As shown below, a statute, by definition, is never "unfair."  Manifestly, the law rejects such attempts to circumvent the Uniform Commercial Code requirements for perfected security interests with allegations of equitable liens and trusts.  Equitable constructs such as "equitable liens," "constructive trusts" and "resulting trusts" are disfavored and rarely granted in bankruptcy because, by definition, they override bankruptcy priorities and rules governing secured claims.

21.      ***Movants Are Not Parties-In-Interest and Lack Standing***.  Movants would have the Court believe the addition of the Trustee solves the issue of standing.  M.Br. at 18 n.15.  It may

---

[12] *See* Offering Statements, *supra* note 10.

solve the problem under the Trust Agreement, but not the problem that the Trustee cannot assert

PRIFA's rights.  Movants' actually clarify that this is precisely what they are trying to do.

22.     The Trust Agreement governs the relationship between PRIFA and its

Bondholders.  The Enabling Act governs the relationship between PRIFA and the Commonwealth.

But there is no legal relationship, as it pertains to the Rum Tax Remittances, between PRIFA

Bondholders and the Commonwealth (other than the unsecured promise by the Commonwealth

under the Enabling Act that the Commonwealth will not limit or alter the rights conferred by the

Enabling Act to PRIFA).  The Commonwealth is not a party to the Trust Agreement.  None of this

is in dispute.  M.Br. at 36 ("Movants' lien did not result from any security agreement entered into

by the Commonwealth.  The lien arose [from] a contract between PRIFA and its Trustee…. PRIFA

is not a debtor.").  Movants are thus creditors of a creditor and accordingly, lack standing to pursue

claims against the Commonwealth.  *See Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach*

*Corp.)*, 698 F.2d 571, 574 (2d Cir. 1983) ("As a stranger to the proceeding [ ] [a] creditor [of a

creditor] did not qualify to seek modification of the stay which had been imposed when the debtor

filed for bankruptcy.").

23.     Movants admit they are attempting to step into PRIFA's shoes and assert PRIFA's

alleged rights.  They repeatedly assert "PRIFA['s] ownership" rights.  *E.g.*, M.Br. at 9.  But without

a "direct claim to" the Rum Tax Remittances, Movants "lack[] the direct interest necessary to

establish prudential standing."  *BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,

301 F. Supp. 3d 312 (D.P.R. 2017); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2002)

(to have standing, a party's claims generally must be "premised on [their] own legal rights (as

opposed to those of a third party)") (citation omitted).

24.     ***There is No Cause to Lift the Stay or Grant Adequate Protection***.  Movants' lack

13

of a security interest in the Retained Rum Tax Remittances dooms Movants' requested relief.
Without a security interest, they cannot seek stay relief under Bankruptcy Code sections 362(d)(2)
or 362(d)(1).  While the Motion addresses a host of other issues such as adequate protection and
cause to lift the stay, the Opposition does not respond to these issues in light of the Court's
*Amended Interim Case Management Order for Revenue Bonds* [ECF No. 10595] (the "Amended
Case Management Order") limiting briefing to the issues of standing and secured status.  If the
Motion proceeds past the preliminary hearing, Movants reserve all rights to make all appropriate
arguments.  At that stage, the Commonwealth will show that Movants do not even attempt to make
a *prima facie* case of diminution warranting adequate protection.  Ironically, they do the exact
opposite.  Movants point to the Treasury's publicly available cash flow reports (*see* M.Br. at 42
n.28), which show the TSA's balance has been rising since well before Movants filed their motion,
and, as of December 2019, contains over $8.7 billion.[13]  This amount is well in excess of the
aggregate amount payable on the PRIFA Bonds, and covers several multiples of the $117 million
per year of Rum Tax Remittances retained in the TSA since the Commonwealth's Title III case
commenced.

*     *     *     *

25.     The forest should not get lost for the trees.  Movants' claims boil down to a simple,
straight-forward question: do they have a property interest in Rum Tax Remittances retained by
the Commonwealth? The answer is equally straight-forward and simple.  Any right Movants could
have is derived from PRIFA.  The Commonwealth's appropriation of Rum Tax Remittances to
PRIFA was always conditional on its Retention Powers, and is now preempted by PROMESA.

---

[13] *See Publications & Reports*, AAFAF, http://www.aafaf.pr.gov/reports.html.

14

Even if PRIFA had a property interest in the Retained Rum Tax Remittances, Movants' security interest is determined by the Trust Agreement, which limits it "solely" to monies deposited in PRIFA's Sinking Fund.  It is cut off from the PRIFA Infrastructure Fund, cannot reach preceding funds such as reach the Rum Tax Remittances in the TSA, and the Commonwealth's purported obligation to appropriate the Rum Tax Remittances to PRIFA is preempted by PROMESA.  That is all this Court needs decide to resolve the Motion.

## **FACTUAL BACKGROUND**

26.     The factual background concerning the Rum Taxes, PRIFA, and the PRIFA bonds has already been extensively briefed.[14]  Accordingly, we briefly recount the facts relevant to the Motion using the same defined terms as in prior submissions.  Per the Court's June 13, 2019 order [ECF No. 7420], these facts are limited to the statutes and contracts applicable to the Rum Taxes and the PRIFA bonds.

### *A.  Rum Taxes are Collected by the Federal Government, Remitted to the Commonwealth Treasury, and Appropriated by the Commonwealth.*

27.     Rum produced in Puerto Rico and sold on the mainland is subject to a federal excise tax collected by the United States Treasury – the Rum Taxes.  The United States Treasury deposits the Rum Taxes into the "treasury of Puerto Rico" – the Rum Tax Remittances – without limitation on use.  26 U.S.C. § 7652.[15]  The United States can amend that appropriation statute at any time.

28.     <u>The Rum Producers Have a Deposit Account Control Agreement ("DACA"); the</u>

---

[14] *See, e.g.*, *Complaint Objecting to Defendants' Claims and Seeking Related Relief* [ECF No. 1; Case No. 20-003-LTS] (the "<u>PRIFA Revenue Bond Complaint</u>"); *Opposition of the Commonwealth of Puerto Rico to Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay* [ECF No. 7827] (the "<u>Lift Stay Opposition</u>")

[15] Section 7652(e)(1) provides, in full: "All taxes collected under section 5001(a)(1) on rum imported into the United States (less the estimated amount necessary for payment of refunds and drawbacks) shall be covered into the treasuries of Puerto Rico and the Virgin Islands." 26 U.S.C. § 7652(e)(1).

PRIFA Bond Trustee Does Not.  As shown in Exhibit A, the Rum Tax Remittances first flow to a Lockbox account pursuant to a Lockbox Agreement for the benefit of, among others, the rum producers, [16] not PRIFA bondholders.  The next to last WHEREAS clause in the Lockbox Agreement recites the parties are entering into a DACA to perfect a security interest in cash.  That is exactly what the PRIFA Bond Trustee did not do.  Section 24 of the agreement provides it shall not create any right on behalf of anyone other than its parties.  Neither PRIFA, the Bondholders, nor the PRIFA Bond Trustee under the Trust Agreement is a party to the Lockbox Agreement, and none of them have control of the Rum Tax Remittances.

29.     Pursuant to section 5(a) of the Lockbox Agreement, the first $117 million are disbursed by the Lockbox Bank to the TSA "for deposit to the credit of PRIFA,"[17] and commingled with other governmental public funds.[18]  Such disbursement is expressly subject to section 15 of the Lockbox Agreement which provides that if there is any change in federal or Commonwealth

---

[16] May 5, 2015 Lockbox Agreement between Government of Puerto Rico, Banco Popular (as trustee), and Citibank, N.A. (as paying agent).  The Lockbox Agreement is available at ECF No. 10109-12.

[17] Section 5(a) provides, in relevant part,

"**Disposition of Cover Over Payments in the Account.** The Lockbox Bank shall make disbursements of Cover Over Payments deposited by the U.S. Government in the Account during each Fiscal Year by making the following payments from the Account in the following order of priority, **solely to the extent of funds available in the Account**: (a) First, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of PRIFA, the first $117 million of aggregate Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(a) during such Fiscal Year…"

ECF No. 10109-12 (emphasis in original).

[18] After the first $117 million of Rum Taxes are deposited in the TSA, Citibank disburses additional designated amounts to (i) the Treasury Secretary "for deposit to the credit of" the Puerto Rico Science & Technology Trust, and (ii) the Puerto Rico Conservation Trust Fund.  Approximately 46% of the remaining Rum Tax Remittances are disbursed directly to a trustee (Banco Popular) on behalf of Puerto Rico rum producers in exchange for their agreement to continue production of large volumes of rum in Puerto Rico for a period of 20 years, to collaborate with the Commonwealth in the marketing and promotion of its rum and Puerto Rico rums generally in the U.S. market, and to use the Rum Tax Remittances returned to it to market and promote Puerto Rico rum products.

16

law that reduces the amounts appropriated to PRIFA, the corresponding amounts to be disbursed under section 5 will be reduced.[19]   The disbursement is made with an accompanying "Disbursement Detail" (what Movants refer to as "transmittal information"), that describes the disbursements using the similar language from the Lockbox Agreement.  Such "Disbursement Detail" is not an instruction, but is merely a description of how the disbursements were calculated, as the Lockbox Bank has no power to create any property interest in the monies or instruct how they are to be used.[20]

### B. The Commonwealth Historically Appropriated (Subject to Retention) a Portion of the Rum Tax Remittances to PRIFA and Authorized PRIFA to Issue Bonds and Pledge the Rum Tax Remittances it Received to Payment of the Bonds.

30.     PRIFA was created by the Enabling Act in June 1988 to provide assistance to public corporations, governmental instrumentalities, political subdivisions and municipalities with respect to the provision, preservation, operation, maintenance and development of infrastructure facilities.  *See* 3 L.P.R.A. §§ 1901, 1902, 1903.  PRIFA is not a Title III debtor.

31.     The Enabling Act allows or requires the Commonwealth to appropriate to PRIFA a portion of the Rum Tax Remittances in the TSA subject to its Retention Powers under the Commonwealth Constitution.  *See* 3 L.P.R.A. § 1914.  Since Fiscal Year 2006-07, the annual

---

[19] Section 15 provides, in relevant part,

"**Legal Adjustments; Change in Federal Law; Amounts Payable to PRIDCO**. (a) If, at any time after the date of this Lockbox Agreement, Act No. 119 of July 9, 2006 [i.e. 3 L.P.R.A. § 1914] of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to PRIFA from Cover Over Revenues or to eliminate any priority that PRIFA may have with respect to such amounts, the payments from the Lockbox Account set forth in Section 5(a) shall be adjusted accordingly to reflect such reduction or the elimination of such priorities. . . ."

ECF No. 10109-12.

[20] Section 14(c) of the Lockbox Agreement provides that only the Commonwealth and the Lockbox Trustee have any claims to the monies in the Lockbox Account.  The Lockbox Bank, in section 14(b), disclaims its ability to enter into any agreement with any person relating to the Lockbox Account or any monies therein or credited thereto.

amount permitted to be appropriated to PRIFA has been capped at $117 million per fiscal year, all subject to the Commonwealth's Retention Powers.  *Id.*  The Enabling Act makes clear it is an appropriation statute by referring to the first proceeds up to $117 million as "amounts herein *appropriated*."  *Id.* (emphasis added).   Regardless of the labeling, however, any statute requiring transfer or payment of money without Oversight Board certification would be inconsistent with PROMESA, even if not labelled an appropriation.

32.      The Offering Statements for bonds issued by PRIFA, similarly inform Bondholders "[t]he Federal Excise Taxes and other revenues received from the Commonwealth and deposited into the [PRIFA Infrastructure Fund] are subject to being applied first to the payment of general obligation debt or debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor."  *See* 2005 Official Statement at S-2; 2006 Official Statement at S-3.

33.      The Commonwealth deposits any appropriations to PRIFA in the PRIFA Infrastructure Fund to be used by PRIFA for its "corporate purposes" and not necessarily to repay Bondholders.  3 L.P.R.A. § 1914.  The Enabling Act merely authorizes,[21] but does not require, PRIFA to use the monies in the PRIFA Infrastructure Fund to pay the Bonds.[22]  Unlike other funds established by the Enabling Act, it contains no language that monies held in the PRIFA Infrastructure Fund are held in trust or segregated for the benefit of Bondholders.

34.      PRIFA, for its part, is authorized to issue bonds and is the only entity authorized to

---

[21] *Id.* ("The Authority is **hereby empowered** to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority…") (emphasis added).

[22] Indeed, section 1914 states that "corporate purposes…shall include the development of the infrastructure necessary and convenient for holding the Mayaguez 2010 Central American and Caribbean Games."  Section 1914 also states that monies in the PRIFA Infrastructure Fund may be used for the payment of "other obligations" of PRIFA.

18

pledge anything to secure the Bonds.   We will explain what PRIFA pledged, but for present purposes, that is immaterial.   The material fact is the Commonwealth pledged none of its assets to secure the Bonds.   PRIFA is authorized to pledge PRIFA's funds, including tax proceeds it "may receive" from the Commonwealth, as payment for those bonds.   3 L.P.R.A. §§ 1906(m), 1907. Any pledge would be "as provided in the trust agreement … under which the bonds are issued." *Id.*   The use of the word "may" and the appropriation of up to $117 million—at all times subject to the Retention Powers—indicate there may be situations where the Commonwealth does not make any appropriations to PRIFA.[23]   The use of the word "receive" means that PRIFA only has the power to pledge Rum Tax Remittances that the Commonwealth actually appropriates and deposits so the PRIFA Infrastructure Fund receives them.[24]   Section 1907 confirms this when it provides:

> The principal of, and interest on, the bonds issued by the Authority may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the ***proceeds*** of any tax or other funds ***which may be made available to the Authority by the Commonwealth***, all as provided in the trust agreement or resolution under which the bonds are issued.

3 L.P.R.A. §1907 (emphasis added).   PRIFA, therefore, can only pledge the proceeds of Rum Tax Remittances the Commonwealth actually transfers to the PRIFA Infrastructure Fund.   No language

---

[23] 3 L.P.R.A. § 1906(m) provides:

"The Authority shall have all the necessary and convenient powers to carry out and accomplish the purposes and provisions of this chapter, including but without being limited to the following … (m) Mortgage or pledge any property for the payment of the principal of and interest on any bonds issued by the Authority, or bonds issued by a benefited entity, **and pledge all or a portion of such revenues as the Authority *may receive*** including, but not limited to, and subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority."

[24] Under the Enabling Act, PRIFA has no property interest in the Rum Tax Remittances until they are appropriated by the Commonwealth and deposited in the PRIFA Infrastructure Fund.   Therefore, even if PRIFA could pledge its "right to receive" (it cannot and did not), such power would be meaningless because appropriations are no longer being made by the Commonwealth to PRIFA.

19

mentions a pledge of PRIFA's "right to receive" future revenues.  Notably, the above language also makes clear the Enabling Act did not pledge any interest, but rather it merely authorized the Authority to do so in a trust agreement.   The bottom line is whatever PRIFA pledged or pledges has to be property of PRIFA, not the Commonwealth.  For present purposes, that is all that matters.

35.     Under section 1910, any bonds PRIFA issues "shall not constitute an indebtedness of the Commonwealth," and "such bonds shall be payable *solely* out of those funds pledged for the payment thereof."  3 L.P.R.A. § 1910 (emphasis added).

### C. PRIFA Issued Bonds Pursuant to a Trust Agreement That Limited the Pledged Collateral to Money Deposited in Its Sinking Fund.

36.     In 1988, PRIFA entered into a Trust Agreement that governs the approximately $1.612 billion in bonds it has issued.

37.     Section 601 of the Trust Agreement provides the principal, interest and premium on Bonds issued by PRIFA are to be paid "solely from Pledged Revenues."  "Pledged Revenues" are "Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund."  Trust Agreement § 101.  "Special Tax Revenues," in turn, are "Offshore Excise Taxes deposited to the credit of" PRIFA.  *Id.*  And "Offshore Excise Taxes" are the Rum Tax Remittances.  *Id.*

38.     Through these definitional steps, the Trust Agreement traces the Rum Tax Remittances and identifies precisely when they are pledged to bondholders.  First, the Rum Taxes are collected by the federal government.  Second, they are remitted to the Puerto Rico Treasury pursuant to federal statute with no limitations as to use.  At that stage, the Rum Tax Remittances are commingled in the Commonwealth's TSA, what the Trust Agreement defines as "Offshore Excise Taxes."  Third, *if* the Rum Tax Remittances are deposited with PRIFA, they are called

20

"Special Tax Revenues" under the Trust Agreement.  Fourth, *if* PRIFA deposits in the Sinking

Fund the Rum Tax Remittances it receives, they are called "Pledged Revenues," and deemed the

"sole[]" source of funds pledged to bondholders.  In fact, the Trust Agreement *prohibits* PRIFA

from "pledg[ing] or creat[ing] any liens upon" money deposited in the Puerto Rico Infrastructure

Fund (Trust Agreement § 401), which is where the Commonwealth deposits any Rum Tax

Remittances pursuant to 3 L.P.R.A. § 1914 for PRIFA to use "for its corporate purposes" – not

necessarily to pay bondholders.  Thus, the Trust Agreement limits the scope of any lien granted by

PRIFA to funds actually in the Sinking Fund.  The diagram in Exhibit A illustrates this cash flow.

39.     Ample provisions of the Trust Agreement including, the forms of bond contained

therein) and the Offering Statements confirm that any pledge of the Pledged Revenues is limited

to monies in the Sinking Fund.  The forms of bond included in the Trust Agreement make clear

that it is the Sinking Fund that is pledged to and charged with the payment of principal of and

interest on the Bonds:

> The Agreement also provides for the creation of a special fund designated "Puerto Rico
> Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" and for the
> deposit to the credit of said special fund of a sufficient amount of the Pledged Revenues (as
> defined in the Agreement) to pay the principal of and interest on all bonds issued under the
> Agreement as the same become due and payable and to provide a reserve therefor, ***which
> special fund is pledged to and charged with the payment of such principal and interest***.

Trust Agreement at 6 (emphasis added).

40.     The Offering Statements remove any possible doubt as to the proper interpretation

of the definition of "Pledged Revenues" under the Trust Agreement.   Under the heading

"SECURITY FOR THE BONDS" they provide the Bonds "are payable *solely* from, and secured

by a pledge of, the revenues and other moneys deposited in the [Sinking Fund] established under

the Trust Agreement (the 'Pledged Revenues')."   Offering Statements at 9.   The "Pledged

Revenues," in turn, are defined as:

21

(i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

*Id.* (emphasis added). Movants, therefore, certainly knew PRIFA's pledge was limited to monies actually received by PRIFA and actually deposited into the Sinking Fund. Arguments to the contrary defy reality.

41.     Retained Rum Tax Remittances are "available resources"[25] of the Commonwealth. As noted in the Offering Statements, "*Prior to* their application to pay principal of and interest on the Bonds, the Special Tax Revenues *are available revenues* under the Constitution." 2005 Offering Statement at 10; 2006 Offering Statement at 10 (emphasis added).

### D. As the Financial Crisis Hit, the Commonwealth Exercised its Retention Powers, and the Oversight Board Exercised Its Authority Under PROMESA Over the Rum Tax Remittances.

42.     In 2015, the then-Governor exercised the Commonwealth's Retention Powers by issuing emergency orders that required "the Secretary of the Treasury … to withhold the revenue allocation to [PRIFA]," and authorized the use of Commonwealth funds to "safeguard" the public welfare and, to the extent any funds remain available, pay down public debt. Administrative Bulletin OE-2015-046; Administrative Bulletin OE-2015-49.

43.     In 2016, the Commonwealth declared a state of emergency and prioritized the

---

[25] The official English version of the Puerto Rico Constitution uses the term "available revenues," not "available resources," which is used in other translations. Solely for purposes of this Opposition, and without waiver of or prejudice to any argument regarding which version of the Puerto Rico Constitution controls, we use the term "available resources" in accordance with the use of that term in Adversary Proceeding Nos. 19-291, 19-292, 19- 293, 19-294, 19-295, 19-296, and 19-297.

provision of essential services for the health, safety and welfare of the residents of the
Commonwealth over debt service.  To that end, the then-Governor ordered the retention of certain
revenues from, among other entities, PRIFA.  *See* OE-2016-18 at 5; *see also* EO-2016-30 at 2-3;
*see also* EO-2016-31 at 2-3.

44.     On June 30, 2016, PROMESA became effective.  Section 405 provides, among
other things, there is a fiscal emergency in Puerto Rico and the Commonwealth is unable to provide
its citizens with effective services.  PROMESA § 405(m).

45.     PROMESA section 201 gives the Oversight Board the exclusive power to develop
and certify fiscal plans for the Commonwealth and its instrumentalities.  PROMESA §201.
PROMESA section 202 gives the Oversight Board the exclusive power to certify budgets for the
Commonwealth and its instrumentalities over all appropriations, which are deemed "in full force
and effect" once certified.  PROMESA §202(e)(3)(C).  PROMESA "prevail[s] over any general
or specific provisions of territory law, State law, or regulation that is inconsistent with this
chapter."  PROMESA § 4.  Thus, appropriations under pre-PROMESA statutes are preempted.
Additionally, only the Oversight Board may propose a plan of adjustment of the debts of the
Commonwealth.  PROMESA § 312.

46.     Between March 13, 2017 and May 9, 2019, the Oversight Board certified eight
fiscal plans for the Commonwealth.  None provided for any appropriations or transfers of Retained
Rum Tax Remittances to PRIFA.

47.     On September 27, 2019, the Oversight Board filed a proposed plan of adjustment.
[ECF No. 8765].  The proposed plan would pay certain claims based on the Commonwealth's
general obligation bonds at a level less than the full amount of their claims, even after taking into
account the retention of the Retained Rum Tax Remittances.

48.     The Commonwealth has not appropriated or transferred any of the Retained Rum
Tax Remittances to PRIFA since November 30, 2015; none have been deposited into the Sinking
Fund; and none are subject to any bondholder lien.  To the extent Movants have claims against the
Commonwealth arising out of moratorium or similar orders predating the Commonwealth Title III
case, those claims are simply prepetition claims to be restructured in a plan of adjustment.

## PROCEDURAL HISTORY

49.     Ambac seeks to proceed "immediately" with two lawsuits.  The first is the "U.S.
Treasury" action it filed against the U.S. Treasury in the United States District Court for the District
of D.C., in which Ambac seeks to grab Rum Tax Remittances before they are deposited with the
Commonwealth.  *Ambac Assurance Corp. v. U.S. Dep't of Treasury et al.*, 17-cv-00809 (D.D.C.).
Before any responsive pleading was filed in the U.S. Treasury Action, it was stayed in May 2017
once the Commonwealth filed its Title III case.    Ambac's second action, the "PRIFA Clawback
Action" was filed against the Commonwealth in the District of Puerto Rico in an attempt to grab
the Rum Tax Remittances from the Commonwealth's Treasury.  *Ambac Assurance Corp. v.
Commonwealth of Puerto Rico et al.*, 17-cv-01568 (D.P.R.).  That too was ruled stayed by the
automatic stay in May 2017, and Ambac did not appeal the stay in both actions.

50.     Two years after its litigations were stayed, Ambac filed, on May 30, 2019, its
PRIFA Lift Stay Motion [ECF No. 7176], seeking an order that the stay did not apply to Ambac's
litigations, that the stay should be lifted if it did apply, and that it is entitled to adequate protection.
FGIC joined the motion, as did Assured.  [ECF Nos. 7546, 8024].

51.     Following the filing of the Lift Stay Motion, the Court set a hearing for "oral
argument on the legal issues of standing and secured status only," and limited "factual submissions
… to legal documents."  [ECF No. 7420].  Any discovery, if needed, would await determination

24

of the threshold legal issues of standing and secured status.

52.      By July 19, 2019, the PRIFA Lift Stay Motion was fully briefed through the Commonwealth's sur-reply [ECF No. 8164], and oppositions filed by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") [ECF No. 7896].  Oral argument was set for July 24, 2019.

53.      On July 24, 2019, based upon the Court's pronouncement regarding its mediation stay order, Movants requested, and the Oversight Board consented, to the PRIFA Lift Stay Motion being stayed pending a period of mandatory mediation. [ECF Nos. 8244, 9016]. After the Mediation Team Leader filed an interim report, the Court set a schedule for the PRIFA Lift Stay Motion, allowing Movants to seek leave to amend their lift stay motion.  Movants filed the motion to amend on January 16, 2020.  The Oversight Board opposed the motion on January 22, 2020 [ECF No. 10274], and the Court granted the motion on January 31, 2020 [ECF No. 10591].

54.      Pursuant to the Amended Case Management Order, briefing is to be limited to "the issues of standing and secured status" and the Court will hold a preliminary hearing pursuant to 11 U.S.C. § 362(e)(1) on March 5, 2020 at 9:30 a.m. (AST) on the same issues.  [ECF No. 10595 at 4-5].

## LEGAL STANDARDS

## I.      *THE STAY PROVIDES FUNDAMENTAL PROTECTIONS, AND LIFTING IT IS AN EXTRAORDINARY REMEDY.*

55.      By preventing piecemeal adjudication of rights in the debtor's property, "[t]he automatic stay is among the most basic of debtor protections under bankruptcy law."[26] For this

---

[26] *Soares v. Brockton Credit Union (In re Soares)*, 107 F. 3d 969, 975 (1st Cir. 1997) (citing *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 503 (1986)); *see also, e.g.*, *Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311, 313 (1st Cir. 1988); *Municipality of San Juan v. Commonwealth of P.R.*, 919 F 3d. 565, 577 (1st Cir.

reason, the stay "is extremely broad in scope" and "applies to almost any type of formal or informal action taken against the debtor or the property of the estate.  It is all the more so "in the PROMESA and municipal bankruptcy contexts…."  *Gracia-Gracia*, 939 F.3d at 349.

56.     Movants seek relief from the stay under both 11 U.S.C. § 362(d)(1), allowing relief "for cause," and under 11 U.S.C. § 362(d)(2), allowing relief from the stay if "the debtor does not have an equity in such property."  Under both sections, Movants carry the burden to show among other things, that they have a valid security interest in the property.[27]  Notably, Movants' claims against the Commonwealth have been objected to and, as such, they do not enjoy the presumption that their claim is allowed. *See* 11 U.S.C. § 502(a).

## II.     THE "COLORABLE CLAIM" STANDARD DOES NOT APPLY.

57.     Movants attempt to portray their burden as "not demanding."  M.Br. at 17. To the contrary, the stay is such a fundamental protection that lifting it is an "extraordinary remedy."  *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997).  This is especially so when Movants' secured or ownership claims against Commonwealth assets do not arise out of contractual pledges, but are instead lawyers' creative imaginings.   Doing so deprives debtors of "the time, opportunity, and] ability to confirm a plan."  *In re Jefferson Cnty.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013).  Thus, the stay should not be lifted if it would cause "interference with the orderly liquidation or rehabilitation of the debtor" and "detriment [to] other creditors."  *Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982); *Tringali*

---

2019) (citing *Smith v. Me. Bureau of Revenue Servs. (In re Smith)*, 910 F.3d 576, 580 (1st Cir. 2018) ("the automatic stay [ ] is meant to offer the debtor 'breathing room during the period of financial reshuffling' and 'protect[ ] the debtor's assets from disorderly, piecemeal dismemberment outside the bankruptcy proceedings.'")).

[27] *See Gracia-Gracia*, 939 F.3d at 347; *supra* note 8.

26

*v. Hathaway Mach. Co*., 796 F.2d 553, 562 (1st Cir. 1986). The opinions Movants cite do not
diminish the burden they must carry to demonstrate they have valid and perfected liens for the
court to lift the stay, a factor courts across the country consider before granting such relief. [28]

58.     Movant's seize on the word "colorable", analogizing their burden to a motion to
dismiss standard under *Twombly*.  M.Br. at 17.  But the standard is a "preliminary injunction"
standard, and Movants must show "a reasonable likelihood" of success.  *Grella v. Salem Five Cent
Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994).  Contrary to Movants' position, the First Circuit has
made clear the Court must determine the existence and scope of any security interests before
granting a lift stay motion predicated on movants' purported lien rights.[29]

59.     Indeed, particularly where a claimant faces party-in-interest standing issues, as
Movants do here, the colorable claim standard has no application.  *In re Veal*, 450 B.R. 897, 917–

---

[28]  *See In re Cabrillo,* 101 B.R. 443, 450–51 (Bankr. E.D. Pa. 1989) (denying relief under 11 U.S.C. § 362(d)(2) because
the creditor failed to prove that it held a valid security interest in the collateral); *In re Playa Dev. Corp.,* 68 B.R. 549,
553 (Bankr. W.D. Tex. 1986) ("In considering a motion for relief from the stay [brought pursuant to section 362(d)(2)],
it is necessary to observe that the moving party has the burden of establishing the validity and perfection of its security
interest...."); *In re Dahlquist,* 34 B.R. 476, 481 (Bankr. D.S.D. 1983) ("[A] creditor must establish the validity and
perfection of its security interest ... and must carry the ultimate burden of proof with respect to equity [when bringing
a motion to lift the stay pursuant to section 362(d)(2)]."); *United Cos. Fin. Corp. v. Brantley,* 6 B.R. 178, 184 (Bankr.
N.D. Fla. 1980) (explaining that a creditor must "establish the validity and perfection of its security interest ... and ...
must carry the ultimate burden of proof with respect to equity"); *In re Irving A. Horns Farms Inc.,* 42 B.R. 832, 836
(Bankr. N.D. Iowa 1984) ("In any litigation regarding a Motion to Lift the Automatic Stay the moving creditor must
establish the validity and perfection of its security interests"); *see also Grant, Konvalinka & Harrison, P.C. v. Still (In
re McKenzie)*, 737 F.3d 1034, 1039–40 (6th Cir. 2013) ("requiring a creditor to establish the validity of its security
interest makes sense as a matter of sound judicial policy because the creditor will likely be in the best position to show
that its interest is valid. . . . The bankruptcy court therefore properly required GKH to establish the validity of its
security interest in the pledged collateral [when considering a lift stay motion brought pursuant to Section 362(d)(2)].")
(internal citations omitted); *Omega Envt'l. Inc. v. Valley Bank NA (In re Omega Envtl., Inc.)*, 219 F.3d 984, 986 n.1
(9th Cir. 2000) (per curiam) ("A creditor holding an unperfected security interest is not entitled to relief from an
automatic stay imposed under Bankruptcy Code § 362."); *First Nat'l Bank v. Turley*, 705 F.2d 1024, 1027 (8th Cir.
1983) (same).

[29]  *See, e.g., Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt.
Bd. for Puerto Rico)*, 899 F.3d 1, 13 (1st Cir. 2018) (Court's decision on future lift stay must include "the Title III
court's view as to the precise nature and extent of [HTA Bondholder's] collateral"); *see also Gracia-Gracia*, 939
F.3d at 352-53 (remanding lift stay motion to Court to "make at least a preliminary determination of the parties'
respective property interests in the segregated funds.").

18 (B.A.P. 9th Cir. 2011) ("the colorable claim standard … does not free [Movants] from the burden of establishing [their] status as a real party in interest").

60.     Where, as here, claim objections or other defenses are asserted that "strike at the heart of the … creditor's claim or the validity of his lien," those objections and defenses "directly affect the issue of equity and thus the issues of harm and adequate protection" and should be "give[n] consideration … in determining whether or not the stay should remain in effect."  *Drake v. Franklin Equip. Co.* (*In re Franklin Equipment Co.*), 416 B.R. 483, 505 (Bankr. E.D. Va. 2009) (quoting *United Companies Fin. Corp. v.* Brantley, 6 B.R. 178 (Bankr. N.D. Fla. 1980)); *see also, e.g.*, *Bargas v. Rice (In re Rice),* 82 B.R. 623, 626 (Bankr.S.D.Ga.1987) (court denied lift stay motion when the evidence supported an inference the lien might be invalid).  For example, *Gracia-Gracia* quotes *Grella,* where the First Circuit made clear that a debtor's defenses should be considered during a stay relief hearing:

> This is not to say that bankruptcy courts can never consider counterclaims and defenses, including preference counterclaims, during a relief from stay hearing.  As several bankruptcy courts have discussed, there is a significant difference between mere consideration of claims and final adjudication on the merits.  **Certainly, a court may take into account any matter that bears directly on the debtor's equity, or that clearly refutes a creditor's claim to the property.  For example, if a trustee raises a defense to a creditor's claim at the relief from stay hearing, the court need not ignore this defense, but may consider it when deciding whether to lift the stay**.

*Grella*, 42 F.3d at 34 (emphasis added) (internal citations omitted).

61.     Notably, none of the cases cited by Movants involved situations where the debtor that opposed stay relief had a credible challenge to the validity of the security interest.[30]  Indeed,

---

[30] *In Vitreous Steel Products Co.*, 911 F.2d 1233 (7th Cir. 1990), relied upon by the Court in *Grella*, the Seventh Circuit noted how the record demonstrated the creditor held a perfected security interest in the collateral at issue. It was the preference and fraudulent transfer actions to eliminate the lien that the appellate court ruled was not part of the stay relief matter. *See id.* at 1234. Moreover, the bankruptcy trustee was not challenging the lien in *Vitreous Steel*. In fact,

application of a colorable claim standard defies common sense.  Here, for example, the
Commonwealth has far more than a colorable claim that Movants are wrong in their property
interest arguments.  That being the case, there is no way for the Court to make a determination
without making findings about which party is likely to prevail (as a court would in the context of
a preliminary injunction motion).

## ARGUMENT

### I.     NONE OF THE GOVERNING LEGAL DOCUMENTS PROVIDE MOVANTS AN INTEREST IN THE RUM TAX REMITTANCES.

#### A.     The Enabling Act is an Appropriation Statute, Nothing More; It Does Not Pass Title or Turn the Commonwealth Into a "Mere Conduit."

62.     In their attempt to reach Rum Tax Remittances deposited in the TSA, Movants
argue section 1914 of the Enabling Act morphs the Commonwealth into a "mere conduit" by
requiring transfer of the Rum Tax Remittances to PRIFA "immediate[ly]" upon receipt.  M.Br. at
7.  The first step, however in determining what rights, if any, Movants have with respect to the
Rum Tax Remittances is to determine PRIFA's own rights with respect to the Rum Tax
Remittances. The plain language of the Enabling Act clearly and unequivocally does not grant
PRIFA a property right in Rum Tax Remittances prior to their transfer. PRIFA, therefore, could

---

"[t]he bankruptcy court found that the evidence was undisputed that the Bank held a lien on all the realty and
personalty" and the only issue properly before the court on the motion to lift the automatic stay was whether *Vitreous*
had any equity in the real estate. *Id.* at 1229. *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In
re Old Cold, LLC)*, 602 B.R. 798 (B.A.P. 1st Cir. 2019) does not lead to a different conclusion. While repeating
language found in *Vitreous* that a hearing on lift stay motion is limited in scope, the court recognized that "the
bankruptcy court is not precluded from considering defenses to a creditor's claim to property of the estate[.]" *Id.* at
826. *See also Jin Qing Li v. Rosen (In re Jin Qing Li)*, No. 3:12-BK-33630, 2018 WL 1354548, at *4 (B.A.P. 9th Cir.
Mar. 12, 2018) ("Motions for relief from stay are 'summary proceedings' suitable only to ascertain whether the
application of the automatic stay should be modified. As such, bankruptcy courts have the discretion to "consider" the
defective nature of the creditor's interests within a motion for relief from stay") (internal citations omitted). In sum,
courts have always recognized that defenses to alleged property interests can be considered by the bankruptcy court
when determining if to lift the automatic stay.

29

not pledge under the Trust Agreement a property interest it does not have.

63.     The United States Treasury deposits the Rum Taxes into the Puerto Rican Treasury with no restrictions.  *See* 26 U.S.C. § 7652.  As with all Commonwealth property, the Commonwealth is free to appropriate its funds as it sees fit and to change its mind every minute if it chooses to do so.  In 1988, the Commonwealth authorized appropriation of certain portions of the Rum Tax Remittances – currently up to the first $117 million in each Fiscal Year – to PRIFA.  3 L.P.R.A. § 1914.   Any appropriation is, at all times, subject to its Retention Powers.  *Id.* Importantly, PRIFA's Enabling Act does not pledge any money to Bondholders or grant them any security interest whatsoever—it merely authorizes PRIFA to make certain pledges through a trust agreement.[31]  As such, it cannot afford Movants a statutory lien (as Movants have argued in the past).[32]

64.     Nor does the Enabling Act pass title or ownership of the Rum Tax Remittances to PRIFA.  It merely authorizes appropriations to PRIFA and sets a yearly ceiling for them.  *See* 3 L.P.R.A. § 1914.  It expressly refers to any of the "first proceeds….up to $117 million" as "amounts herein *appropriated*."  *Id.* (emphasis added).  Accordingly, there can be no question that 3 L.P.R.A. § 1914 is, at most, an appropriation statute.

---

[31] *See* 3 L.P.R.A. § 1907.

[32] Movants do not appear to argue the Enabling Act provides them with a statutory lien, instead arguing that, together with the Trust Agreement, they have a consensual lien. M.Br. at 33.  To the extent their convoluted arguments could be interpreted as arguing for a statutory lien, such arguments fail.  A statutory lien is a lien that "aris[es] solely by force of a statute on specified circumstances or conditions."  *Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 1, 11 (1st Cir. 2018) (emphasis in original).  No statutory lien exists where the applicable statutory "provisions permit the Authority to secure the payment of bonds by making a pledge of revenues, but they do not require that it do so."  *Id.*  "If the creation of the lien is dependent upon an agreement, it is a security interest even though there is a statute which may govern many aspects of the lien."  *Id.* at 10 (quoting 2 COLLIER ON BANKRUPTCY ¶ 101.53).  The Enabling Act permits, but does not require, PRIFA to issue any bonds or pledge any of its property to secure the bonds.

65.     Movants seize on the words "shall be covered into" to argue the first $117 million of Rum Tax Remittances in each Fiscal Year are never Commonwealth property but immediately belong to PRIFA.  M.Br. at 20.  Such a reading is wholly unrealistic.  First, Movants assume without basis that the length of time the Commonwealth holds the property impacts whether the Commonwealth owns it.  Second, Movants ignore the full picture, whereby the Commonwealth's transfer of the monies is subject to its Retention Powers, thereby showing the monies are considered available revenues of the Commonwealth.  Movants commit the cardinal error of reading the statute in pieces rather than as a whole (which, standing alone, would still not support their argument).[33]  The phrase "shall be covered into" merely identifies where any Rum Tax Remittances appropriated to PRIFA are to be deposited.  They go to the PRIFA Infrastructure Fund for PRIFA's general "corporate purposes."  3 L.P.R.A. § 1914.  The words do not confer any property interest or pass title as they simply mean "deposited into."[34]  Indeed, the Spanish version of the Enabling Act uses the verb "ingresar" or the noun "los ingresos," which respectively translate as "to deposit" or "deposits."

66.     The words "when received" in 3 L.P.R.A. § 1914 also do not render the

---

[33] *See, e.g.*, *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003) (applying "the venerable rule" that "statutes should be interpreted, whenever possible, to give every word and phrase some operative effect"); *see also, e.g.*, *Peralta v. Gonzales*, 441 F.3d 23, 31 (1st Cir. 2006) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."); *United States v. Nason*, 269 F.3d 10, 16 (1st Cir. 2001) (applying the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

[34] *See P.R. v. Blumenthal*, 642 F.2d 622, 623 n.1 (D.C. Cir. 1980) ("The phrase 'covered into' means, literally, 'deposited into.' In practical terms, the provision requires the United States to rebate to the Puerto Rican treasury the same amount of funds as it collected through taxation of Puerto Rican articles [under section 7652(a)(3)].") The definition of "covered into" being the same as "deposited into" is consistent with the Jones Act (enacted in 1917), and consistent with the prior usage of the relevant laws dealing with Puerto Rico, see H.R. REP. No. 64-77 (1916) (using "covered into" and "pay into" somewhat interchangeably).  Similarly, in a recent Congressional report dealing with the excise tax, the Conference Committee (for the recent tax reform bill) stated that "[a]mounts covered over to Puerto Rico and the U.S. Virgin Islands [which have a cover over provision for excise tax on rum that mirrors that of Puerto Rico] are deposited into the treasuries of the two possessions for use as those possessions determine." (H.R. REP. No. 115-466 (2017).

31

Commonwealth a mere conduit. "When received" does not mandate immediate transfer, as Movants argue, or transfer of any particular amount. It just means the Commonwealth is *not* obligated to send any appropriated funds to PRIFA *before* the Rum Taxes Remittances are received. Any appropriations to PRIFA must be Rum Tax Remittances actually received and sitting in the TSA.

67.     Movants also assert that somehow the use of the word "participation" in 3 L.P.R.A. § 1914 confers ownership of the Rum Tax Remittances to PRIFA. M.Br. at 25. Movants are wrong. They cite 15 L.P.R.A. § 75 and 13 L.P.R.A. § 10042(i)(3), but both concern shares of equity in corporations and/or partnerships, and have no relevance to Rum Tax Remittances or a similar construct to 3 L.P.R.A. § 1914. Movants also cite *Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d 49, 51 (1st Cir. 1996), but that case relates to a loan participation agreement (not a statute) under Massachusetts law—something far removed from Rum Tax Remittances—and does not make any statement equating participation with ownership. As a general matter, loan participations do not amount to assignments of ownership.[35]  In actuality, the Spanish version of the Enabling Act controls. There, the word "participación" in this context translates to "portion" or "share." This interpretation makes sense because under the Enabling Act, the General Fund only receives a *portion* (e.g. $117 million) of all Rum Taxes (*e.g.,* ~ $430 million) remitted to the Commonwealth Treasury and placed in a lockbox account.[36]

---

[35] *See, e.g., Ross v. Thousand Adventures*, 675 N.W.2d 812, 817 (Iowa 2004) ("the participation agreement in this case, like loan participation agreements, is not an assignment"); *Yashouafar v. Elkwood Assocs., LLC*, No. 17-ap-01404-MT, 2019 Bankr. LEXIS 255, at *21 (Bankr. C.D. Cal. Jan. 25, 2019) (noting distinction between an assignment and a participation agreement).

[36] In addition, the Spanish text of the Enabling Act makes it clear that the word "participation" cannot be a noun characterizing PRIFA's purported "ownership" interest, but is one word in a phrase regarding the portion of Rum Tax Remittances the Commonwealth may allocate to PRIFA. In the Spanish text, the phrase "which shall be deposited" unquestionably refers to the tax remittances being deposited, not the "participation," because the text uses

32

68.     While Movants' cite *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007) and related cases, including the recent First Circuit decision in *Gracia-Gracia*,[37] for the proposition the Commonwealth is a "mere conduit," they are entirely inapposite.  *Flores Galarza* and its progeny involved statutes mandating—without exception—that the Department of the Treasury either turn over insurance premiums to the insurers providing motorists auto insurance under the public program, or reimburse insured motorists that had been required to pay duplicate premiums to the government.  In both situations, the government was holding either premiums intended for the insurers or duplicate premiums to be returned to motorists who had private insurance.  Moreover, as noted by the First Circuit, these statutes made clear (i) that "[t]he Secretary of the Treasury shall retain these funds as *trustee*," *García-Rubiera v. Calderón*, 570 F.3d 443, 452 (1st Cir. 2009) (quoting 26 L.P.R.A. § 8055(l)), and (ii) that the Treasury's collection of the funds constituted a "collection service performed in favor of the" plaintiffs.  *Flores Galarza*, 484 F.3d at 29 (quoting 26 L.P.R.A. § 8055(c)).  Thus, the applicable statute made the Secretary of the Treasury "merely the custodian of these funds" with "no entitlement" to them.  *Id.*

69.     The statute governing the premium reimbursements in *Flores Galarza* is clearly distinguishable from the statutes at issue here.  Here, the Commonwealth receives the Rum Taxes from the federal government with no strings attached, and deposits them into a treasury lockbox

---

the masculine plural form of the word "which."  The Spanish refutes, rather than supports, Movants' position. *See* 31 L.P.R.A. § 13 (providing that to the extent a discrepancy exists between the English translation and original Spanish version of a statute, the Spanish text shall be preferred).

[37] *See also García-Rubiera v. Calderón*, 570 F.3d 443, 452 (1st Cir. 2009); *Garcia-Rubiera v. Fortuño*, 665 F.3d 261, 263 (1st Cir. 2011); *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight Mgmt. Bd. for P.R.)*, 939 F.3d 340, 345 (1st Cir. 2019).  *See* M.Br. 20-21.

account, which then transfers a certain portion of them to the TSA.  The Commonwealth then specifies that it may appropriate—subject to certain conditions—those funds to PRIFA (and not Movants) for PRIFA's "corporate purposes."  3 L.P.R.A. § 1914.  In addition, no "trustee" or "fiduciary" language exists and the Commonwealth always reserved the right to retain those funds and use them for the Commonwealth's purposes.  *Id*.  This eliminates the argument the Commonwealth is a "mere custodian" of funds—it has authority to retain and use the funds as it sees fit.  Moreover, the funds are not required to be transferred to PRIFA bondholders, but to PRIFA for its "corporate purposes"—nothing even begins to support an argument that the funds are held for the Bondholders' benefits.  In addition, the Offering Statements never mention the existence of a trust relationship— a feature that would have been disclosed had it existed.

70.    Accordingly, the plain language of the 3 L.P.R.A § 1914 demonstrates it is a statute requiring an appropriation.  Indeed, if appropriation statutes transfer the amount appropriated, then upon passage of a budget effective July 1, all the Commonwealth's money for the year would be transferred and gone.  That easily qualifies as an absurd interpretation.  Thus, no provision of the Enabling Act transfers any title or ownership interest in the Rum Taxes Remittances to PRIFA or its Bondholders.

### B.  The Appropriations to PRIFA in the Enabling Act Are Preempted by PROMESA.

71.    To show entitlement to any of their requested relief, Movants must be able to demonstrate a property interest in the Retained Rum Tax Remittances—that is, they must demonstrate a property interest in the monies before they ever leave the Commonwealth and hit the Sinking Fund.  As explained, the Enabling Act does not provide any such interest.  But even if there were a Commonwealth statute that required transfer of monies to PRIFA and granted Movants a security interest beyond that in the Trust Agreement, such statute  would be preempted

34

by PROMESA.

72.     The Oversight Board argued preemption in its prior opposition [ECF No. 7827 at 47], but if there was any doubt as to preemption then, the First Circuit has definitively removed it. In December, the First Circuit held: "[I]f a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), *there can be no spending* from sources not listed in that budget, *regardless of what any territorial laws say*." *Vázquez-Garced*, 945 F.3d at 8, *aff'g Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("a budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law … and inconsistent Commonwealth laws are preempted").[38]

73.     It is worth quoting, as the First Circuit did, this Court's "cogent explanation:"

> It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year. Since a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget. *A prior year authorization for spending that is not covered by the budget is inconsistent with PROMESA's declaration that the Oversight Board-certified budget for the fiscal year is in full force and effect, and is therefore preempted by that statutory provision by force of Section 4 of PROMESA.* Accordingly, the Fiscal Plan language regarding suspension of authority to approve off-budget reprogramming may well be superfluous, and in any event merely has the same effect as PROMESA's explicit provisions.

*Vázquez-Garced*, 945 F.3d at 8 (quoting *Rosselló Nevares*, 330 F. Supp. 3d 685, 704) (emphasis in original).

74.     This is just the latest in a series of decisions upholding the Oversight Board's

---

[38] Preemption does not effect a "taking" as Movants claim.  M.Br. at 39-40.  There can only be a taking if it is Movants' property.  It is not – the Enabling Act is just a conditional appropriation to PRIFA and has nothing to do with Movants' property. Even if there were a "taking" claim, such claim would be owned by *PRIFA*, not Movants.

position on preemption.  The First Circuit previously held, "[u]nder PROMESA's preemption

provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and

Budgets 'prevail over **any** general or specific provisions of territory law' … that are

'inconsistent….'" *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*

*Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019) (emphasis added) (citation omitted).

Similarly, this Court held in 2018 that "Congress' determination, in PROMESA, to empower the

Oversight Board to accept, reject, develop and certify budgets, and to render certified budgets

effective by operation of law, prevails over the general allocation of budgetary power to Puerto

Rico's legislature." *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*

*Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 365, 372 (D.P.R. 2018).

75.    Any Commonwealth statute purporting to allocate funds to PRIFA or its

Bondholders runs headlong into, and is thus preempted by, two core aspects of PROMESA.  *First*,

it is preempted by PROMESA Title II, because it purports to appropriate Commonwealth money

outside the certified fiscal plan and budget, thus conflicting with the Oversight Board's exclusive

appropriation powers.  *See* PROMESA §§ 201, 202.  *Second*, it is inconsistent with PROMESA

Title III because it purports to distribute funds outside a Title III plan.  PROMESA Title III

recognizes no priority claims other than administrative claims provided by Bankruptcy Code

section 507(a)(2).  *See* PROMESA § 301(a).  Movants would have the Court treat their claim like

a nondischargeable, specifically enforceable claim to the Rum Tax Remittances.

76.    The Oversight Board must determine whether Commonwealth revenues, including

Rum Tax Remittances, should go to PRIFA or teachers or police or some other public need or

expense.  The Enabling Act is a forward-looking budgetary appropriation in conflict with the

Oversight Board's powers under PROMESA sections 201 and 202 to certify fiscal plans and

provide for all budgetary allocations.  It appropriates a certain amount of the Rum Tax Remittances from the Treasury to PRIFA for each fiscal year up to 2056-57.  Neither the currently certified Commonwealth fiscal plan nor the current Commonwealth budget provide for payment of the claimed revenues to PRIFA.

77.     Fiscal plans for the Commonwealth and Commonwealth budgets from April 2017 through 2019 certified by the Oversight Board all require continued retention of certain Commonwealth revenues previously allocated to various instrumentalities (the "Allocable Revenues"), including the Rum Tax Remittances.  For instance, the May 9, 2019 Fiscal Plan requires the Commonwealth to retain Allocable Revenues to meet cash flow projections and fund required expenditures.  *2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity* (May 9, 2019) at 27, 148.

78.     If the Enabling Act's appropriation of money to PRIFA remains enforceable, then the Oversight Board's exclusive power to appropriate Commonwealth monies is meaningless.  It would completely frustrate Congress's intent that the Oversight Board allocate funds, balance the budget and "achieve fiscal responsibility and access to the capital markets". PROMESA § 101(a).  Accordingly, the Enabling Act and any Puerto Rico law providing for such transfer is preempted.  If, as Movants would have it, a prior statutory appropriation of money to PRIFA is nondischargeable, specifically enforceable, and immune to the Oversight Board's Title II and Title III powers, then creditors of Commonwealth instrumentalities like PRIFA are given priority over direct creditors of the Commonwealth.[39]  This clearly is not the result Congress intended in passing

---

[39] The caselaw on preemption is extensive and incontestable.  *See, e.g.*, *Perez v. Campbell*, 402 U.S. 637, 654 (1971) (state law providing bankrupt had to pay an automobile tort claim was preempted because it had the "effect of frustrating federal [bankruptcy] law"); *Ohio v. Kovacs*, 469 U.S. 274, 285-86 (1985) (O'Connor, concurring) (although the nature of a creditor's claim is determined under state law, the Code establishes the priorities of claims); *Int'l Shoe*

37

PROMESA and explicitly providing it "prevail[s] over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act."  PROMESA § 4.

79.     Movants' position that any appropriation in the Enabling Act is an immutable forever promise is nonsensical for the additional reason that any Commonwealth Legislature since 3 L.P.R.A. § 1914 was enacted in 1988 was, and will continue to be, fully empowered to repeal or amend the statute.[40]  There is no such thing as unrepealable legislation.  *See Fletcher v. Peck*, 6 Cranch 87, 10 U.S. 87, 135 (1810) (Marshall, J.) ("[O]ne legislature cannot abridge the powers of a succeeding legislature….The correctness of this principle, so far as respects general legislation, can never be controverted.").     As the First Circuit recently made clear in the ERS context, "legislative appropriations are the method by which the Commonwealth allocates the Employers' Contributions to the System.  Although required by section 2-116(g), this directive could be disregarded by a subsequent legislature (to the Bondholders' detriment)." *See Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 2020 U.S. App. LEXIS 2954, at *17-18, Case No. 19-1699 (1st Cir. Jan. 30, 2020) (citing *Fletcher v. Peck,* at 135).

---

*Co. v. Pinkus*, 278 U.S. 261, 266-67 (1929) ("States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations…."); *In re City of Detroit*, 504 B.R. 97, 161 (Bankr. E.D. Mich. 2013) ("[S]tate law cannot reorder the distributional priorities of the bankruptcy code."); *In re Chambers*, 500 B.R. 221, 229 (Bankr. N.D. Ga. 2013); *In re Kitty Hawk, Inc.*, 255 B.R. 428, 439 (Bankr. N.D. Tex. 2000) ("Where a state statute would alter the priority of claims in a bankruptcy case, the state statute is pre-empted by the Code."); *In re Lull Corp.*, 162 B.R. 234, 240 (Bankr. D. Minn. 1993) ("A state statute cannot reset bankruptcy priorities."); *In re Webster*, 126 B.R. 4, 5-6 (Bankr. D. Me. 1991) ("Congress may, and has, determined the extent of the [claim's] wage priority. Having done so, its determination is exclusive, notwithstanding the content of state enactments with which it may collide.").

[40] The federal excise tax law, for example, has been frequently amended.  *E.g.*, Revenue Act of 1951, Pub. L. No. 82-183, 65 Stat. 452 (1951); Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (1984); Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993); Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 106-170, 113 Stat. 1912 (1999).

80.     Thus, the Enabling Act either does not require any Rum Tax Remittances be deposited with PRIFA, or any such requirement is preempted.  This torpedoes Movants' case.

### C. The Commonwealth's Retention Powers Confirm Movants' Lack of Property Interest in the Rum Tax Remittances.

81.     Even when appropriated, Rum Tax Remittances remain subject to the Commonwealth's Retention Powers, which treat all monies in the TSA, including Rum Tax Remittances, as "available revenues" for the Commonwealth's use. 3 L.P.R.A. § 1914 (any appropriations "subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico").[41]  PRIFA has no authority to override the Retention Powers.  3 L.P.R.A. § 1907(a) (subjecting any pledge of Rum Tax Remittances "to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico"); *see also* 3 L.P.R.A. § 1906(m) (same).

82.     As "available revenues," the Commonwealth has equity in the Rum Tax Remittances.  They remain subject to the Commonwealth's continuing property interests even if appropriated to PRIFA in a given year.   This property interest is *superior* to the PRIFA Bondholders' interest because, when invoked, it entitles the Commonwealth to use the monies to pay the public debt before they may be applied to payment of the bonds.  *See* 3 L.P.R.A. § 1914. The Commonwealth is thus far from the "mere conduit" Movants claim.  If the Commonwealth were only a conduit, there would be no need for it to provide for appropriations of Rum Taxes

---

[41] Section 8 of Article VI provides that "[i]n case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. Art. VI, § 8.  In this context, it allows the Commonwealth to retain the Rum Tax Remittances if other "available revenues" "are insufficient to meet the [Commonwealth's] appropriations" in any fiscal year.

each year.  Indeed, it would have no power over the Rum Tax Remittances whatsoever.  That is clearly untrue.

83.     While the foregoing facts establish the Commonwealth's ongoing ownership interest in the Rum Taxes, so does the absence of facts negating it.  Where the Commonwealth intended to transfer ownership of funds, it deployed language to accomplish it.  When it created COFINA, Puerto Rico enacted statutes providing the sales and use taxes transferred to COFINA would not be "available resources" of the Commonwealth.[42]  Puerto Rico did not do that for the Rum Tax Remittances.  It did the opposite.  When it created COFINA, it did not provide the sales and use taxes would be subject to clawback pursuant to the Puerto Rico Constitution.  And even with this clear language, there were still doubts as to whether the Commonwealth transferred its property rights under the applicable statutes.  The PRIFA Enabling Act has none of this language.

84.     Movants' only response is that the Retention Powers have not been triggered because the Commonwealth has had sufficient "available resources" to meet appropriations in a particular fiscal year's budget.  Yet again Movants miss the mark.  Whether clawback has been triggered is immaterial.  The material fact is that the monies are subject to clawback as available revenues of the Commonwealth.  Besides, the reason Congress stepped in and enacted PROMESA was because the Commonwealth was in a fiscal emergency and the "available revenues" of the Commonwealth were insufficient to cover the Commonwealth's appropriations.  Were available

---

[42] 13 L.P.R.A. § 12 states a portion of the sales and use tax collected "shall be directly deposited in [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico…" 13 L.P.R.A. § 12.  Section 12 further emphasizes the Dedicated Sales Tax Fund, all the funds deposited therein on the effective date of the Enabling Act, and all future funds that must be deposited therein, "are hereby transferred to, and shall be the property of COFINA."  *Id.*

resources sufficient, the Commonwealth would not have needed to institute a Title III case to adjust

its debt.  And, indeed, the Commonwealth Plan does not provide for full payment of the GO debt.

85.    Finally, Movants argue even if the Retention Powers were triggered, the

Commonwealth is not using them to pay the public debt.  M.Br. at 42.  Movants' arguments assume

a pre-Title III world where the Commonwealth must pay its debts on a current basis.   Simply

because the Retained Rum Tax Remittances are not being applied to the public debt *now* does not

mean they will not be needed to pay off the public debt under a plan (where GOs will not be paid

in full).  In all likelihood, all the so-called diverted Allocable Revenues (and more) will be used to

pay the public debt under a plan over time.  But, again, this is Movant's frolic and detour.  The

key fact is the monies are, at the least, contingently subject to clawback as available revenues of

the Commonwealth.

### D.  The Trust Agreement Limits Movants' Lien to Monies Deposited in PRIFA's Sinking Fund.

86.    A security interest cannot be effective against the borrower in a bankruptcy case if

(1) the security interest does not cover the asserted collateral, or (2) the security interest was not

perfected.  *See* Bankruptcy Code § 544(a)(1); 19 L.P.R.A. § 2267(a)(2).  Here, neither the Enabling

Act nor any statute grants Movants a security interest in the Rum Tax Remittances, and the only

security interest Movants could have perfected is against the Sinking Fund.

87.    While the Enabling Act authorizes PRIFA to issue bonds and pledge PRIFA's

proceeds to payment of the bonds, the Enabling Act does not do so itself.  It repeatedly makes

clear any lien or security interest that PRIFA might grant would be "as provided in the trust

agreement." 3 L.P.R.A. §§ 1906, 1907, 1911.  Accordingly, while the Enabling Act provides the

outer scope of PRIFA's authority to pledge property, any security interest Movants may have exists

entirely by operation of the Trust Agreement, which sets the metes and bounds of any pledge. This is, of course, subject to the limitation that, PRIFA can only grant a security interest in property interests it owns (and, as shown above, it has no interest in the Retained Rum Tax Remittances).[43]

88.     The Trust Agreement provides that Bondholders' security interest, if any, is confined to Rum Tax Remittances deposited in PRIFA's Sinking Fund. Section 601 of the Trust Agreement – the clause granting a security interest – states: the "principal, interest and premium [on the Bonds], if any, are payable *solely* from the Pledged Revenues…." Trust Agreement § 601 (emphasis added). Pledged Revenues are defined as "…moneys that *have been deposited to the credit of the Sinking Fund*." Trust Agreement § 101 (emphasis added).

89.     Movants' argument that the definition of "Pledged Revenues" actually means *all* Rum Tax Remittances wherever held ignores the actual construction of the Trust Agreement. M.Br. at 8. It pledges "Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund." As written, "deposited to the credit of the Sinking Fund" modifies both "Special Tax Revenues" and "any other moneys," not just the latter.[44]  This interpretation is unequivocally confirmed by the Offering Statements.[45]  Any doubt as to the proper construction was resolved by the First Circuit, where, in affirming this Court, it observed:

> We start by rejecting the Bondholders' argument, as did the Title III court, that, in the Bond Resolution's definition of Employers' Contributions, the limiting clause "which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113" modifies only the

---

[43] *See* Uniform Commerical Code ("UCC") § 9-203.

[44] *See, e.g.*, *In re CRS Steam,* 217 B.R. 365, 373-74 (Bankr. D. Mass. 1998) (construing an antecedent clause to apply to both parts of a phrase because "[t]here are no commas or disjunctives separating the phrases here"); *Demko v. United States*, 44 Fed. Cl. 83, 89-90 (Fed. Cl. 1999) (same); *see also Thomas v. Comm'r of Soc. Sec.*, 294 F.3d 568, 572 (3d Cir. 2002), *rev'd sub nom.*, *Barnhart v. Thomas,* 540 U.S. 20 (2003) ("When a sentence sets out one or more specific items followed by 'any other' and a description, the specific items must fall within the description.").

[45] As mentioned above (*see* ¶ 38), the Offering Statements explain the extent of the "Pledged Revenues" and emphasize that its components are limited to amounts deposited to the Sinking Fund. It demonstrates that the phrase "deposited to the credit of the Sinking Fund" modifies both "Special Tax Revenues" and "any other moneys."

antecedent phrase "any assets in lieu thereof or derived thereunder" and not the other antecedent phrase "the contributions paid from and after the date hereof that are made by the Employers." The Supreme Court has held that "when several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (quoting *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)). That principle applies here, and the limiting clause here is applicable to both antecedent phrases. Such Employers' Contributions, and so the extent of the security interest granted by the Security Agreement, are limited to those contributions payable to the System pursuant to *Sections 2-116*, *3-105*, and *4113 of the Enabling Act*.

*Andalusian Glob.*, 2020 U.S. App. LEXIS 2954, at *14. Such construction is particularly relevant where, as here, the definition of Pledge Revenues uses the words "any other," which Miriam Webster defines as "in addition to the person or thing just mentioned,"[46] and which courts have defined to indicate that the former is a species of the latter.[47]

90.    Perhaps realizing their ill-conceived attempt to invoke the "last antecedent canon" only served to disprove their interpretation of "Pledged Revenues," Movants fall back on playing self-serving definitional games. They ascribe magical properties to the words "deposit" and "to the credit of" to argue that Rum Tax Remittances do not have to actually be *transferred* to PRIFA for their security interest to attach, it is sufficient that they are sitting in the TSA "to the credit of

---

[46] *Any other*, Merriam-Webster Online Dictionary (2019), https://www.merriam-webster.com/dictionary/any%20other (last visited February 2, 2020).

[47] In *Thomas v. Comm'r of Soc. Sec.*, the Third Circuit observed:

When a sentence sets out one or more specific items followed by "any other" and a description, the specific items must fall within the description. For example, it makes sense to say: "I have not seen a tiger or any other large cat" or "I have not read *Oliver Twist* or any other novel which Charles Dickens wrote." But it would make no sense to say, "I have not seen a tiger or any other bird" or "I have not read *Oliver Twist* or any other novel which Leo Tolstoy wrote."

294 F.3d 568, 572 (3d Cir. 2002), *rev'd sub nom. Barnhart*, 540 U.S. 20 (2003).

While the Supreme Court in *Barnhart* would overturn the Third Circuit's ruling on the basis of the last antecedent canon, the provision at issue contained commas whereas no commas separate "Special Tax Revenues" from "any other monies deposited to the credit of the Sinking Fund" in the definition of Pledged Revenues. The Third Circuit's reasoning in the case thus applies.

the [PRIFA] Infrastructure Fund." M.Br. at 9-10. Movants' interpretation of the phrase "to the

credit of" is unfounded and inconsistent with the use of that term elsewhere in the Trust

Agreement.

91.     As a preliminary matter, Movants improperly attempt to graft the phrase "deposit

to the credit of the Puerto Rico Infrastructure Fund" from the Trust Agreement onto the Enabling

Act to expand PRIFA's rights beyond what was granted in the Enabling Act. M.Br. ¶¶ 49–50. The

phrase nowhere appears in any of the relevant sections of the Enabling Act, and Movants cannot

rely on what PRIFA pledged or granted to its bondholders under the Trust Agreement—a contract

between PRIFA and its bondholders—to expand PRIFA's rights against the Commonwealth.

92.     Second, because bank accounts are a debt, the phrase "to the credit of" the depositor

refers to the accounting entry that the bank makes to establish its debt to the depositor.[48] Trust

Agreement section 401 confirms this interpretation: "moneys held *to the credit of* the Sinking Fund

shall be held in trust and disbursed by the Trustee for the purposes set forth below." Trust

Agreement § 401 (emphasis added). The Trustee cannot hold in trust or disburse funds that reside

in an account that lies beyond the Trustee's control. Section 401 provides a waterfall in which

PRIFA is required to "withdraw an amount of such Special Tax Revenues and other moneys to

make the following *deposits* in the following order: (a) *to the credit of* the Bond Service

Account…(b) *to the credit of* the Redemption Account…and (c)…*to the credit of* the Reserve

Account." *Id*. No one could credibly argue that the withdrawals and deposits under this provision

---

[48] Movants claim the phrase "to the credit of" allows their interest to travel up the chain beyond the Sinking Fund. M.Br.
at 23-24. But "to the credit of" merely reflects the fact that bank accounts are a debt. When a person, Jane Smith,
opens a bank account at Chase and deposits money, the bank makes accounting entries to her credit to reflect the bank's
debt to her. The bank does not incur that debt unless and until Jane actually deposits funds into the account. The same
is true of the Sinking Fund. PRIFA's pledge does not attach unless and until funds are actually deposited into the
Sinking Fund (*i.e.*, "to the credit of" the Sinking Fund).

44

could be accomplished if PRIFA merely *intended* for such funds to be deposited as opposed to *actually* withdrawing and depositing the funds into the accounts.  Moreover, section 502 requires the Trustee to invest "[m]oneys held *for the credit of* the Bond Service Account" (emphasis added); again, the Trustee cannot invest money that is not under its control and, as Movants argue, is in the General Fund.  Movants' self-serving definition of "to the credit of" would lead to absurd results and must be rejected.

93.     Moreover, the use of the word "deposited" is critical and limits the pledge to the Sinking Fund.  Movants do not contest that the funds must be "deposited" to be subject to the pledge.  M.Br. at 22 ("Neither the Trust Agreement nor any other applicable legal principle requires more than that the funds be 'deposited.'").  As demonstrated above, the use of the word "deposit" in the Trust Agreement refers to funds actually sitting in an account.  Hence, Rum Taxes deposited in the TSA are not "to the credit of the Sinking Fund," they are to the credit of the TSA (even under Movants' erroneous and distorted interpretation monies in the TSA would be to the credit of PRIFA and not the Sinking Fund).  Likewise, Rum Tax Remittances deposited in the PRIFA Infrastructure Fund are not "to the credit of the Sinking Fund," they are to the credit of the PRIFA Infrastructure Fund.  To be "deposited to the credit of the Sinking Fund," monies must be actually deposited in the Sinking Fund.  And because the Bonds "are payable *solely* from the Pledged Revenues," (Trust Agreement § 601 (emphasis added)) the monies need to be actually deposited in the Sinking Fund and under the control of the Trustee for the Trustee to make payments to the Bondholders.

94.     Movants also attempt to argue that under 3 L.P.R.A. § 1907(a) their security interest automatically attaches to Rum Tax Remittances regardless of delivery to PRIFA.  But Movants again misrepresent the statute's text.  Section 1907(a) provides that whatever pledge PRIFA

45

makes, the lien will attach "without the need of the physical delivery" to PRIFA. Whether or not

it had the authority, PRIFA did not make a pledge of monies outside the Sinking Fund. Nothing

in the Trust Agreement purports to pledge any funds that have not been deposited in PRIFA's

Sinking Fund. Section 1907(a) of the Enabling Act does not change the terms of the pledge itself.

Nor could it, as the Commonwealth, through the Enabling Act, does not itself pledge anything or

create a lien. Movants concede this, calling section 1907(a) a "statutory authorization." M.Br. at

33. As the First Circuit recently held, section 1906(m) is clear any lien "arises only when the

Authority chooses to grant it." *Peaje Invs.*, 899 F.3d at 12. PRIFA's actual pledge, which

controls, requires deposit in PRIFA's Sinking Fund before the pledge applies. Trust Agreement §

601.[49]  For these same reasons, the automatic perfection provisions of 3 L.P.R.A. § 1907 are

irrelevant because PRIFA cannot perfect an interest beyond what is pledged in the Trust

Agreement.

95.     Further emphasizing that the pledge to Bondholders, if any, is limited to the Sinking

Fund and does not travel up to the PRIFA Infrastructure Fund, is the fact that section 401 prohibits

PRIFA from granting a security interest to any party in the PRIFA Infrastructure Fund. Trust

Agreement § 401 ("The Authority **shall not** pledge or create any liens upon any moneys in the

[PRIFA] Infrastructure Fund.") (emphasis added).

96.     The case of *In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2010)

---

[49] Movants refer to their claimed super lien that expands beyond its contractual limits as a "consensual lien." M.Br. at 33-34. There is no such thing, and Movants cite no authority for the concept. *Cf. Peaje Invs. LLC*, 899 F. 3d at 10 (holding liens are divided into *only* "three mutually exclusive categories: judicial liens, statutory liens, and security interests"). Whatever a "consensual lien" might be, if it even exists, it is neither a "security interest" nor a "statutory lien." Nor did the Commonwealth "consent" to any lien. *See* 3 L.P.R.A. § 1910 ("The bonds issued by the Authority shall not constitute an indebtedness of the Commonwealth nor of any of its political subdivisions, and neither the Commonwealth nor any of its political subdivisions shall be liable therefor, and such bonds shall be payable solely out of those funds pledged for the payment thereof.").

provides a notable parallel. There, the debtor issued bonds secured by monies deposited in certain accounts. While the debtor had covenanted to transfer funds into the accounts, and the court held the debtor's breach of the covenant may have been a default, but the default did not render the lenders secured by the funds. As the court explained:

> An adroit and hardnosed bank lawyer would have insisted on a security interest in all revenues whenever acquired that would attach as soon as the debtor acquired the revenues, with no guaranties of payment to any other creditor. And he or she would have insisted on procedures within its control to maintain perfection at all times. But the Indenture cannot be read to mean what the bondholders wish they could have or should have negotiated; this court can read it only as it is written. And that means that no security interest attaches in any of LVMC's revenues until the earlier of: (i) possession or control of the revenues by the Trustee; or (ii) after payment of Operation and Maintenance Costs, with a balance remaining.

*Id.* at 339.

97.     The Trust Agreement is clear. Yet Movants maintain that their security interest reaches beyond the Sinking Fund through self-serving definitional games that infect their entire brief. They define "Pledged Rum Taxes" to encompass monies in the PRIFA Infrastructure Fund. M.Br. at 2, 9. But it is the Trust Agreement's definition of "Pledged Revenues" – "moneys that have been deposited to the credit of the Sinking Fund" – and not Movants' convenient definition – that controls. Trust Agreement § 101. Even if the Trust Agreement could be interpreted as Movants desire, it cannot expand PRIFA's property rights under the Enabling Act, which only provides PRIFA a property interest in Rum Tax Remittances actually appropriated and deposited in the PRIFA Infrastructure Fund.

### *E.  The Enabling Act Does Not Create a Trust for PRIFA's Benefit.*

98.     Unable to show a security interest flowing from the Enabling Act, Movants argue the Enabling Act somehow "create[s] a series of trust relationships in which [the Commonwealth] and PRIFA act as mere conduits for the transfer of the Pledged Rum Taxes." M.Br. ¶ 58. To

47

support their claim, Movants have to demonstrate the existence of a trust between (i) the Commonwealth as trustee and PRIFA as beneficiary, and (ii) between PRIFA as trustee and the Bondholders as beneficiaries.  Movants cannot establish the existence of such trust relationships.

99.    Under Puerto Rico law, for money to be held in valid trust, a public deed of trust is required to be executed.  *See* Trust Act, Puerto Rico Act 219-2012.[50]  This makes perfect sense, because otherwise, secret, springing trusts would render useless the Uniform Commercial Code by corralling property no one could know was in trust.[51]  Movants make no allegation that there is a public deed of trust for either the TSA or the PRIFA Infrastructure Fund.  To the contrary, Movants concede the Enabling Act does not use the word "trust" or any language indicative of a trust.  Nonetheless, Movants insist the Enabling Act somehow creates a trust, relying on *Columbia Falls*[52] and *In re Bologna*.[53]  Neither decision supports Movants' search for a trust.

100.    *Columbia Falls* is inapposite.  It was a pre-Uniform Commercial Code case and it involved a situation where the fund was created for a specific purpose and the collected monies were to be used solely for the payment of bonds.  *Id.* at 761–62.  It did not address whether a trust relationship exists where, as here, (i) the funds are not created for the specific purpose of repaying the bonds, or (ii) the monies in the fund are used for operations or general corporate purpose.  It further does not address whether monies that may be, but have not yet been, deposited into a special

---

[50] Prior to the Trusts Act, the Puerto Rico Civil Code provided that trusts should be created by public deed. *See* 31 L.P.R.A. § 2543. Under the Trusts Act, trusts can be created *only* through public deed or a last will and testament, see 32 L.P.R.A. § 3352, and "[e]very trust constituted in Puerto Rico must be recorded in the Special Trust Registry under penalty of nullity," id. § 3351d.

[51] *See supra* note 5.

[52] *In re City of Columbia Falls, Montana, Special Improvement District Number 25*, 143 B.R. 750 (Bankr. D. Mont. 1992).

[53] *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628 (Bankr. D. Mass. 1997).

fund are held in trust.[54]

101.    *In re Bologna* distinguishes express trusts from technical trusts.  An express trust "requires a declaration of trust and the intent to create a trust relationship with respect to a clearly defined res."  206 B.R. 628, 632.  Nothing in the Enabling Act purports to create a trust at the TSA or PRIFA Infrastructure Fund level.  Movants (whose entire argument regarding the existence of a trust is confined to paragraph 58) do not even attempt to make a *prima facie* showing of a "manifest written intent of the parties [] sufficient to find that a trust has been created."  M Br. ¶ 59.  Indeed, where the Commonwealth has attempted to create a trust relationship, it has done so explicitly.  Section 1923(b) of the Enabling Act itself, for example, creates a "special fund … ***to be held in trust***."  3 L.P.R.A. § 1923(b) (emphasis added).[55]  No equivalent language is used regarding the TSA or the PRIFA Infrastructure Fund.[56]

102.    A "technical trust" can be imposed by statute where "the statute (1) defines the trust res, (2) spells out the trustee's fiduciary duties, and (3) imposes a trust prior to and without reference to the wrong that created the debt."  *In re Bologna,* 206 B.R. at 632.  Movants do not

---

[54]  *Columbia Falls* may have been erroneously decided in any case, as the only citations it gave supporting the finding of a trust relationship were to opinions predating Article 9 of the Uniform Commercial Code with respect to perfection of interests in collateral.  *See Columbia Falls*, 143 B.R. at 762 (citing *State ex rel. Clark v. Bailey*, 99 Mont. 484, 44 P.2d 740 (1935), *State ex rel. Central Auxiliary Corp. v. Rorabeck*, 111 Mont. 320, 108 P.2d 601, 603 (1941), and *Blackford v. City of Libby*, 103 Mont. 272, 62 P.2d 216, 217–18 (1936) to support the finding of a trust relationship).

[55]  3 L.P.R.A. § 1923(b) provides in full : "A special fund is hereby created, which shall be a fund to be held in trust, denominated as the 'Infrastructure Financing Authority Special Economic Assistance Fund'. The special fund may consist of one or more bank accounts held in trust. The monies deposited in said Special Fund, including pledged revenues, shall be used by the Authority to (1) repay (A) the Transferred Debt, (B) Refinancing Bonds, (C) any Collateralized Debt Obligation, and (D) any other debt incurred by the Authority to refinance the Transferred Debt; and (2) any other purpose authorized by this chapter or § 31751a of Title 13."  Even this language, which is much stronger than what Movants rely on, is not free from doubt as to whether a trust was created.

[56]  Arguably, and with no need to get into this issue in this pleading, even the mention of a trust in a statute is insufficient to create a trust under Commonwealth law. As another example, when the Legislature created the Puerto Rico Children's Trust (the "Children's Trust"), the trust was constituted solely by force of its enabling act.  Article 4 of Act 173-1999 provides: "A public *trust fund* is hereby created, attached to the [Government Development Bank for Puerto Rico], which shall maintain said fund as fiduciary, apart from other public funds under its custody."

claim the Enabling Act satisfies these requirements, and there can be no argument that a "wrong created the debt." Significantly, the Enabling Act does not "spell out the trustee's fiduciary duties"—not as it relates to the Commonwealth and PRIFA, nor as it relates to PRIFA and the Bondholders. In fact, the Enabling Act does not even use the word "trust" or "fiduciary" in reference to the TSA or PRIFA Infrastructure Fund, and does not try to create such relationship. It also does not mandate the segregation of funds or identify the trust beneficiaries. This can be contrasted with the Trust Agreement's creation of a trust in the Sinking Fund, wherein the Trustee's duties and powers are expansively delineated.[57] Indeed, Trust Agreement section 801 provides "[t]he Trustee accepts and agrees to execute the trusts imposed upon it by this Agreement…. The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement…." For its agreement to execute the trusts, the Trustee is provided an indemnity (§ 802) and limitation on liabilities (§ 803). The utter lack of any equivalent provisions for PRIFA shows the parties did not manifest any intent to create a trust.

103.    Based on their misinterpretation of the Enabling Act, Movants argue the mandated transfer of Rum Tax Remittances from the Commonwealth to the PRIFA Infrastructure Fund (and then, pursuant to the Trust Agreement, to the Sinking Fund) creates a series of trusts. But Movants neither cite nor quote any statutes to make this argument, and it is wrong. As demonstrated above, *see supra* ¶ 33, all the applicable statutes provide for the conditional prepetition promise to transfer funds to PRIFA for its "corporate purposes." Instead of creating property interests in the Rum Tax

---

[57] *See*, *e.g.*, Trust Agreement §§ 401 (noting the Trustee holds the monies in the Sinking Fund "in trust"); 403 (specifying how the Trustee shall apply monies in the Sinking Fund to payment of the Bonds); 405 (designating any monies the Trustee withdraws from the Sinking Fund as "held in trust for the respective Holders of such Bonds); 501 (directing Trustee to hold monies in trust as security for the Bonds); 701 (providing the Trustee shall proceed with enforcement of remedies).

Remittances, the statutes merely "**authorize**" PRIFA to grant security interests in them. *Supra* ¶ 87. This does not create a trust: the First Circuit has specified that no trust can exist where no "specific restriction [is] placed upon [the debtor's] use of the supposed trust funds," and "[the debtor] was left free to use what it received for its own benefit rather than" hold it for the purported trust beneficiary. *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981) (holding that contracts and International Air Transport Association resolutions that specified the debtor was "in general terms" supposed to "hold whatever monies it collected in trust" for a creditor was ineffective to create a trust where the debtor retained the right to use the monies as it saw fit and was not required to keep the funds separate from others).[58] Accordingly, unappropriated Rum Tax Remittances which sit in the TSA, not segregated, and commingled with other revenues are far from a "clearly defined trust *res*." And, even if transferred to PRIFA (for its corporate purposes), they are commingled in the PRIFA Infrastructure Fund with other funds as required by 3 L.P.R.A. § 1914.

104.    To the extent Movants argue the Enabling Act can be interpreted to create a trust in their favor, such interpretation is belied by 3 L.P.R.A § 1910, which expressly absolves the Commonwealth from any liability for the Bonds. Movants effectively make the self-refuting

---

[58] *See also, e.g., LFD Operating, Inc. v Ames Dep't Stores Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 624 (Bankr. S.D.N.Y. 2002), *aff'd*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 F. App'x 900 (2d Cir. 2005) ("Therefore, the Court finds that Ames did not hold the Net Sales Proceeds in trust for LFD because Ames, at all relevant times, has commingled the Net Sales Proceeds and used the funds between settlement dates for purposes other than paying LFD, before making payment to LFD out of general funds provided by GECC."). Even the cases cited by Movants recognize the same and prohibit the finding of a trust here. *See, e.g., In re Tap, Inc.*, 52 B.R. 271, 276 (Bankr. D. Mass. 1985) (trust does not exist "where funds are collected from third parties and used at will by the defendant whose only responsibility is to pay when billed, or at some monthly or other non-immediate date, much the same as any other creditor"). *In re Bologna* at 632 does not help Movants' case (M.Br. ¶¶ 60): there, the statute involved monies (a security deposit) paid to the debtor by plaintiff, and specifically provided that "[a] security deposit shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the lessor, and shall not be subject to the claims of any creditor of the lessor or of the lessor's successor in interest." *In re Bologna*, 206 B.R. at 632. None of the statutes at issue here provide the same as in *Bologna*.

51

argument that the Commonwealth enacted a statute broadcasting it was not liable for PRIFA bonds, while, with a wink and nod, rendering its assets liable for PRIFA bonds.  This simply cannot be.

### F.  Movants Have No Claim to a Constructive or Resulting Trust, or an Equitable Lien.

105.     In a last-ditch effort to show some kind of secured interest in the Retained Rum Tax Remittances, Movants resort to inapplicable equitable remedies – either an equitable lien or an equitable trust – arising from the Enabling Act.  M.Br. at 27, 34-36.[59]  Movants' attempt to invoke equitable remedies to expand their rights beyond what they bargained for and, to the detriment of other claimholders, turns equity upside down.

106.     As an initial matter, Puerto Rico law does not recognize the existence of equitable liens.  In *Acevedo v. Solivellas & Co.,* 49 D.P.R. 633 (P.R. 1936), the Puerto Rico Supreme Court quoted the lower court's statement that "the doctrine of equitable liens invoked by the intervener is not in force in Puerto Rico. In Puerto Rico, just as in the State of Louisiana, no legal existence is recognized to implied liens, created by presumptions, such as equitable liens." *Id.* at 633 (citing, inter alia, *Estate of Romero v. Willoughby*, 10 D.P.R. 71 (P.R. 1906); *Ramis v. The Registrar*, 19 D.P.R. 747 (P.R. 1913)).[60]  Moreover, even if Puerto Rico law recognized equitable liens, it would

---

[59] It should be noted Movants cannot simultaneously be equitable owners of the Rum Tax Remittances and have a lien on them.  As this Court previously observed in granting the Oversight Board's motion to dismiss various bondholders' complaint (including PRIFA Bondholders): "[t]he existence of a trust is equally inconsistent with full, outright ownership because a trust divides ownership of property, placing legal title with trustee while the beneficiary enjoys an equitable interest."  *Assured Guar. Corp. v. Commonwealth of P.R.* (*In re Fin. Oversight & Mgmt. Bd. For P.R.*), 582 B.R. 579, 597 (D.P.R. 2018) (citing *U.S. Fid. & Guar. Co. v. Guzman,* 2012 WL 4790314, at *5 (D.P.R. Sept. 20, 2012)).  Put simply, "the assertion of a lien is inconsistent with the assertion of a title interest." *Id.* (citing *William W. Bierce, Ltd. v. Hutchins*, 205 U.S. 340 (1907)).

[60] Movants cite a more recent case from the District of Puerto Rico to argue that Puerto Rico law recognizes the existence of equitable liens. See *United States Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs., Inc.)*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005) (recognizing in passing that party moving for adequate protection was a beneficiary of an express trust arrangement, and, as a result, had an "equitable lien" in the trust res and was entitled to adequate protection). In *In re Maxon*, however, no party sought to have the bankruptcy court grant an equitable lien. Rather, the decision merely recognized (in the context of a dispute regarding adequate protection) that, under Puerto Rico law, the beneficiary of an express trust arrangement is the equitable beneficiary of a trust res (and used "equitable lien" to

be displaced by Article 9 of the UCC.[61]  Finally, equitable constructs are disfavored and rarely

granted in bankruptcy because they invariably overturn the statutory priorities.[62]

107.    More fundamentally, all the grounds on which Movants seek a constructive trust

are inapplicable.  They assert a "constructive trust or, in the alternative, a resulting trust" because,

they say, the Commonwealth is "unjustly enriched" by the Retained Rum Tax Remittances.  M.Br.

at 27-28.[63]    The Commonwealth cannot be "unjustly enriched" by the Retained Rum Tax

Remittances because they are retained pursuant to statute: PROMESA and the Enabling Act.  The

effect of a *statute* cannot create any equitable right because an equitable lien is a remedy to address

unfair transactions.  A statute, by definition, is never "unfair" because it represents the judgment

---

describe this interest). The case did not address the question of whether a bankruptcy court could impose an equitable
lien where a lien does not already exist from the express agreement of the parties.

[61] U.C.C. § 1-103, 19 L.P.R.A. § 402.  Puerto Rico adopted the Uniform Commercial Code in 1996.  The UCC does not
recognize equitable liens when the lender could have created a security interest under Article 9.  Allowing equitable
remedies between ordinary creditors and borrowers where the UCC provides a method of creating and perfecting a
security interest would undermine the UCC's public notice requirement. *See Uniroyal, Inc. v. Universal Tire & Auto
Supply Co.*, 557 F.2d at 22, 23 (1st Cir. 1977) (courts should not substitute an equitable rule where the UCC provides a
statutory method of perfecting a security interest).

[62] *See Hunter v. Bank of N.Y. (In re Anderson)*, 266 B.R. 128, 134 (Bankr. N.D. Ohio 2001) ("[E]quitable liens are not
favored in bankruptcy"); *Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*, 145 B.R. 719, 727 (Bankr. D. Mass. 1992)
("Business failures cause hardships that cannot and should not be rectified by the misapplication of equitable
principles permitting the imposition of constructive trusts and the creation of equitable liens. One of the fundamental
precepts of our bankruptcy laws is the even-handed treatment of similarly situated unsecured creditors."); *see also
Uniroyal*, 557 F.2d at 23 (1st Cir. 1997) ("Efforts by courts to fashion equitable solutions to mitigate the hardship on
particular creditors of literal application of statutory filing requirements would have the deleterious effect of
undermining the reliance which can be placed upon them. The harm would be more serious than the occasional
harshness resulting from strict enforcement."); *In re T. Brady Mech. Servs., Inc.*, 129 B.R. at 563 ("[I]n a bankruptcy
case, there is nothing equitable about taking money away from unsecured creditors and giving it to a creditor that
failed to protect its own interests when it had a chance to do so.").

[63] Movants' resulting trust theory must be rejected.  As the very case Movants' cite specifies, a resulting trust can only
apply where "a person **makes or causes to be made a disposition of property** under circumstances which raise an
inference that he does not intend that the person taking or holding the property should have the beneficial interest
therein." *Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 263 (1st Cir. 2004) (emphasis added).  Here, there
has been no disposition of property in which the transferor could intend to retain a beneficial interest—indeed,
Movants' entire complaint is that the Commonwealth has decided *not* to dispose of the Rum Tax Remittances but has
instead retained those funds.  No resulting trust can therefore exist.

53

of the legislative and executive branches of the state.[64]  Exercising rights and powers pursuant to statute cannot create the "wrongdoing," "breach of fiduciary duties," or "unjust enrichment" Movants must show for entitlement to an equitable trust.[65]  Indeed, Commonwealth law does not recognize a cause of action for unjust enrichment against the Commonwealth,[66] or where there is a contract that governs the dispute.  *See Puerto Rico Tel. Co. v. SprintCom, Inc*., 662 F.3d 74, 97 (1st Cir. 2011).

108.    At its core, Movants' grounds for an equitable trust rely on their misreading of the Enabling Act.  That misreading has already been addressed.  Nothing in the Enabling Act "raise[s] an inference that [the Commonwealth] does not intend that [it] should have the beneficial interest" in the Rum Tax Remittances.  *See* M.Br. at 28 (citing *Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 263 (1st Cir. 2004)).  As noted, the Enabling Act clearly allows for the Commonwealth to retain the Rum Tax Remittances.  The Commonwealth's Retention Powers make clear there was never any intent to deprive the Commonwealth of a beneficial interest in the Rum Tax Remittances.  And, where the Retention Powers are invoked, that interest is superior to any interest Movants' may have because the Enabling Act entitled the Commonwealth to use *all* the Retained Rum Tax Remittances *before* they are applied to payment of the bonds.  *See* 3

---

[64] *See Restatement (Third) of Restitution & Unjust Enrichment,* Part II, Chapter 2, Topic 3, Introductory Note (transfers made under "legal compulsion" are not appropriate for an equitable remedy unless the statute is mistakenly applied); *Atl. Coast Line R. Co. v. Florida*, 295 U.S. 301, 315 (1935) (Cardozo, J) (transfer made under "color of legal right" generally not subject to equitable remedy).

[65] None of Movants' constructive trust cases addressed a situation where, as here, the debtor was retaining funds pursuant to statute. This renders all Movants' cases inapplicable.

[66] Puerto Rico law is clear that equitable remedies such as unjust enrichment are not available against the government when affording such a remedy would undermine an important public policy of the Commonwealth embodied in statutory or constitutional law. *See, e.g.*, *Hatton v. Municipality de Ponce,* 134 D.P.R. 1001, 1010 (P.R. 1994) (holding that a medical equipment supplier could not recover as unjust enrichment the value of equipment delivered to a municipality where the purchase agreement violated a clear public policy embodied in rules governing municipal contracts).

L.P.R.A. § 1914 ("The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth…"). In addition to the Enabling Act, PROMESA allows for retention because it preempts any contrary statutory appropriation. Movants' contention that the Commonwealth "may not use or divert" (M.Br. at 29) the Rum Tax Remittances is wrong.[67]

109.    The same is true of Movants' arguments for an equitable lien.  Movants assert they must show the funds at issue "are earmarked for the purpose of paying a particular debt."  M.Br. at 34.  The Enabling Act does not earmark any funds for PRIFA Bondholders; it only authorizes PRIFA to do so.  PRIFA, for its part, earmarked "solely" those funds deposited in its Sinking Fund. Thus, Movants' lien, equitable or otherwise, cannot reach beyond the Sinking Fund.  Movants cannot use equitable lien principles to expand what was bargained for in the Trust Agreement. *Am. Fid. Fire Ins. Co. v. Construcciones Werl, Inc.*, 407 F. Supp. 164, 203 (D.V.I. 1975) ("[E]quitable lien principles cannot create vested rights … which are contrary to express and implied contractual undertakings.").

110.    Finally, even if there were grounds to create an "equitable lien," it would be (i) disallowable under section 502(d) as a lien avoidable under section 544(a) and (ii) subordinate to the Commonwealth's interest in the Rum Tax Remittances under 19 L.P.R.A. § 2267(a)(2). Equitable liens, by nature, are subject to and avoidable by a 'lien creditor', which, pursuant to Bankruptcy Code section 544(a) and 19 L.P.R.A. § 2212(a)(52), includes a trustee in bankruptcy. *See, e.g., McRoberts v. Transouth Fin. (In re Bell)*, 194 B.R. 192, 196 (Bankr. S.D. Ill. 1996)

---

[67] Movants' argument that the Rum Tax Remittances are somehow "restricted funds" (M.Br. at 25-26) is thus incorrect. While the Commonwealth has set out forward-looking appropriations, it can adjust or remove those appropriations at any time.  In any event, accounting earmarking, internal memos and transmittal information do not and cannot create property rights.

("equitable liens arising under state law are contrary to the letter and purpose of the Bankruptcy Code").[68]

111.    Nothing in the Enabling Act indicates to Bondholders that the Rum Tax Remittances will forever be available to them.  Even if it did, PROMESA preempts.  This was made clear in the Offering Statements, which note the Rum Tax Remittances are subject to the Commonwealth's Retention Powers, the Pledged Revenues were limited to the Sinking Fund, and are devoid of any reference to any Bondholder trust, constructive trust or equitable liens.

### G.  The Commonwealth's Retention of the Rum Tax Remittances Gives Rise to, at Most, a Dischargeable, Unsecured Claim in Favor of PRIFA.

112.    Even if the Enabling Act obligates the Commonwealth to transfer a portion of the Rum Tax Remittances to PRIFA, and if that purported obligation escapes PROMESA preemption – which, as explained, it cannot – the Commonwealth's alleged noncompliance would give PRIFA (and not its claimholders) at most a dischargeable unsecured claim.

113.    Here, the Commonwealth's appropriation of a portion of the Rum Tax Remittances to PRIFA is at most a conditional promise to pay PRIFA a certain sum of money.  *See Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (holding a promise to pay a debt from a particular fund does not create a contractual lien in the fund nor an equitable lien).

---

[68] *See also, e.g.,* W. Raushenbush, BROWN ON PERSONAL PROPERTY § 15.5 (3d ed. 1975) ("equitable pledges" are ineffective against lien creditors without knowledge of the interest).  Notably, any equitable lien Movants may hold would be unperfected as it was not granted by any of the statutes governing the Rum Taxes (which would have created a statutory lien, not an equitable lien) or granted by PRIFA (which would have granted a security interest, not equitable lien), and therefore would not be saved by the automatic perfection provision of 3 L.P.R.A. § 1907(a).  Such equitable liens would be unperfected and subject to avoidance under Bankruptcy Code section 544.

Noncompliance with a promise in a statute is tantamount to breach of contract, and would provide PRIFA (and not Movants) an unsecured claim at best.[69]

114.    Movants admit that such statutory provisions are equivalent to "covenants" in a "contract."  M.Br. at 36.  They point to 3 L.P.R.A. § 1913, which contains a covenant from the Commonwealth to Bondholders that the Commonwealth will not "limit or alter" PRIFA's rights.[70] Based on this language, Movants argue "[a]ny impairment or rescission of bondholders' rights to the Pledged Rum Taxes, including contractual rights, would be an unconstitutional 'taking' of this property right."  This argument fails on many levels.

115.    *First*, Movants ignore the most basic principle underlying all bankruptcy law – the equity policy.  Assume a debtor owes each of ten people $1,000 apiece, and the debtor's assets are $2,000.  If the debtor pays two people $1,000 apiece, they are paid in full while eight other people get zero.  Thus, it is easy to see the most equitable outcome arises from the debtor's breach of all ten debts so the debtor can pay each person $200.  Here, Movants insist they get paid in full, while all the Commonwealth's other creditors simply take larger losses.  Nothing could be more inequitable than Movants' position.

116.    *Second*, 3 L.P.R.A. § 1913 bars any action by the *Commonwealth* to limit or alter *PRIFA's rights*.  That section is no more powerful than a contract or statute requiring the

---

[69] *See, e.g., Kovacs,* 469 U.S. at 279 (1985) (holding that breach of statute and court order gave rise to dischargeable unsecured claim, and rejecting argument that breach should be treated differently because it "was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim" that was dischargeable in bankruptcy); *FCC v. NextWave Pers. Commc'ns Inc*., 537 U.S. 293, 302 (2003) (continuing right under statute to pay installment payments for FCC license is dischargeable unsecured claim); *Pennsylvania. Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552 (1990) (statutory criminal restitution obligation dischargeable as unsecured claim); *In re Berry Estates Inc.,* 49 B.R. 1002 (S.D.N.Y. 1985) (penalty for violating statute regarding rent limits dischargeable).

[70] 3 L.P.R.A. § 1913 provides, in relevant part, "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter . . . that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full . . . .".

57

Commonwealth to pay a debt or transfer property. Pursuant to the equity policy, the Commonwealth must reject or breach that obligation to be able to treat the universe of creditors fairly. Moreover, it is not really the Commonwealth that is repealing or amending the Enabling Act. Instead, the appropriation was preempted by PROMESA, a statute enacted by Congress.

117. *Third*, Movants acknowledge this is a "covenant" yet shift in the same sentence to asserting that breach of a covenant gives rise to a "taking" of property. But, for the reasons above, Movants cannot point to any "property" that has been taken. Contract rights do not entitle Movants to adequate protection, as it strictly pertains to the diminution in the value of property. To the extent Movants assert the "value" of their contractual right has diminished, all they have is an unsecured claim for that value. Notably, in a chapter 11 case, no one would think twice about the need to reject contracts – precisely to carry out the equity policy. That the obligations breached here are contracts and statutes, does not change the calculus. Congress expressly preempted the statutes because otherwise, the equity policy and rehabilitation would be frustrated.

118. Fourth, non-impairment clauses are a kind of "negative covenant." Breaches of a negative covenant, such as non-impairment and negative pledge clauses, do not create property rights in favor of Movants and cannot convert an unsecured claim into a secured claim. *See Knott v. Shepherdstown Mfg. Co.*, 5 S.E. 266 (W.Va. 1888) ("Of course [the agreement's negative pledge covenant] creates no lien on or pledge of any property. It is simply negative; an agreement not to do a particular thing. The creation of a lien is an affirmative act, and the intention to do such act cannot be implied from an express negative."); *see also* 2 Gilmore, Security Interests in Personal Property, note 31, § 38.3.[71]

---

[71] 2 Gilmore at 1017: "Negative pledges should not, it is submitted, be allowed to operate as informal or inchoate security arrangements, even against third parties with notice. ... The debtor's covenant not to encumber property…

## II.   SECTION 362(d)(2) DOES NOT APPLY BECAUSE THE COMMONWEALTH HAS EQUITY IN THE RUM TAX REMITTANCES AND THEY ARE NECESSARY TO THE PLAN OF ADJUSTMENT.

### A.   The Commonwealth Has Equity in the Rum Tax Remittances.

119.    Section 362(d)(2) allows relief from the stay if "the debtor does not have an equity in such property" *and* "such property is not necessary to an effective reorganization."  The Court need not reach these issues, because, as explained, the Commonwealth has the equity in the Rum Tax Remittances (*supra* ¶¶ 13, 82).  In any event, pursuant to the Court's January 31, 2020 Amended Case Management Order, [ECF No. 10595], we understand this topic is reserved for a second hearing if it becomes necessary.  For now, we simply point to Movants' admission in paragraph 29 of the Motion that pursuant to its public reports the Commonwealth has over $8.7 billion cash and the total amount of all retained Allocable Revenues is considerably smaller.

## III.   SECTION 362(d)(1) DOES NOT APPLY BECAUSE THE MOVANTS' INTERESTS, IF ANY, ARE "ADEQUATELY PROTECTED" AND THERE IS NO CAUSE TO LIFT THE STAY.

120.    To make a *prima facie* case for relief from the stay or adequate protection under Bankruptcy Code section 362(d)(1), Movants must show (1) a valid and perfected security interest; and (2) cause.[72]  Putting aside cause for a follow-up hearing, if necessary, for all the reasons above, Movants do not have a valid and perfected security interest in Commonwealth assets.

---

should be treated, as on the whole the case law has done, as a covenant 'merely personal'-good enough to give rights against the covenantor for breach, to bring an acceleration clause into play, to constitute an 'event of default' under a loan agreement, but not good enough to give rights, whether they be called legal or equitable, in property."); *In re Friese*, 28 B.R. 953, 955 (Bankr.D.Conn. 1983) (referring to *Knott*, concluding that a negative pledge agreement "does not create a security interest.").

[72]  *In re Jug End in Berkshires, Inc.*, 46 B.R. 892, 901 (Bankr. D. Mass. 1985) ("The moving creditor in a motion for relief from stay proceeding has the burden of establishing the validity and perfection of its security interests"); *Sonnax Indus., Inc. v. Tri Component Prod. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(d)(1) requires an initial showing of cause by the movant").

### A. *Movants Do Not Have a Security Interest in the Retained Rum Tax Remittances.*

121.    Even if Movants' could show PRIFA has a right to the Retained Rum Tax Remittances, Movants' security interest, if any, is limited to monies deposited in PRIFA's Sinking Fund.  *See supra* ¶¶ 86-96.  Without a security interest, Movants cannot seek relief for lack of adequate protection under section 362(d)(1).  *See e.g.*, *In re S. Ill. Railcar Co.*, 301 B.R. at 305 (denying motion for relief from stay on basis creditor failed to show it had a valid and perfected security interest).

122.    Movants argue Bankruptcy Code section 552(a) does not cut off their purported security interest because it arises only from a contract with PRIFA, not from the Commonwealth. M.Br. at 36.  That is *precisely the point*:  Movants' security interest does not reach Commonwealth funds because the Commonwealth never executed a single document creating a security interest in Movants' favor.[73]

123.    For section 552 to have any relevance, Movants would need to have a security interest in PRIFA's right to receive future revenues.  As explained above (*supra* ¶¶ 33-34), the Enabling Act only authorizes PRIFA to pledge revenues it actually *receives*, all as provided for the in Trust Agreement, and the Trust Agreement only pledges monies deposited in the Sinking Fund.  Moreover, PRIFA's "right to receive" Rum Tax Remittances was always conditional on the Commonwealth's appropriation, and such appropriation is now preempted by PROMESA.

---

[73] Under Article 9 a debtor can only grant security interests in its own property—not a third party's, such as the Commonwealth.  19 L.P.R.A. § 2233(b)(2) (debtor can only grant security interest in property the debtor "has rights in … or the power to transfer rights in").  The fact the Commonwealth never "entered into" a security agreement creating a lien in favor of Movants demonstrates no lien exists against the Commonwealth's property for section 552(a) to cut off.

124.     The fact Movants cannot have a security interest on an ongoing "stream" of future Revenues is also demonstrated by the recent First Circuit opinion relating to ERS bonds.  *See Andalusian Glob.*, 2020 U.S. App. LEXIS 2954.  On January 30, 2020, the First Circuit issued an opinion addressing ERS bondholders' claimed property interest in employer contributions previously to be made to the retirement system following the commencement of these Title III proceedings by the Commonwealth and other public corporations and instrumentalities, including the retirement system.  Such employer contributions were to be calculated based on a percentage of payroll and only payable after the public employees performed work for their employers. Employer contributions were allocated to the retirement system by legislative appropriations.  The First Circuit held that the retirement system did not have a property interest in future employer contributions as it only had "merely an expectancy,", that such contributions would be made.  *Id.* at *16. The court stated that any statutory requirement for the payment of employer contributions could be disregarded by a subsequent legislature.  Similarly, PRIFA (or Movants) had and have no property right in future Rum Tax Remittances, only an expectation.  The Rum Tax Remittances conditionally appropriated to PRIFA could be modified or eliminated by a subsequent legislature. *Id.* at *17-18.  Ironically, Movants themselves recognized that future Rum Taxes are a mere expectancy when they asserted there are a host of factors outside the Commonwealth's control, such as the level of production of rum on-island and repeal of the federal law remitting the monies to the Commonwealth, that could also impact future Rum Tax Remittances.  M.Br. ¶ 96.[74]  As a result, under no interpretation could Movants' have a security interest on any "stream" of future PRIFA revenues.

_____

[74] The First Circuit also observed "[i]t is also clear and our result is reinforced by the fact that language in the Bond Resolution and the Official Statement for the bonds explicitly contemplated that the payment of future Contributions

125.     To the extent Movants argue that they hold special revenue bonds, they are wrong. The Bonds are not secured by special revenues (as defined in Bankruptcy Code section 902) because the Rum Tax Remittances are not a special excise tax of the Commonwealth, but a mere appropriation from the United States.  Not only are the Rum Tax Remittances not derived from PRIFA's operations or the Commonwealth's operations, PRIFA is not even a Title III debtor and the Enabling Statute makes clear that any money the Commonwealth promised to send to PRIFA is dependent on appropriation from the United States.  As a result, section 928(a) of the Bankruptcy Code does not save Movants' security interest (if any) from being cut off by Bankruptcy Code section 552(a).

## IV.     *MOVANTS, AS CREDITORS OF A CREDITOR, LACK STANDING TO SEEK STAY RELIEF.*

126.     Movants are PRIFA Bondholders, insurers, and the Trustee.  M.Br. at 1.  They are in contractual privity with PRIFA, not the Commonwealth.  That appears to be common ground: "Movants' lien did not 'result from any security agreement entered into by the Commonwealth.' The lien arose based on the Trust Agreement, which is a contract between PRIFA and its Trustee on behalf of the bondholders…."  M.Br. at 36.  The Commonwealth is not a party to the Trust Agreement and the relevant statutes and documentation do not give rise to a debtor-creditor relationship between the Commonwealth and PRIFA Bondholders.  Whatever claims Movants might have against PRIFA, they do not have the right to seek stay relief vis-à-vis the Commonwealth.

---

was contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures."  *Andalusian Glob.*, 2020 U.S. App. LEXIS 2954, at *16.  Here the Offering Statements notified Bondholders that the continued flow of Rum Taxes was contingent on future federal government allocations.  *See supra* ¶ 32, 41.

127.    Movants do not dispute they are seeking to press PRIFA's alleged rights.  They repeatedly assert "PRIFA['s] ownership" rights.  *E.g.*, M.Br. at 9.  Without a "direct claim to" the Rum Tax Remittances, however, Movants "lack[] the direct interest necessary to establish prudential standing."[75]

128.    Party-in-interest standing under Bankruptcy Code section 1109(b) is confined to parties whose interests are directly (not indirectly or derivatively) affected by a Title III case.[76] Party-in-interest status does not include a creditor of a creditor of a debtor.  This reasoning is obvious – the creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what the other creditor is trying to do.

129.    Movants are too far removed from the debtor (the Commonwealth) to have standing to seek relief from the stay.  They are at most creditors of a creditor of the Commonwealth with no standing to assert a security interest against the Commonwealth.  Even if they claim to be an unsecured claimholder of the Commonwealth, only a secured claimholder may seek stay relief or seek adequate protection from the debtor.[77]  The sections of the Bankruptcy Code relating to stay

---

[75] *Bank of N.Y. Mellon v. Puerto Rico Sales Tax Fin. Corp. (COFINA) (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306 (D.P.R. 2017); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2002) (to have standing, a party's claims generally must be "premised on [their] own legal rights (as opposed to those of a third party)").

[76] Party-in-interest status under Bankruptcy Code § 1109(b) is a necessary prerequisite to bankruptcy standing.  *In re Tower Park Props., LLC*, 803 F.3d 450, 452 (9th Cir. 2015) (citing *In re Thorpe Insulation Co.*, 677 F.3d 869, 884 (9th Cir. 2012)).  "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).

[77] Unsecured claimholders do not have the right to adequate protection payments.  *In re S. Biotech, Inc.*, 37 B.R. 318, 324 (Bankr. M.D. Fla. 1983); *see also In re Babcock & Wilcox Co.*, 250 F.3d 955, 961 n.12 (5th Cir. 2001); *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 90-91 (2d Cir. 2003) (concluding that an unsecured claimholder was ineligible to receive adequate protection under section 361 of the Bankruptcy Code; rather, the adequate protection provision of section 361 only protects secured claimholders; *see also*, *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 19 B.R. 231, 234 (Bankr. S.D.N.Y. 1982) (emphasis added) ("A noncreditor of a debtor, even though owed a debt by a creditor of the debtor, does not have standing *to seek relief from the automatic stay* for the purpose of recovering on its claim.").

relief and adequate protection (§§ 361-364) are intended to protect secured claimholders of a debtor, not alleged secured claimholders of a creditor of a debtor. Movants are "not intended beneficiaries" of these sections of the Bankruptcy Code and therefore lack prudential standing.[78]

## **CONCLUSION**

For the reasons set forth herein, the Commonwealth respectfully submits the Motion be denied.

*[Remainder of page intentionally left blank.]*

---

[78] As articulated by the Second Circuit in *Comcoach*: "Support for this view is found in the Code's legislative history which suggests that, notwithstanding the use of the term 'party in interest', [sic] it is ***only creditors*** who may obtain relief from the automatic stay." *In re Comcoach Corp.*, 698 F.2d at 573–74 (citing H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 175, (1977)); *see also In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) (section 1109 was not "intended to waive other limitations on standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim.").

64

Dated: February 3, 2020
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Hermann D. Bauer* _____
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel S. Desatnik (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: brosen@proskauer.com
Email: ebarak@proskauer.com
Email: ddesatnik@proskauer.com

Michael A. Firestein (*pro hac vice*)
Lary Alan Rappaport (*pro hac vice*)
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 557-2900
Fax: (310) 557-2193
Email: mfirestein@proskauer.com
lrappaport@proskauer.com

*Attorneys for the Financial Oversight and*
*Management Board for Puerto Rico, as*
*representative of the Commonwealth of*
*Puerto Rico*

65

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all

CM/ECF participants in this case.

*/s/ Hermann D. Bauer*_____
Hermann D. Bauer
