

**BANCO
GUBERNAMENTAL
DE FOMENTO PARA
PUERTO RICO**

ESTADO LIBRE ASOCIADO DE PUERTO RICO

PO Box 42001
San Juan, PR 00940-2001
Teléfono (787) 722-2525

3 de enero de 2012

**A LA MANO**

Lcdo. Juan Acosta Reboyras
Acosta & Ramírez CSP Law Offices
Po Box 195492
San Juan, Puerto Rico 00919-5492
151 Calle Tetuán, Esquina San José
Viejo San Juan, Puerto Rico 00901

Estimado licenciado Acosta:

**Re: Acuerdo entre Destilería Serrallés, Inc. y el Gobierno de Puerto Rico**

Adjunto incluyo un original del Acuerdo con Serrallés con fecha del 31 de
diciembre de 2011, firmado por todas las partes con sus *exhibits*.

Atentamente,

Zulema E. Martínez Álvarez
Vicepresidenta *Senior* y
    Asesora Legal General

Anejo

received
1/4/2012

PUERTO RICO
LO HACE MEJOR

28028

EXECUTION VERSION

AGREEMENT

Between

DESTILERÍA SERRALLÉS, INC.

and

THE GOVERNMENT OF PUERTO RICO

Dated as of December 31, 2011

EXECUTION VERSION

## AGREEMENT

**THIS AGREEMENT** (this "Agreement"), dated as of the 31st day of December, 2011, is made by and among Destilería Serrallés, Inc. ("Serrallés") and the Government of Puerto Rico (the "Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico ("GDB"),as fiscal agent for the Government, the Executive Director of the Office of Management and Budget, and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO") as authorized by the Puerto Rico Tax Code as defined herein. The Government and Serrallés are collectively referred to as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, the Government is committed to promoting the growth, development and diversification of the economy of Puerto Rico ("Puerto Rico"); to promoting capital investment for the economic development of Puerto Rico; and to enhancing the business climate in Puerto Rico, all of which purposes and objectives are declared to be in the public interest; and

WHEREAS, since 1917, United States federal excise taxes on rum produced in Puerto Rico have been "covered-over" or transferred to Puerto Rico pursuant to Section 7652 of the U.S. Internal Revenue Code of 1986, as amended (the "Cover Over Revenues" as defined herein); and

WHEREAS, the Cover Over Revenues program was later extended to the United States Virgin Islands ("USVI"); and

WHEREAS, since 1999 the rate for the Cover Over Revenues has been set at $13.25 per proof gallon by periodic acts of Congress which have added $2.75 to the permanent cover over rate of $10.50 legislated in 1984; and

WHEREAS, in 2008 and 2009, the USVI entered into long-term agreements with two Serrallés competitors providing for significant incentives by using the Cover Over Revenues funds of the USVI (the "USVI Incentives"); and



WHEREAS, starting in 2012, this is expected to result in a significant competitive disadvantage for companies that produce their rum in Puerto Rico, including Serrallés, when compared to those USVI rum producers, as well as a significant decrease of over $135 million in Cover Over Revenues funds currently covered-over to Puerto Rico; and

WHEREAS, the Don Q brand is the leading rum brand consumed in Puerto Rico and Serrallés has produced high quality rums in Puerto Rico since 1865; and

WHEREAS, Serrallés and its Affiliates are one of the largest employer of the southern region of Puerto Rico; and

WHEREAS, Serrallés in the past five years has invested from its own funds over $50 Million in capital expenditures to upgrade its rum production facilities; and

EXECUTION VERSION

WHEREAS, Serrallés' rum production in Puerto Rico and ultimate sale in the United States has generated over $1 billion in the last 10 years and will generate in calendar year 2011 approximately $140 million in Cover Over Revenues to Puerto Rico; and

WHEREAS, the termination by Diageo of its supply contract with Serrallés and the subsequent USVI Incentives granted to Diageo, shall cause a substantial reduction in Serrallés rum production levels after year 2011; and

WHEREAS, Serrallés desires to recover as quickly as possible the rum production lost to the USVI; and

WHEREAS, Puerto Rico has used the Cover Over Revenues to fund infrastructure and public works programs, support expenditures of the central government, preserve and improve the environment by protecting certain vital ecosystems, support the development of the science and technology industry and promote the Puerto Rican rum industry through its Rums of Puerto Rico program ("ROPR") which is administered by PRIDCO; and

WHEREAS, the Government recognizes that the protection and promotion of the rum production industry in Puerto Rico will have a significant positive impact on the welfare of the community, including the potential for the creation of jobs in Puerto Rico, the protection and increase of Cover Over Revenues to the Puerto Rico treasury, the creation of additional economic opportunities and revenues for other Puerto Rico industries that will support and otherwise do business with Puerto Rico rum producers and therefore, the Government is desirous of supporting Serrallés' rum production operations in Puerto Rico; and

WHEREAS, the Government is entering into this Agreement with Serrallés in reasonable reliance upon the United States Congress ("Congress") longstanding commitment to assist Puerto Rico in attracting and protecting rum production in Puerto Rico through the availability of the rum Cover Over Revenues program; and

WHEREAS, the Government of Puerto Rico understands the importance of taking the steps necessary to maintain Puerto Rico as a competitive jurisdiction for the rum industry especially during the present difficult global economic conditions; and

WHEREAS, it is in the best interest of the Government and the people of Puerto Rico that the Government of Puerto Rico enter into this Agreement with Serrallés to assure the continuance of the benefits generated by the Cover Over Revenues program to Puerto Rico; and

WHEREAS, in order to maintain, promote and grow the production of rum by Serrallés in Puerto Rico and to protect the corresponding Cover Over Revenues, the Parties desire to enter into this long-term Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

2

EXECUTION VERSION

# ARTICLE I

## GENERAL PROVISIONS

### 1.1    Agreement Scope

Subject to the terms and conditions set forth herein, this Agreement shall become effective as of the date hereof, such date being hereinafter referred to as, the "Effective Date". This Agreement shall be recorded by the Government with the Office of the Comptroller of Puerto Rico, as required by Act No. 18 of October 30, 1975, as amended, within fifteen (15) days after the full execution hereof. The Agreement includes this document and any exhibits, attachments, schedules or appendices attached hereto or referenced herein all of which are hereby incorporated by reference. This Agreement shall constitute the valid and binding obligation of the Parties, enforceable against any party in accordance with its terms.

### 1.2    Government Obligations

In consideration of Serrallés' long-term commitment to maintain and expand its Rum production in Puerto Rico as set forth in this Agreement, including a commitment by Serrallés to produce exclusively in Puerto Rico all Rum to be sold in the United States by Serrallés or its Affiliates in which Serrallés holds a controlling interest in excess of fifty percent (50%), the Government agrees to fully perform its obligations as also set forth in this Agreement. Except for Section 4.1.3 (b) the Government shall not support any federal, Puerto Rico and/or municipal legislation, executive order, resolution, regulation, agreement, obligation, legal instrument, or other undertaking which materially impairs or limits the Government's ability to fully perform its obligations as set forth in this Agreement.

### 1.3    No Additional Cost to Serrallés

The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Serrallés be responsible for or be required to incur or pay or reimburse any cost, charge or expense under this Agreement relating to those obligations other than the direct expenses incurred by Serrallés in the negotiation and preparation of this Agreement and those expenses that this Agreement specifically identifies as a cost, charge or expense to be borne or paid by Serrallés.

### 1.4    Inducement



The Parties acknowledge that (a) the molasses, refurbishment, tax, production and marketing incentives granted by the Government hereunder constitute an important inducement for Serrallés to commit to produce Rum in Puerto Rico in the long term, (b) absent such molasses, refurbishment, tax, production and marketing incentives, due to the USVI Incentives, among other reasons, Serrallés would have serious competitive disadvantages in maintaining its Rum producing operations in Puerto Rico for sale in the United States, and (c) Serrallés' development and operation plans with respect to the production of Rum in Puerto Rico for sale in the United States rely on the continued availability of such incentives throughout the Term of

3

this Agreement. The Parties also acknowledge that Serrallés' commitment to produce Rum in Puerto Rico in accordance with the terms of this Agreement constitutes one of the main inducements for the Government to provide Serrallés with the molasses, refurbishment, tax, production and marketing incentives set forth in this Agreement.

### 1.5    Serrallés Obligations

In consideration of the Government granting the benefits and incentives to Serrallés under this Agreement, which consideration shall be acknowledged by Serrallés upon the full execution, adoption and filing of this Agreement by the Government, Serrallés agrees to obtain all necessary internal approvals prior to the execution of this Agreement and to fully perform its obligations as set forth in this Agreement. Serrallés shall not enter, and shall not cause or suffer its Affiliates to enter, into any contract, agreement, arrangement, undertaking or transaction that materially impairs or limits its ability to fully perform its obligations as set forth in this Agreement.

### ARTICLE II

### DEFINITIONS

### 2.1 Defined Terms

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Affiliate" shall mean with respect to Serrallés, (i) any entity which is controlled directly or indirectly by Serrallés, or which is under common control with Serrallés, or which controls Serrallés, or (ii) any entity on which Serrallés, directly or indirectly, owns at least thirty-three percent (33%) of the total common stock or voting equity interest of such entity, or (iii) any entity that owns, directly or indirectly, at least thirty-three percent (33%) of the total common stock or voting equity interest of Serrallés.

"Aggregate Minimum Rum Production Requirements" shall mean, with respect to any Fiscal Year, the sum of the Minimum Rum Branded Production Requirements and the Minimum Bulk Rum Production Requirements for that Fiscal Year.

"Aggregate Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of all taxable Rum sold in the United States during such Fiscal Year attributable to the total of Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales, as reported in the Monthly Cover Over Reports for such Fiscal Year.

"Agreement" shall have the meaning specified in the preamble of this Agreement.

"Branded Rum Products" shall mean all Rum produced at Serrallés' rum manufacturing operations in Puerto Rico for products ultimately to be sold to consumers in the United States under brand names owned or Licensed by Serrallés or its Affiliates, and shall be counted cumulatively toward the incentives provided in this Agreement for Serrallés Branded Rum Sales.

4

"Bulk Rum" shall mean all Rum, other than Branded Rum Products, that is produced in Serrallés' rum manufacturing operations in Puerto Rico and sold by Serrallés for resale to Persons (including Affiliates) ultimately to be sold to consumers in the United States in products under brand names that are not owned or Licensed by Serrallés or its Affiliates, and shall be counted cumulatively toward the incentives provided in this Agreement for Serrallés Bulk Rum Sales.

"Cover Over Rate" shall mean the dollar amount per proof gallon of the Rum excise tax that is returned or covered over by the U.S. Government to the Government pursuant to Section 7652 of the United States Internal Revenue Code of 1986, as amended, or any other statute or regulation which may substitute such Section in the future. As of the date hereof, the Cover Over Rate is $13.25 per proof gallon.

"Cover Over Revenues" shall mean the federal excise tax revenues payable to the Government by the U.S. Government pursuant to Section 7652(a) of the U.S. Internal Revenue Code of 1986, as amended, or any other statute or regulation which may substitute such Section in the future. For purposes of this Agreement, Cover Over Revenues are deemed to be "payable to the Government" in respect of a Fiscal Year when all Monthly Cover Over Reports in respect of such Fiscal Year have been submitted by TTB to the United States Department of the Interior and a copy of each has been received by the Puerto Rico Department of the Treasury, and shall be determined without regard to the actual timing of such payment by the U.S. Government. The Cover Over Revenues attributable to any relevant Rum sales during any Fiscal Year are determined by multiplying the number of proof gallons of relevant Rum sales by the applicable Cover Over Rate.

"Disbursement Agent" shall have the meaning specified in Section 3.2 hereof.

"Dispute" shall have the meaning specified in Section 8.3.1 hereof.

"Economic Development Incentives" shall mean those incentives provided by the Government to Serrallés in accordance with Sections 5.1 and 5.2 hereof.

"Effective Date" shall have the meaning specified in Section 1.1 hereof.

"Event of Force Majeure" shall mean any act that (a) materially and adversely affects the affected Party's ability to perform the relevant obligations under this Agreement or delays such affected Party's ability to do so, (b) is beyond the reasonable control of the affected Party, (c) is not due to the affected Party's fault or negligence and (d) could not be avoided, by the Party who suffers it, by the exercise of commercially reasonable efforts, including the expenditure of any reasonable sum of money and, subject to the satisfaction of the conditions set forth in (a) through (d) above, an "Event of Force Majeure" shall include: (i) natural phenomena, such as storms, floods, hurricanes and earthquakes; (ii) wars, civil disturbances, revolts, insurrections, terrorism, sabotage and threats of sabotage or terrorism; (iii) transportation disasters, whether by ocean, rail, land or air, (iv) strikes or other labor disputes that are not due to the breach of any labor agreement by the affected Party; (v) fires; and (vi) actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions) that were not voluntarily induced or promoted



by the affected Party, or brought about by the breach of its obligations under this Agreement or any Governmental Rule; provided, however, that under no circumstances shall an Event of Force Majeure include any of the following events: (A) economic hardship; (B) changes in market conditions; (C) any strike or labor dispute involving the employees of Serrallés or any Affiliate of Serrallés, other than industry or nationwide strikes or labor disputes; (D) ordinary weather conditions which could reasonably be managed by experienced contractors operating in the relevant location; (E) the occurrence of any manpower, material or equipment shortages; or (F) any delay, default, or failure (financial or otherwise) of the affected Party that is not the result of an event that would otherwise be an Event of Force Majeure; provided further, that upon the occurrence of any Event of Force Majeure, the affected Party shall promptly notify the unaffected Party and shall use commercially reasonable efforts to mitigate the effects thereof.

"Federal Adjustment" shall have the meaning specified in Section 4.6.2 hereof.

"Fiscal Year" shall mean the Government's fiscal year of July 1 through June 30.

"GDB" shall have the meaning specified in the preamble of this Agreement.

"Government" shall mean the government of the Commonwealth of Puerto Rico.

"Governmental Authority" shall mean any federal, Puerto Rico, commonwealth, state, municipal or local governmental entity, authority or agency, department, instrumentality, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) and any arbitrator to whom a dispute has been presented under Governmental Rule, pursuant to the terms of this Agreement or by agreement of the Parties.

"Governmental Function" means any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government or any of its instrumentalities is authorized or required to perform in its capacity as a Governmental Authority in accordance with Governmental Rules.

"Governmental Rule" shall mean any statute, law, treaty, rule, code, ordinance, regulation, permit, interpretation, certificate or order of any Governmental Authority, or any judgment, decision, decree, injunction, writ, order or like action of any court, arbitrator or other Governmental Authority.

"Historic Base Level" shall mean a Cover Over Rate of $10.50 per proof gallon.

"License" or "Licensed" shall mean or refer to the grant of permission by the brand owner (the "licensor") to a recipient (the "licensee") to use a brand of such licensor in the manufacture and distribution of Rum products under such licensor's brand.   A "License" shall also include a sub-license granted by a duly licensed licensee but shall not include an agreement limited to the production of Rum.

"Marketing Activities" shall have the meaning specified in Section 4.1.1 hereof.

EXECUTION VERSION

"Marketing and Production Support Payments" shall have the meaning specified in Section 4.1.3 hereof.

"Material Default" shall mean (a) in the case of Serrallés (i) if Serrallés fails to meet the Aggregate Minimum Rum Production Requirements by 10% or more in any Fiscal Year during the first five years of this Agreement and by five percent (5%) or more in any Fiscal Year during the remaining term of this Agreement, in each case, after the expiration of the twelve (12) month cure period as provided in Section 4.7.2 hereof, (ii) if Serrallés fails to rebuild its manufacturing plant and so re-commence production of rum therein, as provided in Section 4.8.1 hereof, (iii) if Serrallés provides a certification and sworn statement which is found to be intentionally false, misleading, altered or forged under Section 8.21.5 hereof, or (iv) if Serrallés provides a criminal proceedings certification that is not correct in its entirety or in any of its parts under Section 8.21.8 hereof; (b) in the case of the Government (i) if the Refurbishment and Production Initiative payments are not made to Serrallés as provided in Section 3.1 and 3.2 hereof; (ii) if the Marketing and Production Support Payments are not paid by the Government as provided in Section 4.1.3 hereof, (iii) if the Molasses Subsidy Payments are not paid by the Government as provided in Section 4.1.4 hereof, and  (iv) if the Government fails to provide  for the obligations or other commitments agreed upon in Section 6.3.3 hereof; and (c) in the case of any Party, the failure of such Party to perform any other material obligation imposed upon that Party by the Agreement not listed in (a) and (b) above (including but not limited to failure to make a payment when due), if such failure or breach is not cured within ninety (90) days following written notice from the non-breaching Party.

"Minimum Incentives" shall have the meaning specified in Section 4.1.3 (b) hereof,

"Minimum Branded Rum Production Requirements" for the first five (5) Fiscal Years commencing on July 1, 2010 shall mean the amount of proof gallons not less than those set forth in Exhibit D hereof, and thereafter, the minimum rum production requirements determined by Serrallés as provided in Section 4.7.1 hereof.

"Minimum Bulk Rum Production Requirements" for the first five (5) Fiscal Years commencing on July 1, 2010 shall mean the amount of proof gallons not less than those set forth in Exhibit D hereof, and thereafter, the minimum rum production requirements determined by Serrallés as provided in Section 4.7.1 hereof

"Molasses Subsidy Payments" shall have the meaning specified in Section 4.1.4 hereof.

"Monthly Cover Over Reports" shall mean the report of actual monthly collections of federal excise tax revenues pursuant to Section 7652 of the U.S. Internal Revenue Code, which report is prepared immediately following the end of such month by TTB, a copy of which is delivered to the Puerto Rico Department of the Treasury approximately forty-five (45) days after the end of such month and/or any successor report providing the same information.

"Party" or "Parties" shall have the meaning specified in the introduction to this Agreement.

EXECUTION VERSION

"Permit" or "Permits" means all consents, registrations, filings, licenses, permits, certificates, decrees, approvals, authorizations, qualifications, entitlements and orders of Governmental Authorities.

"Person" means any individual or entity (including any corporation, limited partnership, joint venture, limited liability company, estate, trust or other body).

"Pledged Cover Over Requirement" shall have the meaning specified in Section 4.6.1 hereof.

"PRIDCO" shall have the meaning specified in the preamble of this Agreement.

"Production Activities" shall have the meaning specified in Section 4.1.2 hereof.

"Project" shall mean the design, construction, ownership and operation of a sugar cane agricultural/industrial project and rum production facility in Puerto Rico as further described in Section 3.3. hereof, for the potential benefit of rum producers in Puerto Rico, including Serrallés.

"Puerto Rico" shall mean the Commonwealth of Puerto Rico.

"Puerto Rico Tax Code" shall mean Act No. 1 of January 31, 2011 known as the Puerto Rico Internal Revenue Code of 2011, as amended from time to time.

"Refurbishment and Production Initiatives" shall have the meaning specified in Section 3.1 hereof.

"ROPR" shall have the meaning specified in the Recitals hereof.

"Rum" shall mean alcohol distillate produced from sugar cane molasses, sugar cane juice, or other derivatives of sugar cane which complies with the requirement of Section 7652 of the U.S. Internal Revenue Code of 1986, as amended.

"Serrallés" shall have the meaning specified in the preamble of this Agreement.

"Serrallés Branded Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of Branded Rum Products subject to federal excise tax sold in the United States during such Fiscal Year and attributable to Serrallés' Rum manufacturing operations in Puerto Rico, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U.S. Government) for such Fiscal Year. Notwithstanding anything to the contrary, with respect to Rum sales from Branded Rum bottled in Puerto Rico, only those sales occurring on and after January 1, 2011 shall be deemed included in this definition.

"Serrallés Bulk Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of all Bulk Rum subject to federal excise tax sold in the United States during such Fiscal Year and attributable to Serrallés' Rum manufacturing operations in Puerto Rico, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U. S. Government) for such Fiscal Year. Notwithstanding anything

8

to the contrary, with respect to Rum sales from Bulk Rum bottled in Puerto Rico, only those sales occurring on and after January 1, 2011 shall be deemed included in this definition.

"Serrallés Rum Affiliate" shall mean any Affiliate of Serrallés engaged in activities related or ancillary to the production or distribution of Rum produced by Serrallés.

"Strategic Third-Party Branded Products" shall mean Bulk Rum produced by Serrallés in Puerto Rico to be sold under brands not owned or licensed by Serrallés or its Affiliates, which third-party brands are to the extent permitted under Puerto Rico Tax Code identified on their respective labels with the seal mentioned in Section 4.5 hereof for Branded Rum Products, and notified in writing by Serrallés to the Government as a Strategic Third Party Branded Product, and shall be counted cumulatively toward the incentives provided in this Agreement. Notwithstanding the foregoing, the qualification of Bulk Rum sold after June 30, 2012 pursuant to supply agreements executed by Serrallés prior to the Effective Date as Strategic Third-Party Branded Products shall be exempted from compliance with the seal requirement of Section 4.5 hereof, if such supply contracts do not grant Serrallés the authority to require the use of such a seal. In addition, Bulk Rum sold after June 30, 2012 as Strategic Third-Party Branded Products will be exempted from complying with the seal requirement of Section 4.5 until one hundred twenty days have elapsed from the date on which the seal was submitted to Serrallés for reproduction.

"Strategic Third-Party Branded Rum Sales" shall mean with respect to any Fiscal Year commencing on or after July 1, 2012, the aggregate number of proof gallons of Strategic Third-Party Branded Products sold in the United States and subject to federal excise tax during such Fiscal Year and attributable to Serrallés facilities in Puerto Rico, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U. S. Government) for such Fiscal Year.

"Strategic Third-Party Marketing Support Payments" shall mean those payments set forth in Section 4.1.3 (e) of this Agreement.

"Tax or Taxes" shall mean any form of tax, levy, impost, duty, surcharge, contribution, assessment or withholding in the nature of tax (including without limitation, income tax, capital tax, gross receipts tax, municipal license tax or volume of business tax (patente), excise tax, franchise tax, sales and use tax, value added tax, alternative minimum tax, land or, mortgage registration tax or fee, recording and filing fees, and real estate and personal property tax) imposed, collected or assessed by, or payable to, a Tax Authority and all interest, surcharges and penalties included in or related to any Tax.

"Tax Authority" shall mean any governmental body of Puerto Rico (including municipalities) competent to impose or collect or assess any tax in Puerto Rico.

"Tax Free" shall mean that the grants and incentives granted and paid to Serrallés by the Government as Refurbishment and Production Initiatives, Marketing and Production Support Payments, Molasses Subsidy Payments and Strategic Third Party Support Payments under Articles III and IV of this Agreement shall be totally exempt from the payment of any Taxes imposed by a Tax Authority.

EXECUTION VERSION

"Term" shall have the meaning set forth in Section 8.15 of this Agreement.

"TTB" shall mean the U.S. Alcohol and Tobacco Tax and Trade Bureau of the U.S. Department of Treasury.

"United States" shall mean the continental United States, Hawaii and Alaska.

"U.S. Government" shall mean the federal government of the United States of America.

"USVI Incentives" shall have the meaning specified in the Recitals.

## ARTICLE III

### INFRASTRUCTURE SUPPORT FOR REFURBISHMENT AND RUM PRODUCTION

### 3.1    Infrastructure Support

3.1.1   So long as the Cover Over Revenues are paid or transferred to Puerto Rico, and with respect to the Fiscal Year commencing on July 1, 2011, the Government agrees, after the satisfaction of the Pledged Cover Over Requirement for that Fiscal Year, to make capital improvements support payments to Serrallés to refurbish Serrallés' Rum producing facilities in Puerto Rico, as described in Exhibit A hereto (the "Refurbishment and Production Initiatives"). Such funds will be disbursed on a Tax Free basis by the Government to Serrallés. The Refurbishment and Production Initiatives payments will constitute non-shareholder capital contributions by the Government to Serrallés.

3.1.2   The total amount of Refurbishment and Production Initiatives due to be paid to Serrallés with respect to the Fiscal Year commencing July 1, 2011 shall be ten percent (10%) of the Cover Over Revenues attributable to Aggregate Rum Sales in that Fiscal Year, which amount shall be payable in full without any deduction, withholding or discount whatsoever and payable with respect to expenditures described in Exhibit A placed in service on or after July 1, 2011 by Serrallés or a Serrallés Rum Affiliate.

### 3.2    Disbursements of Incentives

The Refurbishment and Production Initiative payments will be disbursed by PRIDCO (the "Disbursement Agent") following the Effective Date, according to Section 3.1 and after Serrallés and/or Serrallés Rum Affiliates have incurred the expenses described in Exhibit A, which shall include capitalizable operating expenses directly related to such capital expenditures, and submits reasonable evidence and certifications to the Disbursement Agent of the equipment and materials ordered, capitalizable operating expenses incurred and/or the work performed to cover such approved refurbishment. Payment will be made by the Disbursement Agent to Serrallés within thirty (30) days of the submission of such evidence assuming the Pledged Cover Over Requirement has been met. Serrallés will have until June 30, 2019 to obtain full disbursement of these Incentives. Any incentives for Refurbishment and Production Initiatives that remain unused as of June 30, 2019 shall be returned to the Government.

10

### 3.3    Development of the Project

The parties hereto acknowledge their awareness of existing Government plans to develop the Project. The Government will use its reasonable best efforts to keep Serrallés informed of the development of the Project and may, at its sole discretion, request Serrallés' technical assistance with respect to the design, feaility or development of the Project. It is hereby agreed that Serrallés will decide at its sole discretion the extent to which it may be able to respond to each such assistance request. Any assistance provided by Serrallés for the Project will be without any cost or expense to the Government. It is agreed that Serrallés' intervention will be solely in an advisory capacity and any and all advice rendered shall not in any manner be held to produce any risk or liability for Serrallés vis-à-vis the Government.

### ARTICLE IV

### MARKETING AND PRODUCTION SUPPORT PAYMENTS

### 4.1    Marketing Activities; Production Activities; Marketing and Production Support Payments and Molasses Subsidy

#### 4.1.1    Marketing Activities

(a)    Serrallés shall use the Marketing and Production Support Payments to perform or cause its Affiliates to perform marketing activities, including, but not limited to, the marketing activities pre-approved by the Government which are specified in Exhibit B hereof (the "Marketing Activities").

(b)    Serrallés' Marketing Activities shall be in furtherance of its promotion of Serrallés' Rum products or any other third party Rum products or brands in the United States utilizing Bulk Rum produced by Serrallés in Puerto Rico for sale in the United States, and when advisable from a marketing standpoint, at Serrallés' sole discretion, for the promotion of "Puerto Rican Rums".

(c)    Serrallés shall annually report to the Government the content and effectiveness of the Marketing Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Serrallés to discuss the Marketing Activities and its progress in promoting Serrallés' Rum products or any other third party products or brands in the United States utilizing bulk Rum produced by Serrallés in Puerto Rico for sale in the United States.

#### 4.1.2    Production Activities

(a)    Serrallés shall use the Marketing and Production Support Payments and the Molasses Subsidy Payments to support and promote the continued production of Rum by Serrallés or any Serrallés Rum Affiliate in Puerto Rico (the "Production Activities").



EXECUTION VERSION

(b)     Serrallés' Production Activities shall be in furtherance of its production of Serrallés' Rum products or any other third party products or brands utilizing Rum produced by Serrallés in Puerto Rico for sale in the United States.

(c)     Serrallés shall annually report to the Government the content and effectiveness of the Production Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Serrallés to discuss the Production Activities and its progress in producing, supporting, and promoting Serrallés' Rum products or any other third party Rum products or brands utilizing Bulk Rum produced in Puerto Rico for sale in the United States.

### 4.1.3 Marketing and Production Support Payments

(a)     So long as the Cover Over Revenues are paid or transferred to the Government, from the Effective Date of this Agreement and during the Term of this Agreement, the Government agrees, to make marketing and production support payments (the "Marketing and Production Support Payments") to Serrallés, in the amounts obtained by multiplying the Cover Over Revenues attributable  to Aggregate Rum Sales for each Fiscal Year by ten  percent (10%), or such other higher percentage agreed upon as provided in this Agreement.  The Marketing and Production Support Payments to be paid to Serrallés, will be for each Fiscal Year covered by this Agreement beginning with the Fiscal Year commencing on July 1, 2010; provided, however, that the Marketing and Production Support Payments attributable to Fiscal Year 2010-2011 shall be paid as described in Section 4.6.1 hereof.

(b)     The Parties acknowledge that, notwithstanding the Refurbishment and Production Initiatives described in Section 3.1 and the Marketing and Production Support Payments described in Section 4.1.3 (a) above, the USVI Incentives are expected to result in a competitive disadvantage for Serrallés.  As a result, Serrallés and the Government agree to support joint efforts to promote legislation at the United States federal level to limit the direct and indirect assistance provided to companies producing Rum in Puerto Rico or USVI and selling it in the United States until June 30, 2012, provided that said support is reasonable and appropriate and such legal limits allow for the Government to provide Serrallés with, at least, 10% of the Cover Over Revenues attributable to Aggregate Rum Sales paid annually to be used for Marketing and Production Support Payments, and/or Refurbishment and Production Initiatives to Serrallés (the "Minimum Incentives").

(c)     Notwithstanding anything to the contrary set forth herein, if at any time during the term of this Agreement any Puerto Rico Rum producers or their affiliates (excluding Serrallés or the Serrallés Rum Affiliates) (i) are receiving Marketing and Production Support Payments or Strategic Third-Party Marketing Support Payments, or any similar type of incentives based on or paid out of Cover Over Revenues  for  bulk Rum sold under brand names not owned or licensed by such Puerto Rico Rum producers or their affiliates  greater as a percentage of Cover Over Revenues than those being received by Serrallés for Serrallés Bulk Rum Sales or Strategic Third-Party Branded Rum Product Sales, and (ii) those same Puerto Rico rum producers or their affiliates sell or enter into agreements to sell in the United States in any given Fiscal Year, in the aggregate, at least  200,000 proof gallons of Rum produced in their facilities in Puerto Rico to third parties for resale under brand names not owned or licensed by such Puerto Rico rum producers or their affiliates, as applicable, the Parties agree that this Agreement shall be amended



12

EXECUTION VERSION

so that Serrallés shall receive additional incentives to ensure that the incentives provided by the Government to Serrallés are equal on a per proof gallon basis in all respects with the incentives provided to such other Puerto Rico Rum producers (the "Additional Incentives") for so long as such conditions persist and for an additional period of six months after such conditions cease (the "Adjustment Period"). In addition, if the above described sales of or agreements to sell Bulk Rum by such other Puerto Rico Rum producer or their affiliates exceed 500,000 proof gallons in any given Fiscal Year, any Additional Incentives granted to Serrallés for the sale of Bulk Rum in the United States will become permanent throughout the remaining Term of this Agreement with respect to any Bulk Rum customer (including its affiliates)  that had a multiannual supply contract with Serrallés eligible for the Additional Incentives during the Adjustment Period.  The Government shall use its best efforts to promptly notify Serrallés upon gaining knowledge of the occurrence of the above described sales of Bulk Rum by such other producer.

(d)      The Government agrees to provide Serrallés with Marketing and Production Support Payments in the amounts obtained by multiplying the Aggregate Rum Sales by ten percent (10%). However, the Government agrees that, to the extent that, despite the Government's efforts, the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to any rum producer in the USVI after June 30, 2012, the Government will take the necessary action as contemplated in the Puerto Rico Tax Code so that commencing in the Fiscal Year starting July 1, 2012 it will:

(i) increase the Marketing and Production Support Payments that Serrallés receives on account of its Serrallés Branded Rum Sales, so that the same are equal to thirty-six percent (36%) of the Cover Over Revenues attributable to Serrallés Branded Rum Sales,

(ii) increase the Marketing and Production Support Payments that Serrallés receives on account of its Serrallés Bulk Rum Sales so that the same are equal to twenty-five percent (25%) of the Cover Over Revenues attributable to Serrallés Bulk Sales,

(iii) provide Strategic Third-Party Marketing Support Payments as provided in Section 4.1.3 (e) equal to eleven percent (11%) of the Cover Over Revenues Attributable to Strategic Third-Party Branded Rum Sales, and

(iv) make Molasses Subsidy Payments to Serrallés as provided in Section 4.1.4 hereof in an amount equal to ten percent (10%) of the Cover Over Revenues attributable to Serrralles Branded Rum Sales for such Fiscal Year.

(e)      Assuming that the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to any rum producer in the USVI after June 30, 2012 and  so long as the Cover Over Revenues are paid or transferred to the Government, for each Fiscal Year commencing July 1, 2012 and covered by this Agreement, Strategic Third-Party Support Payments shall be paid to Serrallés, in addition to the Marketing and Production Support Payments applicable to Bulk Rum, for the production of Strategic Third-Party Branded Products in an amount equal to 11% of the Cover Over Revenues attributable to Strategic Third-Party Branded Rum Product Sales for each Fiscal Year (the "Strategic Third-Party Marketing Support Payments"); provided, however, that 100% of such support payments shall be passed through Serrallés and/or its Affiliates to the owners of the respective third-party branded products (the "Pass-Through Requirement"). Compliance with the Pass-Through Requirement may be evidenced by any reasonable methodology that shows that the economic benefit of the incentive has been passed by Serrallés to the Bulk Rum client. This requirement shall not be interpreted as



13

EXECUTION VERSION

requiring that Serrallés pass to the Bulk Rum client any other incentives provided under this Agreement. Notwithstanding the foregoing, Serrallés shall be deemed to have passed-through the Strategic Third-Party Marketing Support Payments to a third party in accordance with this Agreement if the third party brand owner has contractually accepted that the eleven percent (11%) Strategic Third-Party Marketing Support Incentive granted under this Agreement has been passed through as part of the agreed to proof gallon unit price. Such Strategic Third Party Marketing Support Payments shall be in addition to, and shall not reduce, any incentives provided in this Article IV of this Agreement.

(f)    If federal legislation is passed that places a limit on the direct or indirect assistance from Cover Over Revenues provided to companies producing Rum in Puerto Rico and the USVI and selling it in the United States, and such limitation affects the incentives granted under this Agreement, the Parties agree to, within sixty (60) days from the signing into law of the new federal legislation, amend the Agreement accordingly, if necessary, to comply with such federal legislation to provide Serrallés with incentives which are consistent with such new limitations.

(g)    If following the Effective Date, other incentives are granted by the Government to any Serrallés competitor which result, in the aggregate, in a larger percentage of Cover Over Revenues or total economic incentives provided to said competitor than the percentage of the Cover Over Revenues provided to Serrallés under this Agreement with respect to Branded Rum Products , then additional benefits will be also granted to Serrallés, as necessary, without any further amendment to the Agreement, unless such competitors sell during each Fiscal Year in the United States less than ten percent (10%) of Serrallés proof gallons of rum produced in Puerto Rico for sale in the United States, in which case, the Government will disclose to Serrallés the terms and conditions of any such incentives at the request of Serrallés, as permitted by law. If, following the Effective Date, incentives to Serrallés competitors in the USVI (including through a percentage of Cover Over Revenues and total economic incentives) for Branded Rum Products are increased above forty seven point five percent (47.5%), the parties agree to negotiate in good faith and, if necessary, amend the terms of this Agreement to provide additional incentives to Serrallés for the production of Branded Rum Products. If, however, the Parties are not able to reach an agreement on the amount of such additional incentives within ninety (90) days, Serrallés shall have the right to request a final thirty (30) day negotiation period with the Government. If the Parties cannot reach an agreement during this final 30-day negotiation period, Serrallés shall have the right to terminate the Agreement.

### 4.1.4   Molasses Subsidy

Assuming that the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to any rum producer in the USVI after June 30, 2012 and so long as the Cover Over Revenues are paid or transferred to the Government, for Fiscal Years from July 1, 2012 and during the Term of this Agreement, the Government agrees to make molasses subsidy payments to Serrallés (the "Molasses Subsidy Payments") in the amounts obtained by multiplying the Cover Over Revenues attributable to Serrallés Branded Rum Sales for each Fiscal Year by ten percent (10%). The Molasses Subsidy Payments shall be used by Serrallés in the purchase of molasses to be utilized in Puerto Rico in the production of Rum in Puerto Rico.

14

EXECUTION VERSION

    **4.1.5** The foregoing provisions shall not give Serrallés any rights with respect to the Cover Over Revenues of the Government but the Government covenants that it will provide the Refurbishment and Production Initiative, Molasses Subsidy Payments, Marketing and Production Support Payments and Strategic Third-Party Marketing Support Payments set forth in this Agreement from any available sources of revenue, in its sole discretion.

    **4.1.6** If the Refurbishment and Production Initiative, Molasses Subsidy Payments, Marketing and Production Support Payments and Strategic Third-Party Marketing Support Payments are timely and properly made to Serrallés by the Government, PRIDCO or any other designated agency, and economic conditions in the United States improve as expected by Serrallés, then Serrallés expects to achieve, for each fiscal year covered by the initial 20-year term of the Agreement, the range of projections of Aggregate Rum Sales (in numbers of proof gallons) set forth in Exhibit C hereto. The Parties understand and agree that the immediately preceding sentence shall be deemed to be an indication of the anticipated normal business trajectory of Serrallés under facts currently known or anticipated, and shall not be deemed to be a legal commitment, representation, warranty, or guarantee of results except for the Minimum Bulk Rum Production Requirements and Minimum Branded Rum Production Requirements.

### 4.2     Marketing and Production Activities

    **4.2.1** Subject to the limitations in Sections 4.2.2 and 4.2.3, Serrallés shall be permitted to use any such Marketing and Production Support Payments to fund any and all Marketing Activities and Production Activities for its Rum products produced in Puerto Rico for sale in the United States market in any manner that is reasonably expected to promote or benefit Aggregate Rum Sales in the United States.

    **4.2.2** With respect to the Marketing and Production Support Payments, (i) any and all Marketing Activities and Production Activities funded with Marketing and Production Support Payments will be disbursed to Serrallés by the Government, PRIDCO or any other designated agency, and (ii) Serrallés shall file with the Government through PRIDCO or any other designated agency, an annual plan for the Marketing Activities for each Fiscal Year.

    **4.2.3** All advertisement (print, broadcast or other advertising) placed using the Marketing and Production Support Payments will be so placed through a media agency designated by the Government through PRIDCO or any other designated agency, which shall provide its services at competitive fees, including matching any fee by Serrallés' own U.S. advertising agency in compliance with Section 4.2.4 hereof. Serrallés by itself or through an independent third party shall have the right, at its own cost, to make periodic audits, but no more than twice a year, of Serrallés' media campaign placed by the agency designated by the Government.

    **4.2.4** Both parties agree to the following mechanism to replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Serrallés' own U.S. advertising agency or agencies, if Serrallés is not satisfied with, among other criteria, the services, efficiency or fees offered by the media agency designated by the Government:

(a)     Serrallés shall use, at its own cost, an outside media agency to audit the Government's designated media agency's performance based on its media purchasing power, measured by its costs per Total Gross Rating Points ("TGRP's");

(b)     Serrallés shall compare the Government's agency media plan, as if said plan were to be executed by its US agency, and assess for efficiencies;

(c)     Serrallés shall evaluate the Government's media agency turnaround performance and/or media placement to be within industry standards;

(d)     Serrallés shall notify the Government of its media agency deficiencies and the Government's media agency shall have  thirty (30) days to cure said deficiencies; and

(e)     If the Government's designated media agency fails to cure the deficiencies notified by Serrallés or continuously fails to comply with the considerations described in this Section 4.2.4, Serrallés shall notify the Government of its dissatisfaction with said media agency and the Government shall replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Serrallés' own U.S. advertising agency or agencies. Serrallés and the Government will work together to maximize media buying efficiencies for both parties.

### 4.3     Use of Serrallés' Image

Use of Serrallés' intellectual property (including, without limitation, proprietary names, logos, bottle shapes, etc.) by ROPR will require Serrallés' prior written approval, which may be withheld, in its sole discretion. The Parties agree that the marketing and advertisement of the Serrallés brand products shall be under the exclusive control of Serrallés.

### 4.4     Promotion of Serrallés' Rum Brands

Serrallés' Marketing Activities shall be in furtherance of its promotion of the Serrallés Branded Rum Products in the United States (or any other Rum products utilizing Bulk Rum produced by Serrallés in Puerto Rico for sale in the United States), and when advisable from a marketing viewpoint, it may also promote the "Rums of Puerto Rico" brand in the United States.

### 4.5     Labeling

The Government will develop a quality seal of approval, or other written reference to Puerto Rico that complies with the Puerto Rico Tax Code and that will be included by Serrallés on the back labels of the Branded Rum Products bottled with a minimum volume of two hundred milliliters made in Puerto Rico to promote Puerto Rico. In addition, those bottled Branded Rum Products which qualify as "Puerto Rican Rum" under Puerto Rico law will be identified as such on their front labels. The Government and Serrallés shall cooperate with each other to develop a seal that meets, in terms of size and design, the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Notwithstanding the foregoing, if the Government and Serrallés cannot agree on a seal within 180 days from the Effective Date, either Party may request the intervention of a mutually acceptable third party which will make a final decision as to the appropriate seal to be used by Serrallés for its Branded Rum Products and its



EXECUTION VERSION

Strategic Third-Party Branded Products taking into consideration the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Any seal implemented under this Section must meet any requirements imposed by law or the TTB.

## 4.6    Payment Procedure and Timing

**4.6.1**    Under Act No. 119 of July 8, 2006 and existing contractual obligations, the first $117 million of Cover Over Revenues received by the Government in each Fiscal Year through fiscal 2057 are pledged and have to be transferred to the Puerto Rico Financing Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Pledged Cover Over Requirement"). Each Fiscal Year, after the Government complies with the Pledged Cover Over Requirement, the Refurbishment and Production Initiatives,  the Marketing and Production Support Payments, the Strategic Third-Party Marketing Support Payments and the Molasses Subsidy Payments will be paid on a monthly basis as the Government receives and identifies the Cover Over Revenues attributable to the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales as further described below; provided, however, that (i) the Marketing and Production Support Payments relating to Cover Over Revenues for  Fiscal Year 2010-2011, will be paid to Serrallés on seven equal annual installments due on July 1 of each year commencing with July 1, 2012 and (ii) the Marketing and Production Support Payments relating to Cover Over Revenues for Fiscal Year 2011-2012 that have already been received by the Government as of the Effective Date shall be payable to Serrallés within sixty (60) days from the Effective Date assuming that the Pledged Cover Over Requirement for that Fiscal Year has been satisfied.

**4.6.2**    The Cover Over Revenues received by the Government are transferred monthly to the Puerto Rico Treasury Department by the TTB, based on the net Rum excise tax collected by the U.S. Government in the previous months. The Cover Over Revenues are transferred to the Government via the Automated Clearing House network with a two month lag. The Monthly Cover Over Reports often reflect adjustments to the Cover Over Revenues previously received by the Government in the current or prior Fiscal Years (the "Federal Adjustment").

**4.6.3**    Upon receipt of the Monthly Cover Over Report and other reports containing information on Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales from the U.S. Government or Serrallés, including reports filed by Serrallés with the U.S. Government and delivered to the Government by Serrallés, and receipt of the Cover Over Revenues, the Government shall cause the Refurbishment and Production Initiatives and the Marketing and Production Support Payments due to Serrallés from the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales to be disbursed to Serrallés within thirty (30) days of receipt of the Cover Over Revenues and the necessary corresponding reports described herein.

**4.6.4**    The Parties agree that:

(a)    Serrallés will submit monthly reports to the Puerto Rico Treasury Department with copies to PRIDCO and the GDB of the Serrallés Branded Rum Sales and the Serrallés Bulk Rum Sales and the federal excise taxes paid to the U. S. Government to facilitate the review and processing of the Refurbishment and Production Initiatives and the Marketing and Production Support Payments by the Government.

(b)      On September of each year, the Puerto Rico Treasury Department will prepare and submit to Serrallés a certified report on the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the prior Fiscal Year based on the Monthly Cover Over Reports or such other reports from the U.S. Government that contain information on such sales, in order to determine if, due to the Federal Adjustments, any true-up adjustments have to be made (upwards or downwards) on the Marketing and Production Support Payments, Strategic Third-Party Marketing Support Payments or Molasses Subsidy Payments, paid during the immediately preceding Fiscal Year. If the adjustment does not exceed five percent (5%) of the total incentives paid by the Government to Serrallés under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid by the Party which had received the excess funds on or prior to October 30 of such year. If the adjustment exceeds five percent (5%) of the total incentives paid by the Government to Serrallés under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid by the Party which had received the excess funds in three (3) equal end of the month installments in October, November and December of such year.

### 4.7      Minimum Rum Production Requirements

4.7.1   Provided that (i) the Cover Over Revenue determined in accordance with Section 7652(a) of the U.S. Internal Revenue Code (the "Cover Over Rate") is not reduced below its historic base level of US $10.50 per proof gallon with respect to Aggregate Rum Sales (the "Historic Base Level") or (ii) the incentives granted by the Government to Serrallés under Articles III, IV and V, as applicable, of this Agreement have not been materially reduced or made unavailable to Serrallés, Serrallés shall produce Branded Rum and Bulk Rum for sale in the United States in amounts not less than those set forth in Exhibit D to this Agreement for the first five (5) Fiscal Years commencing on July 1, 2010, unless the occurrence of an Event of Force Majeure prevents such production during the duration of such Event of Force Majeure. Thereafter, for each subsequent period of five (5) Fiscal Years, Serrallés shall determine its minimum production requirement for that period based upon the average of Branded Rum Sales and Bulk Rum Sales for the previous five (5) year period, subject to Serrallés' right to adjust the minimum production requirements by up to twenty five percent (25%) above or up to twenty percent (20%) below the average of Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the previous five (5) year period. The new five (5) year estimates shall be delivered by Serrallés to the Government within sixty (60) days after the beginning of such five (5) year period. For such five (5) year period, Serrallés shall produce Branded Rum and Bulk Rum in Puerto Rico for sale in the United States at least equal to the amounts so determined, unless the occurrence of an Event of Force Majeure prevents such production. Except as otherwise agreed in Section 4.7.3, any other changes in Minimum Branded Rum Production Requirements and Minimum Bulk Rum Production Requirements shall require the mutual agreement of the parties.

4.7.2   If at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months or the Economic Development Incentives granted under Article V by the Government to Serrallés are materially reduced or unavailable to Serrallés (other than as a result of Serrallés' failure to comply with any contractual or legal requirements) for a period greater than twelve (12) months, Serrallés shall not be obligated to make Aggregate Rum Sales and may terminate this Agreement with thirty (30) day prior written notice to the Government.

EXECUTION VERSION

**4.7.3** If Serrallés cannot perform the applicable Minimum Branded Rum Production Requirements or Minimum Bulk Rum Production Requirements by reason of any Event of Force Majeure, the Government will waive Serrallés' compliance with such minimum production requirements during the duration of the Event of Force Majeure. Upon the occurrence of a Event of Force Majeure, Serrallés shall promptly notify the Government and shall use commercially reasonable efforts to mitigate the effect thereof.

**4.7.4** Serrallés agrees that during the term of this Agreement, it will directly or indirectly through its Affiliates in which it holds a controlling interest in excess of fifty percent (50%), produce Rum for the United States market exclusively in Puerto Rico.

### 4.8 Further Obligations

**4.8.1** After the completion of construction and commencement of commercial operation of the Refurbishment and Production Initiatives, and following the occurrence of fire or other damage to the Serrallés' manufacturing plant resulting in a commercially significant reduction in the output of Rum that can be produced by Serrallés in Puerto Rico and that is caused by an event that is insurable at the time of the occurrence of the event at commercially reasonable rates, Serrallés agrees to rebuild its Rum manufacturing facilities in Puerto Rico and re-commence production of Rum therein as soon as reasonably possible after the occurrence of such event of loss at the levels of production required by this Agreement. If Serrallés fails to so rebuild its manufacturing plant and so re-commence production of Rum therein, such failure shall be a Material Default and the Government may terminate this Agreement subject to the termination remedies available to the Government under Section 7.2.1 hereof.

**4.8.2** Serrallés agrees to maintain commercially reasonable insurance against the property damage risks described in Section 4.8.1 above either as part of the global insurance program for the portfolio of facilities operated by Serrallés or on a stand-alone basis, at the discretion of Serrallés. The proceeds from any claim made on such insurance shall be available to Serrallés toward the satisfaction of its obligations under this Agreement.

### ARTICLE V

### ECONOMIC DEVELOPMENT INCENTIVES AND OBLIGATIONS

### 5.1 Economic Development Incentives; Tax Exemptions

Serrallés currently enjoys certain tax exemptions pursuant to the Tax Grant No. 07-135-I-31 (the "Tax Grant") issued under Act No. 135 of December 2, 1997, as amended ("Act 135"). Serrallés Environmental Technologies, Inc., a Serrallés Rum Affiliate, enjoys certain tax exemptions pursuant to the Tax Grant No. EI-09-(04-135-I-5)-B issued under Act No. 135 of December 2, 1997, as amended ("Act 135"). The Government agrees that nothing in this Agreement shall adversely affect the rights of Serrallés and Serrallés Environmental Technologies, Inc. to retain, enjoy and obtain the tax incentives and benefits described in these tax grants or under Law 135.

19

### 5.2   Tax Free Payments

All payments made by the Government to Serrallés as Refurbishment and Production Initiatives, Marketing and Production Support Payments, Strategic Third-Party Marketing Support Payments and Molasses Subsidy Payments, pursuant to Article III and Article IV hereof shall be in the nature of non-shareholder contributions and shall be disbursed Tax Free to Serrallés and not be subject to any tax, deduction or withholding on the part of the Government or its Tax Authorities. The Government hereby acknowledges that Serrallés will be entitled to receive such Tax Free treatment without the need for any formal application procedure by Serrallés. Other than the terms of this Article V, there shall be no additional conditions or requirements imposed upon Serrallés that could result in the suspension, revocation or reduction of such Tax Free treatment.

### 5.3   No Adverse Actions

The Government hereby agrees and covenants with Serrallés that, except as otherwise provided in this Agreement and to the extent permitted by law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Serrallés to lose any applicable Tax, exemptions or benefits granted to Serrallés pursuant to this Agreement or any extension thereto.

### 5.4   Effective Date of Tax Benefits

The effective date of the benefits described under Section 5.2 hereof shall be July 1, 2010.



## ARTICLE VI

## REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS

### 6.1   Representations, Warranties and Acknowledgements

**6.1.1**   The Government hereby represents and warrants to Serrallés as of the Effective Date that:

(a)   The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order or judgment;

(b)   The Government has: (i) the legal power, due authority and necessary and adequate funding ability to execute and deliver this Agreement, to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; and (ii) duly obtained such approvals, authorizations, or consents in accordance with applicable law and procedures to the extent that the approval, authorization, or consent of the federal or any other

EXECUTION VERSION

local government or agency or any third party to make the representations and perform its obligations contained herein is required;

(c)      The Government knows of no material impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder; and

(d)      There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out its obligations under this Agreement.

**6.1.2**   Serrallés hereby represents and warrants to the Government as of the Effective Date that:

(a)      Serrallés is a corporation duly organized and validly existing under the laws of Puerto Rico and has the corporate power and authority, and has taken all necessary action to authorize the execution and delivery this Agreement and to perform its obligations hereunder.

(b)      The execution, delivery and performance by Serrallés of this Agreement do not violate or conflict with, or result in a default under, any material contract or agreement to which Serrallés is bound or any of its organizational documents.

(c)      Assuming due authorization, execution and delivery of this Agreement by the Government, this Agreement is the legal, valid and binding obligation of Serrallés, enforceable against Serrallés in accordance with its terms, subject to the effects of bankruptcy or insolvency or laws affecting creditors' rights generally.

(d)      There are no actions, suits or proceedings pending or, to the best of Serrallés' knowledge, threatened against or affecting Serrallés before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of Serrallés to meet and carry out its obligations under this Agreement.

(e)      Neither Serrallés nor its Affiliates is involved in any material litigation, arbitration or claim against the Government.

**6.2**      [Intentionally left in blank]

**6.3**      Make-Whole Actions

**6.3.1**   The Government and Serrallés each assert that they enter into this Agreement based upon certain objectives and expectations, more specifically described below in this Section 6.3. The Government and Serrallés each further acknowledge and agree that it is not possible to predict, consider and provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, in order to preserve the basis upon which the Agreement is entered into by the Government and Serrallés, the Government and Serrallés each agree to the terms and conditions set forth in this Section 6.3.



**6.3.2** Each of Serrallés and the Government acknowledges and agrees that each has entered into this Agreement in material reliance on each and all of the obligations and commitments of the other party under this Agreement, as a package and without exception, with the reasonable expectation that each of them will receive all of the benefits of such obligations and commitments, including, in the case of the Government, without limitation, the Minimum Production Requirements, and including, in the case of Serrallés, without limitation, receipt of benefits in the form of the incentives described in Articles III, IV and V of this Agreement.

**6.3.3** The Government and Serrallés each further agree and acknowledge that it is not possible to predict, consider or provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, the Government represents, warrants and covenants to Serrallés that in the event of a change in local law, the imposition of any special, additional or new levy or Tax on Serrallés or any other act, event or circumstance (except the enactment of federal legislation affecting the amount of the Cover Over Revenues received by the Government), the result of which would be to diminish, impede, impair or prevent the full performance after the Effective Date of any or all of the obligations and commitments made by the Government under this Agreement, the Government, shall exercise its best efforts to, and to the extent permitted by law shall, provide Serrallés with another obligation or commitment reasonably acceptable to Serrallés and having economic effect equivalent to the commitment so lessened or removed. If the Government fails to provide such obligation or other commitment, such failure shall be a Material Default. In furtherance of the foregoing, in the event that Cover Over Revenues attributable to the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales are for any reason received by the Government but are not available to satisfy the Government's payment obligations to Serrallés hereunder, the Government agrees to fund such obligations from other sources of revenue, to the extent permitted by law.

**6.3.4** The Government agrees to use reasonable efforts to strenuously oppose any proposed legislation, initiative, act, event, plan or proposal which would otherwise have the effect of voiding or reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally necessary steps to defend the obligations and commitments contained herein.

**6.3.5** Serrallés acknowledges and agrees that the Government has entered into this Agreement in material reliance on each and all of the obligations and commitments of Serrallés under this Agreement, as a package and without exception, with the reasonable expectation that the Government will receive all the benefits contemplated to inure to it under the terms of this Agreement.

**6.3.6** The Government and Serrallés each acknowledge and agree that: (a) the objectives and expectations set forth in this Section 6.3 are reasonable; (b) the commitments and obligations set forth in this Section 6.3 are intended to be continuous throughout the duration of this Agreement and (c) that the terms and conditions set forth in this Section 6.3 are material to this Agreement and intended to be enforced to the maximum extent possible.



**6.4**     **Acknowledgements**

EXECUTION VERSION

The Government and Serrallés agree and acknowledge that:

6.4.1   Serrallés would face serious competitive disadvantages to produce Rum in Puerto Rico due to the USVI Incentives, without the obligations and commitments to be provided by the Government hereunder for the entire period for which such obligations and commitments are to be made available during the Term of this Agreement.

6.4.2   The Government would not have considered granting the benefits and exemptions to be provided to Serrallés under the terms of this Agreement without the obligations and commitments to be provided by Serrallés as set forth in this Agreement.

6.4.3   The Parties will exercise their best efforts and take all actions to fulfill and maintain the obligations and commitments that they have made for the specific period referenced herein.

6.4.4 This Agreement has been the subject of arm's length negotiations between Serrallés and the Government and it is the intent of the Parties that this Agreement constitutes an enforceable contract.

**6.5    Negative Covenants**

Without the prior written consent of Serrallés, the Government, to the extent permitted by law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to adversely affect, diminish or impair the beneficial use, operation, utility or the ability of Serrallés to beneficially use, occupy, obtain, receive or otherwise enjoy any of (i) the physical sites, facilities and improvements developed as a result of the Refurbishment and Production Initiatives and the Marketing and Production Support Payments, or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement.



**6.6    Maintenance and Audit of Records.**

6.6.1   During the term of this Agreement, Serrallés shall maintain accurate books, records and accounts of the Refurbishment and Production Initiatives, the Marketing Activities, the Production Activities, the Marketing and Production Support Payments, the Strategic Third-Party Marketing Support Payments and the Molasses Subsidy Payments granted by this Agreement in order to assist the Government in auditing the use of such incentives by Serrallés. The Government and Serrallés shall cooperate to create a record keeping program reasonably acceptable to both Parties.

6.6.2   When so requested, Serrallés will provide the Government with information directly related to the incentives and activities described in Section 6.6.1 above and supporting documentation. The Government shall have the right, upon reasonable request during the term of this Agreement, to cause an audit of the books, records, and accounts specifically maintained by Serrallés pursuant to Section 6.6.1 above, to be performed by the Puerto Rico Department of the Treasury, or other agency designated by the Government upon prior written notice to Serrallés. The Government shall be responsible for the costs of such audits and the out-of-pocket expenses

of Serrallés directly incurred in connection with such audit; provided, however, that if the results of such audit demonstrate that Serrallés has materially failed to comply with the terms of this Section 6.6, Serrallés shall be responsible for the costs of such audit.

**6.6.3**  In the event of any discrepancy between the Government and Serrallés with respect to the result of any audit under this Section 6.6, any Party may seek to resolve such discrepancy as provided in Section 8.3 hereof.

## ARTICLE VII

## TERMINATION REMEDIES

### 7.1    Termination

The Agreement may be terminated prior to expiration of the Term upon the occurrence of any of the following events:

**7.1.1**  By Serrallles, upon failure by the Government to file the Agreement with the Office of the Comptroller of Puerto Rico, as required by Act No.18 of October 30, 1975, as amended, within fifteen (15) days after the full execution hereof; or

**7.1.2**  By the non defaulting Party, upon any Material Default by the other Party (beyond any applicable cure period set forth in the definition of Material Default); or

**7.1.3**  By Serrallés, if following the Effective Date of the Agreement, (i) the Cover Over Revenues program is terminated; (ii) the incentives payments to Serrallés are reduced below the amounts required to be paid according to Articles III and IV of this Agreement; (iii) if at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months as provided in Section 4.7.2 hereof, or (iv) the Economic Development Incentives currently enjoyed by Serrallés under the Tax Grant and Act 135 as provided in Section 5.1 hereof, and the Tax Free treatment provided under Section 5.2 hereof, are materially reduced or unavailable to Serrallés (other than as a result of Serrallés' failure to comply with any contractual or legal requirements) for a period greater than twelve (12) months as provided in Section 4.7.2. In any of the abovementioned events in this Section 7.1.3, Serrallés will be entitled to retain any incentives already paid by the Government under this Agreement.

### 7.2    Remedies

The parties shall have the following remedies under the Agreement:

**7.2.1** Upon a Material Default by Serrallés, the Government will be entitled to terminate the Agreement, and/or to reduce prospectively, at its sole option, the incentives granted under Articles III and IV of this Agreement. The foregoing remedies shall be the sole and exclusive remedies of the Government in the event of a Material Default by Serrallés. Notwithstanding the above, if the Material Default consists of a reduction in the Aggregate Minimum Production Requirement below the allowable percentage cushions included in the definition of "Material Default" herein, instead the following remedies shall apply after the expiration of the applicable, twelve (12) month cure period,

24

EXECUTION VERSION

(i) if the reduction is of one percent (1%) to twenty percent (20%) of the Aggregate Minimum Production Requirement, the Government will be entitled to deduct five percent (5%) of the total the incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default;

(ii) if the reduction is of twenty percent (20%) or more but less than thirty percent (30%) of the Aggregate Minimum Production Requirement, the Government will be entitled to deduct seven and one half percent (7.5%) of the total incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default;

(iii) if the reduction is of thirty percent (30%) or more but less than fifty percent (50%) of the Aggregate Minimum Production Requirement, the Government will be entitled to deduct ten percent (10%) of the total incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default; or

(iv) if the reduction is of fifty percent (50%) or more of the Aggregate Minimum Production Requirement, the Government will be entitled to terminate the Agreement and/or to deduct 15 percent (15%) of the total incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default. In case of termination, Serrallés will be entitled to keep all incentives received up to the date of termination and will also be entititled to receive the incentives accrued but unpaid up to the date of termination after application of the liquidated damages provided under this Section.



The Parties recognize that the incentives payable to Serrallés under Article III and IV will be automatically reduced as a direct consequence of any reduction in the production of rum in Puerto Rico for sale in the United States. The above remedies will be Serrallés maximum exposure under the Agreement.

7.2.2   Upon a Material Default by the Government, Serrallés may seek specific performance of this Agreement to the extent permitted by law, and/or termination of the Agreement. In case of said termination, Serrallés will be entitled to keep all incentives received up to the date of termination and will also be entititled to receive the full amount of any such incentives with respect to that fiscal year which remain unpaid. Serrallés may not terminate this Agreement for any default other than a Material Default. The foregoing remedies shall be the sole and exclusive remedies of Serrallés in the event of a Material Default by the Government

7.2.3   The Parties expressly agree and recognize that, with respect to a breach on their part of certain of the covenants, agreements, representations, warranties or commitments contained herein, that the non defaulting Party may not be fairly or adequately compensated by any legal remedy in an action for monetary damages. Therefore, the Parties agree that upon a breach of this Agreement by a Party, the non-defaulting Party, in accordance with the dispute resolution procedures set forth in Section 8.3 hereof, may seek the specific performance of any of the covenants, agreements, representations, warranties or commitments of the defaulting Party contained herein or may be awarded damages for failure of performance or breach of any representation or warranty, or both, on the part of the defaulting Party, to the extent permitted by this Agreement and applicable law and subject to the express remedy limitations of Section 7.2.1

EXECUTION VERSION

and Section 7.2.2 hereof. Except as set forth in Section 7.2.1 and Section 7.2.2, no action taken by such Party pursuant to the provisions of this Section 7.2.3 or pursuant to the provisions of any other Section of this Agreement shall be deemed to constitute an election of remedies, and all remedies set forth in this Agreement shall be cumulative and non-exclusive of any other remedy either set forth herein or available to a Party at law or in equity.

**7.2.4**  No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

### ARTICLE VIII

### MISCELLANEOUS

**8.1**    **Counterparts**

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

**8.2**    **Governing Law**

The governing law of this Agreement shall be the law of Puerto Rico. The Government hereby waives any right, forum, defense or limitation based upon it sovereign immunity for purposes of any action for breach of its obligations under this Agreement.

**8.3**    **Dispute Resolution**

**8.3.1**  Mutual Discussions. Except as otherwise provided in this Section 8.3, if a dispute or difference of any kind whatsoever shall arise among the Parties in connection with, relating to or arising out of this Agreement (each, a "Dispute"), one of such Parties shall notify the other of such Dispute. The Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. If a settlement of any such Dispute or difference is not reached pursuant to this Section 8.3.1 within 60 days after such notice of Dispute is delivered, then the provisions of Section 8.3.2 hereof shall apply. The parties intend to cooperate in implementing Section 8.3.1; however, either Party may (i) decline to participate in negotiations pursuant to Section 8.3.1 or (ii) withdraw from negotiations at any time upon written notice to the other, and in either case, may institute mediation proceedings pursuant to Section 8.3.2.

**8.3.2**  Mediation. If a settlement of any such Dispute or difference is not reached pursuant to Section 8.3.1, the Parties agree to submit the matter to mediation. Mediation shall take place at a time and place agreed by the Parties before a single neutral mediator approved by both Parties. Following a proposal to mediate, either Party may initiate, at any time prior to or following the beginning of the mediation process, arbitration proceedings pursuant to Section 8.3.3 of this Agreement. If a Party intends to be accompanied by an attorney at a meeting in the



context of negotiations or mediation, at least three (3) working days' notice of such intention shall be given to the other Party and the other Party may also be accompanied by an attorney. All discussions and exchanges of information pursuant to negotiation and mediation under Sections 8.3.1 and 8.3.2 are confidential and may not be used in the context of arbitration proceedings or in a court-of-law unless otherwise lawfully discoverable. The Parties intend to cooperate in implementing Sections 8.3.1 and 8.3.2; however, either Party may withdraw at any time upon written notice to the other from mediation under this Section 8.3.2 and may institute arbitration proceedings pursuant to Section 8.3.3.

8.3.3   Arbitration. If a Dispute cannot be settled pursuant to Section 8.3.1 and 8.3.2 above, or if either Party has declined to participate in or has withdrawn from mediation, such Dispute shall be determined by arbitration administered by the American Arbitration Association ("AAA"). The number of arbitrators shall be three. Within thirty (30) days of delivery of the request for arbitration, each party shall appoint one (1) arbitrator, and the two arbitrators appointed by the parties shall mutually select a third arbitrator. If the two Party-appointed arbitrators do not reach an agreement on the appointment of a third arbitrator who shall serve as the chairman of the tribunal within fifteen (15) days of their appointment, the AAA shall appoint the third arbitrator. The arbitration award shall be reasoned and in accordance with Puerto Rico law and the terms of this Agreement including without limitation those provided in Section 7.2.1 and 7.2.2 hereof. Judgment upon any award(s) rendered by the arbitrators may be entered in any court having jurisdiction thereof. Nothing in this Agreement shall prevent Serrallés or the Government from seeking provisional measures from any court of competent jurisdiction, and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. The fees of the mediator shall be shared 50/50 by the Parties. Each Party shall be responsible for the fees of the arbitrator it appointed, and the fees of the third arbitrator shall be shared 50/50 by the Parties.

8.3.4   Continued Performance. The Parties shall continue to perform their respective obligations under this Agreement during the existence of any Dispute under this Agreement or the pendency of any mediation or arbitration.

8.3.5   Commercial Acts. The Parties each agree that the execution, delivery and performance of this Agreement constitute private and commercial acts rather than public or governmental acts.

8.4   Rules of interpretation

In this Agreement, unless the context otherwise requires, headings are for convenience only and do not affect the interpretation of this Agreement; a reference to an Exhibit, Article or Section is a reference to that Exhibit to, or Article or Section of, this Agreement; a reference to a document includes any amendment or supplement to, or replacement or novation of, that document; a reference to the singular includes the plural and vice versa: the words "include," "includes," and "including" mean include, includes, and including "without limitation" and "without limitation by specification," and any list or series following any such term is: (a) not exhaustive and (b) not meant to be limited to elements or items of the same or similar kind; and the words "hereof", "herein" and "hereunder", or "thereof", "therein" and "thereunder" and words of similar import when used shall refer to this Agreement or any other agreement as a whole and not to any particular provision.



27

EXECUTION VERSION

### 8.5   Construction

This Agreement shall not be construed more strictly against one Party than against any other Party merely by virtue of the fact that the Agreement may have been prepared by counsel for one of the Parties, it being recognized that all Parties have contributed substantially and materially to the preparation of this Agreement.

### 8.6   Conflicts

For purposes of the interpretation, enforcement, and performance of this Agreement, all statutes, codes, ordinances, rules and regulations in effect in Puerto Rico as of the date hereof shall be deemed to continue in effect in their current form during the entire Term of this Agreement, except as may otherwise be agreed to by Serrallés in writing and except to the extent of amendments mandated by Government or federal requirements. Notwithstanding the foregoing, if any statute, code, ordinance, rule or regulation is hereafter adopted, amended or interpreted so as to be less restrictive upon Serrallés than is currently the case, then at the option of Serrallés, such less restrictive amendment or interpretation shall control and become applicable without the requirement of an amendment to this Agreement.

### 8.7   Severability

In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect and for any reason whatsoever, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. In the event any such provision is held to be invalid, illegal or unenforceable, the Parties hereto shall make their best efforts to agree on a provision in substitution for such invalid, illegal or unenforceable provision that is as near in economic benefit as possible to the provision found to be invalid, illegal or unenforceable.



### 8.8   Notices

All communications and notices expressly provided for herein shall be sent, by registered first class mail, postage prepaid, by an internationally recognized overnight courier for delivery on the following business day or by telecopy (with such telecopy to be confirmed promptly in writing sent by mail or overnight courier as aforesaid), as follows:

GOVERNMENT OF
PUERTO RICO:

Secretary
Department of the Treasury
P. O. Box 90140
San Juan, PR, 00902-4140
Intendente Ramírez Bldg.,
Stop 1 #10 Paseo Covadonga
San Juan, PR 00902-4140
Telephone: 787-722-2121, 787-723-4344
Telefax: 787-725-7303

28

Secretary
Department of Economic Development and
Commerce
P. O. Box 362350
San Juan, PR, 00936-2350
#355 F. D. Roosevelt Ave.
Fomento Industrial Bldg.,
Suite 401, San Juan, PR 00918
Telephone: 787-758-4747, 787-765-2900
Telefax: 787-753-4094; 787-753-6874

Secretary
Department of Agriculture
P. O. Box 10163 24 San Juan, PR, 00908-1163
1309 Fernandez Juncos Ave.,
San Juan, PR 00908
Telephone: 787-721-2120, 787-722-0871
Telefax: 787-723-8512

President
Government Development Bank of Puerto Rico
P. O. Box 42001
San Juan, PR, 00940-2001
José de Diego Ave., Stop 22
Centro Gubernamental R. Sánchez Vilella
Santurce, PR 00940-2001
Telephone: 787-722-2525
Telefax: 787-721-1443

Executive Director
Office of Management and Budget
PO Box 9023228
San Juan, P.R., 00902-3228
Calle Cruz 254
San Juan, Puerto Rico
Telephone: 787-725-9420
Telefax: 787-722-0299

Executive Director
Puerto Rico Industrial Development Company
P. O. Box 362350
SAN JUAN, PR, 00936-2350
355 Ave. F.D. Roosevelt
Fomento Industrial Bldg., Suite 404
Hato Rey, PR, 00940
Telephone: 787-758-4747, 787-754-9481
Telefax: 787-764-1415

EXECUTION VERSION

WITH A COPY TO:

Attorney General
Puerto Rico Department of Justice
P. O. Box 909192
San Juan, PR, 00907
Olimpo St. and corner of Lindbergh, Stop11
San Juan, 00902-0192
Telephone: 787-721-2900
Telefax: 787-724-4770

O'Neill & Borges
American International Plaza
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Tel: 787-764-8181 Fax: 787-753-8944
Attention: Managing Partner

SERRALLÉS:

Destilería Serrallés, Inc.
P. O. Box 198
Mercedita, Puerto Rico 00715
Telephone: 787-840-1000
Telefax: 787-651-8010
Attention: President – Félix J. Serrallés, Jr.

WITH COPIES TO:

Destilería Serrallés, Inc.
P. O. Box 198
Mercedita, Puerto Rico 00715
Attention: Jorge A. Vázquez, Treasurer
And
Alberto J. Torruella, Executive Vice President

or to such other address as the receiving Party shall have most recently forwarded to the sending Party pursuant to the provisions of this Section 8.8.

8.9    **Press Communications**

The Parties shall agree on the form and forum on how to communicate the execution of this Agreement and the mutual long-term commitment to Puerto Rico. The Parties agree to cooperate fully with each other in connection with all communications-related activities (i.e., public relations, media relations, press releases, news conferences, media advisories, news organizations, etc.) concerning this Agreement and the transactions contemplated hereunder.

8.10    **Assignments**

This Agreement is not assignable by the Government in whole or in part except where Serrallés consents, in its sole discretion, to such assignment in writing. Serrallés shall have the right at any time to assign all its rights and obligations, or any part thereof, in and to this Agreement, or any part thereof, to any Affiliate of Serrallés that agrees to assume the



assigned obligations of Serrallés in and to this Agreement or applicable portion thereof; provided, however, that proof of the ability of such Affiliate to fulfill any assigned obligations shall be provided to the Government as part of the advance notice by Serrallés. The Government may object to such assignment if it reasonably appears that the Affiliate of Serrallés lacks such ability. Serrallés shall provide the Government at least sixty (60) days advance written notice of its intention to assign this Agreement. The Government shall receive a copy of the written agreement of the Affiliate of Serrallés to agree to assume all assigned obligations and shall acknowledge, to the Government its ability to fulfill such obligations.

### 8.11    No Third Party Beneficiary

This Agreement is for the sole and exclusive benefit of the Government and Serrallés and, if applicable, any permitted successors, transferees or assigns thereof. No other persons or entities are intended third party beneficiaries of this Agreement, including, without limitation, any third parties that may, from time to time, have ownership, security or other interests in any real or personal property associated with the Refurbishment and Production Initiatives, nor shall such third parties have any rights to enforce any of the provisions of this Agreement.

### 8.12    Contractual Relationship

None of the commitments or other obligations, agreements or provisions contained in this Agreement shall or shall be deemed to give the Government the right or power to exercise control over the affairs or management of Serrallés or any of its Affiliates, the Refurbishment and Production Initiatives, or any part thereof. The relationship between the Government and Serrallés is, and at all times shall remain, contractual. No commitment or other obligation, agreement or provision of this Agreement, nor any agreement executed pursuant hereto, is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest between or among the Government and Serrallés or to create any equity interest in Serrallés for the Government. Notwithstanding any other provision of this Agreement or agreement executed pursuant hereto, the Government is not and shall not be construed as a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Serrallés, its stockholders, members, or partners.

### 8.13    Further Assurances

The Government and Serrallés agree to do all things and take all actions required, necessary or appropriate to carry out the terms of this Agreement and the implementation of the Parties' intent as reflected by the terms of this Agreement. Such things and actions include, but are not limited to, the obtaining, negotiation, execution and delivery of all necessary or desirable agreements, filings, consents, authorizations, approvals, licenses or deeds. Without limiting the generality of the foregoing, the Parties agree: (a) to take all actions, without exception, which are necessary and appropriate at any time to assure the binding effect, legality and enforceability of their respective obligations and commitments hereunder and (b) not to take any action which would affect adversely in any way whatsoever the binding effect, legality and enforceability of their respective obligations and commitments hereunder.

EXECUTION VERSION

**8.14    Survival of Representations and Warranties**

The representations, warranties and covenants made by each of the Parties hereto and contained herein shall survive the performance of any obligations to which such representations, warranties and covenants relate.

**8.15    Term of Agreement**

The term of this Agreement (the "Term") shall commence on the Effective Date and continue in effect until the last day of the twentieth (20th) full Fiscal Year after the Effective Date unless earlier terminated pursuant to Sections 7.1 and 7.2. Upon expiration or termination of this Agreement, Serrallés shall retain, at no additional cost, the full amount of all payments disbursed by the Government to Serrallés under this Agreement for Refurbishment and Production Initiatives and for Marketing and Production Support Payments. Notwithstanding the foregoing, after the expiration or termination of this Agreement, the Parties will remain obligated to each other for the return of any excess funds received as a result of a Federal Adjustment. Payment of such funds will be due and payable immediately upon demand.

**8.16    Binding Effect**

This Agreement and all terms, provisions and obligations set forth herein shall be binding upon and shall inure to the benefit of the Government and Serrallés and their respective successors and assigns.

**8.17    Waivers**

Waiver of any of the obligations of a Party set forth in this Agreement may only be effected, in writing, by the other Party hereto. No delay or omission to exercise any right or power by any Party shall be construed to be a waiver. In the event any provision is waived by a Party, such waiver shall not be deemed to waive any other provision.

**8.18    Entire Agreement**

This Agreement is the entire agreement and supersedes all prior and collateral communications and agreements of the Parties relating to the subject matter.

**8.19    Amendments**

This Agreement may be amended only by a written modification duly executed by the Parties' authorized representatives.

**8.20    Compliance with Laws**

The Parties shall comply in a reasonable and substantial manner with all applicable provisions of the laws of the United States and Puerto Rico and all their applicable rules and regulations.

EXECUTION VERSION

**8.21     Government Contract Clauses**

**8.21.1  (Intentionally left blank)**

**8.21.2 No Payments or Gratuities.** Neither Serrallés nor any of its officers, directors or employees have made any payment, gift or anything of value to any Government employee or official to obtain a favorable evaluation or the execution of this Agreement. If there occurs a violation of this Section 8.21.2, in addition to any other remedies available to the Government, the Government shall be entitled to recover any payments made or gratuities given. No fee or gratuity will be paid to any Government employee or official in connection with this Agreement (except to attorneys and consultants engaged to advise Serrallés) to meet the requirements of the Agreement.

**8.21.3 Conflicts of Interest.** Serrallés hereby certifies that neither Serrallés nor any of its directors, officers, members, partners or employees have any interest nor shall they acquire any interest, directly or indirectly, in cases or issues which may conflict in any manner with its performance under this Agreement. To the best knowledge of Serrallés (i) no public official or employee of the Government has participated in any decision relating to this Agreement which affects such official's or employee's personal interest or the interest of any entity or business in which such officer or employee or any member of his family has or has had an economic interest, directly or indirectly, and (ii) no official or employee of the Government has any interest, direct or indirect, in this Agreement or any proceeds thereof. Serrallés agrees to request Government's consent or waiver to any agreement described in this Section 8.21.3 prior to its execution which consent or waiver will not be unreasonably denied.



**8.21.4 Full Disclosure.** To the best of its knowledge, Serrallés has furnished to the Government all material facts necessary to make the statements contained herein true and correct as of the date hereof. To the best of its knowledge, as of the Effective Date, there are no issues, facts or matters that materially adversely affect, or which could materially adversely affect Serrallés' ability to perform its obligations under this Agreement.

**8.21.5 Compliance with Tax Laws.** Serrallés shall be responsible for retention, proper filing and payment of all social security, income tax, worker's compensation, unemployment insurance, disability insurance, and all other labor requirements arising under this Agreement, if applicable. Serrallés agrees that it will comply with Puerto Rico's tax laws, rules and regulations. Serrallés will be responsible for filing its income tax returns and for making any necessary payments to the Department of the Treasury and the Internal Revenue Service of the United States of America, if applicable. Serrallés certifies that it has filed all of its Tax returns that it has been required to file for the past five (5) years, owes no Taxes and/or is up to date in any payment plan for such Taxes. Prior to the execution of this Agreement, Serrallés has submitted to the Government the following certifications and documents, in each case, dated within thirty (30) days of the Effective Date:

(a)     A certification of filing of income tax return for the past five (5) years, issued by the Department of the Treasury.

(b)     A negative debt certificate, or payment plan and compliance therewith, issued by the Department of the Treasury of Puerto Rico.



EXECUTION VERSION

(c)      A negative certificate of debt, or payment plan and compliance therewith, with respect to real and personal property taxes issued by the Municipal Revenue Collection Center ("CRIM" for its Spanish acronym).

(d)      A negative certificate of debt, or payment plan and compliance therewith, for unemployment insurance, temporary disability insurance and chauffeur's social security issued by the Puerto Rico Department of Labor and Human Resources.

(e)      A copy of the Workmen's Compensation Insurance policy issued by the State Insurance Fund.

(f)      A negative certificate of debt, or payment plan and compliance therewith, issued by the State Insurance Fund.

(g)      A good standing certificate from the Puerto Rico Department of State.

It is acknowledged that the certifications and sworn statements above are essential conditions of this Agreement, and if found to be intentionally false, misleading, altered or forged, such finding shall constitute a Material Default and the Government shall have the right to terminate this Agreement.

**8.21.6 Business Documents; Evidence of Authority.** Prior to the execution of this Agreement Serrallés shall provide copies of its articles of incorporation, by-laws, or partnership or joint venture agreement, as applicable. Serrallés shall deliver to the Government before the execution of this Agreement an original certificate of resolution evidencing the authorization to enter into this Agreement.

**8.21.7 Registration of the Agreement.** The Government shall remit a copy of this Agreement to the Office of the Comptroller within fifteen (15) days following the date of the execution of this Agreement and any subsequent amendment of this Agreement. No provision or consideration of services under this Agreement may be demanded until the same has been filed for registration with the Office of the Comptroller pursuant to Act No. 18 of October 30, 1975, as amended.

**8.21.8 Certification on Criminal Proceedings.** Serrallés certifies that as of the date of this Agreement, it has not been convicted, or has no knowledge of being indicted in a criminal procedure for offenses against public integrity, embezzlement of public funds or for the felonies or misdemeanors mentioned in Act Number 458 of September 29, 2000, as amended, in Puerto Rico courts, federal courts, or any other court with jurisdiction. It is acknowledged by the Parties that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute a Material Default and a cause for the Government to terminate this Agreement.      Serrallés shall immediately notify in writing the Government if it, or any of its officers and directors becomes indicted or convicted in a criminal procedure for any type of offense mentioned above. Failure to comply with this notice constitutes a Material Default and a cause for the Government to terminate this Agreement.

EXECUTION VERSION

**8.21.9 Ethics Representations.** In addition to any of the foregoing warranties and representations, Serrallés acknowledges, represents and warrants that no official or employee of the Government has a direct or indirect economic interest in Serrallés' rights under this Agreement in accordance with the provisions of Act Number 84 of June 18, 2002, as amended, also known as the Code of Ethics for Contractors. Serrallés certifies that it has received a copy of the Code, read, understood, has complied and will subsequently continue to comply with it in its entirety.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE FOLLOWS]





EXECUTION VERSION

WHEREFORE, the Parties hereto have executed this Agreement as of the date first written above.

DESTILERÍA SERRALLÉS, INC.

By: _____
Name: Félix J. Serrallés, Jr.
Title: President

THE GOVERNMENT OF
PUERTO RICO

By: _____
Name: Jesús Méndez
Title: Secretary
      Department of Treasury

By: _____
Name: José R. Pérez-Riera
Title: Secretary
Department of Economic Development
and Commerce

By: _____
Name: José R. Pérez-Riera
Title: Executive Director
Puerto Rico Industrial Development
Company

By: _____
Name: Javier A. Rivera Aquino
Title: Secretary
      Department of Agriculture

By: _____
Name: Juan Carlos Pavía
Title: Executive Director of Office of
Management and Budget

By: _____
Name: Juan Carlos Batlle
Title: President of Government
Development Bank for Puerto Rico

## EXHIBIT A

### Refurbishment and Production Incentives

1. Blending Area expansion and renovation
2. Rum processing equipment and refurbishment
3. Tank instrumentation
4. Electric substation renovation
5. Boiler renovation
6. Boiler water renovation
7. Fire systems upgrades
8. Roads renovations
9. Laboratory equipment
10. Flavors coolers
11. New land parcels adjacent to distillery
12. Waste water treatment upgrade and refurbishment
13. Aging warehouse refurbishment
14. Central software upgrade
15. Aging warehouse insulation and cooling
16. Cost production incentives
17. Cost efficiencies warehouse modifications
18. Port tank facilities modifications
19. Bottling plant improvements and refurbishment
20. Bottling lines and improvements of existing line and refurbishment
21. New palletizers
22. Rectifying plant expansion and improvements
23. Distillation system and control upgrades and refurbishment
24. Fermnetation and Distilation refurbishment
25. Blending area expansion and renovation
26. Electric generation including renewable energy sources

**EXHIBIT B**

**MARKETING ACTIVITIES**

<u>**Potential Marketing Activities**</u>

Relationship Marketing

Relationship Market Agency Fees

Consumer Public Relations

Trade Public Relations

Consumer Sponsorships

Innovation and Product Development

Brand Identification l Packaging Development

Consumer Planning and Research

Experimental Marketing l Sampling

Point of Sale

Consumer Promotions

Value Added Packaging

Commercial Advertising and Promotion

Discounts and consideration to customers

<u>**Potential Advertising Activities**</u>

Media-Television

Media-Digital

Media-Other

Advertising Production

Creative Agency Fees



B-1

**EXHIBIT C**

**AGREGATE RUM SALES***

| Fiscal Periods | YOY Growth | Volume (m PG) ** |
|---|---|---|
| 2010-2011 | 0% | 10.40 |
| 2011-2012 | -32% | 7.10 |
| 2012-2013 | -51% | 3.50 |
| 2013-2014 | 14% | 4.00 |
| 2014-2015 | 13% | 4.50 |
| 2015-2016 | 11% | 5.00 |
| 2016-2017 | 4% | 5.20 |
| 2017-2018 | 6% | 5.50 |
| 2018-2019 | 4% | 5.70 |
| 2019-2020 | 5% | 6.00 |
| 2020-2021 | 5% | 6.30 |
| 2021-2022 | 6% | 6.70 |
| 2022-2023 | 4% | 7.00 |
| 2023-2024 | 4% | 7.30 |
| 2024-2025 | 5% | 7.70 |
| 2025-2026 | 5% | 8.10 |
| 2026-2027 | 5% | 8.50 |
| 2027-2028 | 6% | 9.00 |
| 2028-2029 | 4% | 9.40 |
| 2029-2030 | 4% | 9.80 |



\*    Assumes receipt of uniform incentive and obtaining contracts to supply additional bulk rum requirements for the U.S. market from 2012 on, in addition to maintaining the two contracts obtained to date.

\*\*    Sales are stated in millions of U.S. proof gallons per year

C-1

## EXHIBIT D

## MINIMUM RUM PRODUCTION REQUIREMENTS IN PROOF GALLONS (PG)

| Year | Branded (PG) | Total |
|------|------|------|
| 2010/2011 and 2011/2012 | 500,000 | 3,000.000 |
| 2012/2013 through 2015/2016 | 600,000 | 3,000.000 |
| 2016/2017 and thereafter ** | | |



** From 2016-2017 to the reminder of the initial 20-year term, Serrallés shall determine the minimum production requirements every five (5) years based upon the average of the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the previous five (5) year period and Serrallés may further adjust up to twenty five percent (25%) above or up to twenty (20%) below the average of the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the previous five (5) year period.  Any other changes in minimum production requirements shall be made by mutual agreement of the parties.