# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>    Debtor. | Case No. 17-BK-3567-LTS |
| ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,<br><br>    Movants,<br><br>v. | **Re: Case No. 17-BK-3567-LTS, ECF No. 633, 673** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY,

      Respondent.

**OPPOSITION OF FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO TO MOTION OF ASSURED GUARANTY CORP.,
ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION,
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND FINANCIAL
GUARANTEE INSURANCE COMPANY FOR RELIEF FROM AUTOMATIC
STAY OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION [ECF NO. 673]**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND ............................................................................................... 9

    I.    HTA and the HTA Bonds ......................................................................................... 9

    a.    1968 Bonds .............................................................................................................. 10

    b.    1998 Bonds .............................................................................................................. 13

    c.    The 1968 Bond Financing Statements ................................................................... 15

    d.    The 1998 Bond Financing Statements ................................................................... 15

    II.    Toll Revenues and the HTA Allocable Revenues ............................................... 16

    III.    PROMESA, Retention of the HTA Allocable Revenues, and the Use of Toll Revenues 18

        a.    PROMESA ........................................................................................................ 18

        b.    The Fiscal Plans and the Retention of the HTA Allocable Revenues ........................ 18

        c.    HTA's Use of Toll Revenues ............................................................................. 19

    II.    The HTA Title III Case ......................................................................................... 19

    III.    The Commonwealth Plan of Adjustment .............................................................. 20

    IV.    The HTA Revenue Bond Complaints ................................................................... 20

ARGUMENT ........................................................................................................................ 21

    I.    **THE STAY PRESERVES THE COMMONWEALTH'S FUNCTIONS AND LIFTING IT IS AN EXTRAORDINARY REMEDY JEOPARDIZING LIFE, HEALTH, AND WELFARE, THEREBY MAKING IT CRITICAL FOR MOVANTS TO SHOW AT LEAST A LIKELIHOOD OF SUCCESS ON THEIR PROPERTY INTERESTS TO PROCURE STAY RELIEF** ....................................................................................... 21

    II.    MOVANTS ARE MERE CREDITORS OF A CREDITOR THAT LACK STANDING TO SEEK STAY RELIEF AGAINST THE COMMONWEALTH ......................................... 25

    III.    MOVANTS **DO** NOT HAVE VALID, ENFORCEABLE PROPERTY RIGHTS OR LIENS, EXCEPT AGAINST MONEY BOTH RECEIVED BY HTA AND DEPOSITED TO THE CREDIT OF THE PLEDGED FUNDS HELD BY THE FISCAL AGENT ................. 26

        A.    Movants' Security Interest is Limited to Monies Both Received by HTA and Deposited to the Credit of the Pledged Funds ............................................................................ 26

        B.    Movants Do Not Have Any Property Interests Arising From the HTA Allocable Revenue Statutes Because Those Statutes Have Been Preempted by PROMESA ............. 34

        C.    Movants Do Not Have A "Statutory Entitlement" or Ownership Interest in Revenues 36

        D.    The HTA Allocable Revenues Are Not Held in Trust for HTA or Bondholders ......... 40

        E.    Movants' Restricted Funds Argument Does Not Assist Them ..................................... 44

F.   Movants Do Not Have Statutory Liens on Any Revenues ........................................... 45

G.   Movants Do Not Have Property Interests Protected by the Takings Clause ............... 47

H.   Section 928(a) Does Not Protect Movants' Security Interests .................................... 49

I.   Movants' Purported Collateral is Not Protected by Section 928(a). ........................... 49

IV.   MOVANTS DO NOT STATE A *PRIMA FACIE* CASE TO OBTAIN RELIEF FROM
THE STAY UNDER BANKRUPTCY CODE SECTION 362(d)(1) or (d)(2)....................... 55

CONCLUSION....................................................................................................................... 57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

*1st Farm Credit Servs., PCA v. Phillips (In re Phillips)*,
No. 05-87521, 2007 WL 4179845 (Bankr. C.D. Ill. Nov. 20, 2007)......................................30

*Ahlers v. Norwest Bank Worthington, N.A.*,
794 F.2d 388 (8th Cir. 1986), *rev'd on other grounds sub nom.*, *Norwest Bank
Worthington v. Ahlers*, 485 U.S. 197 (1988) .........................................................................21

*Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad
Obligatorio v. Flores Galarza*,
484 F.3d 1 (1st Cir. 2007) .......................................................................................................38

*Atlantic Coast Line R. Co. v. Florida*,
295 U.S. 301 (1935).................................................................................................................43

*Austin v. Cahill*,
99 Tex. 172 (Tex. 1905) ..........................................................................................................40

*Bargas v. Rice (In re Rice)*,
82 B.R. 623 (Bankr. S.D. Ga. 1987) .......................................................................................23

*Bd. of Trs. v. Thompson Bldg. Materials, Inc.*,
749 F.2d 1396 (9th Cir. 1984) ................................................................................................47

*Bedell v. Lassiter*,
143 Fla. 43 (Fla. 1940).............................................................................................................40

*Begier v. IRS*,
496 U.S. 53 (1990).....................................................................................................................2

*Bexar County Hosp. Dist. v. Crosby*,
160 Tex. 116 (Tex. 1959) ........................................................................................................40

*BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
301 F. Supp. 3d 306 (D.P.R. 2017).........................................................................................25

*Brown v. United Airlines, Inc.*,
720 F.3d 60 (1st Cir. 2013) .....................................................................................................43

*Connolly v. Pension Ben. Guar. Corp.*,
475 U.S. 211 .............................................................................................................................52

*Dallas Levee Imp. Dist. ex rel. Simond v. Indus. Props. Corp.*,
89 F.2d 731 (5th Cir. 1937) .....................................................................................................40

iii

*Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*,
   75 F.2d 870 (5th Cir. 1938) ................................................................40

*FCC v. NextWave Pers. Commc'ns Inc.*,
   537 U.S. 293 (2003)............................................................................35

*Fed. Deposit Ins. Corp. v. Casady*,
   106 F.2d 784 (10th Cir. 1939) ............................................................40

*First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*,
   18 B.R. 868 (Bankr. D. Colo. 1982) ...................................................53

*First Nat'l Bank of Denver v. Turley*,
   705 F.2d 1024 (8th Cir. 1983) ............................................................22

*Fleet Nat'l Bank v. Valente (In re Valente)*,
   360 F.3d 256 (1st Cir. 2004)...............................................................43

*Fletcher v. Peck*,
   10 U.S. 87 (1810)..................................................................................3

*Franklin Cal. Tax-Free Trust v. Puerto Rico*,
   805 F.3d 322 (1st Cir. 2015), *aff'd* 136 S. Ct. 1938 (2016)...............52

*Franklin California Tax-Free Trust v. Puerto Rico*,
   85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd on different grounds*, 136 S. Ct. 1938
   (2016)....................................................................................................47

*García-Rubiera v. Calderón*,
   570 F.3d 443 (1st Cir. 2009)...............................................................38

*Garcia-Rubiera v. Fortuño*,
   665 F.3d 261 (1st Cir. 2011)...............................................................38

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight
   Mgmt. Bd. for P.R.)*,
   939 F.3d 340 (1st Cir. 2019) .................................................... passim

*Grella v. Salem Five Cent Sav. Bank*,
   42 F.3d 26 (1st Cir. 1994)..............................................................22, 23

*Hays v. Isaacs*,
   275 Ky. 26 (Ky. 1938) .........................................................................40

*Howard Delivery Serv. v. Zurich Am. Ins. Co.*,
   547 U.S. 651 (2006)...............................................................................6

iv

*In re 300 Wash. St. LLC,*
   528 B.R. 534 (Bankr. E.D.N.Y. 2015) ................................................................22

*In re Alliance Well Serv., LLC,*
   551 B.R. 903 (Bankr. D.N.M. 2016) ................................................................22

*In re Ames Dep't Stores, Inc.,*
   274 B.R. 600 (Bankr. S.D.N.Y. 2002), *aff'd sub nom. LFD Operating, Inc. v.*
   *Ames Dep't Stores, Inc.,* No. 01-42217 (REG), 2004 WL 1948754 (S.D.N.Y.
   Sept. 1, 2004), *aff'd sub nom. In re Ames Dep't Stores, Inc.,* 144 F. App'x 900
   (2d Cir. 2005) .......................................................................................................41

*In re Arctic Air,*
   202 B.R. 533 (Bankr. D.R.I. 1996) ................................................................30

*In re Babcock & Wilcox Co.,*
   250 F.3d 955 (5th Cir. 2001) ................................................................25

*In re Best Prods. Co.,*
   138 B.R. 155 (Bankr. S.D.N.Y. 1992) ................................................................21

*In re Booth,*
   19 B.R. 53 (Bankr. D. Utah 1982) ................................................................47

*In re Brian Wise Trucking, Inc.,*
   386 B.R. 215 (Bankr. N.D. Ind. 2008) ................................................................22

*In re Cason,*
   190 B.R. 917 (Bankr. N.D. Ala. 1995) ................................................................21

*In re Columbia Falls, Special Improv. Dist. No. 25,*
   143 B.R. 750 (Bankr. D. Mont. 1992) ................................................................40

*In re Comcoach Corp.,*
   19 B.R. 231 (Bankr. S.D.N.Y. 1982) ................................................................25

*In re Comcoach Corp.,*
   698 F.2d 571 (2d Cir. 1983) ................................................................25, 26

*In re Continental Airlines, Inc.,*
   146 B.R. 536 (Bankr. D. Del. 1992) ................................................................21

*In re Crabtree,*
   48 B.R. 528 (Bankr. E.D. Tenn. 1985) ................................................................22

*In re Dairy Mart Convenience Stores, Inc.,*
   351 F.3d 86 (2d Cir. 2003) ................................................................25

v

*In re Daves*,
   770 F.2d 1363 (5th Cir. 1985) ...................................................................................30

*In re Elmira Litho, Inc.*,
   174 B.R. 892 (Bankr. S.D.N.Y. 1994) .......................................................................22

*In re Elmore*,
   94 B.R. 670 (Bankr. C.D. Cal. 1988) .........................................................................47

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   2020 U.S. App. LEXIS 2954, Case No. 19-1699 (1st Cir. Jan. 30, 2020) ..................... passim

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   301 F. Supp. 3d 290 (D.P.R. 2017), *aff'd sub nom. Peaje Invs. LLC v. Fin.*
   *Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 1 (1st Cir. 2018)...................................46

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   582 B.R. 579 (D.P.R. 2018).................................................................................8, 36

*In re Fonseca*,
   534 B.R. 261 (Bankr. D.P.R.), *aff'd*, 542 B.R. 628 (B.A.P. 1st Cir. 2015)............................46

*In re Franklin Equip. Co.*,
   416 B.R. 483 (Bankr. E.D. Va. 2009) ........................................................................23

*In re Hayes*,
   393 B.R. 259 (Bankr. D. Mass. 2008) ........................................................................25

*In re James Wilson Assocs.*,
   965 F.2d 160 (7th Cir. 1992) ....................................................................................26

*In re Jug End in Berkshires, Inc.*,
   46 B.R. 892 (Bankr. D. Mass. 1985) ..........................................................................21

*In re Kowalsky*,
   235 B.R. 590 (Bankr. E.D. Tex. 1999) .......................................................................21

*In re Las Vegas Monorail Co.*,
   429 B.R. 317 (Bankr. D. Nev. 2010) .................................................................4, 11, 30

*In re Lifeco Inv. Grp.*,
   173 B.R. 478 (Bankr. D. Del. 1994) ...........................................................................25

*In re Lopez*,
   446 B.R. 12 (Bankr. D. Mass. 2011) ..........................................................................25

*In re Marion St. P'ship*,
   108 B.R. 218 (Bankr. D. Minn. 1989) ........................................................................47

*In re McKenzie*,
   737 F.3d 1034 (6th Cir. 2013) .............................................................................22

*In re Morales Travel Agency*,
   667 F.2d 1069 (1st Cir. 1981) ..............................................................................41

*In re Nichols*,
   440 F.3d 850 (6th Cir. 2006) ................................................................................47

*In re Planned Sys., Inc.*,
   78 B.R. 852 (Bankr. S.D. Ohio 1987) ..................................................................21

*In re Plant Insulation Co.*,
   469 B.R. 843 (Bankr. N.D. Cal. 2012), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012),
   *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013) ........................................47

*In re Robert Bogetti & Sons*,
   162 B.R. 289 (Bankr. E.D. 1993) .........................................................................28

*In re S. Biotech, Inc.*,
   37 B.R. 318 (Bankr. M.D. Fla. 1983) ...................................................................25

*In re S. Ill. Railcar Co.*,
   301 B.R. 305 (Bankr. S.D. Ill. 2002) ...................................................................21

*In re Swift* ,
   07-B-12787, 2009 Bankr. LEXIS 589 (Bankr. N.D. Ill. Feb. 19, 2009) ..............21

*In re Self*,
   239 B.R. 877 (Bankr. E.D. Tex. 1999) .................................................................21

*In re Tap, Inc.*,
   52 B.R. 271 (Bankr. D. Mass. 1985) ....................................................................42

*In re Tower Park Props., LLC*,
   803 F.3d 450 (9th Cir. 2015) ................................................................................25

*In re Waverly Textile Processing*,
   214 B.R. 476 (Bankr. E.D. Va. 1997) ..................................................................21

*Jin Qing Li v. Rosen*,
   2018 WL 1354548 (B.A.P. 9th Cir. 2018)............................................................23

*Kane v. Coulson (In re Price)*,
   575 B.R. 461 (Bankr. D. Haw. 2017) .....................................................................4

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2002)...................................................................................25

*Keyes v. City of Tacoma*,
    12 Wash. 2d 54 (1941) ........................................................................................40

*Knapp v. Comm'r*,
    41 B.T.A. 23 (B.T.A. 1940) ...............................................................................31

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005) ............................................................................................52

*Local Loan Co. v. Hunt*,
    292 U.S. 234 (1934) ............................................................................................52

*Luperena v. P.R. Transp. Auth.*,
    79 D.P.R. 464, 1956 PR Sup. LEXIS 186 (P.R. 1956) ......................................43

*Marine Midland Bank v. Bennett Funding Grp., Inc. (In re Bennett Funding Grp.,
    Inc.)*,
    1997 Bankr. LEXIS 2194 (Bankr. N.D.N.Y. May 30, 1997) ...........................22

Matter of *Vitreous Steel*,
    911 F.2d 1223 (7th Cir. 1990) ...........................................................................23

*McAndrews v. Fleet Bank of Mass.*,
    989 F.2d 13 (1st Cir. 1993) ................................................................................52

*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old
    Cold, LLC)*,
    602 B.R. 798 (B.A.P. 1st Cir. 2019) .................................................................23

*Municipality of San Juan v. Commonwealth of P.R.*,
    919 F.3d 565 (1st Cir. 2019) ............................................................................20

*Newman v. Comm'r*,
    68 T.C. 433 (T.C. 1977) ....................................................................................31

*Ohio v. Kovacs*,
    469 U.S. 274 (1985) ...........................................................................................35

*Omega Envt'l. Inc. v. Valley Bank NA*,
    219 F.3d 984 (9th Cir. 2000) (per curiam) .......................................................22

*Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
    Mgmt. Bd. for P.R.)*,
    899 F.3d 1 (1st Cir. 2018) ......................................................................... passim

*Peaje Invs. LLC v. Garcia-Padilla*,
    845 F.3d 505 (1st Cir. 2017) .......................................................................33, 47

*Perry v. Blum*,
    629 F.3d 1 (1st Cir. 2010) ..................................................................................... 33

*Poss v. Morris (In re Morris)*,
    260 F.3d 654 (6th Cir. 2001) .............................................................................. 43

*Puerto Rico v. Blumenthal*,
    642 F.2d 622 (D.C. Cir. 1980) ............................................................................ 44

*Rentas v. Claudio (In re Garcia)*,
    484 B.R. 1 (Bankr. D. P.R. 2012) ................................................................. 42, 43

*Rossello v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*
    *Bd. for P.R.)*,
    330 F. Supp. 3d 685 (D.P.R. 2018), *aff'd*, No. 18-2154, 2019 WL 6887258
    (1st Cir. Dec. 18, 2019) ................................................................................. 1, 34

*Rossello v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*
    *Bd. for P.R.)*,
    No. 18-2154, 2019 WL 6887258 (1st Cir. Dec. 18, 2019) ................................... 34

*Safe Deposit Bank & Tr. Co. v. Berman*,
    393 F.2d 401 (1st Cir. 1968) .............................................................................. 30

*Shelton v. Erwin*,
    472 F.2d 1118 (8th Cir. 1973) ........................................................................... 30

*Sims v. Jamison*,
    67 F.2d 409 (9th Cir. 1933) ............................................................................... 53

*Soares v. Brockton Credit Union (In re Soares)*,
    107 F.3d 969 (1st Cir. 1997) .............................................................................. 20

*Steslow v. Citicorp Mortg., Inc. (In re Steslow)*,
    225 B.R. 883 (Bankr E.D. Pa. 1998) ................................................................ 30

*Stowe v. Bologna (In re Bologna)*,
    206 B.R. 628 (Bankr. D. Mass. 1997) ............................................................... 42

*Town of Shattuck v. Barcafer*,
    137 P.2d 238 (Okla. 1943) ................................................................................. 40

*U.S. Trust Co. of New York v. New Jersey*,
    431 U.S. 1 (1977) ............................................................................................... 47

*United States v. Security Industrial Bank*,
    459 U.S. 70 (1982) ............................................................................................. 52

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
*Mgmt. Bd. for P.R.)*,
945 F.3d 3 (1st Cir. 2019) ...................................................................................5, 6

*Vickery v. Sioux City*,
104 F. 164 (Cir. Western Div. 1900) ........................................................................40

*Winter Haven v. Summerlin*,
114 Fla. 727 (Fla. 1934) ..........................................................................................40

*Wright v. Union Cent. Life Ins. Co.*,
311 U.S. 273 ............................................................................................................47

*Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke, Va.*,
300 U.S. 440 (1937) .................................................................................................47

*Wulff-Hansen & Co. v. Silvers*,
21 Cal. 2d 253 (Cal. 1942) .......................................................................................40

**STATUTES**

9 L.P.R.A. §§ 2001-2035 ..................................................................................................10

9 L.P.R.A § 2002 ....................................................................................................10, 51

9 L.P.R.A § 2004(j) ...........................................................................................................16

9 L.P.R.A § 2004(l) .......................................................................................................10, 31

9 L.P.R.A § 2012(b) ...........................................................................................................28

9 L.P.R.A § 2012(e)(1) ..................................................................................................28, 46

9 L.P.R.A § 2013(a) ...........................................................................................................36

9 L.P.R.A § 2015 ....................................................................................................... passim

9 L.P.R.A § 2021 ....................................................................................................... passim

9 L.P.R.A § 5681 ....................................................................................................... passim

13 L.P.R.A. § 31625 ...........................................................................................................16

13 L.P.R.A. § 31626 ...........................................................................................................16

13 L.P.R.A. § 31627 ...........................................................................................................16

13 L.P.R.A. § 31751 ...........................................................................................7, 17, 34, 36, 49

x

13 L.P.R.A. § 31751(1).................................................................................................51

13 L.P.R.A. § 31751(1)(C)............................................................................................8

13 L.P.R.A. § 31751(1)(E)............................................................................................8

13 L.P.R.A. § 31751(3)(C)............................................................................................8

13 L.P.R.A. § 31751(a)................................................................................................38

13 L.P.R.A. § 31751(a)(1)................................................................................17, 36, 39

13 L.P.R.A. § 31751(a)(1)(A)......................................................................................36

13 L.P.R.A. § 31751(a)(1)(A)......................................................................................44

13 L.P.R.A. § 31751(a)(1)(C).................................................................................passim

13 L.P.R.A. § 31751(a)(1)(C)......................................................................................46

13 L.P.R.A. § 31751(a)(1)(E)..................................................................................34, 37

13 L.P.R.A. § 31751(a)(1)(F)......................................................................................50

13 L.P.R.A. § 31751(a)(1)(G)......................................................................................39

13 L.P.R.A. § 31751(a)(3)....................................................................................7, 17, 24

13 L.P.R.A. § 31751(a)(3)(C)..............................................................................16, 17, 37

19 L.P.R.A. § 2214(a)(1)-(3)........................................................................................29

19 L.P.R.A. § 2233(b)(2)........................................................................................27, 31

19 L.P.R.A. § 2260(a)..................................................................................................29

19 L.P.R.A. § 2262(b)(1).............................................................................................29

19 L.P.R.A. § 2267(a)(2).............................................................................................26

19 L.P.R.A. § 2322(a)..................................................................................................29

24 L.P.R.A. § 3122......................................................................................................42

26 L.P.R.A. § 8055(c)....................................................................................................7

26 L.P.R.A. § 8055(l).....................................................................................................7

31 L.P.R.A. § 13..........................................................................................................34

31 L.P.R.A. § 2543 ...................................................................................................43

32 L.P.R.A. § 3352 ...................................................................................................43

11 U.S.C. § 101(53) ..........................................................................................35, 45

11 U.S.C. § 361 .......................................................................................................25

11 U.S.C. § 362 .......................................................................................................22

11 U.S.C. § 362(d)(1) .......................................................................................21, 55

11 U.S.C. § 362(d)(2) ...............................................................................21, 22, 54

11 U.S.C. § 362(g) ..................................................................................................22

11 U.S.C. § 502(a) ..................................................................................................21

11 U.S.C. § 507(a)(2) .............................................................................................35

11 U.S.C. § 544 .......................................................................................................32

11 U.S.C. § 544(a)(1) .............................................................................................26

11 U.S.C. § 901(a) ..................................................................................................52

11 U.S.C. § 902(2) ...........................................................................................48, 49

11 U.S.C. § 902(2)(E) .....................................................................................48, 50

11 U.S.C. § 922(d) ..................................................................................................48

11 U.S.C. § 928(a) ...........................................................................................48, 49

11 U.S.C. § 928(b) ..........................................................................51, 52, 53, 54

11 U.S.C. § 1109(b) ...............................................................................................25

UCC § 9–203 cmt. 5 .................................................................................................4

PROMESA § 101(b) ...............................................................................................17

PROMESA § 104(j) ................................................................................................19

PROMESA § 201 ........................................................................................6, 17, 34

PROMESA § 202 ........................................................................................3, 6, 34

PROMESA § 202(e)(3)(C) ..............................................................................6, 17

PROMESA § 202(e)(4)(C) ..................................................................................6

PROMESA § 206 ..............................................................................................19

PROMESA § 304(a) ..........................................................................................19

PROMESA § 405(m)(1)-(3) ..............................................................................18

**OTHER AUTHORITIES**

P.R. Const. art. VI, § 8 ............................................................................. passim

H.R. Rep. No. 64-77 (1916) .............................................................................44

S. Rep. No. 100-506 (1988) .......................................................................49, 54

A.D. Flachsbart, *Municipal Bonds in Bankruptcy: Sec. 902 (2) and the Proper
Scope of Special Revenues in Chapter 9*, 72 Wash. & Lee L. Rev. 955, 998
(2015) ..........................................................................................................49

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal
Texts* (Minn, Thompson West 2012) ...........................................................3

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT, pt. II, Chapter
2, Topic 3 ....................................................................................................43

**To the Honorable United States District Judge Laura Taylor Swain:**

The Puerto Rico Highways and Transportation Authority ("HTA"), and the Commonwealth of Puerto Rico (the "Commonwealth," and with HTA, the "Debtors") by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtors' sole representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this opposition ("Opposition") to the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative Adequate Protection* [ECF No. 673] (the "Motion") filed by Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "Assured"), Ambac Assurance Corporation ("Ambac"), National Public Finance Guarantee Corporation ("National"), and the Financial Guarantee Insurance Company ("FGIC," and together with Assured, Ambac, and National, "Movants").[3]  For its Opposition, the Oversight Board respectfully states as follows:

## PRELIMINARY STATEMENT

1.      For reasons explained in the following paragraphs, based on this Court's affirmed ruling that pre-PROMESA appropriations are preempted,[4] the instant Motion and its two companion motions must be denied because pre-PROMESA appropriations form the underpinnings of all the moving parties' alleged security interests and property interests in Commonwealth assets, for which they claim entitlement to adequate protection.  Moreover, even without consideration of preemption,

---

[2]  PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

[3]  The Motion amends and supersedes the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation for Adequate Protection or, in the Alternative, for Relief from the Automatic Stay* [ECF No. 633], filed on August 23, 2019 (the "Motion Filing Date") by Assured and National.

[4]  *Rossello v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018), *aff'd*, No. 18-2154, 2019 WL 6887258, at *3 (1st Cir. Dec. 18, 2019)

none of the moving parties has an interest in Commonwealth assets entitled to adequate protection. That is a second ground for denial of the motions, and many more are set forth below. But, those two grounds are each independently sufficient to resolve the motions, without more.

2.      The Commonwealth owes tens of billions of dollars to retirees, general obligation ("GO") bondholders, and others. It became obligated to pay in full its different unsecured debts based on written agreements, Commonwealth statutes, and/or the Puerto Rico constitution. In each instance, the written agreement or law obligated the Commonwealth to pay the debtholders in full. In Title III, the debtholders, however, are all sharing losses arising from the Commonwealth's fiscal emergency, consistent with the equality policy underlying all bankruptcy law that creditors of equal rank share the losses.[5]

3.      Conversely, the Commonwealth never promised to pay HTA's bondholders. Nor did any statute or constitution obligate the Commonwealth to pay HTA's bondholders. Rather, Commonwealth statutes, enacted prior to PROMESA, provided the Commonwealth shall appropriate to HTA certain Commonwealth tax and fee revenues (the HTA Allocable Revenues, as defined below) for HTA's "corporate purposes" subject to the Commonwealth's retention powers under section 8 of Article VI of the Puerto Rico Constitution. The Commonwealth pledged no collateral to secure its statutory obligation. In turn, the HTA Bond Resolutions require HTA to deposit the HTA Allocable Revenues HTA receives from the Commonwealth (along with Toll Revenues, as defined below) in accounts controlled by the HTA Bondholders' Fiscal Agent (the Pledged Funds, as defined herein), which accounts secure HTA's repayment of its bonds.

4.      Movants are not entitled to stay relief against the Commonwealth. Movants attempt

---

[5]   *See, e.g., Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property.").

mightily to parlay the Commonwealth's statutes requiring appropriations to HTA (the HTA Allocable Revenue Statutes, as defined below) into the equivalent of a specifically enforceable, nondischargeable Commonwealth obligation in Title III to provide HTA or its bondholders funds to pay HTA's bonds in full.  Movants do this in the face of 9 L.P.R.A. § 2015 providing the HTA Bonds are not debts of the Commonwealth.

5.    When viewed from the perspectives of public policy, PROMESA Titles II and III, logic, and common sense, it is apparent that Movants' requested relief is contrary to all of them.  First, the proposition that the Commonwealth must pay HTA bondholders in full while the Commonwealth's own creditors absorb all the losses violates the equality policy.  HTA bondholders do not even hold claims against the Commonwealth, let alone secured claims.  Second, the lynchpin of Movant's case, the HTA Allocable Revenues Statutes requiring the Commonwealth to transfer money to HTA for HTA's corporate purposes, is a pre-PROMESA appropriation.  Both this Court and the First Circuit Court of Appeals have ruled all such appropriations are preempted by PROMESA section 202 because they are not certified by the Oversight Board.  And, even without preemption, no appropriation of future years' revenues can bind future legislatures.[6]  Third, the appropriation is separately preempted by Title III because it requires payment of an obligation that Title III does not render a priority claim.  The Commonwealth cannot insert priority claims into Title III.  Fourth, Movants' kitchen sink of property law theories—equitable ownership, trust fund, statutory lien, and

---

[6] *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 U.S. App. LEXIS 2954, Case No. 19-1699, at *17-18 (1st Cir. Jan. 30, 2020) ("legislative appropriations are the method by which the Commonwealth allocates the Employers' Contributions to the System. Although required by [Puerto Rico law], this directive could be disregarded by a subsequent legislature (to the Bondholders' detriment)."); Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (Minn, Thompson West 2012), at 278 ("The one body whose future actions a legislature has no power to affect is the legislature itself… [L]egislators cannot make their laws irrepealable or disable themselves or their successors from taking action . . . ."); *see also, e.g.*, *Fletcher v. Peck*, 6 Cranch 87, 10 U.S. 87, 135 (1810) (Marshall, J.) ("[O]ne legislature cannot abridge the powers of a succeeding legislature . . . The correctness of this principle, so far as respects general legislation, can never be controverted.").

restricted fund—are each refuted by the Uniform Commercial Code which would be totally vitiated

if it could be circumvented by such theories.  Fifth, logic and common sense demonstrate that HTA

bonds sold on the basis of collateral consisting of a sinking fund at HTA would not be further secured

by Commonwealth assets the Commonwealth nowhere pledged.[7]

6.      No one disputes that where a debtor promises to pay a debt on an unsecured basis, the

promisee has nothing more than an unsecured claim.  Here, the Commonwealth has not promised to

pay HTA Bondholders.  It has done something less.  It has, by statute, conditionally obligated itself

to appropriate certain tax revenues (the HTA Allocable Revenues, as defined below) to HTA for its

"corporate purposes" and to continue to do so.  *See, e.g.,* 9 L.P.R.A. § 5681.  HTA then issued bonds

pursuant to the HTA Bond Resolutions, and promised to deposit Revenues (which are made up of (*i*)

HTA Allocable Revenues and (*ii*) Toll Revenues) that HTA "receives" into specific Pledged Funds

held by the Fiscal Agent.  Pursuant to the HTA Bond Resolutions, HTA granted a security interest

only against the Pledged Funds, and the Pledged Funds are the *sole* source of payment for the Bonds.

HTA Bond Resolutions, §§ 401, 601.  An annotated diagram showing the flow of funds is attached

hereto as **Exhibit A**.

7.      Promises to put money in an account do not give rise to a security or property interest.

*See Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (a promise to pay a debt

from a particular fund does not create a contractual lien in the fund nor an equitable lien).  A promise

by the Commonwealth to appropriate money continuously into an account for HTA's corporate

purposes—not even for Bondholders' benefit—cannot possibly make HTA's Bondholders better off

---

[7]   The Uniform Commercial Code eliminates most equitable theories.  *See* former UCC § 9–203, Comment 5  ("Since this Article reduces formal requisites to a minimum, the doctrine [of equitable mortgage] is no longer necessary or useful.") and current UCC § 9–101, Comment 1 (explaining comments to former UCC remain the rule of law); *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 339 n.39 (Bankr. D. Nev. 2010) (stating trustee's equitable arguments to establish by operation of law what it failed to obtain by contract and practice failed because "[t]hese theories are . . . contrary to the general notion that Article 9 generally supplanted such theories in favor of one simple system.").

than if they had an unsecured promise from the Commonwealth to pay the Bonds continuously until paid in full.  And far from making any promise to pay HTA Bondholders, the Commonwealth expressly disclaimed any liability on the Bonds.  9 L.P.R.A. § 2015 ("the bonds issued by [HTA] shall not be a debt of the Commonwealth of Puerto Rico . . . nor shall such bonds or the interest thereon be payable out of any funds other than those pledged for the payment of such bonds and interest").

8.    Nevertheless, Movants attempt to convince the Court that somehow the Commonwealth's statutory obligation to appropriate monies into an HTA account is not only superior to an unsecured promise to pay, it entitles them to the equivalent of a nondischargeable, specifically enforceable obligation to transfer money until the Bonds are paid in full.  In doing so, Movants are attempting to undermine the fundamental bankruptcy equality policy.

9.    Dissatisfied that the statutes levying and conditionally allocating the HTA Allocable Revenues to HTA (the "HTA Allocable Revenue Statutes") do not provide them with rights they wish they had, Movants posit unsupportable and internally contradictory theories of ownership in the hopes something will work.  Their Motion consists of a number of "Hail Mary" passes that the Commonwealth's lesser obligation to appropriate money into an account somehow turns into one or all of (*i*) a "statutory entitlement" (?) of either HTA or the HTA Bondholders to the HTA Allocable Revenues (Mot. ¶¶ 50-58), (*ii*) a statutory, constructive, or resulting trust in favor of either HTA or Movants (Mot. ¶¶ 59-65), and (*iii*) a statutory lien (Mot. ¶¶ 72-74).  It is obvious these theories are recent inventions because they are not mentioned in any of the offering statements for the HTA Bonds.  But, regardless, the bottom line is simple: preempted appropriations statutes neither create liens nor transfer ownership interests.

10.    The pre-PROMESA HTA Allocable Revenue Statutes are preempted by PROMESA on two independent grounds.  First, while Movants never mention it, in *Vázquez-Garced v. Financial*

*Oversight & Management Board for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019), the First Circuit confirmed that PROMESA preempts all Puerto Rico statutes that purport to appropriate the Commonwealth's money without regard to an Oversight Board certified budget. In *Vazquez-Garced*, the First Circuit confirmed "that PROMESA subsection 202(e)(4)(C) itself precludes the territorial government from reprogramming funds from prior fiscal years except to the extent such reprogrammed expenditures are authorized in a subsequent budget approved by the Board, ***and any Puerto Rico law to the contrary is preempted by virtue of PROMESA section 4*** . . . Simply put, if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget, ***regardless of what any territorial laws say***." *Id.* at 8 (emphasis added).

11. The consequence of *Vázquez-Garced* is clear: the requirements of the HTA Allocable Revenue Statutes that the Commonwealth transfer the HTA Allocable Revenues to HTA are preempted because they are inconsistent with PROMESA's requirement that the Oversight Board approve all appropriations. PROMESA §§ 201, 202. Movants' attempts to turn preempted Commonwealth appropriation statutes into ownership of future revenues fail.

12. <u>Second</u>, Movants' claims must be rejected because PROMESA Title III does not grant a priority to claims arising out of Commonwealth appropriation statutes. Movants' attempt to transform the Commonwealth's obligations under the HTA Allocable Revenue Statutes into priority claims that must be paid in full fall to the absence in Title III of a section granting priority status to such obligations and to PROMESA Title III's equality principle. *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) ("we are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed.").

13. Even disregarding preemption, Movants are not granted any of the rights they claim

6

under Commonwealth law.  As a preliminary matter, Movants are creditors of a creditor that lack standing to seek stay relief against the Commonwealth.  The HTA Allocable Revenue Statutes made conditional appropriations to HTA for its "corporate purposes" and not for the benefit of the HTA Bondholders.  To the extent the HTA Bondholders are trying to seize this appropriation from the Commonwealth they are impermissibly attempting to assert HTA's rights, not their own.

14.     Movants are not "statutorily entitled" to the HTA Allocable Revenues.  Movants' reliance on the *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight Mgmt. Bd. for P.R.)*, 939 F.3d 340, 345 (1st Cir. 2019), line of cases relating to the reimbursement of duplicate premiums to motor-vehicle owners under Commonwealth law is misplaced.  First, the First Circuit did not decide any of the trust issues raised in that case.  Second, in *Gracia-Gracia*, the Commonwealth was holding monies that came directly from plaintiffs pursuant to statutes that expressly provided "[t]he Secretary of the Treasury shall retain these funds as *trustee*," 26 L.P.R.A. § 8055(l), and the Treasury's collection of the funds constituted a "collection service performed in favor of the" plaintiffs.  26 L.P.R.A. § 8055(c).  Here, the money did not come from Movants, and none of the statutes provide the HTA Allocable Revenues are collected for the benefit of Movants or that the Commonwealth or HTA are to hold them as trustee or fiduciary.  Movants have no such interest in the funds at issue here, which originate from third party taxpayers obligated to the Commonwealth under its own taxing power.

15.     For similar reasons the HTA Allocable Revenues are not held in trust for Movants.  As noted above, the HTA Allocable Revenue Statutes make clear the HTA Allocable Revenues are conditionally appropriated to HTA for its "corporate purposes," not for the benefit of bondholders, and authorize HTA to pledge them for "any lawful purpose."  *See* 13 L.P.R.A. § 31751(a)(1), (a)(3);[8]

---

[8]  Movants contend that the version of 13 L.P.R.A. § 31751 attached as Exhibit E to ECF No. 10107 (the "Natbony Declaration") is the correct translation of that section of the Puerto Rico Code, as amended.  *See* Mot. ¶ 9 n.4.  Without

9 L.P.R.A. § 5681.  The Commonwealth could not have been any clearer than 9 L.P.R.A. § 2015 ("the

bonds issued by [HTA] shall not be a debt of the Commonwealth of Puerto Rico . . . nor shall such

bonds or the interest thereon be payable out of any funds other than those pledged for the payment of

such bonds and interest").   Movants are effectively making the self-refuting argument that the

Commonwealth enacted a statute broadcasting it was not liable for HTA bonds, while, with a wink

and nod, rendering its assets liable for HTA bonds.  Cannot be!  If the HTA Allocable Revenue

Statutes already gave Bondholders equitable ownership over the funds as claimed by Movants, why

would the same statutes authorize HTA to grant a security interest in HTA Allocable Revenues?  They

wouldn't because it would not be necessary.  Movants' trust theory would impermissibly write these

provisions out of the HTA Allocable Revenue Statutes and Enabling Act.  And as this Court has

explained before, ownership interests and security interests cannot coexist in favor of the same person

at the same time on the same property.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 582 B.R. 579,

599 (D.P.R. 2018) (citing *William W. Bierce, Ltd. v. Hutchins*, 205 U.S. 340, 347 (1907) ("[T]he

assertion of a lien is inconsistent with the assertion of the title interest.")).

16.     Movants also do not have statutory liens against the HTA Allocable Revenues.   As

the First Circuit has already ruled once with respect to the Toll Revenues, no statutory lien exists

where the applicable statutory "provisions ***permit*** the Authority to secure the payment of bonds by

making a pledge of revenues, ***but they do not require*** that it do so."  *Peaje Invs. LLC v. Fin. Oversight

& Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 1, 11 (1st Cir. 2018)

(emphasis added).   Here, all the applicable HTA Allocable Revenue Statutes state HTA is

"authorized," but not required, to grant security interests against its revenues.  *See* 9 L.P.R.A. § 2021

(HTA is "authorized" to grant security interest on certain revenues); 9 L.P.R.A. § 5681 (same); 13

conceding whether Movants' translation is correct or not, references to 13 L.P.R.A. § 31751 made herein are to Movants'
translation for ease of reference.

8

L.P.R.A. § 31751(3)(C) (same); 13 L.P.R.A. § 31751(1)(C) (same); *cf.* 13 L.P.R.A. § 31751(1)(E) (referring to funds "pledged" by HTA). *Peaje* controls and is dispositive of Movants' claims to a statutory lien. Moreover, Movants cannot meritoriously contend the Commonwealth granted a statutory lien against its assets, when the Commonwealth enacted 9 L.P.R.A. § 2015 providing the HTA bonds would not be a debt of the Commonwealth.

17.    While the Motion primarily rests on a claim against the Commonwealth in connection with the HTA Allocable Revenues, Movants also seek relief against HTA with respect to Toll Revenues held by HTA. The HTA Bondholders likewise are not entitled to stay relief as against HTA. Movants claim to have a lien on HTA's Toll Revenues, and seek to enforce their purported lien against the Toll Revenues. The HTA Bondholders' argument is inconsistent with the HTA Bond Resolutions, which limit any security interest against Toll Revenues to Toll Revenues deposited into the Pledged Funds.

18.    As all Movants' claims to property rights granted by statute fail, Movants' request that the Court lift the stay must be denied. Notably, however, Movants have conceded their Motion must be dismissed against the Commonwealth even if they have the expansive liens they claim on the HTA Allocable Revenues: Movants concede that all the HTA Allocable Revenues are being deposited into the Commonwealth's Treasury Single Account ("TSA"), and that the TSA's balance "vastly exceeds" the value of their purported lien. Mot. ¶ 24. As a result, Movants cannot show they lack adequate protection or that the Commonwealth lacks equity.[9]

## **RELEVANT BACKGROUND**

### **I.    HTA and the HTA Bonds**

---

[9]   The Motion involves a great number of issues not detailed in this Opposition, including, without limitation, lack of adequate protection, due process, and *Sonnax*. Pursuant to this Court's order dated January 31, 2020 [ECF No. 10595], this Opposition is limited to issues of standing and secured status. The Oversight Board will address all the issues raised in the Motion before a final hearing, if any, and reserves all rights to make any and all arguments in further briefing on the Motion.

19.     HTA is a public corporation established pursuant to Act No. 74-1965, which is codified as 9 L.P.R.A. §§ 2001-2035 (as amended, the "Enabling Act").  HTA is responsible for the construction, operation, and maintenance of the Commonwealth's transportation system.  *See* 9 L.P.R.A § 2002.  Pursuant to the Enabling Act, HTA is authorized to issue bonds and to secure their repayment by granting a security interest against certain of its property.  *See* 9 L.P.R.A. § 2004(l).

20.     HTA issued several series of bonds governed by: (*i*) Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution," and the bonds issued thereunder, the "1968 Bonds"), and (*ii*) Resolution No. 98-06, adopted February 26, 1998 (the "1998 Resolution," and the bonds issued thereunder, the "1998 Bonds," and the 1968 Bonds together with the 1998 Bonds, the "Bonds," and the holders of Bonds, the "HTA Bondholders,") and the 1968 Resolution together with the 1998 Resolution, the "HTA Bond Resolutions").[10]

### a.  1968 Bonds

21.     The 1968 Resolution contemplates the 1968 Bonds would be secured by a security interest against certain revenues of HTA ("1968 HTA Revenues") both received by HTA *and* actually deposited with the Fiscal Agent to the credit of a special fund created and designated by the 1968 Resolution as the "Sinking Fund" (the "1968 Sinking Fund").  Section 601 of the 1968 Resolution provides, in relevant part:

> Except as in this Resolution otherwise provided, the [1968 Bonds] are payable *solely from Revenues and from any funds received* by the Authority for that purpose from the Commonwealth *which Revenues and funds are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified*.

1968 Resolution § 601 (emphasis added).  Notably, section 601: (*i*) restricts any security interest to

---

[10] The 1968 Resolution is attached as Exhibit C to the Natbony Declaration.  The 1998 Resolution is attached as Exhibit D to the Natbony Declaration.  For ease of reference and to avoid overburdening the Court, the Oversight Board has not filed its own copies of documents that were attached to the Natbony Declaration.  The Oversight Board reserves all rights with respect to the documents attached to the Natbony Declaration, including, without limitation, the right to challenge the validity or accuracy of any of such documents.

Revenues and other funds "received" by HTA from the Commonwealth, and (*ii*) limits any grant of

a security interest "to the extent hereinabove particularly specified."  1968 Resolution § 601.

22.     The 1968 Resolution defines "Revenues" as follows:

> The word "Revenues" shall mean (a) all moneys received by the Authority on account
> of gasoline tax allocated to [HTA] . . . ; (b) Toll Revenues; (c) the proceeds of any
> other taxes, fees or charges which the Legislature of Puerto Rico has allocated . . . to
> [HTA] and expressly authorize [HTA] to pledge to the payment of . . . Bonds . . . and
> which are pledged by [HTA] to the payment of . . . Bonds . . . ; and (d) investment
> earnings on deposit to the credit of the funds and accounts established hereunder . . .

*Id.* at § 101 (at 11).

23.     Section 401 "particularly specifies" the manner and extent to which 1968 HTA

Revenues secure the 1968 Bonds.  Specifically, section 401 provides "all of the Revenues . . . and

any other funds of the Commonwealth allocated to [HTA] for the payment of principal and interest

on bonds of [HTA] . . . *which it receives will be deposited monthly with the Fiscal Agent . . . .*" into

the accounts comprising the Sinking Fund.  1968 Resolution § 401 (emphasis added).

24.     Section 401 specifies only the moneys received by HTA and deposited into the 1968

Sinking Fund are subject to a security interest for the benefit of the holders of the 1968 Bonds:

> A special fund is hereby created and designated "Puerto Rico Highway
> Authority Highway Revenue Bonds Interest and Sinking Fund" (herein
> sometimes called the "Sinking Fund").  There are hereby created in the
> Sinking Fund three separate accounts designated "Bond Service
> Account", "Redemption Account" and "Reserve Account",
> respectively.
>
> *The moneys in said Funds and Accounts shall be held by the Fiscal
> Agent in trust*[11] and applied as hereinafter provided with regard to each
> such Fund and Account and, pending such application, *shall be subject
> to a lien and charge in favor of the holders of the bonds* issued and
> outstanding under this Resolution and for the further security of such
> holders until paid out or transferred as herein provided.

---

[11] Provisions purportedly providing that funds are to be held "in trust" in these circumstances amount to no more than an
attempt to create a security interest in whatever is held "in trust."  *See, e.g., In re Las Vegas Monorail Co.*, 429 B.R. 317,
339 n.38 (Bankr. D. Nev. 2010) (finding that despite purported transfer of ownership interest in security agreement, only
security interest was created to secure debt under Article 9).  Such a security interest would be subject to the usual UCC
perfection (and other) rules applicable to security interests.

*Id.*

25.     The 1968 Resolution granted a security interest against only those Revenues that are *both* received by HTA *and* deposited into the 1968 Sinking Fund held by the Fiscal Agent.  It does not grant a security interest against (*i*) HTA's right (if any) to receive 1968 HTA Revenues, or (*ii*) Revenues not in accounts held by the Fiscal Agent.[12]  Moreover, a security interest in HTA's rights to Revenues would do Movants no good because the statutes appropriating monies to HTA are preempted.  And as the Commonwealth is not a party to the 1968 Resolution (or any other agreement with, or for the benefit of, the 1968 Bondholders), it did not grant a security interest against any of its assets or revenues for the benefit of the 1968 Bondholders.

26.     The form of bond contained in the 1968 Resolution provides HTA "hereby promises to pay, solely from the special fund provided therefor as hereinafter set forth [principal and interest of the bond] . . . ."  1968 Resolution § 203.  The form of bond refers to the 1968 Resolution "for provisions, among others, with respect to . . . the fund charged with and pledged to the payment of the interest on and the principal of the bonds . . . ."  *Id*.  The form of bond specifies this "special fund" is the 1968 Sinking Fund.  *Id*. ("The Resolution provides for the creation of a special fund . . . herein called the 'Sinking Fund'[] which special fund is pledged to and charged with the payment of the principal of and the interest on all bonds issued under the provisions of the Resolution.").  The form of bond contained in the 1968 Resolution provides that "[t]his bond shall not be deemed to constitute a debt of the Commonwealth . . . nor shall this bond or the interest thereon be payable out of any funds other than those pledged for the payment thereof pursuant to the Resolution."

---

[12]   In fact, every reference to the granting of a security interest in the Revenues limits the security interest to moneys HTA *received*, moneys *held* by the Fiscal Agent and moneys *deposited* in the relevant HTA account.  *See id.* §§ 401, 406 (referring to "moneys held" in the accounts in the Sinking Fund as pledged to 1968 Bonds), 407 (referring to moneys withdrawn from the Sinking Fund for the payment of particular 1968 Bonds after having been deposited in the Sinking Fund as subject to a property interest in favor of the holders of those 1968 Bonds), 501 (stating "moneys deposited with the Fiscal Agent under the provisions of this Resolution shall be held in trust").

27.     In short, the scope of the collateral against which security interests are granted to the 1968 Bondholders is limited to the 1968 HTA Revenues both "received" by HTA and "deposited" to the credit of the 1968 Sinking Fund held by the Fiscal Agent.

### b.  1998 Bonds

28.     The 1998 Resolution contemplates the 1998 Bonds would be secured by certain revenues of HTA ("1998 HTA Revenues," and together with the 1968 HTA Revenues, the "Revenues") both received by HTA and deposited to the credit of a special fund designated as the "Revenue Fund" and held by the Fiscal Agent.  Section 601 provides, in relevant part:

> Except as in this Resolution otherwise provided, [the 1998 Bonds] are payable *solely from Revenues and other moneys deposited to the credit of the Revenue Fund and from any funds received by the Authority for that purpose from the Commonwealth, which Revenues, moneys and funds are hereby pledged* (with such priorities with respect to the use and disposition of Revenues as are in this Resolution specified) to the payment thereof *in the manner and to the extent hereinabove particularly specified.*

1998 Resolution § 601 (emphasis added).  Notably, section 601: (*i*) restricts any security interest to Revenues "deposited" in the Revenue Fund and other funds "received" by HTA from the Commonwealth, and (*ii*) limits any grant of a security interest "to the extent hereinabove particularly specified."  1998 Resolution § 601.

29.     The term "Revenues" is defined by the 1998 Resolution as follows:

> The word "Revenues" shall mean [a] all moneys received by the Authority on account of the crude oil tax allocated to [HTA] . . . [b] all Existing Tax and Fee Revenues upon the repeal and cancellation of the 1968 Resolution, [c] any tolls . . . imposed by [HTA] for the use of any of the Toll Facilities other than [those pledged in the 1968 Resolution] . . . [d] the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to [HTA] and expressly authorize [HTA] to pledge to the payment of the principal of and interest on bonds .  .  . and which are pledged by [HTA] to the payment of the principal of and interest on bonds issued under the provisions of this Resolution . . . , and [e] investment earnings on deposits to the credit of funds and accounts established hereunder . . .

*Id*. § 101 (at 13).

30.     Section 401 of the 1998 Resolution "particularly specifies" the manner and extent to

13

which the 1998 HTA Revenues secure the 1998 Bonds.  Specifically, section 401 creates the Revenue

Fund and related sinking funds (the "1998 Sinking Funds," and together with the Revenue Fund, the

"1998 Resolution Funds," and the 1998 Resolution Funds together with the 1968 Sinking Fund, along

with the moneys on deposit in such funds, the "Pledged Funds") for the payment of 1998 Bonds, and

then states "all Revenues . . . *will be deposited when received to the credit of the Revenue Fund*."

1998 Resolution § 401 (emphasis added).  Section 401 requires the monthly transfer from the Revenue

Fund to the 1998 Sinking Funds of all moneys then on deposit in the Revenue Fund.  Section 401

goes on to provide that:

> *The moneys in said Funds and Accounts shall be held by the Fiscal*
> *Agent in trust* and applied as hereinafter provided with regard to each
> such Fund and Account and, pending such application, *shall be subject*
> *to a lien and charge in favor of the holders of the bonds* issued and
> outstanding under this Resolution and for the further security of such
> holders until paid out or transferred as herein provided.

1998 Resolution § 401 (emphasis added).

31.     The 1998 Resolution granted 1998 Bondholders a security interest against only

Revenues both *received* by HTA and *deposited* into the 1998 Resolution Funds.  The 1998 Resolution

lacks any language granting a security interest against any right of HTA to receive 1998 HTA

Revenues.  The Commonwealth is not a party to the 1998 Resolution (or any other agreement with,

or for the benefit of, the 1998 Bondholders), and thus did not grant any security interest for the benefit

of the 1998 Bondholders.

32.     Pursuant to a security agreement, dated February 7, 2002 (the "1998 Security

Agreement"),[13] HTA granted a security interest against (*i*) the 1998 Resolution Funds, and (*ii*) all

amounts required to be on deposit therein by the terms of the 1998 Resolution. HTA could only grant

a security interest against its own property: that is, *amounts it receives* that are required to be on

---

[13] The 1998 Security Agreement is attached as Exhibit F to the Natbony Declaration.

deposit by the 1998 Resolution in the 1998 Resolution Funds. The 1998 Security Agreement restricts the security interest to only the 1998 Resolution Funds and the 1998 HTA Revenues deposited to the credit of those funds. The scope of the security interest granted pursuant to the 1998 Security Agreement, which has no separate authorization outside of the 1998 Resolution, can be no greater than the scope of the security interest authorized by and granted pursuant to the 1998 Resolution.

### c.  The 1968 Bond Financing Statements

33.  Four financing statements were filed that name HTA as the debtor for the 1968 Bonds. *See* Dep't of State Doc. Nos. 2014002566, 2014002568, 2014003808, 2014003807 (the "1968 Financing Statements").  All of the 1968 Financing Statements describe the HTA Bondholders' collateral as "all of [HTA's] right, title, and interest in and to 'Revenues'" or contain a substantially similar description.  None of the 1968 Financing Statements indicate HTA's *right to receive* (if any) Revenues as collateral.  None of the 1968 Financing Statements adequately name the "secured party" for the Bonds.  The 1968 Resolution is not attached to any of the 1968 Financing Statements.

34.  For the 1968 Bonds, there are no deposit account control agreements and the Fiscal Agent does not have control over any accounts, of the Commonwealth or HTA, other than the 1968 Sinking Fund (which is held by the Fiscal Agent).  Thus, those are the only accounts subject to perfected security interests.

### d.  The 1998 Bond Financing Statements

35.  Six financing statements were filed that name HTA as the debtor for the 1998 Bonds. *See* Dep't of State Nos. 2014003809, 2014003810, 2014004845, 2014004847, 2014004848, 2014004846 (the "1998 Financing Statements," and with the 1968 Financing Statements, the "Financing Statements").[14]  All of the 1998 Financing Statements indicate the HTA Bondholders' collateral as "all of [HTA's] right, title, and interest in and to 'Revenues'" or a substantially similar

---

[14]  The Financing Statements are attached as Exhibit N to the Natbony Declaration.

description.  None of the 1998 Financing Statements describe HTA's *right to receive* Revenues as collateral.  None of the 1998 Financing Statements adequately name the "secured party" for the Bonds.  The 1998 Resolution is not attached to any of the 1998 Financing Statements.

36.     For the 1998 Bonds, there are no deposit account control agreements and the Fiscal Agent does not have control over any accounts, of the Commonwealth or HTA, other than the 1998 Resolution Funds (which are held by the Fiscal Agent).  Thus, those are the only accounts subject to perfected security interests.

**II.     Toll Revenues and the HTA Allocable Revenues**

37.     Pursuant to the HTA Bond Resolutions, HTA granted a security interest against (*i*) the revenues of specified tolls levied by HTA (the "Toll Revenues"), and (*ii*) the revenues of certain taxes and fees imposed and collected by the Commonwealth that are conditionally allocated to HTA for its corporate purposes (the "HTA Allocable Revenues").

38.     The Enabling Act provides HTA is authorized to, among other things, impose and collect tolls.  9 L.P.R.A § 2004(j).  The Commonwealth conditionally allocates three sets of tax or fee revenues to HTA: (*i*) revenues of gasoline, diesel, crude oil, and other excise taxes imposed by the Commonwealth pursuant to 13 L.P.R.A. § 31626 and 13 L.P.R.A. § 31627 (the "Gasoline Excise Taxes"); (*ii*) revenues of cigarette excise taxes imposed by the Commonwealth pursuant to 13 L.P.R.A. § 31625 ("Cigarette Excise Taxes"); and (*iii*) revenues of motor vehicle license fees imposed by the Commonwealth pursuant to Act 22-2000, as amended (the "Vehicle Fees").

39.     The statutes conditionally allocating the HTA Allocable Revenues to HTA expressly set forth that the HTA Allocable Revenues are subject to retention by the Commonwealth if the Commonwealth's available resources[15] are insufficient to cover its expenses in a given fiscal year as

---

[15] The official English version of the Puerto Rico Constitution uses the term "available revenues," not "available resources," which is used in other translations. Solely for purposes of this Opposition, and without waiver of or prejudice to any argument regarding which version of the Puerto Rico Constitution controls, the Oversight Board uses the term "available

provided in Article VI, section 8 of the Commonwealth Constitution. 13 L.P.R.A. § 31751(a)(1)(C) (allocation of Gasoline Excise Taxes to HTA "subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico"); 13 L.P.R.A. § 31751(a)(3)(C) (any pledge of Cigarette Excise Taxes to HTA bondholders "subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico"); 9 L.P.R.A. § 2021 (any pledge of Vehicle License Fees "subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico"); 9 L.P.R.A. § 5681 (any pledge of Vehicle Fees "subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico").

40.     13 L.P.R.A. § 31751(a)(1), (3) provides the Gasoline Excise Taxes and the Cigarette Taxes "shall be covered into a special deposit account in favor of [HTA] for its corporate powers and purposes." 9 L.P.R.A. § 5681 provides motor vehicle license fees shall "be covered in its entirety into a special deposit account in the name and for the benefit of [HTA]."

41.     The HTA Allocable Revenue Statutes (*i*) do not provide HTA has a right to receive any HTA Allocable Revenues that have not yet been collected, (*ii*) provide the HTA Allocable Revenues are property of the Commonwealth when collected and subject to retention by the Commonwealth under certain conditions, and (*iii*) provide the HTA Allocable Revenues are property of HTA and held by HTA for its benefit once they have been transferred to HTA.[16]

_____

resources" in accordance with the use of that term in Adversary Proceeding Nos. 19-291, 19-292, 19- 293, 19-294, 19-295, 19-296, and 19-297.

[16] The Excise Taxes are conditionally payable to HTA on a monthly basis after they are "collected." *See* 13 L.P.R.A. § 31751(a)(1) (Gasoline Excise Taxes covered over to HTA on monthly basis following collection); 13 L.P.R.A. § 31751(a)(3) (Cigarette Excise Taxes covered over to HTA on monthly basis following collection). After the Excise Taxes are collected, 13 L.P.R.A. § 31751 provides they "shall be covered into a special deposit in favor of [HTA] for its corporate purposes"—not in favor of HTA Bondholders. 13 L.P.R.A. § 31751(a)(1) (Gasoline Excise Taxes); *see also* 13 L.P.R.A. § 31751(a)(3) (Cigarette Excise Taxes that have been collected "shall be covered into a special deposit account in favor of [HTA] for its corporate powers and purposes"). 13 L.P.R.A. § 31751 does not specify how HTA must use the Excise Taxes. It provides HTA "is hereby authorized to pledge or encumber" the Excise Taxes. 13 L.P.R.A. § 31751(a)(3)(C) (Cigarette Excise Taxes); *see also* 13 L.P.R.A. § 31751(a)(1)(C) (Gasoline Excise Taxes). The Vehicle Fees are allocated to HTA after they are "collected." *See* 9 L.P.R.A. § 5681 (Vehicle Fees that have been collected "shall be covered in [their] entirety into a Special Deposit in the name and for the benefit of the Highways and Transportation Authority."). After the Vehicle Fees are collected, 9 L.P.R.A. § 5681 provides they "shall be covered in [their] entirety into a Special Deposit in the name and for the benefit of [HTA]"—not for the benefit of HTA Bondholders. 9 L.P.R.A. § 5681 does not specify how HTA must use the Vehicle Fees, but provides HTA "is hereby authorized to pledge or encumber" the Vehicle Fees. 9 L.P.R.A. § 5681.

III.     **PROMESA, Retention of the HTA Allocable Revenues, and the Use of Toll Revenues**

a.  **PROMESA**

42.     On June 30, 2016, President Obama signed PROMESA into law, creating the Oversight Board for Puerto Rico.  PROMESA § 101(b).  PROMESA section 201 gives the Oversight Board the sole power to certify fiscal plans for the Commonwealth and its instrumentalities.  PROMESA § 201.  PROMESA section 202(e)(3)(C) gives the Oversight Board the sole power to certify budgets for the Commonwealth and its instrumentalities over ***all*** appropriations, which shall be deemed to be "in full force and effect" once certified.

43.     PROMESA section 4 provides that "the provisions of [PROMESA] shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with [PROMESA]."  PROMESA § 4.

44.     PROMESA section 405(m)(1), (2), and (3) provides, among other things, (*i*) there is a fiscal emergency in Puerto Rico, (*ii*) the Commonwealth is unable to provide its citizens with effective services, and (*iii*) the fiscal emergency has contributed to the accelerated outmigration of residents and businesses.  PROMESA § 405(m)(1)-(3).

b.  **The Fiscal Plans and the Retention of the HTA Allocable Revenues**

45.     Between March 13, 2017 and May 9, 2019, the Oversight Board certified eight fiscal plans for the Commonwealth.  None of the fiscal plans provided the Commonwealth would appropriate and transfer the HTA Allocable Revenues to HTA.

46.     On May 9, 2019, the Oversight Board certified the current fiscal plan for the Commonwealth ("May 2019 Fiscal Plan") (attached as Exhibit M to the Natbony Declaration).  The May 2019 Fiscal Plan does not provide for the Commonwealth to appropriate or transfer the HTA Allocable Revenues to HTA.  *Id.* at 28, 40, and 122.  The May 2019 Fiscal Plan contains a "Revenue Breakdown" that lists HTA Allocable Revenues as available for the Commonwealth's use.  *Id.* at 148,

18

Ex. 84.

47.     On June 30, 2019, the Oversight Board certified a budget for the Commonwealth for the current Fiscal Year 2020 (the "FY20 CW Budget") (attached as Exhibit K to the Natbony Declaration).  The FY20 CW Budget does not include an appropriation or transfer of HTA Allocable Revenues by the Commonwealth to HTA.

48.     On June 5, 2019, the Oversight Board certified the current fiscal plan for HTA (the "HTA Fiscal Plan") (attached as Exhibit HH to the Natbony Declaration).  The HTA Fiscal Plan does not provide for the appropriation of any of the HTA Allocable Revenues to HTA (or the receipt by HTA of such HTA Allocable Revenues).  *Id.* at 50.

### c.   HTA's Use of Toll Revenues

49.     Between April 28, 2017 and June 5, 2019, the Oversight Board certified four fiscal plans for HTA. All of these fiscal plans contemplate HTA will use the Toll Revenues to fund the expenditures necessary to keep the transportation system in working order.

50.     On June 30, 2019, the Oversight Board certified the current budget for HTA (the "FY20 HTA Budget").[17] The FY20 HTA Budget projects HTA will apply its Toll Revenues to fund budgeted expenditures. The FY20 HTA Budget projects HTA will operate at a deficit.

## II.    The HTA Title III Case

51.     On May 21, 2017 (the "Petition Date"), the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for HTA pursuant to PROMESA section 304(a), commencing HTA's Title III case (the "HTA Title III Case").

52.     On June 1, 2017, the Court entered an order granting the joint administration of the HTA Title III Case with the Commonwealth's Title III case (the "Commonwealth Title III Case") [Case No. 17-BK-3283-LTS].  *See* Case No. 17-BK-3283-LTS, ECF No. 242.

---

[17] The FY20 HTA Budget is attached hereto as **Exhibit B**.

19

53.     Pursuant to PROMESA, the Oversight Board is the sole representative of each Title III debtor, and has certain powers of a chapter 11 trustee.  *See* PROMESA §§ 301(c)(7), 315(b).  Only the Oversight Board may propose a plan of adjustment for a Title III debtor.  PROMESA § 312.

**III.     The Commonwealth Plan of Adjustment**

54.     On September, 27, 2019, the Oversight Board filed a proposed Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. in the Commonwealth Title III Case (the "Commonwealth Plan").  Case No. 17-BK-3283-LTS, ECF No. 8765.  The Commonwealth Plan proposes to pay certain claims based on the Commonwealth's general obligation bonds at a level less than the full amount of their claims, even after taking into account the retention of the HTA Allocable Revenues. See Plan Arts. XXXVIII (providing for impairments to general obligation bond claims).

**IV.     The HTA Revenue Bond Complaints**

55.     On January 16, 2020, the Oversight Board filed a complaint objecting to certain proofs of claims, including claims filed by Movants against the Commonwealth based on the retention of the HTA Allocable Revenues, and the Takings Clause, Contracts Clause, and Due Process Clause.  *See* Case No. 20-AP-05-LTS, ECF No. 1 (the "CW-HTA Revenue Bond Complaint").

56.     On January 16, 2020, the Oversight Board filed a complaint objecting to certain proofs of claims, including claims filed by Movants against HTA based on the Bonds and the retention of the HTA Allocable Revenues, and the Takings Clause, Contracts Clause, and Due Process Clause. *See* Case No. 20-AP-07-LTS, ECF No. 1 (the "HTA Revenue Bond Complaint," and together with the CW-HTA Revenue Bond Complaint, the "HTA Revenue Bond Complaints").

57.     The statutes and documents the Oversight Board incorporates into the Revenue Bond Complaints are identical to those relied upon in this Opposition.

58.     Pursuant to Court order, *see* ECF No. 10595, the issues discussed in detail in this Opposition are limited to standing and secured status.  To the extent the Court requires or requests

20

briefing on other issues, the Oversight Board will supplement this Opposition.

## ARGUMENT

I.   **THE STAY PRESERVES THE COMMONWEALTH'S FUNCTIONS AND
     LIFTING IT IS AN EXTRAORDINARY REMEDY JEOPARDIZING LIFE,
     HEALTH, AND WELFARE, THEREBY MAKING IT CRITICAL FOR
     MOVANTS TO SHOW AT LEAST A LIKELIHOOD OF SUCCESS ON THEIR
     PROPERTY INTERESTS TO PROCURE STAY RELIEF**

59.     "[T]he automatic stay is among the most basic of debtor protections under bankruptcy

law." *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 975 (1st Cir. 1997) (citing

*Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 503 (1986);

*Municipality of San Juan v. Commonwealth of P.R.*, 919 F.3d 565, 577 (1st Cir. 2019) (citing *In re

Smith*, 910 F.3d 576, 580 (1st Cir. 2018)) ("the automatic stay . . . is meant to offer the debtor

'breathing room during the period of financial reshuffling' and 'protect[] the debtor's assets from

disorderly, piecemeal dismemberment outside the bankruptcy proceedings.'").

60.     The burden of proof is a shifting one: Movants must make an initial showing of cause;

only if Movants meet this burden is the debtor required to show lack of cause. *See In re Fin. Oversight

& Mgmt. Bd.*, 899 F.3d at 23; *Gracia-Gracia*, 939 F.3d at 344.  The First Circuit has made clear the

nature and extent of the collateral must be established. *See, e.g., Peaje*, 899 F.3d at 13 (determination

should provide "the Title III court's view as to the precise nature and extent of [HTA Bondholder's]

collateral"); *see also Gracia-Gracia*, 939 F.3d at 352-53 (remanding lift stay motion to Court to

"make at least a preliminary determination of the parties' respective property interests in the

segregated funds.").  Here, Movants' claims have been objected to in the HTA Revenue Bond

Complaints and, as such, are not presumed allowable. *See* 11 U.S.C. § 502(a).

61.     To make a *prima facie* case for relief from the stay or adequate protection under

Bankruptcy Code section 362(d)(1), Movants must show (1) a valid and perfected security interest;[18]

and (2) that the *value* of their security has diminished as of the date the stay relief motion was filed.[19]

A *prima facie* case requires the moving party to demonstrate a "factual and legal right to the relief it

seeks." *Gracia-Gracia*, 939 F.3d at 350. This burden is Movants' to bear. *Id.* at 347.

62.     Similarly, "the secured creditor who seeks relief from the automatic stay under §

362(d)(2) must demonstrate (1) the amount of its claim, (2) that its claim is secured by a valid,

perfected lien in property of the estate, and (3) that the debtor lacks equity in the property." *In re

Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bankr. S.D.N.Y. 1994) (citing *First Agricultural Bank v. Jug

End in the Berkshires, Inc. (In re Jug End in the Berkshires, Inc.*), 46 Bankr. 892, 901 (Bankr. D.

---

[18] *See In re Planned Sys., Inc.*, 78 B.R. 852, 861 (Bankr. S.D. Ohio 1987) ("a prima facie case may include: (1) a showing of an obligation owing by the debtor to the creditor; (2) a valid security interest as to which relief from stay is sought; and (3) the cause justifying relief from stay, in this case a decrease in the value of the equipment securing debtor's obligation to the movant combined with the failure on the part of the debtor to provide adequate protection of the movant's interest in the equipment."); *In re Jug End in Berkshires, Inc.*, 46 B.R. 892, 901 (Bankr. D. Mass. 1985) ("The moving creditor in a motion for relief from stay proceeding has the burden of establishing the validity and perfection of its security interests."); *In re S. Ill. Railcar Co.*, 301 B.R. 305 (Bankr. S.D. Ill. 2002) (denying motion for relief from stay on basis creditor failed to show it had a valid and perfected security interest); *In re Kowalsky*, 235 B.R. 590, 594 (Bankr. E.D. Tex. 1999) ("A secured creditor who seeks relief from the automatic stay under § 362(d)(2) has the burden to demonstrate (1) the amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate, and (3) that the debtor lacks equity in the property."); *In re Self*, 239 B.R. 877, 881 (Bankr. E.D. Tex. 1999) (same); *In re Swift*, Bankr. No. 07-B-12787, 2009 Bankr. LEXIS 589 (Bankr. N.D. Ill. Feb. 19, 2009) (same).

[19] *See, e.g., In re Continental Airlines, Inc.*, 146 B.R. 536 (Bankr. D. Del. 1992) (adequate protection awarded only from date motion is filed); *In re Cason*, 190 B.R. 917 (Bankr. N.D. Ala. 1995) (same); *In re Best Prods. Co.*, 138 B.R. 155 (Bankr. S.D.N.Y. 1992) (same); *In re Waverly Textile Processing*, 214 B.R. 476, 479 (Bankr. E.D. Va. 1997) (holding same and stating that "valuing collateral as of the petition date for adequate protection purposes would reward inaction by secured creditors and subject reorganizing debtors to potentially crippling demands for "make-up" payments late in a case."); *Ahlers v. Norwest Bank Worthington, N.A.*, 794 F.2d 388, 395 & n.6 (8th Cir. 1986), *rev'd on other grounds sub nom.*, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) (holding same arguing that "[i]f the secured creditor has not initiated any action to gain possession and liquidate the collateral prior to the filing of the bankruptcy petition, it has not been deprived of its benefit of its bargain when the petition is filed. Thus, the starting date should not be when the petition is filed, but rather when the secured creditor seeks either possession of the collateral or adequate protection. Moreover, this ruling will prevent a hardship to the debtor caused by an adequate protection motion filed well after the bankruptcy petition has been filed, which could require sizeable 'makeup' payments. It is not unreasonable to require the creditor to be vigilant in requesting protection if it wants this protection."); *In re Alliance Well Serv., LLC*, 551 B.R. 903, 907 (Bankr. D.N.M. 2016) (holding same and noting that it is the "majority view"); *In re Brian Wise Trucking, Inc.*, 386 B.R. 215, 218 (Bankr. N.D. Ind. 2008) ("adequate protection under 362[d](1), is to cover depreciation of collateral from the date the motion seeking adequate protection is filed"); *In re 300 Wash. St. LLC*, 528 B.R. 534, 552 n.10 (Bankr. E.D.N.Y. 2015) ("If the value of the collateral has declined, adequate protection is owed as of the time the creditor made its motion, rather than from the filing of the petition.").

Mass. 1985)).[20]  The "party requesting such relief has the burden of proof on the issue of the debtor's

equity in property" pursuant to Bankruptcy Code section 362(g).

63.    Movants vastly understate their burden to show an interest in property, stating it is

"not demanding," Mot. ¶ 46, and trying to obfuscate the infirmities of their position by asserting they

must only show a "colorable claim."  Mot. ¶¶ 43-49.  They analogize their burden to a motion to

dismiss standard, claiming they must show only a "plausible legal claim."  M. Br. ¶ 95 (citing *Jin*

*Qing Li v. Rosen*, 2018 WL 1354548 (B.A.P. 9th Cir. 2018)).  But the First Circuit holds movants to

a higher bar.  In *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 34 (1st Cir. 1994), the First Circuit

acknowledged that some lift stay hearings "do not involve a full adjudication on the merits," but such

proceedings are "analogous to a preliminary injunction hearing" to determine "the reasonable

likelihood that the creditor has a legitimate claim or lien as to a debtor's property."  This requires the

court to consider any relevant counterclaims or defenses.  *Id*.  Movants omit mention of *Grella's*

preliminary injunction standard.

64.    Moreover, where, as here, claim objections or other defenses are asserted that "strike

at the heart of the . . . creditor's claim or the validity of his lien," those objections and defenses

"directly affect the issue of equity and thus the issues of harm and adequate protection" and should

be "give[n] consideration . . . in determining whether or not the stay should remain in effect."  *In re*

---

[20]  *See also Marine Midland Bank v. Bennett Funding Grp., Inc. (In re Bennett Funding Grp., Inc.)*, 1997 Bankr. LEXIS
2194, at *63 (Bankr. N.D.N.Y. May 30, 1997) ("[t]o succeed under Code § 362(d)(2), a secured creditor must initially
demonstrate '(1) the amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate,
and (3) that the debtor lacks equity in the property.'"); *In re Crabtree*, 48 B.R. 528, 532-33 (Bankr. E.D. Tenn. 1985)
(denying motion for relief from the stay pursuant to Bankruptcy Code section 362(d)(2) as movants failed to demonstrate
their prepetition security interests were perfected); *In re McKenzie*, 737 F.3d 1034, 1039-40 (6th Cir. 2013) ("requiring a
creditor to establish the validity of its security interest makes sense as a matter of sound judicial policy because the creditor
will likely be in the best position to show that its interest is valid. . . . The bankruptcy court therefore properly required
GKH to establish the validity of its security interest in the pledged collateral [when considering a lift stay motion brought
pursuant to Section 362(d)(2)].") (internal citations omitted); *Omega Envt'l. Inc. v. Valley Bank NA*, 219 F.3d 984, 986
n.1 (9th Cir. 2000) (per curiam) ("A creditor holding an unperfected security interest is not entitled to relief from an
automatic stay imposed under Bankruptcy Code § 362."); *First Nat'l Bank of Denver v. Turley*, 705 F.2d 1024, 1027 (8th
Cir. 1983) (same).

23

*Franklin Equip. Co.*, 416 B.R. 483 (Bankr. E.D. Va. 2009) (quoting *United Cos. Fin. Corp. v. Brantley*, 6 B.R. 178 (Bankr. N.D. Fla. 1980)); *see also, e.g.*, *Bargas v. Rice (In re Rice)*, 82 B.R. 623, 626 (Bankr. S.D. Ga. 1987) (court denied stay relief until litigation on claim resolved when presented with evidence that strongly supported the inference movants' lien was invalid). Notably, none of the Movants' cases involved situations where Movants' security interest was subject to a credible challenge,[21] nor did they involve the situation here, where Movants' documents limit the security interest to funds received by HTA and deposited in the Pledged Funds, and Movants' whole case is based on virtually self-refuting grasps at trusts, equitable remedies, and the like.

65.     Moreover, as the First Circuit has ruled, "in order to properly weigh the *In re Sonnax* factors, the Title III court first needs to make *at least* a preliminary determination of the parties' respective property interests in the disputed funds."  *Gracia-Gracia*, 939 F.3d at 348 (emphasis added).  Where, as here, the Court can determine Movants' property interests without determining complex issues relating to commingling that arose in *Gracia-Gracia*, and based solely on the plain language of the HTA Allocable Revenue Statutes, HTA Bond Resolutions, and the First Circuit's ruling that pre-PROMESA appropriations are preempted, the Court can determine (on a preliminary or final basis) Movants have no property interests in Commonwealth assets, before deciding the

---

[21] In *Vitreous Steel*, relied upon by the Court in *Grella*, the Seventh Circuit noted how the record demonstrated the creditor held a perfected security interest in the collateral at issue. *See Vitreous Steel*, 911 F.2d at 1233–34. It was the preference and fraudulent transfer actions to eliminate the lien that the appellate court ruled was not part of the stay relief matter. *See id*. at 1234. Moreover, the bankruptcy trustee was not challenging the lien in *Vitreous Steel*. In fact, "[t]he bankruptcy court found that the evidence was undisputed that the Bank held a lien on all the realty and personalty" and the only issue properly before the court on the motion to lift the automatic stay was whether *Vitreous* had any equity in the real estate. Matter of *Vitreous Steel*, 911 F.2d 1223, 1229, 1232 (7th Cir. 1990). *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*, 602 B.R. 798 (B.A.P. 1st Cir. 2019) does not lead to a different conclusion. While repeating language found in *Vitreous* that a hearing on lift stay motion is limited in scope, the court recognized that "the bankruptcy court is not precluded from considering defenses to a creditor's claim to property of the estate[.]" *Id*. at 826. *See also Jin Qing Li v. Rosen (In re Jin Qing Li)*, No. NC-17-1062, 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018) ("Motions for relief from stay are "summary proceedings" suitable only to ascertain whether the application of the automatic stay should be modified. As such, bankruptcy courts have the discretion to "consider" the defective nature of the creditor's interests within a motion for relief from stay") (internal citations omitted). In sum, courts have always recognized that defenses to alleged property interests can be considered by the bankruptcy court when determining if to lift the automatic stay.

Motion.  That Movants' claims might be colorable (*and they are not*), is simply not enough.

## II.   MOVANTS ARE MERE CREDITORS OF A CREDITOR THAT LACK STANDING TO SEEK STAY RELIEF AGAINST THE COMMONWEALTH

66.   Movants are insurers of HTA's Bonds. Mot. ¶¶ 1, 4.  They are in contractual privity only with HTA, not with the Commonwealth.  The Commonwealth is not a party to the HTA Bond Resolutions (or the 1998 Security Agreement), and, as discussed below, the relevant statutes do not give Movants any secured claim against the Commonwealth.  Whatever claims Movants might have against HTA, they do not have the right to seek stay relief based on lack of adequate protection or lack of equity *vis-à-vis* the Commonwealth.

67.   As detailed below, all the statutes that allocate the HTA Allocable Revenues to HTA appropriate them to HTA for HTA's "corporate purposes"—not for the benefit of Bondholders.  *See* 13 L.P.R.A. § 31751(a)(1), (a)(3); 9 L.P.R.A.  §§ 2021, 5681.  Bondholders only obtain security interests against HTA Allocable Revenues to the extent they are both (*i*) received by HTA and (*ii*) deposited into the Pledged Funds.  Movants thus lack any direct claim to the HTA Allocable Revenues—and without a "direct claim to" the HTA Allocable Revenues, Movants "lack[] the direct interest necessary to establish prudential standing" in the Commonwealth Title III Case.[22]

68.   Party-in-interest standing under Bankruptcy Code section 1109(b) is confined to parties whose interests are directly (not indirectly or derivatively) affected by a Title III case.[23]  Party-in-interest status does not include a creditor of a creditor of a debtor.[24]  This reasoning is obvious—

---

[22] *BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306 (D.P.R. 2017); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2002) (to have standing, a party's claims generally must be "premised on [their] own legal rights (as opposed to those of a third party)").

[23] Party-in-interest status under Bankruptcy Code § 1109(b) is a necessary prerequisite to bankruptcy standing.  *In re Tower Park Props., LLC*, 803 F.3d 450, 452 (9th Cir. 2015) (citing *In re Thorpe Insulation Co.*, 677 F.3d 869, 884 (9th Cir. 2012)).  "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).

[24] *See, e.g., In re Comcoach Corp.*, 698 F.2d 571, 574 (2d Cir. 1983) (mortgagee of debtor's landlord that was foreclosing on property that was leased to bankrupt tenant, not "party in interest" in relation to bankrupt tenant's bankruptcy proceedings as "the Bank possesses no claim against the debtor or the estate, lacks 'creditor' status, and cannot move to

the creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what the other creditor is trying to do.

69.     With respect to the Bonds, Movants are too far removed from the Commonwealth to have standing to seek relief from the stay in the Commonwealth Title III Case. They are at most creditors of a creditor of the Commonwealth with no standing to assert a security interest against the Commonwealth. Even if they claim to be an unsecured creditor of the Commonwealth, only a secured creditor may seek stay relief or seek adequate protection from the debtor.[25] The sections of the Bankruptcy Code relating to stay relief and adequate protection (§§ 361-364) are intended to protect secured claimholders of a debtor, not alleged secured claimholders of a creditor of a debtor. Movants are "not intended beneficiaries" of these sections of the Bankruptcy Code and therefore lack prudential standing.[26]

### III.    MOVANTS DO NOT HAVE VALID, ENFORCEABLE PROPERTY RIGHTS OR LIENS, EXCEPT AGAINST MONEY BOTH RECEIVED BY HTA AND DEPOSITED TO THE CREDIT OF THE PLEDGED FUNDS HELD BY THE FISCAL AGENT

#### A. Movants' Security Interest is Limited to Monies Both Received by HTA and Deposited to the Credit of the Pledged Funds

---

lift the automatic stay."); *In re Lifeco Inv. Grp.*, 173 B.R. 478, 487 (Bankr. D. Del. 1994) ("I find no statutory or judicial support to conclude that a creditor of a creditor has standing in a bankruptcy case. Indeed, numerous cases state the contrary."); *In re Lopez*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) ("the moving party must be asserting its own rights and not those belonging to or derivative of a third party."); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (the "general principle that 'party in interest standing does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding' survives.") (internal quotes and cites omitted).

[25] Unsecured claimholders do not have the right to adequate protection payments. *In re S. Biotech, Inc.*, 37 B.R. 318, 324 (Bankr. M.D. Fla. 1983); *see also In re Babcock & Wilcox Co.*, 250 F.3d 955, 961 n.12 (5th Cir. 2001); *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 90-91 (2d Cir. 2003) (concluding that an unsecured claimholder was ineligible to receive adequate protection under section 361 of the Bankruptcy Code; rather, the adequate protection provision of section 361 only protects secured claimholders; *see, also, In re Comcoach Corp.*, 19 B.R. 231, 234 (Bankr. S.D.N.Y. 1982) (emphasis added). ("A noncreditor of a debtor, even though owed a debt by a creditor of the debtor, does not have standing *to seek relief from the automatic stay* for the purpose of recovering on its claim.").

[26] As articulated by the Second Circuit in *Comcoach*: "Support for this view is found in the Code's legislative history which suggests that, notwithstanding the use of the term 'party in interest', [sic] it is **only creditors** who may obtain relief from the automatic stay." *In re Comcoach Corp.*, 698 F.2d at 573-74 (citing H.R. Rep. No. 95–595 (1977)) (emphasis added); *see also In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) (section 1109 was not "intended to waive other limitations on standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim.").

26

70.     Contrary to Movants' assertion of a litany of different property interests and liens, the only documents granting Movants any security interests (or any other property interests) are the HTA Bond Resolutions (and the 1998 Security Agreement), which grant security interests only against Revenues both (*i*) received by HTA and (*ii*) deposited to the credit of the Pledged Funds.  All Movants' claims to "statutory entitlements," equitable rights, beneficial ownership interests, and statutory liens are made of whole cloth.

### i.      *Movants' Security Interest is Limited to the Pledged Funds*

71.     A security interest cannot be effective against the borrower in a bankruptcy case if (1) the security interest does not cover the asserted collateral, or (2) the security interest was not perfected.  *See* Bankruptcy Code § 544(a)(1); 19 L.P.R.A. § 2267(a)(2).  Here, the Resolutions only provide Movants with a security interest against the Pledged Funds, and the only security interest Movants could have perfected is against the Pledged Funds.

72.     Section 601 of each Resolution is part of the granting clause.  They do not grant a security interest against all Revenues: instead, they provide that the "Revenues and funds [received by HTA] are hereby pledged to the payment [of Bonds] in the manner and *to the extent hereinabove particularly specified*."  1968 Resolution § 601 (emphasis added); 1998 Resolution § 601 (providing same).

73.     Section 401 of each Resolution "particularly specifies" the grant of the security interest against Revenues.  Section 401 of the 1968 Resolution provides that: "A special fund is hereby created and designated [the "Sinking Fund"]."  *Id.* § 401.  Similarly, section 401 of the 1998 Resolution creates the 1998 Resolution Funds.  *See* 1998 Resolution § 401.  Both Resolutions contain a covenant from HTA to deposit Revenues *received* by HTA to the applicable fund (monthly in the case of the

1968 Resolution and when received in the case of the 1998 Resolution).[27]  Section 401 of each

Resolution specifies these Pledged Funds "shall be subject to a lien and charge in favor of the holders

of the bonds . . . ."  1968 Resolution § 401; *see also* 1998 Resolution § 401.

74.    The Resolutions make clear Revenues (both Toll Revenues and HTA Allocable

Revenues) are pledged to the payment of Bonds *only* to the extent "particularly specified" in section

401 of each Resolution—that is, only to the extent they are received by HTA and deposited into the

Pledged Funds.  The HTA Bond Resolutions do not grant a security interest against all Revenues, nor

HTA's right (if any) to receive Revenues, nor any of the Commonwealth's property (nor could they

as the Commonwealth is not a party to them and HTA does not have any "rights" in that property. 19

L.P.R.A. § 2233(b)(2)).  This is confirmed by the template bonds contained in the Resolutions, which

state only that the "special fund [the Sinking Fund] is pledged to and charged with the payment" of

the Bonds.  1968 Resolution § 203; *see also* 1998 Resolution § 204 (stating Bonds are not "be payable

out of any funds other than those pledged for the payment thereof pursuant to the Resolution.").[28]

---

[27] 1968 Resolution § 401 ("The Authority covenants that all of the Revenues . . . and any other funds of the Commonwealth allocated to the Authority for the payment of principal and interest on bonds of the Authority issued under the provisions of this Resolution which it receives will be deposited monthly with the Fiscal Agent."); 1998 Resolution § 401 ("The Authority covenants that all Revenues . . . will be deposited when received to the credit of the Revenue Fund . . . .").

[28] Movants point to several ambiguous statements in the official statements that accompanied the issuance of the Bonds as supposed support for their argument. Mot. ¶ 69.  None of the quotes supports Movants' expansive view of their lien— indeed, they only confirm any security interest was granted solely in the Pledged Funds. *See, e.g.,* Official Statement for Series AA Bonds issued pursuant to 1968 Resolution (Natbony Decl., Exhibit EE), at 14 (providing that the Bonds "are payable solely from, and secured by a pledge of, the 1968 Resolution Revenues and all other **moneys held for the credit of the 1968 Bond Sinking Fund** . . . ") (emphasis added).  Regardless, the HTA Bond Resolutions govern the scope of any security interests held by Movants, and the official statements cannot expand the scope of any security interest granted by the HTA Bond Resolutions. *See, e.g., id.* at 5, ("This Official Statement includes . . . summaries of the terms of the 2003 Bonds, the 1968 Resolution, the 1998 Resolution, and the various statutes affecting the Authority. Such summaries and the references to all documents referred to herein do not purport to be complete, and each summary and reference is qualified in its entirety by reference to each such document, copies of which are available from the Authority. All references to the 2003 Bonds are qualified in their entirety by reference to the definitive forms thereof and the information with respect thereto contained in the 1968 Resolution, the 1998 Resolution and the 2003 Resolutions.").  Similarly, to the extent that the Financing Statements contain collateral indications that differ from the collateral indications in the HTA Bond Resolutions, the Financing Statements cannot expand the scope of any security interests of Movants.  When the collateral indications in a security agreement and a related financing statement differ the scope of the perfected security interest is controlled solely by the narrower collateral indication, which in this case is the security agreement. *In re Robert Bogetti & Sons,* 162 B.R. 289, 295-96 (Bankr. E.D. 1993); *see also* 1 Sec. Interests in Pers. Prop. § 7.3 ("The security agreement not the financing statement is the contract between the parties.  The collateral may be enlarged by subsequent agreements or by reference to other writings, but a description in a financing statement alone should not confer additional

28

75.     The 1998 Security Agreement is in accord.  Specifically, it grants a security interest to the Trustee against the 1998 Resolution Funds and "all amounts required to be on deposit therein by the terms of the [1998] Resolution."[29]  On the Oversight Board's information and belief, no HTA board resolution was ever passed approving the one page 1998 Security Agreement, and as a result it is ineffective to the extent it purports to grant a security interest against collateral broader than the collateral authorized by the 1998 Resolution.  As the 1998 Resolution is the only resolution authorizing any grant of a security interest to 1998 Bondholders, the 1998 Security Agreement could not have granted larger security interests than provided for in the 1998 Resolution because such a larger grant would have been beyond HTA's authority.  *See* 9 L.P.R.A. § 2012(b) (providing that Bonds "may be authorized by **resolution or resolutions**" that can contain "such . . . terms and covenants **as such resolution or resolutions may provide**"); 9 L.P.R.A. § 2012(e)(1) ("Any **resolution or resolutions** authorizing any bonds may contain provisions . . . pledging of all or any part [of Revenues]") (emphasis added).  Regardless, by its own terms the 1998 Security Agreement to which HTA is a party can only pledge HTA property.  By pledging "amounts required to be on deposit" in the 1998 Resolution Funds "*by the terms of the 1998 Resolution*," HTA could and did only pledge the amounts it receives.  It could never pledge Commonwealth assets.  Section 401 of the 1998 Resolution makes clear that only Revenues "*received*" by HTA are required to be deposited in the 1998 Resolution Funds.  No moneys not actually received by HTA are "required" to be deposited therein, meaning that the 1998 Security Agreement, even if effective, could only grant a security interest against Revenues received by HTA—not funds possessed by the Commonwealth.

76.     Even if Movants were granted a security interest against all Revenues, Movants did

---

rights on the secured party.") (emphasis omitted).  The collateral indications contained in the HTA Bond Resolutions therefore control over any broader indications that may exist in the Financing Statements.

[29] The limitation to amounts "required" to be on deposit in the 1998 Pledged Funds clarifies that only monies that have to be deposited in the Revenues Fund and 1998 Sinking Funds (that is, 1998 HTA Revenues) are subject to the security interest, not any other monies that may also be deposited in those funds.

not perfect it.  The only way to perfect a security interest in funds credited to a deposit account is by "control" of the deposit account.  19 L.P.R.A. § 2262(b)(1) ("a security interest in a deposit account may be perfected only by control").  A secured party has "control" of a deposit account only if (a) the secured party is the bank with which the deposit account is maintained, (b) the secured party is the customer of the bank (and the holder of the deposit account), or (c) the borrower/debtor, the secured party and the bank have executed a deposit account control agreement that gives the secured party requisite "control" of the deposit account. *See* 19 L.P.R.A. § 2214(a)(1)-(3).

77.    The Pledged Funds are held by the Fiscal Agent, and arguably the Fiscal Agent has control of them.  But there are no deposit account control agreements with respect to any deposit accounts of HTA or the Commonwealth and, therefore, Movants do not have the requisite control over any HTA or Commonwealth deposit account (other than, in the case of HTA, the Pledged Funds).  As a result, even if Movants were granted a security interest against all Revenues regardless of where they are deposited, that security interest is unperfected (except as to the Pledged Funds).[30]

78.    As a result, Movants cannot have a valid, perfected security interest in anything other than the Pledged Funds.  And Movants do not even allege the Pledged Funds have decreased in value since the filing of the Motion or since the Petition Date.  As a result, Movants' assertion that they are entitled to stay relief must be rejected.

### ii.    Movants Do Not Have A Property Interest in an "Ongoing Stream" of Revenues

79.    Movants' argument that their "lien extends to the ongoing stream of current and future Pledged Revenues" (Mot. ¶ 69) is wrong.  As discussed above, Movants' security interest is limited

---

[30] Moreover, even if Movants were granted a security interest in HTA's right (if any) to receive Revenues (they were not), such security interest has not been perfected.  The only way to perfect a security interest in a right to receive Revenues is to file a financing statement "indicating the collateral covered." *See* 19 L.P.R.A. § 2260(a); 19 L.P.R.A. § 2322(a).  None of the Financing Statements identify HTA's right to receive Revenues as collateral.  Therefore, any security interest in HTA's right (if any) to receive Revenues is unperfected.

to the Pledged Funds.  Before the Petition Date, Movants' security interest in "Revenues" would only continue to attach as Revenues were deposited into the Pledged Funds.  Thus Movants' security interest was against a "stream" of Revenues only to the extent such "stream" ended up on deposit in the Pledged Funds.  But HTA's obligation to transfer Revenues into the Pledged Funds is simply a *contractual*, prepetition unsecured obligation: if HTA does not deposit Revenues into the Pledged Funds, HTA may breach its contractual obligation, but the HTA Bondholders' security interest does not enlarge to include funds outside the Pledged Funds.[31]  Movants' contentions must be rejected.

80.    That Movants do not have a security interest on a "stream" of future Revenues is also demonstrated by the recent First Circuit opinion relating to ERS bonds.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 U.S. App. LEXIS 2954, Case No. 19-1699 (1st Cir. Jan. 30, 2020).  In that case, the ERS bondholders claimed an ongoing property interest in postpetition employer contributions allocated to the to the retirement system by prepetition legislative appropriations. The First Circuit held that the retirement system did not have a property interest in future employer contributions as it only had "merely an expectancy" that such contributions would be made. *Id.* at 16. The court stated that any statutory requirement for the payment of employer contributions could be disregarded by a subsequent legislature.  Here too, the taxes and fees conditionally allocated to HTA could be modified or eliminated by a subsequent legislature.  *See id.* at *17-18.  The HTA Allocable

---

[31]  *See, e.g., Steslow v. Citicorp Mortg., Inc. (In re Steslow)*, 225 B.R. 883, 886 n.4 (Bankr E.D. Pa. 1998) (a "covenant without a pledge granting a security interest is simply a promise, not a security interest."); *In re Las Vegas Monorail Co.*, 429 B.R. 317, 338 (Bankr. D. Nev. 2010) (debtor's default in failing to comply with cash flow covenants did not render lender secured by funds); *see also Safe Deposit Bank & Tr. Co. v. Berman*, 393 F.2d 401, 404 (1st Cir. 1968) (where parties "apparently wished" to grant security interest to creditor but failed to comply with Article 9 requirements for grant of security interest are unsecured); *In re Arctic Air*, 202 B.R. 533 (Bankr. D.R.I. 1996) (in the absence of a "separate written agreement . . . which evidences the debtor's intent to grant a security interest" in specific property, no security interest exists in that property); *In re Daves*, 770 F.2d 1363, 1366 (5th Cir. 1985) (breach of "promise to secure" loans leaves lender with unsecured claim); *Shelton v. Erwin*, 472 F.2d 1118, 1120 (8th Cir. 1973) (where parties intended to grant security interest but documents did not specifically provide for grant of security interest, no security interest created under Uniform Commercial Code: "[s]ince the Code is not ambiguous on the requirements of the creation of an enforceable security interest, there is no reason to relax those requirements."); *1st Farm Credit Servs., PCA v. Phillips (In re Phillips)*, No. 05-87521, 2007 WL 4179845, at *3 (Bankr. C.D. Ill. Nov. 20, 2007) ("A borrower's covenant in a security agreement requiring prior authority for the disposition of collateral is only as valuable as compliance with it.").

Revenue Statutes, like the ERS employer contribution statutes, thus create no property right in the HTA Allocable Revenues—HTA has only an expectancy, which is not a property interest under Puerto Rico law. *See id.* (citing *Redondo-Borges v. HUD*, 421 F.3d 1, 9 (1st Cir. 2005)). Accordingly, HTA could not have granted the Movants a security interest on any "stream" of future HTA Allocable Revenues.

81.     Even if Movants had a perfected security interest in funds the Commonwealth transfers to HTA, that would not help Movants as the Commonwealth has not appropriated the HTA Allocable Revenues to HTA. In connection with the HTA Allocable Revenues, HTA only has the power to, "subject to the provisions of § 8 of Art. VI of the Constitution . . . pledge to the payment of [the bonds] bonds and interest thereon, the proceeds of any tax or other funds which may be **made available** to the Authority by the Commonwealth." 9 L.P.R.A. § 2004(l). Funds only conditionally allocated to HTA and never in fact transferred to HTA cannot possibly be considered funds "made available" to HTA.[32] It would also be ineffective under Article 9, because a security interest can only attach to property "the debtor has rights in . . . or the power to transfer rights in," 19 L.P.R.A. § 2233(b)(2), and HTA has neither rights in nor the power to transfer rights in the Commonwealth's property.

### iii.     *The Oversight Board and HTA are not Judicially Estopped From Denying Movants' Asserted Lien Scope*

82.     Movants' contentions that the Oversight Board and HTA are estopped from denying Movants' claimed security interests (Mot. ¶ 70) are wrong. First, the Oversight Board never contended Movants had equitable ownership, trust interests, statutory liens, or the like. Moreover, the statements about pledges that Movants point to were not made by the Oversight Board and were

---

[32] In other contexts, the phrase "made available" has been interpreted only to encompass funds actually transferred to or otherwise unconditionally available for use by the taxpayer. *See, e.g., Knapp v. Comm'r*, 41 B.T.A. 23, 27 (B.T.A. 1940) (funds not "made available" to taxpayer when taxpayer only had conditional right to obtain them, stating "[n]one of the funds now being taxed to him were 'made available' to him within the meaning of the statute at any time prior to 1934, when the actual distribution to him was made."); *Newman v. Comm'r*, 68 T.C. 433, 448 (T.C. 1977) (funds not "made available" to petitioner "at any time prior to his retirement because of the conditions placed on withdrawal.").

made prior to the Petition Date and the application of Bankruptcy Code provisions such as section

544.  Notably, Movants hinge their judicial estoppel case on the argument that "FOMB and HTA

repeatedly admitted that the Bonds were 'secured by a pledge of revenues generated by highway tolls,

excise taxes on gasoline, vehicle license fees, and investment earnings.'"  Mot. ¶ 70.  But neither the

Oversight Board nor HTA filed the brief Movants quote in the main text.[33]  It thus cannot estop

them.[34]  Moreover, the requirements of judicial estoppel are not met.  None of the statements quoted

by Movants were made in the context of litigation deciding the scope of Movants' security interests

and none are "clearly inconsistent" with the Oversight Board's current position Movants' lien is

limited to the Pledged Funds.  Nor did the Oversight Board "succeed in persuading a court to accept

the earlier position."  *See Perry v. Blum*, 629 F.3d 1, 8-9 (1st Cir. 2010) (listing requirements for

judicial estoppel).  In the pre-Title III litigation cited by Movants, the First Circuit and lower court

merely accepted Peaje's *allegation* relating to the scope of its security interest at face value before

ruling that, based on Peaje's allegations, it would be adequately protected.  *See, e.g.*, *Peaje Invs. LLC

v. Garcia-Padilla*, 845 F.3d 505, 514 (1st Cir. 2017).  They did not rule on the precise scope of HTA

bondholders' security interests, an issue now subject to challenge in adversary proceedings.  *See, e.g.,*

---

[33] *See Peaje Invs LLC v. Garcia Padilla*, Case No. 16-2377 (1st Cir.), Dkt. No. 64 (brief filed by Alejandro Garcia-Padilla, Juan C. Zaragoza-Gomez, Luis G. Cruz-Batista, and Carmen Villar-Prados).  By contrast, HTA and the Commonwealth "assum[ed] *arguendo*" HTA bondholders had a security interest without conceding it did. Case No. 16-02365, ECF No. 30, at 8; *see also id.* at 11 (describing Peaje's "alleged security interest").

[34] None of the other selective quotes cited by Movants in a footnote (*see* Mot. ¶ 70 n.18) found a claim of judicial estoppel either.  Read in context, both briefs merely stated that—as of 2016 and before the Title III cases were commenced—there was no harm to the HTA bondholders from the PROMESA section 405 stay because their collateral was not being diminished at that time and would be available for payment once the section 405 stay expired.  *See also Peaje Invs. LLC v. Garcia Padilla,* Case No. 16-2365-FAB (D.P.R. Oct. 28, 2016), Dkt. No. 67 at 12; *Peaje Invs LLC v. Garcia Padilla,* Case No. 16-2377 (1st Cir. Dec. 23, 2016) at 18.  These statements were directed solely to the facts as they existed in 2016 and the immediate litigation context (which did not seek determinations on the scope of Movants' security interests)—they did not concede that Movants had a lien on all future revenues in all eventualities (such as in a Title III case), and they are not inconsistent with the Oversight Board's current contentions.  Moreover, both statements pre-dated the filing of the HTA Title III Case.  Upon the commencement of the HTA Title III Case, the Oversight Board, acting in its capacity as representative of HTA, *see* PROMESA § 315(b), and with many of the powers of a trustee, *see* PROMESA §301(c)(7), was invested with avoidance powers pursuant to Bankruptcy Code section 544.  Statements made by either HTA or the Oversight Board before the commencement of the case cannot form the basis of a judicial estoppel case extinguishing the Oversight Board's section 544's powers to avoid unperfected security interests.

Case No. 19-AP-363-LTS, ECF No. 1.  Movants' judicial estoppel claim must be rejected.

B.  **Movants Do Not Have Any Property Interests Arising From the HTA Allocable Revenue Statutes Because Those Statutes Have Been Preempted by PROMESA**

83.     Presumably aware of the limits to their security interests, Movants resort to arguing that the Enabling Act and HTA Allocable Revenue Statutes provide them with a kaleidoscopic array of different property interests against the HTA Allocable Revenues.  Motion ¶¶ 50-65, 72-74.[35]  All these arguments fail, however, because regardless of what kinds of entitlements these statutes created, all statutes allocating the Commonwealth's money to HTA have been preempted by PROMESA.

84.     The preemption of these statutes is a logical imperative.  If statutes on the books providing appropriations to HTA are not preempted, how could Congress have enabled all instrumentalities in Puerto Rico to restructure their debts?  The whole purpose of Title III would be upended.  All nonbankruptcy law provides for debtors to pay their debts in full.  Chapter 11 would be a nullity if these laws were not always preempted.  Here Movants oppose the obvious only because the original source of all their repayment (other than Toll Revenues) starts with appropriations.

85.     PROMESA sections 201 and 202 give the Oversight Board exclusive authority to certify fiscal plans and budgets for the Commonwealth setting all Commonwealth appropriations.  Budgets certified by the Oversight Board are deemed "in full force and effect" upon certification.  PROMESA § 202(e)(1)(C).  As held by the First Circuit, PROMESA preempts any territorial law

---

[35] Movants make a number of unsupported and inconsistent assertions about the property rights purportedly granted to them by the HTA Allocable Revenue Statutes.  *See, e.g.,* Mot. ¶ 8 (asserting without support that (i) the Commonwealth acts as "a mere collection agent on behalf of Bondholders," (ii) "the Secretary of the Treasury is required by statute to hold the Excise Taxes in a segregated account for the benefit of HTA and its Bondholders," (iii) "[f]rom the time of their collection, the Excise Taxes constitute trust funds."); ¶ 15 ("The Excise Tax Statutes grant Bondholders the most senior possible lien on the Excise Taxes"); ¶ 50 ("the Commonwealth never had, or it relinquished, beneficial ownership and all equity in[] the Pledged Revenues" under the statutes); ¶ 52 ("there is no question that the Excise Taxes constitute property of HTA, not the Commonwealth."); ¶ 60 ("By mandating the transfer of the Excise Taxes to HTA, through a special fund segregated from the Commonwealth's general fund, and covenanting in the Excise Tax Statutes and the HTA Enabling Act not to impair the fund flow, the Commonwealth intended to, and did, create a series of trust relationships"); ¶ 72 ("the Commonwealth must collect the Excise Taxes on behalf of HTA *solely* for payment of the Bonds.").  While Movants use all manner of wildly assertive language that "there can be no question" they are right as to the scope of their property interests, not a single of their liens, trusts, or entitlements are attested to by the actual language of the statutes, which Movants rarely quote to support their assertions.

purporting to appropriate funds outside of an Oversight Board certified budget because "[s]imply put, there can be no spending from sources not listed in [a certified] budget, regardless of what any territorial law says." *Rossello v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, No. 18-2154, 2019 WL 6887258, at *3, (1st Cir. Dec. 18, 2019); *see also Rossello v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A] budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are preempted.").

86.     Here, the Puerto Rico statutes governing the Allocable Revenues appropriate the Commonwealth's tax revenues to HTA without regard to Oversight Board certified budgets and fiscal plans.[36]  As a result, they are inconsistent with PROMESA, and pursuant to PROMESA section 4 preempted, eliminating any claim that Movants could have to the HTA Allocable Revenues or any purported property interests Movants argue springs from the HTA Allocable Revenue Statutes.[37]

87.     Moreover, PROMESA Title III also preempts Movants' claims.  PROMESA only incorporates into Title III a single priority claim: administrative expenses.  *See* PROMESA § 301(a) (incorporating 11 U.S.C. § 507(a)(2)).  PROMESA does not recognize that any claim arising from an appropriation statute has priority.  Simply put, if statutes purporting to appropriate moneys to instrumentalities are not preempted, they would block any possible restructuring. They would also create the absurd result that creditors of Commonwealth instrumentalities have superior rights than

---

[36] While the English translation contained in the Laws of Puerto Rico Annotated states that the HTA Allocable Revenues are "allocated" to HTA, the Spanish version of the relevant statutes uses the word term "asignados," which would be more accurately translated as "appropriated."  *See* 13 L.P.R.A. § 31751(a)(1)(E) (Spanish version, entitled "Disposición de fondos").  Pursuant to 31 L.P.R.A. § 13, the Spanish version of the HTA Allocable Revenue Statutes should prevail. Notably, the copy of 13 L.P.R.A. § 31751 quoted in the Motion also uses "appropriation."  *See* Mot. ¶ 10; *see* ECF No. 10107-4 at 2 (quoting 13 L.P.R.A. § 31751(a)(1)(C)).

[37] For the same reasons, the HTA Allocable Revenue Statutes would be preempted pursuant to implied preemption principles, as they stand as an obstacle to Congress's purpose in enacting PROMESA: to ensure the Oversight Board could provide a method for Puerto Rico to regain fiscal responsibility and access to capital markets (PROMESA § 101). *See, e.g., Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996) *(*quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (conflict preemption exists when a state law "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

Commonwealth creditors who hold the Commonwealth's promise to pay them. Non-bankruptcy law always requires that debts be paid in full, and prepetition promises to pay are always preempted.

88.     Notably, even if the Puerto Rico statutes governing the Allocable Revenues were not preempted, they create merely a prepetition unsecured claim against the Commonwealth.  *See, e.g., Ohio v. Kovacs,* 469 U.S. 274, 279 (1985) (held breach of statute and court order gave rise to dischargeable unsecured claim, and rejected argument that breach should be treated differently because it "was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim" that was dischargeable in bankruptcy); *FCC v. NextWave Pers. Commc'ns Inc*., 537 U.S. 293, 302 (2003) (continuing liability under statute to pay installment payments for FCC license is dischargeable unsecured claim).

### C.  Movants Do Not Have A "Statutory Entitlement" or Ownership Interest in Revenues

89.     Movants assert the HTA Allocable Revenue Statutes provide them with a "statutory entitlement" to the HTA Allocable Revenues.  Mot. ¶¶ 50-58.  If they mean a statutory right, the right disappears with the preemption of the statute.  Otherwise, it is not really preempted.  Nowhere in the Motion do Movants explain what a "statutory entitlement" is, or how it is meant to be different from a "statutory lien" or a trust.  As recognized by the First Circuit, "the Code divides liens into three mutually exclusive categories": security interests (§ 101(51)), statutory liens (§ 101(53)), and judicial liens (§ 101(36)).  *Peaje*, 899 F.3d at 7.  Nowhere does the Bankruptcy Code or other applicable law recognize the amorphous concept of a "statutory entitlement."  Movants' attempt to create an undefined fourth category of "statutory entitlement" must be rejected as the attempt to circumvent the Bankruptcy Code.

90.     Regardless, Puerto Rico law does not purport to give Movants any form of "statutory

entitlement" rights against either the Commonwealth or HTA.[38]  Movants fail to cite or quote a single

statute that purports to give Movants—or any other HTA bondholders—*any rights* to anything.  *See*

Mot. ¶¶ 50-58.  The only statute that Movants quote is 13 L.P.R.A. § 31751, Mot. ¶ 57, but this does

not give them any "statutory entitlement."  As is made clear by the subsections quoted by Movants,

the HTA Allocable Revenues are to be (subject to certain conditions) transferred by the

Commonwealth *to HTA* for "[HTA's] corporate purposes."  *See* 13 L.P.R.A. § 31751(a)(1) (providing

certain Excise Taxes "shall be covered into a special deposit in favor of [HTA] **for its corporate**

**purposes**."); 13 L.P.R.A. § 31751(a)(1)(A) (stating that funds will be transferred each month *to HTA*

without reference to any HTA creditors); *see also* 9 L.P.R.A. § 2021 (vehicle fees deposited with

HTA "to be used by the Authority **for its corporate purpose**s"); 9 L.P.R.A. § 5681 (fees "shall be

covered into a Special Deposit **in the name and for the benefit of the Highways and**

**Transportation Authority**") (emphasis added).  No statute "require[s] the Secretary of Treasury to

collect the Excise Taxes on behalf of HTA **for the benefit of the Bondholders**."  Mot. ¶ 57 (emphasis

added).  While Movants point to 13 L.P.R.A. §31751(a)(1)(C), *id.*, that also does not purport to give

them any rights.  Rather, it provides, in full:

> (C) **The Highways and Transportation Authority is hereby authorized to commit
> or pledge the proceeds of the collection thus received on** [the Gasoline Excise
> Taxes], **for** the payment of the principal and the interest on bonds **or other obligations
> or for any other legal purpose of the Authority**. Said commitment or pledge shall
> be subject to the provisions of Section 8 of Item VI of the Constitution of the
> Commonwealth of Puerto Rico. The proceeds of said collection shall be solely used
> for the payment of interest and amortization of the public debt, as provided in said
> Section 8 of Item VI of the Constitution, until the other resources available to which

---

[38] Movants also make a cursory assertion in the preliminary statement of their Motion that the Toll Revenues are "held by
HTA on behalf of the Bondholders, and therefore constitute property of HTA and its Bondholders" citing section
2013(a)(2) of the HTA Enabling Act. Motion ¶ 7. But this provision does not grant ownership interests, it specifies simply
that HTA must in certain respects "account as if it were the trustee of an express trust" "subject to any contractual
limitations." 9 L.P.R.A. § 2013(a). The fact that the Commonwealth inserted a provision requiring HTA to account "as if
it were" a trustee only further demonstrates that HTA is not, in fact, a trustee. Further, the Court has already held that this
language does not provide ownership to bondholders. *See In re Fin. Oversight & Mgmt. Bd.*, 582 B.R. 579, 598 n.15
(D.P.R. 2018) ("Plaintiffs also reference 9 L.P.R.A. § 2013(a)(2), which grants bondholders the right to commence a suit
against PRHTA for an accounting 'as if it were the trustee of an express trust.' The right to sue PRHTA 'as if it were the
trustee' provides no plausible basis for an inference that the bondholders already own the revenues.").

reference is made in said section are insufficient for such purposes. Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds **and other obligations** of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds **or other obligations**.

13 L.P.R.A. § 31751(a)(1)(C); *see also, e.g.,* 13 L.P.R.A. § 31751(a)(3)(C).  This subsection further

demonstrates Movants' lack of any "statutory entitlement" to the HTA Allocable Revenues.  Instead

of giving Bondholders property rights, it simply "authorizes" HTA to grant a security interest to pay

bonds "**or other obligation[s] or for any other lawful purpose** of the Authority."  *Id.*[39]  Far from

restricting the funds to the payment of Bonds, the very provision Movants (selectively) quote

demonstrates the HTA Allocable Revenues are provided to HTA unencumbered for HTA to use for

any lawful purpose and to pay **any** obligation.  Indeed, the fact HTA is expressly authorized to grant

security interests to **non-Bondholders** demonstrates the HTA Bondholders cannot be "statutorily

entitled" to the Cigarette Excise Taxes as HTA can grant those funds to others.[40]  To the extent

Movants have any statutory entitlement, it is merely an unsecured dischargeable claim against the

---

[39] The same is true of all the statutes governing the other HTA Allocable Revenues.  *See* 9 L.P.R.A. § 2021 (providing that HTA "is hereby **authorized to pledge** or pignorate the proceeds of the collection thus received, to the payment of the principal and interest on bonds and other obligations of the Authority or for any other legal purpose of the Authority."); 9 L.P.R.A. § 5681 (providing that HTA "is **hereby authorized to pledge** or encumber the proceeds of the taxes collected" to bondholders); 13 L.P.R.A. § 31751(a)(3)(C) ("The Highways and Transportation Authority is **hereby authorized** to pledge or encumber the proceeds from the excise tax on cigarettes"); 13 L.P.R.A. § 31751(a)(1)(C) ("The Highways and Transportation Authority is **hereby authorized** to commit or pledge the proceeds of the collection thus received on gasoline and the tax of four cents (4¢) on gas oil or diesel oil fixed in Section 3020.06 and the amount appropriated by virtue of this Subtitle of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07 . . ."); 13 L.P.R.A. § 31751(a)(1)(E) (referring to tax revenue that "has been pledged" without providing for creation of statutory lien).

[40] The same is true of the other HTA Allocable Revenues.  Movants also cite 9 L.P.R.A. § 2021 and 9 L.P.R.A. § 5681 (*see* Mot. ¶ 57, n. 13), but both make clear the HTA Allocable Revenues are not the HTA Bondholders but HTA's.  *See* 9 L.P.R.A. § 2021 (specifying the Vehicle Fees are to be transferred a special deposit "in behalf of and **for the benefit of [HTA], to be used by [HTA] for its corporate purposes,**" and that unless retained by the Commonwealth the Vehicle Fees are to be used "for the payment of the principal and interest on bonds **and other obligations** of [HTA]."); 9 L.P.R.A. § 5681 (specifying Vehicle Fees are to be transferred to HTA "for the benefit of [HTA]," that HTA is "authorized" to grant a security interest in the Vehicle Fees to secure Bonds "or other obligation or for any other lawful purpose of [HTA]," and that if the Vehicle Fees are not retained by the Commonwealth they are to be used "for the payment of principal of and interest on the bonds and other obligations of [HTA]."). This is only further borne out by the fact the Enabling Act provides that "neither the Commonwealth of Puerto Rico nor any such political subdivision shall be liable" on the bonds, negating any possibility that the Commonwealth could be liable to pay the HTA bondholders directly.  9 L.P.R.A. § 2015.

Commonwealth.[41]

91.     While Movants' cite *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007) and related cases, including the recent First Circuit decision in *Gracia-Gracia*,[42] they are inapposite.  *Flores Galarza* and its progeny involved statutes mandating—without exception—that the Treasury reimburse insured motorists that had been required to pay duplicate premiums to the government.  The relevant money had been paid to the Commonwealth by the plaintiffs themselves.  Moreover, as noted by the First Circuit, these statutes made clear (i) that "[t]he Secretary of the Treasury shall retain these funds as *trustee*," *García-Rubiera v. Calderón*, 570 F.3d 443, 452 (1st Cir. 2009) (quoting 26 L.P.R.A. § 8055(l)), and (ii) that the Treasury's collection of the funds constituted a "collection service performed in favor of the" plaintiffs.  *Flores Galarza*, 484 F.3d at 29 (quoting 26 L.P.R.A. § 8055(c)).  As the First Circuit held, the applicable statute made the Secretary of the Treasury "merely the custodian of these funds" with "no entitlement" to them.  *Flores Galarza*, 484 F.3d at 29.

92.     The statutes governing the premium reimbursements in *Flores Galarza* and the statutes at issue here both use the phrase "shall transfer."  That is where the similarity ends.  Here, the Commonwealth collects the HTA Allocable Revenues from taxpayers (not Movants) under its taxing authority, deposits them in the TSA, and is then required by statute—subject to certain conditions—to transfer those funds to HTA for HTA's "corporate purposes."  13 L.P.R.A. § 31751(a).  The Commonwealth always reserved the right to retain those funds and use them for its own purposes.  *See, e.g.,* 13 L.P.R.A. § 31751(a)(1)(C) (making allocation to HTA subject to section 8 of Article VI of the P.R. Constitution).  This, among other reasons, eliminates the argument the Commonwealth is a "mere custodian" of funds—it has authority to retain and use the funds.  Moreover, the funds are

---

[41] *See supra* ¶ 89.
[42] *See also García-Rubiera v. Calderón*, 570 F.3d 443, 452 (1st Cir. 2009); *Garcia-Rubiera v. Fortuño*, 665 F.3d 261, 263 (1st Cir. 2011); *Gracia*, 939 F.3d 340.  *See* Mot. ¶¶ 53-58.

not required to be transferred to HTA bondholders, but to HTA for HTA's "corporate purposes." This is affirmed by comparison to Act 1-2015, section 2.07, which added subsection (G) to 13 L.P.R.A. §31751(a)(1), specifying that "on or after the Effective Date" the account into which the Commonwealth is required to deposit HTA's Allocable Revenues "shall belong to [HTA] for the benefit of the holders of the bonds . . . ." *See* Act 1-2015, § 2.07 (inserting 13 L.P.R.A. § 31751(a)(1)(G)). The "Effective Date" specified in Act 1-2015 never happened,[43] and so the account was never converted into an account held "for the benefit of the holders of the bonds." Nonetheless, the fact Movants negotiated so the Puerto Rico legislature would alter the ownership of the account to specify it would be held for bondholders shows it is not held for their benefit under existing law. Further, as explained above, the statute requiring the Commonwealth to transfer future revenues to HTA was an appropriation by one legislature, and is repealable at any time by the legislature. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 U.S. App. LEXIS 2954, Case No. 19-1699, *17-18 (1st Cir. Jan. 30, 2020) (ERS bondholders lacked a property interest in statutory appropriations in part because appropriations "could be disregarded by a subsequent legislature (to the Bondholders' detriment).").

### D. The HTA Allocable Revenues Are Not Held in Trust for HTA or Bondholders

---

[43] As added by Act 1-2015, "Effective Date" was defined in new Section 12A(a)(4) as "the date on which the following two (2) requirements are met: (i) all liens on income, taxes, and fees earmarked for the Authority, including those designated under Acts No. 30-2013 and 31-2013, to collateralize the BANs of the Authority (as a result of the payment of said BANs or with the consent of the holders of said BANs) as well as any outstanding debt of the Authority with the Government Development Bank for Puerto Rico are satisfied; (ii) all outstanding loans and obligations that the Authority currently has with the Government Development Bank for Puerto Rico and the Authority's BANs have been repaid or transferred from the Authority to the Infrastructure Financing Authority . . ." New Section 12A(a)(4) further provides that the "President of the Government Development Bank for Puerto Rico shall certify the date on which the requirements in subparagraphs (i) and (ii) are met and said certification shall be filed with the Office of the Secretary of the Senate and the Office of the Clerk of the House of Representatives and shall be published on the website of the Government Development Bank for Puerto Rico." By its terms, Section 12A(b) never became effective because neither prerequisite occurred. Page 125 of the Commonwealth Of Puerto Rico Financial Information and Operating Data Report (December 18, 2016), available at http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf, indicates that the Effective Date has not occurred and "[t]he Commonwealth does not currently contemplate that" such conditions would "be satisfied in the foreseeable future." The requisite certification by the President of the GDB has not been published at the GDB website http://www.gdb-pur.com/.

93.     Movants' invocation of "a well-settled body of case law holding that where, as here, a state statute restricts the use of taxes or other revenues for the payment of bonds, the taxing entity holds the taxes in trust for the bondholders" is also mistaken.  Mot. ¶ 59.  This line of case law is not relevant.  First, the statutes are preempted.  Second, the HTA statutes **do not** restrict the use of the Allocable Revenues for the payment of bonds.  Each of the cases cited by Movants involved statutes that expressly limited the use of the revenues collected solely to the payment of bonds.[44]  As demonstrated above, the statutes requiring transfers to HTA do not do this—only the HTA Bond Resolutions require HTA to transfer revenues it "receives" to the HTA Bondholders' Fiscal Agent.

94.     Movants also argue that a statute does not have to "explicitly use the word 'trust'" and that "[b]y mandating the transfer of the Excise Taxes to HTA, through a special fund segregated from the Commonwealth's general fund, and covenanting in the Excise Tax Statutes and the HTA Enabling Act not to impair that fund flow, the Commonwealth intended to, and did, create a series of trust

---

[44] *Fed. Deposit Ins. Corp. v. Casady*, 106 F.2d 784, 788 (10th Cir. 1939) (statute provided that treasury "must keep the [funds] in a separate special fund, not derived from general taxes, and in no sense a fund of the city or town, **for the purpose of paying the paving bonds and interest coupons thereon**") (emphasis added); *Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*, 75 F.2d 870, 871 (5th Cir. 1938) (board resolution provided that "the taxes theretofore levied . . . should, when collected, **be used for the purpose of paying the principal and interest of said bonds and for no other purpose.**") (emphasis added); *Dallas Levee Imp. Dist. ex rel. Simond v. Industrial Properties Corp.*, 89 F.2d 731, 732 (5th Cir. 1937) (statute specifically gave power to bondholders to sue to enforce turnover of taxes to them); *Vickery v. Sioux City*, 104 F. 164, 167 (Cir. Western Div. 1900) (statute provided that the taxes "**shall be used and appropriated to no other purpose**, than the payment of the costs of said improvements, and any bonds which may be issued as hereinafter provided."); *In re Columbia Falls, Special Improv. Dist. No. 25*, 143 B.R. 750, 761 (Bankr. D. Mont. 1992) (statute provided that purpose of revenue fund was "to secure prompt payment of any . . . bonds" and "secured" such bonds); *Bexar County Hosp. Dist. v. Crosby*, 160 Tex. 116, 122 (Tex. 1959) (statute provided "the City and County hold in trust for the bondholders taxes **levied specifically to retire certain bonded indebtedness**"); *Bedell v. Lassiter*, 143 Fla. 43, 50 (Fla. 1940) (statute provided that tax revenues "so far as necessary are hereby set apart and apportioned for the purpose, to apply said moneys and to pay the interest upon the said bonds"); *Hays v. Isaacs*, 275 Ky. 26, 28-29 (Ky. 1938) (statute provided that sinking fund for tax revenues would "be held and kept sacredly" to redeem the bonds); *Austin v. Cahill*, 99 Tex. 172, 182 (Tex. 1905) (stating tax was specifically levied "for the payment of interest on said bonds and to provide the two percent sinking fund for their redemption" and "pledged, to the payment of said bonds"); *Town of Shattuck v. Barcafer*, 137 P.2d 238, 239 (Okla. 1943) (statute provided that it was "the duty of such city or town treasurer . . . to pay one or more bonds to so call and pay such bonds" with tax revenues); *Wulff-Hansen & Co. v. Silvers*, 21 Cal. 2d 253, 260 (Cal. 1942) (court noted that statute provided that "when a tax sale is had and the city becomes the purchaser of the property, it becomes its duty to pay the amount of the delinquent assessment into a bond redemption fund"); *Keyes v. City of Tacoma*, 12 Wash. 2d 54, 56 (1941) (statute provided that "[a]ll moneys received or collected by the Treasurer upon assessments for improvements . . . shall be kept as a separate fund, and in nowise used for any other purpose whatever except for the redemption of warrants drawn against such funds"); *Winter Haven v. Summerlin*, 114 Fla. 727, 732 (Fla. 1934) (court noted that statute provided "that the proceeds of deposited municipal special assessment certificates or liens shall be applied exclusively to the payment or retirement of municipal bonds").

relationships in which it and HTA act as mere conduits for the transfer of the Excise Taxes." Mot. ¶ 60. Movants nowhere explain why the Commonwealth enacted 9 L.P.R.A. § 2015 providing the HTA bonds are not debts of the Commonwealth, if the Commonwealth was creating a trust of Commonwealth assets to pay the bonds. It makes no sense the Commonwealth would exclude liability on the Bonds in 9 L.P.R.A. § 2015 but through winks and nods in other provisions make itself strictly liable as a *trustee* regarding the HTA Allocable Revenues. And, why would the Commonwealth statute appropriate money to HTA for its "corporate purposes" if the Commonwealth intended to create a trust for HTA bondholders? Clearly, the Commonwealth acted to steer clear of allowing the HTA debt to be considered Commonwealth debt. Movants neither cite nor quote any statutes to support their argument, and it is wrong. As demonstrated above, *see supra* ¶ 90, all the applicable statutes provide for the conditional prepetition promise to transfer funds to HTA for HTA's "benefit" and HTA's "corporate purposes" to use for "any lawful purpose." The statutes all just "**authorize**" HTA to grant security interests in them. *Supra* ¶ 90.[45] This does not create a trust under First Circuit law: the First Circuit has specified that no trust can exist where no "specific restriction [is] placed upon [the debtor's] use of the supposed trust funds," and "[the debtor] was left free to use what it received for its own benefit rather than" hold it for the purported trust beneficiary. *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981) (holding that contracts and resolutions that specified the debtor was "in general terms" supposed to "hold whatever monies it collected in trust" for a creditor was ineffective to create a trust where debtor retained the right to use the monies as it saw fit and was not required to keep the funds segregated).[46]

---

[45] Elsewhere Movants cite to 9 L.P.R.A. § 2013(a)(2) as purportedly demonstrating HTA is a trustee. *See, e.g.,* Mot. ¶ 62. For the reasons expressed above in connection with the Toll Revenues, *see supra* n. 38, this argument fails. Moreover, and in any event, this provision only applies to funds HTA possesses—not funds possessed by the Commonwealth.

[46] *See also, e.g., In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 624 (Bankr. S.D.N.Y. 2002), *aff'd sub nom. LFD Operating, Inc. v. Ames Dep't Stores, Inc.*, No. 01-42217 (REG), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd sub nom. In re Ames Dep't Stores, Inc.*, 144 F. App'x 900 (2d Cir. 2005) ("Therefore, the Court finds that Ames did not hold the Net Sales Proceeds in trust for LFD because Ames, at all relevant times, has commingled the Net Sales Proceeds and used the funds between settlement dates for purposes other than paying LFD, before making payment to LFD out of general funds

95.     Further, none of the statues cited by Movants meets the requirement of creating a trust under Puerto Rico law. When the Legislature wants to create a trust under a statute it knows how to do so, and it has always done so explicitly and not through vague statements cobbled together from various statutes.  For example, in the statute creating the Puerto Rico Children's Trust, the Legislature specifically provided: "A public trust fund is hereby created, attached to the [Government Development Bank for Puerto Rico], which shall maintain said fund as fiduciary, apart from other public funds under its custody." 24 L.P.R.A. § 3122.  There is no equivalent of this language here.

96.     Moreover, the Commonwealth's unsecured commitment not to limit HTA's rights to the HTA Allocable Revenues does not create a trust.  *See, e.g.,* 9 L.P.R.A. § 2021.  If it did, then virtually every loan agreement containing covenants limiting permitted uses of the debtor's cash would create trusts.   Quite the contrary: the Commonwealth's promise demonstrates the Commonwealth retained power to do as it saw fit with the taxes, but—to provide reassurance to the HTA Bondholders—made an unsecured promise not to take certain actions.  Breach of this promise, if not preempted, may give rise to an unsecured claim against the Commonwealth, but it does not create a trust.

97.     Unable to show they are beneficiaries of an express trust, Movants argue they are entitled to a constructive or resulting trust.  *See* Mot. ¶¶ 61-64.  Movants are clearly wrong.  Under Puerto Rico law, constructive trusts cannot be imposed where agreements or statutes govern the parties' relationship.[47]   Moreover, constructive trusts are equitable remedies to correct unjust

---

provided by GECC.").  Even the cases cited by Movants recognize the same and prohibit the finding of a trust here.  *See, e.g., In re Tap, Inc.,* 52 B.R. 271, 276 (Bankr. D. Mass. 1985) (trust does not exist "where funds are collected from third parties and used at will by the defendant whose only responsibility is to pay when billed, or at some monthly or other non-immediate date, much the same as any other creditor.").  *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997) does not help Movants (Mot. ¶¶ 60): there the statute involved monies (a security deposit) paid to the debtor by plaintiff, and specifically provided that "[a] security deposit shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the lessor, and shall not be subject to the claims of any creditor of the lessor or of the lessor's successor in interest."  *Id.*  None of the statutes here are similar to *Bologna*'s statute.

[47]  *See Rentas v. Claudio (In re Garcia)*, 484 B.R. 1, 17 (Bankr. D. P.R. 2012) ("The constructive trust equitable doctrine was incorporated in Puerto Rico . . . to prevent unjust enrichment.  The doctrine of unjust enrichment, however, is not

43

enrichment which cannot be imposed where contracts and statutes govern the parties' rights.[48]  Here, the Bonds and Movants' rights are governed by PROMESA, the Bankruptcy Code, and to the extent not preempted, the Enabling Act, HTA Allocable Revenue Statutes, and the HTA Bond Resolutions. Movants cannot invoke the constructive trust doctrine to enlarge the security interests they bargained for.[49]  In actuality, Movants are seeking constructive and resulting trusts to undo Title III.[50]

98.       Similarly, Movants' resulting trust theory must be rejected.  As the very case Movants cite specifies, a resulting trust can only apply where "a person **makes or causes to be made a disposition of property** under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein."  *Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 263 (1st Cir. 2004).  Here, there has been no disposition of property—indeed, Movants' entire complaint is that the Commonwealth did *not* dispose of the HTA Allocable Revenues, but instead retained those funds.  No resulting trust can therefore exist.

E.  **Movants' Restricted Funds Argument Does Not Assist Them**

99.       As an alternative to their property interest arguments, Movants fall back to arguing

---

applicable in Puerto Rico when there is a written contract between the parties.  When there is a contract, there is no need to resort to equity for only the contract governs."); *Luperena v. P.R. Transp. Auth.*, 79 D.P.R. 464, 1956 PR Sup. LEXIS 186, *13 (P.R. 1956) (constructive trusts "must be confined, in any event, to situations unforeseen by our positive law.").

[48] *Brown v. United Airlines, Inc.*, 720 F.3d 60 (1st Cir. 2013) ("Ordinarily, a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties."); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT, Part II, Chapter 2, Topic 3 (transfers made under "legal compulsion" are not appropriate for an equitable remedy unless the statute is mistakenly applied); *Atlantic Coast Line R. Co. v. State of Florida*, 295 U.S. 301 (1935) (Cardozo, J) (transfer made under "color of legal right" generally not subject to equitable remedy).

[49] Moreover, many cases have held constructive trusts should not be imposed in bankruptcy to upset the policy of equality of distribution.  *See, e.g., Poss v. Morris (In re Morris)*, 260 F.3d 654, 666 (6th Cir. 2001) ("a claim filed in bankruptcy court asserting rights to certain assets held in 'constructive trust' for the claimant is nothing more than that: a claim . . . the bankruptcy policy of ratable distribution among creditors conflicts with the constructive trust remedy and counsels its sparing use . . . ."); *Rentas v. Claudio (In re Garcia)*, 484 B.R. 1, 17 (Bankr. D.P.R. 2012) ("many bankruptcy courts refuse to recognize constructive trusts based on a creditor's claim of entitlement to one unless state law has impressed property with a constructive trust prior to its entry into bankruptcy."), *rev'd on other grounds*, 507 B.R. 32 (B.A.P. 1st Cir. 2014).

[50] Moreover, neither a constructive nor resulting trust could have been constituted under Puerto Rico law.  Prior to the Trusts Act, the Puerto Rico Civil Code provided that trusts should be created by public deed.  *See* 31 L.P.R.A. § 2543. Under the Trusts Act, Act 219-2012, trusts can be created *only* through public deed or a last will and testament, see 32 L.P.R.A. § 3352, and "[e]very trust constituted in Puerto Rico must be recorded in the Special Trust Registry under penalty of nullity," *id.* § 3351d. Accordingly, no Puerto Rico court has established a constructive trust under the Trusts Act.

that because Puerto Rico law requires the Commonwealth to appropriate the HTA Allocable Revenues to HTA, the HTA Allocable Revenues constitute "restricted funds."  Mot. ¶ 65. Movants adopt the language used in the Oversights Board's analysis of Commonwealth cash to contrast cash available for any purpose, to (i) encumbered or otherwise restricted cash, or (ii) cash from the federal government that will give rise to remedies if not used in accordance with federal instructions. But this term has no meaning in a bankruptcy case, where funds are either encumbered or unencumbered. "Restricted funds" are not encumbered funds.  Pre-PROMESA, the HTA Allocable Revenue Statutes may have purported to direct how the funds should be appropriated, and as such they are preempted. In any event, the statutes only contain an unsecured promise to transfer money to HTA,[51] which, at most, creates an unsecured claim.  If the Commonwealth's promises to pay its own general obligation debts are not specifically enforceable, its lesser commitment to transfer money to HTA cannot be specifically enforceable either.  Movants' argument only goes to demonstrate further that the HTA Allocable Revenue Statutes are preempted, *see supra* ¶¶ 83-88, as they purport to appropriate Commonwealth money outside of an Oversight Board certified fiscal plan and budget.

### F.  Movants Do Not Have Statutory Liens on Any Revenues

100.    Movants also argue they possess a statutory lien against the HTA Allocable Revenues, stating that Puerto Rico law "provid[es] that the Commonwealth must collect the Excise Taxes on behalf of HTA *solely* for payment of the Bonds." Mot. ¶¶ 72-74.  As a threshold matter, Movants' statutory lien argument cannot win due to 9 L.P.R.A. § 2015.  The Commonwealth enacted a statute

---

[51] The statutes conditionally require the Commonwealth to "transfer" the HTA Allocable Revenues and "cover [them] into" a deposit account of HTA's.  *See, e.g.,* 13 L.P.R.A. § 31751(a)(1)(A), (3)(A); 9 L.P.R.A. §§ 2021, 5681.  These words do not confer any property interest or pass title as they simply mean "deposited into."  *See Puerto Rico v. Blumenthal*, 642 F.2d 622, 623 n.1 (D.C. Cir. 1980) ("The phrase 'covered into' means, literally, 'deposited into.' In practical terms, the provision requires the United States to rebate to the Puerto Rican treasury the same amount of funds as it collected through taxation of Puerto Rican articles [under section 7652(a)(3)].") The definition of "covered into" being the same as "deposited into" is consistent with the Jones Act (enacted in 1917), and consistent with the prior usage of the relevant laws dealing with Puerto Rico, see H.R. REP. No. 64-77 (1916) (using "covered into" and "pay into" somewhat interchangeably).

providing the HTA bonds are not debt of the Commonwealth. If they are not Commonwealth debt, the Commonwealth cannot secure the debt with a statutory lien on its own property.  It is that simple.

101.    Movants' summary of their interpretation of the statutes creates nothing.  But, even if a statute provided the Commonwealth must collect certain taxes solely for payment of HTA's bonds, the statute would not convert unsecured claims into secured claims.  Such a statute would be perfectly implemented outside bankruptcy and accomplish its stated purpose—the application of a certain revenue stream to certain bonds.  But, inside Title III, the statute fails to create a statutory lien or trust because it does not include the necessary components of either one.  To be sure, the Commonwealth knows how to create liens and trusts: statutory language that fails to mention liens, trusts, enforcement mechanisms, fiduciaries, and the like cannot be chalked up to carelessness.  The language was simply never intended to do what Movants claim it does.  Movants don't explain why a transaction documented with security agreements and UCC-1 financing statements is subject to a statutory lien and tellingly fail to *quote* a single HTA statute to support their argument (*see* Mot. ¶¶ 72-74).  In the First Circuit, a statutory lien is a lien that "aris[es] solely by force of a statute on <u>specified circumstances or conditions</u>."  *Peaje*, 899 F.3d at 11 (emphasis in original).  No statutory lien exists where the applicable statutory "provisions permit the Authority to secure the payment of bonds by making a pledge of revenues, but they do not require that it do so." *Id*.  "If the creation of the lien is dependent upon an agreement, it is a security interest even though there is a statute which may govern many aspects of the lien." *Id.* at 10 (quoting 2 COLLIER ON BANKRUPTCY ¶ 101.53).  Additionally, the statute's authorization for HTA to grant security interests in the HTA Allocable Revenues further demonstrates it does not create a statutory lien.  The Bankruptcy Code's definition of "statutory lien" states that it "does not include security interest or judicial lien, *whether or not such interest or lien is provided by or is dependent on a statute and whether such interest or lien is made fully effective by statute*." 11 U.S.C. § 101(53) (emphasis added).  Therefore, the First Circuit ruled that the statutes

46

governing HTA's Toll Revenues, which provide that HTA is "empowered . . . to secure payment of bonds and interest thereon by pledge of . . . revenues" did not create a statutory lien. *Id.* at 10-12.

102.    The statutes governing the HTA Allocable Revenues are analogous to those at issue in *Peaje* and do not grant a statutory lien. Instead, as detailed above, *see supra* ¶ 90, they expressly provide that any transfer of HTA Allocable Revenues is made to HTA "**for its corporate purposes**" and HTA is then "authorized"—but not required—to pledge them to Bondholders pursuant to a written agreement. *See, e.g.,* 9 L.P.R.A. § 2012(e)(1) (authorizing HTA to issue resolutions "pledging "all or any part" of Revenues); 13 L.P.R.A. § 31751(a)(1)(C), (3)(C) (stating HTA is "authorized"— not required—to pledge the Allocable Revenues). Under *Peaje*, this does not create a statutory lien, as all the statutory provisions merely "permit the Authority to secure the payment of bonds by making a pledge of revenues, but they do not require that it do so." *Id.* at 11.[52]

**G.  Movants Do Not Have Property Interests Protected by the Takings Clause**

103.    Movants argue even if they lack every property interest in the HTA Allocable Revenues they allege, they would still have a "protected property interest in the Pledged Revenues under the Takings Clause" that would entitle them to adequate protection. Mot. ¶ 71. This is wrong. Supreme Court jurisprudence reserves takings to property interests—ownership and liens.[53]  Even when a creditor holds a secured claim (Movants do not against the Commonwealth), not all promises

---

[52] While Movants cite *In re Fonseca*, 534 B.R. 261, 268-69 (Bankr. D.P.R.), *aff'd*, 542 B.R. 628 (B.A.P. 1st Cir. 2015) in support of their statutory lien argument, the case does not help them.  As this Court recognized when denying Peaje Investment LLC's request for a preliminary injunction, in *Fonseca* the statute provided that a lien arising from setoff rights "w[as] created only on the performance of certain conditions (*e.g.*, accrual of contribution liabilities[]), but the HTA Enabling Act creates no automatic lien even upon the performance of conditions and does not implicate set off rights. Rather, the HTA Enabling Act provides that a 'contract' between HTA and a third party may contain a lien, which consensual lien would be enforceable assuming that it satisfied certain conditions." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 301 F. Supp. 3d 290, 298 (D.P.R. 2017), *aff'd sub nom. Peaje Investments LLC v. Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 1 (1st Cir. 2018).  The exact same analysis applies here, and shows why *In re Fonseca* is not relevant.

[53] A "mere expectancy" is not a property interest that is protected by the Fifth Amendment.  *See, e.g., In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 U.S. App. LEXIS 2954, Case No. 19-1699, *17-18 (1st Cir. Jan. 30, 2020) (ERS bondholders lacked a property interest in statutory appropriations in part because appropriations "could be disregarded by a subsequent legislature (to the Bondholders' detriment).").

to and remedies of a secured claimholder are protected by the Fifth Amendment. *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017) (quoting H.R. Rep. No. 95-595, at 339 (1977)). The Supreme Court has made clear time and again a secured claimholder's contractual entitlements can be eliminated without violating the Fifth Amendment, as long as the collateral's value is in some way preserved. *See Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke, Va.*, 300 U.S. 440, 460-62 (1937) (bankruptcy law depriving a secured creditor of its receivership remedy to have rents and profits collected was not unconstitutional on Fifth Amendment grounds).[54]   Concomitantly, courts have consistently held that Bankruptcy Code section 361 protects only the value of the secured claimholder's collateral[55] and nothing else.  Movants arguments to the contrary must be rejected.[56]

---

[54] *See also In re Nichols,* 440 F.3d 850, 854 (6th Cir. 2006) (distinguishing between a contractual right to payment and a secured creditor's property rights in collateral for Fifth Amendment purposes and noting that "bankruptcy laws have long been construed to authorize the impairment of contractual obligations"); *In re Plant Insulation Co.,* 469 B.R. 843, 875 (Bankr. N.D. Cal. 2012) (only "claims that rise to the level of an enforceable interest in specific property are protected under the Takings Clause")*, aff'd*, 485 B.R. 203 (N.D. Cal. 2012)*, rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013); *Bd. Of Trs. v. Thompson Bldg. Materials, Inc.,* 749 F.2d 1396, 1406 (9th Cir. 1984) (recognizing "distinction between purely contractual rights and identifiable property rights").

[55] *See In re Marion St. P'ship*, 108 B.R. 218, 224 (Bankr. D. Minn. 1989) ("The interest in property that is to be protected by section 361 of the Bankruptcy Code is the value of the collateral, not contractual or legal rights such as receiving interest or being permitted to foreclose on default."); *In re Elmore*, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988) ("A creditor's contract rights are not entitled to adequate protection under the Bankruptcy Code."); *In re Booth*, 19 B.R. 53, 61 n.18 (Bankr. D. Utah 1982) ("[Adequate protection] protects against any decrease in value of the lien, [but] it does not guarantee performance of the contract."); *see also Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, *to the extent of the value of the property. There is no constitutional claim of the creditor to more than that.*") (emphasis added).

[56] Movants' cites to *Franklin California Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd on different grounds*, 136 S. Ct. 1938 (2016) and *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977), do not help Movants. Mot. ¶ 71. *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977) is inapposite because it did not involve a Fifth Amendment challenge, but rather involved a Contracts Clause challenge to a New Jersey statute that diverted to other uses revenues pledged as security bonds without compensating the bondholders for impairment of New Jersey's contractual obligation to the bondholders. Since PROMESA, as federal law, is not prohibited from impairing contracts, *U.S. Trust* is inapplicable. *Franklin California Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd on different grounds*, 136 S. Ct. 1938 (2016) does not help Movants either. While deciding the main issue, that Puerto Rico was not allowed to enact its own restructuring statute, the court ruled creditors stated a plausible claim for a taking of their contractual right to a receiver. This was on the basis, the court held, that "[c]ontracts are a form of property for purposes of the Takings Clause." *Id.* at 611-12. As explained above, the fact that contracts and contract rights are property does not make them collateral. If taking a contract right gives rise to a secured claim, then all unsecured promises to pay are secured claims when a debtor repudiates its contractual obligation to pay. In the bankruptcy context, "bankruptcy laws have long been construed to authorize the impairment of contractual obligations." *In re Nichols*, 440 F.3d 850, 854 (6th Cir. 2006).

**H. Section 928(a) Does Not Protect Movants' Security Interests**

104.    As a preliminary matter, Movants' security interests only attach to and are perfected in monies deposited to the credit of the Pledged Funds, as detailed above.  As no monies are being deposited into these funds any longer, the special revenue protections in chapter 9 are irrelevant— even assuming HTA's revenues are special revenues—because they only apply to "special revenues" "subject to [a] lien."  *See* 11 U.S.C. §§ 922(d) (referring to "pledged special revenues"), 928.  As a preliminary point, only revenues deposited to the credit of the Pledged Funds are subject to a security interest, and those funds have not increased since HTA's petition date, making discussion of section 552(a) moot.

105.    Regardless, even if Movants had the security interests they claim, section 928(a) would not help them.  This is because they do not have a security interest in "special revenues" and therefore do not receive the protections of section 928.[57]

**I. Movants' Purported Collateral is Not Protected by Section 928(a).**

106.    Movants contend that the HTA Allocable Revenues are "special revenues" either on the basis of section 902(2)(B) ("special excise taxes imposed on particular activities or transactions") or on the basis of section 902(2)(E) ("taxes specifically levied to finance one or more projects or systems").

107.    Movants are incorrect.  As a preliminary point, regardless of whether the HTA Allocable Revenues qualify as special revenues under section 902(2) (they do not, as discussed below), section 928(a) is inapplicable to this case because section 928(a) only applies to special revenues "acquired by the debtor," and specifies only that special revenues remain subject to a "lien

---

[57] Notably, Movants could not have liens against tax revenues extending perpetually into the future, as HTA's right (if any) to receive any HTA Allocable Revenues from the Commonwealth only arises on a monthly basis as the Commonwealth collects the HTA Allocable Revenues.  *See supra* n. 16.   No security interest or other lien could attach to property that does not yet exist.

resulting from any security agreement **entered into by the debtor**." 11 U.S.C. § 928(a). Here, the

only debtor that issued the Bonds is HTA, and HTA has not acquired any of the HTA Allocable

Revenues that have been retained by the Commonwealth (which is not liable on the Bonds, *see* 9

L.P.R.A. § 2015). As a result no special revenues have been "acquired by the debtor." Moreover,

even if the Commonwealth were considered "the debtor," there is no "security agreement entered into

by the debtor [*i.e.* the Commonwealth]," and as a result section 928(a) is inapplicable on its face.

Because section 928 is specific that a lien has to result from a "security agreement" Movants' theories

regarding equitable liens, trusts or statutory entitlements or ownership interest provide them with

nothing for purposes of section 928.

108.    Movants' arguments also fail because the Allocable Revenues are not within the

Bankruptcy Code section 902(2) definition. The HTA Allocable Revenues are not excise taxes that

are imposed by the **debtor** (HTA) that issued Movants' bonds—instead, they are imposed by the

Commonwealth and **conditionally** allocated to HTA. As a result, they are not the debtor's revenues,

and cannot qualify as the debtor's "special revenues" under section 902(2)(B). *See* A.D. Flachsbart,

*Municipal Bonds in Bankruptcy: Sec. 902 (2) and the Proper Scope of Special Revenues in Chapter*

*9*, 72 Wash. & Lee L. Rev. 955, 998 (2015) ("state aid used to secure a bond issuance would not

qualify as 'special revenues' because such transfer payments would be non-tax receivables not related

to 'municipal ownership, operation, or disposition' of a project.").

109.    Moreover, section 902(2)(B) only applies to "**special** excise taxes"—not **all** "excise

taxes." Indeed, the legislative history makes clear that section 902(2)(B) was only intended to cover

taxes that "are not 'generally' available to all creditors under state law." *See* S. REP. 100-506 (1988)

at 21. Here, however, Puerto Rico law makes clear that (1) the HTA Allocable Revenues

conditionally allocated to HTA "shall be deposited into the General Fund" of Puerto Rico except as

otherwise provided, *see* 13 LPRA § 31751, (2) HTA is conditionally allocated the HTA Allocable

Revenues for its general "corporate purposes"—not to pay bonds, and (3) the taxes are subject to retention to pay general obligations of the Commonwealth.  *See, e.g.,* 13 L.P.R.A. § 31751(a)(1)(F).  The Excise Taxes therefore cannot be "special revenues" under the Bankruptcy Code definition, because applicable territorial law makes clear that the HTA Allocable Revenues are "generally available to all creditors"—both all creditors of HTA (because HTA can use them for "any lawful purpose") *and* all creditors of the Commonwealth (because of P.R. Const. Art. VI, § 8).

110.    Similarly, the HTA Allocable Revenues are not "special revenues" under Bankruptcy Code section 902(2)(E) as "taxes specifically levied to finance one or more projects or systems."  11 U.S.C. § 902(2)(E).  This is because they are clearly not levied to "finance one or more projects or systems."  Instead, as detailed above, the HTA Allocable Revenues are levied by the Commonwealth, conditionally allocated to HTA for its general "corporate purposes," and subject to retention by the Commonwealth for the Commonwealth's use if the Commonwealth's resources are insufficient.  The HTA Allocable Revenues are levied for general purposes, and cannot qualify under section 902(2)(E).

i.      *Assuming the Revenues are Special Revenues Subject to Section 928(a), Section 928(b) Would Apply to Movants' Purported Security Interests*

111.    After asserting that all HTA's "Pledged Revenues" constitute special revenues and therefore are entitled to the Bankruptcy Code's special revenue protections, Movants audaciously turn around and allege that the *limitations* on special revenues somehow do not apply to them, Mot. ¶¶ 80-82, and that HTA's use of its Revenues to pay operating expenses and capital expenditures would "misappropriate" their collateral.  Mot. ¶¶ 103.  Movants are wrong.  Movants argue they are entitled to all the benefits of the Bankruptcy Code's special revenue provisions yet none of the Congressionally-imposed limitations.  Movants allege "the Excise Taxes are not revenues generated from a project or a system; rather, they are special excise taxes pledged solely for the payment of the Bonds."  Mot. ¶ 81.  But Movants cannot have it both ways—only two paragraphs earlier Movants claim the "Excise Taxes" are "taxes specifically levied to finance one or more projects or systems,"

51

*id.* ¶ 79—Movants apparently want to argue that the taxes are derived from a project or system as long as it benefits Movants, then turn around and argue that somehow they are not derived from a project or system if it hurts them. Movants' arguments cannot be sustained.

112.    Indeed, it is clear that—assuming the HTA Allocable Revenues and the Toll Revenues are special revenues and that they are received by HTA—Movants' security interest would be subject to section 928(b). The Toll Revenues are clearly "derived from a project or system" and thus fall within section 928(b)—something that Movants do not appear to contest. Assuming they are special revenues at all, the HTA Allocable Revenues are also "derived from [HTA's] system" and subject to section 928(b) because they are conditionally allocated under Puerto Rico law to HTA for "its corporate purposes." *See, e.g.,* 13 L.P.R.A. § 31751(1); 9 L.P.R.A. § 2021. As is made clear in HTA's Enabling Act, HTA's main corporate purpose is to operate and maintain the transportation system of Puerto Rico. *See* 9 L.P.R.A. § 2002. The HTA Allocable Revenues are allocated to HTA to fulfill its purposes—*i.e.* to run the system—and are therefore subject to section 928(b).

113.    Moreover, the HTA Allocable Revenues are largely composed of the Gasoline Excise Taxes and Vehicle Fees. These revenues and taxes are inextricably connected to the operation and use of HTA's transportation system and as a result they are "derived from [HTA's] project or system" and subject to section 928(b). 11 U.S.C. § 928(b).[58]

114.    To double down on their contention they are entitled to every good thing relating to special revenues but none of the bad, Movants argue that application of section 928(b) would be unconstitutional because it would convert their purported "gross lien" on Revenues, granted before PROMESA was passed, into a "net lien" in violation of the Takings and Due Process Clauses of the U.S. Constitution. Mot. ¶ 82. Movants are right that section 928(b) would make the gross lien they

---

[58] For reasons described above, Movants lack a statutory lien, and so there is no merit to their argument that they are excused from section 928(b) by because they have a statutory lien. *See* Mot. ¶ 81.

claim into a net lien—this is, in fact, the whole purpose of section 928(b).  *See* NATIONAL

BANKRUPTCY REFORM REPORT ON 1988 AMENDMENTS at 599 (under section 928(b) "a net revenue

pledge would survive, and a gross revenue pledge would be treated as if it were a net revenue

pledge.").  But they are wrong that this is unconstitutional.

115.    Under *United States v. Security Industrial Bank*, 459 U.S. 70 (1982), a bankruptcy

statute affecting a security interest is analyzed under the regulatory taking framework.  459 U.S. at

76.  Whether a regulation constitutes a taking depends on the regulation's impact on a party's

reasonable expectations and the character of the regulation—specifically, whether it amounts to a

physical invasion or merely adjusts "the benefits and burdens of economic life to promote the

common good."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

116.    Here, application of section 928(b) to the bondholders would not interfere with the

HTA Bondholders' reasonable expectations and therefore cannot be unconstitutional.  Section 928(b)

is not a new statute.  It has long been part of the Bankruptcy Code and has long been available to

municipal debtors.  *See* 11 U.S.C. § 901(a) (incorporating § 552 into Chapter 9 of the Bankruptcy

Code).  Chapter 9 applied in Puerto Rico prior to 1984.  *See Franklin Cal. Tax-Free Trust v. Puerto

Rico*, 805 F.3d 322, 329–30 (1st Cir. 2015), *aff'd* 136 S. Ct. 1938 (2016).  Although Puerto Rico was

removed from chapter 9 in 1984, *id.* at 330–31, the HTA Bondholders were on notice when they

obtained their security interest that Congress could restore Chapter 9 or some similar form of

bankruptcy (and thus apply section 928(b)) to Puerto Rico at any point.  *Cf. Connolly v. Pension Ben.

Guar. Corp.*, 475 U.S. 211, 227 ("Those who do business in the regulated field cannot object if the

legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (quoting

*FHA v. Darlington, Inc.*, 358 U.S. 84, 91 (1958)).  Given that Puerto Rico's instrumentalities such as

HTA had previously been eligible for relief under chapter 9, a reasonable creditor would not anticipate

that it would "remain unaffected by subsequent changes in federal law."  *McAndrews v. Fleet Bank*

*of Mass.*, 989 F.2d 13, 19 (1st Cir. 1993).

117.    Moreover, it is significant that section 928 actually expands rights that Movants would have under long-standing decisional law, which would have stopped their security interest continuing to attach to special revenues received following the Petition Date.[59]  PROMESA merely applies these basic principles in the context of a territorial bankruptcy and purports to give holders of special revenues bonds *greater* protections through section 928.  As a result, Movants' arguments that application of section 928(b) to their Bonds would be unconstitutional must be rejected.

118.    Finally, an argument essentially the same as Movants' has already been rejected by the First Circuit.  In *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 U.S. App. LEXIS 2954, Case No. 19-1699, *17-18 (1st Cir. Jan. 30, 2020), the ERS bondholders argued that section 552(a) could not constitutionally be applied to them, because their Bonds were issued before PROMESA was enacted and applying section 552(a) to cut off their liens would violate the Takings Clause.  *Id.* at *32.  Like Movants here, the bondholders asked the Court to rule that section 552(a) did not apply to their bonds, to avoid the constitutional issue.  The First Circuit rejected their argument, holding that "Congress plainly intended to apply § 552 to security interests and agreements created before the enactment of PROMESA," relying in particular on PROMESA section 1(b)(2), stating "[s]ubchapters III and VI shall apply with respect to debts, claims, and liens (as such terms are defined in section 101 of Title 11) created before, on, or after [June 30, 2016]."  *Id.* at *33.  Movants' argument here must be rejected for the same reasons.

---

[59]  *See Local Loan Co. v. Hunt*, 292 U.S. 234, 243 (1934) (holding there cannot be "creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt"); *see also Sims v. Jamison*, 67 F.2d 409, 410 (9th Cir. 1933) ("[T]here can be no lien upon something which does not exist at the time of the adjudication [in bankruptcy].  Consequently, there is no lien preserved by the Bankruptcy Act to the creditor in case of discharge."); *First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*, 18 B.R. 868, 870 (Bankr. D. Colo. 1982) ("[i]t is impossible on the face to have a vested property right in after-acquired property.  That is so because, by definition, after-acquired property is a mere contingency.").

ii.    *Assuming Section 928(b) Applies, it Applies to the Necessary Operating Expenses of HTA's Entire Transportation System*

119.    Movants argue that if section 928(b) applies at all it only applies to "the necessary operating expenses of the toll highways that generate the Toll Revenues," Mot. ¶ 83, not other parts of HTA's system and not "capital improvements or enhancements." Mot. ¶ 85.[60]

120.    Assuming Movants have the security interests they claim they have, section 928(b) subordinates their security interest to all necessary operating expenses of the system—including any capital expenditures needed to maintain and operate the system. *See, e.g.,* 6 Collier on Bankruptcy ¶ 928.03 ("the phrase 'operating expenses' should not be construed to exclude capital expenses or expenditures, because they may be as necessary as ordinary operating expenses to maintain the source of revenue from which bonds are to paid.").[61]

121.    If the Motion proceeds past the preliminary hearing stage and proceeds to a final hearing, the Oversight Board will demonstrate section 928(b) applies to subordinate the Bonds to the necessary operating expenses of **all** of HTA's system—including all highways, buses and Tren Urbano, and capital expenditures necessary to keep the system operating.

### IV.    MOVANTS DO NOT STATE A *PRIMA FACIE* CASE TO OBTAIN RELIEF FROM THE STAY UNDER BANKRUPTCY CODE SECTION 362(d)(1) or (d)(2)

122.    Pursuant to the Court's order of January 31, 2020 [ECF No. 10595], the Oversight Board understands any consideration of this topic (beyond Movants' secured status) is reserved for a second hearing if it becomes necessary. As Movants cannot show they hold any enforceable property

---

[60] As detailed above, Movants' security interests only extend to funds deposited with the Fiscal Agent to the credit of the Pledged Funds. As no monies continue to be deposited to the credit of the Pledged Funds, section 928 simply is not relevant.

[61] Section 928(b) is not limited to payment of post-petition expenses, but also includes necessary prepetition expenses. 6-928 Collier on Bankruptcy ¶ 928.03[3][a] (16th 2017). Indeed, the Senate Report on section 928(b), which makes liens on special revenues derived from a project or system subject to the "necessary operating expenses" of such project or system, states that "[p]repetition operating expenses are included to the extent payment is deemed necessary by the court for this purpose." S. Rep. No. 100-506, 100th Cong., 2d Sess. 22 (1988). As explained in Collier, "it could become necessary to pay prepetition claims related to a project or system in order, as a practical matter, to preserve a source of goods or services which might be necessary for the continued operation of the project or system." Collier ¶ 928.03[3][a].

interests against (*i*) any Commonwealth money or (*ii*) any money owned by HTA that has not been deposited in the Pledged Funds, necessarily, that means they cannot show the Commonwealth and HTA lack equity in those monies and thus cannot obtain stay relief under Bankruptcy Code section 362(d)(2).  Movants also cannot obtain stay relief under section 362(d)(1) because they cannot show a perfected security interest against anything other than the Pledged Funds, and they do not allege the Pledged Funds have diminished in value since the Motion Filing Date or the Petition Date.  Beyond this, for now, we simply point to Movants' admission in ¶ 24 of the Motion that pursuant to its public reports the Commonwealth has over $8 billion cash, which "vastly exceeds" the total amount of all HTA Allocable Revenues.


[*Remainder of page intentionally left blank*]

## CONCLUSION

For the reasons stated herein, the Motion should be denied.


Dated: February 3, 2020
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative of the
Debtor*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative of the
Debtor*