**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORPORATION, ASSURED GUARANTY MUNICIPAL CORP., and THE BANK OF NEW YORK MELLON, as Fiscal Agent,<br><br>     Movants,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO<br><br>     Respondent. | PROMESA<br>Title III<br><br><br><br>**Re: ECF No. 10104** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OPPOSITION OF COMMONWEALTH OF PUERTO RICO TO MOTION
OF AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY
INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED
GUARANTY MUNICIPAL CORP., AND THE BANK OF NEW YORK MELLON
CONCERNING APPLICATION OF AUTOMATIC STAY [ECF NO. 10104]**

## Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTS ............................................................................................................................................ 10

    A.    The Implementing Statutes. ....................................................................... 10

    B.    The CCDA Bonds and Bond Documents. ......................................................... 12

        1.    The Assignment Agreement. ............................................................ 13

        2.    The Pledge Agreement. .................................................................... 15

        3.    The Trust Agreement. ....................................................................... 18

        4.    The Supplemental Trust Agreement. .............................................. 20

    C.    The Retained Occupancy Tax Revenues. ........................................................ 21

        1.    The Emergency Orders. ................................................................... 22

        2.    PROMESA. ...................................................................................... 23

ARGUMENT ................................................................................................................................. 25

    A.    The Automatic Stay Applies Here To Preserve the Commonwealth's Functions and Lifting it is an Extraordinary Remedy Jeopardizing Life, Health, and Welfare, Thereby Making it Critical For Movants to Show At Least a Likelihood of Success on Their Property Interests to Procure Stay Relief. ............................................................................................................. 25

    B.    Movants Lack a Property Interest in the Retained Occupancy Tax Revenues. ......................................................................................................... 32

        1.    The Bond Documents Do Not Confer a Security Interest in the Retained Occupancy Tax Revenues. ........................................... 34

        2.    Movants Do Not Have Any Security Interests Arising from the Tax Act Because it Has Been Preempted by PROMESA. ............................... 38

        3.    Movants Do Not Have a Statutory Lien against the Retained Occupancy Tax Revenues. ............................................................ 40

        4.    Movants Do Not Have Equitable Ownership of the Retained Occupancy Tax Revenues. ............................................................ 45

    C.    Movants Do Not State A Prima Facie Case to Obtain Relief From the Stay Under Bankruptcy Code Section 362(d)(2). ................................................. 52

    D.    Movants Do Not State a Prima Facie Case for Stay Relief Under Bankruptcy Code Section 362(d)(1). ............................................................. 53

CONCLUSION ............................................................................................................................... 54

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*1st Farm Credit Servs., PCA v. Phillips (In re Phillips)*,
 No. 05-87521, 2007 WL 4179845 (Bankr. C.D. Ill. Nov. 20, 2007)......................................27

*Americredit Fin. Servs., Inc. v. Nichols (In re Nichols)*,
 440 F.3d 850 (6th Cir. 2006) ............................................................................40

*Associacion de Subscripcion Conjunta del Seguro de Responsibilidad Obligatorio
 v. Flores Galarza*,
 484 F.3d 1 (1st Cir. 2007)............................................................................46, 47

*Assured Guar. Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
 582 B.R. 579 (D.P.R. 2018)............................................................................4, 25

*Begier v. IRS*,
 496 U.S. 53 (1990)........................................................................................5

*City & Cty. of Dallas Levee Imp. Dist. v. Indus. Props. Corp.*,
 89 F.2d 731 (5th Cir. 1937) ..........................................................................51, 52

*City of Springfield v. Ostrander (In re Lan Tamers, Inc.)*,
 329 F.3d 204 (1st Cir. 2003)..........................................................................49, 50

*Davila v. Agrait*,
 R-84-24, 1985 WL 301217 (P.R. Oct. 1, 1985)........................................................48

*Emps. Ret. Sys. of Gov't of P.R. v. Andalusian Glob. Designated Activity Co. (In
 re Fin. Oversight & Mgmt. Bd. for P.R.)*,
 No. 19-1699, Dkt. No. 00117544634 (1st Cir. 2020)..........................................5, 27, 31, 32

*FCC v. NextWave Pers. Commc'ns Inc.*,
 537 U.S. 293 (2003)....................................................................................27

*FDIC v. Casady*,
 106 F.2d 784 (10th Cir. 1939) ........................................................................51

*Fletcher v. Peck*,
 10 U.S. 87 (1810)....................................................................................5, 31

*Fonseca v. Gov't Emps. Ass'n*,
 542 B.R. 628 (B.A.P. 1st Cir. 2015) ................................................................43, 44

**Table of Contents**

(cont'd)

**Page**

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
85 F. Supp. 3d 577 (D.P.R. 2015) ............................................................40

*García-Rubiera v. Calderón*,
570 F.3d 443 (1st Cir. 2009) ..................................................................46

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*,
939 F.3d 340 (1st Cir. 2019) .................................................25, 31, 33, 46

*Greene v. Assocs. (In re Greene)*,
248 B.R. 583 (Bankr. N.D. Ala. 2000) ...................................................12

*Grella v. Salem Five Cent Sav.*,
42 F.3d 26, 32–33 (1st Cir. 1994) ..........................................................33

*Howard Delivery Serv. v. Zurich Am. Ins. Co.*,
547 U.S. 651 (2006) ..................................................................................5

*In re Ames Dep't Stores, Inc.*,
274 B.R. 600 (Bankr. S.D.N.Y. 2002), *aff'd sub nom. LFD Operating, Inc. v.
Ames Dep't Stores, Inc.*, No. 01-42217 (REG), 2004 WL 1948754 (S.D.N.Y.
Sept. 1, 2004), *aff'd sub nom. In re Ames Dep't Stores, Inc.*, 144 F. App'x 900
(2d Cir. 2005) ...........................................................................................48

*In re Anders*,
151 B.R. 543 (Bankr. D. Nev. 1993) .......................................................28

*In re Arctic Air*,
202 B.R. 533 (Bankr. D.R.I. 1996) .........................................................27

*In re City of Columbia Falls*,
143 B.R. 750 (Bankr. Mont. 1992) .........................................................52

*In re Daves*,
770 F.2d 1363 (5th Cir. 1985) ................................................................27

*In re Elmira Litho, Inc.*,
174 B.R. 892 (Bankr. S.D.N.Y. 1994) ...............................................52, 53

*In re Friese*,
28 B.R. 953 (Bankr. D. Conn. 1983) .......................................................44

*In re Greer*,
242 B.R. 389 (Bankr. N.D. Ohio 1999) ..................................................26

*In re Hunt's Pier Assocs.*,
143 B.R. 36 (Bankr. E.D. Pa. 1992) ........................................................53

**Table of Contents**

(cont'd)

**Page**

*In re Las Vegas Monorail Co.*,
429 B.R. 317 (Bankr. D. Nev. 2010) .............................................................. passim

*In re Morales Travel Agency*,
667 F.2d 1069 (1st Cir. 1981).................................................................48

*In re Plant Insulation Co.*,
469 B.R. 843 (Bankr. N.D. Cal. 2012), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012),
*rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013) ..........................................40

*In re Shree Meldikrupa Inc.*,
547 B.R. 862 (Bankr. S.D. Ga. 2016).................................................................53

*J.K. Mullen Inv. Co. v. Town of Arvada*,
261 P.2d 714 (Colo. 1953).................................................................43

*Kane v. Coulson (In re Price)*,
575 B.R. 461 (Bankr. D. Haw. 2017) .................................................................6, 43

*Keach v. Wheeling & Lake Erie Railway Co. (In re Montreal, Maine & Atlantic Railway, Ltd.)*,
888 F.3d 1 (1st Cir. 2018).................................................................50

*Knott v. Shepherdstown Mfg. Co.*,
5 S.E. 266 (W. Va. 1888).................................................................44

*Kothe v. R.C. Taylor Tr.*,
280 U.S. 224 (1930).................................................................5

*Manigault v. Springs*,
199 U.S. 473 (1905).................................................................31

*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, LLC*,
602 B.R. 798 (B.A.P. 1st Cir. 2019).................................................................33

*Montalvo v. Autoridad de Acueducto y Alcantarillados*,
537 B.R. 128 (Bankr. D.P.R. 2015).................................................................25

*Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
330 F. Supp. 3d 685 (D.P.R. 2018).................................................................39

*Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
No. 18-2154, 2019 WL 6887258 (1st Cir. Dec. 18, 2019) .................................................................39

*Ohio v. Kovacs*,
469 U.S. 274 (1985).................................................................27

vi

**Table of Contents**

(cont'd)

**Page**

*Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
899 F.3d 1 (1st Cir. 2018) .......................................................................4, 41, 42, 45

*Peaje Invs. LLC v. P.R. Highways & Transp. Auth. (In re Fin. Oversight & Mgmt.
Bd. for P.R.)*,
301 F. Supp. 3d 290 (D.P.R. 2017) ...........................................................................44

*PNC Bank, Nat'l Assoc. v. Spring Ford Indus., Inc. (In re Spring Ford Indus.,
Inc.)*,
338 B.R. 255 (E.D. Pa. 2006) ...................................................................................25

*Reichelderfer v. Quinn*,
287 U.S. 315 (1932) .................................................................................................31

*Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*,
145 B.R. 719 (Bankr. D. Mass. 1992) .....................................................................45

*Safe Deposit Bank & Tr. Co. v. Berman*,
393 F.2d 401 (1st Cir. 1968) ...................................................................................27

*Shelton v. Erwin*,
472 F.2d 1118 (8th Cir. 1973) .................................................................................27

*Shipley Co. v. Darr (In re Tap, Inc.)*,
52 B.R. 271 (Bankr. D. Mass. 1985) ..................................................................48, 51

*Soares v. Brockton Credit Union (In re Soares)*,
107 F.3d 969 (1st Cir. 1997) ...................................................................................25

*Steslow v. Citicorp Mortg., Inc. (In re Steslow)*,
225 B.R. 883 (Bankr E.D. Pa. 1998) ..........................................................6, 27, 43

*Stowe v. Bologna (In re Bologna)*,
206 B.R. 628 (Bankr. D. Mass. 1997) ................................................................48, 51

*U.S. Tr. Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) .....................................................................................................40

*United States v. Whiting Pools, Inc.*,
462 U.S. 198 (1983) .................................................................................................25

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
945 F.3d 3 (1st Cir. 2019) .....................................................................................1, 7

*Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke, Va.*,
300 U.S. 440 (1937) .................................................................................................40

**Table of Contents**
(cont'd)

**Page**

**STATUTES**

| | |
|---|---|
| 13 L.P.R.A. § 12 | 30 |
| 13 L.P.R.A. § 2271(a)(1) | 48, 50 |
| 13 L.P.R.A. § 2271a(a) | 10 |
| 13 L.P.R.A. § 2271o | 10 |
| 13 L.P.R.A. § 2271o(b) | 10 |
| 13 L.P.R.A. § 2271v | 28 |
| 13 L.P.R.A. § 2271v(a) | passim |
| 13 L.P.R.A. § 2271v(a)(4) | 42 |
| 13 L.P.R.A. § 2271v(b) | 48, 50 |
| 13 L.P.R.A. § 2271v(5) | 38 |
| 19 L.P.R.A. § 2233(b)(2) | 36 |
| 19 L.P.R.A. § 2262(b)(2) | 17 |
| 23 L.P.R.A. § 6004 | 10 |
| 23 L.P.R.A. § 6412(h) | 10 |
| 23 L.P.R.A. § 6412(i) | 10 |
| 23 L.P.R.A. § 6441(d) | 38 |
| 23 L.P.R.A. § 6446 | 7 |
| 24 L.P.R.A. § 3122 | 49 |
| 11 U.S.C. § 101(53) | 41 |
| 11 U.S.C. § 362(a) | 25 |
| 11 U.S.C. § 362(a)(3) | 25 |
| 11 U.S.C. § 362(d)(1) | 3, 53 |
| 11 U.S.C. § 507(a)(2) | 39 |
| 11 U.S.C. § 541(d) | 33 |

## Table of Contents
(cont'd)

|  | **Page** |
|---|---|
| 48 U.S.C. §§ 2101-2241 | 1 |
| 48 U.S.C. § 2103 | 23 |
| 48 U.S.C. § 2161 | 25 |
| UCC § 9–101, cmt. 1 | 6 |
| UCC § 9–203, cmt. 5 | 6 |
| UCC § 9–617(a)(1) | 12 |
| PROMESA § 202 | 5, 8, 38 |
| PROMESA § 202(e)(1)(C) | 39 |
| PROMESA § 202(e)(3)(C) | 7 |
| PROMESA § 202(e)(4)(C) | 7 |
| PROMESA § 301(a) | 39 |
| PROMESA § 362(d) | 52 |
| PROMESA § 405(m)(2) | 29 |

**OTHER AUTHORITIES**

| P.R. Const. art. VI, § 2 | 26 |
|---|---|
| P.R. Const. art. VI, § 8 | passim |

**To the Honorable United States District Judge Laura Taylor Swain:**

The Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "FOMB"), as sole representative of Debtor pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this opposition (the "Opposition") to the *Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon Concerning the Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* [ECF No. 10104] (the "Motion" or "M. Br."), filed by Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corporation ("Assured"), Assured Guaranty Municipal Corporation ("AGMC"), Financial Guaranty Insurance Company ("FGIC"), and The Bank of New York Mellon, as Fiscal Agent ("BNYM" and together with Ambac, Assured, AGMC, and FGIC, the "Movants").  For its Opposition, the Oversight Board respectfully states as follows:

## PRELIMINARY STATEMENT

1.      For reasons explained in the following paragraphs, based on this Court's affirmed ruling that pre-PROMESA appropriations are preempted,[3] the instant Motion and its two companion motions must be denied because pre-PROMESA appropriations form the underpinnings of all the moving parties' alleged security interests and property interests in Commonwealth assets, for which they claim entitlement to adequate protection.  Moreover, even without consideration of preemption, none of the moving parties has an interest in Commonwealth

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3] *See Vázquez-Garced v. Financial Oversight & Management Board for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019).

assets entitled to adequate protection.  That is a second ground for denial of the motions, and many more are set forth below.

2.      Movants seek relief from the stay to pursue claims against the Puerto Rico Tourism Company (the "Tourism Company"), the Government Development Bank for Puerto Rico ("GDB"), and/or the Puerto Rico Convention Center District Authority ("CCDA") for certain hotel occupancy taxes that they assert should be used to pay principal and interest on bonds issued by CCDA (the "CCDA Bonds" and the holders of CCDA Bonds, the "CCDA Bondholders").  No one disputes that Movants have a contractual security interest in occupancy taxes that have actually been deposited in a specific account, called the "Transfer Account."  But Movants' motion is not about that account, which has gone unfunded since the start of the fiscal crisis.  Movants instead seek to garnish occupancy tax revenues[4] they say should have been, but were not, deposited in the Transfer Account (the "Retained Occupancy Tax Revenues").[5]  Movants' motion, however, fails for two simple reasons.  First, Movants do not have a property interest in the Retained Occupancy Tax Revenues.  Second, any claim that Movants are entitled to Occupancy Tax Revenues that have been levied and collected post-PROMESA fails because the Tax Act, on which Movants rely, is nothing but a pre-PROMESA appropriation statute that is preempted by PROMESA.

3.      ***Movants Have No Security Interest Beyond Moneys in the Transfer Account***.
Movants argue they have a security interest in what they term the "Pledged Hotel Taxes."  But that

---

[4] Tax revenues derived from the Hotel Room Occupancy Tax Act (the "Tax Act") are defined herein as "Occupancy Tax Revenues."

[5] The term "Retained Occupancy Tax Revenues" as used herein only refers to the portion of the Occupancy Tax Revenues that would have been deposited in the Transfer Account but for the Emergency Order, the Moratorium Act, and/or PROMESA.  For the avoidance of doubt, Movants do not have any form of property interest, lien or other entitlement to any of the other Occupancy Tax Revenues held by the Tourism Company and/or collected in the future.

is a term Movants made up, and it appears nowhere in the Bond Documents[6] or any statute. Instead, the Bond Documents carefully delineate the transfer of Occupancy Tax Revenues from the Tourism Company (which levies and collects the taxes pursuant to the Commonwealth's delegated authority) to CCDA (which issued the bonds) and define the security interest or pledge granted by CCDA. Those Bond Documents make clear that the security interest only extends to amounts actually deposited in the Transfer Account.[7] *See* Assignment Agreement, § 6, Granting Clause I; Trust Agreement, § 1.01.[8] No contractual or statutory authority extends Movants' interest beyond the Transfer Account. Their lack of a security interest in the Retained Occupancy Tax Revenues conclusively resolves Movants' efforts to seek relief from the automatic stay irrespective of whether they are moving under Bankruptcy Code section 362(d)(1) or (d)(2).

        4.      ***Movants Do Not Have a Statutory Lien***. Unable to assert a security interest against the Retained Occupancy Tax Revenues, Movants claim they have a "statutory lien" against all collected Occupancy Tax Revenues, pointing to the implementing statutes authorizing CCDA to issue the CCDA Bonds, and establishing the inter-instrumentality flow of funds that would make this possible. But no statutory lien exists where, as here, the statutory provisions merely "***permit*** the [instrumentality] to secure the payment of bonds by making a pledge of revenues, ***but they do***

---

[6] The Bonds are governed by four interrelated documents (collectively, the "<u>Bond Documents</u>"). They consist of: (i) the Assignment and Coordination Agreement between the Tourism Company and GDB (the "<u>Assignment Agreement</u>"); (ii) the Pledge Agreement between GDB, CCDA, and the CCDA Bond Trustee (the "<u>Pledge Agreement</u>"); (iii) the Trust Agreement between CCDA and the CCDA Bond Trustee (the "<u>Trust Agreement</u>"); and (iv) the Supplemental Trust Agreement between CCDA and the CCDA Bond Trustee (the "<u>Supplemental Trust Agreement</u>"). These documents are attached hereto as Exhibits A - D.

[7] An annotated diagram showing the flow of funds is attached hereto as Ex. E.

[8] Under the Assignment Agreement, the Tourism Company "irrevocably pledges, assigns, transfers, conveys, grants, and sets over to GDB all rights it may legally have ***in amounts deposited in the Transfer Account***." Assignment Agreement, § 6 (emphasis added). Under the Trust Agreement, CCDA granted the Bond Trustee: (i) a security interest in "Hotel Occupancy Tax Funds" – defined in the Trust Agreement as "all Hotel Occupancy Tax Revenues that are ***deposited in the Transfer Account*** . . . ." Granting Clause I; Trust Agreement, § 1.01 (emphasis added); and (ii) a security interest in GDB's right title and interest under the Assignment Agreement. Granting Clause IV.

*not require* that it do so." *Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 1, 11 (1st Cir. 2018) (emphasis added). Here, the statutes do not purport to convey ownership or otherwise purport to override the limited security interest granted by the Bond Documents. They merely establish the statutory framework that makes the issuance of the CCDA Bonds possible. That does not give rise to a statutory lien.

5. **_Movants are Not "Equitable Owners" of the Retained Occupancy Tax Revenues_**. With no security interest and no statutory lien, Movants fall back on equitable principles, claiming that the same statutes that fail to confer a statutory lien somehow give them even more: equitable title in all Occupancy Tax Revenues needed to pay the CCDA Bonds. But just as nothing in the statute purports to create a statutory lien, nothing in the statute purports to transfer equitable ownership to the CCDA Bondholders. Indeed, if the Tax Act already gave the CCDA Bondholders equitable ownership over the funds as claimed by Movants, why would the same statute authorize CCDA to grant a security interest in a portion of the Occupancy Tax Revenues? *See* 13 L.P.R.A. § 2271v(a). It wouldn't. And as this Court has explained before, ownership interests and security interests cannot coexist in favor of the same person at the same time on the same property. *See Assured Guar. Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 582 B.R. 579, 599 (D.P.R. 2018) (citing *William W. Bierce, Ltd. v. Hutchins*, 205 U.S. 340, 347 (1907) ("[T]he assertion of a lien is inconsistent with the assertion of [a] title interest.")).

6. **_PROMESA Preempts Any Statutory Obligation to Continue Funding the Transfer Account_**. The Commonwealth owes tens of billions of dollars to retirees, General Obligation bondholders, and others. It became obligated to pay in full its different unsecured debts based on written agreements, Commonwealth statutes, and/or the Puerto Rico Constitution. In each instance, the written agreement or law obligated the Commonwealth to pay the debtholders

4

in full.  But Title III, just as all bankruptcy law, preempts any Commonwealth laws purporting to require full payment of prepetition obligations.   Debtholders, including Movants here, must therefore share in the losses arising from the Commonwealth's fiscal emergency, consistent with the equality policy underlying all bankruptcy law that creditors of equal rank share the losses.[9]

7.       When viewed from the perspectives of public policy, PROMESA Titles II and III, and logic and common sense, it is apparent that Movants' requested relief is contrary to all of them. First, the proposition that the Commonwealth must pay the CCDA Bondholders in full while the Commonwealth's own creditors absorb all the losses violates the equality policy.  The CCDA Bondholders do not even hold claims against the Commonwealth, let alone secured claims. Second, the lynchpin of Movants' case, the Commonwealth statute requiring the Tourism Company to transfer money to the Transfer Account, is a pre-PROMESA appropriation.  Both this Court and the First Circuit Court of Appeals have ruled all such appropriations are preempted by PROMESA section 202 because they are not certified by the Oversight Board.  And, even without preemption, no appropriation of future years' revenues can bind future legislatures.[10]  Third, the appropriation is separately preempted by Title III because it requires payment of an obligation that Title III does not render a priority claim.  The Commonwealth cannot insert priority claims into Title III.  Fourth, Movants' kitchen sink of property law theories—equitable ownership, trust fund,

---

[9] *See, e.g., Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) ("we are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed."); *Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive *pro rata* shares of the debtor's property."); *Kothe v. R.C. Taylor Tr.,* 280 U.S. 224, 227 (1930) ("The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate . . . .").

[10] *Emps. Ret. Sys. of Gov't of P.R. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, No. 19-1699, Dkt. No. 00117544634 (1st Cir. 2020) (stating legislative appropriations can be disregarded by subsequent legislatures); *see also, e.g., Fletcher v. Peck*, 10 U.S. 87, 135 (1810) (Marshall, J.) ("[O]ne legislature cannot abridge the powers of a succeeding legislature . . . The correctness of this principle, so far as respects general legislation, can never be controverted.").

and statutory lien—are each refuted by the Uniform Commercial Code which would be totally vitiated if it could be circumvented by such theories.[11]  Fifth, logic and common sense demonstrate CCDA Bonds sold on the basis of collateral consisting of funds in the Transfer Account at GDB, would not be further secured by Commonwealth assets the Commonwealth nowhere pledged. Indeed, if Movants had property rights in Commonwealth assets, this would have been publicized in the Bond Offering Statement the Bondholders relied on—but this document is tellingly silent.[12]

8.    Promises to appropriate money (or, as here, to "make sure" that money will be deposited in an account) do not give rise to a security or property interest.  *See Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (a promise to pay a debt from a particular fund does not, in itself, create a contractual lien in the fund nor an equitable lien);  *Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*, 225 B.R. 883, 886 n.4 (Bankr E.D. Pa. 1998) ("[a] covenant without a pledge granting a security interest is simply a promise, not a security interest"). A promise by the Tourism Company to collect tax revenues and continuously deposit them into a particular account for CCDA, or a promise from the Commonwealth to "make sure" such funds are deposited, cannot possibly make CCDA's Bondholders better off than if they had an unsecured promise from the Commonwealth to pay the CCDA Bonds continuously until paid in full.  Here, far from making any promise to pay CCDA Bondholders, the Commonwealth expressly

---

[11] The Uniform Commercial Code eliminates most equitable theories.  *See* former UCC § 9–203, Comment 5 ("Since this Article reduces formal requisites to a minimum, the doctrine [of equitable mortgage] is no longer necessary or useful.") and current UCC § 9–101, Comment 1 (explaining comments to former UCC remain the rule of law); *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 339 n.39 (Bankr. D. Nev. 2010) (stating trustee's equitable arguments to establish by operation of law what it failed to obtain by contract and practice failed because "[t]hese theories are . . . contrary to the general notion that Article 9 generally supplanted such theories in favor of one simple system.").

[12] *See Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds, Series A*, dated as of March 15, 2006, available at http://www.gdb.pr.gov/investors_resources/prccda.html (last visited Jan. 28, 2020) (not indicating that any Bonds are secured by statutory liens or other property interests in Retained Occupancy Tax Revenues or any other property of the Tourism Company or the Commonwealth).

disclaimed any liability on the Bonds. *See, e.g.,* 23 L.P.R.A. § 6446 ("The bonds . . . do not constitute a debt of the Commonwealth . . . and said bonds shall be payable solely from those funds that have been set aside for their payment."); Trust Agreement §§ 2.03, 6.02 ("All financial obligations of [CCDA] under this Trust Agreement, every Supplemental Trust Agreement and the Bonds . . . shall not be deemed or construed as creating a debt, liability, or obligation of the Commonwealth . . . . ").

9.     Here, however, Movants deploy Commonwealth laws requiring debt payments or appropriations as the non-preemptable foundations for their purported security interests or other property interests at the Tourism Company level, and then request full payment of such amounts as if the Commonwealth laws are both nondischargeable and specifically enforceable. If they are right, they receive full payment while all the Commonwealth's other creditors share all the losses. Movants, however, are not right.

10.     The Court need look no further than the First Circuit's recent preemption decision in *Vázquez-Garced v. Financial Oversight & Management Board for Puerto Rico*, 945 F.3d 3 (1st Cir. 2019), to dispose of the Motion. There, the First Circuit confirmed "that PROMESA subsection 202(e)(4)(C) itself precludes the territorial government from reprogramming funds from prior fiscal years except to the extent such reprogrammed expenditures are authorized in a subsequent budget approved by the Board, ***and any Puerto Rico law to the contrary is preempted by virtue of PROMESA section 4*** . . . Simply put, if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget, ***regardless of what any territorial laws say***." *Id*. at 8 (emphasis added). The consequence of *Vázquez-Garced* is clear: the appropriation of funds to CCDA under the Tax Act (and subsequent requirement to transfer such funds to the Transfer Account), is preempted because it is inconsistent

with PROMESA's requirement that appropriations can only be made pursuant to sections 201 and 202 of PROMESA.

11.     This is not just binding First Circuit law, it is logical.  Outside of bankruptcy, debts are to be paid in full.  But the whole purpose of bankruptcy, and PROMESA, is to preempt and restructure those obligations.  If statutes purporting to appropriate moneys to instrumentalities are not preempted, they would make restructuring impossible and would also preclude the Oversight Board from balancing the Commonwealth's budget.  It would also create the absurd result of placing creditors of an instrumentality—who can point to nothing more than the Commonwealth's promise to appropriate money to the instrumentality—ahead of creditors of the Commonwealth who actually hold the Commonwealth's direct promise to pay.  Just as a prepetition promise to pay is preempted under PROMESA, so too is a prepetition appropriation.

12.     Movants seek to avoid this result by claiming that the Retained Occupancy Tax Revenues are not Commonwealth property, either because the funds are theirs or because they belong to the Tourism Company.  The former argument fails because, as noted, Movants lack any property interest in the Retained Occupancy Tax Revenues.  The latter argument fails because the Occupancy Tax Revenues emanate from the Commonwealth's sole sovereign Constitutional power to tax.  Taxes collected pursuant to this Constitutional authority remain Commonwealth property, unless and until the Commonwealth actually transfers ownership in them.  This it has not done.  To the contrary, the Commonwealth has expressly reserved a reversionary interest under "Section 8 of Article VI of the Constitution," which allows the Commonwealth to retain or claw back appropriations to pay public debt when its "available resources"[13] are insufficient.   13

---

[13] The official English version of the Puerto Rico Constitution uses the term "available revenues," not "available resources," which is used in other translations.  Solely for purposes of this Opposition, and without waiver of or prejudice to any argument regarding which version of the Puerto Rico Constitution controls, the Commonwealth uses

L.P.R.A. § 2271v(a); P.R. Const., art. VI, § 8.  As noted below, these conditions precedent for triggering this reversionary interest have already been met (and are continuing to be met).  But even if that were not the case, the existence of a reversionary interest is sufficient to bar Movants from seeking to garnish these funds outside the confines of PROMESA.

13.    ***Movants Are Adequately Protected.***  Movants' motion should also be denied because they cannot show cause to lift the stay.  Movants do not dispute that the Tourism Company has continued, and will continue, to levy and collect the Occupancy Tax Revenues.  Nor do they seriously contend that that those revenues are insufficient to pay principal and interest on CCDA Bonds in the future.  Indeed, as the Commonwealth is prepared to show in accordance with any schedule set by the Court (if such a showing is deemed necessary), the Retained Occupancy Tax Revenues are being collected and deposited in a separate commercial bank account of the Tourism Company (the "Retention Fund").  As such, there is no diminution in value of Movants' collateral (if they have any), and thus, no cause to lift the stay.[14]

*        *        *        *

The forest should not get lost for the trees.  Movants' claims boil down to a simple, straight-forward question: do they have a security interest in Retained Occupancy Tax Revenues?  The answer is equally straight-forward and simple.  Movants' security interest is determined by the Bond Documents, which limit the pledge only to "amounts deposited in the Transfer Account." The security interest does not reach anything that precedes the Transfer Account, it does not reach the Retained Occupancy Tax Revenues, and the Commonwealth's purported obligation to

---

the term "available resources" in accordance with the use of that term in Adversary Proceeding Nos. 19-291, 19-292, 19- 293, 19-294, 19-295, 19-296, and 19-297.

[14] Although the Motion raises additional issues, per the Court's Amended Interim Case Management Order for Revenue Bonds [ECF No. 10595], this Opposition is confined to the issue of secured status and the Commonwealth reserves the right to brief and provide evidence on other issues should the Motion proceed past the preliminary hearing.

appropriate the Retained Occupancy Tax Revenues to CCDA is preempted by PROMESA.  That is all this Court need decide to resolve the Motion.

## FACTS

**A.    *The Implementing Statutes.***

14.     The Commonwealth created the CCDA in September 2000, through Act 351-2000 (the "Enabling Act"), to build and operate the Puerto Rico Convention Center.  23 L.P.R.A. § 6004.  To finance the cost of construction, the Enabling Act allows the CCDA to "make and issue negotiable bonds" and to "secure the payment of said Bonds . . . through the pledge, mortgage, assignment, trust, indentures of [certain] occupancy tax revenues."  *Id*. § 6412(h), (i).  The CCDA, however, does not levy those taxes.

15.     The Occupancy Tax Revenues are levied and collected by a separate government instrumentality, the Tourism Company, which is a covered territorial instrumentality under PROMESA (as is the CCDA).  In September 2003, the Commonwealth enacted the Tax Act.  13 L.P.R.A. § 2271*o*.  This Act delegates the Commonwealth's constitutional taxation authority to the Tourism Company and requires it to "levy, charge, and collect a general tax" on hotel room occupancy (*i.e.*, the Occupancy Tax Revenues).  *Id*. § 2271*o*(b); *see also* 13 L.P.R.A. § 2271a(a) (delegating the power to "[d]etermine, assess, impose, collect, enforce, regulate and distribute the tax.").  The Tourism Company, however, did not issue bonds secured by the taxes.  That is, the Tourism Company collects taxes but did not issue bonds; and the CCDA issued bonds, but does not collect taxes.

16.     The Tax Act addresses this by requiring the Tourism Company to deposit a portion of the collected Occupancy Tax Revenues into a "special account to be maintained by [GDB] in the name of [CCDA] for the benefit of the bondholders."  13 L.P.R.A. § 2271v(a).  As described below, under the Bond Documents, this special account is referred to as the "Transfer Account."

10

The Tax Act then authorizes CCDA to pledge the amounts placed in the Transfer Account as security for the CCDA Bonds. Specifically, the statute provides:

> The [CCDA] is hereby authorized, with the prior written consent of the [Tourism] Company, to pledge or otherwise encumber the . . . tax collected which is to be deposited in [the specified] special account . . . as security for the payment of the principal and interest on the bonds . . .

*Id.*[15] By its express terms, therefore, CCDA is only authorized to pledge amounts that are deposited in the Transfer Account and then only with the prior written consent of the Tourism Company.

17.    While the Tax Act establishes this inter-governmental agency transfer, neither the Tax Act nor the Enabling Act purports to give CCDA the power to pledge or otherwise encumber funds that have not been deposited in the Transfer Account, including any Occupancy Tax Revenues that have been collected, but not so deposited. Likewise, contrary to Movants' assertion, nothing in the Tax Act or the Enabling Act purports to transfer equitable ownership of any funds, and certainly not any funds that have not been deposited in the Transfer Account. Specifically, Movants assert the Tax Act "expressly provides that CCDA Bondholders have equitable ownership of the Pledged Hotel Taxes." M. Br. ¶ 18. But they play definitional games by making up the term "Pledged Hotel Taxes," which nowhere appears in any applicable statute or Bond Documents. To the extent Movants intend this term to reach money not actually deposited in the Transfer Account—as they surely do—Movants paint with too broad a brush. The Tax Act does not "expressly" purport to transfer equitable ownership at all. It simply requires the Tourism

---

[15] The Tax Act also contains a non-impairment provision pursuant to which the Commonwealth "agrees and makes a commitment with any person … who subscribes" to the CCDA Bonds that, among other things, it will not reduce or eliminate the Occupancy Tax Revenues, and it will "make sure that the amounts that must be deposited in the special account … are deposited in such special account." 13 L.P.R.A. § 2271v(a). As discussed further below (*see* fn. 36), a breach of a negative covenant, such as non-impairment and negative pledge clauses, does not create property rights and cannot convert an unsecured claim into a secured claim.

11

Company to deposit certain funds in an account "in the name of [CCDA] for the benefit of bondholders." Thus, if equitable ownership ever transfers, it does so only *after* the funds have been deposited in the Transfer Account.[16] Because nothing in the Tax Act or the Enabling Act purports to transfer any property interest in funds *before* they have been so deposited, Movants are wrong when they assert these statutes "expressly provide[] that CCDA bondholders have equitable ownership" of the Retained Occupancy Tax Revenues. M. Br. ¶ 18.

**B.    *The CCDA Bonds and Bond Documents.***

18.    With all statutory authorizations to issue bonds and effectuate the necessary inter-governmental transfers in place, in 2006, CCDA proceeded to issue the CCDA Bonds in the amount of approximately $468 million.

19.    The Bonds are governed by four interrelated documents (defined as the Bond Documents, above): (i) the Assignment Agreement between the Tourism Company and GDB; (ii) the Pledge Agreement between GDB, CCDA, and the CCDA Bond Trustee; (iii) the Trust Agreement between CCDA and the CCDA Bond Trustee; and (iv) the Supplemental Trust Agreement between CCDA and the CCDA Bond Trustee.

20.    Contrary to Movants' assertion, the Bond Documents do not transfer equitable ownership to the Retained Occupancy Tax Revenues, and—at most—give the CCDA Bondholders a security interest only in (i) amounts that have been actually deposited in the Transfer Account; and (ii) GDB's rights under the Assignment Agreement. The former is a property interest, but

---

[16] Movants' argument is further belied by the fact that, under the UCC, the secured party does not have any ownership interest in collateral unless and until the secured party completes its enforcement action or disposition of the collateral. *See Greene v. Assocs. (In re Greene)*, 248 B.R. 583, 594 (Bankr. N.D. Ala. 2000) (stating that, prior to disposition, the secured creditor "*only* [has] a security interest . . . More simply, the Uniform Commercial Code treats the debtor as retaining a property interest in the collateral until its disposition under either § 9–504 or § 9–505.") (emphasis in original); UCC § 9–617(a)(1) (Secured party's "disposition" of collateral upon foreclosure transfers debtor's ownership of collateral to person who acquires collateral at foreclosure).

does not concern the Retained Occupancy Tax Revenues at issue here.  The latter is nothing more than a contractual right against the Tourism Company that does not grant any property interest in Retained Occupancy Tax Revenues.

     **1.**     ***The Assignment Agreement.***

21.     The Assignment Agreement was entered into by and between the Tourism Company and GDB.  It is the ***only*** agreement to which the Tourism Company is a party and it governs the timing and extent of any property transferred by the Tourism Company.

22.     Section 1 of the Assignment Agreement creates two accounts at GDB into which the Occupancy Tax Revenues are to be deposited by the Tourism Company after they are collected, the Transfer Account and the Surplus Account.  Assignment Agreement, §§ 1-2.  The Assignment Agreement further provides that, "[o]n a monthly basis, all Hotel Occupancy Tax Funds received by the Tourism Company shall be deposited in the Transfer Account until" certain caps have been met, with any remaining funds deposited in the Surplus Account.  *Id.* § 4.  This is consistent with the funds flow authorized by the implementing Tax Act, and accordingly, the Tourism Company agreed to comply with such provisions.  *Id*. § 3.

23.     The Tourism Company, however, did ***not*** grant any property rights in Occupancy Tax Revenues *before* it deposited them into the Transfer Account.  The sole property grant (if any) by the Tourism Company is a grant to GDB set forth in Section 6 of the Assignment Agreement. The full text of Section 6 provides:

> The Tourism Company hereby irrevocably pledges, assigns, transfers, conveys, grants and sets over to GDB all rights it may legally have in amounts ***deposited in the Transfer Account*** collected by the Tourism Company as required under the provisions of Section 31 of the Occupancy Tax Act up to the amounts certified by GDB in the GDB Certificate (including any amounts as may be necessary to pay any previously unpaid amounts).

Assignment Agreement, § 6 (emphasis added).  As this provision makes clear, any property right conveyed is limited to, at most, the amounts that have actually been deposited in the Transfer Account.  Section 6 of the Assignment Agreement does not purport to grant any property interest to the CCDA Bondholders or the Trustee; any assignment of property rights in the Assignment Agreement is to GDB alone, in its capacity as the bank where a deposit was made.  Importantly, neither section 6 nor any other provision of the Assignment Agreement grants GDB or CCDA any rights in the Retained Occupancy Tax Revenues.[17]

24.     The limited nature of the property right conveyance (to only amounts actually deposited in the Transfer Account) is further reflected in Section 7 of the Assignment Agreement. There, the Tourism Company "expressly acknowledge[d] and consent[ed] to GDB entering into that certain Pledge Agreement with the [CCDA] and the Trustee . . . under which the *Hotel Occupancy Tax Funds transferred to GDB* [under the Assignment Agreement] will be further pledged" by the CCDA to the Bondholders.[18]  Assignment Agreement, § 7 (emphasis added).  This provision limits the Tourism Company's consent to pledge Occupancy Tax Revenues to the amounts deposited in the Transfer Account for two separate and independent reasons.  First, the term "Hotel Occupancy Tax Funds" is expressly defined as "all Hotel Occupancy Tax Revenues ***that are deposited in the Transfer Account.***"  *See* Trust Agreement, § 1.01 (emphasis added);

---

[17] Movants argue that Section 6 establishes a "duty [of the Tourism Company] to transfer *legal title* to every dollar of the Debt Service Amount it collects to GDB."  M. Br. ¶ 35(v) n.4.  Movants, however, misread Section 6.  The duty to deposit funds into the Transfer Account is set forth in Section 5 of the Assignment Agreement.  Section 5 does not transfer any property rights, and a breach of that provision gives rise to, at most, a breach of contract claim.  Section 6, which contains the conveyance of a property interest, is expressly limited to "amounts deposited in the Transfer Account."  Arguing otherwise, Movants emphasize the phrase "as required under the provisions of [the Hotel Occupancy] Tax Act."  *Id*. (brackets in original).  But this language simply describes the taxes collected by the Tourism Company and where they are to be deposited; it does not expand the property grant beyond the operative phrase "amounts deposited in Transfer Account."  That term indisputably circumscribes the conveyance.

[18] This contractual consent was required by the Tax Act, in which CCDA's authority to contractually "pledge" a "security" interest was predicated on the Tourism Company's "written consent."  13 L.P.R.A. § 2271v(a).

14

Assignment Agreement at 1 (incorporating Trust Agreement definitions). Second, Section 7 is limited to funds that are "transferred to GDB." And the funds transferred to GDB constitute only those funds deposited in the Transfer Account.

25. Notably, both the terms "deposited" and "transferred" are past tense, and thus, those provisions expressly limit the pledge authorization to funds actually "deposited" and "transferred," and do not reach amounts that allegedly should have been, but were not, so deposited and transferred. Moreover, even if the Trustee and CCDA Bondholders had a security interest in CCDA or GDB's rights to the Retained Occupancy Tax Revenues (which they do not), such an interest would do Movants no good because the statutes appropriating moneys to CCDA are preempted, thereby eliminating the source of moneys to be transferred to CCDA or GDB. In any event, they do not create a security interest against the Commonwealth's or Tourism Company's property, or in future tax revenues not yet collected.

**2.      *The Pledge Agreement.***

26. The Pledge Agreement was entered into between and among CCDA, GDB, and the Bond Trustee. The Pledge Agreement governs the transfer of property interests from the CCDA and GDB to the Bond Trustee. It is axiomatic, of course, that only property CCDA owns under its Enabling Act can be pledged; the Pledge Agreement cannot expand CCDA's or the CCDA Bondholder's rights vis-a-vis the Tourism Company or the Commonwealth. The Pledge Agreement first creates a Pledge Account, into which pledged property is deposited. Specifically, under Section 2(a) of the Pledge Agreement, GDB "creates and establishes a special and irrevocable account designated as the 'Hotel Occupancy Tax Pledge Account' (the 'Pledge Account') to be held in trust by GDB on behalf of [CCDA] for the benefit of the Owners of the Bonds . . . ." Pledge Agreement, § 2(a).

27.     Section 2(b) of the Pledge Agreement, then grants a "security interest" against the Transfer Account and the Pledge Account.  Specifically, Section 2(b) provides:

> Each of GDB and [CCDA] does hereby grant, bargain, convey, assign, mortgage and pledge a security interest to the Trustee . . . subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico . . . (i) all Hotel Occupancy Tax Funds received from the Tourism Company, (ii) all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement, and (iii) all right title and interest of GDB in the Assignment Agreement.

Pledge Agreement, § 2(b).

28.     The pledge in Section 2(b) of the Pledge Agreement is expressly made subject to Section 8 of Article VI of the Puerto Rico Constitution.  Section 8 is the section of the Constitution that provides that if available resources and surplus are insufficient to pay all appropriations, the public debt (General Obligation debt) shall first be paid.  Thus, the taxes levied and collected by the Tourism Company are considered "available resources" of the Commonwealth, as also specified in the Tax Act.  *See* 13 L.P.R.A. § 2271v(a) (making appropriation to CCDA and any pledge of Occupancy Tax Revenues subject to Article VI, Section 8 of the Puerto Rico Constitution).

29.     None of the provisions of Section 2(b), however, purport to create a security interest against the Retained Occupancy Tax Revenues.  As an initial matter, to the extent the Retained Occupancy Tax Revenues were not deposited in the Transfer Account, they remain the property of the Tourism Company.  As such, it is beyond the power of CCDA or GDB to convey a security interest in such funds.  Moreover, any security interest against any property other than the funds deposited in the Transfer Account would be unperfected even if it existed, as Movants do not have

16

control over any Tourism Company or Commonwealth deposit accounts, and, moreover, no financing statements were filed against the Tourism Company or Commonwealth.[19]

30.     Even by its express terms, Section 2(b) of the Pledge Agreement does not convey a security interest in the Retained Occupancy Tax Revenues.  With respect to Section 2(b)(i), as noted above, the term "Hotel Occupancy Tax Funds" is defined as "all Hotel Occupancy Tax Revenues that are **deposited in the Transfer Account**."  Pledge Agreement, § 1; Trust Agreement at 7 (emphasis added).  Section 2(b)(i) further limits the security interest to funds GDB or the CCDA "received" from the Tourism Company, which, under the Assignment Agreement, is likewise limited to amounts actually deposited in the Transfer Account.

31.     With respect to Section 2(b)(ii), any security interest only extends to funds "required to be deposited in the *Pledge Account* pursuant to the . . . Pledge Agreement"—**not** funds the Tourism Company is allegedly required to deposit into the *Transfer Account* under the Assignment Agreement.  Because the Tourism Company is not a party to the Pledge Agreement, any funding obligation thereunder it is not an obligation of the Tourism Company.  The obligation to fund the Pledge Account is GDB's.  Under Section 3 of the Pledge Agreement, GDB is only required to transfer to the Pledge Account "all Hotel Occupancy Tax Funds received from the Tourism Company as [soon as they are] received."  Pledge Agreement, § 3(a).  By definition, this too is limited to amounts actually deposited in the Transfer Account.

32.     With respect to Section 2(b)(iii), any security interest is limited to any "right title and interest of GDB in the Assignment Agreement."  Pledge Agreement, § 2(b).  As discussed

---

[19] Indeed, any security interest against either the Transfer Account or the Pledge Account would be unperfected, as these accounts are held by GDB, not the Trustee, and there is no deposit account control agreement in favor of the Trustee over these accounts.  *See* 19 L.P.R.A. § 2262(b)(2) ("[a] security interest in a deposit account may be perfected only by control").

above, while GDB may have contractual rights against the Tourism Company pursuant to the Assignment Agreement, the conveyance of any property right under the Assignment Agreement is limited to amounts actually deposited in the Transfer Account.  The CCDA Bondholders cannot have more rights to the Retained Occupancy Tax Revenues than GDB, and GDB—at most—only has a contractual claim against the Tourism Company arising from the Assignment Agreement.  As such, neither this provision, nor any other provision of the Pledge Agreement, conveys a security interest against Retained Occupancy Tax Revenues.

**3.    *The Trust Agreement.***

33.    The Trust Agreement was entered into by and between CCDA and the Bond Trustee.  As specified in the Trust Agreement and the CCDA Bonds themselves, that agreement constitutes the sole contract between the CCDA Bondholders and CCDA.  The Tourism Company is not a party to that agreement, and as such, it does not, and cannot, create a security interest in Occupancy Tax Revenues the Tourism Company has not deposited in the Transfer Account (*i.e.*, the Retained Occupancy Tax Revenues).

34.    The Trust Agreement makes this clear.  The Granting Clause provides CCDA grants and conveys "all . . . title or interest" it has (if any) in the "following described property":

I.    [A]ll Hotel Occupancy Tax Funds;

II.    All funds, accounts and all money from time to time held by the Trustee under this Trust Agreement or any Supplemental Trust Agreement and any fund or account other than (i) the Rebate Fund, (ii) any Defeasance Escrow Account and (iii) any fund or account created by a Supplemental Trust Agreement that is expressly excluded from the Trust Estate;

III.    [A]ll right, title and interest of the Authority [CCDA] acquired by the Trustee for the benefit of the Owners from GDB with respect to its rights under the Pledge Agreement, and any money from time to time held thereunder including the Pledge Account created thereunder;

IV.    [A]ll right, title and interest of GDB acquired by the Trustee for the benefit of the Owners from GDB with respect to its rights under the Assignment

18

Agreement, including the Transfer Account created thereunder, and any money from time to time held therein;

V.   [A]ny and all other property, revenues or funds from time to time hereafter by delivery or by writing of any kind specially granted, assigned or pledged as and for additional security hereunder, by the Authority or anyone else, in favor of the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

Trust Agreement at 1–2 (the "Granting Clause").

35.   None of these provisions reach the Retained Occupancy Tax Revenues.  Granting Clause I only conveys a security interest against CCDA's rights in "Hotel Occupancy Tax Funds," which, as noted above, is defined as "all Hotel Occupancy Tax Revenues that are **_deposited_** in the Transfer Account."  Trust Agreement, § 1.01 (emphasis added).  Granting Clause II only conveys a security interest against "[a]ll funds, accounts and all money from time to time held by the Trustee under this Trust Agreement."  _Id_. at 2.  But the Trustee does not hold any funds, accounts, or money that was not previously deposited in the Transfer Account and then the Pledge Account.  Granting Clause III only conveys a security interest against "right, title and interest of [CCDA] acquired by the Trustee . . . from GDB with respect to its rights under the Pledge Agreement . . . including the Pledge Account created thereunder."  _Id_.  As explained above, the Pledge Agreement does not (and cannot) convey any rights in the Retained Occupancy Tax Revenues.  Granting Clause IV only conveys a security interest against "right, title [or] interest of GDB acquired by the Trustee . . . under the Assignment Agreement, including the Transfer Account."  _Id_.  GDB did not acquire any rights in the Retained Occupancy Tax Revenues under the Assignment Agreement.  Granting Clause IV does not (and could not) create a security interest against the Retained

Occupancy Tax Revenues.[20]  Granting Clause V only conveys a security interest against CCDA property subject to an express, written grant or pledge by CCDA as "additional security".  But there is no "additional security" pledged under the Trust Agreement.

36.     The limited nature of the security is further evidenced by the second "Further Witnesseth" clause following the Granting Clause, which specifies that "the Hotel Occupancy Tax Funds pledged pursuant to Granting Clauses I, II, III, IV, and V of this Trust Agreement shall be valid and binding from the time such funds *are transferred to GDB* . . . ."  Trust Agreement at 2 (emphasis added).  Because the funds are only transferred to GDB upon (or after) being deposited in the Transfer Account, this provision similarly shows that no security interests attach against funds not so deposited.

### 4.     *The Supplemental Trust Agreement.*

37.     The Supplemental Trust Agreement was entered into by and between CCDA and the Bond Trustee.  The Supplemental Trust Agreement authorizes the issuance of the Series A Bonds (§ 2), specifies the maturity dates and interest rates of the Series A Bonds (§ 3), and specifies the form of bond to be used for the Series A Bonds (§ 4), among other things.  The Supplemental Trust Agreement does not alter the scope of the security interest granted by the Trust Agreement, if any, or otherwise impose any liability with respect to the Commonwealth on the CCDA Bonds.

38.     The Supplemental Trust Agreement contains the form of the Series A Bonds that were ultimately issued.  The form bond provides (*i*) the "Trust Agreement constitutes the contract between the registered owner of [the] bond and the [CCDA]," and (*ii*) the "Bond is only evidence

---

[20] In addition, because GDB is not a party to the Trust Agreement, the purported grant by CCDA of any rights of GDB is ineffective.

of such contract and, as such, is subject in all respects to the terms of the Trust Agreement."

Supplemental Trust Agreement at 7.  The form bond provides that:

- CCDA Bondholders "may not look to any other revenues of the [CCDA] for the payment of the Bonds."

- The Bonds "shall not be deemed to constitute a debt of the Commonwealth of Puerto Rico or of any of its political subdivisions."

- "[N]either the Commonwealth of Puerto Rico nor any such political subdivisions shall be liable thereon."

- The Bonds shall not be "payable out of any funds of the [CCDA] other than those pledged for the payment thereof pursuant to the Trust Agreement."

- "All financial obligations of the [CCDA] . . . (i) are special, limited obligations of the [CCDA] payable solely from the Trust Estate and shall not constitute nor give rise to a pecuniary liability or a charge against the general credit of the [CCDA] or the Commonwealth and (ii) shall not be deemed or construed as creating a debt, liability or obligation of the Commonwealth, or any political subdivision of the Commonwealth."

*Id*.

## C.   *The Retained Occupancy Tax Revenues.*

39.   At a final hearing, the Debtor will be prepared to show that, until late 2015, the flow of funds operated as contemplated under the implementing statutes and the Bond Documents. The Tourism Company would levy and collect the Occupancy Tax Revenues; it would then transfer the appropriate amounts to the Transfer Account and assign the amount GDB certified to GDB; those funds would then be transferred to the Pledge Account, and finally, the funds would be distributed to the Trustee and then to the CCDA Bondholders in accordance with the Trust Agreement.

40.     In late 2015, however, the Tourism Company ceased depositing funds into the Transfer Account and instead retained those funds.[21]  As discussed below, prior to PROMESA, this retention of Occupancy Tax Revenues was based on various Commonwealth emergency orders authorizing the retention of these funds.  After the enactment of PROMESA, the continued retention of the Retained Occupancy Tax Revenues was based on PROMESA and its preemption of inconsistent, pre-existing Commonwealth laws.

41.     Although the Tourism Company ceased depositing funds in the Transfer Account, it continues to levy and collect Occupancy Tax Revenues.

**1.     *The Emergency Orders.***

42.     All obligations under the CCDA Bonds were expressly made subject to the Commonwealth's powers under Article VI, Section 8 of the Commonwealth Constitution to use the Occupancy Tax Revenues, as available resources, to pay General Obligation bonds.  *See* 13 L.P.R.A. § 2271v(a);  Assignment Agreement, § 11; Pledge Agreement, § 2(b); Trust Agreement, § 5.01; Supplemental Trust Agreement, § 4.  Article VI, Section 8 provides:

> In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

Commonwealth Const. art. VI, § 8.

43.     Beginning in late 2015, a series of executive orders and legislation were enacted, which caused the Tourism Company to cease funding the Transfer Account.  Specifically, on November 30, 2015, the then-Governor of the Commonwealth issued Administrative Bulletin OE-

---

[21] The Transfer Account was addressed as part of GDB's restructuring.

2015-046.  That Order required the "Tourism Company . . . to transfer all monies collected [under the Tax Act] to the Treasury Department."  *See id*. at 3.

44.    On April 6, 2016, the Commonwealth enacted the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, Act No. 21-2016 (the "Moratorium Act").  The Moratorium Act was passed pursuant to the Commonwealth's police powers under Article II, Section 19 of the Commonwealth Constitution.  That Constitutional provision provides "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively."  Pursuant to the Moratorium Act, the Governor issued a Moratorium Order on June 30, 2016 (the "Moratorium Order"), which "suspended" "any obligation of CCDA to transfer hotel occupancy tax revenues."  Administrative Bulletin EO-2016-31 at 2.

45.    Following the issuance of the Moratorium Order, the Tourism Company ceased depositing Occupancy Tax Revenues in the Transfer Account.

### 2.    *PROMESA.*

46.    PROMESA became effective on June 30, 2016.  Under Section 4 of PROMESA, "[t]he provisions of [PROMESA] shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with [PROMESA]."  48 U.S.C. § 2103.  On May 3, 2017 (the "Petition Date"), the Oversight Board filed a petition for relief under PROMESA Title III for the Commonwealth, commencing the Commonwealth's Title III case (the "Commonwealth Title III Case").

47.    Between March 13, 2017, and May 9, 2019, the Oversight Board certified eight fiscal plans for the Commonwealth.  None of the fiscal plans provided for the appropriation or transfer of the Retained Occupancy Tax Revenues to CCDA.

48.     On May 9, 2019, the Oversight Board certified the current fiscal plan for the Commonwealth ("May 2019 Fiscal Plan").  The May 2019 Fiscal Plan does not provide for the transfer of the Retained Occupancy Tax Revenues to CCDA.

49.     On June 30, 2019, the Oversight Board certified a budget for the Commonwealth for the current Fiscal Year 2020 (the "Certified FY20 Budget").  The Certified FY20 Budget does not include an appropriation or transfer of Retained Occupancy Tax Revenues to CCDA.

50.     On September, 27, 2019, the Oversight Board filed a proposed Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. in the Commonwealth Title III Case (the "Commonwealth Plan"), Case No. 17-BK-3283-LTS, ECF No. 8765.  The Commonwealth Plan proposes to pay certain claims based on the Commonwealth's General Obligation ("GO") bonds at a level less than the full amount of the claims, even after taking into account the retention of the Retained Occupancy Tax Revenues.  *See* Plan Arts. XXXVIII (providing for impairments to general obligation bond claims).

51.     On January 16, 2020, the Oversight Board filed a complaint objecting to certain proofs of claims, including claims filed by Movants, asserting claims against the Commonwealth based on the Commonwealth's retention of the Retained Occupancy Tax Revenues, and the Takings Clause, Contracts Clause, and Due Process Clause.  *See* Case No. 20-AP-00004-LTS, ECF No. 1 (the "CW-CCDA Revenue Bond Complaint").

52.     The statutes and documents the Oversight Board incorporates into the CW-CCDA Revenue Bond Complaint are identical to those relied upon in this Opposition.

## ARGUMENT

**A.**   ***The Automatic Stay Applies Here to Preserve the Commonwealth's Functions and Lifting it is an Extraordinary Remedy Jeopardizing Life, Health, and Welfare, Thereby Making it Critical For Movants to Show at Least a Likelihood of Success on Their Property Interests to Procure Stay Relief.***

53.   Movants argue the automatic stay does not apply to the Retained Occupancy Tax Revenues because these funds are supposedly "equitably owned" by Movants, not the Commonwealth, and the Commonwealth cannot "exercise any control" over these taxes because it delegated the power to levy and collect the Occupancy Tax Revenues to the Tourism Company. M. Br. ¶¶ 70–73. Movants are wrong.

54.   PROMESA expressly incorporates the automatic stay provisions of Bankruptcy Code section 362(a), which—as Movants concede—covers any "act to obtain possession of property of the [debtor] or of property from the [debtor]." 48 U.S.C. § 2161; 11 U.S.C. § 362(a)(3). The "automatic stay is among the most basic of debtor protections under bankruptcy law." *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 975 (1st Cir. 1997). Because it is fundamental to any reorganization, courts construe the automatic stay broadly. *Montalvo v. Autoridad de Acueducto y Alcantarillados*, 537 B.R. 128, 140 (Bankr. D.P.R. 2015). It is all the more so "in the PROMESA and municipal bankruptcy contexts . . . ." *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*, 939 F.3d 340, 349 (1st Cir. 2019).

55.   The automatic stay applies here. *First*, the Commonwealth has, at the very minimum, a reversionary interest in the Retained Occupancy Tax Revenues. As this Court has already held, "[a] contingent reversionary interest constitutes property of the debtor." *Assured Guar. Corp.*, 582 B.R. at 599 n.17; *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983); *see also PNC Bank, Nat'l Assoc. v. Spring Ford Indus., Inc. (In re Spring Ford Indus., Inc.)*, 338 B.R.

255, 260 (E.D. Pa. 2006); *In re Greer*, 242 B.R. 389, 396–97 (Bankr. N.D. Ohio 1999) ("contingent interests are clearly property of the bankruptcy estate.") (internal citation omitted).

56.     Here, the Retained Occupancy Tax Revenues emanate from the Commonwealth's sole constitutional power of taxation.   Pursuant to section 2 of Article VI of the Puerto Rico Constitution, "[t]he power of the Commonwealth of Puerto Rico to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and ***shall never be surrendered or suspended***."  P.R. Const. art. VI, § 2 (emphasis added).  Movants' position that the Tax Act's appropriation of the Occupancy Tax Revenues to CCDA either creates property interests in favor of the CCDA Bondholders immediately upon collection or otherwise eliminates the Commonwealth's right to the Occupancy Tax Revenues is easily refuted.  First, by making the transfer to CCDA subject to Section 8 of Article VI of the Commonwealth Constitution, the Commonwealth showed its delegation of taxing power to the Tourism Company did not cause the taxes to stop being "available resources" usable by the Commonwealth.  Second, any alienation of the tax would amount to a surrender of the Commonwealth's power to tax, which is barred by the Commonwealth Constitution.  To the contrary, while the Commonwealth delegated its power to levy and collect Occupancy Tax Revenues to one of its instrumentalities, the Tourism Company, the Commonwealth always maintained the ultimate power over its own tax revenues.  Indeed, had the Commonwealth given up the ultimate power over its own tax revenues, why would it have had to covenant and agree to "[n]ot reduce [the] tax," to "make sure that the amounts [required to] be deposited in [the Transfer Account] . . . are deposited" as set forth in 13 L.P.R.A. § 2271v(a)?[22] *See In re Las Vegas Monorail*

---

[22] Further, the Commonwealth's agreements or commitments do not, in and of themselves, transfer property interests not conveyed in the Bond Documents.  To the extent there is a breach of the Commonwealth's commitment, that would be remedied not by creating a lien on the underlying property of the Tourism Company, but by an unsecured

*Co.*, 429 B.R. 317, 339 n.38 (Bankr. D. Nev. 2010) (stating that "[i]f the Trustee is arguing that

[the debtor] loses all interest in such funds when they are deposited, it is mistaken. . . . [T]he most

that the Trustee obtains upon deposit of such funds is a security interest, a property interest which

recognizes residual ownership in the debtor."). The simple answer is because the Commonwealth

retained control over the Occupancy Tax Revenues as "available resources" for purposes of paying

the Commonwealth's public debt.

57.     The Commonwealth likewise has the power to alter the instrumentality charged

with levying and collecting the tax. Movants' argument that the Commonwealth supposedly

statutorily relinquished its power to alter the *distribution* of the funds fails because that

commitment does not limit the Commonwealth's power to levy or collect the tax, or change the

entities responsible for doing so. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 19-1699,

Dkt. No. 00117544634 (1st Cir. 2020) (stating legislative appropriations can be disregarded by

---

claim against the Commonwealth. *See, e.g., Ohio v. Kovacs*, 469 U.S. 274, 279 (1985) (holding that breach of statute and court order gave rise to dischargeable unsecured claim, and rejecting argument that breach should be treated differently because it "was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim" that was dischargeable in bankruptcy); *In re Las Vegas Monorail Co.*, 429 B.R. 317, 338 (Bankr. D. Nev. 2010) (debtor's default in failing to comply with cash flow covenants did not render lender secured by funds); *Steslow v. Citicorp Mortg., Inc. (In re Steslow)*, 225 B.R. 883, 886 n.4 (Bankr E.D. Pa. 1998) (a "covenant without a pledge granting a security interest is simply a promise, not a security interest."); *see also Safe Deposit Bank & Tr. Co. v. Berman*, 393 F.2d 401, 404 (1st Cir. 1968) (where parties "apparently wished" to grant security interest to creditor but failed to comply with Article 9 requirements to grant of security interest, claims of creditors are unsecured); *In re Arctic Air*, 202 B.R. 533 (Bankr. D.R.I. 1996) (in the absence of a "separate written agreement . . . which evidences the debtor's intent to grant a security interest" in specific property, no security interest exists in that property); *In re Daves*, 770 F.2d 1363, 1366 (5th Cir. 1985) (breach of "promise to secure" loans leaves lender with unsecured claim); *Shelton v. Erwin*, 472 F.2d 1118, 1120 (8th Cir. 1973) (where parties intended to grant security interest but documents did not specifically provide for grant of security interest, no security interest created under Uniform Commercial Code: "[s]ince the Code is not ambiguous on the requirements of the creation of an enforceable security interest, there is no reason to relax those requirements."); *1st Farm Credit Servs., PCA v. Phillips (In re Phillips)*, No. 05-87521, 2007 WL 4179845, at *3 (Bankr. C.D. Ill. Nov. 20, 2007) ("A borrower's covenant in a security agreement requiring prior authority for the disposition of collateral is only as valuable as compliance with it."); *see also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (continuing right under statute to pay installment payments for FCC license is dischargeable unsecured claim).

subsequent legislatures).  The alleged non-impairment provision does not speak to ownership at all, but only to the post-collection appropriation of those funds to CCDA or Bondholders.[23]

58.    Under Article VI, Section 8 of the Commonwealth Constitution, the Commonwealth retains a superseding right to use these funds under specified circumstances.  This not only gives the Commonwealth a property interest in the Retained Occupancy Tax Revenues, but ensures that the Commonwealth public debt gets paid first.

59.    In response, Movants argue the Commonwealth does not have a "reversionary interest" in the Retained Occupancy Tax Revenues.  M. Br. ¶¶ 89–92.  Movants do not dispute, however, that the Commonwealth Constitution gives the Commonwealth the ability to use the taxes if its "available resources . . . are insufficient to meet the appropriations made for that year," in which case, such revenues may be used to pay general obligation debt of the Commonwealth. *See* Commonwealth Const. art. VI, § 8.  Nor do Movants dispute that all rights and obligations in the implementing statutes or the Bond Documents were made expressly subject to this provision in the Constitution.

60.    Instead, Movants argue it is unlikely a situation will arise where this reversionary interest is triggered.  But this is irrelevant (not to mention wrong).  The automatic stay applies to *all* reversionary interests in existing assets, regardless of Movants' speculation as to the likelihood of reversion.  *See In re Anders*, 151 B.R. 543, 545 (Bankr. D. Nev. 1993) ("[A]ll legal or equitable interests of a debtor in property as of the commencement of the case are property of the estate . . . [T]he conditional, future, speculative, or equitable nature of an interest does not prevent it from

---

[23] Under the non-impairment provision, the Commonwealth only agreed to "[n]ot reduce [the] tax," to "make sure that the amounts [required to] be deposited in [the Transfer Account] … are deposited," to "not alter or limit the rights acquired" by the CCDA, and to "comply with the terms of any agreement entered into with … bondholders." 13 L.P.R.A. § 2271v.  None of these provisions are implicated by the preemption of the allocation from Tourism Company to GDB. In any case, Movants can only have an unsecured claim for breach of non-impairment covenant. *See* fn. 22, above, and 36, below.

becoming property of the bankruptcy estate.") (citation omitted).  Movants' attempt to seize the

Retained Occupancy Tax Revenues and apply them to Movants' debt would be an attempt to

extinguish the Commonwealth's reversionary interest in those moneys, and is subject to the stay.

61.    Nor are Movants correct about the likelihood of reversion.  Far from being a

"situation that has never occurred," as Movants assert, M. Br. ¶ 90, the Commonwealth expressly

triggered the reversionary interest beginning with the November 2015 Emergency Order.  As

demonstrated by the Commonwealth Plan, which does not propose to pay GO bond debt in full

even taking into account the Retained Occupancy Tax Revenues, the Commonwealth's available

resources are insufficient to meet all appropriations, and the Commonwealth's authority to retain

the Occupancy Tax Revenues under Puerto Rico Constitution Article VI, Section 8 has been

triggered.[24]   The whole reason Congress stepped in and enacted PROMESA was because the

Commonwealth's "available resources" were insufficient to cover its appropriations.  *See, e.g.,*

PROMESA § 405(m)(2) ("As a result of its fiscal emergency, the Government of Puerto Rico has

been unable to provide its citizens with effective services.").  Indeed, were available resources

sufficient, the Commonwealth would not have needed to institute a Title III case to adjust its debts

in the first place.  Since the "available resources" are plainly insufficient to meet all appropriations,

the Commonwealth's reversionary interest has in fact been triggered.  Likewise, because the

General Obligation bondholders have not been paid in full, the Commonwealth continues to have

---

[24] Movants also argue that, even if the Commonwealth has a contingent reversionary interest, an enforcement action
will not interfere with it because the Commonwealth could assert that interest against taxes collected in future years.
M. Br. ¶ 91.  But Movants' argument wrongly assumes that "available resources" for purposes of Article VI, Section
8 exclude previously collected revenues.  Movants cite no authority for their position and the plain language of Section
8 suggests otherwise.  Indeed, the Bond Offering Statement expressly states that "Hotel Occupancy Tax revenues are
available resources under the Constitution."  *See* Offering Statement at 22.  Nothing in the Offering Statement limits
this to amounts to be collected in the future.  Movants' collection actions will eliminate the Commonwealth's
reversionary interest in the Retained Occupancy Tax Revenues currently possessed by the Tourism Company—that
is prohibited by the stay.

the right to use the Retained Occupancy Tax Revenues in furtherance of an effective reorganization.

62.     Movants are also wrong about what it takes to trigger the reversionary interest, although that is immaterial to the issues at bar.  Movants assert the Tax Act limits the scope of the reversionary interest to situations in which "no other monies are available" to pay General Obligation bondholders.  *Id.*  But that is not what the Constitution (or the Tax Act) says.  The Constitution does not require all other revenue sources be used before the reversionary interest is triggered.  It allows any and all available Commonwealth resources to be used to pay general obligation debts whenever Commonwealth resources are "insufficient to meet the appropriations" required by law (that is, *all* "appropriations")—not whenever Commonwealth resources are "insufficient to cover payment on GO bond debt."  In any event, the Commonwealth Plan demonstrates that such resources are insufficient: despite taking into account the Retained Occupancy Tax Revenues as part of the Commonwealth's available resources, it still does not propose to pay GO bond claims in full.[25]

63.     Significantly, the Tax Act is unlike the statutes that expressly seek to render taxes outside of the Commonwealth's available resources.  For example, the statute at issue in COFINA, which attempted to transfer title in the Commonwealth's sale and use taxes, expressly stated: (1) certain tax revenues "***are hereby transferred to, and shall be the property of COFINA***"; and (2) certain revenues "***shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico***."  13 L.P.R.A. § 12 (emphasis added).

---

[25] Movants also argue that that they are entitled to reimbursement out of "first revenue" of excess Occupancy Tax Revenues in subsequent years.  Mot. ¶ 54.  Movants are wrong, because any reimbursement obligation is preempted by PROMESA Title III, and, regardless, any obligation to reimburse CCDA for the retention of Occupancy Tax Revenues in one year is not enforceable to the extent the Commonwealth remains entitled to retain the Occupancy Tax Revenues in subsequent years, as is the case here.

Such language is absent from the Tax Act and opposite to the Tax Act which provides for the taxes to be available resources.[26]  Moreover, the Commonwealth has the power to control the Tourism Company and, if it chooses, the power to restructure or reconstitute its public instrumentalities. Further, the Commonwealth retained the power to repeal or amend the Tax Act.[27]

64.     The First Circuit's decision in *Austin*, on which Movants rely, does not suggest otherwise.  *See* M. Br. ¶ 70 (citing *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 4 (1st Cir. 1983)). There, the First Circuit held the automatic stay did not prevent litigation against *unrelated*, nondebtor co-defendants in a pending tort action.  That case does not involve efforts to assert claims against a governmental instrumentality exercising the taxing power of a governmental debtor pursuant to a delegation of power, nor an action to seize property in which the debtor had a reversionary interest.  As the First Circuit has held, "[t]he practical ramification [of the statutory framework] is that the reach of the automatic stay is broader" under PROMESA than it is in private-party bankruptcy cases.  *Gracia-Gracia*, 939 F.3d at 349.

65.     Put simply, the Tourism Company was always subject to the appropriation power of the Commonwealth, and nothing prevents the Commonwealth from manifesting its control of its assets.

66.     Indeed, on January 30, 2020, the First Circuit issued an opinion making it clear bondholders do not have a property interest in future tax revenues that may never come into

---

[26] Even in COFINA, with this clear language, there were still doubts as to whether the Commonwealth transferred its property rights under the applicable statutes.

[27] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 19-1699, Dkt. No. 00117544634 (1st Cir. 2020) ("[L]egislative appropriations are the method by which the Commonwealth allocates [funds]…Although required by [statute], this directive could be disregarded by a subsequent legislature (to the Bondholders' detriment).") (citing *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996). As Chief Justice Marshall wrote: "[O]ne legislature cannot abridge the powers of a succeeding legislature…The correctness of this principle, so far as respects general legislation, can never be controverted." *Fletcher v. Peck*, 10 U.S. 87, 135 (1810); *accord Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932); *Manigault v. Springs*, 199 U.S. 473, 487 (1905).

31

existence.  In that case, the court addressed the bondholders claimed property interests in employer contributions to be made following the commencement of these Title III proceedings by the Commonwealth and other public corporations and instrumentalities to the retirement system.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 19-1699, Dkt. No. 00117544634 (1st Cir. 2020).  Such employer contributions were to be calculated based on a percentage of payroll and only payable after the public employees performed work for their employers.  Employer contributions were allocated to the retirement system by legislative appropriations.  The First Circuit held that the retirement system did not have a property interest in future employer contributions as it only had "merely an expectancy" that such contributions would be made.  *Id*. at 20.  The court stated that any statutory requirement for the payment of employer contributions could be disregarded by a subsequent legislature.  *Id*.  Similarly, Movants have no property right in the Retained Occupancy Tax Revenues, only an expectation.  The untransferred Occupancy Tax Revenues conditionally allocated to CCDA could be modified or eliminated by a subsequent legislature.  *Id*. at 21–22.  What the Commonwealth may do with the Occupancy Tax Revenues is a question to be addressed as part of this Title III case; it is *not* an issue to be decided in another court outside the purview of this Court's exclusive jurisdiction over the Commonwealth Title III Case and the Commonwealth's property.  As such, the automatic stay applies.

**B.**      ***Movants Lack a Property Interest in the Retained Occupancy Tax Revenues.***

67.      Movants argue that, if the "automatic stay somehow applies," it should be lifted because they have a "colorable claim" they are the "equitable owners" of the Retained Occupancy Tax Revenues, or otherwise have a statutory lien or security interest that exceeds the value of the Retained Occupancy Tax Revenues.  *See* M. Br. ¶¶ 93–96.  Movants analogize their burden to a motion to dismiss standard under *Twombly*, claiming they must show only a "plausible legal claim."  M. Br. ¶ 95 (citing *Jin Qing Li v. Rosen (In re Jin Qing Li)*, BAP No. NC-17-1062-STaB,

2018 WL 1354548 (B.A.P. 9th Cir. March 12, 2018)).  In contending Movants only need to show

a colorable claim to equitable ownership (whatever that is), Movants first ignore that here, the

Puerto Rico Constitution already provides the Commonwealth with an undisputable claim to, at a

minimum, a reversionary interest, regardless of how speculative Movants claim the interest is.

Second, Movants misstate and confuse the legal standard in two respects.

68.     Movants misstate *Grella*, where the First Circuit acknowledged that some lift stay

hearings "do not involve a full adjudication on the merits," but it went on to explain that such

proceedings are "analogous to a preliminary injunction hearing" to determine "the reasonable

likelihood that a creditor has a legitimate claim or lien as to a debtor's property." *Grella v. Salem

Five Cent Sav.* Bank, 42 F.3d 26, 32–33 (1st Cir. 1994).  This requires the court to consider any

relevant counterclaims or defenses that bear on that issue. *Id*.  Movants omit mention of *Grella's*

preliminary injunction standard.  Second, Movants confuse the issues because they are making

two contentions—that the stay does not apply because they own the taxes, and if the stay does

apply they should get stay relief.  Movants would apply a colorable claim standard to both

contentions.  But, there is no basis to apply it to the first contention, whether the stay applies in the

first place.  On that issue, Movants ignore the First Circuit's ruling in *Gracia-Gracia*, that because

PROMESA does not incorporate Bankruptcy Code section 541(d), PROMESA does not exclude

equitable interests from property of the debtor even if the debtor only holds legal title.  *Gracia-*

*Gracia*, 939 F.3d at 349.  Thus, here, the Commonwealth's reversionary interest alone triggers the

automatic stay.  On the second issue, Movants must show a likelihood of prevailing on their claim

that they have a property interest entitled to adequate protection (i.e., equitable

ownership/trust/statutory lien) and that their property interest is diminishing in value due to use of

the property.  *See Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, LLC*, 602 B.R.

798, 825 (B.A.P. 1st Cir. 2019).   By any yardstick, likelihood of success lies with the Commonwealth.

69.     Movants claim that, as a matter of law, they have a security interest or statutory lien in the Retained Occupancy Tax Revenues, or otherwise hold equitable ownership of such funds. In fact, however, they hold *only* a security interest in funds actually deposited in the Transfer Account, and have no security interest against, statutory lien against, or equitable ownership of the Retained Occupancy Tax Revenues.   At most, Movants hold an unsecured, dischargeable claim against the Commonwealth.

**1.     *The Bond Documents Do Not Confer a Security Interest in the Retained Occupancy Tax Revenues.***

70.     Movants first assert they have a "security interest" in what they define as the "Pledged Hotel Taxes."  *See*, *e.g.*, M. Br. ¶ 38.  The term "Pledged Hotel Taxes," however, is not found in the Bond Documents and Movants conveniently fail to define the term with any precision.[28]  The actual Bond Documents only grant a security interest in the amounts actually deposited in the Transfer Account (as well as funds subsequently transferred to the Pledge Account and accounts held with the Bond Trustee).   Movants, however, are not seeking to collect from these accounts.  Instead, they seek to initiate an enforcement action against funds possessed by the Tourism Company they claim should have been, but were not, deposited in the Transfer Account. These funds, the Retained Occupancy Tax Revenues, fall outside the security interests granted by

---

[28] Movants purport to define the term "Pledged Hotel Taxes" as "all equitable ownership over the portion of Hotel Taxes pledged to the repayment of CCDA bonds."  M. Br. ¶ 3.  As an initial matter, the Bond Documents *do not* expressly mention, or even recognize, any "equitable ownership" supposedly transferred by statute.  Thus, the use of the term "Pledged Hotel Taxes," as Movants define it, when analyzing the scope of the pledge under the Bond Documents is a nonsequitur.  Moreover, defining "Pledged Hotel Taxes" as "the portion of Hotel Taxes pledged" is circular, as its meaning depends on what exactly was pledged.  As noted throughout this Opposition, the Bond Documents clearly specify the portion of the Occupancy Tax Revenues that are pledged, and that pledge only reaches funds that have been actually deposited in the Transfer Account.

the Bond Documents, and the Commonwealth has, at a minimum, a reversionary interest in them, if not full ownership.

71.     In *In re Las Vegas Monorail*, the court addressed a similar situation.  429 B.R. 317. The court found that a provision granting a security interest in "all amounts held in any funds of accounts created under the [debt documents] . . . [r]ead literally . . . means that all funds delivered to the Trustee and kept by it in its deposit account (except for the few excluded accounts) are immediately subject to a perfected security interest."  *Id*. at 336.  The court stated that "no security interest attaches in any of [debtor's] revenues until . . . possession or control of the revenues by the Trustee."  *Id*. at 339.  Until the security interests attach, the court stated, "the Trustee cannot hold an 'interest' in the property."  *Id*. at 340.  The court concluded that at the time of the petition, the only collateral was the "amount[] then on deposit with the Trustee."  *Id*.

72.     Movants do not cite any provision of the Bond Documents, and do not actually assert that such documents grant a security interest in amounts that were not actually deposited in the Transfer Account.[29]  Nor could they.  As an initial matter, the moneys Movants seek are funds the *Tourism Company* levied, collected, and retained.  The Tourism Company is only a party to the Assignment Agreement.  That Assignment Agreement does two things.  It conveys a property interest in the amounts *actually* deposited in the Transfer Account to GDB, and, subject to certain exceptions, it contractually obligates the Tourism Company to fund that account.  The Assignment Agreement grants no rights in, to, or against the Retained Occupancy Tax Revenues.  Because the Retained Occupancy Tax Revenues never become property of GDB or CCDA, and GDB and

---

[29] Movants point to various statutory provisions they say require the Tourism Company to fund the Transfer Account. This, however, has no bearing on the scope of the security interest conveyed by the Bond Documents.  Statutory obligations are just claims, and do not expand the scope of a security interest beyond the contract's express terms.  In any event, as discussed in greater detail below, the statute cited does not convey any property interests in the Retained Occupancy Tax Revenues.

CCDA are given no rights against the Retained Occupancy Tax Revenues, those funds cannot be—and were not—pledged by GDB or CCDA in support of the CCDA Bonds.[30]  Notably, under Article 9 a debtor can only grant security interests in its own property, not a third party's, such as the Commonwealth in this case.  *See* 19 L.P.R.A. § 2233(b)(2) (debtor can only grant security interest in property the debtor "has rights in . . . or the power to transfer rights in").

73.    The Bond Documents also *expressly* limit the grant of a security interest to the amounts actually deposited in the Transfer Account.  As the Pledge Agreement states, "[e]ach of GDB and [CCDA] does hereby grant . . . and pledge a *security interest* to the Trustee [in] . . . (i) all Hotel Occupancy Tax Funds *received* from the Tourism Company, (ii) all moneys deposited in or required to be deposited in the *Pledge Account* pursuant to the provisions of this Pledge Agreement, and (iii) all right, title, and interest of GDB in the Assignment Agreement."  Pledge Agreement, § 2(b) (emphasis added).  This is the *sole* grant of any security interest to the Trustee on behalf of the CCDA Bondholders in the Pledge Agreement.[31]

---

[30] Movants incorrectly assert the "[t]he Tourism Company expressly consented to the security interest established in the Pledge Agreement granting CCDA a property right in all funds that are deposited in – or are required to be deposited in – the GDB Special Account."  M. Br. ¶ 45 (relying on Section 7 of the Assignment Agreement).  But Movants do not actually quote Section 7 of the Assignment Agreement.  That provision simply states that the Tourism Company "consents to GDB entering into that certain Pledge Agreement … under which the *Hotel Occupancy Tax Funds transferred to the GDB* hereunder will be further pledged by the Authority and transferred from GDB to the Trustee for the benefit of the Owners of the Bonds."  Assignment Agreement, § 7 (emphasis added).  The term "Hotel Occupancy Tax Funds" is expressly limited to amounts deposited in the Transfer Account, and Section 7 is further limited to amounts "received by the GDB."  Contrary to Movants' argument, Section 7 does not purport to reach amounts that have not been deposited in the Transfer Account (and thus, are neither a Hotel Occupancy Tax Fund or moneys "received by the GDB.").  Nor does Section 7 purport to transfer a property right beyond that set forth in Section 6 of the Assignment Agreement, which is limited to amounts actually deposited in the Transfer Account and does not reach amounts allegedly required to be deposited in that account.  This is confirmed by Assignment Agreement Section 15, which only refers to the "right of the Tourism Company to pledge the Transfer Account."  Assignment Agreement, § 15.

[31] Movants cite to Section 2(b), claiming that it "granted a security interest in the legal title to the Pledged Hotel Taxes."  M. Br. ¶ 42.  But they *improperly omit* the actual language of the security interests pledge and replace it with their own self-defined term, "Pledged Hotel Taxes", in brackets.  The actual term in the Pledge Agreement is "Hotel Occupancy Funds," which is expressly defined as "all Hotel Occupancy Tax Revenues *that are deposited in the Transfer Account*."  Trust Agreement, § 101; Pledge Agreement, § 1 (incorporating Trust Agreement definitions) (emphasis added).  This term does not include the Retained Occupancy Tax Revenues at issue here.

36

74.     None of these provisions extend to the Retained Occupancy Tax Revenues.  Section 2(b)(1) is limited to amounts actually deposited in the Transfer Account for two separate and independent reasons.  First, Section 2(b)(1) limits the grant to amounts "received" by CCDA from the Tourism Company.  The term "received" is past tense, and thus, is limited to amounts actually received, and does not include amounts CCDA allegedly should have received.  Similarly, under the Assignment Agreement, CCDA only *actually* receives amounts deposited in the Transfer Account.  Second, the term "Hotel Occupancy Taxes" itself is limited to Hotel Occupancy Tax Revenues **deposited** in the Transfer Account.  Trust Agreement, § 7.  Again, this is both past tense and expressly limited to moneys deposited in the depository account.  Sections 2(b)(ii) and 2(b)(iii) similarly do not extend to the Retained Occupancy Tax Revenues, as the only money "required to be deposited in the Pledge Account pursuant to [the] Pledge Agreement" is money deposited in the Transfer Account.

75.     The Trust Agreement similarly does not (and cannot) grant a security interest in the Retained Occupancy Tax Revenues.  Specifically, Granting Clause I is expressly limited to taxes "that are deposited in the Transfer Account."  Granting Clause II does not reach the Retained Occupancy Tax Revenues because it only applies to funds "held by the Trustee," not funds held by the Tourism Company.  Granting Clause III does not reach the Retained Occupancy Tax Revenues because it too is limited to rights acquired by the Trustee from CCDA under the Pledge Agreement.  But under the Pledge Agreement, no party obtained a property interest in the Retained Occupancy Tax Revenues.  Granting Clause IV fails for the same reason, as it refers solely to rights obtained by GDB under the Assignment Agreement.[32]  Even if GDB has contractual rights

---

[32] Movants assert that their "security interest also sweeps in GDB's covenants in the Pledge Agreement that it: (i) would 'deposit or cause to be deposited into the [GDB Special Trust Account] all [Pledged Hotel Taxes] received from the Tourism Company as received."  M. Br. ¶ 47 (as bracketed in Movants' brief).  But this provision simply

under the Assignment Agreement, the only pledge of security interest is with respect to money deposited in the Transfer Account—all other claims are, at most, unsecured obligations. Granting Clause V also does not apply because it relates to subsequently pledged property, of which there is none.[33]

76.     Because the Bond Documents do not purport to convey either any property interest or security interest in the Retained Occupancy Tax Revenues, Movants cannot establish they have a property interest in such funds.

### 2.     *Movants Do Not Have Any Security Interests Arising from the Tax Act Because it Has Been Preempted by PROMESA.*

77.     Movants' purported property interests depend entirely on an appropriation statute (specifically, the Tax Act) that purport to transfer moneys collected pursuant to the Commonwealth's taxing power to CCDA. The appropriation of funds, however, is subject to PROMESA preemption. Post-PROMESA, the statutes purporting to appropriate Occupancy Tax Revenues to CCDA are preempted. The Tax Act is an appropriation of Commonwealth tax revenues. *See* 13 L.P.RA. § 2271v(5) ("The funds ***appropriated*** to the [Tourism] Company . . . ."). PROMESA sections 201 and 202 give the Oversight Board alone authority to certify fiscal plans and budgets for the Commonwealth setting all Commonwealth appropriations. Budgets certified by the Oversight Board are deemed "in full force and effect" upon certification.

---

requires GDB to transfer funds from the Transfer Account to the Pledge Account, and does not purport to reach the vast majority of the Retained Occupancy Tax Revenues, which have never been received by GDB. Notably, the Tourism Company is not a party to the Pledge Agreement, and thus the Tourism Company's property could not be pledged pursuant to it.

[33] Movants claim that they have a security interest in funds beyond the amounts actually deposited in the Transfer Account also fails because any such interest is unperfected. Movants claim their security interest is automatically perfected under 23 L.P.R.A. § 6441(d). But § 6441(d) only reaches property that has actually been pledged by CCDA. Because the Bond Documents only pledge the amounts CCDA received after the Tourism Company deposits them in the Transfer Account, that pledge does not reach the Retained Occupancy Tax Revenues, which were never deposited in the Transfer Account.

PROMESA § 202(e)(1)(C).  As held by the First Circuit, PROMESA preempts any territorial law

purporting to appropriate funds outside of an Oversight Board certified budget because "[s]imply

put, there can be no spending from sources not listed in [a certified] budget, regardless of what any

territorial law says." *Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*

*Mgmt. Bd. for P.R.)*, No. 18-2154, 2019 WL 6887258, at *3, (1st Cir. Dec. 18, 2019); *see also*

*Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330

F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A] budget approved and adopted by the Oversight Board

as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws

are preempted.").

78.     Here, the Tax Act purports to appropriate the Commonwealth's tax revenues (the

Occupancy Tax Revenues) to the Tourism Company and CCDA without regard to Oversight Board

approved budgets and fiscal plans.  As a result, they are inconsistent with PROMESA, and pursuant

to PROMESA section 4 preempted, eliminating any claim that Movants could have to the Retained

Occupancy Tax Revenues or any other purported property interests Movants argue springs from

the Tax Act.

79.     Moreover, PROMESA Title III also preempts Movants' claims.  PROMESA only

incorporates into Title III a single priority claim: administrative expense claims.  *See* PROMESA

§ 301(a) (incorporating 11 U.S.C. § 507(a)(2)).  PROMESA does not grant priority to any claim

arising from an appropriation statute.  Simply put, if statutes purporting to appropriate moneys to

instrumentalities are not preempted, they would block any possible restructuring.  Those statutes

would also create the absurd result that creditors of Commonwealth instrumentalities have superior

rights to Commonwealth creditors who hold the Commonwealth's promise to pay them.  Non-

bankruptcy law always requires that debts be paid in full, and prepetition promises to pay are always preempted.

80.     As the Tax Act (and any other act purporting to appropriate tax revenues to CCDA) has been preempted, Movants' attempt to obtain property rights from those statutes must be rejected.[34]

### 3.     *Movants Do Not Have a Statutory Lien against the Retained Occupancy Tax Revenues.*

81.     Unable to show a contractual security interest reaching the Retained Occupancy Tax Revenues, Movants argue they have a statutory lien against such funds.  That claim, however, fails because the relevant statutes simply authorize the CCDA to issue secured bonds; they do not create an independent statutory lien.  Indeed, it would be incongruous for a statute authorizing consensual security interests, to use subtle language intended to create a statutory lien.  Moreover, regardless of what kinds of entitlements these statutes created, all statutes appropriating the Retained Occupancy Tax Revenues to CCDA have been preempted by PROMESA.

---

[34] Further, preemption does not effect a "taking," as Movants claim.  M. Br. ¶ 85.  There can only be a taking if the Retained Occupancy Tax Revenues are Movants' collateral, which they are not.  The Supreme Court has made clear time and again a secured claimholder's contractual entitlements can be eliminated without violating the Fifth Amendment, as long as the collateral's value, as opposed to the contractual rights, are in some way preserved.  *See Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke, Va.*, 300 U.S. 440, 460–62 (1937) (bankruptcy law depriving a secured creditor of its receivership remedy to have rents and profits collected was not unconstitutional on Fifth Amendment grounds); *see also Americredit Fin. Servs., Inc. v. Nichols (In re Nichols),* 440 F.3d 850, 854 (6th Cir. 2006) (distinguishing between a contractual right to payment and a secured creditor's property rights in collateral for Fifth Amendment purposes and noting that "bankruptcy laws have long been construed to authorize the impairment of contractual obligations"); *In re Plant Insulation Co.,* 469 B.R. 843, 875 (Bankr. N.D. Cal. 2012) (only "claims that rise to the level of an enforceable interest in specific property are protected under the Takings Clause"), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013).  Movants' citation to *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1977) and *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 612 (D.P.R. 2015) are inapposite. *U.S. Tr. Co. of N.Y. v. New Jersey* does not even involve a takings claim—it involved a Contracts Contracts Clause challenge related to a state statute allegedly diverting property without just compensation—but, since PROMESA is federal law, it is not prohibited from impairing contracts.  Similarly, *Franklin California Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd on different grounds*, 136 S. Ct. 1938 (2016), does not help Movants because, while the Court therein stated "[c]ontracts are a form of property for purposes of the Takings Clause," the fact that contracts and contract rights are property does not make them collateral.  If taking a contract right gives rise to a secured claim, then all unsecured promises to pay are secured claims when a debtor repudiates its contractual obligation to pay.  In the bankruptcy context, "bankruptcy laws have long been construed to authorize the impairment of contractual obligations."  *In re Nichols,* 440 F.3d at 854.

82.     The preemption of these statutes is a logical imperative.  If they are not preempted, how could Congress have enabled all instrumentalities in Puerto Rico to restructure their debts if statutes on the books providing appropriations to CCDA and other instrumentalities are enforceable?  The whole purpose of Title III would be upended.  Furthermore, all nonbankruptcy law provides for debtors to pay their debts in full.  Chapter 11 would be a nullity if these laws were not always preempted.  The unique aspect here is only that Movants oppose the obvious because the original source of all their repayment starts with appropriations.

83.     PROMESA only recognizes three types of "mutually exclusive" liens—judicial, statutory, or contractual.  *Peaje*, 899 F.3d at 11.  A statutory lien is:

> [A] lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but ***does not include security interest*** or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute.

11 U.S.C. § 101(53) (emphasis added).  A lien is a security interest if it rests on a contractual transfer of property rights; it is statutory if the property transfer arises "*solely* by force of a statute."

84.     In determining whether Movants have a statutory lien, the First Circuit's decision in *Peaje* controls.  There, the court explained that no statutory lien arises where the statutory "provisions permit the Authority to secure the payment of bonds by making a pledge of revenues, but they do not require that it do so."  *Peaje*, 899 F.3d at 11.  "If the creation of the lien is dependent upon an agreement," the court said, "it is a security interest even though there is a statute which may govern many aspects of the lien."  *Id*. at 10.  Ultimately, the court concluded that the bonds issued by the Puerto Rico Highways and Transportation Authority ("HTA") were secured by a security interest, and not by any statutory lien.

85.     As with the HTA bonds, the CCDA Bonds are secured solely by limited contractual pledges, and the applicable statutory provisions merely authorize CCDA to grant security interests.

41

As in *Peaje*, the Tax Act here states that CCDA is "*authorized*, with the prior written consent of the [Tourism Company], *to pledge* [the] tax collected which is to be deposited in a special account . . . as *security* for the payment of . . . the bonds, notes *or other obligations* issued, assumed or incurred by [CCDA]."  13 L.P.R.A. § 2271v(a)(4) (emphasis added).  This "permits" but "does not require" that CCDA grant a security interest in Occupancy Tax Revenues deposited in the Transfer Account—as a result of *Peaje*, it does not create a statutory lien.

86.     Both of these statutes are, thus, mere authorization statutes that permit the granting of security interests; they do not themselves give rise to a statutory lien.  As the First Circuit noted in *Peaje*, the use of the term "pledge" in the statute is inconsistent with a statutory lien because "[a] pledge of revenues does not attach automatically when the [instrumentality] passes a resolution issuing bonds," but "[r]ather . . . arises only when [it] chooses to grant it."  *Peaje*, 899 F.3d at 12.  Here, the statute likewise contemplates the subsequent issuance of a pledge that will govern the scope of any security interest.  In addition, the statute explicitly states that any such "pledge" only gives rise to a "security" interest for the payment of the bonds.  Because a security interest and statutory liens are "mutually exclusive," the CCDA Bonds are secured only by a security interest, not a statutory lien.

87.     Nor can Movants avoid *Peaje*'s holding by pointing to various supposedly "non-discretionary" provisions of the CCDA Enabling Act or the Tax Act.  While the Tax Act states that the "special account [is] to be maintained by the [GDB] in the name of [CCDA] for the benefit of the bondholders" (13 L.R.P.A. § 2271v(a)), the same statute goes on to "authorize" CCDA, "with the prior consent of the [Tourism Company] to pledge or otherwise or encumber" the same property—a clear indication the Commonwealth did not consider itself to be creating a statutory lien or other kind of property interest even on the Transfer Account.  In any event, such provision

is limited to the Transfer Account at GDB—no other property is implicated.  No statute creates liens or property rights in the Tourism Company's or Commonwealth's property, including the Retained Occupancy Tax Revenues.  In fact, no provision purports to give the CCDA Bondholders a lien beyond the security interests actually granted by CCDA in the contracts to which it is a party.[35]

88.    Movants' summary of their interpretation of the statutes creates nothing.  But, even if a statute provided the Commonwealth or Tourism Company must collect certain taxes solely for payment of CCDA's bonds, the statute would not convert unsecured claims into secured claims.  Such a statute might be perfectly implemented outside bankruptcy and accomplish its stated purpose—the application of a certain revenues to certain bonds.  But, inside Title III, the statute fails to create a statutory lien or trust because it does not include the necessary components of either one.  To be sure, the Commonwealth knows how to create liens and trusts.  Accordingly, statutory language that fails to mention liens, trusts, enforcement mechanisms, fiduciaries, and the like cannot be chalked up to carelessness.  The language was simply never intended to do what Movants claim it does.

89.    Nor can Movants avoid *Peaje* by citing to *Fonseca v. Government Employees Association*, 542 B.R. 628, 637 (B.A.P. 1st Cir. 2015), a case this Court expressly distinguished in *Peaje*.  There, retired employees were statutorily entitled to the "liquidated . . . monetary value of

---

[35] Movants argue that *J.K. Mullen Investment Co. v. Town of Arvada*, 261 P.2d 714 (Colo. 1953), stands for the proposition that, "where a statute provides that special taxes 'shall be applied to the payment of all bonds,'" the bondholders have a "prior lien" on such funds.  M. Br. ¶ 50.  However, promises to pay a debt from a particular fund do not create a lien.  *See Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (a promise to pay a debt from a particular fund does not, in itself, create a contractual lien in the fund nor an equitable lien); *In re Steslow*, 225 B.R. at 886 n.4 ("[a] covenant without a pledge granting a security interest is simply a promise, not a security interest").  Further, the Tax Act lacks any language creating a lien and, to the contrary, it authorizes CCDA to grant a security interest in certain Occupancy Tax Revenues, which is indicative of the fact that the statute was not intended to create a statutory lien.

[their accrued] paid leave time" upon retirement. *Peaje Invs. LLC v. P.R. Highways & Transp. Auth. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 290, 298 (D.P.R. 2017). The entitlement "arose solely by force of the statute," and not by virtue of any debt document. *Fonseca*, 542 B.R. at 636. Further, as this Court recognized when denying Peaje Investment LLC's request for a preliminary injunction, in *Fonseca*, the statute provided that a lien arising from setoff rights "w[as] created only on the performance of certain conditions (e.g., accrual of contribution liabilities[])," but the Tax Act creates no automatic lien even upon the performance of conditions and does not implicate set off rights. The Bankruptcy Code treats a setoff, as the one created by the statute in *Fonseca*, as similar to a secured claim. As such, the debt there was different than debts based on government bonds that are secured by a contractual pledge, and therefore, *Fonseca* does not apply.[36]

---

[36] The Tax Act also contains a non-impairment provision pursuant to which the Commonwealth "agrees and makes a commitment with any person … who subscribes" to the bonds that, among other things, it will not reduce or eliminate the occupancy tax, and it will "make sure that the amounts that must be deposited in the special account … are deposited in such special account." 13 L.P.R.A. § 2271v(a). The Commonwealth intended that this commitment be contractual (not statutory) in nature, as it specifically "authorized" CCDA, as agent of the Commonwealth of Puerto Rico" to "include the commitment … in any contract with the bondholders." *Id.* In any event, this Motion does not concern any alleged breach of this obligation, since Movants expressly disclaimed any intent to "name the Commonwealth as a party" if the stay were lifted. Moreover, as explained in the Commonwealth's Adversary Complaint relating to these bonds, any claim against the Commonwealth fails because, among other reasons, the Bond Documents and implementing statutes expressly exclude Commonwealth liability. *See* Adv. Proc. 20-00004-LTS, ECF No. 1. Further, breach of a negative covenant, such as non-impairment and negative pledge clauses, does not create property rights in favor of Movants and cannot convert an unsecured claim into a secured claim. Non-impairment clauses are a kind of "negative covenant," which does not create a property interest of any sort. *Knott v. Shepherdstown Mfg. Co.*, 5 S.E. 266 (W. Va. 1888) ("Of course [the agreement's negative pledge covenant] creates no lien on or pledge of any property. It is simply negative; an agreement not to do a particular thing. The creation of a lien is an affirmative act, and the intention to do such act cannot be implied from an express negative."); 2 Gilmore, Security Interests in Personal Property, § 38.3 at 1017 ("Negative pledges should not, it is submitted, be allowed to operate as informal or inchoate security arrangements, even against third parties with notice. . . . The debtor's covenant not to encumber property… should be treated, as on the whole the case law has done, as a covenant 'merely personal'- good enough to give rights against the covenantor for breach, to bring an acceleration clause into play, to constitute an 'event of default' under a loan agreement, but not good enough to give rights, whether they be called legal or equitable, in property."); *In re Friese*, 28 B.R. 953, 955 (Bankr. D. Conn. 1983) (referring to *Knott*, and concluding that a negative pledge agreement "does not create a security interest"). If the breach of a negative covenant cannot create a security interest, then it cannot create the greater interest of ownership.

### 4.     *Movants Do Not Have Equitable Ownership of the Retained Occupancy Tax Revenues.*

90.     With no contractual security interest and no statutory lien, Movants assert they are the "equitable owners" of the Retained Occupancy Tax Revenues.[37]  M. Br. ¶ 74.  Movants do not claim the Bond Documents themselves contractually transfer equitable ownership to the CCDA Bondholders.  Nor could they.  For the same reason that the CCDA Bondholders lack a security interest in the Retained Occupancy Tax Revenues, (including that CCDA could not grant such a security interest in something it did not own), they do not have equitable ownership in such funds.

91.     Instead, Movants claim that equitable ownership was statutorily transferred, and that "[t]he Tax Act unambiguously establishes that the CCDA Bondholders are the owners of the Pledged Hotel Taxes."  M. Br. ¶ 74.  But the Tax Act does not purport to transfer ownership of any Occupancy Tax Revenues to any Bondholder.  While the statute authorizes the Tourism Company to collect and levy taxes, allows CCDA to issue bonds secured through a portion of the collected taxes, and sets forth a mechanism by which some of the Tourism Company's funds would be transferred to CCDA (among other entities), it does not purport to address *ownership* of the funds.

92.     Indeed, the Tax Act does not even restrict the use of the funds to the payment of the CCDA Bonds, but instead allows CCDA to use the Occupancy Tax Revenues to pay any "other obligations" incurred by CCDA.  Specifically, 13 L.P.R.A. § 2271v(a) states that the Occupancy

---

[37] Movants do not assert they have an "equitable lien" on the Retained Occupancy Tax Revenues.  This is for good reason.  The Bankruptcy Code only recognizes judicial, statutory, and security interest liens, not equitable liens. *Peaje*, 899 F.3d at 10; *Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*, 145 B.R. 719, 727 (Bankr. D. Mass. 1992) ("Business failures cause hardships that cannot and should not be rectified by the misapplication of equitable principles permitting the imposition of constructive trusts and the creation of equitable liens.")  Nor should this Court effectively allow Movants to achieve the same result by changing the name of their argument from "equitable lien" to "equitable ownership."  Movants' failure to obtain legal title to the Retained Occupancy Tax Revenues or a legally cognizable lien should be fatal to their attempt to achieve the same result by claiming to be "equitable owners."

Tax Revenues are to be transferred to CCDA for the "(f)ull and timely payment . . . [on] bonds, notes **or other obligations issued, assumed or incurred by [CCDA]** . . . ." 13 L.P.R.A. § 2271v(a) (emphasis added). The fact that CCDA is authorized to use the Occupancy Tax Revenues to pay any "other obligations" shows that there can be no trust in favor of the CCDA Bondholders over those funds.

93.    Movants' "equitable ownership" argument rests almost entirely on the First Circuit's decision in *Gracia-Gracia*, 939 F.3d at 345, and its related decision in *Associacion de Subscripcion Conjunta del Seguro de Responsibilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 29 (1st Cir. 2007). Those cases, however, are inapposite.

94.    *Gracia-Gracia* involved *duplicate* motor vehicle insurance premiums erroneously paid by car owners to the Commonwealth. These duplicate premiums were not revenues or assets of the Commonwealth that were then pledged to third-parties in support of bond payments. The relevant money had been paid to the Commonwealth by the plaintiffs themselves. Moreover, as noted by the First Circuit, these statutes made clear (i) that "[t]he Secretary of the Treasury shall retain these funds as *trustee*," *García-Rubiera v. Calderón*, 570 F.3d 443, 452 (1st Cir. 2009) (quoting 26 L.P.R.A. § 8055(l)), and, in *Flores Galarza*, (ii) that the Treasury's collection of the funds constituted a "collection service performed in favor of the" plaintiffs. *Flores Galarza*, 484 F.3d at 29 (quoting 26 L.P.R.A. § 8055(c)). In *Galarza,* the insurers for the motorists who paid the premiums without having duplicate private insurance, successfully claimed the Commonwealth collected the premiums for the insurers and held them for the insurers, especially given that the insurance had already gone into effect. As the First Circuit held, the applicable statute made the Secretary of the Treasury "merely the custodian of these funds" with "no entitlement" to them. *Flores Galarza*, 484 F.3d at 29.

95.     Here, Movants do not seek to preserve a pre-existing property right in the Retained

Occupancy Tax Revenues.  Instead, they seek to turn the Tax Act into an ownership transfer act,

which goes far beyond the holdings in *Gracia-Gracia* and *Flores Galarza*.  Movants are not the

source of the Occupancy Tax Revenues, unlike in *Gracia-Gracia*.  Moreover, they do not dispute

that the Commonwealth, as sovereign, and the Tourism Company, as its delegee, are the only

entities constitutionally empowered to levy taxes.  Moreover, the statutes do not *impliedly* and

*automatically* transfer property rights to those taxes upon collection, and do not provide the

Commonwealth or the Tourism Company act as "trustee" or simply engage in a "collection service

for Movants," and as a result *Gracia-Gracia* and *Flores Galarza* are inapplicable.[38]  In any event,

no trust based on the Tax Act can exist, as the Tax Act has been preempted by PROMESA, as

discussed above.

96.     Movants also assert they hold equitable ownership because "the agreements that

implement the Tax Act require that the Tourism Company and GDB collect and hold the Pledged

Hotel Taxes *in trust* for the benefit of CCDA bondholders."  M. Br. ¶ 80 (emphasis in original).

But Movants do not actually quote any such language in the Bond Documents.  Nor do the Bond

Documents purport either to convey a property interest in the Retained Occupancy Tax Revenues

or to create a trust relationship concerning such funds (irrespective of whether there is such a

---

[38] Movants argue that the "Tax Act even more explicitly than Law 253 establishes that the CCDA bondholders—not
the Commonwealth—are the owners of the Pledged Hotel Taxes." M. Br. ¶ 77.  But their argument is based on a false
premise that Law 253 *created* a property interest in favor of the car owners.  As noted above, the car owners had pre-
existing title to the erroneously paid duplicate insurance premiums.  They were not relying on Law 253 to create their
property rights, but rather simply pointing out that the law did not *destroy* their pre-existing rights.  Because Movants
here are trying to invoke the Hotel Occupancy Act to create property rights in the Retained Occupancy Tax Revenues,
comparisons to Law 253 are irrelevant.  In any event, the Tax Act merely authorizes taxes to be levied and collected
and permits a portion of them to be pledged as security interests.  As discussed above, the statute does not give rise to
a statutory lien and it does not automatically transfer ownership to the Bondholders.

relationship as to amounts actually deposited in the Transfer Account).[39]   The lack of either is fatal

to Movants' equitable ownership claims.[40]   Moreover, the First Circuit has specified that no trust

can exist where no "specific restriction [is] placed upon [the debtor's] use of the supposed trust

funds," and "[the debtor] was left free to use what it received for its own benefit rather than" hold

it for the purported trust beneficiary.  *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir.

1981) (holding that contracts and International Air Transport Association resolutions that specified

the debtor was "in general terms" supposed to "hold whatever monies it collected in trust" for a

creditor was ineffective to create a trust where the debtor retained the right to use the monies as it

saw fit and was not required to keep the funds separate from other funds of the debtor).[41]   Here,

---

[39] Movants cast their argument as one of "equitable ownership."  This is just another way of describing an interest in
a trust—if Movants are not beneficiaries of a trust, they do not have equitable ownership.  Moreover, it is unclear
whether the concept of equitable ownership even exists under Puerto Rico law. *See Davila v. Agrait*, R-84-24, 1985
WL 301217, at *11 (P.R. Oct. 1, 1985) (the Commonwealth, as a civil law jurisdiction, does not recognize the concept
of equitable ownership separate from legal ownership).

[40] Moreover, provisions purportedly providing that funds are to be held "in trust" in these circumstances amount to no
more than an attempt to create a security interest in whatever is held "in trust."  *See, e.g., In re Las Vegas Monorail
Co.*, 429 B.R. at 339 n.38 (finding that despite purported transfer of ownership interest in security agreement, only
security interest was created to secure debt under Article 9).  Such a security interest would be subject to the usual
UCC perfection (and other) rules applicable to security interests.  Further, neither a constructive nor resulting trust
could have been constituted under Puerto Rico law.  Prior to the Trusts Act, the Puerto Rico Civil Code provided that
trusts should be created by public deed.  *See* 31 L.P.R.A. § 2543. Under the Trusts Act, Act 219-2012, trusts can be
created *only* through public deed or a last will and testament, see 32 L.P.R.A. § 3352, and "[e]very trust constituted in
Puerto Rico must be recorded in the Special Trust Registry under penalty of nullity," *id.* § 3351d. Accordingly, no
Puerto Rico court has established a constructive trust under the Trusts Act.

[41] *See also, e.g., In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 624 (Bankr. S.D.N.Y. 2002), *aff'd sub nom. LFD
Operating, Inc. v. Ames Dep't Stores, Inc.*, No. 01-42217 (REG), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd
sub nom. In re Ames Dep't Stores, Inc.*, 144 F. App'x 900 (2d Cir. 2005) ("Therefore, the Court finds that Ames did
not hold the Net Sales Proceeds in trust for LFD because Ames, at all relevant times, has commingled the Net Sales
Proceeds and used the funds between settlement dates for purposes other than paying LFD, before making payment
to LFD out of general funds provided by GECC.").  Even the cases cited by Movants recognize the same and prohibit
the finding of a trust here.  *See, e.g., Shipley Co. v. Darr (In re Tap, Inc.)*, 52 B.R. 271, 276 (Bankr. D. Mass. 1985)
(trust does not exist "where funds are collected from third parties and used at will by the defendant whose only
responsibility is to pay when billed, or at some monthly or other non-immediate date, much the same as any other
creditor.").  *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997) does not help Movants
(Mot. ¶ 81): there the statute involved moneys (a security deposit) paid to the debtor by plaintiff, and specifically
provided that "[a] security deposit shall continue to be the property of the tenant making such deposit, shall not be
commingled with the assets of the lessor, and shall not be subject to the claims of any creditor of the lessor or of the
lessor's successor in interest."  *Id.*  None of the statutes at issue here are similar to the statute in *Bologna*.

the Tourism Company uses Occupancy Tax Revenues for a variety of purposes, *see* 13 L.P.R.A.
§ 2271v(b), and can be pledged by CCDA for purposes other than paying bonds.  *See* 13 L.P.R.A.
§ 2271(a)(1) (permitting pledge "for other obligations").  It cannot be argued that the Tourism
Company is a mere conduit of the Occupancy Tax Revenues.

97.     Further, none of the statues cited by Movants meets the requirement of creating a
trust under Puerto Rico law.  When the Legislature wants to create a trust under a statute it knows
how to do so, and it has always done so explicitly and not through vague statements cobbled
together from various statutes.  For example, in the statute creating the Puerto Rico Children's
Trust, the Legislature specifically provided:  "A public trust fund is hereby created, attached to the
[Government Development Bank for Puerto Rico], which shall maintain said fund as fiduciary,
apart from other public funds under its custody."  24 L.P.R.A. § 3122.  There is no equivalent of
this language here.  As noted above, the Bond Documents only convey property rights in amounts
actually deposited in the Transfer Account.[42]

98.     Movants misplace reliance on *City of Springfield v. Ostrander (In re Lan Tamers,
Inc.)*, 329 F.3d 204 (1st Cir. 2003).  M. Br. ¶ 80.  *Ostrander* involved federal government payments
to subsidize the cost of providing internet access to schools.  The subsidies were owed directly to
the schools, though in some cases the government would send the check to the internet service

---

[42] To support their claim that a trust relationship exists, Movants cite to Sections 1, 4, 5 of the Assignment Agreement
and Sections 2(a) and 3(a) of the Pledge Agreement.  But none of these provisions create a trust relationship as to
funds not actually deposited in the Transfer Account.  Section 1 of the Assignment Agreement simply notes that the
Tourism Company will create a special fund in which to deposit the occupancy taxes.  Section 4 requires the Tourism
Company to deposit a portion of those funds into the Transfer Account.  Section 5 simply requires the Tourism
Company to comply with its statutory obligations.  These provisions may give rise to contractual obligations, but they
do not convey property rights.  Only Section 6 of the Assignment does that, and that section is limited to amounts
actually deposited in the Transfer Account.  Nothing in Sections 1, 4, or 5 purports to give the CCDA Bondholders a
property interest in funds not deposited in the Transfer Account, to divest the Tourism Company of its property interest
in those funds, or to make the Tourism Company a mere trustee as to such funds.  Likewise, Sections 2(a) and 3(a) do
not purport to make the Tourism Company a trustee as to the Retained Occupancy Tax Revenues.  Those provisions
make GDB a trustee as to the Pledge Account only.

provider "who in turn must pass the funds through to the school." *Ostrander*, 329 F.3d at 206. The court explained that, in determining who owned the property, the question is whether the debtor was "merely an agent for the disbursal of funds belonging to another," or whether the funds were more like a "payment under a contract." *Id.* at 210. Because the internet service provider there *never* had any rights to the property, it was "merely [] a vehicle to deliver the reimbursement" back to the school. *Id.* at 211. Here, notably, the Occupancy Tax Revenues can be used for a variety of purposes by the Tourism Company, *see* 13 L.P.R.A. § 2271v(b), and can be pledged by CCDA for purposes other than paying bonds. *See* 13 L.P.R.A. § 2271(a)(1) (permitting pledge "for other obligations"). It cannot be argued that the Tourism Company is a mere conduit of the Occupancy Tax Revenues.

99. That is not the case here. The Tourism Company is the entity charged with levying and collecting the taxes, pursuant to the Commonwealth's constitutional taxing power. It is *not* acting as a mere vehicle for delivering a check to CCDA or the CCDA Bondholders. Moreover, whereas in *Ostrander* the federal program specified that the funds were owed directly to the school district, here, any property grant is limited to amounts actually deposited in the Transfer Account. As such, the Tourism Company is not acting as a trustee as to the Retained Occupancy Tax Revenues, none of which have been deposited in the Transfer Account.

100. Movants' citation to *Keach v. Wheeling & Lake Erie Railway Co. (In re Montreal, Maine & Atlantic Railway, Ltd.)*, 888 F.3d 1 (1st Cir. 2018) is also inapposite. There, the Federal Railroad Administration ("FRA") "initially had title" to certain railways, and authorized their sale with direction that proceeds be placed in escrow for further distribution. The debtor's sole obligation was to transfer the funds into the escrow account. The court held that, because the FRA

had equitable title *and* the debtor was merely "a transfer station along the road to payment," the debtor did not have a property interest in the funds.

101.   Here, in contrast, the CCDA Bondholders do not have ownership of the Occupancy Tax Revenues.  Because the taxes are levied by the Tourism Company, the Tourism Company (or the Commonwealth itself) is the original owner of the property.  As such, the Tourism Company is *not* just a transfer station, taking property from one owner and passing it to another without ever taking a property interest in between.  Indeed, were it not for the Commonwealth and Tourism Company's power to tax—and their right to take ownership of tax revenues from the hotel operators—there would be no money available at all, since the CCDA and the CCDA Bondholders lack taxing authority.  The Bond Documents expressly convey a property interest (specifically, a security interest) in the amounts actually deposited in the Transfer Account, but they do not do so with respect to the Retained Occupancy Tax Revenues.  Any obligations to fund the Transfer Account are contractual in nature, and do not divest the Tourism Company of its property rights in the Retained Occupancy Tax Revenues.[43]

102.   Movants also cite two cases from the 1930s, dealing with municipal bonds.  M. Br. ¶ 83.   Neither case involved efforts to assert property rights beyond the express property conveyance in the bond documents themselves.  In *FDIC v. Casady*, 106 F.2d 784 (10th Cir. 1939), the Tenth Circuit merely noted the city was a trustee as to amounts in the "sinking fund," which is the equivalent of the Transfer Account here.  In *City & County of Dallas Levee Imp. Dist. v.*

---

[43] Movants misplace reliance on *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997), since the statute there expressly stated that the security deposit at issue "shall continue to be the property of the tenant." There is no similar statute here.  Movants also misplace reliance on *Shipley Co., Inc. v. Darr (In re Tap, Inc.)*, 52 B.R. 271, 275 (Bankr. D. Mass 1985), for the proposition that a trust relationship can arise "where the owner of property transfers it to another with a direction to transfer it to a third person."  Here, the Tourism Company *only* conveyed a property interest to CCDA in amounts it actually deposited in the Transfer Account.  Because the Retained Occupancy Tax Revenues involve funds outside of this property grant, *Shipley* does not apply.

*Industrial Properties Corp.*, 89 F.2d 731, 732 (5th Cir. 1937), the Fifth Circuit rejected the

argument that the district was just an agent of the bondholder.  As the court explained, the simple

facts that "the taxes in question are levied and assessed solely to raise funds to pay . . . the bonds,"

and so "the district must be regarded as a mere agency or instrumentality of the bondholders, ***will***

***not do***" to establish the district was a mere bondholder agent.  *Id*. at 733 (emphasis added).  For

the same reason, Movants' reliance on *In re City of Columbia Falls*, 143 B.R. 750 (Bankr. Mont.

1992), is inapposite.  There, the court held that, although Montana Law required the funding of a

"revolving fund" (similar to the Transfer Account here), Chapter 9 of the Bankruptcy Code may

preempt such state law obligations.  As the Court noted, "in filing for protection under Chapter 9

. . . the debtor . . . may modify the terms of these prepetition bonds, without regard to these

provisions of Montana state law" that would otherwise require the funding of the revolving fund.

*Id.* at 761.  While the court also addressed the scope of the city's rights as trustee for funds in the

revolving account, it did not hold that the relevant statutes conveyed property interests beyond the

security interests expressly granted in the debt documents.

### C.     *Movants Do Not State A Prima Facie Case to Obtain Relief From the Stay Under Bankruptcy Code Section 362(d)(2).*

103.     Pursuant to the Court's order of January 31, 2020 [ECF No. 10595], the Oversight

Board understands any consideration of this topic (beyond Movants' secured status) is reserved

for a second hearing if it becomes necessary.  The Court need not reach these issues, however,

because, as explained, Movants cannot show any property interest in the Retained Occupancy Tax

Revenues.  That is an absolute prerequisite to seeking relief under Bankruptcy Code Section

362(d)(2).  *E.g.*, *In re Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bankr. S.D.N.Y. 1994) ("The secured

creditor who seeks relief from the automatic stay under § 362(d)(2) must demonstrate (1) the

amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate,

and (3) that the debtor lacks equity in the property."). "Serious doubt[s] about the validity of the movant's security interest [will] weigh[] heavily upon the court's determination of a § 362(d) motion." *In re Hunt's Pier Assocs.*, 143 B.R. 36, 50 (Bankr. E.D. Pa. 1992). Movants also fail to satisfy the two conditions of Section 362(d)(2).

104.    Beyond this, for now, to the extent there is a final hearing in connection with the Motion, the Commonwealth will be prepared to show Movants' Motion fails under section 362(d)(2).

**D.    *Movants Do Not State a Prima Facie Case for Stay Relief Under Bankruptcy Code Section 362(d)(1).***

105.    Pursuant to the Court's order of January 31, 2020 [ECF No. 10595], the Oversight Board understands any consideration of this topic (beyond Movants' secured status) is reserved for a second hearing if it becomes necessary. Here, Movants cannot show a perfected security interest against the Retained Occupancy Tax Revenues, and they cannot show their alleged collateral is declining in value—or that there is a threat of a decline—in order to establish a prima facie case under 362(d)(1). *In re Elmira Litho, Inc.*, 174 B.R. at 902 (stating the secured claimholder "must, therefore, prove this decline in value—or the threat of a decline—in order to establish a prima facie case" for stay relief under 362(d)(1)); *see also In re Shree Meldikrupa Inc.*, 547 B.R. 862, 871–72 (Bankr. S.D. Ga. 2016) (stating a "creditor must prove this decline in value, or threat of a decline, in order to establish a *prima facie* case" for stay relief under 362(d)(1)). Movants cannot establish this prima facie case. Beyond this, for now, to the extent there is a final hearing in connection with the Motion, the Commonwealth will be prepared to show that Movants' purported collateral is neither declining in value nor is there any threat to the value of their alleged collateral.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Commonwealth respectfully submits the Motion should

be denied.

[*Remainder of page intentionally left blank*]

Dated: February 3, 2020
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:    (787) 764-8181
Fax:    (787) 753-8944
Email: hermann.bauer@oneillborges.com
Email: gabriel.miranda@oneillborges.com

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Jeffrey Levitan
Timothy W. Mungovan
Ehud Barak
 (Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:    (212) 969-3000
Fax:    (212) 969-2900
Email: mbienenstock@proskauer.com
        jlevitan@proskauer.com
        tmungovan@proskauer.com
        ebarak@proskauer.com

Michael A. Firestein
Lary Alan Rappaport
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel:    (310) 557-2900
Fax:    (310) 557-2193
Email:   mfirestein@proskauer.com
        lrappaport@proskauer.com

Colin R. Kass
(Admitted *Pro Hac Vice*)

55

**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave, N.W.
Washington, DC 20004
Tel: (202) 416-6800
Fax: (202) 416-6899
Email:  ckass@proskauer.com

*Attorneys for the Financial
Oversight and Management Board
as Representative of the Commonwealth*