## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of

THE COMMONWEALTH OF PUERTO RICO *et al.,*

        Debtors.[1]

------------------------------------------------------------------------- x

: PROMESA
: Title III
: Case No. 17-BK-3283 (LTS)
: (Jointly Administered)

## OMNIBUS OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO BANKRUPTCY CODE SECTION 502 AND BANKRUPTCY RULE 3007, TO CLAIMS FILED OR ASSERTED AGAINST COMMONWEALTH BY HOLDERS OF GENERAL OBLIGATION BONDS ASSERTING PRIORITY OVER OTHER COMMONWEALTH UNSECURED CREDITORS

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 6

    I.    Title III Petition and Bar Date Order ................................................. 6

    II.    GO Bondholders' Asserted Title III Priority ....................................... 7

JURISDICTION AND STATUTORY PREDICATE .................................................. 9

RELIEF REQUESTED ............................................................................................. 9

BASIS FOR RELIEF ............................................................................................... 10

    III.    PROMESA Supersedes State Law Payment Priorities .......................... 10

        b.    Section 201 of Title II of PROMESA Does Not Undo Preemptive
              Effect of Title III of PROMESA ............................................ 14

    IV.    Asserted Title III Priority Is Antithetical to Overall Purpose and Specific
        Provisions of Bankruptcy Code and PROMESA ................................. 15

        a.    Overall Purpose of Bankruptcy Laws ...................................... 15

        b.    Specific Bankruptcy Code Provisions ...................................... 17

              ii.    Bankruptcy Code Section 1123(b) ............................... 17

              iii.    Bankruptcy Code Section 502(b)(2) ............................ 18

              iv.    PROMESA Section 314(b)(6) ...................................... 18

              v.    Bankruptcy Code Section 545(1) and General Prohibition
                   of Ipso Facto Clauses ................................................. 19

        c.    Any Doubt Concerning Appropriate Characterization of
           Commonwealth Payment Priority Must Be Resolved Against
           Asserted Title III Priority ...................................................... 22

    V.    Proper Role and Interpretation of Section 201 ................................... 23

        b.    Plain Language of Commonwealth Payment Priority Contradicts
           Asserted Title III Priority ...................................................... 23

        c.    Legislative History Contradicts Asserted Title III Priority ..................... 24

NOTICE ............................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACP Master, LTD. v. Puerto Rico*,
  Case No. 18-1108 (1st Cir. Jul. 2, 2018) ...............................................................9

*In re Allegheny Int'l, Inc.*,
  100 B.R. 247 (Bankr. W.D. Pa. 1989) ...................................................................18

*In re Allen Care Ctrs., Inc.*,
  163 B.R. 180 (Bankr. D. Or.), *aff'd*, 175 B.R. 397 (D. Or. 1994),
  *aff'd*, 96 F.3d 1328 (9th Cir. 1996).....................................................................11

*Ambac Assurance Corp. v. Puerto Rico*,
  Adv. Proc. No. 17-159-LTS (Bankr. D.P.R. Jul. 28, 2017)....................................9

*Begier v. IRS*,
  496 U.S. 53 (1990).................................................................................................22

*In re Boston Regional Medical Center, Inc.*,
  265 B.R. 838 (B.A.P. 1st Cir. 2001) .....................................................................10

*In re Chambers*,
  500 B.R. 221 (Bankr. N.D. Ga. 2013) ...................................................................11

*In re Chateaugay Corp.*,
  961 F.2d 378 (2d Cir. 1992)...................................................................................18

*In re City of Bridgeport*,
  129 B.R. 332 (Bankr. D. Conn. 1991) ...................................................................17

*In re City of Columbia Falls, Mont., Special Improvement District No. 25*,
  143 B.R. 750 (Bankr. D. Mont. 1992) ...................................................................13

*In re City of Detroit*,
  504 B.R. 97 (Bankr. E.D. Mich. 2013) ..................................................................13

*In re City of Detroit*,
  524 B.R. 147 (Bankr. E.D. Mich. 2014).................................................13, 18, 19

*In re City of Stockton, California*,
  542 B.R. 261 (B.A.P. 9th Cir. 2015)......................................................................19

*In re County of Orange*,
  191 B.R. 1005 (Bankr. C.D. Cal. 1996)......................................................... *passim*

*In re Davis*,
   22 B.R. 523 (Bankr. W.D. Pa. 1981) .................................................................21

*Elliott v. Bumb*,
   356 F.2d 749 (9th Cir. 1966) ..........................................................................11

*Emps. Ret. Sys. v. Andalusian Global Designated (In re Fin Oversight & Mgmt
   Bd for P.R.)*,
   Case No. 19-1699 (1st Cir. Jan. 30, 2020) ..............................................2, 5, 15

*In re Fin. Oversight & Mgmt. Bd.*,
   297 F. Supp. 3d 261 (D.P.R. 2017).....................................................................9

*First Federal of Michigan v. Barrow*,
   878 F.2d 912 (6th Cir. 1989) ..........................................................................11

*Flushing Nat'l Bank v. Mun. Assistance Corp. ex rel. City of New York*,
   358 N.E.2d 848 (N.Y. 1976)...........................................................................15

*In re Gen. Growth Properties, Inc.*,
   451 B.R. 323 (Bankr. S.D.N.Y. 2011).............................................................20

*In re Hardeman Cty. Hosp. Dist.*,
   540 B.R. 229 (Bankr. N.D. Tex. 2015).............................................................19

*Howard Delivery Serv. v. Zurich Am. Ins. Co.*,
   547 U.S. 651 (2006)...................................................................................22, 23

*In re Ionosphere Clubs, Inc.*,
   22 F.3d 403 (2d Cir. 1994)..............................................................................13

*In re Kittrell*,
   115 B.R. 873 (Bankr. M.D.N.C. 1990).............................................................21

*In re Kitty Hawk, Inc.*,
   255 B.R. 428 (Bankr. N.D. Tex. 2000).............................................................11

*In re Leicht*,
   222 B.R. 670 (B.A.P. 1st Cir. 1998) .................................................................10

*In re Mount Carbon Met. Dist.*,
   242 B.R. 18 (Bankr. D. Colo. 1999) .................................................................17

*Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for P.R.*,
   Case No. 17-2165 (1st Cir. Apr. 23, 2018)..........................................................9

*In re Price Oil, Inc.*,
   No. 05-34286, 2006 WL 3313781 (Bankr. M.D. Ala. Nov. 14, 2006)...................21

*In re Quality Holstein Leasing*,
   752 F.2d 1009 (5th Cir. 1985) ..................................................................................11

*In re Redford Roofing Co.*,
   54 B.R. 254 (Bankr. N.D. Ill. 1985) .........................................................................11

*In re Residential Capital, LLC*,
   508 B.R. 851 (Bankr. S.D.N.Y. 2014)......................................................................20

*Matter of Sanitary & Imp. Dist., No. 7*,
   98 B.R. 970 (Bankr. D. Neb. 1989) ..........................................................................16

*Schreiber v. Pacific Coast Fire Ins. Co.*,
   195 Md. 639, 75 A.2d 108 .......................................................................................25

*Strom v. Peikes (In re Corston Furniture Co.)*,
   123 F.2d 1003 (2d Cir. 1941)....................................................................................15

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) .......................................................................................20

**Statutes**

48 U.S.C. §§ 2101-2241 ...................................................................................................1

Bankruptcy Code
   § 314(b)(7) ................................................................................................................26
   § 365(e) .....................................................................................................................20
   § 502......................................................................................................................1, 9
   § 502(b)(2) ................................................................................................................18
   § 503...............................................................................................................12, 13, 14
   § 507...................................................................................................................11, 13
   § 507(a)(1) ................................................................................................................12
   § 507(a)(2) ...........................................................................................................*passim*
   § 507(a)(3)-(a)(9)................................................................................................12, 13
   § 507(a)(5) ................................................................................................................22
   § 541(c) .....................................................................................................................20
   § 545.........................................................................................................................21
   § 545(1)...............................................................................................................20, 22
   § 545(1)(E)................................................................................................................21
   § 726.........................................................................................................................11
   § 943(b)(7) ................................................................................................................19
   § 1109(b)....................................................................................................................9
   § 1123(b) ..................................................................................................................18
   § 1123(b)(1) ..............................................................................................................18
   § 1124.......................................................................................................................18
   Chapter 9 .............................................................................................................*passim*
   Chapter 11 ................................................................................................................12

PROMESA

§ 4...................................................................................................................13
§ 201............................................................................................................*passim*
§ 201(b)(1)(N)..................................................................................7, 8, 25
§ 301...............................................................................................................13
§ 301(a).......................................................................................................1, 9
§ 304(a)..............................................................................................................6
§ 306(a)..............................................................................................................9
§ 307(a)..............................................................................................................9
§ 310..........................................................................................................1, 9
§ 314(b)(6)......................................................................................................19
Title II.........................................................................................................*passim*
Title III........................................................................................................*passim*

## Other Authorities

162 CONG. REC. H3601 (daily ed. June 9, 2016) (statement of Rep. Grijalva,
ranking Member, Nat'l Res. Comm., reflecting Committee Markup Actions
from the May 24 and May 25 Nat'l Res. Comm. session) ....................................25

2008 Ann. Surv. of Bankr. Law 6 ...........................................................................18

4-507 Collier on Bankruptcy ¶ 507.02 (16th ed. 2017) ..............................................11

Ballantine's Law Dictionary ...................................................................................26

David A. Skeel, Jr., *Can Pensions be Restructured in (Detroit's) Municipal
Bankruptcy*, FEDERALIST SOC'Y WHITE PAPER (Oct. 2013), available at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=23G0302 ..............................16

David A. Skeel, Jr., *What is a Lien? Lessons from Municipal Bankruptcy*, 2015 U.
Ill. L. Rev. 675 ...............................................................................................15

Fed. R. Bankr. P.
R. 2019...........................................................................................................26
R. 3007........................................................................................................1, 9

P.R. Const. art. IV
§ 8...................................................................................................................7

P.R. Const. art. VI
§ 2.................................................................................................................18
§ 8.................................................................................................................20

To the Honorable United States District Court Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee")[2] hereby files this objection (the "GO Claim Priority Objection") pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these Title III cases by section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[3] and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to these Title III cases by section 310 of PROMESA, as to the Asserted Title III Priority (as defined below) and requesting entry of an order, substantially in the form attached hereto as **Exhibit A**, reclassifying (filed or unfiled) claims against the Commonwealth of Puerto Rico (the "Commonwealth") based on Commonwealth general obligation bonds or bonds guaranteed by the Commonwealth (collectively, "GO Bonds," and the holders and insurers of such bonds, "GO Bondholders") as general unsecured claims and ruling that such (filed or unfiled) claims are not entitled to priority over the claims of other general unsecured creditors in the Commonwealth's Title III case.[4]  In support of this GO Claim Priority Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Certain GO Bondholders have asserted that PROMESA is somehow different from all other bankruptcies governed by federal law, whether individual, corporate, or municipal.

---

[2]   The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[3]   PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

[4]   Through its review of public documents (including the Debtors' claims register), the Committee has identified numerous proofs of claim filed against the Commonwealth by GO Bondholders that assert Asserted Title III Priority.  All such claims exceeding $50 million, which are among the claims to which the Committee hereby objects, are listed on **Appendix I** hereto.  To be clear, however, the Committee objects to any claim based on the GO Bonds to the extent that such claim asserts the Asserted Title III Priority.  Additionally, given that the relief sought herein would affect thousands of claims based on GO Bonds, the Committee will propose a procedure by which such claimants will be given notice of this GO Claim Priority Objection, along the lines of the notice procedures previously approved by the Court in similar instances in these cases.

They assert that, in enacting PROMESA, Congress chose to depart from the well-established treatment of general unsecured claims such as those held by the GO Bondholders, requiring instead that any plan of adjustment comply with the Commonwealth's Payment Priority[5] (the "Asserted Title III Priority").  According to the GO Bondholders, the Asserted Title III Priority requires that GO Bonds be paid before any other unsecured prepetition claims and a plan of adjustment cannot be confirmed unless all GO Bond claims—inclusive of original issue discount and post-petition interest—are paid in full and in cash.

2.       It is, of course, obvious why the GO Bondholders would advance such an argument:  they hold bonds (mostly purchased on the secondary market at a steep discount from their face amount) with almost $18 billion outstanding (including accrued pre-petition interest).  Thus, if any plan of adjustment had to comply with the Commonwealth's Payment Priority, the GO Bondholders would reap a significant windfall.  It is equally obvious that wanting something to be true does not make it so, as there is no legal basis to enforce in the Commonwealth's Title III bankruptcy case a temporary payment priority created by Puerto Rico law.  To the contrary, only a few days ago the First Circuit Court of Appeals held that the Commonwealth's Payment Priority does not govern "the operation of Title III of PROMESA."[6]

3.       The fundamental purpose of any bankruptcy is to allow the adjustment of debts in a way that would be impermissible under non-bankruptcy law.  This is especially true of PROMESA, which was passed in recognition of both the critical need to provide Puerto Rico with a debt adjustment process and the fact that the process available to other municipalities was not available to Puerto Rico.  Because an adjustment of debts, by definition, permits and requires

---

[5]   As defined herein.

[6]   *See* Op., at 41, *Emps. Ret. Sys. v. Andalusian Global Designated (In re Fin Oversight & Mgmt Bd for P.R.)*, Case No. 19-1699 (1st Cir. Jan. 30, 2020).

non-compliance with state law, preemption of state (or territorial) payment priorities is a bedrock

bankruptcy principle that has been consistently applied in municipal bankruptcy cases.  This

principle applies equally to PROMESA.

4.       Indeed, preemption of state law payment priorities such as the Commonwealth's

Payment Priority is most essential in a municipal bankruptcy, the very purpose of which is to

ensure the continued provision of public services to the municipality's residents.  This becomes

impossible if—as the GO Bondholders assert—the municipality is prohibited from impairing

funded debt and must instead prioritize bond payments over the provision of even essential

public services.[7]  It simply makes no sense that Congress would enact a special law to allow

Puerto Rico to restructure its debts and, at the same time, require it to pay its billions of dollars

of outstanding GO Bonds in full.[8]

5.       The impossibility of the Asserted Title III Priority is further illustrated by its

incompatibility with the bedrock principle of equality of distribution amongst general unsecured

creditors recognized by numerous courts, including the Supreme Court, and by Congress's

deliberate decision to incorporate into Title III of PROMESA many provisions of the Bankruptcy

Code that cannot be reconciled with enforcement of a state law payment priority.  For example,

Congress (i) specified which priorities would (and, by exclusion, which would not) apply in a

case under Title III of PROMESA, (ii) disallowed claims for unmatured (i.e., post-petition)

---

[7]   As this Court has already recognized, enforcing the Commonwealth's Payment Priority would be akin to
"say[ing] that this first priority means that any time there is a shortfall everybody on the island necessarily
starves, everything has to get shut down," thus forcing the Court to "determine whether babies should eat or
traffic lights should be on or houses should get to stand up before bondholders get paid."  *See* April 10, 2018
Transcript at 55:14-25.  Relevant excerpts are attached hereto as **Exhibit B**.  The entire purpose of a municipal
bankruptcy is to avoid such an unacceptable outcome.

[8]   As explained below, preemption of state law priorities is most important in the municipal context for the
additional reason that, if not preempted, municipalities' legislative powers would enable them to literally
rewrite the Bankruptcy Code by legislating new priorities in their own bankruptcy cases for favored creditors.
*See In re County of Orange*, 191 B.R. 1005, 1018 (Bankr. C.D. Cal. 1996).

interest, (iii) allowed a plan of adjustment to impair prepetition claims, and (iv) provided that a

plan of adjustment can be confirmed if it is in the best interests of creditors as a whole—not just

the beneficiaries of state law preferences.

6.      In the face of the clear structure of Title III, the GO Bondholders are forced to

look outside of Title III to support their Asserted Title III Priority.  Their argument rests entirely

on the provision in section 201 of Title II of PROMESA directing the Oversight Board to

"respect lawful priorities" contained in local law in certifying a fiscal plan.  However, this

section does not come close to establishing a bankruptcy priority that would apply in Title III of

PROMESA.

7.      The GO Bondholders ignore that Congress placed its directive to the Oversight

Board to "respect lawful priorities" in Title II of PROMESA, not Title III.  Title II of

PROMESA requires the Oversight Board to certify a fiscal plan, a requirement that is separate

from the bankruptcy process governed by Title III.  Critically, only days prior to the filing of this

GO Priority Objection, the First Circuit expressly rejected the argument that "because

PROMESA requires the Board to develop a "Fiscal Plan" that respects the relative lawful

priorities or lawful liens . . . Congress intended that PROMESA not alter the status quo existing

before PROMESA's enactment," holding instead that the directive to respect lawful priorities

found in section 201 of Title II of PROMESA "**governs only the Board's Fiscal Plan, not the**

**operation of Title III of PROMESA**."[9]

---

[9]  *See* Op., at 41, *Emps. Ret. Sys. v. Andalusian Global Designated (In re Fin Oversight & Mgmt Bd for P.R.)*,
Case No. 19-1699 (1st Cir. Jan. 30, 2020) (emphasis added).  The Committee notes that the Oversight Board
argued for this holding, arguing in its sur-reply that "the Bondholders' citation to [section 201 of PROMESA] is
inapposite because that provision concerns only criteria for fiscal plans."  *See* Sur-Reply Brief for Plaintiff-
Appellee, at 15, *Emps. Ret. Sys. v. Andalusian Global Designated (In re Fin Oversight & Mgmt Bd for P.R.)*,
Case No. 19-1699 (1st Cir. Nov. 26, 2019).  This position was entirely consistent with the Oversight Board's
repeated prior statements in these Title III cases.  *See, e.g.*, n.21, *infra.*

8.      This ruling is also consistent with the actual language of section 201 of

PROMESA, which provides that only "lawful" priorities must be respected.  In contrast to Title

III of PROMESA, which applies only once a Title III case has been commenced and which

contains the ground rules for such a case, the fiscal plan process outlined in Title II would have

applied even if the Oversight Board had never commenced a Title III case for the

Commonwealth.  Thus, prior to—but not after—the Commonwealth's Title III bankruptcy case

and the consequent preemption of all non-bankruptcy priorities, the Commonwealth's Payment

Priority would arguably have remained a "lawful" priority for fiscal plan purposes.

9.      Moreover, even if it remained "lawful" during the pendency of the

Commonwealth's Title III Case, the Commonwealth's Payment Priority could not be used to

justify treatment of Commonwealth creditors that would not be lawful even under its own terms.

Yet in arguing that the Commonwealth's Payment Priority—which only delays payment to non-

GO Claim creditors on a temporary, year by year, basis—justifies a permanent discharge of other

general unsecured claims, that is precisely what the GO Bondholders are urging.  Indeed, it is the

GO Bondholders' interpretation of the Commonwealth's Payment Priority that is unlawful.

10.      Finally, even if (contrary to the First Circuit's clear ruling) section 201 of

PROMESA did impose limitations on the operation of Title III of PROMESA, the legislative

history makes clear that "respecting" non-bankruptcy priorities does not mean that a

Commonwealth plan of adjustment must comply with the Commonwealth's Payment Priority.

Indeed, such a reading would potentially leave unadjusted the largest component of the

Commonwealth's debt burden, and PROMESA would fail to fulfill the most basic purpose of a

municipal restructuring.

11.     In the final analysis, the Asserted Title III Priority is an invented priority premised on the misguided notion that—contrary to all bankruptcy law, the structure and language of PROMESA, and the First Circuit's express ruling—Congress incorporated the Commonwealth's Payment Priority into PROMESA.  Any other understanding would make a mockery of PROMESA and the Commonwealth's Title III bankruptcy case.

## **BACKGROUND**

### I.     **Title III Petition and Bar Date Order**

12.     On May 3, 2017 (the "Petition Date"), the Financial Management and Oversight Board (the "Oversight Board") commenced a Title III case for the Commonwealth by filing a voluntary petition for relief pursuant to section 304(a) of PROMESA.  Soon thereafter, the Oversight Board commenced Title III cases for COFINA, ERS, HTA, and PREPA.  On September 27, 2019, the Oversight Board commenced a Title III case for PBA.

13.     As of the Petition Date, the Commonwealth owed approximately $13.3 billion on account of Commonwealth-issued general obligation bonds and had guaranteed an additional $4.5 billion in bond debt.[10]

14.     On February 15, 2018, the Court entered the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereto* [Docket No. 2521] (the "Bar Date Order"), which set May 29, 2018 as the general deadline for filing proofs of claim against the Debtors.  The deadline later was extended to June 29, 2018.[11]

---

[10]   *Statement of Oversight Board in Connection with PROMESA Title III Petition*, at 9 [Docket No. 1].

[11]   *See Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Docket No. 3160].

15.     The Bar Date Order exempted GO Bondholders from all claim-filing requirements but expressly preserved the right of any party in interest to object to the amount, priority, security, and/or allowance of any GO Bond-related obligation, regardless of whether any proof of claim had been filed.[12]

## II.     GO Bondholders' Asserted Title III Priority

16.     Numerous GO Bondholders have filed proofs of claim asserting priority status in the Commonwealth's Title III bankruptcy case based on Article IV, Section 8 of the Puerto Rico Constitution and section 201(b)(1)(N) of PROMESA.

17.     Article IV, Section 8 of the Puerto Rico Constitution provides that "[i]n case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law" (the "Commonwealth's Payment Priority").

18.     Section 201(b)(1)(N) of PROMESA provides that, in certifying a fiscal plan, the Oversight Board shall "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory . . . ."

19.     Relying on section 201(b)(1)(N), numerous GO Bondholders have filed proofs of claims asserting that any plan of adjustment must comply with the Commonwealth's Payment Priority such that all GO Bondholder claims must be paid in full and in cash before other unsecured creditors can receive any recovery in the Commonwealth's Title III bankruptcy case.[13]

---

[12]     Bar Date Order, ¶ 16.

[13]     *See, e.g.*, Claim No. 26695 (asserting that GO Bond claims are "entitled to priority, including treatment as administrative expense claims [that must be fully paid in cash before any plan of adjustment can be confirmed]"); Claim No. 66993 (asserting an "absolute first priority claim on available resources of the Commonwealth"); Claim No. 50742 (asserting that "holders of GO Bonds have an absolute interest in all of the Commonwealth's available resources and can compel the Secretary of the Treasury of Puerto Rico to apply these resources to satisfy public debt"); Claim No. 115645 (asserting that use of Commonwealth resources for

20.     The Oversight Board's filing of a proposed plan of adjustment on September 27,

2019 illustrates the importance of this issue.[14]  That proposed plan of adjustment contemplates a

recovery of as much as 89% for certain GO Bondholders while similarly situated general

unsecured creditors would receive as little as 1.8% of their claims.  This differential treatment is

contrary to the Oversight Board's previously unwavering stance that "nowhere in PROMESA

does it import state law priorities [such as the Commonwealth's Payment Priority]."[15]  Indeed,

from day one, the Oversight Board has consistently taken the position that PROMESA's

directive to respect lawful priorities when certifying a fiscal plan "does not override powers to . .

. restructure debt in PROMESA."[16]  Moreover, the Oversight Board continues to advocate for

this position even after the filing of the September 27, 2019 plan that is inconsistent with it,

arguing that "any Commonwealth laws purporting to recognize priority claims other than those

recognized in PROMESA Title III" are preempted,[17] and that "PROMESA only incorporates into

---

any purpose other than payment of public debt violates the Commonwealth's Payment Priority); Claim No.
66583 ("Claimant is entitled to an absolute first claim to and lien on **all** of the Commonwealth's available
resources . . . .") (emphasis in original).

[14]    For purposes of this GO Claim Priority Objection, the Committee takes no position at this time on other
critically important issues, including whether the Commonwealth's Payment Priority would be applicable to the
GO Bonds if there were no Title III case for the Commonwealth and/or on any related issues such as what
constitutes "available resources" or "public debt" as those terms are used in the constitution or whether the GO
Bonds are even valid.  The Committee reserves all of its rights in this regard.

[15]    *See* Aug. 9, 2017 Hr'g Tr. at 165:15-21.  Relevant excerpts are attached hereto as **Exhibit C**.

[16]    *See Brief for Defendants-Appellees, Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for P.R.*, Case
No. 17-2165 (1st Cir. Apr. 23, 2018).  The Oversight Board has reconfirmed this position on numerous
occasions.  *See, e.g., Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. 12(b)(1) and (b)(6)*,
at 4-5, *Ambac Assurance Corp. v. Puerto Rico*, Adv. Proc. No. 17-159-LTS (Bankr. D.P.R. Jul. 28, 2017)
[Docket No. 48] ("Ambac's Complaint pretends that Congress adopted Puerto Rico's claim priorities as
PROMESA's claim priorities."); *Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. 12(b)(1) and
(b)(6)*, at 15, *ACP Master, LTD. v. Puerto Rico*, Adv. Proc. No. 17-189-LTS (Bankr. D.P.R. Aug. 21, 2017),
[Docket No. 35] ("It would have been easy for Congress to provide in PROMESA that the Title III priorities
shall be the nonbankruptcy law priorities.  Congress did not do that."); *Brief for Defendants-Appellees, ACP
Master, LTD. v. Puerto Rico*, Case No. 18-1108 (1st Cir. Jul. 2, 2018) ("[PROMESA] incorporates only one
priority into Title III: Bankruptcy Code § 507(a)(2), which grants priority to administrative claims.  No other
priorities exist in Title III.").

[17]    *See Compl. Objecting to Defendants' Claims and Seeking Related Relief* [Docket No. 10071], at ¶ 120; *see also
Compl.* Objecting to Defendants' Claims and Seeking Related Relief [Docket No. 10079], (CCDA Complaint)
para.177 (Docket No. 10079) *(same).*

Title III a single priority claim: administrative expense claims" and "does not recognize that any claim arising from an appropriation statute has priority."[18]

## JURISDICTION AND STATUTORY PREDICATE

21.    The Court has jurisdiction over this GO Claim Priority Objection pursuant to section 306(a) of PROMESA.  Venue is proper in this district pursuant to section 307(a) of PROMESA.

22.    The statutory predicate for the relief sought herein is section 502 of the Bankruptcy Code, as incorporated by section 301(a) of PROMESA, and Bankruptcy Rule 3007, as incorporated by section 310 of PROMESA.

23.    The Committee is a "party in interest" pursuant to section 1109(b) of the Bankruptcy Code, as incorporated by section 301(a) of PROMESA.  *See In re Fin. Oversight & Mgmt. Bd.*, 297 F. Supp. 3d 261, 264 (D.P.R. 2017) ("Pursuant to 11 U.S.C. § 1109(b), a provision of the Bankruptcy Code that was expressly incorporated by PROMESA, '[a] party in interest, including . . . a creditors' committee . . . may raise and may appear and be heard on any issue in a case under this chapter.'").

## RELIEF REQUESTED

24.    The Committee respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, reclassifying all GO Bond-based claims (filed or unfiled) as general unsecured claims and ruling that such claims are not entitled to the Asserted Title III Priority in the Commonwealth's Title III case.

---

[18]    *See Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guarantee Insurance Company for Relief from Automatic Stay or, in the Alternative, Adequate Protection [ECF No. 673]*, [Docket No. 10613]; *see also id*. at ¶ 5 (arguing further that "[A]ppropriation is separately preempted by Title III because it requires payment of an obligation that Title III does not render a priority claim.  The Commonwealth cannot insert priority claims into Title III.").

**BASIS FOR RELIEF**

25.     It is well settled that "[w]hen a state law conflicts with federal bankruptcy law,

the state law is preempted."  *In re County of Orange*, 191 B.R. at 1017; *see also In re Boston*

*Regional Medical Center, Inc.*, 265 B.R. 838 (B.A.P. 1st Cir. 2001) (holding that the Bankruptcy

Code preempts "a particular state law [that] is in direct conflict with the federal law to an extent

that the statutes cannot exist"); *In re Leicht*, 222 B.R. 670, 680 (B.A.P. 1st Cir. 1998) (holding

that Massachusetts' homestead law was "not so different in character" from exemptions in the

Bankruptcy Code and, therefore, that "the [bankruptcy court's] conclusion that the

Massachusetts law 'conflicts' with the Bankruptcy Code's congressionally-intended operation,

and must give way to the Code's preemptive powers, [was] unavoidable").

26.     As demonstrated below, the Asserted Title III Priority conflicts with federal law

on at least three levels.  First, the Asserted Title III Priority conflicts with the Bankruptcy Code's

priority scheme as incorporated into PROMESA.  Second, the Asserted Title III Priority conflicts

with the overall purpose of bankruptcy law and municipal bankruptcies in particular.  Third, the

Asserted Title III Priority conflicts with numerous provisions of the Bankruptcy Code

incorporated into Title III of PROMESA.  Ultimately, because compliance with the

Commonwealth's Payment Priority would "create[] a special class of creditors" not provided for

by, and therefore "in conflict with[,] the priority scheme in [PROMESA,] it is preempted."

*County of Orange*, 191 B.R. at 1017.

**III.    PROMESA Supersedes State Law Payment Priorities**

27.     It is a fundamental principle of bankruptcy law that state law payment priorities

are superseded and thus inapplicable in a bankruptcy case.  The Bankruptcy Code "explicitly

defined the order of creditor priority and declared the congressional intent of federal supremacy

over declared but conflicting state law orders of priority."  *First Federal of Michigan v. Barrow*,

878 F.2d 912 (6th Cir. 1989) (explaining that requirement of tracing funds allegedly held in constructive trust is "to avoid conflict with and between creditor classes").[19] Indeed, no public purpose of a state (or territory), no matter how compelling, can override the Bankruptcy Code's priority scheme. *See Elliott v. Bumb*, 356 F.2d 749, 754–55 (9th Cir. 1966) ("Congress has made even clearer its intent that state law shall not be permitted to confer preference on one class of the creditors of one adjudged a bankrupt under federal law, even though the state may have the highest public purpose in attempting to do so."); *In re Allen Care Ctrs., Inc.*, 163 B.R. 180, 183 (Bankr. D. Or.), *aff'd*, 175 B.R. 397 (D. Or. 1994), *aff'd*, 96 F.3d 1328 (9th Cir. 1996) ("If the debtor is in bankruptcy state law is not permitted to prefer a class of unsecured creditors. This is true although the state's motives for so doing are of the highest order.").

28.     Courts have rejected the argument that, because chapter 9 of the Bankruptcy Code incorporates only one part of the Bankruptcy Code's priority scheme—sections 503 and 507(a)(2)—while omitting sections 507(a)(1) and (a)(3) through (a)(9), Congress intended to preserve state law payment priorities in municipal bankruptcies.[20] In *In re County of Orange*, 191 B.R. 1005, 1018 (Bankr. C.D. Cal. 1996), the court explained that "there are valid reasons"

---

[19] *See also In re Quality Holstein Leasing*, 752 F.2d 1009, 1014 n.10 (5th Cir. 1985) ("State law defining property rights may not, of course, go so far as to manipulate bankruptcy priorities."); *In re Chambers*, 500 B.R. 221, 229 (Bankr. N.D. Ga. 2013) ("Further, a state statute cannot reset bankruptcy priorities. Thus, even if Georgia law purports to establish the priority of Rosetta Stone's claim over others, that statute is preempted by the Bankruptcy Code."); *In re Kitty Hawk, Inc.*, 255 B.R. 428, 439 (Bankr. N.D. Tex. 2000) ("Where a state statute would alter the priority of claims in a bankruptcy case, the state statute is pre-empted by the Code."); *In re Redford Roofing Co.*, 54 B.R. 254, 255 (Bankr. N.D. Ill. 1985) ("Priority of distribution in a bankruptcy case is governed exclusively by sections 507 and 726 of the Bankruptcy Code."); 4-507 Collier on Bankruptcy ¶ 507.02 (16th ed. 2017) ("Section 507, together with various other sections of the Code, contains the only priority provisions applicable in a bankruptcy case. To the extent a federal nonbankruptcy statute purports to affect priorities within a bankruptcy case, that statute is preempted by the more specific provisions in the Code. To the extent that a state statute purports to establish the priority of a claim over other claims, that statute is preempted by the Code and of no effect in the bankruptcy case.").

[20] Section 507(a)(2) grants a priority for the administrative expenses listed in section 503, which, in turn, lists allowed administrative expenses. Accordingly, sections 503 and 507(a)(2) go hand in hand. Furthermore, section 503 itself lists nine categories of administrative expenses, some with multiple sub-categories. It is therefore inaccurate to claim that chapter 9 only recognizes one type of priority.

why Congress only incorporated section 507(a)(2) "into chapter 9, and those reasons do not lead

to the conclusion that Congress intended to eliminate federal priorities under chapter 9." *Id.* The

court went on to caution that, if chapter 9 debtors could "rewrite bankruptcy priorities, then

chapter 9 would become a balkanized landscape of questionable value. Moreover, chapter 9

would violate the constitutional mandate for **uniform** bankruptcy laws." *Id.* at 1020 (emphasis

in original). Accordingly, the court concluded that "[c]hapter 9 does not permit individual states

to override the priority scheme that is inherent in the Code. A uniform bankruptcy code

necessitates that federal law control creditor priorities." *Id.* at 1021.[21]

29.     Similarly, in the City of Detroit's bankruptcy, the court rejected the argument that

Michigan's constitutional protection of pensions prohibited their impairment as part of a plan of

reorganization. Echoing the *In re County of Orange* decision, the court explained that "state law

cannot reorder the distributional priorities of the bankruptcy code." *In re City of Detroit*, 504

B.R. 97, 161 (Bankr. E.D. Mich. 2013).[22] Likewise, in *In re City of Columbia Falls, Mont.,*

*Special Improvement District No. 25*, 143 B.R. 750, 759 (Bankr. D. Mont. 1992), the court held

that the municipal debtor was able to "modify or extinguish" bond obligations notwithstanding

---

[21]  Municipal debtors' legislative powers means that the prospect of a municipal debtor "rewriting bankruptcy priorities" is far from hyperbole, and illustrates why preemption of state law priorities (which could, in theory, have been created only hours before a bankruptcy filing by such municipality) is even more crucial in municipal bankruptcies than in commercial chapter 11 cases. Indeed, the Oversight Board has argued elsewhere that state law priorities are unenforceable under PROMESA just as under chapter 11. *See* [Docket No. 24 in Adv. Proc. No. 19-396-LTS] at 18 (arguing that if a promise to pay one creditor before another "were enforceable in bankruptcy, then every [municipal] debtor could create its own priority scheme," which "would undo the priorities imposed by the Bankruptcy Code and PROMESA Title III").

[22]  In that opinion, the court also treated general obligation bondholders as unsecured non-priority creditors. *See In re City of Detroit*, 504 B.R. at 126-27 (describing proposed payment "to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax general obligation bonds)"). And in its confirmation opinion, the court approved a settlement that included a significant write-down on general obligation bondholders' claims, concluding that there was a "substantial likelihood" that the state-law "first budget obligation" was unenforceable in bankruptcy. *In re City of Detroit*, 524 B.R. 147, 190-91 (Bankr. E.D. Mich. 2014).

12

state law protections.  In so holding, the court overruled an objection that doing so "would constitute an unconstitutional interference with state powers."

30.    In short, "simply because Congress did not incorporate § 507(a)([3]) through (a)(9) into chapter 9 does not lead to the sweeping, and potentially chaotic, conclusion that Congress intended to eliminate the federal priority scheme in chapter 9."  *County of Orange*, 191 B.R at 1021.  To the contrary, by incorporating part, but not all, of section 507, Congress demonstrated its intention that section 507 remain the "exclusive list of priorities in bankruptcy." *In re Ionosphere Clubs, Inc.*, 22 F.3d 403, 408 (2d Cir. 1994) (declining to find an implied "super priority for claims arising under CBAs").

31.    As with chapter 9 of the Bankruptcy Code, section 301 of PROMESA adopts the priority provisions of Bankruptcy Code section 507(a)(2) and the administrative expenses delineated in section 503.  Thus, as with chapter 9, Title III of PROMESA imports some, but not all, of the section 507 priorities, which, in PROMESA as in chapter 9, are the only priorities that apply to a municipal/territory plan of adjustment.

32.    Moreover, in enacting PROMESA, Congress explicitly preempted territory law through PROMESA section 4, which provides that PROMESA's provisions "shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this act."  As discussed above, by incorporating section 507(a)(2)—and only section 507(a)(2)—into Title III, Congress deliberately established which claim priorities would apply in a bankruptcy case under Title III (i.e., the numerous categories listed in section 503 of the Bankruptcy Code and referenced in section 507(a)(2)) and, by implication, which would not (i.e., **any and all** other priorities).  Additionally, and as set forth below, the Commonwealth's Payment Priority is fundamentally at odds with the entire purpose of Title III of PROMESA and

federal bankruptcy law generally and directly conflicts with numerous provisions of the

Bankruptcy Code that Congress incorporated into PROMESA.

      b.    <u>Section 201 of Title II of PROMESA Does Not Undo Preemptive Effect of Title
III of PROMESA</u>

33.    For the same reason, the requirement that a fiscal plan "respect the relative lawful

priorities" could not have been intended to make PROMESA an anomalous exception to the

well-established principles of supremacy and equality of distribution among unsecured creditors

central to all other bankruptcies, whether individual, corporate, or municipal.  The Oversight

Board's obligation to certify a fiscal plan is not found in Title III of PROMESA, which contains

the ground rules with respect to the Commonwealth's bankruptcy case, including relative

priorities, rights of creditors and, ultimately, adjustment of the Commonwealth's debt pursuant to

a plan of adjustment.  Instead, it is found in Title II of PROMESA—and thus applies even if the

Oversight Board has not commenced a Title III case.

34.    Thus, prior to a Title III filing and the resulting applicability of section 507(a)(2),

the Commonwealth's Payment Priority would arguably have remained a "lawful" priority for

fiscal plan purposes.  However, whatever its role in the fiscal plan process outlined in Title II of

PROMESA, the Commonwealth's Payment Priority does not constitute a "lawful" priority in the

Commonwealth's Title III case because it is inconsistent with the section 507(a)(2) priority

scheme incorporated into Title III.

35.    Critically, this distinction between Title II and Title III of PROMESA was one of

the bases for the First Circuit's ruling issued only days prior to the filing of this GO Priority

Objection.  Relying on section 201 of Title II, certain ERS bondholders had argued that "because

PROMESA requires the Board to develop a "Fiscal Plan" that respects the relative lawful

priorities or lawful liens . . . Congress intended that PROMESA not alter the status quo existing

14

before PROMESA's enactment."[23]  However, the First Circuit expressly rejected this argument,

holding instead that the directive to respect lawful priorities found in section 201 of Title II of

PROMESA "**governs only the Board's Fiscal Plan, not the operation of Title III of**

**PROMESA**."

36.     Accordingly, the Commonwealth's Payment Priority notwithstanding, GO

Bondholders hold nothing more than general unsecured claims that are subject to the same

treatment as the claims of other unsecured creditors.[24]

## IV.     Asserted Title III Priority Is Antithetical to Overall Purpose and Specific Provisions of Bankruptcy Code and PROMESA

a.     Overall Purpose of Bankruptcy Laws

37.     It would be entirely illogical "to create a federal statute based upon a theory that

federal intervention was necessary to permit adjustment of a municipality's debts and then to

prohibit the municipality from adjusting such debts."  *County of Orange*, 191 B.R. at 1021

(internal citations omitted).  As one court cogently explained in a chapter 9 case:

> If a municipality were required to pay prepetition bondholders the full amount
> of their claim with interest as contained on the face of the bonds and the SID

---

[23]  *See* Op., at 41, *Emps. Ret. Sys. v. Andalusian Global Designated (In re Fin Oversight & Mgmt Bd for P.R.)*,
Case No. 19-1699 (1st Cir. Jan. 30, 2020) (emphasis added).  The Committee notes that the Oversight Board
argued for this holding, arguing in its sur-reply that "the Bondholders' citation to [section 201 of PROMESA] is
inapposite because that provision concerns only criteria for fiscal plans."  *See* Sur-Reply Brief for Plaintiff-
Appellee, at 15, *Emps. Ret. Sys. v. Andalusian Global Designated (In re Fin Oversight & Mgmt Bd for P.R.)*,
Case No. 19-1699 (1st Cir. Nov. 26, 2019) .

[24]  It is also a fundamental bankruptcy law principle that there are only two types of claims in bankruptcy: secured
claims, which are claims secured by interests in specifically identifiable property, and unsecured claims, which
are claims with no recourse to any specific property.  The Commonwealth's Payment Priority creates a priority
of payment, not a right to specific property.  *See Flushing Nat'l Bank v. Mun. Assistance Corp. ex rel. City of
New York*, 358 N.E.2d 848, 851 (N.Y. 1976) ("[T]he effect of [a] pledge of 'full faith and credit' is not to create
a general or special lien or charge upon the unspecified revenues, moneys or income of the obligor."); *Strom v.
Peikes (In re Corston Furniture Co.)*, 123 F.2d 1003, 1005 (2d Cir. 1941) (recognizing the "distinction . . .
between statutes creating priority of distribution and statutes providing security for a creditor by awarding him a
lien"); David A. Skeel, Jr., *What is a Lien? Lessons from Municipal Bankruptcy*, 2015 U. Ill. L. Rev. 675, 685
("A municipality's 'full faith and credit' commitment does not by itself create a lien, which means that the
claims of GO bondholders are unsecured in bankruptcy, and need not be paid in full.").  Because the
Commonwealth's Payment Priority is not secured by any statutory or consensual lien, any claim backed by the
Commonwealth's Payment Priority can only be an unsecured claim.

had no ability to impair the bondholder claims over objection, **the whole purpose and structure of Chapter 9 would be of little value.  State law already requires full payment of the bonds issued prepetition** and the state and the municipality are forbidden the opportunity to compromise the amounts due, without 100 percent consent of the bondholders.  **To create a federal statute based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result**.

*Matter of Sanitary & Imp. Dist., No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) (emphasis added).  Following this line of reasoning to its logical end, law professor and Oversight Board member David Skeel was not exaggerating when he observed that enforcing state repayment and non-impairment laws would "make Chapter 9 a dead letter."[25]  Surely, it would make no sense to enact legislation allowing Puerto Rico to adjust its debts while restricting its ability to adjust the largest component of its debt burden.  Under the Asserted Title III Priority, claims that would be disallowed in any other bankruptcy (such as for original issue discount or post-petition interest) would not only be allowed but required to receive full payment in cash before any plan of adjustment could be confirmed.

38.     Furthermore, it must not be forgotten that "[t]he primary purpose of debt restructure for a municipality is not future profit, but rather continued provision of public services." *In re Mount Carbon Met. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999).  *See also In re City of Bridgeport*, 129 B.R. 332, 336–37 (Bankr. D. Conn. 1991) ("Cities cannot go out of business.  Chapter 9 is intended to enable a financially distressed city to "continue to provide its residents with essential services such as police protection, fire protection, sewage and garbage removal, and schools . . . while it works out a plan to adjust its debts and obligations.") (internal

---

[25]     *See* David A. Skeel, Jr., Can Pensions be Restructured in (Detroit's) Municipal Bankruptcy, FEDERALIST SOC'Y WHITE PAPER (Oct. 2013), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2360302 (last visited Feb. 3, 2020).

references omitted).  As this Court has already recognized, enforcing the Commonwealth's

Payment Priority would be akin to "say[ing] that this first priority means that any time there is a

shortfall everybody on the island necessarily starves, everything has to get shut down."[26]  Indeed,

enforcing the Commonwealth's Payment Priority in Title III would, at least in principle, be

tantamount to "determin[ing] whether babies should eat or traffic lights should be on or houses

should get to stand up before bondholders get paid."[27]  This is directly, fundamentally, and

irreconcilably at odds with the very purpose of a municipal bankruptcy, which is to ensure that

the municipal debtor can provide essential services to its citizens, and it would be beyond absurd

to believe that, in enacting PROMESA, Congress intended for the Commonwealth to be forced

to choose between "bonds or babies."

   b. <u>Specific Bankruptcy Code Provisions</u>

  39. Given that the Asserted Title III Priority is antithetical to the overall purpose of

the Bankruptcy Code, it is unsurprising that the Asserted Title III Priority is also fundamentally

at odds with specific Bankruptcy Code provisions that Congress incorporated into PROMESA.

Below are the most salient examples.

    ii. *Bankruptcy Code Section 1123(b)*

  40. Section 1123(b) of the Bankruptcy Code describes what a plan may do, and

subsection (b)(1) provides that a plan may "impair or leave unimpaired any class of claims,

secured or unsecured."  If a plan of adjustment must comply with the Commonwealth's Payment

Priority, this would infringe on the Commonwealth's statutory ability to impair a class of claims.

*See In re City of Detroit*, 524 B.R. at 212 (overruling an objection that the Michigan constitution

---

[26] *See* **Exhibit B**, April 10, 2018 Transcript at 55:14-25.

[27] *See id.*

protected pension obligations because "[u]nder § 1123(b)(1), the plan may impair unsecured creditors").[28]

### iii.   Bankruptcy Code Section 502(b)(2)

41.   Section 502(b)(2) of the Bankruptcy Code disallows any claim for unmatured (i.e., post-petition) interest.[29]  This disallowance provision is inconsistent with the assertion that GO Bonds must be paid in full as provided under their pre-petition documents.  It is also specifically inconsistent with the entitlement to "payment of interest," without distinction between pre- and post-petition interest, provided for by the Commonwealth's Payment Priority.[30] As in any other conflict between federal and state (or territorial) law, federal law must prevail.

### iv.   PROMESA Section 314(b)(6)

42.   Closely modeled on chapter 9's confirmation requirement, section 314(b)(6) of PROMESA permits confirmation of a plan of adjustment only if the plan "is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy law and constitution of the priority would result in a greater recovery for the creditors than is provided by such plan."  Because it requires a reasonable effort by the municipal debtor to provide a better outcome to all creditors (as a whole) than dismissal of the

---

[28]   Section 1124 of the Bankruptcy Code provides that a class of claims is impaired unless "the plan leaves unaltered the legal, equitable, and contractual rights to which such claim [] entitles the holder of such claim." Because the Commonwealth's Payment Priority is entirely derivative of the underlying claim against the Commonwealth, non-compliance with the Commonwealth's Payment Priority impairs the GO Bondholders' claims and therefore must be permitted by section 1123(b).

[29]   Courts have uniformly held that original issue discount ("OID") that is unamortized as of the petition date is also disallowed by section 502(b)(2).  *See, e.g.*, *In re Chateaugay Corp.*, 961 F.2d 378, 381 (2d Cir. 1992) (noting that "[t]he courts that have considered the issue under section 502(b)(2) have held that unamortized OID is unmatured interest and therefore unallowable as part of a bankruptcy claim" and concluding that "unamortized OID is 'unmatured interest' within the meaning of section 502(b)(2)"); *In re Allegheny Int'l, Inc.*, 100 B.R. 247, 250 (Bankr. W.D. Pa. 1989) ("[O]riginal issue discount is unmatured interest, as that term is used in section 502(b)(2)."); 2008 Ann. Surv. of Bankr. Law 6 ("[B]ankruptcy courts unanimously have held that nonamortized OID is not allowable as a claim in bankruptcy.").  As of the Petition Date, there was **over $250 million of unamortized OID on the various GO Bonds**, all of which would be disallowed as against the Commonwealth under section 502(b)(2).

[30]   P.R. Const. art. VI, § 2.

case, the best interests of creditors test "depend[s] upon the prioritizing of creditors" under the

Bankruptcy Code's priority scheme. *County of Orange*, 191 B.R. at 1020. Otherwise, "[i]f

states could rewrite priorities in chapter 9, this test would become extremely difficult to satisfy."

*Id.*

43.     Furthermore, courts have uniformly interpreted the "best interests of creditors"

test as asking whether a chapter 9 plan is in the best interests of creditors as a whole rather than

any individual creditors of the municipality. *See, e.g.*, *In re City of Stockton, California*, 542

B.R. 261, 286 (B.A.P. 9th Cir. 2015) (holding that "the 'best interests' test in chapter 9 considers

the collective interests of all concerned creditors in a municipal plan of adjustment rather than

focusing on the claims of individual creditors"); *In re City of Detroit*, 524 B.R. 147, 216-17

(Bankr. E.D. Mich. 2014) (holding that the question under Bankruptcy Code section 943(b)(7) is

"whether the plan is in the best interests of creditors as a whole"); *In re Hardeman Cty. Hosp.*

*Dist.*, 540 B.R. 229, 241 (Bankr. N.D. Tex. 2015) (finding that the proposed plan was in "the

best interests of Creditors because it provide[d] Creditors, **as a whole**, with a better alternative

than dismissal of the Chapter 9 Case") (emphasis added). Putting the interests of one creditor

group ahead of all others' interests in violation of the Bankruptcy Code's priority scheme would

be contrary to the requirement that the Court consider whether all creditors, considered as a

whole, would fare better under a proposed plan than outside of bankruptcy.

> v.     *Bankruptcy Code Section 545(1) and General Prohibition of Ipso Facto*
> *Clauses*

44.     An "*ipso facto* clause" is a contractual provision that is triggered by a party's

bankruptcy, insolvency, or financial condition. Although enforcement of *ipso facto* clauses is

expressly prohibited by sections 541(c) and 365(e) of the Bankruptcy Code, "the general trend of

the federal courts [is] that the prohibition against *ipso facto* clauses is not limited to actions based

upon [these sections]." *In re W.R. Grace & Co.*, 475 B.R. 34, 153-54 (D. Del. 2012) (holding

that an *ipso facto* clause that "involve[d] neither a forfeiture of the property of the estate nor an

executory contract" was unenforceable); s*ee also In re Residential Capital, LLC*, 508 B.R. 851,

862 (Bankr. S.D.N.Y. 2014) (noting that *ipso facto* clauses "are generally disfavored although

not *per se* invalid in this circuit" and finding that it would be inequitable to enforce the

bankruptcy default at issue).  Even courts that have declined to recognize a general prohibition of

*ipso facto* clauses have recognized that such clauses should not be allowed "where the clause

may impede a debtor's ability to enjoy a 'fresh start.'" *In re Gen. Growth Properties, Inc.*, 451

B.R. 323, 330 (Bankr. S.D.N.Y. 2011) (debtor's fresh start was not endangered by *ipso facto*

clause where debtor "and its affiliated debtors are solvent, [the debtor] has confirmed a Plan, and

it emerged from bankruptcy months ago").

45.    The Commonwealth's Payment Priority is effectively an *ipso facto* clause in that

it takes effect only if the Commonwealth's available resources are "insufficient to meet the

appropriations made for [a given] year."[31]  Thus, its enforcement in Title III would be

inconsistent with the Bankruptcy Code's general prohibition of *ipso facto* provisions.  *See*

*generally In re Price Oil, Inc.*, No. 05-34286, 2006 WL 3313781, at *3 (Bankr. M.D. Ala. Nov.

14, 2006) ("[I]t is axiomatic that the bankruptcy laws disfavor ipso facto clauses which purport

to entitle a creditor to call due an indebtedness solely on account of a bankruptcy filing.").  And

given that the Commonwealth's Payment Priority is at odds with the entire purpose of

restructuring the Commonwealth's debt, it is unquestionably an *ipso facto* provision that would,

if enforced, impede the Commonwealth's fresh start.  Indeed, given the magnitude of the

---

[31]    P.R. Const. art. VI, § 8.

Commonwealth's GO Bond debt, the need to restructure the GO Bondholders' claims cannot be overstated.

46.     Enforcing the Asserted Title III Priority would also run counter to the Bankruptcy Code's treatment of *ipso facto* statutory liens.  Section 545(1)(E) of the Bankruptcy Code (which is incorporated into PROMESA) avoids a "statutory lien on property of the debtor to the extent that such lien . . . first becomes effective against the debtor . . . when the debtor's financial condition fails to meet a specified standard."[32]  This section "was intended to prevent state laws which prioritized liens on the happening of insolvency from undercutting federal bankruptcy laws."  *In re Davis*, 22 B.R. 523, 525 (Bankr. W.D. Pa. 1981) ("These spurious liens [are] in reality disguised priorities and the effect of their recognition in bankruptcy would be to distort the federally ordered scheme of distribution.") (quoting H. Rep. No. 686, 89th Cong., 1st Sess. (1965)).  As the court explained in *In re Kittrell*, 115 B.R. 873, 882-83 (Bankr. M.D.N.C. 1990), "[s]tate created statutory liens are generally intended to give various classes of what would otherwise be unsecured creditors some sort of priority status," and thus the Bankruptcy Code avoids such liens, "including those that first become effective against the debtor when the debtor's financial condition fails to meet a specific standard."

47.     In other words, section 545(1) avoids *ipso facto* statutory liens precisely because such liens are, in substance, disguised non-bankruptcy statutory payment priorities.  If the Bankruptcy Code nullifies *ipso facto* statutory liens, then, *a fortiori,* it must also nullify *ipso facto* statutory or constitutional priorities themselves.

---

[32]   While not directly applicable to the Asserted Title III Priority, section 545 of the Bankruptcy Code applies to any lien allegedly securing the GO Bonds.  The Oversight Board and the Committee, as co-plaintiffs, have filed an adversary complaint seeking to avoid any such lien pursuant to section 545.  *See* Adv. Proc. No. 19-291 (LTS).

c.      Any Doubt Concerning Appropriate Characterization of Commonwealth Payment
        Priority Must Be Resolved Against Asserted Title III Priority

48.     A fundamental principle of the Bankruptcy Code is the "equal distribution
objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing
preferences must be tightly construed." *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S.
651, 667 (2006).[33]  While obviously true, the fact that the Asserted Title III Priority is
inconsistent with this principle against expanding the bankruptcy priorities is more than just
another way the Asserted Title III Priority is antithetical to the overall purpose and structure of
the Bankruptcy Code and PROMESA.  Indeed, as applied by the Supreme Court this principle
against expanding bankruptcy priorities represents the final nail in the coffin of the Asserted
Title III Priority.

49.     In *Howard Delivery Service*, the Supreme Court addressed whether premiums
owed by an employer to a workers' compensation carrier fit within the priority (accorded under
section 507(a)(5) of the Bankruptcy Code) for unpaid contributions to an employee benefit plan.
*Id.* at 655-56.  Introducing its answer, the Court explained that "[i]n holding that claims for
workers' compensation insurance premiums do not qualify for [the claimed] priority, we are
mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among
creditors. . . . We take into account, as well, the complementary principle that preferential
treatment of a class of creditors is in order **only when clearly authorized by Congress**."  *Id.*
(emphasis added).  This is because "[e]very claim granted priority status reduces the funds
available to general unsecured creditors."  *Id.* at 667.

---

[33]   *See generally Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central
       policy of the Bankruptcy Code.  According to that policy, creditors of equal priority should receive pro rata
       shares of the debtor's property.").

50.     Applying this principle to the question before it, the Court concluded that "[i]n sum, "we find it far from clear that" the asserted priority fits the priority enumerated in the statute.  *Id.* at 668.  "**Any doubt concerning the appropriate characterization, we conclude, is best resolved in accord with the Bankruptcy Code's equal distribution aim.  We therefore reject the expanded interpretation Zurich invites**."  *Id.* (emphasis added).

51.     For the numerous reasons enumerated herein, it should be beyond peradventure that the Asserted Title III Priority is an invented priority that is not supported by the case law and is inconsistent with fundamental principles of bankruptcy law.  However, under the clear rule of *Howard Delivery Service*, even if there was any doubt as to the invalidity of the Asserted Title III Priority, that doubt itself would require a rejection of the Asserted Title III Priority.

## V.     Proper Role and Interpretation of Section 201

52.     As demonstrated above, basic principles of bankruptcy law, the structure and language of PROMESA, and the First Circuit's express ruling, all make clear that section 201 of Title II of PROMSEA does not impose limitations on the operation of a bankruptcy case under Title III of PROMESA.  However, even if it did, the GO Bondholders would still find no support in section 201 for the Asserted Title III Priority.

b.     Plain Language of Commonwealth Payment Priority Contradicts Asserted Title III Priority

53.     The Asserted Title III Priority rests entirely on the twin premises that section 201 of Title II of PROMESA (i) makes the Commonwealth's Payment Priority applicable not just to the Fiscal Plan process, but also to the Commonwealth's bankruptcy case under Title III of PROMESA and (ii) requires compliance with the Commonwealth's Payment Priority as it existed pre-bankruptcy.  Even if the first of these premises were true (it is not), the plain

language of the Commonwealth's Payment Priority reveals that the second premise actually

dooms the Asserted Title III Priority.[34]

54.     On its face, the Commonwealth's Payment Priority is purely temporary, as it

applies only when the government of Puerto Rico's resources "for any fiscal year are insufficient

to meet the appropriations for that year."  In other words, the Commonwealth's Payment Priority

only permits the government to delay payment to other creditors—it does not discharge the

government of the obligation to pay those creditors.  Accordingly, even if the Commonwealth's

Payment Priority was incorporated into Title III of PROMESA (it was not), it cannot be used to

justify a plan of adjustment that permanently elevates GO Bond claims and discharges the

government of the obligation to ever pay creditors that hold valid, undisputed claims simply

because, under (preempted) state law, these creditors would, under certain circumstances, have to

wait one year to get paid.  By advocating for such a result, the GO Bondholders attempt to utilize

the Commonwealth's Payment Priority to create a result that would never be lawful under its

own terms and even if the priority had remained "lawful" once the Commonwealth commenced

its Title III bankruptcy case.

    c.     <u>Legislative History Contradicts Asserted Title III Priority</u>

55.     Even if the Commonwealth's Payment Priority remained a "lawful" priority in the

context of the Commonwealth's Title III bankruptcy case (it does not) and even if the "lawful"

application of the Commonwealth's Payment Priority could somehow be convoluted to justify

the permanent discharge (as opposed to temporary delay) of the Commonwealth's obligation to

pay non-GO Bond claims, the GO Bondholders would still not prevail on their Asserted Title III

Priority.

---

[34]   As discussed below, the second premise is further flawed in that it equates "respect" with "comply."

56.    As discussed above, one of the twin premises of the Asserted Title III Priority is that section 201 requires compliance with the Commonwealth's Payment Priority.  This is wrong, as in the context of section 201(b)(1)(N) of PROMESA, "respect" does not mean "comply with."  Indeed, Congress **twice** rejected proposals to replace "respect" with "comply" because "the verb 'comply with' was unduly restrictive and . . . the Oversight Board needed the flexibility afforded by the verb 'respect,' which is more open-ended."[35]  Thus, Congress did not intend that fiscal plans (let alone plans of adjustment) "ensure the protection of lawful priorities and liens," as the Asserted Title III Priority would rigidly dictate.[36]

57.    The question then arises:  What does it mean to "respect lawful priorities" in a PROMESA Title III case?  Given that Congress meant something more "flexible" and "open-ended" than "comply," the most fitting definition of "respect" in this context is "show consideration for, show regard for, take into consideration, take into account, make allowances for, take cognizance of, observe, pay attention to, pay heed to, bear in mind, be mindful of, be heedful of, remember."[37]

58.    With regard to this meaning of "respect," courts have recognized that to "consider" or "take into account" is not the same as to "comply with" in all respects.  *See, e.g.*, *Schreiber v. Pacific Coast Fire Ins. Co.*, 195 Md. 639, 75 A.2d 108, 20 A.L.R.2d 951 ("In construing tax statutes we have held that factors required to be considered in making a valuation may be sufficiently 'considered' though they do not enter into the result in a particular case.");  *see also* Ballantine's Law Dictionary (defining "considered" as "thought about, brought into a

---

[35]    162 CONG. REC. H3601 (daily ed. June 9, 2016) (statement of Rep. Grijalva, ranking Member, Nat'l Res. Comm., reflecting Committee Markup Actions from the May 24 and May 25 Nat'l Res. Comm. session).

[36]    *Id*.

[37]    *See* www.lexico.com, online Oxford Dictionary (defining and providing synonyms for "respect" as a transitive verb).

process of reasoning, but not necessarily determining a decision" and noting that, "[i]n some

connections, the word has been construed as meaning 'reasonably regarded.'").

59.     Thus, while the Oversight Board must consider and be mindful of lawful Puerto

Rico payment priorities when certifying a fiscal plan, those priorities are not incorporated into

PROMESA as the priorities with which any fiscal plan (let alone any plan of adjustment) must

comply.  Ultimately, the treatment of creditors under a plan of adjustment is a matter of the

Bankruptcy Code priorities expressly incorporated into PROMESA and the confirmation

requirements of section 314(b)(7).

## **NOTICE**

60.     Notice of this GO Claim Priority Objection has been provided to the following

entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States

Attorney for the District of Puerto Rico; (iii) the Puerto Rico Fiscal Agency and Financial

Advisory Authority; (iv) the Official Committee of Retirees; (v) the insurers of the bonds issued

or guaranteed by the Debtors; (vi) counsel to certain ad hoc groups of holders of bonds issued or

guaranteed by the Debtors; (vii) holders of GO Bonds who are parties to any group that has filed

a statement under Bankruptcy Rule 2019; (viii) the holders and insurers of GO Bonds identified

on Appendix I hereto;[38] (ix) Cede & Co., as depository for Commonwealth bonds; and (x) all

parties that have filed a notice of appearance in the above-captioned Title III cases.

[*Remainder of page intentionally left blank.*]

---

[38]     According to the claims registry maintained by Prime Clerk, more than 4,000 proofs of claim have been filed
asserting bond-based claims against the Commonwealth.  Many of these claims are based on bonds other than
GO Bonds.  However, given the sheer volume of claims, it would be cost-prohibitive to review and analyze
more than 4,000 proofs of claim to determine which ones, in fact, assert claims based on holdings of GO Bonds.
The Committee, therefore, limited its review to proofs of claim alleging more than $50 million of bond debt
related to GO Bonds.

WHEREFORE, the Committee respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Dated: February 3, 2020

/s/ Luc A. Despins

**PAUL HASTINGS LLP**
Luc A. Despins, Esq. (*Pro Hac Vice*)
James R. Bliss, Esq. (*Pro Hac Vice*)
James B. Worthington, Esq. (*Pro Hac Vice*)
G. Alexander Bongartz, Esq. (*Pro Hac Vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212)318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to Official Committee of Unsecured Creditors for all Title III Debtors*

– and –

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to Official Committee of Unsecured Creditors for all Title III Debtors*

## **APPENDIX I**

**Bondholders and Insurers That Have Filed Proofs of Claim That Include GO Bond Claims
of Over $50 Million Against Commonwealth[1]**

| Name of Claimant | Claim Number | Date Filed |
|---|---|---|
| Adirondack Holdings I LLC | 61361 | 6/28/2018 |
| Adirondack Holdings II LLC | 36253 | 6/28/2018 |
| Assured Guaranty Corp. | 33081 | 5/25/2018 |
| Assured Guaranty Municipal Corp. | 27427 | 5/25/2018 |
| Aurelius Capital Master, Ltd. | 66514 | 6/27/2018 |
| Aurelius Investment, LLC | 66624 | 6/27/2018 |
| Aurelius Opportunities Fund, LLC | 66867 | 6/27/2018 |
| Autonomy Master Fund Limited | 66993 | 6/27/2018 |
| Brigade Capital Management, LP | 21179 | 5/25/2018 |
| Candlewood Constellation SPC Ltd., acting for and on behalf of Candlewood Puerto Rico SP | 118852 | 6/28/2018 |
| Cooperativa de Ahorro y Crédito de Aguada | 32818 | 5/24/2018 |
| Financial Guaranty Insurance Company | 120416 | 6/28/2018 |
| Fir Tree Capital Opportunity Master Fund III, LP | 114925 | 6/28/2018 |
| Fir Tree Capital Opportunity Master Fund, LP | 115227 | 6/28/2018 |
| Fir Tree Value Master Fund, LP | 112062 | 6/28/2018 |
| LMAP 903 Limited | 66593 | 6/27/2018 |
| Mason Capital Master Fund, L.P. | 110600 | 6/27/2018 |
| MCP Holdings Master LP | 66618 | 6/27/2018 |
| Monarch Capital Master Partners III LP | 66444 | 6/27/2018 |
| Monarch Debt Recovery Master Fund Ltd | 66406 | 6/27/2018 |
| Monarch Special Opportunities Master Fund Ltd. | 66394 | 6/27/2018 |
| National Public Finance Guarantee Corporation | 43037 | 5/25/2018 |
| National Public Finance Guarantee Corporation | 24545 | 5/25/2018 |
| OppenheimerFunds, Inc. and OFI Global Institutional, Inc., on behalf of funds and/or accounts managed or advised by them | 168430 | 4/2/2019 |
| Prisma SPC Holdings Ltd. Segregated Portfolio AG | 66436 | 6/27/2018 |
| The Canyon Value Realization Master Fund, L.P. | 159397 | 6/29/2018 |
| Whitebox Asymmetric Partners, LP as Transferee of Syncora Guarantee Inc. | 50742 | 6/20/2018 |

---

[1]   This chart identifies certain holders of GO Bond claims based on a summary review of proofs of claim filed against the Commonwealth categorized by Prime Clerk (the Debtors' claims agent) as "Bond" or "Insurers of Long Term Debt" claims.  The Committee objects, at a minimum, to these claims.  The GO Priority Objection will be served on the above entities at the service addresses provided on their respective proofs of claim, as well as on their counsel, if known.

**Master Proofs of Claim Filed Against Commonwealth on Account of GO Bonds**

| Name of Claimant | Claim Number | Date Filed |
|---|---|---|
| Banco Popular de Puerto Rico, as Trustee for PRASA Revenue Refunding Bonds, 2008 Series A and B | 22620 | 5/29/2018 |
| The Bank Of New York Mellon, as Trustee for PRIFA Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 2015 | 19814 | 5/24/2018 |
| U.S. Bank Trust National Association and U.S. Bank National Association, as Fiscal Agent for PBA Bonds | 62833 | 6/27/2018 |