# **EXHIBIT B**

1         The Retirees' Committee and others make a big deal of
2    the fresh start principle, and Mr. Kirpalani has already
3    addressed that issue. I want to amplify it with the closing
4    remark of Mr. Yanez. He said any transfer might be undone.
5    You're putting the legislature in a position where any transfer
6    might be undone.
7         Your Honor, I've looked through PROMESA fairly
8    carefully, and I can't find the words "fresh start," but I can
9    find the words "access to capital markets" in five places. I
10   can find them in Section 101(a), where it is the first purpose
11   of the Oversight Board, and I can find them in Section 201(a)
12   where it is the first purpose of a fiscal plan, and I can find
13   them in Section 209. It is the last duty of the Oversight
14   Board, to obtain access to the capital markets.
15        Your Honor, when you fly to Puerto Rico, you land at
16   Luis Munoz Marin International Airport. That was sold. That
17   was a transfer. Revenues from that airport, those were
18   available revenues. I realize that's a thing, and you have
19   already asked what the difference is between a thing and an
20   inchoate stream of taxes. Given practice in other states, I
21   don't think there is a difference, and I don't see why there is
22   any federal common law principle that prevents a state
23   legislature or a Commonwealth's legislature from enacting a law
24   to transfer the property. But if you strike down COFINA on the
25   ground that it couldn't happen, you're putting Puerto Rico in a

1  situation where it will not regain access to the capital

2  markets for probably the professional lifetimes of the people

3  in this court, because nobody's going to lend Puerto Rico money

4  unless it's backed by a stream of revenues that are committed

5  to the repayment of the debt.

6         With that, I reserve the balance of my time.

7         THE COURT:  You're reserving it for rebuttal?

8         MR. MAYER:  Yes, I reserve for rebuttal, and I may

9  very well yield it back to other members of the COFINA side.

10        Thank you, your Honor.

11        THE COURT:  You have two minutes and 45 seconds out

12 there, in the bank.

13        MR. MAYER:  Thank you.

14        THE COURT:  OK.

15        We now turn to the Commonwealth's interest,

16 Mr. Stancil, for 33 minutes.

17        MR. STANCIL:  Yes.

18        Good morning, your Honor, and may it please the Court,

19 my name is Mark Stancil from the firm of Robbins Russell, and I

20 represent the Ad Hoc Group of General Obligation Bondholders.

21 My counsel today are Mr. Luc Despins and James Bliss, from Paul

22 Hastings, and Mr. Rich Levin, from Jenner & Block.

23        With the Court's indulgence, we've divided up the

24 substantive issues to avoid duplication.  I'm going to be

25 addressing what we call the core constitutional issue, which

1  is, assuming for the moment that COFINA's creators intended to
2  transfer the pledged sales taxes, did they have the
3  constitutional authority to do so?
4            Mr. Despins will then address the nonconstitutional
5  issue regarding whether Act 91, in fact, transferred ownership
6  of those revenues to COFINA.
7            Time permitting, Mr. Bliss will address the balanced
8  budget clause issue.
9            (Continued on next page)

1  MR. STANCIL: Mr. Levin will address the fresh start

2  argument and I believe also the civil code issues that he has

3  raised.

4  So, your Honor, if I may, let me begin by restating

5  the constitutional question. I think it's fairly clear from

6  the discussion thus far. Assuming for the moment that the

7  legislature tried to do what the COFINA parties suggest, which

8  is to irrevocably transfer the pledged sales taxes to COFINA,

9  did they have the authority under Puerto Rico's Constitution to

10  do that? The answer is no.

11  Article 6, section 8 gives the constitutional debt,

12  what we often call the GOs, gives them an absolute first claim

13  on all of the Commonwealth's available resources. As the

14  COFINA parties would have it, available resources means

15  whatever resources the legislature deems fit to make available.

16  And that's wrong for three main reasons that I'd like to get to

17  today.

18  First, the COFINA position defies the plain text of

19  the available resources provision and the context in which it

20  appears. I will walk through word by word of the text --

21  THE COURT: I will look forward to that.

22  MR. STANCIL: Thank you, your Honor.

23  Second, their position ignores the founder's stated

24  intent to place the constitutional debt in "absolute first

25  term" over "all of the resources of the government."

54

1           You didn't hear a thing about the drafting history in
2   my colleague's presentation earlier today, but, again, I will
3   walk through that in detail as well.
4           Third, and certainly not least, their position would
5   eviscerate the interlocking protections in article 6. It
6   attributes a fundamental level of incompetence to the drafters
7   of Puerto Rico's Constitution to suggest that this web of
8   protections for the people of Puerto Rico and constitutional
9   debt holders are evaded with a simple step to the left by
10  saying, whoops, we have transferred these future revenues, and
11  I am going to get into why that would render this entire system
12  effectively meaningless.
13          But, in short, article 6 was supposed to be an
14  absolute commitment to constitutional debt holders. They want
15  to turn it into an option to withhold resources from
16  constitutional debt holders, and it has these careful
17  limitations on the amount of revenue that can be absolutely
18  committed for debt service. They turn that into an unlimited
19  license to commit an unlimited amount of resources irrevocably
20  for an unlimited amount of debt. In short, it turns article 6
21  on its head.
22          I think it's helpful to maybe start by reading the
23  text of article 6, section 8. That's the centerpiece of the
24  entire constitutional scheme. It says: In case the available
25  resources, including surplus, for any fiscal year are

1  insufficient to meet the appropriations paid for that year,

2  interest on the public debt and amortization thereof shall

3  first be paid and other disbursements shall thereafter be made

4  in accordance with the order of priorities established by law.

5              Available resources has meaning under the

6  Constitution.  It can't be just assumed away that available

7  means whatever the legislature says.  And ultimately both the

8  COFINA agent and the Senior Bondholder Coalition, I believe,

9  everybody would reluctantly concede that the legislature

10 doesn't get you to define the constitutional term available

11 resources.  This Court is charged with giving content to that

12 term, as it would any other provision like, what does due

13 process mean?  What does a taking amount to?

14              THE COURT:  Isn't it a fundamental political function

15 of elected leaders to determine what resources are prioritized

16 resources, determine the appropriate application of resources?

17 Unless you are going to say that this first priority means that

18 any time there is a shortfall everybody on the island

19 necessarily starves, everything has to get shut down, and any

20 money that was ever spent before somehow has to be clawed back

21 and that's what a court can understand.  How is the Court in a

22 position to determine whether babies should eat or traffic

23 lights should be on or houses should get to stand up before

24 bondholders get paid?  Those are important political

25 distinctions.

1     MR. STANCIL:  Your Honor, there are probably three

2  different answers to that.

3     Let me start by first saying under the Constitution,

4  if the Constitution is respected, it will never come to that

5  precisely because of the debt limit, and we will get to that in

6  a minute.

7     Your Honor is exactly right.  It would be crazy, would

8  it not, to think that you could give bondholders an unlimited

9  check to come ahead of all other services of the government.

10 But it doesn't follow from that that the bondholders identified

11 in the Constitution do not come ahead of other expenditures.

12    And don't take my word for it.  Take the word of the

13 Puerto Rico legislature for 40, 50 years, until two summers ago

14 when we started throwing out statutes.  This is a statute.  I

15 apologize it is not in our briefs.  It's in our complaint.  I

16 think this answers your Honor's question correctly.  23

17 L.P.R.A. 104(c) is the statutory order of priorities that is

18 directly referenced in the Constitution.  So that addresses

19 your Honor's question, did they really mean to pay

20 constitutional debt before public health, safety, and welfare?

21 Yes, your Honor, they did.

22    If I may, I would read to you a few provisions from

23 104(c).  It begins:  In keeping with section 8, article 6 of

24 the Constitution in Puerto Rico, the governor shall proceed

25 according to the following priority rules in disbursement of

1   public funds when resources available for a fiscal year are

2   insufficient to cover the appropriations made for that year.

3   1.  Payment of interest and amortization related to public

4   debt.  2 -- it's a little wordy.  I'll paraphrase.  2.

5   Commitments under legal contracts enforced.  Court judgments,

6   binding obligations to safeguard credit.  3.  Order that

7   disbursements be made for expenses under the allocations for

8   recurrent expenditure related to (A) the preservation of public

9   health (B) protection of persons and property (C) the public

10  education programs (D) the public welfare programs (E) the

11  payment of employer contributions to retirement systems and

12  pension payments to individuals etc., etc.

13            THE COURT:  I as a court should respect that

14  legislatively determined list of priorities because you like

15  that and that's not really offensive and you could sleep at

16  night because babies are going to get fed.  But, otherwise, I

17  should ignore anything, any other judgment that the legislature

18  made, and come up with some holistic concept of availability

19  that was in the third branch?

20            MR. STANCIL:  No, your Honor.  That's not how it

21  works.  This is what we would say is absolute clear evidence of

22  what the intent of the founding document means.  I want to come

23  back to the premise of your question.

24            THE COURT:  This is a statute passed by the

25  legislature.

1          MR. STANCIL:  Yes.  I will just come back to the first

2    phrase of Section 23 L.P.R.A. 104(c) which says:  In keeping

3    with section 8, article 6, here is what we do.  They recognize

4    that that's what article 6 means.

5          Your Honor, let me take the premise, which is no one

6    is taking anything out of the mouths of babies because we have

7    a debt limit.  And the reason we are here, in large part or in

8    substantial part, is because COFINA was used as an end run

9    around the debt limit and that's why the Commonwealth is facing

10   choices that it should not have to face.  If it had been

11   respected, the Constitution had been respected and any

12   commitments made for debt, absolute commitments made for debt

13   were limited to 15 percent of their revenues, we would not be

14   here.

15         THE COURT:  But it doesn't say absolute commitments

16   made for debt.  It says absolute commitments made for direct

17   obligations of the Commonwealth backed by the full faith and

18   credit of the Commonwealth.

19         And we know from the cases that have been cited all

20   over the place that there are different kinds of state

21   constitutional provisions and there are constitutional

22   provisions that require referenda or put caps on any kind of

23   debt on the state at all.  Could have been written that way.

24   Wasn't written that way.

25         MR. STANCIL:  Your Honor, I respectfully disagree that

Case:17-03283-LTS Doc#:10638-2 Filed:02/03/20 Entered:02/03/20 22:23:34 Desc. Exhibit B Page 11 of 12

59

1  available resources is as flexible as COFINA would have it.

2  THE COURT: You said that we wouldn't be in this

3  problem but for violation of the debt limit, and so I think

4  you've necessarily put the import of the debt limit on the

5  table in that last sentence.

6  MR. STANCIL: I apologize. Absolutely. I think that

7  makes a mockery of the debt limit. Let's focus on what the

8  purpose of the debt limit was. So the debt limit implies by

9  its terms the full faith and credit debt because, as I've just

10 described in article 6, section 8, full faith and credit debt

11 gets this absolute first priority. So, of course, you would

12 want to limit the amount of such promise you can make.

13 The fiction of COFINA is that you can evade the

14 central policy objective of the debt limit by transferring

15 future revenues as opposed to merely promising future revenues.

16 It would make a mockery. I think it would sort of ascribe an

17 astonishing level of incompetence to the drafters of the

18 constitutional debt limit to say yes, you are going to hold

19 their feet to the fire and limit them to 15 percent if they are

20 going to make this super full faith and credit promise. We

21 will let you sell revenue before it even gets to the coffers.

22 THE COURT: I think I perceive the COFINA people, and

23 they can tell me if I'm wrong on rebuttal, as saying that it's

24 not the transfer that's the key magic with respect to the debt

25 limit; it's that the COFINA statute not only doesn't say full

1   faith and credit; it says you look to a particular body of

2   revenues, and there is no commitment to use the taxing powers

3   to get something more to replace those revenues that are taken

4   off the table. So the COFINA people seem to focus on it not

5   being full faith and credit and not being a direct obligation.

6         MR. STANCIL: With respect, your Honor, their position

7   is entirely question begging. They say the debt limit doesn't

8   apply because it's not full faith and credit debt, but that

9   skips over the question of whether the transferring in the

10  first instance is consistent with the idea of the debt limit.

11        If we can take a step back. If the Commonwealth

12  had -- grant my premise, which I understand your Honor is

13  testing, but grant my premise that GO debt does have what the

14  Constitution says, an absolute first claim on resources.

15        If we were facing only that, in any given year it

16  would no more than 15 percent of their revenues over the

17  average of the last two years when they issued the debt, but

18  roughly 15 percent of the budget go to debt service. We would

19  be facing --

20        THE COURT: For full faith and credit debt.

21        MR. STANCIL: Yes, your Honor. We would be facing a

22  fraction of the drain on the Commonwealth's resources had they

23  respected that and not done an end run around.

24        Your Honor, if I could explain the way that this makes

25  not just a mockery of section 2 of the debt limit but the rest