# **EXHIBIT C**

1  place since March.  He has not run a public utility before,

2  which is the one thing they point to in their papers as

3  evidence of mismanagement.  But I spend virtually every day

4  with Mr. Ramos.  He's a dedicated industry professional who is

5  working very hard to turn around PREPA.

6        And if given the opportunity to have an evidentiary

7  hearing, which we think is unnecessary, we certainly would be

8  happy to have the Court introduce Mr. Ramos.  We would be

9  happy to introduce him to the movants, because they certainly

10 haven't met him and wouldn't recognize him if they met with

11 him.

12       With regard to the balance of the argument, the one

13 other thing I think is important is that this utility is

14 critically important to the island.  And as the government of

15 Puerto Rico and the duly appointed representatives of the

16 people of Puerto Rico, protecting this utility and

17 transforming this utility is critical to not only the

18 restructuring, but to the daily lives of the people in Puerto

19 Rico.

20       For the bondholders to suggest that we should simply

21 pull the existing management out and put in some unknown

22 receiver so that they can get their rate increase and

23 destabilize an organization that has put in a project

24 management organization, is actively working with the

25 Oversight Board on a transformation plan, it is really at this

1  point -- if you spent any time in our organization, would be
2  hugely prejudicial to the progress that we made with PREPA and
3  our goal that we have of turning it into a world-class
4  utility.
5         Thank you, Your Honor.
6         THE COURT: Thank you.
7         MR. BIENENSTOCK: Your Honor, I did --
8         THE COURT: There's a gentleman behind you.
9         MR. BIENENSTOCK: I'm sorry.
10        MR. KLEINHAUS: Good afternoon, Your Honor. For the
11 record, Emil Kleinhaus from Wachtell Lipton Rosen & Katz. I
12 represent Scotia Bank of Puerto Rico. Scotia Bank is a
13 significant creditor of PREPA. It's administrative agent on a
14 fuel line of 550 million dollars.
15        PREPA borrowed that 550 million dollars to buy fuel
16 necessary to operate its system, and PREPA committed to treat
17 the Scotia fuel line as a current expense for purposes of the
18 Trust Agreement.
19        Your Honor, Scotia Bank agent filed a short statement
20 in response to the bondholders' motion. The statement had a
21 very simple and narrow point, which is that in light of the
22 prepetition negotiations at PREPA in which Scotia Bank was
23 very significantly involved, which yielded an RSA and an
24 amended RSA and a further amended RSA, we believe that there's
25 a realistic prospect at PREPA for a mediated solution of the

1  issues in this case in the near term.

2  And we heard Judge Houser say today that mediation
3  often works after parties have forcefully expressed their
4  positions. The bondholders have forcefully expressed their
5  position in terms of the need for a receiver and other
6  matters.

7  There are many things in the bondholders' motion that
8  our clients agree with. In particular, our clients share the
9  bondholders dismay at the Oversight Board's decision not to
10 certify the restructuring support agreement, which was the end
11 of a three-year process of negotiation.

12 But we don't agree with the punch line of the
13 bondholders' motion, which is that the stay should be lifted
14 today so that a new lawsuit can be filed to seek appointment
15 of a receiver. There are only two reasons for that. The
16 first is we really believe that the mediation process should
17 be given a chance to play out in the short term to see if a
18 new solution can be reached along the lines of the RSA. And
19 the second reason, Your Honor, is that while the receiver
20 motion or the motion to lift the stay narrowly raises the
21 question whether the stay should be lifted as the briefing has
22 developed, it has also touched on much broader questions.

23 And one of the broader questions that's developed in
24 the briefing is the scope of the bondholders' lien. Is it a
25 net revenue lien or a gross revenue lien? And if it's a net

1  revenue lien, net of what?

2  And we would submit, Your Honor, those issues that
3  are also raised in the adversary proceedings, raised a couple
4  days ago would require more factual development than legal
5  development. And in particular, there is a profound interest
6  of unsecured creditors, and Scotia Bank in particular and
7  other fuel line lenders are being heard on those issues and
8  having an opportunity to present their case.

9  So for those reasons, Your Honor, we would suggest
10  that the Court hold this motion in abeyance. Do not grant it
11  today. Provide an opportunity for the mediation to play out
12  and allow the bondholders to bring a motion again in the
13  future, should they choose to do so.

14  Thank you.

15  THE COURT: Thank you. And just for clarity, by hold
16  in abeyance, you're saying I should deny it without prejudice,
17  not that I should ignore the statutory period?

18  MR. KLEINHAUS: Well, the statutory period I think
19  provides Your Honor with flexibility. You could hold today a
20  preliminary hearing, for example, but I'll defer to Your Honor
21  as to whether hold it as a preliminary hearing or deny without
22  prejudice. Our focus is on making sure there is an
23  opportunity to mediate before the flood gates open for
24  mediation.

25  Thank you.

1		THE COURT: Thank you.
2		MR. BAKER: Good afternoon, Your Honor. Nicholas
3	Baker, Simpson, Thacher & Bartlett on behalf of Solus
4	Alternative Asset Management.
5		Your Honor, Solus is actually the largest unsecured
6	creditor in this case. They hold over 280 million dollars of
7	fuel line debt over two separate facilities. One, 140 million
8	under the Scotia facility, as well as a stand-alone facility
9	of 140 million dollars.
10		And Solus' position, therefore, is that this is a
11	decision that does not need to be made today. The
12	implications are far too wide, not only for the fuel line
13	lenders, for the unsecured creditors in general, the
14	implications in general for a receiver being appointed.
15		So we respectfully request, similarly, that this not
16	be decided today, even though you have two sides forcing the
17	issue. I also would like to reserve all rights, again, as
18	this motion has -- a response has been filed, the
19	intercreditor issues of current expense relative to the bond
20	rights to the revenue have become more and more relevant.
21		And so I would like to reserve all of Solus' rights
22	with respect to the current expense issues, and to private
23	issues generally under the Trust Agreement.
24		THE COURT: Thank you.
25		So Mr. Despins, you wanted to be heard?

1        MR. DESPINS: No, thank you. I'll wait until
2   Mr. Bienenstock --
3        THE COURT: Thank you.
4        Mr. Bienenstock.
5        MR. BIENENSTOCK: Thank you. I might spare
6   Mr. Despins the minute he asked for. I realize I hadn't
7   responded to Mr. Polkes on behalf of National. So he made two
8   points, that somehow PROMESA Section 314(b)(6) and Bankruptcy
9   Code Section 1129(a)(6) have some bearing here, and I just
10  want to just explain briefly why they don't.
11       1129(A)(6) simply requires, as a confirmation
12  requirement, that any rate increases in the plan be obtained,
13  the non-bankruptcy law approvals necessary, and they will.
14  It's certainly not in front of the Court today.
15       And 314(b)(6) is the Title III best interest test
16  which says the Court should continue what creditors would
17  receive, if they force their claims under non-bankruptcy law.
18  So two points about that.
19       Point number one is nowhere in PROMESA does it import
20  state law priorities. It just uses some, but not all of the
21  Bankruptcy Code priorities. But most important and applicable
22  to Mr. Polkes' comment is what they -- what 314(b)(6) is
23  asking this Court to do is to say, well, if the creditors were
24  all free to enforce their claims under non-bankruptcy law
25  today, what would they end up with?

1	So just imagine, all those bondholders, plus the
2	unsecureds, charge into the courthouse, I want mine.  What
3	will they get and what will happen to PREPA?  We'll be able to
4	pass that test, Your, Honor.  And it's certainly not
5	applicable today.
6	         And there's still a minute for Mr. Despins.
7	         THE COURT:  Thank you.
8	         MR. DESPINS:  Your Honor, we rest on our papers
9	filed.
10	         THE COURT:  Thank you.
11	         MR. HOROWITZ:  Five minutes?
12	         THE COURT:  Yes.
13	         MR. HOROWITZ:  Thank you, Your Honor.  Again, Gregory
14	Horowitz on behalf of the movants.
15	         Your Honor, I think it's really quite remarkable.  I
16	got up at the podium and I think I directly -- I tried to be
17	pretty direct --
18	         THE COURT:  Could you speak a bit louder?  Thank
19	you.
20	         MR. HOROWITZ:  Sure.  I directly challenged
21	Mr. Bienenstock to address what the Oversight Board failed to
22	address in their papers, the fact that Puerto Rico, by
23	statute, requires rates to be set at a level appropriate --
24	well, identical to the rate covenant, at a level appropriate
25	to pay all expenses and service all debt.  Not one word about

1  the statutes.

2  Your Honor, there's a pledge of rates, what do rates
3  mean. I pointed out on my opening argument and
4  Mr. Bienenstock did not contest that on their theory, it's
5  meaningless. It's a pledge of rates at whatever level the
6  debtor chooses to set. That's not true. It's a part of the
7  rate covenant -- I'm sorry. The revenue pledge is a pledge of
8  a bundle of property rights, and one of those rights is the
9  right provided under Puerto Rico law to have the rates set at
10 an appropriate level. It's also defined in the agreement, and
11 that's the meaning of pledging the rate covenant, it's making
12 it clear what the rates are that are provided.

13 Mr. Bienenstock says that we did not offer any
14 evaluation of our collateral. It's not our burden to
15 establish that we're adequately protected. It's their burden.

16 That said, Your Honor, I'll take that. The value of
17 our collateral is 8.3 billion dollars. It has to be. By
18 definition, we have to be exactly fully secured, because our
19 collateral is the pledge of revenues adequate to service our
20 debt.

21 Our debt is 8.3 billion. Therefore, the value of our
22 collateral has to be 8.3 billion. So as long as it's possible
23 to set rates at a level appropriate to satisfy all debt, and I
24 repeat, Mr. Wolfe did not challenge that. Nowhere in his
25 opinion does he suggest that it is not possible to charge

1 rates that are going to be adequate to service all of the
2 debt.
3     That said, if the debtors and the Oversight Board
4 continue on their announced plan to refuse to seek a rate
5 increase, then it's entirely possible that the value of our
6 collateral will diminish. That's the threat that justifies
7 the lifting of the stay.
8     Your Honor, counsel for PREPA suggested that I have
9 been misleading or confused about the ability to get a rate
10 increase or increase rates. I think I have been very clear.
11 Neither the receiver nor PREPA has the power to set rates.
12 They only have the power to put in a rate to PREC. PREC has
13 to set rates.
14     I think I also was clear, in the January 2017 order
15 which sets rate for fiscal year 2017, expiring June 30th,
16 2017, the order requires PREPA to come up -- to come back to
17 them in October with a rate update. And orders PREPA to
18 submit a proposed rate that will be adequate to service all
19 debt.
20     I want to just read one paragraph from the order,
21 paragraph 450, quote, to prevent any misunderstanding, the
22 commission is committed to creating a rate setting process
23 that provides PREPA the revenues it needs to operate
24 efficiently and pay bondholders timely.
25     So the commission has made it clear that if PREPA

1  complies with the order and comes back before them with an
2  appropriate rate case, they will set the rates we're entitled
3  to.
4       Unfortunately, everything that has happened in the
5  context of this motion gives us ample cause to believe that
6  the Oversight Board and PREPA have no intention of complying
7  with that requirement.
8       Your Honor, the last thing I want to do is to come
9  back to your question to me on what Mr. Bienenstock opened up
10 with.  We do not believe that the grant of exclusive
11 jurisdiction over the property to this Court under 306 in any
12 way interferes with the right of the bondholders to pursue
13 their state law remedy of getting a receiver who would manage
14 the property, but not dispose of it.
15      That receiver would be subject to all of the same
16 oversight exclusive jurisdiction powers of this Court that
17 PREPA currently is.  It could not -- you cannot read 306 to
18 prohibit the bondholders or PREC, for example, from setting
19 rates, because 303 is quite explicit. Nothing in Title III in
20 any way impairs or undermines the power of the Commonwealth to
21 regulate its instrumentalities through legislation and
22 otherwise.
23      So that exclusive jurisdiction provision cannot be
24 inconsistent with the power of the Commonwealth to continue --
25 with our right, I should say, to continue to enforce our

Case:17-03283-LTS Doc#:10638-3 Filed:02/03/20 Entered:02/03/20 22:23:34 Desc:
Exhibit C Page 12 of 12

170

1 | statutory rights to a receiver.

2 | THE COURT: Well, I don't think it was said that 306
3 | prevents PREC from doing its governmental thing, and maybe
4 | there might be a different situation if PREC, in invoking its
5 | police powers or whatever, sought an order of mandamus against
6 | the debtor to raise rates.

7 | But you all are bondholders, private creditors
8 | seeking to commandeer control over aspects of the governmental
9 | function of seeking rate changes from the government, the
10 | other governmental entity, PREC. And I think that the
11 | construct is receiver of the revenues and the property putting
12 | a third party, a non-debtor, a non-governmental party as -- in
13 | the position controlling the management and husbanding of the
14 | revenues.

15 | So I think there is a difference. You had sort of
16 | said, well, it doesn't impede PREC, it doesn't impede us.
17 | There's a difference between you and PREC.

18 | MR. HOROWITZ: Okay. Your Honor, I think I should
19 | have made a distinction. I think that we are concerned that
20 | they will challenge PREC's continuing jurisdiction, and I had
21 | to make that clear.

22 | My other point, though, is that the appointment of a
23 | receiver would simply put the receiver in the shoes of the
24 | debtor, subject to the same oversight of the Court, and with
25 | no power to dispose of the property, to pay -- for example, to