**Objection Deadline:** March 18, 2020 at 5:00 p.m. (Atlantic Standard Time)
**Hearing Date:**  April 30, 2020 at 10:00 a.m. (Atlantic Standard Time)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### NOTICE OF MOTION TO DISMISS OMNIBUS CLAIM OBJECTIONS TO CLAIMS FILED OR ASSERTED BY HOLDERS OF CERTAIN COMMONWEALTH GENERAL OBLIGATION BONDS AND <u>PUBLIC BUILDINGS AUTHORITY BONDS</u>

PLEASE TAKE NOTICE that, upon the accompanying *Motion of The Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Building Authority Bonds* (the "<u>Motion</u>"), the Ad Hoc Group of General

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

Obligation Bondholders (the "GO Group"); the Ad Hoc Group of Constitutional Debtholders (the "Constitutional Debtholders"); Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together "Assured"); and the funds managed by Invesco Advisers, Inc. and funds and/or accounts managed or advised by OFI Global Institutional Inc. (the "Invesco Funds") (collectively, "Movants")[2] will move this Court before the Honorable Laura Taylor Swain, United States District Court Judge, in Courtroom 17C of the United States District Court for the Southern District of New York, Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, NY 10007, on April 30, 2020 at 10:00 a.m. (Atlantic Standard Time), for an order dismissing: (i) the *Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* (Dkt. No. 4784, the "2012-2014 GO Claim Objection") filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board") and the Official Committee of Unsecured Creditors (the "UCC," and together with the Oversight Board, the "Objectors"); (ii) the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds* (Dkt. No. 7057, the "2011 GO Claim Objection"); (iii) the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds* (Dkt. No. 8141, the "PBA Claim Objection"); and (iv) *the*

---

[2] Movants file this notice of motion exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

2

*Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth* (Dkt. No. 9730, the "Debt Coalition Claim Objection," and collectively with the 2012-2014 GO Claim Objection, the 2011 GO Claim Objection, and the PBA Claim Objection, the "Public Debt Claim Objections"), and for such other and further relief as this Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that, as set out in the Court's Interim Case Management Order (Dkt. 9619) ("Interim Case Management Order"), other interested parties and other holders of bonds subject to the Public Debt Claim Objections may file additional briefs in support of the Motion ("Additional Opening Briefs").  Such Additional Opening Briefs must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the District of Puerto Rico, and the requirements set out in the Interim Case Management Order, must be filed with the Court (a) by attorneys practicing in the Court, including attorneys admitted *pro hac vice*, electronically in accordance with Rule 5 of the Local Rules for the District of Puerto Rico, and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF), to the extent applicable, and shall be served in accordance with the Court's *Order (A) Imposing and Rendering Applicable Local Bankruptcy Rules to These Title III Cases, (B) Authorizing Establishment of Certain Notice, Case Management, and Administrative Procedures, and (C) Granting Related Relief*, as amended (Dkt. Nos. 249, 262, 1065, 1512), so as to be filed and received no later than **February 19, 2020 at 5:00 p.m. (Atlantic Standard Time)** (the "Additional Opening Brief Deadline").

PLEASE TAKE FURTHER NOTICE that any response or objection (any "Objection") to the Motion must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, the

Local Bankruptcy Rules for the District of Puerto Rico, and the requirements set out in the Interim Case Management Order, must be filed with the Court (a) by attorneys practicing in the Court, including attorneys admitted *pro hac vice*, electronically in accordance with Rule 5 of the Local Rules for the District of Puerto Rico, and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF), to the extent applicable, and shall be served in accordance with the Court's *Order (A) Imposing and Rendering Applicable Local Bankruptcy Rules to These Title III Cases, (B) Authorizing Establishment of Certain Notice, Case Management, and Administrative Procedures, and (C) Granting Related Relief*, as amended (Dkt. Nos. 249, 262, 1065, 1512), so as to be filed and received no later than **March 18, 2020 at 5:00 p.m. (Atlantic Standard Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that a hearing on the Motion will be held before the Honorable Laura Taylor Swain, United States District Court Judge, in Courtroom 17C of the United States District Court for the Southern District of New York, Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, NY 10007 with a video connection to the United States District Court for the District of Puerto Rico, 150 Carlos Chardón Street, Federal Building, Office 150, San Juan, Puerto Rico 00918-1767 on **April 30, 2020 at 10:00 a.m. (Atlantic Standard Time)**.

PLEASE TAKE FURTHER NOTICE that if an Objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Court may enter

4

an order granting the relief sought without a hearing pursuant to the Court's case management

procedures.

*[Remainder of page intentionally left blanks.]*

Dated: February 5, 2020

Respectfully submitted,

/s/ Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

/s/ Mark T. Stancil
Mark T. Stancil (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
Email: mstancil@willkie.com

/s/ Andrew N. Rosenberg
Andrew N. Rosenberg (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Email: arosenberg@paulweiss.com

/s/ Lawrence S. Robbins
Lawrence S. Robbins (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Kathryn S. Zecca (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: lrobbins@robbinsrussell.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

CASELLAS ALCOVER & BURGOS P.S.C.

By: */s/ Heriberto Burgos Pérez*

    Heriberto Burgos Pérez
    USDC-PR 204809
    Ricardo F. Casellas-Sánchez
    USDC-PR 203114
    Diana Pérez-Seda
    USDC-PR 232014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
           rcasellas@cabprlaw.com
           dperez@cabprlaw.com

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Howard R. Hawkins, Jr.*

    Howard R. Hawkins, Jr.*
    Mark C. Ellenberg*
    William J. Natbony*
    Ellen M. Halstead*
    Thomas J. Curtin*
    Casey J. Servais*
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
           mark.ellenberg@cwt.com
           bill.natbony@cwt.com
           ellen.halstead@cwt.com
           thomas.curtin@cwt.com
           casey.servais@cwt.com

* Admitted *pro hac vice*

*Attorneys for Assured Guaranty Corp. and Assured
Guaranty Municipal Corp.*

**G. CARLO-ALTIERI LAW OFFICES, LLC**

By: */s/ Gerardo A. Carlo*
Gerardo A. Carlo
USDC PR No. 112009
Telephone: (787) 247-6680
gacarlo@carlo-altierilaw.com

By: */s/ Mª Mercedes Figueroa y Morgade*
Mª Mercedes Figueroa y Morgade
USDC PR No. 207108
Telephone: (787) 234-3981
figueroaymorgadelaw@yahoo.com

254 San Jose St., Third Floor
San Juan, Puerto Rico 00901
Telephone: (787) 247-6680
Facsimile: (787) 919-0527

**MORRISON & FOERSTER LLP**

By: */s/ Gary S. Lee*
James M. Peck (admitted *pro hac vice*)
Gary S. Lee (admitted *pro hac vice*)
Lena H. Hughes
Andrew R. Kissner (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jpeck@mofo.com
glee@mofo.com
lhughes@mofo.com
akissner@mofo.com

-and-

Joseph R. Palmore
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 887-6940
Facsimile: (202) 887-0763
jpalmore@mofo.com

*Counsel for the Ad Hoc Group of Constitutional Debtholders*

**TORO COLÓN MULLET P.S.C.**

*/s/ Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
Email: mfb@tcm.law

*/s/ Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
Email: lft@tcm.law

*/s/ Jane Patricia Van Kirk*
JANE PATRICIA VAN KIRK
USDC–PR No. 220,510
Email: jvankirk@tcm.law
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

*/s/ Amy Caton*
THOMAS MOERS MAYER*
AMY CATON*
DOUGLAS BUCKLEY*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: tmayer@kramerlevin.com
     acaton@kramerlevin.com
     dbuckley@kramerlevin.com
* (admitted *pro hac vice*)

*Counsel to funds managed by Invesco Advisers, Inc. and funds and/or accounts managed or advised by OFI Global Institutional Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |

## MOTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS, AD HOC GROUP OF CONSTITUTIONAL DEBTHOLDERS, ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP., AND THE INVESCO FUNDS TO DISMISS OMNIBUS CLAIM OBJECTIONS TO CLAIMS FILED OR ASSERTED BY HOLDERS OF CERTAIN COMMONWEALTH GENERAL OBLIGATION BONDS AND PUBLIC BUILDINGS AUTHORITY BONDS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 2

BACKGROUND .................................................................................................... 7

   A.  The Constitutional Debt Limit .......................................................................... 7

   B.  The 2012-2014 GO Claim Objection............................................................... 9

   C.  The 2011 GO Claim Objection and the PBA Claim Objection ....................... 10

   D.  The Debt Coalition Claim Objection ............................................................... 11

ARGUMENT .......................................................................................................... 11

   I.   The Public Debt Claim Objections Should Be Dismissed Because, As A Matter Of
      Law, No Bonds Were Issued In Violation Of The Puerto Rico Constitution .................. 12

      A.  PBA Bonds Cannot Be Recharacterized As Direct-Issued GO Debt ......................... 12

          1.  The Precisely Drafted Text Of The Puerto Rico Constitution's Debt Limit
              Forecloses The Objectors' Recharacterization Argument ................................... 13

          2.  As A Matter Of Law, The PBA Is Not A Sham Entity ..................................... 18

              a.  The PBA Is Separate And Independent From The Commonwealth .............. 19

              b.  The PBA's Leases And Rent Practices Are Legitimate................................ 20

              c.  The PBA's History Confirms Its Legitimacy ................................................. 23

          3.  The Objectors' Cases Are Inapposite ............................................................... 25

      B.  The Commonwealth's Rental Payments To The PBA Were Not Payments "For
          Principal Or Interest On Account Of Any Outstanding Obligations Evidenced
          By Bonds Or Notes Guaranteed By The Commonwealth" ......................................... 28

          1.  The Debt Coalition Fails To Respect The Distinction Between Direct And
              Guaranteed Obligations ................................................................................... 29

              a.  The Constitutional Text .............................................................................. 30

                  i.  A Payment Must Be "For" Principal And Interest.................................... 30

                  ii.  A Payment Must Also Be "On Account Of" Guaranteed
                     Indebtedness............................................................................................ 31

              b.  Legislative History...................................................................................... 32

              c.  Historical Practice ....................................................................................... 34

          2.  The Debt Coalition Has Conceded That Lease Payments Are "For" Rent,
              And Not "For" Principal And Interest ............................................................... 36

      C.  Interest Payments Funded From Bond Proceeds Were Properly Excluded From
          The Debt Limit Calculation For The 2014 GO Bonds ............................................... 37

D. The GO Bonds Issued In July 2011 Complied With The Debt Limit Even If
PBA Debt Service Were To Be Included In The Calculation ................................... 41

E. The UCC's Deficit Financing Argument Is Meritless ................................................ 42

   1. The Original Spanish Text Of The Constitution Permits Deficit Financing ........ 43

   2. An Admitted Error In The English Translation Does Not Control Over The
Original Constitutional Text ..................................................................................... 44

   3. The UCC's Balanced Budget Clause Argument Fails In Any Event Because
Even The English Term "Revenues" Should Be Read To Include Bond
Proceeds And Because The Clause Governs Spending, Not Borrowing.............. 46

II. The Public Debt Claim Objections Should Be Dismissed Because, Even If Their
Allegations Could Establish A Constitutional Violation, They Would Not Support
The Relief Requested ....................................................................................................... 48

A. Even If The Public Debt Claim Objections Correctly Construed The Puerto
Rico Constitution, They Provide No Basis For Granting The Extreme Remedy
Of Retroactive Invalidation ........................................................................................... 49

   1. As A Matter Of General Retroactivity Principles, Any Conclusion That The
Challenged Bonds Were Invalidly Issued Would Be Given Only
Prospective Application ............................................................................................. 50

   2. The Commonwealth's Recitals In Connection With Its Issuance Of The
Challenged Bonds Foreclose Any Challenge To Their Validity .......................... 54

      a. The Doctrine of Estoppel by Recitals ............................................................. 55

      b. *La Doctrina de Actos Propios*....................................................................... 56

B. The Public Debt Claim Objections Fail As A Matter Of Law Because They Do
Not Establish, As They Must, That The Prior Debt They Include In The Debt-
Limit Calculation Was Validly Issued ......................................................................... 59

   1. Only Valid Bonds Count Toward The Debt Limit ............................................... 59

   2. Objectors Fail To Allege The Validity Of Prior Bonds....................................... 60

C. The Public Debt Claim Objections Fail As A Matter Of Law Because They Do
Not Establish That The Challenged Bonds Exceeded The Debt Limit In Their
Entirety.............................................................................................................................. 61

   1. Debt May Be Invalid Only To The Extent It Exceeds A Debt Limit .................. 62

   2. Total Invalidation Is Contrary To The Structure Of Puerto Rico's Debt
Limit.............................................................................................................................. 64

CERTIFICATION ............................................................................................................................... 66

NOTICE ................................................................................................................................................ 66

CONCLUSION .................................................................................................................................... 66

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Disaster in Lockerbie, Scotland, on Dec. 21, 1988*,
    733 F. Supp. 547 (E.D.N.Y. 1990) ........................................................46

*Air France v. Saks*,
    470 U.S. 392 (1985) ..........................................................................46

*Alden v. Maine*,
    527 U.S. 706 (1999) ..........................................................................25

*Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.*,
    435 F.3d 1140 (9th Cir. 2006) ..........................................................45

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................37

*Ashuelot Nat'l Bank v. Lyon Cty.*,
    81 F. 127 (C.C.N.D. Iowa 1897) ......................................................60

*Asociación de Empleados v. Corporación del Fondo del Seguro del Estado*,
    No. KLAN201500471, 2015 WL 4075649 (P.R. Cir. May 29, 2015) ...................................44

*Autoridad de Edificios Publicos v. Corp. del Centro Cardiovascular de P.R. y el Caribe*,
    No. KCD2009-3278 (Aug. 25, 2009) ................................................21

*Autoridad de Edificios Publicos v. Oficina de Administración de los Tribunales*, No.
    KCD2009-3277 (Jan. 15, 2010) ........................................................21

*Ayer v. Commissioner of Admin.*,
    165 N.E.2d 885 (Mass. 1960) ..................................................26, 27, 51

*Ayotte v. Planned Parenthood of N. New England*,
    546 U.S. 320 (2006) ..........................................................................64

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002) ..........................................................................17

*Board of Comm'rs of Chaffee Cty. v. Potter*,
    142 U.S. 355 (1892) ....................................................................55, 56

*Board of Comm'rs of Gunnison Cty. v. E.H. Rollins & Sons*,
    173 U.S. 255 (1899) ....................................................................55, 56

*Boll v. City of Ludlow,*
    29 S.W.2d 547 (Ky. 1930) ............................................................................... 63

*In re Brankle Brokerage & Leasing, Inc.,*
    394 B.R. 906 (Bankr. N.D. Ind. 2008) .......................................................... 20

*Buchanan v. City of Litchfield,*
    102 U.S. 278 (1880) ....................................................................................... 55

*Burrow-Giles Lithographic Co. v. Sarony,*
    111 U.S. 53 (1884) ......................................................................................... 25

*Cipriano v. City of Houma,*
    395 U.S. 701 (1969) .................................................................................. 50, 51

*Citizens' Bank v. City of Terrell,*
    14 S.W. 1003 (Tex. 1890) .............................................................................. 63

*City of Albuquerque v. Gott,*
    389 P.2d 207 (N.M. 1964) ............................................................................. 38

*City of Jackson v. First Nat'l Bank of Jackson,*
    157 S.W.2d 321 (Ky. 1941) ........................................................................... 38

*City of Phoenix v. Kolodziejski,*
    399 U.S. 204 (1970) .................................................................................. 50, 51

*CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon,*
    410 F. Supp. 2d 61 (D.P.R. 2006) ................................................................ 56

*Commonwealth of Puerto Rico v. Northwestern Selecta, Inc.,*
    185 D.P.R. 40 (P.R. 2012) .............................................................................. 5

*Culbertson v. City of Fulton,*
    18 N.E. 781 (Ill. 1888) ................................................................................... 63

*In re Daben Corp.,*
    469 F. Supp. 135 (D.P.R. 1979) .................................................................... 21

*In re Double G Trucking of the Arklatex, Inc.,*
    432 B.R. 789 (Bankr. W.D. Ark. 2010) ........................................................ 22

*Driscoll v. Burlington-Bristol Bridge Co.,*
    86 A.2d 201 (N.J. 1952) ........................................................................... 55, 58

*Eastern Airlines, Inc. v. Floyd,*
    499 U.S. 530 (1991) ....................................................................................... 46

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)..................................................................................64

*Figueroa v. Puerto Rico*,
    232 F.2d 615 (1st Cir. 1956)....................................................................45

*In re Financial Oversight & Mgmt. Bd. for Puerto Rico*,
    914 F.3d 694 (1st Cir. 2019)....................................................................45

*In re Financial Oversight & Mgmt. Bd. for Puerto Rico*,
    919 F.3d 121 (1st Cir. 2019)....................................................................32

*Florida Sugar Mktg. & Terminal Ass'n, Inc. v. United States*,
    220 F.3d 1331 (Fed. Cir. 2000)..............................................................44

*Fordice v. Bryan*,
    651 So. 2d 998 (Miss. 1995)...................................................................47

*Fults v. City of Coralville*,
    666 N.W.2d 548 (Iowa 2003)..................................................................39

*German Ins. Co. of Freeport v. City of Manning*,
    95 F. 597 (C.C.S.D. Iowa 1899)............................................................60

*Gorbea Vallés v. San Juan Prop. Registrar*,
    131 D.P.R. 10 (P.R. 1992)......................................................................52

*Hall v. United States*,
    566 U.S. 506 (2012)................................................................................23

*Henson v. Santander Consumer USA Inc.*,
    137 S. Ct. 1718 (2017)............................................................................17

*Herman v. City of Oconto*,
    86 N.W. 681 (Wis. 1901)........................................................................63

*Hill v. Stone*,
    421 U.S. 289 (1975)..........................................................................50, 51

*Huggins v. Superior Court*,
    788 P.2d 81 (Ariz. 1990)........................................................................38

*In re Integrated Health Servs.*,
    Inc., 260 B.R. 71 (Bankr. D. Del. 2001)............................................20, 22

*International Gen. Elec. v. Concrete Builders of P.R., Inc.*,
    104 D.P.R. 871 (P.R. 1976)....................................................................56

*Iravedra v. Public Bldg. Auth.*,
  196 F. Supp. 2d 104 (D.P.R. 2002)......................................................20

*Johns-Manville Corp. v. Vill. of DeKalb, Mo.*,
  439 F.2d 656 (8th Cir. 1971) ..................................................55, 56

*Keene Five-Cent Sav. Bank v. Lyon Cty.*,
  97 F. 159 (C.C.N.D. Iowa 1899)..........................................................60

*Knott Cty. v. Aid Ass'n for Lutherans*,
  140 F.2d 630 (6th Cir. 1944) ..............................................................40

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
  932 F.2d 1475 (D.C. Cir. 1991)..........................................................46

*Kronsbein v. City of Rochester*,
  76 A.D. 494 (N.Y. App. Div. 1902) ....................................................41

*Lance v. McGreevey*,
  180 N.J. 590 (2004) ............................................................................47

*Lyon Cty. v. Ashuelot Nat'l Bank of Keene*,
  87 F. 137 (8th Cir. 1898) ....................................................................60

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)..............................................................39

*In re Marhoefer Packing Co., Inc.*,
  674 F.2d 1139 (7th Cir. 1982) ......................................................20, 22

*Martin v. Oregon Bldg. Auth.*,
  554 P.2d 126 (Or. 1976) ........................................................26, 27, 51

*McPherson v. Foster Bros.*,
  43 Iowa 48 (1876)................................................................................63

*Mendoza Aldarondo, v. Asociación de Empleados*,
  94 D.P.R. 564 (1967) ..........................................................................57

*Michigan v. Bay Mills Indian Cmty.*,
  572 U.S. 782 (2014)............................................................................17

*Morgan v. Board of Supervisors*,
  192 P.2d 236 (Ariz. 1948)....................................................................38

*O'Gilvie v. United States*,
  519 U.S. 79 (1996)..............................................................................31

*Onyeanusi v. Pan Am*,
  952 F.2d 788 (3d Cir. 1992)...................................................................................46

*In re PCH Assocs.*,
  804 F.2d 193 (2d Cir. 1986)...................................................................................36

*Pittsburgh Paving Co. v. City of Pittsburgh*,
  3 A.2d 905 (Pa. 1938).............................................................................................63

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
  91 F. Supp. 3d 267 (D.P.R. 2015)..........................................................................53

*PREPA v. Vitol, Inc.*,
  No. CV 09-2242 (DRD), 2012 WL 12995756 (D.P.R. Sept. 10, 2012)..................57

*Printz v. United States*,
  521 U.S. 898 (1997).................................................................................................25

*Pritchett v. Office Depot, Inc.*,
  420 F.3d 1090 (10th Cir. 2005) .............................................................................45

*State ex rel Pub. Institutional Bldg. Auth. v. Neffner*,
  30 N.E.2d 705 (Ohio 1940) .........................................................................26, 27, 51

*Pueblo v. Tribunal Superior*,
  92 D.P.R. 596 (P.R. 1965) ......................................................................................44

*Quiles Rodríguez v. Superintendent of Police*,
  139 D.P.R. 272 (P.R. 1995) ....................................................................................52

*Republic Sec. Corp. v. Puerto Rico Aqueduct & Sewer Auth.*,
  674 F.2d 952 (1st Cir. 1982)...................................................................................45

*Rexach Constr. Co. v. Municipality of Aguadilla*,
  142 D.P.R. 85 (1996) ..............................................................................................53

*Reynolds v. City of Waterville*,
  42 A. 553 (Me. 1898)....................................................................................26, 27, 51

*Risser v. Klauser*,
  558 N.W.2d 108 (Wis. 1997)...................................................................................47

*Rodriguez Torres v. Autoridad de Edificios Publicos*,
  141 D.P.R. 362, 369, 370 (P.R. 1996) ....................................................................20

*Rodriguez v. United States*,
  480 U.S. 522 (1987).................................................................................................17

vii

*School Town of Winamac v. Hess*,
    50 N.E. 81 (Ind. 1898) ............................................................................63

*Scroggs v. Kansas City*,
    499 S.W.2d 500 (Mo. 1973) ...................................................26, 27, 51

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996).................................................................................45

*Soto Padró v. Public Bldg. Auth.*,
    747 F. Supp. 2d 319 (D.P.R. 2010).......................................................20

*State v. Volusia Cty. Sch. Bldg. Auth.*,
    60 So. 2d 761 (Fla. 1952)........................................................26, 27, 51

*Stockdale v. School-District No. 2 of Wayland*,
    10 N.W. 349 (Mich. 1881)....................................................................63

*Thomas v. Rosen*,
    569 P.2d 793 (Alaska 1977)..................................................................47

*Todok v. Union State Bank of Harvard, Neb.*,
    281 U.S. 449 (1930).............................................................................46

*Town of Camden v. Fairbanks, Morse & Co.*,
    86 So. 8 (Ala. 1920)..............................................................................39

*U.S. Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993).............................................................................45

*United Airlines, Inc. v. HSBC Bank USA, N.A.*,
    416 F.3d 609 (7th Cir. 2005) ...............................................................36

*United States v. Bajakajian*,
    524 U.S. 321 (1998).............................................................................64

*United States v. Classic*,
    313 U.S. 299 (1941).............................................................................44

*United States v. Crooker*,
    608 F.3d 94 (1st Cir. 2010)...................................................................31

*Velez v. Superior Court of P.R.*,
    75 D.P.R. 585 (P.R. 1953) ....................................................................25

*Waite v. City of Santa Cruz*,
    184 U.S. 302 (1902).............................................................................40

*State ex rel Wash. State Bldg. Fin. Auth. v. Yelle*,
  289 P.2d 355 (Wash. 1955).................................................................26, 27, 51

*Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*,
  894 F.3d 509 (3d Cir. 2018)..............................................................................31

*Wein v. Carey*,
  362 N.E.2d 587 (N.Y. 1977)..............................................................................58

*Westship, Inc. v. Trident Shipworks, Inc.*,
  247 B.R. 856 (M.D. Fla. 2000).........................................................................20

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
  827 F.3d 201 (1st Cir. 2016).............................................................................21

*Winkler v. State Sch. Bldg. Auth.*,
  434 S.E.2d 420 (W. Va. 1993)..................................................................26, 51, 52

*Wisniewski v. Murphy*,
  186 A.3d 321 (N.J. Super. Ct. App. Div. 2018).................................................51

**Constitutions and Statutes**

U.S. Const. art. II, § 2, cl. 2 ..............................................................................46

Ariz. Const. art. IX, § 5 ......................................................................................15

Cal. Const. art. XVI, § 1 ................................................................................14, 16

N.Y. Const. art. VII, § 11 ...................................................................................14

Ill. Const. art. IX, § 9 .........................................................................................34

Me. Const. art. IX, § 14 ..................................................................................14, 15

Me. Const. art. IX, § 14-B ..................................................................................15

Mo. Const. art. III, § 37 .....................................................................................14

Ohio Const. art. VIII, § 17 ..................................................................................15

Or. Const. art. XI, § 7 .........................................................................................14

P.R. Const. art. II, § 2 ........................................................................................57

P.R. Const. art. VI, § 2............................................................................... *passim*

P.R. Const. art. VI, § 7 ........................................................................................43

ix

P.R. Const. art. VI, § 8 ..................................................................................................48, 57

Pa. Const. art. VIII, §7(c) ......................................................................................................16

Tex. Const. art. III, § 49-j .....................................................................................................34

Wash. Const. art. VIII, § 1 .....................................................................................................15

Wash. Const. art. VIII, § 1(d) .................................................................................................18

Wash. Const. art. VIII § 9 ......................................................................................................18

48 U.S.C. § 731b ....................................................................................................................45

48 U.S.C. § 2121(a) ..................................................................................................................6

Pub. L. No. 64-368, § 3, 39 Stat. 953 (1917).................................................................14, 15

Pub. L. No. 87-121, § 1, 75 Stat. 245 (1961).........................................................................23

22 L.P.R.A. § 902 ...................................................................................................................19

22 L.P.R.A. § 906(a)(1) ..........................................................................................................19

22 L.P.R.A. § 907a.......................................................................................................24, 30, 34

31 L.P.R.A. § 13 .....................................................................................................................45

31 L.P.R.A. § 14 .....................................................................................................................32

31 L.P.R.A. § 4012 .................................................................................................................21

31 L.P.R.A. § 4053 .................................................................................................................21

31 L.P.R.A. § 4058 .................................................................................................................22

Act 56 of June 19, 1958 ...................................................................................................19, 23

Act 51 of June 19, 1962, § 1 ..................................................................................................24

Act 27 of May 14, 1964, § 1 ..................................................................................................24

Act 17 of Apr. 11, 1968, § 1 ..................................................................................................34

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014).................................................................................38

*Diario de Sesiones de la Asamblea Legislativa*, Vol. 14, No. 27 (Extraordinaria) (Sept. 5,
1961) .................................................................................................................................33, 34

*Diario de Sesiones Procedimientos y Debates de la Convencion Constituyente de Puerto
Rico* ...............................................................................................................................43

John F. Dillon, *Commentaries on the Law of Municipal Corporations* (5th ed. 1911) ....58, 60, 62

Hacienda, *Ingresos Netos al Fondo General - General Fund Net Revenues dated August
13, 2018*, https://tinyurl.com/v6m3vuj...................................................................42

H.R. Rep. No. 82-1832 (1952), reprinted in 1952 U.S.C.C.A.N. 1892........................................45

Kobre & Kim LLP, *Final Investigative Report* (Aug. 20, 2018).....................................24, 34, 54

Gloria Ruiz Kuilan, *Edificios Públicos comienza la operación para remozar las escuelas*,
El Nuevo Día (Jun. 17, 2017), https://tinyurl.com/qof9ef7 ......................................19

Eugene McQuillin, *The Law of Municipal Corporations* (3d ed. 2019) ............................... *passim*

José Trías Monge, *Historia Constitucional de Puerto Rico* (1982)...............................................57

Opinion of the Sec'y of Justice, No. 1974-15 (May 21, 1974)......................................................44

*Random House Dictionary of the English Language Unabridged* (2d ed. 1987)...................30, 31

*Webster's Third New International Dictionary Unabridged* (1981) .............................................31

The Ad Hoc Group of General Obligation Bondholders (the "GO Group"); the Ad Hoc Group of Constitutional Debtholders (the "Constitutional Debtholders"); Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together "Assured"); and the funds managed by Invesco Advisers, Inc. and funds and/or accounts managed or advised by OFI Global Institutional Inc. (the "Invesco Funds") (collectively, "Movants")[2] respectfully file this motion to dismiss (the "Motion") (i) the *Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* (Dkt. No. 4784, the "2012-2014 GO Claim Objection") filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board") and the Official Committee of Unsecured Creditors (the "UCC," and together with the Oversight Board, the "Objectors"); (ii) the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds* (Dkt. No. 7057, the "2011 GO Claim Objection"); (iii) the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds* (Dkt. No. 8141, the "PBA Claim Objection"); and (iv) *the Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth* (Dkt. No. 9730, the

---

[2] Movants file this Motion exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

"Debt Coalition Claim Objection," and collectively with the 2012-2014 GO Claim Objection, the

2011 GO Claim Objection, and the PBA Claim Objection, the "Public Debt Claim Objections").

A proposed order granting the Motion is attached as Ex. 1.

 The Motion proceeds in the following manner.  Following an introduction, the background

section describes the various—and contradictory—Public Debt Claim Objections that have been

filed to date.  In this section, Movants also explain the text, history, and purpose of the

Commonwealth's constitutional debt limit.  See pp. 7-11, *infra*.  Movants' argument section is

divided in two parts.  In the first part, Movants show why neither of the alternative (and

contradictory) readings of the constitutional debt limit proffered by the Public Debt Claims

Objections has merit.  See pp. 12-48, *infra*.  Each of those theories would subvert the plain text of

the Commonwealth constitution by eliminating the precisely drawn distinctions between direct

and guaranteed obligations.  In the second part, Movants explain why, in any event, the Objectors

are not entitled to the relief that they seek.  See pp. 48-66, *infra*.  The drastic remedy sought—

retroactive invalidation of approximately $10 billion of bonds based on recharacterization of one

entity's debts as belonging to another—has never been endorsed by any court.  Even if retroactive

invalidation were ever appropriate, Objectors do not allege facts showing that they are entitled to

that remedy here, much less the total invalidation they demand for even the slightest retroactive

transgression of their newly conceived constitutional rule.  The Court may choose to reject the

objections for this independent reason without addressing their arguments on the meaning of the

constitution's debt limit provisions.

## INTRODUCTION

 Between 2012 and 2014, the Commonwealth of Puerto Rico (the "Commonwealth")

borrowed more than $5.7 billion from the public securities market through three issuances of

general obligation bonds ("GO Bonds").  When it did so, the Commonwealth investigated,

calculated, and then expressly "certified and recited" to the investing public "that . . . the total indebtedness of the Commonwealth of Puerto Rico, including this bond, does not exceed any debt or other limitation prescribed by law."  Commonwealth of Puerto Rico Bond Resolution (Mar. 7, 2012), at B-4, B-11 (attached as Ex. 2) ("2012 GO Bond Resolution"); see also, e.g., Commonwealth of Puerto Rico Bond Resolution (Mar. 11, 2014), at B-4 (attached as Ex. 3) ("2014 GO Bond Resolution").  To encourage investment, the Commonwealth set forth detailed calculations supporting its conclusion that the bonds' issuance complied with the Puerto Rico Constitution's debt limit.

Now, years after the bond proceeds have been spent to fund the Commonwealth's public purposes, the Oversight Board and the UCC insist that the Commonwealth's commitments and solemn representations are not worth the paper they were printed on.

In the 2012-2014 GO Claim Objection, the Board and the UCC contend that the GO Bonds issued in 2012 and 2014 (along with the other bond claims that are subject to the Public Debt Claim Objections, the "Challenged Bonds") violated the Commonwealth's constitutional debt limit.  They contend that the Challenged Bonds issued in 2012 and 2014 are therefore "null and void," and that "bondholders have no remedy."  2012-2014 GO Claim Objection ¶ 99 (emphasis added).  In their view, the Commonwealth need not repay a dime of the billions of dollars it borrowed—leaving innocent bondholders and bond insurers holding the bag for the Commonwealth's supposed constitutional malfeasance and misrepresentations.

The rationale for this startling—and deeply unjust—attack on the Commonwealth's bondholders and bond insurers is that, in the Objectors' view, the Commonwealth has been miscalculating its debt limit and misrepresenting that fact for more than five decades.  Objectors' core contention is that the Puerto Rico Public Buildings Authority (the "PBA") was a "transparent

sham[] designed to circumvent" the debt limit in the Commonwealth Constitution.  2012-2014 GO Claim Objection ¶ 5.  The Objectors contend that, because of this supposedly "transparent" (*id.*) scheme—which somehow escaped the notice of *every* Puerto Rico government official dating back to the adoption of the constitutional debt limit in 1961—the Commonwealth should have included debt service owed on the PBA's bonds ("PBA Bonds") when it performed the debt-limit calculations for the Challenged Bonds issued in 2012 and 2014.  Had the PBA's debt service been included, they allege, the issuances of these Challenged Bonds would have violated the constitutional debt limit.

The Oversight Board's and UCC's irresponsible decision to launch their 2012-2014 GO Claim Objection set off a feeding frenzy of further objections to bondholder claims on the Commonwealth's public debt, including additional GO Bonds issued in 2011 and PBA Bonds issued in 2011 and 2012.  As a result of these additional Public Debt Claim Objections, which are generally premised on the constitutional and remedial arguments first articulated in the 2012-2014 GO Claim Objection,[3] roughly ***$10 billion*** of the Commonwealth's $18 billion in public debt bond claims are now alleged to have been issued in violation of the Puerto Rico Constitution and thus (under Objectors' arguments) are entirely unenforceable.

The Public Debt Claim Objections fail as a matter of law and should be dismissed.  First and foremost, their constitutional analysis is contrary to the plain language of the Puerto Rico Constitution.  Under the Constitution's text, which Objectors make no serious effort to confront, only certain debt service on specified bonds is included in debt-limit calculations for GO bond issuances.  For guaranteed bonds, for instance, only "amounts" actually "paid" for principal and interest on account of the guarantee in the previous fiscal year are included.

---

[3] See 2011 GO Claim Objection ¶¶ 25-30; PBA Claim Objection ¶¶ 18-21.

Otherwise, principal and interest are included only with regard to obligations that are (1) "direct" (as distinguished from "indirect") obligations of the Commonwealth, (2) "issued by the Commonwealth" (rather than a separate legal entity), (3) "for money borrowed directly" (as opposed to indirectly) by the Commonwealth, and  (4) "evidenced by bonds or notes" (and not leases or obligations under a statutory guaranty).  P.R. Const. art. VI, § 2.  In each respect, the carefully reticulated language of the constitutional debt limit forecloses the freewheeling recharacterization analysis that Objectors advance.  Indeed, the Constitution's language reflects a deliberate policy judgment to promote clarity and predictability—a policy judgment that Objectors seek to override for the sake of expediency.

Even putting those textual barriers aside, Objectors' contention that the PBA can be written off as a "sham" entity is badly mistaken.  The PBA is a 60-plus-year-old separate operating legal entity in Puerto Rico.  It has more than 1,000 employees.  It owns and manages a huge portfolio of real estate across a wide swath of Puerto Rico's public and private sectors.  And, until now, there has been no suggestion in the PBA's 60-year history that it has anything to do with the debt limit.

The Public Debt Claim Objections also suffer from an independent and equally fundamental defect.  Even if the Objectors could establish a violation of the debt limit (which they cannot), the remedy they seek here—retroactive invalidation of $10 billion in public debt sold into public markets—is unavailable as a matter of law.  The Commonwealth issued the bonds under statutes that are "presumed to be constitutional," *Commonwealth of Puerto Rico v. Northwestern Selecta, Inc.*, 185 D.P.R. 40, 71 (P.R. 2012) (translation available on Lexis), and provided express assurances that the bonds complied with the constitutional debt limitation.  Retroactively invalidating the bonds based on Objectors' recharacterization argument would fly in the face of

long-settled legal principles that prohibit such a draconian remedy for a government bond issuer's own negligence or malfeasance.  Beyond the evident unfairness to bondholders, that result would be severely destabilizing for Puerto Rico, scaring off investors for decades to come, as well as for the municipal-bond market generally.  And, of course, none of the cases cited by the Objectors in support of their attack on the PBA structure actually endorses the retroactive invalidation remedy urged here; indeed, the only case they cite that addressed it at all squarely *rejected* the idea that a bond may be invalidated based upon an after-the-fact recharacterization.  Nor do Objectors point to any authority for nullifying bonds that contain facial recitals of validity.  The relief Objectors seek is, in a word, unprecedented.

The Public Debt Claim Objections suffer from yet another remedial flaw—they are based on incorrect assumptions about how debt-limit calculations should be performed in the event that any debt may be invalidated.  Objectors assume that the debt-limit calculation for one issuance of bonds can be performed in isolation, without considering whether the prior bond issuances included in the calculation are valid and enforceable.  That is, they contend that a bond can somehow be void ab initio, yet still have its debt service counted against future bonds.  They also assume that *any* violation of the debt-service limit—by even a single dollar in a single year—triggers total invalidation of an entire bond issuance.  Both assumptions are wrong.  The Objectors accordingly fail to make the factual allegations that are necessary predicates to the total-invalidation remedy they seek.

\*     \*     \*

Under PROMESA, the Board must ensure that Puerto Rico "achieve[s] fiscal responsibility and access to the capital markets," 48 U.S.C. § 2121(a).  It could have done that by inducing the Commonwealth to implement a set of economic reforms that, by the Board's own account, are

reasonable and necessary and would generate as much as $38 billion in economic growth.[4]  But

instead, the Board yielded to a "lack of political will" and caved on those core economic reforms.[5]

Having failed to boost the economy through meaningful structural improvements, the Board seeks

to make up the shortfall by reneging on the Commonwealth's commitments to its public

bondholders through this longshot litigation.  Such a course will not inspire confidence from, much

less promote access to, the capital markets.  This Motion should be granted, and the Public Debt

Claim Objections should be dismissed.

## BACKGROUND

### A.      The Constitutional Debt Limit

Article VI, Section 2 of the Constitution provides:

[N]o *direct obligations* of the Commonwealth for money *borrowed directly* by the
Commonwealth evidenced by bonds or notes for the payment of which the full faith
credit and taxing power of the Commonwealth shall be pledged shall be *issued by
the Commonwealth* if the total of

> (i) the amount of *principal of and interest on such bonds and notes*,
> together with the amount of principal of and interest on all such bonds and
> notes theretofore *issued by the Commonwealth* and then outstanding,
> *payable* in any fiscal year and

> (ii) any amounts *paid* by the Commonwealth in the fiscal year next
> preceding the then current fiscal year for principal or interest on account of
> any outstanding obligations evidenced by bonds or notes *guaranteed* by the
> Commonwealth,

shall exceed 15% of the average of the total amount of the annual revenues raised
under the provisions of Commonwealth legislation and covered into the Treasury
of Puerto Rico in the two fiscal years next preceding the then current fiscal year.

P.R. Const. art. VI, § 2 (emphases added).  Accordingly, the debt-limit calculation applicable to

each issuance of bonds or notes representing *direct obligations of the Commonwealth* (for money

---

[4] Oversight Board, *2019 Fiscal Plan for Puerto Rico 43* (May 9, 2019), https://tinyurl.com/tfdyw6e.

[5] *Id.* at 17.

borrowed directly by the Commonwealth) requires that, as of the date of that issuance, the sum of
(a) the principal and interest on the new bonds or notes, together with scheduled principal and
interest on other "such" bonds and notes already outstanding (*i.e.*, issued directly by the
Commonwealth for money borrowed directly by it), payable in any fiscal year *plus* (b) amounts
actually paid by the Commonwealth on account of guaranteed debt in the fiscal year immediately
prior to such issuance date, not exceed 15% of average internal revenues over the two fiscal years
immediately prior to such issuance date.

The same constitutional provision sets forth a separate and distinct test for guaranteed
obligations:

> [T]he Commonwealth **shall not guarantee** any obligations evidenced by bonds or
> notes if the total of the amount payable in any fiscal year on account of principal of
> and interest on all the direct obligations referred to above theretofore issued by the
> Commonwealth and then outstanding and the amounts referred to in item (ii) above
> shall exceed 15 percent of the average of the total amount of such annual revenues.

*Id.* (emphasis added). The calculation for each ***new guaranty by the Commonwealth*** thus requires,
as of the date such guaranty is given, that the sum of (a) amounts payable on direct obligations of
the Commonwealth (for money directly borrowed by the Commonwealth) in any future fiscal year
plus (b) amounts actually paid by the Commonwealth on account of Commonwealth-guaranteed
debt in the prior fiscal year, not exceed the 15% of average revenues cap.

In both calculations, debt service on bonds guaranteed by the Commonwealth is taken into
account only to the extent that the Commonwealth ***actually paid on those guaranties*** in the prior
fiscal year.  Debt service owed in the future by an issuer of Commonwealth-guaranteed debt—
such as the PBA—is not taken into account under any scenario.  In accordance with the
constitutional text, the Commonwealth has consistently excluded debt service owed on PBA Bonds
from its constitutional debt-limit calculations.  Those bonds are issued by the PBA, not the
Commonwealth.

8

B.      The 2012-2014 GO Claim Objection

On January 14, 2019, the Oversight Board and the UCC filed the 2012-2014 GO Claim

Objection, in which they object to Challenged Bonds issued in 2012 and 2014.  See 2012-2014

GO Claim Objection ¶¶ 22-32.  Objectors contend that the Commonwealth issued the Challenged

Bonds in violation of its constitutional debt service limit and that the Challenged Bonds are

therefore void.  *Id.* ¶¶ 61-62.  In making this argument, Objectors primarily assert that the debt

limit should be recalculated to include not only debt service on direct-issued GO Bonds (as was

done at the time the bonds were issued), but also all present and future debt service owed on PBA

Bonds.  *Id.* ¶¶ 63-86.

In advancing that position, the Oversight Board and the UCC ignore the plain text of the

Puerto Rico Constitution's debt limit provisions, which, as explained above, painstakingly

distinguish between bonds *issued directly* by the Commonwealth (such as the GO Bonds) and

those *guaranteed* by the Commonwealth (such as the PBA Bonds).  The 2012-2014 GO Claim

Objection nonetheless maintains that, because the PBA Bonds are guaranteed by the

Commonwealth and serviced in part with Commonwealth rent payments, the PBA Bonds are "just

as much direct obligations of the Commonwealth as any GO bond issued by the Commonwealth

itself."  2012-2014 GO Claim Objection ¶ 2.  This contention rests on the assertion that the PBA

is a "transparent sham[] designed to circumvent" the Commonwealth's "constitutional debt

limits."  *Id.* ¶ 5.  Objectors maintain that all debt service on the PBA Bonds—even if not payable

for many years—must consequently be included in each calculation of the constitutional debt limit

as though the PBA Bonds were direct Commonwealth obligations.  *Id.* ¶ 86.  Objectors contend

that, if all PBA debt service were included, the debt limit calculation for each issuance of

Challenged Bonds would exceed the 15% limit.  *Id.* ¶¶ 63-64.

9

The 2012-2014 GO Claim Objection also separately contends that the Challenged Bonds

issued in 2014 (the "2014 GO Bonds") exceeded the constitutional debt limit because the debt

limit calculation should have included interest payments funded from the proceeds of that bond

issuance.  2012-2014 GO Claim Objection ¶¶ 87-90.  Objectors do not dispute that these payments

of "capitalized interest" were funded from money that bondholders provided as part of the bond

issuance (see id. ¶ 87) and that, as a result, they would not burden the Commonwealth's future

revenue-raising capacity.  Nonetheless, Objectors contend that the source of payment is irrelevant

to whether a payment is properly taken into account for purposes of the constitutional debt limit.

Id. ¶ 88.[6]

### C.    The 2011 GO Claim Objection and the PBA Claim Objection

In the 2011 GO Claim Objection and the PBA Claim Objection, the UCC extends the 2012-

2014 GO Claim Objection's core legal theories to additional issuances of bonds.[7]  Both filings

expressly adopt and incorporate the argument that the PBA is a sham and that PBA Bonds should

be recharacterized as direct obligations of the Commonwealth.  See 2011 GO Claim Objection

¶ 27; PBA Claim Objection ¶ 19.  According to the UCC's allegations, accepting that premise

leads to the conclusion that an additional four series of GO Bonds and four series of PBA Bonds

---

[6] The UCC, but not the Oversight Board, also challenges the 2012 GO Bonds and the 2014 GO Bonds on the ground that they supposedly facilitated constitutionally forbidden "deficit financing."  See 2012-2014 GO Claim Objection ¶¶ 91-98.

[7] Although the Oversight Board did not join the UCC's 2011 GO Claim Objection and PBA Claim Objection, it has filed adversary proceedings seeking to clawback debt-service payments on bonds implicated by the 2011 GO Claim Objection and PBA Claim Objection.  See, e.g., Special Claims Comm. of the Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Defendant 1A, No. 19-ap-285, Amended Adversary Complaint To Avoid And Recover Fraudulent Transfers And To Disallow Claims Pursuant To 11 U.S.C. §§ 502, 544, 548, And 550 And Puerto Rico Law (Dkt. No. 14) (Aug. 23, 2019).  The Oversight Board has acknowledged that the complaints filed in these adversary proceedings include an objection to the validity of the bonds implicated therein.  See Dkt. No. 7550, ¶ 9.c.

were all issued in violation of the constitutional debt limit.  See 2011 GO Claim Objection ¶¶ 6-14; PBA Claim Objection ¶¶ 10-13.

### D.      The Debt Coalition Claim Objection

The (self-proclaimed) Lawful Constitutional Debt Coalition (the "Debt Coalition") filed its own claim objection, challenging the GO Bonds issued in 2012 and 2014 and certain other obligations guaranteed by the Commonwealth.

The Debt Coalition *rejects* the core premise of the various Public Debt Claim Objection filed by the Oversight Board and UCC.  It acknowledges the reality that the PBA is not a "sham" and that bonds issued by the PBA are *not* direct obligation of the Commonwealth.  See Debt Coalition Claim Objection ¶¶ 19, 39.  Instead, the Debt Coalition contends that portions of the Commonwealth's rental payments to the PBA are actually payments "for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth."  P.R. Const. art. VI, § 2.

Pursuing a revisionist argument as untenable as the Objectors' "sham" theory, the Debt Coalition similarly concludes that the GO Bonds issued in 2012 and 2014 violated the constitutional debt limit.  Debt Coalition Claim Objection ¶¶ 45-48.

## ARGUMENT

Each of the varied and contradictory constitutional analyses underlying the Public Debt Claim Objections is fundamentally wrong.

Contrary to Objectors' contentions, the text of the Puerto Rico Constitution forecloses any attempt to recharacterize guaranteed bonds as direct obligations of the Commonwealth.  Moreover, the PBA is a separate legal entity with independent existence from the Commonwealth, and to hold otherwise would require a showing that the PBA is, in essence, a sham.  Suffice it say that Objectors have failed, as a matter of law, to plead facts that could support such a conclusion.

11

Similarly, the Commonwealth's payments of rent under its leases with PBA cannot be recharacterized as payments of principal and interest under the Commonwealth's guarantee of PBA Bonds—that argument is foreclosed by the text, history, and purpose of the Constitution. Nor are the attacks on the Commonwealth's use of capitalized interest (a common feature of municipal finance) or so-called "deficit financing" any more availing.

No matter how Objectors contort the constitution, as a matter of law, no bonds were issued in violation of the Puerto Rico Constitution. But even were that not the case, Objectors are not entitled to the unprecedented remedy of retroactive invalidation that they seek, much less total invalidation untethered to the actual degree of the purported constitutional violation. Thus, even if any bond issuance tripped the debt limit (and none did), dismissal would still be required because the remedy sought is unavailable as a matter of law.

I.   **The Public Debt Claim Objections Should Be Dismissed Because, As A Matter Of Law, No Bonds Were Issued In Violation Of The Puerto Rico Constitution**

A.   **PBA Bonds Cannot Be Recharacterized As Direct-Issued GO Debt**

The core premise of the Public Debt Claim Objections filed by the Oversight Board and UCC is that bonds issued years ago by the PBA should be recharacterized as bonds issued by the Commonwealth on the theory that the Commonwealth is indirectly responsible for payment of those bonds via the Commonwealth's rental obligations to PBA and guarantee obligations to PBA bondholders. That premise cannot be reconciled with the precisely drawn text of the Puerto Rico Constitution's debt-limit provision, which carefully distinguishes between direct obligations of the Commonwealth and guaranteed debt. The PBA Bonds are the obligations of a separate and independent public corporation, not direct obligations of the Commonwealth. For that reason, the debt-limit calculation properly did not include debt service on those bonds.

1.      **The Precisely Drafted Text Of The Puerto Rico Constitution's Debt Limit Forecloses The Objectors' Recharacterization Argument**

Article VI, Section 2 of the Puerto Rico Constitution sets forth two distinct incurrence tests for the Commonwealth's public debt: one applies to direct-issued obligations, and the other applies to guaranteed obligations.  As explained above, the constitutional text distinguishes these two provisions in clear and emphatic terms.  See pp. 7-8, *supra*.  The first governs the issuance of "***direct obligations*** of the Commonwealth for money ***borrowed directly*** by the Commonwealth evidenced by bonds or notes"  P.R. Const. art. VI, § 2 (emphasis added).  The text provides that no such direct obligations "shall be issued by the Commonwealth" if the sum of (a)  "the amount of ***principal of and interest on such bonds and notes***, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, ***payable*** in any fiscal year" and (b) "any amounts ***paid*** by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes ***guaranteed*** by the Commonwealth," exceeds 15% of the Commonwealth's average internal revenues over the prior two fiscal years.  *Id.* (emphasis added).  With respect to guaranteed obligations, by contrast, the Constitution prescribes a different test:  "the Commonwealth ***shall not guarantee*** any obligations evidenced by bonds or notes" if (a) amounts payable on direct obligations in any future fiscal year plus (b) amounts actually paid on account of guaranteed debt in the prior fiscal year, exceed the 15% of average revenues cap.  *Id.* (emphasis added).

In both calculations, existing guaranteed bonds are taken into account only to the extent that the Commonwealth, in the prior fiscal year, *actually made a payment* on account of its guaranty.  Debt service owed in the future by an issuer of guaranteed debt—such as the PBA—is not taken into account under *any* scenario.  The Commonwealth's guaranties of other issuers'

obligations are *irrelevant* for purposes of calculating the debt limit unless and until the Commonwealth actually pays on those guarantees.

The constitutional language thus expressly draws a distinction between direct-issued bonds and guaranteed bonds, providing for different treatment of those categories of bonds in the debt-limit calculation. Yet the Objectors' arguments would eviscerate that carefully drawn distinction by automatically treating all debt issued by the PBA and guaranteed by the Commonwealth as though it had been issued by the Commonwealth directly. In effect, Objectors would rewrite the debt-limit provisions in Article VI, Section 2 to declare that future debt service on the PBA's guaranteed obligations must be counted even if a payment is *not actually made* on account of the guarantee. That is just not what the Constitution says.

Indeed, the drafters of Puerto Rico's Constitution could not have been clearer in foreclosing the recharacterization argument that Objectors now advance. Before the adoption of the Puerto Rico Constitution, Puerto Rico (like most states) had an expansively worded debt limit, set forth in the federal Jones Act, that restricted the issuance of all "public indebtedness of Porto [sic] Rico or of any subdivision or municipality thereof." Pub. L. No. 64-368, § 3, 39 Stat. 953 (1917); accord, *e.g.*, Cal. Const. art. XVI, § 1 (restricting creation "in any manner [of] any debt or debts, liability or liabilities"); Me. Const. art. IX, § 14 ("any debt or debts, liability or liabilities, on behalf of the State"); Mo. Const. art. III, § 37 ("any liability of the state"); N.Y. Const. art. VII, § 11 ("no debt . . . by or in behalf of the state"); Or. Const. art. XI, § 7 ("any debt or liabilities"). But the drafters of Puerto Rico's Constitution took a decidedly different approach and replaced the sweeping limit in the Jones Act with a narrowly drafted limit that covered only certain types of government debt. See P.R. Const. art. VI, § 2. At least four aspects of the debt limit for direct-issued bonds underscore its narrow and precise focus.

*First*, this portion of the debt limit applies only to "*direct*" obligations of the Commonwealth. That alone is a marked departure from (and narrowing of) the all "public indebtedness" limit that existed under the Jones Act, § 3, 39 Stat. 953. Instead of following the lead of other states with expansive debt limits that restricted all debts, both "direct and contingent," *e.g.*, Ariz. Const. art. IX, § 5, the drafters of the Puerto Rico Constitution made clear that only "direct" obligations would count towards its debt limit, P.R. Const. art. VI, § 2. At least one state (Ohio) later followed Puerto Rico's lead and enacted a new debt limit provision that specifically targeted "direct obligations," *i.e.*, those debts where "the state of Ohio is the primary or only *direct obligor*." Ohio Const. art. VIII, § 17 (emphasis added) (adopted Nov. 2, 1999). That "direct obligation" language serves only one purpose—to highlight that "indirect" or "contingent" obligations do *not* count towards the debt limit in Puerto Rico's (and Ohio's) Constitution. Had the drafters wanted to include indirect obligations (like the PBA's obligations) in the debt limit, they would have said so expressly—just as several other states have. See, *e.g.*, Me. Const. art. IX, §§ 14, 14-B (including "indirect[]" debt to "insure" bonds issued by the Maine School Building Authority); Wash. Const. art. VIII, § 1 (calculating debt as any "indebtedness" that is "required to be repaid, directly or indirectly, from general state revenues").

*Second*, the debt limit applies only to obligations "for money borrowed *directly* by the Commonwealth." This repetition of the word "directly" underscores the carefully circumscribed scope of the provision: Under the Puerto Rico Constitution, a debt does not count towards the debt limit merely because the "obligation" is directly borne by the Commonwealth; the "money" must also be "borrowed directly" by the Commonwealth. The manifest purpose of this provision is to make clear that money borrowed by another entity—such as the PBA—*cannot* count as a "direct obligation" under the debt limit *even if the Commonwealth adopts the obligation to repay that*

15

*money*.  Again, the language of the Puerto Rico Constitution stands in stark contrast to the approach taken by certain other states.  Pennsylvania, for example, provides that debts incurred by its "agencies or authorities" count towards the debt limit "to the extent they are to be repaid from lease rentals or other charges payable directly *or indirectly* from revenues of the Commonwealth." Pa. Const. art. VIII, §7(c) (emphasis added).  While those states would count the bonds of a state building authority, the drafters of the Puerto Rico Constitution decided that only "money borrowed *directly* by the Commonwealth" counts.  P.R. Const. art. VI, § 2 (emphasis added).

*Third*, the debt limit applies only to obligations "evidenced by bonds or notes."  It is not enough that an obligation be incurred "directly" by the Commonwealth for "money borrowed directly by the Commonwealth"; to come within the debt limit, that obligation must also be in a specific form—*i.e.,* "bonds or notes."  Yet again, the narrow language that the drafters chose stands in contrast to the expansive "public indebtedness" language from the Jones Act and the equally capacious language adopted by many states.  See, *e.g.*, Cal. Const. art. XVI, § 1 (restricting creation "*in any manner* [of] any debt or debts, liability or liabilities") (emphasis added).  The only conceivable purpose of Puerto Rico's narrowing language is to foreclose consideration of obligations evidenced by things other than bonds and notes—such as the Commonwealth's obligations to pay rent under its leases with the PBA and the Commonwealth's obligations under its guaranty of the PBA Bonds.

*Fourth*, the obligations must be "issued by the Commonwealth."  So, even if there is a direct obligation of the Commonwealth for money borrowed by the Commonwealth that is evidenced in a bond or note, it does not count unless that bond or note flows from a particular *issuer*—namely, the Commonwealth.  Again, this narrow language could not be clearer that bonds or notes issued by other entities, such as the PBA, are not taken into account.

16

Case:17-03283-LTS   Doc#:10702   Filed:02/05/20   Entered:02/05/20 16:31:05   Desc: Main
Document     Page 38 of 91

These textual limitations—each standing alone, and certainly taken together—are so strict and unambiguous that they leave no room for Objectors' recharacterization theory. That conclusion is reinforced by the basic structure of the relevant constitutional provisions, which impose distinct tests for evaluating the Commonwealth's authority to issue direct obligations and its authority to incur guaranties of another entity's debts. By equating the guaranteed debt issued by the PBA with direct Commonwealth obligations, Objectors' arguments would render the latter test mere surplusage. Their Public Debt Claim Objections accordingly cannot be squared with the constitutional structure.

The Puerto Rico Constitution's debt limit does not limit any and all debt for which the Commonwealth might ultimately become responsible. But even if that were the objective of the debt limit (and the text makes quite clear it was not), "it is quite mistaken to assume . . . that 'whatever' might appear to 'further[] the [provision's] primary objective must be the law.'" *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (quoting *Rodriguez v. United States*, 480 U.S. 522, 526 (1987)). While the Objectors may be dissatisfied with the narrow wording of the debt limit, "[d]issatisfaction . . . is often the cost of legislative compromise." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461 (2002). A Constitution (even more than ordinary legislation) is "the art of compromise, the limitations expressed in" the text are often the "price" of ratification, and "no [provision] yet known pursues its [stated] purpose [ ] at all costs." *Henson*, 137 S. Ct. at 1725 (quoting *Rodriguez*, 480 U.S. at 525-26) (second and third brackets in original). Here, the Puerto Rico Constitution's debt limit sets a precise rule, prioritizing clarity and ease of application over breadth. That provision cannot be rewritten merely because—nearly seventy years after ratification—Objectors purport to have identified "an apparent anomaly as to some subject it does not address." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014).

17

Whatever one may think of the policy judgments underlying Puerto Rico's carefully reticulated debt limit provisions, there can be no serious doubt that those judgments were made.[8]  It is not the place of the Oversight Board (or the UCC or anyone else) to second-guess the principles and limitations set forth in Puerto Rico's duly ratified Constitution.

### 2.       As A Matter Of Law, The PBA Is Not A Sham Entity

Skipping past the constitutional text, Objectors insist that PBA Bonds should be treated as direct obligations because the PBA is merely a "sham" to evade the debt limit.  They are wrong, even taking as true the (sparse) factual allegations the Objectors offer in support of that legal conclusion.  As an initial matter, the PBA does not evade anything because, as just explained, Article VI, Section 2 reaches only certain debts ("direct obligations" of the Commonwealth) incurred by a particular party ("directly by the Commonwealth") in a particular form ("evidenced by bonds or notes") and issued in a particular manner ("by the Commonwealth").  The PBA cannot "evade" a debt limit that never would have reached PBA's obligations in the first place.

In any event, the Objectors' recharacterization argument fails as a matter of law even on its own terms.  The PBA cannot plausibly be described as a sham or artifice to avoid the constitutional debt limit.  On the contrary, it is beyond dispute that the PBA is an independent structure with bona fide legal and economic existence.  For six decades, it has provided important public services as the landlord for the Commonwealth and many of its agencies and other public authorities.  The Objectors' allegations do not undermine that conclusion.

---

[8] Puerto Rico is not alone in making that policy judgment.  In response to one of the cases on which the Objectors rely, the State of Washington amended its constitution to *exclude* from its debt limit any "obligations issued to fund or refund the indebtedness of the Washington state building authority."  Wash. Const. art. VIII, § 1(d); see also *id*. § 9.

a.      **The PBA Is Separate And Independent From The
Commonwealth**

The Legislative Assembly of Puerto Rico created the PBA in 1958 to construct, maintain,

and operate public facilities.  See Act 56 of June 19, 1958 (codified as amended at 22 L.P.R.A.

§ 901 *et seq.*) (attached as Ex. 4).  The PBA is as an independent public corporation that is separate

and distinct from the Commonwealth's government.  See 22 L.P.R.A. § 902.  Multiple features of

the PBA confirm this independent legal existence:

- By law, the PBA has "perpetual existence as a corporation," 22 L.P.R.A.
  § 906(a)(1), and the capacity to sue and be sued in its own name, *id.* § 906(a)(4).

- The PBA's own audited financial statements—which are issued separately from the
  Commonwealth's—reflect of approximately $3.5 billion of capital assets.[9]

- The PBA has material operating expenses (separate and apart from its debt-service
  obligations).[10]

- The PBA employs more than 1,000 people.[11]

- The PBA derives revenue from sources other than the Commonwealth.[12]

---

[9] See Public Buildings Authority, *Independent Auditors' Report and Basic Financial Statements and other Supplementary Information for the Fiscal Years Ended June 30, 2016, and 2015*, at 7, https://emma.msrb.org/ES1388910.pdf.

[10] See *id.* at 23 (reporting approximately $217.9 million in operating expenses for Fiscal Year 2016 and $220.5 million for Fiscal Year 2015); Public Buildings Authority, *Basic Financial Statements for the Fiscal Years Ended June 30, 2014 and 2013 and Independent Auditors' Report* 12, https://tinyurl.com/yaurjjm2 (reporting approximately $234.5 million in operating expenses for Fiscal Year 2014 and $221.5 million for Fiscal Year 2013).

[11] See Gloria Ruiz Kuilan, *Edificios Públicos comienza la operación para remozar las escuelas*, El Nuevo Día (Jun. 17, 2017), https://tinyurl.com/qof9ef7.  In Fiscal Year 2016, the PBA's employees were paid approximately $79.9 million in salary and benefits.  See Public Buildings Authority, *Independent Auditors' Report and Basic Financial Statements and other Supplementary Information for the Fiscal Years Ended June 30, 2016, and 2015*, at 23, https://emma.msrb.org/ES1388910.pdf.

[12] See Official Statement for PBA Government Facilities Revenue Refunding Bonds, Series U (June 8, 2012), at 16 (noting that 85% of PBA rental payments originated from the Commonwealth's General Fund), https://tinyurl.com/shraaqo.

It is thus no surprise that courts have concluded that, for Eleventh Amendment purposes, the PBA is not an alter ego of the Commonwealth. *Soto Padró v. Public Bldg. Auth.*, 747 F. Supp. 2d 319, 327 (D.P.R. 2010); *Iravedra v. Public Bldg. Auth.*, 196 F. Supp. 2d 104, 116 (D.P.R. 2002) ("PBA is not a mere 'alter ego' of the Commonwealth . . . They are two separate, albeit related, legal entities."). As the Supreme Court of Puerto Rico has explained, unlike government "agencies or departments . . . whose operational funds come *directly* from the State," the PBA "operate[s] practically as a 'private business[]' and do[es] not receive significant direct allotments of public funds from the central government." *Rodriguez Torres v. Autoridad de Edificios Publicos*, 141 D.P.R. 362, 369, 370 (P.R. 1996).[13] The Objectors have provided no basis in fact or in law to override those (clearly correct) determinations that PBA is a genuine entity distinct from the Commonwealth.

### b. The PBA's Leases And Rent Practices Are Legitimate

In any event, the economic realities of the PBA's leases with the Commonwealth confirm that the PBA provides legitimate services as a landlord and is not simply a financing conduit. Most critically, the PBA generally holds title to the rental properties, and the leases do not contain a purchase option for the lessees at their expiration. As courts have observed in the context of "true lease" disputes, that fact cuts decisively in favor of the conclusion that the lessor is truly acting as a landlord.[14] In addition to holding formal legal title, the PBA also retains many of the practical

---

[13] Certified translation available at Exhibit B to Dkt. No. 63 in Adv. Proc. No. 18-149-LTS.

[14] See, *e.g.*, *In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1146 (7th Cir. 1982) ("The difference between a true lease and a security transaction lies in whether the lessee acquires an equity of ownership through his rent payments."); *In re Brankle Brokerage & Leasing, Inc.*, 394 B.R. 906, 913 (Bankr. N.D. Ind. 2008) ("A key, some would say pivotal, consideration in this regard is whether the lessee acquires some type of ownership or equity interest in the property."); *In re Integrated Health Servs.*, Inc., 260 B.R. 71, 76 (Bankr. D. Del. 2001) (true lease where "agreements contain no purchase option at the end of the leases"); *Westship, Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 863 (M.D. Fla. 2000) ("[T]he most significant factor in determining whether a transaction is a lease or a sale is whether the lessor has retained a residual interest at the end of the lease term.").

burdens and benefits of ownership.  For example, the PBA generally must obtain insurance on the
rental properties and maintain them.   The PBA's lessees also cannot make alterations or
improvements to the properties without the PBA's consent.[15]   The PBA requires all tenants
(including Commonwealth agencies) to pay rent, and has taken legal actions to collect when
tenants have failed to do so.[16]

The PBA's leases are also unquestionably valid under Puerto Rico law, which defines a
lease as a contract between two parties whereby "one of the parties thereto binds himself to give
to the other the enjoyment or use of a thing for a specified time and a fixed price."  31 L.P.R.A.
§ 4012.  Puerto Rico courts have explained that this means a lease must provide for: (1) the use or
enjoyment of property by the lessee, (2) in exchange for a rent that is either a sum certain or readily
ascertainable, for (3) a fixed term or a term that is variable depending upon the occurrence of
specified events.  See *In re Daben Corp.*, 469 F. Supp. 135, 148 (D.P.R. 1979).  The PBA's leases
meet each of these requirements to qualify as "true leases" under Puerto Rico law.  See, *e.g.*,
Exhibit D to Dkt. No. No. 1 in Adv. Proc. No. 18-149, §§ 1.01, 4.01 (establishing term of lease
and providing that tenant has "Unconditional Obligation" to pay rent); cf. *id.* at 11 (amendment
renewing original lease term beyond initial expiration date); see also 31 L.P.R.A. § 4053 (landlord

---

[15] Because certain of the leases between the Commonwealth and the PBA have become "matters of
public record," they are properly considered even on a motion to dismiss.  See, *e.g.*, *United States ex rel.
Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (considering press releases, news
articles, a report, and records from Congressional testimony).  That is particularly true where, as here, there
is no serious dispute over the existence or terms of those leases—Objectors dispute only the legal
significance of the leases and the treatment they should be afforded in bankruptcy.

[16] See, *e.g.*, *Autoridad de Edificios Publicos v. Oficina de Administración de los Tribunales*, No.
KCD2009-3277 (Jan. 15, 2010) (PBA suing Commonwealth Office of Court Administration for in excess
of $42 million owed under Leases); *Autoridad de Edificios Publicos v. Corp. del Centro Cardiovascular
de P.R. y el Caribe*, No. KCD2009-3278 (Aug. 25, 2009) (PBA suing Cardiovascular Center of Puerto Rico
and the Caribbean for unpaid rent in excess of $47 million).

may rescind lease contract upon non-payment of rent by tenant); *id.* § 4058 (tenant "must return the estate at the expiration of the lease" to the landlord in good condition).

The Objectors repeatedly point to the PBA's rent practices as though those practices offered proof of their artifice theory. See, *e.g.*, 2012-2014 GO Claim Objection ¶¶ 47, 67. Indeed, Objectors make the audacious claim that the PBA stands apart as even more of a "sham" than most public building authorities because the rent charged to the Commonwealth was "tied directly to the payment of debt service" and had to be paid even if the buildings were destroyed at no fault of the lessee. *Id*. But that supposed "smoking gun" is really just smoke-and-mirrors.

Contracts requiring tenants to pay "all costs related to the premises including the mortgage, taxes, and utilities" are common in net lease arrangements. *In re Integrated Health Servs., Inc.*, 260 B.R. 71, 77 (Bankr. D. Del. 2001); see also *In re Double G Trucking of the Arklatex, Inc.*, 432 B.R. 789, 799-800 (Bankr. W.D. Ark. 2010) (collecting cases and explaining that a requirement that lessee bear costs related to "maintenance, risks of loss or damage," and other "usual semblances of ownership is typical of [a] net lease"). Who ultimately bears those costs "reflect[s] less the true character of the transaction than the strength of the parties' respective bargaining positions." *In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1146 (7th Cir. 1982). And it makes perfect sense that the PBA, a public entity, should charge the Commonwealth only the amount necessary to meet the PBA's actual costs of doing business—neither hoarding excess rental income nor running deficits that would jeopardize its ability to accomplish its public purpose.

In any event, this feature of the PBA is hardly some dark secret that the Public Debt Claim Objections only recently unmasked. To the contrary, it has been on full public display for decades. And yet, until the Objectors found it tactically advantageous to do so, no one so much as suggested that this payment structure could somehow transform a major public agency with thousands of

22

employees into "a gutless intermediary whose sole reason for existence [was] to insulate the state
from the constitutional debt limitation."  2012-2014 GO Claim Objection ¶ 77 (internal quotation
marks omitted; brackets in original).

### c.   The PBA's History Confirms Its Legitimacy

The decades-long history of the PBA structure provides additional confirmation that it is a
valid structure, not a contrivance to evade the debt limit.  The PBA was created in 1958, three
years *before* Puerto Rico's current debt limitation was added to the Constitution by amendment.
See Act 56 of June 19, 1958, § 1 (establishing the PBA); Pub. L. No. 87-121, § 1, 75 Stat. 245
(1961) (repealing Jones Act debt limit upon adoption of amendment to the Puerto Rico
Constitution).  From the beginning, the PBA was empowered "[t]o borrow money" and "make and
issue bonds . . . for any of its corporate purposes."  Act 56 of June 19, 1958, § 5(10).  Since the
PBA predates the current debt limit, the "sham" argument requires Objectors to rewrite history.
In reality, the drafters of the debt limit drew specific lines knowing full well how the PBA operated
(and incurred its own debt).  See *Hall v. United States*, 566 U.S. 506, 516 (2012) ("We assume
that Congress is aware of existing law when it passes legislation.").  If the drafters had intended to
sweep PBA Bonds into the debt-limit calculation, they could have easily done so.  See pp. 14-16,
*supra* (discussing broadly worded debt-limit provisions from other jurisdictions).  The fact that
they did not shows that they did not intend the PBA's debt to count towards the Commonwealth's
limit.

The Puerto Rico Legislative Assembly likewise never hinted that later amendments to the
PBA might somehow operate to stymie the carefully crafted debt limit in the Commonwealth's
Constitution.  In 1962, only a year after the adoption of the constitutional debt limit, the Legislative
Assembly amended the PBA's enabling legislation to make the Commonwealth's rental

23

obligations under its leases with PBA full faith and credit obligations. See Act 51 of June 19, 1962, § 1 (attached as Ex. 5). In 1964, the Legislative Assembly amended the enabling act again to extend the Commonwealth's full faith and credit guarantee to rent owed by Commonwealth agencies and instrumentalities. See Act 27 of May 14, 1964, § 1 (attached as Ex. 6). On the Objectors' reasoning, the provision of such guarantees converted the PBA's bonds into direct Commonwealth obligations. See 2012-2014 GO Claim Objection ¶ 86. But there is no record of anyone in the Legislative Assembly—which included many legislators who had voted to adopt the constitutional debt limit—ever suggesting that view. Nor is there any suggestion that anyone raised a concern four years later, in 1968, when the Legislative Assembly authorized the Commonwealth to guarantee the PBA's bonds. See 22 L.P.R.A. § 907a (enactment notes).

Indeed, the Oversight Board has come up empty on this score, despite engaging counsel to conduct a (costly) independent investigation that covered 120 witness interviews, and more than 2.7 million pages of documents over a 10-month period. See Kobre & Kim LLP, *Final Investigative Report* 23-27 (Aug. 20, 2018) ("Kobre Report"). Even after that extensive independent investigation, Kobre & Kim could find "no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violates the Constitutional Debt Limit." *Id.* at 262. To the contrary, the relevant officials "were not aware of *anyone* expressing the view that PBA Bonds should be included in the Debt Limit Calculation." *Id.* (emphasis added).[17]

---

[17] It is worth noting that, as recently as the Commonwealth's last issuance of GO Bonds in 2014, Greenberg Traurig, LLP, as bond counsel, gave an unqualified legal opinion that "the [2014 GO Bonds] constitute valid and binding general obligations of the Commonwealth for the payment of the principal of and the interest on the Bonds, to which the good faith, credit and taxing power of the Commonwealth are pledged." 2014 GO Official Statement, at III-1.

Both the United States Supreme Court and the Puerto Rico Supreme Court have recognized that early legislative practice provides important guidance in construing a constitution's terms. See, *e.g.*, *Alden v. Maine*, 527 U.S. 706, 743-44 (1999) ("[E]arly congressional practice . . . provides 'contemporaneous and weighty evidence of the Constitution's meaning.'") (quoting *Printz v. United States*, 521 U.S. 898, 905 (1997)). In the copyright context, for example, the Supreme Court has observed that "[t]he construction placed upon the constitution by the first [copyright] act of 1790 . . . by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight." *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884). The Puerto Rico Supreme Court has made the same point, holding that the "contemporaneous views" of Legislative Assembly members who participated in Puerto Rico's Constitutional Convention "should be given weight in passing on the validity of" legislation. *Velez v. Superior Court of P.R.*, 75 D.P.R. 585, 628 (P.R. 1953) (translation available on Lexis). Here, early and consistent practice under the Puerto Rico Constitution's debt limit confirm that PBA Bonds are properly treated as guaranteed obligations, rather than direct obligations. It is unfathomable that the PBA's supposed perversion of the constitution's meaning simply escaped notice of Puerto Rico's founding generation. And it is rich irony, indeed, that the Objectors now label PBA a contrivance when it is the Objectors' own legal theory that was conceived out of expediency for tactical advantage, without regard to six decades of settled practice and understanding.

### 3.    The Objectors' Cases Are Inapposite

Bereft of any textual, structural, or historical support, Objectors rely on cases from a handful of other jurisdictions. Indeed, Objectors would have this dispute turn on whether the PBA obligations at issue here would (in their view) offend courts applying constitutional provisions applicable in, say, Massachusetts or West Virginia. But this case is not a referendum on PBA-

type structures generally.  It presents a question of the meaning of *Puerto Rico*'s constitution.
Objectors' failure to engage that essential question—resorting instead to a sampling of debt-limit
disputes across time and space—is telling and fatal.  All of Objectors' cases involved either
different constitutional provisions, different factual circumstances, or both.

*First*, all of the decisions cited in the 2012-2014 GO Claim Objection addressed
constitutional debt limits (or related procedural requirements) phrased in general language that
contrasts markedly with the detailed and precise language of the Puerto Rico Constitution's debt
limit.  Unlike the provisions of Puerto Rico's Constitution, the provisions in the cited cases referred
to the jurisdiction's "indebtedness," "debt," "borrowing," or the like.[18]  This general phrasing thus
referred to one undifferentiated category of "debt" or "borrowing," without any attempt to
distinguish between direct-issued bonds on the one hand and third-party guarantees on the other.
As explained above, however, the carefully calibrated language of the Puerto Rico Constitution
expressly distinguishes between direct and guaranteed debt and between bonds or notes and other
forms of obligations.  See pp. 7-8, 12-18, *supra*.

*Second*, a number of the cases Objectors cite involved a municipality or state creating a
financing conduit for purposes of a single-asset real estate financing so that the public entity could
acquire or construct a particular individual property.  *E.g.*, *Ayer v. Commissioner of Admin.*, 165
N.E.2d 885, 886 n.1 (Mass. 1960) (non-profit entity created for sole purpose of financing

---

[18] See *Winkler v. State Sch. Bldg. Auth.*, 434 S.E.2d 420, 423 n.1 (W. Va. 1993) ("debts or liabilities");
*Martin v. Oregon Bldg. Auth.*, 554 P.2d 126, 139 (Or. 1976) ("debts or liabilities"); *Scroggs v. Kansas City*,
499 S.W.2d 500, 505 (Mo. 1973) ("indebtedness"); *Ayer v. Commissioner of Admin.*, 165 N.E.2d 885, 886
n.1, 888 n.2 (Mass. 1960) ("incur[ring] obligations," "borrow[ing] money," and "expend[ing] money");
*State ex rel Wash. State Bldg. Fin. Auth. v. Yelle*, 289 P.2d 355, 357 (Wash. 1955) ("debts, direct and
contingent"); *State v. Volusia Cty. Sch. Bldg. Auth.*, 60 So. 2d 761, 761 (Fla. 1952) ("issue bonds") (citing
Fla. Const. of 1885, art. IX, § 6 (as amended in 1929)); *State ex rel Pub. Institutional Bldg. Auth. v. Neffner*,
30 N.E.2d 705, 706 (Ohio 1940) (per curiam) ("indebtedness"); *Reynolds v. City of Waterville*, 42 A. 553,
555 (Me. 1898) ("any debt or liability").

construction of single state office building); *Reynolds v. City of Waterville*, 42 A. 553, 556 (Me. 1898) (commission created by city to finance construction of city hall).   In many cases, the financing conduit was created solely for purposes of a single transaction that, while formally labeled as a lease, bore the economic hallmarks of a financing because it resulted in transfer of title to the premises to the lessee at the end of the lease.   See *State ex rel Pub. Institutional Bldg. Auth. v. Neffner*, 30 N.E.2d 705, 706, 708 (Ohio 1940); *State ex rel Wash. State Bldg. Fin. Auth. v. Yelle*, 289 P.2d 355, 360 (Wash. 1955); *Scroggs v. Kansas City*, 499 S.W.2d 500, 501, 501 (Mo. 1973); *Ayer*, 165 N.E. 2d at 887, 889-91 (state lessee to obtain title to office building at end of lease with lessor who was "mere intermediary"); *Reynolds*, 42 A. at 555-57 (city was to retain title at end of lease, and lessor was "naked of all authority" except as a "formal medium" to finance city debt); *Martin v. Oregon Bldg. Auth.*, 554 P.2d 126, 128 (Or. 1976).   The PBA, by contrast, predates the constitutional debt limit, possesses legal separateness and real economic substance, and has provided services as a landlord for more than six decades.   See pp. 18-25, *supra*.   And Objectors do not allege that the PBA's leases provide for a transfer of title to the Commonwealth at the end of their terms.   The PBA thus bears no resemblance to the financing conduits addressed in the cited cases.

*Finally*, Objectors' cases stressed that the entities nominally issuing the debt did *not* "perform services for [anyone] other[] than the" municipality or state that created them.   2021-2014 GO Claim Objection ¶ 74 (quoting *Ayer*, 165 N.E. 2d at 890); see also *Martin*, 276 Or. at 145 (noting that the "state [was] the *sole* source of funds" to pay rent on the leases) (emphasis added); *State v. Volusia Cty. Sch. Bldg. Auth.*, 60 So. 2d 761, 761 (Fla. 1952) (similar).   But that is not the case with the PBA.   Indeed, Objectors have previously conceded that the PBA has "entered into bona fide leases" with "Private or Non-Commonwealth Related Entities," including

27

the federal Department of Housing and Urban Development and the U.S. Post Office. Plfs.' Opp. to Rule 12(c) Mot. for Judgment on the Pleadings 18, Dkt. No. 88 in Adv. Proc. No. 18-149-LTS. In stark contrast to the "gutless intermediar[ies]" in the cited cases (2012-2014 GO Claim Objection ¶ 77), the PBA is a true landlord that leases to the Commonwealth's agencies, municipal entities, and "private or non-Commonwealth related entities" alike.

*     *     *

For all of these reasons, Objectors fail to identify any plausible basis to recharacterize bonds issued by the PBA as direct obligations of the Commonwealth. Rather, the PBA Bonds were properly treated as guaranteed obligations for purposes of the constitutional debt limit, with the debt service owed on those bonds excluded from the calculation.

**B.    The Commonwealth's Rental Payments To The PBA Were Not Payments "For Principal Or Interest On Account Of Any Outstanding Obligations Evidenced By Bonds Or Notes Guaranteed By The Commonwealth"**

The Debt Coalition has belatedly conjured up an alternative argument for including in the debt-limit calculation the portion of the Commonwealth's rental payments that the PBA, in turn, used to make payments on its own bonds. Unlike the Board and the UCC, the Debt Coalition recognizes that the PBA is not a "sham." Debt Coalition Claim Objection ¶ 19. Indeed, the Debt Coalition argues elsewhere that the Commonwealth's leases with the PBA are "true leases"—*i.e.*, that the Commonwealth legitimately pays rent to the PBA in exchange for continued use and occupancy of the premises leased by the PBA. The Debt Coalition nonetheless contends that the Commonwealth's guaranty of the PBA Bonds requires that the Commonwealth's rental payments to PBA be included in the debt-limit calculation as "amounts paid by the Commonwealth . . . for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth." P.R. Const. art. VI, § 2.

The Debt Coalition's argument is wrong.  It is foreclosed by the text of the Puerto Rico Constitution's debt limit, by the debates surrounding the debt limit's adoption, and by longstanding historical practice.  And it is squarely incompatible with the Debt Coalition's own concession that the PBA receives rental payments from the Commonwealth as a true, legitimate landlord.  The Debt Coalition's argument therefore fails as a matter of law, and the Debt Coalition Claim Objection should be dismissed.

### 1. The Debt Coalition Fails To Respect The Distinction Between Direct And Guaranteed Obligations

As explained above, the Puerto Rico Constitution's debt limit carefully distinguishes between direct-issued obligations and obligations guaranteed by the Commonwealth.  Clause (i) of the debt limit (the "Direct Debt Calculation") concerns direct-issued obligations, that is, "direct obligations of the Commonwealth for money borrowed directly by the Commonwealth."  P.R. Const. art. VI, § 2.  Clause (ii) (the "Guarantee Calculation"), by contrast, concerns guaranteed obligations, that is, "obligations evidenced by bonds or notes guaranteed by the Commonwealth" but not issued by the Commonwealth.  *Id.*  Importantly, while the Direct Debt Calculation is forward-looking (*i.e.*, it accounts for debt service payable on direct obligations in future years), the Guarantee Calculation looks to the past, in that it considers only payments actually made in the previous fiscal year on account of guaranteed debt.

Unlike the Board and the UCC, the Debt Coalition does not rely on the Direct Debt Calculation; it correctly recognizes that the PBA's bonds were issued by a distinct legal entity and are not "obligations of the Commonwealth for money borrowed directly by the Commonwealth." Debt Coalition Claim Objection ¶ 39.  Instead, the Debt Coalition relies on the Guarantee Calculation, because the Commonwealth has guaranteed payment of the principal and interest on

29

the PBA's bonds in the event that the PBA cannot do so.  22 L.P.R.A. § 907a; see Debt Coalition

Claim Objection ¶¶ 40-41.

But the Debt Coalition's argument distorts the Constitution beyond its plain meaning.

Guaranteed obligations count toward the debt limit only if the issuer has defaulted and the

Commonwealth has been required to make a payment to bondholders pursuant to its guaranty of

the bonds.  That conclusion follows directly from the text of the Puerto Rico Constitution's debt

limit, the debates surrounding the adoption of that provision, settled historical practice, and the

manifest policy considerations underlying the debt limit.  But in the absence of a payment default

by the PBA that triggers the Commonwealth's obligations under its guaranty of the PBA Bonds,

the Commonwealth itself does not make any payments "for" debt service "on account of" the PBA

Bonds.  The Commonwealth's rental payments therefore have no role to play in the debt limit

calculation.

### a.     The Constitutional Text

By its text, the Guarantee Calculation considers only payments made by the

Commonwealth pursuant to its obligation to guarantee the obligations of another entity.  As

explained above (see pp. 7-8, 13-14, *supra*), the presence of a guarantee is what distinguishes the

two clauses of the debt limit; payments falling within the scope of the Guarantee Calculation must

be payments made pursuant to that guarantee, because the clause is limited to "amounts paid by

the Commonwealth . . . *for* principal or interest *on account of* any outstanding obligations

evidenced by bonds or notes guaranteed by the Commonwealth."  P.R. Const. art. VI, § 2

(emphases added).

### i.     *A Payment Must Be "For" Principal And Interest*

A payment is "for" principal and interest only if it is made "in consideration of" or for the

direct "payment of" such principal and interest.  *Random House Dictionary of the English*

*Language Unabridged* 747 (2d ed. 1987); see also, *e.g.*, *Webster's Third New International Dictionary Unabridged* 886 (1981) ("with the purpose or object of").  Consistent with the plain meaning of the term, courts require there to be a close nexus or relationship between X and Y in order to find that X was done "for" Y.  See, *e.g., United States v. Crooker*, 608 F.3d 94, 97 (1st Cir. 2010) (per curiam) (use of "for" in criminal firearm statute meant that X was done "with the object or purpose of" Y, and not simply "knowledge" that X was "capable" of causing Y); *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 530 (3d Cir. 2018) (emphasizing the "limiting function" of the word "for").

In this respect, the Debt Coalition's argument turns the Constitution's actual text on its head.  It would treat the portions of the Commonwealth's rental payments to the PBA that the PBA uses to repay its bondholders as a payment "for" principal and interest.  But the Commonwealth's purpose in paying rent to the PBA is to satisfy the Commonwealth's obligation under the terms of the Leases and enable it to remain in occupancy of PBA property, and *not* to satisfy the PBA's obligations to its bondholders.  The Guarantee Calculation does not apply to indirect payments of rent under the Leases simply because they are later used by the PBA to satisfy its own obligations to bondholders.

### ii.   A Payment Must Also Be "On Account Of" Guaranteed Indebtedness

The Puerto Rico Constitution also requires that a payment be made "on account of" guaranteed bonds in order to be included in the Guarantee Calculation.  P.R. Const. art. VI, § 2.  The phrase "on account of" means "by reason of" or "because of."  See *Random House Dictionary of the English Language Unabridged* 13; *Webster's Third New International Dictionary Unabridged* 13 (1981).  Courts have therefore understood the phrase to require a proximate or direct connection.  *E.g.*, *O'Gilvie v. United States*, 519 U.S. 79, 83 (1996) (tax statute addressing

31

amounts received "on account" of personal injury required a "stronger causal connection" than but-for causation, reaching only amounts received "by reason of, or because of, the personal injuries"). For its part, the Debt Coalition asserts that rental payments under the Leases are "indisputably made on account of . . . principal and interest" on the PBA Bonds, see Debt Coalition Claim Objection ¶ 41, but that is a non sequitur. The Guarantee Calculation does not ask whether a payment was made "on account of" principal and interest—it asks whether a payment "*for* principal or interest*" was made "on account of" guaranteed bonds. P.R. Const. art. VI, § 2 (emphasis added). Even if the payments were somehow "for" principal and interest (but see pp. 30-31, *supra*), they were not "on account of" the guaranteed bonds. The Commonwealth did not make its rental payments because of the guaranteed bonds. It made those payments because of its rent obligations under its leases with the PBA. Or, put another way: even if the PBA chose not to put the Commonwealth's rent payments toward debt service, the Commonwealth remained obligated to make its rent payments under its leases.

### b.    Legislative History

Because the constitution's plain text forecloses the Debt Coalition's theory, the inquiry ends there.[19] If there were any doubt, however, the legislative history of the debt limit confirms that the Guarantee Calculation covers only payments made after the Commonwealth's guaranty is triggered by the issuer's non-payment. The debt limit was added to the Puerto Rico Constitution by amendment in 1961. The Puerto Rico Senate formed a special committee to consider the amendment. In its report to the Senate recommending the amendment, the special committee

---

[19] *Cf.* 31 L.P.R.A. § 14; *In re Financial Oversight & Mgmt. Bd. for Puerto Rico*, 919 F.3d 121, 129 (1st Cir. 2019) ("Because the language of the statute is unambiguous [] we find it unnecessary to turn to the legislative history.").

explained that the provision at issue would apply only to payments made pursuant to the Commonwealth's guarantee of non-Commonwealth debt following a default by the issuer:

> [T]he **bonds that have been issued** and may be issued **by public corporations of the Commonwealth** of Puerto Rico **will not be taken into consideration** in the calculation of the debt margin of the State, since the good faith of the People is not pledged for the repayment of such, and repayment will only be based on the revenues obtained by such corporations.  It will **only be the case if the State is a guarantor** of these bonds, which has not been the case until now, **and the State were to be obligated to pay a deficiency** in the debt requirement of such, that **the amount so paid will be counted** against the debt margin of the Commonwealth of Puerto Rico.

*Diario de Sesiones de la Asamblea Legislativa*, Vol. 14, No. 27, at 221 (Extraordinaria) (Sept. 5, 1961) (translation attached as Ex. 7) (emphases added).  In other words, only payments made by the Commonwealth on a *triggered* guaranty would be taken into account.

The special committee also reported that amounts paid for public corporation bonds would "only be counted against the Commonwealth's debt margin if the Commonwealth were to guarantee one of those bonds . . . and if it had to pay an outstanding balance for them on a certain year."  *Id.* at 248.  The report further clarified that the Debt Limit applied only to "public debt" consisting of "bonds and promissory notes,"—which the report defined as "negotiable obligation[s] sold on the United States securities market,"—and would *not* take into account "the Commonwealth's current or contingent obligations or debts incurred in order to maintain the Government's normal operations" (*e.g.*, the payment of rent).  See *id.*

No member of the Legislative Assembly challenged this apparently uncontroversial understanding of the relevant constitutional language.  To the contrary, members expressed the exact same views in floor statements that described the conditions under which guaranteed debt

33

would trigger the debt limit.[20]  Simply put, had the legislature meant to include indirect payments within the Guarantee Calculation—like some states do—it would have said so.[21]

### c. Historical Practice

Longstanding historical practice reinforces the original understanding evinced by the Legislative Assembly.  The Commonwealth started to guarantee bonds issued by the PBA in 1968, just seven years after the debt limit's addition to the Puerto Rico Constitution.  See Act 17 of Apr. 11, 1968, § 1 (codified as amended at 22 L.P.R.A. § 907a) (attached as Ex. 8).  Yet the Commonwealth did not then suggest it should count its rental payments to the PBA toward its debt limit.  To the contrary, the Commonwealth and the PBA consistently have reaffirmed that "annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the issuers of such guaranteed bonds are unable to make such payments and the Commonwealth is therefore required to make such payments under its guarantee, in which case such debt service would be included in the calculation of the 15% constitutional debt limitation."  *E.g.*, Official Statement for PBA Government Facilities Revenue Refunding Bonds, Series U (June 8, 2012), at 21, https://tinyurl.com/shraaqo.  This position has gone unchallenged for fifty years, until the present litigation.  See generally Kobre Report 258-62.

Further, the long-settled understanding regarding the PBA Bonds is consistent with the approach taken by the Government Development Bank for Puerto Rico (the "GDB") and

---

[20] See, *e.g.*, *id.*, at 249 ("[T]he public debt shall be comprised of or shall include the direct obligations of the Commonwealth of Puerto Rico, plus any amounts that the Commonwealth of Puerto Rico may have to pay, which is known as "default," on behalf of any of the public authorities they have guaranteed.") (statement of Rep. Polanco-Abreu).

[21] See, e.g., Tex. Const. art. III, § 49-j ("[b]onds or lease purchase agreements that pledge the full faith and credit of the state . . . [and] require[] use of the state's general revenue for payment" are included in the debt limit); Ill. Const. art. IX, § 9 ("bonds or other evidences of indebtedness which are secured by the full faith and credit of the State or are required to be repaid, directly or indirectly, from tax revenue" are included in the debt limit).

Commonwealth officials in connection with bonds issued by the Puerto Rico Aqueduct and Sewer Authority ("PRASA Bonds").  In 1995, the Commonwealth began guaranteeing certain issuances of the PRASA Bonds, which are payable in the first instance from the revenues PRASA collects from ratepayers.[22]  Starting in 1997, PRASA could no longer service its debt, so "the Commonwealth began to make payment of debt service on the PRASA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth."[23]  This practice continued until 2006, when PRASA was once again able to service its debt.  The Commonwealth's financial statements reflect that only those amounts paid from 1997 to 2006 were included in the Guarantee Calculation. Amounts appropriated to PRASA on or after July 1, 2006 (when PRASA resumed servicing the PRASA Bonds from its own revenues) were not counted.[24]  By the Debt Coalition's logic, however, *all* amounts paid by the Commonwealth to PRASA for water and sewer charges that are then used by PRASA to service the debt on its Bonds should be included in the Guarantee Calculation *every year*, regardless of PRASA's ability to pay.  The Commonwealth, of course, never did so, which only reinforces the common-sense conclusion that the Guarantee Calculation simply does not account for anything except a direct payment of principal and interest by the Commonwealth on its guarantee of another issuer's bonds.

---

[22] See Official Statement for Commonwealth of Puerto Rico Tax and Revenue Anticipation Notes Series 2002 (Oct. 5, 2001), at 9, https://tinyurl.com/sk8avdw.

[23] *Id.*

[24] See, *e.g.*, Official Statement for PBA Government Facilities Revenue Refunding Bonds, Series M, PBA Government Facilities Revenue Bonds, Series N, and PBA Government Facilities Revenue Bonds, Series O (Dec. 7, 2007), at 35, https://tinyurl.com/w6fcymm.

### 2.    The Debt Coalition Has Conceded That Lease Payments Are "For" Rent, And Not "For" Principal And Interest

The Debt Coalition's argument is also foreclosed by the Debt Coalition's concession that the Commonwealth's leases with the PBA are "true leases."[25]  That is, the Debt Coalition has expressly rejected the position that the Commonwealth's rental payments were, "in truth, payments of principal and interest" on a secured financing.  *In re PCH Assocs.*, 804 F.2d 193, 199 (2d Cir. 1986).

Rather, by the Debt Coalition's *own* account, each payment of rent from the Commonwealth to the PBA "cover[ed] another month's use of a productive asset."  See *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 613 (7th Cir. 2005) (describing leases). Specifically, by paying rent to the PBA, the Commonwealth obtained the "occup[ancy] and use[]" of real property "for offices and all other purposes as specified in the [PBA] Enabling Act for its officers and employees in the performance of its functions."  *E.g.*, Exhibit D to Dkt. No. No. 1 in Adv. Proc. No. 18-149, § 1.01 (lease contract).

At bottom, this concession is logically inconsistent with the Debt Coalition's argument that the Commonwealth has made payments of principal and interest on the PBA Bonds.  If the Commonwealth was not paying the PBA for financing provided by *the PBA* then, *a fortiori*, the Commonwealth was not paying the PBA for financing provided by *the PBA's bondholders*.  It therefore follows that the amounts paid by the Commonwealth to the PBA were properly excluded from the constitutional debt-limit calculation.

*      *      *

---

[25] Answer of Intervenor-Defendant Lawful Constitutional Debt Coalition, Dkt. No. 60 in Adv. Proc. No. 18-149-LTS, ¶¶ 36-44, (Mar. 19, 2019).

In sum, the Debt Coalition Claim Objection fails because its basic legal premise is mistaken. The Commonwealth's rental payments to the PBA were not payments "for principal or interest on account of . . . bonds or notes guaranteed by the Commonwealth." The Debt Coalition Claim Objection should accordingly be dismissed.[26]

### C.   Interest Payments Funded From Bond Proceeds Were Properly Excluded From The Debt Limit Calculation For The 2014 GO Bonds

The 2012-2014 GO Claim Objection contends that the 2014 GO Bonds were issued in violation of the Puerto Rico Constitution's debt limit due to the treatment of interest payments that were funded from the proceeds of that bond issuance. Objectors argue that such amounts, referred to in the 2014 GO Bonds' Official Statement as "capitalized interest,"[27] were improperly "excluded from the calculation of the Commonwealth's Debt Service Limit" and would have put

---

[26] In a footnote, the Debt Coalition alludes to an argument in the alternative that any funds provided to the PBA by the GDB under various lines of credit, although "structured as an extension of credit," were in fact "draws on the Commonwealth's guaranty." Debt Coalition Claim Objection ¶ 43 n. 45. The Debt Coalition argues that, because PBA Bonds are purportedly non-recourse to the PBA, then, by process of elimination, any payment of principal and interest that is not made using rental payments must *necessarily* be a draw on the Commonwealth guarantee. See *id.* The Debt Coalition refers the reader to an unrelated document filed by Ambac Assurance Corporation, but otherwise does not develop the argument or support its legal conclusion. See *id.* Conclusory statements are insufficient to state a claim, and the Debt Coalition has therefore failed to adequately plead any alternative argument regarding GDB lines of credit. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In any event, this argument fails on the merits. It proceeds from the faulty premise that debt service can be paid on the PBA Bonds *only* through the Commonwealth's rent payments or through the Commonwealth's guarantee of the PBA Bonds. But the sole purported "restriction" on the PBA's ability to repay its bonds that the Debt Coalition can point to is in a bond covenant that limits the enforcement rights of bondholders to certain discrete streams of revenues. See Puerto Rico Public Buildings Authority, Resolution No. 468, Authorizing and Securing Government Facilities Revenue Bonds Guaranteed by the Commonwealth of Puerto Rico, adopted June 22, 1995, § 703. Contrary to the Debt Coalition's argument, this covenant does not prohibit the PBA from *voluntarily* using other resources to repay its debt. The Debt Coalition is thus wrong to presume that any debt service not funded through rent payments must necessarily represent a draw on the Commonwealth's guaranty.

[27] See 2014 GO Official Statement, at 30-31; see also *id.* at 34 n.† (noting that debt-service requirements were reported "[n]et of interest capitalized through July 1, 2016.").

the 2014 issuance over the debt limit even if the PBA payments are not included.  2012-2014 GO

Claim Objection ¶¶ 87, 89.  Yet again, Objectors ignore the actual constitutional text.

Only "the amount of principal . . . and interest . . . *payable in any fiscal year*" counts

against the debt limit.  P.R. Const. art. VI, § 2 (emphasis added).  The term "payable" refers to

amounts that are "to be paid."  *Black's Law Dictionary* 1309 (10th ed. 2014).  But after issuance,

nothing remained for the Commonwealth to pay on the capitalized interest for the first three years.

To the contrary, the bondholders specifically set aside funds for those interest payments "in the

Redemption Fund . . . for the benefit of all holders of general obligation bonds."  Official Statement

for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A (Mar. 11, 2014)

("2014 GO Official Statement"), at 31, https://tinyurl.com/r4jaeqa.  Those funds therefore already

belonged to bondholders and were no longer "payable" within the meaning of the Constitution.

The leading treatises and precedent (even from jurisdictions with much broader debt limits)

reinforce that conclusion.  A so-called "sinking fund" (like the fund holding the capitalized interest

amounts here) "is a proper offset as against existing bonds in payment of which it is pledged"

because the amount that remains payable "would be a sum equal" to the outstanding indebtedness

minus the amounts in the fund. 15 Eugene McQuillin, *The Law of Municipal Corporations* § 41:41

(3d ed. 2019).  Put differently, "a sinking fund reserved and pledged for the payment of existing

bond obligations may be deducted in computing outstanding bonded indebtedness."  *Morgan v.

Board of Supervisors*, 192 P.2d 236, 238 (Ariz. 1948), abrogated on other grounds by *Huggins v.

Superior Court*, 788 P.2d 81 (Ariz. 1990); see also, *e.g.*, *City of Jackson v. First Nat'l Bank of

Jackson*, 157 S.W.2d 321, 324 (Ky. 1941) (calculating total debt for debt limit purposes by

deducting amounts in a sinking fund from total outstanding indebtedness); *City of Albuquerque v.

Case:17-03283-LTS   Doc#:10702   Filed:02/05/20   Entered:02/05/20 16:31:05   Desc: Main
Document   Page 60 of 91

*Gott*, 389 P.2d 207, 209 (N.M. 1964) (similar); *Town of Camden v. Fairbanks, Morse & Co*., 86 So. 8, 12 (Ala. 1920) (similar).

That widespread understanding also makes good sense.  The debt limit exists to constrain the amount of future Commonwealth tax revenue that can be devoted to service Commonwealth debt.  See 15 McQuillin, *The Law of Municipal Corporations* § 41:41; accord *Town of Camden*, 86 So. at 12.  Capitalized interest is not tax revenue.  It is money the Commonwealth did not have before the transaction and has only as a result of the transaction.  Setting aside those funds "to pay interest" on those bonds does not implicate the debt limit because those funds "comprise[] . . . proceeds from the initial sale rather than [funds] that must be replenished by taxation."  *Fults v. City of Coralville*, 666 N.W.2d 548, 558 (Iowa 2003).  It makes no sense to think the provision prevents the Commonwealth from setting aside bondholders' own money for their benefit.

Objectors reach the opposite result only by blinding themselves to the language of the Commonwealth's debt limit.  Overlooking the critical actual "payable" language, Objectors reason that the debt calculation turns solely on "the amount of principal of and interest on such bonds and notes."  2012-2014 GO Claim Objection ¶ 88 (internal quotation marks omitted).  And because the capitalized interest was an "amount of . . . interest" on the notes, they conclude it must go into the debt limit calculation.  That would be incompatible even with a differently worded debt limit provision, given the judicial consensus noted above that funds held on deposit for the payment of bonds are properly treated as an offset against an issuer's indebtedness.  But the actual text at issue here instructs that only amounts "*payable*" matter, and it "cannot be presumed that any clause in the constitution is intended to be without effect."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

39

Apart from ignoring the text of the debt limit and longstanding judicial consensus on the proper treatment of amounts held in sinking funds, the Objectors' proposed treatment of capitalized interest would also be destabilizing to the municipal marketplace.  As the 2012-2014 GO Claim Objection acknowledges (¶ 87), capitalized interest "is not uncommon in municipal project financing."  Nor is the use of capitalized interest limited to "project financing"; it is in fact a common feature of general obligation bonds as well.  See, *e.g.*, Preliminary Official Statement, City of Chicago General Obligation Bonds, Refunding Series 2020A (Dec. 23, 2019), at 11, https://tinyurl.com/t5pa29u.  Thus, Objectors seek to upend a common municipal practice for no apparent reason or purpose.  Nothing in the text of the debt limit of the Commonwealth (or elsewhere) would require that dramatic and disruptive result.

Finally, Objectors quibble with the placement of the capitalized interest in the Commonwealth Redemption Fund, rather than a separate escrow account dedicated solely to the particular interest payments that were to be funded from these bond proceeds.  2012-2014 GO Claim Objection ¶ 90.  But far from explaining why that technical detail is relevant, Objectors frankly concede that it would "not change the analysis."  *Id*.  There are good reasons for that concession.  As an initial matter, the recitals to the 2014 GO Bonds expressly required both that the capitalized interest amounts be deposited in the Redemption Fund and that they be used to pay interest for the first three years.  *E.g.*, 2014 GO Bond Resolution §§ 3, 26; 2014 GO Official Statement, at 1, 11.  And basic principles of municipal law bar the Commonwealth (or those acting on its behalf) from now arguing that those recitals with respect to the disposition of the bond proceeds were false.  15 McQuillin, *The Law of Municipal Corporations* § 43:110; see also *Waite v. City of Santa Cruz*, 184 U.S. 302, 316-17 (1902); *Knott Cty. v. Aid Ass'n for Lutherans*, 140 F.2d 630, 632 (6th Cir. 1944).  The law has likewise been clear, for over a hundred years, that a

"sinking fund invested for [one] purpose" cannot be lawfully "diverted for the payment of [other expenses]." *Kronsbein v. City of Rochester*, 76 A.D. 494, 502 (N.Y. App. Div. 1902).  Objectors are therefore quite right that details about the particular account where the Commonwealth chose to park the sinking fund are irrelevant to the constitutional analysis.

### D.    The GO Bonds Issued In July 2011 Complied With The Debt Limit Even If PBA Debt Service Were To Be Included In The Calculation

The UCC's 2011 GO Claim Objection challenges, among other bonds, three series of GO Bonds issued by the Commonwealth on July 12, 2011:  the 2011 Public Improvement GO Bonds, the 2011 D GO Bonds, and the 2011 E GO Bonds (collectively, the "July 2011 GO Bonds").  See 2011 GO Claim Objection ¶¶ 10-12.  The UCC alleges that, if PBA debt service were included in the debt-limit calculation, these bonds would have exceeded the Puerto Rico Constitution's 15% limit.  See *id.* ¶¶ 27-28.  As a matter of law, however, the July 2011 GO Bonds were issued in compliance with the debt limit, even if the PBA debt service should have been included in the calculation.

Because the July 2011 GO Bonds were issued in July 2011, they were issued in fiscal year 2012.  As a result, the calculation of the constitutional debt limit turns on the average of the Commonwealth's internal revenues for fiscal years 2010 and 2011.  See P.R. Const. art. VI, § 2 (tying debt limit to "15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the *two fiscal years next preceding the then current fiscal year*") (emphasis added).  The Official Statement that accompanied the July 2011 GO Bonds, however, was issued on June 29, 2011—at the very end of fiscal year 2011—and reported a debt-limit calculation based on revenue figures for fiscal years 2009 and 2010.  See Official Statement for Commonwealth of Puerto Rico Public Improvement Bonds of 2011, Public Improvement Refunding Bonds, Series 2011 D, and Public

Improvement Refunding Bonds, Series 2011 E (General Obligation Bonds) (June 29, 2011), at 23, https://tinyurl.com/va7nluk.  The calculations underlying the UCC's debt-limit challenge are, in turn, based on that mistaken calculation, augmented to include debt service owed by the PBA on its bonds.  See, *e.g.*, Appendix 1 to Adversary Complaint, Dkt. No. 6810-14 (reporting average internal revenue figure of $7,333,246,000, matching figure reported in the Official Statement for the July 2011 GO Bonds).

Adjusting the UCC's debt-limit calculation only to reflect the fiscal year in which the July 2011 GO Bonds were issued, using the Commonwealth's publicly reported internal revenue figures,[28] yields the following corrected calculation:

| Calculation | 2-year Avg. Internal Revenues | Revenue Years | Year of Max Debt Service | GO Future Max Debt Service | PBA Future Max Debt Service | Total Future Max Debt Service | Previous FY Amounts Paid | Total | Total as % of Internal Revenues |
|---|---|---|---|---|---|---|---|---|---|
| OB/UCC | $7,333,246,000 | FY09&FY10 | 2015 | $872,570,000 | $231,054,332 | $1,103,624,332 | $10,491,303 | $1,114,115,635 | 15.19% |
| Corrected | 7,595,987,000 | FY10&FY11 | 2015 | 872,570,000 | 231,054,332 | 1,103,624,332 | 16,520,000 | 1,120,144,332 | 14.75% |

Because the debt-limit calculation for the July 2011 GO Bonds did not exceed 15% *even if PBA debt service is included*, the UCC's debt-limit challenge to the July 2011 GO Bonds should be dismissed.

### E.    The UCC's Deficit Financing Argument Is Meritless

The UCC (but not the Oversight Board) argues that certain of the Challenged Bonds are invalid because they were issued to finance deficit spending, which (according to the UCC) is prohibited by the Commonwealth Constitution.  That argument is meritless.[29]

---

[28] See Hacienda, *Ingresos Netos al Fondo General - General Fund Net Revenues dated August 13, 2018*, https://tinyurl.com/v6m3vuj.

[29] Puzzlingly, the UCC makes no effort to explain why it has limited its deficit-financing challenge to GO Bonds issued in 2011 and later.  The UCC's challenge would presumably extend to bonds issued in prior years, yet the UCC has made no effort to pursue a challenge to those bonds.  The unexplained selectivity of the UCC's challenge is yet another indication of its lack of merit.

1.     **The Original Spanish Text Of The Constitution Permits Deficit Financing**

The Balanced Budget Clause of the Constitution, as originally drafted, expressly permits deficit financing.  The original Spanish text of that provision reads: "The appropriations made for any fiscal year shall not exceed the *total resources* [recursos totales], including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  P.R. Const. art. VI, § 7 (emphasis added).  During the drafting process, one of the delegates asked (in Spanish) about the meaning of "recursos totales" (total resources) in the Balanced Budget Clause.  *Diario de Sesiones Procedimientos y Debates de la Convencion Constituyente de Puerto Rico* ("Journal of Constitutional Convention"), at 1090 (certified translation available at Dkt. No. 4785-26).  In response, the president of the drafting committee explained (again, in Spanish) that the draft intentionally replaced "total revenues"— the term used in the corresponding provision of the Jones Act—with the broader term "total resources," so that new the Balanced Budget Clause would capture additional sources of government funding, *specifically including the "resources that are generated by issuing bonds." Id*. (emphasis added). After the drafting process (all of which took place in Spanish) concluded and the official Spanish text was approved, an English translation was also prepared.[30]   But the English translation incorrectly used the narrower term "total revenues," not "total resources."

The UCC concedes that its argument "depends, as an initial matter, on which version of the [Commonwealth] Constitution controls."  2012-2014 GO Claim Objection ¶ 96.  It frankly admits that it cannot succeed unless the Court concludes that the English (mis)-translation governs

---

[30] Journal of Constitutional Convention at 104 (certified translation available at Dkt. No. 452-1 in Adv. Proc. No. 17-257-LTS) (Apr. 18, 2018).  Unlike the original Spanish text, the English translation was not subject to substantive debate or amendment.  *Id.*

over the "Spanish version debated at the constitutional convention." *Id.* ¶ 98.  As explained below,

that is an insurmountable barrier to the UCC's argument.

> ### 2.   An Admitted Error In The English Translation Does Not Control Over The Original Constitutional Text

There is no question that the original Spanish text of the Commonwealth Constitution

reflects the evident intent of its drafters.  Far from arguing that point, the UCC concedes that the

Constitution, as drafted, "uses a term that is broader than 'total revenues' and was meant to include

some form of bond proceeds."  2012-2014 GO Claim Objection ¶ 96; see also *id.* ¶ 95 (citing

statement from president of drafting committee).  That should be the end of the matter; courts must

reject a constitutional interpretation that would "defeat rather than effectuate the Constitutional

purpose." *United States v. Classic*, 313 U.S. 299, 316 (1941); see also *Florida Sugar Mktg. &*

*Terminal Ass'n, Inc. v. United States*, 220 F.3d 1331, 1333 (Fed. Cir. 2000) (noting that courts

must look both to the constitutional text "and the evident intent of the Framers").  Indeed, Puerto

Rico's government itself has for decades interpreted the Spanish text to encompass bond proceeds.

See Opinion of the Sec'y of Justice, No. 1974-15 (May 21, 1974) (certified translation available

at Dkt. No. 4785-23).

That interpretation is consistent with half a century of Puerto Rico case law that interprets

the Commonwealth Constitution based on its original Spanish text, not the English translation.

See, *e.g.*, *Asociación de Empleados v. Corporación del Fondo del Seguro del Estado*, No.

KLAN201500471, 2015 WL 4075649 (P.R. Cir. May 29, 2015) (certified translation available at

Dkt. No. 9700-7).  The Puerto Rico Supreme Court has similarly noted that "[i]t is a fact not subject

to historical rectification that the vehicle of expression, the language of the Puerto Rican people—

[an] integral part of our origin and of our hispanic culture—has been and continues to be Spanish."

*Pueblo v. Tribunal Superior*, 92 D.P.R. 596, 604 (P.R. 1965) (translation available on Lexis).  And

the Legislative Assembly has codified the rule that the original Spanish text of Puerto Rico statutes

generally prevails over their English translations.  See 31 L.P.R.A. § 13; see also *Republic Sec.*

*Corp. v. Puerto Rico Aqueduct & Sewer Auth.*, 674 F.2d 952, 956 (1st Cir. 1982) (in cases of

discrepancy, "the Spanish text shall be preferred").

There is no reason to jettison half a century of constitutional law in favor of an admitted

mistranslation.[31]  Certainly nothing in the federal statutes that authorized and approved the Puerto

Rico Constitution would require such a dramatic result.  Indeed, those statutes point in the opposite

direction.  Rather than simply revising the Jones Act or passing a new federal statute to govern the

island,[32] Public Law 600 specifically offered the people of Puerto Rico "a constitution of *their own*

*adoption*."  48 U.S.C. § 731b (emphasis added).  And there is no dispute that the constitution that

was drafted, approved, and adopted by the people of Puerto Rico was the original Spanish text. [33]

---

[31] As a general matter, an admitted drafting error does not control over the intended text.  It is well-settled that courts will not "distort[] a statute's true meaning" based on "a simple scrivener's error."  *U.S. Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 454, 462 (1993); see also, *e.g.*, *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.*, 435 F.3d 1140, 1146 (9th Cir. 2006) (rejecting drafting error that was "illogical and contrary to the stated purpose of the provision"); *Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1093 n.2 (10th Cir. 2005) (same); *In re Financial Oversight & Mgmt. Bd. for Puerto Rico*, 914 F.3d 694, 717 (1st Cir. 2019) (declining to attribute significance to change in English translation absent "evidence that the legislature of the Commonwealth intended to change the English name of the" Employees Retirement System).  That rule of statutory interpretation should apply with particular force in constitutional cases where "correction through legislative action is practically impossible."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 63 (1996) (limiting stare decisis for similar reasons).

[32] To the extent the UCC argues that the Commonwealth Constitution should be treated as just another act of Congress, that argument is foreclosed by long-settled First Circuit precedent.  *E.g.*, *Figueroa v. Puerto Rico*, 232 F.2d 615, 620 (1st Cir. 1956) ("This constitution is not an act of Congress, though congressional approval was necessary to launch it forth.").

[33] The Commonwealth Constitution was submitted to the people of Puerto Rico for approval by referendum.  More than 1,000,000 copies of the original Spanish text were printed and distributed throughout the island, compared to just 30,000 copies of the English translation.  H.R. Rep. No. 82-1832, at 4 (1952), reprinted in 1952 U.S.C.C.A.N. 1892, 1895-96.  The people of Puerto Rico overwhelmingly ratified the Commonwealth Constitution by a vote of 374,649 in favor to 82,923 against.  *Id.*

The fact that Congress reviewed and approved the English translation of the Commonwealth Constitution does not mean that a mistranslation must govern over the Spanish text drafted by Puerto Rico's constitutional convention and approved by the people of Puerto Rico. The law on treaties is instructive here.  Much like the Commonwealth Constitution, treaties become effective only upon Congressional approval.  See U.S. Const. art. II, § 2, cl. 2 (requiring approval by two-thirds of the Senate).  But the fact that Congress reviewed a treaty in English does not mean the English translation is controlling.  To the contrary, the Supreme Court has repeatedly held that the original foreign language text is still "the only authentic text."  *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 536 (1991) (interpreting the French text by looking to the "French legal meaning" of the relevant term because "the Convention was drafted in French by continental jurists").[34]  That case law makes clear that "the original [foreign language text] would govern over a long accepted but improper English translation."  *In re Air Disaster in Lockerbie, Scotland, on Dec. 21, 1988*, 733 F. Supp. 547, 552 n.9 (E.D.N.Y. 1990) (citing *Air France v. Saks*, 470 U.S. 392, 399 (1985)).  Simply put, the UCC's reliance on a translation error is misplaced.

3.     **The UCC's Balanced Budget Clause Argument Fails In Any Event Because Even The English Term "Revenues" Should Be Read To Include Bond Proceeds And Because The Clause Governs Spending, Not Borrowing**

In any event, the Balanced Budget Clause would not invalidate any of the Challenged Bonds even if the English mistranslation did govern.  As an initial matter, it is simply not the case that the term "revenues" in English has a single, fixed meaning that could override the intent of

---

[34] See also, *e.g.*, *Todok v. Union State Bank of Harvard, Neb.*, 281 U.S. 449, 454 (1930) ("The text of the treaty of 1783 with Sweden was in French only, and the French text is therefore controlling."); *Onyeanusi v. Pan Am*, 952 F.2d 788, 791 (3d Cir. 1992) ("Because the official version of the treaty is in French—the version contained in the United States Code is merely an unofficial translation."); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1486 (D.C. Cir. 1991) ("French is the controlling language of the Convention.").

the framers of the Puerto Rico constitution.  Instead, as the New Jersey Supreme Court noted in

*Lance v. McGreevey*, 180 N.J. 590 (2004) (per curiam), the term "revenues" in English has many

different possible definitions, some of which would be broad enough to include bond proceeds.

*Id.* at 597; see also *id.* at 860 (citing *Black's Law Dictionary* definition of governmental revenue

as "including all public monies which the State collects and receives, *from whatever source and*

*in whatever manner*") (emphasis added); see also *id.* at 862 (LaVecchia, J., concurring in part and

dissenting in part) (noting that "[t]he majority's opinion recognizes the term 'revenue' is shrouded

in ambiguity" and advancing the view that bond proceeds could constitute "revenue" as that term

is used in the New Jersey constitution).  Given that the English word "revenues" *can* be broad

enough to include bond proceeds, even the English text of the Puerto Rico constitution should be

read in a manner consistent with the intent of the constitution's framers by interpreting the term

"revenues" in the Balanced Budget Clause to include bond proceeds.

Even more fundamentally, the Balanced Budget Clause cannot invalidate any Challenged

Bonds because the clause limits appropriations (*i.e.*, spending), not borrowing.  Bond issuances do

not spend revenue; they raise it.  See *Risser v. Klauser*, 558 N.W.2d 108, 115 (Wis. 1997); see

also, *e.g.*, *Fordice v. Bryan*, 651 So. 2d 998, 1000 (Miss. 1995) ("The creation of a debt is an

entirely different thing from an appropriation for its payment."); *Thomas v. Rosen*, 569 P.2d 793,

796 (Alaska 1977) ("[T]he sale of general obligation bonds . . . is therefore distinguishable from

[an appropriation].").  If the Commonwealth had made excessive appropriations (as the UCC

alleges), the proper remedy (if any is available at this late stage) could not include invalidation of

obligations that the Balanced Budget Clause does not govern.

Moreover, the UCC's reading of the Balanced Budget Clause is incompatible with the

absolute protections the Constitution itself gives to Puerto Rico's public debt.  The Constitution

makes clear that when there is a budget deficit, the Commonwealth must pay "interest on the public debt and amortization . . . first" and then pay all "other disbursements . . . in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.  So when resources are scarce, those at the back of the line might not get paid.  But it would make no sense to invalidate public debt to effectuate a provision (Article VI, Section 2) that simultaneously requires it to be paid first and in full.

## II.   The Public Debt Claim Objections Should Be Dismissed Because, Even If Their Allegations Could Establish A Constitutional Violation, They Would Not Support The Relief Requested

Even if the Public Debt Claim Objections established a violation of the Puerto Rico Constitution (which they do not), they would still fail as a matter of law because the remedy they seek—complete, retroactive invalidation of the Challenged Bonds—is unavailable.  As explained below, there is no basis to retroactively invalidate billions of dollars in bonds—a profoundly unfair result that would allow the Commonwealth not to only to shed its obligation to pay interest according to the terms of the bonds, but also to retain forever all the money lent to it by bondholders who accepted the Commonwealth's own representations that the bonds complied with the debt limit.   The wrongdoer would reap a windfall paid for entirely by the victims of the Commonwealth's malfeasance.  It should not be surprising, then, that Objectors have cited no case in which a court has retroactively invalidated bonds based on an *ex post* recharacterization of another issuer's debt or has rejected bondholders' reliance on solemn recitals of validity like those that accompanied the Challenged Bonds here.

But even apart from these fundamental problems, the Public Debt Claim Objections fail because they do not even seek to establish that the outstanding debt they propose to include in the constitutional debt limit calculations was valid and enforceable or that the Challenged Bonds

exceeded the debt limit in their entirety.  Both propositions are logical predicates to the total

invalidation remedy sought.[35]

A.    **Even If The Public Debt Claim Objections Correctly Construed The Puerto Rico Constitution, They Provide No Basis For Granting The Extreme Remedy Of Retroactive Invalidation**

The remedy the Public Debt Claim Objections seek—invalidation of billions of dollars'

worth of bonds sold years ago—is fundamentally *retroactive*.  The Objectors' theory is that,

although the bonds were issued long ago and without any suggestion that they violated the debt

limit, they may now be invalidated based on a newly announced construction of the Puerto Rico

Constitution, and thus bondholders are not entitled to receive a dime of what they are owed—not

the interest that the Commonwealth and the PBA agreed to pay, nor even the billions of dollars of

principal that the bondholders lent to the Commonwealth and the PBA.  But the Puerto Rico

Constitution's debt limit is a limitation on the Commonwealth's authority to act; it instructs the

Commonwealth, under specified circumstances, not to issue additional GO Bonds or to guarantee

additional bonds.  See P.R. Const. art. VI, § 2.  It does not limit the actions of bondholders in

purchasing such bonds, and it does prescribe any particular remedy—much less the draconian

remedy of retroactive invalidation pursued here—in the event of a violation.

The Public Debt Claim Objections do not even attempt to justify such a sweeping and

unprecedented remedy in this context.  Indeed, that remedy is foreclosed by Supreme Court

---

[35] The Debt Coalition Claim Objections suggests (¶ 5) that "disputes concerning whether and to what extent claims based" on the bonds it targets "are disallowed should be deferred until after an appropriate court determines whether and when" there was a breach of the debt limit.  But the Debt Coalition goes on to assert (*id.*) that, "regardless of whether such GO bonds and Commonwealth-guaranteed bonds have any allowable claim, they are not entitled to the same relative lawful priority under the Puerto Rico Constitution and applicable Commonwealth law as the Commonwealth's full faith and credit bonds that did not violate the Constitutional Debt Limit."  Thus, although the Debt Coalition is agnostic as to whether the claims it objects to should ultimately be disallowed, it proposes that the lawful priority status of those claims should be entirely stripped on a retroactive basis.  That proposal suffers from all of the same remedial flaws as the other Public Debt Claim objection.

precedent.  To the extent that authorities cited in support of the Objectors' challenge to the PBA structure address this issue at all, they uniformly endorse only the *prospective* remedy contemplated by the Supreme Court's case law—*i.e.*, a holding that, when the Commonwealth issues debt in the future, it must calculate the debt limit in accordance with this Court's construction of the Puerto Rico Constitution.  Moreover, and in any event, Objectors' belated attempt to invalidate the Challenged Bonds is foreclosed by the express recitals of compliance with the debt limit that accompanied their issuance.

> **1.      As A Matter Of General Retroactivity Principles, Any Conclusion That The Challenged Bonds Were Invalidly Issued Would Be Given Only Prospective Application**

In support of its radical theory of retroactive invalidation, the 2012-2014 GO Claim Objection relies primarily on decisions from other jurisdictions concluding that debts of entities that were purportedly analogous to the PBA were subject to constitutional limitations.  See 2012-2014 GO Claim Objection ¶¶ 65-86.  Those cases, though, are inapposite—not only with respect to the merits of Objectors' recharacterization argument, see pp. 25-28, *supra*, but also with respect to the retroactive remedy sought here.  *Not one* of those cases granted a request to invalidate previously issued bonds.  Indeed, Movants' counsel are aware of *no case* in which one issuer's bonds were retroactively invalidated based on a recharacterization of another entity's debts.  Yet that is precisely the unprecedented step the Objectors ask the Court to take here.

The Supreme Court has held, however, that when a new judicial decision "could produce substantial inequitable results if applied retroactively, there is ample basis . . . for avoiding the 'injustice or hardship' by a holding of nonretroactivity."  *Cipriano v. City of Houma*, 395 U.S. 701, 706 (1969) (per curiam).  In three decisions, the Supreme Court has applied that principle to foreclose retroactive application of new precedents that otherwise could have threatened the validity of previously issued municipal bonds.  See *Hill v. Stone*, 421 U.S. 289 (1975); *City of*

*Phoenix v. Kolodziejski*, 399 U.S. 204 (1970); *Cipriano* 395 U.S. 701.  In each decision, the Court

held that limitations on which citizens could vote to authorize certain bonds violated the Equal

Protection Clause.  Despite the important constitutional principle at issue, however, the Court

expressly held that bonds that had been issued under analogous voting regimes were not thereby

invalidated.  The Court explained that it would "apply [its] decision in th[ese] case[s]

prospectively," because "[s]ignificant hardships would be imposed on cities, bondholders, and

others" were the decisions "given full retroactive effect."  *Cipriano*, 395 U.S. at 706; see *City of*

*Phoenix*, 399 U.S. at 213-14 ("In view of the fact that over the years many general obligation

bonds have been issued on the good-faith assumption that restriction of the franchise in bond

elections was not prohibited by the Federal Constitution, it would be unjustifiably disruptive to

give our decision in this case full retroactive effect."); *Hill*, 421 U.S. at 301-02 (expressly

following *Cipriano* and *City of Phoenix*).[36]

Indeed, the one case the 2012-2014 GO Claim Objection cites in support of its attack on

the PBA structure that actually addressed a request for retroactive invalidation relied on this trio

of Supreme Court decisions to decisively *reject* that remedy.[37]  In *Winkler v. State School Building*

*Authority*, 434 S.E.2d 420 (W. Va. 1993), the highest court of West Virginia addressed whether

bonds issued by the state's school building authority violated a state constitutional prohibition

---

[36] Courts in New Jersey have reached a similar conclusion, treating the disruption that would be caused by retroactive relief as a basis to conclude that a constitutional challenge to a bond issuance becomes moot once the bonds have "been sold and distributed into the marketplace."  *Wisniewski v. Murphy*, 186 A.3d 321, 329 (N.J. Super. Ct. App. Div. 2018); see also *id.* (observing that "it would be difficult to envision circumstances that would be so extraordinary as to warrant a recall of the bonds").

[37] The other cases the 2012-2014 GO Claim Objection cites addressed challenges by taxpayers seeking to *prospectively* block an issuance of bonds that would violate a debt limit.  See *Volusia Cty. Sch. Bldg. Auth.*, 60 So. 2d at 761-62; *Reynolds*, 42 A. at 554-55; *Ayer*, 165 N.E.2d at 886; *Scroggs*, 499 S.W.2d at 505; *Neffner*, 30 N.E.2d at 708; *Martin v. Oregon Bldg. Auth.*, 554 P.2d 126, 127-28 (Or. 1976); *State ex rel. Washington State Bldg. Fin. Auth. v. Yelle*, 289 P.2d at 356-57.

against obligating future legislatures to appropriate funds.  See *id.* at 423 n.1, 428.  It held that the bonds violated that provision.  *Id.* at 436.  Even so, the court "*decline[d] to make this decision retroactive so as to invalidate the bonds earlier issued.*"  *Id.* (emphasis added).  It reasoned that "the funds from those bonds . . . were used" already, that "voiding these bonds would bring considerable financial chaos to the State" and "would place an enormous financial hardship on the State and ultimately the citizens," and that "today's opinion could be said to have been unanticipated" because state law was "unsettled."  *Id.* at 436, 437.

The law of Puerto Rico, which Objectors invoke, is of a piece with *Winkler* and the Supreme Court's decisions.  Although Puerto Rico courts have not had occasion to directly address retroactive invalidation of bonds, their decisions have recognized that retroactive relief is inappropriate where it would disrupt settled expectation.  For example, *Quiles Rodríguez v. Superintendent of Police*, 139 D.P.R. 272 (P.R. 1995) (per curiam), concerned whether to apply a due-process requirement retroactively.  *Id.* at 274-75 (translation attached as Ex. 9).  The Supreme Court of Puerto Rico explained that whether "a judicial decision will be applied or not in a retroactive manner" is determined by reference to "considerations of a public policy and social order . . . that respond to the best social co-existence."  *Id.* at 277 (internal quotation marks omitted).  That court thus has applied its remedies prospectively, not retroactively, to avoid "the nullity of several transactions," *Gorbea Vallés v. San Juan Prop. Registrar*, 131 D.P.R. 10, 19 (P.R. 1992) (translation attached as Ex. 10), to accommodate parties who had "adhered to the legal practice" regarding an issue that "had not been ruled on," *id.*, to avoid "grave impairment of the [public] economic resources," *Quiles Rodríguez*, 139 D.P.R. at 279 (internal quotation marks omitted), and "to prevent violent dislocations in an economic system that has been structured

52

relying on a state of jurisprudence," *Rexach Constr. Co. v. Municipality of Aguadilla*, 142 D.P.R. 85, 88 (1996) (per curiam) (internal quotation marks omitted) (translation attached as Ex. 11).[38]

Retroactive invalidation in this case would be at least as unanticipated and disruptive as it would have been in the foregoing cases that applied remedies prospectively.

*First*, as in *Winkler*, the Commonwealth spent the proceeds of the Challenged Bonds long ago. Thus, in stark contrast to a pre-issuance prospective remedy, no retroactive remedy could return the parties to the positions they occupied but for issuance of the bonds.

*Second*, voiding the bonds would bring financial chaos and hardship. Congress enacted PROMESA because the Commonwealth's political system had for years made decisions, myopically focused on the short term, that limited the Commonwealth's access to capital markets. The strategy of retroactive invalidation smacks of the financial gamesmanship that the Board was created to stop. While invalidation might offer some near-term relief from pursuing the very economic reforms the Board acknowledges the Commonwealth should undertake, the Commonwealth and its citizens will pay a much steeper price in the long run if investors are forced to account for the possibility that they cannot rely on constitutional text, long-settled practice, and express representations of validity by the Commonwealth. If allowed, the remedy sought here will throw the Commonwealth back into the same vicious cycle of financial chaos from which it seeks to escape.

*Third*, and finally, the Public Debt Claims Objections do not identify any basis on which the purchasers of GO bonds could have imagined that their bonds might later be deemed to have

---

[38] *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267 (D.P.R. 2015), cited in the 2012-2014 GO Claim Objection (¶ 100) in support of its contention that an invalid contract with a governmental entity must be treated as "null and void," did not address whether the court's ruling as to the validity of the relevant contract should have been given retroactive effect. See 91 F. Supp. 3d at 287-91.

been issued in violation of the constitution's debt limit. Nor could they. The multi-million-dollar

Kobre Report commissioned by the Board—issued after a year of investigations into debt-limit

issues—proves as much. The report notes that the Commonwealth made no secret of the fact that

its debt-limit calculations included debt service on guaranteed debt only in those rare instances in

which the Commonwealth was required to make payments pursuant to those guaranties. See Kobre

Report 259. Even as the Commonwealth's financial condition deteriorated, the Commonwealth

affirmatively and repeatedly disclosed this practice, and no one suggested it was unlawful. *Id.* In

fact, the Board's own investigators, who interviewed "over 100 witnesses and review[ed] . . .

thousands of documents," *id.* at 2, found no evidence that "any . . . official believed that Puerto

Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional

Debt Limit," *id.* at 254. To the contrary, multiple witnesses attested that they were not even "aware

of anyone expressing the view that PBA Bonds should be included in the Debt Limit Calculation."

*Id.* at 262. With not even a single Commonwealth official doubting the validity of the bonds, a

bond purchaser—who has far less access to information on the Commonwealth's debt service

obligations—could not possibly have concluded otherwise.

## 2. The Commonwealth's Recitals In Connection With Its Issuance Of The Challenged Bonds Foreclose Any Challenge To Their Validity

Separate and apart from general principles of retroactivity, the proposed remedy of

retroactive invalidation is also foreclosed by more specific rules governing government-issued

bonds. The Challenged Bonds all carried on their face the Commonwealth's express

representations that they were issued in compliance with the constitutional debt limit. Bondholders

were entitled to rely on those representations. Objectors' contrary rule—that bondholders cannot

depend on the good faith of issuers, must conduct their own independent investigation of

compliance with constitutional debt limits, and risk their entire investment if they are wrong—
would be deeply destabilizing to debt markets.

### a.        The Doctrine of Estoppel by Recitals

The United States Supreme Court has long held that bonds that on their face recite
compliance with applicable constitutional limitations cannot be retroactively nullified based on
their alleged non-compliance with such limitations.  *E.g.*, *Board of Comm'rs of Gunnison Cty. v.
E.H. Rollins & Sons*, 173 U.S. 255, 259, 274-75 (1899) (refusing to invalidate bonds that incurred
"an indebtedness not authorized by the constitution" because "the recital in the bonds" stated "that
they did not create a debt in excess of the constitutional limit").  That result follows from "the
sound principle" that "legal defects which might have application in a proceeding to prevent the
issuance and negotiation of municipal bonds will not be allowed to authorize the repudiation of
bonds which have come into the possession of bona fide holders."  *Johns-Manville Corp. v. Vill.
of DeKalb, Mo.*, 439 F.2d 656, 660 (8th Cir. 1971).

This doctrine—generally called "estoppel by recitals"—rests on commonsense and
fundamental principles of equity.  "[A]n innocent holder of the bonds" is "entitled . . . to rely upon
the truth of the recitals," and is not "chargeable with knowledge or notice that the debt created by
the bonds exceeded the constitutional limit."  *E.H. Rollins*, 173 U.S. at 273-75.  The rule is
necessary to protect investors:  "[I]n what way was the purchaser to ascertain the extent of the
[government's] indebtedness existing at the time the bonds in question were issued?  The extent
of that indebtedness was a fact peculiarly within the knowledge of the constituted authorities."
*Buchanan v. City of Litchfield*, 102 U.S. 278, 289 (1880).  In determining whether a bond was
issued in compliance with a "constitutional limitation" on "indebtedness," then, the purchaser is
"bound to look no further" than the bond's "express recital that that limitation had not been
passed."  *Board of Comm'rs of Chaffee Cty. v. Potter*, 142 U.S. 355, 363 (1892); see also *Driscoll*

55

*v. Burlington-Bristol Bridge Co.*, 86 A.2d 201, 226-27 (N.J. 1952) (affording bondholders "protection by virtue of their reliance on certain recitals and representations appearing on the face of the bonds").

These principles apply with full force to the Challenged Bonds. Those bonds specifically certified that their issuance did not exceed the Commonwealth's debt limit: "It is hereby certified and recited that . . . the total indebtedness of the Commonwealth of Puerto Rico, including this bond, does not exceed any debt or other limitation prescribed by law." 2012 GO Bond Resolution at B-4, B-11; see also, *e.g.*, 2014 GO Bond Resolution at B-4. Given these unambiguous recitals, the bondholders were not required to analyze every bond the Commonwealth or any related entity had ever issued to make their own independent assessment of whether the Commonwealth's representations were true. *Potter*, 142 U.S. at 363. They were instead entitled to rely on the validity of those recitals, and the Commonwealth's representations cannot now be disavowed in order to retroactively nullify the bonds. *E.H. Rollins*, 173 U.S. at 273-75; see *Johns-Manville*, 439 F.2d at 660 n.6 (recognizing that "bona fide purchasers" will prevail "where municipalities issue bonds containing recitals of compliance with governing constitutional and statutory provisions").

### b.    *La Doctrina de Actos Propios*

Objectors make no meaningful effort to grapple with the doctrine of estoppel by recitals. They contend instead that principles of estoppel are categorically inapplicable because "[t]he Puerto Rico Supreme Court has 'unequivocally rejected' the application of equitable estoppel . . . in its civil law system," in favor of the (supposedly) distinct *doctrina de actos propios*. 2012-2014 GO Claim Objection ¶ 101 (quoting *CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 76 (D.P.R. 2006)). Not so. Objectors' own cases acknowledge that the doctrine of *actos propios* is generally "parallel to the doctrine of estoppel in English law." *CMI Capital Mkt. Inv., LLC*, 410 F. Supp. 2d at 76 (quoting *International Gen. Elec. v. Concrete*

*Builders of P.R., Inc.*, 104 D.P.R. 871, 877 (P.R. 1976)).  Indeed, the relationship between the two

doctrines is so close that courts in Puerto Rico frequently use the terms interchangeably.  *E.g.*,

*Mendoza Aldarondo, v. Asociación de Empleados*, 94 D.P.R. 564, 1967 (1967) (acknowledging

that "the government may be subject to the doctrine of estoppel") (translation available on Lexis);

*PREPA v. Vitol, Inc.*, No. CV 09-2242 (DRD), 2012 WL 12995756, at \*15 (D.P.R. Sept. 10, 2012)

(holding that "PREPA may be estopped" by application of *actos propios*).

Next, Objectors contend that *actos propios* is inapplicable because, in their view, affording

bondholders any relief in the event that their bonds were issued in violation of the constitutional

debt limit would violate a "fundamental public policy of the Commonwealth."  2012-2014 GO

Claim Objection ¶ 102.  But Objectors' exclusive focus on the policy underlying the debt limit

ignores the even more compelling public policies that would be shredded by granting the Objectors

the draconian remedy sought here.  Allowing the Commonwealth to reap the benefits of the GO

bonds while disavowing any and all obligations to bondholders would violate the

Commonwealth's constitutional policy requiring payment of "interest on the public debt" before

making any "other disbursements" when "available revenues including surplus for any fiscal year

are insufficient to meet the appropriations made for that year."  P.R. Const. art. VI, § 8.  So central

are protections for bondholders to the Puerto Rico Constitution that bondholders have a mandamus

remedy to ensure they are paid.  P.R. Const. art. II, § 2.  These explicitly pro-creditor constitutional

provisions were adopted with the avowed "purpose of protecting and even increasing the good

credit of the bonds of Puerto Rico."  3 José Trías Monge, *Historia Constitucional de Puerto Rico*

223-25 (1982) (certified translation attached as Ex. 12).  That is the public policy advanced by

application of the doctrines of both estoppel by recitals and *actos propios*, and it is at least as

strong—if not stronger—than any policy purportedly underlying retroactive application of the debt limit.

Objectors are also wrong in supposing that Puerto Rico courts' reluctance to apply *actos propios* when important public policies are at stake represents a marked departure from common law principles. To the contrary, under the common law (just as under the civil law of Puerto Rico) government entities generally "may not be estopped to deny the invalidity of a contract that is ultra vires in the sense that it is not within the power of the [government entity] to make." 10A McQuillin, *The Law of Municipal Corporations* § 29:110; see also 2 John F. Dillon, *Commentaries on the Law of Municipal Corporations* § 791 (5th ed. 1911). Estoppel by recitals represents an exception to that general principle, as courts have recognized that holding governmental issuers to their solemn representations is necessary to ensure the negotiability of their debt instruments. See, *e.g.*, *Driscoll*, 86 A.2d at 227 (tying the doctrine to "the essential need for assuring the marketability of municipal securities"); *Wein v. Carey*, 362 N.E.2d 587, 590 (N.Y. 1977) (explaining that, if bonds "remain[ed] vulnerable to constitutional attack" indefinitely, then they would be "speculative rather than the prime investment securities they are, issuable at comparatively low rates of interest").[39] Accordingly, the fact that Puerto Rico courts have sometimes declined to apply *actos proprios* in cases *that did not involve bond issuances*—and hence did not implicate the important policy interest of negotiability—does not evidence any departure from common law principles. It therefore offers no sound basis for the retroactive invalidation remedy sought here.

---

[39] See also 15 McQuillin, *The Law of Municipal Corporations* § 43:100 (explaining that the estoppel by recitals doctrine serves to "to make . . . bonds meet with a ready sale in commercial markets by estopping the municipality to deny the truth of the affidavits of its officers, even though such recitals may be false"); 1 Dillon, *Commentaries on the Law of Municipal Corporations* § 204 (explaining that holding governmental issuers to their recitals furthers negotiability, which is in turn necessary to facilitate borrowing at attractive interest rates).

Finally, Objectors' *actos propios* argument has no application to the 2014 GO Bonds, which are governed by New York law, rather than Puerto Rico law.  See 2014 GO Bond Resolution § 37(a) ("This Resolution shall be governed and construed in accordance with the laws of the State of New York, and the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or this Resolution, except with respect to the adoption and execution hereof by the Commonwealth, which shall be governed by the laws of the Commonwealth.").  That fact forecloses any suggestion that ordinary common law principles of estoppel would not apply to the 2014 GO Bonds.

### B.   The Public Debt Claim Objections Fail As A Matter Of Law Because They Do Not Establish, As They Must, That The Prior Debt They Include In The Debt-Limit Calculation Was Validly Issued

The Public Debt Claim Objection do not allege (indeed, they *dispute*) the validity of the prior-issued bonds that they propose to include in their retroactive recalculations of the debt limit. As a matter of law, however, an invalid and unenforceable obligation may not be taken into account in any such recalculation.  The Public Debt Claim Objections therefore fail as a matter of law because they do not allege a fundamental predicate of the relief they seek.

### 1.   Only Valid Bonds Count Toward The Debt Limit

Under the constitutional provision on which Objectors rely, the debt limit applicable to each new issuance of Commonwealth debt is a function of the future amounts due on issuances of Commonwealth debt outstanding at the time the new debt is issued.  See pp. 7-8, *supra*. Consequently, to determine whether any given issuance of debt exceeded the debt limit, it is necessary first to identify the amounts owed on all debt "theretofore issued by the Commonwealth and then outstanding."  P.R. Const. art. VI, § 2.

As a matter of constitutional text and established precedent, the only outstanding issuances of Commonwealth debt that are relevant to calculation of the debt limit are those that are

enforceable against the Commonwealth.  As to text, if Objectors were correct that invalidly issued bonds are void, such voided bonds would no longer be "outstanding" and the debt service scheduled to be paid on them would no longer be "payable in any fiscal year."  P.R. Const. art. VI, § 2.  Thus, any void bonds would have no place in the debt-limit calculation for future issuances.

As for precedent:  Courts have long recognized that "void bonds are not an indebtedness, and this includes bonds issued at a time when the indebtedness of the municipality exceeds the debt limit."  15 McQuillin, *The Law of Municipal Corporations* § 41:40 (footnote omitted); *see also, e.g.*, *Ashuelot Nat'l Bank v. Lyon Cty.*, 81 F. 127, 130, 133 (C.C.N.D. Iowa 1897), aff'd *sub nom. Lyon Cty. v. Ashuelot Nat'l Bank of Keene*, 87 F. 137 (8th Cir. 1898).[40]  Moreover, courts have applied this principle to debt the validity of which was never questioned and which received full payment in the past.  *E.g.*, *Keene Five-Cent Sav. Bank v. Lyon Cty.*, 97 F. 159, 166 (C.C.N.D. Iowa 1899) (excluding invalidly issued warrants from debt-limit analysis, even though the warrants had been paid); *German Ins. Co. of Freeport v. City of Manning*, 95 F. 597, 600 (C.C.S.D. Iowa 1899) (excluding invalidly issued bonds from debt-limit analysis, even though they had been "treated . . . as a valid indebtedness" and "had been paid in full").  It naturally follows, then, that where an issuer asserts a violation of a debt limit as a defense to non-payment, "the burden is upon the [issuer] of proving the amount of the valid indebtedness existing against the [issuer] at the date of issuance of the bonds."  *Keene Five-Cent Sav. Bank*, 97 F. at 166.

### 2.   Objectors Fail To Allege The Validity Of Prior Bonds

The 2012-2014 GO Claim Objection is insufficient as a matter of law because it fails to allege that *any* Commonwealth debt outstanding at the time of the challenged issuances was valid.

---

[40] See also 1 Dillon, *Commentaries on the Law of Municipal Corporations* § 205, at 397 ("If the city has issued any *obligations which are invalid* and cannot be enforced against it in the hands of the owners, these obligations are not to be considered.").

60

The same is true of the UCC's 2011 GO Claim Objection and PBA Claim Objection.  None of these objections alleges that prior-issued bonds were valid and enforceable, and each specifically reserves the right to challenge additional bond issuances in the future.  See 2012-2014 GO Claim Objection ¶ 11; 2011 GO Claim Objection ¶ 3 n.6; PBA Claim Objection 1 n.4.  And, of course, the fact that both the Board and the UCC have now extended their debt-invalidation program to bonds issued prior to 2012 means that, from the perspective of the Challenged Bonds issued in 2012 and 2014, Objectors have expressly alleged that prior-issued bonds were *not* valid and enforceable.[41]

In short, none of the Objectors have even attempted to carry their burden of showing that previously issued debt was within the debt limit and thus valid.  Because Objectors fail to allege these necessary, factual predicates, they do not state legally sufficient claims of invalidity.

### C.    The Public Debt Claim Objections Fail As A Matter Of Law Because They Do Not Establish That The Challenged Bonds Exceeded The Debt Limit In Their Entirety

Basic logic and established precedent also dictate that a debt issuance can be held invalid (if at all) only to the extent that it exceeds the applicable debt limit.  For example, if a bond exceeded the limit by a dollar, only that dollar (and not the entire bond) would violate the limit. Here, although the Public Debt Claim Objections seek to invalidate bond issuances in their entirety, Objectors do not even attempt to establish that the entirety of each bond issuance exceeded the debt limit.  As a consequence, the Public Debt Claim Objections fail as a matter of law.

---

[41] See, *e.g.*, Amended Adversary Complaint ¶¶ 16-22, 30, 73-74, Dkt. No. 14 in Adv. Proc. No. 19-285-LTS (Aug. 23, 2019); 2011 GO Claim Objection; PBA Claim Objection.

### 1. Debt May Be Invalid Only To The Extent It Exceeds A Debt Limit

The Objectors do not attempt to hide the breathtaking expanse of their legal theory. "[B]ecause the [Challenged Bonds] were issued in violation of the Debt Service Limit," the Objectors argue, "[a]ll claims based on [those] Bonds should be disallowed," "the bonds are *null and void*," and "the holders of such bonds have *no remedy*." 2012-2014 GO Claim Objection ¶ 60 (emphasis added); see also, *e.g.*, *id.* ¶ 7 (arguing against "any remedy to a private counterparty" where a government transaction violates a "policy embodied in . . . constitutional law"); *id.* ¶ 99. The 2012-2014 GO Claim Objection says this explicitly, but all of the Public Debt Claim Objections adopt this theory by objecting wholesale to allowance of claims on the bonds they challenge. The degree of the violation, in other words, is irrelevant. Even if the Commonwealth exceeded the debt limit by only one dollar—even because of a debatable accounting issue resolved only with the benefit of hindsight—billions of dollars of debt must be wiped from the books in their entirety. To state that proposition is to refute it.

In applying constitutional debt limits, in the context of cases that did not involve anything like Objectors' attempt to invalidate bonds through retroactive reclassification of one issuer's debts as belonging to another (and where the bonds lacked express recitals of validity of the sort present here), courts long have embraced the more sensible theory that public debt is invalid (if at all) only to the extent of the violation at issue. As the leading treatises explain, if "bonds are issued at the same time, or as part of one transaction, . . . which *in part only* exceeds the constitutional limit of indebtedness, the just and equitable rule . . . has been adopted that each obligation should be *void in a sum in proportion to the excess and valid as to the remainder*." 1 Dillon, *Commentaries on the Law of Municipal Corporations* § 203, at 384-85 (emphasis altered); accord 15 McQuillin, *The Law of Municipal Corporations* § 41:43. An entire bond does not violate a debt limit if only a fraction of the bond exceeds the limit.

For example, in an early case that proved influential, a state constitution limited a school district to incurring $2,057.50 of new debt, but the district incurred $15,000. See *McPherson v. Foster Bros.*, 43 Iowa 48, 55-56, 72 (1876). The plaintiffs there, like the Objectors here, sought a declaration that the bonds were "illegal and void" and could not be paid at all. *Id.* at 50-51. Their argument was rejected as a matter of law. The court explained: "It is no unusual thing for instruments of this character to be partly valid and partly invalid. . . . The case is analogous to the act of an agent which is partly within his authority and partly without. The act, so far as authorized, would bind the principal, while, to the extent it was unauthorized, it would not be binding." *Id.* at 72. Thus, the court held that the bonds were invalid only to the extent that they had exceeded the debt limit. Of the $15,000 issuance, "$2,057.50 [wa]s valid." *Id.* at 73.

Other courts of last resort have confirmed the principle that only debt incurred in excess of a limit, not all other debt incurred at the same time, is subject to invalidation. In *Culbertson v. City of Fulton*, 18 N.E. 781 (Ill. 1888), for example, the city issued $11,619 of debt in the face of a $10,453 limit. *Id.* at 783. The court let stand $10,453 of the debt, reasoning that the debt "can only be regarded as void to the extent of the amount of the excess over the constitutional limit. Up to and under that limit the indebtedness is valid. The inhibition operates upon the indebtedness, and not upon the form of the debt." *Id.* Similarly, when a city issued bonds for roughly twice its debt limit, the highest court of Kentucky held that "only the excess is void." *Boll v. City of Ludlow*, 29 S.W.2d 547, 548 (Ky. 1930). The clear majority of cases in other state supreme courts have reached the same result.[42]

---

[42] See *School Town of Winamac v. Hess*, 50 N.E. 81, 84-85 (Ind. 1898); *Stockdale v. School-District No. 2 of Wayland*, 10 N.W. 349, 350 (Mich. 1881); *Pittsburgh Paving Co. v. City of Pittsburgh*, 3 A.2d 905, 910 (Pa. 1938); *Citizens' Bank v. City of Terrell*, 14 S.W. 1003, 1007 (Tex. 1890); *Herman v. City of Oconto*, 86 N.W. 681, 687-89 (Wis. 1901).

That bonds are valid up to the constitutional debt limit is consistent with general principles of constitutional adjudication.  "Generally speaking, when confronting a constitutional flaw," courts "try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).  Thus, for example, courts typically "prefer . . . to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact."  *Id.* at 328-29 (internal citation omitted).  Likewise, awards of punitive damages are allowed up to the constitutional limit and invalidated only as to any excess.  *E.g.*, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 515 (2008).  And if a fine is "excessive" under the Eighth Amendment, courts recognize that the fine is valid up to the constitutional limit.  *E.g.*, *United States v. Bajakajian*, 524 U.S. 321, 327, 344 (1998).

These settled principles defeat the Public Debt Claim Objections' sweeping legal theory as a matter of law.  As numerous courts have held, to seek invalidation of an entire bond issuance, a plaintiff must establish that every dollar of the issuance exceeded the debt limit.  In contravention of this rule, the Public Debt Claim Objections seek invalidation of multiple bond issuances in their entirety without even trying to establish that all of the debt incurred in those issuances exceeded the debt limit.  Because the Public Debt Claim Objections fail to allege that necessary predicate, they fail as a matter of law.

### 2. Total Invalidation Is Contrary To The Structure Of Puerto Rico's Debt Limit

The Public Debt Claim Objections' legal theory makes even less sense for the particular debt limit adopted by the Puerto Rico Constitution.  In the debt-limit cases just cited, the states limited the total amounts of debt that public entities could assume.  Under such debt limits, how the entities planned to repay the debt was beside the point.  In Puerto Rico, by contrast, the limit is not on the total amount of debt but (in relevant part) on the amount of principal and interest

"payable in any [future] fiscal year."  P.R. Const. art. VI, § 2.  This debt limit makes the Commonwealth's repayment schedule paramount.  Under it, the Commonwealth might be forbidden from incurring a certain amount of debt repayable within one year, but permitted to incur the exact same amount of debt if repayments were spread out over thirty years.

Accordingly, Puerto Rico's debt limit does not necessarily limit how much debt the Commonwealth can incur; it may limit only how the Commonwealth can repay that debt.  The Objectors' own allegations show that this is such a case.  According to the 2012-2014 GO Claim Objection (¶¶ 87-90), the Commonwealth violated the debt limit in 2014 if capitalized interest is counted.  Even counting capitalized interest—and assuming, for the sake of argument, that all other aspects of the Objectors' proposed calculation are correct—only *one year* of future debt service would exceed the limit, by a mere *$8 million*.[43]  That amounts to just *0.1%* of the $7.7 billion in cumulative debt service scheduled to be paid on the 2014 GO Bonds.  Had the Objectors' thesis caused even remote concern, the Commonwealth easily could have paid that $8 million in *any other year* without offending the debt limit.[44]

It is absurd to think, as the Objectors do, that the Commonwealth would have violated its Constitution merely to repay $8 million in one year instead of another.  And it would be more absurd still to invalidate an entire $3.5 billion bond issuance merely because of this wrinkle in how

---

[43] See 2012-2014 GO Claim Objection Appendix II at 2.  According to this calculation, the maximum annual debt service allowable in the future was $1,228,749,550 (15 percent of line 4 minus line 2).  The only year exceeding this amount, by the Claim Objection's calculation, was fiscal year 2016, with annual debt service of $1,236,777,697.  The difference is $8,028,147.

[44] See 2012-2014 GO Claim Objection Appendix II at 2.  The year with the second-highest annual debt service was fiscal year 2015, with $1,163,734,818 of principal and interest owed.  Adding $8,028,147 to that amount yields $1,171,762,965, well below the threshold calculated in the preceding footnote ($1,228,749,550).

the Commonwealth scheduled its repayments.  As explained above, the law does not permit, much less compel, that absurd result.

## CERTIFICATION

In accordance with paragraphs 4-5 of the *Interim Case Management Order* (Dkt No. 9619), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

## NOTICE

Notice of this Motion has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Oversight Board; (iv) the Official Committee of Unsecured Creditors; (v) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (vi) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico; (vii) insurers of bonds issued or guaranteed by the Commonwealth; (viii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Commonwealth; (ix) the PBA; (x) U.S. Bank Trust National Association and U.S. Bank National Association, as fiscal agents for the PBA Bonds, and (xi) all parties that have filed a notice of appearance in the above-captioned Title III cases.

## CONCLUSION

The Public Debt Claim Objections should be dismissed.

Dated: February 5, 2020

/s/ Ramón Rivera Morales
_____

J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

/s/ Andrew N. Rosenberg
Andrew N. Rosenberg (admitted
*pro hac vice*)
Karen R. Zeituni (admitted *pro hac
vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Email: arosenberg@paulweiss.com

Respectfully submitted,

/s/ Mark T. Stancil
Mark T. Stancil (admitted *pro hac
vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 303-1133
Facsimile:  (202) 303-2133
Email:  mstancil@willkie.com

/s/ Lawrence S. Robbins
_____

Lawrence S. Robbins (admitted *pro
hac vice*)
Gary A. Orseck (admitted *pro hac
vice*)
Kathryn S. Zecca (admitted *pro hac
vice*)
Donald Burke (admitted *pro hac
vice*)
ROBBINS, RUSSELL, ENGLERT,
ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email:
lrobbins@robbinsrussell.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

67

CASELLAS ALCOVER & BURGOS P.S.C.   CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Heriberto Burgos Pérez*

    Heriberto Burgos Pérez
    USDC-PR 204809
    Ricardo F. Casellas-Sánchez
    USDC-PR 203114
    Diana Pérez-Seda
    USDC-PR 232014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone:  (787) 756-1400
    Facsimile:  (787) 756-1401
    Email:  hburgos@cabprlaw.com
          rcasellas@cabprlaw.com
          dperez@cabprlaw.com

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

By: */s/ Howard R. Hawkins, Jr.*

    Howard R. Hawkins, Jr.*
    Mark C. Ellenberg*
    William J. Natbony*
    Ellen M. Halstead*
    Thomas J. Curtin*
    Casey J. Servais*
    200 Liberty Street
    New York, NY 10281
    Telephone:  (212) 504-6000
    Facsimile:  (212) 504-6666
    Email:  howard.hawkins@cwt.com
          mark.ellenberg@cwt.com
          bill.natbony@cwt.com
          ellen.halstead@cwt.com
          thomas.curtin@cwt.com
          casey.servais@cwt.com

* Admitted *pro hac vice*

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**G. CARLO-ALTIERI LAW OFFICES, LLC**

By: */s/ Gerardo A. Carlo*
Gerardo A. Carlo
USDC PR No. 112009
Telephone: (787) 247-6680
gacarlo@carlo-altierilaw.com

By: */s/ Mª Mercedes Figueroa y Morgade*
Mª Mercedes Figueroa y Morgade
USDC PR No. 207108
Telephone: (787) 234-3981
figueroaymorgadelaw@yahoo.com

254 San Jose St., Third Floor
San Juan, Puerto Rico 00901
Telephone: (787) 247-6680
Facsimile: (787) 919-0527

**MORRISON & FOERSTER LLP**

By: */s/ Gary S. Lee*
James M. Peck (admitted *pro hac vice*)
Gary S. Lee (admitted *pro hac vice*)
Lena H. Hughes
Andrew R. Kissner (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jpeck@mofo.com
glee@mofo.com
lhughes@mofo.com
akissner@mofo.com

-and-

Joseph R. Palmore
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 887-6940
Facsimile: (202) 887-0763
jpalmore@mofo.com

*Counsel for the Ad Hoc Group of Constitutional Debtholders*

**TORO COLÓN MULLET P.S.C.**

/s/ Manuel Fernández-Bared
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
Email: mfb@tcm.law

/s/ Linette Figueroa-Torres
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
Email: lft@tcm.law

/s/ Jane Patricia Van Kirk
JANE PATRICIA VAN KIRK
USDC–PR No. 220,510
Email: jvankirk@tcm.law
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**

/s/ Amy Caton
THOMAS MOERS MAYER*
AMY CATON*
DOUGLAS BUCKLEY*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: tmayer@kramerlevin.com
         acaton@kramerlevin.com
         dbuckley@kramerlevin.com
* (admitted *pro hac vice*)

*Counsel to funds managed by Invesco Advisers, Inc. and funds and/or accounts managed or
advised by OFI Global Institutional Inc.*