# EXHIBIT 7

CERTIFIED TRANSLATION

DAILY JOURNAL OF THE LEGISLATURE

( Seal of Puerto Rico]          PROCEEDINGS AND DEBATES OF THE

Commonwealth of Puerto Rico   LEGISLATURE

| Vol. XIV | San Juan, Puerto Rico-Tuesday, September 5, 1961 | No. 27 |
|---|---|---|

## SENATE

(Session on Monday September 4, 1961)

At twelve noon, the Senate proceeded with its business, presided by Mr. Rivera-Colón, designated for that purpose by the President, Mr. Quiñones.

Mr. Colón-Velázquez: Mr. President.

President pro tempore (Mr. Rivera-Colón): Senator Mr. Colón-Velázquez.

Mr. Colón-Velázquez: To propose that we return to the turn on the Permanent Committees Reports.

President pro tempore (Mr. Rivera-Colón): Proceed.

## PERMANENT COMMITTEES REPORTS

The Special Committee that is working on the consideration of amendments to the Constitution proposes that the following concurrent resolution be approved, without amendments:

### Senate Concurrent Resolution 3

"To propose amendments to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico."

## BILLS AND RESOLUTIONS RECEIVED IN THE HOUSE OF REPRESENTATIVES AND REFERRED TO COMMITTEES

The Secretary reports that the following bill has been received by the House of Representatives and Referred to Committees

House Bill 385 (by Mr. Mendez). "To authorize chiefs of departments, agencies, instrumentalities, or public corporations of the Commonwealth of Puerto Rico, further to prior authorization by the Governor of Puerto Rico to enter into agreements with any political subdivision, city, agency, or instrumentality of the Government of the United States of America or the States thereof, to provide them with services and facilities." (State and Municipal Government) (Labor)

## COMMUNICATIONS ON LEGISLATIVE BUSINESS

The Secretary reports that the House of Representatives submits the following joint resolution, signed by the President:

### House Bill 936

"Assigning to the University of Puerto Rico the amount of twelve thousand (12,000) dollars for the purchase and installation of an electronic microscope, and amount that may be matched with federal funds for the purposes of this project, and which amount shall be transferred to the Provisional Board of the Medical Center so that the microscope be at that Center."

The Secretary reports that the President of the Senate has signed this joint resolution and has ordered the return thereof to the House of Representatives.

-  - -

## MISCELLANEOUS COMMUNICATIONS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The Secretary reads the following communication:

"No. 26 Nenadich St., Mayaguez, Puerto Rico, September 3, 1961. Honorable Members of the Senate of Puerto Rico. Insular Capitol. San Juan, Puerto Rico. Dear Sirs:

The Movimiento Estudiantil pro Monumento a José de Diego has the pleasure of inviting all of the members of the Senate of Puerto Rico and their distinguished families to the unveiling of the monument in honor of José de Diego, founder of the Agricultural and Mechanical Arts College, our College.

Date: Sunday, September 18. Time: 10:30 AM. Place: At the entrance of the College.

Sincerely, (Signed) Loida Figueroa, Professor Loida Figueroa (Counselor) (Signed) J. A. González-González (Member).

Duly noted by the Senate.

---

EXCUSED

Mr. Colón-Velázquez: Mr. President.

President pro tempore (Mr. Rivera-Colón): Senator Mr. Colón-Velázquez.

Mr. Colón-Velázquez. To request that our fellow legislator Mr. Bauzá be excused, since he cannot attend today session as he is sick.

President pro tempore (Mr. Rivera-Colón): Yes.

Mr. Reyes-Delgado is called to preside, and assumes the presidency.

MOTION

The Secretary reads the following motion, written by Mr. Carrasquillo:

"To designate a special Committee to study the problem of the transportation of people and cargo for the islands of Vieques and Culebra.

Whereas: The inhabitants of these islands have been clamoring for a long time regarding the cost of the fare for individuals and cargo which is a great burden for the inhabitants of those islands.

Whereas: Basic necessities on those islands are being sold at exorbitant prices because of the high cost of transportation of such.

Whereas: The high cost of transportation of persons and merchandise raises the cost of living for all inhabitants of the islands, and especially the poor class that is frequently unemployed.

Therefore: It is hereby decided by this Senate that a Special Committee be appointed to study, recommend, and report to the next regular session of this Body regarding the transportation of persons and cargo for the islands of Vieques and Culebra."

-    -      -

Submitted to a vote, the motion passed.

---

SPECIAL ORDER OF BUSINESS FOR THE DAY

As the sole business in the Special Order of Business, the Secretary read the Joint Resolution of the Senate, as follows:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

To propose an amendment to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico

Article 1: Be it resolved by the Legislature of Puerto Rico:

An amendment of Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico is proposed to read as follows:

"Section 2: The power of the Commonwealth of Puerto Rico to levy and collect taxes and authorize municipalities to levy and collect shall be exercised as provided by the Legislature, and will never be relinquished or suspended. The power of the Commonwealth of Puerto Rico to undertake and authorize debts will be exercised as provided by the Legislature but not for direct obligations of the Commonwealth of Puerto

219

220                               DAILY JOURNAL                               SEPTEMBER 5

Rico for funds directly borrowed by the Commonwealth of Puerto Rico evidenced by bonds or promissory notes for the payment of which the good faith and credit and the power to levy taxes of the Commonwealth of Puerto Rico were pledged shall be issued by the Commonwealth of Puerto Rico if the total of (i) the amount of the principal and interest of such bonds and promissory notes, along with the amount of the principal and interest on the total amount of the bonds and promissory notes issued up to such time by the Commonwealth of Puerto Rico in circulation and payable in any fiscal year and (ii) any amounts paid by the Commonwealth of Puerto Rico in the immediately preceding fiscal year for interest and principal on any obligations evidenced by bonds or promissory notes secured by the Commonwealth of Puerto Rico were to exceed 15 percent of the total amount of revenue obtained according to the laws of the Commonwealth of Puerto Rico and deposited in the Treasury of Puerto Rico in the fiscal year immediately preceding the current fiscal year, and none of such bonds and promissory notes issued by the Commonwealth of Puerto Rico for any purpose other than housing will mature after a term of thirty years from the date of their issue and no bond or promissory note issued for housing will mature later than in 40 years after the date of issue; and the Commonwealth of Puerto Rico will not guarantee any obligation secured by bonds and promissory notes if the total amount owed in any fiscal year for principal and interest on the total amount of such direct obligations issued up to that time by the Commonwealth of Puerto Rico and in circulation and the amounts referred to in subsection (ii) were to exceed fifteen percent (15%) of such total revenue.

The Legislature will set the limits for the issue of direct obligations by any municipality of Puerto Rico for money that is directly borrowed by such municipality as evidenced by bonds or promissory notes, for the payment of which the good faith, credit and power to levy taxes of such municipality were pledged, and it is further provided, however, that no such bonds and promissory notes issued by any municipality shall be for an amount, which along for the total amount of bonds and promissory notes issued by the municipality up to that time and in circulation shall exceed the percentage set by the Legislature, which shall be no less than five (5) percent nor more than ten (10) percent of the total appraised value of the property located in that municipality.

Demand may be made of the Secretary of the Treasury to assign available resources, including the surplus from the payment of interest on the public debt and any amortization thereof to which Section 8 of this Article Vi may be applicable, by any holder of bonds or promissory notes issued as evidence of such."

Article 2 – This amendment will enter into effect upon being ratified by majority of the voters who vote on such in a referendum to be held for this purpose.

Commonwealth of Puerto Rico

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Senate of Puerto Rico

San Juan, Puerto Rico

September 4, 1961

Report

To the Senate of Puerto Rico:

The Special Committee designated to study and consider Senate Concurrent Resolution 3 has the honor of reporting to this Body that it recommends the approval of the measure without amendments.

Your Committee held joint hearings with the Special Committee appointed by the House of Representatives on August 2, 22, 23, 24, 25, 26, and 29, 1961. Messrs. José Ramón Noguera, Secretary of the Treasury; Rafael Picó, President of the Government Development Bank for Puerto Rico; Francis Bowen, first Vice President of that Bank, and Ramón García-Santiago, Chairman of the Planning Board, all of whom are public officials testified at the hearings. Attorney Mr. Rodolfo Aponte, Vice President of the Banco Popular; Esteban Bird, Executive Vice President of the Banco Crédito y Ahorro Ponceño, who also appeared on behalf of the Bankers Association; Cesar Vizcarrondo and S. L. Descartes, who appeared on behalf of the Chamber of Commerce of Puerto Rico; Webster Pulled, Vice President of the First National City Bank of New York in charge of Puerto Rico business; Roberto de Jesús, President of the Banco de Ponce; Francisco de Jesús, Vice President of Chase Manhattan Bank in Puerto Rico; Leandro Cabranes, Executive Director of the Mayors Association of Puerto Rico; Emiliano Pol, CPA; and Juan Diez de Andino, as a private citizen, also testified at the hearings. The Committee also received written memoranda in support of the resolution from Mr. José R. Noguera, Secretary of the Treasury; Mr. Francis Bowen, first Vice President of the Government Development Bank for Puerto Rico; Dr. Rafael Picó, President of that Bank; and Mr. Ramón García-Santiago, Chairman of the Planning Board.

The public officials and the afore mentioned private individuals who appeared on behalf of the institutions indicated above or in the personal character favored, with the exception of Mr. Diez de Andino, the principle involved in the constitution amendment under consideration directed at setting the borrowing limit for the Commonwealth of Puerto Rico based on the income of the Government instead of the current system, which is based on a percentage of the appraise value of property.

In Joint Resolution Number 1 approved on June 23, 1958, the Legislature of Puerto Rico requested of the United States Congress that it eliminate Section 3 of the Federal Puerto Rico Relations Act the provisions regarding setting a borrowing limit for the Commonwealth of Puerto Rico and the municipalities of Puerto Rico.

Further to that request, the United States Congress passed Public Law No. 87-221 which was approved by the President on August 8 of that year. This Law provides for striking the following language from Section 3 of the Puerto Rican Federal Relations Rico Act:

"It is further provided that no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras, and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality…In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

That federal statute also provides that its provisions will enter into effect as soon as able voters in Puerto Rico have voted in a referendum under Section 8 of Article VII of the Constitution of the Commonwealth of Puerto Rico that provisions be included in that Constitution to substitute the provisions related to Section 8 of the aforementioned Puerto Rican Federal Relations Act of the United States, which limit the borrowing capacity of the Commonwealth of Puerto Rico and its municipalities, in accordance with what was prosed in a Concurrent Resolution approved by the Legislature.

Joint Resolution of the Senate Number 3 and Concurrent Resolution of the House Number 5, which are identical and are now before the consideration of the Legislature, contain provisions for the full and specific compliance with the provisions of Public Law Number 87-121 of the United States Congress. Upon being approve by the Legislature and the able voters of Puerto Rico in a referendum, they would have the effect of striking the provisions set forth in the Puerto Rican Federal Relations Act and including in our Constitution appropriate provisions to set the borrowing capacity of Commonwealth of Puerto Rico and the municipalities of Puerto Rico.

Currently, under the provisions of the Federal Relactions act, the borrowin limits of the commonwealath of Puerto Rico and the municipalites of San Juan, Ponce, Mayaguez, and Arecivo are establish in terms of 10 perceent of the assessed valuation of property and 5 percenfor the remaining municipalities. This formula, although it is flexible, since it allows for the borrowing capacity to increase as the value of property increases, and therefore the assessed valuation of such, has failed to provide an adequate mens for the procesing of public debt of the State in view of the sifingicant economic grouwth in Puerto Rico in recent years and the corresponding need to obtain more and better public services for the people of Puerto Rico.

The need to increase the debt margin of Puerto Rico has become imperative when we see that as of July 31, 1961 the Commonwealth of Puerto Rico only had available

1961                                    DAILY JOURNAL                                    221

about $3,000,000. Being aware of this situation, which was foreseen quite a few years ago, the Concurrent Resolutions that are now before the consideration of the Legislature include several provisions that should be included in our Constitution to set the debt margin of the Commonwealth of Puerto Rico and the municipalities of Puerto Rico in a more flexible and realistic manner, according to sound economic principles.

The proposed provisions are based on setting a debt margin of the Commonwealth according to the revenue of the Government from internal sources during the fiscal year that is prior to the year in which the debt will be undertaken. Revenue from federal contributions are not included or customs duties and levies on shipments, since such public levies are not under the control of the Legislature of Puerto Rico. This makes the formula more conservative, since such revenue may also be used for the payment of the debt.

The limitation is set in terms of the highest principal and interest payments in any maturity ear of existing debt and that is currently being considered for authorization, plus any payment that the State may have had to make in the prior fiscal year under bonds that are secured by the State and issued by agencies or public corporations. When these payment requirements plus the amount the Government may have had to pay for secured bonds amount to the amount of income from state sources during the prior fiscal year, the Government may not incur more direct obligations, nor may it secure more bonds for public instrumentalities. For example, assuming that Government revenue is derived from internal sources in the year prior to the year in which it is intended to sell authorized bonds in the amount of $200 million, 15 percent of that amount would be $30 million and supposing that the highest principal and interest

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

payment requirements in the years remaining in the life of the bonds that have already been issued were $15 million, an additional $15 million would remain for assuming payment of annual requirements for future obligations.

It may be noted, therefore, that under the proposed formula, the limit of the debt that may be incurred is expressed in terms of the funds that are available to amortize the debt, instead of being expressed as it is now, in terms of the total amount of money that may be borrowed at a given time. Under the provisions of current legislation, the debt margin is approximately $190 million, that is to say 10 percent of the assessed valuation of the property, which is approximately $1,900 million.

If this debt margin of $30 million (15 percent of $200 million revenue) were to be translated to a more or less set amount, it could be calculated historically based on the average interest rate and the maturity pattern of existing debt, or if a more exact calculation is sought, the maturity patatern and interest rate of the most recent bond issue could be used. Based on the most recent bond issue of the Commonwealth of Puerto Rico of $40 million in March of this year, and using a maturity pattern of a mximum of twenty years and an interest rate of 4 percent per annum, we could say that the debt margin currently available to the Government is $212.3 million, with available revenues for fiscal year 1960-61 of $204 million. In making this calculation we are assuming that there would be a free margin of $15 million for undertaking new debt, and the remaining 15 percent of $204 (above $15 million) would already be obligated for the payment of principal and interest of the bonds in circulation.

We must emphasize however, that we use these examples for the sole purpose of demonstrating in practice how the mechanics of the proposed formula function to set the borrowing limit through the constitutional amendment under consideration. The actual limitation is on the capacity to repay the borrowed money, expressed in terms of a set percentage (15 percent) of the annual revenue available for repayingk the direct obligations issued by the State. Once the amount calculated by that percentage is obligated for the annual reparyment of the debt evidenced by direct bonds and promissory notes of the State, the borrowing capacity is exhausted.

As can been seen in this analysis, the proposed formula for setting the debt margin for the state is more flexible and realistic than the one that is currently being used. The formula is based on the available resources of the Government, which is the true source for meeting the obligations of the State, and not on an assesment value of property,which is not a true index of repayment capcity. It should be noted that the proposed formula is actually consistent with Section 8 of Article VI of our Constitution, which in synthesis provides that the available resources of the State will be used first for the payment of interst and mortization of public debt. Although currently, as a matter of fact, property taxes are used to address the payment of public debt, the truth is that in terms of the referenced constitutional provision, all Government resources are obligated for such payments. The proceeds from property taxes currently only represents 7 percent of Government revenue.

Under the current system, the debt margin increases according to the increase in property [value] and the increase in the assessed valuation of such. These factors are not necessarily under the control of the Legislature. However, the Legislature would have a more absolute control over the debt margin.

The principle of the proposed formula for setting the debt margin on a percentage of the available resources of the State, although it seems novel in the arena of fiscal public policy, it has for quite a while been used to authorize revenue bonds issues by public and private corporation. In general, the capacity to issue this kind of bond is based on a percentage of revenue or repayment capacity of the debt of such corporations. Besides, Connecticut and Mississippi recently adopted legislation setting the loan limit of the State at a percentage of the annual revenue of the State. Although the system that is used in those states is not the same as the formula that is proposed in the constitutional amendment under consideration, it follows the general principle of tying public debt to Government revenues.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

In discussing revenue bonds, it should be clarified that the bonds that have been issued and may be issued by public corporations of the Commonwealth of Puerto Rico will not be taken into consideration in the calculation of the debt margin of the State, since the good faith of the People is not pledged for the repayment of such, and repayment will only be based on the revenues obtained by such corporations. It will only be the case if the State is a guarantor of these bonds, which has not been the case until now, and the State were to be obligated to pay a deficiency in the debt requirement of such, that the amount so paid will be counted against the debt margin of the Commonwealth of Puerto Rico.

The proposed constitutional amendment limits public debt to obligations of the Commonwealth of Puerto Rico that are evidenced by bonds and promissory notes that have been directly issued by the State. Bonds and promissory notes are not deemed to be the classic obligations that are sold on United States securities exchanges. They do not include current or contingent debts or obligations of the State which are incurred normally in the operations of the Government. The language used in the amendment clarifies the standard that has been followed in practice up to the present.

The proposed constitutional amendment will not affect in any way the credit and sale of bonds of the Commonwealth of Puerto Rico. On the contrary, a survey among prominent figures in the banking world in the securities markets of the United States carried out by the Secretary of the Treasury and the president of the Government Development Bank for Puerto Rico shows that the proposed formula not only has the approval and acceptance of all concerned, but in their opinion, it will improve the credit and the saleability of Puerto Rico bonds. The good credit of Puerto Rico in the United States securities market is principally based on the punctuality with which throughout its history it has paid its obligations, on the sound judgment it has exercised in undertaking public debt, and in not having engaged in subterfuge to avoid limitations to such. The record contains interesting testimonials by several figures of the American financial world, frankly and openly endorsing the proposed constitutional amendment. There has not be a single credit source among those used by the People of Puerto Rico in the sale of its bonds that has spoken out against the new formula. Some of them think that Puerto Rico has an opportunity to make a valuable contribution to the field of fiscal policy by approving this amendment.

Another provision of the proposed constitutional amendment that is considered that will be substantially useful in the sale of Puerto Rico bonds is that it grants bondholders the right to sue the State in the event of default

222                                    DAILY JOURNAL                                    SEPTEMBER 5

in the repayment of the debt. This provision implements the provision of Section 8, Article VI, that obligates the revenues of the Government for the payment of principal and interest of the public debt. In New York State, and in other states of the Union, there are analogous provisions in their Constitutions. This waiver of the immunity of the State from being sued will result in a greater acceptance and better rating of our obligations.

As for the municipalities, the constitutional amendment proposes that the current method continue to be used, pursuant to the Federal Relations with Puerto Rico Act, to set the debt margin for such. The only difference is that in stead of setting of ten percent on the assessed valuation of property in the municipalities of San Juan, Ponce, Mayagüez, and Arecibo, and 5 percent in the remaining municipalities, it is provided in general terms that the Legislature will set the borrowing limits, which may not be less than 5 nor more than 10 percent. Naturally, any limit between 5 and 10 percent may be set.

The intention is to use the valuation of all assessed property in the different municipalities, with the exception of property that is not subject to taxation. In calculating the debt margin of the different municipalities, however, the assessed valuation of property used as housing for their owners and by legislative action taxes have been reduced or may be reduced in the future up to a given amount of the assessed valuation. This distinction between totally tax-exempt property and property assessed [sic] by

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

their owners as housing, is made since the latter must be maintained on the lists of property that is subject to taxation, since such property has been assessed for tax purposes for an amount that is higher than the tax-exempt amount, and taxes will be collected on the remaining amount, and, also if the property is no longer used for housing, the owner will once again have to pay taxes. There is also another reason for including this kind of property n the calculation of the debt margin of the municipalities, which is the fact that they will not have a reduction in their revenues due to the legislation that reduces taxes on properties used by their owners as housing, since the Legislature has taken steps to reimburse the municipalities for the amount they no longer receive due to said reduction.

This kind of property will be available in the future for the payment of taxes if the Legislature deems it advisable and necessary to repay the public debt.

The Special Committee, in recommending the favorable approval of this measure is aware that its approval is indispensable for the economic development of our People.

Respectfully submitted.

Yldefonso Solá-Morales

President

Cruz Ortiz-Stella

Chair

Mr. García-Mendez: Mr. President.

President pro tempore (Mr. Reyes-Delgado): Mr. Senator

Mr. García-Mendez: We would like to call attention, and have it clearly noted in the record that this report of the Special Committed appointed to study and consider Senate Concurrent Resolution 3 does not clarify that the opposing votes of the Senators that represent the minority in the Senate were not indicated, to specify the basis for the thorough discussion of the Resolution today, and we want this to be clear, so that it does not appear as a unanimous report.

Mr. Ortiz-Stella: Mr. President, our colleague García-Méndez is correct. The report was approved by a majority.

President pro tempore (Mr. Reyes-Delgado): Let the record show that.

Mr. Ortiz-Stella: I have no objection to having the record show that.

Mr. President, I am going to ask for a turn, to use it right now to defend the resolution and the report.

Mr. García-Méndez: Mr. President, before the distinguished colleague uses his turn, we want to comment that we have two amendments, which in our judgment are fundamental, to the text of the Concurrent Resolution.

If our colleague wants to use his turn to defend a report like this, of course he will not be able to address the question of the amendments that we are going to formulate. The practice has normally been to discuss the amendments and then request a turn to defend the proposed document as it has been amended, if it has been amended, or as is, if it had not been amended. However, I have no objection to accepting that our colleague may expound on his theory in this turn to defend the report, but we are making it clear that we have not waived the right, and on the contrary, we reserve the right, to make these amendments we have brought to submit for consideration by the Senate.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Ortiz-Stella: I would go further, Mr. President. So that it may be absolutely clear, I mean, that this turn of mine to defend the report and the resolution, as submitted by the Special committee fully protects the right of our colleague García-Méndez to formulate the amendments to this resolution that he may deem appropriate.

President pro tempore (Mr. Reyes-Delgado): Is this to use it now?

Mr. Ortiz-Stella: Yes, Mr. President.

President pro tempore (Mr. Reyes-Delgado): Proceed.

Mr. Ortiz-Stella: Mr. President and fellow Senators, I am going to defend Senate Concurrent Resolution 3 and request a favorable vote for it.

As co-drafter of the report that I have just read, I will necessarily repeat some of the concepts contained in the report during the turn I am taking now.

I do not have Victor Hugo's imagination to could draft a report on this Resolution and then consume an expository turn with completely new ideas. So, I am warning my fellow Senators that what I am going to say has probably been said already in the Report.

The provisions on the public debt of the Commonwealth of Puerto Rico and its municipalities are currently set forth in Section 3 of the Federal Relations Act as follows:

"*Provided , however,* That no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras and Mayagüez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality."

"In computing the indebtedness of the People of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the People of Puerto Rico is pledged shall be counted."

By virtue of Public Law 87.121 of the United States Congress, these provisions on public indebtedness would be eliminated from the Federal Relations Act as soon as the able voters of Puerto Rico approve an amendment to the Constitution containing all matters that are related to said indebtedness. Section 2 of such Public Law Number 87.121 reads as follows:

Section 1 of this Act shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section of Article VII of the constitution of the Common-. wealth of Puerto Rico, to include provisions in the Commonwealth Constitution in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth."

This means that if this Resolution is approved by both Chambers, since it is a Concurrent Resolution, it does not have to be signed by the Executive, until the People of Puerto Rico have not approved this proposed amendment to the Constitution, the provisions of the Federal Relations Act regarding the debt margin of the Commonwealth of Puerto Rico and its municipalities will remain in effect. Only when able voters in a referendum approve the proposed amendment with the provisions of the Federal Relations statute cease to exist and the constitutional amendment will enter into effect immediately.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

In compliance with the provisions of such Congressional statue, Concurrent Resolution Number 3 is submitted in the Senate and in the House of Representatives, Concurrent Resolution Number 5, which propose an amendment to Section 2 of Article VI of the Constitution of the Commonwealth of

| 1961 | DAILY JOURNAL | 223 |
|------|---------------|-----|

Puerto Rico, which amendment shall provide for the limit of the borrowing capacity of the Commonwealth of Puerto Rico and its municipalities.

This Senate appointed a Special Committee to which said Concurrent Resolution Number 3 was referred. The House of Representatives likewise appointed a Special Committed to which it referred House Concurrent Resolution Number 5, and both committees have worked jointly during public hearings, hearing the testimony of all persons who are interested in advising of their criteria and opinion regarding the proposed amendment to our Constitution.

The Committees have heard the testimony of Mr. José Noguera, the Secretary of the Treasury; Dr. Rafael Picó, President of the Government Bank; Mr. Francis Bowen, Vice President of that Bank and an expert on bonds; Mr. César Vizcarrondo, First Vice President of the Chamber of Commerce of Puerto Rico; Mr. Sol Luis Descartes, Vice President of Crédito y Ahorro Ponceño, and who spoke on behalf of the Chamber of Commerce, in his personal capacity, and as a personal delegate of Angel Sanz, the president of said Bank; Mr. Esteban A. Bird, who appeared in his capacity as President of the Bankers Association of Puerto Rico; Mr. Leandro Cabranes, in representation of the Mayors Association of Puerto Rico; Mr. Webster Pullen, of the National City Bank; Rodolfo Aponte, Esq., representing the Banco Popular de Puerto Rico (Mr. Aponte was a member of the House of Representatives for eight years); Mr. Roberto de Jesús-Toro, the President of Banco de Ponce; Francisco de Jesús, Vice President of the Chase Manhattan Bank; Mr. Ramón García-Santiago, Chairman of the Planning Boards; Mr. Emiliano Pol, CPA, who appeared in his personal capacity; and Mr. Juan Diez de Andino, who appeared in his personal capacity. Mr. Diez de Andino is a well-known person who was an officer of the Banco Comercial for many years.

I would like to inform the Senate that all of the persons involved in banking, who appeared before the special committees, favor the resolution proposing the constitutional amendment, and which increases the borrowing capacity of the Commonwealth of Puerto Rico and its municipalities.

I must add that these persons involved in banking who appeared before the special committees, are the persons who directly intervened in the sale of the bonds issued by the Commonwealth of Puerto Rico and its municipalities. In other words, the buyers of our bonds, accept as solid and full security of such the formula for the borrowing limit contained in the propose amendment to Section 2 of Article VI of the Commonwealth of Puerto Rico.

It cannot be denied, and I do not want my words to be given any meaning they do not have, it cannot be denied that the aforementioned Public Law Number 82-121 of the United States Congress means a greater autonomy for our government. The Federal Relations Act is the law that establishes the relations between our People and the People of the United States, and it does not seem appropriate that a matter that is exclusively affect the People of Puerto Rico should be covered by the Federal Relations Act. All matters related to public indebtedness should be set forth in the Constitution of the Commonwealth of Puerto Rico and it should be in the power of the People of Puerto Rico to set the limit to their public indebtedness.

I believe that in this we have all been in agreement, and when during the last administration a resolution was submitted in which the provisions on public indebtedness would be stricken from the Federal Relations Act in order to include them in the Constitution, we were all in agreement in this Senate and the House that that was how it should be.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my ability, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

To that effect, it would be advisable to know what was said in the United States Senate itself, when the Joint Resolution of the House was approved, which later became Public Law Number 87-121. Senator Anderson said, among other things, the following, during the debate on the Joint Resolution of the House that later became Public Law Number 87-121. Senator Anderson said, among other things, during the debate on that Joint Resolution of the House that became the aforementioned Public Law 87-121: "One of the things that he (referring to the Governor of Puerto Rico) would like to do is arrange for Puerto Ricans to bond themselves for needed improvements in the economy of that country.

"In the Subcommittee on Territories, headed by the junior Senator from Washington, [Mr. Jackson], we took into consideration the request of Gov. Muñoz-Marin in reference to the problem of increasing the bonding capacity of the territory." He is referring to a letter that Mr. Muñoz-Marin wrote to Mr. Jackson, in which he mentioned to him (that was back in June) that it was already being discussed that the debt margin based on a percentage above the assessed valuation was inadequate, and that the Economic Development Administration and the Secretary of the Treasury were carrying out studies to determine what formula, what means there could be for a margin, a borrowing limit, that would allow for the economic projections in the economic program of the Planning Board.

"At the present time we limit Puerto Rico's capacity to 10 percent of the assessed valuation.["] "I know of no State," continues Senator Anderson, ""upon which we impose that sort of an obligation, but I certainly know that there is no State where that is limited by Federal Government as to how much it may bond itself." [This text appears in Spanish and does not appear in the Congressional Record: The states state set this limit themselves, whether by law or by constitution.

"It does those things on its own. Every one of our States has the right to decide for itself how much it will bond itself for Improvements, for the construction of schools and highways, and various other projects.["] "The people of Puerto Rico," Senator Anderson continues, "would like the privilege of doing the same thing. They would like to be able to decide that they can bond themselves for whatever amount is necessary. We were a little worried with respect to complete authority to do so, and we found that they intend to bring this matter in proper fashion before the legislature. The measure will have to pass by a two-thirds vote. Any limitation that they want to put on it or any lifting of the limitation," I want to repeat the Senator's words, "Any limitation that they want to put on it or any lifting of the limitation will then be referred to the people, and the people will decide whether they will or will not bond themselves."

"We discussed the subject in the committee at great length. We heard all sorts of viewpoints upon it. we decided that those measures ought to be passed. It is a House joint resolution. The House held carefully prepared hearings, and decided that this action was satisfactory."

"The Senate Committee on Interior and Insular Affairs has considered the joint resolution carefully. We think it is all right."

"It would be of great benefit to the people of Puerto Rico if it could be passed by the Senate today in order that the people of Puerto Rico might know [omitted words] that we have taken the same action which the House has taken. Therefore the House joint resolution should be agreed to."

Those were the words of Senator Anderson on the floor of the United States Senate. If I remember correctly, he is the junior Senator from New Mexico.

Since 1909, the borrowing capacity of Puerto Rico has been set on the basis of a percentage of the assessed valuation of property At first, it was seven percent, for the State and for its municipalities.

And in 1921, the Organic Act was amended two raise the borrowing margin to two [sic] percent of the assessed valuation of property. Subsequently there were other amendments to the Organic Act under which the borrowing margin of the municipalities was set at five percent of the assessed valuation of property, with the exception of San Juan, Mayaguez, Ponce, Arecibo, and Rio Piedras for which the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

margin was set at ten percent of the assessed valuation of taxable property. I clarify what I said before, since Rio Piedras, not being a municipality, is not included in this provision.

What is the assessed valuation of property in the Commonwealth of Puerto Rico? On June 30 of the current year, the assessed valuation of taxable property in Puerto Rico was one billion nine hundred million dollars. Therefor the borrowing capacity of the Commonwealth of Puerto Rico, at that time, was one hundred ninety million dollars and for June thirty, 1962, it will be one hundred ninety-seven million dollars. Adding the different bond issues that have been authorized by the Legislature, and subtracting the amounts for amortization of principal and interest on public indebted ness, as well as the amount of the redemption fund, on June 30, 1962, we will have a net public indebtedness of one hundred eighty-one million three hundred twenty-seven thousand six hundred and twenty-four dollars. This means simply that on June 30 of next year, the net available debt margin will be approximately 15 million.

I am providing these figures to point out the fact that we are very close to exhausting or debt margin. My colleagues here in the Senate no that I am by no means an economist. But I believe that it is not realistic to set the limit of public indebtedness of the Commonwealth of Puerto Rico based on a

| 224 | DAILY JOURNAL | SEPTEMBER 5 |
|---|---|---|

Percentage of the assessed valuation of taxable property.

The amendment to the Constitution proposed in the Concurrent Resolution of the Senate Number 3 and the Concurrent Resolution of the House Number 5 is designed on the bases of what all bankers consider the first factor to be taken into consideration in a loan application. And here there is a person hearing what I am saying who is a very distinguished banker, besides being a very distinguished Senator, esteemed by all of us.

This factor is the repayment ability or capacity. I remember that a representative of one of the most powerful banks in Puerto Rico appeared before the special committees of the Senate and the House that were studying these concurrent resolutions. I am referring to Mr. Francisco de Jesús-Toro, the Vice President of Chase Manhattan Bank. And his words before the special committees were the following:

"Among many other factors, there are two that I would consider to be of great importance, and that in my judgment, is very similar to this matter of the public debt[.]" He was referring to the factors that considers important when a client applies for a loan at his bank.

1. Is there repayment capacity?

"For this, I, in the case of a long-term credit, would ask for a profit and loss statement for the past three or five years, to measure the profit history and the economic capacity, based on the past. But I would also ask for a projection of expected profits for the next three or four years."

That is number one.

2. Mr. de Jesús-Toro continues by saying, "What are those funds going to be used for? Are they going to be used by dissipating them on trips to Europe or additional bonds that could be used for such a purpose, whether justified or not, or are they going to be used to extend the economic base of the company, for an expansion, for new equipment? I think, of course, there may be other factors to consider. But, essentially, if I concluded that the funds will be employed in something useful, that will increase the wherewithal of a company and its future capacity to increase the volume of its business, that there is a repayment capacity, in all likelihood I would grant that loan." My fellow Senators, see how he emphasizes the repayment capacity. An it is precisely for this repayment capacity that this amendment to the Constitution is designed, in which the limit to public indebtedness of the Commonwealth of Puerto Rico is set.

"I believe the same criteria should be applied here."

This finalized Mr. Francisco de Jesús intervention.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The proposed amendment to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico rests on the economic principle that I have stated, to wit, the ability to repay. That is why the revenue of the prior fiscal year is taken into account and it is provided that if bonds are to be issued, the principal and interest of such bonds, add to the principal and interest of bonds that have been issued already and the payments made in the prior year on bonds that are secured by the State, should never exceed fifteen percent of the revenues of the prior fiscal year.

Therefore, if at the end of a given fiscal year revenues have been $200,000,000, the limit set in this amendment to the Constitution would be thirty million for the payment of principal and interest on the bonds to be issued or the bonds that have already been issued. That is to say, bonds could not be issued that required repayment above fifteen percent of the revenues during the prior fiscal year.

I am going to try to explain this in the simplest way I can.

According to the information I have in my hands, revenue to be collected under state legislation during the current fiscal year will be two hundred million dollars, rounded off. I do not purport to provide exact figures, but rather approximate figures. Public indebtedness is one hundred eighty million dollars, in rounded figures, and the annual repayment requirements for principal amounts to fifteen million dollars, rounded off.

Under the provisions of the proposed amendment to the Constitution, based on the figures I have just stated, the People of Puerto Rico could issue bonds for a sum that is equal to the current public indebtedness, that is to say, one hundred and eighty million dollars, and that is the case because fifteen percent of two hundred million is thirty million dollars, and if we are currently paying fifteen million dollars for principal and interest of a debt that has already been issued of one hundred eight million, this means that we would have free a payment requirement of another fifteen million dollars a year.

In other words: The current debt requires payment of principal and interest that are seven and one-half percent of the revenues of this fiscal year; therefore, there is an additional free margin of seven and one-half percent on these same revenues.

What revenues should be taken into consideration for setting the limit on the borrowing capacity? The revenues to be considered are those from state sources. We explained that already in the report, that is to say, customs revenue and tariffs on shipments are not taken into account, because those are revenues that do not depend on the Legislature of Puerto Rico. However, I think that the report also states that although they are not considered for the purposes of the fifteen percent for setting the limit on public debt, I should say, the borrowing capacity, it is revenue available to cover the indebtedness. And this provides solidity and strength for the bonds issued by the Commonwealth of Puerto Rico.

That is to say, revenues from federal customs and federal tariffs are not taken into account, because those are under the exclusive control of the United States Congress. The revenues that are considered for setting the limit on the borrowing capacity would be the following: Property taxes, which although not constituting the factor for deciding what the borrowing capacity of the Commonwealth of Puerto Rico is, since property taxes produce revenue and that revenue is counted for the purpose of setting the fifteen percent for determining the borrowing capacity; income taxes; estate and gift taxes; use and consumption taxes, that is to say the Excise Tax Act; licenses; permits; commercial fees and charges; the lottery and miscellaneous revenues.

The sum of all of these items yields the total revenue, and fifteen percent of such would be the limit to the borrowing capacity of the Commonwealth of Puerto Rico.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my ability, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The method or formula for determining the limit to the borrowing capacity of the Commonwealth of Puerto Rico contained in the Concurrent Resolution of the Senate Number 3 and the Concurrent Resolution of the House Number 5 has been being used in two States of the Union, to wit: Connecticut and Mississippi.

In the first of these states we have mentioned, the limit on the borrowing capacity is four times and a half of the revenues of the prior fiscal year, whereas in the latter State, the limit to the borrowing capacity is one and a half times the revenue of the prior fiscal year. If I remember correctly, Connecticut adopted this method in an amendment to its Constitution... no...by law, in a legislative action; Mississippi, by and amendment to the Constitution. The remaining States of the Union do not measure their borrowing capacity with a percentage of their revenues of the prior year, but according to the information that the Special Committees of the Senate and House have received, there is a trend in all of the States to have the borrowing capacity measured in terms of a percentage of revenue.

I have already said that the banking industry in Puerto Rico favors the Concurrent Resolution we are talking about here, and I would like to add that according to the information received by the Special Committees, the entities and individuals who are involved in the acquisition of Puerto Rico bonds also unanimously favor such Concurrent Resolution.

This Concurrent Resolution was drafted by bond experts, and was subjected to the approval of the entities and individuals who are involved with Puerto Rico bonds in the United States. In that sense, I think that the Senate should be advised of some of the opinions of these entities and individuals, who are all experts in terms of bonds and related matters, as I have said, with regard to Puerto Rico bonds.

Mr. Donald B. Meyners [sic], Vice President of the Chemical Bank New York Trust Company, said the following in a letter addressed to Mr. Bowen, Vice President of the Government Development Bank [This is a retranslation into English of the translation into Spanish].

"Chemical Bank New York Trust Company. Bank Investment Division. Donald B. Meyner, Vice President. August 18, 191. Mr. Francis Bowen, Vice President, Government Development Bank for Puerto Rico, 45 Wall Street, New York 5, N.Y. Dear Fran: We have carefully studied the amendment to the Constitution of the Commonwealth of Puerto Rico. Both Mr. Houset and I believe that the proposition is sound and realistic. The formula is not a new concept and the fifteen percent limit is definitely conservative. The magnificent credit reputation that has been developed as a result of the record in debt management will not be affected by this amendment."

"As buyers for some investors in almost all in of the Puerto Rico obligations, we see the proposed changes as constructive. We will continue to actively participate in the market of these obligations. We appreciate the opportunity to express our opinion and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

1961                          DAILY JOURNAL                          225

I remain, Sincerely, (signed) Donald B. Meyner."

I transcribe below a letter that Mr. John W. Demilhoe, Vice President of Chase Manhattan Bank, in charge of the bond division of that bank, addressed in August of this year to Mr. Bowe, Vice President of the Government Development Bank: [This is a retranslation from Spanish of a translation into Spanish from English]

"The Chase Manhattan Bank, New York, NY, August 18, 1961. John W. Demilhoe, Vice President. Mr. Francis Bowen, First Vice President of the Government Development Bank of Puerto Rico PO Box 492, an Juan, Puerto Rio.

"Dear Mr. Bowen:"

I have studied the propose amendment to Section 2, Article VI of the Constitution of the Commonwealth of Puerto Rico. I believe that the proposed limitation on debt are essentially sound. I am of the opinion that the Commonwealth of Puerto Rico is protecting the investors who might purchase their obligations, and at the same time they are protecting a certain flexibility that is necessary for their capital financing programs.

The reference made by the limit that the Legislature is to set for municipal debt is also healthy.

The provision of imposing," Mr. Demilhoe continues, "of imposing on the revenues of the Commonwealth of Puerto Rico a claim of the first rank for service of the debt, is a measure that firmly and decidedly emphasizes to investors the responsibility with which the Commonwealth ensures the repayment of its debts.

"[sic] He is referring to the provision, if I remember correctly, in Section 8 of Article VI of the Constitution which provides that the revenues of the Commonwealth of Puerto Rico shall first be available for the payment of the public debt, that is to say, that collection will have priority with regard to the revenues of the Government of Puerto Rico.

The right to sue the State, for the greater vigor of this provision, is also a firm expression of the intention of the Commonwealth of Puerto Rico. You are probably aware that the Constitution of the State of New York contains a similar clause. If I can be of any further service to you, please contact me. Sincerely. John W. Demilhoe, Vice President."

This last paragraph refers to the provision of the resolution under which the bondholders may bring, without legislative authorization, legal action against the Treasury of Puerto Rico to collect its obligations.

I would also like to advise of some of the paragraphs of the letter, which I am not reading completely, since it is quite long, which was addressed to Mr. Bowen by Mr. Frederick L. Bird, a credit specialist in credit reports, Director of the Municipal Research Department, Financial Consultant for the State of New York, and a person who is considered a dean of the authorities on municipal borrowing. [Retranslation from a Spanish translation from English]

"August 17, 1961, Mr. Francis Bowen, Executive Vice President of the Government Development Bank, San Juan, Puerto Rico. Dear Mr. Bowen:

I am pleased that under the recent amendment to the Federal Relations Act the Commonwealth of Puerto Rico now has full authority to regulate its borrowing power.

Although it involves assuming a somewhat delicate responsibility, it provides, however, flexibility for a judicious exercise of the borrowing power of the State in its long-term fiscal plan.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Thank you for having sent me a copy of the proposed amendment to the Constitution, the purpose of which is to implement this power. I have examined it with special interest, in view of the need of several states to revise their antiquated provisions regarding the debt margin. That is why I was just saying that there is a trend in all of the States to do something similar to what is being proposed. And I am pleased to see that you, instead of adopting as a model more or less antiquated provisions, have suggested amendments that are more in accord with current conditions. I like your plan for several reasons.

First of all, because it only includes basic principles, very appropriately leaving the details to the Legislature. Secondly, because it very clearly defines general obligations, which is the true nature of what is being offered, obligations that entail the good faith, the credit and the power to levy taxes of the Commonwealth of Puerto Rico."

That is why you see that the resolution mentions direct obligations of the People of Puerto Rico.

"Very frequently, with regard to State and municipal bonds, this basic guarantee is not entirely clear, because it is not included in the provisions related to property taxes. This is due, of course, to old ideas, in which property taxes were the backbone of state and local governments.

It is known that land and property taxes in Puerto Rico are barely seven percent of total revenue.

"Thirdly, the proposition realistically recognizes that first of all, property taxes have become a factor of minor importance in the revenue structure of the Commonwealth of Puerto Rico, and secondly, it is not a satisfactory measure of the fiscal capacity of the State and it offers an alternative that seems very satisfactory, a debt margin in which debate requirements are related to total annual revenue produced by legislative measures.

Although this system may be novel in the United States, it is my understanding that it is used by certain European countries, and I am certain that its adoption has been highly recommended by renowned authorities in the matter, such as professor V. U. Hartford, the author of *American State Debts,* a first-rate book on these subjects."

And Mr. Bird continues

"Most of the current constitutional limits on borrowing margin in the United States follow the tradition that was originally adopted more than a hundred years ago. You have the opportunity to start a new movement based on more solid considerations. Sincerely, (signed) Frederik L. Bird."

We are all aware that the proposed amendment to Section 2 of Article VI of the Constitution in Concurrent Resolution of the Senate 3 and Concurrent Resolution of the House 5, in addition to establishing a single formula for measuring the borrowing capacity of Puerto Rico, broadens that borrowing capacity. I would like to point out the very eloquent fact that none of the persons who testified before the special committees expressed themselves against the increase in the borrowing capacity. I can say even more, I can say that all of the accepted, with some comments, I mean some with comment, the formula in the Concurrent Resolution to which I am referring.

The only adverse testimony to the formula in the Resolution, was by Mr. Diez de Andino, a person who in the past was a banking officer and who said he favored continuing with the old method of setting a percentage on the assessed valuation of property, although he said that it should be set at 15 percent instead of at 10 percent

That is to say that he, the only one that objected to the formula in the Resolution, stated that he was in favor, that he believed, that the amount should be raised from 10 percent to 15 percent of the appraised valuation of property.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

But except for Mr. Diez de Andino, all of the others, including Mr. Emiliano Pol, substantially agreed with the method that is established in the Concurrent Resolution that proposes amendments to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

I have already said that the current borrowing capacity of 10 percent of the assessed valuation of taxable property is inadequate, insufficient for the economic development needed by our people. Already, at the time that I am speaking, it may be affirmed that the use of that borrowing capacity has surpassed 9 percent of the assessed valuation of taxable property. By 1963 that debt margin will reach 10.2 percent, surpassing the limit set in the Federal Relations Act. By 1965 it will be 11.8 percent, by 1966, 12.8 percent, by 1967, 18.7 percent. And you must bear in mind that the taxable value of property is now 1,900,000,000, and for `1967 it is estimated that the value will reach $2,445,000,000. But allow me to dwell on this a moment.

This means that if we were to continue with the antiquated and obsolete method of ten percent, even if the assessed valuation of property increases for obvious reasons, because the property is worth more and there is more construction, we would always go beyond the iron fence set by the 10 percent of the assessed valuation of property.

Therefore, in spite of the increase in the assessed valuation of taxable property, 10 percent on such would be insufficient for the economic development of our people.

Mr. García-Santiago, the Chairman of the Planning Board, appeared, as I have said, before the special committees of the Senate and the House, and summarized the fourteenth economic program that was submitted by the Planning Board to the Legislature. Mr. García-Santiago reported that the program requires a $275,000,000 bond issued

for carrying out capital improvements for a total value of $361,000,000, since the other $86,000,000 will be defrayed from ordinary funds, that is to say, the general fund.

And Mr. García-Santiago added that if the current system on the borrowing limit is not change, only one hundred and three million dollars could be issued for the economic program, which would mean that there would be a deficiency for capital improvements of one hundred forty-two million dollars. That is to say, many works could not be carried out, such as schools, highways, etc.

That $275,000,000 in bonds that would have to be issued would be $25,000,000 for 1962, $40,000,000 for 1963, $45,000,000 for 1964, $50,000,000 for 1965, $55,000,000 for 1966, and $60,000,000 for 1967, which is the last year of the economic program. Under the current debt margin, we cannot issue this $275,000,000, but under the proposed formula, with the amendment to the Constitution these bonds that are needed for those capital improvements could be issued.

According to the information provided to the special committees of the Senate and the House by the Secretary of the Treasury, ad if the method for setting the limit on borrowing in the Resolution I am referring to, in 1962, gross indebtedness would reach $193,200,000, and the repayment requirements would be $15,400,000, that is to say, 7.5 percent of the revenue of the prior year. In 1963, gross indebtedness would reach $223,300,000, and repayment requirements would be $17,400,000, that is to say, 8.1 percent of the revenue of the prior year. In 1964, gross indebtedness, would be $256, 200,00, with a repayment requirement of $21,300,000, equivalent to 9.2 percent of the revenue of the prior year. In 1965, gross indebtedness would be $292,900,00, with a repayment requirement of $24,200,00, a percentage of 9.4 of percent of the revenue of the prior year. In 1966, gross indebtedness would be $331,600,00, with a repayment requirement of $29,400,000, a percentage of the revenue of the prior year of 10.5 percent. And for 1967, the last year of the eighteenth economic program of the Planning Board, gross indebtedness would be $372,800,00, with a repayment requirement of $32,600,000 or 4 percent of the revenue.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

I would like to add that one of the benefits of t his formula is that is will made the Legislature and the Executive be more judicious, because the will have to issue bonds based on not exhausting the borrowing capacity, so that here, in this Economic Program of the Planning Board, we have reached the last year and we have 4 percent on the revenue of Puerto Rico available.

The proposed amendment to The Constitution in the Resolution that we are considering also contains a new provision, which I believe I already referred to, that is already contained in the Constitution of the State of New York, and that provision provides that legal action may be brought against the Secretary of the Treasury so that the resources that are available in the Treasury be assigned for the payment of interest on the principal of the public debts. This provision undoubtedly provides a greater

1961            DAILY JOURNAL            227

guarantee for the bonds issued by the Government.

Senate Concurrent Resolution 3 and House Concurrent Resolution Number 5 also contain provisions on borrowing limits for the municipalities. With regard to these, it is provided that the same basis that is currently used under the Puerto Rican Federal Relations Act will continue to be used, that is to say, the assessed valuation of taxable property.

The reason for maintaining the assessed valuation of taxable property as the bases for setting the borrowing limit for the municipalities is that the situation, with regard to this, is different from that of the Commonwealth of Puerto Ric. Property taxes continue to be the largest source of revenue, the larges source of revenue of the municipalities, and the system being recommended for the Commonwealth of Puerto Rico could be unnecessary complicated to be applied to the 76 municipalities. That is to say, it cannot, because I wan to say that a banker, I think that it was Mr. Roberto de Jesús, said he that this formula of the 15 percent is so good that it should be extended to the municipalities.

However, the system is changed in that the percentage of the debt margin of each municipality will not be set in the Constitution, as it is now in the Federal Relations Act, but it is left to legislative discretion.

I have said that the limit on the borrowing capacity for the municipalities is 10 percent of the assessed valuation of taxable property for the municipalities of San Juan, Ponce, Mayagüez, and Arecibo, and 5 percent for the remaining municipalities.

According to the concurrent Resolution under debate, the borrowing capacity of the municipalities will be determined by legislative action, and the limit of this capacity will not be less than 5 percent nor more than 10 percent of the total assessed valuation of property located in the municipality.

That is to say, the Legislature will determine what will be the limit on the borrowing capacity of each municipalities, which in some cases may be 5, 6, 7, 8 or 9 percent of the assessed valuation of property. And in other municipalities it may reach 10 percent. It should reach that, naturally. There are municipalities in Puerto Rico that for some years had significant economic growth, and in my personal opinion, it is not fair for these municipalities to continue to have the same limit to their borrowing capacity that they have now. I note two cases as an example of these cases: the municipalities of Bayamón and Caguas that currently have a borrowing capacity of 5 percent of the assessed valuation of property, and I believe that limit should be raised to the limit that the Legislature may deem reasonable.

That is to say, it cannot be denied that Bayamón has had fantastci growth, and Caguas is not far behind it. It would be entirely unfair to these municipalities, which have grwon so much, fpr them to continue to have the debt margin set forth in the Federal Relations Act, that is to say, 5 percent. I honestly believe that, and I am expressing my personal opinion, this will be determined by the Legislature, the limit for these two municipalaities should be raised substantially.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

I am going to finish and I ask you to excuse for this lengthy exposition of mine. I have wanted to fulfill my dute of advising the Senate, many of whose members were not in the Special Committee that studied this matter, of the information and reports that I have in my hands. So that they may have the best possible information on this issue.

I would like to add, in ending, that this amendment that is being proposed for the Constitution of the Commonwealth of Puerto Rico, setting a limit on the borrowing capacity of the State and the municipalities in the Constitution, and modifying the system for measuring the borrowing capacity of the State, is a matter, y repeat, that goes beyond party lines. I cannot think, and I think that nobody could think, that this issue be considered based on party differences. We are all Puerto Ricans that love our people deeply, and we all want to see them advance and progress.

To ensure that this advance continues, this progress of our people continues, this Resolution must be passed, and our people must approve the amendment to the Constitution contained in the resolution.

Thank you very much, Mr. President, and thank you very much to all of the Senators that have had so much patience to hear me.

Mr. García Méndez: Mr. President.

President pro tempore (Mr. Reyes-Delgado): Mr. Senator.

Mr. García Méndez: Mr. President, it would seem that in the order that has been used, as I have already said, when I accepted the request made by my colleague Ortiz-Stella to present his report in favor of the Report of the Special Committee, what would normally be in order now would be to have a turn against the Report, which has been submitted to this Body, but the fact is that w have drafted some amendments, which are of general knowledge, and it is necessary for the purpose of having a debate that follows the purest procedure, that the amendments be formulate first, and for this purpose I am going to formulate them, some of them, for the consideration of this Body.

President pro tempore (Mr. Reyes-Delgado: First of all, or are you going to formulate them one by one.

Mr. García Méndez: No, I am going to formulate them one by one.

President pro tempore (Mr. Reyes-Delgado: To vote on each one of them?

Mr. García Méndez: Except if its wished to be voted on together. We would not object, but we could reach an agreement after we have debated them lightly.

We would like to say first, as a matter of a prologue, we might say, that our position, the position of the Party that we represent in this side of the Senate and presided by your humble servant, all of you being my colleagues, is not to oppose an extension of the debt margin, it is not to oppose that the resources of the government of Puerto Rico be increased through any formula or formulas to address public needs and carry out the government's program.

In fact, the significant difference that motivates this opposition is that we have the feeling that the Majority does not want to approve these amendments, when the truth is that with these amendments it would be possible to achieve something, not only constructive in the sense of approving the novelty

228                          DAILY JOURNAL                          SEPTEMBER 5

that informs the formula that is being used, that is contrary to the traditional formula of the assessed valuation of property, but we would also demonstrate that the United States Congress has given us the faculty, which increases our autonomic power to be ourselves and not the Congress that sets the limit, we use this power, we use that authority with the austerity, with the care with the parsimony of men who take great care to defend not only public credit, but the credit of their country in general, specially upon have been granted the faculty to do so by Congressional provision.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

That is why these two amendments are really more than two, but the basic ones I have here, and they read as follows:

First amendment: At the end of the first paragraph, page 2 of the resolution, to add a "it is further provided that" to read as follows:

"It is further provided, that the total sum of such obligations may in no way exceed the total revenue as set forth in the preceding clause (i), plus an additional 50 percent, said total annual revenue to be computed based on the three years immediately preceding the current fiscal year, and said 150 percent of said average annual average shall constitute the maximum limit for public debt that may be directly contracted by the Commonwealth of Puerto Rico."

Mr. Ortiz-Stella: What I would like to know, Mr. President, is on what part of page 2 would the amendment proposed by the distinguished colleague by placed.

Mr. García-Méndez: I said at the end of the first the first paragraph of page 2.

Mr. Ortiz-Stella: After the word "revenue"?

Mr. García-Méndez: Correct, yes, after the word "revenue."

Mr. Ortiz-Stella: the word "revenue."

Mr. García-Méndez: "and it is further provided" …And we are doing to make a short statement in favor of the amendment, since when we use our turn with regard to the entire resolution, well, we don't want to repeat.

My fellow Senators, the amendment consists of establishing a stable ceiling, that is to say, a true limit to the total amount of the public debt of the Commonwealth of Puerto Rico.

There are opinions that the formula that has been established based on the availability of 15 percent of annual revenue of the People of Puerto Rico, obtained from revenue under the laws of the Commonwealth of Puerto Rico, to repay, in other words, "to service" the loans based on bonds or promissory notes of the government of the Commonwealth of Puerto Rico, in and of itself establishes a limit. We hold, with all the respect and admiration we have for Mr. Francis Bowen, who is a senior officer of the Development Bank of Puerto Rico, the Government Development Bank and who is unquestionably an authority on the subject, we hold, I repeat, that there is no absolute incompatibility between using that formula and establishing a "ceiling," as the Americans calling, to provide stability for the debt margin.

This is not contrary in any way to flexibility. Flexibility will continue. This will merely put in place what we would say in common language, a "Stop, Look, and Listen," that here you have a limit. Because the nature of the margin that would be created under this amendment that we have submitted, that the amount, not only to cover all works, the services contained in the plan of the government of Puerto Rico, but there would still be a margin, after covering the entire 6-year plan which the officials of the Executive have illustrated for this Legislature, there is still a margin of more than 61 million dollars. If we do not approve this amendment, or a similar amendment we are not refusing to consider, I repeat, whether the Majority considers that instead of 150 percent of the annual revenue of the People of Puerto Rico for revenue under its laws, more than 150 percent is required, we are open to consider the increase if we are shown that we are in fact mistaken as to whether there is a surplus that would allow for absolute flexibility, a comfortable margin for carrying out the entire program and still having an additional margin.

What we think is that there should be a limit, what we want to make clear is that the United States Congress, my distinguished colleagues in the Senate, has approved this amendment to "delete," in other words, to eliminate Section 3, what is being eliminated, is under the impression that a true limit will be established. Why do I say this? Well, colleagues, you should read the Congressional Record.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

In the Insular Affairs Committee of the House of Representatives, when it was aske once and time and again, what the proposal we had for Puerto Rico was for substituting the current margin, the current limit, the only clear answer on the record, with examples, my fellow Senators, was in the testimony of the Secretary of the Treasury of Puerto Rico who responded to questions posed by Congressman Westland.

"Mr. Secretary, I would like to know what the proposal you have in mind is." And I answered, "Well, we are studying a proposal to increase by 10 percent the current limit of 10 percent that exists in the current Federal Relations Act." And the Westland asks him: "So you mean to say, then, that that would be to use 20 percent?" To which he answered, "Exactly." "What is now 10 percent of the assessed valuation of property in Puerto Rico?" And the Secretary of the Treasury answered: "Well it is now 1 billion 900 million." "so are you saying that you want to approve an increase in the limit of another 10 percent, that is to say, raise it to 380 million. Would that be the result?" "That would be the result."

My friends, my fellow Senators, there are no more specific questions and answers in that record for the Congress to approve this provision. There is a statement, and I want to be intellectually honest, by the Resident Commissioner, Mr. Fernós, who, in a very indirect way said: Well, the proposition is being studied in the Legislature and there could be some changes. I cannot intervene in that." So that there is a witness, who is the Secretary of the Treasury of Puerto Rico, and that witness, when he was asked, specifically answered that that was the study and that is the proposition that is pending consideration.

And the Congressman continues asking a series of questions and based on that, he warns that care should be taken, that precisely now that the concession is being made, everything that he and others who also had reservations, but who wanted to be on record, we are ringing the bell so that you realize that you should make good use of this authority you are being conceded. And the Chair of the Committee, of the Subcommittee, who all of you know, Mr. O'brien says: we are granting this additional power, in the light of the resolution that was approved by the Legislature of Puerto Rico, we are going to eliminate the Whereases, because they are irrelevant, but the resolution is that we allow them over there to set the margin, and I don't know a lot about numbers, but those who know about that, you, Doctor Fernós, be so good as to explain." Doctor Fernós gave a generic explanation and did not enter into which propositions and the record of that stud, before the Congress he limited himself to a single specific proposition. That is to say, that an increase of 10 percent over the previous 10 percent was going to be made.

With what I am saying here we are not arguing that it would be better to increase the 10 percent than so set the 15 percent availability, which is not subject to a mathematical calculation of the margin. The 15 percent is not for the margin, the 15 percent is merely the amount that will be available to Puerto Rico to pay what it owes, without knowing what it owes. That is the truth. So, if the People of Puerto Rico have revenues of 200 million, well, they will have the right, as our distinguished colleague Ortiz-Stella explained to use 30 million for repayment, which is 15 percent of 200 million, but that is as far, as far as the numbers go.

The limit is how much, up to what amount could be used specifically. That is what is called a limit or a ceiling. And that is what our admirable friend, the distinguished intellectual in this subject, Francis Bowen, says in this regard. He says, first of all, that when is it feasible, the referendum is a satisfactory way to decide on whether the debt is incurred and to control the debt…

Mr. Ortiz-Stella: Mr. President, I would like to ask the distinguished colleague what memorandum he is reading from.

Mr. García-Méndez: Now I am, now I have in my hands the Debt Limit Provisions Memorandum to comment on it.

Mr. Ortiz-Stella: From what page were you reading?

Mr. García-Méndez: …submitted by…

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Ortiz-Stella: Mr. Bowen, yes.

Mr. García-Méndez: …Mr. Bowen, on page 4.

Mr. Ortiz-Stella: I think that was the copy I gave to the colleague.

Mr. García-Méndez: That I asked my colleague to give me, because somebody asked me for mine and I didn't have it this morning.

Mr. Ortiz-Stella: You're reading from page 4?

Mr. García-Méndez: From page 4.

Mr. Ortiz-Stella: Thank you, colleague.

Mr. García-Méndez: First of all: He says that when it is feasible, the referendum is the satisfactory way of incurring the debt and controlling the debt. And he says that that is the way they do it in 20 states of the Union.

In the hearings in 1959, in '58, to be more exact, held on May 28, 1958, Mr. Muñoz-Amato, an expert brought in who is well-versed in these studies, testified

1961                                   DAILY JOURNAL                                   228

that a substantial majority of the States of the Union had the referendum system.

Mr. Bowen now tells us that 20 states now use this system. That may have changed in some states. Well, two of them we know have changed, which are Connecticut and Mississippi. But even with a referendum, that is, even with the intervention of the People, and that is was referendum means, which instead of discussing it here, as representative of the People, the people themselves discuss it, voting directly, even with the intervention of the people, many states establish additional restrictions. Virginia and Wyoming, those two states, limit the debt, the debt margin, they establish the limit, the ceiling regardless of whatever the formula is, by constitutional provision, at 1 percent of the assessed valuation of property. And South Carolina requires two-thirds of the votes in a referendum for approving the increase of a debt margin. Twenty of the current 50 states have limits to the bonds they issue. The term varies between 5 years in Wisconsin, which does not have any debt at all, and 50 years, in California, the gold state; the majority vary between 20 and 80 years. We, since we are so rich, have put the limit at 30, the highest of that average in 20 states of the Union.

The remaining nine states, take careful note of this, of those that do not use this system, three of them, three of them have the restriction that it should go beyond legislative action and 2/3 are required in Hawaii and a 3/4 majority in the state of Delaware. Massachusetts is the same as the state of Hawaii. And listen to this, this what Mr. Bowen said, not me, I'm reading from page 5 of his report: "In Hawaii's case the debt limit is expressed in the first place in numerical terms, at a maximum of 60 million, with the provision that the ceiling may not be exceeding except by the 2/3 vote of both chambers, but in no way, in no way, under the ceiling, in no way may it may be more than 15 percent of the assessed valuation of property." And that was approved by a Constitutional Convention in 1950.60 million, and secondly, no more than the maximum

And Hawaii's austerity doesn't end there, but rather on the consideration on which these two ceilings were based, instead of one or two ceilings, first of all: specifically, in monetary terms, 60 million, and secondly, no more than 15 percent of the assessed value of property. But what was it based on? On this: The consideration that any kind of formula that shows "any fixed percentage on the appraised valuation of property is that which offers or will offer the most stable ceiling in the use of revenue that is collected or may be collected. This was also put in quotes by Mr. Bowen."

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

I ask myself now, and that is the core question of our amendment, what opposition could their be, and should their be, how cannot be decided that we are not or should not be using the public interest, which term has so eloquently been used by colleague, in an issue of this nature, if we have said recently set in the recent state of Hawaii, if we, and we want the press to clearly take note of this, to avoid precisely that political arguments be engaged into, are favor of increasing the debt margin? Do we ant that among so many resources that are needed, without signing a blank check that should mortgage the future of this and three future generations more. That is all we are asking for. Why? Because flexibility is not disturbed.

I am going to set forth a simple example for my colleagues, that explains very simply why flexibility is not disturbed. If the people of Puerto Rico, which according to this proposal has, and we are not debating that, although we believe that thre has not been sufficiently austerity, the maximum term of 30n years, instead of a ten-year loan, it is decided to do it for 2-, which of you, even though you are not bankers or certified public accountants don't know through daily live that you may take out double the amount, if instead of the loan is for ten years it is for 20? Who can deny that? Nobody can deny it.

If I have, and I have here an example for my colleague, an annual income of $50,000 and I what to use 15 percent of that income to incur debt, in order to buy a helicopter for myself to travel more efficiently or buy something or other for my family or make an investment that I think is worthy, since I have 15 percent of $50,000, which is $7,500. I set aside that $7,500 from the $50,000 to repay that I will incur and my fellow Senator or any other person, using this or any other example goes into the bank and tells the bank "well, I want a loan for $50,000 and I will pay it back in 10 years. I have an income of $50,000, but I don't want to use the $50,000 so that after a year you come up to me and say, "pay me the $50,000" because I'm not going to have, I have [sic] anything to eat, pay the doctor and clothing and food for my family, I want to pay you in 10 years. And the person says, "Well of course, you have $50,000, pay in10 years." And you pay $5,000 on the principal in the first year and in the first year you pay 5 percent, let's say, to make it easy, in interest, which is $2,500. And as the years go by, you still have the same margin for the payment. That is flexibility.

But if I say to you, "well, I am going to ban that is not a commercial bank and that bank gives me 20 years, which is what is happening with insurance companies, which happens when you ask for money to build a house, that they are now giving 40 years, and then, I tell you: "Now I want $75,000, but you have to give me 20 years." So, I take $75,000 and pay at the rate of $5,000 also on principal. And the same 5 that I paid based on 10 years on the $50,000 of the loan I will pay them in 15 years, taking $25,000 more, which is $75,000.

And what will I pay? Well I pay $5,000 on the principal and the only difference between one loan and the other is that instead of paying $2,500 in the first year, during the first year I will pay $3,750 interest. So, I would seem to be going over by $1,750. No, I'm not exceeding anything. Why? Because I, as a person, like the People of Puerto Rico as a public entity, I am supposed to be earning $50,000 a year, every year that goes by, and in a little while, whether in very little while or just a little while, sometimes it could be more than a little while, my income will be increasing, logically, by indestructible economic principles

and the proof is that the Honorable Secretary of the Treasury of Puerto Rico, in answer to my questions, at a public hearing, beside that it was already in the report, the question was to verify that there was an increase of the revenue of the People of Puerto Rico which from over 204 million increases to over 220 some million, and I added and divided by the number of years and it is an average increase of 18 and a half million a year.

So that if a person who is going to take out a loan is going to have an average increase, the person will be perfectly able to pay back the loan and so, instead of 50, the person took out 150 percent of what

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

his original loan was going to be. Also, if it is for 25 years or for 30 years he can take out three times and much and be able to pay.

And if he says to me: "Ah, but he loses flexibility." No, he doesn't lose it, because in addition to his increase in income, which is very natural, and the Secretary of the Treasury has said that in Puerto Rico it is an average of 18 and a half million dollars and year, and it is supposed to continue increasing, there is flexibility so that with each installment that I pay, o another we less, and if I took $50,000 at 10 years, and I pay $5,000 a year, each year I have $5,000 more free, and if it is twice that, in the same proportion. So that flexibility is maintained in two ways: First, by the natural increase in income; secondly, by the amortization that is done annually on the principal of the loan. This sees to me all too clear. Therefore, our amendment does not even conflict with flexibility, as was determined by Mr. Francisco de Jesús.

That our colleagues' numbers indicate that 150 percent is still insufficient, well we are willing to discuss any other increase. We have been willing to consider what our colleagues were proposing two years ago, but our guiding principle is basically that there should be a limit, that there should be a stable ceiling, that does no eliminate flexibility, first of all for the two reasons that I have set forth, and secondly, because there is always the same right that if in 10 years the margin has not increased by itself based on those two economic factors, well the margin will be increased based on the new amendment, which is something that is totally easy, especially if it is shown that it is reasonable for this margin to be increased.

These are, in short, the grounds for the amendment, that we are submitting to our colleagues for consideration on this bill.

Mr. Ortiz-Stella: Mr. President.

President pro tempore (Mr. Reyes-Delgado): Mr. Senator.

Mr. Ortiz-Stella: To oppose the amendment proposed by our colleague García-Méndez.

I want to say, before I argue my opposition to the amendment, that in my exposition I ended with some words to which my colleague García-Méndez has alluded. I want to acknowledge here, Mr. President and my fellow Senators that this is a legitimate concern of our colleague García-Méndez, in formulating this amendment. He proposed it in the Committee meeting and he knows that we spent an entire afternoon meeting with Mr. Bowen, with Mr. Picó, with Mr. Noguera, and Mr. García-Santiago in my office, Polanco-Abreu and I, discussing

these amendments that are now being formulated by our colleague García-Méndez.

He knows that after we meet and that we told him that these people, who are our advisors, who are experts, above all Mr. Bowen, well, they said it was impossible to accept that formula, because it was compatible [sic] with the other formula. So, I acknowledge that Mr. García-Méndez has a legitimate concern in the amendment that he is formulating here.

In beginning to argue for his amendment, our colleague García-Méndez referred to the fact that the hearings of the House Committee to consider the joint resolution of the House that later became Public Law Number 87-121, what the Representatives heard there was the desire of the government of Puerto Rico to increase the debt margin by an additional 10 percent, that is to say, the 10 percent that was already in the Federal Relations Act and an additional 10 percent that would be used for public schools and highways.

Mr. Noguera was saying what at that time the government of Puerto Rico was thinking, because during the last four-year term we considered a possible amendment to the Constitution to raise the debt

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

margin in that manner, form the ten percent it is now, plus an additional ten percent for educational purposes and highways, and Mr. Noguera could not say otherwise, because that was the only thing he knew, or what was being thought of at the time. That was on March 6, 1961

Now, I want to say to the Senator, my colleague, that in June of this year, the concern of the government was to desist from this obsolete and inadequate formula and to think of something that is more flexible.

I have received today a letter written by Senator Jackson, who is the Chair of the Committee referred to in the Joint Resolution of the House that later became Public Law 87-121, and forgive my English, I don't know why I didn't learn English. This letter is addressed to Mr. Muñoz-Marín, by Mr. Jackson:

Chairman of Committees on Territories and Insular Affairs. It is dated June 20, 1961. It says:

"On June 19 the Subcommittee on Territories held a hearing on House Joint Resolution 124, the resolution to provide for amending Section 3, of the Puerto Rican Federal Relations Act.

Several questions were raised in connection with this legislation that Subcommittee members would like to have answered before the legislation is taken up by the full Committee."

That is what the gentleman says there. And he continues later: First of all, and the letter is a little blurry, this is a photocopy:

"1. What is the plan of the Commonwealth in the proposed amendment of the Constitution? In other words, what would be the maximum debt limitation and what amount of interest would be paid on bonded indebtedness?

2. Has the Taxing Authority increased tax values on property to reflect more nearly the market value in order to increase the amount of bonded indebtedness on the present ceiling?

3. What has been the total amount of taxes in Puerto Rico for all sources for the past ten years?"

This is the letter addressed by Mr. Jackson to Mr. Muñoz-Marín dated June 20. The bill is already in the Senate and it seems that the subcommittee has already begun to consider it, and so Mr. Jackson is asking to have these three questions answered for the information of the subcommittee, and then...

President pro tempore (Mr. Reyes-Delgado): But you read it well.

Mr. Ortiz-Stella: What did you say?

President pro tempore (Mr. Reyes-Delgado): I mean, maybe you don't know English, but you read it well.

Mr. Ortiz-Stella: You have been very benevolent with me, fellow Senator. García-Méndez doesn't think that's the case.

Mr. García-Méndez: I wouldn't want to interrupt my colleague, because I am true to my promises, but I don't think that's the case.

Mr. Ortiz-Stella: No, I'm joking, I'm joking.

Mr. García-Méndez: I've always though very highly of my colleague, in all orders, in the highly spiritual order and also in the order of his legal knowledge. He was one of the brilliant students in my class at the University of Puerto Rico.

Mr. Ortiz-Stella: Well, there were brilliant students, and one of them was García-Méndez.

So, then there is the letter, I am not going to read all of it…I am going to read the part referring to was is going to happen here, which is what the government of Puerto Rico was already thinking on that date, at that time:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

"The pending legislation provides that the action of the Puerto Rican Federal Relations act concerning the debt limitation an obsolete disposition dating from a time when the Commonwealth of Puerto Rico was one of the most backwards in the world shall remain in effect until the Constitution of Puerto Rico is amended and provided and provision is made in that instrument concerning this matter.

The procedure for amending the Constitution of Puerto Rico requires that the Legislature propose the amendment to the electorate by 2/3 votes of each House and for acceptance by the electorate by majority of those voting."

"The Constitution requires that at least 3 months shall elapse between submission of the Legislature's proposal and the referendum, so that ample public debate can take place. When a study is completed by our Treasury Department and the Puerto Rico Government Development Bank in consultation with reputable consulting firms of New York, I shall make recommendations to the legislature. The Legislature will no doubt call public hearings" …etc…

So that the Governor of Puerto Rico, already in June, this letter is dated June 30, had charged the Department of the Treasury and the Puerto Rico Government Development Bank with studying the debt margin of Puerto Rico without using the obsolete formula of 10 percent of property.

So, I acknowledge that when the bill was discussed in the House, well, the only thing that was being considered was, well, an increase in the percentage, an additional ten percent. But when the bill reached the Senate, the government's proposal was to find a formula that would set aside the obsolete formula of a percentage of the assessed valuation of property.

Our colleague. García-Méndez has said, and he would say that in the meetings we have had, we have discussed this issue a lot, that the 15 percent does not set a ceiling. I beg to differ from my distinguished friend and colleague. The 15 percent is a ceiling, we cannot go over that, so that when we reach 15 percent we cannot borrow any more.

The benefit of this formula, Mr. President and fellow Senators who are honoring me by listening to what I am saying at this time about this formula, is that it forces the Executive Branch of the government and the Legislature to deal cautiously and make prudent use of the debt margin, because if there is carelessness and the 15 percent is reached, the debt margin will be exhausted. So, this forces us to be more cautious, to be more prudent, more circumspect, in issuing bonds, because you have to think of how the debt requirement is going to increase, it will take me to what percentage of revenue. Will it reach 11? No, that is too much. So, I am going to issue so many bonds, in such a time frame, so that I don't go over 10.

So, 15 percent is a flexible formula, it helps to reach the best way of dealing with public finance and it is also a ceiling, it is a ceiling, because you get there, the debt margin is already exhausted.

I want to say to the colleague that it is impossible, absolutely impossible, and the experts have assured me of this, that in legislation of this kind, that the two formulas would operate in it, that is to say, 15 percent of revenue, and besides that, a multipole of the revenue of the previous year or the past two years or the past three years. It is not possible. It has to be one of the two formulas.

My colleague, has the case, the example, the proof of this in two states of the American Union, I think I mentioned them: Connecticut and Mississippi. In Connecticut, the borrowing capacity is four and a half times the revenue of the previous year. In Mississippi, it is one and a half times the revenue of the previous year. But in Connecticut and Mississippi there is not that, and besides, the other thing has to be one of the two things. There comes a time, Mr. President and my fellow Senators, that the two formulas are mutually exclusive, that they can't, that one of them cannot be.

Besides, when my colleague made that proposition, we considered it seriously and I believe that it is a legitimate concern of the Senator, but I think he is wrong. And so, we called in our advisors so that

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

they could do some numbers. So, the numbers show the following: The formula in the resolution has the following results.

In 1962, gross required indebtedness is 193.2 million dollars; maximum limit, 398 million dollars; free margin, 204 million 900,000 dollars.

In 1963 gross required indebtedness is 223 million 300, 000 dollars; maximum limit, 419 million dollars; free margin, 196 million 400,000 dollars.

1964 gross required indebtedness is 256 million 200,000 dollars; maximum limit, 448 million dollars 4000,000; free margin, 192 million, 200,000 dollars.

1965: gross required indebtedness, 292 million, 900,00 dollars; maximum limit

239                          DAILY JOURNAL                          SEPTEMBER 5

489 million 600,000 dollars; free margin 196 million 700,000 dollars.

1966: gross required indebtedness, 331 million 100,000 dollars; maximum limit, 685 million 900,000 dollars; free margin, 204 million 800,000 dollars.

1967: gross required indebtedness, 372 million 900,000 dollars; maximum limit, 575 million 700,000 dollars; free margin, 202 million 900,000 dollars.

Now, with the formula being proposed by my colleague, which is one and a half times the revenue of the past two years, or the past three years. [sic] This table has been prepared based on the average revenue of the last two years, but would have the following difference in comparison with the formula in the resolution: I already said that the formula in the Senate Concurrent Resolution 3 would leave a free margin in 1962 of 204 million 900,000 dollars. The amendment being proposed by Senator García-Méndez would leave a free margin for that year of 105 million 500,000 dollars. In 1963, the formula of 15 percent that is proposed in the resolution would leave a free margin of 196 million 400,000 dollars, while the ceiling being proposed by my distinguished friend and colleague would leave a free margin of 91 million 500,000. In 1964, the formula in the resolution leaves a free margin of 192 million, 200,000 dollars, and the proposed amendment leaves a free margin of 80 million dollars, in 1965, the formula in the resolution leaves a free margin of 196 million 700,000 dollars, the one proposed by my esteemed and distinguished colleague, would eave a free margin of 74 million 300,000 dollars. In 1966, the formula would leave a free margin of 204 million 800,000 dollars, while with my colleague García-Mendez's amendment there would be a free margin of 70 million 900 thousand dollars. And in 1967, the last year, the formula would leave a free margin of 202 million 900,000 dollars, while with Senator García-Mendez's amendment, the free margin, based on this ceiling, would be 59 million 100,000 dollars.

There is a big difference, he has said it could go up, but it's that no, they are incompatible, for God's sake, they are incompatible, they cannot operate in the same legislation, they are mutually exclusive. There comes a time when one of them ceases to be functional.

My colleague García-Méndez very wisely has read Mr. Bowen's testimony, who is a person, I would say one of the most knowledgeable persons on this question of bonds and the debt margin. Senator García-Méndez spoke with him, well this gentleman, when we discussed with him the proposed formula, the formula being proposed by Senator García-Méndez and that I, I repeat, arises from a legitimate concern that he has, well he said it couldn't be. So, he drafted a short memorandum and I am going to read just two paragraphs.

Mr. Bowen says:

"If in addition to the formula being proposed in concurrent resolutions Number 3 of the Senate and Number 5 of the House, another formula were added to limit that capacity based on a maximum ratio

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

that the debt could have with regard to previous public revenue, there would be several inconveniences, although it depends on the percentages used in each of the formulas, in all probability and consequently, one of them would be more restrictive than the other, and therefore the less restrictive one would be inoperative or academic."

In other words, one excludes the other.

"It would create confusion for the understanding by the Puerto Rican electorate, as well as for the buyers and bond raters, as it would be more complex. It would create doubts regarding the insecurity we have in ourselves by making this double verification of our capacity, which could adversely affect our credit."

I would like to say that Mr. Bowen was asked by the Chair of the Special Committee of the House, Representative Polanco-Abreu, whether this formula could affect our credit adversely, and he said that it was harmful, that it would hurt the credit of Puerto Rico bonds.

I regret that my attitude at this time is what I advised my colleague García-Méndez when he, I think it was yesterday, told us that they would insist on this amendment.

So, for the reasons I have stated, and may the Senate once again forgive for taking so much time in participating in this debate, I oppose this amendment.

Mr. García-Méndez: Mr. President, a couple of words of rectification. I am forced to provide another example for my colleague or set forth another example, I mean, Mr. President and colleague, to show that such incompatibility does not exist. I want to start out by saying that I reiterate my respect and admiration for Mr. Bowen and admit that a formula that is enhanced with a ceiling, one of the two of them the time would come when one would stop the other, but that does not mean they are incompatible, my fellow Senators.

If my colleague goes to a bank, supposing that he had "X" business, that would cost him annually to and he go to the bank and tells it: "I need an annual loan for operating expenses of $150,000. The bank studies the repayment capacity of my colleague and also studies the soundness of my colleague's finances. [The bank] doesn't study only one factor of these two."

That thing of saying here, because someone said it at the public hearings, that the only thing that bankers should take into consideration in analyzing whether there is repayment capacity, in all humility I want to say that that is totally wrong. I have been a banker and am a banker, although a very humble banker, and we have here another banker who knows that right now, what is the repayment capacity of many of our fellow legislators? Well their capacity is $5,400 plus the per diems that we would value at, let's say $1,000, more or less $6,500, some of the legislators.

Now, my fellow legislator goes to the bank that has no evidence that he has anything to repay with if he ceases to be a legislator and says to the banker, "I want $10,000." Well, for $10,000 you have to have a magnificent repayment capacity, just by using $2,000 of that to make payments and renew the obligation annually. But is that the only factor? And what if the person who is making the request, has an income capacity not of $6,000 but of $50,00 a year and is 65 or 70 years old, because he is a great doctor or an excellent attorney or a grand entrepreneur, but does not have the capital, will the bank give that "x" individual an amount for several years, merely because in that year he still has an income capacity? NO, the other factor is fundamental.

Therefore, in this formula of the amendment, what is being done is to cover both things in the same proportion that is covered when an individual goes to take out a loan. "Well, you have a repayment capacity, all well and good. The 15 percent of income that increases periodically in Puerto Rico is a formula that we are not going to refute. We are accepting it, but we want to put a ceiling on it, for the same reason that my fellow Senator, the other fellow Senator says: I need $150,000 for maintenance expenses, but right now I need to buy equipment because my regular operating expenses of my business

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

aren't enough, let's suppose that it's an agricultural business, growing and cutting and transporting sugar cane, and you pay overhead and Social Security and unemployment insurance and the State Insurance Fond and taxes and rent, but also you have to buy mechanized equipment. Then the banker says to him: "Well, I'm going to open a credit line for you, not for $150,000, for $200,000, but unless it's really indispensable, try to keep it in the range of maintenance expenses of $150,000." And that is what the amendment does. What the amendment says is "well with a ceiling, so that it can be known just how far it can go, the same as what a private banker does."

Now, my fellow Senator Ortiz-Stella, I am reciprocating your kind words that I have made an effort to contribute to this bill and that my colleague knows that it is not our intention to hindr more resources from coming in, because we have discussed this in detial and from our hearts.But my colleague cannot tell me that if two years ago all of the government experts of Puerto Rico were saying that a staable ceiling had to be set, and bsides, that the bill that this colleague submitted, along with two other fellow Senators, established a stable ceiling, because ait was based on an increase on the limit that was based on a percentage, how can it be possible than in the mere passage of two years, when the majority of the States of the Union follow the referendum mehtod, when still the majority or if not the majority the greater part of the States of the Union use the system of the assessed valuation of property, let us say here, because an expert that we respect and is esteemed by us is obsolete, we are going to accept that that is the case? And even supposing that that were true, arent'we accepting the new method? Yes, we are accepting it. That method that is bein alleged is the modern method.

But what does that expert say, my fellow Senator Ortiz-Stella? The expert says that onlyb tow States of the union have a method that is similar but not the same as the one we are setting forth here. Of the 50 states, two states. And what do these two states do? Well one sets a ceiling of 4 and a half times the annual revenue and the other one, Mississippi, at one and a half of annual revenue. So they are setting a ceiling. How? Well based on a percentage of revenue. And what does our amendmenet say? Well, 150 percent of revenue as stated above in subparagraph (ii) of clause (ii) of this bill.

231

Now does that mean that we are firm that we have to stay firm and that it has to be 150 percent? Amend my amendment, my fellow Senator. I would like to say more, I wouldn't have said it if my colleague hadn't said what he said a minute ago, but I accepted his saying it because it is the absolute truth. He said to me, "We understand that it is a principle that you contend is reasonable and that you believe in good faith, but that today, the equivalence would not be 150 percent it would be 200 percent." In other words, that if my amendment were elevated by my fellow Senators, so that instead of 150 percent it said 200 percent, that is to say, double the revenue, my colleague would have his tables exactly according to what he just read to us a minute ago regarding the margin he thinks is needed. So, where is the principle for opposing the amendment? If this colleague, and also my colleague the Chair of the Special Committee of the House think that 150 is not the equivalence, but something more, they think that what is reasonable, what is conservative is to say that it is 200 percent, well say 200 percent. So, we are not discussing here thing that imply bargaining down, that imply that we don't want to obtain sufficient resources. It is to establish a ceiling and the colleague says that he has been told that it is incompatible. And I am telling him that it follows the same exact, the same exact parallel process as that of a private loan where the credit that is opened is higher, and that is the ceiling. And every year there is a free margin left, according to my table, which has also bee prepared by an expert, because I have to confess that I am not an expert, the amount of the gross debt taken as a basis, my colleague, I would like you to listen to this, indicates that in 1962 under this table, under this amendment that revenue would be, not revenue, the availability of obligations that would be pledging the good faith of the People of Puerto Rico would be three hundred point three million; in 1963 it would be one hundred six point three million; in 1964 three hundred forty million; in 1965, three hundred eighty five point three; in 1966 four hundred eighteen point six million; and in 1967, four hundred forty- five point two million.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

If my fellow Senators, instead of combatting our amendment, wat to raise the percentage by fifty percent more, adding a third to four hundred forty-five point two million for 1967, which is when this six-year Program that this administration of the Commonwealth of Puerto Rico has submitted will end, and it would have one hundred thirty-eight million four hundred thousand dollar more, so that it would come to about six hundred million dollars.

That there are still some amounts that are being paid, of course these amounts have to be reduce. But that is the table according to the gross debt. I am not great the table in order not to prolong the record, but since it would be based on the net debt, but my colleague already went into that.

And I ask, in order to finalize and submit the amendment. I this system is so obsolete, why is it that the vast majority of the States still use it. Why, with the exception of tow, all of them have a ceiling? My colleague says that there is a ceiling in this formula. The formula has a limit, and I am not going to discuss it the mere words, because semantics is the most incredible thing in the world, it's how things are said. I don't want to get into discussions of word, but I am saying here and now, and I want it to be clear, that if there is a limit, it is an un limited. And that is not the limitation that is mentioned in the public treasury, that is not the limitation that is being talked about with regard to setting a limitation to the debt margin in the Constitution of a People. Constitutions, as much as we would like to pretend that it isn't the case, are supported by a philosophy, and it is to restrict the undue use of the powers of the Legislature, the Executive, and the other powers of the Government. My colleague is as well aware of this as I am. And constitutions include provisions that are limitations, why? Because a constitution is the creator and is creating some creatures. I have said many, many times in this Senate, and in creating these creatures, it gives it powers, but it limits such powers. That is why the constitution of the United States, when it gives Congress powers it says: this and this and this are its powers, the other powers that I am not giving you here are reserved for the states and their people.

And the state has the right to set a limit. But it establishes as a limitation. Why? Because this is its guarantee, that is the guarantee, not against a given government, and I am happy to repeat the eloquent words of my colleague. We are discussing this based on partisan interests. I want this debate to be kept at the high level of ideas, but I wan the ideas to be heard, I want the ideas to be in the record, I want, my fellow Senators, that it not be said tomorrow that there was a minority hear that did not constructively oversee the Majority, because the rights of the dimensions have two dimensions: one is to provide constructive oversight, and the other is to submit ideas to obtain acceptance by the majority. I we cannot obtain the acceptance of new ideas, the least a minority can do that has a scrupulous concept of its responsibility is to provide constructive oversight.

And I am not just talking about today, because the years go by, my colleague, breathing over u. I am talking for tomorrow, I am talking for when those records are raid and that it is known that at the time that we are given the autonomic power in this territory of Puerto Rico for us to use our discretion to se what are debt margin should be in Puerto Rico, we do it with the austerity that is proper I public men that know how to stay firm and control themselves.

This is not about politics. This is merely setting limits with austerity, and that is all we are asking for. If our fellow Senators in the Majority think that this amendment lacks substance [sic]. If a technical expert, who we respect, and I have said this three times, has an opinion, and experts always have divergent opinions among themselves, why should we, in this body that is highest representative of the people of Puerto Rico be open only to having investors only have the last word? No. Investors have the right to study, to oversee, but we cannot be subject to having the investors be the only ones to have the last word. It is we, the legislators, who have this obligation, and obligations must be met even if it hurts us.

In end by insisting, Mr. President and fellow Senators in that I don't want it to be seen, even remotely as a question of obtaining political capital, nor anything like it. If my fellow Senators want to, amend the amendment, and my colleagues will see how they will find us to be absolutely reasonable, but

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

failing to establish a ceiling is a bad precedent. And the fact that an expert says incompatibility, no, if those who have common sense, which unfortunately is the least common of senses, we know that two and two are four and three and three are six. And the fact is that I say to a banker, give me a credit of three hundred thousand dollars, but I won't take more than two hundred thousand and I will leave that one hundred thousand as a margin in case of an emergency, that is what the amendment says.

Now, a time comes when the economy grows, and I hope that it continues to grow at a faster pace that the Treasurer of Puerto Rico explained. All the countries of the contemporary world, in the East and in the West, are facing a geometrical increase in the acceleration of their economies. There is Japan, there is Wester Germany, there are all the countries that are setting a wonderful record, and that is due to the fact, as it is in our beloved Puerto Rico, to the generous assistance, the fundamentally generous and noble assistance of the United States of America, and they recognize that, they don't hide it in West Germany to admit I, we also admit it, and we have be3n in agreement on that, our colleagues that we have to keep ourselves in check and that is my amendment. Since I don't want to repeat, and I am submitting the amendment to the respectful consideration of my fellow Senators.

Mr. Colón Velazquez: Mr. President, let's have a vote.

The amendment submitted by Mr. García-Méndez upon having been voted on was defeated.

Mr. García-Méndez: Mr. President.

President pro tempore (Mr. Rivera-Colón): Senator Mr. García-Méndez

Mr. García-Méndez: I, since I have mentioned that we are not engaging in partisan debate, I would like to have the Senate divide, even once, for my satisfaction.

President pro tempore (Mr. Rivera-Colón): Let us divide the Senate.

Sergeant-at-Arms: I am calling the Senators.

Senators in favor of the amendment please stand. Secretary, count them.

Mr. García-Méndez: Of the amendment, no? Of the amendment, Mr. President.

Secretary: Six Senators are standing.

President pro tempore (Mr. Rivera-Colón): Those against the amendment, please stand. The President is standing.

Secretary: Eighteen Senators are standing.

Mr. García-Méndez: We have no question that the President is standing. We have no question regarding the votes.

Mr. President: To formulate a second amendment.

Second amendment: That after paragraph 2 on page 2, a separate paragraph be added as follows:

"To be effective in election years there will be no increase in the public debt of the Commonwealth of Puerto Rico or any

municipality more than an increase that would be equivalent to the average annual increase of the three preceding fiscal years, and neither the government of the Commonwealth of Puerto Rico or any municipality will undertake or carry out public words or incur expenses for an amount in excess of the annual average of expenses in the three previous years, except for reasons of an emergency that has previously been recognized by the Legislature of Puerto Rico in a resolution approved by three quarters of the votes in both houses."

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

I am going to give the Secretary the amendment in writing so that he can verify it.

With regard to this amendment, Mr. President, we would like to indicate, reciprocating the gracious expression of the distinguished Chair of the Special Committee, that at all times I saw in him the greatest spirit of understanding and likewise I must shay that all of my fellow Senators with whom I tried to discuss this amendment.

The purpose is not, in anyway, to curtail Government resources or paralyze the work to be carried out, but rather to include a provision in the amendment to the Relations act, but included as part of the Constitution, this Senate Concurrent Resolution 3.

This is not for today or for five years from now. This is an amendment that will be there until it may be amended in the future, if it is included with the approval of my fellow Senators in the constitutional amendment.

However, it could be included in an enabling bill of the Constotution, it could be included in some manner in the legislative history, but I think that it should be in writint, as a guarantee for now and the future.

I don't'think there can be any argument of any kind against this amendment, because it is inspired by high political morals and principles. For all quasi-public bodies, whether political parties, which are quasi-pulbic boidies, for all of them there this provision exists if it is approved in the Consittution. For all of them if will exist, if enabling legislation is approved for the Constitution.

This amendment is a safeguard against any possible future irregualrities and is in its spriti, if not in its language, full included in the Municipal act of Puerto Rico, that is to say, and my fellow Senator that is presiding at this time, worked with me a couple of years ago on an amendment of this kind when the Municipal Act was going to be amended, I mean, so that the municipalities would not be allowed to spend more than fifty percent of their annual budgets durint the first half of the fiscal year in an general eleciton year. This is for all governments and for all government parties at any time.

The moralizing purpose is to prevent public funds from eing used for strictly political partisan ends, and establishing great credit for the People that approves them. In many States of the Union there are provisions of this kind and I don't think it's necessary to go into further arguments in order to ask for the approval of this amendment that we are proposing.

President pro tempore (Mr. Rivera-Colón): Let's vote on the amendment. If any other Senator wants to…

Mr. Fernández-Méndez: Mr. President.

President pro tempore (Mr. Rivera-Colón): Senator Mr. Fernández-Méndez.

Mr. Fernández-Méndez: We are going to oppose the amendment and we are going to be very brief in our statement of the reasons why we are opposing the amendment.

The amendment by our colleague Mr. García-Méndez is to the effect that constitutional language be established in the Constitution of Puerto Rico so that in the year before an election year the Legislature of Puerto Rico cannot issue bonds except in a restricted as provided in the language he is suggesting.

We believe, first of all, that our colleagues amendment is not really a constitutional issue. It could be the subject of legislation, perhaps, in which the Legislature establishes whether unanimously of the votes of the Legislature or by a majority, that it is desirable for the health of the country to have this kind of restriction, but that highest statute of a country is the Constitution, for a People that prides itself in being one of the peoples that has a proven democratic system for the past sixty-one years in the public life of Puerto Rico, it should seem that the legislators themselves, this very same Legislature here, should be saying to the future legislatures of Puerto Rico that this is the best Legislature that Puerto Rico could have

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

had, because this Legislature, the present one, the one constituted by us, that it is putting a primer in the hands of future legislatures, is to have very little faith in Puerto Rico.

This is equivalent to saying that the men of tomorrow who will constitute this Senate, and the men of tomorrow who will constitute the House of Representatives of Puerto Rico, will act in financial matters, in matters relating to bond issues, for cheap political reasons.

I don't think Puerto Rico should have this kind of stigma in its Constitution. Puerto Rico is living a time of democracy which has earned the admiration of other countries in the world, because it ha known how to live n this democracy, it has known how to exercise it. That we should put a black patch on this history by saying that we want put restrictions, those of us today on those of tomorrow, I don't think the men of the future deserve this kind of affront.

I think that the Puerto Rican people know that at each moment of their history what is best for them, and what is best for the general interests of the country, and that there will be a political party, not two ha we have today, but probably four, five, six, there will be men who all we believe I the best interests of the country, like those who constitute this Legislature doe believe.

For the men of today to say that we are to be the judges, from this time, I advance, of the bests interests of Puerto Rico, is to have a self-inflated sense of our own capabilities.

I think that the men of tomorrow will have the same interest that we have in what will benefit Puerto Rico at each point in their lives, and they will as good or better judgment as that we have.

This is strictly perhaps a matter of a legislative nature, not a constitutional issue, and being a legislative matter, when it may be considered as a statue, what would have to be weighted would be the pro and cons, but in the manner that it is being proposed today, clearly, I have greater faith in the legislators of tomorrow than that had by my distinguished colleague and dear friend, Miguel Angel García-Méndez. I believe that the legislators of the future will be as good as those of today, and they have no need for a primer of any kind being imposed by the legislators of the present.

For these reasons, Mr. President, we are opposed to this amendment, and we believe that they will know how to make the best use, in each year of the life of our country, as will those who are proposing to the people of Puerto Rico this constitutional amendment will know how to make the best use.

Mr. Colón-Castaño: Mr. President.

President pro tempore (Mr. Rivera-Colón): Senator Mr. Colón-Castaño:

Mr. Colón-Castaño: To ask Senator Fernández-Méndez a question regarding the statements he has just made.

Should we trust, my fellow Senator, in public official and employees that work in all the revenue collecting services, etc. in the country?

Mr. Fernández-Méndez: That we should trust in what…?

Mr. Colón-Castaño: In the public employees and officials that manage the Government.

Mr. Fernández-Méndez: I think so. I mean, I presume there is human goodness, include that of public employees and humanity in general.

Mr. Colón-Castaño: So, I would also like to ask whether the Senator knows if those public employees have a liability bond for the event of any incorrect action?

Mr. Fernández-Méndez: I think that most of them do.

Mr. Colón-Castaño: Most of them or all of them?

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Fernández-Méndez: I can't answer you with certainty. I assume that all of them that have to do with the expenditure of funds or management of funds.

Mr. Colón-Castaño: So, from my fellow Senator's answer it may be inferred that in spite of the trust that may be had and that should be had in the persons that hold these positions, for the assurance of the people that we represent, there should be measures, such as lability bonds for any incorrect action of an official.

Mr. Fernández-Méndez: In cases of error that could cause the loss of funds and due to error that there could be an unfavorable balance in the public treasury, there should always be a policy so that the public use of these funds may not be diminished due to this loss of funds. But in the case of legislators elected by the people, the ultimate Overseer is the public will of the human beings that constitute the electorate of a country and are overseen every four years in their public conduct, and this is the best overseer that the country has, the elections every four years.

Mr. Colón-Castaño: Mr. President, we are frankly surprised.

Mr. Fernández-Méndez: Besides, the bond is not set forth in the Constitution. A system is established in which every four years or in each year in which works are to be carried out with a specific amount of money, and that amount is set by law, it has to be there when it is needed. If by error or malfeasance or by criminal conduct, the amount is not there, the public interest

1961                           DAILY JOURNAL                           233

will not be bereft when the amount is needed or is not there whether by error or for the reason it is not there.

Mr. Colón-Castaño: Mr. president, we are truly surprised by the opposition borough by our fellow Senator to this amendment, this amendment that is inspired in the principles that have been stated by the floor-leader of this side of the Senate. Actions by legislators have been restricted constitutionally. For example, a Senator who has voted an increase in salary for a position in the government cannot hold that or a new position created by that Senator.

We are trying to establish here a framework to ensure careful consideration and good judgment by those who will in the future represent, as those who currently represent, the People in the houses of the Legislature. We cannot speak of the judgment of the people every four years. In fact, this amendment is to allow the People to be able to form their judgment and that it may not be in any year, a matter of bribery through loans what may be obtained by the People of Puerto Rico or any municipality.

It is that freedom of the People to make its judgment what we are trying to guarantee, Mr. President, with this amendment, so that the People may be free of any attempt by any municipal official, by any legislator in the future, and we are not making any conclusions about whether future legislators will be better than those that are currently directing public interests with such effort and dedication.

Nor are we saying that they are going to be worse. We are setting the foundation, that unquestionably, a large part of the members of the Senate agrees is necessary, limitations that are needed in our Constitution. This is not a statutory matter. We are talking about an amendment to the Constitution and we should favor this amendment as a need to ensure what we are enjoying today in Puerto Rico may continue to be enjoyed by future generations.

Mr. García-Méndez: Has the colleague finished? Is the colleague finished?

Mr. Colón-Castaño: Yes, Sir.

Mr. García-Méndez: Mr. President and fellow Senators, two words of rectification. It is difficult to carry on, for as much as one makes an unheard-of effort, these debates at a high cerebral level of

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

discussion, when another colleague improvises, without having studied the issue, to answer an amendment of this nature.

I am going to have to give up n this regard, to avoid having myself to incur in this kind of defect that I am condemning from the bottom of my heart. I am making an amendment that was accepted by the majority, and that my fellow Senators know to be the case, and instead of the fellow Senator standing up, because they are not accepted to accept it, and I do have great respect for the rights of others and I defend my right with my life and also with my life the rights of others, if necessary, as a great philosopher said, but what need it there to use gross adjectives? How can it be imputed that Senator García-Méndez in this amendment is casting a stigma on the legislators of the future, when the majority of this Senate has been willing to accept this amendment, if we had reached a final agreement with regard to the two amendments?

Stigma, primer in hand, are not the adjectives and phrases to be used. Affront. So, I am creating an affront to our fellow Senators of the future. My colleagues, I give up, I cannot go venture in to that terrain.

And I am affirming that my fellow Senator could have said to me, well, we do not think this is advisable in the Constitution, as a distinguished representative of the House, the Chair of the Special Committee said to me "Golly, I don't think this is in the right tenor." A gracious phrase. And I answered hi: "Golly, I should give some thought to that argument, it seems to me to have some merit."

That's how things should be discussed in a Senate. No immediately with an epithet such as stigma, affront, primer in hand. Especially we are already getting along in life, and gymnastics should be worth something in theses parliamentarian skirmishes, where it is nicer that we treat each other with affection and not always provoking undesirable situations and that in general force into going into terrain that we hate to walk on, eve though we are aware that the poisonous plant usually finds fertile land on which to thrive. Unfortunately, that is the case.

We do not want, therefore, to go into another argument which arose from a spontaneous question of my colleague, as to whether imposing a bond on public officials wasn't an affront implying they were thieves, is the guarantee to taxpayers, it is guaranteed to the poor that they will have those services. When a legislator is prohibited in a code of ethics from doing business with the Government, it is no longer the public employee, it is the legislator to whom an affront is being made. They are being called thieves, no, they are being asked to comply with this code of ethics. When a high official of the house or the senate recuses himself from intervening as an attorney at administrative offices, he himself is creating an affront against himself, he himself is holding the primer against himself, he is stigmatizing himself, he is stamping the word "thief" on his forehead, no, he is fulfilling his duty. And so on and so forth, we could provide 20 examples to show that the guarantees never create an affront, never stigmatize, never mean there is a primer to be held against anybody. These are the guarantees of the populace to defend their own rights.

I don't want to say anything more about this amendment. I am submitting it to a vote by my fellow Senators.

President pro tempore (Mr. Rivera-Colón): Let us see what the will of the Senate is. Let the amendment be voted on.

Those in favor of the amendment, please stand. Mr. Secretary, please count.

Secretary: Eight Senators standing, Mr. President.

President pro tempore (Mr. Rivera-Colón): Those against please stand.

Secretary: Eleven Senators standing.

President pro tempore (Mr. Rivera-Colón): The amendment is defeated.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Colón-Castaño: Mr. President.

President pro tempore (Mr. Rivera-Colón): Senator Mr. Colón-Castaño.

Mr. Colón-Castaño: We are going to submit an amendment. On page two, at the end of the second paragraph, immediately after the word "municipality" to insert the following, "And it is further provided that the total assessed valuation of property will not include the value of tax exempt property.

This amendment, Mr. President, I am not going to consume a lot of time to argue in favor of it, because the amendment itself reflect what motivates this Senator to make it.

The Concurrent resolution that we are considering, change at the state level the current procedure for setting the debt margin of Puerto Rico. This is not the case for the municipal level, where it will continue to be, if this Concurrent Resolution is approved, to be based on the assessed valuation of property. Page thirteen of the report that was submitted by the Committee states: "the intention is to use the valuation of all of the assessed property I the different municipalities, with the exception of that which is tax exempt." So that what this Senator is trying to do with this amendment is to clearly include in the Resolution, so that it will part of the amendment to the Constitution, what is being said is an intention. So, if the valuation of property is used as the basis for the loan margin of the municipalities, we should not use the valuation of property that is tax-exempt, because according to what the Report says, apparently that is the intention, but it is not stated like that in the Resolution, so that we think that it is advisable to make it clear once and for all.

I want to anticipate, Mr. President, that the bankers mentioned by Senator Cruz Ortiz-Stella that testified in favor of the Resolution we are discussing today, were also in agreement that the amendment was necessary and that they favored it.

Mr. Ortiz-Stella: Mr. President.

President pro tempore (Mr. Rivera-Colón): Senator Mr. Ortiz-Stella.

Mr. Ortiz-Stella: I just have a note, to see if this is what the colleague Colón-Castaño proposed: "it is further provided, also that the total assessed valuation of property will not include the value of tax-exempt property."

It seems to me that the amendment is directed at property that is totally exempt, these are not included in the debt margin. Is that the colleagues thinking?

Mr. Colón-Castaño: Our colleague doesn't think that the assessed valuation should not be included for the purposes of the sale of bonds or borrowing by the municipalities, not only property that is totally exempt, but also property that is partially exempt.

Mr. Ortiz-Stella: Uh-huh. Well, on that…

Mr. Colón-Castaño: Up to the proportion that is tax exempt.

Mr. Ortiz-Stella: I mean that then, because I am sorry to have to oppose the amendment, and I want to say that my fellow Senator's concern was expressed in the hearings. I think he was informing the Secretary of the Treasury at that time.

234                                    DAILY JOURNAL                          SEPTEMBER 5

I am opposed because one thing is totally exempt property, let's say a homestead, which I think now is $3,5000, I think, I can't remember, $3,5000 that doesn't get counted, but properties which are used as housing, in the past regular session we granted a tax reduction to a half, if $15,000 is the assessed valuation of the property. Those are assessed and counted for the debt margin, they are assessed. The thing that there is a tax reduction, a tax reduction, not a total exemption.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

And, also according to this law, Mr. President, this reduction could be partial, because if a person rents part of a house, then the rented part is not tax exempt in any way.

The same thing may be said that if the person that lives in the house and moves out and rents it, the person no longer has a tax exemption. Therefore, I am noting that there is a great difference between homestead property that is totally exempt and property that has a tax reduction. Therefore, these properties must be counted for the debt margin, and that was the opinion of the Secretary of the Treasury.

Besides, he noted as an additional argument, an addition reason for it to be counted, the fact that what the relevant municipality does not receive, well, it will be returned by the government of the Commonwealth of Puerto Rico, and therefore, the municipality will not have any decrease in the tax revenue for that property. So, for these reasons, I very much regret that I will ah veto oppose the amendment.

President pro tempore (Mr. Rivera-Colón): The vote on the amendment.

Mr. Colón-Castaño: Mr. President, we knew the arguments of our fellow Senator Cruz Ortiz-Stella, which are those that were outlined by the Secretary of the Treasury.

There are, Mr. President, to ways of setting a debt margin. At the state level there is the repayment capacity based on a percentage of revenue. This is what the Majority is defending. But this is not advantageous for the municipalities and there the archaic principle of system, as it has been called several times, of a percentage of the value of property, that is good. So, we have to be careful when we disparage something because, we are probably using it.

I heard witnesses say that this system was already archaic, using the assessed valuation of property to establish the debt margin. And then I ask, why do we use it in the municipalities and we don't change it there to. And you say, "No, because there it is advantageous."

Now, if the assessed valuation of property is used, it is not because of the symbolism of assessment, but because that is what the property earns, what that property contributes to the municipality. If that property is exempt for the purposes of the debt margin, it is as though it did not exist. There is no revenue on that property and my fellow Senator accepts that up to this correct. Now, but when the exemption is partial. No, things are not correct there. What is the difference? What is the difference in accepting that it a property that is worth $30,000 is totally tax-exempt an it is accepted to eliminate it, but for another property that is 50 percent exempt the entire property must be considered.

No. A principle must be followed and if the principle is that a tax-exempt assessment must be used for a total exemption then it must be used for a partial exemption.

The argument employed by my fellow Senator, repeating what was said by the Secretary of the Treasury in that there is no problem, because the Legislature is providing appropriations for the municipalities to compensate for what they are not obtaining due to the partial exemption on housing construction, is an argument against him and in favor of our arguments. At the state level, revenue is used as margin. If part of the revenue is going to the municipalities, why do the municipalities go back to using the assessment for borrowing purposes? There, if that were done, Mr. President, we would be, as they say, talking out of both sides of their mouths. On the state level it would be a percentage of revenue, when a part of that revenue goes to the municipalities, and then again, the total value of property in the municipalities is taken, based on the deficit they already have because of that partial exemption has already been covered with state funds.

We believe, Mr. President, that if the intention is, as the Report says, to use the total value of all assessed property in the municipalities, with the exception of tax-exempt property, that same principle should prevail for all exempt property, even partially exempt property.

A we said in the amendment, if a partially exempt property ceases to be exempt, the margin will increase. This is the case set forth by our colleague. He says that a house can be, can have a partial tax

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

exemption, and the next year may or may not have it, because it has a different owner or part of it may have been rented, well then it will be considered for the total assessed valuation. But for as long as it is exempt, according to the amendment we are proposing, it shall not be considered.

For these reasons we recommend that the amendment should be approved, Mr. President.

Mr. Ortiz-Stella: To request a vote on our colleague Mr. Colón-Castaño's amendment.

- - -

Having been submitted to a vote, Mr. Colón-Castaño's amendment was defeated.

Mr. García-Méndez: Mr. President, just one last amendment, just mine, to the bill. ON page 2, line 10, after the phrase, "if it were to exceed 15 percent of," to add the words "average of." And to continue to read "the total amount of revenue?

So, on line 11, after the word "revenue," add the word annual." And then in line 12, where it reads, "in the immediately preceding fiscal year," that t should read "in the prior two fiscal years." And so that this amendment may be consistent with what is established in the last line of the last paragraph, in the next to last line of the paragraph, after "should exceed 15 percent of" it should say "of the average of"; "of the average of the total of such annual revenue."

I want to state for the record that this is the amendment to lines 11, 12, 13 lines and the next to the last and last lines of that paragraph, I want to make it clear that the amendment will then read, this part will read thus in line 10, "if it were to exceed 15 percent of the average of the total annual revenue obtained according to the provisions of the law of the Commonwealth of Puerto Rico that are entered into the Treasury of Puerto Rico in the two fiscal years immediately preceding the current fiscal year." And under that t the end. "were to exceed 15 percent of the average of such annual revenue."

And the clear interpretation of this is that instead of using the most recent year, instead of using the immediately preceding year, an annual average of the to previous years divided by two were used. That is to say, to cover the situation in which the immediately preceding year were a year in which revenue was enormous, because of inflation or because we are at war and also the contrary situation in which the immediately preceding year were a recession year or a hurricane year or a year in which there was a crisis of one kind or another. This amendment, uses g an average of the total amount of revenue in the two years, divided by two, that is to say the annual average for the two years, so that there will be a greater assurance that the immediately preceding year may not be an extraordinarily irregular or extraordinarily low revenue year for one or another of the situations I mentioned before. This is the underlying principle of this amendment.

Mr. Ortiz-Stella: Mr. President.

President pro tempore (Mr. Muñoz-Rivera): Senator Mr. Ortiz-Stella.

Mr. Ortiz-Stella: To say that we second the amendment, for the same reasons set forth by our colleague García-Méndez, and we are asking for a vote.

- - -

There being no objection to the amendment of Mr. García-Méndez, it is approved.

- - -

Mr. Ortiz-Stella: Mr. President, to propose an amendment, since the line in this resolution aren't numbered, it would be on the fifth line counting from the bottom up in the first paragraph in page 2. The amendment consists of deleting "of" and inserting "and," so that it will read "principal and interest." This is clearly a typographical error.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. García-Méndez: There is no objection.

Mr. Ortiz-Stella: May a vote be taken, Mr. President. The amendment that I just made, which was seconded by my fellow Senator García-Méndez.

- - -

Submitted to a vote, the above amendment was passed.

- - -

Mr. Colón-Castaño: Mr. President, for an amendment. On page 2 and counting, and I'm sorry that you have to count, because as my fellow Senator noted, this resolution does not have line numbers, I don't know why, it seems that it was not thought it could even be touched by an amendment. This is the first time that I see a bill, even though this a concurrent resolution, according to the Rules, it is a considered a bill, an according to the Rules the line number must be stated in order to amend it, well counting from bottom up, at line 17, substitute "twenty years" for "thirty years."

| 1961 | DAILY JOURNAL | 235 |
|------|---------------|-----|

We are not going to deprive the gentlemen who have not had their lunch, I know that those in the Minority have not had lunch, I don't know about those in the Majority, but for the record, we have been told that there has never been a need in the history of Puerto Rico to issue bonds for more that twenty years, that the intention is to continue in that line, which is recommended, and I am now going to talk about the bondholders, which is recommended to be followed by the bondholders. It seems to me that 30 years is almost a generation, Mr. President, because three generations constitute a century, which is 33 1/3 years, just by 3 1/3 we are not encumbering an entire generation with debt. The good works that are undoubtedly built with these loans also have a limited lifetime, and that is why we are proposing that the time be reduced from 30 to 20 years.

We are submitting the amendment.

Mr. Reyes-Delgado: Mr. President.

President pro tempore (Mr. Muñoz-Rivera): Mr. Reyes-Delgado.

Mr. Colón-Castaño: My pleasure.

Mr. Reyes-Delgado: I heard the distinguished Senator García-Méndez say, just when it was I'm not sure, but it was as though it should be 30, but it should be more, the margin of years set in California. Isn't it 40 that are set in California.

President pro tempore (Mr. Muñoz-Rivera): To Senator García-Méndez or to Senator Colón-Castaño?

Mr. Reyes-Delgado: No, I am asking.

Mr. Colón-Castaño: I don't remember. Our colleague García-Méndez could answer that.

García-Méndez If my colleague will allow me, with the permission of the President. No, what I was arguing was that with loans, and specially with regard to the debt margin, there are two basic factors that regulate the increase or decrease of the margin, and they are the interest rate and the term. If you take out a loan for "x" amount for a term of only ten years, well, you can do it for a lot more, almost double that if you do it for twenty.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Reyes-Delgado: So, the longer the term the better.

Mr. García-Méndez: And if you do it for 30, you have a wider margin in which to do it, but I wasn't saying that to say it was better. I said it because I was reading, I was reading from Bowen's report that the average in the United States is between 20 and 30.

Mr. Reyes-Delgado: But California, how much does it have?

Mr. García-Méndez: NO, California has 40 and Wyoming has 5. But those are the two extremes. But the average is 20 to 30 and so here the maximum average has been used. What I wanted to say with this is that there is such a flexibility in the ceiling that if the ceiling were with ten years, it would be a lot lower, but with 20 it would be higher, and with 30, higher still.

Mr. Ortiz-Stella: Mr. President, we are going to oppose the amendment, because this detracts from the flexibility from the power to issue bonds, above all, and I don't want to repeat the arguments I have already made, when the formula for the margin of the borrowing capacity is set as a percentage of revenue. If we lower it, as Senator Colón-Castaño is proposing, so that bonds may be issued from 30 t0 20 years [sic], this would detract flexibility and could reduce at any time the repayment capacity requirement.

I'll explain myself. In a 30-year loan, annual payments are lower than in a 20-year loan for the same amount. At times it is advisable to do it for 25 years, because the installments are lower, the repayment requirements, and there is more free margin for issuing new bonds.

For this reason, because this method of a percentage of revenue detracts from the flexibility of such a method, which is now not for one year, but for two years, due to the amendment formulated by our fellow Senator García-Méndez, I am going to oppose the amendment, and I am calling for a vote, Mr. President.

Having been submitted to a vote, Mr. Colón-Castaño's amendment was defeated.

Mr. Colón-Castaño: Mr. President.

President pro tempore (Mr. Muñoz-Rivera): Senator Mr. Colón-Castaño.

Mr. Colón-Castaño: For one last amendment. Counting once again, because of this thing of the lines not being numbered, from the top down, even though we have to count more, it would be shorter to count from the bottom up, but I like it better from the top down, line 19, where it says, "forty years," to write "thirty years."

I would like to say, Mr. President, that a lot of bankers and experts in bonds, are being quoted here, but as it may be relevant, sometimes Mr. Esteban Bird has been quoted as a banker and great economist who is active in bond operations and who criticized 40 years for the housing project, simply based on the fact that a loan should not be for a longer term than the life of the property or the thing for which the loan is made. As a good banker and economist, he said that the depreciation of housing is greater than the 40-year term. That is to say, from the point of view of business and economics, with a knowledge of when a property or residence will depreciate, 40 years of life may not be given, and therefore, that being the case it would not be logical to extend it up to 40 years.

Based on this, Mr. President, for the sole purpose of having these programs that are to be developed based on loans have a truly solid basis and we do not have a risk of running into obstacles in the future, I am making this amendment. Because I also think that these bondholders who are placing a surcharge on Puerto Rico bonds, something that has not been mentioned here, they can have a lot of opinions, but when it comes time to buying the bonds, nothing forces them, and they can say, "No, we don't like those bonds, because their term is too long, more than a generation, a term that is longer than the life of the property involved,["], because if you don't think that there aren't going to be any obstacles for selling the bonds, which have always done well in the market, Puerto Rico bonds, in all of the history

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

of Puerto Rico, that doesn't mean that thee bondholders are making a commitment. I don't think that any of my colleagues present here today can guarantee that. These bondholders, who do not explain why Puerto Rico bonds are rated Type A [sic], as my fellow Senators must be aware, Mr. President, the bonds are rated as Triple A, Double A, A, B, and C. Puerto Rico bonds have been classified Type A, those of other States as Triple A, Double A, A, and some bonds have a lower rating. We aren't going to get into arguments about why there is an A rating, we believe that it should be fair and appropriate, but after it is rated A, as with some States that have A, there is an index for establishing according to the market the interest that is to be paid.

Yet, the Puerto Rico bonds have a surcharge of .67 percent, more than one half of one percent, on that interest rate according to that index, and which today, it is my understanding, that the most recent bond issue by the People of Puerto Rico paid that surcharge of .56, more than one half of one percent, more than one half.

Nobody has been able to say why that is, nor are the bondholders forthcoming. It is not because of the rating, because the rating had been done.

Mr. President, we have been very careful to maintain the good credit of the bonds. I am making a public recognition here to all the men in our government who have been involved in the sale of bonds, with Puerto Rico's credit in the history of our government, because they have shown zealous care for that credit. We must continue to be so zealous.

We now have the responsibility of recommending an amendment to the Constitution in which we may destroy that credit, which is a protection for the taxpayers, and let it not be said now that it is the rich who pay taxes. Taxes are paid by all of the people, from the one that just smokes one cigarette to the one who buy a Cadillac car. Everybody pays taxes.

Sometimes, we are confused, and we think that taxpayers in Puerto Rico are the privileged. Taxes weigh more on the shoulders of the poor than of the rich. Income taxes, which sometimes sounds a little uncomfortable, for the one pays them from what he earns, but the public, the consumers who do not pay income tax, because they don't have enough income to pay that kind of tax, pay another kind of tariff, which are a greater burden than income taxes that are paid by those with large incomes.

We should also think a lot about that. We believe that there is a need for credit. We haven't opposed this, at any time, that the debt margin be increased. We were never opposed, but to the contrary we favored that the debt margin be removed from the Federal Relations document and be included in the Constitution, because that is how it is in all of the States of the Union. Today we are not opposing an increase to the debt margin. There is a need to obtain funding for certain pressing and necessary works and we favor all of that. But as the floor leader of the Statehood Party in this Senate put it so well, we have a great responsibility to oversee this document that we are being presented with here and try to improve it for the assurance of our taxpayers and the future welfare of our country.

Finally, we are submitting this amendment, Mr. President.

| | | |
|---|---|---|
| 236 | DAILY JOURNAL | SEPTEMBER 5 |

President pro tempore (Mr. Muñoz-Rivera): Is there any opposition to the amendment?

Mr. Ortiz-Stella: Mr. President, we are going to oppose the amendment, but we are going to be very brief, because I must confess that I am practically worn out, I think we have been talking here for about four and a half hours, I haven't had anything to eat. It was said here that the Majority had had lunch. I declare that I haven't had lunch.

Mr. Colón-Castaño: So, my colleague is a minority in that Majority that had lunch.

Mr. Ortiz-Stella: Did the Minority have lunch?

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Colón-Castaño: I am a minority even for lunch.

Mr. Ortiz-Stella: I mean, the arguments I made against the previous amendment of lowering current bonds from 30 years to 20, are valid against the amendment formulated by the distinguished Senator Colón-Castaño.

The explanation that I could give for setting a 40-year maximum, it is because this kind of bond for housing and FHA, since the loans are for 40 years. I don't think that a concrete house, for example, will last less than 40 years. I think that it lasts more than that.

So, the fact that this maximum is being set there does not mean that that maximum will be used. It is set there so that there may be flexibility. We go back to the previous argument that what this formula requires is flexibility, and we do that we take away flexibility, which is one of the best things this formula has with regard to debt margin.

Now, my colleague has referred to that in the Bonds Buyer Index there are Puerto Rico bonds. This is not a surcharges, is that at times the market has certain conditions and at other times it has others. I can tell you that in an issue of $17,000,000 in 1960, .31 of one percent was paid, very little more than other bonds. And it has been more or it has been less. Now, our bonds are rated Class A, which is a good rating and the experts on this subject believe that when this formula will have been approved by the People of Puerto Rico in the referendum that is to be held, and bonds are issued for this formula, are bonds will have a better rating. I want to say that in many States the rating does not even reach A. It is less than that, it is A or B, or B only. So, A is a good rating, and speaks well of the credit of the government of Puerto Rico.

I want to thank you, to end this, for the laudatory words of recognition made by my colleague Colón-Castaño regarding government officials. I thank him most heartily because it is not very frequent to ear such things in a debate like this. I tried to keep this debate on a cordial level, and thank God, it seems that it is going to end on that level and the recognition made by our colleague Colón-Castaño regarding government officials tells me that this debate continues on that level. Thank you very much, Colón-Castaño, for your recognition of the officials of the government of Puerto Rico

So, Mr. President may Senator Colón-Castaño's amendment be voted on.

Having been submitted to a vote, Senator Colón-Castaño's amendment was defeated.

Mr. García-Méndez: Mr. President.

President pro tempore (Mr. Muñoz-Rivera): Senator Mr. García-Méndez.

Mr. García-Méndez: We had one last amendment to make, but really, after what has already been debated, it would mean an unnecessary prolongation of the record. I will state in making my arguments, what the amendment was, which I know beforehand would not have been approved, and I want now, as a gift to all of my colleagues, from both sides of the aisle, since it has been said that they have not had lunch I don't want to subject them to the torture of having to hear a statement that I am going to try to make as summarized as possible, but I want it to be on the record, and therefore, if the colleagues so desire, I wouldn't have any objection to a brief recess for them to have something.

However, I fear that if we take a recess, then we will get out of here too late. So, I am depending on the kindness of some of my colleagues here, so that if a little cup of coffee could come this way, that might help us to mitigate our exhaustion. I have breakfast at six I the morning. If there is no interest in a recess, we can continue.

So, Mr. President and my fellow Senators, as a first precaution, I want to say to all of my colleagues that if in the course of my statemen, once in a while I raise my voice in a tone that sound like heated debate, it is not directed at making this a heated debate, It is simply part of the temperament of

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

those of us who have been considered, rightfully or not, to be "orators," that as we speak, we raise our voices at little more than may be needed.

I wan to consider this matter as carefully as possible, answering in this report the report made by the distinguished colleague that requested the approval of the bill, and I once again want to state for the record to begin with that, even though I did it when I formulated my first amendment. That it is not our purpose to object to receiving more resources for the People of Puerto Rico attend to public services, for the People of Puerto Rico to be able to maintain a constantly increasing rate in the growth of our economy, and so that the People of Puerto Rico may invest in capital improvements, which are more important than operational budgets, such sums as may be necessary so that there may be additional revenue for the Treasury of Puerto Rico so that day by day a better standard of living may be achieved for the inhabitants of the People of Puerto Rico [sic].

However, consistent with what has been developing as a difference of opinion for three years now, we believe that the bill, as it has most recently submitted, and is now pending our consideration, is so far distant in its formulation from the original method, without establishing a ceiling or true limit, which as I said before, the alleged limitation of fifteen percent of availability for the repayment of direct loans or bonds that may be issued is a limited limit, although it may seem a paradox.

An unlimited limit. Why? Because besides the flexibility entailed by the fact that the revenue of the People of Puerto Rico increases every year at a percentage rate that is more than normal, for very obvious reasons, because we are changing from a strictly agricultural economy to a semi-agricultural and industrial economy, and it is natural that there by that tremendous increase in the annual revenue of the People of Puerto Rico, it is the case in all countries that have gone from a purely agricultural stage to an industrial stage, or at least, to a semi-industrial stage.

My fellow Senators, what is the concept that informs this bill? We should know what it is so that we don't vote without being fully aware of what we are voting on. This bill not only eliminates, based on an amendment made by the Congress, the provisions that establish a limit on the debt margin and as all of you know, was seven percent originally since 1900, both at the state (at that time insular) level, and the municipal level. Then, in 1921, it was raised to ten percent at both levels, the state level and the municipal level, and in 1927 it was set what it is today, that is to say, that for more than a generation it was based on ten percent for the state level and the five largest municipalities of Puerto Rico, and five percent as the limit for the remaining municipalities.

The bill that is now under our consideration, not only takes advantage of the elimination of the ten percent margin and changes it to fifteen percent of revenue as the repayment availability for any loan, but it establishes that the municipalities could have a margin that could fluctuate between…it says, no less than five nor greater than ten percent. If this is interpreted based on the letter of the law, it would seem that no municipality could have less than five percent, but it was explained, and it is part of the legislative history in the various public hearings, what that means is that in some municipalities the maximum will be five, and in other municipalities the maximum will be ten, that is to say, that there are municipalities that may not have a loan that exceeds two or three percent and others where it may be up to ten.

The languague is a little confusing, but that is the interpretation and we admit that unquestionably that is its purpose. But there is something that has been forgotten and has not been touched on in the public hearings, and it is that i the Federal Relations Act says the following:

"Provided," and this is the part that has been deleted, "It is further provided that no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras, and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality, and this is the point, in computing the indebtedness of the people of Puerto Rico and the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

municipalities, and municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted

and that indebtedness, but, and this is at the end, and is also deleted, all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted."

What does this mean? This means that there are two levels for incurring public indebtedness. One is the ten percent level of the municipalities, the largest five, and the People of Puerto Rico, that is to say the Sate Government, and the other is the level for the remaining municipalities. For the former percentage the equivalent of bonds of municipal corporations or school boards will not be considered. That will not be counted for reducing the ten percent, but all bonds that are issued in the future by any municipality or subdivision within the five percent authorized herein that are secured by the good faith of the People of Puerto Rico, shall be counted, and what the amendment being made now it is forgotten that that provision was there and it establishes fifteen percent of annual revenue, which already with the approved amendment, will be the annual average for the two years preceding the current year, but the same system of five and ten percent is approved, I ask the distinguished colleague that is the Chair of the Senate Special Committee, where is the provision that establishes that these bonds were not to be counted to deduct them from the total? That is not in the current provision.

So, it is not just the unlimited limit that I am talking about, my fellow Senators, but that in addition to this unlimited limit of that fifteen percent, as Senator Colón-Castaño put is so well, the same obsolete system is established, called obsolete, but that still exists in most of the States, and exists in the State of Hawaii which has just recently joined the American federation, and there also exists a provision that ignores counting hose bonds, why? Because that makes the margin still broader, enormously broader.

In other words, the property in the municipalities is the same property of the People of Puerto Rico. Yes, it is the same. The total of property in the municipalities informs the entire property of all of the People of Puerto Rico. There are seventy-six municipalities and total sum of the property in the seventy-six municipalities informs, as a result, the property of all of the People of Puerto Rico.

But there is one system for the state margin and a different system for the municipal margin. And in the two separate systems, the result is obtained that provides the most, with the unlimited limit will reach figures, that if the loans are made long-term, result in unlimited figures. What's more, I would like to make any statements about figures so that the record, would not contain any errors, but if the amount that would be informed by the former system is added to the amount informed by the latter system, it would result in the fact that with the same guarantee, the same guarantee indirectly, we would be raising the debt margin to such a degree, that it would reach astronomical figures.

And it is not that the duplication is on the same system, no. So that there may be no confusion, in the former, since this is clear to everybody, I don't think that there is any confusion, it is a simple thing, the availability of fifteen percent. For example, if there is a revenue of two hundred million, fifteen percent is thirty million. Puerto Rico can incur as much indebtedness as it can to pay with those thirty million a year.

But the thirty million are not the only source of the People of Puerto Rico. The two hundred million is the revenue of Puerto Rico under laws of the Commonwealth of Puerto Rico. There is also federal revenue returned by the United States Government, and these funds may be used at any time to pay interest on the loans, even part of the loan may be amortized, if so desired.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The important thing is that there are two sources there and the other source is the source for the limit on the margin of the municipalities, it is the same in a different manner.

Whereas at the beginning, with the former method, revenue is considered, in the latter, what is considered is the percentage of the assessed valuation of property. But, as we have already said here, property in and of itself means nothing. What is meaningful is the value in terms of the facilities this property produces, and the value is what the property yields in taxes or what it allows for in terms of indebtedness.

Therefore, the two systems, my fellow Senators, for raising the reserves of a country at a given time, are always through taxes or through loans. It is completely true that these are methods act as a premise for reducing taxes. So that it cannot be said, and who ever says it is falsifying the truth, it cannot be said that mi opposition to this bill is because I am, as sometimes said by persons who have the same ideology, ah, because he pays high taxes. No, because this system scientifically may be used as a premise when the purpose is to cut taxes. It has not been said here, but I want to say it. That they are not going to be lowered is something else. I know that it is difficult for them to be lowered, because all of you have had that experience. There have been emergency measures, like that of the five percent increase in income tax, for X purposes, and then it has been left there forever, even though it is used for other ends.

But that is not the core issue. The core issue is that the limit each time is raised regard to the debt margin for the obvious reason that a diversity of sources is not being used for that purpose.

I am absolutely certain, my fellow Senators, that if a ceiling had been set, if my colleague had approved that ceiling, there is not question, there is no question that we could have set an energizing and constructive example that an entire country, through men that represent both unique parties in Puerto Rico, had joined without partisan differences to defend a mechanism that informs, that expresses a fair and reasonable criterion of both entities that are represented in the Parliament.

We would not have been exposed to the criticism of our own people, nor would we have been open to the criticism of the colleagues of the Majority by their own people, because for as much that was talked about that we were on a honeymoon or we had a set up or we had made a pact, allegations made by third groups that want to participate in the political arena, the truth is that we had joined together for something that is fundamentally constructive, but based on a position of great reasonability, in which the responsibility of this Minority was exercised to the fullest. It is a pity that this has not been accomplished.

What is the history of this legislation, so that the firmness of our position ay be seen? The history is as clear as the noonday sun.

In 1958 our distinguished colleagues from the other side of the Senate, submitted two resolutions for consideration by the Legislature of Puerto Rico. One was Senate Concurrent Resolution 24, signed by Senators Quiñones, Negrón-López, Solá-Morales, and Ortíz-Stella. They submitted on May 13, 1958. Another is Joint Resolution of the House 1302 which was submitted by Representatives Ramos-Antonini, Font-Saldaña, Alvarado, Polanco-Abreu, and Morales-Otero, also on May 13, 1958.

We met in a Joint Committee to discuss this legislation. It was proposed that one of them be set aside and that we should work with the other. And during the analysis of this legislation, Representative Ramos-Antonini said that we were three parties the PPD and the PER, the 1960 elections had not yet been held and the PAC had not appeared on the horizon, the party of our colleagues in the Majority, the Party that I have the honor to preside, and the Independence Party. The issue was put to us, and Ramos-Antonini said, "The PPD and the PER agree that we must exercise authority. Well, if our colleagues insist on including "transfer" after "eliminate," that separates us, and if we are forced to a vote, with that amendment on transfer, we would not be prepared to vote. The Minority maintains its position of not writing a blank check and they prefer to discuss a specific increase. If the Majority does not accept this, the mere transfer from the legislative arena to the constitutional arena, for periodic increases by referendum, and finally, to make a long story short, it turns out that House Concurrent Resolution 1302

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

was the one that was approved at last, becoming Joint Resolution 1, which was approved on June 23, 1958.

What informed both resolutions? Senate Concurrent Resolution 24established the increases. It was said that in addition to the ten percent established in the Federal Relations Act, subject to the provisions of clause C, and forwar, none of such bonds or other obligations that might in the future be issued for educational facilities or roads, streets, or highways would be never circuate for a total principal amount in ecess of ten percent in addition to the assessed valuatio of all taxable property in the Commonwealth of Puerto Rico. This was the basic amendment and it established the final ceiling, that this original ten could never be exceeded and that this other ten was for specific purposes of educational facilities and roads, sstreets, or highways.

It was discusssed that public health had been left out and what I remember is that I think that it was included in the preliminary discussions, but a I said a little while ago, instead of approving Senatae Concurrent Resolution 24, what became the Resolution was House Concurrent Resolution 1302, which became Joint Resolution

238                                   DAILY JOURNAL                              SEPTEMBER 5

Number 1 and was approved on June 23, 1958.

Why was there a debate that lasted for hours in this Senate? Why is today's debate exclusively on the arguments on economic principles, without meaning that from time to time the history of this can be mentioned? This is because from that we were asked to vote on several Whereases in which it was established that there was the question of the alleged compact, the alleged agreement. And that resolution 1302 was approved on June 23, as a consequence of the debate on the Resolutions of May 13, 1958, which were several, and at that time, the Resident Commissioner, Mr. Fernós, submitted a petition in Congress to have the provisions of the debt margin eliminated, because the Resolution only mentioned the elimination of the provisions regarding the debt margin and not the increase based on the ten percent in the Senate Concurrent Resolution 24.

The United States Congress, it was in the Congress that the Resident Commissioner, Mr. Fernós filed Joint Resolution 124 on January 12, 1961. The resolution once again includes the Whereases of Resolution No. 1 that was approved by the Puerto Rico Legislature and ends with a "Further provided," which mentions "deleting," that is to say, the suppression of the provisions that established the debt limit with a limit based on the assessed valuation of property.

The Subcommittee on the Interior and Insular affairs of the House of Representatives met, and the Chair, Mr. O'Brien, who, of course, you know also chaired the subcommittee in Puerto Rico for the public hearings on the Fernós Bill, establishes the following premises:

"In 1952 the people of Puerto Rico adopted their own Constitution by their own vote and since that time they have been operating in the status of a local government, which is peculiar in or system, the commonwealth. They can be considered to be a territory and unincorporated territory as it were if you want to use that kind of expression. But they are a commonwealth, the only one we have ever had. It has been our good fortune, those of us sitting on the top of this committee, to have been in Puerto Rico many times, Governor Muñoz is a great leader, one of the great leaders of the Western Hemisphere. His right power, our own colleague Dr. Fernós Isern another great leader, Morales, all the rest of them. On the other side of the fence you have some great leaders also, those who belong to the Statehood Party down there, Garcia Méndez and Luis Ferré. The Independent leaders Garcia Concepcion a great leader in his own right. Of courses they have their arguments. The reason for taking out this preamble, a such, the word assets, is that we just do not want to get into any particular argument over some of the questions that arouse those people down there."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

And right after these words, which is a verbatim reading of pages 3 and 4 of the Committee report, the Chair ends on page 12 of the Report:

"Mr. Chairman, I move there be stricken from House Resolution 124 the entire preamble beginning with the word "Whereas the Commonwealth of Puerto Rico" on page 1 an ending on page 2, with the words "Puertoricans [sic] Federal Relations Act" and also now therefore be stricken from the resolution. The gentleman is recognized. ["] He explains the reasons and Joint Resolution 124 is approved in its depository part only.

I mention this so that my fellow Senators can see how in the terrain of mutual concessions it is possible to arrive at what is reasonable. What was our reasoning in the debates two years ago that went on for hours and hours? It was that we could not approve the Resolution if a ceiling wasn't sent and the Whereases weren't eliminated.

The United States Congress, whether out of conviction or for expediency or for momentary convenience, I am not going to go into the motivation of the congressmen's thinking or of the senators, the truth is that they also eliminated the Whereases and exclusively approved what we were about to vote on. That is to say, that the limitation be elevated from the legislative arena, from the arena of the Federal Relations Act, to the constitutional arena. Why? Well, because we accepted, as Ramos-Antonini said so well at the first meeting of the Joint Committee, that one more concession be granted to increase the internal autonomy enjoyed by Puerto Rico. And we cannot oppose a concession of this nature. We would be unpatriotic, we would be opposing the progress of our people.

We were in agreement, a we agree today basically in that it is necessary to broaden the debt margin, because the Government experts, and many of them are persons who deserve our entire credit, who are not coming here to lie to us, they tell us that the margin is already near the limit, that it will probably exceed the limit in 6 months, that no more than three million are left, and we believe that this is a basic reason for us to agree to expanding the debt margin, not based on absolutes unlimited expansions, but based on reasonable extension. So, we are as willing as we were before.

And why are we willing? Why we, who are this little group of laymen in terms of highly technical economic matters, why do we have an opinion that we want to raise as an objection, no matter what? No. That was the opinion of those same technicians of the Majority Party, that through the administration was being given to us two years ago. And

And here is the evidence. Mr. Muñoz-Amato, the first witness at the public hearings, and I call the attention of my colleagues to this, so that if I am mistaken, anybody can correct me on the basis of the record we have here of the public hearings, the public hearings on Concurrent Resolution of the House 1302 that became Joint Resolution No. 1…And here it is, if I were to read the statements one by one, it would take many hours in this report that I am making to my fellow Senators, but in short it is that Mr. Muñoz-Amato argued that it was advisable to establish limits. He favored that it would not be at the constitutional level. He believed that the matter should be regulated by the Legislature. That was the only discrepancy between hi at the other experts that were brought to these public hearings and that are set forth here.

But then Mr. Jorge Bermúdez testified, and Mr. Jorge Bermúdez testified as the Executive Vice President of the Bankers Association, and the Executive Vice President of the Bankers Association answered, to my questions that if there was not a clear and specific limit, he would oppose the Resolution. And he also testified that it has been delayed a couple of times, that the first time was because it had not been since 1920, that the second time was recently, and that automatically these reassessments would have increase the debt margin. And he said more. He said that the loans of public authorities should not be included and he explained the reasons, and then our colleague Solá-Morales asked him again, to se if was something he had said off the top of his head, and Mr. Bermudez's answer was, I think that no

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

misuse will be made of the change, but I think that the written limitation is a self-restraint. Those were Mr. Bermudez's words.

He was questioned again, and he said there should be a clear Constitutional limitation regarding the soundness of the securities market and submitting to a referendum. The margin should be established with great care to avoid losing soundness on the securities market.

And then, at the request of our colleagues in the Majority, the attorney Celestino Iriarte testifies, favoring the referendum and that the limit be made very clear and then the attorney Gutierrez-Franqui testified. I don't have anything noted on that statement except that what he testified there quite clearly and frankly that there had been a debate between Descartes and Buscaglia, in which Descartes believed that the provision should be eliminated from the Federal Relations Act, while Buscaglia believed that it should not be eliminated, and that also Bowen, according to him I this statement, thought it was a lot to ask of the bondholders, he had serious fears that harm would be done to the bondholders.

I am saying this, my fellow Senators, because of what has been said today about the obsolete system. It has only been two years from that time. It has been said that it is so obsolete, that there is already a trend to eliminate it. But there is only a trend. Still the vast majority of states have the other systems, and only two states, Connecticut and Mississippi, that have a system that is not a sibling of this one but rather a third cousin of it, but it has a high ceiling, the truth is that the Connecticut ceiling is very high, 4 ½ times revenue, but also Con-

necticut is on the heights of the nine highest solvent states of the United States, having an AAA rating, while Puerto Rico, which has not yet reached economic maturity, has an A rating, like Hawaii. That is why Hawaii has two ceilings, the first is a ceiling of sixty million and then a ceiling that cannot exceed 15% of its annual revenue. We here do not commit 15% of annual revenue. We are committing here annual revenue based on twice the time, if it were necessary, although my amendment was time and a half, to give my fellow senators a greater chance to amend my amendment, if they wanted to, to increase it to two hundred percent, which means twice annual revenue.

Hawaii limits it to 15% and caps it at $60,000,000.

Guillermo Rodriguez, Senate Colleagues, President of Caribbean Refining Corp. and former President, before that date if I recall correctly, of the Government Development Bank, testifies that he is, naturally, in favor of the bill. That the bondholders don't agree with the process suggested by Muñoz-Amato, that it's difficult to establish our credit in the United States because there are economic and policy factors that don't exist in federal States. He explains our situation and why bondholders and analysts in the United States have accepted us, and we must pay the price of that uncertainty of our current economic weakness and of not being sufficiently known.

There must be a clear limit, says Guillermo Rodriguez, former President of the Government Development bank. Most of the states, he says, do so through a referendum; others, based on this proposal. What was the proposal? The proposal was to increase said limit to 10% of the assessed property valuation. The proposal was not the 15% of annual income available for the issuing of any kind of bond or promissory notes as an obligation of the Government. No, it was the 10% increase over 10% of the

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

assessed valuation. And he explained a series of numbers that led him to conclude: going above the law damages our credit, said Guillermo Rodriguez. Going above the law damages our credit, and I reminded him of an example: when an authority is created, and the borrowing limit is based on that same property's income, the debt is being duplicated, and that has happened in Puerto Rico. Authorities have taken X loans, and it's true that the source of the payments is their own income, it's true, but on the other hand, what is behind, as a definitive guarantee, is the property. And it is that same property that is already included by its values in the total appraisable property of the people of Puerto Rico, and he said that we must be careful.

The case of the provision, because there was a case, Senate Colleagues, in which a series of properties were transferred from the Government to the Development Bank, which asked for 6 million and at the last minute it was only possible to give it four million and it had to be given properties, without any auctions and without charging anything at all, so that it could use those 6 million.

That was said or commented when Guillermo Rodriguez testified. And finally, Trías-Monje testified, a brilliant lawyer, without a doubt one of the most brilliant and most well-educated lawyers in Puerto Rico, and this great lawyer, who was Prosecutor General of Puerto Rico, made some remarks, that he preferred a clear limit in the Constitution, contrary to Muñoz-Amato's thesis, and he suggested the convenience of clearly knowing the limits from the start, because he believed that the twenty percent maximum limit should be put in exact numbers.

Those were, in essence, my colleagues, the statements of all the witnesses, without exception, who testified in the public hearings of May 28, 1958, which served as a basis for these two resolution bills, one of which became Concurrent Resolution number 1, which is what was the foundation for this law that we are discussing today in this High Assembly of the Senate.

That is what Commissioner Fernós clearly says. Reading the record of the hearings before the United States House Committee on Insular and Territorial Affairs, that is, from the House of Representatives of Congress, reading page 3, listen to the expressions made by the distinguished Resident Commissioner Mr. Fernós-Isern:

**[Translator's note: in the paragraphs below, the person speaking is reading a document in English and sight-translating it into Spanish. For the purposes of this document, the Spanish text has been translated back into English.]**

"On January 19, —I am translating in an almost literal sense, but I assure you, my colleagues, that this is what iscontained on page 3, starting on the second paragraph and ending on the first paragraph of page 4.

"On January 19, 1959, I filed Concurrent Resolution number 155 in accordance with the request made by the Legislative Assembly of Puerto Rico. Concurrent Resolution Number 155 was favorably reported by the Department of the Interior and by the Bureau of the Budget. However, the Legislative Assembly of Puerto Rico later adopted another Concurrent Resolution requiring the Resident Commissioner to file a legislation in Congress to review the Federal Relations Act with Puerto Rico on a number of aspects in addition to the limitation to the people of Puerto Rico's debt margin. I introduced that bill. It was considered and was not accepted. The decision now is to reintroduce legislation exclusively aimed at limiting the people of Puerto Rico's debt margin, "*confined exclusively to the borrowing limitation matter*," dedicated exclusively to the debt margin limitation matter. This explains the reason behind my Concurrent Resolution Number 124 that has been brought before this Committee.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

"The history of the provisions of the debt margin limits in Puerto Rico, as they now appear in Section 3 of the Federal Relations Act, begins in the year 1900. From 1900 to 1921, the limitation was seven percent of the assessed valuation both for the island and on a municipal level. In 1921, it was increased to ten percent at both levels. In 1927, it was reduced to five percent for municipalities with some exceptions, it's in 1937 that they raise it back to ten percent for Mayagüez as well, and in 1950 Rio Piedras and Arecibo are included in the ten percent."

That is the same thing I said before, creating a record of what has historically occurred concerning that matter in the Organic Acts before arriving at the Federal Relations Act.

And then he asks the Committee to approve his Resolution, which as I said before, was approved in its operative provisions, eliminating all of the Resolution's whereas clauses by order of President O'Brien, the House Committee on Insular Affairs.

What are the conclusions, Senate Colleagues and Mr. President, that we should reach if we look upon this picture that I have painted for you based on a thorough reexamination of this legislation's history? Two, three years ago, two resolutions were filed. They were discussed, there were public hearings, each and every one of the experts appeared, except that now there were many more bankers. Guillermo-Rodríguez didn't come, Trías-Monje didn't come, Muñoz-Amato didn't come, the ones who held that the legislation should be approved by making the ten percent increase and clearly establishing the limitations did not come. And Mr. Picó attended this time, but he also attended then. And what did Mr. Picó say? I've saved it for last: that it was very wrong to change the system. That the system that must be maintained was the system based on the assessed valuation or property. And after those hearings and all those statements made by experts, what happened? That two years went by after this Resolution's approval, of the Senate's Concurrent Resolution being discussed, of which our colleague Ortiz-Stella was one of its authors and it was said that the margin was more than enough because so said Picó and Muñoz-Amato and Sifre and Guillermo-Rodríguez and all the experts, and now, two years later, because of a "fiat," because of one of those things that anyone would say that a spell has been cast, that anyone would say that is something that  only wizards can understand, not those of us with a poor understanding of matters of the public treasury limitations. We now find that those same people, with different titles, now say that it is obsolete, that it doesn't work, that it doesn't work, that it can't be used anymore because it causes a great deal of harm to Puerto Rico. And we, the legislators, who sit down here and who are expected to represent to people of Puerto Rico, who are the genuine representatives, both of the Majority as well as the Minority, but this is particularly true for those of the Majority, it just so happens that we have to accept that, just because three or four witnesses come two years later and say that this is obsolete, that it doesn't work, we immediately cast that system that is being called obsolete as terrible, but there is a record where it is defended with tooth and claw by Puerto Rico's foremost economic experts, the highest representatives of Puerto Rico's public administration. And two years later, it's not good anymore.

And we have to come here and submissively accept that it's true that it's obsolete and that it doesn't work and push it aside as useless junk, all of this legacy that serves as the history of this piece of legislation, in order to approve what an expert is saying, who is respectable, dignified, and highly regarded, but who is contradicting everything that was said two years before and, if I'm not mistaken, contradicting what he himself sustained two years ago.

Picó, who is once again President of the Government Development Bank, though now


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

based in New York, said on that occasion that this method should not be changed. And now we're going to change it if you vote in favor of it, on the basis that it's obsolete. We're asked to vote on it, and we do so if we feel we are guaranteed that this new thing works, and something new is something that is still part of an experimental process. Something new isn't something that is already guaranteed by the patina of experience, like that old system. The system that we've used since Puerto Rico's change in sovereignty, we have to accept that new system as something that is the "non-plus ultra" and that the system the experts defended doesn't work.

And that same piece of legislation, Mr. President and Senate Colleagues, uses the same system for municipalities, as pointed out by Senator Colón when he developed his amendments. So it is obsolete on a state level, but continues to be magnificent on a municipal level.

Can we really be asked to simply cast our vote, without explanation, in a case like that? Why is the 15% revenue availability system used at the state level and a system based on 5% to 10% of the assessed valuation used at a municipal level? Why? Because at the state level, the first model, the first method, the first formula produces still more than is necessary. And the second method, for municipalities, produces much more than they need. If when one asks at a public hearing, how is it possible that it can produce in municipalities where the impact of the $15,000 tax exemption per household is felt? The answer is that it doesn't matter, because municipal expenditures are covered in the budget by means of allocations. So they have the allocations in the budget and they can also issue bonds up to what the debt margin limit allows, based on the assessed valuation. The third hole for the expansion of the unlimited limit, as I have taken to calling that 15% availability limit.

We should not, and I have said it four times already, obstruct the expansion of public services, nor the economy's growth. But I don't believe, Senate Colleagues, that we should write a blank check good for fifty years. When the Constitution is amended, it's done through a referendum, what does that mean? When talking about the constitutional sphere, as opposed to the legislative sphere, what does that mean? It means that those who should approve this aren't the municipalities, not even the legislators, but rather the people through a direct vote. That is what it means. So then, the purpose outlined in this bill, what is it? It's not having to amend the Constitution in fifty years.

Is the congressional purpose being fulfilled that way? No. It's not being fulfilled. Because the purpose has been for us to obtain the authority that Congress previously held. But we should place it where it should be most guaranteed, which is in the Constitution. And each time we come close to the margin, and another amendment comes so that the people have a chance to vote on the referendum, thereby keeping it from being a provision in a vacuum.

It's not a myth, it's a provision that means what it says, and not just words on the Constitution, because they will be there for fifty years, without the people getting a chance to vote once again on whether they want to increase the debt margin.

There is a risk that money will be short for the ten or twelve or fifteen or twenty years. According to the amendment that we produced and submitted to our colleague's consideration, there is no risk. Why is there no risk? Because the ceiling does not destroy flexibility. And I'm going to repeat this because it's part of my statement, so that it's clear on the record.

If the people of Puerto Rico, based on this new method, as the expert himself says, which is apparently only being used in two other states, could use thirty million this year to pay the principal and

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

interest of the bonds issued to the promissory notes signed informing the additional public debt of the people of Puerto Rico plus the debt that the people of Puerto Rico already have, we cannot forget that as the years go by and that amount is gradually paid off, when thirty million, twenty-five million are paid for the principal, those twenty-five million have automatically increased the debt margin. And the ceiling doesn't hurt that flexibility, because the ceiling continues to be the amount that is available, and it is being used, for now the debt is already much lower because it has been paid for a year, or two, or three, or four, or ten.

But it also cannot be emphasized enough that the Hon. Secretary of the Treasury has presented us a very illustrative exhibit. And that exhibit indicates that there is a normal, progressive increase in the income of the Commonwealth's Treasury which he indicates totals, as an average, 18½ million a year. That means that because the economy grows, that 15% also automatically grows because it's 15% of an amount that has increased by 18½ million. Also, because the first twenty-five million are paid, the margin increases because they are available for use. And if it's two years then it's fifty, and if it's three years it's seventy-five. The flexibility continues to work, and the only thing the ceiling does is safeguard against possible excesses and demand attention, nothing more. Keep in mind that the ceiling is there. Keep in mind that the ceiling is there. That's what the congressmen asked about when this legislation was being approved.

I repeat what I said at the beginning, the fact that I speak in a loud voice does not mean that I'm angry, or that I want to debate with anger, but that merely is the result of improvisation, so that my distinguished colleagues do not misunderstand me.

What was discussed in that log?

Listen to these words I'm going to translate so you can tell me, and my colleagues who have this log know I'm strictly relating the truth.

On page 10, the Congressman—Vice President Mr. O'brien, gives the floor to congressman Westland, and Mr. Westland states the following:

Page 10, Log of Public Hearings before the United States House Committee on Insular and Territorial Affairs from March 1961.

**[Translator's note: In the paragraph below, the person speaking is quoting a document that was originally in English and then translates parts of it into Spanish. For the purposes of this document, the original English text is shown in italics.]**

"I have a couple of questions I'd like to ask. I don't have any objections to this legislation. In fact, it's almost like a father telling a son that he's an adult and should already how to use money like an adult would. But I understand that if this resolution is approved, this resolution 124, it would come into effect when voters in Puerto Rico, through a majority vote, pass legislation that provides for a limitation that works as an automatic stop for the debt margin. That is correct, right?

**Dr. Fernós:** Correct. That's correct. There would be no lapse in the effect of this resolution between now and when the amendments to the Constitution begin. There would be no point at which there is no limit. It would be this one or some other one penned in the Constitution of Puerto Rico, but there would always be a clear limit.

**Mr. Westland, once again**: I would like to ask the Secretary of the Treasury of Puerto Rico, what kind of limit to the debt margin are you proposing?

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Mr. Noguera, José R. Noguera, Secretary of the Treasury**: He answers, and I quote and translate: A resolution is being evaluated by both Chambers which proposes adding 10% to be dedicated to schools and highways. They haven't finished yet. Something may have changed, (*some change*), he said in English. (*But that is the proposition*), but that is the proposition. An increase of 10%.

**Mr. Westland:** So, you will then have a limit of 20%, is that right?

**Mr. Noguera, answer**: Of our assessed property valuation (*Of our assessed valuation*).

**Mr. Westland:** What is the assessed property valuation over there? Is it 10%? Suppose someone has a $20,000 house, what is that property's appraisable value?

**Mr. Noguera:** The appraisable value is calculated based on 90% of the value on the market, in the year 1957. *The assessed valuation is computed on de [sic] basis of 90% of the market value of 1957.*

**Mr. Westland:** *It would be assessed at 90% of the market value?*

**Mr. Noguera:** *Yes, in 1957, which was the last time we recalculated the values. And it is 90% of the market value in 1957 for assessed valuations.*

**Mr. Westland:** *That is a pretty high assessed valuation. What are we doing in the State of Washington? Ours is way below that. Is it not?*

Mr. Hansen (another congressman, who had not said anything before): *Ours is way too low.*

**Mr. Westland:** *And you could issue bonds up to twenty percent of ninety percent of the market value of property, is that it?*

You can then, with the amendment, get loans, issue bonds up to 20% of 90% of the market value of property?

**Mr. Noguera:** *With the conditions*—with the condition—*that this are 1957 values*. With the condition that these are appraisable 1957 values. *And as time goes on, the percentage is not very realistic.* And as time goes on the percentage is not very realistic.

1961                    LEGISLATIVE ASSEMBLY (SENATE)                    241

**Mr. Westland:** *Because the market value increases, you assume? Because the market value increases, you assume?*

**Mr. Noguera:** That is correct. *That is correct.*

**Mr. Westland:** *Let me ask you this. Say there is a twenty years bond, what interest are you paying now?*

**Mr. Noguera:** *The last issue was paid 8.89%.*

**Mr. Westland:** *And that is a tax-exempt bond?*

**Mr. Noguera:** *A tax exempt bond.*

**Mr. Westland:** *Would it be a tax-exempt bond if I were to buy it?*

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Mr. Noguera:** *Yes sir.*

**Mr. Westland:** *That is a fairly high rate of interest, is it not, for a tax exempt security with the kind of credit that Puerto Rico has?*

**Mr. Noguera:** *In June it usually comes to about half a percent more.*

The Secretary of the Treasury was very honest in answering, without any subterfuge; in June it was yet another half a percent more. No, in June it generally increases by half a percent.

**Mr. Westland:** *How are your bonds rated? Double A, Triple A.*

**Mr. Noguera:** A.

**Mr. Westland:** *Well that does not sound too good, Mr. Noguera. If this resolution passes, and I am sure you have considered this part more than I and are far better qualified to consider it if an increase in your borrowing limit goes up to 20%, would you not get a corresponding increase in the [illegible] on your bonds?"*

**Mr. Noguera:** *"No sir, I do not think we will. I do not think we will because in the last issue, May and June, it was considered, explained and put into the papers given to the syndicate that there is plan [sic] to do just this that is being considered by this Committee and it did not have any effect."*

**Mr. Westland:** *"Is there any indenture of any of your present issues outstanding to the effect that you will not increase your debt ceiling during the life of the bonds?"*

Note the question: That limit, not the unlimited one, but the limit or the ceiling that Westland is asking about.

**Mr. Noguera:** *"No sir."* Not for the current bonds.

**Mr. Westland:** *"So then you have about one million nine assessed valuation and this would give you 380 million."*

**Mr. Noguera:** *"Three hundred eighty million."*

**Mr. Westland:** *"That is a little better than double, of course what you have now."*

**Mr. Noguera:** *"Yes."*

And he continues asking questions and then comes the answer concerning details that don't deal with the point we're trying to make but rather whether the people of Puerto Rico's good faith is being used and applied, concluding with, to keep this quote from being too long, the following words:

*"Just as a note of caution, may I say that you have done real well under this present set up and I can understand, as your economy grows, you will perhaps need more working capital, but it has been doing real good and do not through an increased borrowing limit and just putting that much more money in the back of your people of Puerto Rico spoil it." [sic]*

This is what Westland said before voting on the resolution and this is what several other congressmen said as well, especially another one, who is here towards the end, who expressed himself with a much greater degree of reluctance.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Aside from that declaration, Mr. President and Senate Colleagues, not another word was spoken in the public hearings concerning what the limit would be, except this from March 6, 1961. We're not dealing anymore with Resolutions number 24 and number 1302, no. This is a few months before coming to discuss this legislation and, when asked, the Secretary of the Treasury of Puerto Rico says that what he is evaluating is a 10% increase. And this representation tells you that if they want to approve the bill for us right now, not based on the 15% that was the transaction we were going to arrive at two years ago, but rather based on the 20%, that is, in order not to make the Secretary of the Treasury of Puerto Rico look bad, to defend the integrity of the highest-ranking official on matters of Puerto Rico's treasury, we would approve that amendment and you would be happy not only with today's 380-million limit, which is double, because right now we have a margin of 190 million, but also with the flexibility that we've already had in two ways: one, because of the increase that takes place every year in Puerto Rico's income; and two, because of the reduction that takes place as payments are made every year.

Is that clear, or not, Senate Colleagues? It's not 380 million, it's much more than 380 million. But also, the restrictions of the Federal Relations Act were based on the assessed property valuation and there was an inflexible limit based on the assessed valuation. This limit, as it has clearly and rightly described by our colleague Ortiz-Stella, has flexibility as its most valid factor. Yes, it's true, it's flexible in two ways and it's flexible, also, in a third way that has not been discussed, that instead of issuing bonds or signing promissory notes, levying the good faith of the people of Puerto Rico for ten years, this bill says 30 years, which means that those 380 million could be over 600 million if it's on a 20 year basis as an invariable rule and could be close to 900 million.

If I'm wrong it's exclusively in terms of what must be reduced for the interest payments, but it's accurate that mathematically a 100 thousand loan taken on a 10 year term could be 200 million on a 20 year term after the greatest interest is subtracted to bring it down to 190 or 186, because in the first years more interest has to be paid, but as each year passes, interests also automatically decrease because it's based on a balance after payments have been made, which is not the original debt.

So there is that flexibility as well, but now then, Senate Colleagues, we are not opposed to that flexibility either. We are telling you that we accept the 15% formula. You don't like it, you believe it's obsolete. We are with you in rendering tribute to that gentleman, that finance expert who tells us it's better for us to adopt that method even if it's new and because he is the one who deals with bondholders, well he is the one in charge of convincing them to continue buying bonds and in this we must be pragmatic.

We accept that method, but we accept it on the condition that it is not a blank check and we make our amendment and leave the alternative to you, first: you either introduce the 10%, which is the only thing mentioned to Congress that would be increased, and we won't oppose. Or make an increase based on the flexibility of the 15% availability, but we establish a ceiling, so they over there don't say "Well they've done what Guillermo-Rodríguez said they would. They've done it." They could very well say, God forbid, but they could say what Guillermo-Rodríguez said at the hearing from May 23, 1958. He said "Going above the law damages our credit. Authorities should not be created when the borrowing limit is based on that same property." In order words, they could very well say: "Well, they told us something and now it turns out they're doing something else."

And that something else is coming without the obsolescence argument having any weight behind it, colleague Cruz Ortiz-Stella. Why? Because that same method is in place for the municipalities. And it's there, in writing, in the very law. And then they say: "Ah, well that's going off on a tangent, so the credit is more, and more, and more." And then they'd think, where's the austerity? Where's the soundness

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my ability, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

of a method used by a people who have just been given the authority of establishing a limit, where is the self-control? It's nowhere. And that is what they could say and what they will likely say for the obvious reason that there is a report of which they have copies where it is stated that a highway department could be declared or established in a similar manner as one of the authorities, and that because the authorities' debts are not factored, then another amount could be taken for highways without needing that 10%. That is what the report from this Legislature says regarding when Senate Resolution Number 24 was being discussed, that it could be done but they didn't want to do so.

So, now they'll say: "Well the right thing has been done here but in a different way," circumventing the congressional provisions that has said: "Yes, of course, do it yourselves. But listen, be careful, use self-control, don't go overboard."

I don't want to overly exhaust your attention, though I could be presenting much greater and even stronger principles, but note that this thing about the ceiling isn't something just I came up with. Look at what the monthly letter from the First National City Bank says regarding the economic and commercial situation. The bank's President, of this First National City Bank, came and he's human, he's human and if they call him, they invite him, well he comes to testify, and he says:

"Yes, the method seems good. Scholars and [illegible] economists believe it's better, that it allows for greater flexibility."

That is all he says and that's what Francisco de Jesús, Vice President of the Chase Manhattan Bank said, but his brother, Roberto de Jesús, said: "I believe in this method and I think this method should also be used for municipalities, but I believe in clear limits."

That is what the President of Banco de Ponce said, who is the brother of the Chase Manhattan Bank's Vice President. But both for the First National City and Chase Manhattan, as well as Banco de Ponce, their representatives come

242                                      DAILY JOURNAL                                      September 5

and are asked to say something, and they said what we are saying here. That even though that is not new, as an expert says, we trust in the expert's words and we vote in favor of a new system being made, of a new system being established with the natural reservations that it is wrong, and so we change our vote so that exaggerations and excesses don't occur because of such an unlimited margin. But the very Bank, whose President came here not long ago in August, in the monthly letter from August, that same August—I think this is from a greater authority than the other thing. What does it say here? "Public Debt Limit." Note that this is now the national debt—and excuse me if I'm taking up your time, though it's not too long, it's very short.

"Insofar as the Administration requested only one temporary increase…"

That is, the Administration goes to Congress every year and says: "Look, the limit is being reached, increase it." And they ask Congress. But when the budgets are balanced as it happened, if I recall correctly, in 1954 or 1955, and some other year after that, when President Eisenhower presented balanced budgets with money left over, Congress lowered the limit, they raise it and lower it. The national system is established by law. So it is Congress which acts. And it says here:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

"The Administration only requested one temporary increase, the report from the Money and Credit Committee asked for the limit's approval in order to extend the breadth of the discretionary administrative authority exercised by the Executive Branch of the federal government.

I'm reading from page 88 of this report:

"The borrowing limit isn't restricted. In the long run, the debt increases or decreases as a result of the deficit or surplus in the federal budget, not because of any law that establishes an unchangeable limit."

Of course, why? Because of the flexibility of the income. And what happened? What happened here. We have gone over the borrowing limit here. Let's be clear. We've recently gone over because of some needs that the Authority had and because of that we passed that law giving 6 million to one of the Authorities and now, as our colleague Ortiz-Stella has so honestly put it, we are 3 million away from the debt margin. But that doesn't mean it's unchangeable. It has the flexibility afforded to it by growing income and property values. In fact, it's affected by the growing economy in general. Those are values, factors of the economy itself that work on their own and improve the situation day by day for a developing country. And then it says:

"The Committtee observed that the debt boundaries not only failed in their purpose of improving fiscal responsibility and reduce spending…

Note that not even with the limit was there a complete stop, instead they have restricted the Treasury's freedom in carrying out its administrative work. And then it says:

"… It has been common practice to limit the authority governments have to incur debt. As a reaction to past difficulties caused by excessive borrowing, the Constitution of almost all states prohibits or restricts borrowing, except through a constitutional amendment or referendum. This very fact makes it doubly important to control the federal government's borrowing limit if the value of the dollar is to be protected and if inflation caused by a lack of payments is to be avoided. Under the Federal Constitution, the government has the authority to print money. The first authority has been delegated to the Federal Reserve, which answers to Congress. The second, of borrowing money, has been delegated to the Executive Branch, with two main restrictions: the limit of the debt and the type of interest paid at 4.5% over bonds from the Treasury."

The United States Congress has never, never been willing to delegate this authority. The United States Congress has firmly maintained that there must be two limits, a limit to the debt and a limit to the type of interest.

So then, this same monthly letter says:

"During George M. Humphrey's time as Secretary of the Treasury, he was very much in favor of the idea of limiting the debt, saying: 'I think that it is very healthy to have that limiting factor that represents an actual borrowing limit for the Executive Branch, for Congress, and for everyone involved, and I think that it is equivalent to penetrating a safety barrier, an explosion occurs when it's crossed and that is how it should be. I approve of the general sense and I think that it prevents spending that goes beyond a fixed sum. I am therefore in favor of it.'"

And then the letter ends saying:

"When the borrowing limit is being debated, the Representatives and Senators, the newspaper editors, and citizens in general have the opportunity to stop and think of the damage that unchecked

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

federal spending causes, and said damage can be enormous, an erosion of the value of currency and of all future promises to pay and a tribulation that could stifle our effort to produce.

"The Congressional debate records do not feature many examples of how spending has increased in a way that has required the borrowing limit to be raised.

"One of the questions asked about increasing the limit a few years ago led to the comments made by Congressman Forester from Georgia, who said:

'Today is a somber day for the country. In the end, we find ourselves at a point that we should have all foreseen. Expenditures that disregard the future have led us to this situation. I wonder whether the President's request to increase the borrowing limit has restored some of our sobriety. It is evident that the country fell into a drunken stupor for a long time, but if we don't calm down now, things will get out of hand.'

And Senator Clinton P. Anderson, from New Mexico, stated:

"There were many people who noticed that we would have to increase the borrowing limit if we did not cut our spending. I think that the general attitude Senators had would have been different if Congress had been clear about cutting the bill or confronting the alternative of increasing the borrowing limit. Congress has often voted on and probably borrowed and perhaps disbursed sums smaller than the one requested by the Administration if it had no other option. The Treasury has surely found a way to sometimes surpass the legal limit."

So it hasn't been done here, or it was almost done, rather it was done in the Federal Treasury, but the First National City Bank basically claims, in an article published with its approval, that the role played by a clear limit is therefore more important than ever today because it discourages a tendency to move towards a greater deficit and a growing public debt.

This ends that document, and to conclude, I ask: what is more important, Senate colleagues, that the representatives from various banks, who will naturally present their point of view without going into more detail, but rather in a general sense, declare that they consider the method to be good—well, we also agree with the method's principles—or, what the Bank itself is officially saying to the Nation with its approval. It doesn't end here, where each of those banks, as is typical, has a certain degree of reluctance to new ideas because of their large deposits, but it's now officially the bank speaking to the whole Continent. What carries more weight? This clear limit is present in Hawaii in two forms: 60 million as a flat number and 15% of the national income. And we're here willing to accept an amendment, first: 150% and if necessary reaching 200. I think our position is very reasonable, I think we've established our position in a clear and final manner.

And I would like to reiterate one last time that the use of freedom isn't what we usually think it is. Freedom must be used with self-control. I believe that, in that manner, putting a definitive ceiling in place, of course, without harming the method's flexibility or formula, which we accept, we would succeed in moving towards progress.

I honestly believe that you are convinced that it hasn't been our goal, because of how liberal our acceptance is, to restrict the Government's resources. And it's the fifth time I say it, because I believe that I must emphasize this point to prevent erroneous interpretations.

And I'll finish by saying that I have here the study from the National Planning Association, and that this study is a thorough study, which has been accepted by the Government of Puerto Rico, and

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

which establishes that when methods like these are used, based on availability, on percentages of income, a reduction in taxes has been contemplated. So there is no possible argument that would lead us to not want taxes. Taxes are currently paid by everyone, big and small. Some pay some types of tax, and others pay others. No, on the contrary, the method you're approving and with which we accept in principle as a replacement for the method we would be accepting, is the one that you proposed to us two years ago; it establishes the premise for a reduction in taxes, whether they are reduced or not.

| 1961 | LEGISLATIVE ASSEMBLY (SENATE) | 243 |
|------|-------------------------------|-----|

Therefore, with our position being clear, establishing our attitude to some degree, we finish by asking that this bill, without those amendments, not be approved, because it will definitely harm Puerto Rico's economy, and hopefully that's not the case, but it might be. And constitutions are written, and laws are approved to have written guarantees, they wouldn't be written otherwise. It would be like in England, unwritten constitutions.

For those reasons, we have formulated our opposition to the bill if those amendments are not approved and we ask that you vote against the bill.

**Mr. Ortiz-Stella:** Mr. President, I'll briefly use my turn to speak to rectify in this long debate, and of course, this debate will conclude with my turn. I reiterate that I will be very brief.

I understand, as I've said, the Minority's intellectual position. They believe that the resolution, as written, does not establish a limit to the public debt. That is the reason behind proposing another limit, a ceiling. On this point, we are profoundly divided. I've already said and explained that the reasons why the Resolution, as written, limits the people of Puerto Rico's borrowing limit.

Now, I don't know whether I used the word obsolete with regard to calculating the borrowing limit based on a percentage of the assessed valuation, or if it was that upon reading the Governor's letter, the word obsolete was found there. But I want to clarify that. I want to say that, for us, it's unsuitable to measure the Commonwealth's borrowing limit based on a percentage of the assessed property valuation simply because what the property taxes produce amounts to six and a half or seven percent of Puerto Rico's total income.

For that reason, not being an economist, I believe that it's unrealistic and unsuitable that the Commonwealth's borrowing limit is calculated based on something that is seven percent of the Government's total income.

Now, why, and I think a contradiction in what I had said was being pointed out there, why not apply the same argument to municipalities? Well, simply due to the opposite. The largest source of income for municipalities is property tax, which, if I'm not mistaken, constitutes between 75 and 80% of the income received by municipalities. That is why, to calculate the borrowing limit for municipalities, we should use a percentage of the assessed property value, as it is proposed in the Resolution.

So there is no contradiction. It's unsuitable for the Commonwealth because the percentage of those taxes is insignificant. It's suitable for municipalities because that is that greatest source of income that municipalities have.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Our colleague García-Méndez referred to the words spoken by Mr. Roberto Jesús at a public hearing. Indeed, it is absolutely true that Mr. Roberto Jesús-Toro said he preferred that the Commonwealth's borrowing limit be calculated on the basis of a share of the income in proportion to the debt, which would be, and I don't know if this is accurate, would be, say, three times greater than the debt.

Now, I also recall what when one of the members of the Committee, I don't know if it was from Senate or the House, asked him, well, but do you believe that what you are suggesting is fundamental? He answered: No, this is something secondary. I will vote, if the Resolution is approved as it is, I will vote for it in the referendum. What I'm proposing is something secondary and not something fundamental.

So, he pointed this out to show that Mr. Roberto De Jesús did not give much importance to that formula being based on four times the income or three times the income.

In our colleague García-Méndez's last statement, it was said that the States have certain restrictions in their constitutions regarding taking on debt. I would like to point out the situation for the state of Florida. The constitution prohibits the state of Florida from incurring public debt. Now, why does this happen in the states? Why are they so extremely conservative about incurring debt? Simply because, in the states, contrary to what happens in Puerto Rico, there are special subdivisions, there are counties, school districts, highway districts, and all of those districts and subdivisions have the authority to issue bonds and incur debt. The state then doesn't have to do so. But does that exist in Puerto Rico? In Puerto Rico, the State is the one that issues bonds to fund public works, to build schools, to build roads, to build hospitals. Municipalities issue bonds for certain local matters. But for other matters, it's generally the Commonwealth that issues the bonds and incurs debt. It is not like that in the states.

I think that when I held the floor to speak, I pointed out the circumstances why, when the amendment is present, the Joint House Resolution, whose number I can't recall but it became Public Law 87-121. Why, in the hearings, Noguera expressed himself as our colleague García-Méndez said. I said it in my exposition, that, at the time, we were only thinking about what we had evaluated in the last term, that is, a method under which the debt margin would be the existing 10% and an additional 10% for education and for the construction of highways. That is why he said that's what we were thinking about: the existing 10%, plus 10% for schools and highways.

Well then, what if we think of something else later on? That is to say, just because two years ago we were thinking about 10 and 10, that means we can't change our mind? I pointed out the fact that, when this was already before the Senate, the Government of Puerto Rico was already concerned with finding another way to calculate the Commonwealth's borrowing limit and I read a paragraph by Governor Muñoz-Marín directed at the Chairman of the Senate's Subcommittee, Senator Jackson, in which the Governor tells him that he has tasked the Secretary of the Treasury and the Government Bank with looking into that and seeing what they find. So already at the time, which was June I believe, or July, already the Government was considering another formula for calculating the Commonwealth's borrowing limit, and those studies resulted in this formula, which it's not that it's just accepted by the local bankers, as it's been said here, I mean they accept it, but I believe they accept it out of intellectual honesty, because they believe that it is good for calculating the state's borrowing limit, but in addition to this, it's accepted by the people who purchase the bonds over there in the United States, who don't have to defer to the people of Puerto Rico. Bankers over there, the banking syndicates, the ones who buy bonds, those people have accepted that formula as something logical to measure the Commonwealth's borrowing capacity.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

I read, in my turn to speak, I read letters from distinguished officials from over there, from Chase Manhattan Bank, from the National City Bank, from the Chemical Trust Bank, etc. where they all state they're in favor of the formula, which is a realistic and suitable formula for calculating the Commonwealth's borrowing limit.

To conclude, I mean, we've read part of the hearing here, the one that took place in the House Subcommittee. And I, at least, at least I have gotten the impression that because what those people knew was that, at the time, we were considering a that the debt margin would be 10% plus an additional 10% of the property for education and highways, well that we could not move on from that, that any resolution we approve as an amendment to the Constitution to calculate the debt margin that isn't based on a percentage of the assessed property valuation would not be in line with what those people believed or were led to believe.

I have in my possession, and I regret that it's in English, and I'll have to read it in my very poor English, a letter from the law firm Arnold, Fortas, & Porter. The letter is dated August 24 of this year, and it's directed at Mr. Richard Petty, who was at the hearings, he did not testify, but he was at the hearings, that gentleman is an expert on the subject of bonds, he is a person who counsels banking syndicates on what the classification of bonds is. So that gentleman knows plenty about bonds, Mr. Petty.

This letter is directed to Mr. Petty.

**[Translator's Note: Italics are used in the text below to indicate the insertion of English text in the original.]**

*Richard Petty, Esquire, Mitchell, Pershing, Shetterly & Mitchell, 80 Broadway, New York 4, New York, Dear Mr. Petty:*

*You have requested that we consider the Concurrent Resolutions now before the Legislative Assembly of the Commonwealth of Puerto Rico to amend Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico by adding thereto limitation upon the authority of the Commonwealth of Puerto Rico to borrow money and guarantee obligations evidenced by bonds or notes. A copy of the text of the Concurrent Resolutions which was submitted to us is enclosed.*

*It is our opinion that the Concurrent Resolutions and the proposed amendment to the Constitution of the Commonwealth of Puerto Rico if duly adopted, fully comply with and meet the conditions of Public Law 87-121, approved by the President on August 8, 1961.*

*Further, it is our opinion that the proposed constitutional amendment is compatible and in conformity with existing*

244                                   DAILY JOURNAL                                   September 5

*provisions of the Constitution of the Commonwealth of Puerto Rico. In our opinion, if the Concurrent Resolutions are duly adopted by the Legislative Assembly of the Commonwealth of Puerto Rico and if the proposed constitutional amendment is ratified by a majority of the qualified electors of Puerto Rico, voting in a referendum conducted pursuant to Article VII, Section 1 of the Puerto Rican Constitution, the amendment will become effective as a part of that Constitution and will effect the complete repeal of the relevant provisions of Section 3 of the Puerto Rico Federal Relations Act. 19 Stat. 953, as amended. It is*

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*our opinion that the Constitution of the Commonwealth of Puerto Rico, as thus amended, will then contain the effective provisions applicable to the Commonwealth of Puerto Rico, in respect of the authority of the Commonwealth of Puerto Rico to borrow money and guarantee obligations evidenced by bonds or notes.*

The law firm, as I said, is Arnold, Fortas, and Porter, by Abe Fortas.

So here we have the opinion of a distinguished law firm that says that this concurrent resolution we've debated for six hours is already in line with Public Law number 87-121 approved by the President in August of this year. And that was all they had to say and I believe I've spoken too much this afternoon, at least more than I usual.

So, I'm going to ask Mr. President to approve the resolution.

**Mr. Colón-Velázquez:** Mr. President.

**Mr. President:** Mr. Senator Colón-Velázquez.

**Mr. Colón-Velázquez:** Before it is submitted to a vote, we will motion that the transcripts of the hearings held by the Special Joint Committee, as they have been written, be made part of the bill's file.

**Mr. García-Méndez:** No objection. Mr. President.

**Mr. President:** Mr. Senator García-Méndez.

**Mr. García-Méndez:** It is my understanding, if I'm not mistaken, that I was entitled to a short turn to rectify, because our colleague initiated the debate, and I answered, then he rectified, and I would then be entitled, but I won't use that turn.

I will, however, ask our colleague and the Senate, whose time I don't want to take up any further because of how late it is, to allow me to close this debate with two words that don't come from me but rather from a great mind of the written word.

**Mr. Ortiz-Stella:** I have no qualms about that, I'm try to please our colleague however I can. I mean, according to the Rules I had to close the debate, but our colleague wants to say some words and I have nothing against him saying them.

**Mr. García-Méndez:** Honestly, what's happening is that because it's really just been two reports, one from our colleague and one from me, well, naturally one wouldn't be able to talk and rectify in return. He'd have to wait for the other to talk to rectify and that's how it's always been done when it's just two. But that's academic, because all I'm going to do is say that I hope our position has been clearly understood, that I trust there haven't been any misinterpretations, that I believe that we've accomplished our mission, we've accomplished it by bringing attention to the fact that the price of freedom is eternal vigilance, and that we have been fulfilling our duty.

And to move on from that very dry subject that Cruz Ortiz-Stella, a great poet, and I, a terrible lecturer, have been debating, neither of us being great economists, I would like to read these closing words from a great artist of the written word, who is the great writer José Ortega y Gasset, two little paragraphs that express how nobody should stop exercising self-control and how everyone should focus their minds on what they should accomplish on their own instead of depending on the state.

In these two little paragraphs, Ortega y Gasset says:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

"This is the gravest danger that today threatens civilization: State intervention; the absorption of all spontaneous social effort by the State, that is to say, of spontaneous historical action, which in the long run sustains, nourishes, and impels human destinies. Such was the unfortunate fate of ancient civilization. No doubt the imperial State created by the Julii and the Claudii was an admirable machine, incomparably superior as a mere structure to the old republican State of the patrician families. But, by a curious coincidence, hardly had it reached full development when the social body began to decay. Already in the times of the Antonines (II Century), the State overbears society with its anti-vital supremacy. Society begins to be enslaved, to be unable to live except in the service of the State. All life is bureaucratized. What happens? The bureaucratization of life brings about its absolute decay in all orders. Wealth diminishes, births are few. Then the State, in order to attend to its own needs, forces on still more the bureaucratization of human existence. This is what State intervention leads to: the people are converted into fuel to feed the mere machine which is the State. The skeleton eats up the flesh around it. The scaffolding becomes the owner and tenant of the house."

To me, these words have a direct value and, by analogy, an indirect value, and it's that we must be careful, we must be vigilant, not just about staying within the limits of reasonableness and austerity in matters of the treasury, and even more in matters of the public debt, but also that parliamentary bodies must be careful not to cede its prerogatives more and more each day to administrative powers, that is to say, the Executive Branch.

This resolution, in the form we've approved, presents a delegation of authority to the administration, that is, to the Executive Branch of Puerto Rico, for 20 years because the legislature can intervene to approve or deny the issuances periodically brought before it, but margin established in the constitution, without giving the Legislature an opportunity to once again ask for an increase in the margin so it can be the subject of a referendum through popular vote, clearly represents a complete delegation of Legislative powers to the Executive Branch.

That is what the United States Congress has not wanted to do. That is what we have fundamentally attempted to prevent, aside from the fact that we would have also established a great austerity in this legislation. That is why I trust God to help prevent what is going to happen, but I believe that we have been able to put out a piece of legislation of which we can all be proud of and everyone contributed to.

I regret to announce that, for these reasons, and the ones that led to my report opposing the bill without our amendments, we will vote against the bill.

President (Mr. Fernández-Cerra): Before the Senate is a motion by Senator Colón-Velázquez in the sense that the transcripts of the public hearings held concerning this concurrent resolution form part of this concurrent resolution's legislative file.

We submit Senator Colón-Velázquez's motion to the Senate's vote. Is anyone opposed to Senator Colón-Velázquez's motion?

**Mr. García-Méndez:** If I'm not mistaken, we are voting…

President (Mr. Fernández-Cerra): No, no, the motion is regarding the transcription of the hearings forming part of the legislative file.

**Mr. García-Méndez:** There is no objection, but we would like to take this opportunity to express, and our colleague Ortiz-Stella is aware, that in the last meeting I requested that this record of the public hearings concerning the C. R. of C. 1302, which is the resolution that led to this bill, also be



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

included, and our colleague, Mr. Polanco-Abreu and the two floor-leaders from both bodies agreed. That is to say, they agreed to including it, but we had to leave the meeting we held in a hurry and there was no time to include it in the hearing. So we would like to ask, supporting our colleague, that the transcripts from the public hearing regarding the C. R. from C. 1302, from May 23, 1958, also be included.

**Mr. Colón-Velázquez:** Mr. President, colleague Ortiz-Stella informs me that it was an agreement in the Committee and we have no objections to also including it in the file.

**Mr. Reyes-Delgado:** Mr. President.

President (Mr. Fernández-Cerra): Mr. Senator Reyes-Delgado.

**Mr. Reyes-Delgado:** Because that record is not included in the different parts of the hearing's file we've been provided, until we can use it in the future, that additional record should be provided to each of the senators so that the file is complete as a reference.

**Mr. Ortiz-Stella:** Of course, Mr. President, we assume it would be that way because if it will be part of the file for the hearings, well that forms part of the hearings and must be given to each senator and each representative.

Submitted to a vote, Senator Colón-Velázquez's motion, amended by Senator García-Méndez, is approved.

1961        LEGISLATIVE ASSEMBLY (SENATE)        245

**Mr. Colón-Velázquez:** Mr. President the Resolution should be approved.

**Mr. García-Méndez:** To tell the President that it should be put to a vote without dividing the Senate, because it could be approved unanimously. There is objection. There should be a vote. For the purpose of the second reading, Mr. President, a voice vote should be held.

Submitted to a vote, Conc. R. of S. 3 is approved.

(It is made clear that during the consideration of Special Orders on the Day of the Conc. R. of the S. 3, Mr. Negrón-López, Mr. Dapena-Laguna, and Mr. Bauzá entered the Session Room; Mr. Muñoz-Rivera was called upon to preside and acted as President and was replaced by Mr. Fernández-Cerra).

**Mr. Ortiz-Toro:** Mr. President, due to the projection that this debate has had and how late it is, we will not make a presentation we planned to share, but we reserve the right to submit a Qualified Vote.

**Mr. Colón-Velázquez:** Mr. President.

President (Mr. Fernández-Cerra): Mr. Senator Colón-Velázquez.

**Mr. Colón-Velázquez:** In order to request the Senate's unanimous consent to consider the Final Approval Schedule for the Conc. R. of S. 3 and proceed to vote.

Submitted to vote, the Senator Colón-Velázquez's motion is unanimously approved.

### FINAL APPROVAL SCHEDULE

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The following concurrent resolution is considered to be in Final Approval, its number and title are as follows:

### Conc. R. of S. 3

"To propose amendments to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico."

Said Conc. R. of S. 3 is submitted to a vote with the following result:

### VOTE

Votes for:

Mr. Anselmi, Mr. Bauzá, Mr. Burgos, Mrs. Cabrera-de Ibarra, Mr. Carrasquillo, Mr. Colón-Velázquez, Mr. Dapena-Laguna, Mr. Fernández-Méndez, Mr. Fonfrias, Mr. Gaztabide-Arrillaga, Mr. Marcano, Mr. Muñoz-Rivera, Mr. Negrón-López, Mr. Ortiz-Stella, Mr. Palmer, Mr. Quiñones, Mr. Reyes-Delgado, Mr. Rivera-Colón, Mrs. Rodríguez-Mundo, Mr. Román-Benitez, Mr. Solá, Mr. Morales, and the President Pro Tempore, Mr. Fernández-Carra.

Votes Against:

Mr. Amadeo, Mr. Colón-Castaño, Mr. Espada, Mr. García-Méndez, Mr. Juliá, Mr. Ortiz-Toro, Mr. Quirós-Méndez, and Mr. Schmidt.

**Mr. García-Méndez:** No, and we offer a Qualified Vote to add to the record.

**Mr. Ortiz-Toro:** No, and we reiterate what we said a moment ago, that we will submit a Qualified Vote for the record.

Mr. Quiñones is presiding:

**Mr. President:** The Sergeant-at-Arms indicates to the Senators, and the President also indicates to everyone present, that the session is not adjourned and that the Senators must remain on the floor until the session is adjourned or suspended and the Sergeant-at-Arms shall distribute employees under his supervision to have this message reach each one of the absent Senators.

**Mr. Colón-Velázquez:** Mr. President.

**Mr. President:** Mr. Senator Colón-Velázquez.

**Mr. Colón-Velázquez:** To propose a recess until tonight at ten.

**Mr. President:** Before voting on the motion for recess, the President wishes to indicate to the Senators that everyone's presence is required here at ten in the evening. If some are late to arrive, that means the session could be unnecessarily prolonged. It would likely not last long past ten provided we are all here, but because it is absolutely necessary to hold this session at ten, we ask all Senators to be here at ten.

RECESS

Through Mr. Colón-Velázquez's motion, the Senate declares itself in recess until tonight at 10:00 P.M.

At ten in the evening, the Senate continues its work with Mr. Rivera-Colón presiding.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Mr. Ortiz-Stella:** Mr. President.

President (Mr. Rivera-Colón): Mr. Senator Ortiz-Stella.

**Mr. Ortiz-Stella:** To propose that we return to the Communication of the Legislative Process.

## LEGISLATIVE PROCESS COMMUNICATIONS

The Secretary informs that the House of Representatives returns the following concurrent resolution approved without any amendments:

### Conc. R. of S. 3

"To propose amendments to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico"

### RECESS

Through Mr. Colón-Velázquez's motion, the Senate declares itself in recess until tomorrow, Wednesday September 6 of this month at 12:00 noon.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## HOUSE OF REPRESENTATIVES

(September 5, 1961)

At nine in the morning, the House meets with Ms. González-Chapel presiding, who announces that she has been designated to open this session.

## ATTENDANCE

Mr.:
Alvarado
Alvarez-Costa
Mrs.:
Arco-de Franklin
Mr.:
Báes
Borges-López
Cabranes
Canales
Cancel-Ríos
Castaño
Cole
Collazo
Concepción-de Gracia
Cordero
Dominguez
Figueroa-Carreras
Figueroa-Rodríguez
Fonseca-Jiménez
Font-Saldaña
Gandia
Ms.:
González-Chapel
Mr.:
González-González
Iglesias-Silva
Meléndez-Báez
Meléndez-Carreras
Méndez
Milán-Padró
Miranda-Rivera
Mojica-Marrero
Morales-Otero
Muñiz-Ramos
Náter-Pabón
Ortiz-Noriega
Ortiz-Ortiz

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Otero-Boseo
Pagán-Collazo
Polanco-Abreu
Ramos-Antonini
Ramos-Barreto
Ramos-Barroso
Ramos-Rodríguez
Reyes-Rivera
Rivera-Morales
Rivera-Ramos
Rivera-Santiago
Robledo
Roig-Vélez
Salas-Quintero
Sánchez-Cappa
Sánchez-Martínez
Sánchez-Pérez
Santana
Mrs.:
Solá-de Pereira
Mr:
Torres-Gómez
Torres-Medina
Torres-Santos
Vargas-Rodríguez
Vázquez-Vélez
Velázquez
Vélez-González
Viera-Morales
Westerband
Zayas-Aponte
Zorrilla
Mrs.:
González-Chapel, Speaker Pro Tempore
There being a quorum, the session is declared open.

## MINUTES

Ms. President: The minute from the previous session has not arrived.

## EXCUSED

The Secretary announces that Mr. Bacó-Passarel requested that his absence from today's session be excused and it is so ordered by the Speakership.

## SPECIAL COMMITTEES REPORTS

From the Special Committee assigned to study and consider the Concurrent House Resolution Number 5, recommending its approval without amendments.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## MESSAGES

The Secretary acknowledges the following messages:

From the Secretary of the Senate, informing the House of Representatives that the President of the Senate has signed the Senate's Concurrent Resolution 309 and requests the same of the Speaker of the House.

## SPECIAL ORDER OF BUSINESS FOR THE DAY

Being the only matter on the Schedule, the Secretary reads the Conc. R. from C. 5, as follows:

"To propose amendments to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

**Be it resolved by the Legislative Assembly of Puerto Rico:**

Article 1.—A proposal is made to amend Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico so that it reads as follows:

"Section 2.— The power of the Commonwealth of Puerto Rico to levy and collect taxes and authorize municipalities to levy and collect shall be exercised as provided by the Legislature, and will never be relinquished or suspended. The power of the Commonwealth of Puerto Rico to undertake and authorize debts will be exercised as provided by the Legislature but not for direct obligations of the Commonwealth of Puerto Rico for funds directly borrowed by the Commonwealth of Puerto Rico evidenced by bonds or promissory notes for the payment of which the good faith and credit and the power to levy taxes of the Commonwealth of Puerto Rico were pledged shall be issued by the Commonwealth of Puerto Rico if the total of (i) the amount of the principal and interest of such bonds and promissory notes, along with the amount of the principal and interest on the total amount of the bonds and promissory notes issued up to such time by the Commonwealth of Puerto Rico in circulation and payable in any fiscal year and (ii) any amounts paid by the Commonwealth of Puerto Rico in the immediately preceding fiscal year for interest and principal on any obligations evidenced by bonds or promissory notes secured by the Commonwealth of Puerto Rico were to exceed 15 percent of the total amount of revenue obtained according to the laws of the Commonwealth of Puerto Rico and deposited in the Treasury of Puerto Rico in the fiscal year immediately preceding the current fiscal year, and none of such bonds and promissory notes issued by the Commonwealth of Puerto Rico for any purpose other than housing will mature after a term of thirty years from the date of their issue and no bond or promissory note issued for housing will mature later than in 40 years after the date of issue; and the Commonwealth of Puerto Rico will not guarantee any obligation secured by bonds and promissory notes if the total amount owed in any fiscal year for principal and interest on the total amount of such direct obligations issued up to that time by the Commonwealth of Puerto Rico and in circulation and the amounts referred to in subsection (ii) were to exceed fifteen percent (15%) of such total revenue.

The Legislature will set the limits for the issue of direct obligations by any municipality of Puerto Rico for money that is directly borrowed by such municipality as evidenced by bonds or promissory notes, for the payment of which the good faith, credit and power to levy taxes of such municipality were pledged, and it is further provided, however, that no such bonds and promissory notes issued by any municipality shall be for an amount, which along for the total amount of bonds and promissory notes issued by the municipality up to that time and in circulation shall exceed the percentage set by the Legislature, which shall be no less than five (5) percent nor more than ten (10) percent of the total appraised value of the property located in that municipality.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Demand may be made of the Secretary of the Treasury to assign available resources, including the surplus from the payment of interest on the public debt and any amortization thereof to which Section 8 of this Article Vi may be applicable, by any holder of bonds or promissory notes issued as evidence of such."

Article 2.—This amendment will come into effect upon being ratified by a majority of electors who vote in a referendum held for this purpose."

The Secretary acknowledges a report from the Special Committee on the Conc. R. from C. 5.

Said report reads as follows:

"To the House of Representatives:

The Special Committee assigned to study and consider the Concurrent House Resolution Number 5 is honored to report this High Body that it recommends its approval without amendments.

Our Committee held public hearings, in cooperation with the Special Committees designated by the Senate of Puerto Rico, on August 21, 22, 23, 24, 25, 28, and 29 of 1961. In these hearings,

| 1961 | LEGISLATIVE ASSEMBLY (HOUSE) | 247 |

statements were given by Mr. José Ramón-Noguera, Secretary of the Treasury; Rafael Picó, President of the Government Development Bank; Mr. Francis Bowen, first Vice-President of said Bank; Mr. Ramón García-Santiago, President of the Planning Committee; Mr. Rodolfo Aponte, Vice-President of Banco Popular; Mr. Esteban Bird, Executive Vice-President of Banco de Crédito y Ahorro Ponceño, who also testified on behalf of the Bankers Association; Mr. César Vizcarrondo, and Sol L. Descartes, who appeared on behalf of the Puerto Rican Chamber of Commerce; Mr. Webster Pullen, Vice-President of the First National City Bank of New York, in charge of Puerto Rican affairs; Mr. Roberto de Jesús, President of Banco de Ponce; Mr. Francisco de Jesús, Vice-President of Chase Manhattan Bank in Puerto Rico; Mr. Leandro Cabranes, Executive Director of the Mayors Association of Puerto Rico; Mr. Emiliano Pol, Certified Public Accountant; and Mr. Juan Díaz-de Andino, appearing as a private citizen. The committee also had before it memorandums written by Mr. José Ramón-Noguera, Secretary of the Treasury; from Dr. Rafael Picó, President of the Government Development Bank for Puerto Rico; from Mr. Francis Bowen, first Vice-President of said Bank; and from Mr. Ramón García-Santiago, Chairman of the Puerto Rican Planning Committee.

Both the aforementioned public officials and the private citizens who appeared before the Committee representing the related institutions or on a personal capacity, with the exception of Mr. Díaz-de Andino, favored the principle involved in the constitutional amendment being considered regarding the establishing the Commonwealth of Puerto Rico's borrowing limit based on the Government's income instead of the current system, which is based on a percentage of the assessed valuation of property.

Through Concurrent Resolution Number 1 of June 23, 1958, the Legislative Assembly of Puerto Rico asked the United States Congress to suppress provisions in Section 3 of the Federal Relations Act concerning the establishment of a borrowing limit for the Commonwealth of Puerto Rico and its Municipalities.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

In line with said request, the United States Congress approve Public Law 87-121, which was sanctioned by the President on August 3 of this year. This law provides for the suppression of the following language in Section 3 of the Federal Relations Act with Puerto Rico:

"'*Provided, however*, That no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," and "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted."

Said federal statute also states that its provisions shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include said provisions in the Commonwealth's constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities, as proposed in the concurrent resolution approved by the Legislative assembly.

Senate Concurrent Resolution Number 3 and House Concurrent Resolution Number 5, which are identical and are now being considered by the Legislative Assembly, contain provisions to fully and precisely comply with United States Congress Public Law 87-121. Upon being approved by the Legislative Assembly and the qualified electors of Puerto Rico in a referendum, it will suppress the Federal Relations Act provisions described above and include in our Constitution suitable provisions establishing the borrowing capacity of the Commonwealth of Puerto Rico and its Municipalities.

Currently, under the provisions of the Federal Relations Act, the debt limit of the Commonwealth and the municipalities of San Juan, Ponce, Mayagüez, and Arecibo is established to be 10 percent of the assessed valuation of property, and it is 5 percent of that valuation for the rest of the municipalities. This formula, although flexible because the debt limit will change as property values increase, is no longer suitable means of managing the public debt in light of the great economic boom Puerto Rico has experienced in recent years and the related need to offer more and better public services to the people of Puerto Rico.

The need to expand Puerto Rico's debt margin becomes extremely evident when we are confronted with the fact that, as of July 31, 1961, the Commonwealth has an available debt margin of only around $3,000,000. Being aware of that situation, which was foreseen a few years ago, the Concurrent Resolutions being considered by the Legislative Assembly feature provisions that that would be included in our Constitution, setting the debt margin of the Commonwealth of Puerto Rico and its Municipalities in a more flexible, realistic way, and in line with sound economic principles. The proposed provisions set the Commonwealth's debt margin based on revenue collected by the Government from internal sources during the previous fiscal year at the time a given debt is incurred. Income collected from federal contributions, customs duties, and freight excise taxes is not included because these sources of public revenue are not controlled by the Legislative Assembly of Puerto Rico. This makes the formula more conservative because said sources of revenue can also be used to pay the debt.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The limit is set in terms of requirements to pay highest principal or interest on any given maturity date of an existing, plus the obligation currently being considered for approval, in addition to any payments the State has had to make during the previous fiscal year for bonds issued by public agencies or corporations and guaranteed by the State. When said payment requirements plus the amount the Government has had to pay for guaranteed bonds reaches 15 percent of the state's revenue during the previous fiscal year, the Government will not be able to incur further direct obligations and will not be able to guarantee any bonds from public institutions. For example, assuming that the Government's revenues during the fiscal year immediately preceding the year when they intend to sell certain amount of authorized bonds stands at $200 million, 15 percent of that amount would be $30 million. Assuming that the requirement for higher principal and interest payments in the lifetime of existing bonds is $15 million, an additional $15 million would remain cover the required yearly payments of future obligations.

It is therefore evident that, using the proposed formula, the debt limit is expressed in terms of the amount of money available to pay the debt, in place of expressing it as it currently is, in terms of the total amount of money that can be borrowed at any given time. Under the law's current provisions, the debt margin is approximately $190 million, that is to say, 10 percent of the assessed valuation of property, which is approximately $1.9 billion.

If we wanted to make this debt margin of $30 million (15 percent of $200 million in revenue) a more or less fixed figure, we could calculate it historically based on the average type of interest and the expiration pattern of the existing debt, or if a more exact basis is preferred, we could use the expiration pattern and the average interest paid on the most recently issued bonds. Based on the bonds most recently issued in the Commonwealth, sold at $40 million in march of this year, and using an expiration pattern of twenty years as a maximum and an annual interest rate of 4%, we could say that the Government's current available debt margin is $212.4 million, with an available revenue of $204 million for the 1960-61 fiscal year. When making this calculation, we assume there will be a margin of $15 million available to take on new obligations, and that remaining 15% of the $204 million (over $15 million) would already be committed to the payment of the principal or interest of current bonds.

We would like to emphasize, however, that we use these examples for the sole purpose of

248                                    DAILY JOURNAL                                    September 5

demonstrating how the mechanisms of the formula proposed in the constitutional amendment under consideration would work in practice. The actual limit will depend on the capacity to repay the borrowed money, expressed in terms of a fixed percentage (15 percent) of the annual revenue available for the payment of principal and interest on direct obligations issued by the State. Once the amount represented by said percentage is committed to the yearly payment of the debt evidenced by bonds and promissory notes issued directly by the State, the debt limit will be depleted.

As is evident in this analysis, the formula proposed to set the State's debt margin is more flexible and realistic than the one currently being used. It is based on the Government's available resources, which is the true source of the funds used to pay for the State's obligations, and not a percentage of the assessed valuation of property, which is not a real indication of its ability to pay. It should be noted that the proposed formula is actually in line with Section 8 of Article VI of our Constitution, which essentially states that the resources available to the State will be first used to pay interests and reduce the public debt. Even though we currently used property taxes to pay for the public debt, the truth is that said

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

constitutional provision states that all of the Government's resources are committed to said purpose. What is produced by property taxes currently represents only 7 percent of the Government's revenue.

Under the current system, the debt margin increases as the property valuation increases. These factors are not necessarily under the Legislative Assembly's control. However, under the proposed formula, the Legislative Assembly will have full control over the debt margin.

The principle behind the proposed formula of setting the debt margin based on a percentage of the State's available resources may seem new in terms of our fiscal public policies, but it has been used for quite some time to authorize the issuance of bonds by public and private corporations. In general, the capacity to issue this type of bond is based on a percentage of the revenues, or on the payment requirements of said corporation's debts. In addition, the states of Connecticut and Mississippi have recently adopted legislation fixing the State's debt limit based on a percentage of its revenue. Although the system used in said states doesn't involve the same formula proposed in the constitutional amendment under consideration, it does, however, follow the general principle of comparing the public debt with the Government's revenue.

When discussing bonds, it should be clarified that the bonds that have been and will be issued by the Commonwealth of Puerto Rico's public corporations will not take into account the State's debt margin because the people of Puerto Rico's good faith isn't committed to their payment and they would continue to be paid only with the revenue collected by said corporations. The amount paid for such bonds would only be counted against the Commonwealth's debt margin if the Commonwealth were to guarantee one of those bonds, which is something is has yet to do, and if it had to pay an outstanding balance for them on a certain year.

The proposed constitutional amendment limits the public debt to the Commonwealth's debts that are only evidenced by bonds and promissory notes issued directly by the Commonwealth. What is referred to as a bond or promissory note is a classic and negotiable obligation sold on the United States securities market. That does not include the Commonwealth's current or contingent obligations or debts incurred in order to maintain the Government's normal operations. The language used in the amendment clarifies the rule that has been used up to this point.

The proposed amendment and the Constitution would not affect the credit and sale of the Commonwealth of Puerto Rico's bonds in any way. On the contrary, a survey carried out by the Secretary of the Treasury and the President of the Government Development Bank for Puerto Rico in the United States securities market in which prominent banking entities participated revealed that the proposed formula would not only has their approval, but would also, in their opinion, improve the credit and desirability of Puerto Rican bonds. Puerto Rico's good credit in the United States Securities Market is primarily based on its promptness in paying its obligations, in the good judgment it has exercised in incurring public debt, and in not using deception to circumvent the limitations imposed upon it. There are interesting testimonies on file from different North American personalities who frankly and openly endorse the proposed constitutional amendment. There hasn't been a single major source of credit Puerto Rico uses to sell its bonds that has declared its opposition to the new formula. Some of them believe that it presents an opportunity for Puerto Rico to make a valuable contribution in the field of political-fiscal science with the approval of this amendment.

Another provision of the proposed constitutional amendment that is expected to substantially improve the sale and rating of Puerto Rico's bonds is the one allows bondholders to sue the Commonwealth for nonpayment of the debt. This provision backs what is stated in Section 8, Article VI, which commits the Government's revenue to the payment of the public debt's interests and principal. The

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

State of New York, as well as other states in the Union, have analogous provisions in their Constitutions. It renounces the immunity the State has from being sued, which would result in a better rating and acceptance of our obligations.

Concerning municipalities, the constitutional amendment provides that the same method currently being used under the Federal Relations Act with Puerto Rico will continue to be used to set their debt margin. The only difference is that, in place of setting a limit of 10 percent of the assessed valuation of property for the municipalities of San Juan, Ponce, Mayagüez, and Arecibo, and 5 percent for the rest of the municipalities, in general terms it is stated that the Legislation will set the debt limits, which will be no less than 5 percent and no greater than 10 percent. Naturally, it would be possible to set it anywhere between 5 and 10 percent.

The intent is to use the assessed valuation of all property in the various districts, aside from those that are tax exempt. When calculating the debt margin for municipalities, we will, however, include the assessed valuation of properties that are used as homes by their owners and those that, through legislative action, have had or will have their taxes reduced until the assessed valuation is determined. A distinction is made between properties that are completely tax exempt and those used by their owners as homes because the latter must be kept in the list of taxable properties since taxes must be paid for them should their assessed value surpass the exempt amount, and because if it is no longer used as a home, the owner must once again pay taxes. There is another reason for including this type of property when calculating the debt margin for municipalities, and it is the fact that they will not experience a reduction in the taxes they collect from properties used as homes as a result of the legislation because the Legislative Assembly has taken steps to reimburse municipalities the amount they no longer receive as a result of such a reduction.

This type of property would be taxable in the future, should the Legislative Assembly decide it is advisable and necessary to repay the public debt.

The Special Committee recommends the approval of this measure because it believes it to be vital to the economic development of our People.

Respectfully submitted,

**Mario Canales,**
Secretary.

**Santiago Polanco-Abreu,**
President.

**Mr. Alvarado:** Ms. Speaker.

**Ms. Speaker:** Mr. Representative.

**Mr. Alvarado:** I would like to inform our colleagues and the Speaker that the Minority and the Majority have entered into a stipulation of the Rules to govern the debate regarding this measure that is under our consideration. The Rules we have agreed upon and that we now wish to submit for the House's approval are as follows: Each one of the two Parties represented here will have four hours for this debate; a total of eight hours. During the time that corresponds to each Party, they must make amendments and ask questions

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

as they deem necessary, and the time used on amendments and questions will be attributed to the party producing them. In the case of questions, it is stipulated that the time required to answer them is to be included. The debate must be closed by the Majority, that is, by the party that approves of the proposal, with a guaranteed fifteen-minute turn for closing included in its four-hour quota. Broadly speaking, those are the fundamental terms that have been stipulated.

(Mr. Ramos-Antonini assumes the Speakership)

**Mr. Figueroa-Carreras:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Figueroa-Carreras:** It should be understood, Mr. Speaker… to clarify certain statements… it should be understood that, within the time each Party is allotted, each Party may use it as it sees fit…

**Mr. Alvarado:** Yes.

**Mr. Figueroa-Carreras:** … one person would be able to speak once, or twice, or three, or seven times if he or she can. So in that case, the parliamentary provision that states they cannot speak for more than one hour does not apply, it's based on time; what a Party cannot do is exceed the four hours being timed…

**Mr. Alvarado:** That's right. A Representative would be able to speak more than once as opposed to what is stated in the Rules. We submit the Rules to the House's consideration and we request their approval.

**Mr. Speaker:** Any objections?

(The Rules are submitted to a vote and they are approved unanimously.)

**Mr. Speaker:** Approved. It seems as though it should have been established late tonight, even though it's out of the ordinary, that the final list distribution should take place when the House was assembling.

**Mr. Alvarado:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Alvarado:** Our colleague Santiago Polanco-Abreu will be opening the debate on behalf of the Majority.

**Mr. Speaker:** Go ahead.

**Mr. Figueroa-Carreras:** Mr. Speaker

**Mr. Speaker:** Mr. Representative.

**Mr. Figueroa-Carreras:** To expand upon the Speaker's criteria, we could say the following: that we have thought to raise, either ourselves or through some of our colleagues, the issue of the quorum because we do not believe it is appropriate to discuss something as important, transcendental, and of such connotation with empty seats.

**Mr. Speaker:** And the Speaker would like to say to Mr. Representative that the Speaker will welcome suggestions concerning a lack of quorum at any time or as many times as is justified.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Mr. Figueroa-Carreras:** Thank you, Mr. Speaker.

**Mr. Speaker:** Go on.

**Mr. Polanco-Abreu:** Mr. Speaker, colleagues of the House.

**Mr. Speaker:** Mr. Representative.

**Mr. Polanco-Abreu:** I have had the honor, on many occasions, of being responsible for informing this House on bills, joint resolutions, and concurrent resolutions of great importance. This morning we have initiated what is, apparently, a long debate, and I once again have the honor of defending a measure that would have a substantial political and economic impact on our people. And I am honored to be able to participate—and I'll thank God for that just in case, and I hope this isn't the last time—in this debate about which I have heard comments that it is a very technical subject where one must deal with numbers, percentages, statistics, but which I would like to confront because I assure you in the most solemn manner, in the most emphatic manner, that behind any technical aspects this legislative measure may have, lies Puerto Rico's fate in terms of its healthcare, housing, education, and many other services that are vital for the people of Puerto Rico to continue to progress towards a level of civilization in which in every corner of our land, no matter how remote and isolated it is, the word democracy isn't just that beautiful abstraction from the 19th century but also the human and social reality. As I address my Colleagues this morning, I am aware that whatever this Legislation does, what each of the legislators individually does here should be supported by the people of Puerto Rico. Should the people of Puerto Rico not do so…

**Mr. Figueroa-Carreras:** Interruption. Colleague, if you'll allow me; sorry for interrupting you.

**Mr. Polanco-Abreu:** It's not trouble at all, Doctor.

**Mr. Figueroa-Carreras:** Mr. Speaker, I would like to ask a question. I would like to know if the time being invested is being tracked.

**Mr. Speaker:** It is being tracked.

**Mr. Figueroa-Carreras:** Well, that's all. Thank you.

**Mr. Polanco-Abreu:** Should the people of Puerto Rico, should the qualified electors of Puerto Rico refuse to support this legislative measure, it will not take effect. That alone gives shows a facet, an aspect of how transcendental the approval of this legislative measure is. Transferring the provisions concerning the Commonwealth's borrowing capacity from the Federal Relations Act to its Constitution, allow me to share a brief story—I repeat, brief—of a historic nature concerning the manner in which Puerto Rico's borrowing capacity has been established in the past.

Upon the approval of the Foraker Act of 1900, the United States Congress set the borrowing capacity for Puerto Rico and its municipalities at 7 percent of the assessed valuation of their properties. In 1921, in subsequent amendments, said margin was modified and the State Government had 10 percent of the assessed valuation of its property as its borrowing capacity while municipalities had 5 percent of the assessed valuation of their properties, with the exception of San Juan, Ponce, Mayagüez, and Arecibo, for which the limit was set at 10 percent.

I reiterate, transferring the provisions concerning borrowing capacity from the Relations Act to the Constitution has two essential facets: One, of a purely political capacity. I believe that there should be no disagreement concerning what the People of Puerto Rico setting their own debt margin in the

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Constitution represents in terms of self-governance. It's certain that, from my point of view, each and every Puerto Rican should work to ensure that the People of Puerto Rico approve this Resolution. Of course, it also represents growth for the Commonwealth, as well as new tools in the hands of Puerto Ricans so that our country, Puerto Rico, can function economically with all of the responsibility imposed upon it by Puerto Ricans.

I'm not worried about putting too much emphasis on this aspect, because I believe—I'll repeat—that what this new step in conquering essential attributes represents for Puerto Rico's life, for our people's lives, should be in the spirits and minds and hearts of all Puerto Ricans.

Now, there are economic aspects, which is the second facet, as I see it, upon which I should expand because therein lie the technical matters, therein lie the seemingly cold matters that emanate data and statistics that I want to translate, at least in this forum, perhaps the highest forum in Puerto Rico's history, to terms of justice, of social impact, of services for our people. You have already read the Special Committee's report. For the first time, we will establish whether this measure should be approved by this Assembly, whether the Commonwealth Government's debt limit should be set that so that its payments on interests and principals does not exceed 15 percent of the Government's revenue in the previous fiscal year. What does that mean? Well, first: That we will discard the method of setting the borrowing capacity based on the assessed valuation of property. That we will incorporate in our Constitution a new way of confronting a reality. It relies on the people of Puerto Rico's ability to pay. It does not rely on what value property has at a given time, instead it relies on revenue generated in the previous fiscal year through taxes set by Puerto Rico's legislative assembly. I want to emphasize this fact, because I want to drive into the minds and attention of my Colleagues that this formula does not include aid received from the Government of the United States, nor does it include revenue from excise fright taxes or customs duties. These last three sources I've mentioned represent an additional guarantee of having sufficient resources to handle all of the debts incurred by the People of Puerto Rico. But that provision stating that the Government's debt limit is to be set based on a percentage of its revenue in the previous fiscal year also represents a conquest for Puerto Rico's legislature because we have depended on the assessed valuation of property and that valuation has not been under the direct control of the Legislation, because it can be done year after year through an official from the Executive Branch, whereas by using the new method, the Legislature is in charge of

determining the previous year's revenue through sources of revenue stemming from Puerto Rico's legislation, Puerto Rico's legislature will thereby have in its hands all the decisions when bonds or obligations are issued on behalf of the People of Puerto Rico.

Now, this provision has an additional aspect that I want to highlight before my House Colleagues. Note that the language used in the Resolution states that the public debt shall be comprised of or shall include the direct obligations of the Commonwealth of Puerto Rico, plus any amounts that the Commonwealth of Puerto Rico may have to pay, which is known as "default," on behalf of any of the public authorities they have guaranteed.

I believe, my House Colleagues, that the old borrowing capacity system based on the property valuation did not represent the true reality of Puerto Rico's economic capacity, because the revenues of the Commonwealth of Puerto Rico from property taxes represent, at this time, 7 percent of the Government of Puerto Rico's total collections. And, under said provision, we were required to borrow

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

based on the property's valuation. That was unrealistic, since the Government of Puerto Rico has other sources of income to guarantee its ability to properly meet its obligations, which turns out to be 93 percent of its total collections. And it seems to me that the new method, the one we suggest that be adopted as policy, is more realistic. The public debt will depend on the ability to pay. The ability to pay is based on the State's total revenues. You can tell me that it will require increased oversight from each of my House Colleagues, and from each of the Senators and the Executive Branch, when new bonds are issued. And I think it must be so, and I think it is a good thing, because it means adding new responsibilities to ourselves, new responsibilities that will require increased oversight of everything related to dealing with the public debt.

I am not worried that it could be argued that it is something new, that it does not exist in the United States, except in States where the borrowing capacity is directly related to the ability to deal [with the debt], that is, the income from previous years. One of the arguments that I believe we should take to the People of Puerto Rico when visiting the cities, and the towns, and the wards, and the areas, is precisely that this legislation marks a new milestone in this creative endeavor that this generation has set for itself to bring happiness to the people of Puerto Rico. We cannot be compromising based on procedures. We need to create new ways to deal with the Puerto Rican reality, which is unique, because we are this lost little island on the Atlantic with a 3,600-mile area and 2,350,000 inhabitants who, day by day, benefiting from the political and democratic education, demand more services, and they are entitled to do so, and when we are demanded [these services], we should be proud that our people is no longer in the lethargic state mentioned by Pedreira in his book "Insularismo." And this is a new way. Now, things are not done out of vanity or on a whim. Would Puerto Rico's good credit be at risk with this new way of facing its borrowing capacity? We could state, almost categorically, that it would not be, but my word would not be of great significance. But that statement is sustained by numerous authorities in the sale of bonds in the U.S. market. They are all included in the record's transcription. I point out that there is not a single opinion against it, not a single opinion of the U.S. market that has objected the new way of imposing or developing the loan margin. Check the history of this Resolution. Check the existing correspondence and you will see there is no single one. On the contrary, specialized technicians state that it is a new, realistic way to face the issue.

Now, I have talked to you about what we could define as the number one aspect of the Resolution; on the brief analysis I am trying to make of the Resolution.

The second aspect is related to the municipalities of Puerto Rico. The second aspect has to do with the borrowing capacity of the municipalities of Puerto Rico, and the Resolution provides that the Legislative Assembly shall set the debt limit of any municipality within a range of five to ten percent of the appraised property value in said municipality. Note that while we are using the financial resources from the previous year for the purposes of the State's borrowing capacity, with a fifteen percent limit, in the case of the municipalities we keep the assessed property value rule. The explanation is simple. Property tax is still the main source of revenue for the municipalities of Puerto Rico, and that is why we believe it is advisable for the Legislative Assembly to use the appraised property value as basis to set the borrowing capacity of each municipality, but we have laid down minimum and maximum limits; five and ten, which will allow, and perhaps require, the Legislative Assembly to conduct a specific study of each municipality to determine their capacity at a given time.

I have not overlooked the reality of a town such as Bayamón, for example, which has grown significantly, and it might not be advisable or useful for it to have a five percent margin; but in any case, or either way, it will always be up to the Legislative Assembly to determine the borrowing capacity of each municipality. If time permits, I will be referring again to this issue of the municipalities later.

I have already covered two essential aspects of the Resolution. I now move to the third aspect, which is the one setting the maximum maturity term of the bonds or notes issued by the Commonwealth of Puerto Rico, and limits it to thirty years, except for bonds or notes issued for housing purposes, which

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

may have up to 40 years maturity. This aspect has also been reviewed, analyzed, and studied by experts on the field, and they all consider that the time limits we have set are convenient.

Moreover, it has been said that the Resolution is conservative, setting these maturities. It is always good to set a term. Given that a restriction or limitation in the Constitution is, after all, a restriction or limitation of the Legislative and Executive power, it is a good thing to have a minimum or a maximum both for the emission of current income bonds and for those issued for housing purposes. We believe it is advisable to take forty years, to take forty years as basis or as limit in the case of housing, because of what this problem of public housing represents, the need to provide all Puerto Rican's with shelter, with a home.

Lastly, the Bill calls for the ability to sue the Secretary of State, the Secretary of Treasury, if the provisions of the corresponding section of the Constitution are not met. I would summarize this fourth aspect as an anticipated waiver of the Commonwealth of Puerto Rico of its immunity from lawsuits. It is common knowledge that the State has immunity, an immunity which has been waived up to the sum of fifteen thousand dollars in case of damages and that we will now establish in our Constitution, for these purposes—the waiver of immunity that we are referring to. I have been assured that this provision, which appears to have no real content, will have positive effects on the U.S. securities market. This provision, along with the others I have been pointing out, is expected to have two consequences: First, we will be able to issue bonds at a lower interest rate. Second, the rating of our bonds; and in the U.S. market, bonds are rated as "C," "B," "A," and triple "A." We are rated as "A" for our good public debt payment history over a sixty-year period, and we hope this improves our rating. Rating is not a harmless thing. What it means is better market opportunities at a much lower interest.

That's why I was telling you, when I started talking to you this morning, that an essential aspect for the life of Puerto Rico lies behind any statistic that you may find in this provision, and this is a simple example. A better bond rating will lead to savings in the payment of interest, and these savings in the payment of interest will translate into better services for all the people of Puerto Rico.

Now, let me sum up, since maybe I should have followed the section-by-section method, but I have done it in order to save time, and I will sum up the four essential aspects contained in the Resolution, for further clarification of the history and a better comprehension among my House Colleagues:

First: The Government's public debt limit shall be equal to an amount in which the annual interest and principal payment does not exceed 15% of the Government revenue obtained by virtue of state legislation in the immediately preceding fiscal year.

Second: The Legislative Assembly shall set the debt limit of any municipality within a range of five to

1961                 LEGISLATIVE ASSEMBLY (HOUSE)             251

ten percent of the appraised property value in said municipality.

Third: The maximum maturity of the bonds or notes issued by the Commonwealth of Puerto Rico shall be thirty years, from the date of issuance, except for bonds or notes issued for housing purposes, which may have up to 40 years maturity.

Fourth: Authorization to sue the Secretary of Treasury. The State's waiver of immunity against lawsuits.

That is, or could be, a summary of the four outstanding features of the Resolution.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Now, let us briefly analyze what the first aspect means; what does it mean for the borrowing capacity to be set based on the revenue from the past year, with fifteen percent as ability to pay.

At present, property in Puerto Rico is appraised at one thousand nine hundred million dollars. This means that the ten percent, which is what the governing provision states, would allow the use of one hundred ninety million dollars as borrowing capacity. Based on the new formula, Puerto Rico's borrowing capacity for 1962 would be around four hundred million dollars, and this capacity will continue to increase as the revenue of the Government of Puerto Rico increases. The four hundred million-dollar amount must be determined based on fifteen percent of the total resources of the past year, and as an example, I will say that it is two hundred million dollars. As a matter of fact, I believe it was two hundred four. If we multiply the two hundred million by fifteen, we would have thirty million, which is what the People of Puerto Rico would have to make principal and interest payments.

Since our debt, in terms of the new formula, would currently amount or amounts to fifteen million dollars in interest and capital payments, we would have an additional fifteen million dollars available as baseline, as ability to pay our obligations.

I think that there has come a time in the life of our people where a legislative restriction should not continue to seize the people of Puerto Rico. I believe that it is, that it was imperative that the borrowing capacity be expanded. Why is it imperative? The People of Puerto Rico is developing a series of programs. The People of Puerto Rico must provide some services; it must bring minimum essential services to all corners of our country that will ensure, first, fulfill the needs, and then, furnish some amenities, and, as time goes by, provide certain comforts that we want for our people. If changing the formula used to determine the borrowing capacity will ensure that our people will have an additional amount to issue bonds, even from the first year, which would translate into permanent improvements and services for our people, improvements and services that could not be provided with the ordinary resources of the State, then it seems to me that it is desirable that this step be taken as soon as possible.

I want to refer now, albeit briefly, Mr. Speaker and House Colleagues, to what we all individually seek: to improve the conditions of the peoples we represent; bringing more services to them. It is common knowledge, for we have seen it in the last couple of years, that all agencies in Puerto Rico, without exception, submit programs to the Executive Branch that are five, six, and up to ten times higher than what can be approved. In this program, the agency reflects the opinion of the Mayor, of the townspeople, of the legislator. In every town, in all corners, in Morovis, in San Juan, in Ponce, in Naranjito, in Patillas, in all corners—we must carry out additional work. We are not satisfied. A lot has been done; the living conditions of our people have been improved; but we need face the challenge that this may stall, and perhaps that we must revitalize it in order to accelerate this transformation process, and that the transformation process is not the exclusive heritage of the Capital City and of Arecibo, and Ponce, and Mayagüez; but that it also be the heritage of the Cerro Gordo Ward of Aguada, or of the Bejuco Ward in Isabela, or of the San Antón ward or the El Pastillo ward; that it is not limited to certain areas that enjoy something about which we, indeed, feel proud, but it should be our goal to distribute and see to it that these new ways reach all corners of the Island.

And, in somewhat technical terms, these are the financial projections of the people of Puerto Rico. And what are these projections? Are we or are we not going to achieve them, and what type of economic resources do we need to achieve them, and is it only necessary for us to worry about that transformation which, for the purposes of this argument, we will define as purely materialistic, but at the same time, isn't it necessary to provide this people with spiritual values, for which economic resources are required?—the Casals Festivals, the Institute of [Puerto Rican] Culture, to honor the men who have been shaping the history of Puerto Rico throughout the life of the people. And in order to achieve this, my House Colleagues, we need economic resources, for both things. And I believe that this legislative measure contains the form, contains the ways to guarantee that this goal is achieved.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Look, my fellow House Representatives: There are some goals, there are some projections; we want to raise the Puerto Rican economy's net income to two billion six hundred fifty thousand dollars—$2,650,000.00—[sic] by 1970. And when I say '70, I am talking about a year that is pretty close.

I still remember when I first came to this House in 1948, I think, I was accompanied by colleague Ramos-Barreto, and I look back and it seems like yesterday; and it has been already thirteen years. So, when I talk about 1970, only nine years away, I'm not talking about something that is in the distant future. Quite the opposite, again, we aspire to to increase the Puerto Rican economy's net income of to $2,650,000. At that time, this will represent a per capita income of $1,070 in said year, and an average income of $4,500 per family.

And now I can look at the rightwing men, because I'm sure that they want the same thing; because all Puerto Ricans must aim for the same thing.

Now, to achieve this growth, a four percent annual increase in agricultural production and a 12 percent annual increase in manufacturing production will be necessary. It shall require the creation of an efficient road infrastructure, ports, water supply, electric power production, and other facilities that are necessary for industrial development, as well as a substantial improvement of our people's health and education.

This statement or these statements that I have just made contain all our aspirations in terms of education, health, electric power, aqueducts, school lunchrooms, and roads. That's what we aspire to; that's what we aspire to.

The main contribution of the Commonwealth of Puerto Rico towards the achievement of these goals is the implementation of a permanent improvements and activities program that will boost economic activity. Such program requires a 361 million-dollar investment by the Commonwealth of Puerto Rico during the six-year period that ends on fiscal year 1967. So, we are legislating or making projections for 1967.

I have talked about our aspirations in general terms. I now want to be more specific. These permanent improvements and services will require the amount that I just mentioned, which is distributed as follows. Note, my friends, and I refer again to what I said a minute ago. Behind each statistic that I cited, which is cold, which has no soul, there's… I repeat, behind each statistic there's the heartbeat of something human; there's a projection that may be translated into services, and there's, lastly, a Puerto Rican jíbaro who is enjoying that service—-the jíbaro living in the farthest corner of our land.

Back to the numbers:

Transportation and communications: $118,200,000. Health—I regret that Dr. Figueroa is not present here; he always shows an extraordinary concern, legitimate concern, commitment to the service of what public health means: $46,492.000.

**Mr. Ramos-Rodríguez:** If you will allow me, my Colleague?

**Mr. Polanco-Abreu:** Yes, of course.

**Mr. Ramos-Rodríguez:** I mean, only for the record, I want to clarify that although Dr. Figueroa is not here on the floor, he's here in the hallway and he's listening to what colleague Santiago Polanco-Abreu is saying.

**Mr. Polanco-Abreu:** Then he was not present, but he was listening.

**Mr. Speaker:** The Speakership had already seen him, and we knew he was not lobbying around.

**Mr. Polanco-Abreu:** Very good.

Public Housing, Colleagues: $40,778,000. Public Education, and I'm looking at colleague Aguedo-Mojica and the two distinguished teachers of this House: $87,425,000. Industrial Development:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

$29,730,000. Public Buildings: $16,110,000. Agricultural Development: $16,075,000. I should have looked

252                              DAILY JOURNAL                              SEPTEMBER 5

at colleague Canales on that. Protection and Public Safety: $9,727,000. Other activities and services: $46,627,000. It all amounts to what I had told you: $361,259,700 required for the investment program during the six-year period ending in 1967.

No, let's be even more specific. Let's see in terms of kilometers of road and health and housing. This permanent improvement program has the following objectives: Completing 359 kilometers of roads currently under construction and initiating and completing 588 additional kilometers, for a total of 947 kilometers. Picture Puerto Rico with 1,000 extra kilometers of road.

Providing 2,636 additional beds for the hospitals, building diagnosis and treatment centers, health centers, rehabilitation centers, public health units, and health houses.

Building rural aqueducts for 173,000 families; providing an adequate sanitary sewer system for the San Juan metropolitan area, completing the construction; and completing ten additional sewer systems on the Island of Puerto Rico. Note that we're talking about finishing the sanitary sewer system in San Juan; note that we're talking about finishing 10 sewer systems on the Island; and the conclusion is that even if this is done, there will still be some municipalities in Puerto Rico and some sectors of municipalities in Puerto Rico without sewer.

Extending public services to 12,701 housing units in public developments; developing 7,082 plots of land; rehabilitating 12,658 housing units; relocating 9,800 families and building 7,874 structural frames of houses on plots of land that have already been developed.

And I think that, despite all these projections, there will still be people in our urban areas, and note that I'm not talking about rural areas, who will not have adequate housing.

Providing 3,000 additional classrooms; boosting industrial development to set up 144 new factories every year until 1965 and 205 factories per year from then on, creating 70,000 new manufacturing jobs. Improving grasslands, helping the coffee industry, planting new sugarcane varieties, expanding the agricultural facilities. We expect to cover part of this permanent improvement program with general fund allocations in the amount of $86,000,000, and it will be necessary to issue bonds to finance the $275,000,000 balance based on the formula currently in force. With a maximum of $190,000,000 at the time and an available balance of only $3,000,000 as of July 31, 1961, I ask each of my House Colleagues whether these economic projections that is to be translated in terms of health and education and happiness for our people, can be achieved.

My dear Colleagues: I have envisaged, perhaps arbitrarily, that economic developments in any country have three phases. Again, this may be arbitrary. I do this, perhaps, to simplify my argument, or perhaps to lay the foundations that will serve as examples for all my Colleagues.

In my opinion, every economic development, in any country, has an essential and basic phase that I define as the phase to "meet the needs." Essential needs to life in a democratic community with equal opportunities for all citizens, regardless of whether they live in the capital city or in a remote countryside area of the Island. The second phase is what I call "conveniences." The essential and basic need have already been met, so we can then aspire to provide certain conveniences to the human beings of that



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

county, which are not the commodities that are essential for human life. And the third classification or the third stage, as I see it, is the "comfort stage" or phase. Needs have already been met, comforts have been provided, so then the people can aspire to have comforts. In this comfort stage, we could say that we can include purely spiritual aspects, where the individual already has the essential minimum requirements for their livelihood and the education of their children and a modest, but nice home; the conveniences have been addressed and the human being has a legitimate right to aspire to comforts.

I don't think it is for me this morning to conduct an analysis of the current state of the country, in this conception of the economic development of a country that I am presenting you. We probably have not met all the needs in some areas. In other areas we may have already achieved and supplied some of the conveniences, and maybe in some areas, which I suspect are minimal and which I could call privileged, we have achieved some comforts. But our people, our people deserves to leave the first stage and aim for the third stage. I don't intend to—perhaps it would be extremely controversial—I don't intend to analyze in which stage, but I believe there is a common denominator between the man who represents the Republican Statehood Party here and the man who represents the Popular Party here, and going beyond this forum, in every Puerto Rican, I believe there is a common denominator to legitimately aspire to see our people reach such a degree of civilization where we could be proud of abolishing extreme poverty and where everyone has the necessary resources to live and essential services are provided to them.

That's what we're working on, Colleagues. We're making progress. We've had some instruments: the borrowing capacity. It being a fixed thing, it is now transferred to the Puerto Rican scene, it is transferred to Puerto Rican hands. Let us make good use of this new opportunity, and when we make good use—I'm referring to this generation that is governing—let's make good use of this opportunity that heaven has given us to be able to create new mechanism, a new way, a new route, a new breach to deal with the problems of our people.

The peasant, the jíbaro, the farmer, the merchant, the driver, the teacher, the professional, the landowner, all of them, absolutely all of them, always thinking about the those who have less, who need our creative power, our imagination. There was a way, the valuation, to create a borrowing capacity for the People of Puerto Rico. Today the horizon expands, and a new road is seen. I invokethe best patriotism of all my House colleagues, looking at those on both the right and the left, to leave any political-partisan force that may prevent this Resolution from being taken to able Puerto Rican voters on behalf of all Puerto Ricans.

My dear Colleagues, I have tried to make a simpler, clearer statement of an issue that I know is technical; that I know may be difficult to understand. I insist that this legislation we are evaluating represents a ray of light and hope for the needy, for the poor people of Puerto Rico. Once again, I invoke the patriotism of my Colleagues and I ask them, on behalf of the deprived men who live in the isolated areas of our country, who still has not been able to enjoy this social and economic development that has been enjoyed by other areas, to vote for this legislative measure. I am in a position to say that this new breach that is opening will not hurt or harm the good credit of Puerto Rico to fulfill its responsibilities and which, quite the opposite, it will ensure that all these goals, all these projections that will translate into happiness and justice, will come true.

On behalf of the Special Committee that reviewed this measure, I am honored to ask the House of Representatives to give it its approval. Thank you very much.

**Mr. Speaker:** Colleague Polanco-Abreu spoke exactly for one hour.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Mr. Rivera-Morales: Mr. Speaker:** [To move] an amendment, if colleague Polanco-Abreu accepts it.

**Mr. Speaker:** Mr. Representative.

**Mr. Rivera-Morales:** On page 1, at the end, after the word "yes," to delete "the" and, likewise, to delete everything else until more than half the page two of that paragraph and replace it with the following:

**Mr. Polanco-Abreu:** Will the entire paragraph be deleted from that point on?

**Mr. Rivera-Morales:** The entire subsequent paragraph is deleted until page two.

**Mr. Polanco-Abreu:** Until page two. Which ends with what word?

**Mr. Rivera-Morales:** With "revenue."

**Mr. Polanco-Abreu:** With "revenue." And then a new paragraph begins?

**Mr. Rivera-Morales:** Then a new paragraph begins, yes.

**Mr. Polanco-Abreu:** Very well.

**Mr. Rivera-Morales:** The amendment consists of deleting everything I have said and replacing it with: "exceed ten percent of the total property assessed valuation." That's all.

**Mr. Polanco-Abreu:** Is it a formal amendment or is it a joke on the part of our Colleague?

**Mr. Rivera-Morales:** No, it is an amendment.

**Mr. Polanco-Abreu:** Oh! An amendment. Very well. I object, Mr. Speaker.

**Mr. Rivera-Morales:** [To move] a speech in favor of the amendment.

**Mr. Speaker:** You may proceed.

**Mr. Rivera Morales:** The amendment consists of structuring the first paragraph of Section 2 to state the following:

| 1961 | LEGISLATIVE ASSEMBLY (HOUSE) | 253 |
|---|---|---|

"The power of the Commonwealth of Puerto Rico to levy and collect taxes and authorize municipalities to levy and collect shall be exercised as provided by the Legislature and will never be relinquished or suspended. The power of the Commonwealth of Puerto Rico to undertake and authorize debts will be exercised as provided by the Legislature but not for direct obligations of the Commonwealth of Puerto Rico for funds directly borrowed by the Commonwealth of Puerto Rico evidenced by bonds or promissory notes for the payment of which the good faith and credit and the power to levy taxes of the Commonwealth of Puerto Rico were pledged shall be issued by the Commonwealth of Puerto Rico if it were to exceed ten percent of the total assessed valuation of its properties." It would remain as it currently stands in the Federal Relations Act.

The purpose of the amendment is to follow the guideline or order given by Congress to the Commonwealth of Puerto Rico, to transfer the provision contain in Section 3 of the Federal Relations


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Act, which limits Puerto Rico's borrowing capacity, to the Constitution of the Commonwealth of Puerto Rico. We must nor forget that this Legislature passed a Concurrent Resolution to ask the United States Congress to transfer the loan margin limit from the Federal Relations Act to the Constitution of the Commonwealth of Puerto Rico. Moreover, they passed another Resolution, against which the Minority voted, as far as I know, to authorize the increase of said borrowing capacity to twenty percent. To my knowledge, Congress did not pass the Concurrent Resolution. If House Concurrent Resolution Number 5 were passed, it would be like approving what did not have the unanimous consent of the parties represented in the Legislature, and which was also not approved by the United States Congress. Later on, when the results of the hearings held in the United States Congress with regard to this law, we will find that the United States Congress was never told that it was the intention of the Commonwealth of Puerto Rico to transfer the loan margin limit to the Constitution, but, beforehand, to change the system that had been used for over fifty years and to indirectly increase the loan margin.

Remember that Article 3 of the Federal Relations Act is still in force, which provides that:

"No Export duties shall be levied or collected on exports from Porto Rico, but taxes and assessments on property, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Porto Rico; and, when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law." The federal provision that limits the imposition of taxes by Commonwealth of Puerto Rico is still in force.

**[Translator's Note: Italics are used in the text below to indicate the insertion of English text in the original.]**

What did the United States Congress say? The 87th Congress, under Public Law 124, stated the following: *"To provide for amending section 3 of the Puerto Rico Federal Relations Act (64 (Stat. 319), as amended (64 Stat. 458).*

*"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That section 3 of the Puerto Rico Federal Relations Act, (64 Stat. 319), as amended, (64 Stat. 458), is amended by deleting therefrom the following language:" That is what will be deleted from Section 3 of the Federal Relations Act. "Provided, however, That no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Río Piedras, and Mayagüez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its properties, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," and "In computing the indebtedness of the people of Puerto Rico, municipal bond for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted."*

*"Sec. 2. Section 1 of this Act shall take effect upon a majority of the qualified voters of Puerto Rico having voted in a referendum pursuant to section of Article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act specified herein, limiting the debt-incurring capacity of the Common wealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth." Approved August 3, 1961.*

That's what the United States Congress approved. The Concurrent Resolution asking the United States Congress to transfer the limit provided under Section 3 of the Federal Relations Act to the

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Constitution. Changing any word of Section 3, is going beyond the agreement of the United States Congress. We were told during the hearing that we cannot continue to use the old method that all Government experts accepted as a good method, that it had given the Administration the opportunity to carry out certain works. It was stated that said method must be changed, since the property does not reflect anymore the ability to pay the people of Puerto Rico. It has been argued that exempting Puerto Rican homes from paying taxes over the first fifteen thousand dollars already detracts from the clause that sets ten percent of the total valuation of Puerto Rico's real and personal property as basis. I don't see why it should have an impact. It is the inhabitants of Puerto Rico who will pay for any debt they incur, as with the debt incurred so far, not only those who own exempted real property or those who own non-exempted real property, but all cigarette and beer consumers, those who use cars and pay the tax on gas, all of those paying high taxes in Puerto Rico are the ones who will ultimately pay these taxes, the ones who will pay the bonds, the ones who will pay the debt incurred by this current Government. The total valuation remains the same. The fact that an amount is exempted does not mean anything, but the valuation remains the same. Taxes are imposed and, afterwards, the Legislature, by law, exempts them from paying for up to fifteen thousand dollars. But that same Legislature that exempts them from paying can now say at any time that this property, which is valued at twenty thousand dollars and pays for five thousand, will now pay for twenty thousand, because it is a national emergency. So, the issue of eliminating the method, which has been good for nearly 60 years, is not a sufficient argument. What is not of good argument is saying that Puerto Rico's taxable income should be taken as basis. According to all reports, Puerto Rico's taxable income for the year 1961 would amount to two hundred million. Based on the new formula, 15% of that is $30,000,000. At present, with a property appraisal or valuation of one thousand nine hundred million, the borrowing capacity is clear. It is 10% of that, one hundred ninety million. One hundred thirteen million were due until last year, and the Legislature authorized new bond issues up to approximately two 290 million, but the economist's ability could not be used to go beyond that. Now, 15% of a 200-million taxable income, 30 million. How does this new formula work? Fifteen million to pay current bonds, the current debt, for debt repayment, that is, debt amortization, plus interest, it leaves 15 million. With 15 million, no matter what the current debt is, which reaches nearly 190 million, with 15 million, the ability of the seller of the bonds, if it is a 10-year bond, since an arithmetical calculation tells us that they could borrow around 150 million more. You see? If it is for a 30-year period, they could borrow 350 million. That's the new method that has no limit, they only hope, as we were told in the hearing, that the man occupying the Vice Presidency, the first vice president of the Government's Fiscal agent, the Government Development Bank, is an honest man, is a man who knows how to work with that. This Legislature cannot bind the future generations to, thinking only about the capacity and the ability of the seller of bonds of the People of Puerto Rico, that we give them a blank check, it would be like asking the people to surrender the privilege of a referendum to us, to surrender it to this Legislature so that the henceforth the people will accept that future legislatures continue to commit Puerto Rico's credit more than it has been committed so far.

It is good to consider the presentation of the Chairman of the Planning Board before the Joint Committee. The Planning Board Chairman was called to tell the Committee what the urgent needs of the Commonwealth of Puerto Rico are, and why the method should be changed. Mr. García-Santiago starts by predicting that by

254                                    DAILY JOURNAL                                    SEPTEMBER 5

1970, the net revenue of the Commonwealth of Puerto Rico would reach $2,650,000, as compared to 1,465 million from '60 to '61. We have a six-year economic program, and, on this regard, this six-year economic program predicts that the net revenue could be duplicated from $1,311 million in 1959-'60 to possibly $2,700 million in 1970. A difference of only $100 million in Mr. García-Santiago's estimates for

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

the Joint Committee and the estimates of the Planning Board itself. When we asked Mr. García-Santiago about that, he couldn't specify whether it was his estimates or the Planning Board's estimates that were correct when he prepared the six-year Economic Program. Upon being asked by this Representative, on page 2, Mr. García-Santiago stated that: "Puerto Rico's revenue for 1970 will be $2,750,000,000" and on the first page of his memorandum says the same thing, but $2,650,000,000. How can we ascertain it? Mr. García-Santiago, although it seems, Mr. Rivera-Morales: "Then it should be interpreted that the memorandum states that it is $2,650,000,000? Mr. García-Santiago: No, pardon me, the one that must be displayed is the one from the Planning Board, which is $2,650,000,000, as shown on page 3." So, Mr. García-Santiago, who made a presentation, for he made a presentation before the Joint House and Senate Committee, upon predicting the Commonwealth of Puerto Rico's revenue for 1970, he reflected right there a $100,000,000 deficit, as compared to the Economic Program that the Board, the Planning Board itself, had previously prepared. We asked a few more questions because, if Mr. García-Santiago came to present the Legislature a picture, the economic picture of the Commonwealth of Puerto Rico, he must have made comparisons. For example, if he said that the per capita for 1970 would be such and such, he should have brought the estimates that the Board itself had made so far, so that the Legislature would have an idea of whether or not the Board's forecasts were good.

We asked another question. It goes like this: Page 2, of the memorandum, the last paragraph where it refers to the construction of 1,400 factories by 1960—it should be '70—as compared to 660 factories in June of '61. I would like to know what the estimate of the previous six-year program was and what would be the estimate it had for 1961." Mr. García-Santiago: "Anyway, I don't have it with me, but if you're interested in it, it will be my pleasure." We would like to know whether this estimate that you are presenting us now had a strong basis, if it is reliable, whether past Board estimates were close to reality, if they had the expected outcome. Mr. García-Santiago did not make the Joint House and Senate Committee available to determine whether it was true that those estimates were based on real information. We asked other questions regarding the metropolitan area sanitary sewer. The Item corresponding to the metropolitan area sanitary sewer states: "The purpose of this Project is to provide the San Juan metropolitan area with an adequate sanitary sewer system to serve the urban and suburban areas of the municipalities that comprise the metropolitan area. The revised cost of this Project amounts to about $40,000,000, of which 11.2 million represented the total contribution that was originally determined as corresponding to the Commonwealth of Puerto Rico; therefore, no allocations were recommended, etcetera." We asked Mr. García-Santiago whether there were federal funds available for the metropolitan area sanitary sewer. He had made some statements that the federal contribution could not be determined. Then we asked, in the last paragraph, where it says: "Since we cannot determine six years in advance the contribution that can be expected from the United States Government for permanent improvements, why is that? Mr. García-Santiago: "I believe it is called the contribution that can be expected from the Government of the United States." Mr. Rivera Morales: "I thought that it was a fixed thing, one dollar for the Commonwealth and one dollar for roads, etcetera." Mr. García-Santiago: "No sir, first, it varies from program to program, and it may vary as Congress allocates funds or modifies the basic legislation authorizing the program. For example, so that you know, this year, the law that allows the extension of aid to high unemployment areas was passed this year. Well, said law modified, for example, the law related to the housing program in the part that we're interested in, which is the planning aid, which under the Housing Act system was two dollars for each peso. This law, then, states that in cases where the towns, cities in areas declared as high unemployment areas, instead of two to one, it's three to one." Mr. Rivera-Morales: "Alright. So, regarding the sanitary sewer, he was asked: "One last question; sanitary sewer, metropolitan area, the second to last paragraph, states: "The revised cost for this project amounts to about $40,000,000, of which $11.2 million represented the [federal] contribution." What is the existing federal contribution?" Mr. García-Santiago: I think that no federal contribution is being considered; if there are federal contributions for some… There are, indeed, federal contributions for some sanitary sewer projects on the island. If you're interested, I could dive you specifically, I can't tell you for sure." Well, I know there are, because… etcetera.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Then a Planning employee hands him a note and he says yes, that there are federal contributions. I asked for it at the time, it was promised to me, and it has never been given to me. Therefore, in that same data regarding the permanent improvements that must be made during the next six years, the Chairman of the Planning Board has, first, a slight error of one hundred million in connection with his revenue estimates for '70, and then he says that federal contributions cannot be considered. And he later states that there are no federal contributions for the metropolitan area sanitary sewer. He said yeas to an employee, he is asked to show them, he offered to hand them in the next day, and, so far, we haven't obtained the federal contribution that existed for said project.

The entire memorandum of Mr. García-Santiago shows that according to the current method, all the works could not be carried out without an additional allocation of $51,000,000. On page… no, there's no page. It says: "The recommendation of funds for permanent improvements—which is what bonds are issued for—the recommendation of funds for permanent improvements presented in the latest economic program are realistic, from the standpoint of its potential implementation, considering the building capacity. These recommendations recognize the inability to triplicate the public works program within a short period of time. For example, the program requires an increase in allocations from $29,000,000 up to $81,000,000 during the six-year period. In other words, there is a $52,000,000 difference; this is what would be needed to be able to complete the program that has been outlined by the Chairman of the Planning Board, without considering the federal contributions. He says that it is difficult to consider it.

We all know that, if the programs are accepted, 20 percent of the budget for Puerto Rico comes from federal allocations. That is for Puerto Rico's budget, no counting other allocations that are not included in Puerto Rico's budget. We all know that in order to build any road in Puerto Rico, if the Commonwealth of Puerto Rico contributes one dollar, the Federal Government contributes another dollar. We all know that to build an armory in Puerto Rico, if the Insular Government or the Government of the Commonwealth of Puerto Rico contributes one dollar, the Federal Government contributes three dollars. Those are already fixed numbers.  If upon making this program and bringing a recommendation to the Legislature for permanent improvements, Mr. García Santiago did not take into account the federal contributions, then we cannot have faith in this program, nor can we rely on it. Mr. García-Santiago could have told us: "with the fixed federal contribution we know we have so far, we would have this much income to be added to what the Commonwealth has. Without this allocation, we would be missing this much,"—but he didn't say that. He only brought us a prepared report to convince us that the only possible method to meet the needs of the People of Puerto Rico during the next seven years is the new method that they're trying to implement against the will of this Legislature and against the will and the order of the United States Congress, which told the Legislature of Puerto Rico, the Commonwealth of Puerto Rico: I authorize you to transfer this portion from Section 3 of the Federal Relations Act, which is still in force in Puerto Rico, the full part that limits the borrowing capacity of the People of Puerto Rico to 10 percent of the total valuation. For this reason, my House Colleagues, I request that this amendment be accepted, which would be complying with the order and mandate we received from Congress.

Many thanks.

**Mr. Ortiz-Ortiz:** Mr. Speaker

**Mr. Speaker:** Mr. Representative

**Mr. Ortiz-Ortiz:** To oppose to the amendment proposed by our Colleague, for the following reasons:

It's interesting that an amendment is proposed to reverse all this work and all this effort, to reverse the same work that



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

We are doing, that is, to return to the same previous situation that governs today. We would not have required the passing of any kind of legislation or making any amendments to the Constitution in order to to that. Simply to carry on as we are. And, of course, our Colleague's amendment is a symbol of stagnation, in other words, it means that there will be no progress in Puerto Rico from now on, that we continue as we are, without further expansion for the Government, without increased services, because this is the best of the possible scenarios. Since this has been going on for so many years, up to one hundred years that this formula has existed in the United States, then we're going to continue using it. In other words, there will be no progress in Puerto Rico in the future, there will be no more factories, there will not be the same growth rate. This stagnation and this regression is the result of our Colleague's amendment, and I will explain that, for example, we were told the difference that there would be between the current system and the proposed system. It says: There is a permanent improvements program with certain projections for the future to raise the standard of living in thousands of dollars; to increase from 600 to 1,450 the number of factories that would be achieved with this new revenue-based system. Of course, our Colleague may have the ambition that we keep the 600 factories, that we make no progress in the industrialization of Puerto Rico, but I support the idea of growth and the development of the industrial process in Puerto Rico.

Before moving forward, I will give the floor to our Colleague here.

**Mr. Alvarado:** Mr. Speaker.

(Mr. Muñiz-Ramos assumes the Speakership.)

**Mr. Speaker:** Mr. Representative.

**Mr. Alvarado:** To propose a 15-minute recess, at the request of some Colleagues. Upon resuming work, colleague Benjamin Ortiz will continue his presentation right where he left it.

**Mr. Speaker:** Those who are in favor of the recess.

**Mr. Viera-Morales:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Viera-Morales:** Before the recess, prior to leaving the floor, I would like some clarification with regards to the rules that were adopted a moment ago in terms of the time to speak that counts against each party in this specific debate. Whether, for example, the answer being offered right now by colleague Benjamín Ortiz, the time to speak he was consuming, counts against his arguments or against us.

**Mr. Speaker:** It counts against the part maintained by colleague Alejo Rivera-Morales.

**Mr. Figueroa-Carreras:** Mr. Speaker, to clarify something.

**Mr. Speaker:** Mr. Representative.

**Mr. Figueroa-Carreras:** I think there is… We have not understood each other very well. When a question is asked, it counts against the person who asks the question, but a speech against another speech does not count as speech against.

**Mr. Viera-Morales:** That was my question.

**Mr. Alvarado:** According to the provision, if a question is asked, both the time used to ask the question and the time used by the person who answers the question will be charged against the speech time of the person who asks the question. Now, if an amendment is made, a speech is made, and a person who supports a different point of view on the other side gets up and answers, that time is charged to the corresponding party, to the Party of the person who provides the answer.

**Mr. Speaker:** Is it clarified, then?

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Mr. Alvarado:** We insist in our motion for a 15-minute recess.

**Mr. Speaker:** I mean, the motion was approved; so, let there be a recess.

## RECESS

At the request of Mr. Alvarado, the House agrees to recess for fifteen minutes.

The recess having expired, the session is resumed under the Speakership of Mr. Muñiz-Ramos.

**Mr. Speaker:** Colleague Ortiz may proceed with the speech he was giving.

**Mr. Ortiz-Ortiz:** Mr. Speaker, by opposing the amendment, I had stated, in the first place, that our Colleague's proposal entails the futility of everything we are doing now, that is, to return to what there is, the same provision that is contained now in Law 800; and I also said that through this amendment, there is no possibility whatsoever of achieving any progress for Puerto Rico, stagnation; and I had pointed out, among other aspects, that according to the economic plans, a piece of evidence that was presented before the Committee, which has been already mentioned by colleague Polanco-Abreu, those plans for future growth to raise the standard of living, education, culture, health, material and cultural progress, requires the expansion of our Government's ability to obtain loans. So, stabilizing, halting, or paralyzing the situation as it is now, required, firstly, and that's where I ended my speech when the recess began, that, for example, of 600 factories that we have, according to the economic plans, we would have 1,450 factories and our Colleague's amendment also implies the halting of the process for the industrialization of Puerto Rico. I mean, if our Colleague is willing to present a program to the people so there is no more progress in Puerto Rico, well, that's his prerogative, isn't it? A constitutional right to go with that platform, without any more industries, or more schools, or more roads. He would be quite entitled to proclaim the virtues of no progress, but I will disagree with that thesis, and I also want to point out that, as stated before the Committee, and is recorded on the record, that the current borrowing capacity under the ten percent system that he suggests should be kept, is one hundred ninety million dollars. Now, under the amendment involved in the Resolution, the borrowing capacity would be four hundred million dollars. Our Colleague prefers that we continue with the one hundred ninety million instead of the four hundred million represented in this Resolution, and, as it was also stated, the difference between both formulas, the current one and the proposed one, states: "This means," I'm reading Mr. García-Santiago's statement, "continuing with the current system," that is, by approving our Colleague's amendment, if it is approved, "this," in other words, this amendment, means that we would have a deficiency of one hundred forty-two million dollars in the permanent improvements program, included in the Eighteenth Economic Program. Therefore, we could invest two hundred nineteen million in permanent improvements, instead of three hundred sixty-one million; or an annual average of thirty-six million. So, the amendment established by our Colleague means one hundred forty-two million less dollars in six years, for the Government to provide essential services to the people.

The following is another aspect: Our Colleague criticizes the revenue-based formula. He says it should be based on the value of land, of property. Of course, the revenue obtained by the Government of Puerto Rico from income taxes is five times more than the contributions obtained from property taxes. In other words, the Government's capacity, liquidity, to pay, is five times greater with the Resolution than with the amendment proposed by our Colleague, who wants us to remain as we are. Unless… I understand that in order to pay a debt, for even an individual person who owns property, but no equity, and it is… The Bank says: How can you pay your debt to us? Either with the money in their pockets or with some properties they have not sold, and the bankers themselves say that liquid money is better. Our Colleague's thesis, from a financial standpoint, states that it is preferable to do it based on property than based on revenue. I respect the financial criterion of our Colleague, but the records of this Committee contain several letters from banks in New York. There's a letter from Donald B. Miners, Vice President of Chemical Bank, comparing both systems. It says: The provision to impose a first claim for debt service

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

on the revenue of the Commonwealth of Puerto Rico is a strong measure and, decidedly, emphasizes to the investor the responsibility of the Commonwealth of Puerto Rico to ensure payment of its debts. It says that the proposed limits are essentially healthy. It is my opinion that the Commonwealth of Puerto Rico is protecting the investor who is able to buy the Commonwealth's obligations and, at the same time, is providing a somewhat necessary flexibility for its capital financing programs. This is from Chemical Bank.

Now, there's another letter from Morgan Trust Company, which states that they prefer the revenue system than the system based on property value: Morgan Guarantee Trust Company.

There's also another communication from First National City Bank; the First National City Bank we know, which tells us, the Committee, that from their standpoint, as investors, from the financial standpoint, the Resolution's system provides greater guarantee than the system favored by our Colleague. And there's also a communication from Mr. Frederick Bird, from Don and Bradstreet. This financier's letter states that, thirdly, the proposal realistically acknowledges that property taxes have become a less important factor in the revenue structure of the Commonwealth of Puerto Rico. Number two—and this is not us talking, but

the gentleman who represents Don and Bradstreet, which is one of the most important credit entities in the United States—that the property taxes basis does not constitute a satisfactory measure of the state's fiscal capacity. And he offers that of revenue, an alternative that appears to be extremely satisfactory: A debt margin that links the debt requirements with the total annual revenues produced by legislative measures. Although this system will be new in the United States, it is my understanding that it is used by certain European countries and I am well aware that its adoption in the United States has been highly recommended by renowned authoritative sources, such as B. U. Ratchford, author of "American State Debts," a leading book on these matters. Most of the current constitutional limits on the debt margin in the United States, that is, proposed amendments based on property, follow the tradition originally adopted more than a hundred years ago. You have the opportunity to initiate a new movement on the basis of principles that I consider to be sounder, and this is a gentleman that represents those who lend money, who must protect their interests. So, in terms of Puerto Rico's future needs, the revenue system is better than the property value system, because it has more flexibility. It is more in line with the solvency realities of our Government, with its financial situation, and it also prevents the current stagnation, ensures progress, the growing progress rate for Puerto Rico.

I had the impression that our Colleague had stated that under the Resolution or the law passed by Congress, we're practically required to follow the current system on… based on property value, and he read a provision of the Law that states the following, as translated herein: "Article 1 hereof will enter into effect when most of the able voters in Puerto Rico have voted in a referendum in accordance with Article 7 of the Constitution of the Commonwealth of Puerto Rico, to include provisions in the Constitution of the Commonwealth of Puerto Rico. Including provisions in our Constitution, and here's the point that he mentioned: "In lieu" or "in lieu of" the provisions of Article 3 of the Federal Relations [Act], is translated here as "en lugar the las disposiciones del Artículo 3." In other words, that the translation is… our Colleague interprets that the phrase "in lieu of" means that it must remain the same, not that it means instead of, but that it means the same, that the interpretation that it should be "instead of" is incorrect. When it says, "instead of," it means that one thing is replaced by another. One thing is eliminated, and it is replaced with one that may be different. If it is "instead of," it means that there's no need to follow the same pattern. Then I draw attention by solving this, let's say, grammatical conflict. What is the meaning of that phrase in Congress? The Velázquez Spanish Dictionary says: "lieu" (l-i-e-u), and it specifically

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

says "in lieu of," "en lugar de." *In other words*, that the translation made by this House is correct, that one thing replaces the other. In other words, there is no such mandate as our Colleague has insinuated, but we're fully empowered to adopt our own system, our own rule. If we were required, Mr. Speaker, to reproduce what we already have and if we interpret this provision of law as our Colleague indicates, that Congress has given us a mandate to do the same thing, besides that it is not stated in the law, the law provides the opposite, it would be really degrading for our Island to admit that what Congress has done is to tell Puerto Rico: Add an amendment to your Constitution as it is written in the provision contained in the Federal Relations Act. That is to say, that we would be required to follow their mandate, according to our Colleague's interpretation, and, well, I disagree with any interpretation that implies that we are subject to the will of Congress, or that Congress intended to tell us: "Look, you will do as we wish, but you have to do it this or that way." And that is not the real interpretation of what the law really states.

**Mr. Rivera-Santiago:** Mr. Speaker, am I allowed to ask a brief question to our Colleague? Our Colleague here affirms that we're not subject to the will of Congress.

**Mr. Ortiz-Ortiz:** Exactly, I do.

**Mr. Rivera-Santiago:** Then, why has it been necessary for Congress to authorize us to be here today dealing with problem?

**Mr. Ortiz-Ortiz:** It's very simple, because what Congress has done is to amend Law No. 600, and it cannot amend it unilaterally, without our consent, and we're here to give our consent, the people represented by the Legislature. Just like we did before passing the legislation to ask Congress to do what they're doing now; our previous consent; it must be bilateral; they can't impose their ruling upon us; the entire procedure that has been followed in connection with this Bill reflects the criterion that what has been legislated by Congress has no validity unless it has been approved by our people and, furthermore, what we want to do is to put this Constitutional amendment to the vote of the people. So, it is not what Congress says, but also what the Puerto Rican people wants.

Therefore, Mr. Speaker, we can't adopt that interpretation that destroys our powers, our autonomy, and specially that there's no room for that interpretation, because what Congress has stated is [that] we can put one thing instead of what currently exists. Now, our Colleague doesn't want us to put "instead of," but he wants us to continue with the same thing.

So, from this standpoint, I disagree with the amendment proposed by our Colleague.

**Mr. Speaker:** Any other speech in favor or against colleague Alejo Rivera-Morales' amendment? A speech to rectify.

**Mr. Alvarado:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Alvarado:** I will propose a 1-hour recess to continue this debate afterwards.

**Mr. President:** I want to remind all Colleagues that we can all meet now, outside the Capitol, to spend this recess hour together and return after the hour has passed.

**Mr. President:** Those in favor will say "aye" …

(The motion is put to a vote and is passed.)

**Mr. President:** Recess is ordered.

On a motion moved by Mr. Alvarado, a one-hour recess is declared.

Once the recess has elapsed, the House meets under the Speakership of Mr. Muñiz-Ramos.

**Mr. Alvarado:** Mr. Speaker.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Mr. Speaker:** Mr. Representative.

**Mr. Alvarado:** What is the parliamentary situation?

**Mr. President:** It will be put to a vote…

**Mr. Alvarado:** No. What is the parliamentary situation right now?

**Mr. Speaker:** The bell just rang right now; some Representatives are coming in. I think there's a quorum here right now.

**Mr. Alvarado:** The status of the debate, how much time has been used?

**Mr. Speaker:** The Popular Party Representatives have consumed one hour, and the Representatives of the Republican Statehood Party have used thirty-tree minutes.

**Mr. Alvarado:** So, the last debate participant spoke on behalf of the Popular Party, in the affirmative team?

**Mr. Speaker:** Colleague Benjamín Ortiz.

**Mr. Alvarado:** The floor now corresponds to someone who represents the Opposition, doesn't it?

**Mr. Speaker:** If you want… there's an amendment. It was asked whether there were speeches in favor and against the amendment; nobody answered; and there are also no rectification speeches. It means that what is appropriate now is to submit the amendment to the consideration of the House.

**Mr. Iglesias-Silva:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Iglesias-Silva:** I raise the issue of quorum.

**Mr. Speaker:** Let us conduct the roll call.

On a motion moved by Mr. Iglesias-Silva, the Secretary proceeds to conduct the roll call, with the following members answering "present:"

        Alvarado

Mrs.:

        Arce de Franklin

Messrs.:

        Borges-López

        Cabranes

        Canales

        Cancel-Ríos

        Castaño

        Cordero

        Domínguez

        Figueroa-Carreras

Miss.:

        González-Chapel

Messrs.:

        González-González

        Iglesias-Silva

        Meléndez-Báez

        Miranda-Rivera

        Mojica-Marrero

        Morales-Otero

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ortiz-Noriega
Ortiz-Ortiz

1961          LEGISLATIVE ASSEMBLY (HOUSE)          257

Otero-Bosco
Pagán-Collazo
Polanco-Abreu
Ramos-Barreto
Reyes-Rivera
Rivera-Morales
Rivera-Santiago
Roig-Vélez
Salas-Quintero
Sánchez-Capppa

Mrs.:
Solá de Pereira

Messrs.:
Torres-Santos
Velázquez
Viera-Morales
Westerband
Zayas-Aponte
Zorrilla
Muñiz-Ramos, Pro tempore Speaker

**Mr. Speaker:** Thirty-Seven Representatives are present. There is a quorum. The session is resumed.

**Mr. Alvarado:** Mr. Speaker.

**Mr. Speaker:** It could be that the language that I used to explain the provision and the Rules that would govern this debate were not clear enough, but I would like to clarify now that the idea is that any amendments may be introduced and discussed during the entire debate. Which means that any amendments presented would only be put to a vote at the end of the entire debate. I want to clarify this in terms that no amendment is put to a vote until the debate has ended.

**Mr. Speaker:** Very well. We then proceed with the debate, with colleague Benjamín Ortiz having consumed time to speak. Does any of the Pro-Statehood Minority Colleagues wish to consume time to speak now?

**Mr. Figueroa-Carreras:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative Figueroa-Carreras.

**Mr. Figueroa-Carreras:** To introduce a couple of amendments, in line with what the Majority Leader just stated, that more than one amendment may be introduced, and that all amendments presented would be considered.

**Mr. Speaker:** You may proceed.

**Mr. Figueroa-Carreras:** The first amendment states that at the end of the first paragraph on page 2, the phrase "It is further provided that" be added, so that it reads: "It is further provided, that the total


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

sum of such obligations may in no way exceed the total revenue as set forth in the preceding clause (i), plus an additional 50 percent, said total annual revenue to be computed based on the three years immediately preceding the current fiscal year, and said 150 percent of said average annual average shall constitute the maximum limit for public debt that may be directly contracted by the Commonwealth of Puerto Rico."

That's one of the amendments.

And the second amendment reads as follows: Second amendment, separate paragraph after the second paragraph on page 2:

"To be effective in election years there will be no increase in the public debt of the Commonwealth of Puerto Rico or any municipality more than an increase that would be equivalent to the average annual increase of the three preceding fiscal years, and neither the government of the Commonwealth of Puerto Rico nor any municipality will undertake or carry out public words or incur expenses for an amount in excess of the annual average of expenses in the three previous years, except for reasons of an emergency that has previously been recognized by the Legislature of Puerto Rico in a resolution approved by three quarters of the votes in both houses."

Those are the two amendments we are submitting.

**Mr. Polanco-Abreu:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Polanco-Abreu:** We had had the benefit of having a written copy of the amendments proposed by our colleague Dr. Figueroa. I hereby inform you that I object to the amendments, both the first one and the second one.

**Mr. Speaker:** Will anyone be holding the floor to speak in favor?

**Mr. Viera-Morales:** Mr. Speaker.

**Mr. Speaker:** Mr. Viera-Morales.

**Mr. Viera-Morales:** Fellow Delegates: I wish to inform you that in the same way, with the same state of mind of the honorable Chairman of this Body's Treasury Committee, our dear friend Santiago Polanco-Abreu, with that same contemplation and that same awareness of the seriousness, the great importance that this Concurrent Resolution Number 5, which has been brought before the House for its consideration, entails for all the people of Puerto Rico, that same state of mind, I repeat, that same honor is what I'm experiencing right now when I'm about to defend two amendments jointly, that is, simultaneously, that have been filed by the Pro-Statehood Minority this afternoon through our spokesman, Dr. Leopoldo Figueroa.

As he had begun to state, the amendments, as far as the first one is concerned, it would only be to insert a paragraph at the end of the first paragraph on page 2, and I will take the liberty of repeating it before discussing it. The amendment states:

"It is further provided, that the total sum of such obligations may in no way exceed the total revenue as set forth in the preceding clause (ii), plus an additional 50 percent, said total annual revenue to be computed based on the three years immediately preceding the current fiscal year, and said 150 percent of said average annual average shall constitute the maximum limit for public debt that may be directly contracted by the Commonwealth of Puerto Rico."

The second amendment, which, as I already said, I intend to discuss it in conjunction with the first one, consists of the addition of a separate paragraph after the second paragraph on page 2, and it reads as follows:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

"To be effective in election years there will be no increase in the public debt of the Commonwealth of Puerto Rico or any municipality more than an increase that would be equivalent to the average annual increase of the three preceding fiscal years, and neither the government of the Commonwealth of Puerto Rico nor any municipality will undertake or carry out public words or incur expenses for an amount in excess of the annual average of expenses in the three previous years, except for reasons of an emergency that has previously been recognized by the Legislature of Puerto Rico in a resolution approved by three quarters of the votes in both houses."

As you may recall, the first turn to speak in favor of the Resolution, without amendments, was consumed by the proposing party, by Mr. Santiago Polanco-Abreu. I took some notes of his statements in support of the measure, without amendments, and I remember exactly that one of the main arguments made by the Chairman of the Treasury Committee was the fact that several experts, bankers, businessmen, most of them public officials, appeared at the public hearings hastily held by a House and Senate Special Committee, since I remember that the public hearings began with the testimony of the Secretary of Treasury, Honorable José Ramón Noguera, and continued with the testimony of Dr. Rafael Picó, Executive President of the Government Development Bank. To my fellow Representatives who have closely followed the background of this measure, the initial presence of these two witnesses at the public hearings should not have come as a surprise. Both of them, Mr. José Ramón Noguera and Dr. Rafael Picó, are distinguished Government officials, one of them for a longer period, and, according to the official press releases of communications authorized by the Executive Branch, the Honorable Governor of Puerto Rico, they are both fully aware of all the plans made from the first instant until this Bill, which is eminently Administrative, was finally brought, first before the Senate and now before the House of Representatives. Furthermore, both officials traveled, also in a hurry, to the United States to take a closer look at the securities prospectuses for the Puerto Rico bonds in the event that, as intended by the Administration, this Bill, which introduces a brand new formula to compute the borrowing capacity of the People of Puerto Rico, is approved; a novel experiment, in the words of the President of the Government Development Bank, that is only being used in two States of the United States; that is only being used in the State of Connecticut and the State of Mississippi. You will recall that this State of Mississippi became very popular, at least because of its name, when the Governor of Puerto Rico included it as the State that the Island of Puerto Rico would have to catch up with, since it is the poorest state in the Nation, so he could then think about moving to Statehood for Puerto Rico.

So, these two states constitute the precedent, as public finance principles, to establish the new system and set aside the old system that established a specific margin regarding Puerto Rico's borrowing capacity.

And wen we asked Dr. Picó during the hearings why was it that only two states were following the formula, were following the equation to consider public revenue as the basis to

compute a state's borrowing capacity, despite—since that's how he conditioned the question—the fact that Mississippi was being considered in Puerto Rico as the poorest state in the Nation, he replied by saying that they were not required to follow an old rule, subject to experimentation, and once again he raised the same argument that Mr. Abreu-Polanco had began to discuss, to make—the argument that bankers, businessmen, and experts in public finance issues in general had welcomed the new formula or experiment of the Governor of Puerto Rico and of this Administrative Bill that we are discussing this afternoon under the name of Concurrent House Resolution Number 5.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

And using the same argument and calling the attention of my fellow House Representatives towards one of the amendments, I would like to argue that everyone, including the Government officials themselves, high-ranking Government officials who testified, they are all pleased with one of the main principles contained by one of this amendments, such as the provision that it is extremely dangerous to consider only the previous year as the basis for the formula discussed here this afternoon.

One of those bankers, affiliated to the Popular [Democratic Party], a distinguished public man who served as Government official in the past, Mr. Roberto de Jesús, who is currently the President of Banco de Ponce, spontaneously, without being asked any questions by members of the Joint House and Senate Committee, made the following statements to the Committee. I refer to the memorandum that he has provided to my fellow House Representatives, referring to the Fourth Public Hearing in relation to Senate Joint Resolution Number 3 and House Joint Resolution Number 5, regarding the borrowing capacity of the Commonwealth of Puerto Rico. On paragraph 10, second paragraph, it says:

"Secondly," these are the statements by Mr. Roberto de Jesús, "and I have learned about this from the press, that it has been mentioned by other persons who have appeared here and now Mr. Pullen just added it, I think referring to the public revenue of the Commonwealth of Puerto Rico up to the past year may not be advisable. I would use an average of the past five years. Three years would also be fine, but preferably five years. Why not an average of those years? Because with the recent experience of what happened in World War II, where rum revenues rose unexpectedly, as well as other income, and they rose sharply in the blink of an eye, and that could last two or three years. That is why I think that a five-year period would be more reasonable, since it would have the ups and downs, and there can be sudden fluctuations in government revenue from one year to the other, even under relatively normal circumstances."

This citation thoroughly maintains one of the amendments of the Pro-Statehood Minority, a citation that I have inserted by reading it from the testimony spontaneously given by banker Roberto de Jesús, a former Government official.

Since I attended all the hearings and heard all the testimonies, I am in a position to assure, that Mr. De Jesús, Mr. Bird, Mr. Pullen, all the bankers, officials, and businessmen testified to that effect; therefore, the innovation being introduced through this first amendment that I am discussing in conjunction with the second amendment is not a purely reckless innovation of the Pro-Statehood Minority.

And I would like to digress now to comment on the sound purposes of this Pro-Statehood Minority in introducing these two amendments, which, in terms of Party policy, is not limited to obstructing in any way the approval of this measure, but it presents a thorough plan, it presents a formula by enhancing it with two pivotal amendments so that this Resolution, if finally adopted, meets the true purposes and is in line with the constitutional mandate of the related Resolution of the United States Congress.

The Pro-Statehood Minority shares the unanimous opinion of the Popular Majority that Puerto Rico really needed this autonomous measure that substantially liberalizes our Constitution of the Commonwealth of Puerto Rico. So, as we have historically done since the beginning of the discussion of this issue of the debt margin two years ago, we do not oppose to the transferring of the non-negotiated power of the People of Puerto Rico from the legislative to the constitutional scope, that the people of Puerto Rico themselves decide their borrowing capacity in a referendum. On that we completely agree with the Majority, casting our minds back to two years ago, when the discussion of the issue of the debt margin first began and the Pro-Statehood Minority always agreed, as they do now, that said power be transferred to the Constitution of the Commonwealth of Puerto Rico, taking it outside the legislative scope.   What the Pro-Statehood Minority has always opposed is the absence of a margin, and the contention of this Pro-Statehood Republican Party is that, if these two amendments are not finally approved, Concurrent Resolution Number 5 of the House of Representatives would not have any margin,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

and the principle, the postulate that embodies the Resolution of the United States Congress, would be completely defeated.

It's not that there is a fluctuating limit, like another Puerto Rico Government official said. It's just that what the United States Congress always contemplated was there be a limit, without it being called fluctuating. And the same applies to this first amendment too. When the Pro-Statehood Minority introduced this first amendment on page two of the Bill, it has two objectives. First, that there be a limit so that it can be called margin. In this case, debt margin. And second, the guarantee of a referendum by the people of Puerto Rico. If this amendment is not adopted as proposed by the Pro-Statehood Minority, none of these two objectives would be achieved and it would be mocking not only the spirit of the congressional Resolution, but also the spirit of all the people of Puerto Rico, who, both under the old system and within the new formula, if it prevails, has always wanted that the debt margin be a true limited margin, in order to avoid what was also acknowledge by one of the bankers who appeared as extraordinary witness in the public hearings. I will immediately refer to the same speech that refers to the fourth public hearing and which has been handed to the delegates this afternoon, because, exceptionally, we have that Mr. Roberto de Jesús, a preferred witness, not only because of his experience, but for his suitability, for his position on these public finance matters in Puerto Rico, is, without a doubt, a Government witness. When he was asked… Correction, nobody asked him. Deposing spontaneously before the Special Committee, I refer to page twelve of the same speech, Mr. Roberto de Jesús declares, and I read: "Now," referring to the limit, "that is, in fact, an amount that can fluctuate, how much they can borrow, depending on the average life of the issuances that are in force. For example, a bond issuance, the ones known as "general obligation bonds," that is, where the good faith of the issuing entity, of the Commonwealth of Puerto Rico, is pledged, which range from one to 20 years, but it can be a 25-year bond, a 15-year bond, a 30-year bond, depending on the market and on a series of circumstances.

"The average life of a one to 20-year issuance is eleven to twelve years, twelve and a half years, but nothing prevents it from having an average life of 17 years, for example. The formula is, simply, the first maturities, having very small amounts, based on 100 thousand dollars, and concentrating most of the debt in the last maturities, four or five maturities. In other words, let's give an example: a 10 million-dollar issuance of one to 20-year bonds. During the first 10 years, it could be 100 thousand dollars each, which is one million dollars, and concentrating on the last 10, the amount, the other 9 million dollars, and this would give us an average life of 15 or 16 million dollars, which means that the bill provides that bonds shall not be issued for more than 30 years, except in the case of housing bonds, and I believe that the distinction is a good distinction, because housing bonds are generally issued for longer terms than current bonds for other purposes. But within the 1 to 30-year range, depending on the average life of the loan, based on 30 million dollars, the margin could be 400 or 600 or 700 or much less. In other words, it can fluctuate, because you can serve a higher debt with a fixed amount of money, depending on where the maturity dates are concentrated."

He later explains this same expression, to the questions asked, precisely, by this humble servant of yours to Mr. De Jesús, where he admits that the so-called debt limit or margin is neither a margin nor a limit. In other words, that it could be the case, following the same example and using round figures, that the capacity that was authorized under this formula was two hundred million and, based on said fluctuation, also explained by Mr. De Jesús, the Government could be

1961            LEGISLATIVE ASSEMBLY (HOUSE)            259

able to borrow up to seven hundred million, to use the same calculations and the same words of this extraordinary witness, who was introduced to the public hearings, who was a Government official, and who currently serves as President for Banco de Ponce.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

So, my friends, I understand that in order to duly comply with the purposes of the Congress law, which literally authorizes the people of Puerto Rico itself to include in the Constitution the formula that they may deem acceptable to determine its borrowing capacity, would require this Body to approve these two amendments, the second one and the first one. I regret that I have not been able to devote more time to the second one, due to time constraints, but this amendment is so explicit, is so general, so unbiased, that it would cover not only the ruling party, but any party that would eventually take over government, for it would be absolutely immoral that any party, regardless of its name, that had all the power, and in the case of the Popular Party, with their absolute control over the Government of Puerto Rico, that as elections draw near every four years they would take advantage of all the borrowing capacity to hasten projects, works, constructions, not with the plausible purpose stated by fellow Representative Polanco-Abreu of contributing to the economic development of Puerto Rico and to permanent improvements in the areas of health, education, and roads, but only and exclusively to buy the conscience of Puerto Rican voters and undermine the objectives of the scale in general elections.

He ends by saying that these two amendments must be approved, because, otherwise, the purpose of the Congress Resolution and of Concurrent Resolutions Number 3 and Number 5, would not be met.

Thank you very much.

**Mr. Speaker:** Our fellow Representative consumed 32 minutes.

**Mr. Alvarado:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Alvarado:** We're examining some extraordinary issues in the legislative measure that we have before us. First of all, we're transferring to the people of Puerto Rico a power that they didn't have until now. Until now, that power was in the hands of the United States Congress. Through our efforts, through Puerto Rican efforts, the United States, by way of its Congress, has stripped itself of that power, and the people of Puerto Rico, who asked Congress, by agreement of its Legislative Assembly, to strip itself from that power and to agree to said power being freely exercised by the People of Puerto Rico, now the people of Puerto Rico, through its Legislative Assembly, defines how this crucial public power should be exercised: the power to self-limit their use of public credit. This is, therefore, a historic moment and it pleases me, based on what colleague Viera-Morales said, his statement that he supports the Bill insofar as it means a transfer of the powers of the people of the United States, through their Congress, to the people of Puerto Rico. Where we cannot agree with colleague Viera-Morales is in his theory as expressed on the amendments proposed by Mr. Figueroa on how we should make this self-limitation.

**Mr. Speaker:** The economic growth of individuals and of the peoples has two key pillars, based on how modern economy works. These key pillars are capital and credit. An adequate economic growth is not possible without an appropriate use of credit. By relying only on the means defined by the capital that we have at hand, we can hardly create an economic power that is progressive enough to make a private institution, or the great public institution that is our state, our Commonwealth, our Puerto Rican nation, if you will, the people of Puerto Rico. How to use our resources properly. How to use our credit properly. That is the great moment we are structuring here, and how we need to do it to get it right for the future that we can foresee right now. That's what keeps us debating and thinking today.

Individuals don't have their credit limited by Constitutions or laws. Their credit is limited by the market itself. That is to say, they can use their bank credit to the extent they are given credit, to the extent said credit is granted. It is not set in any way. Countries usually set limits for different reasons. I think that a natural limit would be set to credit abuse. There would be a limit for every country that tried to abuse its credit, a natural limit would be set, which is the point at which the potential acquirers of their debt would say: No, we will not lend you more money. And that would be a natural limit produced by the natural functioning of the economy. But that's not what we want. We want to draw a line to a point where, without there ever being a need to reach that line, we will always be in a position where the people who

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

can accept the representative documents of that debt on the market, the bonds, rest assured that they are acquiring substantial, reliable securities, and that we can commit to pay the highest interest possible for the acquisition of power of said securities. And at the same time, at the same time we are dealing with how to set that limit, how to self-limit ourselves, so that as we look into the future, in the ideas we have developed about how the Puerto Rico that we want to leave for those coming behind us, in the ideas about education, about communications, about industries, about agriculture, about all those things that Mr. Polanco-Abreu mentioned so eloquently and so clearly this morning; about all that, what do we want to do? How is the Puerto Rico that we want? A Puerto Rico with no debts, but without livelihood? Or a Puerto Rico with livelihood, with life capability, with the capacity to grow, always growing, always creating, with some debts that may be shared by different generations? That's the decision, and we have reached the point where we must draw the line where it should be drawn. Of course, if the thought that prevailed right now and in the morning, were colleague Alejo Rivera-Morales' ultra-conservative thought, we could not use the public credit at all; we could not grow; we would have to give up on our ability to properly use one of the biggest instruments of the political and economic creation, which is the public credit. And I find an inexplicable contradiction between the views of Alejo Rivera-Morales and what is proposed by this amendment. It cannot be said about this amendment, as it can categorically be said about the bold amendment by colleague Alejo Rivera-Morales, bold in terms of how conservative it is, we cannot say that it is such an absurdity in the conservative field. We cannot say such a thing. But to colleague Alejo Rivera-Morales, that is, we are against progress because of the clear, categorical, and definitive language. That's what colleague Alejo Rivera-Morales told us here this morning. Socialist! And faithful to his new interpretation of Cuban socialism.

Now, as for these two amendments that we are being proposed, one of them says: Look, you want to use the borrowing margin to borrow more money during election years, to carry on more public works and to win the elections based on that. Therefore, with this amendment, we propose that nothing more than a predetermined lower amount can be borrowed during election years, so that the people, even if the people will be deprived of the public works they need, said public works cannot be developed during those years. It seems to me that this is disrespectful for the people of Puerto Rico. I believe it means not recognizing that the people of Puerto Rico understands how democracy works. Not recognizing that they know how to go to elections and how to vote for the party that they believe will provide a better future for their children. That they can discriminate between parties that have amendments such as the one by colleague Rivera-Morales as the basis of their political philosophy against parties that have amendments such as the one proposed here by the Popular Party as the basis of its political philosophy. That is not the people of Puerto Rico. That is not the people of Puerto Rico, my fellow Pro-Statehood colleagues. The people of Puerto Rico understands how democracy works and lives it regardless of what they are given, they are against those that they know will betray them. They will defeat us the day they stop believing in us, no matter what we do, if they think they cannot trust us anymore. Just like you were defeated once and like you continue to be defeated since then because they stopped believing in you, because you rid yourselves of the methods that existed from other type of social control that forced them to yield, and did not have the education, the teachings that you have received during these twenty-one years of political school under the Popular Democratic Party. That amendment is disrespectful to the concept of democracy of the Puerto Rican people. To me, the amendment is completely devoid of any respect, because just as the amendment disrespects the people of Puerto Rico, I cannot respect the amendment based on a lack of respect for the people of Puerto Rico. That's all, in terms of this amendment.

The other amendment, we clearly and categorically established in our proposal a public debt limit that may be ascertained by numbers that don't lie. Fifteen (15) percent, not more, of the previous year's public revenues, based on our local legislation. Completely verifiable at any time. And that's the limit, the ceiling. We can't go beyond that. Whatever can be paid with that 15 percent, the public debt can't be more than that. A limit is clearly defined. But you say: A debt limit is not enough. A debt ceiling is not enough. We want two limits, we want two ceilings. And why do you want two limits, if there's one that has been clearly established? And why do you want to put a plafond on something that already has a



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

ceiling? You propose another limit in addition to the one that we are proposing. Why? Why? So that when bond buyers see the inconsistency in our constitutional provision, they will say: "This people distrust themselves so much that they bind themselves twice. They not only tie one leg, but they tie both legs." According to bond market specialists, that would be the effect of this amendment of yours, which would cause a sense of oddness among potential buyers with regard to our excessive limitation, and instead of having a beneficial effect for our bonds, these excessive precautions, what these excessive limitations, this double back-stitch of limitations, this plafond and ceiling, this duplicity of limits, would create in the buyer's market is quite the opposite, instead of a favorable feeling. In the end, what are you looking for? What do you want? You say you agree that we achieve the development projected by the Planning Board. You say that more should be achieved for Puerto Rico, but that's by your words alone. With your actions, you now look for a way to prevent that from happening, by imposing a limit to the limit. That is inconsistent. You are inconsistent, you, friends of the Pro-Statehood wing. I ask, I ask that in view of this momentous problem, of this historic problem for Puerto Rico, at this time when we're structuring our economic future and the entire future of Puerto Rico, don't play politics. I ask that you think about the realities. I ask you to be Puerto Ricans and only Puerto Ricans, and if you will do what I ask you, desist from those amendments, my fellow Colleagues, vote for the Resolution as it has been proposed. Thank you very much.

**Mr. Speaker:** Our Colleague consumed sixteen minutes. Mr. Morales.

**Mr. Roig-Vélez:** Mr. Speaker, to propose an amendment to the bill.

**Mr. Speaker:** Go ahead.

**Mr. Roig-Vélez:** So that on the first paragraph of page 2, starting with "fifteen percent (15%)" to the word "previous," it be deleted and that the following be inserted: "two hundred percent (200%) of the total revenue obtained in accordance with the provisions of the laws of the Commonwealth of Puerto Rico and deposited with the Puerto Rico Treasury on the fiscal year with the highest revenue within the five (5) years immediately preceding the current fiscal year."

**Mr. Polanco-Abreu:** Mr. Speaker, we also knew about this amendment, that is why we are able to object to it.

**Mr. Speaker:** Proceed.

**Mr. Roig-Vélez:** Mr. President, I request the floor to speak in favor of the amendment.

**Mr. Speaker:** Proceed.

**Mr. Roig-Vélez:** Based on the words spoken a moment ago, Mr. Speaker and fellow House colleagues, this Representative could come to the conclusion that proposing amendments to this Resolution would be wasting time. But, for the purposes of the record of this House, I want to make the following defense of the amendment that I am proposing. First of all, Mr. Speaker and House colleagues, we're not proposing here something we have made up, but we're proposing a formula that has been established in two states of the American Union. What are those states? The State of Mississippi and the State of Connecticut. Mississippi limits their debt margin to one hundred fifty percent of the previous year's income. The State of Connecticut limits it to 400% of the highest revenue within the four years preceding the current year. As far as we know, that measure has not affected the credit issue power of these two states, which are very different from each other, one because of its poverty level and little development, and the other for its great wealth and constant progress.

We propose 200% because, with that margin, the Commonwealth of Puerto Rico would have a remaining margin of $220,800,000 in 1967, accepting that the predictions of the people in charge of Puerto Rico's finances are turned into a reality. That is to say that in the first year of 1962, discounting the gross debt, not the net $193,200,000-million debt, the remaining revenues would stand at 215.2 million. In the year '63 it would be 207.9, in'64 it would be 209.2, in'65 it would be 220.9, in '66 it would be

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

227.1, and in '67 it would be 220.8. This is, having issued and made all borrowings proposed by the Planning Board for their six-year economic plan. And when would that credit be exhausted? Well, it would last ten or twelve more years, which in the event that the People of Puerto Rico incurred enormous debts that we cannot predict right now, we can still resort to the referendum, because we would still have the powers conferred by the United States Congress to continue to amend said constitutional clause that we want to insert. Although I don't believe too much in the referendum, I think, however, that as our country's culture is being shaped, as it grows, and as knowledge of this subject increases, the institution of the referendum will be a great democratic measure in Puerto Rico; it would be an institution.

Mississippi State bonds are rated as double "AA." Puerto Rico bonds are now rated as "A," despite the fact that Puerto Rico bonds are tax-exempted. Some argue, in those same hearing that were held in the United States to consider the project submitted to Congress, that we're currently paying extremely high interests here for bonds that are tax-exempted. We're absolutely aware of the progress achieved by the island and the People of Puerto Rico over the past years, and even more aware of the extent of the works that remain to be made, and we are more than willing to help the People of Puerto Rico to obtain the necessary resources to be able to carry out their permanent improvements.

I think that the Planning Board still falls short in their predictions for the future. On the one hand, they present small figures, but they say those are needed for the island's road program; on the other hand, it is said that $370,000,000 will be needed for roads. Meanwhile, the Treasurer of Puerto Rico states in his Report that once the next six years have passed, the most important permanent improvements will have executed and that it would not be necessary to incur further credit obligations. I believe that the Government of Puerto Rico will continue to progressively increase its revenues as it has done during the past years, and I believe it will have enough resources to face what is being suggested now, particularly in the Excise Tax Act. All forecasts state that this law will bring millions of dollars into the coffers of the public Treasury in the future. Therefore, I believe that, if by 1967 the People of Puerto Rico have over two hundred twenty million dollars to use to borrow more money, it will take many more years for Puerto Rico's margin to be exhausted. I propose in my amendment, Mr. Speaker and House Colleagues, that the highest-revenue year during the past few years be used as basis.

We all know that a little storm known as "Santa Clara" hit Puerto Rico several years ago and the Secretary of Agriculture is still blaming the agricultural woes on that little storm. Nobody can say that instead of "Santa Clara," we would rathe be hit by a "San Felipe" or a "San Ciprián," and people who are well-versed in agriculture know that you don't get a coffee plantation off the ground in four years, and that the ravages of a storm cause damages for many years, not for only one year. That's why I wouldn't want that the immediately preceding year be adopted, but the highest of the last five years. Can anyone say that what I say is based on demagogy? No sir. I'm not one who believes that you can increase expenditures and lower taxes, and I think that this Bill also makes all Puerto Rican men and women bear the burden, so that they all have the sense and conviction that they are contributing to the repayment of the public debt, which until now has been borne by Puerto Rico's owning class. I assume that the states of Mississippi and Connecticut also had a meeting with this finance experts and they, too, recommended those formulas. Most probably, bank representatives from the same foreign banks that attended the hearings here, also attended the hearings held by the legislatures of those states to change the formula used to incur debt. Naturally, I am not truly convinced by the presence of the arguments of these gentlemen, because they are creditors of the People of Puerto Rico. They attend the hearing because they are invited, but also because they're interested. Of course, how would they not be interested, if we're exchanging a small guarantee, such as ten percent of the assessed valuation of property in Puerto Rico, for all the revenue of the Government of Puerto Rico, including all property taxes collected. They must be satisfied with that. Besides, we know, and we have to assume that

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

they are qualified, since they hold such distinguished positions in bank finances. But the fact that they say that they all accept this issue, that they accept this formula of fifteen percent of the total taxable income of the people of Puerto Rico, that, by itself, could not move a Legislature like this one to act based on what our creditors demand; a meeting between debtors and creditors.

The fifteen percent of revenue is said to be a limit. Yes. That is a limit of the payment requirements, of the amount that must be designated annually for paying interests and principals of the corresponding annual period. That is the fifteen percent. But that is not the debt's limit. The debt would be what the fifteen percent could acquire in the securities market, which over twenty years it's supposed to be… for each million we're supposed to acquire 11.8 million dollars, six million dollars. It's true that the fifteen fluctuates, and the method I propose also fluctuates, and it fluctuates because as revenue increases, so does the capacity to pay for debt. But can we predict what the debt is, what the debt will be? Using the fifteen percent of revenue method, you have to rely on what mathematicians and experts who predict the future think, and that is why someone said this constitutes an unlimited limit. An unlimited limit, that is what fifteen percent of the People of Puerto Rico's revenue can acquire on the securities market. That is a method that I believe will also be accepted by the bondholders. What the bondholders want is to be paid because they know that the taxes paid for property in Puerto Rico are one of its smaller resources and that the ten percent of the assessed valuation of Puerto Rico's property no longer constitutes a guarantee backing the bonds already issued. Because they know that, they come, and look at how interested they are, that we have five letters written in the United States from five different banking institutions and they are all dated August 18. Why? Because someone went into their offices over there and said: —Look, give me that letter; I have to take it to Puerto Rico today. And he went to five banks, and the five banks gave him the letter. Well they didn't have to think twice. That is a great deal for bondholders and for banks. Was there a study on this? None. The situation is so advantageous to them that they don't have to evaluate anything. It's as if I had a mortgage with Mr. Polanco Abreu and owed him five thousand dollars and I guarantee with a house I have, and then the next day I tell Polanco: —Look, I have three more houses and I'm going to cover the three houses with the five thousand dollars I owe you. He says: —Well, if you're going to use four houses as collateral, then alright. That is the situation with bondholders. On this matter of the Planning Committee, they're talking about building roads. Highways in the metro area, roads in the metro area: they have a number of roads that I had here somewhere… The thing is that each kilometer of road costs one million one hundred thousand dollars. Roads in the metro area. The Planning Committee pays one million one hundred thousand dollars per kilometer. That why there are so many engineers who are millionaires. They were poor yesterday, and now they're all rich. They live in San Ignacio, in San Francisco, big two hundred thousand-dollar houses.

I've recently seen a one hundred and ten miles, four-lane highway in Florida, which would be one hundred and eighty three kilometers, that crosses areas that used to be mangroves and had to be filled, where they've had to build a series of overpasses so the intersecting roads can pass over this avenue, where they've had to build a series of bridges, and the engineering firm Trouppe and Company, in ten months, had completed the highway for sixty million dollars; and that is why days ago I stated here that, because this House of Representatives assigns money for these works, we should put together an investigative committee to regulate this, because at that low cost I'm talking about for the Florida project, you also have to add that the wages paid to workers here is eighty three cents an hour, while over there no worker will work on a road for you for less than two and a half dollars an hour. Everyone is thinking about monorails recently. They're getting this monorail thing into the Governor's head as something that will solve the traffic problem in San Juan. That's been ruled out in the United States, as are large, freeway avenues, and in Los Angeles, they're building sixteen-lane avenues, and the amount of traffic still

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

overwhelms their transportation and travel facilities. And what people are thinking about is using the air or the ground to decongest traffic in large urban areas. But here I've sent a letter through this House to the Secretary of Public Works concerning a bridge across the Bay of San Juan and the only answer he gave me is that it's too expensive. With no kind of explanation. Where in the world can you find a port like the one in San Juan that isn't crossed by not one but multiple bridges? Where in the world is there a city with a location like the one San Juan has, where it's a strip of land with no exit on the west, north, or south; that cannot commute across bodies of water on bridges that alleviate traffic congestion and help them remain economically competitive; does such a place currently exist? And a problem that everyone thought these good men had been looking into—because we have been talking about the traffic problem for years—now it seems they've found out that the United States Congress had made some assignments for that, and that they are planning to request one million dollars to begin a traffic study in the city of San Juan. To us, that term used, 'reacting'…that's something you can use with political parties, but not with individual legislators, because those who react are those who fear a past will occur once again. Nobody is asking for that here. Nobody is asking for that. The Minority here has voted in favor of the Government Program from the Popular Party in spite of the significant political implications that program has. And we all know how those programs work and the true strength those programs lend to the Government's Party. We know that. But we came here to vote for what is beneficial and useful to the People of Puerto Rico with no regard for whether this Party will go from 253,000 votes to 100,000 votes in the next election.

The interests of the People of Puerto Rico are held above all else. The wellbeing and happiness of the People of Puerto Rico are held above all else. This isn't about one political party or the other. I believe that everyone loves their country just as every child loves his or her mother no matter how bad she's been. Now, we're discussing a matter here that is under the jurisdiction of the Constituent Assembly. We're here as if we were a Constituent Assembly because we will, for the first time, amend a fundamental aspect of the Constitution of Puerto Rico. And there should be unanimity. There is unanimity in the purpose; there should be unanimity in the result. But the party seeking statehood and the people in that party, in order to demonstrate that they do not oppose right-wing propositions, in order to demonstrate that the matter of the ceiling or of what they want to call a "ceiling," of the limit, isn't inconsequential and that we are not achieving it by being an obstruction, that is why we're proposing that Puerto Rico's debt margin be set at two hundred percent of the greatest revenue from the year with the greatest revenue in the last five years. And that goes up to $408,000,000 in 1962, to $593,600,000 in 1967.

However, in 1967, according to the numbers released by the Government of Puerto Rico, from the Treasurer of Puerto Rico, Mr. Noguera—by 1967 we would have incurred a total debt of $372,000,000 based on the 15 percent; and that would be, in 1967, 127 percent—127 percent of the previous year's income. And that would have a ratio of 11 percent. We would be missing four percent more to reach fifteen. But the purpose is to never reach fifteen, I mean, as it is stated here, I don't know, the criteria change afterwards based on the circumstances. Human thought cannot be limited solely to sovereign countries, it can't limit itself.

That is to say, we are still submitting a proposition that produces a margin greater than the one produced by the 15 percent, and we know that the credit established by the People of Puerto Rico, since 1900, will not be affected because the People of Puerto Rico are like men who have no capital but whose signature is accepted at banks over those of men with capital but who are a bunch of shysters.

We submit this formula with the same level of patriotism with which our distinguished colleague Polanco Abreu called upon us. We are on the same page. And we know that he is on our level, having a common purpose, with a heart dedicated to helping our people continue to progress, of helping our people complete all the works it has in mind, as well as those it may need in the future, as well as helping our

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

people to prepare for any unforeseeable emergencies the future may hold for us. So that we may overcome the disastrous effects of

262                                    DAILY JOURNAL                                    SEPTEMBER 5

any hurricane, and so that we may also be able to survive any attack that any madman out there may someday decide to perpetrate against the People of Puerto Rico.

So I am submitting this for the consideration of my Colleagues of the House.

**Mr. Speaker:** Mr. Representative spoke for 39 minutes.

**Mr. Polanco Abreu:** Mr. Speaker.

**Mr. Speaker:** Go ahead, Mr. Representative.

**Mr. Polanco Abreu:** A brief turn directed at the comments made by some of our colleagues in the Minority. Firstly, I would like to bring the attention of my Colleagues of the House to the fact that, so far, it has been difficult to discern what the Republican Party's true position is. I ask this in a frank and honest way.

Let's see:

Doctor Figueroa produces two amendments. The first one for an addition to the first paragraph. The second for an addition to the second paragraph. Both paragraphs are on page 2. These two amendments are sustained and defended by our colleague Viera Morales. The scope of the first amendment is, as I understand it, inserting, as brilliantly explained by our distinguished colleague Alvarado, a second ceiling; that is, in addition to the 15 percent limit, to address payment requirements that until the Resolution is made, a new formula is introduced within the formula contained in the Resolution so that we depend on the average revenue over the last three years, plus 50 percent. In order words, 1½ percent, of one and a half times the average income over the last three years. That is sustained by our colleague Viera Morales.

Now, our colleague Roig-Vélez produces an amendment that is, as I understand it, is contradictory from the point of view of Doctor Figueroa, because the amendment proposed by our colleague Roig-Vélez excludes the formulae contained in the Resolution that use the 15 percent as a source for payment requirements and it only depends on the average from the last two times multiplied by two, in place of one and a half times, twice, but excluding, eliminating, the 15 percent provision.

Based on the circumstances, I must confront the two theses or the two doctrines or the two positions without knowing exactly what the party's true intent is, doctor. But I will do so…

Well, no; my Colleague has informed me that there is a third position that was expressed by our colleague Viera Morales. I'm simply being completely sincere in saying this: I won't bother mentioning why the amendments do not merit any intellectual respect. I believe that the Party… on that level of patriotism that I invoked and on which my colleague Viera Morales agrees, and on which my colleague Roig-Vélez agrees, and on which I believe Doctor Figueroa would agree, I cannot descend the level constituted by the amendment I mentioned.

Let us analyze the arguments made by our colleague Viera Morales, which sustain Doctor Figueroa's amendment. The first thing. Firstly, our Colleague says that the formula contained in the Resolution is an essential part of our colleague Viera Morales's arguments. I will demonstrate our colleague Viera Morales that the formula proposed by Doctor Figueroa does not set a fixed limit either, nor does the formula currently used in Puerto Rico based on assessed valuation set a fixed limit. Simply

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

put, my friends, no formula can ever set a fixed limit unless we close our eyes and speak nonsense like saying that the maximum limit of Puerto Rico's borrowing capacity would be $200,000,000. And that cannot be done in a practical and realistic sense because we will reach it when we least expect it and because that formula has not been accepted in the securities market.

Let us analyze the formula currently used in Puerto Rico. The formula currently being used in Puerto Rico is 10% of the assessed valuation of property. Now, last year, the assessed valuation of property was $200,000,000, multiplied by 10%, that's $20,000,000; but the next year, when new properties enter the lists of taxpayers and on the valuation list, the valuation will increase and so will the 10%. So there is no fixed limit. It's easier to decipher it mathematically. That's true. The mathematical operation X times 10% is the same thing; it's much simpler. We shouldn't be worried about simple math here that isn't even algebra—by simple math.

The formula contained in the Resolution also sets a limit. Why? The 15% used as a source of payment based on the previous year's revenue is a determined value; it's a factor of the previous year's revenue that can be determined. Yes. There is no doubt. It's not in anyone's hands there; it's an established fact. X number of dollars enter Puerto Rico's treasury from taxes imposed by the Legislature. That is multiplied by fifteen, and that is what the People of Puerto Rico have to pay with.

The formula does not establish a fixed limit; it does not establish a fixed maximum. It's a maximum that fluctuates; it is a fluctuating limit. What will those fluctuations depend on? On the revenue from the previous year. Just like the previous formula depended on the assessed valuation of property.

The third formula, proposed by our colleague Doctor Figueroa, and sustained by Viera Morales, what is that formula? One and a half times or twice the average revenue in the last three years. That means that, if in the last three years, the revenue was $200,000,000 one year, 300,000,000 the other, and 400,000,000 the last, we add 200 plus 300 plus 400 and divide it by 3, the average is 300,000,000 because the example I'm using adds up to 900. We add 50% to this: it's 150,000,000, plus 300: 450,000,000. But will that always be the case? No. Why? Because revenue will fluctuate. It will change. Because there is factor that changes, the entire formula changes. That is the reality.

Now: There is an additional circumstance that leads me to object to Doctor Figueroa's formula, and I showed that formula to the experts, and when I mention "experts" it's not because an expert's suggestions must be followed to the letter, but a legislator who doesn't know about medicine, or about nuclear energy law, and doesn't have specialized education in economy must depend on people who can provide guidance. Based on the counsel I received, I reached a conclusion grounded in logic and common sense. Doctor Figueroa's formula, which I refer to as "the insertion of a formula into another formula," was evaluated by experts, experts who are above party politics, of any party politics in Puerto Rico, and who have told us, —I have it here in writing:

"It's impossible to combine the use of two formulae to determine the Commonwealth's debt margin when one is concerned with the payment requirements of debt using the available revenue, and the other based on the ratio between the total debt and the available revenue. At any given moment, one other the other, whichever is most restrictive, will constitute the debt margin. The result will be that, at any given time, the margin will have to be calculated based on two formulae, thereby confusing those who authorize bonds and the investors who would buy them. It will therefore make it difficult to project good fiscal policies and will be detrimental to the acceptance of our bonds in the market.

Look at that. You make remarks saying that I believe things out of faith, that you're not worried too much about the creditors' position. Our distinguished colleague Roig-Vélez has just said it. However, with the amendment they propose, they are assuming an attitude of greater assurances, of greater safety for the creditors.

I find it difficult to understand, because if a clear position were maintained concerning the mechanisms of the formulae, then I would have to respect that. But if they sometimes make statements

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

contradicting what has been said before, that confuses me. Before that, before that emotional state of confusion, I present a formula that has been approved by various specialized experts on the subject, and that everyone agrees will benefit or improve Puerto Rico's credit. And so I tell you, my dear Colleagues: what is the need behind introducing a formula that, in place of helping, will produce confusion? Note the position in which they place the Majority, and these comments I'm going to make refer to our colleague Roig-Vélez, who said, "I'm noticing that producing amendments isn't worth the trouble." But this whole subject has been carefully studied. We aren't going to improvise, because we can't improvise with a country's fate. Each of our words, each of our actions must be properly planned.

And the expert, who is above party politics, continues by saying:

"If the ratio between the debt and the revenue is set at a very low amount, the advantages of the other formula are lost and it will soon be necessary to once again amend the Constitution to increase said ratio. If the ratio between the debt and the revenue is set at an amount that is too high, the limit will have no practical effect and will only serve to cause confusion and not to control the debt limit. If, under this

1961                    LEGISLATIVE ASSEMBLY (SENATE)                    263

dual system, an excessive debt is incurred, the resulting penalty of having to pay higher interests will not constitute a protection or abuse of the use of the formula based on a ratio between the debt and revenue.

"On the other hand, if good judgment used in the administration of the Government's fiscal policy results in paying relatively lower interests, then the resulting benefits of a greater debt limit set by the formula based on payment requirements would be nullified and lost because of the other formula that compares total debt and revenue."

I have used this turn to show you that we have complied with the evaluation of your proposal; that we have not capriciously assumed this position. But I'm intellectually convinced that it would be a mistake, a profound mistake, to insert a formula into another.

Our colleague Viera Morales used an expression that I say should be copied to the letter, but more or less the idea is that the Congress's spirit would be making fun of us. I frankly and sincerely disagree with our Colleague. I believe that the only scope is good democracy and good law, from a judicial point of view, it's that, in transferring it or moving it to the Constitution, it rests in the good judgment of the Legislature of Puerto Rico and that the United States Congress can't legitimately, in this day and age, sit down to determine whether someone is more or less protected by the limits set by the Legislature on Puerto Rico's borrowing capacity. But you may think that my thoughts aren't enough, and so, to support this theory and so that we can see the opinion of others who are specialized in constitutional law, who were presented with the amended proposals, that is, a copy of Concurrent Resolution 5 and a copy of the Senate's Concurrent Resolution 3, which are identical, in a consultation made by a law firm called Mitchell, Pershing, and Mitchell; this law firm consulted a law firm of constitutional lawyers who specialize in this, Arnold, Fortas, and Porter. And it reads:

"Dear Mr. Pettit." Mr. Pettit appeared before us.

"You have requested that we consider the Concurrent Resolutions now before the Legislative Assembly of the Commonwealth of Puerto Rico to amend Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico by adding thereto limitation upon the authority of the Commonwealth of Puerto Rico to borrow money and guarantee obligations evidenced by bonds or notes. A copy of the text of the Concurrent Resolutions which was submitted to us is enclosed.

It is our opinion that the Concurrent Resolutions and the proposed amendment to the Constitution of the Commonwealth of Puerto Rico if duly adopted, fully comply with and meet the conditions of Public Law 87-121, approved by the President on August 8, 1961. Further, it is our opinion that the

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

proposed constitutional amendment is compatible and in conformity with existing provisions of the Constitution of the Commonwealth of Puerto Rico. In our opinion, if the Concurrent Resolutions are duly adopted by the Legislative Assembly of the Commonwealth of Puerto Rico and if the proposed constitutional amendment is ratified by a majority of the qualified electors of Puerto Rico, voting in a referendum conducted pursuant to Article VII, Section 1 of the Puerto Rican Constitution, the amendment will become effective as a part of that Constitution and will effect the complete repeal of the relevant provisions of Section 3 of the Puerto Rico Federal Relations Act. 19 Stat. 953, as amended. It is our opinion that the Constitution of the Commonwealth of Puerto Rico, as thus amended, will then contain the effective provisions applicable to the Commonwealth of Puerto Rico, in respect of the authority of the Commonwealth of Puerto Rico to borrow money and guarantee obligations evidenced by bonds or notes."

(Mr. Mojica Marrero is acting as Speaker.)

**Mr. Viera Morales:** Mr. Speaker.

**Mr. Speaker:** Mr. Representative.

**Mr. Viera Morales:** Would our colleague Polanco Abreu allow me to ask a question?

**Mr. Polanco Abreu:** Of course, gladly.

**Mr. Viera Morales:** Am I to understand that, because of the intellectual and legal concerns embodied by that opinion rendered by that constitutional law firm, there was originally doubt regarding the judicial scope of Congress's Resolution?

**Mr. Polanco Abreu:** There was no doubt. There was no doubt. There was no doubt, because, to my knowledge, there couldn't be.

**Mr. Viera Morales:** And what was the reason for the consultation?

**Mr. Polanco Abreu:** The consultation results from the need for a much clearer and definitive record, because otherwise we would have depended solely on the judicial criteria of some experts specializing in bonds, lawyers specializing in bonds. But the constitutional aspect would have been left untouched and, as I understand it, Mr. Pettit acted very properly in contributing to this legislative measure's file.

**Mr. Viera Morales:** Was that opinion submitted before the bill was sent to the Senate of Puerto Rico?

**Mr. Polanco Abreu:** I don't know, because the letter I have is a translation.

**Mr. Viera Morales:** Does it have a date?

**Mr. Polanco Abreu:** It doesn't have a date, that's why I didn't mention it.

So then, my friends, the situation of Doctor Figueroa's first amendment and our colleague Viera Morales's position are unacceptable. But they are not unacceptable because of a mere arbitrary position, it is because of a reasoning, to my clear judgment, concerning the scope of the measure in relation to the one we are discussing.

Now, there are some psychological values present in the formula as well… There are some psychological values, he said, and it's that the formula contained in the Bill demands more from the people who will have to be responsible for recommending and approving the issuance of bonds and I think that is useful. I think that is useful and good. Those psychological factors disappear with Doctor Figueroa's proposal.

Now, let us briefly analyze our colleague Roig's amendment. Our colleague Roig's amendment presents a different picture. Our colleague Roig's amendment presents a different picture, and it's one that eliminates the fifteen percent and then finds a substitute or substitute formula. The fifteen percent

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

included in the formula contained in the Resolution would produce a certain figure of millions of dollars. Our colleague Roig's formula would produce certain millions of dollars. Now, the formula contained in the Resolution has been evaluated, has been analyzed, has been advised on, and we have a clear record of the reaction people who specialize on the subject have had, and if our colleague Roig's formula will not add anything in terms of dollars, why eliminate the one contained in the Resolution, which has already been studied? For a capricious reason, because it would be useful to please my dear friends? I don't think that is a good argument. Also, I'll repeat, our colleague Roig's formula, just like Doctor Figueroa's formula, would exclude the psychological factors that I've been talking about as I've gone on this morning and this afternoon, of demanding greater oversight from the people who will advise on and approve the issuance of bonds in the future. It seems to me, my Colleagues from the House, that none of the amendments produced by Doctor Figueroa, or by our colleague Roig, must be accepted. And I say none, because you, my colleagues, may have noticed that I have not mentioned the election year. This was commented by our colleague Alvarado. To my knowledge, this amendment does not represent, does not have a constitutional status, not even of a law. This must depend on the good democratic practices developed by a people fighting to better themselves.

On those grounds, I ask that the three amendments be discarded.

**Mr. Speaker:** Representative Polanco-Abreu has consumed thirty-one minutes. Is anybody else going to address the floor?

**Mr. Rivera-Santiago:** Mr. President.

**Mr. Speaker:** Mr. Rivera-Santiago

**Mr. Rivera-Santiago:** Mr. President, fellow House Representatives. We must now begin to forge the shield that we are going to need against the libel that may be raised during the upcoming campaign on the referendum on this constitutional amendment, against this side of the House, and against our party, I would like to go on the record with the following statements and affirmations. We want for our people the broadest, most comprehensive, and fullest Civilization that me may be able to conquer through our own individual and collective efforts within the natural limitations of our resources and talents. We want for our people the deepest culture that we may be able to forge along with the advance our civilization to enlighten the spirit of each and that each and every Puerto Rico be the epitome of civilization and culture. It is our wish that there not be a mouth without bread, a body without clothing or a family without a roof among our people. It is our wish that there not only be no extreme poverty, and the misery of our people, but that there not be even the poverty of those who need to seek the help of their fellow men. We want all Puerto Rican children to have the opportunity to learn and have an education to be better prepared

264

up to the limits of their intellectual capacity and by their own efforts for adult life. We want our people to be a people that does not live in fear of hunger, against need, against scarcity, much less against misery, against the slavery that he himself may create or may be created for him in his environment, within the confines of our people, or beyond such confines. In short, we want for all Puerto Ricans, those of the present and those of the future, the physical, spiritual, and moral circumstances and conditions that will allow them to lead a good life not a life of good living, that it not be a privilege, that it be for all. According to these convictions and principles we want to facilitate for the leaders of our people---and here I am referring to the governing leaders of our people, all of the financial and material tools and all of


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

the moral and spiritual assistance and support that may be essential for them to continue with their indispensable work that will lead our people to that state of well-being and freedom from fear in which each and every Puerto Rican may have his fair share of happiness and the good life. Not of good living, and that is why. Mr. President and my fellow Representatives, we have come here in good faith, very willingly, and all of us infused with a sense of civic and patriotic responsibility that brings us here together to try to provide this administration with the instruments, the resources, that I have just mentioned. To this effect, in view of the scenario at this time of practically the bankruptcy of our official economy with a debt margin of only about twenty-seven million dollars, which by 1967 will become a deficit, unless remedial legislation is approved, and that is what we are considering now, and that is why in view of the scenario of a debt margin of not more than $27,000.00, if that is what it is now, we are willing to vote for a limit here, not for a margin without any limit, that will allow this administration to have $27,000,000 at its disposal until 1961, and $200,000,000 more from there on.

I want to be very clear about what I am saying here, because I started out by saying that I am setting the groundwork for a shield against the slander that I fear may be raised and spread against this side of the Houses and against our Party in the  upcoming campaign on the referendum on this measure, in which we will be accused, as its repugnant face feared itself here this afternoon,  of being reactionaries and that we are against the increasing progress of our people.

And here I digress to express my regret that this debate has descended from a desirable height, and not through our fault, which was initiated and submitted by our distinguished fellow Representative and friend, Mr. Santiago Polanco-Abreu. ·

We want to provide this administration with adequate resources that are more than double than what our people have counted on in 60 years to carry out the work of progress that had never before been detained before this year due to how limited our resources are. Therefore, it cannot be affirmed here that we are fettered and chained to insurmountable limitations, since everything our people have done since 1898 until now in 63 long years, has been done with very limited resources, with a borrowing capacity that was at one time $60,000,000 and that at present has reached $190,000,000, and the progress of our people has not stopped. We come here to contribute in  good faith, honestly, with absolute intellectual and moral integrity, the resources that this administration needs to continue with the works of progress and culture and general welfare for our people, but we are not here to give them our votes or a blank check so that the credit of our people may be disposed of, and this is in no way a reflection on the current administration, as may be the whim of those who one day may lose their wits and plunge into a macabre Can-Can dance of spending and extravagance. We come here in good faith because we believe that we have been invited in good faith, we have been called here to establish a true limited margin for the borrowing capacity of our people. We have not come here to sign a blank check, nor are we willing to sign such a blank check.

We are not here either to approve legislation that will enter the constitutional sphere that implies a danger or risk for the credit of Puerto Rico and the opportunities for increasing progress for Puerto Rico, becoming a captive of bondholders in the United States, or wherever they may be. I say this because it has been alleged,

not in this House, but by all who have participated in this and have had the intellectual honesty in committees and in conversations and in conferences, and nobody has said it yet from that side of the aisle, admitting there is no limit on the debt margin under this legislation. And it was admitted by Mr. Esteban A. Bird, a distinguished member of the Popular party, and a very important public official. And he did not dare not to admit it to Mr. José Ramón Noguera, the Secretary of the Treasury. And he had already

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

admitted it two years ago, others testified with regard to the Resolutions being disputed, that I wasn't here then, this amendment that was to be submitted to the Congress for our [Federal] Relations Act.

We want all of these things to be known. We want it to be clearly known that we Republicans, the Statehooder Republicans, have come here in good faith to double, of necessary the borrowing capacity of this Administration, in which we do not have any effective voice but that is all we want, that is all that we are willing to give. And I am speaking in this tone and in these terms, in anticipation of the slander that may be brought against us during the upcoming campaign for the referendum on that legislation.

It has been said here that there has been disrespect. I regret that that phrase has been used, because although I was not alluded to, I was in no way alluded to, I would like to refer to this. I have been reading this morning the report on the hearing that was held in Washington on March 3

Of this year, chaired by Congressman Leo O'Bryan, known to all as the Subcommittee on Territories and Insular Affairs of the corresponding Committee of the United State House of Representatives. On pages 11 and 12 and following of this document, the representatives of the People of Puerto Rico at that hearing, the Honorable Antonio Fernós-Isern, Resident Commissioner of Puerto to Rico in Washington, the Honorable José Ramón Noguera, Secretary of the Treasury of Puerto Rico, never, at any time during the hearing a, and I refer to that report, they never spoke of this kind of legislation as being for implementing (I don't like the term "instrumenting"), as implementing the authorization that Congress would give Puerto Rico to include in our Constitution this right that we are clamoring for and which we are very pleased with and against which not a single voice was raised in our Party. I have read that report and in that report the debt margin is always mentioned being based on the assessment of property for tax purposes. It is here that we are talking about something else, which the Congress was not advised of. The Congress was informed that a proposition to that effect was being worked on. To what effect? To the effect of doubling the current debt margin so that it would go from 10 to 20 of the assessed valuation of property for tax purposes. I could say here, Mr. President, and fellow Representatives of the House, that this legislation that we are considering here is an instrument to deceive the United States Congress and the people of Puerto Rico. It is also disrespectful to the good faith of the United States Congress, who believed in the good faith of the word of the men who were representing Puerto Rico in Washington on March 3 and who there did not mention a single word about this new method that has been brought here for our consideration, because all of the discussion was reduced to talking about the debt margin from 10 to 20 on the assessment of property for tax purposes, and it was established in the record that the current valuation is $190,000.000,

It was in response to questions by Congressman Westland, from the State of Washington, that Mr. José Ramón Nogueras [sic] mentioned that the proposition was to increase the debt margin from 10 to 20. He said that the proposition was being worked on and it was not final, but that that was correct, it was along those lines that they were working. This was followed not by a long debate, but a long exchange of statements between Doctor Fernós, Mr. Nogueras, Congressman Westland, Congressman Hayley, from Florida, where, it should be noted parenthetically that the government does not have the power to borrow on the basis of bonds, that it is prohibited by. the Constitution. During this exchange of statements, expression, opinions, questions, and answers among these gentlemen at no time was this method mentioned. What was always talked about was doubling, multiplying by two, the current percentage on the assessment on f property for the purposes of setting the debt margin. And we came here ready to vote on such a proposition, which was what was reported to the United States Congress by the Representatives of the Government of Puerto Rico and the people of Puerto Rico. And when our colleague Rivera-Morales offered, for the purposes of initiating the debate, the amendment that has been called a lack of respect, a lack of respect by the Congress that has lasted nearly sixty years, he was simply initiating the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

formula, which improved, amended, worked on and elaborated, could lead us all to agree, so that all would vote in favor of this legislation. He was laying the groundwork so that we would arrive at what Mr. José Ramón Nogueras informed in

265

Washington, which is what you wanted as a debt margin, 20% of the valuation of property for tax purposes $380,000,000, that would be $207,000,000 more than you have now to borrow. And when that initiative was not addressed ...

Mr. Ortiz-Ortiz: Mr. Representative, Mr. Representative, I have not understood Representative Rivera-Morales's amendment of 10%. I don't understand it.

Mr. Rivera-Santiago: I just said that it was the beginning, that it was the beginning. That it was up to you to have amended it to 20 to be ... to be in agreement with your Representatives, that go to n

Washington to any one thing when here you are thinking something else. So, once this proposition was discarded, none of us had any illusions that you were going to accept it. What we were hoping was that our colleague would not be accused of being disrespectful, by reproducing here in the House what has prevailed in the constitution arena of the United States, and I am referring to the [Federal] Relations At of more than sixty years ago. Once that possibility was discarded, Doctor Figueroa's amendment was offered to you, and an amendment was also offered, improperly called also, but absolutely legitimate, because we are men, and we are subject to all the weaknesses of men, individually and collectively, as persons and as people, as groups and collective entities, and

constitutions may not be considered as being documents in which limits may not be included; constitutions are limiting, they are prescriptive, they are affirmative, they are declaratory. Constitutions reaffirm the rights of individuals and peoples, and they set forth the ideological framework within which the social edifice will be erect. The Founding Fathers of the American Nation and the fathers that drafted the Constitution of Puerto Rico, almost all of them were fathers. With the affirmation of rights and freedoms they established limitations, and nobody who expects to be respected for his knowledge can come here and endeavor that constitutional limitations cannot be made on a people, above all if by such a limit possible future risks are being foreseen, because that is the function of constitutions for all peoples. That is why constitutions are amended constantly, that is why Parliaments are constantly meeting to approve amendments to their fundamental statute, their constitution. I am referring to free peoples, because in Russia and Cuba, and in Paraguay and all the puppet governments of Russia and in China nobody meets, the tyrant of Turbe dictates. But for free peoples, parliaments are constantly meeting to amend their constitutions, and sometimes the amendments are to create restrictions, as is the case with the Gosped [sic] Act, and other times they are to eliminate restrictions when such restrictions are shown to be ineffectual and counter to nature.

There is nothing to prevent that if the debt margin that we are offering, with a true limit, not with an apparent and misleading limit, which is what we have here, there is nothing to prevent us from meeting again in five years, or in seven years, or in ten years or in fifteen years or in twenty years, and once again

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

amend our Constitution, and set a broader or stricter limit, which could also be the case, for our borrowing capacity. But what is being sought with this is

that there not be an opportunity for that, that we won't have to come back here, nor in a referendum for the people, for something as serious as revising our Constitution for the purpose of establishing a debt margin that is effective but safe, when in quite a few States of the Union in order to sell bonds there must be a referendum. I limit myself to the record I already mentioned, the case of the State of Florida. And when a referendum is held not all of the citizens that vote in Florida can vote; only those that are affected may vote, affected. I don't want to use the term "concerned." I'm not sure that it's correct; affected by the constitutional amendment; not by a constitutional amendment, by legislation on loans for bond issues. This is the case in Florida. That they are constantly calling on the people in cities, in counties or in the entire state so that they may express their opinion, their approval or rejection, when it is such serious matter that affects everyone, such has determining the debt to be undertaken by taxpayers in their state, their county, their municipality. Which doesn't happen here, because we all vote here.

Mr. Muñiz-Ramos: Mr. President.

Mr. President: Mr. Representative.

Mr. Muñiz-Ramos: I want to ask the colleague a question. Am I to understand that Representative Rivera-Santiago endorses the Florida system in which only the affect persons can vote ...

Mr. Rivera-Santiago: The system, the system?

Mr. Muñiz Ramos: Of the State of Florida.

Mr. Rivera Santiago: No, no, no. I speak very clear Castilian. I am cases so that it may be seen how far reservations go in the United States,

I some Sates, regarding such serious matters that we are seeking to deal with so frivolously, so frivolously. No, no. I am not endorsing the method that is used in Florida. I have my method as a Puerto Rican. Our method, which has been validated for sixty years in its exercises and practice, it has withstood the test of time of sixty years of practice. That is the method.

Mr. Muñiz-Ramos: Yes. Another question, if you will allow we. Am I to understand, that you support the amendment proposed by Representative Alejo Rivera-Morales?

Mr. Rivera-Santiago: I didn't say that either.

Mr. Muñiz-Ramos: Which of the three amendments does my colleague support?

Mr. Rivera-Santiago: I have said it very clearly, I support the amendment that will provide you with the most resources, the maximum resources, but with a limit; it can't go over that.

Mr. Muñiz-Ramos: Which of these amendments is the one that ...

Mr. Rivera-Santiago: I support it insofar as the current Constitution at 20% mentioned by Mr. José Ramón Noguera in Washington, and I also support the amendment by my colleague Mr. Baldomero Roig. You have where to choose from. Another thing, Mr. President. In a matter that is as serious as this one, that affects all of our people, because Puerto Rico is not the Popular Party and the Government of Mr. Luis Muñoz-Marín. Puerto Rico belongs to the Puerto Ricans, and among those of us who vote, well we are 253,000 Statehooder Republicans that vote, and with the families …

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Muñiz-Ramos: Mr. President, I mean, with the permission of my fellow Representative.

Mr. Rivera-Santiago: Yes, of course.

Mr. Muñiz: Ramos: Am I to understand that Representative Rivera Santiago does not support the amendment proposed by Doctor Figueroa

Mr. Rivera-Santiago: You have where to choose from, but since I suppose that what you want is money, well choose the one with the highest sum, choose that one. You want

Doctor Figueroa's; I support Doctor Figueroa's, but since I can foresee that that is not enough for you, we have offered you an even more generous one. Another thing, Mr. President and my fellow Representatives is to bring us here for such a serious matter that we follow a dictum from the Governor's Mansion, and we have not come here for that. We have very respectable interests to defend and protect, even the interests of all taxpayers that are not well-defended who belong to the Popular Party whose pockets are subject to and obligated by this unlimited debt margin that you want to establish with this legislation. Thank you very much.

Mr. Speaker: Mr. Rivera-Santiago has occupied 35 minutes.

Mr. Figueroa-Carreras: I have a question, Mr. Speaker.

Mr. Speaker: Continue.

Mr. Figueroa-Carreras: We want to know if the three interruptions that were included in those 35 minutes, because, in that case, they should be deducted from the Popular Democratic Party, not from our Party.

Mr. Speaker: They were not included, Doctor.

Mr. Figueroa-Carreras: They were not included. Very well then.

Mr. Speaker: Anyone other fellow Senators?

Mr. Cordero: Mr. Speaker.

Mr. Speaker: Representative Cordero.

Mr. Cordero: Mr. Speaker, Fellow members of the House: I'll be brief and try to avoid covering the field which was discussed with such brilliance, expertise, and eloquence by our Messrs. Polanco-Abreu, Benjamín-Ortiz, and Arcilio-Alvarado.

The Commonwealth of Puerto Rico is experiencing a process of growth, a process that began on June 23, 1958 with Joint Resolution No. 1 issued on that same date. At that time, deleting the two provisions of Section 3 of the Puerto Rican Federal Relations Act regarding setting a borrowing limit for the Commonwealth of Puerto Rico and the municipalities of Puerto Rico was requested. Acknowledging said Resolution issued by this Legislative Assembly, Public Law 18-121 was recently passed by Congress and signed by President Kennedy on August 3 of that same year. Subsequently, Joint Resolution of the House Number 5

was presented to this House of Representatives on August 17 of that same year.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Our friend Viera-Morales stated that the intention of Congress was to set a limit and our colleague Rivera Santiago expands on Mr. Viera-Morales' position and says that this Joint Resolution Number 5 of the House is misleading because the Resolution's calculations are a little difficult and, in the colleague's opinion, since the limit is not clearly shown, then Congress was misled. Now, what our colleague, Mr. Rivera-Santiago, fails to say is that in some of the many formulas suggested in the amendments proposed today by our Republican friends, it is admitted that they would include as part of the formula that would be added to the Constitution of the Commonwealth of Puerto Rico the formula that our colleague, Mr. Rivera-Santiago, stated was misleading the United States Congress.

If there were deception, which I categorically deny, and I'm going to prove it, if there were any deception, Mr. Rivera-Santiago, we would all be accomplices. All of us would be accomplices if there were any deception. Now, an objective, calm, and impartial analysis reveals that any deception is not possible, and, let's see what the facts are. The fact is that since the creation of the Commonwealth of Puerto Rico, the matter of Puerto Rico's debt margin should have never, never, been in the Federal Relations Statute. This has been pointed out since 1953 in an articled by Dr. Pedro Muñoz-Anato published in the Annals of Political Science. The fact that the matter of the debt margin should have never been in the Federal Relations Statute has been noted since 1953. Why? Well, simply put, this fact is well known by my dear fellow colleague Dr. Figueroa and the republican colleagues who are attorneys, because debt margin is a matter for the local government. It's a local government issue and should never have been in a statute related to relations between Puerto Rico and the Federal Government.

Article VII of the Constitution of the Commonwealth of Puerto Rico, which was approved with the vote of Mr. Figueroa, the honorable Senator García-Méndez, former candidate for governor, Mr. Luis Ferré, and, if I'm not mistaken, with the vote of that well-known socialist, our colleague Alejo-Rivera. Article VII of the Constitution of the Commonwealth of Puerto Rico provides the full amendment process for the Constitution of the Commonwealth of Puerto Rico. Furthermore, said Constitution was approved by the United States Congress and clearly provides that the United States Congress does not have the right to intervene in the process of amending the Constitution of the Commonwealth, since it is a local government matter in which Puerto Rico has autonomy and the full authority to resolve local government matters. The United States Congress lacks the authority to intervene with the Constitution of the Commonwealth of Puerto Rico. The amendment process, the process of deciding which changes will be made to the Constitution of the Commonwealth is a decision-making process that must be exclusively addressed by Puerto Ricans. If only Puerto Ricans may participate in the process, how is it possible for a distinguished attorney, who is a member of the Puerto Rico Bar Association, to attest that Congress can set forth provisions for the People of Puerto Rico regarding matters in which the People of Puerto Rico have absolute autonomy? Mr. Viera-Morales, in matters of local government, in matters of the Constitution of the Commonwealth, with the affirmative vote of your <mark>Legislative Leader</mark> it was decided that only Puerto Ricans could decide how that Constitution can be changed and Congress approved.

Mr. Viera-Morales: Mr. Speaker

Mr. Speaker: Representative Viera-Morales.

Mr. Viera-Morales: Would our colleague allow me to ask a question.

Mr. Cordero: With pleasure, as long as it is deducted from the fellow Representative's wing.

Mr. Speaker: Go ahead.

Mr. Viera-Morales: Does the attorney Federico Cordero know that the Resident Commissioner presented, filed a resolution to Congress related to this debt margin matter and, at the request of the Chair


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

of the Relations Committee of reference, all of the "Recitals" were eliminated from that resolution and the resolution was solely and finally approved with the enabling clause?

Mr. Cordero: Our colleague is not saying that Mr. Fernós-Isern was presenting an amendment to the Constitution of Puerto Rico. Well, sir, amendments to the Constitution of Puerto Rico cannot be presented to the United States Congress. Mr. Fernós-Isern would be presenting a bill to the United States House of Representatives. Sir, make the distinction.

Mr. Viera-Morales: That was finally approved and has resulted in the Resolution that is now being discussed.

Mr. Cordero: But that is a bill for the amendment of a federal law, fellow colleague. Amending a federal law is one thing, amending the Constitution of Puerto Rico is another. My colleague, the fact of the matter is that Puerto Rico is no longer a colony, but there are still some that think it is.

Mr. Rivera-Morales: Mr. Speaker, I have a question for Mr. Cordero.

Mr. Speaker: Will you allow it?

Mr. Cordero: Of course, with pleasure.

Mr. Speaker: Go ahead.

Mr. Rivera-Morales: I was outside when you referred to me. I would like to know what Mr. Cordero called me. No, it's just to know. I was told that Mr. Cordero when referring to this Representative said: "That well-known socialist." I want our colleague to repeat it.

Mr. Cordero: Fellow colleague, I said that I was referring to the well-know socialist. Is our colleague not a socialist?

Mr. Rivera-Morales: No, if you said it that way, I rise a question of personal privilege.

Mr. Speaker: Go ahead.

Mr. Rivera-Morales: Although calling other members of the House names is not customary, it has been repeatedly done here, but if he did say it, I'm going to rise a question of personal privilege.

Mr. Speaker: Go ahead.

Mr. Figueroa-Carreras: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Figueroa-Carreras: It must be noted that it does not count. It's a question of personal privilege that does not affect the…

Mr. Speaker: That it does not count is understood. Go ahead.

Mr. Cordero: Fellow colleague, in any case I would yield my time for his personal privilege.

Mr. Rivera-Morales: Thank you very much. Representatives have been admonished when they get off the subject. Now, what I want is for Mr. Cordero to repeat what he said about me.

Mr. Speaker: In order to clarify and quickly resolve the matter, Mr. Cordero already said that that he had called Your Honor "the well-known socialist." That's what he said.

Mr. Rivera-Morales: That is what Mr. Cordero said?

Mr. Speaker: Exactly.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Rivera-Morales: Well I'm going to ask our colleague to retract those words.

Mr. Cordero: Which words do you want me to retract… socialist?

Mr. Rivera-Morales: "Well-known socialist."

Mr. Cordero: Well, if our colleague is offended by being called a "socialist," I won't call him a socialist again.

Mr. Rivera-Morales: No, I'm not offended by that. I`m offended by being called "that well-known socialist", and I believe the House is also offended.

Mr. Cordero: Fellow colleague, I didn't say "that well-known socialist." For that matter, when I said "well-known socialist" I was pointing at your desk, believing that you were there.

Mr. Rivera-Morales: I was not here.

Mr. Cordero: I regret that you weren't.

Mr. Rivera-Morales: Then, if you said that, I'll ask you to retract it.

Mr. Cordero: If my colleague wants me to retract it, I'll retract. It.

Mr. Speaker: The expression is retracted and continue.

Mr. Cordero: My intention was not to offend you, fellow colleague.

   Mr. Speaker, what's important is that it seems that Puerto Rico's political status and the authority the People of Puerto Rico have to exercise its discretion is better understood by the United States Congress than by the republican wing of this House. That is to say, when the United States Congress renounces the reserved right to set Puerto Rico's debt margin provided to such by the Federal Relations Act and says that said matter shall be decided by the People of Puerto Rico, exercising its sound judgment, United States Congress clearly believes that this is a local government matter and that the United States Congress should not set forth provisions. That's why it says: I'm retiring, it's your turn; and that is why we are debating this matter here today, sir. But then, our colleague Alejo Rivera-Morales, whom I don't dare to call a "Socialist," says that it must be added, that what is provided in the Federal Relations Act must be added to the Constitution of the Commonwealth of Puerto Rico. Colleague! Colleague! If we come here to do that, then that would be beneath us, to come here to stamp Congress' rubber seal. That would be a game, a total farce, greatly deceiving global opinion. For Congress to say: Let's

1961                                    DAILY JOURNAL (HOUSE)                                    267

transfer the federal statute to the Constitution of the Commonwealth of Puerto Rico. Oh! But you can't give your opinion. Pass it verbatim; what must prevail is the intention of Congress in 1902, not even Congress of 1961; of 1902. Let's not discuss the financial impact of the proposed amendment made by Mr. Viera-Morales. I believe that Mr. Arcilio Alvarado has already crushed it. Meaning the amendment, not our fellow colleague.

   However, Mr. Speaker and members of the House, it worries me that there in Puerto Rico there are still traces of the colony, and they are part of the most dangerous thing, in the spirit of colleagues that hold seats in the House of Representatives. The position held by Mr. Alejo Rivera-Morales is colonialism at its fullest extent. That Congress continues legislating and that we continue acting as rubber stamps of

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Congress regarding local government matters. That is what prevailed before, before the creation of the Commonwealth. In his spirit, in his court of conscience, in his inner self, Mr. Rivera-Morales wants for this status that has been overcome to keep existing in Puerto Rico for years and years, and that it remains in our Constitution.

When our colleague, Mr. Viera-Morales, argued against the formula provided in the Joint Resolution of the House, his colonialist spirit arises, Mr. Speaker and fellow members of the House. The quantum, experience, the Constitution of most of the federated states must be taken into consideration. Therefore, when most federated states do something, then the winds must sweep over Puerto Rico. If only two do it, that is not enough for the colonialist spirit. We must look at what many Americans do, what is good for the majority, what is in fashion. We must keep up American fashion. What most Americans say, that is what's good for the colonist spirit. With that spirit, if the majority adopted that spirit, we would never grow. If we had assumed that attitude, these significant thing that is the Commonwealth of Puerto Rico would not have been created, which our fellow colleague recognizes when the fog of colonist spirit is lifted from his eyes.

And when Mr. Roig –and I am sorry that he is not present today, but it's not my fault that the minority is absent from the chamber and that some of the majority are also missing– and when Mr. Roig refers to "monorails", as he does in perfect English, when Mr. Roig refers to "honorails" [sic] and says that such have already been discarded in the United States, what are the implications? If the metropolis discards something, then we don't have to think about it here, because Americans have already thought for us; the colonialist spirit that arises from Mr. Roig.

Clearly, when Mr. Rivera-Santiago speaks about the examples that must be followed, he refers to Florida. Now, what he fails to tell us is how many black people voted in Florida in those referenda. Of course, he doesn't refer to other countries because he must keep in step with the spirit, because what the United States does must be observed before deciding if we can think about monorails or if we can think about referenda.

In terms of the reactionary attitude, I'm not going to get into that. Mr. Arcilio Alvarado discussed the matter very clearly, in terms of the ultraconservatives, and I dare to rise another question of privilege.

Lastly, Mr. Speaker and fellow members of the House, we are here experiencing a spectacle sui generis. There is no longer a Minority here; now there are four Minorities. Before our colleague, Mr. Rivera-Santiago, stood it was a matter of three in one. One party, three amendments. Mr. Rivera-Santiago did not move to amend so that he would not harm the three in one, but he took the risk of proposing, but not as an amendment so that the three in one would not be harmed, that the formula that at present is set forth in the Federal Relations Statute be increased by 20 percent. Clearly, as Mr. Santiago Polanco-Abreu showed, these formulas are contradictory, their economic impact is different, and the four formulas are irreconcilable. But, the Popular Party proposed a formula, a formula recognized by experts, a formula that is acceptable to persons that are willing to finance the future bond emissions with their resources, which will not be secured by owners, but by the good reputation and standing of the Commonwealth of Puerto Rico. The Republican Minority is faced with the clear and conclusive position of the Popular Party, with the three in one and Mr. Rivera-Santiago's amendment that is not amended. Based on this situation, I don't see how our Popular Party colleagues can change their opinion regarding which of the formulas is in the best interest of Puerto Rico.

Thank you very much, Mr. Speaker and fellow members of the House, for your attention.

(Mr. Torres-Gómez assumes the Speakership)

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Speaker: Mr. Cordero has occupied exactly 23 minutes, after deducting ten minutes related to the previous incident that were not attributed to anyone. Any other Representative?

Mr. Otero-Bosco: Mr. Speaker.

Mr. Speaker: Representative Otero-Bosco.

Mr. Otero-Bosco: Mr. Speaker and fellow members of the House: I'm going to hold the floor to speak in favor of the two amendments presented by Dr. Figueroa, to wit: the first amendment at the end of first paragraph of page 2 and the second amendment, separate paragraph after paragraph 2 of page 2.

I'm going to start my statement with the same words used by Mr. Roig when he first held the floor to speak, which were not appreciated by Mr. Chaguín Polanco-Abreu –that it's not worth to move amendments. It's not worth to move amendments because it seems that, as it usually said, the right wing of this House has closed ranks, has not admitted a single point or comma of the Joint Resolution of the House.

We agree on what the transfer of powers from the Relations Act to the constitutional level represents, on its significant importance. In that matter we have not disagreed with the Popular Party Majority. We can't disagree because throughout this Party's history, in terms of matters of this nature, which would represent more autonomic powers for Puerto Rico, this Party has always assumed an elevated opinion. However, due to our supervisory mission we are bound to look after the safety of our current generation, as well as future generations. The first amendment refers to the debt margin limit of the borrowing capacity, which may be summarized as follows: At present, according to the current report, borrowing capacity is set at 10 percent over the total assessed valuation of property in Puerto Rico. The value of property in Puerto Rico is currently assessed at around $1,900,000. That is to say, that the debt margin of the Commonwealth is $190,000,000. The amendment, the first amendment submitted by Dr. Figueroa states: "It is further provided, that the total sum of such obligations may in no way exceed the total revenue as set forth in the preceding clause (i), plus an additional 50 percent, said total annual revenue to be computed based on the three years immediately preceding the current fiscal year, and said 150 percent of said annual average shall constitute the maximum limit for public debt that may be directly contracted by the Commonwealth of Puerto Rico."

Pursuant to reports issued by the Secretary of the Treasury of the Commonwealth of Puerto Rico, annual revenues have currently been around $200,000,000. Pursuant to this amendment, Puerto Rico's borrowing capacity would increase from $190,000,000 to $300,000,000, that is to say $110,000,000 more. This amendment reflects the patriotic spirit of the men that form this House's left wing, who are part of the Pro Statehood Party. With this amendment, we are not trying to hold back progress, as has been said here, since we are being very liberal, very cooperative, since we are giving the Government of Puerto Rico, the absolute Government lead by the Puerto Rico Popular Party $110,000,000 more than the current debt margin. Without a doubt, words are shaped to reflect what the person wishes to convey, and, as our colleague Rivera Santiago said, a campaign will be launched for the referendum accusing us of being reactionary and of trying to put a hold to Puerto Rico's progress and that we are against building more schools and more hospitals and providing more services to the people. This has been going on for the last twenty years. That is clear, it' been clearly entered in the record, and the country will be informed that this amendment would provide limit increase of $110,000,000 for the Government of Puerto Rico, with those services, more schools, and, based on our means, we could continue with the rhythm of progress that has been achieved up to now, with $110,000,000 more, a much higher margin than the one we have had in the previous sixty years.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The second amendment was not discussed by our colleague Chaguín Polanco, other than the fact that

268                DAILY JOURNAL                SEPTEMBER 5

good democratic practices developed by a government fail to allow excessive expenses, overspending, which is what this second amendment expects to avoid.

The second amendment, sets limits for the municipalities and Government of the Commonwealth so that no increase whatsoever can be made to the debt margin in an election year. If this is included here, it's due to past experience, since, here, in this House, members of the Majority Party have admitted that in election years we have to feed the people so that they can vote on a full stomach. During a debate held here about a House Bill, our colleague Justo Náter admitted to this, and it's on the record. Undoubtedly, in electoral years, the distribution of goats and cows begins. In electoral years, road, highway, and school repairs are undertaken throughout Puerto Rico. In electoral years, a river of money flows through Puerto Rico and, without a doubt, the purpose of this amendment is to suppress this viscous wastefulness, this squandering of public funds for the sole purpose of filling the lines of polling places with voters wearing a pava[1]. Mr. Polanco-Abreu says that that results from good democratic practices developed by a government and what we see happening in electoral years in Puerto Rico, of which the Popular Party members are aware of, of which we are aware of, of which all of the People of Puerto Rico are aware of, denies that statement of good democratic practices developed by a government. Moreover, this can be taken even further in terms of the need for this amendment to be passed; the need for this amendment to be passed can be taken even further.

I believe that the visit to Puerto Rico by the Civil Rights Commission, chaired by Mr. Baldwing, should still be fresh in the minds of the People of Puerto Rico. In one of the hearings, held by the Civil Rights Commission in Puerto Rico evidence was produced, evidence was produced of a note signed by Governor Luis Muñoz-Marín while he was President of the Senate, addressed to a senior officer of a Government department instructing him to transfer an employee from Public Welfare for the mere fact of being a supporter of the independence movement. And I believe that that could not have been forgotten by the colleagues that are members of the Majority, just like it has not been forgotten by the People of Puerto Rico, just like the admission by the Governor of Puerto Rico himself that, yes, that must have been true, has not been forgotten, but that those bad habits had ended as of 1948. But the Governor admitted that that had taken place during the Administration of the Popular Party, while he was the President of the Senate, and he admitted that the document and the signature were his, and in it he ordered the transfer of an employee due to the fact that he was a supporter of the independence movement. And this amendment would eliminate the possibility that that continues happening in Puerto Rico, because, although the Governor stated in 1949 or in 1950 or in 1951 that that had happened in 1948, but that those bad habits had ended, the truth of the matter is that in 1940 when they won the elections and came into power, they also said that those practices had ended, however, they continued until 1948. Therefore, this is the amendment that would protect, in part, the People of Puerto Rico from repeating this or, in case this happens again, these acts would be less frequent.

---

[1] Translator's Note: * The pava is the traditional hat used by sugar cane cutters, coffee pickers, and other agricultural workers. It is emblematic of the jíbaro (a Puerto Rican from the countryside) and the rustic traditions of the island's folkways. The pava is so closely associated with the notion of authentic Puerto Rican culture that when Luis Muñoz Marín founded the Popular Democratic Party (PDP) in 1938, the party adopted the pava, as its symbol. [*Pava*, entry on the website of the National Museum of American History, http://americanhistory.si.edu/collections/search/object/nmah_603046, last visited January 28, 2018.]

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

My friends, Mr. Roig says, and I completely agree with him, that it's not worth to move amendments, but if we take into account previous records, undoubtedly these amendments are brought to show and attest that we intervened in this debate and moved two amendments in good faith, in order to guarantee services are provided, and that there will be schools and highways, and that hospitals will have more beds, but that the margin is not inflated in such a manner that it is used during election years to feed voters during election time and have them go with a full stomach to the polling places to vote for the Pava, as my colleague Justo Náter said. Regarding this matter, a more recent event, a more recent event is what was covered by the press on the 1960 visit made by the Puerto Rico Governor after the floods in the district of Humacao. It was still fresh news the story that Governor called for a press conference inside the van –the van that he was using to survey the Humacao district– to inform them, in the middle of a political campaign, which is when the Humacao floods occurred, that he was instructing the corresponding department heads to assign one million dollars for the Humacao victims, after having assigned another million the previous week. Perhaps many more million will be needed and all Puerto Ricans wished that there were many more millions for the Humacao victims, but calling a press conference in the van used to survey de area so that he may make an announcement only had the political intention of gaining support for the Popular Party in the elections. And that, my friends, will not be possible if that amendment is passed, since it will not allow the misuse of public funds –instead of the use of public funds– so that certain political ruling party, be it the Popular Party today or be it the Statehood party tomorrow, or any other party that may subsequently rule, is not able to secure votes, because, even though the colleagues in the Majority believe that they will never lose power, that the Popular Party will rule for 240 more years, it is possible that tomorrow, in four years, in eight years, or in twelve years Party X rules, and there's a possibility that it's the Statehood Party, because we are fighting for that power so that we may patriotically and austerely resolve the problems of the People of Puerto Rico. These limitations, that in your opinion are limitations to this Resolution, which were proposed with the purpose of having another four million dollars approved for the Government of Puerto Rico, those same limitations will be faced by the ruling Party, even though our friends in the Majority believe that no other Party will hold the Majority while Puerto Rico remains Puerto Rico and while they enjoy their material wealth.

Mr. Cordero said, he was referring to the fact that the amendment presented by Mr. Rivera-Morales, would not act as the rubber seal of the United States Congress. I'm not going to delve into the rubber stamps issue. Frankly, I remember that Senator Juliá started writing regarding said matters in the United States press and he gained the contempt of all of his colleagues, and I don't want our friends from the right wing to snub me at another time, but Mr. Cordero is adding insult to injury.

Now I'll discuss some data from the Department of the Treasury regarding the amount that each of the nation's states and Puerto Rico must deposit to pay the principal and interest of their debt. Pursuant to the data for 1959, Puerto Rico should had deposited in 1959 8.9 million dollars and that sum is higher than the sum for 24 US states. This information was provided by the Department of the Treasury and is at the disposal of my Colleagues. I believe that the honorable Chair of the Treasury Committee should also gave them. In terms of the sum that Puerto Rico must deposit in 1967, pursuant to statistics of the Puerto Rico Department of the Treasury, in 1967 the amount that should be deposited to pay capital and interest on the debt is $32,000,000. This amount is higher than the amount that had to be deposited in 1959 by forty-four US states. We're not going to get into comparing wealth between Puerto Rico and the states. In terms of the percentage, there are only two states that surpass Puerto Rico's percentage. These are Delaware, with 20 %, and Massachusetts, with 17%. Here, we're requesting 15%, a higher amount that the amount of forty-eight US states.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

When referring to the allegation that Mr. Roig was not present in the chamber, Mr. Fico Cordero said that he was sorry that the colleagues of the Minority were not present in the chamber. Mr. Roig had to excused himself, but I want to discuss those things, because this morning, while our colleague Chaguín Polanco-Abreu was giving a brilliant report on the Resolution, I noticed the desks of the Majority's right wing and there were eight desks occupied, which means, my friends, that regardless of that brilliant statement made by Mr. Chaguín Polanco, with the purpose of providing orientation to the Majority and the Minority on this Bill, on this Resolution that is being at present discussed and that is significantly important for the people of Puerto Rico, thirty-nine desks were empty in the left wing of the Popular Party Majority, while the entire Statehood Party Minority was represented here. Here I have the names, the eight names of our friends of the Popular Party Majority that were in their desks at that time when Mr. Font-Saldaña was acting as Speaker. That means that the seventeen members of the Statehood Party Minority were paying attention –our colleague Polanco-Abreu himself had to address this wing because the other wing was deserted– were paying attention to the orientation so that they may be well advised when they participated in the debate and then it seemed that the words uttered by Mr. Roig, that it's not worth to move amendments, were uttered while our friends

1961                                DAILY JOURNAL (HOUSE)                                269

from the Majority were not present, so that when it came to vote on the Bill, they did not need the orientation that was given by our colleague Polanco-Abreu in order to vote on the Bill.

I believe that provided the explanations that were given regarding these two amendments, that the Statehood Party Minority in good faith does not have the intention of giving a few dollars more to the Government of Puerto Rico so that services may be provided to the People of Puerto Rico, because with this first amendment we are giving one hundred and ten million dollars more than the current debt margin and more will be disbursed later, and, as our colleague Rivera Santiago said, a campaign will be launched for the referendum accusing us of being reactionary and of trying to oppose Puerto Rico's progress. But I want to state for the record that we have agreed on the transfer of powers from the Relations Act to the constitutional level, and we have been even more generous with the limit, by increasing it in such a manner that the Government of Puerto Rico would now have, pursuant to the first amendment, one hundred and ten million dollars more and much more in the future, because, without a doubt, this revenue, pursuant to the reports issued by the Secretary of the Treasury, are increasing at a rate of fifteen to sixteen to seventeen million dollars per year. That is to say, the Government of Puerto Rico would have earned this year two hundred million dollars in revenues and next year, it would have earned two hundred eighteen or two hundred twenty million, and each year that goes by, pursuant to the rhythm of progress, revenues will continue to increase and the debt margin will automatically increase. That is to say, the Pro Statehood Party's attitude and position with regard to this Resolution of significant importance for our people has been to ones adopted throughout its political history: to patriotically look out for the best interest of the people of Puerto Rico and to provide such with more services.

I request that my fellow members of the House approve these two amendments so that the Bill is approved unanimously.

Thank you.

Mr. Speaker: Representative Otero-Bosco occupied twenty-four minutes. Any other Representative?

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Alvarado: I would like to clarify that we are not going to answer any of the arguments on political campaigns performed during the last elections, which were resolved through the people's vote. We are not going to bicker about it in this debate. I have asked for the floor at this time to propose an amendment to the Resolution.

Mr. Speaker: Go ahead.

Mr. Alvarado: The amendment is: It's the entire text, but some amendments to several lines of the Resolution have to be made to produce the final result. In page two, in line number 10, which begins with the words "Commonwealth of Puerto Rico," and then "for the" and before the term "amount," in said line 10, insert the word: "average." In line 11, before the word "revenue," insert the word "annual." In line 13, cross out the word "the" that is immediately after the first three words "Puerto Rico in" and replace the crossed out word "the" with the words "the two"; change into plural the word "year" that's immediately afterwards, so that it says "fiscal years", in line 13. Then, in accordance with what was previously proposed and as part of the same amendment, in line twenty-three, cross out the word "of" and replace it with the word [illegible]. In line twenty-six, add "the" after "of", so that it says "of the". Cross out the word "such" and replace it with "the average". In line twenty-seven, add the word "such" between the words "of" and "revenue". Add the word "total" before the word "revenue", with an end period (.), so that it says, after incorporating all of the amendments that jointly would constitute the proposed amendment. I would say, limiting ourselves to [illegible]: "for funds directly borrowed by the Commonwealth of Puerto Rico evidenced by bonds or promissory notes for the payment of which the good faith and credit and the power to levy taxes of the Commonwealth of Puerto Rico were pledged shall be issued by the Commonwealth of Puerto Rico if the total of (i) the amount of the principal and interest of such bonds and promissory notes, along with the amount of the principal and interest on the total amount of the bonds and promissory notes issued up to such time by the Commonwealth of Puerto Rico in circulation and payable in any fiscal year and (ii) any amounts paid by the Commonwealth of Puerto Rico in the immediately preceding fiscal year for interest and principal on any obligations evidenced by bonds or promissory notes secured by the Commonwealth of Puerto Rico were to exceed 15 % of the total amount of revenue obtained according to the laws of the Commonwealth of Puerto Rico and deposited in the Treasury of Puerto Rico in the two fiscal years immediately preceding the current fiscal year, and none of such bonds and promissory notes issued by the Commonwealth of Puerto Rico for any purpose other than housing will mature after a term of thirty years from the date of their issue and no bond or promissory note issued for housing will mature later than in 40 years after the date of issue; and the Commonwealth of Puerto Rico will not guarantee any obligation secured by bonds and promissory notes if the total amount owed in any fiscal year for principal and interest on the total amount of such direct obligations issued up to that time by the Commonwealth of Puerto Rico and in circulation and the amounts referred to in subsection (ii) were to exceed 15% of the average of such total revenue." That is our amendment.

Mr. Figueroa-Carreras: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Figueroa-Carreras: Firstly, I would like to request that they are written down and that we are given a copy so that we may look at it.

Mr. Speaker: It is so ordered by the Speaker.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Figueroa-Carreras: I want to ask a question, to see if I understood. You are saying that it will be doubled. Instead of being the preceding year, it will now be two years?

Mr. Alvarado: That is the average... The only effect of the amendment is...

Mr. Figueroa-Carreras: That is to say, that they are more similar.

Mr. Alvarado: The only effect the amendment will have is that instead of using as the basis for the calculation 15 percent of revenues that will be available for payment of the public debt obligations, instead of the preceding year, the average revenue of the two preceding years will be used. The idea behind our amendment, Mr. Speaker and fellow members of the House, is mainly to consider that Puerto Rico is located in an area prone to storms and in any given year revenue can decrease considerably, which can result in a considerable decrease of the percentage that could be set for the debt. On the other hand, this has a small restrictive effect in the sense that by calculating the average based on two years, the complete benefit of usual growth is not experienced, which is about seven percent per annum, but the balance of the two things produces desirable security, which is what we are proposing through this amendment.

Mr. Speaker: Transcription has been ordered, so that each Representative may have a copy.

Go ahead. No, the Speaker assumed that the debate regarding the previous comments could be continued.

Mr. Ramos-Rodríguez: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Ramos-Rodríguez: Can the Speaker explain to me...

Mr. Figueroa-Carreras: How much time did he occupy?

Mr. Speaker: The time occupied by Mr. Alvarado? Eleven minutes.

Mr. Ramos-Rodríguez: That's what I was going to ask. Mr. Speaker.

Mr. Speaker: Representative

Mr. Ramos-Rodríguez: Could you tell me how much time did Mr. Ruben Otero occupy?

Mr. Speaker: I already notified it when he finished. He occupied 24 minutes.

Mr. Ramos-Rodríguez: Mr. Speaker, fellow members of the House: I'll take the floor briefly to speak in favor of the two amendments made by our dear "floor leader", Doctor Figueroa.

I would like to begin, Mr. Speaker and fellow members of the House, by saying that the Statehood Party is not opposed and will not oppose to building more schools in Puerto Rico; to having more schoolteachers and better prepared schoolteachers. The Statehood Party is not opposed to improving the public health services that we currently offer in this country. The Statehood Party is not opposed to building more public housing for the humble people of Puerto Rico. The Statehood Party is not opposed to building hospitals to avoid the terrible situation of the country regarding public welfare. Moreover, the Statehood Party is not opposed to continue distributing cows and goats. What the Statehood Party wants to do is set a limit to the debt

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

margin, which is what has been done in the country until now. The system that we have followed for long years is what has resulted in Puerto Rico having the credit that it currently with United States bondholders, regardless that within the Government of Puerto Rico there may be at present a few militants of this Administration who would prefer that those loans to United States bondholders are effected with Russian bondholders. The system that we have had until now, which regulates the debt margin, as I said before, is the reason for the credit Puerto Rico has with United States bondholders. Changing this system could result in failure. Since we are changing it, why not set a debt margin limit? The Government is opposed to this limit. Let me ask you: after approving this system, as it will most likely happen with the votes of the Popular Party, will taxes decrease. Will taxes remain as they are? I bet taxes will not be lowered and they will not remain the same, but rather they will increase.

Regarding the second amendment proposed by Doctor Figueroa to put a stop to investments made during electoral years, one Representative said that that is disrespectful to the People. Was it not disrespectful to the People when the following clause was added to the Municipal Act? "More than 50 percent of items may not be used during electoral years, unless approval is provided by five sixths of the Municipal Assembly." Minority Party Oversight. The Minority Party must give consent. Was that not disrespectful to the People? On the contrary. The People are disrespected when attempts are made to buy the conscience of the people during the elections with taxpayers' money.

Our Party's goal with this amendment is that the people is not disrespected, that the people do not continue to be disrespected, as the Party of the Majority has been doing until now, by using Puerto Rico taxpayers' money to incur in big expenses during the electoral year in Puerto Rico.

With regard to the arguments used by the current Administration against the Statehood Party, by saying that we are reactionary and that we have opposed the change in the system used to establish the debt margin, I sincerely hope that the Popular Party would not go to those extremes, because saying that is disrespectful to the people, because amendments proposing the opposite have been presented here. At no time has any legislator of the Statehood Party ever opposed to improvements for the people of Puerto Rico.

Not one of us has stated that and I disagree with my colleague Rivera-Santiago, because, at this time, I want to exalt the Governing Party to see if they achieve this, and if so, to see them crash down and reach the lowest point possible for a political party in Puerto Rico. For this reason, I believe the Governing Party will never dare to accuse the Statehood Party in a public platform in Puerto Rico of having tried to avoid the dynamic progress of Puerto Ricans. No. Why would we be opposed to that? I suppose that you have noticed that the Statehood Party has been progressing in the same rhythm in which the people of Puerto Rico is dynamically progressing; after each election, we have doubled our votes. In the same rhythm in which the the people of Puerto Rico have been dynamically progressing, the Puerto Rico Statehood Party has dynamically progressed, doubling its votes in each election and we're going to address that same issue in the next elections in 1964, when, with all certainty, will once again put its trust in the Statehood Party, once again doubling its votes, and in those conditions you will stop loose the Government on the 1964 elections.

Thank you.

(Speakership assumed by Mr. Canales.)

Mr. Ortiz-Ortiz: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Speaker: Mr. Ramos-Rodríguez occupied 10 minutes.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Ortiz-Ortiz: With regard to the amendments proposed by our colleague, Dr. Figueroa, and with regard to the statements made in this chamber by such distinguished Representatives of the Statehood Minority and the immediately preceding statements made by Mr. Luis Ramos, I must first say that I'm glad he started by saying and admitting the borrowing capacity that the Government of Puerto Rico has with regards to bonds, because Mr. Rivera-Santiago had said before that the purpose of this measure was to avoid the Government's financial ruin and bankruptcy, and now there is another colleague of the Minority that admits that our credit is solid, which is set forth in the letters included in the record from financial institutions and investors that acknowledge the solid bonded credit of the Government of the Commonwealth of Puerto Rico. And our colleague Ramos asks why do we not continue with that system that has resulted in this credit and at the same time he says that he is not opposed to improving schools, roads, and services provided to the people, but if we continue with the current system, as he proposes, of course we would be able to continue with the current rhythm, but we would not experience the growth demanded by the Puerto Rican people to reach the highest standards of civilization and culture.

In terms of the first amendment proposed by Dr. Figueroa, regardless of its interpretation, that amendment is more restrictive. It establishes a more restrictive formula than the one adopted in the Resolution, which has been submitted for the approval of this House. That is to say, 150 percent is a lower ceiling than the one that results in 15 percent and it will also mean a lower margin, a freer margin, a lower borrowing margin for the Government of the Commonwealth of Puerto Rico. Therefore, on the one hand, our colleagues from the Minority say that they are not opposed to growth and to more schools and more roads, but, at the same time, through that amendment, they intend to restrict those services, restrict the progress of the people, so that it's not as high as provided in our Resolution. Furthermore, we believe that that first amendment suggested by Dr. Figueroa not only restricts borrowing capacity, but it also establishes two formulas in the Resolution, which would make the proposal the Government of the Commonwealth of Puerto Rico more confusing and less attractive to bondholders.

In terms of the second amendment, and here we're discussing a general matter, which was the reason for holding the floor, our friends of the Minority say that they want to take the high road and talk about public welfare, without bringing up any political elements, but they are the ones that introduce political elements when they characterize or limit the bond issue to an electoral year. That is to say, the phrase "electoral year" comes from the amendment proposed by our colleague Figueroa. The matter of the elections comes from that amendment, regardless of the debate on constitutional purity, legislative purity, in the sense that in a constitutional amendment based on bond issues the electoral year should bot be included, which merges a political factor with constitutional factors related to the capacity to borrow money. That is to say, it is not an amendment that corresponds to a Constitution and, furthermore, it's an amendment that limits the discretion and the authority of Puerto Rico's legislature in future years, implies lack of trust in the future borrowing capacity of our legislatures by restricting them through a constitutional provision and damages the initiatives of future legislative assemblies even in electoral years. And we must trust our legislators to not squander away investments or bond issues for the mere fact of it being an electoral year, which would put into risk Puerto Rico's financial stability. And, according to them, their purpose is to avoid political maneuvering, it's to avoid political maneuvering during an electoral year. In several other debates and in this same table, I have noticed confusion every time there is a discussion on services provided to the people by the Government, the growth of the progress of the people, since it is said that there are political purposes. If we were to continue complying with that rule, there would be special allocations, which would consist of political allocations. The truth is that the Government is responsible for providing those services to the people. And it is not political maneuvering if, consequently, the people favors the Government that provides such services; it's

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

achieving the people's gratitude for and recognition of the social justice actions undertaken by the Government. How many times have I heard colleagues from the Minority, not only in this term, but also in previous terms, say that increasing salaries, the Minimum Wage Act, is used for political maneuvering; that building more roads, more schools, more sewers, is used for political maneuvering purposes; that the Department of Labor's task of defending workers is used for political purposes; that those improvements to the quality of life of Puerto Ricans and all that immense work carried out by the Government of the Commonwealth, since they relate that to political maneuvering. I still remember the matter related to Public Welfare: "Everyone eats or nobody eats"; they wanted to restrict the work being done by the Administration to help the elderly and the needy, and that's how they were immediately successful in the legislative level, but in the elections, the people expressed their dissent with that same attitude of restricting

| 1961 | DAILY JOURNAL (HOUSE) | 271 |

services provided to the people, calling it political maneuvering, and in the preceding years and the preceding elections, this Administration has increased services, has improved standards of living, there's power, there's sewers, aqueducts in rural areas, and there's more schools, more roads throughout Puerto Rico. However, the people does not believe that it was disrespected; the people believes that promises made to them have been kept and that the services needed by the people have been provided. What the people would actually interpret as disrespectful for a government to fail to try, to be interested, and worry about increasing the financial level of the Puerto Rican masses and to fail to provide more aqueducts, sewers, and more schools for the people. What's disrespectful is to not provide the services demanded by the people and that the people deserves. However, this Government is providing those services, fulfilling its democratic obligations, and the people notices the difference between those that provide services and those that are opposed to providing said services, attributing it to political maneuvering.

Of course, it must be noted that the new formula based on revenue implies... it's specifically related to taxes. No indication has been made to us regarding that an increase in tax revenue is needed or that there is a reason for it. If that were the case due to future circumstances, there could be an implicit defense of taxpayers. We believe that the people, as a whole, the working class, are more valuable and significant than taxpayers. Therefore, by increasing services and improving standards of living, we are fulfilling our obligations and must not be categorized as political maneuvering by my colleagues. With regard to these amendments, I don't know if my colleagues are aware that: On the one hand, Puerto Rico's borrowing capacity should not be subjected to lower limits and restrictions, as is the case with the first. And my colleagues also know that the second one, the second amendment regarding election years should not be approved, because we don't want to tie the hand of future legislatures. Our colleagues should also know that those amendments would not receive, will not receive the approval of the Majority. The fact that we won't approve those amendments should not be cause for them to oppose this legislation, this amendment to the Constitution, which is to the benefit of the people of Puerto Rico, as a whole. We have already assessed the propositions made by the Planning Board. The six-year plan is there, as well as the allocations for the electoral year itself. It's in black and white, for your evaluation. It's not that it's an electoral year, but rather it's the rhythm, the percentage of progress, based on previous plans. Its purpose is not to gain votes, but to provide services to Puerto Ricans, to improve the personality of Puerto Ricans. Of course, if by providing services to the people, if by fulfilling promises, if by complying with our obligations to the working masses, to the people from rural areas, if by doing so we gain more votes, then so be it, because that is the reward deserved by a Government whose purpose is to fully serve the people

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

and it's the democratic reward from the people to a Government that acts with a sense of democratic responsibility and that does not make political allegations to relate such to the fulfillment of the obligations to the people regarding the improvement of standards of living and civilization in Puerto Rico.

That is why I request that the two amendments presented by Dr. Figueroa are not passed.

Mr. Ramos-Barroso: Mr. Speaker.

Mr. Speaker: A moment, please. Mr. Ortiz occupied fifteen minutes of his time. Go ahead.

Mr. Ramos-Barroso: Mr. Speaker. I would like to hold the floor to speak in favor of amendments proposed by my colleague Figueroa.

The Statehood Minority in this afternoon, through its leader has proposed two essential amendments to the Joint Resolution of the House number 5. Said amendments are based, first, on the fact that a ceiling must be set; a margin that sets the loan limit for the Government of Puerto Rico, so that the people of Puerto Rico does not fall into debt unnecessarily, for future generations. By giving a blank check to an administration, as the case will be if the Bill is approved as is, would result in endangering the freedom to act of future generations. It would mean endangering the freedom to act, the things that future generations could do, because we would confine them to pay the debt that could be needlessly incurred today.

The second proposed amendment is to the effect of preventing that the Administration in charge squanders money needlessly in political campaigns. And this applies to any administration: not only the Government of the Popular Party, which could be voted out and replaced by another government. This refers to any ruling government and that irresponsibly tries to buy the conscience of voters. When these amendments were being discussed, colleagues from the Popular Party were opposed to them. The second amendment, the one providing that certain moneys may not be spent during electoral years, was called an offering to the people of Puerto Rico. The Statehood Minority is not against any measure that provides for the basic resources needed to do the work, to do the work the Government needs to do. Also, it's not against any measure that would tend to increase the standards of living of our people and we believe that it is necessary for the Government to make substantial investments in permanent improvements. However, the Minority, which is at present the Statehood Minority, in keeping with its principles of honest and patriotic work, is not able to deny its duties to the people that elected such and the purposes for which Minorities are elected, that is to say, to propose legislation and audit the work done by the Government. When... and going back to when one our colleagues of the Majority said that our second amendment was an insult to the people, I was curious to know if that colleague had forgotten about the legislation proposed by the Popular Party and approved by this Legislature, which limits the expenses incurred by municipalities during election years. If this amendment is an insult to the people, I would say that the first insult was incurred by the popular party upon passing the Municipal Act, because it also sets a limit for municipalities during election years. But, we don't think that this measure, that this proposed amendment, is an insult. On the contrary, the intention is to prevent the ruling Party from buying the people's conscience by squandering money and to ensure that the electoral process in Puerto Rico is democratic and clean; that this process is not one in which the Government is able to influence voters in any given election, due to the fact that such Government holds power and has at its disposal substantial amounts of money.

When Mr. Cordero was speaking in opposition to the amendments, he was specifically referring to the statement made by Mr. Julio Viera-Morales, that Mr. Julio Viera-Morales had a colonialist complex. If advocating for the permanent union with the United States is his colonialist complex, then I am also a colonialist. However, colonialists are those that pretend to say that something is black, when it

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

is white, instead of acknowledging the situation, the status, as it is, and advocate for a non-colonial status. Mr. Cordero was saying that Mr. Julio Viera was a colonialist because he was referring to the experience of the States of the United States of America. When that Bill was being discussed by the Popular Party Majority, American economists and bondholders were consulted. Let me ask you, is that being a colonialist? It means to gather the experience of those states that have already gone through this legislation. And with regard that we are confused or that we fail to understand the current status, let me ask you Mr. Cordero if it is not the members of the Majority the ones who are actually confused with said status. Mr. Cordero said that Puerto Rico's debt margin should have never been in the Federal Relations Statutes because it's a matter of local government. Furthermore, by approving the measure that gave us the opportunity to pass legislation to include the debt margin in the Constitution of Puerto Rico, the United States Legislative Assembly gave up one of the rights of the United States. This position is completely different to the one taken by the Majority colleague Benjamín Ortiz, who said that this federal legislation was bilateral. Therefore, here, we were trying to pass legislation to enter, to complete the part that corresponded to us. Let's go back to the amendments. Dear Colleagues, we believe that the Minority in the exercise of its rights of its duties, has presented two amendments that would improve the Joint Resolution, and thus I request that this measure is approved.

Thank you.

Mr. Speaker: Eight minutes.

Mr. Ramos-Barroso: Eight?

Mr. Speaker: Eight minutes. Any other Representative wishes to speak?

Mr. Ramos-Rodríguez: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Ramos-Rodríguez: What is the parliamentary situation?

Mr. Speaker: We are...

Mr. Ramos-Rodríguez: Waiting for someone from the Popular Party wing to hold the floor?


272                                    DAILY JOURNAL                          SEPTEMBER 5


Mr. Speaker: Anyone, or from the Statehood Party wing?

Mr. Ortiz-Ortiz: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Ortiz-Ortiz: At the moment, there is nobody from the Popular wing that would like to speak.

Mr. Speaker: Precisely.

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Alvarado: The Majority at this time will not hold the floor to speak. It is understood that there is nothing more to add or rectify, at the moment.

Mr. Figueroa-Carreras: Mr. Speaker.


 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Speaker: Representative.

Mr. Figueroa-Carreras: Then I only have thirty minutes to close?

Mr. Speaker: Exactly.

Mr. Figueroa-Carreras: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Figueroa-Carreras: ...and fellow Representatives. First of all, I want to take responsibility for the statements made by all of my colleagues, so that I may present the position of our collective, in order to make clear that the intention of Party is to hold back or obstruct legislation that is able to contribute to the rhythmic industrial growth of our country. We have all made it clear that our position is to cooperate with you in that regard. We disagree with you regarding certain matters.

Now, cooperating does not [Illegible] or negate oversight, and oversight may result in avoiding squandering. This is our position. We are with you in everything that is related to the welfare of our social classes, but we do not agree with something that would result in squandering of public funds. This is the reason behind several disagreements related to the interpretation of law.

In two brief points we have summarized our position, before analyzing of the statements made by some of our Colleagues... and we want to state for the record that the amendments that we have contributed, in our opinion, clearly set forth the position of the Statehood Party. The intention of the Party is to state that we are against the debt margin. The Party has not come here to say that we object to taxes being levied. We took it a step further. If the amendments are examined, not based on specialized, very specialized, work done by the men that work in finance, bond issue, and lucrative speculation for bankers and bondholders. If the proposal made by this Statehood Minority is examined, you'll notice that, in part, it is higher than the one presented by the men of the Majority. By examining what was described in a pejorative manner by Mr. Alvarado as something that was disrespectful to the Legislature and the people of Puerto Rico, which saddened me. Then, regarding the second motion presented, Mr. Speaker and members of the House, we were put in the position of not knowing how to explain the Majority Party's position. Bear in mind that when the leader of the majority party spoke, everyone kept quiet, nobody disagreed with him. Afterwards, everyone agrees with the fact that what's we proposed in the second amendment is disrespectful. And what is the purpose of the second amendment? What is its purpose? Its purpose is precisely to address what is held most holy and... most sacred: respect for democracy, which is the purpose of the second proposition. What do we want to do with it, Mr. Speaker? To put it simply, that public funds be respected during electoral years, since it is a well known fact that they have not always been respected, since such funds are grossly misused in and outside Puerto Rico. I see that our colleague who is beside Mr. Alvarado is taking notes. So that he is able to take even more notes, I'm going to provide some information, because I like to meet everyone head-on and attack immediately. I was going to avoid getting into this matter, but since I see that our colleague is taking notes, then take note of what I'm going to say to our Colleague.

It was 1944. And what happened in 1944, Mr. Speaker? Well in 1940, Mr. Speaker, the famed elections in which, without winning the elections, took hold of power and kept it. And take notes. You took hold of power because the Minority Party received more votes than you. Bear in mind that we elected Mr. Bolívar Pagán as Resident Commissioner, and your candidate was defeated. First point that I'm going to make: What happened? In 1944, while you were the ruling party, for which reason the Government was in your hands, my dear God, you jumped in with both feet in the emergency funds and you disposed of $13,000,000 that was held in the Emergency Fund. Mr. Speaker, I remember that when I went to the Senate in 1945, the first Resolution was passed, which ratified this fact. I was jeered at by

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

everyone that you had there in the balconies when I got up to protest the disposal of the emergency funds in order win the 1944 elections. There you have more evidence. I was not going to discuss this, but in order to prove that we are not disrespecting truth, but rather we have so much respect for it that we want to put a stop to what you have been doing for some time. We truly believe this, but let us not get into this, so that it isn't said that we want to debate past politics, when in fact I want to discuss to the present. What happened with the Municipal Act? What does Section 60 of the Municipal act provide? Simply put, it provides that in election years, if from July until January more public funds are wanted, five sixths of the Municipal Assembly have to give their approval. Ha! Us, disrespectful, Mr. Alvarado! And what about you when you did the same? Such disrespect to public opinion! Uh?! Then that wasn't disrespect? You were acting democratically then? And now its political sacrilege for us to propose something similar that was set forth in the Municipal Act. This is so clear, Mr. Speaker, that I believe that no further arguments are needed, but something else comes to mind regarding this, which will make clear why we have to be a bit mistrustful while you hold power. Yes, we are, and I'm going to prove it. How? What have you done with the budget? You take the interest? How much in revenue and how much in expenses? Well, my fellow Representatives, there's a difference of forty-four million dollars between the expenses and revenue of operational funds. In operational funds, Mr. Speaker. That is to say, in those matters that are prone to political maneuvering, because that's how you pay for the more than forty thousand Government employees, a number that's constantly increasing, and for services that are unduly increased and for salary increases so that you may gain more votes. Of course, that isn't disrespectful to democracy, since it's buying the people's conscience.

For those that have been saying "*Vergüenza contra dinero*" [Honor against money], that really doesn't have any explanation. It doesn't have an explanation. Remember what happened a few years ago when the Emergency Act was passed. What did you do?

Your leader, the honorable Governor of Puerto Rico, whom I personally hold in high regard, but whom politically, I have more than once criticized harshly and whom I will continue to criticize... What did you do on his behalf? Do you remember what happened with Public Welfare? The seven fifties. Do you remember? "*Don* Luis sends you this small check", that's what they said every time Public Welfare was handed to someone in need.

Do we or don't we have reason to fear that some things can be done and that we need to set a ceiling. Yes, a ceiling: not a false ceiling that can be removed, like the one you want, but a ceiling that exposes the house once it is removed. That is this Party's position; a position that is fair and noble, that agrees with altruistic acts, such as public services. But it is also a brave position, when we stand up to you, to the Majority that will shortly crush us with the number of votes. However, I'm sure that many of you will hear your conscience saying: "Dr. Figueroa is quite right!" How unfortunate to be in a party in which its members cannot have the independence that the men in the Statehood Party enjoy, where amendments are clearly proposed and there are no differences between them. One of your colleagues believed that he would be able to cause discord in our Party and he addresses Mr. Rivera Santiago with an almost demeaning tone of voice, but he is surprised a second time by Mr. Rivera-Santiago, when he said: "No; I'm in favor of Mr. Roig's amendment. I'm also in favor of Dr. Figueroa's amendment." Why? Because he knows that both amendments are liberal and that if you admitted either one or the other you would have the consensus of our Party, in which we do not obey a man's orders and not even a comma may be changed after it is issuing an order. No. In this Party, we disagree amongst each other; there are difference of opinions, and then, there's discipline and something that unites us: mutual respect and friendship. Having given this explanation as an introduction, to begin the discussion I'll refer to the statement made by our colleague Rivera-Santiago, who struck a blow against the bill. When?... Remember: and we kept quite, because I don't tend to speak unless I have evidence at hand. Mr. Rivera-

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Santiago said that you had gone to Congress and you did not say the truth regarding the situation that would be brought. I have in my hands the Congressional Record of the House. The Hearing of the House, the date for the purposes of the record is March 6, 1961 and that record also answers the letter sent to Washington and that Representative Polanco gave me, when a fellow Representative

1961                  DAILY JOURNAL (HOUSE)                 273

asked him: "Well, and why was that consultation made? Who was it? Representative Rivera? Rivera, and why that consultation and he said: Well because those things weren't clear." Oh, here is the letter too, because the matter is related to both issues. The letter is written by no less than Abe Fortas. Do you know who Abe Fortas is? Abe Fortas is the one who when Ickes was Secretary of the Interior, he was Ickes's man, and it was he who said that Puerto Rico could not have any legal reason to have a lawyer up there. That for that Puerto Rico had the attorneys of the Justice Department and that is why you appointed him as attorney in Washington when you came into power, because you worked on it when you were in the minority and you got this man to harm us, the men that were at that time in what was called the "government," which never was such a government, because we didn't have three powers, we didn't even have one power. And what happened? That this man became your man and after, when you assumed the government, you appointed him as your attorney, when he stopped working for Ickes, with twenty-five thousand dollars, that I think he has a contract, and the thing is that the man who said that there couldn't be counsel for the people of Puerto Rico in Washington is now the counsel for the Popular Party, and he is the man who wrote the letter. And who was it that wrote to him asking about the situation with this bill? Why? Well, because of the issue that had been raised by Representative Rivera-Santiago. Why? Because when you went to Washington, when the man who had the authority to speak about finance, about these matters, this man who is the representative of power in the fiscal branch, that man, who is the Treasurer of Puerto Rico, when you brought him to testify, he appears as saying the following on page 11 of the hearings I referred to before, held on March 8, 1961.

"Mr. Noguera, José Noguera, Secretary of the Treasury. A Resolution has been studied in both houses, proposing and addition of ten percent for schools, roads, and construction." "they have not finished." There have been many changes. "But what is the proposition." But that is the proposition. Mr. Westland.: "**So then you have a limitation of twenty percent**." The answer. **"Mr. Noguera: Of our property, the valuation of our property."** I don't want to read what is not relevant, because there are so many impertinent things that have been said that I don't want to be impertinent too. There you have proof of the statements which my colleague Rivera-Santiago has referred to. With regard to you have called, in an improper manner, the colleague Rivera-Morales, I regret that you forget the norms that should be respected, above all in politics, for which…he can dissent, differ, and yet, he has to respect his person. For some time now, and I have to raise my voice in protest against this, I see a certain mortifying tendency in my colleague and one or two other colleagues, and I think this is not correct, parliamentary speaking.

Mr. Speaker: What happened with this bill? You know what happened and to make our position clear it is that we have never been against transferring the debt margin to the American constitutional arena from the Puerto Rican constitutional arena.

The person who is addressing you has the authority to speak of this, just as I was with you to defend Law 600, which I have never ridiculed. That Law 600, which I also recognize. We were also deceived with it. Because your Governor promised the people of Puerto Rico that it would be a transitory formula of Government, and now he is saying that it is a permanent formula of Government. I was with him then. Today I openly differ with him in this situation, because I believe that all public men should

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

fulfill the promises that they offer the people, on the political grandstand or in any other manner, if the person wants and needs the respect of other public men.

And when the matter of the margin came up, you will remember that Joint Resolution 1302 was submitted, and that Joint Resolution 1302, what did it provide? The transfer of the debt margin. I am referring to June 20, 1958, which Resolution 302 [sic] was voted on. What was the position of the Statehood Party? The Statehood Party was not then opposed to the transfer of the debt margin. Here is the vote. We abstained from voting. The vote shows forty in favor and 15 abstaining. Page 13 of the Minutes of the House for June 20, 1958.

And so, the question arises, why this abstention? Why? Because there were other matters that were included. We made our position very clear, when Resolution 1510 arose o March 10, 1959. You will remember the titanic battle that took place here and you will also remember that we did not vote on Resolution 1510, we withdrew, and we announced here on the floor that Resolution 1510 would be dead, because we would fight it here and in the United States. And we fought it and Resolution 1510, in spite of the very powerful forces that your man in the United States has, died, and the Fernós Bill died, and may it rest in peace.

What motivated this? What was the reason for this? Well, that along with the debt margin there was something that was the issue for you, a fact, Mr. Speaker, that now gives me great joy to say, that in middle of the defeat that we are going to suffer, we are also going to rejoice. Why? Because when you pass the Bill that you are going to pass in a moment (a copy of what was decided by Congress), you are going to find the following: that you have brought to the text of this Bill what signifies your great ideal, that obsession you have with the compact, the agreement, and you will see that the agreement is dead, Mr. Speaker. What happened to the agreement? They gave it a legislative kick and said: "No, not that, if you want this other thing, yes, but not anything to do with that compact business. That is not possible. And who did this? Well, Mr. Speaker, it was done like this: Mr. Fernós submits Resolution 124, with all of is "Whereas" in January of 1961, and the thing about the compact appears in it. Here it is. Resolution 124. And how was it passed? Here it is, the Resolution also, here is the Report, the Committee Report that recommends it. And what does the Committee Report say? "Strike out the preamble." What's more, it even seems like they were playing ball. Strike, strike that, that thing of the preamble, what are you bringing us that for! And that is what is in the Committee Report that was approve unanimously. Not only by O-Brien, but by the Committee of which O'Brien is a member. Unanimously.

Here is the report, Mr. Report, a report that I would like to take the opportunity that I have had the satisfaction that I asked the Resident Commissioner for all of the information and that he was so gracious and gentlemanly to send it to me, in spite of all the obstacles that are present here for you.

And when you read this report, you find that it says that there is no need for the matter of the margin to be related in the preamble with the compact. The Report is validated by the Secretary of the Interior and the Legal Director of the Budget.

Pages 1961 and 1962 of the Congressional Record of March 21 also blows away the matter of the compact, take note my colleague Font-Saldaña who these days was saying that when the Committee on the Judiciary says that that is a compact, it's because of what it is. Note that it is not when a Committee on the Judiciary says it, but rather when the Congress has to say it, which is the body that has authority over us. And here is the Resolution. Now in the Senate. Please note. When it reaches the Senate, are the "Whereas" there? How do you call them, the "Whereas," right? All of the "Whereas" are gone! Here it is. The Committee only considers the dispositive part from where it vanished, and the matter of the compact just flew away, Mr. Speaker. Here is the report. I also have here the Senate report with the record. But, so

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

as not to repeat, since time is limited, I am not going to go into these details, because there are some topics I want to consider later, and so I am just going to go lightly over these things. But I'm putting the Senate report at your disposal…

And here also there is another report of other hearings where, dear God, it was so harsh what was said, that I don't want to mortify you more by reading it, so I will just refer to the Resolution, without the expository part, that is to say, without the "Whereas" with which it was drafted.

So, what does this mean? Well, it shows what I have said o many times, I was the first to say it in Puerto Rico in front of the man who is sittin here to my left, when we were debating in 1950 the Resolution to approve Law 600, that I sustained at that time that there was no compact, and this is in writing, it is printed in a pamphlet, and all of my opinions have been confirmed. Senator Jackson, I don't know whether they had sent them to him or he knew of them, but I so happens, that the points raised by Senator Jackson to Governor Muñoz-Marín, when last year the hearings before the Senate ended, coincide 1000 percent, almosst literally, with the statements I made in 1950 on the floor of this House.

Mr. Speaker: How much time have I taken? Because I want to have…

Mr. Speaker: You have thirty-five minutes left.

Mr. Figueroa-Carreras: Thirty-five?

274                               DAILY JOURNAL                          SEPTEMBER 5

That clock is…I have thirty-five left? Thirty-five?

Mr. Speaker: You had fifty-seven minutes when you started talking.

Mr. Figueroa-Carreras: Mr. Speaker, I have heard ""to speak of the union,"" that there "is not jurisdiction." That "there is an agreement," and "a compact"..but…gentlemen, where do you get this? I order to be a compact there first has to have been equality. In this case there only exists, socially, what is called "unio civilis," but when it is done as in the case of Puerto Rico, then it is called in constitutional law "unio subiectionis," "subiectionis," that is to say, "humillicioni" [sic], and that understanding was one of humiliation, taking into account that we had to accept amendments to the Organic Act, referring to the Federal Relations Act, and in certain provisions, among which provisions was included this one about the debt margin, which we are discussing today, and another shameful one that you did not have the valor to reject nor did you accompany us in the gesture of dignity we had to request that the part about Puerto Rico "is a possession belonging to the United States" be eliminated. No! You didn't want to do that, and it even pains me to see the record that it's here that you say that it was you who asked for that. Page 13 of the House Record, Legislature Wednesday [sic] 18, 1958. If makes me feel ashamed that you were the ones that asked that the part in the Federal Relations Act where it says Puerto Rico "belonging to the United States," should remain. And to think that one of your colleagues dared to [illegible] to Representative Roig that he was speaking with a colonialist spirit. '

Now, what is really being colonialist is to talk the way you do, trying to present the Associated Free State like what it is not, which is neither a State, nor Free, nor Associated, but rather a dependency, "belonging to the United States" as agreed to by you yourselves. To be colonialist is to make an improper representation of the Associated Free State to the American people as a Commonwealth, and to the republics of Central and South America as an independent nation, by using the name Associated Free State for Central and South America, whereas for the United States the name of the Associated Free State is not translated literally, but rather it is called a "Commonwealth," which means community, playing with words, even with this.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Now, as I explained the other day, we accepted the name, and we voted, because as we said, we do not think that the name makes the thing, and because we had arguments to prove that just as the name does not make the person, the person is who endows the name with grandeur, and the same thing happens with peoples.

Yes, our colleague Mrs. Arce reminds me of a simile I used, that of Blondie Rose. The marriage of a colored man and woman who had a daughter and they named her Blondie, the paternal surname being Rose. So, they would call her "Blondie Rose! Blondie Rose! And when everybody expected to see a blonde girl, there was the little colored girl. That is what happens with the Associated Free State, that when in Central America they say Associated Free State, they expect to find a nation, and they are disappointed and say, no if it is "a possession belonging to the United States." That is the situation. And the use of the simile is not pejorative, as a colleague said, because if anybody has a positive concept of the Associated Free State in terms of the acquisition of better rights for autonomy, for an autonomous internal Government, for the acquisition of more rights, it is I. But from that to be saying that the Associated Free State exists in the international concert, enjoying a national personality, is, my colleagues will forgive me, like the matter of the debt martin: wanting to get us to write a blank check, so that we will seem to be favoring the public good, that is where you are wrong. It is to pout us in an impossible position for us to be in. We cannot be in that position; we cannot be there.

As for our esteemed colleague Alejo Rivera, who I believed was not treated with the parliamentary courtesy that he deserves, and in effect, what is it that Mr. Alejo Rivera proposes or suggests? That the debt margin that we have now, that is to say ten percent on real property, be duplicated. That is to say, that it be 20%, which is exactly what you went to the Congress to say. That is what he was saying. And those were the words of the Treasurer, Mr. Noguera. Here is the record, Noguera says: "a resolution has been studied by both Houses proposing a 10 percent increase on property, on the property tax."

Mr. Speaker, my fellow Representative Alejo Rivera puts himself in the same position as your Secretary and, yet he was labeled in a certain way, and I was not satisfied by the position of those who debated with him. Yes, the loan was to be for schools and roads. That is another one of my points of disagreement, because, Mr. Speaker, this Government isn't think of anything but roads, schools. And what about public health? The "salux populi" that is the "suprema lex"? That doesn't count for you. Ah! I know why. The past is something terrible. It's that Mr. Speaker, the Majority party has always had a deep panic about public health. I remember, Mr. Speaker, back in 1941, when the Popular Party had an understanding with the men in the Unificación [party], when Mr. Ramirez-Santibañez went to see the Governor to demand the participation that they should have in the Government ant that the eminent physician Pablo Morales-Otero be appointed Secretary of Public Health, Hygiene, as it was called then, and you must know that the answer the Governor gave them was "that pistol, that revolver, I wouldn't put in any hand." From that time he has been managing that pistol; since the ten the revolver is only I his hands, and that is why public health is in the condition it is now, even when we have federal cooperation, because for every dollar that Puerto Rico contributes for hospitals we are given two dollars, from federal funds, Mr. Speaker, public welfare in Puerto Rico leave much to be desired, and that is one of the reasons that some of us also have to differ from you, as well as having put your hands in the special funds, and annually used $10,000,000 from the special funds of th lottery that were for hospitals and welfare and are now tranfered every year to the general fund, to pay for travel, for excursions, and to bring people here to talk about showcases and who for as long as he is given a meal and is bid goodbye, puts one thing in one pocket and another in another pocket. I don't know what he's taking in one pocket, but in the other one I do know. "He's taking with he what he has to say when he gets back to his country, that this island is the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

showcase of the Americas." Now what he has in the other pocket, you are the ones who know, since I only know about one of the and I don't knokw anything about the other.

And why do we have this fear? Why is there this thing about the ceiling? It it an insult to future generations. No, Mr. Speaker. This means caution on the part of a conscientious and responsible legislator. Legislators do not legislate for theselves alone. They legislate with a view to the future. And we know what the current situation of our Govenrment is; we know that even with you we are going through painful situations. Who can say whether worse things might happen if this Governmet of yours falls, as it must fall. Because it must be supposesd that you could live in the Govenrment for four, eight, twelve, twenty, thirty, forty, note how I am exaggerating hyperbolically, fifty years, but in fifty years, and I might hope that you and I would live so long, whether or not you were in the Government, well in fifty years another Government must come int. And can you vouch for the honesty, the rectitude of those men? Is it not fair for us to take precautions, safeguards, provisions, measures, to prevent this? This is called legislating conscientiously. This is calle legislating, not by a mandate from above. This is called legislating, not having to vote without changing even a comma.

Mr. Speaker, I am surprised and I want to rectify something, because our amendment that established a three-year average and that caused so much surprise, I see that after that a majority leader has brough an amendmente to raise the average to two years. Well, if they always did that.

If they studied the issues this way, there are so many good things we could accomplish. But to want to legislate, Mr. Presidnet, by the force of votes, to want to legislate by debating an important measure, of the relevance and significance of the bill that we are disscussing, which is not only for one generation, as it is drafted, we do not think this is appropriate,

Mr. Speaker, to legislate in this manner, don't you think that it makes it necessary to take future precautions? This is another of the reasons we have for taking a position like this, in that being in agreement as we are, since none of you can go further than the men of the Minority, above all, the one who is addressing you, that has always demonstrated in in the past, who has known at all times in which measures related to social welfare, public welfare, of benefit to the community, to act in a liberal manner, with what has been deemed to be the public interest. And what's more

1961                            DAILY JOURNAL (HOUSE)                            275

in difficult conditions, I have been at your side on more than one occasion, when I was alone, in this House, against 38 of you, alone, for four years, and during those four years and you weren't able to catch me at anything. Why? Because I have an elevated concept of what social welfare is and when it is a question of public need, I forget about partisan benefit.

Now, Mr. Speaker, but that is something far different from my also becoming a spendthrift, that I don't take precautions, that I don't seek to have measures taken to assure taxpayers and the funds of taxpayers, which are weighing so heavily on the backs of our fellow citizens, which may possibly be employed as they say Doña Fela has, to back Mayor Wagner, for which you have censured her, when from the Governor's Mansion they said that the Popular Party does not support her political attitude. When you see all these things, Mr. Speaker, doesn't it justify that we put ourselves in the position we are in? This is what I want you to consider; that you realize that we have no desire to thwart you and in the matter of conquering rights and political prerogatives for our people, you don't go farther than we do. We are the ones who go farther. We are asking for Statehood. You, the Associated Free State. Associated Ste for North America, and Free for Central and South America. That is what you want. Not us. We say to the entire world, holding our heads high with all the dignity of a responsible politician, and we say it and we have it in the bylaws that govern our Party as its program. We tell the whole world that we want

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Statehood. Equality! We are not negotiating with cronyism to stay in power. Power means nothing to us when our Party grows in the arena of ideals. One of our fellow Representatives was saying a moment ago, I think it was Mr. Roig, and he was exactly right. Our Party is losing elections. We lose, and we accept it. But while our Party is not acquiring power, what does it acquire? Well, it is acquiring strength in the conscience of our people. While you in the last elections only increased by 20,000 votes, with that bureaucratic and electoral machinery you have, our minority Party, without any of that, duplicated our votes, and did the same in the previous campaign. So, what is going to happen? Well, possibly the same thing that happened with the Union Party of Puerto Rico, to which I belonged. What happened to the Union Party of Puerto Rico? Well while we conceded a landslide victory to the Republicans, and another, and another landslide victory, what happened at last? The Union Party of Puerto Rico disappeared, and the Republican Party continued to grow and to grow, and here you have it today, representing a quarter of a million Puerto Ricans.

Mr. Speaker, these are the things of the hisotry of our people that must be known so that you can see the significance of an organization that is ingrained in the conscience of the people, and has deepened its roots in the hearts of Puerto Ricans. That is the Statehood Party. I won't deny that we would like to come into power. We would like that, above all, the one who is addressing you, Mr. Speaker; and I would like that pinrcipally, for a single thing, to be able to properly address public health, to take away the revolver that Mr. Muñoz-Marín said he had in his hand and that he doesn't want to let go of and put tht revolver in the hands of somebody that will take good care of public werfare, somebody who will know how to give our people everythinng they need, so as to honor the principle established in the Lati naphorism "Salu populi suprema lex." Mr. Speaker, I would like tht, becaue I would declare forthwith that there would be no more jaunts. No, the jaunats would end, and just with what was ssave I the jaunt, I think that we would have enough to solve the problem of public welfare, because, the matter of the jaunts, what these enormous parties cost, that are thrown so frequently, must be known. If we did the numbers, we would be amazed. How much time do I have left, Mr. Speaker?

Mr. Speaker: Two minutes.

Mr. Figueroa-Carreras: How many?

Mr. Speaker: Two minutes.

Mr. Figueroa-Carreras: Two minutes? Two? That clock…well

Mr. Speaker: I don't know whether it's this one, this one here.

Mr. Figueroa-Carreras: So, that one isn't running…

Mr. Speaker: It's not wokring.

Mr. Figueroa-Carreras: Because they're not telling the same time, but it seems to me they're running the same or this one isn't running right.

Mr. Speaker: There is no reason to deny the minutes the doctor may have. I would l give you…

Mr. Figueroa-Carreras: No, no, no. No, it is precisely so that that clock on the wall may run correctly, because the person who is speaking should be able to see the clock, so that he can adjust what he is saying to the time he has left. It's not that I am doubting anything about our Speaker, who knows he has my respect and personal friendship.

Mr. Speaker: Thank you.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Figueroa-Carreras: And besides, if I needed more time, I would have the opportunity because we have a certain understanding that would allow it.

Mr. Speaker: To be sure. Proceed.

Mr. Figueroa-Carreras: But I don't want to exceed myself, Mr. Speaker, and to finalize, we will say that the reason for the cap that bothers you, so much is it is precisely the guarantee we want to have. Yes, the guarantee, because as I said before, sometimes the regular budgets are drafted based on disbursements of revenue and are balanced with loans, and that is our fear that they be taken without any limit, my friends, with legislation of this sort. Anybody would be terrified! I am in a terrified panic. I need at least a limit on borrowing that you cannot exceed. So, in addition to the 15% limit on the margin, we need a ceiling. Not a weak little ceiling like the one you are proposing, which can come and go, at legislative whim, but an unchangeable ceiling set in a referendum of the people.

And having made theses statement, I thank my colleagues for having listened to me and I set forth the position of my Party by saying that with respect of the purpose of the Bill, we agree. What's more, we are all in favor of public services, we are not against anything that provides good social services. We cannot be against any of that, nor should we. But we do need, as guarantee, that was is collected as taxes, the proceeds of taxes, must be well-invested, without squandering, and above all, Mr. Speaker, that services like public health be addressed, which has been so neglected since the Popular Party came into power.

Mr. Font-Saldaña: Mr. Speaker.

Mr. Speaker: Mr. Representtive.

Mr. Font-Saldaña: Not much on the analysis of this important legislative measure. I think that this analysis was made precisely and clearly by our distinguised colleague, the Chaiara of the Treasury Committee, Santiago Polanco-Abreu, by the Majority Whip, Arcilio Alvarado, and by the Chair of the Committee on the Judiciary, Benjaming Ortiz-Ortiz. I am going to refer to some basic aspects of this measure, it general principle, and some of the remarks made by Doctor Figueroa.

A few days ago the Puerto Rian journalist Fernando Sierra-Berdecía published an article in the paper titled "Los Vociferantes, los Resistentes y los Callado." [The Vociferous, the Resisters, and the Quiet]. All of this was with regard to the situation of the povery-stricken masses of Latin America and the attitude of the oligarchies that resist all measures of indemnity and the theories being set forth by the vociferous in the courts.

Here we have a very clear and important question, in which two political organizations are coming face to face. In terms of their ideolofy, they (the Republicans,) are the eternal resisters, those that have resisted the avalanche of reform. We, who reprent the quiet, the large masses whose voice is only felt on election daywhere they make their will known. This legislative measure invovles twwo questions. One, the which is fundamental, is transferring the power to set the debt margin from the Federal Relations act to th Constitution of Puerto Rico. This is an undeniably grand, worthy, and important political right. The other, which is to set the borrwoing capacity, that debt margin, wihtin certain lines of reality and justice.

In tems of establishing the power in the Constitution of Puerto Rico to decide our debt margin, that is a question that has been debated for some time. In 1958, the issue was brought up in the Puerto Rico Legislature in House Joint Resolution 1302. What happened? The Popular Pary approved the measure. That is to say, it supported the intention and the idea that the power to set the debt margin be transferred from the Federal Relations Act to the Constitution of Puerto Rico, which would become one

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

more instrument for the rights and justice of the people of Puerto Rico, and they voted affirmatively, see page 199 of the Daily Journal of the Houses of this Legislature, on June 20, 1958, Joint House Resolution 1302. How did the Pouplar Party vote? All of the legislators of the Popular Party voted for this conquest of right for Puerto Rico. How did the Republican Party vote. We could say that it washed its hands like Pontius Pilate. It abstained. That

| 1961 | DAILY JOURNAL (HOUSE) | 276 |

is a way of disagreeing. It abstained. In other words, it abstained on a clear question. This was no longer a question of what percentage was allegedly being overspent, the words that have been used here. It is a quesiton of the rights of the people of Puerto Rico.

Mr. Figueroa-Carreras: May I be allowed a question?

Mr. Font-Saldaña: I don't have any objection, doctor, the half hour I have as my time, well…

Mr. Figueroa-Carreras: A brief question. My fellow Representative will remember that it was studied in a Committee and that here we abstained, noting that we favored transferring the margin.

Mr. Font-Saldaña: But you abstained, I mean, it was a terse question, becaue no percentage was being set there. So, then when the matter of the percentage was discussed, my distinguished friend and outstanding Puerto Rican, who deserves my utmost respect and admirtion, Doctor Figueroa, who as a leader of a conservtive political organization must feel himself tmany times to be trapped between his liberal spirit and the reaility of political interests. Doctor Figueroa says on page 120 of the Daily Journl of that same day, June 20, 1958, "Mr. Speaker, thank you for the information you have provided, tht is of satisfaction to us and I want to reiprocate thi courty of the Spaker by saying tht our position will also be that there will be no delay in the Committee or in the approval of this measure, and so that more time may be saved, we can even advance how we will vote." What will be? Hear it in the voice or in the workd of Doctor Figueroa. Advance, to save time," What will that position be? That was in 1948, and now we are in 19561. This isn't new or sudden. "We can even advance that our vote will be in oppossition. In opposition? "In oppposition to any increase, to any increase, in tht meaure." To any increase. It is not to five or ten or half a percent. He aid: to any increase. That is to say, the resisteres. The resisters. And he has said, I am not abandoning my position ever. So that the same position that I found myself in the Deplartment of the Treasury in 1941. Income Tax, how much? Three million, five hundred thousand dollars. Resistance to increasing tax rates, to investigate and broaden the scope of the law. In other words, there is no will of the Legislature, which at the time was under the political power of the distiguished adversaires; there was no intention of sternghtening the fiscal arm of the State, so that the rich, the fortunate, the comfortable could pay on their profits, their profits. The same position, the resisters! The resissters of that time, who are the same ones that are talking about squandering.  Squandering to do justice to teachers, to the police, rural aqueducts, swers, rural electrification, schools, progress, a higher standard of living, etc. , etec. Squandering! More than fifty percent of the budget of Puerto Rico devoted to health and education! Squandering! No, the squndering should be for the grand magnates, for the grand barons of the Puerto Rican economy. Of course, with their overflowing coffers, their wives could buy their grand dresses at Dior in Paree. Now, he wantas appraopriations for public service: squandering.

And this mistrust, this mistrust as to how the Popular Party will use public funds. But what's the matter? Here there is a report, and in this report, a long report submitted by the Special Committee, they say, look at these characters, above suspicion, above suspicion in matters of squandering, (they have to be, if it weren't theirs, their own money, that they want to spend, or thoes of the big executives of the Banco Créito y Ahorro Ponceño, who also tesified on behalf of the Bankers Association; Cesar Vizcarrondo and Sol Descartes who appeared on behalf of the Chamber of Commerce of Puero Rico;

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[illegible] Pullen, Vice President of the First National Bank of New York, in charge of Puerto Rico business; Roberto de Jesús, Presidnet of the Banco de Ponce, Francisco de Jesús, Vice President of the Chase Manhattan Bank; Leandro Cabranes, Exeutive Director of the Mayors Associaiaton of Puerto Rico, representing the Quit, representing the mayors who owe themselves to the quiet. And I mention these conservative genlemen because ther represent a guarante for the Bill, for the security they provide for the bill, and because they find the tax base to be fairer.These gentlemen don't normally seem to be romantics. So, when they support a measure it's because they thing think that it is a measure in which they were guranteed, in which they are protected. So, of course, besides these private enterpirse pople, well, there are repreantives of the Government Development Bank of Puerto Rico, which is a financial success. And there is the report from the Cairman of the PlannigBoard of Puerto Rico. And there is the one from the Secretary of the Treasury of Puerto Rico. All of them favor the bill. And even a friend brought in by the Minortiy, Mr. Pol,who was in favor of the principle, but with a different formula. But a different formula doesn't mean that his must be the best and ours is the bad one. He studied it and gave his opinion. And do our opinions count for nothing? Is their opinions are the ones that count for something?

    This has been being studied for a while. This is the Bill, clearly explained in the report. What is this about? It is transreffed form the FederalRelations aCt to the Constitution of Puerot Rico. And what the Federal Relations Act says, I mean, in the Bill, is to eliminate this provision, which is deleted, and in substituted in the Constition as it is created by the people of Puerto Rcio. Now, the People of Puerto Rico take precautions and they must take into consideration the opinions of the investors  and the men who are going to sell the bonds and how we, the Popular Party members think. And they will gind what we decide to be reasonble. Reasonable the provision, reasonable the mehetod, and reasonable the maximum percentage. It is the maximum. It doesn't mean that we will reach it, but if we do reach it, it would in fact be below the debt limit, not just of that of some States, but that of the Government of the united States of America, which is siply fabulous, but with regard to the  proprotion is the same thing, I mean, with reard to the fact that is msut be considered that the proportio is relative, in one instance as in the other.

    Then the report says: "It will be noted, therefore, that under the proposed formula the debt limit that may be deduced is expressed in terms of the amount of funds that are available to amortize the debt." This is the maximum guarantee.  "The amound of funds available to amoartize th debt." In other word, no ceiling for the loan in itself, but  rather the capacity to amortize theloan, whatever it may be, whatever it may be. "Instead of bein epressed as it currenetly is in terms of the total amoun of monet that ay be borrowed at a given moment." Well, and there are other magnificent example presented by the Committee. "We should emphasize however," says the Committee in the report, "that we use these examples for the sole purpose of showing how the formula in the proposed a constitutional amendment under consideration works in practice to set the debt limit. The rue limittion rests in the repayment capacity of the loan. , expressed in terms of a fixed percentage of the annual available revenue for repayment of the principal and interest on the direct obligations of the State. Once the amount of this percentage is commited to the annualre payment of the debt evidenced by bonds and promissory notes issued directly by the State, the borrowing capacity will be exahusted. Automatically.

    I cannot belive that there is a wiser provision than that I am stating here. It is the same basis for the bonds of public corporations for their revenue bonds.  How are the loans of public corporation secured, such as the Aqueducts Authority or the the Water Resources Authority? Basesd on the capacity to ask for $100,000.000 or $50.000,000? No. Based onte revenue of the Authority to repay the debt, to amortize the debt and pay the interest. In other words, it is the same sound economic principle, validated by these gentlemen who testified here. And there is a dichotoy in this. The Republican Party wants to seem on the one hand as being liberal, and on the other hand, as being very conservative. Of course, we are aware of the ambivalences of the Republican Party. But I mean, there comes the wolf. Nobody beives

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

then, and the Quite don't belive them, who are the people of Puerto Rico, who are seeing here what is going on.  They are not boing to believe in the resisters.  I am showing what was the attitude in 1958.  Well, in 1961, through amendments, they want to disguise the same proposition. Of course, I think it is an electorla mistake, I think it is a political mistake. How are they going to go to the electorate? To say that they opposite it because it is a lot of money so that they can do works for Puerto Rico? No, they will say they want works, but what about the squandering? Nobody is going to bleive them, because there is a history, but I don't want to talk about the history.

I now want to refer to two or three things that the Doctor mention that is relevant to the unsutainble position of the Republican Pary.

The Doctor says that in election yeaers…Look, we passed a Tariff Act on automobiles, the most unpopular law that there was in Puerto Rico, which went into effect in 1956, an election year, Doctor. It went into effect in 1956, an eleciotn year. So, we in no way, just because it is an election year, fail to do something that we think is good and

1961                                    DAILY JOURNAL (HOUSE)                                    277

beneficial for the people of Puerto Rico. I don't think that it's relevant either for the Doctor to go into the emergency funds, because it's like rubbing salt into a wound, when they jailed e our distinguished compatriots, the members of the Governor's Cabinet (Upon Doctor Figueroa's interruption regarding who the Governor was, Font-Saldaña answered, Yes, whoever he was. But the litigation or case was brought by you, and you remember what the outcome was).

Who were the people seen behind bars? Well, the apostles. Those who represent the quiet were behind bars, those who wanted to give people bread and opportunities. And their accusers, who were they? The resisters, the resisters of all reform, the resisters of all progress. Naturally, from a political point of view, well, you all know what happened. There was a landslide in favor of the Popular Democratic Party, that in 1940 had won the election by a slight precarious margin, since people turned out massively. The people said, these people who give us bread are being jailed on technicalities. They go to jail to help us. But their accusers, who are they defending? So, from an electoral point of view, it seems to me to be a serious error that my distinguished friends are making. It's like when we are talking about flooding. Ferré was doing pretty well with his campaign and the Republican Party. But when they tried to blame the Popular Party for the floods and that how they helped the victims was political opportunism and to make electoral capital, even the opposition press, "El Imparcial," which is a pro-independence newspaper, the "El Mundo," which is a paper that favors Statehood, and the "San Juan Star," which is also a paper that tends to statehood, the three of them rejected this position as demagogy of the Republican Party.

That is why we have two positions here: Polanco-Abreu says: Senators, this is the measure, these are its effects, let's set politics aside and let us all with great patriotism vote on this measure. Then you decide to vote, from a partisan point of view, which in my view is mistaken. I mean, I don't know how you are going to face a defeat before1964. If you have hopes for 1964, the defeat that the people are going to inflict, now in the 1961 referendum is a bad presage.  I mean, nobody should enter an electoral fight with a defeatist attitude.  If you had gone into 1964, doing your exercises, and you hadn't had a few hits on you, people could say, gee, maybe they can make an effort, but when they see their bruises… That is what is going to happen here this year. I am setting you up for a few months from now when you go the people. I'm telling you that you are going to get a thrashing. You are going to put your head on the guillotine and the people will once again punish the resisters and will favor those who defend the quiet. It's the same as a balancing act on politics, Doctor. And you talk about politics ...

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Speaker: The Representative has one-minute left.

Mr. Font Saldaña: One minute? Well, I'm short on time. I was going to answer the Doctor on all that about the compact and Jackson with his own voice and vote and the Congress, because Law 1447[sic], law 447 of the United States congress, accepting the Constitution of Puerto Rico, approving it, very clearly sates the following: "Whereas the People of Puerto Rico overwhelmingly approved such act in a referendum held on June 4, 1951 and a Constitution for the Commonwealth of Puerto Rico was drafted by a Constitutional Convention held as provided by such act" and so on and so forth. Then it says here: "Whereas the act entitled An act to provide for the Constitutional Government by the People of Puerto Rico approved on July 3rd, 1950 was adopted by the Congress," that I to say, the United States Congress, "as a compact," "as a compact," not "in the nature of a compact."

Mr. Figueroa-Carreras: Mr. Speaker.

Mr. Font Saldaña: Like a compact.

Mr. Figueroa-Carreras: Mr. Speaker.

Mr. Speaker: Mr. Representative

Mr. Figueroa-Carreras: So that the truth be told. That is the expository part. Now look for the dispositive part where it says "a compact" or "in the nature of a compact."

Mr. Font Saldaña: No, but, if…

Mr. Figueroa-Carreras: Look at the dispositive part, which is the legal part.

Mr. Font Saldaña: We'll look for the dispositive part, doctor. You mentioned the "whereas," you mentioned the "whereas," but in any case, it's clear, and I could…

Mr. Cordero: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Cordero: Will my colleague allow me?

Mr. Font Saldaña: With great pleasure.

Mr. Figueroa-Carreras: Then I am asking for more time. I don't have any problem working all night.

Mr. Font Saldaña: Respecting the agreement, respecting the agreement…

Mr. Speaker: He is speaking, if he answers the question, he is going to lose his turn, of the minute he has left, there is only half a minute.

Mr. Font Saldaña: There's half left?

Mr. Speaker: Yes.

Mr. Font Saldaña: Well, the half left is to address my colleague with deep sadness at seeing him in this position of a juggler, juggling and walking on an impossible tight-rope. In 1958, he abstained, and it was announced that they would vote against any increase and in 1961 6hey accept these amendments that contradict each other, one of which favors the current system, another accepting the base but proposing another formula, in other words, the resisters are using trickery to stop a measure that is for advancement, justice, progress and rights for the People of Puerto Rico. That's it.

Mr. Rivera-Morales: Mr. Speaker.

Mr. Speaker: Mr. Representative.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Rivera-Morales: We had talked with Doctor Figueroa to reserve us five minutes, but it seems like the time has gone by. I want to request unanimous consent to address the House on the matter that is being debated.

Mr. Speaker: But it's that…

Mr. Rivera-Morales: Well, call it a matter of personal privilege and I think that it wouldn't matter too much if I'm given those five minutes.

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Alvarado: If the question is a matter of privilege, it can be raised at any time. If it is not a matter of privilege, it will have to be heard in the course of business, after the House addresses the issue before it consideration at the time

Mr. Rivera-Morales: Well, I am going to call it personal privilege. I am going to submit an amendment.

Mr. Speaker: But it is not a matter of the Representative calling what he is going to say is a matter of personal privilege. Whatever the issue. What is the…

Mr. Rivera-Morales: Mr. Speaker, I did not want to interrupt the distinguished colleague of the Majority when he was making his statement when I could have asked for personal privilege. I did not want to interrupt him, and I wanted to leave it for last.

Mr. Speaker: What does the personal privilege consist of?

Mr. Rivera-Morales: It is in reference to the fact that Representative Polanco-Abreu, after making a magnificent defense of the Administration's position, intervened to attack the amendment of this Representative, and said, Rivera-Morales's is not worthy of intellectual respect. And I am sure that my colleague Polanco-Abreu, after I explain to him or talk to him about the matter, he himself, I will ask him to take back those words, because in truth my colleague Polanco-Abreu.

Mr. Torres-Gómez: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Torres-Gómez: Point of order.

Mr. Speaker: What is the point of order?

Mr. Torres-Gómez: I believe that the point brought by Representative Rivera-Morales is not a point of personal privilege in any manner.

Mr. Speaker: Until now it is. I am awaiting a decision by Mr. Polanco-Abreu.

Mr. Rivera-Morales: I am sure that Representative Polanco-Abreu…it was in a moment of struggle there, and I am sure that after the statements he has made here, he himself understands that the opinion he gave on my amendment is not the one he should have given. Representative Polanco-Abreu knows that this Representative,

Mr. Cordero: Mr. Speaker.

Mr. Rivera-Morales: But, gee, let me talk.

Mr. Cordero: Mr. Speaker.

Mr. Speaker: Mr. Representative.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Cordero: The only one that could bring a point of personal privilege is the amendment itself. The Representative did not refer to the person of our colleague, but to the amendment.

Mr. Speaker: Some statements made by Representative Polanco

Mr. Cordero: No to the amendment.

Mr. Speaker: Right, with regard to that.

Mr. Cordero: He was referring to the amendment, not to our colleague Mr. Rivera-Morales.

Mr. Rivera-Morales: I think that our colleague Polanco-Abreu understands that the amendment that I made is within the intellectual criteria of any attorney, as our colleague Benjamin Ortiz has understood it,

| 278 | DAILY JOURNAL | SEPTEMBER 5 |
|---|---|---|

and those were unfair statements and I am going to ask our colleague Polanco-Abreu to withdraw them now.

Mr. Polanco-Abreu: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Polanco-Abreu: I am very careful when I speak on this floor. In no way did I address Representative Alejo Rivera-Morales. I said that the amendment as such did not merit respect from an intellectual point of view. I mean, if had made reference to the intellectual position of my colleague in formulating the amendment, I would not object to taking back my remarks, but I was very careful, I said that the amendment, the amendment, the intellectual content of the amendment, did not deserve my respect, so that I was not going to comment on it. I do not feel any obligation to take back anything because I could not have offended my colleague, logically, in spite of the fact that I have come here with a sole function, to serve my people. In order to serve my people, I don't have to offend anybody. My record, in my thirteen years here will show that.

Mr. Speaker: We fin that the point of personal privilege I out of order.

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Alvarado: Before we proceed to consider the measure, I am going to ask the Secretary to read the Messages and Reports that may have been received after the Session began.

Mr. Speaker: Proceed.

### MESSAGES

The Secretary reports the following messages:

The Secretary of the Senate informs the House that Senate Concurrent Resolution 3 has been passed and the Senate requests a similar Resolution from the House, titled, "To propose amendments to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico." The Secretary reports that by order of the President of the Senate the Resolution has been referred to the Treasury and Judiciary Committees.

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Mr. Representative.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Alvarado: The Secretary has reported the approval by the senate of Senate Concurrent Resolution 3. This Resolution is identical to House Concurrent Resolution 5, which we have been debating today. I am proposing that the Treasury and Judiciary Committees be relieved from any further consideration of Senate Concurrent Resolution 3 in consideration of the fact that the similar measure of the House has been studied by a Special Committee that has made an exhaustive report to this House on the content of this measure and the House is able to consider such.

Mr. Speaker: Any objection?

     Mr. Figueroa-Carreras: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Figueroa-Carreras: I want to remind my distinguished colleague that he spoke to me about the matter and I told him that I would have no objection provided that I had the opportunity to see how it had been approved, because I can't accept something that I haven't seen, and my Party can't either. So, we can look at it in a minute…

Mr. Alvarado: At this time what we are proposing is that the Committees be relieved of further consideration. We have come to the time that the Representative can see…he can verify the text to see if it is…

     Mr. Figueroa-Carreras: I want to remind my colleague that we still have…

Mr. Alvarado: Yes, yes, it's still there.

Mr. Speaker: So, is there any objection to relieving the Judiciary and Treasury Committees?

(The motion is voted on and was passed)

Mr. Alvarado: Mr. Speaker, since I continue to make motions to be considered at this time related to the debate on House Concurrent Resolution 5, the consideration by the House of Senate Concurrent Resolution 3, and to the effect that my colleagues in the Minority have the equal opportunity as the Majority to read the Senate Bill and verify it, I propose a ten-minute recess at this time.

Mr. Speaker: Any objection?

(The motion is voted on and was passed)

Mr. Speaker: A ten-minute recess.

RECESS

Upon a motion by Mr. Alvarado, the House agrees to a ten-minute recess.

The recess having concluded, the session resumes, presided by Mr. Ramos-Antonini.

Mr. Speaker: The session comes to order.

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Alvarado: Regarding the House bill, the only thing remaining is to vote on the proposed amendments, and I propose that at this tie we proceed to vote on the four amendments that have been proposed, that is to say the amendment by Representative Alejo Rivera-Morales, a set of two amendments submitted by Representative Figueroa, and amendment by Representative Baldomero Roig, and an amendment that I had the honor to submit for consideration by the House, four amendments.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Speaker: One by one? Voting on the first amendment.

(The first amendment is voted on and defeated.)

Mr. Speaker: Defeated. Voting on the second.

(The second amendment is voted on and defeated.)

Mr. Speaker: Defeated. Voting on the third amendment. You know what it is.

(The third amendment is voted on and defeated.)

Mr. Speaker: Voting on the last amendment.

(The last amendment is voted on and approved.)

Mr. Speaker: Unanimously.

Mr. Alvarado: The measure as amended should be approved.

Mr. Speaker: The measure as amended is submitted for a vote. All in favor say Yea, all against, say Nay. Any questions?

Mr. Alvarado: I don't have any.

Mr. Rivera-Morales: Let the House be divided.

Mr. Speaker: I was expecting that.

(Questions are raised about the results of the vote and the Speaker decides to divide the House. The Resolution was approved by a vote of 40 in favor and 17 against).

Mr. Speaker: The results of the vote are confirmed.

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Mr. Representative.

Mr. Alvarado: I propose that we consider the Calendar of Special Orders and Senate Concurrent Resolution 3 should be read.

Mr. Speaker: proceed.

Upon Mr. Alvarado's motion, the Secretary proceeds to read Senate Concurrent Resolution 3, as follows:

"To propose amendments to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

Be it resolved by the Legislature of Puerto Rico;

Article 1 -An amendment of Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico is proposed to read as follows:

"Section 2: The power of the Commonwealth of Puerto Rico to levy and collect taxes and authorize municipalities to levy and collect shall be exercised as provided by the Legislature, and will never be relinquished or suspended. The power of the Commonwealth of Puerto Rico to undertake and authorize debts will be exercised as provided by the Legislature but not for direct obligations of the Commonwealth of Puerto Rico for funds directly borrowed by the Commonwealth of Puerto Rico evidenced by bonds or promissory notes for the payment of which the good faith and credit and the power

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

to levy taxes of the Commonwealth of Puerto Rico were pledged shall be issued by the Commonwealth of Puerto Rico if the total of (i) the amount of the principal and interest of such bonds and promissory notes, along with the amount of the principal and interest on the total amount of the bonds and promissory notes issued up to such time by the Commonwealth of Puerto Rico in circulation and payable in any fiscal year and (ii) any amounts paid by the Commonwealth of Puerto Rico in the immediately preceding fiscal year for interest and principal on any obligations evidenced by bonds or promissory notes secured by the Commonwealth of Puerto Rico were to exceed 15 percent of the total amount of revenue obtained according to the laws of the Commonwealth of Puerto Rico and deposited in the Treasury of Puerto Rico in the fiscal year immediately preceding the current fiscal year, and none of such bonds and promissory notes issued by the Commonwealth of Puerto Rico for any purpose other than housing will mature after a term of thirty years from the date of their issue and no bond or promissory note issued for housing

1961                                    DAILY JOURNAL (HOUSE)                                    279

will mature later than in 40 years after the date of issue; and the Commonwealth of Puerto Rico will not guarantee any obligation secured by bonds and promissory notes if the total amount owed in any fiscal year for principal and interest on the total amount of such direct obligations issued up to that time by the Commonwealth of Puerto Rico and in circulation and the amounts referred to in subsection (ii) were to exceed fifteen percent (15%) of such total revenue.

The Legislature will set the limits for the issue of direct obligations by any municipality of Puerto Rico for money that is directly borrowed by such municipality as evidenced by bonds or promissory notes, for the payment of which the good faith, credit and power to levy taxes of such municipality were pledged, and it is further provided, however, that no such bonds and promissory notes issued by any municipality shall be for an amount, which along for the total amount of bonds and promissory notes issued by the municipality up to that time and in circulation shall exceed the percentage set by the Legislature, which shall be no less than five (5) percent nor more than ten (10) percent of the total appraised value of the property located in that municipality.

Demand may be made of the Secretary of the Treasury to assign available resources, including the surplus from the payment of interest on the public debt and any amortization thereof to which Section 8 of this Article VI may be applicable, by any holder of bonds or promissory notes issued as evidence of such.

Article 2 – This amendment will enter into effect upon being ratified by majority of the voters who vote on such in a referendum to be held for this purpose.

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Alvarado: I move that this Bill is approved.

Mr. Speaker: Those in favor, say "Yea"?

Mr. Alvarado: And Mr. Speaker, I move that the entire debate regarding Joint Resolution of the House No. 5 be included in the record of this Bill.

Mr. Figueroa-Carreras: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Figueroa-Carreras: We move that the votes be clearly itemized, because some of us voted "yea" and others voted "nae."

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. Alvarado: Well, then, I move that the entire debate regarding Joint Resolution of the House No. 5 be added to the record of this Bill.

(The motion was put to a vote and was carried)

Mr. Alvarado. I move that the Bill be approved.

(The Bill was put to a vote and was carried.)

Mr. Alvarado: I move that we put the Bill to the final vote.

Mr. Speaker: Go ahead.

Mr. Alvarado: Mr. Speaker, I move that the final vote on this Bill be considered as the final roll call of this Session.

Mr. Speaker: Any objection?

Mr. Figueroa-Carreras: Representative.

Mr. Figueroa-Carreras: It must be noted that the ones that say "nae" were here, OK?

Mr. Alvarado: Clearly.

Mr. Speaker: Go ahead.

FINAL APPROVAL

Joint Resolution of the Senate No. 3 titled "To propose an amendment to Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico" is submitted for the consideration of the House during Final Approval"

The aforementioned Joint Resolution of the Senate No. 3 is submitted to vote and resulted in:

Aye:

Messers:

    Alvarado

    Alvarez-Costa

    Borges-López

    Cabranes

    Canales

    Cancel-Ríos

    Castaño

    Collazo

    Concepción de Gracia

    Cordero

    Dominguez

    Figueroa-Rodríguez

    Font-Saldaña

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

       Gandía

Miss:

       González-Chapel

Messers:

       González-González

       Meléndez-Báez

       Méndez

       Milán-Padró

       Miranda-Rivera

       Mojica-Marrero

       Muñiz-Ramos

       Náter-Pabón

       Ortiz-Noriega

       Ortiz-Ortiz

       Pagán-Collazo

       Polanco-Abreu

       Ramos-Barreto

       Reyes-Rivera

       Rivera-Ramos

       Robledo

       Salas-Quintero

       Sánchez-Cappa

       Sánchez-Martínez

       Sánchez-Pérez

Madame:

       Solá de Pereira

Messers:

       Torres-Gómez

       Torres-Santos

       Vargas-Rodríguez

       Velázquez

       Vélez-González

       Zayas-Aponte

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Zorrilla

Ramos Antonini, Speaker.

Total..............................................................................................................44


Nae:

Madame:

Arce de Franklin

Messers:

Báez

Figueroa-Carreras

Fonseca .Jiménez

Iglesias-Silva

Meléndez-Carreras

Otero-Bosco

Ramos-Barroso

Ramos-Rodríguez

Ramos-Morales

Rivera-Santiago

Roig-Vélez

Santana

Torres-Medina

Vázquez-Vélez

Viera-Morales

Westerband

Total..............................................................................................................17

## EXCUSED

The Clerk states that Mr. Cole was excused by the Speakership of the House.

Mr. Alvarado: Mr. Speaker

Mr. Speaker. Representative

Mr. Alvarado: The measure was approved by the two thirds that is constitutionally required and I believe it was approved. I move for a fifteen-minute break, Mr. Speaker.

Mr. Speaker: Any objection?

(The Motion was put to a vote and was carried)

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

RECESS

Upon approval of a motion presented by Mr. Alvarado, the House takes a fifteen-minute recess.

Once the recess was over, the session under the Speaker Mr. Meléndez-Báez was adjourned.

MINUTES

Mr. Alvarado: Mr. Speaker.

Mr. Speaker: Representative.

Mr. Alvarado: I move to approve the Minutes of yesterday's Session, which had not been done.

Mr. Speaker: On motion that the Minutes of yesterday's Session be approved.

(There being no amendments to the minutes for Monday, September 4, 1961, it is unanimously approved)

EXCUSES

The Clerk notifies that before final roll was called by the Speaker of the House, Mr. Morales-Otero had excused himself.

Mr. Alvarado: Mr. Speaker

Mr. Speaker: Representative Alvarado.

Mr. Alvarado: I move to adjourn the session until tomorrow, at the scheduled time of 2:00 p.m.

Mr. Speaker: On motion to adjourn the session until tomorrow, at the scheduled time of 2:00 p.m.

RECESS

To the moved by Mr. Alvarado, the House agrees to adjourn the session until tomorrow, Wednesday, September 6, 1961, at 2:00 p.m.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.