# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

## URGENT MOTION OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION TO COMPEL PRODUCTION OF DOCUMENTS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................2

JURISDICTION AND VENUE ...............................................................................................4

BACKGROUND .......................................................................................................................4

      A.     The Lift-Stay Motions and the Bondholders' Document Requests .......................4

      B.     The Government Parties' Refusal to Produce Documents That Are Critical
           to the Lift-Stay Motions ........................................................................................8

ARGUMENT ..........................................................................................................................10

I.     The Bondholders' Discovery Requests Are Relevant and Necessary to Resolve
      Key Disputed Issues .............................................................................................12

      A.     The Bondholders Are Entitled to Discovery to Show That the HTA,
           PRIFA, CCDA, and Their Bondholders Have Property Interests in the
           Pledged Revenues ...............................................................................................13

      B.     The Bondholders Are Entitled to Discovery to Show That the Tax Statutes
           at Issue Are Not Mere "Appropriations" .......................................................16, 17

      C.     The Bondholders Are Entitled to Seek Course-of-Dealing and Parol
           Evidence ..............................................................................................................20

II.    There Is No Undue Burden in Producing the Necessary Information .............................23

RELIEF REQUESTED ...........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*,
   591 F.3d 1 (1st Cir. 2009) ........................................................................11

*Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*,
   319 F.R.D. 422 (D.P.R. 2016) ...........................................................10, 11, 21

*Behrend v. Comcast Corp.*,
   248 F.R.D. 84 (D. Mass. 2008)..................................................................20

*Clinton Co. v. United States*,
   No. 88 C 2705, 1991 WL 95284 (N.D. Ill. May 24, 1991) ...................................19

*Commonwealth Ins. Co. v. Casellas*,
   3 P.R. Offic. Trans. 750 (1975) .................................................................17

*Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*,
   838 F.2d 612 (1st Cir. 1988) .....................................................................15

*Diaz-Garcia v. Surillo-Ruiz*,
   45 F. Supp. 3d 163 (D.P.R. 2014)...............................................................10

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In
   re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   899 F.3d 13 (1st Cir. 2018)......................................................................11

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   386 F. Supp. 3d 175 (D.P.R. 2019)..............................................................11

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.
   for P.R.)*,
   939 F.3d 340 (1st Cir. 2019) .....................................................................15

*Nieves-Romero v. United States*,
   715 F.3d 375 (1st Cir. 2013)......................................................................22

*Parker Waichman LLP v. Salas LC*,
   328 F.R.D. 24 (D.P.R. 2018) ....................................................................10

*In re PHC, Inc. S'holder Litig.*,
   762 F.3d 138 (1st Cir. 2014)......................................................................22

*Resolution Tr. Corp. v. N. Bridge Assocs., Inc.*,
   22 F.3d 1198 (1st Cir. 1994)......................................................................22

*Skytec, Inc. v. Logistic Sys., Inc.*,
   Civ. No. 15-2104-BJM, 2018 WL 4372726 (D.P.R. Sept. 12, 2018)....................................10

*Sterling Merch., Inc. v. Nestle, S.A.*,
   2008 WL 1767092 (D.P.R. Apr. 15, 2008)........................................................................21

*Thomas & Betts Corp. v. New Albertson's, Inc.*,
   2013 WL 11331377 (D. Mass. July 11, 2013)..................................................................20

*United Shoe Workers of Am., AFL-CIO v. Bedell*,
   506 F.2d 174 (D.C. Cir. 1974)........................................................................................17

*Vázquez-Fernández v. Cambridge Coll., Inc.*,
   269 F.R.D. 150 (D.P.R. 2010)........................................................................................20

**Statutes**

11 U.S.C. § 362(d)(1) ...............................................................................................................5

11 U.S.C. § 362(d)(2) ...............................................................................................................5

48 U.S.C. § 2170 ......................................................................................................................1

**Other Authorities**

Fed. R. Civ. P. 26(b) ..............................................................................................................10

Federal Rules of Bankruptcy Procedure 7026, 7034, 7037, and 9014 ...........................................1

Federal Rules of Civil Procedure 26, 34, and 37 .......................................................................1

HTA Request Number 4 ............................................................................................................7

Lift-Stay Motions and the Amended Interim Case Management Order for
   Revenue Bonds, No. 17-3283, ECF No. 10595 ...........................................................2

Restatement (Second) of Contracts § 223 (1981) ......................................................................19

Rule 26 ....................................................................................................................................20

Rule 56(d) ..........................................................................................................................21, 22

Rule 56(f) ...............................................................................................................................22

To the Honorable United States Magistrate Judge Judith G. Dein:

Pursuant to Federal Rules of Bankruptcy Procedure 7026, 7034, 7037, and 9014 and Federal Rules of Civil Procedure 26, 34, and 37, made applicable to this contested matter by 48 U.S.C. § 2170, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation (collectively, the "Movants" or the "Bondholders") respectfully submit this urgent motion (the "Urgent Motion") requesting entry of an order, substantially in the form of Exhibit A, compelling the Federal Oversight and Management Board for Puerto Rico (the "FOMB"), the Puerto Rico Highways and Transportation Authority (the "HTA"), the Puerto Rico Infrastructure Financing Authority ("PRIFA"), the Puerto Rico Convention Center District Authority ("CCDA"), and the Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("AAFAF" and, together with FOMB and HTA, the "Government Parties") to produce documents that are critical to the resolution of the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay* [ECF No. 10102] ("HTA Lift-Stay Motion"), *Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 10602] ("PRIFA Lift-Stay Motion"), and *Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon's Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* [ECF No. 10104] ("CCDA Lift-

Stay Motion) (together, the "Lift-Stay Motions").[2]

In support of this Urgent Motion, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      This Urgent Motion is necessitated by the Government Parties' refusal to produce discrete categories of documents that are directly relevant to the so-called "gating" issues of standing and property interests with respect to the pledged revenues that secure the HTA, PRIFA, and CCDA bonds.  This Urgent motion could wait no longer in light of the current schedule, in which the Movants must file reply briefs in support of their Lift-Stay Motions on February 18 and prepare for the preliminary hearing currently scheduled for March 5, 2020.[3]

2.      In its Oppositions to the Lift-Stay Motions,[4] the FOMB's primary arguments turn on factual assertions: for example, that excise tax proceeds pledged to the Movants by HTA, CCDA and PRIFA (collectively "the Instrumentalities") are instead property of the Commonwealth, that these instrumentalities have never had more than an expectancy in receiving the excise taxes in the form of appropriations from the Commonwealth, that they lack even a beneficial interest in the excise taxes and therefore Movants' security interests and statutory liens could not have attached to the excise tax proceeds nor could Movants hold a legal, beneficial or other property interest in them.  Further, the FOMB asserts that, as mere alleged appropriations

---

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Lift-Stay Motions and the Amended Interim Case Management Order for Revenue Bonds, No. 17-3283, ECF No. 10595.

[3] On February 12, 2020, the Bondholders filed an urgent motion to adjourn the preliminary hearing to the April 22, 2020 Omnibus Hearing and extend the deadline for the Bondholders' reply in support of their motion for relief from the automatic stay.  17-bk-3283, ECF No. 10841 ("Extension Motion").

[4] *See Opposition of Financial Oversight Board for Puerto Rico to Motions for Relief from Automatic Stay* [ECF No. 10613] ("HTA Opp."); *Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA Bondholder Motion to Lift the Automatic Stay* [ECF 10611] ("PRIFA Opp."); *Opposition of Commonwealth of Puerto Rico to Motion Concerning Application of Automatic Stay* [ECF 10615] ("CCDA Opp.") (together, the "Oppositions").

from the Commonwealth to the instrumentalities, the excise tax statutes are preempted by PROMESA. Although the FOMB protests mightily that it raises no factual issues and that discovery is entirely irrelevant to its defenses, it has not come close to demonstrating that the statutes and security agreements so clearly favor the FOMB's interpretation that nothing else could possibly matter. The strong showing by Movants in their Lift-Stay Motions—and common sense—tells a vastly different story. If discovery demonstrates, for example, that the tax proceeds have been or are held in Commonwealth accounts explicitly designated for the sole benefit of the instrumentalities, and that the regulations, rules, and requirements developed by the Commonwealth agencies charged with implementing the appropriations process and tax statutes show that the tax revenues are outside the appropriations process and belong to the instrumentalities, such evidence would be extremely probative of whether the FOMB's contentions make any sense (and they do not). Without such discovery into these types of factual assertions, the Bondholders will be denied a full and fair opportunity to refute the arguments that the FOMB has elected to bring to the fore.

3.     The Bondholders' document requests are focused, relevant, and necessary. First, to counter the FOMB's assertion that the instrumentalities and therefore the Bondholders lack a property interest in the pledged revenues, the requests seek documents that detail the flow of funds between the Commonwealth and HTA, PRIFA, and CCDA—including discovery about the actual and beneficial ownership of the accounts throughout which the pledged revenues flow, including where and in which accounts they are held, and what the account balances have been over the relevant period of time (a matter of importance to a property interest in commingled funds). Second, to rebut the FOMB's bare assertion that the excise tax statutes are allegedly preempted appropriations statutes, the requests seek documents such as regulations and rules to determine

whether the Commonwealth officials charged with implementing actual appropriations laws and the excise tax statutes treated proceeds from the latter as property of HTA, or the Commonwealth to be appropriated. *See, e.g.*, *Commonwealth Ins. Co. v. Casellas*, 3 P.R. Offic. Trans. 750, 756 (1975) (turning to the "existing practice" of executive officials to shed light on the meaning of statutory provisions).

4.      Just days after filing the Lift-Stay Motions, the Bondholders described the categories of discovery that they anticipated would be necessary. *See* 17-bk-3283, ECF No. 10251 (Bondholders' Objection re: Interim Case Management Order) at 24-27. And within two days of receiving the Government Parties' lengthy Oppositions, the Bondholders served the informal document requests and participated in a meet-and-confer with the Government Parties. After the Government Parties stated that responding fully to the requests would be too burdensome given the "time constraints" under the current schedule, the Bondholders sought to adjourn the hearing to April 22, 2020. But the Government Parties refused. *See* 17-bk-3283, ECF No. 10841 ("Extension Motion"). Nonetheless, the discovery sought by the Movants is essential and should be provided as soon as possible. The Urgent Motion should be granted.

## JURISDICTION AND VENUE

5.      The United States District court for the District of Puerto Rico has subject matter jurisdiction over this matter under PROMESA § 306(a).

6.      Venue is proper under PROMESA § 307(a).

## BACKGROUND

### A.      The Lift-Stay Motions and the Bondholders' Document Requests

7.      In the pending Lift-Stay Motions, the Bondholders seek relief from the automatic stay to pursue their rights with respect to revenue bonds issued by the HTA, PRIFA, and CCDA. In December 2019, the Court implemented a dual litigation track that allowed the Bondholders to

4

pursue relief from the automatic stay while the FOMB filed adversary complaints challenging, among other things, the validity and scope of the Bondholders' liens. *See* 17-bk-3567, ECF No. 663 (Interim Case Management Order) at 4–6.

8.     Accordingly, on January 16, 2020, the Bondholders moved for relief from the automatic stay under both 11 U.S.C. § 362(d)(2)—which requires stay relief when "the debtor does not have an equity in [the] property; and [the] property is not necessary to an effective reorganization"—and 11 U.S.C. § 362(d)(1), which allows a court to lift the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest."[5]  On the same day, the FOMB initiated adversary proceedings challenging certain of the Bondholders' proofs of claim by attacking their asserted security interests in pledged revenues retained by the Commonwealth (the "Revenue Bond Adversary Proceedings").  *See* 20-ap-05, ECF No. 1 (the "CW-HTA Revenue Bond Complaint"); 20-ap-07, ECF No. 1 (the "HTA Revenue Bond Complaint"); 20-ap-04, ECF No. 1 (the "CCDA Revenue Bond Complaint"); 20-ap-03, ECF No. 1 (the "PRIFA Revenue Bond Complaint").

9.     Following the January 29, 2020 Omnibus Hearing, the Court entered an order setting a preliminary hearing concerning "gating" issues: (1) whether the Bondholders have standing to sue; and (2) whether the Bondholders have security or other property interests in the relevant revenues.  *See* 17-bk-3283, ECF No. 10595 (Amended Interim Case Management Order) at 5.  To this end, the Court ordered that further briefing on the Lift-Stay Motions—the FOMB's oppositions and the Bondholders' replies—address only these gating issues of standing and property interests.  *Id*. at 4.  Because the questions of standing and property interests implicate material factual issues, as the Bondholders argued at the Omnibus Hearing, the Court instructed

---

[5] *See* Lift-Stay Motions, *supra* at 1–2.

the parties to meet and confer about, among other things, a proposed schedule for any necessary discovery. *Id.* at 5; *see also* 17-3283, ECF No. 10594 (Omnibus Hearing Tr.) at 162:22–163:4, 163:17–164:9.

10.    On February 3, 2020, the FOMB filed its Oppositions to the Lift-Stay Motions. *See supra* ¶ 2.  In those briefs (and as detailed below) the FOMB set forth arguments that raise material factual issues and thus warrant discovery.  For example, FOMB argues that the relevant public corporations do not "acquire" the special revenues, because the Commonwealth is retaining them.  Thus, according to FOMB, the security interests of the bondholders do not attach pursuant to section 928(a) of the Bankruptcy Code.  *See e.g.*, HTA Opp. ¶¶ 104–05.  The FOMB's defense rests on a factual assertion that is unsupported by any evidence, but in any event warrants discovery.

11.    In its opposition to the PRIFA Lift-Stay Motion, the FOMB confirmed, for the first time, that pursuant to a lockbox agreement, the Puerto Rico Treasury Department has, for years, been receiving the Pledged Rum Taxes with a "Disbursement Detail" document that "describes the disbursements" of "the first $117 million" as "***for deposit to the credit of PRIFA***."  PRIFA Opp. ¶ 29.  Movants had been asking for this information, and documents evidencing the disbursement information, for months, including during a colloquy at the January 29 Omnibus Hearing.  Following the revelation in the Opposition, during a telephonic meet-and-confer on February 5, 2020, Movants specifically requested the "Disbursement Detail" documents, which the FOMB clearly has collected and reviewed, as it made factual representations about these documents in its brief.  Nevertheless, as of this filing, the "Disbursement Detail" documents have not been produced to Movants.

12.    Similarly, in the FOMB's opposition to the CCDA Lift-Stay Motion, the FOMB

conceded that the Movants have a lien on the "Transfer Account" and the "Pledged Account"—
making the funds that are or were in either account concededly subject to Movants' security
interest (even setting aside legal arguments concerning the status of funds that are not in the
Transfer Account or Pledge Account).  Opp. ¶¶ 23–24, 27.  AAFAF produced a single document
to Movants regarding CCDA that lists various accounts held by the Tourism Company, but that
document does not even begin to answer the important question of which accounts constitute the
Transfer Account and the Pledge Account, in which FOMB concedes Movants have a security
interest.  Moreover, the FOMB has argued that the Transfer Account was addressed as part of
GDB's restructuring, which gives rise to a factual issue of whether funds subject to Movants'
security interest were improperly diverted from the Transfer Account. *See* CCDA Opp. ¶ 40 n.21.

13.     On February 5, the Bondholders served the Government Parties with informal
document requests directed at the FOMB's factual assertions. *See* Ex. B (Feb. 5, 2020 email from
J. Hughes to Government Parties).  The requests seek critical information regarding the flow of
the Pledged Revenues, Pledged Rum Taxes, and the Pledged Hotel Taxes, Commonwealth account
balances, and the Commonwealth's budgetary practices.  For example, the requests related to HTA
seek documents sufficient to show (1) the transfer or deposit of Pledged Revenues to the
Commonwealth or HTA from January 1, 2015 to the present, (2) each transfer or deposit of funds
from the Commonwealth to HTA, and (3) the total amount of Pledged Revenues held by HTA or
the Commonwealth, including information sufficient to identify the accounts where Pledged
Revenues are retained and the cash balance of the accounts.  *See* Ex. C.  The requests also seek
certain communications and agreements relating to the Pledged Revenues and their use, and
documents showing the terms, scope, and effects of restrictions placed on these funds, including
funds described as "restricted" in the Commonwealth's "Summary of Cash Restriction Analysis"

dated Oct. 2, 2019. *Id.* The Bondholders' requests related to PRIFA and CCDA sought similar documents. *See* Exs. D and E. Though more limited in scope than previous requests, the requested documents were consistent with prior requests made to the Government Parties without positive response.

14. Following the February 5 meet-and-confer, and at the Government Parties' request, the Bondholders further clarified certain of their document requests via email on February 7. Specifically, the Bondholders responded with a list of the particular types of documents encompassed by HTA Request Number 4. *See* Ex. F (Feb. 7, 2020 email from G. Rappoport to counsel for the Government Parties). The Bondholders explained that the request included regulations, internal agency rules, manuals, or official communications or memoranda regarding the budgeting treatment of the Excise Taxes; communications between individuals at HTA responsible for budgetary matters and their counterparts in the Commonwealth government, and other documents and communications related to Commonwealth and HTA budgetary practices. *Id.* The Bondholders also specifically requested that the Government Parties produce resolutions and supplemental resolutions related to the Bonds (which extend beyond the 1968 Bond Resolution and 1998 Bond Resolution). These resolutions are directly relevant to what specific taxes or revenues were pledged (and the amounts that were pledged to the bondholders) and thus are relevant to the nature and scope of the bondholders' security interests—which is precisely one of the gating issues that this Court will address at the March 5 hearing.

**B.** **The Government Parties' Refusal to Produce Documents That Are Critical to the Lift-Stay Motions**

15. The Government Parties responded in writing to the Bondholders' clarified requests on February 9. They claimed at the outset that the requests "are not relevant to the issues to be addressed at the Preliminary Hearing" and that the bond resolutions are unambiguous. But the

Government Parties' vague response provided no indication of what documents the Government Parties would produce and when. The Government Parties set forth broad-based objections, offered a cursory production limited in scope to minimal and immediately accessible information related to the flow of funds, and refused to provide other critical categories of information. *See* Ex. G (Feb. 9, 2020 letter from counsel for the Government Parties).[6]

16.    At a minimum, in their February 9 letter, the Government Parties outright refused to produce any of the requested information regarding the budgetary practices of Commonwealth officials that would inform the Court's interpretation of the excise tax statutes (*see* Ex. G)—even though those facts are plainly relevant under governing law. *See infra* at ¶¶ 33-38. They also refused to produce the categories of communications demanded in HTA Request No. 4 (even after the Bondholders' detailed clarification in writing) that would shed light on the flow of funds and on Commonwealth officials' treatment of the Pledged Revenues. And they were unwilling or unable to describe the types of documents they *do* intend to produce, except to emphasize that any production will be minimal in light of the Government Parties' self-imposed "time constraints" and their desire to self-select the limited documents to be produced. Ex. G at 2.

17.    The Bondholders replied via email the next day, rejecting the concept of piecemeal discovery and seeking compromise on an extension of the preliminary hearing and reply brief deadlines, to allow some additional time for proper (though still limited) discovery and the resolution of discovery motions. *See* Ex. H (Feb. 10, 2020 email from G. Mainland to counsel for

---

[6] The most the Government Parties would commit to was to "work with AAFAF's consultants to determine what information relating to the flow of funds, beyond what is already publicly available, they could efficiently provide given the time constraints," and to "determine what responsive materials may exist and to consider providing easily accessible materials." *Id.* at 2. The Government Parties stated that they "anticipate providing a further update in the coming days." *Id.* at 3. But expediency and efficiency are insufficient excuses for inadequate productions of documents long known by the Government Parties to be relevant on important issues.

the Government Parties).

18.     In response, the Government Parties informed the Bondholders that they anticipated producing an initial set of documents on February 12, and finalizing a production by the end of the week, with the caveat that "the timing may be delayed slightly." *See* Ex. I (February 11, 2020 e-mail from E. McKeen).  But the Government Parties still have given no indication that their upcoming admittedly limited and unilaterally selective productions will satisfy the Bondholders' requests.  Far from it, the Government Parties' February 12 production turned out to contain all of ***nineteen (19) documents—*** one of which was duplicative—with no documents produced in response to most of the Bondholders' narrowly tailored requests.  Clearly, the Government Parties are standing on their position that they "do not believe the documents [the Bondholders'] seek have any probative value." *Id*.  And, in opposing the Bondholders' Motion to Extend Deadlines, the Government Parties again argued that discovery is not warranted. *See* 17-bk-3283, ECF No. 10958 at 3 ¶ 5, 11 ¶ 21 ("Opposition to Motion to Extend Deadlines"). Taken together, the Government Parties' correspondence and their initial production make it abundantly clear that they will not undertake to make a genuine and reasonable production, even on the limited categories requested, without judicial intervention.

19.     The Bondholders' reply briefs in support of the Lift-Stay Motions are currently due early next week, on February 18, 2020, immediately following the upcoming holiday weekend.  In light of the pending discovery dispute, the Bondholders have moved to extend that deadline, along with the March 5 hearing date. *See supra* at ¶ 2 n3.

## ARGUMENT

20.     This Urgent Motion seeks documents that are critical to the Court's consideration of the gating issues of standing and property interests.  Although the Bondholders' discovery requests are narrowly tailored to the factual issues raised by the FOMB in its Oppositions,

discovery under the Federal Rules of Civil Procedure "casts a wide net" and "alter[s] the adversarial nature of litigation" to provide a "transparent, fair process." *Skytec, Inc. v. Logistic Sys. Inc.*, Civ. No. 15-2104-BJM, 2018 WL 4372726, at *5 (D.P.R. Sept. 12, 2018). "The range of discovery is thus extremely broad," *Parker Waichman LLP v. Salas LC*, 328 F.R.D. 24, 26 (D.P.R. 2018), and extends to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). "If there is some legitimate relevance to the requested information and if no cognizable privilege attaches, it ought to be discoverable—at least in the absence of some countervailing consideration, *e.g.*, that production would be disproportionately onerous or burdensome, that unfair prejudice would result, or the like." *Parker Waichman LLP*, 328 F.R.D. at 26 (internal citation omitted). A party's failure or refusal to produce such information may be remedied, upon a showing of good cause, by a court order compelling disclosure. *See Diaz-Garcia v. Surillo-Ruiz*, 45 F. Supp. 3d 163, 166 (D.P.R. 2014).

21.     The party resisting a request for production "bears the burden of establishing lack of relevancy or undue burden." *Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*, 319 F.R.D. 422, 427 (D.P.R. 2016). "The objecting party must show specifically how each . . . request for production is not relevant or how each question is overly broad, burdensome or oppressive." *Id.* (citations and internal quotation marks omitted) ("[G]eneralized objections to an opponent's discovery requests are insufficient." *Id.*). As discussed below, the Government Parties have failed to meet and cannot meet this burden.

22.     Because there are relevant factual issues pertinent to the Lift Stay Motions, the Bondholders are entitled to discovery. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 386 F. Supp. 3d 175, 180 (D.P.R.), objections overruled, 392 F. Supp. 3d 244 (D.P.R. 2019) (ordering discovery

in connection with lift stay motion); *see also Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp.
of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13, 22-23 (1st Cir.
2018) (listing relevant factual inquiries in ruling on a lift stay motion, including "whether and to
what extent the bondholders possessed property interests").

23.     Indeed, if the FOMB refuses to provide the necessary discovery, the Bondholders
should be entitled to an adverse inference regarding the ownership of the pledged revenues and the
nature of the tax statutes at issue.  *See Astro-Med, Inc. v. Nihon Kohden Am., Inc*., 591 F.3d 1, 20
(1st Cir. 2009) ("[A]n adverse inference instruction may be allowed when a party fails to produce
a document that exists or should exist and is within its control.").

## I.     The Bondholders' Discovery Requests Are Relevant and Necessary to Resolve Key Disputed Issues

24.     The discovery the Bondholders have requested from the Government Parties is
directly relevant to the arguments raised in the FOMB's Oppositions.  Unfortunately, the process
of discussion and production has been slow and with much disagreement.  And the Government
Parties' most recent responses to the Bondholders' inquiries are clear about only one thing: the
Government Parties' ultimate productions that might be forthcoming will be extremely limited in
scope, will not provide discovery on many of the limited categories of documents requested, and
will be insufficient to meet the Bondholders' needs.

25.     The Oppositions present at least two crucial issues of fact that necessitate discovery.
First, they are entitled to information on the flow of funds—including discovery on the transfers
of Pledged Revenues from the Commonwealth to instrumentalities, the specific accounts in which
they are held, and the balances have been over the relevant period of time.  In many cases, the
FOMB's assertion that the instrumentalities, and thus the Bondholders, lack a property interest in
the pledged revenues is based on factual assertions that Pledged Revenues have not been deposited

to the credit of certain special funds or accounts on which bondholders have a lien—but even the limited discovery received to date raises factual disputes concerning those issues, highlighting the probative value of discovery here.  Second, the Bondholders are entitled to discovery to rebut the FOMB's assertion that the tax statutes at issue are "appropriations" statutes.  At bottom, because discovery is critical to adjudication of the Lift-Stay Motions, the Government Parties' unfounded protests that discovery is unduly burdensome cannot trump the importance of fairly deciding motions that implicate billions of dollars in debt.

     **A.**     <u>**The Bondholders Are Entitled to Discovery to Show That the HTA, PRIFA, CCDA, and Their Bondholders Have Property Interests in the Pledged Revenues**</u>

26.     The FOMB raises fact questions in its effort to rebut the Bondholders' argument that, under either a legal or an equitable theory of ownership, the instrumentalities and thus the Bondholders lack any property interest in the pledged revenues.

27.     Even though the relevant statutes transfer the excise tax proceeds to the HTA (e.g., "The sum of the tax collected on gasoline . . . shall be covered into a special deposit in favor of the Highways and Transportation Authority for its corporate purposes"), the FOMB argues that these laws do not convey property rights, but only a mere expectancy to receive an appropriation, and that the Commonwealth is more than a mere custodian of funds, asserting that, after the Commonwealth collects the pledged revenues under its taxing authority, it deposits them into its own Treasury Single Account, allegedly held without restriction and not for the beneficial interest of HTA or its bondholders.  HTA Opp. ¶ 92. With respect to PRIFA, the FOMB similarly argues that the Commonwealth receives the Rum Taxes from the federal government with "no strings attached," deposits them into a treasury lockbox account, then transfers a certain portion to the TSA, and then transfers them to PRIFA."  PRIFA ¶ 69.  It also points to unattributed and authenticated flow of fund charts, attached as exhibits to each Opposition, that purport to illustrate

the flow of pledged revenues all in accordance with its theory at issue in each motion.  Using these charts, the FOMB suggests that, after the Commonwealth or the Tourism Company collects the revenues into its accounts other than the accounts designated by statute and it then makes "appropriations" in accordance with the statutes at issue.  *See* HTA Opp.  ¶ 6; *id.* Ex. A., CCDA Opp., Ex. E, PRIFA Opp. ¶ 38; *id.* Ex. A; CCDA Opp., Ex. E, PRIFA Opp. ¶ 38; *id.* Ex. A.  The Bondholders are entitled to information on the flow of funds to evaluate and rebut the FOMB's assertions.  Simply put, the factual assertions the FOMB wants the Court to adopt from these charts *require* adversarial testing through discovery and cannot be assumed to be true for purposes of deciding the Lift-Stay Motion.

28.     Moreover, the FOMB asserts, again without evidentiary support, that, even if the Excise Taxes and Pledged Rum Taxes were held in restricted accounts for the beneficial interest of others and/or were directly transferred to the special deposits as mandated by law, the money would not be for the benefit of the Bondholders.  *See* HTA Opp.  ¶¶ 7, 13, 15, 67, 90, 92; PRIFA Opp. ¶¶ 5–6, 33, 38, 69.  With respect to CCDA, the FOMB asserts "the Tourism Company ceased depositing funds into the Transfer Account and instead retained those funds" but fails to identify the accounts where those funds are being retained by the Tourism Company. CCDA Opp. ¶ 40– 41.  These conclusory assertions assume underlying facts that are critical to determining the parties' legal or equitable property interests—such as who holds the funds at any particular stage of their journey into and out of public coffers, how those moneys are held, in which accounts, for whose benefit, in which amount, and under which restrictions or conditions.  Discovery is thus necessary to evaluate the FOMB's assertions and understand the specific path taken by the Excise Taxes, Pledged Rum Taxes, and Pledged Hotel Taxes, from collection of the funds from taxpayers to their deposit into specific accounts and their potential transfers out of the accounts.  As before,

14

the factual assertions the FOMB wants the Court to adopt require adversarial testing through discovery and cannot be assumed to be true for purposes of deciding the Lift-Stay Motions.

29.     With respect to equitable property principles, the FOMB argues that in the First Circuit "no trust can exist where no 'specific restriction [is] placed upon [the debtor's] use of the supported trust funds,' and '[the debtor] was left free to use what it received for its own benefit rather than' hold it for the purported trust beneficiary." HTA Opp. ¶ 94; CCDA Opp. ¶ 96; PRIFA Opp. ¶ 103. This contention too rests on a factual assumption that the Commonwealth has not restricted the use of the revenues in any way. The Bondholders are entitled to discovery to refute this premise.

30.     The FOMB's Opposition similarly contends that, while the Bondholders have drawn a distinction between Commonwealth cash that is available for any purpose and cash that is encumbered or otherwise restricted, "this term has no meaning in a bankruptcy case, where funds are either encumbered or unencumbered." HTA Opp. ¶ 99. The FOMB then advances the unsupported factual assertion that "'[r]estricted funds' are not encumbered funds." *Id.* Discovery, however, could demonstrate that these pledged funds were "encumbered," and that the FOMB's arguments are newly minted from whole cloth.

31.     This argument then flows over to FOMB's other defenses in its Opposition. For example, FOMB argues that the bondholders' security interests attach only to revenues received by HTA, CCDA, and PRIFA or into specific accounts held by each authority. HTA Opp. ¶¶ 21, 24, 25 n. 12, 27, 64, 70-75; CCDA Opp. ¶¶ 74-76; PRIFA Opp. ¶¶ 40, 93-97.[7] FOMB then goes on to argue (without citing any plausible evidence) that section 928(a) of the Bankruptcy Code

_____

[7] The FOMB makes a similar argument in PRIFA. *See* PRIFA Opp. ¶ 121 ("Movants' security interest, if any, is limited to monies deposited in PRIFA's Sinking Fund.").

does not apply because HTA purportedly is not "acquiring" the Excise Taxes (HTA Opp. ¶ 107) and because the Pledge Rum Taxes are "not a special excise tax of the Commonwealth, but a mere appropriation" (PRIFA Opp. ¶ 125). These arguments thus hinge on whether HTA and PRIFA are "receiving" the revenues, which clearly implicates factual issues. Noticeably, FOMB refrains from arguing that the Hotel Taxes are not special revenues. FOMB's apparent distinction between HTA and PRIFA on the one hand and CCDA on the other hand turns on factual questions that must be explored. This also requires discovery to test FOMB's unsubstantiated assertions, because it is directly relevant to the bondholders' property interests. Finally, given the potential commingling of the Pledged Revenues with other funds in Commonwealth accounts, the Bondholders need discovery related to the flow of funds and Commonwealth account balances to establish their right as a trust beneficiary.

32. In *Gracia-Gracia*, the First Circuit held that to establish such a right, a "'claimant must "identify the trust fund or property and, where the trust fund has been commingled with general property of the bankrupt, <u>sufficiently trace the property or funds</u>."'" *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340, 351 (1st Cir. 2019) (internal citation omitted). To trace intermixed funds, the court must apply the "lowest intermediate balance rule," through which it "follow[s] the trust fund and decree[s] restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund." *Id.* (quoting *Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988)). The Bondholders thus should be allowed discovery to identify (1) where the Commonwealth has deposited the Excise Taxes, Pledged Rum Taxes, and Pledged Hotel taxes, and (2) the amounts deposited in those accounts.

**B.** **The Bondholders Are Entitled to Discovery to Show That the Tax Statutes at**

**Issue Are Not Mere "Appropriations"**

33.     The Oppositions rest on the FOMB's attempt to reclassify the tax statutes at issue as "appropriation" laws that create "merely an expectancy" that the Commonwealth would continue transferring the Excise Taxes to HTA, the Pledged Rum Taxes to PRIFA, and the Pledged Hotel Taxes to CCDA.  HTA Opp. ¶¶ 80, 83, 92; PRIFA Opp. ¶¶ 62–66, 69–70; CCDA Opp. ¶¶ 8, 25, 28, 57, 65.  While it asserts that the statutes are unambiguous, the FOMB's showings in this regard are far too weak to render all possible evidence irrelevant.  The opposite is true.  From its factual premise, the FOMB argues that (1) this expectancy is insufficient to confer a property interest to the Bondholders or HTA, PRIFA, or CCDA and (2) section 202 of PROMESA preempts the statutes at issue because PROMESA purportedly preempts all preexisting appropriation statutes.  HTA Opp. ¶¶ 83–86; PRIFA Opp. ¶¶ 1-4, 10-13, 45, 71-80, 124; CCDA Opp. ¶¶ 67, 65–67, 77–82.

34.     The FOMB's characterization of the tax statutes at issue raises issues that are fundamentally factual.  The FOMB asserts that the "Puerto Rico statutes governing the Allocable Revenues appropriate the *Commonwealth's* tax revenues to HTA without regard to Oversight Board certified budgets and fiscal plans."  HTA Opp. ¶ 86.  The FOMB makes the exact same assertions with respect to the statutes at issue in PRIFA and CCDA.  *See* PRIFA Opp. ¶ 75 (statute is preempted if it "purports to appropriate Commonwealth money outside the certified fiscal plan and budget"); CCDA Opp. ¶ 78 ("[T]he Tax Act purports to appropriate the Commonwealth's tax revenues (the Occupancy Tax Revenues) to the Tourism Company and CCDA without regard to Oversight Board approved budgets and fiscal plans.").  These unsupported assertions assume the truth of the FOMB's legal conclusion—that the Excise Taxes, Pledged Rum Taxes, and Pledged Hotel Taxes are indeed the Commonwealth's property and subject to continuing appropriations.  A review of historical appropriation and budgetary practices and processes related to the pledged

revenues will show whether the Commonwealth's unsupported assertions are specious. Regardless, the Bondholders are entitled to discovery to rebut the FOMB's appropriation theory.

35.     Indeed, the Bondholders intend to show that the Commonwealth's long-standing regulations, rules, official communications and its other budgetary practices are wholly at odds with the FOMB's interpretation of the statutes at issue.  This discovery will demonstrate that the statutes do not require annual appropriations for payment of revenue bonds and that the course of dealing supports the Bondholders' interpretation.  The contemporaneous practices of members of the executive and legislative branches of government may guide interpretation of the constitutional and statutory meaning of "appropriation" under Puerto Rico law.  *See, e.g.*, *Commonwealth Ins. Co. v. Casellas*, 3 P.R. Offic. Trans. 750, 756 (1975) (turning to the "existing practice" of executive officials to shed light on the meaning of statutory provisions); *United Shoe Workers of Am., AFL-CIO v. Bedell*, 506 F.2d 174, 185 (D.C. Cir. 1974) ("Contemporaneous interpretation of a statute by those designed to oversee it commands great respect . . . ."); *Roig Commercial Bank v. Buscaglia*, 74 P.R. 919, 933 (1953) ("This Court has decided that in case that a provision of law is ambiguous, the administrative practice is important, serving as an effective aid in the construction of a statute."); *Brugal &Co. v. Buscaglia*, 64 P.R. 903 (1945) (approving of the principle that administrative "practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility" for administering it (quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933))); see also *Banco Popular v. Mun. de Mayagüez*, 126 D.P.R. (P.R. Offic. Trans.) 653, 671 (1990) (Hernandez Denton, J., dissenting) (relying on the "administrative practice of the municipalities and of the Treasury Department since the Law was approved" to interpret the scope of the tax statute at issue).

36.     The Bondholders believe that dedicated revenue streams assigned and allocated to

public corporations (such as the Excise Taxes assigned to HTA, the Pledged Rum Taxes assigned to PRIFA, and the Pledged Hotel Taxes authorized to be imposed, collected, and assigned by the Tourism Company) are not subject to annual budgetary appropriations.   But the limited information that the government makes publicly available obviously is not an adequate substitute for discovery.[8]  Moreover, the limited publicly available information contains contradictions that must be factually clarified.[9]  Because the Bondholders must be given the opportunity to show that historically the Commonwealth and the public corporations to which Excise Taxes, Pledged Rum Taxes, and Pledged Hotel Taxes were pledged did not treat these pledged revenues as "appropriations" but rather as the public corporations' own revenues, the Bondholders are entitled to discovery on these issues.   To that end, the Bondholders have made targeted requests for budgetary documentation relating to HTA and the Commonwealth, including internal agency rules, administrative manuals and official communications regarding the budgeting treatment of the Excise Taxes, the Pledged Rum Taxes, and the Pledged Hotel Taxes.

37.     The FOMB additionally maintains that the term "allocated," as used in the English translation of the Annotated Laws of Puerto Rico, "the Spanish version uses the word term [sic] 'asignados,' which would be more accurately translated as 'appropriated.'"  HTA Opp. ¶ 86 n.36 (citing 13 L.P.R.A. § 31751(a)(1)(E)).  The FOMB also makes similar factual claims regarding

---

[8] The information is limited because it gives only rudimentary information about the authorities' budgets and the flow of funds between the Commonwealth and the authorities.

[9] For example, the Commonwealth's Basic Financial Statements and Required Supplementary Information as of June 30, 2016, states that pledged revenues are "conditionally allocated" whereas the Commonwealth's Financial Information and Operating Data Report, as of December 18, 2016, states: "Special Revenue Funds are Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation.  Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds."

the translations of words appearing in the statues at issue in PRIFA.  *See* PRIFA Opp. ¶¶ 65 (interpreting "ingresar" and "los ingresos"), 67 (interpreting "participación").  In offering its own English translation of the statutes, the FOMB has introduced another factual dispute that requires discovery, including whether authorities charged with implementing the statutes adopted FOMB's preferred interpretation or not.  *See United States v. Gayle*, 406 F. App'x 352, 359 (11th Cir. 2010) (holding that correctness of a translation is a question of fact); *United States v. Gonzalez*, 319 F.3d 291, 296 (7th Cir. 2003) (same).  The same evidence of how official regulations, rules and documents interpreted and implemented these laws is relevant to determine whether FOMB's linguistic factual assertion is accurate.

38.     Thus, to refute the FOMB's factual assertions and demonstrate that the bonds are in fact special revenue bonds whose repayment did not depend on annual appropriations by the Commonwealth, the Bondholders are entitled to discovery concerning flow of funds and the Commonwealth's pre-PROMESA budgeting treatment of excise taxes, which will show that the Commonwealth has not treated the statutes at issue as appropriations statutes.

### C.     The Bondholders Are Entitled to Seek Course-of-Dealing and Parol Evidence

39.     Whether the Court finds any ambiguity in the agreements, course-of-dealing evidence is admissible to establish the facts on certain disputed issues.  *See* Restatement (Second) of Contracts § 223 (1981) ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing.").

40.     In particular, it is now clear that that the parties have a factual dispute regarding which monies are held in the Puerto Rico Infrastructure Fund (which Movants contend is subject to a security interest in favor of the PRIFA bonds), and which monies are held in, *inter alia*, the Transfer Account and the Pledge Account (in both of which the FOMB concedes is subject to a

security interest in favor of the CCDA bonds).  Course-of-dealing evidence into how the funds

flowed prior to any default, and how the funds flow now, could clarify for the Court which monies

in fact constitute Movants' collateral.  This discovery could resolve the issues of secured status

that the Court is opining on:  If the Court were to find that a particular set of monies constitute part

of the Transfer Account or Pledge Account held by the Tourism Company, for instance, that could

resolve the question of secured status on the CCDA bonds because there is no dispute that Movants

have a security interest in the Transfer Account or Pledge Account.  Similarly, a finding regarding

which monies are held to the credit of the Puerto Rico Infrastructure Fund could significantly

simplify the issues that the Court needs to resolve in order to determine secured status for the

PRIFA bonds, as many of the Oversight Board's arguments rest on the supposition (very much in

dispute) that it is not holding monies in any fund subject to Movants' security interest.[10]

41.    Moreover, while the Bondholders contend that the Bond Documents relating to all

three Lift-Stay Motions unambiguously support their position, it is well settled that, even where

"both sides contend that the agreement is unambiguous (when read their way)," the Court

nevertheless can find ambiguity. *Clinton Co. v. United States*, No. 88 C 2705, 1991 WL 95284, at

*5 (N.D. Ill. May 24, 1991).  If the Court does so here, it is entitled to consider evidence that bears

on the ambiguity.  The Bondholders would be prejudiced if they are denied the opportunity to

introduce course of dealing evidence here.[11]

---

[10] For this reason, discovery into the "lockbox" arrangement with rum producers such as Bacardi and
Serrales is relevant course-of-dealing evidence to PRIFA (and also could constitute relevant parol evidence
on the meaning of the PRIFA bond documents).  FOMB concedes that the lockbox agreement provides that
the first $117 million in rum taxes each year should be disbursed to the credit of PRIFA—but makes factual
arguments about how these disbursements occur and legal arguments about the significance of such
disbursements.  *E.g.*, PRIFA Opp. ¶ 29.  Discovery will clarify the effect of the arrangements with rum
producers on the flow of funds and bondholders' security interests or other property rights in those funds.

[11] To the extent the FOMB argues that the parties should go forward with a preliminary hearing regarding
secured status, at which it may consider only whether ambiguity exists, and only later can consider course-

42.     To the extent the FOMB argues that the parties should go forward with a preliminary hearing regarding secured status, at which it may consider only whether ambiguity exists, and only later can consider course-of-dealing or other evidence resolving that ambiguity, that is inconsistent with the FOMB's scheduling proposal for a Disclosure Statement hearing in June, before which it is seeking a resolution on these issues.

43.     In addition, as to HTA, the Government Parties claim that the Bond Resolutions are unambiguous and thus discovery as to supplemental resolutions, bond closing transcripts, and other resolutions related to the Bonds is unnecessary.  They claim that the supplemental resolutions and other resolutions related to the Bonds (beyond the Bond Resolutions) are irrelevant to the bondholders' security interests.  However, as the Movants will demonstrate in their Reply in Support of the Motion to Lift the Automatic Stay, the Resolutions actually cross reference supplemental bond resolutions, meaning that the documents themselves contemplated that certain rights related to the revenue pledge would be subsequently granted to the bondholders *outside* of the Resolution, but nevertheless pursuant to the terms of the Resolutions.  The bondholders have already located one of those supplemental resolutions, which explicitly grant a gross pledge of those revenues without reference to section 401 of the Resolution.  Indeed, the defined term "Revenues" explicitly includes a category of "Revenues" which includes taxes and fees that HTA has pledged to secure the Bonds.  1968 Resolution § 101 (definition of "Revenues" subcategory (c)).  Presumably, additional documents of this sort are in the Government Parties' custody and control, given that they are documents issued or adopted by HTA itself.

---

of-dealing or other evidence resolving that ambiguity, that is inconsistent with the FOMB's scheduling proposal for a Disclosure Statement hearing in June, before which it is seeking a resolution on these issues.

## II.    **There Is No Undue Burden in Producing the Necessary Information**

44.    The Government Parties bear the burden of proving that producing this limited but necessary, relevant information would be an undue burden.  *See Vázquez-Fernández v. Cambridge Coll., Inc.*, 269 F.R.D. 150, 164 (D.P.R. 2010).   The Court considers "the relevance of the documents sought, the necessity of the documents sought, the breadth of the request . . . expense and inconvenience." *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008).

45.    The Government Parties cannot establish that producing documents in response to the Bondholders' document requests would present an *undue* burden.  Especially in this context, where billions of dollars in secured debt are on the line, the Government Parties' cannot cry undue burden while to force Movants' towards a preliminary hearing without a properly developed record.  As explained above, the documents sought are both relevant and necessary; they are also tailored to specific issues concerning the Bondholders' property interests, which this Court will be considering at the preliminary lift stay hearing.  *See Thomas & Betts Corp. v. New Albertson's, Inc.*, 2013 WL 11331377, at *5 (D. Mass. July 11, 2013) (subpoena was of appropriate breadth where it was "tailored to seek information" regarding a specific claim at issue).

46.    Nor can the FOMB show that the expense or effort necessary to respond to the Document Requests outweighs Bondholders' right under Rule 26 to receive them.  To sustain their burden, the FOMB must show specifically how responding to each request would be unduly burdensome.  *Autoridad de Carreteras*, 319 F.R.D. at 427; *see also Sterling Merch., Inc. v. Nestle, S.A.*, 2008 WL 1767092, at *2 (D.P.R. Apr. 15, 2008) (stating that a party "cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance.").   The Government Parties cannot do so here, given the narrow scope of the Bondholders' requests and their direct relevance to factual issues of ownership raised in the FOMB's own pleadings.  Indeed,

23

the only asserted basis for burden in the Government Parties' February 11 email is a "delaying [of]

the resolution of the threshold issues."  That impermissible generalized assertion is not enough.

Any such delay is not undue given the importance of the issues, the need for a full record, the

relevance of the Bondholders' Document Requests, and the factual issues this Court must resolve.

Further, the Government Parties do not explain why delay is even a legitimate consideration in

this context, where they are the parties opposing the relief sought by the Lift-Stay Motions; after

all, it is the Government Parties that want the automatic stay to remain in place and the

Bondholders that are prejudiced by the prolonged continuation of the stay.  To the extent the

Government Parties have ulterior motives—such as rushed confirmation of a plan of adjustment—

that should not factor into the proper resolution of these Lift-Stay Motions, and the Bondholders

should be afforded their due process rights in seeking stay relief.[12]

47.     Additionally, the FOMB cannot show any undue burden because the Discovery

Requests seek information that FOMB will have to produce anyway in response to the Revenue

Bond Adversary Proceedings.  The Revenue Bond Adversary Proceedings—filed the same day as

the Lift-Stay Motions—raise similar factual issues to those identified above.  *See supra* at ¶ 8.  At

the summary judgment stage, the Bondholders are entitled to discovery to defend themselves

against the claims in the adversary proceedings.  Rule 56(d) would permit Bondholders to respond

to any motion for summary judgment with a showing that "'it cannot present facts essential to

justify its opposition.'"  *In re PHC, Inc. S'holder Litig.*, 762 F.3d 138, 143 (1st Cir. 2014) (quoting

---

[12] Movants respectfully reserve their right to seek third-party discovery into these issues, if it becomes
necessary.  Even assuming *arguendo* that Respondents could show that they are unable to locate certain
materials without an unduly burdensome search (which Movants dispute), those materials may be readily
available from third parties.  For example, to the extent that the Respondents are unable to find certain
transaction or bank account records, the banks that maintained the accounts may be able to locate and
produce those records readily from central filing systems.  Respondents should have the opportunity to
obtain records from any source where they may be available.

Fed. R. Civ. P. 56(d)).  Rule 56 is intended to "safeguard against judges swinging the summary judgment axe too hastily," *Resolution Tr. Corp. v. N. Bridge Assocs., Inc.*, 22 F.3d 1198, 1203 (1st Cir. 1994), and provide diligent parties "'a fair chance to obtain necessary and available evidence from the other party,'" *In re PHC*, 762 F.3d at 145.  In cases like this, "when the parties have no opportunity for discovery, denying the Rule [56(d)][13] motion and ruling on a summary judgment motion is likely to be an abuse of discretion."  *Id*. at 144.

## RELIEF REQUESTED

48.     In light of the foregoing, the Bondholders request that this Court order the FOMB, HTA, CCDA, PRIFA, and AAFAF, to produce the documents responsive to the Discovery Requests attached hereto as Exhibits C, D, and E.

49.     WHEREFORE the Bondholders respectfully request that this Court (i) enter the Proposed Order attached hereto as Exhibit A granting the relief requested herein, and (ii) grant Bondholders such other relief as is just and proper.

---

[13] "Rule 56(d) was formerly Rule 56(f)" and the "textual differences between current Rule 56(d) and former Rule 56(f) are purely stylistic."  *Nieves-Romero v. United States*, 715 F.3d 375, 381 n.3 (1st Cir. 2013). Accordingly, "case law developed under former Rule 56(f) remains controlling." *Id*.

**Certification of Compliance with**
**Local Rule 9013-1 and Tenth Amended Case Management Procedures**

Pursuant to Local Rule 9013-1 and ¶ I.H of the *Tenth Amended Notice, Case Management and Administrative Procedures*, the undersigned counsel hereby certify that they have (a) carefully examined the matter and concluded that there is a true need for an urgent decision; (b) not created the urgency through any lack of due diligence; and (c) made reasonable, good-faith communications in an effort to resolve or narrow the issues that are being brought to the Court.

*[Remainder of page intentionally left blank]*

Dated: February 14, 2020
San Juan, Puerto Rico


CASELLAS ALCOVER & BURGOS P.S.C.        CADWALADER, WICKERSHAM & TAFT LLP


By: */s/ Heriberto Burgos Pérez*              By: */s/ Howard R. Hawkins, Jr.*


     Heriberto Burgos Pérez              Howard R. Hawkins, Jr.*
     USDC-PR 204809                    Mark C. Ellenberg*
     Ricardo F. Casellas-Sánchez          William J. Natbony*
     USDC-PR 203114                    Ellen M. Halstead*
     Diana Pérez-Seda                  Thomas J. Curtin*
     USDC-PR 232014                    Casey J. Servais*
                                              200 Liberty Street
P.O. Box 364924                             New York, NY 10281
San Juan, PR 00936-4924                     Telephone:  (212) 504-6000
Telephone:  (787) 756-1400                  Facsimile:  (212) 504-6666
Facsimile:   (787) 756-1401
Email:  hburgos@cabprlaw.com
       rcasellas@cabprlaw.com
       dperez@cabprlaw.com            Email: howard.hawkins@cwt.com
                                                mark.ellenberg@cwt.com
*Attorneys for Assured Guaranty Corp. and*      bill.natbony@cwt.com
*Assured Guaranty Municipal Corp.*              ellen.halstead@cwt.com
                                                thomas.curtin@cwt.com
                                                casey.servais@cwt.com

* Admitted *pro hac vice*

*Attorneys for Assured Guaranty Corp. and Assured
Guaranty Municipal Corp.*

ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC

By:/s/ *Eric Perez-Ochoa*
    Eric Pérez-Ochoa
    USDC-PR No. 206,314
    E-mail:    epo@amgprlaw.com

By:/s/*Luis A. Oliver-Fraticelli*
    Luis A. Oliver-Fraticelli
    USDC-PR NO. 209,204
    E-mail:    loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Tel.:    (787) 756-9000
    Fax:    (787) 756-9010

*Attorneys for National Public Finance
Guarantee Corp.*

WEIL, GOTSHAL & MANGES LLP

By:/s/ *Robert Berezin*
    Jonathan Polkes*
    Gregory Silbert*
    Robert Berezin**
    Kelly DiBlasi*
    Gabriel A. Morgan*

    767 Fifth Avenue
    New York, New York 10153
    Tel.:    (212) 310-8000
    Fax:    (212) 310-8007
    Email:    jonathan.polkes@weil.com
            gregory.silbert@weil.com
            robert.berezin@weil.com
            kelly.diblasi@weil.com
            gabriel.morgan@weil.com

* admitted *pro hac vice*
**\*pro hac vice* application forthcoming

*Attorneys for National Public Finance
Guarantee Corp.*

FERRAIUOLI LLC

MILBANK LLP

By:/s/ *Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes
    USDC-PR NO. 219,002
    E-mail:    rcamara@ferraiuoli.com

By:/s/ *Sonia Colón*
    Sonia Colón
    USDC-PR NO. 213809
    E-mail:    scolon@ferraiuoli.com

    221 Ponce de Leon Ave., 5th Floor
    San Juan, PR 00917
    Tel.:    (787) 766-7000
    Fax:    (787) 766-7001

*Counsel for Ambac Assurance Corporation*

By:/s/ *Atara Miller*
    Dennis F. Dunne*
    Atara Miller*
    Grant R. Mainland*
    John J. Hughes*
    55 Hudson Yards
    New York, New York 10001
    Tel.:    (212) 530-5000
    Fax:    (212) 530-5219
    Email:    ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com

*admitted *pro hac vice*

*Counsel for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

By: /s/ *María E. Picó*
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    E-mail: mpico@rexachpico.com


*Attorneys for Financial Guaranty Insurance
Company*

BUTLER SNOW LLP

By: /s/ *Martin A. Sosland*
    Martin A. Sosland (pro hac vice)
    5430 LBJ Freeway, Suite 1200,
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    E-mail: martin.sosland@butlersnow.com

    Jason W. Callen (pro hac vice)
    150 3rd Avenue, South, Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    E-mail: jason.callen@butlersnow.com

    *Attorneys for Financial Guaranty
    Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 14, 2020, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Puerto Rico by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.

At New York, New York, on February 14, 2020.

By: */s/ Robert Berezin*  
Robert Berezin*  
* Admitted *pro hac* v*ice*

# **EXHIBIT A**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.,*<br><br>                  Debtors.[14] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## [PROPOSED] ORDER GRANTING THE URGENT MOTION OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY TO COMPEL PRODUCTION OF DOCUMENTS

---

[14] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THIS MATTER is before the Court on an Urgent Motion filed by Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation (collectively, the "Bondholders") to compel the production of documents by the Federal Oversight and Management Board for Puerto Rico (the "FOMB"), the Puerto Rico Highway and Transportation Authority (the "HTA"), the Puerto Rico Infrastructure Financing Authority ("PRIFA"), the Puerto Rico Convention Center District Authority ("CCDA"), and the Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("AAFAF" and, together with FOMB and HTA, the "Government Parties").  The Urgent Motion seeks an order compelling the FOMB to produce documents responsive to a set of documents requests attached as Exhibits C, D, and E to the Urgent Motion to Compel.

UPON CONSIDERATION of the Urgent Motion, the relevant portions of the docket, and being otherwise fully advised in the matter it is hereby **ORDERED** that:

1.   The Urgent Motion is **GRANTED** as set forth herein.

2.   The Government Parties shall produce documents responsive to the Bondholders' Discovery Requests.

3.   The parties shall meet and confer to set a document-production schedule.

4.   If the Government Parties fail to produce documents responsive to the Bondholders' Discovery Requests, the Court will draw an adverse inference regarding the ownership of the Pledged Revenues and the nature of the Excise Tax Statutes.

Dated: _____, 2020

SO ORDERED:

_____

Honorable Judith G. Dein
United States Magistrate Judge