**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**AMBAC ASSURANCE CORPORATION, ASSURED GUARANTY CORP.,
ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION, AND FINANCIAL GUARANTY INSURANCE
COMPANY'S OPPOSITION TO DRA PARTIES' MOTION AND MEMORANDUM
OF LAW IN SUPPORT OF THEIR (I) NOTICE THAT THE DRA IS A PARTY IN
INTEREST AND CAN PARTICIPATE IN THE MONLINES' AMENDED LIFT STAY
LITIGATION AND REQUEST TO MODIFY THE AMENDED REVENUE BOND
SCHEDULING ORDER OR, (II) IN THE ALTERNATIVE, MOTION TO
PERMIT THE DRA PARTIES TO INTERVENE IN THE MONOLINES'
AMENDED LIFT STAY LITIGATION [ECF NO. 10835]**

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND .............................................................................................. 3

    A.    HTA Lift Stay Litigation Begins. ........................................................................ 3

    B.    The Court Continues to Order Separate Schedules for DRA and the
          Monolines' Lift Stay Litigation. ......................................................................... 4

    C.    The Parties Comply with the Court's Scheduling Orders. ................................... 5

ARGUMENT ......................................................................................................................... 6

  I.  The DRA Parties' *Sub Rosa* Motion for Reconsideration Should Be Denied. .................. 6

  II.  Participation Is Unnecessary to Preserve the DRA Parties' Rights to Raise Unique
      Issues. ............................................................................................................................ 8

    A.    The DRA Parties' Rights to Raise Unique Issues Are Preserved Under the
          DRA Parties' Lift Stay Litigation Schedule. ...................................................... 8

    B.    Traditional Intervention Factors Indicate the DRA Parties' Shared
          Interests Are Adequately Protected and Intervention Is Not Warranted for
          the DRA Parties' Unique Interests. ..................................................................... 9

        i.    Intervention as of Right. .......................................................................... 10

        ii.  Permissive Intervention. ........................................................................... 14

  III.  If the DRA Parties Are Permitted to Participate, the Court Should Limit Such
        Participation. ............................................................................................................. 15

CONCLUSION ...................................................................................................................... 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adelphia Commc'n. Corp.*,
  285 B.R. 848 (S.D.N.Y. 2002).................................................................15

*Am. Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974) (Blackmun, J., concurring).....................................14

*In re Caldor Corp.*,
  303 F.3d 161 (2d Cir. 2002)....................................................................10

*Caterino v. Barry*,
  922 F.2d 37 (1st Cir. 1990).....................................................................11

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  301 F. Supp. 3d 325 (D.P.R. 2018)...........................................................9

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  872 F.3d 57 (1st Cir. 2017)...........................................................9, 10, 15

*Marie v. Allied Home Mortg. Corp.*,
  402 F.3d 1 (1st Cir. 2005).........................................................................7

*In re Smart World Techs., LLC.*,
  423 F.3d 166 (2d Cir. 2005)....................................................................16

*United Nuclear Corp. v. Cannon*,
  696 F.2d 141 (1st Cir. 1982)................................................................8, 11

**Statutes**

11 U.S.C. § 1109(b) ........................................................................... *passim*

**Other Authorities**

9 COLLIER ON BANKRUPTCY ¶ 2018.02 (16th ed. 2019) ...............................10

Fed. R. Bankr. P. 2018................................................................................10

Fed. R. Bankr. P. 7024................................................................................10

Fed. R. Civ. P. 24...........................................................................10, 11, 14

Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. (together with AGC, "Assured"), National Public Finance Guarantee Corporation ("National"), and Financial Guaranty Insurance Company ("FGIC", and, together with Ambac, Assured, and National, the "Monolines"), by and through their undersigned counsel, respectfully submit this brief in opposition to the *DRA Parties' Motion and Memorandum of Law in Support of Their (I) Notice that the DRA is a Party in Interest and Can Participate in the Monolines' Amended Lift Stay Litigation and Request to Modify the Amended Revenue Bond Scheduling Order or, (II) In the Alternative, Motion to Permit the DRA Parties to Intervene in the Monolines' Amended Lift Stay Litigation* [ECF No. 10835] (the "Intervention Motion"), which seeks leave to intervene in the Monolines' HTA-related lift stay litigation and adversary proceedings currently pending before the Court. (*See* ECF No. 10102; Case No. 20-ap-5; Case No. 20-ap-7 (the "Monoline Revenue Bond Litigation")).[2]  In support of their opposition, the Monolines respectfully state as follows:

## PRELIMINARY STATEMENT

1.      During the Court-ordered mediation stay, the DRA Parties and the Monolines each negotiated schedules governing their respective litigation efforts, which were then ordered by the Court. The DRA Parties' schedule has been agreed upon and in place for months. Like all parties in interest, the DRA Parties have a right to be heard. And the interests unique to the DRA Parties will be heard—as set out in their agreed schedule. To the extent the DRA Parties seek to participate in the Monoline Revenue Bond Litigation, however, several factors militate against anything but the most limited participation. To the extent the DRA Parties seek anything beyond this, such a

---

[2] The DRA Parties have filed substantially similar motions to intervene in Case No. 20-ap-5 (ECF No. 11) and Case No. 20-ap-7 (ECF No. 14). (*See* Intervention Motion at 2 n.3.) The Monolines are filing substantially similar oppositions in each of the three dockets in which the DRA Parties have moved to intervene.

request is tantamount to a motion for reconsideration of the Court's prior scheduling orders and should be rejected.

2.      First, the DRA Parties' separate scheduling order should govern those issues unique to the DRA Parties.  That schedule has been in place and ordered since June of last year.  The DRA Parties should not be permitted, months later, to renegotiate the scope of the Monoline Revenue Bond Litigation, especially as the DRA Parties have rested on their own schedule until now. Moreover, the Monoline Revenue Bond Litigation has already begun, making it particularly inappropriate for the DRA Parties to attempt to expand its scope at this late date.

3.      Second, the DRA Parties' apparent attempt to expand the substantive scope of the Monoline Revenue Bond Litigation should also be rejected.  The DRA Parties assert two principal exposures:  one arising from their holdings of HTA bonds, and another arising from certain loans allegedly made by GDB to HTA, which they claim are secured by the same monies securing the HTA bonds by virtue of an apparent security agreement that is nowhere at issue in the Monoline Revenue Bond Litigation.  There is no credible argument that the DRA Parties' interests are not adequately represented with respect to the first bucket;  the four Monolines have significant exposures to HTA bonds and have demonstrated a serious commitment to vindicating their rights as holders and insurers of those bonds.  To the extent the DRA Parties now wish to be heard in the Monoline Revenue Bond Litigation, it stands to reason that they are doing so only with respect to their purported security agreement relating to the GDB loans, potentially interposing a premature and unnecessary intercreditor dispute into what is already an exceedingly complex matter.  This attempt to shoehorn new issues into the Monoline Revenue Bond Litigation is inappropriate and counterproductive to the Court's resolution of the important issues presented by the Monoline Revenue Bond Litigation.

-2-

4.       In the alternative, should the Court permit the DRA Parties to participate in the

Monoline Revenue Bond Litigation, such participation should be limited.  Given that oppositions

to the Monolines' lift-stay motion have already been filed, the DRA Parties should be required to

file a limited statement of position totaling no more than 15 pages and strictly limited to the issues

presented by the lift-stay motion.  That brief should be due no later than March 9, in order to allow

the Monolines an adequate opportunity to reply.

## RELEVANT BACKGROUND

### A.       HTA Lift Stay Litigation Begins.

5.       The DRA Parties first sought stay relief with respect to their HTA exposure last

summer, filing *The DRA Parties' Motion and Memorandum of Law in Support of Their Motion*

*for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection*

[ECF No. 7643] (the "DRA Lift Stay Motion") on June 25, 2019.  The DRA Parties raised the

same issues there that they purportedly seek to raise here:  diminution of the value of their alleged

security interest in the Act 30-31 Revenues.[3]  (*See* DRA Lift Stay Motion ¶¶ 25-34; Intervention

Motion ¶ 10.[4])

6.       Shortly following that filing, the DRA Parties agreed with FOMB and AAFAF that

establishing the DRA Parties' standing to bring their motion was a gating item (the "DRA Standing

Issue"), and accordingly stipulated to a briefing schedule in which the DRA Standing Issue would

be heard first.  (*See* ECF No. 7822 ¶ 1.)  Importantly, the DRA Parties agreed that "[a]ll issues

concerning the underlying merits of the [DRA Lift] Stay Motion ***will be stayed*** pending the Court's

---

[3] Capitalized terms not defined herein shall have the meanings given them in the Intervention Motion.

[4] *See also* Case No. 20-ap-5, ECF No. 11 ¶ 10; Case No. 20-ap-7, ECF No. 14 ¶ 10.

consideration and determination of the [DRA] Standing Issue." (*Id.* ¶ 6 (emphasis added).)  The

Court so-ordered this stipulated agreement on July 3, 2019.  (*See* ECF No. 7832.)

7.      Later that month, the Court entered its *Order Regarding Stay Period and*

*Mandatory Mediation* (ECF No. 8244), staying a variety of litigation matters and referring them

to mandatory mediation.  The DRA Lift Stay Motion was among these stayed and referred matters

(*see* ECF No. 8481), as was a subsequent lift-stay motion with respect to HTA filed by several of

the Monolines in August of 2019 (*see* ECF 8567).

**B.      The Court Continues to Order Separate Schedules for DRA and the
Monolines' Lift Stay Litigation.**

8.      On December 19, 2019, the Court ordered an amended stipulation between the

DRA Parties, FOMB, and AAFAF, schedule, again providing that the DRA Standing Issue would

be heard first and the merits of the DRA Lift Stay Motion would be stayed pending its resolution.

(ECF No. 9622.)  A report filed by the Mediation Team prior to this order noted that DRA was "in

full agreement" with this schedule governing this litigation (the "DRA Lift Stay Litigation").  (ECF

No. 9365 (the "Interim Report") at 7.)

9.      Also on December 19, 2019, the Court ordered a separate schedule governing the

Monoline Revenue Bond Litigation.  (ECF No. 9620.)  This schedule, unlike that governing the

DRA Lift Stay Motion, has been the subject of much motion practice and debate.  Chief among

the contested issues were the sequencing of lift stay motion practice and adversary proceeding

litigation across multiple types of revenue bonds, and whether FOMB would consent to the Court's

jurisdiction of affirmative defenses raised in the revenue bond adversary proceedings.  (*See* Interim

Report at 7 (noting the parties' disagreement on consolidation of lift stay motions and adversary

proceedings); *e.g.*, ECF No. 9493 (FOMB's response to the Court's interim order regarding

revenue bonds); ECF No. 10251 (Monolines' objection to FOMB's response); ECF No. 10424

-4-

(FOMB's reply)). The DRA Parties remained silent in connection with these crucial issues, other than to reserve rights to seek to participate at a later date.  (*See* ECF No. 10421 (reserving rights "to file additional submissions or objections with the Court")).  At no point did the DRA Parties move to accelerate or otherwise modify their schedule or withdraw their agreement to have the DRA Standing Issue heard first.

### C.   The Parties Comply with the Court's Scheduling Orders.

10.     In mid-January, the Monoline Revenue Bond Litigation began in earnest.  On January 16, 2020, FOMB filed four adversary proceedings against the Monolines (Case Nos. 20-ap-3, 20-ap-4, 20-ap-5, 20-ap-7), and the Monolines filed three lift stay motions (or motions to amend prior lift stay motions) (ECF Nos. 10102 (HTA); 10104 (CCDA), 10109 (PRIFA, motion to amend)).  Briefing and discovery are ongoing with respect to each, with all parties committing substantial resources and time.

11.     The first deadline in the DRA Parties' Lift Stay Litigation has not yet arrived.  The agreed and so-ordered schedule requires FOMB and AAFAF to file an objection to the DRA Parties' Lift Stay Motion—"solely concerning the [DRA] Standing Issue" (ECF No. 9622-1 ¶ 2)— by February 21, 2020.  The Court will hear argument on the DRA Standing Issue in April.  (*See Id.* ¶ 5.)

12.     On February 10, 2020, the Mediation Team filed an amended report that recommended the Court enter, on a final basis, separate schedules for the Monoline Revenue Bond Litigation and the DRA Lift Stay Litigation.  (*See* ECF No. 10756 at Exhibit 1 (Monoline Revenue Bond Litigation schedule), Exhibit 2 ¶ 3 (recommending entry of the stipulated DRA Lift Stay Litigation schedule on a final basis).)  The parties to the Monoline Revenue Bond Litigation are set out in an appendix, and do not include the DRA Parties.  (*See id.* at Exhibit 1, Appendix A.)

-5-

13.     The next day, the DRA Parties filed the Intervention Motion.

### ARGUMENT

## I.     THE DRA PARTIES' *SUB ROSA* MOTION FOR RECONSIDERATION SHOULD BE DENIED.

14.     As noted above, the DRA Parties have agreed to a bifurcated schedule for their DRA Lift Stay Litigation, which is proceeding on a separate track from the Monoline Revenue Bond Litigation.  This structure, under which the DRA Parties will first brief the issue of standing, has been in place since shortly after the DRA Lift Stay Motion was first filed last June.  (*See* ECF No. 7822 (initial stipulation among FOMB, AAFAF, and DRA Parties).)  Indeed, under the terms of the Court's most recent scheduling order addressing the DRA Lift Stay Litigation, the merits of the DRA Lift Stay Motion are presently ***stayed***.  (*See* ECF No. 9622, Exhibit A ¶ 6 ("All issues concerning the underlying merits of the [DRA Lift] Stay Motion will be stayed pending the Court's consideration and determination of the [DRA] Standing Issue.").)  The Intervention Motion improperly seeks to undo this agreed-upon schedule.

15.     To the extent the DRA Parties seek to raise their own issues in the Monoline Revenue Bond Litigation, the Intervention Motion is, in effect, a motion to reconsider the Court's interim orders governing the Monoline Revenue Bond Litigation (ECF Nos. 9620, 10595) and the DRA Lift Stay Litigation (ECF No. 9622).  Those orders established, respectively, when the Monoline Revenue Bond Litigation would begin and which parties would participate, and when the DRA Lift Stay Litigation would begin and which parties would participate.  The relief the DRA Parties request would disturb these orders—the orders concerning Monoline Revenue Bond Litigation by adding another party after litigation is well underway; the order concerning the DRA Lift Stay Litigation by disturbing the reasoned sequence of litigation provided for therein.

-6-

16.     Reconsideration generally requires a movant to clear a high bar—essentially demonstrating that "manifest injustice" would result in the absence of relief.  *See Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 7 n.2 (1st Cir. 2005).  The DRA Parties will suffer no injustice if the Intervention Motion is not granted—their right to be heard and litigate their issues is preserved, on the very timeline to which they repeatedly agreed.  (*See infra* Section III.A.)  But injustice would result to the Monolines and all parties to the Monoline Revenue Bond Litigation.  Litigation on the Monoline Revenue Bond Litigation is in full swing, as the Court is well aware; the parties are active in matters ranging from discovery to drafting a variety of affirmative and responsive pleadings.  The addition of another party at this late hour results in added complexity, uncertainty, and additional work for all litigants, each of whom has been active in negotiating this schedule for many months now.  Moreover, addition of the DRA Parties is especially inappropriate where they have their own proceeding in which to raise issues. (*See infra* Section II.A.)

17.     Not only is the relief sought unwarranted, the request itself is untimely.  The DRA Parties have been privy to the schedule set for the Monoline Revenue Bond Litigation for months through the mediation process and through the Mediation Team's reports filed on the public docket.  If the DRA Parties wished to insert themselves in the Monoline Revenue Bond Litigation, they should have attempted to do so much earlier, and at latest before the lift-stay motions and adversary proceedings were filed on January 16, 2020.  The DRA Parties perhaps even had a final opportunity to move for participation when the Court scheduled argument concerning amendments to the Monoline Revenue Bond Litigation schedule for January 29, 2020.  (*See* ECF No. 9661 ¶ 7 (order, *inter alia*, setting "a hearing to address . . . proposed amendments to[] the Revenues Bonds [Scheduling] Order" on January 29.)  But the DRA Parties did not move to participate at any time

throughout this process.  Indeed, the Intervention Motion was not filed until well after the Monoline Revenue Bond Litigation began.[5]

18.     Rather than move for participation earlier, the DRA Parties rested on their own negotiated and agreed upon schedule, well aware that the Monolines were negotiating a separate schedule. Now that the Monoline Revenue Bond Litigation is proceeding, however, the DRA Parties appear unhappy with their previous strategic decision, and now seek to intervene to reap the benefits of the Monolines' negotiated schedule.  At this late hour, however, the DRA Parties should abide by the schedule to which they agreed.  *See United Nuclear Corp. v. Cannon*, 696 F.2d 141, 143 (1st Cir. 1982) (denying a motion to intervene where putative intervenor knew of the suit long before it moved to intervene, and where late intervention would "result in the disruption of painstaking work by the parties and the court.") (citations omitted).

## II.     PARTICIPATION IS UNNECESSARY TO PRESERVE THE DRA PARTIES' RIGHTS TO RAISE UNIQUE ISSUES.

### A.     The DRA Parties' Rights to Raise Unique Issues Are Preserved Under the DRA Parties' Lift Stay Litigation Schedule.

19.     The DRA Parties submit that section 1109(b) requires that they be allowed to participate in the Monoline Revenue Bond Litigation.  With respect to the few overlapping issues the DRA Parties share with monolines, limited participation may be appropriate.  But the DRA Parties' unique issues need not, and should not, be heard here.  The DRA Parties' rights to pursue their Lift Stay Litigation have been preserved expressly for months, and section 1109(b) does not demand that "parties in interest" be permitted to interject external issues into litigation already in progress.

---

[5] The DRA Parties did seek to negotiate a consensual intervention with the Monolines.  However, no agreement was reached as the DRA Parties made clear their intent to raise additional, non-overlapping issues before the Court and seek broader intervention than appropriate.

20.     Section 1109(b) states that "a party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).  The DRA Parties are therefore guaranteed a right to "raise" and "appear" and "be heard" on any issue. In the complex Title III cases currently before the Court, the Court has ordered heavily-negotiated schedules that preserve these rights—of the DRA Parties, of the Monolines, and of many others. The DRA Parties *will* raise their unique issues, appear, and be heard—on the schedule they negotiated with FOMB and AAFAF and this Court ordered.

21.     But those issues relevant only to the DRA Parties should not be heard here.  Section 1109(b) is permissive, but it is not carte blanche to disrupt the careful construction of previously-negotiated scheduling orders across myriad parties and issues.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 301 F. Supp. 3d 325, 328 (D.P.R. 2018) ("[t]he right granted by Section 1109 to 'raise', 'appear' and 'be heard' on any issue requires only a limited form of intervention . . . [t]he scope of intervention is at the discretion of the court"); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 872 F.3d 57, 63 (1st Cir. 2017) (courts have "broad discretion to control and limit the scope of intervention," including intervention granted under section 1109(b)).  As the DRA Parties' section 1109(b) right to be heard is preserved expressly in the scheduling orders for the DRA Lift Stay Litigation, section 1109(b) does not require the Court to allow the DRA Parties to raise their parochial issues here.

**B.    Traditional Intervention Factors Indicate the DRA Parties' Shared Interests Are Adequately Protected and Intervention Is Not Warranted for the DRA Parties' Unique Interests.**

22.     An analysis of the DRA Parties' alleged need to participate in the Monoline Revenue Bond Litigation with respect to their few shared interests under traditional intervention analysis militates in favor of extremely limited participation, as those shared interests are

-9-

adequately protected.  Intervention to litigate the DRA Parties' unique interests, however, is not warranted.

23.     The First Circuit has instructed that section 1109(b) applies to intervention in adversary proceedings as well as contested matters.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.,* 872 F.3d at 63-4.  Accordingly, the DRA Parties' requests to participate in a contested matter and adversary proceedings are evaluated under a uniform standard.  Section 1109(b) intervention analysis is guided by Federal Rule of Civil Procedure 24 ("Rule 24"), made applicable by Federal Rule of Bankruptcy Procedure 7024 or 9014, as the DRA Parties acknowledge.  (*See* Intervention Motion at 2 n.3 ("intervention in the two adversary proceedings is governed by [Rule] 7024");[6] *id.* ¶ 43 n.9 ("courts have found case law concerning Rule 24 to be helpful in construing whether cause for permissive intervention exists").[7])

24.     Rule 24 governs both intervention as of right and permissive intervention.  Both indicate that only extremely limited participation is warranted with respect to the DRA Parties' shared interests, and unwarranted as to their unique interests.

### i.     Intervention as of Right.

25.     Under Rule 24(a)(2), a party seeking intervention as of right must meet the following four requirements: (i) the application for intervention "must be timely";   (ii) the applicant "must have a direct and substantial interest in the subject matter of the litigation";

---

[6] *See also* Case No. 20-ap-5, ECF No. 11 at 1 n.3; Case No. 20-ap-7, ECF No. 14 at 2 n.5.

[7] The DRA Parties assert that Federal Rule of Bankruptcy Procedure 2018(a) governs a right to intervene in contested matters.  *See id.*  But Section 1109, and not Rule 2018, traditionally governs participation in contested matters.  "Rule 2018 does not actually implement section 1109 or have any bearing on a party's right to intervene under section 1109. In fact, the permissive intervention provision found in Rule 2018(a) is only applicable when a party *cannot* establish that it is entitled to intervene as of right under section 1109(b)."  9 COLLIER ON BANKRUPTCY ¶ 2018.02 n.2 (16th ed. 2019) (emphasis in original); *see In re Caldor Corp.*, 303 F.3d 161, 172 n.9 (2d Cir. 2002) ("§ 1109(b) provides for intervention as of right by a party in interest while [Rule] 2018 provides for permissive intervention by an entity not otherwise entitled to do so under the Code (*e.g.,* an entity other than a party in interest under § 1109(b)).").

-10-

(iii) "the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest"; and (iv) "the applicant's interest must be inadequately represented by existing parties." *Caterino v. Barry*, 922 F.2d 37, 39-40 (1st Cir. 1990).  Evaluation of all factors establishes that the DRA Parties' participation, if permitted, should be limited to shared interests only.

26.    **Timeliness**.    Rule 24's timeliness requirement is "of first importance" in intervention analysis.  *United Nuclear,* 696 F.2d at 143 (citing *NAACP v. New York*, 413 U.S. 345, 365-66 (1973)).  Whether an application to intervene is timely is guided by (i) "the length of time the prospective intervenors knew or reasonably should have known of their interest before they petitioned to intervene"; (ii) "the prejudice to existing parties due to the intervenor's failure to petition for intervention promptly" and "the prejudice the prospective intervenors would suffer if not allowed to intervene"; and (iii) "the existence of unusual circumstances militating for or against intervention." *Caterino,* 922 F.2d at 40 (citing *United States v. Metropolitan Dist. Comm'n*, 865 F.2d 2, 5 (1st Cir. 1989)).

27.    Each of the above factors indicates the DRA Parties' application is untimely. *First*, the Monolines' desire to move to lift the HTA stay has been apparent since certain of the Monolines filed a lift stay motion in August of last year.  (ECF No. 8536.)  Yet this filing is the DRA Parties' first formal attempt to intervene in such litigation.  Moreover,  the DRA Parties have been privy to the schedule set for the Monoline Revenue Bond Litigation for some time, and at least as early as November 27, 2019, when the Mediation Team issued its first report regarding a proposed schedule for such litigation.  Significant opportunity has existed in the more than two months since the filing of that report for the DRA Parties to move to intervene; they only did so on February 11, 2020, well after the Monoline Revenue Bond Litigation was in full swing. *Second*,

no prejudice will result to the DRA Parties if intervention is denied.  As discussed in Section III.A.,

*supra*, the agreed schedule for the DRA Lift Stay Litigation will allow the DRA Parties to raise

and litigate their issues.  But prejudice would result to the numerous parties actively participating

in the Monoline Revenue Bond Litigation, which is well under way on a schedule that was known

to the DRA Parties while they sat silent before the Court.  *Third*, the unresolved DRA Standing

Issue is an additional circumstance militating against the DRA Parties' intervention.  (*See* ECF

No. 9622, Exhibit A ¶ 6.)  In a stipulation last June with FOMB and AAFAF and in every iteration

of the Court's scheduling orders, the DRA Parties have agreed to resolve the issue of their standing

before the merits of their claims may be addressed.  The DRA Standing Issue has not been

addressed.  Until it is, the DRA Parties should not be permitted to abrogate their previous

agreements and proceed directly to litigate the merits of their claims.

28.    ***Direct and substantial interest.***  The DRA Parties claim "a significant stake" in the

Monoline Revenue Bond Litigation proceedings because they allegedly hold liens on certain of

the same collateral in which the Monolines claim a security interest.  (Intervention Motion ¶ 45.[8])

But while there is some small overlap in the DRA Parties' alleged ownership of certain 1998 HTA

bonds and in certain collateral in which the DRA Parties have a subordinate interest to the

Monolines,[9] the DRA Parties admit that they claim interests in different collateral than do the

Monolines.  (*See* Intervention Motion ¶ 2 (claiming interest in Act 31 cigarette taxes, which the

DRA Parties assert is not presently HTA bond collateral),[10] ¶ 46 (admitting no interest in HTA's

---

[8] *See also* Case No. 20-ap-5, ECF No. 11 ¶ 44; Case No. 20-ap-7, ECF No. 14 ¶ 47.

[9] The DRA Parties acknowledge their security interest in the Act 30-31 Revenues is subordinate to that of the HTA bonds.  *See* DRA Lift Stay Motion ¶ 8 (GDB's security interest in the Act 30-31 Revenues is "subordinate" to outstanding HTA bonds); ECF No. 7463-23 (GDB Security Agreement) (granting GDB an interest in the Act 30-31 Revenues that is "junior, inferior and subordinate in all respects to the outstanding bonds of [HTA]").

[10] *See also* Case No. 20-ap-5, ECF No. 11 ¶ 2; Case No. 20-ap-7, ECF No. 14 ¶ 2.

toll revenues, which are pledged to HTA bonds).[11])  Litigation of what the DRA Parties present as substantially different interests is more appropriate in another forum—namely, in the schedule set out for the DRA Lift Stay Litigation.  They are not issues raised in the context of the Monoline Revenue Bond Litigation.

29.  ***Whether disposition of the matter will impede putative intervenor's interest***.  The DRA Parties' and the Monolines' different interests in collateral prevents the DRA Parties from facing prejudice from an adjudication of the Monolines' interests in their separate collateral.  The DRA Parties acknowledge that they claim separate interests, and go so far as to claim that they have "perhaps the sole economic stake with respect to the Act 30-31 Revenues."  (Intervention Motion ¶ 45.[12])  And while the DRA Parties claim that they might be harmed if the Court decides "substantive and legal issues pertaining to the DRA's collateral" without affording them a chance to be heard (Intervention Motion ¶ 38[13]), this is simply not the case.  The nature of the DRA Parties' interests are so different from the Monolines'—subordinate interests or interests in different collateral—that litigation of these interests separately, as the DRA Parties have repeatedly agreed, is the appropriate path forward.

30.  ***Shared interests adequately protected***.  To the extent that the DRA Parties share interests with parties to the Monoline Revenue Bond Litigation, these interests are adequately protected.  If the DRA Parties desire to establish that HTA bondholders are secured claimants of HTA and the Commonwealth, the Monolines will argue that position vociferously.  And if the DRA Parties wish to argue that the Monolines are not secured claimants of HTA or the

---

[11] *See also* Case No. 20-ap-5, ECF No. 11 ¶ 46; Case No. 20-ap-7, ECF No. 14 ¶ 49.

[12] *See also* Case No. 20-ap-7, ECF No. 14 at 1 n.3, ¶ 47.

[13] *See also* Case No. 20-ap-5, ECF No. 11 ¶ 41; Case No. 20-ap-7, ECF No. 14 ¶ 43.

Commonwealth (as their papers seem to suggest[14]), FOMB will argue that the Monolines are not secured.  Both sides of this binary issue are well-defended.

31.    As the DRA Parties' request to intervene is untimely, their differing interests warrant separate litigation (for which the Court has already set a schedule), and because their shared interests are protected, the DRA Parties should not be permitted to intervene as of right with respect to their unique interests.

### ii.    Permissive Intervention.

32.    Nor is permissive intervention warranted with respect to such unique interests. Permissive intervention requires a showing of common questions of law or fact.  *See* Fed. R. Civ. P. 24(b)(1)(B).  But as noted above, the DRA Parties' asserted interests are either sufficiently distinct from the Monolines' to warrant litigation under a separate schedule, or—with respect to the binary issue of whether or not the Monolines are secured—already well-protected.

33.    Permissive intervention is a discretionary prerogative of the court.  *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 562 (1974) ("Permissive intervenors may be barred . . . if the district judge, in his discretion, concludes that the intervention will 'unduly delay or prejudice the adjudication of the rights of the original parties.'") (Blackmun, J., concurring) (citing Fed. R. Civ. P. 24(b)).  The DRA Parties' failure to timely apply to participate in the Monoline Revenue Bond Litigation militates against granting intervention permissively with respect to the DRA Parties' unique issues.

---

[14] *See* Intervention Motion  ¶ 45 (alleging the DRA Parties have "perhaps the sole economic stake with respect to the Act 30-31 Revenues"); Case No. 20-ap-7, ECF No. 14 at 1 n.3, ¶ 47.

### III.    IF THE DRA PARTIES ARE PERMITTED TO PARTICIPATE, THE COURT SHOULD LIMIT SUCH PARTICIPATION.

34.    Should the Court allow the DRA Parties to participate in the Monoline Revenue Bond Litigation, limits on the DRA Parties' participation consistent with those the Court has previously set in other matters are especially appropriate here.

35.    It is well-settled that the scope of intervention is at the broad discretion of the Court. *See, e.g., In re Fin. Oversight & Mgmt. Bd. for P.R.*, 872 F.3d at 63 (courts have "broad discretion to control and limit the scope of intervention"); *In re Adelphia Commc'n. Corp.*, 285 B.R. 848, 851 (S.D.N.Y. 2002) ("it does not necessarily follow that once having intervened, intervenors have the right to litigate as the possessors of causes of action do, or to act wholly free of any limitations imposed by the Court in the interests of orderly procedure."). As this Court has recognized, "the right granted by Section 1109 to 'raise', 'appear' and 'be heard' on any issue requires only a limited form of intervention." *Order Resolving Motion to Intervene*, No. 18-00021-LTS, ECF No. 36 at 3.

36.    The Monolines respectfully submit that if the Court is inclined to grant the DRA Parties' Intervention Motion, the DRA Parties should be restricted from propounding discovery or examining witnesses during depositions, hearings, or trial relating to these proceedings. *See Order Granting Limited Intervention*, Case No. 17-00156-LTS, ECF No. 89 (granting the UCC narrow discovery rights; distinguishing between "the right to intervene in an adversary proceeding" and "the right to take ownership of the debtor's claims in that adversary proceeding"). The DRA Parties should similarly be restricted from participating in hearings where their interests are adequately represented. *See Order Resolving Motion to Intervene*, Case No. 18-00021-LTS, ECF No. 36 (granting monoline insurers limited intervention but denying permission to participate at a hearing where the insurers' position was adequately represented).

-15-

37.     Likewise, to the extent that the DRA Parties are granted the right to file briefs, such briefs should be restricted to issues already raised by the parties and consistent with briefing guidelines set by this Court. *See Order Granting Limited Intervention*, Case No. 17-00156-LTS, ECF No. 89 (granting the UCC the right to file briefs but narrowly tailoring that right to issues already raised by the existing parties); *Order Granting Limited Intervention*, Case No. 17-00228-LTS, ECF No. 92 (granting AAFAF limited participation rights, including narrow briefing rights and narrow discovery rights).

38.     Finally, in accordance with the Court's prior intervention limitations, the DRA Parties should not be permitted to enter into settlement, oppose settlement, or appeal settlement of claims in the Monoline Revenue Bond Litigation. *See Order Granting Limited Intervention*, Case No. 17-00156-LTS, ECF No. 89 (stating the UCC did not have the ability to settle, oppose or appeal settlement in the action in which it sought intervention); *In re Smart World Techs., LLC.*, 423 F.3d 166, 181 (2d Cir. 2005) (concluding that although a party may have the right to intervene under § 1109(b), a creditors' right to intervene does not include the right to settle the proceeding).

## CONCLUSION

39.     For the foregoing reasons, the Monolines respectfully request that the Court deny the Intervention Motion.

*[Remainder of Page Intentionally Omitted]*

Dated: February 18, 2020
      San Juan, Puerto Rico


**FERRAIUOLI LLC**

By: */s/ Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile: (787) 766-7001
    Email:  rcamara@ferraiuoli.com
            scolon@ferraiuoli.com


**MILBANK LLP**

By: */s/ Atara Miller*
    Dennis F. Dunne (admitted *pro hac vice*)
    Atara Miller (admitted *pro hac vice*)
    Grant R. Mainland (admitted *pro hac vice*)
    John J. Hughes, III (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email: ddunne@milbank.com
          amiller@milbank.com
          gmainland@milbank.com
          jhughes2@milbank.com


*Attorneys for Ambac Assurance Corporation*

**ARENT FOX LLP**

By: */s/ David L. Dubrow*
    David L. Dubrow (admitted *pro hac vice*)
    Mark A. Angelov (admitted *pro hac vice*)
    1301 Avenue of the Americas
    New York, NY 10019
    Telephone: (212) 484-3900
    Facsimile: (212) 484-3990
    Email: david.dubrow@arentfox.com
           mark.angelov@arentfox.com
    Randall A. Brater (admitted *pro hac vice*)
    1717 K Street, NW
    Washington, DC  20006
    Telephone: (202) 857-6000
    Facsimile: (202) 857-6395
    Email: randall.brater@arentfox.com

*Attorneys for Ambac Assurance Corporation*

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

***Attorneys for Financial Guaranty Insurance
Company***

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac
vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com
    Jason W. Callen (admitted *pro hac vice*)
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    Email: jason.callen@butlersnow.com

***Attorneys for Financial Guaranty Insurance
Company***

<table>
<tr><td>

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
           rcasellas@cabprlaw.com
           dperez@cabprlaw.com

***Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.***

</td><td>

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ *Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr. (admitted *pro hac
vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac
vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
           mark.ellenberg@cwt.com
           bill.natbony@cwt.com
           ellen.halstead@cwt.com
           thomas.curtin@cwt.com
           casey.servais@cwt.com

***Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.***

</td></tr>
</table>

**ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC**


By: */s/ Eric Perez-Ochoa*
    Eric Pérez-Ochoa
    USDC-PR No. 206,314
    Email: epo@amgprlaw.com

By: */s/ Luis A. Oliver-Fraticelli*
    Luis A. Oliver-Fraticelli
    USDC-PR No. 209,204
    Email: loliver@amgprlaw.com
    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Telephone: (787) 756-9000
    Fax: (787) 756-9010


*Attorneys for National Public Finance Guarantee Corp.*

**WEIL, GOTSHAL & MANGES LLP**

By: */s/ Robert Berezin*
    Jonathan Polkes (admitted *pro hac vice*)
    Gregory Silbert (admitted *pro hac vice*)
    Robert Berezin (admitted *pro hac vice*)
    Kelly Diblasi (admitted *pro hac vice*)
    Gabriel A. Morgan
    767 Fifth Avenue
    New York, NY 10153
    Telephone: (212) 310-8000
    Fax: (212) 310-8007
    Email: jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com
        kelly.diblasi@weil.com
        gabriel.morgan@weil.com


*Attorneys for National Public Finance Guarantee Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ Roberto Cámara-Fuentes
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com

-21-