**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

```
------------------------------------------------------------------ x
In re:                                                              :
                                                                    :
THE FINANCIAL OVERSIGHT AND                                         :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                   :   Title III
                                                                    :
         as representative of                                       :   Case No. 17-BK-3283 (LTS)
                                                                    :
THE COMMONWEALTH OF PUERTO RICO et al.,                             :   (Jointly Administered)
                                                                    :
         Debtors.¹                                                  :
------------------------------------------------------------------ x
```

**OMNIBUS RESPONSE OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO (A) AMENDED REPORT AND RECOMMENDATION OF MEDIATION TEAM
AND (B) JOINT MOTION FOR AN ORDER (I) SCHEDULING A HEARING TO
CONSIDER ADEQUACY OF INFORMATION CONTAINED IN DISCLOSURE
STATEMENT, (II) ESTABLISHING DEADLINE FOR FILING SPANISH
TRANSLATION OF DISCLOSURE STATEMENT, (III) ESTABLISHING
DEADLINE FOR FILING OBJECTIONS TO DISCLOSURE STATEMENT
AND REPLIES THERETO, AND (IV) GRANTING RELATED RELIEF**

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four
(4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto
Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID:
3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-
LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority
("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees
Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No.
17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority
("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi)
Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of
Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software
limitations).

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

RESPONSE.....................................................................................................................8

I.      Court Should Resolve Certain Additional Gating Issues Before Approval of Any
        Disclosure Statement .........................................................................................8

        A.      Court Should Resolve GO Priority Issue Now ......................................9

        B.      Court Should Resolve GO Bondholders' Pending Motions to Dismiss
                Constitutional Debt Limit Objections and GO Lien Challenge.............13

        C.      Court Should Resolve Pending Rule 12(c) Motions in PBA "Lease"
                Litigation............................................................................................15

II.     Court Should Not, in a Vacuum, Stay Motions and Actions Not Yet Filed.....................17

III.    Scheduling Motion Is Procedurally Improper, and Oversight Board's Request to
        Establish a Schedule for Consideration of Amended Disclosure Statement Is
        Premature ...........................................................................................................19

        A.      Scheduling Motion Should Be Denied As Procedurally Improper......................20

        B.      Scheduling Motion Should Be Denied On Its Merits Because Proposed
                Schedule Is Inadequate and Premature .................................................22

IV.     Miscellaneous Objections ...................................................................................24

        A.      Summary Judgment Motions Should Be Permitted With Respect to
                Additional Counts in Revenue Bond Adversary Proceedings..............................25

        B.      Page Limitation Should Not Apply to Committee.................................25

RESERVATION OF RIGHTS ..........................................................................................26

CONCLUSION...............................................................................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 3DFX Interactive, Inc.*,
  No. 02-55795 JRG, 2006 WL 2010786 (Bankr. N.D. Cal. June 29, 2006)..............................21

*In re 500 Fifth Ave. Associates*,
  148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ....................................................................................19

*ACP Master Ltd. v. Puerto Rico*,
  300 F.Supp.3d 328 (D.P.R. 2018), *aff'd* 919 F.3d 638 (1st Cir. 2019) ...................................20

*Assured Guar. Corp. v. Garcia-Padilla*,
  214 F. Supp. 3d 117 (D.P.R. 2016)...........................................................................................12

*In re Catholic Bishop of N. Alaska,* No. F08-00110-DMD, 2009 WL 8412170
  (Bankr. D. Alaska July 20, 2009) ..............................................................................................21

*In re Envirodyne Indus., Inc.*,
  174 B.R. 986 (Bankr. N.D. Ill. 1994) ........................................................................................21

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  945 F.3d 3 (1st Cir. 2019).........................................................................................................11

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  948 F.3d 457 (1st Cir. 2020)......................................................................................................12

*In re Gabriel Techs. Corp.*,
  No. 13-30341, 2013 WL 5550391 (Bankr. N.D. Cal. Oct. 7, 2013)..........................................10

*In re Hillside Park Apartments, L.P.*,
  205 B.R. 177 (Bankr. W.D. Mo. 1997)......................................................................................18

*Landis v. N. Am. Co.*,
  229 U.S. 248 (1936)...................................................................................................................18

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*,
  385 F.3d 72 (1st Cir. 2004)........................................................................................................18

*In re Mirant*,
  2005 WL 6440372, No. 03-46590-DML-11 (Bankr. N.D. Tex. May 24, 2005)......................10

*In re Ponce de Leon 1403, Inc.*,
  No. 11-07920-ESL, 2012 WL 5880443 (Bankr. D. P.R. Nov. 20, 2012)..................................21

*In re ReoStar Energy Corp.*,
  No. 10-47176, 2012 WL 1945801 (Bankr. N.D. Tex. May 30, 2012) ......................................10

*In re Texas Rangers Baseball Partners*,
 434 B.R. 393 (Bankr. N.D. Tex. 2010)...................................................................................10

*In re Valrico Square Ltd. Partnership*,
 113 B.R. 794 (Bankr. S.D. Fla. 1990) ...................................................................................19

*In re Vega*,
 No. 09-08785 BKT, 2010 WL 3282656 (Bankr. D. P.R. Aug. 17, 2010)...........................21

**Statutes**

Bankruptcy Code § 507(a)(2) ...............................................................................................11, 12

**Other Authorities**

Bankruptcy Rule
 3013.......................................................................................................................................18, 19
 9014.......................................................................................................................................21
 9019.......................................................................................................................................17, 24

Fed. R. Bankr. P. 7026-7037.....................................................................................................21

PROMESA § 314(b)(5)..............................................................................................................24

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee")[1] hereby files this omnibus response (the "Response") to the *Amended Report and Recommendation of the Mediation Team*, dated February 10, 2020 [Docket No. 10756] (the "Amended Report")[2] and the *Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (IV) Granting Related Relief* [Docket No. 10808] (the "Scheduling Motion").[3]  In support of this Response, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      It has now been almost eight months since this Court entered its *Order Regarding Stay Period and Mandatory Mediation* (the "Stay Order") [Docket No. 8244] staying various matters in favor of a mediation process under the supervision of the Mediation Team.  While the Committee recognizes the efforts of the Mediation Team in facilitating the recent settlement between the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and certain holders of bonds issued or guaranteed by the Commonwealth (collectively,

---

[1]   The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[2]   Capitalized terms not defined in this Response have the meanings set forth in the Amended Report.

[3]   The Oversight Board agreed to extend the Committee's deadline to object to the Scheduling Motion until February 21, 2020, at 4:00 p.m. (AST).

the "GO Bonds" and the holders of such bonds, "GO Bondholders"), the mediation process was a colossal failure from the Committee's perspective.

2.      For one, the Committee is dismayed that the Oversight Board has chosen to breach its agreement to include the Committee in settlement discussions regarding their joint objection to the 2012 and 2014 GO Bonds [Docket No. 4784] (the "2012-2014 GO Claim Objection").[4]  As the Amended Report makes clear, the plan support agreement (the "PSA")[5] was negotiated between the Oversight Board and GO Bondholders (with assistance of the Mediation Team).[6]  In this regard, the Amended Report's silence with respect to the engagement of the Committee by the Oversight Board in plan negotiations is deafening.[7]

3.      Worse, the Oversight Board negotiated and entered into a plan support agreement that, according to the Oversight Board, allocates virtually all available plan currency (not counting retiree benefits) to holders of GO Bonds.  Indeed, in order to secure the support of GO Bondholders for a plan of adjustment, the PSA provides that GO Bondholders will receive **96.4%** of the total consideration to be distributed under the plan (not counting retiree benefits), *i.e.*, $13.95 billion out of $14.48 billion.[8]  That consideration includes a $400 million "tip" to GO

---

[4]   The Common Interest and Cooperation Agreement Relating to Prosecution of Objection to Certain General Obligation Bond Claims, dated as of January 14, 2019 (the "Cooperation Agreement"), provides that (a) "[t]he FOMB will consult with the Committee in good faith regarding any potential settlement of any claim to which the [2012-2014 GO Claim] Objection relates, whether or not arising from mediation" and (b) the Committee "shall have the right to participate fully in the mediation of any general obligation bond claims to which the [2012-2104 GO Claim] Objection relates with respect to issues raised by or bearing on the [2012-2014 GO Claim] Objection, including, without limitation, the right to . . . participate in all mediation sessions and calls or other communications with mediators." Cooperation Agreement ¶9.  A copy of the Cooperation Agreement is attached hereto as **Exhibit A**.

[5]   A copy of the PSA is attached hereto as **Exhibit B**.

[6]   *See* Amended Report at 8.

[7]   In fact, the Amended Report only once mentions the Committee, and that in connection with an unrelated issue, namely the scheduling of litigation related to the ERS bonds.  *See* Amended Report at 3.

[8]   *See* Commonwealth of Puerto Rico Title III Case: Plan Support Agreement, dated February 9, 2020 (the "Oversight Board Presentation") at 11.  A copy of the Oversight Board Presentation is attached hereto as **Exhibit C**.  According to the Oversight Board's estimates, the PSA provides that, depending on the year of issuance, holders of GO Bonds will receive a recovery between 65.4% and 77.6% under a proposed plan of

Bondholders for supporting the plan, which "tip" alone is **four times** the proposed total
distribution (*i.e.*, $100 million) to the Committee's constituents.

4.      At the same time, the eight-month mediation stay has meant that little progress
has been made in obtaining judicial resolution of certain "gating" issues.  The Mediation Team
recognizes, and the Committee concurs, that gating issues related to the pending revenue bond
litigation (which, depending on its outcome, could upend the proposed plan of adjustment)
should be decided before (or contemporaneously with) the hearing on the approval of the
disclosure statement to avoid the delay and costs associated with having to re-solicit a further
amended plan.  The Mediation Team further notes that "[m]erits rulings on . . . gating issues will
assist the parties in understanding this Court's views of their respective rights, if any."[9]

5.      However, the Committee submits that there are other critical gating issues not
identified by the Mediation Team that should also be decided before (or contemporaneously
with) the hearing on the approval of a disclosure statement, including, most importantly, the
purely legal question of whether the GO Bonds are entitled to priority in a Title III case under
PROMESA.  In fact, just like the gating issues identified by the Mediation Team, the GO priority
issue could require, depending on the Court's resolution of that issue, material modifications to
the plan of adjustment and the re-solicitation of creditors.  Expending the time and cost of
soliciting the Amended Plan and preparing for a contested confirmation hearing, only to be told

---

adjustment.  *Id.* at 15.  The Committee believes that the Oversight Board's recovery estimates for the GO Bond
claims understate the actual recovery rates (including because (a) the GO Bond claims include unmatured
original issue discount and (b) the Oversight Board's recovery estimates do not include the $400 million
consent fees).  Moreover, as the Court may already be aware, **certain GO Bonds have been trading as low as
20 cents on the dollar in December 2017, which means that a bondholder who purchased GO Bonds at
that time and now stands to receive a plan recovery of approximately 80% would see a 300% return on
its investment**.

[9]      Amended Report at 12, n. 14.

at confirmation that GO Bonds are not entitled to any priority in Title III, would be a tremendous waste of resources.

6. Nor would deferring the GO priority issue to the confirmation hearing provide any cost savings. Whether the Oversight Board and the GO Bondholders like it or not, the Court is already going to have to decide, in the context of the revenue bond litigation, whether Title III of PROMESA preempts priorities under Commonwealth law, as the Oversight Board is opposing the claims of certain revenue bondholders against the Commonwealth on exactly those grounds (as detailed in Section I below).[10] Thus, at the disclosure statement hearing, the Oversight Board may find itself in the bizarre situation of having obtained a ruling in the revenue bond litigation that Title III preempts Commonwealth priorities, but nevertheless moving forward with a plan of adjustment premised on GO Bonds having priority over other unsecured claims. For that reason alone, the Committee submits that the Court should address the GO priority issue now for all Title III purposes.

7. In addition, as detailed in Sections I.B and I.C below, the Committee submits that other gating issues should also be decided before (or contemporaneously with) the hearing on the approval of a disclosure statement, namely (a) the GO Bondholders' pending motions to dismiss the constitutional debt limit objections and the challenges to their purported secured status and (b) the pending motions for judgment on the pleadings in the PBA "lease" litigation. In all these instances, briefing has already been commenced (and, in the case of the motions for judgment on the pleadings in the PBA "lease" litigation, it is almost completed). These motions seek rulings on purely legal issues, which rulings would provide much needed clarity, be of assistance in

---

[10] The Mediation Team recognizes this fact, as it proposes that one of the claims on which the parties to the Revenue Bond Adversary Proceedings may seek summary judgment is the "[d]isallowance of claims for post-PROMESA unlawful retention of allocable revenues because allocable revenue statutes are **preempted by PROMESA**." Amended Report at 15 (emphasis added).

4

continuing plan mediation and negotiation, and streamline the confirmation process.  Yet, the
Oversight Board is settling these matters for pennies on the dollar, including claims brought by
the Committee (with regards to the constitutional debt limit objections, certain of those claims
were brought solely by the Committee and never joined by the Oversight Board) that would lead
to the total disallowance of billions of dollars of claims.

8.     The Committee acknowledges the Mediation Team's statement that it "expects to
continue to engage the parties in substantive mediation of the remaining issues in dispute among
them."[11]  However, the Committee is mystified as to how (given the proposed blanket stay of all
GO-related challenges and the Oversight Board's position that it has used up all its plan "chips"
for other creditors) the Mediation Team or the Oversight Board will extract concessions from
GO Bondholders in order to fund improved distributions to other general unsecured creditors—
unless the game plan is simply to attempt to convince the Committee that, at the end of the day,
general unsecured creditors should accept a distribution of only "up to 1.8%" under the proposed
plan of adjustment.[12]  Suffice it to say, the Committee, as the sole fiduciary for general
unsecured creditors,[13] will not accept a distribution of 1.8% for general unsecured creditors, the
overwhelming majority of which are based in Puerto Rico.[14]

---

[11]   Amended Report at 23.

[12]   *See Disclosure Statement for the Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, the
Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico
Public Buildings Authority*, dated Sept. 27, 2019 (the "Original Disclosure Statement") [Docket No. 8766] at
13.  As of the filing of this Response, the Committee has no reason to believe that this recovery will change
under the Amended Plan of Adjustment.  Moreover, under the Oversight Board's construct, any change could
only come from a reduction in the recovery of other creditors, which would require re-solicitation of the
affected creditors.

[13]   General unsecured creditors include Puerto Rico trade creditors and service providers to the Commonwealth,
contract counterparties with damages claims under contracts or leases with the Commonwealth, and litigation
claimants.

[14]   According to the claims register, more than 90% of the proofs of claim filed by general unsecured creditors
were filed by creditors based in Puerto Rico.

9.      Against this backdrop, the Oversight Board requests, and the Mediation Team recommends, a highly expedited timeline—given the magnitude and complexity of these Title III cases—to seek approval of a disclosure statement (the "Amended Disclosure Statement") for an amended plan of adjustment (the "Amended Plan") for the Commonwealth, ERS and PBA. Under the requested timeline, the deadline to object to the Amended Disclosure Statement would be **April 17, 2020**, and the hearing on the approval of the disclosure statement would take place on **June 3, 2020**.  The Oversight Board seeks this relief even though it has not yet filed the Amended Disclosure Statement or the Amended Plan, and may not file them until February 28, 2020—**less than three business days before the March 4, 2020 hearing on the Scheduling Motion**.  It is plainly impossible for any party in interest to evaluate the reasonableness of the proposed disclosure statement schedule, including the extent of related discovery, without even having seen the Amended Disclosure Statement (which will surely be similar in length to the 1,800-page disclosures statement filed on September 27, 2019).

10.      Moreover, as a practical matter, given the recent one-month adjournment of the preliminary hearing on the lift stay motions in the revenue bond litigation, it is highly doubtful that merits rulings in the revenue bond litigation can be obtained, and the inevitable appeals of such rulings be prosecuted to conclusion, before the proposed June 3, 2020 disclosure statement hearing.  Therefore, even if one were to accept the rationale advanced by the Mediation Team that the only gating issues the Court should address arise in the context of the revenue bond litigation, these issues are not going to be finally resolved for months after the proposed June 3 disclosure statement hearing.

11.      In short, after spending more than two-and-a-half years in Title III, the Oversight Board is suddenly trying to rush the Commonwealth "across the finish line" on a compressed

confirmation schedule, while all matters that could actually streamline the process, including

resolving the Committee's challenge to the purported priority of GO Bonds, would be deferred

until the last possible date, namely the confirmation hearing.  Worse, the Oversight Board is

doing so without having any assurance whatsoever that the Puerto Rico Legislature will pass,

and the Governor will enact, legislation necessary for the issuance of new GO bonds and junior

COFINA bonds, as contemplated under the PSA.  Indeed, the Governor does not support the

Amended Plan based on the PSA.[15]  It is perhaps for this reason that Oversight Board members

David Skeel and Ana Matosantos voted against the PSA, with David Skeel noting that "I

concluded there still are **too many loose ends**."[16]  The Oversight Board's strategy is not only

extremely risky and costly (if such legislation is not obtained),[17] but it is obviously designed to

put the Committee and other parties in interest not party to the PSA in a highly prejudicial

litigation posture.  In any event, by now the Court should be familiar with the Oversight Board's

playbook (first minted in the PREPA case): "occupy the territory" to the exclusion of other

parties in interest by filing a blockbuster settlement and then sit on that settlement for months in

the hopes of obtaining implementing legislation while other parties in interest are practically

frozen out because the Oversight Board has "settled" the issues.

12.    There is no reason why this Court should sequence confirmation issues so as to

give the Oversight Board and GO Bondholders every possible advantage in an eventual

---

[15]    *See The Puerto Rico Fiscal Agency and Financial Advisory Authority's (I) Objection to the Financial Oversight and Management Board for Puerto Rico's (A) Motion to Schedule a Disclosure Statement Hearing (ECF No. 10808] and (B) Motion to Establish Pre-Solicitation Procedures [ECF No. 10839]; and (II) Response to the Amended Report and Recommendation of the Mediation Team [ECF No. 10756]* [Docket No. 11159] at 2.

[16]    David Skeel (@daskeel), Twitter (Feb. 10, 2020, 6:44 AM).
https://twitter.com/daskeel/status/1226879658945400833 (emphasis added).

[17]    In addition to the costs of solicitation and preparation for a contested confirmation trial, the PSA also provides that the Commonwealth will have to pay $100 million in termination fees to GO Bondholders if the Oversight Board terminates the PSA under certain circumstances, including if the milestones for confirmation and the effective date of the Amended Plan are not met.

confirmation litigation, while tying the hands of the Committee and other parties in interest before the confirmation process has even begun. Doing so would needlessly impair parties' due process rights and simultaneously waste limited time and resources. Instead, the Court should permit the Committee to move forward with its challenge to the purported GO priority (and resolve the other gating items identified herein) and not stay future motions and actions that could further promote judicial economy. The Committee respectfully submits that in no event should the Court approve a disclosure statement schedule at this time, without all parties in interest having had an adequate opportunity to review the proposed disclosure statement and address the proposed timeline, including in light of the need for discovery.

13.     In the end, the Oversight Board and the GO Bondholders are not really concerned about preserving judicial resources and time; rather, they desperately want to avoid a ruling on the merits of the purported GO priority and PBA "lease" issues because they know the answer to these questions (*i.e.*, there is no such priority in Title III and the PBA "lease" are disguised financings). Their goal is to keep these issues in limbo so that they can request that this Court approve these issues under the Amended Plan through the prism of a "settlement." The Court should resist this invitation and consider the issues on their merits now.

## **RESPONSE**

## I.     **Court Should Resolve Certain Additional Gating Issues Before Approval of Any Disclosure Statement**

14.     As the Court is well aware, solicitation in these Title III Cases, in which tens of thousands of creditors have filed proofs of claim, is going to be a monumental undertaking of both time and money. Solicitation could easily take 2-3 months, if not longer, and cost millions of dollars. While these costs are unavoidable and necessary to ensure that all of Puerto Rico's hundreds of thousands of residents that are also creditors in these cases have their voices heard

and their due process rights protected, it illustrates why judicial economy requires that re-solicitation must be avoided at all costs.  The best way to avoid the needless waste of re-solicitation is to rule on key threshold issues—especially issues that cannot be avoided and, therefore, do not add to the total amount of time or money spent on these matters.

15.     Even after solicitation, the confirmation process will likely raise (among other things) issues of unfair discrimination, claim estimation, feasibility, and best interests of creditors, with all of the attendant document discovery, witness depositions, briefings, expert opinions and testimony, and all of the other features of a contested trial with which this Court is more than familiar.[18]  Accordingly, the Committee fully agrees with the Mediation Team that the Court should resolve key gating issues prior to proceeding to solicitation, let alone a full confirmation hearing with all that entails.  The Committee believes, however, that there are additional gating issues not identified by the Mediation Team that should also be resolved before moving forward with the approval of a disclosure statement, including (a) the Committee's objection to the purported GO priority, (b) the GO Bondholders' motions to dismiss the constitutional debt limit objections and the challenges to their purported secured status, and (c) the pending motions for judgment on the pleadings in the PBA "lease" litigation.

A.     Court Should Resolve GO Priority Issue Now

16.     The entire Amended Plan is premised on the asserted GO priority, and there is no better illustration of this than the fact that **96.4%** of the total consideration to be distributed under the Amended Plan (not counting retiree benefits) will be distributed to the holders of GO Bonds, which are mere unsecured claims.  In light of the centrality of the purported GO priority

---

[18]   The Oversight Board recognizes the complexity of a contested confirmation hearing, as it allocates up to ten days (between October 13 and 23, 2020) for such a hearing.  Scheduling Motion ¶ 3; Amended Report at 23. Especially in the event that the Court determines to adopt the sequencing recommended by the Mediation Team, the Committee does not concede that even ten days will be sufficient time to address all of the issues that will arise in a contested confirmation hearing, and reserves all rights in this regard.

to the Amended Plan, the Committee submits that it is both prudent and practical, and an appropriate exercise of judicial discretion, to rule on the GO priority issue prior to expending all the time and money that will be required to proceed to a confirmation hearing.  This is consistent with the caselaw, which has explained that judicial economy frequently requires resolution of key legal issues prior to incurring the significant expenses of the confirmation process.  For example, in *In re Gabriel Techs. Corp.*, No. 13-30341, 2013 WL 5550391, at *3 (Bankr. N.D. Cal. Oct. 7, 2013), the court stayed a "costly and uncertain confirmation" process where the proposed plan was premised on the outcome of a pending appeal, explaining that "[t]o deal with confirmation issues would also involve more briefing and arguments, and seems premature and unnecessary at present since the outcome of the Appeals is so critical to the ultimate disposition of these cases. . . . ."  Similarly, in *In re Texas Rangers Baseball Partners*, 434 B.R. 393, 397 (Bankr. N.D. Tex. 2010), "the court posed five questions pertinent to the confirmability of " the debtor's prepackaged plan and "addresse[d] these issues prior to a plan confirmation hearing in the interests of judicial economy."[19]

17.    Moreover, the Mediation Team's proposed litigation sequencing makes it particularly illogical to refrain from determining the GO priority issue prior to a disclosure statement hearing.  Reasoning that it is imperative to avoid a "re-solicitation of creditors, with the attendant delay and costs associated with such a re-solicitation,"[20] the Mediation Team has determined that the issues relating to the revenue bond litigation, including issues that will be

---

[19]    *See also In re ReoStar Energy Corp.*, No. 10-47176, 2012 WL 1945801, at *2 (Bankr. N.D. Tex. May 30, 2012) (court ruled on certain issues "prior to allowing [the plan proponents] to disseminate the Plan and Disclosure Statement to creditors"); *In re Mirant*, No. 03-46590-DML-11, 2005 WL 6440372, at *1 n. 1 (Bankr. N.D. Tex. May 24, 2005) ("The court's determination of these issues will be effective for purposes of any confirmation hearing on the Plan . . . Because the parties identified certain critical issues posed by the Plan the court, with the consent of the parties, determined to address some matters relating to confirmability of the Plan prior to confirmation and in connection with consideration of Debtors' disclosure statement.").

[20]    *See* Amended Report at 12, n.14.

addressed in connection with the monolines' lift stay motions, are critical gating issues that must

be resolved prior to commencing solicitation on the Amended Disclosure Statement.  One of the

specific claims on which the Mediation Team recommends the parties seek summary judgment

in advance of solicitation is the request for "[d]isallowance of claims for post-PROMESA

unlawful retention of allocable revenues because allocable revenue statutes are **preempted by**

**PROMESA**."[21]  The Mediation team, however, apparently fails to appreciate that this very same

preemption issue controls the outcome of the GO priority litigation.

18.    The Mediation Team also makes no mention of the Oversight Board's repeated

arguments in the revenue bond litigation that "**in Title III . . . all nonbankruptcy law requiring**

**full payment of prepetition obligation is preempted by bankruptcy law,**"[22] that "**PROMESA**

**Title III recognizes no priority claims other than administrative claims provided by**

**Bankruptcy Code section 507(a)(2),**"[23] and that the "**caselaw on preemption is extensive and**

**incontestable**."[24]  In that context, the Oversight Board has also made clear that the preemption

issue is a pure legal issue that does not require any discovery.[25]

---

[21]    Amended Report at 15 (emphasis added).

[22]    *Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA Bondholder Motion to Lift Automatic Stay [ECF No. 10602]* [Docket No. 10611] ¶ 2 (emphasis added).

[23]    *Id.* ¶ 75 (emphasis added).

[24]    *Id.* at 37, n. 39 (emphasis added).  *See also Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guarantee Insurance Company for Relief from Automatic Stay or, in the Alternative, Adequate Protection [ECF No. 673]* [Docket No. 10613] ¶ 87 ("PROMESA does not recognize that any claim arising from an appropriation statute has priority.  Simply put, if statutes purporting to appropriate moneys to instrumentalities are not preempted, they would block any possible restructuring."); *Complaint Objecting to Defendants' Claims and Seeking Related Relief* [Docket No. 1 in Adv. Proc. No. 20-003] ¶¶ 156 -57, 279 ("Any Commonwealth laws purporting to recognize priority claims other than those included in PROMESA Title III (and the incorporated Bankruptcy Code provisions) are preempted pursuant to PROMESA section 4;" "[n]one of Defendants' claims qualify for priority under PROMESA Title III's sole priority claim in Bankruptcy Code section 507(a)(2) for administrative expenses;" "even if Ambac had a priority under Commonwealth law (not based on a lien), such a priority is not recognized in PROMESA Title II"); *Complaint Objecting to Defendants' Claims and Seeking Related Relief* [Docket No. 1 in Adv. Proc. No. 20-005] ¶ 177 ("Neither PROMESA nor the Bankruptcy Code provisions incorporated into

19.     Nevertheless, the Mediation Team would have the Court delay a ruling on the

pure legal issue of the purported GO priority—which turns largely on the preemption issues—

even while deciding the very same preemption issue in the context of the revenue bond litigation.

This proposed sequencing is illogical because any determination of the issue in the context of the

revenue bond litigation will make it (practically) impossible to move forward with the Amended

Plan: if the Court rules (as the Oversight Board urges) that the only priorities in Title III are those

found in section 507(a)(2) of the Bankruptcy Code, then the fundamental premise of the

Amended Plan (*i.e.*, the priority of GO Bond claims) cannot possibly stand.  Exacerbating the

illogic of this outcome is the fact that the First Circuit has, in the past three months, issued two

separate rulings that support the argument that Commonwealth law priorities are preempted by

PROMESA and/or have no application in Title III.[26]

---

Title III grant any of Defendants' unsecured claims any priority over general unsecured claims against the
Commonwealth.").

[25]   *See Opposition of the of Financial Oversight and Management Board for Puerto Rico to Urgent Motion of
Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public
Finance Guarantee Corporation, and Financial Guarantee Insurance Corporation to Adjourn Hearing on Motions
for Relief From Automatic Stay and Extend Deadline for Replies in Support of Motions for Relief From
Automatic Stay* [Docket No. 10958] ¶ 8 (". . . the requirement to send the revenue streams to PRIFA, HTA, and
CCDA is inconsistent with the express priorities in Title III and the power of the Oversight Board in Title II to
determine what to do with the revenues.  Thus, the statutes are preempted.  **No discovery can change those
basic facts**.") (emphasis added).

[26]   In the first instance, on December 18, 2019, the First Circuit affirmed that territorial government may
reprogram funds from prior fiscal years only to the extent authorized in a subsequent budget approved by the
Oversight Board, and held further that "any Puerto Rico law to the contrary is preempted by virtue of
PROMESA section 4."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 945 F.3d 3, 8 (1st Cir. 2019).  Even
more recently, on January 30, 2020 the First Circuit expressly rejected the argument, advanced by certain ERS
bondholders, that "because PROMESA requires the Board to develop a 'Fiscal Plan' that respects the relative
lawful priorities or lawful liens . . . Congress intended that PROMESA not alter the status quo existing before
PROMESA's enactment."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 948 F.3d 457, 476-77 (1st Cir.
2020), holding instead that "provision governs only the Board's Fiscal Plan, not the operation of Title III of
PROMESA."  *Id. at* 477. Additionally, even if the GO Bondholders' asserted priority under Puerto Rico law is
not preempted by PROMESA (it is) and must be complied with in any plan of adjustment (it does not), this does
not mean that an authorization to delay payment to other creditors in favor of GO Bondholders somehow turns
into a tool to fundamentally alter the nature of the obligation to those creditors.  Indeed, the District Court for
the District of Puerto Rico has already explained that Puerto Rico's statutory priorities "establish a payment
priority scheme . . . nowhere do they discuss or indicate that the Commonwealth will [or may] settle with or
force debtors to accept less than the full value owed to them."  *Assured Guar. Corp. v. Garcia-Padilla*, 214 F.
Supp. 3d 117, 122 (D.P.R. 2016).  To the contrary, Puerto Rico's priority statute "ensures that any obligation

20.     For all of the above reasons, the Committee believes that considerations of judicial economy and efficiency dictate that the Court determine the GO priority dispute prior to confirmation.

B.     Court Should Resolve GO Bondholders' Pending Motions to Dismiss Constitutional Debt Limit Objections and GO Lien Challenge

21.     Other gating issues that the Committee believes the Court should address without delay are the GO Bondholders' pending motions to dismiss (a) the objections to certain GO Bonds on grounds that they were issued in violation of Puerto Rico's constitutional debt service limit and (b) the adversary proceedings commenced jointly by the Oversight Board and the Committee seeking declarations that the GO Bond are not entitled to secured status.[27]  As noted above, virtually all of the consideration under the Amended Plan (not counting retiree benefits) would be distributed to the GO Bondholders, which is also the result of the very rich settlement under the PSA.

22.     The motions to dismiss, which have already been filed, raise discrete legal issues relating to whether (a) the Committee and other objecting parties have adequately pled claims for relief that approximately $10 billion in GO Bonds were issued in violation of the constitutional debt service limit and (b) the Committee and the Oversight Board have adequately pled claims for relief that the GO Bondholders merely hold unsecured claims.  Resolving these motions to dismiss would involve little additional time and expense.  Briefing is well underway, with response briefs due by March 18, 2020 (in the case of the constitutional debt limit challenge) and

---

not paid in the year of budgetary shortfall will be entered as a debt existing in the following year's budget."  *Id.* at 122-23.  In other words, the "priority" the GO Bondholders relied on, even if not preempted, is not a bankruptcy priority at all.

[27]     As the Court will recall, certain GO Bondholders have asserted that they hold secured claims because, among other things, the Commonwealth "pledged" its "good faith, credit and taxing power" to the GO Bonds and the Puerto Rico Constitution requires that, in certain circumstances, "available revenues" be used first to pay GO Bonds.  The Committee (and, until recently, the Oversight Board as well) believes that these arguments are completely without merit.

April 3, 2020 (in the case of the GO lien challenge).  A hearing on the motions to dismiss the GO

claim objections on April 30, 2020 and on the motions to dismiss the GO lien challenge on June

3 or 4, 2020 (in connection with the June Omnibus Hearing).  In the event the Court denies these

motions, the parties and the Court can then reevaluate whether it makes sense for the litigation to

proceed further, including with respect to discovery.[28]  At the very least, creditors voting on the

plan of adjustment would have a much better sense of the value of such litigation if they had the

benefit of the Court's ruling on such motions to dismiss.

      23.      Another reason the Court should decide the motion to dismiss now is that this

Court (or perhaps another court) will inevitably have to address the same underlying legal issues

in any event (at least as it relates to the constitutional debt limit issue).  The question of whether

certain GO Bonds were issued in violation of Puerto Rico's constitutional debt service limit is

also the centerpiece of the "clawback" adversary proceedings which the Committee and the

Oversight Board are pursing to recover principal and interest payments from past holders of GO

Bonds.  Although this litigation is presently stayed (and the Mediation Team is recommending

that such litigation remain stayed), there is no suggestion in the PSA or elsewhere that this

litigation would not go forward post-confirmation.  The same is true of the pending adversary

proceeding against certain underwriters involved in GO Bond issuances—that litigation, too, will

require the Court (or perhaps another court) to resolve the constitutional debt limit issue.  Thus,

there is no true cost savings by delaying resolution of these issues until after plan confirmation,

and, accordingly, the Committee believes that the pending motions to dismiss should be decided

now.  Moreover, the Court can certainly appreciate the incredible unfairness of a scenario where

the Court were to approve the release of such claims against the GO Bondholders through the

---

[28]    At this stage, no discovery or other time-consuming litigation is necessary for the parties to obtain a threshold
ruling on the motion to dismiss.

prism of a settlement (for miniscule discounts) and subsequently rule on the merits that the

constitutional debt service limit was exceeded.

24.     The Oversight Board will likely respond that the Court should not rule on the

motions to dismiss because doing so would disrupt the settlement with the GO Bondholders

under the PSA.  This settlement, however, is not worth preserving, at least not for any non-

bondholders.  Although the Oversight Board contends that the settlement of the constitutional

debt limit issue results in a $435 million "benefit to the Commonwealth," any such benefit is

dubious.[29]  Indeed, under the PSA, despite the fact that the Committee was a co-objector on

some and sole objector on other GO claim objections, the savings generated by the settlement are

simply rerouted to other GO Bondholders not subject to a constitutional challenge—none of

these "savings" are made available to the Commonwealth or its other unsecured creditors.[30]

25.     In addition, as to the GO lien challenge, given how patently absurd the GO

Bondholders' arguments in favor of secured status are, it would be truly bizarre for the

Commonwealth's Title III case to proceed to confirmation without a judicial determination that

the GO Bonds are unsecured claims.

C.     <u>Court Should Resolve Pending Rule 12(c) Motions in PBA "Lease" Litigation</u>

26.     Similarly, the Committee believes that the pending adversary proceeding (filed

jointly by the Oversight Board and the Committee as co-plaintiffs) challenging the nature of the

purported "leases" between the PBA and the Commonwealth should proceed at this time, at least

---

[29]  *See* Oversight Board Presentation at 9.

[30]  To the extent the Mediation Team expresses concern regarding the timing and cost of resolving the motions to dismiss, *see* Amended Report at 9, the Committee believes these concerns are unfounded for the reasons discussed above.  The Committee suspects that the real driver of any concern about resolving the motion to dismiss is that the Court could deny the motion, allow the objection to move forward, and thereby expose the settlement with GO Bondholders as indefensibly rich in light of the disproportionately high litigation risk to the GO Bondholders.  From the Oversight Board and the GO Bondholders' point of view, such a scenario must be avoided at all cost.

as to the pending motion for judgment on the pleadings, which (other than movants' reply) has already been fully briefed.[31]  All parties would benefit from the Court's decision on that motion, given that the Plan purports to "settle" the PBA lease challenge by effectively paying in full all postpetition rents allegedly due to PBA from the Commonwealth.[32]  In other words, because the Amended Plan cannot be confirmed absent approval of the "settlement" of the PBA "lease" challenge litigation and because that settlement is premised on the notion that somehow the PBA "leases" could survive the currently pending challenge as to which the Committee is a co-plaintiff, this is a threshold issue that should be resolved prior to solicitation.

27.     Moreover, resolution of the question regarding the true nature of the PBA "leases" would also provide clarity regarding the constitutional debt limit.  As eloquently explained by the same law firm now defending the PSA, the "only reason the PBA bonds have yet to be included in the debt limit calculation, even though they are backed by the full faith and credit of the Commonwealth (in two ways), is that the PBA acts as a conduit thereby creating the illusion that the Commonwealth does not have a direct full faith and credit obligation to PBA bond investors, only a guarantee."[33]  However, "[g]iven the nature of the PBA bonds' recourse, and its double full faith protection, it is quite plain to see the 'rental obligations and payments' by the Commonwealth were in fact for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth."[34]  Not only does this demonstrate the unreasonableness of the proposed settlements of the constitutional debt limit

---

[31]  *See PBA Funds', Assured's and QTCB Noteholder Group's Rule 12(c) Motion for Judgment on the Pleadings* [Adv. Pro. No. 18-149, Docket No. 63].

[32]  Depending upon the Court's decision with respect to the motion for judgment on the pleadings, the parties could later revisit whether the remainder of the PBA litigation should continue to be stayed or proceed further.

[33]  *Lex Claim, LLC v. Garcia-Padilla*, Case No. 16-cv-2374-FAB, *COFINA Senior Bondholders' Motion and Incorporated Memorandum of Law for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c)*, dated March 18, 2017, at 32.

[34]  *Id.* (internal quotation marks omitted).

and the PBA "leases", it also—as relevant to the issues at hand—demonstrates that interests of
efficiency and judicial economy weigh in favor of resolving already pending issues regarding the
PBA "leases", as doing so would provide clarity into two critical issues.  This is literally two for
the price of one.

28.      Even if the Court is inclined to continue the stay with respect to the PBA
litigation, the Court should require that the Oversight Board's proposed "settlement" of the PBA
litigation be teed up through a separate motion under Bankruptcy Rule 9019 for a ruling by this
Court before the hearing on the approval of the Amended Disclosure Statement.  In fact, this is
what the Oversight Board had previously agreed to do under the prior plan support agreement,
dated May 31, 2019, with certain GO Bondholders,[35] but for some unexplained reason the
Oversight Board has abandoned that approach in favor of cramming the PBA "settlement" into
an already packed confirmation hearing.

## II.    Court Should Not, in a Vacuum, Stay Motions and Actions Not Yet Filed

29.      The Mediation Team's Amended Report recommends that the Court stay not only
certain enumerated matters and adversary proceedings that have already been commenced, but
also "[c]ontested matters or adversary proceedings commenced after the date of this Order that
address issues (i) being settled under the Amended Plan, or (ii) already joined in litigation that is
being stayed pending a decision on confirmation."[36]  In other words, the Mediation Team asks
the Court to stay motions, contested matters, and other proceedings that have not yet been filed.

30.      As a general matter, such a request runs counter to the Supreme Court's
precaution that where "there is even a fair possibility that the stay for which [the movant] prays

---

[35]   *See* Original Disclosure Statement, Ex. B (Plan Support Agreement, dated as of May 31, 2019) [Ex. E at 3].

[36]   *See [Proposed] Final Order Regarding (A) Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines
Related Thereto*, Ex. 2 to Amended Report ¶ 5.

will work damage to someone else," the movant "must make out a clear case of hardship or

inequity in being required to go forward."[37]  It is hard to understand how the Court can conduct

the case-by-case determination that is necessary to determine if a movant has satisfied its

"heavy" burden of demonstrating a stay is necessary[38] when the Court does not even know what

particular motion or adversary proceeding it is staying.

31.     Apart from the general due process concerns a blanket stay creates, such a stay is

specifically objectionable in the context of plan confirmation.  The Court (assuming it is willing

to stay matters not yet commenced) should make clear that any such stay does not apply to

threshold disclosure statement and solicitation issues.  For example, Bankruptcy Rule 3013

allows the court (upon request) to determine issues of classification, and courts have explained

that judicial economy dictates determination of classification prior to solicitation and

confirmation.  *See, e.g.*, *In re Hillside Park Apartments, L.P.*, 205 B.R. 177, 189–90 (Bankr.

W.D. Mo. 1997) ("[F]or reasons of judicial economy the bankruptcy court should address and

rule upon a gerrymandering issue raised by a creditor in its objection to the debtor's disclosure

statement when, as in this case, resolution of the issue will be dispositive as to the outcome of

further proceedings.  There is no need to waste time and money on a confirmation hearing that

will only prove to be futile because of [the debtor]'s improper classification . . . .").  As the

Bankruptcy Court for the Southern District of New York has observed, "[i]ssues of claim

classification raised pursuant to a Rule 3013 [motion] may be ripe for determination prior to a

confirmation hearing," *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1017 n.7 (Bankr. S.D.N.Y.

1993), and this is consistent with the advisory committee notes to Bankruptcy Rule 3013, which

---

[37]   *Landis v. N. Am. Co.,* 299 U.S. 248, 255 (1936).

[38]   *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1stCir. 2004).

explained that the rule "recognizes that it may be desirable or necessary to establish proper classification before a plan can be formulated." *Id.*

32.     In fact, courts have even held that consideration of judicial economy **require** that classification be addressed prior to confirmation. *See In re Valrico Square Ltd. P'ship,* 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) (rejecting debtor's request to defer to the confirmation hearing the propriety of separate classification of different unsecured creditors because soliciting votes and seeking court approval of a "clearly fruitless venture is a waste of the time of the Court and the parties"). Here, the Committee believes that the confirmation process would greatly benefit from a determination, prior to the commencement of the solicitation process, regarding the classification of certain unsecured claims.[39]  In addition, under the current Stay Order, classification motions are not precluded, and there is no reason to preclude them under the Mediation Team's proposed revised stay order.

33.     For all these reasons, the Court should not stay motions and actions not yet filed, and should specifically permit motions under Bankruptcy Rule 3013 and any other motions and actions that will economize confirmation issues.

## III.     Scheduling Motion Is Procedurally Improper, and Oversight Board's Request to Establish a Schedule for Consideration of Amended Disclosure Statement Is Premature

34.     Through the Scheduling Motion, the Oversight Board seeks approval of a schedule for litigating objections to the Amended Disclosure Statement even though it has not

---

[39]    As noted below, the Oversight Board and the Mediation Team have created a construct in which the Committee is forced to address both the timing and the substance of any objection to the disclosure statement prior to the filing of the disclosure statement (or plan) itself.  Obviously, without actually reviewing the disclosure statement (and plan), the Committee cannot, at this stage, state whether it believes a Rule 3013 motion will be required.  Accordingly, the Committee reserves all rights to file such a motion contesting the specific classification scheme embodied in the disclosure statement and plan, once filed.  In this Response, the Committee merely notes that the suggestion that classification issues be reserved for a confirmation hearing that may take place nine months from now, after millions of dollars have been spent on approving a disclosure statement, solicitation, and confirmation discovery and litigation is simply inconsistent with the Bankruptcy Rules, the applicable caselaw, and considerations of judicial economy.

19

yet filed the Amended Disclosure Statement with the Court and has indicated it may not even do

so until February 28, 2020—less than three (3) business days before the scheduled hearing on the

Scheduling Motion.  The Oversight Board's request is procedurally improper and should be

denied for this reason alone.  To the extent the Court considers the substance of the Scheduling

Motion, it should be denied on the merits because the schedule it contemplates is inadequate and

premature given the status of open issues affecting the confirmation process.

        A.      <u>Scheduling Motion Should Be Denied As Procedurally Improper</u>

        35.      The Court should not consider a proposed schedule for approval of the Amended

Disclosure Statement before the Oversight Board has even filed the Amended Plan Documents

with the Court.  The Court has rejected requests for relief based on a "hypothetical factual

context and an unripe claim" previously in these Title III cases.  *See In re Fin. Oversight &*

*Mgmt. Bd. for Puerto Rico,*, 300 F.Supp.3d 328, 336-37 (D.P.R. 2018) (holding, among other

things, that certain claims were unripe where government had not made final determination as to

treatment of plaintiff's property rights), *aff'd* 919 F.3d 638 (1st Cir. 2019).  Because the

Oversight Board has not yet filed the Amended Disclosure Statement, the scheduling relief it

seeks with respect to that document is hypothetical.  The Scheduling Motion should be denied

for this reason alone.

        36.      In addition to its technical impropriety, the Oversight Board's request to hold a

hearing on March 4, 2020—less than three business days after the contemplated filing of the

Amended Plan Documents with the Court —is highly prejudicial to the Committee and other

parties.  The prior disclosure statement filed by the Oversight Board on September 27, 2019

consisted of more than 1,800 pages.[40]  The Amended Plan Documents will in all likelihood be

---

[40]   *See* Original Disclosure Statement.

more, not less, complex than their prior versions.  The Committee and other parties will need far more than a few days to review these documents before considering an appropriate schedule for litigating objections to the adequacy of the Amended Disclosure Statement.[41]

37.     The actual content of the Amended Disclosure Statement is plainly critical in evaluating any proposed timetable for the litigation.  Among other things, the Committee and other parties may decide, after reviewing the Amended Plan Documents, that they require discovery to support their disclosure statement objections.[42]  The Committee cannot predict the precise contours of such discovery, but suffice it to say that it could impact the litigation schedule, perhaps significantly.  The Committee and other parties may also determine upon review of the Amended Plan Documents that they need additional time to formulate their objections to the Amended Disclosure Statement given the complexity of the issues it raises.

38.     For all of these reasons, the Committee requests that the Court deny the Scheduling Motion without prejudice to its renewal after the Oversight Board has filed the Amended Disclosure Statement and parties have had an adequate time to review.

---

[41]   That the Committee and other parties will have a few days' notice to review the documents assumes the Oversight Board files them on February 28.  There is, however, no guarantee the Oversight Board will actually file the documents by February 28, or any date before the scheduled hearing on the Scheduling Motion for that matter.

[42]   As set forth in the advisory committee notes to Bankruptcy Rule 9014, "the filing of an objection to . . . a disclosure statement creates a dispute which is a contested matter."  *See In re Ponce de Leon 1403, Inc.,* No. 11-07920-ESL, 2012 WL 5880443, at *2 (Bankr. D. P.R. Nov. 20, 2012) (Court permitted discovery in connection with hearing on approval of disclosure statement.); *accord In re Vega,* No. 09-08785 BKT, 2010 WL 3282656 at *1 (Bankr. D. P.R. Aug. 17, 2010) (allowing discovery relating to disclosure statement); *In re Envirodyne Indus., Inc.,* 174 B.R. 986, 989 (Bankr. N.D. Ill. 1994); *In re 3DFX Interactive, Inc.,* No. 02-55795 JRG, 2006 WL 2010786 at *6 (Bankr. N.D. Cal. June 29, 2006) ("Additionally, there needs to be additional discovery and disclosure before this court can determine that any disclosure statement accompanying the Creditors' Committee's proposed plan has adequate information."); *In re catholic Bishop of N. Alaska,* No. F08-00110-DMD, 2009 WL 8412170, at *2 (Bankr. D. Alaska July 20, 2009) ("Because the UCC has objected to the pending disclosure statement, it has become a contested matter.  Discovery within a contested matter is governed by Fed. R. Bankr. P. 7026-7037, rather than the more expedited procedure of Rule 2004.") (footnote omitted).

B.    Scheduling Motion Should Be Denied On Its Merits Because Proposed Schedule
Is Inadequate and Premature

39.    The Oversight Board asks the Court, with the Mediation Team's blessing, to set a
deadline of April 17, 2020 to object to the Amended Disclosure Statement and a hearing to
consider its approval on June 3, 2020.  Although the Committee has not seen the Amended
Disclosure Statement—and therefore reserves all rights with respect to its position on the
proposed schedule—the pace at which the Oversight Board seeks to proceed appears to be far
too aggressive given the status and complexity of these Title III cases.  In fact, the Committee
believes it is premature to set any schedule at all at this juncture given uncertainty surrounding
key open items that bear directly on the timing and ultimate success of plan confirmation.

40.    For example, one key gating issue that the Mediation Team has identified as
"invaluable" to the plan confirmation process is the resolution of certain threshold issues in the
litigation between the Oversight Board and certain monoline insurers of revenue bonds issued by
HTA, the Puerto Rico Infrastructure Financing Authority, and the Puerto Rico Convention
Center District Authority.[43]  At the time of the issuance of the Amended Report, a preliminary
hearing on certain of these issues was scheduled for March 5, 2020.  On February 14, 2020, the
Court granted a motion by the monoline insurers to adjourn the hearing to April 2, 2020 to allow
for discovery to occur.[44]  The fact that this hearing has already been delayed by one month to
allow for discovery shows it is far from certain that this gating issue will be resolved before the
proposed disclosure statement hearing.  Moreover, while the Mediation Team acknowledges the
possibility of an appeal of a ruling in the revenue bond litigation,[45] it is a virtual certainty that,

---

[43]  Amended Report at 12.

[44]  *Order Granting Urgent Motion to Adjourn Hearing on Motions for Relief from the Automatic Stay and Extend
Deadlines for Replies in Support of Motions for Relief from the Automatic Stay* [Docket No. 11057].

[45]  Amended Report at 16, n. 18.

regardless of this Court's rulings in that litigation, the parties will appeal the ruling to the First

Circuit.  It is simply impossible, however, for any such appeals to be completed before the

proposed June 3, 2020 hearing on the approval of the Amended Disclosure Statement.  It makes

no sense to identify certain gating issues but not contemplate final resolution of such issues

before proceeding to plan confirmation.

        41.     Furthermore, the Mediation Team expressly acknowledges that, while the

litigation with the monoline insurers continues, the Mediation Team will continue to explore

further mediation of the same and other issues.  To the extent any of these issues are resolved,

either through litigation or through the mediation process, the Oversight Board may need to

revise the Amended Plan and Amended Disclosure Statement and re-solicit votes.[46]  Indeed, the

Mediation Team appears to recognize this risk, stating that it would be "highly preferable" to

resolve these issues "before (or contemporaneously with) approval of the Amended Disclosure

Statement and before solicitation commences, if possible without a significant delay."[47]  It is,

however, far from certain that these issues will actually be resolved on this schedule.  It will only

waste time and resources to rush to confirmation now if the plan will have to be further amended

and re-solicited.

        42.     Finally, the PSA is contingent upon the Puerto Rico Legislature passing, and the

Governor enacting, legislation regarding the issuance of new GO bonds and junior COFINA

bonds to be distributed under the Amended Plan,[48] and PROMESA is clear that such approvals

---

[46]   *See, e.g.,* Amended Report at 13 ("[I]f the lift stay movants themselves (rather than the government instrumentality whose bonds they hold) have allowed unsecured claims against the Commonwealth, those claims will need to be addressed in the Amended Plan.").

[47]   Amended Report at 12, n. 4.

[48]   *See, e.g.*, definitions in PSA of "COFINA Junior Bonds Legislation" (PSA at 4), "New GO Bonds Legislation" (PSA at 11), Section 4.2(e) of the PSA where the Commonwealth covenants to use "its reasonable best efforts to cause the Legislature to enact, and the Governor to execute, the legislation required for the issuance of the New GO Bonds and the COFINA Junior Lien Bonds" (PSA at 20).

are a prerequisite to plan confirmation.[49]  AAFAF raised this very point in its objection to the

Scheduling Motion.[50]  The Governor of Puerto Rico does not support the PSA, and it is

impossible to predict when, or if, the Governor or the Legislature will support the PSA (or any

amendments thereto).  As the recent experience in PREPA's title III case has shown, it is highly

uncertain whether and when the Legislature will enact new legislation.  In PREPA, the Oversight

Board strategically filed its motion seeking approval of a settlement with the bondholders as

early as possible in May 2019, only to repeatedly adjourn the hearing by **more than a year** due

to, among other things, delays in obtaining legislative approvals.  The Oversight Board's request

for confirmation of the Amended Plan may very well suffer a similar fate.  The Court should not

permit the Oversight Board to use the confirmation process—as it used Rule 9019 in PREPA—to

shut down litigation regarding claims being "settled" pursuant to a settlement that it may never

be able to implement due to a lack of legislation.

43.     For all of these reasons, it is premature to set any schedule a hearing on the

approval of the Amended Disclosure Statement at this juncture, let alone a schedule that

contemplates objections as early as by April 17, 2020 and a hearing on June 3, 2020.  The

Committee believes it would be more productive to use this time to address open items, both

through mediation with all parties in interest and through Court rulings on gating issues for the

confirmation of a plan of adjustment.

## IV.     **Miscellaneous Objections**

44.     Finally, the Committee believes that a few other, miscellaneous modifications

should be made to the proposed final case management order for the revenue bond litigation.

---

[49]   *See* PROMESA § 314(b)(5) (expressly requiring Court to find that plan proponents have obtained "any
        legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision
        of the plan").

[50]   *See* Docket No. 11159.

A.      Summary Judgment Motions Should Be Permitted With Respect to Additional
        Counts in Revenue Bond Adversary Proceedings

45.     The Committee agrees with the Mediation Team that an important gating issue is

whether the holders of revenue bonds issued by HTA, PRIFA, and CCDA have unsecured claims

against the Commonwealth, and, accordingly, that motions for partial summary judgment on

certain identified counts in the Revenue Bond Adversary Proceedings be allowed to go forward.

The Committee submits that, in addition to the counts listed in the Amended Report, motions for

partial summary judgment should also be allowed with respect to the following claims, in order

to fully address the range of unsecured claims that the holders and/or insurers of revenue bonds

have asserted against the Commonwealth:

- Disallowance of claims against the Commonwealth for breach of the HTA Non-Impairment Provision;

- Disallowance of claims against the Commonwealth because of the CCDA bonds' express exclusion of liability;

- Disallowance of claims against the Commonwealth for post-PROMESA unlawful retention of allocable revenues for breach of contract;

- Disallowance of claims against the Commonwealth for post-PROMESA unlawful retention of allocable revenues for common law tort claims;

46.     In addition, the Court should consider whether any claims against the

Commonwealth should be disallowed on the basis that the HTA, PRIFA, and CCDA bonds are

non-recourse bonds.

B.      Page Limitation Should Not Apply to Committee

47.     As the only statutory fiduciary for the Commonwealth's and HTA's general

unsecured creditors, the Committee should not be limited by the seven (7) page limit on

intervenor briefing set forth in the proposed *Final Case Management Order for Revenue Bonds*.

It would be more cost effective to grant the Committee relief from the page limitation, rather

than require the Committee to seek such relief each time it anticipates filing a brief greater than seven (7) pages.

48.     The Committee has no interest in duplicating the efforts of the Oversight Board, with respect to those issues in which the Committee has joined, and the Committee will coordinate with the Oversight Board to ensure that its participation in the revenue bond adversary proceedings is as non-disruptive and cost-efficient as possible.  Indeed, the Committee has worked cooperatively in recent weeks with the Oversight Board on the opposition to the related HTA lift stay motion filed by certain monoline insurers.  The Committee was afforded the opportunity to review and comment on the Oversight Board's opposition to the HTA lift stay motion, which allowed the Committee to ensure that all of the Committee's arguments would be presented to the Court. This allowed the Committee to file a short, three-page joinder that only addressed points not included in the Oversight Board's opposition.

## RESERVATION OF RIGHTS

49.     The Committee reserves the right to raise any additional issues at the March 4, 2020 hearing that could not have been addressed in light of the fact that the Amended Disclosure Statement has not been filed as of the Committee's deadline to respond to the Scheduling Motion.

## CONCLUSION

50.     For all these reasons, the Committee respectfully submits that (a) the Court should rule on certain additional gating issues, including the GO priority issues, before (or contemporaneously with) the hearing on the approval of the Amended Disclosure Statement, (b) the Court not, in a vacuum, stay motions and actions not yet filed, (c) the Court deny the Scheduling Motion without prejudice to its renewal after the Oversight Board has filed the

Amended Disclosure Statement and parties have had an adequate time to review, and (d) the

Court grant the other relief requested in this Response.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that the Court grant the relief

requested in this Response and grant any other relief as is just and proper.


Dated:  February 21, 2020             By:  */s/ Luc A. Despins*

                                      PAUL HASTINGS LLP
                                      Luc. A. Despins, Esq. *(Pro Hac Vice)*
                                      James R. Bliss, Esq. *(Pro Hac Vice)*
                                      Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
                                      G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
                                      200 Park Avenue
                                      New York, New York 10166
                                      Telephone:  (212) 318-6000
                                      lucdespins@paulhastings.com
                                      jamesbliss@paulhastings.com
                                      nicholasbassett@paulhastings.com
                                      alexbongartz@paulhastings.com

                                      *Counsel to the Official Committee of Unsecured
                                      Creditors*

                                      -and-

                                      By:  */s/ John Arrastia*

                                      GENOVESE JOBLOVE & BATTISTA, P.A
                                      John H. Genovese, Esq. (*Pro Hac Vice*)
                                      John Arrastia, Esq. (*Pro Hac Vice*)
                                      Jesus M. Suarez, Esq. (*Pro Hac Vice*)
                                      Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
                                      100 SE 2nd Street, Suite 4400
                                      Miami, Florida 33131
                                      Tel: 305-349-2300
                                      jgenovese@gjb-law.com
                                      jarrastia@gjb-law.com
                                      jsuarez@gjb-law.com
                                      mguitian@gjb-law.com

                                      *Special Litigation Counsel to the Official Committee of
                                      Unsecured Creditors*

                                      -and-

By: */s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*