Hearing Date: March 4, 2020 at 9:30 a.m. (Atlantic Standard Time)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

———————————————————X
:
In re:                                          :
:
THE FINANCIAL OVERSIGHT AND                     :       PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,               :       Title III
:
      as representative of                      :       Case No. 17-BK-3283 (LTS)
:
THE COMMONWEALTH OF PUERTO RICO *et al.*,       :       (Jointly Administered)
:
    Debtors.[1]                                  :        Re: Dkt. No. 10756
———————————————————X

## DRA PARTIES' RESPONSE TO AMENDED REPORT AND RECOMMENDATION OF THE MEDIATION TEAM [DKT. NO. 10756]

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

A.  The DRA Parties File the DRA Lift Stay Motion........................................................ 3

B.  The UCC Objects to the GDB Proof of Claim. ......................................................... 4

C.  The Court Stays Litigation and Orders Mediation..................................................... 4

D.  Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public
Finance Guarantee Corporation File a Lift Stay Motion. ................................................ 5

E.  The Court Subjects the UCC Objection to Mediation. .............................................. 6

F.  The Mediation Team Files the Interim Report. .......................................................... 6

G.  The Monolines Amend Their Lift Stay Motion, and the FOMB Files the HTA
Revenue Bond Adversary Proceedings.......................................................................... 8

H.  The Mediation Team Files the Amended Report........................................................ 10

I.  The DRA Parties Seek to Participate in the Monolines' Amended Lift Stay
Motion and the HTA Revenue Bond Adversary Proceedings. ...................................... 11

J.  The DRA Parties Enter Into a Stipulation with AAFAF and the FOMB to
Participate in the Monolines' Amended Lift Stay Motion.............................................. 12

RESPONSE............................................................................................................................ 13

I.  The Confirmation Schedule Must Address Overarching Issues Regarding the
Propriety and Structure of the Commonwealth's Diversion of Pledged Revenues. ........ 13

II.  The DRA Parties Object In Part to the Final Revenue Bond Scheduling Order. ............ 15

    A.  The DRA Parties Continue to Object to the Prejudice Caused by the Final
Revenue Bond Scheduling Order........................................................................ 15

    B.  The DRA Parties Support the Mediation Team's Investigation of the
FOMB's Potential Conflict in Its Simultaneous Representation of the
Commonwealth and HTA, But the Court Should Permit the DRA Parties
to Participate in this "Gating" Issue.................................................................... 19

III.  The DRA Parties Oppose the Mediation Team's Proposal to Stay the UCC
Objection Through Confirmation and Effectiveness of the Amended Plan. ................... 20

RESERVATION OF RIGHTS ................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Biolitec, Inc.*,
   528 B.R. 261 (Bankr. D.N.J. 2014) ...................................................................................14

*In re Congoleum Corp.*,
   No. 03–51524, 2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009), *aff'd in part,
   rev'd in part*, 414 B.R. 44 (D.N.J. 2009) ..........................................................................14

*In re Miami Metals I, Inc.*,
   603 B.R. 531 (Bankr. S.D.N.Y. 2019) ..............................................................................14

**Statutes**

Act No. 109-2017, Art. 201 .......................................................................................................1

Act No. 109-2017, Art. 204 .......................................................................................................1

Act No. 109-2017, Art. 207 .......................................................................................................1

Act No. 30-2013 ......................................................................................................................14

Act No. 31-2013 ......................................................................................................................14

Bankruptcy Code § 502(d) ......................................................................................................21

Bankruptcy Code § 552(a) ......................................................................................................19

23 L.P.R.A. §104(c) ................................................................................................2, 3, 4, 14, 15

PROMESA § 201(b)(1)(N) .....................................................................................................15

PROMESA § 305 .....................................................................................................................10

PROMESA § 314(b)(3) ...........................................................................................................15

PROMESA § 314(b)(6) .................................................................................................2, 14, 15

PROMESA § 314(b)(7) ...........................................................................................................15

PROMESA § 407 .....................................................................................................................11

**Other Authorities**

Puerto Rico Constitution Article VI, § 8 ............................................................................ *passim*

**COME NOW** AmeriNational Community Services, LLC (hereafter the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds issued by the DRA pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018 and the approved Qualifying Modification for the Government Development Bank for Puerto Rico[2] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* (the "Collateral Monitor" and with the Servicer, the "DRA Parties"),[3] by and through the undersigned legal counsel, and respectfully submit this response and reservation of rights to the *Amended Report and Recommendation of the Mediation Team* (the "Amended Report") [Dkt. No. 10756].

## PRELIMINARY STATEMENT

The DRA Parties appreciate the care and effort taken by the mediators to develop a comprehensive approach to confirmation that could enable the Commonwealth to reach resolution of its proposed plan in as orderly and efficient a manner as possible. As a general matter, the DRA Parties find the Mediation Team's approach sensible and thoughtful.

The DRA Parties express one significant concern about the overarching approach: it does not contain a comprehensive and detailed resolution of the so-called "clawback" of revenues from various Commonwealth entities (such as HTA) to the Commonwealth. This fundamental

---

[2] *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS).

[3] The DRA is a statutory public trust and governmental instrumentality of the Commonwealth created by the Government Development Bank for Puerto Rico Debt Restructuring Act, Act No. 109-2017, as amended by Act No. 147-2018 (the "GDB Restructuring Act") to facilitate the GDB's Title VI restructuring of certain indebtedness pursuant to the Qualifying Modification. *See* Act No. 109-2017 at Arts. 201 and 204. The DRA receives the property transferred from the GDB and then liquidates those assets to pay obligations under new bonds issued by the DRA to GDB creditors on account of their GDB claims. *See id.* at Arts. 204 and 207.

1

issue has always hung over the Commonwealth plan process as a seemingly unresolvable threshold issue.  Yet the Court must resolve it.

While Article VI, Section 8 of the Commonwealth Constitution and Section 104(c) of the *Management and Budget Office Organic Act* seem simple on their face, the Commonwealth must implement them carefully and precisely on a year-by-year, revenue stream-by-revenue stream basis.  Only with careful consideration of this issue can the Court determine the propriety of the Commonwealth's efforts—over many years and many revenue streams—to divert massive revenues from one set of entities and their creditors to the pockets of the Commonwealth's creditors.  This is necessary to ensure compliance with the "best interests" test under section 314(b)(6) of PROMESA, as well as other applicable provisions of PROMESA and Commonwealth law.

More narrowly, the DRA Parties also have concerns about their treatment in the Mediation Team's proposed final revenue bonds scheduling order.  As the DRA Parties have identified for this Court previously, the DRA Parties filed a lift stay motion related to the improper diversion of HTA revenues in June 2019.  The Monolines filed a similar lift stay motion two months later.  Subsequently, the Court stayed all litigation, including both lift stay motions.  Several months later, the DRA Parties agreed to a stipulation with AAFAF and the FOMB scheduling the DRA Parties' lift stay motion on a bifurcated basis.  During the same time, the mediators—unknown to the DRA Parties—proposed a schedule for the Monolines' lift stay motion that addresses substantive issues directly affecting the DRA Parties on a different, earlier schedule.

As the DRA Parties have noted for this Court and the parties at issue, proceeding on this disjointed basis will prejudice the DRA Parties by resolving critical overlapping substantive

2

issues in the Monolines' lift stay motion without the Court having the opportunity to hear the

DRA Parties.  To resolve this dislocation while preserving the stipulations agreed to by the DRA

Parties, the DRA Parties requested (and here request again) that the DRA Parties be permitted to

participate in overlapping issues where the DRA Parties could be prejudiced.  AAFAF and the

FOMB have recognized the legitimacy of the DRA Parties' concerns and entered into a

stipulation with the DRA Parties on February 19, 2020 that provides for the DRA Parties'

participation on these overlapping issues and aims to ensure that they will not suffer prejudice.

*See* Dkt. No. 11285.  The Court should do the same by modifying the revenue bond scheduling

order as detailed herein.

## BACKGROUND

### A.  The DRA Parties File the DRA Lift Stay Motion.

1.     On June 25, 2019, the DRA Parties filed *The DRA Parties' Motion and*

*Memorandum of Law in Support of Their Motion for Relief from the Automatic Stay, or in the*

*Alternative, Ordering Payment of Adequate Protection* (the "DRA Lift Stay Motion") [Dkt.

No. 7643].  In the DRA Lift Stay Motion, the DRA Parties explained how they have a security

interest in certain revenues that HTA pledged as debt service on HTA loans and HTA bonds

issued under Resolution No. 98-06, as well as the stream of post-petition HTA revenues

stemming therefrom (collectively, the "Act 30-31 Revenues").  *See* DRA Lift Stay Motion §§ II,

VI.

2.     The DRA Parties argued that the Commonwealth illegally diverted and retained

the Act 30-31 Revenues and used such funds to pay government operations or other

expenditures.  *See id.* §§ IV, V.  The DRA Parties asserted that such actions violate Article VI,

Section 8 of the Puerto Rico Constitution and Puerto Rico statutes such as the *Management and*

*Budget Office Organic Act*, 23 L.P.R.A. § 104(c) (the "OMB Act").  *See* DRA Lift Stay Motion

3

¶¶ 21–24; *see also* P.R. CONST. art. VI, § 8; OMB Act § 104(c) (creating a waterfall of the priorities of payment for when the available fund for a specific fiscal year are not sufficient to cover the appropriations approved for that year). The DRA Parties further allege that the Commonwealth continues to unlawfully divert the Act 30-31 Revenues, diminishing the value of the DRA's collateral. *See* DRA Lift Stay Motion ¶ 34.

### B. The UCC Objects to the GDB Proof of Claim.

3.       On July 15, 2019, the UCC filed the *Objection of Official Committee of Unsecured Creditors to Claim of Government Developmental Bank for Puerto Rico Against Commonwealth of Puerto Rico [Claim Number 29,485]* (the "UCC Objection") [Dkt. No. 8000] challenging the proof of claim, filed on May 25, 2018, by the Government Development Bank for Puerto, Claim Number 29,485 (the "GDB Proof of Claim").[4] The UCC Objection seeks disallowance of the GDB Proof of Claim in its entirety, arguing that the GDB received avoidable and fraudulent transfers and that the claim is unenforceable against the Commonwealth. *See* UCC Objection ¶¶ 2, 3.

### C. The Court Stays Litigation and Orders Mediation.

4.       At a hearing on July 24, 2019, the Court noted that "litigation in potentially dozens of separate silos, each of which is jostling for the Court's attention and has numerous potential intervenors concerned about collateral effects would be an inefficient use of judicial and debtor resources." July 24, 2019 Hr'g Tr. at 55:20–24 [Dkt. No. 8266]. Accordingly, the Court stated that it would impose a 120-day litigation stay with respect to a number of issues and adversary proceedings. *See id.* at 56:1–19. The Court directed the FOMB, AAFAF, the official

---

[4] Following the GDB's Title VI Qualifying Modification, a portion of the GDB Proof of Claim was transferred to the DRA.

committees and other litigants to work with the Court-appointed mediation team during this time
"to identify key and gating issues, assess their crosscutting and collateral implications, seek to
reach substantial consensus as to the prioritization of matters for litigation or mediation, and
formulate a proposed schedule and appropriate notice and participation mechanisms that are as
standardized and comprehensive as possible."  *Id.* at 56:4–10.

5.      The Court then entered the *Order Regarding Stay Period and Mandatory
Mediation* (as amended) (the "Mediation Stay Order") [Dkt. No. 8244], which—consistent with
its comments at the hearing—provided that certain matters in the Title III cases would be stayed
through November 30, 2019 (the "Stay Deadline") and subjected certain matters to mandatory
mediation.[5]  The Court asked the Mediation Team and the parties to develop an overarching
litigation calendar that would, among other things, "avoid piecemeal litigation of potentially
overlapping key issues."  Mediation Stay Order at 1.

6.      On August 16, 2019, the Court entered an order providing that all issues related to
the DRA Lift Stay would be subject to the Mediation Stay Order.  *See* Dkt. No. 8481.

**D.  Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public
Finance Guarantee Corporation File a Lift Stay Motion.**

7.      On August 23, 2019, Assured Guaranty Corp., Assured Guaranty Municipal
Corp., and National Public Finance Guarantee Corporation (and together with Ambac Assurance
Corporation and Financial Guaranty Insurance Company, the "Monolines") filed a motion
similar to the DRA Lift Stay Motion.  *See* Dkt. No. 8536 (the "Monolines' Lift Stay Motion").
Like the DRA, the Monolines alleged that they have a perfected security interest in certain
pledged revenues, including some of the Act 30-31 Revenues, and that the Commonwealth

---

[5] The Court has since extended the Stay Deadline multiple times, first to December 31, 2019, then to January 31, 2020,
and, most recently, to March 11, 2020.  *See* Dkt. Nos. 9016, 9618, 9639.

unlawfully diverted payments of such revenues in violation of Article VI, Section 8 of the Puerto

Rico Constitution. *See generally* Monolines' Lift Stay Motion ¶¶ 6, 63, 68.  They also claimed

that the Commonwealth's diversion of the pledged revenues diminishes the value of the

Monolines' security interest and jeopardizes their right to repayment for the foreseeable future.

*See generally id.* ¶¶ 68, 75–77.

8.      The Court subsequently entered an order subjecting the Monolines' Lift Stay

Motion to the Mediation Stay Order.  *See* Dkt. No. 8567.

### E.  The Court Subjects the UCC Objection to Mediation.

9.      On August 27, 2019, the DRA Parties filed an urgent motion requesting that the

Court subject the UCC Objection to the Mediation Stay Order.  *See* Dkt. No. 8551 (the "DRA

Mediation Request").  The DRA Parties stated that the Court should decide the UCC Objection

in concert with other significant claims objections prior to the disclosure statement hearing.  *See*

DRA Mediation Request ¶¶ 19–22.  In their reply further arguing in support of the DRA

Mediation Request (the "DRA Mediation Reply") [Dkt. No. 8637], the DRA Parties argued that

leaving the UCC Objection outside of mediation would result in uncertainty among the parties

and compromise the efficiency of the mediation process.  *See* DRA Mediation Reply ¶ 3.

Accordingly, they posited that "resolution of the GDB Claim cannot wait until the post-

confirmation claims allowance process as the UCC suggests and should be included in any

mediation."  *Id.* ¶ 4.

10.     On September 9, 2019, the Court entered an order subjecting the UCC Objection

to the Mediation Stay Order.  *See* Dkt. No. 8647.

### F.  The Mediation Team Files the Interim Report.

11.     On November 27, 2019, the Mediation Team filed the *Interim Report and

Recommendation of the Mediation Team* (the "Interim Report") [Dkt. No. 9365].  The Interim

6

Report contained the Mediation Team's proposed interim scheduling orders governing

procedures to litigate several matters, including (i) the DRA Lift Stay Motion, (ii) the

Monolines' Lift Stay Motion, and (iii) new adversary proceedings to be filed by the FOMB

against the Monolines that would overlap with (and possibly be consolidated with) the

Monolines' Lift Stay Motion. *See* Interim Report at Exs. 2, 3.

12. The *Proposed Interim Case Management Order for Revenue Bonds* provided that

the Monolines would file any amendments to the Monolines' Lift Stay Motion by January 16,

2020, with oppositions due January 30, 2020, and replies due on February 13, 2020. *See* Interim

Report at Ex. 2.[6] Additionally, the schedule contemplated that the FOMB would file its new

adversary proceedings against the Monolines in January 2020, with briefing filed throughout the

winter and spring of 2020. *See id.*

13. By contrast, the proposed schedule pertaining to the DRA Lift Stay Motion

contemplated the DRA Parties litigating their standing to file the DRA Lift Stay Motion in

February through April 2020, with merits briefing thereafter. *See id.* at Ex. 3. Based on these

schedules, the Court could determine the merits of the Monolines' Lift Stay Motion before even

ruling on the DRA Parties' standing to address similar and overlapping substantive issues.

14. Recognizing that this scheduling could prejudice them in prosecuting their claims,

the DRA Parties filed the *DRA Parties' Response and Reservation of Rights with Respect to the*

*Interim Report and Recommendation of the Mediation Team* (the "<u>Reservation of Rights</u>") [Dkt.

No. 9503] on December 6, 2019. In their Reservation of Rights, the DRA Parties noted that they

are not a party to and were never made aware of the proposed scheduling order regarding the

---

[6] On January 31, 2020, the Court entered an order that extended the opposition and reply deadlines to February 3, 2020 and February 18, 2020, respectively. *See* Dkt. No. 10595 ¶ 1(b). On February 14, 2020, the Court entered another order directing the parties to meet and confer and propose a new reply deadline. *See* Dkt. No. 11057.

Monolines' Lift Stay Motion prior to the filing of the Interim Report.  *See* Reservation of Rights ¶ 2.  The DRA Parties expressed their concern that, under the Interim Report's proposed schedules, the Monolines would be able to address significant overlapping substantive issues while the Court is still considering the DRA Parties' standing to address these same issues.  *See id.*

15.     The DRA Parties asserted that the conflicting timeframes between the two schedules could prejudice their rights with respect to both the DRA Lift Stay Motion and potential arguments regarding confirmation of a plan in both the Commonwealth and HTA Title III cases.  *See id.*  To address the economic and constitutional injury that could result, the DRA Parties noted that they "may move to intervene and participate in the [Monolines' Lift Stay Motion] litigation so that the Court may address the overlapping topics covered by the [Monolines' Lift Stay Motion] and the DRA Lift Stay Motion concurrently."  *Id.* ¶ 3.

16.     On December 19, 2019, the Court entered orders approving the proposed interim scheduling orders governing procedures to litigate the Monolines' Lift Stay Motion and the DRA Lift Stay Motion.  *See* Dkt. Nos. 9620 (the "Revenue Bond Scheduling Order"), 9622 (the "DRA Scheduling Order").  The Court further modified the Revenue Bond Scheduling Order the following month.  *See* Dkt. No. 10595 (the "Amended Revenue Bond Scheduling Order").

**G. The Monolines Amend Their Lift Stay Motion, and the FOMB Files the HTA Revenue Bond Adversary Proceedings.**

17.     Consistent with the terms of the Revenue Bond Scheduling Order, on January 16, 2020, the Monolines filed the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* (the "Monolines' Amended Lift Stay Motion") [Dkt.

8

No. 10102].  The arguments in the Monolines' Amended Lift Stay Motion largely echo those in

the original motion (as well as in the DRA Lift Stay Motion).  *See generally* Monolines'

Amended Lift Stay Motion ¶¶ 1, 11, 20, 33, 39.

18.     Also on January 16, 2020, and pursuant to the Revenue Bond Scheduling Order,

the FOMB commenced five adversary proceedings (the "Revenue Bond Adversary

Proceedings"), two of which seek to disallow the proofs of claim filed against HTA and the

Commonwealth by the Monolines, the Bank of New York Mellon as Fiscal Agent for the HTA

bonds and Peaje Investments LLC (the "HTA Revenue Bond Adversary Proceedings").  *See* Dkt.

No. 1 of Adv. Proc. No. 20-00007 (the "Lien Stripping Complaint"); Dkt. No. 1 of Adv. Proc.

No. 20-00005 (the "Clawback Complaint").  In the Lien Stripping Complaint, the FOMB

challenged the validity and enforceability of the Monolines' security interests in certain HTA

current and future revenues, including the Act 30-31 Revenues.  *See generally* Lien Stripping

Compl. ¶¶ 106–127.  In the Clawback Complaint, the FOMB alleged that the diversion of the

pledged revenues was appropriate under Article VI, Section 8 of the Puerto Rico Constitution

and also questioned the Monolines' standing to obtain recovery from the Commonwealth.  *See*

*generally* Clawback Compl. ¶¶ 119–20, 125–28.

19.     Shortly after the filing of the Monolines' Amended Lift Stay Motion and the HTA

Revenue Bond Adversary Proceedings, the Monolines filed the *Objection of Assured Guaranty*

*Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation,*

*Ambac Assurance Corporation, and Financial Guaranty Insurance Company to (I) Response of*

*the Financial Oversight and Management Board for Puerto Rico to Interim Report and*

*Recommendation of the Mediation Team (ECF No. 9493), as Incorporated in (II) Interim Case*

*Management Order for Revenue Bonds (ECF No. 9620)* (the "Monolines' Revenue Bond

Objection") [Dkt. No. 10251].  In their objection, the Monolines argued that (i) the Court should

hold a final hearing on their lift stay motions (including the Monolines' Amended Lift Stay

Motion) and stay the Revenue Bond Adversary Proceedings pending resolution of the lift stay

motions, *see* Monolines' Revenue Bond Objection ¶¶ 32–41, (ii) the FOMB's proposed

interpretation of section 305 of PROMESA as set forth in the Revenue Bond Scheduling Order—

if ultimately accepted—might impede the ability of revenue bondholders to raise constitutional

and statutory defenses, *see id.* ¶¶ 42–47, and (iii) the Court should permit reasonable discovery

in connection with the Monolines' Amended Lift Stay Motion and their other lift stay motions,

*see id.* ¶¶ 48–54.

20.     The DRA Parties subsequently filed a reservation of rights and joinder to the

Monolines' Revenue Bond Objection.  *See* Dkt. No. 10421 (the "Joinder").  In the Joinder, the

DRA Parties again expressed concerns about being prejudiced by litigation of overlapping issues

that could affect the DRA Parties without participating in the Monolines' Amended Lift Stay

Motion and each of the HTA Revenue Bond Adversary Proceedings.  *See* Joinder ¶ 6.  The

Joinder further noted that the DRA Parties were working with other parties on an agreement that

would allow the DRA Parties to participate in the litigation on the Monolines' Amended Lift

Stay Motion on a consensual basis, but that they nevertheless reserved their right to intervene in

such litigation and the HTA Revenue Bond Adversary Proceedings as necessary.  *See id.* ¶ 6 n. 4.

The DRA Parties did seek to reach agreement with the parties on participation in the HTA

Revenue Bond Adversary Proceedings but have, at this point, failed to reach resolution on the

issue.

**H.  The Mediation Team Files the Amended Report.**

21.     On February 10, 2020, the Mediation Team filed the Amended Report.  The

Mediation Team seeks to, among other things, (i) resolve certain key issues in the Monolines'

Amended Lift Stay Motion and HTA Revenue Bond Adversary Proceedings that it deems

integral to the mediation and plan confirmation process, *see* Amended Report at 11–12, 21,

(ii) modify the Amended Revenue Bond Scheduling Order to incorporate (a) a briefing schedule

for narrowly tailored motions for partial summary judgment in certain Revenue Bond Adversary

Proceedings, including the adversary proceeding with respect to the Clawback Complaint,[7] and

(b) a briefing schedule to determine whether the FOMB and/or Government of Puerto Rico are

operating under a conflict of interest in simultaneously acting for both the Commonwealth and

HTA (such modified order, the "Final Revenue Bond Scheduling Order"), *see id.* at 12–14, and

(iii) stay the entirety of the UCC Objection until after the effective date for the Amended Plan,[8]

*see* Amended Report at 18–20, 26.

## I.   The DRA Parties Seek to Participate in the Monolines' Amended Lift Stay Motion and the HTA Revenue Bond Adversary Proceedings.

22.    On February 11, 2020, after failing to arrive at a consensual agreement with the

Monolines and in light of their reservations about being prejudiced by lack of an opportunity to

be heard, *see supra* ¶¶ 14–15, 20, the DRA Parties filed three interrelated motions seeking to

participate in the litigation on the Monolines' Amended Lift Stay Motion and in the HTA

---

[7] The claims on which the Mediation Team recommends summary judgment motions be permitted in the relevant Revenue Bond Adversary Proceedings are those seeking the following relief: (i) disallowance of claims for post-PROMESA unlawful retention of allocable revenues because allocable revenue statutes are preempted by PROMESA; (ii) disallowance of claims predicated on claims of violations of the Contracts Clause of the Commonwealth and the U.S. Constitutions because no contract was impaired; (iii) disallowance of claims predicated on claims of violations of the Contracts Clause of the Commonwealth and U.S. Constitutions because no legislation created an impairment; (iv) disallowance of claims predicated on claims of violations of the Contracts Cause of the Commonwealth and U.S. Constitutions because the Commonwealth's retention of the allocable revenues was due to PROMESA, not legislation; (v) disallowance of claims premised on PROMESA § 407; (vi) disallowance of secured claims against the Commonwealth; (vii) disallowance of claims asserting perfected security interests against the Commonwealth; and (viii) disallowance of claims of ownership in allocable revenues.  *See* Amended Report at 15.

[8] Capitalized terms used herein and otherwise not defined shall have the meaning ascribed to such term in the Amended Report.

Revenue Bond Adversary Proceedings.[9]  *See* Dkt. No. 10895 (the "Lift Stay Motion to

Intervene"); Adv. Proc. No. 20-00007, Dkt. No. 14 (the "Lien Stripping Motion to Intervene");

Adv. Proc. No. 20-00005, Dkt. No. 11 (the "Clawback Motion to Intervene," and, together with

the Lift Stay Motion to Intervene and the Lien Stripping Motion to Intervene, the "Motions to

Intervene").  The DRA Parties requested that their participation be memorialized in the Amended

Revenue Bond Scheduling Order (and, to the extent it is entered, the Final Revenue Bond

Scheduling Order).

23.      On February 18, 2020, the Monolines filed three objections to the DRA Parties'

three Motions to Intervene.  *See* Dkt. No. 11126 (the "Monolines' Lift Stay Intervention

Objection"); Adv. Proc. No. 20-00007, Dkt. No. 21; Adv. Proc. No. 20-00005, Dkt. No. 18.  In

all three of their objections, the Monolines admit that "[w]ith respect to the few overlapping

issues the DRA Parties share with monolines, limited participation may be appropriate."  *E.g.*,

Monolines' Lift Stay Intervention Objection ¶ 19.

24.      Similarly, the FOMB objected to the Lien Stripping Motion to Intervene on behalf

of HTA, *see* Adv. Proc. No. 20-00007, Dkt. No. 23, and the Clawback Motion to Intervene on

behalf of the Commonwealth, *see* Adv. Proc. No. 20-00005, Dkt. No. 17.

**J.     The DRA Parties Enter Into a Stipulation with AAFAF and the FOMB to
         Participate in the Monolines' Amended Lift Stay Motion.**

25.      On February 19, 2020, AAFAF, the FOMB, and the DRA Parties entered into the

*Joint Stipulation Regarding (I) the DRA Parties' Motion and Memorandum of Law in Support of*

*their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of*

---

[9] As noted therein, the three motions contain significant overlapping factual background and arguments.  However,
the DRA Parties filed three separate motions (rather than one combined motion) because they pertain to three separate
proceedings and because intervention in the HTA Adversary Proceedings is governed by a different legal standard
than intervention in the Monolines' Amended Lift Stay Motion.

4151-4189-7506

*Adequate Protection [ECF No. 7643]; and (II) the DRA Parties' Motion and Memorandum of*
*Law in Support of their Notice that the DRA is a Party In Interest and can Participate in the*
*Monolines' Amended Lift Stay Litigation [ECF No. 10835]* (the "Participation Stipulation")
[Dkt. No. 11285, Ex. A] regarding the extent of the DRA's participation in the Monolines'
Amended Lift Stay Motion litigation on the Overlapping Issues (as defined in the Participation
Stipulation) to avoid prejudicing the DRA's rights on its DRA Lift Stay Motion. *See* Dkt.
No. 11285.

26.     On February 20, 2020, the Monolines filed a limited objection to the Participation
Stipulation.  *See* Dkt. No. 11325.

## RESPONSE

I.  **The Confirmation Schedule Must Address Overarching Issues Regarding the
    Propriety and Structure of the Commonwealth's Diversion of Pledged Revenues.**

27.     While the DRA Parties express support for the efforts of the mediators throughout
this process, the DRA Parties object in part to the proposed resolution suggested in the Amended
Report.  The proposal does not appear to address directly the propriety of any diversion of
pledged revenues from entities like HTA to the Commonwealth.  Any confirmation schedule
must address this issue squarely.[10]

28.     The Amended Report may attempt to address this issue indirectly by listing "[a]ny
challenges to the reasonableness of the settlements of the so-called 'clawback claims' against the
Commonwealth" and "[a]ny disputes regarding the dischargeability of constitutional claims[]" as

---

[10] While the DRA Parties do not object to the proposed confirmation schedule detailed in the Amended Report and
the joint scheduling motion filed by the Commonwealth, ERS and PBA [Dkt. No. 10808] at this time, they have not
yet seen the proposed plan at issue; confirmation will require addressing issues such as the Commonwealth's diversion
of HTA revenues.  The proposed schedule may permit the Court and FOMB to address such issues in the proposed
timeline; failure to do so would make a proposed plan unconfirmable.

issues that will need to be addressed at confirmation.  Amended Report at 25.  However, this

does not address fully the propriety of any diversion of pledged revenues.

29.     With respect to the Act 30-31 Revenues, the DRA Parties believe the DRA and/or

HTA has a property interest in those revenues.  *See* Act. No. 30-2013 (2013); Act. No. 31-2013

(2013); Assignment and Security Agreement dated August 28, 2013 [Dkt. No. 7643, Ex. E] §§

1.1, 1.2; *see also, e.g.*, Lift Stay Motion to Intervene ¶¶ 1–7.  If the Court agrees with the DRA

Parties, it cannot confirm a plan that violates those property rights by "settlement."  *See, e.g.*, *In

re Miami Metals I, Inc.*, 603 B.R. 531, 535–36 (Bankr. S.D.N.Y. 2019) (declining to approve a

settlement that impinged on non-settling creditors' property rights); *In re Biolitec, Inc.*, 528 B.R.

261, 270 (Bankr. D.N.J. 2014) (noting that "the Court must analyze the effect of the settlement

on all parties to the bankruptcy proceeding, and not simply the largest creditor" when deciding

whether to approve a settlement); *In re Congoleum Corp.*, No. 03–51524, 2009 WL 499262, at

*8 (Bankr. D.N.J. Feb. 26, 2009), *aff'd in part, rev'd in part*, 414 B.R. 44 (D.N.J. 2009) ("Parties

may not do an end run around the Bankruptcy Code by calling something a settlement.").

30.     The Court may not confirm a plan that end-runs around section 314(b)(6) of

PROMESA, which requires the plan to satisfy the "best interests" test.  PROMESA provides that

the proposed plan must ensure that creditors will not receive a greater recovery under applicable

"non-bankruptcy laws and constitution of the territory."  PROMESA § 314(b)(6).  To ensure

this, the Court will have to examine whether the Commonwealth has properly diverted revenues

from HTA and other Commonwealth entities in accordance with Article VI, Section 8 of the

Commonwealth Constitution, Section 104(c) of the OMB Act and other applicable law.  If the

DRA would fare better under applicable Commonwealth law than under the proposed Plan, the

Court cannot confirm the plan irrespective of any settlement.  Merely calling the terms of a plan

a "settlement" does not resolve the issue.

31.     Similarly, sections 314(b)(3) and 314(b)(7) of PROMESA require the debtor's

compliance with applicable Commonwealth law and that the plan be consistent with the

applicable Fiscal Plan, which itself must respect applicable priority under Commonwealth law.

*See* PROMESA §§ 314(b)(3), (7); *see also id.* § 201(b)(1)(N).  While the Mediation Team may

well have these issues in mind in their description of issues to be addressed at confirmation, the

Court should ensure that this is clear.

## II.     The DRA Parties Object In Part to the Final Revenue Bond Scheduling Order.

### A.     The DRA Parties Continue to Object to the Prejudice Caused by the Final Revenue Bond Scheduling Order.

32.     The Final Revenue Bond Scheduling Order will prejudice the DRA Parties by

failing to permit them to participate in the litigation of overlapping issues related to HTA on an

even footing with other parties in interest.  The DRA Parties have continuously voiced their

concerns about being prejudiced by the scheduling of issues related to the HTA revenue bonds to

the extent the Court addresses overlapping substantive issues.  *See, e.g.*, Reservation of Rights ¶¶

2–3; Joinder ¶ 6; Lift Stay Motion to Intervene ¶¶ 36, 38, 45–46, 48; Lien Stripping Motion to

Intervene ¶¶ 38, 48–49, 52; Clawback Motion to Intervene ¶¶ 41–42, 45, 49.  In fact, even the

Monolines acknowledge that there are "overlapping issues the DRA Parties share with the

monolines" and that the DRA's limited participation with respect to such issues may be

appropriate.  *E.g.*, Monolines' Lift Stay Intervention Objection ¶ 19.  The DRA Parties again

request that the Court not prejudice them.  To resolve this concern, the Court should permit the

DRA Parties to participate in litigation of the Monolines' Amended Lift Stay Motion and the

HTA Revenue Bond Adversary Proceedings with respect to critical overlapping issues.[11]

33.     The Mediation Team itself has highlighted the critical nature of the overlapping substantive issues in the Amended Report, stating that "the Court's ruling on certain key issues raised in the lift stay motions and/or the newly filed revenue bond adversary proceedings will (i) be of assistance to it in the plan mediation process, and (ii) streamline the anticipated confirmation hearing on the Amended Report."  Amended Report at 11–12.  The Mediation Team likewise agrees that these issues "need to be decided on the merits as soon as possible, as the parties' disparate views on these issues have been a handicap to the negotiation of the treatment of the so-called 'claw back' claims under a Commonwealth plan of adjustment.  Thus, merits determinations on these key issues will be invaluable to both the mediation and the plan confirmation process."  *Id.* at 12.  Clearly, resolving these issues is a paramount concern in achieving plan confirmation.  It stands to reason, then, that affording all interested parties an opportunity to be heard is critical to obtaining such a resolution.

34.     As explained in more detail in their prior filings, the DRA Parties have a significant economic stake in the Act 30-31 Revenues.  *See* DRA Lift Stay Motion §§ II, VI; Lift Stay Motion to Intervene ¶¶ 1–7; Lien Stripping Motion to Intervene ¶¶ 1–7; Clawback Motion to Intervene ¶¶ 1–7.  Decisions on the Monolines' Amended Lift Stay Motion and the HTA Revenue Bond Adversary Proceedings could impact the DRA Parties' rights with respect to both the DRA Lift Stay Motion and potential arguments regarding confirmation of a plan in both the Commonwealth and HTA Tittle III cases.  Furthermore, the DRA Parties could suffer potentially

---

[11] Should the Court ultimately enter an order approving the Participation Stipulation and overruling the Monolines' Lift Stay Intervention Objection, the DRA Parties' concerns with respect to the Monolines' Amended Lift Stay Motion will be resolved.  However, their concerns with respect to the HTA Revenue Bond Adversary Proceedings will remain unchanged.  The DRA Parties therefore request that the Amended Revenue Bond Scheduling Order (and any final order) include the language set forth in paragraph 39 herein.

meaningful economic and constitutional injury if they are unable to participate in litigation around these issues.

35.     For example, in opposing the Monolines' Amended Lift Stay Motion, the FOMB argues that the Monolines, as "creditors of a creditor," lack standing to seek stay relief against the Commonwealth.  *See* Dkt. No. 10613 ¶¶ 66–69 (the "FOMB Opposition").  They also argue that the Monolines do have not any property interests in the revenues of certain taxes and fees imposed and collected by the Commonwealth that are conditionally allocated to HTA (including the Act 30-31 Revenues) because the statutes governing such revenues are preempted by PROMESA.  *See id.* ¶¶ 83–88.

36.     The FOMB has not yet filed an opposition to the DRA Lift Stay Motion and, indeed, will not file a merits-based opposition until later this year under the terms of the DRA Scheduling Order and the Participation Stipulation.  However, the DRA Parties anticipate that the FOMB will raise these same challenges against the DRA and that the Court's decisions made with respect to the Monolines' Amended Lift Stay Motion will have an impact on the Court's ruling on the same issues being litigated in connection with the DRA Lift Stay Motion.

37.     The HTA Revenue Bond Adversary Proceedings will likewise potentially prejudice the DRA's interests.  As detailed in the Lien Stripping Complaint, the bondholders (including the Monolines) may lack a valid lien in the Act 30-31 Revenues.  That would leave the DRA Parties as the parties with a secured interest in those revenue streams—and the parties best positioned to address their improper diversion by the Commonwealth.

38.     In that case, the Clawback Complaint will pertain in part to the Act 30-31 Revenues, which only the DRA—not the bondholders—would have a lien on.  In the Clawback Complaint, the FOMB argues that the clawback was properly invoked under Commonwealth law

and is expressly contemplated under the resolutions governing the HTA bonds.[12]  *See* Clawback

Compl. ¶¶ 125–28.  The Court will certainly consider and determine issues that have a

significant bearing on the DRA and its economic interests—namely, whether the Commonwealth

improperly diverted funds (including the Act 30-31 Revenues) under Article VI, Section 8 of the

Puerto Rico Constitution that would otherwise be used to pay HTA's debt service.

39.     To avoid prejudicing the DRA Parties' rights, the DRA Parties should be included

in any scheduling order governing the Monolines' Amended Lift Stay Motion and the HTA

Revenue Bond Adversary Proceedings.  To that end, the DRA Parties request that the Court

modify the Amended Revenue Bond Scheduling Order (and, to the extent it is entered, the Final

Revenue Bond Scheduling Order) to expressly permit their participation in the Monolines'

Amended Lift Motion litigation and the HTA Revenue Bond Adversary Proceedings by adding

the following language:

> The DRA Parties are permitted to participate in (i) the litigation of the HTA Lift Stay
> Motion, (ii) Adv. Proc. No. 20-00007, and (iii) Adv. Proc. No. 20-00005 with respect to
> the following issues:
>
> - the extent to which Commonwealth statutes enacted pre-PROMESA
>   which purport to allocate, on the terms and conditions set forth therein,
>   certain excise tax revenues to HTA (as identified in the HTA Lift Stay
>   Motion and the Oversight Board's opposition to the HTA Lift Stay
>   Motion [Dkt. No. 10613], the "Excise Tax Statutes") are preempted by
>   PROMESA;
> - the extent to which the Excise Tax Statutes can bind future
>   legislatures;
> - whether the Excise Tax Statutes give rise to an equitable lien, trust, or
>   other ownership interest in favor of the holders of bonds issued by
>   HTA;
> - the extent to which PROMESA Title III recognizes a priority claim
>   arising out of the Excise Tax Statutes;

---

[12] The FOMB also reiterates the "creditor of a creditor" standing argument that it sets forth in the FOMB Opposition.
*See* Clawback Compl. ¶¶ 119–20.  The DRA Parties need to participate on this issue for the same reason that they
need to participate in the Monolines' Amended Lift Stay Motion.  *See supra* ¶¶ 35–36.

- the scope and validity of any security interests granted to HTA bondholders pursuant to the terms of (i) Resolution No. 68-18, adopted by HTA on June 13, 1968 and (ii) Resolution No. 98-06, adopted by HTA on February 26, 1998, and whether HTA bondholders' security interests extend to tax revenues retained by the Commonwealth;

- whether any liens possessed by the HTA bondholders stopped attaching once the Commonwealth and/or HTA filed for relief under Title III including pursuant to Bankruptcy Code Section 552(a);

- the validity of the Commonwealth's retention and use of the tax revenues under the Excise Tax Statutes; and

- whether creditors of HTA have standing to seek stay relief against the Commonwealth (collectively, the "Overlapping Issues").

Such participation includes, but is not limited to, filing any relevant briefing on any Overlapping Issues (which shall be coordinated among the parties to avoid duplication) and appearing at oral argument. The DRA Parties shall not be authorized to settle or prevent a settlement or take discovery in connection with the HTA Lift Stay Motion or the HTA Adversary Proceedings, but discovery made available to the movants in the HTA Lift Stay Motion and the HTA Adversary Proceedings will be made available to the DRA Parties. The DRA Parties will have the right to participate in all meet and confers regarding discovery in the HTA Lift Stay Motion and HTA Adversary Proceedings and attend all depositions in the HTA Lift Stay Motion and HTA Adversary Proceedings (if any). Such discovery will not preclude the DRA Parties from requesting discovery regarding the DRA Lift Stay Motion (and AAFAF's and the Oversight Board's right to object to such requests) after the stay of issues in the DRA Lift Stay Motion is terminated.

### B. The DRA Parties Support the Mediation Team's Investigation of the FOMB's Potential Conflict in Its Simultaneous Representation of the Commonwealth and HTA, But the Court Should Permit the DRA Parties to Participate in this "Gating" Issue.

40.     The Mediation Team has identified two "gating" issues that it says would benefit

from merits rulings prior to the hearing on the Amended Disclosure Statement. One of these

issues is whether the FOMB and/or Government of Puerto Rico are operating under a conflict of

interest acting for both Commonwealth and HTA, including, without limitation, acting for both

entities in connection with resolution of HTA's clawback claims against Commonwealth, voting

or objecting to any plan of adjustment addressing such claims, and bringing or defending any

avoidance or other claims under PROMESA affecting HTA. *See* Amended Report at 12–13.

Accordingly, the Final Revenue Bond Scheduling Order includes deadlines governing motions

that seek relief addressing such conflicts.  *See* Final Revenue Bond Scheduling Order ¶ 3.

41.    The DRA Parties agree that such conflicts pose a significant problem with respect to multiple pieces of the Title III process and that they should be resolved as soon as possible. As noted above, the FOMB has argued that the Monolines (and will likely argue that the DRA Parties) are "creditors of a creditor" and that, therefore, only HTA has standing to challenge the Commonwealth with respect to any purported improper diversion of revenues under the Commonwealth Constitution.  *See supra* ¶¶ 18, 38 n. 12.  This argument—if ultimately successful—creates a massive conflict of interest for the FOMB and/or the Government of Puerto Rico, who would need to simultaneously bring the claim on behalf of HTA while defending the claim on behalf of the Commonwealth.  The FOMB surely would not, and indeed could not, prosecute HTA's claim given its representation of the Commonwealth.  The DRA Parties therefore support the inclusion of paragraph 3 in the Final Revenue Bond Scheduling Order, provided that the Final Revenue Bond Scheduling Order makes clear the DRA Parties may participate in this litigation.

## III.    The DRA Parties Oppose the Mediation Team's Proposal to Stay the UCC Objection Through Confirmation and Effectiveness of the Amended Plan.

42.    The Interim Report did not address the UCC Objection.  *See* Interim Report at 9 (including the UCC Objection on a list of proceedings and matters "neither previously addressed by Court order, nor addressed in the Interim Report").  However, in the Amended Report, the Mediation Team recommends that the UCC Objection remain stayed pending a decision on confirmation and effectiveness of the Amended Plan.  *See* Amended Report at 18–20, 26.  The DRA Parties strongly oppose this recommendation.

43.    As set forth in the DRA Mediation Request and DRA Mediation Reply, the DRA Parties believe that UCC Objection should be decided prior to the disclosure statement hearing.

20

*See* DRA Mediation Request ¶¶ 19–22; DRA Mediation Reply ¶ 3. Deferring any decision on the UCC Objection post-confirmation will make it difficult for the DRA Parties to have any certainty regarding how its Commonwealth assets will be treated. Such uncertainty will make it difficult for the DRA Parties to assess the Amended Plan and the DRA's recovery under the Amended Plan. For this critical reason, resolving the UCC Objection prior to the hearing on the Amended Disclosure Statement will help promote a more efficient and consensual plan process.

44.     In particular, the DRA Parties request that the Court consider the UCC's standing to bring the UCC Objection prior to the hearing on the Amended Disclosure Statement. The DRA Parties do not believe that the UCC has standing to bring the UCC Objection because the UCC (and the FOMB) released the GDB from claims and causes of action, including claims under chapter 5 of the Bankruptcy Code. *See Stipulation Resolving the Objection of the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) to the Approval Application* [Case No. 18-01561, Dkt. No. 187] ¶¶ 15, 18. Having waived these Chapter 5 avoidance actions, the UCC does not have an argument that any transfers were "avoidable" under Chapter 5 and thus the UCC lacks the ability to object under Section 502(d) of the Bankruptcy Code.

45.     Therefore, the DRA Parties request that the Court consider this standing issue prior to the hearing on the Amended Disclosure Statement and modify the *Proposed Final Order Regarding (A) the Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto*, attached as Exhibit 2 to the Amended Report, by striking the current "Disposition" language relating to the UCC Objection on Appendix A (*i.e.*, "Objection to remain stayed pending decision on confirmation of Amended Plan; objection to be unstayed and go forward thereafter") and adding the following language in its place:

21

All issues concerning the UCC's standing to bring and prosecute the UCC Objection shall be decided prior to the hearing on the Amended Disclosure Statement.  The UCC and DRA Parties are ordered to meet and confer on a litigation schedule with respect to this issue.  If this Court determines that the UCC has standing to bring and prosecute the UCC Objection, then all other matters raised in the UCC Objection, including its underlying substantive merits, shall be determined post-confirmation in accordance with this Order.

## **RESERVATION OF RIGHTS**

46.      The DRA Parties reserve all rights and remedies with respect to the Amended Report, the Amended Revenue Bond Scheduling Order, the Final Revenue Bond Scheduling Order, and the DRA Scheduling Order, including but not limited to, the right to file additional submissions or objections with the Court.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, today February 21, 2020.

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
PO Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: 787-250-5632
Facsimile:  787-759-9225

By: */s/Arturo J. García-Solá*
Arturo J. García-Solá
USDC No. 201903
Email: ajg@mcvpr.com

By: */s/Nayuan Zouairabani*
Nayuan Zouairabani
USDC No. 226411
Email: nzt@mcvpr.com

*Attorneys for AmeriNational Community Services, LLC as servicer for the GDB Debt Recovery Authority*

**C. CONDE & ASSOC. LAW OFFICES**

By: */s/ Carmen D. Conde Torres*

Carmen D. Conde Torres
(USDC No. 207312)
254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel. 787-729-2900
Fax. 787-729-2203
E-Mail: condecarmen@condelaw.com

*-and-*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

By: */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted pro hac vice)
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone:  (202) 339-8400
Facsimile:   (202) 339-8500
E-mail:    dmintz@orrick.com

and

Laura Metzger (admitted pro hac vice)
Peter Amend (admitted pro hac vice)
Monica Perrigino (admitted pro hac vice)
51 West 52nd Street
New York, N.Y. 10019
Telephone:  (212) 506-5000
E-mail:     lmetzger@orrick.com
            pamend@orrick.com
            mperrigino@orrick.com

*Attorneys for Cantor-Katz Collateral Monitor LLC, as Collateral Monitor for GDB Debt Recovery Authority*

23

4151-4189-7506