# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>**Re: ECF Nos. 1799, 1860**<br>Case No. 17-BK-4780-LTS<br><br>**This Pleading relates only to PREPA, and shall be filed in the lead Case No. 17-BK-3283-LTS, and PREPA's Title III case (Case No. 17-BK-4780-LTS)** |

## REPLY OF PUERTO RICO FISCAL AGENCY AND FINANCIAL AUTHORITY TO COBRA ACQUISITION LLC'S OMNIBUS OBJECTION TO FEE APPLICATIONS FILED BY PROFESSIONALS AND REQUEST TO INCREASE HOLDBACK AMOUNT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

ARGUMENT ........................................................................................................................... 5

    I.      COBRA SEEKS TO LIMIT PROFESSIONAL COMPENSATION IN A
            MANNER INCONSISTENT WITH PROMESA SECTION 316 AND
            THE INTERIM COMPENSATION ORDER. ...................................................... 5

    II.     COBRA'S UNSUPPORTED CLAIM THAT PREPA IS
            ADMINISTRATIVELY INSOLVENT HAS NO RELEVANCE IN
            TITLE III. ............................................................................................................ 9

    III.    PREPA IS NOT ADMINISTRATIVELY INSOLVENT. ................................. 11

    IV.    SUSPENSION OF FURTHER INTERIM PROFESSIONAL FEE
            PAYMENTS IS NOT APPROPRIATE UNDER THE
            CIRCUMSTANCES NOR SHOULD THE COURT INCREASE THE
            HOLDBACK AMOUNT.................................................................................... 13

CONCLUSION ...................................................................................................................... 14

## TABLE OF AUTHORITIES

**Page**

### Cases

*Aurelius Capital Master, Ltd. v. Commonwealth of P.R.*,
919 F.3d 638 (1st Cir. 2019)...........................................................................8

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Group of PREPA Bondholders*,
899 F.13 (1st Cir. 2018)...................................................................................7

*In re Bank of New England Corp.*,
134 B.R. 450 (Bankr. D. Mass. 1991) ............................................................14

*In re Brooke Corp.*,
No. 08-22786, 2013 WL 6782877 (Bankr. D. Kan. Dec. 20, 2013).................14

*In re City of Detroit, Mich.*,
841 F.3d 684 (6th Cir. 2016) ..........................................................................11

*In re City of Stockton*,
486 B.R. 194 (Bankr. E.D. Cal. 2013).............................................................8

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
No. 17-3283, 2020 WL 114518 (D.P.R. Jan. 7, 2020) ...........................7, 11

*In re HQ Glob. Holdings, Inc.*,
282 B.R. 169 (Bankr. D. Del. 2002) ...............................................................10

*In re New York City Off-Track Betting Corporation*,
No. 09-71121, 2011 WL 309594 (Bankr. S.D.N.Y. Jan. 25, 2011) ...............11

*In re Pub. Serv. Co. of New Hampshire*,
138 B.R. 660 (Bankr. D.N.H. 1992) ...............................................................14

*In re PYXSYS Corp.*,
288 B.R. 309 (Bankr. D. Mass. 2003) .............................................................10

*In re Standard Furniture Co.*,
3 B.R. 527 (Bankr. S.D. Cal. 1980) .................................................................10

*In re Sun Runner Marine, Inc.*,
134 B.R. 4 (9th Cir. BAP 1991) ......................................................................10

*Matter of Baptist Med. Ctr. of New York, Inc.*,
52 B.R. 417 (E.D.N.Y. 1985), *aff'd*, 781 F.2d 973 (2d Cir. 1986) ...............10

*U.S.A. v. Tribble*,
No. 19-CR-541-FAB, (D.P.R. Sep. 3, 2019) ...................................................4

### Statutes

11 U.S.C. § 726(b) ....................................................................................................9

11 U.S.C. § 943(b)(5) ...............................................................................................10

48 U.S.C. § 2165......................................................................................................7

## TABLE OF AUTHORITIES
### (continued)

**Page**

48 U.S.C. § 2174(b)(4) ......................................................................................... 10

48 U.S.C. § 2176(a) ............................................................................................... 6

48 U.S.C. § 2176(c) ............................................................................................... 6

**Other Authorities**

3 Collier on Bankruptcy P. 331.05 (16th 2019)............................................... 9

1978 U.S. Code Cong. & Admin. News 5787, 6147 ........................................ 12

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Fiscal Agency and Financial Authority ("AAFAF"), as the entity authorized to act on behalf of PREPA pursuant to the authority granted to it under the *Enabling Act of the Fiscal Agency and Financial Advisory Authority*, Act 2-2017, respectfully submits this reply (the "Reply") to the *Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount* (the "Objection")[2][ECF No. 9419][3] and the *Supplement to the Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount* (the "Supplemental Objection") [ECF No  9752] filed by Cobra Acquisitions LLC ("Cobra").[4]  In support of this Reply, AAFAF respectfully states as follows:

## **PRELIMINARY STATEMENT**

1.      Cobra concedes that it "has no objection to any particular firm's fees or time entries." Objection ¶ 25.   Rather, it argues this Court should halt procedures for interim compensation of PREPA's professionals, or significantly increase the holdback, purportedly out of concern for the rights of administrative claimants as a whole.  Yet no other administrative claimants have joined Cobra's Objection.  This is unsurprising—the Objection is not founded in any legitimate concern that rightful administrative expense claims will go unpaid.  Indeed, PREPA has already paid Cobra approximately $1.1 billion.

2.      At the heart of this Objection is PREPA's refusal to pay the roughly 18% of Cobra's total invoices that remain outstanding in the wake of a federal indictment alleging improprieties

---

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.
[3]  Unless otherwise specified, "ECF No." refers to docket entries in Case No. 17-3283 and "PREPA ECF No." refers to docket entries in Case No. 17-4780.
[4]  Specifically, the Objection and the Supplemental Objection include [PREPA ECF No. 1746; ECF No. 9204]; [PREPA ECF No.1770; ECF No. 9305]; [PREPA ECF No. 1774]; [PREPA ECF No. 1776]; [PREPA ECF No. 1778]; [PREPA ECF No. 1786; ECF No.9354]; [PREPA ECF No. 1788]; [ECF No. 9144]; [ECF No. 9167]; [ECF No. 9176]; [ECF No.9207]; [ECF No. 9213]; [ECF No. 9218]; [ECF No. 9219]; [ECF No. 9220]; [ECF No. 9245]; [ECF No. 9312]; [ECF No. 9314];[ECF No. 9316]; and [ECF No. 9626] (collectively, the "Fee Applications").

between Cobra's chief executive officer and senior FEMA officials as well as unresolved disputes regarding hundreds of invoices with a total value of over $200 million. These disputes between PREPA and Cobra are being litigated through the Administrative Expense Motion (defined below).[5] This Court should reject the Objection for what it is—an attempt to pressure PREPA to pay disputed invoices by threatening PREPA's ability to compensate its professionals, including those litigating against Cobra.

3.      *First*, because Cobra has conceded it has no substantive objection to any professional's fees, there is no basis for relief under PROMESA section 316 or the Interim Compensation Order. Accordingly, Cobra's attempt to restrict PREPA's ability to compensate its professionals is precluded by PROMESA section 305.

4.      *Second*, Cobra's Objection is predicated on an allegation that PREPA is administratively insolvent. But administrative insolvency as a concept has no application in municipal bankruptcy, where liquidation is not possible and all administrative expenses will be paid in cash and in full upon effectiveness of a plan or adjustment (or upon allowance thereafter).

5.      *Third*, even if administrative insolvency existed in Title III (and it does not), PREPA is not administratively insolvent.

6.      *Fourth*, Cobra provides no credible justification for suspending interim compensation procedures or increasing the holdback amounts. Cobra does not cite a single case to support the idea that interim compensation for professionals can be suspended during a municipal bankruptcy. Moreover, the current holdback percentages are already in line with those in the cases upon which Cobra relies.

---

[5]   AAFAF reserves the right to assert objections to the Administrative Expense Motion on any and all grounds regardless of whether they are discussed herein.

2

7.     Accordingly and as set forth more fully below, AAFAF respectfully requests that the Court recognize the Objection for the litigation tactic that it is and overrule the Objection.

## **BACKGROUND**

8.     On July 2, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for PREPA pursuant to PROMESA Section 304(a), commencing a case under Title III thereof (the "Title III Case").

9.     During September 2017, Puerto Rico was hit by two historically powerful hurricanes—Irma and Maria—that severely damaged PREPA's transmission grid and other infrastructure and left the island without power for several weeks. On September 20, 2017, President Donald J. Trump issued a major disaster declaration for Puerto Rico due to the damage resulting from Hurricane Maria, which was designated FEMA-4339-DR.

10.     Pursuant to FEMA-4339-DR, the Federal Emergency Management Agency ("FEMA") was authorized, among other things, to provide assistance to the Commonwealth of Puerto Rico and to PREPA to assist in rebuilding the power system.

11.     On October 19, 2017, PREPA and Cobra entered into the Emergency Master Service Agreement for PREPA's Electrical Grid Repairs – Hurricane Maria ("First Contract") for Cobra to perform emergency "storm restoration services" for $200 million. Declaration of Gary Germeroth ("Germeroth Decl.") ¶ 6. Through subsequent amendments, the contract amount for the First Contract was increased to $945 million. *Id.* Cobra asserts that over $92 million remains unpaid, including interest and other unresolved issues that PREPA disputes. *See* Objection ¶ 10.

12.     On May 26, 2018, PREPA and Cobra entered into the Master Services Contract for PREPA's Electrical Grid Repairs - Hurricane Maria ("Second Contract," and with the First Contract, the "Cobra Contracts"), for Cobra to perform restoration and reconstruction services in addition to its emergency storm repair services under the First Contract, in the amount of up to

3

$900 million. Germeroth Decl. ¶ 7.  Cobra asserts that over $152 million remains unpaid, including interest and other unresolved amounts that PREPA disputes. *See* Objection ¶ 11.

13.     Of the $244 million that Cobra asserts remains outstanding, PREPA disputes over $200 million as part of its ordinary invoice review processes. Germeroth Decl. ¶ 8.  PREPA additionally refuses to pay any amounts outstanding to Cobra at this time, pending resolution of an ongoing criminal proceeding. *Id.*

14.     Specifically, on September 3, 2019, a federal grand jury in the District of Puerto Rico returned a criminal indictment against two FEMA officials—Ahsha Nateef Tribble ("Ms. Tribble"), Region II Deputy Regional Administrator, and Jovanda R. Patterson ("Mr. Patterson"), Deputy Chief of Staff—assigned to work in Puerto Rico as part of FEMA's response to Hurricane Maria and against Donald Keith Ellison ("Mr. Ellison"), the former President of Cobra Acquisitions, LLC.  *See U.S.A. v. Tribble*, Case No. 19-CR-541-FAB, ECF No. 3  at ¶¶ 3-6 (D.P.R. Sep. 3, 2019), attached hereto as Exhibit A (the "Indictment").  The indictment alleges that Mr. Ellison, Ms. Tribble, and Mr. Patterson used Ms. Tribble's positions in FEMA to enrich themselves.  Specifically, it alleges that Mr. Ellison provided Ms. Tribble with various "things of value" in an attempt to influence Ms. Tribble and persuade her to exert pressure on PREPA and FEMA officials to award restoration work to Cobra under both the First Contract and the Second Contract, and to accelerate payments to Cobra in violation of several federal criminal statutes. *Id.*

15.     On September 30, 2019, Cobra filed *Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims* (the "Administrative Expense Motion") [ECF No. 8789].  At the Government Parties' request, the court stayed adjudication of that motion.  *See Order Granting Joint Urgent Motion of the Oversight Board, PREPA, and*

4

*AAFAF to Extend All Applicable Deadlines to Cobra Acquisitions LLC's Motion for Allowance and Payment of Administrative Expense Claims* [ECF No. 8886].

16.     On January 22, 2020, the Government Parties and Cobra filed the *Joint Informative Motion Pursuant to Order of October 17, 2019 Regarding Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims* [ECF No. 10307].

17.     At the Omnibus Hearing on January 29, 2020, the Court provided for a further stay of the Administrative Expense Motion through the June omnibus hearing and directed the parties to file a further status report on May 27, 2020.  *See Order Scheduling Further Status Conference in Connection with Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims* [PREPA ECF No. 1894].

## **ARGUMENT**

### I.     **COBRA SEEKS TO LIMIT PROFESSIONAL COMPENSATION IN A MANNER INCONSISTENT WITH PROMESA SECTION 316 AND THE INTERIM COMPENSATION ORDER.**

18.     Cobra objects to the Fee Applications on the ground that PREPA should not be permitted to pay its professionals unless it demonstrates the payments will not prejudice PREPA's ability to pay other administrative claimants, including Cobra.  Objection ¶¶ 20–25.  Cobra's position is wrong as a matter of law.  None of the criteria for approving professional fee applications in Title III makes any reference to the debtor's ability to pay other (disputed) administrative claimants.

19.     This Court's review of PREPA's payments to its professionals is governed by PROMESA section 316 and the *Order Setting Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, as amended (the "Interim Compensation Order") [ECF No. 1715].  Section 316 provides that after notice and hearing, the Court may award "reasonable compensation" and "reimbursement" for actual, necessary professional services.  48

5

U.S.C. § 2176(a).  Section 316 makes explicit the criteria the Court should use in determining the

reasonableness of a fee application:

> In determining the amount of reasonable compensation to be
> awarded to a professional person, the court shall consider the nature,
> the extent, and the value of such services, taking into account all
> relevant factors, including--
> **(1)** the time spent on such services;
> **(2)** the rates charged for such services;
> **(3)** whether the services were necessary to the administration of,
> or beneficial at the time at which the service was rendered
> toward the completion of, a case under this chapter;
> **(4)** whether the services were performed within a reasonable
> amount of time commensurate with the complexity, importance,
> and nature of the problem, issue, or task addressed;
> **(5)** with respect to a professional person, whether the person is
> board certified or otherwise has demonstrated skill and
> experience in the restructuring field; and
> **(6)** whether the compensation is reasonable based on the
> customary compensation charged by comparably skilled
> practitioners in cases other than cases under this subchapter or
> Title 11.

48 U.S.C. § 2176(c).  In addition, the court "shall not allow" compensation for services that are

unnecessarily duplicative, not reasonably likely to benefit the debtor, and not necessary for the

administration of the estate.  *Id.* § 2176(d).  The Interim Compensation Order sets forth procedures

for review of applications by the fee examiner and hearing by the Court.

20.      Cobra makes no attempt to argue that any of the fees it challenges are unreasonable

under these standards.  To the contrary, Cobra acknowledges it "has no objection to any particular

firm's fees or time entries."  Objection ¶ 25.  Rather, Cobra seeks to restrict PREPA's ability to

use its property to compensate professionals until it proves other claimants, like Cobra, can be

repaid.  The relief Cobra seeks is wholly unsupported by section 316 and the Interim Compensation

Order.  This is reason enough to overrule Cobra's objection.

21.      Cobra's objection must be overruled for the additional reason that the relief it seeks

is precluded by PROMESA.  Under the pretext of objecting to professional fees, Cobra seeks a

Court order limiting the conditions under which PREPA may use its property to pay for professional services deemed reasonable by this Court. But as this Court has recognized, "PROMESA provides for significant deference to the prerogatives of the governmental debtors and of their statutory representative and makes clear that Congress intended to preserve governmental debtors' ability to initiate transactions affecting their assets." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-3283, 2020 WL 114518, at *3 (D.P.R. Jan. 7, 2020).

22.    For instance, due to important omissions of Bankruptcy Code provisions that typically restrict a debtor's control over its own cash in the Chapter 11 context, during the Title III case, PROMESA does not prevent PREPA from using its cash for any purpose necessary for its operations. Specifically, Bankruptcy Code section 363(b), which restricts a debtor's use, sale, or lease of property outside the ordinary course of business, does not apply in Chapter 9 or under PROMESA. *Compare* 11 U.S.C. § 363(b) *with* § 901(a) and PROMESA § 301(a) (no incorporation of Bankruptcy Code section 363). Accordingly, PREPA is afforded autonomy with respect to the use and control of its cash on hand and may pay vendors in the ordinary course however it deems appropriate. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 WL 114518, at *3, n.5 (noting omission of Bankruptcy Code section 363 as evidence of Congressional deference to the prerogatives of Title III debtors).

23.    Moreover, an order precluding PREPA from compensating its professionals would violate PROMESA section 305. Section 305 prevents the Title III Court from issuing "any stay, order or decree . . . [that] interfere[s] with . . . any property or revenues of the debtor …" *See* 48 U.S.C. § 2165; *see also Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Group of PREPA Bondholders*, 899 F.13, 21 (1st Cir. 2018) (Section 305 is "respectful and protective of the status of the Commonwealth and its instrumentalities as governments, much like section 904 of the

municipal bankruptcy code respects and protects the autonomy of states and their political subdivisions.").  The debtor's right to use its property as it sees fit without judicial interference includes the right to make spending decisions with which any given creditor disagrees.  *See, e.g.*, *Aurelius Capital Master, Ltd. v. Commonwealth of P.R.*, 919 F.3d 638 (1st Cir. 2019) (declaratory judgment that certain Commonwealth revenues must be allocated to bondholder debt service is an impingement on debtor autonomy precluded by section 305); *In re City of Stockton*, 486 B.R. 194,198 (Bankr. E.D. Cal. 2013) (the court cannot prevent a municipal debtor "from spending its money for any reason, even foolishly or in a manner that disadvantages other creditors, unless the municipality consents to such judicial oversight.").

24.     While section 316 allows the Court discretion to disallow or reduce professional fees, interference with PREPA's payment of its professionals based on considerations that are wholly untethered to the criteria in section 316 without the consent of the Oversight Board is precluded under section 305.  The Oversight Board has not consented to interference with PREPA's payment of retained professionals on any ground other than those in section 316 and the Interim Compensation Order.  Indeed, the Order expressly states that nothing therein "shall constitute, or shall be deemed to constitute the Oversight Board's consent, pursuant to PROMESA section 305, to this Court's interference with (a) any of the political or governmental powers of the Debtors, (b) any property or revenues of the Debtors, or (c) the use or enjoyment of the Debtors of any income-producing property."  Interim Compensation Order ¶ 11.

25.     Cobra has not pointed to any authorization in PROMESA section 316 nor followed the objection procedures under the Interim Compensation Order that would allow the Title III Court to limit payment to PREPA's professionals.  Accordingly, the Objection should be overruled.

## II. COBRA'S UNSUPPORTED CLAIM THAT PREPA IS ADMINISTRATIVELY INSOLVENT HAS NO RELEVANCE IN TITLE III.

26.    Cobra argues that this Court should suspend future interim compensation payments or significantly increase the holdback amount on the theory that PREPA is administratively insolvent, or at risk for administrative insolvency. Objection ¶¶ 20–25. However, the concept of administrative insolvency has no application in a municipal restructuring. Cobra cites no authority for the proposition that a municipal debtor must remain administratively solvent during a Title III case—nor could it. *See* H.R. REP. 95-595, 400, 1978 U.S.C.C.A.N. 5963, 6356; *See also* H.R. REP. 95-595, 549, 1978 U.S.C.C.A.N. 5963, 6465 (Explaining that in chapter 9 cases the best interest confirmation standard is not phrased in terms of liquidation of the debtor "[b]ecause that is not possible in a municipal case.")

27.    Administrative insolvency occurs when estate assets are insufficient to pay all administrative claims. 3 Collier on Bankruptcy P. 331.05, n.12 (16th 2019). When administrative insolvency occurs in Chapter 11 cases, the case is "often, but not always, accompanied by the conversion of a Chapter 11 reorganization case to a Chapter 7 case, where the Chapter 7 administrative priorities have superpriority over prior Chapter 11 administrative priorities." *Id.*; *see also* 11 U.S.C. § 726(b). Following conversion of a Chapter 11 reorganization case to a Chapter 7 liquidation case due to administrative insolvency, courts have taken differing views as to whether interim compensation to Chapter 11 professionals must be disgorged to ensure pro rata distribution to administrative claimants in the Chapter 7 case. Some courts hold that disgorgement is mandatory, some hold disgorgement is discretionary, and some hold there is no authority in the Bankruptcy Code to order disgorgement of fees paid. *See* 3 Collier on Bankruptcy P. 331.05 (collecting cases). Notably, however, there is no ability to convert a Title III case under PROMESA.

28.     All of the cases cited by Cobra are Chapter 7 or Chapter 11 cases.  *See, e.g., In re PYXSYS Corp.*, 288 B.R. 309 (Bankr. D. Mass. 2003) (Chapter 7 case); *In re HQ Glob. Holdings, Inc.,* 282 B.R. 169, 174 (Bankr. D. Del. 2002) (Chapter 11 case); *Matter of Baptist Med. Ctr. of New York, Inc.,* 52 B.R. 417 (E.D.N.Y. 1985), *aff'd*, 781 F.2d 973 (2d Cir. 1986) (Chapter 11 case); *In re Standard Furniture Co.*, 3 B.R. 527 (Bankr. S.D. Cal. 1980) (Chapter 7 case).  These cases have no applicability to a municipal case where all administrative claims are paid out on the effective date of the plan (or must be paid thereafter upon allowance of such claims). *See* 48 U.S.C. § 2174(b)(4), 11 U.S.C. § 943(b)(5).  PROMESA Section 314(b)(4) makes clear that a holder of an administrative expense claim has a right to cash payment on its allowed administrative claim on the effective date of a confirmed plan of adjustment.  *See* 48 U.S.C. § 2174(b)(4) (providing that a plan must provide for the payment of allowed administrative expense claims on the plan's effective date or otherwise make satisfactory arrangements for payment upon allowance of such a claim ).  Because PROMESA requires that PREPA's plan of adjustment pay all administrative claims upon its exit from Title III and there is no ability to convert a Title III case, there is no risk that PREPA could exit Title III without satisfying Cobra's claim if such claim ultimately becomes allowed.

29.     Further, any bar to payment of professionals or other administrative claimants related to administrative insolvency springs from a set of priorities in a Chapter 7 case that do not exist in a case under Title III of PROMESA.  For example, it is well settled that administrative claims arising from a Chapter 11 case are, after conversion, subordinate to administrative claims arising from the subsequent Chapter 7 case.  *In re Sun Runner Marine, Inc.*, 134 B.R. 4 (9th Cir. BAP 1991).  This is true even if the Chapter 11 claims enjoyed section 507(b) "superpriority" arising from failure of adequate protection.  *Id.*  The reason for this hierarchy is simple: "Those

10

who must wind up the affairs of a debtor's estate must be assured of payment, or else they will not participate in the liquidation or distribution of the estate."  H.R.Rep. No 95–595, 95th Cong., 1st Sess. (1977) 186–87, 1978 U.S. Code Cong. & Admin. News 5787, 6147.  That justification is not applicable to a Title III case, as there is no "estate" being liquidated.  As such, Cobra's allegation that administrative insolvency justifies suspension of professional payments misses the mark, as the concept does not exist in Title III.

30.     The absence of a requirement that a debtor be administratively solvent during a Title III case to pay its fees is further underscored by the purpose of municipal bankruptcies and the structure of Title III.  There is no ability for a municipal debtor to liquidate and no provision to convert a restructuring case to a liquidating case.  *See, e.g.*, *In re City of Detroit, Mich.*, 841 F.3d 684, 689 (6th Cir. 2016) ("Neither the court nor creditors can directly force a liquidation of a municipality's assets in bankruptcy.").  This is consistent with the purpose of municipal restructurings, which prioritize the continuation of government operations.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 WL 114518, at *3 ("[T]hese restructuring cases require a more holistic approach that focuses on the continuation and future of a government and its instrumentalities and their ability to meet the needs of the Commonwealth's residents as well as provide proper recompense of creditors."); *In re New York City Off-Track Betting Corporation*, No. 09-71121, 2011 WL 309594, at *5 (Bankr. S.D.N.Y. Jan. 25, 2011) ("Unlike the Bankruptcy Code generally, Chapter 9 is not concerned with balancing the rights of creditors and debtors. Rather, the principal purpose of Chapter 9 is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations.").

## III.     PREPA IS NOT ADMINISTRATIVELY INSOLVENT.

31.     Even assuming administrative insolvency concerns have any application in Title III (and they do not), Cobra's argument is still meritless because PREPA is not administratively

11

insolvent.  PREPA continues to pay its ordinary course vendors. Germeroth Decl. ¶ 12.  Indeed, no other party has joined Cobra in the Objection.  As of February 14, 2020, PREPA's operating accounts totaled $488.5 million. Germeroth Decl. ¶ 11.   Additionally, in March 2019, PREPA paid off in full the $300 million loan that the Government of Puerto Rico granted it in February 2018 after the passage of Hurricanes Irma and Maria.  *Id.*  Since paying off this loan, PREPA has increased its cash on hand by $173.6 million.  *Id.*  Additionally, between November 15, 2019 and February 21, 2020, PREPA generated revenues of approximately $45 million to $80 million per week. *Id.* ¶ 12.

32.    By contrast, Cobra has literally offered no evidence showing PREPA is administratively insolvent.  Cobra cites an out of context excerpt from PREPA's motion to stay the Administrative Expense Motion, where the Government Parties stated: "PREPA relies upon FEMA funding to pay for the costs of power repairs and power restoration.  But PREPA was and remains financially incapable of undertaking the extension grid repairs necessary after Hurricane Maria without public assistance from FEMA."  ECF No. 8838, ¶ 20, 28 n.6; *see* Objection ¶ 5.

33.    This statement is not an admission of administrative insolvency, nor is it an admission that PREPA is unable to operate (which it is currently doing) absent federal funding to undertake extension grid repairs.  It is merely a statement of fact that PREPA relies on federal disaster relief funding—which is specifically earmarked for grid repairs—to fund disaster repairs necessitated by the devastation caused by two of the most destructive hurricanes on record, Hurricanes Irma and Maria, the same as most other municipalities affected by natural disasters.  PREPA's reliance on federal disaster relief funding to pay for post-hurricane grid repair has nothing to do with its ability to pay its vendors in the ordinary course.  *See* Germeroth Decl. ¶ 13-

14.  Even if it did, the federal funds received by PREPA are specifically earmarked for disaster relief and could not be used to pay such vendors anyway. *Id.* ¶ 14.

34.     With respect to Cobra in particular, Cobra has already been paid approximately $1.1 billion by PREPA (*Id.* ¶ 8), which is more than the fees and expenses all of PREPA's professionals have incurred since the Title III filing, combined.[6]  Less than 18% of Cobra's invoices remain unpaid and Cobra knows exactly why: PREPA disputes hundreds of Cobra's outstanding invoices and the Indictment calls into question Cobra's entitlement to any payments under the Cobra Contracts. *Id.* ¶ 8.  If all litigation is resolved in Cobra's favor and the Court authorizes payment of the disputed amounts, there is no reason to believe that PREPA would be unable to make the remaining payments as it has with respect to the other $1.1 billion already paid to Cobra. *See id.* ¶¶ 9-12.   On the other hand, if the Court finds that Cobra is not entitled to payment because of a violation of federal or Puerto Rico law, PREPA might have monumental claims against Cobra for the disgorgement of funds it already received under the Cobra Contracts. In short, PREPA's reluctance to pay Cobra while it is disputing the unpaid invoices and Cobra's former President is under criminal indictment for unlawful contracting practices in connection with the very contracts at issue is hardly indicative of administrative insolvency.

## IV.   SUSPENSION OF FURTHER INTERIM PROFESSIONAL FEE PAYMENTS IS NOT APPROPRIATE UNDER THE CIRCUMSTANCES NOR SHOULD THE COURT INCREASE THE HOLDBACK AMOUNT.

35.     Cobra's request for suspended payments and its request for increased holdbacks is unjustified. While PREPA agrees that holdbacks are used to "moderate potentially excessive interim allowances," the cases cited by Cobra either advocated for a similar holdback amount as

---

[6]  Cobra attempts to distort the magnitude of professional fees by citing numbers that include all of the fees and expenses of all professionals for <u>all Title III debtors and their committees, including those in the Title III case for the Commonwealth of Puerto Rico.</u>

the Title III Court employs or are a Chapter 7 cases with no applicability here. *In re Pub. Serv. Co. of New Hampshire*, 138 B.R. 660, 663 (Bankr. D.N.H. 1992) (average 12.5% holdback for professionals over life of case); *In re Bank of New England Corp*., 134 B.R. 450, 459 (Bankr. D. Mass. 1991), *aff'd*, 142 B.R. 584 (D. Mass. 1992) (Chapter 7 case); *In re Brooke Corp*., No. 08-22786, 2013 WL 6782877 (Bankr. D. Kan. Dec. 20, 2013) (Chapter 7 case).  The sole case cited by Cobra that increased the holdback (from an agreed-upon 15% holdback to 20% holdback) was a Chapter 7 case where the Court decided to slightly increase the holdback for the Chapter 7 Trustee's counsel because a large portion of their fees were being paid by a contingency arrangement and the holdback was only for the hourly portion of their fee arrangement. *See In re Brooke Corp*., 2013 WL 6782877. The facts in that case are wholly different from the facts presented here.

36.     PREPA is currently paying its vendors in the ordinary course and will continue to do so.  *See* Germeroth Decl. ¶ 12.  Cobra's request for significantly increasing PREPA's professionals' holdback amounts is disingenuous, since the percentage outstanding on the Cobra Contracts is roughly the same as current holdback amounts.  PREPA's professionals are subject to a 10% fee holdback, while the UCC's professionals are subject to a 20% fee holdback.  Cobra is advocating for a larger than 20% holdback when that is more than the amount outstanding under the Cobra Contracts.

37.     There is no inequity here. The Objection is simply a strong-arm tactic to receive payment in full before anyone else.

## CONCLUSION

WHEREFORE, AAFAF respectfully requests that the Court overrule the Objection and any other relief as is just and proper.

Dated: February 25, 2020                    Respectfully submitted,
        San Juan, Puerto Rico

**O'MELVENY & MYERS LLP**                   **MARINI PIETRANTONI MUNIZ, LLC**

By: /s/ *Elizabeth L. McKeen*                By: /s/ *Luis C. Marini-Biaggi*
    John J. Rapisardi*                           Luis C. Marini-Biaggi
    Nancy A. Mitchell*                            USDC No. 222301
    7 Times Square                                250 Ponce de León Ave.
    New York, NY 10036                            Suite 900
    Telephone: (212) 326-2000                     San Juan, PR 00918
    Facsimile: (212) 326-2061                      Telephone: (787) 705-2171
    Email:    jrapisardi@omm.com                   Facsimile: (787) 936-7494
              nmitchell@omm.com                     Email: lmarini@mpmlawpr.com

    Peter Friedman*                              *Co-Attorneys for the Puerto Rico Fiscal*
    1625 Eye Street, NW                          *Agency and Financial Advisory*
    Washington, DC 20006                         *Authority*
    Telephone: (202) 383-5300
    Facsimile: (202) 383-5414
    Email:    pfriedman@omm.com

    Elizabeth L. McKeen*
    Ashley M. Pavel*
    610 Newport Center Drive, 17th Floor
    Newport Beach, CA 92660
    Tel: (949) 823-6900
    apavel@omm.com

    * admitted pro hac vice

    *Attorneys for the Puerto Rico Fiscal*
    *Agency and Financial Advisory*
    *Authority*

15