**<u>EXHIBIT 2</u>**

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF PUERTO RICO
   _____x
4    In re:

5    THE FINANCIAL OVERSIGHT AND          PROMESA
     MANAGEMENT BOARD FOR PUERTO
6    RICO,                               Title III
           as representative of
7                                        Case No.
8    THE COMMONWEALTH OF PUERTO RICO,    17-BK-3283(LTS)
     et al.,
9          Debtors.
   _____x
10   In re:

                                         PROMESA
11   THE FINANCIAL OVERSIGHT AND
     MANAGEMENT BOARD OF PUERTO RICO,     Title III
12
           as representative of       17-BK-4780(LTS)
13
     PUERTO RICO ELECTRIC POWER AUTHORITY,
14         Debtor.
   _____x
15   (Caption continued on following page.)
16   * P R O F E S S I O N A L   E Y E S   O N L Y  *
17             VIDEOTAPED DEPOSITION
18                    OF
19            NATALIE A. JARESKO
20

21

22

23   Reported by:
24   ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 170379

Page 14

1    N. Jaresko - Professional Eyes Only
2   to everyone, including your counsel. I'm
3   going to hand them to you now.
4        These are documents that have
5   been marked Exhibits 1 through 4.
6        MR. BASSETT: And just for the
7   record, Exhibit 1 is the Official
8   Committee of Unsecured Creditors'
9   revised deposition notice pursuant to
10  Rule 30(b)(6) of the Federal Rules of
11  Civil Procedure dated October 16th,
12  2019 for today's deposition.
13       Exhibit 2 is a subpoena to
14  testify at a deposition directed to
15  Natalie Jaresko.
16       Also for today's deposition,
17  Exhibit 3 is a copy, I believe, of the
18  preliminary -- or sorry, the
19  definitive, rather, Restructuring
20  Support Agreement that is at issue in
21  this dispute.
22       And then Exhibit 4 is a copy of
23  the declaration that you submitted,
24  Ms. Jaresko, in this case on July 2nd,
25  2019.

Page 15

1    N. Jaresko - Professional Eyes Only
2        MR. NATBONY: Mr. Bassett, can we
3   just for the record note that Exhibit 3
4   is a redlined and the final version --
5        MR. BASSETT: That's fine.
6        MR. NATBONY: -- of the RSA?
7        MR. BASSETT: And also, for the
8   record, this is what we pulled from the
9   EMMA filings. This should be the
10  publicly available version.
11       MR. NATBONY: Thank you.
12  BY MR. BASSETT:
13   Q. So, Ms. Jaresko, first, directing
14  your attention to the document that's been
15  marked as Exhibit 1, the Rule 30(b)(6)
16  deposition notice, do you understand that
17  you are here today testifying as a
18  representative on behalf of the Oversight
19  Board?
20   A. Yes.
21   Q. And if you turn to page 6 of this
22  document, there are a number of topics of
23  examination, 1 through 13. And there has
24  been, leading up to this deposition today,
25  some discussion with your counsel about the

Page 16

1    N. Jaresko - Professional Eyes Only
2   scope of the topics. But I just want to
3   ask you whether you are prepared to testify
4   as to each of these topics today; and, if
5   not, which ones are you not prepared to
6   testify on?
7        MR. MASHBERG: So Mr. Bassett, as
8   you indicated, we have had discussions
9   about this. We objected to certain of
10  these topics and indicated that they
11  are not appropriate for the witness.
12       You can ask her to go through
13  them. I don't know that she has the
14  memory. This is not a memory test.
15  But the record will show that we have
16  objected to several of these topics as
17  inappropriate under the rulings of the
18  court and beyond the scope of this
19  proceeding.
20       So you can --
21       MR. BASSETT: Okay.
22       MR. MASHBERG: -- go down the
23  list, but I will state the objections
24  that we made certain to these topics.
25       MR. BASSETT: So just to expedite

Page 17

1    N. Jaresko - Professional Eyes Only
2   things, then, you're willing to
3   represent that Ms. Jaresko is here
4   prepared to testify consistent with the
5   email exchange we had in advance of
6   this deposition?
7        MR. MASHBERG: That's correct.
8        MR. BASSETT: Okay.
9   BY MR. BASSETT:
10   Q. Ms. Jaresko, do you also
11  understand that you are here, and I'll
12  direct your attention to Exhibit 2, to
13  testify in your individual capacity?
14   A. Yes.
15   Q. So that means regardless of
16  whatever topics may or may not apply to the
17  Rule 30(b)(6) representative deposition,
18  there may be other questions that I will
19  ask you that are outside those topics; and
20  to the extent that it's within your
21  personal knowledge, unless you are
22  instructed not to answer, you would answer
23  that question.
24       Do you understand that?
25   A. Yes.

Page 18

```
1         N. Jaresko - Professional Eyes Only
2      Q.  Ms. Jaresko, what did you do,
3    without revealing any substance of
4    communications that you had with counsel,
5    generally speaking, to prepare for today's
6    deposition?
7      A.  In preparation for this
8    deposition, I reviewed documentation.  I've
9    met with my legal counsel.  And I have
10   reviewed my own statement.
11     Q.  How many times did you meet with
12   your legal counsel?
13     A.  Three to four times.
14     Q.  And was there anyone present at
15   those meetings aside from your legal
16   counsel?
17     A.  No, there was not.
18     Q.  Did you talk to anyone other than
19   your legal counsel as you prepared for this
20   deposition?
21     A.  I have spoken with and seen one
22   of my board members who was deposed, David
23   Skeel.  I have spoken with David
24   Brownstein.
25     Q.  And when did those, when did
```

Page 19

```
1    those, each of those conversation occur?
2      A.  I had a meeting with board
3    members and saw David Skeel on Tuesday
4    afternoon of this week.
5         I spoke with Mr. Brownstein this
6    morning.
7      Q.  Was counsel involved in either of
8    those discussions?
9      A.  No.
10     Q.  So what did you talk to Mr. Skeel
11   about on Tuesday?
12     A.  I asked Mr. Skeel how his
13   deposition went, and he said it went well.
14     Q.  Nothing else?
15     A.  Nothing else.
16     Q.  Did you review Mr. Skeel's
17   deposition transcript?
18     A.  No.
19     Q.  What did you talk to
20   Mr. Brownstein about this morning?
21     A.  I asked him how his deposition
22   went, and he said it went well.
23     Q.  You didn't talk about anything
24   else?
```

Page 20

```
1         N. Jaresko - Professional Eyes Only
2      A.  No.
3      Q.  You said you reviewed some
4    documents in advance of the deposition
5    today.
6         Without -- excluding any
7    documents that your counsel showed you,
8    what documents did you review?
9      A.  I'm sorry, can you repeat the
10   question?
11     Q.  I don't want you to reveal to me
12   what documents your counsel showed you in
13   advance of today's deposition.
14         So setting aside any documents
15   that fit in that category, are there other
16   documents that you reviewed in advance of
17   the deposition today?
18     A.  My own notes.
19     Q.  Your own notes from what?
20     A.  From reviewing documents, legal
21   documents, legal filings.  My statement,
22   for example.
23     Q.  So you reviewed your statement,
24   and you reviewed other legal documents, and
25   then you took notes while doing that?
```

Page 21

```
1         N. Jaresko - Professional Eyes Only
2      A.  Yes.
3      Q.  And then you reviewed those
4    notes?
5      A.  Yes.
6      Q.  When you say other legal
7    documents and legal filings outside of your
8    statement, what are you referring to?
9      A.  The declarations of other
10   individuals, as well as the legal filing
11   for the RSA.
12     Q.  Okay.  So I'd like to direct your
13   attention now to what's been marked as,
14   going a little bit out of order here,
15   Exhibit 4, which is your declaration.
16         So Ms. Jaresko, who drafted this
17   declaration?
18     A.  I drafted this in cooperation
19   with my legal counsel.
20     Q.  Did you do the first draft?
21     A.  No, I did not.
22     Q.  Counsel did the first draft?
23     A.  Yes, I believe so.
24     Q.  How much time did you personally
25   spend on the declaration?
```

Page 22

N. Jaresko - Professional Eyes Only

A.  I don't recall exactly how much time.  Hours.

Q.  Less than ten hours?

A.  Yes, less than ten hours.

Q.  Less than five?

A.  In that range.

Q.  Aside from your attorneys, did you speak to anyone about your declaration as you were preparing it?

A.  DI deputy general counsel.

Q.  Who is that?

A.  Kyle Rifkind.

Q.  How about since you prepared the declaration, have you spoken to anybody about it?

A.  No.

Q.  Looking at this declaration, which I trust you're familiar with and I think you mentioned you reviewed, is everything in this declaration, to your knowledge, was it true and accurate at the time you signed this declaration?

A.  Yes.

Q.  And is everything in here still

Page 23

N. Jaresko - Professional Eyes Only

true and accurate today?

A.  Some of it has become outdated in line with events.

Q.  Can you tell me what those things are?

A.  Since this document was drafted, additional supporters of the RSA have been signed on.

Q.  Who would they be?

A.  National and Syncora.

Q.  Okay.  Anything else?

A.  Not that I'm aware of.  Oh, I disagree.  Mr. Sobrino is no longer the executive director of AAFAF since this document was filed --

Q.  Okay.

A.  -- nor does he play the roles that are written in the document at this time.

Q.  Okay.  If you look at paragraph 6 of the declaration, you described yourself as the highest-level executive responsible for a variety of things that are then listed thereafter.

Page 24

N. Jaresko - Professional Eyes Only

What does that mean with respect to the responsibilities that you have relating to the RSA?

A.  As described in this document, I am the highest level executive at the Oversight Board.  I have a very wide range of responsibilities, beginning with coordinating the work on fiscal plans, moving from the development of fiscal plans for covered instrumentalities to the development of budgets within those fiscal plans on an annual basis.

Moving on from the budgetary process to the implementation of that budget and the individual measures within each of the budget and other reforms for certain instrumentalities.

I have responsibility for other parts of the mandate of the Oversight Board, including contract review, Title V for economic development purposes.

And then I have responsibility to coordinate the efforts on behalf of Title III and Title VI with regard to debt

Page 25

N. Jaresko - Professional Eyes Only

restructuring, which leads to this in particular.

I am responsible for developing the recommendations and analysis that are developed by our own staff of 30, 35 people, as well as advisers and counsel, and presenting that to the board of directors, organizing the meetings of the board of directors and the discussions of the board.

Q.  Okay.  So you don't have any authority to approve the RSA, correct?

A.  I have that authority when given the authority by the board.  And so I have signed the RSA after the board made the decision to provide me that authority.

Q.  Okay.  But ultimately it's the board members who either had to approve the RSA or give you the authority to sign the RSA?

A.  Yes.

Q.  In paragraph 8 of your declaration, you referred to communications.  Or you said that you

Page 26

1  N. Jaresko - Professional Eyes Only
2  regularly consult with Christian Sobrino,
3  who was the executive director of AAFAF at
4  the time you signed this declaration.
5  About what did you regularly
6  consult with him?
7  A.  Mr. Sobrino played several
8  critical roles.  He was the governor's
9  representative to the board, so I would
10  consult with him on board meetings, board
11  events.
12  Mr. Sobrino was the executive
13  director of AAFAF, which was the
14  counterpart for all of the work that we do,
15  whether it be on debt restructuring or on
16  budgetary fiscal plan work; so the
17  development of fiscal plans, the deadlines,
18  the documentation, the differences between
19  us during those development processes; as
20  well as the coordination of debt talks,
21  debt restructuring, whether they were being
22  lead by the government under Title VI or by
23  the board in Title III; as well as the two
24  of us serving as the co-heads, co-chairs of
25  the transformation committee delegated by

Page 27

1  N. Jaresko - Professional Eyes Only
2  the governor and the board to work towards
3  the transformation and complete the
4  transformation of PREPA.
5  Q.  And you spoke with him about the
6  RSA, correct?
7  A.  At times, yes.
8  Q.  And when you did that, when you
9  communicated with him about the RSA, by
10  what means did you do so?
11  A.  By phone, by text message, by
12  email, by text messenger -- I mean
13  messenger services.
14  Q.  Like Telegram, for example?
15  A.  Yes.
16  Q.  So let me just understand.  How
17  would you decide which method to use in
18  communicating with Mr. Sobrino?
19  A.  I would just be responsive to
20  wherever the message came up.
21  Q.  So he --
22  A.  No selection.
23  Q.  -- he would initiate all
24  conversations?
25  A.  I can't recall who initiated

Page 28

1  N. Jaresko - Professional Eyes Only
2  every conversation, but it's random.
3  Q.  Okay.  But you used, like, text
4  and then you also used separately Telegram,
5  for example?
6  A.  Correct, yes.
7  Q.  Why use Telegram as a means of
8  communication?
9  A.  Again, I use multiple different
10  messaging, and I don't distinguish between
11  them.
12  Q.  So now that Mr. Sobrino is no
13  longer with the government, the new
14  executive director of AAFAF is Mr. Omar
15  Marrero, correct?
16  A.  Yes.
17  Q.  Do you consult with Mr. Marrero
18  in the same way that you consulted with
19  Mr. Sobrino?
20  MR. MASHBERG:  Objection to form.
21  A.  Could you restate the question?
22  Q.  So I mean, you have indicated in
23  your declaration that you regularly consult
24  with Mr. Sobrino, and then you gave me a
25  description about the types of matters that

Page 29

1  N. Jaresko - Professional Eyes Only
2  you consult with him on.
3  He's no longer the executive
4  director of AAFAF.  He's been replaced by
5  Mr. Marrero.  I'm trying to get a sense of,
6  do you now communicate with Mr. Marrero in
7  the same way that you described you
8  communicated with Mr. Sobrino before he
9  left AAFAF?
10  A.  I communicated about the same
11  topics with Mr. Marrero, yes.
12  MR. NATBONY:  Objection.
13  BY MR. BASSETT:
14  Q.  Do you communicate with him
15  frequently?
16  A.  Yes, I communicate with him
17  frequently.
18  Q.  And have you discussed the RSA
19  with him?
20  A.  No, I have not.
21  Q.  Why not?
22  A.  It hasn't come up in conversation
23  as a discussion of the RSA.
24  There's one element that we have
25  discussed, and that is the transition

Page 30

```
1         N. Jaresko - Professional Eyes Only
2    charge of one cent, but we haven't
3    discussed the RSA.
4         Q.   You don't -- okay.
5            Have you discussed any matters
6    relating to the RSA with Mr. Marrero other
7    than the one cent --
8         A.   I have discussed the one cent
9    charge.
10        Q.   Okay.  Well, first of all, when
11   did that discussion occur?
12        A.   I don't recall the exact date.
13   In the last several weeks.
14        Q.   What did you discuss with him
15   about the one cent transition charge?
16        A.   We discussed whether or not it
17   was being -- when and whether or not it was
18   going to be added to the rates.
19        Q.   And what did he say?
20        A.   He would look into it.
21        Q.   So you reached out to him to ask
22   him when it would be added to the rates?
23        A.   That's correct, yes.
24        Q.   Are you aware that a rate motion
25   has been filed --
```

Page 31

```
1         N. Jaresko - Professional Eyes Only
2         A.   Yes.
3         Q.   -- by PREPA to have the one cent
4    transition charge added to bills by
5    offsetting it against the base rate?
6            MR. MASHBERG:  Objection to form.
7         A.   I'm aware of the motion.
8         Q.   So I guess what I'm trying to
9    understand is, was his answer anything
10   other than it will be implemented once that
11   rate motion is decided?
12           MR. MASHBERG:  Objection to form.
13        A.   His response was as I described
14   to you, that he would look into it.
15        Q.   Okay.  But do you have an
16   understanding, I mean, will it be -- do you
17   have an understanding as to whether or not
18   it will be implemented as soon as that rate
19   motion is ruled upon?
20           MR. MASHBERG:  Objection to form.
21        A.   I would assume that we will be
22   implementing the RSA.
23        Q.   On that topic, is it the
24   Oversight Board's understanding that the
25   settlement charge will not be added as an
```

Page 32

```
1         N. Jaresko - Professional Eyes Only
2    additional charge on top of base rates on
3    customer bills but will be offset against
4    base rates?
5            MR. NATBONY:  Objection to form.
6            MR. MASHBERG:  You're talking
7    about the one cent charge?
8            MR. BASSETT:  I said the
9    settlement charge.  Yes.
10   BY MR. BASSETT:
11        Q.   The settlement charge as defined
12   in the RSA is --
13        A.   The one cent charge.
14           No.  It is my understanding that
15   it is to be added.
16        Q.   So the rate motion, that is
17   inconsistent with your understanding of how
18   the RSA would work with respect to the
19   settlement charge being added to customers'
20   bills?
21           MR. MASHBERG:  Objection to form.
22        A.   I have not read the motion that
23   you described, so I can't --
24        Q.   Well, to the extent that it would
25   ask to have the one cent rate offset
```

Page 33

```
1         N. Jaresko - Professional Eyes Only
2    against base rates, it would be
3    inconsistent with your understanding?
4         A.   Yes.
5            MR. NATBONY:  Objection to form.
6    BY MR. BASSETT:
7         Q.   And do you have any -- is
8    there -- do you have any concerns with the
9    one cent settlement charge being offset
10   against base rates instead of being added
11   as an additional charge?
12           MR. NATBONY:  Objection to form.
13        A.   No, I don't have any concerns.
14   I'm simply asking the question as to how
15   things are going to be implemented in
16   accordance with the RSA.
17        Q.   Okay.  And in talking with
18   Mr. Marrero, did you ask him why this rate
19   motion was filed?
20        A.   No.
21        Q.   Do you have any understanding as
22   to why it was filed?
23        A.   Nothing more than assumptions,
24   no.
25        Q.   What's your assumption?
```

Page 34

N. Jaresko - Professional Eyes Only
A. That someone at PREPA filed it.
I don't -- I don't know why.
Q. You don't know who?
A. No.
Q. You didn't ask?
A. No.
Q. Do you have an understanding of,
under the RSA, when the one cent charge --
I understand that you asked Mr. Marrero
when the one cent charge is going to be
implemented and he said he would look into
it, but do you have an understanding of
when under the RSA it's supposed to be
implemented?
A. Yes, generally.
Q. What is that understanding?
A. Before the -- in the documents,
it says as of July 1st of 2019, but
generally, it's supposed to be implemented
before the agreement is approved.
Q. So how does that work, then, if
it's implemented as of July 1st of 2019 or,
as you said, generally before the agreement
is approved? Do the bondholders who are

Page 35

N. Jaresko - Professional Eyes Only
the beneficiaries of the one cent charge,
do they start receiving payments on account
of that before the 9019 motion is approved
by the court?
MR. NATBONY: Objection to form.
A. I don't know.
Q. What would the point of having it
be implemented as of July 2019 or any other
time prior to the court's approval of the
settlement motion be if it's not actually
distributed to anyone?
A. I just don't know whether it's
being accrued or distributed. I don't
recall.
Q. And when you say "accrued," that
would mean it could be that as soon as the
charge is implemented, it's collected; and
then once the settlement is approved,
whatever has been collected is paid out?
A. Correct. Yes.
Q. But your understanding is that
one way or another, whether it's on a
realtime basis or accrual, the bondholders
will receive whatever has been generated on

Page 36

N. Jaresko - Professional Eyes Only
account of that one cent charge?
A. Yes.
Q. In cash?
A. Yes.
Q. In paragraph 8 of your
declaration, you mentioned that, and you
referred to this as well, that you co-head
PREPA's transformation supervisory
committee or, I guess, co-headed it at the
time with Mr. Sobrino.
I mean, you describe here
generally what that is, but can you maybe
tell me in a little bit more detail what --
exactly what is the transformation
supervisory committee and what does it do?
A. It is a group of government
representatives, board representatives,
advisers, who are working towards the --
and working on the process of
transformation for PREPA, specifically at
this time focused on a process of
attracting a private operator to manage the
transmission and grid of PREPA.
Q. So my understanding is that the

Page 37

N. Jaresko - Professional Eyes Only
P3 Authority --
A. Is one of the government parties.
Q. So the -- excuse me, the P3
Authority is part of the transformation
supervisory committee?
A. They are one of the government
parties in that committee, yes.
Q. Okay. What are your roles and
responsibilities as co-head of that
committee?
A. It's not a formally documented
scope, but the responsibilities are to
ensure that that transformation happens on
an efficient and effective basis and meets
the objectives and goals of the board and
the government and the people of Puerto
Rico.
Q. So you say that you provide input
to the P3 Authority as to the ongoing
transformation process.
What kind of input have you
provided?
MR. MASHBERG: Objection to form.
A. The P3 Authority is one of the

Page 38

1        N. Jaresko - Professional Eyes Only
2   members of the committee.  We hear from the
3   P3 committee where they are in the P3
4   process, which is a legally based -- a
5   legal-based process under Puerto Rico law.
6   We hear from the P3 committee about what
7   issues have arisen or where the process
8   requires more work.
9        Q.   Who are the other government
10  parties on the committee?
11       A.   Again, it's not a formal scope,
12  but at that time, COR3 was also represented
13  because of the importance of attracting and
14  ensuring the federal funds for the
15  rebuilding of the transmission grid post
16  hurricanes Irma and Maria.  So there was a
17  representative from COR3, P3, and there
18  would be representatives of PREPA at times.
19            That's all that I recall.
20       Q.   And has Mr. Sobrino has been
21  replaced as co-head of that committee?
22       A.   I don't know.  It's not a formal
23  committee, so I don't know that they have
24  formally replaced him.  It has not met with
25  me present since then.

Page 39

1        N. Jaresko - Professional Eyes Only
2        Q.   Okay.  By the way, when you
3   referred to transformation -- or strike
4   that.
5            As I read your declaration in
6   paragraph 8, the defined term capital T,
7   Transformation, you define that as a
8   "process to select a private proponent to
9   enter into an agreement to manage and
10  operate PREPA's energy distribution and
11  transformation system."
12            Do you see that?
13       A.   Yes, I do.
14       Q.   So my understanding is that there
15  is another aspect of the transformation
16  that relates to the potential privatization
17  of PREPA's generation assets.
18            Are you aware of that?
19       A.   Yes.
20       Q.   So when you refer to
21  Transformation throughout your declaration,
22  again, capital T, the defined term, are you
23  referring only to the distribution and
24  transmissions transformation or are you
25  also referring to the generation

Page 40

1        N. Jaresko - Professional Eyes Only
2   transformation?
3            (Document review.)
4            MR. MASHBERG:  Objection to form.
5        A.   I would say that in this
6   document, it is a defined term, and that is
7   how it is defined in the document.
8            However, when I speak of
9   transformation, I speak of it more broadly
10  including but not only that element, as
11  well as the element of de-linking
12  generation and the privatization and/or
13  private operation of generation, as well as
14  other elements.
15       Q.   Okay.  I mean, we'll talk about
16  some other provisions of the -- or other
17  paragraphs of the declaration that used
18  that term, but it sounds like, generally
19  speaking, perhaps it should have been
20  defined to include both?
21            MR. MASHBERG:  Objection to form.
22       A.   Again, I would have to go through
23  and see whether it was used -- in every
24  paragraph that's been used, whether or not
25  that would apply.

Page 41

1        N. Jaresko - Professional Eyes Only
2        Q.   Okay.
3        A.   And I can't tell you unless if --
4   you'd like to show me --
5        Q.   Sure.
6        A.   -- a particular paragraph --
7        Q.   Sure.
8        A.   -- I'm happy to comment on that
9   one.
10       Q.   Sure.  Okay.  That's fair.
11       A.   I don't know what we're looking
12  at.
13       Q.   Yeah, that's fair.  We'll get to
14  that.
15            I would like to direct your
16  attention to paragraph 10 of your
17  declaration.
18            You say you participated in the
19  Oversight Board's internal discussions with
20  respect to the RSA and with the Oversight
21  Board's financial and legal advisers.
22            Internal discussions regarding
23  the RSA, what are you referring to there?
24       A.   That is a reference to any
25  discussion that's not being held during a

Page 150

N. Jaresko - Professional Eyes Only
kilowatt-hour would be unsustainable?
           MR. NATBONY:  Asked and answered.
     A.   That is what the letter says,
yes.  It says unsustainable at
approximately 30 cents, yes.
           At the same time, as I described
to you earlier, there is no magic number
that at that number, it becomes
unaffordable, 30, 29, 31.
           You can't take the text out of
the context of the purpose because the
point of the letter is that you have
unsustainable rates if you don't act.  That
the alternative to not doing the things in
the letter is unsustainable rates.
           The focus of the letter is not
the 30 cents.  30 cents is an indicator
that's why it says "approximately."
     Q.   I just want a clean answer to
this question because you're telling me
about the purpose of the letter.  I'm just
asking you, and you said it's not a magic
number, but whether it's 29, 30, 31,
approximately 30 cents, is unsustainable?

Page 151

N. Jaresko - Professional Eyes Only
           MR. NATBONY:  Objection.
           MR. MASHBERG:  Objection.
           MR. NATBONY:  Asked and answered.
           MR. MASHBERG:  She's answered the
question.  You got a clean answer.
     A.   I don't know what to add.
     Q.   I mean, is that true or not?
           MR. NATBONY:  Objection.
     A.   Is what true?
     Q.   That a rate of approximately, I'm
not holding you to -- the "approximately"
qualifier is there, is a rate of
approximately 30 cents in your view
unsustainable?
           MR. NATBONY:  Asked and answered
several times.
           MR. MASHBERG:  Objection to form.
     A.   The higher the rates, the more
difficult it is for this economy and for
the consumers.  The more unsustainable the
rate becomes, the higher it becomes.
           The whole goal of the
transformation is to reduce rates.  I think
we're taking, again -- you're driving it in

Page 152

N. Jaresko - Professional Eyes Only
a direction.
           The reduction of rates is not
about the RSA or the legacy claims alone.
Those make up, you know, take a look at any
of these charts, 15, 12 percent of a rate.
           So the goal is to reduce rates.
The higher they become, the more
unsustainable they become.
           The goal is to reduce every
component to the extent possible.  The RSA
does that with regard to the one component
of the legacy bond debt.  But the other
components are 80 or more percent of it and
this is about reducing every component,
that one being one part of it.
     Q.   I understand -- I appreciate
that.
           What I'm trying to figure out is,
at the time you wrote this letter, you
believed that rates of approximately 30
cents per kilowatt-hour would be
unsustainable, right?
           MR. NATBONY:  Same objection.
           MR. MASHBERG:  Asked and

Page 153

N. Jaresko - Professional Eyes Only
answered.  She answered that question.
     A.   I really don't know what else to
say.
     Q.   Well, I'm just asking you --
     A.   I'm repeating myself.
     Q.   -- a very simple question, which
is -- and I'm not getting an answer --
           MR. MASHBERG:  You've gotten an
answer.  You're not listening to what
she says.  She has specifically
answered the question several times.
BY MR. BASSETT:
     Q.   Outside of this statement in this
letter, has the Oversight Board formed any
view as to what level of rates would be
sustainable?
           MR. NATBONY:  Objection as to
form.
           MR. MASHBERG:  Objection to form.
     A.   As I said earlier, there are
target rates that we have been trying to
drive as targets, again, targets, to reduce
all components of the rates.  Yes, we have
had target rates and fiscal plans.  I don't

Page 154

1    N. Jaresko - Professional Eyes Only
2   recall the exact number or which document,
3   but we have tried to drive in all cases the
4   rates done to the extent possible.
5    That is the core of why the
6   transformation is occurring, to reduce the
7   fuel cost through the generation side, to
8   reduce the maintenance and increase
9   reliability through the T&D, and to reduce
10   the cost of all the legacy claims through
11   the eventual plan of adjustment in part
12   with this RSA.
13    Q.  Has anything happened since
14   September 5th, 2018, until now that would
15   lead you to have a different view as to
16   what level of rates are sustainable?
17    MR. NATBONY:  Objection.  Lack of
18   foundation.
19    A.  Nothing that I can think of.
20    Q.  So you mentioned -- or as we've
21   been discussing, it has been your testimony
22   that you think there is an assumption that
23   there is additional room in the fiscal plan
24   to raise rates to pay claims of other
25   creditors, is that correct, including the

Page 155

1    N. Jaresko - Professional Eyes Only
2   fuel line lenders and potentially the
3   committee?
4    MR. NATBONY:  Objection.
5   Mischaracterizes.
6   BY MR. BASSETT:
7    Q.  I'm sorry.  Let me restate the
8   question.
9    It is your understanding, I
10   believe, as you've testified, and correct
11   me if I'm wrong, that there is an
12   assumption in the fiscal plan that space
13   remains in rates to potentially provide
14   recoveries to other legacy creditors aside
15   from the bondholders?
16    MR. MASHBERG:  Objection to form.
17   BY MR. BASSETT:
18    Q.  I'm not trying to be difficult.
19   I thought that's what you testified to.
20    A.  What I was trying to say was that
21   in the fiscal plan, the board understands
22   and acknowledges and documents the need to
23   pay other claims.
24    Space in the rates, and I may
25   have used that language, if I recall, is

Page 156

1    N. Jaresko - Professional Eyes Only
2   the way I described what was on the page,
3   right.
4    Q.  Okay.  Do you have an
5   understanding of whether under the RSA, if
6   PREPA were to reach a settlement with other
7   creditors that would pay the -- and I'm
8   talking about other legacy creditors --
9   that would pay those legacy creditors by,
10   for example, increasing or adding another
11   surcharge, would the bondholders who are a
12   party to the RSA have to consent to that
13   settlement?
14    MR. NATBONY:  Objection.  Calls
15   for a legal conclusion.
16    MR. MASHBERG:  Objection to form.
17    A.  I don't recall.
18    Q.  You don't recall whether there is
19   some indebtedness that's permitted and
20   other that is not under the RSA?
21    MR. NATBONY:  Objection.
22    MR. MASHBERG:  Objection.
23    A.  I think I referred to that once
24   before.  I know that additional
25   indebtedness is allowed, not in the form of

Page 157

1    N. Jaresko - Professional Eyes Only
2   incremental additional transition charge,
3   but we'd have to go back to the documents
4   to review the text of the document.
5    Q.  Has the Oversight Board been in
6   -- was the Official Committee of Unsecured
7   Creditors part of any of the negotiations
8   of the RSA?
9    A.  No, I don't believe they were.
10    Q.  Why not?
11    A.  I don't recall a specific reason
12   other than the progress made with certain
13   creditors and the process that occurred.
14    Q.  Were the fuel line lenders
15   involved?
16    MR. MASHBERG:  Involved in what?
17    MR. NATBONY:  Objection.
18    MR. BASSETT:  Negotiations of the
19   RSA.
20    MR. MASHBERG:  Objection to form.
21    A.  I believe there was a time when
22   there were discussions ongoing with the
23   fuel line lenders.  I don't know whether
24   they were involved in the negotiation.  I
25   don't believe they were involved in the

Page 158

1    N. Jaresko - Professional Eyes Only
2  negotiations of the RSA, but there were
3  discussions with fuel line lenders at
4  different times, yes.
5    Q.   When negotiating and deciding to
6  -- strike that.
7        When deciding to enter into the
8  RSA, did you consider the effect, if any,
9  that it would have other creditors of PREPA
10 aside from the bondholders?
11   A.   Yes, you know, the board -- I'm
12 restating my testimony.
13       We assumed that there would be
14 additional discussion with additional
15 legacy claims, and we acknowledged that
16 throughout the process.  Reaching this
17 agreement did not in any way change the
18 ability, willingness of the board to reach
19 additional agreements.
20   Q.   So it's your view that this
21 agreement has no effect whatsoever on the
22 ability of PREPA to negotiate agreements
23 with other creditors?
24       MR. MASHBERG:  Objection as to
25 the form of the question.

Page 159

1    N. Jaresko - Professional Eyes Only
2       MR. NATBONY:  Objection as to
3  form and legal conclusion.
4    A.   Could you restate the question,
5  please?
6    Q.   Does this agreement, the RSA,
7  have any effect on PREPA's ability to
8  negotiate assessments with other creditors?
9       MR. NATBONY:  Objection as to
10 form and legal conclusion.
11      MR. MASHBERG:  Objection as to
12 form.
13   A.   Yes, it has some effect.  There
14 is an MFN clause that I'm aware of that has
15 some effect on any future discussions.
16   Q.   Other than that?
17   A.   What I told you previously with
18 regard to additional indebtedness not in
19 the form of the transition charge.
20   Q.   I'm sorry, additional
21 indebtedness is not in the form of the
22 transition charge, that's -- no
23 indebtedness other than the transition
24 charge permissible under the RSA?  Is that
25 what you told me?

Page 160

1    N. Jaresko - Professional Eyes Only
2       MR. MASHBERG:  Hold on a second.
3       MR. NATBONY:  Objection as to
4  form.
5       MR. MASHBERG:  Objection as to
6  form.
7    A.   No, that is not what I said.
8    Q.   What did you say?
9    A.   It is my recollection that the
10 RSA does permit additional indebtedness but
11 not in the form of the transition charge.
12 That's how I recall it.
13       Again, I'd be happy if you could
14 share the document with me and I could
15 refer to the text of the document.
16   Q.   Okay.  I think we'll do that in a
17 minute.  All right.
18       Earlier you alluded to, I
19 believe, one of the benefits of the RSA
20 being that it settled the receivership
21 litigation; is that correct?
22   A.   Yes.
23   Q.   And I think you said that absent
24 a settlement, there was a chance that rates
25 could increase in an unstrained fashion and

Page 161

1    N. Jaresko - Professional Eyes Only
2  in an unpredictable manner; is that right?
3       MR. MASHBERG:  Objection to form.
4       MR. NATBONY:  Objection.
5    A.   In general terms, yes.
6    Q.   So do you have an understanding
7  as to whether any rate increases have to be
8  approved by a regulator?
9    A.   It's my understanding --
10      MR. NATBONY:  Objection to form.
11   A.   It's my understanding that they
12 do.
13   Q.   Which regulator?
14   A.   PREB.  PREB, the Puerto Rico
15 Energy Bureau.
16   Q.   First, as part of your decision
17 to approve the RSA, did the Oversight Board
18 conduct any analysis concerning the
19 likelihood that PREB would, in fact,
20 approve rate increases absent a settlement
21 of the receivership litigation?
22      MR. MASHBERG:  Objection to form.
23   A.   Not that I recall.
24   Q.   So in other words, if you were to
25 assume that PREPA loses the receivership

41

Page 162

1    N. Jaresko - Professional Eyes Only
2  litigation and either the receivership or
3  bondholder seeks to have rates increased to
4  pay their legacy bond debt, there was no
5  analysis or assessment undertaken by the
6  Oversight Board as to the likelihood that
7  PREPA would actually do that?
8        MR. MASHBERG:  Objection to form.
9    A.  As I recall, the trust agreement
10 would have allowed them to increase the
11 rates at a rate covenant that allowed them
12 to increase the rates, plus a margin.
13       I do not recall analyzing whether
14 or not someone -- the regulator would try
15 to stop that.
16    Q.  Will you turn to page 47 of the
17 fiscal plan, please.
18       (Witness complies.)
19    Q.  Do you see in the right-hand
20 column, it says, "PREB standards for
21 enforcing rate mechanics."
22    A.  Yes.
23    Q.  And the first one says,
24 "Amendments to rates require PREB
25 approval"?

Page 163

1    N. Jaresko - Professional Eyes Only
2    A.  Yes.
3    Q.  And the second one below that
4  sayings "Rate-setting standard under Act
5  17-2019 rates for electric service must
6  be..." and then it says "...prudent and
7  reasonable consistent with accurate fiscal
8  and operating practices and provide for
9  reliable service at the lowest possible
10 cost."
11       Do you see that?
12    A.  Yes.
13    Q.  So is it your understanding that
14 PREB would have to determine that any rate
15 increase is consistent with those
16 requirements?
17       MR. MASHBERG:  Objection to form.
18       MR. NATBONY:  Objection.
19       MR. MASHBERG:  You're taking it
20 out of context.
21       MR. CAIN:  Calls for a legal
22 conclusion.
23    A.  I am not an expert on rate
24 setting or on the regulator.  I just really
25 cannot comment.  This is not an area of my

Page 164

1    N. Jaresko - Professional Eyes Only
2  detailed expertise.
3    Q.  Well, you're here as the
4  representative of the Oversight Board in
5  connection with the Oversight Board's
6  request for approval of the RSA as being in
7  the Oversight Board's best interest and
8  being reasonable for all the reasons set
9  forth in your declaration.
10       And what I'm trying to figure out
11 is, in determining that a benefit of the
12 settlement was avoiding these rate
13 increases that could occur if a settlement
14 is not entered into, did you conduct any
15 analysis?
16       Did you ask for any advice
17 regarding whether or not that rate increase
18 would actually even happen?
19       MR. MASHBERG:  Objection to form.
20 You're also asking for a legal
21 conclusion, which is not part of the
22 witness's responsibilities under
23 30(b)(6).
24    A.  We received a variety advice and
25 counsel and believed that there was a real

Page 165

1    N. Jaresko - Professional Eyes Only
2  risk that if there was a receiver, that
3  receiver would have the right to increase
4  rates in alignment with the legacy debt.
5    Q.  What do you mean by "the right to
6  increase rates"?
7    A.  The right to increase the rates
8  as necessary to repay the legacy debt per
9  the legacy debt requirements.
10    Q.  But before that, you agreed with
11 me that any rate increase has to be
12 approved by PREB, right?
13    A.  That's what it appears, yes.
14    Q.  Even if a receiver were appointed
15 and sought that rate increase?
16    A.  That is my assumption, yes.
17    Q.  So to be clear, in approving this
18 agreement, which you've said is based in
19 part on the benefit that comes from
20 avoiding rate increases absent an
21 agreement, you did not conduct any analysis
22 or assessment or ask for any advice
23 regarding the likelihood that PREB, upon
24 the request of a receiver, would actually
25 increase rates.

Page 166

1      N. Jaresko - Professional Eyes Only
2          MR. MASHBERG:  Objection to form.
3      A.  Just the opposite.  I said that
4  our judgment and our analysis after
5  receiving advice and counsel was that rates
6  would -- there was a high risk of rates
7  increasing, yes.  And that means that PREB
8  might have to approve it, might approve it.
9      Q.  Who did you rely on for the
10  advice you received that led you to
11  determine that there was a high risk of
12  rates increasing, including with PREB
13  approval?
14      A.  We relied on the advice of legal
15  counsel, Proskauer and O'Neill & Borges,
16  and well as our advisers, in this case,
17  Citi and McKinsey and...
18          THE WITNESS:  Can we take a break
19  now?
20          MR. BASSETT:  Does everyone want
21  to do lunch now?
22          THE WITNESS:  Yes.
23          THE VIDEOGRAPHER:  The time is
24  1:04.  Off the record.
25          (Recess is taken.)

Page 167

1      N. Jaresko - Professional Eyes Only
2  A F T E R N O O N   S E S S I O N
3      (Time noted:  1:56 p.m.)
4          *      *      *
5          THE VIDEOGRAPHER:  We're back on
6  the record.  The time is 1:56.
7  Beginning video No. 3.
8          MR. MASHBERG:  Before we begin,
9  Mr. Bassett, the witness, Ms. Jaresko,
10  would like to clarify something that
11  came up during her questions right
12  before lunch.
13          MR. BASSETT:  Okay.
14          MR. MASHBERG:  Ms. Jaresko, can
15  you make your clarification, please?
16          THE WITNESS:  Yes.  I apologize,
17  but I'd like to correct what I said.  I
18  confused two issues in the RSA and
19  misspoke.
20          *      *      *
21  N A T A L I E  A.  J A R E S K O,
22      resumed and testified as follows:
23  EXAMINATION BY (Cont'd.)
24  MR. BASSETT:
25      Q.  Okay.

Page 168

1      N. Jaresko - Professional Eyes Only
2      A.  I'm referring to the issue of
3  additional indebtedness for legacy claims.
4  So this was Exhibit 3, page -- well, let's
5  see.
6      Q.  I think I know.
7      A.  It's like the term sheet-looking
8  document --
9      Q.  IB4 or 5, IB-something?
10      A.  Page 14 --
11      Q.  No?  Okay.
12      A.  -- and page 9.
13          Page 14 refers to other charges,
14  which is what you were asking me about,
15  which is what I -- which are additional
16  legacy claims against PREPA and whether or
17  not they could be added.  I said they could
18  not be added in the transition charge.  I
19  was wrong.  It can be.
20          I confused it, unfortunately,
21  with on page 9, additional permitted
22  indebtedness, which is not legacy claims
23  but any future -- potential future
24  indebtedness, and that cannot be in the
25  form of a transition charge like this.

Page 169

1      N. Jaresko - Professional Eyes Only
2          So I apologize.  I confused those
3  two.  But legacy is referred to on page 14
4  as other charges and the additional
5  permitted indebtedness on page 9 for
6  non-legacy, new incrementally additional
7  indebtedness --
8      Q.  Thank you.
9      A.  -- which cannot be in the form of
10  a transition charge.
11      Q.  Thank you for that clarification.
12          Ms. Jaresko, how did that come to
13  your attention during the break?
14      A.  I was thinking about what I said
15  in the two different categories, and when I
16  came in here, I went to the document and
17  pulled it out.
18      Q.  So to make sure I understand, is
19  -- because I don't think this was covered
20  by what you were just talking about, but
21  would PREPA be able to take on new
22  indebtedness for the purpose of repaying
23  preexisting indebtedness?
24          MR. NATBONY:  Objection as to
25  form.

Page 170

1     N. Jaresko - Professional Eyes Only
2          A.  I don't know the answer to that.
3     It doesn't -- it doesn't clearly state that
4     in the documents.
5          Q.  So, for example, restructuring
6     existing indebtedness through the issuance
7     of new indebtedness?
8          MR. MASHBERG:  Objection to form.
9          A.  I look at that as a legal
10    question.  I don't know the answer to that.
11    I'll go back and refer to the document.
12          (Document review.)
13          A.  Again, I'm just reading from the
14    document, but on additional permitted
15    indebtedness, A6, there is a reference to
16    indebtedness incurred to refinance in whole
17    or in part, but then it refers back to A1
18    through A5.
19          Q.  Right.
20          And I've read this as well, and
21    my understanding is that I don't think that
22    would cover legacy indebtedness, but you
23    can let me know if that's incorrect.
24          MR. MASHBERG:  I'm not clear what
25    the question is.

Page 171

1     N. Jaresko - Professional Eyes Only
2          MR. NATBONY:  If there is a
3     question, I object on a legal
4     conclusion.
5          A.  So it's my understanding that the
6     "other charges" section refers to any
7     payment of legacy obligations.  That's the
8     way I understand.
9          Q.  And that's through a charge,
10    through, like, for example, another charge
11    similar to a transition charge?
12          A.  Other transition charges --
13          MR. NATBONY:  Same objection.
14          MR. MASHBERG:  Objection to form.
15          A.  A document refers to other
16    transition charges, statutory charge, or
17    other tax or revenue stream to provide for
18    the payment.
19          MR. BASSETT:  Just a reminder,
20    one objection is good for all.
21          MR. NATBONY:  Sometimes we have
22    different objections.
23    BY MR. BASSETT:
24          Q.  Is it possible to impose a charge
25    to pay back legacy obligations without

Page 172

1     N. Jaresko - Professional Eyes Only
2     incurring additional indebtedness?
3          MR. MASHBERG:  Objection to form.
4          MR. NATBONY:  Objection.
5          A.  I'm not a lawyer.  It sounds like
6     we're looking for legal definitions.  I'm
7     not aware.  I don't know the answer to
8     that.
9          Q.  So let me -- okay.  Let's look
10    at -- if I can direct your attention to the
11    next section of the RSA.  So it's going to
12    be -- now you directed my attention to page
13    14, right?  I don't know if you have that.
14    I'm sorry.  I should have asked before you
15    left the page.
16          A.  Yes, sir.  Yes.
17          Q.  If you go to the next page, you
18    have IA, this is a Demand Protection Term
19    Sheet.
20          And then after that, you have the
21    Schedule IB, which is the securitization
22    protections.
23          Do you see that?
24          A.  Yes.
25          Q.  Can you go to page IB 4, please?

Page 173

1     N. Jaresko - Professional Eyes Only
2     And I'm not going to read the whole thing
3     into the record, but I want to direct your
4     attention to Section 5, "Certain Covenants"
5     at the bottom of IB 4.
6          And I guess what I'm trying to
7     figure out is, is it possible to read this
8     covenant section, which describes certain
9     things that the government of Puerto Rico
10    will not do, consistent with the other
11    charges provision you showed me on page 14?
12          MR. MASHBERG:  Objection to form.
13    Legal conclusion.
14          MR. NATBONY:  Objection.
15    BY MR. BASSETT:
16          Q.  As an example, I'd direct your
17    attention to 5A 4.
18          Read together, that would say
19    "The government of Puerto Rico..." and I'm
20    skipping some language here, "...will agree
21    in covenant with the issue of each secured
22    party that it will not..." and I'm skipping
23    the rest, but then it says, "...for imposed
24    charges, taxes or other fees on electricity
25    other than those directly associated with

Page 174

1    N. Jaresko - Professional Eyes Only
2  the operation of the system or authorized
3  debt secured by restructuring property..."
4  and it goes on.
5    What I'm trying to understand is,
6  as I read this, it seems to prohibit the
7  imposition of additional charges under this
8  covenant.  So I don't know how that can be
9  read consistent with what you just showed
10 me on page 14.
11   MR. NATBONY:  Objection.
12   MR. MASHBERG:  Objection to form.
13   MR. NATBONY:  Legal conclusion.
14 BY MR. BASSETT:
15   Q.  Can you explain that, please?
16   A.  I'm not a lawyer, but to the
17 extent that I understand it, it says,
18 "except as otherwise permitted by the
19 securitization trust agreement," and it'd
20 be my understanding as a non-lawyer, that
21 the other charges, the same language that I
22 pointed to earlier on page 14, would be
23 reflected in that securitization trust
24 agreement as well; and, therefore, as with
25 the exception, except charges like the ones

Page 175

1    N. Jaresko - Professional Eyes Only
2  in page -- on page 14, which would
3  theoretically be in the securitization
4  trust agreement.  However, again, I repeat,
5  I am not a lawyer.
6    Q.  If you go back to page 14, it
7  says, in that provision, it says, "subject
8  to any restrictions in the securitization
9  trust agreement."
10   Do you see that?
11   A.  Yes.
12   Q.  So a securitization trust
13 agreement, has that been drafted?
14   A.  No, it has not.
15   Q.  Okay.  So there's no way knowing
16 at this time what those restrictions might
17 be?
18   A.  That is my understanding, yes.
19   Q.  Before we broke, Ms. Jaresko, I
20 had asked you some questions about what
21 analysis you undertook and what advice you
22 received regarding the likelihood that
23 rates would increase absent a settlement.
24 And we talked about specifically the
25 likelihood of PREB increasing rates.  And I

Page 176

1    N. Jaresko - Professional Eyes Only
2  believe you told me that you did, in fact,
3  receive advice from your advisers on that
4  topic?
5    MR. NATBONY:  Objection as to
6  form.
7  BY MR. BASSETT:
8    Q.  Is that correct?
9    A.  Yes, we received advice from
10 legal and counsel and advisers.
11   Q.  So specifically, which adviser
12 provided advice to you as to the likelihood
13 that PREB would increase rates?
14   A.  I don't recall it specifically.
15 I recall discussions about the potential
16 risk of losing that receiver litigation and
17 that receiver having the right to raise
18 rates, which would then be approved, if
19 necessary, by PREB.
20   Q.  Did any of the advisers, though,
21 provide advice specifically relating to
22 whether PREB would, in fact, approve a rate
23 increase requested by a receiver?
24   MR. MASHBERG:  Hold on a second.
25   I'm going to instruct you not to

Page 177

1    N. Jaresko - Professional Eyes Only
2  answer that question to the extent it
3  may require you to divulge any
4  communications with your counsel, the
5  FOMB's counsel, with respect to legal
6  advice.
7    MR. BASSETT:  I believe it was a
8  "yes" or "no" question.
9    Can you read back the question,
10 please?
11   (Question was read back as
12 follows:
13   "QUESTION:  Did any of the
14 advisers, though, provide advice
15 specifically relating to whether PREB
16 would, in fact, approve a rate increase
17 requested by a receiver?")
18   A.  I don't recall any conversations
19 specifically pointing or discussing that
20 issue.
21   As I said, we talked in general
22 terms with advisers about the potential
23 risk of rates being increased by a receiver
24 and that, you know, it was assumed that
25 PREB would potentially approve those rates

Page 178

1  N. Jaresko - Professional Eyes Only
2  in accordance with the rights of that
3  receiver to do it in particular situations.
4      Q.  Okay.  So, but, again, you just
5  said that --
6      A.  The specifics, we did not
7  discuss -- I did not -- I do not recall
8  discussing specifically the rights or the
9  role of PREB --
10      Q.  Okay.
11      A.  -- in that specific instance.
12      Q.  Okay.  And in your prior answer,
13  you had -- or part of that answer, you had
14  just said it was assumed that PREB would
15  potentially approve the requested rate
16  increases.
17      What's that assumption based on?
18      A.  My assumption is based similarly
19  on the same document you pointed to earlier
20  that talked about reasonableness.  And the
21  understanding of reasonableness in some --
22  from some perspectives would include
23  reasonable if it is required by law and if
24  they have a right in the rate covenant in
25  trust documents that that is reasonable to

Page 179

1  N. Jaresko - Professional Eyes Only
2  request and to add to the rates.
3      Q.  Okay.  But you didn't receive
4  advice on that specific topic, as you just
5  said before?
6      A.  No, I did not.
7      Q.  Okay.  So can I direct your
8  attention back to Exhibit 11, please.
9      So I just wanted to direct your
10  attention on page 23 again to the second
11  bullet down that says, "The restructuring
12  support agreement is conditioned on the
13  legislature approving legislation that
14  enables the imposition and collection of
15  the mechanics of the transition charge."
16      Do you see that?
17      A.  Yes.
18      Q.  So you and I had a discussion
19  before about what legislative approvals
20  were necessary for the RSA.  And I believe
21  what you had told me at the time was that
22  only -- the only legislative approval that
23  you were aware of was approval for the
24  demand protections?
25      Do you recall that testimony?

Page 180

1  N. Jaresko - Professional Eyes Only
2      A.  Yes, in general terms, yes.
3      Q.  I guess, does this refresh your
4  recollection as to legislation being
5  necessary for the imposition and collection
6  of the transition charge?
7      MR. NATBONY:  Objection.  Calls
8  for a legal conclusion.
9      MR. MASHBERG:  Objection to form.
10      A.  Do I -- I see what it says, and I
11  don't dispute what it says here.
12      I think the way I understood your
13  previous question, we would have to go
14  back, but the way I understood it was
15  whether or not -- what I understood the
16  previous question to be was whether or not
17  the legislature was required to approve
18  transition charges, which I understand to
19  be specific numbers and specific charges.
20  And I was trying to say, no, I don't
21  believe legislation was required for the
22  imposition of specific transition charges.
23      Q.  I understand.
24      A.  This talks about the
25  securitization as a whole.  And, yes, they

Page 181

1  N. Jaresko - Professional Eyes Only
2  have a role to play and they have a
3  necessity to approve some legislation with
4  regard to the mechanics.
5      And what I was speaking about in
6  terms of mechanics was the demand
7  protection is part of it.
8      Q.  I see.
9      So is any approval, legislative
10  or regulatory, required for the actual
11  transition charge?
12      MR. NATBONY:  Objection.  Calls
13  for a legal conclusion.
14      MR. MASHBERG:  Objection to form.
15      A.  I don't know the answer to that
16  at this time.
17      Q.  Well, we talked about how PREB
18  has -- we talked at length about how PREB
19  approves rate increases, right?
20      A.  I think this is a legal question
21  for my lawyers, and there are -- and I'm
22  not --
23      Q.  I understand and I'm not -- look,
24  I really am not meaning to give you a legal
25  examination here.

Page 182

1    N. Jaresko - Professional Eyes Only
2         I'm just trying to understand as
3    the representative of the Oversight Board
4    who is talking about the Oversight Board's
5    decision to approve the RSA, I'm just
6    trying to understand what you knew and what
7    you took into consideration at the time you
8    decided to approve it.
9         And one of the questions I have
10   is, you know, what did you know about what
11   would have to happen for it to be
12   implemented.
13        And my question to you is -- you
14   told me before that you understood that
15   legislation would have to be passed for the
16   demand protections.  You're saying that
17   legislation does not need to be passed for
18   the transition charge itself.
19        What I'm asking you is, what
20   approvals, if any, are you aware of in
21   connection with your approval of this
22   agreement that are necessary for the
23   transition charge to be imposed?
24        MR. MASHBERG:  Objection to form.
25        MR. NATBONY:  And legal

Page 183

1    N. Jaresko - Professional Eyes Only
2    conclusion.
3         A.  I believe we're still working
4    through the specific answers to those
5    questions and that we understand there is
6    legislative approval necessary for some
7    portions of this and it's as written here,
8    and that there may be PREB approval
9    necessary as well, as written in the
10   document that you referred to earlier, for
11   increase in rates.
12        Q.  Ms. Jaresko, are you aware of
13   whether any legislation -- strike that.
14        Are you aware that the
15   securitization structure contemplates that
16   the bondholders will have a statutory lien
17   on the transition charge?
18        MR. MASHBERG:  Objection to form.
19        MR. NATBONY:  Calls for a legal
20   conclusion.
21        A.  That's not an area that I'm very
22   knowledgeable about.
23        Q.  So that's not something you knew
24   about one way or the other at the time the
25   Oversight Board approved the RSA?

Page 184

1    N. Jaresko - Professional Eyes Only
2         MR. MASHBERG:  Objection to form.
3         A.  I don't recall that specific
4    issue in any detail.
5         Q.  So you don't recall whether
6    legislation would have been necessary, for
7    example, to create a statutory lien?
8         MR. NATBONY:  Same objection.
9         MR. MASHBERG:  Objection to form.
10        A.  I just don't recall that
11   conversation.
12        (Jaresko Exhibit 13, Email dated
13        5/16/19 from Zayas to Unknown party,
14        Bates-stamped FOMB_9019_MOBILE_00000088
15        through 95, marked for identification,
16        as of this date.)
17   BY MR. BASSETT:
18        Q.  Ms. Jaresko, I've handed you a
19   document marked Exhibit 13 that I believe
20   consists of a series of text messages.  And
21   the Bates label on this is
22   FOMB_9019_MOBILE, a series of zeroes, and
23   then 88.  The first text message is dated
24   May 16th, 2019.
25        First of all, if you look at the

Page 185

1    N. Jaresko - Professional Eyes Only
2    "from" on this text message it's from
3    somebody by the name of Edward Zayas, and
4    then it's to what says an unknown party,
5    and there is some garbled letters and
6    numbers.
7         Is this a text message -- are
8    these your text messages?
9         A.  I believe they are, yes.
10        Q.  Do you know who Edward Zayas is?
11        A.  Yes, I do.
12        Q.  Who is that?
13        A.  Edward is our communications
14   director, press spokesperson.
15        Q.  What date was the RSA approved,
16   to your memory?
17        Does May 3rd, 2019, sound right?
18        A.  Yes, it does sound right.
19        Q.  Okay.  So this was May 16th,
20   2019, approximately two weeks after.
21        And Mr. Zayas emails you and
22   says, "About PREPA," and then says, "is it"
23   -- or texts you, rather and says, "is it
24   okay if Kike," I believe is how that looks
25   to be pronounced, "limits his questions

Page 198

N. Jaresko - Professional Eyes Only

1   A.   Yes.
2   Q.   What are those interdependent
3   initiatives that you talk about there of
4   which this is part of a broader range?
5       MR. NATBONY:  Objection.  Asked
6   and answered.
7   A.   It relates to the transformation.
8   That range of initiatives includes
9   everything from ensuring that there is a
10  more independent depoliticized regulator,
11  which we had accomplished through the
12  legislation; to the attraction of the
13  private operator to the transmission in the
14  grid; to the most efficient and beneficial
15  use of federal funds to rebuild the
16  destruction caused by hurricanes Irma and
17  Maria; to the separation of the generation
18  assets and eventual private operation and
19  privatization of them; and in so doing,
20  reducing fuel costs, which also meant
21  including initiatives that were underway
22  currently at PREPA, for example, moving to
23  L&G at San Juan 5 and 6, amongst
24  potentially other things.  It is a wide

Page 199

N. Jaresko - Professional Eyes Only

1   range of things that need to get done and
2   that this refers to.
3   Q.   These are all things that need to
4   get done for the transformation to be
5   completed?  I'm just trying to understand
6   if that's what you were saying.
7   A.   These are all parts of general
8   understanding of transformation, yes.
9   Q.   On page 10 of your declaration,
10  you talk about the reduction of
11  indebtedness.
12      And you talk about how the
13  Tranche A bonds will be in a principal
14  amount equal to 67-and-a-half percent of
15  the applicable bond claim, and then Tranche
16  B bonds is in an amount up to, I believe,
17  10 percent of the applicable bond claims,
18  for a total possible percentage of
19  77-and-a-half percent.
20      Is that how you understand
21  bondholders' recoveries to work under the
22  RSA?
23      MR. MASHBERG:  Objection to form.
24  A.   If you're reading what's stated,

Page 200

N. Jaresko - Professional Eyes Only

1   what's stated is correct.  Up to 10
2   percent.  We never expected, with the
3   projections that we were using for the
4   Tranche B bonds, to pay in full at 10
5   percent but something closer to 5 percent.
6   So the expectation was somewhere, a total
7   of 73 percent, 73-and-a-half.
8   Q.   So you're aware that the RSA
9   contains other components of consideration
10  beyond the Tranche A and Tranche B bonds
11  that go to bondholders, right?
12      MR. MASHBERG:  Objection to form.
13  A.   Yes.
14  Q.   That would include, for example,
15  the settlement payments; is that right?
16  A.   Yes.
17  Q.   And administrative claims; is
18  that right?
19  A.   Yes.
20  Q.   And waiver and support fees; is
21  that correct?
22  A.   Yes.
23  Q.   And payment of legal fees; is
24  that correct?

Page 201

N. Jaresko - Professional Eyes Only

1   A.   Yes.
2   Q.   Did the Oversight Board perform
3   any calculation as to what the total
4   recovery of bondholders would be when all
5   components of consideration are included?
6       MR. NATBONY:  Objection as to
7   form.
8       MR. MASHBERG:  Objection.
9   A.   That's not the way we look at it
10  or calculate it.
11  Q.   Why not?
12  A.   These two sets of bonds are the
13  restructuring of the legacy claim through
14  the petition date.  Some of the other costs
15  that you describe are costs that occurred,
16  frankly speaking, after, in essence, this
17  occurs, like the equivalent of
18  post-petition interest.  So the
19  administrative claim, as an example, it is
20  something that's calculated from May 1st
21  through another date, and that is
22  post-petition calculated already, assuming
23  that this transaction, this restructuring,
24  this new securitization occurs.  So you

Page 202

1  N. Jaresko - Professional Eyes Only
2  wouldn't add it in the way that you would
3  calculate a single number.
4  Q.  Well, how about just in terms of
5  the total dollars out, did you do that
6  calculation?
7  A.  We certainly did it in terms
8  of -- and reviewed it multiple times in
9  terms of what it meant in terms of
10  transition rates -- transition charges,
11  excuse me, transition charges.
12  Q.  I don't understand that.  I'm
13  sorry.
14  The transition charge only goes
15  to pay the Tranche A and Tranche B bonds,
16  right?
17  A.  Transition -- can you repeat the
18  question, please?
19  Q.  Well, let me ask a different
20  question.
21  I'm just trying to understand,
22  did the Oversight Board sit down and
23  perform a calculation to say here is the,
24  for example, the present value of all
25  consideration that's going to the

Page 203

1  N. Jaresko - Professional Eyes Only
2  bondholders under the settlement?
3  A.  I don't recall present value of
4  all of those together, no.
5  Q.  You mentioned post-petition
6  interest.
7  Do you have an understanding of,
8  as a representative of the Oversight Board,
9  whether the bondholders are entitled to
10  post-petition interest?
11  A.  From a legal perspective, I don't
12  know the answer to your question.  But to
13  clarify my previous statement, I said like
14  post-petition interest.
15  The idea behind that
16  administrative charge is that we have
17  reached agreement and yet we're asking the
18  same creditors that are parties to this
19  agreement to wait, to wait not a month, not
20  two months, but something probably likely
21  to be a year or potentially longer, and
22  that is the idea behind that administrative
23  charge.
24  Q.  So you think they're entitled to
25  post-petition interest because they have to

Page 204

1  N. Jaresko - Professional Eyes Only
2  wait?
3  A.  It's part of a larger agreement.
4  It's part of reaching agreement with
5  people, asking them to forbear their rights
6  and not litigate, asking them to give up
7  their receiver litigation that was pending.
8  It's part of a larger agreement, and it's a
9  small piece of a large agreement.  And the
10  larger agreement is, when taken all
11  together, including those smaller pieces,
12  part of that reasonable deal, part of that
13  reasonable agreement.
14  Q.  Before agreeing to award the
15  bondholders what amounts to post-petition
16  interest, did you conduct any analysis as
17  to whether or not, in the absence of the
18  settlement, they would be entitled to
19  post-petition interest?
20  MR. MASHBERG:  Objection to form.
21  MR. NATBONY:  Objection to form.
22  A.  I think that's a question for my
23  legal counsel.
24  Q.  Did you ask for advice from your
25  legal counsel on that question before

Page 205

1  N. Jaresko - Professional Eyes Only
2  approving the RSA?
3  MR. NATBONY:  Objection.
4  A.  I don't remember asking that
5  direct question, no.  I do not recall that.
6  Q.  Do you recall receiving advice on
7  that question?
8  MR. NATBONY:  Objection.
9  A.  Again, I received and asked for
10  advice about the nature of the entire scope
11  of the transaction.
12  Q.  Back to the specific question of
13  the advice on post-petition interest, are
14  you aware of whether anyone at the
15  Oversight Board received advice on that
16  question?
17  A.  I'm not aware of it.
18  Q.  Are you aware of the fact that
19  the new bonds do not have a maturity date?
20  A.  Yes, I am aware.
21  Q.  So before, I think you mentioned
22  one of the benefits of the RSA is that
23  through the transition charge, the rates
24  that would be used to pay bondholders are
25  capped; is that right?

Page 206

N. Jaresko - Professional Eyes Only
1
2     A.   The rates are not capped.  The
3  transition charge is capped.
4     Q.   The transition charge is capped.
5         And as a result, if demand were
6  to decrease to the point where the
7  transition charge doesn't, you know, pay
8  the bondholders what they would be doing in
9  an individual year on debt service, there
10  is no true-up?
11         I think I've seen that in your
12  declaration --
13     A.   Yes.
14     Q.   -- is that correct?
15         MR. MASHBERG:  Objection to form.
16     A.   Yes, and that -- yes, there's no
17  true-up mechanism.  And we viewed that as a
18  major advantage in, again, assuring
19  predictability and stability of the rates
20  for the ultimate consumers.
21     Q.   But isn't there ultimately a
22  true-up because there's no maturity date?
23  The bondholders -- is it correct that the
24  bondholders will ultimately receive
25  everything they are owed on the new bonds,

Page 207

1     N. Jaresko - Professional Eyes Only
2  plus accrued interest, including interest
3  on interest; it's just a question of how
4  long that takes?
5         MR. MASHBERG:  Objection to form.
6     A.   So the way I understand it, they
7  are indeed going to receive their
8  67-and-a-half percent recovery regardless
9  of how long it takes.
10     Q.   And I think I'm going to pull a
11  line from Mr. Brownstein's deposition, but
12  it could take 300 years in theory; is that
13  correct?
14         MR. MASHBERG:  Is that a
15  question?
16  BY MR. BASSETT:
17     Q.   It could take as long as it
18  takes, correct?
19     A.   Correct.
20     Q.   And if debt service isn't paid in
21  one year, then interest accrues whatever
22  debt service, including interest, that
23  hasn't been paid, right?
24     A.   I don't recall the calculation,
25  but I understand that interest is paid

Page 208

1     N. Jaresko - Professional Eyes Only
2  before principal.
3     Q.   You didn't have an understanding
4  when you entered into the agreement whether
5  or not these bonds would charge interest on
6  unpaid interest?
7         MR. MASHBERG:  Misstates the
8  testimony.  Objection to form.
9  BY MR. BASSETT:
10     Q.   Do you have an understanding as
11  to whether or not these bonds would accrue
12  interest on unpaid interest?
13     A.   It's my understanding they would,
14  yes.
15     Q.   Are you aware of the coupon rate
16  on the securitization bonds?
17     A.   Yes.
18     Q.   Are you aware that coupon rate
19  was arrived at in connection with the
20  preliminary RSA in July of 2018?
21     A.   Yes, I am.
22     Q.   In connection with your
23  consideration of the RSA, did you, I mean
24  the Oversight Board, receive any advice or
25  conduct any analysis regarding yields in

Page 209

1     N. Jaresko - Professional Eyes Only
2  the municipal bond market?
3     A.   Yes, we did at that time.
4     Q.   At the time of the preliminary
5  RSA?
6     A.   Yes, we did.
7     Q.   Did you ever update that analysis
8  after entering into the preliminary RSA?
9     A.   Not that I recall.
10     Q.   Why not?
11     A.   It is a very small component of
12  the overall costs that we are talking here,
13  and it is something that moves with the
14  market in small fashion at different times
15  and we -- not that I recall.  I didn't have
16  the discussion of it moving at one or
17  another time.
18     Q.   Do you have any understanding of
19  whether yields have increased or decreased
20  in a municipal bond market since July of
21  2018?
22     A.   I have a general understanding,
23  yes.
24     Q.   In which direction?
25     A.   That they have decreased.  But I

Page 218

1     N. Jaresko - Professional Eyes Only
2  get.  Our position was that their claim is
3  weak.  However, I cannot predict a court's
4  decision and there is a probability of
5  risk.  And I was advised by counsel and by
6  my advisers that this was a real risk and
7  that we benefitted from eliminating this
8  risk.
9     Q.  So I'm not asking you to predict
10  the outcome right now.  I'm asking you just
11  if, if you have an understanding of what
12  the outcome would be if the government lost
13  in litigation against the bondholders.
14     MR. MASHBERG:  She answered that
15  question already.  Objection to form.
16     A.  It was my understanding that we
17  would -- if we lost, it would -- that they
18  were oversecured and entitled to 100
19  percent payment of interest, principal,
20  plus fees.
21     Q.  Okay.  What does "oversecured"
22  mean to you?
23     A.  That they would get paid 100
24  percent prior to other claims being paid.
25  That they were more secured; that they were

Page 219

1     N. Jaresko - Professional Eyes Only
2  oversecured in their position and in their
3  claims.
4     Q.  Does it mean they would be
5  secured by collateral that exceeds the
6  value of their claims?
7     A.  Collateral in the form of
8  potentially revenues, yes.
9     Q.  Did you calculate what the full
10  amount of the payments bondholders would be
11  entitled to receive would be with the 100
12  percent of interest, principal, plus fees?
13     A.  To some extent, I believe the
14  answer to that question is page 122 of 142
15  of the fiscal plan, page 104.  It talks
16  about what the rates would be without debt
17  restructuring.
18     This may not be in full,
19  incomplete, because it may not -- I'm not
20  certain the basis for which the
21  calculation, whether it included all fees,
22  for example.  But this is the
23  unrestructured -- the cost of
24  unrestructured debt.
25     Q.  Which page?

Page 220

1     N. Jaresko - Professional Eyes Only
2     A.  Well, document page 122 of 142.
3     Q.  Oh, I'm sorry.  It's hard to read
4  sometimes.
5     A.  But at the bottom of the page,
6  it's page 104.
7     Q.  I see.
8     A.  So at the top, it's page 122 of
9  142.
10     Q.  I guess I'm just talking about in
11  terms of the total value of -- I mean, is
12  there a total combined number of, you know,
13  X billion dollars, or whatever it would be,
14  for 100 percent interest, principal, plus
15  fees that you calculated when you decided
16  whether or not to approve the RSA?
17     MR. MASHBERG:  Objection to form.
18     A.  I don't recall a gross number.  I
19  recall the comparison again of the p/v of
20  this agreement and what we accomplished
21  with this RSA as compared to what that
22  would be, and this RSA was some 40 percent
23  of the present value of the unrestructured
24  legacy debt.  But in terms of a gross
25  number, I don't recall.

Page 221

1     N. Jaresko - Professional Eyes Only
2     Q.  In the next sentence, you say
3  "However weak this claim may be in view of
4  the Oversight Board, supporting bondholders
5  have advanced it aggressively and even if
6  rejected by the court, it is expected the
7  decision would be appealed resulting in
8  further risk, litigation costs, and delay,
9  all of which is vitiated by the
10  settlement."
11     Do you see that?
12     A.  Yes.
13     Q.  So according to this, you viewed,
14  at the time you decided to enter into the
15  RSA, the bondholders' position in
16  litigation as weak; is that right?
17     A.  Yes, at the -- on the basis of
18  the judgment of the counsel that I
19  received.
20     Q.  How weak?
21     MR. MASHBERG:  Objection to form.
22     A.  I don't even know -- I don't know
23  how to answer that.
24     Q.  Did you conduct any probabilistic
25  assessment of the likelihood of outcome in

Page 222

1    N. Jaresko - Professional Eyes Only
2  litigation?
3         MR. MASHBERG:  Objection to form.
4    A.  Probabilistic assessment?
5    Q.  Yes.
6    A.  No.  No.
7    Q.  So when you say that you
8  believe -- if you believe their position is
9  weak, is it fair to say that -- by the way,
10 elsewhere, I believe you characterized the
11 government's arguments as strong.
12        If you believe the government's
13 arguments are strong and that the
14 bondholders a week, is it fair to say that
15 you believe the government has a greater
16 than 50 percent likelihood of prevailing in
17 litigation?
18        MR. NATBONY:  Objection.
19        MR. MASHBERG:  Objection to form.
20   A.  I never thought about it in
21 probability terms so...
22   Q.  I'm just trying to get a sense
23 what you mean by "weak."
24        I mean, does that mean you
25 thought that -- you actually thought that

Page 223

1    N. Jaresko - Professional Eyes Only
2  there was a greater chance that the
3  bondholders would win?
4    A.  No.
5    Q.  So you thought there was a
6  greater chance that if you had to
7  litigate --
8    A.  The government would --
9        (Crosstalk.)
10   A.  I apologize.
11   Q.  I apologize.
12        I just want to see the
13 transcript.
14        So the last question in the
15 transcript was:  Does that mean you thought
16 there was a chance the bondholders would
17 win --
18        MR. MASHBERG:  Objection.  Asked
19 and answered.
20        MR. BASSETT:  I'm just trying to
21 figure out where we are in the
22 transcript.  I'm sorry.
23        MR. NATBONY:  I don't think
24 that's the question.  The question was
25 does that mean you thought there was a

Page 224

1    N. Jaresko - Professional Eyes Only
2  better chance, not that they were --
3  that a chance.  That's not what your
4  question was.
5        MR. BASSETT:  You're right.  The
6  transcript was wrong.
7        MR. NATBONY:  The transcript is
8  inaccurate.
9        (Discussion off the record.)
10       MR. BASSETT:  I'll just reask the
11 question.
12 BY MR. BASSETT:
13   Q.  So did you think that the
14 government had a better chance of winning
15 in litigation than the bondholders?
16       MR. MASHBERG:  Objection to form.
17   A.  As I stated earlier, I can't put
18 a probability on winning or losing.  We
19 believed our case was strong.  We believed
20 we had strong arguments.  I was advised by
21 counsel that we had a strong case.
22 However, it is not predictable with
23 certainty.  That's why it's defined as
24 risk.
25   Q.  I understand that.  But if the

Page 225

1    N. Jaresko - Professional Eyes Only
2  bondholders' claims are weak, as you
3  characterized them in your declaration, how
4  is it that they could have a greater chance
5  than the government in prevailing in
6  litigation?
7        MR. MASHBERG:  Object to form.
8  You're just arguing with the witness
9  now.
10   A.  I did not say they had a greater
11 chance.  I said there was a risk.
12   Q.  So but --
13   A.  I am not putting a probability
14 and a number on it.  I said we believed our
15 case was strong but there was an
16 outstanding risk.  I don't know what that
17 probability was.  Was it 50?  Was it 60?
18 Was it 30?  Was it 10?  Was it 15?  I don't
19 have a number to put it on it.
20        In the judgment of my counsel and
21 in the judgment of the board and myself,
22 there was an outstanding risk, an
23 unpredictable risk, and this resolved that
24 risk.
25   Q.  So it would be fair to say that

57

Page 226

1       N. Jaresko - Professional Eyes Only
2  you were concerned about just the fact that
3  there was a risk and not the level of that
4  risk?
5          MR. MASHBERG: Objection to form.
6          MR. NATBONY: Objection to form.
7     A. No, I think that would be
8  oversimplification. We believed there was
9  a real risk; albeit, we believed we had a
10  strong case. And it wasn't just that the
11  risk existed, which is what your question
12  implied, no.
13     Q. I'm just trying to understand how
14  is it you can have a strong case but yet
15  not be able to say that you think that you
16  had a greater likelihood than the
17  bondholders of prevailing.
18         MR. MASHBERG: She's answered
19    that question several times now. Let's
20    move on.
21  BY MR. BASSETT:
22     Q. Can you try to answer one more
23  time?
24     A. You said -- read the question to
25  me one more time.

Page 227

1     N. Jaresko - Professional Eyes Only
2       (Question was read back as
3  follows:
4      "QUESTION: I'm just trying to
5  understand how is it you can have a
6  strong case but yet not be able to say
7  that you think that you had a greater
8  likelihood than the bondholders of
9  prevailing.")
10     A. I don't think I said that we
11  didn't have a greater likelihood. That's
12  the definition of "strong" is.
13      You asked me to put a numerical
14  probability to it and I am unable to give
15  you 50, 51 or 54 or 60. But, yes, to me,
16  that's the definition of a strong case.
17      We believed there was a greater
18  likelihood that would make it strong.
19  However, we had no knowledge of the final
20  outcome. And there was a real risk, I
21  can't put a number on it what the
22  probability was, that we might lose. And
23  that even if we won, it would be appealed
24  and that appeal process would take another
25  year and another set of costs and another

Page 228

1       N. Jaresko - Professional Eyes Only
2  period of time that would take away from
3  the focus of what we were trying to do with
4  this agreement and what I described to you
5  earlier needs to get done for the people of
6  Puerto Rico and for the economy here to
7  have any chance of recovering.
8      We can't spend another three
9  years, another five years just litigating
10  and going through the process of
11  determining who is more or less right when,
12  you know, we need reliable, low cost
13  electricity for life, for schools, for
14  business.
15      And this agreement is about not
16  just the element of eliminating this risk
17  and whether it's 40 or 50, but of doing
18  something much bigger, much greater that is
19  critical for Puerto Rico. And this is just
20  a small element of it and it kind of -- it
21  takes it out of context to put the numbers
22  on a specific legal risk when the risk, the
23  real risk is that you don't have functional
24  electricity at a reasonable rate that's
25  reliable and you can't, you can't -- the

Page 229

1     N. Jaresko - Professional Eyes Only
2  society and the economy can't return to a
3  higher level of functionality and
4  development.
5     Q. Thank you.
6      So do you have an understanding
7  of what it would mean to prevail in
8  litigation?
9      In other words, if the government
10  wins in litigation against the bondholders,
11  what do the bondholders have at that point?
12        MR. MASHBERG: Objection. Calls
13  for a legal analysis.
14     A. And I don't even know what
15  litigation you're referring to
16  specifically. The receiver litigation,
17  lien, I don't know what we're talking
18  about.
19     Q. Let's start with the lien
20  litigation, please.
21        MR. MASHBERG: Objection.
22  Calling for a legal conclusion.
23     A. I would have to ask lawyers for
24  counsel on answering these questions. I'm
25  not a lawyer. It's not my area of

Page 230

1     N. Jaresko - Professional Eyes Only
2     expertise.
3         Q.   But I guess you don't think, in
4     deciding whether or not the settlement was
5     reasonable, you needed to understand what
6     it would mean to win and what it would mean
7     to lose?
8         MR. MASHBERG:  Objection.
9     Objection.  You're mischaracterizing
10    her testimony and trying to put words
11    in her mouth.
12        A.   Winning and losing involve very
13    specific things; much higher costs to PREPA
14    and to PREPA's consumers, much less
15    predictability for those consumers; and
16    definitely interference in trying to
17    achieve the transformation that require
18    certainty and predictability and moving
19    forward and out of bankruptcy.
20        So I understood those risks and
21    the cost of being mired in that litigation,
22    whichever of the pieces it was, whichever
23    of them had different effects, the receiver
24    had one effect, something else had a
25    different effect, but all of them I

Page 231

1     N. Jaresko - Professional Eyes Only
2     understood very well would put at risk the
3     entire transformation and put at risk that
4     development that I described to you just
5     previously.
6         Q.   Will you go to page 33 of your
7     declaration, please.
8         A.   There isn't a page.
9         Q.   I'm sorry, paragraph 33.  It
10    says, "As director of the Oversight Board,
11    I became familiar with the issues
12    concerning the amount and enforceability of
13    the bondholders' alleged liens."
14        Do you see that?
15        A.   Yes.
16        Q.   All right.  So what I'm trying to
17    ask you is, what is the government parties'
18    position as to the amount of the
19    bondholders' liens?
20        MR. MASHBERG:  Objection.  Asked
21    and answered.
22        A.   Exactly what I just said, that
23    this is a reasonable outcome as compared to
24    what we would have to go through in terms
25    of winning every litigation, winning every

Page 232

1     N. Jaresko - Professional Eyes Only
2     appeal, the time and the cost without
3     undermining, as I've written here, the
4     goals that were identified by the board in
5     negotiating this agreement.
6         Those costs outweighed it both
7     monetary but also not only monetary, time,
8     uncertainty, unpredictability.
9         Q.   I understand that, but,
10    respectfully, I don't think I'm getting an
11    answer to my question.
12        In your declaration, you say that
13    as executive director of the Oversight
14    Board, you became familiar with the issues
15    concerning the amount and enforceability of
16    the bondholders' alleged liens.
17        And I'm just asking you, given
18    that you've said that you have familiarity
19    with the issues concerning the amount and
20    enforceability of the liens, what is your
21    understanding of the amount of the liens
22    assuming the government is correct in
23    litigation?
24        MR. MASHBERG:  It says with the
25    issues concerning the amount and

Page 233

1     N. Jaresko - Professional Eyes Only
2     enforceability of the alleged liens.
3     So if we're going to parse the
4     language, let's read it specifically.
5     The issues concerning the amount and
6     enforceability.  But I object.  This
7     has all been asked and answered.
8         A.   And my answer to the question is
9     paragraph 29; that they would be entitled
10    to 100 percent payment of interest,
11    principal, plus fees.
12        And when you asked me what that
13    meant, I also referred you to the document
14    that showed the transition charges that
15    would be the equivalent of unrestructured
16    debt.
17        Q.   But I'm asking if the government
18    were to prevail against them in litigation,
19    does that mean they have no liens?
20        That's what -- I'm trying to get
21    your understanding of that.
22        A.   If the government --
23        Q.   I'm not trying to be difficult,
24    I'm sorry.  If the government prevailed.
25        MR. NATBONY:  Objection to form.

Page 266

```
1        N. Jaresko - Professional Eyes Only
2    securitization termination, the
3    securitization structure no longer exists,
4    but the bondholders get the stipulated
5    treatment?
6            MR. DELL:  Objection to form.
7            MR. MASHBERG:  Objection to form.
8            MR. DELL:  Calls for a legal
9    conclusion.
10       A.  As I described earlier, what I
11   understand is that in a securitization
12   termination, the detail and the structure
13   falls away and the economics remain in
14   place.  The stipulation treatment would
15   mean that we maintain the economics without
16   the necessary detail of the structure.
17       Q.  So the bondholders would still
18   get their applicable bond claim and an
19   allowed amount, correct?
20           MR. DELL:  Objection to form.
21       A.  Again, I'm not a lawyer, so
22   applicable bond claim I'm sure has a legal
23   definition, which I'm not going to answer
24   the question.
25           The way I understand it is as I
```

Page 267

```
1        N. Jaresko - Professional Eyes Only
2    described to you, which is the economics of
3    the deal.  The discount remains 67 -- the
4    maximum of 67-and-a-half and 10 percent.
5        Q.  Under that situation, how would
6    the bondholders be paid on their new bonds?
7        A.  That would be something that I
8    understand we would need to work out in
9    that situation.
10       Q.  But that may or may not contain
11   any of the same protections and benefits
12   that are contained in the securitization
13   structure, right?
14           MR. NATBONY:  Objection to form.
15           MR. MASHBERG:  Objection to form.
16           MR. DELL:  Objection to form.
17       A.  It is our intent -- if you're
18   speaking with regard to the rate cap that
19   the transition charge concept of capping
20   rate -- not having a rate covenant, it is
21   our intent and it is our intention and our
22   understanding that we would have that
23   included in any other structuring of the
24   bonds.
25       Q.  Where is that in this agreement?
```

Page 268

```
1        N. Jaresko - Professional Eyes Only
2        A.  I don't recall if it's in the
3    agreement.
4        Q.  So if it's not in the agreement,
5    would you have any entitlement to that?
6            MR. NATBONY:  Objection.  Lack of
7    foundation.
8            MR. MASHBERG:  Objection to form.
9    Calling for a legal conclusion.
10       A.  What I described was our
11   intention to include it in any further
12   negotiations of any revised structure that
13   we would have to come up with.
14       Q.  But regardless of whether or not
15   you are in fact able to include it in a
16   revised structure that you come up with,
17   the bondholders are entitled to the same
18   economic treatment?
19           MR. DELL:  Objection to form.
20           MR. MASHBERG:  Objection.
21       A.  And I'd have to have legal
22   counsel to answer that question.
23       Q.  As the representative of the
24   Oversight Board talking about the RSA, you
25   don't know whether or not, in the event of
```

Page 269

```
1        N. Jaresko - Professional Eyes Only
2    a securitization termination, the
3    government has the right to continue to
4    impose the same terms and conditions that
5    are set forth in the securitization
6    structure?
7            MR. NATBONY:  Objection.
8            MR. MASHBERG:  Objection.
9        A.  I don't recall whether it's in
10   the agreement or not, but I am sure that
11   we've been advised on the subject.  I just
12   don't recall.
13       Q.  I'd like to direct your attention
14   to page 41 of the RSA, specifically D5
15   which says that "This definitive RSA may be
16   terminated by any of the government parties
17   as to any individual supporting holder if
18   such supporting holder commits a bondholder
19   breach upon the receipt by such supporting
20   holder of a notice delivered in accordance
21   with Section 27."
22           Do you see that?
23       A.  I do.
24       Q.  Do you have an understanding of
25   what happens with regard to any settlement
```

68

Page 270

1    N. Jaresko - Professional Eyes Only
2  payments or other cash payments under the
3  RSA that have been made to a supporting
4  holder who is found they have committed a
5  bondholder breach in the event of an
6  individual termination?
7         MR. NATBONY:  Objection.  Calls
8     for a legal conclusion.
9         MR. MASHBERG:  The document
10    speaks for itself.
11    A.  I don't recall it.  If you would
12  wish me to look at a particular --
13    Q.  Sure.
14    A.  -- of the document, but I --
15    Q.  Let's look at page 40, romanette
16  2.  It says, "In the event of a stipulated
17  treatment termination as to all supporting
18  holders or an individual termination as to
19  an individual supporting holder."
20         Do you see that?
21    A.  Yes.
22    Q.  And then there is one and then
23  there is two, which says, "All prior
24  settlement payments, increased settlement
25  payments, adequate protection payments, and

Page 271

1    N. Jaresko - Professional Eyes Only
2  payments made on administrative claims as
3  applicable received by the supporting
4  holder subject to such termination shall be
5  retained by the recipient."
6         Do you see that?
7    A.  Yes, I do.
8    Q.  So now do you have that
9  understanding as to what happens to those
10  payments in the event of a bondholder
11  breach that leads to an individual
12  termination?
13         MR. NATBONY:  Objection.
14         MR. MASHBERG:  Objection.  You're
15    just reading a document to her.
16    A.  I've read the document.
17    Q.  My question for you is, as the
18  representative of the Oversight Board who
19  approved this transaction, how does it make
20  sense to allow a bondholder who has
21  terminated the RSA, to receive all the
22  payments -- to retain all the payments that
23  it has received thereunder?
24         MR. NATBONY:  Objection.
25         MR. MASHBERG:  Objection to form.

Page 272

1    N. Jaresko - Professional Eyes Only
2         Mischaracterizes the document.
3    A.  Again, I will say what I've said
4  earlier which is you're pulling one small
5  potential theoretical situation out of a
6  very long and complex agreement.
7         The individual detail that you
8  mentioned I am quite certain has been
9  discussed, considered, analyzed by my
10  advisers in the context of this entire
11  agreement, but I don't have a legal comment
12  on that specific small piece of this.
13         I am responsible for the document
14  as a whole, what it accomplishes.  Yes, I
15  understand the document and these risks,
16  but I don't have a particular comment on
17  that particular line.
18    Q.  So let me direct your attention
19  to page 6 of the RSA where it defines
20  bondholder breach.
21         It includes the situation where a
22  supporting holder takes any action that has
23  a material adverse effect on any
24  transformation transaction.
25         Do you see that?

Page 273

1    N. Jaresko - Professional Eyes Only
2    A.  Yes.
3    Q.  So as the representative of the
4  Oversight Board and the executive director
5  of the Oversight Board who had submitted
6  the declaration attesting to the
7  reasonableness of this transaction, is it
8  your view that it's reasonable and in the
9  best interest of the Oversight Board and
10  PREPA to allow a supporting holder who has
11  taken an action that has a material adverse
12  effect on the transformation to retain
13  payments it has received under this
14  agreement?
15         MR. MASHBERG:  Objection.  Asked
16    and answered.
17    A.  I have stated that the agreement
18  as a whole is reasonable with that included
19  and as a part of it, not taken out of
20  context individually as one line.
21         MR. BASSETT:  I'm think I'm close
22    to done.  Can we take a break?
23         THE VIDEOGRAPHER:  The time 4:07.
24    Going off the record.
25         (Recess is taken.)

69

Professional Eyes Only

Page 274

1   N. Jaresko - Professional Eyes Only
2       THE VIDEOGRAPHER:  We're back on
3   the record.  The time is 4:19.
4   EXAMINATION BY
5   MS. MÉNDEZ COLBERG:
6       Q.  For the record, this is Jessica
7   Méndez on behalf of UTIER and Systema
8   de Retiro de los Empleados de la
9   Authoridad de Energia Eléctrica.
10      Ms. Jaresko, my question to you
11  is if the oversight board analyzed the
12  impact of the RSA to the retirement system?
13      A.  Could you restate the question?
14      Q.  If the oversight board analyzed
15  the impact of the RSA to the retirement
16  system, meaning when it was going to be
17  approved by you, the RSA?
18      MR. NATBONY:  Objection as to
19  form.
20      MR. MASHBERG:  Objection to form.
21      A.  No, it's my understanding the RSA
22  doesn't impact or affect retirement system
23  directly and indirectly.
24      Q.  Is it your belief or impression
25  that the RSA doesn't -- or let me strike

Page 275

1   N. Jaresko - Professional Eyes Only
2   that.
3       Do you believe that with the RSA,
4   PREPA would be -- would be able to make the
5   payments and employer contributions to the
6   retirement system?
7       MR. NATBONY:  Objection to form.
8       MR. MASHBERG:  Objection to form.
9       A.  Again, I don't believe the RSA
10  affects whether PREPA will or will not be
11  able to make its contributions to the
12  retirement system.
13      Q.  So is it your testimony that it
14  doesn't affect -- the approval of the RSA
15  doesn't affect in any way the retirement
16  system or PREPA's ability to contribute or
17  make payments to the retirement system?
18      MR. MASHBERG:  Objection to form.
19      MR. NATBONY:  Objection.  Asked
20  and answered.
21      A.  I'm not aware of any effect on
22  the payments to the retirement system from
23  the RSA, no.
24      Q.  Okay.
25      MS. MÉNDEZ COLBERG:  Well, that

Page 276

1   N. Jaresko - Professional Eyes Only
2   will be all.
3       MR. LYNCH:  Why don't we go off
4   the record to switch seats.
5       THE VIDEOGRAPHER:  The time is
6   4:22.  Going off the record.
7       (Recess is taken.)
8       THE VIDEOGRAPHER:  Back on the
9   record the time is 4:25.
10      (Jaresko Exhibit 14, Notice of
11  Deposition of Natalie Jaresko by
12  Cortland Capital Market Services LLC,
13  as administrative agent, and Solus,
14  marked for identification, as of this
15  date.)
16      (Jaresko Exhibit 15, Amended
17  Notice of Deposition of Financial
18  Oversight and Management Board for
19  Puerto Rico by Cortland Capital Market
20  Services LLC, as administrative agent,
21  and Solus, marked for identification,
22  as of this date.)
23      (Jaresko Exhibit 16, Credit
24  Agreement dated as of May 4, 2012
25  amongst PREPA and Scotiabank de Puerto

Page 277

1   N. Jaresko - Professional Eyes Only
2   Rico, Bates-stamped PREPA_RSA0028179
3   through 28256, marked for
4   identification, as of this date.)
5       (Jaresko Exhibit 17, Trade
6   Finance Facility Agreement dated
7   7/20/12 between PREPA and Citibank,
8   Bates-stamped PREPA_RSA0028086 through
9   28132, marked for identification, as of
10  this date.)
11  EXAMINATION BY
12  MR. LYNCH:
13      Q.  Good afternoon, Ms. Jaresko.  My
14  name is John Lynch with Wachtell Lipton
15  Rosen & Katz.  We represent Cortland
16  Capital Market Services LLC.
17      We have premarked some exhibits
18  for this part of your deposition today.
19  Exhibit 14 is a Notice of Deposition served
20  by the fuel line lenders on you.
21      Exhibit 15 is an amended 30(b)(6)
22  Notice of Deposition to the Oversight
23  Board.
24      Exhibit 16 is the Scotiabank
25  credit agreement.