**EXHIBIT 5**

Page 1

1

2


        IN THE UNITED STATES DISTRICT COURT

3

          FOR THE DISTRICT OF PUERTO RICO

4    _____x

     In re:

5

     THE FINANCIAL OVERSIGHT AND            PROMESA
6    MANAGEMENT BOARD FOR PUERTO
     RICO,                                  Title III
7          as representative of

                                            Case No.
8

     THE COMMONWEALTH OF PUERTO RICO,    17-BK-3283(LTS)
9    et al.,
           Debtors.
10   _____x

     In re:
11                                          PROMESA

     THE FINANCIAL OVERSIGHT AND
12   MANAGEMENT BOARD OF PUERTO RICO,    Title III
13         as representative of       17-BK-4780(LTS)
14   PUERTO RICO ELECTRIC POWER AUTHORITY,
           Debtor.
15   _____x

     (Caption continued on following page.)

16

     * P R O F E S S I O N A L   E Y E S   O N L Y  *

17

18                    DEPOSITION
19                       OF
20             CHRISTIAN SOBRINO VEGA
21          Tuesday, October 22, 2019
22            San Juan,Puerto Rico

23

24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 170380

Page 218

1     C. Sobrino - Professional Eyes Only
2  BY MR. WORTHINGTON:
3     Q.  Do you know if a collection was
4  made of your texts and chats while you were
5  at AAFAF relating to the PREPA RSA?
6     A.  I don't know.
7     Q.  So while you were employed at
8  AAFAF, you're not aware of whether any
9  collection was made of your texts and chat
10  messages relating to the PREPA RSA; is that
11  right?
12     A.  No.
13     Q.  We've seen at least one
14  example -- we've seen a number of examples
15  of emails that you were a party to, and
16  we've seen at least one example of a chat
17  that you were a party to.
18        How did you choose -- let's take
19  Ms. Jaresko.
20        When you communicated with
21  Ms. Jaresko, is it correct that sometimes
22  you communicated with her by email?  That's
23  right?
24     A.  Yes.
25     Q.  And sometimes you communicated

Page 219

1     C. Sobrino - Professional Eyes Only
2  with her by chat; is that right?
3     A.  Yes.
4     Q.  Sometimes you communicated with
5  her by text; is that right?
6     A.  Yes.
7     Q.  How did you decide what medium of
8  communication that you would use with
9  Ms. Jaresko at any point in time?
10     A.  I don't know.  It would depend on
11  the moment.
12     Q.  Okay.  Like would it depend on
13  the topic of conversation?  Were some
14  subjects of communication you would handle
15  them by email and other topics of
16  communication, you would handle them by
17  chat?  Was it random?  Is there a pattern
18  to your selection of means of
19  communication?
20     A.  There wasn't a protocol on how we
21  communicated.
22     Q.  Okay.  Are there any topics
23  you're aware of related to the PREPA RSA
24  that you only you and Ms. Jaresko
25  communicated by visa text or chat as

Page 220

1     C. Sobrino - Professional Eyes Only
2  opposed to email?
3     A.  I don't know.
4     Q.  Do you know if your hard copy
5  documents were collected while you were at
6  AAFAF, excuse me, your hard copy documents
7  relating to the PREPA RSA were collected
8  while you were at AAFAF?
9        Did anyone come and ask you for
10  any notes, any handwritten notes that you
11  might have kept?
12     A.  I didn't keep notes, generally.
13  My files and reference materials were in my
14  office, and if they needed to be collected,
15  somebody would ask my assistant and I
16  didn't really -- I wasn't really involved
17  in document production.
18     Q.  Does AAFAF -- did either AAFAF or
19  PREPA have any policies you're aware of
20  regarding the use of non-official emails as
21  a medium to communicate concerning AAFAF
22  and PREPA business?
23     A.  Can you repeat that?
24     Q.  Did either AAFAF or PREPA have
25  any policies that you're aware of regarding

Page 221

1     C. Sobrino - Professional Eyes Only
2  the use of non-official email means of
3  communication to communicate concerning
4  AAFAF or PREPA business?
5     A.  I don't remember.
6        MR. SAGARDIA-ABREU:  One second.
7  I have to...
8        MR. WORTHINGTON:  Sure.  Let's go
9  off the record.
10     (Witness and counsel conferring.)
11  BY MR. WORTHINGTON:
12     Q.  Do you maintain -- strike that.
13        While you were at AAFAF, did you
14  maintain both personal and work cell
15  phones?
16        Did you have two or one cellphone
17  while you worked at AAFAF?
18     A.  I owned one cellphone.
19     Q.  Okay.
20     (Sobrino Exhibit 12, Chat
21     transcript, Bates-stamped
22     PREPA_RSA0034658 through 34663, marked
23     for identification, as of this date.)
24  BY MR. WORTHINGTON:
25     Q.  So I've handed you a chat marked

Page 222

1      C. Sobrino - Professional Eyes Only
2    PREPA RSA.  The first Bates number is
3    34658.
4        A.  Um-hmm.
5        Q.  And do you recall these chat
6    exchanges or text exchanges?
7          (Document review.)
8          MR. NATBONY:  Objection as to
9      form.
10   BY MR. WORTHINGTON:
11       Q.  So this is a set of chats that
12   were produced to us.  They include English
13   and Spanish.  So we had a translation
14   prepared.  So the first half of the exhibit
15   is the Spanish original -- Spanish and
16   English original as it was produced to us.
17   And then the second half of the document is
18   a certified translation which translates
19   the Spanish components of the chat and
20   integrates it into a single document.
21       A.  Okay.
22       Q.  So do you recall the chat
23   exchanges that occurred that are in this
24   document?
25          MR. NATBONY:  Same objection.

Page 223

1      C. Sobrino - Professional Eyes Only
2        A.  Each one specifically?
3        Q.  Do you recall the time frame over
4    which -- there seems to be a number of
5    communications back and forth that are
6    embedded in this document.
7          Do you recall when the first
8    exchange was and when the last exchange
9    was?
10         What is the time frame that you
11   recall over which the chats in this
12   document occurred?
13         MR. TEELE:  Object to the form.
14     I'm going to object to the form for
15     now.
16         (Document review.)
17       A.  I recognize some of the messages,
18   yes.
19       Q.  Okay.  So the last -- let's go to
20   the last message.
21         "Guys, don't want to be a dick,
22   but I need the demand protection stuff now,
23   like final with all the numbers that I
24   asked for.  It's getting really difficult
25   for me to get final signup on things

Page 224

1      C. Sobrino - Professional Eyes Only
2    without this."
3          Do you see that?  That's on the
4    last page.
5        A.  Um-hmm.
6        Q.  Do you recall when you sent that
7    message?  The issue is these were produced
8    to us without dates, and we're trying to
9    get an understanding of when these chats
10   occurred.
11       A.  I don't remember when.
12       Q.  Okay.
13         MR. TEELE:  Is there --
14         MR. WORTHINGTON:  Go ahead.
15         MR. TEELE:  Never mind.  I'm
16     sorry.
17   BY MR. WORTHINGTON:
18       Q.  If you look at the first document
19   here --
20       A.  The first page?
21       Q.  The first page.
22         (Document review.)
23       Q.  And in English, the translation
24   reads, for a message you send, at the
25   bottom of the first page:  "Fernando, where

Page 225

1      C. Sobrino - Professional Eyes Only
2    are we with the PREPA RSA?  I'm back.  I'm
3    resting.  I have a win under my belt.  I am
4    hungry for more wins.  Where is my RSA?"
5          Do you recall when you sent that
6    message, approximately?
7          Do you know what the win you were
8    referring to as having under your belt was?
9        A.  No.  I could be really cocky
10   sometimes.
11         MR. FRIEDMAN:  No objection.
12         (Laughter.)
13   BY MR. WORTHINGTON:
14       Q.  The end of this first exchange of
15   chats at 8:05, if you can turn to page 2,
16   you sent a chat saying, "The beast is
17   hungry."
18       A.  Um-hmm.
19       Q.  What were you referring to?
20       A.  I have no idea.
21       Q.  Do you know Elias Sanchez?
22         MR. SAGARDIA-ABREU:  Objection.
23         MR. WORTHINGTON:  You want to
24     talk off the record?
25         MR. TEELE:  Can we take a second

Page 226

1     C. Sobrino - Professional Eyes Only
2       break?
3         MR. WORTHINGTON:  Sure.  That is
4       fine.
5         (Witness and counsel conferring.)
6       A.  Okay.
7       Q.  So the question is:  Do you know
8   Elias Sanchez?
9       A.  Yes.
10      Q.  Since starting your role at
11  AAFAF, have you met with Mr. Sanchez?
12      A.  So given the fact that the
13  Justice Department in Puerto Rico is
14  conducting an investigation that involves a
15  number of people, including myself, and
16  there is public knowledge that the Justice
17  Department has requested information from
18  Elias Sanchez, I am exercising my Fifth
19  Amendment right.
20      Q.  Okay.  Since starting your role
21  at AAFAF, have you had any conversations
22  with Mr. Sanchez about either the
23  preliminary or the definitive RSA?
24      A.  Again, I'm exercising my Fifth
25  Amendment right regarding any matter with

Page 227

1     C. Sobrino - Professional Eyes Only
2   Elias Sanchez.
3       Q.  Okay.  Have you had -- since
4   starting your role at AAFAF, have you had
5   any conversations with Mr. Sanchez about
6   the PREPA T&D transformation process?
7       A.  I'm exercising Fifth Amendment
8   rights regarding anything regarding Elias
9   Sanchez.
10      Q.  Since starting your role at
11  AAFAF, have you had any conversations with
12  anyone you knew to be a client of
13  Mr. Sanchez regarding the preliminary or
14  definitive RSA?
15      A.  Regarding any matter that
16  involves Elias Sanchez, I am exercising --
17        MR. SAGARDIA-ABREU:  I'm sorry, I
18      think Mr. Sobrino has been crystal
19      clear as to the fact that he's not
20      going to answer any question relating
21      to Mr. Sanchez or any aspect of any
22      communications that could be a subject
23      of the criminal probe that is conducted
24      by the Justice Department.  Today, the
25      Justice Department has informed that

Page 228

1     C. Sobrino - Professional Eyes Only
2       they have requested an extension to
3       finalize the preliminary investigation
4       until January 10th.  The office of the
5       special independent prosecutor has
6       approved that extension.  So in view of
7       the pendency of that investigation,
8       Mr. Sobrino will not answer any
9       questions related to that subject
10      matter.
11        I understand that he must
12      exercise his rights as to a particular
13      question, but in terms of time and
14      research, I think it's the best move to
15      move to another subject because he's
16      not going to answer any of that.
17  BY MR. WORTHINGTON:
18      Q.  Okay.  So let me ask a final
19  question then.
20        If I were to ask you any question
21  about your work at AAFAF and any meetings
22  or communications that you may have had
23  with Mr. Sanchez or any clients of
24  Mr. Sanchez or any associates of
25  Mr. Sanchez, would you exercise your Fifth

Page 229

1     C. Sobrino - Professional Eyes Only
2   Amendment right?
3       A.  I will exercise my Fifth
4   Amendment right regarding any question that
5   involves Elias Sanchez.
6       Q.  Okay.  Do you know Manny Ortiz?
7       A.  Yes.
8       Q.  Have you had any meetings or
9   communications with Mr. Ortiz since you
10  started your role at AAFAF?
11      A.  I met with Manny Ortiz.  I said
12  yes.
13      Q.  Okay.  Have you met with
14  Mr. Ortiz on numerous occasions since you
15  started your role at AAFAF?
16      A.  I don't have a role in AAFAF.
17      Q.  Sorry.  Since you started your
18  role at AAFAF, since that time going
19  forward --
20        MR. SAGARDIA-ABREU:  During the
21      period he worked --
22  BY MR. WORTHINGTON:
23      Q.  During the period you worked at
24  AAFAF, did you have any meetings or
25  communications with Mr. Ortiz?

Page 230

1    C. Sobrino - Professional Eyes Only
2        A.  Yes.
3        Q.  Approximately, how many?
4        A.  I don't know.
5        Q.  More than a few?
6        A.  I guess.
7        Q.  Did any of those conversations
8    with Mr. Ortiz relate to the negotiation of
9    either the preliminary RSA or the
10   definitive RSA?
11       A.  Regarding the RSA, my discussions
12   with Manuel Ortiz were framed by the
13   discussions of the PREPA RSA that were
14   being conducted in Congress and his
15   feedback on what he was receiving from
16   them.
17       Q.  Sorry.  By that, you're referring
18   to the congressional reaction, letters from
19   Congress that were received after the
20   definitive RSA was announced?
21       A.  Yes.
22       Q.  Okay.  Have you had any
23   discussions with Mr. Ortiz concerning the
24   PREPA T&D transformation process?
25       A.  Not that I recall.

Page 231

1    C. Sobrino - Professional Eyes Only
2        Q.  What are you doing professionally
3    today?  Strike that.
4        Since you left AAFAF, what have
5    you been doing professionally?
6        MR. TEELE:  Objection to form.
7    BY MR. WORTHINGTON:
8        Q.  Have you been employed?
9        MR. TEELE:  You can answer.
10       A.  I've been providing corporate
11   legal and administrative services to one
12   client.
13       Q.  Who is that client?
14       A.  I can't -- the professional
15   service agreement I have is -- does not
16   allow me to give the name of the client,
17   but it's a -- I can say that it's a company
18   that is involved in the healthcare sector
19   in Florida and southern United States and
20   had no relationship with the government of
21   Puerto Rico, directly or indirectly, other
22   than requesting an Act 20 decree.
23       Q.  And is it a company that has had
24   any involvement in issues relating to PREPA
25   in any way?

Page 232

1    C. Sobrino - Professional Eyes Only
2        A.  Other than in paying the light
3    bill, no.
4        Q.  And so actually at the very
5    beginning of the day, I asked if your
6    LinkedIn profile covered all of your
7    significant professional experience.  And
8    your answer was it covered all of your
9    salaried experience.
10       Is there other -- with -- this
11   employment now, is it being done -- is it
12   being done on a salary basis?
13       A.  I said it's a professional
14   services.
15       Q.  Professional services, okay.
16       So you're being paid consulting
17   fees?
18       A.  Essentially.
19       Q.  And is that -- when you made the
20   distinction between salaried employment and
21   other employment, was this the distinction
22   that you had in mind?
23       A.  I didn't have one in mind.  I
24   think I said it was significant because
25   this has only been in place for about a

Page 233

1    C. Sobrino - Professional Eyes Only
2    month or two.
3        Q.  Got it.  Okay.
4        Is there other professional work
5    that you've done where your compensation
6    has been other than through a salary which
7    is not reflected in your LinkedIn profile?
8        A.  Right now?
9        MR. TEELE:  I'm going to object
10   to the form of the question, but you
11   can answer.
12   BY MR. WORTHINGTON:
13       Q.  Yeah, let's say -- actually, I
14   can give you -- let's do it -- since the
15   beginning of 2017, have you done any
16   professional work for compensation other
17   than a salary that's not reflected in your
18   LinkedIn profile?
19       A.  No.
20       Q.  Okay.  When I asked you
21   earlier --
22       THE WITNESS:  Sorry, excuse me.
23       MR. WORTHINGTON:  Why don't we go
24   off record and take a quick break.  I
25   may be done.

Page 234

1    C. Sobrino - Professional Eyes Only
2        MR. TEELE:  Before going off the
3    record, the question was about it just
4    being professional services.
5        MR. WORTHINGTON:  Okay.  Let's
6    take a five-minute break.
7        (Recess is taken.)
8        MR. TEELE:  Just clear it up.
9        THE WITNESS:  Just to be clear,
10   from 2017 up to when I left the
11   Government of Puerto Rico, I was paid
12   -- my compensation was paid through the
13   Government Development Bank.
14       In 2017, I received a liquidation
15   payment of my benefits in 2016 from my
16   previous employer, which was AbbVie,
17   which is here.
18       Since 2019, I've been consulting
19   for one engagement on a professional
20   services basis, which is the one that I
21   described earlier.
22   BY MR. WORTHINGTON:
23       Q.  Okay.  Thank you.  That clears
24   things up.
25       I have just a couple of other

Page 236

1    C. Sobrino - Professional Eyes Only
2    what I am trying to get at.
3        A.  I didn't have a device -- a
4    cellphone that was owned by AAFAF?
5        Q.  Yes.
6        A.  There was a portable WiFi that
7    provided --
8        Q.  Like a hot spot?
9        A.  Yes.
10       Q.  That's fine.  But you didn't --
11       A.  That was owned by AAFAF.
12       Q.  But you didn't send text with it
13   and text --
14       A.  On the WiFi?
15       Q.  -- on the WiFi hot spots --
16       MR. SAGARDIA-ABREU:  There are no
17   official cellphones --
18       A.  No.
19       Q.  Got it.
20       MR. SAGARDIA-ABREU:  I was just
21   clarifying the governor of Puerto Rico
22   doesn't have official cell phones a
23   couple of years ago.
24       MR. WORTHINGTON:  Got it.  Good
25   to know.

Page 235

1    C. Sobrino - Professional Eyes Only
2    final questions.
3        You testified earlier -- I asked
4    if, during the time in which you worked at
5    AAFAF, if you had more than one cellphone
6    and your answer was that you owned one
7    cellphone.  So I should have asked a more
8    precise question.
9        Did you use more than one
10   cellphone during the period in which you
11   worked for AAFAF?
12       A.  No.  I had one cellphone.  I
13   exchanged it for newer versions.
14       Q.  At any given point in time, did
15   you ever regularly use more than one
16   cellphone while you worked at AAFAF at the
17   same time?
18       MR. SAGARDIA-ABREU:  When you say
19   cellphone, you mean cellphone number
20   or --
21   BY MR. WORTHINGTON:
22       Q.  No, I mean a physical device.
23       Like did you have a work device
24   that was owned by AAFAF and a personal
25   device that you owned yourself?  That is

Page 237

1    C. Sobrino - Professional Eyes Only
2    BY MR. WORTHINGTON:
3        Q.  To your knowledge, does Manny
4    Ortiz or his firm represent any
5    bondholders, insurers, or PREPA T&D
6    concessionaires?
7        MR. NATBONY:  Objection as to
8    form.
9        A.  To my knowledge, no.
10       Q.  At the time after the preliminary
11   RSA was entered into, did you have an
12   understanding as to whether or not it was
13   binding?
14       MR. TEELE:  Objection.  Calls for
15   a legal conclusion.
16       You can still answer if you know.
17       MR. NATBONY:  Objection to form.
18       A.  What do you mean?
19       Q.  I'll ask a different question.
20       Did you have an understanding
21   that there would be economic consequences
22   for PREPA, AAFAF if they were to choose not
23   to proceed with the definitive RSA arising
24   from -- strike that.
25       Did you have an understanding

60

Page 238

1  C. Sobrino - Professional Eyes Only
2  that there would be economic consequences
3  for PREPA and AAFAF, penalties for
4  breaching or terminating the preliminary
5  RSA if they chose not to the proceed with a
6  definitive RSA?
7      MR. NATBONY:  Objection as to
8   form and calls for a legal conclusion.
9      MR. TEELE:  I also want to state
10   the objection that if you can answer
11   without divulging any attorney-client
12   privileged communications, you can
13   answer, but otherwise...
14  BY MR. WORTHINGTON:
15      Q.  Well, as the chairman of AAFAF at
16  the time, did you have an understanding
17  that there would be negative consequences
18  to -- arising from the preliminary RSA if
19  AAFAF did not choose to proceed with the
20  definitive RSA?
21      MR. TEELE:  Same objection.
22      MR. NATBONY:  Same objection as
23   to a legal conclusion.
24  BY MR. WORTHINGTON:
25      Q.  You can answer.

Page 239

1  C. Sobrino - Professional Eyes Only
2      A.  The legal -- the -- any causes of
3  action that could have arisen from not
4  proceeding with the preliminary RSA, I can
5  -- I can't say that I recall if that was a
6  primary consideration.  The primary
7  concern, both from the Oversight Board as
8  it was expressed to me and myself for not
9  including the preliminary RSA, was a Title
10  III process that could have impeded or made
11  more difficult the transformation process
12  and/or that could have ended with adverse
13  decisions against the debtor.  That was the
14  main concern.
15      Q.  Okay.  So remedies arising from
16  the preliminary RSA itself were not the
17  main concern of AAFAF and PREPA as they
18  considered the definitive RSA?
19      A.  That I recall at this moment, no.
20  The main concern that I recall was the --
21  from not following through with the
22  preliminary RSA was concerns with the
23  transformation process and with an adverse
24  result in the PREPA Title III.
25      Q.  Do you know what Puerto

Page 240

1  C. Sobrino - Professional Eyes Only
2  Rico-based consultants or advisors
3  represent Duke Energy?
4      MR. TEELE:  Objection as to form.
5      A.  It's either -- I think it's DLA
6  Piper or McConnell Valdés, one of those
7  two.
8      Q.  How about PSE&G?
9      A.  PSE&G, I don't know if they have
10  any in Puerto Rico.
11      Q.  How about Exelon, E-x-e-l-o-n?
12      A.  I don't recall.
13      Q.  How about Quanta, ATCO and IEM?
14      MR. TEELE:  Objection to form.
15  BY MR. WORTHINGTON:
16      Q.  Are you aware there is a
17  consortium of Quanta, ATCO and IEM?
18      A.  I don't recall.
19      Q.  Do you know if Mr. Elias Sanchez
20  or anyone affiliated with Mr. Sanchez acts
21  as a consultant or an adviser to any of the
22  participants in the P3 transformation
23  process?
24      A.  As I stated before, any question
25  regarding Elias Sanchez, I exercise my

Page 241

1  C. Sobrino - Professional Eyes Only
2  Fifth Amendment rights.
3      MR. WORTHINGTON:  Okay.  I have
4   no further questions at this time.  I
5   reserve in case there are follow-up
6   questions following after -- if there
7   are follow-up questions at the end, I
8   reserve the right to make final
9   questions.
10      MR. LYNCH:  Let's go off the
11   record very briefly.
12  EXAMINATION BY
13  MR. LYNCH:
14      Q.  Good afternoon, Mr. Sobrino.
15      A.  Hello.
16      Q.  I'm John Lynch.  I'm at Wachtell
17  Lipton Rosen & Katz.  We represent Cortland
18  Capital Market Services LLC.
19      Just a couple of questions about
20  your background and following up on some of
21  the testimony this morning.
22      The LinkedIn page that you were
23  shown this morning as Sobrino Exhibit 1, it
24  says that you were at the Government
25  Development Bank for Puerto Rico from

Page 242

1    C. Sobrino - Professional Eyes Only
2  January 2017 to July 2019.  Feel free to
3  have a look at it.
4        Is that correct?
5        (Document review.)
6    Q.  Page 3 of 8.
7    A.  I was -- the board of directors
8  of GDB named me president in January of
9  2017, and I resigned in July of '19.
10    Q.  So you were at both the GDB and
11  AAFAF at the same time; is that right?
12    A.  When I was named executive
13  director of AAFAF, yes.
14    Q.  And did you do work for both at
15  the same time?  I believe you testified
16  that your paychecks came from the GDB while
17  you were at AAFAF.
18        Do I have that right?
19    A.  Yes.
20    Q.  Okay.  Did you also get paychecks
21  from AAFAF?
22    A.  No.  You can only receive
23  compensation from one government entity.
24    Q.  Okay.  Was any part of your
25  day-to-day responsibility, after you became

Page 243

1    C. Sobrino - Professional Eyes Only
2  the CEO of AAFAF, work that you would
3  describe as relating to GDB but not -- to
4  the GDB but not AAFAF?
5    A.  By the time I became executive
6  director of AAFAF, my work with the GDB was
7  mostly concentrated in finalizing the Title
8  VI restructuring or overseeing that
9  process, but operations of the entity
10  itself had more or less ceased, other than
11  financial.
12    Q.  And before you became executive
13  director of AAFAF and you were still at the
14  GDB, did any of your work for the GDB
15  relate to PREPA?
16    A.  There was -- my delegation of the
17  AAFAF chair in the PREPA governing board
18  was done by Jerry Portela, who is the
19  executive director of AAFAF, to me as
20  president of GDB, because that delegation
21  was authorized under the AAFAF enabling
22  law, mentioned specifically GDB.
23        The GDB had -- if I remember
24  correctly, the GDB had -- there was a loan
25  and deposit arrangement that still remained

Page 244

1    C. Sobrino - Professional Eyes Only
2  between GDB and PREPA.  That was handled
3  mostly through O'Melveny.
4    Q.  Did you do any work in relation
5  to --
6    A.  In relation to that one, no.
7    Q.  If I understand it, and I'm just
8  trying to get the lay of the land here, you
9  were -- when you went on to the PREPA
10  governing board, that was, in essence, a
11  role that you assumed because you were
12  involved with the GDB; is that correct?
13    A.  It was assumed in light of the
14  transformation transactions that the
15  governor had announced in -- was it January
16  of 2018? -- when he announced that he
17  wanted to carry out a privatization and
18  concession of PREPA.
19    Q.  I'm sorry, what was announced?
20  Can you explain what you mean by that?
21    A.  In around January of 2018, after
22  the hurricane, the governor made an
23  announcement saying that his administration
24  was going to enter into a long-term
25  concession for the T&D functions of PREPA

Page 245

1    C. Sobrino - Professional Eyes Only
2  and seek to sell the generation fleet as
3  well as carry out an energy policy reform,
4  and he asked me to oversee that process.
5  So my -- I went into the PREPA governing
6  board in response to that.
7    Q.  Thank you.
8        O'Melveny & Myers is counsel for
9  PREPA and AAFAF; is that right?
10    A.  My understanding is so, yes.
11    Q.  Was there anyone at AAFAF who had
12  responsibility for reviewing papers that
13  owe O'Melveny & Meyers submitted to court
14  in the PREPA Title III case?
15    A.  They would typically include from
16  the AAFAF legal department, PREPA legal.
17  There were people, other people that
18  reviewed it.
19    Q.  Were you involved in -- let me
20  just step back just to be sure I have that
21  right.
22        So your testimony is that there
23  were people in both the PREPA legal
24  department and the AAFAF legal
25  department --