**<u>EXHIBIT 9</u>**



# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

## Municipal Secondary Market Disclosure Information Cover Sheet
## Municipal Securities Rulemaking Board (MSRB)
## Electronic Municipal Market Access System (EMMA)

### Additional / Voluntary Event-Based Disclosure

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:_____**Puerto Rico Electric Power Authority (PREPA)**_____

Other Obligated Person's Name (if any):_____

Six-digit CUSIP number(s):____**745268 and 74526Q**_____

**TYPE OF INFORMATION PROVIDED:**

A.   ☐ Amendment to Continuing Disclosure Undertaking

B.   ☐ Change in Obligated Person

C.   ☐ Notice to Investor Pursuant to Bond Documents

D.   ☐ Communication from the Internal Revenue Service

E.   ☐ Bid for Auction Rate and Other Securities

F.   ☐ Capital or Other Financing Plan

G.   ☐ Litigation / Enforcement Action

H.   ☐ Change of Tender Agent. Remarketing Agent or Other On-going Party

I.   ☐ Derivative or Other Similar Transaction

J.   ☒ Other Event-Based Disclosures:___Amendment to Restructuring Support Agreement_____

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.


*/s/ Iván Garau González*_____
Iván Garau González
Puerto Rico Fiscal Agency and Financial Advisory Authority,
   as Fiscal Agent for the Commonwealth

Dated: September 9, 2019



PO Box42001 • San Juan, PR 00940-2001 • Telephone (787) 722-2525

# PUERTO RICO ELECTRIC POWER AUTHORITY

## NOTICE OF VOLUNTARY FILING

As previously disclosed, on May 3, 2019, (i) the Puerto Rico Electric Power Authority ("PREPA"), (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), (iii) the Financial Oversight and Management Board for Puerto Rico ("FOMB"), (iv) the members of the Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group"), and (v) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured"), entered into a Definitive Restructuring Support Agreement (together with the annexes, exhibits and schedules attached thereto, the "Agreement").

On September 9, 2019, FOMB, PREPA, AAFAF, and the Super Majority Holders under the Agreement agreed, pursuant to Section 13 of the Agreement, to an amendment to the Agreement (the "Amendment") to, among other things to permit Syncora Guarantee Inc. ("Syncora") and National Public Finance Guarantee Corporation ("National") to become parties to the Agreement and the terms under which National and Syncora agreed to join the Agreement.  Each undefined capitalized term used herein shall have the meaning given to it in the Agreement, as amended by the Amendment.

A copy of the Amendment is attached as Exhibit A.  Pursuant to the Amendment, the Agreement is amended (a) to add National and Syncora on the terms set forth therein, (b) to delete the stricken text and to add the double-underlined text as set forth in the pages of Schedule 1 attached to the Amendment, and (c) to delete the stricken text and to add the double-underlined text of the Agreement (Recovery Plan Term Sheet) (but not its annexes and schedules) as set forth in the pages of Schedule 2 attached to the Amendment.  Schedule 3 to the Amendment provides a clean compiled copy of the Agreement reflecting all amendments.

Parties that were party to the Agreement or previously executed Joinders to the Agreement continue to be parties to the Agreement, as amended by the Amendment, and need not take any further action.

PUERTO RICO ELECTRIC POWER AUTHORITY

Dated: September 9, 2019

## Exhibit A

RSA Amendment

## AMENDMENT NO. 3 TO DEFINITIVE RESTRUCTURING AGREEMENT

This Amendment No. 3, dated as of September 9, 2019 (this "**Amendment**"), to Definitive Restructuring Support Agreement (the "Agreement"), dated as of May 3, 2019, entered into by and among: (i) the Puerto Rico Electric Power Authority ("**PREPA**"), (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (iii) the Financial Oversight and Management Board for Puerto Rico ("**FOMB**"), (iv) the members of the Ad Hoc Group, and (v) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "**Assured**") is entered into by and among: (i) PREPA, (ii) AAFAF, (iii) FOMB, (iv) the Super Majority Holders, (v) Syncora Guarantee Inc. ("**Syncora**"), and (vi) National Public Finance Guarantee Corporation ("**National**").  Each undefined capitalized term used herein shall have the meaning given to it in the Agreement (as defined below) as amended by this Amendment.

**WHEREAS**, PREPA, AAFAF, FOMB, the Ad Hoc Group Members, and Assured entered into the Definitive Restructuring Support Agreement, providing for, among other things, the principal terms of a proposed restructuring of the Uninsured Bonds and the Bonds insured or beneficially owned by Assured.

**WHEREAS**, various other Uninsured Supporting Holders have joined the Agreement since its original execution.

**WHEREAS,** as of the date hereof, the total principal amount of Bonds that are beneficially owned or that are insured by Syncora under the Bond Insurance Agreements is $▒▒▒▒▒▒▒▒.

**WHEREAS,** as of the date hereof, the total principal amount of Bonds that are beneficially owned or that are insured by National under the Bond Insurance Agreements is $▒▒▒▒▒▒▒▒.

**WHEREAS,** the Government Parties, the Super Majority Holders, National, and Syncora have engaged in good faith, arms-length negotiations regarding the addition of Syncora and National each as a party to the Agreement and the principal terms of a proposed restructuring of the Bonds insured or beneficially owned by Syncora and National, all as set forth in this Amendment.

**WHEREAS,** the Super Majority Holders and other Required Parties consent to this Amendment.

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and with the intention of legally binding all Parties, it is agreed as follows:

1.    Amendments.

(a)    The Agreement is hereby amended to add National and Syncora as Parties to the Agreement on the terms set forth herein.

(b)    The Agreement is hereby further amended to delete the stricken text and to add the double-underlined text as set forth in the pages of **Schedule 1** attached hereto.

(c)    Exhibit C to the Agreement (*Recovery Plan Term Sheet*) (but not its annexes and schedules) is hereby amended to delete the stricken text and to add the double-underlined text as set forth in the pages of **Schedule 2** attached hereto.

(d)    For purposes of the Agreement, Assured's signature page to the Agreement is amended to replace the amount of Uninsured Bonds beneficially owned by Assured from $⬛⬛⬛⬛ to $⬛⬛⬛⬛.

2.    Clean Compiled Copy of Agreement. For convenience of reference, a clean copy of the Agreement, as amended by Section 1 of this Amendment, including all annexes, exhibits, appendixes and schedules thereto, is attached as **Schedule 3** hereto.

3.    Effectiveness.    This Amendment shall become effective as of the date (the "**Amendment Effective Date**") on which the Government Parties, the Super Majority Holders, Assured, National, and Syncora shall have duly executed and delivered a counterpart of this Amendment.  On or after the Amendment Effective Date, each reference in the Agreement to "this Agreement," "Definitive RSA," "hereunder," "hereof," herein," or words of like import referring to the Agreement shall mean and be a reference to the Agreement, as amended by this Amendment. Except as expressly amended by this Amendment, the provisions of the Agreement are and shall remain in full force and effect.

4.    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a) THIS AMENDMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF, EXCEPT THAT, WITH RESPECT TO THE EXISTENCE, POWERS, LEGAL CAPACITY, AND AUTHORITY OF (I) EACH OF AAFAF AND PREPA, THIS AMENDMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO, EXCLUDING THE CONFLICT OF LAWS PRINCIPLES THEREOF, AND (II) AS TO FOMB, THIS AMENDMENT SHALL BE GOVERNED BY PROMESA. Each Party agrees that it shall bring any action or proceeding with respect to any claim arising out of or related to this Amendment in the Chosen Court, and solely in connection with claims arising under this Amendment: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional

2

authority to finally adjudicate the matter. The Government Parties submit to the jurisdiction of the Chosen Court and irrevocably waive any immunity from suit in the Chosen Court that they may have for any action or proceeding arising out of or relating to this Amendment.

(b) Each Party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Amendment (whether based on contract, tort or any other theory).

(c) The rights and obligations of the Parties under this Amendment shall be binding and enforceable against the Parties, and, to the extent necessary, the Government Parties consent for purposes of section 305 of PROMESA to such enforcement by the Chosen Court.

5.      Counterparts. This Amendment may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Amendment delivered by PDF shall be deemed to be an original for the purposes of this paragraph.

6.      Entire Agreement. The Agreement, as amended by this Amendment, and the May 2019 Technical Clarification concerning the CUSIP Reassignment process referenced therein, constitute the entire agreement among the Parties regarding the subject matter hereof and supersede any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

7.      Notice of Amendment. Notice of this Amendment, including a copy thereof, shall be promptly posted on EMMA by the Government Parties within one (1) Business Day of the Amendment Effective Date.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Financial Oversight and Management Board for Puerto Rico

By: _____

Name: Natalie A. Jaresko
Title:  Executive Director

[Signature Page to RSA]

109475969v1

Puerto Rico Electric Power Authority

By: _____

    Name: José F. Ortiz Vázquez
    Title: Chief Executive Officer

[Signature Page to RSA]

Puerto Rico Fiscal Agency and Financial Advisory
Authority

By: _____

Name: OMAR MARRERO

Title: Executive Director

[Signature Page to RSA]

AG MM, L.P.
AG CAPITAL RECOVERY PARTNERS VIII, L.P.
AG CORPORATE CREDIT OPPORTUNITIES FUND,
L.P.
NUTMEG PARTNERS, L.P.
AG CENTRE STREET PARTNERSHIP, L.P.
AG SUPER FUND MASTER, L.P.

By: Angelo, Gordon & Co., L.P., as manager or advisor

By: _____

Name: **D. Forest Wolfe**
Title: **General Counsel**

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially owned by accounts for which Supporting Holder has investment management responsibility, which it would be entitled to vote on in a plan solicitation: ▊▊▊▊▊▊

[Signature Page to RSA]

BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.
BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.
BLUEMOUNTAIN CREDIT OPPORTUNITIES
MASTER FUND I L.P.
BLUEMOUNTAIN KICKING HORSE FUND L.P.
BLUEMOUNTAIN FURSAN FUND L.P.
BLUEMOUNTAIN TIMBERLINE LTD.
BLUE MOUNTAIN CREDIT ALTERNATIVES
MASTER FUND L.P.
BLUEMOUNTAIN MONTENVERS MASTER FUND
SCA SICAV-SIF
BLUEMOUNTAIN LOGAN OPPORTUNITIES
MASTER FUND L.P.
BLUEMOUNTAIN SUMMIT TRADING L.P.

By: BLUEMOUNTAIN CAPITAL MANAGEMENT,
LLC, ITS INVESTMENT MANAGER

By: _____
    Name: David O'Mara
    Title: Deputy General Counsel

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ▮▮▮▮▮▮▮

[Signature Page to RSA]

FRANKLIN ADVISERS, INC. on behalf of the
following funds:

CALIFORNIA INTERMEDIATE TERM TAX
FREE INCOME FUND

CALIFORNIA HIGH YIELD MUNICIPAL BOND
FUND

TENNEESEE MUNICIPAL BOND FUND

CALIFORNIA TAX FREE INCOME FUND

NEW YORK TAX FREE INCOME FUND

FEDERAL TAX FREE INCOME FUND

COLORADO TAX FREE INCOME FUND

GEORGIA TAX FREE INCOME FUND

PENNSYLVANIA TAX FREE INCOME FUND

HIGH YIELD TAX FREE INCOME FUND

MISSOURI TAX FREE INCOME FUND

OREGON TAX FREE INCOME FUND

VIRGINIA TAX FREE INCOME FUND

FLORIDA TAX FREE INCOME FUND

LOUISIANA TAX FREE INCOME FUND

MARYLAND TAX FREE INCOME FUND

NORTH CAROLINA TAX FREE INCOME
FUND

NEW JERSEY TAX FREE INCOME FUND

FRANKLIN STRATEGIC INCOME FUND –
CANADA

FTIF- FRANKLIN STRATEGIC INCOME FUND

[Signature Page to RSA]

FSS-FRANKLIN STRATEGIC INCOME FUND

FTVIP – FRANKLIN STRATEGIC INCOME VIP FUND

FIST-FRANKLIN TOTAL RETURN FUND

By: _____

Name: Tom Walsh

Title: SVP

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially owned by accounts for which Supporting Holder has investment management responsibility, which it would be entitled to vote on in a plan solicitation: ▮▮▮▮▮▮

[Signature Page to RSA]

GOLDENTREE ASSET MANAGEMENT LP, on
behalf of all funds and accounts holding Uninsured
Bonds (now and hereafter) for which it serves as
investment advisor

By: _____

Name: Sasha Linney

Title: Associate General Counsel

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ██████████

[Signature Page to RSA]

KNIGHTHEAD (NY) FUND, L.P.

By: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name: Laura L. Torrado
Title: Authorized Signatory

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially owned by accounts for which Supporting Holder has investment management responsibility, which it would be entitled to vote on in a plan solicitation: ██████████

[Signature Page to RSA]

KNIGHTHEAD ANNUITY & LIFE ASSURANCE
COMPANY

By: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____
     Name: Laura L. Torrado
     Title: Authorized Signatory

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ████████

[Signature Page to RSA]

KNIGHTHEAD MASTER FUND, L.P.

By: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name: Laura L. Torrado
Title: Authorized Signatory

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ██████████

[Signature Page to RSA]

Silver Point Capital Fund, L.P.
Silver Point Capital Offshore Master Fund, L.P.

By: Silver Point Capital, L.P., Its Investment Manager

By: _____
Name: David Steinmetz
Title: Authorized Signatory

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ███████████████

*Principal amount stipulated above represents our trade-date position. Our settle-date position
amounts to: ████████████████

[Signature Page to RSA]

Assured Guaranty Corp. and Assured Guaranty
Municipal Corp.

By: _____

Name: Holly Horn
Title: Senior Managing Director

Principal amount of Uninsured Bonds beneficially owned by Assured, which it would be entitled
to vote on in a plan solicitation: $▮▮▮▮▮▮.[1]

Principal amount of Assured Insured Bonds: $▮▮▮▮▮▮.

---

[1] This figure includes principal amounts paid by Assured under its Bond Insurance Agreements on account
of matured Assured Insured Bonds.  Pursuant to the Bond Insurance Agreements, Assured has become
subrogated to the holders of such matured Assured Insured Bonds.

[Signature Page to RSA]

Syncora Guarantee Inc.

By: _____

Name: FREDERICK B, HNATI

Title: CEO & PRESIDENT

Principal amount of Uninsured Bonds beneficially owned by Syncora, which it would be entitled to vote on in a plan solicitation: $█████████

Principal amount of Syncora Insured Bonds:  $██████████

---

[1]   This figure includes principal amounts paid by Syncora under its Bond Insurance Agreements on account of matured Syncora Insured Bonds. Pursuant to the Bond Insurance Agreements, Syncora has become subrogated to the holders of such matured Syncora Insured Bonds.

[Signature Page to RSA]

National Public Finance Guarantee Corporation

By: _____

Name: Patricia Ferrari

Title: Managing Director

Principal amount of Uninsured Bonds beneficially owned by National, which it would be entitled to vote on in a plan solicitation: $██████████[1]

Principal amount of National Insured Bonds: $██████████

---

[1] This figure includes principal amounts paid by National under its Bond Insurance Agreements on account of matured National Insured Bonds. Pursuant to the Bond Insurance Agreements, National has become subrogated to the holders of such matured National Insured Bonds.

**<u>Schedule 1</u>**

CONFORMED **DEFINITIVE RESTRUCTURING SUPPORT AGREEMENT**
INCORPORATING AMENDMENTS THROUGH SEPTEMBER 9, 2019

**DEFINITIVE RESTRUCTURING SUPPORT AGREEMENT**

  This Definitive Restructuring Support Agreement (together with the annexes, exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**" or the "**Definitive RSA**"), dated as of May 3, 2019, is entered into by and among: (i) the Puerto Rico Electric Power Authority ("**PREPA**"), (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (iii) the Financial Oversight and Management Board for Puerto Rico ("**FOMB**"), (iv) the members of the Ad Hoc Group of PREPA Bondholders identified on Annex A hereto, as such members may change from time to time in accordance with Section 6(c)(vii) (collectively, the "**Ad Hoc Group Members**" or the "**Ad Hoc Group**," and each individually, an "**Ad Hoc Group Member**"), (v) any other persons who beneficially own or control Uninsured Bonds and are party to this Agreement or execute and deliver, or have executed and delivered, a Joinder Agreement in the form of Exhibit A hereto (such persons, together with the Ad Hoc Group Members, the "**Uninsured Supporting Holders**") ~~and~~, (vi) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "**Assured**"~~and together with~~), (vii) Syncora Guarantee Inc. ("**Syncora**"), and (viii) National Public Finance Guarantee Corporation ("**National**"). This Agreement refers to the Uninsured Supporting Holders, Assured, National, and Syncora collectively as the "**Supporting Holders**")~~.  This Agreement collectively refers~~ each individually as a "**Supporting Holder**" and to FOMB, AAFAF, PREPA, and the Supporting Holders collectively as the "**Parties**" and each individually as a "**Party**."

  **WHEREAS**, PREPA is the issuer of power revenue bonds and power revenue refunding bonds (together, the "**Bonds**," and persons who beneficially own or control Bonds, "**Bondholders**") issued and outstanding pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented (the "**Trust Agreement**"), between PREPA and U.S. Bank National Association (in its capacity as successor trustee, the "**Trustee**").

  **WHEREAS**, in connection with the issuance of certain of the Bonds (such Bonds, the "**Insured Bonds**"), PREPA entered into various insurance agreements with the Trustee corresponding to insurance policies issued by certain monoline insurers (such monoline insurers, the "**Insurers**", such insurance policies to which any of such Insurers is currently a party, and the insurance agreements related thereto, collectively, the "**Bond Insurance Agreements**" and, together with the Trust Agreement, the Bonds, the resolutions approving the Bonds, and any other agreements, supplements, amendments, or other documents executed, adopted, or delivered in connection with the issuance or maintenance of the Bonds, the "**Bond Documents**").  Any Bonds that are not Insured Bonds are referred to herein as "**Uninsured Bonds**."

  **WHEREAS**, the total principal amount of Uninsured Bonds that are beneficially owned by each member of the Ad Hoc Group and each other Supporting Holder as of the date hereof is set forth on their respective signature pages hereto.

**WHEREAS**, as of the date hereof, the total principal amount of Bonds that are beneficially owned or that are insured by Assured under the Bond Insurance Agreements is $██████████.

**WHEREAS**, as of the date hereof, the total principal amount of Bonds that are beneficially owned or that are insured by Syncora under the Bond Insurance Agreements is $████████.

**WHEREAS**, as of the date hereof, the total principal amount of Bonds that are beneficially owned or that are insured by National under the Bond Insurance Agreements is $████████.

**WHEREAS**, on June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187, "**PROMESA**").

**WHEREAS**, PROMESA created FOMB with certain powers over the finances and restructuring process with respect to the Commonwealth of Puerto Rico and its instrumentalities as provided for in PROMESA, and FOMB has designated PREPA as a Covered Territorial Instrumentality (as defined in PROMESA).

**WHEREAS**, pursuant to Act 2-2017, AAFAF was granted authority over reaching agreements with creditors on any debt issued by any government entity of the Commonwealth of Puerto Rico.

**WHEREAS**, on July 2, 2017, FOMB filed a Title III petition on behalf of PREPA (together with related adversary proceedings, the "**Title III Case**") in the Title III Court.

**WHEREAS**, FOMB is the representative of PREPA in the Title III Case pursuant to PROMESA section 315(b) with the sole authority to file and seek confirmation of a Plan for PREPA.

**WHEREAS**, the Parties have engaged in good faith, arms-length negotiations regarding the principal terms of a proposed restructuring of the Bonds subject to this Agreement to be implemented in a manner to be mutually agreed upon and as set forth in this Agreement.

**WHEREAS**, FOMB and AAFAF consent to PREPA's entering into this Agreement and to PREPA exercising its rights under this Agreement (including its rights to terminate this Agreement and/or its right to consent to any waiver or amendment in accordance with the provisions of this Agreement).

**WHEREAS**, on July 30, 2018, certain of the Parties entered into the Preliminary RSA (as defined below), with the intent of entering into this Agreement that shall replace, supersede and terminate any of the obligations and covenants in the Preliminary RSA.

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment with respect to the Restructuring, including matters discussed in this Agreement.

2

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**Section 1**      **Certain Definitions & Rules of Interpretation**.

(a)      <u>Definitions</u>.  Each undefined capitalized term shall have the meaning given to it in the Bankruptcy Code as incorporated into PROMESA if defined therein.  As used in this Definitive RSA, the following terms have the following meanings:

(i)      "**9019 Order**" means an order approving the 9019 Settlement.

(ii)      "**9019 Settlement**" has the meaning given to such term in Section 2(b).

(iii)      "**AAFAF**" has the meaning given to such term in the Preamble.

(iv)      "**Acceleration Price**" has the meaning given to such term in the Recovery Plan Term Sheet.

(v)      "**Act 4-2016**" means the Puerto Rico Electric Power Authority Revitalization Act 4-2016, as amended through the date hereof.

(vi)      "**Adequate Protection Payments**" has the meaning given to such term in <u>Section 2(e)(vii)</u>.

(vii)      "**Ad Hoc Group**" has the meaning given to such term in the Preamble.

(viii)      "**Ad Hoc Group Member(s)**" has the meaning given to such term in the Preamble.

(ix)      "**Ad Hoc Group Waiver and Support Fee**" has the meaning given to such term in <u>Section 4(a)</u>.

(x)      "**Additional Definitive Documents**" or "**Additional Definitive Documentation**" means all documents, including agreements, resolutions, instruments, legislation, rules, regulations, opinions, and orders, (other than Definitive Documents) that are necessary or desirable to implement, or otherwise relate to, this Definitive RSA or the Restructuring, including any Plan (including any supplements thereto), qualifying modification, restructuring, or exchange documents, any disclosure statement (including the Disclosure Statement), any order approving such disclosure statement (including the Disclosure Statement Order) and any information materials required pursuant to PROMESA, the Confirmation Order, filings with PREB concerning the Transition Charge, the PREB Order, and shall include any attachments, exhibits, schedules, or other addendums to such documents, and any documents ancillary to such documents.

3

(xi)    "**Administrative Claim**" has the meaning given to such term in Section 2(d)(iii).

(xii)    "**Administrative Claim Commencement**" means (a) May 1, 2019 for (x) Assured Insured Bonds, Syncora Insured Bonds, and National Insured Bonds, (y) Uninsured Bonds that are subject to this Definitive RSA ~~within twenty-one (21) days from the date of this Agreement~~on or prior to 5:00 p.m. (ET) on May 31, 2019 and Uninsured Bonds that are beneficially owned by Syncora, National, and Assured as identified on their respective signature pages hereto, and (z) for purposes of Administrative Claims accruing on Waiver and Support Fees, (b) ~~the date of entry of the 9019 Order for Uninsured Bonds that become subject to the Definitive RSA between the date that is twenty-one (21) days from the date of this Agreement and the date of entry of the 9019 Order, (c)~~ September 1, 2019 for Uninsured Bonds ~~made~~that become subject to this ~~Definitive RSA after the date of entry of the 9019 Order~~Agreement after 5:00 p.m. (ET) on May 31, 2019 and prior to ~~September~~5:00 p.m. (ET) on December 1, 2019, and (~~e~~d) the first day of the month after the end of any Joinder Period for Uninsured Bonds made subject to this ~~Definitive RSA~~Agreement during such Joinder Period; provided that if the Settlement Motion is denied or reversed on appeal and a Stipulated Treatment Termination results, no Administrative Claim shall have accrued.

(xiii)    "**Agreement**" has the meaning given to such term in the Preamble.

(xiv)    "**Allowed Claim**" has the meaning given to such term in Section 2(c)(i).

(xv)    "**Applicable Bond Claim**" means, in respect of any Bond, the principal amount of such Bond plus interest accrual at the contract rate through May 1, 2019.

(xvi)    "**Assured**" has the meaning given to such term in the Preamble.

(xvii)    "**Assured Acceleration Price Payment Option**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xviii)    "**Assured Bondholder Elections**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xix)    "**Assured Election**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xx)    "**Assured Insurance Policies**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xxi)    "**Assured Insured Bonds**" means the Bonds insured by Assured other than Bonds insured by Assured on a secondary basis (the

"**Assured/Syncora Secondary Bonds**") that are primarily insured by Syncora ~~Guarantee Inc. ("Syncora").~~[1]

(xxii)  "**Assured Insured Interest Rate Swaps**" means (i) that certain International Swap and Derivatives Association, Inc. Master Agreement, including its related Schedule and Credit Support Annex, each dated as of April 18, 2007, by and between PREPA and JPMorgan Chase Bank, N.A., and a transaction entered into pursuant to such documents and reflected in that certain confirmation dated April 27, 2007, insured by Assured pursuant to that certain Financial Guaranty Insurance Policy, #218491A-SWP, issued on May 3, 2007, and secured by PREPA's "Subordinate Obligations Fund" established and governed by the Trust Agreement; and (ii) that certain International Swap and Derivatives Association, Inc. Master Agreement, including its related Schedule and Credit Support Annex, each dated as of April 18, 2007, by and between PREPA and UBS AG, and a transaction entered into pursuant to such documents and reflected in that certain confirmation dated as of April 18, 2007 and insured by Assured pursuant to that certain Financial Guaranty Insurance Policy, No. 208491B-SWP, dated as of May 3, 2007, and secured by PREPA's "Subordinate Obligations Fund" established and governed by the Trust Agreement.

(xxiii)  "**Assured Securitization Bonds**" means Securitization Bonds allocable to holders of Assured Insured Bonds, Securitization Bonds allocable to Assured as a beneficial owner of Uninsured Bonds identified on Assured's signature page hereto, or Securitization Bonds that Assured is otherwise entitled to receive, in each case in accordance with the terms of this Definitive RSA.

(xxiv)  "**Assured Treatment**" means the treatments set forth in the Recovery Plan Term Sheet with respect to Assured on the account of the Assured Insured Bonds, the Uninsured Bonds identified on Assured's signature page hereto that are beneficially owned by Assured and the Assured Insured Interest Rate Swaps.

(xxv)  "**Bankruptcy Code**" means title 11 of the United States Code, as amended, §101, *et seq*.

(xxvi)  "**Bankruptcy Rule(s)**" means the Federal Rules of Bankruptcy Procedure.

(xxvii)  "**Bond(s)**" has the meaning given to such term in the Recitals.

(xxviii)  "**Bond Claim**" means the Claim(s) in respect of any Bond.

---

[1] With respect to the Assured/Syncora Secondary Bonds, ~~the Government Parties agree to work collaboratively with Assured on a treatment consistent with the Assured Treatment for such Assured/Syncora Secondary Bonds prior to the Disclosure Statement filing date~~such Bonds shall be treated as Syncora Insured Bonds.

(xxix) "**Bond Counsel**" means U.S. nationally recognized bond counsel retained by SPV.

(xxx) "**Bond Documents**" has the meaning given to such term in the Recitals.

(xxxi) "**Bond Insurance Agreements**" has the meaning given to such term in the Recitals.

(xxxii) "**Bond Qualified Transferee**" has the meaning given to such term in Section 6(c)(i).

(xxxiii)"**Bondholder(s)**" has the meaning given to such term in the Recitals.

(xxxiv)"**Bondholder Breach**" shall mean, whether prior to or after a Securitization Termination (a) any Supporting Holder commences or joins a Bondholder Litigation; (b) a Supporting Holder takes any action that has a material adverse effect on any Transformation Transaction; or (c) a breach by a Supporting Holder of any of the Bondholder Breach Covenants, or any of the representations set forth in Section 11 are untrue as to such Supporting Holder in any material respect, which in the case of each of clauses (a)-(c), remains uncured for a period of twenty (20) business days after the receipt by such Supporting Holder of notice in accordance with Section 27 of such breach from any Government Party.

(xxxv) "**Bondholder Breach Covenants**" means the covenants of the Supporting Holders set forth in Sections 2(a), 2(f)(ii), 3(a), 3(b), 3(c), 3(l), 3(n), 5(a), 5(b), 6(a)(i), 6(b), 6(c)(i) (subject to the provisions of Section 6(c)(ii)), and 6(d) of this Agreement.

(xxxvi)"**Bondholder Litigation**" means (A) any litigation, action, or claim (including, without limitation, the Monoline Motion) by the Trustee, a Bondholder or insurer of Bonds involving or directly relating to PREPA or the Transformation Transaction, including appeals related thereto, in any court of competent jurisdiction including, but not limited to, the Title III Court, (a) seeking relief from the automatic stay for any purpose, including to allow Bondholders to seek appointment of a receiver or to exercise any rights or remedies under the Trust Agreement or the Puerto Rico Electric Power Authority Act (Act 83-1941), as amended (including actions as a Bondholder on account of the Bonds and including seeking adequate protection (other than the Adequate Protection Payments if required under this Definitive RSA or the 9019 Order)), or under any other law, rule, or regulation relating to PREPA, the Transformation Transaction or the Bonds, (b) pursuing such rights or remedies with or without such stay relief, (c) seeking adequate protection (other than the Adequate Protection Payments if required under this Definitive RSA or the 9019 Order) or other payments under the Trust Agreement (including under section 922(d) of the

Bankruptcy Code (if applicable)), or (d) directing the Trustee to do any of the foregoing, and (B) the Supporting Holders providing legal or financial advice or assistance to any other party pursuing any Bondholder Litigation. "Bondholder Litigation" shall not include actions taken by Supporting Holders in capacities other than their capacities as Bondholders or insurers of Bonds, and shall also not include participation in any litigation related to the Appointments Clause; provided that no Supporting Holder shall oppose the Settlement Motion in any capacity, and doing so shall constitute Bondholder Litigation.

(xxxvii) "**Chosen Court**" has the meaning given to such term in Section 15.

(xxxviii) "**Claim**" has the meaning given to such term in section 101(5) of the Bankruptcy Code.

(xxxix) "**Confirmation Order**" means a court order pursuant to Title III of PROMESA approving the Plan as satisfying the requirements of Title III of PROMESA, any proposed version of which shall implement the Definitive RSA and provide necessary findings and legal conclusions to support the Transformation Transaction.

(xl) "**Consulting Parties**" shall mean National and Syncora.

(xli) (xl) "**CUSIP**" means a Committee on Uniform Securities Identification Procedures number.

(xlii) (xli) "**Demand Protections**" means the protections set forth on Schedule I-A to the Securitization Term Sheet.

(xliii) (xlii) "**Definitive Documents**" or "**Definitive Documentation**" means the Settlement Motion, the 9019 Order, the Tolling Agreement, the Securitization Documents, IRS Private Letter Ruling Request (if any), IRS Private Letter Ruling (if any), Amended Act (as defined in the Securitization Term Sheet), and any agreements, instruments, schedules, resolutions, exhibits, supplements, annexes, appendices, opinions, legislation, rules, regulations, and orders related to the foregoing.

(xliv) (xliii) "**Delayed Implementation Date**" has the meaning given to such term in Section 2(e)(i).

(xlv) (xliv) "**Disclosure Statement**" means the disclosure statement in respect of the Plan, approved by an order of the Title III Court as containing adequate information under section 1125(b) of the Bankruptcy Code, and disseminated to creditors of PREPA in connection with the solicitation of votes on the Plan.

(xlvi) (xlv) "**Disclosure Statement Order**" means the order to be entered by the Title III Court authorizing the use of the Disclosure Statement for soliciting votes on the Plan and establishing solicitation procedures.

(xlvii) (xlvi) "**Dismissal Motion**" has the meaning given to such term in Section 3(a).

(xlviii) (xlvii) "**DSRF**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xlix) (xlviii) "**Effective Date**" means the date upon which all the conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms, which conditions precedent shall include the provision of the Securitization Bond Treatment or Stipulated Treatment, as applicable, subject to the Definitive Documents and the Additional Definitive Documents.

(l) (xlix) "**EMMA**" means the Municipal Securities Rulemaking Board's Electronic Municipal Market Access system at www.emma.msrb.org.

(li) (l) "**Exchange Ratio**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lii) (li) "**Financial Indebtedness**" means any Bonds or any funded debt owed to the fuel line lenders.

(liii) (lii) "**Fiscal Plan**" means the certified fiscal plan (as defined in PROMESA) for PREPA, as may be amended and certified in accordance with PROMESA.

(liv) (liii) "**FOMB**" has the meaning given to such term in the Preamble.

(lv) (liv) "**Force Majeure Event**" has the meaning given to such term in Section 8.

(lvi) (lv) "**Government Parties**" means collectively AAFAF, FOMB, and PREPA, and each of AAFAF, FOMB, and PREPA is referred to individually as a "**Government Party**."

(lvii) (lvi) "**Increased Settlement Charge**" has the meaning given to such term in Section 2(e)(i).

(lviii) (lvii) "**Increased Settlement Payment**" has the meaning given to such term in Section 2(e)(ii).

(lix) (lviii) "**Individual Termination**" has the meaning given to such term in Section 9(d)(v).

8

(lx)   "**Insurance Conditions**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxi)   (lix) "**Insured Bonds**" has the meaning given to such term in the Recitals.

(lxii)   (lx) "**Insurers**" has the meaning given to such term in the Recitals.

(lxiii)   (lxi) "**IRS**" means the United States Internal Revenue Service.

(lxiv)   (lxii) "**IRS Private Letter Ruling**" means all private letter rulings or closing agreements, if any, that Bond Counsel requires in order to deliver an unqualified opinion that interest on all or a portion of the Securitization Bonds is excludable from gross income for federal income tax purposes and exempt from all state and Puerto Rico taxes.

(lxv)   (lxiii) "**IRS Private Letter Ruling Request**" means any documents submitted to the IRS requesting or supporting an IRS Private Letter Ruling and any related material submissions, if any, including any written pre-submission communications.

(lxvi)   (lxiv) "**Joinder Agreement**" means a joinder agreement in the form of Exhibit A hereto.

(lxvii)   (lxv) "**Joinder Period**" has the meaning given to such term in Section 2(c)(iii).

(lxviii)   (lxvi) "**Lien Challenge**" means any action that a Government Party (including, without limitation, as to FOMB, any future or successor to FOMB and any members thereof) may bring to challenge the liens and claims (including the validity, priority, nature or extent of any liens or security interests) related to the Bonds.

(lxix)   (lxvii) "**Market Fixed Rate**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxx)   (lxviii) "**Monoline Motion**" means the Motion of National ~~Public Finance Guarantee Corporation~~, Assured ~~Guaranty Corp., Assured Guaranty Municipal Corp.~~, and Syncora ~~Guarantee Inc.~~ for Relief from the Automatic Stay to Allow Movants to Enforce their Statutory Right to Have a Receiver Appointed [Case No. 17-04780, Dkt. No. 975].

(lxxi)   (lxix) "~~Other Insured Bonds~~"National" has the meaning given to such term in ~~Section 6(d)(i)~~the Preamble.

(lxxii)   "**National Acceleration Price Payment Option**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxiii) "**National Bondholder Elections**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxiv) "**National Election**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxv) "**National Insurance Policies**" has the meaning given to such terms in the Recovery Plan Term Sheet.

(lxxvi) "**National Insured Bonds**" means the Bonds insured by National.

(lxxvii) "**National Securitization Bonds**" means Securitization Bonds allocable to holders of National Insured Bonds, Securitization Bonds allocable to National as a beneficial owner of Uninsured Bonds identified on National's signature page hereto, or Securitization Bonds that National is otherwise entitled to receive, in each case in accordance with the terms of the Agreement.

(lxxviii)       "**National Treatment**" means the treatments set forth in the Recovery Plan Term Sheet with respect to National on the account of the National Insured Bonds and the Uninsured Bonds identified on National's signature page hereto that are beneficially owned by National.

(lxxix) (lxx) "**Outside Date**" means June 30, 2020.

(lxxx) (lxxi) "**Parties**" has the meaning given to such term in the Preamble.

(lxxxi) (lxxii) "**Permitted Objection**" means an objection by a Supporting Holder to a Plan, qualifying modification, exchange, or restructuring of Bonds subject to this Agreement (i) solely on the grounds that it does not comply with this Agreement or does not provide the Stipulated Treatment, as applicable, or (ii) in the case of an Uninsured Supporting Holder that holds Other Insured Bonds, a limited objection to its treatment solely on account of its Insured Bonds with respect to the treatment of the Bond Insurance Agreements, including the terms, conditions, and structure of any custodial trust or escrow arrangement relating to such Bond Insurance Agreements, if such treatment is unreasonable or violates the rights of the beneficial holders of the Other Insured Bonds under the Bond Insurance Agreements and to the extent it would have been able to file such objection if it were not a Supporting Holder or (iii) in the case of an Uninsured Supporting Holder that holds Assured Insured Bonds, Syncora Insured Bonds, or National Insured Bonds, a limited objection to its treatment solely on account of its Assured Insured Bonds, Syncora Insured Bonds, or National Insured Bonds, as applicable, with respect to the treatment of the Bond Insurance Agreements, including the terms, conditions, and structure of any custodial trust or escrow arrangement relating to such Bond Insurance Agreements, if such treatment violates the rights of the beneficial holders of the Assured Insured Bonds, Syncora Insured Bonds, or National Insured Bonds under the Bond Insurance Agreements and to the extent it would have been able to file such objection if it were not a

Supporting Holder.  Notwithstanding anything herein to the contrary, a Permitted Objection shall not be considered a Bondholder Litigation or a Bondholder Breach.

(lxxxii)~~(lxxiii)~~ "**Permitted Puerto Rico Objection**" means an objection by AAFAF to a Plan proposed by FOMB, including an objection to the treatment or classification of any Claims under the Plan, other than an objection that relates to the classification or treatment of the Bond Claims or Bonds.

(lxxxiii)          ~~(lxxiv)~~ "**PIK Payments**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxxiv)          ~~(lxxv)~~ "**Plan**" means the plan of adjustment (including any supplements thereto) for PREPA pursuant to Title III of PROMESA.

(lxxxv)~~(lxxvi)~~ "**PREB**" means the Puerto Rico Energy Bureau.

(lxxxvi)          ~~(lxxvii)~~ "**PREB Order**" means any order(s) from PREB concerning this Agreement.

(lxxxvii) ~~(lxxviii)~~ "**Preliminary RSA**" means that certain Preliminary Restructuring Support Agreement (including the exhibits and annex thereto), dated as of July 30, 2018, by and among PREPA, AAFAF, FOMB and the Bondholders who are or were parties to such agreement, as extended from time to time.

(lxxxviii)          ~~(lxxix)~~ "**PREPA**" has the meaning given to such term in the Preamble

(lxxxix)          ~~(lxxx)~~ "**PROMESA**" has the meaning given to such term in the Recitals.

(xc)     ~~(lxxxi)~~ "**Qualified Marketmaker**" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the Bonds or enter with customers into long and short positions in debt securities such as the Bonds, in its capacity as a dealer or market maker in such Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to Bonds, is registered with the SEC and Financial Institutions Regulatory Authority..

(xci)     ~~(lxxxii)~~ "**Recovery Plan Term Sheet**" means the term sheet attached Exhibit C hereto.

(xcii)     ~~(lxxxiii)~~ "**Required Holders**" means the Required Uninsured Holders and Assured.

(xciii) (lxxxiv) "**Required Parties**" means at any time (i) each Government Party that is party to this Definitive RSA at such time, (ii) the Required Uninsured Holders, and (iii) Assured.

(xciv) (lxxxv) "**Required Threshold**" means (A) no later than two (2) business days prior to hearing on the Settlement Motion (i) Uninsured Supporting Holders holding a minimum of 60% in aggregate principal amount of the Uninsured Bonds or (ii) Supporting Holders holding or insuring a minimum of 60% in aggregate principal amount of all Bonds and (B) no later than September 1, 2019 (and continuing thereafter) (i) Uninsured Supporting Holders holding a minimum of 67% in aggregate principal amount of the outstanding Uninsured Bonds and (ii) Supporting Holders holding or insuring a minimum of 67% in aggregate principal amount of all outstanding Bonds.

(xcv) (lxxxvi) "**Required Uninsured Holders**" means, as of any date of determination, Ad Hoc Group Members that beneficially own or control at least a majority in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all Ad Hoc Group Members as of such date.

(xcvi) (lxxxvii) "**Restructuring**" means the proposed restructuring of the Bonds subject to this Agreement as provided in this Agreement.

(xcvii) (lxxxviii) "**RSA Execution Date**" means the date on which counterpart signature pages to this Definitive RSA shall have been executed and delivered by PREPA, AAFAF, FOMB, Assured and the members of the Ad Hoc Group.

(xcviii) (lxxxix) "**RSA Marketmaker**" means a Qualified Marketmaker acting in its capacity as a Qualified Marketmaker that is party to an RSA Marketmaker Joinder approved by the Required Uninsured Holders and each Government Party.

(xcix) (xc) "**RSA Marketmaker Joinder**" means a joinder agreement in the form attached as <u>Exhibit B</u> hereto, with such modifications as are acceptable to the Required Uninsured Holders and each Government Party. The Ad Hoc Group and Government Parties agree to work together in good faith to agree on reasonable modifications to such form of joinder agreement to address any concerns that may be raised by a Qualified Marketmaker.

(c) (xci) "**RSA Marketmaker List**" means a list of RSA Marketmakers, an updated version of which shall be available at a dedicated URL and also posted on EMMA. The RSA Marketmaker List shall be promptly updated (A) to add any new RSA Marketmaker that signs an RSA Marketmaker Joinder and (B) to remove any RSA Marketmaker that (x) fails to materially comply with the requirements of the RSA Marketmaker Joinder or (y) is no longer regularly in the business of making a market in Uninsured Bonds subject to

this RSA. The dedicated URL for the RSA Marketmakers List shall be posted on EMMA. The initial RSA Marketmaker List shall be delivered to the Supporting Holders party hereto at the time of such delivery and shall include the date on which the RSA Marketmaker Period starts.

(ci)   (xcii) "**RSA Marketmaker Period**" means the period after the date set forth on the initial RSA Marketmaker List delivered to the Supporting Holders (which shall not be earlier than the 15th day following the RSA Execution Date).

(cii)   (xciii) "**SEC**" means the United States Securities and Exchange Commission.

(ciii)   (xciv) "**Securitization Bonds**" or "**Securitization Instruments**" means the Tranche A Bonds and Tranche B Bonds.

(civ)   (xcv) "**Securitization Bond Treatment**" means the issuance of Securitization Bonds on the terms and conditions set forth in this Definitive RSA. The Securitization Bonds shall be issued on the Effective Date of the Plan and shall not be issued pursuant to a Title VI qualifying modification or similar structure without the consent of the Government Parties and the Required Holders, after consultation with the Consulting Parties.

(cv)   (xcvi) "**Securitization Documents**" means all documents, resolutions, certificates, and opinions, relating to the Securitization Instruments or Transition Charge, including, without limitation, any resolutions, trust agreements, insurance or surety documents, servicing agreements, depository agreements, the Securitization Instruments, governing documents of SPV, and any documents entered into or adopted by SPV or PREPA affecting the Securitization Instruments or the holders thereof.

(cvi)   (xcvii) "**Securitization Protections Term Sheet**" means Schedule I-B to the Securitization Term Sheet.

(cvii)   (xcviii) "**Securitization Termination**" has the meaning given to such term in Section 9(b).

(cviii)   (xcix) "**Securitization Term Sheet**" means the Term Sheet attached as Annex A to the Recovery Plan Term Sheet.

(cix)   (c) "**Settlement Charge**" means a charge of 1 c/kWh to be implemented by PREPA and included in its customer bills by July 1, 2019.

(cx)   (ci) "**Settlement Motion**" has the meaning given to such term in Section 2(a).

(cxi)   (cii) "**Settlement Payments**" means commencing August 30, 2019 in accordance with Section 5(c)(iv) and continuing through the earliest of

(A) a Stipulated Treatment Termination, (B) a termination pursuant to Section 9(d)(vi) as to PREPA or AAFAF, (C) the Effective Date, or (D) dismissal of PREPA's Title III Case, monthly settlement payments to be made by PREPA equal to (i) the number of kilowatt hours PREPA billed during the previous month, multiplied by (ii) 92% (representing the projected collection percentage and certain statutory exceptions), multiplied by (iii) the Settlement Charge.

(cxii) (ciii) "**Solicitation**" means the solicitation of votes for the Plan pursuant to, and in compliance with, PROMESA or any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

(cxiii) (civ) "**SPV**" or "**Issuer**" means a bankruptcy remote special purpose vehicle (which may be the Puerto Rico Electric Power Authority Revitalization Corporation, or another entity as agreed by the Required Parties after consultation with the Consulting Parties, established by the Government of Puerto Rico, and used for the Restructuring).

(cxiv) (cv) "**Stay Motion**" has the meaning given such term in Section 3(b).

(cxv) (cvi) "**Stipulated Treatment**" has the meaning given such term in Section 2(c)(ii).

(cxvi) (cvii) "**Stipulated Treatment Termination**" has the meaning given such term in Section 9(c)(i).

(cxvii) (cviii) "**Super Majority Holders**" means the Super Majority Uninsured Holders and Assured.

(cxviii)(cix) "**Super Majority Uninsured Holders**" means, as of the date of determination, Ad Hoc Group Members that beneficially own or control at least two-thirds in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all the Ad Hoc Group Members as of such date.

(cxix) (cx) "**Supporting Holder(s)**" has the meaning given to such term in the Preamble.

(cxx) (cxi) "**Surviving Administrative Claim**" has the meaning given to such term in Section 2(c)(iv).

(cxxi) (cxii) "**Swap MTM Amount**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxii) "**Syncora**" has the meaning given to such term in the Preamble.

14

(cxxiii) **"Syncora Acceleration Price Payment Option"** has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxiv) **"Syncora Bondholder Elections"** has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxv) **"Syncora Election"** has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxvi) **"Syncora Insurance Policies"** has the meaning given to such terms in the Recovery Plan Term Sheet.

(cxxvii) **"Syncora Insured Bonds"** mean the Bonds insured by Syncora.

(cxxviii) **"Syncora Securitization Bonds"** means Securitization Bonds allocable to holders of Syncora Insured Bonds, Securitization Bonds allocable to Syncora as a beneficial owner of Uninsured Bonds identified on Syncora's signature page hereto, or Securitization Bonds that Syncora is otherwise entitled to receive, in each case in accordance with the terms of the Agreement.

(cxxix) **"Syncora Treatment"** means the treatments set forth in the Recovery Plan Term Sheet with respect to Syncora on the account of the Syncora Insured Bonds and the Uninsured Bonds identified on Syncora's signature page hereto that are beneficially owned by Syncora.

(cxxx) ~~(cxiii)~~ **"TC Cap"** has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxxi) ~~(cxiv)~~ **"Title III Case"** has the meaning given to such term in the Recitals.

(cxxxii) ~~(cxv)~~ **"Title III Court"** means the United States District Court for the District of Puerto Rico in its capacity as the court presiding over the Title III Case.

(cxxxiii) ~~(cxvi)~~ **"Tolling Agreement"** has the meaning given to such term in Section 3(c).

(cxxxiv) ~~(cxvii)~~ **"Tracking Mechanics Term Sheet"** has the meaning given to such term in Section 2(f)(i).

(cxxxv) ~~(cxviii)~~ **"Tranche A Bonds"** has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxxvi) ~~(cxix)~~ **"Tranche B Bonds"** has the meaning given to such term in the Recovery Plan Term Sheet.

15

(cxxxvii)   (exx) "**Transfer**" has the meaning given to such term in Section 6(c)(i).

(cxxxviii)   (exxi) "**Transformation Transaction**" means any and all transactions supported by the Government Parties whereby PREPA or the Government of Puerto Rico establishes one or more sales, leases, public-private partnerships, management contracts, concessions, or similar arrangements or transactions related to any of PREPA's functions, assets, services, or facilities, including without limitation, any "PREPA Transaction" as defined in the *Puerto Rico Electric Power System Transformation Act*, Act 120-2018 (approved June 21, 2018).

(cxxxix)   (exxii) "**Transition Charge**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxl)   (exxiii) "**Transition Charge Termination**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxli)   (exxiv) "**Triggering Event**" means (i) a Stipulated Treatment Termination, (ii) the continuation of the Monoline Motion or commencement of any other Bondholder Litigation, provided, however, that if any Bondholder Litigation is commenced by any party, the Parties shall work in good faith to have such Bondholder Litigation dismissed, stayed, or withdrawn and a Triggering Event shall not occur as a result of such Bondholder Litigation until three (3) business days after any Government Party provides notice in accordance with Section 27 to the Required Holders, the Consulting Parties, and the Trustee that it has determined in good faith in its sole discretion that commencing a Lien Challenge is necessary to protect the rights of any Government Party, or (iii) when the Government Parties determine in good faith that pursuit of a Lien Challenge is necessary as part of the plan formulation process (*e.g.*, in response to an actual or anticipated disclosure statement or plan objection) to provide the Supporting Holders the Securitization Bond Treatment or to provide the Stipulated Treatment after a Securitization Termination.

(cxlii)   (exxv) "**Trust Agreement**" has the meaning given to such term in the Recitals.

(cxliii)   (exxvi) "**Trustee**" has the meaning given to such term in the Recitals.

(cxliv)   (exxvii) "**Uninsured Bond(s)**" has the meaning given to such term in the Recitals.

(cxlv)   (exxviii) "**Uninsured Supporting Holders**" has the meaning give to such term in the Preamble.

(cxlvi)   (exxix) "**Waiver and Support Fees**" means the fees set forth in Sections 4(a)-(c).

16

(cxlvii)(cxxx) "**Withdrawal Event**" has the meaning given to such term in Section 9(a).

(b)    Rules of Interpretation.

(i)    Except as expressly set forth herein, nothing contained herein shall be construed to alter, waive or otherwise affect the respective powers, rights, or responsibilities of FOMB, AAFAF, or PREPA, whether such powers, rights, or responsibilities arise under PROMESA or other applicable law.

(ii)    Each Supporting Holder is a party hereto solely in its capacity as the beneficial owner or insurer of Bonds issued by PREPA; provided that no Supporting Holder shall oppose the Settlement Motion in any capacity.

(iii)    When a reference is made in this Definitive RSA to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Definitive RSA unless otherwise indicated. Each of the exhibits, annexes and schedules to this Definitive RSA is expressly incorporated herein and made a part of this Definitive RSA, and all references to this Agreement or this Definitive RSA (including by use of words such as "herein") shall include such exhibits, annexes and schedules. Unless the context of this Definitive RSA otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this Definitive RSA, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (d) the word "or" shall not be exclusive and shall be read to mean "and/or," (e) the word "person" shall be understood to refer to any individual, corporation, limited liability company, estate, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, or government, or agency, instrumentality, or political subdivision thereof, (f) "business day" shall refer to any day other than a Saturday, Sunday or any other day on which banks located in New York, New York or San Juan, Puerto Rico are closed for business as a result of a federal, state, or local holiday, and (g) "writing," "written," and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent, or other information shall be provided in "writing" shall include email.

(iv)    All Definitive Documents must be consistent with this Agreement and (other than in the case of the IRS Private Letter Ruling Request, which is subject to the consultation rights set forth in Section 7(b)(ii)) in form and substance mutually agreed upon by the Required Parties after consultation with the Consulting Parties. If a Definitive Document must be entered by the Title III Court, enacted into law, or issued by the IRS, the as-entered, as-enacted, as-confirmed, or as-issued version of such Definitive Document must be consistent with this Agreement, and in form and substance reasonably acceptable to the

17

Required Parties after consultation with the Consulting Parties. Notwithstanding the foregoing, after a Securitization Termination, the form and substance of the Definitive Documents shall be deemed to be reasonably acceptable to the Required Uninsured Holders and Assured if such Definitive Documents provide the Stipulated Treatment and other required payments and otherwise comply with the surviving requirements of this Definitive RSA.   Any reference in this Agreement to a Definitive Document means a Definitive Document that meets the standards in this Section 1(b)(iv). Without limiting the foregoing, any Definitive Document or portion thereof that is applicable only to any Consulting Party or that either (a) modifies a Consulting Party's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to National or Syncora as an Insurer of the National Insured Bonds or the Syncora Insured Bonds, respectively, or (c) provides for legal rights or obligations of a Consulting Party that are different in any material respect from those of any other Supporting Party, must be in form and substance mutually agreed upon by the affected Consulting Party and the Government Parties.

(v)      The Additional Definitive Documents or Additional Definitive Documentation must be in form and substance reasonably acceptable to each of the Government Parties   and, if an Additional Definitive Document must be entered by the Title III Court, enacted into law, or issued by the IRS or PREB, the as-entered, as-enacted, as-confirmed, or as-issued version must be in form and substance reasonably acceptable to each of the Government Parties; provided that if the Additional Definitive Documents are not reasonably acceptable to AAFAF or PREPA and FOMB proceeds without such consent, nothing herein shall prevent AAFAF from filing a Permitted Puerto Rico Objection. In addition, any portion of an Additional Definitive Document that materially relates to the treatment of the Bond Claims of Supporting Holders (including any portion relating to the Securitization Bonds, the Transition Charge or the Demand Protections) shall be consistent with this Agreement and in form and substance mutually agreed upon by the Required Parties, after consultation with the Consulting Parties, and nothing else in the Additional Definitive Documentation shall be materially inconsistent with this Agreement.  If an Additional Definitive Document must be entered by the Title III Court, enacted into law, or issued by the IRS or PREB, then any portion of such Additional Definitive Document that relates to the treatment of the Bond Claims of Supporting Holders (including any portion relating to the Securitization Bonds, the Transition Charge or the Demand Protections) contained in the as-entered, as-enacted, as-confirmed, or as-issued version of such Additional Definitive Document must be in form and substance reasonably acceptable to the Required Parties, after consultation with the Consulting Parties, and nothing else in such Additional Definitive Document shall be materially inconsistent with this Agreement.  Notwithstanding the foregoing, after a Securitization Termination, the form and substance of any portion of the Additional Definitive Documents that directly relates to the treatment of the Bond Claims of Supporting Holders shall be deemed to be reasonably acceptable to the Required Uninsured Holders and Assured if such portions of the Additional Definitive Document provide the Stipulated Treatment and other required

18

payments and otherwise comply with the surviving requirements of this Definitive RSA. Any reference in this Agreement to an Additional Definitive Document (including provisions requiring such documents to be mutually agreed upon by, or acceptable to, the Required Parties) means an Additional Definitive Document that meets the standards in this Section 1(b)(v).  Without limiting the foregoing, any Additional Definitive Document or portion thereof that is applicable only to any Consulting Party or that either (a) modifies a Consulting Party's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to National or Syncora as an Insurer of the National Insured Bonds or the Syncora Insured Bonds, respectively, or (c) provides for legal rights or obligations of a Consulting Party that are different in any material respect from those of any other Supporting Party, must be in form and substance mutually agreed upon by the affected Consulting Party and the Government Parties.

(vi)    FOMB is a party hereto solely in its capacity as the representative of PREPA under PROMESA section 315(b), and AAFAF is a party hereto solely in its capacity as a representative of PREPA pursuant to Act 2-2017; provided that, without limiting the above, PREPA is entitled to exercise its rights under this Agreement (including its rights to terminate this Agreement and/or its right to consent to any waiver or amendment in accordance with the provisions of this Agreement) and provided further, that for purposes of determining whether a termination pursuant to Section 9 has occurred, (i) all actions of FOMB shall be treated only as actions of FOMB, and (ii) all actions of AAFAF shall be treated only as actions of AAFAF.

**Section 2**    **9019 Settlement**.

(a)    FOMB shall file a motion (the "**Settlement Motion**") together with a draft 9019 Order with the Title III Court seeking approval of this Definitive RSA and 9019 Settlement within ten (10) business days after the execution of this Definitive RSA by the Government Parties, the Ad Hoc Group Members and Assured.  Within five (5) business days of the filing of the Settlement Motion, the Ad Hoc Group and Assured shall direct the Trustee, pursuant to the Trust Agreement, to join the Settlement Motion.  By signing the RSA after the RSA Execution Date, a Supporting Holder shall be deemed to have joined in such direction. None of the Supporting Holders or the Government Parties shall be required by this Definitive RSA to provide any indemnity to the Trustee and any relief requested under the Settlement Motion shall be contingent on the entry of the 9019 Order that includes a full exculpation of the Trustee and the directing Supporting Holders for any liability for joining the Settlement Motion and entering into the Tolling Agreement or providing direction in respect of the same.  Concurrently with the filing of the Settlement Motion, the FOMB shall file a motion (the "**Dismissal Motion**") and form of order seeking dismissal of the Monoline Motion, which Dismissal Motion and form of order shall be in form and substance reasonably acceptable to the Required Parties.

(b)    Once approved by the Title III Court, the 9019 Order shall constitute (A) a settlement of (i) the Bondholder Litigation including, without limitation, the Monoline Motion (which shall be settled as to the Supporting Holders and dismissed without prejudice to the

renewal of any motion similar to the Monoline Motion by the Supporting Holders in the event of a Stipulated Treatment Termination or an Individual Termination as to Assured, Syncora, or National only (unless the Individual Termination is rescinded by the Government Parties as if such termination never occurred) and, in the event of such renewal, without prejudice to the Government Parties' right to defend such motion) by all Supporting Holders, (ii) the Supporting Holders' ability to exercise or assert any rights or remedies under the Trust Agreement or other applicable law (including seeking to lift the stay or to accomplish any of the foregoing) or to direct the Trustee or provide legal or financial advice or assistance to support any other parties in connection with any of the foregoing, and (iii) the Supporting Holders' asserted right to receive any current payment or adequate protection payments on the Bonds (other than, in the case of Insured Bonds, payment from the Insurers under the Bond Insurance Agreements); (B) a tolling (including, without limitation, as to FOMB, any future or successor to FOMB and any members thereof) of all unexpired statutes of limitations for any causes of action related to the Bonds, including any Lien Challenge and any potential Bondholder Litigation, until forty-five (45) days after a Stipulated Treatment Termination; and (C) approval and authorization of (x) the Settlement Charge, the Settlement Payments, the Increased Settlement Charge, the Increased Settlement Payments, the Waiver and Support Fees, the Adequate Protection Payments, and the incurrence of the Administrative Claims, and (y) the right of the Supporting Holders to receive the Stipulated Treatment (collectively, the "**9019 Settlement**"). The 9019 Settlement shall terminate as to all Supporting Holders upon a Stipulated Treatment Termination and as to applicable individual Supporting Holder upon an Individual Termination.

      (c)    <u>Allowed Claim and Stipulated Treatment</u>.

        (i)    The 9019 Order shall provide that, if a Securitization Termination has occurred, then, except as otherwise set forth in this Definitive RSA in the event of an Individual Termination (as to such terminated Supporting Holder) or a Stipulated Treatment Termination (as to all Supporting Holders), each of the Supporting Holders shall be deemed to have an allowed secured claim in a face amount equal to (i) 73.25 % of the Applicable Bond Claim of the outstanding Bonds held or insured by such Supporting Holder, plus (ii) such Supporting Holder's allocated share (if any) of the Waiver and Support Fees inclusive of interest accrual at the contract rate through Administrative Claim Commencement, plus (iii)(a) in the case of Assured, to the extent that Assured's Stipulated Treatment is required to be adjusted as described in Section 2(c)(ii) to compensate Assured for the loss of the value of any portion of the Assured Treatment, the amount of such loss of value, (b) in the case of Syncora, to the extent that Syncora's Stipulated Treatment is required to be adjusted as described in Section 2(c)(ii) to compensate Syncora for the loss of the value of any portion of the Syncora Treatment, the amount of such loss of value, and (c) in the case of National, to the extent that National's Stipulated Treatment is required to be adjusted as described in Section 2(c)(ii) to compensate National for the loss of the value of any portion of the National Treatment, the amount of such loss of value (the "**Allowed Claim**").

        (ii)    The 9019 Order shall provide that, if a Securitization Termination occurs, then, except as set forth below in the event of an Individual Termination

(as to such applicable holder) or a Stipulated Treatment Termination (as to all Supporting Holders), and solely for purposes of settlement and without prejudice to the rights of the Parties in any other context, (i) the Supporting Holders' Allowed Claim shall be treated as if it were an allowed secured claim against the Net Revenues (as defined in the Trust Agreement) of PREPA in any subsequent Plan that is confirmed after a Securitization Termination, secured by collateral worth at least the amount of the Allowed Claim as of the Effective Date of such Plan, (ii) the foregoing shall be included in any Plan, qualifying modification, exchange, or other restructuring of Bonds subject to this Agreement, and (iii)(a) in the case of Assured, Assured shall be provided the opportunity to wrap debt securities being issued on account of the Assured Insured Bonds, to provide a DSRF surety for such debt securities and receive the related premiums to the same extent as set forth in the Assured Treatment below; provided that if Assured is not offered  the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, then Assured's Stipulated Treatment shall be adjusted to compensate Assured for the loss of that value; and, provided further, that if Assured is offered the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, and it declines to do so, Assured's ~~stipulated treatment~~Stipulated Treatment shall not be adjusted to include such value, (b) in the case of Syncora, Syncora shall be provided the opportunity to wrap debt securities being issued on account of the Syncora Insured Bonds, to provide a DSRF surety for such debt securities and receive the related premiums to the same extent as set forth in the Syncora Treatment below; provided that if Syncora is not offered the opportunity to provide such wrap (other than as a result of a failure to meet the Insurance Conditions), to provide such DSRF surety and receive such premiums, then Syncora's Stipulated Treatment shall be adjusted to compensate Syncora for the loss of that value; and, provided further, that if Syncora is offered the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, and it declines to do so, Syncora's Stipulated Treatment shall not be adjusted to include such value, and (c) in the case of National, National shall be provided the opportunity to wrap debt securities being issued on account of the National Insured Bonds, to provide a DSRF surety for such debt securities and receive the related premiums to the same extent as set forth in the National's Treatment below; provided that if National is not offered the opportunity to provide such wrap (other than as a result of a failure to meet the Insurance Conditions), to provide such DSRF surety and receive such premiums, then National's Stipulated Treatment shall be adjusted to compensate National for the loss of that value; and, provided further, that if National is offered the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, and it declines to do so, National's Stipulated Treatment shall not be adjusted to include such value (collectively, the "**Stipulated Treatment**").

(iii)    If at any time after September 1, 2019, the Supporting Holders who have not committed a Bondholder Breach hold or insure less than the applicable Required Threshold, then upon notice in accordance with Section 27 from any of the Required Holders, the Consulting Parties, or any of the Government Parties, the remaining Supporting Holders shall have 60 days to

obtain signatures to this Definitive RSA from additional Bondholders or acquire additional Uninsured Bonds such that the Bonds subject to this Definitive RSA equal or exceed the Required Threshold (each such 60 day period, a "**Joinder Period**") and the Government Parties shall cooperate with the Supporting Holders in connection therewith including posting appropriate notices on EMMA; provided, however, that any such Joinder Period shall terminate no later than ten (10) days prior to the date of the hearing on the Disclosure Statement. Any Uninsured Bond that becomes subject to this Definitive RSA during a Joinder Period shall begin receiving its first pro rata share of any Settlement Payments and accruing Administrative Claims as of the applicable Administrative Claim Commencement.     Bonds that have a particular Administrative Claim Commencement shall be identified by a separate CUSIP in accordance with Section 2(f) or, if mutually agreed to by the Required Parties, after consultation with the Consulting Parties, be subject to a special administrative claim bar date under the Plan.   Uninsured Bonds purchased by Supporting Holders after SeptemberDecember 1, 2019, at any period other than during a Joinder Period shall not be entitled to Administrative Claims, Settlement Payments, Increased Settlement Payments, or Adequate Protection Payments but shall be subject to this Definitive RSA for all other purposes, including voting obligations and entitlement to the Stipulated Treatment.

(iv)     The 9019 Order shall provide that in the event of a Securitization Termination then, and unless the Title III Case has been dismissed, until the occurrence of an Individual Termination (as to such applicable Bondholder) or a Stipulated Treatment Termination (as to all Supporting Holders), Settlement Payments (or Increased Settlement Payments or Adequate Protection Payments, as applicable) shall continue to be made to the Supporting Holders and the Administrative Claims shall continue to accrue.   In the event of an Individual Termination (as to such applicable holder) or a Stipulated Treatment Termination (as to all Supporting Holders), any accrued and unpaid Administrative Claim shall be disallowed; provided that, with regard to a Stipulated Treatment Termination under Section 9(c)(i)(6), Supporting Holders will be entitled to an Administrative Claim that will have accrued through the date the Title III Court first denied confirmation of a Plan where such denial is not solely on grounds raised in an objection by PREPA or AAFAF ("**Surviving Administrative Claim**").

(d)     Settlement Payments and Administrative Claims.

(i)     Subject to entry of the 9019 Order, the Government Parties shall implement and collect the Settlement Charge and make the Settlement Payments.

(ii)     Subject to approval of the Title III Court, the Settlement Payments shall be made solely on account of Bonds subject to this Definitive RSA at the time such Settlement Payment is made on a pro rata basis based on the outstanding principal amounts of the Bonds subject to this Definitive RSA; provided that no Settlement Payment shall be made on any Bond that is not subject to this Definitive RSA by SeptemberDecember 1, 2019 (unless such Bond

is an Uninsured Bond that becomes subject to this Definitive RSA during a subsequent Joinder Period) and no Bondholder shall receive any Settlement Payments on account of Bonds held by such Bondholder after an Individual Termination as to such Bondholder. Any Settlement Payments made on account of (i) Assured Insured Bonds shall be made to Assured, (ii) Syncora Insured Bonds shall be made to Syncora, and (iii) National Insured Bonds shall be made to National.

(iii)   If a Bond is subject to this Definitive RSA prior to Administrative Claim Commencement and the 9019 Order is entered (and a Stipulated Treatment Termination does not occur subsequently as a result of the 9019 Order being reversed on appeal), such Bond subject to this Definitive RSA shall be entitled to a stipulated administrative expense claim for

(x) an amount equivalent to the Tranche A Bond interest payments accrued in respect of such Bond (including accruals at the same rate on such interest payments that would have been due on any interest payment date for Tranche A Bonds if such bonds were issued as if such interest payments were paid in kind), less

(y) the amount of Settlement Payments or Increased Settlement Payments that are made on account of such Bond (such claim, the "**Administrative Claim**")

from and after the Administrative Claim Commencement applicable to such Bond until the earliest of (A) a Stipulated Treatment Termination, (B) with respect to a Supporting Holder, an Individual Termination with respect to such Supporting Holder, or (C) the Effective Date of a Plan in PREPA's Title III Case. The Administrative Claims shall also include accrual and payment-in-kind of interest on the Waiver and Support Fees.

(iv)   In lieu of Settlement Payments and/or cash payment of Administrative Claims on the Effective Date of a Plan (to the extent the Government Parties elect to pay Administrative Claims in cash), an individual Supporting Holder may elect to receive Tranche A Bonds for its Administrative Claims at the Exchange Ratio for Administrative Claims; provided that such election shall be structured as between the Supporting Holders and in a manner that does not increase the aggregate Administrative Claim or Transition Charge that would otherwise be payable under this Definitive RSA. If no agreement is reached by the Required Holders, after consultation with the Consulting Parties on implementing the election as provided herein, then no such election shall be available.

(v)   Effective on the earlier of May 1, 2019 and the date of entry of the 9019 Order, solely for purposes of the 9019 Settlement and recoveries under this Definitive RSA, interest accrual on the Bonds shall be deemed to terminate. In

the event of a Stipulated Treatment Termination or an Individual Termination, all Parties reserve all rights regarding post-petition interest.

(e)     Delayed Implementation Date.

(i)     If a Title III plan for PREPA has not been confirmed and has not gone effective (and no other transaction has been consummated pursuant to which the Stipulated Treatment or the Securitization Bonds have been provided) by March 31, 2021 (the "**Delayed Implementation Date**"), and subject to and conditioned upon issuance or enactment of all required legislative and regulatory approvals, PREPA shall put into effect a charge equal to the Transition Charge that would have gone into effect on that date assuming the Effective Date occurred and Securitization Bonds were issued on such date, which charge shall thereafter increase from time to time as if the Securitization Bonds were outstanding (the "**Increased Settlement Charge**").

(ii)     Collections on account of the Increased Settlement Charge shall be (A) paid monthly (the "**Increased Settlement Payments**"), pro rata on account of Bonds that are subject to this Definitive RSA and became subject to this Definitive RSA prior to ~~September~~December 1, 2019 or, in the case of Uninsured Bonds, during a Joinder Period, unless otherwise mutually agreed to by the Required Parties, after consultation with the Consulting Parties, on terms mutually agreed to by the Required Parties, and (B) applied (y) first on account of accrued and unpaid Administrative Claims (subject to any election to receive the Administrative Claims in Tranche A Bonds as set forth in this Definitive RSA), and (z) after payment of the Administrative Claims, to reduction of the Allowed Claim or amount of the Tranche A Bonds (as applicable); provided, however, only amounts actually collected by PREPA on account of the Increased Settlement Charge are required to be distributed.

(iii)     On and after the Delayed Implementation Date, the obligation to make Settlement Payments shall be replaced by the obligation to make Increased Settlement Payments.

(iv)     On and after the Delayed Implementation Date, the accrual of Administrative Claims in favor of the eligible Bonds held or insured by Supporting Holders shall continue, to the extent not paid by the Increased Settlement Charge, for an amount equal to the higher of (i) an amount equivalent to Tranche A interest payments (including accruals on unpaid Administrative Claims as if such unpaid Administrative Claims were paid in kind semi-annually) and (ii) an amount equal to the difference between (A) the amount of any Increased Settlement Payments or Adequate Protection Payments that would have been required to have been made as set forth above and (B) the amount of any Increased Settlement Payments or Adequate Protection Payments actually received in respect of such Bond. If the payment (whether in cash or in Tranche A Bonds) of any resulting Administrative Claim under clause (ii) exceeds the amount in clause (i), the Allowed Claim or the principal amount of Tranche A

24

Bonds to be issued at Effective Date, as applicable, shall be reduced by the amount of such excess.

(v)     To the extent the Securitization Bond Treatment or the Stipulated Treatment is provided after the Delayed Implementation Date, the terms of such Securitization Bonds or Stipulated Treatment, including maturity of the Tranche B Bonds and accrual of the Tranche B Bond amounts between the Delayed Implementation Date and the Effective Date, if applicable, shall be adjusted in a manner mutually agreed upon by the Required Parties, after consultation with the Consulting Parties, (or if no such agreement can be reached, as ordered by the Title III Court) to take into account the Increased Settlement Payments made prior to the date of issuance of the Securitization Bonds or the provision of the Stipulated Treatment so that the cost to the Government Parties (and recovery on account of any Bond) is no greater (and no less) than that of the 9019 Settlement (including with respect to the maturity of the Securitization Bonds or the Stipulated Treatment to be provided under this Definitive RSA, as applicable).

(vi)     On and after the Delayed Implementation Date, no Increased Settlement Payments shall be made if an Individual Termination (as to such applicable Bondholder) or if a Stipulated Treatment Termination (as to all Supporting Holders) occurs or has occurred, and any Administrative Claim accrued by such Supporting Holders under this Definitive RSA shall be expunged and disallowed as a result of an Individual Termination (as to such applicable Bondholder) or a Stipulated Treatment Termination (as to all Supporting Holders), other than the Surviving Administrative Claim. In addition, the obligation to make Increased Settlement Payments shall terminate on the earliest of (i) a termination pursuant to Section 9(d)(vi) as to PREPA or AAFAF, (ii) the Effective Date of a Plan (or the effective date of another transaction pursuant to which the Securitization Bond Treatment or Stipulated Treatment is provided), or (iii) dismissal of the Title III Case.

(vii)     The 9019 Order shall provide that, if the Delayed Implementation Date occurs and PREPA has not implemented the Increased Settlement Charge to the extent required by this Definitive RSA, or in the event the Delayed Implementation Date occurs or has passed and PREPA is no longer a party to the RSA due to a termination pursuant to Section 9(d)(vi), then PREPA shall be obligated pursuant to the 9019 Order to make cash adequate protection payments (the "**Adequate Protection Payments**") on a monthly basis in an amount equal to the amount of Increased Settlement Payments (as defined below) that would have been required had the Increased Settlement Charge been implemented on such date and assuming that all Increased Settlement Payments would have been made to eligible Bonds subject to this Definitive RSA. PREPA's obligation to make Adequate Protection Payments shall terminate on the earliest of (i) the date the Increased Settlement Charge is implemented, (ii) the Effective Date of a Plan (or the effective date of another transaction pursuant to which the Securitization Bond Treatment or Stipulated Treatment is provided), (iii) in the case of an individual

Supporting Holder, an Individual Termination, or (iv) in the case of all Supporting Holders, a Stipulated Treatment Termination.

(f)     Tracking Provisions.

(i)     Uninsured Bonds held by Supporting Holders shall be assigned alternative identifying CUSIPs to allow such Uninsured Bonds to be freely transferable and remain subject to the provisions of this Definitive RSA. The Supporting Holders shall, and to the extent necessary shall direct the Trustee to, cooperate with the Government Parties in obtaining the alternative identifying CUSIPs. The details of the foregoing, as well as other mechanisms for implementing, tracking and disclosing the different payments and claims that Bonds are entitled to hereunder, shall be set forth on a term sheet to be mutually agreed upon by the Required Parties, after consultation with the Consulting Parties, and filed with the Title III Court prior to entry of the 9019 Order (the "**Tracking Mechanics Term Sheet**"). Such mechanisms shall be set up in such a manner such that they do not have an adverse effect on the enforceability, validity, tax exemption, or other rights of the Bonds, or on the lawful transferability of the Bonds under applicable securities laws.

(ii)     The Supporting Holders shall (A) to the extent necessary, direct the Trustee to cooperate with the Government Parties in obtaining the alternative identifying CUSIPs, and (B) take the related actions agreed upon in the Tracking Mechanics Term Sheet.

**Section 3     Litigation Stay and Forbearance**.

The Parties agree as follows:

(a) The Ad Hoc Group shall support dismissal of the Monoline Motion. Assured shall not oppose the Dismissal Motion and shall withdraw from the Monoline Motion upon the granting of the Settlement Motion.

(a)     Upon the entry of the 9019 Order, Assured, National, and Syncora shall withdraw the Monoline Motion. The Ad Hoc Group shall support the withdrawal of the Monoline Motion.

(b)     Unless all applicable deadlines on the Monoline Motion are extended as mutually agreed by the Parties and the other movants, the Ad Hoc Group, Assured, and the Government Parties shall jointly file an urgent motion(s) (or separate motions and/or joinders thereto) with the Title III Court as soon as practicable seeking to stay all applicable deadlines for the Monoline Motion (the "**Stay Motion**") until five (5) business days after the later of the date of entry of the 9019 Order and the date of entry of the order resolving the Dismissal Motion.

(c)     The Government Parties, Ad Hoc Group, Assured, and the Trustee shall execute an agreement tolling all unexpired statutes of limitations for all causes of action related to the Bonds, including any Lien Challenge and any potential Bondholder Litigation (the "**Tolling Agreement**") and request Title III Court approval of such Tolling Agreement. By

signing this ~~RSA~~Agreement after the RSA Execution Date, a Supporting Holder shall be deemed to have joined the Tolling Agreement.

(d)     If a Bondholder Litigation (as defined below) is commenced or continued, the Parties shall work in good faith to have such Bondholder Litigation dismissed, stayed, or withdrawn; provided that, so long as the Ad Hoc Group, Syncora, and National, and Assured are in compliance with this covenant, only Supporting Holders that are represented by counsel that has appeared in the Title III Case shall be required to file a pleading pursuant to this covenant but all Supporting Holders will be required to otherwise work in good faith.

(e)     The Government Parties shall not commence a~~or seek to terminate the stay of any~~ Lien Challenge, as applicable, except in the following circumstances:  (i) ~~if an order granting the Stay Motion has not been entered by May 3, 2019 (or such later date as the Government Parties' response to the Monoline Motion is required to be filed); (ii)~~ a Triggering Event has occurred; (~~iii~~ii) if any applicable statute of limitations is expiring within the next seven (7) days; (~~iv~~iii) FOMB's authority to prosecute PREPA's Title III Case is expiring; or (~~v~~iv) with the written consent of the Required Holders after consultation with the Consulting Parties; provided that in the case of clause (~~iii~~ii) or (~~iv~~iii) above, none of the Government Parties shall commence a Lien Challenge so long as the applicable statute of limitations is (and remains) tolled (including, without limitation, as to FOMB, any future or successor to FOMB, and any members thereof) by an order of the Title III Court in form and substance acceptable to each of the Required Parties.  If any of the Government Parties files a Lien Challenge permitted by clause (~~iii~~ii) or (~~iv~~iii) above, the Government Parties shall use commercially reasonable efforts to stay any further proceedings in respect of such Lien Challenge (including extending all relevant deadlines and otherwise forbearing from pursuit of such Lien Challenge) if they are able to do so in a manner that does not prejudice their ability to resume or prosecute the Lien Challenge after expiration or termination of such stay. ~~If any of the Government Parties files a Lien Challenge permitted by clause (i) above, the Government Parties shall seek a stay of such Lien Challenge (including extending all relevant deadlines and otherwise forbearing from pursuit of such Lien Challenge) concurrently with any filing of an adversary complaint related to the Lien Challenge, and request that the stay shall continue until the Government Parties would have otherwise been permitted to commence a Lien Challenge under the terms hereof; provided that such stay shall only go into effect if the Stay Motion is granted and the Government Parties shall be permitted to prosecute the Lien Challenge until the Stay Motion is granted or the Monoline Motion is denied or dismissed.~~

(f)     Except as otherwise permitted by this Agreement (including Sections 3(g) and 3(h)), Supporting Holders cannot contest or defend against a Lien Challenge on any grounds. In the event a Lien Challenge is commenced at any time prior to entry of the 9019 Order and such Lien Challenge has not been stayed, the Supporting Holders reserve all rights regarding such Lien Challenge, nothing herein shall constitute an admission by the Supporting Holders as to the Government Parties' authority or standing to prosecute such Lien Challenge or the merits of their claims, and, subject to any right herein of any Government Party to declare a Stipulated Treatment Termination prior to entry of the 9019 Order, the Supporting Holders shall have the right to contest and defend against such Lien Challenge on any grounds, including bringing counterclaims related to such Lien Challenge, which defense or counterclaims shall be withdrawn without prejudice upon entry of the 9019 Order, and, notwithstanding anything herein

to the contrary, such contest or defense prior to entry of the 9019 Order by the Supporting Holders shall not be considered to have been a Bondholder Litigation or Bondholder Breach.

(g)     If a Lien Challenge is brought by the Government Parties at any time in violation of the terms hereof, the Supporting Holders shall have the right to contest and defend against such Lien Challenge on any grounds, including bringing counterclaims related to such Lien Challenge, and, notwithstanding anything herein to the contrary, such contest or defense by the Supporting Holders shall not be considered a Bondholder Litigation or Bondholder Breach and shall not be grounds for the Government Parties to declare a Stipulated Treatment Termination.

(h)     Notwithstanding anything to the contrary herein, upon the commencement of any Lien Challenge, Assured, Syncora, National, and the Ad Hoc Group shall have the right to file briefs and participate in oral argument with respect to such Lien Challenge and to otherwise appeal any legal issues implicated in such Lien Challenge, and such participation by Assured, Syncora, National, and the Ad Hoc Group in any Lien Challenge shall not be considered to have been a Bondholder Litigation or a Bondholder Breach, and shall not be grounds for the Government Parties to declare an Individual Termination or a Stipulated Treatment Termination; provided, however, that none of Assured and, Syncora, National or the Ad Hoc Group shall not have the right to participate in discovery in such Lien Challenge.

(i)     The 9019 Order shall provide that no person or entity (including a person or entity acting on behalf of a Government Party) other than the Government Parties shall have standing or otherwise be permitted to bring a Lien Challenge.

(j)     Subject to Sections 7(a)(i) - (ii), the Transformation Transaction structure shall be in the sole discretion of the Government Parties.

(k)     The Supporting Holders shall support and not interfere with Transformation Transaction to the extent such Transaction is consistent with Sections 7(a)(i) - (ii).

(l)     To the extent any consents are required for a Transformation Transaction from the Supporting Holders, such consent shall not be unreasonably withheld or delayed, subject to a good faith determination that such Transformation Transaction will not adversely affect its Stipulated Treatment and is otherwise in compliance with Sections 7(a)(i) - (ii).

(m)     The Supporting Holders may take actions reasonably necessary to protect their rights and treatment under this Definitive RSA, including the value of the recovery thereunder, which actions may include, without limitation, opposing any request by the Government Parties for approval of any priming post-petition financing arrangement; provided that such actions shall not include (i) seeking appointment of a receiver, (ii) exercising any rights or remedies under the Trust Agreement or the Puerto Rico Electric Power Authority Act (Act 83-1941), as amended (including actions as a Bondholder on account of the Bonds and including seeking adequate protection), or (iii) preventing or seeking to prevent the Government Parties from providing the Supporting Holders with the Stipulated Treatment; provided that the preceding clause (iii) shall not prevent Supporting Holders from objecting to a Plan, qualifying

modification, exchange, or restructuring through a Permitted Objection. Nothing herein shall prevent a Supporting Holder from challenging any action to prime the Bonds subject to this Agreement; provided that Supporting Holders shall not be permitted to seek appointment of a receiver (or seek to lift the stay to seek a receiver) as part of such challenge. Notwithstanding anything herein to the contrary, any action permitted pursuant to this paragraph shall not constitute a Bondholder Litigation or Bondholder Breach.

(n) The Supporting Holders shall not take any actions preventing or seeking to prevent the Government Parties from providing the Supporting Holders with the Stipulated Treatment; provided that this subsection (n) shall not prevent Supporting Holders from taking actions expressly permitted under the terms of this Agreement, including objecting to a Plan, qualifying modification, exchange, or restructuring through a Permitted Objection.

(o) Supporting Holders hereby consent to an amendment to the Trust Agreement (the "**TA Amendment**") to increase certain thresholds for certain Bondholder action or direction under Sections 502, 804 and 808 of the Trust Agreement to no more than a majority in aggregate principal amount of the outstanding Bonds if and to the extent that the Required Parties and the Consulting Parties deem the TA Amendment to be reasonable and appropriate to facilitate implementation of the RSA, provided that the Consulting Parties' consent shall be limited to the form and content of the TA Amendment, and provided further that such consent shall be consistent with this paragraph. Upon the request of the Required Parties, after consultation with the Consulting Parties, Supporting Holders agree to take commercially reasonable efforts to promptly confirm and transmit such consent to any parties necessary to ratify the TA Amendment.

**Section 4** **Waiver and Support Fees**.

(a) On the Effective Date and concurrently with the issuance of the Securitization Bonds, the Ad Hoc Group members shall receive a waiver and support fee in the form of Tranche A Bonds, which, as of May 1, 2019, equals 1.9350% of the par amount of PREPA Bonds held as of July 1, 2018 by the Ad Hoc Group (as defined in the Preliminary RSA) members in the aggregate (the "**Ad Hoc Group Waiver and Support Fee**"). The Ad Hoc Group Waiver and Support Fee shall be allocated among the members of the Ad Hoc Group as set forth on Annex B hereto, which Annex B shall be in the sole discretion of the Ad Hoc Group. Once Annex B is finalized, counsel to the Ad Hoc Group shall notify counsel to the Government Parties, and following finalization, Annex B cannot be amended without the consent of every Supporting Holder listed therein.

(b) On the Effective Date and concurrently with the issuance of the Securitization Bonds, Assured shall receive a waiver and support fee in the form of Tranche A Bonds initially equal to 1.8850 1.8834% of the par amount of PREPA Bonds held or insured by Assured as of May 1, 2019.

(c) Additional support (and potential On the Effective Date and concurrently with the issuance of the Securitization Bonds, (i) Syncora shall receive a waiver) and support fee in the form of Tranche A Bonds initially equal to 0.8360 9.3979% of the par amount of total outstanding PREPA Bonds held or insured by Syncora as of May 1, 2019, to be provided to

Supporting Holders, including additional signatories, in a manner to be mutually agreed upon by the Required Parties.and (ii) National shall receive a waiver and support fee in the form of Tranche A Bonds initially equal to 3.8722% of the par amount of PREPA Bonds held or insured by National as of May 1, 2019.

        (d)    Any unpaid fee payable at any time to any Ad Hoc Group Member or other Supporting Holder (including Administrative Claims accruing on Waiver and Support Fees) shall not be paid to such Ad Hoc Group Member or other Supporting Holder if there has been an Individual Termination as to such Ad Hoc Group Member or other Supporting Holder, and such unpaid fee shall be reallocated among the Ad Hoc Group (in the case of a termination as to an Ad Hoc Group Member) or the Supporting Holders.

**Section 5**      **Mutual Obligations and Acknowledgments**.

        (a)    Each Party shall work collaboratively and in good faith with the other Parties to finalize, document, and implement the 9019 Settlement and Plan incorporating the terms and conditions described in this Agreement and such other terms, conditions, and documents necessary or appropriate to implement and effectuate the 9019 Settlement and the Plan based on and, consistent with, this Agreement, including without limitation the Definitive Documents and the Additional Definitive Documents.  The Definitive Documents shall meet the standards set forth in Section 1(b)(iv) herein.  The Additional Definitive Documents shall meet the standards set forth in Section 1(b)(v) herein.

        (b)    Each Party shall refrain from promoting or supporting (by providing legal or financial advice or assistance), or entering into any agreement, in each case that is materially inconsistent with the Restructuring or this Definitive RSA, that would materially and adversely affect the ability of the Government Parties to comply with their respective obligations under this Definitive RSA, the Definitive Documents, or the Additional Definitive Documents (to the extent relating to treatment of Bonds subject to the RSA), or that would prevent the Government Parties from providing the Securitization Bond Treatment or the Stipulated Treatment, as applicable. Except as set forth herein, nothing in this Agreement shall prevent any Government Party from discharging its statutory duties, including by amending the Fiscal Plan or budget or commencing or defending any litigation against any party (other than the Supporting Holders, solely in their capacity as Bondholders).

        (c)    The Parties shall use commercially reasonable efforts to cause each of the below milestones to occur by the dates specified therein:

        (i)    the filing of the Settlement Motion no later than ten (10) business days after execution of this Agreement by the Required Parties;

        (ii)    the entry of the 9019 Order by June 30, 2019;

        (iii)    the implementation of the Settlement Charge by July 1, 2019;

        (iv)    the commencement of the Settlement Payments by August 30, 2019the last day of the month in which the 9019 Order is entered;

(v)     the enactment of all legislation necessary to support the Restructuring by the date the Plan is filed;

(vi)    the filing of the Plan by March 31, 2020;

(vii)   the occurrence of the Effective Date and issuance of the Securitization Bonds or Stipulated Treatment by the Outside Date.

(d)     Except as expressly provided herein, this Agreement shall not require any Supporting Holder to expend any cash resources or assume any additional risk or liability (including, for the avoidance of doubt, indemnifying the Trustee) in support of the Plan or this Agreement.

**Section 6        Agreements of the Supporting Holders**.

(a)     Agreement to Vote and other Covenants.   Subject to the terms and conditions hereof, each Supporting Holder agrees that it shall:

(i)     subject to the receipt by such Supporting Holder of the Disclosure Statement, vote or cause to be voted its Claims with respect to Bonds (and, in relation to Assured, Claims with respect to the Assured Insured Interest Rate Swaps) beneficially owned or controlled (including pursuant to a Bond Insurance Agreement) by it for voting purposes, whenever acquired, to accept a Plan that is consistent with the Definitive RSA by delivering its duly executed and completed ballots accepting the Plan on a timely basis and not object to such Plan other than through a Permitted Objection; provided that, in the case of Insured Bonds, an Uninsured Supporting Holder shall only be obligated to vote the Insured Bonds beneficially owned or controlled by it if the conditions set forth in Section 6(d) are satisfied; provided, further, with respect to votes contemplated by this Section 6(a)(i) or 6(b), in the event of a declaration of a Stipulated Treatment Termination or an Individual Termination (or, in the case of this Section 6(a)(i), a Securitization Termination) as to any Supporting Holder prior to the Effective Date, then (A) the votes of such Supporting Holder, if the voting deadline has not passed, shall be immediately and automatically revoked and deemed void *ab initio*, and (B) if the voting deadline has passed, nothing shall prevent such Supporting Holder from petitioning the Title III Court (or other applicable court) to allow it to change or withdraw its vote;

(ii)    support and take any and all commercially reasonable, necessary, or appropriate actions to facilitate, implement, and consummate the Restructuring, including, without limitation, by working cooperatively with the Government Parties, Assured, the Ad Hoc Group, and the other Supporting Holders to prepare and execute any documentation necessary (including the Definitive Documents and Additional Definitive Documents) and by giving any notices, orders, instructions, or directions that are commercially reasonable, necessary, or appropriate to support, facilitate, implement, or consummate, or otherwise give

effect to, the Restructuring; provided, however, that nothing in this Agreement shall require any Party to indemnify any person; and

(iii)    at the reasonable request of any of the Government Parties, the Supporting Holders shall support the confirmation of the Plan, including by supporting the Government Parties' efforts to defend against objections to confirmation and other Plan-related litigation; provided that nothing herein shall require a Supporting Holder to file pleadings adverse to (A) itself in any capacity or (B) its rights under Bond Insurance Agreements; and provided further that, so long as the Ad Hoc Group, Syncora, National, and Assured are in compliance with this covenant, only Supporting Holders that are represented by counsel that has appeared in the Title III Case shall be required to file a pleading pursuant to this covenant but all Supporting Holders will be required to otherwise support confirmation of the Plan.

(b)    Agreement to Vote for Stipulated Treatment.  If a Supporting Holder is entitled to the Stipulated Treatment and such Stipulated Treatment is offered in any Plan, qualifying modification, exchange, or restructuring of the Bonds after a Securitization Termination, then, subject to the receipt by such Supporting Holder of appropriate disclosure documents, such Supporting Holder shall vote or cause to be voted, or provide consent on behalf of, its Bonds or Claims with respect to Bonds (and, in relation to Assured, Claims with respect to the Assured Insured Interest Rate Swaps) beneficially owned or controlled (including pursuant to a Bond Insurance Agreement) by it for voting purposes to accept or consent to such Plan, qualifying modification, exchange, or restructuring by delivering its duly executed and completed ballots or consents to such Plan, qualifying modification, exchange, or restructuring on a timely basis and not object to such Plan, qualifying modification, exchange, or restructuring other than through a Permitted Objection; provided that such vote is subject to revocation on the terms set forth in Section 6(a)(i).

(c)    Transfers.

(i)    No Supporting Holder shall sell, assign, transfer or otherwise pledge or dispose of ("**Transfer**") any Uninsured Bonds beneficially owned by such Supporting Holder, or any voting, consent, or direction rights related to such Uninsured Bonds, provided, however, that such Transfer may be made (A) if the transferee is a Supporting Holder at the time of the Transfer or (B) if the transferee is not a Supporting Holder at the time of the Transfer, such transferee delivers to counsel to the Ad Hoc Group, PREPA, AAFAF, and FOMB, at or prior to the consummation of the Transfer, the Joinder Agreement attached hereto as Exhibit A, pursuant to which such transferee shall assume all rights and obligations (other than the right to the Waiver and Support Fees) of such Supporting Holder transferor hereunder with respect to the transferred Bonds (such transferee (a "**Bond Qualified Transferee**"), if any, shall also be a Supporting Holder hereunder). Subject to Section 6(c)(iv), any additional Bonds held by such Bond Qualified Transferee at the time it joins this Definitive RSA shall become subject to this Definitive RSA.  To the extent that a Transfer violates the provisions of this Section 6, the Transfer shall be void *ab initio* and

the applicable Uninsured Bonds and the Supporting Holder attempting the Transfer of the Uninsured Bonds shall continue to remain subject to the terms of this Agreement and count towards the Required Threshold if the Supporting Holder can demonstrate to the satisfaction of the Government Parties in their sole discretion that they retain control of such Bond.

(ii)     Qualified Marketmaker. Notwithstanding anything contained in this Agreement to the contrary,

(1)     solely prior to the RSA Marketmaker Period or any other time during which there are no RSA Marketmakers listed on the RSA Marketmakers List, a Supporting Holder may Transfer any right, title or interest in the Uninsured Bonds to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a Supporting Holder; provided that such Qualified Marketmaker subsequently Transfers such right, title or interest in the Uninsured Bonds to a Supporting Holder or a Bond Qualified Transferee within the date that is thirty (30) business days after such Qualified Marketmaker's acquisition of such right, title or interest, and in any event no later than ten (10) business days prior to the voting deadline on the Plan, qualifying modification, exchange, or other restructuring of the Uninsured Bonds pursuant to which the Securitization Bond Treatment or the Stipulated Treatment is being offered (the "**Marketmaker Holding Period**").  For the avoidance of doubt, upon expiration of the Marketmaker Holding Period, if the Qualified Marketmaker has not Transferred such right, title or interest in the Uninsured Bonds to a Supporting Holder or a Bond Qualified Transferee, the Qualified Marketmaker shall be required to sign the Joinder Agreement attached hereto as Exhibit A, which Joinder Agreement shall be binding with respect to any Uninsured Bonds subject to this Definitive RSA that are held by such Qualified Marketmaker in its capacity as a Qualified Marketmarker.  Whether the Qualified Marketmaker signs a Joinder Agreement or not, upon expiration of the Marketmaker Holding Period, the Qualified Marketmaker (by accepting or otherwise participating in the Transfer of Uninsured Bonds subject to this Definitive RSA) will be deemed to have agreed to comply with the voting obligations set forth in Sections 6(a) and (b) hereto; provided, however, that such obligations shall be replaced by the obligations in the RSA Marketmaker Joinder if such Qualified Marketmaker subsequently becomes an RSA Marketmaker.  If a Qualified Marketmaker does not comply with the foregoing procedures, such failure by such Qualified Marketmaker to comply shall not be considered a Bondholder Breach by such Transferring Supporting Holder unless (i) the Supporting Holder transferring such Uninsured Bonds does not inform the Qualified Marketmaker that such Uninsured Bonds are subject to the RSA and (ii) the Qualified Marketmaker fails to vote the subject Uninsured Bonds as required under

this Agreement, in which case such failure shall be deemed to be a Bondholder Breach by the Transferring Supporting Holder;

(2) during the RSA Marketmaker Period, so long as at least one RSA Marketmaker appears on the RSA Marketmakers List, a Supporting Holder may transfer any right, title or interest in the Uninsured Bonds to either (x) another Supporting Holder or other Bond Qualified Transferee in accordance with Section 6(c)(i) or (y) an RSA Marketmaker (and not any other Qualified Marketmaker), acting in its capacity as a Qualified Marketmaker, without the requirement that such RSA Marketmaker be or become a Supporting Holder; provided that such RSA Marketmaker pursuant to clause (y) above shall be obligated to comply with its obligations under its RSA Marketmaker Joinder; provided further that failure of such RSA Marketmaker to comply with its obligations shall not be considered a Bondholder Breach by a Transferring Supporting Holder unless (i) the Supporting Holder transferring such Uninsured Bonds does not inform the RSA Marketmaker that such Uninsured Bonds are subject to the RSA and (ii) the RSA Marketmaker fails to vote the subject Uninsured Bonds as required under its RSA Marketmaker Joinder; provided, that after voting, if the class in which the Bonds are classified has not accepted a Plan providing the Securitization Bond Treatment or Stipulated Treatment due to failure of one or more RSA Marketmakers to vote Uninsured Bonds subject to this Definitive RSA in compliance with the provisions of the Definitive RSA, then a two (2) week Joinder Period shall be declared (during which time the Parties shall work together to cause the RSA Marketmaker to vote Uninsured Bonds it holds), and if the requisite votes have not been received upon expiration of such Joinder Period (or, if later, a new voting deadline), then any of the Government Parties can declare a Stipulated Treatment Termination pursuant to Section 9(c)(i)(3);

(3) to the extent that a Supporting Holder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in the Bonds that the Qualified Marketmaker acquires from a holder of the Bonds that is not a Supporting Holder without the requirement that the transferee be or become a Supporting Holder; and

(4) a Qualified Marketmaker may, with the consent of the Government Parties, which consent shall not be unreasonably withheld, join this Definitive RSA solely on behalf of a specific trading desk.

(iii) Notice of Transfers. In connection with any Transfer of an Uninsured Bond by a Supporting Holder, such Supporting Holder shall (A) give notice to its direct transferee that the Uninsured Bonds it is Transferring are Uninsured Bonds subject to this Definitive RSA, and (B) give notice to counsel to the Ad Hoc Group and counsel to each of the Government Parties of (i) the CUSIP (or, when available, alternative identifying CUSIP) of Uninsured Bonds it

is Transferring, (ii) the principal amount being Transferred, and (iii) the name of the Supporting Holder or Qualified Marketmaker that is the direct transferee. Failure to give such notices shall not constitute a Bondholder Breach, nor shall it invalidate such Transfer.

(iv)   <u>Additional Bonds</u>.   Any Supporting Holder may purchase additional Bonds, and any Bondholder may become a Supporting Holder by signing a Joinder Agreement; <u>provided that</u> (A) any such acquired Bonds (and any Bonds held by such joining Bondholder) shall automatically and immediately be deemed subject to all of the terms of this Definitive RSA (including, in the case of Uninsured Bonds, the obligations of the Supporting Holders under this <u>Section 6</u>); provided that (x) Uninsured Bonds that become subject to this Definitive RSA after September<u>December</u> 1, 2019, at any period other than during a Joinder Period, shall not be entitled to Administrative Claims, Settlement Payments, Increased Settlement Payments, or Adequate Protection Payments but shall be subject to this Agreement for all other purposes, including voting obligations and entitlement to the Stipulated Treatment, and (y) Other Insured Bonds shall not be entitled to any rights or distributions under this Definitive RSA and (B) on the first of each month, all Supporting Holders shall notify counsel for the Ad Hoc Group (who shall notify the Government Parties) of the amounts and types of Uninsured Bonds acquired during the previous month and the date of such acquisition.

(v)   <u>Reporting</u>.   Upon the reasonable request of a Required Party, each Supporting Holder shall provide its holdings to counsel to each Required Party.

(vi)   <u>Holdings Confidential</u>.   Any disclosure by any Supporting Holder to any other Party of its holdings of Bonds shall be treated as confidential information by such other Party unless such other Party receives such information through other means that are not subject to a duty of confidentiality.   The foregoing shall not prohibit disclosure of the aggregate principal amount of Bonds held by the Ad Hoc Group or all Supporting Holders collectively and shall not limit the duty of any Party to disclose holdings as required by law, including pursuant to Bankruptcy Rule 2019 or as otherwise required by the Title III Court.

(vii)   <u>The Ad Hoc Group</u>.   The Ad Hoc Group Members as of the date hereof are listed on <u>Annex A</u> hereto. The members of the Ad Hoc Group may change from time to time upon delivery by counsel to the Ad Hoc Group of a notice to FOMB, PREPA, AAFAF, <u>Syncora, National,</u> and Assured with an updated <u>Annex A</u>, and, in the case of the addition of a person to the Ad Hoc Group who is not otherwise party to this Agreement, execution by such person of a Joinder Agreement and delivery of such Joinder Agreement to counsel to FOMB, PREPA, and AAFAF.

(viii)   <u>Joinders</u>.   In the event a Party to this Agreement receives a Joinder Agreement that was not sent to counsel to the Ad Hoc Group, PREPA, AAFAF

and FOMB, then such Party shall forward such Joinder Agreement to counsel to the aforementioned Parties that did not receive such Joinder Agreement.

(d) <u>Insured Bonds Held by Uninsured Supporting Holders.</u>

(i) Assured shall have all of the rights and obligations related to any Assured Insured Bonds and the Assured Insured Interest Rate Swaps, including without limitation the exclusive right to vote such Assured Insured Bonds and Assured Insured Interest Rate Swaps on account of any Plan, other than as expressly set forth in this <u>Section 6(d)</u>, <u>Section 9(c)</u> and <u>Section VII(b)</u> of the Recovery Plan Term Sheet, and the ~~9019~~<u>Plan, Confirmation</u> Order<u>, and Disclosure Statement</u> shall provide the same. ~~In addition, the Bonds insured by any other monoline insurer (the "**Other Insured Bonds**") shall not be entitled to any rights or distributions under this Definitive RSA or the 9019 Order.~~<u>Syncora shall have all of the rights and obligations related to any Syncora Insured Bonds, including without limitation the exclusive right to vote such Syncora Insured Bonds on account of any Plan, other than as expressly set forth in this Section 6(d), Section 9(c) and Section XV(b) of the Recovery Plan Term Sheet, and the Plan, Confirmation Order, and Disclosure Statement shall provide the same. National shall have all of the rights and obligations related to any National Insured Insured Bonds, including without limitation the exclusive right to vote such National Insured Bonds on account of any Plan, other than as expressly set forth in this Section 6(d), Section 9(c) and Section XVI(b) of the Recovery Plan Term Sheet, and the Plan, Confirmation Order, and Disclosure Statement shall provide the same.</u>

~~(ii) The obligations of Uninsured Supporting Holders with respect to any Insured Bonds held by such Supporting Holder shall be as follows:~~

(ii) ~~(1) With respect to Assured Insured Bonds, the~~<u>The</u> Uninsured Supporting Holders shall be subject to the obligations concerning Bondholder Litigation and Bondholder Breach and, if there is a court order providing that the Uninsured Supporting Holders are entitled to vote ~~such~~<u>any</u> Assured Insured Bonds<u>, Syncora Insured Bonds, or National Insured Bonds</u>, and that such vote shall not adversely affect its rights under the Bond Insurance Agreements, each Uninsured Supporting Holder shall be obligated to vote any Assured Insured Bonds<u>, Syncora Insured Bonds, or National Insured Bonds</u> held by such Uninsured Supporting Holders as of the record date in accordance with this ~~Definitive RSA~~<u>Agreement</u>; provided that such Uninsured Supporting Holder may file a Permitted Objection. The Uninsured Supporting Holders shall not have any other obligations with respect to Assured Insured Bonds<u>, Syncora Insured Bonds, or National Insured Bonds</u> under this ~~Definitive RSA~~<u>Agreement</u> or the 9019 Order, and shall be permitted to transfer such bonds without any requirement that the transferee sign a Joinder Agreement. Nothing in this Definitive RSA or the 9019 Order shall prejudice the rights of the beneficial holders of any Assured Insured Bonds<u>, Syncora Insured Bonds, or National Insured Bonds</u> against Assured<u>, Syncora, or National, respectively</u>.

36

(2) With respect to the Other Insured Bonds, the Uninsured Supporting Holders shall be subject to the obligations concerning Bondholder Litigation and Bondholder Breach and, if there is a court order providing that its vote shall not adversely affect its rights under the Bond Insurance Agreements, each Uninsured Supporting Holder shall be obligated to vote any Other Insured Bonds held by such Uninsured Supporting Holders as of the record date in accordance with this Definitive RSA; provided that such Uninsured Supporting Holder may file a Permitted Objection. The Uninsured Supporting Holders shall not have any other obligations with respect to Other Insured Bonds under this Definitive RSA or the 9019 Order, and shall be permitted to transfer such bonds without any requirement that the transferee sign a Joinder Agreement. Nothing in this Definitive RSA or the 9019 Order shall prejudice the rights of the beneficial holders of any Insured Bonds against such other monoline insurers.

Section 7    **Agreements of FOMB, PREPA, and AAFAF.**

(a)    Each Government Party agrees that:

(i)    prior to the Effective Date of a Plan and the issuance of the Securitization Bonds or the Stipulated Treatment, as applicable, and except with consent of the Required Parties, after consultation with the Consulting Parties, (x) a Transformation Transaction with regard to the transmission and distribution assets shall not close, and (y) PREPA shall not sell any of its generation assets to the extent used or useful in PREPA's operations.

(ii)    the Government Parties shall not proceed with a Transformation Transaction that would prevent the Government Parties from providing the Stipulated Treatment;

(iii)    the Government Parties shall use commercially reasonable efforts to cause any vacancies of independent board members to be filled promptly with other independent candidates selected and appointed in accordance with the criteria and procedures set forth in Act 4-2016, as amended;

(iv)    PREPA shall provide the Supporting Holders (or, to the extent necessary, their advisors) with the following reports on a monthly basis, unless otherwise mutually agreed to by the Required Parties, after consultation with the Consulting Parties: (1) a 13-week cash flow, (2) a FEMA flash report, and (3) an account balance report;

(v)    FOMB and AAFAF shall provide, within ten (10) business days, written notice to the Ad Hoc Group, Syncora, National, and Assured, between the date hereof and the Effective Date, of receipt of any notice that is not publicly available of any judicial proceeding commenced or threatened in writing against any Government Party related to PREPA, which could reasonably be expected to

have a material, adverse impact on the treatment of the Supporting Holders under this Agreement;

(vi)    each Government Party shall use commercially reasonable efforts to provide the Supporting Holders with periodic updates and current information regarding the progress of and details concerning the Transformation Transaction (with a level of detail similar to the information previously provided in the bi-weekly PREPA mediation call); provided that the Government Parties shall not be required to provide any non-public or confidential information unless the Supporting Holder or its advisors has executed a non-disclosure agreement with the Government Parties and the Puerto Rico Public Private Partnership Authority that contains customary restrictions on the ability to disclose or otherwise use such information in litigation; provided, further, that such failure to provide such information  shall only entitle Supporting Holders to enforce this provision and no other remedies will be available;

(vii)    each Government Party shall (A) act in good faith and use commercially reasonable efforts to support and complete successfully the Solicitation in accordance with the terms of this Agreement, (B) use commercially reasonable efforts to confirm the Plan and consummate the Restructuring and the transactions contemplated thereby in accordance with, and within the time frames contemplated by, this Agreement, (including preparing and executing any documentation necessary (including the Definitive Documents and the Additional Definitive Documents (to the extent relating to treatment of Bonds subject to the RSA)), securing any necessary IRS Private Letter Ruling, and giving any notices, orders, instructions, or directions that are commercially reasonable, necessary, or appropriate to support, facilitate, implement, consummate, or otherwise give effect to the Restructuring, and (C) not take any action that would prevent the Government Parties from providing the Securitization Bond Treatment or Stipulated Treatment contemplated by this Agreement;

(viii)    each of the Government Parties shall use commercially reasonable efforts to provide counsel to the Ad Hoc Group, Syncora, National, and Assured draft copies of material motions, applications, and other documents relating to the Bonds subject to this Agreement, the Restructuring, or this Agreement that such Government Party intends to file in the Title III Case with sufficient time to respond to and comment thereon;

(ix)    FOMB shall amend PREPA's Fiscal Plan and certified budget as required to facilitate the Restructuring; and

(x)    except as provided in Section 23, the Government Parties shall not enter into any restructuring support or similar agreement related to the Financial Indebtedness other than by amendment to this Agreement, unless consented to by the Required Parties, after consultation with the Consulting Parties.

(b)    Each Government Party agrees that:

(i)     to the extent the Government Parties, each acting in its sole discretion and after consultation with a designee of each of the Ad Hoc Group and a designee of, Assured, Syncora, and National (provided such designees are subject to a non-disclosure agreement acceptable to the Government Parties), determine to apply for ratings on the Securitization Bonds, the Government Parties shall use their commercially reasonable efforts to obtain ratings on the Securitization Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with the aforementioned mentioned designee of the Ad Hoc Group and a designee of Assureddesignees. To the extent practicable the Government Parties shall provide counsel to each of the Ad Hoc Group and counsel to, Assured, Syncora and National, drafts of written submissions related to such rating with sufficient time to comment thereon; provided that such counsel for the Ad Hoc Group and Assured are subject to a non-disclosure agreement acceptable to the Government Parties; and

(ii)    the Government Parties shall consult with counsel for each of the Ad Hoc Group and counsel for, Assured, Syncora, and National regarding any IRS Private Letter Ruling Request, including, if practicable, providing drafts of written materials related thereto with sufficient time to comment thereon; provided that such counsel for the Ad Hoc Group and Assured are subject to a non-disclosure agreement acceptable to the Government Parties.

**Section 8**     **Force Majeure**. If an event beyond the control of the Government Parties (including hurricanes, fires, explosion, earthquakes, drought, tidal waves, floods, war, or terrorism) (such event, a "**Force Majeure Event**") prevents any Government Party from complying with any of its obligations under this Agreement, a delay in performance by such Government Party of such obligation shall not be considered a breach of this Agreement through the later of (i) the first day of the month following a restoration of electric service to 85% of the pre-Force Majeure Event levels, or (ii) if any of the Government Parties, Assured, Syncora, National, or the Required Uninsured Holders request a hearing on the issue, the date determined by the Title III Court to be reasonable in light of then-prevailing circumstances; provided that the Administrative Claims shall continue to accrue, but Settlement Payments, Increased Settlement Payments, and Adequate Protection Payments, as applicable, shall not be owed, during the period from the occurrence of a Force Majeure Event through the earlier of the dates set forth in clauses (i) and (ii) of this Section 8.

**Section 9**     **Termination of and Withdrawal from Definitive RSA**.

(a)     Rights of Withdrawal.  If

(i)     the economic terms of this Agreement are materially amended, modified, supplemented or waived (including pursuant to Section 10) without the written consent of a Supporting Holder that causes a material reduction in the economic value of the recovery to be received by such Supporting Holder; or

(ii)    any other provision of this Agreement is materially amended, modified, supplemented, or waived (including pursuant to Section 10) without the written consent of a Supporting Holder in a manner disproportionally and materially adverse to such Supporting Holder in its capacity as a Bondholder,

(any of the preceding clauses of this Section 9(a), a "**Withdrawal Event**"), then in each case, such Supporting Holder shall have the right to withdraw from this Agreement within five (5) business days of receiving notice of such Withdrawal Event (which may be provided through an EMMA notice) by delivering notice of such withdrawal (including the reason for such withdrawal) to counsel to FOMB, PREPA, AAFAF, Assured, Syncora, National, and the Ad Hoc Group in accordance with Section 27.  Such withdrawal shall be effective immediately after delivery of such notice of withdrawal (to the extent such withdrawal is not rescinded), whereupon an Individual Termination shall be deemed to have occurred as to such Supporting Holder.

(b)    Securitization Termination.

(i)    A Government Party may terminate this Agreement to the extent set forth in clause (iii) of this Section 9(b) (a "**Securitization Termination**") by delivering notice of such termination in accordance with Section 27 if any of FOMB, the governing board of PREPA, or AAFAF determines that the terms and conditions of the Restructuring will impede or have an adverse impact on the Transformation Transaction or that the terms of the Restructuring are inconsistent with the Transformation Transaction.

(ii)    A Government Party may declare a Securitization Termination on or after March 15, 2020 if (A) the Required Parties and, if required by Section 1(b)(iv), the Consulting Parties, and otherwise after consultation with the Consulting Parties as required by this Agreement, have not reached agreement on the Definitive Documents after working collaboratively and in good faith and (B) all legislation necessary to support the Restructuring has not been enacted; provided, that upon a Securitization Termination under this subsection (b)(ii), the Government Parties shall use commercially reasonable efforts to provide the Supporting Holders with a market utility securitization as the Stipulatedthat provides the same financial recovery and similar protections as the Securitization Treatment.

(iii)    Upon the occurrence of a Securitization Termination, the obligation of the Government Parties to provide the Securitization Bond Treatment shall terminate and all other rights and obligations of the Parties under the RSA related to the Securitization Bonds or the Securitization Bond Treatment shall terminate to the extent related to the Securitization Bonds or the Securitization Bond Treatment. The remaining terms of this Agreement, including without limitations, the Government Parties' obligations to provide the Stipulated Treatment, Allowed Claim, Settlement Payments, Increased Settlement Payments, Adequate Protection Payments, and Administrative Claims, the Supporting Holders' obligations to vote in favor of a Plan that provides them with the

Stipulated Treatment, and the litigation stay provisions of this Definitive RSA, shall otherwise survive.

(c)     Stipulated Treatment Termination.

(i)     A Government Party (or, in the case of <u>subsection (4)</u> below, either a Government Party or the Required Holders, after consultation with the Consulting Parties) may terminate this Agreement and elect not to provide the Stipulated Treatment (a "**Stipulated Treatment Termination**") by delivering notice in accordance with <u>Section 27</u> (except in the case of <u>subsection (5)</u> below which Stipulated Treatment Termination shall be automatic) if:

(1)     The then applicable Required Threshold has not been met (including, without limitation, if it has not been met because Assured, Syncora or National defaults on a payment obligation under its Bond Insurance Agreements and such default is determined by the court to cause ~~it~~Assured or Syncora or National to lose its right to vote the Assured Insured Bonds or Syncora Insured Bonds or National Insured Bonds, as applicable) by the date of entry of the 9019 Order;

(2)     The then applicable Required Threshold has not been met (including, without limitation, if it has not been met because Assured, Syncora or National defaults on a payment obligation under its Bond Insurance Agreements and such default is determined by the court to cause it to lose its right to vote the Assured Insured Bonds or Syncora Insured Bonds or National Insured Bonds, as applicable) by September 1, 2019;

(3)     The then applicable Required Threshold has not been met (including, without limitation, if it has not been met because Assured, Syncora or National defaults on a payment obligation under its Bond Insurance Agreements and such default is determined by the court to cause it to lose its right to vote the Assured Insured Bonds or Syncora Insured Bonds or National Insured Bonds, as applicable) upon the expiration of any Joinder Period;

(4)     The 9019 Order is reversed on appeal; provided that in the event of reversal of the 9019 Order on appeal, after consultation with the Consulting Parties, either a Government Party or the Required Holders may elect within sixty (60) days of the reversal to declare a Stipulated Treatment Termination pursuant to this subsection (4); provided that the Parties shall work together for such sixty (60) days to find a mutually agreeable solution that addresses the cause of such reversal;

(5)     The Title III Case is dismissed;

(6)     Confirmation of a Plan that complies with this Definitive RSA is denied; provided that no Stipulated Treatment Termination shall occur under this subsection (6) until the Parties have worked in good faith

41

and used their commercially reasonable efforts to agree on amendments or modifications to the Plan in order to achieve confirmation of such Plan for a period of forty-five (45) days, and FOMB has used its commercially reasonable efforts to seek confirmation of such amended or modified plan of adjustment that is consistent with this Definitive RSA and takes into account the Title III Court's ruling denying confirmation of the prior Plan, and confirmation of such amended or modified Plan has also been denied; provided, that if confirmation of a Plan is denied solely as a result of a Permitted Puerto Rico Objection there shall not be a Stipulated Treatment Termination pursuant to this subsection (6) until FOMB has used its commercially reasonable efforts to seek confirmation of an amended or modified Plan that is consistent with this Definitive RSA and takes into account the Title III Court's ruling denying confirmation of the prior Plan(s) and confirmation of such amended or modified Plan has also been denied for any reason other than solely as a result of a Permitted Puerto Rico Objection; or

(7)     Any Supporting Holder (other than Assured, Syncora, National, and the Ad Hoc Group) participates in contesting or defending any Lien Challenge brought by the Government Parties in compliance with the terms of this Definitive RSA (including, without limitation, asserting any defense or counterclaim in connection therewith); provided, further, that an election to declare a Stipulated Treatment Termination based on this subsection (7) must be made prior to entry of the 9019 Order.

(ii)     In the event of a Stipulated Treatment Termination as to all Supporting Holders or an Individual Termination as to an individual Supporting Holder, (1) the Supporting Holder's Bond Claims shall automatically be reduced by the amount of any Settlement Payments (or Increased Settlement Payments or Adequate Protection Payments) made or Administrative Claim accrued and paid to such Supporting Holder on account of its Bond Claims, (2) all prior Settlement Payments, Increased Settlement Payments, Adequate Protection Payments, and payments made on Administrative Claims, as applicable, received by any Supporting Holder subject to such termination shall be retained by the recipient, (3) all Parties reserve all rights as to whether Settlement Payments (or Increased Settlement Payments or Adequate Protection Payments) or payments made on Administrative Claims shall be credited against Claims for principal, pre-petition interest, or (if applicable) post-petition interest; and (4) accrued and unpaid Administrative Claims shall be disallowed other than the Surviving Administrative Claim.

(iii)     Upon the occurrence and declaration by any Government Party of a Stipulated Treatment Termination in accordance with the terms of this Definitive RSA, this Definitive RSA shall become void and of no further force or effect as to all Parties and each Party shall, except as otherwise expressly provided in this Definitive RSA or the 9019 Order, (1) be immediately released

from its respective liabilities, obligations, commitments, undertakings, and agreements under or related to this Definitive RSA or the 9019 Order, (2) have no further rights, benefits, or privileges hereunder, and (3) have all the rights and remedies that it would have had, and be entitled to take all actions, whether with respect to the Restructuring, the 9019 Settlement or otherwise, that it would have been entitled to take had it not entered into this Definitive RSA and had the 9019 Order never been issued, and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; provided that the provisions of this Section 9(c) and the other provisions set forth in Section 17 shall survive; provided, further, that a Stipulated Treatment Termination shall not void any prior tolling pursuant to the Tolling Agreement or the 9019 Order.

(d)   Additional Termination Events.

(i)   This Definitive RSA may be terminated by mutual agreement of the Required Parties, after consultation with the Consulting Parties, upon the receipt of notice delivered in accordance with Section 27.

(ii)   This Definitive RSA may be terminated by the Required Holders, after consultation with the Consulting Parties, if the Settlement Payments have not commenced by August 30, 2019the last day of the month in which the 9019 Order is entered upon the receipt of notice delivered in accordance with Section 27, subject to a thirty (30) day cure period.

(iii)   This Definitive RSA may be terminated by any of the Required Parties, after consultation with the Consulting Parties, if (x) the Settlement Motion is denied or (y) the 9019 Order has not been entered by AugustSeptember 30, 2019, in each case upon the receipt of notice by a Party delivered in accordance with Section 27.

(iv)   This Definitive RSA may be terminated by any of the Government Parties if the Tolling Agreement has not been entered into by the date five (5) business days after the entry of the 9019 Order and subsequently approved by the Title III Court prior to the expiration of the applicable statutes of limitations.

(v)   This Definitive RSA may be terminated by any of the Government Parties as to any individual Supporting Holder if such Supporting Holder commits a Bondholder Breach (an "**Individual Termination**") upon the receipt by such Supporting Holder of notice delivered in accordance with Section 27.

(vi)   Either PREPA or AAFAF may terminate all of its obligations under this Definitive RSA solely as to itself in the event that AAFAF objects to a Plan pursuant to a Permitted Puerto Rico Objection and the Title III court sustains such objection; provided that neither PREPA nor AAFAF shall have the right to terminate under this subsection (vi) until (i) the Parties have worked in good faith and used their commercially reasonable efforts to agree on amendments or modifications to the Plan in order to achieve confirmation of such Plan for a

period of forty-five (45) days,  (ii) FOMB has used its commercially reasonable efforts to seek confirmation of such amended or modified plan of adjustment (which is consistent with this Definitive RSA) taking into account the Title III Court's ruling denying confirmation of the prior Plan, and (iii) AAFAF objects to such amended or modified Plan in a Permitted Puerto Rico Objection and the Title III Court sustains such objection.  Nothing in this subsection (vi) shall alter or limit any other termination rights of any of the Government Parties set forth herein including in Section 9(c)(i)(6).

(vii)   Any termination pursuant to Sections 9(d)(i) - (iv) shall each be treated as a Stipulated Treatment Termination.

(viii)   Any termination pursuant to Section 9(d)(vi) shall be treated as a termination of this Definitive RSA solely as to PREPA or AAFAF, as applicable. Upon the occurrence and declaration by PREPA or AAFAF of a termination pursuant to Section 9(d)(vi), then, except as otherwise expressly provided in the 9019 Order in the form approved by PREPA and AAFAF in connection with this Definitive RSA, the right and obligations in the Definitive RSA shall become void and of no further force or effect as to PREPA and/or AAFAF, and the remaining Parties hereto shall have no obligations to PREPA and/or AAFAF; provided that the provisions set forth in Section 17 shall survive as to PREPA and/or AAFAF. Notwithstanding the foregoing, all of the rights and obligations under this Definitive RSA of all other Parties as to each other shall survive such termination as if no such termination occurred, including (i) the FOMB's obligations to provide the Stipulated Treatment, Allowed Claim, Adequate Protection Payments, and Administrative Claims; provided, that the FOMB shall not be obligated to impose a Settlement Charge or Increased Settlement Charge or provide Settlement Payments or Increased Settlement Payments, (ii) the Supporting Holders' obligations to vote in favor of a Plan that provides them with the Stipulated Treatment, and (iii) the Tolling Agreement and the litigation stay provisions of this Definitive RSA.

(e)   Automatic Stay.  Each Government Party acknowledges and agrees that the giving of notice of termination by any Party pursuant to and in accordance with this Definitive RSA (or any action to enforce this Definitive RSA) shall not be a violation of the automatic stay; provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not in accordance with the terms of this Definitive RSA.

(f)   Limitation on Termination.  No Party may terminate this Agreement if the event giving rise to the termination is the result of such Party failing to perform or comply in any material respect with the terms and conditions of this Agreement.

## Section 10   Definitive Documents; Good Faith Cooperation; Further Assurances.

(a)   Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the Restructuring, as well as the

negotiation, drafting, execution, and delivery of the Definitive Documents and Additional Definitive Documents (to the extent relating to treatment of Bonds subject to the RSA). Upon written confirmation of an agreement (which confirmation may be by email and must specifically state that it constitutes an agreement pursuant to this Section 10), after consultation with the Consulting Parties, and, if required by Sections 1(b)(iv)-(v), with the consent of the Consulting Parties, among the Super Majority Uninsured Holders, Assured and each Government Party on, and finalization of, the Definitive Documents, this Definitive RSA shall automatically be deemed amended to replace the corresponding portions of the Recovery Plan Term Sheet with the Definitive Documents as Exhibit C hereto and all references in this Agreement to such portions of the Recovery Plan Term Sheet shall be deemed to be references to the Definitive Documents or Additional Definitive Documents, as applicable.

(b)     Subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Definitive RSA, and shall refrain from taking any action that would frustrate the purposes and intent of this Definitive RSA.

**Section 11      Representations and Warranties**.

(a)     Mutual Representations and Warranties. Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date a Supporting Holder becomes a party hereto):

(i)     such party has the legal right, power and authority to enter into this Agreement;

(ii)     this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application);

(iii)     except in the case of an individual, it is duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver, and to perform and observe, the terms and provisions of this Agreement;

(iv)     the execution, delivery, performance, and observance of this Agreement by such Party (A) has been duly authorized by all necessary action on the part of such Party, does not and will not conflict with, or result in a violation of, any law applicable to it, and does not require it to obtain any permit, consent, approval, order, or authorization of, or provide notice to or make a filing with, any court, governmental or regulatory agency or authority, or other person or entity that has not been obtained, provided, or made, as applicable, (B) except to the extent modified, stayed or otherwise excused by PROMESA, (1) with respect to FOMB, AAFAF, and PREPA, does not contravene, or constitute a default under any provision of applicable law or regulation or of any agreement, judgment,

injunction, order, decree, or other instrument binding on FOMB, AAFAF, or PREPA, as applicable, and (2) with respect to each Party, does not and will not violate, conflict with, or result in the breach of any provision of its organizational or governance documents, and (C) does not and will not result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of, termination, amendment, acceleration, suspension, revocation, or cancellation of any note, bond, mortgage, indenture, contract, agreement, lease, sublease, license, permit, franchise, or other instrument or arrangement to which it is a party, which would materially adversely affect its ability to carry out its obligations under and otherwise observe this Agreement or cause the occurrence of a Stipulated Treatment Termination; provided, however, that clause (C) hereof shall not apply to any note, bond, mortgage, indenture, contract, agreement, lease, sublease, license, permit, franchise, or other instrument or arrangement to which PREPA is a party.

(b)     Additional Representations of Supporting Holders. Each Supporting Holder individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, in the case of a Party executing a Joinder Agreement other than in connection with a pending Transfer, as of the date of such Joinder Agreement, and in the case of a Party executing a Joinder Agreement in connection with a pending Transfer of Uninsured Bonds to such joining Party, upon consummation of such pending Transfer of Uninsured Bonds to such joining Party) (each of which is a continuing representation, warranty, and covenant): that it owns or has investment management responsibility for accounts that own Uninsured Bonds in the principal amounts set forth on its respective signature page hereto or its Joinder Agreement (as applicable), which it would be entitled to vote on in a plan (or qualifying modification) solicitation, and that it has not sold, assigned, transferred, participated, or otherwise pledged such Bonds, or any voting, consent, or direction rights related to such Bonds, to any other person or entity that would prevent or adversely affect in any way such Supporting Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed, in each case except as permitted by Section 6(c).

(c)     Additional Representation of the Ad Hoc Group Members. Each Ad Hoc Group Member that is party to this Agreement on the RSA Execution Date individually represents and warrants to the other Parties that as of the RSA Execution Date it does not beneficially own or control any Uninsured Bonds in a Qualified Marketmaker capacity.

**Section 12**     **Disclosure; Publicity**. Each Government Party shall endeavor to submit drafts to the Ad Hoc Group, Syncora, National, and Assured of any press releases, public documents, and any and all filings with the SEC, the Municipal Securities Rulemaking Board, or any state or Puerto Rico governmental agency regarding this Definitive RSA or the Restructuring at least two (2) business days, to the extent practicable, before making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between a Party and the applicable Supporting Holder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Supporting Holder), other than advisors to the Government Parties and the Ad Hoc Group, the principal amount or

percentage of Bonds held by the applicable Supporting Holder, in each case, without such Supporting Holder's prior written consent. Notwithstanding the provisions in this Section 12, any Party may disclose, to the extent consented to in writing by a Supporting Holder, such Supporting Holder's individual holdings, and, for the avoidance of doubt, a Supporting Holder shall be permitted to disclose its own individual holdings. Any public filing of this Definitive RSA, with the Title III Court or otherwise, which includes executed signature pages to this Definitive RSA shall include such signature pages only in redacted form with respect to the holdings of each Supporting Holder; provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Title III Court under seal.

**Section 13**     **Amendments and Modifications**. The

(a) Subject to subsections (b) and (c) of this Section 13, the terms and conditions of this Agreement, including any exhibits, annexes, or schedules to this Agreement, may not be waived, modified, amended, or supplemented without consultation with the Consulting Parties and the written consent of (i) FOMB, (ii) PREPA, (iii) AAFAF, and (iv) the Super Majority Holders and (v) Assured, after consultation with the Consulting Parties; provided that the foregoing is subject to the withdrawal rights pursuant to Section 9(a).

(b) The terms and conditions of this Agreement, including any exhibits, annexes, or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the written consent of National if such waiver, modification, amendment, or supplement (a) modifies National's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to National as an Insurer of the National Insured Bonds, or (c) provides for legal rights or obligations of National that are different in any material respect from those of any other Supporting Party.

(c) The terms and conditions of this Agreement, including any exhibits, annexes, or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the written consent of Syncora if such waiver, modification, amendment, or supplement (a) modifies Syncora's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to Syncora as an Insurer of the Syncora Insured Bonds, or (c) provides for legal rights or obligations of Syncora that are different in any material respect from those of any other Supporting Party.

**Section 14**     **Effectiveness**. Except as specifically provided herein, this Definitive RSA shall become effective and binding on the RSA Execution Date; provided that, until entry of the 9019 Order, (i) the 9019 Settlement shall not be effective; (ii) the Government Parties shall have no obligation to impose the Settlement Charge or Increased Settlement Charge; make Settlement Payments, Increased Settlement Payments, or Adequate Protection Payments; or propose a Plan providing for issuance of Securitization Bonds or Stipulated Treatment; and (iii) the Supporting Holders shall not be entitled to Administrative Claims, the Stipulated Treatment, or Waiver and Support Fees and shall not be obligated to vote in favor of any Plan, qualifying modification, exchange, or restructuring. Notwithstanding the foregoing, in the event the Settlement Motion is denied or the 9019 Order is not entered prior to a termination pursuant to Section 9(d)(iii), this Definitive RSA shall be deemed to have been void *ab initio* and shall be of no further force and effect; provided that the obligations of the Government Parties under Section 22 shall survive

with respect to any fees or expenses incurred prior to the date of such denial or termination and required to be reimbursed under the terms of <u>Section 22</u>.

**Section 15**     <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)     THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF, EXCEPT THAT, WITH RESPECT TO THE EXISTENCE, POWERS, LEGAL CAPACITY, AND AUTHORITY OF (I) EACH OF AAFAF AND PREPA, THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO, EXCLUDING THE CONFLICT OF LAWS PRINCIPLES THEREOF, AND (II) AS TO FOMB, THIS AGREEMENT SHALL BE GOVERNED BY PROMESA.  Each Party hereto agrees that it shall bring any action or proceeding with respect to any claim arising out of or related to this Agreement in the Title III Court (or a court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter. The Government Parties submit to the jurisdiction of the Chosen Court and irrevocably waive any immunity from suit in the Chosen Court that they may have for any action or proceeding arising out of or relating to this Definitive RSA or the 9019 Order.

(b)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Definitive RSA or the transactions contemplated herein (whether based on contract, tort or any other theory).

(c)     The rights and obligations of the Parties under this Agreement and the 9019 Order shall be binding and enforceable against the Parties, and, to the extent necessary, the Government Parties consent for purposes of section 305 of PROMESA to such enforcement by the Chosen Court.

**Section 16**     <u>Specific Performance/Remedies</u>. The Parties understand and agree that monetary damages would be an insufficient remedy for any breach of this Definitive RSA by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, without the necessity of proving the inadequacy of monetary damages as a remedy.  Specific performance and injunctive or other equitable relief to the extent appropriate and allowed by applicable law and the right to terminate this Definitive RSA in accordance with the terms of this Definitive RSA shall be the sole and exclusive remedies for any breach of this Definitive RSA by any Party.  Without limiting the ability of a Party to sue for payment of money owed under this Agreement or the 9019 Order, no person or entity shall be entitled to monetary damages for any breach of this Agreement or the 9019 Order.  Each Party hereby waives any requirement for security or the posting of any bond in connection with such remedies.

**Section 17** **Survival**. Subject to entry of the 9019 Order, notwithstanding the termination of this Definitive RSA pursuant to Section 9(d)(vi) (as to PREPA or AAFAF), pursuant to an Individual Termination (as to an individual Supporting Holder), or a Stipulated Treatment Termination (as to all Parties), Sections 9(c) and 15-19(a), 20-22 and 24-31 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

**Section 18** **Headings**. The headings of the sections, paragraphs, and subsections of this Definitive RSA are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Definitive RSA.

**Section 19** **Successors and Assigns; Severability**.

(a) This Definitive RSA is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided that nothing contained in this Section 19 shall be deemed to permit Transfers of the Bonds or any related Claims other than in accordance with the express terms of this Definitive RSA. If any provision of this Definitive RSA, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and the remainder of this Definitive RSA shall continue in full force and effect.

(b) Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Definitive RSA so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**Section 20** **Several, Not Joint, Obligations**. The agreements, representations, warranties, and obligations of the Parties under this Definitive RSA are, in all respects, several and not joint.

**Section 21** **Relationship Among Parties**. Unless expressly stated herein, this Definitive RSA shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof. No Party shall have any responsibility for any trading by any other entity by virtue of this Definitive RSA. Except as expressly set forth in this Definitive RSA, nothing in this Definitive RSA shall be construed to affect any actual or potential claims arising from any obligation of the Government of Puerto Rico or any of its instrumentalities other than PREPA. Except as expressly set forth in this Definitive RSA, nothing in this Definitive RSA shall constitute or be construed as a waiver or release of any claims or causes of action against FOMB, AAFAF, PREPA, or the Government of Puerto Rico or any of its affiliates or instrumentalities prior to the Effective Date.

No Bondholder shall have any liability to any other Bondholder arising from or related to: (i) any extensions of the deadlines set forth herein pursuant to the terms of this Definitive RSA; (ii) the termination of this Definitive RSA pursuant to its terms, whether or not such termination is as to all Supporting Holders; (iii) any waivers, modifications, amendments, or supplements of or to this Definitive RSA; or (iv) the exercise of, or failure to exercise, any other consent, termination, or other rights pursuant to this Definitive RSA or the 9019 Order. This

paragraph shall be included in the 9019 Order.

**Section 22**   **Fees & Expenses**.

    (a)    (i) The reasonable fees and reasonable expenses of the Ad Hoc Group incurred in connection with the Preliminary RSA, this Definitive RSA, and any documents and transactions relating to or implementing the foregoing on or after July 23, 2018 through the Effective Date (or, if earlier, a Stipulated Treatment Termination), limited to one (1) primary law firm, one (1) municipal bond counsel law firm, one (1) Puerto Rico law firm, one (1) financial advisor, and one (1) utility consultant, shall be reimbursed by PREPA on a monthly basis within sixty (60) days following submission of an invoice and redacted time detail summary to counsel to FOMB, PREPA, and AAFAF and (ii) the reasonable fees and reasonable expenses of the Ad Hoc Group members up to $25 million for the period prior to July 23, 2018, shall be reimbursed on the Effective Date as agreed in connection with the Preliminary RSA.

    (b)    The reasonable fees and reasonable expenses of Assured incurred in connection with the Preliminary RSA, this Definitive RSA and any documents and transaction relating to or implementing the foregoing on or after August 1, 2018 through the earliest to occur of (i) the Effective Date, (ii) a Stipulated Treatment Termination, or (iii) an Individual Termination as to Assured, limited to one (1) primary law firm, one (1) Puerto Rico law firm, one (1) financial advisor, one (1) municipal bond counsel law firm, and one (1) utility consultant, shall be reimbursed by PREPA on a monthly basis within sixty (60) days following submission of an invoice and redacted time detail summary to counsel to FOMB, PREPA, and AAFAF. The reasonable fees and reasonable expenses of each of Syncora and National incurred in connection with the Preliminary RSA, this Definitive RSA and any documents and transaction relating to or implementing the foregoing on or after August 1, 2018 through the earliest to occur of (i) the Effective Date, (ii) a Stipulated Treatment Termination, or (iii) an Individual Termination as to Syncora or National, as applicable, limited as to each to one (1) primary law firm, one (1) Puerto Rico law firm, one (1) municipal bond counsel law firm, one (1) utility consultant, and one (1) financial advisor and/or consultant, shall be reimbursed by PREPA on a monthly basis within sixty (60) days following submission of an invoice and redacted time detail summary to counsel to FOMB, PREPA, and AAFAF, provided that such fees and expenses of shall not be reimbursed in excess of (x) $500,000 for Syncora for the period prior to June 1, 2019, (y) $1.2 million for National for the period prior to June 1, 2019, and (z) $130,000 monthly for each of Syncora and National.

    (c)    Reimbursement of reasonable fees and expenses pursuant to Sections 22(a)(i) and 22(b) shall be subject to delivery of all required certifications under Puerto Rico law and accompanied by detailed time records with appropriate redactions.

    (d)    Payments made pursuant to this Agreement (including reimbursement of fees and expenses pursuant to this Section 22, other than in the case of reimbursement of fees and expenses for services rendered in Puerto Rico) shall not be subject to withholding tax under the Puerto Rico Internal Revenue Code of 2011, as amended.

    (e)    In the event of a termination by PREPA or AAFAF pursuant to Section 9(d)(vi), the obligation of PREPA or AAFAF to pay any fees that accrue after the effective date

of such termination shall terminate, but any fees and expenses incurred after such date and until the earlier of the Effective Date or a Stipulated Treatment Termination or any fees and expenses pursuant to Section 22(a)(ii), in each case to the extent they would otherwise have been due and payable hereunder, shall constitute an Administrative Claim entitled to be paid in cash on the Effective Date of a Plan and, notwithstanding anything herein to the contrary, such Administrative Claim shall survive a Stipulated Treatment Termination.

**Section 23**     **Most Favored Nations**.

Other than with respect to the receipt by Assured of the Assured Treatment, by Syncora of the Syncora Treatment or by National of the National Treatment in accordance with the terms hereof, to the extent any holder(s) of Financial Indebtedness receives a treatment under a Plan, qualifying modification, exchange, or restructuring, however funded, more economically favorable than the treatment proposed to be received by the Ad Hoc Group Members or, Assured, Syncora or National then (i) such treatment shall only be allowed and considered consistent with this Agreement if it does not adversely affect the Ad Hoc Group's or, Assured's, Syncora's or National's recoveries, and (ii) additional consideration shall be provided to the Ad Hoc Group, Syncora, National or Assured, as applicable, such that the treatment of the Ad Hoc Group or, Syncora, National, or Assured is at least as favorable as the treatment being provided to such holder(s) of Financial Indebtedness.

Notwithstanding the foregoing, none of the Ad Hoc Group and, Syncora, National or Assured shall not object pursuant to this Section 23 if holders of Financial Indebtedness (other than Uninsured Bonds) receive the same treatment with the same terms as the Ad Hoc Group is receiving, so long as such treatment does not adversely affect the Ad Hoc Group's or, Assured's, Syncora's or National's recoveries. Adjustments to coupons and par on the bonds received by such holder(s) of Financial Indebtedness are authorized, so long as total cash flow payable each year remains the same (with proportional adjustments for the varying claim sizes of varying legacy debt claims), and so long as such treatment shall not adversely affect the Ad Hoc Group's or, Assured's, Syncora's, or National's recoveries.

**Section 24**     **Preservation of Rights**. Except as expressly provided in this Agreement or the 9019 Order, the Parties expressly reserve all rights, contractual or otherwise, under Title III or any other provision of PROMESA or any other law or regulation.  Upon an Individual Termination (as to an individual Supporting Holder), a Stipulated Treatment Termination (as to each Party), or a termination pursuant to 9(d)(vi) (as to AAFAF or PREPA), subject to Section 9(c), (i) no such Party shall be precluded, by virtue of having been a Party to this Agreement or otherwise having engaged in negotiations regarding the Restructuring, 9019 Settlement or other matters related to this Agreement, from exercising any and all rights, whether contractual or otherwise, in connection with any proceeding under Title III or under any other provision of PROMESA or any other law or regulation, (ii) no provision of this Agreement, the 9019 Order or other document related to this Agreement, the Restructuring or the 9019 Settlement or statement made during the negotiations thereof, shall be used against any such Party in any proceeding under Title III or any other provision of PROMESA or otherwise, provided that a Section 9(d)(vi) termination as to AAFAF and PREPA shall have no effect on any remaining Parties' rights with respect to any other remaining party hereunder and in the 9019 Order and ability to enforce such rights, and (iii) each such Party shall be restored to its original position.

Notwithstanding the generality of the foregoing in this <u>Section 24</u>, except as otherwise provided in this Agreement, no Party shall be precluded from asserting any right, and each Party shall preserve each of its rights and shall not be impeded by this Agreement from bringing before any applicable court any available averment, defenses or priority allegation, or from challenging or contesting any such rights, whether under such law or otherwise, on any grounds.

**Section 25**     **<u>Prior Negotiations; Entire Agreement</u>**. This Definitive RSA, including the exhibits, annexes and schedules hereto, constitutes the entire agreement of the Parties and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that all confidentiality agreements executed between one or more Parties before the execution of this Definitive RSA shall continue in full force and effect. Without limitation of the foregoing, the Preliminary RSA is superseded by this Definitive RSA and terminated in its entirety and shall be of no further force and effect.

**Section 26**     **<u>Counterparts</u>**. This Definitive RSA may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Definitive RSA delivered by PDF shall be deemed to be an original for the purposes of this paragraph.

**Section 27**     **<u>Notices</u>**. All notices hereunder shall be deemed given if they are made in writing and delivered by electronic mail, courier, or registered or certified mail (postage prepaid, return receipt requested) (and if by any method other than electronic mail, then with a copy by electronic mail) to the following addresses (or at such other addresses as shall be specified by like notice):

      (i)     if to PREPA or AAFAF, to:

               O'Melveny & Myers LLP
               7 Times Square
               New York, NY 10036
               Attention: Nancy Mitchell, Maria DiConza, and Matthew Hinker
               Email: nmitchell@omm.com; mdiconza@omm.com; mhinker@omm.com

      (ii)    if to FOMB, to:

               Proskauer Rose LLP
               Eleven Times Square
               New York, NY 10036
               Attention: Martin J. Bienenstock, Paul V. Possinger, and Ehud Barak
               Email: mbienenstock@proskauer.com; ppossinger@proskauer.com; ebarak@proskauer.com

      (iii)   if to the Ad Hoc Group, to:

               Kramer Levin Naftalis & Frankel LLP
               1177 Avenue of the Americas

New York, New York 10036
Attention: Amy Caton, Alice J. Byowitz, and Steven Segal
Email: acaton@kramerlevin.com; abyowitz@kramerlevin.com;
ssegal@kramerlevin.com.

(iv)     if to Assured, to:

Assured Guaranty Corp. and Assured Guaranty Municipal Corp.
1633 Broadway
New York, NY 10019
Attention: Kevin J. Lyons and Terence Workman
Email:  klyons@agltd.com; tworkman@agltd.com

-and-

Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281
Attention:  Mark C. Ellenberg, Ivan Loncar, and Thomas J. Curtin
Email:  mark.ellenberg@cwt.com; ivan.loncar@cwt.com;
thomas.curtin@cwt.com

(v)     if to Syncora, to:

Syncora Guarantee Inc.
555 Madison Avenue, 11th Floor
New York, NY 10022
Attention:  James W. Lundy, Jr.
Email:  james.lundy@scafg.com

-and-

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention:  My Chi To and Elie J. Worenklein
Email:  mcto@debevoise.com; eworenklein@debevoise.com

(vi)     if to National, to:

National Public Finance Guarantee Corporation
1 Manhattanville Road, Suite 301
Purchase, NY 10577
Attention: Gary Saunders
Email: gary.saunders@mbia.com

-and-

53

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
Attention: Marcia Goldstein and Debora Hoehne
Email: marcia.goldstein@weil.com; debora.hoehne@weil.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by mail or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission. For purposes of this Agreement, notices and other communications may be delivered by a Party or by its authorized representatives. Any notice provided to an individual Supporting Holder hereunder must also be provided to the Required Parties and the Consulting Parties.

(b)   If this Agreement is terminated as to any Government Party, Assured, Syncora, National, or the Ad Hoc Group, FOMB shall publish notice of such withdrawal or termination on its website and PREPA shall file a notice with EMMA not later than one (1) business day after receipt of such notice.

(c)   Unless otherwise mutually agreed to by the Required Parties, after consultation with the Consulting Parties, this Agreement, and each amendment hereto, shall be posted by FOMB on its website and PREPA shall file a notice with EMMA not later than one (1) business day after the execution and delivery hereof and thereof, subject to the confidentiality restrictions contained herein, including Section 12.

**Section 28**     **Settlement Discussions**. This Definitive RSA is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. This Definitive RSA and all negotiations relating thereto shall be deemed to be settlement discussions covered by Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic. Further, other than in a proceeding to enforce or implement this Definitive RSA's terms (or the terms of the 9019 Order), no Party shall offer into evidence this Definitive RSA, or any negotiations relating thereto. If this Definitive RSA is terminated, for any reason, no Party shall use any of the terms in this Definitive RSA against the other Party other than for enforcing its remedies under this Definitive RSA and to extent provided.

**Section 29**     **No Solicitation; Adequate Information**. This Definitive RSA is not and shall not be deemed to be a solicitation for consents to a Plan, qualifying modification, exchange, or restructuring. The votes of the holders of Claims against PREPA will not be solicited until such holders who are entitled to vote on Plan have received the required solicitation in accordance with PROMESA. In addition, this Definitive RSA does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

**Section 30**     **No Waiver**. The failure or neglect by a Party to enforce any rights under this Agreement will not be deemed a waiver of that Party's rights. No waiver of satisfaction of or

nonperformance of an obligation under this Agreement will be effective unless in writing and signed by the Party granting the waiver.

**Section 31**     <u>**Representation by Counsel**</u>. The Parties agree that they have each been represented by legal counsel during the negotiation and execution of this Definitive RSA and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[*Signature pages follow.*]

## Schedule 2

## RECOVERY PLAN TERM SHEET

Capitalized terms used herein without definition shall have the meanings given such terms in the Definitive RSA to which this Recovery Plan Term Sheet is attached.

### I.    Acceleration of Bonds.

The Plan and Confirmation Order shall accelerate all of the Uninsured Bonds and Insured Bonds to the extent such Bonds are insured by a party to the RSA as of the Effective Date, with the same effect and treatment as if all of the Bonds were accelerated under the terms of the Trust Agreement. For the avoidance of doubt, the payment obligations of the applicable bond insurer under any Bond Insurance Agreement shall not be accelerated unless otherwise explicitly elected by such bond insurer.

### II.    Supporting Holder Exchange.

The Supporting Holders shall commit to exchange (or commit to cause an exchange, as applicable) all of their Bonds, whenever acquired, for Securitization Bonds on the Effective Date, on the terms and in the manner set forth herein.

### II.    Securitization Bonds.[1]

a)    The SPV shall issue Securitization Bonds, in the tranches provided below, secured by the Transition Charge.

b)    The Securitization Bonds shall be issued on the Effective Date.

### III.    Transition Charge.

a)    The transition charge allocable to outstanding power revenue and revenue refunding bonds issued by PREPA under the Trust Agreement (the "**Transition Charge**")[2] shall be set at the following levels:

---

[1] In the event of conflict with these terms, the terms of the Securitization Term Sheet, attached to the Recovery Plan Term Sheet as Annex A, relating to the Securitization Bonds shall govern.

[2] The calculation of the Transition Charge (including the TC Cap) set forth in this Recovery Plan Term Sheet assumes (i) 100% of the Bonds are exchanged, (ii) interest accrues on Bonds until May 1, 2019 calculated at prior stated interest rates for each CUSIP, (iii) interest stops accruing on all power revenue bonds on May 1, 2019, (iv) the Administrative Claim for the Tranche A interest accrues for the benefit of all Bonds beginning May 1, 2019 as provided in the Definitive RSA, (v) any portion of the Administrative Claim not paid through the Settlement Charge is satisfied in Tranche A Bonds, (vi) the transaction closes on June 30, 2020, and (vii) the Settlement Charge is paid as provided herein. To the extent these assumptions are not correct or have to be modified, the Transition Charge (including the TC Cap) will need to be adjusted in connection with the issuance of the Securitization Bonds. The Transition Charge amounts (including the TC Cap) set forth above also do not include (i) the Assured Treatment, National Treatment, or Syncora Treatment or any premium paid to Assured, National, or Syncora, (ii) the costs of administration of the securitization vehicle (including costs such as trustee fees and servicer fees), or (iii) the Assured swap, and the Transition Charge will need to be adjusted in connection with the issuance of the Securitization Bonds to take those items into account.

(i)     2.768 c/kWh for Years 1-3 [FY21-FY23]

(ii)     2.957 c/kWh for Years 4-8 [FY24-FY28]

(iii)     3.242 c/kWh in Year 9 [FY29]

(iv)     3.323 c/kWh in Year 10 [FY30]

(v)     3.406 c/kWh in Year 11 [FY31]

(vi)     3.492 c/kWh in Year 12 [FY32]

(vii)     3.579 c/kWh in Year 13 [FY33]

(viii)     3.668 c/kWh in Year 14 [FY34]

(ix)     3.760 c/kWh in Year 15 [FY35]

(x)     3.854 c/kWh in Year 16 [FY36]

(xi)     3.950 c/kWh in Year 17 [FY37]

(xii)     4.049 c/kWh in Year 18 [FY38]

(xiii)     4.150 c/kWh in Year 19 [FY39]

(xiv)     4.254 c/kWh in Year 20 [FY40]

(xv)     4.361 c/kWh in Year 21 [FY41]

(xvi)     4.470 c/kWh in Year 22 [FY42]

(xvii)     4.552 c/kWh in Year 23 [FY43]

(xviii) 4.552 c/kWh in Year 24 [FY44] and thereafter through Transition Charge Termination

b)     The Transition Charge allocable to the Bonds shall begin on the earlier of the Title III plan Effective Date or the Delayed Implementation Date and shall be capped at 4.552 c/kWh (the "**TC Cap**").

IV.     **Exchange Ratio.**[3]

a)     Tranche A Bonds: 67.5% of principal amount of outstanding Bonds subject to the

---

[3] As used in "Exchange Ratio," the principal amount of Supporting Holders' Claims to be calculated to include (i) accrued and unpaid interest on the existing Bonds through an assumed exchange date of May 1, 2019 (which interest, in the case of a series of Assured Insured Bonds that bear interest at a floating interest rate, will be calculated based on the fixed rate under the related interest rate swap), and (ii) in the case of a series of Assured Insured Bonds that bear interest at a floating interest rate, the mark-to-market amount (the "**Swap MTM Amount**")

exchange plus, at the option of the Government Parties to the extent such Administrative Claim is not being paid in cash, 100% of any Administrative Claim being satisfied with Tranche A Bonds.

     b)     Tranche B Bonds: 10% of principal amount of outstanding Bonds subject to the exchange. The Tranche B Bonds shall not be required to be tax-exempt.[4]

     c)     With respect to Assured, Syncora and National, the Exchange Ratio shall be subject to the Assured Treatment, the Syncora Treatment and the National Treatment, as applicable.

## V.     Tranche A Bonds.

     a)     There will be a tranche of Securitization Bonds known as the Tranche A Bonds (the "**Tranche A Bonds**"), with the following maturities and coupons:

---

on the related interest rate swap as of the Effective Date (or such earlier date as negotiated by the Government Parties with the swap counterparties and Assured). As a result, Assured shall be entitled to receive additional Tranche A and B Bonds on account of the Swap MTM Amounts based on the same Exchange Ratio that is applicable to its claim with respect to Assured Insured Bonds. Such Swap MTM Amounts will be mutually agreed to between the Government Parties and Assured, provided that, if the parties cannot agree to such Swap MTM Amounts, then such amounts will be determined by obtaining actionable quotations from at least three swap dealers in accordance with Section 6(e) of the respective interest rate swap agreements (assuming that PREPA is the defaulting party for such purpose).

On the Effective Date, the Assured Insured Interest Rate Swaps will be extinguished and PREPA's obligation thereunder will be satisfied by the treatment accorded to Assured on account of such interest rate swaps as described in this Term Sheet. Assured will have the option to (i) continue making net scheduled payments under the insurance policies insuring the Assured Insured Interest Rate Swaps or (ii) accelerate its obligations thereunder by paying the termination payment to the respective swap counterparties.

Notwithstanding the foregoing, in lieu of receiving additional Tranche A and B Bonds on account of the Swap MTM Amounts as described above, Assured may elect, if agreed by Assured and the swap counterparties, to insure a security to be issued by the issuer of the Securitization Bonds that (i) is delivered to the counterparties to the Assured Insured Interest Rate Swaps with PREPA in exchange for their agreement to the extinguishment of the Assured Insured Interest Rate Swaps, the cancellation of the respective swap insurance policies and the release of all of their claims thereunder, (ii) entitles the holder of such security to receive periodic payments that are equal to the fixed amounts that the respective interest rate swap counterparty would have been entitled to receive under the respective interest rate swap if floating rates were zero at all times during the term of such swap and the respective fixed rate were equal to the difference between the actual fixed rate under such swap and the on-market fixed rate (the "**Market Fixed Rate**") for an interest rate swap otherwise having the same terms as such swap, and (iii) is secured by a Transition Charge segregated from the Transition Charges securing Assured Securitization Bonds and other Securitization Bonds, with any excess revenues from such Transition Charge securing future payments under such security or being used to prepay such future payments if such prepayment is allowed in the definitive documentation. If Assured makes such election, the Market Fixed Rate will be the fixed rate agreed to among the Government Parties, Assured and the respective swap counterparties, provided that, if the parties cannot agree to such fixed rate, then such Market Fixed Rate will be determined by obtaining actionable quotations from at least three swap dealers to enter into an offsetting interest rate swap pursuant to which such swap dealers would be paying such fixed rate. If Assured makes such election, Assured will be entitled to receive premium payments with respect to the insurance policy wrapping such security that for each year during which such security is outstanding are equal to 0.5% per annum of the aggregate payments payable under such security in such year.

[4] To the extent it has no economic effect on PREPA, the Tranche A and Tranche B Bonds shall be allocated in satisfaction of Bond principal and interest, whenever accrued, in the most tax-efficient manner.

(i)      **Maturity:** 40-year stated final maturity, subject to early mandatory redemption from sweep of Transition Charge Revenues (33 year expected maturity from FOMB's May 2018 projections, which may change).

(ii)     **Coupon:** 5.25% to be paid in cash, on a tax-exempt basis.

(iii)    Any interest not paid when due shall be added to the interest to be paid on the next payment date for such Tranche A Bonds.  Interest shall accrue on overdue principal and interest at the coupon rate, compounding semi-annually.

(iv)     The obligation to pay the Tranche A Bonds (including accrual and compounding, as applicable of interest) will extend beyond the stated final maturity if not paid in full on the stated final maturity until all principal of, and accrued and unpaid interest on, the Tranche A Bonds is paid in full.

**VI.**   **Tranche B Bonds.**

a)       There will be a tranche of Securitization Bonds known as the Tranche B Bonds (the "**Tranche B Bonds**"), with the following maturities and coupons:

(i)      **Maturity:** 47-year stated final maturity.

(ii)     **Coupon:** 7.00% accretion rate for tax-exempt bonds; 8.75% for taxable bonds.[5]

(iii)    Interest on Tranche B Bonds shall be paid in additional Tranche B Bonds in a principal amount equal to the unpaid balance of Tranche B Bond interest due (such payment of interest on Tranche B Bonds referred to as "**PIK Payments**").

(iv)     No cash flow on Tranche B bonds until Tranche A paid in full.

(v)      Tranche B Bonds shall receive 100% of total excess cash flow from the Transition Charge (including any cash on deposit in the DSRF) after repayment of the Tranche A Bonds until maturity.

(vi)     Any amounts on such Tranche B Bonds not paid with Transition Charge Revenues imposed prior to the stated final maturity of the Tranche B Bonds shall not be recoverable by Bondholders.

---

[5] The Government Parties shall work in good faith to try to obtain tax-exempt status for the Tranche B Bonds or as great a portion thereof as possible or, to the extent the Tranche B Bonds are not tax-exempt to work in good faith to minimize the tax impacts thereof; provided that the Government Parties shall not be required to change or modify the terms of any Transformation Transaction or incur any additional material costs to achieve such a result.  A majority of the Ad Hoc Group, with the agreement of the Government Parties, may elect to alter the structure of the Tranche B Bonds received by holders of Uninsured Bonds to maximize tax exemption and minimize tax issues while otherwise maintaining equivalent economics.

**VII**.   **Assured Treatment**.[6]

The Plan shall provide for the following treatments with respect to Assured on the account of the Assured Insured Bonds, the Uninsured Bonds identified on Assured's signature page hereto that are beneficially owned by Assured, and the Assured Insured Interest Rate Swaps, which treatments shall be selected by Assured in its sole discretion on or prior to the hearing on the disclosure statement:

a)   **Assured Election:** At Assured's election (the "**Assured Election**"), all or any portion of the Assured Insured Bonds selected by Assured shall be paid, in full, on the Effective Date, at an acceleration price (the "**Acceleration Price**") equal to the outstanding principal amount of such Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured Securitization Bonds allocable to holders of Assured Insured Bonds that shall be (i) insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12 and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of Assured Securitization Bonds are not sufficient to pay the Acceleration Price, amounts equal to such deficiency paid by Assured in accordance with the insurance policies (the "**Assured Insurance Policies**") guaranteeing the Assured Insured Bonds. In addition, at Assured's election, all or any of Assured Securitization Bonds allocable to Assured as a beneficial owner of Uninsured Bonds identified on Assured's signature page hereto, or that Assured is otherwise entitled to receive in accordance with the terms of this Definitive RSA, shall be insured, offered and underwritten in the same manner as Assured Securitization Bonds allocable to holders of Assured Insured Bonds would be required to be insured, offered and underwritten if Assured exercised the Assured Election in respect of such Assured Insured Bonds, and any proceeds of the sale of such Assured Securitization Bonds shall be transferred to Assured. The principal amounts, maturities and interest rates on the Assured Securitization Bonds in respect of which any of the foregoing elections is exercised, shall be determined by Assured in consultation with  applicable underwriter(s), such that the interest rates on the Assured Securitization Bonds shall be the lowest interest rates necessary for such Assured Securitization Bonds to be issued with increased par amounts relative to other Securitization Bonds and otherwise result in the Assured Securitization Bonds being issued at the lowest aggregate yield; provided, however, that the annual debt service on the Assured Securitization Bonds due in any fiscal year shall not be greater than the annual debt service that would have been due in such fiscal year if such Assured Securitization Bonds had the same terms as the other Securitization Bonds.  The costs associated with the issuance of the Assured Securitization

---

[6] Transition Charge, DSRF, and surety repayments allocable to Assured Securitization Bonds, National Securitization Bonds, Syncora Securitization Bonds and swap counterparty security must be segregated from Transition Charge and DSRF allocable to Uninsured Bonds and separately accounted for in a manner agreed to by the Required Parties, so that Assured Treatment, National Treatment, Syncora Treatment and swap counterparty treatment do not affect recoveries on Uninsured Bonds and vice versa.  For avoidance of doubt, the Uninsured Bond Transition Charge or allocation must be set at levels sufficient to cover debt service in respect of Securitization Bonds allocable to the Uninsured Bonds, and Assured's Transition Charge or allocation must be set at levels sufficient to cover both debt service and premiums in respect of Assured Securitization Bonds and otherwise to provide for the Assured Treatment.

Bonds (including the fees and compensation of the applicable underwriter(s)) shall be paid by PREPA and shall not be withheld from the proceeds of the Assured Securitization Bonds. The offering and underwriting of the Assured Securitization Bonds shall be provided for in the Plan or in connection with providing the Stipulated Treatment, provided, however, that if either (i) at or prior to the time of pricing of Assured Securitization Bonds, Assured determines, based on its good faith evaluation of the circumstances, that Assured Securitization Bonds cannot be sold into the market on terms acceptable to Assured or (ii) such Assured Securitization Bonds are not issued to the underwriter(s) for any reason, then in either case, Assured (A) may elect, in its sole discretion, to pay the applicable Acceleration Price (such payment election, the "**Assured Acceleration Price Payment Option**") to the holders of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election, and (B) shall receive, on the Effective Date, the Assured Securitization Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any other Assured Securitization Bonds allocable to Assured or the Assured is otherwise entitled to receive hereunder, which Assured Securitization Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it. The Plan shall provide that payment of the applicable Acceleration Price with respect to any Assured Insured Bond in accordance with the Assured Election shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

b)    **Assured Bondholder Elections:** In the event that Assured declines to make the Assured Election with respect to any Assured Insured Bonds as described above (or makes the Assured Election but declines to exercise the Assured Acceleration Price Payment Option upon the occurrence of any event that gives Assured the right to exercise such option as described above), the plan or Stipulated Treatment provision may offer each beneficial holder of an Assured Insured Bond with respect to which Assured has not made the Assured Election any one or more of the following options (collectively, the "**Assured Bondholder Elections**"), in each case on terms acceptable to Assured: (1) Assured Bondholder Election 1, pursuant to which such holder shall receive from Assured the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive Assured Securitization Bonds allocable to such holder under the plan that may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it; (2) Assured Bondholder Election 2, pursuant to which such holder shall opt into a custodial trust, escrow arrangement, or similar structure established by Assured that would provide such holder with an interest in the applicable Assured Insurance Policy and Assured Securitization Bonds allocable to such holder in accordance with terms acceptable to Assured; or (3) Assured Bondholder Election 3, pursuant to which such holder shall, on the Effective Date, and in full satisfaction of Assured's obligations under the applicable Assured Insurance Policies, receive (i) the Assured Securitization Bonds allocable to such holder under the plan, which Assured Securitization Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, and (ii) a cash payment from Assured in an amount to be determined or defined by Assured prior to the hearing on the disclosure statement. The Assured Bondholder Elections offered to Assured Insured Bondholders shall include at least either Assured Bondholder Election 1 or Assured Bondholder Election 2. In the event that Assured Bondholder Election 1 is not one of the options offered, the structure, terms, and conditions of the custodial trust, escrow arrangement or similar structure established as part of Assured Bondholder Election

2 must be reasonably acceptable to Assured and the Government Parties and the interests granted therein must be DTC eligible, provided that such custodial trust, escrow arrangement or similar structure will be deemed to be reasonably acceptable to the Government Parties if it is consistent with either one of the structures set forth in Annex B hereto. The Definitive RSA will provide that in the event an Assured Bondholder fails to make an election such Assured Bondholder is deemed to have elected Election 2 (unless otherwise provided in the Plan).

c)    **DSRF Surety**: Assured may, at its election, provide a DSRF surety to satisfy the DSRF requirement with respect to Tranche A Bonds that are Assured Securitization Bonds, which DSRF surety will be in effect during the entire term of such Tranche A Bonds.  Any reimbursement obligation with respect to such DSRF surety will be secured and payable from the portion of the Transition Charge allocable to Assured Securitization Bonds, subordinate only to interest on Tranche A Bonds secured by such DSRF Surety.  In exchange for such DSRF surety, Assured will be entitled to receive (i) additional Tranche A Bonds having a principal amount equal to the present value of the projected cash flow that would fund the DSRF requirement with respect to Tranche A Bonds that are Assured Securitization Bonds in the absence of the DSRF surety from Transition Charge excess cash following interest paid on Tranche A Bonds, and (ii) an upfront one-time DSRF surety fee equal to 2% of the DSRF requirement with respect to Tranche A Bonds that are Assured Securitization Bonds.  Such DSRF Surety shall only secure the Tranche A Bonds that are Assured Securitization Bonds.

d)    **Insurance Premiums:** To the extent that Assured insures any Assured Securitization Bonds, Assured will be entitled to receive a premium that (a) in the case of any Tranche A Bonds that it insures, will be payable in each year during which such Tranche A Bonds are outstanding, will be equal to 0.50% per annum of the principal amount of such Tranche A Bonds that were outstanding as of the first day of such year and will be payable from and secured by the Transition Charge revenues on a *pari passu* basis with interest on Tranche A Bonds, and (b) in the case of any Tranche B Bonds that it insures, will be a one-time premium payable in form of Tranche A Bonds having a principal amount equal to 2% of the expected aggregate cash flow of such Tranche B Bonds.

## VIII.   Call Protection

a)    Tranche A Bonds: Callable starting on the first interest payment date after the tenth anniversary of the issuance date.

b)    Tranche B Bonds:  Starting on the first interest payment date after the tenth anniversary of the issuance date, callable at the product of (i) the accreted value of the Tranche B Bonds at the date of redemption, multiplied by (ii) the Tranche B Call Premium. "Tranche B Call Premium" shall be (i) 110% for the twelve-month period starting on the first call date, (ii) 109.5% for the next twelve-month period and (iii) shall continue to decline by 0.5% each twelve-month period thereafter until it reaches 100%.

## IX.   Debt Service Reserve Fund ("DSRF").

a)    The DSRF requirement shall be set at 5% of principal amount of the Tranche A Bonds.

b)     DSRF will be funded through first dollars from Transition Charge excess cash following interest paid on Tranche A Bonds.

**X.     Payment Default**.

a)     No default on Tranche A Bonds for failure to pay scheduled debt service prior to maturity, so long as full amount collected under the Transition Charge (minus administrative fees) is used to pay debt service.  Interest shall continue to accrue (and compound, as applicable) at the original Coupon rate.

b)     No default on Tranche B Bonds for failure to pay debt service, so long as full amount collected under the Transition Charge (minus administrative fees) is used to pay debt service.  Interest shall continue to accrue (and pay-in-kind, as applicable) and accrete at the original Coupon rate.

c)     The Transition Charge shall extend, and interest shall continue to accrue (and compound or pay-in-kind, as applicable) at the original Coupon rate, until the "**Transition Charge Termination**," which shall be the later of (1) the date necessary to pay the Tranche A Bonds in full, even if past their stated maturity, and (2) the earlier of (i) the stated maturity of the Tranche B Bonds, and (ii) the date on which the Tranche B Bonds are paid in full.

**XI.     Remedies**.

a)     Remedies will be mutually agreed upon in the Definitive Documentation or Additional Definitive Documentation and will include, at a minimum, the right to replace the Transition Charge servicer and the right to enforce the Securitization Bonds' trust agreement' the servicing agreement, and non-impairment covenants.  Requirements for replacement servicer to be mutually agreed upon as part of Definitive Documentation.

**XII.     Securitization Protections (including structure of SPV)**.

a)     As set forth in Schedule I-B to the Securitization Term Sheet.

**XIII.     Administrative Fees**.

a)     Terms, structure, and cap on administrative fees to be mutually agreed upon.

**XIV.     Demand Protections**.

a)     As set forth in Schedule I-A to the Securitization Term Sheet.

**XV.     Syncora Treatment.**

The Plan shall provide for the following treatments with respect to Syncora on the account of the Syncora Insured Bonds and the Uninsured Bonds identified on Syncora's signature page hereto that are beneficially owned by Syncora, which treatments shall be selected

by Syncora in its sole discretion on or prior to the hearing on the disclosure statement:

a) Syncora Election: At Syncora's election (the "**Syncora Election**"), all or any portion of the Syncora Insured Bonds selected by Syncora shall be paid, in full, on the Effective Date, at the Acceleration Price from (a) the proceeds of all or any portion of the Syncora Securitization Bonds allocable to holders of Syncora Insured Bonds that shall be (i) insured, at Syncora's election, in accordance with a new insurance policy issued by Syncora on terms acceptable to Syncora; provided, however, Syncora may only insure any portion of the Syncora Securitization Bonds if (A) such insurance is for a term of no less than one year, and (B) the interest rate on such insured Securitization Bonds shall be at least 35 basis points lower than on uninsured Securitization Bonds, as determined by the applicable underwriter retained in connection with the sale of insured Securitization Bonds into the public market and the financial advisor to the FOMB (both (A) and (B) collectively, the "**Insurance Conditions**"), (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12 and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of Syncora Securitization Bonds are not sufficient to pay the Acceleration Price, amounts equal to such deficiency paid by Syncora in accordance with the insurance policies (the "**Syncora Insurance Policies**") guaranteeing the Syncora Insured Bonds. In addition, at Syncora's election (but subject to the Insurance Conditions), all or any of Syncora Securitization Bonds allocable to Syncora as a beneficial owner of Uninsured Bonds identified on Syncora's signature page hereto, or that Syncora is otherwise entitled to receive in accordance with the terms of this Definitive RSA, shall be insured, offered and underwritten in the same manner as Syncora Securitization Bonds allocable to holders of Syncora Insured Bonds would be required to be insured, offered and underwritten if Syncora exercised the Syncora Election in respect of such Syncora Insured Bonds, and any proceeds of the sale of such Syncora Securitization Bonds shall be transferred to Syncora. The principal amounts, maturities and interest rates on the Syncora Securitization Bonds in respect of which any of the foregoing elections is exercised, shall be determined by Syncora in consultation with the applicable underwriter(s), such that the interest rates on the Syncora Securitization Bonds shall be the lowest interest rates necessary for such Syncora Securitization Bonds to be issued with increased par amounts relative to other Securitization Bonds and otherwise result in the Syncora Securitization Bonds being issued at the lowest aggregate yield; provided, however, that the annual debt service on the Syncora Securitization Bonds due in any fiscal year shall not be greater than the annual debt service that would have been due in such fiscal year if such Syncora Securitization Bonds had the same terms as the other Securitization Bonds. The costs associated with the issuance of the Syncora Securitization Bonds (including the fees and compensation of the applicable underwriter(s)) shall be paid by PREPA and shall not be withheld from the proceeds of the Syncora Securitization Bonds. The offering and underwriting of the Syncora Securitization Bonds shall be provided for in the Plan or in connection with providing the Stipulated Treatment, provided, however, that if either (i) at or prior to the time of pricing of Syncora Securitization Bonds, Syncora determines, in its sole discretion, that Syncora Securitization Bonds should not be sold into the market or (ii) such Syncora Securitization Bonds are not issued to the underwriter(s) for any reason, then in either case, Syncora (A) may elect, in its sole discretion, to pay the applicable Acceleration Price (such payment election, the "**Syncora Acceleration Price Payment Option**") to the holders of any Syncora Insured Bonds with respect to which Syncora has exercised the Syncora Election, and (B) shall receive, on the Effective Date, the Syncora Securitization Bonds in respect of which the Syncora Acceleration

Price Payment Option is exercised and any other Syncora Securitization Bonds allocable to Syncora or that Syncora is otherwise entitled to receive hereunder, which Syncora Securitization Bonds may, at Syncora's election, be insured in accordance with a new insurance policy issued by Syncora on terms acceptable to it, subject to the Insurance Conditions. The Plan shall provide that payment of the applicable Acceleration Price with respect to any Syncora Insured Bond in accordance with the Syncora Election shall satisfy and discharge all of Syncora's obligations under the Syncora Insurance Policies with respect to such Syncora Insured Bond.

   b)   Syncora Bondholder Elections: In the event that Syncora declines to make the Syncora Election with respect to any Syncora Insured Bonds as described above (or makes the Syncora Election but declines to exercise the Syncora Acceleration Price Payment Option upon the occurrence of any event that gives Syncora the right to exercise such option as described above), the Plan or Stipulated Treatment provision may offer each beneficial holder of an Syncora Insured Bond with respect to which Syncora has not made the Syncora Election any one or more of the following options (collectively, the "**Syncora Bondholder Elections**"), in each case on terms acceptable to Syncora: (1) Syncora Bondholder Election 1, pursuant to which such holder shall receive from Syncora the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of Syncora's obligations with respect to such holder under the applicable Syncora Insurance Policies, and Syncora shall receive Syncora Securitization Bonds allocable to such holder under the Plan that may, at Syncora's election, be insured in accordance with a new insurance policy issued by Syncora on terms acceptable to it; (2) Syncora Bondholder Election 2, pursuant to which such holder shall opt into a custodial trust, escrow arrangement, or similar structure established by Syncora that would provide such holder with an interest in the applicable Syncora Insurance Policy and Syncora Securitization Bonds allocable to such holder in accordance with terms acceptable to Syncora; or (3) Syncora Bondholder Election 3, pursuant to which such holder shall, on the Effective Date, and in full satisfaction and discharge of Syncora's obligations under the applicable Syncora Insurance Policies, receive (i) the Syncora Securitization Bonds allocable to such holder under the Plan, which Syncora Securitization Bonds may, at Syncora's election, be insured in accordance with a new insurance policy issued by Syncora on terms acceptable to Syncora, and (ii) additional consideration from Syncora in the form of cash or Syncora Securitization Bonds that Syncora is otherwise entitled to receive, in the sole discretion of Syncora, in an amount to be determined or defined by Syncora prior to the hearing on the disclosure statement. Any new insurance policy issued by Syncora pursuant to any of the Syncora Bondholder Elections under this Agreement must be for a term of no less than one year and the interest rate on such insured Syncora Securitization Bond must be the lesser of (y) the interest rate determined by the Insurance Conditions, if applicable, and (z) 35 basis points lower than the interest rate on the corresponding tranche of uninsured Securitization Bonds. The Syncora Bondholder Elections offered to Syncora Insured Bondholders shall include at least either Syncora Bondholder Election 1 or Syncora Bondholder Election 2. In the event that Syncora Bondholder Election 1 is not one of the options offered, the structure, terms, and conditions of the custodial trust, escrow arrangement or similar structure established as part of Syncora Bondholder Election 2 must be reasonably acceptable to Syncora and the Government Parties and the interests granted therein must be DTC eligible, provided that such custodial trust, escrow arrangement or similar structure will be deemed to be reasonably acceptable to the Government Parties if it is consistent with either one of the structures set forth in Annex B hereto. In the event a Syncora Bondholder fails to make a timely election or makes an election for less than all of its Syncora Insured Bonds, such Syncora Bondholder will be deemed to have

elected Election 3 with respect to Syncora Insured Bonds not subject to a timely election (unless otherwise provided in the Plan).

     c)    DSRF Surety: Syncora may, at its election, provide a DSRF surety to satisfy the DSRF requirement with respect to Tranche A Bonds that are Syncora Securitization Bonds, which DSRF surety will be in effect during the entire term of such Tranche A Bonds. Any reimbursement obligation with respect to such DSRF surety will be secured and payable from the portion of the Transition Charge allocable to Syncora Securitization Bonds, subordinate only to interest on Tranche A Bonds secured by such DSRF Surety. In exchange for such DSRF surety, Syncora will be entitled to receive (i) additional Tranche A Bonds having a principal amount equal to the present value of the projected cash flow that would fund the DSRF requirement with respect to Tranche A Bonds that are Syncora Securitization Bonds in the absence of the DSRF surety from Transition Charge excess cash following interest paid on Tranche A Bonds, and (ii) an upfront one-time DSRF surety fee equal to 2% of the DSRF requirement with respect to Tranche A Bonds that are Syncora Securitization Bonds. Such DSRF Surety shall only secure the Tranche A Bonds that are Syncora Securitization Bonds.

     d)    Insurance Premiums: To the extent that Syncora insures any Syncora Securitization Bonds, Syncora will be entitled to receive a premium that (a) in the case of any Tranche A Bonds that it insures, will be payable in each year during which such Tranche A Bonds are outstanding, will be equal to 0.50% per annum of the principal amount of such Tranche A Bonds that were outstanding as of the first day of such year and will be payable from and secured by the Transition Charge revenues on a *pari passu* basis with interest on Tranche A Bonds, and (b) in the case of any Tranche B Bonds that it insures, will be a one-time premium payable in form of Tranche A Bonds having a principal amount equal to 2% of the expected aggregate cash flow of such Tranche B Bonds. If Syncora cannot insure Syncora Securitization Bonds because of the failure to satisfy the Insurance Conditions, then Syncora shall not be entitled to an insurance premium.

## XVI.  National Treatment.

     The Plan shall provide for the following treatments with respect to National on the account of the National Insured Bonds and the Uninsured Bonds identified on National's signature page hereto that are beneficially owned by National, which treatments shall be selected by National in its sole discretion on or prior to the hearing on the disclosure statement:

     a)    National Election: At National's election (the "**National Election**"), all or any portion of the National Insured Bonds selected by National shall be paid, in full, on the Effective Date, at the Acceleration Price from (a) the proceeds of all or any portion of the National Securitization Bonds allocable to holders of National Insured Bonds that shall be (i) insured, at National's election, in accordance with a new insurance policy issued by National on terms acceptable to National; provided, however, National may only insure any portion of the National Securitization Bonds if the Insurance Conditions are satisfied, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12 and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of National Securitization Bonds are not sufficient to pay the Acceleration Price, amounts equal to such deficiency paid by National in accordance with the insurance policies (the "**National**

**Insurance Policies**") guaranteeing the National Insured Bonds. In addition, at National's election (but subject to the Insurance Conditions), all or any of National Securitization Bonds allocable to National as a beneficial owner of Uninsured Bonds identified on National's signature page hereto, or that National is otherwise entitled to receive in accordance with the terms of this Definitive RSA, shall be insured, offered and underwritten in the same manner as National Securitization Bonds allocable to holders of National Insured Bonds would be required to be insured, offered and underwritten if National exercised the National Election in respect of such National Insured Bonds, and any proceeds of the sale of such National Securitization Bonds shall be transferred to National. The principal amounts, maturities and interest rates on the National Securitization Bonds in respect of which any of the foregoing elections is exercised, shall be determined by National in consultation with the applicable underwriter(s), such that the interest rates on the National Securitization Bonds shall be the lowest interest rates necessary for such National Securitization Bonds to be issued with increased par amounts relative to other Securitization Bonds and otherwise result in the National Securitization Bonds being issued at the lowest aggregate yield; provided, however, that the annual debt service on the National Securitization Bonds due in any fiscal year shall not be greater than the annual debt service that would have been due in such fiscal year if such National Securitization Bonds had the same terms as the other Securitization Bonds. The costs associated with the issuance of the National Securitization Bonds (including the fees and compensation of the applicable underwriter(s)) shall be paid by PREPA and shall not be withheld from the proceeds of the National Securitization Bonds. The offering and underwriting of the National Securitization Bonds shall be provided for in the Plan or in connection with providing the Stipulated Treatment, provided, however, that if either (i) at or prior to the time of pricing of National Securitization Bonds, National determines, based on its good faith evaluation of the circumstances, that National Securitization Bonds cannot be sold into the market on terms acceptable to National or (ii) such National Securitization Bonds are not issued to the underwriter(s) for any reason, then in either case, National (A) may elect, in its sole discretion, to pay the applicable Acceleration Price (such payment election, the "**National Acceleration Price Payment Option**") to the holders of any National Insured Bonds with respect to which National has exercised the National Election, and (B) shall receive, on the Effective Date, the National Securitization Bonds in respect of which the National Acceleration Price Payment Option is exercised and any other National Securitization Bonds allocable to National or that National is otherwise entitled to receive hereunder, which National Securitization Bonds may, at National's election, be insured in accordance with a new insurance policy issued by National on terms acceptable to it, subject to the Insurance Conditions. The Plan shall provide that payment of the applicable Acceleration Price with respect to any National Insured Bond in accordance with the National Election shall satisfy and discharge all of National's obligations under the National Insurance Policies with respect to such National Insured Bond.

b)      National Bondholder Elections: In the event that National declines to make the National Election with respect to any National Insured Bonds as described above (or makes the National Election but declines to exercise the National Acceleration Price Payment Option upon the occurrence of any event that gives National the right to exercise such option as described above), the Plan or Stipulated Treatment provision may offer each beneficial holder of an National Insured Bond with respect to which National has not made the National Election any one or more of the following options (collectively, the "**National Bondholder Elections**"), in each case on terms acceptable to National: (1) National Bondholder Election 1, pursuant to

which such holder shall receive from National the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of National's obligations with respect to such holder under the applicable National Insurance Policies, and National shall receive National Securitization Bonds allocable to such holder under the Plan that may, at National's election, be insured in accordance with a new insurance policy issued by National on terms acceptable to it; (2) National Bondholder Election 2, pursuant to which such holder shall opt into a custodial trust, escrow arrangement, or similar structure established by National that would provide such holder with an interest in the applicable National Insurance Policy and National Securitization Bonds allocable to such holder in accordance with terms acceptable to National; or (3) National Bondholder Election 3, pursuant to which such holder shall, on the Effective Date, and in full satisfaction and discharge of National's obligations under the applicable National Insurance Policies, receive (i) the National Securitization Bonds allocable to such holder under the Plan, which National Securitization Bonds may, at National's election, be insured in accordance with a new insurance policy issued by National on terms acceptable to National, and (ii) additional consideration from National in the form of cash or National Securitization Bonds that National is otherwise entitled to, in the sole discretion of National, in an amount to be determined or defined by National prior to the hearing on the disclosure statement. Any new insurance policy issued by National pursuant to any of the National Bondholder elections under this Agreement must be for a term of no less than one year and the interest rate on such insured National Securitization Bonds must be the lesser of (y) the interest rate determined by the Insurance Conditions, if applicable, and (z) 35 basis points lower that the interest rate on the corresponding tranche of uninsured Securitization Bonds. The National Bondholder Elections offered to National Insured Bondholders shall include at least either National Bondholder Election 1 or National Bondholder Election 2. In the event that National Bondholder Election 1 is not one of the options offered, the structure, terms, and conditions of the custodial trust, escrow arrangement or similar structure established as part of National Bondholder Election 2 must be reasonably acceptable to National and the Government Parties and the interests granted therein must be DTC eligible, provided that such custodial trust, escrow arrangement or similar structure will be deemed to be reasonably acceptable to the Government Parties if it is consistent with either one of the structures set forth in Annex B hereto. In the event a National Bondholder fails to make a timely election or makes an election for less than all of its National Insured Bonds, such National Bondholder will be deemed to have elected Election 3 for all National Insured Bonds not subject to a timely election (unless otherwise provided in the Plan).

c)      DSRF Surety: National may, at its election, provide a DSRF surety to satisfy the DSRF requirement with respect to Tranche A Bonds that are National Securitization Bonds, which DSRF surety will be in effect during the entire term of such Tranche A Bonds. Any reimbursement obligation with respect to such DSRF surety will be secured and payable from the portion of the Transition Charge allocable to National Securitization Bonds, subordinate only to interest on Tranche A Bonds secured by such DSRF Surety. In exchange for such DSRF surety, National will be entitled to receive (i) additional Tranche A Bonds having a principal amount equal to the present value of the projected cash flow that would fund the DSRF requirement with respect to Tranche A Bonds that are National Securitization Bonds in the absence of the DSRF surety from Transition Charge excess cash following interest paid on Tranche A Bonds, and (ii) an upfront one-time DSRF surety fee equal to 2% of the DSRF requirement with respect to Tranche A Bonds that are National Securitization Bonds. Such DSRF Surety shall only secure the Tranche A Bonds that are National Securitization Bonds.

d)      Insurance Premiums: To the extent that National insures any National Securitization Bonds, National will be entitled to receive a premium that (a) in the case of any Tranche A Bonds that it insures, will be payable in each year during which such Tranche A Bonds are outstanding, will be equal to 0.50% per annum of the principal amount of such Tranche A Bonds that were outstanding as of the first day of such year and will be payable from and secured by the Transition Charge revenues on a *pari passu* basis with interest on Tranche A Bonds, and (b) in the case of any Tranche B Bonds that it insures, will be a one-time premium payable in form of Tranche A Bonds having a principal amount equal to 2% of the expected aggregate cash flow of such Tranche B Bonds. If National cannot insure National Securitization Bonds because of the failure to satisfy the Insurance Conditions, then National shall not be entitled to an insurance premium.

**Schedule 3**

**CONFORMED DEFINITIVE RESTRUCTURING SUPPORT AGREEMENT
INCORPORATING AMENDMENTS THROUGH SEPTEMBER 9, 2019**

**DEFINITIVE RESTRUCTURING SUPPORT AGREEMENT**

This Definitive Restructuring Support Agreement (together with the annexes, exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**" or the "**Definitive RSA**"), dated as of May 3, 2019, is entered into by and among: (i) the Puerto Rico Electric Power Authority ("**PREPA**"), (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (iii) the Financial Oversight and Management Board for Puerto Rico ("**FOMB**"), (iv) the members of the Ad Hoc Group of PREPA Bondholders identified on Annex A hereto, as such members may change from time to time in accordance with Section 6(c)(vii) (collectively, the "**Ad Hoc Group Members**" or the "**Ad Hoc Group**," and each individually, an "**Ad Hoc Group Member**"), (v) any other persons who beneficially own or control Uninsured Bonds and are party to this Agreement or execute and deliver, or have executed and delivered, a Joinder Agreement in the form of Exhibit A hereto (such persons, together with the Ad Hoc Group Members, the "**Uninsured Supporting Holders**"), (vi) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "**Assured**"), (vii) Syncora Guarantee Inc. ("**Syncora**"), and (viii) National Public Finance Guarantee Corporation ("**National**"). This Agreement refers to the Uninsured Supporting Holders, Assured, National, and Syncora collectively as the "**Supporting Holders**" each individually as a "**Supporting Holder**" and to FOMB, AAFAF, PREPA, and the Supporting Holders collectively as the "**Parties**" and each individually as a "**Party**."

**WHEREAS**, PREPA is the issuer of power revenue bonds and power revenue refunding bonds (together, the "**Bonds**," and persons who beneficially own or control Bonds, "**Bondholders**") issued and outstanding pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented (the "**Trust Agreement**"), between PREPA and U.S. Bank National Association (in its capacity as successor trustee, the "**Trustee**").

**WHEREAS**, in connection with the issuance of certain of the Bonds (such Bonds, the "**Insured Bonds**"), PREPA entered into various insurance agreements with the Trustee corresponding to insurance policies issued by certain monoline insurers (such monoline insurers, the "**Insurers**", such insurance policies to which any of such Insurers is currently a party, and the insurance agreements related thereto, collectively, the "**Bond Insurance Agreements**" and, together with the Trust Agreement, the Bonds, the resolutions approving the Bonds, and any other agreements, supplements, amendments, or other documents executed, adopted, or delivered in connection with the issuance or maintenance of the Bonds, the "**Bond Documents**"). Any Bonds that are not Insured Bonds are referred to herein as "**Uninsured Bonds**."

**WHEREAS**, the total principal amount of Uninsured Bonds that are beneficially owned by each member of the Ad Hoc Group and each other Supporting Holder as of the date hereof is set forth on their respective signature pages hereto.

**WHEREAS**, as of the date hereof, the total principal amount of Bonds that are beneficially

1

owned or that are insured by Assured under the Bond Insurance Agreements is $██████.

**WHEREAS,** as of the date hereof, the total principal amount of Bonds that are beneficially owned or that are insured by Syncora under the Bond Insurance Agreements is $██████.

**WHEREAS,** as of the date hereof, the total principal amount of Bonds that are beneficially owned or that are insured by National under the Bond Insurance Agreements is $██████.

**WHEREAS,** on June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187, "**PROMESA**").

**WHEREAS,** PROMESA created FOMB with certain powers over the finances and restructuring process with respect to the Commonwealth of Puerto Rico and its instrumentalities as provided for in PROMESA, and FOMB has designated PREPA as a Covered Territorial Instrumentality (as defined in PROMESA).

**WHEREAS,** pursuant to Act 2-2017, AAFAF was granted authority over reaching agreements with creditors on any debt issued by any government entity of the Commonwealth of Puerto Rico.

**WHEREAS,** on July 2, 2017, FOMB filed a Title III petition on behalf of PREPA (together with related adversary proceedings, the "**Title III Case**") in the Title III Court.

**WHEREAS,** FOMB is the representative of PREPA in the Title III Case pursuant to PROMESA section 315(b) with the sole authority to file and seek confirmation of a Plan for PREPA.

**WHEREAS,** the Parties have engaged in good faith, arms-length negotiations regarding the principal terms of a proposed restructuring of the Bonds subject to this Agreement to be implemented in a manner to be mutually agreed upon and as set forth in this Agreement.

**WHEREAS,** FOMB and AAFAF consent to PREPA's entering into this Agreement and to PREPA exercising its rights under this Agreement (including its rights to terminate this Agreement and/or its right to consent to any waiver or amendment in accordance with the provisions of this Agreement).

**WHEREAS,** on July 30, 2018, certain of the Parties entered into the Preliminary RSA (as defined below), with the intent of entering into this Agreement that shall replace, supersede and terminate any of the obligations and covenants in the Preliminary RSA.

**WHEREAS,** the Parties desire to express to each other their mutual support and commitment with respect to the Restructuring, including matters discussed in this Agreement.

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**Section 1**  **Certain Definitions & Rules of Interpretation**.

(a)  Definitions.  Each undefined capitalized term shall have the meaning given to it in the Bankruptcy Code as incorporated into PROMESA if defined therein.  As used in this Definitive RSA, the following terms have the following meanings:

(i)  "**9019 Order**" means an order approving the 9019 Settlement.

(ii)  "**9019 Settlement**" has the meaning given to such term in Section 2(b).

(iii)  "**AAFAF**" has the meaning given to such term in the Preamble.

(iv)  "**Acceleration Price**" has the meaning given to such term in the Recovery Plan Term Sheet.

(v)  "**Act 4-2016**" means the Puerto Rico Electric Power Authority Revitalization Act 4-2016, as amended through the date hereof.

(vi)  "**Adequate Protection Payments**" has the meaning given to such term in Section 2(e)(vii).

(vii)  "**Ad Hoc Group**" has the meaning given to such term in the Preamble.

(viii)  "**Ad Hoc Group Member(s)**" has the meaning given to such term in the Preamble.

(ix)  "**Ad Hoc Group Waiver and Support Fee**" has the meaning given to such term in Section 4(a).

(x)  "**Additional Definitive Documents**" or "**Additional Definitive Documentation**" means all documents, including agreements, resolutions, instruments, legislation, rules, regulations, opinions, and orders, (other than Definitive Documents) that are necessary or desirable to implement, or otherwise relate to, this Definitive RSA or the Restructuring, including any Plan (including any supplements thereto), qualifying modification, restructuring, or exchange documents, any disclosure statement (including the Disclosure Statement), any order approving such disclosure statement (including the Disclosure Statement Order) and any information materials required pursuant to PROMESA, the Confirmation Order, filings with PREB concerning the Transition Charge, the PREB Order, and shall include any attachments, exhibits, schedules, or other addendums to such documents, and any documents ancillary to such documents.

(xi)  "**Administrative Claim**" has the meaning given to such term in Section 2(d)(iii).

3

(xii)    "**Administrative Claim Commencement**" means (a) May 1, 2019 for (x) Assured Insured Bonds, Syncora Insured Bonds, and National Insured Bonds, (y) Uninsured Bonds that are subject to this Definitive RSA on or prior to 5:00 p.m. (ET) on May 31, 2019 and Uninsured Bonds that are beneficially owned by Syncora, National, and Assured as identified on their respective signature pages hereto, and (z) for purposes of Administrative Claims accruing on Waiver and Support Fees, (b) September 1, 2019 for Uninsured Bonds that become subject to this Agreement after 5:00 p.m. (ET) on May 31, 2019 and prior to 5:00 p.m. (ET) on December 1, 2019, and (c) the first day of the month after the end of any Joinder Period for Uninsured Bonds made subject to this Agreement during such Joinder Period; provided that if the Settlement Motion is denied or reversed on appeal and a Stipulated Treatment Termination results, no Administrative Claim shall have accrued.

(xiii)    "**Agreement**" has the meaning given to such term in the Preamble.

(xiv)    "**Allowed Claim**" has the meaning given to such term in Section 2(c)(i).

(xv)    "**Applicable Bond Claim**" means, in respect of any Bond, the principal amount of such Bond plus interest accrual at the contract rate through May 1, 2019.

(xvi)    "**Assured**" has the meaning given to such term in the Preamble.

(xvii)    "**Assured Acceleration Price Payment Option**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xviii)   "**Assured Bondholder Elections**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xix)    "**Assured Election**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xx)    "**Assured Insurance Policies**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xxi)    "**Assured Insured Bonds**" means the Bonds insured by Assured other than Bonds insured by Assured on a secondary basis (the "**Assured/Syncora Secondary Bonds**") that are primarily insured by Syncora.[1]

(xxii)    "**Assured Insured Interest Rate Swaps**" means (i) that certain International Swap and Derivatives Association, Inc. Master Agreement, including its related Schedule and Credit Support Annex, each dated as of April 18, 2007, by and between PREPA and JPMorgan Chase Bank, N.A., and a transaction entered

---

[1] With respect to the Assured/Syncora Secondary Bonds, such Bonds shall be treated as Syncora Insured Bonds.

into pursuant to such documents and reflected in that certain confirmation dated April 27, 2007, insured by Assured pursuant to that certain Financial Guaranty Insurance Policy, #218491A-SWP, issued on May 3, 2007, and secured by PREPA's "Subordinate Obligations Fund" established and governed by the Trust Agreement; and (ii) that certain International Swap and Derivatives Association, Inc. Master Agreement, including its related Schedule and Credit Support Annex, each dated as of April 18, 2007, by and between PREPA and UBS AG, and a transaction entered into pursuant to such documents and reflected in that certain confirmation dated as of April 18, 2007 and insured by Assured pursuant to that certain Financial Guaranty Insurance Policy, No. 208491B-SWP, dated as of May 3, 2007, and secured by PREPA's "Subordinate Obligations Fund" established and governed by the Trust Agreement.

(xxiii) "**Assured Securitization Bonds**" means Securitization Bonds allocable to holders of Assured Insured Bonds, Securitization Bonds allocable to Assured as a beneficial owner of Uninsured Bonds identified on Assured's signature page hereto, or Securitization Bonds that Assured is otherwise entitled to receive, in each case in accordance with the terms of this Definitive RSA.

(xxiv) "**Assured Treatment**" means the treatments set forth in the Recovery Plan Term Sheet with respect to Assured on the account of the Assured Insured Bonds, the Uninsured Bonds identified on Assured's signature page hereto that are beneficially owned by Assured and the Assured Insured Interest Rate Swaps.

(xxv) "**Bankruptcy Code**" means title 11 of the United States Code, as amended, §101, *et seq*.

(xxvi) "**Bankruptcy Rule(s)**" means the Federal Rules of Bankruptcy Procedure.

(xxvii) "**Bond(s)**" has the meaning given to such term in the Recitals.

(xxviii) "**Bond Claim**" means the Claim(s) in respect of any Bond.

(xxix) "**Bond Counsel**" means U.S. nationally recognized bond counsel retained by SPV.

(xxx) "**Bond Documents**" has the meaning given to such term in the Recitals.

(xxxi) "**Bond Insurance Agreements**" has the meaning given to such term in the Recitals.

(xxxii) "**Bond Qualified Transferee**" has the meaning given to such term in Section 6(c)(i).

(xxxiii)"**Bondholder(s)**" has the meaning given to such term in the Recitals.

(xxxiv)"**Bondholder Breach**" shall mean, whether prior to or after a Securitization Termination (a) any Supporting Holder commences or joins a Bondholder Litigation; (b) a Supporting Holder takes any action that has a material adverse effect on any Transformation Transaction; or (c) a breach by a Supporting Holder of any of the Bondholder Breach Covenants, or any of the representations set forth in Section 11 are untrue as to such Supporting Holder in any material respect, which in the case of each of clauses (a)-(c), remains uncured for a period of twenty (20) business days after the receipt by such Supporting Holder of notice in accordance with Section 27 of such breach from any Government Party.

(xxxv) "**Bondholder Breach Covenants**" means the covenants of the Supporting Holders set forth in Sections 2(a), 2(f)(ii), 3(a), 3(b), 3(c), 3(l), 3(n), 5(a), 5(b), 6(a)(i), 6(b), 6(c)(i) (subject to the provisions of Section 6(c)(ii)), and 6(d) of this Agreement.

(xxxvi)"**Bondholder Litigation**" means (A) any litigation, action, or claim (including, without limitation, the Monoline Motion) by the Trustee, a Bondholder or insurer of Bonds involving or directly relating to PREPA or the Transformation Transaction, including appeals related thereto, in any court of competent jurisdiction including, but not limited to, the Title III Court, (a) seeking relief from the automatic stay for any purpose, including to allow Bondholders to seek appointment of a receiver or to exercise any rights or remedies under the Trust Agreement or the Puerto Rico Electric Power Authority Act (Act 83-1941), as amended (including actions as a Bondholder on account of the Bonds and including seeking adequate protection (other than the Adequate Protection Payments if required under this Definitive RSA or the 9019 Order)), or under any other law, rule, or regulation relating to PREPA, the Transformation Transaction or the Bonds, (b) pursuing such rights or remedies with or without such stay relief, (c) seeking adequate protection (other than the Adequate Protection Payments if required under this Definitive RSA or the 9019 Order) or other payments under the Trust Agreement (including under section 922(d) of the Bankruptcy Code (if applicable)), or (d) directing the Trustee to do any of the foregoing, and (B) the Supporting Holders providing legal or financial advice or assistance to any other party pursuing any Bondholder Litigation. "Bondholder Litigation" shall not include actions taken by Supporting Holders in capacities other than their capacities as Bondholders or insurers of Bonds, and shall also not include participation in any litigation related to the Appointments Clause; provided that no Supporting Holder shall oppose the Settlement Motion in any capacity, and doing so shall constitute Bondholder Litigation.

(xxxvii) "**Chosen Court**" has the meaning given to such term in Section 15.

(xxxviii) "**Claim**" has the meaning given to such term in section 101(5) of the Bankruptcy Code.

(xxxix) "**Confirmation Order**" means a court order pursuant to Title III of PROMESA approving the Plan as satisfying the requirements of Title III of PROMESA, any proposed version of which shall implement the Definitive RSA and provide necessary findings and legal conclusions to support the Transformation Transaction.

(xl)    "**Consulting Parties**" shall mean National and Syncora.

(xli)   "**CUSIP**" means a Committee on Uniform Securities Identification Procedures number.

(xlii)  "**Demand Protections**" means the protections set forth on Schedule I-A to the Securitization Term Sheet.

(xliii) "**Definitive Documents**" or "**Definitive Documentation**" means the Settlement Motion, the 9019 Order, the Tolling Agreement, the Securitization Documents, IRS Private Letter Ruling Request (if any), IRS Private Letter Ruling (if any), Amended Act (as defined in the Securitization Term Sheet), and any agreements, instruments, schedules, resolutions, exhibits, supplements, annexes, appendices, opinions, legislation, rules, regulations, and orders related to the foregoing.

(xliv)  "**Delayed Implementation Date**" has the meaning given to such term in Section 2(e)(i).

(xlv)   "**Disclosure Statement**" means the disclosure statement in respect of the Plan, approved by an order of the Title III Court as containing adequate information under section 1125(b) of the Bankruptcy Code, and disseminated to creditors of PREPA in connection with the solicitation of votes on the Plan.

(xlvi)  "**Disclosure Statement Order**" means the order to be entered by the Title III Court authorizing the use of the Disclosure Statement for soliciting votes on the Plan and establishing solicitation procedures.

(xlvii) "**Dismissal Motion**" has the meaning given to such term in Section 3(a).

(xlviii) "**DSRF**" has the meaning given to such term in the Recovery Plan Term Sheet.

(xlix)  "**Effective Date**" means the date upon which all the conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms, which conditions precedent shall include the provision of the Securitization Bond Treatment or Stipulated Treatment, as applicable, subject to the Definitive Documents and the Additional Definitive Documents.

(l)      "**EMMA**" means the Municipal Securities Rulemaking Board's Electronic Municipal Market Access system at www.emma.msrb.org.

(li)     "**Exchange Ratio**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lii)    "**Financial Indebtedness**" means any Bonds or any funded debt owed to the fuel line lenders.

(liii)   "**Fiscal Plan**" means the certified fiscal plan (as defined in PROMESA) for PREPA, as may be amended and certified in accordance with PROMESA.

(liv)    "**FOMB**" has the meaning given to such term in the Preamble.

(lv)     "**Force Majeure Event**" has the meaning given to such term in Section 8.

(lvi)    "**Government Parties**" means collectively AAFAF, FOMB, and PREPA, and each of AAFAF, FOMB, and PREPA is referred to individually as a "**Government Party**."

(lvii)   "**Increased Settlement Charge**" has the meaning given to such term in Section 2(e)(i).

(lviii)  "**Increased Settlement Payment**" has the meaning given to such term in Section 2(e)(ii).

(lix)    "**Individual Termination**" has the meaning given to such term in Section 9(d)(v).

(lx)     "**Insurance Conditions**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxi)    "**Insured Bonds**" has the meaning given to such term in the Recitals.

(lxii)   "**Insurers**" has the meaning given to such term in the Recitals.

(lxiii)  "**IRS**" means the United States Internal Revenue Service.

(lxiv)   "**IRS Private Letter Ruling**" means all private letter rulings or closing agreements, if any, that Bond Counsel requires in order to deliver an unqualified opinion that interest on all or a portion of the Securitization Bonds is excludable from gross income for federal income tax purposes and exempt from all state and Puerto Rico taxes.

8

(lxv) "**IRS Private Letter Ruling Request**" means any documents submitted to the IRS requesting or supporting an IRS Private Letter Ruling and any related material submissions, if any, including any written pre-submission communications.

(lxvi) "**Joinder Agreement**" means a joinder agreement in the form of Exhibit A hereto.

(lxvii) "**Joinder Period**" has the meaning given to such term in Section 2(c)(iii).

(lxviii) "**Lien Challenge**" means any action that a Government Party (including, without limitation, as to FOMB, any future or successor to FOMB and any members thereof) may bring to challenge the liens and claims (including the validity, priority, nature or extent of any liens or security interests) related to the Bonds.

(lxix) "**Market Fixed Rate**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxx) "**Monoline Motion**" means the Motion of National, Assured, and Syncora for Relief from the Automatic Stay to Allow Movants to Enforce their Statutory Right to Have a Receiver Appointed [Case No. 17-04780, Dkt. No. 975].

(lxxi) "**National**" has the meaning given to such term in the Preamble.

(lxxii) "**National Acceleration Price Payment Option**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxiii) "**National Bondholder Elections**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxiv) "**National Election**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxv) "**National Insurance Policies**" has the meaning given to such terms in the Recovery Plan Term Sheet.

(lxxvi) "**National Insured Bonds**" means the Bonds insured by National.

(lxxvii) "**National Securitization Bonds**" means Securitization Bonds allocable to holders of National Insured Bonds, Securitization Bonds allocable to National as a beneficial owner of Uninsured Bonds identified on National's signature page hereto, or Securitization Bonds that National is otherwise entitled to receive, in each case in accordance with the terms of the Agreement.

(lxxviii) "**National Treatment**" means the treatments set forth in the Recovery Plan Term Sheet with respect to National on the account of the National

Insured Bonds and the Uninsured Bonds identified on National's signature page hereto that are beneficially owned by National.

(lxxix)  "**Outside Date**" means June 30, 2020.

(lxxx)  "**Parties**" has the meaning given to such term in the Preamble.

(lxxxi) "**Permitted Objection**" means an objection by a Supporting Holder to a Plan, qualifying modification, exchange, or restructuring of Bonds subject to this Agreement (i) solely on the grounds that it does not comply with this Agreement or does not provide the Stipulated Treatment, as applicable, or (ii) in the case of an Uninsured Supporting Holder that holds Assured Insured Bonds, Syncora Insured Bonds, or National Insured Bonds, a limited objection to its treatment solely on account of its Assured Insured Bonds, Syncora Insured Bonds, or National Insured Bonds, as applicable, with respect to the treatment of the Bond Insurance Agreements, including the terms, conditions, and structure of any custodial trust or escrow arrangement relating to such Bond Insurance Agreements, if such treatment violates the rights of the beneficial holders of the Assured Insured Bonds, Syncora Insured Bonds, or National Insured Bonds under the Bond Insurance Agreements and to the extent it would have been able to file such objection if it were not a Supporting Holder.  Notwithstanding anything herein to the contrary, a Permitted Objection shall not be considered a Bondholder Litigation or a Bondholder Breach.

(lxxxii)"**Permitted Puerto Rico Objection**" means an objection by AAFAF to a Plan proposed by FOMB, including an objection to the treatment or classification of any Claims under the Plan, other than an objection that relates to the classification or treatment of the Bond Claims or Bonds.

(lxxxiii)        "**PIK Payments**" has the meaning given to such term in the Recovery Plan Term Sheet.

(lxxxiv)        "**Plan**" means the plan of adjustment (including any supplements thereto) for PREPA pursuant to Title III of PROMESA.

(lxxxv)"**PREB**" means the Puerto Rico Energy Bureau.

(lxxxvi)        "**PREB Order**" means any order(s) from PREB concerning this Agreement.

(lxxxvii) "**Preliminary RSA**" means that certain Preliminary Restructuring Support Agreement (including the exhibits and annex thereto), dated as of July 30, 2018, by and among PREPA, AAFAF, FOMB and the Bondholders who are or were parties to such agreement, as extended from time to time.

(lxxxviii)        "**PREPA**" has the meaning given to such term in the Preamble

(lxxxix)        **"PROMESA"** has the meaning given to such term in the Recitals.

(xc)        **"Qualified Marketmaker"** means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the Bonds or enter with customers into long and short positions in debt securities such as the Bonds, in its capacity as a dealer or market maker in such Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to Bonds, is registered with the SEC and Financial Institutions Regulatory Authority..

(xci)        **"Recovery Plan Term Sheet"** means the term sheet attached Exhibit C hereto.

(xcii)        **"Required Holders"** means the Required Uninsured Holders and Assured.

(xciii)        **"Required Parties"** means at any time (i) each Government Party that is party to this Definitive RSA at such time, (ii) the Required Uninsured Holders, and (iii) Assured.

(xciv)        **"Required Threshold"** means (A) no later than two (2) business days prior to hearing on the Settlement Motion (i) Uninsured Supporting Holders holding a minimum of 60% in aggregate principal amount of the Uninsured Bonds or (ii) Supporting Holders holding or insuring a minimum of 60% in aggregate principal amount of all Bonds and (B) no later than September 1, 2019 (and continuing thereafter) (i) Uninsured Supporting Holders holding a minimum of 67% in aggregate principal amount of the outstanding Uninsured Bonds and (ii) Supporting Holders holding or insuring a minimum of 67% in aggregate principal amount of all outstanding Bonds.

(xcv)        **"Required Uninsured Holders"** means, as of any date of determination, Ad Hoc Group Members that beneficially own or control at least a majority in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all Ad Hoc Group Members as of such date.

(xcvi)        **"Restructuring"** means the proposed restructuring of the Bonds subject to this Agreement as provided in this Agreement.

(xcvii)        **"RSA Execution Date"** means the date on which counterpart signature pages to this Definitive RSA shall have been executed and delivered by PREPA, AAFAF, FOMB, Assured and the members of the Ad Hoc Group.

(xcviii) **"RSA Marketmaker"** means a Qualified Marketmaker acting in its capacity as a Qualified Marketmaker that is party to an RSA Marketmaker Joinder approved by the Required Uninsured Holders and each Government Party.

11

(xcix)  "**RSA Marketmaker Joinder**" means a joinder agreement in the form attached as Exhibit B hereto, with such modifications as are acceptable to the Required Uninsured Holders and each Government Party.  The Ad Hoc Group and Government Parties agree to work together in good faith to agree on reasonable modifications to such form of joinder agreement to address any concerns that may be raised by a Qualified Marketmaker.

(c)  "**RSA Marketmaker List**" means a list of RSA Marketmakers, an updated version of which shall be available at a dedicated URL and also posted on EMMA. The RSA Marketmaker List shall be promptly updated (A) to add any new RSA Marketmaker that signs an RSA Marketmaker Joinder and (B) to remove any RSA Marketmaker that (x) fails to materially comply with the requirements of the RSA Marketmaker Joinder or (y) is no longer regularly in the business of making a market in Uninsured Bonds subject to this RSA. The dedicated URL for the RSA Marketmakers List shall be posted on EMMA. The initial RSA Marketmaker List shall be delivered to the Supporting Holders party hereto at the time of such delivery and shall include the date on which the RSA Marketmaker Period starts.

(ci)  "**RSA Marketmaker Period**" means the period after the date set forth on the initial RSA Marketmaker List delivered to the Supporting Holders (which shall not be earlier than the 15th day following the RSA Execution Date).

(cii)  "**SEC**" means the United States Securities and Exchange Commission.

(ciii)  "**Securitization Bonds**" or "**Securitization Instruments**" means the Tranche A Bonds and Tranche B Bonds.

(civ)  "**Securitization Bond Treatment**" means the issuance of Securitization Bonds on the terms and conditions set forth in this Definitive RSA. The Securitization Bonds shall be issued on the Effective Date of the Plan and shall not be issued pursuant to a Title VI qualifying modification or similar structure without the consent of the Government Parties and the Required Holders, after consultation with the Consulting Parties.

(cv)  "**Securitization Documents**" means all documents, resolutions, certificates, and opinions, relating to the Securitization Instruments or Transition Charge, including, without limitation, any resolutions, trust agreements, insurance or surety documents, servicing agreements, depository agreements, the Securitization Instruments, governing documents of SPV, and any documents entered into or adopted by SPV or PREPA affecting the Securitization Instruments or the holders thereof.

(cvi)  "**Securitization Protections Term Sheet**" means Schedule I-B to the Securitization Term Sheet.

(cvii)  "**Securitization Termination**" has the meaning given to such term in Section 9(b).

12

(cviii) "**Securitization Term Sheet**" means the Term Sheet attached as
Annex A to the Recovery Plan Term Sheet.

(cix) "**Settlement Charge**" means a charge of 1 c/kWh to be
implemented by PREPA and included in its customer bills by July 1, 2019.

(cx) "**Settlement Motion**" has the meaning given to such term in Section
2(a).

(cxi) "**Settlement Payments**" means commencing in accordance with
Section 5(c)(iv) and continuing through the earliest of (A) a Stipulated Treatment
Termination, (B) a termination pursuant to Section 9(d)(vi) as to PREPA or
AAFAF, (C) the Effective Date, or (D) dismissal of PREPA's Title III Case,
monthly settlement payments to be made by PREPA equal to (i) the number of
kilowatt hours PREPA billed during the previous month, multiplied by (ii) 92%
(representing the projected collection percentage and certain statutory exceptions),
multiplied by (iii) the Settlement Charge.

(cxii) "**Solicitation**" means the solicitation of votes for the Plan pursuant
to, and in compliance with, PROMESA or any applicable nonbankruptcy law, rule,
or regulation governing the adequacy of disclosure in connection with such
solicitation.

(cxiii) "**SPV**" or "**Issuer**" means a bankruptcy remote special purpose
vehicle (which may be the Puerto Rico Electric Power Authority Revitalization
Corporation, or another entity as agreed by the Required Parties after consultation
with the Consulting Parties, established by the Government of Puerto Rico, and
used for the Restructuring).

(cxiv) "**Stay Motion**" has the meaning given such term in Section 3(b).

(cxv) "**Stipulated Treatment**" has the meaning given such term in
Section 2(c)(ii).

(cxvi) "**Stipulated Treatment Termination**" has the meaning given such
term in Section 9(c)(i).

(cxvii) "**Super Majority Holders**" means the Super Majority Uninsured
Holders and Assured.

(cxviii)"**Super Majority Uninsured Holders**" means, as of the date of
determination, Ad Hoc Group Members that beneficially own or control at least
two-thirds in principal amount of the aggregate amount of the Uninsured Bonds
beneficially owned or controlled by all the Ad Hoc Group Members as of such date.

(cxix) "**Supporting Holder(s)**" has the meaning given to such term in the
Preamble.

13

(cxx)   "**Surviving Administrative Claim**" has the meaning given to such term in Section 2(c)(iv).

(cxxi)   "**Swap MTM Amount**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxii) "**Syncora**" has the meaning given to such term in the Preamble.

(cxxiii)"**Syncora Acceleration Price Payment Option**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxiv)"**Syncora Bondholder Elections**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxv) "**Syncora Election**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxvi)"**Syncora Insurance Policies**" has the meaning given to such terms in the Recovery Plan Term Sheet.

(cxxvii)        "**Syncora Insured Bonds**" mean the Bonds insured by Syncora.

(cxxviii)        "**Syncora Securitization Bonds**" means Securitization Bonds allocable to holders of Syncora Insured Bonds, Securitization Bonds allocable to Syncora as a beneficial owner of Uninsured Bonds identified on Syncora's signature page hereto, or Securitization Bonds that Syncora is otherwise entitled to receive, in each case in accordance with the terms of the Agreement.

(cxxix)"**Syncora Treatment**" means the treatments set forth in the Recovery Plan Term Sheet with respect to Syncora on the account of the Syncora Insured Bonds and the Uninsured Bonds identified on Syncora's signature page hereto that are beneficially owned by Syncora.

(cxxx) "**TC Cap**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxxi)"**Title III Case**" has the meaning given to such term in the Recitals.

(cxxxii)        "**Title III Court**" means the United States District Court for the District of Puerto Rico in its capacity as the court presiding over the Title III Case.

(cxxxiii)        "**Tolling Agreement**" has the meaning given to such term in Section 3(c).

(cxxxiv)        "**Tracking Mechanics Term Sheet**" has the meaning given to such term in Section 2(f)(i).

14

(cxxxv)     "**Tranche A Bonds**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxxvi)     "**Tranche B Bonds**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxxxvii)     "**Transfer**" has the meaning given to such term in Section 6(c)(i).

(cxxxviii)     "**Transformation Transaction**" means any and all transactions supported by the Government Parties whereby PREPA or the Government of Puerto Rico establishes one or more sales, leases, public-private partnerships, management contracts, concessions, or similar arrangements or transactions related to any of PREPA's functions, assets, services, or facilities, including without limitation, any "PREPA Transaction" as defined in the *Puerto Rico Electric Power System Transformation Act*, Act 120-2018 (approved June 21, 2018).

(cxxxix)     "**Transition Charge**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxl)     "**Transition Charge Termination**" has the meaning given to such term in the Recovery Plan Term Sheet.

(cxli)     "**Triggering Event**" means (i) a Stipulated Treatment Termination, (ii) the continuation of the Monoline Motion or commencement of any other Bondholder Litigation, provided, however, that if any Bondholder Litigation is commenced by any party, the Parties shall work in good faith to have such Bondholder Litigation dismissed, stayed, or withdrawn and a Triggering Event shall not occur as a result of such Bondholder Litigation until three (3) business days after any Government Party provides notice in accordance with Section 27 to the Required Holders, the Consulting Parties, and the Trustee that it has determined in good faith in its sole discretion that commencing a Lien Challenge is necessary to protect the rights of any Government Party, or (iii) when the Government Parties determine in good faith that pursuit of a Lien Challenge is necessary as part of the plan formulation process (*e.g.*, in response to an actual or anticipated disclosure statement or plan objection) to provide the Supporting Holders the Securitization Bond Treatment or to provide the Stipulated Treatment after a Securitization Termination.

(cxlii) "**Trust Agreement**" has the meaning given to such term in the Recitals.

(cxliii) "**Trustee**" has the meaning given to such term in the Recitals.

(cxliv) "**Uninsured Bond(s)**" has the meaning given to such term in the Recitals.

(cxlv)     "**Uninsured Supporting Holders**" has the meaning give to such term in the Preamble.

(cxlvi) "**Waiver and Support Fees**" means the fees set forth in Sections 4(a)-(c).

(cxlvii)"**Withdrawal Event**" has the meaning given to such term in Section 9(a).

(b)     Rules of Interpretation.

(i)     Except as expressly set forth herein, nothing contained herein shall be construed to alter, waive or otherwise affect the respective powers, rights, or responsibilities of FOMB, AAFAF, or PREPA, whether such powers, rights, or responsibilities arise under PROMESA or other applicable law.

(ii)     Each Supporting Holder is a party hereto solely in its capacity as the beneficial owner or insurer of Bonds issued by PREPA; provided that no Supporting Holder shall oppose the Settlement Motion in any capacity.

(iii)     When a reference is made in this Definitive RSA to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Definitive RSA unless otherwise indicated. Each of the exhibits, annexes and schedules to this Definitive RSA is expressly incorporated herein and made a part of this Definitive RSA, and all references to this Agreement or this Definitive RSA (including by use of words such as "herein") shall include such exhibits, annexes and schedules. Unless the context of this Definitive RSA otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this Definitive RSA, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (d) the word "or" shall not be exclusive and shall be read to mean "and/or," (e) the word "person" shall be understood to refer to any individual, corporation, limited liability company, estate, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, or government, or agency, instrumentality, or political subdivision thereof, (f) "business day" shall refer to any day other than a Saturday, Sunday or any other day on which banks located in New York, New York or San Juan, Puerto Rico are closed for business as a result of a federal, state, or local holiday, and (g) "writing," "written," and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent, or other information shall be provided in "writing" shall include email.

(iv)     All Definitive Documents must be consistent with this Agreement and (other than in the case of the IRS Private Letter Ruling Request, which is subject to the consultation rights set forth in Section 7(b)(ii)) in form and substance

16

mutually agreed upon by the Required Parties after consultation with the Consulting Parties. If a Definitive Document must be entered by the Title III Court, enacted into law, or issued by the IRS, the as-entered, as-enacted, as-confirmed, or as-issued version of such Definitive Document must be consistent with this Agreement, and in form and substance reasonably acceptable to the Required Parties after consultation with the Consulting Parties. Notwithstanding the foregoing, after a Securitization Termination, the form and substance of the Definitive Documents shall be deemed to be reasonably acceptable to the Required Uninsured Holders and Assured if such Definitive Documents provide the Stipulated Treatment and other required payments and otherwise comply with the surviving requirements of this Definitive RSA. Any reference in this Agreement to a Definitive Document means a Definitive Document that meets the standards in this Section 1(b)(iv). Without limiting the foregoing, any Definitive Document or portion thereof that is applicable only to any Consulting Party or that either (a) modifies a Consulting Party's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to National or Syncora as an Insurer of the National Insured Bonds or the Syncora Insured Bonds, respectively, or (c) provides for legal rights or obligations of a Consulting Party that are different in any material respect from those of any other Supporting Party, must be in form and substance mutually agreed upon by the affected Consulting Party and the Government Parties.

(v)     The Additional Definitive Documents or Additional Definitive Documentation must be in form and substance reasonably acceptable to each of the Government Parties and, if an Additional Definitive Document must be entered by the Title III Court, enacted into law, or issued by the IRS or PREB, the as-entered, as-enacted, as-confirmed, or as-issued version must be in form and substance reasonably acceptable to each of the Government Parties; provided that if the Additional Definitive Documents are not reasonably acceptable to AAFAF or PREPA and FOMB proceeds without such consent, nothing herein shall prevent AAFAF from filing a Permitted Puerto Rico Objection. In addition, any portion of an Additional Definitive Document that materially relates to the treatment of the Bond Claims of Supporting Holders (including any portion relating to the Securitization Bonds, the Transition Charge or the Demand Protections) shall be consistent with this Agreement and in form and substance mutually agreed upon by the Required Parties, after consultation with the Consulting Parties, and nothing else in the Additional Definitive Documentation shall be materially inconsistent with this Agreement. If an Additional Definitive Document must be entered by the Title III Court, enacted into law, or issued by the IRS or PREB, then any portion of such Additional Definitive Document that relates to the treatment of the Bond Claims of Supporting Holders (including any portion relating to the Securitization Bonds, the Transition Charge or the Demand Protections) contained in the as-entered, as-enacted, as-confirmed, or as-issued version of such Additional Definitive Document must be in form and substance reasonably acceptable to the Required Parties, after consultation with the Consulting Parties, and nothing else in such Additional Definitive Document shall be materially inconsistent with this Agreement. Notwithstanding the foregoing, after a Securitization Termination, the

17

form and substance of any portion of the Additional Definitive Documents that directly relates to the treatment of the Bond Claims of Supporting Holders shall be deemed to be reasonably acceptable to the Required Uninsured Holders and Assured if such portions of the Additional Definitive Document provide the Stipulated Treatment and other required payments and otherwise comply with the surviving requirements of this Definitive RSA. Any reference in this Agreement to an Additional Definitive Document (including provisions requiring such documents to be mutually agreed upon by, or acceptable to, the Required Parties) means an Additional Definitive Document that meets the standards in this Section 1(b)(v). Without limiting the foregoing, any Additional Definitive Document or portion thereof that is applicable only to any Consulting Party or that either (a) modifies a Consulting Party's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to National or Syncora as an Insurer of the National Insured Bonds or the Syncora Insured Bonds, respectively, or (c) provides for legal rights or obligations of a Consulting Party that are different in any material respect from those of any other Supporting Party, must be in form and substance mutually agreed upon by the affected Consulting Party and the Government Parties.

(vi) FOMB is a party hereto solely in its capacity as the representative of PREPA under PROMESA section 315(b), and AAFAF is a party hereto solely in its capacity as a representative of PREPA pursuant to Act 2-2017; provided that, without limiting the above, PREPA is entitled to exercise its rights under this Agreement (including its rights to terminate this Agreement and/or its right to consent to any waiver or amendment in accordance with the provisions of this Agreement) and provided further, that for purposes of determining whether a termination pursuant to Section 9 has occurred, (i) all actions of FOMB shall be treated only as actions of FOMB, and (ii) all actions of AAFAF shall be treated only as actions of AAFAF.

## Section 2    9019 Settlement.

(a) FOMB shall file a motion (the "**Settlement Motion**") together with a draft 9019 Order with the Title III Court seeking approval of this Definitive RSA and 9019 Settlement within ten (10) business days after the execution of this Definitive RSA by the Government Parties, the Ad Hoc Group Members and Assured. Within five (5) business days of the filing of the Settlement Motion, the Ad Hoc Group and Assured shall direct the Trustee, pursuant to the Trust Agreement, to join the Settlement Motion. By signing the RSA after the RSA Execution Date, a Supporting Holder shall be deemed to have joined in such direction. None of the Supporting Holders or the Government Parties shall be required by this Definitive RSA to provide any indemnity to the Trustee and any relief requested under the Settlement Motion shall be contingent on the entry of the 9019 Order that includes a full exculpation of the Trustee and the directing Supporting Holders for any liability for joining the Settlement Motion and entering into the Tolling Agreement or providing direction in respect of the same. Concurrently with the filing of the Settlement Motion, the FOMB shall file a motion (the "**Dismissal Motion**") and form of order seeking dismissal of the Monoline Motion, which Dismissal Motion and form of order shall be in form and substance reasonably acceptable to the Required Parties.

(b)        Once approved by the Title III Court, the 9019 Order shall constitute (A) a settlement of (i) the Bondholder Litigation including, without limitation, the Monoline Motion (which shall be settled as to the Supporting Holders and dismissed without prejudice to the renewal of any motion similar to the Monoline Motion by the Supporting Holders in the event of a Stipulated Treatment Termination or an Individual Termination as to Assured, Syncora, or National only (unless the Individual Termination is rescinded by the Government Parties as if such termination never occurred) and, in the event of such renewal, without prejudice to the Government Parties' right to defend such motion) by all Supporting Holders, (ii) the Supporting Holders' ability to exercise or assert any rights or remedies under the Trust Agreement or other applicable law (including seeking to lift the stay or to accomplish any of the foregoing) or to direct the Trustee or provide legal or financial advice or assistance to support any other parties in connection with any of the foregoing, and (iii) the Supporting Holders' asserted right to receive any current payment or adequate protection payments on the Bonds (other than, in the case of Insured Bonds, payment from the Insurers under the Bond Insurance Agreements); (B) a tolling (including, without limitation, as to FOMB, any future or successor to FOMB and any members thereof) of all unexpired statutes of limitations for any causes of action related to the Bonds, including any Lien Challenge and any potential Bondholder Litigation, until forty-five (45) days after a Stipulated Treatment Termination; and (C) approval and authorization of (x) the Settlement Charge, the Settlement Payments, the Increased Settlement Charge, the Increased Settlement Payments, the Waiver and Support Fees, the Adequate Protection Payments, and the incurrence of  the Administrative Claims, and (y) the right of the Supporting Holders to receive the Stipulated Treatment (collectively, the "**9019 Settlement**"). The 9019 Settlement shall terminate as to all Supporting Holders upon a Stipulated Treatment Termination and as to applicable individual Supporting Holder upon an Individual Termination.

(c)        Allowed Claim and Stipulated Treatment.

(i)        The 9019 Order shall provide that, if a Securitization Termination has occurred, then, except as otherwise set forth in this Definitive RSA in the event of an Individual Termination (as to such terminated Supporting Holder) or a Stipulated Treatment Termination (as to all Supporting Holders), each of the Supporting Holders shall be deemed to have an allowed secured claim in a face amount equal to (i) 73.25 % of the Applicable Bond Claim of the outstanding Bonds held or insured by such Supporting Holder, plus (ii) such Supporting Holder's allocated share (if any) of the Waiver and Support Fees inclusive of interest accrual at the contract rate through Administrative Claim Commencement, plus (iii)(a) in the case of Assured, to the extent that Assured's Stipulated Treatment is required to be adjusted as described in Section 2(c)(ii) to compensate Assured for the loss of the value of any portion of the Assured Treatment, the amount of such loss of value, (b) in the case of Syncora, to the extent that Syncora's Stipulated Treatment is required to be adjusted as described in Section 2(c)(ii) to compensate Syncora for the loss of the value of any portion of the Syncora Treatment, the amount of such loss of value, and (c) in the case of National, to the extent that National's Stipulated Treatment is required to be adjusted as described in Section 2(c)(ii) to compensate National for the loss of the value of any portion of the National Treatment, the amount of such loss of value (the "**Allowed Claim**").

(ii)      The 9019 Order shall provide that, if a Securitization Termination occurs, then, except as set forth below in the event of an Individual Termination (as to such applicable holder) or a Stipulated Treatment Termination (as to all Supporting Holders), and solely for purposes of settlement and without prejudice to the rights of the Parties in any other context, (i) the Supporting Holders' Allowed Claim shall be treated as if it were an allowed secured claim against the Net Revenues (as defined in the Trust Agreement) of PREPA in any subsequent Plan that is confirmed after a Securitization Termination, secured by collateral worth at least the amount of the Allowed Claim as of the Effective Date of such Plan, (ii) the foregoing shall be included in any Plan, qualifying modification, exchange, or other restructuring of Bonds subject to this Agreement, and (iii)(a) in the case of Assured, Assured shall be provided the opportunity to wrap debt securities being issued on account of the Assured Insured Bonds, to provide a DSRF surety for such debt securities and receive the related premiums to the same extent as set forth in the Assured Treatment below; provided that if Assured is not offered  the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, then Assured's Stipulated Treatment shall be adjusted to compensate Assured for the loss of that value; and, provided further, that if Assured is offered the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, and it declines to do so, Assured's Stipulated Treatment shall not be adjusted to include such value, (b) in the case of Syncora, Syncora shall be provided the opportunity to wrap debt securities being issued on account of the Syncora Insured Bonds, to provide a DSRF surety for such debt securities and receive the related premiums to the same extent as set forth in the Syncora Treatment below; provided that if Syncora is not offered the opportunity to provide such wrap (other than as a result of a failure to meet the Insurance Conditions), to provide such DSRF surety and receive such premiums, then Syncora's Stipulated Treatment shall be adjusted to compensate Syncora for the loss of that value; and, provided further, that if Syncora is offered the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, and it declines to do so, Syncora's Stipulated Treatment shall not be adjusted to include such value, and (c) in the case of National, National shall be provided the opportunity to wrap debt securities being issued on account of the National Insured Bonds, to provide a DSRF surety for such debt securities and receive the related premiums to the same extent as set forth in the National's Treatment below; provided that if National is not offered  the opportunity to provide such wrap (other than as a result of a failure to meet the Insurance Conditions), to provide such DSRF surety and receive such premiums, then National's Stipulated Treatment shall be adjusted to compensate National for the loss of that value; and, provided further, that if National is offered the opportunity to provide such wrap, to provide such DSRF surety and receive such premiums, and it declines to do so, National's Stipulated Treatment shall not be adjusted to include such value (collectively, the "**Stipulated Treatment**").

(iii)      If at any time after September 1, 2019, the Supporting Holders who have not committed a Bondholder Breach hold or insure less than the applicable Required Threshold, then upon notice in accordance with Section 27 from any of the Required Holders, the Consulting Parties, or any of the Government Parties, the

remaining Supporting Holders shall have 60 days to obtain signatures to this Definitive RSA from additional Bondholders or acquire additional Uninsured Bonds such that the Bonds subject to this Definitive RSA equal or exceed the Required Threshold (each such 60 day period, a "**Joinder Period**") and the Government Parties shall cooperate with the Supporting Holders in connection therewith including posting appropriate notices on EMMA; provided, however, that any such Joinder Period shall terminate no later than ten (10) days prior to the date of the hearing on the Disclosure Statement. Any Uninsured Bond that becomes subject to this Definitive RSA during a Joinder Period shall begin receiving its first pro rata share of any Settlement Payments and accruing Administrative Claims as of the applicable Administrative Claim Commencement.   Bonds that have a particular Administrative Claim Commencement shall be identified by a separate CUSIP in accordance with Section 2(f) or, if mutually agreed to by the Required Parties, after consultation with the Consulting Parties, be subject to a special administrative claim bar date under the Plan.  Uninsured Bonds purchased by Supporting Holders after December 1, 2019, at any period other than during a Joinder Period shall not be entitled to Administrative Claims, Settlement Payments, Increased Settlement Payments, or Adequate Protection Payments but shall be subject to this Definitive RSA for all other purposes, including voting obligations and entitlement to the Stipulated Treatment.

(iv)    The 9019 Order shall provide that in the event of a Securitization Termination then, and unless the Title III Case has been dismissed, until the occurrence of an Individual Termination (as to such applicable Bondholder) or a Stipulated Treatment Termination (as to all Supporting Holders), Settlement Payments (or Increased Settlement Payments or Adequate Protection Payments, as applicable) shall continue to be made to the Supporting Holders and the Administrative Claims shall continue to accrue.  In the event of an Individual Termination (as to such applicable holder) or a Stipulated Treatment Termination (as to all Supporting Holders), any accrued and unpaid Administrative Claim shall be disallowed; provided that, with regard to a Stipulated Treatment Termination under Section 9(c)(i)(6), Supporting Holders will be entitled to an Administrative Claim that will have accrued through the date the Title III Court first denied confirmation of a Plan where such denial is not solely on grounds raised in an objection by PREPA or AAFAF ("**Surviving Administrative Claim**").

(d)    Settlement Payments and Administrative Claims.

(i)    Subject to entry of the 9019 Order, the Government Parties shall implement and collect the Settlement Charge and make the Settlement Payments.

(ii)    Subject to approval of the Title III Court, the Settlement Payments shall be made solely on account of Bonds subject to this Definitive RSA at the time such Settlement Payment is made on a pro rata basis based on the outstanding principal amounts of the Bonds subject to this Definitive RSA; provided that no Settlement Payment shall be made on any Bond that is not subject to this Definitive RSA by December 1, 2019 (unless such Bond is an Uninsured Bond that becomes

subject to this Definitive RSA during a subsequent Joinder Period) and no Bondholder shall receive any Settlement Payments on account of Bonds held by such Bondholder after an Individual Termination as to such Bondholder. Any Settlement Payments made on account of (i) Assured Insured Bonds shall be made to Assured, (ii) Syncora Insured Bonds shall be made to Syncora, and (iii) National Insured Bonds shall be made to National.

(iii) If a Bond is subject to this Definitive RSA prior to Administrative Claim Commencement and the 9019 Order is entered (and a Stipulated Treatment Termination does not occur subsequently as a result of the 9019 Order being reversed on appeal), such Bond subject to this Definitive RSA shall be entitled to a stipulated administrative expense claim for

(x) an amount equivalent to the Tranche A Bond interest payments accrued in respect of such Bond (including accruals at the same rate on such interest payments that would have been due on any interest payment date for Tranche A Bonds if such bonds were issued as if such interest payments were paid in kind), less

(y) the amount of Settlement Payments or Increased Settlement Payments that are made on account of such Bond (such claim, the "**Administrative Claim**")

from and after the Administrative Claim Commencement applicable to such Bond until the earliest of (A) a Stipulated Treatment Termination, (B) with respect to a Supporting Holder, an Individual Termination with respect to such Supporting Holder, or (C) the Effective Date of a Plan in PREPA's Title III Case. The Administrative Claims shall also include accrual and payment-in-kind of interest on the Waiver and Support Fees.

(iv) In lieu of Settlement Payments and/or cash payment of Administrative Claims on the Effective Date of a Plan (to the extent the Government Parties elect to pay Administrative Claims in cash), an individual Supporting Holder may elect to receive Tranche A Bonds for its Administrative Claims at the Exchange Ratio for Administrative Claims; provided that such election shall be structured as between the Supporting Holders and in a manner that does not increase the aggregate Administrative Claim or Transition Charge that would otherwise be payable under this Definitive RSA. If no agreement is reached by the Required Holders, after consultation with the Consulting Parties on implementing the election as provided herein, then no such election shall be available.

(v) Effective on the earlier of May 1, 2019 and the date of entry of the 9019 Order, solely for purposes of the 9019 Settlement and recoveries under this Definitive RSA, interest accrual on the Bonds shall be deemed to terminate. In the event of a Stipulated Treatment Termination or an Individual Termination, all Parties reserve all rights regarding post-petition interest.

(e)   Delayed Implementation Date.

(i)   If a Title III plan for PREPA has not been confirmed and has not gone effective (and no other transaction has been consummated pursuant to which the Stipulated Treatment or the Securitization Bonds have been provided) by March 31, 2021 (the "**Delayed Implementation Date**"), and subject to and conditioned upon issuance or enactment of all required legislative and regulatory approvals, PREPA shall put into effect a charge equal to the Transition Charge that would have gone into effect on that date assuming the Effective Date occurred and Securitization Bonds were issued on such date, which charge shall thereafter increase from time to time as if the Securitization Bonds were outstanding (the "**Increased Settlement Charge**").

(ii)   Collections on account of the Increased Settlement Charge shall be (A) paid monthly (the "**Increased Settlement Payments**"), pro rata on account of Bonds that are subject to this Definitive RSA and became subject to this Definitive RSA prior to December 1, 2019 or, in the case of Uninsured Bonds, during a Joinder Period, unless otherwise mutually agreed to by the Required Parties, after consultation with the Consulting Parties, on terms mutually agreed to by the Required Parties, and (B) applied (y) first on account of accrued and unpaid Administrative Claims (subject to any election to receive the Administrative Claims in Tranche A Bonds as set forth in this Definitive RSA), and (z) after payment of the Administrative Claims, to reduction of the Allowed Claim or amount of the Tranche A Bonds (as applicable); provided, however, only amounts actually collected by PREPA on account of the Increased Settlement Charge are required to be distributed.

(iii)   On and after the Delayed Implementation Date, the obligation to make Settlement Payments shall be replaced by the obligation to make Increased Settlement Payments.

(iv)   On and after the Delayed Implementation Date, the accrual of Administrative Claims in favor of the eligible Bonds held or insured by Supporting Holders shall continue, to the extent not paid by the Increased Settlement Charge, for an amount equal to the higher of (i) an amount equivalent to Tranche A interest payments (including accruals on unpaid Administrative Claims as if such unpaid Administrative Claims were paid in kind semi-annually) and (ii) an amount equal to the difference between (A) the amount of any Increased Settlement Payments or Adequate Protection Payments that would have been required to have been made as set forth above and (B) the amount of any Increased Settlement Payments or Adequate Protection Payments actually received in respect of such Bond. If the payment (whether in cash or in Tranche A Bonds) of any resulting Administrative Claim under clause (ii) exceeds the amount in clause (i), the Allowed Claim or the principal amount of Tranche A Bonds to be issued at Effective Date, as applicable, shall be reduced by the amount of such excess.

23

(v)     To the extent the Securitization Bond Treatment or the Stipulated Treatment is provided after the Delayed Implementation Date, the terms of such Securitization Bonds or Stipulated Treatment, including maturity of the Tranche B Bonds and accrual of the Tranche B Bond amounts between the Delayed Implementation Date and the Effective Date, if applicable, shall be adjusted in a manner mutually agreed upon by the Required Parties, after consultation with the Consulting Parties, (or if no such agreement can be reached, as ordered by the Title III Court) to take into account the Increased Settlement Payments made prior to the date of issuance of the Securitization Bonds or the provision of the Stipulated Treatment so that the cost to the Government Parties (and recovery on account of any Bond) is no greater (and no less) than that of the 9019 Settlement (including with respect to the maturity of the Securitization Bonds or the Stipulated Treatment to be provided under this Definitive RSA, as applicable).

(vi)     On and after the Delayed Implementation Date, no Increased Settlement Payments shall be made if an Individual Termination (as to such applicable Bondholder) or if a Stipulated Treatment Termination (as to all Supporting Holders) occurs or has occurred, and any Administrative Claim accrued by such Supporting Holders under this Definitive RSA shall be expunged and disallowed as a result of an Individual Termination (as to such applicable Bondholder) or a Stipulated Treatment Termination (as to all Supporting Holders), other than the Surviving Administrative Claim. In addition, the obligation to make Increased Settlement Payments shall terminate on the earliest of (i) a termination pursuant to Section 9(d)(vi) as to PREPA or AAFAF, (ii) the Effective Date of a Plan (or the effective date of another transaction pursuant to which the Securitization Bond Treatment or Stipulated Treatment is provided), or (iii) dismissal of the Title III Case.

(vii)     The 9019 Order shall provide that, if the Delayed Implementation Date occurs and PREPA has not implemented the Increased Settlement Charge to the extent required by this Definitive RSA, or in the event the Delayed Implementation Date occurs or has passed and PREPA is no longer a party to the RSA due to a termination pursuant to Section 9(d)(vi), then PREPA shall be obligated pursuant to the 9019 Order to make cash adequate protection payments (the "**Adequate Protection Payments**") on a monthly basis in an amount equal to the amount of Increased Settlement Payments (as defined below) that would have been required had the Increased Settlement Charge been implemented on such date and assuming that all Increased Settlement Payments would have been made to eligible Bonds subject to this Definitive RSA.  PREPA's obligation to make Adequate Protection Payments shall terminate on the earliest of (i) the date the Increased Settlement Charge is implemented, (ii) the Effective Date of a Plan (or the effective date of another transaction pursuant to which the Securitization Bond Treatment or Stipulated Treatment is provided), (iii) in the case of an individual Supporting Holder, an Individual Termination, or (iv) in the case of all Supporting Holders, a Stipulated Treatment Termination.

(f)     Tracking Provisions.

(i)     Uninsured Bonds held by Supporting Holders shall be assigned alternative identifying CUSIPs to allow such Uninsured Bonds to be freely transferable and remain subject to the provisions of this Definitive RSA. The Supporting Holders shall, and to the extent necessary shall direct the Trustee to, cooperate with the Government Parties in obtaining the alternative identifying CUSIPs. The details of the foregoing, as well as other mechanisms for implementing, tracking and disclosing the different payments and claims that Bonds are entitled to hereunder, shall be set forth on a term sheet to be mutually agreed upon by the Required Parties, after consultation with the Consulting Parties, and filed with the Title III Court prior to entry of the 9019 Order (the "**Tracking Mechanics Term Sheet**").  Such mechanisms shall be set up in such a manner such that they do not have an adverse effect on the enforceability, validity, tax exemption, or other rights of the Bonds, or on the lawful transferability of the Bonds under applicable securities laws.

(ii)     The Supporting Holders shall (A) to the extent necessary, direct the Trustee to cooperate with the Government Parties in obtaining the alternative identifying CUSIPs, and (B) take the related actions agreed upon in the Tracking Mechanics Term Sheet.

## Section 3     Litigation Stay and Forbearance.

The Parties agree as follows:

(a)     Upon the entry of the 9019 Order, Assured, National, and Syncora shall withdraw the Monoline Motion.  The Ad Hoc Group shall support the withdrawal of the Monoline Motion.

(b)     Unless all applicable deadlines on the Monoline Motion are extended as mutually agreed by the Parties and the other movants, the Ad Hoc Group, Assured, and the Government Parties shall jointly file an urgent motion(s) (or separate motions and/or joinders thereto) with the Title III Court as soon as practicable seeking to stay all applicable deadlines for the Monoline Motion (the "**Stay Motion**") until five (5) business days after the later of the date of entry of the 9019 Order and the date of entry of the order resolving the Dismissal Motion.

(c)     The Government Parties, Ad Hoc Group, Assured, and the Trustee shall execute an agreement tolling all unexpired statutes of limitations for all causes of action related to the Bonds, including any Lien Challenge and any potential Bondholder Litigation (the "**Tolling Agreement**") and request Title III Court approval of such Tolling Agreement.  By signing this Agreement after the RSA Execution Date, a Supporting Holder shall be deemed to have joined the Tolling Agreement.

(d)     If a Bondholder Litigation (as defined below) is commenced or continued, the Parties shall work in good faith to have such Bondholder Litigation dismissed, stayed, or withdrawn; provided that, so long as the Ad Hoc Group, Syncora, and National, and Assured are in compliance with this covenant, only Supporting Holders that are represented by counsel that

has appeared in the Title III Case shall be required to file a pleading pursuant to this covenant but all Supporting Holders will be required to otherwise work in good faith.

(e)     The Government Parties shall not commence or seek to terminate the stay of any Lien Challenge, as applicable, except in the following circumstances: (i) a Triggering Event has occurred; (ii) if any applicable statute of limitations is expiring within the next seven (7) days; (iii) FOMB's authority to prosecute PREPA's Title III Case is expiring; or (iv) with the written consent of the Required Holders after consultation with the Consulting Parties; provided that in the case of clause (ii) or (iii) above, none of the Government Parties shall commence a Lien Challenge so long as the applicable statute of limitations is (and remains) tolled (including, without limitation, as to FOMB, any future or successor to FOMB, and any members thereof) by an order of the Title III Court in form and substance acceptable to each of the Required Parties. If any of the Government Parties files a Lien Challenge permitted by clause (ii) or (iii) above, the Government Parties shall use commercially reasonable efforts to stay any further proceedings in respect of such Lien Challenge (including extending all relevant deadlines and otherwise forbearing from pursuit of such Lien Challenge) if they are able to do so in a manner that does not prejudice their ability to resume or prosecute the Lien Challenge after expiration or termination of such stay.

(f)     Except as otherwise permitted by this Agreement (including Sections 3(g) and 3(h)), Supporting Holders cannot contest or defend against a Lien Challenge on any grounds. In the event a Lien Challenge is commenced at any time prior to entry of the 9019 Order and such Lien Challenge has not been stayed, the Supporting Holders reserve all rights regarding such Lien Challenge, nothing herein shall constitute an admission by the Supporting Holders as to the Government Parties' authority or standing to prosecute such Lien Challenge or the merits of their claims, and, subject to any right herein of any Government Party to declare a Stipulated Treatment Termination prior to entry of the 9019 Order, the Supporting Holders shall have the right to contest and defend against such Lien Challenge on any grounds, including bringing counterclaims related to such Lien Challenge, which defense or counterclaims shall be withdrawn without prejudice upon entry of the 9019 Order, and, notwithstanding anything herein to the contrary, such contest or defense prior to entry of the 9019 Order by the Supporting Holders shall not be considered to have been a Bondholder Litigation or Bondholder Breach.

(g)     If a Lien Challenge is brought by the Government Parties at any time in violation of the terms hereof, the Supporting Holders shall have the right to contest and defend against such Lien Challenge on any grounds, including bringing counterclaims related to such Lien Challenge, and, notwithstanding anything herein to the contrary, such contest or defense by the Supporting Holders shall not be considered a Bondholder Litigation or Bondholder Breach and shall not be grounds for the Government Parties to declare a Stipulated Treatment Termination.

(h)     Notwithstanding anything to the contrary herein, upon the commencement of any Lien Challenge, Assured, Syncora, National, and the Ad Hoc Group shall have the right to file briefs and participate in oral argument with respect to such Lien Challenge and to otherwise appeal any legal issues implicated in such Lien Challenge, and such participation by Assured, Syncora, National, and the Ad Hoc Group in any Lien Challenge shall not be considered to have been a Bondholder Litigation or a Bondholder Breach, and shall not be grounds for the Government Parties to declare an Individual Termination or a Stipulated Treatment Termination;