**<u>EXHIBIT 10</u>**

Page 1

1

2              UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF PUERTO RICO

4     _____x

      In re:

5

      THE FINANCIAL OVERSIGHT AND            PROMESA

6     MANAGEMENT BOARD FOR PUERTO

      RICO,                                  Title III

7          as representative of

8     THE COMMONWEALTH OF PUERTO RICO,

      et al.,

9          Debtors.

      _____x

10    In re:

                                             PROMESA

11    THE FINANCIAL OVERSIGHT AND

      MANAGEMENT BOARD OF PUERTO RICO,       Case No.

12

                                             17 BK 4780-LTS

13

           as representative of

14

      PUERTO RICO ELECTRIC POWER AUTHORITY,

15         Debtor.

      _____x

16    (Caption continued on following page.)

17    * P R O F E S S I O N A L   E Y E S   O N L Y *

18              VIDEOTAPED DEPOSITION

19                     OF

20              DAVID BROWNSTEIN

21              New York, New York

22          Wednesday, October 16, 2019

23

24    Reported by:

      ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25    JOB NO. 169670

Page 18

D. Brownstein - Professional Eyes Only

1  bonds in the tobacco market, which are
2  securitizations and, as you may be aware,
3  secured by payments into states from the
4  tobacco companies that are securing those
5  securitization bonds.
6      Q.  Okay.
7      A.  We looked at securitizations in
8  the utility space, and we looked at where
9  high-yield bonds were trading in the
10 secondary market.
11     Q.  Let me ask you a few questions
12 about that.
13        When you say you looked at the
14 utility space, was that power generation or
15 some other type of utility?
16     A.  Securitizations have been used
17 primarily in the utility space for closures
18 of nuclear power plants.  But they've also
19 been used for issuers such as Long Island
20 Power Authority to finance their legacy
21 assets.
22     Q.  And you believe that those types
23 of bonds in the utility space provide a
24 basis of comparison to arrive at 5.25

Page 19

D. Brownstein - Professional Eyes Only

1  percent for the coupon rate on these bonds?
2      MS. SPILLANE:  Objection to form.
3      A.  I believe that all of those
4  securities I mentioned assist in
5  determining what is a fair market value.
6      Q.  Okay.  You indicated, I believe,
7  that you looked at certain high-yield
8  bonds.
9         Were those municipal high-yield
10 bonds?
11     A.  Yes.  Everything we looked at was
12 a municipal.
13     Q.  When did you look -- did you look
14 at all these different bonds at the same
15 period of time?
16     A.  Yes, sir.
17     Q.  Okay.  And when did you look?
18     A.  As we were negotiating the price
19 and the coupon for the bonds, of course
20 there were, as you have seen from
21 documentation, arguments between us and the
22 creditors as to what was the appropriate
23 coupon for the bonds.  And so we needed to
24 justify the coupon we were using.

Page 20

D. Brownstein - Professional Eyes Only

1      Q.  Okay.  Can you tell me what
2  period of time this took place?
3      A.  I can't.
4      Q.  Well, can you tell me if it was
5  2018?
6      A.  Yes.
7      Q.  Okay.  So would it be fair to say
8  that the coupon rate was -- or you looked
9  at these other bonds to determine the range
10 in 2018?
11     MR. MASHBERG:  Objection to the
12 form.
13     A.  I would suggest that we were
14 looking at them as we were discussing with
15 the board what was the appropriate rate and
16 as we were making our proposals to the
17 creditors.
18     Q.  Okay.  And do you know the last
19 time that you looked at these different
20 bonds, the utility space bonds, the
21 high-yield bonds, and the tobacco market
22 bonds?
23     MS. SPILLANE:  Objection to form.
24     A.  It would have been prior to the

Page 21

D. Brownstein - Professional Eyes Only

1  agreement of the preliminary RSA.
2      Q.  I think that you mentioned with
3  respect to the tobacco securitization
4  bonds, those have -- is it your
5  understanding those have a guaranteed
6  revenue stream?
7      MS. SPILLANE:  Objection to form.
8      A.  They have a revenue stream to the
9  extent it exists.
10     Q.  Okay.  How about with the utility
11 space bonds that you looked at?
12     A.  Those have a guaranteed revenue
13 stream to the extent that there's
14 compliance with the terms of the documents.
15     Q.  Okay.  And the municipal
16 high-yield bonds, did you look at the
17 entire market or specific bonds within that
18 high-yield bond space?
19     A.  We looked at the entire market,
20 including many different types of security
21 structures.
22     Q.  Would it be fair to say that you
23 looked at the entire market or you looked
24 at the entire market and then specific

Page 22

D. Brownstein - Professional Eyes Only

1  bonds within that market?
2       MS. SPILLANE:  Objection to form.
3  A.  I don't understand your question.
4  Q.  Okay.  I understood, and I could
5  have misunderstood, that you looked at the
6  entire high-yield bond market.
7       But I want to clarify and make
8  sure, did you look at individual municipal
9  high-yield bonds within the high-yield bond
10  market as well?
11       MR. MASHBERG:  Objection to form.
12  A.  Your last question was about the
13  entire market --
14  Q.  Yes.
15  A.  -- not specifically about the
16  high-yield market?
17  Q.  Right, which is why I want to
18  clarify.
19  A.  To clarify, I said the high-yield
20  market.
21  Q.  Okay.  Are you familiar with the
22  COFINA bonds?
23  A.  Yes.
24  Q.  Did you look at the COFINA bonds

Page 23

D. Brownstein - Professional Eyes Only

1  at all in determining the coupon rate?
2       MR. MASHBERG:  Objection to form.
3  A.  To go back a step so you
4  understand, I'm the one who determines the
5  COFINA yields.
6  Q.  Right.
7  A.  And, therefore, I would have
8  taken them into account in my analysis.
9  Q.  And when did you determine the
10  rate for the COFINA bonds?
11  A.  At the time that we entered into
12  the restructuring support agreement in
13  mediation for COFINA.
14  Q.  Okay.  And the bond yields, do
15  you know what's happening with the bond
16  yields with respect to -- or let me
17  rephrase it.
18       Do you know whether or not the
19  COFINA bonds are now trading above par?
20  A.  Some of them are, yes.  We've had
21  a significant amount of luck in the market
22  because the entire municipal market due to
23  supply and demand has increased in value
24  and, therefore, decreased in yield

Page 24

D. Brownstein - Professional Eyes Only

1  dramatically over the past six months.
2  Q.  I'm sorry, six months?
3  A.  Yes.
4  Q.  Did you update --
5  A.  And by the way, I should note
6  that not all of the bonds are over par now.
7  Some are below.
8  Q.  Right.
9       Are the 2058 COFINA bonds over
10  par?
11  A.  I'm sorry, I can't get that
12  specific for you.  I don't track it on a
13  daily basis.
14  Q.  I appreciate the clarification.
15  A.  I believe it's the longest bonds
16  that are still all below par, just for the
17  record.
18  Q.  Okay.  Thank you.
19       Is it your practice to update the
20  FOMB with respect to the yields -- I'm
21  sorry, the current interest rates with
22  respect to the high-yield bond market?
23       MS. SPILLANE:  Objection to form.
24       MR. MASHBERG:  Objection to form.

Page 25

D. Brownstein - Professional Eyes Only

1  A.  No.
2  Q.  Do you know what the current
3  yields are in the high-yield bond market?
4       MS. SPILLANE:  Objection to form.
5       MR. MASHBERG:  Objection to form.
6  A.  I'm sorry, to be clear, there are
7  thousands of names in the high-yield
8  municipal market, so I don't understand
9  your question.
10  Q.  If yields come down, is it your
11  experience that that's a benefit to the
12  bondholders?
13       MS. SPILLANE:  Objection to form.
14       MR. MASHBERG:  Objection to form.
15  A.  If yields come down, the
16  beneficiary of that would be the existing
17  bondholder on that day, correct.
18  Q.  When establishing the 5.25
19  percent, did you sound the market?
20  A.  I don't understand your question,
21  sir.
22  Q.  I'll try to rephrase it to be
23  clear and come back to you.
24       In your declaration, you analyzed

Page 26

1       D. Brownstein - Professional Eyes Only
2  the total consideration that was to be paid
3  to supporting holders under the RSA.
4         Is that a fair statement?
5      A.  Yes.
6      Q.  Okay.  Did you negotiate those
7  numbers?  Were you involved in negotiating
8  the percentage and total recoveries under
9  the RSA?
10     A.  Yes.
11     Q.  Now in doing that, did you have a
12 threshold recovery percentage that you
13 would not have exceeded?
14     A.  No.
15     Q.  Now in creating that analysis of
16 the consideration that was paid, did you
17 put -- let me ask you, are you familiar
18 with the terms "settlement payments,"
19 "administrative claims"?  You're familiar
20 with those?
21        MR. MASHBERG:  Objection to form.
22        MS. SPILLANE:  Objection to form.
23     A.  Yes.
24     Q.  Did you put a value on the
25 settlement payments in calculating the

Page 27

1       D. Brownstein - Professional Eyes Only
2  total consideration that would be paid
3  under the RSA?
4         MS. SPILLANE:  Objection to form.
5         MR. NATBONY:  Objection to form.
6      A.  I don't understand your question.
7      Q.  Do you think that settlement
8  payments during the course of negotiations,
9  did that represent a value that you were
10 exchanging in order to arrive at a deal for
11 the RSA?
12        MS. SPILLANE:  Objection to form.
13        MR. MASHBERG:  Objection to form.
14     A.  I still don't understand your
15 question.
16     Q.  In arriving at the RSA, did you
17 analyze the likelihood of different
18 litigation scenarios during the course of
19 negotiations?
20        MR. MASHBERG:  Objection to form.
21        MS. SPILLANE:  Objection to form.
22     A.  I am not a lawyer.  I didn't
23 analyze anything when it comes to legal
24 determinations.
25     Q.  Well, did you take anyone's

Page 28

1       D. Brownstein - Professional Eyes Only
2  determinations and try to ascribe a dollar
3  value it in the course?
4         MS. SPILLANE:  Objection to form.
5         MR. MASHBERG:  Objection to form.
6      A.  I think you need to get a little
7  more specific.
8      Q.  Okay.
9      A.  It's too generic for me.
10     Q.  Okay.  Did you contemplate
11 different litigation scenarios in the
12 course of negotiating the RSA?
13        MR. MASHBERG:  Objection to form.
14        MS. SPILLANE:  Objection to form.
15 Same question.
16     A.  So I think it would be helpful if
17 I take a step back for you and help you
18 understand our goals and objectives at the
19 board in negotiating the settlement.
20     So let's start with the critical
21 pieces of the puzzle for us.
22     First and foremost, the board was
23 not comfortable with leaving the public in
24 Puerto Rico with a structure of a security
25 that could result in significant increases

Page 29

1       D. Brownstein - Professional Eyes Only
2  in cost to the public without some known
3  factor to it.
4      And I know you have the
5  presentation that we made to creditors
6  before the board turned down the original
7  RSA.  And what it said in there is we were
8  prepared to live with a band around rates
9  and charges.  That proposal was turned down
10 by the creditors.
11     So when we went back to negotiate
12 with the creditors, we basically required
13 that they agree to a couple of important
14 factors.  The first and foremost was that
15 we were locking the rates and charges
16 payable by the public, which means there
17 would be no rate covenant -- in a
18 securitization, it's known as a true-up; in
19 a revenue bond, it's known as a rate
20 covenant -- so that the investors would
21 know that there would be a cash flow
22 available to make sure they were paid back
23 over time.
24     Q.  Okay.
25     A.  Okay?  So that's item 1.

Page 30

D. Brownstein - Professional Eyes Only
1     Item 2 is, we wanted to reduce
2  the par amount of debt.
3     Number 3 is, we wanted to make
4  sure that we didn't interfere with
5  transformation. So what that meant is we
6  couldn't have debt issued or an obligation
7  of PREPA because it was possible that
8  through transformation, PREPA would no
9  longer exist, which was one of our goals.
10     So what we were focused on, to be
11  clear for you, is how do we create a
12  construct acceptable to the creditors under
13  those criteria. And to make sure you're
14  aware of it, which it says in my
15  declaration, as far as I know, on a global
16  basis, there has never been a debt
17  financing for a utility where there is no
18  mechanism to increase the cost to the
19  consumer for utilization of the assets in
20  the event utilization goes down for
21  whatever reason.
22     So that was our key criteria in
23  negotiating a restructuring of the debt.
24     Q.  Okay.  Are you done?

Page 31

D. Brownstein - Professional Eyes Only
1     A.  Yes.
2     Q.  Thank you.  Thank you for that.
3     I have a couple of questions
4  about that.  You've used the term a few
5  times "creditors."
6     To whom do you refer to, all
7  creditors or someone else or another group?
8     A.  I refer to in the case of this,
9  the negotiations with the creditors, which
10  included the ad hoc group, the three
11  monoline insurers, the fuel line lenders.
12     Q.  Okay.  But PREPA -- are you aware
13  whether or not PREPA has creditors beyond
14  those entities you just identified?
15     A.  Yes, I am.  But what we're
16  talking about here is the structure of the
17  debt that was being issued to replace the
18  existing debt of those creditors.
19     Q.  I understand that.  I had moved
20  on to a different question.  I'm sorry if I
21  was unclear.
22     A.  Okay.
23     Q.  Now those creditors, were any of
24  those creditors involved in any litigation

Page 32

D. Brownstein - Professional Eyes Only
1  with respect to claims asserted on behalf
2  of bonds that they had held?
3     MR. NATBONY:  Objection to form.
4     MR. MASHBERG:  Objection to form.
5     A.  I understand that the -- certain
6  of those bond creditors that I was talking
7  about were litigating or had proposed to
8  litigate, I don't know if they started the
9  litigation or not, on a receiver motion to
10  start, which was a right I believe they had
11  under the indenture of trust relating to
12  the revenue bonds outstanding.
13     Q.  Okay.  Are you aware of any
14  claims or positions that the FOMB had taken
15  with respect to the extent or nature of the
16  security that the bondholder creditors
17  claimed?
18     MS. SPILLANE:  Objection to form.
19     MR. MASHBERG:  Objection to form.
20     A.  I believe Proskauer was -- either
21  has or was considering litigating on
22  whether the bondholders had a lien.
23     Q.  Okay.  Now going back to a few
24  moments, did you consider that lien issue

Page 33

D. Brownstein - Professional Eyes Only
1  that you just identified in the course of
2  your negotiations?
3     MS. SPILLANE:  Objection to form.
4     A.  We discussed with Proskauer and
5  the board the possible benefits of the lien
6  challenge.  But we also discussed with
7  Proskauer and the board the desire to find
8  a settlement with the creditors for several
9  reasons.  I think I've described some of
10  them.
11     One, the risk of the receiver
12  motion would be that rates would
13  significantly increase and the bondholders
14  would have a true-up mechanism, a rate
15  covenant that would apply as well.
16     Two, that if we were in
17  litigation, it would impact our process of
18  transformation, which was the second
19  critical fact in the roadmap to
20  a successful agreement amongst creditors
21  and the board and ultimately all government
22  parties.
23     Q.  Okay.
24     A.  And so in the end here, we tried

Page 34

1   D. Brownstein - Professional Eyes Only
2  to strike the right balance between risks
3  and rewards.
4       Q.  Thank you.
5       With respect to -- you mentioned
6  the risk of the receiver motion.
7       Did anyone evaluate what that
8  risk was?
9       MS. SPILLANE:  Objection to form.
10      A.  We discussed it, but the people
11  who would have evaluated it are Proskauer,
12  not Citi.
13      Q.  I understand that.
14      But did Citi, once that -- if
15  that risk was evaluated, did Citi do
16  anything to ascribe a monetary value or a
17  settlement value to the risk of that
18  receiver motion?
19      MS. SPILLANE:  Objection to form.
20      MR. NATBONY:  Objection as to
21  form.
22      A.  The determination by the
23  government and the board was that there was
24  a risk that we didn't want the public in
25  Puerto Rico to continue to have.  And that

Page 35

1   D. Brownstein - Professional Eyes Only
2  was the determination for negotiating a
3  settlement.
4       Q.  Okay.  So was it the fact the
5  risk existed, not the level of risk?
6       Would that be fair?
7       MS. SPILLANE:  Objection to form.
8       A.  Correct.
9       Q.  Also you mentioned on the second
10  part of your response, litigation -- and I
11  wrote this down, tell me if I'm wrong --
12  could impact, could have an impact?
13      Do you recall that?
14      A.  What I said is what I said.
15      Q.  Okay.
16      A.  I'm not going to recall what I
17  said.
18      Q.  All right.
19      A.  If you want them to read it back,
20  we can do that.
21      Q.  All right.  If the FOMB -- I
22  believe -- if the FOMB had been successful
23  on these lien challenges that we
24  identified, would that have had a positive
25  impact in transformation?

Page 36

1   D. Brownstein - Professional Eyes Only
2       MS. SPILLANE:  Objection to form.
3       MR. MASHBERG:  Objection to form.
4       A.  I have no idea.
5       Q.  Okay.
6       A.  But what I do know is it would
7  have taken a long time, which is what we
8  were trying to avoid.
9       Q.  So would you say that the
10  expediency was a critical factor in the
11  evaluation?
12      MS. SPILLANE:  Objection to form.
13      MR. MASHBERG:  Objection to form.
14      A.  Timing was a factor in our
15  determinations, yes.
16      Q.  Was it an important factor?
17      MS. SPILLANE:  Objection to form.
18      A.  I don't have an answer to that
19  question.
20      Q.  While that's getting handed out,
21  let me ask you, going back to the coupon
22  rate, is that 5.25 percent coupon rate on
23  the bonds locked in?
24      A.  Yes.
25      Q.  Okay.  Any circumstance under

Page 37

1   D. Brownstein - Professional Eyes Only
2  which it can change?
3       A.  Not that I'm aware of.
4       Q.  And I believe with respect to
5  timing, you indicated that when you
6  performed the analysis to come at the 5.25
7  percent, that it was done in 2018?
8       MS. SPILLANE:  Objection to form.
9       A.  I believe so.
10      Q.  Okay.  Is there a reason that the
11  coupon rate wasn't -- or was the coupon
12  rate revisited after the preliminary RSA?
13      A.  Not that I recall.
14      Q.  Do you know why it wasn't?
15      MR. MASHBERG:  Objection to form.
16      A.  We had an agreement.
17      Q.  Was the preliminary RSA binding
18  or unbinding, in your opinion?
19      MS. SPILLANE:  Objection to form.
20      A.  It was binding.
21      Q.  So is it your understanding that
22  the 5.25 percent would have been locked in
23  as of the date of the preliminary RSA or at
24  some other point?
25      A.  I believe it was the preliminary

Page 38

1      D. Brownstein - Professional Eyes Only
2   RSA, but I need to go back and look at all
3   the documents.
4          (Brownstein Exhibit 3, Email
5       chain beginning with email dated
6       4/26/19 from ICG-MKTS, Castiglioni and
7       sent to Batlle and Porter and others
8       with attachments, Bates-stamped
9       CGMIRSA_001458 through 1465, marked for
10      identification, as of this date.)
11  BY MR. ARRASTIA:
12      Q.  Let me ask you if you recognize
13  this is document which I'll mark as
14  Exhibit 3.
15          MR. MASHBERG:  The Bates-stamp
16      number in the record for clarity?
17          MR. ARRASTIA:  Yes, No. 3.
18          MR. MASHBERG:  The Bates.
19          MR. ARRASTIA:  Oh, I'm sorry, the
20      Bates.
21          That begins on 1458, ending on
22      1465, with the prefix CGMIRSA.
23          MR. MASHBERG:  Thank you.
24      A.  I'm sorry, are you asking me if I
25  recognize the email, or the presentation,

Page 39

1       D. Brownstein - Professional Eyes Only
2   or both?
3       Q.  Well, let's start with both.  Do
4   you recognize both?
5           MR. NATBONY:  Objection to form.
6       (Document review.)
7       A.  Yes.
8       Q.  Looking at the PREPA discussion
9   material that begins on Bates No. 1460, if
10  you could look at the last page of that.
11      (Witness complies.)
12      Q.  It's entitled "Benefits and
13  Considerations of the Current PREPA RSA."
14      A.  Um-hmm.
15      Q.  Is that reflective of the type of
16  information that would be given to the
17  board?
18          MS. SPILLANE:  Objection to form.
19      A.  Some of the information that was
20  given to the board.
21      Q.  Okay.  And what other
22  communications would be reflective, not
23  exhaustive, but reflective of the
24  information that would be given to the
25  board regarding the PREPA RSA?

Page 40

1       D. Brownstein - Professional Eyes Only
2           MS. SPILLANE:  Objection to form.
3           MR. MASHBERG:  Objection to form.
4           MR. NATBONY:  Objection to form.
5       A.  We had numerous calls either with
6   the board as a whole or with each
7   individual board member to review all of
8   the concepts embedded in the PREPA RSA.
9       Q.  Okay.
10      A.  The PREPA securitization
11  structure is probably the most complex
12  thing any of us involved have ever seen or
13  hopefully will see in our lifetime.  And
14  the fact is that it took a lot of dialogue
15  with the board and the other advisers to
16  the board and the government to get people
17  comfortable with the terms of it.
18      Q.  Okay.  So would it be fair to say
19  that the other types of communications that
20  would be reflective of the information
21  given to the board would have occurred
22  through phone calls and other verbal
23  communications?
24          MR. MASHBERG:  Objection to form.
25          MS. SPILLANE:  Objection to form.

Page 41

1       D. Brownstein - Professional Eyes Only
2       A.  Some of it, some of it would have
3   been in presentations, of which there were
4   many.
5       Q.  Okay.  Did you keep notes of the
6   phone calls or personal conversations with
7   the board or the individual members of the
8   board?
9       A.  No, I don't keep notes.
10      Q.  On the top right where it says,
11  "Power revenue bonds may be unsecured
12  because perfection was defective,
13  successful litigation could result in lower
14  recoveries" --
15      A.  Um-hmm.
16          MR. MASHBERG:  I'm sorry, where
17      are you?
18          THE WITNESS:  On the last page.
19          MR. ARRASTIA:  Last page of Bates
20      No. 1465.  The title of the page is
21      "Benefits and Considerations of the
22      Current PREPA RSA."
23          MR. MASHBERG:  Got it.
24      A.  Um-hmm.
25      Q.  Okay.  These power revenue bonds

Page 42

1    D. Brownstein - Professional Eyes Only
2  -- well, first of all, let me ask you, do
3  you have an understanding of the difference
4  between a nonrecourse and a recourse bond?
5        MS. SPILLANE:  Objection to form.
6    A.  I'm not quite sure of your
7  question.  Perhaps you could you describe
8  the difference.
9    Q.  Well, are you familiar with the
10  concept that some bonds or some
11  obligations, there is recourse against the
12  issuer in the case of a default; and in
13  other instances, there is no recourse or
14  there is no opportunity to seek a recovery
15  against the issuer in the event of a
16  default?
17    A.  I'm not aware of any revenue
18  bonds that are, as you called them,
19  nonrecourse.
20    Q.  Are you familiar with a sinking
21  fund?
22        MR. MASHBERG:  Objection to form.
23        MS. SPILLANE:  Objection to form.
24        MR. NATBONY:  Same.
25  BY MR. ARRASTIA:

Page 43

1    D. Brownstein - Professional Eyes Only
2    Q.  That existed at the point of the
3  petition date?
4    A.  I don't know what you're asking
5  me.
6    Q.  Okay.  Well, I'm asking if you're
7  familiar with it.  And if you don't know,
8  then --
9    A.  I don't know what you're talking
10  about.
11    Q.  Have you heard of something
12  called the sinking fund with respect to
13  PREPA?
14    A.  Bond issues often have term bonds
15  with sinkers or bond fund where cash flow
16  is received and then paid out by the
17  trustee to the bondholders --
18    Q.  Okay.
19    A.  -- if that's what you're asking
20  about.
21    Q.  Did that exist with respect to
22  these power revenue bonds?
23    A.  PREPA had term bonds with sinkers
24  and sinking funds, yes.
25    Q.  And do you know how much cash was

Page 44

1    D. Brownstein - Professional Eyes Only
2  in those sinking funds as of the petition
3  date?
4    A.  I don't recall.
5    Q.  Earlier we talked about an actual
6  or potential challenge with respect to the
7  bond claims.
8        Do you know if that had to do
9  with respect to the -- whether or not they
10  were secured or unsecured?
11        MR. MASHBERG:  Objection to form.
12    A.  It had to do with whether they
13  had a lien, which would mean that
14  potentially if funds were transferred into
15  the bond funds or were not transferred in,
16  the bondholders wouldn't have a right to
17  them.  That was what Proskauer's position
18  was.
19    Q.  And just to be clear, so your
20  understanding was -- is that this -- the
21  lien would be on the funds and these term
22  bond sinkers?
23    A.  In the bond funds --
24        MR. MASHBERG:  Objection to form.
25        MS. SPILLANE:  Objection to form.

Page 45

1    D. Brownstein - Professional Eyes Only
2    A.  -- is what I would tell you.
3    Q.  Did you ever have a conversation
4  with the FOMB with respect to the issue of
5  liens on the term bonds?
6    A.  We had numerous conversations
7  with the board on that topic led by
8  Proskauer.  Since I am not an attorney, I
9  wouldn't be the one making the case for
10  that.
11        MR. MASHBERG:  I would just
12    caution the witness in further
13    questions not to disclose
14    communications with Proskauer to the
15    board at which he was present with
16    regard to any legal advice or legal
17    analysis.  That would be subject to the
18    attorney-client privilege given the
19    role that Citi was playing in this
20    process as an adviser to the board.
21        MR. ARRASTIA:  Thank you for
22    that.  I'm trying to tap dance around
23    it, by the way.
24        MR. LYNCH:  And I would just like
25    to object to that cautioning because it

Page 110

1    D. Brownstein - Professional Eyes Only
2  that during a majority of the day, the
3  amount of utilization of PG&E's system, as
4  an example, is very low.
5        But at night, PG&E's requirements
6  go up dramatically in electricity they
7  need.  So they have to maintain systems in
8  place to cover that peak need for the
9  public.  And yet if you think about it, if
10  you're only paying for what you use, then
11  how does PG&E maintain that system and keep
12  that system operating properly 24/7 for the
13  time that people need it off-peak or peak
14  for -- because there's no sun out.
15        So that is what we are telling
16  the public in Puerto Rico that they --
17  clearly we've seen a lot of push back on.
18        If you want to remain on the
19  system and therefore have the right to call
20  on it at will, we have to, PREPA has to
21  maintain it.  Someone has to pay for it.
22  You will cover your share of the legacy
23  debt to cover it.
24        So that's the last piece of the
25  really three pieces of the demand

Page 111

1    D. Brownstein - Professional Eyes Only
2  protections.
3      Q.  Okay.  You mentioned that with
4  respect to the government or
5  instrumentalities paying the power bills,
6  that the government has to own that issue.
7  But it's actually the consumers, government
8  or otherwise, that would have to pay?
9      A.  No.
10        MS. SPILLANE:  Objection to form.
11      A.  Here's how we look at this.  And
12  the government looks at it, by the way.
13      Q.  Which government?
14      A.  The government of Puerto Rico.
15      Q.  Okay.  Current government, last
16  government?
17        MS. SPILLANE:  Objection to form.
18  BY MR. ARRASTIA:
19      Q.  Which government?
20      A.  AAFAF.
21      Q.  Okay.
22      A.  And the issue here is that the
23  public, the general public will be aware
24  now that if their rates go up, it's because
25  the government of Puerto Rico or PRASA, or

Page 112

1    D. Brownstein - Professional Eyes Only
2  the local government wasn't paying.  And so
3  they have a voice.  That's something that
4  wasn't known before, wasn't part of how --
5  there was no transparency as to how your
6  charge was set.
7      Q.  Right.
8      A.  And as I think we all are aware
9  in this room, PREPA has issues.  Everybody
10  has issues.  There's goals of trying to
11  eliminate PREPA as the operating entity
12  here because of those issues.
13        So by creating transparency as to
14  how your charges could be impacted, the
15  public, through their voice, will make it
16  clear that PRASA needs to pay its own
17  bills.
18      Q.  And when you spoke about,
19  mentioned AAFAF, you had spoken with them
20  about this?
21      A.  Yes.  They were the principal
22  designer of this.
23      Q.  Okay.  And when did that happen?
24      A.  It's been going on for a very
25  long time.  Since the beginning of

Page 113

1    D. Brownstein - Professional Eyes Only
2  negotiations with the creditors, we've been
3  negotiating and negotiated -- pretty much a
4  concept in principle, from my perspective,
5  at the time we signed the preliminary RSA
6  as to what demand protections were going to
7  be.
8      Q.  Okay.  Specifically including the
9  government instrumentality aspect failing
10  to pay their own power bills?
11      A.  Well, it's a function of -- it's
12  the one-and-a-half percent, if you think
13  about it that way, right?
14        If the bill is sent out and more
15  than one-and-a-half percent of those --
16      Q.  Right.
17      A.  -- of the revenues don't come in,
18  we get to unfortunately be left with an
19  increased charge for the public at large.
20        And so, yes, they were well
21  integrated into the discussion as to how do
22  we -- what can we do and will we do to make
23  sure that the public is not impacted by
24  this.
25      Q.  Okay.  But is the government --

Page 114

1    D. Brownstein - Professional Eyes Only
2  and in your declaration, that's Roman
3  numeral 3 --
4       A.  On what page?  I'm sorry.
5       Q.  That's on page 19, and that is
6  the continuation of paragraph 44.
7       (Document review.)
8       A.  Um-hmm.
9       Q.  I just want to make sure that I
10  understand; I'm not confused.
11       So the government or
12  instrumentalities failing to pay their own
13  power bills, which is Roman numeral 2, is
14  separate from the general public fails to
15  pay their bills in full?
16       A.  That's correct.
17       Q.  Okay.
18       A.  That's where the general public
19  is one-and-a-half percent.  The government
20  entities is if they don't pay them.
21       Q.  Now, when you were describing
22  this, you mentioned a couple of times that
23  some of these aspects at least were fairly
24  standard in the U.S.?
25       What do you base that on, the

Page 115

1    D. Brownstein - Professional Eyes Only
2  fact that you consider it fairly standard?
3       A.  How securitizations are
4  structured.  So if you look at the criteria
5  for getting a rating on a securitization
6  bond in the utility space, the rating
7  agencies pretty much block you off on how
8  it needs to be structured in order to get
9  to a rating.
10       The fact is, we will not get to a
11  rating on these bonds.  These bonds aren't
12  structured to obtain a rating.  I don't
13  know if they will ever been in a position
14  to obtain a rating because the specific
15  criteria, the first criteria of the rating
16  agencies is a true-up.
17       MS. SPILLANE:  Counsel, if you're
18  reaching a natural stopping place, I
19  think we can break for lunch soon.
20       MR. ARRASTIA:  That's good.  Does
21  this work fine?
22       THE VIDEOGRAPHER:  The time is
23  12:20 p.m. going off the record.
24       (Recess is taken.)
25

Page 116

1    D. Brownstein - Professional Eyes Only
2    A F T E R N O O N   S E S S I O N
3       (Time noted:  1:20 p.m.)
4       *     *     *
5       THE VIDEOGRAPHER:  The time is
6  12:59 p.m.  We are on the record.
7
8  D A V I D   B R O W N S T E I N,   resumed
9       and testified as follows:
10  EXAMINATION BY (Cont'd.)
11  MR. ARRASTIA:
12       Q.  Mr. Brownstein, you used the term
13  "true-up" a little bit during your
14  testimony.
15       Could you explain to me what you
16  mean by true-up?
17       A.  Sure.
18       So it's not that different -- in
19  fact, it's identical except for potentially
20  timing -- to a rate covenant for a revenue
21  bond.  So if you look at, as an example,
22  the PREPA indenture, right, PREPA is
23  obligated to maintain rates and charges on
24  the debt sufficient to cover debt service
25  at 1.2 times coverage.

Page 117

1    D. Brownstein - Professional Eyes Only
2       In a true-up on a securitization
3  bond, you also have a true-up equivalent of
4  a rate covenant where on a monthly basis,
5  you will adjust the rates and charges that
6  the customers pay so that you have a
7  sufficient amount of money to cover one
8  times, usually, debt service on the
9  upcoming next payment.
10       And the reason that it's one
11  times as opposed to 1.2 has a lot to do
12  with two things.
13       One, the reserve requirement on a
14  securitization, so there's cash there to
15  cover that monthly shortfall if need be,
16  but the constant obligation to adjust the
17  charge monthly as opposed to for revenue
18  bonds where it's generally changed
19  quarterly or semiannually.
20       Q.  Okay.
21       A.  So it's the same concept as we
22  already had and that you'd see in LIPA, you
23  see in California state securitization
24  bonds, things of that sort.
25       Q.  All right.  So -- but the current

Page 118

1    D. Brownstein - Professional Eyes Only
2  PREPA bonds, those have a specific period?
3    A.  They have a rate covenant.
4       MR. MASHBERG:  Objection to form.
5    A.  They have a rate covenant.
6    Q.  Okay.  But do the bonds have a
7  certain period of time, 30 years, 50 years,
8  60 years?  Or can they go on forever?
9    A.  Oh, no, the existing revenue
10 bonds have a final state in maturity, but
11 there is a default when payment due.
12   Q.  Okay.
13   A.  So that's when you can have the
14 creditors require a receiver, as an
15 example, to make sure that you actually
16 comply with the rate covenant, which is the
17 1.2 times.
18   Q.  Okay.
19   A.  But I think what you were asking
20 me, if I can -- just to be clear so I
21 answer your question properly, is what
22 happens at maturity, not on an ongoing
23 basis; is that right?
24   Q.  No.
25   A.  Okay.  Sorry.

Page 119

1    D. Brownstein - Professional Eyes Only
2    Q.  I was just wondering if it had a
3  maturity date.  That's all.  And you
4  answered it.
5    A.  Okay.  In neither case -- they
6  both have maturities, but failure to pay in
7  both cases doesn't allow you to walk away
8  from your liability.
9    Q.  Wait a second.  When you say, I'm
10 sorry, in both cases, what do you mean by
11 "both cases"?
12   A.  Securitization as well as the
13 revenue bonds.
14   Q.  And the revenue bonds do not have
15 the true-up, correct?
16   A.  They have a rate covenant which
17 is stricter and requires that you maintain
18 or you are in default.
19   Q.  Okay.  But is there a provision
20 that if the debt service isn't made, that
21 debt service is carried over?
22   A.  You have an acceleration
23 potentially of the debt.  You have a
24 default and remedies for default under a
25 revenue bond and in case of PREPA.  That's

Page 120

1    D. Brownstein - Professional Eyes Only
2  what we were -- we're arguing over is what
3  are the remedies the bondholders are
4  entitled to, including appointment of a
5  receiver.
6    Q.  Okay.  The Tranche A bonds under
7  the RSA, those have a term, correct?
8    A.  They have a stated term.
9    Q.  Okay.  And -- because you said
10 PREPA bonds, and I want to make sure we're
11 clear.
12      When you say -- when we're
13 talking about them, I'm talking about the
14 bonds contemplated Tranche A --
15   A.  The securitization?
16   Q.  Yes.
17   A.  Okay.
18   Q.  So the debt service, if it's not
19 made in any particular period, does it
20 carry forward?
21   A.  It carries forward.  That's the
22 only right the bondholders have is to, over
23 time, receive repayment.  That time period
24 on Tranche A could be 300 years.  So they
25 have no remedies other than for a failure

Page 121

1    D. Brownstein - Professional Eyes Only
2  by the servicer to charge customers.
3       So if you don't send out bills, I
4  the securitization holder, the bondholder,
5  can force a replacement of the party
6  responsible for sending out those bills.
7    Q.  Okay.
8    A.  So that is the only remedy that
9  you have.  Other than that, you wait to get
10 paid until there's cash flow sufficient.
11 And, again, that cash flow is fixed from
12 customers on a charge per kilowatt-hour,
13 subject to the demand protections we've
14 already talked about.
15   Q.  Okay.  And until the cash flow is
16 sufficient, is it fair to say that as the
17 debt service carries forward, it's interest
18 on interest?
19      MS. SPILLANE:  Objection to form.
20   A.  Yes.
21   Q.  You said Tranche A could be 300
22 years.
23      What do you mean by that?
24   A.  It means that it could take -- as
25 long as it takes to get you repaid, you

Page 122

1    D. Brownstein - Professional Eyes Only
2  will get repaid, but the present value
3  recovery to you, obviously you as a
4  bondholder goes down every day you wait,
5  right?  Because you're not getting your
6  principal back.
7    Q.  Okay.  Now you had -- I believe
8  it was modeled that there's an expectation
9  that the Tranche A bonds will be repaid in
10  33 years?
11    A.  Correct.
12    Q.  Even though it's a 40-year
13  maturity?
14    A.  Correct.
15    Q.  And what sort of load was used in
16  coming up with a repayment in 33 years?
17    A.  The fiscal plan.
18    Q.  Which one?  2018?
19    A.  The April of 2018.  Is that
20  right?
21    MS. SPILLANE:  Answer to your
22  memory if you're not sure.
23    A.  Yes, I think it was 2018.  It
24  could have been -- no, it would have
25  been...

Page 123

1    D. Brownstein - Professional Eyes Only
2    I'm terrible with dates.  I
3  apologize.
4    Q.  Not a problem.
5    Has --
6    A.  But it's in the RSA.  Somewhere
7  it says it.
8    Q.  Okay.  Has that load calculation
9  changed, do you know, from 2018 to 2019?
10    A.  Yes.
11    Q.  How has it changed?
12    A.  Well, there's been several
13  additional fiscal plans since then.  And I
14  believe in some of them, it has gone down
15  more before it started going up.  And in
16  others, it went up.  It is based on the
17  numbers when we struck a deal.
18    Q.  And hasn't been revisited since
19  striking that deal?
20    A.  Correct.
21    Q.  Now I look back at this handy
22  electronic device, and I realize that I
23  wasn't very clear.
24    You had asked me to give you a
25  definition of nonrecourse.  When I looked

Page 124

1    D. Brownstein - Professional Eyes Only
2  at it, I was not accurate.
3    So we talked about the PREPA
4  bonds and you asked me for a definition.
5  So if we use my definition that nonrecourse
6  is a secured loan that's secured by a
7  pledge of collateral and recourse allows an
8  issuer to collect from collateral or any
9  other assets of the issuer, do you have an
10  understanding as to whether or not the
11  PREPA bonds are recourse or nonrecourse?
12    MS. SPILLANE:  Objection to form.
13    MR. MASHBERG:  Objection.
14    MR. NATBONY:  Objection.
15    A.  We could try one more time if you
16  want to try and help me understand your
17  definition.
18    Q.  Sure.
19    A.  I'm not trying to be difficult.
20  I don't understand.
21    Q.  That's okay.  That's fine.  And I
22  don't think that you are, by the way.
23    Let me ask you this way:  The
24  PREPA bonds, there were certain claims as
25  to security.

Page 125

1    D. Brownstein - Professional Eyes Only
2    Do you know or do you have an
3  understanding as to what they were secured
4  by?
5    A.  Well, they have a rate covenant,
6  right?
7    Q.  Okay.
8    A.  Which requires that the -- that
9  PREPA charge the customer base to cover
10  debt service at 1.2 times.
11    Q.  Okay.
12    A.  So whether they have -- what I
13  can't answer for you, because I'm not a
14  lawyer, is whether having a lien or not
15  having a lien on the debt service funds
16  changes in any way, shape, or form whether
17  they're entitled to the revenue charge
18  against the system.  And clearly the
19  indenture requires that excess money, after
20  payment of certain expenses, flows through
21  to the debt service fund.
22    So I'm not in a position to
23  answer for you in any way, shape, or form
24  whether in fact that creates a secured or
25  an unsecured position because of what

Page 126

D. Brownstein - Professional Eyes Only

1  arguably people are considering is a
2  challenge with a lien.
3  Q.  Okay.
4  A.  All right?  I don't know how to
5  help you with that.
6  Q.  And I want to make sure that --
7  because we talked about those definitions
8  before.
9  And so this debt, let's see, that
10  you just referred to, debt service fund,
11  that is the sinking fund account or
12  something else?
13  MS. SPILLANE:  Objection to form.
14  MR. NATBONY:  Objection.
15  A.  So if you look at the indenture,
16  it specifically outlines the different
17  trust accounts there are.  And the debt
18  service fund is where all the cash flows to
19  pay debt service on the bonds when due.
20  Q.  Okay.
21  A.  That's how I understand it.
22  Q.  And so it hasn't come into your
23  analysis whether or not -- or what
24  collateral might have been subjected to a

Page 127

D. Brownstein - Professional Eyes Only

1  lien?
2  MS. SPILLANE:  Objection to form.
3  MR. HAMERMAN:  Objection to form.
4  A.  No.
5  Q.  Have you ever you finalized the
6  securitization cash flow?
7  MS. SPILLANE:  Objection to form.
8  MR. MASHBERG:  Objection to form.
9  A.  The only portion of the
10  transaction from our perspective that isn't
11  finalized is what will be the charge
12  necessary to cover the total debt service
13  which depends on when the Commonwealth and
14  PREPA put in place charges that will be
15  paid by the customer base.
16  Q.  Okay.
17  A.  If you look at the RSA, the
18  expectation is there would be a one cent
19  charge going into effect in July of 2019
20  that would be a credit against interest
21  due.  And the longer we wait to put that in
22  place, the higher we're accruing on that
23  effectively and have to pay it.
24  Q.  Okay.

Page 128

D. Brownstein - Professional Eyes Only

1  A.  Right?
2  So that is the only portion that
3  is an unknown.
4  Q.  Okay.  I'll get back to that.
5  So if that is the only unknown,
6  would it be fair to say that the load that
7  was used from the 2018 fiscal plan is the
8  load that will be used in finalizing any
9  cash flow for the securitization?
10  A.  As I said, everything else I
11  believe is in place and finalized.
12  Q.  So you mentioned that one cent
13  charge.
14  Is it your understanding that
15  that was supposed to be or intended to be
16  in effect prior to this date?
17  MR. NATBONY:  Objection as to
18  form.
19  MS. SPILLANE:  Objection.
20  A.  I believe so.  I mean, we'd have
21  to look at the RSA, but I believe it's in
22  there with a specific date.
23  Q.  Do you have an understanding of
24  when it might be?

Page 129

D. Brownstein - Professional Eyes Only

1  A.  I don't.
2  Q.  Can you tie it to anything in
3  this process, a 9019 hearing, confirmation,
4  plan of adjustment?
5  A.  Can I tie it how?  What do you
6  mean by that?
7  Q.  In other words, you might not
8  have a date.  You might not be able to tell
9  me December 3rd, 2021, but you might be
10  able to say it would be around the same
11  time as this other event even if you don't
12  know what that date will be.
13  A.  It was expected to be July 2019.
14  There is no other date.  That is the date.
15  Q.  So that one cent per
16  kilowatt-hour, is that expected -- is that
17  accruing interest?
18  A.  No.  It was a reduction against
19  the interest we owe on the bonds between
20  now and settlement.
21  Q.  Now when this is implemented --
22  let me rephrase it.
23  If this one cent reduction is
24  implemented, upon the first payment, would

Page 142

D. Brownstein - Professional Eyes Only
1   
2        MR. ARRASTIA:  It starts "Certain
3   covenants," and the subsection I'd like
4   Mr. Brownstein to focus on in his
5   responses, IB5.
6        A.   Which is "Imposed charges, taxes,
7   or other fees."
8        Q.   Correct.
9        (Document review.)
10       A.   Okay.
11       Q.   So let me go back to what I
12  believe was my question, which is:  And
13  what is your understanding of the permitted
14  indebtedness under the RSA?
15       MR. HAMERMAN:  Objection.
16       MS. SPILLANE:  Objection.
17       A.   So the first and most important
18  thing for everybody to understand is this
19  relates specifically to pre-park party
20  securitization bonds.  It does not mean
21  that under other means we can issue
22  additional debt.
23       Having said that, the purpose of
24  this was to give us the flexibility to
25  issue additional bonds for a couple of very

Page 143

D. Brownstein - Professional Eyes Only
1   
2   important purposes.
3        One, to cover any pension
4   liabilities.
5        Two, to cover expenses necessary
6   for operations.  So that would include, as
7   an example, reserves that the
8   concessionaire would require that we
9   maintain for operations and potentially for
10  capital requirements.
11       I don't know if that fully
12  answers your question or if there is more
13  to your question.
14       Q.   If that is your understanding,
15  then you have fully answered my question.
16       A.   Then I fully answered your
17  question.
18       Q.   Okay.  Let me follow up.  You
19  said that there are other means.
20       A.   Yes.
21       Q.   What are the other means other
22  than imposing charges, taxes, or other fees
23  on electricity?
24       A.   We could issue revenue bonds
25  potentially as a means to generate cash

Page 144

D. Brownstein - Professional Eyes Only
1   
2   flow.  So we clearly would want to make
3   sure those were structured in a way that
4   wouldn't interfere with our ability to
5   bring in a concessionaire, which is one of
6   the reasons we weren't comfortable with the
7   original RSA because of the mirror bonds
8   the insurers had, but there are ways to
9   accomplish that.
10       So what you need to keep in mind
11  is any debt we issue requires that we
12  charge the customer base.  So it's more
13  important that we find mechanisms to borrow
14  money at the lowest cost of capital
15  possible and that they're structured in a
16  way where we protect the consumer against
17  rate increases as a result of utilization,
18  which I've probably said 50 times today.
19       Q.   So revenue bonds -- your
20  understanding is that revenue bonds are not
21  encompassed by this provision No. 4 that
22  we're looking at?
23       A.   I believe that's case, yes.
24       Q.   Where did you get that belief?
25       MS. SPILLANE:  Objection to the

Page 145

D. Brownstein - Professional Eyes Only
1   
2   extent that it bears on the advice of
3   counsel.
4        A.   So I'd need to withhold any
5   dialogue.
6        Q.   Okay.  Did you negotiate this
7   provision?
8        A.   I was in the room when we
9   negotiated it, yes.
10       Q.   Who else was in the room?
11       A.   The attorneys representing the
12  government and the board.
13       Q.   Okay.  This is what I would like
14  you to help me to understand, if you can.
15       It says basically "prescribes
16  authorizing debt secured by restructuring
17  property or any other rights or interest in
18  electric rates or charges other than
19  secured obligations, transition charge
20  provided for in the RSA."
21       Can you explain to me how PREPA
22  could hope to issue revenue bonds or
23  obligate itself in some other way to get
24  capital that doesn't fall into that
25  provision?

Page 146

D. Brownstein - Professional Eyes Only

1
2     A.  I think that's --
3         MS. SPILLANE:  Objection to form.
4     A.  -- a question not for me.  I'm
5  not a lawyer.
6     Q.  Well, do you have an
7  understanding?
8     A.  I think it's a question not for
9  me as to how you accomplish it.  You're
10 asking a legal conclusion --
11    Q.  No, I'm not.
12    A.  -- and I'm not going to provide
13 one.  I don't -- I'm not in that business.
14    Q.  And that's why I'm not asking
15 one, sir.
16        I'm just asking, do you have a
17 view?
18    A.  I believe from my discussions
19 with -- so, no, I'm not prepared to respond
20 to your question.
21    Q.  Okay.  So in your experience
22 working in this field, you have no
23 viewpoint as to how revenue bonds or
24 another obligation can be incurred that
25 isn't prohibited by this?

Page 147

D. Brownstein - Professional Eyes Only

1
2         MR. HAMERMAN:  Objection to form.
3         MS. SPILLANE:  Objection to form.
4     A.  That would be based on my
5  discussions with counsel, so I'm not going
6  to respond.
7     Q.  Okay.  Are you aware of any
8  provision in the RSA that allows PREPA to
9  impose additional charges or issue
10 additional debt to repay other legacy
11 obligations without bondholder consent?
12        MR. HAMERMAN:  Objection.
13        MR. MASHBERG:  Objection to form.
14    A.  Again, I would suggest to you
15 that those are discussions that I'm not in
16 a position to discuss with you.
17    Q.  Okay.  Are you aware of anything
18 in the RSA that talks about -- that just
19 uses the words additional charges or
20 additional debt to repay legacy
21 obligations?
22        MS. SPILLANE:  Objection to form.
23        MR. NATBONY:  Objection.
24        MR. MASHBERG:  Object to the
25 form.

Page 148

D. Brownstein - Professional Eyes Only

1
2     A.  I believe what you're asking, if
3  I can put this into my words for a moment,
4  is, is there mechanism here under which we
5  can provide funding for the UCC.
6     Q.  Among other things, that is a
7  subset of the question.
8     A.  And based on discussions with
9  counsel, I believe there is.
10    Q.  Okay.
11    A.  Okay?  But that's as far as I
12 will go today.
13    Q.  Would it be fair to say that you
14 still believe -- that you believe that
15 after the execution of the RSA, there would
16 still be value in PREPA sufficient to pay
17 creditors other than the supporting
18 bondholders?
19        MS. SPILLANE:  Objection to form.
20        MR. HAMERMAN:  Objection to form.
21        MR. NATBONY:  Objection to form.
22        MR. MASHBERG:  Same.
23    A.  I believe there is always a
24 roadmap available to accomplish goals if
25 you want to accomplish them.  That's why we

Page 149

D. Brownstein - Professional Eyes Only

1
2  have this RSA with bond creditors on PREPA.
3     Q.  I'm sorry, I don't understand.
4         Do you mean to say that this RSA
5  reflects the fact that -- or your belief
6  that -- what?  I'm sorry.  I'm confused.  I
7  don't understand.
8     A.  That's okay.  Let me say it, try
9  and say it a little better for you.
10    Q.  How about different?  I'm not
11 going to categorize that.
12    A.  What I am saying is that this RSA
13 is very complicated and was clearly very
14 difficult to negotiate.  If we could
15 accomplish this when we wanted to, we can
16 clearly accomplish a roadmap to settlements
17 with other creditors if we choose to.
18    Q.  Okay.  Do you know if the FOMB
19 has chosen to do that?
20        MS. SPILLANE:  Objection to form.
21        MR. MASHBERG:  Objection.
22        To the extent that your answer
23 would implicate any communications with
24 lawyers or the FOMB, I would ask that
25 your counsel direct you not to answer

Page 150

1  D. Brownstein - Professional Eyes Only
2  the question.
3      MS. SPILLANE:  Do you have an
4  answer based on things other than
5  legal --
6      MR. ARRASTIA:  Well, I just asked
7  if.  I didn't ask him the substance.
8      A.  Well, unfortunately, all of my
9  dialogue would involve both the board and
10 Proskauer; so I think for now, I need to
11 not answer that.
12     Q.  Do you know if the RSA that you
13 negotiated requires bondholder consent to
14 reach a settlement with other creditors?
15     MS. SPILLANE:  Objection to form.
16     MR. NATBONY:  Objection.
17     MR. HAMERMAN:  Objection.
18     A.  Under circumstances, yes.  Under
19 others, no.
20     Q.  Okay.  What circumstances yes?
21     MR. HAMERMAN:  Same objection.
22     MR. NATBONY:  Same.  Calls for a
23 legal conclusion.
24     A.  Yeah, as I said earlier, I mean,
25 your line of questioning continues to be

Page 151

1  D. Brownstein - Professional Eyes Only
2  based on my dialogue with counsel.  And,
3  therefore, I'm going to have to decline to
4  give you a response right now.
5      Q.  I'm asking you what's in a
6  document that's public that you negotiated.
7  I'm asking you if you think it's in this
8  document.
9      A.  I believe it is.  And, again,
10 that is based on dialogue with counsel.  So
11 I'm going to have to leave it there.
12     Q.  Okay.
13     A.  Okay?
14     Q.  Have you read something in this
15 document that indicates to you that you
16 need shareholder consent to reach a
17 settlement with other creditors?
18     MS. SPILLANE:  Objection to form.
19     MR. MASHBERG:  Objection to form.
20     MR. HAMERMAN:  Objection.
21     MR. NATBONY:  Objection.
22     A.  What I understand is that the
23 fuel line lenders' counsel believes we do.
24     Q.  Does anyone else, that you know?
25     MR. HAMERMAN:  Same objection.

Page 152

1  D. Brownstein - Professional Eyes Only
2      MS. SPILLANE:  Objection.
3      MR. MASHBERG:  Same objection.
4      A.  I will answer the way I answered
5  it a moment ago because I think that's the
6  best answer I can give to be helpful.
7      I believe that to the extent we
8  want to solve a problem, we can accomplish
9  that goal.
10     MR. ARRASTIA:  Why don't we take
11 a quick break.  Let me look through my
12 notes, please.
13     THE VIDEOGRAPHER:  The time is
14 1:41 p.m.  We are off the record.
15     (Recess is taken.)
16     THE VIDEOGRAPHER:  The time is
17 2:03 p.m.  We are back on the record.
18 BY MR. ARRASTIA:
19     Q.  Let me go back and clear up a
20 couple of things where I wasn't certain.
21     You had talked a little bit about
22 RSA bonds that were currently trading at a
23 discount to par.
24     Do you recall that?
25     A.  Yes.

Page 153

1  D. Brownstein - Professional Eyes Only
2      Q.  All right.  Is that discount to
3  par, do you know if that's related -- or
4  let me put it this way:  Do you know if
5  those bonds bear the risk that the RSA
6  won't be approved and those bonds won't be
7  issued?
8      MS. SPILLANE:  Objection to form.
9      MR. HAMERMAN:  Objection.
10     A.  There are loads of components as
11 to why their value is less than par, and
12 that clearly has a role in it as well.
13     Q.  Okay.
14     A.  The bigger role is that as a
15 credit, there is a limited number of buyers
16 who can buy it from the current owners
17 because of the structure.
18     Q.  Okay.  If those -- if the RSA is
19 approved and those bonds are issued, will
20 the pool of potential buyers grow?
21     A.  No.  Unfortunately, it's about
22 credit, not about legals.
23     Q.  Have you evaluated how much of a,
24 of the factor, the fact that the RSA might
25 not be approved and the bonds issued, have

Page 154

1  D. Brownstein - Professional Eyes Only
2  you analyzed how much of a factor that is
3  in the trading value?
4  　　　MS. SPILLANE:  Objection to form.
5  A.  I'm an investment banker.  I'm
6  not a trader, okay?
7  Q.  So from that, I take it that you
8  haven't done that analysis?  It's not in
9  your bailiwick?
10  A.  Correct.
11  　　　I think it would be more in the
12  bailiwick of an AlixPartners to do for you.
13  Q.  Okay.  And your projection is
14  that once these bonds are issued, that they
15  will, based on the 2018 load, they will
16  perform well?
17  　　　MS. SPILLANE:  Objection to form.
18  　　　MR. MASHBERG:  Objection to form.
19  　　　MR. HAMERMAN:  Objection.
20  A.  No.
21  Q.  Okay.  So why don't you think
22  that they will perform -- well, let me ask
23  you this:  These were 40-year maturity
24  bonds, correct?
25  A.  Yes.

Page 155

1  D. Brownstein - Professional Eyes Only
2  Q.  And you have calculated an
3  expectation that they will be paid off in
4  33 years?
5  A.  No, I have not done a calculation
6  that expectations are they will be paid in
7  33 years.
8  Q.  Okay.  And where did that
9  expectation come from?
10  A.  That is based on the fiscal
11  plan's numbers.  And using those numbers,
12  we structured to, based on the numbers,
13  have the bonds amortized within 33 years,
14  the Tranche A bonds.
15  Q.  Sorry, just to be clear, Tranche
16  A, right?
17  A.  Um-hmm.  That's what I said.
18  Q.  What you say and what I hear are
19  not always the same.  But thank you.
20  　　　Now when we talked about the
21  permitted indebtedness, you said that you
22  were in a room with counsel and -- when
23  some of the items were discussed.
24  　　　Which counsel are you referring
25  to?

Page 156

1  D. Brownstein - Professional Eyes Only
2  A.  Counsels to both AAFAF and the
3  board.
4  　　　So perhaps I can make this a
5  little easier and give you one of the
6  examples of how I believe we can issue debt
7  to cover other liabilities.
8  　　　And if you were to go to the back
9  of the RSA, which you've given us, and
10  let's go to 14, which is right before
11  Schedule I-A.  Let's see, so what does that
12  mean it is?  It would be way in the back --
13  　　　MS. SPILLANE:  Annex A?
14  　　　THE WITNESS:  Annex A.  Thank you
15  for finding that so quickly for me.
16  A.  Annex A, the Recovery Plan Term
17  Sheet.
18  　　　MR. LYNCH:  Where are we?
19  　　　THE WITNESS:  Annex A.  It's in
20  the back.  It's like 15 pages from the
21  end at most.
22  　　　MS. SPILLANE:  It's a chart form.
23  A.  It's a chart form.  This is
24  the --
25  Q.  Let me make sure we're on the

Page 157

1  D. Brownstein - Professional Eyes Only
2  same page.
3  A.  Sorry.
4  Q.  Is it this (indicating)?
5  A.  So it's Annex A to Recovery Plan
6  Term Sheet.
7  Q.  Right.
8  A.  And then please go to page 14.
9  You found it?
10  Q.  Yeah.  The next page is I-A-1.
11  A.  The next page is I-A-1, correct.
12  Q.  That helps.
13  　　　MR. LYNCH:  Thank you.
14  A.  Take a look at "Other Charges."
15  Q.  Okay.
16  　　　(Document review.)
17  A.  Did you find it?
18  Q.  Oh, no, I've got it.
19  A.  Okay.
20  Q.  Is there something else or is
21  that what you wanted to point out?
22  A.  No.  That's an example of, as I
23  have said, I believe there are mechanisms
24  we could use to finance legacy charges.
25  Q.  Okay.  Now so let me ask you

Page 158

D. Brownstein - Professional Eyes Only
1  D. Brownstein - Professional Eyes Only
2  this:  It says, "Subject to any
3  restrictions of the securitization trust
4  agreement."
5      A.  Um-hmm.
6      Q.  Is it your understanding that
7  that includes the Certain Covenants
8  position that we looked at starting on 1B4?
9  Or 1B4 doesn't apply to the provision you
10  just shared with us?
11      MS. SPILLANE:  Objection to the
12      extent it calls for a legal
13      conclusions.
14      MR. NATBONY:  Objection.
15      MR. HAMERMAN:  Objection.
16      A.  What I would do is suggest,
17  Counsel, that you all take a look at the
18  section and the others.  And, as I've said,
19  I believe there is a roadmap to doing what
20  we need to do to get to a successful
21  conclusion of PREPA so that we can help the
22  people of Puerto Rico with their recovery.
23      Q.  Okay.
24      A.  And in case you're not aware of
25  it, I'm one of those people, Counselor.

Page 159

1  D. Brownstein - Professional Eyes Only
2      Q.  I appreciate your suggestion.
3      I was just asking if it is your
4  understanding, your belief, that these
5  other charges, the section you shared with
6  us, is still applicable in light of the
7  certain covenants that we talked about on
8  I-B-4 and IB5?
9      MR. NATBONY:  Objection to form.
10      MS. SPILLANE:  Objection.  Calls
11      for a legal conclusion.
12      A.  And I continue to give you the
13  same answer I've given you.
14      Q.  You do not have an understanding?
15      MR. NATBONY:  Objection to form.
16      A.  I've given you the answer that
17  I've given you, which is I believe there's
18  a roadmap to accomplishing the goals that
19  we'd need to accomplish here.
20      Q.  And you're suggesting that this
21  is the roadmap?
22      A.  No, I'm suggesting --
23      MR. MASHBERG:  Objection.
24      Mischaracterizes.
25      MS. SPILLANE:  Objection to form.

Page 160

1  D. Brownstein - Professional Eyes Only
2      A.  -- it's one of many places where
3  we can utilize this document to accomplish
4  whatever goals we need to accomplish for
5  the benefit of PREPA and the people of
6  Puerto Rico.
7      Q.  All right.  Speaking of
8  creditors, are you currently engaged in any
9  conversations with other creditors other
10  than the bondholders as to this roadmap
11  that you discussed?
12      A.  No.
13      Q.  Is that because they refuse to
14  engage or some other reason?
15      MS. SPILLANE:  Objection to form.
16      MR. MASHBERG:  Objection to form.
17      A.  I believe the fuel line lenders
18  understand where the government parties are
19  today as it relates to PREPA.  And I
20  believe with respect to the UCC, we're
21  trying to determine what actually -- who
22  your clients are and what your claims are.
23      Q.  Thank you.
24      You mentioned government parties.
25  Let me talk to you a little bit about

Page 161

1  D. Brownstein - Professional Eyes Only
2  government.
3      I had asked you and you had
4  shared with me that you didn't know when
5  government approval might be forthcoming,
6  but I failed to ask you, do you know if --
7      A.  Government approval of what?  I'm
8  sorry.  I know you asked --
9      Q.  I'm sorry.  Of the RSA.
10      A.  Government approval of the RSA?
11      MS. SPILLANE:  Legislative
12      approval?
13      A.  They've approved it.
14      You meant legislation.
15      Q.  Legislation.  I'm sorry.  We're
16  using different terms as to government.  I
17  mean the legislature.
18      I asked you and you told you
19  didn't know when the legislature might?
20      A.  Correct.
21      Q.  Do you know if it will approve
22  it?
23      MR. MASHBERG:  Objection to form.
24      A.  I'm not on the legislature, so I
25  wouldn't know.

Page 350

D. Brownstein - Professional Eyes Only
that?
A.  Um-hmm.
Q.  Okay.  Did the government parties
have a goal of advancing the interests of
PREPA's creditors in connection with the
RSA?
MS. SPILLANE:  Objection to form.
A.  I don't understand your question.
MR. NATBONY:  Objection as to
form.
A.  PREPA is in bankruptcy.  Our goal
is to make sure we utilize that to create
the most beneficial restructuring that we
can given our very difficult requirements,
including the cap charge, the duration
before execution will occur of the plan of
adjustment, and the other provisions of the
RSA, such as no acceleration rates.
Q.  Under the RSA, if it's approved
and PREPA somehow generates significant
unexpected revenue or savings before a plan
is confirmed, the benefit of those revenues
or savings would go to ratepayers, right?
MR. NATBONY:  Objection.

Page 351

D. Brownstein - Professional Eyes Only
MS. SPILLANE:  Objection to form.
MR. HAMERMAN:  Objection to form.
MR. MASHBERG:  Objection to form.
A.  I'm sorry, I don't -- I believe
what you asked is in the event prior to the
plan being confirmed there are additional
revenues available at PREPA above the
required interest under the RSA that goes
to the RSA participants, that that money
would flow back to the ratepayers.
If that's what you're asking, I
don't know where it would flow, but if
there was excess after what's required
under the RSA to be paid to the
bondholders, I believe that money would be
the property of PREPA.
Q.  Did you have a chance to read
those forbearance agreements that I showed
you before we broke at one point?
A.  No.
Q.  Do you understand -- without
looking at them, because I don't want to
take the time, but are you able to answer
this question without looking at it?

Page 352

D. Brownstein - Professional Eyes Only
Would you understand a
forbearance of Citi on its fuel line loan
to amount in effect to a re-lending of the
amounts due under the Citi fuel line loan?
MR. MASHBERG:  Objection to form.
MS. SPILLANE:  Objection to form.
MR. NATBONY:  Objection.
MR. HAMERMAN:  Objection.
A.  Well, first of all, I haven't
looked at it.  But, again, if your question
is about re-lending, let's make sure you
understand what happened with the
bondholders.
Q.  Sure.
A.  As I understand it from PREPA's
adviser at the time, Lisa Donahue, that the
concern was that in the event PREPA
defaulted on its bonds, they would not be
able to purchase fuel.  It wasn't a
function of whether they would have money
to purchase it or not.  What I understood
was that the fuel sellers would walk away.
So this was a matter of keeping
the lights on in Puerto Rico.  And so what

Page 353

D. Brownstein - Professional Eyes Only
happened was PREPA used cash it had to pay
bondholders their P&I other than the
signatories to the RSA, which included
Assured, National, Syncora and the ad hoc
group.  So each of them agreed to lend
PREPA money so that they had sufficient
money to pay debt service on their bonds.
What I don't know is whether, but
I don't believe so, that the fuel line
loans were in the same position.  But those
are questions for Lisa Donahue, not me.
Q.  Okay.  Let me direct your
attention to paragraph 36 of your
declaration.
A.  Um-hmm.
Q.  It says -- I'll wait until you
have it.
A.  Yes.
Q.  It says there, "In negotiating
the terms of the RSA, it was also necessary
to compensate supporting holders in
consideration of their prepetition
re-lending bonds that remain outstanding
and forbearance from exercising any rights

Page 354

D. Brownstein - Professional Eyes Only

1  or remedies or seeking stay relief to do so
2  pending implementation of the RSA."
3
4        It goes on from there.
5        A.   Um-hmm.
6        Q.   What I'd like to know is why was
7  it necessary, in your view, to compensate
8  them for that?
9        A.   Because what Lisa had agreed to
10  with the fuel line -- I mean with the
11  bondholders was that she would pay them
12  back at par on those loans, plus accrued,
13  very quickly after those loans were made
14  and that the purpose was, again, to keep
15  the lights on in Puerto Rico.
16        So we were honoring the deal that
17  the restructuring officer of PREPA had
18  agreed to with the fuel line lenders -- I
19  mean with the bondholders.
20        Q.   Was it legally necessary in your
21  view to compensate the re-lenders the way
22  that PREPA has done under the RSA?
23        MS. SPILLANE:  Objection.  Calls
24  for a legal conclusion.
25        MR. NATBONY:  Objection to form.

Page 355

D. Brownstein - Professional Eyes Only

1
2        A.   I can't answer that question.  I
3  don't know.  But what I'm telling you is
4  that that was the business deal the
5  restructuring officer of PREPA agreed to
6  with the bondholders to make sure the
7  lights remained on in Puerto Rico, and we
8  didn't want to be the party that dishonored
9  that agreement to dishonor the agreement
10  that she had struck.
11        Q.   Are you aware of Citi selling its
12  fuel line loan?
13        A.   I know that Citi has sold its
14  fuel line loan, yes.
15        Q.   Were you involved in the process
16  that led to the sale of that loan?
17        A.   No.  That would have been done by
18  an organization in Citi called IRM, which
19  is our restructuring arm, which works
20  independent from any other any other arm at
21  Citi.  So they would not have engaged us in
22  that dialogue.
23        Q.   Why don't I ask -- you were
24  talking about IRM and whether --
25        A.   IRM would have done the sale of

Page 356

D. Brownstein - Professional Eyes Only

1
2  that asset through third parties, never
3  through our organization, through lawyers
4  who are not part of our organization, and
5  therefore we would have no role or dialogue
6  on that topic.
7        Q.   And just so I'm clear, would they
8  also be the ones to decide whether it was
9  desirable for Citi to sell the fuel line
10  loan?
11        A.   Correct.
12        Q.   Okay.  And you had no involvement
13  in the decision, regardless how it was
14  executed, to sell the Citi fuel line loan
15  is that --
16        A.   Well, again, they have their own
17  counsel.  They do their own analysis as to
18  credit risk and make a determination as to
19  whether to sell with outside counsel and
20  inside counsel of their choosing, who has
21  no tentacles to the business side of Citi.
22        Q.   Okay.  Please --
23        A.   That's how banks work.
24        Q.   Please turn to paragraph 25.
25        A.   Of what document?

Page 357

D. Brownstein - Professional Eyes Only

1
2        Q.   Of your declaration.
3        And just generally, you describe
4  in paragraphs 25 through 29 what you say
5  were the objectives of the government
6  parties in connection with the, the
7  negotiation with the RSA; is that fair?
8        A.   Um-hmm.  Yes.
9        Q.   When were those objectives
10  decided upon?
11        A.   At the time that the board first
12  engaged with the signatories to the RSA.
13        Q.   How was -- how was it
14  communicated -- how were those objectives
15  communicated to you?
16        A.   By the board in a meeting as we
17  prepared our proposal together to the RSA
18  signatories, the original RSA signatories,
19  to request that they agree to certain
20  changes to the RSA in advance of the
21  board's vote on whether to approve the RSA
22  or not.
23        Q.   Are the objectives reflected in
24  any documents?
25        A.   I'm sorry, are the objectives?

Page 358

D. Brownstein - Professional Eyes Only

1   D. Brownstein - Professional Eyes Only
2       Q.   The objectives that are described
3   in paragraphs 25 through 29, is the
4   communication of those objectives reflected
5   in any documents?
6       A.   In the RSA itself.
7       Q.   I'm talking about from the
8   beginning of the negotiation of the RSA.
9       A.   Yes.  We submitted a presentation
10  to all of the creditors, including your
11  clients, with changes that we proposed in
12  order to proceed with the original RSA.
13          Do you not have that?
14      Q.   I very well may.
15      A.   Okay.
16      Q.   Do you agree that bondholders
17  before -- while the fuel lines were being
18  paid, do you agree that bondholders derived
19  a benefit from PREPA being able to buy
20  fuel?
21          MS. SPILLANE:  Objection to form.
22          MR. MASHBERG:  Objection to form.
23      A.   No.
24      Q.   You were talking before about how
25  PREPA would go dark if it couldn't buy

Page 359

1   D. Brownstein - Professional Eyes Only
2   fuel, right?
3       A.   Yes.
4       Q.   Did the provision of the fuel
5   line credit benefit PREPA by permitting
6   PREPA to buy fuel?
7       A.   No.
8       Q.   Why not?
9       A.   Because that's not what its
10  purpose was.  It was a timing drag of 90
11  days, right?
12          It was all about a cash flow
13  need.  It wasn't about actually paying into
14  a default to make sure that the lights
15  didn't go off.  It's very different.
16      Q.   Let's go to paragraph 29 of your
17  declaration.
18          (Witness complies.)
19      Q.   And this is a paragraph that
20  talks about the transformation of PREPA,
21  correct?
22      A.   Correct.
23      Q.   And I'll start with the second
24  sentence.  It says, "This goal ran in
25  tandem with the other goals to reduce the

Page 360

1   D. Brownstein - Professional Eyes Only
2   overall financial burden and risk on PREPA
3   and its ratepayers but added an additional
4   key component to any agreement that would
5   be reached to avoid disruption to the
6   transformation bid process.  Supporting
7   holders would have to stay patiently on the
8   sidelines and wait to the effective date of
9   a confirmed plan of adjustment before
10  receiving the new securitization bonds."
11          Do you see that?
12      A.   Um-hmm.
13      Q.   Why do they needed to stay
14  patient eventually on the sidelines, the
15  supporting holders?
16      A.   Because there is no way to
17  consummate the issuance of debt for them
18  without the plan of adjustment.  And the
19  plan of adjustment would not go to court
20  until we had the operator or concessionaire
21  on board and could, as I said earlier
22  today, make sure that we were protecting
23  them against liability for prior actions at
24  PREPA.
25      Q.   And why can't that happen after

Page 361

1   D. Brownstein - Professional Eyes Only
2   confirmation?
3       A.   Because it's only through that
4   court that we can provide them those
5   protections.
6       Q.   Can you help me understand that?
7       A.   I'm not a lawyer, so I think that
8   I would recommend you speak to lawyers
9   about the reasons behind that.
10      Q.   What liabilities would a
11  transformation partner be concerned about
12  succeeding to if it were -- if it were not
13  involved in the -- you know, in the plan
14  confirmation --
15          MS. SPILLANE:  Objection to form.
16  BY MR. LYNCH:
17      Q.   -- if a bid process were to
18  happen after the plan confirmation?
19          MR. MASHBERG:  Objection to form.
20      A.   I'm sorry, if I take over a
21  company and that company has liabilities
22  that spring up that were prior liabilities
23  after the day I acquired the company, I
24  still have liabilities for it.
25      Q.   What prior liabilities would --