**EXHIBIT 11**

# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 17-2079

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO AS REPRESENTATIVE OF PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA),

*Debtor.*

---

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT OF PUERTO RICO, SAN JUAN

## BRIEF FOR DEBTOR-APPELLEE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO AS REPRESENTATIVE OF PUERTO RICO ELECTRIC POWER AUTHORITY

MARTIN J. BIENENSTOCK
STEPHEN L. RATNER
TIMOTHY W. MUNGOVAN
MARK D. HARRIS
CHANTEL L. FEBUS
PROSKAUER ROSE LLP
*Attorneys for Debtor-Appellee Financial
Oversight and Management Board for
Puerto Rico as representative of Puerto
Rico Electric Power Authority*
11 Times Square
New York, New York 10036
(212) 969-3000

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO AS REPRESENTATIVE OF PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA),

*Debtor-Appellee,*

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD; PUERTO RICO
FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

*Objectors-Appellees,*

– against –

AD HOC GROUP OF PREPA BONDHOLDERS; ASSURED GUARANTY
CORPORATION; ASSURED GUARANTY MUNICIPAL CORPORATION;
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; SYNCORA
GUARANTEE, INC.,

*Movants-Appellants.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................8

STATEMENT OF THE CASE AND FACTS .........................................8

   I.     PREPA and the PREPA Bonds ................................................8

   II.    PREPA's Fiscal Crisis ...........................................................11

   III.   PROMESA ...........................................................................14

   IV.   Procedural History ..............................................................15

SUMMARY OF ARGUMENT ..............................................................17

STANDARD OF REVIEW ....................................................................19

ARGUMENT .........................................................................................20

   I.     THE BONDHOLDERS HAVE NO COLLATERAL ENTITLED
        TO ADEQUATE PROTECTION. .........................................20

        A.    The PREPA Bondholders Alleged No Value Of Their
             Security Interest. ......................................................22

        B.    The Bondholders Do Not Have A Property Interest In Their
             Contract Promises For Rate Hikes And A Receivership
             Remedy Under The Trust Agreement. ......................25

   II.    THE DISTRICT COURT CORRECTLY HELD PROMESA §
       305, ON THE INSTANT FACTS, PREVENTED IT FROM
       LIFTING THE STAY TO ALLOW THE BONDHOLDERS TO
       SEEK A RECEIVER ..........................................................30

        A.    The District Court Correctly Held The Stay Relief
             Requested By The Bondholders Is Prohibited By § 305. .............32

            1.    The plain language of § 305 precludes the specific
                relief requested by the PREPA bondholders. ....................32

            2.    The appointment of a receiver is expressly barred by
                § 105(b) on the facts here, and the relief sought
                would undermine the broader statutory scheme. ................38

            3.    The relief requested is inconsistent with § 306's grant
                of exclusive jurisdiction and would imperil the

i

PREPA Title III case and all other pending Title III cases. ..................................................................40

    4.    The bondholders trivialize a Title III court's exclusive jurisdiction. ...........................................42

  B.    The PREPA Bondholders' Interpretation Of §§ 305 And 362(d)(1) Cannot Be Reconciled With PROMESA. ...................45

III.    THE *SONNAX* FACTORS WEIGH IN FAVOR OF DENYING THE BONDHOLDERS RELIEF FROM THE STAY FOR CAUSE. ..................................................................47

IV.    REMAND FOR AN EVIDENTIARY HEARING IS UNWARRANTED. ..............................................................50

CONCLUSION ..........................................................................54

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989)...................................................................51

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006)...................................................................................34

*Bartel v. Walsh*,
    404 B.R. 584 (1st Cir. Bankr. App. Panel 2009)....................................44

*Butner v. United States*,
    440 U.S. 48 (1979).....................................................................................26

*Cont'l Ill. Nat'l Bank & Tr. Co. v. Chi., Rock Island & Pac. Ry.*,
    294 U.S. 648 (1935)..................................................................31, 37,  38

*Dimino v. Sec'y of Commonwealth*,
    695 N.E.2d 659 (Mass. 1998) ...................................................................29

*Duquesne Light Co. v. Barasch*,
    488 U.S. 299 (1989)...................................................................................29

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009)...................................................................................34

*In re 620 Church St. Bldg. Corp.*,
    299 U.S. 24 (1936).....................................................................................23

*In re Addison Cmty. Hosp. Auth.*,
    175 B.R. 646 (Bankr. E.D. Mich. 1994)..................................................35

*In re City of Detroit, Mich.*,
    841 F.3d 684 (6th Cir. 2016) ....................................................... 34-35

*In re City of Stockton*,
    478 B.R. 8 (Bankr. E.D. Cal. 2012)....................................35, 36, 37

iii

*In re Cont'l Airlines, Inc.*,
154 B.R. 176 (Bankr. D. Del. 1993) ............................................................22, 23

*In re Cty. of Orange*,
179 B.R. 185 (Bankr. C.D. Cal. 1995) ............................................................36

*In re Dulgerian*,
No. 06-10203, 2008 WL 220523
(Bankr. E.D. Pa. Jan. 25, 2008) ............................................................23

*In re Elmore*,
94 B.R. 670 (Bankr. C.D. Cal. 1988) ............................................................28

*In re Jefferson Cty., Ala.*,
474 B.R. 228 (Bankr. N.D. Ala. 2012) ........................................................41, 43

*In re Jefferson Cty., Ala.*,
484 B.R. 427 (Bankr. N.D. Ala. 2012) ............................................................22

*In re Jefferson Cty., Ala.*,
491 B.R. 277 (Bankr. N.D. Ala. 2013) ............................................................21

*In re Levitt & Sons, LLC*,
384 B.R. 630 (Bankr. S.D. Fla. 2008) ........................................................ 23-24

*In re Lopez*,
492 B.R. 595 (Bankr. D.P.R. 2013) ............................................................21

*In re Marion St. P'ship*,
108 B.R. 218 (Bankr. D. Minn. 1989) ............................................................28

*In re McMullen*,
386 F.3d 320 (1st Cir. 2004) ............................................................21

*In re Mullen*,
172 B.R. 473 (Bankr. D. Mass. 1994) ........................................................22, 23

*In re Planned Sys., Inc.*,
78 B.R. 852 (Bankr. S.D. Ohio 1987) ........................................................23, 24

*In re Schweikart*,
154 B.R. 616 (Bankr. D.R.I. 1993) ............................................................43

*In re Smithfield Estates, Inc.*,
    48 B.R. 910 (Bankr. D.R.I. 1985).......................................................23

*In re Sonnax Indus., Inc.*,
    907 F.2d 1280 (2d Cir. 1990) ..........................................................47

*In re Sun Valley Ranches, Inc.*,
    38 B.R. 595 (Bankr. D. Idaho 1984)...................................................24

*In re Watman*,
    301 F.3d 3 (1st Cir. 2002)........................................................... 49-50

*In re Windsor Hotel, LLC*,
    295 B.R. 307 (Bankr. C.D. Ill. 2003) ...........................................23, 24

*Irving Tanning Co. v. Kaplan*,
    876 F.3d 384 (1st Cir. 2017)..........................................................49

*Jackson v. Fair*,
    846 F.2d 811 (1st Cir. 1988)..........................................................53

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935).................................................................27, 28

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
    814 F.2d 844 (1st Cir. 1987)..........................................................19

*Paolino v. JF Realty, LLC*,
    830 F.3d 8 (1st Cir. 2016)......................................................... 19-20

*Patterson v. Carey*,
    41 N.Y.2d 714 (1977) ..................................................................29

*Peaje Invs. LLC v. García-Padilla*,
    845 F.3d 505 (1st Cir. 2017)...............................................26, 29, 53

*Powell v. Nevada*,
    511 U.S. 79 (1994).....................................................................49

*Schubert v. Nissan Motor Corp. in U.S.A.*,
    148 F.3d 25 (1st Cir. 1998), *cert. denied*,
    137 S. Ct. 2093 (2017)................................................................20

*Suntrust Bank v. Den-Mark Constr., Inc.*,
    406 B.R. 683 (E.D.N.C. 2009) ....................................................................23, 24

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) .........................................................................................22

*United States v. Collazo-Castro*,
    660 F.3d 516 (1st Cir. 2011) ...........................................................................20

*Worcester v. Filene's Basement, Corp.*,
    No. 96-1940, 1997 WL 556060 (1st Cir. Sept. 5, 1997) ..................................52

*Wright v. Union Cent. Life Ins. Co.*,
    311 U.S. 273 (1940) .........................................................................................28

*Wright v. Vinton Branch of Mountain Tr. Bank*,
    300 U.S. 440 (1937) .........................................................................................27

**STATUTES**

19 L.P.R.A. §1702 ...................................................................................................26

19 L.P.R.A § 2212(a)(2) .........................................................................................26

19 L.P.R.A § 2219(a)(1) ....................................................................................25, 26

19 L.P.R.A. § 2233(b)(2) ........................................................................................26

19 L.P.R.A. § 2301 ..................................................................................................26

19 L.P.R.A. § 2367 ..................................................................................................26

22 L.P.R.A. § 191 .....................................................................................................8

22 L.P.R.A. § 207(a) ...............................................................................................10

22 L.P.R.A. § 207(b) ...............................................................................................10

11 U.S.C. § 105(b) .............................................................................................38, 50

11 U.S.C. § 333 .......................................................................................................47

11 U.S.C. § 351 .......................................................................................................47

11 U.S.C. § 361 ...................................................................................1, 18, 22, 28

11 U.S.C. § 362(a) ............................................................................................15

11 U.S.C. § 362(b)(1)........................................................................................44

11 U.S.C. § 362(d)(1) ...............................................................................passim

11 U.S.C. § 363 ................................................................................................34

11 U.S.C. § 364(c) ............................................................................................47

11 U.S.C. § 364(d) ......................................................................................24, 47

11 U.S.C. § 365 ................................................................................................47

11 U.S.C. § 510 ................................................................................................47

11 U.S.C. § 553 ................................................................................................47

11 U.S.C. §§ 555-562 .......................................................................................47

11 U.S.C. § 904 ...............................................................................34, 35, 36, 37

11 U.S.C. § 922 ................................................................................................48

11 U.S.C. § 927 ................................................................................................47

11 U.S.C. § 928 ................................................................................................48

11 U.S.C. § 1104 .............................................................................30, 39, 50

28 U.S.C. § 1334 ..............................................................................................43

42 U.S.C. § 1983 ..............................................................................................34

48 U.S.C. § 4 ....................................................................................................38

48 U.S.C. § 201 ................................................................................................22

48 U.S.C. § 202 ................................................................................................22

48 U.S.C. § 305 .......................................................................................passim

48 U.S.C. § 306 ...........................................................................................40, 43

48 U.S.C. § 312(a) ............................................................................6

48 U.S.C. § 362(d) .......................................................................21, 22

48 U.S.C. § 2101 ............................................................................14

48 U.S.C. § 2103 ............................................................................38

48 U.S.C. § 2121 ............................................................................42

48 U.S.C. § 2121(a) ....................................................................14, 39

48 U.S.C. § 2121(b) .........................................................................14

48 U.S.C. § 2121(d)(1)(E) ..................................................................14

48 U.S.C. § 2141 ............................................................................39

48 U.S.C. § 2142 ............................................................................39

48 U.S.C. § 2142(c) .........................................................................39

48 U.S.C. §§ 2161-77 .......................................................................14

48 U.S.C. § 2161(a) ....................................................................15, 38

48 U.S.C. § 2165 ....................................................................... 8, 32-33

48 U.S.C. § 2166(a) .........................................................................40

48 U.S.C. § 2166(b) ....................................................................14, 43

48 U.S.C. § 2171 ............................................................................47

48 U.S.C. § 2172 ............................................................................39

48 U.S.C. § 2173 ............................................................................39

48 U.S.C. § 2174(b)(7) ......................................................................39

48 U.S.C. § 2175(b) .........................................................................39

48 U.S.C. § 2194(n) .........................................................................48

48 U.S.C. § 2221(b)(1) ......................................................................14

48 U.S.C. § 2221(d)(1)(A) ...................................................................................14

**OTHER AUTHORITIES**

2A Norman J. Singer & Shambie Singer, Statutes and Statutory
  Construction § 46.5  (7th ed. 2014) .................................................................46

Fed. R. Civ. P. 52 ...............................................................................................49

H.R. Rep. No. 95-595 (1977),
  *reprinted in* 1978 U.S.C.C.A.N. 5963 ............................................................27

## **PRELIMINARY STATEMENT**

Sixteen days after the Puerto Rico Electric Power Authority ("PREPA") Title III case commenced, Appellants demanded specific stay relief. They wanted a receiver, appointed by another court and answerable to them, who would control all revenues (and have full management power under the receivership statute) and be obligated to request an electricity price hike sufficient to pay all their debt service (on $8.3 billion of bond debt).

Bankruptcy Code § 361 provides adequate protection to avoid diminution of collateral value. Appellants' collateral consists solely of PREPA's *net* revenues after expenses, and their motion admitted that for years, PREPA's collections "were inadequate to cover PREPA's costs." (Joint Appendix (hereinafter "A-__"), (A-143)). They blamed this deficiency on historic corruption, mismanagement, and the lack of price hikes. So even though their pledged net revenues were admittedly zero, Appellants contended they were entitled to stay relief to have a receiver appointed who would control PREPA—whose assets were unencumbered except for net revenues—and pursue rate increases to pay them in full. Accordingly, Appellants are not entitled to stay relief, as they have no collateral entitled to adequate protection.

Appellants do everything possible to avoid acknowledging that they are asking to create collateral value, not to protect collateral value that existed on

PREPA's petition date.  Appellants' lien is against PREPA's *net* revenues, and there were (and are) none.  Expenses exceeded revenues at the time of the hearing. (PREPA's financial situation following Hurricane Maria is even worse.  PREPA needed to borrow $300 million to finance its operating expenses and anticipates needing to borrow more in the near future.)  Neither their motion nor their declarations asserts their collateral was worth even $1 or any particular value.

Undeterred by the absence of net revenues, Appellants invented a new contention, namely that PREPA's covenant to seek increases of electricity rates was not a liability or obligation of PREPA, but rather was a piece of collateral entitled to adequate protection in the form of specific performance.  Similarly, Appellants contended their receivership remedy was collateral.  If PREPA's covenant to seek a rate hike was collateral and was entitled to specific performance to boot, then PREPA's promise to pay debt service must be collateral too.  Of course, collateral consists of assets owned by a debtor that are salable by the debtor.  Covenants, promises, and remedies are neither owned by the promisor nor salable by the promisor.  Covenants are obligations and liabilities, not assets.  And the Supreme Court has long ruled a receivership remedy is not what the Fifth Amendment protects.  For short, lenders often refer to all credit enhancements, such as covenants and guaranties, as security.  That does not mean they are collateral for adequate protection purposes.  Significantly, even if the covenant and

2

remedy were collateral, they will remain available until there is a plan of adjustment. They require no special adequate protection.

Appellants commence their brief by arguing in the abstract, without acknowledging their admission that net revenues were zero, that the District Court committed reversible error by ruling (a) PROMESA § 305 prohibits the District Court from terminating the automatic stay to allow bondholders to procure a receiver and (b) stay relief would be denied without an evidentiary hearing on whether the bondholders' collateral was adequately protected. The District Court did not, as Appellants claim, "read [the adequate protection] requirement out of the statute." (Appellants' Brief (hereinafter "Br."), at 4). What the District Court actually ruled was § 305 barred the specific relief Appellants demanded (which it referenced eight times in its decision), but even without § 305, the District Court would deny it. The District Court did not hold an evidentiary hearing because the parties' stipulation only requested one if the District Court's ruling depended on a disputed fact. The District Court reached its ruling without relying on any disputed fact.

The District Court denied the relief requested principally based on the statutory framework, especially § 305, but of course emphasized the near-term risk to Puerto Rico's recovery in the balancing of the hardships and independently denied relief based on its balancing of the equities. The relief would upend the

statutory framework. Turnover of PREPA to a creditors' receiver would oust the District Court of its exclusive jurisdiction over PREPA's property. In sum and substance, Appellants were contending PREPA was not entitled to reorganize under Title III and must be turned over to a creditors' receiver. The relief would undermine the exclusive right of the Financial Oversight and Management Board ("Oversight Board") to propose a plan of adjustment. It would circumvent the court's lack of power to appoint trustees and receivers. And it would interfere with the debtor's property, revenues, and governmental powers.

If appointed, a receiver would have powers and duties that would clearly require and allow it to interfere with PREPA. Appellants admitted the receiver would have a duty to pursue rate hikes to pay debt service in full. The District Court discussed additional powers a receiver would have, including (a) the power to exclude "the Authority, its Board, officers, agents, and employees," and (b) the power to "hold, use, operate, manage, and control the same . . . in the name of the Authority or otherwise, as the receiver may deem best . . . ." (Addendum (hereinafter "ADD-__"), ADD-6)). Although Appellants admitted they have no lien against tangible assets other than net revenues, and net revenues were zero, the receiver would manage all PREPA's assets and gross revenues. Adequate protection is to protect collateral value existing on the petition date, not value a creditor wants to create afterwards. Accordingly, Appellants were asking the

4

District Court to circumvent its lack of power to order the appointment of a trustee and to change the adequate protection requirement into a requirement to create collateral that did not exist on the petition date.

Additionally, the District Court chose—correctly—not to ignore the fact that although PREPA is a legal entity separate from the Commonwealth of Puerto Rico (the "Commonwealth") and all its instrumentalities, PREPA and the Commonwealth are nevertheless completely interdependent, and the relief requested by Appellants would have a devastating impact on the entire Commonwealth. The cost of energy is critical to the cost of living and doing business in Puerto Rico. The declaration of Mr. Andrew Wolfe, the Oversight Board's economist, explained his analysis that raising real electricity rates beyond 21.4 cents per kilowatt-hour prevents the Commonwealth from reversing its negative real economic growth of -1.5% per year and attaining the minimum real growth necessary to sustain it, +0.8% per year. But Appellants demand a receiver be appointed to raise rates so they might be paid in full. As out-migration continues and accelerates due to Hurricane Maria, the rate increases needed to ensure Appellants are paid in full will need to be higher and higher, because the increased revenue must be raised from selling fewer kilowatt-hours to the diminishing number of people and businesses left paying electric bills. To be sure, PREPA's promises to raise rates are Appellants' contractual rights outside Title III.

5

Just as sure, they are contractual rights subject to impairment (as Appellants' cited decisions corroborate) in Title III, especially to stop out-migration of residents and businesses and to attract new residents and businesses.  The District Court did not find Mr. Wolfe was right.   It simply acknowledged Mr. Wolfe's concern. Dismissing such a concern would be irresponsible.  Notably, Appellants proffered a supplemental declaration of Mr. HasBrouck (not an economist) who dismissed Mr. Wolfe's concern as "irrelevant" because the receiver would be mandated to request a rate hike from the Puerto Rico Energy Commission ("Energy Commission") required by law to set rates sufficient to pay all debt service. Without deciding whether HasBrouck or Wolfe was right, the District Court prudently determined not to ignore the risk Mr. Wolfe identified.    That was well in the zone of common sense, not an abuse of discretion.

Indeed, had the District Court granted the stay relief Appellants requested, the grant would have been an abuse of discretion.  PROMESA § 312(a) grants the Oversight Board the exclusive right to propose a plan of adjustment for PREPA.  If a receiver controlled the revenues and electricity rates, the Oversight Board could not propose the essential elements of any plan.  And if the receiver could procure rate increases, the Commonwealth's and PREPA's financial recovery could be obstructed.  Appellants dismiss concerns over the rate increases needed to pay their bonds in full by asserting any rate increases would be a few pennies per kilowatt-

hour. That is deceptive. When a few pennies per kilowatt-hour raise enough money to pay interest on $8.3 billion of bond debt, those few pennies per kilowatt-hour are costing consumers and businesses hundreds of millions of dollars per year.

In sum, the bondholders' case is premised on their desire to enforce the rate covenant to create collateral value. While it is a completely understandable economic desire, it is not on the instant facts, as a matter of law, a ground to turn over PREPA to a receiver answerable to bondholders who will request rate increases the Oversight Board believes will prevent Puerto Rico's recovery. Regardless of what the net revenues might have been, we respectfully submit no federal reorganization court should relinquish a municipal utility case to a creditors' receiver, especially when price hikes could thwart any recoveries. Additionally, since Congress would not allow the District Court to order the appointment of a trustee for gross mismanagement, it is hard to quarrel with the denial of stay relief on the ground of mismanagement to appoint a receiver who could manage PREPA's unencumbered assets. There is therefore no basis to overturn the District Court's decision, let alone in the infancy of PREPA's Title III case, when Appellants are seeking rate increases without regard to their impact on PREPA and the entire Commonwealth.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      When the bondholders were requesting adequate protection of a covenant to raise rates and a receivership remedy and had no net revenues as collateral, did the District Court correctly hold 48 U.S.C. § 2165 limited its power to allow a receiver to take over and manage PREPA's unencumbered assets and seek rate hikes that might thwart Puerto Rico's recovery?

2.      Did the District Court have discretion to hold that, even if it could grant the specific relief requested, cause did not exist under 11 U.S.C. § 362(d)(1) to lift the stay because the balance of harms weighed heavily against granting the relief?

3.      When the District Court's ruling did not rely on any disputed fact, did the District Court err by not holding an evidentiary hearing when the parties had agreed it should only be held if the District Court's ruling turned on a disputed fact?

## STATEMENT OF THE CASE AND FACTS

### I.      PREPA AND THE PREPA BONDS

PREPA is a government-owned corporation statutorily charged with the conservation, development, and utilization of the energy resources of the Commonwealth.  22 L.P.R.A. § 191.  PREPA generates, transmits, and distributes substantially all the electric power used in the Commonwealth.

8

PREPA has over $14 billion in debts, including approximately $8.3 billion in bonds issued under a Master Trust Agreement dated January 1, 1974 ("Trust Agreement"). (A-1513-1608). The bondholders assert they own or insure approximately $5.3 billion of the bonds. (Br. at 4).

As the District Court painstakingly set out (ADD-5), PREPA pledged the "revenues of the System . . . and other moneys *to the extent provided in this [Trust] Agreement* as security." (A-1530) (emphasis added). The Trust Agreement provides the revenues PREPA receives are placed into a "General Fund." (A-1564 at § 503). Before any bond payments can be made, revenues placed into the General Fund must be "used first for the payment of the Current Expenses of the System." (A-1565-66 at § 505). "Current Expenses" are expenditures "reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner" and include wages, fuel, and power purchases. (A-1663 at § 505; A-1680 at § 702). PREPA may also hold in reserve an aggregate amount of "not more than one-sixth (1/6) of the amount shown by the Annual Budget to be necessary . . . for the current fiscal year." (A-1566 at § 506). Neither the General Fund nor the reserve is subject to bondholder control.

After Current Expenses are paid and the reserve is funded, PREPA is required to transfer any remaining funds into the "Revenue Fund." (A-1566 at § 506). The Revenue Fund is also not controlled by the bondholders.

9

Only then, § 507 of the Trust Agreement requires amounts in the Revenue Fund to be transferred to a "Sinking Fund" for the benefit of the bondholders.  (A-1566-70 at § 507).   In contrast to the General Fund and Revenue Fund, moneys in the Sinking Fund are "Net Revenues" "subject to a lien . . . in favor of the holders of the bond[s]."  (A-1569 at § 507(h)).  Critically, no document in the record grants the PREPA Bond Trustee the ability to direct the use of PREPA's revenues in any account other than the Sinking Fund.  (A-1535).

PREPA covenanted it would charge "reasonable rates" for electricity service to cause its revenues to cover its current expenses plus 120% of upcoming debt payments (the "Rate Covenant").  (A-1563 at § 502).  The preamble to the Trust Agreement describes the Rate Covenant as a covenant that is secured by revenues and also refers to the Rate Covenant as security (but does not pledge the Rate Covenant, as it does the revenues).  (ADD-1625); *compare* ("in order to secure the performance and observance of all the covenants, agreements and conditions . . . the Authority . . . does hereby pledge to the Trustee the revenues of the System"); (ADD-1626) *with* ("it is mutually agreed and covenanted . . . for . . . security of all . . . holders of the bonds . . . as follows:"; what follows is all the sections of the Trust Agreement, including the Rate Covenant).

By statute, the bondholders have a right to seek a receiver in the event of a default.   22 L.P.R.A. §§ 207(a) (power to appoint receiver), (b) (powers of

receiver, including the power to exclude "the Authority, its Board, officers, agents, and employees," and to "hold, use, operate, manage, and control the same . . . in the name of the Authority or otherwise, as the receiver may deem best . . . .").

Several financing statements were filed with respect to the bonds; none identify either the Rate Covenant or a right to appoint a receiver as collateral. (A-1609-1714 (collectively, "Financing Statements")).

## II. PREPA'S FISCAL CRISIS

Over past decades, PREPA has faced serious financial and operational challenges. (*See* Puerto Rico Electric Power Authority Fiscal Plan, dated April 28, 2017 ("Fiscal Plan"), A-1425). Those challenges include: a prolonged recession; inadequate reinvestment leading to old, inefficient, and unreliable facilities and systems; a high dependence on expensive fuel; relatively high levels of electricity theft and losses; and a disorganized customer service infrastructure. (A-1425). PREPA also must operate an isolated system in a challenging terrain subject to natural disasters. (A-1426-27).

As a result of these challenges, PREPA's facilities and safety record have fallen significantly below industry standards. (A-1427-28). Over $4 billion in infrastructure improvements are required. (A-1425). Further, PREPA historically has suffered from above-industry-average outages. (A-1430). Moreover, PREPA

has historically had difficulty meeting its operating expenses and has been forced to use proceeds from bond issuances to cover operational shortfalls. (A-1431).

Accordingly, PREPA suffers from chronic underinvestment, unsafe and unreliable infrastructure, and unsustainable debt. Since 2014, PREPA has had no access to financing due to the severity of its fiscal situation. (A-1425). Currently, PREPA faces liabilities exceeding $14 billion, including $9 billion in financial debt. (A-1436).

PREPA's fiscal shortfall is stark. The Oversight Board's restructuring expert, Mr. Kevin Lavin, corroborated the absence of Net Revenues, which Appellants' motion already said were nonexistent. Mr. Lavin declared as of July 21, 2017, PREPA did not project any excess revenues after paying current expenses and expected its cash reserve to shrink in fiscal year 2018. (A-1389 at ¶¶ 10-12). Accordingly, even before the hurricanes, PREPA did not expect to have any Net Revenues with which to pay debt service for its 2018 fiscal year. (A-1389 at ¶¶ 11-12). PREPA's fiscal situation is more dire now, after Hurricanes Irma and Maria caused catastrophic damage. Two months ago, PREPA faced a severe liquidity crisis and the real prospect of having to cease operations. To avert this possibility, PREPA required an urgent loan of $300 million. Case No. 17-bk-4780, ECF No. 744. PREPA anticipates requiring additional loans within the next few months.

The Oversight Board also submitted a declaration by its expert, Mr. Andrew Wolfe, that explained the severity of the fiscal crises facing both PREPA and the Commonwealth and their complex interconnections. For the Commonwealth to achieve fiscal sustainability, it needs to achieve a minimum amount of real economic growth. (A-1397 at ¶ 10). Mr. Wolfe stated economic growth in the Commonwealth, which is critical to both PREPA's and the Commonwealth's financial recovery, is highly sensitive to electricity prices. (A-1397-98, 1408-13 at ¶¶ 11, 12, 48-59). Even before the severe impacts of Hurricanes Irma and Maria, increasing PREPA's rates above 21.4 cents per kilowatt-hour or at a pace disproportionate to that of other Caribbean countries would prevent the Commonwealth from achieving economic growth, ultimately reduce demand for electricity, and cause another debt service and liquidity crisis for PREPA. (A-1397-98, 1411-13 at ¶¶ 11, 12, 53-59). The bondholders' energy consultant, not an economist, filed a supplemental declaration asserting Mr. Wolfe's opinion was unsupported and irrelevant because the Energy Commission will set rates. (A-1822 at ¶ 7). That consultant, however, makes an important admission, namely that the impact on Puerto Rico's recovery is irrelevant because the Energy Commission is statutorily required to raise rates to cover debt service. (A-1822-23 at ¶ 9). He states "the Energy Commission found that the opinion was irrelevant,

since PREPA is legally bound to charge a rate for electricity sufficient to service PREPA's debt." (*Id.*).

## III. PROMESA

In 2016, Congress enacted PROMESA to address the urgent fiscal crisis facing Puerto Rico. 48 U.S.C. § 2101, *et seq.* The purpose of PROMESA is to "provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets." *Id.* § 2121(a). To this end, PROMESA created the Oversight Board and granted it expansive authority to, *inter alia*, reform governmental operations and the economy. *Id.* § 2121(b).

The Oversight Board is empowered, in its sole discretion, to designate any territorial instrumentality as a "covered territorial instrumentality" subject to PROMESA. *Id.* §§ 2221(b)(1), 2221(d)(1)(A). For any designated instrumentality, the Oversight Board may, in its sole discretion, require the Governor to develop a fiscal plan and a budget. *Id.* § 2121(d)(1)(E). The Oversight Board is also empowered to commence a restructuring, called a Title III case, in district court for any covered entity desiring to restructure. *Id.* §§ 2161-77.

PROMESA further provides the district court in a Title III case has "exclusive jurisdiction of all property, wherever located, of the debtor as of the commencement of the case." *Id.* § 2166(b).

14

In September 2016, the Oversight Board designated PREPA as a "covered territorial instrumentality," which subjects PREPA to the Oversight Board's control.  As required by PROMESA, on April 28, 2017, the Oversight Board certified a fiscal plan for PREPA.  The Fiscal Plan addresses PREPA's operational deficiencies and prescribes a pathway for long term sustainability; it is currently being revised to account for the consequences of Hurricane Maria.

## IV.   PROCEDURAL HISTORY

On July 2, 2017, a petition under Title III of PROMESA was filed on behalf of PREPA.  Pursuant to the automatic stay provision of the United States Code ("Bankruptcy Code") (incorporated into PROMESA by 48 U.S.C. § 2161(a)), the filing of the Title III case triggered the automatic stay of creditor actions against PREPA.  11 U.S.C. § 362(a).  The Oversight Board has also filed four other Title III cases on behalf of the Commonwealth and its instrumentalities, all of which would be affected if the bondholders' relief were granted.

On July 18, 2017, sixteen days after PREPA commenced its Title III case, the bondholders filed a motion seeking the relief described in the Preliminary Statement, along with declarations by Mr. Stephen Spencer, a financial advisor, and Mr. Derek HasBrouck, an energy and utility consultant.  Mr. Spencer's declaration describes the Governor's replacement of PREPA board members and negotiations regarding a restructuring support agreement the Oversight Board did

15

not approve. (A-212-18). Mr. HasBrouck's declaration alleges mismanagement at PREPA and sets forth the pre-hurricane rate increases needed to pay PREPA's debt in full. (A-436-52). His supplemental declaration states if PREPA's Net Revenues are in fact negative, then it must be mismanaged, and argues that Mr. Wolfe's concerns about rate hikes frustrating Puerto Rico's recovery are irrelevant because the Energy Commission is statutorily bound to set rates sufficient to pay all debt service. (A-1819-1825).

The Oversight Board filed an opposition to the motion and included the declarations of Mr. Wolfe and Mr. Lavin. The bondholders presented no evidence contradicting the critical fact that, as of the filing of the Title III petition, the bondholders' collateral had no value because PREPA did not have Net Revenues with which to pay debt service. (*See* A-212-18; A-436-52; A-1819-1825). Prior to the hearing on the motion, the Oversight Board and movants agreed no evidence would be presented at the hearing and that oral argument would focus on legal issues and undisputed facts. The parties further agreed if the District Court determined it was necessary to reach any disputed facts, an evidentiary hearing would be scheduled. (Supplemental Appendix (hereinafter "SA-__"), SA-4 at n.1).

The District Court denied the relief Appellants requested based on PROMESA § 305 and, independently, on a balancing of the equities. The District Court's ruling did not turn on any disputed fact. This appeal followed.

16

## SUMMARY OF ARGUMENT

The bondholders admitted they have no liens against tangible assets other than revenues, and they admitted revenues did not cover expenses for years. Their pleadings and declarations show a conspicuous absence of any assertion whatsoever that their purported collateral value was even $1. Yet when PREPA's Title III case was sixteen days old, they requested specific relief requiring the turnover of control of all of PREPA's unencumbered assets to a receiver who would seek rate hikes to pay them in full. Their consultant called "irrelevant" the Oversight Board's economist's concerns about thwarting Puerto Rico's recovery with rate hikes.

On this record, the District Court was clearly correct that PROMESA § 305 bars it from enabling the bondholders to take total control of, let alone interfere with, PREPA and all its unencumbered assets and to throw out PREPA's officers directors, and employees at the creditors' receiver's will.

To try to make it appear they are entitled to stay relief for lack of adequate protection of collateral value, the bondholders contend PREPA's Rate Covenant and the bondholders' receivership remedy are collateral. Neither is collateral by any yardstick. If they were collateral, then every debtor's promise to pay is collateral. Why would a covenant to raise prices be collateral if a promise to pay is not? There is no rationale. Bottom line, the bondholders cannot circumvent

17

PROMESA § 305 by chanting adequate protection. And even if the covenant and remedy were collateral, the outcome would not change. The covenant and remedy will always be available until a plan of adjustment is confirmed.

If the bondholders had collateral value as of PREPA's petition date, adequate protection would apply to the extent PREPA's use of the collateral caused value diminution pursuant to Bankruptcy Code § 361, and that would be virtually impossible to prove because PREPA must operate to retain the possibility of creating any positive Net Revenues in the future. But here, the bondholders' motion admits to "years of collections that were inadequate to cover PREPA's costs." (A-143). The bondholders never alleged any petition date value, instead focusing on covenants and remedies as collateral, which they are not. The District Court was clearly right that the receiver's control would obstruct the District Court's exclusive jurisdiction over PREPA's property. Moreover, PROMESA expressly prohibits the District Court from appointing a receiver, and under PROMESA, mismanagement cannot constitute cause to lift the stay to displace management and to control unencumbered assets when creditors admit there were no Net Revenues (their only collateral) for years. There is no provision in PROMESA for the appointment of a trustee for even gross mismanagement. Without collateral that has value, the bondholders are effectively unsecured for now. Moreover, the bondholders' receiver's loyalties would be to the bondholders.

The District Court therefore correctly concluded the bondholders' specific request was barred by § 305 as it would heavily interfere with PREPA's revenues and operations and is inconsistent with PROMESA's statutory scheme.

The District Court also correctly concluded the bondholders had not shown cause for granting relief from the stay based on the motion filed sixteen days after the Title III case commenced. The balance of harms weighed in favor of maintaining the stay as rate hikes could thwart all recovery, and PREPA's ability to confirm a plan would be severely jeopardized.

Remand for an evidentiary hearing is unwarranted. The District Court did not rely on any disputed fact.

## STANDARD OF REVIEW

The District Court's decision to deny the bondholders' motion to lift the stay should be reviewed for abuse of discretion. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 814 F.2d 844, 847 (1st Cir. 1987). The District Court applied a balancing test and found facts based on the uncontested record before it.[1] (ADD-4) (stating it "considered carefully all of the arguments and submissions made in connection with the motion"). The abuse-of-discretion standard is deferential and the court's decision should be affirmed so long as the circuit court

---

[1]   The bondholders claim they contested certain facts. (Br. at 18). However, aside from a conclusory footnote, (SA-4 at n.1), they did not (and could not) contest facts in the declarations submitted by the Oversight Board.

is not "left with a definite and firm conviction that the court below committed a clear error of judgment." *Paolino v. JF Realty, LLC*, 830 F.3d 8, 13 (1st Cir. 2016) (quoting *Schubert v. Nissan Motor Corp. in U.S.A.*, 148 F.3d 25, 30 (1st Cir. 1998), *cert. denied*, 137 S. Ct. 2093 (2017).

To the extent the District Court's decision regarding its authority under § 305 turns on statutory construction, it is a matter of law that should be reviewed *de novo*. *See United States v. Collazo-Castro*, 660 F.3d 516, 518 (1st Cir. 2011).

## <u>ARGUMENT</u>

## I.     THE BONDHOLDERS HAVE NO COLLATERAL ENTITLED TO ADEQUATE PROTECTION.

The bondholders argued that cause existed to lift the stay for lack of adequate protection.  But the bondholders never asserted their collateral, PREPA's Net Revenues, had any value nor were diminishing on account of the stay or PREPA's use.  Rather, they admitted to "years of collections that were inadequate to cover PREPA's costs."  (A-143).  The bondholders' main argument was that they were entitled to adequate protection for the Rate Covenant and receiver remedy.  But those are contractual promises of PREPA, not collateral entitled to adequate protection.  The bondholders therefore never established or even alleged facts showing cause to lift the stay due to a lack of adequate protection existed.

The District Court balanced the only harm to the bondholders, the cessation of debt payments until a plan is confirmed (a harm all creditors suffer), against the

grievous harm a receiver for PREPA could cause to the restructuring of the Commonwealth and its instrumentalities. The District Court did not abuse its discretion in making that determination of a motion filed sixteen days into the case.

The automatic stay "is one of the fundamental debtor protections in the Bankruptcy Code." *In re Lopez*, 492 B.R. 595, 601 (Bankr. D.P.R. 2013); *see also In re McMullen*, 386 F.3d 320, 324 (1st Cir. 2004). It gives the debtor "a 'breathing spell' from creditors [by stopping] all collection efforts . . . ." *In re Lopez*, 492 B.R. at 601. The stay "safeguard[s] the debtor estate from piecemeal dissipation . . ., better enabling the debtor's 'fresh start.'" *In re McMullen*, 386 F.3d at 324. Here, the stay protects against the bondholders grabbing all of PREPA.

This breathing spell is "particularly important" in a case involving an indebted municipality, such as a Chapter 9 case or a case under Title III of PROMESA. *In re Jefferson Cty., Ala.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013). Accordingly, it should not "be lifted routinely . . . [or else] a municipality will not have the time, opportunity or ability to confirm a plan. This certainly was not the policy or intent of Congress . . . ." *Id.* (citation omitted).

The automatic stay provision further provides "the court shall grant relief from the stay . . . for cause, including the lack of adequate protection." 11 U.S.C. § 362(d)(1). Contrary to the bondholders' contention, however, § 362(d) nowhere

requires stay termination. Even when cause is shown, § 362(d) provides a court wide discretion to terminate, annul, modify, or condition the stay. A court may grant some relief for lack of adequate protection only if the bondholders first present enough evidence to make out a *prima facie* case of entitlement. *See, e.g.*, *In re Jefferson Cty., Ala.*, 484 B.R. 427, 465 (Bankr. N.D. Ala. 2012).

### A. The PREPA Bondholders Alleged No Value Of Their Security Interest.

The bondholders argue failure to provide adequate protection requires the District Court to lift the stay. As shown above, the District Court is given wide discretion and is not required to lift the stay. But PREPA's Net Revenues were (and still are) negative, meaning the bondholders had no collateral value to protect. Moreover, PROMESA §§ 201-202 show the Oversight Board must certify fiscal plans and budgets for PREPA, which by itself eliminates much of the politicization about which the bondholders complain.

To establish a right to any affirmative adequate protection, a secured claimholder must show the value of its collateral is declining or eroding as a result of the automatic stay or the debtor's use. 11 U.S.C. § 361; *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd*., 484 U.S. 365, 370 (1988); *In re Mullen*, 172 B.R. 473, 476 (Bankr. D. Mass. 1994); *In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993). A secured claimholder is only entitled to adequate protection of the value of its collateral existing as of the

22

petition date. *See, e.g., Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 702 (E.D.N.C. 2009) ("Adequate protection is designed to preserve the pre-petition position of the existing lender."); *In re Windsor Hotel, LLC*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) ("Adequate protection is designed to preserve the secured creditor's position as it existed at the time of the bankruptcy filing."); *In re Planned Sys., Inc.*, 78 B.R. 852, 863 (Bankr. S.D. Ohio 1987) (same); *In re Smithfield Estates, Inc.*, 48 B.R. 910, 914 (Bankr. D.R.I. 1985) ("The secured creditor is entitled to protection against any depreciation or diminution in the value of the collateral as it existed and was available to satisfy the debt on the date of the filing . . . ."). Accordingly, to establish a lack of adequate protection as "cause" to lift the stay, a creditor must show the value of its collateral is decreasing since the date the stay was imposed and that it is not compensated for that diminution. *See Mullen*, 172 B.R. at 476; *Cont'l Airlines*, 154 B.R. at 180.

If a security interest has "no value" at the time a petition is filed, there is no need for adequate protection because there is "no value to be protected." *In re 620 Church St. Bldg. Corp.*, 299 U.S. 24, 27 (1936); *see also In re Dulgerian*, No. 06-10203, 2008 WL 220523, at *5 (Bankr. E.D. Pa. Jan. 25, 2008) ("In this case, [the creditor] is not entitled to adequate protection. There is no value in the [collateral]."); *In re Levitt & Sons, LLC*, 384 B.R. 630, 640 (Bankr. S.D. Fla. 2008)

("[C]laimants are not entitled to adequate protection pursuant to 11 U.S.C. § 364(d) because at best they have a zero value lien").

The bondholders are not entitled to adequate protection because their collateral had no value, and even if the covenant and receivership remedy were collateral, they remain available.  To be sure, PREPA and the Oversight Board want to create value for the bondholders.  But future value is not the subject of adequate protection.  PREPA pledged its "revenues of the System . . . and other moneys *to the extent provided in this [Trust] Agreement* as security . . ." for its bonds.  (A-1528) (emphasis added).  As shown above, only the Net Revenues serve as collateral, and that makes perfect sense because ceasing payments of expenses critical to generating electricity is not an option for a public utility.

Nowhere in the record did the bondholders allege $1 or more of collateral value.  But even if they had, they know terminating operations is not an option and would not help them.  Presumably, that is why the thrust of their efforts is to enforce the Rate Covenant.  But that is not collateral, and even if it were, it will not disappear while PREPA reorganizes.

The bondholders are not entitled to adequate protection for collateral not in existence on the petition date.  *See, e.g.*, *Suntrust Bank*, 406 B.R. at 702; *Windsor Hotel*, 295 B.R. at 314; *Planned Sys.*, 78 B.R. at 86; *In re Sun Valley Ranches, Inc.*, 38 B.R. 595, 597 (Bankr. D. Idaho 1984).  In any event, the bondholders

knew Net Revenues were negative before they requested stay relief as their motion refers to "years of collections that were inadequate to cover PREPA's costs." (A-143).

The uncontested evidence, then, demonstrated that PREPA's current expenses exceed its revenues. Accordingly, the value of the bondholders' collateral (PREPA's Net Revenues after a two-month reserve) was zero.

### B. The Bondholders Do Not Have A Property Interest In Their Contract Promises For Rate Hikes And A Receivership Remedy Under The Trust Agreement.

The bondholders argue they are entitled to adequate protection for two contractual promises in the Trust Agreement, the Rate Covenant and the receivership remedy. Aside from promises and remedies not being collateral, this argument is refuted by the Financing Statements, which demonstrate the bondholders' security interest is only in Net Revenues, not in any covenant or remedy. The Financing Statements never identify either the Rate Covenant or the receivership remedy as collateral. (A-1609-1714).

This is not surprising, as PREPA could not have granted the bondholders a security interest in PREPA's own promises under the Uniform Commercial Code (the "UCC"). Article 9 of the UCC applies to security interests in "personal property." 19 L.P.R.A § 2219(a)(1). Whether something is property under both the Bankruptcy Code and the UCC is generally determined by reference to other

state law. *Id.* § 2301; *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law," in the absence of special federal interest). Article 9 repeatedly refers to collateral as encompassing the "rights" of the party granting a security interest arising under other law (generally contract law). *See, e.g.*, 19 L.P.R.A §§ 2212(a)(2) ("account" means "right to payment"); 2233(b)(2) (security interest can be created only in debtors' "rights" in collateral); 2301(a) (referring to a debtor's "rights in collateral"); 2367, Cmt. 3 (as part of enforcing a security interest secured party may enforce borrowers' contractual rights against "third parties"); 1702, Cmt. 1 (breach of contract does not give other party to the contract a property claim against the party in breach).

PREPA does not have a property right in its own promises embodying the Rate Covenant or the receivership remedy. PREPA is contractually obligated to comply with the Rate Covenant, and if it defaults, the bondholders can then exercise remedies. PREPA's promises, such as its Rate Covenant, cannot be sold. Likewise, the bondholders' entitlement to the remedy of a receiver is not a property right of PREPA. Remedies cannot be sold to yield value.

Because PREPA's covenants and their remedies are not collateral, they are not entitled to adequate protection under the Fifth Amendment. The concept of adequate protection "is derived from the [F]ifth [A]mendment protection of property interests." *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511 (1st Cir.

2017) (quoting H.R. Rep. No. 95-595, at 339 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295). As the Supreme Court has explained, not all promises to and remedies of a secured creditor are protected under the Fifth Amendment. In *Louisville Joint Stock Land Bank v. Radford*, the Supreme Court identified five rights that a secured creditor possesses, including a receivership right:

1. The right to retain the lien until the indebtedness thereby secured is paid.

2. The right to realize upon the security by a judicial public sale.

3. The right to determine when such sale shall be held, subject only to the discretion of the court.

4. The right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself.

5. The right to control meanwhile the property during the period of default, subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt.

295 U.S. 555, 594-95 (1935).

But two years after *Radford* was decided, the Supreme Court held that an amendment to the Bankruptcy Act of 1898 that impaired rights 3 and 5 (receivership) identified in *Radford* did not render the amendment unconstitutional on Fifth Amendment grounds. *See Wright v. Vinton Branch of Mountain Tr. Bank*, 300 U.S. 440, 460-62 (1937). *Vinton Branch* demonstrates that not every right

27

held by a secured creditor is entitled to protection. A few years after *Vinton Branch*, the Supreme Court held in *Wright v. Union Cent. Life Ins. Co.* that the same amendment to the Bankruptcy Act did not violate the Fifth Amendment by enabling a debtor to pay the mortgagee the appraised value of its collateral without holding a public auction or providing the mortgagee the right to credit bid. 311 U.S. 273, 280-81 (1940). Thus, *Union Central* allowed impairment of rights 2 and 4 identified in *Radford* without running afoul of the Constitution.

Accordingly, a secured creditor has a constitutionally protected property interest in the value of its collateral, but its contractual rights are not constitutionally protected. *Id.* at 278 ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. There is no constitutional claim of the creditor to more than that."). Subsequent cases confirm this distinction. *See, e.g.*, *In re Elmore*, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988) (holding "contract rights are subject to broad impairment under bankruptcy law," and that "[a] creditor's contract rights are not entitled to adequate protection under the Bankruptcy Code"); *In re Marion St. P'ship*, 108 B.R. 218, 224 (Bankr. D. Minn. 1989) (holding "[t]he interest in property that is to be protected by [§] 361 of the Bankruptcy Code is the value of the collateral, not contractual or legal rights such as receiving interest or being permitted to foreclose on default."). Indeed, the First Circuit reaffirmed this

distinction just last year in ruling on a creditor's request to lift the PROMESA stay to protect its alleged "contractual right to monthly deposits [of toll revenues] with the fiscal agent and the maintenance of [] accounts at particular levels." *Peaje*, 845 F.3d at 514. As this Court noted, the request "reflects a misunderstanding of the adequate protection requirement," because a creditor is not entitled to adequate protection of its contractual rights. *Id.*[2]

The foregoing case law clearly demonstrates the bondholders are only entitled to adequate protection on their collateral, PREPA's Net Revenues. As set forth above, the value of Net Revenues is zero and, as a result, no adequate protection is warranted.

---

[2]     The three cases Appellants cite to show breaching contractual promises, like the Rate Covenant, destroy property entitled to Fifth Amendment protection actually address impairment of contract. In *Dimino v. Secretary of Commonwealth*, the court held entirely eliminating toll collections would result in the taking of bondholders' rights in gross toll revenues. 695 N.E.2d 659, 663-64 (Mass. 1998). *Dimino* relied on a prior holding that a freeze on tolls was a contractual impairment that violates the Contracts Clause of the U.S. Constitution. *Id.* at 663 n. 4. *Patterson v. Carey* involved the Due Process Clause of the New York State Constitution and the Contract Clause of the U.S. Constitution, not the Fifth Amendment. 41 N.Y.2d 714 (1977). There, the bondholders' contract included a promise the parkway authority could, in its discretion, raise tolls to pay debt and operating expenses. *Id.* at 720. The legislature enacted a law repealing the authority's toll increase without a sufficient justification under the police power. *Id.* at 722-723. Lastly, *Duquesne Light Co. v. Barasch* has no bearing on this appeal, as it involved a claim brought by a utility alleging that rates set by state law were confiscatory. 488 U.S. 299, 305 (1989). The Supreme Court did not hold the Fifth Amendment required higher rates, and there was not a fiscal emergency at issue. *Id.* at 315.

Additionally, the bondholders' request to lift the stay to impose the receivership remedy and seek fulfillment of the Rate Covenant is, at its core, a request for specific performance: the bondholders asked the District Court to permit them to initiate a process by which PREPA would have a receiver appointed for it, and that receiver would take total control and seek an increase in PREPA's rates. But the bondholders, like all the other creditors in PREPA's Title III case, are owed money. There is no such thing as specific performance for money claims in bankruptcy. And the bondholders cite no authority that could possibly provide such a remedy.

Moreover, if the bondholders were correct, then every creditor could secure itself with its debtor's promise to repay and would be entitled to stay relief on the ground the debtor's promise to pay is their collateral. The Supreme Court's carefully honed distinction between the value of a secured creditor's collateral, which is entitled to adequate protection, and a creditor's various other contractual rights and remedies, which are not, would topple.

## II. THE DISTRICT COURT CORRECTLY HELD PROMESA § 305, ON THE INSTANT FACTS, PREVENTED IT FROM LIFTING THE STAY TO ALLOW THE BONDHOLDERS TO SEEK A RECEIVER.

There is no dispute that in Title III cases there is no power to order the appointment of a trustee. Congress did not incorporate Bankruptcy Code § 1104 into PROMESA. And based on PROMESA § 305, there is no power to interfere in

PREPA's governmental powers, property or income without the Oversight Board's consent. If a creditor asks the District Court to interfere directly or to authorize another court to interfere, § 305 bars such relief. While stay relief to enable diminishing collateral value to be protected to the extent required by the Fifth Amendment may empower the District Court to grant stay relief for that purpose, here the absence of Net Revenues was admitted, and the Rate Covenant and receivership remedy were not collateral in the first place. Delay does not trigger Fifth Amendment remedies. *See Cont'l Ill. Nat'l Bank & Tr. Co. v. Chi., Rock Island & Pac. Ry.*, 294 U.S. 648, 675-77 (1935) (stay affirmed when case already 17 months old). Moreover, the bondholders' requested relief would severely impact PREPA's viability and would impair the Commonwealth's economic recovery. It is thus abundantly clear that, for the future of Puerto Rico, the District Court correctly avoided interfering with PREPA in the manner requested by the bondholders and was required to do so by § 305. Appellants' pleadings make clear they want to enforce a covenant and remedy to create future collateral value. That is not a Fifth Amendment requirement.

The bondholders argue the District Court's decision ignored the requirement under the Bankruptcy Code that "the court *shall* grant relief from the stay . . . for cause, including lack of adequate protection." 11 U.S.C. § 362(d)(1) (emphasis added). The District Court, they argue, misread PROMESA § 305 as

31

overriding the specific "command" to lift the stay for cause; they also incorrectly

allege the District Court held it could not lift the stay "even if creditors are denied

adequate protection." (Br. at 19). As explained herein, that is not what the District

Court ruled.

The bondholders' argument fails. The District Court correctly held § 305,

along with other provisions of PROMESA, limited its authority to grant the

*specific relief* requested in this case because doing so would interfere with

PREPA's property and revenues and improperly transfer control without the

Oversight Board's consent. (ADD-10-12). It did so under the unique

circumstances presented. The District Court did not hold § 305 precludes stay

relief for all purposes, all the time.

### A. The District Court Correctly Held The Stay Relief Requested By The Bondholders Is Prohibited By § 305.

### 1. The plain language of § 305 precludes the specific relief requested by the PREPA bondholders.

The bondholders' requested relief to protect their Rate Covenant and

receivership remedy would violate PROMESA § 305 on its face. Section 305

provides that, absent Oversight Board consent, a Title III court "may not" enter

any:

> stay, order, or decree, in the case or otherwise, [that would] interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of

32

the debtor; or (3) the use or enjoyment by the debtor of any income-producing property.

48 U.S.C. § 2165. The provision of electricity services is a governmental power of PREPA, as are the decisions it makes with respect to its property and revenues, including whether to request rate increases. (ADD-10). The District Court, sitting as a Title III court, could not directly order PREPA to turn over revenues to a receiver and to request higher rates, as that would violate § 305. (ADD-10-11). Allowing a creditor to do so to vindicate its contractual covenants and remedies is no different.

Nor could the District Court order PREPA to pay certain expenditures under § 305. The District Court's limited role regarding PREPA's expenses is further demonstrated by the fact Congress did not incorporate into PROMESA the limitations on use of property imposed on a debtor by Bankruptcy Code § 363. Yet the relief requested would allow the bondholders to control expenses where they have no secured interest in the monies used for that purpose and where the District Court could not order the relief directly.

The bondholders claim that, because their request would only require the Title III court to lift the stay, some other court could actually implement the relief sought without violating § 305. This argument fails because § 305 expressly forecloses end-runs by prohibiting the court from acting "otherwise" to interfere with the operations, property, or revenues of the debtor. *Id.* As the district court

33

correctly found, § 305 does not allow it to take any *other* action that would allow "indirect achievement of what [it] could not do directly." (ADD-12). It is well established that a litigant cannot circumvent a limitation on remedies by choosing to present their claim in a way that undercuts the limitation provided for by Congress. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254-55 (2009) (litigant could not sue under § 1983 for a remedy when doing so would undercut statutory limitations on that remedy because "[a]llowing a plaintiff to circumvent the statutes' provisions in this way would have been 'inconsistent with Congress' carefully tailored scheme'").

The District Court's ruling on § 305 is consistent with the manner in which other courts have interpreted Bankruptcy Code § 904, the analog to § 305. The language of § 305 is nearly identical to the language of Bankruptcy Code § 904,[3] and courts interpreting § 904 have routinely recognized its express limitations on a court's authority to interfere with the property of the debtor.[4]

---

[3] Identical statutory language should be interpreted consistently. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 302 (2006). Section 904 was adopted to implement the Tenth Amendment's protection of state sovereignty, and § 305 protects similar sovereignty concerns for the Commonwealth and its instrumentalities.

[4] *See, e.g.*, *In re City of Detroit, Mich.*, 841 F.3d 684, 687 (6th Cir. 2016) ("§ 904 . . . explicitly prohibits this relief. Whether grounded in state law or federal constitutional law, a bankruptcy court order requiring DWSD to provide water service at a specific price, or refrain from terminating service, interfere[s] with the

For instance, in *In re City of Stockton*, retired city employees sought injunctive relief in the bankruptcy court against the municipality-debtor and, alternatively, relief from the automatic stay in order to commence litigation in another forum to prevent the debtor from unilaterally reducing health benefits. 478 B.R. 8 (Bankr. E.D. Cal. 2012). The question before the court was whether § 904 prohibited it from exercising its authority in a manner that would interfere with the chapter 9 debtor's property or revenues. *Id.* at 17. And similar to the bondholders in this case, the retirees in *City of Stockton* argued § 904 did not prevent the specific relief they sought because their challenge aimed to preserve the status quo (continued health benefits), not an order directing the debtor's actions with respect to the City's property or revenues. *Id.* at 21. The retirees argued that their request therefore would not violate the limitations imposed by the Bankruptcy Code because the specific relief would not require *direct* interference with the debtor's property. *Id.*

The court rejected the retirees' argument. It reasoned that, as a practical matter, "coercively preserving a status quo that entails payment of money from the

---

City's political [and] governmental powers, its property and revenues, and its use [and] enjoyment of income producing property") (citation omitted); *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994) ("[§ 904] makes clear that the court may not interfere with the choices a municipality makes as to what services and benefits it will provide").

City treasury interferes with the City's choice to suspend such payments" because the "contents of the City's treasury are 'property or revenues'" for purposes of § 904. *Id.* The court recognized it would be "impossible" to grant the relief requested without interfering, directly or indirectly, with the debtor's property or revenues. *Id.* The court further found the relief requested involved issues central to the debtor-creditor relationship and that a creditor's resort to another forum to seek its preferred relief was "fundamentally at odds with the basic policy underlying chapter 9."[5] *Id.* at 25, 26.

The considerations are no different here. Like a chapter 9 case, Title III is meant to provide the debtor with the means to resolve its debts in a collective action through a plan of adjustment. PROMESA § 305 provides PREPA with the equivalent protections as Bankruptcy Code § 904, as it likewise limits the court's power to issue an order that interferes with PREPA's property or revenues for the purpose of protecting governmental decisions and actions. The bondholders,

---

[5] The *City of Stockton* court did not, as the bondholders claim, hold that it could have imposed a total restraining order against the debtor because "the municipality consents, within the meaning of § 904, to interference by a federal court as the Bankruptcy Code provisions that apply in chapter 9 cases." (Br. at 24). As indicated above, the court held the opposite—that it could not issue the relief the retirees sought because doing so would run afoul of the Bankruptcy Code's restrictions on the court's ability to interfere with the debtor. The quote the bondholders cite concerned the court's discussion of the limits of § 904 discussed in the *In re County of Orange* decision which stated, in dicta, that a debtor could not ignore a specific provision of the Bankruptcy Code on the basis that the court could not interfere with its decision. 179 B.R. 185, 190 (Bankr. C.D. Cal. 1995).

36

dissatisfied with the Oversight Board and PREPA's decisions to date, sought to lift the stay for the express purpose of displacing the Oversight Board and PREPA with a receiver to recover on their claim. But allowing appointment of a receiver to act solely for the benefit of a subset of creditors is fundamentally at odds with the policies underlying PROMESA. The District Court was correct in denying relief.

We explained above why the relief the bondholders requested is the protection of neither actual collateral nor any collateral value. But even if we ignore the foregoing decisions that did not deal with secured claims and assume for argument's sake that Appellants had collateral value on the petition date, the Supreme Court long ago explained that enforcement of secured claims can be enjoined when creditor actions would frustrate attainment of a reorganization. In *Continental Ill.*, the Supreme Court affirmed issuance of a stay against lien enforcement that had already been in effect for seventeen months, explaining (a) "[t]he power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is, therefore, inherent in a court of bankruptcy," (294 U.S. at 675), (b) "without the maintenance of the *status quo* for a reasonable length of time[,] no satisfactory plan could be worked out," (*id.* at 679), and (c) a "claim that injurious consequences will result to the pledgee or the mortgagee may not, of course, be disregarded by the district court, but it presents a question addressed not

37

to the power of the court, but to its discretion—a matter not subject to the interference of an appellate court unless such discretion be improvidently exercised" (*id.* at 677).

> ## 2. The appointment of a receiver is expressly barred by § 105(b) on the facts here, and the relief sought would undermine the broader statutory scheme.

The requested relief is also foreclosed as a matter of law because the Bankruptcy Code prohibits the appointment of a receiver for PREPA. The bondholders argue the District Court's "lack of authority to appoint a trustee or receiver under PROMESA does not diminish Appellants' right to obtain a receiver under Puerto Rico law" from another court. (Br. at 28). That is wrong on the facts here where neither the Rate Covenant nor receivership remedy are collateral entitled to adequate protection.[6] A receiver of collateral for adequate protection purposes is not what is at issue here, because there is no collateral to receive.

Congress expressly incorporated into Title III of PROMESA Bankruptcy Code § 105(b), which provides "a court may not appoint a receiver in a case under this title." 11 U.S.C. § 105(b) (incorporated by 48 U.S.C. § 2161(a)). The bondholders' requested relief is in conflict with this express statutory provision.

---

[6] Not only are the bondholders incorrect for the reasons discussed below, but they also ignore that PROMESA § 4 expressly preempts any law "that is inconsistent with" PROMESA, including their statutory right to appoint a receiver. 48 U.S.C. § 2103.

Notably, Congress *did not* incorporate the only Bankruptcy Code provision that would have opened the door to the appointment of a receiver or trustee equivalent. *See* 11 U.S.C. § 1104 (providing that "gross mismanagement" may be grounds for cause to appoint a trustee). As such, the appointment of a trustee or receiver for any reason, including alleged mismanagement, is not provided for under PROMESA.

The appointment of a receiver would undermine other operative provisions of PROMESA. The Oversight Board is authorized to exercise oversight power over PREPA for the purpose of achieving a durable solution for Puerto Rico's fiscal and economic crisis and "fiscal responsibility [for Puerto Rico and its instrumentalities] and access to the capital markets." 48 U.S.C. § 2121(a). To achieve these goals, Congress mandated that the Oversight Board control PREPA's budget and fiscal plan and be the sole representative of PREPA in the Title III case. 48 U.S.C. §§ 2141-42, 2175(b). Congress closed the loop on this statutory structure by vesting the Oversight Board with authority over a plan of adjustment and mandating that PREPA's budget and the eventual plan of adjustment be consistent with the fiscal plan certified by the Oversight Board. 48 U.S.C. §§ 2172, 2173, 2142(c), 2174(b)(7).

The District Court correctly found that transferring control to a receiver appointed by a territorial court would undermine PROMESA's goals. A receiver

39

would act in the interests of the bondholders seeking to be paid in full. Their interests, however, are not aligned with the economic recovery interests of other creditors, PREPA, or the Commonwealth—all of which are subject to a comprehensive resolution by the Oversight Board as part of the restructuring effort. Yet control of PREPA's revenues and expenses by a receiver and the imposition of rate hikes would undermine the ability of the Oversight Board, the only party authorized to file a plan of adjustment, to direct PREPA's reorganization efforts. In turn, disruption of PREPA's reorganization efforts could thwart the Title III process for the Commonwealth and other government instrumentalities. Thus, the District Court correctly denied the bondholders' motion.

### 3. The relief requested is inconsistent with § 306's grant of exclusive jurisdiction and would imperil the PREPA Title III case and all other pending Title III cases.

PROMESA § 306 vests the court with exclusive jurisdiction over all property of the debtor. 48 U.S.C. § 2166(a). The appointment of a receiver answerable to another court and constituency is inconsistent. As the District Court found, permitting a territorial court to appoint a receiver to control the issues most critical to debt restructuring—*i.e.*, managing PREPA's operations, dictating expenses, and controlling revenue and investment through charged rates—would require the District Court to cede jurisdiction over all the disputed matters central

40

to PREPA's debt restructuring, calling into question not only the sustainability of the PREPA Title III case (ADD-15), but all the other pending Title III cases as well.

In *In re Jefferson County, Ala.*, 474 B.R. 228, 283 (Bankr. N.D. Ala. 2012), creditors moved to modify the stay to allow a receiver to control the debtor's sewer system, including the authority to change rates and dictate collections. Rejecting that request, the court held that "relinquishing [its] jurisdiction over the sewer system properties would be the practical equivalent of declining jurisdiction over the case." *Id*. The transfer of the debtor's property to a receiver would threaten the "viability" of the county's chapter 9 debt adjustment by (1) transferring a significant portion of the debtor's property from the bankruptcy court; (2) causing complex issues regarding debt resolution to exist in two courts subject to different laws; and most significantly, (3) courting a probable conflict between the receiver's actions regarding rates and collections and the bankruptcy court's authority to utilize non-consensual impairment of claims. *Id*. As the court observed, "[w]hen one realizes that such a transfer limits, complicates, and places at risk the ability of the County to adjust its debts in one setting, it defeats one of the primary benefits of having a bankruptcy case." *Id*. (citations omitted).

Lifting the stay here would prevent the Oversight Board and the Commonwealth's transformation of PREPA into an efficient utility not dependent

on fossil fuels and would hamper PREPA's Fiscal Plan, budget, and eventual plan of adjustment. There cannot be simultaneous control over PREPA's decisions, property, and revenues in two courts and a successful transformation and plan of adjustment.

The disruption that would be caused by the bondholders' receivership would not be limited to the PREPA Title III case because electricity prices are integral to all the other Title III cases and to Puerto Rico's recovery. Under PROMESA, the Oversight Board is charged with restoring overall fiscal health to the Commonwealth and its instrumentalities. 48 U.S.C. § 2121. Reforming PREPA is critical to the Commonwealth's long-term success: electricity costs are a major contributor to the cost of living and doing business in Puerto Rico, and a cost-effective electrical system is critical to the Commonwealth's ability to reverse its long history of economic decline and outmigration. (A-1408-10 at ¶¶ 48-52).

### 4. The bondholders trivialize a Title III court's exclusive jurisdiction.

The bondholders claim bankruptcy courts routinely grant stay relief that relinquishes their exclusive jurisdiction over debtors' property. That is correct, but not in municipality cases or in any case where the property at issue is indispensable to a successful reorganization. Here, the bondholders want their receiver to control all of PREPA, including all revenues and prices, both of which are critical to any

plan of adjustment. The plan would therefore be dictated by their receiver, contrary to the Oversight Board's exclusive power to propose it.

The bondholders' argument that § 306, like jurisdiction under 28 U.S.C. § 1334, merely provides original jurisdiction for purposes of case administration, and therefore does not preclude another court from exercising jurisdiction over debtor property, is wrong. While the courts only have original jurisdiction over some matters, they are granted exclusive *in rem* jurisdiction over property of the debtor. *See In re Jefferson Cty.*, 474 B.R. at 246.

Section 306 provides the "district court in which a case under this subchapter is commenced or is pending shall have exclusive jurisdiction of all property, wherever located, of the debtor as of the commencement of the case." 48 U.S.C. § 2166(b). The language of § 1334 is nearly identical. Both statutes show "the property that may be used to effect the adjustment of the debtor's relationship with its creditors comes under the exclusive jurisdiction of the court." (ADD-15).

The bondholders' reliance on chapter 11 and 7 cases to support their argument proves the point. That another court can exercise jurisdiction over debtor property when the stay is terminated or does not apply does not show any court can relinquish jurisdiction over a debtor's most critical assets and fulfill a reorganization statute's goal of a successful rehabilitation. For example, the bondholders cite *In re Schweikart,* 154 B.R. 616, 617 (Bankr. D.R.I. 1993), an

43

individual's bankruptcy case in which it was unclear what interest in the marital residence the family court had granted the debtor's former husband. The bankruptcy court allowed the family court to rule what interest it had granted. The result could also have been obtained by abstention. Likewise, in *Bartel v. Walsh*, 404 B.R. 584, 592 (1st Cir. Bankr. App. Panel 2009), the court ruled criminal proceedings against the chapter 7 individual debtor that led to larceny convictions were excepted from the automatic stay under 11 U.S.C. § 362(b)(1).[7] Such authorities do not remotely mean the District Court should have relinquished exclusive jurisdiction over PREPA's critical assets. Appellants have failed to identify even one case where a court in a municipal bankruptcy lifted a stay to permit the appointment of a receiver to control debtor property.[8]

The bondholders' interpretation of PROMESA's jurisdiction section invites the "jurisdictional conundrum" the district court sought to avoid. (ADD-14). As the District Court observed, unless the Title III action is dismissed entirely in favor of the requested relief, lifting the stay would result in two courts exercising concurrent jurisdiction over the debtor's property. (ADD-15). For the aforementioned reasons, that result is untenable under PROMESA.

---

[7]  The bondholders cite a series of other cases that are inapposite for the same underlying policy reasons. (Br. at 31-34).

[8]  The cases cited by the bondholders involved situations where claimholders sought to remove property from the estate, not a situation like PREPA's where the property is required for the adjustment of the debtor-creditor relationship.

## B.     The PREPA Bondholders' Interpretation Of §§ 305 And 362(d)(1) Cannot Be Reconciled With PROMESA.

The bondholders asked the District Court for specific relief: lifting of the stay to file a complaint (annexed to their motion) to appoint a receiver to supplant the Oversight Board and PREPA's managers and to pursue a rate increase and control all revenues.  (A129-71; SA-1-3; A-172-90).  They attempt to reduce their relief to a mere request to lift the stay and argue that granting that narrow relief does not implicate the limitations of § 305.  The District Court held the relief sought was "facially inconsistent" with § 305 because granting it would require the court to issue an order interfering with PREPA's decisions, property, and revenues.  (ADD-10).

The District Court did not hold, as the bondholders claim, that it could not lift the stay even if creditors were denied adequate protection.  The court explained that its authority under § 305 is determined by whether the requested relief interferes with, not merely impacts, the debtor's property or revenues, and expressly observed that this provision "does not preclude all relief from the automatic stay."  (ADD-11).  The District Court made plain that its decision should not be interpreted to mean PROMESA's restrictions on its power would prohibit it from lifting the stay in all cases.  Indeed, the District Court expressly identified circumstances where stay relief could be granted without running afoul of § 305.  (ADD-10).

45

Unlike the District Court, which only determined the particular stay relief the bondholders requested was blocked by § 305, the bondholders insist no relief under 11 U.S.C. § 362(d)(1) can ever be blocked by § 305. As this case demonstrates, when creditors want to interfere with and control a debtor's operations and all its unencumbered assets, there is no reason § 305 does not apply. Section 305 would have no meaning if it could be circumvented so easily. The bondholders' argument runs afoul of the rule of statutory construction requiring courts to interpret the words and provisions in the context of the "whole statute." 2A Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 46.5, at 204 (7th ed. 2014); *see also id.* at 204-218 ("it is not proper to confine interpretation to one section to be construed . . . Neither clinical construction nor a statute's letter . . . should be permitted to defeat its clear and definite purpose").

The bondholders ask this Court to do the opposite by interpreting a single word from § 362(d) ("shall") requiring a court to grant relief from the stay for cause, including lack of adequate protection, as meaning § 305 never blocks any stay relief. The bondholders' statutory interpretation fails from the outset, given that § 362(d)(1) nowhere instructs the granting of the relief the bondholders requested. Rather, it allows the court to choose from terminating, annulling, modifying, or conditioning the stay. Here, however, the District Court found multiple causes not to grant the relief the bondholders requested in the second

month of PREPA's Title III case: it would obstruct the Commonwealth's and PREPA's entire reorganizations and the Oversight Board's exclusive right to propose a plan of adjustment, and it would interfere with PREPA's property, income, and governmental powers. The District Court did this against a record showing the bondholders admitted there had been no Net Revenues for years, and the bondholders were treating a covenant and remedy as collateral. Under those circumstances, the District Court correctly applied § 305 and 11 U.S.C. § 362(d)(1).

The bondholders try to perform a sleight of hand by arguing PROMESA § 305 could render other provisions of PROMESA inoperative. Not so. The other provisions the bondholders cite concern administrative matters (11 U.S.C. §§ 333, 351) or the treatment of claims (48 U.S.C. § 2171; 11 U.S.C. §§ 364(c), 364(d), 365, 510, 553, 555-562, 927). The District Court's interpretation of § 305, applied to the instant facts, does not alter or conflict with those provisions.

## III. THE *SONNAX* FACTORS WEIGH IN FAVOR OF DENYING THE BONDHOLDERS RELIEF FROM THE STAY FOR CAUSE.

The District Court applied the dominant authority followed in most circuits, *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). Applying the relevant *Sonnax* factors (focusing on the "impact of the stay on the parties and the balance of harms"), the District Court held the bondholders had not demonstrated cause to lift the stay. *Id.* The District Court determined the harm to the Title III

cases (PREPA's and all others) and the economic recovery of the Commonwealth overwhelmingly outweighed the temporary harm to the bondholders. The District Court's determination is sound and entitled to deference.

As discussed previously, receiver control of PREPA would substantially impair, if not prevent, the Oversight Board's oversight of PREPA and its exclusive right to propose a confirmable plan of adjustment (ADD-14), as well as undermine the statutory scheme established in PROMESA. *See* Sections I and II *supra*. As the District Court found, loss of the "locus of control" (ADD-14) that would be caused by the relief the bondholders seek would have a destructive effect on the Title III processes necessary to "resolve [Puerto Rico's] longstanding fiscal governance issues and return to economic growth." 48 U.S.C. § 2194(n).

In stark contrast, the District Court found the harm to the bondholders is a temporary "cessation" of payments during the pendency of the Title III case. (ADD-14). Even if PREPA's Net Revenues are "special revenues" under Bankruptcy Code § 928, that section does not help the bondholders because it does not require a debtor to turnover special revenues. At most, Bankruptcy Code §§ 922 and 928 permit a debtor to willingly turnover special revenues. Here, turning over any revenues for debt payment would not leave sufficient funds for PREPA to operate.

48

Importantly, no permanent change to the rights of the bondholders can be imposed absent a confirmed plan of adjustment or voluntary agreement, processes that provide creditors an opportunity to participate. While the bondholders would take different steps than the Oversight Board to create positive Net Revenues, both want to create them.

The bondholders argue that the District Court's balance of the hardships analysis was conclusory. This is simply not true. The analysis jumps off the page. No court would jeopardize the recovery of Puerto Rico by hiking energy prices in the second month of PREPA's Title III case, before PROMESA's multiple steps to recovery (fiscal plan, budgets, infrastructure projects, critical projects, plans of adjustment) are implemented. The parties had a full and fair opportunity to develop the record with the declarations of their experts. The bondholders' dissatisfaction with the District Court's balancing of the hardships analysis does not support their claim that the District Court "ignored" the proffered evidence or warrants reversal. The cases they rely upon do not demonstrate otherwise.[9]

---

[9] The first case cited by the bondholders, *Powell v. Nevada*, in no way relates to the instant case. 511 U.S. 79 (1994). Rather, the case concerns a murder conviction which was vacated and remanded and, in any event, the bondholders quote from the dissenting opinion. The second case, *Irving Tanning Co. v. Kaplan*, concerns the level of detail required in a trial setting pursuant to Fed. R. Civ. P. 52. 876 F.3d 384 (1st Cir. 2017). The First Circuit ruled the missing facts of the trial court were not essential and the bankruptcy court's decision was affirmed. *Id.* at 395. Finally, while the third case, *In re Watman*, is in fact a bankruptcy case in

49

Finally, there is no cause to lift the stay for alleged mismanagement. As discussed above, mismanagement cannot be a legal "cause" for relief from the automatic stay to obtain a receiver controlling unencumbered assets because Congress did not incorporate Bankruptcy Code § 1104 into Title III, thereby denying a Title III court the power to displace PREPA's management, even for alleged mismanagement. (ADD-13). Again, here, the bondholders want a new manager to create collateral, not a receiver that would collect existing collateral. Instead, Congress incorporated the section of the Bankruptcy Code barring the District Court from appointing a receiver for PREPA, as a Title III debtor. 11 U.S.C. § 105(b); (ADD-13).

For these reasons, the District Court's determination regarding cause should be affirmed.

## IV. REMAND FOR AN EVIDENTIARY HEARING IS UNWARRANTED.

The bondholders ask that this case be remanded for further factual findings because, they claim, the District Court failed to engage in the analysis required by a motion to lift the stay. They are simply wrong. The District Court already engaged in the analysis required of it when considering a lift stay motion, applying the *Sonnax* factors to the record with a particular emphasis on the impact of the

---

which the case was remanded, the court's decision to remand was due to the incompleteness of the bankruptcy court's fraud analysis. 301 F.3d 3 (1st Cir. 2002).

stay on the parties and the balance of harms.  The bondholders are simply unhappy

with the result, and they offer no valid reasons to disturb the District Court's

factual findings.  An evidentiary hearing is unnecessary for at least three reasons.

*First*, the bondholders are not entitled to remand for an evidentiary hearing

because they never requested such a hearing while their motion was before the

District Court.  *Aoude v. Mobil Oil Corp*., 892 F.2d 1115, 1120 (1st Cir. 1989)

("[W]e regularly turn a deaf ear to protests that an evidentiary hearing should have

been convened but was not, where, as here, the protester did not seasonably request

such a hearing").  The brief accompanying their initial motion was devoid of any

reference to an evidentiary hearing, and the parties agreed that they would only

request an evidentiary hearing if disputed facts were necessary to the District

Court's ruling.  The ruling does not rely on any disputed fact.

In other words, the bondholders contemplated that the District Court might

proceed exactly as it did: namely, decide the motion on the submissions, which

included significant briefing by the parties and fact declarations.  The District

Court did not rely on any disputed facts.  Accordingly, the District Court resolved

the matter based solely on legal issues and uncontested facts before it.

Consequently, none of the parties ever asked to schedule an evidentiary hearing.

Indeed, the very *first* time the bondholders specifically requested an evidentiary

hearing was in their opening brief before this Court.  That is far too late.

*Second*, the bondholders premise their request for an evidentiary hearing on the need to "tak[e] stock of new developments," such as Hurricanes Irma and Maria and purported mismanagement in the hurricanes' wake. (Br. at 47-48). It is elementary, however, that as an appellate court, this Court must "not consider arguments or evidence not presented to the district court." *Worcester v. Filene's Basement, Corp.*, No. 96-1940, 1997 WL 556060, at *1 (1st Cir. Sept. 5, 1997). Their request for an evidentiary hearing runs afoul of this principle. They acknowledge, as they must, that these "new developments" were not before the lower court, but nonetheless ask this Court to take those developments into account. It would be improper for this Court to remand this case for an evidentiary hearing on the basis of facts that were never before the lower court in the first place when those facts would not be relevant to that court's disposition.[10] Hurricane Irma hit Puerto Rico on September 6, 2017, after supplemental briefing concluded on August 29, and Hurricane Maria hit on September 20, shortly after the District Court rendered its September 14 decision on the bondholders' motion. They could easily have requested reconsideration if they believed that either the hurricanes or alleged post-hurricane mismanagement by PREPA

---

[10]  None of the cases cited by the bondholders—all of which stand for the unremarkable point that a case may be remanded for further fact-finding if the court has not made factual findings necessary for the appellate court to reach a conclusion on the law—require otherwise.

provided additional reasons why appointment of a receiver was necessary. But they chose not to do so, and rightly so: as described above, PREPA's alleged mismanagement in the wake of the hurricanes cannot, as a matter of law, constitute "cause" for lifting the stay.

*Third*, the District Court did not need to hold an evidentiary hearing because the parties did not present conflicting evidence on the facts the court relied on. An evidentiary hearing is appropriate when the court must resolve conflicting evidence. *See, e.g.*, *Jackson v. Fair*, 846 F.2d 811, 820 (1st Cir. 1988). By the same token, a hearing "may be unnecessary where [] the material facts are not disputed." *Peaje*, 845 F.3d at 512 (1st Cir. 2017).

Finally, as explained above, the District Court did not decide whether Mr. Wolfe or Mr. HasBrouck were correct. It simply acknowledged the risk Mr. Wolfe articulated about raising rates. But the bondholders' consultant, Mr. HasBrouck, makes a damaging admission in his supplemental declaration, namely the Energy Commission is required to set rates sufficient to pay all debts. (A-1822-23 at ¶ 9). Outside bankruptcy, all energy commissions are required to set rates sufficient for the utilities to pay all their debt. Otherwise all utilities would default! The bondholders' argument exposes why stay relief is completely unwarranted. PREPA's Title III case cannot proceed on the basis that rates must provide for all debt to be paid. For that matter, no chapter 11 case can proceed on the basis that

53

state law always provides remedies assuring that all valid debt, secured and unsecured, be paid in full. Section 4 of PROMESA preempts territorial law, just as chapter 11 preempts state law. So here, Mr. HasBrouck's declaration admits the bondholders want stay relief so the preempted territorial law will prevail because the Energy Commission must set rates so all debt can be paid. As a practical matter, that in itself is a valid reason not to grant the stay relief the bondholders request. If stay relief must be granted to implement state law requiring all debt to be paid, federal rehabilitation laws can serve no purpose.

## <u>CONCLUSION</u>

The judgment of the District Court should be affirmed.

Dated: April 2, 2018
New York, New York

Respectfully submitted,

/s/ Timothy W. Mungovan

PROSKAUER ROSE LLP
Martin J. Bienenstock
Stephen L. Ratner
Timothy W. Mungovan
Mark D. Harris
Chantel L. Febus
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: sratner@proskauer.com
Email: tmungovan@proskauer.com
Email: mharris@proskauer.com
Email: cfebus@proskauer.com

*Counsel to Debtor-Appellee Financial
Oversight and Management Board for
Puerto Rico as representative of Puerto Rico
Electric Power Authority*

55

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief

complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(5) and

32(a)(7)(B).  This brief contains 13,000 words, excluding those exempted by Fed.

R. App. P. 32(a)(7)(B)(iii). This brief was prepared in a proportionally spaced 14-

point Times New Roman font.

Respectfully submitted,

*/s/ Timothy W. Mungovan*
PROSKAUER ROSE LLP
Martin J. Bienenstock
Stephen L. Ratner
Timothy W. Mungovan
Mark D. Harris
Chantel L. Febus
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: sratner@proskauer.com
Email: tmungovan@proskauer.com
Email: mharris@proskauer.com
Email: cfebus@proskauer.com

*Counsel to Debtor-Appellee Financial
Oversight and Management Board for
Puerto Rico as representative of Puerto Rico
Electric Power Authority*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 2, 2018, a true and correct copy of the Brief for

Brief for Debtor-Appellee Financial Oversight and Management Board for Puerto

Rico as representative of Puerto Rico Electric Power Authority was electronically

filed with the United States Court of Appeals for the First Circuit by using the

CM/ECF system, which electronically served a copy on all counsel of record.

Respectfully submitted,

*/s/ Timothy W. Mungovan*
PROSKAUER ROSE LLP
Martin J. Bienenstock
Stephen L. Ratner
Timothy W. Mungovan
Mark D. Harris
Chantel L. Febus
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: sratner@proskauer.com
Email: tmungovan@proskauer.com
Email: mharris@proskauer.com
Email: cfebus@proskauer.com

*Counsel to Debtor-Appellee Financial
Oversight and Management Board for
Puerto Rico as representative of Puerto Rico
Electric Power Authority*