**<u>EXHIBIT 18</u>**

**NEW ISSUE – BOOK-ENTRY ONLY**   RATINGS (see RATINGS herein):   **Moody's: Baa1**
**S&P: BBB+**
**Fitch: BBB+**

## $650,000,000
## PUERTO RICO ELECTRIC POWER AUTHORITY
### Power Revenue Bonds, Series 2012A
### Power Revenue Refunding Bonds, Series 2012B

The Power Revenue Bonds, Series 2012A and Power Revenue Refunding Bonds, Series 2012B (collectively, the "Bonds") of Puerto Rico Electric Power Authority (the "Authority") are being issued pursuant to a Trust Agreement, dated as of January 1, 1974, as amended, between the Authority and U.S. Bank National Association, New York, New York, successor trustee (the "Trust Agreement"). The Bonds, the outstanding bonds previously issued under the Trust Agreement and any additional bonds that the Authority may from time to time issue under the Trust Agreement are payable solely from the Net Revenues (as described herein) of the Authority's electric generation, transmission and distribution system.

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.

- The Bonds will be registered under the book-entry only system of The Depository Trust Company ("DTC"). Purchasers of the Bonds will not receive certificates evidencing the Bonds.

- Interest on the Bonds will be payable on July 1, 2012 and on each January 1 and July 1 thereafter.

- The Bonds will be subject to redemption, commencing on July 1, 2022, as described herein. See *Mandatory Redemption* and *Optional Redemption* under DESCRIPTION OF THE BONDS for more information.

- The inside cover page contains information concerning the maturity schedule, interest rates and prices or yields of the Bonds.

- The Authority may determine, in its sole discretion, to obtain insurance with respect to some or all of the Bonds. The Underwriters will provide notice on or before the date of pricing if the Authority determines to insure all or any part of the Bonds.

- Prospective investors should consider the information appearing under RISK FACTORS AND INVESTMENT CONSIDERATIONS before making an investment decision.

- *In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Authority described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations. Bond Counsel is further of the opinion that interest on the Bonds is exempt from state, Commonwealth of Puerto Rico and local income taxation. See TAX MATTERS herein.*

- The Authority expects that the Bonds will be available for delivery to DTC on or about May 1, 2012.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel, and certain other conditions. Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

**The Bonds are not a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities or political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions, other than the Authority, shall be liable for the payment of the principal of or interest on the Bonds.**

### Morgan Stanley

| Citigroup | | J.P. Morgan |
|---|---|---|
| Barclays | BMO Capital Markets | BofA Merrill Lynch |
| Goldman, Sachs & Co. | Jefferies | Ramirez & Co. Inc. |
| Raymond James | RBC Capital Markets     UBS FS Puerto Rico | Wells Fargo Securities |
| BBVAPR MSD | FirstBank PR Securities | Oriental Financial Services |
| Popular Securities | Santander Securities     Scotia MSD | VAB FINANCIAL |

April 12, 2012

# $650,000,000
# PUERTO RICO ELECTRIC POWER AUTHORITY

## $630,110,000 Power Revenue Bonds, Series 2012A

| Maturity Date July 1, | Principal Amount | Interest Rate | Yield | CUSIP[*] |
|---|---|---|---|---|
| 2029 | $34,510,000 | 4.80% | 4.82% | 74526QZX3 |
| 2042 | 80,000,000 | 5.05 | 5.08 | 74526QZY1 |

$157,460,000 5.00% Term Bonds due July 1, 2029; Yield: 4.82%[†]; CUSIP[*] 74526QZZ8
$358,140,000 5.00% Term Bonds due July 1, 2042; Yield: 5.08%; CUSIP[*] 74526QA28

## $19,890,000 Power Revenue Refunding Bonds, Series 2012B

| Maturity Date July 1, | Principal Amount | Interest Rate | Yield | CUSIP[*] |
|---|---|---|---|---|
| 2016 | $ 3,345,000 | 2.50% | 2.00% | 74526QA36 |
| 2016 | 16,545,000 | 5.00 | 2.00 | 74526QA44 |

---

[*] Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

[†] Priced at the stated yield to the July 1, 2022 optional redemption date at a redemption price of 100%. See "Redemption" under DESCRIPTION OF THE BONDS herein.

**In connection with this offering, the Underwriters may overallot or effect transactions which stabilize or maintain the market prices of the Bonds offered hereby and of the Authority's outstanding Power Revenue Bonds at levels above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.**

The information set forth herein has been obtained from the Authority, the Commonwealth of Puerto Rico, and other official sources that are believed to be reliable, but it is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth of Puerto Rico since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained herein, and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell, or the solicitation of an offer to buy, nor shall there be any sale of the Bonds offered hereby by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, trust agreements, the Bonds and other documents herein do not purport to be complete. Reference is made to said laws, trust agreements, the Bonds and other documents for a full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Authority and the Trustee.

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Authority. In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially and adversely from those expressed or implied by forward-looking statements.**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

**Page**

**Page**

INTRODUCTORY STATEMENT ................................ 1
OVERVIEW ................................................................ 2
   General ................................................................... 2
   Summary of Operating Results................................ 3
   Capital Improvement Program................................ 6
   Strategic Plans to Address the Authority's Challenges ... 7
RISK FACTORS AND INVESTMENT CONSIDERATIONS ... 15
   The Authority's Financial Condition..................... 15
   The Authority's ability to charge and collect rates sufficient
      to provide for debt service on the Power Revenue
      Bonds and other indebtedness and meet its operating
      expenses ......................................................... 19
   The Authority's ability to meet its projections of Net
      Revenues........................................................ 20
   The Trend in Demand for Electricity..................... 21
   Dependence on Fuel Oil; Fuel Cost Volatility ........ 21
   The Authority's ability to manage substantial construction
      efforts related to its fuel diversification program.... 22
   The Authority's ability to access the capital markets..... 23
   The Authority's System may be affected by general
      operating risks and hazards customary in the power
      generation industry. The Authority may not have
      adequate insurance to cover all these hazards............ 23
   Weather and Other Uncontrollable Events,.............. 23
   Labor Factors ..................................................... 24
   Changes in Commonwealth Legislation, Competition and
      Self-Generation................................................. 24
   Changes in Federal Laws or Regulations ................ 26
   The Authority's ability to comply with environmental and
      public health standards, maintain self-sufficiency in a
      highly regulated industry and fund capital
      improvements required to comply with these
      regulatory requirements..................................... 26
   New or Future Environmental Regulatory Requirements.... 28
   Limited Rights of Bondholders............................. 30
   Limited Nature of Ratings; Reductions, Suspension or
      Withdrawal of a Rating..................................... 30
PLAN OF FINANCING .............................................. 31
   Series 2012A Bonds............................................. 31
   Series 2012B Bonds............................................. 31
   Estimated Sources and Uses of Funds for the Bonds,...... 32
SECURITY ................................................................ 32
   Source of Payment............................................... 32
   Flow of Funds under Trust Agreement.................... 33
   Rate Covenant .................................................... 34
   Reserve Account ................................................. 34
   Reserve Maintenance Fund, Self-insurance Fund and
      Capital Improvement Fund................................. 35
   Additional Bonds................................................ 35
   Subordinate Obligations....................................... 36
DESCRIPTION OF THE BONDS ................................. 37
   General .............................................................. 37
   Book-Entry Only System...................................... 37
   Discontinuance of the Book-Entry Only System ...... 40
   Optional Redemption........................................... 40
   Mandatory Redemption ........................................ 40
   Notice of Redemption.......................................... 41
THE AUTHORITY ..................................................... 41
   Powers .............................................................. 41
   Management........................................................ 42
   Subsidiaries........................................................ 44
   Fiscal Oversight Agreement.................................. 45
THE SYSTEM ........................................................... 45
   Generating Facilities ........................................... 45

Transmission and Distribution Facilities.................. 47
Adequacy of Capacity........................................... 50
Plans for Fuel Diversification ................................ 53
Statistical Information.......................................... 57
Historical Capital Improvement and Financing Program ....... 58
Projected Five-Year Capital Improvement and Financing
   Program ......................................................... 58
Rates ................................................................. 59
Major Clients...................................................... 61
Fuel................................................................... 62
Subsidies and Contributions in Lieu of Taxes .......... 63
Wheeling............................................................ 65
DEBT....................................................................... 66
   Lines of Credit – Operational................................ 66
   Other Loans and Debt – Subordinated.................... 66
   Swap Agreements................................................ 67
   Principal and Interest Requirements....................... 69
NET REVENUES AND COVERAGE............................. 70
   Management's Discussion and Analysis of Operating
      Results............................................................ 72
   Projected Net Revenues ....................................... 76
ENVIRONMENTAL MATTERS.................................... 80
   Environmental Litigation and Administrative
      Proceedings..................................................... 80
   Compliance Programs .......................................... 84
INSURANCE .............................................................. 95
   Coverage............................................................ 95
   Self-insurance Fund............................................. 96
   Fire Prevention Program ...................................... 96
LABOR RELATIONS .................................................. 96
PENSION PLAN ........................................................ 97
OTHER POST-EMPLOYMENT BENEFITS.................... 99
LITIGATION ............................................................. 99
TAX MATTERS ........................................................ 102
   Federal Income Taxes ........................................ 102
   State Taxes ...................................................... 102
   Original Issue Discount....................................... 102
   Original Issue Premium....................................... 103
   Ancillary Tax Matters ........................................ 103
   Changes in Law and Post Issuance Events ............. 104
VERIFICATION OF MATHEMATICAL
   COMPUTATIONS ............................................ 104
UNDERWRITING ..................................................... 104
MATERIAL RELATIONSHIPS ................................... 106
LEGAL MATTERS ................................................... 107
LEGAL INVESTMENT .............................................. 107
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ............................................................ 107
INDEPENDENT AUDITORS....................................... 107
RATINGS ................................................................ 108
CONTINUING DISCLOSURE ..................................... 108
MISCELLANEOUS.................................................... 111

APPENDIX I     -   Definitions of Certain Terms and
                  Summary of Certain Provisions of
                  the Trust Agreement..................... I-1
APPENDIX II   -   Audited Financial Statements ........... II-1
APPENDIX III  -   Letter of the Consulting Engineers ....... III-1
APPENDIX IV  -   Proposed Form of Bond Counsel
                  Opinion....................................... IV-1

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

$650,000,000
# PUERTO RICO ELECTRIC POWER AUTHORITY
## Power Revenue Bonds, Series 2012A
## Power Revenue Refunding Bonds, Series 2012B

### INTRODUCTORY STATEMENT

The purpose of this Official Statement of the Puerto Rico Electric Power Authority (the "Authority"), which includes the cover page, the inside cover page, the Appendices hereto and the information incorporated by reference as set forth below, is to furnish information in connection with the issuance and sale by the Authority of its Power Revenue Bonds, Series 2012A (the "Series 2012A Bonds") and its Power Revenue Refunding Bonds, Series 2012B (the "Series 2012B Bonds"; and together with the Series 2012A Bonds, the "Bonds").

Capitalized terms not defined elsewhere in this Official Statement are defined in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

The Bonds will be issued under and secured by a Trust Agreement, dated as of January 1, 1974, as amended (the "Trust Agreement"), between the Authority and U.S. Bank National Association, successor trustee (the "Trustee"). The Bonds, the other Puerto Rico Electric Power Authority Power Revenue Bonds and Power Revenue Refunding Bonds outstanding, and such additional bonds as may be issued from time to time under the Trust Agreement, are hereinafter collectively referred to as the "Power Revenue Bonds."

In order to give potential purchasers of the Bonds general information on the economy of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), this Official Statement incorporates by reference Appendix A to the Official Statement of the Puerto Rico Sales Tax Financing Corporation, dated December 1, 2011, relating to its $1,006,474,702 Sales Tax Revenue Bonds, Senior Series 2011C (the "Commonwealth Economic Report"). The Commonwealth Economic Report was filed by the Puerto Rico Sales Tax Financing Corporation with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org). The Commonwealth Economic Report was not prepared by the Authority, and the Authority does not assume any responsibility for its accuracy or completeness.

Any official statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Economic Report, or any new or revised Commonwealth Economic Report or other document that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Economic Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

# OVERVIEW

**General**

The Authority was created in 1941 as a public corporation and governmental instrumentality of the Commonwealth by Act No. 83 of the Legislative Assembly of Puerto Rico, approved May 2, 1941, as amended (the "Act"). The Authority supplies virtually all of the electric power consumed in the Commonwealth. The Authority is one of the largest municipal utilities in the United States, ranking first in number of customers and revenues among public power utilities. As of June 30, 2011, it served approximately 1.5 million clients and had utility plant in service totaling approximately $11.2 billion, including $4.1 billion of production plant in service and $5.4 billion of transmission and distribution plant in service, all based on original cost. The Authority's production facilities, together with two private co-generation facilities with long-term power purchase contracts with the Authority, have a dependable generating capacity of 5,839 megawatts ("MW"). For the twelve months ended December 31, 2011, the average percentage of the Authority's generating capacity available for service ("equivalent availability"), which includes the two co-generation facilities, was 80.9%. As of December 31, 2011, the Authority had 2,450 circuit miles of transmission lines and 32,548 circuit miles of distribution lines.

Approximately 69% of the Authority's energy generation for fiscal year 2011 was produced by Authority-owned and operated facilities. The Authority owns six major generating plants and a number of smaller facilities with a combined dependable generating capacity of 4,878 MW. Nearly all of these facilities are currently fired with fuel oil, although the Authority has converted the two main units at its Costa Sur generation facility to allow them to use either natural gas or fuel oil and, as part of its capital improvement plan, plans to convert several other units to dual fuel units. In order to allow these facilities to use natural gas, the Authority also plans to develop the infrastructure to transport and deliver natural gas. See *Plans for Fuel Diversification* under THE SYSTEM. The cost of such transportation and delivery infrastructure is not included in the Authority's capital improvement plan.

Approximately 31% of the Authority's energy generation for fiscal year 2011 was purchased from EcoEléctrica, L.P. ("EcoEléctrica") and AES Puerto Rico, L.P. ("AES-PR"), the owners and operators of two independent power production facilities. Under the long-term contract with EcoEléctrica, the Authority purchases 507 MW of dependable generating capacity from a natural gas-fired cogeneration plant built by EcoEléctrica and located in Peñuelas, Puerto Rico, which commenced commercial operation in March 2000. Under the long-term contract with AES-PR, the Authority purchases 454 MW of dependable generating capacity from a coal-fired cogeneration facility built by AES-PR and located in Guayama, Puerto Rico, which commenced commercial operation in November 2002. These contracts have allowed the Authority to reduce its dependence on fuel oil while passing on to EcoEléctrica and AES-PR substantially all of the risks of operating the facilities.

Unless otherwise noted, this Official Statement presents Revenues, Current Expenses and Net Revenues of the Authority as defined in the Trust Agreement and described herein. For purposes of the Trust Agreement, the Authority calculates Revenues, Current Expenses and Net Revenues on an accrual basis. Such calculations differ in several important respects from the Authority's calculations of change in net assets prepared in accordance with generally accepted accounting principles ("GAAP"). For example, Net Revenues under the Trust Agreement are computed excluding depreciation expense, other post-employment benefits expense and the payment of debt service on the Power Revenue Bonds. For a discussion of some of the most significant differences between Net Revenues under the Trust Agreement and change in net assets under GAAP and the treatment of non-cash items under the Trust Agreement, see NET REVENUES AND COVERAGE and Schedule II to the Financial Statements for the fiscal years ended June 30, 2011 and 2010 in Appendix II, which includes a reconciliation of the Authority's change in net assets under GAAP with its Net Revenues under the Trust Agreement.

The Authority's fiscal year begins on July 1 and ends on the following June 30.

## Summary of Operating Results

*Five-Year Period*

During the five-year period from fiscal year 2007 through fiscal year 2011, the Authority experienced a net decrease of 10.5% in electric energy sales in kilowatt hours ("kWh"), as shown in the table that follows under the heading "Operating Results." The Authority's sales during this period were adversely affected by the significant increase in oil prices (the average cost of fuel oil per barrel to the Authority increased by 66.7%), the principal source of fuel used in its generating facilities, and a reduction in the level of economic and business activity in the Commonwealth due to a prolonged recession, which commenced in the fourth quarter of fiscal year 2006.

The Authority's Net Revenues, however, increased from $672.4 million in fiscal year 2007 to $706.0 million in fiscal year 2011, or 5.0%. During this period, the Authority experienced decreases in Net Revenues in fiscal years 2009 and 2011, when compared to the respective prior fiscal years. Principal and Interest Requirements on the Authority's Power Revenue Bonds increased from $455.0 million in fiscal year 2007 to $480.2 million in fiscal year 2011 (which excludes $79.6 million of interest in fiscal year 2011 that was capitalized through the issuance of Power Revenue Bonds).

*Fiscal Year 2011*

Net Revenues for fiscal year 2011 were $706.0 million, representing a decrease of $30.6 million, or 4.2%, from Net Revenues for fiscal year 2010. The decrease in Net Revenues was primarily the result of a 3.8% decrease in electric energy sales (in kWh) and increases in maintenance expenses of $11.3 million, or 5.4%, and in transmission and distribution expenses of $15.6 million, or 9.7%. Revenues were $4.4 billion, a 5.9% increase from the prior year as a result of an increase in the revenues from the fuel adjustment charge due to the 14.2% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $3.7 billion for the year, an 8.1% increase from the prior year. Fuel and purchased power expenses, the principal component of the Authority's Current Expenses, are passed on to clients through a separate fuel adjustment charge included in electric service rates. The Authority's revenues from its basic charges (which exclude the fuel adjustment charge) decreased by 3.0% from fiscal year 2010 to fiscal year 2011 as a result of the decrease in electric energy sales. Excluding fuel and purchased power expenses, Current Expenses increased from $728.4 million for fiscal year 2010 to $752.9 million for fiscal year 2011, or 3.4%, as a result of the increases in maintenance and transmission and distribution expenses mentioned above. The increase in these expenses was due in part to increases in salaries pursuant to the collective bargaining agreement with the Authority's principal union. The accrued revenues attributable to the municipalities' consumption and the residential fuel, irrigation system and hotel subsidies increased from $237.8 million for fiscal year 2010 to $251.2 million for fiscal year 2011, or 5.6%. The treatment of the municipalities' consumption and these subsidies, which are included in Revenues although they are not collected, is discussed below and in *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

During fiscal year 2011, accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $932.1 million as of June 30, 2010 to $1.0 billion as of June 30, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge, due to the increase in the cost of fuel, and slower payments by clients. Accounts receivable from government clients increased from $274.7 million as of June 30, 2010 to $287.6 million as of June 30, 2011, of which 78% were considered past due (in excess of 30 days) as of June 30, 2011, compared to

3

73% as of June 30, 2010. Accounts receivable from general clients (residential, industrial and commercial) increased from $657.4 million as of June 30, 2010 to $720.1 million as of June 30, 2011, of which 8% were past due as of June 30, 2011, compared to 10% as of June 30, 2010.

*Six Months Ended December 31, 2011*

Net Revenues for the six months ended December 31, 2011 were $410.5 million, representing an increase of $75.2 million, or 22.4%, from the same period in the prior year. Net Revenues increased despite a 2.6% decrease in electric energy sales (in kWh), primarily as a result of higher revenues from the fuel and purchased power adjustment charges relative to the increase in the cost of fuel and purchased power due to differences between these adjustment charges, as determined by the Authority's formula, and actual costs of fuel and purchased power for the period. Revenues for the six months ended December 31, 2011 were $2.605 billion, a 23.9% increase from the same period of the prior year, mainly as a result of an increase in the revenues from the fuel adjustment charge due to the 40.3% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the same period in the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $2.195 billion for the period, a 24.1% increase from the same period in the prior year. The increase in Net Revenues during the six month period was also due in part to a decrease in maintenance expenses of $8.8 million, or 7.3%, and a decrease in transmission and distribution expenses of $7.6 million, or 8.1%. During the comparable period of 2010 these expenses had been higher than normal due to poor weather conditions that required higher maintenance and transmission and distribution expenses. Administrative and general expenses of $90.5 million for this period were 1.7% higher than in the comparable period of 2010. The accrued revenues attributable to the municipalities' consumption and the residential fuel, irrigation system and hotel subsidies increased from $118.6 million for the six months ended December 31, 2010 to $141.5 million for the six months ended December 31, 2011, or 19.3%.

Accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $822.5 million as of December 31, 2010 to $994.6 million as of December 31, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge, due to the increase in the cost of fuel, and slower payments by clients. Accounts receivable from government clients (excluding municipalities) increased from $253 million as of December 31, 2010 to $261.8 million as of December 31, 2011, of which 81% were considered past due (in excess of 30 days) as of December 31, 2011, compared to 79% as of December 31, 2010. Accounts receivable from general clients increased from $595.1 million as of December 31, 2010 to $719.5 million as of December 31, 2011, of which 10% were past due as of December 31, 2011, compared to 12% as of December 31, 2010.

The table appearing below summarizes the operating results of the Authority for the five fiscal years ended June 30, 2011 and the six months ended December 31, 2011 and 2010. For purposes of the Trust Agreement, the Authority calculates Revenues and Net Revenues including (i) amounts billed to the Commonwealth's municipalities for electric energy sales that the Authority is legally entitled to collect but historically has not collected because it instead offsets such billings against the contribution in lieu of taxes ("CILT") that the Authority is required to pay the municipalities, and (ii) amounts attributable to a residential fuel subsidy, a hotel subsidy and a rural electrification and irrigation systems subsidy that the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to credit these subsidies directly to customers in their electric energy bills). The amount of the required annual CILT is at least equal to the municipalities' annual electric energy consumption. The aggregate amount of accrued revenues for each period attributable to the municipalities' consumption of electric energy and these subsidies is shown in footnote 1 to the table below. As shown in the table, when these amounts are deducted from Revenues and Net Revenues (shown in the table as adjusted net revenues), the Authority's debt service coverage is reduced significantly. For a discussion of Bond

Counsel's treatment of Revenues and Net Revenues for purposes of the additional bonds test and rate covenant under the Trust Agreement, see *Rate Covenant* and *Additional Bonds* under SECURITY. For a discussion of the CILT and the subsidies provided by the Authority, see *The Authority's Financial Condition – Subsidies and Contributions in Lieu of Taxes* under RISK FACTORS AND INVESTMENT CONSIDERATIONS, *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM, and *Projected Net Revenues* under NET REVENUES AND COVERAGE.

## Operating Results
### (dollars in thousands)

| | Fiscal Years Ended June 30 | | | | | Six Months Ended December 31 | |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2010[2] | 2011[2] |
|---|---|---|---|---|---|---|---|
| Revenues[1] | $3,687,385 | $4,369,498 | $4,007,268 | $4,165,733 | $4,411,213 | $2,103,476 | $2,605,492 |
| Less: Current Expenses | 3,014,983 | 3,688,070 | 3,377,772 | 3,429,095 | 3,705,192 | 1,768,201 | 2,195,036 |
| Net Revenues[1] | $ 672,402 | $ 681,428 | $ 629,496 | $ 736,638 | $ 706,021 | $ 335,275 | $ 410,456 |
| Principal and Interest Requirements[3] | $ 455,022 | $ 419,569 | $ 435,042 | $ 397,579 | $ 480,234 | (4) | (4) |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.48 | 1.62 | 1.45 | 1.85 | 1.47 | (4) | (4) |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[5] | 1.04 | 1.09 | 0.92 | 1.25 | 0.95 | (4) | (4) |
| Electric energy sales (in millions of kWh) | 20,672 | 19,602 | 18,516 | 19,235 | 18,501 | 9,671 | 9,421 |
| Percentage change in electric energy sales from prior year | 0.3% | (5.2)% | (5.5)% | 3.9% | (3.8)% | (2.5)% | (2.6)% |
| Peak load (in MW) | 3,604 | 3,546 | 3,351 | 3,404 | 3,406 | 3,406 | 3,303 |
| Percentage change in peak load from prior year | (2.2)% | (1.6)% | (5.5)% | 1.6% | 0.1% | 0.1% | (3.0)% |

[1] Includes revenues attributable to electric energy consumption by municipalities, residential fuel subsidy, hotel subsidy, and rural electrification and irrigation systems subsidy of $198.2 million, $225.1 million, $229.6 million, $237.8 million and $251.2 million for fiscal years 2007, 2008, 2009, 2010 and 2011, respectively, and $118.6 million and $142.7 million for the six months ended December 31, 2010 and 2011, respectively.

[2] Unaudited.

[3] The Principal and Interest Requirements for fiscal years 2008, 2009, 2010 and 2011 have been reduced by the interest that was capitalized through the issuance of Power Revenue Bonds in the amounts of $21.2 million, $37.7 million, $8.4 million and $79.5 million, respectively. The Principal and Interest Requirements for fiscal year 2010 have been adjusted to reflect the restructuring of $73.9 million of the Authority's debt service requirements for such fiscal year through the issuance of Power Revenue Bonds, the proceeds of which were used to pay debt service for that fiscal year. The Principal and Interest Requirements for fiscal year 2011 have been further reduced by the amount of the Federal Build America Bonds subsidy on the Power Revenue Bonds, Series YY and Series EEE, equal to 35% of the interest payable on such Bonds.

[4] Calculated only for full fiscal year.

[5] Excludes from Net Revenues, for purposes of computing this ratio, the basic charges and fuel adjustment charges attributable to energy consumption by the municipal governments as well as the subsidies for energy consumption charges provided by law to certain residential customers and hotels and those subsidies related to rural electrification and irrigation systems, which are not collected.

Although the ratio of adjusted net revenues (net of municipalities' consumption and subsidies) to Principal and Interest Requirements was below 1.00 for fiscal years 2009 and 2011, the Authority made timely payments on its Power Revenue Bonds in such fiscal years. The Authority, however, had to borrow in order to meet all of its operational and financial obligations. See *The Authority's Financial Condition* under RISK FACTORS AND INVESTMENT CONSIDERATIONS and DEBT.

The Authority's rate covenant requires that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that Revenues are sufficient to pay Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all bonds then Outstanding. Pursuant to the accrual method of calculating Revenues and Current Expenses under the Trust Agreement, the Authority is in compliance with the rate covenant, even if the accrued residential fuel, hotel and rural electrification and irrigation subsidies are excluded from Revenues.

For a more detailed discussion of the Authority's operating results for the past five fiscal years, see *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

5

*Seven Months Ended January 31, 2012*

Net Revenues for the seven months ended January 31, 2012 were $431.3 million, representing an increase of $38.1 million, or 9.7%, from the same period in the prior year. Net Revenues increased despite a 2.0% decrease in electric energy sales (in kWh), primarily as a result of higher revenues from the fuel and purchased power adjustment charges relative to the increase in the cost of fuel and purchased power due to differences between these adjustment charges, as determined by the Authority's formula, and actual costs of fuel and purchased power for the period. Revenues for the seven months ended January 31, 2012 were $2.987 billion, a 22.2% increase from the same period of the prior year, mainly as a result of an increase in the revenues from the fuel adjustment charge due to the 39.1% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the same period in the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $2.556 billion for the period, a 24.6% increase from the same period in the prior year. Excluding fuel and purchased power, Current Expenses during the seven month period increased by $4.5 million, or 1.0%. The increase in Current Expenses, excluding fuel and purchased power, was mainly due to an increase in administrative and general expenses of $21.4 million, or 21.1%, partly offset by a decrease in maintenance expenses of $11.9 million, or 8.8%. The increase in administrative and general expenses of $21.4 million for this period was mainly due to extraordinary expenses related to the settlement of certain multi-year disputes with labor unions.

**Capital Improvement Program**

The total cost of the Authority's capital improvement program in fiscal years 2012 through 2016 is estimated to be approximately $1.72 billion, which is $811.7 million less than the cost of the capital improvement program for fiscal years 2007 through 2011. The Authority's capital expenditures in fiscal years 2007, 2008 and 2009 were at historically high levels principally due to the costs associated with certain production plant construction projects, which were completed in fiscal year 2009. The Authority expects that substantially all of the cost of the capital improvement program through 2016 will be provided from the issuance of the Bonds, additional Power Revenue Bonds and other borrowings.

Set forth below is a summary of the Authority's historical total capital improvement program for the five fiscal years ended June 30, 2011 and the projected capital improvement program for the five fiscal years ending June 30, 2016. For a more detailed discussion of the Authority's historical and projected capital improvement program, see *Historical Capital Improvement and Financing Program* and *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

**Capital Improvements**
**(dollars in thousands)**

| Capital Improvements | Fiscal Years | | | |
| --- | --- | --- | --- | --- |
| | 2007-2011 | % of Total | 2012-2016 | % of Total |
| Production plant | $1,182,336 | 46.7 | $ 644,308 | 37.5 |
| Transmission facilities | 585,028 | 23.1 | 381,554 | 22.2 |
| Distribution facilities | 589,127 | 23.3 | 453,326 | 26.4 |
| Other[1] | 174,098 | 6.9 | 239,717 | 13.9 |
| Total | $2,530,679 | 100.0 | $1,718,905 | 100.0 |

[1] Includes land and buildings, general equipment, preliminary surveys and investigations.

As discussed further below, the Authority's capital improvement program through fiscal year 2016 does not include the estimated costs of a proposed 93-miles of underground natural gas pipeline referred to as "Vía Verde" and a proposed offshore natural gas terminal at the Aguirre generation facility,

the two principal infrastructure projects required in order to deliver natural gas to most of the Authority's generation facilities. The Authority estimates that the construction and development costs of the Vía Verde natural gas pipeline will be approximately $450 million, of which approximately $55 million has already been spent. The Authority preliminarily estimates that the construction costs of the Aguirre offshore natural gas terminal will be approximately $175 million. Both of these projects are in the permitting stage. If permits and project financing are obtained, the Authority expects that the construction period for the Vía Verde project will be between 14 and 16 months and that the construction period for the Aguirre offshore terminal will be approximately 12 months.

The Authority, together with Government Development Bank for Puerto Rico ("Government Development Bank"), as fiscal agent, is evaluating various financing structures for these projects. Some of the alternatives being considered include financing these projects on a project finance, off-balance sheet basis or through fuel purchase agreements with third parties for the delivery of natural gas. Under these financing methods, the Authority would pay the capital costs of the projects through service agreements with third parties to construct and/or operate the natural gas facilities. Under these financing alternatives, payments made by the Authority for services related to the natural gas facilities or for the acquisition of natural gas from third parties would constitute a Current Expense under the Trust Agreement and, thus, would be paid prior to debt service payments on the Power Revenue Bonds. In order for payments of services related to the natural gas facilities to qualify as Current Expenses under the Trust Agreement, those facilities have to be usable and in use. Additionally, in order for payments for the acquisition of natural gas to be considered a Current Expense, such fuel must actually be ordered by the Authority, delivered by the third party and used by the Authority. Because natural gas is currently a substantially cheaper source of fuel than oil, and this price differential is projected to continue, the Authority expects that even after recouping the capital costs of the projects through the fuel adjustment charge or other charge, the generation of electricity with natural gas will result in net savings to the Authority's clients, which could also have a positive effect on electric energy demand and the Puerto Rico economy. At present, the Authority estimates that the use of natural gas instead of fuel oil in the Authority's facilities that would be supplied through the Vía Verde and Aguirre projects could result in annual fuel cost savings to the Authority of between $500 million and $1.0 billion by fiscal year 2016, depending on market prices of fuel oil and natural gas, the sourcing of natural gas and the Authority's execution of the plant conversions to dual fuel units that can burn oil and natural gas. For more information on the Vía Verde natural gas pipeline, the Aguirre offshore natural gas terminal, the sourcing of natural gas and the projected savings from the use of natural gas, see *Plans for Fuel Diversification – Conversion of Generating Facilities to Dual Fuel* and *– Transportation of Natural Gas to Puerto Rico and Projected Savings from Natural Gas Diversification Strategy* under THE SYSTEM.

For a more detailed description of the Authority's electric generation, transmission and distribution system and the Authority's historical and projected capital improvement program, see THE SYSTEM.

## Strategic Plans to Address the Authority's Challenges

The Authority faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the volatility in oil prices. Its principal challenges, some of which are interrelated, are: (i) addressing the decline in electric energy sales; (ii) addressing the volatility of oil costs; (iii) addressing high customer electric power rates; (iv) reducing past due accounts receivables; (v) reducing its operating costs; and (vi) improving its liquidity. The Authority's management is focused on addressing these challenges by continuing with the implementation of a financial stabilization plan and other strategic initiatives.

For a discussion of certain considerations affecting an investment in the Bonds, see RISK FACTORS AND INVESTMENT CONSIDERATIONS below.

*Financial Stabilization Plan*

The principal component of the financial stabilization plan is the reduction of operating costs in line with the reduction in electric energy sales (in kWh) in order to maintain adequate operating margins. The principal cost reduction measures included in the plan have been (i) reducing the number of employees through a combination of attrition from voluntary retirement and the elimination of temporary and vacant positions, (ii) reducing retiree health care benefits by adopting changes to the health plan in 2009 that included the imposition of caps on the amount of monthly benefits for all current and future retirees and stricter eligibility requirements, (iii) reducing overtime and miscellaneous expenses, and (iv) implementing enhanced budget controls and expense management in each of the three operational units and support areas (generation, transmission and distribution, and customer service). These measures, which the Authority began implementing in 2009, resulted in recurring annual savings of approximately $135 million, consisting of (i) a reduction of 904 employees from January 1, 2009 through December 31, 2011 that has resulted in annual savings of approximately $56 million, (ii) changes to retiree health care benefits that have reduced actual benefit payments from $80.9 million for fiscal year 2009 to $43.1 million for fiscal year 2010 and $22.1 million for fiscal year 2011, a reduction of $58.8 million since fiscal year 2009, and (iii) other cost reduction initiatives, such as the reduction of overtime, materials, administrative and miscellaneous expenses, that are expected to result in annual savings of approximately $20 million.

As a result of various cost reduction measures implemented, the Authority's operating expenses for fiscal year 2011 (excluding fuel and purchased power) decreased by $33.2 million, or 4.2%, compared to fiscal year 2009, which represented the highest point of historical operating expenses (excluding fuel and purchased power). The Authority's operating expenses (excluding fuel and purchased power) for fiscal year 2011, however, increased by $24.5 million, or 3.4%, compared to fiscal year 2010, mainly due to increases in maintenance and transmission and distribution expenses attributable, in part, to increases in salaries pursuant to the collective bargaining agreement with the Authority's principal union. For the first seven months of fiscal year 2012, the Authority's operating expenses (excluding fuel and purchased power) increased by $4.5 million, or 1.0%, compared to the same period of fiscal year 2011, mainly due to an increase in administrative and general expenses of $21.4 million as a result of extraordinary expenses related to the settlement of certain multi-year disputes with labor unions.

In fiscal year 2012, Government Development Bank, as fiscal agent, hired a leading U.S. based consulting and restructuring firm to perform a review of the Authority's operations to further identify opportunities for improving operating efficiency and reducing costs. An initial assessment is expected to be delivered by the last quarter of fiscal year 2012.

Another component of the financial stabilization plan has been the restructuring of a portion of the Authority's debt service on the Power Revenue Bonds to reduce Principal and Interest Requirements in several fiscal years through the refinancing of principal and interest payments. During fiscal year 2010, the Authority refinanced approximately $73.9 million of principal and interest due during such fiscal year. In addition, the Authority issued Power Revenue Bonds to refinance certain lines of credit with private financial institutions and Government Development Bank that had been used to finance working capital needs of the Authority. During fiscal year 2012, in connection with the issuance of the Series 2012A Bonds, the Authority expects to repay a Government Development Bank line of credit facility used to pay approximately $128.4 million of the interest on the Power Revenue Bonds due during such fiscal year and approximately $29.9 million of the principal of the Power Revenue Bonds due on July 1, 2012. The Authority's projections for fiscal years 2012 through 2016 include the assumption that

interest on the Bonds and all additional Power Revenue Bonds to be issued during this period will be capitalized for a three-year period. The aggregate reductions to Principal and Interest Requirements for each fiscal year during the projection period attributable to capitalized interest are $81.5 million for fiscal year 2012, $67.1 million for fiscal year 2013, $61.2 million for fiscal year 2014, $73.6 million for fiscal year 2015 and $80.9 million for fiscal year 2016.

*Fuel Diversification Strategy*

*General.* As opposed to mainland United States utilities, the Authority's energy generation is heavily reliant on fuel oil. As a result of the increase in the price of fuel oil in the past several years, the Authority's retail price for electricity has also increased significantly, which has in turn adversely affected demand for electricity and Puerto Rico's economic growth. In order to address the current high prices of oil as well as the volatility of oil prices, the Authority's management is focused on diversifying fuel sources. Furthermore, new rules adopted by the U.S. Environmental Protection Agency (the "EPA") in 2011 pursuant to the Clean Air Act ("CAA"), which will become effective on April 16, 2012, establish emissions limitations for mercury, non-mercury metallic hazardous air pollutants and acid gases by utility generating units. Although the Authority is still evaluating the impact of this rule, known as the "Mercury and Air Toxics Standards" or "MATS," it believes that in order to comply within the current three-year compliance period, it will have to convert substantially all of its existing generating units to burn natural gas instead of fuel oil. If the Authority were not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it would need to incur significant capital investments to control emissions in order to comply with the MATS within the current compliance schedule without being able to offset these costs with any cost savings on the purchase of fuel. The Authority is still in the process of analyzing the costs of compliance if it is not able to implement the natural gas diversification strategy. While it is not possible for the Authority to determine at this point the exact magnitude or timing of such expenditures, it currently estimates that required capital investments could amount to approximately $631.6 million to $1.26 billion and also result in additional annual recurring expenses related to the operation and maintenance of the emissions control systems. The Authority may not be in a position to fund such additional expenditures without increasing its revenues.

The Authority's fuel diversification strategy has two principal components: (1) convert most of the Authority's existing oil-fired generating units to dual fuel units that can burn either oil or natural gas and develop the necessary natural gas transportation and delivery infrastructure, and (2) purchase power from renewable energy projects. The Authority has already completed the conversion of the two main generating units at the Costa Sur power plant to dual fuel, representing approximately 820 MW of generating capacity, or 14% of the Authority's total dependable generating capacity. The Authority is able to receive natural gas at Costa Sur through an existing pipeline from the EcoEléctrica terminal and has already conducted testing of these units with natural gas. The Authority is in the process of completing other necessary improvements in order to burn up to 100% natural gas at these two Costa Sur units. The Authority expects to commence burning natural gas at Costa Sur in April 2012 and that the full 820 MW of capacity will be fueled with natural gas by April 2013.

The Authority's capital improvement program for fiscal years 2012 through 2016 includes the conversion to dual fuel of the main generating units at the other generation facilities of the Authority, representing approximately 2,420 MW of generating capacity, at an estimated cost of approximately $119.3 million. In order for the Authority to be able to burn natural gas at these other facilities, however, the Authority has to develop the associated natural gas delivery infrastructure. To this end, the Authority has been procuring the permits for Vía Verde, an approximately 93 mile long underground natural gas pipeline system that would transport natural gas from the EcoEléctrica terminal in the south to the San Juan, Palo Seco and Arecibo (Cambalache) generating plants in the north. These plants would represent an aggregate of 1,520 MW of dependable generating capacity that would be fueled with natural gas. The

Authority's preliminary estimate of the cost of the Vía Verde project is approximately $450 million, of which $55 million has already been spent. The Authority has received several of the Puerto Rico permits required for construction. The only remaining permit required to be able to commence construction is the permit from the U.S. Army Corps of Engineers. Several environmental groups have expressed opposition to the project; however, the Authority expects that it will be able to obtain the remaining permit. On March 21, 2012, the Puerto Rico Supreme Court dismissed several consolidated judicial actions against Vía Verde that primarily challenged the Puerto Rico Environmental Quality Board's ("EQB") approval of the final environmental impact statement for the project. If permits and the required project financing are obtained, the Authority expects to complete construction of this project in approximately 14 to 16 months following the receipt of permits and financing.

The Authority's capital improvement program for fiscal years 2012 through 2016 also includes the conversion to natural gas of two of Aguirre's generating units representing 900 MW of capacity, which in addition to 592 MW of capacity that has already been converted to dual fuel at Aguirre, would represent 1,492 MW of dual fuel capacity. In order to deliver natural gas to the Aguirre power plant, which is the largest of the Authority's generating plants, the Authority engaged a leading company in the development of liquefied natural gas ("LNG") storage and regasification infrastructure to conduct a feasibility study for the engineering, procurement, construction and operation of a floating offshore LNG regasification facility. The feasibility study was completed with a positive result. This facility will require permits from the Federal Energy Regulatory Commission ("FERC") and will be subject to a full environmental review and analysis under the National Environmental Policy Act. The Authority has also engaged this company to commence the permitting process, which includes a pre-filing with FERC that has already been submitted, and is currently in negotiations with the company regarding the development of this facility. If the negotiations are satisfactorily completed and the required permits and project financing are obtained, the Authority expects that the cost of this facility will be approximately $175 million and that the construction period will be approximately 12 months.

The Authority is also considering other alternatives to bring natural gas to its main generating facilities. On February 15, 2012, the Governor of Puerto Rico adopted an Executive Order creating a multi-sectoral committee, of which the Authority is a part, to study and submit a report regarding the necessary measures to comply with the new EPA rules and the impact of not complying on the economy (in particular on the manufacturing sector), and to examine all alternatives to transport and deliver natural gas to the Authority's generating plants on the north.

In order to develop renewable energy generation, the Authority had, as of March 1, 2012, signed power purchase agreements with respect to 33 renewable energy projects totaling approximately 1,000 MW of capacity, subject to financing, permitting and other technical requirements. These projects are for renewable energy from solar, wind, waste-to-energy and landfill gas technologies and the agreements provide for the purchase of power at fixed prices that are currently lower than the cost of the Authority's most expensive generation capacity. Over time, however, the cost of purchasing power from these renewable energy facilities could exceed the cost of energy produced by the Authority's natural gas fired units but is expected to remain lower than the cost of fuel oil generation. The cost of purchased power from these facilities will be passed on to the consumer through the purchased power adjustment charge. The Authority's projections for the five fiscal years ending June 30, 2016 assume the Authority will have approximately 650 MW of renewable energy capacity by fiscal year 2016, which, based on expected availability, would represent approximately 10% of its projected energy generation.

The Authority's fuel diversification strategy has the ultimate goal of reducing the dependence on oil for energy generation from 69% for fiscal year 2011 to 41% by 2016 (assuming only the conversion of the Costa Sur power plant to natural gas and the development of the renewable capacity mentioned above) and 10% by 2016 (assuming the completion of Vía Verde and the Aguirre offshore natural gas terminal

that would allow most of the Authority's generating units to burn natural gas and the development of the renewable capacity mentioned above). See *Plans for Fuel Diversification – Conversion of Generating Facilities to Dual Fuel* under THE SYSTEM.

*Transportation of Natural Gas to Puerto Rico and Projected Savings from Natural Gas Diversification Strategy.* During the past decade, liquefied natural gas ("LNG") has been imported to Puerto Rico for use in the EcoEléctrica cogeneration facility, which has an LNG terminal. On March 28, 2012, the Authority entered into a two-year purchase agreement for natural gas in order to provide natural gas to the Authority's Costa Sur power plant, where the Authority has already completed the conversion of the main generating units to dual fuel, and is able to receive natural gas through an existing pipeline from the EcoEléctrica LNG terminal. The LNG that is imported through the EcoEléctrica LNG terminal is currently from non-U.S. sources as the United States does not currently produce LNG in the contiguous 48 states that can be delivered outside the mainland and lacks the infrastructure and facilities required for such production. The Authority's contracted natural gas prices for the Costa Sur plant are based on a discount to the prices of fuel oil, as is typical in international markets.

In recent years, technological advances have allowed energy companies to tap into large previously untouched reserves of natural gas that could allow the U.S. to become a major producer of LNG in the future, but this would require the development of the appropriate infrastructure. While natural gas inside the U.S. mainland is generally transported via pipeline, deliveries to markets that are not accessible via pipelines would require the construction of LNG production facilities to convert the gas into liquid form and transport it via specialized tankers to foreign or domestic overseas destinations. Several companies are planning or evaluating the construction of such liquefaction plants and related facilities in the United States. Whether the infrastructure for the production of a significant amount of LNG from the U.S. mainland will be developed ultimately will depend on market conditions in the coming years and the energy policy of the United States government.

Natural gas, unlike oil, does not trade on a unified world market. Currently, there is a significant differential in the price of natural gas in international markets versus U.S. based prices, with U.S.-based prices being significantly lower. In the future, if the Authority were able to purchase LNG from the U.S. mainland, it would have to transport it in compliance with the Jones Act. The Jones Act generally requires that the transportation of merchandise between two U.S. points (including Puerto Rico) be carried in vessels that are documented in the United States, built in the United States, and owned and operated by U.S. eligible citizens. The Jones Act contains a limited exemption (adopted in 1996) for vessels that transport LNG to Puerto Rico if the vessel (1) is a foreign built vessel that was built before October 19, 1996, or (2) was documented under U.S. flag before that date, even if the vessel was thereafter redocumented under foreign flag before being redocumented under U.S. flag. In either case, the vessels still have to be U.S. owned and U.S. manned. Although there are currently no Jones Act compliant LNG vessels (either directly or within the limited exemption) operating in U.S. coastwise trade, there are some vessels currently in operation (thirteen (13) vessels that were built in U.S. yards and up to twenty-four (24) vessels that were built in non-U.S. shipyards between January 1, 1990 and October 16, 1996) that could potentially meet the previously mentioned limited exemption and be used to transport LNG from one or more future U.S. LNG production facilities to Puerto Rico. Even if such vessels were available, however, the provisions of the Jones Act would have the effect of increasing the cost of transporting LNG from the United States to Puerto Rico, as such vessels would have a higher cost profile than a foreign-flag LNG vessel. In addition, in November 2011, the U.S. Congress passed a law creating another limited exemption from the Jones Act. The law allows three specific LNG vessels (i.e., LNG Gemini, LNG Leo, and LNG Virgo) to transport natural gas between U.S. ports. This exemption may not be useful for LNG transport to Puerto Rico, since the vessels are quite old and are planned to be used as part of a project to transport ethane from Pennsylvania to the Gulf Coast. As a result, these vessels may not be available to transport natural gas between U.S. ports and Puerto Rico.

At the request of the Government of Puerto Rico, the U.S. Government Accountability Office is currently performing a comprehensive study on the Jones Act. After this study is concluded, the Government of Puerto Rico will analyze its findings and, as part of its efforts to reduce the cost of electricity in Puerto Rico, possibly seek from the U.S. Congress a broadening of the current Jones Act exemptions to include newer and more efficient LNG vessels in order to facilitate the transportation of LNG from the U.S. There is no assurance that the current exemptions will be broadened or, if they are broadened, that the Authority would be able to contract for the purchase and transportation of LNG from the U.S. mainland at lower prices than what it would be able to obtain in international markets.

The Authority estimates that the use of natural gas instead of fuel oil in the Authority's facilities that would be supplied through the Vía Verde and Aguirre projects could result in annual fuel cost savings to the Authority of between $500 million and $1.0 billion by fiscal year 2016, depending on market prices of fuel oil and natural gas and on the Authority's execution of the plant conversions to dual fuel units that can burn oil and natural gas. To the extent that LNG is produced in the U.S. mainland and becomes available for delivery to foreign or domestic overseas markets, the price differential with international markets persists, and the Authority is able to secure transportation of such LNG in compliance with the Jones Act, as it may be amended from time to time, the Authority believes its savings from the use of natural gas could be in the upper part of the above-mentioned range. Conversely, to the extent the Authority has to continue purchasing natural gas in international markets, it believes its projected savings may be in the lower portion of this range, unless global prices come down as a result of increased production and exports of U.S. natural gas.

*Reducing Past Due Receivables*

In order to improve the Authority's liquidity, the Authority has also made efforts to reduce past due receivables from the government sector. The central government's outstanding balance as of June 30, 2011 was approximately $54.2 million, an increase of $17.0 million compared to $37.2 million as of June 30, 2010, mainly as a result of increases in the price of electricity. Approximately 69% of the balance as of June 30, 2011 was for past due accounts (in excess of 30 days), compared to 59% as of June 30, 2010. As of December 31, 2011, the central government's outstanding balance decreased to $41.8 million, of which 58% represented past due accounts. Also, the public corporations had an outstanding balance of $228.1 million as of June 30, 2011, of which 88% was for past due accounts, compared to $225.7 million and 88% as of June 30, 2010. As of December 31, 2011, the outstanding balance of the public corporations decreased to $209.7 million, of which 85% was for past due accounts. On January 20, 2012, the Authority received a payment of $60 million from the Ports Authority, which at $63.6 million had the largest outstanding balance of all public corporations as of December 31, 2011, mostly for past due invoices. See *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

Act 239-2011, adopted on December 11, 2011, provides that each fiscal year the Office of Management and Budget of the Commonwealth shall establish a projection of electricity expenses for agencies whose operations depend on the General Fund and shall coordinate with the Puerto Rico Treasury Department so that the total amount of these expenses is reserved exclusively for these purposes and the monthly payment is sent directly to the Authority at the beginning of each month. In accordance with Act 239-2011, the Puerto Rico Treasury Department is making current payments for electric energy consumption by central agencies of the Commonwealth. While the payment of past due accounts from the government sector is not covered by Act 239-2011, the Authority continues to pursue the collection of all past due accounts from government clients, as discussed above, with the assistance of Government Development Bank, as its fiscal agent.

*Energy Theft Reduction Initiatives*

The Authority is also continuing with the implementation of a more aggressive energy theft reduction program through the use of "smart grid" technologies that reduce the need for door-to-door inspections, among other steps. One of the principal components of this plan is the replacement of old meters with new smart meters that are more resistant to tampering or magnetic interference. The Authority has already installed approximately 110,000 of the new meters, which allow the Authority to perform remote disconnections. In addition, the Authority is implementing data systems and technology solutions that will enable it to identify areas where there are network losses of energy or usage patterns that differ from historical norms, thus allowing the Authority to deploy its resources more efficiently. In addition, Act 235-2011, adopted on December 11, 2011, assigns primary responsibility for investigating illegal appropriation of electric energy to the Special Investigations Unit of the Puerto Rico Department of Justice, with the assistance of the Authority. Acts 237-2011 and 238-2011, also adopted on December 11, 2011, increase the criminal and administrative penalties for tampering with the electric energy system. During fiscal year 2011, theft recovery initiatives resulted in theft-related billings of approximately $27 million and collections of approximately $13.4 million. The Authority's various theft recovery initiatives are expected to result in $25 million of annual revenues for fiscal year 2012 and $30 million in annual revenues for fiscal years 2013 through 2016, as reflected in the Authority's five-year projections. See *Transmission and Distribution Facilities – Operations* under THE SYSTEM.

*Reduce CILT*

The Authority is required to compensate municipalities for foregone tax revenue related to the Authority's properties by paying a CILT. The amount of the required annual CILT is at least equal to the municipalities' annual electric energy consumption. While the Authority is legally entitled to collect from the municipalities their electric energy consumption bills, the Authority for many years has followed the practice of not pursuing the collection of energy bills from the municipalities, and instead it offsets such bills against the CILT. Many municipalities have taken advantage of the current CILT formula to subsidize for-profit ventures located in municipal facilities. Act 233-2011, approved December 11, 2011, modifies the CILT formula to exclude from the municipality's electric energy consumption the consumption related to municipal facilities in which for-profit businesses operate and for which the municipalities receive compensation through rent or an entrance fee. The Authority is in the process of implementing the provisions of Act 233-2011 by installing additional meters in municipal facilities to be able to determine the consumption that is no longer subject to the CILT. The Authority's preliminary estimate is that Act 233-2011 will result in additional collections of approximately $15 million in fiscal year 2013, $20 million in fiscal year 2014, $25 million in fiscal year 2015 and $30 million in fiscal year 2016. The Authority's projections for the five fiscal years ending June 30, 2016 take into consideration the provisions of Act 233-2011. See *Projected Net Revenues* under NET REVENUES AND COVERAGE. For more information regarding contributions in lieu of taxes, see *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

*Efficiency of Capital Improvement Program*

The decrease in the demand for electricity and the completion of certain key projects in the production plants has allowed the Authority to reduce the sizes of, and to refocus, its capital improvement program for fiscal years 2012 through 2016. The Authority is refocusing its capital improvement program away from the historical trend of capacity expansion and towards diversifying the fuel sources for its generating units, improving the reliability of its production capacity and the efficiency of its transmission and distribution system. In establishing its capital improvement program, the Authority reviewed potential projects to select and prioritize those that it believes will enable it to reduce costs and improve its operating efficiency. As a result, the Authority has been able to reduce its capital

improvement program from $2.5 billion for fiscal years 2007 through 2011 to a projected $1.72 billion for fiscal years 2012 through 2016. The Consulting Engineers have examined the projected capital improvement program and found it to be reasonable. As discussed previously, however, these amounts exclude (i) the costs of the Vía Verde natural gas pipeline and the Aguirre offshore natural gas terminal, which are necessary to reduce the Authority's cost of fuel and comply with the MATS, and (ii) the costs of complying with the MATS if the natural gas conversion projects cannot be completed. See *Transmission and Distribution Facilities* and *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

*Fuel Procurement Model*

As another measure to decrease the cost of fuel oil, the Authority, together with Government Development Bank, as fiscal agent, is evaluating the restructuring of the Authority's fuel oil procurement process in order to achieve efficiencies and savings that can result in a lower cost of fuel oil. The Authority and Government Development Bank, with the assistance of outside firms, are evaluating the current fuel oil procurement model and the terms of the purchase contracts to determine the extent to which a more flexible model and different purchase terms may result in the Authority paying a lower price for fuel oil. The Authority also believes that payment delays by the Authority in the purchase of fuel oil beyond the stipulated contract terms have also resulted in higher prices offered by the suppliers. An important goal of this process is to establish a procurement model that will attract more interested parties and reduce the delay in payments to suppliers, thus resulting in lower fuel oil prices to the Authority due to increased competition in the fuel supply process. Act 234-2011, adopted on December 11, 2011, provides greater flexibility to the Authority to purchase fuel without a competitive bidding process when Government Development Bank, as fiscal agent, is involved in the negotiation of the terms of the purchase contracts. Act 234-2011 will permit the Authority to implement the new fuel oil procurement model. The Authority has already commenced implementing this initiative on a short-term basis for some of its fuel oil purchases, which has resulted in some savings, and expects to implement the new procurement model for all of the Authority's fuel oil purchases by July 2012.

In addition, the Authority, together with Government Development Bank, continues to regularly explore alternatives to reduce its exposure to the volatility of fuel prices, such as entering into derivative contracts for hedging oil prices. To date, the Authority has no hedges related to oil prices in effect. See *Fuel* under THE SYSTEM.

## RISK FACTORS AND INVESTMENT CONSIDERATIONS

AN INVESTMENT IN THE BONDS INVOLVES A DEGREE OF RISK.   SET FORTH BELOW IS A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE BONDS. EACH PROSPECTIVE INVESTOR SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW IN ORDER TO MAKE A DECISION AS TO THE CREDIT-WORTHINESS OF THE AUTHORITY AND MUST EXAMINE ITS FINANCIAL CONDITION IN ORDER TO MAKE A JUDGMENT AS TO ITS ABILITY TO BEAR THE RISK OF AN INVESTMENT IN THE BONDS,

THE FOLLOWING DISCUSSION OF RISK FACTORS IS INTENDED ONLY AS A SUMMARY AND DOES NOT PURPORT TO IDENTIFY ALL THE RISK FACTORS THAT MAY AFFECT THE AUTHORITY'S ABILITY TO PAY DEBT SERVICE ON THE AUTHORITY'S POWER REVENUE BONDS. PROSPECTIVE INVESTORS ARE ADVISED TO REVIEW ALL THE INFORMATION IN THIS OFFICIAL STATEMENT IN EVALUATING AN INVESTMENT IN THE BONDS.

ANY ONE OR MORE OF THE FACTORS DISCUSSED AND OTHERS COULD ADVERSELY AFFECT THE AUTHORITY'S OPERATIONS, REVENUES AND EXPENSES TO AN EXTENT THAT CANNOT BE DETERMINED AT THIS TIME, COULD ADVERSELY AFFECT THE AUTHORITY'S ABILITY TO COMPLY WITH ITS OBLIGATIONS AND COULD LEAD TO A DECREASE IN THE MARKET VALUE AND/OR THE LIQUIDITY OF THE AUTHORITY'S POWER REVENUE BONDS.  THERE IS NO ASSURANCE THAT OTHER FACTORS WILL NOT BE MATERIAL IN THE FUTURE.

### The Authority's Financial Condition

The Authority's financial condition has been adversely affected by a variety of factors, some of which are described below.

*Operating Losses Pursuant to GAAP*

For the three fiscal years ended June 30, 2009, 2010 and 2011, the Authority incurred losses before contributed capital of $163.0 million, $219.8 million and $286.0 million, respectively, in accordance with GAAP.  These losses reflect the continuation of a historical trend of net losses that have resulted in a deficit in the Authority's consolidated net assets of $169.5 million as of June 30, 2011.  This means that, as of June 30, 2011, the Authority's total liabilities of $10.1 billion exceed its total assets of $9.9 billion.  As of December 31, 2011, the Authority had unconsolidated net assets (on a stand-alone basis, excluding the Authority's subsidiaries) of negative $296.1 million (unaudited).

The Authority's operating expenses (as reported in its audited financial statements) for fiscal year 2011 (excluding depreciation and the cost of fuel oil and purchased power) of $793.1 million were $25.8 million, or 3.4%, higher than for fiscal year 2010, and $50.8 million, or 6.8%, higher than for fiscal year 2009.  As discussed above, operating expenses under GAAP differ from Current Expenses under the Trust Agreement mainly because Current Expenses exclude depreciation expense, other post employment benefits expense, and debt service payments on Power Revenue Bonds and other subordinated debt. Other post employment benefits expense was $27.5 million and $27.4 million for fiscal years 2010 and 2011, respectively.  Depreciation expense was $355.4 million and $350.7 million for fiscal years 2010 and 2011, respectively.  The Authority is analyzing the status of its depreciable assets to review whether the Authority's accumulated depreciation aligns with the reduction in value and estimated useful life of these assets.  This analysis may result in an adjustment to the Authority's annual depreciation rates.

For the six month period ending on December 31, 2011, unaudited operating expenses (excluding depreciation and the cost of fuel oil and purchased power) decreased 3.9%, from $397.6 million for the six month period ended December 31, 2010 to $382.2 million for the same period in fiscal year 2011.

*Subsidies and Contributions in Lieu of Taxes*

The Authority includes in Revenues and Net Revenues, for purposes of complying with its requirements under the Trust Agreement, amounts billed to the Commonwealth's municipalities for electric energy sales to the municipalities that the Authority is legally entitled to collect but historically has not collected because it instead offsets such billings against its CILT obligation. The Authority also includes in Revenues and Net Revenues amounts attributable to (i) a residential fuel subsidy and a hotel subsidy that the Authority also does not collect because it is required by law to credit such amounts directly to the customers in their electric energy bills and (ii) amounts attributable to a rural electrification and irrigation system subsidy that the Authority is legally entitled to collect from the Commonwealth but historically has not billed and collected. For a detailed description of the Authority's obligation to make CILT payments and provide these and other subsidies, and the procedures followed by the Authority to comply with such obligations, see *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

The annual CILT is equal to, at a minimum, the municipality's actual electric energy consumption and is payable only from Net Revenues available after provision is made for debt service and other Trust Agreement obligations in each fiscal year. The Authority is legally entitled to collect the municipalities' electric energy consumption bills on a current basis and defer the payment of the CILT until November 30 following the end of the fiscal year. The Act provides that the Authority's obligations under the Trust Agreement have priority over the Authority's obligation to make any CILT payment. Historically, however, the municipalities have not been paying for their electricity on a current basis and the Authority has followed the practice of not pursuing the collection of the municipalities' bills and instead it offsets the outstanding bills against the CILT. This practice, which the Act provides is at the option of the Authority, has affected the Authority's liquidity and its ability to meet its financial obligations. If the Authority were to change this practice and enforce its legal right to require the municipalities to pay their bills on a current basis, however, there is no assurance that the Authority in fact would be able to collect such bills or, in some cases, collect such bills from municipalities that are in a difficult financial position.

In fiscal years 2010 and 2011, the Authority's Revenues from sales of electricity to municipalities were $196.5 million and $212.5 million, respectively, and the aggregate amount of the residential fuel, rural electrification and irrigation system, and hotel subsidies included in Revenues was $41.3 million and $38.7 million, respectively. The sum of the sales of electricity to municipalities and these subsidies ($237.8 million for fiscal year 2010 and $251.2 million for fiscal year 2011) represented approximately 32.3% and 35.6%, respectively, of the Authority's Net Revenues for the corresponding periods. That sum is expected to be $250.3 million, or 29.1% of projected Net Revenues, by fiscal year 2016, as the Authority is implementing measures to reduce the consumption of the municipalities subject to the CILT. The historical and projected Revenues from sales of electricity to municipalities and the residential fuel, rural electrification and irrigation system, and hotel subsidies are set forth in footnotes to the tables titled Historical Net Revenues and Coverage and Projected Net Revenues and Coverage appearing under NET REVENUES AND COVERAGE. Because the determination of Revenues and Net Revenues under the Trust Agreement is on an accrual basis, the Authority is able to include the municipalities' consumption and the subsidies in Revenues even though it does not collect the same. If those Revenues were excluded from the calculation of Net Revenues, the Authority's ratio of Net Revenues to Principal and Interest Requirements would be reduced significantly. In some of the prior years, that ratio was below 1.00. For a discussion of Bond Counsel's treatment of Revenues and Net Revenues for purposes of the additional

bonds test and rate covenant under the Trust Agreement, see *Rate Covenant* and *Additional Bonds* under SECURITY.

As mentioned above, Act 233-2011 modifies the CILT formula to exclude from the municipality's electric energy consumption electric energy consumption related to municipal facilities in which for-profit businesses operate and for which the municipalities receive compensation through rent or an entrance fee. The Authority's preliminary estimate is that Act 233-2011 will result in additional collections of approximately $15 million in fiscal year 2013, $20 million in fiscal year 2014, $25 million in fiscal year 2015 and $30 million in fiscal year 2016. The Authority's projections for the five fiscal years ending June 30, 2016 take into consideration the provisions of Act 233-2011. There is no assurance that the Authority will be able to achieve these additional collections.

*Funding of Capital Improvements*

Substantially all of the Authority's capital improvement program has been and is expected to continue to be financed through the issuance of Power Revenue Bonds and other borrowings. This has caused the Authority's level of indebtedness and related debt service requirements to increase significantly as well.

The Authority's Consulting Engineers have recommended that the Authority increase the amount of its capital improvement program funded from internally-generated sources to at least 16%. The Authority is not expected to achieve this goal in the next five fiscal years.

*Liquidity; Government Accounts Receivable; Operational Lines of Credit*

During fiscal years 2010 and 2011, the Authority experienced a deterioration of its liquidity. Among the factors that affected the Authority's liquidity were the increase in the level of accounts receivable during fiscal years 2010 and 2011, the higher level of operating expenses relative to decreasing or constant revenues and the Authority's practice of not collecting the municipalities' electric consumption receivables and offsetting such receivables against the CILT.

As of December 31, 2011, accounts receivable from the central government and public corporations amounted to $251.4 million, consisting of $41.8 million from the central government and $209.7 million from public corporations, of which 58% and 85%, respectively, represented past due amounts.

Due to liquidity constraints, the Authority has had an increasing need to use lines of credit from Government Development Bank and private financial institutions to finance its operational expenses, including the purchase of fuel oil. In fiscal year 2011, the Authority borrowed $310 million to cover operating expenses. As of December 31, 2011, the Authority had in place two one-year revolving credit facilities provided by private financial institutions, with a maximum aggregate amount of $385 million and an outstanding balance of $300 million as of December 31, 2011 ($285 million as of January 31, 2012). These lines of credit mature in June 2012 and July 2012. In addition, on March 8, 2012, the Authority obtained an additional $50 million revolving credit facility from Government Development Bank to allow the Authority to make timely payment to suppliers of fuel oil under the new fuel procurement process currently implemented for a portion of the Authority's fuel oil purchases that began on a short-term basis in March 2012. This line of credit expires in June 2012. See *Notes* and *Government Development Bank – Lines of Credit* under DEBT.

Repayment of these and future lines of credit to cover operational expenses is treated as a Current Expense under the Trust Agreement, which is entitled to be paid before debt service on the Power Revenue Bonds.

### Refinancing of Debt Service Payments

The Authority's financial situation has forced the Authority to engage in a restructuring of its debt service requirements. During fiscal year 2010, the Authority refinanced approximately $73.9 million of principal and interest due during such fiscal year. In addition, the Authority issued Power Revenue Bonds to refinance certain lines of credit with private financial institutions and Government Development Bank that had been used to finance working capital needs of the Authority. During fiscal year 2012, in connection with the issuance of the Series 2012A Bonds, the Authority expects to repay a Government Development Bank line of credit facility used to pay approximately $128.4 million of the interest on the Power Revenue Bonds due during such fiscal year and approximately $29.9 million of the principal of the Power Revenue Bonds due on July 1, 2012. The Authority's projections for fiscal years 2012 through 2016 include the assumption that interest on the Bonds and all additional Power Revenue Bonds to be issued during this period will be capitalized for a three-year period. The aggregate reductions to Principal and Interest Requirements for each fiscal year during the projection period attributable to capitalized interest are $81.5 million for fiscal year 2012, $67.1 million for fiscal year 2013, $61.2 million for fiscal year 2014, $73.6 million for fiscal year 2015 and $80.9 million for fiscal year 2016.

The restructuring of current debt service payments increases the Authority's debt service obligations in future years.

### Funding of Pension Liabilities

The employees of the Authority participate in a defined benefit pension plan which provides retirement and death benefits. The Authority's pension plan faces a number of financial difficulties, as reflected in its large unfunded actuarial accrued liability ("UAAL"), which amounted to $1.4 billion as of the June 30, 2010 actuarial valuation, and low funded ratio of 50.2% as of June 30, 2010, based on the actuarial value of the plan's assets. The funded ratio as of June 30, 2010 based on the market value of the plan's assets was 40.5%. Furthermore, the plan has been subject to historical funding shortfalls, and these funding shortfalls are expected to continue. For fiscal years 2009, 2010 and 2011, the employer and employee contributions to the plan amounted to $116.5 million, $106.8 million and $122.4 million, respectively, while annual benefit payments amounted to $190.2 million, $203.9 million and $198.3 million, respectively.

As a result of the plan's low funded ratio and the funding shortfalls referred to above, and depending on the actual return on the plan's assets compared to the assumed return in the actuarial valuation, the Authority may have to increase its annual contribution to the plan in order for the plan to be able to keep making benefit payments at current levels on a long-term basis. This additional contribution would result in an increase in the Authority's Current Expenses before the payment of debt service on the Power Revenue Bonds. For more information regarding pension liabilities affecting the Authority, see PENSION PLAN. Any required increase in the Authority's annual contribution may adversely affect the Authority's ability to meets its other obligations.

### Sale of Hydroelectric Facilities

The Authority is considering the sale of its hydroelectric generating assets, which currently represent 100 MW of generating capacity, to the Puerto Rico Aqueduct and Sewer Authority ("PRASA") because it believes that PRASA can better maximize the use of these assets. For fiscal year 2011, the

Authority's hydroelectric generating assets accounted for 149.8 million kWh, or 0.66% of the Authority's total generation. Currently, hydroelectric generation represents approximately 22% of PRASA's annual energy consumption (664.7 million kWh for fiscal year 2011). The Authority, with the assistance of Government Development Bank and outside firms, is currently evaluating the impact of this transaction on the Authority, including by performing a valuation to ensure that the transaction is fair to both public corporations. While this transaction would result in the Authority receiving a purchase price for these assets and eliminating the associated operating expenses, it would result in a reduction of future revenues from PRASA as PRASA would be meeting part of its energy consumption from the generating capacity of the hydroelectric assets. The fiscal years 2012 through 2016 projections of Net Revenues included in this Official Statement do not include the impact of this transaction as such impact is currently under evaluation. PRASA is the Authority's largest consumer of electric energy and its electric consumption generated $139.0 million in revenues to the Authority for fiscal year 2011. Under the provisions of the Trust Agreement, the Authority would be permitted to sell these assets only if its ratio of Net Revenues to maximum aggregate annual Principal and Interest Requirements is not reduced due to such transfer. The Authority is also evaluating the potential sale or transfer to PRASA of certain irrigation assets.

**The Authority's ability to charge and collect rates sufficient to provide for debt service on the Power Revenue Bonds and other indebtedness and meet its operating expenses**

The imposition and collection by the Authority of rates, fees and charges for the services of the System provide the only security for payment of the Power Revenue Bonds, but are subject to being applied first to the payment of Current Expenses, which are the operating expenses of the System.

The Revenues of the Authority are dependent on the rates which it charges and the revenues it collects from its customers. The inability of or failure by the Authority to charge rates that produce, and to collect, sufficient Revenues could result in the Authority being unable to cover its Current Expenses or to meet coverage requirements or debt service payments on its Power Revenue Bonds. The Authority is able to adjust rates, subject to it complying with certain public hearing and review procedures, as described in *Rates* under THE SYSTEM. The Authority has not increased basic charges since 1989. However, because the cost of fuel and purchased power is passed along to clients through a fuel adjustment charge, the cost of electricity to clients has increased significantly during the past several years. The high level of the current fuel adjustment charge limits the Authority's ability to increase its basic rate without further affecting the demand for electricity.

The Authority's ability to increase its rates and/or collect additional Revenues from its customers is also affected by economic conditions and population trends in the Commonwealth. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. In its most recent projections, the Puerto Rico Planning Board (the "Planning Board") projects a decrease in real gross national product of 1.0% for fiscal year 2011 and an increase of 0.7% for fiscal year 2012. Electric energy sales in kWh have experienced a declining trend during the past five years. A continued slowdown in the economy or a low rate of economic growth will adversely affect the Authority's ability to maintain or increase its Net Revenues as electric energy consumption may remain constant or continue to decrease. In addition, the population of the Commonwealth decreased from 2000 to 2010 and decreased further from 2010 to 2011. If this trend continues, the Authority's ability to maintain or increase its Revenues and its capacity to comply with debt service obligations may be adversely affected.

The Authority expects that if it is able to implement its fuel diversification strategy, it will be able to reduce its fuel adjustment charges. This, in turn, may result in higher demand for electricity and may stimulate economic growth.

**The Authority's ability to meet its projections of Net Revenues**

The Authority's ability to generate sufficient Net Revenues to meet its Principal and Interest Requirements during the projected period of fiscal years 2012 through 2016 is based on meeting the assumptions underlying its projections, several of which involve factors beyond the control of the Authority. One of the key assumptions is the Authority's cost of residual and distillate fuel, which have been and continue to be very volatile. The Authority's projections assume that for fiscal year 2012, its blended cost for the two fuel oils will average $117.09 per barrel and that the average price of oil during the five year period ending 2016 will be $108.31 per barrel. However, since the price of fuel oil has kept increasing since the Authority completed its projections, it may currently be higher that what the Authority assumed in its projections. The price of oil is dependent on a number of exogenous factors, including political factors affecting the supply of crude oil, which are impossible to predict. See *Projected Net Revenues* under NET REVENUES AND COVERAGE.

If Current Expenses of the Authority should experience a significant increase without a corresponding increase in rates and charges, the Authority's Net Revenues and its debt service coverage could be negatively affected. These expenses will be significantly influenced by the performance of management and their ability to execute on the strategic initiatives discussed above, as well as by external circumstances, such as the outcome of litigation against the Authority, changes in regulatory policy or legislation (such as the implementation of the MATS), changes in uncontrollable costs (such as fuel and insurance), and the necessity to carry out unexpected repairs or replacements, any of which could have a material adverse financial effect on the Authority. There can be no assurance that the Authority's projections of Current Expenses will not be substantially exceeded.

The projections of Net Revenues prepared by the Authority for the five fiscal year period from 2012 through 2016, which show that the Authority is able to meet the coverage requirements of the Trust Agreement (based on the Trust Agreement's accrual method), are also premised in part on the inclusion as Revenues of the municipalities consumption of electric energy and certain subsidies that the Authority does not collect. When these revenues are eliminated from Revenues and Net Revenues, the Authority's debt service coverage is reduced significantly as shown in the preceding *Operating Results* table and in the table of "Historical Net Revenues and Coverage" appearing under NET REVENUES AND COVERAGE. Such projections are also premised on the expectation that the Authority will be able to reduce operating expenses (excluding maintenance), principally in administrative and general expenses and production plant and transmission and distribution expenses, by approximately 19% by fiscal year 2016, compared to fiscal year 2011. There can be no assurance, however, that the Authority will in fact be able to achieve the expected reductions in every year. If such projected reductions are not achieved, the Authority's ability to meet its debt service obligations may be adversely affected, unless the Authority is able to implement other revenue raising measures or there is a higher than projected increase in demand for electricity.

Even if the projections for fiscal years 2012 through 2016 are met, the Authority's ability to obtain sufficient Net Revenues to pay an increasing amount of debt service on the Power Revenue Bonds beyond fiscal year 2016 (see *Principal and Interest Requirements* under DEBT) will ultimately depend on its ability to execute the strategic initiatives described herein and/or implement further revenue raising or expense reduction measures.

The Authority's financial projections involve many assumptions, some of which are beyond the control of the Authority, such as the cost of fuel oil and its impact on the level of demand for electricity. In the past, the Authority's projections of Net Revenues have at times materially differed from what the Authority has been able to achieve.

If the Authority's financial results do not meet the various assumptions underlying the projections, its ability to generate sufficient Net Revenues to pay debt service on the Power Revenue Bonds after paying its Current Expenses may be adversely affected. In addition, its ability to continue funding its capital improvement program to improve the System, execute on its fuel diversification strategy and comply with its regulatory requirements may also be adversely affected. The inability to comply with its regulatory obligations may result in additional monetary penalties and other adverse consequences.

### The Trend in Demand for Electricity

During fiscal years 2008 and 2009, the Authority experienced a decrease in electric energy sales (in kWh) as a result of the ongoing economic recession in Puerto Rico and the high rates charged to the Authority's clients, which are the result of the combination of the high cost of fuel oil and the Authority's dependence on fuel oil for 69% of its power production. For fiscal years 2008 and 2009, when Puerto Rico's real gross national product decreased by 2.8% and 3.7%, respectively, the Authority's electric energy sales decreased by 5.2% and 5.5%, respectively. Residential, industrial and commercial energy sales were all negatively impacted during these two fiscal years. During fiscal year 2010, however, the Authority experienced an increase in electric energy sales compared with fiscal year 2009. This increase mainly occurred in the residential sector, which experienced an increase of 10.8%, partly attributable to lower fuel oil prices during the first six months of fiscal year 2010 (which averaged $83.05 per barrel) compared with the price of fuel oil during the first six months of fiscal year 2009 (which averaged $97.35 per barrel). During fiscal year 2011, electric energy sales (in kWh) decreased 3.8% compared to fiscal year 2010, with all customer categories experiencing the downward trend. During the first six months of fiscal year 2012, compared to the first six months of fiscal year 2011, electric energy sales (in kWh) have decreased in all segments, with the largest decreases experienced in the residential and industrial sectors, which experienced declines of 3.4% and 3.3%, respectively. The Authority believes the reduction in demand during this period is principally due to the increase in the cost of fuel oil, which is passed on to the Authority's clients.

The Authority is projecting declines in electric energy sales (in kWh) of 3.03% and 1.11% for fiscal years 2012 and 2013, respectively, and increases of 0.32%, 1.07% and 1.52% for fiscal years 2014, 2015 and 2016, respectively. The increases for the last three fiscal years are expected to result from improved economic conditions in Puerto Rico and the stabilization of fuel prices through the fuel diversification strategies contemplated in the projections. To address the expected decreases in the level of demand for electricity during fiscal years 2012 and 2013, the Authority's management has been implementing the financial stabilization and fuel diversification plan previously disclosed that aims to reduce operational costs to bring them in line with the expected energy sales. The Authority projects that the price of fuel oil will average $108.31 thru 2016. If the price of fuel oil remains at current levels or increases, however, it is expected that the Authority may continue to experience a decrease in sales.

For more information regarding the historical and projected sales and revenues of the Authority, see NET REVENUES AND COVERAGE.

### Dependence on Fuel Oil; Fuel Cost Volatility

Approximately 69% of the Authority's energy generation for fiscal year 2011 was produced by oil-fueled units. The Authority's dependence on oil, contrary to the situation of mainland United States utilities, has resulted in the Authority's electricity rates being among the highest of all United States utilities. For the first six months of fiscal year 2012, the Authority's average retail price of electricity was $0.27 per kWh.

The Authority's main operating expense is the cost of fuel oil. Fuel oil expenses amounted to $2.3 billion, or 61.8% of Current Expenses, for fiscal year 2011, and $2.0 billion, or 58.5% of Current Expenses, for fiscal year 2010. During the last five fiscal years, there has been significant volatility in the price of oil. The average cost per barrel to the Authority was $57.55 for fiscal year 2007, $84.18 for fiscal year 2008, $76.23 for fiscal year 2009, $76.55 for fiscal year 2010 and $95.91 for fiscal year 2011. For the first six months of fiscal year 2012, the average cost per barrel was $117.01, compared to $83.05 for the comparable period of fiscal year 2011, an increase of 40.9%.

Since the cost of fuel is passed on to the Authority's clients on a current basis through a fuel adjustment charge, the Authority's dependence on fuel oil has resulted in overall increases and significant volatility in the cost of energy to the Authority's customers during the last five fiscal years. The increased cost of energy, in turn, has a negative impact on Puerto Rico's economy and has contributed to the reduced demand for electricity discussed above. The Authority's management is focused on diversifying fuel sources, with the goal of reducing the dependence on oil for energy generation from 65% today to 41% by 2016 (assuming the conversion of the Costa Sur power plant to natural gas and the development of the renewable energy capacity previously mentioned) and 10% on a long-term basis (once the Vía Verde and Aguirre offshore natural gas terminal are online). In order to achieve this reduction, the Authority plans to convert existing oil-fired facilities to allow them to use either fuel oil or natural gas, build a pipeline system to transport natural gas to several of the Authority's generating plants, and build an offshore terminal to supply natural gas to the Aguirre plant. The Authority's ability to achieve these plans, however, is subject to factors beyond its control such as completion of the permitting process and obtaining financing for these projects.

The Authority has also entered into power purchase agreements with developers of renewable energy projects with the long-term goal of increasing the use of renewable energy and complying with the renewable energy portfolio standards described below. As of March 1, 2012, the Authority had signed power purchase agreements with respect to 33 renewable energy projects totaling approximately 1,000 MW of capacity. All of these agreements are subject to financing, permitting and other technical requirements. Four of the renewable energy projects have already obtained private financing commitments and have commenced construction. The Authority's projections for the five fiscal years ending June 30, 2016 assume the Authority will have approximately 650 MW of renewable energy capacity by fiscal year 2016, which, based on expected availability, would represent approximately 10% of its projected energy generation. There is no assurance that these renewable energy projects will be completed or come on line by fiscal year 2016. These renewable energy projects, while reducing the cost of energy below the current levels of costs based on fuel oil, may result in costs of energy that are higher than the cost of generation through the burning of natural gas. See *Plans for Fuel Diversification* under THE SYSTEM.

For more information regarding the fuel used by the Authority for its generating units, see *Fuel* under THE SYSTEM.

**The Authority's ability to manage substantial construction efforts related to its fuel diversification program**

Although the Authority's five-year capital improvement program is smaller than the Authority's capital improvement program for the prior five years, the Authority is embarking on an aggressive fuel diversification plan in order to lower the cost of electricity and meet regulatory requirements. The Authority has engaged external companies to assist in the development of some of these projects. The implementation of projects of this magnitude at multiple generating plants and the integration into the system of several renewable energy projects, however, is technically complex and elevates the operational risks and the need for superior execution. Although the Authority has successfully implemented and

managed a larger capital improvement program in the past, there can be no assurance that the Authority will be able to successfully implement a capital improvement and fuel diversification program of this magnitude on a timely basis, on budget and without adverse consequences to the System. The Authority's financial condition and results of operations could be materially adversely affected if it is unable to successfully manage these plans as well as the risks inherent in operating and improving its facilities.

**The Authority's ability to access the capital markets**

As a capital intensive company, the Authority relies on access to the capital markets and other borrowings. The Authority regularly accesses capital markets and other private borrowings, from Government Development Bank and private financial institutions, to finance its activities, for both capital improvement and working capital purposes. The Authority expects to continue to need access to such capital and borrowings for its ongoing capital improvement program, which is substantial, and for working capital purposes. The Authority's ability to arrange financing as well as its ability to refinance debt and make scheduled payments of principal and interest are dependent on numerous factors, including the Authority's levels of indebtedness, maintenance of acceptable credit ratings, its financial performance, liquidity and cash flow, and other market conditions. The Authority's inability to obtain additional financing from time to time would have a material adverse effect on its liquidity, operations and its ability to meet all of its obligations.

**The Authority's System may be affected by general operating risks and hazards customary in the power generation industry. The Authority may not have adequate insurance to cover all these hazards.**

The operation of power generation facilities is a potentially dangerous activity that involves many operating risks, including transmission disruptions and constraints, equipment failures and shortages, and system limitations, degradation and interruption. The Authority's operations are also subject to risks of human performance and workforce capabilities. There can be no assurance that the Authority's insurance will be sufficient or effective under all circumstances or protect against all hazards to which the Authority may be subject, or that insurance coverage will continue to be available on terms similar to those presently available, or at all. The Authority has a number of older facilities with potentially higher risks of failure or outage than an average plant. Under the Trust Agreement, the Authority maintains a Self-insurance Fund for paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement. The Self-insurance Fund had a balance of $85 million as of March 20, 2012.

**Weather and Other Uncontrollable Events**

Puerto Rico is an island located in an area subject to tropical storms, hurricanes and earthquakes. If a major natural disaster were to strike Puerto Rico, the System and customers' homes may experience substantial damage and a resulting interruption in service. Such events may materially adversely affect the Authority's ability to provide service and collect Revenues. Repair and maintenance of the System may also be subject to availability of key materials. The Authority has taken steps to mitigate the impact of tropical storms, including implementation of a hurricane preparedness plan and securing insurance coverage where available and contracts with suppliers providing for emergency inventories. The Authority also has an ongoing plan for the gradual burying of distribution lines in order to make them less susceptible to damage from weather related events.

If all, substantially all or any portion of the System is damaged or destroyed by any casualty, there is no assurance that casualty insurance proceeds or other proceeds (if available) will be sufficient to repair or replace such property. Even if applicable insurance coverages are adequate, there is no assurance that such damage or destruction would not have a material adverse effect on the ability of the Authority to provide electric energy service to its customers or on the Revenues of the Authority. The interruption of electric energy service for a prolonged period of time may have an adverse impact on the Authority's Revenues.

**Labor Factors**

The Authority is currently negotiating new collective bargaining agreements with its four unions. Three of the collective bargaining agreements have expired and the fourth, with its largest union, expires on August 24, 2012. While the Authority's relations with its labor unions are considered satisfactory at this time, these may be adversely affected by issues arising as a result of the bargaining process or other labor disputes. The Authority has experienced prior episodes of labor unrest that included work stoppages and occasional incidents of sabotage to its facilities. The ability of the Authority and its labor unions to continue the current spirit of cooperation and consultation will facilitate the Authority's meeting its financial and operating objectives and projections. Should these relations deteriorate, however, and recurrent work stoppages occur, it is possible that this may have an adverse effect on the ability of the Authority to provide electric power services to its customers or on the Revenues of the Authority. See LABOR RELATIONS.

**Changes in Commonwealth Legislation, Competition and Self-Generation**

The Commonwealth has identified high energy costs as one of the main factors affecting Puerto Rico's competitiveness and has made the adoption of a new energy policy an important part of its economic development initiatives. Act No. 73-2008, also known as the Economic Incentives Act, Puerto Rico's most recent tax incentives legislation, also created the Puerto Rico Energy Affairs Administration, a new government agency under the Department of Economic Development and Commerce in charge of developing and implementing a new energy policy for Puerto Rico. The Economic Incentives Act provides, among other things, for tax credits against Puerto Rico income tax equal to a percentage of the payments made to the Authority for the net consumption of energy related to business operations. These credits are available to any business that is an industrial client of the Authority and has been designated as an eligible business by the Secretary of the Department of Economic Development and Commerce with the endorsement of the Executive Director of the Puerto Rico Industrial Development Company and the Secretary of the Puerto Rico Treasury Department. These tax credits will be covered from moneys from the Commonwealth's General Fund and payments from the Authority.

The Economic Incentives Act provides that the Authority's cost of the tax credit will be absorbed by the Authority through a reduction in operational costs, increased efficiencies, revenues generated through "wheeling" and reductions in the cost of generating or purchasing energy. The Economic Incentives Act expressly provides that the Authority's cost in providing the tax credit shall not be subsidized by or passed through, either directly or indirectly, to the customers of the Authority, nor shall such costs cause a reduction in employment or in the payroll of the Authority. If during the 10-year term of the tax credit the average cost of energy is reduced to 10 cents per kWh for a period of two consecutive years, the tax credit will terminate.

The Authority expects to pay its portion of the cost of the tax credit from Revenues in a given year, but only after the application of Revenues to pay Current Expenses and debt service on the Authority's outstanding bonds in such given year, and after certain debt service, maintenance, capital improvement and self-insurance reserves are funded as required under the Trust Agreement. To date, the

24

Authority has only incurred administrative costs related to the Economic Incentives Act. The Authority estimates that it will incur costs related to the Economic Incentives Act of approximately $70 million in the five years ending in fiscal year 2016.

The Economic Incentives Act mandated the introduction of "wheeling" by January 2, 2010 and created a committee in charge of the implementation of a wheeling system. Under a wheeling system, the Authority must make available its transmission and distribution system to third party power generators. Although the Authority did not meet the deadline established in the Economic Incentives Act, public hearings were held on June 1 and 2, 2010 to consider the Wheeling System Tariffs, Wheeling Transmission Regulation and Wheeling Interconnection Procedure. The examiner recommended approval of the Wheeling Transmission Regulation and Wheeling Interconnection Procedure, but rejected approval of the Wheeling System Tariffs based on lack of information to the public. He recommended further public hearings with enough time for public evaluation. Based on such recommendations, the Authority modified the Wheeling Transmission Tariff Schedules and held new public hearings on June 2 and 3, 2011. The public hearing examiner submitted his report to the Board of Directors on July 22, 2011, including various recommendations that are under evaluation by the Authority. The Authority is also currently revising the Wheeling Regulation and Wheeling Interconnection Procedure. These regulations implement the wheeling system at transmission voltage level (115kV and 38kV). The Authority is planning to evaluate the implementation of the wheeling system at the distribution voltage level (13kV).

Under the Economic Incentives Act, if the Authority and a third party power generator do not agree on the wheeling rates within a period of 60 days, the Executive Director of the Energy Affairs Administration has the authority to appoint an arbitrator to determine, approve and establish the rates to be paid to the Authority by the third party power generator. See *Wheeling* under THE SYSTEM.

On July 19, 2010, the Commonwealth enacted Act No. 82-2010, known as the Act for a Public Policy for Energy Diversification Through Sustainable and Alternative Renewable Energy. Act No. 82-2010 requires the Authority to meet prescribed targets of energy generation from renewable sources by specified dates, as follows: 12% of energy sales from renewable energy production by 2015 and 15% of energy sales from renewable energy production by 2020, with a requirement to establish a plan to reach 20% of energy sales from renewable energy production by 2035. Act No. 82-2010 also establishes Renewable Energy Certificates as a legally recognized asset that can be purchased, sold, traded and transferred separately from electric power and used to meet the renewable energy targets and creates a Renewable Energy Commission with the power to implement and supervise compliance with Act No. 82-2010. Failure to comply with the renewable energy targets could result in the imposition of fines. The Authority is taking measures to comply with Act No. 82-2010, such as entering into power purchase agreements with developers of renewable energy projects, but it is too early to determine whether the Authority will be able to comply with the requirements of Act No. 82-2010.

Concurrently with the enactment of Act No. 82-2010, the Commonwealth enacted Act No. 83-2010, known as the Green Energy Incentives Act, which provides cash and further tax incentives to promote the development of renewable energy projects. It is too early to determine what impact Act No. 82-2010 and Act No. 83-2010 will have on the Authority, but existing or new legislation that would reduce the Authority's electric energy sales could have a material impact on the Authority's operations and financial condition.

New methods of producing low cost electricity and self-generation by certain industrial or commercial customers are other factors that could affect the Authority. The Authority is currently subject to "net metering" legislation under Act No. 114-2007, also known as the Net Metering Act, which allows residential and small business customers with their own generation to sell power back to the Authority.

Current net metering applies to residential owners generating up to 25 kW and commercial clients generating up to 1 MW. The Net Metering Act is under review by the Legislative Assembly to increase the net metering limits to 1 MW for commercial clients connected to the distribution voltage and 5MW to commercial clients connected to the transmission voltage. The Authority cannot determine with certainty what effects these factors will have on its business operations, but the effects are unlikely to be significant in the short-term. The Authority's management, however, is focused on reducing the cost of power to its customers in order to make it more competitive in a market environment.

Any new legislation that promotes competition in the energy sector in Puerto Rico or affects the Authority's rate-setting independence could have a material impact on the Authority's operations and financial condition. The Authority cannot predict at this time whether any additional legislation or rules will be enacted by the Commonwealth that will affect the Authority's operations or financial condition.

**Changes in Federal Laws or Regulations**

The electric utility industry in the United States mainland has changed from a regulated monopoly business to a deregulated competitive industry. FERC has mandated wholesale wheeling and open access for transmission facilities owned by utilities that engage in interstate commerce. Many states have enacted or proposed laws and regulations that are designed to (i) ensure open access to transmission facilities to promote wholesale power supply competition and (ii) phase in retail competition. The requirements of FERC, including those regarding wholesale wheeling, are generally not applicable to the Authority because it is not engaged in transactions in interstate commerce. In addition, there are currently no wholesale clients in the Commonwealth, although the Authority is required to offer a wheeling service. As a result, the Authority has operated as a monopoly in the sale of electricity in Puerto Rico which has allowed it to charge rates determined by reference to their costs of service rather than by competitive forces. This may change, however, as a result of the "wheeling" initiatives discussed above. The Authority remains subject to the mandatory purchase obligation and other legal requirements in the Public Utility Regulatory Policies Act of 1978 ("PURPA"), which requires the Authority to purchase energy from certain generators at the Authority's avoided costs. Changes in Federal legislation, market development and other factors, however, could expose the Authority to competition.

**The Authority's ability to comply with environmental and public health standards, maintain self-sufficiency in a highly regulated industry and fund capital improvements required to comply with these regulatory requirements**

Electric utilities are subject to continuing environmental regulation, which may change from time to time. These changes may arise from continuing legislative, regulatory and judicial action. Compliance with these regulations may require modification of existing facilities, require additional capital and operating expenditures, cause a reduction in operating levels, and create barriers to new facility development. Failure to comply with these regulations could result in penalties or in the shutdown of generating units that are not in compliance.

The environmental aspects of the Authority's operations are regulated primarily by the EPA and the EQB under federal and Commonwealth statutes and associated rules and regulations. In the past, there have been various instances of non-compliance by the Authority with U.S. federal and Commonwealth environmental laws and regulations, which have resulted in monetary penalties, injunctive relief and criminal action against the Authority. The Authority is currently operating under a consent decree (the "Consent Decree") related to regulatory issues arising under federal environmental laws. For more information regarding the Consent Decree and other administrative proceedings, please see ENVIRONMENTAL MATTERS.

26

There are no assurances that the federal and Commonwealth agencies regulating environmental matters will not bring additional enforcement actions under existing statutes, the Consent Decree or other current administrative proceedings, which could require additional, unexpected capital and/or operating expenditures. For more information regarding the Authority's compliance with environmental laws and regulations, please see ENVIRONMENTAL MATTERS.

The Authority has budgeted for compliance with the Consent Decree and other applicable environmental requirements (other than new and future regulations discussed further below) approximately $63.5 million for fiscal years 2012 through 2016. The actual cost of compliance and the Authority's total capital expenditures may vary substantially depending on, among other things, (i) the availability of an adequate pool of qualified contractors to carry out needed projects, (ii) the inflationary environment with respect to the costs of labor and supplies needed to implement the compliance program, (iii) weather conditions that could adversely affect construction schedules and consumption patterns, (iv) population trends and political and economic developments in Puerto Rico that could adversely impact the collection of operating revenues, (v) the willingness of the EPA to cooperate with respect to various issues that may arise as the Authority implements its remedial plans, (vi) the possibility of new environmental legislation or regulations affecting the Authority's facilities and operations, (vii) unanticipated costs or potential modifications to projects resulting from requirements and limitations imposed by environmental laws and regulations and (viii) the inherent uncertainty involved in capital improvement projects of the magnitude undertaken by the Authority.

There can be no assurance that the actual cost of compliance will not be significantly higher than the Authority's current estimate (budgeted amount), nor can any assurances be given that the Authority will be able to comply fully with the terms of the Consent Decree and avoid the imposition of additional monetary penalties. In addition, in order to comply with the Consent Decree and achieve compliance with new regulations, the Authority may need to implement necessary capital improvements. In order to fund these capital improvements, the Authority may need to issue additional indebtedness beyond the amounts currently projected to be issued. The burden of such additional debt and other obligations may require the implementation of revenue raising and/or expense reduction measures. No assurances can be given that the Authority will be able to finance, through the issuance of bonds or otherwise, the estimated costs of the needed capital improvement during the next five years or of any additional capital improvement requirements that may be imposed on the Authority, or that rate increases will be implemented on a timely basis to support any such additional obligations.

In addition, although new or future environmental regulatory requirements may provide for a period of time to achieve compliance with, or provide a plan to comply, such regulatory requirements may also require additional capital and operating expenditures. For more information on these regulatory requirements, see "New or Future Environmental Regulatory Requirements" and ENVIRONMENTAL MATTERS. It is not possible for the Authority to determine at this point the magnitude of these expenditures.

With respect to the new EPA regulations governing air emissions known as the MATS, discussed further below, the Authority will be required to reduce emissions of hazardous air pollutants (including mercury) by 90%. In order to comply with these requirements, the Authority will be required to make significant capital investments, which the Authority currently estimates could cost between $631.6 million to $1.26 billion and would also result in additional annual recurring significant expenses related to the operation and maintenance of the emissions control systems. Therefore, the Authority believes that in order to comply with the MATS, it will have to convert substantially all of its existing generating units to burn natural gas, a cleaner burning fuel, instead of fuel oil. In addition, conversion to natural gas may also be required for the Authority to comply with current or future laws or regulations governing greenhouse gas emissions. If the Authority were not able to convert its existing units to natural gas

(including completing the natural gas delivery infrastructure), then it would need to make significant capital investments without being able to offset these costs with any cost savings on the purchase of fuel. It is possible that the Authority may not be in a position to fund such additional expenditures. For more information on these and other future regulatory requirements, see "New or Future Environmental Regulatory Requirements" and ENVIRONMENTAL MATTERS.

Although the Authority is committed to bringing its facilities and operations into compliance with applicable law, it is expected that the Authority will continue to pay stipulated penalties and to make additional capital expenditures (some not included in current capital improvement program) in the future under its existing Consent Decree and to comply with new environmental requirements. No assurance can be given, however, that the amounts budgeted for payment of stipulated penalties will be in all cases sufficient to cover potential civil, administrative or criminal liabilities or that the capital improvement program for the next five years will result in regulatory compliance. However, the Authority believes it is taking the necessary steps to substantially comply with applicable environmental laws and regulations in the near future.

For a more detailed description of the environmental matters affecting the Authority, see ENVIRONMENTAL MATTERS.

**New or Future Environmental Regulatory Requirements**

There are new regulatory developments under the CAA and the Clean Water Act ("CWA"), some of which may have a significant adverse effect on the Authority's operations and expenditures. These developments are summarized below and discussed in more detail under ENVIRONMENTAL MATTERS.

*New Developments under the CAA- Mercury and Air Toxics Standards and Greenhouse Gas ("GHG") Emissions*

The EPA has recently finalized regulations pursuant to various provisions of the CAA, namely- the MATS and new requirements related to GHG emissions that may have a significant adverse effect on the Authority.

The MATS were published on February 16, 2012 and will become effective on April 16, 2012, with a three-year compliance period as described below. The MATS are new standards promulgated by the EPA on existing electric utility steam generating units ("EGUs") larger than 25 megawatts that burn coal or oil for purpose of generating electricity for sale and distribution through the national grid to the public. These standards require these EGUs, among other things, to reduce emissions of mercury, arsenic, chromium, nickel and acid gases by the imposition of more stringent emissions limits that reflect the application of maximum achievable control technology ("MACT"). Existing EGU's generally will have up to four years if they need it to comply with the MATS. This includes the three years provided to all sources by the CAA, and an additional year that may be granted by the EQB, as needed, for technology installation. At the same time the MATS were promulgated, revised standards for new coal and oil-fired power plants, called New Source Performance Standards ("NSPS"), were also promulgated imposing more stringent numerical limits on particulate matter, sulfur dioxide and nitrogen oxides. The NSPS will also enter into effect on April 16, 2012. For a complete description of these regulatory developments, please see *Compliance Matters – MATS Regulation* under ENVIRONMENTAL MATTERS.

Although the Authority is still evaluating the impact of the MATS, it estimates that without a conversion of its oil fired generating capacity to natural gas, it will be required to install MACT on its oil-

fired units. The MACT for these units could consist of various retrofitted emission control systems, such as filter baghouses and flue gas desulfurization equipment associated with ancillary systems. The Authority would have until April 2015 to install the MACT, and the capital costs associated with this effort are estimated between $631.6 million to $1.26 billion. Therefore, the Authority believes that in order to comply with the MATS, it will have to convert substantially all of its existing generating units to burn natural gas instead of fuel oil. If the Authority were not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it would need to make significant capital investments to control emissions in order to comply with the MATS without being able to offset these costs with any cost savings on the purchase of fuel.

In addition to the recent MATS regulation, in the past five years, certain judicial and regulatory events have set a framework for GHG emissions regulations under the CAA and potential future legislation. After a Supreme Court decision essentially holding that GHGs are air pollutants that may be regulated under the CAA and various related administrative rulemakings and pronouncements, on October 30, 2009, the EPA issued a final rule requiring mandatory monitoring in 2010 and reporting of GHGs emissions beginning in 2011 for virtually all industrial source categories across the United States. This rule does not require control of GHGs, but rather requires sources above certain threshold levels to monitor and report emissions. When it issued this rule, the EPA stated that this program would provide data for future policy development on the subject.

After other agency pronouncements, on May 13, 2010, the EPA issued a final rule setting thresholds for GHG emissions that define when certain permits issued under the CAA are required for new and existing facilities. In essence, this new rule would require certain existing air emissions sources that will increase GHG emissions beyond certain established thresholds to implement Best Available Control Technology and have their permits subject to additional review. For more details on the background and substance of this rule and the GHG reporting rule discussed above, please see *Compliance Matters – GHG Regulations* under ENVIRONMENTAL MATTERS.

The Authority submitted its first report on GHG emissions as required by the GHG reporting rule on September 2011. In 2012, the report will be submitted in March 2012. As for the GHG threshold rule, at this moment, the Authority believes that this rule may require it to take measures to reduce GHG emissions, but it is still evaluating the extent of such reductions. One of the alternatives identified to achieve this reduction is the installation of carbon sequestration technology, but this technology does not appear to be feasible for the Authority. In addition, as a result of this rule, the Authority may have to conduct an evaluation of impacts to endangered species, which could potentially require a formal consultation under Section 7 of the Endangered Species Act. The Authority is currently evaluating the extent of this evaluation, if any.

In light of the costs associated with carbon reduction technologies, the Authority believes that the best alternative to achieve lower GHG emissions is to convert its existing units to burn natural gas instead of fuel oil. If the Authority is not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it may need to make significant capital investments to control GHG emissions without being able to offset these costs with any costs savings on the purchase of fuel.

It must be noted that, in 2009, the House of Representatives of the United States Congress proposed legislation (H.R. 2454) that, among other things, would have required existing coal-fired power plants to obtain "allowances" for each ton of GHG emissions, and thus effectively create a "price of carbon." This proposed legislation would also have pre-empted the EPA's authority to regulate GHG emissions. For more details on this proposed legislation, please see *Compliance Matters – GHG Regulations* under ENVIRONMENTAL MATTERS. Although this proposed legislation did not become

Exhibit 18   Page 37 of 257

law, it raises the possibility that the United States Congress may in the future decide to take action on this subject.

In light of the above, the Authority is unable to predict whether and when the EPA or the United States Congress ultimately will impose additional regulations and restrictions on GHGs, and if so, what their content and form or effect would be. At this time, it is not entirely clear what the level of future regulation of emissions will be, or the costs associated with that regulation. However, any such costs could be material to the Authority.

*New Developments under the CWA*

On April 20, 2011, the EPA published a draft rule proposing the imposition of additional requirements on cooling water intake structures regulated under Section 316(b) of the CWA. The draft rule would: (i) establish of an upper limit on how many fish can be killed by impingement (that is, by being pinned against intake screens or other parts of the facility) for those existing facilities with a design intake flow of greater than 2 million gallons per day; (ii) require facilities withdrawing water in very large quantities (at least 125 million gallons per day) to conduct studies to determine whether and what site-specific controls, if any, would be required to reduce the number of entrained aquatic organisms (that is, those aquatic organisms that are sucked into the cooling intake water system); and (iii) require new units added to existing facilities to add a closed-cycle technology. For more details on this proposed rule, see *Compliance Matters – Proposed Regulations under the CWA* under ENVIRONMENTAL MATTERS.

The Authority has a proposal to implement an impingement and entrainment control technology at the South Coast and Palo Seco power plants (aquatic filter barriers), that includes verification sampling for impingement and entrainment. In addition, the Authority is preparing a Plan of Action ("POA") for San Juan and South Coast power plants to be submitted to EPA on June 1, 2012. The POA will recommend steps for impingement and entrainment reduction. The Authority has also budgeted some funds in the capital improvements program for implementing control technologies for impingement and entrainment. Although there is no assurance that the Authority will be able to comply with proposed rule, based on the steps that have been and will be taken, the Authority understands that it will be able to comply with the proposed rule.

**Limited Rights of Bondholders**

The holders of Power Revenue Bonds have no mortgage or other lien on the physical assets of the Authority and have no rights to direct management changes, continuity or decisions except in the case of bringing suit to compel compliance with the Rate Covenant as described under *Rate Covenant* in SECURITY.

In the event of a default by the Authority, the ability of the Trustee to raise sufficient funds to pay the principal of and interest on Power Revenue Bonds will depend upon the exercise of various remedies specified by the Trust Agreement. Under existing law, those remedies are often subject to discretion and delay and may not be readily available or may be limited. Equitable principles may also delay or otherwise adversely affect the enforcement of Bondholders' rights.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Bonds on their respective maturity or mandatory redemption dates. Any rating of the Bonds is not a recommendation to purchase, hold or sell such Bonds and such rating will not address the marketability of such Bonds, their market

price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Authority. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Bonds. Finally, the Trust Agreement does not include a covenant by the Authority to maintain a specific rating with respect to outstanding Power Revenue Bonds.

## PLAN OF FINANCING

### Series 2012A Bonds

The Authority is issuing the Series 2012A Bonds pursuant to the Trust Agreement to (i) finance a portion of the cost of various projects under its capital improvement program, (ii) repay certain advances made to the Authority by Government Development Bank under a line of credit facility to (a) pay a portion of the interest due on January 1, 2012 and July 1, 2012 on the Authority's outstanding Power Revenue Bonds and (b) pay a portion of the principal due on July 1, 2012 on the Authority's outstanding Power Revenue Bonds, (iii) fund a deposit to the Reserve Account in the Puerto Rico Electric Power Authority Revenue Bonds Interest and Sinking Fund, (iv) pay capitalized interest on the Series 2012A Bonds through January 1, 2015, and (v) pay the costs of issuance of the Series 2012A Bonds.

### Series 2012B Bonds

The Authority is issuing the Series 2012B Bonds pursuant to the Trust Agreement to (i) provide funds, together with other available moneys, to refund the following bonds of the Authority (the "Refunded Bonds") on the redemption dates and at the redemption prices set forth below plus accrued interest to the redemption dates, or pay such Refunded Bonds at maturity, and (ii) pay the costs of issuance of the Series 2012B Bonds.

| Refunded Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date July 1, | Redemption Price (% of Par) | Redemption Date |
|---|---|---|---|---|---|
| Power Revenue Bonds, Series II | $21,345,000 | 5.375% | 2016 | 101% | July 1, 2012 |

The refunding will permit the Authority to realize savings on its debt service requirements on Power Revenue Bonds outstanding under the Trust Agreement. The Authority will deposit the net proceeds of the Series 2012B Bonds with the Trustee, as escrow agent, under the terms of an escrow deposit agreement. The net proceeds of the Series 2012B Bonds will be invested in Government Obligations, the principal of and interest on which when due will provide moneys sufficient to pay the principal of or the redemption price of the Refunded Bonds and the interest coming due on the Refunded Bonds through their date of redemption or maturity date, as applicable.

Upon the deposit with the Trustee, the Refunded Bonds will, in the opinion of Bond Counsel, no longer be outstanding under the provisions of the Trust Agreement and the Refunded Bonds will thereupon be defeased. In rendering the foregoing opinion, Bond Counsel will rely on the report of Causey Demgen & Moore, as verification agent, dated the date of delivery of the Series 2012B Bonds, relating to the verification of certain mathematical computations with respect to the moneys and Government Obligations deposited with the escrow agent under the terms of the escrow deposit agreement.

The Authority expects to issue additional Power Revenue Bonds in fiscal years 2013 through 2016 to fund the Authority's capital improvement program. See *Projected Five-Year Capital Improvement and*

*Financing Program* under THE SYSTEM.  No assurance can be given that any such Power Revenue Bonds will be issued for such purposes.

**Estimated Sources and Uses of Funds for the Bonds**

**Sources**

| | |
|---|---:|
| Principal Amount of the Bonds.................................................................. | $650,000,000.00 |
| Net Original Issue Discount................................................................... | (597,329.70) |
| Other Available Moneys[1] ..................................................................... | 382,431.25 |
| **Total Sources** | $649,785,101.55 |

**Uses**

| | |
|---|---:|
| Deposit to Construction Fund ................................................................ | $359,529,035.56 |
| Payment of line of credit....................................................................... | 161,900,900.00 |
| Deposit to Escrow Fund for the Refunded Bonds.................................... | 22,129,518.03 |
| Deposit to Reserve Account.................................................................... | 17,183,417.27 |
| Capitalized Interest ............................................................................... | 82,555,885.00 |
| Underwriters' Discount and Other Costs of Issuance[2] .......................... | 6,486,345.69 |
| **Total Uses** | $649,785,101.55 |

---

[1] Derived from moneys on deposit in the Bond Service Account of the Sinking Fund to pay debt service on the Refunded Bonds.
[2] Includes legal, printing and other financing expenses.

## SECURITY

The Power Revenue Bonds are not a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions, other than the Authority, and neither the Commonwealth nor any such municipalities or other political subdivisions, other than the Authority, are liable thereon, nor shall the Power Revenue Bonds be payable out of any funds other than those of the Authority as further described herein.

### Source of Payment

The Power Revenue Bonds are payable solely from the Revenues of the System after payment of the Current Expenses of the Authority and any reserve therefor.  For purposes of the Trust Agreement and this Official Statement, "System" means all the properties owned and operated by the Authority as a single integrated system in connection with the production, distribution or sale of electric energy, the acquisition or construction of which was financed in whole or in part from the proceeds of Power Revenue Bonds or from the proceeds of bonds issued under a previous indenture, or from moneys deposited to certain accounts established under the Trust Agreement, or (to the extent specified by the Authority) from certain subordinated obligations; "Revenues" means all moneys received by the Authority as a result of the ownership or operation of the System, including any income derived by the Authority from the sale of electricity generated or distributed by the System, any proceeds of certain insurance, and certain investment income; and "Current Expenses" means the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System.  The Authority has covenanted to deposit in the Sinking Fund a sufficient amount of such Revenues (after payment of Current Expenses) to pay the principal of and the interest on all the Power Revenue Bonds and to provide a reserve therefor.  See Appendix I—*Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement,* which should be read in conjunction herewith.

**Flow of Funds under Trust Agreement**

The following schematic representation is provided only to guide readers and does not purport to be complete.



(1) Monthly deposits to the Bond Service Account and the Redemption Account for all Power Revenue Bonds bearing at a fixed rate are capped at 1/6 of the interest due within the next six months and 1/12 of the principal due within the next twelve months and 1/12 of the Amortization Requirements for the current fiscal year.

**Rate Covenant**

The Authority has covenanted in the Trust Agreement to fix, charge and collect reasonable rates and charges so that Revenues of the System will be sufficient to pay Current Expenses and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any accrued interest thereon for such fiscal year.

For purposes of the Trust Agreement and application of the rate covenant, Revenues include the accrued amounts attributable to the residential fuel, hotel and rural electrification and irrigation systems subsidies, which the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to provide a credit for such amounts in its recipients' billing), and the accrued electric consumption charges of the municipalities, which the Authority is legally authorized to collect but does not because it follows the practice of applying them as an offset against the CILT obligation. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM. In delivering their approving opinion, Bond Counsel will take into consideration and will rely on the fact that, although the Authority includes the accrued residential fuel, hotel and rural electrification and irrigation system subsidies in the calculation of Revenues for purposes of the rate covenant, even if these amounts were excluded from such calculation, the rate covenant described above will be satisfied. In the future, the Authority will review with Bond Counsel the treatment of these subsidies as Revenues for Trust Agreement purposes and consider their conclusions in the computation of Net Revenues.

In addition, for purposes of calculating Principal and Interest Requirements under the rate covenant and the additional bonds tests described below, the Accreted Value of any capital appreciation bonds of the Authority on their maturity dates must be included as principal due and payable on said maturity dates. The Accreted Value at any date of a capital appreciation bond currently outstanding equals the original principal amount of such capital appreciation bond plus the interest accrued from its date of issuance to such date, based upon the interest rate used to calculate the yields thereof, compounded in the manner provided in the Trust Agreement, and for future issues of capital appreciation bonds will be determined as provided in the respective resolutions of the Authority authorizing such issues. In addition, interest payable with respect to Build America Bonds and other Federally Subsidized Bonds is calculated net of the Federal Subsidy Payment as described under "Reserve Account" below. See "Rate Covenant" in Appendix I—*Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Reserve Account**

The Authority has covenanted in the Trust Agreement to accumulate in the Reserve Account an amount equal to the interest payable on all outstanding Power Revenue Bonds within the next 12 months, provided that for Power Revenue Bonds issued for other than refunding purposes, the amount to be so deposited in any month, as set forth in "Disposition of Revenues" in Appendix I—*Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement,* need not exceed one-sixtieth of the amount of the increase in the interest payable within the next 12 months resulting from the issuance of such Power Revenue Bonds. In connection with the capital appreciation bonds of the Authority, the minimum amount required to be on deposit in the Reserve Account with respect to the interest accrued thereon is to be derived from the interest rate used to calculate the assumed yields through their maturity times the Accreted Value of such Power Revenue Bonds determined in the manner provided in the Trust Agreement on the valuation date therefor occurring on or after the first day of the twelfth month succeeding the date of calculation.

In connection with a series of Build America Bonds or other Federally Subsidized Bonds, the amount of interest deemed to be payable on such bonds within the next twelve months for purposes of the calculation of interest to be credited to the Reserve Account shall exclude the amount of interest to be paid from the Federal Subsidy Payment; provided, however, that if the Trustee does not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within 30 days of the date such Federal Subsidy Payments were scheduled to be received, then for purposes of such calculation the amount of interest to be credited to the Reserve Account shall be equal to the interest payable on the bonds within the next twelve months.

As of March 20, 2012, approximately $382.3 million was on deposit to the credit of the Reserve Account. The amount required to be accumulated in the Reserve Account will be approximately $399.3 million after giving effect to the issuance of Power Revenue Bonds issued for non-refunding purposes within the previous 60 months and the issuance of the Bonds. In accordance with the provisions of the Trust Agreement, the Authority will transfer any excess amount on deposit from time to time in the Reserve Account to the Bond Service Account of the Sinking Fund.

### Reserve Maintenance Fund, Self-insurance Fund and Capital Improvement Fund

The Trust Agreement establishes the Reserve Maintenance Fund, the Self-insurance Fund and the Capital Improvement Fund. Revenues are deposited monthly into each of such Funds after the required deposits into the Sinking Fund as set forth in the schematic representation above for purposes of (a) paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, including major items of equipment, in the case of the Reserve Maintenance Fund, (b) paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement, in the case of the Self-insurance Fund, and (c) paying the cost of anticipated extensions and improvements which cost has not otherwise been provided for from the proceeds of the Power Revenue Bonds, in the case of the Capital Improvement Fund. Each of these Funds serves as an additional reserve for the payment of principal of and interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Sinking Fund (including the Reserve Account) are insufficient for such purpose. As of March 20, 2012, the balances of the Reserve Maintenance Fund and the Self-insurance Fund were $15.0 million and $85.0 million, respectively.  As of March 20, 2012, there was no money on deposit in the Capital Improvement Fund. See "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

### Additional Bonds

Additional Power Revenue Bonds may be issued under the Trust Agreement for the purpose of paying all or any part of the cost of any improvements to the System or for any other proper corporate purpose of the Authority; provided that, among other requirements, Net Revenues (as defined in the Trust Agreement) of the Authority for 12 consecutive months out of the preceding 18 months, adjusted to reflect rates in effect on the date of issuance of such bonds, shall be not less than 120% of maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding, and that the average annual Net Revenues for the five fiscal years succeeding the issuance of such bonds, adjusted to reflect any rate schedule the Authority has covenanted to put in effect during such five fiscal years, as estimated by the Authority and approved by its Consulting Engineers, shall be not less than 120% of the maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding and the Power Revenue Bonds then to be issued.

For purposes of the additional bonds test, Net Revenues include the accrued amounts attributable to the residential fuel, hotel and rural electrification and irrigation systems subsidies, which the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to provide a credit for such amounts in its recipients' billing), and the accrued electric consumption charges of the municipalities, which the Authority is legally authorized to collect but does not because it follows the practice of applying them as an offset against the CILT obligation. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM. In delivering their approving opinion, Bond Counsel will take into consideration and will rely on the fact that, although the Authority includes the accrued residential fuel, hotel and rural electrification and irrigation systems subsidies in the calculation of Net Revenues, even if these amounts were excluded from such calculation, the additional bonds test described above will be satisfied. In the future, the Authority will review with Bond Counsel the treatment of the subsidies as Revenues for Trust Agreement purposes and consider their conclusions in the computation of Net Revenues.

Power Revenue Refunding Bonds may also be issued under the Trust Agreement for the purpose of refunding all or any part of the outstanding Power Revenue Bonds of any series; provided that, among other requirements, either (i) the earnings tests described above for the issuance of additional Power Revenue Bonds are satisfied (except that effect is given to the retirement of the bonds to be refunded) or (ii) the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued (after giving effect to the retirement of the bonds to be refunded) shall be less than the maximum aggregate Principal and Interest Requirements on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued). See "Issuance of Power Revenue Bonds - Sections 208, 209 and 210 of the Trust Agreement" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

Under the additional bonds test of the Trust Agreement, Net Revenues (including the residential fuel, hotel and rural electrification and irrigation systems subsidies) for the twelve months ended December 31, 2011 of $781 million were 131% of the maximum aggregate annual Principal and Interest Requirements of $594.8 million on all outstanding Power Revenue Bonds (including the Bonds). Estimated average annual Net Revenues (including the residential fuel, hotel and rural electrification and irrigation systems subsidies) for the five fiscal years ending June 30, 2017 of $837 million would be 141% of the maximum aggregate annual Principal and Interest Requirements of $594.8 million on all outstanding Power Revenue Bonds (including the Bonds). If the accrued amounts attributable to the residential fuel, hotel and rural electrification and irrigations systems subsidies were excluded, the percentages set forth in the preceding sentence would be 125% and 135%, respectively. The amount of Principal and Interest Requirements for fiscal years 2012, 2013, 2014 and 2015 has been reduced by the interest that was capitalized through the Authority's issuance of its Power Revenue Bonds, Series XX (the "Series XX Bonds"), Power Revenue Bonds, Series ZZ (the "Series ZZ Bonds"), Power Revenue Bonds, Series CCC (the "Series CCC Bonds"), Power Revenue Refunding Bonds, Series DDD (the "Series DDD Bonds"), and the Bonds in the following amounts: approximately $81.5 million due during fiscal year 2012, $67.1 million due during fiscal year 2013, $31.5 million in fiscal year 2014, and $15.8 million in fiscal year 2015. See NET REVENUES AND COVERAGE.

**Subordinate Obligations**

The Authority may incur or issue obligations for any proper corporate purpose secured by a pledge of moneys in the Subordinate Obligations Fund. If the Authority incurs any such obligations, Net Revenues of the Authority must be deposited monthly to the credit of the Subordinate Obligations Fund (after the required deposits have been made to the Sinking Fund and the Reserve Maintenance Fund) in amounts sufficient to pay such obligations as they become due.

The Authority may, in connection with the incurrence of any such obligations, limit the deposit to the Reserve Maintenance Fund as described above to not more than $400,000 per month, notwithstanding any higher amounts recommended by the Authority's Consulting Engineers. If such deposit is so limited, the Authority will be required, immediately after each monthly deposit to the Subordinate Obligations Fund, to deposit to the Reserve Maintenance Fund (and prior to any deposits to the Self-insurance Fund and the Capital Improvement Fund) the lesser of the amount remaining in the Revenue Fund and the amount of any such deficiency.

Unless a particular project financed with any such obligations is specified by the Authority as being part of the System, any revenues attributable to such project will not be pledged to the payment of Power Revenue Bonds and any expenses associated with such project will not be payable from Revenues as Current Expenses of the System. *See* "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

As of December 31, 2011, the Authority had approximately $29.9 million aggregate outstanding principal amount of subordinate obligations. See DEBT.

## DESCRIPTION OF THE BONDS

**General**

The Bonds will bear interest at such rates and will mature on the dates and in the principal amounts set forth on the inside cover page of this Official Statement. The Bonds will be dated their date of delivery. Interest on the Bonds will be payable on each January 1 and July 1, commencing on July 1, 2012.

*Form of Bonds*

Principal of and premium, if any, and interest on the Bonds will be payable in the manner described below under "Book-Entry Only System." The Bonds are being issued in fully registered form and, when issued, are to be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC is to act as securities depository for the Bonds. Individual purchases of interests in the Bonds will be made in book-entry form only, in denominations of $5,000 or any multiple thereof. Purchasers of such interests will not receive definitive Bonds. Principal, redemption premium, if any, and interest are payable directly to DTC by the Trustee. Upon receipt of such payments, DTC will remit such principal and interest to the DTC Participants (as such term is hereinafter defined) for subsequent disbursement to the purchasers of beneficial interests in the Bonds.

**Book-Entry Only System**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate

will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example,

Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this Section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority believes to be reliable, but the Authority takes no responsibility for the accuracy thereof.

NONE OF THE AUTHORITY, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Power Revenue Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Power Revenue Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate trust office of the Trustee in New York, New York; (iii) interest on the Power Revenue Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Authority maintained by the Trustee; (iv) the Power Revenue Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Power Revenue Bonds will be registrable and the Power Revenue Bonds may be exchanged at the corporate trust office of the Trustee in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Optional Redemption**

The Series 2012A Bonds that mature after July 1, 2022 may be redeemed at the option of the Authority prior to maturity, from any available moneys (except moneys deposited in the Sinking Fund in respect of an Amortization Requirement), upon not less than 30 days' prior notice by mail, either in whole or in part, in such order of maturity as directed by the Authority, on any date not earlier than July 1, 2022, at a redemption price equal to the principal amount of the Series 2012A Bonds to be redeemed plus accrued interest to the redemption date, without premium.

The Series 2012B Bonds are not subject to redemption prior to maturity.

**Mandatory Redemption**

The Series 2012A Bonds maturing on July 1, 2029 and bearing interest at a rate of 5.00% and July 1, 2042 and bearing interest at a rate of 5.00% will be redeemed in part on July 1, 2028 and 2041, respectively, and on each July 1 thereafter for which there is an Amortization Requirement in respect of such Series 2012A Bonds, in amounts equal to the Amortization Requirements for such Series 2012A Bonds (less the principal amount of any Series 2012A Bonds retired by purchase and otherwise subject to adjustment as provided in the Trust Agreement), from moneys in the Sinking Fund, at a redemption price equal to the principal amount of the Series 2012A Bonds to be redeemed plus accrued interest to the redemption date, without premium, in the years and amounts set forth below:

| | Annual Sinking Fund Requirements for Series 2012A Bonds due July 1, | |
| Year | 2029[*] | 2042[†] |
| --- | --- | --- |
| 2028 | $ 12,400,000 | |
| 2029 | 145,060,000[‡] | |
| 2030 | | |
| 2031 | | |
| 2032 | | |
| 2033 | | |
| 2034 | | |
| 2035 | | |
| 2036 | | |
| 2037 | | |
| 2038 | | |
| 2039 | | |
| 2040 | | |
| 2041 | | $213,725,000 |
| 2042 | | 144,415,000[‡] |

[*] Bearing interest at a rate of 5.00%.
[†] Bearing interest at a rate of 5.00%.
[‡] Maturity.

## Notice of Redemption

Notice of redemption shall be mailed by the Trustee, not less than thirty (30) days nor more than sixty (60) days prior to the redemption date, to the Holders of Bonds called for redemption at their addresses appearing on the bond registration books of the Trustee. The Trustee shall also give notice of redemption by overnight mail or carrier service to the Authority, and such securities depositories and/or securities information services as shall be designated by the Authority.

## THE AUTHORITY

The Authority was created as a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth by the Act.

The Authority was created for the purpose of conserving, developing and utilizing the water and power resources of the Commonwealth in order to promote the general welfare of the Commonwealth. It supplies virtually all the electricity consumed in Puerto Rico and is one of the largest municipal utilities in the United States, ranking first in number of customers and revenues among public power utilities.

The executive offices of the Authority are located at 1110 Ponce de Leon Avenue, San Juan, Puerto Rico 00907, telephone number (787) 521-4666.

## Powers

The Authority has broad powers under the Act, including, among others: to make contracts; to acquire properties by eminent domain or otherwise; to borrow money and to issue bonds for any of its corporate purposes; to secure the payment of its bonds and all other obligations by pledge of its revenues; to determine, fix, alter, charge and collect reasonable rates, fees, rentals and other charges for use of its facilities; and to have complete control and supervision of its properties and activities. In addition, the Authority has the power to create, acquire and maintain corporations, partnerships or subsidiary corporations.

41

**Management**

The Act provides that the Governing Board of the Authority (the "Board") shall be composed of nine members. The Secretary of Transportation and Public Works of the Commonwealth serves *ex officio* as a member of the Board, and six other members are appointed by the Governor with the advice and consent of the Senate of Puerto Rico.  The remaining two members are client representatives elected directly by the Authority's clients. Members of the Board serve for a term of four years and members who are not *ex officio* can be reappointed or reelected.  There is currently one vacancy on the Board.  The members of the Board are set forth below.

| Name | Principal Occupation | Term Ends |
|---|---|---|
| José Ortiz Vázquez, P.E., Chairman | Executive President, Puerto Rico Aqueduct and Sewer Authority | (1) |
| José A. Pérez Canabal, P.E. | Engineer | June 2013 |
| Jerome Garffer | Investment Management | June 2014 |
| Rubén A. Hernández-Gregorat, P.E. | Secretary of Transportation and Public Works | Ex Officio |
| Andrés Salas Soler, Esq. | Attorney | February 2014 |
| Eugenio Torres-Oyola | Certified Public Accountant | February 2015 |
| Maria A. Veras-Fernández* | Education Administration Officer | (2) |
| Roberto Volckers Esteves, P.E. | Former Director of the Electric System at the Authority | (1) |

---
(1)  Mr. Ortiz Vázquez and Mr. Volckers Esteves were appointed by the Governor in November 2011 and are pending confirmation by the Senate.

(2)  Mrs. Veras Fernández's term ended in October 2009, but she will continue to serve as a member of the Governing Board until her successor is appointed.

The Board appoints an Executive Director who is the chief executive officer of the Authority and is responsible for the general operation of the Authority.

*Otoniel Cruz Carrillo* was appointed Executive Director on October 3, 2011.  Mr. Cruz has 28 years of service with the Authority.  Prior to this appointment, he was the Director of Customer Service.  Mr. Cruz has also occupied various positions in Client Service, Budget, Finance and the Authority's Employees Retirement System.  Mr. Cruz is also President of the Employees Retirement System's Board of Trustees.  Mr. Cruz holds a Master in Business Administration degree with a concentration in finance.

Other principal officers of the Authority include the following:

*Nelson Morales,* Director of Finance, was appointed to this position on October 3, 2011.  Prior to his appointment at the Authority, Mr. Morales was the Chief Financial Officer for the Puerto Rico Ports Authority from May 2010 to September 2011 and Deputy Executive Director at the Municipal Revenues Collection Center from May 2009 to May 2010.  Prior to joining the public sector, Mr. Morales held various management positions for over 20 years in the financial services industry in Puerto Rico and on Wall Street, with Lehman Brothers, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Citigroup Financial Services Corporation.

*Raúl Burgos Santiago*, Director of Transmission and Distribution, is a Professional Electrical Engineer.  During his 28 years of service with the Authority, Mr. Burgos has occupied various positions, including Head of the Electrical Distribution Division, Regional Administrator of Technical Operations in Caguas and Ponce, and Superintendent – Distribution Engineering Department.

*Josué A. Colón Ortiz,* Director of Generation, is a Professional Mechanical Engineer with 24 years of service at the Authority. During that time, he has occupied various positions, including Mechanical Design Engineer, Maintenance Engineer, Head of the Power Plants Maintenance Projects Department, Electrical System Outage Manager, Superintendent of the Mechanical Maintenance Machine Shops, Head of the Palo Seco Power Plant and Director of the Electric System.

From January 13, 2009 to October 2010 he occupied the position of Generation, Transmission and Distribution Director, with a new organizational model that consolidated in one area the Engineering Directorate, the Electric System Directorate and the Transmission and Distribution Directorate. This area was responsible for the generation, transmission and distribution of the electric energy in Puerto Rico.

Since September 2010, he is the Director of Generation in charge of the electric system, and member of the Vía Verde Project Committee.

*Félix Echeandía Costa,* Director of Customer Service, was appointed to this position on October 3, 2011. Mr. Echeandía has 27 years of service with the Authority. Prior to this appointment, he was the Head of the Customer Service Division and also occupied various positions at the Authority, including Government Accounts Manager, Commercial Business Process Analyst and Financial Analyst. Mr. Echeandía holds a Master in Business Administration with a concentration in Accounting.

*Justo González,* Director of Planning and Environmental Protection, is a Professional Engineer with 23 years of service with the Authority. During his tenure, Mr. González has occupied various positions at the Authority, including the following positions at the Aguirre Steam Plant: Steam Plant Operation Manager, Acting Power Plant Manager, Power Plant Operation Engineer, Steam Plant Outage Coordinator and Steam Plant Shift Engineer.

*Richard Cruz-Franqui, Esq.,* Director of Legal Affairs, was appointed to this position on November 27, 2011. Prior to his appointment at the Authority, Mr. Cruz was an attorney in private practice and also held positions at the Employees Retirement System of the Government of Puerto Rico and the Department of Education. Mr. Cruz holds a Juris Doctor from the Interamerican University of Puerto Rico and a Bachelor of Science degree from the University of Puerto Rico.

*Astrid I. Rodríguez Cruz,* Director of Human Resources and Labor Affairs, holds a Juris Doctor and a Bachelor's Degree in Business Administration, with a concentration in Industrial Management, and has approximately 13 years of service with the Authority. She has occupied various positions at the Authority, including Head of the Opinion, Legislation and Contract Division, Director of Human Resources, and Acting General Counsel.

The Authority retains the firm of URS Corporation, successor to the Washington Division of URS Corporation, as the consulting engineers (the "Consulting Engineers") to perform certain responsibilities under the Trust Agreement. Washington Division of URS Corporation was formed in November 2007 following the acquisition by URS Corporation of Washington Group International, Inc. In January 2010, URS Corporation elected to use only its corporate name to identify all its operating divisions. The Consulting Engineer's responsibilities include submitting an annual report to the Trustee by November 1 of each year setting forth their recommendations: (a) as to any necessary or advisable revisions of the Authority's rates and charges, (b) as to the amount that should be deposited monthly by the Authority during the ensuing fiscal year to the credit of various funds established under the Trust Agreement for the purposes specified in the Trust Agreement, and (c) as to any advice and recommendations as they deem advisable. The most recent Consulting Engineers report is the Thirty-Eighth Annual Report for fiscal year 2011. A copy of this report is available on the Authority's website

at www.prepa.com. Neither this report nor any additional information on the Authority's website is deemed to be part of or incorporated by reference in this Official Statement.

Ernst & Young LLP has been engaged to audit the Authority's financial statements for fiscal year 2012.

**Subsidiaries**

Pursuant to the Act, the Authority is authorized to create subsidiaries in order to, among other things, delegate or transfer any of its rights, powers, functions or duties. The Authority currently has five principal subsidiaries organized in a holding company structure. Currently, only one of the Authority's subsidiaries has significant operations.

PREPA Holdings, LLC, a wholly-owned subsidiary of the Authority, was created for the sole purpose of acting as a holding company and has no current operations. PREPA Holdings, LLC is the direct parent of the following entities: PREPA Networks, LLC, also known as PREPA.net; PREPA Utilities, LLC; PREPA Oil & Gas, LLC; and InterAmerican Energy Sources, LLC.

In 2002 the Authority completed the installation of a Backbone Fiber Optic Cable System which has modernized its internal communications by providing faster and more secure data transmission for operations, load management, system protection and security. This fiber optic system consists of a 663 mile fiber optic telecommunications network of which 386 miles are for the Authority's use and 277 miles are for the use of PREPA.net. The system is installed on the Authority's rights-of-way (mainly its transmission lines) and was financed through the issuance of $43.7 million aggregate principal amount of subordinate obligations.

In addition to the Backbone Fiber Optic Cable System, the Authority has installed a Distribution Fiber Optic Cable System that consists of 691 miles of fiber optic cables, of which 399 miles are for the Authority's and PREPA.net's use and 292 miles are for the exclusive use of PREPA.net. The Authority created PREPA.net in order to commercially exploit the excess fibers of the installed fiber optic cable system. PREPA.net markets the excess communication capacity of the Authority's fiber optic cable system. PREPA.net currently offers next generation telecommunications services to carriers, internet service providers, and large commercial enterprises. These services include data transmission via Synchronous Optical Network (SONET), metro and long haul Ethernet transport services, wireless last mile, and internet protocol services optimized for voice over internet protocol. PREPA.net also offers international fiber optic cable capacity and satellite teleport facilities through the submarine fiber optic cable capacity acquired in 2008. As of June 30, 2011, PREPA.net had total assets of $27.9 million and total liabilities of $18.1 million. PREPA.net's change in net assets for fiscal year 2011 was $3.8 million. PREPA.net has a term loan with a commercial bank with an outstanding principal balance of $9.8 million as of June 30, 2011 and, as of that date, owed the Authority approximately $3.7 million for advances made by the Authority in the ordinary course of business. PREPA.net continues to add customers to its portfolio and the Authority continues with the installation of fiber optic cables. The Authority expects that the commercial exploitation of the fiber optic system will provide a new source of revenues to its operations that will ultimately benefit its electric energy customers.

PREPA Utilities, LLC, was created for the purpose of investing, financing, constructing and operating industrial projects and other infrastructure relating to the optimization of the Authority's electric infrastructure. PREPA Oil & Gas, LLC, was created for the purpose of buying, selling, exchanging and otherwise trading or dealing with the export, import, manufacture, production, preparation, handling, storage, and distribution of oil and gas and any other fuels required to satisfy the Authority's power generation needs. Finally, InterAmerican Energy Sources was created for the purpose

of investing, developing, financing, constructing and operating renewable energy projects and other infrastructure related to the optimization of the Authority's electric infrastructure. PREPA Utilities, LLC, PREPA Oil & Gas, LLC, and InterAmerican Energy Sources, LLC are currently not operating.

## Fiscal Oversight Agreement

The Authority and Government Development Bank, as fiscal agent for the Authority, entered into a Fiscal Oversight Agreement, dated as of July 1, 2009, as amended (the "Fiscal Oversight Agreement"), pursuant to which the Authority agreed to implement a comprehensive expense reduction program, including certain fiscal oversight controls, subject to laws and existing agreements of the Authority, and provide Government Development Bank with certain financial information and operating data, as well as other financial information reasonably requested by Government Development Bank. The Fiscal Oversight Agreement is intended to allow the Authority to become self sufficient and to protect and improve the credit rating of the Authority, so that the Authority may obtain adequate financing to fund its capital expenditure requirements and operate the Systems in an efficient and reliable manner and in compliance with applicable laws and regulations and other regulatory requirements.

## THE SYSTEM

The Authority is the supplier of virtually all of the electric power consumed in the Commonwealth. As of December 31, 2011, the Authority served approximately 1.5 million clients, representing a population of approximately 3.7 million.

## Generating Facilities

As of June 30, 2011, investment in Authority-owned production plant in service totaled approximately $4.1 billion based on original installed cost, the total nameplate rating of the Authority-owned generating facilities of the System was 4,937 MW and their total dependable generating capacity was 4,878 MW. In addition, the Authority purchases power under long-term power purchase agreements from two cogeneration facilities: EcoEléctrica and AES-PR. Under its agreement with EcoEléctrica, it has the right to purchase 507 MW of net dependable generating capacity. Under its agreement with AES-PR, it has the right to purchase 454 MW of net dependable generating capacity. The Authority has dispatch control over both facilities, and their output is fully integrated into the System.

**Existing Generating Facilities (in MW)**

| Generating Plants | Nameplate Rating (82 Units) | Dependable Generating Capacity | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total (82 Units) | Steam (16 Units) | Combined Cycle Power Blocks (13 Units) | Combustion Turbine (25 Units) | Hydro (21 Units) | Other (7 Units) |
| Aguirre ................................. | 1,554 | 1,534 | 900[1] | 592[2] | 42[3] | - | - |
| Costa Sur ............................. | 1,030 | 1,032 | 990 | - | 42[3] | - | - |
| Palo Seco............................. | 731 | 728 | 602 | - | 126[4] | - | - |
| San Juan .............................. | 870 | 840 | 400 | 440[5] | - | - | - |
| Mayagüez.............................. | 220 | 220 | - | - | 220[6] | - | - |
| Arecibo................................. | 248 | 248 | - | - | 248[7] | - | - |
| Other Locations.................... | 284 | 276 | - | - | 168[8] | 100 | 8[9] |
| Subtotal........................ | 4,937 | 4,878 | 2,892 | 1,032 | 846 | 100 | 8 |
| Peñuelas – EcoEléctrica ........ | 507 | 507 | - | 507[10] | - | - | - |
| Guayama – AES-PR.............. | 454 | 454[11] | 454[11] | - | - | - | - |
| Renewable – Windmar........... | 2[12] | - | - | - | - | - | - |
| Total......................... | 5,900 | 5,839 | 3,346 | 1,539 | 846 | 100 | 8 |

[1] Consists of the Authority's two largest units, Aguirre Units 1 and 2, each with a dependable generating capacity of 450 MW.
[2] Consists of two combined-cycle power blocks, each made up of four 50 MW combustion turbine units and one 96 MW steam-turbine unit.
[3] Consists of two 21 MW units.
[4] Consists of six 21 MW units.
[5] Consists of two combined cycle power block, each made up of one 160 MW combustion turbine unit and one 60 MW steam-turbine unit.
[6] Consists of four 55 MW units.
[7] Consists of three 83 MW units.
[8] Consists of eight 21 MW units.
[9] Consists of five diesel units in the Municipality of Culebra and two in the Municipality of Vieques with an aggregate dependable capacity of approximately 8 MW held on standby reserve.
[10] Consists of one combined cycle power block, made up of two 165 MW combustion turbine units and a 177 MW steam turbine unit.
[11] Consists of two 227 MW units.
[12] Consists of photovoltaic energy.

　　　The EcoEléctrica plant is a cogeneration facility located in the Municipality of Peñuelas. The facility includes a combined cycle power block, consisting of one steam and two combustion turbine units, and a liquefied natural gas terminal. The Authority began purchasing power from EcoEléctrica in September 1999 during the testing and start-up phase of the facility. Commercial operation began in March 2000. The Authority entered into an agreement with EcoEléctrica to purchase all of the power produced by the facility for a term of 22 years from the date of commencement of commercial operation. The agreement requires EcoEléctrica to provide 507 MW of dependable generating capacity to the Authority. The Authority may purchase any energy produced by the facility in excess of 507 MW, if made available, by paying an energy charge only. No capacity charge would be imposed on the Authority for this "excess" power. EcoEléctrica has entered into a long-term supply agreement to meet its expected needs for natural gas at the facility.

　　　The power purchase agreement with EcoEléctrica includes monthly capacity and energy charges to be paid by the Authority for the 507 MW of capacity, which EcoEléctrica is committed to provide. The capacity charge is subject to reduction, progressively to zero, if the facility does not achieve certain availability guarantees determined on a 12-month rolling average basis. The energy charges for power purchases are based on a number of factors including a natural gas related charge on a per kWh of energy basis and inflation indices. The EcoEléctrica purchased power costs incorporate a minimum monthly power or fuel purchase requirement based on an average capacity utilization factor on the part of the Authority. After paying this minimum requirement, the Authority only pays for energy actually received (including energy in excess of the 507 MW guaranteed by EcoEléctrica). This element of the agreement, when combined with the possible reduction in the capacity charge described above, effectively transfers substantially all of the economic risk of operating the facility to EcoEléctrica.

46

The AES-PR plant is a co-generation facility located in the Municipality of Guayama. Commercial operation began in November 2002. This clean burning coal technology facility consists of two identical fluidized bed boilers and two steam turbines with 454 MW of dependable generating capacity. The Authority entered into an agreement with AES-PR to purchase all of the power produced by this facility for a term of 25 years from the date of commencement of commercial operation. The contract with AES-PR is substantially similar to the EcoEléctrica contract described above, including the compensation structure. Above a certain minimum amount, the Authority is only obligated to purchase energy actually produced by the facility. AES-PR is an affiliate of AES Corporation.

The AES-PR and EcoEléctrica projects contribute to the Authority's efforts towards fuel diversification and improved reliability of service. Prior to the commencement of operations of the EcoEléctrica and AES-PR facilities, oil-fired units produced approximately 99% of the Authority's energy. After the incorporation of the EcoEléctrica and AES-PR facilities to the System, approximately 31% of the Authority's annual energy generation is being provided by non-oil-fired generating facilities.

Among other benefits, the integration of the EcoEléctrica and AES-PR cogeneration facilities into the Authority's System reduces the impact of changes in energy costs to the Authority's clients resulting from short-term changes in fuel costs due to the manner of calculation of the energy charges under the EcoEléctrica and AES-PR agreements. While the agreements provide that energy charges will change based on different formulas relating to the prior year, each agreement fixes the energy price for each year of the contract at the beginning of such year. Fixing the energy component of the price for the whole year reduces the impact of seasonal or short duration variations in the market price of electricity. Because the energy price is fixed and known for the entire year, the Authority is able to achieve better economic dispatching and scheduling of maintenance outages of all of its generating units. In addition, the year delay in the effect of energy price changes for these two facilities on the Authority's energy costs reduces variations of the fuel and purchased power components in the price of electricity sold by the Authority by postponing the impact of the price changes and bringing these changes out of step with price changes in the other components of the Authority's fuel mix.

All of the Authority's purchased power costs under the EcoEléctrica and AES-PR power purchase agreements are accounted for as operating expenses on the Authority's financial statements, are treated as a Current Expense under the Trust Agreement, and are being recovered by the Authority pursuant to the purchased power charge under its current rate structure.

**Transmission and Distribution Facilities**

The Authority's transmission and distribution system interconnects its power plants with major switching and load centers throughout Puerto Rico in order to allow the flow of power to and between these locations. The System is integrated and each generating unit is able to provide electric power to the transmission and distribution system.

Since the early 1990's, a substantial portion of the Authority's capital improvement program was directed at (i) improving its generating units in order to extend their life and increase their availability, thereby improving the System's equivalent availability, and (ii) expanding its generating capacity to improve its quality of service and meet forecasted increases in demand. As a result of the recent trends in demand, however, the Authority believes that it has sufficient capacity to meet current and future demand. Consequently, it has refocused its capital improvement program towards maintaining its existing generating units, converting its existing units into natural gas fired generation units and improving its transmission and distribution network in order to enhance reliability and improve efficiency. The Authority expects this shift in its capital improvement program to result in a marked improvement in its

47

economic dispatch schemes, energy transfer and transmission system losses, reliability, system security margins, voltage stability and system performance during double contingencies.

During the period from fiscal year 2007 to fiscal year 2011, the Authority invested $1.2 billion (or 46.4% of its capital improvement program) in its transmission and distribution system. The capital improvement program for the five fiscal years ending June 30, 2016 includes $811 million (or 48% of such program) for transmission and distribution facilities.

*Transmission Facilities*

As of June 30, 2011, the Authority's transmission plant in service totaled $2.0 billion based on original installed cost. The capital improvement program for the five fiscal years ending June 30, 2016 includes $407 million, or 24% of total capital improvement program, for extensions and improvements to transmission lines. As of December 31, 2011, the Authority had 2,450 circuit miles of transmission lines, consisting of 364 circuit miles of 230 kV lines, 710 circuit miles of 115 kV lines and 1,375 circuit miles of 38 kV lines. The Authority has 30 miles of underground 115 kV cable, 60 miles of underground 38 kV cable and 55 miles of submarine 38 kV cable to the islands of Vieques and Culebra. The Authority also has 175 transmission and distribution switchyards and 129 transmission substations located at generating sites and at other sites throughout the island with a total transformer capacity of 18,535,250 kilovolt amperes ("kVA"). In addition, the Authority has 20 portable substations with a total capacity of 289,600 kVA and two capacitor banks with a total capacity of 36,000 kVar for substation maintenance without service interruptions.

As part of the Authority's refocused capital improvement program, it is constructing two new 230 kV transmission lines to complement the transmission loops in the center and western parts of Puerto Rico. These two 230 kV transmission lines will connect one of the Authority's principal generation complexes in the south with major switching and load centers in the northern and central parts of the island. The first project consists of a 38-mile long 230 kV transmission line between the South Coast steam plant and the switchyard at the Cambalache gas turbines plant. The first stage of this project consists of the reconstruction and conversion to 230 kV of an existing 115 kV circuit line between the South Coast Steam Plant and Dos Bocas hydroelectric power plant. The second stage of the project consists of the construction of a new 230 kV line from Dos Bocas to the Cambalache facilities. The construction of this project is expected to be completed during fiscal year 2014. The Authority is also constructing a new 50-mile long 230 kV transmission line between its South Coast steam plant and the transmission center in Aguas Buenas. The construction of this new transmission line is expected to be completed during fiscal year 2016. Once in operation, these major infrastructure projects will significantly enhance the reliability and security margins of the transmission system, and will permit the increase of power transfers from the south coast of Puerto Rico to the northern, central and western regions. During fiscal year 2012, the Authority completed the conversion to 230 kV of the existing 115 kV circuit line from Costa Sur to the Ponce transmission center. The Authority also completed the conversion of the fuel oil fired boilers of Costa Sur Units 5 and 6 to units that will be able to use either oil or natural gas by April 2012.

The Authority has completed an underground 115 kV transmission circuit line around the San Juan metropolitan area in order to reduce power loss incidents in the aftermath of hurricanes and other major storms which strike Puerto Rico from time to time. The program to improve the 38 kV sub-transmission system continues in effect, including the construction of underground 38 kV lines in Carolina, Guaynabo and San Juan. Construction of the underground 38 kV lines in Vega Baja and Mayagüez has been completed. In addition, major reconstruction projects of aerial 38 kV lines in the central and western part of the island will significantly improve the reliability of the sub-transmission system.

48

During fiscal year 2009, the Authority commenced operations of the Palo Seco Gas Insulated Switchgear ("GIS"), one of the Authority's major gas insulated 115/38 kV switchyards with direct interconnection to 600 MW of generating capability, and a 90 MVARS Static Var Compensator (SVC) at the 38 kV bus of Bayamón Transmission Center, which improves the System's dynamic reactive power response to major contingencies and outages in the generation or transmission system. The Authority also commenced the operation of a new air insulated 38 kV switchyard in the municipality of Cidra, which improves the reliability and efficiency of the System while increasing its power transfer capability and improving voltage regulation of the sub-transmission system under normal conditions and contingency situations. Finally, the Authority completed the installation of a new 115 kV capacitor bank in the Juncos transmission center, which is intended to improve the voltage regulation in major load centers, increase the transmission system's power factor and reduce its reactive power losses. During fiscal year 2010, the Authority commenced operations of a new air insulated 38 kV switchyard in Aguadilla.

During fiscal year 2012, the Authority expects to commence operations of a new 115 kV capacitor bank in the Canóvanas transmission center in order to continue improving the voltage regulation in major load centers, increase the transmission system's power factor and reduce its reactive power losses. The Authority also expects to complete a new 150 megavolt ampere ("MVA") 115/38 kV transmission center in the municipality of Bayamón (Hato Tejas TC), as well as major expansion projects that add 150 MVA of 115/38 kV transforming capacity in the transmission centers of Canóvanas. A new 450 MVA 230/115 kV transmission center in Ponce TC, as well as an expansion project to add 150 MVA of 115/38 kV transforming capacity to existing facilities were in operation during fiscal years 2011 and 2012.

The Authority expects that the San Juan GIS 38 kV and 115 kV switchgears will enter into service in fiscal year 2014 and 2016, respectively. This will be one of the Authority's major gas insulated 115/38 kV switchyards with direct interconnection through the existing air insulated 115 kV bus to approximately more than 850 MW of generating capability.

*Distribution Facilities*

Investment in distribution plant in service as of June 30, 2011 totaled $3.3 billion based on original installed cost. The capital improvement program for the five fiscal years ending June 30, 2016 includes $404 million (or 24% of the total) for extensions and improvements to existing distribution lines to serve new clients and substations for accommodating new load growth areas. As of December 31, 2011, the electric distribution system included approximately 32,633 circuit miles of primary and secondary distribution lines and 1,139 distribution substations (806 are client-owned) with a total installed transformer capacity of 8,202,920 kVA.

The construction of new distribution substations is expected to improve the capacity and reliability of the Distribution System. Recently, the increase in capacity of Buen Pastor 1 13.2 kV substation was energized at Guaynabo. The Juan Martín 13.2 kV (Yabucoa) and Santa Isabel 13.2 kV substations have been energized. Recently, the Mora TC 13.2 kV substation was energized at Arecibo. The Factor 13.2 kV substation at Arecibo is currently in the commissioning process. Moreover, the new 13.2 kV distribution substation at Río Bayamón II is under construction. This substation is expected to enter into service during fiscal year 2012.

*Operations*

The Authority has digitized all the transmission and distribution facilities into a geographic information system. This allows the Authority to create a common database for all its transmission and distribution facilities.

The Authority's data management system integrates a work management system, a geographic information system and an outage management system that is known by its Spanish acronym of AIRe. The AIRe system is structured to maintain its databases as well as interface with existing computerized systems in other Authority divisions such as finance, human resources, and payroll. This integration enables the Authority to track all work from initiation to completion through the same system, while keeping all geographic information (such as maps) updated with necessary additions and modifications. Some of the AIRe system benefits include improved client service, reduced operations and management expenses, improved emergency response, better planning, improved and consistent engineering/design and estimating practices, archived maintenance records and real-time system status reporting. The work management system of the AIRe system has been in service in all of the Authority's districts since 2001.

The Authority also expanded its satellite-based vehicle locator system from 107 to 747 vehicles in order to improve the service fleet's efficiency. In addition, the Authority is in the process of upgrading its asset and work management system and implementing an automatic service outage detection system.

The Authority has also implemented energy theft recovery initiatives that resulted in theft-related billings of approximately $27 million during fiscal year 2011 and collections of approximately $13.4 million. As part of these initiatives, the Authority is in the process of deploying "smart grid" technology by replacing its current automated meter reading system with new "smart meters" that allow the Authority to identify areas where theft is prevalent, include more robust anti-tampering technology and permit service to be remotely shut off. The Authority has also significantly increased its theft detection and prevention program by using comparison of local/temporary meters on the distribution lines versus the aggregate of the served meters, a comparison of a client's present electricity usage versus historical data, and a toll free hotline for anonymous reporting of suspected electricity theft. The Authority expects that these initiatives will result in $25 million of annual revenues for fiscal year 2012 and $30 million of annual revenues for fiscal years 2013 through 2016. The actual results from the theft recovery program may differ from the Authority's projections.

The Authority regularly reviews and upgrades its operating and maintenance practices, with an emphasis on improving the reliability of its transmission and distribution system. In order to improve the productivity of its transmission and distribution employees, the Authority has instituted programs to assist them in both technical and supervisory training. In addition, as part of its continuous effort to improve service quality, the Authority has acquired new software applications and trained its personnel for the analysis and monitoring of power quality.

The Consulting Engineers are of the opinion that the Authority's production plant and transmission and distribution system are in good repair and sound operating condition. See Appendix III—*Letter of the Consulting Engineers.*

## Adequacy of Capacity

*General*

Electric utilities provide reliable service by establishing a level of dependable generating capacity that is at least equal to their load plus a reserve sufficient to allow for scheduled maintenance, forced or

unscheduled outages (defined below), reductions in generating capacity due to partial outages, and other unforeseen events. Unlike most electric utilities in the United States, which are able to purchase power from neighboring systems in the event of unscheduled outages of generating units or temporary surges in demand, the Authority, as an island utility, is not able to do so. In addition, the absence of significant seasonal variations in demand results in a relatively high load factor (approximately 75.8% in fiscal year 2011), which affords the Authority less flexibility to schedule maintenance. Therefore, the Authority must have greater total reserve capacity than other utilities in the United States to cover instances of generating unit outages.

The Authority's program to extend the life and increase the availability of its generating units has three components: formal operator training, comprehensive preventative maintenance, and design modification. The formal operator training part emphasizes safety, operating efficiency, and equipment integrity. The comprehensive preventative maintenance part of the program requires the Authority to remove all major generating units from service for maintenance at regularly scheduled intervals to ensure their reliability ("scheduled outages"). The design modification part of the program represents the Authority's commitment to improve the operation of generating units by installing redesigned, improved components, or by undertaking conversions of such generating units, in order to reduce the risk of units being forced out of service or being forced to operate at partial output ("forced or unscheduled outages"). About half of the $1.2 billion in capital expenditures for the five fiscal years ended June 30, 2011 for production plant was spent for such scheduled maintenance program.

The Authority maintains some generating capacity as a reserve (referred to as a "controlled reserve") for frequency quality, in anticipation of unscheduled outages or other unforeseen events. The Authority controlled reserve criterion is 200 MW, but in order to maintain it, more than 500 MW of spinning reserve was needed. Based on its experience, however, the Authority implemented improvements in the System that allowed it to reduce its spinning reserve requirements while continuing to provide reliable service to clients and reducing its fuel cost.

In December 2006, a fire at the Authority's Palo Seco plant damaged one of the four oil-fired generating units. In a separate incident, a fire also damaged the control room that controls all four generating units. The Authority returned the first of the four Palo Seco units to service in November 2007. As of the end of the first quarter of fiscal year 2010, all Palo Seco generating units and the control room had returned to service.

The table on the following page shows annualized equivalent availability and the equivalent forced outage rate (an indication of the average percentage of total dependable generating capacity which is unavailable throughout the year due to forced outages or partial generating capacity outages) for fiscal years 2007 through 2011.

### Electric Generation Equivalent Availability and Reliability

|  | 2007[3] | 2008[3] | 2009[3] | 2010 | 2011 |
|---|---|---|---|---|---|
| Equivalent availability[1] | 84% | 80% | 76% | 78% | 78.9% |
| Equivalent forced outage rate[2] | 10% | 15% | 16% | 12% | 15.8% |

[1] Cogenerator data is included.
[2] Cogenerator data is not included.
[3] Variations over previous years was due primarily to Palo Seco steam plant outage.

For planning purposes, the Authority determines adequacy of capacity using probabilistic analytic methods widely used throughout the electric utility industry. The use of these methods takes into account the unique operational aspects of the Authority.

By more effectively utilizing scheduled outages, and by implementing major design modifications, the Authority has reduced the need for extended maintenance downtime and increased the overall reliability of all of its generating facilities. The additional reserve capacity represented by the two co-generation facilities gives the Authority more flexibility in scheduling maintenance periods on its own generation facilities and favorably affects the System's equivalent availability. Total production plant availability, however, decreased consistently from 84% in fiscal year 2006 to 76% in fiscal year 2009 due primarily to the Palo Seco steam plant outage. For fiscal year 2010, total production plant availability increased to 78% and further increased to 84% for fiscal year 2011. As the Palo Seco steam plant returned to full generating capacity, the Authority has removed other generating units from service for maintenance that the Authority was not able to perform during the time the Palo Seco steam plant was out of service. The Authority calculates that each percentage point increase of System availability is equivalent to adding approximately 60 MW of available capacity to the System.

*Projected Load Growth*

Projections of future load growth are a key component in the Authority's financial and capacity planning. As part of its planning process, the Authority receives information from three sources relating to economic activity: Advantage Business Consulting, Inter-American University, and the Commonwealth Planning Board. The Inter-American University uses a macroeconomic model developed in conjunction with Global Insight, a nationally recognized econometrics forecasting firm. The Commonwealth Planning Board also uses data provided by Government Development Bank. The Authority's forecasts of electric energy sales and income are based in part on the correlations between the consumption of electricity and various economic and financial activities in the Commonwealth as represented in the above-mentioned models. The Authority continuously monitors actual performance relative to its forecasts and prepares new forecasts at least once a year.

The Authority incorporates the highest of the three forecasts (or the higher of two forecasts when the third is not available) as its base case for planning the additional generating capacity required by the System. Recognizing the inherent uncertainty of forecasting growth, the Authority ordinarily uses the lowest of the three forecasts (or the lower of two forecasts when the third is not available) in preparing its base case revenue forecast.

The Consulting Engineers have reviewed the Authority's projections of future load growth and estimates of peak load and have found them to provide a reasonable basis for planning purposes. See Appendix III—*Letter of the Consulting Engineers*.

*The Authority's Capacity Expansion Plan*

The Authority periodically updates its capacity expansion plan as part of its efforts to ensure its ability to meet expected long term electric load growth, to provide reliable, cost-effective electric service to its clients, and to reduce its dependence on fuel oil. Based on the Authority's current projections of peak load and the continued level of production plant equivalent availabilities of its generating units, the Authority and the Consulting Engineers believe that reliable service will continue to be provided to the Authority's clients through fiscal year 2016. See *Plans for Fuel Diversification – Purchase of Renewable Energy Power.*

The following table summarizes the Authority's projected peak load, dependable capacity, reserve margin and dependable reserve margin through fiscal year 2016 under the peak load projections shown below. Projections of future peak load (for capacity planning purposes) from fiscal year 2012 to fiscal year 2016 prepared by the Authority show an average annual increase of less than 1%.

52

| Fiscal Years Ending June 30 | Peak Load | Dependable Capacity | Reserve Margin | Dependable Reserve Margin (%) |
|---|---|---|---|---|
| | | (in MW, except percentages) | | |
| 2012 | 3,365 | 5,839 | 2,474 | 74 |
| 2013 | 3,381 | 5,839 | 2,458 | 73 |
| 2014 | 3,410 | 5,839 | 2,429 | 71 |
| 2015 | 3,454 | 5,839 | 2,385 | 69 |
| 2016 | 3,497 | 5,839 | 2,342 | 67 |

The Consulting Engineers have examined the Authority's proposed long-term capacity expansion plan (and the methodologies and assumptions upon which it is based) and have found its development to be reasonable and generally consistent with utility industry practice and appropriate for the Authority. See Appendix III—*Letter of the Consulting Engineers.*

The Authority's recent load growth projections show that the Authority's current capacity is sufficient to meet short- to medium-term load growth demands. As a result, the Authority's capital improvement program in connection with its generating facilities is concentrated on maintaining its generating units and converting existing oil-fired generation units to dual fuel units that can burn oil and natural gas, as described below.

## Plans for Fuel Diversification

### Conversion of Generating Facilities to Dual Fuel

In order to reduce the Authority's dependency on fuel oil and the cost of electricity, and to comply with the MATS, the Authority is pursuing a fuel diversification strategy. The principal component of this strategy is the conversion of most of the Authority's existing oil-fired generating units to dual fuel units that can burn either oil or natural gas and the development of the necessary natural gas transportation and delivery infrastructure.

The Authority has already completed the conversion of the main generating units at the Costa Sur power plant to dual fuel, representing approximately 820 MW of generating capacity, or 14% of the Authority's total dependable generating capacity. The Authority is able to receive natural gas at Costa Sur through an existing pipeline from the EcoEléctrica LNG terminal and pursuant to a Tolling Services Agreement with Gas Natural Electricidad SDG, S.A. ("Gas Natural") whereby Gas Natural makes available to the Authority, subject to the payment of certain fees and costs, tolling services at the EcoEléctrica LNG terminal, including the berthing of LNG vessel, the unloading, receipt and storage of LNG for the Authority's account, the regasifying of LNG and the transportation of the regasified LNG. The term of the Tolling Services Agreement expires on August 1, 2020. The Authority has already conducted testing of the Costa Sur units with natural gas. The Authority is in the process of completing other necessary improvements in order to burn 100% natural gas at these units. The Authority expects to commence burning natural gas at Costa Sur in April 2012 and that the full 820 MW of capacity will be fueled with natural gas by April 2013.

The Authority's capital improvement program for fiscal years 2012 through 2016 includes the conversion to dual fuel of the main generating units at most of the other generation facilities of the Authority, representing approximately 2,420 MW of generating capacity, at an estimated cost of approximately $119.3 million. In order for the Authority to be able to burn natural gas at these other facilities, however, the Authority has to develop the associated natural gas delivery infrastructure. To this end, the Authority has been procuring the permits for Vía Verde, an approximately 93 miles long underground natural gas pipeline system that would transport natural gas from the EcoEléctrica LNG

terminal in the south to the San Juan, Palo Seco and Arecibo (Cambalache) generating plants in the north. The generating units projected to be converted to dual fuel at these generation facilities would represent an aggregate of 1,520 MW of dependable generating capacity that would be fueled with natural gas. The Authority's preliminary estimate of the cost of the Vía Verde project is approximately $450 million, of which $55 million has already been spent. The Authority has received several of the Puerto Rico permits required for construction. The only remaining permit required to be able to commence construction is the permit from the U.S. Army Corps of Engineers. Several environmental groups have expressed opposition to the project; however, the Authority expects that it will be able to obtain the remaining permit. On March 21, 2012, the Puerto Rico Supreme Court dismissed several consolidated judicial actions against Vía Verde that primarily challenged the EQB's approval of the final environmental impact statement for the project. If permits and the required project financing are obtained, the Authority expects to complete construction of this project in approximately 14 to 16 months following the receipt of permits and financing.

The Authority's capital improvement program for fiscal years 2012 through 2016 also includes the conversion to natural gas of two of Aguirre's generating units representing 900 MW of capacity, which in addition to 592 MW of capacity that has already been converted to dual fuel at Aguirre, would represent 1,492 MW of dual fuel capacity. In order to deliver natural gas to the Aguirre power plant, which is the largest of the Authority's generating plants, the Authority engaged a leading company in the development of LNG storage and regasification infrastructure to conduct a feasibility study for the engineering, procurement, construction and operation of a floating offshore LNG regasification facility. The feasibility study was completed with a positive result. This facility will require permits from the FERC and will be subject to a full environmental review and analysis under the National Environmental Policy Act. The Authority has also engaged this company to commence the permitting process, which includes a pre-filing with FERC that has already been submitted, and is currently in negotiations with the company regarding the development of this facility. If the negotiations are satisfactorily completed and the required permits and project financing are obtained, the Authority expects that the cost of this facility will be approximately $175 million and that the construction period will be approximately 12 months.

The Authority is also considering other alternatives to bring natural gas to its main generating facilities. On February 15, 2012, the Governor of Puerto Rico adopted an Executive Order creating a multi-sectoral committee, of which the Authority is a part, to study and submit a report regarding the necessary measures to comply with the new EPA rules and the impact of not complying on the economy (in particular on the manufacturing sector), and to examine all alternatives to transport and deliver natural gas to the Authority's generating plants on the north.

For a discussion of the financing alternatives being considered with respect to these projects, see *Plans for Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

*Transportation of Natural Gas to Puerto Rico and Projected Savings from Natural Gas Diversification Strategy.*

During the past decade, LNG has been imported to Puerto Rico for use in the EcoEléctrica cogeneration facility, which has an LNG terminal. On March 28, 2012, the Authority entered into a two-year purchase agreement for natural gas in order to provide natural gas to the Authority's Costa Sur power plant, where the Authority has already completed the conversion of the main generating units to dual fuel, and is able to receive natural gas through an existing pipeline from the EcoEléctrica LNG terminal. The LNG that is imported through the EcoEléctrica LNG terminal is currently from non-U.S. sources as the United States does not currently produce LNG in the contiguous 48 states that can be delivered outside the mainland and lacks the infrastructure and facilities required for such production.

The Authority's contracted natural gas prices for the Costa Sur plant are based on a discount to the prices of fuel oil, as is typical in international markets.

In recent years, technological advances have allowed energy companies to tap into large previously untouched reserves of natural gas that could allow the U.S. to become a major producer of LNG in the future, but this would require the development of the appropriate infrastructure. While natural gas inside the U.S. mainland is generally transported via pipeline, deliveries to markets that are not accessible via pipelines would require the construction of LNG production facilities to convert the gas into liquid form and transport it via specialized tankers to foreign or domestic overseas destinations. Several companies are planning or evaluating the construction of such liquefaction plants and related facilities in the United States. Whether the infrastructure for the production of a significant amount of LNG from the U.S. mainland will be developed ultimately will depend on market conditions in the coming years and the energy policy of the United States government.

Natural gas, unlike oil, does not trade on a unified world market. Currently, there is a significant differential in the price of natural gas in international markets versus U.S. based prices, with U.S.-based prices being significantly lower. In the future, if the Authority were able to purchase LNG from the U.S. mainland, it would have to transport it in compliance with the Jones Act. The Jones Act generally requires that the transportation of merchandise between two U.S. points (including Puerto Rico) be carried in vessels that are documented in the United States, built in the United States, and owned and operated by U.S. eligible citizens. The Jones Act contains a limited exemption (adopted in 1996) for vessels that transport LNG to Puerto Rico if the vessel (1) is a foreign built vessel that was built before October 19, 1996, or (2) was documented under U.S. flag before that date, even if the vessel was thereafter redocumented under foreign flag before being redocumented under U.S. flag. In either case, the vessels still have to be U.S. owned and U.S. manned. Although there are currently no Jones Act compliant LNG vessels (either directly or within the limited exemption) operating in U.S. coastwise trade, there are some vessels currently in operation (thirteen (13) vessels that were built in U.S. yards and up to twenty-four (24) vessels that were built in non-U.S. shipyards between January 1, 1990 and October 16, 1996) that could potentially meet the previously mentioned limited exemption and be used to transport LNG from one or more future U.S. LNG production facilities to Puerto Rico. Even if such vessels were available, however, the provisions of the Jones Act would have the effect of increasing the cost of transporting LNG from the United States to Puerto Rico, as such vessels would have a higher cost profile than a foreign-flag LNG vessel. In addition, in November 2011, the U.S. Congress passed a law creating another limited exemption from the Jones Act. The law allows three specific LNG vessels (i.e., LNG Gemini, LNG Leo, and LNG Virgo) to transport natural gas between U.S. ports. This exemption may not be useful for LNG transport to Puerto Rico, since the vessels are quite old and are planned to be used as part of a project to transport ethane from Pennsylvania to the Gulf Coast. As a result, these vessels may not be available to transport natural gas between U.S. ports and Puerto Rico.

At the request of the Government of Puerto Rico, the U.S. Government Accountability Office is currently performing a comprehensive study on the Jones Act. After this study is concluded, the Government of Puerto Rico will analyze its findings and, as part of its efforts to reduce the cost of electricity in Puerto Rico, possibly seek from the U.S. Congress a broadening of the current Jones Act exemptions to include newer and more efficient LNG vessels in order to facilitate the transportation of LNG from the U.S. There is no assurance that the current exemptions will be broadened or, if they are broadened, that the Authority would be able to contract for the purchase and transportation of LNG from the U.S. mainland at lower prices than what it would be able to obtain in international markets.

The Authority estimates that the use of natural gas instead of fuel oil in the Authority's facilities that would be supplied through the Vía Verde and Aguirre projects could result in annual fuel cost savings to the Authority of between $500 million and $1.0 billion by fiscal year 2016, depending on

market prices of fuel oil and natural gas and on the Authority's execution of the plant conversions to dual fuel units that can burn oil and natural gas. To the extent that LNG is produced in the U.S. mainland and becomes available for delivery to foreign or domestic overseas markets, the price differential with international markets persists, and the Authority is able to secure transportation of such LNG in compliance with the Jones Act, as it may be amended from time to time, the Authority believes its savings from the use of natural gas could be in the upper part of the above-mentioned range. Conversely, to the extent the Authority has to continue purchasing natural gas in international markets, it believes its projected savings may be in the lower portion of this range, unless global prices come down as a result of increased production and exports of U.S. natural gas.

*Purchase of Renewable Energy Power*

The other principal component of the Authority's fuel diversification strategy is the development of renewable energy generation. The Authority had, as of March 1, 2012, signed power purchase agreements with respect to 33 renewable energy projects totaling approximately 1,000 MW of capacity. These projects are for renewable energy from solar, wind, waste-to-energy and landfill gas technologies. The power purchase agreements generally have a 25 year term and provide that the Authority has to accept delivery of and purchase the net electrical output from the facility to the extent it is available (except for reasons of force majeure or certain emergencies and subject to the facility complying with certain technical requirements). The table below shows the capacity of the renewable energy projects under contract by source of energy.

| | **Number of Projects** | **Capacity** |
|---|---|---|
| Wind | 9 | 341.9 |
| Solar | 16 | 400.4 |
| Waste-to-Energy | 6 | 243.0 |
| Landfill Gas | 2 | 3.5 |
| Total | 33 | 988.8 |

These renewable energy projects are in various stages of development, most still being subject to obtaining financing and permitting. Four of the projects have already obtained private financing commitments and have commenced construction. Pursuant to these power purchase agreements, the Authority has agreed to purchase energy (not capacity) at a fixed price once a particular facility has commenced operations. These agreements are subject to terms and conditions that must be met before the Authority is required to purchase any power produced, including meeting certain technical requirements with respect to the integration of the projects to the Authority's system. All of the Authority's purchased power costs under these agreements are expected to be treated as a Current Expense under the Trust Agreement.

The power purchase agreements provide for the purchase of power at fixed prices that are currently lower that the cost of the Authority's most expensive generation capacity. Over time, however, the cost of purchasing power from these renewable energy facilities could exceed the cost of energy produced by the Authority's natural gas fired units. The cost of purchased power from these facilities would be passed on to the consumer through the fuel and purchased power adjustment charges. The Authority's projections for the five fiscal years ending June 30, 2016 assume the Authority will have approximately 650 MW of renewable energy capacity by fiscal year 2016, which, based on expected availability, would represent approximately 10% of its projected energy generation. There is no assurance that these renewable energy projects will be completed or come on line by fiscal year 2016.

## Statistical Information

The following table sets forth certain statistical information regarding the System for the five fiscal years ended June 30, 2011 and the six months ended December 31, 2011 and 2010. The information below includes 507 MW of capacity provided pursuant to the EcoEléctrica contract and 454 MW of capacity provided pursuant to the AES-PR contract.

### Statistical Information

| | Years Ended June 30 | | | | | Six Months Ended December 31 | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2010 | 2011 |
| Nameplate rating at end of period (in MW) ... | 5,388 | 5,402 | 5,898 | 5,898 | 5,898 | 5,898 | 5,900 |
| Dependable generating capacity at end of period (in MW)[1] ................................ | 5,365 | 5,372 | 5,839 | 5,839 | 5,839 | 5,839 | 5,839 |
| Peak load, 60-minute (in MW) ................... | 3,604 | 3,546 | 3,351 | 3,404 | 3,406 | 3,406 | 3,303 |
| Reserve Margin (%)................................ | 48.9 | 51.5 | 75.1 | 71.5 | 71.4 | 71.4 | 76.8 |
| Average load (in MW)............................. | 2,863 | 2,721 | 2,586 | 2,692 | 2,583 | 2,673 | 2,588 |
| Load factor (%)..................................... | 79.4 | 76.7 | 77.2 | 79.1 | 75.8 | 78.5 | 78.4 |
| | | | | | | | |
| Energy generated, purchased and sold (in millions of kWh): | | | | | | | |
| Electric energy generated and purchased[2] | 25,082 | 23,838 | 22,651 | 23,579 | 22,630 | 11,803 | 11,427 |
| Auxiliary equipment use......................... | (1,020) | (914) | (888) | (1,020) | (991) | (519) | (497) |
| Net electric energy generated and purchased | 24,062 | 22,924 | 21,763 | 22,559 | 21,639 | 11,284 | 10,930 |
| Losses and unaccounted for...................... | (3,390) | (3,322) | (3,247) | (3,324) | (3,138) | (1,613) | (1,509) |
| Electric Energy Sold ............................. | 20,672 | 19,602 | 18,516 | 19,235 | 18,501 | 9,671 | 9,421 |
| | | | | | | | |
| Electric Energy Sales (in millions of kWh): | | | | | | | |
| Residential.......................................... | 7,244 | 6,757 | 6,368 | 7,057 | 6,708 | 3,573 | 3,452 |
| Commercial[3]....................................... | 8,910 | 8,744 | 8,498 | 8,759 | 8,551 | 4,431 | 4,353 |
| Industrial............................................ | 4,136 | 3,743 | 3,289 | 3,047 | 2,881 | 1,485 | 1,436 |
| Other................................................. | 382 | 358 | 361 | 372 | 361 | 182 | 180 |
| Total................................................... | 20,672 | 19,602 | 18,516 | 19,235 | 18,501 | 9,671 | 9,421 |
| | | | | | | | |
| Electric Energy Revenues (in thousands): | | | | | | | |
| Residential.......................................... | $1,272,389 | $1,498,576 | $1,374,344 | $1,514,413 | $1,579,445 | $766,969 | $935,956 |
| Commercial[3]....................................... | 1,666,358 | 2,015,375 | 1,897,022 | 1,959,953 | 2,107,448 | 1,001,564 | 1,243,532 |
| Industrial............................................ | 630,569 | 720,912 | 601,985 | 563,915 | 596,046 | 279,028 | 345,519 |
| Other................................................. | 101,650 | 115,652 | 112,830 | 116,134 | 123,216 | 58,236 | 68,780 |
| Total................................................... | $3,670,966 | $4,350,515 | $3,986,181 | $4,154,415 | $4,406,155 | $2,105,797 | $2,593,787 |
| | | | | | | | |
| Average revenue per kWh (in cents): | | | | | | | |
| Residential.......................................... | 17.57 | 22.18 | 21.58 | 21.46 | 23.55 | 21.47 | 27.11 |
| Commercial[3]....................................... | 18.70 | 23.05 | 22.32 | 22.38 | 24.65 | 22.60 | 28.57 |
| Industrial............................................ | 15.24 | 19.26 | 18.31 | 18.51 | 20.69 | 18.79 | 24.07 |
| Other................................................. | 26.60 | 32.28 | 31.21 | 31.19 | 34.10 | 32.01 | 38.19 |
| All Classes ......................................... | 17.76 | 22.19 | 21.53 | 21.60 | 23.82 | 21.77 | 27.53 |
| | | | | | | | |
| Average number of clients: | | | | | | | |
| Residential.......................................... | 1,317,454 | 1,314,454 | 1,324,752 | 1,335,928 | 1,341,291 | 1,340,584 | 1,341,419 |
| Commercial[3]....................................... | 130,295 | 130,011 | 129,492 | 129,208 | 129,537 | 129,618 | 128,995 |
| Industrial............................................ | 1,576 | 1,514 | 898 | 808 | 770 | 781 | 740 |
| Other................................................. | 3,204 | 3,232 | 3,494 | 3,549 | 3,528 | 3,534 | 3,504 |
| Total................................................... | 1,452,529 | 1,449,211 | 1,458,636 | 1,469,493 | 1,475,126 | 1,474,517 | 1,474,658 |
| | | | | | | | |
| Monthly average revenue per client: | | | | | | | |
| Residential.......................................... | $ 80.48 | $ 95.01 | $ 86.45 | $ 94.47 | $ 98.13 | $ 95.35 | $ 116.29 |
| Commercial[3]....................................... | 1,065.76 | 1,291.80 | 1,220.81 | 1,264.08 | 1,355.76 | 1,287.84 | 1,606.69 |
| Industrial............................................ | 33,342.27 | 39,680.32 | 55,863.49 | 58,159.55 | 64,507.14 | 59,545.03 | 77,819.59 |
| Other................................................. | 2,643.83 | 2,981.95 | 2,691.04 | 2,726.92 | 2,910.43 | 2,746.46 | 3,271.50 |
| All classes .......................................... | $ 210.61 | $ 250.17 | $ 227.73 | $ 227.73 | $ 235.59 | $ 238.02 | $ 293.15 |

[1] Includes generating capacity of the EcoEléctrica and AES-PR cogeneration facility.
[2] Includes power purchased from EcoEléctrica and AES-PR cogeneration facility.
[3] Includes sales to the governmental sector, including central government agencies, public corporations and municipalities.

**Historical Capital Improvement and Financing Program**

Capital improvements and their financing are made pursuant to a program established by the Authority and reviewed annually by the Consulting Engineers. The program for the five fiscal years ended June 30, 2011 and for the six-month periods ended December 31, 2010 and 2011 is shown in the following table. Substantially all of the capital improvements have been financed with Power Revenue Bonds and other borrowed funds.

| Capital Improvements | Fiscal Years Ended June 30 (in thousands) | | | | | | Six-Months Ended December 31, | |
|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | Total | 2010 | 2011 |
| Production plant | $311,038 | $334,309 | $246,578 | $139,369 | $151,043 | $1,182,337 | $ 70,679 | $ 84,524 |
| Transmission facilities | 132,771 | 170,244 | 91,508 | 112,760 | 77,745 | 585,028 | 36,528 | 30,717 |
| Distribution facilities | 104,826 | 111,849 | 105,028 | 124,963 | 142,461 | 589,127 | 64,063 | 53,182 |
| Other[1] | 36,510 | 50,407 | 37,100 | 9,903 | 40,226 | 174,146 | 12,960 | 24,569 |
| Total | $585,145 | $666,809 | $480,214 | $386,995 | $411,475 | $2,530,638 | $184,230 | $192,992 |

[1] Includes general land and buildings, general equipment, preliminary surveys and investigations.

**Projected Five-Year Capital Improvement and Financing Program**

Following a public hearing and approval by the Consulting Engineers, the Board must adopt the Authority's capital budget on or before the first day of the ensuing fiscal year. If revisions are required, the Board may amend the capital budget at any time during the fiscal year with the approval of the Consulting Engineers.

The projected capital improvement program for the five fiscal years ending June 30, 2016 (excluding the Vía Verde pipeline and the Aguirre offshore terminal projects) totals approximately $1.72 billion. It is currently estimated that substantially all of the capital improvement program will be financed with borrowed funds. Estimated capital costs reflect, among other factors, construction contingency allowances and annual cost escalations.

The five-year capital improvement program includes $644 million for production plant. Of this amount, the Authority projects that approximately $104 million will be invested during fiscal year 2012 in its production plant for the conversion of generating units to dual fuel units, to extend their useful life and continue to increase their reliability and efficiency.

The projected capital improvement program also includes $382 million for transmission facilities and $453 million for distribution facilities. During the next five fiscal years, the Authority will dedicate a significant amount of its resources to the improvement and expansion of its transmission and distribution facilities.

The Consulting Engineers have examined the projected capital improvement program and found it to be reasonable.

The capital improvement program is subject to periodic review and adjustment because of changes in expected demand, environmental requirements, design, equipment delivery schedules, costs of labor, equipment and materials, interest rates and other factors. The following table presents a summary of the projected capital improvement program for the five fiscal years ending June 30, 2016. The Authority expects that substantially all of the five-year capital improvement program will be funded through the issuance of additional Power Revenue Bonds and other borrowed funds.

**Projected Capital Improvement Program**
**(in thousands)**

| Capital Improvements | Fiscal Years Ending June 30 | | | | | Total |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | |
| Production plant | $104,340 | $121,200 | $151,145 | $150,748 | $116,875 | $ 644,308 |
| Transmission facilities | 76,110 | 57,100 | 82,084 | 82,463 | 83,797 | 381,554 |
| Distribution facilities | 87,205 | 82,955 | 105,629 | 94,089 | 83,448 | 453,326 |
| Other[1] | 58,845 | 38,745 | 53,752 | 45,695 | 42,680 | 239,717 |
| Total | $326,500 | $300,000 | $392,610 | $372,995 | $326,800 | $1,718,905 |

[1] Includes general land and buildings, general equipment, preliminary surveys and investigations.

The Authority's capital improvement program through fiscal year 2016 does not include the estimated costs of Vía Verde and the offshore natural gas terminal at the Aguirre power plant, the two principal projects required in order to deliver natural gas to most of the Authority's power plants. The Authority estimates that the construction and development costs of the Vía Verde natural gas pipeline will be approximately $450 million, of which approximately $55 million has already been spent. The Authority preliminarily estimates that the construction costs of the Aguirre offshore natural gas terminal will be approximately $175 million.

The Authority, together with Government Development Bank, is evaluating various financing structures for these projects. Some of the alternatives being considered include financing these projects on a project finance, off-balance sheet basis or through fuel purchase agreements with third parties for the delivery of natural gas. Under these financing methods, the Authority would pay the capital costs of the projects through service agreements with third parties to construct and/or operate the natural gas facilities. Under these financing alternatives, payments made by the Authority for services related to the natural gas facilities or for the acquisition of natural gas from third parties would constitute a Current Expense under the Trust Agreement and, thus, would be paid prior to debt service payments on the Power Revenue Bonds. In order for payments of services related to the natural gas facilities to qualify as Current Expenses under the Trust Agreement, those facilities have to be usable and in use. Additionally, in order for payments for the acquisition of natural gas to be considered a Current Expense, such fuel must actually be ordered by the Authority, delivered by the third party and used by the Authority. Because natural gas is currently a substantially cheaper source of fuel than oil, and this price differential is projected to continue, the Authority expects that even after recouping the capital costs of the projects through the fuel adjustment charge or other charge, the generation of electricity with natural gas will result in net savings to the Authority's clients, which could also have a positive effect on electric energy demand and the Puerto Rico economy. At present, the Authority estimates that the use of natural gas instead of fuel oil in the Authority's facilities that would be supplied through the Vía Verde and Aguirre projects could result in annual fuel cost savings to the Authority of between $500 million and $1.0 billion by fiscal year 2016, depending on market prices of fuel oil and natural gas, the sourcing of natural gas and the Authority's execution of the plant conversions to dual fuel units that can burn oil and natural gas. For more information on the Vía Verde natural gas pipeline, the Aguirre offshore natural gas terminal, the sourcing of natural gas and the projected savings from the use of natural gas, see *Plans for Fuel Diversification – Conversion of Generating Facilities to Dual Fuel* and *– Transportation of Natural Gas to Puerto Rico and Projected Savings from Natural Gas Diversification Strategy* under THE SYSTEM.

**Rates**

Under the Act, the Authority has the power to determine, alter, establish and collect reasonable rates for electric service, which shall produce sufficient revenues to cover the operating costs of the Authority, the payment of the principal of and the interest on its bonds, and other contractual obligations. Public hearings are required before the setting of permanent rates, with the final approval vested solely

within the Authority. Act No. 21 of the Legislative Assembly of Puerto Rico, approved May 31, 1985 ("Act No. 21"), provides uniform procedures for public hearings and review of the actions of certain public corporations, including the Authority, in connection with changes in the rates set by such public corporations. Act No. 21 also authorizes the Legislative Assembly by resolution to review rates of certain public corporations, including the Authority.

Electric service rates consist primarily of (i) basic charges, made up of demand, client and energy related charges, (ii) fuel adjustment charges to recover the cost to the Authority of fuel oil, and (iii) purchased power charges to recover the cost to the Authority of power purchased from third party independent power producers such as the EcoEléctrica and AES-PR facilities. Consequently, revenues will reflect changes in the fuel charge and the purchased power charge caused by fluctuations in the price of fuel oil or purchased power. Basic charges currently average 5.7 cents per kilowatt-hour. The Authority has not increased basic charges since 1989. The table below presents the electric sales revenues derived from basic charges, fuel adjustment charges and purchased power charges for the five fiscal years ended June 30, 2011 and the six months ended December 31, 2010 and 2011.

**Electric Sales Revenues**
**(in thousands)**

| | Fiscal Year Ended June 30, | | | | | Six Months Ended December 31 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2010[1] | 2011[1] |
| Basic charges | $1,183,862 | $1,131,535 | $1,071,967 | $1,120,904 | $1,087,027 | $ 563,858 | $ 555,331 |
| Fuel adjustment charges | 1,778,198 | 2,473,227 | 2,161,604 | 2,255,989 | 2,578,869 | 1,169,564 | 1,638,710 |
| Purchased power charges | 708,906 | 745,753 | 752,610 | 777,522 | 740,259 | 372,375 | 399,746 |
| Total | $3,670,966 | $4,350,515 | $3,986,181 | $4,154,415 | $4,406,155 | $2,105,797 | $2,593,787 |

[1] Unaudited

The fuel adjustment charges imposed in any month are based upon the average of (i) the actual average fuel oil costs for the second preceding month and (ii) the estimated average fuel oil costs for the current month. Purchased power charges are based on estimated purchased power costs for the current month. To the extent that such charges do not fully recover actual fuel or purchased power costs (or recover more than such costs), charges are adjusted in the second succeeding month.

Under the Act, certain residential clients receive a subsidy for the fuel adjustment charge. See *Subsidies and Contributions in Lieu of Taxes* below for a more detailed description of this and other subsidies. On December 1, 2011, the Authority implemented a temporary rate stabilization program to offer a reduction in rates to residential customers that do not benefit from the subsidy. This reduction, which is being reflected through a lower fuel adjustment charge, has resulted in an aggregate reduction in Revenues for the three months ended February 29, 2012 of approximately $25.7 million. The rate stabilization program is currently scheduled to end in May 2012 and is expected to result in an aggregate reduction in Revenues of approximately $70 million for the six month period during which it will be in effect. The Authority, however, is evaluating a possible extension of this program, although it does not expect that any such extension would have a material impact in Revenues because the reduction in rates expected to result from the commencement of burning natural gas at Costa Sur in April 2012 and the implementation of the new fuel procurement model would reduce or eliminate the rate reduction contemplated by the rate stabilization program.

To promote an increase in industrial development, the Authority instituted five new special rates in June 2003 that were available for new customers until July 30, 2008. These special rates offered a discount of approximately 11%. Qualifying industrial clients receive this discount on their total electric bill, while existing industrial clients that expanded their operations prior to July 30, 2008 receive this discount on the demand, energy, and adjustment charges associated with the expansion. Customers billed

at these rates receive the benefit of the reduced rate for a five year period. While these rates expired on July 30, 2008, they are available to existing users to complete the balance of their five year term. During fiscal years 2010 and 2011, these rates benefited qualifying industrial clients with savings of $9.8 million and $7.9 million, respectively.

During the first half of fiscal year 2010, the Authority approved a reduction in the load factor requirement applicable to Large Industrial Service 115 kV and Large Industrial Service 115 kV – Special rates in order to provide certain industries with additional operation flexibility without affecting overall electric utility charges. According to the approved modifications, the load factor requirement was reduced from 80% to 50%; provided, that if a customer does not achieve a load factor of 50% during a specific month, such customer would be billed for the additional kilowatt-hours required to achieve the 50% load factor requirement. The Authority implemented this reduced load factor requirement in order to take advantage of the excess generation capacity resulting from falling demand as a result of the extended economic recession affecting Puerto Rico.

The Authority, in its commitment to public safety, joined municipalities and communities in their efforts to improve public safety and facilitate the use of new communication technologies. For this reason, in July 2007, the Authority temporarily adopted the Unmetered Service for Small Loads Rate ("USSL"). This rate was approved permanently in January 2008. The USSL was designed to address the requests of various municipalities for the installation of security camera surveillance systems and wireless telecommunication equipment on the Authority's poles and structures.

Pursuant to the Trust Agreement, the Consulting Engineers have reviewed the Authority's rate schedules and believe that the Authority will receive sufficient Revenues to cover Current Expenses and to make the required deposits in the Sinking Fund, the Reserve Maintenance Fund and, if any are required, the Self-insurance Fund. See Appendix III—*Letter of the Consulting Engineers.* For a discussion of the impact of including the CILT and subsidies in Revenues and Net Revenues, see *Authority's Financial Condition – Subsidies and Contributions in Lieu of Taxes* under RISK FACTORS AND INVESTMENT CONSIDERATIONS, *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM, and *Projected Net Revenues* under NET REVENUES AND COVERAGE.

**Major Clients**

The public sector, which consists of the Commonwealth government, its public corporations and the municipalities (included primarily in the commercial category), accounted for approximately 15% of kWh sales and 17% of revenues from electric energy sales for fiscal year 2011. Of these, PRASA represents 4% of kWh sales and 4% of Revenues. PRASA has embarked in a plan to develop its own renewable energy projects and is evaluating the purchase from the Authority of the hydroelectric generating assets, which would reduce PRASA's consumption of energy from the Authority in the future. See *The Authority's Financial Condition – Sale of Hydroelectric Facilities* under RISK FACTORS AND INVESTMENT CONSIDERATIONS.

The ten largest industrial clients accounted for 4% of kWh sales and 3% of revenues from electric energy sales for fiscal year 2011. No single client accounted for more than 1% of electric energy sales or more than 1% of revenues from electric energy sales.

In September 1997, the Authority established a reduced rate for large industrial clients connected at an 115 kV voltage level and meeting certain criteria such as a minimum demand and a high load factor and power factor. This rate is designed to provide large clients with an incentive to buy more electricity from the Authority. As of June 30, 2011, two of the Authority's industrial clients were using such rate.

**Fuel**

For the fiscal year ended June 30, 2011, fuel oil expenses amounted to $2.3 billion, or 61.8% of total Current Expenses ($2.0 billion or 58.5% of total Current Expenses for the preceding fiscal year). For the five fiscal years ended June 30, 2011, fuel oil averaged 59.4% of average total Current Expenses for the same period. See *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

The thermal generating units owned by the Authority, which produced approximately 66.5% of the net electric energy generated by the System in fiscal year 2011, are fueled by No. 6 fuel oil, except for the twenty-six smaller combustion-turbine units, the two Aguirre combined-cycle units, the 249 MW combustion turbine plant in Arecibo, and the new San Juan combined-cycle units, which burn No. 2 distillate fuel oil.

The Authority's fuel requirements for its generation facilities are covered by one-year contracts, which expire at various times and are usually renewable at the option of the Authority. The Authority's contracted fuel oil prices consist of a market based escalation factor plus a fixed price differential. The fixed price differential compensates for the fact that the fuel oil is delivered in the Commonwealth and not New York. It also takes into account other aspects of the delivery such as maximum cargo volume and draft restrictions. The Authority regularly explores alternatives to reduce its exposure to the volatility of fuel prices, such as entering into fixed price fuel supply contracts or derivative contracts for hedging oil prices. To date, the Authority does not have any hedges related to oil prices in effect.

As part of its strategic initiatives, the Authority, together with Government Development Bank, as fiscal agent, is evaluating the restructuring of the fuel procurement process in order to achieve efficiencies and savings that can result in a lower cost of fuel. The Authority expects that this initiative will be implemented by July 2012. See *Plans to Address the Authority's Challenges – Fuel Procurement Model* under OVERVIEW.

The Authority's customary inventory of fuel oil covers 40 days of ordinary operations, up from 25 days in the past. Although sources of fuel oil are continually changing as a result of variations in relative price, availability and quality, the Authority has never been forced to curtail service to its clients because of fuel oil shortages. The Authority's total inventory capacity for fuel oil is 4.7 million barrels. On October 23, 2009, the Authority's inventory of fuel oil decreased by 400,000 barrels due to an explosion at the Caribbean Petroleum Corp. ("CAPECO") oil storage facility, which stored this inventory on behalf of the Authority. The Authority's operations were not affected as a result of this explosion and it was immediately able to replace the lost inventory. As of December 31, 2011, the Authority had an inventory of 2.1 million barrels of fuel oil. In March 2011, Puma Energy Caribe ("Puma") acquired the oil storage facility through the bankruptcy court. Puma is currently refurbishing the site and is expected to be available for storage in January 2013.

Average fuel oil costs and related costs of production for the five fiscal years ended June 30, 2011 and the six months ended December 31, 2010 and 2011 are shown in the following table:

**Fuel Costs**

| | Fiscal Year Ended June 30 | | | | | Six Months Ended December 31 | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2010 | 2011 |
| Average fuel oil cost per barrel (net of handling costs)............. | $  57.55 | $  84.18 | $  76.23 | $  76.55 | $  95.91 | $83.05 | $117.01 |
| Number of barrels used (in millions).................................. | 29.83 | 27.36 | 25.18 | 26.22 | 23.89 | 12.50 | 12.45 |
| Fuel oil cost (in millions) | $1,717.0 | $2,303.0 | $1,919.8 | $2,006.9 | $2,291.4 | $1,038.4 | $1,456.6 |
| Net kWh generated (excluding purchased power from 2007 to 2011) (in millions)............... | 16,974.2 | 15,626.3 | 15,099.4 | 15,652.1 | 14,543.5 | 7,564.4 | 7,391.2 |
| Average net kWh per barrel ......... | 569.0 | 571.1 | 599.7 | 597.0 | 608.8 | 605.2 | 593.7 |
| Average fuel oil cost per net kWh generated (in cents)......... | 10.12 | 14.74 | 12.71 | 12.82 | 15.76 | 13.7 | 19.7 |

With the addition of the output of the EcoEléctrica and AES-PR facilities to the Authority's System, the Authority's traditional dependence on oil-fired generation has decreased. The Authority estimates that approximately 31% of its annual energy requirements are now being provided by non-oil-fired generating facilities.

### Subsidies and Contributions in Lieu of Taxes

Under the Act, the Authority is required to set aside 11% of the Authority's gross revenues from electric energy sales to fund certain government subsidy programs (those provided by laws in effect as of June 30, 2003), pay CILT to the municipalities and, if there is any remaining amount, fund the Authority's capital improvement program. In addition, the Authority is required to provide certain other subsidies consisting principally of a residential fuel subsidy, a residential rate subsidy and a subsidy for hotels, as described below.

#### Subsidies

Under the Act, a subsidy is provided for a portion of fuel charges to qualifying residential clients who use up to 425 kWh monthly or 850 kWh bi-monthly. Residential clients who qualify for the subsidy are billed the full applicable basic charges and fuel adjustment charges, with the applicable subsidy taking the form of a credit against the bill. The Act limits this subsidy to a maximum of $100 million per year and limits the cost of fuel oil used in calculating the amount of such subsidy to a maximum of $30 per barrel. The residential clients must pay any fuel adjustment charge resulting from a price of fuel oil in excess of $30 per barrel. As of the end of fiscal year 2011, there were approximately 214,175 clients, or 16% of the total residential classification, who qualified for this subsidy. For fiscal year 2011, the cost of the subsidy was $26 million. For fiscal years 2012 thru 2016, the annual average cost of the residential subsidy is expected to be $19 million.

Act No. 69 of August 11, 2009 provides residents of public housing units the alternative of receiving electric power at a fixed rate. According to the provisions of Act No. 69, the Authority is required to establish a fixed rate for electric power consumption for residents of public housing and provide a payment plan for all residents with past due amounts. Once the Authority has established its fixed rate, residents of public housing that are current with their payments may opt-out of this fixed rate program if their current rate is lower and the Authority may eliminate all state subsidy programs currently in effect. The Authority is also prohibited from suspending service to these residents unless they fail to

comply with their payment plan or the payment of the fixed rate. The Authority has approved a fixed rate from $30 to $50 (depending on the number of rooms) for a maximum consumption of 425 kWh. Approximately 35,000 residential clients currently take advantage of this fixed rate. The Authority revenues from clients under the fixed rate amounted to $16.6 million for fiscal year 2011.

Hotels receive a subsidy in an amount equal to 11% of their monthly billing, which has averaged approximately $6 million per year for the five fiscal years ended June 30, 2011. In order to receive this subsidy, hotels must maintain the hotel's electric service accounts on a current basis.

The Authority provides the residential fuel and hotel subsidy in the form of a credit against the recipient's electric bills and not as a reimbursement of a portion of their electric bills. As a result, the Authority never receives the amount corresponding to these subsidies.

In addition, the Authority has recently been offering certain discounts and incentives in the form of credits to certain industrial clients, as discussed under *Rates* above.

For a discussion of Bond Counsel's treatment of the accrued residential fuel and hotel subsidies (as described above) and the rural electrification and irrigation systems subsidies (as described below) for purposes of the additional bonds test and the rate covenant under the Trust Agreement, see *Rate Covenant* and *Additional Bonds* under SECURITY

### Contributions In Lieu of Taxes

The CILT is intended to compensate the municipalities for foregone tax revenues. The Act provides that the Authority's obligations under the Trust Agreement have priority over the Authority's obligation to make any CILT. The amount of the CILT payable to the municipalities is the greater of the following amounts: (1) 20% of the Authority's Net Revenues (as defined in the Trust Agreement), after deducting from Net Revenues the cost of certain government subsidy programs; (2) actual electric power consumption by the municipalities; and (3) the prior five year average of the CILT paid to the municipalities. The CILT is payable only from Net Revenues available in each fiscal year. The Authority is required to pay the CILT no later than November 30 following the end of the fiscal year to which the CILT applies. The Act further provides that the Authority may, at its option, deduct any municipality's receivable that is outstanding at the end of any fiscal year from the CILT payable to such municipality. If the Authority does not have sufficient Net Revenues available in any fiscal year to pay the CILT to the municipalities, the difference is carried forward for a maximum of three years, at the end of which the Authority is required to pay the remaining balance, subject to the Authority's compliance with its obligations under the Trust Agreement.

While the Authority has the legal right to collect from the municipalities their electric energy consumption bills, historically the Authority has followed the practice of not pursuing the collection of the municipalities' bills for energy consumption and instead it offsets such bills against the CILT. At the end of each fiscal year, the Authority determines the amount of Net Revenues for that fiscal year available to cover the CILT. The amount so determined is applied against any CILT payable from prior fiscal years, beginning with any CILT that has then become immediately due and payable due to the three fiscal year limitation. Any remaining amount of Net Revenues is applied against the CILT for the current fiscal year. At the same time, the Authority reduces its municipalities' receivable by an amount equal to the aggregate amount of the CILT being reduced from its payables.

For fiscal year 2011, the total amount of the CILT due to the municipalities, based on the value of power consumed by the municipalities, was $212.5 million. Of this amount, the CILT paid to the municipalities corresponding to fiscal year 2011 was $99.1 million, which was applied by reducing the

outstanding municipal accounts receivable balances by that amount. The remaining balance of the CILT for fiscal year 2011 ($113.4 million) is being carried forward for payment over the next three years. The deferred CILT balance has grown steadily since the end of fiscal year 2007, when it was $34.3 million. During fiscal year 2011, the Authority also paid to the municipalities $49.9 million of outstanding unpaid CILT that had been carried forward for fiscal years 2008, 2009 and 2010 and $9.2 million to amortize the outstanding balance of a note issued to the municipalities as part of the settlement of a lawsuit brought by the municipalities against the Authority. These payments to the municipalities were all made by offsetting the municipalities' electric energy consumption receivables.

Act 233-2011, approved December 11, 2011, modifies the CILT formula to exclude from the municipality's electric energy consumption electric energy consumption related to municipal facilities in which for-profit businesses operate and for which the municipalities receive compensation through rent or an entrance fee. The Authority is in the process of implementing the provisions of Act 233-2011 by installing additional meters in municipal facilities to be able to determine the consumption that is no longer subject to the CILT. The Authority's preliminary estimate is that Act 233-2011 will result in additional collections of approximately $15 million in fiscal year 2013, $20 million in fiscal year 2014, $25 million in fiscal year 2015 and $30 million in fiscal year 2016. The Authority's projections for the five fiscal years ending June 30, 2016 take into consideration the provisions of Act 233-2011.

If the Authority were to pursue the collection of bills for energy consumption by the municipalities, there is no assurance that the Authority in fact would be able to collect such bills or, in some cases, collect such bills from many municipalities that are in a difficult financial position.

*Rural Electrification and Irrigation Systems*

The Authority provides certain technical and maintenance services for dams that supply PRASA and some irrigation users. The cost of these services is treated by the Authority as a subsidy.

The following table sets forth the amount of CILT that the Authority paid during fiscal year 2011 and expects to pay during the five fiscal years ending on June 30, 2016, and the residential fuel, hotel and irrigation system subsidies that the Authority incurred during fiscal year 2011 and expects to incur during the five fiscal years ending on June 30, 2016. The amounts appearing on this table for municipalities for fiscal years 2012 through 2016 represent the municipalities' expected electric power consumption in such fiscal years.

| | Fiscal Years Ending June 30 (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| Description | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| Municipalities (CILT) | $158,194 | $230,863 | $221,269 | $215,616 | $216,326 | $217,758 |
| Hotel Subsidies | 7,449 | 7,768 | 7,480 | 7,148 | 7,040 | 7,147 |
| Subsidies: | | | | | | |
| Irrigation Systems | 4,517 | 6,449 | 6,578 | 6,710 | 6,844 | 6,981 |
| Residential Customers | 26,847 | 19,987 | 19,968 | 19,051 | 18,542 | 18,351 |
| Total | $197,007 | $265,067 | $255,295 | $248,525 | $248,752 | $250,237 |

## Wheeling

Act No. 73 provides that the Authority shall identify and implement a system that permits the operation of a wheeling service mechanism by January 2, 2010. Act No. 73 also provides for the creation of a Committee of Wheeling, which Committee is responsible for the implementation of the wheeling system. The Committee of Wheeling engaged Christensen Associates Energy Consulting, LLC, based in Wisconsin, to prepare the Puerto Rico Wheeling System Implementation Plan Study that was delivered to the Authority in December 2009. This study, which included various regulatory proposals regarding the

establishment of the system and the applicable tariffs, was reviewed by the Authority and substantial changes were made.

Although the Authority did not meet the deadline established in the Economic Incentives Act, public hearings were held on June 1 and 2, 2010 to consider the Wheeling System Tariffs, Wheeling Transmission Regulation and Wheeling Interconnection Procedure. The public hearing examiner submitted a final report to the Authority's Governing Board on July 29, 2010. In the report, the examiner recommended approval of the Wheeling Transmission Regulation and Wheeling Interconnection Procedure, but rejected approval of the Wheeling System Tariffs based on lack of information to the public. He recommended further public hearings with enough time for public evaluation. Based on such recommendations, the Authority modified the Wheeling Transmission Tariff Schedules and held new public hearings on June 2 and 3, 2011. The public hearing examiner submitted his report to the Board of Directors on July 22, 2011, including various recommendations that are under evaluation by the Authority. Meanwhile, the Authority's Board of Directors further extended the temporarily approved wheeling system tariff structure. See *Changes in Commonwealth Legislation and Market Developments* under INVESTMENT CONSIDERATIONS.

## DEBT

The following table sets forth the Power Revenue Bonds and notes of the Authority (i) outstanding as of December 31, 2011, and (ii) as adjusted for the issuance of the Bonds.

|  | Outstanding as of December 31, 2011 | As adjusted for the Issuance of the Bonds |
|---|---|---|
|  | (in thousands) | |
| Lines of Credit (operational) | $ 300,000 | $ 300,000 |
| Power Revenue Bonds | 7,605,435 | 8,234,090 |
| Other Loans and Debt (subordinated)[1] | 120,505 | 43,105 |
| Total | $8,025,940 | $8,577,195 |

[1] Includes $4.9 million payable solely from Commonwealth appropriations.

## Lines of Credit – Operational

As of December 31, 2011, the Authority had two one-year, revolving lines of credit provided by private financial institutions for the purchase of fuel oil and power and working capital expenses. These two lines of credit have a maximum aggregate amount of $385 million, of which $300 million was outstanding as of December 31, 2011. These lines of credit mature in June 2012 and July 2012. These lines of credit are senior to the Authority's Power Revenue Bonds as debt service payments are Current Expenses payable prior to the debt service payments on the Authority's Power Revenue Bonds.

In addition, on March 8, 2012, the Authority obtained an additional $50 million revolving credit facility from Government Development Bank to allow for timely payment for the purchase of fuel oil under the new fuel procurement process that began on a short-term basis for a portion of the Authority's fuel oil purchases. This line of credit, which expires in June 2012, is also senior to the Authority's Power Revenue Bonds.

## Other Loans and Debt – Subordinated

As of December 31, 2011, the Authority had two term loans with private financial institutions that had an outstanding balance of approximately $29.9 million. The term loans are subordinated in payment priority to the Authority's Power Revenue Bonds and are payable from the subordinate

obligations fund established under the Trust Agreement, which is funded from the annual Revenues of the Authority remaining after all deposits to the Sinking Fund and the Reserve Maintenance Fund required by the Trust Agreement have been made.

The Authority also has available three lines of credit from Government Development Bank which are also subordinate in payment priority to the Authority's Power Revenue Bonds. One of these lines of credit is a non-revolving facility, with a maximum aggregate principal amount of $244 million, to be used by the Authority to pay debt service requirements on its outstanding Power Revenue Bonds for fiscal year 2012. As of December 31, 2011, $77.4 million was outstanding under this line of credit. This line of credit will be repaid with the proceeds of the Series 2012A Bonds. Another line of credit is a revolving line of credit in the maximum aggregate principal amount of $150 million to be used to cover certain collateral posting requirements under the Authority's basis swap, described below. As of the date of this Official Statement, no amounts were outstanding under this line of credit. The third line of credit had an outstanding balance of approximately $750,000 as of December 31, 2011. The Authority also had other debt in the amount of $12.4 million as of December 31, 2011.

## Swap Agreements

As of July 1, 2008, the Authority entered into a basis swap agreement in the notional amount of $1.375 billion (the "Basis Swap Agreement") with an amortization schedule matching certain maturities of the Authority's outstanding power revenue and power revenue refunding bonds from 2027 to 2037. Under the terms of a master swap agreement, the Authority receives from Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, an affiliate of Goldman, Sachs & Co.) quarterly payments, commencing on October 1, 2008, equal to a floating amount applied to said notional amount at a rate equal to 62% of the 3-month London Inter-Bank Offered Rate ("LIBOR") index reset each week plus 29 basis points (hundredths of a percent) and a fixed rate payment of 0.4669% per annum (the "basis annuity"), quarterly for the term of the swap in return for quarterly payments by the Authority on such notional amount at a rate based on changes to the Securities Industry and Financial Markets Association ("SIFMA") municipal swap index. The terms of the master swap agreement also require the Authority to post collateral (in cash or securities) in the event the fair value of the swap is negative and exceeds a threshold amount of $50 million, subject to adjustment based on changes to the Authority's credit ratings with Moody's Investors Service ("Moody's") and Standard & Poor's ("S&P"). If the Authority's current ratings were to be downgraded by one notch by both Moody's and S&P, the threshold would decrease to $30 million, and if the current ratings were downgraded by two notches by both Moody's and S&P the threshold would be zero. Recently, Goldman Sachs Capital Markets transferred the Basis Swap Agreement to its affiliate, Goldman Sachs Bank U.S.A.

This basis swap provides the Authority the cash flow benefit of the basis annuity in exchange for the Authority taking tax and other basis risks tied to the change in the relationship between LIBOR and the SIFMA municipal swap index. Pursuant to the Trust Agreement, regularly scheduled payments to the counterparty by the Authority and payments relating to the termination or other fees, expenses, indemnification or other obligations to the counterparty under the Basis Swap Agreement are subordinate to the Power Revenue Bonds, including the Bonds.

During fiscal years 2009, 2010 and 2011, the Authority received $7.9 million, $9.5 million and $9.6 million, respectively, from the counterparty to the basis swap, net of the Authority's payments to the counterparty. For the first six months of fiscal year 2012, the Authority received an additional $5.9 million from the counterparty. Since inception, the Authority has had a maximum collateral posting requirement of $84.2 million in November 2008. As of December 31, 2011, the basis swap had a negative fair value to the Authority of $974,546, which is below the collateral posting requirement threshold of $50 million. As of the date of this Official Statement, the fair value of the basis swap was

below the collateral posting threshold. The Authority has not been required to post collateral since January 2011.

In January 2012, the Authority terminated $225 million in notional amount under the Basis Swap Agreement in order to reduce its exposure. The Authority received $265,000 from the counterparty in connection with this termination. Following this termination, the notional amount of the basis swap is $1.150 billion.

In connection with the issuance of its Power Revenue Refunding Bonds, LIBOR Bonds Series UU (the "LIBOR Bonds") and Power Revenue Refunding Bonds, Muni-BMS Bonds Series UU (the "Muni-BMS Bonds"), the Authority entered into certain interest rate swap agreements (the "Interest Rate Swap Agreements"). The Interest Rate Swap Agreements have a current aggregate notional amount of $411.8 million, matching the principal amount of the associated Power Revenue Refunding Bonds, Series UU. Under the terms of the master swap agreement, the Authority receives from JPMorgan Chase Bank, N.A. and UBS AG (an affiliate of UBS Securities, Inc.) quarterly payments equal to a floating amount based on a rate equal to 67% of LIBOR reset each every third month plus a fixed basis point spread (hundredths of a percent), for the term of the swap in return for quarterly payments by the Authority equal to a fixed amount based on a fixed rate, in each case based on a notional amount equal to the principal amount of LIBOR Bonds outstanding. The Authority also receives from JPMorgan Chase Bank, N.A. quarterly payments equal to a floating amount based on a rate equal to 100% of the five-year SIFMA swap rate for the term of swap in return for quarterly payments by the Authority equal to a fixed amount based on a fixed rate, in each case based on a notional amount equal to the principal amount of Muni-BMS Bonds outstanding. As of December 31, 2011, the Interest Rate Swap Agreements had a negative fair value of approximately $100.8 million.

At the Authority's current rating levels by Moody's and S&P, the Authority is not subject to collateral posting thresholds on the Interest Rate Swap Agreements. In the event of downgrades to the Authority's credit ratings, however, the Authority could also be subject to collateral posting requirements on the Interest Rate Swap Agreements in the event the fair value of the swap is negative and exceeds a threshold amount. With respect to Interest Rate Swap Agreements with a notional amount of $252.9 million, which are insured, if the Authority's current ratings were to be downgraded by one notch by both Moody's and S&P, and the insurer's current ratings were also lowered, the threshold would be $50 million, and if the current ratings were downgraded by two notches by both Moody's and S&P, and the insurer's current ratings were also lowered, the threshold would be $30 million. Based on the fair value of these swap agreements as of December 31, 2011, the Authority would not have been required to post collateral under the $50 million threshold and would have been required to post $15.2 million of collateral under the $30 million threshold. With respect to the other Interest Rate Swap Agreements with a notional amount of $159.0 million, which are uninsured, if the Authority's current ratings were to be downgraded by one notch by both Moody's and S&P, the threshold would be $30 million, and if the current ratings were downgraded by two notches by both Moody's and S&P the threshold would be zero. If the collateral posting threshold with respect to the uninsured swap agreements had been $30 million, the Authority would have been required to post collateral of approximately $3.5 million as of December 31, 2011 and if the threshold had been zero, the Authority would have been required to post collateral of approximately $33.5 million.

For the fiscal year ended June 30, 2010, the Authority adopted Governmental Accounting Standards Board Statement No. 53 - Accounting and Financial Reporting for Derivative Instruments, which requires that the fair value of derivatives be reported in a government entity's financial statements. In order to comply, a journal entry for the amount of $109.9 million was booked to register a Swap Liability and a Deferred Outflow, resulting from the change in the fair market value of the derivative instruments.

The Authority regularly reviews its derivatives portfolio and from time to time may make changes that it determines to be in its best interest.

## Principal and Interest Requirements

Principal and Interest Requirements, as used herein and as defined in the Trust Agreement, means for any fiscal year the sum of all principal of, including Amortization Requirements for, and interest on, outstanding Power Revenue Bonds which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year. The following table shows the annual Principal and Interest Requirements for the outstanding Power Revenue Bonds after giving effect to the issuance of the Bonds and the refunding of the Refunded Bonds. The figures for interest and total debt service have been reduced by the interest that was capitalized through the issuance of the Series XX Bonds, the Series ZZ Bonds, the Series CCC Bonds, the Series DDD Bonds, and the Bonds in the following amounts: approximately $81.5 million due during fiscal year 2012, $67.1 million due during fiscal year 2013, $31.5 million in fiscal year 2014, and $15.8 million in fiscal year 2015. The Amortization Requirements are subject to adjustment as provided in the definition thereof. See Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

### Debt Service Requirements

| Year Ending Jun 30 | Outstanding Bonds Debt Service[1][2] | The Bonds Principal | The Bonds Interest[4] | Total Debt Service[3] | Total Outstanding Bonds Debt Service[2][3] |
|---|---|---|---|---|---|
| 2012 | $ 484,769,796 | - | $ 1,533,208 | $ 1,533,208 | $ 486,303,003 |
| 2013 | 526,198,560 | - | 910,875 | 910,875 | 527,109,435 |
| 2014 | 561,856,727 | - | 910,875 | 910,875 | 562,767,602 |
| 2015 | 561,856,905 | - | 16,649,115 | 16,649,115 | 578,506,020 |
| 2016 | 540,510,293 | $ 19,890,000 | 32,387,355 | 52,277,355 | 592,787,648 |
| 2017 | 563,003,310 | - | 31,476,480 | 31,476,480 | 594,479,790 |
| 2018 | 563,002,786 | - | 31,476,480 | 31,476,480 | 594,479,266 |
| 2019 | 563,363,113 | - | 31,476,480 | 31,476,480 | 594,839,593 |
| 2020 | 563,366,498 | - | 31,476,480 | 31,476,480 | 594,842,978 |
| 2021 | 563,366,495 | - | 31,476,480 | 31,476,480 | 594,842,975 |
| 2022 | 563,364,688 | - | 31,476,480 | 31,476,480 | 594,841,168 |
| 2023 | 563,367,202 | - | 31,476,480 | 31,476,480 | 594,843,682 |
| 2024 | 563,364,219 | - | 31,476,480 | 31,476,480 | 594,840,699 |
| 2025 | 563,343,049 | - | 31,476,480 | 31,476,480 | 594,819,529 |
| 2026 | 563,367,710 | - | 31,476,480 | 31,476,480 | 594,844,190 |
| 2027 | 563,366,927 | - | 31,476,480 | 31,476,480 | 594,843,407 |
| 2028 | 550,963,515 | 12,400,000 | 31,476,480 | 43,876,480 | 594,839,995 |
| 2029 | 341,629,220 | 179,570,000 | 30,856,480 | 210,426,480 | 552,055,700 |
| 2030 | 402,478,806 | - | 21,947,000 | 21,947,000 | 424,425,806 |
| 2031 | 405,563,762 | - | 21,947,000 | 21,947,000 | 427,510,762 |
| 2032 | 381,396,109 | - | 21,947,000 | 21,947,000 | 403,343,109 |
| 2033 | 268,453,161 | - | 21,947,000 | 21,947,000 | 290,400,161 |
| 2034 | 229,297,211 | - | 21,947,000 | 21,947,000 | 251,244,211 |
| 2035 | 229,064,323 | - | 21,947,000 | 21,947,000 | 251,011,323 |
| 2036 | 229,358,523 | - | 21,947,000 | 21,947,000 | 251,305,523 |
| 2037 | 321,779,686 | - | 21,947,000 | 21,947,000 | 343,726,686 |
| 2038 | 322,559,928 | - | 21,947,000 | 21,947,000 | 344,506,928 |
| 2039 | 296,841,308 | - | 21,947,000 | 21,947,000 | 318,788,308 |
| 2040 | 295,140,838 | - | 21,947,000 | 21,947,000 | 317,087,838 |
| 2041 | - | 213,725,000 | 21,947,000 | 235,672,000 | 235,672,000 |
| 2042 | - | 224,415,000 | 11,260,750 | 235,675,750 | 235,675,750 |
| Total | $13,145,994,667 | $650,000,000 | $735,590,418 | $1,385,590,418 | $14,531,585,084 |

---

[1] Debt service requirement on all Power Revenue Bonds outstanding on the date hereof after giving effect to the refunding of the Refunded Bonds. Debt service for fiscal year 2012 includes interest paid in January 2012.

[2] The numbers shown are reduced by the amount of the Federal Build America Bonds subsidy with respect to the Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) and the interest that was capitalized through the issuance of the Series XX Bonds, the Series ZZ Bonds, the Series CCC Bonds and the Series DDD Bonds in the amount of $77,659,178 in fiscal year 2012 and $35,661,344 in fiscal year 2013.

[3] The numbers shown are reduced by the interest that was capitalized through the issuance of the Bonds in the amount of $3,864,685 in fiscal year 2012, $31,476,480 in fiscal year 2013, $31,476,480 in fiscal year 2014, and $15,738,240 in fiscal year 2015.

## NET REVENUES AND COVERAGE

The following table presents the Net Revenues of the Authority under the provisions of the Trust Agreement for the five fiscal years ended June 30, 2011 and for the six-months periods ended December 31, 2010 and 2011 and the ratio of such Net Revenues to Principal and Interest Requirements on the Power Revenue Bonds. The Authority calculates Revenues, Current Expenses and Net Revenues on the accrual basis. These calculations of Net Revenues differ in several important respects from the Authority's calculations of changes in net assets prepared in conformity with GAAP. For example, the calculations of Net Revenues do not include depreciation, interest expense on the Power Revenue Bonds, other post-employment benefits actuarial accruals, and CILT as a deduction in calculating Net Revenues. The figures for Revenues and Net Revenues in this table include the revenues attributable to the residential fuel, hotel and rural electrification and irrigation systems subsidies (see footnotes 2 and 3), which the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to provide a credit for such amounts in its recipients' billing), and the electric consumption charges of the municipalities, which the Authority does not collect because it is applied as an offset against the CILT (see footnote 3). The debt service coverage is shown as calculated under the Trust Agreement and as adjusted to reflect the elimination from Net Revenues of the municipalities' consumption and the hotel and residential subsidies. In delivering their approving opinion, Bond Counsel will take into consideration and will rely on the fact that, although the Authority includes the accrued residential fuel, hotel and rural electrification and irrigation subsidies in the calculation of Revenues for purposes of the additional bonds test and the rate covenant, even if these amounts were excluded from such calculations, both the additional bonds test for the Bonds and the Authority's rate covenant will be satisfied.

## Historical Net Revenues and Coverage

| | Fiscal Year Ended June 30 | | | | | Six-Months Ended December 31, | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2010[1] | 2011[1] |
| Average number of clients | 1,452,529 | 1,449,211 | 1,458,636 | 1,469,493 | 1,475,126 | 1,474,517 | 1,474,698 |
| Electric energy sales (in millions of kWh) | 20,672 | 19,602 | 18,516 | 19,235 | 18,501 | 9,671 | 9,421 |
| **Source of Net Revenues** **(dollars in thousands)** | | | | | | | |
| Revenues: | | | | | | | |
| Sales of electric energy: | | | | | | | |
| Residential[2] | $1,272,389 | $1,498,576 | $1,374,344 | $1,514,413 | $1,579,445 | $ 766,969 | $ 935,956 |
| Commercial[3] | 1,666,358 | 2,015,375 | 1,897,022 | 1,959,953 | 2,107,448 | 1,001,564 | 1,243,532 |
| Industrial | 630,569 | 720,912 | 601,985 | 563,915 | 596,046 | 279,028 | 345,518 |
| Other | 101,650 | 115,652 | 112,830 | 116,134 | 123,216 | 58,236 | 68,781 |
| Sub-Total | $3,670,966 | $4,350,515 | $3,986,181 | $4,154,415 | $4,406,155 | 2,105,797 | 2,593,787 |
| Revenues from Commonwealth for rural electrification | 76 | 26 | 19 | - | - | - | - |
| Other operating revenues | 11,068 | 22,210 | 14,641 | 15,915 | 16,595 | 7,881 | 9,926 |
| Other (principally interest earned) | 5,275 | (3,253) | 6,427 | (4,597) | (11,537) | (10,202) | 1,779 |
| Total Revenues | $3,687,385 | $4,369,498 | $4,007,268 | $4,165,733 | $4,411,213 | 2,103,476 | 2,605,492 |
| **Current Expenses:** | | | | | | | |
| Operations: | | | | | | | |
| Fuel | 1,716,965 | 2,303,036 | 1,919,789 | 2,006,931 | 2,291,386 | 1,038,356 | 1,456,628 |
| Purchased power | 624,653 | 661,097 | 671,849 | 693,724 | 660,872 | 332,233 | 356,182 |
| Fuel Extra Expense Claimed[4] | (114,261) | (96,273) | - | - | - | - | - |
| Other production | 56,170 | 57,507 | 62,271 | 62,697 | 67,451 | 34,326 | 35,996 |
| Transmission and Distribution | 157,569 | 171,585 | 162,334 | 160,796 | 176,369 | 94,030 | 86,392 |
| Customer accounting and Collection | 109,361 | 118,196 | 111,126 | 114,542 | 114,837 | 57,745 | 57,706 |
| Administrative and General | 212,530 | 220,553 | 222,477 | 178,982 | 173,502 | 89,033 | 90,548 |
| Maintenance[5] | 250,563 | 248,406 | 225,107 | 209,516 | 220,775 | 120,385 | 111,584 |
| Other | 1,433 | 3,963 | 2,819 | 1,907 | - | 2,093 | 0 |
| Total Current Expenses | $3,014,983 | $3,688,070 | $3,377,772 | $3,429,095 | $3,705,192 | $1,768,201 | $2,195,036 |
| Net Revenues[5] | $ 672,402 | $ 681,428 | $ 629,496 | $ 736,638 | $ 706,021 | $ 335,275 | $ 410,456 |
| **Coverage** | | | | | | | |
| Principal and Interest Requirements[6] | $ 455,022 | $ 419,569 | $ 435,042 | $ 397,579 | $ 480,234 | (7) | (7) |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.48 | 1.62 | 1.45 | 1.85 | 1.47 | (7) | (7) |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[8] | 1.04 | 1.09 | 0.92 | 1.25 | 0.95 | (7) | (7) |

[1] Unaudited.
[2] Includes residential fuel subsidies of $27 million, $24.3 million, $30.6 million, $29.6 million and $26.8 million for fiscal years 2007, 2008, 2009, 2010 and 2011, respectively, and $12.8 million and $13.4 million for the six months ended December 31, 2010 and 2011, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.
[3] Includes (i) electric energy consumption by municipalities of $159.8 million, $187.3 million, $187.6 million, $196.5 million and $212.5 million for fiscal years 2007, 2008, 2009, 2010 and 2011, respectively, and $100.0 million and $121.0 million for the six months ended December 31, 2010 and 2011, respectively; (ii) hotel subsidies of $5.6 million, $6.7 million, $6.5 million, $6.3 million and $7.4 million for fiscal years 2007, 2008, 2009, 2010 and 2011, respectively, and $3.6 million and $4.5 million for the six months ended December 31, 2010 and 2011, respectively; and (iii) rural electrification and irrigation systems subsidies of $5.7 million, $6.8 million, $4.9 million, $5.4 million and $4.5 million for fiscal years 2007, 2008, 2009, 2010 and 2011, respectively, and $2.2 million and $3.8 million for the six months ended December 31, 2010 and 2011, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.
[4] Represents amounts claimed by the Authority under its insurance policies in connection with the Palo Seco steam plant fire.
[5] Includes, for maintenance of generating facilities, $134.5 million, $128.6 million, $117.3 million, $105.0 million and $107.7 million for fiscal years 2007, 2008, 2009, 2010 and 2011, respectively, and $58.5 million and $59.1 million for the six months ended December 31, 2010 and 2011, respectively.
[6] The Principal and Interest Requirements for fiscal years 2008, 2009, 2010 and 2011 have been reduced by the interest that was capitalized through the issuance of Power Revenue Bonds in the amounts of $21.2 million, $37.7 million, $8.4 million and $29.5 million, respectively. The Principal and Interest Requirements for fiscal year 2010 have been adjusted to reflect the restructuring of $73.9 million of the Authority's debt service requirements for such fiscal year through the issuance of Power Revenue Bonds, the proceeds of which were used to pay debt service for that fiscal year. The Principal and Interest Requirements for fiscal year 2011 have been further reduced by the amount of the Federal Build America Bonds subsidy on the Power Revenue Bonds, Series YY and Series EEE, equal to 35% of the interest payable on such Bonds.
[7] Calculated only for full fiscal year.
[8] Excludes from Net Revenues, for purposes of computing this ratio, the basic charges and fuel and purchased power adjustment charges attributable to energy consumption by the municipal governments as well as the subsidies for energy consumption charges provided by law to certain residential customers and hotels and those subsidies related to rural electrification and irrigation systems, in the amounts set forth in footnotes (2) and (3) above, which are not collected.

Although the ratio of adjusted net revenues (net of municipalities' consumption and subsidies) to Principal and Interest Requirements was below 1.00 for fiscal years 2009 and 2011, the Authority made timely payments on its Power Revenue Bonds in such fiscal years. The Authority, however, has had to obtain additional borrowings in order to meet all of its operational and financial obligations. See *The Authority's Financial Condition* under RISK FACTORS AND INVESTMENT CONSIDERATIONS.

The Authority's rate covenant requires that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that Revenues are sufficient to pay Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all bonds then Outstanding. Pursuant to the accrual method of calculating Revenues and Current Expenses under the Trust Agreement, the Authority is in compliance with the rate covenant, even if the accrued residential fuel, hotel and rural electrification and irrigation system subsidies are excluded from Revenues.

### Management's Discussion and Analysis of Operating Results

The following represents the Authority's analysis of its operations for the five fiscal years ended June 30, 2011 and the six months ended December 31, 2011 and 2010. For additional analysis of the Authority's results of operations, see *Management's Discussion and Analysis* in the Authority's audited financial statements, included as Appendix II.

*Six months ended December 31, 2011 compared to six months ended December 31, 2010*

Net Revenues for the six months ended December 31, 2011 were $410.5 million, representing an increase of $75.2 million, or 22.4%, from the same period in the prior year. Net Revenues increased despite a 2.6% decrease in electric energy sales (in kWh), primarily as a result of higher revenues from the fuel and purchased power adjustment charges relative to the increase in the cost of fuel and purchased power due to differences between these adjustment charges, as determined by the Authority's formula, and actual costs of fuel and purchased power for the period. Revenues for the six months ended December 31, 2011 were $2.605 billion, a 23.9% increase from the same period of the prior year, mainly as a result of an increase in the revenues from the fuel adjustment charge due to the 40.3% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the same period in the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $2.195 billion for the period, a 24.1% increase from the same period in the prior year. The increase in Net Revenues during the six month period was also due in part to a decrease in maintenance expenses of $8.8 million, or 7.3%, and a decrease in transmission and distribution expenses of $7.6 million or 8.1%. These expenses during the comparable period of 2010 had been higher than normal due to poor weather conditions that required higher maintenance and transmission and distribution expenses. Administrative and general expenses of $90.5 million for this period were 1.7% higher than in the comparable period of 2010. The accrued revenues attributable to the municipalities' consumption and the residential fuel, irrigation system and hotel subsidies increased from $118.6 million for the six months ended December 31, 2010 to $142.7 million for the six months ended December 31, 2011, or 20.3%.

Accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $807.5 million as of December 31, 2010 to $988.9 million as of December 31, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge due to the increase in the cost of fuel and slower payments by clients. Accounts receivable from government clients (excluding municipalities) increased from $210.3 million as of December 31, 2010 to $269.4 million as of December 31, 2011, of which 81% were considered past due (in excess of 30 days) as of December 31, 2011, compared to 79% as of December 31, 2010. Accounts receivable from general

clients increased from $597.2 million as of December 31, 2010 to $719.5 million as of December 31, 2011, of which 10% were past due as of December 31, 2011, compared to 12% as of December 31, 2010.

*Fiscal year 2011 compared to fiscal year 2010*

Net Revenues for fiscal year 2011 were $706.0 million, representing a decrease of $30.6 million, or 4.2%, from Net Revenues for fiscal year 2010. The decrease in Net Revenues was primarily the result of a 3.8% decrease in electric energy sales (in kWh) and increases in maintenance expenses of $11.3 million, or 5.4%, and in transmission and distribution expenses of $15.6 million, or 9.7%. Revenues were $4.4 billion, a 5.9% increase from the prior year as a result of an increase in the revenues from the fuel adjustment charge due to the 14.2% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $3.7 billion for the year, an 8.1% increase from the prior year. Fuel and purchased power expenses, the principal component of the Authority's Current Expenses, are passed on to clients through a separate fuel adjustment charge included in electric service rates. The Authority's revenues from its basic charges (which exclude the fuel adjustment charge) decreased by 3.0% from fiscal year 2010 to fiscal year 2011 as a result of the decrease in electric energy sales. Excluding fuel and purchased power expenses, Current Expenses increased from $728.4 million for fiscal year 2010 to $752.9 million for fiscal year 2011, or 3.4%, as a result of the increases in maintenance and transmission and distribution expenses mentioned above. The increase in these expenses was due in part to increases in salaries pursuant to the collective bargaining agreement with the Authority's principal union. The accrued revenues attributable to the municipalities' consumption and the residential fuel, irrigation and hotel subsidies increased from $237.8 million for fiscal year 2010 to $251.2 million for fiscal year 2011, or 5.6%. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

During fiscal year 2011, accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $932.1 million as of June 30, 2010 to $1.0 billion as of June 30, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge, due to the increase in the cost of fuel, and slower payments by clients. Accounts receivable from government clients (excluding municipalities) increased from $274.7 million as of June 30, 2010 to $282.3 million as of June 30, 2011, of which 78% were considered past due (in excess of 30 days) as of June 30, 2011, compared to 73% as of June 30, 2010. Accounts receivable from general clients (residential, industrial and commercial) increased from $657.4 million as of June 30, 2010 to $720.1 million as of June 30, 2011, of which 8% were past due as of June 30, 2011, compared to 10% as of June 30, 2010.

*Fiscal year 2010 compared to fiscal year 2009*

For the fiscal year ended June 30, 2010, as compared to the fiscal year ended June 30, 2009, Net Revenues increased by $107.1 million, or 17.0%. This increase was mainly due to an increase of 3.9% in electric energy sales (kWh), which resulted in an increase of $158.5 million, or 4.0%, in Revenues. Although Current Expenses increased by $51.3 million, or 1.5%, administrative and general expenses decreased by $43.5 million, or 19.6%. Accounts receivable decreased from $1.019 billion as of June 30, 2009 to $976.4 million as of June 30, 2010. Of this total, $373.1 million were due from the Commonwealth central government and the public corporations, a decrease from $471.4 million as of June 30, 2009.

*Fiscal year 2009 compared to fiscal year 2008*

For the fiscal year ended June 30, 2009, as compared to the fiscal year ended June 30, 2008, Net Revenues decreased by $52 million, or 7.6%. This decrease was mainly due to a reduction of 5.5% in electric energy sales (kWh). Revenues decreased by $362 million, or 8.3%, as a result of the reduction in energy sales and a reduction in the price of fuel from $84.18 per barrel in 2008 to $76.23 per barrel in 2009. Current Expenses decreased by $310 million, or 8.4%. Fuel and purchased power expenses, the largest component of Current Expenses, were down by $372 million or 12.6%, partly because of the reduction in the price of fuel, but also because in 2008 the Authority incurred additional fuel expense resulting from the Palo Seco fire that occurred in December 2006. A portion of this extra cost ($96 million in 2008) is being claimed by the Authority from its insurers and is shown as a separate line item. Maintenance expenses also declined by $23 million or 9.4% when compared with 2008. Accounts receivable as of June 30, 2009, decreased by 3.1%, to $1.019 billion, when compared by 2008. Of this total, $471.3 million were due from the Commonwealth central government and the public corporations, an increase of 31.9% from the previous year.

*Fiscal year 2008 compared to fiscal year 2007*

For the fiscal year ended June 30, 2008, as compared to the fiscal year ended June 30, 2007, Net Revenues increased by $9 million, or 1.3%, despite a 5.2% decrease in electric energy sales (kWh). The increase in Net Revenues was primarily due to a 46.3% increase in the price of fuel, which resulted in an increase of $623 million, or 26.6%, in fuel and purchased power expense, an increase of $673 million, or 22.3%, in Current Expenses, and an increase of $682 million, or 18.5%, in Revenues. Administrative and general expenses, another component of Current Expenses, increased by $8 million, or 3.8%. The Authority incurred additional fuel expense in both 2007 and 2008 as a result of the Palo Seco fire that occurred in December 2006. A portion of this extra cost ($114 million in 2007 and $96 million in 2008) is being claimed by the Authority from its insurers and is shown as a separate line item. Accounts receivable of the Authority increased from $835.9 million on June 30, 2007 to $1.061 billion on June 30, 2008. Accounts receivable due from the Commonwealth central government and the public corporations increased from $316.6 million on June 30, 2007 to $357.3 million on June 30, 2008.

## Historical Disposition of Net Revenues
### (in thousands)

| Disposition of Net Revenues | Fiscal Year Ended June 30 | | | | | Six-Months Ended December 31, | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2010 | 2011 |
| Sinking Fund: | | | | | | | |
| Interest | $257,457 | $255,593 | $261,486 | $246,072 | $304,778 | $152,706 | $149,869 |
| Principal | 197,565 | 164,492 | 173,040 | 151,507 | 175,455 | 87,727 | 92,803 |
| Reserve Account | - | - | (29,523) | - | - | - | - |
| Reserve Maintenance Fund | - | - | - | - | - | - | - |
| Self-insurance Fund | - | (20,438) | 10,000 | 10,000 | 10,000 | - | - |
| Capital Improvement Fund | 10,212 | 11,400 | 4,695 | 63,405 | 17,231 | 4,359 | 35,951 |
| Interest on Notes | 38,922 | 44,291 | 28,434 | 33,985 | 1,550 | 632 | 730 |
| Contributions in lieu of taxes and other uses[1] | 168,246 | 226,090 | 181,364 | 231,669 | 197,007 | 89,851 | 131,103 |
| Net Revenues[1] | $672,402 | $681,428 | $629,496 | $736,638 | $706,021 | $335,275 | $410,456 |

[1] Includes the following amounts attributable to the residential fuel subsidy and the subsidy granted to the hotel industry: $32.6 million, $31.0 million, $37.1 million, $35.9 million and $34.2 million for fiscal years ended June 30, 2007, 2008, 2009, 2010 and 2011, respectively.  See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Since Net Revenues include amounts billed to the municipalities and other subsidies that are not collected, as discussed previously, in some years, the Authority may not have had sufficient cash available to make the deposits and payments shown above as being made prior to the application of "Contributions in lieu of taxes and other uses." In those years, the Authority made some of the deposits and payments from additional borrowings.

**Projected Net Revenues**

The main assumptions used by the Authority in preparing the estimates of Net Revenues set forth below are the following:

Revenues  -  Projected Revenues from sales of electric energy are based upon economic growth projections for the Commonwealth.  The Revenue projections assume that sales in kWh will decline by 3.03% and 1.11% for fiscal years 2012 and 2013, respectively, and increase by 0.32%, 1.07%, and 1.52% for fiscal years 2014, 2015 and 2016, respectively.

Current  -  Projected Current Expenses assume reductions in operating expenses (excluding fuel,
Expenses    purchased power and maintenance expenses) as a result of expense reduction measures the Authority expects to undertake, of 4.3%, 4.0%, 3.0%, 2.0% and 1.0% for fiscal years 2012, 2013, 2014, 2015 and 2016, in each case compared to the preceding fiscal year.

Fuel  -  Projected fuel oil prices are based upon an analysis prepared by the Authority, which takes into consideration the Annual Energy Outlook issued by the United States Department of Energy and the Authority's historical fuel data. The Authority passes through the cost of fuel oil to its consumers. The following table sets forth projected average per barrel fuel prices:

**Projected Fuel Oil Prices**

| Fiscal Year Ending June 30 | Average Price Per Barrel[1] |
|---|---|
| 2012 | $117.09 |
| 2013 | 110.93 |
| 2014 | 105.00 |
| 2015 | 105.89 |
| 2016 | 102.63 |

[1] This is a blended price of No. 2 and No. 6 fuel oil prices. The prices exclude handling charges.

The following table presents the Authority's estimates of Net Revenues for the five fiscal years ending June 30, 2016, in accordance with the provisions of the Trust Agreement, and the ratio of Net Revenues to Principal and Interest Requirements for Power Revenue Bonds. The figures for Revenues and Net Revenues in this table include the revenues attributable to the residential fuel, hotel and rural electrification and irrigation systems subsidies (see footnotes 2 and 3), which the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to provide a credit for such amounts in its recipients' billing), and the electric consumption charges of the municipalities, which the Authority is legally authorized to collect but does not because it follows the practice of applying them as an offset against the CILT obligation (see footnote 2).  See *Authority's Financial Condition - Subsidies and Contributions in Lieu of Taxes* under INVESTMENT CONSIDERATIONS and *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.  As discussed under THE SYSTEM – *Additional Bonds*, in delivering their approving opinion, Bond Counsel will take into consideration and will rely on the fact that, although the Authority includes the hotel, residential and irrigation subsidies in the calculation of Revenues, even if these amounts were excluded from such calculation, the additional bonds test described above will be satisfied.

The Principal and Interest Requirements in this table for fiscal year 2012 are reduced by the $158.3 million deposited with the Trustee from a Government Development Bank line of credit for the

payment of principal and interest on the Power Revenue Bonds for fiscal year 2012, which is being refinanced with the proceeds of the Series 2012A Bonds. The Principal and Interest Requirements in this table for fiscal years 2012 through 2016 are further reduced by (i) the interest that was capitalized from the issuance of the Authority's Series XX Bonds, Series ZZ Bonds, Series CCC Bonds, Series DDD Bonds, and the Bonds of approximately $81.5 million due during fiscal year 2012, $67.1 million due during fiscal year 2013, $31.5 million in fiscal year 2014, and $15.8 million in fiscal year 2015, and (ii) the interest that is expected to be capitalized with the issuance of additional Power Revenue Bonds during this five-year period. The aggregate reductions to Principal and Interest Requirements for each fiscal year during the projection period attributable to capitalized interest are $81.5 million for fiscal year 2012, $67.1 million for fiscal year 2013, $61.2 million for fiscal year 2014, $73.6 million for fiscal year 2015 and $80.9 million for fiscal year 2016.

The projections set forth in the following table assume that the Authority will commence to burn natural gas at the Costa Sur power plant in April 2012 and that the full 820 MW of dual fuel capacity at Costa Sur will be fueled with natural gas by April 2013. The projections also assume that, under power purchase agreements, the Authority will have renewable energy capacity of approximately 285 MW by fiscal year 2013, 383 MW by fiscal year 2014, 565 MW by fiscal year 2015 and 650 MW by fiscal year 2016. See *Plans for Fuel Diversification* under THE SYSTEM.

The projections do not take into consideration the costs of financing the Vía Verde and Aguirre offshore terminal projects and the estimated annual fuel cost savings expected to be derived from the use of natural gas at the generating units to be supplied by these two projects, the impact of such projects on Net Revenues, or the resulting impact on the ratio of Net Revenues to Principal and Interest Requirements. The cost of these projects is not included in the Authority's current capital improvement program for fiscal years 2012-2016. To the extent that the costs of financing the Vía Verde and Aguirre offshore terminal projects are not offset by higher Net Revenues, the actual coverage ratio would be lower than that set forth below. For a discussion of the financing alternatives being considered with respect to these projects, see *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

### Projected Net Revenues and Coverage

| | Fiscal Year Ending June 30 | | | | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** |
| Average number of clients | 1,473,376 | 1,474,507 | 1,475,683 | 1,476,905 | 1,477,984 |
| Electric energy sales (in millions of kWh) | 17,940.2 | 17,741.1 | 17,797.3 | 17,987.5 | 18,261.6 |
| Authority generation (gross)(in millions of kWh) | 15,244.7 | 14,487.7 | 14,000.4 | 13,526.1 | 13,474.4 |
| Purchased generation (gross)(in GWHR) | 6,739 | 7,214 | 7,770 | 8,477 | 8,864 |
| **Sources of Net Revenues** | | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential[1] | $1,780,767 | $1,708,419 | $1,674,044 | $1,697,531 | $1,722,273 |
| Commercial[2] | 2,387,897 | 2,274,501 | 2,205,299 | 2,212,184 | 2,226,008 |
| Industrial | 659,269 | 615,562 | 596,181 | 604,335 | 617,575 |
| Other | 137,751 | 133,466 | 130,512 | 130,319 | 130,329 |
| Theft Recovery[3] | 25,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Rate Stabilization[4] | (70,000) | - | - | - | - |
| Sub-Total | 4,920,684 | 4,761,948 | 4,636,036 | 4,674,369 | 4,726,185 |
| Revenues from Commonwealth for Rural Electrification | - | - | - | - | - |
| Other (principally interests earned) | 5,058 | 5,058 | 5,058 | 5,058 | 5,058 |
| Total Revenues | $4,925,742 | $4,767,006 | $4,641,094 | $4,679,427 | $4,731,243 |
| Current Expenses: | | | | | |
| Operations: | | | | | |
| Fuel | $2,802,337 | $2,472,915 | $2,281,957 | $2,187,275 | $2,136,881 |
| Purchased Power | 672,026 | 802,042 | 879,509 | 999,854 | 1,083,858 |
| Production | 60,751 | 54,580 | 50,136 | 47,263 | 45,855 |
| Transmission and Distribution | 168,569 | 161,384 | 156,212 | 152,867 | 151,227 |
| Maintenance | 220,775 | 220,775 | 220,775 | 220,775 | 220,775 |
| Client accounting and collection | 112,837 | 110,995 | 109,668 | 108,811 | 108,390 |
| Administration and general | 157,708 | 144,080 | 134,269 | 127,924 | 124,814 |
| Total Current Expenses | $4,195,003 | $3,966,771 | $3,832,526 | $3,844,768 | $3,871,801 |
| Net Revenues[1][2] | $ 730,739 | $ 800,235 | $ 808,568 | $ 834,659 | $ 859,442 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[5] | 328,021 | 527,109 | 562,768 | 578,506 | 592,788 |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 2.23 | 1.52 | 1.44 | 1.44 | 1.45 |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[6] | 1.42 | 1.06 | 1.03 | 1.06 | 1.08 |

(1) Includes residential fuel subsidies of approximately $20 million, $20 million, $19.1 million, $18.5 million and $18.4 million for fiscal years 2012, 2013, 2014, 2015 and 2016, respectively. See *Subsidies and Contributions in Lieu of Taxes* and *Additional Bonds* under THE SYSTEM.

(2) Includes (i) electric energy consumption by municipalities of approximately $230.7 million, $221.3 million, $215.6 million, $216.3 million and $217.8 million for fiscal years 2012, 2013, 2014, 2015 and 2016, respectively; (ii) hotel subsidies of approximately $7.8 million, $7.5 million, $7.1 million, $7.0 million and $7.1 million for fiscal years 2012, 2013, 2014, 2015 and 2016, respectively; and (iii) rural electrification and irrigation systems subsidies of $6.4 million, $6.6 million, $6.7 million, $6.8 million and $7.0 million for fiscal years 2012, 2013, 2014, 2015 and 2016, respectively. See *Subsidies and Contributions in Lieu of Taxes* and *Additional Bonds* under THE SYSTEM.

(3) Projections based on the Authority's theft recovery initiatives. See *Transmission and Distribution Facilities — Operations* under THE SYSTEM.

(4) Represents the estimated reduction in Revenues from the temporary rate stabilization program to non-subsidized residential customers. See *Rates* under THE SYSTEM.

(5) Includes debt service requirements for (i) the outstanding Power Revenue Bonds, (ii) the Bonds, and (iii) Power Revenue Bonds expected to be issued in each of fiscal years 2013-2016 to fund the Authority's capital improvement program (which does not include the Via Verde pipeline and the Aguirre offshore terminal projects) at an assumed interest rate of 6% with interest capitalized for approximately three years. See *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM. The Principal and Interest Requirements in this table for fiscal year 2012 are reduced by the $158.3 million deposited with the Trustee from a Government Development Bank line of credit for the payment of principal and interest on the Power Revenue Bonds for fiscal year 2012, which is being refinanced with the proceeds of the Series 2012A Bonds. The Principal and Interest Requirements in this table for fiscal years 2012 and 2013 are further reduced by the interest that was capitalized through the Authority's issuance of its Series XX Bonds, its Series ZZ Bonds, the Series CCC Bonds, the Series DDD Bonds and the Bonds in the following amounts: approximately $81.5 million due during fiscal year 2012, $67.1 million due during fiscal year 2013, $31.5 million in fiscal year 2014, and $15.8 million in fiscal year 2015. Actual Principal and Interest Requirements will vary based on the actual principal and interest on the future Power Revenue Bonds and Power Revenue Refunding Bonds issued and no assurance can be given that the assumed reductions in Principal and Interest Requirements or any other level of reductions will actually be achieved.

(6) Excludes from Net Revenues, for purposes of computing this ratio, the base charges and fuel and purchased power adjustment charges attributable to energy consumption by the municipal governments (net of projected recoveries as a result of Act 233-2011 of $15 million in fiscal year 2013, $20 million in fiscal year 2014, $25 million in fiscal year 2015, and $30 million in fiscal year 2016) as well as the subsidies for energy consumption charges provided by law to certain residential customers and hotels, and other subsidies related to the irrigation system, in the amounts set forth in footnotes (1) and (2) above, which are not collected.

The Consulting Engineers had initially reviewed a different set of projections than those set forth above in their Thirty-Eighth Annual Report to the Trustee required by the Trust Agreement. The prior projections showed a lower level of Net Revenues, when compared to the projections set forth above, in each of fiscal years 2013, 2014, 2015 and 2016 of $33 million, $54 million, $67 million and $74 million, respectively. These prior projections showed a constant level of operating expenses (excluding fuel and

78

purchased power) and did not take into consideration the further expense reduction initiatives that the Authority expects to undertake. The Authority revised its prior projections to consider the following factors: (i) further reductions in operating expenses in those fiscal years of $29 million, $50 million, $63 million and $70 million, respectively, expected to be achieved as a result of the implementation of further expense reduction initiatives, and (ii) additional revenues of $5 million per fiscal year from theft reduction initiatives. The projections set forth above show an aggregate reduction in operating expenses (excluding fuel, purchased power and maintenance) by fiscal year 2016 of $102 million, or 19%, compared to the level of these operating expenses in fiscal year 2011. The expense reduction initiatives include, among others, the restructuring of supply chain processes, customer service and collection processes and general and administrative processes, improvement of inventory management, and headcount reductions through attrition. There can be no assurance, however, that the Authority will in fact be able to achieve the expected reductions in every year.

The Consulting Engineers have reviewed and analyzed the revised projections of the Authority shown above and will amend their Thirty-Eighth Annual Report to reflect these projections. Based on the assumptions set forth in their letter, the Consulting Engineers have concluded that (i) the methodology used by the Authority in preparing its revenue and capacity projections generally follows accepted utility practice and is appropriate for the Authority, (ii) the Authority's estimates of future growth form a reasonable basis for its projected operating results, and (iii) the Authority's rates should generate sufficient revenues to pay its Current Expenses and debt service and to meet the Trust Agreement obligations for deposits into certain funds from current operating revenues. See Appendix III—*Letter of Consulting Engineers.*

Although the Authority and the Consulting Engineers believe that the assumptions upon which the estimates of Net Revenues are based are reasonable, actual results may differ from the estimates as circumstances change. The Authority's financial projections involve many assumptions, some of which are beyond the control of the Authority, such as the cost of fuel oil and its impact on the level of demand for electricity. In the past, the Authority's projections of Net Revenues have at times materially differed from what the Authority has been able to achieve.

If the Authority is unable to obtain the level of Net Revenues it has projected, it will not be able to meet its Principal and Interest Requirements unless it borrows funds to meet its debt service or implements measures to increase Revenues and/or reduce its Current Expenses. See the discussion in *The Authority's ability to meet its projections of Net Revenues* under RISK FACTORS AND INVESTMENT CONSIDERATIONS for a discussion of factors that can affect the Authority's ability to achieve its projected Net Revenues.

The Authority's projections were not intended to comply with the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial projections. The projections have been prepared on the basis of Net Revenues as defined in the Trust Agreement, which differs in several important respects from the Authority's net income prepared in conformity with GAAP in that they do not include, for example, depreciation, other post-employment benefits actuarial accrual and the CILT as a current expense and do not reflect interest expense on Power Revenue Bonds as a deduction from Net Revenues.

The following table presents the projected disposition of Net Revenues, in the order of priority of payment, for the five fiscal years ending June 30, 2016, in accordance with the provisions of the Trust Agreement.

### Projected Disposition of Net Revenues
### (in thousands)

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| **Disposition of Net Revenues** | | | | | |
| Sinking Fund: | | | | | |
| Interest | $172,294 | $332,189 | $358,463 | $364,096 | $347,408 |
| Principal | 155,728 | 194,920 | 204,305 | 214,410 | 245,380 |
| Reserve Account | - | - | - | - | - |
| Reserve Maintenance Fund | - | - | - | - | - |
| Self-insurance Fund | 5,000 | - | - | - | - |
| Capital Improvement Fund | 131,181 | 26,459 | 4,720 | 21,901 | 38,417 |
| Interest on Notes | 1,469 | 6,372 | 12,555 | 10,500 | 8,000 |
| Contributions in lieu of taxes and other uses[1] | 265,067 | 240,295 | 228,525 | 223,752 | 220,237 |
| Net Revenues | $730,739 | $800,235 | $808,568 | $834,659 | $859,442 |

[1] Includes the following amounts attributable to the residential fuel subsidy and the subsidy granted to the hotel industry: $27.8 million, $27.5 million, $26.2 million, $25.5 million and $25.5 million for fiscal years ended June 30, 2012, 2013, 2014, 2015 and 2016, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Since Net Revenues include amounts billed to the municipalities and other subsidies that are not collected, as discussed previously, in some years, the Authority may not have sufficient cash available to make the deposits and payments shown above as being made prior to the application of "Contributions in lieu of taxes and other uses." In those years, the Authority may have to make some of the deposits and payments from additional borrowings.

## ENVIRONMENTAL MATTERS

The Authority's Environmental Protection and Quality Assurance Division is responsible for ensuring the Authority's compliance with all applicable federal and Commonwealth environmental laws and regulations. The Division is in charge of developing and implementing a comprehensive program to improve the Authority's performance in all applicable environmental media, taking into account new regulatory requirements as well as alleged instances of noncompliance cited by the EPA and any other environmental agencies.

### Environmental Litigation and Administrative Proceedings

*Consent Decree*

1992, the EPA conducted a multimedia inspection of the Authority's facilities and identified several alleged instances of non-compliance related to the Authority's air, water and oil spill prevention control and countermeasures compliance programs, among other things. As a result, the EPA filed a complaint against the Authority on October 27, 1993 seeking injunctive relief and the imposition of penalties for alleged violations of the CAA, the CWA, the Emergency Planning and Community Right-to-Know Act ("EPCRA"), the Comprehensive Response, Compensation and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA"). To settle the complaint, the Authority and the EPA entered into a consent decree (the "Consent Decree") approved by the United States federal court in 1999.

The Consent Decree covered alleged violations with respect to the Authority's electric power generating plants in Aguirre, Palo Seco, San Juan and the South Coast and the Authority's main transmission center in Monacillos, San Juan. Under the terms and conditions of the Consent Decree, the Authority was required to: (i) implement measures to ensure that the operation of its generating units complies with the opacity standards applicable to air emissions under the EQB's Regulation for the Control of Atmospheric Pollution ("RCAP"), among other things, including the refurbishment of generating units and the implementation of operation and maintenance programs (termed, "Air Compliance Programs"); (ii) achieve and maintain compliance with the CWA and NPDES permit requirements by implementing certain upgrades and modifications of the discharges of each power plant; (iii) operate its facilities in compliance with Oil Spill Prevention and Spill Prevention Control and Countermeasure ("SPCC") requirements of the CWA, including the preparation and implementation of SPCC plans for all of the power plants and the transmission center and the implementation of a construction and maintenance program to modify these facilities to achieve compliance; (iv) achieve compliance with EPCRA requirements by filing hazardous chemical reporting forms that were not filed when due in the past (known as "Tier I/Tier II" forms) and conduct any current and future filings; (v) achieve compliance with CERCLA and EPCRA with respect to potential releases from its facilities by implementing an in-house hazardous material spill training for employees and contractors; and (vi) achieve compliance with RCRA's underground storage tank requirements by ensuring that all underground storage tanks at its facilities were closed or removed in compliance with these requirements.

As part of the Air Compliance Program, the Authority is required to combust fuel with low sulfur content, as per the specifications in the Consent Decree, in order to achieve compliance with air emission opacity standards. Furthermore, under the Consent Decree, the Authority was required to pay a civil penalty of $1.5 million, and implement additional compliance projects amounting to $4.5 million, which include $1 million to hire an independent party to review the Authority's implementation of the terms of the Consent Decree and inform the public about it (the "Environmental Review Contractor"), $100,000 for a fire department hazmat training, and $3.4 million to implement an environmental restoration and protection project. The University of Puerto Rico's Graduate School of Public Health was subsequently hired as the Environmental Review Contractor. The Consent Decree can be terminated or modified if the Authority shows compliance for three years.

To settle a dispute between the Authority and EPA regarding the application of a method for performing air opacity readings and alleged violations of the opacity standards by the Authority, in 2004 the Authority and the EPA entered into a Consent Decree modifying the Consent Decree, which was approved by the United States federal court. Under this agreement, the Authority was required to reduce, in two steps, the sulfur content in the No. 6 fuel oil used in certain generating units of its South Coast and Aguirre power plants (to 0.75% or less by March 1, 2005 and to 0.5% or less by March 1, 2007), and use No. 6 fuel oil with sulfur content of not more than 0.5% through July 18, 2009 at its Palo Seco and San Juan power plants. The Authority was also given the option of installing pollution controls in lieu of using fuel with 0.5% sulfur or less, but only if the equipment reduces sulfur dioxide emissions as much as they would have been reduced using the cleaner fuel. Additionally, the Authority was required to conduct a nitrogen oxide emissions reduction program and modify the optimal operating ranges for all its units under the Consent Decree. The Authority also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs under the Consent Decree.

Since September 2004, there has been no legal action in the United States federal court or any administrative proceeding against the Authority regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of noncompliance. Noncompliance events must be disclosed to EPA in the corresponding report. Ordinarily, when a covered noncompliance event occurs, the Authority pays the stipulated penalty in advance in order to benefit from a 50% discount of the applicable stipulated penalty provided for under the Consent Order.

The Authority has had some difficulties complying with the emissions and opacity limits in the Consent Decree, as amended, and has occasionally been in violation of other terms of the Consent Decree. From 1999 until 2011, stipulated penalties attributable to noncompliance with the Consent Decree have totaled $2.1 million, of which $1.4 million were related to compliance with the Air Compliance Program and the remainder to compliance with CWA requirements. Based on the 50% discount allowed under the Consent Order (mentioned above), the Authority has in fact paid 50% of the mentioned stipulated penalties. The Authority has devoted great efforts at complying with the Consent Decree and understands that many of the stipulated penalties paid resulted from noncompliance events related to events outside their control, such as equipment malfunctions. As a result, there is no assurance that the Authority will be able to fully comply with the terms of the Consent Decree at all times and eliminate the possibility of paying stipulated penalties in the future.

Another reason compliance with the Consent Decree has been challenging is the requirement that the Authority use low sulfur fuel in some of its power plants. Given that this fuel is more expensive, operational costs have increased significantly. In order to address this challenge, the Authority is planning to restructure its fuel procurement process in order to achieve efficiencies and savings that can result in a lower cost of fuel. The Authority is also planning to convert its generating units to natural gas, a cleaner burning fuel. However, if the Authority is not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it may need to incur in significant capital investments to control emissions in order to comply with the Consent Decree. For more information regarding these initiatives, please see "Fuel Diversification Strategies" under "Plans to Address the Authority's Challenges."

*Other Proceedings*

In 1997, as a result of an inspection carried out by the EPA and EQB at the Authority's Palo Seco power plant, the EPA issued an Administrative Order (the "RI/FS Order") for the investigation and possible remediation of seven areas identified by the EPA at the Palo Seco power plant and the Palo Seco General Warehouse (Depot). The Administrative Order required the Authority to carry out a Remedial Investigation/Feasibility Study ("RI/FS"). The RI/FS required under the order is designed to: (1) determine the nature and extent of contamination and any threat to the public health, welfare, or environment caused by any release or threatened release of hazardous substances, pollutants, or contaminants at or from the site; and (2) determine and evaluate alternatives for the remediation or control of the release or threatened release of hazardous substances, pollutants or contaminants at or from the site. The RI was completed and submitted to the EPA for evaluation. The Authority was notified by EPA that the FS will not be required and that EPA would issue a "No Action" Record of Decision ("ROD"), with a follow-up review in five years. Public hearings will be scheduled to get public comments on this ROD.

The information gathered in the RI indicated the presence of free product (Separate Phase Hydrocarbons or "SPH") in several monitoring wells. The analysis of this product reflected a low concentration of polychlorinated biphenyls ("PCB"). In 2008, the Authority and the EPA entered into an Administrative Agreement and Order on Consent for a Removal Action (CERCLA 02 2008 2022) (the "AOC") requiring the Authority to provide an enhanced delineation and accurate identification of areas of PCB contamination, implement removal activities to address the PCB-contaminated oil layer and soils and perform confirmatory sampling. The Authority completed the activities of delineation and identification of PCB-containing SPH. By letter dated December 13, 2011, EPA notified the Authority that no further removal action was required at the site and requested that the Authority submit its final removal action report to EPA. The EPA further indicated that, upon receipt of this final report, EPA would issue a site close out letter.

The pending matters to close the RI/FS Order are the issuance of final reports, a public hearing to obtain comments, and the submittal by EPA of a request for reimbursement of costs. The pending matters to close the AOC are the issuance of final reports and the submittal by EPA of a request for reimbursement of costs. The estimated cost to close both orders is $250,000.00. The Authority has not received any requests for reimbursement of costs from the EPA as of this date. However, if it does receive any such requests, the Authority will remit payment to EPA as required by the applicable orders. The Authority believes there are no other matters related to these orders that could potentially result in other enforcement proceedings.

In 2002, the Authority received a "Special Notice Concerning Remedial Investigation/Feasibility Study for Soil at the Vega Baja Solid Waste Disposal Superfund Site." The EPA has identified the Authority and six other entities as "potentially responsible parties," as defined in the CERCLA. In 2003, the Authority agreed to join the other potentially responsible parties in an Administrative Order on Consent ("AOC") for an RI/FS, with the understanding that such agreement did not constitute an acceptance of responsibility. Under the AOC, the Authority committed up to $250,000 as its contribution to partially fund the RI/FS. The Authority and other settling defendants, with the EPA's oversight, completed a RI pertaining to Operating Unit 2 (related to soil contamination) of the site on April 2, 2009, and a FS on July 29, 2010. In April 2004, the EPA issued a ROD determining that no remedial action was required with respect to the groundwater at the site (referred to as Operating Unit 1). In September 2010, the EPA issued a ROD establishing the remedial alternatives to address soil contamination (Operating Unit 2). The Authority and other potentially responsible parties have been negotiating with the EPA and the U.S. Department of Justice ("DOJ") the terms of a settlement agreement covering the responsibilities of the different parties for response actions, including post remedial operations and maintenance, as well as reimbursement of costs incurred by the EPA and DOJ for response actions at the site. The Authority has reached a verbal agreement with EPA to settle this matter by contributing $1.3 million for such efforts to be paid in four yearly payments based on its fiscal years, with the understanding that it is not admitting to any liability. This settlement amount has been authorized by the Authority's Governing Board. In November 2011, EPA and DOJ agreed to send the Authority a draft of the consent order to settle this matter, but the Authority has not received it yet. The final execution of a consent order is subject to final agreement of the parties, including other potentially responsible parties, on the settlement terms. Once this consent order is executed, no additional disbursements are foreseeable, other than the compliance of the parties with the terms of the consent order.

In December 2004, the EPA sent a request for information to the Authority and to other potentially responsible parties that did business with certain recycling companies regarding the release of pollutants by these recycling companies in a Toa Baja superfund site. The EPA has stated that it is particularly interested in entities that disposed of batteries at this site. The Authority has responded to the request for information, stating that it only sold scrap metal to these recycling companies. The Authority does not believe it has any liability regarding this site. In September 2006, EPA issued a Record of Decision determining that the groundwater at the site does not pose an unacceptable risk to the public health or environment and, therefore, no action is required with respect to the groundwater. EPA then continued to investigate potential buried waste and contaminated soil associated with the Site to determine the magnitude and extent of contamination in soil conducted the removal of disposed battery cases, contaminated soil and other debris. According to EPA's Superfund Information Systems website, a combined RI/FS is underway. At this time, we have no knowledge that the EPA has initiated, or intends to initiate, any action against the Authority concerning this matter.

**Compliance Programs**

The Authority continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

*Air Quality Compliance*

The CAA is a comprehensive federal law that addresses the nation's air quality and the stratospheric ozone layer, and authorizes the EPA to implement and enforce regulations reducing air pollutant emissions. Under the CAA, the EPA is authorized to establish and enforce limits on certain air pollutants from various sources, including utilities. Pursuant to the CAA, the EPA promulgated primary and secondary national ambient air quality standards ("NAAQS") with respect to certain air pollutants, including particulate matter ("PM"), sulfur dioxide ("SO2"), and nitrogen oxide ("NOx"). These standards are to be achieved by the application of control strategies developed by the states (including Puerto Rico) and included in implementation plans which must be approved by EPA to be effective. The Puerto Rico EQB has adopted a State Implementation Plan which was approved by EPA, generally designed to achieve the NAAQS.

The CAA also establishes a permit program (known as the "Title V operating permit program") for large industrial and commercial sources that release pollutants into the air above a specified threshold, known as "major sources." Operating permits include information on which pollutants are being released, how much may be released, and what kinds of steps the source's owner or operator is required to take to reduce pollution. Responsibility for the Title V operating permit program in Puerto Rico was delegated to EQB.

The CAA requires new major stationary sources of air pollution and certain modifications to these sources to obtain an air permit before commencing construction. This permitting process is known as the New Source Review ("NSR"). The NSR program applies to sources that are located in areas that meet the NAAQS (known as "attainment areas"), areas that do not meet the NAAQS (known as "nonattainment areas") and areas that are unclassifiable with respect to the NAAQS. Permits for sources in attainment or unclassifiable areas are issued under the Prevention of Significant Deterioration ("PSD") permit program. The purpose of the PSD program is to prevent the development of new nonattainment areas, among other things.

The Authority's power plants are subject to the Title V operating permit program under the CAA. All of these power plants have their corresponding Title V permits in effect, except for the gas turbine facilities at Yabucoa, Palo Seco, and Mayagüez. The permits for Yabucoa and Mayagüez expired, but the Authority submitted timely renewal applications for both permits, which effectively extended the coverage of these permits during the renewal period. In addition, the Authority submitted a request to modify the Mayagüez permit for the replacement of four old single cycle gas turbine units with four new aero derivative gas turbine units, which request is still being processed by EQB. The permit application for the Palo Seco power plant was filed with EQB in 1996 but the agency has not issued a final permit as of this date. This permit application was filed within the filing term provided for by regulation to activate coverage of the activities covered by the application while the application is in process. Finally, although still within its original effective term, the Authority has also applied for the renewal of the Aguirre power plant's permit in order to ensure extension of coverage under the permit after its expiration date in February 2013.

Generally, the Authority is in compliance with its Title V permits, with the exception of the matters covered by a Consent Decree between EPA and the Authority in 1999, as modified in June 2004,

84

which continues in effect. Among other things, this Consent Decree covers alleged past noncompliance with opacity requirements and requires the use of fuel oil with sulfur content equal to or less than 0.5% in certain of the Authority's power plants or implement technology that would achieve emissions that would be equivalent to the use of such fuel. The Authority has had some difficulties complying with the emissions and opacity limits in the Consent Decree, as amended, and has occasionally been in violation of other terms of the Consent Decree. For more details on these issues, see "Environmental Litigation and Administrative Proceedings" above.

During fiscal year 2007, the Authority completed projects to reduce NOx emissions at steam electric generating stations at Palo Seco, Aguirre and Costa Sur. As a condition of receiving certain permits, the units at the San Juan plant had previously been modified to reduce NOx emissions. The Authority and EPA monitor compliance with the lower NOx emissions requirements. The Authority is currently in compliance with the $NO_X$ requirements, which are verified by annual testing on units at Costa Sur, Palo Seco and Aguirre.

During the past fiscal year, the Authority reported achieving compliance in excess of 99% with its in-stack opacity requirements and its Air Compliance Program. As required by the Consent Decree's Air Compliance Program, the Authority also submitted and performed all quarterly reports regarding opacity monitors. As of December 2011, when the last quarterly report was submitted, the Authority had achieved a level of compliance with the Air Quality Compliance Program in excess of 99%.

The Authority continues its efforts to use No. 6 fuel oil with a sulfur content equal to or less than 0.5% in all of its power plants, which should contribute to maintaining air quality. Given the high costs associated with the purchase of this fuel and the implementation of the alternative of upgrading air pollution control equipment, continued compliance with this requirement will be very difficult and costly for the Authority. This difficulty is exacerbated by the future requirements to comply with the MATS. Please see "MATS Regulation" below.

In order to address this challenge, the Authority is planning to restructure its fuel procurement process in order to achieve efficiencies and savings that can result in a lower cost of fuel. In addition, the Authority is planning to convert its existing units to natural gas. If the Authority is unable to convert these units to natural gas (including completing the natural gas delivery infrastructure), it may need to incur significant capital investments to control emissions in order to continue to comply with the CAA opacity requirements and the MATS.

*MATS Regulation*

EPA has issued new regulations related to the requirements of Sections 111 and 112 of the CAA. Section 111 of the CAA requires EPA to set emissions limits for major new stationary sources referred to as New Source Performance Standards or NSPS regulations. Section 112 of the CAA requires the EPA to issue technology-based standards for major sources and certain area sources for hazardous air pollutants ("HAPs"). The categories and subcategories of sources to be regulated under these provisions are listed in Section 112(c) of the CAA. For these sources, the EPA is required to establish emissions standards that require the maximum degree of reduction in emissions of HAPs. These emissions standards are commonly referred to as maximum achievable control technology or MACT standards. Section 112(b) of the CAA contains a list of those pollutants that must be regulated as HAPs pursuant to CAA Section 112, and requires the EPA Administrator to periodically review this list and, where appropriate, revise the list by adding pollutants which present or may present a threat of adverse human health effects or adverse environmental effects.

In 2008, in response to a United States federal court decision and a related consent decree, the EPA decided to regulate coal- and oil-fired electric utility steam generating units, also referred to as EGUs, under Section 112(c) of the CAA. The EPA also subsequently proposed Section 112 air toxic standards for these EGU's that reflect the application of MACT consistent with the requirements of the CAA. This proposal was published in the Federal Register on May 3, 2011 and was signed into a final rule (with minor modifications) on December, 16, 2011.

In connection with the Section 111 standards, on February 27, 2006, EPA promulgated amendments to the NSPS for PM, SO2, and NOx contained in the standards of performance for EGU's. EPA was subsequently sued for these amendments, and on September 2, 2009, was granted a voluntary remand without vacatur of these amendments. The final revisions to these amendments were approved on December 16, 2011, along with the Section 112 air toxic standards discussed above.

On February 16, 2012, EPA published in the Federal Register the final CAA Section 112 rule and the new CAA Section 111 standards. With respect to Section 112, EPA established HAP standards (known as, "National Emission Standards for Hazardous Air Pollutants" or "NESHAP") for coal and oil-fired EGUs to meet standards for toxic air pollutants reflecting the application of the MACT. These standards, known as MATS, are geared at reducing these types of emissions from new and existing coal and oil-fired EGUs. The standards address emissions of mercury, arsenic, chromium, nickel, and acid gases, including hydrochloric acid ("HCl") and hydrofluoric acid ("HF").

The MATS apply to EGU's larger than 25 megawatts that burn coal or oil for the purpose of generating electricity for sale and distribution through the national grid to the public. Existing EGU's generally will have up to four years if they need it to comply with the MATS. This includes the three years provided to all sources by the CAA, and an additional year that may be granted by the EQB, as needed, for technology installation. In essence, the rule establishes: (i) numerical emission limits for mercury, PM, and HCL for all existing coal-fired EGUs; (ii) numerical emission limits for PM, HCL and HF for existing and new oil-fired EGUs, but compliance for HCl and HF may also be achieved by limiting the moisture content of the oil; (iii) alternative numeric emission standards, including SO2 (as an alternate to HCl), individual non-mercury metal air toxics (as an alternate to PM), and total non-mercury metal air toxics (as an alternate to PM) for certain subcategories of power plants; and (iv) work practices, instead of numerical limits, to limit emissions of organic air toxics, including dioxin/furan, from existing and new coal and oil-fired power plants, which require annual performance test program for each unit to ensure optimal combustion.

As for Section 111, EPA revised the NSPS for fossil-fuel-fired EGU's. This NSPS revised the standards that new coal and oil-fired power plants must meet for PM, SO2, and NOx, by establishing revised numerical emission limits for these. These standards apply to EGUs that burn fossil fuel to produce steam.

The new rule establishing the MATS and the NSPS (which, as mentioned, was published in the Federal Register in February 16, 2012) will become effective on April 16, 2012.

As previously discussed in *New and Future Regulatory Requirements* under RISK FACTORS AND INVESTMENT CONSIDERATIONS, although the Authority is still evaluating the impact of the MATS, it estimates that without a conversion of its oil fired generating capacity to natural gas, it will be required to install MACT on its oil-fired units. The MACT for these units could consist of various retrofitted emission control systems, such as filter baghouses and flue gas desulfurization equipment associated with ancillary systems. The Authority would have until April 2015 to install the MACT, and the capital costs associated with this effort are estimated at $631.6 million to $1.26 billion. Therefore, the Authority believes that in order to comply with the MATS, it will have to convert substantially all of its

existing generating units to burn natural gas instead of fuel oil. If the Authority were not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it would need to make significant capital investments to control emissions in order to comply with the MATS without being able to offset these costs with any cost savings on the purchase of fuel.

*GHG Regulations*

On April 2, 2007, the U.S. Supreme Court (the "Court") issued a CAA decision in <u>Massachusetts v. Environmental Protection Agency</u>, 549 U.S. 497 (2007) concluding that GHGs meet the CAA definition of an air pollutant and are subject to regulation under the CAA. More specifically, the Court found that the CAA authorizes the EPA to regulate tailpipe greenhouse gas emissions if the EPA determines they cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. The Court remanded the case to the EPA to make such an "endangerment determination," which is the statutory prerequisite to authorizing regulations.

In response to the decision, on July 30, 2008, the EPA issued an Advance Notice of Proposed Rulemaking titled "Regulating Greenhouse Gases under the Clean Air Act." This Advance Notice sought comments regarding GHGs regulation under the CAA. The Advance Notice also suggested that the EPA in the future would consider using an existing provision of the CAA to impose energy efficiency standards on electric generating units to reduce greenhouse gases. The comment period closed in November 28, 2008, with parties filing thousands of comments both in favor of and opposed to using the CAA as a tool to address GHGs. Many parties filed comments that supported comprehensive climate change regulation such as cap and trade to address GHGs, but opposed the EPA regulation under the existing CAA due to the unavoidable adverse consequences of using the CAA to regulate GHGs. On April 17, 2009, the EPA, in response to the Massachusetts decision, issued proposed "endangerment" and "cause or contribute" findings for greenhouse gases under Section 202(a) of the CAA. On May 19, 2009, the EPA issued a notice of intent to regulate GHG emissions for cars and trucks under Section 202 of the CAA, following up on the Massachusetts decision discussed above.

On September 15, 2009, the EPA and the Department of Transportation's National Highway Safety Administration proposed a national program to reduce GHG emissions and improve fuel economy for new cars and trucks sold in the United States. On September 30, 2009, the EPA proposed new thresholds for GHG emissions that define when CAA permits under the NSR and Title V operating permits programs would be required. According to the EPA, the proposed thresholds would tailor these permit programs to limit which facilities would be required to obtain permits and would cover nearly 70% of the nation's largest stationary source GHG emitters—including power plants, refineries, and cement production facilities- while shielding small businesses and farms from permitting requirements.

Subsequently, the EPA issued a number of rulemakings and announcements to lay a potential framework for GHG regulation under the CAA and future legislation. On October 30, 2009, the EPA issued a final rule requiring mandatory monitoring in 2010 and reporting of GHGs emissions beginning in 2011 for virtually all industrial source categories across the country. This final rule does not require control of greenhouse gases, rather it requires only that sources above certain threshold levels monitor and report emissions. Additionally, the EPA stated that this rulemaking does not indicate that the agency has made any final decisions on pending actions. The EPA stated that the mandatory GHG reporting program will provide the agency, other government agencies, and outside stakeholders with economy-wide data on facility-level (and in some cases corporate-level) GHG emissions, which should assist in future policy development.

On December 7, 2009, the EPA issued the final "endangerment" and "cause or contribute" findings regarding GHGs under Section 202(a) of the CAA. The EPA received several Petitions for

Reconsideration of the Endangerment and Cause or Contribute Findings. Although the findings did not themselves impose any requirements on industry or other entities, this action was a prerequisite to finalizing the EPA's proposed GHGs emission standards for light-duty vehicles, which the EPA proposed in a joint proposal including the Department of Transportation's proposed standards on September 15, 2009.  On April 1, 2010, EPA and the Department of Transportation's National Highway Safety Administration issued the first national rule limiting GHG emissions from cars and light trucks.  The requirements of this rule took effect on January 2, 2011.

On May 29, 2010, the EPA completed its reconsideration of a memorandum of December 18, 2009, entitled "EPA's interpretation of regulations that determine pollutants covered by the federal PSD program." In this action, the EPA confirmed that any new pollutant that the EPA may regulate becomes covered under the PSD program on the date when the EPA rule regulating that new pollutant takes effect. Accordingly, EPA clarified that the compliance date for GHGs was January 2, 2011 when the rule applicable to mobile sources took effect.

On May 13, 2010, the EPA issued a final rule setting thresholds for GHG emissions that define when permits under the NSR-PSD and Title V operating permit programs are required for new and existing facilities.  This final rule "tailors" the requirements of these CAA permitting programs to limit which facilities will be required to obtain PSD and Title V operating permits, and is known as the "tailoring rule".  Under this rule, the following dates and limits will apply:

1)      January 2, 2011 through June 30, 2011: Existing PSD sources undertaking projects that will increase GHG emissions in excess of 75,000 tons per year will be subject to the PSD review for GHGs and would require implementation of the Best Available Control Technology for the emission source.  In a similar manner, existing Title V sources will be subjected to Title V requirements for GHGs if a project exceeds 75,000 tons per year of GHGs.

2)      July 1, 2011 through June 30, 2013: In addition to step one above, any source that undertakes a new project that exceeds 100,000 tons per year of GHG emissions will be subject to PSD and Title V requirements.

In connection with the EPA rule requiring GHG reporting, on September 2011, the Authority submitted the first report on GHG emissions via electronic submission to EPA.  In 2012, the report will be submitted in March 2012 and will include emissions of sulfur hexafluoride from electric power sources.

As for the "tailoring rule," at this moment, the Authority believes that this rule may require it to take measures to reduce GHG emissions, but it is still evaluating the extent of such reductions.  One of the alternatives identified to achieve this reduction is the installation of carbon sequestration technology, but this technology does not appear to be feasible for the Authority.  In addition, as a result of this rule, the Authority may have to conduct an evaluation of impacts to endangered species, which could potentially require a formal consultation under Section 7 of the Endangered Species Act.  The Authority is currently evaluating the extent of this evaluation, if any.

In light of the costs associated with carbon reduction technologies, the Authority believes that the best alternative to achieve lower GHG emissions is to convert its existing units to burn natural gas instead of fuel oil.  If the Authority is not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it may need to make significant capital investments to control GHG emissions without being able to offset these costs with any costs savings on the purchase of fuel.

On a related matter, in the spring and summer of 2009 the U.S. House Energy and Commerce Committee advanced a comprehensive climate change bill that would impose economy-wide cap and trade on virtually all industrial sectors, including electricity generation. The Energy and Commerce Committee approved H.R. 2454 on May 21, 2009, and the full House of Representatives passed H.R. 2454 on June 26, 2009. H.R. 2454 would have required existing coal-fired power plants to obtain "allowances" for each ton of GHG emissions, and thus effectively create a "price of carbon." The number of available allowances would have been decreased over future years, increasing the price. It is generally understood that newer facilities that are more energy efficient or which are adaptable to a mix of various conventional and alternative fuels as well as carbon capture and sequestration will be at a competitive advantage in a cap and trade framework compared to less efficient facilities. Further, H.R. 2454 would have preempted much of—but not all of—the EPA's authority to regulate GHG emission from coal-fired power plants under the CAA. Despite the approval of H.R. 2454 by the House, this bill was never passed into law. Although this bill was not enacted into law, the possibility exists that the United States Congress in the future may decide to enact legislation addressing GHGs. At this time, it is not entirely clear what the level of future regulation of these emissions will be, or the costs associated with it.

*Water Quality Compliance*

The CWA is comprehensive federal law governing water pollution. Section 301 of the CWA prohibits the discharge of pollutants, including thermal discharges, from point sources (which include any discrete conveyances from industrial facilities) into waters of the United States (which includes bodies of water in Puerto Rico), except as authorized under the National Pollutant Discharge Elimination System ("NPDES") permit program. Although EPA may delegate the NPDES permitting authority to states (including Puerto Rico), in Puerto Rico EPA has retained this authority.

With respect to thermal discharges, Section 316(a) of the CWA authorizes EPA to establish effluent limitations for these types of discharges. In addition, Section 316(b) of the CWA requires that NPDES permits for cooling water intake structures ensure that the location, design, construction, and capacity of these structures reflect the best technology available to minimize adverse environmental impacts, which include the impingement and entrainment of fish and egg larvae. As mentioned, impingement refers to the killing of these aquatic organisms by being pinned against intake screens and other parts of the facility, and entrainment refers to the killing of these aquatic organisms by being sucked into the cooling water structures.

The Authority's power plants have discharges associated with their process water systems, cooling water systems and storm water discharges. For these discharges, the Authority's power plants have to comply with NPDES permits under the CWA. The Authority holds NPDES permits under the CWA for all these plants, which are currently in effect (or are under renewal within the applicable regulatory renewal period which affords continued coverage under applicable regulations).

Under the Consent Decree, the Authority was required to abate water pollution at its four major power plants- Aguirre, San Juan, South Coast, and Palo Seco- by implementing certain upgrades and modifications to the discharges of these plants. The Authority has completed the compliance plans for abating water pollution at all of the mentioned plants.

Section 316(a) of the CWA allows EPA to impose alternative effluent limitations for the control of the thermal component of a discharge (in other words, a thermal variance from the otherwise applicable effluent limit). According to EPA regulations, in order to get a thermal variance, a permit holder must demonstrate that the otherwise applicable thermal discharge effluent limit is more stringent than necessary to assure the protection and propagation of the water body's balanced, indigenous

population of shellfish, fish and wildlife. The Authority requested EPA to grant a thermal variance under Section 316(a) for the San Juan power plant's NPDES. The EPA granted this request and incorporated the alternate temperature limit in this plant's NPDES permit, which permit has an effective date on April 1, 2007.

The EPA also included, as a compliance requirement in the San Juan power plant NPDES permit, the performance of thermal plume studies and a biological monitoring program under Section 316(a) of the CWA, and the performance of a Comprehensive Demonstration Study (CDS) under Section 316(b) of the CWA, which requires complying with performance standards for entrainment and impingement at the power plants cooling water intake structures. On March 13, 2010, the Authority submitted the plans for the thermal plume study and the biological monitoring program to the EPA and is currently awaiting its approval. On March 31, 2008, the Authority submitted an Impingement and Entrainment Characterization Study and Current Status Report for the EPA's evaluation. The Authority also submitted a Post-Repowering Verification Study Work Plan on June 30, 2008. The Authority is waiting for the EPA's approval of such plans in order to perform the thermal plume studies and biological monitoring program. In general, the Authority is up to date in meeting the requirements of this NPDES permit.

With respect to the South Coast power plant, the renewed NPDES permit issued by EPA for this plant in 2009 requires the Authority to construct an outfall discharge pipe offshore so that the thermal discharges can mix with the ocean's cooler waters in the Guayanilla Bay in order to meet temperature water quality standards. The current outfall pipe empties into a cove at the shoreline. The permit requires the Authority to submit progress reports every six months, and to meet a compliance schedule with interim effluent limits and several interim milestones that must be met during the period leading to the construction of the new discharge pipe. The estimated capital cost for this project is approximately $60 million. The Authority is also required to develop a construction mitigation plan to minimize environmental impacts during the construction of the new discharge pipe. The permit further requires that the location design, construction, and capacity of the cooling water intake structure reflects the best technology available to minimize adverse environmental impacts, which includes compliance with impingement and entrainment performance standards to reduce biota mortality, as per Section 316(b) of the CWA. The Authority already performed some operational measures at the South Coast power plant to reduce impingement and entrainment, such as increasing the traveling screens rotation and reducing the screen wash pressure. The Authority is also in the process of designing improvements to the fish return system of the screen wash wastewater system.

As per the South Coast plant's NPDES permit, the Authority is required to perform a Detailed Engineering and Environmental Review ("DEER") of alternatives for the cooling water discharge that meets the water temperature standard or otherwise qualifies for a waiver request under Section 316(a) of the CWA. In addition, in accordance with the compliance schedule, the Authority submitted a Draft Environmental Impact Statement ("DEIS") for the cooling water discharge alternatives to the Puerto Rico Permits Management office in October 2011. The DEIS selected the alternative with the least environmental impact, which is the reduction of the cooling water temperature to a range of 96° to 98° by restoring part of the Guayanilla Bay historic flow and improving the Units 5 and 6 condensers. The DEIS will be subject to the comments of federal and local agencies. The estimated capital cost of the selected alternative is approximately $7 million. The completion of these South Coast projects is not expected until fiscal year 2018. In general, the Authority in compliance with the requirements of the compliance plan for this plant.

The Authority submitted to the EPA a Low Impact Demonstration for a Section 316(a) variance for the cooling water discharge at the Palo Seco power plant. The Authority also submitted an Intermittent Flow Application to the EQB under that agency's water quality regulations. Currently, the Authority is negotiating with the EQB and the EPA to include a temperature limit in the water quality

certificate for the cooling water discharge that complies with the Section 316(a) thermal variance requirements.

On February 24, 2011, the EPA issued an Administrative Compliance Order (CWA-02-2010-3119) against the Authority regarding the alleged noncompliance with effluent limitations in the San Juan power plant's NPDES primarily related to nickel, copper, mercury, fecal coliforms and flow parameters. The Administrative Compliance Order required the Authority to submit to the EPA a compliance plan to achieve compliance with the alleged violations and to implement the plan within 180 days. The Authority submitted the required compliance plan and completed all actions required under the plan. Although the Authority has achieved improvements in the compliance record for this plant for fiscal year 2011, certain exceedances of effluent limitations for Outfalls 002 and 003 continue. In order to address this situation, the Authority is currently in a procurement process for the installation of an advanced treatment technology in order to convert the discharges of these outfalls into storm water discharges only. The Authority has informed the EPA of these prospective actions and does not anticipate additional enforcement action related to the Administrative Compliance Order. As of this date, the EPA has not assessed any penalties against the Authority related to this matter. There is no assurance, however, that the EPA will not take additional enforcement action in connection with the exceedances that remain.

As of December 2011, the Authority had achieved a level of compliance with CWA regulations (NPDES permits, Drinking Water Act program, Oil Pollution Act (FRP and operations manual), and SPCC regulations) in excess of 99%.

*Proposed Regulation under the CWA*

Pursuant to a consent decree with environmental organizations, the EPA has issued past rulemaking under Section 316(b) of the CWA in three phases. In pertinent part, existing large electric-generating facilities were addressed in Phase II rulemaking finalized in February 2004, and existing small electric-generating and all manufacturing facilities were addressed in Phase III rulemaking finalized in June 2006. However, the Phase II rulemaking and a portion of the Phase III rulemaking were subject to a legal challenge and were remanded to EPA for reconsideration. As a result, on April 20, 2011, EPA published a new draft rule pertaining to Section 316(b) of the CWA. Compliance with this rule is established in reference to the date of issuance of the final rule. According to the terms of a settlement agreement, EPA must sign the final rule by July 27, 2012. Therefore, the compliance date with the rule is anticipated to occur at some time after that date.

This new proposed regulation has three components. First, existing facilities that withdraw at least 25 percent of their water from an adjacent water body exclusively for cooling purposes and have a design intake flow of greater than 2 million gallons per day would be subject to an upper limit on how many fish can be killed by impingement. In order to comply with this requirement, the facility is given the option of choosing technologies that would be best suited to address it or reduce its intake velocity to 0.5 feet per second. Second, existing facilities that withdraw very large amounts of water- at least 125 million gallons per day- would be required to conduct studies to help their permitting authority determine whether and what site-specific controls, if any, would be required to reduce the number of aquatic organisms sucked into cooling water systems, known as entrainment. Third, new units that add electrical generation capacity at an existing facility would be required to add technology that is equivalent to closed-cycle cooling which may be achieved by incorporating a closed-cycle system into the design of the new unit or making other design changes with equivalent results.

The Authority has a proposal to implement an impingement and entrainment control technology at the South Coast and Palo Seco power plants (aquatic filter barriers), that includes verification sampling for impingement and entrainment. In addition, the Authority is preparing a Plan of Action ("POA") for

the San Juan and South Coast power plants to be submitted to EPA on June 1, 2012. The POA will recommend steps for impingement and entrainment reduction. Based on the steps that have been and will be taken, the Authority understands that it will be able to comply with the proposed rule.

### Underground Injection Control Regulation

EPA regulations in 40 C.F.R. Parts 144 to 147 establish requirements governing the protection of ground water. In accordance with these requirements, EPA regulates the construction, operation, permitting, and closure of underground injection control facilities, which are injection wells used to place fluids underground for storage or disposal. This implementation and enforcement of this regulatory program was delegated to the EQB which has issued regulations governing these types of well referred to as underground injection control facilities.

The Authority has septic systems for sanitary discharges for which it does not have underground injection control permits. The Authority prepared a compliance plan to achieve compliance with EQB's underground injection control regulations, which plan was approved by EQB. The compliance plan provides for the closure of 39 septic systems in different power plants, among other things. The schedule of closure is tied to the completion of connections to PRASA's sewer system. As of December 2009, the Authority had completed the connection of sanitary discharges to PRASA's system at the San Juan, Aguirre and Palo Seco power plants. The South Coast power plant's sanitary discharge system was connected to PRASA's system at the beginning of fiscal year 2010. As a result, the Authority is currently engaged in the closing of septic tanks at all of its power plants and is specifically in the process of sampling and analyzing the septic systems at Aguirre, San Juan and Palo Seco. The analysis reports are being sent to EQB for their review and approval prior to beginning closure activities. The Authority understands that it is in compliance with the requirements of the compliance plan approved by EQB.

### Spill Prevention Control and Countermeasures Plan

Under the authority of Section 311 of the CWA, EPA has issued regulations setting forth requirements for prevention of, preparedness for, and response to oil discharges at specific non-transportation-related facilities. To prevent oil from reaching navigable waters and adjoining shorelines, and to contain discharges of oil, the regulation requires these facilities to develop and implement SPCC Plans and establishes procedures, methods and equipment requirements. Some facilities are also required to implement Facility Response Plans ("FRP") depending on the fuel storage capacity and risk of harm to navigable waters and extent of risk they present with respect to an oil spill to a body of water.

Pursuant to the terms of the Consent Decree, the Authority was required to implement a Spill Prevention Maintenance and Construction Program ("SPMCP"). This program included major overhauls to dikes and fuel tanks. As of December 2009, the Authority completed all compliance projects under the SPMCP of the Consent Decree in accordance with the established scope of work.

The Authority has a program to comply with new SPCC requirements that became effective on November 10, 2011, which addressed the containment of potential leakage from oil containing electrical equipment in its distribution substations. The Authority has already implemented the monitoring and inspection requirements under these new regulations (40 C.F.R. §112.7(k)). Notwithstanding the foregoing, during fiscal year 2011, the Authority completed the installation of signage and spill response material at all its substations. In addition, it completed the construction of compliance containment at 21 of the 54 substations that need to be upgraded. The Authority has budgeted $3.5 million for the completion of this program.

All Authority facilities required to have FRPs have these plans in place in accordance with EPA regulations.

*Hazardous Substances and Wastes*

The Authority's operations may be regulated or impacted by various federal laws, and their Commonwealth counterparts, related to the handling of hazardous substances and wastes, including petroleum and related substances. Following, we provide a summary of these laws as a background.

The Oil Pollution Act ("OPA") imposes substantial penalties for spills of oil or EPA listed hazardous substances into bodies of water and for the failure to report such spills. In addition, OPA imposes strict liability on certain responsible parties for the cleanup of oil spills in bodies of water. CERCLA, on the other hand, also imposes strict liability to certain potentially responsible parties for damages and remedial action related to contamination caused by hazardous substances. Under CERCLA liability, which is strict, joint and several, can be imposed on any generator of hazardous substances who arranged for disposal or treatment at the affected facility. As such, potentially responsible parties can be held liable for cleanup costs associated with Superfund actions.

CERCLA provides for reporting requirements to cover the release of hazardous substances generally into the environment, including water, land and air. When these substances are processed, stored, or handled, reasonable and prudent measures must be employed to prevent a release to the environment. In addition, pursuant to the Toxic Substances Control Act, EPA has issued regulations imposing stringent requirements for labeling, handling, storing and disposing of polychlorinated biphenyls ("PCB") and associated equipment. There are regulations governing PCB notification and manifesting, restrictions on disposal of drained electrical equipment, spill cleanup, recordkeeping requirements, among other things.

Moreover, under EPCRA, which forms part of CERCLA, entities that store or manage hazardous chemicals in specified quantities must comply with a program of emergency planning and a community right-to-know designed to inform the public about routine chemical hazards present at the facilities. Both programs have stringent enforcement provisions. Among other things, EPCRA requires reporting of hazardous chemicals by means of Tier I and/or Tier II reports that are filed with EPA and other public entities.

Furthermore, pursuant to the Resource Conservation and Recovery Act ("RCRA"), the EPA has the authority to control hazardous waste from the "cradle-to-grave." This includes the generation, transportation, treatment, storage, and disposal of hazardous waste. RCRA also set forth a framework for the management of non-hazardous solid wastes, and includes provisions that enable EPA to address environmental problems that could result from underground tanks storing petroleum and other hazardous substances. Certain waste, including spent boiler cleaning solutions, waste solvents and certain waste oils generated by the Authority may be considered hazardous wastes under RCRA.

*Hazardous Chemicals Reporting*

The Consent Decree required the Authority to submit past due Tier I or Tier II reporting for hazardous chemicals and to continue to file these reports as required by EPCRA. The Authority met these requirements of the Consent Decree and is currently in compliance with Tier II reporting requirements.

*PCB Program*

The Authority has completed a ten-year EPA-mandated program to sample and test its oil-filled transformers and other equipment in order to identify and dispose of transformers with more than 49 parts per million (ppm) of PCB. Pursuant to this program, the Authority has completed the removal and disposal of PCB transformers with PCB concentrations of more than 499 ppm. The Authority continues with the removal and disposal of transformers with PCB concentrations of between 50 and 499 ppm. As of March 2012, the Authority had 179 PCB contaminated transformers remaining to be disposed of. The Authority is in compliance with the regulations governing the handling and disposal of PCB.

As mentioned, the Authority is also in the process of removing PCB impacted soils at its Palo Seco power plant pursuant to an EPA Administrative Agreement and Order on Consent. For more information on this matter, please see "Environmental Litigation and Administrative Proceedings" above.

*Asbestos Abatement*

The Authority identified asbestos containing materials ("ACM") in the insulation of its power plants, at units, control rooms, mezzanines, warehouses, administrative buildings, auxiliary equipment and pipelines. ACM is regulated under solid waste regulations as well as air quality control regulations (due to its potential to emit harmful particles into the air). The Authority has developed an ACM removal program which provides for the encapsulation or removal of ACM on an ongoing basis to reduce the risk of exposure. The Authority is currently in compliance with this program, and continues to work to encapsulate or gradually remove ACM. The Authority understands that the risk of exposure to ACM is minimal given that most ACM is located in areas that are not accessible to employees. The removal is conducted gradually and, as conditions allow, given that most ACM can only be removed when units are taken out of operation for repairs and other activities.

*Underground Storage Tank Regulations*

Pursuant to RCRA, EPA has issued regulations establishing standards and corrective action requirements applicable to underground storage tanks ("USTs") that store regulated materials, including petroleum and related substances. EQB has issued regulations essentially mirroring the federal requirements and has been delegated the implementation of this program. These regulations establish requirements governing registration and operation of USTs and related recordkeeping, among other things. As previously mentioned, the Consent Decree required the Authority to ensure all USTs at its facilities that were closed met applicable UST closure requirements. The Authority has met these requirements of the Consent Decree. The Authority understands that all of the Authority's USTs that are currently in use are in compliance with applicable UST requirements.

*Homeland Security*

The Department of Homeland Security ("DHS") has promulgated regulations under the Homeland Security Act of 2002 relating to anti-terrorism standards at major industrial facilities. Facilities that store or process chemicals in quantities exceeding established thresholds must submit a screening assessment to the DHS. Based on these assessments, the DHS may impose additional requirements, including a screening vulnerability assessment and a Site Security Plan.

The following Authority generation facilities are subject to the requirements of the Homeland Security Act of 2002 and DHS regulations: San Juan Generation Complex, Aguirre Generation Complex, Palo Seco Power Plant, Cambalache Power Plant, and Mayaguez Mayagüez Power Plant. As required by

94

law, these generation facilities are supervised by the US Coast Guard and each one has a designated security officer and a facility security plan.

DHS has also recommended that these Authority generation facilities participate in the Site Assistance Visits program. The Authority has currently scheduled a visit to one of the generation facilities located in Puerto Rico's southern region (i.e., Costa Sur Power Plant or Aguirre Generation Complex). The Authority is also planning to schedule Site Assistance Visits to the Palo Seco Power Plan and the San Juan Generation Complex, subject to the availability of DHS resources. No other requirements have been imposed by the DHS on the Authority or its generation facilities.

*Capital Improvement Program*

The Authority's capital improvement program for the fiscal year which ended June 30, 2011 included $13.6 million in order to comply with existing Commonwealth and federal environmental laws and regulations, including the South Coast plant related projects in compliance with the CWA sections 316(a) and 316(b) previously discussed. Actual expenditures for the 2011 fiscal year totaled approximately $8.1 million. The Authority's five-year capital improvement program for fiscal years 2012 through 2016 identifies environmental projects valued at $63.5 million. During fiscal year 2012, approximately $10.2 million is budgeted for environmental projects. Approximately one quarter of the 2012 budget is dedicated to asbestos abatement, $3 million is budgeted for the CWA Section 316 projects at the South Coast plant, $1 million is budgeted for the refurbishment of fuel storage tanks at the Aguirre Plant, $1 million is budgeted to the PCB removal action at Palo Seco, and $1 million is budgeted for the SPCC compliance program. The South Coast Section 316 projects are budgeted to cost $23 million over five years ending in fiscal year 2016. The Authority believes it is taking the necessary steps to comply with all applicable environmental laws and regulations and the terms of the Consent Decree requirements, as discussed above.

## INSURANCE

**Coverage**

The Authority maintains, among others, insurance policies covering all-risk property (excluding transmission and distribution lines other than underground lines), boiler and machinery and public liability. The combined insurance coverage of these policies is $750 million, consisting of a maximum of $200 million under the all-risk property insurance policy, $175 million under the boiler and machinery insurance policy, an excess layer of $100 million under an all-risk and boiler and machinery insurance policy and $250 million under an excess umbrella policy.

The policies' self-retention in case of earthquake and windstorm losses is $25 million and $75 million, respectively, and $2 million for all other covered risks. The boiler and machinery insurance policy has a $25 million deductible.

The proceeds of the all-risk property and boiler and machinery policies are used prior to drawing upon the Reserve Maintenance Fund or the Self-insurance Fund established under the Trust Agreement.

The Authority's business interruption insurance covers up to $200 million, with the Authority covering the costs of the first 30 days.

The general liability policy covers property damage and bodily injury to third parties with a $75 million aggregate limit in excess of the self-retention limit of $1 million per occurrence. The general liability policy has a $1 million deductible per occurrence with a $2 million aggregate.

As with all electric utilities located on the east coast of the United States, the Authority's transmission and distribution facilities are susceptible to adverse weather conditions, such as hurricanes. The Authority is currently self-insured with respect to property damage for its transmission and distribution systems, as are most U.S. utilities. While the Authority and the Consulting Engineers believe that the Authority's reserves are generally sufficient, there can be no assurance that the Authority will be able to provide adequate coverage for damage that might be incurred as a result of any future adverse weather conditions.

In the Authority's opinion, its insurance coverage adequately protects it against property damage or bodily injury resulting from the possession, operation and maintenance of the System.

The State Insurance Fund, a Commonwealth agency which provides worker's compensation insurance, is funded by mandatory contributions from the Authority.

**Self-insurance Fund**

The Authority has supplemented the Trust Agreement to create a Self-insurance Fund, which is funded from Net Revenues (after deposits to the Sinking Fund and the Reserve Maintenance Fund) in the amounts recommended from time to time by the Consulting Engineers. The Authority has no obligation to make deposits to, or to replenish, the Self-insurance Fund in the event of withdrawals therefrom, except to the extent recommended by the Consulting Engineers. Amounts on deposit in the Self-insurance Fund are also available for the payment of principal of and interest on the Power Revenue Bonds. As of March 20, 2012, approximately $85.0 million was on deposit in the Self-Insurance Fund. See "Disposition of Revenues" under Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Fire Prevention Program**

In an effort to reduce the Authority's risk profile, the Authority continually evaluates industry practices and implements programs geared towards minimizing the Authority's losses. As part of this effort, on March 25, 2010, the Authority implemented a fire prevention program with the principal goal of preventing and minimizing the risks of fire in its power generation plants and protecting the lives of its personnel and its property. The program integrates and standardizes actual fire prevention and protection protocols to safeguard the Authority's personnel and the power generation infrastructure, while having designated and competent staff at each facility. The program dynamically maintains and improves the fire protection equipment in the generating plants and includes on-going training of designated staff at each facility. The designated staff is responsible for the certification and maintenance of the fire protection systems located at the Authority's power plants, the compliance of the operational emergency plan, and coordinating resources for an immediate and effective response facing an emergency.

## LABOR RELATIONS

As of December 31, 2011, the Authority had 8,639 employees. Four local unions represented 5,996 employees. The remaining 2,643 employees were members of the executive, managerial, and administrative staff. The Electrical Industry and Irrigation Workers Union or "UTIER" represented 4,737 employees engaged in operations and maintenance. The Insular Union of Industrial and Electrical Construction Workers or "UITICE" represented 888 construction workers. The Professional Employees Independent Union or "UEPI" represented 365 professional employees. The Electric Power Authority Pilots Union or "UPAEE" represented the 6 pilots employed by the Authority.

The Authority has in effect collective bargaining agreements with each of these unions. The Authority believes that labor relations are stable. The Authority is currently honoring all collective bargaining agreements. The UTIER agreement expires on August 24, 2012. The UITICE agreement expired on January 26, 2011, the UEPI agreement expired on December 13, 2010 and the UPAEE agreement expired on July 2, 2010. The Authority is currently negotiating a new contract with all four unions. These negotiations are in advanced stages. All negotiations are proceeding in an orderly and constructive manner.

Of the Authority's 8,639 employees as of December 31, 2011, 5,823 are employed in the generation, transmission and distribution facilities directorate, 1,541 are employed in the customer service directorate, and the remaining employees are employed in the administrative directorates and other areas. In order to improve the productivity of its employees, the Authority has instituted various programs to reduce absenteeism, increase safety measures, and minimize the level of illegal drug abuse among its employees. In addition, the Authority continues to implement programs to provide both technical and supervisory training to its employees. The Authority believes that the implementation of these programs helps the Authority provide service that is more reliable to its clients.

## PENSION PLAN

The Employees' Retirement System of Puerto Rico Electric Power Authority (the "Retirement System"), a separate trust fund created by the Authority, administers the Authority's defined benefit pension plan, which provides employee retirement and death benefits. The pension plan provides for contributions by both the Authority, based on annual actuarial valuations, and the plan members. The most recent actuarial valuation was conducted as of June 30, 2010. As of June 30, 2010, the Retirement System had 18,008 members, consisting of 9,127 retirees currently receiving benefits, 73 terminated employees entitled to but not yet receiving benefits and 8,808 active members. In addition, the Retirement System had 2,143 beneficiaries. The Authority's accrued liability contributions are determined based on a percentage of covered payroll recommended by the Retirement System's actuaries to liquidate the unfunded actuarial accrued liability over a 30-year period that commenced on June 30, 2010. Covered payroll includes all elements of compensation paid to active employees on which contributions to the Retirement System are made.

The contributions recorded by the Authority for fiscal years 2010 and 2011 were $69.9 million and $85.3 million, respectively. All of these contributions have been paid. For fiscal years 2010 and 2011, the recorded contributions represented 19.7% and 23.80%, respectively, of covered payroll. For fiscal year 2012, the Authority's contributions to the Retirement System will be approximately 23.86% of covered payroll. Employee contributions and other withholdings are being paid to the Retirement System on a current basis. As of June 30, 2010, the present value of the Authority's future contributions on account of benefits was approximately $1.4 billion.

The table below shows the funding shortfalls for each of the last five fiscal years for the Retirement System.

**Funding Shortfalls**
**(in millions)**

| Fiscal Year Ending June 30, | Employer and Member Contributions | System Benefit Payments and Administrative Expenses | Net Funding Shortfall |
|---|---|---|---|
| Employees Retirement System | | | |
| 2007 | $109.6 | $(176.9) | $(67.3) |
| 2008 | $112.1 | $(181.0) | $(68.9) |
| 2009 | $116.5 | $(190.6) | $(74.1) |
| 2010 | $106.8 | $(204.3) | $(97.5) |
| 2011 | $122.4 | $(198.6) | $(76.2) |

Unfunded actuarial accrued liability to be borne entirely by the Authority was approximately $1.4 billion as of June 30, 2010. The actuarial valuation for fiscal year 2010 used a closed amortization period based on a level percent of pay, assumed an investment return of 8.5% per annum, a payroll growth rate of 4% per year, projected salary increases of 4.00% per year, an inflation rate of 3.0% per year, and a remaining amortization period of 30 years for the unfunded accrued liability.

The following table shows, for the five fiscal years ended June 30, 2010, the Retirement System's actuarial accrued liability, unfunded actuarial accrued liability, covered payroll and the ratio of the unfunded actuarial accrued liability to covered payroll.

| Fiscal Years Ending June 30, | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability ("UAAL") | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|
| 2006 | $2,279,988,278 | $ 877,400,654 | $349,182,982 | 251.3% |
| 2007 | 2,313,124,627 | 825,592,169 | 348,928,666 | 236.6% |
| 2008 | 2,336,944,425 | 765,743,108 | 362,892,937 | 211.0% |
| 2009 | 2,497,639,122 | 980,288,838 | 364,402,800 | 269.0% |
| 2010 | 2,816,370,702 | 1,401,686,298 | 357,405,428 | 392.2% |

The following table shows, for the five fiscal years ended June 30, 2010, the Retirement System's actuarial value of assets and market value of assets and the historical funded ratios using the actuarial and market value of assets. A five-year smoothing of the market value of assets is used for actuarial valuation purposes. Thus, in a declining market, such as in 2008 and 2009, the actuarial value of assets exceeds the market value of assets as there are unsmoothed losses that are not yet reflected in the actuarial value of assets.

| Fiscal Years Ending June 30, | Actuarial Value of Assets | Market Value of Assets | Funded Ratio (actuarial value) | Funded Ratio (market value) |
|---|---|---|---|---|
| 2006 | $1,402,587,624 | $1,458,002,168 | 61.5% | 63.9% |
| 2007 | 1,487,532,458 | 1,598,941,337 | 64.3% | 69.1% |
| 2008 | 1,571,201,317 | 1,447,914,296 | 67.2% | 62.0% |
| 2009 | 1,517,350,284 | 1,130,683,460 | 60.8% | 45.3% |
| 2010 | 1,414,684,404 | 1,140,467,954 | 50.2% | 40.5% |

The increase in the ratio of the unfunded actuarial accrued liability to covered payroll for fiscal years 2009 and 2010 and the decrease in the funded ratios show deterioration in the financial strength of the Retirement System partly as a result of the effect on the Retirement System's investment portfolio of the general market decline during 2008 and 2009. During fiscal years 2010 and 2011, however, the Retirement System's investment portfolio had positive returns of approximately 9.5% and 20.4%, respectively. As of June 30, 2011, the market value of assets increased to $1.3 billion, a 12.8% increase from fiscal year 2010. As a result of the plan's low funded ratio and the funding shortfalls referred to above, and depending on the actual return on the plan's assets compared to the assumed return in the

actuarial valuation, the Authority may have to increase its annual contribution to the plan in order for the plan to be able to keep making benefit payments at current levels on a long-term basis.

The Retirement System's financial statements are audited by a firm of independent public accountants that does not serve as independent accountants to the Authority.

## OTHER POST-EMPLOYMENT BENEFITS

In addition to the pension benefits, the Authority provides non-pension post-employment benefits to retirees under a Healthcare Plan that consist of a fixed maximum monthly payment to cover medical expenses for retired employees meeting the service eligibility requirements. Based on this Plan's features, it is treated as a single-employer defined benefit healthcare plan. These benefits are funded by the Authority on a "pay-as-you-go basis," which means that there is no reserve or pool of assets against the benefit expenses that the Authority may incur in future years. For fiscal year 2011, the Authority paid $22.1 million for these non-pension post-employment benefits for its eligible retirees, which is included in administrative and general expenses. For fiscal year 2012, these benefits are also expected to amount to $23.9 million.

In accordance with the provisions of GASB Statement No. 45, the Authority is required to quantify and disclose its obligations to pay non-pension post employment benefits to current and future retirees. The most recent actuarial valuation report for these benefits, as of July 1, 2010, reflects a UAAL of $612.7 million with respect to these benefits, and the funding ratio is 0% since, as mentioned previously, these benefits are funded on a "pay-as-you-go basis."

## LITIGATION

*General.* The Authority is a defendant or codefendant in numerous legal proceedings pertaining to matters incidental to its business and typical for an electrical utility of its size and nature, including claims for damages due to electrified wires, failure to supply power and fluctuations in the power supply. Pursuant to the Act, the Authority is authorized to sue and be sued by individuals or legal entities.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors, executive directors and employees of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under the provisions of Act No. 9 in cases before federal court, but in all other cases the Secretary of Justice of the Commonwealth may determine whether, and to what extent, the Commonwealth will assume payment of such judgment. Although the Authority's directors, executive director and employees are covered by the provisions of Act No. 9, Article 19 of Act No. 9 requires the Authority to cover the costs associated with judgments, expenses and attorneys' fees incurred by the Commonwealth in the legal representation of its directors, executive director and employees. To the extent the Authority is unable to cover these costs and expenses, the Authority would be required to reimburse the Commonwealth from future revenues, as provided by the Secretary of the Treasury of the Commonwealth in consultation with the Authority's board of directors.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following paragraphs, as of June 30, 2011, the Authority has included in its financial statements reported liabilities of approximately $23.9 million for awarded and anticipated unfavorable judgments. Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts

claimed against the Authority exceed $700 million; however, the ultimate liability cannot be presently determined. The Authority believes that none of these cases, if decided against the Authority, would have a material adverse effect on the Authority's financial condition or operations.

*Abengoa Litigation.* In May 2000, Abengoa, Puerto Rico, S.E., the Authority's original contractor for the construction of the new generating units (Units 5 and 6) at the San Juan power plant, unilaterally declared a termination of the contract and filed a complaint for breach of contract. The Authority filed a counterclaim for breach of contract and for all damages caused to the Authority by the contract termination. On September 21, 2007, the Regional Administrating Judge for the Superior Court of San Juan certified the case as complex civil litigation pursuant to the Authority's petition. On July 27, 2011, Mr. Angel F. Rossy Garcia, a retired Commonwealth appeals court judge, was named as special master for the case. After his appointment, the special master intervened as a neutral evaluator for purposes of assisting the parties in reaching a potential settlement. The parties filed their respective position papers stating their legal contentions and case theories in August 2011. After reviewing the position papers and meeting separately with each party to discuss the strength and weakness of their respective cases, the parties were unable to reach a settlement agreement. The special master then determined that the contested issues would be resolved at trial and that the case would be bifurcated into two phases: a liability phase that would determine whether the termination was wrongful and a damages phase. The Authority continues to defend this claim vigorously, and has raised various defenses thereto. At the current stage, however, the Authority cannot predict with any certainty the outcome of this case or the range of potential loss, if any. In order to mitigate its possible losses, the Authority entered into an agreement with Washington Engineers P.S.C. for the completion of such generating units, which units entered into service in 2009. Preliminary expert reports have been developed assessing potential damages to be recovered from Abengoa, including excess amounts billed to the Authority prior to the wrongful termination.

*Aguas Puras del Caribe Litigation.* In 2010, Aguas Puras del Caribe filed suit against the Authority alleging that the Authority negotiated in bad faith and created a reasonable expectation that the negotiation of a contract to provide certain of the Authority's generation facilities with demineralized water for a term of 25 years would lead to the execution of a final and binding agreement. Aguas Puras seeks damages of approximately $40 million. The case is currently in the discovery stage.

*CAPECO Litigation.* In 2009, a large fire at a tank farm owned by CAPECO caused major damage to surrounding areas. The Authority stored some of its fuel at this facility. In the aftermath of the fire, numerous claims were filed against CAPECO. Some of the plaintiffs included the Authority as a defendant in these suits, alleging that the Authority failed in its duty (as the owner of fuel stored at the site) to properly monitor CAPECO's operations in the tank farm. All cases are in the initial stages and the Authority intends to vigorously defend against these claims. On August 12, 2010, CAPECO filed for bankruptcy. As a result thereof, all proceedings against CAPECO have been stayed. The proceedings against the Authority continue.

*Comptroller Report Related Litigation.* In June 2004, the Office of the Comptroller of the Commonwealth of Puerto Rico issued a report stating that the Authority overcharged its clients by approximately $49.8 million, and should reimburse this amount to such clients. On June 17, 2004, the President of the Governing Board of the Authority sent a written response to the Comptroller and issued a press release in which the Authority denied that any overcharges were made. The Authority's position is that the Comptroller incorrectly based his conclusion on data that is not relevant to the calculation of the Authority's rates, and that the Authority's rates were properly established in accordance with applicable laws and regulations. In particular, the Authority notes that its tariffs properly take into consideration the cost of the fuel used by the Authority's generating facilities and the cost of the electricity purchased from the two co-generating facilities that sell power to the Authority. See *Rates* under THE SYSTEM above.

After this report was made public, seven lawsuits were filed separately by different plaintiffs against the Authority demanding the reimbursement of such alleged overcharges, but the court ordered that all cases be consolidated. Plaintiffs sought certification of a class in order to proceed as a class action, but such request was denied by the trial court and the denial affirmed by the Court of Appeals (and certiorari was denied by the Puerto Rico Supreme Court). Following denial of certiorari, several of the plaintiffs voluntarily dismissed their cases. Given the failure of the plaintiff to certify a class, it is anticipated that if the suits of the remaining plaintiffs continue to trial, the total amounts awarded would not exceed $1 million. The court also ordered that the case be classified as a complex litigation. The Authority believes that the allegations of the complaints are similar to those made in a previous lawsuit in which the Authority prevailed on the merits of the case.

*Compute All, Inc. Litigation.* In 2008, Compute All, Inc. filed suit against the Authority, alleging breach of contract and damages due to the unlawful termination of a contract pursuant to which Compute All, Inc. would provide the Authority with a computer-based motor vehicle fleet management system, including global positioning system capabilities. Compute All seeks damages of $8.25 million plus the payment of expenses and attorneys' fees. The case is currently in the discovery stage.

*Consumer Billing Litigation.* In 2011, separate lawsuits were filed against the Authority by various consumers claiming damages allegedly caused by incorrect and unlawful billing and invoicing practices. The consumers are claiming damages in excess of $100 million. The Authority has requested that all cases filed by consumers regarding this matter be consolidated, while each respective consumer is currently seeking class certification from the court. The court has neither ruled on the Authority's consolidation request nor on the class certification matter. The Authority believes it is likely that these cases will be consolidated and certified as complex litigation under the local rules. Once the cases are consolidated and certified as complex litigation, the discovery stage of the class certification request will begin. The Authority believes that the allegations of the complaints are similar to those made in a previous lawsuit in which the Authority prevailed on the merits of the case and that these cases should be treated similarly as those described under *Comptroller Report Related Litigation* above. The case is currently in the discovery stage.

*Power Technologies Corp. Litigation.* In 2008, Power Technologies Corp. filed suit against the Authority, alleging that the Authority had withdrawn from a contracting process for a new energy facility, in which Power Technologies was involved, without explanation or justification. Power Technologies seeks damages of $52.4 million. The case is currently in the discovery stage.

*Vitol, Inc. Litigation.* In 2009, the Authority filed suit in Commonwealth court against Vitol, Inc. and certain of its affiliates and subsidiaries seeking a declaratory judgment as to the nullity of a $2 billion fuel supply agreement due to Vitol's failure to disclose certain corruption cases for which it accepted responsibility. Vitol removed this suit to federal court and presented a counterclaim alleging that the Authority owed it approximately $45 million, consisting of $28 million in fuel that was delivered to, and used by, the Authority and approximately $17 million in excise taxes to be reimbursed to Vitol by the Authority. Although the case is currently in the discovery stage, the court has stayed this process until such time as certain motions regarding forum selection have been resolved.

*Ponce Landslide Litigation.* In 2007, 2008 and 2009, six cases were filed against the Authority, PRASA, and other entities alleging damages resulting from landslides in a neighborhood in Ponce. The complaints allege that the Authority caused or contributed to the landslides based on its construction of transmission lines in the area. In total, the six plaintiffs have claimed approximately $19.5 million in damages. These cases, which are in the discovery stage, have been stayed by the court due to the bankruptcy of PRASA's insurer. Once proceedings in this case resume, the Authority will continue with its vigorous defense.

*Environmental Litigation.* Among the cases currently pending, some deal with environmental issues. These are described above in *Environmental Litigation and Administrative Proceedings* under ENVIRONMENTAL MATTERS.

*Litigation Regarding the Bonds.* There is no pending litigation seeking to restrain or enjoin the sale of the Bonds or contesting or affecting the validity of the Bonds, the proceedings of the Authority taken with respect to the authorization, issuance or sale of the Bonds, or the pledge or application of any moneys under the Trust Agreement or the existence or powers of the Authority.

## TAX MATTERS

### Federal Income Taxes

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the resolution authorizing the Bonds and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 (the "Tax Certificate"), the Authority has covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Authority has made certain representations and certifications in the resolution authorizing the Bonds and the Tax Certificate. Bond Counsel will not independently verify the accuracy of those representations and certifications.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Authority described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

### State Taxes

Bond Counsel is also of the opinion that, under existing statutes, interest on the Bonds is exempt from state, Commonwealth and local income taxation. Bond counsel expresses no opinion as to other state, Commonwealth or local tax consequences arising with respect to the Bonds.

### Original Issue Discount

Bond Counsel is further of the opinion that the difference between the principal amount at maturity of the Series 2012A Bonds maturing on July 1, 2029 bearing interest at a rate of 4.80%, July 1, 2042 bearing interest at a rate of 5.00%, and July 1, 2042 bearing interest at a rate of 5.05% (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2012A Bonds. Further, such original issue discount accrues actuarially on a

constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

**Original Issue Premium**

The Bonds maturing on July 1, 2016 bearing interest at a rate of 2.50%, July 1, 2016 bearing interest at a rate of 5.00%, and July 1, 2029 bearing interest at a rate of 5.00% (collectively, the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium). For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year. The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Bonds. Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

**Ancillary Tax Matters**

Ownership of the Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit. Ownership of the Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Bonds. Prospective investors are advised to consult their own tax advisors regarding these rules.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations. In addition, interest on the Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described in the opinion attached as Appendix IV. Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

**Changes in Law and Post Issuance Events**

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Bonds. This could result from changes to Federal or state income tax rates, changes in the structure of Federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Bonds from gross income for Federal or state income tax purposes, or otherwise. For example, in September, 2011, the President released legislative proposals that would, among other things, subject interest on tax-exempt bonds (including the Bonds) to a federal income tax for taxpayers with incomes above certain thresholds for tax years beginning after 2012. It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the Federal or state income tax treatment of holders of the Bonds may occur. Prospective purchasers of the Bonds should consult their own tax advisers regarding the impact of any change in law on the Bonds.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Bonds may affect the tax status of interest on the Bonds. Bond Counsel expresses no opinion as to any Federal, state or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey Demgen & Moore will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Series 2012B Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Bonds, and (2) the computations of yield on both the securities and the Series 2012B Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Series 2012B Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Series 2012B Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $4,153,778.50 from the initial public offering prices of such bonds. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent. The Underwriters will be obligated to purchase all the Bonds, if any such bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed, from time to time, by the Underwriters. The Authority has agreed to indemnify the Underwriters, to the extent permitted by law, against certain liabilities, including liabilities under federal securities laws, or to contribute to payments that the Underwriters may be required to make in respect thereof.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future

perform, various investment banking services for the Authority, the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Authority, the Commonwealth and/or its instrumentalities.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Barclays Capital Inc. and Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of BMO Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal. BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the United States capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto

Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the United States capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities LLC ("Santander Securities") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or United States issuances. Santander Securities and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

RBC Capital Markets, LLC ("RBC") and BBVAPR División de Valores Municipales ("BBVAPR MSD") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, RBC and BBVAPR MSD share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## MATERIAL RELATIONSHIPS

URS Corporation serves as the Consulting Engineers to the Authority under the provisions of the Trust Agreement. The Authority entered into a professional services agreement with Washington Engineers P.S.C., an affiliate of URS Corporation, to provide services to the Authority in connection with the construction of the San Juan 5 and 6 combined cycle generating units completed during fiscal year 2009 and the restoration of the Palo Seco plant following the fires in December 2006.

Citibank, N.A., an affiliate of Citigroup, an underwriter for the Bonds, has provided to the Authority a revolving line of credit for the purchase of fuel oil and power with an approved maximum principal amount of $235 million as of December 31, 2011, of which $150 million was outstanding as of that date.

Scotiabank, an affiliate of Scotia MSD, an underwriter for the Bonds, has provided to the Authority a revolving line of credit for the payment of working capital expenses, with an approved maximum principal amount of $150 million as of December 31, 2011, of which the full amount had been drawn and was outstanding as of that date.

Banco Popular de Puerto Rico ("BPPR"), an affiliate of Popular Securities, Inc., an underwriter for the Bonds, has provided to the Authority a term loans with an aggregate outstanding principal amount of approximately $25.0 million as of December 31, 2011, that is syndicated among BPPR, FirstBank Puerto Rico and Scotiabank. BPPR also has another term loan to the Authority with an aggregate principal amount of $4.9 million as of December 31, 2011.

See also GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO.

## LEGAL MATTERS

The proposed form of opinion of Nixon Peabody LLP, Bond Counsel, is set forth in Appendix IV to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

## INDEPENDENT AUDITORS

The financial statements of the Authority as of and for the years ended June 30, 2011 and 2010 included in Appendix II hereto have been audited by Ernst & Young LLP, San Juan, Puerto Rico, independent auditors, as stated in their report appearing therein.

The prospective financial information included in this Official Statement has been prepared by, and is the responsibility of the management of the Authority. Ernst & Young LLP has neither examined nor compiled the accompanying prospective financial information, and accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto. The Ernst & Young LLP report for fiscal years 2011 and 2010 included in Appendix II to this Official Statement relates to the historical financial information of the Authority. Such report does not extend to the prospective financial information and should not be read to do so.

## RATINGS

The Bonds have been assigned ratings of "Baa1" (stable outlook) by Moody's Investors Service ("Moody's"), "BBB+" (stable outlook) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and "BBB+" (negative outlook) by Fitch Ratings ("Fitch"). Moody's ratings represent a recent downgrade from a rating of "A3." Fitch's prior rating did not have a negative outlook.

These ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies, if in the judgment of any or all, circumstances so warrant. Any such downward revision or withdrawal of either of such ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, see Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating under RISK FACTORS AND INVESTMENT CONSIDERATIONS. The Trust Agreement does not include a covenant by the Authority to maintain a specific rating with respect to the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC, the Authority has covenanted in its resolution authorizing the issuance of the Bonds for the benefit of the Beneficial Owners (as defined in such resolution and, generally, the tax owners of the Bonds):

(a) to file within 275 days after the end of each fiscal year with EMMA (http://emma.msrb.org) established by the MSRB, core financial information and operating data for the prior fiscal year, including (i) the Authority's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority's System and revenues, expenditures, financial operations and indebtedness generally found in this Official Statement (but excluding the Commonwealth Economic Report incorporated by reference herein); and

(b) to file in a timely manner not in excess of 10 business days of the occurrence of the event, with EMMA, notice of failure of the Authority to comply with clause (a) above and notice of any of the following events with respect to the Bonds:

(1) principal and interest payment delinquencies;

(2) non-payment related defaults, if material;

(3) unscheduled draws on debt service reserves reflecting financial difficulties;

(4) unscheduled draws on credit enhancements reflecting financial difficulties;

(5) substitution of credit or liquidity providers, or their failure to perform;

(6) adverse tax opinions or the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax-exempt status of the Bonds;

(7)     modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)    release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)    rating changes;

(12)    tender offers;

(13)    bankruptcy, insolvency, receivership or similar events;

(14)    the consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions other than pursuant to its terms, if material; and

(15)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to event (4) and (5), the Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

With respect to event (6) and the tax status of the Bonds, see TAX MATTERS.

With respect to event (8), the Authority does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *Mandatory Redemption* under DESCRIPTION OF THE BONDS above, (ii) the only open issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

According to the Rule, event (13) is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the United States Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other event is material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Authority has made similar continuing disclosure covenants in connection with prior bond issuances, and has complied with all such covenants, except that the Authority's audited financial statements for the fiscal year ended June 30, 2009 and material quantitative historical data on the Authority's System and finances were inadvertently not timely filed with EMMA by the deadline of April 1, 2010. The Official Statement for the Series XX Bonds, dated March 26, 2010, contained all the information required to comply with the Authority's continuing disclosure obligation and was filed with EMMA on April 5, 2010 to comply with MSRB rules and on April 13, 2010 specifically to comply with the Authority's continuing disclosure obligation.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority evidence of ownership and a written notice of and request to cure such breach, the Authority shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Authority (such as, but without limitation, the Authority's financial advisor or bond counsel); or

(b)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Authority elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing summaries of or references to certain provisions of the Trust Agreement, the various acts and the Bonds are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement (i) a summary of the Trust Agreement, (ii) the financial statements of the Authority for the fiscal years ended June 30, 2011 and 2010, together with the independent accountants' report of Ernst & Young LLP, San Juan, Puerto Rico, (iii) a letter from the Authority's Consulting Engineers, URS Corporation, regarding its opinion as to certain engineering matters in this Official Statement, and (iv) the proposed form of opinion of Nixon Peabody LLP, Bond Counsel.

The information set forth in this Official Statement, except for certain information on the page following the inside cover page and the information appearing in UNDERWRITING, MATERIAL RELATIONSHIPS, Appendices III and IV, and the information pertaining to DTC was supplied by the Authority.  The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with the MSRB through EMMA.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By:  _____ /s/ Otoniel Cruz Carillo  _____
Executive Director

111

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX I

**DEFINITIONS OF CERTAIN TERMS AND SUMMARY OF CERTAIN PROVISIONS
OF THE TRUST AGREEMENT**

*This Appendix contains summaries of certain provisions of the Authority's Trust Agreement. This
summary is not to be considered a full statement of the terms of the Trust Agreement and accordingly is
qualified by reference to such Trust Agreement and subject to the full text thereof. Capitalized terms not
otherwise defined herein have the meanings set forth in the Trust Agreement or the Official Statement.*

### DEFINITIONS OF CERTAIN TERMS

The following are definitions of certain terms defined in Section 101 of the Trust
Agreement and used in this Official Statement.

"Amortization Accrual" means for any period the amount of an Amortization
Requirement that would accrue during such period if such Requirement accrued ratably on the
basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by
resolution of the Authority or an agreement supplemental to the Trust Agreement, the monthly
accrual in respect of an Amortization Requirement for a term bond shall commence on the first
day of each month in the fiscal year for which such Amortization Requirement has been
established and shall end on the first day of the month succeeding the relevant Deposit Day.

As applied to the term bonds of any Series, "Amortization Requirement" for any fiscal
year means the principal amount fixed or computed for such fiscal year for the retirement of such
term bonds by purchase or redemption.

The Amortization Requirements for the term bonds of each Series shall be initially the
respective principal amounts for each fiscal year as fixed in a resolution of the Board adopted
prior to the issuance of the bonds of such Series; provided, however, that if any additional term
bonds of such Series shall be issued under the provisions of the first paragraph of Section 210 of
the Trust Agreement, the respective Amortization Requirements for the term bonds of such
Series shall be increased in proportion as nearly as may be practicable to the increase in the total
principal amount of the term bonds of such Series. The aggregate amount of such Amortization
Requirements for the term bonds of each Series shall be equal to the aggregate principal amount
of the term bonds of such Series. The Amortization Requirements for the term bonds of each
Series shall begin in the fiscal year determined by the Board.

If at the close of any fiscal year the total principal amount of term bonds of any Series
retired by purchase or redemption, or prior to the close of such fiscal year called for redemption,
shall be in excess of the amount of the Amortization Requirements for the term bonds of such
Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds
of such Series shall be reduced for such subsequent fiscal years in such amounts aggregating the
amount of such excess as shall be determined by the Executive Director in an order filed with the
Trustee on or before the 10th day of July following the close of such fiscal year.

If at the close of any fiscal year the total principal amount of term bonds of any Series
retired by purchase or redemption, or called for redemption, prior to the close of such fiscal year

shall be less than the amount or the Amortization Requirements for the term bonds of such Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds of such Series for the next succeeding fiscal year shall be increased by the amount of the excess of such deficiency over the amount then held to the credit of the Redemption Account.

It shall be the duty of the Trustee, on or before the 15th day of July in each fiscal year, to compute the Amortization Requirements for the then current fiscal year for the term bonds of each Series then outstanding. The Amortization Requirement for the then current fiscal year shall continue to be applicable during the balance of such current fiscal year and no adjustment shall be made therein by reason of term bonds purchased or redeemed or called for redemption during such current fiscal year.

"Annual Budget" means the Authority's budget of Current Expenses and Capital Expenditures for a fiscal year adopted pursuant to the provisions of the Trust Agreement.

"Board" means the governing board of the Authority as constituted from time to time and defined in the Act, or if said Board shall be abolished then the Board, body or officer succeeding to the principal functions thereof or to whom the powers of the Authority shall be given by law.

"Build America Bonds" means a series of bonds designated as "Build America Bonds" by the Authority for purposes of Section 54AA of the Code and for which the Authority has irrevocably elected pursuant to Section 54AA(g) of the Code to receive the Federal Subsidy from the United States Treasury in connection therewith under Section 6431 of the Code and apply it in accordance with the provisions of the resolution or resolutions adopted by the Board authorizing the issuance of such bonds.

"Current Expenses" means the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to capital expenditures, engineering expenses relating to operations and maintenance, fees and expenses of the Trustee and the Paying Agents, legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by the Authority under the provisions of the Trust Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of the Authority and applicable in the circumstances, but shall not include any deposits to the credit of the Sinking Fund, the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self-insurance Fund and the Capital Improvement Fund.

"Deposit Day" means the date specified in the Trust Agreement as the date by which all of the moneys then held to the credit of the Revenue Fund shall be withdrawn by the Treasurer and deposited in the manner set forth under "Disposition of Revenues" herein.

"Designated Maturity Bonds" means the indebtedness incurred by the Authority under the terms of a separate trust agreement or resolution, which indebtedness has a maturity of at least ten (10) years and is secured, as to the unamortized principal thereof, on a subordinate basis to the bonds and for which (i) no amortization of principal has been established or (ii) the aggregate amount of the amortized principal that has been established is less than the principal

amount of the indebtedness; provided that interest on said indebtedness and any amortized principal of said indebtedness may be payable on a parity, respectively, with interest on bonds and Amortization Requirements on term bonds, in which case said interest and amortized principal shall be included in the calculation of Principal and Interest Requirements on bonds for purposes of the Trust Agreement and shall otherwise be deemed to be, and be payable as, interest and Amortization Requirements on bonds for purposes of the Trust Agreement.

"Extendible Maturity Bonds" means bonds the maturities of which, by their terms, may be extended by and at the option of the bondholder or the Authority.

"Federally Subsidized Bonds" means either Build America Bonds or Other Subsidy Bonds or both, as the case may be.

"Federal Subsidy" means a payment made by the Secretary of the Department of Treasury to or for the account of the Authority pursuant to the Code in respect of a series of bonds constituting Federally Subsidized Bonds. Any Federal Subsidy to be received by the Authority in respect of such series of bonds shall be identified as such in the resolution authorizing the issuance of such series of bonds to which it relates.

"Federal Subsidy Payments" means the amount of Federal Subsidy actually paid to and received by the Trustee in respect of an interest payment for the series of Federally Subsidized Bonds to which it relates. Such Federal Subsidy Payments shall be deposited directly into the Bond Service Account in the Sinking Fund.

"Government Obligations" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government including securities evidencing ownership interests in such obligations or in specified portions thereof (which may consist of specific portions of the principal of or interest on such obligations), (ii) bonds, debentures or notes issued by any of the following Federal agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association, Federal Land Banks, or the Federal National Mortgage Association (including participation certificates issued by such Association) and (iii) all other obligations issued or unconditionally guaranteed as to principal and interest by an agency or person controlled or supervised by and acting as an instrumentality of the United States Government pursuant to authority granted by the Congress.

"Improvements" means improvements, renewals and replacements of the System or any part thereof and such extensions and additions thereto as may be necessary or desirable, in the judgment of the Board, to keep the same in proper condition for the safe, efficient and economic operation thereof and to integrate into the System any unit or part thereof, and shall include such electric-power projects as may be authorized to be acquired or constructed by the Authority under the provisions of the Act and such improvements, renewals and replacements of such properties and the System and such extensions and additions thereto as may be necessary or desirable for continuous and efficient service to the public, which shall be financed in whole or in substantial part from the proceeds of bonds issued under the provisions of the Trust Agreement or from moneys deposited to the credit of the Construction Fund or the Renewal and Replacement Fund.

"Independent Consultant" means the consultant or consulting firm or corporation at the time employed by the Authority under the provisions of the Trust Agreement to perform and carry out the duties of the Independent Consultant under the Trust Agreement.

"Interest Accrual" means for any period the amount of interest that would accrue during such period if such interest accrued ratably on the basis of a year consisting of twelve (12) thirty-day months.  Unless otherwise provided by resolution of the Authority or an agreement supplemental to the Trust Agreement, the monthly accrual in respect of interest on the bonds shall commence on the later to occur of the date of issue of the bonds of such Series and the date that is six months prior to the due date of such interest and shall end on the first day of the month following the relevant Deposit Day.

"Investment Obligations" means (i) Government Obligations, (ii) obligations of any state or territory of the United States or political subdivision thereof (other than obligations rated lower than the three highest grades by a nationally recognized rating agency), (iii) repurchase agreements with commercial banks fully secured by Government Obligations and (iv) any other investment obligations permitted for governmental instrumentalities under the laws of the Commonwealth which are rated, on the date of investment therein, in any of the three highest grades by a nationally recognized rating agency or which are collateralized by any other Investment Obligations described in the Trust Agreement

"Net Revenues" means, for any particular period, the amount of the excess of the Revenues for such period over the Current Expenses for each period.

"Other Subsidy Bonds" means bonds for which a subsidy or other payment made by the Secretary of the Department of Treasury may be made in respect of such bonds other than under Section 6431 of the Code.

"Prerefunded Municipals" means any bonds or other obligations of any state of the United States of America or Puerto Rico or of any agency, instrumentality or local governmental unit of any such state or Puerto Rico (a) which are (x) not callable prior to maturity or (y) as to which irrevocable instructions have been given to the trustee of such bonds or other obligations by the obligor to give due notice of redemption and to call such bonds or other obligations for redemption on the date or dates specified in such instructions, (b) which are secured as to principal, redemption premium, if any, and interest by a fund consisting only of cash or Government Obligations or Time Deposits, secured in the manner set forth in the Trust Agreement, which fund may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (c) as to which the principal of and interest on such Government Obligations or Time Deposits, secured in the manner set forth in the Trust Agreement, which have been deposited in such fund, along with any cash on deposit in such fund are sufficient to pay principal of and interest and redemption premium, if any, on the bonds or other obligations on the maturity date or dates thereof or on the redemption date or dates specified in the irrevocable instructions referred to in clause (a) above, as appropriate.

"Principal Accrual" means for any period the amount of principal that would accrue during such period if such principal accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by resolution of the Authority or an agreement supplemental to the Trust Agreement, the monthly accrual in respect of the principal of serial bonds shall commence on the first day of the twelfth month preceding the due date of such principal and shall end on the first day of the month succeeding the relevant Deposit Day,

"Principal and Interest Requirements" means, for any fiscal year, as applied to the bonds of any Series issued under the Trust Agreement, the sum of:

(a)      the amount required to pay the interest on all outstanding bonds of such Series which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year,

(b)      the amount required to pay the principal of all outstanding serial bonds of such Series which is payable after July 31 in such fiscal year and on or prior to July 31 in the following fiscal year, and

(c)      the Amortization Requirement for the term bonds of such Series for such fiscal year.

The Principal and Interest Requirements for the bonds of any Series issued under the Trust Agreement shall be determined, as required from time to time, by the Trustee. In computing the Principal and Interest Requirements for any fiscal year for the bonds of any Series, the Trustee shall assume that an amount of the term bonds of such Series equal to the Amortization Requirement for the term bonds of such Series for such fiscal year will be retired by purchase or redemption on July 1 in the following fiscal year.

Principal and Interest Requirements on bonds shall be deemed to include the amount required to pay interest on outstanding Designated Maturity Bonds and any amortized principal of said Designated Maturity Bonds for any fiscal year, if said interest and amortized principal are payable, under the trust agreement or resolution providing for said Designated Maturity bonds, on a parity with interest and Amortization Requirements on bonds.

To the extent all or a portion of the principal of, Amortization Requirements for or interest on, any bonds of any Series are payable from moneys irrevocably set aside or deposited irrevocably for such purpose with a bank or trust company (which may include the Trustee) or from Investment Obligations irrevocably set aside or deposited irrevocably for such purpose with is bank or trust company (which may include the Trustee) or Time Deposits, secured in the manner set forth in the Trust Agreement, and irrevocably set aside for such purpose, the principal of and the interest on which when due will provide sufficient moneys to make such payments, such principal, Amortization Requirements or interest shall not be included in determining Principal and Interest Requirements; provided, however, that for purposes of compliance with the Authority's rate covenant (see "Rate Covenant" herein) said definition shall include any interest payable from any amount deposited to the credit of the Bond Service Account in the Sinking Fund from the proceeds of bonds to pay interest to accrue thereon. The Executive Director or his designee shall deliver to the Trustee a certificate describing the principal of,

I-5

Amortization Requirements for and interest on any bonds for which moneys, Investment Obligations or Time Deposits have been set aside or deposited as described in this paragraph, and stating that such principal, Amortization Requirements and interest should not be included in determining the Principal and Interest Requirements. Upon request of the Trustee, the Authority shall cause to be delivered to the Trustee a certificate of an independent verification agent as to the sufficiency of the maturing principal amounts of any Investment Obligations or Time Deposits, together with interest thereon, set aside or deposited to pay said principal, Amortization Requirements and interest.

For purposes of determining the maximum Principal and Interest Requirements for purposes of the Trust Agreement and the aggregate Principal and Interest Requirements in the covenant as to rates contained in the Trust Agreement, on the date of issuance of a Federally Subsidized Bonds and for so long as the Trustee shall receive the scheduled amount of the Federal Subsidy Payments on or before such interest is payable, all or a portion of the interest in respect of one or more series of Federally Subsidized Bonds shall be excluded from the calculation of the Principal and Interest Requirement if, and to the extent that the interest thereon is payable from a Federal Subsidy. Notwithstanding the foregoing, if the Trustee shall not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within thirty (30) of the date such Federal Subsidy Payments were scheduled to be received under the then current applicable law and regulations, then from and after the occurrence of such failure to receive such Federal Subsidy and until such Federal Subsidy Payments shall resume and all prior deficiencies are cured, the exclusion from the calculation of the Principal and Interest Requirement set forth in the preceding sentence shall no longer be effective for purposes of determining the maximum Principal and Interest Requirements for purposes of the Trust Agreement and the aggregate Principal and Interest Requirements in the covenant as to rates contained in the Trust Agreement.

"Reserve Account Insurance Policy" and "Reserve Account Letter of Credit" mean (1) the insurance policy, surety bond or other acceptable evidence of insurance, if any, or (2) the irrevocable, transferable letter of credit, if any, respectively, to be deposited in the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, for the purpose of making the payments required to be made from the Reserve Account under the Trust Agreement. The issuer providing such insurance or letter of credit shall be a municipal bond insurer or a banking association, bank or trust company or branch thereof whose policy or bond or letter of credit results in the rating of municipal obligations secured by such policy or bond or such letter of credit, respectively, to be rated, at the time of deposit into the Reserve Account, in one of the three highest grades by (i) either Standard & Poor's Corporation or its successor, or Moody's Investors Service, Inc. or its successor or (ii) if both such corporations shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, a nationally recognized rating agency.

"Revenues" means all money received by the Authority in connection with or as a result of its ownership or operation of the System, including the income derived by the Authority from the sale of electricity generated or distributed by the System, any proceeds of use and occupancy insurance on the System or any part thereof and income from the investment of moneys under the Trust Agreement, except income from the investment of moneys in the Construction Fund,

I-6

the Capital Improvement Fund and the Subordinate Obligations Fund to the extent such income has been derived from the investment of moneys in such Fund to be used to pay Subordinate Obligations incurred to pay the cost of any work or properties which have not been included by the Authority as part of the System as provided in "Disposition of Revenues" below, and the Reserve Maintenance Fund which shall be deemed to be a part of said Funds, respectively.

"Subordinate Obligations" means any obligations of the Authority incurred as provided in "Disposition of Revenues" below.

"System" means all the properties presently owned and operated by the Authority as a single integrated system, together with all works and properties which may be after the date of the Trust Agreement acquired or constructed by the Authority in connection with the production, distribution or sale of electric energy and the acquisition or construction of which shall be financed in whole or in part from the proceeds of bonds issued under the provisions of the Trust Agreement or from moneys deposited to the credit of the Construction Fund, the Capital Improvement Fund or from Subordinate Obligations to the extent such works and properties have been included by the Authority as part of the System as provided in "Disposition of Revenues" below.

"Time Deposits" means time deposits, certificates of deposit or similar arrangements with the Trustee, Government Development Bank for Puerto Rico or any bank or trust company which is a member of the Federal Deposit Insurance Corporation having a combined capital and surplus aggregating not less than $100,000,000.

**Security for the Power Revenue Bonds**

The Power Revenue Bonds are secured by a pledge from the Authority to the Trustee of the Revenues of the System and other moneys to the extent provided in the Trust Agreement as security for the payment of the Power Revenue Bonds and the interest and the redemption premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such Power Revenue Bonds. (Trust Agreement, Section 701).

The Power Revenue Bonds shall not be deemed to constitute a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions. (Trust Agreement, Section 701).

**Issuance of Bonds Other than Refunding Bonds**

The Trust Agreement provides for the issuance of Power Revenue Bonds for Improvements, including the repayment of advances therefor, to provide moneys for deposit to the Reserve Account in the Sinking Fund (the "Reserve Account") and for any proper corporate purpose of the Authority (other than for the purpose of refunding outstanding Power Revenue Bonds), subject to the conditions and limitations in the Trust Agreement. Power Revenue Bonds may be issued, if among other things:

(i)     the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months immediately preceding the date of the issuance of such bonds, adjusted to reflect the then current rate schedule, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds, and

(ii)    the estimated average annual Net Revenues for each of the five fiscal years immediately following the fiscal year in which the issuance of such bonds occurs, adjusted to reflect the then current rate schedule and any rate schedule the Authority has covenanted to put in effect during such five fiscal years, shall be not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued. (Trust Agreement, Sections 208 and 209).

**Issuance of Refunding Bonds**

The Trust Agreement provides for the issuance of Power Revenue Bonds to refund or redeem prior to or at their maturities all or any part of the outstanding bonds of any Series issued under the Trust Agreement, including the payment of any redemption premium, accrued interest and financing costs and for the purpose of providing moneys for deposit to the credit of the Reserve Account, subject to the conditions and limitations set forth in the Trust Agreement. Power Revenue Refunding Bonds may be issued under the Trust Agreement if, among other things, either (i) the earnings tests described above under the caption "Issuance of Bonds Other than Refunding Bonds" for the issuance of bonds under the Trust Agreement (except that effect is given to the retirement of the bonds to be refunded) are satisfied or (ii) the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued (after giving effect to the

I-8

retirement of the bonds to be refunded) shall be less than the maximum aggregate Principal and Interest Requirements on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued).  The proceeds of Power Revenue Refunding Bonds shall, to the extent practicable, be invested and reinvested by the Trustee, with the approval of the Executive Director, in Government Obligations, Prerefunded Municipals or in Time Deposits, secured in the manner set forth in the Trust Agreement, and the moneys so invested shall be available for use when required.  (Trust Agreement, Section 210).

**Funds and Accounts**

*General Fund*

A special fund is created pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority General Fund" (the "General Fund").  The Authority covenants that all Revenues, other than income from investments made under the provisions of the Trust Agreement, will be deposited as received in the General Fund.  The Authority covenants that moneys in the General Fund will be used first for the payment of Current Expenses of the System, and that, if the amount expended in any fiscal year for Current Expenses shall exceed the amount provided therefor in the Annual Budget, the Authority will report such excess and the reasons therefor to the Consulting Engineers and to the Trustee as soon as practicable but not later than the end of the sixth month following the month in which such excess shall have occurred.  (Trust Agreement, Sections 503 and 505).

*Revenue Fund*

A special fund is created pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority Power Revenue Fund" (the "Revenue Fund").  The Treasurer of the Authority is required to transfer, on or before the 15th day of each month, from the General Fund to the Revenue Fund an amount equal to the amount of all moneys held in the General Fund on the last day of the preceding month less an amount to be held as a reserve for Current Expenses as the Treasurer may determine, equal to not more than one-sixth ($1/6^{th}$) of the amount shown by the Annual Budget to be necessary for Current Expenses for the current fiscal year, such transfer to be made on the books of the Authority as of the close of the preceding month. (Trust Agreement, Section 506).

*Sinking Fund, Reserve Maintenance Fund, Self-insurance Fund, Capital Improvement Fund and Subordinate Obligations Fund*

A special fund is created pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund" (sometimes referred to in this Appendix I as the "Sinking Fund"). There are three separate accounts created in the Sinking Fund and designated the "Bond Service Account," "Reserve Account" and "Redemption Account." Four additional special funds are created pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority Reserve Maintenance Fund" (sometimes referred to in this Appendix I as the "Reserve Maintenance Fund"), the "Puerto Rico Electric Power Authority Self-insurance Fund" (sometimes referred to in this Appendix I as the "Self-insurance Fund"), the "Puerto Rico Electric Power Authority Capital Improvement Fund" (sometimes referred to in this Appendix I as the "Capital Improvement Fund") and the "Puerto Rico Electric Power Authority Subordinate Obligations Fund" (sometimes referred to in this Appendix I as the "Subordinate Obligations Fund"). (Trust Agreement, Section 507).

**Disposition of Revenues**

On or before the 25th day of each month, the Treasurer shall withdraw from the Revenue Fund, all the moneys then in such Fund (less any amount equal to the amount of Federal Subsidy Payments that have not been received as of the 25th of the month preceding the Interest Payment Date to which such Federal Subsidy Payments relate, which amount will be held in the Revenue Fund and (x) if the Federal Subsidy Payment has not been received by the Authority by such Interest Payment Date, transferred to the Bond Service Account on the Interest Payment Date and applied to the payment of interest on Bonds or (y) if the Federal Subsidy Payment has been received by the Authority on or before such Interest Payment Date, remain on deposit in the Revenue Fund for application in accordance with the provisions below in the following calendar month) and deposit the moneys so withdrawn to the credit of the following Accounts and Funds in the following order:

1. to the credit of the Bond Service Account such amount thereof (or the entire sum so withdrawn if less than the required amount) as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of (i) the Interest Accrual on all the outstanding Power Revenue Bonds to and including the first day of the next calendar month, and (ii) the Principal Accrual on the outstanding serial bonds of each Series of outstanding Power Revenue Bonds to and including the first day of the next calendar month;

2. to the credit of the Redemption Account such amount, if any, of any balance remaining after making the deposit as described in Paragraph 1 above, (or the entire balance if less that the required amount) as may be required to make the amount then to the credit of the Redemption Account equal to the Amortization Accrual for the term bonds of each Series of Power Revenue Bonds then outstanding to and including the first day of the next calendar month;

3.    to the credit of the Reserve Account such amount, if any, of the balance remaining after making the deposits described in paragraphs 1 and 2 above (or the entire balance if less than the required amount) as may be required to make the amount then to the credit of the Reserve Account, including the amount of any Reserve Account Insurance Policy or any Reserve Account Letter of Credit therein, equal to the interest payable on all outstanding Power Revenue Bonds within the next ensuing 12 months; provided, however, that the monthly deposit in respect of any Series of Power Revenue Bonds, other than refunding bonds, issued under the Trust Agreement need not exceed 1/60 of the amount of the increase in the interest payable within the next ensuing 12 months resulting from the issuance of bonds of such Series, and provided, further, that if the amount so deposited in any month to the Reserve Account shall be less than the required amount for such month, the requirement therefor shall nevertheless be cumulative and the amount of any deficiency in any month shall be added to the amount otherwise required to be deposited in each month thereafter until such time as the deficiency is made up and provided, however, that in the case of Federally Subsidized Bonds, the amount of interest deemed to be payable on such bonds from the date of issuance of such Federally Subsidized Bonds and for so long as the Trustee shall receive the scheduled amount of the Federal Subsidy Payments on or before such interest shall be payable shall exclude the amount of interest to be paid from the Federal Subsidy and provided further, however, that if the Trustee shall not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within thirty (30) of the date such Federal Subsidy Payments were scheduled to be received under the then current applicable law and regulations,, then for purposes of the calculation of interest to be credited to the Reserve Account, the amount shall be equal to the interest payable on the bonds of each Series issued hereunder within the next twelve (12) months;

4.    to the credit of the Reserve Maintenance Fund, such amount, if any, of any balance remaining after making the deposits described in paragraphs 1, 2 and 3 above (or the entire balance if less than the required amount) as may be recommended by the Consulting Engineers; provided that the monthly requirements for deposit to the Reserve Maintenance fund shall be cumulative, and provided further that in the event that the Authority shall covenant in respect of any Subordinate Obligation to limit the monthly deposit to the Reserve Maintenance Fund as described in Subordinate Obligations Fund below, the monthly deposit required by this paragraph shall be equal to the least of

(i)    the amount described above in this paragraph,

(ii)    $400,000, and

(iii)    an amount that when added to the amount then on deposit in the Reserve Maintenance Fund shall make the total amount on deposit equal to $10,000,000;

5.    to the credit of one or more special accounts in the Subordinate Obligations Fund, such amount, if any, of any balance remaining after making the deposits described under paragraphs 1, 2, 3 and 4 above (or the entire balance if less than

I-11

the required amount) that together with funds then on deposit in the Subordinate Obligations Fund will make the total amount then on deposit equal to any amounts required to be paid or accrued with respect to any Subordinate Obligations prior to the Deposit Day of the next succeeding month from or to the Subordinate Obligations Fund;

6.     if the Authority shall have covenanted pursuant to the Trust Agreement with respect to Subordinate Obligations to limit its deposit to the Reserve Maintenance Fund in accordance with the provisions of the second proviso of paragraph 4 above and in fact the deposit to said Fund pursuant to paragraph 4 was limited to the amount described in clause (ii) or (iii) of such paragraph, the Reserve Maintenance Fund, such amount of any balance remaining after making the deposits described under paragraphs 1, 2, 3, 4 or 5 above (or the entire balance if less than the required amount) as may be required to make the total amount deposited in the Reserve Maintenance Fund in such month equal to the amount described in clause (i) of clause (4) above;

7.     to the credit of the Self-insurance Fund, any balance remaining after making the deposits described in paragraphs 1, 2, 3, 4, 5 and 6 above as the Consulting Engineers shall from time to time recommend; and

8.     to the credit of the Capital Improvement Fund such amount of any balance remaining after making deposits described under paragraphs 1, 2, 3, 4, 5, 6 and 7 above as the Consulting Engineers shall from time to time recommend; provided that the monthly requirements for deposit to the Capital Improvement Fund shall be cumulative.

Any balance remaining after making the deposits under paragraphs 1 through 8 above may be used for any lawful purpose of the Authority. (Trust Agreement, Section 507).

If amounts applied to the payment of interest and principal on bonds are paid by a credit or liquidity facility issuer, the amounts deposited in the Bond Service Account allocable to said payment (other than a payment of the purchase price of bonds pursuant to a "put") may be paid to said credit or liquidity facility issuer. (Trust Agreement, Section 509).

Moneys in the Reserve Account shall be used by the Trustee first for the purpose of paying the interest on the Power Revenue Bonds and maturing principal of serial bonds whenever and to the extent moneys in the Bond Service Account are insufficient for such purposes and thereafter for the purpose of making the deposits to the Redemption Account described in paragraph 2 above whenever the withdrawals from the Renewal and Replacement Fund or the Revenue Fund, as the case may be, are insufficient for such purpose. Excess moneys in the Reserve Account shall be transferred to the Bond Service Account or may be used to reduce any Reserve Account Insurance Policy or Reserve Account Letter of Credit.

The Authority may deposit a Reserve Account Insurance Policy or Reserve Account Letter of Credit into the Reserve Account, in lieu, or in partial satisfaction, of any required deposit into the Reserve Account. Any reimbursement obligation in respect of a drawing under a Reserve Account Insurance Policy or Reserve Account Letter of Credit may be secured by a lien on Revenues not inconsistent with the provisions of the Trust Agreement and shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required

thereunder), on any date on which moneys are required to be paid out of the Reserve Account pursuant to the Trust Agreement.   If a disbursement is made under any Reserve Account Insurance Policy or Letter or Credit, the Authority shall be obligated either to reinstate the amount of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement or to deposit into the Reserve Account moneys, in accordance with the provisions of the Trust Agreement, in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, or a combination of such alternatives.  The Authority may at any time substitute (i) all or a portion of the moneys held to the credit of the Reserve Account with a Reserve Account Insurance Policy or Reserve Account Letter of Credit, (ii) all or a portion of any Reserve Account Insurance Policy on deposit in the Reserve Account with moneys or a Reserve Account Letter of Credit, or a combination of such alternatives, or (iii) all or a portion of any Reserve Account Letter of Credit on deposit in the Reserve Account with moneys or a Reserve Account Insurance Policy, or a combination of such alternatives.  Any moneys on deposit in the Reserve Account in substitution of which a Reserve Account Insurance Policy or Reserve Account Letter of Credit is deposited shall, to the extent not required to fund any deficiencies in the amount then required to be on deposit in the Reserve Account, be released and immediately paid over to the Authority to be used by the Authority for any proper corporate purpose.  Prior to the expiration date of any Reserve Account Insurance Policy or Reserve Account Letter of Credit then on deposit to the credit of the Reserve Account the Authority shall (x) cause the term of such Reserve Account Insurance Policy or Reserve Account Letter of Credit to be extended, (y) replace any such Reserve Account Insurance Policy with moneys (which may include, without limitation, moneys available under the Reserve Account Insurance Policy or from any other source available for such purpose) or a Reserve Account Letter of Credit, or a combination of such alternatives, or (z) replace any such Reserve Account Letter of Credit with moneys (which may include, without limitation, moneys available under the Reserve Account Letter of Credit or from any other source available for such purpose) or a Reserve Account Insurance Policy, or a combination of such alternatives; provided that in the event that the Authority has not extended or replaced the expiring Reserve Account Insurance Policy or Reserve Account Letter of Credit by the fifth business day prior to its date of expiration, the expiring Reserve Account Insurance Policy or Reserve Account Letter of Credit shall, on such date, be drawn upon and the moneys so made available shall thereupon be deposited in the Reserve Account. (Trust Agreement, Section 510).

Moneys in the Reserve Maintenance Fund shall be used only for the purpose of paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, including major items of equipment.  The Reserve Maintenance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Bond Service Account, Redemption Account and the Reserve Account are insufficient for such purpose. (Trust Agreement, Section 512).

Moneys in the Self-insurance Fund shall he used only for the purpose of paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement.  See "Insurance" below.  The Self-insurance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the

Bond Service Account, Redemption Account and the Reserve Account and in the Reserve Maintenance Fund are insufficient for such purpose. (Trust Agreement, Section 512A).

Moneys in the Capital Improvement Fund shall be used only for the purpose of paying the cost of anticipated extensions and Improvements which cost has not otherwise been provided for from the proceeds of Power Revenue Bonds issued under the provisions of the Trust Agreement. The Capital Improvement Fund also serves as an additional reserve for the payment of principal of and the interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Bond Service Account, Redemption Account and the Reserve Account, in the Reserve Maintenance Fund and in the Self-insurance Fund are insufficient for such purpose. (Trust Agreement, Section 512B).

*Construction Fund*

A special fund is created and designated the "Puerto Rico Electric Power Authority Power System Construction Fund" (the "Construction Fund"). The proceeds of any Power Revenue Bonds issued for the purpose of paying the cost of Improvements, together with the moneys received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the Reserve Account, (iii) deposited in the Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the Construction Fund and by the Authority in trust. (Trust Agreement, Sections 208 and 401).

Payments from the Construction Fund are made by the Executive Director or by any officer or employee of the Authority designated by him for such purpose. (Trust Agreement, Section 402).

**Rate Covenant**

The Authority covenants that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that the Revenues will be at all times sufficient to pay the Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any amount deposited in the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year.

The Authority further covenants that if at any time the Revenues shall not be sufficient to satisfy the foregoing covenant as to rates, it will revise the rates and charges for the services and facilities furnished by the System and, if necessary, it will revise its regulations in relation to the collection of bills for such services and facilities, so that such deficiency will be made up before the end of the next ensuing fiscal year. Should any deficiency not be made up in such next ensuing fiscal year, the requirement therefor, shall be cumulative and the Authority shall continue to revise such rates until such deficiency shall have been completely made up. (Trust Agreement, Section 502).

**Build America Bonds**

With respect to Build America Bonds, the Authority covenants to file, or cause to be filed, a Form 8038-CP with the Internal Revenue Service not less than 45 days and not more than 90 days prior to the date interest on the Build America Bonds shall be payable, as provided in Notice 2010-26 issued by the Internal Revenue Service, so long as filing such form is a condition to receipt of the Federal Subsidy prior to the date such interest shall be payable. In the event that the Internal Revenue Service shall amend or revise the guidance provided in Notice 2010-26, the Authority agrees that it shall take all such actions as are necessary to ensure receipt of the Federal Subsidy. The only effect of any failure to comply with Section 713 of the Trust Agreement shall be that the Federal Subsidy to which such failure relates shall no longer be excluded from the calculation of Principal and interest Requirements. (Trust Agreement, Section 713).

**Investment of Funds**

The Trust Agreement provides for the following types of investments:

      (a)      Government Obligations;

      (b)      Investment Obligations; and

      (c)      Time Deposits.

Moneys in the Bond Service Account, the Redemption Account and the Revenue Fund shall be invested and reinvested by the Trustee or by the Authority, as the case may be, in Government Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when such moneys will be required for the purposes intended, or in Time Deposits; provided, that each such Time Deposit shall permit the moneys so placed to be available for use when required for the purposes intended.

Any moneys in the Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Account shall be invested and reinvested by the Trustee or the Authority, as the case may be, in Investment Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, in the case of the Construction Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Maintenance Fund, not later than the respective dates when the moneys invested will be required for the purposes intended, and in the case of the Reserve Account, as to approximately 50% of such moneys, not later than five years after the date of such investment, and as to the balance of such moneys, as directed by order of the Executive Director or other authorized officer of the Authority pursuant to the Trust Agreement. In lieu of such investments, moneys in the Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Account may be invested in Time Deposits which shall permit the moneys so placed to be available for use at the times provided for investments in Investment Obligations. (Trust Agreement, Section 602).

Any moneys in the Self-insurance Fund may also be invested by the Authority in any investments authorized by law for the Retirement System of the Employees of the Government for Puerto Rico and its Instrumentalities, but the Authority shall invest not less than the smaller of $25,000,000 and the entire balance in such Fund in Investment Obligations with an average weighted maturity of not more than three years.

Prior to investing any moneys in the Self-insurance Fund in other than Investment Obligations, the Authority shall obtain an Independent Consultant's report pursuant to the Trust Agreement recommending what portion of moneys held in the Self-insurance Fund the Authority shall maintain invested in Investment Obligations and shall, after duly considering the report, formally adopt, subject to the consent of Government Development Bank for Puerto Rico, and maintain an investment policy first determining the minimum portion of the moneys held for the credit of the Self-insurance Fund to remain invested in Investment Obligations and then setting forth prudent investment principles, considerations and goals, including liquidity, diversification of assets, safety and rate or rates of return, that will govern the investment strategies and goals for the balance of the moneys held for credit of the Self-insurance Fund and shall advise the Trustee in writing of those investments other than Investment Obligations that are authorized by said investment policy. (Trust Agreement, Section 602).

## Accounting

The Authority covenants that its accounts will be kept according to standard practices for public utility systems similar to the properties and business of the Authority and applicable in such circumstances, of all items of cost and expenditures relating to the System and each integral unit of the System, the Revenues collected and the application of the Revenues. The Authority further covenants that in the first month of each fiscal year it will cause an audit for the preceding fiscal year to be made of its books and accounts pertaining to the System by an independent firm of certified public accountants of suitable experience and responsibilities and widely known in the United States and approved by the Trustee. (Trust Agreement, Section 710).

## Release of Property

The Authority covenants that so long as any Power Revenue Bonds shall be outstanding under the Trust Agreement and except as permitted under the Trust Agreement it will not sell, lease or otherwise dispose of or encumber the System or any part thereof and will not create or permit to be created any charge or lien on the Revenues ranking equally with or prior to the charge or lien on the Revenues of the Power Revenue Bonds issued under and secured by the Trust Agreement. The Authority may, however, from time to time, sell machinery, fixtures, apparatus, tools, instruments or other movable property or materials if the Authority shall determine that such articles are no longer needed or useful in connection with the construction or operation and maintenance of the System. Any such moneys received may be applied to replace any such properties sold or disposed of or shall be deposited in the Redemption Account or the Construction Fund at the option of the Authority; provided that in connection with the issuance of bonds the Authority may secure its obligations to the provider of a credit or liquidity facility securing such bonds on a parity with the bonds. Other property forming part of the Systems, not needed or serving no useful purpose in connection with the System, may be sold, leased or

transferred provided the proceeds of which shall be deposited in the Redemption Account or the Construction Fund and the rentals be deposited in the Revenue Fund.

Notwithstanding the immediately preceding paragraph, the Authority may abandon, sell, lease or transfer any property forming a part of the System, if, among other things, the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months next preceding the date of such abandonment, sale, lease or transfer, adjusted to give effect to such abandonment, sale, lease or transfer and any replacement and to reflect the rate schedule then in effect, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all Power Revenue Bonds outstanding and if the Reserve Account is fully funded. Any transferee of said property may be considered in lieu of or in addition to the Authority for purposes of such coverage if among other things the transferee agrees to assume the Authority's obligations under the Trust Agreement. Said coverage test need not be met if the transferee is a public corporation or other governmental entity provided the coverage is not reduced due to such transfer. The proceeds of such sale shall be deposited in the Redemption Account or in the Construction Fund, at the option of the Authority, or shall be applied to the replacement of the property so sold. The rentals under any such lease shall be deposited in the Revenue Fund.

In addition, the Authority may lease portions of the System or grant licenses, easements and other rights or make contracts or other arrangements for operation or use of the System, if certain reports and certificates of the Consulting Engineers are provided that confirm, among other things, that operational covenants will be binding on the lessee or other contracting entity and that the lease, contract, license, easement or other arrangement provides for rent or other payments that are projected to be sufficient with other projected Net Revenues of the System to make all payments of the Principal and Interest Requirements for all Power Revenue Bonds. Rents received under any such lease, contract, license, easement or other arrangements shall be deposited to the credit of the Revenue Fund. (Trust Agreement, Section 712).

**Insurance**

The Authority covenants that it will at all times carry insurance, in a responsible insurance company or companies authorized and qualified under the laws of Puerto Rico to assume the risk thereof, covering such properties belonging to the System as are customarily insured, and against loss or damage from such causes as are customarily insured against, by companies engaged in similar business.

The Authority covenants that, immediately after any loss or damage, it will cause its engineers to prepare plans and specifications for repairing, replacing or reconstructing the damaged or destroyed property, and will forthwith proceed with the repair, replacement or reconstruction of the damaged or destroyed property unless it shall determine that the repair, replacement or reconstruction of such property is not essential to the efficient operation of the System. Proceeds of all insurance shall be deposited in the Redemption Account or, at the option of the Authority, the Construction Fund unless the Authority shall be prevented from doing so by conditions beyond its control or unless the holders of 51% in aggregate principal amount of the Power Revenue Bonds then outstanding under the Trust Agreement shall otherwise direct. (Trust Agreement, Section 707).

**Consulting Engineers and Independent Consultant**

The Authority covenants that so long as any of the Power Revenue Bonds are outstanding under the Trust Agreement it will employ as Consulting Engineers an independent engineer or engineering firm or corporation having a wide and favorable repute in the United States for skill and experience in the construction and operation of electric systems. It shall be the duty of the Consulting Engineers to prepare and file an annual report with the Authority and the Trustee on or before the 1st day of each November setting forth their recommendations as to any necessary or advisable revisions of rates and charges and such other advices and recommendations as they may deem desirable. It shall be the duty of the Consulting Engineers to include in such report their recommendations as to the amount to be deposited in the Reserve Maintenance Fund, the Capital Improvement Fund and the Self-insurance Fund. (Trust Agreement, Section 706).

The Authority covenants that so long as any Power Revenue Bonds are outstanding under the Trust Agreement it will employ as Independent Consultant one or more independent firms having a wide and favorable repute in the United States for expertise in risk management and other insurance matters related to the construction and operation of electric systems. It shall be the duty of the Independent Consultant to prepare and file with the Authority and the Trustee at least biennially on or before the first day of November a report setting forth its recommendations, based on a review of the insurance then maintained by the Authority in accordance with the Trust Agreement and the status of the Self-insurance Fund, of any changes in coverage, including its recommendations of policy limits and deductibles and self-insurance, and investment strategies for the Self-insurance Fund. (Trust Agreement, Sections 706 and 707).

**Modifications**

The Authority and the Trustee may, without the consent of the holders of the Power Revenue Bonds, enter into such supplemental agreements as shall not be inconsistent with the Trust Agreement, (i) to cure any ambiguity, to correct or supplement any provision in the Trust Agreement which may be inconsistent with any other provision therein, to make any other provisions which shall not be inconsistent with the provisions of the Trust Agreement, provided such action shall not adversely affect the interest of the bondholders, or (ii) to grant to or confer upon the Trustee for the benefit of the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders or the Trustee, or (iii) to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the Trust Agreement other conditions, limitations and restrictions thereafter to be observed, or (iv) to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power reserved to or conferred upon the Authority by the Trust Agreement.

At least thirty (30) days prior to the execution of any supplemental agreement for any of the purposes described in the immediately preceding paragraph, the Trustee shall cause a notice of the proposed execution of such supplemental agreement to be mailed to all registered owners of Power Revenue Bonds and to all bondholders of record. Such notice shall briefly set forth the nature of the proposed supplemental agreement and shall state that copies thereof are on file at the principal office of the Trustee for inspection by all bondholders. A failure on the part of the

Trustee to mail the notice required by the Trust Agreement shall not affect the validity of such supplemental agreement. (Trust Agreement, Section 1101).

The holders of not less than 60% in aggregate principal amount of the Power Revenue Bonds at the time outstanding shall have the right, from time to time (anything contained in the Trust Agreement to the contrary notwithstanding), to consent to and approve the execution by the Authority and the Trustee of such agreement or agreements supplemental to the Trust Agreement as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to, repealing or rescinding, in any particular, any of the terms or provisions contained in the Trust Agreement or in any supplemental agreement; provided, however, that nothing contained in the Trust Agreement shall permit, or be construed as permitting, (a) an extension of the maturity of principal or interest on any Power Revenue Bond, or (b) a reduction in the principal amount of any Power Revenue Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of the Revenues other than any lien and pledge created by the Trust Agreement, or (d) a preference or priority of any Power Revenue Bond or Bonds over any other Power Revenue Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Power Revenue Bonds required for consent to such supplemental agreement. (Trust Agreement, Section 1102).

**Events of Default and Remedies of Bondholders**

Among the events described in the Trust Agreement as "events of default" are the following:

(a)     payment of the principal of and redemption premium, if any, on any of the Power Revenue Bonds shall not be made when the same shall become due and payable, or

(b)     payment of any installment of interest on any of the Power Revenue Bonds shall not be made when the same shall become due and payable, or

(c)     the Authority shall for any reason be rendered incapable of fulfilling its obligations under the Trust Agreement, or

(d)     the Authority shall default in the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the Power Revenue Bonds or in the Trust Agreement on the part of the Authority to be performed, including meeting any Amortization Requirement, and such default shall continue for thirty (30) days after written notice specify such default and requiring same to be remedied shall have been given to the Authority by the Trustees which may give such notice in its discretion and shall give such notice at the written request of 10% in aggregate principal amount of the bonds then outstanding, or

(e)     if notice has been received by the Trustee and the Authority from the bank or lending institution providing a credit or liquidity facility or other entity insuring, guaranteeing or providing for payments of principal or interest in respect of any Power Revenue Bonds that an event of default has occurred under the agreement underlying said facility or a failure of said bank or other financial or lending institution or other entity to

make said facility available or to reinstate the interest component of said facility in accordance with its terms, to the extent said notice or failure is established as an event of default under the terms of the resolution authorizing the issuance of Power Revenue Bonds secured by the credit or liquidity facility). (Trust Agreement, Section 802)

In the event of the happening and continuance of any event of default specified in the Trust Agreement the Trustee may, and upon the written request of the holders of not less than 20% in aggregate principal amount of all Power Revenue Bonds then outstanding shall, declare the principal of the Power Revenue Bonds then outstanding to be due and payable, and, providing it shall be indemnified to its satisfaction, the Trustee may, and upon the written request of the holders of not less than 10% in aggregate principal amount of the Power Revenue Bonds then outstanding shall, proceed to protect and enforce its rights and the rights of the bondholders under the Trust Agreement by such suits, actions or special proceedings in equity or at law, or by such proceedings in the office of any board or officer having jurisdiction, either for the appointment of a receiver of the System as authorized by the Act or for the specific performance of any covenant or agreement or for the enforcement of any proper legal or equitable remedy, as the Trustee shall deem most effectual to protect and enforce the rights aforesaid; provided, however, that the Trustee shall not be required to proceed for the appointment of a receiver unless it shall have received the written request of the holders of not less than 25% in aggregate principal amount of such bonds then outstanding. (Trust Agreement, Sections 803, 804 and 902).

It is the intent of the Trust Agreement that all proceedings shall be instituted and maintained for the benefit of all holders of outstanding Power Revenue Bonds. (Trust Agreement, Section 809).

**Defeasance**

The Trust Agreement provides that if, when the Power Revenue Bonds shall have become due and payable or shall have been duly called for redemption or irrevocable instructions to call said bonds for redemption or payment shall have been given by the Authority to the Trustee, the whole amount of the principal and the interest and the premium, if any, so due and payable upon all of the Power Revenue Bonds then outstanding shall be paid or sufficient moneys, or Government Obligations or Prerefunded Municipals or Time Deposits secured in the manner set forth in the Trust Agreement, the principal of and the interest on which when due will provide sufficient moneys, shall be held by the Trustee or the Paying Agents for such purpose under the provisions of the Trust Agreement, and provision shall be made for paying all other sums payable by the Authority, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, determine and become void, and the Trustee in such case, on demand of the Authority, shall release the Trust Agreement. (Trust Agreement, Section 1201).

**Bonds Not Deemed Outstanding**

The Power Revenue Bonds and portions of Power Revenue Bonds which have been duly called for redemption pursuant to the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or payment at or prior to maturity have been given to the Trustee in form satisfactory to it, and for the payment of principal or the redemption price and

I-20

the accrued interest of which sufficient moneys, or Government Obligations or Prerefunded Municipals or Time Deposits secured in the manner set forth in the Trust Agreement, shall be held in separate accounts by the Trustee or by the Paying Agents in trust for the holders of the bonds or portions thereof to be paid or redeemed, all as provided in the Trust Agreement, shall not thereafter be deemed to be outstanding under the provisions of the Trust Agreement. (Trust Agreement, Section 307).

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX II**



FINANCIAL STATEMENTS, REQUIRED
SUPPLEMENTARY INFORMATION AND
SUPPLEMENTAL SCHEDULES

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)
Years Ended June 30, 2011 and 2010
With Report of Independent Auditors

**ΞΙΙ ERNST & YOUNG**

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Financial Statements, Required Supplementary Information
and Supplemental Schedules

Years Ended June 30, 2011 and 2010

# Contents

Financial Section

Report of Independent Auditors ............................................................................................... 1
Management's Discussion and Analysis ................................................................................... 3

Audited Financial Statements

Balance Sheets ......................................................................................................................... 17
Statements of Revenues, Expenses and Changes in Net Assets ............................................. 19
Statements of Cash Flows ....................................................................................................... 20
Notes to Audited Financial Statements ................................................................................... 22

Required Supplementary Information

Schedule I – Supplementary Schedule of Funding Progress .................................................. 87

Supplemental Schedules

Notes to Schedules II-VII – Information Required by the 1974 Agreement ............................ 88
Schedule II – Supplemental Schedule of Source and Disposition of
  Net Revenues under the Provisions of the 1974 Agreement ................................................. 89
Schedule III – Supplemental Schedule of Sources and Disposition of
  Net Revenues under the Provisions of the 1974 Agreement ................................................. 90
Schedule IV – Supplemental Schedule of Funds under the Provisions
  of the 1974 Agreement .......................................................................................................... 91
Schedule V – Supplemental Schedule of Changes in Cash and
  Investments by Funds – June 30, 2011 ................................................................................. 92
Schedule V – Supplemental Schedule of Changes in Cash and
  Investments by Funds – June 30, 2010 ................................................................................. 94
Schedule VI – Supplemental Schedule of Changes in Long-Term
  Debt and Current Portion of Long-Term Debt ...................................................................... 96

# Financial Section

1112-1313725

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EY ERNST & YOUNG**

Ernst & Young LLP
1000 Scotiabank Plaza, 10th Floor
273 Ponce de León Avenue
San Juan, Puerto Rico 00917

Tel: +1 787 759 8212
Fax: +1 787 753 0808
www.ey.com

## Report of Independent Auditors

To the Governing Board of the
Puerto Rico Electric Power Authority

We have audited the accompanying financial statements of the Puerto Rico Electric Power Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of and for the years ended June 30, 2011 and 2010, as listed in the table of contents. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of PREPA Networks, Inc. (PREPA.Net) (a blended component unit), which financial statements reflect total assets constituting approximately .3% and .2% of total assets as of June 30, 2011 and 2010, and revenues constituting .2% of total revenues for the years then ended. Those financial statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for PREPA Holdings and PREPA.Net, is based solely on the reports of the other auditors.

We conducted our audits in accordance with auditing standards generally accepted in the United States and the standards applicable to financial audits contained in *Government Auditing Standards,* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Authority's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Authority's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits, and the reports of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of the Authority as of June 30, 2011 and 2010, and the changes in its financial position and its cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

1

**ERNST & YOUNG**

As more fully described in Note 19 to the financial statements, the July 1, 2009 net assets balances and contributed capital for the year ended June 30, 2010, have been restated to correct an error in previously issued financial statements in the accounting for contributed capital. Our audit report on the June 30, 2010 financial statements, dated January 31, 2011, should not be relied upon due to this misstatement. The previously issued report is replaced by this opinion.

In accordance with *Government Auditing Standards*, we have also issued our report, dated December 23, 2011, on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audits.

Management's Discussion and Analysis on pages 3 through 16 and the required supplementary information disclosed on page 87 is not a required part of the basic financial statements but is supplementary information required by the Governmental Accounting Standards Board (GASB). We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audits were conducted for the purpose of forming an opinion on the financial statements of the Puerto Rico Electric Power Authority. The supplemental information included in Schedules II - VI is presented for purposes of additional analysis and is not a required part of the basic financial statements. The supplemental information included in Schedules II - VI has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole, and is prepared in accordance with the terms of the 1974 Agreement (described herein).

*Ernst & Young LLP*

December 23, 2011

Stamp No. 2614231
affixed to
original of
this report.

2

1112-1313725

A member firm of Ernst & Young Global Limited

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

Year Ended June 30, 2011

This section of the financial report of the Puerto Rico Electric Power Authority (the Authority) presents the analysis of the Authority's financial performance during the fiscal years ended June 30, 2011, 2010 and 2009. As management of the Authority, we offer readers of the financial statements this narrative overview and analysis of the financial activities. We recommend readers to consider the information herein presented in conjunction with the financial statements that follow this section.

**Financial Highlights**

- Operating income for fiscal year ended June 30, 2011 was $326.9 million representing a decrease of 6.1 percent for the fiscal year ended June 30, 2010. For the fiscal years ended June 30, 2010, it was $348.1 million representing a decrease of 1.2 percent for the fiscal year ended June 30, 2009.

- Operating expenses increased by $272.7 million or 7.1 percent for the fiscal year ended June 30, 2011; increased by $172.9 million or 4.7 percent and decreased by $530.7 million or 12.7 percent for the fiscal years ended June 30, 2010 and 2009, respectively, when compared to previous fiscal years.

- The Authority's Net Utility Plant for the fiscal year ended June 30, 2011 increased by $79.8 million or 1.2 percent. For the fiscal year ended 2010 the increase was $129.2 million or 2.0 percent.

- Total assets and deferred outflows increased by $644.8 million, increased by $208.6 million and decreased by $346.1 million, or 6.9 percent increase, 2.3 percent increase and 3.7 percent decrease, respectively, for the fiscal years ended June 30, 2011, 2010 and 2009.

- For the fiscal year ended June 30, 2011, as compared to the fiscal year ended June 30, 2010 and June 30, 2009, accounts receivable increased by 17.8 percent, from $1,085.1 million to $1,277.9 million and decreased by 3.7 percent from $1,126.9 million to $1,085.1 million, respectively. The increase in 2011 was mainly due to a delay in collections from the government sector.

- Accounts receivable from the governmental sector increased 34.3 percent from $345.5 million on June 30, 2010 to $464.1 million on June 30, 2011, and decreased 26.7 percent from $471.4 million on June 30, 2009 to $345.5 million on June 30, 2010.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Highlights (continued)**

- The Authority's net assets decreased by $272.4 million (264.7 percent), $129.7 million (55.8 percent) and $139.0 million (37.4 percent) as a result of operations during fiscal years ended June 30, 2011, 2010 and 2009, respectively. As of June 30, 2011, the Authority is in a net deficit position.

- Ratios of fuel and purchased power adjustment revenues to total operating revenues were 75 percent for 2010-2011, 72.7 percent for 2009-2010 and 72.8 percent for 2008-2009.

- Ratios of fuel oil and purchased power expense to total operating expense (excluding depreciation expense) were 78.8 percent for 2010-2011, 77.9 percent for 2009-2010 and 77.7 percent for 2008-2009.

- The increase in the fuel adjustment revenues and fuel expense for fiscal year 2011 as compared to 2010 of $322.9 million and $284.5 million, respectively, was mainly due to an increase in the average fuel oil price per barrel of $19.36 (25.3%). The increase in the fuel adjustment revenues and fuel expense for fiscal year 2010 as compared to 2009 of 94.4 million and 87.1 million, respectively, was mainly due to an increase in the average fuel oil price per barrel of $0.32 (0.4%). In addition, the decrease in the fuel adjustment revenues and fuel expense for fiscal year 2009 as compared to 2008 of $311.6 million and $383.2 million, respectively, was mainly due to a decrease in the average fuel oil price per barrel of $7.95 (9.4%) and a decrease of 2.2 million (7.9%) in the consumption of fuel oil barrels for 2008-2009.

- The decrease in the purchased power adjustment revenue and expense of $37.3 million and $32.8 million, respectively, was due to a decrease of 179,662MWh (or 2.6 percent) purchase power for fiscal 2011 when compared to fiscal 2010. The increase in the purchased power adjustment revenue and expense of $24.9 million and $21.9 million, respectively, was due to an increase of 243,159 MWh (or 3.6 percent) purchase power for fiscal 2010 when compared to fiscal 2009. The increase in the purchased power adjustment revenue and expense of $6.9 million and $10.8 million, respectively, was mainly due to an increase of 1.0 cent (9.9 percent) per kWh in the average price of purchased power for fiscal 2009 when compared to 2008.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Plans to Address the Authority's Challenges**

The Authority faced a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the volatility in oil prices. Its principal challenges, some of which are interrelated, are: (i) addressing the decline in electric energy sales; (ii) addressing the volatility of oil costs; (iii) addressing high customer electric power rates; (iv) reducing government accounts receivables; and (v) improving its liquidity.

The Authority's management focused on addressing these challenges by implementing a financial stabilization plan and other strategic initiatives. The principal component of the financial stabilization plan was the reduction of operating costs in line with the reduction in electric energy sales in order to maintain adequate operating margins.

The principal cost reduction measures included in the plan are (i) reducing the number of employees through a combination of attrition from voluntary retirement and the elimination of temporary and vacant positions, (ii) reducing retiree health care benefits, and (iii) reducing overtime and miscellaneous expenses. The Authority has already implemented measures that are expected to result in recurring annual savings consisting of (i) a reduction of employees from January 1, 2010 through June 30, 2011, (ii) changes to retiree health care benefits and (iii) other cost reduction initiatives, such as the reduction of overtime and miscellaneous expenses, that are expected to result in annual savings of approximately $30 million.

**Via Verde Pipeline**

The Via Verde Pipeline is a planned natural gas network that will supply energy from North to South Puerto Rico. Proposed by the Island government more than 20 years ago, it found new backing under current Puerto Rican Governor Luis Fortuño. Via Verde is expected to save Puerto Rican consumers more than $1 billion in energy costs annually, and will cut carbon emissions by an average of 64 percent. This pipeline is part of PREPA's commitment to green energy on the Island and to weaning the Island off of much more expensive imported crude oil.

The pipeline itself will cost $74 million to build, part of an overall project cost of $450 million that includes the conversion of several oil-fired power plants to natural gas. Via Verde's capacity will help the Island secure long-term energy savings through the purchase of a 30-year futures contract for natural gas. Further, natural gas is valued as a "clean-burning" fuel, accounting for just 10 percent of the world's carbon emissions.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Customer Care and Billing Project**

On February 2010 the contracts for the implementation and Quality Control respectively, of this Oracle based System were signed with PWC Consulting and AAC Consulting. The purpose of this implementation is to replace the Customer Service System installed in the early 1980's. This new system will be capable of providing detailed information on PREPA's wide customer base, as well as serving as the energy sales Accounts Receivable Subsidiary Ledger. It will also improve the quality of this important information and enhance the financial analysis currently performed using a variety of tools. The system is expected to be commissioned by December 2012. It is part of our commitment to use technology to improve customer services quality, financial performance and operational efficiency.

**Overview of Financial Report**

Management's Discussion and Analysis (MD&A) of operating results serves as an introduction to the basic financial statements and supplementary information. Summary financial statement data, key financial and operational indicators used in the Authority's strategic plan, projected capital improvement program, operational budget and other management tools were used for this analysis.

**Required Financial Statements**

The financial statements report the financial position and operations of Puerto Rico Electric Power Authority and its blended component units, Puerto Rico Irrigation Systems and PREPA Holdings LLC as of and for the year ended June 30, 2011, which include a Balance Sheet, Statement of Revenues, Expenses and Changes in Net Assets, Statement of Cash Flows and the notes to financial statements.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management´s Discussion and Analysis (continued)

**Required Financial Statements (continued)**

PREPA Networks, Corp. issues a separate financial report that includes audited financial statements. That report may be obtained by writing to PREPA Networks, Corp. City View Plaza Suite 803, Guaynabo, Puerto Rico 00968.

The Balance Sheet presents the financial position of the Authority and provides information about the nature and amount of resources and obligations at year-end.

The Statement of Revenues, Expenses and Changes in Net Assets presents the results of the business activities over the course of the fiscal year and information as to how the net assets changed during the fiscal year.

The Statement of Cash Flows shows changes in cash and cash equivalents, resulting from operating, non-capital and capital financing, and investing activities, which include cash receipts and cash disbursement information, without consideration of the depreciation of capital assets.

The notes to the financial statements provide information required and necessary to the understanding of material information of the Authority's financial statements. These notes present information about the Authority's significant accounting policies, significant account balances and activities, risk management, obligations, commitments and contingencies, and subsequent events.

The financial statements were prepared by the Authority's management from the detail accounting books and records.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Analysis**

The Authority's net assets decreased by $272.4 million for the fiscal year ended June 30, 2011 and decreased by $129.7 million and $139.0 million for the fiscal years ended June 30, 2010 and 2009, respectively. Our analysis below focuses on the Authority's net assets and changes in net assets during the year.

**Authority's Net Assets**
*(In thousands)*

|  | 2011 | As Restated 2010 | As Restated 2009 |
|---|---|---|---|
| Current, non-current and other assets | $ 3,119,743 | $ 2,554,764 | $ 2,475,320 |
| Capital assets | 6,812,602 | 6,732,790 | 6,603,593 |
| Total assets | $ 9,932,345 | $ 9,287,554 | $ 9,078,913 |
| | | | |
| Long-term debt outstanding | $ 7,895,288 | $ 7,572,024 | $ 6,628,867 |
| Other liabilities | 2,206,552 | 1,612,597 | 2,217,407 |
| Total liabilities | $10,101,840 | $ 9,184,621 | $ 8,846,274 |
| | | | |
| Net assets (deficit): | | | |
| Invested in capital assets, net of related debt | $ 17,070 | $ 161,389 | $ 212,853 |
| Restricted | 77,606 | 136,053 | 233,208 |
| Unrestricted | (264,171) | (194,509) | (213,422) |
| Total net assets (deficit) | $ (169,495) | $ 102,933 | $ 232,639 |

A significant portion of the Authority's net assets (deficit) is restricted and represents resources that are subject to external restrictions on how they may be used. An additional portion of the Authority's net assets reflects its investment in capital assets, less any related debt used to acquire those assets that is still outstanding.

Net assets (deficit) invested in utility plant, net of related debt decreased from $161.4 million in 2009-2010 to $17.1 million in 2010-2011, mainly due to decreases in the financing of construction expenditures to compensate for a reduction in the construction activity.

1112-1313725

II-8

8

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

### Financial Analysis (continued)

Restricted assets for capital and debt service requirements decreased from $136.1 million as of June 30, 2010 to $77.6 million as of June 30, 2011. The decrease was mainly due to a decrease in the reserve account. As allowed by the 1974 Trust Agreement, cash reserves in excess of required balances were transferred to debt service accounts.

Changes in the Authority's net assets can be determined by reviewing the following condensed Statements of Revenues, Expenses and Changes in Net Assets.

### Authority's Changes in Net Assets
*(In thousands)*

|  | Year Ended June 30 | | |
|  | 2011 | 2010 | 2009 |
| --- | --- | --- | --- |
|  |  | *(As restated)* |  |
| Operating revenues | $4,422,997 | $4,171,493 | $4,002,713 |
| Other income | 4,087 | 11,160 | 25,326 |
| Total revenues | 4,427,084 | 4,182,653 | 4,028,039 |
| Operating expenses | 4,096,080 | 3,823,396 | 3,650,490 |
| Interest expense, net | 370,251 | 346,653 | 326,165 |
| Total expenses | 4,466,331 | 4,170,049 | 3,976,655 |
| (Loss) income before contribution in lieu of taxes and other and contributed capital | (39,247) | 12,604 | 51,384 |
| Contribution in lieu of taxes and other | (246,758) | (232,431) | (224,792) |
| Loss before contributed capital | (286,005) | (219,827) | (173,408) |
| Contributed capital | 13,577 | 90,121 | 34,390 |
| Change in net assets | (272,428) | (129,706) | (139,018) |
| Net assets at beginning of year, *as restated* | 102,933 | 232,639 | 371,657 |
| Net assets at end of year, *as restated* | $ (169,495) | $ 102,933 | $ 232,639 |

For fiscal year ended June 30, 2011, as compared to June 30, 2010, net assets decreased by $272.4 million. The reduction in net assets was mainly due to an increase in operating expenses of $272.7 million, mainly due to an increase of $284.5 net of a decrease of $4.7 million in the fuel expenses and depreciation expenses, respectively, as well as increases in interest expense and contribution in lieu of taxes.

1112-1313725

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Analysis (continued)**

The Authority's management has taken the following expense control measures:

The Authority reduced the number of employees through a combination of attrition from voluntary retirement and the elimination of temporary and vacant positions. In addition, the Authority is still enforcing the new staff hiring freeze implemented in January 2009.

The Authority's management has also identified the following strategies to stabilize the cost of energy:

- Revenue diversification – Net income generated from two recently created subsidiaries will be used to find a revenue stabilization fund to reduce fuel price volatility.
- Fuel diversification – The Authority is in the process of evaluating generating units that use fuel oil to convert them to burn coal and natural gas.
- Reducing energy theft – The Authority has implemented an energy theft reduction program through the use of smart grid technologies and increasing the unannounced door-to-door visits.

For the fiscal year ended June 30, 2010, as compared to June 30, 2009, net assets decreased by $129.7 million. The reduction in net assets was mainly due to an increase in operating expenses of $172.9, mainly due to increases of $38.9 million and $37.8 million in the administrative and general and depreciation expenses, respectively, as well an increase in interest expense and contribution in lieu of taxes.

For the fiscal year ended June 30, 2009, as compared to June 30, 2008, net assets decreased by $139.0 million. The decrease in net assets was mainly due to a reduction of 1,085.8 MWh in sales of electric energy, which represented $59.6 million in basic rate revenues.  In addition, revenues decreased due to a decline in the price of fuel of $7.95 per barrel, which is billed to clients as pass-through in their electric bills. Expenses decreased mainly due to a reduction in the price of fuel and an adjustment to other pension obligation expenses, resulting from the modification of health benefits to retired employees.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration**

*Capital Assets*

The Authority's capital assets were restated in order to account for prior years contributed capital which was not accounted for. The total amount of the restatement was $206,549 and was divided as follows (in thousands):

|  | **2010** | **2009** |
|---|---|---|
| Capital assets | **$22,821** | $225,578 |

Investment in capital assets as of June 30, 2011, 2010 and 2009, amounts to approximately $6,813 million, $6,733 million, and $6,604 million (net of accumulated depreciation), respectively. This investment in capital assets includes land, generation, transmission and distribution systems, buildings, fixed equipment, furniture, fixtures and equipment. The total increases in the Authority's investment in capital assets (net of accumulated depreciation) were 1.2 percent, 2.0 percent, and 3.8 percent for 2010-2011, 2009-2010, and 2008-2009, respectively.

A substantial portion of the capital expenditures for production plant in fiscal year ended June 30, 2011, 2010 and 2009, was spent on the rehabilitation and life extension of generating plants in order to achieve and maintain higher levels of availability, reliability and efficiency.

Major capital assets projects during fiscal years 2010 and 2011 included the following:

- The Authority replaced the four 21 MW combustion turbines with new four 55MW dual fuel aero-derivative combustion turbines, which represent a net increase in capacity of approximately 136 MW over the replaced combustion turbines and they will generate electricity more efficiently. The first two combustion turbines were installed in fiscal year 2010 and the remainders two were installed and in service on fiscal year 2011.

- The Authority modified the eight 50 MW combustion turbines of Aguirre Combined Cycle Plant to enable them to burn natural gas or light distillate. This conversion to dual capability was completed in fiscal year 2010. The Authority evaluates various alternatives to supply natural gas to the plant.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

*Capital Assets (continued)*

- The Authority repaired steam turbines generator and replaced transformers and major electrical equipments of Palo Seco Steam units, which have 85 MW capacities. In addition, the Authority replaced the control room for all the units and switchgear for Palo Seco Steam Plant units two, three and four. The total cost of repairing the Palo Seco Steam Plant was approximately $125 million.

- The Authority is now constructing a 38-mile long 230 kV transmission line between the South Coast Steam Plant and Cambalache gas turbines plant's switchyard. The first stage of this project consists of the reconstruction and conversion to 230 kV of an existing 115 kV circuit line between the South Coast Steam Plant and Dos Bocas hydroelectric power plant. The second stage of the project consists of the construction of a new 230 kV line from Dos Bocas to the Cambalache facilities. The construction of both stages is expected to be completed during fiscal year 2013. The estimated cost of this project is $80 million.

- The Authority is also constructing a new 50-mile long 230 kV transmission line between its South Coast Steam Plant and the transmission center in Aguas Buenas. The construction of this new transmission line is expected to be completed during fiscal year 2015. The estimated cost of this project is $120 million.

- The program to improve the 38 kV sub-transmission systems continues in effect, including the construction of underground 38 kV lines in Guaynabo, Isabela, and San Juan. In addition, major reconstruction projects of aerial 38 kV lines in the central and western part of the Island will significantly improve the reliability of the sub-transmission system.

1112-1313725

12

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management´s Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

*Capital Assets (continued)*

- The Authority completed an underground 115 kV transmission circuit line around the San Juan metropolitan area in order to reduce the incidence of loss of power in the aftermath of hurricanes and other major storms, which strike Puerto Rico from time to time. This project is presently improving the reliability of its transmission system in San Juan by interconnecting two steam plants, three existing transmission centers, and four new 115 kV gas insulated substations (GIS) through a 30-mile underground loop of 115 kV. The cost of this project was $200 million. The Federal Emergency Management Agency provided $75 million for of construction for this project through grants to the Authority.

- Martin Peña GIS is a new gas insulated 115/38 kV transmission center with a 300 MVA installed transforming capacity. Palo Seco GIS, one of PREPA's major gas insulated 115/38 kV switchyards with direct interconnection to 600 MW of generating capability, was energized during fiscal year 2009 at a cost of $66 million. San Juan GIS, one of PREPA's major gas insulated 115/38 kV switchyards with direct interconnection through the existing air insulated 115kV bus to approximately more than 850 MW of generating capability, is expected to be in service during fiscal year 2012. A new gas insulated 38 kV substations in Isabela, is also expected to be in service during fiscal year 2011.

- Two major expansion projects to add 300 MVA of 115/38 kV transforming capacity in the transmission centers of Aguadilla and Ponce were completed and energized between fiscal year 2010 and the beginning of fiscal year 2011. A new air insulated 38 kV switchyard in the municipality of Aguadilla also started operating during fiscal year 2010. A new 150 MVA 115/38 kV transmission center in the municipality of Bayamón (Hato Tejas TC) as well as a major expansion projects that add 150 MVA of 115/38 kV transforming capacity in the transmission center of Canóvanas are expected to be completed during fiscal year 2011. In addition, a new 450 MVA 230/115 kV transmission center in Ponce TC is expected to be completed during fiscal year 2011.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

*Capital Assets (continued)*

- The following projects are expected to be in construction for the next five years: a new 230 kV line between Aguirre steam plant and Cayey, the new transmission centers below: Venezuela TC in Río Piedras, Bairoa TC in Caguas, Barranquitas TC and Las Cruces TC in Cidra, to add 500 MVA of 115/38 kV transforming capacity.

- A new 115 kV capacitor bank is also expected to be energized in the transmission center of Canóvanas during fiscal year 2012.

These projects are funded from cash reserves, excess-operating revenues, grants, and debt issued for such purposes.

Additional information on the Authority's capital assets can be found in Note 6 to the financial statements.

*Long-Term Debt*

At the end of the fiscal year 2011, 2010 and 2009, the Authority had total long-term debt outstanding of $8089.0 million, $7,587.1 million and $7224.2 million, respectively, comprised of revenue bonds and other borrowings.

**Authority's Outstanding Debt**
*(In thousands)*

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Power revenue bonds, net | $ 7,895,288 | $ 7,572,024 | $ 6,628,867 |
| Notes payable | 193,700 | 15,090 | 595,374 |
|  | 8,088,988 | 7,587,114 | 7,224,241 |
| Current portion | (552,252) | (187,368) | (1,448,414) |
| Long-term debt excluding current portion | $ 7,536,736 | $ 7,399,746 | $ 5,775,827 |

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

### *Long-Term Debt (continued)*

The Authority maintains ratings of "A3" by Moody's, and "BBB+" by S&P and BBB+ by Fitch for its bonds.

Additional information on the Authority's long-term debt can be found in Notes 8 and 11 to the financial statements.

**Economic Factors and Next Year's Budgets and Rates**

In the last five years, Puerto Rico's economy has shown a different behavior from US economy in term of the annual Gross Domestic Product growth, even though Puerto Rico is part of the US monetary and banking systems. The US economy, measured by the Real Gross Domestic Product (GDP), increased 3% in calendar year 2010. In the second and third quarter of 2011, real GDP increased 1.3% and 2.5%, respectively.

The economy of Puerto Rico is measured by the Gross National Product. For the fiscal year 2011, the Puerto Rico Planning Board estimated a decrease of .96%, according to their last forecast of May 2011. The main components of the PR economy are: manufacturing (approximately 40% of the GNP), finance, insurance and the real estate, trade and service sectors.

The Authority adopted the 2012 fiscal year budget on June 30, 2011. The total revenues for fiscal year 2011-2012 are projected to be approximately $4,927.2 million. In addition, the Capital Improvement Program amounted to approximately $326.5 million. The 2012 consolidated budget increased by $405.1 million (9.0 percent) when compared to the consolidated budget approved for fiscal year 2010-2011, due mainly to a increase on projected fuel oil price per barrel from $88.20 for 2010-2011 to $111.61 for 2011-2012, representing a 26.5 percent. In addition, the Capital Improvement Program increased by $26.5 million, representing a 8.8 percent.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Request for Information**

This financial report is designed to provide a general overview of the Authority's finances. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Authority's Chief Financial Officer. The executive offices of the Authority are located at 1110 Ponce de León Avenue, San Juan, Puerto Rico 00907.

# Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Balance Sheets
*(In thousands)*

|  | June 30 | |
| --- | --- | --- |
|  | **2011** | **2010** |
|  |  | *(As restated)* |
| **Assets and deferred outflows** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ 64,856 | $ 81,646 |
| Receivables, net | 1,182,468 | 976,896 |
| Fuel oil, at average cost | 228,007 | 185,293 |
| Materials and supplies, at average cost | 196,649 | 178,897 |
| Prepayments and other assets | – | 3,364 |
| Total current assets | 1,671,980 | 1,426,096 |
| Other non-current receivables | 95,407 | 108,216 |
| Restricted assets: |  |  |
| Cash and cash equivalents held by trustee for payment of principal and interest on bonds | 313,531 | 198,693 |
| Investments held by trustee | 616,506 | 433,496 |
| Construction fund and other special funds | 244,444 | 162,866 |
| Total restricted assets | 1,174,481 | 795,055 |
| Utility plant: |  |  |
| Plant in service | 11,156,611 | 10,573,128 |
| Accumulated depreciation | (5,364,446) | (5,022,563) |
|  | 5,792,165 | 5,550,565 |
| Construction in progress | 1,020,437 | 1,182,225 |
| Total utility plant, net | 6,812,602 | 6,732,790 |
| Deferred expenses: |  |  |
| Unamortized debt issue costs | 60,961 | 63,914 |
| Deferred outflows | 69,142 | 109,938 |
| Other | 47,772 | 51,545 |
| Total deferred expenses | 177,875 | 225,397 |
| Total assets and deferred outflows | $ 9,932,345 | $ 9,287,554 |

*(Continued)*

17

1112-1313725

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Balance Sheets (continued)
*(In thousands)*

| | June 30 | |
| | 2011 | 2010 |
|---|---:|---:|
| | | *(As restated)* |
| **Liabilities and net assets** | | |
| Current liabilities: | | |
| Notes payable | $ 193,700 | $ 15,090 |
| Accounts payable and accrued liabilities | 1,251,690 | 969,233 |
| Customers' deposits | 39,505 | 40,354 |
| Total current liabilities | 1,484,895 | 1,024,677 |
| | | |
| Current liabilities payable from restricted assets: | | |
| Current portion of long-term debt and bond anticipation notes | 358,552 | 172,278 |
| Accrued interest | 183,314 | 23,978 |
| Other current liabilities payable from restricted assets | 69,408 | 72,432 |
| Total current liabilities payable from restricted assets | 611,274 | 268,688 |
| | | |
| Noncurrent liabilities: | | |
| Long-term debt, excluding current portion | 7,536,736 | 7,399,746 |
| Fair value of derivative instruments | 69,142 | 109,938 |
| Customers' deposits (excluding current portion) | 136,274 | 134,431 |
| Sick leave benefits to be liquidated after one year | 139,903 | 128,810 |
| Accrued unfunded other post-employment benefits liability | 123,616 | 118,331 |
| Total noncurrent liabilities | 8,005,671 | 7,891,256 |
| Total liabilities | 10,101,840 | 9,184,621 |
| | | |
| Net assets (deficit): | | |
| Invested in utility plant, net of related debt | 17,070 | 161,389 |
| Restricted for capital activity and debt service | 77,606 | 136,053 |
| Unrestricted | (264,171) | (194,509) |
| Total net assets (deficit) | (169,495) | 102,933 |
| Total liabilities and net assets | $ 9,932,345 | $ 9,287,554 |

*See accompanying notes.*

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Statements of Revenues, Expenses and Changes in Net Assets
*(In thousands)*

|  | Year Ended June 30 | |
|  | 2011 | 2010 |
|  |  | *(As restated)* |
| Operating revenues | $ 4,422,997 | $ 4,171,493 |
| Operating expenses: | | |
| Operations: | | |
|   Fuel | 2,291,386 | 2,006,931 |
|   Purchased power | 660,871 | 693,724 |
|   Other production | 68,931 | 64,948 |
|   Transmission and distribution | 179,002 | 164,033 |
|   Customer accounting and collection | 114,995 | 114,686 |
|   Administrative and general | 205,586 | 210,721 |
| Maintenance | 224,612 | 212,993 |
| Depreciation | 350,697 | 355,360 |
| Total operating expenses | 4,096,080 | 3,823,396 |
| Operating income | 326,917 | 348,097 |
| Interest income and other | 4,087 | 11,160 |
| Income before interest charges, contribution in lieu of taxes and contributed capital | 331,004 | 359,257 |
| Interest charges: | | |
|   Interest on bonds | 378,343 | 304,614 |
|   Interest on notes payable and other long-term debt | 1,882 | 34,279 |
|   Other interest | – | 1,907 |
|   Amortization of debt discount, issuance costs and refunding loss | 6,497 | 14,281 |
|   Allowance for funds used during construction | (16,471) | (8,428) |
| Total interest charges, net | 370,251 | 346,653 |
| Loss/Income before contribution in lieu of taxes and contributed capital | (39,247) | 12,604 |
| Contribution in lieu of taxes and other | (246,758) | (232,431) |
| Loss before contributed capital | (286,005) | (219,827) |
| Contributed capital | 13,577 | 90,121 |
| Change in net assets | (272,428) | (129,706) |
| Net assets, beginning balance | 102,933 | 232,639 |
| Net assets (deficit), ending balance | $ (169,495) | $ 102,933 |

*See accompanying notes.*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Cash Flows
*(In thousands)*

| | Year Ended June 30 | |
| --- | --- | --- |
| | 2011 | 2010 |
| | | *(As restated)* |
| **Cash flows from operating activities** | | |
| Cash received from customers | $   4,203,889 | $   4,210,885 |
| Cash paid to suppliers and employees | (3,675,557) | (3,554,091) |
| Net cash flows provided by operating activities | 528,332 | 656,794 |
| | | |
| **Cash flows from noncapital financing activities** | | |
| Proceeds from notes payable | 172,062 | 38,364 |
| Principal paid on notes payable | (36,119) | (337,985) |
| Interest paid on notes payable | (28,286) | (16,937) |
| Principal paid on fuel line of credit | (125,000) | (275,000) |
| Proceeds from fuel line of credit | 125,000 | — |
| Interest paid on fuel line of credit | (3,100) | (11,992) |
| Net cash flows provided by (used in) noncapital financing activities | 104,557 | (603,550) |
| | | |
| **Cash flows from capital and related financing activities** | | |
| Construction expenditures | (423,872) | (395,444) |
| Proceeds received from contributed capital | 6,064 | 14,408 |
| Allowance for funds used during construction | 16,471 | 8,428 |
| Power revenue bonds: | | |
|    Proceeds from issuance of bonds, net of original discount | 361,620 | 1,547,073 |
|    Principal paid on revenue bonds maturities | | (173,062) |
|    Interest paid on revenue bonds | (209,287) | (353,501) |
|    Proceeds from issuance of refunding bonds, net of original discount | 222,883 | 939,646 |
|    Defeased bonds, net of original discount or premium | (200,173) | (924,361) |
| Proceeds from bond anticipation notes | 50,750 | 186,610 |
| Payment of bond anticipation notes | (50,000) | (747,675) |
| Interest paid on notes payable | (201) | (24,547) |
| Net cash flows (used in) provided by capital and related financing activities | (225,745) | 77,575 |
| | | |
| **Cash flows from investing activities** | | |
| Purchases of investment securities | (3,260,411) | (2,231,395) |
| Proceeds from sale and maturities of investment securities | 3,042,316 | 2,137,457 |
| Interest on investments | 4,860 | 11,795 |
| Transfer from general fund to restricted funds | (15,000) | (15,000) |
| Net cash flows used in investing activities | (228,235) | (97,143) |
| Net increase in cash and cash equivalents | 178,909 | 33,676 |
| | | |
| Cash and cash equivalents at beginning of year | 431,644 | 397,968 |
| Cash and cash equivalents at end of year | $   610,553 | $   431,644 |

*(Continued)*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Cash Flows
*(In thousands)*

|  | Year Ended June 30 | |
|  | 2011 | 2010 |
|  |  | *(As restated)* |
| **Cash and cash equivalents** | | |
| Unrestricted | $ 64,856 | $ 81,646 |
| Restricted: | | |
| Cash and cash equivalents held by trustee for payment of principal and interest on bonds | 313,531 | 198,693 |
| Cash and cash equivalents within construction and other special funds | 232,166 | 151,305 |
|  | $ 610,553 | $ 431,644 |

|  | Year Ended June 30 | |
|  | 2011 | 2010 |
|  |  | *(As restated)* |
| **Reconciliation of net operating revenues to net cash provided by operating activities** | | |
| Operating income | $ 326,917 | $ 348,097 |
| Adjustments to reconcile operating income to net cash provided by operating activities: | | |
| Depreciation | 350,697 | 355,360 |
| Provision for uncollectible accounts and other | 30,109 | 29,063 |
| Changes in assets and liabilities: | | |
| Receivables | (313,141) | (217,776) |
| Fuel oil | (42,714) | 36,961 |
| Materials and supplies | (17,738) | 17,792 |
| Prepayments and other assets | 3,364 | (1,187) |
| Other deferred debits | 47,522 | (17,494) |
| Noncurrent liabilities, excluding revenue bonds and notes payable | 37,680 | 18,853 |
| Accounts payable and accrued liabilities | 104,642 | 82,332 |
| Customer's deposits | 994 | 4,793 |
| Total adjustments | 201,415 | 308,697 |
| Net cash flows provided by operating activities | $ 528,332 | $ 656,794 |

*See accompanying notes.*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements

June 30, 2011

## 1. Reporting Entity

Puerto Rico Electric Power Authority (the Authority) is a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the Commonwealth) created on May 2, 1941, pursuant to Act No. 83, as amended, re-enacted, and supplemented, of the Legislature of Puerto Rico (the Act) for the purpose of conserving, developing and utilizing the water, and power resources of Puerto Rico in order to promote the general welfare of the Commonwealth. Under the entity concept, the Authority is a component unit of the Commonwealth. The Authority produces, transmits, and distributes, substantially, all of the electric power consumed in Puerto Rico.

The Authority has broad powers including, among others, to issue bonds for any of its corporate purposes. The Authority is required, under the terms of a Trust Agreement dated as of January 1, 1974, as amended (the 1974 Agreement), and the Act, to determine and collect reasonable rates for electric service in order to produce revenues sufficient to cover all operating and financial obligations, as defined.

On August 18, 2003, the Commonwealth of Puerto Rico approved Act No. 189, which authorizes the Authority to create, acquire and maintain corporations, partnerships or subsidiary corporations, for profit or non-profit entities.

### Basis of Presentation – Blended Component Units

The financial statements of the Authority as of June 30, 2011 and 2010, include the financial position and operations of the Puerto Rico Irrigation Systems (Irrigation Systems) and PREPA Holdings LLC. The Irrigation Systems operate pursuant to the provisions of the Act, and Acts No. 83 and 84, approved on June 20, 1955, regarding the Puerto Rico Irrigation Service, South Coast, and Isabela Irrigation Service, respectively, and the Lajas Valley Public Irrigation Law, approved on June 10, 1953, as amended. PREPA Holdings LLC, a wholly-owned subsidiary of the Authority, was created for the sole purpose of acting as a holding company and has no current operations. PREPA Holdings LLC is the direct parent of the following entities: PREPA Networks, LLC, also known as PREPA.net; PREPA Utilities, LLC; PREPA Oil & Gas, LLC; and InterAmerican Energy Sources, LLC.

The financial statements of the Authority as of June 30, 2011 and 2010, include the financial position and operations of the Irrigation System and PREPA Holdings LLC.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**1. Reporting Entity (continued)**

**Basis of Presentation – Blended Component Units (continued)**

The Irrigations Systems and PREPA Holdings LLC conform to the requirements of Governmental Accounting Standards Board (GASB) No. 39, *Determining Whether Certain Organizations are Component Units,* on its stand-alone financial statements. GASB No. 39 establishes standards for defining and reporting on the financial reporting entity. It also establishes standards for reporting participation in joint ventures. It applies to financial reporting by primary governments, and other stand-alone governments; and it applies to the separately issued financial statements of governmental component units. In addition, this Statement should be applied to governmental and non-governmental component units when they are included in a governmental financial reporting entity.

Condensed financial information as of June 30, 2011 and 2010 and for the years then ended for the Irrigation Systems is as follows:

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Balance sheets: | | |
| Assets: | | |
| Receivables, net | $ 16,555 | $ 14,829 |
| Prepayments and other assets | 240 | 240 |
| Utility Plant, net of depreciation | 20,254 | 20,081 |
| Total assets | $ 37,049 | $ 35,150 |
| | | |
| Liabilities: | | |
| Accounts payable, net | $ 1,066 | $ 1,043 |
| | | |
| Statements of revenues, expenditures and changes in net assets: | | |
| Operating revenues | $ 6,002 | $ 7,370 |
| Operating expenses | (4,126) | (13,436) |
| | 1,876 | (6,066) |
| | | |
| Net assets, beginning balance | 34,107 | 40,173 |
| Net assets, ending balance | $ 35,983 | $ 34,107 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**1. Reporting Entity (continued)**

**Basis of Presentation – Blended Component Units (continued)**

Pursuant to the Act, the Authority is authorized to create subsidiaries in order to, among other things, delegate or transfer any of its rights, powers, functions or duties. The Authority currently has four principal subsidiaries organized in a holding company structure. Currently, only PREPA.Net has significant operations.

PREPA.Net was created to develop strategies for commercializing the surplus capacity of the installed Optical Fiber Network (OFN), adding flexibility and diversification to its operations. PREPA.Net was created on April, 2004 and started commercial operations during fiscal year 2005-2006.

PREPA.Net provides Optical Infrastructure to carriers, ISPs and enhanced services providers – with a highly reliable island wide fiber optic network.

PREPA.Net entered into a long-term lease with PREPA for the Indefeasible Right of Use (IRU) of all PREPA's Optical Infrastructure. PREPA.Net's network features state of the art optical technology that is being used by service providers to reach underseas cable landing stations, wireless network towers, and island wide locations.

In February 2008, PREPA.Net acquired Telecomunicaciones Ultramarinas de Puerto Rico (Ultracom). Ultracom is one of the three submarine cable station administrators in Puerto Rico. This acquisition provides PREPA.Net with International fiber optic capacity and satellite teleport facilities.

PREPA Utilities, LLC, was created for the purpose of investing, financing, constructing and operating industrial projects and other infrastructure relating to the optimization of the Authority's electric infrastructure.

PREPA Oil & Gas, LLC, was created for the purpose of buying, selling, exchanging and otherwise trading or dealing with the export, import, manufacture, production, preparation, handling, storage, and distribution of oil and gas and any other fuels required to satisfy the Authority's power generation needs.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**1. Reporting Entity (continued)**

**Basis of Presentation – Blended Component Units (continued)**

InterAmerican Energy Sources was created for the purpose of investing, developing, financing, constructing and operating renewable energy projects and other infrastructure related to the optimization of the Authority's electric infrastructure. PREPA Utilities, LLC, PREPA Oil & Gas, LLC, and InterAmerican Energy Sources, LLC are currently not operating.

Condensed financial information for PREPA Holdings LLC as of June 30, 2011 and 2010 and for the year then ended is as follows:

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Balance sheets: | | |
| Assets: | | |
| Cash and cash equivalents | **$15,012** | $13,062 |
| Receivables, net | **1,943** | 2,324 |
| Prepayments and other assets | **77** | 17 |
| Utility plant, net of depreciation | **9,769** | 7,903 |
| Other receivables | **–** | 155 |
| Total assets | **$26,801** | $23,461 |
|  | | |
| Liabilities: | | |
| Accounts payable, net | **$ 8,322** | $ 7,385 |
| Notes payable | **9,819** | 10,100 |
| Total liabilities | **$18,141** | $17,485 |
|  | | |
| Statements of revenues, expenditures and changes in net assets: | | |
| Operating revenues | **$10,945** | $ 9,781 |
| Operating expenses | **(8,261)** | (7,065) |
|  | **2,684** | 2,716 |
|  | | |
| Net assets, beginning balance | **5,976** | 3,260 |
| Net assets, ending balance | **$ 8,660** | $ 5,976 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 2. Summary of Significant Accounting Policies

The following is a summary of the most significant accounting policies followed by the Authority in preparing its financial statements:

**Basis of Accounting**

The accounting and reporting policies of the Authority conform to the accounting rules prescribed by the Governmental Accounting Standards Board (GASB). As such, it functions as an enterprise fund. The Authority maintains its accounting records on the accrual basis of accounting in conformity with U.S. generally accepted accounting principles. Although the Authority is not subject to all Federal Energy Regulatory Commission (FERC) regulations, the Authority has adopted the uniform system of accounts prescribed by FERC.

The Authority follows the provisions of GASB Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities that Use Proprietary Fund Accounting*, as amended by GASB Statement No. 34, which requires proprietary activities to apply all applicable GASB pronouncements as well as all Financial Accounting Standards Board (FASB) Statements and Interpretations, and Accounting Principles Board Opinions and Accounting Research Bulletins issued on or before November 30, 1989, unless the pronouncements conflict or contradict GASB pronouncements.

This pronouncement permits the adoption of all FASB Statements and Interpretations issued after November 30, 1989, except for those that conflict or contradict GASB pronouncements. The Authority, as allowed by GASB, decided not to implement any FASB Statement or Interpretation issued after November 30, 1989.

**Cash and Cash Equivalents**

For purposes of the statements of cash flows, the Authority considers all highly liquid debt instruments with maturities of three months or less when purchased to be cash equivalents. Cash and cash equivalents included in the restricted funds are considered cash equivalents for purposes of the statements of cash flows.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Receivables**

Receivables are stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions.

**Materials, Supplies and Fuel Oil**

Materials, supplies and fuel oil inventories are carried at average cost and are stated at the lower of cost or market.

**Investments**

The Authority follows the provisions of GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investment Pools*, which require the reporting of investments at fair value in the balance sheet and the recording of changes in fair value in the statement of revenues, expenses and changes in net assets. The fair value is based on quoted market prices.

The funds under the 1974 Agreement may be invested in:

- Government obligations, which are direct obligations of, or obligations whose principal and interest is guaranteed by the U.S. Government, or obligations of certain of its agencies or instrumentalities.

- Investment obligations of any of the states or territories of the United States or political subdivisions thereof (other than obligations rated lower than the three highest grades by a nationally recognized rating agency) and repurchase agreements with commercial banks fully secured by U.S. Government obligations.

- Time deposits with Government Development Bank for Puerto Rico (GDB) or the Authority's Trustee under the 1974 Agreement or any bank or trust company member of the Federal Deposit Insurance Corporation having a combined capital and surplus of not less than $100 million.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Investments (continued)**

Effective April 1999, the 1974 Agreement was amended to provide that permitted investments of moneys to the credit of the Self-insurance Fund be expanded (subject to the Authority's adoption of an investment policy with the consent of GDB) to coincide with the investments permitted for the pension fund for employees of the Commonwealth of Puerto Rico and its instrumentalities.

Such investments include various debt instruments, such as mortgage loans and leases, common and preferred stock, real property and various other financial instruments.

**Utility Plant**

Utility plant is carried at cost, which includes labor, materials, overhead, and an allowance for the cost of funds used during construction (AFUDC). AFUDC represents the cost of borrowed funds used to finance construction work in progress. AFUDC is capitalized as an additional cost of property and as a reduction of interest expense. Capitalized interest expense is reduced by interest income earned on related investments acquired with proceeds of tax-exempt borrowings. Such costs are recovered from customers as a cost of service through depreciation charges in future periods. Capitalized interest during the years ended June 30, 2011 and 2010 amounted to $16.5 million and $8.4 million, respectively. These amounts are net of interest income earned on investments amounting to $.8 million and $.7 million, respectively.

Capital expenditures of $1,200 or more are capitalized at cost at the date of acquisition. Maintenance, repairs, and the cost of renewals of minor items of property units are charged to operating expenses. Replacements of major items of property are charged to the plant accounts. The cost of retired property, together with removal cost less salvage, is charged to accumulated depreciation with no gain or loss recognized.

The Authority follows the provisions of GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*. This statement establishes guidance for accounting and reporting for the impairment of capital assets and for insurance recoveries.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 2. Summary of Significant Accounting Policies (continued)

**Depreciation**

Depreciation is computed on the straight-line method at rates considered adequate to allocate the cost of the various classes of property over their estimated service lives. The annual composite rate of depreciation, determined by the Authority's consulting engineers, was approximately 4.25% for 2011 and 2010.

**Unamortized Debt Issuance Expense**

Debt issuance expenses and discounts incurred in the issuance of bonds are deferred and amortized using the straight-line method, which approximates the interest method, over the term of the related debt.

For debt refunding debt, the excess of reacquisition cost over the carrying value of long-term debt is deferred and amortized to operating expenses using the straight-line method over the remaining life of the original debt or the life of the new debt, whichever is shorter.

**Pension Plan**

Pension expense is equal to the statutory required contribution to the employees' retirement system. A pension liability or asset is reported equal to the cumulative difference between annual required contributions and actual contributions.

**Other Postemployment Benefits**

Other Postemployment Benefits (OPEB) cost of healthcare provided to employees is measured and disclosed using the accrual basis of accounting (see Note 12).

**Accounting for Compensated Absences**

Accumulated unpaid vacation and sick leave pay are accrued when earned and an additional amount is accrued as a liability for the employer salary-related benefits associated with compensated absences using salary rates in effect at the balance sheets date.

# Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

### 2. Summary of Significant Accounting Policies (continued)

### Accounting for Compensated Absences (continued)

The cost of compensated absences expected to be paid in the next twelve months is classified as current accounts payable and accrued liabilities while amounts expected to be paid after twelve months are classified as noncurrent liabilities.

### Revenue Recognition, Fuel Costs and Purchase Power

Clients are billed monthly, except for rural clients who are billed bi-monthly. Revenues are recorded based on services rendered during each accounting period, including an estimate for unbilled services. Revenues include amounts resulting from a fuel and purchased power cost recovery clause (Fuel Adjustment Clause), which is designed to permit full recovery through customer billings of fuel costs and purchased power. Fuel costs and purchased power are reflected in operating expenses as the fuel and purchased power are consumed.

### Contributions in Lieu of Taxes and Governmental Subsidies

The Act exempts the Authority from all taxes that otherwise would be levied on its properties and revenues by the Commonwealth and its Municipalities, except as follows:

#### *Municipalities*

To the extent net revenues, as defined, are available, the Authority is required under the Act to make a contribution in lieu of taxes of 11% to the Commonwealth and the Municipalities of gross electric sales as follows:

The Authority is required under the Act to make a contribution in lieu of taxes to municipalities of the greater of:

**a)** Twenty percent of the Authority's Adjusted Net Revenues (Net Revenues, as defined in the 1974 Agreement, less the cost of the Commonwealth rate subsidies);

**b)** The cost collectively of the actual electric power consumption of the municipalities; or

**c)** The prior five-year moving average of the contributions in lieu of taxes paid to the municipalities collectively.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Contributions in Lieu of Taxes and Governmental Subsidies (continued)**

*Municipalities (continued)*

If the Authority does not have sufficient funds available in any year to pay the contribution in lieu of taxes, the difference is accrued and carried forward for a maximum of three years. The contribution in lieu of taxes to Municipalities can be used to offset accounts receivable balance owed by the Municipalities to the Authority as permitted by law.

*Commonwealth of Puerto Rico*

To the extent net revenues are available, the Authority is also required under the Act to set aside the remainder of contribution in lieu of taxes of gross electric sales for the purpose of (i) financing capital improvements, (ii) offsetting other subsidies (other than cost of fuel adjustments to certain residential clients) of the Commonwealth, and (iii) any other lawful corporate purpose. Amounts assigned to (ii) above, are classified as a contribution in lieu of taxes in the accompanying statements of revenues, expenses and changes in net assets and reduce the related accounts receivable in the balance sheets.

**Contributed Capital**

The Authority records contributed capital as income in the year earned. The Authority receives contributed capital in the form of cash and property from residential projects developed by third parties during recent years and local and federal agencies.

**Risk Management**

The Authority purchases commercial insurance covering casualty, theft, tort claims, natural disaster and other claims covering all risk property (excluding transmission and distribution lines), boiler and machinery, boiler, machinery and public liability. In addition the Authority has a self insured fund to pay cost of repairing, replacing or reconstructing any property damaged or destroy from, or extraordinary expenses incurred as a result of a cause, which is not covered by insurance required under 1974 agreement.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Estimates**

The preparation of the basic financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the basic financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

**Reclassifications**

Certain reclassifications were made to 2010 figures to conform with 2011 presentation.

**Interest-Rate Swap Agreements**

The Authority follows the provisions of GASB Statement No. 53, *Accounting and Financial Reporting for Derivative Instruments*. This statement establishes guidance for the recognition, measurement, and disclosure of information regarding derivative instruments.

The interest-rate swaps are used in the area of debt management to take advantage of favorable market interest rates and to limit interest rate risk associated with variable rate debt exposure.

Under the interest-rate swap programs, the Authority pays fixed and variable rate of interest based on various indices for the term of the variable interest rate Power Revenue Bonds and receives a variable rate of interest, which is also based on various indices. These indices are affected by changes in the market. The net amount received or paid under the swap agreements is recorded as an adjustment to interest expense on the statements of income.

**3. Cash and Cash Equivalents**

The 1974 Agreement established the General Fund, the Revenue Fund, and certain other funds (see Note 5). All revenues (other than income from investments and construction funds obtained from financing) are deposited in these funds. The moneys held in these funds are presented as unrestricted cash and cash equivalents in the balance sheets.

# Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

### 3. Cash and Cash Equivalents (continued)

At June 30, 2011 and 2010, the carrying amount and bank balance of cash deposits held by the Authority and restricted cash deposits held by the Trustee under the 1974 Agreement are as follows (in thousands):

| | 2011 | | 2010 | |
|---|---|---|---|---|
| | Carrying Amount | Bank Balance | Carrying Amount | Bank Balance |
| Unrestricted | $  64,856 | $  43,915 | $  81,646 | $  57,326 |
| Restricted: | | | | |
| Held by the Trustee | 313,531 | 313,531 | 198,693 | 198,693 |
| Held by the Authority | 232,166 | 232,166 | 151,305 | 151,305 |
| | $ 610,553 | $ 589,612 | $ 431,644 | $ 407,324 |

### Custodial Credit Risk - Deposits

Custodial credit risk is the risk that in the event of a bank failure, the Bank's deposits may not be returned. The Commonwealth of Puerto Rico (the Commonwealth) requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized. Deposits maintained in GDB or Economic Development Bank (EDB) are exempt from collateral requirement established by the Commonwealth and thus represents custodial credit risk  because in the event of GDB's or EDB's failure the Authority may not be able to recover the deposits. The Authority's policy is to deposit funds with either institution which provides insurance or securities as collateral. Such collateral is held by the Department of the Treasury of the Commonwealth.

All moneys deposited with the Trustee or any other Depositary hereunder in excess of the amount guaranteed by the Federal Deposit Insurance Corporation or other federal agency are continuously secured by lodging with a bank or trust company approved by the Authority and by the Trustee as custodian, or, if then permitted by law, by setting aside under control of the trust department of the bank holding such deposit, as collateral security, Government Obligations or other marketable securities.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**4. Accounts Receivable**

At June 30, receivables consist of (in thousands):

|  | 2011 | 2010 |
|---|---|---|
| Electric and related services: | | |
| Government agencies and municipalities | $ 464,103 | $ 345,535 |
| Residential, industrial, and commercial | 720,133 | 657,426 |
| Recoveries under fuel adjustment clause under billed | 28,329 | 14,412 |
| Unbilled services | 203,499 | 179,583 |
| Commonwealth subsidy (fuel adjustment clause) | | |
| for certain residential clients | 12,653 | 18,980 |
| Miscellaneous accounts and others | 24,257 | 23,946 |
| | 1,452,974 | 1,239,882 |
| Allowance for uncollectible accounts | (214,125) | (194,852) |
| | 1,238,849 | 1,045,030 |
| Receivable from insurance companies and other | 37,649 | 37,954 |
| Accrued interest on investments | 1,377 | 2,128 |
| Less other non-current receivables, mostly related to | | |
| the Commonwealth | (95,407) | (108,216) |
| | $1,182,468 | $ 976,896 |

On October 29, 1991, the Authority entered into an agreement with the Commonwealth for the payment of the outstanding fuel adjustment subsidy receivable amounting to approximately $94 million. Under this agreement, the Commonwealth was paying that amount over a fifteen-year period in installments of approximately $6.3 million per year, without interest. As of June 30, 2004, the outstanding fuel adjustment subsidy receivable amounted to approximately $31.6 million. In June 2004, the Legislature of the Commonwealth of Puerto Rico superseded the 1991 agreement with a revised agreement containing an eight-year payment schedule that totals $55.7 million. The amount owed to the Authority under the 2004 agreement includes an allocation for past due government account receivables in addition to the unpaid balance of the fuel adjustment subsidy. As of June 30, 2011 and 2010, the outstanding receivable amounted to approximately $6.3 million. This amount is included in other non-current receivables in the accompanying balance sheet.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**4. Accounts Receivable (continued)**

In addition, the Authority has other subsidies and reimbursable costs receivable from the Commonwealth, which are reduced by means of charges (accounted for as a contribution in lieu of taxes and to the extent net revenues, as defined, are available) against a portion of the 11% of gross electric sales, after the contribution in lieu of taxes to municipalities, it is required to set aside under the Act. The portion of such receivables and other governmental receivables not expected to be collected during the next fiscal year are reflected in the accompanying balance sheets as other noncurrent receivables.

**5. Restricted Assets**

At June 30, 2011 and 2010, certain investments and cash deposits of the Authority were restricted to comply with long-term principal and interest debt service requirements (sinking funds) as well as for self-insurance. These restricted assets are held by the Trustee under the 1974 Agreement (see Note 3) in the following funds:

*1974 Reserve Account* – Reserve for payment of principal of and interest on Power Revenue Bonds in the event moneys in Bond Service Account or Redemption Account are insufficient for such purpose.

*1974 Self-Insurance Fund* – Fund to pay the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of a cause, which is not covered by insurance required under the 1974 Agreement. The 1974 Self-Insurance Fund also serves as an additional reserve for the payment of the principal of and interest on the Power Revenue Bonds, and meeting the amortization requirements to the extent that moneys in the Bond Service Account, the Redemption Account and the 1974 Reserve Account are insufficient for such purpose. During fiscal years 2010-2011 and 2009-2010, the Authority deposited $10 million each to the 1974 Self-Insurance Fund.

*Bond Service Account and Redemption Account* (1974 Sinking Fund) – Current year requirements for principal of and interest on Power Revenue Bonds. As of June 30, 2011 and 2010, cash and cash equivalents in this account amounted to $313.5 million and $198.7 million, respectively.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

At June 30, investments held by the Trustee consist of (in thousands):

|                                      | 2011       | 2010       |
|--------------------------------------|------------|------------|
| 1974 Reserve Account                 | $ 377,903  | $ 359,714  |
| 1974 Self-Insurance Fund             | 84,645     | 73,782     |
| Sinking Fund – Capitalized Interest  | 153,958    | --         |
|                                      | $ 616,506  | $ 433,496  |

Investments held by Trustee under the 1974 Agreement are invested exclusively in securities of
the U.S. Government and its agencies.

The Authority also has cash and investment securities held by the trust department of a
commercial bank restricted for the following purposes:

*1974 Construction Fund* – Special fund created by the 1974 Agreement. The proceeds of any
Power Revenue Bonds issued for the purpose of paying the cost of acquiring or constructing
improvements, together with the money received from any other source for such purpose, except
proceeds which are (i) applied to the repayment of advances, (ii) deposited in the 1974 Reserve
Account, (iii) deposited in the Bond Service Account as capitalized interest or (iv) used for the
payment of financing expenses, shall be deposited in the 1974 Construction Fund and held by the
Authority in trust.

*Reserve Maintenance Fund* – Fund to pay the cost of unusual or extraordinary maintenance or
repairs, not recurring annually, and renewals and replacements, including major items of
equipment. The Reserve Maintenance Fund also serves as an additional reserve for the payment
of principal of and interest on the Power Revenue Bonds and meeting the amortization
requirements to the extent that moneys in the 1974 Sinking Fund, including money in the 1974
Reserve Account, are insufficient for such purpose. During fiscal years 2010-2011 and 2009-
2010 the Authority deposited $5 million in each fiscal year to the 1974 Reserve Maintenance
Fund.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

At June 30, 2011 and 2010, the 1974 Construction Fund and Reserve Maintenance Fund consist of (in thousands):

| | 2011 | | 2010 | |
|---|---|---|---|---|
| | Cash and Cash Equivalents | Investments | Cash and Cash Equivalents | Investments |
| 1974 Construction Fund | $225,254 | $1,099 | $ 149,405 | $ 921 |
| Reserve Maintenance Fund | 5,012 | 10,679 | — | 10,640 |
| Other Restricted Funds | 1,900 | — | 1,900 | — |
| PREPA Client Fund | — | 500 | — | — |
| | $232,166 | $12,278 | $ 151,305 | $ 11,561 |

Following is the composition of the investments in the 1974 Construction Fund and other special funds (in thousands):

| | 2011 | 2010 |
|---|---|---|
| U.S. Government obligations | $ 1,099 | $ 921 |
| Certificate of deposit | 11,179 | 10,640 |
| | $ 12,278 | $ 11,561 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

**Investments**

The following table provides a summary of the Authority's investments by type at June 30, 2011 (in thousands):

| | Coupon Rate | Maturity Dates | Face Value | Fair Value | % of Total Portfolio |
|---|---|---|---|---|---|
| **June 30, 2011** | | | | | |
| **1974 Reserve Maintenance Fund** | | | | | |
| Federal National Mortgage Association | | | | | |
| Federal Farm Credit Bank | 0.16% | Jun-14 | 5,000 $ | 4,979 | 46.6% |
| Certificate of Deposits | .14 to 1.05% | 7/2011 to 8/2011 | 5,700 | 5,700 | 53.4% |
| | | | Total Portfolio | 10,679 | |
| **1974 Self Insurance Reserve Fund** | | | | | |
| Federal Home Loan Mortgage Corp. | .825 to 1.05% | 10/2013 to 6/2014 | 26,700 | 26,682 | 31.5% |
| Certificate of Deposit | .15 to .17% | Jul-11 | 57,963 | 57,963 | 68.5% |
| | | | Total Portfolio | 84,645 | |
| **1974 Reserve Account** | | | | | |
| Federal Home Loan Mortgage Corporation | 1.93 to 2.00% | 8/2014 to 8/2015 | 31,300 | 31,354 | 8.3% |
| Federal Home Loan Bank | .625 to 2.00% | 9/2015 to 12/2015 | 78,285 | 77,793 | 20.6% |
| Federal National Mortgage Association | 1.63 to 2.08% | 10/2015 to 6/2016 | 79,800 | 78,769 | 20.8% |
| Federal Farm Credit Bank | 1.85 to 2.25% | 8/2015 to 5/2016 | 76,560 | 76,576 | 20.3% |
| Certificates of Deposits | .12 to .20% | Jul-11 | 113,411 | 113,411 | 30.0% |
| | | | Total Portfolio | 377,903 | |
| **Sinking Fund - Capitalized Interest** | | | | | |
| US Treasury Note | .625 to 4.625% | 7/2011 to 8/2011 | 37,579 | 38,260 | 24.9% |
| Federal Home Loan Mortgage Corporation | 0.63% | Dec-12 | 14,060 | 14,107 | 9.2% |
| Federal Home Loan Bank | .20 to 2.00% | 9/2011 to 11/2012 | 31,220 | 31,466 | 20.4% |
| Federal National Mortgage Association | .17 to 1.25% | 7/2011 to 12/2012 | 21,839 | 21,913 | 14.2% |
| US Bank Money Market | 0.10% | | 37,400 | 37,387 | 24.3% |
| Certificates of Deposits | 0.14% | Jul-11 | 10,825 | 10,825 | 7.0% |
| | | | Total Portfolio | 153,958 | |
| **1974 Construction Fund** | | | | | |
| Other - Rural Electrification Administration (REA) | | | 1,099 | 1,099 | 0.5% |
| | | | Total Portfolio | 1,099 | |
| **1974 PREPA Client** | | | | | |
| Certificates of Deposits | | | 500 | 500 | 100.0% |
| | | | Total Portfolio | 500 | |
| | | | | $ 628,784 | |

**Puerto Rico Electric Power Authority**
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Audited Financial Statements (continued)**

**5. Restricted Assets (continued)**

**Investments (continued)**

The following table provides a summary of the Authority's investments by type at June 30, 2010 (in thousands):

| | Coupon Rate | Maturity Dates | Face Value | Fair Value | % of Total Portfolio |
|---|---|---|---|---|---|
| | | **June 30, 2010** | | | |
| **1974 Reserve Maintenance Fund** | | | | | |
| Federal National Mortgage Association | 1.00% | Jun-13 | 5,602 | $  5,635 | 53% |
| Certificate of Deposits | 0.24% | Jul-10 | 5,004 | 5,004 | 47% |
| | | | Total Portfolio | 10,639 | |
| **1974 Self Insurance Reserve Fund** | | | | | |
| Federal Home Loan Mortgage Corp. | 2.35% | Mar-12 | 11,500 | 11,532 | 16% |
| Federal National Mortgage Association | 2.00% | Feb-13 | 10,100 | 10,116 | 14% |
| Federal Home Loan Bank | 1.69 to 2.00% | 4/2013 to 6/2013 | 20,611 | 20,644 | 28% |
| Certificates of Deposit | .24 to .37% | Jul-10 | 31,490 | 31,490 | 43% |
| | | | Total Portfolio | 73,782 | |
| **1974 Reserve Account** | | | | | |
| Federal Home Loan Mortgage Corporation | 3.00 to 3.05% | 1/2015 to 5/2015 | 66,389 | 66,846 | 19% |
| Federal Home Loan Bank | 2.09 to 3.00% | 9/2013 to 6/2015 | 85,850 | 86,249 | 24% |
| Federal National Mortgage Association | 2.00 to 3.05% | 6/2013 to 2/2015 | 51,640 | 51,817 | 14% |
| Federal Farm Credit Bank | 2.35 to 2.80% | 9/2014 to 5/2015 | 25,323 | 25,419 | 7% |
| Certificates of Deposit | .18 to .50% | Jul-10 | 129,384 | 129,384 | 36% |
| | | | Total Portfolio | 359,715 | |
| **1974 Construction Fund** | | | | | |
| Other – Rural Electrification Administration (REA) Investment | | | 921 | 921 | 100% |
| | | | Total Portfolio | 921 | |
| | | | | $ 445,057 | |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

**Credit Risk**

Credit risk is the risk that an issuer of an investment will not fulfill its obligation to the holder of the investment. This is measured by the assignment of a rating by a nationally recognized statistical rating organization. The 1974 Trust Agreement limits investments in:

- Government obligations, which are direct obligations of, or obligations whose principal and interest is guaranteed by the U.S. Government, or obligation of certain of its agencies or instrumentalities.

- Investment obligation of any of the states or territories of the United States or political subdivisions therefore (other than obligations rated lower than the three highest grades by a nationally recognized rating agency) and repurchase agreements with commercial banks fully secured by U.S. Government Obligations.

- Time deposits with GDB or the Authority's Trustee under the 1974 Agreement or any bank or trust company member of the Federal Deposit Insurance Corporation having a combined capital and surplus of not less than $100 million.

As of June 30, 2011, the Authority's investments in Federal Home Loan Mortgage, Federal Home Loan Bank, Federal National Mortgage Association and Federal Farm Credit Bank and Freddie Mac were rated AAA by Standard & Poor's (S&P) and Aaa by Moody's Investors Service. In August 2011, S&P downgraded the United States Government debt's credit rating from AAA to AA+.

**Concentration Credit Risk**

Concentration of credit risk is the risk of loss attributable to the magnitude of investment in a single issuer by five percent or more of total investment. The Authority's investment policy does not contain a limitation to invest in the securities of single issuer. As June 30, 2011, more than 5% of the Authority's total investments are in Federal Home Loan Mortgage, Federal Home Loan Bank, Federal National Mortgage Association, Federal Farm Credit Bank, and Certificate of Deposits.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

**Interest Rate Risk**

Interest rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment. Generally, the longer the maturity of an investment, the greater the sensitivity of its fair value to changes in market interest rates. In accordance with the 1974 Trust Agreement, the Authority manages its exposure to declines in fair values by limiting the maturity of its investment portfolio up to 5 years. Information about the sensitivity of the fair values of the Authority's investment to market interest fluctuations is provided by the following tables that show the distribution of the investments by maturity as of June 30, 2011 and 2010 (in thousands):

**June 30, 2011**

| Investment Type | Fair Value | Investment Maturities | | Total |
|---|---|---|---|---|
| | | Less than 1 year | 1-5 years | |
| Federal Home Loan Mortgage | $ 45,461 | $      – | $ 45,461 | $ 45,461 |
| Federal Home Loan Bank | 135,941 | – | 135,941 | 135,941 |
| Federal National Mortgage | 100,682 | | 100,682 | 100,682 |
| Federal Farm Credit Bank | 81,553 | – | 81,553 | 81,553 |
| Certificate of Deposits | 188,401 | 188,401 | – | 188,401 |
| US Treasury Note | 38,260 | 38,260 | – | 38,260 |
| US Bank Money Market | 37,387 | 37,387 | – | 37,387 |
| Other – REA Investment | 1,099 | – | 1,099 | 1,099 |
| Total Investments | | | | $ 628,784 |

**June 30, 2010**

| Investment Type | Fair Value | Investment Maturities | | Total |
|---|---|---|---|---|
| | | Less than 1 year | 1-5 years | |
| Federal Home Loan Mortgage | $ 78,378 | $      – | $ 78,378 | $ 78,378 |
| Federal Home Loan Bank | 106,893 | – | 106,893 | 106,893 |
| Federal National Mortgage | 67,568 | | 67,568 | 67,568 |
| Federal Farm Credit Bank | 25,419 | – | 25,419 | 25,419 |
| Certificate of Deposits | 165,878 | 165,878 | – | 165,878 |
| Other – REA Investment | 921 | – | 921 | 921 |
| Total Investments | | | | $ 445,057 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**6. Utility Plant**

As of June 30, utility plant consists of:

|  | 2011 | As restated 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Distribution | $ 3,331,748 | $ 2,937,624 |
| Transmission | 2,042,152 | 1,906,720 |
| Production | 2,615,803 | 2,389,143 |
| Other production | 1,460,560 | 1,409,138 |
| Hydroelectric | 130,846 | 128,702 |
| General | 1,523,043 | 1,751,793 |
| Irrigation systems | 33,597 | 33,307 |
| Fiber Network | 18,862 | 16,701 |
|  | 11,156,611 | 10,573,128 |
| Less accumulated depreciation | (5,364,446) | (5,022,563) |
|  | 5,792,165 | 5,550,565 |
| Construction in progress | 1,020,437 | 1,182,225 |
|  | $ 6,812,602 | $ 6,732,790 |

Utility plant activity for the years ended June 30, 2011 and 2010 was as follows (in thousands):

|  | 2010 Beginning Balance | Increases | Decreases | Transfers | 2011 Ending Balance |
|---|---|---|---|---|---|
| Utility plant, as restated | $10,573,128 | $ — | $(8,814) | $ 592,297 | $ 11,156,611 |
| Construction work in progress | 1,182,225 | 430,509 | — | (592,297) | 1,020,437 |
| Total utility plant, as restated | 11,755,353 | 430,509 | (8,814) | — | 12,177,048 |
| Less: | | | | | |
| Accumulated depreciation | (5,022,563) | (350,697) | 8,814 | — | (5,364,446) |
| Total utility plant, net as restated | $ 6,732,790 | $ 79,812 | $ — | $ — | $ 6,812,602 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**6. Utility Plant (continued)**

|  | 2009 | | | | 2010 |
|---|---|---|---|---|---|
|  | Beginning Balance | Increases | Decreases | Transfers | Ending Balance |
| Utility plant, as restated | $ 9,573,646 | $ -- | $ (22,976) | $ 1,022,458 | $ 10,573,128 |
| Construction work in progress | 1,697,250 | 507,433 | -- | (1,022,458) | 1,182,225 |
| Total utility plant | 11,270,896 | 507,433 | (22,976) | -- | 11,755,353 |
| Less: | | | | | |
| Accumulated depreciation | (4,667,203) | (378,336) | 22,976 | -- | (5,022,563) |
| Total utility plant, net as restated | $ 6,603,593 | $ 129,097 | $ -- | $ -- | $ 6,732,790 |

Construction work in progress at June 30, 2011 and 2010 consists principally of expansions and upgrades to the electric generation, distribution and transmission systems.

**7. Defeasance of Debt**

In prior years, the Authority has refunded in advance certain Power Revenue Bonds and other obligations by placing the proceeds of new debt in an irrevocable trust to provide for future debt service payments on such bonds. Accordingly, the trust accounts, assets, and liabilities for the defeased bonds are not included in the Authority's financial statements. At June 30, 2011, $4.1 million of Power Revenue Bonds which remain outstanding are considered defeased.

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

### 8. Notes Payable

The following is a summary of notes payable as of June 30, 2011 (in thousands):

| | | | | | |
|---|---|---|---|---|---|
| | | | | **June 30, 2011** | |
| | **Maturity Date** | **Effective Interest Rate** | **Current Liabilities** | **Long-Term Debt** | **Total** |
| Notes payable, unrestricted: | | | | | |
| Line of credit of $64.2 million to fund payments required under a settlement agreement with municipalities | June, 2014 | .70%+LIBOR(v) | $   9,700 | $ 20,158 | $ 29,858 |
| Loan of $41.5 to sale at discount the funds assigned by the Legislature of Puerto Rico through Joint Resolution 1290 of August 24, 2004, to pay the amount owed by the Commonwealth regarding the fuel subsidy | Nov- 2013 | 4.375%(v) | 5,853 | 4,901 | 10,754 |
| Revolving line of credit of $150 million to Working capital | June-2012 | 1.75%+LIBOR(v) | 150,000 | – | 150,000 |
| Line of credit of $35.0 million for the construction of Gasoducto del Sur | Aug - 2011 | 6.00%(f) | 26,485 | – | 26,485 |
| Line of credit of $25 million to finance improvements to Isabela Irrigation System | June-2018 | 7.00%(v) | 750 | – | 750 |
| PREPA.Net - Loan used in the acquisition of subsidiary, Ultramarinas de P.R. (ULTRACOM) | Feb-2023 | 3.25%(v) | 912 | 8,978 | 9,890 |
| Total notes payable | | | $ 193,700 | $ 34,037 | $227,737 |

(V) – *variable interest rate*
(F) – *fixed interest rate*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**8. Notes Payable (continued)**

The following is a summary of notes payable as of June 30, 2010 (in thousands):

| | June 30, 2010 | | | | |
| | Maturity Date | Effective Interest Rate | Current Liabilities | Long-Term Debt | Total |
|---|---|---|---|---|---|
| Notes payable, unrestricted: | | | | | |
| Line of credit of $64.2 million to fund payments required under a settlement agreement with municipalities | Jun-2014 | 3.40%[V] | $ 9,200 | $ 29,858 | $ 39,058 |
| Loan of $41.5 to sale at discount the funds assigned by the Legislature of Puerto Rico through Joint Resolution 1290 of August 24, 2004, to pay the amount owed by the Commonwealth regarding the fuel subsidy | Nov-2013 | 4.30%[V] | 5,609 | 10,754 | 16,363 |
| Line of credit of $35.0 million for the construction of Gasoducto del Sur | Aug-2011 | 6.00%[F] | – | 26,271 | 26,271 |
| PREPA.Net - Loan used in the acquisition of subsidiary, Ultramarinas de P.R. (ULTRACOM) | Feb-2023 | 3.36%[V] | 281 | 9,819 | 10,100 |
| Total notes payable | | | $ 15,090 | $ 76,702 | $ 91,792 |

(V) – *variable interest rate*
(F) – *fixed interest rate*

Short-term debt activity for the years ended June 30, 2011 and 2010 was as follows:

| | 2011 | 2010 |
|---|---|---|
| | *(In thousands)* | |
| Balance at beginning of year | $ 15,090 | $ 1,113,957 |
| Proceeds and transfers from long-tem debt | 339,800 | 177,183 |
| Payment of short-term debt | (161,190) | (1,276,050) |
| Balance at end of year | $ 193,700 | $ 15,090 |
| Notes payable – short-term: | | |
| Unrestricted | $ 193,700 | $ 15,090 |
| Total of notes payable | $ 193,700 | $ 15,090 |

# Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

### 9. Accounts Payable and Accrued Liabilities

Accounts payable and accrued liabilities at June 30, 2011 and 2010 were as follows:

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Accounts payable, accruals, and withholdings in process of payment | $ 898,910 | $ 705,215 |
| Additional accruals and withholdings: | | |
| Injuries and damages and other | 23,911 | 23,911 |
| Accrued vacation and payroll benefits | 60,609 | 59,833 |
| Accrued sick leave and payroll benefits - exclusive of benefits to be liquidated after one year of approximately $139.9 million in 2011 and $128.9 million in 2010 | 26,665 | 34,139 |
| Accrued compensation | 22,647 | 34,770 |
| Accrued pension plan contribution and withholding from employees: | | |
| Employees' Retirement System | 16,588 | 15,800 |
| Employees health plan | 13,187 | 14,607 |
| Contribution in lieu of taxes | 176,514 | 70,813 |
| Other accrued liabilities | 12,659 | 10,145 |
|  | $ 1,251,690 | $ 969,233 |

### 10. Other Current Liabilities Payable from Restricted Assets

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Contract retainage | $ 10,209 | $ 12,733 |
| Other liabilities | 59,199 | 59,699 |
|  | $ 69,408 | $ 72,432 |

## Puerto Rico Electric Power Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

### 11. Long-Term Debt

At June 30, long-term debt consists of:

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Power Revenue Bonds payable: | | |
| Publicly offered at various dates from 1997 to 2010, interest rates ranging from 2% to 6.125%, maturing to 2040 | $ 7,780,890 | $ 7,422,875 |
|  | 7,780,890 | 7,422,875 |
| Plus unamortized premium and debt reacquisition costs | 80,362 | 72,447 |
| Revenue bonds payable, net | 7,861,252 | 7,495,322 |
| Notes payable and bond anticipation notes | 227,736 | 91,792 |
|  | 8,088,988 | 7,587,114 |
| Less current portion of long-term debt: | | |
| Notes payable from unrestricted assets | 193,700 | 15,090 |
| Power revenue bonds | 358,552 | 172,278 |
| Current portion of long-term debt from restricted assets | 358,552 | 172,278 |
| Total current portion of long-term debt | 552,252 | 187,368 |
|  | $ 7,536,736 | $ 7,399,746 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

Long-term debt activity for the years ended June 30, 2011 and 2010 was as follows:

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Long-term debt excluding current portion | $ 7,587,114 | $ 6,843,137 |
| New issues: |  |  |
|   Power revenue bonds | 355,730 | 1,536,105 |
|   Power revenue refunding bonds | 218,225 | 994,235 |
|   Debt discount and excess reacquisition costs |  |  |
|     on new bond issues, – net | (10,548) | 43,621 |
|   Defeaseance of bonds | (215,940) | (965,094) |
|   Debt discount and excess reacquisition costs on cancelled |  |  |
|     bonds, – net | 15,767 | 40,734 |
|   Notes payable | 172,062 | 212,881 |
|  | 8,122,410 | 8,705,619 |
| Payments: |  |  |
|   Power revenue bond – July 1 | – | (172,640) |
|   Power revenue bond – January 1 | – | (422) |
|   Notes payable | (36,119) | (955,841) |
| Total payments | (36,119) | (1,128,903) |
| Amortization of debt discount and excess reacquisition costs | 2,697 | 10,398 |
| Balance at end of year | $ 8,088,988 | $ 7,587,114 |
| Current portion of notes payable | $ 193,700 | $ 15,090 |
| Current portion of power revenue bonds | 358,552 | 172,278 |
| Total current portion of long-term debt | $ 552,252 | $ 187,368 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Power Revenue Bonds Payable**

During fiscal year 2011, the Authority issued its Power Revenue Bonds, Series DDD and EEE. In addition, Series EEE was issued under the Build America Bonds (BAB's) federal program, for the purpose of financing the cost of its Capital Improvements Program (CIP). Under this program the Authority will receive a credit from the United States Treasury equal to 35% of the stated interest paid on such bonds.

A summary of the net proceeds of the Power Revenue Bonds, Series DDD and EEE and the application of the proceeds follows (in thousands):

| | |
|---|---|
| Principal amount of the bonds | $ 573,955 |
| Net original issue premium | 14,310 |
| Deposits in bond service accounts | 2,552 |
| Authority Contribution | 150 |
| Total sources | $ 590,967 |
| | |
| Application of net proceeds: | |
| Deposit to 1974 construction fund | $ 284,466 |
| Deposit to reserve account | 14,050 |
| Deposit to escrow fund for the refunded bonds | 219,929 |
| Capitalized interest on bonds through July 1, 2012 | 12,377 |
| Payment of accrued interest on bond anticipation notes | 150 |
| Underwriting discount and estimated legal, printing and other financing expenses | 9,995 |
| Repayment of bond anticipation notes | 50,000 |
| Total application of proceeds | $ 590,967 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Power Revenue Bonds Payable (continued)**

During fiscal year 2010, the Authority issued its Power Revenue Bonds, Series XX, ZZ, AAA, BBB and CCC. In addition, Series YY was issued under the Build America Bonds (BAB's) federal program, for the purpose of financing the cost of its Capital Improvements Program (CIP). Under this program the Authority will receive a credit from the United States Treasury equal to 35% of the stated interest paid on such bonds.

A summary of the net proceeds of the Power Revenue Bonds, Series XX, YY, ZZ, AAA, BBB and CCC and the application of the proceeds follows (in thousands):

| | |
|---|---:|
| Principal amount of the bonds | $ 2,530,340 |
| Net original issue discount | (6,991) |
| Net original issue premium | 58,914 |
| Deposits in bond service accounts | 235,931 |
| Total sources | $ 2,818,194 |
| | |
| Application of net proceeds: | |
| Deposit to 1974 construction fund | $ 163,527 |
| Deposit to reserve account | 80,502 |
| Deposit to the debt service reserve fund | 2,637 |
| Deposit to escrow fund for the refunded bonds | 662,847 |
| Capitalized interest on bonds through July 1, 2010 | 188,825 |
| Payment of accrued interest on lines of credit | 325 |
| Underwriting discount and estimated legal, printing and other financing expenses | 27,774 |
| Swap termination payment | 44,500 |
| Repurchase of the purchased bonds | 329,306 |
| Repayment of bond anticipation notes | 100,473 |
| Repayment of lines of credit | 1,108,177 |
| Repayment of Government Development Bank line of credit | 109,300 |
| Total application of proceeds | $ 2,818,194 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Power Revenue Bonds Payable (continued)**

Maturities of the Power Revenue Bonds Series DDD issued during fiscal year 2011 range from July 1, 2020 to July 1, 2024. The Series DDD Bonds bear fixed interest rates ranging from 3.625% to 3.875%. Interest on the Series DDD Bonds is payable on each July 1 and January 1.

Maturities of the Power Revenue Refunding Bonds Series EEE issued during fiscal year 2011 range from July 1, 2020 to July 1, 2040. The Series EEE Bonds bear a coupon rate of 6.1%. Interest on the Series EEE Bonds is payable quarterly on each July 1, October 1, January 1 and April 1.

Maturities of the Power Revenue Bonds Series XX issued during fiscal year 2010 range from July 1, 2025 to July 1, 2040. The Series XX Bonds bear fixed interest rates ranging from 4.6% to 5.7%. Interest on the Series XX Bonds is payable on each July 1 and January 1.

Maturities of the Power Revenue Refunding Bonds Series YY issued during fiscal year 2010 range from July 1, 2037 to July 1, 2040. The Series YY Bonds bear a coupon rate of 6.1%. Interest on the Series YY Bonds is payable quarterly on each July 1, October 1, January 1 and April 1.

Maturities of the Power Revenue Refunding Bonds Series ZZ issued during fiscal year 2010 range from July 1, 2011 to July 1, 2028. The Series ZZ Bonds bear fixed interest rates ranging from 2.0% to 5.2%. Interest on the Series ZZ Bonds is payable on each July 1 and January 1.

Maturities of the Power Revenue Refunding Bonds Series AAA issued during fiscal year 2010 range from July 1, 2021 to July 1, 2031. The Series AAA Bonds bear a fixed interest rate of 5.25%. Interest on the Series AAA Bonds is payable on each July 1 and January 1.

Maturity of the Power Revenue Bonds Series BBB issued during fiscal year 2010 is July 1, 2028. The Series BBB Bonds bear fixed interest rate of 5.4%. Interest on the Series BBB Bonds is payable quarterly on each July 1, October 1, January 1 and April 1.

Maturities of the Power Revenue Bonds Series CCC issued during fiscal year 2010 range from July 1, 2021 to July 1, 2028. The Series CCC Bonds bear fixed interest rates ranging from 4.3% to 5.3%. Interest on the Series CCC Bonds is payable on each July 1 and January 1.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Power Revenue Bonds Payable (continued)**

The Authority has issued Power Revenue Bonds pursuant to the 1974 Agreement principally for the purpose of financing the cost of improvements; as such term is defined in the 1974 Agreement, and subject to the conditions and limitations set forth therein.

In the 1974 Agreement, the Authority covenants to fix, charge, and collect rates so that revenues will be sufficient to pay current expenses and to provide the greater of (i) the required deposits or transfers under the Sinking Fund, the 1974 Self-insurance Fund and the Reserve Maintenance Fund or (ii) 120% of the aggregate principal and interest requirements for the next fiscal year on account of all outstanding Power Revenue Bonds.

Gross revenues, exclusive of income on certain investments, less current expenses as defined in the Agreement have been pledged to repay Power Revenue Bonds principal and interest.

**Bond Anticipation Notes**

Bond anticipation notes (BANs) are used primarily to provide interim construction financing and are usually retired with the proceeds of long-term debt.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Interest-Rate Swap Agreements**

To protect against the potential of rising interest rates, the Authority entered into quarterly separate pay-fixed, receive-variable interest-rate swaps at a cost anticipated to be less than what the Authority would have paid to issue fixed-rate debt.

On June 30, 2011 and 2010, the Authority had the following derivative instruments outstanding: (in thousands)

| Item | Type | Objective | Notional Amount | Effective Date | Maturity Date | Terms | Counterparty Credit Rating |
|------|------|-----------|-----------------|----------------|---------------|-------|----------------------------|
| A | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | $ 25,525 | 5/3/2007 | 7/1/2017 | Pay 4.014%; receive 5Y SIFMA | Aa1/AA- |
| B | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 17,000 | 5/3/2007 | 7/1/2018 | Pay 4.054%; receive 5Y SIFMA | Aa1/AA- |
| C | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 29,055 | 5/3/2007 | 7/1/2020 | Pay 4.124%; receive 5Y SIFMA | Aa1/AA- |
| D | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 14,570 | 5/3/2007 | 7/1/2025 | Pay 4.232%; receive 67% 3M LIBOR + 0.68% | Aa1/AA- |
| E | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 169,532 | 5/3/2007 | 7/1/2029 | Pay 4.08%; receive 67% 3M LIBOR + 0.52% | Aa1/AA- |
| F | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 72,800 | 5/3/2007 | 7/1/2031 | Pay 4.286%; receive 67% 3M LIBOR + 0.70% | Aa1/AA- |
| G | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 83,343 | 5/3/2007 | 7/1/2029 | Pay 4.08%; receive 67% 3M LIBOR + 0.52% | Aa3/A+ |
| H | Basis Swap | Hedges tax risk on underlying fixed rate bonds (various) and provides expected positive cash flow accrual | 1,375,000 | 7/1/2008 | 7/1/2037 | Pay SIFMA; receive 62% 3M LIBOR + 0.29% + 0.4669% | A1/A |
| | Total | | $1,786,825 | | | | |

Derivative instruments A through G hedge changes in cash flows of the underlying bonds – floating rate notes with coupons based on 5y SIFMA or 67% of 3m LIBOR index, and maturities equal to the maturities of the corresponding swaps. As such they are considered hedging derivative instruments. The total fair value of these instruments as of June 30, 2011 is ($52.3) million.

# Puerto Rico Electric Power Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Interest-Rate Swap Agreements (continued)**

The following tables include fiscal year 2011 and 2010 summary information for the Authority's effective hedges related to the outstanding swap agreements.

| Instrument Type | Changes in Fair Value | | Fair Value at June 30, 2011 | | | |
|---|---|---|---|---|---|---|
| | Classification | Amount | Classification | Amount | | Notional |
| Interest Rate Swap | Deferred Outflows | $     11,811 | Fair value of derivative instruments | $     (52,286) | $ | 411,825 |
| Basis Swap | Deferred Outflows | 28,985 | Fair value of derivative instruments | (16,856) | | 1,375,000 |
| | Total | $     40,796 | | $     (69,142) | $ | 1,786,825 |

| Instrument Type | Changes in Fair Value | | Fair Value at June 30, 2010 | | | |
|---|---|---|---|---|---|---|
| | Classification | Amount | Classification | Amount | | Notional |
| Interest Rate Swap | Deferred Outflows | $     (21,556) | Fair value of derivative instruments | $     (64,097) | $ | 411,825 |
| Basis Swap | Deferred Outflows | 15,506 | Fair value of derivative instruments | (45,841) | | 1,375,000 |
| | Total | $     (6,050) | | $     (109,938) | $ | 1,786,825 |

The terms, fair values and credit ratings of the outstanding interest-rate swaps as of June 30, 2011, were as follows (in thousands) (excludes basis swap):

| Associated Power Revenue Bonds | Notional Amount | Effective Date | Maturity Date | Fixed Rate | Fair Value | |
|---|---|---|---|---|---|---|
| | | | | | 2011 | 2010 |
| LIBOR Bonds, Series UU | $ 169,532 | 3-May-07 | 1-Jul-29 | 4.080% | $ (23,814) | $ (29,278) |
| LIBOR Bonds, Series UU | 14,570 | 3-May-07 | 1-Jul-25 | 4.232% | (1,962) | (2,294) |
| LIBOR Bonds, Series UU | 72,800 | 3-May-07 | 1-Jul-31 | 4.286% | (10,703) | (13,311) |
| LIBOR Bonds, Series UU | 83,343 | 3-May-07 | 1-Jul-29 | 4.080% | (11,857) | (14,463) |
| Muni-BMS Bonds, Series UU | 25,525 | 3-May-07 | 1-Jul-17 | 4.014% | (1,407) | (1,619) |
| Muni-BMS Bonds, Series UU | 17,000 | 3-May-07 | 1-Jul-18 | 4.054% | (945) | (1,121) |
| Muni-BMS Bonds, Series UU | 29,055 | 3-May-07 | 1-Jul-20 | 4.124% | (1,597) | (2,010) |
| Total | $ 411,825 | | | | $ (52,285) | $ (64,096) |

The notional amounts of the swaps match the principal amounts of the associated Power Revenue Bonds.

During fiscal years 2010-2011 and 2009-2010, the payments of fixed rate interest from the Authority exceeded the amount received as variable interest rate from swap counter parties by $13.0 million and $23.4 million, respectively.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Interest-Rate Swap Agreements (continued)**

Using rates as of June 30, 2011, debt service requirements of the variable-rate debt and net swap payments, assuming current interest rates remain the same for their term. These debt service requirements are included in the scheduled maturities of long-term debt disclosed further on this note. As rates vary, variable-rate bond interest payments and net swap payments will vary.

| Fiscal Year Ending June 30 | Principal | Interest | Interest-Rate Swap, Net | Total |
|---|---|---|---|---|
| | | *(In thousands)* | | |
| 2012 | $       — | $   4,008 | $  12,958 | $  16,966 |
| 2013 | — | 4,008 | 12,958 | 16,966 |
| 2014 | — | 4,008 | 12,958 | 16,966 |
| 2015 | — | 4,008 | 12,958 | 16,966 |
| 2016 | — | 4,008 | 12,958 | 16,966 |
| 2017-2032 | 411,825 | 38,245 | 155,428 | 605,498 |
| Total | $  411,825 | $  58,285 | $ 220,218 | $ 690,328 |

As of June 30, 2011 and 2010, the swaps had a negative fair value of approximately $52.3 million and $64.1 million, respectively. The negative fair value of the swaps may be countered by reduction in future net interest payments required on the variable-rate Power Revenue Bonds, creating higher synthetic rates.

As of June 30, 2011 and 2010, the Authority was not exposed to credit risk because the swaps had a negative fair value in the amount of the swaps' fair value. However, should interest rates change and the fair value of the swap become positive, the Authority would be exposed to credit risk in the amount of the derivative's fair value. The swaps counterparties were rated Aa1 and Aa3 as issued by Moody's Investor Services (Moody's), AA- and A+ by Standard & Poors (S&P), and AA- and A+ by Fitch Ratings.

The derivative contract uses the International Swaps and Derivatives Association, Inc. master agreement, which includes standard termination events, such as failure to pay bankruptcy. The Authority or the counterparties may terminate the swaps if the other party fails to perform under the terms of the contracts. Also, the swaps may be terminated by the Authority if the counterparties' credit quality rating falls below Baa1 as issued by Moody's or BBB+ as determined by S&P. If at the time of termination the swap has a negative fair value, the Authority would be liable to the counterparty for a payment equal to the swap's fair value.

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Basis Swap Agreement**

In March 2008 (with effective date of July 1, 2008), the Authority entered into a basis swap agreement in the notional amount of $1,375 million with an amortization schedule matching certain maturities of the Authority's outstanding power revenue and revenue refunding bonds issued in various years from 2027 to 2037 (the 2008 basis swap). Under the terms of a master swap agreement, the Authority receives from its counterparty (Goldman Sachs Capital Markets, L.P., an affiliate of Goldman, Sachs & Co.) quarterly, commencing on October 1, 2008, a floating amount applied to said notional amount at a rate equal to 62% of the taxable London Inter-Bank Offering Rate (LIBOR) index reset each week plus 29 basis points (hundredths of a percent) and a fixed rate payment of 0.4669% per annum (the "basis annuity"), quarterly for the term of swap in return for quarterly payments by the Authority, commencing also on October 1, 2008, on such notional amount at a rate based on the Securities Industry and Financial Markets Association (SIFMA) municipal swap index.

The basis swap hedges the portion of the fair value of the underlying liabilities attributable to the relative value/basis risk between tax-exempt and taxable rates. Because of the tax-exemption, tax-exempt bonds trade at yields lower than taxable yields. The percent at which tax-exempt yields trade relative to taxable yields (UST or LIBOR) is referred to as MMD ratios or muni bond ratios.

In order to assess effectiveness of the basis swap as a hedge, the Authority ran a regression of SIFMA ratios (as an independent variable) and MMD ratios (as dependent variable), adjusting to the specific circumstances. The result showed a high correlation. The method used can be qualified as Other Quantitative Method.

Because the MMD ratios and SIFMA ratios reflected respectively the change in the relative value of the tax-exempt rates to taxables in the bond market and the SIFMA swap market, the Authority concluded that the regression showed that the SIFMA swap could effectively hedge the bond's value attributable to basis risk between tax-exempt and taxables and, therefore, the basis swap was considered an effective hedge instrument under GASB 53.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Basis Swap Agreement (continued)**

By using derivative financial instruments to hedge the exposure to changes in interest rates, the Authority exposes itself to credit risk, market-access risk and basis risk. Credit risk is the failure of the counterparty to perform under the terms of the derivative contract. When the fair value of a derivative contract is positive, the counterparty owes the Authority, which creates a credit risk for the Authority. When the fair value of the derivative contract is negative, the Authority owes to the counterparty and, therefore, does not pose credit risk to the Authority. The Authority minimizes the credit risk in derivative instruments by entering into transactions with high-quality counterparties whose credit rating is acceptable under the investment policies of the Authority and of Government Development Bank for Puerto Rico (GDB), its fiscal agent.

Market risk is the adverse effect on the value of a financial instrument that results from a change in interest rates. The market risk associated with an interest rate swap contract is managed by establishing and monitoring parameters that limit the types and degree of market risk that may be undertaken. The Authority assesses market risk by continually identifying and monitoring changes in interest rate exposures that may adversely affect expected interest rate swap contract cash flows and evaluating other hedging opportunities. The Authority and GDB maintain risk management control systems to monitor interest rate cash flow risk attributable to both the Authority's outstanding or forecasted debt obligations as well as the Authority's offsetting hedge positions.

Basis risk arises when different indices are used in connection with a derivative instrument such as an interest rate swap contract. The 2009 basis swap exposes the Authority to basis risk should the relationship between LIBOR and the SIFMA municipal swap index converge. If a change occurs that results in the relationship moving to convergence, the expected financial benefits may not be realized. The Authority assesses basis risk by following the aforementioned market risks control system.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Basis Swap Agreement (continued)**

During the fiscal years 2010-2011 and 2009-2010, the Authority received from its counterparty $9.6 million and $9.5 million, respectively. The following table shows the cash flow benefit of the basis annuity in exchange for the Authority taking tax and other basis risks tied to the change in the relationship between LIBOR and the SIFMA municipal swap index.

|  | 2010-2011 | 2009-2010 |
|---|---|---|
|  | *(In thousands)* | |
| Basis annuity received | $ 6,420 | $ 6,420 |
| LIBOR index amounts received | 6,685 | 6,919 |
| SIFMA index amounts paid | (3,499) | (3,832) |
| Net amount received | $ 9,606 | $ 9,507 |

As of June 30, 2011 and 2010, the 2009 basis swap had a negative fair value to the Authority of approximately $16.9 million and $45.8 million, respectively. The negative fair value of the basis swap may be viewed as a reduction in future benefits to be received from the counterparty.

According to the Credit Support Annex of the Master Swap Agreement, if the fair value of the 2009 basis swap is negative and exceeds the threshold amount, the Authority shall post eligible collateral on the next business day upon notification from its counterparty. During fiscal year 2009-2010 the threshold amount for the Authority was $50 million. The Authority and GDB entered into an agreement for a $150 million revolving line of credit to meet collateral posting requirements from the 2009 basis swap. As of June 30, 2011 and 2010, there was no balance outstanding on the line of credit.

As of June 30, 2011 and 2010, negative fair values of the derivative instruments are $69.1 million and $109.9 respectively.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Scheduled Maturities of Long-Term Debt**

The scheduled maturities of long-term debt with interest thereon at June 30, 2011, are as follows:

| Fiscal Year Ending June 30, | Principal | Interest | Total |
|---|---|---|---|
| | *(In thousands)* | | |
| 2012 | $   554,579 | $   230,279 | $   785,038 |
| 2013 | 210,363 | 368,658 | 579,021 |
| 2014 | 215,605 | 359,058 | 574,663 |
| 2015 | 215,252 | 348,826 | 564,078 |
| 2016 | 226,332 | 337,717 | 564,049 |
| 2017-2021 | 1,317,863 | 1,503,221 | 2,820,904 |
| 2022-2026 | 1,678,252 | 1,139,998 | 2,818,250 |
| 2025-2031 | 1,549,020 | 714,983 | 2,264,003 |
| 2032-2036 | 938,015 | 399,554 | 1,337,569 |
| 2037-2041 | 1,103,345 | 132,977 | 1,236,322 |
| Total | 8,008,626 | 5,535,271 | 3,543,897 |
| Less: | | | |
| Unamortized discount and premium | 203,787 | – | 203,787 |
| Excess reacquisition costs | (123,425) | – | (123,425) |
| Interest | – | (5,535,271) | (5,535,271) |
| Total long-term debt | 8,088,988 | – | 8,088,988 |
| Current portion of notes payable | (193,700) | – | (193,700) |
| Current portion, net of discount and excess reacquisition costs of bonds | (358,552) | – | (358,552) |
| Total current portion | (552,252) | – | (552,252) |
| Long-term debt, excluding current portion | $ 7,536,736 | $           – | $ 7,536,736 |

**Puerto Rico Electric Power Authority**
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Audited Financial Statements (continued)**

## 12. Employees' Retirement Benefits

### Pension Plan

#### Plan Description

All of the Authority's permanent full-time employees are eligible to participate in the Authority's Pension Plan, a single employer defined benefit pension plan (the Plan) administered by the Employees' Retirement System of the Puerto Rico Electric Power Authority (the System). The System issues a publicly available financial report that includes financial statements and required supplementary information for the Plan. That report may be obtained by writing to the Retirement System of the Puerto Rico Electric Power Authority, PO Box 13978, San Juan, Puerto Rico 00908-3978.

Benefits include maximum retirement benefits of 75% of average basic salary (based on the three highest annual basic salaries) for employees with 30 years of service; also, reduced benefits are available upon early retirement. The Plan was amended on February 9, 1993 to provide revised benefits to new employees limiting the maximum retirement basic salary to $50,000. The plan was further amended in January 1, 2000 to provide improved retirement benefits to employees with 25 years or more of credited service. Disability and death benefits are also provided. Separation benefits fully vest upon reaching 10 years of credited service.

If a member's employment is terminated before he becomes eligible for any other benefits under this Plan, he shall receive a refund of his member contribution plus interest compounded annually. The Plan is not subject to the requirements of the Employees Retirement Income Security Act of 1974 (ERISA).

#### Funding Policy and Annual Pension Cost

The contribution requirements of plan members and the Authority are established and may be amended by the Authority. The Annual Pension Cost (APC) and the Annual Required Contribution (ARC) were computed as part of an actuarial valuation performed as of June 30, 2010 and projected to June 30, 2011, based on current year demographic data.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

The Authority's annual pension cost for the year ended June 30, 2011 and related information for the Plan and supplemental benefits follows:

| | **Pension Plan** |
|---|---|
| Contribution rates: | |
|   Authority | 23:80% |
|   Plan members | 10.05% |
| Annual pension cost (thousands) | $85,447 |
| Contributions made and accruals (thousands) | $85,180 |
| Actuarial valuation date | 6/30/2009 |
| Actuarial cost method | Entry age |
| Amortization method | Level percentage of pay, closed (4% payroll increases per year) |
| Remaining amortization period | 27 years |
| Asset valuation method | 5-year smoothed market |
| Actuarial assumptions: | |
|   Investment rate of return (net of administrative expenses)* | 8.5% |
|   Projected salary increases* | 4.10% – 5.40% depending on age |
| *Includes inflation at | 3.0% |
| Cost-of-living adjustments | 8% per year for yearly pension up to $3,600 and 4% per year for yearly pension between $3,600 and $7,200, 2% per year for yearly pension in excess of $7,200. The minimum adjustment is $300 per year. The maximum is $600 per year. |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Supplemental Benefits not Funded Through the System (continued)**

Trend Information
*(In millions)*

| Fiscal Year Ended | Annual Pension Cost (APC) | Percentage of APC Contributed | Net Pension Obligation |
|---|---|---|---|
| Pension Plan: | | | |
| 06/30/03 | $50.6 | 100% | $  0.0 |
| 06/30/04 | 65.0 | 81% | 12.3 |
| 06/30/05 | 69.9 | 100% | 12.6 |
| 06/30/06 | 74.8 | 100% | 12.9 |
| 06/30/07 | 74.6 | 100% | 13.2 |
| 06/30/08 | 76.3 | 100% | 13.5 |
| 06/30/09 | 78.6 | 100% | 13.8 |
| 06/30/10 | 75.9 | 100% | 14.1 |
| 06/30/11 | 85.4 | 100% | 14.4 |

The annual required contribution amounted to $85.4 million and $75.9 million in 2011 and 2010, respectively. The net pension obligation is included in accounts payable and accrued liabilities on the balance sheet.

**Supplemental Benefits not Funded Through the System**

Supplemental benefits were unfunded and such benefits were reimbursed to the System when paid up to December 31, 1999. Effective January 1, 2000, the Board of Trustees of the System approved the transfer of the obligation for supplemental benefits provided by the Authority and not funded through the System (supplemental pension obligations exchanged for forfeited sick leave benefits and the supplemental spousal survivor benefits) to the Retirement System. Also, the Board of Trustees of the System accepted an amortization period for the Plan of 40 years, which commenced on June 30, 1996.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Supplemental Benefits not Funded Through the System (continued)**

Supplemental Pension Obligations Exchanged for Forfeited Sick Leave Benefits

The Authority's employees with over 20 years of service are entitled to exchange accrued sick leave for supplemental pension benefits and/or be paid in cash the value of such sick leave upon separation from employment.

**Other Post-Employment Benefits (OPEB)**

Postemployment Health Plan

*Plan Description* – PREPA Retired Employees Healthcare Plan (Health Plan) is a single-employer defined contribution benefit healthcare plan administered by the Authority. During the fiscal year 2009-2010, the Authority adopted a resolution to change the Health Plan. The Health Plan for all retirees will be capped at $300 per member per month for retirees and spouses under age 65 and $200 per member per month for retirees and spouses age 65 and over.

*Membership* – During the fiscal year 2009-2010, the Health Plan changed to require all new retired employees on or after September 1, 2009, to have 30 year of services to receive health benefits. Certain retired employees on or after September 1, 2009, all retired employees before September 1, 2009, their legal spouses, and certain disabled dependents are eligible to participate in the Postretirement Health Plan. To remain eligible for participation, Medicare eligible retired participants and their spouses must enroll in Medicare Part B at age 65, or whenever eligible, at their own expenses. The benefit provisions to retired employees are established and may be amended by the Authority.

# Puerto Rico Electric Power Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Other Post-Employment Benefits (OPEB) (continued)**

*Funding Policy and Annual OPEB Cost* – The required contribution is based on projected pay-as-you-go financing requirements. The contribution requirements of plan members and the Authority are established and may be amended by the Authority.

The Annual OPEB Cost is calculated based on the Annual Required Contribution (ARC) of the employer, an amount actuarially determined in accordance with the provisions of GASB Statement No. 45. The ARC represents a level of funding that, if paid on ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed thirty years. The following table shows the components of the Authority's annual OPEB cost for the fiscal year 2010-2011 and 2009-2010 (in thousands):

|  | 2011 | 2010 |
|---|---|---|
| Annual OPEB cost | $ 27,376 | $ 27,482 |
| Actuarial Accrued Liability (AAL) | $612,674 | $ 586,886 |
| Unfunded AAL | $612,674 | $ 586,886 |
| Funded Ratio | 0% | 0% |
| Annual Covered Payroll | $357,405 | $ 362,893 |

The net OPEB obligation change is as follows (in thousands):

|  | 2011 | 2010 |
|---|---|---|
| Change in net OPEB obligation: |  |  |
| Net OPEB obligation, beginning balance | $ 118,331 | $ 134,176 |
| Total annual required contribution (ARC), July 1– June 30 | 26,587 | 26,587 |
| Interest on Net OPEB obligation | 4,733 | 5,367 |
| Adjustments to annual required contribution | (3,944) | (4,472) |
| Actual benefit payments, July 1–June 30 | (22,091) | (43,327) |
| Net OPEB obligation, ending balance | $ 123,616 | $ 118,331 |

For the fiscal years ended June 30, 2011 and 2010, the Authority's annual OPEB expense was $27.4 million and $27.5 million, respectively. This expense is included in Administrative and General Expenses.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Other Post-Employment Benefits (OPEB) (continued)**

Postemployment Health Plan (continued)

The OPEB expense is not equal to the Annual Required Contribution, which is $26.6 million. The OPEB expense is considered in operating expenses in the Authority's Statement of Revenues, Expenses and Changes in Net Assets. The actual payment to the health plan for retirees and their beneficiaries, which totaled $22.1 million, is included in Administrative and General Expenses.

For the fiscal year ended June 30, 2010, the Authority's annual OPEB expense of $27.5 million. The OPEB expense is considered in operating expenses in the Authority's Statement of Revenues, Expenses and Changes in Net Assets. The payment to the health plan for retirees and their beneficiaries, which totaled $43.3 million for fiscal year 2010, is included in Administrative and General Expenses.

The Authority's annual OPEB cost, and the net OPEB obligation for 2011 and the two preceding years were as follows:

**Trend Information**
*(In millions)*

| Fiscal Year Ended | Annual OPEB Cost | Percentage of Annual OPEB Cost Contributed | Net OPEB Obligation |
|---|---|---|---|
| 06/30/09 | $25.6 | 316% | $ 134.2 |
| 06/30/10 | 27.5 | 158% | 118.3 |
| 06/30/11 | 27.4 | 81% | 123.6 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Other Post-Employment Benefits (OPEB) (continued)**

Postemployment Health Plan (continued)

*OPEB Actuarial Valuation* – The Authority's other Post-Employment Benefits Program actuarial valuation was conducted by Cavanaugh Macdonald Consulting, LLC. Cavanaugh Macdonald Consulting, LLC is a member of the American Academy of Actuaries. The valuation was performed in accordance with GASB Statement No. 45 requirements.

Actuarial Methods and Assumptions:

| Actuarial Valuation Date | July 1, 2010 |
|---|---|
| Actuarial Cost Method | Projected Unit Credit |
| Amortization method | Level Percent of Pay, Open |
| Remaining Amortization Period | 30 years |
| Actuarial Assets Valuation Method | Market Value of Assets |
| Investment Rate of Return | 4% (includes inflation rate) |
| Inflation Rate: | 3% |
| Medical | Not applicable |
| Prescription drug | Not applicable |
| Dental | Not applicable |
| Projected Salary Increases | 4% |

The required schedule of funding progress, included supplementary information (Schedule I) that presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

The actuarial calculations reflect a long-term perspective. Consistent with that perspective, actuarial methods and assumptions used include techniques that are designed to reduce short-term volatility in actuarial accrued liabilities and the actuarial value of assets.

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Notes to Audited Financial Statements (continued)

### 13. Revenues from Major Clients and Related Parties

Electric operating revenues from major clients and related parties are as follows:

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Governmental sector, principally instrumentalities, agencies and corporations of the Commonwealth of Puerto Rico | $ 534,323 | $ 497,697 |
| Municipalities of the Commonwealth of Puerto Rico | 212,462 | 196,490 |
|  | $ 746,785 | $ 694,187 |

### 14. Net Assets

Restricted assets at June 30, 2011 and 2010 include $77.6 million and $136.1 million, respectively, which have been appropriated principally to comply with long-term principal and interest debt services requirements and a reserve for damaged or destroyed property of the Authority not fully covered by insurance as required by the 1974 Agreement. Funds set aside for self-insurance purposes are deposited in the Self-Insurance Fund held by the Trustee (see Note 5).

As of June 30, 2011, the Authority is in a net deficit position. The Authority faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession, the volatility in oil prices, and the fact that the Authority has not increased rates to its customers at sufficient levels to offset the effects of its rising costs. Its principal challenges, some of which are interrelated, are: (i) addressing the decline in electric energy sales; (ii) addressing the volatility of oil costs; (iii) addressing high customer electric power rates; (iv) reducing government accounts receivables; and (v) improving its liquidity. The Authority is committed to take all necessary measures to ensure it achieves a healthy financial condition.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 15. Claim for Extra Fuel Expense

The Authority expects insurance companies to cover higher fuel price and other costs associated with alternate generation capacity in connection with two fires on the Authority's generating units. In years preceding and up to June 30, 2011, there were $339 million in claims to insurance companies due to these fires. $301 million has been collected up to June 30, 2011 and $38 million was outstanding as of June 30, 2011. During the year ended June 30, 2011, there were no additional claims related to extra fuel expense. During fiscal year June 30, 2010, the Authority received $17 million of the outstanding amount. No additional moneys were received during fiscal year ended June 30, 2011.

### 16. Contribution in Lieu of Taxes

|  | 2011 | 2010 |
|---|---|---|
|  | *(In thousands)* | |
| Municipalities | $ 212,462 | $ 196,490 |
| Commonwealth: |  | 0 |
| Hotels | 7,449 | 6,316 |
| Fuel adjustment subsidy | 26,847 | 29,625 |
|  | $ 246,758 | $ 232,431 |

### 17. Commitments and Contingencies

#### Environmental Matters

Facilities and operations of the Authority are subject to regulation under numerous Federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, Oil Pollution Act (OPA), Resource Conservation Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and Underground Storage Tanks, among others.

In February 1992, the Environmental Protection Agency (EPA) conducted a multimedia inspection of the Authority's facilities and identified several alleged instances of non-compliance related to the Authority's air, water and oil spill prevention control and countermeasures compliance programs.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

The Authority and the EPA undertook negotiations to resolve the issues regarding the deficiencies observed during the inspection and to ensure future compliance with all applicable laws and regulations. As a result of the negotiations, the Authority and the EPA reached an agreement that resulted in a consent decree (the Consent Decree) approved by the United States federal court in March 1999. Under the terms and conditions of the Consent Decree, the Authority paid a civil penalty of $1.5 million, and implemented additional compliance projects amounting $4.5 million. In addition, the Consent Decree requires that the Authority improves and implements compliance programs and operations in order to assure compliance with environmental laws and regulations.

In 2004, the United States federal court approved a modification to the Consent Decree agreed by the Authority and the EPA under which the Authority reduced, in two steps, the sulfur content in the No. 6 fuel oil used in certain generating units of its Costa Sur and Aguirre power plants (to 0.75% or less by March 1, 2005 and to 0.5% or less by March 1, 2007), and used No. 6 fuel oil with sulfur content of not more than 0.5% through July 18, 2009 at its Palo Seco and San Juan power plants. Additionally, the Authority has completed a nitrogen oxide emissions reduction program and modified the optimal operating ranges for all its units under the Consent Decree. The Authority also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs under the Consent Decree.

PREPA has audited the Consent Decree programs and a considerable number of them can be closed since their requirements have been completed. The programs can be closed under a Stipulation of Partial Termination filed jointly, in federal court, with the Environmental Protection Agency.

Since September 2004, there has been no legal action in the United States federal court or any administrative proceeding against the Authority regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of non-compliance. Non compliance events must be disclosed to EPA in the corresponding report. Ordinarily, when a covered non compliance event occurs, the Authority pays the stipulated penalty in advance in order to benefit from a 50% discount of the applicable stipulated penalty.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

*Other Proceedings*

In 1997, as a result of an inspection carried out by the EPA and the Puerto Rico Environmental Quality Board (the EQB) at the Authority's Palo Seco power plant, the EPA issued an Administrative Order for the investigation and possible remediation of seven areas identified by the EPA at the Palo Seco power plant and the Palo Seco General Warehouse (Depot). The Administrative Order required the Authority to carry out a Remedial Investigation/Feasibility Study (RI/FS). The RI/FS required under the order is designed to: (1) determine the nature and extent of contamination and any threat to the public health, welfare or environmental caused by any release or threatened release of hazardous substances, pollutants, or contaminants at or from the site; and (2) determine and evaluate alternatives for the remediation or control of the release or threatened release of hazardous substances, pollutants, or contaminants at or from the site. The RI/FS is still in progress. The RI was completed and a final report was submitted to EPA for evaluation. PREPA is waiting for EPA's evaluation.

The information gathered under the RI reflected the presence of free product (Separate Phase Hydrocarbons) in several monitoring wells. The analysis of this product also reflected a low concentration of polychlorinated biphenyls (PCBs). PREPA and EPA entered into an Administrative Order on Consent (CERCLA-02-2008-2022) requiring the Authority to complete a removal plan that consists of determining if the underground water has been impacted by PCBs, the extension of the contamination and the implementation of a work plan for free product removal. Analytical data collected during this activity reflected that underground water has not been impacted by PCBs. Nevertheless, water/oil mix has been found in seven monitoring wells (MWs). PCBs concentrations between 1.36-2.36 parts per million were detected in the oil found in 3 of the 7 MWs. Multiphase extraction (MPE) activities in the MWs where water/oil phases were found, has been performed on a weekly basis. After several MPE, this activity was discontinued as USEPA's recommendations. MWs gauging readings were performed during these activities. The last MW gauging readings reflected the presence of oil/water mix in nine MW's. Three of these wells are located off-site. This situation represents an environmental threat since the wells are located near the ocean. USEPA request the take actions to avoid the environmental threat. PREPA proposed the installation of LNAPL Barrier wall which prevent further off-site migration of LNAPL and include long term/passive recovery of the LNAPL. The

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

*Other Proceedings (continued)*

cost of the wall barrier installation is around $1,000,000. As part of the USEPA/PREPA
meetings regarding RI/FS and AOC, USEPA is considered that RI/FS will be completed as a no
action ROD with some institutional controls and the AOC will be closed with the installation of
the barrier wall. USEPA will notify PREPA with the final decision after discussion with other
USEPA Region 2 personnel.

The remaining costs to achieve compliance have been estimated at $1,500,000. Both Orders also
establishes a Reimbursement of Costs condition in which the Authority agrees to reimburse EPA
for all costs incurred by EPA in connection to the site. No bill has been received by the
Authority, as of this date.

The Record of Decision (ROD) was published as scheduled by EPA on September 30, 2011.
Alternative No. 2, Removal with On-Site Consolidation and Cover in the Non-Residential Area,
was selected. From this point on, EPA resumed negotiations with the Potential Responsible
Parties (PRP's), both private and public, towards signing a Consent Decree through which the
PRP's would contribute enough funds to cover the costs of the remedial action and the
maintenance of the site. PREPA has already approved a contribution of $1,000,000 through
Resolution 3804, April 1, 2011. Notwithstanding, through further negotiations an additional
contribution of $300,000 was required by EPA. This contribution will be considered by
PREPA's Governing Board in the upcoming weeks. Once approved PREPA should be able to
finalize the negotiations and execute the Consent Decree, subject to the ability of the other public
PRP's to do the same. Once this CD is executed no further disbursements are foreseeable, but
for the noncompliance of other PRP's.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

_Other Proceedings (continued)_

In 2002, the Authority received a "Special Notice Concerning Remedial Investigation/Feasibility Study for Soil at the Vega Baja Solid Waste Disposal Superfund Site. The EPA has identified the Authority and six other entities as "potentially responsible parties", as defined in the CERCLA. In 2003, the Authority agreed to join the other potentially responsible parties in an Administrative Order on Consent (AOC) for an RI/FS, with the understanding that such agreement did not constitute an acceptance of responsibility. Under the AOC, the Authority committed up to $250,000 as its contribution to partially fund the RI/FS. At this time, RI/FS has been completed. The work proceeded in accordance with the schedule established by the Authority and the other designated potentially responsible parties. On July 2010, a proposed Plan was issued identifying the Preferred Alternative to address soil contamination at the Vega Baja Solid Waste Disposal Site. EPA held a public hearing on August 3, 2010 to discuss the alternatives to address soil contamination. A Record of Decision (ROD) by EPA is scheduled for the end of September 2010 in which a determination of the selected alternative will be made.

In 2004, the EPA filed a complaint against the Authority regarding an alleged Resource Conservation and Recovery Act (RCRA) violation at its Aguirre power plant related to an oil sheen observed during an EPA inspection in 2000. The Authority filed an answer to the complaint disputing the allegations. The Authority paid a $67,000 penalty and carried out certain activities at the Aguirre power plant designed to prevent future, similar violations.

In December 2004, the EPA sent a request for information to the Authority and to other potentially responsible parties that did business with certain recycling companies regarding the release of pollutants by these recycling in a Toa Baja superfund site. The EPA has stated that is particularly interested in entities that disposed of batteries at this site. The Authority has responded to the request for information, stating that it only sold scrap metal to these recycling companies. The Authority does not believe it has any liability regarding this site. At this time, we have no knowledge that the EPA has initiated, or intends to initiate any action against the Authority concerning this matter.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs**

The Authority continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

_Air Quality Compliance_

In general, the Authority is consistently maintaining a 99% or better level of compliance with in-stack opacity requirements. The Authority continues to use No. 6 fuel oil with a sulphur content equal to or less than 0.50% in all its power plants which should contribute maintain air quality. These are requirements under the Consent Decree as modified in June 2004. This modification allows for Palo Seco Power Plant to use fuel with sulfur content other than 0.50% provided that it issues a public notification (in a general circulation newspaper) and directly notifies the group Comunidades Unidas Contra la Contaminacion.

_QA/QC Continuous Monitoring Program_

This program requires quarterly audits to the opacity monitors to insure compliance with the Consent Decree Clean Air Compliance Program. All quarterly reports have been performed and submitted in compliance with the Consent Decree stipulations.

_Relative Accuray Test Audit (RATA)_

A Relative Accuracy Test Audit (RATA) is a test to validate and certify for a period of one year the plant's Continuous Emission Monitoring Systems (CEMS) equipment for purposes of continuous data collection. The requirements to perform this test are found at 40 CFR Part 60 Appendix F and is to insure compliance with the Plants PDS air operation permits. Annually reports have been performed and submitted in compliance with the air operation permits requirements.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*Title V Permitting Program*

PREPA is still awaiting issuance of a Title V Permit for the Palo Seco Power Plant. The permit application was submitted in November 1996.

PREPA is also awaiting issuance of a Title V for the San Juan Power Plant. A modification was submitted to include the natural gas scenario for units 5 and 6.

In September 2011, PREPA submitted a modification of the Costa Sur Power Plant's Title V permit to include the natural gas scenario for units 5 and 6.

The Title V permit for the Aguirre Power Complex expires in February 2013, but a permit renewal application will be submitted in February 2012.

PREPA is awaiting issuance of the Title V permit for the Cambalache Plant.

The Title V Permit for the Vega Baja, Daguao and Jobos gas turbines were issued by the Environmental Quality Board. PREPA is still awaiting permits for the Mayaguez and Yabucoa turbines.

Also, the Costa Sur Power Plants units 5 and 6 have been converted to burn natural gas and should start using the fuel by May 2012.

This program requires operational permits for PREPA's units. During the year 2009, the permit renewal applications for the gas turbines facilities located at Daguao, Vega Baja, and Jobos were submitted in compliance with the Clean Air Title V Program stipulations. On May 14, 2010, the EQB issued a final permit for the Daguao gas turbines.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*Water Quality Compliance*

As of December 2010, the Authority had achieved a level of compliance with the Clean Water Act regulations (NPDES permits, Drinking Water Program, OPA'90 (FRP's and Operations Manual) and SPCC Regulation) in excess of 99%.

The Authority has completed compliance plans for abating water pollution at its four major power plants - Aguirre, San Juan, South Coast, and Palo Seco, as required by the Consent Decree, Section VI, Part I.

PREPA prepared and submitted the San Juan Power Plant NDPES Renewal Application on September 30, 2011. In compliance with the regulatory requirement, this established to submit it 180 days before the current NDPES Permit expiration date (March 31, 2012).

Since 1977, PREPA submitted to EPA an updated request under Section 316(a) of the Clean Water Act that its South Coast power plant be permitted to discharge into the Caribbean Sea heated sea water that was previously used as for cooling purposes, as part of the plant's combustion and generation process, known as "thermal effluent". EPA denied a 316(a) Thermal Varinace Request in December 2000. After several discussions and meetings, EPA and PREPA agreed to perform a Detailed Engineering and Environmental Review (DEER) of alternatives to select a final alternative for the cooling water discharge that meets the water temperature standard or otherwise, qualify for a waiver request under Section 316(a) of the Water Quality Act. While the DEER was in progress EPA issued a draft permit for the power plant, which included a compliance schedule for the DEER selected alternative (Offshore Submerged Discharge – OSD). The selected alternative estimated capital cost is approximately $60 million. EPA issued a final permit in October 1, 2009 with a schedule of compliance for relocation of Outfall 001. PREPA submitted the scoping document, an inventory of the environmental studies already performed and a Joint Permit Application for the Outfall 001 relocation in December 2009. As part of the permit requirements, PREPA prepared a Preliminary Environmental Impact Statement (PEIS) including the discussions of four alternatives for the 001 Outfall by October 2011. The PEIS included an in-cove alternative to reduce the cooling water discharge temperature to a thermal tolerance temperature range based on operations improvements and partial restoration of the historic flow.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

_Water Quality Compliance (continued)_

EPA included, as part of Section 316 (a) requirements in the current San Juan Power Plant NPDES Permit, the performance of thermal plume studies and the biological monitoring program. PREPA submitted the thermal plume study plan and the QA/QC Plan for the Biological Monitoring Program in March 13, 2009, and it is waiting for EPA approvals. Also, EPA included, as another compliance requirement, the performance of a Comprehensive Demonstration Study (CDS) under the Section 316(b) of the Clean Water Act. On March 31, 2008, PREPA submitted an Impingement and Entrainment Characterization Study and Current Status Report for EPA evaluation. Also, PREPA submitted a Post-repowering Verification Study Work Plan for 316 (b) in June 30, 2008 and it is waiting for EPA approval.

_Underground Injection Control Regulation_

The Authority has prepared a compliance plan in order to comply with the Puerto Rico Environmental Quality Board's underground injection control regulations. The compliance plan contemplates the closing of septic systems where sanitary discharges can be connected to the facilities of the Puerto Rico Aqueduct and Sewer Authority. As of December 2010, the projects at San Juan, Aguirre, Palo Seco, and South Coast Power Plants for the connection of the sanitary discharges to the PRASA system were 100% completed. Consequently, the execution of the compliance plans for the closing of the septic tanks at the power plants is on-going. Currently, PREPA completed the sampling and analysis of the septic systems at Aguirre and San Juan. The sampling and analysis for the Palo Seco Power Plant septic system is 50% completed.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*Spill Prevention Control and Countermeasures Plan*

To meet its obligations under the Spill Prevention Control and Countermeasures (SPCC), a program under the Oil Pollution Act of 1990 plan requirements and the Consent Decree, the Authority continues to implement corrective measures at all of its facilities. As of December 2010, the Authority completed all the compliance projects under the Spill Prevention Maintenance and Construction Program of the Consent Decree in accordance with the established scope of work. In July of 2002, an amendment to the SPCC regulations was adopted that affects the Authority's oil filled equipment at its electrical transmission and distribution substations. The Authority has been inspecting its substations and evaluating the impact of these new requirements for the preparation of the SPCC plan for the corresponding substations. EPA extended the regulatory deadline until November 10, 2011 to comply with the SPCC plans substations implementation. PREPA is already implementing the monitoring and inspection program required under the non-contention clause stipulated at 40 CFR 112.7 (k). Notwithstanding, PREPA is working with a construction program to provide the secondary containment for 54 substations located adjacent to water bodies, instead of the 316 substations considered at the initial plan. Current project estimated cost is $2.7 million.

*CERCLA Compliance*

The Remedial Investigation (RI)/Feasibility Study (FS) for the Palo Seco Power Plant were the result of a joint inspection performed by EPA and EQB in the decade of the 90's. This inspection determined that conditions existed that represented a risk to human health. Therefore, PREPA was ordered to perform a RI/FS. The RI was completed and the report was submitted to EPA for evaluation. PREPA is waiting for EPA's evaluation to determine if the FS has to be performed or a Record of Decision is issued which could indicate that no remedial actions or control is needed for the areas under study. However, the studies performed under the RI reflected the presence of free product (Separate Phase Hydrocarbons) in several monitoring wells. The analysis of this product also reflected a low concentration of polychlorinated biphenyls (PCBs). PREPA and EPA reached an agreement in which PREPA must complete a removal plan that consists of determining if the underground water has been impacted by PCBs, the extension of the contamination and the implementation of a work plan for free product removal. Analytical data collected during this activity reflected that underground water has not been impacted by PCBs.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*CERCLA Compliance (continued)*

Nevertheless, water/oil mix has been found in seven monitoring wells (MWs). PCBs concentrations between 1.36 - 2.36 parts per million were detected in the oil found in 3 of the 7 MWs. Multiphase Extraction (MPE) activities in the MWs where water/oil phases were found, has been performed on a weekly basis in order to remove the oil. After several MPE, this activity was discontinued as USEPA's recommendations. MWs gauging readings were performed during these activities. The last MW gauging readings reflected the presences of oil/water mix in nine MW's three of these wells are located off-site. This situation represents an environmental threat since the wells are located near the ocean. USEPA request the take actions to avoid the environmental threat. PREPA prosed the installation of LNAPL Barrier wall which prevent further off-site migration of LNAPL and include long term/passive recovery of the LNAPL. The cost of the wall barrier installation is around $1,000,000. As part of the USEPA/PREPA meetings regarding RI/FS and AOC, USEPA is considered that RI/FS will be completed as a no action ROD with some institutional controls and the AOC will be closed with the installation of the barrier wall, USEPA will notify PREPA with the final decision after discussion with other USEPA Region 2 personnel.

The Remedial Investigation/Feasibility Study for the Vega Baja Solid Waste Superfund Site is schedule for completion by the summer of 2010.

*PCB Program*

The Authority has completed a ten-year EPA-mandated program to sample and test its oil-filled transformers and other equipment in order to identify and dispose of PCB contaminated equipment. Pursuant to this program, the Authority has completed the removal and disposal of transformers with PCB concentrations of more than 500 ppm. The Authority continues with the removal and disposal of transformers with PCB concentrations between 50 and 499 ppm. As March 2011, the Authority estimates that approximately 179 of these units remain to be disposed of. According to EPA, the Authority has been the only utility to go so far with a program sample, test, identify, remove, and dispose of PCB or PCB contaminated transformers.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*PCB Program (continued)*

The Authority has completed a ten-year EPA-mandated program to sample and test its oil-filled transformers and other equipment in order to identify and dispose of transformers with more than 49 part per million (ppm) of PCBs. Pursuant to this program, the Authority has completed the removal and disposal of PCBs transformers with PCBs concentrations of more than 500 ppm. According to EPA, the Authority has been the only utility to go so far with a program to sample, test, identify, remove and dispose of PCBs or PCBs contaminated transformers. The Authority continues with the removal and disposal of transformers with PCB concentrations of between 50 and 499 ppm. The Authority updated the estimate of these units pending for disposal. As of June 30, 2011, the Authority had 36 PCBs contaminated transformers for disposal.

*Capital Improvement Program*

The Authority's capital improvement program for fiscal year ended June 30, 2011 includes $13.3 million in order to comply with existing Commonwealth and federal environmental laws and regulations, including the South Coast water related projects in compliance with the Clean Water Act 316(a) and 316(b) sections previously discussed. The Authority believes it is taking the necessary steps to comply with all applicable environmental laws and regulations and the Consent Decree requirements.

Changes in the balances of the health insurance program (self-insurance risk) incurred but no recorded (IBNR) during fiscal years 2011 and 2010 were as follows:

|  | Liability Beginning Balance | Expenses | Payments | Liability Ending Balance |
|---|---|---|---|---|
|  | *(In thousands)* | | | |
| **2010** | $ 5,552 | $ 114,179 | $ 114,134 | $ 5,597 |
| **2011** | $ 5,597 | $ 95,921 | $ 94,351 | $ 7,167 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

**Gasoducto del Sur**

On January 10, 2008, the Authority and Skanska Energy Services, LLC (Skanska) entered into an Engineer Procure Construct Finance Contract for the construction of the Gasoducto del Sur Project (the Project) for an original Contract Price of $74,324,259. On December 2, 2008, the Superior Court of Ponce issued an injunction stopping all construction. On July 23, 2009, PREPA'S Governing Board authorized the termination and settlement of the Contract. The Authority obtained title to all equipment and material procured and 100% of engineering documents and all pending disputes were settled for a lump-sum payment of $59,000,000 due to the Contractor. The Termination and Settlement Agreement was executed on August 7, 2009. Pursuant to an Asset Purchase Agreement dated August 17, 2009, PREPA sold the assets of the Gasoducto del Sur Project to The Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority (AFICA by its Spanish acronym) for approximately $36 million. In addition, PREPA entered into a Subordinated Loan Agreement with the Government Development Bank (GDB) for $35,000,000 evidenced by a 24-month subordinated note until such time that Puerto Rico Aqueduct and Sewer Authority (PRASA) shall purchase from AFICA the Project.

**Contingencies**

The Authority is a defendant or codefendant in several lawsuits incidental to its business, some involving substantial amounts. In those instances that management and legal counsel believe that the outcome of the litigation will be unfavorable to the Authority, a provision has been made to cover the estimated liability. Management, based on discussions with legal counsel, believes that the additional liability, if any, resulting from the ultimate resolution of these matters will not have a material effect on the Authority's financial position or results of operations.

On May 18, 2000, Abengoa, Puerto Rico, S.E. (Abengoa), the Authority's contractor for the repowering of San Juan steam plant units 5 and 6, unilaterally declared a termination of the contract with the Authority and filed a complaint for breach of contract. The Authority has moved for time to answer the complaint and has filed a counter claim for the cost of the project and for all damages caused to the Authority by the alleged illegal contract termination. The Authority believes that the actions by the contractor will not materially affect the ability of the Authority to provide service nor there will be a material difference in the quality of service provided by the Authority.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Commitments and Contingencies (continued)**

**Contingencies (continued)**

In June 2004, the Office of the Comptroller of the Commonwealth of Puerto Rico (the Comptroller) issued a report stating that the Authority overcharged its clients by approximately $49.8 million, and should reimburse this amount to such clients. After this report was made public, two lawsuits were filed by clients of the Authority against the Authority demanding the reimbursement of such alleged overcharges. The Authority's position is that the Comptroller incorrectly based his conclusion on data that is not relevant to the calculation of the Authority's rates, and that the Authority's rates were properly established in the year 2000 in accordance with applicable laws and regulations. In particular, the Authority notes that its rates properly take into consideration the cost of the fuel used by the Authority's generating facilities and the cost of the electricity purchased from the two co-generating facilities that sell power to the Authority.

In 2008, Power Technologies Corp. filed a suit against the Authority, alleging that the Authority had withdrawn from a contracting process for a new energy facility, in which Power Technologies was involved, without explanation or justification. Power Technologies seeks damages of $51.4 million. The case is currently in the discovery stage.

In addition to these cases, the Authority is involved in typical litigation for an electric power utility, but management estimates the amounts of such claims are not material and will not affect adversely the Authority's operations.

**Construction and Other Commitments**

As of June 30, 2011, the Authority has commitments of approximately $105.1 million on active construction, maintenance and engineering services contracts.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 18. Recently Issued Accounting Pronouncements

In December 2009, the GASB issued Statement 57 (GASB 57), *OPEB Measurements by Agent Employers and Agent Multiple-Employer Plans*. GASB 57 address issues related to the use of the alternative measurement method and the frequency and timing of measurements by employers that participate in agent multiple-employer other postemployment benefit (OPEB) plans and clarifies that when actuarially determined OPEB measures are reported by an agent multiple-employer OPEB plan and its participating employers. Provisions of this Statement related to the use and reporting of the alternative measurement method are effective immediately. The adoption of GASB 57 does not have any impact on the Authority's financial Statements.

GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements*. The objective of this Statement is to improve financial reporting by addressing issues related to service concession arrangements (SCAs), which are a type of public-private or public-public partnership. As used in this Statement, an SCA is an arrangement between a transferor (a government) and an operator (governmental or nongovernmental entity) in which: (i) the transferor conveys to an operator the right and related obligation to provide services through the use of infrastructure or another public asset (a facility) in exchange for significant consideration; and (ii) the operator collects and is compensated by fees from third parties. This statement is effective for periods beginning after December 15, 2011.

GASB Statement No. 61, *The Financial Reporting Entity: Omnibus- an amendment of GASB Statements No. 14 and No. 34*. The objective of this Statement is to improve financial reporting for a governmental financial reporting entity. The requirements of Statement No. 14, *The Financial Reporting Entity*, and the related financial reporting requirements of Statement No. 34, *Basis Financial Statements and Management's Discussion and Analysis for State and Local Governments*, were amended to better meet user needs and to address reporting entity issues have arisen since the issuance of those Statements. This statement is effective for periods beginning after June 15, 2012.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**18. Recently Issued Accounting Pronouncements (continued)**

GASB Statement No. 62, *Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements.* The objective of this Statement is to incorporate into the GASB's authoritative literature certain accounting and financial reporting guidance that is included in the following pronouncements issued on or before November 30, 1989, which does not conflict with or contradict GASB pronouncements. (i) Financial Accounting Standard Board (FASB) Statements and Interpretations; (ii) Accounting Principles Board Opinions; and (iii) Accounting Research Bulletins of the American Institute of Certified Public Accountants' (AICPA) Committee on Accounting Procedure. This statement is effective for periods beginning after December 15, 2011.

GASB Statement No. 63, *Financial reporting of Deferred Outflows of Resources, Deferred Inflows of Resources, and Net Position.* The objective of this Statement is to provide financial reporting guidance for deferred outflows of resources and deferred inflows of resources. The requirements of this Statement will improve financial reporting by standardizing the presentation of deferred outflows of resources and deferred inflows of resources and their effects on a government's net position. It alleviates uncertainty about reporting those financial statement elements by providing guidance where none previously existed. The provisions of this Statement are effective for financial statements for periods beginning after December 15, 2011.

GASB Statement No. 64, *Application of Hedge Accounting Termination Provisions.* The objective of this Statement is to clarify whether an effective hedging relationship continues after the replacement of a swap counterparty or a swap counterparty's credit support provider. This Statement sets forth criteria that establish when the effective hedging relationship continues and hedge accounting should continue to be applied. The provisions of this Statement are effective for financial statements for periods beginning after June 15, 2011.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**19. Restatement of 2010 Financial Statements**

During the year ended June 30, 2011, management determined that its prior period capital contributions, plant in service, depreciation expense and accumulated depreciation were understated by the amounts disclosed below due to delays in the Authority's process for recognizing capital contributions in the form of property in its accounts.

The Authority had not been recording capital contribution projects that had been placed in service and had been certified as being part of the Authority's capital assets during previous fiscal years.

The effect of the restatement is as follows:

| | As previously reported | | Restatement | | As restated |
|---|---|---|---|---|---|
| Plant in service | $ | 10,304,310 | $ | 268,818 | $ | 10,573,128 |
| Accumulated depreciation | | (4,960,294) | | (62,269) | | (5,022,563) |
| Depreciation expense | | (343,935) | | (11,425) | | (355,360) |
| Contributed capital | | 65,567 | | 24,554 | | 90,121 |
| | | | | | | |
| Change in net assets | $ | (142,835) | $ | 13,129 | $ | (129,706) |
| Net assets, beginning | | 39,219 | | 193,420 | | 232,639 |
| Net assets, ending | $ | (103,616) | $ | 206,549 | $ | 102,933 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**20. Subsequent Events**

**Long-Term Debt**

During the month of July 2011, the Authority entered into a revolving line of credit with Citibank amounting to $260 million to finance fuel purchases. This credit facility has an automatic reduction provision that will lower the balance to $210 million on March 30, 2012. This line of credit matures on July 13, 2012, and bears interest at a variable rate per annum equal to the sum of 90-day LIBOR Floating Pool Rate plus the applicable Spread of 1.70%.

**Natural Disaster**

On September 2011, Hurricane Irene struck Puerto Rico causing significant damages across the island and to PREPA infrastructure. As a result distribution, transmission and production components of the utility plant were seriously damaged. At this time the financial effect of the hurricane on the Authority's operations could not be determined; however, certain types of assets were insured and the Authority expects to collect all restoration costs from their insurances agencies. In addition the Authority will claim to the Federal Emergency Management Agency (FEMA) uninsured damages caused by the hurricane.

**Non-revolving Line of Credit**

During the Month of October 2011, the Authority entered into a non-revolving line of credit with the Government Development Bank (GDB) amounting to $244 million. This line of credit matures on June 30, 2012 and bears interest per annum equal to prime rate plus 150 basis points, as determined from time to time in good faith by GDB or upon written notice to the Authority, at a variable rate of interest per annum, which interest rate may be revised periodically, equal to the GDB cost of funding for variable rate loan transactions or the cost of any other obligations or source of funds used to fund the loan.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**20. Subsequent Events (continued)**

**Rate Stabilization Account**

During the month of November 2011, the Authority's Governing Board approved the creation of a Rate Stabilization Account ("RSA") which is going to be managed by the Authority and GDB. The Authority will make deposits to the RSA on a monthly basis from any moneys that are available after the payment of current expenses, principal and interest due, the funding of the required deposits to the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self Insurance Fund and the Capital Improvement Fund created by the Trust Agreement. Available amounts in the RSA can be used by the Authority with the approval of GDB to offset the application of a credit to consumers.

**Act No. 233**

On December 11, 2011, the Commonwealth of Puerto Rico approved Act No. 233 (the Act) amending Act No. 83 of May 2, 1941, also known as the Puerto Rico Electric and Power Authority Act. The Act modified the calculation of the Contribution in Lieu of Taxes (CILT) made by the Authority as described in Note 2. Energy used in municipal facilities for which the municipality receives rent or right of admission revenues will not be taken into consideration in the CILT calculation. The primary purpose of Act 233 is to give relief in energy costs to customers.

# Required Supplementary Information

Schedule I

### Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Suplementary Schedule of Funding Progress

Years Ended June 30, 2011
*(In millions)*

| Actuarial Valuation Date | Actuarial Value of Assets (a) Note 1 | | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b)- (a) | Funded Ratio (a)/(b) | Covered Payroll (c) | UAAL Percentage of Covered Payroll [(b)-(a)]/(c) |
|---|---|---|---|---|---|---|---|
| **Pension Plan** | | | | | | | |
| 6/30/2005 | $ | 1,338 | $ 2,203 | $ 866 | 61% | $ 349 | 248% |
| 6/30/2006 | | 1,403 | 2,280 | 877 | 62% | 349 | 251% |
| 6/30/2007 | | 1,488 | 2,313 | 826 | 64% | 349 | 237% |
| 6/30/2008 | | 1,571 | 2,337 | 766 | 67% | 363 | 211% |
| 6/30/2009 | | 1,517 | 2,497 | 980 | 61% | 364 | 269% |
| 6/30/2010 | | 1,414 | 2,816 | 1,402 | 50% | 357 | 392% |
| | | | | | | | |
| **Postemployment Health Plan\*** | | | | | | | |
| 6/30/2007 | $ | – | $ 531 | $ 531 | 0% | $ 349 | 152% |
| 6/30/2008 | | – | 587 | 587 | 0% | 363 | 162% |
| 6/30/2010 | | – | 613 | 613 | 0% | 357 | 172% |

*Note 1: The system, as permitted by the GASB, reflects its investments at an average fair market value of the last three years to determine its actuarial funding.*

*\*Postemployment Health Plan valuation performed every two years, as required by the GASB.*

# Supplemental Schedules

# Puerto Rico Electric Power Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Note to Schedules II-VII - Information Required by the 1974 Agreement

### As of June 30, 2011 and 2010, and for the Years then Ended

Schedules II - VII present certain information which is required by the 1974 Agreement. The Net Revenues data, as defined in the 1974 Agreement (Net Revenues), presented in Schedules II and III differ in some important respects from generally accepted accounting principles (GAAP). Such differences are explained below; Schedule II also presents a reconciliation of Net Revenues with GAAP.

The most significant differences between Net Revenues and GAAP are the following:

1) Revenues do not include investment income on investments in the construction fund (see Note 5 to the financial statements);
2) Depreciation and interest expense on bonds covered by the 1974 Agreement are not included as deductions in calculating Net Revenues;
3) Amortization of debt discount and issuance costs and the allowance for funds used during construction are not considered in the computation in calculating Net Revenues;
4) Contribution in lieu of taxes is not considered a deduction for purposes of Net Revenues;
5) Net Revenues do not include revenues or expenses of the Irrigation Systems (see Note 1 to the financial statements).

For further details and information on the definition of Net Revenues, please refer to the 1974 Agreement.

Schedule II

Puerto Rico Electric Power Authority

Sources and Disposition of Net Revenues
Under the Provisions of the 1974 Agreement
Statements of Income (GAAP)
and Reconciliation of Net Income

Years Ended June 30, 2011 and 2010
*(In thousands)*

| | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | 1974 Trust Agreement | Statement of Income (GAAP) | Reconciliation of Net Income | 1974 Trust Agreement | Statement of Income (GAAP) *(As restated)* | Reconciliation of Net Income |
| **Reconciliation of components of net income:** | | | | | | |
| Revenues: | | | | | | |
| Operating revenues | $ 4,406,155 | $ 4,422,997 | | $ 4,154,415 | $ 4,171,493 | |
| Revenues from Commonwealth for rural electrification | – | – | | | | |
| Other operating revenues | 16,595 | 16,595 | | 15,915 | 15,915 | |
| Other | (11,537) | (13,299) | | (4,597) | (5,450) | |
| 1974 agreement construction fund investment income and gain on sale of other properties | | 14,368 | | | 90,816 | |
| | 4,411,213 | 4,440,661 | 29,448 | 4,165,733 | 4,272,774 | 107,041 |
| Current Expenses: | | | | | | |
| As shown | 3,705,192 | 3,718,796 | | 3,429,095 | 3,441,449 | |
| Other interest | – | – | | | 1,907 | |
| Total as defined | 3,705,192 | 3,718,796 | (13,604) | 3,429,095 | 3,443,356 | (14,261) |
| Net revenues, as defined | $ 706,021 | | | $ 736,638 | | |
| Depreciation | | 350,697 | (350,697) | | 355,360 | (355,360) |
| Other post-employment benefit (OPEB) | | 26,587 | (26,587) | | 26,587 | (26,587) |
| Disposition of Revenues: | | | | | | |
| (not classified in order of payment) | | | | | | |
| Interest on debt | 304,778 | 378,343 | | 246,072 | 304,614 | |
| Interest on general obligation notes | 1,550 | 1,882 | | 33,985 | 34,279 | |
| Amortization of debt discount, financing expenses | – | (10,162) | | | (7,590) | |
| Amortization of bond defeasance | – | 16,659 | | | 21,871 | |
| Allowance for funds used during construction | – | (16,471) | | | (8,428) | |
| Net interest on long-term debt | 306,328 | 370,251 | (63,923) | 280,057 | 344,746 | (64,689) |
| Power revenue bonds: | | | | | | |
| Principal | 175,455 | | 175,455 | 151,507 | | 151,507 |
| Reserve Account | – | | – | – | | – |
| Internal Funds | 17,231 | | 17,231 | 63,405 | | 63,405 |
| Appropriation Self Insurance Fund | 10,000 | | 10,000 | 10,000 | | 10,000 |
| Contribution in lieu of taxes | 197,007 | 246,758 | (49,751) | 231,669 | 232,431 | (762) |
| Other post-employment benefit (OPEB): | | | | | | |
| Total expenses (GAAP) | | 4,713,089 | | | 4,402,480 | |
| Net revenues, as defined | $ 706,021 | | | $ 736,638 | | |
| Net income | | $ (272,428) | $ (272,428) | | $ (129,706) | $ (129,706) |

Schedule III

Puerto Rico Electric Power Authority

Supplemental Schedule of Sources and Disposition
of Net Revenues under the Provisions of the 1974 Agreement

Years Ended June 30, 2011 and 2010
*(In thousands)*

|  | 2011 | 2010 |
|---|---|---|
| **Sources of Net Revenues:** | | |
| **Revenues:** | | |
| Electric revenues | $    4,406,155 | $    4,154,415 |
| Other operating revenues | 16,595 | 15,915 |
| Other (principally interest) | (11,537) | (4,597) |
|  | 4,411,213 | 4,165,733 |
| **Current Expenses:** | | |
| Operations: | | |
| Fuel | 2,291,386 | 2,006,931 |
| Purchased Power | 660,871 | 693,724 |
| Other productions | 67,451 | 62,697 |
| Transmissions and distributions | 176,369 | 160,796 |
| Customer accounting and collection | 114,837 | 114,542 |
| Administrative and general | 173,503 | 178,982 |
| Maintenance | 220,775 | 209,516 |
| Interest (other than long-term debt) | — | 1,907 |
|  | 3,705,192 | 3,429,095 |
| **Net revenues, as defined** | $       706,021 | $       736,638 |
| **Disposition of Net Revenues:** | | |
| **Revenue fund:** | | |
| Power revenue bonds - sinking fund requirements: | | |
| Interest | $       304,778 | $       246,072 |
| Principal | 175,455 | 151,507 |
| Self Insurance Fund | 10,000 | 10,000 |
| Balance available for capital improvements and other needs | 17,231 | 63,405 |
|  | 507,464 | 470,984 |
| **General obligation notes:** | | |
| Interest | 1,550 | 33,985 |
| **Contribution in lieu of taxes and other** | 197,007 | 231,669 |
| **Net revenues, as defined** | $       706,021 | $       736,638 |

Schedule IV

Puerto Rico Electric Power Authority

Supplemental Schedule of Funds Under the Provisions of the
1974 Trust Agreement

Years Ended June 30, 2011 and 2010
(In thousands)

| | 2011 | | | | 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Held by Authority Other Assets | Restricted Deposits with Trustee Other Assets | Non-Current Assets | Total | Held by Authority Other Assets | Restricted Deposits with Trustee Other Assets | Non-Current Assets |
| **By Accounts** | | | | | | | | |
| 1974 Agreement (restricted) | | | | | | | | |
| Sinking Fund - principal and interest | $ 313,531 | $ – | $ 313,531 | $ – | $ 198,693 | $ – | $ 198,693 | $ – |
| Reserve account | 377,903 | – | – | 377,903 | 359,714 | – | – | 359,714 |
| Self Insurance Fund | 84,645 | – | – | 84,645 | 73,782 | – | – | 73,782 |
| Sinking Fund - Capitalized Interest | 153,958 | – | – | 153,958 | – | – | – | – |
| Reserve Maintenance Fund | 15,692 | 15,692 | – | – | 10,640 | 10,640 | – | – |
| Other Restricted Fund | 1,900 | 1,900 | – | – | 1,900 | 1,900 | – | – |
| Construction Fund | | | | | | | | |
| Rural Utilities Services (RUS) | 2,020 | 2,020 | – | – | 2,018 | 2,018 | – | – |
| Other | 224,332 | 224,332 | – | – | 148,308 | 148,308 | – | – |
| PREPA Client Fund | 500 | 500 | – | – | – | – | – | – |
| General purpose (unrestricted) | | | | | | | | |
| General (excluding Prepa Net) | 48,863 | 48,863 | – | – | 67,662 | 67,662 | – | – |
| Working funds | 911 | 911 | – | – | 922 | 922 | – | – |
| Total | $ 1,224,255 | $ 294,218 | $ 313,531 | $ 616,506 | $ 863,639 | $ 231,450 | $ 198,693 | $ 433,496 |
| **By Type of Assets Held:** | | | | | | | | |
| Working funds | $ 911 | $ 911 | $ – | $ – | $ 922 | $ 922 | $ – | $ – |
| PREPA Client Fund | 500 | 500 | – | – | – | – | – | – |
| Cash in bank and time deposits (by depository institutions): | | | | | | | | |
| Government Development Bank for Puerto Rico | 11 | 11 | – | – | 125 | 125 | – | – |
| Banco Popular de Puerto Rico | 8,210 | 8,210 | – | – | 4,263 | 4,263 | – | – |
| Citibank, N. A. | 40,551 | 40,551 | – | – | 178,305 | 178,305 | – | – |
| US Bank | 528,009 | 214,478 | 313,531 | – | 198,693 | – | 198,693 | – |
| Banco Bilbao Vizcaya (Chase), Puerto Rico | 5,845 | 5,845 | – | – | 29,051 | 29,051 | – | – |
| Banco Bilbao Vizcaya, Mayagüez, Puerto Rico | 73 | 73 | – | – | 25 | 25 | – | – |
| First Bank, San Juan, Puerto Rico | 337 | 337 | – | – | 562 | 562 | – | – |
| Banco Santander, Santurce, Puerto Rico | 3,545 | 3,545 | – | – | 3,545 | 3,545 | – | – |
| R G Premier Bank | 145 | 145 | – | – | 202 | 202 | – | – |
| Western Bank, Mayagüez, P.R. | – | – | – | – | (108) | (108) | – | – |
| JP Morgan | – | – | – | – | – | – | – | – |
| Other Institutions | 1,099 | 1,099 | – | – | 1,097 | 1,097 | – | – |
| | 589,236 | 275,705 | 313,531 | – | 416,682 | 217,989 | 198,693 | – |
| Investment Securities | 635,019 | 18,513 | – | 616,506 | 446,957 | 13,461 | – | 433,496 |
| Total | $ 1,224,255 | $ 294,218 | $ 313,531 | $ 616,506 | $ 863,639 | $ 231,450 | $ 198,693 | $ 433,496 |

Schedule V
Part A

Puerto Rico Electric Power Authority

Supplemental Schedule of Changes in Cash and Investments by Funds

Year Ended June 30, 2011
*(In thousands)*

| 2010-2011 Activity | Total | General Purposes Funds | | | |
|---|---|---|---|---|---|
| | | General Fund | Revenue Fund | Working Fund | 1974 Agreement |
| Balances at June 30, 2010, *before interfund account* | $ 863,638 | $ 278,889 | $ 16 | $ 922 | $ 198,693 |
| Operations: | | | | | |
| Net revenues | – | (706,021) | 197,007 | – | 304,778 |
| Funds provided from internal operations | 449,477 | 449,477 | – | – | – |
| 1974 Agreement investment income Acct 4191 | – | (811) | – | – | – |
| Investment income and other | 1,115 | 59 | – | – | (7,835) |
| Unrealized gain (or loss) on market value of investment | (2,222) | – | – | – | 212 |
| Offset of current year's contribution in lieu | | | | | |
| of taxes against certain government accounts | | | | | |
| receivable | – | – | – | – | – |
| Offset of current year's 5% contribution in lieu of | | | | | |
| taxes against Commonwealth of Puerto | – | 158,193 | (158,193) | – | – |
| Rico debt and transfers to General Obligations | – | 38,814 | (38,814) | – | – |
| Funds used for construction | (411,527) | – | – | – | – |
| Reclassified construction costs for deferred debits | – | – | – | – | – |
| Financing: | – | – | – | – | – |
| Proceeds from new bond issues-net of | | | | | |
| original discounts | 299,016 | – | – | – | 284,466 |
| Proceeds from Contributed Capital | 6,064 | – | – | – | – |
| Proceeds from refunding bonds issues-net of | | | | | |
| original discounts | 222,883 | – | – | – | – |
| Defeased bonds-net of original discounts | (200,173) | – | – | – | – |
| Sinking Funds and account transfers | – | (5,000) | – | – | – |
| Notes issued for construction | 50,750 | – | – | – | – |
| Notes issued for municipalities settlement agreement | – | – | – | – | – |
| Notes issued to working capital | 172,062 | 172,062 | – | – | – |
| Note issued to finance the acquisition on fuel oil | – | – | – | – | – |
| Notes issued to finance the recovery of Palo Seco Steam Plant | | | | | |
| that are payable from proceeds from insurance companies. | – | – | – | – | – |
| Payment of notes payable | (86,119) | (36,119) | – | – | – |
| Payment of interest | (240,874) | (28,286) | – | – | (209,287) |
| Payment to counterparties - Interest Rate Swap | – | – | – | – | – |
| Payment of current maturities of long-term debt | – | – | – | – | – |
| Payment to municipalities settlement agreement | – | – | – | – | – |
| Changes in assets and liabilities: | | | | | |
| Working funds | (11) | – | – | (11) | – |
| Accounts receivable (includes non-current) | (212,541) | (212,541) | – | – | – |
| Fuel oil | (42,714) | (42,714) | – | – | – |
| Materials and supplies | (17,738) | (17,738) | – | – | – |
| Prepayments and other | 3,448 | 3,448 | – | – | – |
| Deferred debits | 47,522 | 47,522 | – | – | – |
| Accounts payable and accrued liabilities (includes non-current) | 321,205 | 318,181 | – | – | – |
| Customer deposits | 994 | 994 | – | – | – |
| Interfund transfers, etc. | – | (26,999) | (2) | – | (278,993) |
| Total before interfund accounts | 1,224,255 | 391,410 | 14 | 911 | 292,034 |
| Add (deduct) interfund accounts | – | (342,561) | – | – | – |
| Balances at June 30, 2011 | $ 1,224,255 | $ 48,849 | $ 14 | $ 911 | $ 292,034 |

92

1112-1313725

Schedule V (continued)
Part A

| | Sinking Fund | | | Other Funds | | | |
|---|---|---|---|---|---|---|---|
| | 1974 Agreement | 1974 Agreement | Insurance Fund | 1974 Agreement | Maintenance Fund | Obligation Fund | Restricted Fund |
| $ | – $ | 359,713 $ | 73,782 | $ (60,917) $ | 10,640 $ | – $ | 1,900 |
| | 175,455 | – | 10,000 | 17,231 | – | 1,550 | – |
| | – | – | – | – | – | – | – |
| | – | – | – | 811 | – | – | – |
| | – | 6,459 | 926 | 1,403 | 103 | – | – |
| | – | (2,318) | (63) | – | (53) | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | (411,527) | – | – | – |
| | – | – | – | – | – | – | – |
| | – | 14,050 | – | – | – | – | 500 |
| | – | – | – | 6,064 | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | 222,883 | – | – | – |
| | – | – | – | (200,173) | – | – | – |
| | – | – | – | – | 5,000 | – | – |
| | – | – | – | 50,750 | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | (50,000) | – | – | – |
| | – | – | – | – | – | (3,301) | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | – | – | – | – |
| | – | – | – | 3,024 | – | – | – |
| | – | – | – | – | – | – | – |
| | – | (1) | – | 304,242 | 2 | 1,751 | – |
| | 175,455 | 377,903 | 84,645 | (116,209) | 15,692 | – | 2,400 |
| | | | | 342,561 | | – | – |
| $ | 175,455 $ | 377,903 $ | 84,645 | $ 226,352 $ | 15,692 $ | – $ | 2,400 |

Schedule V
Part B

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Supplemental Schedule of Changes in Cash and Investments by Funds

Year Ended June 30, 2010
*(In thousands)*

| 2009-2010 Activity | Total | General Purposes Funds | | | |
|---|---|---|---|---|---|
| | | General Fund | Revenue Fund | Working Fund | Interest 1974 Agreement |
| Balances at June 30, 2009, *before interfund account* | $ 723,666 | $ 166,198 | $ 16 | $ 1,048 | $ 137,585 |
| Operations: | | | | | |
| Net revenues | – | (736,638) | 231,669 | – | 246,072 |
| Funds provided from internal operations | 492,377 | 492,377 | – | – | – |
| 1974 Agreement investment income Acct 4191 | | (695) | | – | – |
| Investment income and other | 18,233 | 7,059 | – | – | 292 |
| Unrealized gain (or loss) on market value of investment | 564 | – | – | – | – |
| Offset of current year's contribution in lieu of taxes against certain government accounts receivable | – | 190,352 | (190,352) | | – |
| Offset of current year's 5% contribution in lieu of taxes against Commonwealth of Puerto Rico debt and transfers to General Obligations | – | 41,317 | (41,317) | – | – |
| Funds used for construction | (389,167) | | | – | – |
| Reclassified construction costs for deferred debits | (8,416) | (8,416) | | – | – |
| Financing: | | | | | |
| Proceeds from new bond issues-net of original discounts | 427,102 | – | – | – | 180,435 |
| Proceeds from Contributed Capital | 14,408 | – | – | | |
| Proceeds from refunding bonds issues-net of original discounts | 939,646 | – | – | – | – |
| Defeased bonds-net of original discounts | (924,361) | – | – | – | – |
| Sinking Funds and account transfers | | (5,000) | | – | 8,390 |
| Notes issued for construction | 186,610 | | | – | – |
| Notes issued for municipalities settlement agreement | | | | – | – |
| Notes issued to working capital | 38,364 | 38,364 | – | – | – |
| Note issued to finance the acquisition on fuel oil | | | | – | – |
| Notes issued to finance the recovery of Palo Seco Steam Plant that are payable from proceeds from insurance companies. | – | – | – | – | – |
| Payment of notes payable | (48,093) | (48,093) | | – | – |
| Payment of interest | (381,029) | (16,937) | – | – | (327,553) |
| Payment to counterparties - Interest Rate Swap | (25,948) | (25,948) | | – | – |
| Payment of current maturities of long-term debt | (324,147) | – | – | – | – |
| Payment to municipalities settlement agreement | – | – | – | – | – |
| Changes in assets and liabilities: | | | | | |
| Working funds | (126) | | | (126) | – |
| Accounts receivable (includes non-current) | (17,982) | (17,982) | – | – | – |
| Fuel oil | 36,961 | 36,961 | – | – | – |
| Materials and supplies | 17,792 | 17,792 | – | – | – |
| Prepayments and other | (3,278) | (3,278) | – | – | – |
| Deferred debits | (17,493) | (17,493) | – | – | – |
| Accounts payable and accrued liabilities (includes non-current) | 103,162 | 126,780 | – | – | – |
| Customer deposits | 4,793 | 4,793 | – | – | – |
| Interfund transfers, etc. | – | 37,376 | – | | (46,528) |
| Total before interfund accounts | 863,638 | 278,889 | 16 | 922 | 198,693 |
| Add (deduct) interfund accounts | – | (211,243) | | | |
| Balances at June 30, 2010 | $ 863,638 | $ 67,646 | $ 16 | $ 922 | $ 198,693 |

94

1112-1313725

Schedule V (continued)
Part B

| | Sinking Fund | | | Other Funds | | | |
|---|---|---|---|---|---|---|---|
| | Principal 1974 Agreement | Reserve 1974 Agreement | Self Insurance Fund | Construction 1974 Agreement | Reserve Maintenance Fund | Subordinated Obligation Fund | Other Restricted Fund |
| $ | 166,895 | $ 267,001 | $ 62,624 | $ (85,684) | $ 5,573 | $ — | $ 2,410 |
| | 151,507 | — | 10,000 | 63,405 | — | 33,985 | — |
| | — | — | — | 695 | — | — | — |
| | 450 | 8,904 | 1,292 | 202 | 34 | — | — |
| | — | 668 | (136) | — | 32 | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | (389,167) | — | — | — |
| | — | — | — | — | — | — | — |
| | — | 83,140 | — | 163,527 | — | — | — |
| | — | — | — | 14,408 | — | — | — |
| | — | — | — | 939,646 | — | — | — |
| | — | — | — | (924,361) | — | — | — |
| | — | — | — | (8,390) | 5,000 | — | — |
| | — | — | — | 186,610 | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | (36,539) | — |
| | — | — | — | — | — | — | — |
| | (324,147) | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | — | — | — | — |
| | — | — | — | (23,618) | — | — | — |
| | 5,295 | — | 2 | 1,810 | 1 | 2,554 | (510) |
| | — | 359,713 | 73,782 | (60,917) | 10,640 | — | 1,900 |
| | | | | 211,243 | | — | — |
| $ | — | $ 359,713 | $ 73,782 | $ 150,326 | $ 10,640 | $ — | $ 1,900 |

1112-1313725

95

II-97

Schedule VI

Puerto Rico Electric Power Authority

Supplemental Schedule of Changes in Long-Term
Debt and Current Portion of Long-Term Debt

Years Ended June 30, 2011 and 2010
*(In Thousands)*

|  | 2011 | 2010 |
|---|---|---|
| **Long-term debt, excluding current portion:** | | |
| **Balance at beginning of year** | $ 7,399,746 | $ 5,775,827 |
| Transfers to current liabilities: | | |
| Power revenue bonds | (183,577) | (3,953) |
| Notes payable | (178,610) | |
| Payment of general obligation notes: | | |
| Notes payable | (36,119) | (234,610) |
| Remainder | 7,001,440 | 5,537,264 |
| | | |
| New Issues: | | |
| Power revenue bonds | 355,730 | 1,536,105 |
| Power revenue refunding bonds | 218,225 | 994,235 |
| Debt discount and excess reacquisition costs on new bond issues - net | (10,548) | 43,621 |
| Defeasance of bonds | (215,940) | (965,094) |
| Debt discount and excess reacquisition costs on cancelled bonds - net | 15,767 | 40,734 |
| Notes payable | 172,062 | 212,881 |
| **Balance at end of year** | $ 7,536,736 | $ 7,399,746 |
| | | |
| **Current portion of long-term debt:** | | |
| **Balance at beginning of year** | $ 187,368 | $ 1,067,310 |
| Transfer from long-term debt | 362,187 | 3,953 |
| Payments to bondholders: | | |
| Power revenue- July 1 | -- | (172,640) |
| Power revenue- January 1 | -- | (422) |
| Payment of general obligation notes | -- | (721,231) |
| Total payments | -- | (894,293) |
| | | |
| Amortization of debt discount and excess reacquisition costs | 2,697 | 10,398 |
| **Balance at end of year** | $ 552,252 | $ 187,368 |

1112-1313725

96

Ernst & Young LLP

Assurance | Tax | Transactions | Advisory

About Ernst & Young
Ernst & Young LLP is a global leader in assurance,
tax, transaction and advisory services.
Worldwide, our 144,000 people are united
by our shared values and an unwavering
commitment to quality. We make a difference
by helping our people, our clients and our wider
communities achieve their potential.

www.ey.com



[THIS PAGE INTENTIONALLY LEFT BLANK]

# URS

**APPENDIX III**

April 12, 2012

Puerto Rico Electric Power Authority
San Juan, Puerto Rico

Dear Sirs:

URS Corporation ("URS") serves as the Consulting Engineers under the provisions of the Trust Agreement, dated as of January 1, 1974, as amended, by and between Puerto Rico Electric Power Authority (the "Authority") and U.S. Bank Trust National Association, in the Borough of Manhattan, City and State of New York, successor trustee. Such Trust Agreement is referred to herein as the "Agreement", and the trustee under the Agreement is referred to herein as the "Trustee". The Agreement requires the Consulting Engineers annually to prepare and file with the Authority and the Trustee a report with their recommendations as to any necessary or advisable revisions of rates and charges and such other advices and recommendations as they may deem desirable. In addition, in accordance with the Agreement the report includes the amount that should be deposited monthly during the next fiscal year to the credit of the Reserve Maintenance Fund; the amount, if any, to be deposited to the Self-insurance Fund in the next fiscal year; and, the amount to be deposited to the Capital Improvement Fund in the next fiscal year. The most recent annual report provided to the Authority and the Trustee was dated as of June 2011.

In preparing this letter and in reaching the conclusions and opinions contained herein and referred to in the Official Statement to which this letter is appended, URS has relied upon inquiries, observations and analyses made and conducted by it in the performance of its duties under the Agreement and upon its professional experience. URS also has relied upon various financial, economic, political and other information and projections provided to it by the Authority and other sources, some of such information and projections having been accepted by URS without it having conducted an independent investigation thereof. In addition, URS has made assumptions which it believes to be reasonable to make including, but not limited to, the following:

     1.     that the Authority will adhere to its proposed schedule of programmed regular maintenance;

     2.     that the Authority will continue to maintain the effective availability of its operable generating units;

     3.     that the Authority's forecasts of costs and availability of fuels are reasonable;

URS Corporation
One Canal Park
Cambridge, MA 02141
Tel: 617.621.0740
Fax: 617.621.9739

**URS**

4.  that financing will be available to the Authority at reasonable rates, in adequate amounts and at appropriate times;

5.  that the Authority will not be adversely affected by labor disputes and will have adequate levels of labor productivity;

6.  that the Authority's budgets for operation, maintenance, and capitalized projects in fiscal years 2013 and beyond will continue to provide adequate funding of activities and projects to maintain the long term reliable and efficient operation of the System and its equipment;

7.  that the Authority will reasonably comply with the projected budgets of the Capital Improvement Program and Current Expenses, excluding fuel and purchased power, included in the Official Statement to which this letter is appended;

8.  that there will be no material changes in the requirements of regulatory authorities and that the Commonwealth and Legislature of Puerto Rico will not enact any regulation or legislation that will materially affect the Authority's projected Net Revenues adversely — these could include, but are not limited to, the financings and operations of the proposed natural gas infrastructure projects which are not included in the Authority's Capital Improvement Program and the Economic Incentives Act regarding wheeling and certain industrial client tax credits to be paid by the Authority as described in the Official Statement to which this letter is appended;

9.  that there will be no unforeseen technological developments;

10.  that the demographic, statistical, economic and other information regarding Puerto Rico obtained by URS from publicly available sources is reliable;

11.  that the Authority will not be unduly affected by natural disasters; and

12.  that the Authority will not experience unforeseeable or extraordinary conditions not included in usual estimates and opinions of engineers.

Based upon and subject to the foregoing which should be read in conjunction with and as part of the following conclusions, it is our considered opinion with respect to the Authority that:

1.  the Authority's revenue and generation planning forecasts (and the methodologies and assumptions on which they are based) are reasonable for planning purposes and are generally consistent with electric utility industry practices;

**URS**

2.    the Authority's projections of future load growth and estimates of peak load referred to in the Official Statement, to which this letter is appended, under the caption "Adequacy of Capacity" are reasonable for base planning purposes;

3.    the Authority's generating capacity expansion plan referred to in the Official Statement, to which this letter is appended, under the caption "Adequacy of Capacity" is adequate and should allow the Authority to meet targeted electric reliability criteria;

4.    the Authority's production, transmission and distribution plant is in good repair and sound operating condition;

5.    the Authority's current projected capital improvement program is reasonable and the estimated expenditures are consistent with the Authority's future needs;

6.    the Authority's estimates of future growth form a reasonable basis for its projected operating results;

7.    the Authority's electric rates and charges should generate sufficient revenues to pay its current expenses and debt service and to meet the Trust Agreement obligations for deposits into certain Funds from current operating revenues; and

8.    the 961 MW of capacity presently being provided by the two cogenerators described in the Official Statement to which this letter is appended, and their role in the Authority's System should not cause the Authority to experience a meaningful reduction in control over its revenue producing capability as a result of the purchase rather than self-generation of electricity.

Sincerely,

URS CORPORATION

George W. Romano, Jr.
Consulting Manager

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX IV

Upon delivery of the Bonds in definitive form, Nixon Peabody LLP, New York, New York, Bond Counsel to the Authority, proposes to render its final approving opinion in substantially the following form:

437 Madison Avenue
New York, New York  10022
(212) 940-3000
Fax:  (212) 940-3111

May 1, 2012

Puerto Rico Electric Power Authority
San Juan, Puerto Rico

Re:    $630,110,000 Power Revenue Bonds, Series 2012A and
$19,890,000 Power Revenue Refunding Bonds, Series 2012B

Ladies and Gentlemen:

We have served as bond counsel in connection with the issuance by the Puerto Rico Electric Power Authority (the "Authority"), a governmental instrumentality of the Commonwealth of Puerto Rico, of its $630,110,000 aggregate principal amount of Power Revenue Bonds, Series 2012A (the "Series 2012A Bonds") and $19,890,000 aggregate principal amount of Power Revenue Refunding Bonds, Series 2012B (the "Series 2012B Bonds," and together with the Series 2012A Bonds, the "Bonds").  The Bonds are dated, mature on July 1 of the years and in such principal amounts, bear interest at the rates and are subject to redemption, all as set forth or provided for in the Resolution referred to herein.  The Bonds are issuable as fully registered bonds without coupons, in authorized denominations of $5,000 or any multiple thereof, in the manner and in accordance with the terms and conditions of the Resolution.

In our capacity as bond counsel, we have examined the transcript of the proceedings (the "Transcript") of the Authority relating to the issuance of the Bonds, including, without limitation, Act No. 83 of the Legislature of Puerto Rico, approved May 2, 1941, as amended and re-enacted by Act No. 19, approved April 8, 1942, as amended, creating the Authority (formerly called Puerto Rico Water Resources Authority) and Act No. 111, approved May 6, 1941, as amended by Act No. 153, approved May 14, 1943 (said Acts No. 83, No. 19, No. 111 and No. 153, as amended, being herein collectively referred to as the "Authority Act"); the Trust Agreement, dated as of January 1, 1974, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank National Association, as successor trustee; Resolution No.     , duly adopted by the Authority on April 12, 2012 (the "Resolution"); and such other documents as we have deemed necessary to render this opinion.  Capitalized words used herein without definitions have the meanings ascribed thereto in the Trust Agreement or the Resolution, as applicable.

We have also examined one of said Series 2012A Bond and one of said Series 2012B Bond, as executed and authenticated.  We assume that all other such Bonds have been similarly executed and authenticated.

IV-1

Puerto Rico Electric Power Authority                                    May 1, 2012
                                                                          Page 2

From such examination, we are of the opinion that:

1.      The Authority Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Series 2012A Bonds have been duly authorized and issued to provide funds to
(i) finance a portion of the cost of various projects under its capital improvement program, (ii) repay
certain advances made to the Authority by Government Development Bank for Puerto Rico under a line
of credit facility to (a) pay a portion of the interest due on January 1, 2012 and July 1, 2012 on the
Authority's outstanding Power Revenue Bonds and (b) pay a portion of the principal due on July 1, 2012
on the Authority's outstanding Power Revenue Bonds, (iii) pay capitalized interest on the Series 2012A
Bonds through January 1, 2015, (iv) fund a deposit to the Reserve Account in the Puerto Rico Electric
Power Authority Power Revenue Bonds Interest and Sinking Fund (the "Sinking Fund") and (v) pay the
costs of issuance of the Series 2012A Bonds.

4.      The Series 2012B Bonds have been duly authorized and issued to provide funds to (i)
refund certain outstanding bonds of the Authority and (ii) pay the costs of issuance of the Series 2012B
Bonds.

5.      The Trust Agreement provides for the issuance of additional bonds, from time to time,
under the conditions, limitations and restrictions therein set forth.

6.      The Bonds are valid and binding special obligations of the Authority, payable solely from
the Sinking Fund established under the Trust Agreement, to the credit of which Fund the Authority has
covenanted to deposit a sufficient amount of the revenues of the System, over and above the expenses of
repair, maintenance and operation, to pay the principal of and the interest on all bonds issued under the
provisions of the Trust Agreement as the same become due and payable and to create a reserve for such
purpose, which Fund is pledged to and charged with the payment of the principal of and the interest on all
bonds issued under the provisions of the Trust Agreement.

7.      The Trust Agreement provides for the fixing and collecting by the Authority of rates and
charges for the use of the services and facilities of the System sufficient for the payment of the expenses
of the Authority incurred in the repair, maintenance and operation of the System and for the payment of
the principal of and the interest on all bonds issued under the provisions of the Trust Agreement as the
same become due and payable, including reserves for such purposes.

8.      The bonds issued under the provisions of the Trust Agreement, including the Bonds, do
not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political
subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political
subdivision is liable thereon, and such bonds, including the Bonds, are payable only out of the revenues
of the System, to the extent provided in the Trust Agreement.

9.      The Internal Revenue Code of 1986 (the "Code") sets forth certain requirements which
must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain
excluded from gross income for Federal income tax purposes. Noncompliance with such requirements
could cause the interest on the Bonds to be included in gross income for Federal income tax purposes
retroactive to the date of issue of the Bonds. Pursuant to the Resolution and the Tax Certificate as to

Puerto Rico Electric Power Authority
May 1, 2012
Page 3

Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 of even date herewith (the "Tax Certificate"), the Authority has covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Authority has made certain representations and certifications in its Resolution and Tax Certificate. We have not undertaken to independently verify the accuracy of those certifications and representations.

Under existing law, assuming compliance with the aforementioned tax covenants and the accuracy of the aforementioned representations and certifications, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

10.   The difference between the principal amount at maturity of the Series 2012A Bonds maturing July 1, 2029 bearing interest at a rate of 4.80%, July 1, 2042 bearing interest at a rate of 5.00% and July 1, 2042 bearing interest at a rate of 5.05% (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for Federal income tax purposes to the same extent as interest on the Series 2012A Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment.

11.   The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

In rendering the opinions set forth herein, we have assumed the accuracy and truthfulness of all public records and of all certifications, documents and other proceedings examined by us that have been executed or certified by public officials acting within the scope of their official capacities and have not verified the accuracy or truthfulness thereof. We have also assumed the genuineness of the signatures appearing upon such public records, certifications, documents and proceedings. As to questions of fact material to our opinion, we have relied on representations of the Authority furnished to us, without undertaking to verify such representations by independent investigation.

Except as stated in paragraphs 9 through 11, we express no opinion as to any other Federal, state, Commonwealth, local or foreign tax consequences with respect to the Bonds.

We express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other bond counsel.

Puerto Rico Electric Power Authority

May 1, 2012
Page 4

The opinions set forth above are subject to the effect of, and restrictions and limitations imposed by or resulting from, bankruptcy, insolvency, debt adjustment, moratorium, reorganization or other similar laws affecting creditors' rights generally and subject to general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Respectfully submitted,

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

PUERTO RICO ELECTRIC POWER AUTHORITY • Power Revenue Bonds, Series 2012A and Power Revenue Refunding Bonds, Series 2012B



MIX
From responsible
sources
FSC® C017146
FSC
www.fsc.org

Printed by: ImageMaster
www.ImageMaster.com