**<u>EXHIBIT 19</u>**

NEW ISSUE – BOOK-ENTRY ONLY

RATINGS (see RATINGS herein):  S&P: **BBB**
Moody's: **Baa3**
Fitch: **BBB-**

**$673,145,000**
# PUERTO RICO ELECTRIC POWER AUTHORITY
### Power Revenue Bonds, Series 2013A

The Power Revenue Bonds, Series 2013A (the "Bonds") of Puerto Rico Electric Power Authority (the "Authority") are being issued pursuant to a Trust Agreement, dated as of January 1, 1974, as amended, between the Authority and U.S. Bank National Association, New York, New York, successor trustee (the "Trust Agreement"). The Bonds, the outstanding bonds previously issued under the Trust Agreement, and any additional bonds that the Authority may from time to time issue under the Trust Agreement, are payable solely from the Net Revenues (as described herein) of the Authority's electric generation, transmission and distribution system.

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.

- The Bonds will be registered under the book-entry only system of The Depository Trust Company ("DTC"). Purchasers of the Bonds will not receive definitive Bonds.

- Interest on the Bonds will be payable on January 1, 2014 and on each January 1 and July 1 thereafter.

- The Bonds will be subject to redemption, commencing on July 1, 2023, as described herein. See *Mandatory Redemption* and *Optional Redemption* under DESCRIPTION OF THE BONDS for more information.

- The inside cover page contains the maturity schedule, interest rates and prices or yields of the Bonds.

- In the opinion of Bond Counsel, under the provisions of the Acts of Congress now in force, (i) subject to continuing compliance with certain tax covenants, interest on the Bonds will not be includable in gross income for federal income tax purposes and (ii) the Bonds and interest thereon will be exempt from state, Commonwealth of Puerto Rico and local income taxation under existing law. However, see TAX MATTERS herein for a description of alternative minimum tax consequences with respect to interest on the Bonds and other tax considerations.

- The Authority expects that the Bonds will be available for delivery through DTC on or about August 21, 2013.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Sidley Austin LLP, New York, New York, Bond Counsel, and certain other conditions. Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

**The Bonds are not a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities or political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions, other than the Authority, shall be liable for the payment of the principal of or interest on the Bonds.**

| | |
|---|---|
| **Morgan Stanley** | **Wells Fargo Securities, LLC** |
| **Citigroup** | **JP Morgan** |

| | | | |
|---|---|---|---|
| **BofA Merrill Lynch** | **Barclays** | **FirstBank PR Securities** | **Goldman Sachs & Co.** |
| **Jefferies** | **Mesirow Financial, Inc.** | **Oriental Financial Services** | **Popular Securities** |
| **Ramírez & Co., Inc.** | **RBC Capital Markets** | **Santander Securities** | **Scotia MSD** | **UBS FS Puerto Rico** |

August 15, 2013

# $673,145,000 Power Revenue Bonds, Series 2013A
# PUERTO RICO ELECTRIC POWER AUTHORITY

## $165,645,000 Serial Bonds

| Maturity Date July 1, | Principal Amount | Interest Rate | Yield | CUSIP[*] |
|---|---|---|---|---|
| 2030 | $ 35,000,000 | 7 ¼% | 6.73% | 74526Q A9 3 |
| 2043 | 130,645,000 | 7 | 7.12 | 74526Q A5 1 |

$150,000,000 7% Term Bonds due July 1, 2033; Price 100%; CUSIP 74526Q A7 7[*]
$307,500,000 6 ¾% Term Bonds due July 1, 2036; Yield: 7.02%; CUSIP 74526Q A6 9[*]
$50,000,000 7% Term Bonds due July 1, 2040; Yield: 7.07%; CUSIP 74526Q A8 5[*]

---

[*] Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This information is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

In connection with this offering, the Underwriters may overallot or effect transactions which stabilize or maintain the market prices of the Bonds offered hereby and of the Authority's outstanding Power Revenue Bonds at levels above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Bonds to certain dealers and dealer banks and others at prices lower (or yields higher) than the public offering prices (or yields) stated on the inside cover page and said offering prices (or yields) may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from the Authority, the Commonwealth of Puerto Rico, and other official sources that are believed to be reliable, but it is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth of Puerto Rico since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have provided the first paragraph of this page and the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained herein, and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell, or the solicitation of an offer to buy, nor shall there be any sale of the Bonds offered hereby by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, trust agreements, the Bonds and other documents herein do not purport to be complete. Reference is made to said laws, trust agreements, the Bonds and other documents for a full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Authority and the Trustee.

Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Authority. These forward-looking statements may relate to the fiscal and economic condition, economic performance, plans and objectives of Authority. In this respect, the words "estimates," "projects," "continues," "aims," "anticipates," "expects," "intends," "believes" and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are intended to identify forward-looking statements. All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially and adversely from those expressed or implied by forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Authority that are difficult to predict.

The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the officers of the Authority responsible for the preparation of such information, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Authority. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. The Authority's independent auditors have not compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, and they have not expressed any opinion or any other form of assurance on such information or its achievability. The Authority's independent auditors have not been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Authority.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ................................... 1
OVERVIEW ............................................................. 2
 General ................................................................ 2
 Summary of Operating Results.............................. 3
 Capital Improvement Program .............................. 6
 Strategic Plans to Address the Authority's
  Challenges.......................................................... 7
PLAN OF FINANCING .......................................... 10
 Series 2013A Bonds ............................................ 10
 Estimated Sources and Uses of Funds for the Bonds.. 11
SECURITY ............................................................ 11
 Source of Payment .............................................. 11
 Flow of Funds under Trust Agreement.................. 11
 Rate Covenant .................................................... 13
 Reserve Account ................................................. 14
 Reserve Maintenance Fund, Self-insurance Fund and
  Capital Improvement Fund................................. 14
 Additional Bonds................................................ 15
 Subordinate Obligations ...................................... 16
DESCRIPTION OF THE BONDS ............................ 16
 General ............................................................... 16
 Book-Entry Only System .................................... 17
 Discontinuance of the Book-Entry Only System .. 19
 Optional Redemption.......................................... 19
 Mandatory Redemption ....................................... 19
 Notice of Redemption......................................... 20
RISK FACTORS AND INVESTMENT
  CONSIDERATIONS............................................ 20
 The Authority's Financial Condition.................... 21
 The Authority's Ability to Comply with
  Environmental Laws and Regulations; MATS
  Regulations ....................................................... 22
 The Authority's Ability to Complete Key Projects
  on a Timely Basis.............................................. 23
 The Authority's Ability to Charge and Collect Rates
  Sufficient to Provide for Debt Service on the
  Power Revenue Bonds and Other Indebtedness
  and Meet its Operating Expenses ....................... 23
 The Authority's Ability to Meet its Projections of
  Net Revenues ................................................... 24
 The Trend in Demand for Electricity.................... 25
 Dependence on Fuel Oil; Fuel Cost Volatility...... 26
 The Authority's Ability to Access the Capital
  Markets ............................................................ 26
 Weather and Other Uncontrollable Events ........... 27
 Changes in Commonwealth Legislation,
  Competition and Self-Generation....................... 27
 Changes in Federal Laws or Regulations ............. 27
THE AUTHORITY ................................................. 27
 Powers ............................................................... 28
 Management ....................................................... 28
 Fiscal Oversight Agreement ................................ 31
 Subsidiaries ........................................................ 31
THE SYSTEM........................................................ 32
 Generating Facilities........................................... 32
 Transmission and Distribution Facilities.............. 35
 Adequacy of Capacity ......................................... 38
 Plans for Fuel Diversification.............................. 40
 Statistical Information ......................................... 43

**Page**

Historical Capital Improvement and Financing
  Program ............................................................ 45
Projected Five-Year Capital Improvement and
  Financing Program ........................................... 45
Rates ................................................................... 46
Major Clients ....................................................... 48
Fuel ..................................................................... 48
Subsidies and Contributions in Lieu of Taxes....... 49
Wheeling.............................................................. 52
DEBT.................................................................... 52
 Lines of Credit – Operational.............................. 53
 Other Loans and Debt – Subordinated ................. 53
 Swap Agreements ............................................... 53
 Principal and Interest Requirements ..................... 55
NET REVENUES AND COVERAGE ...................... 57
 Management's Discussion and Analysis of
  Operating Results ............................................. 59
 Projected Net Revenues ...................................... 62
LEGISLATION...................................................... 66
ENVIRONMENTAL MATTERS............................. 69
 Environmental Litigation and Administrative
  Proceedings ...................................................... 69
 Compliance Programs......................................... 72
INSURANCE ......................................................... 85
 Coverage ............................................................ 85
 Self-insurance Fund............................................ 85
 Fire Prevention Program ..................................... 86
LABOR RELATIONS ............................................ 86
PENSION PLAN .................................................... 87
OTHER POST-EMPLOYMENT BENEFITS ........... 88
LITIGATION......................................................... 89
TAX MATTERS ..................................................... 93
 Federal Income Taxes ......................................... 93
 Original Issue Discount ....................................... 93
 Bond Premium.................................................... 94
 Backup Withholding ........................................... 94
 Future Developments .......................................... 95
UNDERWRITING ................................................. 95
MATERIAL RELATIONSHIPS ............................. 96
LEGAL MATTERS ................................................ 96
LEGAL INVESTMENT ......................................... 96
GOVERNMENT DEVELOPMENT BANK FOR
  PUERTO RICO ................................................. 97
INDEPENDENT AUDITORS ................................. 97
RATINGS ............................................................. 97
CONTINUING DISCLOSURE ................................ 97
 Prior Continuing Disclosure Non-Compliance ...... 100
MISCELLANEOUS ............................................... 101

APPENDIX I  - Definitions of Certain Terms and
   Summary of Certain Provisions
   of the Trust Agreement.................... I-1
APPENDIX II  - Audited Financial Statements ......... II-1
APPENDIX III - Letter of the Consulting
   Engineers...................................... III-1
APPENDIX IV - Proposed Form of Bond Counsel
   Opinion.......................................... IV-1

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

**$673,145,000**
# PUERTO RICO ELECTRIC POWER AUTHORITY
## Power Revenue Bonds, Series 2013A

### INTRODUCTORY STATEMENT

The purpose of this Official Statement of Puerto Rico Electric Power Authority (the "Authority"), which includes the cover page, the inside cover page, the Appendices hereto and the information incorporated by reference as set forth below, is to furnish information in connection with the issuance and sale by the Authority of its Power Revenue Bonds, Series 2013A (the "Bonds").

Capitalized terms not defined elsewhere in this Official Statement are defined in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

The Bonds will be issued under and secured by a Trust Agreement, dated as of January 1, 1974, as amended (the "Trust Agreement"), between the Authority and U.S. Bank National Association, successor trustee (the "Trustee"). The Bonds, the other Puerto Rico Electric Power Authority Power Revenue Bonds and Power Revenue Refunding Bonds outstanding, and such additional bonds as may be issued from time to time under the Trust Agreement, are hereinafter collectively referred to as the "Power Revenue Bonds."

In order to give potential purchasers of the Bonds general information on the economy of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), this Official Statement incorporates by reference the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated May 17, 2013 (the "Commonwealth Economic Report"). The Commonwealth Economic Report was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) on May 17, 2013. The Commonwealth Economic Report was not prepared by the Authority, and the Authority does not assume any responsibility for its accuracy or completeness.

Any official statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Economic Report, or any new or revised Commonwealth Economic Report or other document that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Economic Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

## OVERVIEW

### General

The Authority was created in 1941 as a public corporation and governmental instrumentality of the Commonwealth by Act No. 83 of the Legislative Assembly of Puerto Rico, approved May 2, 1941, as amended (the "Act"). The Authority supplies virtually all of the electric power consumed in the Commonwealth. The Authority is one of the largest municipal utilities in the United States, ranking first in number of clients and revenues among public power utilities. As of June 30, 2013, it served approximately 1.5 million clients and had utility plant in service totaling approximately $11.8 billion, including $4.4 billion of production plant in service and $5.9 billion of transmission and distribution plant in service, all based on original cost. The Authority's production facilities, together with two private co-generation facilities with long-term power purchase contracts with the Authority, have a dependable generating capacity of 5,839 megawatts ("MW"). For the fiscal year ended June 30, 2013, the average percentage of the Authority's generating capacity available for service ("equivalent availability"), which includes the two co-generation facilities, was 79%. As of June 30, 2013, the Authority had 2,644 circuit miles of transmission and sub-transmission lines (230 kV, 115kV and 38kV) and 31,485 circuit miles of distribution lines.

Approximately 68% of the Authority's energy generation is produced by Authority-owned and operated facilities. The Authority owns six major generating plants and a number of smaller facilities with a combined dependable generating capacity of 4,878 MW. Nearly all of these facilities are currently fired with fuel oil, although the Authority has converted the two main units at its Costa Sur generation facility to allow them to use either natural gas or fuel oil and, as part of its capital improvement plan, plans to convert several other units to dual fuel units. In order to allow facilities that are not currently capable of using natural gas to use such fuel, the Authority also plans to develop the infrastructure to transport and deliver natural gas to such facilities. See *Plans for Fuel Diversification* under THE SYSTEM. The cost of such transportation and delivery infrastructure is not included in the Authority's capital improvement plan.

Approximately 32% of the Authority's energy generation is purchased from EcoEléctrica, L.P. ("EcoEléctrica"), AES Puerto Rico, L.P. ("AES-PR"), Windmar Renewable Energy, Inc. ("Windmar"), Pattern Santa Isabel LLC ("Pattern"), AES Ilumina, LLC ("AES Ilumina") and Punta Lima Wind Farm LLC ("Punta Lima"), the owners and operators of independent power production facilities. See *Generating Facilities* under THE SYSTEM.

Financial information included in this Official Statement at or as of June 30, 2013 is unaudited and subject to revision pending the conclusion of the accounting and financial reporting processes necessary to complete the Authority's audited financial statements for fiscal year 2013. Unaudited financial information at or as of June 30, 2013 was prepared by the Authority's management. While the Authority's management believes that such financial information has been prepared on a reasonable basis, there is no guarantee that such unaudited numbers will not be subject to material changes or revisions.

Unless otherwise noted, this Official Statement presents Revenues, Current Expenses and Net Revenues of the Authority as defined in the Trust Agreement and described herein. For purposes of the Trust Agreement, the Authority calculates Revenues, Current Expenses and Net Revenues on an accrual basis. Such calculations differ in several important respects from the Authority's calculations of change in net assets prepared in accordance with generally accepted accounting principles ("GAAP"). For example, Net Revenues under the Trust Agreement are computed excluding depreciation expense, other post-employment benefit accrued expenses and the payment of debt service on the Power Revenue Bonds. For a discussion of some of the most significant differences between Net Revenues under the Trust Agreement and change in net assets under GAAP and the treatment of non-cash items under the

Trust Agreement, see NET REVENUES AND COVERAGE and Schedule II to the Financial Statements for the fiscal years ended June 30, 2012 and 2011 in Appendix II, which includes a reconciliation of the Authority's change in net assets under GAAP with its Net Revenues under the Trust Agreement.

The Authority's fiscal year begins on July 1 and ends on the following June 30.

**Summary of Operating Results**

*Five-Year Period*

During the five-year period from fiscal year 2009 through fiscal year 2013, the Authority experienced a net decrease of 3.0% in electric energy sales in kilowatt hours ("kWh"), as shown in the table that follows under the heading "Operating Results." The Authority's sales during this period were adversely affected by the significant increase in the price of oil (the average cost of fuel oil per barrel to the Authority increased by 45.8%), the principal source of fuel used in its generating facilities, and a reduction in the level of economic and business activity in the Commonwealth due to a prolonged recession, which commenced in the fourth quarter of fiscal year 2006.

The Authority's Net Revenues increased from $629.5 million in fiscal year 2009 to $730.7 million (unaudited) in fiscal year 2013, or 16.1%. During this period, the Authority experienced decreases in Net Revenues in fiscal years 2009, 2011 and 2012, when compared to the corresponding prior fiscal year. The change in Net Revenues during this period was the result of a reduction in the demand for electricity due to higher prices of fuel and the effect in Revenues of the Rate Stabilization Account for fiscal year 2012. See *Rates* under THE SYSTEM. Principal and Interest Requirements on the Authority's Power Revenue Bonds increased from $435.0 million in fiscal year 2009 to $534.3 million (unaudited) in fiscal year 2013 (which excludes $67.1 million (unaudited) of interest in fiscal year 2013 that was capitalized through the issuance of Power Revenue Bonds). The increase in Principal and Interest Requirements was the result of the issuance of additional Power Revenue Bonds by the Authority.

*Fiscal Year 2013 (unaudited) compared to fiscal year 2012*

For the fiscal year ended June 30, 2013, as compared to fiscal year ended June 30, 2012, Net Revenues increased by $93.3 million, or 14.6%. The increase in Net Revenues was primarily the result of a decrease from $79 million for fiscal year 2012 to $53.2 million for fiscal year 2013 in the use of the Rate Stabilization Account to fund the fuel adjustment revenues not billed to certain residential clients. In addition, administrative and general expenses decreased by $63.9 million, or 25.4%, mainly due to $37.2 million of costs related to the cancelled Via Verde Project, which were registered as Current Expenses. Current Expenses were $4,122.3 million, representing a decrease of 6.6% from the prior year. Fuel and purchased power expenses, the principal component of the Authority's Current Expenses, are passed on to clients through a separate fuel adjustment charge included in electric service rates. The Authority's revenues from its basic charges (which exclude the fuel and purchased power adjustment charges) increased by 3.2% from fiscal year 2012 to fiscal year 2013. Excluding fuel and purchased power expenses, Current Expenses decreased from $829.3 million during fiscal year 2012 to $762.9 million during fiscal year 2013, representing an 8% decrease as a result of the decrease in administrative and general expenses mentioned above and expense control measures implemented by the Authority's management. The accrued revenues attributable to the municipalities' consumption, the residential customer fuel subsidy and hotel subsidy were $298.2 million and $282.5 million for fiscal year ended June 30, 2013 and 2012, respectively. The treatment of the municipalities' consumption and these subsidies, which are included in Revenues although they are not collected, is discussed below and in *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

During fiscal year 2013, the accounts receivable from the sale of electric energy (net of the deferred liability to municipalities) increased from $1,083.4 million as of June 30, 2012 to $1,154.3 million (unaudited) as of June 30, 2013.  Accounts receivable from government clients (net of the deferred liability to the contribution in lieu of taxes ("CILT") to municipalities) increased from $239.4 million as of June 30, 2012 to $277.3 million (unaudited) as of June 30, 2013.  Accounts receivable from general clients increased from $844.5 million as of June 30, 2012 to $877.1 million (unaudited) as of June 30, 2013.

*Fiscal year 2012 compared to fiscal year 2011*

For the fiscal year ended June 30, 2012, as compared to fiscal year ended June 30, 2011, Net Revenues decreased by $68.6 million, or 9.7%.  The decrease in Net Revenues was primarily the result of a 2.1% decrease in electric energy sales (kWh) and $79.4 million in fuel adjustment revenues not billed to the residential clients, which were financed by the Rate Stabilization Account.  Current Expenses increased by $710.0 million, or 19.2%.  Current Expenses, excluding fuel and purchased power expenses, increased by $76.4 million or 10.1%, mainly due to $37.2 million of costs related to the cancelled Via Verde Project, registered as Current Expenses during fiscal year ended on June 30, 2012.

Accounts receivable increased from $1,025.4 million as of June 30, 2011 to $1,083.4 million as of June 30, 2012.  Of this amount, $239.4 million were due from the Commonwealth central government, public corporations and municipalities (net of the deferred liability to the contribution in lieu of taxes to the municipalities).

A discussion comparing the Authority's results for fiscal years 2009 through 2011 is set forth in "Management's Discussion and Analysis of Operating Results" under NET REVENUES AND COVERAGE.

The table appearing below summarizes the operating results of the Authority for the five fiscal years ended June 30, 2013.  For purposes of the Trust Agreement, the Authority includes in its calculation of Revenues and Net Revenues (i) amounts billed to the municipalities for electric energy sales that the Authority is legally entitled to collect but historically has not collected because it instead offsets such billings against the CILT that the Authority is required by law to pay the municipalities, and (ii) certain residential and hotel energy sales the accrued revenues of which the Authority offsets against a legally mandated subsidy granted to eligible clients in these categories.  The amount of the required annual CILT is at least equal to the municipalities' annual electric energy consumption.  The aggregate amount of accrued revenues for each period attributable to the municipalities' consumption of electric energy and these subsidies is shown in footnote 1 to the table below.  As shown in the table, when these amounts are deducted from Revenues and Net Revenues (shown in the table as adjusted net revenues), the Authority's debt service coverage is reduced significantly.  For a discussion of the CILT and the subsidies provided by the Authority, see *The Authority's Financial Condition – Subsidies and Contributions in Lieu of Taxes* under RISK FACTORS AND INVESTMENT CONSIDERATIONS, *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM, and *Projected Net Revenues* under NET REVENUES AND COVERAGE.

**Operating Results**
**(dollars in thousands)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013**[1] |
| Revenues[2] | $4,007,268 | $4,165,733 | $4,411,213 | $5,052,678 | $4,853,002 |
| Less: Current Expenses | 3,377,772 | 3,429,095 | 3,705,192 | 4,415,265 | 4,122,315 |
| Net Revenues | $ 629,496 | $ 736,638 | $ 706,021 | $ 637,413 | $ 730,687 |
| Principal and Interest Requirements[3] | $ 435,042 | $ 397,579 | $ 480,233[4] | $ 327,685[4] | $ 530,717[4][5] |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.45 | 1.85 | 1.47 | 1.95 | 1.38 |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[6] | 0.92 | 1.25 | 0.95 | 1.07 | 0.82 |
| Electric energy sales (in millions of kWh) | 18,516 | 19,235 | 18,501 | 18,112 | 17,962 |
| Percentage change in electric energy sales from prior year | (5.5)% | 3.9% | (3.8)% | (2.1)% | (0.8)% |
| Peak load (in MW) | 3,351 | 3,404 | 3,406 | 3,303 | 3,265 |
| Percentage change in peak load from prior year | (5.5)% | 1.6% | 0.1% | (3.2)% | (1.2)% |

---

[1] Unaudited.

[2] Includes revenues attributable to electric energy consumption by municipalities, residential fuel subsidy and hotel subsidy of $224.7 million, $232.4 million, $246.7 million, $282.6 million and $298.3 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively.

[3] The Principal and Interest Requirements for fiscal years 2009, 2010, 2011, 2012 and 2013 have been reduced by the amount set aside by the Authority from the proceeds of Power Revenue Bonds to pay interest thereon in the amounts of $37.7 million, $8.4 million, $79.5 million, $81.5 million and 67.1 million, respectively. The Principal and Interest Requirements for fiscal year 2010 and 2012 have been adjusted to reflect the refunding of $73.9 million and $159 million, respectively, of the Authority's debt service requirements for such fiscal year through the issuance of Power Revenue Refunding Bonds, the proceeds of which were used to pay such debt service.

[4] The Principal and Interest Requirements for fiscal years 2011 through 2013 have been reduced by the amount of the Federal Build America Bonds subsidy on the Power Revenue Bonds, Series YY and Series EEE (Issuer Subsidy Build America Bonds), equal to 35% of the interest payable on such Bonds during such period.

[5] Although not applicable during fiscal year 2013, commencing on July 1, 2013, certain automatic reductions in federal subsidy payments relating to the Authority's outstanding Build America Bonds took effect and will require the Authority to increase its debt service for purposes of calculating the required balance for the Reserve Account and meeting the test for the issuance of additional Power Revenue Bonds under the Trust Agreement. See "*Rate Covenant*" under SECURITY.

[6] Ratio calculated by excluding from Net Revenues the basic charges and fuel and purchased power adjustment charges attributable to energy consumption by the municipal governments as well as the subsidies for energy consumption charges provided by law to certain residential clients and hotels in the amounts set forth in footnotes (2) above, which are not collected.

Although the ratio of adjusted net revenues (net of municipalities' consumption and subsidies) to Principal and Interest Requirements was below 1.00 for fiscal years 2009, 2011 and 2013, the Authority made timely payments on its Power Revenue Bonds in such fiscal years. The Authority, however, had to borrow in order to meet all of its obligations. See *The Authority's Financial Condition* under RISK FACTORS AND INVESTMENT CONSIDERATIONS and DEBT.

The Authority's rate covenant requires that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that Revenues are sufficient to pay Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all bonds then Outstanding.  Pursuant to the accrual method of calculating Revenues and Current Expenses under the Trust Agreement, the Authority is in compliance with the rate covenant.

For a more detailed discussion of the Authority's operating results for the past five fiscal years, see *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

**Capital Improvement Program**

The total cost of the Authority's capital improvement program in fiscal years 2014 through 2018 is estimated to be approximately $1.55 billion, which is $398.4 million less than the cost of the capital improvement program for fiscal years 2009 through 2013.  The Authority's capital expenditures in fiscal years 2008 and 2009 were at historically high levels principally due to the costs associated with certain production plant construction projects, which were completed in fiscal year 2009.  The Authority expects that substantially all of the cost of the capital improvement program through fiscal year 2018 will be provided from the issuance of the Bonds, additional Power Revenue Bonds and other borrowings.

Set forth below is a summary of the Authority's historical total capital improvement program for the five fiscal years ended June 30, 2013 and the projected capital improvement program for the five fiscal years ending June 30, 2018.  For a more detailed discussion of the Authority's historical and projected capital improvement program, see *Historical Capital Improvement and Financing Program* and *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

**Capital Improvements**
**(dollars in thousands)**

| Capital Improvements | Fiscal Years | | | |
|---|---|---|---|---|
| | 2009-2013 | % of Total | 2014-2018 | % of Total |
| Production plant................................ | $ 787,528 | 40.4 | $ 575,742 | 37.1 |
| Transmission facilities...................... | 404,714 | 20.8 | 329,472 | 21.3 |
| Distribution facilities........................ | 618,525 | 31.7 | 465,138 | 30.0 |
| Other[1]............................................. | 137,635 | 7.1 | 179,648 | 11.6 |
| Total..................................... | $1,948,402 | 100.0 | $1,550,000 | 100.0 |

[1] Includes land and buildings, general equipment, preliminary surveys and investigations.

As discussed further below, the Authority's capital improvement program through fiscal year 2018 does not include the estimated costs associated with the development and construction of the infrastructure required to transport natural gas to the generating facilities. The Authority, along with Government Development Bank for Puerto Rico ("Government Development Bank"), as fiscal agent, is evaluating various financing structures for projects that develop and construct such infrastructure.  Some of the alternatives being considered include financing these projects with non Authority Power Revenue Bond financings or through fuel purchase agreements with third parties that will develop and construct the infrastructure and will deliver natural gas.  Under those financing alternatives, payments made by the Authority for services related to the natural gas facilities or for the acquisition of natural gas from third parties would constitute a Current Expense under the Trust Agreement and, thus, would be paid prior to debt service on the Power Revenue Bonds.  Since natural gas is currently a substantially cheaper source of

fuel than oil, and this price differential is projected to continue, the Authority expects that even after recouping the capital costs of the projects through the fuel adjustment charge or other charge, the generation of electricity with natural gas will result in net savings to the Authority's clients. However, such projected savings are subject to certain risks beyond the control of the Authority (including the price of fuel), and thus the Authority cannot guarantee that they will materialize. For more information on the use of natural gas, see *Plans for Fuel Diversification – Conversion of Generating Facilities to Dual Fuel* and *– Transportation of Natural Gas to Puerto Rico and Projected Savings from Fuel Diversification Strategy* under THE SYSTEM.

For a more detailed description of the Authority's electric generation, transmission and distribution system and the Authority's historical and projected capital improvement program, see THE SYSTEM.

## Strategic Plans to Address the Authority's Challenges

The Authority faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and high oil prices. Its principal challenges, some of which are interrelated, are: (i) reliance on high cost fuel oil; (ii) the decline in electric energy sales; (iii) high customer electric power rates; (iv) complying with recent environmental regulations; (v) reducing operating costs; (vi) addressing past due accounts receivables; and (vii) improving liquidity. The Authority's management is addressing these challenges by implementing several strategic initiatives.

### *Fuel Diversification Strategy*

The Authority's energy generation is heavily reliant on fuel oil. As a result of the increase in the price of fuel oil in the past several years, the Authority's retail price for electricity has also increased significantly, which has adversely affected the demand for electricity on the Island. In order to address the current high prices of oil, as well as the volatility of oil prices, the Authority is focused on diversifying fuel sources. The strategy involves (i) the conversion of the Authority's most cost effective existing oil-fired generating units, representing approximately 2,572 MW of generating capacity, which includes 820 MW at the Costa Sur power plant, to dual fuel units that can burn fuel oil and/or natural gas and (ii) the development of the necessary natural gas transportation and delivery infrastructure.

The Authority has already completed the conversion of the two largest generating units at the Costa Sur power plant to burn dual fuel (fuel oil and natural gas), or 14% of the Authority's total dependable generating capacity. The Authority is able to receive natural gas at the Costa Sur power plant through an existing pipeline from the EcoEléctrica terminal, and has commenced burning natural gas since April 2012. The Authority has completed the necessary improvements in order to burn up to 100% natural gas at both of Costa Sur's units.

In order for the Authority to be able to burn natural gas at other facilities, the Authority has to install the associated natural gas delivery infrastructure. At the Aguirre power complex, the Authority is pursuing the Aguirre Offshore GasPort Project ("AOGP"), an LNG import facility and pipeline to bring natural gas to the Aguirre power complex. In addition, the Authority is planning the issuance of a Request for Proposals ("RFP") for the infrastructure required to transport natural gas to its northern plants with the goal of completing the infrastructure by April 2017.

For more details on these matters, please see *Plans for Fuel Diversification – Transportation of Natural Gas to Puerto Rico* and *Projected Savings from Fuel Diversification Strategy* under THE SYSTEM.

*Operational Efficiency and Stability*

The Authority is implementing several strategies to improve the efficiency of its operations, including: (i) intensive tree trimming in anticipation of hurricane season; (ii) correction of transmission and distribution grid deficiencies; (iii) underground systems repairs; (iv) expansion or improvement of transmission centers, substation and switchyards; (v) updated maintenance program for generating units, transformers, switches, relays and protection systems; (vi) restoration of generating units remote regulation; (vii) improved equivalent availability and efficiency of the generating units; and (viii) improved efficiency through equipment rehabilitation.

*Safe Integration of Renewables*

In order to develop renewable energy generation and to reduce reliance on fuel oil, the Authority had signed, as of May 31, 2013, sixty-three (63) power purchase and operating agreements ("PPOA") for renewable energy projects, totaling approximately 1,660.8 MW of additional capacity, which are currently subject to financing, permitting and other technical requirements. These projects include renewable energy from solar, wind, waste-to-energy and landfill gas technologies. Four (4) projects began commercial operation in 2012, with a total capacity of approximately 123 MW (considering only 75 MW for Pattern), with an additional two expected to begin operations in 2013. The Authority is conducting a Renewable Energy Source Integration Study to evaluate if the rest of the proposed renewable energy projects which have executed PPOAs will be able to be interconnected to the grid without adversely affecting the reliability of the system.

For more details on this matter, please see *Plans for Fuel Diversification – Purchase of Renewable Energy Power* under THE SYSTEM.

*Compliance with MATS Regulations*

In 2011, the U.S. Environmental Protection Agency (the "EPA"), pursuant to the Clean Air Act ("CAA"), adopted the Mercury and Air Toxics Standards ("MATS") which became effective on April 16, 2012. These standards establish new emissions limitations for mercury, non-mercury metallic hazardous air pollutants and acid gases to coal and oil fired electric utility steam generating units, with an initial compliance date of April 16, 2015. The Authority has fourteen (14) units affected by MATS. In order to comply with MATS, the Authority expects to: (i) convert eight (8) of its existing generating units to burn natural gas in addition to oil (the conversion process for two of those units at the Costa Sur power plant has already been completed); (ii) declare the remaining six (6) units as "limited-use liquid oil-fired generating units" ("LULOF"); and (iii) apply for waivers that would extend the MATS compliance deadline by up to two years.

For more details on this matter, please see *Compliance Programs* under ENVIRONMENTAL MATTERS.

*Fiscal Stability*

*General.* In order to ensure long-term fiscal stability, the Authority is pursuing several strategies including: (i) continuing reductions in operating costs; (ii) addressing past due accounts receivable; (iii) reducing theft; (iv) reducing or limiting CILTs; and (v) ensuring that funds for capital improvement continue to be spent efficiently.

*Reducing Operating Costs.* The principal cost reduction measures included in the plan have been (i) reducing the number of employees through a combination of attrition from voluntary retirements and the elimination of temporary and vacant positions, (ii) reducing retiree health care benefits by adopting changes to the health plan in 2009 that included the imposition of caps on the amount of monthly benefits for all current and future retirees and stricter eligibility requirements, (iii) reducing overtime and miscellaneous expenses, and (iv) implementing enhanced budget controls and expense management in each of the three operational units and support areas (generation, transmission and distribution, and customer service). These measures, which the Authority began implementing in 2009, resulted in recurring annual savings of approximately $125 million, consisting of (i) a reduction of 1,078 employees from January 1, 2009 through June 30, 2013 that has resulted in annual savings of approximately $67 million, and (ii) changes to retiree health care benefits that have reduced actual benefit payments from $80.9 million for fiscal year 2009 to $23.3 million (unaudited) for fiscal year 2013. The Authority also expects other cost reduction initiatives, such as a reduction in overtime, materials, administrative and miscellaneous expenses, to result in annual savings of approximately $15 million.

As a result of various cost reduction measures implemented, the Authority's operating expenses for fiscal year 2013 (excluding fuel and purchased power, and $37.2 million (unaudited) of costs related to the cancelled Via Verde Project) decreased by $29.3 million (unaudited), or 3.7%, compared to fiscal year 2012, which represented the highest point of historical operating expenses (excluding fuel and purchased power), during the last five fiscal years. The Authority's projection for fiscal year 2014 includes an additional $15 million reduction in operating expenses such as overtime, materials and other expenses, as part of its cost control measures program.

*Addressing Past Due Receivables.* In order to improve the Authority's liquidity, the Authority has also made efforts to reduce past due receivables from the government sector. The central government's and public corporations' past due balance as of June 30, 2013 was approximately $245.4 million (unaudited), an increase of $62.3 million compared to $183.1 million as of June 30, 2012. On July 11, 2013, the Authority received a payment of $18.9 million from the Department of the Treasury covering the payment of past due invoices of various Commonwealth agencies, including the Department of Education, the Corrections Administration, the Public Buildings Authority, and the University of Puerto Rico. See *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

Act No. 239-2011, adopted on December 11, 2011, provides that each fiscal year the Office of Management and Budget of the Commonwealth shall project electricity expenses for agencies whose operations depend on the General Fund and shall coordinate with the Puerto Rico Treasury Department so that the monthly payment is sent directly to the Authority at the beginning of each month. In accordance with Act No. 239-2011, the Puerto Rico Treasury Department is making current payments for electric energy consumption by central agencies of the Commonwealth. While the payment of past due accounts from the government sector is not covered by Act No. 239-2011, the Authority continues to pursue the collection of all past due accounts from government clients, as discussed above, with the assistance of Government Development Bank, as its fiscal agent.

*Energy Theft Reduction Initiatives.* The Authority is also implementing a more aggressive energy theft reduction program through the use of "smart grid" technologies that reduce the need for door-to-door inspections, among other steps. One of the principal components of this plan is the replacement of old meters with meters capable of, among other things, reporting usage and system problems directly to the Authority. The Authority has already installed approximately 170,000 of the new meters, which also allow the Authority to perform remote connections and disconnections. The Authority expects to install an additional 60,000 to 75,000 of new meters in fiscal year 2014. In addition, the Authority is implementing data systems and technology solutions that facilitate the identification of areas where there

are network losses of energy or usage patterns that differ from historical norms, thus allowing the Authority to deploy its resources more efficiently. In addition, Act No. 235-2011, adopted on December 11, 2011, assigns primary responsibility for investigating illegal appropriation of electric energy to the Special Investigations Unit of the Puerto Rico Department of Justice, with the assistance of the Authority. Act Nos. 237-2011 and 238-2011, also adopted on December 11, 2011, increase the criminal and administrative penalties for tampering with the electric energy system. During fiscal year 2013, theft recovery initiatives resulted in theft-related billings of approximately $19.1 million and collections of approximately $5.0 million. The Authority's various theft recovery initiatives are expected to result in $30 million in annual revenues for fiscal years 2014 through 2018, and are reflected in the Authority's five-year projections. See *Transmission and Distribution Facilities – Operations* under THE SYSTEM.

*Reduction of CILT.* The Authority is required to compensate municipalities for foregone tax revenue related to the Authority's properties by paying a CILT. The amount of the required annual CILT is at least equal to the municipalities' annual electric energy consumption. While the Authority is legally entitled to collect from the municipalities their electric energy consumption bills, the Authority for many years has followed the practice of not pursuing the collection of energy bills from the municipalities, and instead it offsets the amount of such bills against the CILT. Many municipalities have taken advantage of the current CILT formula to subsidize for-profit ventures located in municipal facilities. Act No. 233-2011, approved December 11, 2011, modifies the CILT formula to exclude from the municipality's electric energy consumption the consumption in municipal facilities related to for-profit business operations and for which the municipalities receive compensation through rent or an entrance fee. The Authority is identifying municipal facilities that are no longer subject to the CILT. The Authority's preliminary estimate is that Act No. 233-2011 will result in additional collections of approximately $49.0 million annually from fiscal year 2014 through fiscal year 2018. The Authority's projections for the five fiscal years ending June 30, 2018 take into consideration the provisions of Act No. 233-2011. See *Projected Net Revenues* under NET REVENUES AND COVERAGE. For more information regarding contributions in lieu of taxes, see *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

*Efficiency of Capital Improvement Program.* The decrease in the demand for electricity and the completion of certain key projects in its production plants has allowed the Authority to reduce the size of, and to refocus, its capital improvement program for fiscal years 2014 through 2018 away from the historical trend of capacity expansion and towards diversifying the fuel sources for its generating units, improving the reliability of its production capacity and the efficiency of its transmission and distribution system. In establishing its capital improvement program, the Authority reviewed potential projects to select and prioritize those that it believes will enable it to reduce costs and improve its operating efficiency. As a result, the Authority has been able to reduce its capital improvement program from $1.9 billion for fiscal years 2009 through 2013 to a projected $1.5 billion for fiscal years 2014 through 2018. The Consulting Engineers have examined the projected capital improvement program and found it to be reasonable. See *Transmission and Distribution Facilities* and *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

## PLAN OF FINANCING

### Series 2013A Bonds

The Authority is issuing the Series 2013A Bonds pursuant to the Trust Agreement to (i) finance a portion of the cost of various projects under its capital improvement program, (ii) fund a deposit to the Reserve Account in the Puerto Rico Electric Power Authority Revenue Bonds Interest and Sinking Fund, (iii) pay capitalized interest on the Series 2013A Bonds through January 1, 2016 and (iv) pay the costs of issuance of the Series 2013A Bonds.

The Authority expects to issue additional Power Revenue Bonds over the next five fiscal years in order to fund the Authority's capital improvement program. See *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM. No assurance can be given that any such Power Revenue Bonds will be issued for such purposes.

**Estimated Sources and Uses of Funds for the Bonds**

**Sources**

| | |
|---|---|
| Principal Amount of the Bonds | $673,145,000.00 |
| Net Original Issue Discount | (10,501,560.50) |
| **Total Sources** | $662,643,439.50 |

**Uses**

| | |
|---|---|
| Deposit to Construction Fund | $500,000,000.00 |
| Deposit to Reserve Account | 46,438,900.00 |
| Capitalized Interest | 109,647,402.78 |
| Underwriters' Discount and Other Costs of Issuance[1] | 6,557,136.72 |
| **Total Uses** | $662,643,439.50 |

---

[1]  Includes legal, rating agency and other financing expenses.

## SECURITY

The Power Revenue Bonds are not a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions, other than the Authority, and neither the Commonwealth nor any such municipalities or other political subdivisions, other than the Authority, are liable thereon, nor shall the Power Revenue Bonds be payable out of any funds other than those of the Authority as further described herein.

### Source of Payment

The Power Revenue Bonds are payable solely from the Revenues of the System after payment of the Current Expenses of the Authority and any reserve therefor. For purposes of the Trust Agreement and this Official Statement, "System" means all the properties owned and operated by the Authority as a single integrated system in connection with the production, distribution or sale of electric energy, the acquisition or construction of which was financed in whole or in part from the proceeds of Power Revenue Bonds or from the proceeds of bonds issued under a previous indenture, or from moneys deposited to certain accounts established under the Trust Agreement, or (to the extent specified by the Authority) from certain subordinated obligations; "Revenues" means all moneys received by the Authority as a result of the ownership or operation of the System, including any income derived by the Authority from the sale of electricity generated or distributed by the System, any proceeds of certain insurance, and certain investment income; and "Current Expenses" means the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System. The Authority has covenanted to deposit in the Sinking Fund a sufficient amount of such Revenues (after payment of Current Expenses) to pay the principal of and the interest on all the Power Revenue Bonds and to provide a reserve therefor. See Appendix I—*Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement,* which should be read in conjunction herewith.

### Flow of Funds under Trust Agreement

The following schematic representation is provided only to guide readers and does not purport to be complete.



(1) Monthly deposits to the Bond Service Account and the Redemption Account for all Power Revenue Bonds bearing at a fixed rate are capped at 1/6 of the interest due within the next six months and 1/12 of the principal due within the next twelve months and 1/12 of the Amortization Requirements for the current fiscal year.

**Rate Covenant**

The Authority has covenanted in the Trust Agreement to fix, charge and collect reasonable rates and charges so that Revenues of the System will be sufficient to pay Current Expenses and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any accrued interest thereon for such fiscal year.

For purposes of the Trust Agreement and application of the rate covenant, Revenues include the accrued revenues attributable to certain residential and hotel energy consumption, against which the Authority provides 100% subsidies required by law, and the accrued revenues attributable to electric consumption of the municipalities. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

For purposes of calculating Principal and Interest Requirements under the rate covenant and the additional bonds tests described below, the Accreted Value of any capital appreciation bonds of the Authority on their maturity dates must be included as principal due and payable on said maturity dates. The Accreted Value at any date of a capital appreciation bond currently outstanding equals the original principal amount of such capital appreciation bond plus the interest accrued from its date of issuance to such date, based upon the interest rate used to calculate the yields thereof, compounded in the manner provided in the Trust Agreement, and for future issues of capital appreciation bonds will be determined as provided in the respective resolutions of the Authority authorizing such issues. In addition, interest payable with respect to Build America Bonds and other Federally Subsidized Bonds is calculated through March 1, 2013 net of the Federal Subsidy Payment as described under "Reserve Account" below. Pursuant to the Balanced Budget and Emergency Deficit Control Act of 1985, as amended ("GRH"), certain automatic reductions in federal government expenditures took place on March 1, 2013 and thereafter. The Internal Revenue Service (the "IRS") announced that these reductions included a reduction to refundable credits (interest subsidy payments) under Section 6431 of the Internal Revenue Code of 1986 (the "Code") applicable to certain qualified bonds (including, but not limited to, Build America Bonds) for which the issuer of such bonds (including for these purposes, the Authority) elected under the Code to receive a direct credit interest subsidy. Pursuant to the IRS announcement, this reduction applies to payments to, among others, the Authority, on or after March 1, 2013, although, in the case of the Authority, it received from the United States the full federal interest subsidy payment on April 1, 2013 in respect of its outstanding Power Revenue Bonds, Series YY and Series EEE (Issuer Subsidy Build America Bonds). Unless intervening Congressional action takes place, the reduction (at the rate of 8.7% against the otherwise expected subsidy payment) will be applied until September 30, 2013, at which time it is subject to change. As a result, the Principal and Interest Requirements for Authority fiscal years after 2013 exclude the full amount of the interest subsidies received on the Authority's Build America Bonds because the Trust Agreement requires the Authority to do so for so long as any deficiency in such expected interest subsidy payments is not cured. As a consequence, the Authority has, beginning with the July 1, 2013 interest payment, included the full amount of interest on its outstanding Build America Bonds in calculating Principal and Interest Requirements and determining the required balance for the Reserve Account, among other things. Interest subsidy payments received by the Authority after April 1, 2013 will be used, however, as an offset to and serve to reduce the Authority's interest obligation on its Build America Bonds by the amount received from the United States Government. See "Rate Covenant" in Appendix I—*Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement*.

**Reserve Account**

The Authority has covenanted in the Trust Agreement to accumulate in the Reserve Account an amount equal to the interest payable on all outstanding Power Revenue Bonds within the next 12 months, provided that for Power Revenue Bonds issued for other than refunding purposes, the amount to be so deposited in any month, as set forth in "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement,* need not exceed one-sixtieth of the amount of the increase in the interest payable within the next 12 months resulting from the issuance of such Power Revenue Bonds. In connection with the capital appreciation bonds of the Authority, the minimum amount required to be on deposit in the Reserve Account with respect to the interest accrued thereon is to be derived from the interest rate used to calculate the assumed yields through their maturity times the Accreted Value of such Power Revenue Bonds determined in the manner provided in the Trust Agreement on the valuation date therefor occurring on or after the first day of the twelfth month succeeding the date of calculation.

In connection with any outstanding Build America Bonds or other Federally Subsidized Bonds, the amount of interest deemed to be payable on such bonds within the next twelve months for purposes of the calculation of interest to be credited to the Reserve Account excludes the amount of interest to be paid from the Federal Subsidy Payment to the extent there are no shortfalls in such payments or the full amount of interest coming due within the next twelve months for so long as any such uncured shortfalls remain. During fiscal year 2013, as a result of the federal sequester imposed by GRH, the Federal Subsidy Payment for the Authority's outstanding Build America Bonds was not paid at its scheduled amount, and the shortfall remains uncured as of the date of this Official Statement. As a consequence, the Authority is including the full amount of interest on its outstanding Build America Bonds in calculating the required balance for the Reserve Account.

As of June 30, 2013, approximately $445.1 million was on deposit to the credit of the Reserve Account. The amount required to be accumulated in the Reserve Account will be approximately $444.4 million after giving effect to the issuance of Power Revenue Bonds issued for non-refunding purposes within the previous 60 months and the issuance of the Bonds. In accordance with the provisions of the Trust Agreement, the Authority will transfer any excess amount on deposit from time to time in the Reserve Account to the Bond Service Account of the Sinking Fund.

**Reserve Maintenance Fund, Self-insurance Fund and Capital Improvement Fund**

The Trust Agreement establishes the Reserve Maintenance Fund, the Self-insurance Fund and the Capital Improvement Fund. Revenues are deposited monthly into each of such Funds after the required deposits into the Sinking Fund as set forth in the schematic representation above for purposes of (a) paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, including major items of equipment, in the case of the Reserve Maintenance Fund, (b) paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement, in the case of the Self-insurance Fund, and (c) paying the cost of anticipated extensions and improvements which cost has not otherwise been provided for from the proceeds of the Power Revenue Bonds, in the case of the Capital Improvement Fund. Each of these Funds serves as an additional reserve for the payment of principal of and interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Sinking Fund (including the Reserve Account) are insufficient for such purpose. As of June 30, 2013, the balances of the Reserve Maintenance Fund and the Self-insurance Fund were $15.8 million and $91.9 million, respectively. As of June 30, 2013, there was $50.2 million on deposit in the Capital

Improvement Fund.  See "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Additional Bonds**

Additional Power Revenue Bonds may be issued under the Trust Agreement for the purpose of paying all or any part of the cost of any improvements to the System or for any other proper corporate purpose of the Authority; provided that, among other requirements, Net Revenues (as defined in the Trust Agreement) of the Authority for 12 consecutive months out of the preceding 18 months, adjusted to reflect rates in effect on the date of issuance of such bonds, shall be not less than 120% of maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding, and that the average annual Net Revenues for the five fiscal years succeeding the issuance of such bonds, adjusted to reflect any rate schedule the Authority has covenanted to put in effect during such five fiscal years, as estimated by the Authority and approved by its Consulting Engineers, shall be not less than 120% of the maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding and the Power Revenue Bonds then to be issued.

For purposes of the additional bonds test, Net Revenues include the accrued amounts attributable to the residential fuel and hotel subsidies, which the Authority does not collect (the Authority is required by law to provide a credit for such amounts in its recipients' billing), and the accrued electric consumption charges of the municipalities, which the Authority is legally authorized to collect but does not because it follows the practice of applying them as an offset against the CILT obligation.  See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Power Revenue Refunding Bonds may also be issued under the Trust Agreement for the purpose of refunding all or any part of the outstanding Power Revenue Bonds of any series; provided that, among other requirements, either (i) the earnings tests described above for the issuance of additional Power Revenue Bonds are satisfied (except that effect is given to the retirement of the Power Revenue Bonds to be refunded) or (ii) the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the Power Revenue Bonds then to be issued (after giving effect to the retirement of the Power Revenue Bonds to be refunded) shall be less than the maximum aggregate Principal and Interest Requirements on account of all outstanding Power Revenue Bonds (excluding the Power Revenue Bonds then to be issued). See "Issuance of Power Revenue Bonds - Sections 208, 209 and 210 of the Trust Agreement" in Appendix I — *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

Under the additional bonds test of the Trust Agreement, Net Revenues for the twelve months ended June 30, 2013 (adjusted to reflect the rates in effect on the expected date of issuance of the Bonds as if they were in effect for the entire twelve-month period) of $783.9 million were 129% of the maximum aggregate annual Principal and Interest Requirements of $609.3 million on all outstanding Power Revenue Bonds.  The Net Revenues amount reflects a positive adjustment of $53.2 million that takes into account the revenues that would have been collected during the twelve-month period if the Authority's rates had not been reduced due to the effect of the Rate Stabilization Account, which effect ended on November 30, 2012.  Estimated average annual Net Revenues for the five fiscal years ending June 30, 2018 of $825.6 million would be 126% of the maximum aggregate annual Principal and Interest Requirements of $655.7 million on all outstanding Power Revenue Bonds (including the Bonds).  See NET REVENUES AND COVERAGE.

**Subordinate Obligations**

The Authority may incur or issue obligations for any proper corporate purpose secured by a pledge of moneys in the Subordinate Obligations Fund. If the Authority incurs any such obligations, Net Revenues of the Authority must be deposited monthly to the credit of the Subordinate Obligations Fund (after the required deposits have been made to the Sinking Fund and the Reserve Maintenance Fund) in amounts sufficient to pay such obligations as they become due.

The Authority may, in connection with the incurrence of any such obligations, limit the deposit to the Reserve Maintenance Fund as described above to not more than $400,000 per month, notwithstanding any higher amounts recommended by the Authority's Consulting Engineers. If such deposit is so limited, the Authority will be required, immediately after each monthly deposit to the Subordinate Obligations Fund, to deposit to the Reserve Maintenance Fund (and prior to any deposits to the Self-insurance Fund and the Capital Improvement Fund) the lesser of the amount remaining in the Revenue Fund and the amount of any such deficiency.

Unless a particular project financed with any such obligations is specified by the Authority as being part of the System, any revenues attributable to such project will not be pledged to the payment of Power Revenue Bonds and any expenses associated with such project will not be payable from Revenues as Current Expenses of the System. *See* "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

As of June 30, 2013, the Authority had approximately $9.7 million aggregate outstanding principal amount of subordinate obligations. See DEBT.

## DESCRIPTION OF THE BONDS

**General**

The Bonds will bear interest at such rates and will mature on the dates and in the principal amounts set forth on the inside cover page of this Official Statement. The Bonds will be dated their date of delivery. Interest on the Bonds will be payable on each January 1 and July 1, commencing on January 1, 2014.

*Form of Bonds*

Principal of and premium, if any, and interest on the Bonds will be payable in the manner described below under "Book-Entry Only System." The Bonds are being issued in fully registered form and, when issued, are to be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC is to act as securities depository for the Bonds. Individual purchases of interests in the Bonds will be made in book-entry form only, in denominations of $5,000 or any multiple thereof. Purchasers of such interests will not receive definitive Bonds. Principal, redemption premium, if any, and interest are payable directly to DTC by the Trustee. Upon receipt of such payments, DTC will remit such principal and interest to the DTC Participants (as such term is hereinafter defined) for subsequent disbursement to the purchasers of beneficial interests in the Bonds.

**Book-Entry Only System**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any maturity of the Bonds exceeds $500 million, one Bond will be issued with respect to each $500 million of principal amount, and an additional Bond will be issued with respect to any remaining principal amount of such maturity.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is, in turn, to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect

only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their clients.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Trust Agreement. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of clients in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this Section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority believes to be reliable, but the Authority takes no responsibility for the accuracy thereof.

NONE OF THE AUTHORITY, THE TRUSTEE AND THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR

REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, definitive Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event also, definitive Bonds will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate trust office of the Trustee in New York, New York; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Authority maintained by the Trustee; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate trust office of the Trustee in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Optional Redemption**

The Bonds may be redeemed at the option of the Authority prior to maturity, from any available moneys (except moneys deposited in the Sinking Fund in respect of an Amortization Requirement), upon not less than 30 days' prior notice by mail, either in whole or in part, in such order of maturity as directed by the Authority, on any date not earlier than July 1, 2023, at a redemption price equal to the principal amount of the Bonds to be redeemed plus accrued interest to the redemption date, without premium.

**Mandatory Redemption**

The Bonds maturing on July 1, 2030 and 2043 are not subject to any sinking fund requirements prior to their maturity dates. The Bonds maturing on July 1, 2033, 2036 and 2040 will be redeemed in part in amounts equal to the Amortization Requirements for such Bonds (less the principal amount of any Bonds retired by purchase and otherwise subject to adjustment as provided in the Trust Agreement), from moneys in the Sinking Fund, at a redemption price equal to the principal amount of the Bonds to be redeemed plus accrued interest to the redemption date, without premium, in the years and amounts set forth below:

| | Annual Sinking Fund Requirements for Bonds due July 1, | | |
|---|---|---|---|
| Year | 2033 | 2036 | 2040 |
| 2032 | $ 16,790,000 | | |
| 2033 | 133,210,000* | | |
| 2034 | | $ 95,825,000 | |
| 2035 | | 102,525,000 | |
| 2036 | | 109,150,000* | |
| 2037 | | | |
| 2038 | | | |
| 2039 | | | $22,275,000 |
| 2040 | | | 27,725,000* |

* Final Maturity.

**Notice of Redemption**

Notice of redemption shall be mailed by the Trustee, not less than thirty (30) days prior to the redemption date, to the Holders of Bonds called for redemption at their addresses appearing on the bond registration books of the Trustee. The Trustee shall also give notice of redemption by overnight mail or carrier service to the Authority, and such securities depositories and/or securities information services as shall be designated by the Authority.

With respect to any notice of redemption of Bonds at the option of the Authority, such notice may state that such redemption shall be conditional upon the receipt by the Trustee, on or prior to the date fixed for such redemption, of moneys sufficient to pay the principal of and interest on such Bonds to be redeemed, and that if such moneys shall not have been so received, said notice shall be of no force and effect and the Authority shall not be required to redeem such Bonds. In the event that such notice of redemption contains such a condition and such moneys are not so received, the redemption shall not be made and the Trustee shall within a reasonable time thereafter give notice, in the manner in which the notice of redemption was given, that such moneys were not so received.

## RISK FACTORS AND INVESTMENT CONSIDERATIONS

AN INVESTMENT IN THE BONDS INVOLVES A DEGREE OF RISK. SET FORTH BELOW IS A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE BONDS. EACH PROSPECTIVE INVESTOR SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW IN ORDER TO MAKE A DECISION AS TO THE CREDIT-WORTHINESS OF THE AUTHORITY AND MUST EXAMINE ITS FINANCIAL CONDITION IN ORDER TO MAKE A JUDGMENT AS TO ITS ABILITY TO BEAR THE RISK OF AN INVESTMENT IN THE BONDS.

THE FOLLOWING DISCUSSION OF RISK FACTORS IS INTENDED ONLY AS A SUMMARY AND DOES NOT PURPORT TO IDENTIFY ALL THE RISK FACTORS THAT MAY AFFECT THE AUTHORITY'S ABILITY TO PAY DEBT SERVICE ON THE AUTHORITY'S POWER REVENUE BONDS. PROSPECTIVE INVESTORS ARE ADVISED TO REVIEW ALL THE INFORMATION IN THIS OFFICIAL STATEMENT IN EVALUATING AN INVESTMENT IN THE BONDS.

ANY ONE OR MORE OF THE FACTORS DISCUSSED AND OTHERS COULD ADVERSELY AFFECT THE AUTHORITY'S OPERATIONS, REVENUES AND EXPENSES TO AN EXTENT THAT CANNOT BE DETERMINED AT THIS TIME, COULD ADVERSELY AFFECT THE AUTHORITY'S ABILITY TO COMPLY WITH ITS OBLIGATIONS AND COULD LEAD TO A

DECREASE IN THE MARKET VALUE AND/OR THE LIQUIDITY OF THE AUTHORITY'S POWER REVENUE BONDS. THERE IS NO ASSURANCE THAT OTHER FACTORS WILL NOT BE MATERIAL IN THE FUTURE.

**The Authority's Financial Condition**

The Authority's financial condition has been adversely affected by a variety of factors, some of which are described below.

*Operating Losses Pursuant to GAAP*

For each of the last four fiscal years, the Authority incurred losses before contributed capital in accordance with GAAP. These losses reflect the continuation of a historical trend of net losses that have resulted in a deficit in the Authority's consolidated net assets of $515.7 million as of June 30, 2012. This means that, as of June 30, 2012, the Authority's total liabilities of $10.8 billion exceed its total assets of $10.3 billion. As of June 30, 2013, the Authority had an unconsolidated net assets deficit (on a stand-alone basis, excluding the Authority's subsidiaries) of $827.9 million (unaudited). This imbalance represents an increase in the Authority's debt and payment obligations relative to its revenue-producing assets. If this trend were to continue, the Authority's ability to fund its operations and finance its capital program could be negatively impacted.

*Subsidies and Contributions in Lieu of Taxes*

The Authority includes in Revenues and Net Revenues, for purposes of complying with its requirements under the Trust Agreement, amounts billed to the Commonwealth's municipalities for electric energy sales to the municipalities that the Authority is legally entitled to collect but historically has not collected because it instead offsets such billings against its CILT obligation. The Authority also includes in Revenues and Net Revenues energy charges against which the Authority credits its legally mandated subsidy obligation for eligible residential and hotel clients. For a detailed description of the Authority's obligation to make CILT payments and provide subsidies, and the procedures followed by the Authority to comply with such obligations, see *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Because the determination of Revenues and Net Revenues under the Trust Agreement is on an accrual basis, the Authority is able to include in Net Revenues the municipalities' and certain other clients' consumption even though it does not collect the same but rather offsets its CILT and subsidy obligations against them. If those Revenues were excluded from the calculation of Net Revenues, the Authority's ratio of Net Revenues to Principal and Interest Requirements would be reduced significantly. In some prior years, that ratio was below 1.00.

*Funding of Capital Improvements*

Substantially all of the Authority's capital improvement program has been and is expected to continue to be financed through the issuance of Power Revenue Bonds and other borrowings. This has caused the Authority's level of indebtedness and related debt service requirements to increase significantly as well.

The Authority's Consulting Engineers have recommended that the Authority increase the amount of its capital improvement program funded from internally-generated sources.

*Liquidity; Accounts Receivable; Operational Lines of Credit*

During fiscal years 2011, 2012 and 2013, the Authority experienced a deterioration of its liquidity. Among the factors that affected the Authority's liquidity were the increase in the level of accounts receivable, the higher level of operating expenses relative to decreasing or constant revenues and the Authority's practice of not collecting the municipalities' electric consumption receivables and offsetting such receivables against the CILT.

As of June 30, 2013, accounts receivable amounted to $1,154.3 million (unaudited), of which $277.3 million (unaudited) was from the central government and public corporations. Increases in accounts receivable may have an adverse impact on the Authority's liquidity. In addition, the Commonwealth has faced a number of fiscal challenges in recent years, including budgetary deficits. Further fiscal challenges may adversely impact the Authority's ability to collect and reduce its government accounts receivable.

Due to liquidity constraints, the Authority has had a need to use lines of credit and Power Revenue Bonds to finance its operational expenses. There is no assurance that the Authority will be able to renew, extend, substitute or increase these lines of credit in the future. See *Notes* and *Government Development Bank – Lines of Credit* under DEBT.

Repayment of these and future lines of credit to cover operational expenses is treated as a Current Expense under the Trust Agreement, which is entitled to be paid before debt service on the Power Revenue Bonds.

*Funding of Pension Liabilities*

The employees of the Authority participate in a defined benefit pension plan which provides retirement and death benefits. The Authority's pension plan faces a number of financial issues, as reflected in its unfunded actuarial accrued liability ("UAAL"), which amounted to $1.7 billion as of the June 30, 2012 actuarial valuation, and funded ratio of 43.0% as of June 30, 2012, based on the actuarial value of the plan's assets. The funded ratio as of June 30, 2012 based on the market value of the plan's assets was 41.3%. Furthermore, the plan has been subject to historical funding shortfalls, and these funding shortfalls are expected to continue. For fiscal years 2010, 2011 and 2012, the employer and employee contributions to the plan amounted to $106.8 million, $122.4 million and $123.5 million, respectively, while annual benefit payments amounted to $203.9 million, $198.3 million and $203.8 million, respectively.

As a result of the plan's funded ratio and the funding shortfalls referred to above, and depending on the actual return on the plan's assets compared to the assumed return in the actuarial valuation, the Authority modifies its annual contribution to the plan in order for the plan to be able make making benefit payments at current levels on a long-term basis. This contribution is included in the Authority's Current Expenses before the payment of debt service on the Power Revenue Bonds. For more information regarding pension liabilities affecting the Authority, see PENSION PLAN.

**The Authority's Ability to Comply with Environmental Laws and Regulations; MATS Regulations**

The Authority is subject to environmental rules and regulations, such as MATS, greenhouse gases ("GHG"), and air and water quality regulations, among others, the compliance cost of which could have negative effects on the Authority's financial condition, depending upon implementation and timing. In addition, changes to environmental rules and regulations in the future could adversely affect the operation

and financial stability of the Authority. The Authority is unable to predict what, if any, effect future environmental rules and regulations will have on its operations and financial condition.

Because of the Authority's heavy reliance on fuel oil-fired power plants, MATS will present the most immediate challenge. The regulations will require the Authority to reduce emissions of hazardous air pollutants by April 2017 at the latest. In order to maintain its generating plants in operation while complying with the new requirements, the Authority would have to install air pollution control systems in each generating unit, resulting in additional annual recurring significant expenses related to the operation and maintenance of the emissions control systems. Therefore, the Authority has decided that in order to comply with the MATS, it will convert some of its existing generating units to burn dual fuel: natural gas, a cleaner burning fuel, and fuel oil. In addition, conversion to natural gas may also allow the Authority to comply with future laws or regulations governing greenhouse gas emissions. If the Authority is not able to convert its existing units to natural gas prior to regulatory deadlines, including completing the natural gas delivery infrastructure, it would need to make significant capital investments without being able to offset these costs with any cost savings on the purchase of fuel or would be subject to regulatory penalties. It is possible that the Authority may not be in a position to fund such additional expenditures.

Although the Authority is committed to maintaining its facilities and operations in compliance with applicable laws, it is expected that the Authority will continue to pay stipulated penalties and to make additional capital expenditures (some not included in the current capital improvement program) in the future under its existing Consent Decree and to comply with new environmental requirements. However, the Authority believes it is taking the necessary steps to substantially comply with applicable environmental laws and regulations.

For a more detailed description of the environmental matters affecting the Authority, see ENVIRONMENTAL MATTERS.

**The Authority's Ability to Complete Key Projects on a Timely Basis**

The Authority has several key projects geared at utilizing more natural gas in its generating units in order to lower the cost of electricity and meet regulatory requirements. The Authority plans to (i) convert certain existing fuel oil-fired facilities to allow them to use either fuel oil or natural gas, (ii) build the infrastructure needed to transport natural gas to several of the Authority's generating plants, and (iii) build an offshore terminal to supply natural gas to the Aguirre power plant. These projects affect, among other things, the ability of the Authority to comply with MATS, achieve lower fuel costs and meet the Authority's projections of Net Revenues. If the Authority is not able to complete these key projects on a timely basis, the Authority may not meet its projected Net Revenues. The Authority's ability to achieve these plans, however, is subject to factors beyond its control such as completion of the permitting process and obtaining financing for these projects. See *Plans for Fuel Diversification* under THE SYSTEM.

**The Authority's Ability to Charge and Collect Rates Sufficient to Provide for Debt Service on the Power Revenue Bonds and Other Indebtedness and Meet its Operating Expenses**

The imposition and collection by the Authority of rates, fees and charges for the services of the System provide the only security for payment of the Power Revenue Bonds, but are subject to being applied first to the payment of Current Expenses, which are the operating expenses of the System.

The Revenues of the Authority are dependent on the rates which it charges and the revenues it collects from its clients. The inability of or failure by the Authority to charge rates that produce, and to collect, sufficient Revenues could result in the Authority being unable to cover its Current Expenses or to meet coverage requirements or debt service payments on its Power Revenue Bonds. The Authority is

23

able to adjust rates, subject to it complying with certain public hearing and review procedures, as described in *Rates* under THE SYSTEM. The Authority has not increased basic charges since 1989. However, because the cost of fuel and purchased power is passed along to clients through a fuel adjustment charge, the cost of electricity to clients has increased significantly during the past several years. The high level of the current fuel adjustment charge limits the Authority's ability to increase its basic rate without further affecting the demand for electricity.

The Authority's ability to increase its rates and/or collect additional Revenues from its clients is also affected by economic conditions and population trends in the Commonwealth. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. Electric energy sales in kWh have experienced a declining trend during the past five years. A continued slowdown in the economy or a low rate of economic growth will adversely affect the Authority's ability to maintain or increase its Net Revenues as electric energy consumption may remain constant or continue to decrease. In addition, the population of the Commonwealth decreased from 2000 to 2012. If this trend continues, the Authority's ability to maintain or increase its Revenues and its capacity to comply with debt service obligations may be adversely affected.

The Authority expects that if it is able to implement its fuel diversification strategy, it will be able to reduce its fuel adjustment charges. This, in turn, may result in higher demand for electricity and may stimulate economic growth.

### The Authority's Ability to Meet its Projections of Net Revenues

The Authority's ability to generate sufficient Net Revenues to meet its Principal and Interest Requirements during the projected period of fiscal years 2014 through 2018 is based on meeting the assumptions underlying its projections, several of which involve factors beyond the control of the Authority. One of the key assumptions is the Authority's cost of residual and distillate fuel, which have been and continue to be very volatile. The Authority's projections assume that for fiscal year 2014, its blended cost for the fuels (No. 6 fuel oil, light distillate and natural gas) will average $94.96 per equivalent barrel and that the average price of the fuels will decline to $80.91 per equivalent barrel by fiscal year 2018. The price of fuel is dependent on a number of exogenous factors, including political factors affecting the supply of crude oil and LNG, which factors are impossible to predict. See *Projected Net Revenues* under NET REVENUES AND COVERAGE.

If Current Expenses of the Authority should experience a significant increase without a corresponding increase in rates and charges, the Authority's Net Revenues and its debt service coverage could be negatively affected. These expenses will be significantly influenced by the performance of management and its ability to execute the strategic initiatives discussed above, as well as by external circumstances, such as, changes in regulatory policy or legislation (including the implementation of MATS), changes in uncontrollable costs (such as fuel), the outcome of litigation against the Authority, labor related matters, and the need to carry out unexpected repairs or replacements, any of which could have a material adverse financial effect on the Authority. There can be no assurance that the Authority's projections of Current Expenses will not be substantially exceeded.

The projections of Net Revenues prepared by the Authority for the five fiscal year period from 2014 through 2018 are also premised in part on the inclusion in Revenues of the municipalities' consumption of electric energy and certain other revenues that the Authority does not collect but rather offsets with subsidies. When these revenues are eliminated from Revenues and Net Revenues, the Authority's debt service coverage is reduced significantly as shown in the preceding *Operating Results* table and in the table of "Historical Net Revenues and Coverage" appearing under NET REVENUES AND COVERAGE. The projections are also premised on the expectation that the Authority will be able

to control operating expenses (excluding maintenance), principally in administrative and general expenses and production plant and transmission and distribution expenses, by fiscal year 2018, compared to fiscal year 2013. If such projected controls are not achieved, the Authority's ability to meet its debt service obligations may be adversely affected, unless the Authority is able to implement other revenue raising measures or there is a higher than projected increase in demand for electricity.

Even if the projections for fiscal years 2014 through 2018 are met, the Authority's ability to obtain sufficient Net Revenues to pay an increasing amount of debt service on the Power Revenue Bonds beyond fiscal year 2018 (see *Principal and Interest Requirements* under DEBT) will ultimately depend on its ability to execute the strategic initiatives described herein and/or implement further revenue raising or expense control measures. If those projections are not met, the Authority may need to issue additional Power Revenue Bonds or incur other debt to pay its obligations in the absence of revenue increases or expense reductions.

The Authority's financial projections involve many assumptions, some of which are beyond the control of the Authority, such as the cost of oil and other fuels, economic performance in Puerto Rico and the impact on the level of demand for electricity. In the past, the Authority's projections of Net Revenues have at times materially differed from what the Authority has been able to achieve.

If the Authority's financial results do not meet the various assumptions underlying the projections, its ability to generate sufficient Net Revenues to pay debt service on the Power Revenue Bonds after paying its Current Expenses may be adversely affected. In addition, its ability to continue funding its capital improvement program to improve the System, execute on its fuel diversification strategy and comply with applicable regulatory requirements may also be adversely affected. The inability to comply with regulatory obligations may result in monetary penalties and other adverse consequences.

**The Trend in Demand for Electricity**

During fiscal year 2009, the Authority experienced a decrease in electric energy sales (in kWh) as a result of the ongoing economic recession in Puerto Rico and the high rates charged to the Authority's clients, which are the result of the combination of the high cost of fuel oil and the Authority's dependence on fuel oil for 69% of its power production. For fiscal year 2009, when Puerto Rico's real gross national product decreased by 3.7%, the Authority's electric energy sales decreased by 5.5%. Residential, industrial and commercial energy sales were all negatively affected during this fiscal year. During fiscal year 2010, however, electric energy sales increased by 3.9% compared with fiscal year 2009. This increase mainly occurred in the residential sector, where sales in kWh grew 10.8%, partly attributable to lower fuel oil prices during the first six months of fiscal year 2010. During fiscal year 2011, electric energy sales (in kWh) decreased 3.8% compared to fiscal year 2010, with all customer categories declining. During fiscal year 2012, electric sales (in kWh) decreased 2.1% compared to fiscal year 2011. During fiscal year 2013, compared to fiscal year 2012, electric energy sales (in kWh) increased in the residential and commercial sectors by 1.5% and 4.3%, respectively, but declined in the industrial sector by 17.2%.

The Authority is projecting increases in electric energy sales (in kWh) of 1.29%, 0.38%, 1.14%, 1.52% and 1.78% for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively. The projected increases for these fiscal years are expected to result from improved economic conditions in Puerto Rico and the stabilization of fuel prices through the fuel diversification strategies contemplated in the projections. The Authority projects that the price of fuel oil will average $89.20 during the five year period ending fiscal year 2018. If the price of fuel oil increases, however, it is expected that the Authority may experience a decrease in sales.

For more information regarding the historical and projected sales and revenues of the Authority, see NET REVENUES AND COVERAGE.

**Dependence on Fuel Oil; Fuel Cost Volatility**

Approximately 67% of the Authority's energy generation for fiscal year 2012 was produced by oil-fueled units. The Authority's dependence on oil, contrary to the situation of mainland United States utilities, has resulted in the Authority's electricity rates being among the highest of all United States utilities. For fiscal year 2013, the Authority's average retail price of electricity was $0.27 per kWh. See *Fuel* under THE SYSTEM.

Since the cost of fuel is currently passed through to the Authority's clients using a fuel adjustment charge, the Authority's dependence on fuel oil has resulted in overall increases and significant volatility in the cost of energy to the Authority's clients during the last five fiscal years. The increased cost of energy, in turn, has a negative impact on Puerto Rico's economy and has contributed to the reduced demand for electricity discussed above. The Authority's management is focused on diversifying fuel sources, with the goal of reducing the dependence on oil for energy generation from 51% for fiscal year 2013 to 10% by fiscal year 2018 (assuming the conversion of eight steam generating units, the Aguirre and San Juan combined cycles, and 500 MW of renewable power). In order to achieve this reduction, the Authority plans to convert existing oil-fired facilities to allow them to use either fuel oil or natural gas, build the infrastructure needed to transport natural gas to several of the Authority's generating plants, and build an offshore terminal to supply natural gas to the Aguirre power plant. The Authority's ability to achieve these plans, however, is subject to factors beyond its control such as completion of the permitting process and obtaining financing for these projects.

The Authority has also entered into power purchase agreements with developers of renewable energy projects with the long-term goal of increasing the use of renewable energy and complying with the renewable energy portfolio standards described below. The Authority had signed power purchase agreements with respect to sixty-three (63) renewable energy projects totaling approximately 1,660.8 MW of capacity. These projects are for renewable energy from solar, wind, waste-to-energy and landfill gas technologies. All of these agreements are subject to financing, permitting and other technical requirements. Four of the renewable energy projects have already obtained private financing commitments and have commenced commercial operation.

These renewable energy projects, while reducing the cost of energy below the current levels of costs based on fuel oil, may result in costs of energy that are higher than the cost of generation through the burning of natural gas. See *Plans for Fuel Diversification* under THE SYSTEM.

For more information regarding the fuel used by the Authority for its generating units, see *Fuel* under THE SYSTEM.

**The Authority's Ability to Access the Capital Markets**

As a capital intensive company, the Authority relies on access to the capital markets and other borrowings. The Authority regularly accesses capital markets and other private borrowings, from Government Development Bank and private financial institutions, to finance its activities, for both capital improvement and working capital purposes. The Authority expects to continue to need access to such capital and borrowings for its ongoing capital improvement program, which is substantial, and for working capital purposes. The Authority's ability to arrange financing as well as its ability to refinance debt and make scheduled payments of principal and interest are dependent on numerous factors, including the Authority's levels of indebtedness, maintenance of acceptable credit ratings, its financial performance,

liquidity and cash flow, and market conditions. The Authority's inability to obtain additional financing from time to time would have a material adverse effect on its liquidity, and operations and its ability to meet all of its obligations.

**Weather and Other Uncontrollable Events**

The Authority is subject to unpredictable risks related to tropical storms, hurricanes and earthquakes. While the Authority has experience in preparing for, protecting against and recovering from damage due to these events, there can be no assurance that these events would not have a material adverse effect on the ability of the Authority to provide electric energy service to its clients or on the Revenues of the Authority.

**Changes in Commonwealth Legislation, Competition and Self-Generation**

New methods of producing low cost electricity and self-generation by certain industrial or commercial clients are other factors that could affect the Authority. Any new legislation that promotes competition in the energy sector in Puerto Rico or affects the Authority's rate-setting independence could have a material impact on the Authority's operations and financial condition. The Authority cannot predict at this time whether any additional legislation or rules will be enacted by the Commonwealth that will affect the Authority's operations or financial condition. See LEGISLATION.

**Changes in Federal Laws or Regulations**

The electric utility industry in the United States mainland has changed from a regulated monopoly business to a deregulated competitive industry. FERC has mandated wholesale wheeling and open access for transmission facilities owned by utilities that engage in interstate commerce. Many states have enacted or proposed laws and regulations that are designed to (i) ensure open access to transmission facilities to promote wholesale power supply competition and (ii) phase in retail competition. The requirements of FERC, including those regarding wholesale wheeling, are generally not applicable to the Authority because it is not engaged in transactions in interstate commerce. In addition, there are currently no wholesale clients in the Commonwealth, although the Authority is required to offer a wheeling service. As a result, the Authority has operated as a monopoly in the sale of electricity in Puerto Rico which has allowed it to charge rates determined by reference to its costs of service rather than by competitive forces. This may change, however, as a result of the "wheeling" initiatives discussed below. The Authority remains subject to the mandatory purchase obligation and other legal requirements in the Public Utility Regulatory Policies Act of 1978 ("PURPA"), which requires the Authority to purchase energy from certain generators at the Authority's avoided costs. Changes in Federal legislation, market development and other factors, however, could expose the Authority to competition. See THE SYSTEM.

## THE AUTHORITY

The Authority was created as a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth by the Act.

The Authority was created for the purpose of conserving, developing and utilizing the water and power resources of the Commonwealth in order to promote the general welfare of the Commonwealth. It supplies virtually all the electricity consumed in Puerto Rico and is one of the largest municipal utilities in the United States, ranking first in number of clients and revenues among public power utilities.

The executive offices of the Authority are located at 1110 Ponce de Leon Avenue, San Juan, Puerto Rico 00907, telephone number (787) 521-4666.

**Powers**

The Authority has broad powers under the Act, including, among others: to make contracts; to acquire properties by eminent domain or otherwise; to borrow money and to issue bonds for any of its corporate purposes; to secure the payment of its bonds and all other obligations by pledge of its revenues; to determine, fix, alter, charge and collect reasonable rates, fees, rentals and other charges for use of its facilities; and to have complete control and supervision of its properties and activities. In addition, the Authority has the power to create, acquire and maintain corporations, partnerships or subsidiary corporations.

**Management**

The Act, as amended by Act No. 29-2013, provides that the Governing Board of the Authority (the "Board") shall be composed of nine (9) members: four (4) members are appointed by the Governor of the Commonwealth with the advice and consent of the Senate of Puerto Rico, three (3) members are client representatives elected directly by the Authority's clients (of which two (2) must represent the interests of residential clients and the other, the interests of commercial or industrial clients.), and the Secretary of the Department of Transportation and Public Works and the Secretary of the Department of Economic Development and Commerce who will serve as *ex officio* members.

Among the four (4) members that are appointed by the Governor, two (2) shall be engineers licensed to practice as engineers in the Commonwealth (one of which shall be an electrical engineer), one (1) shall be a professional with knowledge and extensive experience in corporate finance, and one (1) shall be chosen by the Governor from a list of at least ten (10) persons submitted by professional associations and nonprofit entities designated by the Governor and which are experienced in economics, planning, public administration or economic development, or whose members are prominent people in those disciplines. The Governor, in his sole discretion, shall evaluate the recommendation made by them and shall choose one (1) person from the list. If the Governor rejects those recommended, the aforementioned associations shall proceed to make another list within thirty (30) calendar days. These members shall serve for a term of four (4) years, while the members representing the clients serve a term of six (6) years.

The changes to the structure of the Board pursuant to Act No. 29-2013 became effective on June 25, 2013. After such date, the functions of all members of the Board shall terminate when their successors take office, except for the elected representatives of clients of the Authority and those professional members whose circumstances conform to the specifications of the structure of the Board established by Act No. 29-2013. Once the term of a member whose appointment to the Board shall not end as a result of the new organization and structure of Board expires, their respective successors shall occupy their positions in the Board for the applicable term of office as provided in Act No. 29-2013.

Currently, the members of the Board are set forth below:

| Name | Principal Occupation | Term Ends |
|---|---|---|
| Harry Rodríguez García, PE, *Chairman* | Chemical Engineer<br>Former Abbot Laboratories Vice President | June 2014 |
| Miguel A. Torres Díaz, PE (*ex officio*) | Secretary of the Department of<br>Transportation and Public Works | N/A |
| Alberto Bacó Bagué, Esq. (*ex officio*) | Secretary of the Department of Economic<br>Development and Commerce | N/A |
| Roberto Volckers Esteves, PE | Electrical Engineer<br>Former Electric System Director of the<br>Authority | Holding Over |
| Andrés Salas Soler, Esq. | Attorney | June 2016 |
| Gabriel Hernández Rodríguez, MPA | Urban Planner | February 2015 |
| Norma Burgos Andújar, MPA | Urban Planner | June 2014 |
| Agustín Irizarry Rivera, PE, PhD | Electrical Engineer and Professor | September 2013 |
| Juan E. Rosario Maldonado | Chemist | September 2013 |

The Governing Board appoints an Executive Director who is the chief executive officer of the Authority and is responsible for the general operation of the Authority.

*Juan F. Alicea-Flores* was appointed Executive Director on February, 2013. Mr. Alicea-Flores is a Professional Engineer with 30 years of experience. Since 1983, he has held various senior executive positions within the Authority including, Acting Executive Director, Planning & Environmental Protection Director and General Power Plant Manager of Palo Seco Steam Power Plant. Other relevant positions he has occupied during his career in the Authority include, Maintenance Department Head and Operations Department Head of the Aguirre Power Plant and Senior Shift Engineer.

Other principal officers of the Authority include the following:

*Roberto L. Garay-González*, Deputy Executive Director. Mr. Garay-González holds a Master Degree in Engineering Management. He is a Professional Engineer specialized in Electrical Power. He has 25 years of experience in the Authority. Among the positions he has held within the Authority are Transmission and Distribution Technical Operations Director, and Transmission and Distribution District Engineer.

*Carlos J. Castro-Montalvo*, Generation Director. Mr. Castro-Montalvo is a Professional Engineer with 28 years of experience within the Authority. He has held different positions including Electrical System Director from 2005 until 2008, Electrical System Operations Management Division Head and Operations Superintendent, and SCADA-EMG Research Department Supervisor.

*Ramón L. Burgos-Medina*, Transmission and Distribution Director. Mr. Burgos-Medina is a Professional Engineer with 29 years of experience. Since 1986, he has held various positions within the Authority. Among the positions that he has occupied are Transmission and Distribution Technical Operations Director from February, 2001 until March 2005

*Emilia Martes-Rodríguez*, Customer Service Director. Ms. Martes-Rodríguez holds a Master Degree in Social Work and has 25 years of experience in the Authority. Throughout her career she has occupied the positions of Commercial Operations Regional Director, District Manager, and Customer Service Supervisor.

*Sonia Miranda-Vega*, Planning and Environmental Protection Director. Ms. Miranda-Vega is a Professional Engineer with 22 years of experience in the Authority. She has held various positions within the Authority. Among these are Head of the Planning and Research Division, Acting Executive Director and Principal Engineering Supervisor.

*Luis Figueroa-Báez*, Finance Director. Mr. Figueroa-Báez is a Certified Public Accountant with 24 years of experience in the Authority. He has held different positions within the Authority's Finance Directorate, including, Senior Auditor, Assistant Controller, Executive Advisor to the Chief Financial Officer and Chief Financial Officer from January 2001 until January 2009. For many years he has been in charge of financial presentations to the financial community related to the Authority's Bond Issuances and other financings.

*María M. Méndez-Rivera*, Human Resources Director and Corporate Secretary of the Governing Board. Ms. Méndez-Rivera holds a *Juris Doctor* degree and 25 years of experience in the Authority. She has held various executive positions within the Authority, including General Counsel, Opinions, Legislation and Contracts Division Head. From May 2006 until December 2008, she was appointed as Deputy Executive Director of the Puerto Rico Ports Authority.

*Jorge A. Concepción-Rivera*. Legal Affairs Director. Mr. Concepción-Rivera holds a Juris Doctor with a Master Degree in Labor Relations and Public Administration. He has 26 years of experience in the Authority. He has held various positions within the Authority, including General Counsel and Opinions, Legislation and Contracts Division Head. Also, he has worked as in-house counsel in the Property Rights and Litigation Divisions.

The Authority retains URS Corporation, successor to the Washington Division of URS Corporation, as the consulting engineers (the "Consulting Engineers") to perform certain responsibilities under the Trust Agreement. The URS Corporation's Washington Division was formed in November 2007 following the acquisition by URS Corporation of Washington Group International, Inc. In January 2010, URS Corporation elected to use only its corporate name to identify all its operating divisions. The Consulting Engineer's responsibilities include submitting an annual report to the Trustee by November 1 of each year setting forth its recommendations: (a) as to any necessary or advisable revisions of the Authority's rates and charges, (b) as to the amount that should be deposited monthly by the Authority during the ensuing fiscal year to the credit of various funds established under and for the purposes specified in the Trust Agreement, and (c) as to any advice and recommendations as they deem advisable. The most recent Consulting Engineers report is the Thirty-Ninth Annual Report for fiscal year 2012. A copy of this report is available on the Authority's website at www.prepa.com. Neither this report nor any additional information on the Authority's website is deemed to be part of or incorporated by reference in this Official Statement.

Ernst & Young LLP has been engaged to audit the Authority's financial statements for fiscal year 2013.

**Fiscal Oversight Agreement**

The Authority and Government Development Bank, as fiscal agent for the Authority, entered into a Fiscal Oversight Agreement, dated as of July 1, 2009, as amended (the "Fiscal Oversight Agreement"), pursuant to which the Authority agreed to implement a comprehensive expense reduction program, including certain fiscal oversight controls, subject to laws and existing agreements of the Authority, and provide Government Development Bank with certain financial information and operating data, as well as other financial information reasonably requested by Government Development Bank. The Fiscal Oversight Agreement is intended to allow the Authority to become self sufficient and to protect and improve the credit rating of the Authority, so that the Authority may obtain adequate financing to fund its capital expenditure requirements and operate the Systems in an efficient and reliable manner and in compliance with applicable laws and regulations and other regulatory requirements.

**Subsidiaries**

Pursuant to the Act, the Authority is authorized to create subsidiaries in order to, among other things, delegate or transfer any of its rights, powers, functions or duties. The Authority currently has four principal subsidiaries organized in a holding company structure. Currently, only two of the Authority's subsidiaries have significant operations.

PREPA Holdings, LLC, a wholly-owned subsidiary of the Authority, was created on October 29, 2009 as a Delaware limited liability company for the sole purpose of acting as a holding company and has no current operations. PREPA Holdings, LLC is the direct parent of the following entities: PREPA Networks, LLC, also known as PREPA.net; InterAmerican Energy Sources, LLC and Consolidated Telecom of Puerto Rico, LLC.

In 2002 the Authority completed the installation of a Backbone Fiber Optic Cable System which has modernized its internal communications by providing faster and more secure data transmission for operations, load management, system protection and security. This fiber optic system consists of a 663 mile fiber optic telecommunications network of which 386 miles are for the Authority's use and 277 miles are for the use of PREPA.net. The system is installed on the Authority's rights-of-way (mainly its transmission lines) and was financed through the issuance of $43.7 million aggregate principal amount of subordinate obligations.

In addition to the Backbone Fiber Optic Cable System, the Authority has installed a Distribution Fiber Optic Cable System that consists of 691 miles of fiber optic cables, of which 399 miles are for the Authority's and PREPA.net's use and 292 miles are for the exclusive use of PREPA.net. The Authority created PREPA.net in order to commercially exploit the excess fibers of the installed fiber optic cable system. PREPA.net markets the excess communication capacity of the Authority's fiber optic cable system. PREPA.net currently offers next generation telecommunications services to carriers, internet service providers, and large commercial enterprises. These services include data transmission via Synchronous Optical Network (SONET), metro and long haul Ethernet transport services, wireless last mile, and internet protocol services optimized for voice over internet protocol. PREPA.net also offers international fiber optic cable capacity and satellite teleport facilities through the submarine fiber optic cable capacity acquired in 2008. As of June 30, 2013, PREPA.net had total assets of $47.2 million and total liabilities of $29.3 million. PREPA.net's change in net assets for fiscal year 2013 was $6.3 million. PREPA.net has a term loan with a commercial bank with an outstanding principal balance of $8.1 million as of June 30, 2013 and, as of that date, owed the Authority approximately $6.6 million for intercompany transactions with the Authority in the ordinary course of business. PREPA.net continues to add wholesale clients to its portfolio, and the Authority continues with the installation of fiber optic cables. The

Authority expects that the commercial exploitation of the fiber optic system will provide a new source of revenues to its operations that will ultimately benefit its electric energy clients.

InterAmerican Energy Sources, LLC was created on May 25, 2007 as a Delaware limited liability company for the purpose of investing, developing, financing, constructing and operating renewable energy projects and other infrastructure related to the optimization of the Authority's electric infrastructure. InterAmerican Energy Sources, LLC is currently not operating.

Consolidated Telecom of Puerto Rico, LLC was created on October 27, 2009 as a Delaware limited liability company for the purpose of developing, financing, constructing and operating a telecommunications business within or outside of the Commonwealth, directly or indirectly, in relation to the operating of the Authority. Consolidated Telecom of Puerto Rico, LLC commenced operations on July 1, 2013 and is providing telecommunication services to businesses.

## THE SYSTEM

The Authority is the supplier of virtually all of the electric power consumed in the Commonwealth. As of June 30, 2013, the Authority served approximately 1.5 million clients, representing a population of approximately 3.7 million.

### Generating Facilities

As of June 30, 2013, investment in Authority-owned production plant in service totaled approximately $4.4 billion based on original installed cost, the total nameplate rating of the Authority-owned generating facilities of the System was 4,937 MW, and their total dependable generating capacity was 4,878 MW. In addition, the Authority purchases power under long-term power purchase agreements from two cogeneration facilities: EcoEléctrica and AES-PR. Under its agreement with EcoEléctrica, it has the right to purchase 507 MW of net dependable generating capacity. Under its agreement with AES-PR, it has the right to purchase 454 MW of net dependable generating capacity. The Authority has dispatch control over both facilities, and their output is fully integrated into the System.

**Existing Generating Facilities (in MW)**

| Generating Plants | Nameplate Rating (82 Units) | Dependable Generating Capacity | | | | | |
|---|---|---|---|---|---|---|---|
| | | Total (82 Units) | Steam (16 Units) | Combined Cycle Power Blocks (13 Units) | Combustion Turbine (25 Units) | Hydro (21 Units) | Other (7 Units) |
| Aguirre | 1,554 | 1,534 | 900[1] | 592[2] | 42[3] | - | - |
| Costa Sur | 1,030 | 1,032 | 990 | - | 42[3] | - | - |
| Palo Seco | 731 | 728 | 602 | - | 126[4] | - | - |
| San Juan | 870 | 840 | 400 | 440[5] | - | - | - |
| Mayagüez | 220 | 220 | - | - | 220[6] | - | - |
| Arecibo | 248 | 248 | - | - | 248[7] | - | - |
| Other Locations | 284 | 276 | - | - | 168[8] | 100 | 8[9] |
| Subtotal | 4,937 | 4,878 | 2,892 | 1,032 | 846 | 100 | 8 |
| Peñuelas – EcoEléctrica | 507 | 507 | - | 507[10] | - | - | - |
| Guayama – AES-PR | 454 | 454[11] | 454[11] | - | - | - | - |
| Ponce – Windmar | 2[12] | - | - | - | - | - | - |
| Guayama – AES Ilumina | 20[13] | - | - | - | - | - | - |
| Naguabo – Punta Lima | 26[14] | - | - | - | - | - | - |
| Santa Isabel – Pattern | 75[15] | - | - | - | - | - | - |
| Total | 6,021 | 5,839 | 3,346 | 1,539 | 846 | 100 | 8 |

[1] Consists of the Authority's two largest units, Aguirre Units 1 and 2, each with a dependable generating capacity of 450 MW.
[2] Consists of two combined-cycle power blocks, each made up of four 50 MW combustion turbine units and one 96 MW steam-turbine unit.
[3] Consists of two 21 MW units.
[4] Consists of six 21 MW units.
[5] Consists of two combined cycle power block, each made up of one 160 MW combustion turbine unit and one 60 MW steam-turbine unit.
[6] Consists of four 55 MW units.
[7] Consists of three 83 MW units.
[8] Consists of eight 21 MW units.
[9] Consists of five diesel units in the Municipality of Culebra and two in the Municipality of Vieques with an aggregate dependable capacity of approximately 8 MW held on standby reserve.
[10] Consists of one combined cycle power block, made up of two 165 MW combustion turbine units and a 177 MW steam turbine unit.
[11] Consists of two 227 MW units.
[12] Photovoltaic energy project (consists of 20,000 solar panels)
[13] Photovoltaic energy project (consists of 101,000 solar panels and 40 inverters)
[14] Wind energy project (consists of 13 wind turbine generators 2 MW each)
[15] Wind energy project (consists of 44 wind turbine generators 2.3 MW each)

The EcoEléctrica plant is a cogeneration facility located in the Municipality of Peñuelas. The facility includes a combined cycle power block, consisting of one steam and two combustion turbine units, and a liquefied natural gas terminal. The Authority began purchasing power from EcoEléctrica in September 1999 during the testing and start-up phase of the facility. Commercial operation began in March 2000. The Authority entered into an agreement with EcoEléctrica to purchase all of the power produced by the facility for a term of 22 years from the date of commencement of commercial operation. The agreement requires EcoEléctrica to provide 507 MW of dependable generating capacity to the Authority. The Authority may purchase any energy produced by the facility in excess of 507 MW, if made available, by paying an energy charge only. No capacity charge would be imposed on the Authority for this "excess" power. EcoEléctrica has entered into a long-term supply agreement to meet its expected needs for natural gas at the facility.

The power purchase agreement with EcoEléctrica includes monthly capacity and energy charges to be paid by the Authority for the 507 MW of capacity, which EcoEléctrica is committed to provide. The capacity charge is subject to reduction, progressively to zero, if the facility does not achieve certain availability guarantees determined on a 12-month rolling average basis. The energy charges for power purchases are based on a number of factors including a natural gas related charge on a per kWh of energy basis and inflation indices. The EcoEléctrica purchased power costs incorporate a minimum monthly power or fuel purchase requirement based on an average capacity utilization factor on the part of the Authority. After paying this minimum requirement, the Authority only pays for energy actually received (including energy in excess of the 507 MW guaranteed by EcoEléctrica). This element of the agreement, when combined with the possible reduction in the capacity charge described above, effectively transfers substantially all of the economic risk of operating the facility to EcoEléctrica.

The AES-PR plant is a co-generation facility located in the Municipality of Guayama. Commercial operation began in November 2002. This clean burning coal technology facility consists of two identical fluidized bed boilers and two steam turbines with 454 MW of dependable generating capacity. The Authority entered into an agreement with AES-PR to purchase all of the power produced by this facility for a term of 25 years from the date of commencement of commercial operation. The contract with AES-PR is substantially similar to the EcoEléctrica contract described above, including the compensation structure. Above a certain minimum amount, the Authority is only obligated to purchase energy actually produced by the facility. AES-PR is an affiliate of AES Corporation.

The AES-PR and EcoEléctrica projects contribute to the Authority's efforts towards fuel diversification and improved reliability of service. Prior to the commencement of operations of the EcoEléctrica and AES-PR facilities, oil-fired units produced approximately 99% of the Authority's energy. After the incorporation of the EcoEléctrica and AES-PR facilities to the System, approximately 31% of the Authority's annual energy generation is being provided by non-oil-fired generating facilities.

Among other benefits, the integration of the EcoEléctrica and AES-PR cogeneration facilities into the Authority's System reduces the impact of changes in energy costs to the Authority's clients resulting from short-term changes in fuel costs due to the manner of calculation of the energy charges under the EcoEléctrica and AES-PR agreements. While the agreements provide that energy charges will change based on different formulas relating to the prior year, each agreement fixes the energy price for each year of the contract at the beginning of such year. Fixing the energy component of the price for the whole year reduces the impact of seasonal or short duration variations in the market price of electricity. Because the energy price is fixed and known for the entire year, the Authority is able to achieve better economic dispatching and scheduling of maintenance outages of all of its generating units. In addition, the year delay in the effect of energy price changes for these two facilities on the Authority's energy costs reduces variations of the fuel and purchased power components in the price of electricity sold by the Authority by postponing the impact of the price changes and bringing these changes out of step with price changes in the other components of the Authority's fuel mix.

All of the Authority's purchased power costs under the EcoEléctrica and AES-PR power purchase agreements are accounted for as operating expenses on the Authority's financial statements, are treated as a Current Expense under the Trust Agreement, and are being recovered by the Authority pursuant to the purchased power charge under its current rate structure.

The Authority is purchasing renewable energy from four projects which have achieved commercial operation. The first project to achieve commercial operation on September 7, 2011, is a 2.1 MW solar photovoltaic project (consisting of 20,000 solar panels) located in Cantera Martinó, Ponce, owned by Windmar Renewable Energy. A larger solar photovoltaic facility of 20 MW (consisting of 101,000 photovoltaic panels) in Guayama, owned by AES Ilumina, started commercial operation on

November 28, 2012. A 26 MW wind farm facility (13 wind turbine generators 2 MW each) in Naguabo, Punta Lima Wind Farm, achieved commercial operation on December 17, 2012. Pattern Santa Isabel, a 95 MW wind farm project (44 wind turbine generators 2.3 MW each) commenced commercial operation on December 5, 2012 with a capacity of 75 MW. System tests to increase output to 95 MW will be completed as the next step. The power purchase agreements have a 20 year term with two possible extensions of five years each. Pursuant to these power purchase agreements, the Authority has agreed to purchase energy (not capacity) at a fixed price. The agreements also provide that the Authority has to accept delivery of and purchase the net electrical output from the facility to the extent it is available (except for reasons of force majeure or certain emergencies and subject to the facility complying with certain technical requirements). All of the Authority's purchased power costs under these agreements are treated as a Current Expense under the Trust Agreement. The cost of purchased power from these facilities is being passed on to clients through the purchased power adjustment charges.

## Transmission and Distribution Facilities

The Authority's transmission and distribution system interconnects its power plants with major switching and load centers throughout Puerto Rico in order to allow the flow of power to and between these locations. The System is integrated and each generating unit is able to provide electric power to the transmission and distribution system.

Since the early 1990's, a substantial portion of the Authority's capital improvement program has been directed at (i) improving its generating units in order to extend their life and increase their availability, thereby improving the System's equivalent availability, and (ii) expanding its generating capacity to improve its quality of service and meet forecasted increases in demand. As a result of the recent trends in demand, however, the Authority believes that it has sufficient capacity to meet current and future demand. Consequently, it has refocused its capital improvement program towards maintaining its existing generating units, converting its existing units into natural gas fired generation units and improving its transmission and distribution network in order to enhance reliability and improve efficiency. The Authority expects this shift in its capital improvement program to improve its economic dispatch schemes, energy transfer and transmission system losses, reliability, system security margins, voltage stability and system performance during double contingencies.

During the period from fiscal year 2009 to fiscal year 2013, the Authority invested $1.0 billion (or 52.7% of its capital improvement program) in its transmission and distribution system. The capital improvement program for the five fiscal years ending June 30, 2018 includes $794.6 million (or 51.3% of such program) for transmission and distribution facilities.

### Transmission Facilities

The Authority's transmission system in service totaled $2.2 billion based on original installed cost. The capital improvement program for the five fiscal years ending June 30, 2018 includes $329 million, or 21% of the total, for extensions and improvements to transmission lines. The Authority has 2,478 circuit miles of transmission lines, consisting of 375 circuit miles of 230 kV lines, 727 circuit miles of 115 kV lines and 1,375 circuit miles of 38 kV lines. The Authority has 35 miles of underground 115 kV cable, 63 miles of underground 38 kV cable and 55 miles of submarine 38 kV cable to the islands of Vieques and Culebra. The Authority also has 175 transmission and distribution switchyards and 130 transmission substations located at generating sites and at other sites throughout the island with a total transformer capacity of 19,207,250 kilovolt amperes ("kVA"). In addition, the Authority has 21 portable substations with a total capacity of 325,600 kVA and two capacitor banks with a total capacity of 36,000 kVar for substation maintenance without service interruptions.

As part of the Authority's refocused capital improvement program, it is constructing a new 230 kV transmission line to complement the transmission loops in the central and western parts of Puerto Rico. This new 230 kV transmission line will connect one of the Authority's principal generation complexes in the south with major switching and load centers in the northern part of the island. The project consists of a 38-mile, 230 kV transmission line between the Costa Sur power plant and the switchyard at the Cambalache gas turbines plant. The first stage of this project consists of the reconstruction and conversion to 230 kV of an existing 115 kV circuit line between the Costa Sur power plant and Dos Bocas hydroelectric power plant. The second stage of the project consists of the construction of a new 230 kV line from Dos Bocas to the Cambalache facilities. The construction of this project is expected to be completed during fiscal year 2014. Once in operation, this major infrastructure project will significantly enhance the reliability and security margins of the transmission system, and will permit the increase of power transfers from the south coast of Puerto Rico to the northern and western regions.

Another major component of the transmission system capital improvements program is the reconstruction and rehabilitation of 115 kV and 38 kV circuit lines throughout the island. These improvements include the reconstruction of 42 miles of a 115 kV line interconnecting the Bayamón Transmission Center, Canas 115 kV switchyard, Barrio Piñas 115 kV switchyard and Dos Bocas hydroelectric plant, as well as important substations in the municipalities of Toa Alta, Corozal, Morovis and Ciales. The reconstruction and rehabilitation of four 115 kV transmission lines interconnecting the Palo Seco power plant with relevant 115/38 kV transmission centers located in the metropolitan area are also included in this capital improvement program. Subtransmission circuits interconnecting substations in the municipalities of Orocovis, Barranquitas, Maricao, Las Marias and Mayaguez, located in the central and western regions of the island, are also part of this program.

The Authority has completed an underground 115 kV transmission circuit line around the San Juan metropolitan area in order to reduce power loss incidents in the aftermath of hurricanes and other major storms which strike Puerto Rico from time to time. The program to improve the 38 kV sub-transmission system continues in effect, including the construction of underground 38 kV lines in Guaynabo and San Juan. Construction of the underground 38 kV lines in Carolina, Vega Baja and Mayagüez has been completed. In addition, major reconstruction projects of aerial 38 kV lines in the central and western part of the island will significantly improve the reliability of the sub-transmission system.

During fiscal year 2009, the Authority commenced operations of the Palo Seco Gas Insulated Switchgear ("GIS"), one of the Authority's major gas insulated 115/38 kV switchyards with direct interconnection to 600 MW of generating capability. In December 2013, the Authority expects to complete a new air insulated 115/38 kV switchyard in the municipality of Barranquitas, which improves the reliability and efficiency of the System while increasing its power transfer capability and improving voltage regulation of the sub-transmission system under normal conditions and contingency situations. Also, the Authority commenced the construction of a new 115/38 kV switchyard at Buen Pastor to improve the reliability of the commercial and industrial loads in areas of San Juan and Caguas, which is expected to be completed in 2014. New 115/38 kV switchyards in Bairoa TC, Caguas and Venezuela TC, San Juan, as well as a new gas-insulated 38 kV switchyard in the urban center of the municipality of Bayamón are planned to commence construction within the next five fiscal years.

During fiscal year 2012, the Authority commenced operation of a new 115 kV capacitor bank in the Canóvanas transmission center in order to continue improving the voltage regulation in major load centers, increase the transmission system's power factor and reduce its reactive power losses. The Authority also completed a new 150 megavolt ampere ("MVA") 115/38 kV transmission center in the

municipality of Bayamón (Hato Tejas TC), a major expansion project that adds 150 MVA of 115/38 kV transforming capacity in the transmission center of Canóvanas, was completed in 2012.

The Authority expects that the San Juan GIS 38 kV and 115 kV switchgears will enter into service in fiscal year 2014 and 2016, respectively. This will be one of the Authority's major gas insulated 115/38 kV switchyards with direct interconnection through the existing air insulated 115 kV bus to approximately more than 850 MW of generating capability.

*Distribution Facilities*

Investment in distribution system in service as of June 30, 2013 totaled $3.7 billion based on original installed cost. The capital improvement program for the five fiscal years ending June 30, 2018 includes $465 million (or 30% of the total) for extensions and improvements to existing distribution lines to serve new clients and substations for accommodating new load growth areas. As of June 30, 2013, the electric distribution system included approximately 31,485 circuit miles of distribution lines and 333 distribution substations with an installed transformer capacity of 5,018,250 kVA owned by the Authority and 811 distribution substations with an installed transformer capacity of 8,286,120.

The construction of new distribution substations is expected to improve the capacity and reliability of the Distribution System. In 2013, the increase in capacity of the Grana II 13.2 kV substation was energized at Guaynabo and the new Hato Tejas 13.2 kV substation at Bayamón was also energized.

*Operations*

The Authority has digitized all the transmission and distribution facilities into a geographic information system. This allows the Authority to create a common database for all its transmission and distribution facilities.

The Authority's data management system integrates a work management system, a geographic information system and an outage management system that is known by its Spanish acronym of AIRe. The AIRe system is structured to maintain its databases as well as interface with existing computerized systems in other Authority divisions such as finance, human resources, and payroll. This integration enables the Authority to track all work from initiation to completion through the same system, while keeping all geographic information (such as maps) updated with necessary additions and modifications. Some of the AIRe system benefits include improved client service, reduced operations and management expenses, improved emergency response, better planning, improved and consistent engineering/design and estimating practices, archived maintenance records and real-time system status reporting. The work management system of the AIRe system has been in service in all of the Authority's districts since 2001, and is scheduled to be upgraded in fiscal year 2014.

The Authority also expanded its satellite-based vehicle locator system from 107 to 747 vehicles in order to improve the service fleet's efficiency. In addition, the Authority already upgraded its asset and work management system and is implementing an automatic service outage detection system. A pilot project is scheduled for fiscal year 2014 for the geographical area near the Distribution Operation Center at Monacillos.

The Authority has also implemented energy theft recovery initiatives that resulted in theft-related billings of approximately $19.1 million during fiscal year 2013 and collections of approximately $5.0 million. As part of these initiatives, the Authority is deploying "smart grid" technology by replacing current meters with new meters that allow for, among other things, remote connect and disconnect of the electric service. The efforts also include a pilot project in progress using a small scale metering data

management system that allows for the identification of areas where theft is prevalent, the comparison of a client's present electricity usage versus historical data, and a toll free hotline for anonymous reporting of suspected electricity theft. The Authority expects that these initiatives will result in $30 million of annual revenues for fiscal years 2014 through 2018. The actual results from the theft recovery program may differ from the Authority's projections.

The Authority regularly reviews and upgrades its operating and maintenance practices, with an emphasis on improving the reliability of its transmission and distribution system. In order to improve the productivity of its transmission and distribution employees, the Authority has instituted programs to assist them in both technical and supervisory training. In addition, as part of its continuous effort to improve service quality, the Authority has acquired new software applications and trained its personnel for the analysis and monitoring of power quality.

The Consulting Engineers are of the opinion that the Authority's production plant and transmission and distribution system are in good repair and sound operating condition. See Appendix III—*Letter of the Consulting Engineers*.

## Adequacy of Capacity

### *General*

Electric utilities provide reliable service by establishing a level of dependable generating capacity that is at least equal to their load plus a reserve sufficient to allow for scheduled maintenance, forced or unscheduled outages (defined below), reductions in generating capacity due to partial outages, and other unforeseen events. The Authority, as an island utility, is not able to do so. In addition, the absence of significant seasonal variations in demand results in a relatively high load factor (approximately 76.8% in fiscal year 2013), which affords the Authority less flexibility to schedule maintenance. Therefore, the Authority must have sufficient total reserve capacity to cover instances of generating unit outages.

The Authority's program to extend the life and increase the availability of its generating units has three components: formal operator training, comprehensive preventative maintenance, and design modification. The formal operator training part emphasizes safety, operating efficiency, and equipment integrity. The comprehensive preventative maintenance part of the program requires the Authority to remove all major generating units from service for maintenance at regularly scheduled intervals to ensure their reliability ("scheduled outages"). The design modification part of the program represents the Authority's commitment to improve the operation of generating units by installing redesigned, improved components, or by undertaking conversions of such generating units, in order to reduce the risk of units being forced out of service or being forced to operate at partial output ("forced or unscheduled outages"). About half of the $787.5 million in capital expenditures for the five fiscal years ended June 30, 2013 for production plant was spent for such scheduled maintenance program.

The Authority maintains some generating capacity as a reserve (referred to as a "controlled reserve") for frequency quality, in anticipation of unscheduled outages or other unforeseen events. The Authority controlled reserve criterion is 200 MW, but in order to maintain it, more than 500 MW of spinning reserve was needed. Based on its experience, however, the Authority implemented improvements in the System that allowed it to reduce its spinning reserve requirements while continuing to provide reliable service to clients and reducing its fuel cost.

In December 2006, a fire at the Authority's Palo Seco power plant damaged one of the four oil-fired generating units. In a separate incident, a fire also damaged the control room that controls all four generating units. The Authority returned the first of the four Palo Seco units to service in November

2007. As of the end of the first quarter of fiscal year 2010, all Palo Seco generating units and the control room had returned to service.

The table below shows annualized equivalent availability and the equivalent forced outage rate (an indication of the average percentage of total dependable generating capacity which is unavailable throughout the year due to forced outages or partial generating capacity outages) for fiscal years 2009 through 2013.

### Electric Generation Equivalent Availability and Reliability

|  | 2009[3] | 2010[3] | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Equivalent availability[1] ............................... | 76% | 78% | 84% | 80% | 79% |
| Equivalent forced outage rate[2]..................... | 16% | 12% | 11% | 15% | 13% |

[1] Cogenerator data is included.
[2] Cogenerator data is not included.
[3] Variations over previous years was due primarily to Palo Seco power plant outage.

For planning purposes, the Authority determines adequacy of capacity using probabilistic analytic methods widely used throughout the electric utility industry. The use of these methods takes into account the unique operational aspects of the Authority.

By more effectively utilizing scheduled outages, and by implementing major design modifications, the Authority has reduced the need for extended maintenance downtime and increased the overall reliability of all of its generating facilities. The additional reserve capacity represented by the two co-generation facilities gives the Authority more flexibility in scheduling maintenance periods on its own generation facilities and favorably affects the System's equivalent availability. Total production plant availability, however, decreased consistently from 84% in fiscal year 2006 to 76% in fiscal year 2009 due primarily to the Palo Seco power plant outage. For fiscal year 2010, total production plant availability increased to 78% and further increased to 84% for fiscal year 2011. The Authority estimates that each percentage point increase of System availability is equivalent to adding approximately 60 MW of available capacity to the System. Since the Palo Seco power plant returned to full generating capacity, the Authority has removed other generating units from service for maintenance that the Authority was not able to perform during the time the Palo Seco power plant was out of service. Total production plant availability was 80% in fiscal year 2012 and 79% for the year ended June 30, 2013. The reduction of 1% in the equivalent availability for fiscal year 2013 was due to the conversion to natural gas of unit No. 5 of Costa Sur.

*Projected Load Growth and Reserve Margin*

Projections of future load growth are a key component in the Authority's financial and capacity planning. As part of its planning process, the Authority receives information from three sources relating to economic activity: Advantage Business Consulting, Inter-American University, and the Commonwealth Planning Board. The Inter-American University uses a macroeconomic model developed in conjunction with Global Insight, a nationally recognized econometrics forecasting firm. The Commonwealth Planning Board also uses data provided by Government Development Bank. The Authority's forecasts of electric energy sales and income are based in part on the correlations between the consumption of electricity and various economic and financial activities in the Commonwealth as represented in the above-mentioned models. The Authority continuously monitors actual performance relative to its forecasts and prepares new forecasts at least once a year.

The Authority incorporates the highest of the three forecasts (or the higher of two forecasts when the third is not available) as its base case for planning the additional generating capacity required by the System. Recognizing the inherent uncertainty of forecasting growth, the Authority ordinarily uses the lowest of the three forecasts (or the lower of two forecasts when the third is not available) in preparing its base case revenue forecast.

The Consulting Engineers have reviewed the Authority's projections of future load growth and estimates of peak load and have found them to provide a reasonable basis for planning purposes. See Appendix III—*Letter of the Consulting Engineers.*

Based on the Authority's current projections of peak load and the continued level of production plant equivalent availabilities of its generating units, the Authority and the Consulting Engineers believe that reliable service will continue to be provided to the Authority's clients through fiscal year 2018. See *Plans for Fuel Diversification – Purchase of Renewable Energy Power.*

The following table summarizes the Authority's projected peak load, dependable capacity, reserve margin and dependable reserve margin through fiscal year 2018 under the peak load projections shown below. Projections of future peak load (for capacity planning purposes) from fiscal year 2014 to fiscal year 2018 prepared by the Authority show an average annual increase of less than 1.35%.

| Fiscal Years Ending June 30 | Peak Load | Dependable Capacity | Reserve Margin | Dependable Reserve Margin (%) |
|---|---|---|---|---|
| | | (in MW, except percentages) | | |
| 2014 | 3,304 | 5,839 | 2,535 | 77 |
| 2015 | 3,339 | 5,839 | 2,500 | 75 |
| 2016 | 3,377 | 5,839 | 2,462 | 73 |
| 2017 | 3,438 | 5,839 | 2,401 | 70 |
| 2018 | 3,492 | 5,839 | 2,347 | 67 |

The Consulting Engineers have examined the Authority's proposed long-term capacity expansion plan (and the methodologies and assumptions upon which it is based) and have found its development to be reasonable and generally consistent with utility industry practice and appropriate for the Authority. See Appendix III—*Letter of the Consulting Engineers.*

The Authority's recent load growth projections show that the Authority's current capacity is sufficient to meet short- to medium-term load growth demands. As a result, the Authority's capital improvement program in connection with its generating facilities is concentrated on maintaining its generating units and converting existing oil-fired generation units to dual fuel units that can burn oil and natural gas, as described below.

**Plans for Fuel Diversification**

*Conversion of Generating Facilities to Dual Fuel*

In order to reduce the Authority's dependency on fuel oil, reduce the cost of electricity, and comply with MATS, the Authority is pursuing a fuel diversification strategy. The principal component of this strategy is the conversion of most of the Authority's existing fuel oil-fired generating units to dual fuel units that can burn either fuel oil (Bunker C) or natural gas and the development of the necessary natural gas transportation and delivery infrastructure.

The Authority has already completed the conversion of the largest generating units at the Costa Sur power plant, representing approximately 820 MW of generating capacity, or 14% of the Authority's total dependable generating capacity. The Authority is able to receive natural gas at Costa Sur power plant through an existing pipeline from the EcoEléctrica LNG terminal and pursuant to a Sale and Purchase Agreement ("SPA") with Gas Natural Electricidad SDG, S.A. ("Gas Natural").

The Authority's capital improvement program for fiscal years 2014 through 2018 includes an estimated cost of $80.2 million, which with previous years' investment would be enough to complete the conversion to dual fuel of several generating units of the Authority, representing approximately 2,572 MW of generating capacity. The Authority commenced burning natural gas at Costa Sur in April 2012. The Authority completed the necessary improvements to burn 100% natural gas up to full load in the two Costa Sur power plant units. In order to be able to burn natural gas at other facilities, however, the Authority has to develop the associated natural gas delivery infrastructure. The Authority plans to start burning natural gas at its Aguirre power plant and at its northern generating plants by April 2015 and April 2017, respectively.

For a discussion of the financing alternatives being considered with respect to these projects, see *Projected Five-Year Capital Improvement and Financing Program* below.

*Transportation of Natural Gas to Puerto Rico and Projected Savings from Fuel Diversification Strategy.*

During the past decade, LNG has been imported to Puerto Rico for use in the EcoEléctrica cogeneration facility, which has an LNG terminal. On March 28, 2012, the Authority entered into a two-year purchase agreement for natural gas in order to provide natural gas to the Authority's Costa Sur power plant, where the Authority has already completed the conversion of the largest generating units to dual fuel, and is able to receive natural gas through an existing pipeline from the EcoEléctrica LNG terminal. The LNG that is imported through the EcoEléctrica LNG terminal is currently from non-U.S. sources as the United States lacks the infrastructure and facilities required for LNG production and delivery outside the mainland. The Authority's contracted natural gas prices for the Costa Sur power plant are based on a discount to the prices of fuel oil, as is typical in international markets. The Authority is in negotiations with EcoEléctrica to amend the SPA in order to be able to receive natural gas until the summer of 2015.

The Authority entered in a Memorandum of Understanding ("MOU") with Excelerate, an LNG transportation, floating regasification and storage provider, in 2011 to complete a feasibility study and start the studies required to complete the pre-filing process with FERC for the infrastructure required for the AOGP. On April 17, 2013, Excelerate filed the FERC permit after completing several studies and the preliminary design, and will apply for all necessary permits, clearances, and licenses relating to the construction and operation of the AOGP. Excelerate's subsidiary, that is developing the project, expects to receive the FERC authorization to site, construct, and operate the Aguirre Offshore GasPort by the second quarter of 2014 and anticipates requesting authorization to commence construction approximately one month after receiving FERC's authorization. The construction schedule is anticipated to allow commercial operation before April 2015 with the advance procurement of long lead items. The estimated cost of the infrastructure is $255 million. As of the date of this Official Statement, no definitive contract has been signed between the Authority and Excelerate providing for the construction and operation of the AOGP.

The Authority is developing a Request For Proposals ("RFP") for the infrastructure required to transport natural gas to the San Juan and Palo Seco generating plants. The RFP will allow the Authority to evaluate different approaches and choose a feasible, cost effective and timely delivery alternative. The

41

RFP process and negotiation with the selected company will be completed by fiscal year 2014. The permits are expected to be granted by February 2016 and construction of the infrastructure to receive, store and regasify natural gas will be completed by April 2017, allowing the Authority's to comply with MATS.

The Authority calculated the generation forecast based on the projected prices of fuels and demand. According to this, the use of natural gas in the Authority's facilities is expected to represent annual fuel cost savings in the range of $200 million and $650 million by fiscal year 2018, depending on market prices of fuel oil and natural gas and the tolling portion applicable to the infrastructure completed to received natural gas. The forecasted prices are based on the following: Short Term Energy Outlook (published on February 2013) and the Annual Energy Outlook 2013 for the mid and long term, both published by the US Department of Energy. The base prices included the fuel oil historical prices (Bunker C and Light Distillate No. 2) used by the Authority, coal prices used in AES, current natural gas supply contracts for the Costa Sur power plant, recent natural gas proposals and prices of natural gas in the European market. The price differential with international markets persists, as long as LNG is produced in the U.S. mainland and becomes available for delivery to foreign or domestic overseas markets, as well as the Authority's ability to secure transportation of such LNG in compliance with the Jones Act. The Authority's ability to achieve these savings depends upon many factors, including the future cost of fuel oil and natural gas, the development of LNG export infrastructure in the mainland United States and the waiver or amendment of the Jones Act.

*Purchase of Renewable Energy Power*

The other principal component of the Authority's fuel diversification strategy is the development of renewable energy generation. The Authority has signed power purchase agreements with respect to sixty-three (63) renewable energy projects totaling approximately 1,660.8 MW of capacity. These projects are for renewable energy from solar, wind, waste-to-energy and landfill gas technologies. The table below shows the capacity of the renewable energy projects under contract by source of energy.

|  | **Number of Projects** | **Capacity** |
|---|---|---|
| Wind | 10 | 382.9 |
| Solar | 46 | 1,157.4 |
| Waste-to-Energy | 3 | 109.0 |
| Landfill Gas | 4 | 11.5 |
| Total | 63 | 1,660.8 |

These renewable energy projects are in various stages of development, most still being subject to obtaining financing and permitting. Four of the projects are in commercial operation. Under the long-term contract with Windmar for the Cantera Martinó project, the Authority purchases 2.1 MW of energy from a solar power plant located in Ponce, Puerto Rico, which plant commenced commercial operation in September, 2011, generating 1.7 MW with an increase to 2.1 MW in October 2012. Under the long-term contract with Pattern, the Authority purchases up to 95 MW (from February to August and 75 MW during the rest of the year) of energy from a wind power plant located in Santa Isabel, Puerto Rico, which plant commenced commercial operation for 75 MW in December, 2012. The increase to 95 MW is subject to additional changes and tests to the System. Under the long-term contract with AES Ilumina, the Authority purchases 24 MW of energy from a solar power plant located in Guayama, Puerto Rico, which plant commenced commercial operation in October, 2012. Under the long-term contract with Punta Lima, the Authority purchases 26 MW of energy from a wind power plant located in Naguabo, Puerto Rico, which plant commenced commercial operation in December, 2012. These contracts have allowed the Authority to reduce its dependence on fuel oil.

Pursuant to the power purchase agreements, generally for 25-year terms, the Authority has agreed or will agree to accept delivery and purchase energy (but not capacity) to the extent available at a fixed price once a particular facility has commenced operations (except for reasons of force majeure or certain emergencies and subject to the facility in question complying with certain technical requirements). These agreements are subject to terms and conditions that must be met before the Authority is required to purchase any power produced, including meeting certain technical requirements with respect to the integration of the projects to the Authority's system. All of the Authority's purchased power costs under these agreements are expected to be treated as a Current Expense under the Trust Agreement.

The fixed prices at which the Authority is required to purchase power under these agreements are currently lower than the cost of the Authority's most expensive generation capacity. Over time, however, the cost of purchasing power from these renewable energy facilities could exceed the cost of energy produced by the Authority's natural gas fired units. The cost of purchased power from these facilities is being passed on to the Authority's clients through the purchased power adjustment charges. There is no assurance that these renewable energy projects will be completed or come on line as scheduled by fiscal year 2015.

**Statistical Information**

The following table sets forth certain statistical information regarding the System for the five fiscal years ended June 30, 2013. The information below includes 507 MW of capacity provided pursuant to the EcoEléctrica contract and 454 MW of capacity provided pursuant to the AES-PR contract.

## Statistical Information

| | Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013[4]** |
| Nameplate rating at end of period (in MW) | 5,898 | 5,898 | 5,898 | 5,900 | 6,021 |
| Dependable generating capacity at end of period (in MW)[1] | 5,839 | 5,839 | 5,839 | 5,839 | 5,839 |
| Peak load, 60-minute (in MW) | 3,351 | 3,404 | 3,406 | 3,303 | 3,265 |
| Reserve Margin (%) | 74.2 | 71.5 | 71.4 | 80.9 | 78.8 |
| Average load (in MW) | 2,586 | 2,692 | 2,583 | 2,533 | 2,506 |
| Load factor (%) | 77.2 | 79.1 | 75.8 | 76.7 | 76.8 |
| **Energy generated, purchased and sold (in millions of kWh):** | | | | | |
| Electric energy generated and purchased[2] | 22,651 | 23,579 | 22,630 | 22,191 | 21,955 |
| Auxiliary equipment use | (888) | (1,020) | (991) | (988) | (946) |
| Net electric energy generated and purchased | 21,763 | 22,559 | 21,639 | 21,203 | 21,009 |
| Losses and unaccounted for | (3,247) | (3,324) | (3,138) | (3,091) | (3,047) |
| Electric Energy Sold | 18,516 | 19,235 | 18,501 | 18,112 | 17,962 |
| **Electric Energy Sales (in millions of kWh):** | | | | | |
| Residential | 6,368 | 7,057 | 6,708 | 6,560 | 6,656 |
| Commercial[3] | 8,498 | 8,759 | 8,551 | 8,300 | 8,654 |
| Industrial | 3,289 | 3,047 | 2,881 | 2,778 | 2,300 |
| Other | 361 | 372 | 361 | 474 | 352 |
| Total | 18,516 | 19,235 | 18,501 | 18,112 | 17,962 |
| **Electric Energy Revenues (in thousands):** | | | | | |
| Residential | $1,374,344 | $1,514,413 | $1,579,445 | $1,756,948 | $1,667,141 |
| Commercial[3] | 1,897,022 | 1,959,953 | 2,107,448 | 2,463,747 | 2,417,481 |
| Industrial | 601,985 | 563,915 | 596,046 | 678,083 | 602,263 |
| Other | 112,830 | 116,134 | 123,216 | 132,651 | 134,463 |
| Total | $3,986,181 | $4,154,415 | $4,406,155 | $5,031,429 | $4,821,348 |
| **Average revenue per kWh (in cents):** | | | | | |
| Residential | 21.58 | 21.46 | 23.55 | 26.78 | 25.05 |
| Commercial[3] | 22.32 | 22.38 | 24.65 | 29.68 | 27.93 |
| Industrial | 18.31 | 18.51 | 20.69 | 24.41 | 26.19 |
| Other | 31.21 | 31.19 | 34.10 | 27.96 | 38.17 |
| All Classes | 21.53 | 21.60 | 23.82 | 27.78 | 26.84 |
| **Average number of clients:** | | | | | |
| Residential | 1,324,752 | 1,335,928 | 1,341,291 | 1,340,405 | 1,353,550 |
| Commercial[3] | 129,492 | 129,208 | 129,537 | 128,590 | 126,735 |
| Industrial | 898 | 808 | 770 | 733 | 709 |
| Other | 3,494 | 3,549 | 3,528 | 3,666 | 4,186 |
| Total | 1,458,636 | 1,469,493 | 1,475,126 | 1,473,394 | 1,485,180 |
| **Monthly average revenue per client:** | | | | | |
| Residential | $ 86.45 | $ 94.47 | $ 98.13 | $ 109.23 | $ 102.64 |
| Commercial[3] | 1,220.81 | 1,264.08 | 1,355.76 | 1,596.64 | 1,589.59 |
| Industrial | 55,863.49 | 58,159.55 | 64,507.14 | 77,089.93 | 70,787.85 |
| Other | 2,691.04 | 2,726.92 | 2,910.43 | 3,015.34 | 2,696.16 |
| All classes | $ 227.73 | $ 235.59 | $ 248.91 | $ 284.57 | $ 270.53 |

[1]  Includes generating capacity of the EcoEléctrica and AES-PR cogeneration facility.
[2]  Includes power purchased from EcoEléctrica and AES-PR cogeneration facility.
[3]  Includes sales to the governmental sector, including central government agencies, public corporations and municipalities.
[4]  Unaudited.

**Historical Capital Improvement and Financing Program**

Capital improvements and their financing are made pursuant to a program established by the Authority and reviewed annually by the Consulting Engineers. The program for the five fiscal years ended June 30, 2013 is shown in the following table. Substantially all of the capital improvements have been financed with Power Revenue Bonds and other borrowed funds.

| | Fiscal Years Ended June 30 (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013**[2] | **Total** |
| Capital Improvements | | | | | | |
| Production plant | $246,578 | $139,369 | $151,043 | $148,256 | $102,282 | $ 787,528 |
| Transmission facilities | 91,508 | 112,760 | 77,745 | 60,198 | 62,503 | 404,714 |
| Distribution facilities | 105,028 | 124,963 | 142,461 | 111,196 | 134,877 | 618,525 |
| Other[1] | 37,100 | 9,903 | 40,226 | 31,487 | 18,919 | 137,635 |
| Total | $480,214 | $386,995 | $411,475 | $351,137 | $318,581 | $1,948,402 |

[1] Includes general land and buildings, general equipment, preliminary surveys and investigations.
[2] Unaudited.

**Projected Five-Year Capital Improvement and Financing Program**

Following a public hearing and approval by the Consulting Engineers, the Board must adopt the Authority's capital budget on or before the first day of the ensuing fiscal year. If revisions are required, the Board may amend the capital budget at any time during the fiscal year with the approval of the Consulting Engineers.

The projected capital improvement program for the five fiscal years ending June 30, 2018 totals approximately $1.55 billion. It is currently estimated that substantially all of the capital improvement program will be financed with borrowed funds. Estimated capital costs reflect, among other factors, construction contingency allowances and annual cost escalations.

The five-year capital improvement program includes $576 million for production plant. Of this amount, the Authority projects that approximately $96.4 million will be invested during fiscal year 2014 in its production plant for the conversion of generating units to dual fuel units, to extend their useful life and continue to increase their reliability and efficiency.

The projected capital improvement program also includes $329 million for transmission facilities and $465 million for distribution facilities. During the next five fiscal years, the Authority will dedicate a significant amount of its resources to the improvement and expansion of its transmission and distribution facilities.

The Consulting Engineers have examined the projected capital improvement program and found it to be reasonable.

The capital improvement program is subject to periodic review and adjustment because of changes in expected demand, environmental requirements, design, equipment delivery schedules, costs of labor, equipment and materials, interest rates and other factors. The following table presents a summary of the projected capital improvement program for the five fiscal years ending June 30, 2018. The Authority expects that substantially all of the five-year capital improvement program will be funded through the issuance of additional Power Revenue Bonds and other borrowed funds.

**Projected Capital Improvement Program**
**(in thousands)**

| | Fiscal Years Ending June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| Capital Improvements | | | | | | |
| Production plant .................. | $96,375 | $115,850 | $110,365 | $128,502 | $124,650 | $ 575,742 |
| Transmission facilities......... | 66,347 | 61,262 | 66,859 | 62,613 | 72,391 | 329,472 |
| Distribution facilities.......... | 99,884 | 87,532 | 88,836 | 96,112 | 92,774 | 465,138 |
| Other[1]............................. | 37,394 | 35,356 | 33,940 | 37,773 | 35,185 | 179,648 |
| Total................................. | $300,000 | $300,000 | $300,000 | $325,000 | $325,000 | $ 1,550,000 |

[1]   Includes general land and buildings, general equipment, preliminary surveys and investigations.

*Aguirre Offshore GasPort Financing*

The Authority is considering an alternative form of financing for the Aguirre offshore LNG terminal and pipeline. Under this alternative structure, a subsidiary of Excelerate will be the owner of the LNG terminal and will enter into a lease agreement with a public corporation affiliated with Government Development Bank, for a term of 35 years. The Government Development Bank affiliate would in turn sublease the terminal to the Authority. It is expected that the lease will require the affiliate of Government Development Bank to purchase the terminal after 15 years. Under this contractual structure, Excelerate's subsidiary would be the legal owner of the LNG terminal and the certificate holder for the project, Government Development Bank's affiliate would raise capital pursuant to a tax-exempt bond issue and the Authority would have all legal rights necessary for use of the LNG terminal. Although the parties have executed a MOU, the parties have not executed a definitive contract for the development and operation of the Aguirre offshore LNG terminal and pipeline. The Authority and Excelerate are currently negotiating the terms of said definitive contract. Although the intent of the parties is to reach an agreement as soon as possible, there is no assurance that the parties will reach a definitive agreement on the terms and that a definitive contract will be executed.

## Rates

Under the Act, the Authority has the power to determine, alter, establish and collect reasonable rates for electric service, which shall produce sufficient revenues to cover the operating costs of the Authority, the payment of the principal of and the interest on its bonds, and other contractual obligations. Public hearings are required before the setting of permanent rates, with the final approval vested solely within the Authority. Act No. 21 of the Legislative Assembly of Puerto Rico, approved May 31, 1985 ("Act No. 21"), provides uniform procedures for public hearings and review of the actions of certain public corporations, including the Authority, in connection with changes in the rates set by such public corporations. Act No. 21 also authorizes the Legislative Assembly by resolution to review rates of certain public corporations, including the Authority.

Electric service rates consist primarily of (i) basic charges, which include demand, client and energy related charges, (ii) fuel adjustment charges to recover the cost to the Authority of fuel oil, and (iii) purchased power charges to recover the cost to the Authority of power purchased from third party independent power producers such as the EcoEléctrica and AES-PR facilities. Consequently, revenues vary based on fluctuations in the price of fuel oil or purchased power. Basic charges currently average 6.2 cents per kilowatt-hour. The Authority has not increased basic charges since 1989. The table below presents the electric sales revenues derived from basic, fuel adjustment and purchased power charges for the five fiscal years ended June 30, 2013.

**Electric Sales Revenues**
**(in thousands)**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013**[1] |
| Basic charges...................... | $1,071,967 | $1,120,904 | $1,087,027 | $1,079,768 | $1,114,052 |
| Fuel adjustment charges..... | 2,161,604 | 2,255,989 | 2,578,869 | 3,185,098 | 2,861,967 |
| Purchased power charges .. | 752,610 | 777,522 | 740,259 | 766,563 | 845,329 |
| Total............................ | $3,986,181 | $4,154,415 | $4,406,155 | $5,031,429 | $4,821,348 |

[1]    Unaudited

The fuel adjustment charges imposed in any month are based upon the average of (i) the actual average fuel costs for the second preceding month and (ii) the estimated average fuel costs for the current month. Purchased power charges are based on estimated purchased power costs for the current month. To the extent that such charges do not fully recover actual fuel or purchased power costs (or recover more than such costs), charges are adjusted in the second succeeding month to capture (positively or negatively) the actual fuel and power purchase costs. These rates also take into account the Authority's 11% gross revenues set-aside required by the Act and more fully described under *Subsidies and Contributions in Lieu of Taxes* below.

Under the Act, certain residential clients receive a subsidy against the fuel adjustment charge. See *Subsidies and Contributions in Lieu of Taxes* below for a more detailed description of this and other subsidies. On December 1, 2011, the Authority implemented a temporary Rate Stabilization Account through November 30, 2012 to offer a reduction in rates to residential clients that do not benefit from the subsidy. This reduction has resulted in an aggregate reduction in Revenues for the year ended June 30, 2013 and 2012 of approximately $53.2 million and $79.4 million, respectively, but is no longer in effect.

During the first half of fiscal year 2010, the Authority approved a reduction in the load factor requirement applicable to Large Industrial Service 115 kV and Large Industrial Service 115 kV – Special rates in order to provide certain industries with additional operational flexibility without affecting overall electric utility charges. According to the approved modifications, the load factor requirement was reduced from 80% to 50%, meaning that a customer that does not achieve a load factor of 50% during a specific month would be billed for the additional kilowatt-hours required to achieve the 50% load factor requirement. The Authority implemented this reduced load factor requirement in order to take advantage of the excess generation capacity resulting from falling demand as a result of the extended economic recession affecting Puerto Rico.

The Authority, in its commitment to public safety, joined municipalities and communities in their efforts to improve public safety and facilitate the use of new communication technologies. For this reason, in July 2007, the Authority temporarily adopted the Unmetered Service for Small Loads Rate ("USSL"). This rate was approved permanently in January 2008. The USSL was designed to address the requests of various municipalities for the installation of security camera surveillance systems and wireless telecommunication equipment on the Authority's poles and structures.

Pursuant to the Trust Agreement, the Consulting Engineers have reviewed the Authority's rate schedules and believe that the Authority will receive sufficient Revenues to cover Current Expenses and to make the required deposits in the Sinking Fund, the Reserve Maintenance Fund and, if any are required, the Self-insurance Fund. See Appendix III—*Letter of the Consulting Engineers*. For a discussion of the impact of including the CILT and subsidies in Revenues and Net Revenues, see *Authority's Financial Condition – Subsidies and Contributions in Lieu of Taxes* under RISK FACTORS AND INVESTMENT CONSIDERATIONS, *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM, and *Projected Net Revenues* under NET REVENUES AND COVERAGE.

**Major Clients**

The public sector, which consists of the Commonwealth government, its public corporations and the municipalities (included primarily in the commercial category), accounted for approximately 16.73% of kWh sales and 18.29% of revenues from electric energy sales for fiscal year 2013. Of these, the Puerto Rico Aqueduct and Sewer Authority ("PRASA") represents 4.27% of kWh sales and 4.42% of Revenues. See *The Authority's Financial Condition* under RISK FACTORS AND INVESTMENT CONSIDERATIONS.

On July 1, 2013, the Legislative Assembly adopted Act No. 50-2013, which establishes a preferential "all in" rate for electricity to PRASA. The initial preferential rate will be twenty two (22) cents per kilowatt hour for fiscal years 2014, 2015 and 2016, falling to sixteen (16) cents per kilowatt hour for fiscal year 2017 until the average rate that the Authority charges to its customers is less than sixteen (16) cents per kilowatt hour. Act No. 50-213 provides that the preferential rate will not be in effect to the extent necessary to enable the Authority to comply with its rate covenant and other financial obligations under the Trust Agreement. To the extent that revenues collected from PRASA are not sufficient to cover the cost of fuel and purchased power used by PRASA, the uncovered cost will be collected by increasing fuel and purchased power charges on the Authority's other customers through the fuel adjustment charge.

See *Recent Legislation – Act No. 50-2013* under LEGISLATION.

The ten largest industrial clients accounted for 4% of kWh sales and 3% of revenues from electric energy sales for fiscal year 2012. No single client accounted for more than 1% of electric energy sales or more than 1% of revenues from electric energy sales.

In September 1997, the Authority established a reduced rate for large industrial clients connected at a 115 kV voltage level and meeting certain criteria such as a minimum demand and a high load factor and power factor. This rate is designed to provide large clients with an incentive to buy more electricity from the Authority.

**Fuel**

For the fiscal year ended June 30, 2013, fuel oil expenses amounted to $2,603.6 million or 63.2% of total Current Expenses ($2,901.8 million or 65.7% of total Current Expenses for the preceding fiscal year).

For the five fiscal years ended June 30, 2013, fuel oil averaged 61.5% of average total Current Expenses for the same period. See *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

The thermal generating units owned by the Authority, which produced approximately 66.7% of the net electric energy generated by the System in fiscal year 2013, are fueled by No. 6 fuel oil, except for the twenty-six smaller combustion-turbine units, the two Aguirre combined-cycle units, the 249 MW combustion turbine plant in Arecibo, and the new San Juan combined-cycle units, which burn No. 2 distillate fuel oil.

The Authority's fuel requirements for its generation facilities are covered by one-year contracts, which expire at various times and are usually renewable at the option of the Authority. The Authority's contracted fuel oil prices consist of a market based escalation factor plus a fixed price differential. The fixed price differential compensates for the fact that the fuel oil is delivered in the Commonwealth and not New York. It also takes into account other aspects of the delivery such as maximum cargo volume

and draft restrictions. The Authority regularly explores alternatives to reduce its exposure to the volatility of fuel prices, such as entering into fixed price fuel supply contracts or derivative contracts for hedging oil prices. The Authority has various commodity hedges in place related to oil prices with different price caps ranging from $108.00 per barrel to $125.00 per barrel. These hedges expire in October 2013.

The Authority's customary inventory of fuel oil covers 40 days of ordinary operations, up from 25 days in the past. Although sources of fuel oil are continually changing as a result of variations in relative price, availability and quality, the Authority has never been forced to curtail service to its clients because of fuel oil shortages. The Authority's total inventory capacity for fuel oil is 4.7 million barrels. On October 23, 2009, the Authority's inventory of fuel oil decreased by 400,000 barrels due to an explosion at the Caribbean Petroleum Corp. ("CAPECO") oil storage facility, which stored this inventory on behalf of the Authority. The Authority's operations were not affected as a result of this explosion and it was immediately able to replace the lost inventory. As of June 30, 2013, the Authority had an inventory of 2.1 million barrels of fuel oil.

The Authority currently receives natural gas at its Costa Sur power plant through an existing pipeline from the EcoEléctrica LNG terminal and pursuant to the SPA with Gas Natural.

Average fuel costs and related costs of production for the five fiscal years ended June 30, 2013 are shown in the following table:

**Fuel Costs**

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013**[1] |
| Average fuel cost per equivalent barrel (net of handling costs)...... | $   76.23 | $   76.55 | $   95.91 | $   118.39 | $   111.17 |
| Number of equivalent barrels used (in millions)................................ | 25.18 | 26.22 | 23.89 | 24.51 | 23.42 |
| Fuel (in millions) .................... | $1,919.8 | $2,006.9 | $2,291.4 | $ 2,901.8 | $2,603.6 |
| Net kWh generated (excluding purchased power) (in millions)... | 15,099.4 | 15,652.1 | 14,543.5 | 14,569.7 | 13,781.6 |
| Average net kWh per equivalent barrel ......................................... | 599.7 | 597.0 | 608.8 | 594.4 | 588.4 |
| Average fuel cost per net kWh generated (in cents) .................... | 12.71 | 12.82 | 15.76 | 19.91 | 18.89 |

[1]  Unaudited.

## Subsidies and Contributions in Lieu of Taxes

Under the Act, the Authority is required to set aside 11% of its gross revenues from electric energy sales to fund certain government subsidy programs (those provided by laws in effect as of June 30, 2003), pay CILT to the municipalities and, if there is any remaining amount, fund the Authority's capital improvement program. In addition, the Authority is required to provide certain other subsidies consisting principally of a residential fuel subsidy, a residential rate subsidy and a subsidy for hotels, as described below. In order to comply with the Act and ensure that fuel and purchased power costs are fully recovered, the Authority sets its fuel and purchased power rates taking this 11% set-aside into account. As a result, fuel and purchased power charges collected from non-subsidized clients are at least as much as the Authority's fuel and purchased power costs.

*Subsidies*

Under the Act, the Authority is required to provide a subsidy for a portion of fuel charges to qualifying residential clients who use up to 425 kWh monthly or 850 kWh bi-monthly. Residential clients who qualify for the subsidy are billed the full applicable basic charges and fuel adjustment charges, with the applicable subsidy taking the form of a credit against the bill. The Act limits this subsidy to a maximum of $100 million per year and limits the cost of fuel oil used in calculating the amount of such subsidy to a maximum of $30 per barrel. The residential clients must pay any fuel adjustment charge resulting from a price of fuel oil in excess of $30 per barrel. For the fiscal year ended June 30, 2013, there were approximately 214,175 clients or 16% of the total residential classification, who qualified for this subsidy, which amounted to $26.4 million (unaudited). For fiscal years 2014 through 2018, the annual average cost of the residential subsidy is expected to be $21 million.

Act No. 69-2009 provides residents of public housing units the alternative of receiving electric power at a fixed rate. According to the provisions of Act No. 69, the Authority is required to establish a fixed rate for electric power consumption for residents of public housing and provide a payment plan for all residents with past due amounts. Once the Authority has established its fixed rate, residents of public housing that are current with their payments may opt-out of this fixed rate program if their current rate is lower and the Authority may eliminate, as to such clients, all subsidy programs currently in effect. The Authority is also prohibited from suspending service to these residents unless they fail to comply with their payment plan or the payment of the fixed rate. The Authority has approved a fixed rate from $30 to $50 (depending on the number of rooms) for a maximum consumption of 425 kWh. Approximately 40,194 residential clients currently take advantage of this fixed rate. The Authority revenues from clients under the fixed rate amounted to $20.3 million for fiscal year 2013.

Hotels receive a subsidy in an amount equal to 11% of their monthly billing, which has averaged approximately $7.6 million per year for the five fiscal years ended June 30, 2013. In order to receive this subsidy, hotels must maintain the hotel's electric service accounts on a current basis.

The Authority credits the residential fuel and hotel subsidy against the recipient's electric bills rather than first collecting the unsubsidized amount of energy charges and then reimbursing the recipient for the amount of the subsidy.

In addition, the Authority has recently been offering certain discounts and incentives in the form of credits to certain industrial clients, as discussed under *Rates* above.

*Contributions In Lieu of Taxes*

The CILT is intended to compensate the municipalities for foregone tax revenues. The Act provides that the Authority's obligations under the Trust Agreement have priority over the Authority's CILT obligation as well as the Authority's subsidy obligations, none of which is characterized as a Current Expense under the Trust Agreement. The amount of the CILT payable to the municipalities is the greater of the following amounts: (1) 20% of the Authority's Net Revenues (as defined in the Trust Agreement), after deducting from Net Revenues the cost of certain government subsidy programs; (2) actual electric power consumption by the municipalities; and (3) the prior five year average of the CILT paid to the municipalities. The CILT is payable from available Net Revenues in each fiscal year, but under the Act the total amount of the CILT and the other subsidies may not exceed 11% of the Authority's gross revenues for any fiscal year. The Authority is required to pay the CILT no later than November 30 following the end of the fiscal year to which the CILT applies. The Act further provides that the Authority may, at its option, deduct any municipality's receivable that is outstanding at the end of any fiscal year from the CILT payable to such municipality. If the Authority does not have sufficient Net Revenues available in any fiscal year to pay the CILT to the municipalities, the difference is carried

forward for a maximum of three years, at the end of which the Authority is required to pay the remaining balance, subject to the Authority's compliance with its obligations under the Trust Agreement.

While the Authority has the legal right to bill and collect for the consumption of electric energy from the municipalities and to pay the municipalities in the form of a CILT, historically the Authority has instead offset each municipality's energy consumption charges against its CILT, eliminating the need to collect and remit payments. At the end of each fiscal year, the Authority determines the amount of Net Revenues for that fiscal year available to cover the CILT. The amount so determined is applied against any CILT payable from prior fiscal years, beginning with any CILT that has then become immediately due and payable due to the three fiscal year limitation. Any remaining amount of Net Revenues is applied against the CILT for the current fiscal year. At the same time, the Authority reduces its municipalities' receivable by an amount equal to the aggregate amount of the CILT being reduced from its payables.

For fiscal year 2013, the total amount of the CILT due to the municipalities, based on the value of power consumed by the municipalities, was $263.0 million (unaudited). Of this amount, the CILT paid to the municipalities corresponding to fiscal year 2013 was $42.9 million, which was applied by reducing the outstanding municipal accounts receivable balances by that amount. The remaining balance of the CILT for fiscal year 2013 ($220.1 million) is being carried forward for payment over the next three years. During fiscal year 2013, the Authority also paid to the municipalities $88.5 million (unaudited) of outstanding unpaid CILT that had been carried forward for fiscal years 2010, 2011 and 2012, and $10.5 million (unaudited) to amortize the outstanding balance of a note issued to the municipalities as part of the settlement of a lawsuit brought by the municipalities against the Authority. These payments to the municipalities were all made by offsetting the municipalities' electric energy consumption receivables.

Act No. 233-2011, approved December 11, 2011, modifies the CILT formula to exclude from the municipality's electric energy consumption electric energy consumption related to municipal facilities in which for-profit businesses operate and for which the municipalities receive compensation through rent or an entrance fee. The Authority is in the process of implementing the provisions of Act No. 233-2011 by installing additional meters in municipal facilities to be able to determine the consumption that is no longer subject to the CILT. The Authority's preliminary estimate is that Act No. 233-2011 will result in additional collections of approximately, $49 million each fiscal year beginning in 2014. The Authority's projections for the five fiscal years ending June 30, 2018 take into consideration the provisions of Act No. 233-2011.

If the Authority were to pursue the collection of bills for energy consumption by the municipalities, there is no assurance that the Authority in fact would be able to collect such bills or, in some cases, collect such bills from many municipalities that are in a difficult financial position.

*Rural Electrification and Irrigation Systems*

The Authority provides certain technical and maintenance services for dams that supply PRASA and some irrigation users. The cost of these services is treated by the Authority as a subsidy.

The following table sets forth the amount of CILT that the Authority expects to pay during the five fiscal years ending on June 30, 2018, and the residential fuel and hotel subsidies that the Authority expects to incur during the five fiscal years ending on June 30, 2018. The amounts appearing on this table for municipalities for fiscal years 2014 through 2018 represent the municipalities' expected electric power consumption, excluding the electric power consumption of facilities that are no longer subject to CILT, in such fiscal years.

| Description | Fiscal Years Ending June 30 (in thousands) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Municipalities (CILT) ............... | $164,703 | $168,815 | $165,375 | $151,438 | $156,610 |
| Hotel Subsidies........................... | 7,949 | 8,099 | 8,098 | 8,215 | 8,119 |
| Subsidies | | | | | |
| Industrial Incentive ................ | 2,203 | 2,937 | 3,671 | 6,425 | 9,179 |
| Irrigation Systems................... | 5,357 | 5,464 | 5,573 | 5,685 | 5,799 |
| Residential Clients ................. | 20,815 | 20,448 | 21,218 | 21,581 | 22,028 |
| Total................................. | $201,027 | $205,763 | $203,935 | $193,344 | $201,735 |

**Wheeling**

Act No. 73-2008 provides that the Authority shall identify and implement a system that permits the operation of a wheeling service mechanism for renewable energy producers by January 2, 2010. Act No. 73 also provides for the creation of a Wheeling Committee, responsible for the implementation of the wheeling system. The Committee of Wheeling engaged Christensen Associates Energy Consulting, LLC, based in Wisconsin, to prepare the Puerto Rico Wheeling System Implementation Plan Study that was delivered to the Authority in December 2009. This study, which included various regulatory proposals regarding the establishment of the system and the applicable tariffs, was reviewed by the Authority and substantial changes were made.

Although the Authority did not meet the deadline established in the Economic Incentives Act, public hearings were held on June 1 and 2, 2010 to consider the Wheeling System Tariffs, Wheeling Transmission Regulation and Wheeling Interconnection Procedure and has adopted a temporary wheeling system tariff structure. The public hearing examiner submitted a final report to the Authority's Governing Board on July 29, 2010. In the report, the examiner recommended approval of the Wheeling Transmission Regulation and Wheeling Interconnection Procedure, but rejected approval of the Wheeling System Tariffs based on lack of information to the public. He recommended further public hearings with enough time for public evaluation. Based on such recommendations, the Authority modified the Wheeling Transmission Tariff Schedules and held new public hearings on June 2 and 3, 2011. The public hearing examiner submitted his report to the Governing Board on July 22, 2011, including various recommendations that are under evaluation by the Authority. Meanwhile, the Authority's Governing Board further extended the temporarily approved wheeling system tariff structure. On November 2, 2012, the Governing Board approved the Wheeling Regulation and the Interconnection for Independent Power Producers Regulations and a pilot program for a period of six months for generation systems with a maximum reserved capacity of 10 MW. Currently, there are no clients utilizing the wheeling service mechanism. See *Changes in Commonwealth Legislation and Market Developments* under INVESTMENT CONSIDERATIONS.

**DEBT**

The following table sets forth the Power Revenue Bonds and notes of the Authority (i) outstanding as of June 30, 2013, and (ii) as adjusted for the issuance of the Bonds.

| | Outstanding as of June 30, 2013 | As adjusted for the Issuance of the Bonds |
| --- | --- | --- |
| | (in thousands) | |
| Lines of Credit (operational).......................... | $ 744,379 | $ 744,379 |
| Power Revenue Bonds ................................... | 8,048,485 | 8,526,710[*] |
| Other Loans and Debt (subordinated) ............ | 16,543 | 16,543 |
| Total................................. | $ 8,809,407 | $ 9,287,632 |

[*]Includes the payment of principal on July 1, 2013 of $194.9 million.

**Lines of Credit – Operational**

As of June 30, 2013, the Authority had two revolving lines of credit provided by private financial institutions for the purchase of fuel oil and power and working capital expenses. These two lines of credit had an initial maximum aggregate amount of $750 million, of which $744.4 million was outstanding as of June 30, 2013. One line of credit had an initial aggregate principal amount of $500 million and matures on August 15, 2013. This line was reduced to $450 million due to one of the syndicate member banks' termination of its $50 million commitment and participation. On August 14, 2013, the Authority renewed this line of credit at the higher aggregate principal amount of $550 million with a new expiration date of August 14, 2014. The other line of credit matures on October 7, 2014. The debt service payments on these lines of credit are Current Expenses payable prior to debt service on the Authority's Power Revenue Bonds.

**Other Loans and Debt – Subordinated**

As of June 30, 2013, the Authority had a term loan with a private financial institution that had an outstanding balance of approximately $9.7 million. The term loan is subordinated in payment priority to the Authority's Power Revenue Bonds and is payable from the subordinate obligations fund established under the Trust Agreement, which is funded from the annual Revenues of the Authority remaining after all deposits to the Sinking Fund and the Reserve Maintenance Fund required by the Trust Agreement have been made.

The Authority has lines of credit issued by Government Development Bank which are also subordinate in payment priority to the Authority's Power Revenue Bonds. These two lines of credit were approved for an amount of $100 million and $25.4 million. The first line of credit covers amounts posted as collateral for several outstanding swap transactions, and had an outstanding amount of $6.1 million as of June 30, 2013. See *Swap Agreements* below. The second line of credit covers the rehabilitation of the Isabela Irrigation System, and had an outstanding amount of $743,216 as of June 30, 2013.

**Swap Agreements**

As of July 1, 2008, the Authority entered into a basis swap agreement in the notional amount of $1.375 billion (the "Basis Swap Agreement") with an amortization schedule matching certain maturities of the Authority's outstanding Power Revenue Bonds from 2027 to 2037. Under the terms of a master swap agreement, the Authority receives from Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, an affiliate of Goldman, Sachs & Co.) quarterly payments equal to a floating amount applied to said notional amount at a rate equal to 62% of the 3-month London Inter-Bank Offered Rate ("LIBOR") index reset each week plus 29 basis points (hundredths of a percent) and a fixed rate payment of 0.4669% per annum (the "basis annuity"), for the term of the swap in return for quarterly payments by the Authority on such notional amount at a rate based on the Securities Industry and Financial Markets Association ("SIFMA") municipal swap index. The terms of the master swap agreement also require the Authority to post collateral (in cash or securities) in the event the fair value of the swap is negative and exceeds a threshold which is determined by the Authority's credit ratings with Moody's Investors Service ("Moody's") and Standard & Poor's ("S&P"). Based on the Authority's current ratings from Moody's and S&P, the collateral posting threshold is zero.

In January 2012, the Authority terminated $225 million in notional amount under the Basis Swap Agreement in order to reduce its exposure. The Authority received $265,000 from the counterparty in connection with this termination. In May 2012, the Authority entered into novation transactions to transfer from Goldman Sachs $200 million in notional amount to Deutsche Bank and $400 million in notional amount to Royal Bank of Canada. In April 2013 and June 2013, the Authority terminated $100

million in notional amount with Royal Bank of Canada and $50 million in notional amount with Goldman Sachs, respectively. The current outstanding notional of the Basis Swap Agreement is $1.0 billion.

This basis swap provides the Authority the cash flow benefit of the basis annuity in exchange for the Authority taking tax and other basis risks tied to the change in the relationship between LIBOR and the SIFMA municipal swap index. Pursuant to the Trust Agreement, regularly scheduled payments to the counterparty by the Authority and payments relating to the termination or other fees, expenses, indemnification or other obligations to the counterparty under the Basis Swap Agreement are subordinate to the Power Revenue Bonds, including the Bonds.

During fiscal years 2009, 2010, 2011, 2012, and 2013, the Authority received $7.9 million, $9.5 million, $9.6 million, $11.1 million, and $9.1 million, respectively, from the counterparties to the basis swap, net of the Authority's payments to the counterparties. Since inception, the Authority has had a maximum collateral posting requirement of $84.2 million in November 2008. As of June 30, 2013, the fair value of the basis swap was negative $7.6 million. Because the collateral posting threshold for this basis swap is zero, the Authority was required to post and, as of June 30, 2013, posted $7.6 million as collateral.

In connection with the issuance of its Power Revenue Refunding Bonds, LIBOR Bonds Series UU (the "LIBOR Bonds") and Power Revenue Refunding Bonds, Muni-BMS Bonds Series UU (the "Muni-BMS Bonds"), the Authority entered into certain interest rate swap agreements (the "Interest Rate Swap Agreements"). The Interest Rate Swap Agreements have a current aggregate notional amount of $411.8 million, matching the principal amount of the associated Power Revenue Refunding Bonds, Series UU. Under the terms of the master swap agreement, the Authority receives from JPMorgan Chase Bank, N.A. and UBS AG (an affiliate of UBS Securities, Inc.) quarterly payments equal to a floating amount based on a rate equal to 67% of LIBOR reset every third month plus a fixed basis point spread (hundredths of a percent), for the term of the swap in return for quarterly payments by the Authority equal to a fixed amount based on a fixed rate, in each case based on a notional amount equal to the principal amount of LIBOR Bonds outstanding. The Authority also receives from JPMorgan Chase Bank, N.A. quarterly payments equal to a floating amount based on a rate equal to 100% of the five-year SIFMA swap rate for the term of swap in return for quarterly payments by the Authority equal to a fixed amount based on a fixed rate, in each case based on a notional amount equal to the principal amount of Muni-BMS Bonds outstanding. As of June 30, 2013, the Interest Rate Swap Agreements had a negative fair value of approximately $70.7 million.

The Authority is subject to collateral posting requirements on the Interest Rate Swap Agreements in the event the fair value of the swap is negative and exceeds a threshold amount. With respect to Interest Rate Swap Agreements that are insured and have a notional amount of $252.9 million, the threshold amount is currently infinite. If the insurer's current ratings were lowered, at the Authority's current ratings the threshold would be $30 million. If the insurer's current ratings were lowered and the Authority's ratings were also downgraded by one notch by Moody's and S&P, the threshold would be zero. Based on the fair value of these swap agreements as of June 30, 2013, the Authority would have been required to post $1.8 million of collateral under the $30 million threshold and would have been required to post $47.5 million of collateral at the zero threshold. With respect to the other Interest Rate Swap Agreements that are uninsured and have a notional amount of $159.0 million, the threshold is zero. As of June 30, 2013, the Authority had posted collateral in the required amount of $23.5 million.

In fiscal year 2010, the Authority adopted Governmental Accounting Standards Board Statement No. 53 - Accounting and Financial Reporting for Derivative Instruments, which requires that the fair value of derivatives be reported in a government entity's financial statements. In order to comply, a journal entry for the amount of $109.9 million was booked to register a Swap Liability and a Deferred Outflow, resulting from the change in the fair market value of the derivative instruments.

**Principal and Interest Requirements**

Principal and Interest Requirements, as used herein and as defined in the Trust Agreement, means for any fiscal year the sum of all principal of, including Amortization Requirements for, and interest on, outstanding Power Revenue Bonds which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year. The following table shows the annual Principal and Interest Requirements for the outstanding Power Revenue Bonds after giving effect to the issuance of the Bonds. The figures for interest and total debt service have been reduced by the interest that was capitalized through prior issuances of Power Revenue Bonds and the issuance of the Bonds in the following amounts: approximately $71.4 million due during fiscal year 2014, $62.1 million during fiscal year 2015 and $23.2 million during fiscal year 2016. The Amortization Requirements are subject to adjustment as provided in the definition thereof. See Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Debt Service Requirements**

| Year Ending Jun 30 | Outstanding Bonds Debt Service[(1)(2)(3)] | The Bonds | | | Total Outstanding Bonds Debt Service[(1)(2)(4)] |
|---|---|---|---|---|---|
| | | Principal | Interest[(2)(4)] | Total Debt Service[(2)(4)] | |
| 2014 | $ 577,196,862.14 | $ | $ | $ | $ 577,196,862.14 |
| 2015 | 592,935,280.90 | | | | 592,935,280.90 |
| 2016 | 607,216,908.40 | | 23,219,450.00 | 23,219,450.00 | 630,436,358.40 |
| 2017 | 608,909,050.90 | | 46,438,900.00 | 46,438,900.00 | 655,347,950.90 |
| 2018 | 608,908,526.12 | | 46,438,900.00 | 46,438,900.00 | 655,347,426.12 |
| 2019 | 609,268,853.62 | | 46,438,900.00 | 46,438,900.00 | 655,707,753.62 |
| 2020 | 609,272,238.62 | | 46,438,900.00 | 46,438,900.00 | 655,711,138.62 |
| 2021 | 609,272,235.42 | | 46,438,900.00 | 46,438,900.00 | 655,711,135.42 |
| 2022 | 609,270,428.84 | | 46,438,900.00 | 46,438,900.00 | 655,709,328.84 |
| 2023 | 609,272,942.16 | | 46,438,900.00 | 46,438,900.00 | 655,711,842.16 |
| 2024 | 609,269,959.22 | | 46,438,900.00 | 46,438,900.00 | 655,708,859.22 |
| 2025 | 609,248,789.06 | | 46,438,900.00 | 46,438,900.00 | 655,687,689.06 |
| 2026 | 609,273,450.20 | | 46,438,900.00 | 46,438,900.00 | 655,712,350.20 |
| 2027 | 609,272,667.64 | | 46,438,900.00 | 46,438,900.00 | 655,711,567.64 |
| 2028 | 609,269,255.86 | | 46,438,900.00 | 46,438,900.00 | 655,708,155.86 |
| 2029 | 566,484,960.36 | | 46,438,900.00 | 46,438,900.00 | 612,923,860.36 |
| 2030 | 438,855,066.58 | 35,000,000.00 | 46,438,900.00 | 81,438,900.00 | 520,293,966.58 |
| 2031 | 440,671,675.60 | | 43,901,400.00 | 43,901,400.00 | 484,573,075.60 |
| 2032 | 414,203,041.26 | 16,790,000.00 | 43,901,400.00 | 60,691,400.00 | 474,894,441.26 |
| 2033 | 298,959,006.26 | 133,210,000.00 | 42,726,100.00 | 175,936,100.00 | 474,895,106.26 |
| 2034 | 259,803,056.26 | 95,825,000.00 | 33,401,400.00 | 129,226,400.00 | 389,029,456.26 |
| 2035 | 259,570,168.76 | 102,525,000.00 | 26,933,212.50 | 129,458,212.50 | 389,028,381.26 |
| 2036 | 259,864,368.76 | 109,150,000.00 | 20,012,775.00 | 129,162,775.00 | 389,027,143.76 |
| 2037 | 352,285,531.26 | | 12,645,150.00 | 12,645,150.00 | 364,930,681.26 |
| 2038 | 351,075,937.50 | | 12,645,150.00 | 12,645,150.00 | 363,721,087.50 |
| 2039 | 323,271,550.02 | 22,275,000.00 | 12,645,150.00 | 34,920,150.00 | 358,191,700.02 |
| 2040 | 319,383,481.28 | 27,725,000.00 | 11,085,900.00 | 38,810,900.00 | 358,194,381.28 |
| 2041 | 235,672,000.00 | | 9,145,150.00 | 9,145,150.00 | 244,817,150.00 |
| 2042 | 235,675,750.00 | | 9,145,150.00 | 9,145,150.00 | 244,820,900.00 |
| 2043 | | 130,645,000.00 | 9,145,150.00 | 139,790,150.00 | 139,790,150.00 |
| Total | $13,843,633,043.00 | $673,145,000.00 | $960,697,137.50 | $1,633,842,137.50 | $15,477,475,180.50 |

[(1)] The numbers shown are reduced by the interest that was capitalized through prior issuances of Power Revenue Bonds in the amount of $31,476,480 in fiscal year 2014, and $15,738,240 in fiscal year 2015. See "Rate Covenant" under SECURITY.

[(2)] The numbers shown assume that the rate paid on variable rate Power Revenue Bonds is equal to the fixed swap rate on these Bonds. The floating rate on the swaps paid to the Authority is equal to the floating interest rate on such Bonds.

[(3)] As a result of the federal sequester under GRH, the Outstanding Debt Service shown is not reduced by any Federal Subsidy Payments. See "Rate Covenant" under SECURITY.

[(4)] The numbers shown are reduced by the interest that was capitalized through the issuance of the Bonds in the amount of $39,989,052.78 in fiscal year 2014, $46,438,900.00 in fiscal year 2015 and $23,219,450.00 in fiscal year 2016. See "Rate Covenant" under SECURITY.

## NET REVENUES AND COVERAGE

The following table presents the Net Revenues of the Authority under the provisions of the Trust Agreement for the five fiscal years ended June 30, 2013 and the ratio of such Net Revenues to Principal and Interest Requirements on the Power Revenue Bonds.  The Authority calculates Revenues, Current Expenses and Net Revenues on the accrual basis.  These calculations of Net Revenues differ in several important respects from the Authority's calculations of changes in Net Assets prepared in conformity with GAAP.  For example, the calculations of Net Revenues do not include depreciation, interest expense on the Power Revenue Bonds, other post-employment benefits actuarial accruals, and CILT as a deduction in calculating Net Revenues.  The figures for Revenues and Net Revenues in this table include the revenues attributable to the residential fuel and hotel energy consumption that are offset by legally mandated subsidies (see footnotes 2 and 3), and the electric consumption charges of the municipalities, against which the Authority applies the CILT (see footnote 3).  The debt service coverage is shown as calculated under the Trust Agreement and as then adjusted to reflect the elimination from Net Revenues of energy charges that the Authority offsets by legally mandated subsidies or the CILT.

**Historical Net Revenues and Coverage**

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013[1]** |
| Average number of clients | 1,458,636 | 1,469,493 | 1,475,126 | 1,473,394 | 1,485,150 |
| Electric energy sales (in millions of kWh) | 18,516 | 19,235 | 18,501 | 18,112 | 17,962 |
| **Source of Net Revenues (dollars in thousands)** | | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential[2] | $1,374,344 | $1,514,413 | $1,579,445 | $1,756,948 | $1,667,141 |
| Commercial[3] | 1,897,022 | 1,959,953 | 2,107,448 | 2,463,747 | 2,417,481 |
| Industrial | 601,985 | 563,915 | 596,046 | 678,083 | 602,263 |
| Other | 112,830 | 116,134 | 123,216 | 132,651 | 134,463 |
| Sub-Total | $3,986,181 | $4,154,415 | $4,406,155 | $5,031,429 | $4,821,348 |
| Revenues from Commonwealth for rural electrification | 19 | - | - | - | - |
| Other operating revenues | 14,641 | 15,915 | 16,595 | 14,126 | 28,405 |
| Other (principally interest earned) | 6,427 | (4,597) | (11,537) | 7,123 | 3,249 |
| Total Revenues | $4,007,268 | $4,165,733 | $4,411,213 | $5,052,678 | $4,853,002 |
| | | | | | |
| **Current Expenses:** | | | | | |
| Operations: | | | | | |
| Fuel | 1,919,789 | 2,006,931 | 2,291,386 | 2,901,815 | 2,603,577 |
| Purchased power | 671,849 | 693,724 | 660,872 | 684,148 | 755,828 |
| Other production | 62,271 | 62,697 | 67,451 | 75,829 | 72,744 |
| Transmission and Distribution | 162,334 | 160,796 | 176,369 | 175,815 | 172,316 |
| Customer accounting and Collection | 111,126 | 114,542 | 114,837 | 113,526 | 116,201 |
| Administrative and General | 222,477 | 178,982 | 173,502 | 251,729 | 187,784 |
| Maintenance[4] | 225,107 | 209,516 | 220,775 | 212,403 | 213,865 |
| Other | 2,819 | 1,907 | - | - | - |
| Total Current Expenses | $3,377,772 | $3,429,095 | $3,705,192 | $4,415,265 | $4,122,315 |
| Net Revenues[3] | $ 629,496 | $ 736,638 | $ 706,021 | $ 637,413 | $ 730,687 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[5] | $ 435,042 | $ 397,579 | $ 480,233[6] | $ 327,685[6] | $ 530,717[6] |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.45 | 1.85 | 1.47 | 1.95 | 1.38 |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[7] | 0.92 | 1.25 | 0.95 | 1.07 | 0.82 |

[1] Unaudited.

[2] Includes residential fuel subsidies of $30.6 million, $29.6 million, $26.8 million, $29.2 million and 26.4 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

[3] Includes (i) electric energy consumption by municipalities of $187.6 million, $196.5 million,$212.5 million, $244.3 million and $263 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively; and (ii) hotel subsidies of $6.5 million, $6.3 million, $7.4 million, $9.1 million and $8.9 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

[4] Includes, for maintenance of generating facilities, $117.3 million, $105.0 million, $107.7 million, $107.9 and $102.2 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively.

[5] The Principal and Interest Requirements for fiscal years 2009, 2010, 2011, 2012 and 2013 have been reduced by the interest that was capitalized through the issuance of Power Revenue Bonds in the amounts of $37.7 million, 8.4 million, $79.5 million, $81.5 million and $67.1 million, respectively. The Principal and Interest Requirements for fiscal year 2010 and 2012 have been adjusted to reflect the restructuring of $73.9 million and $159 million, respectively, of the Authority's debt service requirements for such fiscal year through the issuance of Power Revenue Bonds, the proceeds of which were used to pay debt service for that fiscal year.

[6] The Principal and Interest Requirements for fiscal years 2011 through 2013 have been reduced by the amount of the Federal Build America Bonds subsidy on the Power Revenue Bonds, Series YY and Series EEE (Issuer Subsidy Build America Bonds), equal to 35% of the interest payable on such Bonds. See "Rate Covenant" under SECURITY.

[7] Excludes from Net Revenues, for purposes of computing this ratio, the basic charges and fuel and purchased power adjustment charges attributable to energy consumption by the municipal governments as well as the subsidies for energy consumption charges provided by law to certain residential clients and hotels in the amounts set forth in footnotes (2) and (3) above, which are not collected.

Although the ratio of adjusted net revenues (net of municipalities' consumption and subsidies) to Principal and Interest Requirements was below 1.00 for fiscal years 2009, 2011 and 2013, the Authority made timely payments on its Power Revenue Bonds in such fiscal years. The Authority, however, has had to obtain additional borrowings in order to meet all of its operational and financial obligations. See *The Authority's Financial Condition* under RISK FACTORS AND INVESTMENT CONSIDERATIONS.

The Authority's rate covenant requires that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that Revenues are sufficient to pay Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all bonds then Outstanding. Pursuant to the accrual method of calculating Revenues and Current Expenses under the Trust Agreement, the Authority is in compliance with the rate covenant, even if the accrued residential fuel and hotel subsidies are excluded from Revenues.

## Management's Discussion and Analysis of Operating Results

The following represents the Authority's analysis of its operations for the five fiscal years ended June 30, 2013. For additional analysis of the Authority's results of operations, see *Management's Discussion and Analysis* in the Authority's audited financial statements, included as Appendix II.

### *Five-Year Period*

During the five-year period from fiscal year 2009 through fiscal year 2013, the Authority experienced a net decrease of 3.0% in electric energy sales in kilowatt hours ("kWh"), as shown in the table that follows under the heading "Operating Results." The Authority's sales during this period were adversely affected by the significant increase in the price oil (the average cost of fuel oil per barrel to the Authority increased by 45.8%), the principal source of fuel used in its generating facilities, and a reduction in the level of economic and business activity in the Commonwealth due to a prolonged recession, which commenced in the fourth quarter of fiscal year 2006.

The Authority's Net Revenues increased from $629.5 million in fiscal year 2009 to $730.7 million (unaudited) in fiscal year 2013, or 16.1%. During this period, the Authority experienced decreases in Net Revenues in fiscal years 2009, 2011 and 2012, when compared to the respective prior fiscal years. The change in Net Revenues during this period was the result of a reduction in the demand for electricity due to higher prices of fuel and the effect in Revenues of the Rate Stabilization Account for fiscal year 2012. Principal and Interest Requirements on the Authority's Power Revenue Bonds increased from $435.0 million in fiscal year 2009 to $534.3 million in fiscal year 2013 (which excludes $67.1 million of interest in fiscal year 2013 that was capitalized through the issuance of Power Revenue Bonds). The increase in Principal and Interest Requirements was the result of the issuance of additional Power Revenue Bonds by the Authority.

### *Fiscal Year 2013 (unaudited) compared to fiscal year 2012*

For the fiscal year ended June 30, 2013, as compared to fiscal year ended June 30, 2012, Net Revenues increased by $93.3 million, or 14.6%. The increase in Net Revenues was primarily the result of a decrease from $79 million for fiscal year 2012 to $53.2 million for fiscal year 2013 in the use of the rate stabilization program to fund the fuel adjustment revenues not billed to certain residential clients. In addition, administrative and general expenses decreased by $63.9 million, or 25.4%, mainly due to $37.2 million of costs related to the cancelled Via Verde Project, which were registered as Current Expenses.

Current Expenses were $4,122.3 million, representing a decrease of 6.6% from the prior year. Fuel and purchased power expenses, the principal component of the Authority's Current Expenses, are passed on to clients through a separate fuel adjustment charge included in electric service rates. The Authority's revenues from its basic charges (which exclude the fuel and purchased power adjustment charges) increased by 3.2% from fiscal year 2012 to fiscal year 2013. Excluding fuel and purchased power expenses, Current Expenses decreased from $829.3 million during fiscal year 2012 to $762.9 million during fiscal year 2013, representing an 8% decrease as a result of the decrease in administrative and general expenses mentioned above and expense control measures implemented by the Authority's management. The accrued revenues attributable to the municipalities' consumption, the residential customer fuel subsidy and hotel subsidy were $298.2 million and $282.5 million for fiscal year ended June 2013 and 2012, respectively. The treatment of the municipalities' consumption and these subsidies, which are included in Revenues although they are not collected, is discussed below and in *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

The Authority implemented a new customer service system in May 2012. As a result, many invoices were rejected or subject to estimation. This situation has increased the level past due receivables or contested receivables. The Authority is taking measures to correct these errors. Among them are a reconfiguration of the customer service system, training of personnel to prevent the rejection of invoices and correction of all government and large customer accounts. In addition, the Authority has increased its collection efforts to reduce past due receivables.

During fiscal year 2013, the accounts receivable from the sale of electric energy (net of the deferred liability to municipalities) increased from $1,083.4 million as of June 30, 2012 to $1,154.3 million as of June 30, 2013. Accounts receivable from government clients (net of the deferred liability to municipalities) increased from $239.4 million as of June 30, 2012 to $277.3 million as of June 30, 2013. Accounts receivable from general clients increased from $844.5 million as of June 30, 2012 to $877.1 million as of June 30, 2013.

### Government Accounts Receivable

| | As of June 30, 2012 | | | As of June 30, 2013 | | |
|---|---|---|---|---|---|---|
| | Current | Past Due | Total | Current | Past Due | Total |
| Government Agencies | $23,056 | $ 22,788 | $ 45,844 | $15,219 | $ 48,009 | $ 63,228 |
| Public Corporations | 33,177 | 160,334 | 193,511 | 16,583 | 197,444 | 214,027 |
| Total | $56,233 | $183,122 | $239,355 | $31,802 | $245,453 | $277,255 |

*Fiscal year 2012 compared to fiscal year 2011*

For the fiscal year ended June 30, 2012, as compared to fiscal year ended June 30, 2011, Net Revenues decreased by $68.6 million, or 9.7%. The decrease in Net Revenues was primarily the result of a 2.1% decrease in electric energy sales (kWh) and $79.4 million in fuel adjustment revenues not billed to the residential clients, which were financed by the Rate Stabilization Account. Current Expenses increased by $710.0 million, or 19.2%. Current Expenses, excluding fuel and purchased power expenses, increased by $76.4 million or 10.1%, mainly due to $37.2 million of costs related to the cancelled Via Verde Project, registered as Current Expenses during fiscal year ended on June 30, 2012.

Accounts receivable increased from $1,025.4 million as of June 30, 2011 to $1,083.4 million as of June 30, 2012. Of this amount, $239.4 million were due from the Commonwealth central government, public corporations and municipalities (net of the deferred liability to the contribution in lieu of taxes to the municipalities).

*Fiscal year 2011 compared to fiscal year 2010*

Net Revenues for fiscal year 2011 were $706.0 million, representing a decrease of $30.6 million, or 4.2%, from Net Revenues for fiscal year 2010. The decrease in Net Revenues was primarily the result of a 3.8% decrease in electric energy sales (in kWh) and increases in maintenance expenses of $11.3 million, or 5.4%, and in transmission and distribution expenses of $15.6 million, or 9.7%. Revenues were $4.4 billion, a 5.9% increase from the prior year as a result of an increase in the revenues from the fuel adjustment charge due to the 14.2% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $3.7 billion for the year, an 8.1% increase from the prior year. The Authority's revenues from its basic charges (which exclude the fuel adjustment charge) decreased by 3.0% from fiscal year 2010 to fiscal year 2011 as a result of the decrease in electric energy sales. Excluding fuel and purchased power expenses, Current Expenses increased from $728.4 million for fiscal year 2010 to $752.9 million for fiscal year 2011, or 3.4%, as a result of the increases in maintenance and transmission and distribution expenses mentioned above. The increase in these expenses was due in part to increases in salaries pursuant to the collective bargaining agreement with the Authority's principal union. The accrued revenues attributable to the municipalities' consumption and the residential fuel and hotel subsidies increased from $237.8 million for fiscal year 2010 to $251.2 million for fiscal year 2011, or 5.6%. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

During fiscal year 2011, accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $932.1 million as of June 30, 2010 to $1.0 billion as of June 30, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge, due to the increase in the cost of fuel, and slower payments by clients. Accounts receivable from government clients (excluding municipalities) increased from $274.7 million as of June 30, 2010 to $282.3 million as of June 30, 2011, of which 78% were considered past due (in excess of 30 days) as of June 30, 2011, compared to 73% as of June 30, 2010. Accounts receivable from general clients (residential, industrial and commercial) increased from $657.4 million as of June 30, 2010 to $720.1 million as of June 30, 2011, of which 8% were past due as of June 30, 2011, compared to 10% as of June 30, 2010.

*Fiscal year 2010 compared to fiscal year 2009*

For the fiscal year ended June 30, 2010, as compared to the fiscal year ended June 30, 2009, Net Revenues increased by $107.1 million, or 17.0%. This increase was mainly due to an increase of 3.9% in electric energy sales (kWh), which resulted in an increase of $158.5 million, or 4.0%, in Revenues. Although Current Expenses increased by $51.3 million, or 1.5%, administrative and general expenses decreased by $43.5 million, or 19.6%. Accounts receivable decreased from $1.019 billion as of June 30, 2009 to $976.4 million as of June 30, 2010. Of this total, $373.1 million were due from the Commonwealth central government and the public corporations, a decrease from $471.4 million as of June 30, 2009.

*Fiscal year 2009 compared to fiscal year 2008*

For the fiscal year ended June 30, 2009, as compared to the fiscal year ended June 30, 2008, Net Revenues decreased by $52 million, or 7.6%. This decrease was mainly due to a reduction of 5.5% in electric energy sales (kWh). Revenues decreased by $362 million, or 8.3%, as a result of the reduction in energy sales and a reduction in the price of fuel from $84.18 per barrel in 2008 to $76.23 per barrel in 2009. Current Expenses decreased by $310 million, or 8.4%. Fuel and purchased power expenses, the largest component of Current Expenses, were down by $372 million or 12.6%, partly because of the

reduction in the price of fuel, but also because in 2008 the Authority incurred additional fuel expense resulting from the Palo Seco fire that occurred in December 2006. A portion of this extra cost ($96 million in 2008) is being claimed by the Authority from its insurers and is shown as a separate line item. Maintenance expenses also declined by $23 million or 9.4% when compared with 2008. Accounts receivable as of June 30, 2009, decreased by 3.1%, to $1.019 billion, when compared by 2008. Of this total, $471.3 million were due from the Commonwealth central government and the public corporations, an increase of 31.9% from the previous year.

### Historical Disposition of Net Revenues
### (in thousands)

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| Disposition of Net Revenues | 2009 | 2010 | 2011 | 2012 | 2013 |
| Sinking Fund: | | | | | |
| Interest .................................................... | $261,486 | $246,072 | $304,778 | $184,263 | $332,503 |
| Principal .................................................. | 173,040 | 151,507 | 175,455 | 143,422 | 194,920 |
| Reserve Account ..................................... | (29,523) | - | - | - | - |
| Reserve Maintenance Fund .......................... | - | - | - | - | - |
| Self-insurance Fund ................................... | 10,000 | 10,000 | 10,000 | 5,000 | - |
| Capital Improvement Fund ........................ | 4,695 | 63,405 | 17,231 | 15,086 | 16,686 |
| Interest on Notes ...................................... | 28,434 | 33,985 | 1,550 | 4,405 | 408 |
| Contributions in lieu of taxes and other uses[1] ...... | 181,364 | 231,669 | 197,007 | 285,237 | 186,170 |
| Net Revenues ........................................ | $629,496 | $736,638 | $706,021 | $637,413 | $730,687 |

[1] Includes the following amounts attributable to the residential fuel subsidy and the subsidy granted to the hotel industry: $37.1 million, $35.9 million, $34.2 million, $38.3 million and 35.3 million for fiscal years ended June 30, 2009, 2010, 2011, 2012 and 2013, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Since Net Revenues include amounts billed to the municipalities and other subsidies that are not collected, as discussed previously, in some years, the Authority may not have had sufficient cash available to make the deposits and payments shown above as being made prior to the application of "Contributions in lieu of taxes and other uses." In those years, the Authority made some of the deposits and payments from additional borrowings.

**Projected Net Revenues**

The main assumptions used by the Authority in preparing the estimates of Net Revenues set forth below are the following:

Revenues - Projected Revenues from sales of electric energy are based upon economic growth projections for the Commonwealth. The Revenue projections assume that sales in kWh will increase by 1.32%, 0.38%, 1.14%. 1.52% and 1.78% for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively.

Current Expenses - Projected Current Expenses assume reductions in operating expenses (excluding fuel, purchased power and maintenance expenses) as a result of expense control measures of 2.85% for fiscal year 2018 as compared to fiscal year 2013.

Fuel - Projected fuel prices are based upon an analysis prepared by the Authority, which takes into consideration the Annual Energy Outlook issued by the United States Department of Energy and the Authority's historical fuel data. The Authority passes through the cost of fuel to its clients. The following table sets forth projected average per equivalent barrel fuel prices:

**Projected Fuel Prices**

| Fiscal Year Ending June 30 | Average Price Per Equivalent Barrel[1] |
|---|---|
| 2014 | 94.96 |
| 2015 | 94.41 |
| 2016 | 88.57 |
| 2017 | 87.15 |
| 2018 | 80.91 |

[1] This is a blended price of No. 2, No. 6 fuel oils and natural gas prices. The prices exclude handling charges.

The following table presents the Authority's estimates of Net Revenues for the five fiscal years ending June 30, 2018, in accordance with the provisions of the Trust Agreement, and the ratio of Net Revenues to Principal and Interest Requirements for Power Revenue Bonds. The figures for Revenues and Net Revenues in this table include the revenues attributable to the residential and hotel energy consumption that are offset by legally mandated subsidies (see footnotes 1 and 2), and the electric consumption charges of the municipalities, against which the Authority applies the CILT (see footnote 2). The debt service coverage is shown as calculated under the Trust Agreement and as then adjusted to reflect the elimination from Net Revenues of energy charges that the Authority offsets by legally mandated subsidies or the CILT.  See *Authority's Financial Condition - Subsidies and Contributions in Lieu of Taxes* under INVESTMENT CONSIDERATIONS and *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

The projections set forth in the following table assume that, under power purchase agreements, the Authority will have renewable energy capacity of approximately 300 MW by fiscal year 2014 and 500 MW by fiscal year 2015 through fiscal year 2018.  See *Plans for Fuel Diversification* under THE SYSTEM.

The projections take into consideration the conversion to natural gas of units no. 1 and 2 of the Aguirre Power Plant for fiscal year 2016, and the conversion of units 3 and 4, and units 9 and 10, of the Palo Seco and San Juan power plants, respectively, for fiscal year 2017.

The cost of the Aguirre offshore terminal project is not included in the Authority's current capital improvement program for fiscal years 2014-2018.  For a discussion of the financing alternatives being considered with respect to the Aguirre offshore terminal project, see *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

## Projected Net Revenues and Coverage

| | Fiscal Year Ending June 30 | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Average number of clients | 1,502,841 | 1,520,065 | 1,535,860 | 1,551,657 | 1,567,454 |
| Electric energy sales (in millions of kWh) | 18,199 | 18,268 | 18,476 | 18,767 | 19,091 |
| Authority generation (gross)(in millions of kWh) | 14,590 | 14,085 | 14,346 | 14,668 | 15,108 |
| Purchased generation (gross)(in GWHR) | 7,708 | 8,033 | 8,069 | 8,101 | 8,099 |
| **Sources of Net Revenues** | | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential[1] | $1,642,922 | $1,663,817 | $1,655,368 | $1,675,579 | $1,649,208 |
| Commercial[2] | 2,173,701 | 2,214,832 | 2,214,347 | 2,246,456 | 2,220,105 |
| Industrial | 498,880 | 499,847 | 490,555 | 489,373 | 475,477 |
| Other | 117,529 | 118,362 | 117,322 | 116,665 | 113,897 |
| Theft Recovery[3] | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Sub-Total | 4,463,032 | 4,526,858 | 4,507,592 | 4,558,073 | 4,488,687 |
| Other (principally interest earned) | 31,179 | 31,179 | 31,179 | 31,179 | 31,179 |
| Total Revenues | $4,494,211 | $4,558,037 | $4,538,771 | $4,589,252 | $4,519,866 |
| Current Expenses: | | | | | |
| Operations: | | | | | |
| Fuel | $2,145,911 | $2,100,801 | $2,044,913 | $2,044,304 | $1,934,695 |
| Purchased Power | 805,414 | 903,208 | 932,776 | 963,724 | 995,556 |
| Production | 65,651 | 58,297 | 58,936 | 59,118 | 59,118 |
| Transmission and Distribution | 158,728 | 148,377 | 150,001 | 150,466 | 150,466 |
| Maintenance | 233,425 | 224,894 | 227,357 | 228,061 | 228,061 |
| Client accounting and collection | 115,369 | 111,521 | 112,742 | 113,091 | 113,091 |
| Administration and general | 175,510 | 187,797 | 189,851 | 190,440 | 190,440 |
| Total Current Expenses | $3,700,008 | $3,734,895 | $3,716,576 | $3,749,204 | $3,671,427 |
| Net Revenues | $ 794,203 | $ 823,142 | $ 822,195 | $ 840,048 | $ 848,439 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[4] | $577,197 | $592,935 | $630,437 | $655,348 | $655,347 |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.38 | 1.39 | 1.30 | 1.28 | 1.29 |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[5] | 1.04 | 1.06 | 0.99 | 0.98 | 1.00 |

(1) Includes accrued revenues that will be offset by residential fuel subsidies of approximately $20.8 million, $20.4 million, $21.2 million, $21.6 million and $20.0 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively.  See *Subsidies and Contributions in Lieu of Taxes* and *Additional Bonds* under THE SYSTEM.

(2) Includes accrued revenues attributable to (i) electric energy consumption by municipalities of approximately $213.7 million, $216.7 million, $215.8 million, $218.2 million and $214.8 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively; and (ii) energy consumption offset by hotel subsidies of approximately $7.9 million, $8.1 million, $8.1 million, $8.2 million and $8.1 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively.  See *Subsidies and Contributions in Lieu of Taxes* and *Additional Bonds* under THE SYSTEM.

(3) Projections based on the Authority's theft recovery initiatives.  See *Transmission and Distribution Facilities – Operations* under THE SYSTEM.

(4) Includes debt service requirements for (i) the outstanding Power Revenue Bonds, (ii) the Bonds, and (iii) Power Revenue Bonds expected to be issued in each of fiscal years 2014-2018 to fund the Authority's capital improvement program at an assumed interest rate of 7% with interest capitalized for approximately three years.  See *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM. The Principal and Interest Requirements in this table are reduced by the interest that was capitalized through the Authority's prior issuances, the Bonds and the interest that is expected to be capitalized with the issuance of additional Power Revenue Bonds in the amounts of $71.5 million, $62.2 million, $23.2 million, $46.9 million and $46.9 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively.  Actual Principal and Interest Requirements will vary based on the actual principal and interest on the future Power Revenue Bonds and Power Revenue Refunding Bonds issued and no assurance can be given that the amounts shown in the table will be achieved.  No deductions against debt service have been made for any Federal Subsidy Payments expected to be received in respect of the Authority's outstanding Build America Bonds during the forecast period.  Interest subsidy payments received by the Authority after April 1, 2013 will be used, however, as an offset to and serve to reduce the Authority's interest obligation on its Build America Bonds by the amount received from the United States Government.

(5) Excludes from Net Revenues, for purposes of computing this ratio, the projected revenues attributable to municipal government energy consumption charges (net of projected recoveries as a result of Act No. 233-2011 of $49 million annually from fiscal year 2014 to 2018) and to certain energy consumption charges offset by law by subsidies to residential clients and hotels in the amounts set forth in footnotes (1) and (2) above.

The projections set forth above show an aggregate reduction in operating expenses (excluding fuel and purchased power) by fiscal year 2018 of 2.85% compared to the level of these operating expenses in fiscal year 2013. The expense reduction initiatives include, among others, other cost reduction initiatives, such as a reduction in overtime, materials, administrative and miscellaneous expenses and head count reduction through attrition. There can be no assurance, however, that the Authority will in fact be able to achieve the expected reductions in every year.

The Consulting Engineers reviewed and analyzed the projections of the Authority shown above and based on the assumptions set forth in their letter, the Consulting Engineers have concluded that (i) the methodology used by the Authority in preparing its revenue and capacity projections generally follows accepted utility practice and is appropriate for the Authority, (ii) the Authority's estimates of future growth form a reasonable basis for its projected operating results, and (iii) the Authority's rates should generate sufficient revenues to pay its Current Expenses and debt service and to meet the Trust Agreement obligations for deposits into certain funds from current operating revenues. See Appendix III—*Letter of Consulting Engineers.*

Although the Authority and the Consulting Engineers believe that the assumptions upon which the estimates of Net Revenues are based are reasonable, actual results may differ from the estimates as circumstances change. The Authority's financial projections involve many assumptions, some of which are beyond the control of the Authority, such as the cost of fuel oil and its impact on the level of demand for electricity. In the past, the Authority's projections of Net Revenues have at times materially differed from what the Authority has been able to achieve.

If the Authority is unable to obtain the level of Net Revenues it has projected, it may not be able to meet its Principal and Interest Requirements unless it borrows funds to meet its debt service or implements measures to increase Revenues and/or reduce its Current Expenses. See the discussion in *The Authority's ability to meet its projections of Net Revenues* under RISK FACTORS AND INVESTMENT CONSIDERATIONS for a discussion of factors that can affect the Authority's ability to achieve its projected Net Revenues.

The Authority's projections were not intended to comply with the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial projections. The projections have been prepared on the basis of Net Revenues as defined in the Trust Agreement, which differs in several important respects from the Authority's net income prepared in conformity with GAAP in that they do not include, for example, depreciation, other post-employment benefits actuarial accruals and the CILT as a current expense and do not reflect interest expense on Power Revenue Bonds as a deduction from Net Revenues.

The following table presents the projected disposition of Net Revenues, in the order of priority of payment, for the five fiscal years ending June 30, 2018, in accordance with the provisions of the Trust Agreement.

**Projected Disposition of Net Revenues**
**(in thousands)**

|  | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | 2014 | 2015 | 2016 | 2017 | 2018 |
| **Disposition of Net Revenues** | | | | | |
| Sinking Fund: | | | | | |
| Interest[1] | $358,463 | $364,096 | $391,973 | $403,553 | $391,383 |
| Principal | 204,305 | 214,410 | 224,035 | 237,365 | 249,535 |
| Capital Improvement Fund | 30,408 | 38,873 | 2,252 | 5,786 | 5,786 |
| Contributions in lieu of taxes and other uses[2] | 201,027 | 205,763 | 203,935 | 193,344 | 201,735 |
| Net Revenues | $794,203 | $823,142 | $822,195 | $840,048 | $848,439 |

[1]  The interest amount is shown net of expected Federal Subsidy Payments because, the Trust Agreement does not prohibit the Authority from applying Federal Subsidy Payments as an offset against its interest obligation on outstanding Build America Bonds once received from the United States Government even though for purposes of determining the required balance of the Reserve Account and the tests for the issuance of additional Power Revenue Bonds, the Authority is not permitted to take any such Federal Subsidy Payments into account as such an offset. See "Rate Covenant" under SECURITY.

[2]  Includes the following amounts attributable to the residential fuel subsidy and the subsidy granted to the hotel industry: $28.7 million, $28.5 million, $29.3 million, $29.8 million and $28.0 million for fiscal years ended June 30, 2014, 2015, 2016, 2017 and 2018, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Since Net Revenues include amounts billed to the municipalities and other subsidies that are not collected, as discussed previously, in some years, the Authority may not have sufficient cash available to make the deposits and payments shown above as being made prior to the application of "Contributions in lieu of taxes and other uses." In those years, the Authority may have to make some of the deposits and payments from additional borrowings.

## LEGISLATION

*Economic Incentives Act*

The Commonwealth has identified high energy costs as one of the main factors affecting Puerto Rico's competitiveness and has made the adoption of a new energy policy an important part of its economic development initiatives. Act No. 73-2008, also known as the "Economic Incentives Act," created the Puerto Rico Energy Affairs Administration, a new government agency under the Department of Economic Development and Commerce in charge of developing and implementing a new energy policy for Puerto Rico. The Economic Incentives Act provides, among other things, for tax credits against Puerto Rico income tax equal to a percentage of the payments made to the Authority for the net consumption of energy related to business operations. These credits are available to any business that is an industrial client of the Authority and has been designated as an eligible business by the Secretary of the Department of Economic Development and Commerce with the endorsement of the Executive Director of the Puerto Rico Industrial Development Company and the Secretary of the Treasury Department of Puerto Rico. These tax credits will be covered from moneys from the Commonwealth's General Fund and payments from the Authority.

The Economic Incentives Act provides that the Authority's cost of the tax credit will be absorbed by the Authority through a reduction in operational costs, increased efficiencies, revenues generated through "wheeling" and reductions in the cost of generating or purchasing energy. The Economic Incentives Act expressly provides that the Authority's cost in providing the tax credit shall not be subsidized by or passed through, either directly or indirectly, to the clients of the Authority, nor

shall such costs cause a reduction in employment or in the payroll of the Authority. If during the 10-year term of the tax credit the average cost of energy is reduced to 10 cents per kWh for a period of two consecutive years, the tax credit will terminate.

The Authority expects to pay its portion of the cost of the tax credit from Revenues in a given year, but only after the application of Revenues to pay Current Expenses and debt service on the Authority's outstanding bonds in such given year, and after certain debt service, maintenance, capital improvement and self-insurance reserves are funded as required under the Trust Agreement. To date, the Authority has only incurred administrative costs related to the Economic Incentives Act. The Authority estimates that it will incur costs related to the Economic Incentives Act of approximately $70 million in the five years ending in fiscal year 2018.

The Economic Incentives Act mandated the introduction of "wheeling" for renewable energy producers by January 2, 2010 and created a committee in charge of the implementation of a wheeling system. Under a wheeling system, the Authority must make available its transmission and distribution system to third party renewable energy generators. Although the Authority did not meet the deadline established in the Economic Incentives Act, public hearings were held on June 1 and 2, 2010 to consider the Wheeling System Tariffs, Wheeling Transmission Regulation and Wheeling Interconnection Procedure. The examiner recommended approval of the Wheeling Transmission Regulation and Wheeling Interconnection Procedure, but rejected approval of the Wheeling System Tariffs based on lack of information to the public. He recommended further public hearings with enough time for public evaluation. Based on such recommendations, the Authority modified the Wheeling Transmission Tariff Schedules and held new public hearings on June 2 and 3, 2011. The public hearing examiner submitted his report to the Governing Board on July 22, 2011, including various recommendations that are under evaluation by the Authority. The Authority is also currently revising the Wheeling Regulation and Wheeling Interconnection Procedure. These regulations implement the wheeling system at transmission voltage level (115kV and 38kV). The Authority is planning to evaluate the implementation of the wheeling system at the distribution voltage level (13kV).

Under the Economic Incentives Act, if the Authority and a third party power generator do not agree on the wheeling rates within a period of 60 days, the Executive Director of the Energy Affairs Administration has the authority to appoint an arbitrator to determine, approve and establish the rates to be paid to the Authority by the third party power generator. See *Wheeling* under THE SYSTEM.

*Act for a Public Policy for Energy Diversification Through Sustainable and Alternative Renewable Energy*

On July 19, 2010, the Commonwealth enacted Act No. 82-2010, also known as the "Act for a Public Policy for Energy Diversification Through Sustainable and Alternative Renewable Energy". Act No. 82-2010 requires the Authority to meet prescribed targets of energy generation from renewable sources by specified dates, as follows: 12% of energy sales from renewable energy production by 2015 and 15% of energy sales from renewable energy production by 2020, with a requirement to establish a plan to reach 20% of energy sales from renewable energy production by 2035. Act No. 82-2010 also establishes Renewable Energy Certificates as a legally recognized asset that can be purchased, sold, traded and transferred separately from electric power and used to meet the renewable energy targets and creates a Renewable Energy Commission with the power to implement and supervise compliance with Act No. 82-2010. The Authority had signed power purchase agreements with respect to sixty-three (63) renewable energy projects totaling approximately 1,660.8 MW of capacity to comply with the law. However, the Authority is conducting a Renewable Energy Source Integration Study in order to evaluate the impact of the executed PPOAs in the reliability of the system. The Authority can be

subject to the imposition of fines if the noncompliance with the Renewable Portfolio Standard is not justified. The Authority, as a retail energy provider, needs to demonstrate to the Commission's satisfaction all of the reasonable and good faith efforts were made to try to comply with the Renewable Portfolio Standard for the calendar year under review.

Concurrently with the enactment of Act No. 82-2010, the Commonwealth enacted Act No. 83-2010, known as the Green Energy Incentives Act, which provides cash and further tax incentives to promote the development of renewable energy projects. It is too early to determine what impact Act No. 82-2010 and Act No. 83-2010 will have on the Authority, but existing or new legislation that would reduce the Authority's electric energy sales could have a material impact on the Authority's operations and financial condition.

*Net Metering Act*

The Authority is currently subject to "net metering" legislation under Act No. 114-2007, as amended, also known as the "Net Metering Act," which allows residential and small business clients who have developed and operate their own generation to sell any excess power they produce back to the Authority. Currently, net metering applies to Authority clients that are interconnected to the Authority's transmission or sub-transmission system and are generating from 25kW to 5 MW of renewable energy in accordance with the requirements established in the Authority's Regulation for the Interconnection of Generators to the Electric Transmission and Sub-Transmission System for the Net Metering Program (Regulation No. 8374 of July 9, 2013).

*Recent Legislation*

*Act No. 50-2013.* On July 1, 2013 Act No. 50-2013 was signed into law by the Governor. Act No. 50-2013 establishes a preferential "all in" rate for electricity to PRASA. The initial preferential rate will be twenty two (22) cents per kilowatt hour for fiscal years 2014, 2015 and 2016, which will be further reduced to sixteen (16) cents per kilowatt hour for fiscal year 2017 until the average rate that the Authority charges to its clients is less than sixteen (16) cents per kilowatt hour. Said preferential rate is to be applied prospectively to all of PRASA's invoices without regard to the type of electric service provided to PRASA. Pursuant to Act No. 50-2013, if the Authority achieves an average energy cost for all Puerto Rico that is less than the applicable preferential rate, as documented in the Authority's audited financial statements, then the Authority will reduce the preferential rate to the average power for all Puerto Rico, according to the computation for the corresponding year. The Authority will annually review the average energy cost for all Puerto Rico and will determine if the preferential rate should decrease. The preferential rate is, however, capped at 750 million kilowatt hours per fiscal year. PRASA's consumption of electricity from the Authority in excess of this cap would be invoiced by the Authority at the average cost of energy charged to clients in the previous year as reflected in the most recent audited financial statements of the Authority. Act No. 50-2013 grants the Authority the power to revoke or modify the preferential rate if deemed necessary and prudent, following the processes provided in the applicable laws and the public policy established in Act No. 50-2013, or when determined necessary to meet its obligations under the Trust Agreement.

*Act No. 1-2013.* Act No. 1-2013, also known as the "Jobs Now Act of 2013," was signed into law by the Governor on February 10, 2013. Act No. 1-2013 granted certain businesses the ability to use certain credits against their electric bill payable to the Authority. Eligible businesses that hired employees that were unemployed before such hiring would be entitled to a credit per employee hired to be used to pay such eligible business' electric bill. Said credit would be up to $2,000 if the hiring occurs between January 1, 2013 and December 31, 2013, up to $1,000 if the hiring occurs between January 1, 2014 and March 31, 2014 and up to $500 if the hiring occurs between April 1, 2014 and

June 30, 2014. The eligible business would reduce its payment of electricity bills to the Authority in the aggregate amount of the credits it holds. The credits can only be used by the eligible business and cannot be transferred.

Pursuant to this structure the Authority would not receive cash payment from the eligible business in the amount of the credits used by the eligible business. However, Act No. 1-2013 states that the Authority will be reimbursed for those amounts by the Secretary of the Treasury from the Commonwealth's General Fund. Act No. 1-2013 requires the Authority and the Treasury Department to adopt a joint regulation to establish the procedure to effectuate such reimbursement to the Authority by the Treasury Department. Such regulation is in the process of being drafted and has not been adopted by the Authority and the Treasury Department.

While those moneys are held by the Commonwealth at the Treasury Department such moneys can be used by the Commonwealth for the payment of the interest and amortization of the public debt, as provided in Section 8 of Article VI of the Commonwealth's Constitution. Pursuant to this Section 8 of Article VI of the Constitution the Commonwealth is empowered to use its "available resources" to pay the interest and amortization of the public debt before making other payments or disbursements. In the event that the available resources of the Commonwealth are insufficient to cover all obligations the Commonwealth may use available resources that are earmarked for other purposes (e.g., payments to public employees or to suppliers, receivables) to pay the interest and amortization of the public debt.

## ENVIRONMENTAL MATTERS

The Authority's Environmental Protection and Quality Assurance Division is responsible for ensuring the Authority's compliance with all applicable federal and Commonwealth environmental laws and regulations. The Division is in charge of developing and implementing a comprehensive program and plans to improve the Authority's performance in all applicable environmental media, taking into account new regulatory requirements as well as alleged instances of noncompliance cited any environmental protection agencies.

**Environmental Litigation and Administrative Proceedings**

*Consent Decree*

In 1992, the EPA conducted a multimedia inspection of the Authority's facilities and identified several alleged instances of non-compliance related to the Authority's air, water and oil spill prevention control and countermeasures compliance programs, among other things. As a result, the EPA filed a complaint against the Authority on October 27, 1993 seeking injunctive relief and the imposition of penalties for alleged violations of the CAA, the CWA, the Emergency Planning and Community Right-to-Know Act ("EPCRA"), the Comprehensive Response, Compensation and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA"). To settle the complaint, the Authority and the EPA entered into a consent decree (the "Consent Decree") approved by the United States federal court in March 1999.

The Consent Decree covered alleged violations with respect to the Authority's electric power generating plants of Aguirre, Palo Seco, San Juan and Costa Sur, as well as the Authority's main transmission center of Monacillo in San Juan. Under the terms and conditions of the Consent Decree, the Authority was required to: (i) implement measures to ensure that the operation of its generating units complies with the opacity standards applicable to air emissions under the PREQB's Regulation for the Control of Atmospheric Pollution ("PRRCAP"), among other things, including the refurbishment of generating units and the implementation of operation and maintenance programs (termed, "Air

Compliance Programs"); (ii) achieve and maintain compliance with the CWA and NPDES permit requirements by implementing certain upgrades and modifications of the discharges of each power plant; (iii) operate its facilities in compliance with Oil Spill Prevention and Spill Prevention Control and Countermeasure ("SPCC") requirements, including the preparation and implementation of SPCC plans for all of the power plants and the transmission center, as well as the implementation of a construction and maintenance program to modify these facilities to achieve compliance; (iv) achieve compliance with EPCRA requirements by filing hazardous chemical reporting forms that were not filed when due in the past (known as "Tier I/Tier II" forms) and conduct any current and future filings; (v) achieve compliance with CERCLA and EPCRA with respect to potential releases from its facilities by implementing an in-house hazardous material spill training for employees and contractors; and (vi) achieve compliance with RCRA's underground storage tank requirements by ensuring that all underground storage tanks at its facilities were closed or removed in compliance with these requirements.

As part of the Air Compliance Program, the Authority is required to combust fuel with low sulfur content, as per the Consent Decree's Fuel Quality Program, in order to achieve compliance with air emission opacity standards. Furthermore, under the Consent Decree, the Authority was required to pay a civil penalty of $1.5 million, and implement additional compliance projects amounting to $4.5 million, which include $1 million to hire an independent party ("Environmental Review Contractor") to review the Authority's compliance and implementation of the terms and conditions required under the Consent Decree and inform the general public and different communities about it, $100,000 for Fire Department hazmat training, and $3.4 million to implement an environmental restoration and protection project in Las Cucharillas Marsh in Cataño. The University of Puerto Rico's Graduate School of Public Health was subsequently hired as the Environmental Review Contractor. The Consent Decree shall terminate upon the Authority's: (1) compliance with the Decree's projects; (2) full payment of the civil penalty; (3) implementation of Additional Environmental Projects; and (4) payment of all stipulated penalties with no stipulated penalties outstanding, owed or disputed.

In 2004, to settle a dispute regarding the interpretation and application of the method for performing opacity readings (EPA's Method-9) and the alleged violations to the opacity standards by the Authority, the EPA and the Authority entered into a Consent Decree Modification of the original agreement. In addition to the original requirements, the Authority was required to (1) perform EPA sanctioned visible emissions readings; (2) use diesel fuel (number 2 fuel oil) during cold startups in the generating units of Costa Sur, Aguirre, Palo Seco and San Juan; (3) reduce the sulfur content (0.50%/weight or less) in fuel oil No. 6 (Bunker C) used in the generating units of Costa Sur, Aguirre, Palo Seco and San Juan; (4) implement and conduct a nitrogen oxide ($NO_x$) emissions reduction program for the Costa Sur, Aguirre and Palo Seco generating units; and (5) modify the optimal operating ranges originally set for all of the Authority's units under the Consent Decree, among others. The Authority also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs (Las Cucharillas Marsh environmental restoration and protection and the Environmental Review Contractor) under the Consent Decree.

Since September 2004, there has been no legal action in the United States federal court or any administrative proceeding against the Authority regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of noncompliance. Noncompliance events must be disclosed to EPA in the corresponding quarterly report. Ordinarily, when a covered noncompliance event occurs, the Authority pays the stipulated penalty within sixty (60) days of the end of each reporting quarter in order to benefit from a 50% discount of the applicable stipulated penalty provided for under the Consent Decree.

The Authority has had some difficulties fully complying with the opacity limits, particularly during the startup/shutdown of the generating units and during malfunction periods. From March 1999 until the first quarter of 2013, stipulated penalties attributable to non-compliance with the Consent Decree have totaled $1.06 million, of which $0.70 million are related to non compliance with the opacity emission limits (based on the 50% discount allowed under the Consent Decree). The Authority has devoted great efforts at complying with the Consent Decree.

*Other Proceedings*

In 1997, as a result of an inspection carried out by the EPA and the PREQB at the Authority's Palo Seco power plant, the EPA issued an Administrative Order (the "RI/FS Order") for the investigation and possible remediation of seven (7) areas identified by the EPA at the Palo Seco power plant and the Palo Seco General Warehouse (Depot). The RI/FS Order required the Authority to carry out a Remedial Investigation/Feasibility Study ("RI/FS"). The RI/FS required under the RI/FS Order is designed to: (1) determine the nature and extent of contamination and any threat to the public health, welfare, or environment caused by any release or threatened release of hazardous substances, pollutants, or contaminants at or from the site; and (2) determine and evaluate alternatives for the remediation or control of the release or threatened release of hazardous substances, pollutants or contaminants at or from the site. The RI was completed and submitted to the EPA for evaluation. The Authority was notified by EPA that the FS will not be required and that EPA would issue a "No Action" Record of Decision ("ROD"), with a follow-up review in five years. Public hearings will be scheduled to get public comments on this ROD.

The information gathered in the RI indicated the presence of free product (Separate Phase Hydrocarbons or "SPH") in several monitoring wells. The analysis of this product reflected a low concentration of polychlorinated biphenyls ("PCB"). In 2008, the Authority and the EPA entered into an Administrative Agreement and Order on Consent for a Removal Action (CERCLA 02 2008 2022) (the "AOC") requiring the Authority to provide an enhanced delineation and accurate identification of areas of PCBs contamination, implement removal activities to address the PCBs-contaminated oil layer and soils, and perform confirmatory sampling. The Authority completed the activities of delineation and identification of PCBs-containing SPH. By letter dated December 13, 2011, EPA notified the Authority that no further removal action was required at the site and requested that the Authority submit its final removal action report to EPA. The EPA further indicated that, upon receipt of this final report, EPA would issue a site closeout letter.

The matters that are pending the close of the RI/FS Order are the issuance of a final closing letter from the EPA and the submittal from EPA of a request for reimbursement of costs. The AOC has been closed. To date, the Authority has not received any request for reimbursement of costs from the EPA. However, if it does receive any such request, the Authority will remit payment to EPA as required by the applicable orders. The Authority believes there are no other matters related to these orders that could potentially result in other enforcement proceedings.

In 2002, the Authority received a "Special Notice Concerning Remedial Investigation/Feasibility Study for Soil at the Vega Baja Solid Waste Disposal Superfund Site." The EPA identified the Authority and six (6) other entities as "potentially responsible parties," as defined in the CERCLA. In 2003, the Authority agreed to join the other potentially responsible parties in an AOC for an RI/FS, with the understanding that such agreement did not constitute an acceptance of responsibility. The Authority and other settling defendants, with the EPA's oversight, completed a RI pertaining to the Operable Unit 2 (related to soil contamination) of the site on April 2, 2009, and a FS on July 29, 2010. In April 2004, the EPA issued a ROD determining that no remedial action was required with respect to the groundwater at the site (referred to as Operable Unit 1). In September 2010, the EPA issued a ROD establishing the remedial alternatives to address soil contamination (Operable Unit 2). The Authority and other

potentially responsible parties have been negotiating with the EPA and the U.S. Department of Justice ("DOJ") the terms of a settlement agreement covering the responsibilities of the different parties for response actions, including post remedial operations and maintenance, as well as reimbursement of costs incurred by the EPA and DOJ for response actions at the site. The Authority has reached an agreement with EPA to settle this matter by contributing $1.3 million (composed of Past Response Costs of $900,000 and Landfill Remediation Costs of $400,000) for such efforts to be paid in four (4) payments, with the understanding that it is not admitting to any liability. This settlement amount has been authorized to be paid by the Authority's Governing Board. In April 25, 2013, the Consent Decree became effective. As of this date, the Authority has disbursed the amount of $702,902 and is currently in compliance with the agreement with the EPA.

In December 2004, the EPA sent a request for information to the Authority and to other potentially responsible parties that did business with certain recycling companies regarding the release of pollutants by these recycling companies in a Toa Baja superfund site. The EPA has stated that it is particularly interested in entities that disposed of batteries at this site. The Authority has responded to the request for information, stating that it only sold scrap metal to these recycling companies. The Authority does not believe it has any liability regarding this site. In September 2006, EPA issued a Record of Decision determining that the groundwater at the site does not pose an unacceptable risk to the public health or environment and, therefore, no action is required with respect to the groundwater. EPA then continued to investigate potential buried waste and contaminated soil associated with the Site to determine the magnitude and extent of contamination in soil conducted the removal of disposed battery cases, contaminated soil and other debris. According to EPA's Superfund Information Systems website, a combined RI/FS is underway. At this time, we have no knowledge that the EPA has initiated, or intends to initiate, any action against the Authority concerning this matter.

**Compliance Programs**

The Authority continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

*Air Quality Compliance*

The CAA is a comprehensive federal law that addresses the nation's air quality and the stratospheric ozone layer, and authorizes the EPA to implement and enforce regulations reducing air pollutant emissions. Under the CAA, the EPA is authorized to establish and enforce limits on certain air pollutants from various sources, including utilities. Pursuant to the CAA, the EPA promulgated primary and secondary national ambient air quality standards ("NAAQS") with respect to certain air pollutants, including particulate matter ("PM"), sulfur dioxide ("SO$_2$"), and nitrogen oxide ("NO$_X$"). These standards are to be achieved by the application of control strategies developed by the States (including Puerto Rico) and included in implementation plans that must be approved by EPA to be effective. The PREQB has adopted a State Implementation Plan which was approved by EPA, generally designed to achieve the NAAQS.

The CAA also establishes a permit program (known as the "Title V operating permit program") for large industrial and commercial sources that release pollutants into the air above a specified threshold, known as "major sources." Operating permits include information on which pollutants are being released, the maximum amount that can be released, and the steps the source's owner or operator is required to take to reduce pollution. Responsibility for the Title V operating permit program in Puerto Rico was delegated to the PREQB.

The CAA requires new major stationary sources of air pollution and certain modifications to these sources to obtain an air permit before commencing construction. This permitting process is known as the New Source Review ("NSR"). The NSR program applies to sources that are located in areas that meet the NAAQS (known as "attainment areas"), areas that do not meet the NAAQS (known as "nonattainment areas") and areas that are unclassifiable with respect to the NAAQS. Permits for sources located in attainment or unclassifiable areas are issued under the Prevention of Significant Deterioration ("PSD") permit program. The purpose of the PSD program is to prevent the development of new nonattainment areas, among other things.

The Authority's power plants are subject to the Title V operating permit program under the CAA. Most of these power plants have their corresponding Title V permits in effect, except for the gas turbine facilities at Yabucoa, Mayagüez and the Palo Seco power plants. The permits for Yabucoa and Mayagüez expired, but the Authority timely submitted the respective renewal applications for both permits to the PREQB, which effectively extended their coverage during the renewal period. In addition, the Authority submitted a request to modify the Mayagüez permit for the replacement of four (4) old single cycle gas turbine units with four new aero derivative gas turbine units, which request is still being processed by PREQB. These applications are currently reviewed by the PREQB and in the additional information request stage. The permit application for the Palo Seco power plant was filed with PREQB in 1996, but the agency has not issued a final permit as of this date. The application is currently reviewed by the PREQB and in the additional information request stage. This permit application was filed within the filing term provided for by the regulation to activate coverage of the activities covered by the application while the application is in process. The permit is expected to be issued during the next fiscal year. Finally, although still within its original effective term, the Authority has also applied for the renewal of the Aguirre power complex permit in order to ensure extension of coverage under the permit after its expiration date in February 2013.

Generally, the Authority is in compliance with its Title V permits and matters covered by the Consent Decree between EPA and the Authority, dated March 19, 1999, as modified in June 2004, which is currently in effect for the Authority's four (4) steam power plants (San Juan, Palo Seco, Aguirre and Costa Sur). Among other things, this Consent Decree covers alleged past noncompliance with opacity requirements and requires the use of fuel oil with low sulfur content (equal to or less than 0.50% by weight) in the Authority's steam power plants (San Juan, Palo Seco, Aguirre and Costa Sur) or implement technologies that would achieve emissions equivalent to the use of such fuel. The Authority has had some difficulties fully complying with opacity limits during the generating units startup/shutdown and malfunction periods. For more details on these issues, see "Environmental Litigation and Administrative Proceedings" above.

During fiscal year 2007, the Authority completed projects to reduce $NO_X$ emissions at the Palo Seco, Aguirre and Costa Sur steam generating units. As a condition of receiving certain construction and operational permits for the repowering project, the San Juan steam generating units had previously been modified to reduce $NO_X$ emissions. The Authority and EPA monitor compliance with the lower NOx emissions requirements. The Authority is currently in compliance with the $NO_X$ requirements, which are verified by annual testing on units at Costa Sur, Palo Seco and Aguirre, and in San Juan units by the installation and maintenance of continuous emissions monitoring systems ("CEMS").

During the past fiscal year, the Authority reported achieving compliance in excess of 99% with its in-stack opacity requirements and its Air Compliance Program. As required by the Consent Decree's Air Compliance Program, the Authority also submitted and performed all quarterly quality assurance and quality control ("QA/QC") tests and reports regarding the excess oxygen and opacity monitors for all the applicable units, as well as the RATA tests for the Cambalache and the San Juan power plant CEMS.

The Authority continues its efforts to use fuel oil No. 6 (Bunker C) with sulfur content equal to or less than 0.50% per weight in all of its steam generating units, which contributes to maintain the current air quality standards.

In order to address current and future air pollution environmental laws and regulations, such as MATS, the Authority is in the process of converting its major steam generating units to burn both oil and natural gas. If the Authority is unable to convert these units (including completing the natural gas delivery infrastructure), it may need to incur significant capital investments to control emissions in order to continue to comply with the current and new air pollutant standards.

*MATS Regulation*

EPA has issued new regulations related to the requirements of Sections 111 and 112 of the CAA. Section 111 of the CAA requires EPA to set emissions limits for major new stationary sources referred to as New Source Performance Standards ("NSPS") regulations. Section 112 of the CAA requires the EPA to issue technology-based standards for major sources and certain area sources for hazardous air pollutants ("HAPs"). The categories and subcategories of sources to be regulated under these provisions are listed in Section 112(c) of the CAA. For these sources, the EPA is required to establish emissions standards that require the maximum degree of reduction in emissions of HAPs. These emissions standards are commonly referred to as maximum achievable control technology ("MACT") standards. Section 112(b) of the CAA contains a list of those pollutants that must be regulated as HAPs pursuant to CAA Section 112, and requires the EPA Administrator to periodically review this list and, where appropriate, revise the list by adding pollutants which present or may present a threat of adverse human health effects or adverse environmental effects.

In 2008, in response to a United States federal court decision and a related consent decree, the EPA decided to regulate coal- and oil-fired electric utility steam generating units ("EGUs"), under Section 112(c) of the CAA. The EPA also subsequently proposed under Section 112 air toxic standards for these EGU's that reflect the application of MACT consistent with the requirements of the CAA. This proposal was published in the Federal Register on May 3, 2011 and was signed into a final rule (with minor modifications) on December, 16, 2011.

In connection with the Section 111 standards, on February 27, 2006, EPA promulgated amendments to the NSPS for PM, $SO_2$, and $NO_X$ contained in the standards of performance for EGU's. EPA was subsequently sued for these amendments, and on September 2, 2009, was granted a voluntary remand without vacatur of these amendments. The final revisions to these amendments were approved on December 16, 2011, along with the Section 112 air toxic standards discussed above.

On February 16, 2012, EPA published in the Federal Register the final CAA Section 112 rule and the new CAA Section 111 standards. With respect to Section 112, EPA established HAPs standards (known as, "National Emission Standards for Hazardous Air Pollutants" or "NESHAP") for coal and oil-fired EGUs to meet new standards for toxic air pollutants reflecting the application of the MACT requirements. These standards, known as MATS, are geared at reducing these types of emissions from new and existing coal and oil-fired EGUs. The standards mainly address emissions of mercury, arsenic, chromium, nickel, and acid gases, including hydrochloric acid ("HCl") and hydrofluoric acid ("HF").

MATS apply to EGUs larger than 25 megawatts that burn coal or oil for the purpose of generating electricity for sale and distribution through the national grid to the public. Existing EGU's generally will have up to four years if they need it to comply with MATS. This includes the three years provided to all sources by the CAA, and an additional year that may be granted by the PREQB, as needed, for technology installation. In essence, the rule establishes: (i) numerical emission limits for mercury,

PM, and HCl for all existing coal-fired EGUs; (ii) numerical emission limits for PM, HCl and HF for existing and new oil-fired EGUs, but compliance for HCl and HF may also be achieved by limiting the moisture content of the oil; (iii) alternative numeric emission standards, including $SO_2$ (as an alternate to HCl), individual non-mercury metal air toxics (as an alternate to PM), and total non-mercury metal air toxics (as an alternate to PM) for certain subcategories of power plants; and (iv) work practices, instead of numerical limits, to limit emissions of organic air toxics, including dioxin/furan, from existing and new coal and oil-fired power plants, which require annual performance test program for each unit to ensure optimal combustion.

As for Section 111, EPA revised the NSPS for fossil fuel-fired EGU's. This NSPS revised the standards that new coal and oil-fired power plants must meet for PM, $SO_2$, and $CO_2$, by establishing revised numerical emission limits for these. These standards apply to EGUs that burn fossil fuel to produce steam.

The new rule establishing MATS and the NSPS, which, as mentioned, was published in the Federal Register in February 16, 2012, became effective on April 16, 2012.

The Authority estimates that without the conversion of its oil fired generating capacity to natural gas, it will be required to install MACT to comply with MATS. The MACT for these units could consist of various retrofitted emission control systems, such as filter baghouses, wet or dry electric precipitators and flue gas desulfurization equipment associated with ancillary systems. The Authority would have until April 16, 2015, unless granted deadline extensions as provided by law, to install, test and operate the MACT. Therefore, the Authority determined that in order to comply with MATS, it will have to convert some of its existing generating units to burn natural gas. If the Authority were not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it would need to make significant capital investments to control emissions in order to comply with MATS without being able to offset these costs with any cost savings on the purchase of fuel.

The Authority has already converted the Costa Sur power plant generating units 5 and 6, which are expected to be in compliance with MATS by the initial compliance date of April 16, 2015. According to MATS, EGU's owners and operators can request a one-year extension from PREQB for control equipment installation purposes. Owners and operators can also request a second one-year extension from the EPA for those units that are determined to be critical to the reliability of the electrical system based on the EPA's December 2011 Enforcement Policy for Use of Clean Air Act Section 113(a) Administrative Orders in Relation to Electric Reliability and the Mercury and Air Toxics Standard. In order to obtain this extension, an early notice of compliance plan must be filed with PREQB.

On April 16, 2013, the Authority submitted a MATS Early Notice Compliance Plan to the Planning Authority (the Puerto Rico's Planning Board), the PREQB and the EPA as part of the process of pursuing a second, one-year extension for the Palo Seco (units 3 and 4) and San Juan (units 9 and 10) power plants. Compliance dates for these units with MATS requirements are subject to the natural gas delivery infrastructure that needs to be developed and implemented by the beginning of the second quarter of 2017. According to the plan, the Aguirre power plant units 1 and 2 are expected to be in compliance by the first quarter of 2016, for which the Authority will only seek a one-year extension with the PREQB. The plan also states the Authority's intent to declare some of the Costa Sur (units 3 and 4), San Juan (units 7 and 8) and Palo Seco (units 1 and 2) units as LULOF's, since retrofitting efforts to convert these units would not be cost effective based on their power generation capacity and reduced efficiency.

*GHG Regulations*

On April 2, 2007, the U.S. Supreme Court (the "Court") issued a CAA decision in <u>Massachusetts v. Environmental Protection Agency</u>, 549 U.S. 497 (2007) concluding that GHG meet the CAA definition of an air pollutant and are subject to regulation under the CAA.  More specifically, the Court found that the CAA authorizes the EPA to regulate tailpipe greenhouse gas emissions if the EPA determines they cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. The Court remanded the case to the EPA to make such an "endangerment determination," which is the statutory prerequisite to authorizing regulations.

In response to the decision, on July 30, 2008, the EPA issued an Advance Notice of Proposed Rulemaking titled "Regulating Greenhouse Gases under the Clean Air Act." This Advance Notice sought comments regarding GHG regulation under the CAA. The Advance Notice also suggested that the EPA in the future would consider using an existing provision of the CAA to impose energy efficiency standards on electric generating units to reduce greenhouse gases. The comment period closed in November 28, 2008, with parties filing thousands of comments both in favor of and opposed to using the CAA as a tool to address GHG. Many parties filed comments that supported comprehensive climate change regulation such as cap and trade to address GHG, but opposed the EPA regulation under the existing CAA due to the unavoidable adverse consequences of using the CAA to regulate GHG. On April 17, 2009, the EPA, in response to the Massachusetts decision, issued proposed "endangerment" and "cause or contribute" findings for greenhouse gases under Section 202(a) of the CAA. On May 19, 2009, the EPA issued a notice of intent to regulate GHG emissions for cars and trucks under Section 202 of the CAA, following up on the Massachusetts decision discussed above.

On September 15, 2009, the EPA and the Department of Transportation's National Highway Safety Administration proposed a national program to reduce GHG emissions and improve fuel economy for new cars and trucks sold in the United States. On September 30, 2009, the EPA proposed new thresholds for GHG emissions that define when CAA permits under the NSR and Title V operating permits programs would be required. According to the EPA, the proposed thresholds would tailor these permit programs to limit which facilities would be required to obtain permits and would cover nearly 70% of the nation's largest stationary source GHG emitters, including power plants, refineries, and cement production facilities, while shielding small businesses and farms from permitting requirements.

Subsequently, the EPA issued a number of rulemakings and announcements to lay a potential framework for GHG regulation under the CAA and future legislation.  On October 30, 2009, the EPA issued a final rule requiring mandatory monitoring in 2010 and reporting of GHG emissions beginning in 2011 for virtually all industrial source categories across the country.  This final rule does not require control of GHG, rather it requires only that sources above certain threshold levels monitor and report emissions. Additionally, the EPA stated that this rulemaking does not indicate that the agency has made any final decisions on pending actions. The EPA stated that the mandatory GHG reporting program will provide the agency, other government agencies, and outside stakeholders with economy-wide data on facility-level (and in some cases corporate-level) GHG emissions, which should assist in future policy development.

On December 7, 2009, the EPA issued the final "endangerment" and "cause or contribute" findings regarding GHG under Section 202(a) of the CAA. The EPA received several Petitions for Reconsideration of the Endangerment and Cause or Contribute Findings. Although the findings did not themselves impose any requirements on industry or other entities, this action was a prerequisite to finalizing the EPA's proposed GHG emission standards for light-duty vehicles, which the EPA proposed in a joint proposal, including the Department of Transportation's proposed standards on September 15, 2009.  On April 1, 2010, EPA and the Department of Transportation's National Highway Safety

Administration issued the first national rule limiting GHG emissions from cars and light trucks. The requirements of this rule took effect on January 2, 2011.

On May 29, 2010, the EPA completed its reconsideration of a memorandum of December 18, 2009, entitled "EPA's interpretation of regulations that determine pollutants covered by the federal PSD program." In this action, the EPA confirmed that any new pollutant that the EPA may regulate becomes covered under the PSD program on the date when the EPA rule regulating that new pollutant takes effect. Accordingly, EPA clarified that the compliance date for GHG was January 2, 2011 when the rule applicable to mobile sources took effect.

On May 13, 2010, the EPA issued a final rule setting thresholds for GHG emissions that define when permits under the NSR-PSD and Title V operating permit programs are required for new and existing facilities. This final rule "tailors" the requirements of these CAA permitting programs to limit which facilities will be required to obtain PSD and Title V operating permits, and is known as the "tailoring rule". Under this rule, the following dates and limits will apply:

1)    January 2, 2011 through June 30, 2011: Existing PSD sources undertaking projects that will increase GHG emissions in excess of 75,000 tons per year will be subject to the PSD review for GHG and would require implementation of the Best Available Control Technology ("BACT") for the emission source. In a similar manner, existing Title V sources will be subjected to Title V requirements for GHG if a project exceeds 75,000 tons per year.

2)    July 1, 2011 through June 30, 2013: In addition to step one above, any source that undertakes a new project that exceeds 100,000 tons per year of GHG emissions will be subject to PSD and Title V requirements.

On April 13, 2012, the EPA issued a proposed rule setting new source performance standards ("NSPS") for GHG emissions for new affected fossil-fuel EGUs. The proposed requirements are strictly limited to new sources, would require new fossil fuel-fired EGUs greater than 25 megawatt electric (MWe) to meet an output-based standard of 1,000 pounds of $CO_2$ per megawatt-hour (lbm $CO_2$/MWh), based on the performance of widely used natural gas combined cycle ("NGCC") technology. The EPA is not proposing standards of performance for existing EGUs whose $CO_2$ emissions increase as a result of installation of pollution controls for conventional pollutants. Existing EGUs will require the revisions of state plans (SIPs) to establish emission guidance instead of emission limitations

In connection with the EPA rule requiring GHG's reporting, in March 2013, the GHG's Mandatory Report Year 2012 was submitted via electronic submission to EPA. The report contains the General Stationary Fuel Combustion Sources section (Subpart C of the rule) emission report for all of the Authority's electric power plants and the Electric Transmission and Distribution Equipment section (Subpart DD) which includes emissions of sulfur hexafluoride from electric power sources.

As for the "tailoring rule," at this moment, the Authority believes that this rule may require taking measures to reduce GHG emissions, but it is still evaluating the extent of such reductions. One of the alternatives identified to achieve this reduction is the installation of carbon sequestration technology, but this technology does not appear to be feasible for the Authority. In addition, as a result of this rule, the Authority may have to conduct an evaluation of impacts to endangered species, which could potentially require a formal consultation under Section 7 of the Endangered Species Act. The Authority is currently evaluating the extent of this evaluation, if any.

In light of the costs associated with carbon reduction technologies, the Authority believes that the best alternative to achieve lower GHG emissions, as well as to comply with the MATS regulation, is the conversion of some of its existing units to burn natural gas, thereby reducing the use of fuel oil. If the Authority is not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it may need to make significant capital investments to control GHG emissions without being able to offset these costs with any costs savings on the purchase of fuel.

On a related matter, in the spring and summer of 2009 the U.S. House Energy and Commerce Committee advanced a comprehensive climate change bill that would impose economy-wide cap and trade on virtually all industrial sectors, including electricity generation. The Energy and Commerce Committee approved H.R. 2454 on May 21, 2009, and the full House of Representatives passed H.R. 2454 on June 26, 2009. H.R. 2454 would have required existing coal-fired power plants to obtain "allowances" for each ton of GHG emissions, and thus effectively create a "price of carbon." The number of available allowances would have been decreased over future years, increasing the price. It is generally understood that newer facilities that are more energy efficient or which are adaptable to a mix of various conventional and alternative fuels as well as carbon capture and sequestration, will be at a competitive advantage in a cap and trade framework compared to less efficient facilities. Further, H.R. 2454 would have preempted much of, but not all of, the EPA's authority to regulate GHG emission from coal-fired power plants under the CAA. Despite the approval of H.R. 2454 by the House, this bill was never passed into law. Although this bill was not enacted into law, the possibility exists that the United States Congress may decide in the future to enact legislation addressing GHG. At this time, it is not entirely clear what the level of future regulation of these emissions will be, or the costs associated with it.

On June 25, 2013, the President of the United States issued a Climate Action Plan. The Plan proposes to cut carbon pollution in the United States, prepare the nation for the impacts of climate change, and lead international efforts to combat global climate change. The President instructed the EPA to issue standards, regulations, or guidelines to address carbon pollution from modified, reconstructed, and existing power plants and build on local efforts to move toward a cleaner power sector. As proposed, the EPA is requested to (1) issue proposed carbon pollution standards by no later than June 1, 2014; (2) issue final standards, by no later than June 1, 2015; and (3) include in the guidelines addressing existing power plants a requirement that States submit to EPA the implementation plans required under section 111(d) of the Clean Air Act and its implementing regulations by no later than June 30, 2016. As of the date of this Official Statement, it is uncertain what the proposed or final GHG emission limits will be. The Authority, as well as other affected utilities, will be following very closely the development of these orders and the impact to its generating units.

*Water Quality Compliance*

The CWA is a comprehensive federal law governing water pollution. Section 301 of the CWA prohibits the discharge of pollutants, including thermal discharges, from point sources (which include any discrete conveyances from industrial facilities) into waters of the United States (which includes bodies of water in Puerto Rico), except as authorized under the National Pollutant Discharge Elimination System ("NPDES") permit program. Although EPA may delegate the NPDES permitting program authority to the States, EPA has retained this authority in Puerto Rico. However, the PREQB is the regulatory agency responsible for issuance of water quality certificates, which are incorporated to the final NPDES permits by the EPA.

With respect to water thermal discharges, Section 316(a) of the CWA authorizes EPA to establish effluent limitations for these types of discharges. In addition, Section 316(b) of the CWA requires that NPDES permits for cooling water intake structures ensure that the location, design, construction, and capacity of these structures reflect the best technology available to minimize adverse environmental impacts, which include the impingement and entrainment of fish and egg larvae. As mentioned, impingement refers to the killing of these aquatic organisms by being pinned against intake screens and other parts of the facility, and entrainment refers to the killing of these aquatic organisms by being sucked into the cooling water structures.

The Authority's power plants have discharges associated with their process water systems, cooling water systems and storm water discharges. For these discharges, the Authority's power plants have to comply with NPDES permits and their limits under the CWA. The Authority holds NPDES permits under the CWA for all of its power plants, which are currently in effect or under renewal within the applicable regulatory renewal period, which affords continued coverage under applicable regulations.

Under the Consent Decree with EPA, dated March 19, 1999, the Authority was required to abate water pollution at its four (4) major power plants (Aguirre, San Juan, Costa Sur, and Palo Seco) by implementing certain upgrades and modifications to the discharges of these power plants. The Authority has completed the compliance plans for abating water pollution at all of the mentioned plants, according to the Consent Decree stipulations and requirements.

Section 316(a) of the CWA allows EPA to impose alternative effluent limitations for the control of the thermal component of a discharge (in other words, a thermal variance from the otherwise applicable effluent limit). According to EPA regulations, in order to get a thermal variance, a permit holder must demonstrate that the otherwise applicable thermal discharge effluent limit is more stringent than necessary to assure the protection and propagation of the water body's balanced, indigenous population of shellfish, fish and wildlife. The Authority requested EPA to grant a thermal variance under Section 316(a) for the San Juan power plant. The EPA granted this request and incorporated the alternate temperature limit in this power plant's NPDES permit, which permit has an effective date of April 1, 2007.

The EPA also included, as a compliance requirement for the San Juan power plant NPDES permit, the performance of thermal plume studies and a biological monitoring program under Section 316(a) of the CWA. The EPA also requested the performance of a Comprehensive Demonstration Study (CDS) under Section 316(b) of the CWA, which requires complying with performance standards for entrainment and impingement at the power plant's cooling water intake water structures. On March 13, 2010, the Authority submitted the plans for the thermal plume study and the biological monitoring program to the EPA and is currently waiting for its approval. On March 31, 2008, the Authority submitted an *Impingement and Entrainment Characterization Study and Current Status Report* for the EPA's evaluation. The Authority also submitted a *Post-Repowering Verification Study Work Plan* on June 30, 2008. The Authority is waiting for the EPA's approval of such plans in order to perform the thermal plume studies and biological monitoring program. In general, the Authority is up to date in meeting the requirements of this NPDES permit.

With respect to the Costa Sur power plant, the renewed NPDES permit issued by EPA in 2009 requires the Authority to construct an offshore outfall discharge pipe so that the thermal discharges can mix with the ocean's cooler waters in the Guayanilla Bay in order to meet temperature water quality standards. The current outfall pipe discharges into a cove at the shoreline. The permit requires the Authority to submit progress reports every six (6) months, and to meet a compliance schedule with interim effluent limits and several interim milestones that must be met during the period leading to the construction of the new discharge pipe. The estimated capital cost for this project is approximately $60

million.   The Authority is also required to develop a construction mitigation plan to minimize environmental impacts during the construction of the new discharge pipe.  The permit further requires that the location design, construction, and capacity of the cooling water intake structure reflects the best technology available to minimize adverse environmental impacts, which includes compliance with impingement and entrainment performance standards to reduce biota mortality, as per Section 316(b) of the CWA.  The Authority already performed some operational measures at the Costa Sur power plant to reduce impingement and entrainment, such as increasing the condenser circulating water traveling screens rotation and reducing the screen wash operation pressure.  The Authority is also in the process of designing improvements to the fish return system of the screen wash wastewater discharge.

As per the Costa Sur power plant's NPDES permit, the Authority is required to perform a Detailed Engineering and Environmental Review ("DEER") of the alternatives available for the cooling water discharge that meets the water temperature standard or otherwise qualifies for a waiver request under Section 316(a) of the CWA.  In addition, in accordance with the compliance schedule, the Authority submitted a Draft Environmental Impact Statement ("DEIS") for the cooling water discharge alternatives to the Puerto Rico Permits Management Office in October 2011.  From the findings in the DEIS, the Authority selected the alternative with the least environmental impact, consisting of the reduction of the cooling water temperature to a range of 96° to 98° by restoring some of the Guayanilla Bay historic flow and improving the Costa Sur generating units 5 and 6 condensers.  The DEIS will be subject to the comments of federal and local agencies.  The estimated capital cost of the selected alternative is approximately $7 million.  The completion of these Costa Sur projects is not expected until fiscal year 2018.  In January 2013, the Authority submitted the final environmental assessment for the cooling water discharge temperature reduction alternative to the Puerto Rico Permits Office.  The Authority is in compliance with the requirements of the compliance plan for this power plant.

The Authority submitted to the EPA a Low Impact Demonstration for a Section 316(a) variance for the cooling water discharge at the Palo Seco power plant.  The Authority also submitted an Intermittent Flow Application to the PREQB under the agency's water quality regulations and is negotiating with the PREQB and the EPA to include a temperature limit to the water quality certificate for the cooling water discharge in compliance with the Section 316(a) thermal variance requirements.

On February 24, 2011, the EPA issued an Administrative Compliance Order (CWA-02-2010-3119) against the Authority regarding the alleged noncompliance with effluent limitations in the San Juan power plant's NPDES, which is primarily related to nickel, copper, mercury, fecal coliforms and flow parameter limits.  The Administrative Compliance Order requires the Authority to submit to the EPA a compliance plan to achieve compliance with the alleged violations and to implement it within 180 days from the date of entry of the Order.  The Authority submitted the required compliance plan and completed all actions required under the plan.  Although the Authority has achieved improvements in the compliance record for this power plant for fiscal year 2012, certain deviations from the effluent limitations for Outfalls 002 and 003 have occurred.  In order to address this situation, the Authority is in a procurement process for the installation of an advanced treatment technology in order to convert the discharges of these outfalls into storm water discharges only.  The Authority has notified EPA about the proposed actions and does not anticipate additional enforcement action related to the Administrative Compliance Order.  As of this date, the EPA has not assessed any penalties against the Authority related to this matter.

As of December 2011, the Authority has achieved a level of compliance with CWA regulations (NPDES permits, Drinking Water Act program, Oil Pollution Act (FRP and operations manual), and SPCC regulations) in excess of 99%.

*Proposed Regulation under the CWA*

Pursuant to consent decrees with other environmental organizations, the EPA has issued past rulemaking under Section 316(b) of the CWA in three (3) phases. Existing large electric generating utilities were addressed in the Phase II rulemaking, finalized in February 2004. Existing small electric generating units and all manufacturing facilities were addressed in the Phase III rulemaking, finalized in June 2006. However, the Phase II rulemaking and a portion of the Phase III rulemaking were subject to a legal challenge and remanded to EPA for reconsideration. As a result, on April 20, 2011, EPA published a new draft rule pertaining to Section 316(b) of the CWA. Compliance with this rule is established in reference to the date of issuance of the final rule. According to the terms of a settlement agreement, EPA was required to sign the final rule by July 27, 2012. The final rule was not signed by EPA at the proposed date. EPA has signed an agreement with Riverkeeper (the "Third Amendment") and expects to finish the rule by November 4, 2013. Therefore, the compliance date with the rule is anticipated to occur at some time after that date.

The new proposed regulation has three (3) components. First, existing facilities that withdraw at least 25 percent of their water from an adjacent body of water exclusively for cooling purposes and have a design intake flow of greater than 2 million gallons per day would be subject to an upper limit on fish impingement. In order to comply with this requirement, the facility was given the option of choosing technologies that would be best suited to address the problem or reduce its cooling water intake velocity to 0.5 feet per second. Second, existing facilities that withdraw very large amounts of water (at least 125 million gallons per day) would be required to conduct studies to help their permitting authority determine the site-specific controls, if any, would be required to reduce the number of aquatic organisms that are sucked into the cooling water systems, also known as entrainment. Third, new units that add electrical generation capacity at an existing facility would be required to add technology that is equivalent to closed-cycle cooling which may be achieved by integrating a closed-cycle system into the design of the new unit or making other design changes with equivalent results.

The Authority has a proposal to implement an impingement and entrainment control technology at the Costa Sur power plant consisting of the installation of aquatic filter barriers. This includes the verification sampling for impingement and entrainment. On June 1, 2011, the Authority prepared and submitted to EPA a Plan of Action ("POA") for the Costa Sur power plants. The POA will recommend steps for impingement and entrainment reduction. Based on the steps that have been and will be taken, the Authority understands that it will be able to comply with the existing NPDES permit conditions.

*Underground Injection Control Regulation*

EPA regulations in 40 C.F.R. Parts 144 to 147 establish requirements governing the protection of ground water. In accordance with these requirements, EPA regulates the construction, operation, permitting, and closure of underground injection control facilities. These consist of injection wells used to place fluids underground for storage or disposal. This implementation and enforcement of this regulatory program was delegated to the PREQB, who has issued regulations governing these types of well referred to as underground injection control facilities.

The Authority has septic systems installed for sanitary discharges for which it does not have underground injection control permits. The Authority prepared a compliance plan to achieve compliance with PREQB's underground injection control regulations, which plan was approved by PREQB. The compliance plan provides for the closure of 39 septic systems located in different power plants. The schedule for closure is tied to the completion of connections to PRASA's sewer system. As of December 2009, the Authority has completed the connection of sanitary discharges to PRASA's system at the San Juan, Aguirre and Palo Seco power plants. The Costa Sur power plant's sanitary discharge system was

connected to PRASA's system at the beginning of fiscal year 2010. As a result, the Authority is currently engaged in the closing of septic tanks at all of its power plants and is in the process of sampling and analyzing the septic systems at Aguirre, San Juan and Palo Seco. The Authority has completed the sampling activities at the Aguirre and San Juan power plants. The analysis reports were submitted to the PREQB for its review and approval prior to beginning of the closure activities. The Authority is in compliance with the requirements of the compliance plan approved by the PREQB.

*Spill Prevention Control and Countermeasures Plan*

Under Section 311 of the CWA, EPA has issued regulations setting requirements for the prevention, preparedness, and response to oil discharges at specific non-transportation related facilities. To prevent oil from reaching navigable waters and adjoining shorelines, as well as to contain discharges of oil, the regulation requires these facilities to develop and implement SPCC Plans and establish procedures, methods and equipment requirements. Some facilities are also required to implement Facility Response Plans ("FRP") depending on the fuel storage capacity and risk of harm to navigable waters and the extent of risk they represent with respect to an oil spill to a body of water.

Pursuant to the terms of the Consent Decree, the Authority was required to implement a Spill Prevention Maintenance and Construction Program ("SPMCP"). This program included major overhauls to dikes and fuel tanks. As of December 2009, the Authority completed all compliance projects under the SPMCP of the Consent Decree, in accordance with the established scope of work.

The Authority has a program to comply with new SPCC requirements that became effective on November 10, 2011 and addresses the containment of potential leakage from oil containing electrical equipment in its distribution substations. The Authority has already implemented the monitoring and inspection requirements under these new regulations (40 C.F.R. §112.7(k)). Notwithstanding the foregoing, during fiscal year 2011, the Authority completed the installation of spill response material at all its substations. In addition, it completed the construction of secondary containments at 36 of the 54 substations located near bodies of water. The Authority has budgeted $1.5 million for the completion of this program.

*Hazardous Substances and Wastes*

The Authority's operations are regulated or impacted by various federal and state laws related to the handling and disposal of hazardous substances and wastes, including petroleum and related substances.

The Oil Pollution Act ("OPA") imposes substantial penalties for oil or EPA listed hazardous substance spills into bodies of water and for the failure to report such spills. In addition, OPA imposes strict liability on certain responsible parties for the cleanup of oil spills in bodies of water. On the other hand, CERCLA also imposes strict liability to certain potentially responsible parties for damages and remedial action related to contamination caused by hazardous substances. Under CERCLA, liability can be imposed on any generator of hazardous substances who has arranged for disposal or treatment at the affected facility. As such, potentially responsible parties can be held liable for cleanup costs associated with EPA's Superfund actions.

CERCLA provides for reporting requirements to cover the release of hazardous substances into the environment, including water, soil and air. When these substances are processed, stored, or handled, reasonable and prudent measures must be employed to prevent a release to the environment. In addition, pursuant to the Toxic Substances Control Act ("TSCA"), EPA has issued regulations imposing stringent requirements for labeling, handling, storing and disposing of PCBs and the associated equipment. There are regulations governing PCBs notification and documentation, restrictions on disposal of drained electrical equipment, spill cleanup, and recordkeeping requirements, among others.

Under CERCLA, the EPCRA entities that store or manage hazardous chemicals in specified quantities must comply with a program of emergency planning and a community right-to-know plan designed to inform the public about routine chemical hazards present at the facilities. Both programs have stringent enforcement provisions. Among other things, EPCRA requires reporting of hazardous chemicals by means of Tier I and/or Tier II reports that are annually filed with EPA and other public entities.

Pursuant to the Resource Conservation and Recovery Act ("RCRA"), the EPA has the authority to control hazardous waste from the "cradle-to-grave." perspective. This includes the generation, transportation, treatment, storage, and disposal of hazardous waste. RCRA also set forth a framework for the management of non-hazardous solid wastes, and includes provisions that enable EPA to address environmental problems that could result from underground tanks storing petroleum and other hazardous substances. Certain waste, including used boiler cleaning solutions, waste solvents and certain waste oils generated by the Authority may be considered hazardous wastes under RCRA.

*Hazardous Chemicals Reporting*

The Consent Decree required the Authority to submit past due Tier I or Tier II reporting for hazardous chemicals and to continue to file these reports as required by EPCRA. The Authority met these requirements and is currently in compliance with Tier II reporting requirements.

*PCB Program*

In 2000, the Authority completed a ten-year EPA-mandated program to sample and analyze the oil used in its oil-filled transformers and other equipment in order to identify and properly dispose of such PCB equipment. Pursuant to this program, the Authority has completed the replacement and disposal of transformers with PCB concentrations of more than 500 ppm. The Authority continues with the replacement and disposal of transformers with PCB concentrations between 50 and 499 ppm.

*Asbestos Abatement*

The Authority identified asbestos containing materials ("ACM") in the insulation used on its power plants, specifically at generating units, control rooms, mezzanines, warehouses, administrative buildings, auxiliary equipment and pipelines. ACM is regulated under the solid waste regulations, as well as air quality control regulations, due to its potential to emit harmful particles into the atmosphere. The Authority has developed and runs an ACM removal program, which provides for the encapsulation or removal of ACM, on an ongoing basis, to reduce the risk of exposure. The Authority is in compliance with this program, and continues to work to gradually remove all ACM from its facilities, given that most ACM can only be removed when generating units are taken out of service for maintenance repairs and other activities.

*Underground Storage Tank Regulations*

Pursuant to RCRA, EPA has issued regulations establishing standards and corrective action requirements applicable to underground storage tanks ("USTs") that store regulated materials, including petroleum and related substances. PREQB has issued regulations similar to the federal requirements and has been delegated the implementation of this program.  These regulations establish requirements governing registration and operation of USTs, as well as the related recordkeeping, among other things. As previously mentioned, the Consent Decree required the Authority to ensure that all closed USTs at its facilities meet the applicable UST closure requirements.  The Authority has met these requirements as stipulated under the Consent Decree. The Authority understands that all of the Authority's USTs that are currently in use are in compliance with applicable UST requirements.

*Homeland Security*

The Department of Homeland Security ("DHS") has promulgated regulations under the Homeland Security Act of 2002 relating to anti-terrorism standards at major industrial facilities. Facilities that store or process chemicals in quantities exceeding established thresholds must submit a screening assessment to the DHS. Based on these assessments, the DHS may impose additional requirements, including a screening vulnerability assessment and a Site Security Plan.

The following Authority generation facilities are subject to the requirements of the Homeland Security Act of 2002 and DHS regulations: San Juan Generation Complex, Aguirre Generation Complex, Palo Seco Power Plant, Cambalache Power Plant, and Mayaguez Mayagüez Power Plant.  As required by law, these generation facilities are supervised by the US Coast Guard and each one has a designated security officer and a facility security plan.

DHS has also recommended that these Authority generation facilities participate in the Site Assistance Visits program.  The Authority has currently scheduled a visit to one of the generation facilities located in Puerto Rico's southern region (i.e., Costa Sur Power Plant or Aguirre Generation Complex). The Authority is also planning to schedule Site Assistance Visits to the Palo Seco Power Plan and the San Juan Generation Complex, subject to the availability of DHS resources.  No other requirements have been imposed by the DHS on the Authority or its generation facilities.

*Capital Improvement Program*

The Authority's capital improvement program for the fiscal year which ended June 30, 2013 included $8.1 million in order to comply with existing Commonwealth and federal environmental laws and regulations, including the Costa Sur power plant related projects in compliance with the CWA Sections 316(a) and 316(b) previously discussed.  Actual expenditures for the 2013 fiscal year totaled approximately $2.1 million. The Authority's five-year capital improvement program for fiscal years 2014 through 2018 identifies environmental projects valued at $62.8 million.  During fiscal year 2014, approximately $12.6 million is budgeted for environmental projects.  Approximately one eighth of the 2014 budget is dedicated to asbestos abatement, $1.3 million is budgeted for effluent tank construction at the San Juan power plant, $5 million is budgeted for the CWA Section 316 projects at the Costa Sur power plant, $1 million is budgeted for the NPDES compliance program at the San Juan power plant, $1 million is budgeted for the continuous emissions monitoring systems and $1 million is budgeted for the SPCC compliance program.  The Costa Sur power plant Section 316 projects are budgeted to cost $27 million over five years ending in fiscal year 2018. The Authority believes it is taking the necessary steps to comply with all applicable environmental laws and regulations and the terms of the Consent Decree requirements, as discussed above.

# INSURANCE

## Coverage

The Authority maintains, among others, insurance policies covering all-risk property (excluding overhead transmission and distribution lines), boiler and machinery and public liability. The combined insurance coverage of property and boiler and machinery policies is $750 million, consisting of a maximum of $200 million under the all-risk property insurance policy, $200 million under the boiler and machinery insurance policy, an excess layer of $100 million under an all-risk and boiler and machinery insurance policy and $250 million under an excess property policy.

The policies' deductible in case of earthquake losses is $25 million, $45 million in the case of windstorm losses, and $2 million for all other covered risks. The Authority retained $7.5 million of the first $25 million of all covered risks. The boiler and machinery insurance policy has a $10 million deductible.

The proceeds of the all-risk property and boiler and machinery policies are used prior to drawing upon the Reserve Maintenance Fund or the Self-insurance Fund established under the Trust Agreement.

The Authority's business interruption insurance covers up to $200 million, with the Authority covering the costs of the first 30 days. The Self-insurance Fund can be used to pay insurance policies deductibles under these policies.

The general liability policy covers property damage and bodily injury to third parties with a $75 million aggregate limit in excess of the self-retention limit of $1 million per occurrence. The general liability policy has a $1 million deductible per occurrence with a $3 million aggregate.

As with all electric utilities located on the east coast of the United States, the Authority's transmission and distribution facilities are susceptible to adverse weather conditions, such as hurricanes. The Authority is currently self-insured with respect to property damage for its transmission and distribution systems, as are most U.S. utilities. While the Authority and the Consulting Engineers believe that the Authority's reserves are generally sufficient, there can be no assurance that the Authority will be able to provide adequate coverage for damage that might be incurred as a result of any future adverse weather conditions.

In the Authority's opinion, its insurance coverage adequately protects it against property damage or bodily injury resulting from the possession, operation and maintenance of the System.

The State Insurance Fund, a Commonwealth agency which provides worker's compensation insurance, is funded by mandatory contributions from the Authority.

## Self-insurance Fund

The Authority has supplemented the Trust Agreement to create a Self-insurance Fund, which is funded from Net Revenues (after deposits to the Sinking Fund and the Reserve Maintenance Fund) in the amounts recommended from time to time by the Consulting Engineers. The Authority has no obligation to make deposits to, or to replenish, the Self-insurance Fund in the event of withdrawals therefrom, except to the extent recommended by the Consulting Engineers. Amounts on deposit in the Self-insurance Fund are also available for the payment of principal of and interest on the Power Revenue Bonds. As of June 30, 2013, approximately $91.9 million was on deposit in the Self-Insurance Fund. See "Disposition of

Revenues" under Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Fire Prevention Program**

In an effort to reduce the Authority's risk profile, the Authority continually evaluates industry practices and implements programs geared towards minimizing the Authority's losses. As part of this effort, on March 25, 2010, the Authority implemented a fire prevention program with the principal goal of preventing and minimizing the risks of fire in its power generation plants and protecting the lives of its personnel and its property. The program integrates and standardizes actual fire prevention and protection protocols to safeguard the Authority's personnel and the power generation infrastructure, while having designated and competent staff at each facility. The program dynamically maintains and improves the fire protection equipment in the generating plants and includes on-going training of designated staff at each facility. The designated staff is responsible for the certification and maintenance of the fire protection systems located at the Authority's power plants, the compliance of the operational emergency plan, and coordinating resources for an immediate and effective response facing an emergency.

LABOR RELATIONS

The Authority has in effect collective bargaining agreements with four unions. The Authority believes that labor relations are stable. The Authority is currently honoring all collective bargaining agreements.

The collective bargaining agreement between the Authority and UITICE, the construction workers union representing 839 employees, expired on January 26, 2011. On April 18, 2013, the negotiations of the collective bargaining agreement ended and the agreement was ratified by UITICE's assembly of members. The collective bargaining agreement was approved by the Authority's Governing Board at its July 18, 2013 meeting and is expected to be signed on July 29, 2013. The term of this agreement is from January 27, 2011 until January 27, 2017.

The collective bargaining agreement between the Authority and UTIER, the operations and maintenance workers union representing 4,717 employees, expired on August 24, 2012. The collective bargaining agreement between the Authority and UEPI, the professional and technical workers union representing 360 employees, expired on December 13, 2010. In addition, the collective bargaining agreement between the Authority and UPAEE, the pilots workers union representing 6 employees, expired on July 2, 2010. The Authority is currently negotiating new agreements with all three unions. These negotiations are in advanced stages. All negotiations are proceeding in an orderly and constructive manner.

As of June 30, 2013, the Authority has 8,465 employees, of which 5,440 are employed in the generation, transmission and distribution directorates; 1,571 are employed in the customer service directorate, and the remaining employees are employed in the administrative directorates and other areas. In order to improve the productivity of its employees, the Authority has instituted various programs to reduce absenteeism, increase safety measures, and minimize the level of illegal drug abuse among its employees. In addition, the Authority continues to implement programs to provide both technical and supervisory training to its employees. The Authority believes that the implementation of these programs helps the Authority provide more reliable service to its clients.

86

## PENSION PLAN

The Employees' Retirement System of Puerto Rico Electric Power Authority (the "Retirement System"), a separate trust fund created by the Authority, administers the Authority's defined benefit pension plan, which provides employee retirement and death benefits. The pension plan provides for contributions by both the Authority, based on annual actuarial valuations, and the plan members. The most recent actuarial valuation was conducted as of June 30, 2012. As of June 30, 2012, the Retirement System had 17,579 members, consisting of 8,950 retirees currently receiving benefits, 29 terminated employees entitled to but not yet receiving benefits and approximately 8,500 active members. In addition, the Retirement System had 2,025 beneficiaries. The Authority's accrued liability contributions are determined based on a percentage of covered payroll recommended by the Retirement System's actuaries to liquidate the unfunded actuarial accrued liability over a 28-year period that commenced on June 30, 2012. Covered payroll includes all elements of compensation paid to active employees on which contributions to the Retirement System are made.

The contributions recorded by the Authority for fiscal years 2011 and 2012 were $85.3 million and $85.4 million, respectively. For fiscal years 2011 and 2012, the recorded contributions represented 23.80% and 23.86%, respectively, of covered payroll. The contributions recorded as of June 30, 2013 were $89.4 million (unaudited) and represent 25.78% of covered payroll. For fiscal year 2014, the Authority's contributions to the Retirement System will be approximately 29.29% of covered payroll. As of June 30, 2012, the present value of the Authority's future contributions on account of benefits was approximately $1.7 billion.

The table below shows the funding shortfalls for each of the last five fiscal years for the Retirement System.

### Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions | System Benefit Payments and Administrative Expenses | Net Funding Shortfall |
|---|---|---|---|
| Employees Retirement System | | | |
| 2008 | $112.1 | $(181.0) | $(68.9) |
| 2009 | $116.5 | $(190.6) | $(74.1) |
| 2010 | $106.8 | $(204.3) | $(97.5) |
| 2011 | $122.4 | $(198.6) | $(76.2) |
| 2012 | $123.5 | $(204.3) | $(80.8) |

Unfunded actuarial accrued liability to be borne entirely by the Authority was approximately $1.7 billion as of June 30, 2012. The actuarial valuation for fiscal year 2012 used a closed amortization period based on a level percent of pay, assumed an investment return of 8.5% per annum, a payroll growth rate of 4% per year, projected salary increases of 4.00% per year, an inflation rate of 3.0% per year, and a remaining amortization period of 28 years for the unfunded accrued liability.

The following table shows, for the five fiscal years ended June 30, 2012, the Retirement System's actuarial accrued liability, unfunded actuarial accrued liability, covered payroll and the ratio of the unfunded actuarial accrued liability to covered payroll.

| Fiscal Years Ending June 30, | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability ("UAAL") | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|
| 2008 | 2,336,944,425 | 765,743,108 | 362,892,937 | 211.0% |
| 2009 | 2,497,639,122 | 980,288,838 | 364,402,800 | 269.0% |
| 2010 | 2,816,370,702 | 1,401,686,298 | 357,405,428 | 392.2% |
| 2011 | 2,875,438,109 | 1,512,637,608 | 361,198,851 | 418.8% |
| 2012 | 2,986,298,926 | 1,700,883,058 | 364,981,549 | 466.0% |

The following table shows, for the five fiscal years ended June 30, 2012, the Retirement System's actuarial value of assets and market value of assets and the historical funded ratios using the actuarial and market value of assets. A five-year smoothing of the market value of assets is used for actuarial valuation purposes. Thus, in a declining market, such as in 2009, 2010 and 2011, the actuarial value of assets exceeds the market value of assets as there are unsmoothed losses that are not yet reflected in the actuarial value of assets.

| Fiscal Years Ending June 30, | Actuarial Value of Assets | Market Value of Assets | Funded Ratio (actuarial value) | Funded Ratio (market value) |
|---|---|---|---|---|
| 2008 | 1,571,201,317 | 1,447,914,296 | 67.2% | 62.0% |
| 2009 | 1,517,350,284 | 1,130,683,460 | 60.8% | 45.3% |
| 2010 | 1,414,684,404 | 1,140,467,954 | 50.2% | 40.5% |
| 2011 | 1,362,800,501 | 1,286,583,761 | 47.4% | 44.7% |
| 2012 | 1,285,415,868 | 1,233,267,200 | 43.0% | 41.3% |

The increase in the ratio of the unfunded actuarial accrued liability to covered payroll for fiscal years 2009 and 2010 and the decrease in the funded ratios show deterioration in the financial strength of the Retirement System partly as a result of the effect on the Retirement System's investment portfolio of the general market decline during 2008, 2009 and 2010. During fiscal years 2011 and 2012, however, the Retirement System's investment portfolio had positive returns of approximately 20.4% and 2.9%, respectively. As a result of the plan's funded ratio and the funding shortfalls referred to above, and depending on the actual return on the plan's assets compared to the assumed return in the actuarial valuation, the Authority modifies its annual contribution to the plan in order for the plan to be able to keep making benefit payments at current levels on a long-term basis.

The Retirement System's financial statements are audited by a firm of independent public accountants that does not serve as independent accountants to the Authority.

## OTHER POST-EMPLOYMENT BENEFITS

In addition to the pension benefits, the Authority provides non-pension, post-employment benefits to retirees under a Healthcare Plan that consist of a fixed maximum monthly payment to cover medical expenses for retired employees meeting the service eligibility requirements. Based on this Plan's features, it is treated as a single-employer defined benefit healthcare plan. These benefits are funded by the Authority on a "pay-as-you-go basis," which means that there is no reserve or pool of assets against the benefit expenses that the Authority may incur in future years. The Authority paid $21.5 million and $23.3 million (unaudited) for these non-pension post-employment benefits for its eligible retirees for the fiscal years 2012 and 2013, respectively, which is included in administrative and general expenses.

In accordance with the provisions of GASB Statement No. 45, the Authority is required to quantify and disclose its obligations to pay non-pension post employment benefits to current and future retirees. The most recent actuarial valuation report for these benefits, as of July 1, 2010, reflects a UAAL of $612.7 million with respect to these benefits, and the funding ratio is 0% since, as mentioned previously, these benefits are funded on a "pay-as-you-go basis."

## LITIGATION

*General.*  The Authority is a defendant or codefendant in numerous legal proceedings pertaining to matters incidental to its business and typical for an electrical utility of its size and nature, including claims for damages due to electrified wires, failure to supply power and fluctuations in the power supply. Pursuant to the Act, the Authority is authorized to sue and be sued by individuals or legal entities.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors, executive directors and employees of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them.  There is no limitation on the amount of the judgment that may be paid under the provisions of Act No. 9 in cases before federal court, but in all other cases the Secretary of Justice of the Commonwealth may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.  Although the Authority's directors, executive director and employees are covered by the provisions of Act No. 9, Article 19 of Act No. 9 requires the Authority to cover the costs associated with judgments, expenses and attorneys' fees incurred by the Commonwealth in the legal representation of its directors, executive director and employees.  To the extent the Authority is unable to cover these costs and expenses, the Authority would be required to reimburse the Commonwealth from future revenues, as provided by the Secretary of the Treasury of the Commonwealth in consultation with the Authority's board of directors.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following paragraphs, as of June 30, 2013, the Authority has included in its financial statements reported liabilities of approximately $20.3 million for awarded and anticipated unfavorable judgments.  Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed against the Authority exceed $700 million; however, the ultimate liability cannot be presently determined.  The Authority believes that none of these cases, if decided against the Authority, would have a material adverse effect on the Authority's financial condition or operations.

*Abengoa Litigation.*  In May 2000, Abengoa, Puerto Rico, S.E., the Authority's original contractor for the construction of the new generating units (Units 5 and 6) at the San Juan power plant, unilaterally declared a termination of the contract and filed a complaint for breach of contract. The Authority filed a counterclaim for breach of contract and for all damages caused to the Authority by the contract termination. On September 21, 2007, the Regional Administrating Judge for the Superior Court of San Juan certified the case as complex civil litigation pursuant to the Authority's petition.  On July 27, 2011, Mr. Angel F. Rossy Garcia, a retired Commonwealth appeals court judge, was named as special master for the case.  After his appointment, the special master intervened as a neutral evaluator for purposes of assisting the parties in reaching a potential settlement.  The parties filed their respective position papers stating their legal contentions and case theories in August 2011.  After reviewing the position papers and meeting separately with each party to discuss the strength and weakness of their respective cases, the parties were unable to reach a settlement agreement.  The special master then determined that the contested issues would be resolved at trial and that the case would be bifurcated into two phases: a liability phase that would determine whether the termination was wrongful and a damages phase.

The special master has recited the actions to be taken before the final pretrial conference. Abengoa and the Authority have identified their preliminary list of witnesses expected to testify in the first phase of the trial on the issue of wrongful termination/breach of contract, including their respective experts.

89

The surety company, American International Insurance Company, now AIG Puerto Rico Insurance, has not yet announced their witnesses but has manifested its position that any special defenses to joint and several liability under the performance bond be litigated during the second phase, in the event the Authority prevails against Abengoa. This approach has not yet been agreed upon or determined by the special master.

The Authority understands that it has significant probabilities of prevailing on the merits of its counterclaim against Abengoa and the surety based on the evidence collected during the discovery and case evaluation. A status hearing was held on July 12, 2013. The parties must submit a Joint Pretrial Report by November 27, 2013. The Pretrial Conference is set for December 13, 2013.

In order to mitigate its possible losses, the Authority entered into an agreement with Washington Engineers P.S.C. for the completion of the generating units, said units having entered into service in 2009. Expert reports have been developed assessing potential damages to be recovered from Abengoa, including excess amounts billed to the Authority prior to the wrongful termination.

*Aguas Puras del Caribe Litigation.* In 2010, Aguas Puras del Caribe filed suit against the Authority alleging that the Authority negotiated in bad faith and created a reasonable expectation that the negotiation of a contract to provide certain of the Authority's generation facilities with demineralized water for a term of 25 years would lead to the execution of a final and binding agreement. Aguas Puras seeks damages of approximately $40 million. The case was voluntarily dismissed by plaintiff. Plaintiff and the Authority are currently in the process of engaging in extrajudicial settlement negotiations of plaintiff's claim.

*CAPECO Litigation.* In 2009, a large fire at a tank farm owned by CAPECO caused major damage to surrounding areas. The Authority stored some of its fuel at this facility. In the aftermath of the fire, numerous claims were filed against CAPECO. Some of the plaintiffs included the Authority as a defendant in these suits, alleging that the Authority failed in its duty (as the owner of fuel stored at the site) to properly monitor CAPECO's operations in the tank farm. All cases are in the initial stages and the Authority intends to vigorously defend against these claims. On August 12, 2010, CAPECO filed for bankruptcy. As a result thereof, all proceedings against CAPECO have been stayed. The proceedings against the Authority continue.

*Compute All, Inc. Litigation.* In 2008, Compute All, Inc. filed suit against the Authority, alleging breach of contract and damages due to the unlawful termination of a contract pursuant to which Compute All, Inc. would provide the Authority with a computer-based motor vehicle fleet management system, including global positioning system capabilities. Compute All seeks damages of $8.25 million plus the payment of expenses and attorneys' fees. The case is currently in the discovery stage. The Authority filed a motion for summary judgment arguing that plaintiff's allegations are time-barred, because they constitute a tort claim and not a contract claim. Plaintiff opposed the Authority's motion. The court scheduled a hearing for August 16, 2013 to hear arguments on these motions.

*Consumer Litigation.* In 2011, separate lawsuits were filed against the Authority by various consumers claiming damages allegedly caused by incorrect and unlawful billing and invoicing practices.

These lawsuits have been consolidated and certified as complex litigation, as requested by the Authority. The consumers are claiming damages in excess of $100 million and requested that the case be certified as a class action. The Authority filed its Reply in opposition to the class certification request.

Discovery proceedings have begun.

In 2011 a federal class action lawsuit was filed claiming that the Authority's rate schedules, including subsidies granted to various groups, violate federal antitrust law, specifically the Robinson-Patman Act, and the religious freedom clause of the First Amendment to the United States Constitution by discriminating against certain customers who are not entitled to subsidies and requiring certain customers to associate with persons of different religious or political views by subsidizing those views through the Authority's lower electric rates to such persons. The amount claimed is unspecified.

The Authority believes the claims are without merit because several elements of the Robinson-Patman Act that plaintiffs must prove do not exist in the Authority's case, including that it does not sell electricity in interstate commerce and because the Authority's subsidies are mandated by Commonwealth legislation rather than independent Authority actions.

Discovery proceedings have begun.

In 2011, a civil lawsuit was filed against the Authority and its directors in federal court in Puerto Rico, by eight private individuals and one local private corporation, claiming violations of the Racketeer Influenced and Corrupt Organizations Act (the "RICO Act"), including unlawful use of an enterprise to launder money generated by a pattern of racketeering activity, unlawfully acquiring or maintaining an interest in an enterprise through a pattern of racketeering activity, unlawful manipulation of an enterprise for purposes of engaging in, concealing, or benefiting from a pattern of racketeering activity, unlawful conspiracy to violate the RICO Act and conspiracy to advance a money-laundering scheme. Neither the United States federal government nor the Commonwealth government is a party in this civil lawsuit. The amount claimed is unspecified. Plaintiffs have also asked the federal court to allow them to be the representatives of a class consisting of all consumers of the electricity sold by the Authority from 2007 to the present. On September 25, 2012, the federal court dismissed all of the above claims except those claims regarding conspiracy to advance a money laundering scheme and conspiracy for acquiring an interest in an enterprise.

The federal court has not yet ruled on the issue of class certification. The Authority believes that class certification will not be granted because the grounds advanced by plaintiffs are the same as those made in a prior, unrelated Commonwealth court lawsuit against the Authority in which class certification was denied on facts very similar to those in this RICO Act lawsuit.

Discovery proceedings have begun.

The Authority believes that the undismissed RICO Act claims are without merit because the plaintiffs will be unable to prove the necessary elements of those claims, in particular those that require a showing that the Authority conspired through its employees to violate the RICO Act, or that its directors or Board members obtained any interest in the Authority (other than their board position).

*Power Technologies Corp. Litigation.* In 2008, Power Technologies Corp. filed suit against the Authority, alleging that the Authority had withdrawn from a contracting process for a new energy facility, in which Power Technologies was involved, without explanation or justification. Power Technologies seeks damages of $52.4 million. The case was voluntarily dismissed by plaintiff. Plaintiff and the Authority are currently in the process of engaging in extrajudicial settlement negotiations of plaintiff's claim.

*Vitol, Inc. Litigation.* In 2009, the Authority filed suit in Commonwealth court against Vitol, Inc. and certain of its affiliates and subsidiaries seeking a declaratory judgment as to the nullity of a $2 billion fuel supply agreement due to Vitol's failure to disclose certain corruption cases for which it accepted responsibility. Vitol removed this suit to federal court and presented a counterclaim alleging that the

Authority owed it approximately $45 million for delivered fuel and related excise taxes. Although the case is currently in the discovery stage, the court has stayed this process until such time as certain motions regarding forum selection have been resolved.

On November 28, 2012, the Authority filed a second complaint against Vitol in the Commonwealth Court of First Instance seeking essentially the same remedies sought in the first action but as to four other contracts, after discovery revealed the date in which Vitol learned of the investigations in the corruption cases. Vitol also removed this action to the U.S. District Court for the District of Puerto Rico. The Authority claims approximately $3.5 billion in the aggregate. Vitol has resolved the claim for the $17 million in excise taxes and has stated that it will amend its counterclaim to dismiss that claim. Discovery in the case is closed. The parties have submitted motions for summary judgment against each other and are in the process of filing their respective oppositions thereto.

*Ponce Landslide Litigation*. In 2007, 2008 and 2009, six cases were filed against the Authority, PRASA, and other entities alleging damages resulting from landslides in a neighborhood in Ponce. The complaints allege that the Authority caused or contributed to the landslides based on its construction of transmission lines in the area. In total, the six plaintiffs have claimed approximately $19.5 million in damages. These cases, which are in the discovery stage, have been stayed by the court due to the bankruptcy of PRASA's insurer. Once proceedings in this case resume, the Authority will continue with its vigorous defense.

*Asbestos Litigation*. In the case of Jorge Martínez, et al. v. AEE, fifty-five plaintiffs, former Authority employees, claim that they have health problems due to the Authority's intentional failure to comply with federal and local laws regarding asbestos materials. In particular, plaintiffs claim that, during a certain time-frame, in which the Authority had the obligation to take measures regarding asbestos materials in its facilities, the Authority failed to comply with its duty to protect the plaintiffs from asbestos exposure. Plaintiffs claim $320,960,000.00 in damages.

The Authority alleged employer's immunity but the courts held that a hearing on the merits of said defense was necessary before ruling on the matter of the Authority's alleged gross negligence. After the hearing as to the alleged negligence, held on several dates in July and August 2013, the Court requested that the parties submit legal briefs, which the parties are in the process of filing. If the Authority prevails on the employer immunity defense, the case will be dismissed. If the Authority does not prevail on said defense, the case will proceed to trial on negligence and damages as to every particular plaintiff.

*Environmental Litigation*. Among the cases currently pending, some deal with environmental issues. These are described above in *Environmental Litigation and Administrative Proceedings* under ENVIRONMENTAL MATTERS.

*Litigation Regarding the Bonds*. There is no pending litigation seeking to restrain or enjoin the sale of the Bonds or contesting or affecting the validity of the Bonds, the proceedings of the Authority taken with respect to the authorization, issuance or sale of the Bonds, or the pledge or application of any moneys under the Trust Agreement or the existence or powers of the Authority.

## TAX MATTERS

**Federal Income Taxes**

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which must continue to be satisfied after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of Issuance. The Authority has covenanted to comply with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds.

In the opinion of Bond Counsel, subject to continuing compliance by the Authority with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be includable in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. Interest on the Bonds will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. Bond Counsel expresses no opinion as to the effect of any change to any document pertaining to the Bonds or any action taken or not taken when such change is made or action is taken or not taken without its approval or in reliance upon the advice of counsel other than such firm with respect to the exclusion from gross income of the interest on the Bonds for federal income tax purposes. Bond Counsel is further of the opinion that under the provisions of the Acts of Congress now in force, the Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral tax consequences to certain taxpayers, including without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations doing business in the United States, certain S Corporations with excess passive income, individual recipients of Social Security or railroad retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax exempt obligations, and taxpayers eligible for the earned income tax credit.

The Code contains other provisions that could result in tax consequences, upon which Bond Counsel expresses no opinion, as a result of ownership of the Bonds or the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income. Ownership of tax exempt obligations such as the Bonds may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to the applicability and impact of any such collateral consequences.

**Original Issue Discount**

The excess, if any, of the amount payable at maturity of any maturity of the Bonds purchased as part of the initial public offering over the issue price thereof constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity of the Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. In general, the issue price of a maturity of the Bonds is the first price at which a substantial amount of Bonds of that maturity was sold

(excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest.  A purchaser's adjusted basis in a Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Discount Bonds for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability.  In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed herein. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of such substantially identical Bonds is sold to the public may be determined according to rules that differ from those described above.  An owner of a Discount Bond should consult his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount with respect to such Discount Bond and with respect to state, Commonwealth, and local tax consequences of owning and disposing of such Discount Bond.

**Bond Premium**

The excess, if any, of the tax basis of a Bond purchased as part of the initial public offering to a purchaser (other than a purchaser who holds such Bonds as inventory, stock in trade or for sale to clients in the ordinary course of business) over the amount payable at maturity of that Bond is "bond premium." Bond premium is amortized over the term of such Bond for federal income tax purposes (or, in the case of a bond with bond premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond). An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable bond premium attributable to each taxable year such Bond is held.  The amortizable bond premium on such Bond attributable to a taxable year is not deductible for federal income tax purposes; however, bond premium is treated as an offset to qualified stated interest received on such Bond.  Owners of such Bonds should consult their tax advisors with respect to the determination for federal income tax purposes of the treatment of bond premium upon sale, redemption or other disposition of such Bonds and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Bonds.

**Backup Withholding**

Interest paid on tax-exempt obligations will be subject to information reporting in a manner similar to interest paid on taxable obligations.  Although such reporting requirement does not, in and of itself, affect the excludability of interest on the Bonds from gross income for federal income tax purposes, such reporting requirement causes the payment of interest on the Bonds to be subject to backup withholding if such interest is paid to beneficial owners who (a) are not "exempt recipients," and (b) either fail to provide certain identifying information (such as the beneficial owner's taxpayer identification number) in the required manner or have been identified by the IRS as having failed to report all interest and dividends required to be shown on their income tax returns.  Generally, individuals are not exempt

recipients, whereas corporations and certain other entities generally are exempt recipients. Amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's federal income tax liability provided the required information is furnished to the IRS.

### Future Developments

Future or pending legislative proposals, if enacted, regulations, rulings or court decisions may cause interest on the Bonds to be subject, directly or indirectly, to federal income taxation or to State, Commonwealth or local income taxation, or may otherwise prevent beneficial owners from realizing the full current benefit of the tax status of such interest. Legislation or regulatory actions and future or pending proposals may also affect the economic value of the federal, state, Commonwealth or local tax exemption or the market value of the Bonds. Prospective purchasers of the Bonds should consult their tax advisors regarding any future, pending or proposed tax legislation, regulations, rulings or litigation as to which Bond Counsel expresses no opinion.

For example, various proposals have been made in Congress and by the President (the "Proposed Legislation"), which, if enacted, would subject interest on bonds that is otherwise excludable from gross income for federal income tax purposes, including interest on the Bonds, to a tax payable by certain bondholders that are individuals, estates or trusts with adjusted gross income in excess of thresholds specified in the Proposed Legislation. It is unclear if the Proposed Legislation will be enacted, whether in its current or an amended form, or if other legislation that would subject interest on the Bonds to a tax or cause interest on the Bonds to be included in the computation of a tax, will be introduced or enacted. Prospective purchasers should consult their tax advisors as to the effect of the Proposed Legislation, if enacted, in its current form or as it may be amended, or such other legislation on their individual situations.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $4,305,117.34 from the initial public offering prices of such Bonds. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent. The Underwriters will be obligated to purchase all the Bonds, if any such Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed, from time to time, by the Underwriters. The Authority has agreed to indemnify the Underwriters, to the extent permitted by law, against certain liabilities, including liabilities under federal securities laws, or to contribute to payments that the Underwriters may be required to make in respect thereof.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Authority, Government Development Bank, the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit

default swaps) for their own account and for the accounts of their clients and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Authority, the Commonwealth and/or its instrumentalities.

Certain of the Underwriters have entered into distribution agreements with other Underwriters or certain broker-dealers (that have not been designated by the Authority as Underwriters) for the distribution of the Bonds at the original offering prices. Such agreements generally provide that the relevant Underwriter will share a portion of its underwriting compensation or selling concession with one or more of such broker-dealers.

## MATERIAL RELATIONSHIPS

URS Corporation serves as the Consulting Engineers to the Authority under the provisions of the Trust Agreement. The Authority entered into a professional services agreement with Washington Engineers P.S.C., an affiliate of URS Corporation, to provide services to the Authority in connection with the construction of the San Juan 5 and 6 combined cycle generating units completed during fiscal year 2009 and the restoration of the Palo Seco plant following the fires in December 2006.

Citibank, N.A., an affiliate of Citigroup, an underwriter of the Bonds, has provided to the Authority a revolving line of credit for the purchase of fuel oil and power with an approved maximum principal amount of $250 million as of June 30, 2013, of which $249.1 million was outstanding as of that date.

Scotiabank (for which Scotia MSD is a Separately Identifiable Division (SID)), an underwriter of the Bonds, is the Administrative Agent of a syndicate of banks that has provided to the Authority a revolving line of credit for the payment of working capital expenses, with an approved maximum amount of $500 million as of June 30, 2013. The commitment of Scotiabank in the line of credit is $200 million. Oriental Bank, an affiliate of Oriental Financial Services, an underwriter of the Bonds, had a commitment of $200 million in the same line of credit. Banco Popular de Puerto Rico ("BPPR"), an affiliate of Popular Securities, Inc., and Banco Santander, an affiliate of Santander Securities, both underwriters of the Bonds, each had a commitment in the amount of $50 million in the same line of credit. The outstanding balance of the line of credit was $495.2 million on June 30, 2013. Banco Santander terminated its commitment and participation in the line of credit on July 1, 2013. SEE DEBT.

Banco Popular de Puerto Rico ("BPPR"), an affiliate of Popular Securities, Inc., an underwriter of the Bonds, has another term loan to the Authority with an aggregate principal amount outstanding of $9.7 million as of June 30, 2013.

See also GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO.

## LEGAL MATTERS

The proposed form of opinion of Sidley Austin LLP, Bond Counsel, is set forth in Appendix IV to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank and its subsidiaries and affiliates.

## INDEPENDENT AUDITORS

The financial statements of the Authority as of and for the years ended June 30, 2012 and 2011 included in Appendix II hereto have been audited by Ernst & Young LLP, San Juan, Puerto Rico, independent auditors, as stated in their report appearing therein.

The prospective financial information included in this Official Statement has been prepared by, and is the responsibility of the management of the Authority. Ernst & Young LLP has neither examined nor compiled the accompanying prospective financial information, and accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto. The Ernst & Young LLP report for fiscal years 2012 and 2011 included in Appendix II to this Official Statement relates to the historical financial information of the Authority. Such report does not extend to the prospective financial information and should not be read to do so.

## RATINGS

The Bonds have been assigned ratings of "Baa3" (negative outlook) by Moody's Investors Service ("Moody's"), "BBB" (stable outlook) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and "BBB-" (stable outlook) by Fitch Ratings ("Fitch").

These ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies, if in the judgment of any or all, circumstances so warrant. Any such downward revision or withdrawal of either of such ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. The Trust Agreement does not include a covenant by the Authority to maintain a specific rating with respect to the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC, the Authority has covenanted in its resolution authorizing the issuance of the Bonds for the benefit of the Beneficial Owners (as defined in such resolution and, generally, the tax owners of the Bonds):

(a)   to file within 275 days after the end of each fiscal year with EMMA (http://emma.msrb.org) established by the MSRB, core financial information and operating data for the prior fiscal year, including (i) the Authority's audited financial statements, prepared in accordance with

generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority's System and revenues, expenditures, financial operations and indebtedness generally found in this Official Statement (but excluding the Commonwealth Economic Report incorporated by reference herein); and

(b)      to file in a timely manner not in excess of 10 business days of the occurrence of the event, with EMMA, notice of failure of the Authority to comply with clause (a) above and notice of any of the following events with respect to the Bonds:

(1)      principal and interest payment delinquencies;

(2)      non-payment related defaults, if material;

(3)      unscheduled draws on debt service reserves reflecting financial difficulties;

(4)      unscheduled draws on credit enhancements reflecting financial difficulties;

(5)      substitution of credit or liquidity providers, or their failure to perform;

(6)      adverse tax opinions or the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax-exempt status of the Bonds;

(7)      modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

(8)      bond calls, if material, and tender offers;

(9)      defeasances;

(10)     release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)     rating changes;

(12)     tender offers;

(13)     bankruptcy, insolvency, receivership or similar events;

(14)     the consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions other than pursuant to its terms, if material; and

(15)     appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to event (4) and (5), the Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

With respect to event (6) and the tax status of the Bonds, see TAX MATTERS.

With respect to event (8), the Authority does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *Mandatory Redemption* under DESCRIPTION OF THE BONDS above, (ii) the only open issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the Securities and Exchange Act of 1934, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

According to the Rule, event (13) is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the United States Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other event is material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority evidence of ownership and a written notice of and request to cure such breach, the Authority shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Authority (such as, but without limitation, the Authority's financial advisor or bond counsel); or

(b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of the Bonds ceases to be in effect for any reason, and the Authority elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

**Prior Continuing Disclosure Non-Compliance**

The Authority has made similar continuing disclosure covenants in connection with prior Power Revenue Bond issues. Although the Authority has filed all reports and financial statements required to be filed, some filings have been made after the filing deadlines. Said exceptions are hereby noted.

*Financial Statements*

The Authority's audited financial statements for the fiscal year ended June 30, 2012 were filed on June 4, 2013 after the Authority's filing deadline as a result of delays caused by the transition of a new administration and new management team.

The Authority's audited financial statements for the fiscal year ended June 30, 2009 and material quantitative historical data on the Authority's System and finances were inadvertently not timely filed with EMMA by the deadline of April 1, 2010. The Official Statement for the Series XX Bonds, dated March 26, 2010, contained all the information required to comply with the Authority's continuing disclosure obligation and was filed with EMMA on April 5, 2010 to comply with MSRB rules and on April 13, 2010 specifically to comply with the Authority's continuing disclosure obligation.

*Rating Changes*

The Authority has reported in a timely manner all rating changes affecting its Power Revenue Bonds that do not have bond insurance. In these instances the Authority has been notified by the rating agencies of rating changes and notice of such changes has been filed with EMMA within the next ten business days. However, the Authority has not filed within ten business days rating changes affecting bond insurers insuring certain of the Power Revenue Bonds. The Authority does not receive direct official notification from the applicable rating agency(ies) that the insured ratings have been changed. For that reason the Authority filed once it became aware of the change but did not comply with the within ten business days filing requirement.

The Authority has filed rating change notices with EMMA on November 1, 2010 and December 9, 2011 in connection with rating changes related to Assured Guaranty Municipal Corp. and Assured Guaranty Corp. ("Assured"). These filings were made within ten business days from the issuance of a report from the rating agencies changing Assured's rating. However, the Authority filed with EMMA on June 21, 2013 a rating change notice related to an Assured rating change report that was issued on January 17, 2013. Although the document was executed on January 25, 2013, which was with ten business days from the issuance of the ratings report, the Authority inadvertently did not file it in a timely manner.

The Authority filed with EMMA on July 25, 2013 a ratings change notice relating to rating changes of bond insurers insuring certain Power Revenue Bonds of which the Authority was not notified prior to that date.

The Authority has established new policies and procedures that it believes will ensure full and timely compliance with all continuing obligations in the future.

## MISCELLANEOUS

The foregoing summaries of or references to certain provisions of the Trust Agreement, the various acts and the Bonds are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement (i) a summary of the Trust Agreement, (ii) the financial statements of the Authority for the fiscal years ended June 30, 2012 and 2011, together with the independent accountants' report of Ernst & Young LLP, San Juan, Puerto Rico, (iii) a letter from the Authority's Consulting Engineers, URS Corporation, regarding its opinion as to certain engineering matters in this Official Statement, and (iv) the proposed form of opinion of Sidley Austin LLP, Bond Counsel.

The information set forth in this Official Statement, except for certain information on the page following the inside cover page and the information appearing in UNDERWRITING, MATERIAL RELATIONSHIPS, Appendices III and IV, and the information pertaining to DTC was supplied by the Authority. The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with the MSRB through EMMA.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____  /s/ Juan F. Alicea-Flores _____
Executive Director

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX I

### DEFINITIONS OF CERTAIN TERMS AND SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT

*This Appendix contains summaries of certain provisions of the Authority's Trust Agreement. This summary is not to be considered a full statement of the terms of the Trust Agreement and accordingly is qualified by reference to such Trust Agreement and subject to the full text thereof. Capitalized terms not otherwise defined herein have the meanings set forth in the Trust Agreement or the Official Statement.*

### DEFINITIONS OF CERTAIN TERMS

The following are definitions of certain terms defined in Section 101 of the Trust Agreement and used in this Official Statement.

"Accreted Value" means with respect to any Capital Appreciation Bonds (i) as of any Valuation Date, the amount set forth for such date in the resolution authorizing such Capital Appreciation Bonds and (ii) as of any other date, the sum of (a) the Accreted Value on the preceding Valuation Date and (b) the product of (1) a fraction, the numerator of which is the actual number of days having elapsed from the preceding Valuation Date and the denominator of which is the actual number of days from such preceding Valuation Date to the next succeeding Valuation Date and (2) the difference between the Accreted Values for such Valuation Dates.

"Amortization Accrual" means for any period the amount of an Amortization Requirement that would accrue during such period if such Requirement accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by the Authority, the monthly Amortization Requirement accrual for a term bond begins on the first day of each month in the fiscal year for which such Requirement has been established and ends on the first day of the month succeeding the relevant Deposit Day.

As applied to the term bonds of any Series, "Amortization Requirement" for any fiscal year means the principal amount fixed or computed for such fiscal year for the retirement of such term bonds by purchase or redemption.

The Amortization Requirements for the term bonds of each Series shall be initially the respective principal amounts for each fiscal year as fixed in a resolution of the Board adopted prior to the issuance of the bonds of such Series. The aggregate amount of such Amortization Requirements for the term bonds of each Series shall be equal to the aggregate principal amount of the term bonds of such Series.

If at the close of any fiscal year the total principal amount of term bonds of any Series retired by purchase or redemption, or prior to the close of such fiscal year called for redemption, shall be in excess of the amount of the Amortization Requirements for the term bonds of such Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds of such Series shall be reduced for such subsequent fiscal years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director in an order filed with the Trustee on or before the 10th day of July following the close of such fiscal year.

If at the close of any fiscal year the total principal amount of term bonds of any Series retired by purchase or redemption, or called for redemption, prior to the close of such fiscal year shall be less than the amount of the Amortization Requirements for the term bonds of such Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds of such Series for the next succeeding fiscal year shall be increased by the amount of the excess of such deficiency over the amount then held to the credit of the Redemption Account.

The Trustee is required, on or before the 15th day of July in each fiscal year, to compute the Amortization Requirements for the then current fiscal year for the term bonds of each Series then outstanding. The Amortization Requirement for the then current fiscal year shall continue to be applicable during the balance of such current fiscal year and no adjustment shall be made during such year by reason of term bonds purchased or redeemed or called for redemption during such current fiscal year.

"Annual Budget" means the Authority's budget of Current Expenses and Capital Expenditures for a fiscal year adopted pursuant to the provisions of the Trust Agreement.

"Board" means the governing board of the Authority as constituted from time to time and defined in the Act, or if said Board shall be abolished then the Board, body or officer succeeding to the principal functions thereof or to whom the powers of the Authority shall be given by law.

"Build America Bonds" means a series of bonds designated as "Build America Bonds" by the Authority for purposes of the Code and for which the Authority has irrevocably elected under the Code to receive the Federal Subsidy from the United States Treasury in connection therewith and apply it in accordance with the provisions of the resolution or resolutions adopted by the Board authorizing the issuance of such bonds.

"Capital Appreciation Bonds" means any bonds as to which interest is payable only at the maturity or prior redemption of such bonds. For the purposes of (i) receiving payment of the redemption price if a Capital Appreciation Bond is redeemed prior to maturity, or (ii) receiving payment of a Capital Appreciation Bond if the principal of all bonds is declared immediately due and payable following an event of default under the Trust Agreement, or (iii) computing the principal amount of bonds held by the registered owner of a Capital Appreciation Bond in giving to the Authority or the Trustee any notice, consent, request, or demand pursuant to the Trust Agreement for any purpose whatsoever, the principal amount of a Capital Appreciation Bond shall be deemed to be its Accreted Value. In the case of Capital Appreciation Bonds that are convertible to bonds with interest payable prior to maturity or prior redemption of such bonds, the term "Capital Appreciation Bonds" shall be limited to the period prior to such conversion, and after such conversion, the bonds shall be viewed as any other bonds of the same type for purposes of the Trust Agreement.

"Current Expenses" means the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System, including, but not limited to, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to capital expenditures, engineering expenses relating to operations and maintenance, fees and expenses of the Trustee and the Paying Agents, legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by the Authority under the Trust Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of the Authority, but shall not include any deposits to the credit of the Sinking Fund, the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self-insurance Fund and the Capital Improvement Fund.

"Deposit Day" means the date by which all of the moneys then held to the credit of the Revenue Fund shall be withdrawn by the Treasurer and deposited in the manner set forth under "Disposition of Revenues" below.

"Designated Maturity Bonds" means the indebtedness incurred by the Authority under the terms of a separate trust agreement or resolution, which indebtedness has a maturity of at least ten (10) years and is secured, as to the unamortized principal thereof, on a subordinate basis to the bonds and for which (i) no amortization of principal has been established or (ii) the aggregate amount of the amortized principal that has been established is less than the principal amount of the indebtedness; provided that interest on said indebtedness and any amortized principal of said indebtedness may be payable on a parity, respectively, with interest on bonds and Amortization Requirements on term bonds, in which case said interest and amortized principal shall be included in the calculation of Principal and Interest Requirements on bonds for purposes of the Trust Agreement and shall otherwise be deemed to be, and be payable as, interest and Amortization Requirements on bonds for purposes of the Trust Agreement.

"Extendible Maturity Bonds" means bonds the maturities of which, by their terms, may be extended by and at the option of the bondholder or the Authority.

"Federally Subsidized Bonds" means either Build America Bonds or Other Subsidy Bonds or both, as the case may be.

"Federal Subsidy" means a payment made by the Secretary of the Department of Treasury to or for the account of the Authority pursuant to the Code in respect of a series of bonds constituting Federally Subsidized

Bonds. Any Federal Subsidy to be received by the Authority in respect of such series of bonds shall be identified as such in the resolution authorizing the issuance of such series of bonds.

"Federal Subsidy Payments" means the amount of Federal Subsidy actually paid to and received by the Trustee in respect of an interest payment for the Federally Subsidized Bonds to which such amount relates. Such Federal Subsidy Payments shall be deposited directly into the Bond Service Account in the Sinking Fund.

"Government Obligations" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government including securities evidencing ownership interests in such obligations or in specified portions thereof (which may consist of specific portions of the principal of or interest on such obligations), (ii) bonds, debentures or notes issued by any of the following Federal agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association, Federal Land Banks, or the Federal National Mortgage Association (including participation certificates issued by such Association) and (iii) all other obligations issued or unconditionally guaranteed as to principal and interest by an agency or person controlled or supervised by and acting as an instrumentality of the United States Government pursuant to authority granted by the Congress.

"Improvements" means improvements, renewals and replacements of the System or any part thereof and such extensions and additions thereto as may be necessary or desirable, in the judgment of the Board, to keep the same in proper condition for the safe, efficient and economic operation thereof and to integrate into the System any unit or part thereof, and shall include such electric-power projects as may be authorized to be acquired or constructed by the Authority under the provisions of the Act and such improvements, renewals and replacements of such properties and the System and such extensions and additions thereto as may be necessary or desirable for continuous and efficient service to the public, which shall be financed in whole or in substantial part from the proceeds of bonds issued under the provisions of the Trust Agreement or from moneys deposited to the credit of the Construction Fund or the Renewal and Replacement Fund.

"Independent Consultant" means the consultant or consulting firm at the time employed by the Authority to perform and carry out the duties of the Independent Consultant under the Trust Agreement.

"Interest Accrual" means for any period the amount of interest that would accrue during such period if such interest accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by the Authority, the monthly accrual in respect of interest on the bonds shall commence on the later to occur of the date of issue of the bonds of such Series and the date that is six months prior to the due date of such interest and shall end on the first day of the month following the relevant Deposit Day.

"Investment Obligations" means (i) Government Obligations, (ii) obligations of any state or territory of the United States or political subdivision thereof (other than obligations rated lower than the three highest grades by a nationally recognized rating agency), (iii) repurchase agreements with commercial banks fully secured by Government Obligations and (iv) any other investment obligations permitted for governmental instrumentalities under the laws of the Commonwealth which are rated, on the date of investment therein, in any of the three highest grades by a nationally recognized rating agency or which are collateralized by any other Investment Obligations.

"Net Revenues" means, for any particular period, the excess of the Revenues for such period over the Current Expenses for such period.

"Other Subsidy Bonds" means bonds for which a subsidy or other payment made by the Secretary of the Department of Treasury may be made in respect of such bonds other than under Section 6431 of the Code.

"Prefunded Municipals" means any bonds or other obligations of any state of the United States of America or the Commonwealth or of any agency, instrumentality or local governmental unit of such state or the Commonwealth (a) which are (x) not callable prior to maturity or (y) as to which irrevocable instructions have been given to the trustee of such bonds or other obligations by the obligor to give due notice of redemption and to call such bonds or other obligations for redemption on the date or dates specified in such instructions, (b) which are secured as to principal, redemption premium, if any, and interest by a fund consisting only of cash or Government

I-3

Obligations or Time Deposits, secured in the manner set forth in the Trust Agreement, which fund may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (c) as to which the principal of and interest on such Government Obligations or Time Deposits, secured in the manner set forth in the Trust Agreement, which have been deposited in such fund, along with any cash on deposit in such fund are sufficient to pay principal of and interest and redemption premium, if any, on the bonds or other obligations on the maturity date or dates thereof or on the redemption date or dates specified in the irrevocable instructions referred to in clause (a) above, as appropriate.

"Principal Accrual" means for any period the amount of principal that would accrue during such period if such principal accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by the Authority, the monthly accrual in respect of the principal of serial bonds shall commence on the first day of the twelfth month preceding the due date of such principal and shall end on the first day of the month succeeding the relevant Deposit Day,

"Principal and Interest Requirements" means, for any fiscal year, as applied to the bonds of any Series issued under the Trust Agreement, the sum of:

      (a)      the amount required to pay the interest on all outstanding bonds of such Series which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year,

      (b)      the amount required to pay the principal of all outstanding serial bonds of such Series which is payable after July 31 in such fiscal year and on or prior to July 31 in the following fiscal year, and

      (c)      the Amortization Requirement for the term bonds of such Series for such fiscal year.

The Principal and Interest Requirements shall be determined as required from time to time, by the Trustee. In computing the Principal and Interest Requirements for any fiscal year for the bonds of any Series, the Trustee shall assume that an amount of the term bonds of such Series equal to the Amortization Requirement for the term bonds of such Series for such fiscal year will be retired by purchase or redemption not later than July 1 in the following fiscal year.

Principal and Interest Requirements on bonds shall be deemed to include the amount required to pay interest on outstanding Designated Maturity Bonds and any amortized principal of said Designated Maturity Bonds for any fiscal year, if said interest and amortized principal are payable on a parity with interest and Amortization Requirements on bonds.

To the extent all or a portion of the principal of, Amortization Requirements for or interest on, any bonds of any Series are payable from moneys irrevocably set aside or deposited irrevocably for such purpose with a bank or trust company (which may include the Trustee) or from Investment Obligations or Time Deposits, secured in the manner set forth in the Trust Agreement, irrevocably set aside for such purpose, the principal of and the interest on which when due will provide sufficient moneys to make such payments, such principal, Amortization Requirements or interest shall not be included in determining Principal and Interest Requirements; provided, however, that for purposes of compliance with the Authority's rate covenant (see "Rate Covenant" below) said definition shall include any interest payable from any amount deposited to the credit of the Bond Service Account in the Sinking Fund from the proceeds of bonds to pay interest to accrue thereon. Upon request of the Trustee, the Authority shall cause to be delivered to the Trustee a certificate of an independent verification agent as to the sufficiency of the maturing principal amounts of any Investment Obligations or Time Deposits, together with interest thereon, set aside or deposited to pay said principal, Amortization Requirements and interest. If the Authority has notified the Trustee that a SWAP agreement is in effect in respect of Variable Rate Bonds, then for all purposes of this paragraph, except for the purpose of determining the aggregate Principal and Interest Requirements in the covenant as to rates (see "Rate Covenant" below), the interest rate on such Variable Rate Bonds shall be the SWAP rate under such SWAP agreement.

For purposes of determining the maximum Principal and Interest Requirements and the aggregate Principal and Interest Requirements in the covenant as to rates, on the date of issuance of a Federally Subsidized Bonds and for so long as the Trustee shall receive the scheduled amount of the Federal Subsidy Payments on or before such interest is payable, all or a portion of the interest in respect of one or more series of Federally Subsidized Bonds shall be excluded from the calculation of the Principal and Interest Requirement if, and to the extent that the interest thereon is payable from a Federal Subsidy. Notwithstanding the foregoing, if the Trustee shall not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within thirty (30) of the date such Federal Subsidy Payments were scheduled to be received under the then current applicable law and regulations, then from and after the occurrence of such failure and until such Federal Subsidy Payments shall resume and all prior deficiencies are cured, the exclusion from the calculation of the Principal and Interest Requirement set forth in the preceding sentence shall no longer be effective for such purposes.

For purposes of determining the aggregate Principal and Interest Requirements in the aforementioned covenant as to rates, and the maximum aggregate Principal and Interest Requirements for purposes of asset dispositions and the issuance of additional Power Revenue Bonds (including refunding bonds), subject to the last sentence of the second preceding paragraph, the interest rate on Variable Rate Bonds shall be assumed to be one hundred ten percent (110%) of the greater of (i) the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been outstanding, and (ii) the rate of interest on such Variable Rate Bonds on the date of calculation. If Variable Rate Bonds are payable at the option of the bondholder and the source for payment of said put is a credit or liquidity facility, the "put" date or dates shall be ignored and the stated dates for Amortization Requirements and principal payments thereof shall be used for purposes of this calculation.

For purposes of determining the above requirements in the case of Put Bonds, the "put" date or dates shall be ignored if the source for payment of said put is a credit or liquidity facility and the stated dates for Amortization Requirements and principal payments shall be used. For purposes of determining the above requirements in the case of Extendible Maturity Bonds, the bonds shall be deemed to mature on the later of the stated maturity date or the date to which such stated maturity date has been extended. For purposes of determining the above requirements in the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included in the calculations of accrued and unpaid interest and principal requirements in such manner and during such period of time as is specified in the resolution authorizing such Capital Appreciation Bonds.

Principal and Interest Requirements shall be deemed to include the amount required to pay interest on outstanding Designated Maturity Bonds and any amortized principal of said Designated Maturity Bonds for any fiscal year, if said interest and amortized principal are payable on a parity with interest and Amortization Requirements on bonds.

"Put Bonds" means bonds, other than Variable Rate Bonds, which by their terms may be tendered by and at the option of the holders thereof for payment prior to the stated maturity thereof.

"Reserve Account Insurance Policy" and "Reserve Account Letter of Credit" mean (1) the insurance policy, surety bond or other acceptable evidence of insurance, if any, or (2) the irrevocable, transferable letter of credit, if any, respectively, deposited in the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, for the purpose of making the payments required to be made from the Reserve Account under the Trust Agreement. The issuer providing such insurance or letter of credit shall be a municipal bond insurer or a banking association, bank or trust company or branch thereof whose policy or bond or letter of credit results in the rating of municipal obligations secured by such policy or bond or such letter of credit, respectively, to be rated, at the time of deposit into the Reserve Account, in one of the three highest grades by (i) either Standard & Poor's Corporation or its successor, or Moody's Investors Service, Inc. or its successor or (ii) if both such corporations shall no longer perform the functions of a securities rating agency, a nationally recognized rating agency.

"Revenues" means all money received by the Authority in connection with or as a result of its ownership or operation of the System, including income derived from the sale of electricity generated or distributed by the System, any proceeds of use and occupancy insurance on the System or any part thereof and income from the

investment of moneys under the Trust Agreement, except income from the investment of moneys in the Construction Fund, the Reserve Maintenance Fund, the Capital Improvement Fund and the Subordinate Obligations Fund to the extent such income has been derived from the investment of moneys in such Fund to be used to pay Subordinate Obligations incurred to pay the cost of any work or properties which have not been included by the Authority as part of the System as provided in "Disposition of Revenues" below.

"Subordinate Obligations" means any obligations of the Authority incurred as provided in "Disposition of Revenues" below.

"SWAP agreement" means an agreement between the Authority and a SWAP party whereby the SWAP party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on Variable Rate Bonds at or prior to the times such interest is due and payable in consideration of the Authority's payment to the SWAP party of amounts set forth in the SWAP agreement.

"SWAP party" means a person who is party to a SWAP agreement and whose senior obligations are rated at the time of the execution and delivery of such SWAP agreement in one of the three highest rating categories (without regard to gradations within a category) by (i) Standard & Poor's Corporation or its successor and (ii) Moody's Investors Service or its successor.

"SWAP rate" means the fixed rate per annum on the principal amount of Variable Rate Bonds covered by a SWAP agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the SWAP party less the amount paid to the Authority by the SWAP party by (ii) such principal amount of Variable Rate Bonds; provided, however, that if such SWAP agreement has been in effect for less than twelve months, such percentage shall be multiplied by a fraction equal to 360 divided by the number of days between the effective date of such SWAP agreement and the date of calculation determined on the basis of 30-day months.

"System" means all the properties presently owned and operated by the Authority as a single integrated system, together with all works and properties which may be acquired or constructed by the Authority in connection with the production, distribution or sale of electric energy and the acquisition or construction of which shall be financed in whole or in part from the proceeds of bonds issued under the provisions of the Trust Agreement or from moneys deposited to the credit of the Construction Fund, the Capital Improvement Fund or from Subordinate Obligations to the extent such works and properties have been included by the Authority as part of the System as provided in "Disposition of Revenues" below.

"Time Deposits" means time deposits, certificates of deposit or similar arrangements with the Trustee, Government Development Bank for Puerto Rico or any bank or trust company which is a member of the Federal Deposit Insurance Corporation having a combined capital and surplus aggregating not less than $100,000,000.

"Valuation Date" means with respect to any Capital Appreciation Bonds the date or dates set forth in the resolution authorizing such bonds on which Accreted Values are assigned to the Capital Appreciation Bonds.

"Variable Rate Bonds" means bonds issued with a variable, adjustable, convertible or similar interest rate which is not fixed in percentage at the date of issue for the term thereof but which may or may not be convertible to a fixed interest rate for the remainder of their term.

**Provision for Variable Rate Bonds, Put Bonds, Extendible Maturity Bonds, Capital Appreciation Bonds and other types of bonds**

Under the Trust Agreement, the Authority may issue Capital Appreciation Bonds, Variable Rate Bonds, Put Bonds, Extendible Maturity Bonds and other types of bonds which may from time to time be created. The interest rate calculation methods and interest rate payment dates, which need not be semi-annual, shall be established by the Authority prior to the issuance of particular Series of bonds. The features of Variable Rate Bonds shall be established prior to their issuance and may provide, in addition to provisions for conversion to a fixed interest rate, that bondholders may demand payment of principal and interest within a stated period. In this connection, the

Authority may provide for the remarketing of bonds that have been tendered pursuant to the demand features and for a credit facility or liquidity facility which may be drawn upon to make principal and interest payments on the Variable Rate Bonds. The terms for Put Bonds may contain some of the above provisions. The terms for Extendible Maturity Bonds may include an option to extend the maturity of such bonds granted to bondholders and the Authority. The terms for Capital Appreciation Bonds shall include Valuation Dates, the Accreted Value on such dates, the manner in which and the period during which principal and interest shall be deemed to accrue on said bonds and the amount of any deposit required for the Reserve Account. (Trust Agreement, Sections 208, 209 and 210).

**Security for the Power Revenue Bonds**

The Power Revenue Bonds are secured by a pledge from the Authority to the Trustee of the Revenues of the System and other moneys to the extent provided in the Trust Agreement as security for the payment of the Power Revenue Bonds and as security for the satisfaction of any other obligation assumed by it in connection with such Power Revenue Bonds. (Trust Agreement, Section 701).

The Power Revenue Bonds shall not be deemed to constitute a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions. (Trust Agreement, Section 701).

**Issuance of Bonds Other than Refunding Bonds**

The Trust Agreement provides for the issuance of Power Revenue Bonds for Improvements, including the repayment of advances therefor, to provide moneys for deposit to the Reserve Account in the Sinking Fund (the "Reserve Account") and for any proper corporate purpose of the Authority (other than for the purpose of refunding outstanding Power Revenue Bonds), subject to the conditions and limitations in the Trust Agreement. Power Revenue Bonds may be issued, if among other things:

(i)     the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months immediately preceding the date of the issuance of such bonds, adjusted to reflect the then current rate schedule, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued), and

(ii)     the estimated average annual Net Revenues for the five fiscal years immediately following the fiscal year in which the issuance of such bonds occurs, adjusted to reflect the then current rate schedule and any rate schedule the Authority has covenanted to put in effect during such five fiscal years, shall be not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued. (Trust Agreement, Sections 208 and 209).

**Issuance of Refunding Bonds**

The Trust Agreement provides for the issuance of Power Revenue Bonds to refund prior to or at their maturities all or any part of the outstanding bonds of any Series issued under the Trust Agreement, including the payment of any redemption premium, accrued interest and financing costs and for the purpose of providing moneys for deposit to the credit of the Reserve Account, subject to the conditions and limitations set forth therein. Power Revenue Refunding Bonds may be issued if, among other things, either (i) the earnings tests described above under the caption "Issuance of Bonds Other than Refunding Bonds" for the issuance of bonds under the Trust Agreement (except that effect is given to the retirement of the bonds to be refunded) are satisfied or (ii) the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued (after giving effect to the retirement of the bonds to be refunded) shall be less than the maximum aggregate Principal and Interest Requirements on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued).   Power Revenue Refunding Bonds may be issued without compliance with the foregoing tests to refund serial bonds of any Series of Power Revenue Bonds maturing within one year thereafter (and to pay interest thereon to maturity, if deemed necessary by the Authority), if the Authority

shall determine that the moneys in the Sinking Fund will not be sufficient for paying such serial bonds at their maturity. The proceeds of Power Revenue Refunding Bonds shall, to the extent practicable, be invested and reinvested by the Trustee, with the approval of the Executive Director, in Government Obligations, Prerefunded Municipals or in Time Deposits, secured in the manner set forth in the Trust Agreement, and the moneys so invested shall be available for use when required. (Trust Agreement, Section 210).

## Funds and Accounts

### *General Fund*

A special fund is created by the Trust Agreement and designated the "Puerto Rico Electric Power Authority General Fund" (the "General Fund"). The Authority covenants that all Revenues, other than income from investments made under the provisions of the Trust Agreement, will be deposited as received in the General Fund. The Authority covenants that moneys in the General Fund will be used first for the payment of Current Expenses of the System, and that, if the amount expended in any fiscal year for Current Expenses shall exceed the amount provided therefor in the Annual Budget, the Authority will report such excess and the reasons therefor to the Consulting Engineers and to the Trustee as soon as practicable but not later than the end of the sixth month following the month in which such excess shall have occurred. (Trust Agreement, Sections 503 and 505).

### *Revenue Fund*

A special fund is created by the Trust Agreement and designated the "Puerto Rico Electric Power Authority Power Revenue Fund" (the "Revenue Fund"). The Treasurer of the Authority is required to transfer, on or before the 15th day of each month, from the General Fund to the Revenue Fund an amount equal to the amount of all moneys held in the General Fund at the end of the preceding month less an amount to be held as a reserve for Current Expenses as the Treasurer may determine, equal to not more than 1/6 of the amount shown by the Annual Budget to be necessary for Current Expenses for the current fiscal year, such transfer to be made on the books of the Authority as of the close of the preceding month. (Trust Agreement, Section 506).

### *Sinking Fund, Reserve Maintenance Fund, Self-insurance Fund, Capital Improvement Fund and Subordinate Obligations Fund*

A special fund is created by the Trust Agreement and designated the "Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund" (sometimes referred to in this Appendix I as the "Sinking Fund"). There are three separate accounts created in the Sinking Fund and designated the "Bond Service Account," "Reserve Account" and "Redemption Account." Four additional special funds are created by the Trust Agreement and designated the "Puerto Rico Electric Power Authority Reserve Maintenance Fund" (sometimes referred to in this Appendix I as the "Reserve Maintenance Fund"), the "Puerto Rico Electric Power Authority Self-insurance Fund" (sometimes referred to in this Appendix I as the "Self-insurance Fund"), the "Puerto Rico Electric Power Authority Capital Improvement Fund" (sometimes referred to in this Appendix I as the "Capital Improvement Fund") and the "Puerto Rico Electric Power Authority Subordinate Obligations Fund" (sometimes referred to in this Appendix I as the "Subordinate Obligations Fund"). (Trust Agreement, Section 507).

## Disposition of Revenues

On or before the 25th day of each month, the Treasurer shall withdraw from the Revenue Fund, all the moneys then in such Fund (less any amount equal to the amount of Federal Subsidy Payments that have not been received as of the 25th of the month preceding the Interest Payment Date to which such Federal Subsidy Payments relate, which amount will be held in the Revenue Fund and (x) if the Federal Subsidy Payment has not been received by the Authority by such Interest Payment Date, transferred to the Bond Service Account on the Interest Payment Date or (y) if the Federal Subsidy Payment has been received by the Authority on or before such Interest Payment Date, remain on deposit in the Revenue Fund for application in accordance with the provisions below in the following calendar month) and deposit the moneys so withdrawn to the credit of the following Accounts and Funds in the following order:

1.    the Bond Service Account until there has been deposited therein an amount equal to the sum of (i) the Interest Accrual on all the outstanding Power Revenue Bonds to and including the first day of the next calendar month, and (ii) the Principal Accrual on the outstanding serial bonds of each Series of outstanding Power Revenue Bonds to and including the first day of the next calendar month;

2.    the Redemption Account, until there has been deposited therein an amount equal to the Amortization Accrual for the term bonds of each Series of Power Revenue Bonds then outstanding to and including the first day of the next calendar month;

3.    the Reserve Account until the balance therein is equal to the interest payable on all outstanding Power Revenue Bonds within the next ensuing 12 months; provided, however, that the monthly deposit in respect of any Series of Power Revenue Bonds (other than refunding bonds) need not exceed 1/60 of the amount of the increase in the interest payable within the next ensuing 12 months resulting from the issuance of bonds of such Series, and provided, further, that the monthly requirements for deposits to the Reserve Account shall be cumulative; and that in the case of Variable Rate Bonds, the minimum amount to be deposited in the Reserve Account which shall be funded over the period required herein, shall be based initially on the interest rate in effect on the date of issuance of the Variable Rate Bonds and then shall be adjusted on the 25th day of each subsequent month based on the actual interest accrued from the 25th day of the previous month to the date of adjustment, except that in the case of Variable Rate Bonds in respect of which the Authority has notified the Trustee that a SWAP agreement is in effect, the Trustee shall use the SWAP rate in calculating the interest payable on such Bonds within the next ensuing twelve (12) months; that in the case of Capital Appreciation Bonds, the minimum amount required to be deposited in the Reserve Account shall be an amount derived from the interest rate which has been used to calculate the assumed yield on such bonds through their maturity times the Accreted Value of such bonds on the Valuation Date occurring at or after the first day of the twelfth succeeding month to the date of calculation of this requirement, as may be further specified in the resolution authorizing Capital Appreciation Bonds; and that in the case of Federally Subsidized Bonds, the amount of interest deemed to be payable on such Bonds from their date of issuance and for so long as the Trustee shall receive the scheduled amount of the Federal Subsidy Payments on or before such interest shall be payable shall exclude the amount of interest to be paid from the Federal Subsidy, but if the Trustee shall not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within thirty (30) of the date such Federal Subsidy Payments were scheduled to be received under the then current applicable law and regulations, then for purposes of the calculation of interest to be credited to the Reserve Account, the amount shall be equal to the interest payable on all Power Revenue Bonds within the next twelve (12) months;

4.    the Reserve Maintenance Fund, such amount, if any, of any balance remaining after making the deposits described in paragraphs 1, 2 and 3 above (or the entire balance if less than the required amount) as may be recommended by the Consulting Engineers; provided that the monthly requirements for deposit to the Reserve Maintenance Fund shall be cumulative, and provided further that in the event that the Authority shall covenant in respect of any Subordinate Obligation to limit the monthly deposit to the Reserve Maintenance Fund as described in Subordinate Obligations Fund below, the monthly deposit required by this paragraph shall be equal to the least of

(i)    the amount described above in this paragraph,

(ii)    $400,000, and

(iii)    an amount that when added to the amount then on deposit in the Reserve Maintenance Fund shall make the total amount on deposit equal to $10,000,000;

5.    one or more special accounts in the Subordinate Obligations Fund, such amount, if any, of any balance remaining after making the deposits described under paragraphs 1, 2, 3 and 4 above (or the entire balance if less than the required amount) that together with amounts then on deposit in the Subordinate Obligations Fund will make the total amount then on deposit equal to any amounts required to

be paid or accrued with respect to any Subordinate Obligations prior to the Deposit Day of the next succeeding month from or to the Subordinate Obligations Fund;

6.  if the Authority shall have covenanted with respect to Subordinate Obligations to limit its deposit to the Reserve Maintenance Fund in accordance with the provisions of the second proviso of paragraph 4 above and in fact the deposit to said Fund pursuant to paragraph 4 was limited to the amount described in clause (ii) or (iii) of such paragraph, the Reserve Maintenance Fund, such amount of any balance remaining after making the deposits described under paragraphs 1, 2, 3, 4 or 5 above (or the entire balance if less than the required amount) as may be required to make the total amount deposited in the Reserve Maintenance Fund in such month equal to the amount described in clause (i) of clause (4) above;

7.  the Self-insurance Fund, any balance remaining after making the deposits described in paragraphs 1, 2, 3, 4, 5 and 6 above as the Consulting Engineers shall from time to time recommend; and

8.  the Capital Improvement Fund such amount of any balance remaining after making deposits described under paragraphs 1, 2, 3, 4, 5, 6 and 7 above as the Consulting Engineers shall from time to time recommend; provided that the monthly requirements for deposit to the Capital Improvement Fund shall be cumulative.

Any balance remaining after making the deposits under paragraphs 1 through 8 above may be used for any lawful purpose of the Authority. (Trust Agreement, Section 507).

If amounts applied to the payment of interest and principal on bonds are paid by a credit or liquidity facility issuer, the amounts deposited in the Bond Service Account allocable to said payment (other than a payment of the purchase price of bonds pursuant to a "put") may be paid to said credit or liquidity facility issuer. (Trust Agreement, Section 509).

Moneys in the Reserve Account shall be used by the Trustee first for the purpose of paying the interest on the Power Revenue Bonds and maturing principal of serial bonds whenever and to the extent moneys in the Bond Service Account are insufficient for such purposes and thereafter for the purpose of making the required deposits to the Redemption Account described in paragraph 2 above whenever the withdrawals from the Revenue Fund are insufficient for such purpose. Excess moneys in the Reserve Account shall be transferred to the Bond Service Account or may be used to reduce any Reserve Account Insurance Policy or Reserve Account Letter of Credit.

The Authority may deposit a Reserve Account Insurance Policy or Reserve Account Letter of Credit into the Reserve Account, in lieu, or in partial satisfaction, of any required deposit into the Reserve Account. Any reimbursement obligation in respect of a drawing under a Reserve Account Insurance Policy or Reserve Account Letter of Credit may be secured by a lien on Revenues not inconsistent with the provisions of the Trust Agreement and shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any date on which moneys are required to be paid out of the Reserve Account pursuant to the Trust Agreement. If a disbursement is made under any Reserve Account Insurance Policy or Letter of Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement or to deposit into the Reserve Account moneys, in accordance with the provisions of the Trust Agreement, in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit. The Authority may at any time substitute (i) all or a portion of the moneys held to the credit of the Reserve Account with a Reserve Account Insurance Policy or Reserve Account Letter of Credit, (ii) all or a portion of any Reserve Account Insurance Policy on deposit in the Reserve Account with moneys or a Reserve Account Letter of Credit, or (iii) all or a portion of any Reserve Account Letter of Credit on deposit in the Reserve Account with moneys or a Reserve Account Insurance Policy. Any moneys on deposit in the Reserve Account in substitution of which a Reserve Account Insurance Policy or Reserve Account Letter of Credit is deposited shall, to the extent not required to fund any deficiencies in the amount then required to be on deposit in the Reserve Account, be released and immediately paid over to the Authority to be used by the Authority for any proper corporate purpose. Prior to the expiration date of any Reserve Account Insurance Policy or Reserve Account Letter of Credit then on deposit to the credit of the Reserve Account the Authority shall (x) cause the term of such Reserve Account Insurance Policy or Reserve Account Letter of Credit to be extended, (y) replace any such Reserve Account Insurance Policy with moneys (which may include, without limitation, moneys available under the

Reserve Account Insurance Policy or from any other source available for such purpose) or a Reserve Account Letter of Credit, or (z) replace any such Reserve Account Letter of Credit with moneys (which may include, without limitation, moneys available under the Reserve Account Letter of Credit or from any other source available for such purpose) or a Reserve Account Insurance Policy; provided that in the event that the Authority has not extended or replaced the expiring Reserve Account Insurance Policy or Reserve Account Letter of Credit by the fifth business day prior to its date of expiration, the expiring Reserve Account Insurance Policy or Reserve Account Letter of Credit shall, on such date, be drawn upon and the moneys so made available shall thereupon be deposited in the Reserve Account. (Trust Agreement, Section 510).

Moneys in the Reserve Maintenance Fund shall be used only for the purpose of paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, including major items of equipment. The Reserve Maintenance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Bond Service Account, Redemption Account and the Reserve Account are insufficient for such purpose. (Trust Agreement, Section 512).

Moneys in the Self-insurance Fund shall be used only for the purpose of paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement. See "Insurance" below. The Self-insurance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Bond Service Account, Redemption Account and the Reserve Account and in the Reserve Maintenance Fund are insufficient for such purpose. (Trust Agreement, Section 512A).

Moneys in the Capital Improvement Fund shall be used only for the purpose of paying the cost of anticipated extensions and Improvements which cost has not otherwise been provided for from the proceeds of Power Revenue Bonds. The Capital Improvement Fund also serves as an additional reserve for the payment of principal of and the interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Bond Service Account, Redemption Account and the Reserve Account, in the Reserve Maintenance Fund and in the Self-insurance Fund are insufficient for such purpose. (Trust Agreement, Section 512B).

*Subordinate Obligations Fund*

Moneys in the Subordinate Obligations Fund shall be paid out or pledged by the Authority as necessary to enable the Authority to meet its Subordinate Obligations. Subordinate Obligations may be incurred or issued by the Authority for any proper corporate purpose of the Authority.

The Authority may covenant with the holders of any Subordinate Obligations to limit the deposits to the Reserve Maintenance Fund as authorized by paragraph 4 above and to add to the conditions, limitations and restrictions under which Power Revenue Bonds may be issued under the provisions of Trust Agreement.

Subordinate Obligations shall be payable out of and may be secured by a pledge of (i) available amounts in the Subordinate Obligations Fund and (ii) any other available funds of the Authority. Any such payment or pledge shall be expressly subordinate and junior in all respects to the lien and charge of the Power Revenue Bonds upon the Revenues.

Before incurring any Subordinate Obligations the proceeds of which shall be applied to acquire or construct any works or properties by the Authority in connection with the production, distribution or sale of electric energy, the Authority shall specify by resolution whether or not such works or properties are to be included as part of the System. (Trust Agreement, Section 516).

*Construction Fund*

The Trust Agreement creates a special fund designated the "Puerto Rico Electric Power Authority Power System Construction Fund" (the "Construction Fund"). The proceeds of any Power Revenue Bonds issued for the

purpose of paying the cost of Improvements, together with the moneys received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the Reserve Account, (iii) deposited in the Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the Construction Fund and held by the Authority in trust. (Trust Agreement, Sections 208 and 401).

Payments from the Construction Fund are made by the Executive Director or by any officer or employee of the Authority designated by him for such purpose. (Trust Agreement, Section 402).

**Rate Covenant**

The Authority covenants that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that the Revenues will be at all times sufficient to pay the Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any amount deposited in the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year.

The Authority further covenants that if at any time the Revenues shall not be sufficient to satisfy the foregoing covenant as to rates, it will revise the rates and charges for the services and facilities furnished by the System and, if necessary, it will revise its regulations in relation to the collection of bills for such services and facilities, so that such deficiency will be made up before the end of the next ensuing fiscal year. Should any deficiency not be made up in such next ensuing fiscal year, the requirement therefor shall be cumulative and the Authority shall continue to revise such rates until such deficiency shall have been completely made up. (Trust Agreement, Section 502).

**Build America Bonds**

With respect to Build America Bonds, the Authority covenants to file timely the necessary forms with the Internal Revenue Service so long as such filings are a condition to receipt of the Federal Subsidy prior to the date such interest shall be payable. The only effect of any failure to comply with this filing requirement shall be that the Federal Subsidy to which such failure relates shall no longer be excluded from the calculation of Principal and interest Requirements. (Trust Agreement, Section 713).

**Investment of Funds**

The Trust Agreement provides for the following types of investments:

(a)    Government Obligations;

(b)    Investment Obligations; and

(c)    Time Deposits.

Moneys in the Bond Service Account, the Redemption Account and the Revenue Fund shall be invested by the Trustee or by the Authority, as the case may be, in Government Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when such moneys will be required for the purposes intended, or in Time Deposits; provided, that each such Time Deposit shall permit the moneys so placed to be available for use when required for the purposes intended.

Any moneys in the Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Account shall be invested by the Trustee or the Authority, as the case may be, in Investment Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, in the case of the Construction Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Maintenance Fund, not later than the respective dates when the moneys invested will be required for

the purposes intended, and in the case of the Reserve Account, as to approximately 50% of such moneys, not later than five years after the date of such investment, and as to the balance of such moneys, as directed by order of the Executive Director or other authorized officer of the Authority. In lieu of such investments, moneys in the Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Account may be invested in Time Deposits which shall permit the moneys so placed to be available for use at the times provided for investments in Investment Obligations. (Trust Agreement, Section 602).

Any moneys in the Self-insurance Fund may also be invested by the Authority in any investments authorized by law for the Retirement System of the Employees of the Government for Puerto Rico and its Instrumentalities, but the Authority shall invest not less than the smaller of $25,000,000 and the entire balance in such Fund in Investment Obligations with an average weighted maturity of not more than three years.

Prior to investing any moneys in the Self-insurance Fund in other than Investment Obligations, the Authority shall obtain an Independent Consultant's report recommending what portion of moneys held in the Self-insurance Fund the Authority shall maintain invested in Investment Obligations and shall, after duly considering the report, formally adopt, subject to the consent of Government Development Bank for Puerto Rico, and maintain an investment policy first determining the minimum portion of the moneys held for the credit of the Self-insurance Fund to remain invested in Investment Obligations and then setting forth prudent investment principles, considerations and goals, including liquidity, diversification of assets, safety and rate or rates of return, that will govern the investment strategies and goals for the balance of the Self-insurance Fund and shall advise the Trustee in writing of those investments other than Investment Obligations that are authorized by said investment policy. (Trust Agreement, Section 602).

## Accounting

The Authority covenants that it will keep accurate records and accounts according to standard practices for public utility systems similar to the properties and business of the Authority and applicable in such circumstances, of all items of cost and expenditures relating to the System, the Revenues collected and the application of the Revenues. The Authority further covenants that in the first month of each fiscal year it will cause an audit for the preceding fiscal year to be made of its books and accounts pertaining to the System by an independent firm of certified public accountants of suitable experience and responsibilities and widely known in the United States and approved by the Trustee. (Trust Agreement, Section 710).

## Release of Property

The Authority covenants that so long as any Power Revenue Bonds shall be outstanding it will not sell, lease or otherwise dispose of or encumber the System or any part thereof and will not create or permit to be created any charge or lien on the Revenues ranking equally with or prior to the charge or lien on the Revenues of the Power Revenue Bonds. The Authority may, however, from time to time, sell machinery, fixtures, apparatus, tools, instruments or other movable property or materials if the Authority shall determine that such articles are no longer needed or useful in connection with the construction or operation and maintenance of the System. Any such moneys received may be applied to replace any such properties sold or disposed of or shall be deposited in the Redemption Account or the Construction Fund at the option of the Authority; provided that in connection with the issuance of bonds the Authority may secure its obligations to the provider of a credit or liquidity facility securing such bonds on a parity with the bonds. Other property forming part of the Systems, not needed or serving no useful purpose in connection with the System, may be sold, leased or transferred provided the proceeds of which shall be deposited in the Redemption Account or the Construction Fund and the rentals be deposited in the Revenue Fund.

Notwithstanding the previous paragraph, the Authority may abandon, sell, lease or transfer any property forming a part of the System, if, among other things, the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months next preceding the date of such abandonment, sale, lease or transfer, adjusted to give effect to such abandonment, sale, lease or transfer and any replacement and to reflect the rate schedule then in effect, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all Power Revenue Bonds outstanding and if the Reserve Account is fully funded. Any transferee of said property may be considered in lieu of or in addition to the Authority for purposes of such coverage if, among other things, the transferee agrees to assume the Authority's obligations under the Trust Agreement. Said coverage

I-13

test need not be met if the transferee is a public corporation or other governmental entity provided the coverage is not reduced due to such transfer. The proceeds of such sale shall be deposited in the Redemption Account or in the Construction Fund, at the option of the Authority, or shall be applied to the replacement of the property so sold. The rentals under any such lease shall be deposited in the Revenue Fund.

In addition, the Authority may lease portions of the System or grant licenses, easements and other rights or make contracts or other arrangements for operation or use of the System, if certain reports and certificates of the Consulting Engineers are provided that confirm, among other things, that operational covenants will be binding on the lessee or other contracting entity and that the lease, contract, license, easement or other arrangement provides for rent or other payments that are projected to be sufficient with other projected Net Revenues of the System to make all payments of the Principal and Interest Requirements for all Power Revenue Bonds. Rents received under any such lease, contract, license, easement or other arrangement shall be deposited to the credit of the Revenue Fund. (Trust Agreement, Section 712).

**Insurance**

The Authority covenants that it will at all times carry insurance, in a responsible insurance company or companies authorized and qualified under the laws of Puerto Rico to assume the risk thereof, covering such properties belonging to the System as are customarily insured, and against loss or damage from such causes as are customarily insured against, by companies engaged in similar business.

The Authority covenants that, immediately after any loss or damage, it will cause to be prepared plans and specifications for repairing, replacing or reconstructing the damaged or destroyed property, and will forthwith proceed with the repair, replacement or reconstruction of the damaged or destroyed property unless it shall determine that the repair, replacement or reconstruction of such property is not essential to the efficient operation of the System. Proceeds of any insurance not applied within 18 months after receipt by the Treasurer to repairing, replacing or reconstruction damaged or destroyed property shall be deposited in the Redemption Account or, at the option of the Authority, the Construction Fund unless the Authority shall be prevented from doing so by conditions beyond its control or unless the holders of 51% in aggregate principal amount of the Power Revenue Bonds then outstanding shall otherwise direct. (Trust Agreement, Section 707).

**Consulting Engineers and Independent Consultant**

The Authority covenants that so long as any of the Power Revenue Bonds are outstanding it will employ as Consulting Engineers an independent engineer or engineering firm having a wide and favorable repute in the United States for skill and experience in the construction and operation of electric systems. It shall be the duty of the Consulting Engineers to prepare an annual report setting forth their recommendations as to any necessary or advisable revisions of rates and charges and such other advices and recommendations as they may deem desirable. It shall be the duty of the Consulting Engineers to include in such report their recommendations as to the amount to be deposited in the Reserve Maintenance Fund, the Capital Improvement Fund and the Self-insurance Fund. (Trust Agreement, Section 706).

The Authority covenants that so long as any Power Revenue Bonds are outstanding it will employ as Independent Consultant one or more independent firms having a wide and favorable repute in the United States for expertise in risk management and other insurance matters related to the construction and operation of electric systems. It shall be the duty of the Independent Consultant to prepare a report setting forth its recommendations, based on a review of the insurance then maintained by the Authority in accordance with the Trust Agreement and the status of the Self-insurance Fund, of any changes in coverage, including its recommendations of policy limits and deductibles and self-insurance, and investment strategies for the Self-insurance Fund. (Trust Agreement, Sections 706 and 707).

**Modifications**

The Authority and the Trustee may, without the consent of the holders of the Power Revenue Bonds, enter into such supplemental agreements as shall not be inconsistent with the Trust Agreement, (i) to cure any ambiguity,

to correct or supplement any provision in the Trust Agreement which may be inconsistent with any other provision therein, to make any other provisions which shall not be inconsistent with the provisions of the Trust Agreement, provided such action shall not adversely affect the interest of the bondholders, or (ii) to grant to or confer upon the Trustee for the benefit of the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders or the Trustee, or (iii) to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the Trust Agreement other conditions, limitations and restrictions thereafter to be observed, or (iv) to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power reserved to or conferred upon the Authority by the Trust Agreement. (Trust Agreement, Section 1101).

The holders of not less than 60% in aggregate principal amount of the Power Revenue Bonds at the time outstanding shall have the right, from time to time (anything contained in the Trust Agreement to the contrary notwithstanding), to consent to and approve the execution by the Authority and the Trustee of such agreement or agreements supplemental to the Trust Agreement as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to, repealing or rescinding, in any particular, any of the terms or provisions contained in the Trust Agreement or in any supplemental agreement; provided, however, that nothing contained in the Trust Agreement shall permit, or be construed as permitting, (a) an extension of the maturity of principal or interest on any Power Revenue Bond, or (b) a reduction in the principal amount of any Power Revenue Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of the Revenues other than the lien and pledge created by the Trust Agreement, or (d) a preference or priority of any Power Revenue Bond or Bonds over any other Power Revenue Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Power Revenue Bonds required for consent to such supplemental agreement. (Trust Agreement, Section 1102).

## Events of Default and Remedies of Bondholders

Among the events described in the Trust Agreement as "events of default" are the following:

(a)     payment of the principal of and redemption premium, if any, on any of the Power Revenue Bonds shall not be made when the same shall become due and payable, or

(b)     payment of any installment of interest on any of the Power Revenue Bonds shall not be made when the same shall become due and payable, or

(c)     the Authority shall for any reason be rendered incapable of fulfilling its obligations under the Trust Agreement, or

(d)     the Authority shall default in the due and punctual performance of its other covenants, conditions, agreements and provisions contained in the Power Revenue Bonds or in the Trust Agreement, including meeting any Amortization Requirement, and such default shall continue for thirty (30) days after written notice shall have been given to the Authority by the Trustee which may give such notice in its discretion and shall give such notice at the written request of 10% in aggregate principal amount of the Power Revenue Bonds then outstanding, or

(e)     if notice has been received by the Trustee and the Authority from the bank or lending institution providing a credit or liquidity facility or other entity insuring, guaranteeing or providing for payments of principal or interest in respect of any Power Revenue Bonds that an event of default has occurred under the agreement underlying said facility or a failure of said bank or other financial or lending institution or other entity to make said facility available or to reinstate the interest component of said facility in accordance with its terms, to the extent said notice or failure is established as an event of default under the terms of the resolution authorizing the issuance of Power Revenue Bonds secured by the credit or liquidity facility). (Trust Agreement, Section 802)

I-15

In the event of any such default the Trustee may, and upon the written request of the holders of not less than 20% in aggregate principal amount of all Power Revenue Bonds then outstanding shall, declare the principal of the Power Revenue Bonds then outstanding to be due and payable, and, providing it shall be indemnified to its satisfaction, the Trustee may, and upon the written request of the holders of not less than 10% in aggregate principal amount of the Power Revenue Bonds then outstanding shall, proceed to protect and enforce its rights and the rights of the bondholders under the Trust Agreement by such suits, actions or special proceedings in equity or at law, or by such proceedings in the office of any board or officer having jurisdiction, either for the appointment of a receiver of the System as authorized by the Act or for the specific performance of any covenant or agreement or for the enforcement of any proper legal or equitable remedy, as the Trustee shall deem most effectual to protect and enforce the rights aforesaid; provided, however, that the Trustee shall not be required to proceed for the appointment of a receiver unless it shall have received the written request of the holders of not less than 25% in aggregate principal amount of such bonds then outstanding. (Trust Agreement, Sections 803, 804 and 902).

It is the intent of the Trust Agreement that all proceedings shall be instituted and maintained for the benefit of all holders of outstanding Power Revenue Bonds. (Trust Agreement, Section 809).

**Defeasance**

The Trust Agreement provides that if, when the Power Revenue Bonds shall have become due and payable or shall have been duly called for redemption or irrevocable instructions to call said bonds for redemption or payment shall have been given by the Authority to the Trustee, the whole amount of the principal and the interest and the premium, if any, so due and payable on all of the Power Revenue Bonds then outstanding shall be paid or sufficient moneys, or Government Obligations or Prefunded Municipals or Time Deposits secured in the manner set forth in the Trust Agreement, the principal of and the interest on which when due will provide sufficient moneys, shall be held by the Trustee or the Paying Agents for such purpose under the provisions of the Trust Agreement, and provision shall be made for paying all other sums payable by the Authority, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, determine and become void, and the Trustee in such case, on demand of the Authority, shall release the Trust Agreement.   For purposes of determining whether sufficient amounts have been deposited for defeasance, the interest to become due on Variable Rate Bonds shall be calculated at the maximum rate permitted by the terms thereof, and the principal, premium and interest to become due on Put Bonds and Extendible Maturity Bonds shall mean the maximum amount payable upon the exercise of put options by holders of said bonds or extensions of maturity by the holders of said bonds or the Authority. (Trust Agreement, Section 1201).

**Bonds Not Deemed Outstanding**

The Power Revenue Bonds and portions of Power Revenue Bonds which have been duly called for redemption pursuant to the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or payment at or prior to maturity have been given to the Trustee in form satisfactory to it, and for the payment of principal or the redemption price and the accrued interest of which sufficient moneys, or Government Obligations or Prefunded Municipals or Time Deposits secured in the manner set forth in the Trust Agreement, shall be held in separate accounts by the Trustee or by the Paying Agents in trust for the holders of the bonds or portions thereof to be paid or redeemed, all as provided in the Trust Agreement, shall not thereafter be deemed to be outstanding under the provisions of the Trust Agreement. (Trust Agreement, Section 307).

**APPENDIX II**



FINANCIAL STATEMENTS, REQUIRED
SUPPLEMENTARY INFORMATION AND
SUPPLEMENTAL SCHEDULES

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)
Years Ended June 30, 2012 and 2011
With Report of Independent Auditors

Ernst & Young LLP



Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Financial Statements, Required Supplementary Information
and Supplemental Schedules

Years Ended June 30, 2012 and 2011

# Contents

Financial Section

Report of Independent Auditors ............................................................................... 1
Management's Discussion and Analysis.................................................................. 3

Audited Financial Statements

Balance Sheets........................................................................................................ 16
Statements of Revenues, Expenses and Changes in Net Assets............................. 18
Statements of Cash Flows ...................................................................................... 19
Notes to Audited Financial Statements.................................................................. 21

Required Supplementary Information

Schedule I – Supplementary Schedule of Funding Progress.................................. 82

Supplemental Schedules

Notes to Schedules II-VII – Information Required by the 1974 Agreement ........... 83
Schedule II – Supplemental Schedule of Source and Disposition of
    Net Revenues under the Provisions of the 1974 Agreement.............................. 84
Schedule III – Supplemental Schedule of Sources and Disposition of
    Net Revenues under the Provisions of the 1974 Agreement.............................. 85
Schedule IV – Supplemental Schedule of Funds under the Provisions
    of the 1974 Agreement...................................................................................... 86
Schedule V – Supplemental Schedule of Changes in Cash and
    Investments by Funds – June 30, 2012 ............................................................. 87
Schedule V – Supplemental Schedule of Changes in Cash and
    Investments by Funds – June 30, 2011 ............................................................. 88
Schedule VI – Supplemental Schedule of Changes in Long-Term
    Debt and Current Portion of Long-Term Debt .................................................. 89

1304-1056934

# Financial Section

1304-1056934

[THIS PAGE INTENTIONALLY LEFT BLANK]

**≡Ⅱ ERNST & YOUNG**

Ernst & Young LLP
1000 Scotiabank Plaza
273 Ponce de Leon Avenue
San Juan, PR 00917-1951

Tel: 787 759 8212
Fax: 787 753 0808
www.ey.com

## Report of Independent Auditors

To the Governing Board of the
Puerto Rico Electric Power Authority

We have audited the accompanying financial statements of the Puerto Rico Electric Power Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of and for the years ended June 30, 2012 and 2011, as listed in the table of contents. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of PREPA Networks, Inc. (PREPA.Net) (a blended component unit), which financial statements reflect total assets constituting approximately .3% and .2% of total assets as of June 30, 2012 and 2011, and revenues constituting .2% of total revenues for the years then ended. Those financial statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for PREPA Holdings and PREPA.Net, is based solely on the reports of the other auditors.

We conducted our audits in accordance with auditing standards generally accepted in the United States and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Authority's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Authority's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the reports of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of the Authority as of June 30, 2012 and 2011, and the changes in its financial position and its cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

In accordance with *Government Auditing Standards*, we have also issued our report, dated June 3, 2013, on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to

A member firm of Ernst & Young Global Limited

**⩛ ERNST & YOUNG**

provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audits.

Accounting principles generally accepted in the United States require that management's discussion and the supplementary schedule of funding progress on pages 3 through 15 and 82 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Puerto Rico Electric Power Authority's financial statements. The supplemental schedules listed in the table of contents are presented for purposes of additional analysis and are not a required part of the financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

*Ernst + Young LLP*

June 3, 2013

Stamp No. E74116
affixed to
original of
this report.

1304-1056934

II-2

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

Year Ended June 30, 2012

This section of the financial report of the Puerto Rico Electric Power Authority (the Authority) presents the analysis of the Authority's financial performance during the fiscal years ended June 30, 2012, 2011 and 2010. As management of the Authority, we offer readers of the financial statements this narrative overview and analysis of the financial activities. We recommend readers to consider the information herein presented in conjunction with the financial statements that follow this section.

**Financial Highlights**

- Operating income for fiscal year ended June 30, 2012 was $257.0 million representing a decrease of 21.4 percent for the fiscal year ended June 30, 2011. For the fiscal year ended June 30, 2011 it was $326.9 million representing a decrease of 6.1 percent for the fiscal year ended June 30, 2010.

- Operating expenses increased by $693.4 million or 16.9 percent for the fiscal year ended June 30, 2012; and increased by $272.7 million or 7.1 percent for the fiscal year ended June 30, 2011.

- The Authority's Net Utility Plant for the fiscal year ended June 30, 2012 decreased by $13.4 million or .2 percent. For the fiscal year ended June 30, 2011 net utility plant increased by $79.8 million or 1.2 percent. For the fiscal year ended 2010 the increase was $129.2 million or 2.0 percent.

- Total assets and deferred outflows increased by $321.5 million, increased by $644.8 million and increased by $208.6 million, or 3.2 percent increase, 6.9 percent increase and 2.3 percent increase, respectively, for the fiscal years ended June 30, 2012, 2011 and 2010.

- For the fiscal year ended June 30, 2012, as compared to the fiscal year ended June 30, 2011 and June 30, 2010, accounts receivable increased by 6.8 percent from $1,277.9 million to $1,364.6 million and increased by 17.8 percent from $1,085.1 million to $1,277.9 million, respectively. The increase in 2012 was mainly due to an increase in fuel adjustment revenues.

- Accounts receivable from the governmental sector decreased 7.5 percent from $464.1 million on June 30, 2011 to $429.2 million on June 30, 2012, and increased 34.3 percent from $345.5 million on June 30, 2010 to $464.1 million on June 30, 2011.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Highlights (continued)**

- The Authority's net assets decreased by $346.2 million (200.4 percent), $272.4 million (264.7 percent) and $129.7 million (55.8 percent) as a result of operations during fiscal years ended June 30, 2012, 2011 and 2010, respectively. As of June 30, 2012, the Authority is in a net deficit position.

- Ratios of fuel and purchased power adjustment revenues to total operating revenues were 78.6 percent for 2011-2012, 75.0 percent for 2010-2011 and 72.7 percent for 2009-2010.

- Ratios of fuel oil and purchased power expense to total operating expense (excluding depreciation expense) were 82.0 percent for 2011-2012, 78.8 percent for 2010-2011 and 77.9 percent for 2009-2010.

- The increase in the fuel adjustment revenues and fuel expense for fiscal year 2012 as compared to 2011 of $606.2 million and $610.5 million, respectively, was mainly due to an increase in the average fuel oil price per barrel of $22.48 (23.4%). The increase in the fuel adjustment revenues and fuel expense for fiscal year 2011 as compared to 2010 of $322.9 million and $284.5 million, respectively, was mainly due to an increase in the average fuel oil price per barrel of $19.36 (25.3%). In addition, the increase in the fuel adjustment revenues and fuel expense for fiscal year 2010 as compared to 2009 of 94.4 million and 87.1 million, respectively, was mainly due to an increase in the average fuel oil price per barrel of $0.32 (0.4%).

- The increase in the purchased power adjustment revenue and expense of $26.3 million and $23.2 million, respectively, was due to an increase in the average cost per kwh of (1.1%) purchase power from 10 cents for fiscal 2011 to 11 cents (1.10%) for fiscal 2012. The increase in the purchased power adjustment revenue and expense of $37.3 million and $32.8 million, respectively, was due to a decrease of 179,662 MWh (or 2.6 percent) purchase power for fiscal 2011 when compared to fiscal 2010. The increase in the purchased power adjustment revenue and expense of $24.9 million and $21.9 million, respectively, was due to an increase of 234,159 MWh (or 3.6 percent) purchase power for fiscal 2010 when compared to fiscal 2009.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Plans to Address the Authority's Challenges**

The Authority faced a number of business challenges that have been exacerbated by the
Commonwealth's economic recession and the volatility in oil prices. Its principal challenges,
some of which are interrelated, are: (i) addressing the decline in electric energy sales;
(ii) addressing the volatility of oil costs; (iii) addressing high customer electric power rates;
(iv) reducing government accounts receivables; and (v) improving its liquidity.

The Authority's management focused on addressing these challenges by implementing a
financial stabilization plan and other strategic initiatives. The principal component of the
financial stabilization plan was the reduction of operating costs in line with the reduction in
electric energy sales in order to maintain adequate operating margins.

The principal cost reduction measures included in the plan are (i) reducing the number of
employees through a combination of attrition from voluntary retirement and the elimination of
temporary and vacant positions, (ii) reducing retiree health care benefits, and (iii) reducing
overtime and miscellaneous expenses. The Authority has already implemented measures that are
expected to result in recurring annual savings consisting of (i) a reduction of employees from
January 1, 2011 through June 30, 2012, (ii) changes to retiree health care benefits and (iii) other
cost reduction initiatives, such as the reduction of overtime and miscellaneous expenses, that are
expected to result in annual savings of approximately $30 million.

**Customer Care and Billing Project**

On March 2012 the Authority implemented a new Customer Service System, which will be
capable of providing detailed information on PREPA's wide customer base, as well as serving as
the energy sales Accounts Receivable Subsidiary Ledger. In addition, the Customer Care and
Billing System (CC&B) improved the quality of this important information and enhance the
financial analysis currently performed using a variety of tools. It is part of the Authority's
commitment to use technology to improve customer services quality, financial performance and
operational efficiency.

**Overview of Financial Report**

Management's Discussion and Analysis (MD&A) of operating results serves as an introduction
to the basic financial statements and supplementary information. Summary financial statement
data, key financial and operational indicators used in the Authority's strategic plan, projected
capital improvement program, operational budget and other management tools were used for this
analysis.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Required Financial Statements**

The financial statements report the financial position and operations of Puerto Rico Electric Power Authority and its blended component units, Puerto Rico Irrigation Systems and PREPA Holdings LLC as of and for the year ended June 30, 2012, which include a Balance Sheet, Statement of Revenues, Expenses and Changes in Net Assets, Statement of Cash Flows and the notes to financial statements.

PREPA Networks, Corp. issued a separate financial report that includes audited financial statements. That report may be obtained by writing to PREPA Networks, Corp. City View Plaza Suite 803, Guaynabo, Puerto Rico 00968.

The Balance Sheet presents the financial position of the Authority and provides information about the nature and amount of resources and obligations at year-end.

The Statement of Revenues, Expenses and Changes in Net Assets presents the results of the business activities over the course of the fiscal year and information as to how the net assets changed during the fiscal year.

The Statement of Cash Flows shows changes in cash and cash equivalents, resulting from operating, non-capital and capital financing, and investing activities, which include cash receipts and cash disbursement information, without consideration of the depreciation of capital assets.

The notes to the financial statements provide information required and necessary to the understanding of material information of the Authority's financial statements. These notes present information about the Authority's significant accounting policies, significant account balances and activities, risk management, obligations, commitments and contingencies, and subsequent events.

The financial statements were prepared by the Authority's management from the detail accounting books and records.

1304-1056934

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Analysis**

The Authority's net assets decreased by $346.2 million for the fiscal year ended June 30, 2012 and decreased by $272.4 million and $129.7 million for the fiscal years ended June 30, 2011 and 2010, respectively. Our analysis below focuses on the Authority's net assets and changes in net assets during the year.

**Authority's Net Assets**
(*In thousands*)

|  | 2012 | 2011 | 2010 (As restated) |
|---|---|---|---|
| Current, non-current and other assets | $ 3,454,676 | $ 3,119,743 | $ 2,554,764 |
| Capital assets | 6,799,176 | 6,812,602 | 6,732,790 |
| Total assets | $10,253,852 | $ 9,932,345 | $ 9,287,554 |
| | | | |
| Long-term debt outstanding | $ 8,330,283 | $ 7,895,288 | $ 7,572,024 |
| Other liabilities | 2,439,255 | 2,206,552 | 1,612,597 |
| Total liabilities | $10,769,538 | $10,101,840 | $ 9,184,621 |
| | | | |
| Net assets (deficit): | | | |
| Invested in capital assets, net of related debt | $ 38,122 | $ 17,070 | $ 161,389 |
| Restricted | 18,299 | 77,606 | 136,053 |
| Unrestricted | (572,107) | (264,171) | (194,509) |
| Total net assets (deficit) | $ (515,686) | $ (169,495) | $ 102,933 |

A significant portion of the Authority's net assets (deficit) is restricted and represents resources that are subject to external restrictions on how they may be used. An additional portion of the Authority's net assets reflects its investment in capital assets, less any related debt used to acquire those assets that is still outstanding.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Analysis (continued)**

Net assets invested in utility plant, net of related debt increased from $17.1 million in 2010-2011 to $38.1 million in 2011-2012, mainly due to the amortization of debt issued to finance construction at a higher pace than the depreciation of utility plant.

Restricted net assets (deficit) for capital and debt service requirements decreased from 77.6 million as of June 30, 2011 to $18.3 million as of June 30, 2012. The decrease was mainly due to an increase on outstanding Power Revenue Bonds, which a portion was deposited on the reserve account. As allowed by the 1974 Trust Agreement, cash reserves in excess of required balances were transferred to debt service accounts.

Changes in the Authority's net assets can be determined by reviewing the following condensed Statements of Revenues, Expenses and Changes in Net Assets.

### Authority's Changes in Net Assets
*(In thousands)*

|  | Year Ended June 30 | | |
|  | 2012 | 2011 | 2010 |
| --- | --- | --- | --- |
|  |  |  | *(As restated)* |
| Operating revenues | **$5,046,494** | $4,422,997 | $4,171,493 |
| Other income | **24,344** | 4,087 | 11,160 |
| Total revenues | **5,070,838** | 4,427,084 | 4,182,653 |
| Operating expenses | **4,789,469** | 4,096,080 | 3,823,396 |
| Interest expense, net | **381,943** | 370,251 | 346,653 |
| Total expenses | **5,171,412** | 4,466,331 | 4,170,049 |
| (Loss) income before contribution in lieu of taxes and other and contributed capital | **(100,574)** | (39,247) | 12,604 |
| Contribution in lieu of taxes and other | **(283,111)** | (246,758) | (232,431) |
| Loss before contributed capital | **(383,685)** | (286,005) | (219,827) |
| Contributed capital | **$37,494** | 13,577 | 90,121 |
| Change in net assets | **(346,191)** | (272,428) | (129,706) |
| Net assets at beginning of year | **(169,495)** | 102,933 | 232,639 |
| Net assets at end of year | **$ (515,686)** | $ (169,495) | $ 102,933 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Analysis (continued)**

For fiscal year ended June 30, 2012, as compared to June 30, 2011, net assets decreased by
$346.2 million.  The reduction in net assets was mainly due to a combination of factors that
include, among others, an increase in operating revenue of $623.5 million and operating
expenses of $693.4 million, as a result, there was a decrease in operating income of $69.9
million, mainly due to an increase of fuel oil price and an increase in depreciation expenses of
$63.9 million, as well as increases in interest expense, and contribution in lieu of taxes.  In
addition, the Authority's net assets were reduced by $79.4 million in fuel adjustment revenues
not billed to the customers, which were financed by the revenue stabilization fund and $37.2
million of costs related to the abandoned Via Verde Project (Natural Gas Pipeline Project),
which were registered as operating expenses.

The Authority's management has taken the following expense control measures:

The Authority reduced the number of employees through a combination of attrition from
voluntary retirement and the elimination of temporary and vacant positions. In addition, the
Authority is still enforcing the new staff hiring freeze implemented in January 2009.

The Authority's management has also identified the following strategies to stabilize the cost of
energy:

- Revenue diversification – Net income generated from two recently created subsidiaries
  will be used to find a revenue stabilization fund to reduce fuel price volatility.
- Fuel diversification – The Authority is in the process of converting generating units that
  use fuel oil to convert to burn natural gas in order to comply with new environmental
  regulations. In addition, the Authority has begun negotiations for the construction of an
  offshore gas port to receive natural gas at the south part of the island in Aguirre Steam
  Plant.
- Reducing energy theft – The Authority has implemented an energy theft reduction
  program through the use of smart grid technologies and increasing the unannounced
  door-to-door visits.

For fiscal year ended June 30, 2011, as compared to June 30, 2010, net assets decreased by
$272.4 million.  The reduction in net assets was mainly due to an increase in operating expenses
of $272.7 million, mainly due to an increase of $284.5 net of a decrease of $4.7 million in the
fuel expenses and depreciation expenses, respectively, as well as increases in interest expense
and contribution in lieu of taxes.

1304-1056934

II-9

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Analysis (continued)**

For fiscal year ended June 30, 2010, as compared to June 30, 2009, net assets decreased by $129.7 million. The reduction in net assets was mainly due to an increase in operating expenses of $172.9 million, mainly due to increases of $38.9 million and $37.8 million in the administrative and general and depreciation expenses, respectively, as well an increase in interest expense and contribution in lieu of taxes.

**Capital Assets and Debt Administration**

*__Capital Assets__*

The Authority's capital assets were restated during fiscal 2010 in order to account for prior years contributed capital which was not accounted for. The total amount of the restatement was $206,549 and was divided as follows (in thousands):

|  | 2010 | 2009 |
|---|---|---|
| Capital assets | $13,129 | $193,420 |

Investment in capital assets as of June 30, 2012, 2011 and 2010, amounts to approximately $6,799 million, $6,813 million, and $6,733 million (net of accumulated depreciation), respectively. This investment in capital assets includes land, generation, transmission and distribution systems, buildings, fixed equipment, furniture, fixtures and equipment. The total increases in the Authority's investment in capital assets (net of accumulated depreciation) were decrease by .2 percent, increased by 1.2 percent and increased by 2.0 percent for 2011-2012, 2010-2011, and 2009-2010, respectively.

A substantial portion of the capital expenditures for production plant in fiscal year ended June 30, 2012, 2011 and 2010, was spent on the rehabilitation and life extension of generating plants in order to achieve and maintain higher levels of availability, reliability and efficiency.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

*Capital Assets (continued)*

Major capital assets projects during fiscal years 2011 and 2012 included the following:

- The Authority replaced the four 21 MW combustion turbines with new four 55MW dual fuel aero-derivative combustion turbines, which represent a net increase in capacity of approximately 136 MW over the replaced combustion turbines and they will generate electricity more efficiently. The first two combustion turbines were installed in fiscal year 2010 and the remaining two were installed and in service on fiscal year 2011.

- The Authority completed the conversion of units 5 and 6 at the Costa Sur Power Plant to dual fuel, representing approximately 820 MW of generating capacity. Improvements to boiler's internal components to burn 100% of natural gas have been completed for unit 6 and are in progress for unit 5.

- The Authority is currently working in the conversion of units 1 and 2 at the Aguirre Power Plant to dual fuel, representing approximately 900 MW of generating capacity. Improvements include the evaluation of future retrofits to boiler's internal components to burn 100% of natural gas.

- The Authority has ordered the dual-fuel modules for the conversion of units 5 and 6 at the San Juan Power Plant to burn natural gas.  This project represents approximately 460 MW of generating capacity.

- The Authority is working with the regular scheduled maintenance of its steam unit fleet. Boilers and turbine-generators are included in this comprehensive maintenance program.

- The Authority is also working with the regular scheduled maintenance of its combustion turbine fleet.  Cambalache and San Juan units 5 and 6 are the key facilities included in this comprehensive maintenance program.

- The Authority has important projects for the supply of water for industrial processes and generation.  The new demineralized water plant at Costa Sur Power Plant, as well as Aguirre Power Plant water supply project are examples of key capital improvements focused on reliability and natural resources protection.

1304-1056934

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

*Capital Assets (continued)*

- The Authority repaired steam turbines generator and replaced transformers and major electrical equipment of Palo Seco steam units, which have 85 MW capacities. In addition, the Authority replaced the control room for all the units and switchgear for Palo Seco Steam Plant units two, three and four. The total cost of repairing the Palo Seco Steam Plant was approximately $125 million.

- The Authority is now constructing a 230 kV transmission line (38 mile long) between the South Coast Steam Plant and Cambalache Gas Turbines Plant's switchyard. The first stage of this project consists of the reconstruction and conversion to 230 kV of an existing 115 kV circuit line between the South Coast Steam Plant and Dos Bocas Hydroelectric Power Plant. The second stage of the project consists of the construction of a new 230 kV line from Dos Bocas to the Cambalache facilities. The construction of both stages is expected to be completed during fiscal year 2013. The estimated cost of this project is $80 million.

- The program to improve the 38 kV sub-transmission systems continues in effect, including the construction of underground 38 kV lines in Guaynabo and San Juan. In addition, major reconstruction projects of aerial 38 kV lines in the central and western part of the Island will significantly improve the reliability of the sub-transmission system.

- The Authority completed an underground 115 kV transmission circuit line around the San Juan metropolitan area in order to reduce the incidence of loss of power in the aftermath of hurricanes and other major storms, which strike Puerto Rico from time to time. This project is presently improving the reliability of its transmission system in San Juan by interconnecting two steam plants, three existing transmission centers, and four new 115 kV gas insulated substations (GIS) through a 30-mile underground loop of 115 kV. The cost of this project was $200 million. The Federal Emergency Management Agency provided $75 million for of construction for this project through grants to the Authority.

1304-1056934

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

*Capital Assets (continued)*

- Martin Peña GIS is a new gas insulated 115/38 kV transmission center with a 300 MVA installed transforming capacity. Palo Seco GIS, one of PREPA's major gas insulated 115/38 kV switchyards with direct interconnection to 600 MW of generating capability, was energized during fiscal year 2009 at a cost of $66 million. San Juan GIS, one of PREPA's major gas insulated 115/38 kV switchyards with direct interconnection through the existing air insulated 115kV bus to approximately more than 850 MW of generating capability, is expected to be in service during fiscal year 2016.

- Two major expansion projects to add 300 MVA of 115/38 kV transforming capacity in the transmission centers of Aguadilla and Ponce were completed and energized between fiscal year 2010 and the beginning of fiscal year 2011. A major expansion project that add 150 MVA of 115/38 kV transforming capacity in the Canóvanas TC was completed in 2012. A new air insulated 38 kV switchyard in the municipality of Aguadilla also started operating during fiscal year 2010. A new 150 MVA 115/38 kV transmission center in the municipality of Bayamón (Hato Tejas TC) is expected to complete in 2013. A new 450 MVA 230/115 kV transmission center in Ponce TC was completed during fiscal year 2012.

- A new 115 kV capacitor bank is in operation from 2012 in Canóvanas TC.

- The following projects are expected to be in construction for the next five years: a new 230 kV line between Aguirre steam plant and Cayey, the new 230 kV line between Costa Sur Steam Plant and Aguas Buenas, and the new transmission centers below: Venezuela TC in Río Piedras, Bairoa TC in Caguas, and Las Cruces TC in Cidra, to add 400 MVA of 115/38 kV transforming capacity.

These projects are funded from cash reserves, excess-operating revenues (when available), grants, and debt issued for such purposes.

Additional information on the Authority's capital assets can be found in Note 6 to the financial statements.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets and Debt Administration (continued)**

_**Long-Term Debt**_

At the end of the fiscal year 2012, 2011 and 2010, the Authority had total long-term debt outstanding of $8,935.5 million, $8,089.0 million and $7,587.1 million, respectively, comprised of revenue bonds and other borrowings.

**Authority's Outstanding Debt**
*(In thousands)*

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Power revenue bonds, net | **$8,311,689** | $ 7,861,252 | $ 7,495,322 |
| Notes payable | **623,813** | 227,736 | 91,792 |
|  | 8,935,502 | 8,088,988 | 7,587,114 |
| Current portion | **(985,194)** | (552,252) | (187,368) |
| Long-term debt, excluding current portion | **$7,950,308** | $ 7,536,736 | $ 7,399,746 |

During fiscal year 2012, notes payable increased $400 million mainly as a result of new revolving lines of credit to finance working capital.

The Authority maintains ratings of "Baa2" by Moody's, and "BBB+" by S&P and "BBB+" by Fitch for its bonds.

Additional information on the Authority's long-term debt can be found in Notes 8 and 11 to the financial statements.

**Economic Factors and Next Year's Budgets and Rates**

In the last five years, Puerto Rico's economy has shown a different behavior from US economy in terms of the annual Gross Domestic Product growth, even though Puerto Rico is part of the US monetary and banking systems. The US economy, measured by the Real Gross Domestic Product (GDP), increased 1.8% in calendar year 2011. In the second and third quarter of 2012, real GDP increased 1.3% and 3.1%, respectively.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Economic Factors and Next Year's Budgets and Rates (continued)**

For the fiscal year 2011, the economy of Puerto Rico measured by the Gross National Product, preliminarily decreased 1.5%, according to the Puerto Rico Planning Board. The main components of the PR economy are: manufacturing (approximately 40% of the GNP), finance, insurance and the real estate, trade and service sectors.

For the fiscal year 2012, the PR Planning Board estimated an increase of .9%, according to their last forecast of April 2012.

The Authority adopted the 2013 fiscal year budget on June 29, 2012. The total revenues for fiscal year 2012-2013 are projected to be approximately $ 4,866.7 million. In addition, the Capital Improvement Program amounted to approximately $300.0 million. The 2013 consolidated budget decreased by $61.3 million (1.2 percent) when compared to the consolidated budget approved for fiscal year 2011-2012, due mainly to a decrease on projected fuel oil price per barrel from $117.10 fro 2011-2012 to $116.25 for 2012-2013, representing a 26.5 percent. In addition, the Capital Improvement Program increased by $26.5 million, representing a 8.1 percent.

**Request for Information**

This financial report is designed to provide a general overview of the Authority's finances. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Authority's Chief Financial Officer. The executive offices of the Authority are located at 1110 Ponce de León Avenue, San Juan, Puerto Rico 00907.

## Puerto Rico Electric Power Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

### Balance Sheets
*(In thousands)*

|  | June 30 | |
|---|---|---|
|  | 2012 | 2011 |
| **Assets and deferred outflows** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 199,761 | $ 64,856 |
| Receivables, net | 1,259,782 | 1,182,468 |
| Fuel oil, at average cost | 228,681 | 228,007 |
| Materials and supplies, at average cost | 194,387 | 196,649 |
| Prepayments and other assets | 55 | — |
| Total current assets | 1,882,666 | 1,671,980 |
| Other non-current receivables | 104,780 | 95,407 |
| Restricted assets: | | |
| Cash and cash equivalents held by trustee for payment of principal and interest on bonds | 337,506 | 313,531 |
| Investments held by trustee | 636,635 | 616,506 |
| Construction fund and other special funds | 296,669 | 244,444 |
| Total restricted assets | 1,270,810 | 1,174,481 |
| Utility plant: | | |
| Plant in service | 11,703,301 | 11,156,611 |
| Accumulated depreciation | (5,768,095) | (5,364,446) |
|  | 5,935,206 | 5,792,165 |
| Construction in progress | 863,970 | 1,020,437 |
| Total utility plant, net | 6,799,176 | 6,812,602 |
| Deferred expenses: | | |
| Unamortized debt issue costs | 59,437 | 60,961 |
| Deferred outflows | 111,307 | 69,142 |
| Other | 25,676 | 47,772 |
| Total deferred expenses | 196,420 | 177,875 |
| Total assets and deferred outflows | $ 10,253,852 | $ 9,932,345 |

*(Continued)*

1304-1056934

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Balance Sheets (continued)
*(In thousands)*

|  | June 30 | |
|  | 2012 | 2011 |
| --- | ---: | ---: |
| **Liabilities and net assets** | | |
| Current liabilities: | | |
| Notes payable | $ 605,219 | $ 193,700 |
| Accounts payable and accrued liabilities | 1,038,663 | 1,251,690 |
| Customers' deposits | 49,780 | 39,505 |
| Total current liabilities | 1,693,662 | 1,484,895 |
| | | |
| Current liabilities payable from restricted assets: | | |
| Current portion of long-term debt and bond anticipation notes | 379,975 | 358,552 |
| Accrued interest | 185,757 | 183,314 |
| Other current liabilities payable from restricted assets | 51,546 | 69,408 |
| Total current liabilities payable from restricted assets | 617,278 | 611,274 |
| | | |
| Noncurrent liabilities: | | |
| Long-term debt, excluding current portion | 7,950,308 | 7,536,736 |
| Fair value of derivative instruments | 111,307 | 69,142 |
| Customers' deposits (excluding current portion) | 126,367 | 136,274 |
| Sick leave benefits to be liquidated after one year | 139,904 | 139,903 |
| Accrued unfunded other post-employment benefits liability | 130,712 | 123,616 |
| Total noncurrent liabilities | 8,458,598 | 8,005,671 |
| Total liabilities | 10,769,538 | 10,101,840 |
| | | |
| Net assets (deficit): | | |
| Invested in utility plant, net of related debt | 38,122 | 17,070 |
| Restricted for capital activity and debt service | 18,299 | 77,606 |
| Unrestricted | (572,107) | (264,171) |
| Total net assets (deficit) | (515,686) | (169,495) |
| Total liabilities and net assets | $ 10,253,852 | $ 9,932,345 |

*See accompanying notes.*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Revenues, Expenses and Changes in Net Assets
*(In thousands)*

| | Year Ended June 30 | |
| | 2012 | 2011 |
|---|---|---|
| Operating revenues | $ 5,046,494 | $ 4,422,997 |
| | | |
| Operating expenses: | | |
| Operations: | | |
| Fuel | 2,901,815 | 2,291,386 |
| Purchased power | 684,148 | 660,871 |
| Other production | 78,311 | 68,931 |
| Transmission and distribution | 178,652 | 179,002 |
| Customer accounting and collection | 113,647 | 114,995 |
| Administrative and general | 201,228 | 205,586 |
| Maintenance | 217,095 | 224,612 |
| Depreciation | 414,573 | 350,697 |
| Total operating expenses | 4,789,469 | 4,096,080 |
| Operating income | 257,025 | 326,917 |
| | | |
| Interest income and other | 24,344 | 4,087 |
| Income before interest charges, contribution in lieu of taxes | | |
| and contributed capital | 281,369 | 331,004 |
| Interest charges: | | |
| Interest on bonds | 382,604 | 378,343 |
| Interest on notes payable and other long-term debt | 4,720 | 1,882 |
| Amortization of debt discount, issuance costs and refunding loss | 6,331 | 6,497 |
| Allowance for funds used during construction | (11,712) | (16,471) |
| Total interest charges, net | 381,943 | 370,251 |
| Loss before contribution in lieu of taxes and contributed capital | (100,574) | (39,247) |
| | | |
| Contribution in lieu of taxes and other | (283,111) | (246,758) |
| Loss before contributed capital | (383,685) | (286,005) |
| | | |
| Contributed capital | 37,494 | 13,577 |
| Change in net assets | (346,191) | (272,428) |
| | | |
| Net assets, beginning balance | (169,495) | 102,933 |
| Net assets (deficit), ending balance | $ (515,686) | $ (169,495) |

*See accompanying notes.*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Cash Flows
*(In thousands)*

| | | Year Ended June 30 | |
| | | 2012 | 2011 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Cash received from customers | $ | 4,954,920 $ | 4,203,889 |
| Cash paid to suppliers and employees | | (4,871,027) | (3,675,557) |
| Net cash flows provided by operating activities | | 83,893 | 528,332 |
| | | | |
| **Cash flows from noncapital financing activities** | | | |
| Proceeds from notes payable | | 266,623 | 172,062 |
| Principal paid on notes payable | | (383,988) | (36,119) |
| Interest paid on notes payable | | (4,924) | (28,286) |
| Principal paid on fuel line of credit | | (60,000) | (125,000) |
| Proceeds from fuel line of credit | | 599,995 | 125,000 |
| Interest paid on fuel line of credit | | (6,039) | (3,100) |
| Net cash flows provided by noncapital financing activities | | 411,667 | 104,557 |
| | | | |
| **Cash flows from capital and related financing activities** | | | |
| Construction expenditures | | (370,949) | (423,872) |
| Proceeds received from contributed capital | | 7,291 | 6,064 |
| Allowance for funds used during construction | | 11,712 | 16,471 |
| Power revenue bonds: | | | |
|   Proceeds from issuance of bonds, net of original discount | | 623,421 | 361,620 |
|   Principal paid on revenue bonds maturities | | (175,455) | – |
|   Interest paid on revenue bonds | | (379,991) | (209,287) |
|   Proceeds from issuance of refunding bonds, | | | |
|    net of original discount | | 21,828 | 222,883 |
|   Defeased bonds, net of original discount or premium | | (21,844) | (200,173) |
| Proceeds from bond anticipation notes | | – | 50,750 |
| Payment of bond anticipation notes | | – | (50,000) |
| Interest paid on notes payable | | – | (201) |
| Net cash flows used in capital and related financing activities | | (283,987) | (225,745) |
| | | | |
| **Cash flows from investing activities** | | | |
| Purchases of investment securities | | (4,907,026) | (3,260,411) |
| Proceeds from sale and maturities of investment securities | | 4,880,263 | 3,042,316 |
| Interest on investments | | 24,661 | 4,860 |
| Transfer from general fund to restricted funds | | (5,000) | (15,000) |
| Net cash flows used in investing activities | | (7,102) | (228,235) |
| Net increase in cash and cash equivalents | | 204,471 | 178,909 |
| | | | |
| Cash and cash equivalents at beginning of year | | 610,553 | 431,644 |
| Cash and cash equivalents at end of year | $ | 815,024 $ | 610,553 |

*(Continued)*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Cash Flows
*(In thousands)*

|  | | Year Ended June 30 | |
|  | | 2012 | 2011 |
|---|---|---|---|
| **Cash and cash equivalents** | | | |
| Unrestricted | $ | 199,761 $ | 64,856 |
| Restricted: | | | |
| Cash and cash equivalents held by trustee for payment of principal and interest on bonds | | 337,506 | 313,531 |
| Cash and cash equivalents within construction and other special funds | | 277,757 | 232,166 |
| | $ | 815,024 $ | 610,553 |

|  | | Year Ended June 30 | |
|  | | 2012 | 2011 |
|---|---|---|---|
| **Reconciliation of net operating revenues to net cash provided by operating activities** | | | |
| Operating income | $ | 257,025 $ | 326,917 |
| Adjustments to reconcile operating income to net cash provided by operating activities: | | | |
| Depreciation | | 414,573 | 350,697 |
| Provision for uncollectible accounts and other | | 14,428 | 30,109 |
| Changes in assets and liabilities: | | | |
| Receivables | | (310,148) | (313,141) |
| Fuel oil | | (674) | (42,714) |
| Materials and supplies | | 2,304 | (17,738) |
| Prepayments and other assets | | 3,309 | 3,364 |
| Other deferred debits | | 23,620 | 47,522 |
| Noncurrent liabilities, excluding revenue bonds and notes payable | | 7,097 | 37,680 |
| Accounts payable and accrued liabilities | | (328,009) | 104,642 |
| Customer's deposits | | 368 | 994 |
| Total adjustments | | (173,132) | 201,415 |
| Net cash flows provided by operating activities | $ | 83,893 $ | 528,332 |

*See accompanying notes.*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements

June 30, 2012

## 1. Reporting Entity

Puerto Rico Electric Power Authority (the Authority) is a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the Commonwealth) created on May 2, 1941, pursuant to Act No. 83, as amended, re-enacted, and supplemented, of the Legislature of Puerto Rico (the Act) for the purpose of conserving, developing and utilizing the water, and power resources of Puerto Rico in order to promote the general welfare of the Commonwealth. Under the entity concept, the Authority is a component unit of the Commonwealth. The Authority produces, transmits, and distributes, substantially, all of the electric power consumed in Puerto Rico.

The Authority has broad powers including, among others, to issue bonds for any of its corporate purposes. The Authority is required, under the terms of a Trust Agreement dated as of January 1, 1974, as amended (the 1974 Agreement), and the Act, to determine and collect reasonable rates for electric service in order to produce revenues sufficient to cover all operating and financial obligations, as defined.

On August 18, 2003, the Commonwealth of Puerto Rico approved Act No. 189, which authorizes the Authority to create, acquire and maintain corporations, partnerships or subsidiary corporations, for profit or non-profit entities.

### Basis of Presentation – Blended Component Units

The financial statements of the Authority as of June 30, 2012 and 2011, include the financial position and operations of the Puerto Rico Irrigation Systems (Irrigation Systems) and PREPA Holdings LLC. The Irrigation Systems operate pursuant to the provisions of the Act, and Acts No. 83 and 84, approved on June 20, 1955, regarding the Puerto Rico Irrigation Service, South Coast, and Isabela Irrigation Service, respectively, and the Lajas Valley Public Irrigation Law, approved on June 10, 1953, as amended. PREPA Holdings LLC, a wholly-owned subsidiary of the Authority, was created for the sole purpose of acting as a holding company and has no current operations. PREPA Holdings LLC is the direct parent of the following entities: PREPA Networks, LLC, also known as PREPA.net; PREPA Utilities, LLC; PREPA Oil & Gas, LLC; and InterAmerican Energy Sources, LLC.

The financial statements of the Authority as of June 30, 2012 and 2011, include the financial position and operations of the Irrigation System and PREPA Holdings LLC.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**1. Reporting Entity (continued)**

**Basis of Presentation – Blended Component Units (continued)**

The Irrigations Systems and PREPA Holdings LLC conform to the requirements of
Governmental Accounting Standards Board (GASB) No. 39, *Determining Whether Certain
Organizations are Component Units,* on its stand-alone financial statements. GASB No. 39
establishes standards for defining and reporting on the financial reporting entity. It also
establishes standards for reporting participation in joint ventures. It applies to financial reporting
by primary governments, and other stand-alone governments; and it applies to the separately
issued financial statements of governmental component units. In addition, this Statement should
be applied to governmental and non-governmental component units when they are included in a
governmental financial reporting entity.

Condensed financial information as of June 30, 2012 and 2011 and for the years then ended for
the Irrigation Systems is as follows:

|  | 2012 | 2011 |
|---|---|---|
|  | *(In thousands)* | |
| Balance sheets: | | |
| Assets: | | |
| Receivables, net | $ 17,981 | $ 16,555 |
| Prepayments and other assets | 240 | 240 |
| Utility Plant, net of depreciation | 20,457 | 20,254 |
| Total assets | $ 38,678 | $ 37,049 |
| Liabilities: | | |
| Accounts payable, net | $ 1,066 | $ 1,066 |
| Statements of revenues, expenditures and changes in net assets: | | |
| Operating revenues | $ 5,977 | $ 6,002 |
| Operating expenses | (4,348) | (4,126) |
| | 1,629 | 1,876 |
| Net assets, beginning balance | 35,983 | 34,107 |
| Net assets, ending balance | $ 37,612 | $ 35,983 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**1. Reporting Entity (continued)**

**Basis of Presentation – Blended Component Units (continued)**

Pursuant to the Act, the Authority is authorized to create subsidiaries in order to, among other things, delegate or transfer any of its rights, powers, functions or duties. The Authority currently has four principal subsidiaries organized in a holding company structure. Currently, only PREPA.Net has significant operations.

PREPA.Net was created to develop strategies for commercializing the surplus capacity of the installed Optical Fiber Network (OFN), adding flexibility and diversification to its operations. PREPA.Net was created on April, 2004 and started commercial operations during fiscal year 2005-2006.

PREPA.Net provides Optical Infrastructure to carriers, ISPs and enhanced services providers – with a highly reliable island wide fiber optic network.

PREPA.Net entered into a long-term lease with PREPA for the Indefeasible Right of Use (IRU) of all PREPA's Optical Infrastructure. PREPA.Net's network features state of the art optical technology that is being used by service providers to reach undersea cable landing stations, wireless network towers, and island wide locations.

In February 2008, PREPA.Net acquired Telecomunicaciones Ultramarinas de Puerto Rico (Ultracom). Ultracom is one of the three submarine cable station administrators in Puerto Rico. This acquisition provides PREPA.Net with International fiber optic capacity and satellite teleport facilities.

PREPA Utilities, LLC, was created for the purpose of investing, financing, constructing and operating industrial projects and other infrastructure relating to the optimization of the Authority's electric infrastructure.

PREPA Oil & Gas, LLC, was created for the purpose of buying, selling, exchanging and otherwise trading or dealing with the export, import, manufacture, production, preparation, handling, storage, and distribution of oil and gas and any other fuels required to satisfy the Authority's power generation needs.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**1. Reporting Entity (continued)**

**Basis of Presentation – Blended Component Units (continued)**

InterAmerican Energy Sources was created for the purpose of investing, developing, financing, constructing and operating renewable energy projects and other infrastructure related to the optimization of the Authority's electric infrastructure. PREPA Utilities, LLC, PREPA Oil & Gas, LLC, and InterAmerican Energy Sources, LLC are currently not operating.

Condensed financial information for PREPA Holdings LLC as of June 30, 2012 and 2011 and for the year then ended is as follows:

|  | 2012 | 2011 |
|---|---|---|
|  | *(In thousands)* | |
| Balance sheets: | | |
| Assets: | | |
| Cash and cash equivalents | **$15,032** | $15,012 |
| Receivables, net | **1,577** | 1,943 |
| Prepayments and other assets | **55** | 77 |
| Utility plant, net of depreciation | **9,427** | 9,769 |
| Other receivables | **15,700** | – |
| Total assets | **$41,791** | $26,801 |
| | | |
| Liabilities: | | |
| Accounts payable, net | **$20,028** | $ 8,322 |
| Notes payable | **8,978** | 9,819 |
| Total liabilities | **$29,006** | $18,141 |
| | | |
| Statements of revenues, expenditures and changes in net assets: | | |
| Operating revenues | **$13,685** | $10,945 |
| Operating expenses | **(9,560)** | (8,261) |
| | **4,125** | 2,684 |
| | | |
| Net assets, beginning balance | **8,660** | 5,976 |
| Net assets, ending balance | **$12,785** | $ 8,660 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies**

The following is a summary of the most significant accounting policies followed by the Authority in preparing its financial statements:

**Basis of Accounting**

The accounting and reporting policies of the Authority conform to the accounting rules prescribed by the Governmental Accounting Standards Board (GASB). As such, it functions as an enterprise fund. The Authority maintains its accounting records on the accrual basis of accounting in conformity with U.S. generally accepted accounting principles. Although the Authority is not subject to all Federal Energy Regulatory Commission (FERC) regulations, the Authority has adopted the uniform system of accounts prescribed by FERC.

The Authority follows the provisions of GASB Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities that Use Proprietary Fund Accounting*, as amended by GASB Statement No. 34, which requires proprietary activities to apply all applicable GASB pronouncements as well as all Financial Accounting Standards Board (FASB) Statements and Interpretations, and Accounting Principles Board Opinions and Accounting Research Bulletins issued on or before November 30, 1989, unless the pronouncements conflict or contradict GASB pronouncements.

This pronouncement permits the adoption of all FASB Statements and Interpretations issued after November 30, 1989, except for those that conflict or contradict GASB pronouncements. The Authority, as allowed by GASB, decided not to implement any FASB Statement or Interpretation issued after November 30, 1989.

**Cash and Cash Equivalents**

For purposes of the statements of cash flows, the Authority considers all highly liquid debt instruments with maturities of three months or less when purchased to be cash equivalents. Cash and cash equivalents included in the restricted funds are considered cash equivalents for purposes of the statements of cash flows.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Receivables**

Receivables are stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions.

**Materials, Supplies and Fuel Oil**

Materials, supplies and fuel oil inventories are carried at average cost and are stated at the lower of cost or market.

**Investments**

The Authority follows the provisions of GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investment Pools*, which require the reporting of investments at fair value in the balance sheet and the recording of changes in fair value in the statement of revenues, expenses and changes in net assets. The fair value is based on quoted market prices and recognized pricing services for certain fixed income securities.

The funds under the 1974 Agreement may be invested in:

- Government obligations, which are direct obligations of, or obligations whose principal and interest is guaranteed by the U.S. Government, or obligations of certain of its agencies or instrumentalities.

- Investment obligations of any of the states or territories of the United States or political subdivisions thereof (other than obligations rated lower than the three highest grades by a nationally recognized rating agency) and repurchase agreements with commercial banks fully secured by U.S. Government obligations.

- Time deposits with Government Development Bank for Puerto Rico (GDB) or the Authority's Trustee under the 1974 Agreement or any bank or trust company member of the Federal Deposit Insurance Corporation having a combined capital and surplus of not less than $100 million.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Investments (continued)**

Effective April 1999, the 1974 Agreement was amended to provide that permitted investments of moneys to the credit of the Self-insurance Fund be expanded (subject to the Authority's adoption of an investment policy with the consent of GDB) to coincide with the investments permitted for the pension fund for employees of the Commonwealth of Puerto Rico and its instrumentalities.

Such investments include various debt instruments, such as mortgage loans and leases, common and preferred stock, real property and various other financial instruments.

**Utility Plant**

Utility plant is carried at cost, which includes labor, materials, overhead, and an allowance for the cost of funds used during construction (AFUDC). AFUDC represents the cost of borrowed funds used to finance construction work in progress. AFUDC is capitalized as an additional cost of property and as a reduction of interest expense. Capitalized interest expense is reduced by interest income earned on related investments acquired with proceeds of tax-exempt borrowings. Such costs are recovered from customers as a cost of service through depreciation charges in future periods. Capitalized interest during the years ended June 30, 2012 and 2011 amounted to $11.7 million and $16.5 million, respectively. These amounts are net of interest income earned on investments amounting to $.6 million and $.8 million, respectively.

Capital expenditures of $1,200 or more are capitalized at cost at the date of acquisition. Maintenance, repairs, and the cost of renewals of minor items of property units are charged to operating expenses. Replacements of major items of property are charged to the plant accounts. The cost of retired property, together with removal cost less salvage, is charged to accumulated depreciation with no gain or loss recognized.

The Authority follows the provisions of GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*. This statement establishes guidance for accounting and reporting for the impairment of capital assets and for insurance recoveries.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Depreciation**

Depreciation is computed on the straight-line method at rates considered adequate to allocate the cost of the various classes of property over their estimated service lives. The annual composite rate of depreciation, determined by the Authority's consulting engineers, was approximately 4.25% for 2012 and 2011.

**Unamortized Debt Issuance Expense**

Debt issuance expenses and discounts incurred in the issuance of bonds are deferred and amortized using the straight-line method, which approximates the interest method, over the term of the related debt.

For debt refunding debt, the excess of reacquisition cost over the carrying value of long-term debt is deferred and amortized to operating expenses using the straight-line method over the remaining life of the original debt or the life of the new debt, whichever is shorter.

**Pension Plan**

Pension expense is equal to the statutory required contribution to the employees' retirement system. A pension liability or asset is reported equal to the cumulative difference between annual required contributions and actual contributions.

**Other Postemployment Benefits**

Other Postemployment Benefits (OPEB) cost of healthcare provided to employees is measured and disclosed using the accrual basis of accounting (see Note 12).

**Accounting for Compensated Absences**

Accumulated unpaid vacation and sick leave pay are accrued when earned and an additional amount is accrued as a liability for the employer salary-related benefits associated with compensated absences using salary rates in effect at the balance sheets date.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Accounting for Compensated Absences (continued)**

The cost of compensated absences expected to be paid in the next twelve months is classified as current accounts payable and accrued liabilities while amounts expected to be paid after twelve months are classified as noncurrent liabilities.

**Revenue Recognition, Fuel Costs and Purchase Power**

Clients are billed monthly, except for rural clients who are billed bi-monthly. Revenues are recorded based on services rendered during each accounting period, including an estimate for unbilled services. Revenues include amounts resulting from a fuel and purchased power cost recovery clause (Fuel Adjustment Clause), which is designed to permit full recovery through customer billings of fuel costs and purchased power. Fuel costs and purchased power are reflected in operating expenses as the fuel and purchased power are consumed.

**Contributions in Lieu of Taxes and Governmental Subsidies**

The Act exempts the Authority from all taxes that otherwise would be levied on its properties and revenues by the Commonwealth and its Municipalities, except as follows:

*Municipalities*

To the extent net revenues, as defined, are available, the Authority is required under the Act to make a contribution in lieu of taxes of 11% to the Commonwealth and the Municipalities of gross electric sales as follows:

The Authority is required under the Act to make a contribution in lieu of taxes to municipalities of the greater of:

a) Twenty percent of the Authority's Adjusted Net Revenues (Net Revenues, as defined in the 1974 Agreement, less the cost of the Commonwealth rate subsidies);
b) The cost collectively of the actual electric power consumption of the municipalities; or
c) The prior five-year moving average of the contributions in lieu of taxes paid to the municipalities collectively.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Contributions in Lieu of Taxes and Governmental Subsidies (continued)**

*Municipalities (continued)*

If the Authority does not have sufficient funds available in any year to pay the contribution in lieu of taxes, the difference is accrued and carried forward for a maximum of three years. The contribution in lieu of taxes to Municipalities can be used to offset accounts receivable balance owed by the Municipalities to the Authority as permitted by law.

*Commonwealth of Puerto Rico*

To the extent net revenues are available, the Authority is also required under the Act to set aside the remainder of contribution in lieu of taxes of gross electric sales for the purpose of (i) financing capital improvements, (ii) offsetting other subsidies (other than cost of fuel adjustments to certain residential clients) of the Commonwealth, and (iii) any other lawful corporate purpose. Amounts assigned to (ii) above, are classified as a contribution in lieu of taxes in the accompanying statements of revenues, expenses and changes in net assets and reduce the related accounts receivable in the balance sheets.

**Contributed Capital**

The Authority records contributed capital as income in the year earned. The Authority receives contributed capital in the form of cash and property from residential projects developed by third parties during recent years and local and federal agencies.

**Risk Management**

The Authority purchases commercial insurance covering casualty, theft, tort claims, natural disaster and other claims covering all risk property (excluding transmission and distribution lines), boiler and machinery, boiler, machinery and public liability. In addition the Authority has a self insured fund to pay cost of repairing, replacing or reconstructing any property damaged or destroy from, or extraordinary expenses incurred as a result of a cause, which is not covered by insurance required under 1974 agreement.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

### Estimates

The preparation of the basic financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the basic financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Reclassifications

Certain reclassifications were made to 2011 figures to conform with 2012 presentation.

### Interest-Rate Swap Agreements

The Authority follows the provisions of GASB Statement No. 53, *Accounting and Financial Reporting for Derivative Instruments*. This statement establishes guidance for the recognition, measurement, and disclosure of information regarding derivative instruments.

The interest-rate swaps are used in the area of debt management to take advantage of favorable market interest rates and to limit interest rate risk associated with variable rate debt exposure.

Under the interest-rate swap programs, the Authority pays fixed and variable rate of interest based on various indices for the term of the variable interest rate Power Revenue Bonds and receives a variable rate of interest, which is also based on various indices. These indices are affected by changes in the market. The net amount received or paid under the swap agreements is recorded as an adjustment to interest expense on the statements of income.

## 3. Cash and Cash Equivalents

The 1974 Agreement established the General Fund, the Revenue Fund, and certain other funds (see Note 5). All revenues (other than income from investments and construction funds obtained from financing) are deposited in these funds. The moneys held in these funds are presented as unrestricted cash and cash equivalents in the balance sheets.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 3. Cash and Cash Equivalents (continued)

At June 30, 2012 and 2011, the carrying amount and bank balance of cash deposits held by the Authority and restricted cash deposits held by the Trustee under the 1974 Agreement are as follows (in thousands):

|  | 2012 | | 2011 | |
|---|---|---|---|---|
|  | Carrying Amount | Bank Balance | Carrying Amount | Bank Balance |
| Unrestricted | $199,761 | $ 62,630 | $ 64,856 | $ 43,915 |
| Restricted: |  |  |  |  |
| Held by the Trustee | 337,506 | 337,506 | 313,531 | 313,531 |
| Held by the Authority | 277,757 | 277,757 | 232,166 | 232,166 |
|  | $815,024 | $677,893 | $ 610,553 | $ 545,697 |

**Custodial Credit Risk – Deposits**

Custodial credit risk is the risk that in the event of a bank failure, the Bank's deposits may not be returned. The Commonwealth of Puerto Rico (the Commonwealth) requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized. Deposits maintained in GDB or Economic Development Bank (EDB) are exempt from collateral requirement established by the Commonwealth and thus represents custodial credit risk because in the event of GDB's or EDB's failure the Authority may not be able to recover the deposits. The Authority's policy is to deposit funds with either institution which provides insurance or securities as collateral. Such collateral is held by the Department of the Treasury of the Commonwealth.

All moneys deposited with the Trustee or any other Depositary hereunder in excess of the amount guaranteed by the Federal Deposit Insurance Corporation or other federal agency are continuously secured by lodging with a bank or trust company approved by the Authority and by the Trustee as custodian, or, if then permitted by law, by setting aside under control of the trust department of the bank holding such deposit, as collateral security, Government Obligations or other marketable securities.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**4. Accounts Receivable**

At June 30, receivables consist of (in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Electric and related services: |  |  |
| Government agencies and municipalities | $ 429,254 | $ 464,103 |
| Residential, industrial, and commercial | 811,077 | 720,133 |
| Recoveries under fuel adjustment clause under billed | 41,224 | 28,329 |
| Unbilled services | 226,083 | 203,499 |
| Commonwealth subsidy (fuel adjustment clause) |  |  |
| for certain residential clients | 6,326 | 12,653 |
| Miscellaneous accounts and others | 37,333 | 24,257 |
|  | 1,551,297 | 1,452,974 |
| Allowance for uncollectible accounts | (234,335) | (214,125) |
|  | 1,316,962 | 1,238,849 |
| Receivable from insurance companies and other | 46,540 | 37,649 |
| Accrued interest on investments | 1,060 | 1,377 |
| Less other non-current receivables, mostly related to |  |  |
| the Commonwealth | (104,780) | (95,407) |
|  | $1,259,782 | $1,182,468 |

On October 29, 1991, the Authority entered into an agreement with the Commonwealth for the
payment of the outstanding fuel adjustment subsidy receivable amounting to approximately $94
million. Under this agreement, the Commonwealth was paying that amount over a fifteen-year
period in installments of approximately $6.3 million per year, without interest. As of June 30,
2004, the outstanding fuel adjustment subsidy receivable amounted to approximately $31.6
million. In June 2004, the Legislature of the Commonwealth of Puerto Rico superseded the 1991
agreement with a revised agreement containing an eight-year payment schedule that totals $55.7
million. The amount owed to the Authority under the 2004 agreement includes an allocation for
past due government account receivables in addition to the unpaid balance of the fuel adjustment
subsidy. As of June 30, 2012 and 2011, the outstanding receivable amounted to approximately
$6.3 million. This amount is included in other non-current receivables in the accompanying
balance sheet.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**4. Accounts Receivable (continued)**

In addition, the Authority has other subsidies and reimbursable costs receivable from the Commonwealth, which are reduced by means of charges (accounted for as a contribution in lieu of taxes and to the extent net revenues, as defined, are available) against a portion of the 11% of gross electric sales, after the contribution in lieu of taxes to municipalities, it is required to set aside under the Act. The portion of such receivables and other governmental receivables not expected to be collected during the next fiscal year are reflected in the accompanying balance sheets as other noncurrent receivables.

**5. Restricted Assets**

At June 30, 2012 and 2011, certain investments and cash deposits of the Authority were restricted to comply with long-term principal and interest debt service requirements (sinking funds) as well as for self-insurance. These restricted assets are held by the Trustee under the 1974 Agreement (see Note 3) in the following funds:

*1974 Reserve Account* – Reserve for payment of principal of and interest on Power Revenue Bonds in the event moneys in Bond Service Account or Redemption Account are insufficient for such purpose.

*1974 Self-Insurance Fund* – Fund to pay the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of a cause, which is not covered by insurance required under the 1974 Agreement. The 1974 Self-Insurance Fund also serves as an additional reserve for the payment of the principal of and interest on the Power Revenue Bonds, and meeting the amortization requirements to the extent that moneys in the Bond Service Account, the Redemption Account and the 1974 Reserve Account are insufficient for such purpose. During fiscal years 2011-2012 and 2010-2011, the Authority deposited $5 million and $10 million, respectively to the 1974 Self-Insurance Fund.

*Bond Service Account and Redemption Account* (1974 Sinking Fund) – Current year requirements for principal of and interest on Power Revenue Bonds.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

At June 30, cash, cash equivalents and investments held by the Trustee consist of (in thousands):

| | 2012 | | 2011 | |
|---|---|---|---|---|
| | Cash and Cash Equivalents | Investments | Cash and Cash Equivalents | Investments |
| 1974 Sinking Fund - Principal | $ 185,974 | $         — | $   175,455 | $         — |
| 1974 Sinking Fund – Interest and Capitalized Interest | 141,512 | 154,548 | 138,076 | 153,958 |
| 1974 Reserve Account | — | 401,735 | — | 377,903 |
| 1974 Self-Insurance Fund | 10,020 | 80,352 | — | 84,645 |
| | $337,506 | $636,635 | $313,531 | $616,506 |

Investments held by Trustee under the 1974 Agreement are invested exclusively in securities of the U.S. Government and its agencies.

The Authority also has cash and investment securities held by the trust department of a commercial bank restricted for the following purposes:

*1974 Construction Fund* – Special fund created by the 1974 Agreement. The proceeds of any Power Revenue Bonds issued for the purpose of paying the cost of acquiring or constructing improvements, together with the money received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the 1974 Reserve Account, (iii) deposited in the Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the 1974 Construction Fund and held by the Authority in trust.

*Reserve Maintenance Fund* – Fund to pay the cost of unusual or extraordinary maintenance or repairs, not recurring annually, and renewals and replacements, including major items of equipment. The Reserve Maintenance Fund also serves as an additional reserve for the payment of principal of and interest on the Power Revenue Bonds and meeting the amortization requirements to the extent that moneys in the 1974 Sinking Fund, including money in the 1974 Reserve Account, are insufficient for such purpose. During fiscal years 2010-2011, the Authority deposited $5 million to the 1974 Reserve Maintenance Fund.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

At June 30, 2012 and 2011, the 1974 Construction Fund and Reserve Maintenance Fund consist of (in thousands):

| | 2012 | | 2011 | |
|---|---|---|---|---|
| | Cash and Cash Equivalents | Investments | Cash and Cash Equivalents | Investments |
| 1974 Construction Fund | **$275,107** | **$ 1,101** | $225,254 | $1,099 |
| Reserve Maintenance Fund | — | **15,809** | 5,012 | 10,679 |
| Other Restricted Funds | **1,900** | — | 1,900 | — |
| PREPA Client Fund | **750** | **2,002** | — | 500 |
| | **$277,757** | **$18,912** | $232,166 | $12,278 |

Following is the composition of the investments in the 1974 Construction Fund and other special funds (in thousands):

| | 2012 | 2011 |
|---|---|---|
| U.S. Government obligations | **$ 1,101** | $ 1,099 |
| Certificate of deposit | **17,811** | 11,179 |
| | **$18,912** | $12,278 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

**Investments**

The following table provides a summary of the Authority's investments by type at June 30, 2012 (in thousands):

| | Coupon Rate | Maturity Dates | Face Value | | Fair Value | % of Total Portfolio |
|---|---|---|---|---|---|---|
| **1974 Reserve Maintenance Fund** | | | | | | |
| Federal National Mortgage Association | 0.70% | Mar-15 | 5,000 | S | 5,005 | 31.7% |
| Certificate of Deposits | .16 to .19% | 7/2012 to 9/2012 | 10,804 | | 10,804 | 68.3% |
| | | | Total Portfolio | | 15,809 | |
| **1974 Self Insurance Reserve Fund** | | | | | | |
| Federal Home Loan Mortgage Corp. | 5.00% | Mar-23 | 1,386 | | 1,489 | 1.9% |
| Federal National Mortgage Association | .60 to 5.50% | 10/2014 to 06/2024 | 39,987 | | 40,761 | 50.7% |
| Federal Farm Credit Bank | 0.60% | May-15 | 10,000 | | 10,004 | 12.5% |
| Corporate Issues | .60 to 8.50% | 9/2014 to 08/2019 | 10,320 | | 12,046 | 15.0% |
| Certificate of Deposit | 0.170% | Jul-12 | 16,052 | | 16,052 | 20.0% |
| | | | Total Portfolio | | 80,352 | |
| **1974 Reserve Account** | | | | | | |
| Federal Home Loan Mortgage Corporation | 1.10 to 1.30% | 1/2017 to 02/2017 | 25,000 | | 25,148 | 6.3% |
| Federal Home Loan Bank | 1.240% | Mar-17 | 20,000 | | 20,027 | 5.0% |
| Federal National Mortgage Association | 1.20 to 1.75% | 10/2016 to 05/2017 | 75,000 | | 75,235 | 18.7% |
| Federal Farm Credit Bank | 1.19 to 1.30% | 03/2017 to 05/2017 | 40,000 | | 40,135 | 10.0% |
| Certificates of Deposits | .14 to .40% | 07/2012 to 08/2012 | 241,190 | | 241,190 | 60.0% |
| | | | Total Portfolio | | 401,735 | |
| **Sinking Fund - Capitalized Interest** | | | | | | |
| Federal Home Loan Mortgage Corporation | 0.625% | Dec-12 | 14,060 | | 14,089 | 9.1% |
| Federal Home Loan Bank | .87 to 2.00% | 08/2012 to 11/2012 | 10,600 | | 10,632 | 6.9% |
| Federal National Mortgage Association | .375 to 1.00% | 10/2012 to 12/2012 | 10,535 | | 10,551 | 6.8% |
| US Bank Money Market | .039 to 1.00% | 7/2012 to 09/2012 | 108,404 | | 108,404 | 70.1% |
| US Treasury Note | 0.625% | Jun-12 | 1,000 | | 1,000 | 0.6% |
| Corporate Issues | .55 to 6.375% | Jul-12 | 9,780 | | 9,872 | 6.4% |
| | | | Total Portfolio | | 154,548 | |
| **1974 PREPA Client** | | | | | | |
| Certificates of Deposits | | | 2,002 | | 2,002 | 100.0% |
| | | | Total Portfolio | | 2,002 | |
| **1974 Construction Fund** | | | | | | |
| Other - Rural Electrification Administration (REA) | | | 1,101 | | 1,101 | 100.0% |
| | | | Total Portfolio | | 1,101 | |
| | | | | S | 655,547 | |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

**Investments (continued)**

The following table provides a summary of the Authority's investments by type at June 30, 2011 (in thousands):

| June 30, 2011 | | | | | |
|---|---|---|---|---|---|
| | Coupon Rate | Maturity Dates | Face Value | Fair Value | % of Total Portfolio |
| **1974 Reserve Maintenance Fund** | | | | | |
| Federal National Mortgage Association | | | | | |
| Federal Farm Credit Bank | 0.16% | Jun-14 | 5,000 | $ 4,979 | 46.6% |
| Certificate of Deposits | .14 to 1.05% | 7/2011 to 8/2011 | 5,700 | 5,700 | 53.4% |
| | | | Total Portfolio | 10,679 | |
| **1974 Self Insurance Reserve Fund** | | | | | |
| Federal Home Loan Mortgage Corp. | .825 to 1.05% | 10/2013 to 6/2014 | 26,700 | 26,682 | 31.5% |
| Certificate of Deposit | .15 to .17% | Jul-11 | 57,963 | 57,963 | 68.5% |
| | | | Total Portfolio | 84,645 | |
| **1974 Reserve Account** | | | | | |
| Federal Home Loan Mortgage Corporation | 1.93 to 2.00% | 8/2014 to 8/2015 | 31,300 | 31,354 | 8.3% |
| Federal Home Loan Bank | .625 to 2.00% | 9/2015 to 12/2015 | 78,285 | 77,793 | 20.6% |
| Federal National Mortgage Association | 1.63 to 2.08% | 10/2015 to 6/2016 | 79,800 | 78,769 | 20.8% |
| Federal Farm Credit Bank | 1.85 to 2.25% | 8/2015 to 5/2016 | 76,560 | 76,576 | 20.3% |
| Certificates of Deposits | .12 to .20% | Jul-11 | 113,411 | 113,411 | 30.0% |
| | | | Total Portfolio | 377,903 | |
| **Sinking Fund - Capitalized Interest** | | | | | |
| US Treasury Note | .625 to 4.625% | 7/2011 to 8/2011 | 37,579 | 38,260 | 24.9% |
| Federal Home Loan Mortgage Corporation | 0.63% | Dec-12 | 14,060 | 14,107 | 9.2% |
| Federal Home Loan Bank | .20 to 2.00% | 9/2011 to 11/2012 | 31,220 | 31,466 | 20.4% |
| Federal National Mortgage Association | .17 to 1.25% | 7/2011 to 12/2012 | 21,839 | 21,913 | 14.2% |
| US Bank Money Market | 0.10% | | 37,400 | 37,387 | 24.3% |
| Certificates of Deposits | 0.14% | Jul-11 | 10,825 | 10,825 | 7.0% |
| | | | Total Portfolio | 153,958 | |
| **1974 Construction Fund** | | | | | |
| Other – Rural Electrification Administration (REA) | | | 1,099 | 1,099 | 100.0% |
| | | | Total Portfolio | 1,099 | |
| **1974 PREPA Client** | | | | | |
| Certificates of Deposits | | | 500 | 500 | 100.0% |
| | | | Total Portfolio | 500 | |
| | | | | $ 628,784 | |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

**Credit Risk**

Credit risk is the risk that an issuer of an investment will not fulfill its obligation to the holder of the investment. This is measured by the assignment of a rating by a nationally recognized statistical rating organization. The 1974 Trust Agreement limits investments in:

- Government obligations, which are direct obligations of, or obligations whose principal and interest is guaranteed by the U.S. Government, or obligation of certain of its agencies or instrumentalities.

- Investment obligation of any of the states or territories of the United States or political subdivisions therefore (other than obligations rated lower than the three highest grades by a nationally recognized rating agency) and repurchase agreements with commercial banks fully secured by U.S. Government Obligations.

- Time deposits with GDB or the Authority's Trustee under the 1974 Agreement or any bank or trust company member of the Federal Deposit Insurance Corporation having a combined capital and surplus of not less than $100 million.

- Self-insurance fund (sinking fund) and PREPA client fund are allowed to invest in corporate issues, with certain restrictions (40% of the total fixed income portfolio).

As of June 30, 2012, the Authority's investments in Federal Home Loan Mortgage, Federal Home Loan Bank, Federal National Mortgage Association and Federal Farm Credit Bank and Freddie Mac were rated AA+ by Standard & Poor's (S&P) and Aaa by Moody's Investors Service.

**Concentration Credit Risk**

Concentration of credit risk is the risk of loss attributable to the magnitude of investment in a single issuer by five percent or more of total investment. The Authority's investment policy does not contain a limitation to invest in the securities of single issuer. As June 30, 2012, more than 5% of the Authority's total investments are in Federal Home Loan Mortgage, Federal Home Loan Bank, Federal National Mortgage Association, Federal Farm Credit Bank, and Certificate of Deposits.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 5. Restricted Assets (continued)

### Interest Rate Risk

Interest rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment. Generally, the longer the maturity of an investment, the greater the sensitivity of its fair value to changes in market interest rates. In accordance with the 1974 Trust Agreement, the Authority manages its exposure to declines in fair values by limiting the maturity of its investment portfolio up to 5 years. Information about the sensitivity of the fair values of the Authority's investment to market interest fluctuations is provided by the following tables that show the distribution of the investments by maturity as of June 30, 2012 and 2011 (in thousands):

| | | June 30, 2012 | | |
| | | Investment Maturities | | |
| Investment Type | Fair Value | Less than 1 year | 1-5 years | Total |
|---|---|---|---|---|
| Federal Home Loan Mortgage | | | | |
|   Corporation | $ 40,726 | $ 14,089 | $ 26,637 | $ 40,726 |
| Federal Home Loan Bank | 30,659 | 10,632 | 20,027 | 30,659 |
| Federal National Mortgage | | | | |
|   Association | 131,552 | 10,551 | 121,001 | 131,552 |
| Federal Farm Credit Bank | 50,139 | – | 50,139 | 50,139 |
| Certificate of Deposits | 270,047 | 270,047 | – | 270,047 |
| Other-REA Investment | 1,101 | – | 1,101 | 1,101 |
| US Treasury Note | 1,000 | 1,000 | – | 1,000 |
| US Bank Money Market | 108,404 | 108,404 | – | 108,404 |
| Corporate Issues | 21,919 | 9,873 | 12,046 | 21,919 |
|    Total Investments | | | | $655,547 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**5. Restricted Assets (continued)**

**Interest Rate Risk (continued)**

| | | June 30, 2011 | | |
|---|---|---|---|---|
| | | **Investment Maturities** | | |
| **Investment Type** | **Fair Value** | **Less than 1 year** | **1-5 years** | **Total** |
| Federal Home Loan Mortgage Corporation | $ 45,461 | $ – | $ 45,461 | $ 45,461 |
| Federal Home Loan Bank | 135,941 | – | 135,941 | 135,941 |
| Federal National Mortgage Association | 100,682 | – | 100,682 | 100,682 |
| Federal Farm Credit Bank | 81,553 | – | 81,553 | 81,553 |
| Certificate of Deposits | 188,401 | 188,401 | – | 188,401 |
| US Treasury Note | 38,260 | 38,260 | – | 38,260 |
| US Bank Money Market | 37,387 | 37,387 | – | 37,387 |
| Other – REA Investment | 1,099 | – | 1,099 | 1,099 |
| Total Investments | | | | $628,784 |

**6. Utility Plant**

As of June 30, utility plant consists of:

| | 2012 | 2011 |
|---|---|---|
| | *(In thousands)* | |
| Distribution | $ 3,582,507 | $ 3,331,748 |
| Transmission | 2,061,408 | 2,042,152 |
| Production | 2,713,145 | 2,615,803 |
| Other production | 1,527,748 | 1,460,560 |
| Hydroelectric | 135,821 | 130,846 |
| General | 1,628,416 | 1,523,043 |
| Irrigation systems | 34,150 | 33,597 |
| Fiber Network | 20,106 | 18,862 |
| | 11,703,301 | 11,156,611 |
| Less accumulated depreciation | (5,768,095) | (5,364,446) |
| | 5,935,206 | 5,792,165 |
| Construction in progress | 863,970 | 1,020,437 |
| | $6,799,176 | $ 6,812,602 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 6. Utility Plant (continued)

Utility plant activity for the years ended June 30, 2012 and 2011 was as follows (in thousands):

| | 2011 Beginning Balance | Increases | Decreases | Transfers | 2012 Ending Balance |
|---|---|---|---|---|---|
| Utility plant | $ 11,156,611 | $ — | $(10,924) | $ 557,614 | $ 11,703,301 |
| Construction work in progress | 1,020,437 | 401,147 | — | (557,614) | 863,970 |
| Total utility plant, as restated | 12,177,048 | 401,147 | (10,924) | — | 12,567,271 |
| Less: | | | | | |
| Accumulated depreciation | (5,364,446) | (414,573) | 10,924 | — | (5,768,095) |
| Total utility plant, net as restated | $ 6,812,602 | $ (13,426) | $ — | $ — | $ 6,799,176 |

| | 2010 Beginning Balance | Increases | Decreases | Transfers | 2011 Ending Balance |
|---|---|---|---|---|---|
| Utility plant, as restated | $10,573,128 | $ — | $(8,814) | $ 592,297 | $ 11,156,611 |
| Construction work in progress | 1,182,225 | 430,509 | — | (592,297) | 1,020,437 |
| Total utility plant, as restated | 11,755,353 | 430,509 | (8,814) | — | 12,177,048 |
| Less: | | | | | |
| Accumulated depreciation | (5,022,563) | (350,697) | 8,814 | — | (5,364,446) |
| Total utility plant, net as restated | $ 6,732,790 | $ 79,812 | $ — | $ — | $ 6,812,602 |

Construction work in progress at June 30, 2012 and 2011 consists principally of expansions and upgrades to the electric generation, distribution and transmission systems.

### 7. Defeasance of Debt

In prior years, the Authority has refunded in advance certain Power Revenue Bonds and other obligations by placing the proceeds of new debt in an irrevocable trust to provide for future debt service payments on such bonds. Accordingly, the trust accounts, assets, and liabilities for the defeased bonds are not included in the Authority's financial statements. At June 30, 2012, $4,030.6 million of Power Revenue Bonds which remain outstanding are considered defeased.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

## 8. Notes Payable

The following is a summary of notes payable as of June 30, 2012 (in thousands):

| | Maturity Date | Effective Interest Rate | Current Liabilities | Long-Term Debt | Total |
|---|---|---|---|---|---|
| **June 30, 2012** | | | | | |
| Notes payable, unrestricted: | | | | | |
| Line of credit of $64.2 million to fund payments required under a settlement agreement with municipalities | June 2014 | .70%+LIBOR (V) | $ 9,700 | $10,458 | $ 20,158 |
| Loan of $41.5 to sale at discount the funds assigned by the Legislature of Puerto Rico through Joint Resolution 1290 of August 24, 2004, to pay the amount owed by the Commonwealth regarding the fuel subsidy | Nov 2012 | 4.375% (V) | 4,901 | – | 4,901 |
| Revolving line of credit of $210 million to finance working capital | Jul 2012 | 1.75%+LIBOR (V) | 140,000 | – | 140,000 |
| Revolving line of credit of $500 million to finance working capital | May 2013 | 1.75%+LIBOR (V) | 399,995 | – | 399,995 |
| Revolving line of credit of $50 million to finance fuel oil purchases | Jun 2012 | 6.00% (F) | 49,031 | – | 49,031 |
| Line of credit of $25 million to finance improvements to Isabela Irrigation System | June 2018 | 7.00% (V) | 750 | – | 750 |
| P.R. (ULTRACOM) | Feb 2023 | 3.25% (F) | 842 | 8,136 | 8,978 |
| Total notes payable | | | $605,219 | $18,594 | $623,813 |

(V) – *variable interest rate*
(F) – *fixed interest rate*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 8. Notes Payable (continued)

The following is a summary of notes payable as of June 30, 2011 (in thousands):

| | Maturity Date | Effective Interest Rate | Current Liabilities | Long-Term Debt | Total |
|---|---|---|---|---|---|
| **June 30, 2011** | | | | | |
| Notes payable, unrestricted: | | | | | |
| Line of credit of $64.2 million to fund payments required under a settlement agreement with municipalities | June, 2014 | .70%+LIBOR(v) | $ 9,700 | $ 20,158 | $ 29,858 |
| Loan of $41.5 to sale at discount the funds assigned by the Legislature of Puerto Rico through Joint Resolution 1290 of August 24, 2004, to pay the amount owed by the Commonwealth regarding the fuel subsidy | Nov- 2013 | 4.375%(v) | 5,853 | 4,901 | 10,754 |
| Revolving line of credit of $150 million to Working capital | June-2012 | 1.75%+LIBOR(v) | 150,000 | – | 150,000 |
| Line of credit of $35.0 million for the construction of Gasoducto del Sur | Aug - 2011 | 6.00%(f) | 26,485 | – | 26,485 |
| Line of credit of $25 million to finance improvements to Isabela Irrigation System | June-2018 | 7.00%(v) | 750 | – | 750 |
| PREPA.Net - Loan used in the acquisition of subsidiary, Ultramarinas de P.R. (ULTRACOM) | Feb-2023 | 3.25%(v) | 912 | 8,978 | 9,890 |
| Total notes payable | | | $193,700 | $ 34,037 | $227,737 |

(V) – *variable interest rate*
(F) – *fixed interest rate*

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**8. Notes Payable (continued)**

Short-term debt activity for the years ended June 30, 2012 and 2011 was as follows:

| | 2012 | 2011 |
|---|---|---|
| | *(In thousands)* | |
| Balance at beginning of year | $ 193,700 | $ 15,090 |
| Proceeds and transfers from long-term debt | 603,557 | 339,800 |
| Payment of short-term debt | (192,038) | (161,190) |
| Balance at end of year | $ 605,219 | $ 193,700 |
| | | |
| Notes payable – short-term: | | |
| Unrestricted | $ 605,219 | $ 193,700 |
| Total of notes payable | $ 605,219 | $ 193,700 |

**9. Accounts Payable and Accrued Liabilities**

Accounts payable and accrued liabilities at June 30, 2012 and 2011 were as follows:

| | 2012 | 2011 |
|---|---|---|
| | *(In thousands)* | |
| Accounts payable, accruals, and withholdings in process of payment | $ 650,759 | $ 898,910 |
| Additional accruals and withholdings: | | |
| Injuries and damages and other | 21,396 | 23,911 |
| Accrued vacation and payroll benefits | 62,719 | 60,609 |
| Accrued sick leave and payroll benefits - exclusive of benefits to be liquidated after one year of approximately $139.9 million in 2012 and 2011 | 19,770 | 26,665 |
| Accrued compensation | 25,786 | 22,647 |
| Accrued pension plan contribution and withholding from employees: | | |
| Employees' Retirement System | 17,679 | 16,588 |
| Employees health plan | 23,246 | 13,187 |
| Contribution in lieu of taxes | 189,900 | 176,514 |
| Other accrued liabilities | 27,408 | 12,659 |
| | $ 1,038,663 | $ 1,251,690 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 10. Other Current Liabilities Payable from Restricted Assets

|  | 2012 | 2011 |
|---|---|---|
|  | *(In thousands)* | |
| Contract retainage | $ 8,738 | $ 10,209 |
| Other liabilities | 42,808 | 59,199 |
|  | $ 51,546 | $ 69,408 |

### 11. Long-Term Debt

At June 30, long-term debt consists of:

|  | 2012 | 2011 |
|---|---|---|
|  | *(In thousands)* | |
| Power Revenue Bonds payable: | | |
| Publicly offered at various dates from 1997 to 2012, interest rates ranging from 2% to 6.25%, maturing to 2042 | $ 8,234,090 | $ 7,780,890 |
| Plus unamortized premium and debt reacquisition costs | 77,599 | 80,362 |
| Revenue bonds payable, net | 8,311,689 | 7,861,252 |
| Notes payable and bond anticipation notes | 623,813 | 227,736 |
|  | 8,935,502 | 8,088,988 |
| Less current portion of long-term debt: | | |
| Notes payable from unrestricted assets | 605,219 | 193,700 |
| Power revenue bonds | 379,975 | 358,552 |
| Current portion of long-term debt from restricted assets | 379,975 | 358,552 |
| Total current portion of long-term debt | 985,194 | 552,252 |
|  | $ 7,950,308 | $ 7,536,736 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

Long-term debt activity for the years ended June 30, 2012 and 2011 was as follows:

| | 2012 | 2011 |
|---|---|---|
| | *(In thousands)* | |
| Long-term debt excluding current portion | **$8,088,988** | $ 7,587,114 |
| New issues: | | |
| Power revenue bonds | **630,110** | 355,730 |
| Power revenue refunding bonds | **19,890** | 218,225 |
| Debt discount and excess reacquisition costs on new bond issues, – net | **(4,751)** | (10,548) |
| Defeasance of bonds | **(21,345)** | (215,940) |
| Debt discount and excess reacquisition costs on cancelled bonds, – net | **(499)** | 15,767 |
| Notes payable | **866,648** | 172,062 |
| | **9,579,041** | 8,122,410 |
| Payments: | | |
| Power revenue bond – July 1 | **(175,455)** | — |
| Power revenue bond – January 1 | **—** | — |
| Notes payable | **(470,572)** | (36,119) |
| Total payments | **(646,027)** | (36,119) |
| Amortization of debt discount and excess reacquisition costs | **2,488** | 2,697 |
| Balance at end of year | **$8,935,502** | $ 8,088,988 |
| Current portion of notes payable | **$ 605,219** | $ 193,700 |
| Current portion of power revenue bonds | **379,975** | 358,552 |
| Total current portion of long-term debt | **$ 985,194** | $ 552,252 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Power Revenue Bonds Payable**

During fiscal year 2012, the Authority issued its Power Revenue Bonds, Series 2012A and 2012B. A summary of the net proceeds of the Power Revenue Bonds, Series 2012A and 2012B and the application of the proceeds follows (in thousands):

| | |
|---|---|
| Sources: | |
| Principal amount of the bonds | $650,000 |
| Net original issue premium | (597) |
| Other available moneys | 382 |
| Total sources | $649,785 |
| | |
| Application of net proceeds: | |
| Deposit to 1974 construction fund | $359,529 |
| Deposit to reserve account | 17,183 |
| Deposit to escrow fund for the refunded bonds | 22,130 |
| Capitalized interest | 82,556 |
| Payment of Line of Credit and accrued interest | 161,901 |
| Underwriting discount and estimated legal, printing and other financing expenses | 6,486 |
| Total application of proceeds | $649,785 |

During fiscal year 2011, the Authority issued its Power Revenue Bonds, Series DDD and EEE. In addition, Series EEE was issued under the Build America Bonds (BAB's) federal program, for the purpose of financing the cost of its Capital Improvements Program (CIP). Under this program the Authority will receive a credit from the United States Treasury equal to 35% of the stated interest paid on such bonds.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Power Revenue Bonds Payable (continued)**

A summary of the net proceeds the Power Revenue Bonds, Series DDD and EEE and the application of the proceeds follows (in thousands):

| | |
|---|---:|
| Sources: | |
| Principal amount of the bonds | $573,955 |
| Net original issue premium | 14,310 |
| Deposits in bond service accounts | 2,552 |
| Authority Contribution | 150 |
| Total sources | 590,967 |
| | |
| Application of net proceeds: | |
| Deposit to 1974 construction fund | 284,466 |
| Deposit to reserve account | 14,050 |
| Deposit to escrow fund for the refunded bonds | 219,929 |
| Capitalized interest on bonds through July 1, 2012 | 12,377 |
| Payment of accrued interest on bond anticipation notes | 150 |
| Underwriting discount and estimated legal, printing and other financing expenses | 9,995 |
| Repayment of bond anticipation notes | 50,000 |
| Total application of proceeds | $590,967 |

Maturities of the Power Revenue Bonds Series 2012A, issued during fiscal year 2012 range July 1, 2028 to July 1, 2042. The Series 2012A bear fixed interest rates ranging from 5.95% to 6.25%. Interest on the Series 2012A is payable on each July 1 and January 1.

Maturities of Power Revenue Bonds Series 2012A issued during fiscal year 2012 on July 1, 2016. The Series 2012B bear a fixed interest rates ranging from 2.50% to 5.00%. Interest on the Series 2012B is payable on each July 1 and January 1.

Maturities of the Power Revenue Bonds Series DDD issued during fiscal year 2011 range from July 1, 2020 to July 1, 2024. The Series DDD Bonds bear fixed interest rates ranging from 3.625% to 3.875%. Interest on the Series DDD Bonds is payable on each July 1 and January 1.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Power Revenue Bonds Payable (continued)**

Maturities of the Power Revenue Refunding Bonds Series EEE issued during fiscal year 2011 range from July 1, 2020 to July 1, 2040. The Series EEE Bonds bear a coupon rate of 6.1%. Interest on the Series EEE Bonds is payable quarterly on each July 1, October 1, January 1 and April 1.

The Authority has issued Power Revenue Bonds pursuant to the 1974 Agreement principally for the purpose of financing the cost of improvements; as such term is defined in the 1974 Agreement, and subject to the conditions and limitations set forth therein.

In the 1974 Agreement, the Authority covenants to fix, charge, and collect rates so that revenues will be sufficient to pay current expenses and to provide the greater of (i) the required deposits or transfers under the Sinking Fund, the 1974 Self-insurance Fund and the Reserve Maintenance Fund or (ii) 120% of the aggregate principal and interest requirements for the next fiscal year on account of all outstanding Power Revenue Bonds.

Gross revenues, exclusive of income on certain investments, less current expenses as defined in the Agreement have been pledged to repay Power Revenue Bonds principal and interest.

**Bond Anticipation Notes**

Bond anticipation notes (BANs) are used primarily to provide interim construction financing and are usually retired with the proceeds of long-term debt.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Interest-Rate Swap Agreements**

To protect against the potential of rising interest rates, the Authority entered into quarterly separate pay-fixed, receive-variable interest-rate swaps at a cost anticipated to be less than what the Authority would have paid to issue fixed-rate debt.  On June 30, 2012 and 2011, the Authority had the following derivative instruments outstanding: (in thousands)

| Item | Type | Objective | Notional Amount | Effective Date | Maturity Date | Terms | Counterparty Credit Rating |
|------|------|-----------|-----------------|----------------|---------------|-------|----------------------------|
| A | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | $25,525 | 5/3/2007 | 7/1/2017 | Pay 4.014%; receive 5Y SIFMA | Aa3/A+ |
| B | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 17,000 | 5/3/2007 | 7/1/2018 | Pay 4.054%; receive 5Y SIFMA | Aa3/A+ |
| C | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 29,055 | 5/3/2007 | 7/1/2020 | Pay 4.124%; receive 5Y SIFMA | Aa3/A+ |
| D | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 14,570 | 5/3/2007 | 7/1/2025 | Pay 4.232%; receive 67% 3M LIBOR + 0.68% | Aa3/A+ |
| E | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 169,532 | 5/3/2007 | 7/1/2029 | Pay 4.08%; receive 67% 3M LIBOR + 0.52% | Aa3/A+ |
| F | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 72,800 | 5/3/2007 | 7/1/2031 | Pay 4.286%; receive 67% 3M LIBOR + 0.70% | Aa3/A+ |
| G | Pay-Fixed Interest Rate Swap | Hedge of changes in cash flows on the Series UU Bonds | 83,343 | 5/3/2007 | 7/1/2029 | Pay 4.08%; receive 67% 3M LIBOR + 0.52% | Aa3/A+ |
| H | Basis Swap Goldman Sachs | Hedges tax risk on underlying fixed rate bonds (various) and provides expected positive cash flow accrual | 550,000 | 7/1/2008 | 7/1/2037 | Pay SIFMA; receive 62% 3M LIBOR + 0.29% + 0.4669% | A2/A |
| I | Basis Swap Deutsche Bank | Hedges tax risk on underlying fixed rate bonds (various) and provides expected positive cash flow accrual | 200,000 | 5/10/2012 | 7/1/2037 | Pay SIFMA; receive 62% 3M LIBOR + 0.29% + 0.4669% | A2/A+ |
| J | Basis Swap Royal Bank of Canada | Hedges tax risk on underlying fixed rate bonds (various) and provides expected positive cash flow accrual | 400,000 | 5/10/2012 | 7/1/2037 | Pay SIFMA; receive 62% 3M LIBOR + 0.29% + 0.4669% | Aa3/AA- |
| | Total | | $1,561,825 | | | | |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Interest-Rate Swap Agreements (continued)**

Derivative instruments A through G hedge changes in cash flows of the underlying bonds — floating rate notes with coupons based on 5y SIFMA or 67% of 3m LIBOR index, and maturities equal to the maturities of the corresponding swaps. As such they are considered hedging derivative instruments. The total fair value of these instruments as of June 30, 2012 is negative $108.4 million.

The following tables include fiscal year 2012 and 2011 summary information for the Authority's effective hedges related to the outstanding swap agreements.

| Instrument Type | Changes in Fair Value | | Fair Value at June 30, 2012 | | | |
|---|---|---|---|---|---|---|
| | Classification | Amount | Classification | Amount | | Notional |
| Interest Rate Swap | Deferred Outflows | $ (56,152) | Fair value of derivative instruments | $ (108,438) | $ | 411,825 |
| Basis Swap | Deferred Outflows | 13,986 | Fair value of derivative instruments | (2,869) | | 1,150,000 |
| | Total | $ (42,166) | | $ (111,307) | $ | 1,561,825 |

| Instrument Type | Changes in Fair Value | | Fair Value at June 30, 2011 | | | |
|---|---|---|---|---|---|---|
| | Classification | Amount | Classification | Amount | | Notional |
| Interest Rate Swap | Deferred Outflows | $ 11,811 | Fair value of derivative instruments | $ (52,286) | $ | 411,825 |
| Basis Swap | Deferred Outflows | 28,985 | Fair value of derivative instruments | (16,856) | | 1,375,000 |
| | Total | $ 40,796 | | $ (69,142) | $ | 1,786,825 |

The terms, fair values and credit ratings of the outstanding interest-rate swaps as of June 30, 2012, were as follows (in thousands) (excludes basis swap):

| Associated Power Revenue Bonds | 6/30/2011 | Effective Date | Maturity Date | Fixed Rate | Fair Value | |
|---|---|---|---|---|---|---|
| | | | | | 2012 | 2011 |
| LIBOR Bonds, Series UU | $169,532 | 3-May-07 | 2-Jul-29 | 4.080% | $ (48,006) | $ (23,814) |
| LIBOR Bonds, Series UU | 14,570 | 3-May-07 | 1-Jul-25 | 4.232% | (3,454) | (1,962) |
| LIBOR Bonds, Series UU | 72,800 | 3-May-07 | 1-Jul-31 | 4.286% | (22,271) | (10,703) |
| LIBOR Bonds, Series UU | 83,343 | 3-May-07 | 2-Jul-29 | 4.080% | (24,173) | (11,857) |
| Muni-BMS Bonds, Series UU | 25,525 | 3-May-07 | 3-Jul-17 | 4.014% | (3,212) | (1,407) |
| Muni-BMS Bonds, Series UU | 17,000 | 3-May-07 | 2-Jul-18 | 4.054% | (2,409) | (945) |
| Muni-BMS Bonds, Series UU | 29,055 | 3-May-07 | 1-Jul-20 | 4.124% | (4,913) | (1,597) |
| Total | $411,825 | | | | $(108,438) | $ (52,285) |

1304-1056934

II-52

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Interest-Rate Swap Agreements (continued)**

The notional amounts of the swaps match the principal amounts of the associated Power Revenue Bonds.

During fiscal years 2011-2012 and 2010-2011, the payments of fixed rate interest from the Authority exceeded the amount received as variable interest rate from swap counter parties by $17.0 million and $13.0 million, respectively.

Using rates as of June 30, 2012, debt service requirements of the variable-rate debt and net swap payments, assuming current interest rates remain the same for their term. These debt service requirements are included in the scheduled maturities of long-term debt disclosed further on this note. As rates vary, variable-rate bond interest payments and net swap payments will vary.

| Fiscal Year Ending June 30 | Principal | Interest | Interest-Rate Swap, Net | Total |
|---|---|---|---|---|
| | | | *(In thousands)* | |
| 2013 | $    – | $  3,673 | $  13,293 | $  16,966 |
| 2014 | – | 3,673 | 13,293 | 16,966 |
| 2015 | – | 3,673 | 13,293 | 16,966 |
| 2016 | – | 3,673 | 13,293 | 16,966 |
| 2017 | – | 3,673 | 13,293 | 16,966 |
| 2018-2031 | 411,825 | 37,780 | 138,927 | 588,532 |
| Total | $411,825 | $56,145 | $205,392 | $673,362 |

As of June 30, 2012 and 2011, the swaps had a negative fair value of approximately $108.4 million and $52.3 million, respectively. The negative fair value of the swaps may be countered by reduction in future net interest payments required on the variable-rate Power Revenue Bonds, creating higher synthetic rates.

As of June 30, 2012 and 2011, the Authority was not exposed to credit risk because the swaps had a negative fair value in the amount of the swaps' fair value. However, should interest rates change and the fair value of the swap become positive, the Authority would be exposed to credit risk in the amount of the derivative's fair value. The swaps counterparties were rated Aa1 and Aa3 as issued by Moody's Investor Services (Moody's), AA- and A+ by Standard & Poors (S&P), and AA- and A+ by Fitch Ratings.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Interest-Rate Swap Agreements (continued)**

The derivative contract uses the International Swaps and Derivatives Association, Inc. master agreement, which includes standard termination events, such as failure to pay bankruptcy. The Authority or the counterparties may terminate the swaps if the other party fails to perform under the terms of the contracts. Also, the swaps may be terminated by the Authority if the counterparties' credit quality rating falls below Baa1 as issued by Moody's or BBB+ as determined by S&P. If at the time of termination the swap has a negative fair value, the Authority would be liable to the counterparty for a payment equal to the swap's fair value.

**Basis Swap Agreement**

In March 2008 (with effective date of July 1, 2008), the Authority entered into a basis swap agreement in the notional amount of $1,375 million with an amortization schedule matching certain maturities of the Authority's outstanding power revenue and revenue refunding bonds issued in various years from 2027 to 2037 (the 2008 basis swap). Under the terms of a master swap agreement, the Authority receives from its counterparty (Goldman Sachs Capital Markets, L.P., an affiliate of Goldman, Sachs & Co.) quarterly, commencing on October 1, 2008, a floating amount applied to said notional amount at a rate equal to 62% of the taxable London Inter-Bank Offering Rate (LIBOR) index reset each week plus 29 basis points (hundredths of a percent) and a fixed rate payment of 0.4669% per annum (the "basis annuity"), quarterly for the term of swap in return for quarterly payments by the Authority, commencing also on October 1, 2008, on such notional amount at a rate based on the Securities Industry and Financial Markets Association (SIFMA) municipal swap index.

On May 10, 2012, the Authority terminated a portion of notional amount the 2008 basis swap by $225 million. In addition, the Authority entered into novation transactions to transfer the counterparty from Goldman, Sachs & Co to Deutsche Bank and Royal Bank of Canada the following notional amounts $200 million and $400 million, respectively.

The basis swap hedges the portion of the fair value of the underlying liabilities attributable to the relative value/basis risk between tax-exempt and taxable rates. Because of the tax-exemption, tax-exempt bonds trade at yields lower than taxable yields. The percent at which tax-exempt yields trade relative to taxable yields (UST or LIBOR) is referred to as MMD ratios or muni-bond ratios.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Basis Swap Agreement (continued)**

In order to assess effectiveness of the basis swap as a hedge, the Authority ran a regression of SIFMA ratios (as an independent variable) and MMD ratios (as dependent variable), adjusting to the specific circumstances. The result showed a high correlation. The method used can be qualified as Other Quantitative Method.

Because the MMD ratios and SIFMA ratios reflected respectively the change in the relative value of the tax-exempt rates to taxables in the bond market and the SIFMA swap market, the Authority concluded that the regression showed that the SIFMA swap could effectively hedge the bond's value attributable to basis risk between tax-exempt and taxables and, therefore, the basis swap was considered an effective hedge instrument under GASB 53.

By using derivative financial instruments to hedge the exposure to changes in interest rates, the Authority exposes itself to credit risk, market-access risk and basis risk. Credit risk is the failure of the counterparty to perform under the terms of the derivative contract. When the fair value of a derivative contract is positive, the counterparty owes the Authority, which creates a credit risk for the Authority. When the fair value of the derivative contract is negative, the Authority owes to the counterparty and, therefore, does not pose credit risk to the Authority. The Authority minimizes the credit risk in derivative instruments by entering into transactions with high-quality counterparties whose credit rating is acceptable under the investment policies of the Authority and of Government Development Bank for Puerto Rico (GDB), its fiscal agent.

Market risk is the adverse effect on the value of a financial instrument that results from a change in interest rates. The market risk associated with an interest rate swap contract is managed by establishing and monitoring parameters that limit the types and degree of market risk that may be undertaken. The Authority assesses market risk by continually identifying and monitoring changes in interest rate exposures that may adversely affect expected interest rate swap contract cash flows and evaluating other hedging opportunities. The Authority and GDB maintain risk management control systems to monitor interest rate cash flow risk attributable to both the Authority's outstanding or forecasted debt obligations as well as the Authority's offsetting hedge positions.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Basis Swap Agreement (continued)**

Basis risk arises when different indices are used in connection with a derivative instrument such as an interest rate swap contract. The 2008 basis swap exposes the Authority to basis risk should the relationship between LIBOR and the SIFMA municipal swap index converge. If a change occurs that results in the relationship moving to convergence, the expected financial benefits may not be realized. The Authority assesses basis risk by following the aforementioned market risks control system.

During the fiscal years 2011-2012 and 2010-2011, the Authority received from its counterparty $10.6 million and $9.6 million, respectively. The following table shows the cash flow benefit of the basis annuity in exchange for the Authority taking tax and other basis risks tied to the change in the relationship between LIBOR and the SIFMA municipal swap index.

|  | 2011-2012 | 2010-2011 |
|---|---|---|
|  | *(In thousands)* | |
| Basis annuity received | $ 5,194 | $ 6,420 |
| LIBOR index amounts received | 7,291 | 6,685 |
| SIFMA index amounts paid | (1,877) | (3,499) |
| Net amount received | $10,608 | $ 9,606 |

As of June 30, 2012 and 2011, the 2008 basis swap had a negative fair value to the Authority of approximately $2.8 million and $16.9 million, respectively. The negative fair value of the basis swap may be viewed as a reduction in future benefits to be received from the counterparty.

According to the Credit Support Annex of the Master Swap Agreement, if the fair value of the 2008 basis swap is negative and exceeds the threshold amount, the Authority shall post eligible collateral on the next business day upon notification from its counterparty. During fiscal year 2009-2010 the threshold amount for the Authority was $50 million. The Authority and GDB entered into an agreement for a $150 million revolving line of credit to meet collateral posting requirements from the 2009 basis swap. As of June 30, 2012 and 2011, there was no balance outstanding on the line of credit.

As of June 30, 2012 and 2011, negative fair values of the derivative instruments are $111.3 million and $69.1 million, respectively.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**11. Long-Term Debt (continued)**

**Basis Swap Agreement (continued)**

During the fiscal year 2012, the Authority entered into a 2012 Commodity Swap Agreement that will provide it with protection against increased in the price of fuel of oil No. 6. Under these contracts which cover 10.2 million barrels. The notional amount of the swaps match with the barrel of fuel.

The premium amount of the commodity swap was $29.2 million, which will be amortized from June 2012 to October 2013. On June 2012, the Authority paid to its counterparties $141,500. These derivative instruments as of June 30, 2012 had a fair value of $0.

**Scheduled Maturities of Long-Term Debt**

The scheduled maturities of long-term debt with interest thereon at June 30, 2012, are as follows:

| Fiscal Year Ending June 30, | Principal | Interest | Total |
|---|---|---|---|
| | *(In thousands)* | | |
| 2013 | $  985,744 | $  399,942 | $  1,385,686 |
| 2014 | 215,605 | 390,321 | 605,926 |
| 2015 | 215,252 | 380,066 | 595,318 |
| 2016 | 224,877 | 368,957 | 593,834 |
| 2017 | 238,207 | 357,291 | 595,498 |
| 2018-2022 | 1,383,823 | 1,594,615 | 2,978,438 |
| 2023-2027 | 1,760,425 | 1,214,404 | 2,974,829 |
| 2028-2032 | 1,634,910 | 767,266 | 2,402,176 |
| 2033-2037 | 926,310 | 461,377 | 1,387,687 |
| 2038-2042 | 1,272,750 | 178,981 | 1,451,731 |
| Total | 8,857,903 | 6,113,220 | 14,971,123 |
| Less: | | | |
| Unamortized discount and premium | (184,939) | – | (184,939) |
| Excess reacquisition costs | 107,340 | – | 107,340 |
| Interest | – | 6,113,220 | 6,113,220 |
| Total long-term debt | 8,935,502 | – | 8,935,502 |
| Current portion of notes payable | (605,219) | – | (605,219) |
| Current portion, net of discount and excess reacquisition costs of bonds | (379,975) | – | (379,975) |
| Total current portion | (985,194) | – | (985,194) |
| Long-term debt, excluding current portion | $ 7,950,308 | $         – | $ 7,950,308 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

## 12. Employees' Retirement Benefits

**Pension Plan**

Plan Description

All of the Authority's permanent full-time employees are eligible to participate in the Authority's Pension Plan, a single employer defined benefit pension plan (the Plan) administered by the Employees' Retirement System of the Puerto Rico Electric Power Authority (the System). The System issues a publicly available financial report that includes financial statements and required supplementary information for the Plan. That report may be obtained by writing to the Retirement System of the Puerto Rico Electric Power Authority, PO Box 13978, San Juan, Puerto Rico 00908-3978.

Benefits include maximum retirement benefits of 75% of average basic salary (based on the three highest annual basic salaries) for employees with 30 years of service; also, reduced benefits are available upon early retirement. The Plan was amended on February 9, 1993 to provide revised benefits to new employees limiting the maximum retirement basic salary to $50,000. The plan was further amended in January 1, 2000 to provide improved retirement benefits to employees with 25 years or more of credited service. Disability and death benefits are also provided. Separation benefits fully vest upon reaching 10 years of credited service.

If a member's employment is terminated before he becomes eligible for any other benefits under this Plan, he shall receive a refund of his member contribution plus interest compounded annually. The Plan is not subject to the requirements of the Employees Retirement Income Security Act of 1974 (ERISA).

Funding Policy and Annual Pension Cost

The contribution requirements of plan members and the Authority are established and may be amended by the Authority. The Annual Pension Cost (APC) and the Annual Required Contribution (ARC) were computed as part of an actuarial valuation performed as of June 30, 2011 and projected to June 30, 2012, based on current year demographic data.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

The Authority's annual pension cost for the year ended June 30, 2012 and related information for the Plan and supplemental benefits follows:

| | **Pension Plan** |
|---|---|
| Contribution rates: | |
|   Authority | 23.86% |
|   Plan members | 10.28% |
| Annual pension cost (thousands) | $84,623 |
| Contributions made and accruals (thousands) | $84,300 |
| Actuarial valuation date | 6/30/2010 |
| Actuarial cost method | Individual:  Normal |
| Amortization method | Level percentage of pay, closed (4% payroll increases per year) |
| Remaining amortization period | 30 years |
| Asset valuation method | 5-year smoothed market |
| Actuarial assumptions: | |
|   Investment rate of return (net of administrative expenses)* | 8.5% |
|   Projected salary increases* | 4.10% – 5.40% depending on age |
| *Includes inflation at | 3.0% |
| Cost-of-living adjustments | 8% per year for yearly pension up to $3,600 and 4% per year for yearly pension between $3,600 and $7,200, 2% per year for yearly pension in excess of $7,200. The minimum adjustment is $300 per year. The maximum is $600 per year. |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Supplemental Benefits not Funded Through the System (continued)**

Trend Information
*(In millions)*

| Fiscal Year Ended | Annual Pension Cost (APC) | Percentage of APC Contributed | Net Pension Obligation |
|---|---|---|---|
| Pension Plan: | | | |
| 06/30/04 | $   65.0 | 81% | $   12.3 |
| 06/30/05 | 69.9 | 100% | 12.6 |
| 06/30/06 | 74.8 | 100% | 12.9 |
| 06/30/07 | 74.6 | 100% | 13.2 |
| 06/30/08 | 76.3 | 100% | 13.5 |
| 06/30/09 | 78.6 | 100% | 13.8 |
| 06/30/10 | 75.9 | 100% | 14.1 |
| 06/30/11 | 85.4 | 100% | 14.4 |
| 06/30/12 | 84.6 | 100% | 14.7 |

The annual required contribution amounted to $84.6 million and $85.4 million in 2012 and 2011, respectively. The net pension obligation is included in accounts payable and accrued liabilities on the balance sheet.

**Supplemental Benefits not Funded Through the System**

Supplemental benefits were unfunded and such benefits were reimbursed to the System when paid up to December 31, 1999. Effective January 1, 2000, the Board of Trustees of the System approved the transfer of the obligation for supplemental benefits provided by the Authority and not funded through the System (supplemental pension obligations exchanged for forfeited sick leave benefits and the supplemental spousal survivor benefits) to the Retirement System. Also, the Board of Trustees of the System accepted an amortization period for the Plan of 40 years, which commenced on June 30, 1996.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Supplemental Benefits not Funded Through the System (continued)**

Supplemental Pension Obligations Exchanged for Forfeited Sick Leave Benefits

The Authority's employees with over 20 years of service are entitled to exchange accrued sick leave for supplemental pension benefits just to complete merit annuity (30 years of service) and/or be paid in cash the value of such sick leave upon separation from employment.

**Other Post-Employment Benefits (OPEB)**

Postemployment Health Plan

*Plan Description* – PREPA Retired Employees Healthcare Plan (Health Plan) is a single-employer defined benefit healthcare plan administered by the Authority. During the fiscal year 2009-2010, the Authority adopted a resolution to change the Health Plan. The Health Plan for all retirees will be capped at $300 per member per month for retirees and spouses under age 65 and $200 per member per month for retirees and spouses age 65 and over.

*Membership* – During the fiscal year 2009-2010, the Health Plan changed to require all new retired employees on or after September 1, 2009, to have 30 year of services to receive health benefits. Certain retired employees on or after September 1, 2009, all retired employees before September 1, 2009, their legal spouses, and certain disabled dependents are eligible to participate in the Postretirement Health Plan. To remain eligible for participation, Medicare eligible retired participants and their spouses must enroll in Medicare Part B at age 65, or whenever eligible, at their own expenses. The benefit provisions to retired employees are established and may be amended by the Authority.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

## 12. Employees' Retirement Benefits (continued)

### Other Post-Employment Benefits (OPEB) (continued)

*Funding Policy and Annual OPEB Cost* – The required contribution is based on projected pay-as-you-go financing requirements. The contribution requirements of plan members and the Authority are established and may be amended by the Authority.

The Annual OPEB Cost is calculated based on the Annual Required Contribution (ARC) of the employer, an amount actuarially determined in accordance with the provisions of GASB Statement No. 45. The ARC represents a level of funding that, if paid on ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed thirty years. The following table shows the components of the Authority's annual OPEB cost for the fiscal year 2011-2012 and 2010-2011 (in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Annual OPEB cost | $ 28,555 | $ 27,376 |
| Actuarial Accrued Liability (AAL) | $ 612,674 | $ 612,674 |
| Unfunded AAL | $ 612,674 | $ 612,674 |
| Funded Ratio | 0% | 0% |
| Annual Covered Payroll | $ 357,405 | $ 362,893 |

The net OPEB obligation change is as follows (in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Change in net OPEB obligation: |  |  |
| Net OPEB obligation, beginning balance | $123,616 | $ 118,331 |
| Total annual required contribution (ARC), July 1– June 30 | 27,731 | 26,587 |
| Interest on Net OPEB obligation | 4,944 | 4,733 |
| Adjustments to annual required contribution | (4,120) | (3,944) |
| Actual benefit payments, July 1–June 30 | (21,459) | (22,091) |
| Net OPEB obligation, ending balance | $130,712 | $123,616 |

For the fiscal years ended June 30, 2012 and 2011, the Authority's annual OPEB expense was $28.6 million and $27.4 million, respectively. This expense is included in Administrative and General Expenses.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Other Post-Employment Benefits (OPEB) (continued)**

Postemployment Health Plan (continued)

The OPEB expense is not equal to the Annual Required Contribution, which is considered in operating expenses in the Authority's Statement of Revenues, Expenses and Changes in Net Assets. The actual payment to the health plan for retirees and their beneficiaries, which totaled $21.4 million, is included in Administrative and General Expenses.

For the fiscal year ended June 30, 2012, the Authority's annual OPEB expense of $27.4 million. The OPEB expense is considered in operating expenses in the Authority's Statement of Revenues, Expenses and Changes in Net Assets. The payment to the health plan for retirees and their beneficiaries, which totaled $22.1 million for fiscal year 2012, is included in Administrative and General Expenses.

The Authority's annual OPEB cost, and the net OPEB obligation for 2012 and the three preceding years were as follows:

**Trend Information**
*(In millions)*

| Fiscal Year Ended | Annual OPEB Cost | Percentage of Annual OPEB Cost Contributed | Net OPEB Obligation |
|---|---|---|---|
| 06/30/09 | $ 25.6 | 316% | $  134.2 |
| 06/30/10 | $ 27.5 | 158% | $  118.3 |
| 06/30/11 | $ 27.4 | 81% | $  123.6 |
| 06/30/12 | $ 28.6 | 75% | $  130.7 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**12. Employees' Retirement Benefits (continued)**

**Other Post-Employment Benefits (OPEB) (continued)**

Postemployment Health Plan (continued)

*OPEB Actuarial Valuation* – The Authority's other Post-Employment Benefits Program actuarial valuation was conducted by Cavanaugh Macdonald Consulting, LLC. Cavanaugh Macdonald Consulting, LLC is a member of the American Academy of Actuaries. The valuation was performed in accordance with GASB Statement No. 45 requirements.

Actuarial Methods and Assumptions:

| | |
|---|---|
| Actuarial Valuation Date | July 1, 2010 |
| Actuarial Cost Method | Projected Unit Credit |
| Amortization method | Level Percent of Pay, Open |
| Remaining Amortization Period | 30 years |
| Actuarial Assets Valuation Method | Market Value of Assets |
| Investment Rate of Return | 4% (includes inflation rate) |
| Inflation Rate: | 3% |
|    Medical | Not applicable |
|    Prescription drug | Not applicable |
|    Dental | Not applicable |
| Projected Salary Increases | 4% |

The required schedule of funding progress, included supplementary information (Schedule I) that presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

The actuarial calculations reflect a long-term perspective. Consistent with that perspective, actuarial methods and assumptions used include techniques that are designed to reduce short-term volatility in actuarial accrued liabilities and the actuarial value of assets.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 13. Revenues from Major Clients and Related Parties

Electric operating revenues from major clients and related parties are as follows:

|  | 2012 | 2011 |
|---|---|---|
|  | *(In thousands)* | |
| Governmental sector, principally instrumentalities, agencies and corporations of the Commonwealth of Puerto Rico | $ 577,625 | $ 534,323 |
| Municipalities of the Commonwealth of Puerto Rico | 248,142 | 212,462 |
|  | $ 825,767 | $ 746,785 |

### 14. Net Assets

Restricted assets at June 30, 2012 and 2011 include $18.3 million and $77.6 million, respectively, which have been appropriated principally to comply with long-term principal and interest debt services requirements and a reserve for damaged or destroyed property of the Authority not fully covered by insurance as required by the 1974 Agreement. Funds set aside for self-insurance purposes are deposited in the Self-Insurance Fund held by the Trustee (see Note 5).

As of June 30, 2012, the Authority is in a net deficit position. The Authority faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession, the volatility in oil prices, and the fact that the Authority has not increased rates to its customers at sufficient levels to offset the effects of its rising costs. Its principal challenges, some of which are interrelated, are: (i) addressing the decline in electric energy sales; (ii) addressing the volatility of oil costs; (iii) addressing high customer electric power rates; (iv) reducing government accounts receivables; and (v) improving its liquidity. The Authority is committed to take all necessary measures to ensure it achieves a healthy financial condition.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

## 15. Contribution in Lieu of Taxes

|  | 2012 | 2011 |
|---|---|---|
|  | *(In thousands)* | |
| Municipalities | **$244,265** | $212,462 |
| Commonwealth: | | |
|   Hotels | **9,108** | 7,449 |
|   Fuel adjustment subsidy | **29,738** | 26,847 |
|  | **$283,111** | $246,758 |

## 16. Commitments and Contingencies

### Environmental Matters

Facilities and operations of the Authority are subject to regulation under numerous Federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, Oil Pollution Act (OPA), Resource Conservation Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and Underground Storage Tanks, among others.

In February 1992, the Environmental Protection Agency (EPA) conducted a multimedia inspection of the Authority's facilities and identified several alleged instances of non-compliance related to the Authority's air, water and oil spill prevention control and countermeasures compliance programs.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

The Authority and the EPA undertook negotiations to resolve the issues regarding the deficiencies observed during the inspection and to ensure future compliance with all applicable laws and regulations. As a result of the negotiations, the Authority and the EPA reached an agreement that resulted in a consent decree (the Consent Decree) approved by the United States federal court in March 1999. Under the terms and conditions of the Consent Decree, the Authority paid a civil penalty of $1.5 million, and implemented additional compliance projects amounting $4.5 million. In addition, the Consent Decree requires that the Authority improves and implements compliance programs and operations in order to assure compliance with environmental laws and regulations.

In 2004, the United States federal court approved a modification to the Consent Decree agreed by the Authority and the EPA under which the Authority reduced, in two steps, the sulfur content in the No. 6 fuel oil used in certain generating units of its Costa Sur and Aguirre power plants (to 0.75% or less by March 1, 2005 and to 0.5% or less by March 1, 2007), and used No. 6 fuel oil with sulfur content of not more than 0.5% through July 18, 2009 at its Palo Seco and San Juan power plants. Additionally, the Authority has completed a nitrogen oxide emissions reduction program and modified the optimal operating ranges for all its units under the Consent Decree. The Authority also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs under the Consent Decree.

PREPA has audited the Consent Decree programs and a considerable number of them can be closed since their requirements have been completed. The programs can be closed under a Stipulation of Partial Termination filed jointly, in federal court, with the Environmental Protection Agency.

Since September 2004, there has been no legal action in the United States federal court or any administrative proceeding against the Authority regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of non-compliance. Non compliance events must be disclosed to EPA in the corresponding report. Ordinarily, when a covered non compliance event occurs, the Authority pays the stipulated penalty in advance in order to benefit from a 50% discount of the applicable stipulated penalty.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

*Other Proceedings*

In 1997, as a result of an inspection carried out by the EPA and the Puerto Rico Environmental Quality Board (the EQB) at the Authority's Palo Seco power plant, the EPA issued an Administrative Order for the investigation and possible remediation of seven areas identified by the EPA at the Palo Seco power plant and the Palo Seco General Warehouse (Depot). The Administrative Order required the Authority to carry out a Remedial Investigation/Feasibility Study (RI/FS). The RI/FS required under the order was designed to: (1) determine the nature and extent of contamination and any threat to the public health, welfare or environmental caused by any release or threatened release of hazardous substances, pollutants, or contaminants at or from the site; and (2) determine and evaluate alternatives for the remediation or control of the release or threatened release of hazardous substances, pollutants, or contaminants at or from the site. The RI was completed and a final report was submitted to EPA for evaluation.

The information gathered under the RI reflected the presence of free product (Separate Phase Hydrocarbons) in several monitoring wells. The analysis of this product also reflected a low concentration of polychlorinated biphenyls (PCBs). PREPA and EPA entered into an Administrative Order on Consent (AOC) (CERCLA-02-2008-2022) requiring the Authority to complete a removal plan that consisted of determining if the underground water had been impacted by PCBs, the extension of the contamination and the implementation of a work plan for free product removal. Analytical data collected during this activity reflected that underground water had not been impacted by PCBs. Nevertheless, water/oil mix was found in seven monitoring wells (MWs). PCBs concentrations between 1.36-2.36 parts per million were detected in the oil found in 3 of the 7 MWs. Multiphase extraction (MPE) activities in the MWs where water/oil phases were found, has been performed on a weekly basis. After several MPE, this activity was discontinued as USEPA's recommendations.

On April 19, 2012 PREPA submitted for EPA's review and approval the final report letter for the AOC. On August 13, 2012, EPA notified by certified mail, that the final report was reviewed and determines that the work required pursuant the AOC has been fully carried out in accordance with its terms. Also the letter indicated that the notification shall not affected any continuing obligation of respondents, including but not limited to the reimbursement of EPA response costs, as specified in the AOC.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

*Other Proceedings (continued)*

Based the findings of the RI, the Human Health Risk Assessment, the Screening Level
Ecological Risk Assessment and the AOC, NO ACTION recommendation under CERCLA for
the PREPA Palo Seco site is believed to be protective of human health and environment. The
risk assessments indicate that the levels of residual contaminants present at the site fall within
EPA acceptable risk range. This non-action remedy complies with the federal and
commonwealth requirements.

Both Orders also established a Reimbursement of Costs condition in which the Authority agreed
to reimburse EPA for all costs incurred by EPA in connection to the site. No bill has been
received by the Authority, as of this date.

In 2002, the Authority received a "Special Notice Concerning Remedial Investigation/Feasibility
Study for Soil at the Vega Baja Solid Waste Disposal Superfund Site. The EPA has identified the
Authority and six other entities as "potentially responsible parties", as defined in the CERCLA.
In 2003, the Authority agreed to join the other potentially responsible parties in an
Administrative Order on Consent (AOC) for an RI/FS, with the understanding that such
agreement did not constitute an acceptance of responsibility. Under the AOC, the Authority
committed up to $250,000 as its contribution to partially fund the RI/FS. At this time, RI/FS has
been completed. The work proceeded in accordance with the schedule established by the
Authority and the other designated potentially responsible parties. On July 2010, a proposed Plan
was issued identifying the Preferred Alternative to address soil contamination at the Vega Baja
Solid Waste Disposal Site. EPA held a public hearing on August 3, 2010 to discuss the
alternatives to address soil contamination.

The Record of Decision (ROD) was published as scheduled by EPA on September 30, 2011.
Alternative No. 2, Removal with On-Site Consolidation and Cover in the Non-Residential Area,
was selected. From this point on, EPA resumed negotiations with the Potential Responsible
Parties (PRP's), both private and public, towards signing a Consent Decree through which the
PRP's would contribute enough funds to cover the costs of the remedial action and the
maintenance of the site. PREPA has already approved a contribution of $1,000,000 through
Resolution 3804, April 1, 2011. Notwithstanding, through further negotiations an additional
contribution of $300,000 was required by EPA. This additional contribution was approved by
PREPA's Governing Board.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Environmental Matters (continued)**

*Other Proceedings (continued)*

On December 4, 2012, the Federal Department of Justice lodged with the Court the Consent Decree (CD) Civil Action No. 3:12-cv-01988, which requires that PREPA shall pay to EPA for the Past Response Costs of the agency the amounts of $300,000 within 30 days of the effective date; $300,000 not later than August 15, 2013 and $300,000 not later than August 15, 2014. Also, an Environmental Escrow account must be created to serve as financial assurance for the performance of the obligations under the CD. PREPA shall deposit $400,000 into the escrow account within 60 days of the effective date of the CD. The effective date of the CD has not been established yet.

This CD can be terminated upon motion by any party, provided that all public Defendants have satisfied their obligations of payments of Response Cost and Stipulated Penalties.

**Compliance Programs**

The Authority continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

*Air Quality Compliance*

The Authority is consistently maintaining a 99% or better level of compliance with in stack opacity requirements. The Authority continues to use No. 6 fuel oil with sulfur content of 0.5% or better in its San Juan, Palo Seco and Aguirre Power Plants. The South Coast Units 5 and 6 have been converted to use natural gas and are currently operating on a 70%natural gas / 30% No. 6 fuel oil scenario. Units 3 and 4 operate minimally. This contributes to maintain air quality.

The Authority is also evaluating conversion projects for Aguirre, San Juan and Palo Seco. All the conversion will also facilitate compliance with the Mercury and Air Toxics Standards final rule.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*QA/QC Continuous Monitoring Program*

This program requires quarterly audits to the opacity monitors in PREPA's power plants to insure compliance with the Consent Decree Clean Air Compliance Program. Also, this program requires annual quality assurance audits to the optimization monitors at our power plants in compliance with the Consent Decree. All these reports have been performed and submitted in compliance with the Consent Decree stipulations.

*Relative Accuracy Test Audit (RATA)*

A Relative Accuracy Test Audit (RATA) is a test to validate and certify for a period of one year the plant's Continuous Emission Monitoring Systems (CEMS) equipment for purposes of continuous data collection. The requirements to perform this test are found at 40 CFR Part 60 Appendix F and is to insure compliance with the Plants PDS air operation permits. Annually reports have been performed and submitted in compliance with the air operation permits requirements. The Authority was not able to perform the RATA test for 2012 period for Unit 3 at Cambalache Power Plant, due to operational problems with the plant. These tests were performed during February 2013.

*Title V Permitting Program*

PREPA is still awaiting issuance of a Title V Permit for the Palo Seco Power Plant. The permit application was submitted in November 1996. The Environmental Quality Board continues to request additional information. The last information request was received on January 27, 2012. The information requested was submitted on February 7, 2013. No other information has been requested. The EQB has not issued a final permit.

PREPA is also awaiting issuance of a Title V for the San Juan Power Plant. A modification was submitted to include the natural gas scenario for units 5 and 6. EQB has not issued a final permit, but issued a permit shield on November 2, 2009.

In September 2011, PREPA submitted a modification of the Costa Sur Power Plant's Title V permit to include the natural gas scenario for units 5 and 6. The EQB has not issued a final Title V permit.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*Title V Permitting Program (continued)*

The Title V permit for the Aguirre Power Complex expires on February 24, 2013. A permit renewal application was submitted in February 24, 2012. The Environmental Quality Board deemed the application as complete and, on June 12, 2012 issued a permit shield.

PREPA has a scheduled meeting with the EQB (April 18, 2013) to discuss, among other things, the status of the Title V permits. Our goal is to have EQB issue all the permits in draft form to allow a comment period from PREPA. After this, the comments are either incorporated in the permit or rejected. Then, a final permit can be issued.

*Water Quality Compliance*

As of December 2010, the Authority had achieved and has maintained a level of compliance with the Clean Water Act regulations (NPDES permits, Drinking Water Program, OPA'90 (FRP's and Operations Manual) and SPCC Regulation) in excess of 99%.

The Authority has completed compliance plans for abating water pollution at its four major power plants - Aguirre, San Juan, South Coast, and Palo Seco, as required by the Consent Decree, Section VI, Part I.

PREPA prepared and submitted the San Juan Power Plant NDPES Renewal Application on September 30, 2011. In compliance with the regulatory requirement, PREPA submitted it 180 days before the current NDPES Permit expiration date (March 31, 2012). The current NPDES Permit is administratively extended until the EPA grants a renewed permit.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*Water Quality Compliance (continued)*

Since 1977, PREPA submitted to EPA an updated request under Section 316(a) of the Clean Water Act that its South Coast power plant be permitted to discharge into the Caribbean Sea heated sea water that was previously used as for cooling purposes, as part of the plant's combustion and generation process, known as "thermal effluent". EPA denied a 316(a) Thermal Varinace Request in December 2000. After several discussions and meetings, EPA and PREPA agreed to perform a Detailed Engineering and Environmental Review (DEER) of alternatives to select a final alternative for the cooling water discharge that meets the water temperature standard or otherwise, qualify for a waiver request under Section 316(a) of the Water Quality Act. While the DEER was in progress EPA issued a draft permit for the power plant, which included a compliance schedule for the DEER selected alternative (Offshore Submerged Discharge – OSD). The selected alternative estimated capital cost is approximately $60 million. EPA issued a final permit in October 1, 2009 with a schedule of compliance for relocation of Outfall 001. PREPA submitted the scoping document, an inventory of the environmental studies already performed and a Joint Permit Application for the Outfall 001 relocation in December 2009. As part of the permit requirements, PREPA prepared a Preliminary Environmental Impact Statement (PEIS) including the discussions of four alternatives for the 001 Outfall by October 2011. The PEIS included an in-cove alternative to reduce the cooling water discharge temperature to a thermal tolerance temperature range based on operations improvements and partial restoration of the historic flow. On January 30, 2013, PREPA submitted a Final Environmental Impact Statement (FEA) at the Puerto Rico Management Permits Office (OGPe) including the in-cove alternative, as the preferred one.

PREPA will consult the Environmental Protection Agency for a 316 (a) Variance request at the time as the FEA comments process concludes.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

### 16. Commitments and Contingencies (continued)

**Compliance Programs (continued)**

*Water Quality Compliance (continued)*

EPA included, as part of Section 316 (a) requirements in the current San Juan Power Plant NPDES Permit, the performance of thermal plume studies and the biological monitoring program. PREPA submitted the thermal plume study plan and the QA/QC Plan for the Biological Monitoring Program in March 13, 2009, and it is waiting for EPA approvals. Also, EPA included, as another compliance requirement, the performance of a Comprehensive Demonstration Study (CDS) under the Section 316(b) of the Clean Water Act. On March 31, 2008, PREPA submitted an Impingement and Entrainment Characterization Study and Current Status Report for EPA evaluation. Also, PREPA submitted a Post-repowering Verification Study Work Plan for 316 (b) in June 30, 2008 and it is waiting for EPA approval. PREPA made a reference of all the above mentioned pending work plans approvals and 316 (b) reports at the San Juan Power Plant NDPES Renewal Application submitted to EPA on September 30, 2011. EPA has not answered this petition yet.

*Underground Injection Control Regulation*

The Authority has prepared a compliance plan in order to comply with the Puerto Rico Environmental Quality Board's underground injection control regulations. The compliance plan contemplates the closing of septic systems where sanitary discharges can be connected to the facilities of the Puerto Rico Aqueduct and Sewer Authority. As of December 2010, the projects at San Juan, Aguirre, Palo Seco, and South Coast Power Plants for the connection of the sanitary discharges to the PRASA system were 100% completed. Consequently, the execution of the compliance plans for the closing of the septic tanks at the power plants is on-going. Currently, PREPA completed the sampling and analysis of the septic systems at Aguirre and San Juan. The sampling and analysis for the Palo Seco Power Plant septic system is 50% completed. PREPA is waiting for the Puerto Rico Environmental Quality Board evaluation in order to close the underground injection systems at Aguirre and San Juan Power Plants.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*Spill Prevention Control and Countermeasures Plan*

To meet its obligations under the Spill Prevention Control and Countermeasures (SPCC), a program under the Oil Pollution Act of 1990 plan requirements and the Consent Decree, the Authority continues to implement corrective measures at all of its facilities. As of December 2010, the Authority completed all the compliance projects under the Spill Prevention Maintenance and Construction Program of the Consent Decree in accordance with the established scope of work. In July of 2002, an amendment to the SPCC regulations was adopted that affects the Authority's oil filled equipment at its electrical transmission and distribution substations. The Authority has been inspecting its substations and evaluating the impact of these new requirements for the preparation of the SPCC plan for the corresponding substations. EPA extended the regulatory deadline until November 10, 2011 to comply with the SPCC plans substations implementation. PREPA completed and signed 26 SPCC Plans for the seven Transmission and Distribution Directorate regions at December 7, 2010. PREPA is already implementing the monitoring and inspection program required under the non-contention clause stipulated at 40 CFR 112.7 (k). Notwithstanding, PREPA is working with a construction program to provide the secondary containment for 67 substations located adjacent to water bodies, instead of the 316 substations considered at the initial plan. As today, PREPA completed and is in process for the secondary containment construction at 40 substations. Current project estimated cost is $2.7 million.

*PCB Program*

The Authority completed on 2000, a ten-year EPA-mandated program to sample and test its oil-filled transformers and other equipment in order to identify and dispose of PCB equipment. Pursuant to this program, the Authority has completed the removal and disposal of transformers with PCB concentrations of more than 500 ppm. The Authority continues with the removal and disposal of transformers with PCB concentrations between 50 and 499 ppm. According to EPA, the Authority has been the only utility to go so far with a program sample, test, identify, remove, and dispose of PCB or PCB contaminated transformers.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

*Capital Improvement Program*

The Authority's capital improvement program for fiscal year ended June 30, 2012 includes $8.9 million in order to comply with existing Commonwealth and federal environmental laws and regulations, including the South Coast water related projects in compliance with the Clean Water Act 316(a) and 316(b) sections previously discussed. The Authority is taking all the necessary steps to comply with all applicable environmental laws, regulations, and the Consent Decrees requirements.

Changes in the balances of the health insurance program (self-insurance risk) incurred but no recorded (IBNR) during fiscal years 2012 and 2011 were as follows:

|  | Liability Beginning Balance | Expenses | Payments | Liability Ending Balance |
|---|---|---|---|---|
|  | *(In thousands)* | | | |
| **2011** | $5,597 | $95,921 | $94,351 | $7,167 |
| **2012** | $7,167 | $87,434 | $87,413 | $7,188 |

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Compliance Programs (continued)**

**Gasoducto del Sur**

On January 10, 2008, the Authority and Skanska Energy Services, LLC (Skanska) entered into an Engineer Procure Construct Finance Contract for the construction of the Gasoducto del Sur Project (the Project) for an original Contract Price of $74,324,259. On December 2, 2008, the Superior Court of Ponce issued an injunction stopping all construction. On July 23, 2009, PREPA'S Governing Board authorized the termination and settlement of the Contract. The Authority obtained title to all equipment and material procured and 100% of engineering documents and all pending disputes were settled for a lump-sum payment of $59,000,000 due to the Contractor. The Termination and Settlement Agreement was executed on August 7, 2009. Pursuant to an Asset Purchase Agreement dated August 17, 2009, PREPA sold the assets of the Gasoducto del Sur Project to The Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority (AFICA by its Spanish acronym) for approximately $36 million. In addition, PREPA entered into a Subordinated Loan Agreement with the Government Development Bank (GDB) for $35,000,000 evidenced by a 24-month subordinated note until such time that Puerto Rico Aqueduct and Sewer Authority (PRASA) shall purchase from AFICA the Project.

**Contingencies**

The Authority is a defendant or codefendant in several lawsuits incidental to its business, some involving substantial amounts. In those instances that management and legal counsel believe that the outcome of the litigation will be unfavorable to the Authority, a provision has been made to cover the estimated liability. Management, based on discussions with legal counsel, believes that the additional liability, if any, resulting from the ultimate resolution of these matters will not have a material effect on the Authority's financial position or results of operations.

On May 18, 2000, Abengoa, Puerto Rico, S.E. (Abengoa), the Authority's contractor for the repowering of San Juan steam plant units 5 and 6, unilaterally declared a termination of the contract with the Authority and filed a complaint for breach of contract. The Authority has moved for time to answer the complaint and has filed a counter claim for the cost of the project and for all damages caused to the Authority by the alleged illegal contract termination. The Authority believes that the actions by the contractor will not materially affect the ability of the Authority to provide service nor there will be a material difference in the quality of service provided by the Authority.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**16. Commitments and Contingencies (continued)**

**Contingencies (continued)**

In June 2004, the Office of the Comptroller of the Commonwealth of Puerto Rico (the Comptroller) issued a report stating that the Authority overcharged its clients by approximately $49.8 million, and should reimburse this amount to such clients. After this report was made public, two lawsuits were filed by clients of the Authority against the Authority demanding the reimbursement of such alleged overcharges. The Authority's position is that the Comptroller incorrectly based his conclusion on data that is not relevant to the calculation of the Authority's rates, and that the Authority's rates were properly established in the year 2000 in accordance with applicable laws and regulations. In particular, the Authority notes that its rates properly take into consideration the cost of the fuel used by the Authority's generating facilities and the cost of the electricity purchased from the two co-generating facilities that sell power to the Authority.

In 2008, Power Technologies Corp. filed a suit against the Authority, alleging that the Authority had withdrawn from a contracting process for a new energy facility, in which Power Technologies was involved, without explanation or justification. Power Technologies seeks damages of $51.4 million. The case is currently in the discovery stage.

In addition to these cases, the Authority is involved in typical litigation for an electric power utility, but management estimates the amounts of such claims are not material and will not affect adversely the Authority's operations.

**Construction and Other Commitments**

As of June 30, 2012, the Authority has commitments of approximately $45.6 million on active construction, maintenance and engineering services contracts.

**Natural Disaster**

On September 20, 2011, Tropical Storm Irene passed through the island of Puerto Rico causing damages. Certain municipalities of the Commonwealth were declared an emergency zone by President of the United States of America, thus making it eligible for emergency assistance from the Federal Emergency Management Agency (FEMA).

The Authority total damages from Tropical Storm Jeanne, including restoration cost, amounted to approximately $15.9 million, consisting in damage to the production, transmission and distribution system.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Recently Issued Accounting Pronouncements**

In December 2009, the GASB issued Statement 57 (GASB 57), *OPEB Measurements by Agent Employers and Agent Multiple-Employer Plans*. GASB 57 address issues related to the use of the alternative measurement method and the frequency and timing of measurements by employers that participate in agent multiple-employer other postemployment benefit (OPEB) plans and clarifies that when actuarially determined OPEB measures are reported by an agent multiple-employer OPEB plan and its participating employers. Provisions of this Statement related to the use and reporting of the alternative measurement method are effective immediately. The adoption of GASB 57 does not have any impact on the Authority's financial Statements.

GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements*. The objective of this Statement is to improve financial reporting by addressing issues related to service concession arrangements (SCAs), which are a type of public-private or public-public partnership. As used in this Statement, an SCA is an arrangement between a transferor (a government) and an operator (governmental or nongovernmental entity) in which: (i) the transferor conveys to an operator the right and related obligation to provide services through the use of infrastructure or another public asset (a facility) in exchange for significant consideration; and (ii) the operator collects and is compensated by fees from third parties. This statement is effective for periods beginning after December 15, 2011.

GASB Statement No. 61, *The Financial Reporting Entity: Omnibus- an amendment of GASB Statements No. 14 and No. 34*. The objective of this Statement is to improve financial reporting for a governmental financial reporting entity. The requirements of Statement No. 14, *The Financial Reporting Entity*, and the related financial reporting requirements of Statement No. 34, *Basis Financial Statements and Management's Discussion and Analysis for State and Local Governments*, were amended to better meet user needs and to address reporting entity issues have arisen since the issuance of those Statements. This statement is effective for periods beginning after June 15, 2012.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**17. Recently Issued Accounting Pronouncements (continued)**

GASB Statement No. 62, *Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements*. The objective of this Statement is to incorporate into the GASB's authoritative literature certain accounting and financial reporting guidance that is included in the following pronouncements issued on or before November 30, 1989, which does not conflict with or contradict GASB pronouncements. (i) Financial Accounting Standard Board (FASB) Statements and Interpretations; (ii) Accounting Principles Board Opinions; and (iii) Accounting Research Bulletins of the American Institute of Certified Public Accountants' (AICPA) Committee on Accounting Procedure. This statement is effective for periods beginning after December 15, 2011.

GASB Statement No. 63, *Financial reporting of Deferred Outflows of Resources, Deferred Inflows of Resources, and Net Position*. The objective of this Statement is to provide financial reporting guidance for deferred outflows of resources and deferred inflows of resources. The requirements of this Statement will improve financial reporting by standardizing the presentation of deferred outflows of resources and deferred inflows of resources and their effects on a government's net position. It alleviates uncertainty about reporting those financial statement elements by providing guidance where none previously existed. The provisions of this Statement are effective for financial statements for periods beginning after December 15, 2011.

GASB Statement No. 64, *Application of Hedge Accounting Termination Provisions.* The objective of this Statement is to clarify whether an effective hedging relationship continues after the replacement of a swap counterparty or a swap counterparty's credit support provider. This Statement sets forth criteria that establish when the effective hedging relationship continues and hedge accounting should continue to be applied. The provisions of this Statement are effective for financial statements for periods beginning after June 15, 2011.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Audited Financial Statements (continued)

**18. Subsequent Events**

**Natural Disaster**

As of January 31, 2013, the Authority has submitted claims to Federal Emergency Management Agency (FEMA) for the damage caused by Hurricane Irene, and has received payment of $6.2 million.

**Revenue Stabilization Fund**

The Authority assumed $53.2 million in fuel expenses not billed to the customers from July to November 2012, which were financed by the revenue stabilization fund.

Required Supplementary Information

1304-1056934

**Schedule I**

### Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Suplementary Schedule of Funding Progress

Years Ended June 30, 2012
*(In millions)*

| Actuarial Valuation Date | | Actuarial Value of Assets (a) Note 1 | | Actuarial Accrued Liability (AAL) (b) | | Unfunded AAL (UAAL) (b)- (a) | Funded Ratio (a)/(b) | | Covered Payroll (c) | UAAL Percentage of Covered Payroll [(b)-(a)]/(c) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pension Plan** | | | | | | | | | | |
| 6/30/2005 | $ | 1,338 | $ | 2,203 | $ | 866 | 61% | $ | 349 | 248% |
| 6/30/2006 | | 1,403 | | 2,280 | | 877 | 62% | | 349 | 251% |
| 6/30/2007 | | 1,488 | | 2,313 | | 826 | 64% | | 349 | 237% |
| 6/30/2008 | | 1,571 | | 2,337 | | 766 | 67% | | 363 | 211% |
| 6/30/2009 | | 1,517 | | 2,497 | | 980 | 61% | | 364 | 269% |
| 6/30/2010 | | 1,414 | | 2,816 | | 1,402 | 50% | | 357 | 392% |
| 6/30/2011 | | 1,363 | | 2,875 | | 1,503 | 47% | | 361 | 419% |
| **Postemployment Health Plan*** | | | | | | | | | | |
| 7/1/2007 | $ | – | $ | 531 | $ | 531 | 0% | $ | 349 | 152% |
| 7/1/2008 | | – | | 587 | | 587 | 0% | | 363 | 162% |
| 7/1/2010 | | – | | 613 | | 613 | 0% | | 357 | 172% |

***Note 1:*** *The system, as permitted by the GASB, reflects its investments at an average fair market value of the last three years to determine its actuarial funding.*

*\*Postemployment Health Plan valuation performed every two years, as required by the GASB.*

1304-1056934

II-82

# Supplemental Schedules

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Note to Schedules II-VII - Information Required by the 1974 Agreement

As of June 30, 2012 and 2011, and for the Years then Ended

Schedules II - VII present certain information which is required by the 1974 Agreement. The Net Revenues data, as defined in the 1974 Agreement (Net Revenues), presented in Schedules II and III differ in some important respects from generally accepted accounting principles (GAAP). Such differences are explained below; Schedule II also presents a reconciliation of Net Revenues with GAAP.

The most significant differences between Net Revenues and GAAP are the following:

1) Revenues do not include investment income on investments in the construction fund (see Note 5 to the financial statements);
2) Depreciation and interest expense on bonds covered by the 1974 Agreement are not included as deductions in calculating Net Revenues;
3) Amortization of debt discount and issuance costs and the allowance for funds used during construction are not considered in the computation in calculating Net Revenues;
4) Contribution in lieu of taxes is not considered a deduction for purposes of Net Revenues;
5) Net Revenues do not include revenues or expenses of the Irrigation Systems (see Note 1 to the financial statements).

For further details and information on the definition of Net Revenues, please refer to the 1974 Agreement.

Schedule II

Puerto Rico Electric Power Authority

Sources and Disposition of Net Revenues
Under the Provisions of the 1974 Agreement
Statements of Income (GAAP)
and Reconciliation of Net Income

Years Ended June 30, 2012 and 2011
*(In thousands)*

| | 2012 | | | 2011 | | |
|---|---|---|---|---|---|---|
| | 1974 Trust Agreement | Statement of Income (GAAP) | Reconciliation of Net Income | 1974 Trust Agreement | Statement of Income (GAAP) | Reconciliation of Net Income |
| **Reconciliation of components of net income:** | | | | | | |
| Revenues: | | | | | | |
| Operating revenues | $ 5,031,429 | $ 5,046,494 | | $ 4,406,155 | $ 4,422,997 | |
| Other operating revenues | 14,126 | 18,668 | | 16,595 | 16,595 | |
| Other | 7,123 | 5,052 | | (11,537) | (13,299) | |
| 1974 agreement construction fund investment income and gain on sale of other properties | | 38,118 | | | 14,368 | |
| | 5,052,678 | 5,108,332 | 55,654 | 4,411,213 | 4,440,661 | 29,448 |
| Current Expenses: | | | | | | |
| As shown | 4,415,264 | 4,431,534 | | 3,705,192 | 3,718,796 | |
| Total as defined | 4,415,264 | 4,431,534 | (16,270) | 3,705,192 | 3,718,796 | (13,604) |
| Net revenues, as defined | $ 637,414 | | | $ 706,021 | | |
| Depreciation | | 414,573 | (414,573) | | 350,697 | (350,697) |
| Other post-employment benefit (OPEB) | | (56,638) | 56,638 | | 26,587 | (26,587) |
| Disposition of Revenues: | | | | | | |
| (not classified in order of payment) | | | | | | |
| Interest on debt | 184,264 | 382,604 | | 304,778 | 378,343 | |
| Interest on general obligation notes | 4,405 | 4,720 | | 1,550 | 1,882 | |
| Amortization of debt discount, financing expenses | – | (10,394) | | – | (10,162) | |
| Amortization of bond defeasance | – | 16,725 | | – | 16,659 | |
| Allowance for funds used during construction | – | (11,712) | | – | (16,471) | |
| Net interest on long-term debt | 188,669 | 381,943 | (193,274) | 306,328 | 370,251 | (63,923) |
| Power revenue bonds: | | | | | | |
| Principal | 143,422 | | 143,422 | 175,455 | | 175,455 |
| Internal Funds | 15,086 | | 15,086 | 17,231 | | 17,231 |
| Appropriation Self Insurance Fund | 5,000 | | 5,000 | 10,000 | | 10,000 |
| Contribution in lieu of taxes | 285,237 | 283,111 | 2,126 | 197,007 | 246,758 | (49,751) |
| Other post-employment benefit (OPEB): | | | | | | |
| Total expenses (GAAP) | | 5,454,523 | | | 4,713,089 | |
| Net revenues, as defined | $ 637,414 | | | $ 706,021 | | |
| Net income | | $ (346,191) | $ (346,191) | | $ (272,428) | $ (272,428) |

Schedule III

Puerto Rico Electric Power Authority

Suplemental Schedule of Sources and Disposition
of Net Revenues under the Provisions of the 1974 Agreement

Years Ended June 30, 2012 and 2011
*(In thousands)*

|  | 2012 | 2011 |
|---|---|---|
| **Sources of Net Revenues:** | | |
| **Revenues:** | | |
| Electric revenues | $ 5,031,429 | $ 4,406,155 |
| Other operating revenues | 14,126 | 16,595 |
| Other (principally interest) | 7,123 | (11,537) |
|  | 5,052,678 | 4,411,213 |
| **Current Expenses:** | | |
| Operations: | | |
| Fuel | 2,901,815 | 2,291,386 |
| Purchased Power | 684,148 | 660,871 |
| Other productions | 75,829 | 67,451 |
| Transmissions and distributions | 175,815 | 176,369 |
| Customer accounting and collection | 113,526 | 114,837 |
| Administrative and general | 251,728 | 173,503 |
| Maintenance | 212,403 | 220,775 |
|  | 4,415,264 | 3,705,192 |
| **Net revenues, as defined** | $ 637,414 | $ 706,021 |
| **Disposition of Net Revenues:** | | |
| **Revenue fund:** | | |
| Power revenue bonds - sinking fund requirements: | | |
| Interest | $ 184,264 | $ 304,778 |
| Principal | 143,422 | 175,455 |
| Self Insurance Fund | 5,000 | 10,000 |
| Balance available for capital improvements and other needs | 15,086 | 17,231 |
|  | 347,772 | 507,464 |
| **General obligation notes:** | | |
| Interest | 4,405 | 1,550 |
| **Contribution in lieu of taxes and other** | 285,437 | 197,007 |
| **Net revenues, as defined** | $ 637,614 | $ 706,021 |

Schedule IV

Puerto Rico Electric Power Authority

Supplemental Schedule of Funds Under the Provisions of the
1974 Trust Agreement

Years Ended June 30, 2012 and 2011
*(In thousands)*

| | 2012 | | | | 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Held by Authority Other Assets | Restricted Deposits with Trustee Other Assets | Non-Current Assets | Total | Held by Authority Other Assets | Restricted Deposits with Trustee Other Assets | Non-Current Assets |
| **By Account:** | | | | | | | | |
| 1974 Agreement (restricted) | | | | | | | | |
| Sinking Fund - principal and interest | $ 337,506 | $ – | $ 337,506 | $ – | $ 313,531 | $ – | $ 313,531 | $ – |
| Reserve account | 401,735 | – | – | 401,735 | 377,903 | – | – | 377,903 |
| Self Insurance Fund | 80,352 | – | – | 80,352 | 84,645 | – | – | 84,645 |
| Sinking Fund - Capitalized Interest | 154,548 | – | – | 154,548 | 153,958 | – | – | 153,958 |
| Reserve Maintenance Fund | 15,809 | 15,809 | – | – | 15,692 | 15,692 | – | – |
| Other Restricted Fund | 1,900 | 1,900 | – | – | 1,900 | 1,900 | – | – |
| Construction Fund | | | | | | | | |
| Rural Utilities Services (RUS) | 1,101 | 1,101 | – | – | 2,020 | 2,020 | – | – |
| Other | 275,106 | 275,106 | – | – | 224,332 | 224,332 | – | – |
| PREPA Client Fund | 2,752 | 2,752 | – | – | 500 | 500 | – | – |
| General purpose (unrestricted) | | | | | | | | |
| General (excluding Prepa Net) | 183,844 | 183,844 | – | – | 48,863 | 48,863 | – | – |
| Working funds | 886 | 886 | – | – | 911 | 911 | – | – |
| Total | $ 1,455,539 | $ 481,398 | $ 337,506 | $ 636,635 | $ 1,224,255 | $ 294,218 | $ 313,531 | $ 616,506 |
| | | | | | | | | |
| **By Type of Assets Held:** | | | | | | | | |
| Working funds | $ 886 | $ 886 | $ – | $ – | $ 911 | $ 911 | $ – | $ – |
| PREPA Client Fund | 2,752 | 2,752 | – | – | 500 | 500 | – | – |
| Cash in bank and time deposits (by depository institutions): | | | | | | | | |
| Government Development Bank for Puerto Rico | 60,406 | 60,406 | – | – | 11 | 11 | – | – |
| Banco Popular de Puerto Rico | 38,507 | 38,507 | – | – | 8,210 | 8,210 | – | – |
| Citibank, N. A. | 53,274 | 53,274 | – | – | 40,551 | 40,551 | – | – |
| US Bank | 611,553 | 274,047 | 337,506 | – | 528,009 | 214,478 | 313,531 | – |
| Banco Bilbao Vizcaya (Chase), Puerto Rico | 26,512 | 26,512 | – | – | 5,845 | 5,845 | – | – |
| Banco Bilbao Vizcaya, Mayagüez, Puerto Rico | 2,800 | 2,800 | – | – | 73 | 73 | – | – |
| FirstBank, San Juan, Puerto Rico | 351 | 351 | – | – | 337 | 337 | – | – |
| Banco Santander, Santurce, Puerto Rico | 3,030 | 3,030 | – | – | 3,545 | 3,545 | – | – |
| R G Premier Bank | 23 | 23 | – | – | 145 | 145 | – | – |
| Western Bank, Mayagüez, P.R. | – | – | – | – | – | – | – | – |
| JP Morgan | – | – | – | – | – | – | – | – |
| Other Institutions | 2 | 2 | – | – | 1,099 | 1,099 | – | – |
| | 800,096 | 462,590 | 337,506 | – | 589,236 | 275,705 | 313,531 | – |
| Investment Securities | 655,443 | 18,808 | – | 636,635 | 635,019 | 18,513 | – | 616,506 |
| Total | $ 1,455,539 | $ 481,398 | $ 337,506 | $ 636,635 | $ 1,224,255 | $ 294,218 | $ 313,531 | $ 616,506 |

Schedule V

## Puerto Rico Electric Power Authority

### Supplemental Schedule of Changes in Cash and Investments by Funds

#### Year Ended June 30, 2012
*(In thousands)*

| 2011-2012 Activity | Total | General Fund | Revenue Fund | Working Fund | Interest 1974 Agreement | Principal 1974 Agreement | Reserve 1974 Agreement | Self Insurance Fund | Construction 1974 Agreement | Reserve Maintenance Fund | Subordinated Obligation Fund | Other Restricted Fund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balances at June 30, 2011 | 1,224,255 | (48,849) | 14 | 911 | 292,034 | 175,455 | 377,903 | 84,645 | 226,552 | 15,692 | — | 2,400 |
| **Operations:** | | | | | | | | | | | | |
| Net revenues | — | (637,414) | 285,237 | — | — | — | — | — | 15,886 | — | 4,485 | — |
| Funds provided from internal operations | 681,705 | 681,705 | — | — | — | — | — | — | — | — | — | — |
| 1974 Agreement investment income Acct 4191 | — | (623) | — | — | — | — | — | — | 623 | — | — | — |
| Investment income and other | 22,458 | 166 | — | — | 1,603 | 443 | 4,930 | 656 | 14,568 | 92 | — | — |
| Unrealized gain or loss on market value of investment | 2,203 | — | — | — | 243 | — | 1,820 | 112 | — | 28 | — | — |
| Offset of current year's contribution in lieu of taxes against certain government accounts receivable | — | 246,391 | (246,391) | — | — | — | — | — | — | — | — | — |
| Offset of current year's 5% contributions in lieu of taxes against Commonwealth of Puerto Rico debt and transfers to General Obligations | — | 38,846 | (38,846) | — | — | — | — | — | — | — | — | — |
| Funds used for construction | (361,791) | — | — | — | — | — | — | — | (361,791) | — | — | — |
| Reclassified construction costs for deferred debits | — | — | — | — | — | — | — | — | — | — | — | — |
| **Financing:** | | | | | | | | | | | | |
| Proceeds from new bond issue - net of original discounts | 623,421 | 159,010 | — | — | 82,256 | — | 17,183 | 5,080 | 359,530 | — | 2,901 | 2,252 |
| Proceeds from Contributed Capital | 7,291 | — | — | — | — | — | — | — | 7,291 | — | — | — |
| Proceeds from refunding bonds issue - net of original discounts | 21,828 | — | — | — | — | — | — | — | 21,828 | — | — | — |
| Defeased bonds - net of original discounts | (21,844) | (162,657) | — | — | — | — | — | — | (21,844) | — | — | — |
| Sinking Funds and account transfers | — | — | — | — | 116,617 | 42,183 | — | — | — | — | — | — |
| Notes issued for construction | — | (85,330) | — | — | — | — | — | — | 85,330 | — | — | — |
| Notes issued for municipalities - settlement agreement | (85,330) | 107,623 | — | — | — | — | — | — | — | — | 3,657 | — |
| Previous fiscal years transfers between funds not accounted for | 107,623 | — | — | — | — | — | — | — | — | — | — | — |
| Notes related to working capital | 599,995 | 599,995 | — | — | — | — | — | — | — | — | — | — |
| Note issued to finance the adjustment on fuel oil | 159,000 | 159,000 | — | — | — | — | — | — | — | — | — | — |
| Notes issued to finance the Debt Service Requirements | (433,446) | (433,446) | — | — | — | — | — | — | — | — | — | — |
| Payment of notes payable | (380,954) | (380,954) | — | — | — | — | — | — | — | — | — | — |
| Payment of interest | — | — | — | — | (379,991) | — | — | — | — | — | — | — |
| Payment to counterparties - Interest Rate Swap | (175,455) | (175,455) | — | — | — | (175,455) | — | — | — | — | — | — |
| Payment of current maturities of long-term debt | (9,700) | (9,700) | — | — | — | — | — | — | — | — | — | — |
| Payment to municipalities settlement agreement | — | — | — | — | — | — | — | — | — | — | (10,063) | — |
| **Changes in assets and liabilities:** | | | | | | | | | | | | |
| Working funds | 25 | 25 | — | (25) | — | — | — | — | — | — | — | — |
| Accounts receivable (includes non-current) · | (344,559) | (344,559) | — | — | — | — | — | — | — | — | — | — |
| Fuel oil | (674) | (674) | — | — | — | — | — | — | — | — | — | — |
| Materials and supplies | 2,384 | 2,384 | — | — | — | — | — | — | — | — | — | — |
| Prepayments and other | 3,263 | 3,263 | — | — | — | — | — | — | — | — | — | — |
| Deferred debits | 23,620 | 23,620 | — | — | — | — | — | — | 7,697 | — | — | — |
| Accounts payable and accrued liabilities (includes non-current) | (320,842) | (217,939) | — | — | — | — | — | — | — | — | — | — |
| Customer deposits | 35,838 | 35,838 | — | — | — | — | — | — | — | — | — | — |
| Interfund transfers, etc. | 2,895 | 2,895 | — | — | — | — | — | — | (1,210) | — | — | — |
| Total before interfund accounts | 1,455,539 | 107,178 | 14 | 886 | 292,326 | 185,974 | 401,836 | 90,372 | 353,859 | 15,809 | (3) | 4,651 |
| Add (deduct) interfund accounts | — | (265,910) | — | — | (1,466) | — | (101) | (41) | 264,910 | — | — | — |
| Balances at June 30, 2012 | 1,455,539 | (158,732) | 14 | 886 | 290,860 | 185,974 | 401,735 | 90,372 | 618,769 | 15,809 | (3) | 4,651 |

13t4-1056694

Schedule V (continued)

# Puerto Rico Electric Power Authority

## Supplemental Schedule of Changes in Cash and Investments by Funds

### Year Ended June 30, 2011
*(In thousands)*

| 2010-2011 Activity | Total | General Fund | Revenue Fund | Working Fund | Interest 1974 Agreement | Principal 1974 Agreement | Reserve 1974 Agreement | Self Insurance Fund | Construction 1974 Agreement | Reserve Maintenance Fund | Subordinated Obligation Fund | Other Restricted Fund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at June 30, 2010 | 863,638 | 278,889 | 16 | 922 | 198,693 | — | 359,713 | 73,782 | (60,917) | 10,640 | — | 1,900 |
| **Operations:** | | | | | | | | | | | | |
| Net revenues | 449,477 | (706,021) | 197,907 | — | 304,778 | 175,455 | 14,050 | 10,000 | 17,231 | — | 1,550 | 500 |
| Funds provided from internal operations | | 449,477 | | | | | | | | | | |
| 1974 Agreement investment income Acct 4151 | (811) | (811) | | | | | 6,459 | | 811 | | | |
| Investment income and other | 1,115 | 59 | | | | | | 926 | 1,403 | 103 | | |
| Unrealized gain (or loss) on market value of investment | (2,222) | (2,222) | | | | | (2,318) | (63) | | (53) | | |
| Offset of current year's contribution in lieu of taxes against certain government accounts receivable | | 158,193 | (158,193) | | | | | | | | | |
| Offset of current year's 5% contribution in lieu of taxes against Commonwealth of Puerto Rico debt and transfers to (General Obligations) | | 38,814 | (38,814) | | | | | | | | | |
| Funds used for construction | (411,527) | (411,527) | | | | | | | (411,527) | | | |
| Reclassified construction costs for deferred debits | | | | | | | | | | | | |
| **Financing:** | | | | | | | | | | | | |
| Proceeds from new bond issues-net of original discounts | 299,016 | | | | | | | | | | | |
| Proceeds from Contributed Capital | 6,064 | | | | | | | | 6,064 | | | |
| Proceeds from refunding bonds issues-net of original discounts | 222,883 | | | | | | | | 222,883 | | | |
| Deferred bonds-net of original discounts | (200,173) | | | | | | | | (200,173) | | | |
| Sinking Funds and account transfers | | (5,000) | | | (278,093) | | | | | 5,000 | | |
| Notes issued for construction | 50,750 | | | | | | | | 50,750 | | | |
| Notes issued for municipalities-settlement agreement | 172,062 | 172,062 | | | | | | | | | | |
| Notes issued to working capital | | | | | | | | | | | | |
| Note issued to finance the acquisition on fuel oil | | | | | | | | | | | | |
| Notes issued to finance the recovery of Palo Seco Steam Plant that are payable from proceeds from insurance companies. | | | | | | | | | (50,000) | | | |
| Payment of notes payable | (66,119) | (26,419) | | | | | | | | | | |
| Payment of interest | (240,874) | (28,286) | | | (209,267) | | | | | | (3,301) | |
| Payment to counterparties – Interest Rate Swap | | | | | | | | | | | | |
| Payment of current maturities of long-term debt | | | | | | | | | | | | |
| Payment to municipalities settlement agreement | | | | | | | | | | | | |
| **Changes in assets and liabilities:** | | | | | | | | | | | | |
| **Working funds:** | | | | | | | | | | | | |
| Accounts receivable (includes non-current) | (212,541) | (212,541) | | (11) | | | | | | | | |
| Fuel oil | (42,714) | (42,714) | | | | | | | | | | |
| Materials and supplies | (17,738) | (17,738) | | | | | | | | | | |
| Prepayments and other | 3,448 | 3,448 | | | | | | | | | | |
| Deferred debits | 47,522 | 47,522 | | | | | | | | | | |
| Accounts payable and accrued liabilities (includes non-current) | 321,265 | 318,181 | | | | | | | 3,024 | | | |
| Customer deposits | 994 | 994 | | | | | | | | | | |
| Interfund transfers, etc. | | (26,909) | | | | | | | | | | |
| Total before interfund accounts | 1,234,255 | 391,410 | 14 | 911 | 292,034 | 175,455 | 377,903 | 84,645 | (116,209) | 15,692 | | 2,400 |
| Add (deduct) interfund accounts | | (342,561) | (2) | | | | (1) | | 342,561 | 2 | | |
| Balances at June 30, 2011 | 1,234,255 | 48,849 | 14 | 911 | 292,034 | 175,455 | 377,903 | 84,645 | 226,352 | 15,692 | 1,751 | 2,400 |

II-88

1304-H056934

**Schedule VI**

Puerto Rico Electric Power Authority

Supplemental Schedule of Changes in Long-Term
Debt and Current Portion of Long-Term Debt

Years Ended June 30, 2012 and 2011
*(In Thousands)*

|  | 2012 | 2011 |
|---|---|---|
| **Long-term debt, excluding current portion:** | | |
| **Balance at beginning of year** | $  7,536,736 | $  7,399,746 |
| Transfers to current liabilities: | | |
| Power revenue bonds | (194,390) | (183,577) |
| Notes payable | (411,519) | (178,610) |
| Payment of general obligation notes: | | |
| Notes payable | (470,572) | (36,119) |
| Remainder | 6,460,255 | 7,001,440 |
| | | |
| New Issues: | | |
| Power revenue bonds | 630,110 | 355,730 |
| Power revenue refunding bonds | 19,890 | 218,225 |
| Debt discount and excess reacquisition costs on new bond issues - net | (4,751) | (10,548) |
| Defeasance of bonds | (21,345) | (215,940) |
| Debt discount and excess reacquisition costs on cancelled bonds - net | (499) | 15,767 |
| Notes payable | 866,648 | 172,062 |
| **Balance at end of year** | $  7,950,308 | $  7,536,736 |
| | | |
| **Current portion of long-term debt:** | | |
| **Balance at beginning of year** | $  552,252 | $  187,368 |
| Transfer from long-term debt | 605,909 | 362,187 |
| Payments to bondholders: | | |
| Power revenue- July 1 | (175,455) | — |
| Amortization of debt discount and excess reacquisition costs | 2,488 | 2,697 |
| **Balance at end of year** | $  985,194 | $  552,252 |

Ernst & Young LLP

Assurance | Tax | Transactions | Advisory

**About Ernst & Young**

Ernst & Young is a global leader in assurance,
tax, transaction and advisory services.
Worldwide, our 167,000 people are united by
our shared values and an unwavering commitment to
quality. We make a difference by helping our people, our
clients and our wider communities achieve their potential.

For more information, please visit www.ey.com

Ernst & Young refers to the global organization
of member firms of Ernst & Young Global Limited,
each of which is a separate legal entity.
Ernst & Young Global Limited, a UK company
limited by guarantee, does not provide services
to clients. This Report has been prepared by
Ernst & Young LLP, a client-serving member firm
located in the United States.



**URS**

**APPENDIX III**

August 15, 2013

Puerto Rico Electric Power Authority
San Juan, Puerto Rico

Dear Sirs:

URS Corporation ("URS") serves as the Consulting Engineers under the provisions of the Trust Agreement, dated as of January 1, 1974, as amended, by and between Puerto Rico Electric Power Authority (the "Authority") and U.S. Bank Trust National Association, in the Borough of Manhattan, City and State of New York, successor trustee. Such Trust Agreement is referred to herein as the "Agreement", and the trustee under the Agreement is referred to herein as the "Trustee". The Agreement requires the Consulting Engineers annually to prepare and file with the Authority and the Trustee a report with their recommendations as to any necessary or advisable revisions of rates and charges and such other advices and recommendations as they may deem desirable. In addition, in accordance with the Agreement the report includes the amount that should be deposited monthly during the next fiscal year to the credit of the Reserve Maintenance Fund; the amount, if any, to be deposited to the Self-insurance Fund in the next fiscal year; and, the amount to be deposited to the Capital Improvement Fund in the next fiscal year. The most recent annual report provided to the Authority and the Trustee was dated as of June 2012.

In preparing this letter and in reaching the conclusions and opinions contained herein and referred to in the Official Statement to which this letter is appended, URS has relied upon inquiries, observations and analyses made and conducted by it in the performance of its duties under the Agreement and upon its professional experience. URS also has relied upon various financial, economic, political and other information and projections provided to it by the Authority and other sources, some of such information and projections having been accepted by URS without it having conducted an independent investigation thereof. In addition, URS has made assumptions which it believes to be reasonable to make including, but not limited to, the following:

1.   that the Authority will adhere to its proposed schedule of programmed regular maintenance;

2.   that the Authority will continue to maintain the effective availability of its operable generating units;

3.   that the two cogenerators will continue operations through the terms of their respective power purchase agreements;

4.   that the Authority's forecasts of costs and availability of fuels are reasonable;

URS Corporation
One Canal Park
Cambridge, MA 02141
Tel: 617.621.0740
Fax: 617.621.9739

III-1

**URS**

5.     that financing will be available to the Authority at reasonable rates, in adequate amounts and at appropriate times;

6.     that the Authority will not be adversely affected by labor disputes and will have adequate levels of labor productivity;

7.     that the quantity and characteristics of the power from the intermittent renewable power sources will be controlled to meet the Authority's technical requirements such that these sources will not negatively impact the operation of the System;

8.     that the Authority will reasonably comply with the projected budgets of the Capital Improvement Program and Current Expenses, excluding fuel and purchased power, included in the Official Statement to which this letter is appended;

9.     that there will be no material changes in the requirements of regulatory authorities and that the Commonwealth and Legislature of Puerto Rico will not enact any regulation or legislation that will materially affect the Authority's projected Net Revenues adversely — these could include, but are not limited to, the financings and operations of the proposed natural gas infrastructure projects which are not included in the Authority's Capital Improvement Program and the Economic Incentives Act regarding wheeling and certain industrial client tax credits to be paid by the Authority as described in the Official Statement to which this letter is appended;

10.    that there will be no unforeseen technological developments;

11.    that the demographic, statistical, economic and other information regarding Puerto Rico obtained by URS from publicly available sources is reliable;

12.    that the Authority will not be unduly affected by natural disasters; and

13.    that the Authority will not experience unforeseeable or extraordinary conditions not included in usual estimates and opinions of engineers.

Based upon and subject to the foregoing which should be read in conjunction with and as part of the following conclusions, it is our considered opinion with respect to the Authority that:

1.     the Authority's revenue and generation planning forecasts (and the methodologies and assumptions on which they are based) are reasonable for planning purposes and are generally consistent with electric utility industry practices;

# URS

2.  the Authority's projections of future load growth and estimates of peak load referred to in the Official Statement, to which this letter is appended, under the caption "Adequacy of Capacity" are reasonable for base planning purposes;

3.  the Authority's generating capacity expansion plan referred to in the Official Statement, to which this letter is appended, under the caption "Adequacy of Capacity" is adequate and should allow the Authority to meet targeted electric reliability criteria;

4.  the Authority's production, transmission and distribution plant is in good repair and sound operating condition;

5.  the Authority's current projected capital improvement program is reasonable and the estimated expenditures are consistent with the Authority's future needs;

6.  the Authority's estimates of future growth form a reasonable basis for its projected operating results;

7.  the Authority's electric rates and charges should generate sufficient revenues to pay its current expenses and debt service and to meet the Trust Agreement obligations for deposits into certain Funds from current operating revenues; and

8.  the 961 MW of capacity presently being provided by the two cogenerators described in the Official Statement to which this letter is appended, and their role in the Authority's System should not cause the Authority to experience a meaningful reduction in control over its revenue producing capability as a result of the purchase rather than self-generation of electricity.

Sincerely,

URS CORPORATION

George W. Romano, Jr.
Consulting Manager

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX IV**

**SIDLEY AUSTIN LLP**

**SIDLEY**

SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
(212) 839 5300
(212) 839 5599 FAX

| | | |
|---|---|---|
| BEIJING | HONG KONG | SHANGHAI |
| BOSTON | HOUSTON | SINGAPORE |
| BRUSSELS | LONDON | SYDNEY |
| CHICAGO | LOS ANGELES | TOKYO |
| DALLAS | NEW YORK | WASHINGTON, D.C. |
| FRANKFURT | PALO ALTO | |
| GENEVA | SAN FRANCISCO | |

FOUNDED 1866

August __, 2013

Puerto Rico Electric Power Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

As bond counsel to the Authority (hereinafter mentioned), we have examined the Puerto Rico Electric Power Authority Act (Act No. 83 of the Legislature of Puerto Rico, approved May 2, 1941, as amended and re-enacted by Act No. 19, approved April 8, 1942, as amended) creating Puerto Rico Electric Power Authority (formerly called Puerto Rico Water Resources Authority and herein called the "Authority"), a governmental instrumentality of the Commonwealth of Puerto Rico, and also Act No. 111, approved May 6, 1941, as amended by Act No. 153, approved May 14, 1943 (said Acts No. 83, No. 19, No. 111 and No. 153, as amended, being herein collectively called the "Authority Act").

We have also examined certified copies of the proceedings of the Governing Board of the Authority in authorizing the execution and delivery of the Agreement hereinafter referred to and certified copies of the proceedings and other proofs submitted relative to the authorization, issuance and sale of

**$673,145,000**
**PUERTO RICO ELECTRIC POWER AUTHORITY**
**POWER REVENUE BONDS, SERIES 2013A**
**Dated the date hereof.**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the resolution of the Authority authorizing the issuance of said Series 2013A Bonds (the "Bonds").

We have also examined one of the Bonds as executed and authenticated.

Sidley Austin (NY) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

IV-1



August __, 2013
Page 2

From such examination, we are of the opinion that:

1.   The Authority Act is valid.

2.   Said proceedings have been validly and legally taken.

3.   The Bonds have been duly authorized and issued to provide funds for paying the cost of capital improvements to the electric power properties of the Authority (such properties, together with all improvements, renewals and replacements thereof and extensions and additions thereto, being herein called the "System"), making a deposit to the Reserve Account in the Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund established under the Agreement (the "Sinking Fund"), and paying costs incident to the issuance of the Bonds.

4.   As authorized by the Authority Act and by said proceedings, a trust agreement, dated as of January 1, 1974, as amended (herein called the "Agreement"), has been duly executed by and between the Authority and U.S. Bank National Association, successor Trustee, which contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds issued thereunder, the collection and disposition of revenues, the maintenance, repair and operation of the System, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds issued thereunder.

5.   The Agreement provides for the issuance of additional Puerto Rico Electric Power Authority Power Revenue Bonds under the conditions and limitations therein set forth.

6.   The Bonds are valid and binding special obligations of the Authority payable solely from the Sinking Fund, to the credit of which Fund the Authority has covenanted to deposit a sufficient amount of revenues of the System, over and above the expenses of repair, maintenance and operation, to pay the principal of and interest on all bonds issued under the provisions of the Agreement (including the Bonds) as the same become due and payable and to create a reserve for such purpose, which Fund is pledged to and charged with the payment of the principal of and interest on such bonds (including the Bonds).

7.   The Agreement provides for the fixing and collecting by the Authority of rates and charges for the use of the services and facilities of the System sufficient for the payment of the expenses of the Authority incurred in the repair, maintenance and operation of the System and for the payment of the principal of and the interest on all bonds issued under the provisions of the Agreement (including the Bonds) as the same become due and payable, including a reserve for such purpose.

IV-2



August __, 2013
Page 3

8.   The bonds issued under the provisions of the Agreement (including the Bonds) do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and such bonds (including the Bonds) are payable only out of the revenues of the System, to the extent provided in the Agreement.

9.   The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, which must continue to be satisfied after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes.  The Authority has covenanted to comply with the requirements of the Code in order to maintain the exclusion from gross income of interest on the Bonds for federal income tax purposes.  Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, and subject to continuing compliance with the covenant referred to above and requirements of the Code regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, interest on the Bonds is not includable in gross income for federal income tax purposes.   The failure to comply with such covenant and requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance.

10. Interest on the Bonds is not an item of tax preference for purposes of the federal individual or corporate alternative minimum tax.  Interest on the Bonds owned by a corporation will, however, be included in the calculation of such corporation's federal alternative minimum tax liability.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of ownership of the Bonds or the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

11. Under the provisions of the Acts of Congress now in force, the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

We express no opinion as to the effect of any change to any document pertaining to the Bonds or of any action taken or not taken where such change is made or action is taken or not taken without our approval or in reliance upon the advice of counsel other than ourselves with respect to the exclusion from gross income of the interest on the Bonds for federal income tax purposes.  Other than as described herein, we have not addressed and we are not opining on the tax consequences to any investor of the investment in, the ownership or disposition of, or receipt of any interest on, the Bonds.



August __, 2013
Page 4


      The opinions expressed herein are based on an analysis of existing laws, regulations, rulings and court decisions.  Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof.  We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion light of such actions or events.

                Respectfully submitted,


                [To be signed, "Sidley Austin LLP"]

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

PUERTO RICO ELECTRIC POWER AUTHORITY • Power Revenue Bonds, Series 2013A



MIX
From responsible
sources
FSC® C017146

Printed by: ImageMaster
www.ImageMaster.com