**EXHIBIT 20**

Page 1

```
 1

 2           UNITED STATES DISTRICT COURT

 3         FOR THE DISTRICT OF PUERTO RICO

 4   _____x
     In re:
 5
     THE FINANCIAL OVERSIGHT AND              PROMESA
 6   MANAGEMENT BOARD FOR PUERTO
     RICO,                                    Title III
 7       as representative of

 8   THE COMMONWEALTH OF PUERTO RICO,
     et al.,
 9       Debtors.
     _____x
10   In re:
                                              PROMESA
11   THE FINANCIAL OVERSIGHT AND
     MANAGEMENT BOARD OF PUERTO RICO,         Case No.
12
                                              17 BK 4780-LTS
13
         as representative of
14
     PUERTO RICO ELECTRIC POWER AUTHORITY,
15       Debtor.
     _____x
16   (Caption continued on following page.)

17   * P R O F E S S I O N A L   E Y E S   O N L Y *

18              VIDEOTAPED DEPOSITION

19                     OF

20             STEPHEN J. SPENCER

21             New York, New York

22          Tuesday, October 15, 2019

23

24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 169104
```

TSG Reporting - Worldwide - 877-702-9580

Page 66

1      S. Spencer - Professional Eyes Only
2    BY MR. WORTHINGTON:
3        Q.  Setting aside any legal advice
4    that you've received from Kramer Levin, do
5    you have an understanding of the
6    circumstances in which a bondholder is and
7    is not generally entitled to receive
8    post-petition interest?
9        A.  I have a general understanding of
10   when financial creditors, bondholder,
11   senior lender, might be entitled to receive
12   post-petition interest.  I do have a
13   general understanding of that.
14       Q.  Okay.  And are you aware of
15   precedence, other cases that would support
16   the payment of post-petition interest to
17   the ad hoc bondholders here?
18          MR. DELL:  I'm going to direct
19      you not to answer with respect to
20      conversations with counsel in this
21      matter.
22          MR. WORTHINGTON:  That's fine.
23      I'll rephrase it, actually.
24   BY MR. WORTHINGTON:
25       Q.  Setting aside any information

Page 67

1      S. Spencer - Professional Eyes Only
2    that's conveyed to you by Kramer Levin, are
3    you aware of any precedence that support
4    the payment of post-petition interest to
5    the ad hoc bondholders in this case?
6        A.  As I've said, I think, setting
7    aside any conversation with counsel,
8    setting aside this situation, as I've said,
9    I think PREPA is a pretty impressive
10   situation, in my professional experience.
11       Q.  I suspect I'm -- well, I'll ask
12   another question.  I can guess what the
13   answer is going to be.
14          But are you aware of precedence
15   in other cases in which preplanned
16   descriptions of the magnitude contemplated
17   built definitive RSA were made to
18   bondholders?
19          MR. DELL:  I'm going to direct
20      you not to answer with respect to
21      anything that you've learned from
22      discussions with counsel.
23       A.  Can you ask the --
24          MS. HALSTEAD:  Also object to the
25      form and relevance to this question.

Page 68

1      S. Spencer - Professional Eyes Only
2        A.  Can you ask the question again?
3        Q.  Setting aside advice that you've
4    been given by Kramer Levin, what precedents
5    are you aware of from other cases in which
6    preplanned distributions of the magnitude
7    contemplated by the RSA have been made to
8    bondholders?
9        A.  Preplanned --
10          MS. HALSTEAD:  Same objection.
11       A.  -- distributions of the amount
12   contemplated by the RSA?
13       Q.  Yes.
14       A.  Can you define preplanned
15   distribution?
16       Q.  Do you have an understanding of
17   what it means to talk about a preplanned
18   distribution?
19       A.  So you're asking the general
20   question or are you asking --
21       Q.  Well, do you agree that the RSA
22   contemplates that distributions will be
23   made to members of the ad hoc group prior
24   to the final confirmation of a plan of
25   adjustment in the PREPA case?

Page 69

1      S. Spencer - Professional Eyes Only
2          MR. DELL:  Well, I'm going to
3      direct you not to answer with respect
4      to any communications with counsel.
5    BY MR. WORTHINGTON:
6        Q.  No, I'm just asking as a factual
7    matter, do you agree --
8          MR. DELL:  You asked him whether
9      he read the RSA provision on this and
10      what that -- to give you his
11      understanding of it?
12          MR. WORTHINGTON:  Okay.  Let's
13      step back.
14   BY MR. WORTHINGTON:
15       Q.  Are you familiar with the terms
16   of the definitive RSA as a general matter?
17       A.  I'm... any understanding in
18   any... anything related to the RSA and our
19   understanding of the RSA, the terms of the
20   RSA, have come through our conversations
21   with counsel and so --
22       Q.  You have no independent
23   understanding of how the RSA works than
24   what Kramer Levin has told you?
25       A.  I don't think I can render a view

18 (Pages 66 to 69)

Page 70

1     S. Spencer - Professional Eyes Only
2  of the RSA or how the RSA works independent
3  of my discussions with counsel.
4     Q. But as just as a matter of fact,
5  do you have any understanding, just "yes"
6  or "no," setting aside where it came from,
7  just as a "yes" or "no" question, do you
8  have an understanding whether the RSA
9  provides for distributions to ad hoc group
10 members prior to the confirmation of a
11 final plan of adjustment for PREPA?
12    A. I have a general understanding
13 that certain distributions --
14    MR. DELL: Well, this is a "yes"
15    or "no" question.
16    THE WITNESS: Yeah.
17    A. Yes.
18    Q. Okay. So what is your
19 understanding -- as a factual matter,
20 what's your understanding of the
21 distributions that the RSA provides for to
22 be made to the ad hoc group members prior
23 to the confirmation of a final plan of
24 adjustment?
25    MR. DELL: If that understanding

Page 71

1     S. Spencer - Professional Eyes Only
2     is based on discussions with counsel,
3     then I direct you not to answer.
4     A. That understanding is based on a
5  conversation with counsel, so I don't think
6  I'm at liberty to address the question.
7     Q. So do you have any independent
8  understanding -- strike that.
9        Has Houlihan Lokey made any
10 analysis of its own of what payments will
11 be made to the ad hoc group members under
12 the RSA?
13    A. All analysis we've done has been
14 at the direction of counsel.
15    Q. Okay. Do you have an
16 understanding as to whether -- you're
17 familiar with the fact that the RSA
18 provides for Tranche A and Tranche B bonds?
19       If I refer to those, do you know
20 what I'm talking about?
21    A. I'm familiar with Tranche A and
22 Tranche B bonds, yes.
23    Q. Okay. Do you have an
24 understanding as to what the maturity of
25 the Tranche A bonds is?

Page 72

1     S. Spencer - Professional Eyes Only
2     A. I do have an understanding of the
3  maturity, yes.
4     Q. Do you understand the Tranche A
5  bonds to have an open-ended maturity?
6     A. Yes. That's my understanding.
7     Q. Okay. Are you aware of any
8  precedence for bonds with open-ended
9  maturity dates?
10    MR. DELL: I'm going to direct
11    you not to answer with respect to
12    discussions with counsel.
13    MS. HALSTEAD: Objection.
14    A. Are you asking me -- can you
15 restate the question?
16    Q. Setting aside any advice Kramer
17 Levin may have given you, are you aware of
18 any precedents in other circumstances,
19 other restructuring scenarios, any
20 circumstances, are you aware of any
21 precedents for bonds that have open-ended
22 maturities?
23    MR. DELL: Objection to form.
24    A. I am aware of bonds that have
25 open-ended maturities.

Page 73

1     S. Spencer - Professional Eyes Only
2     Q. What examples are you aware of?
3     A. I have a general understanding
4  that it's a financing feature of certain
5  bonds, tobacco, for example, that extend
6  indefinitely depending upon the amount of
7  cash available to pay the bond.
8     Q. Any other examples you can think
9  of?
10    A. I have a general awareness that
11 it's a feature that's used outside of
12 tobacco bonds in other aspects of the
13 municipal market.
14    Q. What aspects of the municipal
15 market are you aware of that use open-ended
16 bonds?
17    A. I don't know specific instances,
18 but I do understand it to be the financing
19 feature of certain bonds in the mini
20 market.
21    Q. Okay. But you're not -- can you
22 give me any details about who the issuers
23 were or what the circumstances of those
24 bonds were?
25    A. Outside of the tobacco bonds

Page 74

```
 1        S. Spencer - Professional Eyes Only
 2     which I mentioned?
 3        Q.   Other than the tobacco bonds.
 4        A.   I can't specifically reference,
 5     but my understanding is that there may be
 6     some others.
 7        Q.   Got it.  Okay.
 8            MR. WORTHINGTON:  Let's take a
 9     few-minute break.
10            THE VIDEOGRAPHER:  The time is
11     10:45 a.m.  Going off the record.
12            (Recess is taken.)
13            THE VIDEOGRAPHER:  The time is
14     11:04 a.m.  We are on the record.
15     BY MR. WORTHINGTON:
16        Q.   Welcome back, Mr. Spencer.
17            Right before we broke, you said
18     you were generally aware that in the
19     municipal bond markets, there are other
20     bonds with open-ended maturities, but you
21     weren't aware of any specifics.
22            Is that right?
23            MR. DELL:  Objection to form.
24        A.   So I think I indicated that I
25     believed tobacco bonds to be an
```

Page 75

```
 1        S. Spencer - Professional Eyes Only
 2     illustration.  So whether that's a specific
 3     bond or example, I'm not sure whether
 4     that's --
 5        Q.   Okay.  But other than tobacco
 6     bonds, you testified you believe there may
 7     be open-ended maturity bonds in the
 8     municipal markets, but you weren't aware of
 9     specific issuers or details about any such
10     open-ended bonds; is that right?
11            MR. DELL:  Objection to form.
12        A.   So what I've responded is I
13     believe it to be a financing -- a bond type
14     that exists in the mini market, and I cited
15     tobacco bonds, but there may be others.
16        Q.   Do you know if there are any
17     power revenue bonds that have open-ended
18     maturities?
19        A.   I'm personally -- I'm personally
20     not familiar with any.
21        Q.   Okay.  How about water or sewer
22     bonds that have open-ended maturities, were
23     you aware of any?
24        A.   To the best of my knowledge, no.
25        Q.   Okay.  Or highway bonds that have
```

Page 76

```
 1        S. Spencer - Professional Eyes Only
 2     open-ended -- highway bonds, are you aware
 3     of any that have open-ended maturities?
 4        A.   I'm not a municipal market
 5     expert, but to the best of my knowledge,
 6     no.
 7        Q.   Okay.  Is it your understanding
 8     that PREPA's legacy bonds are secured only
 9     by PREPA's net revenues from its electric
10     generation and distribution system as well
11     as reserve accounts held by the trustee?
12            MS. HALSTEAD:  Objection.  Form.
13        A.   So my understanding of the bonds
14     comes from communication with, comes from
15     communication with counsel.
16            MR. WORTHINGTON:  Let me have Tab
17     17, please.
18            (Spencer Exhibit 5, Document
19     entitled "Testimony of Stephen J.
20     Spencer, March 22, 2017, to the U.S.
21     House Committee on Natural Resources,
22     Subcommittee on Indian, Insular, and
23     Alaska Native Affairs", not
24     Bates-stamped, marked for
25     identification, as of this date.)
```

Page 77

```
 1        S. Spencer - Professional Eyes Only
 2     BY MR. WORTHINGTON:
 3        Q.   We've marked as Spencer
 4     Exhibit 5, a document entitled "Testimony
 5     of Stephen J. Spencer, March 22, 2017, to
 6     the U.S. House Committee on Natural
 7     Resources, Subcommittee on Indian, Insular,
 8     and Alaska Native Affairs."
 9            Is that the document that you
10     have in front of you?
11        A.   Yes.
12        Q.   Okay.  Is this your testimony
13     that you provided to the House of -- U.S.
14     House of Representatives on March 22 of
15     2017?
16        A.   Would you like me to read it?
17        Q.   Look at it as much as you needed
18     to to satisfy yourself that is, in fact,
19     the testimony that you provided to the
20     House of Representatives.
21        A.   Yes, I believe it to be the
22     testimony I provided.
23        Q.   Okay.  Can you turn to page 3,
24     please?
25            (Witness complies.)
```

Page 78

1  S. Spencer - Professional Eyes Only
2  Q. The bottom of page 3, you see it
3  says, "PREPA has issued approximately
4  8.3 billion of outstanding revenue bonds to
5  the public"?
6  A. I see that, yes.
7  Q. Okay. And that refers to the
8  PREPA legacy bonds that are being
9  restructured in the definitive RSA,
10  correct?
11  A. That's correct, yes.
12  Q. And the next sentence says, "The
13  bonds are secured by PREPA's net revenues
14  from electric generation and distribution
15  system, as well as reserve accounts held by
16  the trustee."
17   Is that right?
18  A. That's what it says, yes.
19  Q. And is that the testimony that
20  you provided to the House of
21  Representatives back in 2017?
22  A. This appears to be the testimony,
23  that's correct.
24  Q. Was that an accurate statement,
25  to the best of your knowledge, at the time

Page 79

1  S. Spencer - Professional Eyes Only
2  that you made it?
3  A. To the best of my knowledge, that
4  was an accurate statement.
5  Q. Okay. And this nowhere refers to
6  any security interest of the PREPA bonds in
7  gross revenues of PREPA; it refers to a net
8  revenue security interest, correct?
9   MS. HALSTEAD: Objection to form.
10  A. That's the way the language
11  reads, yes.
12  Q. Okay. And was that language,
13  when you wrote that language and submitted
14  it to the House of Representatives, you did
15  that because you believed it was accurate,
16  right?
17  A. I believed it was accurate, yes.
18  Q. Do you have any reason today to
19  question its accuracy?
20  A. I believe this still to be an
21  accurate representation.
22  Q. Okay. When do you believe the
23  Tranche A notes will be fully paid off?
24  A. So we provided an analysis of the
25  Tranche A notes to counsel and at the

Page 80

1  S. Spencer - Professional Eyes Only
2  direction of counsel.
3   I'm not able, I think -- I'm not
4  able to address that question.
5  Q. Do you have any non-privileged
6  expectations with respect to the payment
7  timing of the Tranche A notes?
8   MR. DELL: Objection to form.
9  A. We've provided an analysis to
10  counsel about our expectations relating to
11  payment of the A bonds.
12  Q. Let me ask a different question.
13   Do you believe -- as the ad hoc
14  group's financial adviser, do you believe
15  there's any risk that the Tranche A notes
16  may not be repaid, may not be fully repaid?
17  A. Let me speak independent of our
18  analysis provided to Kramer Levin and at
19  the direction of Kramer Levin, I believe
20  that there is a risk that the A notes might
21  not be repaid.
22  Q. Can you quantify that risk that
23  the A notes may not be repaid?
24  A. It is a -- could I quantify it?
25  Based on a number of macro assumptions, I

Page 81

1  S. Spencer - Professional Eyes Only
2  believe you can assess that risk.
3  Q. Do you believe -- can you make
4  any estimate of the likelihood that the
5  tranche -- let me ask that differently.
6   Sitting here right now, can you
7  make any, even approximate, estimation of
8  the likelihood that the Tranche A notes
9  will not be repaid?
10   MR. DELL: And you're asking
11   independent of his --
12  BY MR. WORTHINGTON:
13  Q. Independent of advice Kramer
14  Levin has given you.
15  A. Independent of the work that we
16  have done for Kramer Levin, sitting here
17  right now, I think it would be very
18  difficult for me to render that view. It's
19  based on --
20  Q. Greater or less than 10 percent?
21  A. I'm not in a position to quantify
22  it sitting here right now.
23  Q. And what was the purpose -- you
24  said you -- you said you've prepared
25  repayment analysis at the request of Kramer

21 (Pages 78 to 81)

Page 82

1    S. Spencer - Professional Eyes Only
2    Levin; is that right?
3       A.  That's correct.
4       Q.  And what -- do you have any
5    understanding of what legal advice those
6    repayment analyses were ultimately prepared
7    in support of?
8           MR. DELL:  You can answer "yes"
9    or "no," but not go into the substance.
10      A.  Yes.
11      Q.  Have you provided any business
12   advice to the ad hoc group members in
13   connection with the negotiation of the
14   PREPA RSA?
15      A.  Independent of conversations that
16   occurred with counsel, I don't -- I don't
17   recall specific business advice.
18      Q.  Has Houlihan Lokey provided any
19   advice to the ad hoc group over the last
20   five years that wasn't relayed through
21   counsel or provided at the request of
22   counsel?
23      A.  I don't recall specific instances
24   of advice that was provided to the ad hoc
25   group independent of Kramer Levin or not at

Page 83

1    S. Spencer - Professional Eyes Only
2    the direction of Kramer Levin.
3       Q.  Over the course of the five-year
4    engagement, has Houlihan Lokey had any
5    communications with the ad hoc bondholders
6    that Kramer Levin didn't participate in?
7       A.  From time to time, we've had
8    conversations with individual ad hoc group
9    members.
10      Q.  What kinds of subjects have you
11   discussed with the individual ad hoc group
12   members?
13      A.  I don't recall specific
14   conversations.
15      Q.  Have you ever had a discussion
16   with an ad hoc group about the expected
17   value of the notes that would be provided
18   as a result of the definitive RSA?
19      A.  To the best of my knowledge, any
20   such conversation would have stemmed from
21   analysis that we had done at the direction
22   of Kramer Levin.
23      Q.  Was the purpose of that analysis
24   to allow Kramer Levin to provide legal
25   advice or for Houlihan Lokey to provide

Page 84

1    S. Spencer - Professional Eyes Only
2    business advice as to the expected value of
3    the notes that would result from the PREPA
4    RSA?
5       A.  Can you restate the question?
6       Q.  Yeah.  Let's step back.
7           You testified that Houlihan Lokey
8    had performed analyses of the expected
9    value of the Tranche A and Tranche B notes
10   under the RSA; is that right?  This is a
11   "yes" or "no."
12      A.  Yes, we have.
13      Q.  Okay.  And you've also testified
14   that you performed those analyses at the
15   request of Kramer Levin; is that right?
16      A.  That's correct.
17      Q.  Okay.  Have you performed any
18   analyses of the value of the Tranche A and
19   Tranche B notes that were not at the
20   request of Kramer Levin?
21      A.  To the best of my knowledge, we
22   have not.
23      Q.  So was the purpose of the
24   analyses that you've provided regarding the
25   expected value of the Tranche A and Tranche

Page 85

1    S. Spencer - Professional Eyes Only
2    B notes to allow the ad hoc group members
3    to understand the expected value of the
4    notes that they will receive if the
5    restructuring goes forward?
6       A.  Yes, I believe that was the
7    purpose.
8       Q.  Okay.  What was your analysis of
9    the expected value of the Tranche A and
10   Tranche B notes to the ad hoc group
11   members?
12      A.  We provided that analysis to
13   counsel.
14          MR. WORTHINGTON:  Mike, can we
15   talk offline?
16          Let's go off the record for a
17   minute.
18          THE VIDEOGRAPHER:  The time is
19   11:15 a.m.  Going off the record.
20          (Recess is taken.)
21          (Discussion off the record.)
22          THE VIDEOGRAPHER:  The time is
23   11:18 a.m.  We are back on the record.
24   BY MR. WORTHINGTON:
25      Q.  Do you have an understanding of

22 (Pages 82 to 85)

Page 94

1  S. Spencer - Professional Eyes Only
2      Q.  And that call protection term was
3  added at the request of the ad hoc group
4  bondholders, right, the ad hoc group
5  members?
6      A.  I don't recall specifically.  I
7  believe that to be the case.
8          MR. WORTHINGTON:  Let's mark Tab
9      18.
10         (Spencer Exhibit 7, Email chain
11     beginning with email dated 6/22/18 from
12     IICG-MKTS to Mondell and others with
13     attachments, Bates-stamped
14     CGMIRSA_002269 through 2276, marked for
15     identification, as of this date.)
16 BY MR. WORTHINGTON:
17     Q.  We're going to come back to
18 Spencer 6.  Skip ahead to Spencer 7 now.
19         So this is an email first Bates
20 No. CGMIRSA002269 which is a June 22, 2018,
21 email that attached a presentation
22 entitled, "PREPA Discussion Materials AHG
23 Counter, June 21, 2018."
24         Do you see that?
25     A.  I do, yes.

Page 95

1  S. Spencer - Professional Eyes Only
2      Q.  Okay.  If you go to 4 of the
3  presentation, page Bates 2273.
4          Have you seen this document
5  before?
6      A.  I don't recall.
7      Q.  If you turn to page 4, you'll see
8  a section called "Call protection."
9          (Witness complies.)
10     Q.  And you see it refers to "Citi
11 June 2018 Discussion Materials, call
12 protection not covered," and then "AHG
13 counter," and then it includes call
14 protection terms.
15         Does this accurately reflect the
16 negotiating positions of the parties at
17 this time with respect to a call protection
18 term in the RSA that was under negotiation?
19     A.  I don't recall.  I have no reason
20 to believe it doesn't, but I don't recall.
21     Q.  Okay.  So when you look at this,
22 does it refresh any recollections about the
23 negotiations that went on with respect to a
24 call protection term?
25     A.  Yes.

Page 96

1  S. Spencer - Professional Eyes Only
2      Q.  Oh, it does?  Okay.
3          What recollections does this
4  refresh for you?
5      A.  Merely that there was some
6  back-and-forth discussion of the issue.
7      Q.  And you agree this document
8  indicates that -- sorry, strike that.
9          The original Citi June 2018
10 discussion materials, does that refer to
11 the starting position in the negotiations
12 that ultimately culminated in the
13 preliminary RSA?
14     A.  I don't recall.
15     Q.  Okay.  Is it at least -- would
16 this at least reflect an early position
17 from the government parties in connection
18 with the negotiations that ultimately
19 culminated in the preliminary RSA?
20     A.  I think that's correct.
21     Q.  Okay.  And is it fair to read the
22 ad hoc group counter as the counter by your
23 side of the negotiation to that early Citi
24 proposal with respect to an RSA?
25     A.  That's what this presentation

Page 97

1  S. Spencer - Professional Eyes Only
2  suggests.
3      Q.  Do you have any reason to believe
4  that it's incorrect?
5      A.  I have no reason to believe --
6  no, I don't.
7      Q.  Okay.  So this indicates that the
8  ad hoc group requested a call protection
9  provision, correct?
10         MR. WORTHINGTON:  Can whoever is
11     on the phone please mute?
12     A.  Can you restate the question?
13     Q.  This indicates that it was the ad
14 hoc group that requested a call protection
15 provision in the RSA, correct?
16     A.  This presentation suggests that's
17 the case, yes.
18     Q.  Okay.  And you have no reason to
19 doubt that that's accurate?
20     A.  No.
21     Q.  Okay.  So why did the ad hoc
22 group request a call protection term?
23     A.  I don't recall specifically.
24     Q.  As a "yes" or "no" question, has
25 the ad hoc group performed any analysis

25 (Pages 94 to 97)

Page 98

1  S. Spencer - Professional Eyes Only
2  placing a value on a call protection term
3  in the RSA?
4      A.  I don't recall.
5      Q.  Absent a call protection term,
6  has the ad hoc group performed any analysis
7  of the likelihood that the restructured
8  PREPA bonds would otherwise be called by
9  PREPA during their term?
10     A.  I don't recall.
11     Q.  Do you have any idea what value,
12 if any, the ad hoc group places on the call
13 protection term in the definitive RSA that
14 ultimately was included in the definitive
15 RSA?
16     A.  No, I don't.
17     Q.  Does a call protection term have
18 value if the PREPA bonds that are issued as
19 a result of the restructuring trade at a
20 premium to par, or does it only have value
21 if they trade at a discount to par?
22        MR. DELL:  Objection to form.
23     A.  You're asking does the call
24 protection --
25     Q.  Let me ask you a different

Page 99

1  S. Spencer - Professional Eyes Only
2  question.
3         Does the value of the call
4  protection turn on whether the PREPA
5  restructured PREPA bonds trade at a
6  discount or premium to par?
7      A.  Not exactly.
8      Q.  Are they correlated?
9      A.  There's a -- I believe there to
10 be a correlation.
11     Q.  Okay.  So has the ad hoc group
12 performed any analysis of the relationship
13 between the expected premium or discount to
14 par of the restructured PREPA bonds and the
15 call protection terms that are included in
16 the definitive RSA?
17     A.  I don't believe I can answer that
18 question as you stated it.
19     Q.  Because of privilege or because
20 you don't understand the question?
21     A.  For two reasons.  One, I don't
22 understand the question; and, two,
23 ultimately I can't answer it because any
24 analysis we've done --
25     Q.  Well, you can answer it "yes" or

Page 100

1  S. Spencer - Professional Eyes Only
2  "no."  I'm not asking you to explain the
3  analysis.
4      A.  Yeah.
5      Q.  I'm just asking if an analysis
6  has been done.  So let's step back.
7      A.  And what specific analysis?
8  Because I think you asked whether there
9  were two --
10     Q.  So let me step back.
11        My question is, had the ad hoc
12 group performed an analysis of the
13 relationship between the expected premium
14 or discount to par of the restructured
15 PREPA bonds and the value of any call
16 protection terms that are included in the
17 definitive RSA?
18     A.  I don't recall.
19     Q.  So what is the correlation
20 between the value of -- what would the
21 correlation be between the value of call
22 protection and the trading price of the
23 bonds, the PREPA bonds?
24     A.  So the call provision has an
25 independent theoretical value attached to

Page 101

1  S. Spencer - Professional Eyes Only
2  it.  The actual value is a function of
3  where the bonds trade on a post-reorg basis
4  after they're issued.
5      Q.  And so directionally, what is the
6  correlation between the theoretical value
7  of the call provision and the trading price
8  of the bonds on a post-reorganized basis?
9      A.  So on a post-reorg basis, if the
10 bonds trade at a premium, then the call
11 protection has value.  If they trade at a
12 discount to face, then, in actuality, it
13 wouldn't have value.
14     Q.  Okay.  Have you performed any
15 analysis comparing the restructure, the
16 anticipated restructure PREPA notes with
17 the COFINA bonds?
18     A.  I don't recall.
19     Q.  Do you have any understanding of
20 what yield the COFINA bonds currently pay?
21     A.  I don't -- sitting here today, I
22 don't have an understanding of what they
23 pay.
24     Q.  Do you know if they're trading
25 above or below 5 percent yield?

26 (Pages 98 to 101)

Page 102

1      S. Spencer - Professional Eyes Only
2          A.  I don't.
3          Q.  Do you believe that there's
4  any -- strike that.
5              Do you believe that the COFINA
6  bonds are a meaningful benchmark, the yield
7  of the COFINA bonds is a meaningful
8  benchmark in evaluating the appropriateness
9  of the yield of the reorganized PREPA
10 bonds?
11             MS. HALSTEAD:  Objection to form.
12     Relevance.
13         A.  I can't render a view of -- it
14 hinges on your use of the term
15 "meaningful."  I believe it's a benchmark.
16 It's a potential benchmark.
17         Q.  Are you aware of risks relating
18 to the Tranche A notes that would justify a
19 higher coupon rate on the -- strike that.
20             Are you aware of risks relating
21 to the Tranche A notes that would justify a
22 higher yield in the Tranche A notes than in
23 the COFINA bonds?
24             MS. HALSTEAD:  Objection.  Form.
25     Relevance.

Page 103

1      S. Spencer - Professional Eyes Only
2          A.  It's a difficult question for me
3  to answer.  I'm aware of distinct and
4  unique risks affecting the A bonds.  And
5  how that compares to COFINA, it's unclear.
6          Q.  What are the risks that you
7  believe confront the Tranche A bonds?
8          A.  There is an a range of potential
9  risks that confront the Tranche A bonds.
10         Q.  Can you give me a quick summary
11 list of the risks you believe are
12 meaningful in evaluating the Tranche A
13 bonds?
14         A.  I can highlight a few.
15         Q.  Sure.  Why don't you highlight
16 the ones that you view as important.
17         A.  One is the macroeconomy in Puerto
18 Rico.
19         Q.  Okay.
20         A.  Another potential risk factor is
21 electricity consumption.
22             A third is the interplay between
23 those first two critical factors.  Those
24 would be three off the top of my head.
25         Q.  Are there other risks that you're

Page 104

1      S. Spencer - Professional Eyes Only
2  aware of which you believe are relevant to
3  the Tranche A, the contemplated Tranche A
4  COFINA -- sorry, PREPA bonds?
5          A.  I believe there to be a number of
6  potential risks, yes.
7          Q.  What are the other ones that you
8  believe are material?
9          A.  As we've seen, potential
10 weather-related disruption in the provision
11 of electric service.
12         Q.  Okay. Others?
13         A.  The implementation independent of
14 PREPA of distributed generation at the
15 retail and commercial level.
16         Q.  So you believe implementation
17 independent of PREPA of distributed
18 generation would be a positive or a
19 negative for the Tranche A bonds?
20         A.  I believe that could potentially
21 be a negative.  It would remain -- it's
22 dependent on a number of factors.
23         Q.  Okay.  Are there other risks?
24 You were running through a list of risks.
25             Are there other risks that you

Page 105

1      S. Spencer - Professional Eyes Only
2  would include in the list of potentially
3  significant risks affecting the COFINA A
4  bonds -- I'm sorry.  Strike that.  Let me
5  take that from the top.
6              Are you aware of other
7  potentially significant risks potentially
8  affecting the PREPA bonds?
9          A.  Those are some of the more
10 prominent risks.  We could continue the
11 exercise, but I guess I'd stop there unless
12 you want to continue.
13         Q.  Well, if we're trying to capture
14 the risk that you view as significant, are
15 there additional risks that you view as
16 significant risks that you haven't
17 mentioned?
18         A.  One is the -- another potentially
19 significant risk is the interrelationship
20 between the Commonwealth and the Federal
21 Government, particularly as that affects
22 funding to municipal agencies like PREPA.
23         Q.  Okay.  Are there other risks that
24 you would include in the list of your list
25 of potentially significant risks affecting