**EXHIBIT 25**

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF PUERTO RICO

4    _____x

     In re:

5

     THE FINANCIAL OVERSIGHT AND            PROMESA

6    MANAGEMENT BOARD FOR PUERTO

     RICO,                                  Title III

7          as representative of

8    THE COMMONWEALTH OF PUERTO RICO,

     et al.,

9            Debtors.

     _____x

10   In re:

11   THE FINANCIAL OVERSIGHT AND

     MANAGEMENT BOARD OF PUERTO RICO,

12

           as representative of

13

     PUERTO RICO ELECTRIC POWER AUTHORITY,

14         Debtor.

     _____x

15

     * P R O F E S S I O N A L   E Y E S   O N L Y *

16

17              VIDEOTAPED DEPOSITION

18                     OF

19         FERNANDO L. BATLLE HERNAIZ

20             New York, New York

21          Friday, October 11, 2019

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 169103

Page 70

1    F. Batlle - Professional Eyes Only
2  before?
3       A.   Yes, I have seen them.
4       Q.   And is it fair to say that in
5  these letters, the members of Congress who
6  wrote them are critical of the definitive
7  RSA?
8       MS. McKEEN:  Objection.  The
9    documents speak for themselves.
10      You can answer.
11      A.   Yes, in this letter, they express
12 their opinion about the RSA and other
13 topics related to Puerto Rico's energy
14 sector.
15      Q.   So among other things, on the
16 second page of the first letter, it says,
17 "The new PREPA RSA also conflicts with
18 Puerto Rico's goal to grow its economy."
19      Do you see that?
20      A.   I'm sorry, where are you, sir?
21      Q.   The third paragraph down.
22      A.   The second page, you said?
23      Q.   Yes.
24      A.   I'm sorry.
25      (Document review.)

Page 71

1    F. Batlle - Professional Eyes Only
2       A.   Yes, I see that, sir.
3       Q.   Do you agree with that statement?
4       MS. DALE:  Objection.
5       A.   No.
6       Q.   Has any analysis been undertaken
7  by PREPA or AAFAF to determine the effect
8  that the RSA has on Puerto Rico's goal to
9  grow its economy?
10      MS. McKEEN:  Objection.  Outside
11   the scope of the 30(b)(6) topics and
12   the topics that the court has said are
13   within the proper scope of the 9019.
14      You can answer if you know.
15      A.   No.
16      Q.   No analysis has been undertaken
17 to that degree?
18      A.   AAFAF did not undertake or PREPA
19 undertake any analysis related to this.
20      Q.   Did anyone else to your
21 knowledge?
22      A.   I don't know.
23      Q.   Let's look at the first page.
24 Sorry for going out of order here.  It
25 says, "National and local policy experts

Page 72

1    F. Batlle - Professional Eyes Only
2  agree that the new PREPA RSA is excessively
3  generous to creditors."
4       Do you see that?
5       A.   Yes, I do.
6       Q.   Do you agree with that statement?
7       A.   No.
8       Q.   So it's your position that the --
9  well, for the record, what is the range of
10 recoveries that the RSA provides to
11 creditors, to the settling bondholders
12 creditors?
13      A.   The RSA establishes a recovery of
14 67.5 percent on tranche A and up to 10
15 percent on tranche B.
16      Q.   So up to 77.5 percent?
17      A.   Potentially, yes.
18      Q.   So in your view, a 77.5 percent
19 recovery is not overly generous to the
20 settling creditors?
21      A.   Well, in my view, given all of
22 the factors that have to be considered, it
23 is something that I believe is reasonable,
24 a reasonable recovery.
25      Q.   When you say "all the factors

Page 73

1    F. Batlle - Professional Eyes Only
2  that have to be considered," what do you
3  mean by that?
4       A.   Well, as I stated earlier in my
5  testimony today, achieving PREPA's
6  transformation is a key objective of the
7  government parties.  And in that context,
8  achieving a resolution to the restructuring
9  of PREPA's debt is, as I've stated before,
10 a key goal of the government parties.
11      As part of that, there was a
12 negotiation that was reached.  And we
13 believe -- when I say "we," the parties
14 that were involved in these negotiations --
15 that the settlement that was reached was a
16 reasonable one.
17      Q.   So let me go back to the 77.5
18 percent recovery.
19      That does not include other
20 components of consideration that are
21 included in the RSA, right?
22      A.   That is correct.  There are other
23 considerations related to the amount of
24 time, for example, that creditors have to
25 wait until the close of this transaction.

Page 74

F. Batlle - Professional Eyes Only

1 And those are separate from the 67 and a
2 half and the up to 10 percent of tranche B.
3 Q.  That includes, for example,
4 settlement payments?
5 A.  Yes.  There is a settlement
6 charge payment of one cent.
7 Q.  And an administrative claim, for
8 example?
9 A.  Yes.
10 Q.  And a waiver and support fee for
11 certain creditors?
12 A.  Yes.
13 Q.  Anything else I'm missing?
14 A.  Not that I recall, no.
15 Q.  Has PREPA or AAFAF performed any
16 calculation of what the total recovery
17 percentages are as a percentage of the
18 bondholders' prepetition claims once all of
19 those additional components of
20 consideration are added in?
21 A.  Yes.
22 Q.  What was the result?
23 A.  I'm going to have to give you an
24 approximate answer.  I don't recall if that

Page 75

F. Batlle - Professional Eyes Only

1 number was probably like another 4 percent,
2 maybe 4 and a half percent, somewhere
3 around there, if I recall correctly.
4 Q.  So what you're telling me is all
5 in, roughly 81 or 81 and a half or 82
6 percent?
7 A.  Yeah, but I don't view that as
8 part of the recovery of a bondholders.
9 That is related to an important part of
10 what the RSA accomplishes, which is it
11 allows for the time to take place to have
12 the transformation process finished.
13 Q.  Well, what do you mean it allows
14 for the time --
15 A.  Well --
16 Q.  -- for the transformation to
17 continue?
18 MS. McKEEN:  Let him finish.
19 THE WITNESS:  My apologies.
20 A.  So the transformation process is
21 a complicated process that eventually leads
22 to selecting a proponent that will run the
23 transmission and distribution operations of
24 PREPA.  That process is ongoing.  And that

Page 76

F. Batlle - Professional Eyes Only

1 process will probably not be finished until
2 sometime in the summer of 2020.
3 And so in the meantime, what this
4 tries to accomplish, what this attempts to
5 accomplish is to account for that period of
6 time and to provide a compensation to
7 bondholders that have agreed not to pursue
8 any remedies, whatever they are, that they
9 could have against PREPA and the
10 government.
11 Q.  Why are they entitled to that
12 compensation?
13 MS. McKEEN:  Object to the form
14 of the question.
15 A.  That was part of a negotiation
16 between the parties.
17 Q.  Okay.  But why did PREPA and
18 AAFAF agree to that?
19 A.  Because we thought that it was a
20 reasonable request and that it was an
21 important part of being able to find a
22 final, a definitive RSA with the supporting
23 holders.
24 Q.  Why couldn't you have waited to

Page 77

F. Batlle - Professional Eyes Only

1 enter into the RSA until the transformation
2 process is ready to close?
3 A.  Because as I have stated earlier,
4 solving PREPA's debt restructuring process
5 is an important part of eliminating the
6 uncertainty related to an ongoing
7 bankruptcy process that would facilitate
8 the billing process for the transformation
9 of PREPA.
10 Q.  So you don't think the
11 transformation process would continue
12 without settlement of the bond claims under
13 the RSA now?
14 MS. McKEEN:  Objection.
15 Misstates testimony.
16 A.  I believe that the signing of the
17 definitive RSA is an important step in
18 providing stability as it relates to the
19 debt part of the transaction that will give
20 more certainty to the bidders that are part
21 of the transformation process.
22 Q.  How do you know that the bidders
23 need more certainty in order to continue
24 the process and eventually execute an



**Page 78**

F. Battle - Professional Eyes Only

1    F. Battle - Professional Eyes Only
2  agreement for the transformation?
3         MS. McKEEN:  Object to the form
4   of the question.
5         A.  If you are part of a process to
6  run an entity like PREPA and you have an
7  open item related to potential endless
8  litigation that could lead to a receiver
9  which will try to run what you're being
10 asked to bid on and the complications that
11 that relates to, I think as a -- if I put
12 myself in the shoes of a bidder, I would
13 like to have certainty about how PREPA will
14 exit from the bankruptcy process.
15        Q.  Have you actually spoken to any
16 of the bidders in the process?
17        A.  I am not part of that process.
18        Q.  Has PREPA or AAFAF?
19        A.  This process is run by the P3
20 Authority, so I wouldn't be able to answer
21 who has had the direct conversations with
22 them.
23        Q.  How long has the transformation
24 process been -- when did it begin?
25        A.  I don't recall the exact date,

**Page 79**

F. Battle - Professional Eyes Only

1    F. Battle - Professional Eyes Only
2  but it was after Hurricane Maria.  So it
3  was probably sometime, I would say, early
4  2018, maybe.  First half of 2018.
5         Q.  Was that before or after the
6  execution of the preliminary RSA?
7         A.  I believe it was before the
8  execution of the preliminary RSA.

**Page 80**

F. Battle - Professional Eyes Only

1

**Page 81**

F. Battle - Professional Eyes Only

1

Page 98

F. Batlle - Professional Eyes Only

1  transaction, it's a combination of what the
2  economic recovery is, but there is also
3  other very important benefits such as a
4  limitation of remedies, such as capping the
5  transition charge, and those are very
6  important considerations as well in
7  addition to the recovery level.
8  Q.  Okay.  So considering that there
9  are these other benefits you believe the
10  RSA has, would an 85 percent recovery to
11  bondholders been reasonable to you?
12  MS. McKEEN:  Objection.  Calls
13  for speculation.
14  MR. BEREZIN:  Hypothetical.
15  A.  I believe that the deal structure
16  is a reasonable deal and any other number
17  is irrelevant at this stage.  We struck a
18  deal for 67 and a half with an up
19  additional 10 percent recovery in the
20  tranche B, and we believe that's a
21  reasonable number.
22  I mean, is 85 reasonable?  I tell
23  you what I think is reasonable, which is
24  the current agreement.

Page 99

F. Batlle - Professional Eyes Only

1  Q.  So if the current agreement was
2  exactly the same as it is today, except the
3  recovery was instead of 77 and a half
4  percent on the two tranches, a total of 85
5  percent, you don't have a view as to
6  whether or not PREPA or AAFAF would have
7  approved that deal?
8  MS. McKEEN:  Same objections.
9  Calls for speculation.  I'll counsel
10  the witness not to guess or speculate.
11  A.  Yes, I'm not going to speculate
12  whether that be would be a reasonable
13  number or not.  I want to repeat one more
14  time that I believe that the current
15  recovery levels are reasonable, are a
16  reasonable settlement.
17  Q.  So you mentioned these other
18  benefits that you believe the settlement
19  has, including, I think you said, capping
20  the transition charge.  You mentioned other
21  provisions of the new bonds regarding
22  remedies.  And you also mentioned effect on
23  the transformation.
24  Is that fair?

Page 100

F. Batlle - Professional Eyes Only

1  A.  Yes, that's fair.
2  Q.  Did PREPA undertake any effort to
3  quantify the value of each of those other,
4  and I'll call them "non-economic benefits"
5  of the RSA?
6  MS. McKEEN:  Objection to the
7  form of the question.
8  A.  Yes.
9  MS. McKEEN:  You can answer.
10  A.  Yes.
11  Q.  What efforts were undertaken to
12  do that?
13  A.  Well, for example, let's talk
14  about rates.  So under the current RSA, you
15  have a capped rate level that starts
16  slightly under 3 cents and then goes up
17  over time up to 4.55, I believe.  And if
18  you compare that to not having an RSA, for
19  example, and seeing what the debt service
20  would look like, there is a significant
21  difference, meaning the RSA much lower than
22  that.
23  If you take the capping concept
24  and you look at the current RSA, it --

Page 101

F. Batlle - Professional Eyes Only

1  regardless of demand, you will have the
2  same charge, the same transition charge.
3  If you didn't have that kind of a
4  protection, which you did not or you do not
5  under the trust agreement because you have
6  a rate covenant, and you lower demand, all
7  that means is that that -- the equivalent
8  of the transition charge would go up and so
9  -- in a material way, potentially,
10  depending how much demand goes down.
11  So I believe that just that
12  element of it provides significant benefits
13  in the certainty that it provides to
14  ratepayers and in having shifted one of the
15  bigger risks you have, which is demand
16  risk, to bondholders.
17  Q.  So did you quantify that in terms
18  of how much that was worth as far as
19  percentage recoveries to bondholders?
20  A.  No, I did not do a detailed
21  analysis of what it represented for
22  bondholders.
23  Q.  Now you mentioned that in your
24  view, absent the settlement, rates could

Page 102

1    F. Batlle - Professional Eyes Only
2  increase under the existing trust agreement
3  going forward beyond the level that are
4  capped by the transition charge; is that
5  right?
6    A.  That is correct.
7    Q.  Is it your understanding that any
8  increase in rates would have to be approved
9  by the Puerto Rico, the relevant Puerto
10  Rico energy regulator, which is PREB?
11    MS. McKEEN:  Objection to the
12  extent it calls for legal testimony.
13    You can answer if you know.
14    A.  Well, I'm not a regulatory
15  expert, but the PREB has purview every
16  PREPA's activities, and they would probably
17  have to undergo a rate case to approve or
18  disapprove rates.
19    Q.  Okay.  So as the representative
20  for PREPA and AAFAF testifying here today
21  in support of the RSA, do you have an
22  understanding as to whether or not PREB
23  would have actually increased rates going
24  forward under the trust agreement?
25    MS. McKEEN:  Objection.  Calls

Page 103

1    F. Batlle - Professional Eyes Only
2  for speculation.
3    I'm sorry, I just want to make
4  sure I understand the question.
5    Are you asking if he knows what
6  PREB would do?
7    MR. BASSETT:  I'm asking him if
8  he has any understanding of what PREB
9  would do.
10    MS. McKEEN:  Okay.  Calls for
11  speculation.
12    You can answer if you know what
13  PREB would do.
14    A.  I don't know what they would do
15  other than carry out the responsibilities
16  of PREPA's regulator.
17    Q.  Okay.  Did you receive any advice
18  from anyone as to the likelihood that rates
19  would actually increase absent the
20  settlement?
21    A.  No.
22    Q.  So another non-economic -- has
23  PREPA or AAFAF had any conversations with
24  anyone at PREB about the RSA?
25    MS. McKEEN:  Object to the form

Page 104

1    F. Batlle - Professional Eyes Only
2  of the question.
3    A.  I don't know specifically whether
4  PREB or AAFAF have had conversations about
5  the RSA with PREB.
6    MR. LYNCH:  Counsel, sorry to
7  interrupt, but are we at a point where
8  we might be able to downgrade the
9  confidentiality designation back to
10  confidential?
11    MS. McKEEN:  Yes.  And I think
12  since we have come back from our break,
13  there is nothing that I would have
14  designated as attorneys' eyes only.  So
15  for purposes of the transcript, we can
16  stop that designation as of when we
17  went off the record, which I believe
18  was around 11 a.m. ^ RQ
19    MR. LYNCH:  Thank you.  Sorry to
20  interrupt.
21  BY MR. BASSETT:
22    Q.  So back to the other non-economic
23  benefits, as we were calling them, one was
24  the effect of the RSA on the transformation
25  process.

Page 105

1    F. Batlle - Professional Eyes Only
2    Did you undertake any effort to
3  quantify the value of that benefit to PREPA
4  and AAFAF?
5    MS. McKEEN:  Object to the form
6  of the question.
7    A.  As part of our deliberations, we
8  had conversations with counsel where
9  counsel would advise us of the
10  implications, both in time and potential
11  cost, of a prolonged Title III process and
12  the potential litigation related to,
13  including the lien challenge and the
14  receivership.  And that formed part of our,
15  of the information we reviewed as part of
16  our decision-making process.
17    Q.  Okay.  But was it -- did PREPA or
18  AAFAF arrive at any conclusion as to the
19  value of this benefit of the RSA which is
20  its effect on the transformation process in
21  terms of percentage recoveries to
22  bondholders that it would be willing to
23  give in the settlement?
24    MS. McKEEN:  Object to the form
25  of the question.

Page 106

1    F. Batle - Professional Eyes Only
2    A.  We did not specifically
3  incorporate the analysis that I just
4  described that was performed with counsel.
5  And I will again repeat that there are
6  non-economic value to being able to provide
7  certainty to the proponents that are
8  bidding for the transformation -- for the
9  operation of the transmission distribution
10  system at PREPA, and that in itself is one
11  of the important reasons why we entered
12  into the RSA.
13    Q.  But just to be clear, yes or no,
14  you did not put a percentage value on that
15  benefit in terms of recoveries to
16  bondholders?
17    A.  No.
18    Q.  You mentioned several times the
19  benefit of resolving certain outstanding
20  litigation, including the receivership
21  litigation; is that right?
22    A.  Yes.
23    Q.  What other litigation does this
24  resolve?
25    There's other litigation with

Page 107

1    F. Batle - Professional Eyes Only
2  bondholders, correct?
3    A.  The litigation right now is --
4  you have the receivership motion and lien
5  challenge. I would defer to counsel for
6  the list of the other litigation. I
7  don't recall.
8    Q.  In PREPA and AAFAF's
9  consideration of the RSA, did they have an
10  understanding as to the potential best-case
11  outcomes in litigation with the
12  bondholders?
13    MS. McKEEN:  I'll object to the
14    extent the question would require the
15    witness to testify regarding the
16    content of conversations with counsel
17    about the likely outcome of litigation.
18    I'll instruct that the witness
19    can testify "yes" or "no" as to whether
20    there was an understanding, but not
21    what that understanding was.
22    A.  Okay. Can you repeat your
23  question?
24    Q.  I'll rephrase it.
25    Do you understand that in

Page 108

1    F. Batle - Professional Eyes Only
2  litigation with the bondholders, the
3  government parties, including PREPA and
4  AAFAF, have taken the position that the
5  bondholders are unsecured?
6    MS. McKEEN:  I'll object to the
7    extent it calls for the witness to
8    testify regarding legal conclusions and
9    legal positions that have been taken at
10    various litigation. The position that
11    the parties have taken in that
12    litigation is a matter of public
13    record.
14    MR. BASSETT:  She did not
15    instruct you not to answer.
16    A.  I'll refer you to the public
17  record as to what the government parties'
18  position is.
19    Q.  So you have no understanding --
20  as the representative for PREPA and AAFAF
21  who is here today supporting the
22  settlement, you have no understanding as to
23  the position that PREPA and AAFAF are
24  taking in litigation against the
25  bondholders?

Page 109

1    F. Batle - Professional Eyes Only
2    MS. McKEEN:  Objection.
3    Misstates testimony. It's not what the
4    witness said.
5    A.  I won't agree with that
6  statement, Counsel, and I would refer you
7  to the public record, and that is what the
8  government parties' position is. I never
9  said I had no understanding.
10    Q.  So do you understand that the
11  government parties have taken the position
12  that the bondholders are unsecured?
13    MS. McKEEN:  Same objection.
14    You can answer if you know.
15    A.  The government parties, as part
16  of their analysis, have determined that
17  there is, yes, a chance that the
18  bondholders are unsecured bondholders.
19    Q.  And if the bondholders are
20  unsecured, do you think that the settlement
21  is reasonable?
22    MS. McKEEN:  Objection. This
23    calls for legal conclusions and would
24    require the witness to divulge the
25    content of his conversations with

Page 110

F. Batlle - Professional Eyes Only

1  counsel regarding the likely outcome of
2  litigation, as well as calls for
3  speculation.
4        I'm going to instruct the witness
5  not to answer that question.
6  BY MR. BASSETT:
7     Q.  Did you -- this is a "yes" or
8  "no" question.
9        Did you receive any advice from
10  counsel as to the likelihood of the
11  government parties prevailing in their
12  litigation against the bondholders?
13        MS. McKEEN:  I'll instruct the
14     witness that he can answer that
15     question with a "yes" or "no," but that
16     he cannot reveal the content of any of
17     that advice, if he did receive advice
18     from counsel, about the likelihood of
19     the outcome of litigation.
20     A.  Yes.
21     Q.  How did that advice factor into
22  your decision to approve the RSA?
23     A.  That advice, among other pieces
24  of information, led us to believe that the

Page 111

F. Batlle - Professional Eyes Only

1  current RSA is reasonable, and that's why
2  we entered in the current RSA.
3     Q.  Do you have an understanding that
4  the bonds subject to the RSA are
5  nonrecourse?
6        MS. McKEEN:  Objection.  Calls
7     for a legal conclusion.
8        You can answer if you know.
9        That's outside of the scope of
10     the topics.
11     A.  I don't know.
12     Q.  As someone with your experience
13  in the industry, including at GDB and being
14  involved in debt issuances, do you have an
15  understanding, generally, of what it means
16  for a bond to be nonrecourse?
17     A.  Yes, I do.
18     Q.  What is that understanding?
19     A.  That you're recourse is limited
20  to whatever your source of repayment is,
21  generally speaking, obviously.
22     Q.  And according to the testimony
23  you just gave, PREPA and AAFAF, when
24  deciding to approve the RSA, did not have

Page 112

F. Batlle - Professional Eyes Only

1  an understanding as to whether or not these
2  bonds are nonrecourse?
3        MS. McKEEN:  Objection.
4     Misstates testimony, Counsel.
5        Do you want to rephrase the
6     question?
7        MR. BASSETT:  No.
8     A.  PREPA and AAFAF were provided
9  with legal advice and that legal advice
10  was --
11        MS. McKEEN:  I'm going to caution
12     the witness not to reveal the content
13     of any communications with counsel.
14     But if you can answer in a way that
15     doesn't reveal the content of those
16     communications, then please do so.
17     A.  All right.  I cannot do so.
18     Q.  So to be clear, you said before
19  you did not have an understanding as to
20  whether or not the PREPA bonds were
21  nonrecourse.  I can read back the
22  testimony.
23     A.  Yes, please read back the
24  testimony.

Page 113

F. Batlle - Professional Eyes Only

1     Q.  "Question:  Do you have an
2  understanding that the bonds subject to the
3  RSA are nonrecourse?"
4        Your counsel objected.
5        Your answer:  "I don't know."
6     A.  Okay.  If I may, I'd like to take
7  that back and say that I know and that
8  AAFAF and PREPA know.  But as part -- that
9  was part of the conversation with counsel,
10  and so I'm not going to divulge the content
11  of that conversation.
12     Q.  So you were mistaken when you
13  gave that answer previously?
14     A.  You're putting words in my mouth,
15  sir.  I am telling you that I am redacting
16  that comment -- I am taking back that
17  comment that I made and telling you that as
18  part of our deliberation, we received legal
19  advice.  And I've been instructed by
20  counsel not to divulge the contents of
21  those conversations.
22     Q.  So when PREPA and AAFAF approved
23  the RSA, did they have an understanding as
24  to whether or not the bonds were recourse

Page 114

1      F. Batlle - Professional Eyes Only
2  or nonrecourse?
3      MR. HAMERMAN:  Asked and
4  answered.
5      MS. McKEEN:  You can answer the
6  question.
7    A.  Yes.
8    Q.  What was your understanding?
9      MS. McKEEN:  Same objections.
10     You can answer if you know.  It's
11  outside the scope, but you can answer.
12    A.  PREPA's --
13      MR. HAMERMAN:  Objection insofar
14  as it calls for a legal conclusion.
15    A.  It is my understanding that the
16  bonds that we're discussing here today
17  are -- it's the government's position that
18  they are unsecured creditors as part of the
19  -- they're unsecured as part of the
20  position that the government has adopted in
21  the public records.
22    Q.  You did not answer my question.
23    A.  Can you ask the question again,
24  please?
25    Q.  You said that PREPA and AAFAF had

Page 115

1      F. Batlle - Professional Eyes Only
2  an understanding as to whether or not the
3  bonds were recourse are or nonrecourse.
4      I'm asking you were they recourse
5  or nonrecourse?
6      MS. McKEEN:  Same objections.
7     You can answer if you know.
8      MR. HAMERMAN:  Objection insofar
9  as it calls for a legal conclusion.
10  It's not a knowable thing.
11      THE WITNESS:  I'm sorry, sir?
12      MR. HAMERMAN:  I just said it's
13  not a knowable thing.  It's a legal
14  conclusion.
15      MR. LYNCH:  I object to the
16  speechifying and the coaching of the
17  witness.
18    A.  I will limit my statements to
19  saying that I am not going to divulge the
20  contents of our conversations, my
21  conversations, AAFAF and PREPA, with
22  counsel.
23    Q.  A couple of times I believe
24  you -- actually, can we go back and look
25  at, I'm sorry, exhibit -- the document

Page 116

1      F. Batlle - Professional Eyes Only
2  that's been marked as Batlle Exhibit 6.
3      Do you have that, sir?
4    A.  Yes, sir.
5    Q.  Go the second page of that
6  document.  Item No. 5 in the considerations
7  list, if I can direct your attention to
8  that.
9      (Witness complies.)
10    Q.  And this says -- and I'm not
11  going to quote the entire passage, but that
12  "The preliminary RSA provides a more
13  favorable resolution than the transaction
14  contemplated in the original restructuring
15  support agreement."
16      Do you see that?
17    A.  Yes, I do.
18    Q.  And I think you mentioned before
19  that when PREPA and AAFAF were considering
20  the preliminary RSA, they compared it to
21  the prior RSA that existed; is that
22  correct?
23    A.  That is correct.
24    Q.  What prior RSA was that?
25    A.  That was the agreement that was

Page 117

1      F. Batlle - Professional Eyes Only
2  originally agreed to by -- under the García
3  Padilla administration as modified at the
4  beginning of the first few months of 2017
5  by the Rosselló administration.
6    Q.  So I guess what I'm trying to
7  understand is, why did PREPA and AAFAF
8  believe that that was a -- you know, that a
9  comparison between the preliminary RSA and
10  the previous RSA was a relevant thing to
11  consider in determining whether to approve
12  the preliminary RSA?
13    A.  So if you are proposing to enter
14  into this RSA, it is only logical to be
15  able to say whether this is better or not
16  than the prior agreement that was in place.
17  And so to me, it is a very fair and logical
18  analysis to do.
19    Q.  But the fact that it's better
20  than another agreement that was ultimately
21  not approved does not really have any
22  bearing on whether this agreement is
23  reasonable, does it?
24      MS. McKEEN:  Object to the form
25  of the question.

Page 122

F. Batlle - Professional Eyes Only

document, just a couple of other questions
on another topic.

So you mentioned that Mr. Sobrino
was the lead negotiator outside of advisers
for PREPA and AAFAF on the RSA, correct?

A. Correct.

Q. How often did you communicate
with Mr. Sobrino about the RSA?

A. Regularly. I mean, depending on
whether there were issues to be discussed,
we had, we had communication.

Q. And how did you communicate?

A. Typically with Nancy Mitchell,
who was the lead counsel. And it could
have been any combination of either phone
calls or other electronic means.

Q. When you say "other electronic
means," does that include text messages?

A. Yes.

Q. How often did you text with
Mr. Sobrino?

A. You know, as needed. I can't
tell you that it was every day. Maybe
sometimes every day, sometimes not. I

Page 123

F. Batlle - Professional Eyes Only

mean, so as needed.

Q. Regarding the RSA?

A. Regarding the RSA.

Q. Did you provide all the texts
that you had with Mr. Sobrino to counsel in
connection with our document request?

A. Yes, I did.

Q. You're not aware of any texts you
may have had with Mr. Sobrino that were not
provided to counsel?

A. No, I'm not aware of any that
wasn't provided.

Q. Any that were deleted from your
phone?

A. No.

Q. Did you communicate with
Mr. Sobrino by any chat applications such
as Telegram?

A. Yes, at times, yes, too.

Q. How often?

A. In as needed. It was one of the
ways that he communicated with people. And
so as needed, I would communicate with him.

Q. How would you decide to

Page 124

F. Batlle - Professional Eyes Only

communicate via Telegram versus text, for
example?

A. I wouldn't say there was any real
logic. Many times it was just the way he
asked. He would ask maybe a question or
where are you or whatever the topic might
have been. And it could have been through
either of the two means. I don't really
know how to answer what was the --

Q. Is one easier than the other?

A. I don't know.

Q. There weren't certain topics that
you discussed with him on Telegram and
others that you discussed on texts and
others that you discussed on email?

A. No, I don't think there was any
selection of anything. It was just the way
he communicated.

Q. Did you provide all of your
telegram chat messages with Mr. Sobrino to
counsel?

A. Yes, I did.

Q. Are you aware of any -- are you
aware of any Telegram conversations you had

Page 125

F. Batlle - Professional Eyes Only

with Mr. Sobrino that had been deleted or
that at one time existed but no longer
exist?

A. Yeah, there could have been --
not being an expert, but the way sometimes
you would form groups and those groups you
could be removed from or not, and there
were probably some that at some point were,
because the topic was no longer relevant or
could have been deleted, that yes.

Q. So you may have had Telegram
conversations with Mr. Sobrino that no
longer exist and therefore you did not
provide to counsel?

A. I mean, I guess, theoretically,
yes, I just don't recall whether there were
any of them that were deleted related to
the topics that were here.

Q. Okay.

A. And I did not have any control
about that, right?

Q. And this is after -- this is
after I think you said you received a hold
notice regarding this litigation?

Page 126

F. Batle - Professional Eyes Only
1
2   MS. McKEEN:  Object to the form
3   of the question.
4   A.  Yeah, I provided, sir -- I'm here
5   to be truthful and honest, obviously under
6   oath about what I know, and I think I
7   provided everything that I had.
8   Q.  Okay.  But there may have been
9   some that you didn't?
10   A.  Well, I provided what I had.
11   MS. McKEEN:  And I'll just object
12   to the form of the question.  It may
13   have been some that you didn't what?
14   MR. BASSETT:  Provide to counsel
15   because they no longer existed.
16   A.  Well, I don't know if in those
17   chats that I'm saying that could have been
18   deleted, if there were any contents related
19   to my deposition here today, but I provided
20   everything I had.
21   Q.  Did you communicate with
22   Mr. Sobrino by any other means other than
23   texts and Telegram, other chat apps, et
24   cetera?
25   A.  No.  As I said, I communicated

Page 127

F. Batle - Professional Eyes Only
1
2   through either email, Telegram, text, or
3   phone, or in person.
4   Q.  Did you communicate with anyone
5   else regarding the RSA by text?
6   A.  I did with counsel, with Nancy
7   Mitchell, and probably with Maria DiConza
8   as well.  And there might have been some
9   communication with maybe the Citi advisers,
10   namely, David Brownstein.  But whatever
11   communications I had in my phone related to
12   this, to the topics of this deposition, I
13   turned over to counsel.
14   Q.  Okay.  And just back to Telegram
15   for one second, do you understand that you
16   could have saved conversations that
17   occurred on Telegram if you had wanted to,
18   right?
19   A.  I don't --
20   MS. McKEEN:  Objection to form of
21   the question.
22   BY MR. BASSETT:
23   Q.  You don't have any understanding
24   of that?
25   A.  No, I don't know.

Page 128

F. Batle - Professional Eyes Only
1
2   Q.  To what extent have you
3   communicated with José Ortiz, PREPA's CEO,
4   regarding the RSA?
5   A.  I did not have direct
6   communication with Mr. Ortiz about the RSA.
7   Q.  You've never had any
8   communications with him?
9   A.  No, not about the RSA.
10   Q.  About the proposed
11   transformation?
12   A.  No.  Very limited, if any, direct
13   conversations about it.
14   Q.  What was Mr. Ortiz's role in the
15   negotiation and approval of the RSA?
16   A.  Mr. Ortiz's role in the
17   negotiation of the RSA was very limited.
18   He was the CEO of PREPA.  Mr. Sobrino kept
19   him and the board of PREPA abreast of what
20   was going on, but he did not have a direct
21   involvement in the negotiations of the RSA.
22   Q.  Okay.  Let's go back to what's
23   been marked as Exhibit 9.
24   Do you recognize this document,
25   Mr. Batle?

Page 129

F. Batle - Professional Eyes Only
1
2   A.  Yes, I do.
3   Q.  And who is -- this is an email
4   sent by Eduardo Muñoz.  Who is that?
5   A.  Mr. Arosemena was a member of the
6   board of PREPA.  He was a government
7   employee.  If I recall correctly, he was at
8   that time in the Secretary of State agency,
9   and he also acted as secretary of the board
10   of PREPA.
11   Q.  And he's sending this email to --
12   is that -- the people listed in the "to"
13   field there, are those the PREPA governing
14   board members?
15   A.  Yes.
16   Q.  And this email was sent on
17   April 16, 2019.  And then it says, "Just
18   received the documents for tomorrow's 10
19   a.m. meeting on the PREPA RSA.  Please let
20   us know if you need anything from our end."
21   Do you see that?
22   A.  Yes, I see that.
23   Q.  First of all, is it your
24   understanding that the meeting to approve
25   the PREPA RSA occurred the next day, on

Page 130

F. Batlle - Professional Eyes Only
April 17, 2019?

A. Yes. That is my recollection, yes.

Q. And then these documents were being sent to the board members at 9:43 p.m. on the 16th; is that right?

A. That's what this email has as their sent date, yes.

Q. Do you have any reason to believe that that's not accurate?

A. It's what the document says.

Q. So the documents includes that are attached to this email includes a presentation entitled "PREPA Restructuring Support Agreement Overview."

Is that right?

A. Yes.

Q. And also attached is a copy of the draft RSA; is that right?

(Document review.)

Q. It's after the presentation?

A. Yes. Looks like the draft, yes.

MS. McKEEN: And I'll just note for the record that that document

Page 131

F. Batlle - Professional Eyes Only
that's attached is pretty voluminous and obviously the witness hasn't had time to go through to make sure every page is included and things like that. We'll obviously accept your representation for the record.

MR. BASSETT: Sure. Yeah, this is a complete copy of what was produced to us in discovery.

BY MR. BASSETT:

Q. Was a copy of the draft RSA provided to the board members prior to this email to which it is attached here?

A. I do not know what Mr. Sobrino provided to the board members prior to this meeting. His interaction -- I was not part any interaction he had with board members.

Q. But you're here today as the representative of PREPA and AAFAF, correct?

A. Yes, I am.

Q. And I think you even told me that, although your counsel wouldn't let you answer, that you had -- you had -- wouldn't let you answer as to the content,

Page 132

F. Batlle - Professional Eyes Only
you had had discussions with Mr. Sobrino about the RSA, correct?

A. That is correct.

Q. So you don't know as PREPA's or AAFAF's representative whether or not board members received a copy of the draft RSA prior to this email?

A. No. Based on my conversation with Mr. Sobrino, we didn't discuss this specifically.

MS. McKEEN: I'll counsel the witness not to divulge the contents of your conversation with Mr. Sobrino on which lawyers were present.

BY MR. BASSETT:

Q. Okay. So you're unprepared -- just to be clear, you are you're unprepared to answer that question today because you don't know?

MS. McKEEN: Counsel, I think that misstates the witness' testimony.

A. I disagree with your characterization that I am unprepared. I am letting you know that I don't know

Page 133

F. Batlle - Professional Eyes Only
whether in another context or prior to this or physically or in an electronic communication Mr. Sobrino provided this document to the other board members.

Q. Do you know whether anyone at PREPA or AAFAF or their advisers discussed the RSA with board members prior to the meeting that occurred on April 17, 2019?

A. So part of my answer would refer to my conversation with Mr. Sobrino which has privileged contents, so I won't answer that.

MS. McKEEN: I want to be clear about my instruction to the witness. I don't want you to give testimony about the conversation itself, but to the extent the purpose of that conversation was to educate you to give testimony here at this deposition today, if there is information that you learned from Mr. Sobrino that would help you answer that question, you may testify as to what you know now on behalf of AAFAF

Page 134

F. Batlle - Professional Eyes Only
1  F. Batlle - Professional Eyes Only
2  and PREPA.  If that knowledge is based
3  in part on that conversation, that's
4  okay.
5        Does that make sense to you?  Do
6  you understand that distinction?  So if
7  the contents of that conversation will
8  help you answer Mr. Bassett's question,
9  please do so.
10        THE WITNESS:  Okay.
11        A.  So it is my understanding that
12  Mr. Sobrino had informed board members
13  about the progress of the negotiations
14  related to the RSA.  And formally, as part
15  of a board meeting, it is my understanding
16  that the document you have here was the
17  document that was used to explain in more
18  detail to board members the RSA.
19        Q.  When you said it's your
20  understanding that Mr. Sobrino had informed
21  board members about the progress of the
22  negotiations related to the RSA, when did
23  he do that?
24        A.  I don't know which specific
25  meetings or whether it was outside of the

Page 135

1  F. Batlle - Professional Eyes Only
2  formal meetings that -- board meetings that
3  took place, but he did have conversations
4  with them about the progress of the RSA
5  negotiations.
6        This was, as you know, a very
7  public topic and so as part of his duties,
8  he would keep people abreast of what was
9  happening.
10        Q.  Were each of those conversations
11  or meetings, or in whatever context they
12  occurred, with all of the board members?
13        A.  I don't know.
14        Q.  And, again, you don't know when
15  these conversations took place?
16        A.  No, I do not know.
17        Q.  Was the RSA, to your knowledge,
18  discussed at any prior board meetings of
19  PREPA or AAFAF?
20        A.  The RSA, my understanding was
21  that this was the only formal presentation
22  that was made to discuss the RSA at the
23  board level, both at AAFAF and PREPA.
24        Q.  Can I now please direct your
25  attention to what's been marked as Batlle

Page 136

1  F. Batlle - Professional Eyes Only
2  Exhibit 10.  Go ahead and take your time to
3  familiarize yourself with this document, if
4  you need it.
5        (Document review.)
6        Q.  Whenever you're ready,
7  Mr. Batlle.  I'm not going to ask you about
8  every single line in the document.
9        A.  So I'll let you know.  I'm still
10  on the next to last page.
11        (Document review.)
12        A.  I am ready.
13        Q.  So is it your understanding,
14  Mr. Batlle, that what I've handed you
15  that's been marked as Exhibit 10 is a copy
16  of the minutes from the meeting that
17  occurred on April 17, 2019?
18        A.  Yes.
19        Q.  The meeting began at 10:25 a.m.
20  in the morning; is that right?
21        A.  That is what the minutes say,
22  yes.
23        Q.  And I think the minutes close by
24  saying the meeting adjourned at 12:04 p.m.;
25  is that right?

Page 137

1  F. Batlle - Professional Eyes Only
2        A.  Yes, that's what the minutes say.
3        Q.  So according to the minutes, the
4  meeting lasted about an hour and a half?
5        A.  Approximately, yes.
6        Q.  So after having -- you attended
7  the meeting, correct?
8        A.  Yes, I was present in that
9  meeting.
10        Q.  After having reviewed the minutes
11  and after having been at the meeting, do
12  these minutes accurately reflect what
13  occurred at the meeting, in your view?
14        A.  Yeah, that what I can recall
15  today of the meeting in April, I think it
16  does.
17        Q.  Do you see anything that is
18  inaccurate?
19        A.  Not really.
20        Q.  Anything that was discussed that
21  is not mentioned in these minutes?
22        A.  Well, this document was discussed
23  in the meetings.
24        Q.  Okay.
25        MS. McKEEN:  Nick, can we take a

Page 138

1    F. Batlle - Professional Eyes Only
2    quick break?
3        MR. BASSETT:  Yeah, sure.
4        MS. McKEEN:  Okay.  Can we go off
5    the record?
6        THE VIDEOGRAPHER:  The time is
7    12:19 p.m.  We are going off the
8    record.
9        (Recess is taken.)
10       (Batlle Exhibit 11, Document
11   entitled "Commonwealth of Puerto Rico,
12   Puerto Rico Electric Power Authority
13   Governing Board Resolution Definitive
14   Restructuring Support Agreement
15   Resolution Number 4695, Tomás Torres,
16   Board Member Consumers Representative,
17   dissenting," Bates-stamped
18   PREPA_RSA0027814 through 278817, marked
19   for identification, as of this date.)
20       (Batlle Exhibit 12, Letter dated
21   5/7/19 from Tomás Torres to Eli Diaz
22   Atienza, Bates-stamped PREPA_RSA0028029
23   through 28033, marked for
24   identification, as of this date.)
25       (Batlle Exhibit 13, Email dated

Page 139

1    F. Batlle - Professional Eyes Only
2    5/22/19 from Cintron Solla to Fernando
3    Batlle,, Bates-stamped PREPA_RSA0029338
4    through 29338 with attached
5    TransPerfect translation certification,
6    marked for identification, as of this
7    date.)
8        THE VIDEOGRAPHER:  The time is
9    12:30 p.m.  We are on the record.
10   BY MR. BASSETT:
11       Q.  Mr. Batlle, are you familiar with
12   the demand protections that exist under the
13   RSA?
14       A.  Yes, I am.
15       Q.  And would you consider that to be
16   a material part of the RSA?
17       MS. McKEEN:  Object to the form
18       of the question.
19       A.  It is a part of the RSA.
20       Q.  It could lead to the increase in
21   rates going forward in the event of
22   non-payment by certain customers.
23       Is that generally your
24   understanding?
25       A.  That is -- it could lead to the

Page 140

1    F. Batlle - Professional Eyes Only
2    increase for government parties
3    specifically going forward, yes.
4        Q.  All right.  So the Demand
5    Protection Term Sheet could not result in
6    an increase in rates for PREPA's
7    non-government customers?
8        MS. McKEEN:  Objection.
9        Misstates testimony.
10       A.  Can you repeat the question?
11       Q.  I thought what you said was that
12   the Demand Protection Term Sheet, the way
13   it works, it could result in an increase in
14   the rates of government customers going
15   forward under certain circumstances?
16       A.  I'm sorry, say that again.  You
17   said in the rate of government customers?
18       Q.  Yes.
19       A.  No.
20       Can you repeat your question?  I
21   want to make sure I'm being responsive to
22   what you're asking.
23       Q.  Yes.  Right.
24       Is it your understanding that the
25   Demand Protection Term Sheet, the way it

Page 141

1    F. Batlle - Professional Eyes Only
2    works is that under certain circumstances,
3    the transition charge, which is otherwise
4    capped, could be increased in subsequent
5    years for all of PREPA's customers?
6        A.  There is a provision that if
7    there is delinquency of government
8    entities, the first 1.5 percent of that
9    delinquency is absorbed by creditors, but
10   if there is anything above that, then there
11   would be an adjustment to the transition
12   charge for that amount, yes.
13       Q.  It's not just nonpayment by
14   government parties, though; it's
15   nonpayment by any customer?
16       A.  No, it's a government.
17       Q.  Only the government parties?
18       A.  If you allow me, let me...
19       (Document review.)
20       Q.  In the interest of time, I'll
21   withdraw the question.
22       A.  Okay.
23       MS. McKEEN:  Counsel, if the
24       witness would like to clarify his
25       answer, I think we should let him do

36

Page 142

F. Batlle - Professional Eyes Only

1 that.
2       MR. BASSETT:  Okay.
3 BY MR. BASSETT:
4       Q.  You want to clarify your answer?
5       MS. McKEEN:  Did you want to --
6 it seemed like you were looking at the
7 document to try to refresh your
8 recollection.
9       THE WITNESS:  There is nothing
10 anything in here that I thought might
11 help me refresh my memory.  No, there's
12 nothing here.
13       MS. McKEEN:  And if there is
14 another document that would be helpful
15 to you to refresh your recollection,
16 you can let Mr. Bassett know.
17       A.  Yeah.  Well, there is a -- in the
18 term sheet, there is a specific section
19 that addresses this, and I'm just trying to
20 recall the specific circumstances under
21 that transition charge would change.  And I
22 specifically recall the government parties,
23 but I'd like to be able to read that
24 section before completing my answer.

Page 143

F. Batlle - Professional Eyes Only

1       Q.  Okay.  Let me direct your
2 attention back to Exhibit 11.
3       Oh, I'm sorry.  That's the wrong
4 number.  I apologize.  It is Exhibit 9.
5 I'm sorry.
6       A.  Okay.
7       Q.  I'm looking specifically at the
8 presentation that was provided in advance
9 of the board meeting.  If you go to page 9
10 of that presentation.
11       A.  Okay.
12       Q.  At the bottom, it says, "certain
13 items not yet agreed."
14       It has demand protections and
15 securitization protections and the form of
16 9019 motion in order.
17       Do you see that?
18       A.  Yes.
19       Q.  What are the securitization
20 protections?
21       A.  Those were items related to the
22 actual vehicle through which the transition
23 charge would -- it was enacted that also
24 required -- those were the basis for them,

Page 144

F. Batlle - Professional Eyes Only

1 the legislation that would be required to
2 enable the implementation of the RSA.
3       Q.  So when the boards of PREPA and
4 AAFAF met and approved the RSA, they did
5 not have in front of them the demand
6 protections or the securitization
7 protections; is that right?
8       A.  That is correct because the
9 documents were not yet agreed to.
10       Q.  How could the board approve a
11 transaction without having these aspects of
12 it to consider?
13       A.  Because the most material aspects
14 of this settlement are included in the
15 definitive RSA document and were explained
16 through this presentation to board members.
17       Q.  Are the protections in the demand
18 protections and the securitization
19 protections material in your view?
20       MS. McKEEN:  Objection.  Object
21 to the form of the question.  Calls for
22 legal testimony.
23       A.  They are part of the agreement.
24 I mean, they are part of what was needed to

Page 145

F. Batlle - Professional Eyes Only

1 be agreed with the supporting bondholders
2 to finish the RSA.
3       Q.  Are they material parts of the
4 agreement?
5       MS. McKEEN:  Same objections.  I
6 don't know what you mean by "material."
7 BY MR. BASSETT:
8       Q.  Are they important?
9       A.  They are part of the deal.
10 Without them, the deal would not have been
11 able to be consummated or signed.
12       Q.  Who decided what provisions of
13 the RSA needed to be finalized prior to
14 this meeting?
15       A.  I don't understand the question.
16       Q.  I'll ask a different question.
17       Did the board of either PREPA or
18 AAFAF approve the Demand Protection Term
19 Sheet and the securitization protections at
20 a subsequent date?
21       A.  No.
22       Q.  Can you go to the last page of
23 that PowerPoint presentation, please?  I'm
24 sorry, it's not going to be the last page;

Page 146

F. Batlle - Professional Eyes Only

1  it's going to be the last page before
2  getting to the annex of RSA terms.
3            (Document review.)
4        MS. McKEEN:  Counsel, would you
5    giving the Bates number for the record,
6    please?
7        MR. BASSETT:  Sure.  The Bates
8    number for the record is
9    PREPA_RSA003003.
10           (Document review.)
11       A.  Okay.
12       Q.  First of all, there is an annex
13   of RSA terms here, right, behind that?
14       A.  Yes.
15       Q.  And did you go through all of
16   that in the meeting in that hour and a
17   half?
18       A.  I don't recall whether we
19   specifically went through each single page
20   of this document, but there was a
21   discussion about this document, and there
22   were interactions between the board members
23   and Mr. Sobrino and the other participants
24   of the meeting.  And they asked all the

Page 147

F. Batlle - Professional Eyes Only

1  questions that -- they were given an
2  opportunity to ask further questions needed
3  to ask.
4        Q.  Is it fair to say that any
5    discussion of particular provisions in any
6    level of detail would likely be reflected
7    on the minutes?
8        MS. McKEEN:  Objection.
9        A.  I mean, I don't -- I didn't write
10   those minutes, so I cannot tell you what's
11   the standard for PREPA's --
12       Q.  But you --
13       A.  Yeah, but I don't know whether
14   PREPA's -- you know, some of the stuff is,
15   was discussed, but it doesn't necessarily
16   mean everything was discussed.  Or it
17   doesn't really reflect everything that was
18   discussed in the meeting, so...
19       Q.  Were there any discussions of key
20   terms in any level of detail that you will
21   recall having that are aren't reflected on
22   the minutes?
23       A.  I don't recall whether there were
24   specific questions or discussions around

Page 148

F. Batlle - Professional Eyes Only

1  the key terms.
2        Q.  Okay.  On 003, I just want to ask
3    you a couple of questions.
4            There is a statement here that
5    says, "The securitization structure is
6    favorable as it provides bondholder limited
7    defaults and remedies only against SPV."
8            Do you see that?
9        A.  Yes, I do.
10       Q.  Are you familiar with the concept
11   of a securitization termination under the
12   RSA?
13       A.  I have to review the term again
14   in the RSA if you allow me.
15       Q.  Without -- okay.
16           (Document review.)
17       Q.  Can I ask a different question
18   and see if it helps?
19       A.  Sure.
20       Q.  Do you have an understanding,
21   sir, that there is a situation in which
22   under the RSA, the securitization structure
23   can be terminated, but the bondholders
24   still receive the same benefits in terms of

Page 149

F. Batlle - Professional Eyes Only

1  secured allowed claims in the amount of 73
2  and a quarter percent and other benefits
3  such as settlement payments and
4  administrative claims?
5        A.  Yes, that is correct.  That is
6    Section 9 of the definitive RSA document
7    that is included in the -- as part of
8    Exhibit 9.
9        Q.  So in that scenario, you're still
10   giving the bondholders the benefits of the
11   recoveries that the RSA provides, but the
12   government's not getting the benefits of
13   the securitization structure, right?
14       MS. McKEEN:  Object to the form
15   of the question.
16           You can answer.
17       A.  All this says is that if a
18   government party terminates this agreement
19   because somebody wakes up one morning and
20   says I don't want to do this agreement,
21   then bondholders would be entitled to the
22   stipulated treatment that is described in
23   this section.
24       Q.  You said that if someone wakes up

Page 154

F. Batlle - Professional Eyes Only

1
2   a stipulated treatment termination under
3   the RSA?
4       A.  Yes.
5       Q.  And do you have an understanding
6   that in the event of a stipulated treatment
7   termination, the bondholders are entitled
8   to retain any settlement payments that
9   they've received under the agreement
10  following that termination?
11          MR. HAMERMAN:  Objection insofar
12      as it calls for a legal conclusion.
13      A.  I don't know what they would be
14  entitled at the end because it is my
15  understanding that the stipulated
16  treatment, the shape it takes would end up
17  being determined in a court process, I
18  believe.
19      Q.  You don't have an understanding
20  under the RSA whether or not in the event
21  of -- for example, let's say, let's say a
22  bondholder breaches the RSA and a
23  termination event occurs.
24          Do you have an understanding
25  whether the bondholder who breaches the RSA

Page 155

F. Batlle - Professional Eyes Only

1
2   is entitled to retain any consideration
3   that it's received in the form of
4   settlement payments?
5           MS. McKEEN:  Objection.  Calls
6       for speculation and calls for a legal
7       conclusion.
8       A.  No, I don't recall what -- that
9   specific termination, but I refer you to
10  the document.
11      Q.  Now we may -- I may walk you
12  through the document, but I won't do that
13  right now.
14          Back to Exhibit 10, please.
15      A.  Yes.
16      Q.  I'd like to direct your attention
17  to page 3 of the minutes.
18          By the way, whenever it
19  references Mr. Sobrino here, it has atty,
20  period, before.
21          What is that?
22      A.  It is my understanding that is
23  the abbreviation for attorney.
24      Q.  Mr. Sobrino is an attorney?
25      A.  That is my understanding.

Page 156

F. Batlle - Professional Eyes Only

1
2       Q.  But was he acting as an attorney
3   in these discussions?
4           MS. McKEEN:  I'll object.
5       You can answer if you know.
6       A.  My understanding is Mr. Sobrino
7   was acting in his capacity as a government
8   officer, not as an attorney.
9       Q.  Okay.  So at the top of page 3,
10  actually, the second line down -- actually,
11  let me go up above that.
12          It's -- the first line of that
13  page says, "In the original RSA, there
14  would have been an exchange of 85 percent
15  for the ad hoc and 100 percent for the
16  insurers."
17          Do you see that?
18      A.  Yes, I do.
19      Q.  And then the next line says,
20  "That was too high, so what we're looking
21  for is a deal that brings us certainty."
22          Do you see that?
23      A.  Yes, I do.
24      Q.  I think we talked this about a
25  little bit earlier, but if 85 percent for

Page 157

F. Batlle - Professional Eyes Only

1
2   the ad hoc and 100 percent for the insureds
3   -- insurers was too high and that the
4   recoveries under the RSA are, in your view,
5   not too high, at what point is there -- at
6   what point is it too high?
7           MS. McKEEN:  Objection.  Asked
8       and answered.
9           MS. DALE:  Calls for speculation.
10      A.  As I have repeatedly said today,
11  we made a determination that this RSA at 67
12  and a half, plus up to a potential
13  additional 10 percent on the tranche B
14  bondholder was a reasonable settlement.
15      Q.  The next line says, "Attorney
16  Sobrino said that since we haven't been
17  doing payments on debt service since 2015,
18  the claims are accumulating as that
19  happens."
20          Do you see that?
21      A.  Yes, I see that.
22      Q.  What is your understanding of
23  what it means that the claims are
24  accumulating?
25      A.  That interest due on the bonds

Page 158

1   F. Batlle - Professional Eyes Only
2   continues to accumulate.
3       Q.   Continues to accumulate even
4   though PREPA is now subject to a Title III
5   proceeding?
6           MS. McKEEN:  I'll object to the
7       extent it calls for legal testimony.
8           You can answer if you know.
9   BY MR. BASSETT:
10      Q.   A Title III case.
11      A.   Under a Title III case, if you
12  are a secured bondholder, you continue to
13  accrue after filing.
14      Q.   So it's your understanding, as
15  the representative of PREPA and AAFAF, that
16  in a Title III case, all secured creditors
17  continue to accrue interest post filing?
18          MS. McKEEN:  I'm going to object
19      the question.  Calls for a legal
20      conclusion of a witness who is not a
21      lawyer.
22          You can answer if you know, but I
23      don't want you to speculate.
24      A.   Generally speaking, that is the
25  case.  That is my understanding.

Page 159

1   F. Batlle - Professional Eyes Only
2           MS. McKEEN:  I'm sorry, Fernando.
3       Could whoever is on the line
4       please mute yourself.  We can hear your
5       background noise.  Thank you.
6   BY MR. BASSETT:
7       Q.   And is it your understanding that
8   these bonds are secured?
9       A.   There is a -- bondholders argue
10  that they are.  And that is part of the
11  potential litigation that is out there.
12      Q.   I just want to clarify because
13  you answered maybe in your personal
14  capacity instead as the representative of
15  PREPA and AAFAF.
16          But as a representative of PREPA
17  and AAFAF who is here to testify about the
18  RSA, including the process by which it was
19  approved, at this meeting and as you sit
20  here today, it's your understanding that in
21  a Title III case, secured claims continue
22  to accrue interest after the Title III
23  petition date?
24          MS. McKEEN:  Same objections.
25      Asked and answered.  Calls for legal

Page 160

1   F. Batlle - Professional Eyes Only
2   testimony.
3           You can answer if you know, but I
4       don't want you to speculate.
5       A.   I'm not going to speculate about
6   that, sir.
7       Q.   Okay.  And in this meeting,
8   Mr. Sobrino was using the accumulation of
9   interest as one of the reasons why the
10  settlement should be approved, right, to
11  avoid that, correct?
12      A.   Well, it's a statement that he
13  makes and is reflected in the minutes.  It
14  is in the minutes, yes.
15      Q.   Do you know what it means for a
16  bondholder to be oversecured or
17  undersecured?
18          MS. McKEEN:  Calls for legal
19      testimony.  Outside the scope.
20          You can answer to the extent that
21      you know.
22      A.   Yes, I know what the definition
23  of that is.
24      Q.   And what is your understanding?
25      A.   If you're oversecured or

Page 161

1   F. Batlle - Professional Eyes Only
2   undersecured, it means whether you have
3   sufficient -- you're covered by sufficient
4   collateral.
5       Q.   Do you have any understanding as
6   to whether or not bondholders or any other
7   creditors' oversecured or undersecured
8   status bears on its entitlement to receive
9   interest after a filing date?
10          MS. McKEEN:  I'm going to object
11      to the question on the grounds that it
12      calls for testimony of a legal nature.
13      And I'm going to further instruct the
14      witness not to answer to the extent his
15      understanding as to that issue is
16      informed by conversations or advice
17      that he may have received from counsel.
18      A.   Yes, my understanding of that is
19  by information I received from counsel.
20      Q.   Yes or no question:  Did you
21  receive advice from counsel as to whether
22  or not the bonds were oversecured or
23  undersecured on the Title III petition date
24  and the consequences of that?
25          MS. McKEEN:  I'm going to further

Page 162

F. Batlle - Professional Eyes Only

1   object since we've been discussing
2   there is debate as to whether they're
3   secured at all.  But I'll allow the
4   witness to answer as to whether or not
5   he had conversations with counsel about
6   this issue generally, if he can answer
7   on a "yes" or "no" basis.
8       A.  Yes, I've had conversations
9   generally.
10      Q.  Can you go to page 4, please?
11      (Witness complies.)
12      Q.  I'd like to direct your attention
13  to the fourth paragraph down where it says,
14  "Attorney Mitchell..."
15      That's Nancy Mitchell of
16  O'Melveny; is that correct?
17      A.  I believe so, yes.
18      Q.  "...said that if we can't get to
19  an agreement on the documentation related
20  to the bond deal, we still have to provide
21  them the value.  We have embedded this
22  haircut for all time and can give it in a
23  different form."
24      Do you see that?
25

Page 163

F. Batlle - Professional Eyes Only

1       A.  Yes.
2       Q.  Is this generally a reference to
3   the securitization termination that we were
4   talking about?
5       A.  It is generally referenced to the
6   stipulated treatment, yes.
7       Q.  Later on in that page, the second
8   paragraph from the bottom, it says
9   "Mr. Batlle," you, "said this is one of the
10  most complex transactions you would see
11  anywhere."
12      Do you see that?
13      A.  Yes, I do.
14      Q.  Do you agree with that statement?
15  Is that a statement that you made at the
16  meeting?
17      A.  Yes, that is a statement that I
18  made in the meeting that is reflected in
19  these minutes.
20      Q.  Why did you say that?
21      A.  I said that because this is a
22  transaction that involves a significant
23  amount of different stakeholders, creditor
24  groups with different perspectives.  It is
25

Page 164

F. Batlle - Professional Eyes Only

1   in the middle of a very politically charged
2   environment.  And so the deliberative
3   process related to a -- one of the largest
4   utilities in the U.S. under an unproven
5   statute like PROMESA creates for many
6   complexities.  And so what I was trying to
7   say in relation to that is that the process
8   to get into this RSA was one -- was a very
9   complex one and time-consuming one.
10      Q.  And is the resulting transaction
11  complex?
12      A.  No, the result of the transaction
13  is a settlement that helps PREPA exit Title
14  III.  The professionals that are involved
15  in the process get paid to deal with the
16  complexities of this.  So the end result is
17  a settlement that is not complex to
18  explain, but getting there was a complex
19  process.
20      Q.  You don't think this is a complex
21  transaction to explain?
22      A.  I just said that it is a very --
23  it was a complex transaction, and I stand
24  by my comment.
25

Page 165

F. Batlle - Professional Eyes Only

1       I think that you can explain it,
2   and this document's intention was to do
3   that, the document that you're referencing,
4   Exhibit 9.  If you're going to go line by
5   line and then start explaining every single
6   detail, yes, it can be complex; I'm not
7   going to deny that.  But in the end, this
8   was something that was reached with the
9   support of very sophisticated advisers on
10  both sides.  And, yes, it is complex, but
11  you can sit down and explain it in a
12  relatively simple way in terms of what it
13  achieves.
14      Q.  Go to on the top of the next
15  page, please.
16      (Witness complies.)
17      Q.  This says, "To provide for
18  additional time" -- and I'll let you read
19  it.  I'm just going to paraphrase here for
20  the sake of expediency.
21      Is it fair to say that there was
22  a member of the PREPA governing board who
23  voiced a concern about the amount of time
24  that the board members had to consider the
25

Page 166

F. Batlle - Professional Eyes Only

1  documents that were provided in advance of
2  the meeting?
3  A. Yeah, the statement here has
4  Mr. Torres indicating that.
5  Q. Who is Mr. Torres?
6  A. He is a board member.
7  Q. And then in response to that
8  concern, Mr. Sobrino -- well, strike that.
9  Mr. Torres asked that the vote on
10 the RSA be postponed until the next meeting
11 which was scheduled for April 23rd,
12 correct?
13 A. Yes, that is what the minutes
14 reflect.
15 Q. And in response to that,
16 Mr. Sobrino stated the importance of voting
17 on the 17th; is that right?
18 A. Voting on that day, correct.
19 Q. What was the importance on voting
20 on the 17th and not waiting until the 23rd?
21 A. It was Mr. Sobrino's opinion that
22 voting in favor of the document -- of the
23 settlement and moving on to complete
24 everything else was important. Timing was

Page 167

F. Batlle - Professional Eyes Only

1  important in getting this done.
2  Q. They couldn't have waited six
3  days?
4  A. Well, I am not a board member. I
5  can read what the board member said here,
6  that the majority did not need a separate
7  session to vote. So in their
8  determination, this was fine, voting on
9  that day.
10 Q. Why was there an urgency at all?
11 A. I'm sorry?
12 Q. Why was there any urgency at all
13 to approve the RSA at this point?
14 A. Well, we all want to exit from
15 the Title III process so everything, in my
16 opinion, should be handled with as much
17 urgency as possible. And we were at a
18 point where the documentation was in enough
19 level of completeness to present it to the
20 board for approval.
21 Q. But there was no specific
22 deadline or event or anything like that
23 that required this to be approved on an
24 urgent basis at this time?

Page 168

F. Batlle - Professional Eyes Only

1  MS. McKEEN: Object to the form.
2  BY MR. BASSETT:
3  Q. Aside what you testified about
4  generally wanting to exit Title III sooner
5  rather than later?
6  MS. McKEEN: Same objection.
7  A. Yeah, I don't recall whether
8  there was a date in black and white, but I
9  do know that there were conversations
10 between the supporting bondholders and the
11 government parties about signing the RSA.
12 And there was some expectations about
13 getting it done, and so generally speaking,
14 as I said, it's in everybody's best
15 interest to apply the highest level of
16 urgency to exit Title III, and this is a
17 step in that direction.
18 Q. I'd like to direct your attention
19 to what's been marked as -- and I'd like to
20 try to do this just to speed things up all
21 at once. They've already been distributed
22 to everybody else, but I'm going to hand
23 you what's been marked as exhibits 11, 12
24 and 13.

Page 169

F. Batlle - Professional Eyes Only

1  MS. McKEEN: Can you tell us
2  which is which?
3  MR. BASSETT: Yeah, sure.
4  11 is the resolution. 12 is the
5  letter dated May 7, 2019. And then the
6  email is 13.
7  BY MR. BASSETT:
8  Q. Mr. Batlle, take your time with
9  these documents. I do not intend to ask
10 you extremely detailed questions about
11 them, but I'm happy to allow you to pause
12 in response to my questions to review it in
13 a little more detail if you'd like.
14 I'm putting that out there in the
15 interest of moving things along, but
16 obviously take your time.
17 (Document review.)
18 Q. Just to spoil the surprise, I'm
19 generally just going to ask you what was
20 the response to these documents. So it's
21 not going to be a detailed overview or a
22 detailed discussion of them.
23 A. Okay.
24 (Document review.)

Page 170

1    F. Batlle - Professional Eyes Only
2        A.  Okay.
3        Q.  Directing your attention to
4    Exhibit 11 first, just generally, based on
5    your review of the document -- first of
6    all, have you seen this document before?
7        A.  Yes.
8        Q.  Is it fair to describe this as
9    Tomas Torres's formal dissent to the
10   approval of the RSA?
11       A.  That is my understanding from
12   reading this document, yes.
13       Q.  Just generally, what is your
14   understanding of the basis for his dissent?
15       MS. McKEEN:  Objection.  The
16   document speaks for itself.
17       A.  Yeah, I mean, you can read what
18   he believes should have been done for him
19   to vote for the transaction or not.
20       Q.  He concludes by saying he would
21   have "ordered an economic impact study to
22   confirm the capacity of PREPA, electricity
23   consumers, and of the Puerto Rico economy
24   to carry the transition charge as described
25   in the agreement considering the additional

Page 171

1    F. Batlle - Professional Eyes Only
2    aggregated charges described."
3        Do you see that?  It's the last
4    paragraph.
5        A.  Yes, I see that.
6        Q.  And I think you said before but
7    no such study was conducted, correct?
8        A.  Right, but Mr. Torres is entitled
9    to his opinion.  There were other
10   independent board members that didn't
11   believe that was necessary, involved in the
12   RSA.
13       Q.  What, if anything, did -- well,
14   did any other board member agree with
15   Mr. Torres?
16       A.  The minutes reflect that the
17   other board members voted in favor of the
18   RSA.
19       Q.  Well, what, if anything, was done
20   in response to Mr. Torres's dissent?
21       A.  Nothing specifically was done.
22   Board members, like any board, are entitled
23   to their vote and are entitled to have a
24   different point of view.  And I respect
25   Mr. Torres, and he has a view, and he

Page 172

1    F. Batlle - Professional Eyes Only
2    expressed it here.
3        Q.  Let me direct your attention to
4    Exhibit 12, please.
5        (Document review.)
6        Q.  This is a letter that Mr. Torres
7    sent to the PREPA board, correct?  To the
8    president of the board, correct?
9        A.  Correct, yes.
10       Q.  What, if anything, was done in
11   response to this letter, including in
12   response to Mr. Torres's statement that he
13   believed the RSA should not have been
14   approved given that not all the documents
15   were available at the board meeting?
16       A.  I don't believe anything
17   specifically was done.  The board had
18   approved the transaction.  And as I stated,
19   Mr. Torres is entitled to his opinion.
20       Q.  In the second to last paragraph
21   of the document, it says that there was --
22   that "the list of the ad hoc group members
23   was not included in the copy of the RSA
24   circulated to board members and therefore
25   possible conflicts could not be evaluated."

Page 173

1    F. Batlle - Professional Eyes Only
2        Do you see that?
3        MS. McKEEN:  I'll just object to
4    the extent the document speaks for
5    itself.
6        You can go ahead.
7        A.  Yeah, that's what the document
8    says.
9        Q.  Is that correct, was any conflict
10   analysis performed?
11       A.  I don't understand what he refers
12   to as conflict under content of 76 capital
13   funds and investment firms.
14       Q.  Okay.  But prior to the vote on
15   the RSA, the board members were not aware
16   of who the members of the ad hoc group
17   were?
18       MS. McKEEN:  Objection.
19       A.  I want to be clear on something
20   here.  The government parties have a
21   responsibility to get the best deal
22   possible and that's what they did.  The ad
23   hoc group and the supporting bondholders
24   had a responsibility to get the best deal
25   they can and that's what they did.  A

Page 206

F. Batlle - Professional Eyes Only

1  F. Batlle - Professional Eyes Only
2     Q.  What I've handed you is an email
3  chain Bates-stamped PREPA_RSA0029088.
4        Mr. Batlle, you appear to be
5  copied on at least one of these emails
6  which -- one or more of these emails which
7  were exchanged in March of 2019.
8        Can you just tell me generally,
9  did you recall this email exchange, first
10  of all?
11     A.  Yes, after reviewing it here, I
12  recall seeing this graph, yes.
13     Q.  And can you tell me generally
14  what's going on?  This looks to be an
15  exchange primarily between people at Citi
16  and people at Ankura where certain
17  information is being shared.
18        Can you just tell me what this
19  related to?
20     A.  This is related to the -- what's
21  called here the collection curve, I
22  believe.  And it relates to the payment,
23  customer payments and the amount of
24  collections.  And it reflects both the
25  total amount and then the amount excluding

Page 207

1  F. Batlle - Professional Eyes Only
2  the government.
3     Q.  And if you go to that chart that
4  appears on that email that's the second
5  from the top in the document and then the
6  text above it, it says this is from James
7  Castiglioni.
8        Who is that?
9     A.  James Castiglioni is part of the
10  Citi team that advises the board.
11     Q.  Okay.  And then his email was
12  later forwarded to you by David Brownstein.
13        But in this his email, he says,
14  "If I understand this, the percentage
15  collection of all clients is 76 percent for
16  the time period 7/1/2012 through
17  11/1/2018."
18        Do you see that?
19        MS. McKEEN:  Objection.  The
20     document speaks for itself.
21     A.  That's what the email says.
22     Q.  Do you have an understanding as
23  to whether or not that is an accurate
24  statement as to the percentage collections
25  for PREPA during that time period?

Page 208

1  F. Batlle - Professional Eyes Only
2     A.  No, I'd have to -- if you're
3  asking me for my understanding, I have to
4  look at the spreadsheet where these numbers
5  come from.
6     Q.  Who prepared the spreadsheet?
7     A.  That spreadsheet was prepared by
8  PREPA, if I read this correctly.
9        The second page attaching the
10  collection current analysis prepared by
11  PREPA.
12     Q.  So as the representative of PREPA
13  and AAFAF and someone who was involved in
14  the RSA, do you have an understanding of
15  what the general collection rate was for
16  PREPA over this time period that's
17  addressed in this email?
18     A.  I have a general understanding
19  based on the numbers included in this
20  email, yes.
21     Q.  Does the number 76 percent sound
22  accurate to you during that time period?
23     A.  It sounds low, but that's what
24  the numbers reflect.
25     Q.  Did PREPA do any analysis as to

Page 209

1  F. Batlle - Professional Eyes Only
2  what it expects the collection rate to be
3  moving forward?
4     A.  Well, it is the expectation of
5  the government that as part of this
6  transformation, the selected entity that
7  will run the T&D operation will have the
8  right incentives to make sure that
9  collections are as high as possible.  100
10  percent being the optimal level and that is
11  the expectation.
12     Q.  It's expected that collections
13  will become 100 percent?
14     A.  No, I'm saying that an optimal
15  level would be to be at 100 percent.  I'm
16  not saying that they're going to go to 100
17  percent.
18     Q.  Was any analysis performed as to
19  what's realistically expected?
20     A.  No.
21     Q.  Do you have an understanding of
22  whether or not the -- strike that.
23        Do you have an understanding of
24  whether after entering into the RSA, PREPA
25  has the ability to provide value to

Page 210

F. Batlle - Professional Eyes Only

1  F. Batlle - Professional Eyes Only
2  creditors in its Title III case other than
3  the bondholders?
4      MR. NATBONY:  Objection.
5      A.  What do you mean by "value"?
6      Q.  Well, does PREPA have the ability
7  to make a distribution as part of a Title
8  III plan, for example, to creditors other
9  than bondholders?
10     MS. McKEEN:  Objection.
11     A.  PREPA's distribution to creditors
12 is what's represented in the RSA.
13     Q.  So all the distributions that
14 PREPA is able to make to creditors, are
15 those contained in the RSA?
16     MS. McKEEN:  Objection.
17     A.  To the best of my knowledge, yes.
18     MS. McKEEN:  I think your
19 question was quite ambiguous about
20 distributions under what.  And I'd like
21 to -- I'd ask that you follow up with
22 the witness to make clear whether you
23 were talking about distributions under
24 the RSA or under a plan of adjustment,
25 because it's not clear from the line of

Page 211

1  F. Batlle - Professional Eyes Only
2  questioning which thing you're actually
3  talking about.
4      MR. BASSETT:  I object to the
5  speaking objection and the blatant
6  instruction to the witness.  I think
7  the record is clear, and I will clarify
8  if I choose.
9      MR. NATBONY:  Well, there is an
10 objection on the record.  If you choose
11 to ignore the objection and not
12 clarify, that's your own risk.
13     MR. LYNCH:  Isn't this what
14 redirect is for?
15     MR. BASSETT:  Yes.
16     MR. NATBONY:  The purpose of an
17 objection is to give you the
18 opportunity to correct a poorly phrased
19 question.  If you choose not to take
20 that opportunity, that's your choice.
21     MR. BASSETT:  Maybe a proper
22 objection.  That's a speaking objection
23 and an instruction to the witness,
24 which was inappropriate.  I will, to
25 the extent I deem necessary, ask a new

Page 212

1  F. Batlle - Professional Eyes Only
2  question now or in the future in this
3  deposition.
4      Could we take like two minutes
5  and not even get up.  I just want to
6  confer with counsel.
7      MS. McKEEN:  Sure.
8      THE VIDEOGRAPHER:  The time is
9  2:34 p.m.  Off the record.
10     (Recess is taken at this time.)
11     THE VIDEOGRAPHER:  The time is
12 2:43 p.m.  We are on the record.
13     MR. BASSETT:  Mr. Batlle, I do
14 not have any additional questions for
15 you at this point in the deposition.
16 As I discussed with your counsel in the
17 hallway, I'm not waiving whatever right
18 I might have to ask another question or
19 two later.  I don't anticipate doing
20 that, but I just wanted to put on the
21 record that I reserve the time.
22 EXAMINATION BY
23 MR. LYNCH:
24     Q.  Good afternoon, Mr. Batlle.
25     A.  Good afternoon.

Page 213

1  F. Batlle - Professional Eyes Only
2      Q.  My name is John Lynch.  I work at
3  Wachtell Lipton Rosen & Katz.  We are
4  counsel for Cortland Capital Market
5  Services LLC.
6      Thank you for being here.  I
7  appreciate your questions -- your answers
8  to our questions.
9      Just a couple of follow-ups on
10 your background.
11     Did you do anything -- when did
12 you graduate from Northeastern?
13     A.  1989.
14     Q.  And did you do anything between
15 1989 and the time you went to Harvard
16 Business School?
17     A.  Yes, I did.
18     Q.  What did you do?
19     A.  I worked for a firm that was
20 called Metmore Financial, which was one
21 of the leading mortgage banks in Puerto
22 Rico, and I was there as assistant to the
23 CEO.
24     Q.  How long were you there?
25     A.  I was there literally from the

Page 214

F. Batlle - Professional Eyes Only

1    time that I graduated from undergrad at
2    Northeastern and the time shortly before I
3    started Harvard Business School, so three
4    years give or take.
5        Q.   Okay.  You started Harvard
6    Business School, I guess, in the fall of
7    '92?
8        A.   Yes.
9        Q.   Okay.  And you're not a lawyer,
10   right?
11       A.   I am not a lawyer.
12       Q.   Are you an investment banker?
13       A.   I am not an investment banker.
14       Q.   What do you call yourself when
15   people ask you what do you do for a living?
16       A.   I am financial adviser.
17       Q.   Okay.  Is that a consultancy
18   role?
19           MS. McKEEN:  Objection.
20   BY MR. LYNCH:
21       Q.   What do you mean by financial
22   adviser?
23       A.   I advise clients on matters
24   related to financial issues that include

Page 215

F. Batlle - Professional Eyes Only

1    restructurings.
2        Q.   And how long have you been doing
3    that?
4        A.   I have been with Ankura for two
5    and a half years now, approximately.
6        Q.   You didn't do that before you
7    came to Ankura; is that correct?
8        A.   Before I came to Ankura, I was
9    CEO of a broker-dealer called Santander
10   Securities.  And as part of that role, I
11   had a unit that did advise clients in
12   financial matters, and I had oversight over
13   that unit.
14       Q.   What else did Santander
15   Securities do while you were CEO?  What
16   other lines of business was it engaged in?
17       A.   Santander Securities was engaged
18   in retail brokerage.  It also had an arm or
19   a subsidiary that did asset management and
20   the incidental business around the
21   securities, retail securities business,
22   mostly.
23       Q.   I may have this wrong, so forgive
24   me and correct me, please, but I believe I

Page 216

F. Batlle - Professional Eyes Only

1    heard you testify this morning that you may
2    have had some involvement with PREPA in
3    connection with a bond offering while at
4    Santander Securities.
5        Do I have that right?
6        A.   Yes, I think I said that, yeah.
7        Q.   What was that?
8        A.   And I don't --
9           MS. McKEEN:  I just object.  I
10   think it misstates the witness'
11   testimony.
12          MR. LYNCH:  That's why I asked
13   the question.
14       A.   Well, what I think I said is,
15   while I was at the GDB, I did have a
16   participation.  When I was at Santander
17   Securities, there were potentially clients
18   that had bonds, PREPA bonds.  And I'd have
19   to look back at the dates.  We might have
20   been part of a syndicate of banks that
21   might have sold PREPA bonds, but I don't
22   recall whether for the time period that I
23   was there, there was a bond issue.  There
24   is a possibility there was, but I don't

Page 217

F. Batlle - Professional Eyes Only

1    recall.
2        Q.   What's the precise time frame or
3    as precise as you can recall that you were
4    at Santander Securities?
5        A.   So I joined Santander Securities
6    in 2011, probably June, July time frame.
7    July, probably.  And I left Santander
8    Securities late, probably late third
9    quarter of 2016, Septemberish type of --
10   September, October.
11       Q.   And you were there continually
12   that begin date to the end date; is that
13   right?
14       A.   Correct.
15       Q.   Okay.  In your career as a
16   financial adviser, do you have any
17   particular specialty?
18       A.   No.  I am versed in financial
19   matters generally.
20       Q.   Do you have any particular
21   geography that you cover?
22       A.   So for part of my career, I was
23   based in Puerto Rico.  And then after I
24   joined Santander Securities, I -- in 2013,