**<u>EXHIBIT 27</u>**

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF PUERTO RICO

4    _____x
     In re:

5
     THE FINANCIAL OVERSIGHT AND            PROMESA
6    MANAGEMENT BOARD FOR PUERTO
     RICO,                                  Title III
7         as representative of

8    THE COMMONWEALTH OF PUERTO RICO,
     et al.,
9          Debtors.
     _____x
10   In re:

11   THE FINANCIAL OVERSIGHT AND
     MANAGEMENT BOARD OF PUERTO RICO,
12
          as representative of
13
     PUERTO RICO ELECTRIC POWER AUTHORITY,
14        Debtor.
     _____x
15
        * P R O F E S S I O N A L   E Y E S   O N L Y *
16

17                VIDEOTAPED DEPOSITION

18                        OF

19                 DAVID A. SKEEL

20              New York, New York

21           Tuesday, October 8, 2019

22

23

24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 169101

Page 50

D. Skeel - Professional Eyes Only
1
2    Q.   But we're talking about July of
3  this year.  So you have no recollection of
4  July of this year?
5    A.   I don't.  I mean, I have hundreds
6  of messages every day.
7    Q.   Speaking of messages -- you're
8  talking about text messages?
9    A.   Emails, phone calls, text
10 messages.
11    Q.   You have a hundred of those?
12    A.   I have a hundred emails.
13    Q.   Okay.  What about text messages?
14    A.   Less --
15    MS. DALE:  What about it?
16 Objection.
17    MR. DESPINS:  You can't have
18 talking objections.  State your
19 objection and then the witness will
20 answer.
21    MS. DALE:  Objection to the form.
22 BY MR. DESPINS:
23    Q.   Tell me about your text messages.
24    MS. DALE:  Objection.
25    A.   I have text messages every day.

Page 51

D. Skeel - Professional Eyes Only
1
2    Q.   Between you and other members of
3  the board?
4    A.   Between me and various people.
5  Sometimes other members of the board,
6  sometimes not.
7    Q.   And other members of the board,
8  if I'm asking you to put aside Ana Matos
9  Santos and Judge Gonzalez, do you have text
10 messages with other members of the board
11 other than those two?
12    A.   Occasionally, yes.
13    Q.   Regarding PREPA?
14    A.   Possibly.
15    Q.   And would it be fair to say board
16 members communicate by text frequently
17 among, you know, between each other?
18    MS. DALE:  Objection.
19    A.   I only know myself.
20    Q.   Well, but you're not
21 communicating with yourself.  So you're
22 communicating with other people?
23    A.   I communicate with other board
24 members, yes.
25    Q.   By text?

Page 52

D. Skeel - Professional Eyes Only
1
2    A.   By text, by phone, by email.
3    Q.   Okay.  And what about other
4  applications, meaning WhatsApp, that type
5  of -- or Telegram, or things like that, do
6  you guys communicate through that?
7    A.   I do not use -- I don't use other
8  applications.
9    Q.   And other board members?
10    A.   I don't know.
11    Q.   Have you received text messages
12 from other board members, again, other than
13 Judge Gonzalez and Ana Matos Santos?
14    MS. DALE:  Objection.  Asked and
15 answered.
16    You can answer it again.
17    A.   Yes.
18    Q.   Including regarding the RSA?
19    A.   I don't remember specifics.
20    MR. DESPINS:  Okay.  Let's go to
21 Tab 21.
22    (Skeel Exhibit 3, Email chain
23 beginning with email dated 7/25/18 from
24 Castiglioni to Brownstein and Skeel
25 with attachments, Bates-stamped

Page 53

D. Skeel - Professional Eyes Only
1
2  FOMB_9019_00006585 through 593, marked
3  for identification, as of this date.)
4  BY MR. DESPINS:
5    Q.   Tell me when you're ready.
6    A.   I'm ready.
7    Q.   Actually the question I'm going
8  to ask you is not about that document yet.
9  I just want to close one loop.
10    Syncora and National were added
11 to the RSA in -- well, when were they added
12 to the RSA?  Do you remember?
13    A.   I don't remember exactly.
14    Q.   Would -- September of 2019 sounds
15 right?
16    A.   It's relatively recently.
17    Q.   All right.  So they were added
18 after the date of the previous text
19 messages that we were looking at?
20    A.   I believe so.
21    Q.   Okay.  Was there a board meeting
22 to approve the joining of National and
23 Syncora to the RSA?
24    A.   I don't remember if there was a
25 final board meeting.  We authorized trying

14  (Pages 50 to 53)

Page 54

1  D. Skeel - Professional Eyes Only
2  to bring them on board.
3  Q.  You authorized trying to bring
4  them on board, but you don't know if there
5  was a vote on it?
6  A.  I don't remember one way or the
7  other.
8  Q.  Well, this would have been in
9  September.  We're in October of 2019 now.
10  A.  I have age-appropriate memory
11  unfortunately.  I don't specifically
12  remember.  If I could go back through our
13  calls, I could -- I'm sure I could refresh
14  my recollection.
15  Q.  Okay.  Going back to the document
16  you have in front of you now.  So this is
17  Bates-stamped, again, FOMB 6885, 6886.
18  A.  Wait a second.
19  MS. DALE:  It's 6585 to 6593.
20  THE WITNESS:  That's what I have.
21  MR. DESPINS:  Oh, I'm sorry.  It
22  keeps going.  Sorry.
23  (Document review.)
24  MS. DALE:  Is that what you have?
25  THE WITNESS:  Yes.  I have what

Page 55

1  D. Skeel - Professional Eyes Only
2  you have.
3  (Document review.)
4  MR. DESPINS:  Sorry.  Let's
5  restate that.  Bates stamps numbers
6  6885 through 6593.
7  MS. DALE:  Luc, I think you're
8  just misstating the number on the
9  bottom, sir.  It's 6585.
10  MR. DESPINS:  Yeah, 6585.  I'm
11  sorry.
12  MS. DALE:  You were saying 6885.
13  MR. DESPINS:  Okay.  I'm sorry.
14  To 6583, right?
15  A.  Wait.
16  (Document review.)
17  A.  Yes, that's what I have.
18  Q.  Look at 6586 at the bottom there.
19  Let's establish the date.  Sorry.
20  The date is -- this is taking place in July
21  of 2018 this time?
22  A.  That's correct.
23  Q.  Okay.  And if you look at the
24  July 25th, 2018, 9:02 a.m. email -- or, I'm
25  sorry, 8:58 a.m. email from yourself to

Page 56

1  D. Skeel - Professional Eyes Only
2  Mr. Brownstein, there is a reference here
3  to, "I'm a tad queazy about the numbers
4  discussed on Friday's call, which I missed
5  as you may remember, given the implied
6  potential payout."
7  What was the implied potential
8  payout?
9  A.  What generally or what
10  specifically?
11  Q.  No, for the bondholders.
12  A.  I don't remember the exact
13  number.
14  Q.  So you have no sense of was it 50
15  percent, 100 percent, 80 percent?
16  A.  I don't remember exactly.  It was
17  in the 70 to 80 percent, I believe.
18  Q.  Okay.  But you said you were a
19  "tad queazy" about these numbers.
20  What did you mean by that?
21  A.  What I meant was we're getting
22  closer to -- we're getting higher into the
23  range of reasonableness, in my view.  And
24  it was my way of nudging Citi to bargain
25  hard.

Page 57

1  D. Skeel - Professional Eyes Only
2  Q.  So what is the upper range of
3  reasonableness in your view?
4  A.  I don't have a specific number.
5  It would depend on all of the features of
6  the deal.
7  Q.  Yeah, but when you sent that
8  email, you knew what the features of the
9  deal were, right, the other features of the
10  deal?
11  A.  I knew what they were at that
12  time.
13  Q.  Okay.  But you were focusing on
14  the percentage recovery to the holders,
15  correct?
16  A.  That was one thing I was focusing
17  on.  I was focusing on other things as
18  well.
19  Q.  Understood.
20  And you just mentioned a few
21  percentages, you know, a minute ago, 75, 80
22  percent or something like that.
23  So given that you knew what the
24  other elements of the deal were, what was
25  your view about the percentage?

Page 58

D. Skeel - Professional Eyes Only
A. I said that the percentages that
we were talking about were moving up into
the upper ranges of my comfort zone.
Q. Which was?
A. I didn't -- I don't have a
specific number in mind.  If it was 100
percent, I wouldn't be happy.
Q. Okay.  How about 90 percent?
A. I probably wouldn't be happy with
that either, but it would depend on what
all the features of the deal were.
Q. But as I said, you knew the other
features of the deal at this point, right?
A. I knew many of the features of
the deal.
Q. Okay.  And how about 85 percent?
A. I don't know what exact number I
had in mind.  This was below 85 percent.
Q. Okay.  So let me ask the
question:  What do you think the percentage
recovery is under the preliminary RSA?
A. The maximum percentage recovery
is in the range of 77.5 percent.
Q. Okay.  And what is it under the

Page 59

D. Skeel - Professional Eyes Only
current RSA?
A. The current, it's in the same
general range.  I forget exactly.  I think
basically the same.
Q. Did you ever see in the
presentations from Citibank those types of
percentage recoveries?  I'm not asking you
precisely what the percent recovery was,
but whether you saw reports from Citibank
that would show you percentage recoveries
for the bondholders?
A. I believe we saw estimated
percentage recoveries, yes.
Q. And they were consistent with the
numbers you just gave us?
A. In the final numbers, yes.
Q. Did anybody else, other than you,
on the board raise issues regarding the
percentage recovery?
A. I don't remember.  Probably.  We
had lots and lots of conversations.
Q. By the way, at the time of the
approval of the preliminary RSA, we're
talking about late July 2018, was Elias

Page 60

D. Skeel - Professional Eyes Only
Sanchez still a representative on the
board?  Or I forget his precise title, but
was he still the governor's representative
on the board at that time?
A. No, he was not.
Q. Did any other member of the board
express concerns regarding the preliminary
RSA before its approval?
MS. DALE:  Objection.  Asked and
answered.
You can answer it again.
A. At some point before approval, I
suspect people raised issues.  I don't
remember.  I don't remember specific board
members raising specific issues.  But as I
said, there were many, many conversations.
Q. Why was the percentage recovery a
factor that you were focusing on?
A. My general perspective is PREPA
is essential to Puerto Rico's recovery, and
I wanted to make sure, to the extent I
could, that PREPA only enters into deals
that are sustainable.
Q. So your focus on the percentage

Page 61

D. Skeel - Professional Eyes Only
recovery was not driven by the potential
challenges to the bondholders' legal
entitlement?
MS. DALE:  Objection.
A. It was driven by many factors.
That's one.  Legal factors are one.
Sustainability is one.
Q. Did you develop a view outside of
advice received from counsel regarding the
legal challenges to the bondholders'
claims?
A. I don't think I can disentangle
those two.  We were getting legal advice
throughout, and that was shaping what I was
thinking.
Q. A minute ago you talked about --
you referred to the concept of
sustainability or sustainable?  You said
that PREPA only enters into deals that are
sustainable.
Do you remember that?
A. Yes.
Q. What did you mean by that?
A. I mean deals PREPA can afford to

Page 62

D. Skeel - Professional Eyes Only

1   pay through time so it can be fully
2   rehabilitated.
3
4       Q.   From your point of view, was that
5   more important than the discount to reflect
6   legal uncertainties?
7           MS. DALE:  Objection to the form.
8       A.   Yeah, I don't understand.
9       Q.   Okay.  You mentioned -- we were
10  discussing two factors.  The first is the
11  challenge to the bondholders' legal
12  entitlement.
13          Do you understand what we mean by
14  that?
15      A.   Yes.
16      Q.   And then you talked about
17  sustainability for PREPA of the RSA, the
18  ability to sustain these payments.
19          Which one of those two is the
20  most important, in your opinion?
21          MS. DALE:  Objection.
22      A.   They're both important.  They're
23  both -- they define the range of the
24  possible.
25      Q.   The range of reasonableness or

Page 63

D. Skeel - Professional Eyes Only

1   the range of possible?  I'm not sure I
2   understand.
3
4       A.   Can you ask -- I'm not
5   understanding your question.
6       Q.   When you say it "defines the
7   range of the possible," what does that
8   mean?
9       A.   I'm still not really
10  understanding your question.
11      Q.   These are the words you used.
12          What did you mean when you said
13  "the range of the possible"?
14      A.   When we're negotiating a Title
15  III, we have to -- we're trying to
16  restructure the debt to make it
17  sustainable, but we're confined by what the
18  creditors' legal entitlements are.  And
19  those are a couple of key factors that go
20  into the decision-making process.
21      Q.   If the transition charge were not
22  sustainable, again your words, would you
23  have approved the RSA?
24          MS. DALE:  Objection to form.
25          Calls for speculation.

Page 64

D. Skeel - Professional Eyes Only

1       A.   Certainly sustainability of the
2   transition charge is a key factor.
3
4       Q.   Were there any studies done of
5   the sustainability of the issue we just
6   talked about?
7           You mentioned sustainable.  Were
8   there any -- did you get any reports from
9   anyone regarding that issue of
10  sustainability?
11      A.   We got regular reports about
12  projected costs for PREPA.  And in a sense,
13  that -- those are connected.  So what
14  electricity is going to cost.  The fiscal
15  plans make projections about what
16  electricity will cost likely under various
17  scenarios.
18      Q.   And what is the cost of
19  electricity today, ballpark, in Puerto
20  Rico?
21      A.   Right now, I believe it's in the
22  22 cents a kilowatt-hour range.
23      Q.   And what does the board project
24  it will be in the next few years?
25      A.   Current projections range from

Page 65

D. Skeel - Professional Eyes Only

1   about 22 to 25 or 26, is my recollection.
2
3       Q.   Excluding the charge?
4       A.   I believe including the charge,
5   yeah.
6       Q.   Including the charge.  Thank you
7   for clarifying that.
8           Do you have a sense of at what
9   point the price per kilowatt-hour becomes
10  unsustainable?
11      A.   We get projections about that
12  from our advisers.
13      Q.   But I'm asking you what is your
14  sense of --
15      A.   I don't have, sitting here, a
16  particular number in mind.
17          MS. DALE:  Luc, when it's
18  convenient, can we just take a
19  five-minute break?
20          MR. DESPINS:  Sure.  Sure.
21          MS. DALE:  Now?
22          MR. DESPINS:  Hold on a second.
23          Yes, sure.  Let's take a break.
24          THE VIDEOGRAPHER:  The time is
25  11:13.  We are going off the record.

17 (Pages 62 to 65)

Page 70

D. Skeel - Professional Eyes Only
1
2      (Document review.)
3      A.  Okay.
4      Q.  Just to identify the document,
5  FOMB 1148 and 1149.  I think I got that
6  right this time.  And this is an email from
7  David Brownstein to, it looks like, all
8  board members, dated Friday, July 27, 2018,
9  correct?
10     A.  Correct.  I will start paying
11 attention to the year.
12     Q.  So will I.
13     (Laughter.)
14     Q.  In the fourth paragraph -- I'm
15 sorry, the fifth paragraph, it says, "The
16 first relates to post-petition interest.
17 Proskauer wanted to make sure that you were
18 comfortable with the fact that we have
19 structured the agreement with the ad hocs
20 to pay post-petition interest at
21 settlement."
22     Did you have a chance to review
23 that, that language this paragraph?
24     A.  If you can give me a minute, I'll
25 read the whole paragraph.

Page 71

D. Skeel - Professional Eyes Only
1
2      Q.  Yes.
3      (Document review.)
4      A.  Okay.
5      Q.  So why was this important to
6  mention post-petition interest?
7      MS. DALE:  Objection to the form.
8  BY MR. DESPINS:
9      Q.  In your view?
10     A.  I don't know.  I mean, it's a
11 term of the RSA.
12     Q.  Okay.  Were you aware when you
13 approved this in July 2018 that the board
14 had taken the position that the bondholders
15 were undersecured on the petition date?
16     A.  I was aware that there were
17 potential legal challenges to the secured
18 status, yes.
19     Q.  No, but I'm asking you whether
20 were aware that the board had taken that
21 position in court?
22     A.  I believe so, yes.
23     Q.  Okay.  And since you have some
24 bankruptcy background, what is the link
25 between being undersecured on the petition

Page 72

D. Skeel - Professional Eyes Only
1
2  date in the issue of post-petition interest
3  in your mind?
4      MS. DALE:  Objection.  Calls for
5  a legal conclusion.  Speculation.
6      You're not an expert here.
7      A.  It is a legal issue, obviously.
8      Q.  I understand that, but your --
9  I'm asking you what your understanding of
10 that is as a law professor on bankruptcy
11 issues.
12     MS. DALE:  And I'm reasserting my
13 objections to this to this line of
14 questioning of a fact witness.
15 BY MR. DESPINS:
16     Q.  You can answer.
17     A.  Can you reask the question?
18     Q.  What is the link between
19 creditors being undersecured on the
20 petition date and the issue of entitlement
21 to post-petition interest?
22     MS. DALE:  Objection.
23     A.  If -- my understanding is, if a
24 creditor is undersecured, they are not
25 entitled to post-petition interest.  If

Page 73

D. Skeel - Professional Eyes Only
1
2  they are oversecured, they are.
3      Q.  Okay.  And this email at the end
4  says something like, "Since we have a
5  deadline of 3:00 p.m. today, we wanted to
6  bring this to your attention now and would
7  appreciate receiving feedback as soon as
8  possible."
9      Do you recall yourself providing
10 feedback on this issue?
11     A.  I don't remember.
12     Q.  And you recall anyone providing
13 feedback on this issue?
14     A.  I don't remember that either.
15     Q.  And do you see the sentence that
16 says, in the same paragraph that I asked
17 you to look at that says, "This has been
18 the case on all of the special revenue
19 bonds restructured in municipal market,"
20 citing a bunch of cases?
21     What is the legal relevance of
22 that to the entitlement to post-petition
23 interest?
24     MS. DALE:  Objection.  Now you're
25 explicitly calling for a legal

19 (Pages 70 to 73)

Page 74

D. Skeel - Professional Eyes Only
conclusion from this fact witness.
BY MR. DESPINS:
   Q.  You can answer.
   A.  I don't know.
   Q.  Do you have a sense of the
magnitude of the post-petition interest
that is being awarded to the bondholders
under the RSA?
   A.  What do you mean by "magnitude"?
   Q.  Magnitude, size, amount.
   A.  I don't.  I know they are -- they
will be receiving interest on their
restructured bonds on the 67.5.
   Q.  No, I'm not asking you that.
      I'm asking you under the RSA, do
you understand that the bondholders are
entitled to -- are being given an
entitlement to post-petition interest?
      I'm not talking about
post-reorganization interest, I'm talking
about post-petition interest from the
petition date until May of 2019.
      Do you understand that?
   A.  Yes, I do.

Page 75

D. Skeel - Professional Eyes Only
      MS. DALE:  Objection to form.
BY MR. DESPINS:
   Q.  And do you know what is the
magnitude of that payment, the size of that
payment, ballpark?
   A.  I don't remember.
   Q.  20 million?  100?  200?
   A.  I don't know.  If you put a
document in front of me, I could see the
number, I'm sure.
   Q.  You don't think that
understanding the size of that claim, given
what we've just been through regarding the
entitlement to post-petition interest, is
critical?
      MS. DALE:  Objection.  Misstates
his testimony.
   A.  Sitting here now, I don't
remember what the dollar amount is.
   Q.  Do you have a sense of -- would
you compare it to other things that --
other claims or other payments that are
receiving under the RSA, how does that
amount compare, larger or smaller?

Page 76

D. Skeel - Professional Eyes Only
      MS. DALE:  Objection.
   A.  The question is the interest as
compared to the principal?
   Q.  No, the interest as opposed to
other benefits they are receiving under the
RSA, such as settlement payments, fees, et
cetera.  If you compare those two, one is
bigger than the other?  Same size?
Smaller?  Do you have any sense?
   A.  It depends on the time frame of
the settlement payments, and the
administrative expense can go on for a
while.  I don't know.
   Q.  You don't know.
      Before seeing this email today,
did you know that there they were getting
post-petition interest under the RSA?
   A.  Yes, I did, certainly at the time
for sure.
   Q.  But this email was sent, I think,
at 10:35 on a Friday, and it called for a
response by 3:00 p.m. that day.
      Did you know before receiving
this email that that was a feature of the

Page 77

D. Skeel - Professional Eyes Only
transaction?
   A.  My recollection is that feature
was in pretty much from the beginning.
That we had multiple presentations that had
the interest included.
   Q.  And how did you get comfortable
that it was appropriate to include that
interest?
   A.  The ad hoc group was arguing they
were entitled to 100 cents on the dollar,
plus interest throughout, and that was one
of the issues of dispute.
   Q.  But you know the fuel line
lenders -- do you know who they are, the
fuel line lenders?  Do you know what I'm
talking about?
   A.  Yes, I do.
   Q.  Okay.  You know they are claiming
to be entitled to 100 cents on the dollar
as well, right?
   A.  Yes, I do.
   Q.  So why are they not getting
post-petition interest?
      MS. DALE:  Objection to the form

20  (Pages 74 to 77)

Page 78

D. Skeel - Professional Eyes Only
of the question.
        Again, to the extent that
anything -- your answer would implicate
legal advice that you've received, you
have to not -- you cannot disclose
that.
    A.  I would just say they're
different creditors with different claims.
    Q.  But you as a bankruptcy professor
have a sense of an undersecured creditor's
entitlement to receive post-petition
interest?
        MS. DALE:  Objection.
    A.  I have a sense of an undersecured
creditors and a sense of an oversecured
creditors.  Different rights with respect
to interest, yes.
    Q.  And you see at the end of that
paragraph, do you see where it says, "As
you may recall, with respect to the
re-lending bonds..."
        Do you see that sentence?
    A.  Yes, I do.
    Q.  Does that confirm your earlier

Page 79

D. Skeel - Professional Eyes Only
testimony that they're getting 100 cents on
the dollar?
        MS. DALE:  Objection to the form.
    Misstates his testimony.
    A.  This is just saying what their
treatment is.  It isn't going into the
bases for the treatment.
    Q.  No, I'm not asking what the bases
is.
        But it says, "We're also agreeing
to transfer them over to the securitization
bonds at par plus accrued."
        What does "par plus accrued" mean
to you?
    A.  To me, that means full payment
plus accrued interest.
    Q.  Okay.  So you testified before
that you would not feel comfortable with
bondholders getting 100 cents on the
dollar?  I thought you said something like
that.
    A.  I will say I would not feel
comfortable with bondholders getting 100
cents -- these bondholders with these

Page 80

D. Skeel - Professional Eyes Only
entitlements getting 100 cents on the
dollar.
    Q.  But some of them are?
    A.  Not for their full claims.
    Q.  Explain that.
    A.  The ad hoc bondholders are not
getting paid 100 cents on the dollar.
    Q.  Oh, so you think the re-lending
bondholders are not ad hoc bondholders?
    A.  That's my point is that the ad
hoc bondholders are -- they're the subject
of the preliminary RSA.  So maybe what I
should say is can you be more specific
about who you're talking about?
    Q.  Well, I'm talking about who
Brownstein is talking about.  He's talking
about the re-lending bonds.  And you seemed
to understand who they were before when we
talked, you know, earlier this morning.
    A.  So you're separating them from
the ad hoc general bond claims?  You're
talking just about re-lending bonds?
    Q.  Well, and this question is
directed at that.  The re-lending bonds are

Page 81

D. Skeel - Professional Eyes Only
apparently getting 100 cents on the dollar.
        Are you comfortable with that?
    A.  I am comfortable with that.
    Q.  And why is that?
    A.  Their payout -- they have an
argument -- their legal argument's about
priority, but they also are being paid for
supporting the plan and for waiving rights
they might otherwise be pursuing.
    Q.  What other rights could they have
other than getting paid in full?
    A.  Rights to object in the Title
III, rights to -- well, I'll just stop
there.
    Q.  But the ad hocs are also waiving
those rights, right?  They're agreeing not
to object.  They're agreeing to the same
things the re-lending bonds are doing,
correct?
    A.  Yes, I think that's correct.
    Q.  Okay.  So what is the distinction
between those two groups?
    A.  I think it's a legal issue that
I'll just leave there.  I mean, our legal

21  (Pages 78 to 81)

Page 122

D. Skeel - Professional Eyes Only
1
2   reflected in that bill in 2021?
3           MS. DALE:  Objection.  Calls for
4       speculation.
5       A.  It would depend on who is paying
6   for those billions of dollars.
7       Q.  But if the Federal Government
8   doesn't pay for them, then it would be on
9   that bill?
10          MS. DALE:  Same objection.
11      A.  It would potentially affect the
12  bill, yes.
13      Q.  Okay.  So how do you know,
14  sitting here today, that that bill in 2021
15  will be sustainable for Puerto Rico?
16          MS. DALE:  Objection.
17      A.  I don't know.  All I know is what
18  we project and what looks like it will be
19  sustainable.
20      Q.  What about other creditors?  You
21  know, we've talked about the bondholders
22  for a while now.
23          Do you know if PREPA has other
24  creditors besides the bondholders?
25      A.  My understanding is, yes, they do

Page 123

D. Skeel - Professional Eyes Only
1
2   have other creditors.
3       Q.  Such as?
4       A.  Such as fuel line lenders.
5       Q.  And how much are they owed,
6   ballpark?  Do you know?
7       A.  Ballpark, 700 million dollars.
8       Q.  And other creditors, other than
9   the fuel line lenders?
10      A.  There are unsecured creditors as
11  general unsecured creditors.  I don't know
12  the magnitude.
13      Q.  So when you approved this
14  transaction, was there any reference to the
15  money owed to the fuel line lenders or to
16  the unsecured creditors?
17      A.  There would have been references,
18  yes.
19      Q.  So we would find that in the
20  presentations?
21      A.  Not necessarily.  But as point of
22  fact, I think there are some references in
23  the presentations.
24      Q.  And what do they say about those
25  creditors?

Page 124

D. Skeel - Professional Eyes Only
1
2       A.  There are references to the fuel
3   line lenders, and the assumptions about
4   them shift from one presentation to the
5   next.
6       Q.  Shift in terms of the size of the
7   fuel line lenders or?
8       A.  Shift in terms of scenarios,
9   scenario payouts.
10      Q.  If these people, just to take the
11  fuel line lenders, get a payout, again,
12  that doesn't come from God, right?  It
13  needs to come from PREPA.  And PREPA is
14  going to charge its customers for that
15  somehow --
16          MS. DALE:  Objection.
17  BY MR. DESPINS:
18      Q.  -- correct?
19          MS. DALE:  Calls for speculation.
20      A.  Presumably, yes.
21      Q.  Okay.  And same thing for
22  unsecured creditors, if there are payouts
23  to unsecured creditors, somehow that's
24  going to have to be paid for by PREPA and
25  therefore passed on to its customers?

Page 125

D. Skeel - Professional Eyes Only
1
2           MS. DALE:  Same objection.
3       A.  Presumably, yes.
4       Q.  But what work did the board do in
5   -- when approving the RSA in terms of
6   determining feasibility of dealing with
7   these other charges; the operating charges
8   with or without federal funding, the fuel
9   line lenders, the unsecured creditors, the
10  pensions?
11          MS. DALE:  Objection.
12          MR. BEREZIN:  Objection.
13  BY MR. DESPINS:
14      Q.  Take us through the process.
15          MS. DALE:  Objection to the form.
16      A.  What process am I taking you
17  through?
18      Q.  The board approved the RSA,
19  correct?
20      A.  Correct.
21      Q.  And you told me that there was a
22  discussion, at least, or references in
23  terms of other creditors, not bondholders,
24  so fuel line lenders, unsecured creditor.
25  We didn't talk about pensions.  I assume

32 (Pages 122 to 125)



Page 126

1      D. Skeel - Professional Eyes Only
2  pension was discussed as well?
3          MR. BEREZIN:  Objection to form.
4  BY MR. DESPINS:
5      Q.  Right?
6      A.  The RSA itself was focusing on
7  the participants, primarily on the
8  participants of -- in the RSA.  There is
9  discussion of some of these other factors
10 around the fiscal plan.  The fiscal plan
11 has estimates of operating expenses and
12 things of that sort.
13     Q.  But it doesn't talk about
14 unsecured creditors, does it?
15     A.  I don't believe it talks about
16 unsecured creditors.
17     Q.  Okay.  And you're familiar with
18 the concept of plan feasibility generally?
19     A.  I am familiar with plan
20 feasibility.
21     Q.  So sitting here today, do you
22 have a view about feasibility of a plan for
23 PREPA, a plan of adjustment for PREPA?
24         MS. DALE:  Objection to the form.
25     A.  I'd have to see the plan.  I

Page 127

1      D. Skeel - Professional Eyes Only
2  would have to see the plan.
3      Q.  She liked that answer better than
4  her interruption.
5          So you would have to see the
6  plan.
7          And therefore, sitting here
8  today, you can't opine on that?  You can't
9  have a view on that?
10     A.  I forget what it is I'm having a
11 view on.
12     Q.  Feasibility of a plan of
13 adjustment for PREPA?
14     A.  I would need to see the plan.
15     Q.  Okay.  Let's talk about the T&D
16 transformation.  I think you listed one of
17 the benefits of the RSA that it could --
18 sorry, I can't even read my own writing.
19 It can be helpful to the T&D process
20 generally.  It's not precisely what you
21 said, but something like that.
22         MS. DALE:  Objection to the form.
23 It misstates the testimony.
24 BY MR. DESPINS:
25     Q.  Okay.  Well, then, you understand

Page 128

1      D. Skeel - Professional Eyes Only
2  what I was referring to.  Why don't you say
3  it in your own words.
4          MS. DALE:  Objection.  No
5  question pending there.
6      A.  I believe that the RSA could help
7  facilitate a -- the transformation.

Page 129

1      D. Skeel - Professional Eyes Only

TSG Reporting - Worldwide 877-702-9580



Page 130

1    D. Skeel - Professional Eyes Only

Page 131

1    D. Skeel - Professional Eyes Only

20    Q.  Have you quantified the
21  difference between what you're giving the
22  bondholders and the total amount of their
23  claims as it would translate into a
24  kilowatt per hour charge?
25        MS. DALE:  Objection to form.

Page 132

1        D. Skeel - Professional Eyes Only
2    BY MR. DESPINS:
3        Q.  Do you want me to break that
4    down?
5        A.  Yes, please.
6        Q.  All right.  So right now, you're
7    offering them X, that is, the RSA.  And you
8    know what that is.  You have a kilowatt per
9    hour charge there, right?  There is a cap?
10       A.  Right.
11       Q.  Okay.  Have you ever seen an
12   analysis that shows the difference between
13   that amount, that charge, and what the
14   charge would need to be if we were going to
15   pay the bondholders in full?
16       A.  I believe I have seen those
17   comparisons.
18       Q.  Okay.  And can you share that
19   with me?
20       A.  The charge is more and the
21   potential downside is significant, the
22   possibility of the charge mushrooming.
23       Q.  Well, I was asking you what the
24   charge is to pay them in full.  So if
25   that's the charge, it's not going to

Page 133

1        D. Skeel - Professional Eyes Only
2    mushroom.  That is the charge.
3        Have you ever seen that figure?
4        MS. HELSTEAD:  Objection.  Form.
5        A.  I am not sure whether I have or
6    not, that particular figure.
7        Q.  Okay.  Do you think it would be
8    two cents more, three cents more, ten cents
9    more?  Do you have any sense?
10       MS. DALE:  Objection to the form.
11       A.  I don't remember.
12       Q.  So when you say that it could
13   have a significant cost because the
14   operators will not know what the charge is,
15   what do you base that on?
16       MS. DALE:  Objection to the form.
17       A.  What I am thinking about is
18   presentations I have seen of the potential
19   shifts in the amount of the transition
20   charge under both the bonds, just the bonds
21   assuming full payment and under the
22   pre-Title III RSA.  And those transition
23   charges were not capped.
24       Q.  No, I understand they were not
25   capped, but did they reflect the full

34 (Pages 130 to 133)

Page 134

D. Skeel - Professional Eyes Only
1
2 amount?
3    A.  I believe I saw presentations
4 that reflected the full amount, yes.
5    Q.  And is that what you believe
6 would happen if this RSA transaction is not
7 approved, the board litigates with the
8 bondholders, the board loses that
9 litigation, that they would get their -- a
10 full charge for the repayment in full of
11 their bonds?
12    A.  They have taken the position that
13 they are entitled to full payment, plus
14 interest throughout.
15    Q.  I understand that's their
16 position.  That's my position too.
17    What's your view of whether
18 that's going to happen?
19    MS. DALE:  Objection.  Calls for
20 a legal conclusion.
21    Please do not discuss any
22 information that you might have
23 received from your counsel.  If you can
24 disentangle, you know, just counsel's
25 communications to you on this point, go

Page 135

D. Skeel - Professional Eyes Only
1
2 ahead.
3    A.  Yeah, I was about to say I didn't
4 think that was your position.
5    Q.  No, no, it's my position as to my
6 claims that I should be paid in full as
7 well.
8    A.  But not your position as to the
9 unsecured creditors' claims.
10    Q.  No, no.  That's what I meant.
11    A.  It may show up somewhere else.
12    Q.  So --
13    MS. DALE:  Does everybody want to
14 clarify the record?
15    (Laughter.)
16 BY MR. DESPINS:
17    Q.  But there was a question pending.
18    So my question was, what do you
19 believe occurs if there's no RSA, the board
20 litigates with the bondholders, they
21 prevail, and what do you think happens at
22 that point to the kilowatt her hour rates
23 charged to customers?
24    MS. DALE:  Same objections.
25    A.  If all that happens, I believe

Page 136

D. Skeel - Professional Eyes Only
1
2 they end up going up.
3    Q.  For the full amount that's owed
4 to the bondholders?
5    A.  Correct.
6    Q.  Okay.  And the analyses you've
7 seen reflect that?  Meaning, some of the
8 scenarios you've seen that were represented
9 to you reflect that scenario?
10    A.  Yes.
11    Q.  Okay.  And do you know if rate
12 increases need to be approved by a
13 regulator in Puerto Rico?
14    A.  I believe they do, yes.
15    Q.  Okay.  And do you believe that
16 regulatory would increase the rates full
17 tilt to pay the bondholders in full?
18    MS. DALE:  Objection.
19    A.  Again, I don't know.
20    Q.  Don't you think that that's a
21 critical part of the analysis when you look
22 at the scenario we've been discussing?
23    MS. DALE:  Objection.
24    A.  There are a variety of elements
25 that matter a lot.  That matters.  The rate

Page 137

D. Skeel - Professional Eyes Only
1
2 covenant in the bond indenture also
3 matters.
4    Q.  So tell me about the rate
5 covenants.
6    How do you think that's relevant?
7    A.  Because if the bonds went back to
8 their original status quo, they have a
9 right to seek a receiver and to ask for
10 rate increases to pay them.
11    Q.  Well, that's if they're
12 unimpaired on their plan.
13    But you don't think that --
14    A.  You just said the premise of this
15 question was --
16    Q.  No.
17    A.  -- that they get everything they
18 asked for.
19    Q.  No.  The premise was, you
20 litigate with them and you lose the issue
21 of whether -- of the scope of their
22 security interest and all that.
23    And so the question I have for
24 you is, you're not under the impression
25 that their rate covenant and the

TSG Reporting - Worldwide 877-702-9580

Page 138

1     D. Skeel - Professional Eyes Only
2  receivership covenants somehow would ride
3  through Chapter 11, are you?
4     MS. DALE:  Objection.
5     A.  No.
6     MR. HAMERMAN:  Objection.
7     A.  You premised the question on them
8  getting everything they asked for.  So if
9  they got everything they asked for, they
10  would get that too.
11     You can change your premise.
12     Q.  No, the premise was the
13  litigation regarding the scope and the
14  extent of the security interest.  And if we
15  lose that litigation, what happens then?
16     A.  They get paid in full, plus
17  interest.
18     Q.  Because you think the PREB would
19  increase the rates as necessary to pay them
20  in full?
21     A.  I am not speculating about what
22  PREB would do.
23     Q.  Well, you are if you're saying
24  they're getting paid in full.
25     You're saying PREB would increase

Page 139

1     D. Skeel - Professional Eyes Only
2  the rates?
3     A.  I'm saying they -- if the lien
4  challenge litigation were unsuccessful,
5  they would have an entitlement to 100 cents
6  on the dollar, plus interest, and I'm not
7  speculating as to whether and how they
8  would get that.

[redacted]

Page 140

1     D. Skeel - Professional Eyes Only

[redacted]

11     MR. DESPINS:  Can we take a
12  ten-minute break -- oh, actually, it's
13  1.  Should we take a lunch break?  I
14  didn't realize it was that late.
15     MS. DALE:  Let's just go off the
16  record.
17     THE VIDEOGRAPHER:  The time is
18  12:51 p.m.  Going off the record.
19     (Recess is taken.)
20
21
22
23
24
25

Page 141

1     D. Skeel - Professional Eyes Only
2  A F T E R N O O N   S E S S I O N
3     (Time noted:  1:27 p.m.)
4     *     *     *
5  D A V I D   S K E E L, J.R.,  resumed and
6     testified as follows:
7     (Skeel Exhibit 6, Email dated
8  5/6/19 from Concannon to Winton and
9  others, Bates-stamped AHG-0004401,
10  marked for identification, as of this
11  date.)
12     THE VIDEOGRAPHER:  The time is
13  1:27 p.m.  We are on the record.
14  EXAMINATION BY (Cont'd.)
15  MR. DESPINS:
16     Q.  Okay.  Professor Skeel, you have
17  Exhibit 6 before you.  For the record,
18  AHG4401, email from Kevin Concannon, sent
19  on May 6, 2019, to James Winton at
20  Citi.com.
21     Did you get a chance to review
22  this?
23     A.  I haven't yet.  Can I -- I mean,
24  I had started to.
25     Q.  Go ahead.

36  (Pages 138 to 141)

Page 142

D. Skeel - Professional Eyes Only
(Document review.)
A.  Okay.
Q.  So what does this refer to?
A.  It looks like -- it's referring
to a sale of some bonds.
Q.  PREPA bonds, correct?
A.  Correct.
Q.  By whom to whom?
A.  By Angelo Gordon to Citigroup.
Q.  Have you ever heard of this
transaction or any similar transactions
before today?
A.  I am not familiar with this
transaction.
Q.  Or any similar transactions?
A.  Or any similar transactions.
Q.  Okay.  But that's something that
you're going to look into or?
MS. DALE:  Objection.
A.  I will take note of it, yes.
Q.  Okay.  Going back to the
Brownstein declaration, paragraph --
MS. DALE:  5.
THE WITNESS:  Thanks.

Page 143

D. Skeel - Professional Eyes Only
BY MR. DESPINS:
Q.  -- 29, if you could read that and
let me know when you're ready.
MS. DALE:  Page 11.
THE WITNESS:  Thank you.
(Document review.)
BY MR. DESPINS:
Q.  So you see there is a reference
to supporting holders having to stay
patiently on the sidelines and wait until
the effective date of the confirmed plan
before receiving the new securitization
bonds.
Do you see the reference to that?
A.  Yes, I do.
Q.  And do you understand that is the
basis pursuant to which these supporting
holders are receiving some form of
consideration under the RSA?
MS. DALE:  Objection to the form
of the question.
A.  I'm not following the question.
Q.  Okay.  So basically, according to
Mr. Brownstein, they have to wait on the

Page 144

D. Skeel - Professional Eyes Only
sidelines until plan confirmation.
And is your understanding that
they are receiving payments or claims to
compensate them for that or to incentivize
them to do that?
A.  Yes.  This paragraph doesn't say
that, but that is my understanding.
Q.  Okay.  So, again, you are a
bankruptcy professor.
Do you know of that standard as a
basis to pay creditors pre-confirmation of
a plan?
MS. DALE:  Objection to the form.
Outside the scope.  Seeking -- it's
speculative, potentially seeking a
legal conclusion.
A.  Can you reask the question?
Q.  So the question is, is that a
legal basis to be receiving pre-plan
confirmation distributions?
MS. DALE:  Same objections.
A.  And I'm not sure what you mean,
is that a legal basis.
Q.  The fact that you have to wait

Page 145

D. Skeel - Professional Eyes Only
until confirmation to get paid, is that a
legal basis to award pre-plan confirmation
distributions to creditors?
MS. DALE:  Objection.  Seeks a
legal conclusion.  Speculative.
A.  It seems to me that that might be
a factor you would take into account.
Q.  But I'm talking from a legal
point of view.
Let me ask you this:  Are
creditors, in your understanding, entitled
to receive pre-plan distributions in
bankruptcy --
MS. DALE:  Objection.  Calling
for a legal conclusion.
BY MR. DESPINS:
Q.  -- generally.
MS. DALE:  Speculative.  Outside
the scope of this deposition.
A.  It depends on what you're talking
about.  If they are oversecured, they are
entitled to receive interest payments.
Q.  Prior to confirmation?
A.  That varies by impression, but I

37 (Pages 142 to 145)

Page 146

D. Skeel - Professional Eyes Only

don't know.  I don't know when they get
them.

Q.  Okay.  Other than that,
oversecured, do you know any other basis to
make payments, pre-confirmation payments to
creditors in a bankruptcy case?

MS. DALE:  Same set of
objections.

A.  Not that I can think of sitting
here right now.

Q.  Okay.  Let's talk about the legal
issues that are being settled here in the
RSA.

Did you ever see -- I'm not
asking you what it said, but did you ever
see a probabilistic analysis, and by that,
I mean a percentage of this issue, we have
a 50 percent chance of winning; this issue,
we have a 80 percent chance of winning; or
anything of the sort before approving the
RSA?

MS. DALE:  You can answer that
"yes" or "no."

A.  No, not a probabilistic --

Page 147

D. Skeel - Professional Eyes Only

Q.  Okay.

A.  Not a probabilistic estimate with
numbers attached to it.

Q.  Okay.  With percentages attached
to it?

A.  With percentages attached to it.

Q.  Thank you.

And what about the worst-case
scenario?  You've talked about best-case,
worse-case.

What is your understanding of the
worst-case scenario for the bondholders,
now, focusing on their downside?

First of all, did you ever see
such an analysis?  Not what it said, just
whether you saw such an analysis?

A.  When you say "saw such an
analysis," you mean with probabilities
attached to it or just --

Q.  No, generally, now.  I'm moving
off of the percentage issue.  I'm just
asking whether you've ever seen an analysis
of the worst-case scenario from the
bondholders' point of view?

Page 148

D. Skeel - Professional Eyes Only

A.  I believe I have.

Q.  Okay.

A.  We've had lots of discussion of
the different possibilities.

Q.  Okay.  And I want to be careful.
I'm not asking you to reveal what that
presentation was, but rather whether you
recall seeing any mention of the words
"nonrecourse"?

A.  I don't know if the specific
words were there.  Certainly the objection
argues that there is very limited recourse.

Q.  When you refer to the objection,
are you talking about the July 2nd
complaint?

A.  Yes.

Q.  Okay.  Fair enough.

Do you understand the term
"nonrecourse" as a term of art in
bankruptcy?

A.  Yes, I do understand it.

Q.  Like a claim that is nonrecourse,
you understand what that means?

A.  Yes, I do.

Page 149

D. Skeel - Professional Eyes Only

Q.  Just in your -- what does it
mean, your understanding of it?

A.  Ordinarily, a nonrecourse claim
is a claim where the creditor is entitled,
it's usually a secured creditor, is
entitled to seek recovery from its
collateral but not from anywhere else.

Q.  And is that relevant in this
case, that term?  Is that applicable in
this context, in the PREPA case?

MS. DALE:  Objection to the form
of the question and to the extent
seeking a legal conclusion.

A.  I don't know if that specific
concept is.  The core argument or one of
the core arguments in the lien objection
has a similar form.  The core argument is
that the creditors are entitled to only to
funds that are in the sinking fund.

Q.  Yeah, but you understand that
when you're a nonrecourse, you don't even
have an unsecured claim?

MS. DALE:  Objection.

A.  Ordinarily if you're nonrecourse,

Page 150

D. Skeel - Professional Eyes Only
1  D. Skeel - Professional Eyes Only
2  you do have a claim.
3    Q.  Okay.  That's your understanding?
4    A.  A core claim.
5    Q.  Pardon?
6    A.  You have a core claim.
7    Q.  So, for example, in this case,
8  the bondholders are owed more or less 8
9  billion or so.
10      Your understanding is that even
11  if we were successful in avoiding all their
12  liens, they would still have an unsecured
13  claim for 8 billion and change?
14    A.  They would argue they do.  I know
15  there is an argument they would -- I
16  believe there is an argument that they
17  would not even have that but that is
18  contested, is my understanding.
19    Q.  What would be that argument that
20  they don't even have that?
21    A.  I can't construct it here.
22    Q.  And what would be their argument?
23  That they have such a claim, an unsecured
24  claim?
25    A.  Ordinarily, you have an unsecured

Page 151

1    D. Skeel - Professional Eyes Only
2  claim.  You have a claim if you're owed
3  money by an entity.
4      Are we putting aside this for
5  now?
6    Q.  Yes, for now.
7      (Skeel Exhibit 7, Text messages
8  dated 8/31/18 to Skeel, Bates-stamped
9  FOMB_9019_MOBILE_00000127 through 143,
10  marked for identification, as of this
11  date.)
12  BY MR. DESPINS:
13    Q.  So if you can read that and let
14  us know when you're ready.
15      (Witness complies.)
16    A.  Okay.
17    Q.  Can you --
18      MR. DESPINS:  First of all, let's
19  identify this.  I apologize.  So it's
20  FOMB 00127 through to 143.  It starts
21  with -- these appear to be text
22  messages between Ana Matos Santos and
23  Professor Skeel, with the first one
24  being on August 31st, 2018.
25  BY MR. DESPINS:

Page 152

1    D. Skeel - Professional Eyes Only
2    Q.  Can you, after reviewing this,
3  can you give us a sense of what you guys
4  are talking about and what is the general
5  topic?
6    A.  I'm not certain.  I think it's
7  probably negotiations relating to COFINA or
8  the Commonwealth.
9    Q.  If you look at the last text,
10  page 143, "I think the impact of the
11  committee walking is not getting the
12  attention that it needs."
13      Are you sure this is going to
14  refer to PREPA or -- I don't know.  I'm --
15    A.  I don't -- I don't know.  I'm
16  pretty certain it doesn't refer to -- there
17  is a reference to PREPA in here --
18    Q.  Yeah.
19    A.  -- but this is not referring to
20  PREPA.  I think it's referring to COFINA,
21  but I'm not sure.
22    Q.  Because I thought there was a
23  reference to PREPA in here.  Okay.  So
24  that's 140, 141.  That seems to refer to
25  PREPA, right?

Page 153

1    D. Skeel - Professional Eyes Only
2  It says, "The prioritization of
3  generation transformation and the focus on
4  killing the beast everywhere feels really
5  bad to me."
6      There's no generation
7  transformation with COFINA, right?
8    A.  No, but it refers to "killing the
9  beast everywhere," which I assume is more
10  than just -- I mean, I'm not sure what it
11  means, but I don't think that's
12  PREPA-specific.
13    Q.  So what does "killing the beast"
14  mean?
15      MS. DALE:  Objection.
16    A.  I'm not sure.  I mean, I think it
17  means transforming everything, but I'm not
18  sure.
19    Q.  Okay.  What about in 140 when you
20  say, "I have the same feeling.  Too many
21  things seems too sleazy"?
22      This is you now.
23    A.  This is I think a response to
24  whatever we're talking about to the prior
25  -- to the prior text.  But I -- I don't

39 (Pages 150 to 153)

Page 154

D. Skeel - Professional Eyes Only

1 think they're about PREPA. I think they're
2 about COFINA or the Commonwealth, although
3 I don't remember the conversation.
4    Q.  But then on 137, you say the --
5 (as read) "Though the local folks,
6 quote/unquote, is largely massive New York
7 law firm that was pushing its own Hail Mary
8 reorg plan without talking to bondholders."
9       MS. DALE:  Is there a question?
10 BY MR. DESPINS:
11    Q.  What does that mean?  This is
12 from you.
13    A.  I'm not sure, but I don't think
14 it's PREPA because there aren't local
15 bondholders that have been a focus of PREPA
16 that I'm aware of.
17    Q.  Were these text messages sent
18 during a meeting or a call?  It appears
19 that you're doing live, live commentary on
20 something that is happening before you.  I
21 could be wrong.
22    A.  It's speculating, but I think
23 it's either a meeting or a call, and these
24 are just kind of stream of consciousness
25

Page 155

D. Skeel - Professional Eyes Only

1 comments during whatever is happening
2 during the meeting.
3    Q.  Because, again, 133 refers to the
4 unions.  There are no unions in COFINA.
5 Let me just...
6       MS. DALE:  Wait for a question.
7 BY MR. DESPINS:
8    Q.  Okay.  So nothing refreshes your
9 recollection?
10    A.  No.
11    Q.  Okay.
12       (Skeel Exhibit 8, Text messages
13 dated 11/19/18 to Skeel, Bates-stamped
14 FOMB_9019_MOBILE_00000144 through 154,
15 marked for identification, as of this
16 date.)
17 BY MR. DESPINS:
18    Q.  So same question, if you can
19 review this and let us know when you're
20 ready.
21       (Witness complies.)
22    A.  Okay.
23    Q.  So first big picture question is:
24 Does this relate to PREPA?
25

Page 156

D. Skeel - Professional Eyes Only

1    A.  I think this one does.
2    Q.  Okay.  It talks about -- just to
3 identify, for the record, we are talking
4 about document FOMB 144 through 155 with
5 the first one on top being dated
6 November 19, 2018.
7       So now we're talking
8 post-preliminary RSA but pre-May 2019 RSA.
9       So what is this reference to the
10 "government is retrading the RSA a bit"?
11    A.  I'm not certain.  It could be a
12 reference to the government wanted to push
13 off the start of the transition charge.  It
14 could be that.  It could be something else.
15       MS. DALE:  I'm just going to
16 caution you not to speculate if you're
17 not sure.
18 BY MR. DESPINS:
19    Q.  And then there's a -- on 148, "I
20 wouldn't cry if we lost Assured.  That was
21 tentative and made it more expensive."
22       What are you referring to there?
23    A.  I think I'm referring to
24 negotiations with Assured to bring them
25

Page 157

D. Skeel - Professional Eyes Only

1 into the RSA.
2    Q.  Okay.  150, your text,
3 "Absolutely.  And I completely agree we
4 should honor the deal we made."
5       You're referring to the
6 preliminary RSA at this point?
7    A.  I think so.
8    Q.  And 153, again from you, "Amen, I
9 don't love the deal, but we agreed to it."
10       And the response at 154, "I'm in
11 the same place.  I don't love it either."
12       And last one is "What we agreed."
13       So the point there is that even
14 though you didn't like the deal, you felt
15 bound because you had signed the
16 preliminary RSA or?
17       MS. DALE:  Objection.
18    A.  I do like the deal.  And I am of
19 the view that overall, it's a good deal.
20 It's not perfect, but it's a good deal.
21    Q.  So when did you start liking the
22 deal?
23    A.  I liked it when I voted on it.  I
24 voted for it.
25

Page 158

D. Skeel - Professional Eyes Only
1
2     Q.   But what did you mean by "I don't
3   love the deal"?
4     A.   I'm not sure what I mean here.
5   I'm not sure precisely what we're talking
6   about.
7     Q.   Well, what deal are we talking
8   about?  The RSA.
9     A.   We're talking about the RSA --
10    Q.   Okay.
11    A.   -- but we seem to be talking
12  about different pieces of the RSA.
13    Q.   What did you mean when you say
14  "Natalie still doesn't understand the BR
15  dynamics"?
16       "BR" means bankruptcy, I assume
17  or...
18    A.   Presumably, yes.
19    Q.   Okay.  That's 151.
20       What did you mean by that?
21    A.   I have no idea what I meant.
22    Q.   You have a lot of texts that are
23  floating like this where you have no clue
24  what was said?
25    A.   These are stream of -- this is in

Page 159

D. Skeel - Professional Eyes Only
1
2   a meeting, texting back and forth.  I mean,
3   I just don't remember what the specific
4   context was.
5     Q.   Okay.
6        (Skeel Exhibit 9, Email chain
7        beginning with email dated 4/26/19 from
8        Castiglioni to Batlle with attachments,
9        Bates-stamped CGMIRSA_001458 through
10       1465, marked for identification, as of
11       this date.)
12  BY MR. DESPINS:
13    Q.   Just to make sure we have the
14  same document, FO -- I'm sorry, not FOMB.
15  This must be Citibank.  1458 through 1465?
16    A.   Just a minute.
17       (Document review.)
18    Q.   And dated 4/25.  April 25, 2019.
19       So the same thing, if you can
20  read it and let us know when you're ready.
21    A.   Read the whole thing or what --
22    Q.   Well, actually, I'm going to
23  focus on page 1465.
24       (Document review.)
25    A.   Okay.

Page 160

D. Skeel - Professional Eyes Only
1
2     Q.   So, again, focusing on page 1465,
3   this appears to be a document prepared by
4   Citibank for the board.
5        Is that your understanding as
6   well?
7     A.   That's what it looks like.
8     Q.   Okay.  So 1465 has Benefits and
9   Considerations, and I just want to ask you
10  some questions about some of the items, the
11  points that are made.
12       Under Benefits, third bullet,
13  "Creditors are taking a meaningful haircuts
14  to claims."
15       How would you -- do you think
16  that's accurate?
17    A.   Do I think that under the RSA,
18  the permanent RSA, do I think that under
19  the permanent RSA creditors are taking
20  meaningful haircuts?
21       Yes, I do think that.
22    Q.   Okay.  Three bullets down from
23  there, it says, "It may result in a stay of
24  receiver motion."
25       Just to put this in context, 4/25

Page 161

D. Skeel - Professional Eyes Only
1
2   is a few days before the release of the --
3   what you call the permanent RSA, right, on
4   May 3rd of 2019?
5     A.   Correct.
6     Q.   Okay.  So at that stage, it was
7   still "may," not "will."
8        Will you agree with that?
9     A.   I agree that's what that said.  I
10  would have expected that we were pretty
11  confident at this point the receiver motion
12  would be stopped.
13    Q.   But in fact, it wasn't withdrawn
14  for many months thereafter, right?  Do you
15  know that?
16    A.   I don't remember that.
17       MS. HELSTEAD:  Objection to form.
18  BY MR. DESPINS:
19    Q.   Okay.  Going on the right-hand
20  side, the top one, "Power revenue bonds may
21  be unsecured because perfection was
22  defective.  Successful litigation could
23  result in lower recoveries."
24       Is that consistent with the other
25  presentations that you've received on this

41 (Pages 158 to 161)

Page 162

D. Skeel - Professional Eyes Only
issue of the litigation risk to the
bondholders?
MS. DALE: Objection to the form.
A. Yes, in the sense that we
received multiple presentations that talked
about the effect if we lost the lien
challenge and the effect if we --
Q. If we won?
A. -- won the lien challenge.
Q. The third bullet still under
Considerations, it says, "Total resulting
cost of electricity plus legacy charges is
unclear."
What does that mean?
A. It means that the total costs are
unclear. I'm not sure what the specific
point here is. I don't remember -- or if I
knew exactly what the, what the unclearness
referred to as.
Q. To the parts that are other than
the legacy charge.
You remember I was asking you
earlier before lunch about when if I'm a
PREPA customer I get a bill, and built in

Page 163

D. Skeel - Professional Eyes Only
there, there will be a special charge for
the legacy bonds?
A. Right.
Q. And then there is the rest. And
don't you think that's what this refers to,
the fact that this fixes the legacy charge,
but the total cost is unclear because we
don't know?
A. That certainly is a plausible
reading of that line.
Q. Okay. Next, "Does not eliminate
lien litigation or litigation or plan
confirmation with non-supporting
bondholders."
Remember before lunch we had a
discussion what I called the disgruntled 10
percent, as a joke, because I don't know if
they're disgruntled or not, or they're just
missing in action? But do you understand
-- what does this refer to?
A. I think they're saying that there
still is the possibility of litigation with
the non-supporting bondholders, at this
point 10 percent who are not part of the

Page 164

D. Skeel - Professional Eyes Only
RSA.
Q. In the next bullet, "If
transformation is unsuccessful, this deal
still applies."
A. I read that as saying, if this
deal gets locked in, it would be locked in.
It would be fixed.
Q. So let's go through that scenario
for a second. Let's assume in June of next
year, I don't know, the transformation is
disappointing or they all bail out. We are
talking about again T&D transformation now.
And the board says, well, it doesn't make
sense to do this deal anymore.
Do you have a sense of how much
money or benefits would have been given to
the bondholders at that point?
MS. DALE: Objection. Calls for
speculation.
A. I don't know exactly.
Q. Well, 5 million?
A. I don't have a guess of exactly
what would be given them by then.
Q. So you don't know if it's 100

Page 165

D. Skeel - Professional Eyes Only
million, 200 million, 500 million, a
billion?
A. I don't know what the number is.
Q. Are you still supporting this
deal today?
A. Yes, I am.
Q. But you don't know what the
amounts are?
A. I know what the amounts under the
deal are. I don't know -- I don't know
what the exact payments would be by some
future date that you've picked.
Q. No, I'm not asking you for exact
payments. I won't hold you to 100 million.
You know, I'll give you 100 million leeway.
So 5 million, 100 million, 200
million, a billion?
A. I don't know. I mean, I could
guess, but I don't know.
MS. DALE: Or he could show you a
document, which he chooses not to do.
BY MR. DESPINS:
Q. Did you ever see a presentation
showing the payments that the bondholders,

Page 166

D. Skeel - Professional Eyes Only
or the benefits and payments the
bondholders would retain if the board
decided no transformation, no T&D
transformation?
   A.   Can you clarify the rest -- the
other states of the world?  Has the RSA
been approved in 2019 --
   Q.   Yeah, RSA is approved today, and
we're in 2020 and, oh, my God, the T&D
process didn't go well, unfortunately.  So
the board decides we're not going forward
with the transformation and -- first of
all, do you understand that the board can
do that, can back out of this deal?
   A.   They can.  There are -- at that
point you're describing, there are
provisions that define what happens based
on why you back out.
   Q.   Did you ever see a presentation
that showed what happened under that
scenario of, you know, what -- that shows
how much the board would have doled out to
the bondholders and -- under that scenario?
   MS. DALE:  Objection.

Page 167

D. Skeel - Professional Eyes Only
   A.   We have seen presentations or
discussions of what the default and
backing-out provisions provide for.
   Q.   No, I understand that.  I am sure
you have seen provisions that describe
that.  But we have not seen produced any
document that shows the dollars associated
with a, what I call, a busted deal.
   Do you know what I mean by that?
A failure to proceed with the T&D
transaction.
   A.   And what is the question?
   Q.   Have you ever seen one?
   A.   Not one that shows specific
dollars that I am aware of.
   Q.   Okay.  Is that irrelevant to you?
   A.   What's most relevant to me are
what are the provisions and what generally
they provide for.
   Q.   Just to be clear, when I was
asking these questions about a busted deal,
you understand that under the RSA, there is
a mechanism for the board not to proceed
with the securitization transaction?

Page 168

D. Skeel - Professional Eyes Only
   A.   Yes, I'm aware of that provision.
   Q.   Okay.  And that's what we've been
talking about?
   A.   I assumed as much --
   Q.   Okay.  Okay.
   A.   -- but that wasn't the question
you asked me.
   Q.   But, okay, that's what you were
responding to?
   A.   I was responding to the questions
you were asking me.
   Q.   Okay.  Well, so let me ask you
the same questions.
   What's your understanding of what
-- what is the understanding what happens
if a securitization termination occurs?
   A.   There is a stipulated treatment
under the RSA.
   Q.   Okay.  So that -- these are the
questions that were asking you about the
amounts payable and all that?
   A.   Right.
   Q.   Is that what you're responding
to?

Page 169

D. Skeel - Professional Eyes Only
   A.   You were asking what I took to be
more open-ended questions, and I was having
trouble figuring out what you were asking.
   Q.   Okay.  So let's go through that.
   Do you know under that scenario
we just described how much money the
bondholders would have received --
   A.   I don't.  I know what the
percentage payment is, more or less.
   Q.   I understand.
   But -- and when I was asking you
have you ever seen presentations showing
the dollar amounts at different points in
time when you exercised that right, have
you ever seen that, I think the answer was
no, but I want to confirm that's what you
meant.
   A.   I don't believe I have.
   Q.   Okay.  What's your understanding
of when a securitization termination can be
exercised?
   A.   My understanding is when the
government -- if the government parties
were to determine that the securitization

43 (Pages 166 to 169)

Page 170

D. Skeel - Professional Eyes Only

1  would interfere with the transformation, it
2  can exercise that.
3
4    Q.  Okay.  And is the board the only
5  party that has the right to terminate on
6  that basis?
7    A.  I believe any of the government
8  parties can terminate.
9    Q.  What is your level of comfort
10  that the other government parties would not
11  exercise that right?
12    MS. DALE:  Objection to the form
13  of the question.
14    A.  I believe that the government
15  parties want this transformation to go
16  forward.  Comfort is never 100 percent, but
17  I have a relatively high degree of comfort.
18    Q.  Do you remember Law 80?  Does
19  that ring a bell?
20    A.  Yes, it does.
21    Q.  So in that case the governor and
22  the board agreed on something that should
23  happen with the legislature and that didn't
24  happen, correct?
25    A.  That is correct.

Page 171

D. Skeel - Professional Eyes Only

1
2    Q.  And does that lead you to believe
3  that the outcome of a determination on this
4  issue by other government parties is not
5  predictable?
6    MS. DALE:  Objection.
7    A.  I wouldn't say that.  That was a
8  particular set of facts and the government
9  responded in a particular way.
10    Q.  Which governor agreed to the RSA,
11  what you called the permanent RSA, the
12  May 2019 RSA?
13    A.  The governor, when it was agreed
14  to, was Governor Rosselló.
15    Q.  Why did the government get a
16  termination right?
17    A.  I don't know.  Yeah, I don't
18  know.
19    Q.  Could the next governor exercise
20  a termination right?  And by that, I mean
21  the securitization termination right.
22    A.  It's not keyed to the governor.
23  There are government -- I don't believe.  I
24  believe it's keyed to AAFAF and PREPA.
25    Q.  Okay.  But who controls PREPA?

Page 172

D. Skeel - Professional Eyes Only

1
2    A.  That's debatable.
3    Q.  So tell me, who controls it?
4    A.  PREPA could terminate the RSA.
5    Q.  And you don't think the governor
6  has any impact on that?
7    A.  I didn't say that.
8    Q.  Okay.  What is your belief?  That
9  the governor could dictate that result?
10    A.  I'm not going to speculate about
11  lines of authority.
12    (Skeel Exhibit 10, Email dated
13  5/21/19 from Battle to CEO@aafaf.pr.gov
14  with attachments, Bates-stamped
15  PREPA_RSA0028795, marked for
16  identification, as of this date.)
17    (Document review.)
18  BY MR. DESPINS:
19    Q.  So same thing, if you could
20  review, but I will direct you to certain
21  pages, but tell me when you're ready.
22    (Witness complies.)
23    A.  Okay.
24    Q.  So just to identify the document,
25  starting at 28795, PREPA 28795 through

Page 173

D. Skeel - Professional Eyes Only

1
2  PREPA 2810 -- no, 28810, 28810.  Sorry.
3    This appears to be another
4  presentation by Citibank to -- is it to the
5  Oversight Board or do you have a sense of
6  that?
7    A.  No.  Well, it looks like the
8  presentation was one that we saw, but
9  that's not who it's being sent to.  It
10  looks like it's being sent by Ankura to
11  AAFAF.
12    Q.  Okay.  The date on this is
13  May 21st, 2019, correct?
14    A.  That is correct.
15    Q.  So that's after the release of
16  the permanent RSA, as you referred to it?
17  After the release of the May 3rd, 2019,
18  RSA?
19    A.  That is correct.
20    Q.  Okay.  So let's go to page 28805.
21    A.  28805.  Okay.  Can I read it?
22    Q.  Sure.  Sure.
23    (Document review.)
24    A.  Okay.
25    Q.  So from the bottom, the third

44 (Pages 170 to 173)

Page 174

D. Skeel - Professional Eyes Only
1  bullet up from the bottom, "If
2  successful..."
3
4       Do you see that sentence?
5       A.  Yes, I do.
6       Q.  "... a challenge to the asserted
7  secure interests would leave non-supporting
8  bondholders secured only by the funds in
9  the sinking fund account approximately $16
10  million."
11       Is this consistent again with the
12  type of presentations you had been
13  receiving from your advisers regarding the
14  challenge to the bondholders' security
15  interest?
16       A.  We had seen these kinds of
17  arguments, yes.
18       Q.  And the last bullet says, "Absent
19  full consensus on a plan by PREPA
20  bondholders, the Oversight Board will
21  likely pursue this challenge against
22  non-supporting holders for purposes of plan
23  confirmation."
24       Do you see that?
25       A.  Yes, I do.

Page 175

D. Skeel - Professional Eyes Only
1
2       Q.  So did you understand that, that
3  litigation that is being settled with the
4  ad hoc members might go forward with other
5  parties when you approve the RSA?
6       A.  Yes, if there are parties who
7  don't ultimately approve the RSA, yes.
8       Q.  Okay.  So therefore, the cost of
9  litigation for that would be incurred
10  regardless?
11       A.  It may or may not be the same
12  cost but...
13       Q.  Okay.  Okay.  Then I'm going to
14  page 28808.  And so we'll go back to that
15  in a second, but I have some background
16  questions I want to ask you first.
17       A.  But before I look at it --
18       Q.  Feel free to look at it, yes.  Go
19  ahead.
20          (Document review.)
21       A.  Okay.
22       Q.  So first some background
23  questions.  I'll admit that I'm not sure
24  whether we covered that precisely, but
25  you'll tell me if we have.

Page 176

D. Skeel - Professional Eyes Only
1
2       When you approved the RSA, did
3  you consider the effect of the RSA on other
4  creditors, meaning, non-bondholders?  By
5  that I mean, fuel line lenders --
6       MR. HAWKINS:  Asked and answered.
7  BY MR. DESPINS:
8       Q.  -- pensions or unsecured
9  creditors?
10       MR. HAWKINS:  Objection.  Asked
11  and answered.  You spent a lot of time
12  on that?
13       MS. DALE:  True, but...
14       MR. DESPINS:  Okay, but he can
15  still answer the question.
16       A.  We focused primarily on the
17  signatories to the RSA.
18       Q.  Okay.  So did you ever consider
19  whether this deal could leave other
20  creditors with no recoveries in the PREPA
21  case?
22       A.  In general terms, I think we
23  probably did.  I don't remember.
24       Q.  In general terms, how would you
25  have done that?

Page 177

D. Skeel - Professional Eyes Only
1
2       A.  Well, at various points, we
3  talked about implications for fuel line
4  lenders and different possible payouts to
5  fuel line lenders, but we focused primarily
6  on the signatories.
7       Q.  But let's put aside the fuel
8  lenders for now, and let's talk about the
9  unsecured creditors.
10       What discussions were there about
11  the impact of this RSA on unsecured
12  creditors?
13       A.  I don't remember.
14       Q.  You don't remember any?
15       A.  I do not.
16       Q.  Okay.  Did you understand when
17  you were approving the RSA that you were
18  giving the bondholders a veto over some
19  form of distributions to unsecured
20  creditors?
21       MS. DALE:  Objection.
22       MR. HAWKINS:  Objection.
23       A.  I don't know.
24       Q.  Do you see on this page 28808, in
25  the middle there says, "Additional

45 (Pages 174 to 177)

Page 178

D. Skeel - Professional Eyes Only

indebtedness, to the extent permitted by
applicable law, may be issued for the
following purposes."
Do you see anything in there
about issuing indebtedness to other legacy
creditors, meaning other prepetition
creditors?
MS. DALE: Objection. I'm sorry,
Luc, where are you pointing us to on
8809?
MR. DESPINS: No, 28808 and
28809.
MS. DALE: Got it.
BY MR. DESPINS:
Q. Whether you see in there any
reference to indebtedness to -- given as
distributions to other legacy creditors,
such as unsecured creditors?
A. I do not, as in this description
of additional indebtedness that can be
taken on, no, I do not see it in those
bullet points.
Q. Would it surprise you to
understand that in fact the bondholders

Page 179

D. Skeel - Professional Eyes Only

have a veto over any such additional
indebtedness for the purpose of providing a
distribution to let other legacy creditors?
MS. DALE: Objection.
Foundation.
MR. BEREZIN: Objection to the
form.
A. I wouldn't know one way or the
other.
Q. Is that something that is
important to you?
A. It's something I would take into
consideration if it were presented to me as
something to be deciding about.
Q. But was it presented to you?
A. I don't know. And I note on
that, I don't know that we ever saw this
document. This may well have been a
document that was prepared for PREPA. Citi
has been working both with the government
and with us, so I don't know that I've ever
seen this particular document before.
Q. But you've seen the RSA itself,
right?

Page 180

D. Skeel - Professional Eyes Only

A. I've seen the RSA, yes.
Q. And you saw the schedules to the
RSA, the attachments to the RSA?
A. I think I have seen them.
Q. Okay. Sitting here today, do you
have any sense of whether there is -- there
could be any distributions to unsecured
creditors after the RSA is approved?
MS. DALE: Objection.
A. I don't know.
Q. Have you ever seen -- strike
that.
You're familiar with
restructuring support agreements generally,
not in this case, but generally? You're
familiar with that concept?
A. Yes, I am.
Q. Or a Plan Support Agreement?
That rings a bell?
A. Yes, it does.
Q. Have you ever seen a Plan Support
Agreement or a Restructuring Support
Agreement that provides for
pre-confirmation distributions of this

Page 181

D. Skeel - Professional Eyes Only

magnitude? By "this," I mean --
MS. DALE: Objection to form.
BY MR. DESPINS:
Q. -- as contemplated by the RSA.
A. I don't know.
MR. DESPINS: Let's circulate
this. That's going to be?
THE REPORTER: 11.
THE WITNESS: Are we finished
with this (indicating)?
MR. DESPINS: For now, yes.
(Skeel Exhibit 11, PREPA RSA -
Bondholders' Recoveries Based on David
Brownstein's Declaration, not
Bates-stamped, marked for
identification, as of this date.)
(Document review.)
MS. DALE: Luc, there is no Bates
on this. Is this something that was
prepared --
MR. DESPINS: No. I'll describe
it in a second.
MS. DALE: Okay. Thank you.
(Document review.)

Page 182

D. Skeel - Professional Eyes Only

A. Okay.

Q. Okay. So this is a document that was generated by our financial advisers, but it is a complete copy of the schedules contained in the Brownstein declaration other than for the shaded lines at the bottom.

Do you see there is two shaded percentages columns at the bottom?

A. Yes, I do.

Q. Okay. So other than that, the rest is just exactly out of the Brownstein declaration.

A. Okay.

Q. So the first thing is you know that there are two types of securities being given to the bondholders under the RSA, correct?

A. Yes, I do.

Q. Okay. So there are the A bonds and the B bonds?

A. Correct.

Q. Okay. And what is your understanding of the expectation regarding

Page 183

D. Skeel - Professional Eyes Only

the payments to be received by bondholders under the A bonds?

A. The expectations in terms of what we believe will happen?

Q. Yes.

A. We believe they will eventually pay off.

Q. And if I'm not mistaken, before lunch you mentioned, was it, 33 years or something like that?

A. It's something, 33, 34, I think are our most recent calculations.

Q. Okay. And what about the B bonds, what is your expectation there?

A. The expectation is that they won't pay off in full. And that's the middle column that you have is based on the expectations.

Q. Okay. Do you see the difference on top there between the claims of the bondholders with post-petition interest or without post-petition interest? This is one little i and two little i on the top. Do you see the difference? 9.3 --

Page 184

D. Skeel - Professional Eyes Only

A. I see it. I'm just looking.

Q. Okay.

(Document review.)

A. Yes, I see those numbers.

Q. Okay. So you testified before that your understanding of the recovery percentage to the bondholders was in the 73 percent range or so.

Is that fair?

MS. DALE: Objection. Misstates his testimony.

BY MR. DESPINS:

Q. Well, please correct me.

A. My expectation -- or our expect -- my understanding of our expectation with the recovery of principal of the bondholders is that they will recover in full on the A bonds and roughly half on the B bonds, a little more than half.

Q. No, no, I understand that.

What I'm saying is that in terms of their percentage recovery compared to their pre-petition position, I thought I, and correct me if I'm wrong, I thought I

Page 185

D. Skeel - Professional Eyes Only

heard you state that you thought it was in the 73 percent range or something like that?

A. I was speaking of the principal recovery, or I meant to be.

Q. Principal, you mean, principal without --

A. Not factoring the interest into it. Their principal as of the commencement of the RSA, of the payout under the RSA.

Q. Okay. Well, I think there is a disconnect there because if you use only their principal amount, and I agree that should be the measure, their recovery in the middle of the column is 86.2 percent.

Are you sure you don't mean principal plus interest?

A. Well, the number I'm thinking of is the principal plus accrued -- percentage of the principal plus accrued interest as of May 20, 2019.

Q. Okay. Thank you.

So that's the 78.8 figure in the middle column?

Page 186

D. Skeel - Professional Eyes Only

By the way, if those figures are wrong, I'm not going to hold you to this, but I think that's the math.

A.  I'm trusting your math.

Q.  Not my math.  Never trust my math.

A.  I'm trusting somebody's math.

MS. DALE:  Yup.

(Document review.)

A.  I mean, I'm not following whether it's including the --

Q.  Yes, that's why the dates are different.  Do you see --

A.  Yeah --

Q.  -- it says --

A.  -- that's post.

Q.  Exactly.  So if you include the post-petition interest, they're getting 78.8 percent.  That's what Mr. Brownstein is saying.  And the total recovery, if you include post-petition interest, is 86.2 percent, again, based on Mr. Brownstein's numbers.

A.  But that's not what he said.

Page 187

D. Skeel - Professional Eyes Only

That's you calculated --

Q.  No, he did not calculate the numbers, but all the other numbers are there.  So this is purely mathematics.  So it's the application of these numbers.

So my question to you is, are you comfortable with this range of you, know, either 78.8 or 86.2 percent of their claims, that's in the middle scenario, expected cash flow to Tranche B.

MS. DALE:  Objection to the form of the question.

A.  These numbers that you've added, you are calculating -- you're looking at different things than what we were looking at.  We were looking -- we're looking -- you're adding -- you appear to be adding in the administrative claim from May 2019 to 2020, the waiver and support fee.  So you are adding things into the numbers.

Q.  No, no, those numbers are all in Mr. -- we can confirm that.  If you take the Brownstein declaration, you will see there are schedules.

Page 188

D. Skeel - Professional Eyes Only

MS. DALE:  No. 5.

BY MR. DESPINS:

Q.  Page 15 and 16, do you see the claim is there for 393.8 -- well, 393.764, page 15, paragraph 37.

(Document review.)

A.  Okay.  Go ahead.

Q.  Okay.  So just to be clear, we're not -- we're using his numbers, just putting percentages on them depending on whether you include -- you measure this including post-petition interest or not.

So my question to you is, are you, focusing on the middle column, the percentages that are there, 78.8 percent and 86.2 percent, are you comfortable that this did not exceed your upper range of recovery?

A.  I am comfortable, yes.  As I said, this is adding things -- this is adding everything up.

Q.  Well, don't you agree that is the right way to do it?

A.  That may be the right endpoint.

Page 189

D. Skeel - Professional Eyes Only

It's not the right -- the start point, in my view, is what is the claim and what percentage of the claim.  And this is adding several things on top of that.  It's adding the administrative claim for the next year, we're in the middle of the year, and the waiver and support fee as well.

Q.  So that should not be included, in your view?

A.  It should be included in your ultimate conclusion, yes.

Q.  Okay.  But your testimony is that these percentages have not exceeded your upper end of the range?

A.  That is correct.

Q.  Even the one at 86.2 percent?

A.  That is correct.  You're looking at this differently than I would look at it, but seeing these numbers, yes, I'm comfortable with this.

Q.  Would you be comfortable at 90 percent?

A.  What we're basing this analysis against is a claim that they're entitled to

Page 190

D. Skeel - Professional Eyes Only
100 cents on the dollar, interest
throughout from the beginning to the end of
time. And the RSA, in my view, is a
significant reduction of that.
Q. Well, we're talking about, if
it's 90 percent, then the discount is 10
percent.
Do you think that is significant
given the legal issues here?
MR. HAWKINS: Objection to form.
A. Yes, the way -- yeah.
Q. Okay.
MS. DALE: When it's convenient,
can we take another break?
MR. DESPINS: Sure. Now if you
want.
THE VIDEOGRAPHER: The time is
2:33 p.m. We are off the record.
(Recess is taken.)
THE VIDEOGRAPHER: The time is
2:48 p.m. We are back on the record.
(Skeel Exhibit 12, Text messages
beginning with text messaged dated
7/13/18 from Matosantos to Skeel,

Page 191

D. Skeel - Professional Eyes Only
Bates-stamped FOMB_9019_MOBILE_00000101
through 126, marked for identification,
as of this date.)
(Document review.)
BY MR. DESPINS:
Q. Tell me when you're ready.
A. Okay.
Q. That's Exhibit 12, correct?
A. That's what it says.
Q. Exhibit 12 appears to be a series
of text messages. The batch numbers are
FOMB0101 through 0126. They are in 2018,
although in different days of 2018, appear
to be late -- mid to late July, early
August.
So the first thing to clarify,
we're talking about PREPA here?
MS. DALE: Objection.
A. Which one are you talking about?
Q. All of them. Generally, the
discussion is about PREPA? There are
references to COFINA as well, but generally
this is about PREPA?
A. At least some of it is about

Page 192

D. Skeel - Professional Eyes Only
PREPA.
Q. Okay. What does Ana, what does
she mean on 101 when she says, "I was not
tracking on the 90. What was that?"
Response, "I wasn't sure either.
I think it may be ad hoc 70/20 proposal."
A. Well, the 70/20 would be
presumably an A bond with a 70 cents on the
dollar payout and a B bond with 20.
Q. For a total potential of 90
percent recovery or?
A. It looks like that's what I was
guessing.
Q. Okay.
A. I wasn't sure, it looks like.
Q. Okay. 105, this is again Ana
saying, "I'm sorry I was getting impatient
with Citi."
And then next page, "I just don't
quite know what their deal is," meaning,
Citi, 107.
"And I was trying to feel out
whether they had direction that had not
come from us." This is on 108.

Page 193

D. Skeel - Professional Eyes Only
And you respond, "No worries.
I'm cautiously optimistic."
What is she talking about Citi
there, or do you have any sense?
A. I do not know what this is in
reference to.
Q. Okay. Then on 111, she says, "It
felt weird to frame things as they did with
four of us here."
What does she mean by the four of
us. Who is that?
A. I don't know. I don't know where
we are or what we're doing.
Q. Okay. In 112 she says, "I find
the duration brutal."
What duration is she referring
to?
A. My guess is it's the duration of
the B bond, but I don't know.
Q. Well, next page, 113, "Issuing
50-year debt to have an unaffordable level
of borrowing for its GO and get around the
constitution didn't work out very well for
the people or the creditors."

49 (Pages 190 to 193)

Page 194

D. Skeel - Professional Eyes Only
1   So I guess that's what she must
2   be talking about.
3   A.  Although that doesn't sound --
4   this doesn't sound like PREPA.  It's --
5   Q.  No, it's not -- she's referring
6   to the fact that that strategy of loading
7   up debt has not worked out well for Puerto
8   Rico.
9   MS. DALE:  Well, wait for a
10   question.
11   MR. DESPINS:  Okay.
12   BY MR. DESPINS:
13   Q.  Then 114, "Makes sense to argue
14   or to raise."
15   Do you know what she's talking
16   about?
17   A.  I do not.
18   Q.  Then you respond, "You could
19   though, Davids," plural, "making the
20   resistance clear."
21   One of these is David Brownstein,
22   correct?
23   A.  I don't know.  It could well be.
24   I don't think the text had said.

Page 195

D. Skeel - Professional Eyes Only
1   Q.  Well, she's talking about the
2   Citibank folks, so...
3   A.  The odds are pretty good --
4   Q.  Okay.
5   A.  -- it's a reference to David
6   Brownstein, but I do not know.
7   Q.  Okay.  Page 118, "Big thing today
8   was PREPA and COFINA and PREPA got a
9   counter 67.5 A and 10 on a B.  Aligned with
10   our last convo - I think.  We said okay."
11   Next one, "I said please call
12   David pre any communication with
13   creditors."
14   David, who is she talking about?
15   She's talking about you then?
16   A.  She -- yeah, I think she is, but
17   I'm not sure.
18   Q.  Okay.  Now this is a text from
19   you on page 120.
20   "Thanks much on both counts.  And
21   the numbers sound consistent.  At the very
22   high end of okay."
23   So -- and the numbers she was
24   quoting was 67.5 and 10.

Page 196

D. Skeel - Professional Eyes Only
1   Is that where we ended up, 67 and
2   a half and 10?
3   A.  Yes, that's where we ended up.
4   Q.  Okay.  So when you're referring
5   to a "very high end of okay," you're
6   referring to that transaction or that --
7   what she just described?
8   A.  I'm saying that those numbers are
9   at the high end of reasonableness.
10   Q.  Okay.  Then on 121, a different
11   date, a question from you:  "Do you know
12   where things stand on PREPA?  I am a little
13   queazy about the 5.25 discount rate.  It
14   looks to me to put the potential recovery
15   over 80 percent from the perspective of a 5
16   percent rate and over the original
17   anticipated deal numbers."
18   Can you expound on that, what did
19   you mean?
20   A.  I think I'm talking about what
21   interest rate will we use as we're
22   negotiating the interest rate.
23   Q.  But you mention an 80 percent
24   recovery percentage in that these numbers

Page 197

D. Skeel - Professional Eyes Only
1   would bring us above 80 percent, correct?
2   A.  Say that again.
3   Q.  You mentioned in your text that
4   using that discount rate would put the
5   potential recovery over 80 percent?
6   A.  It says it looks to me to put the
7   potential recovery over 80 percent.
8   Q.  And is that problematic?
9   A.  Problematic in what sense?
10   Q.  From your point of view.
11   A.  I was -- I was, it looks like,
12   concerned about what interest rate we used
13   and the higher interest rate -- or the
14   lower interest, the better; the higher
15   interest rate, the less better.
16   Q.  So how does that work?  If the
17   interest rate is higher than needed to be
18   trading at par, then there is a higher
19   recovery than the 100 cents?  Is that the
20   way it works?
21   MS. DALE:  Objection to form.
22   BY MR. DESPINS:
23   Q.  Or you tell me what you mean by
24   that.

50 (Pages 194 to 197)

Page 198

D. Skeel - Professional Eyes Only
1
2      A.   What I mean by here is we're
3  negotiating the interest rate, and we're
4  determining what the final interest rate is
5  going to be.  And I would prefer 5 over
6  5.25.
7      Q.   Because 5.25 got you to over 80?
8      A.   From -- if 5 is the correct
9  number, then 5.25 implies a higher
10 recovery.
11     Q.   And you said it's over 80 and
12 that was not acceptable to you, correct?
13         MS. DALE:  Objection.
14     A.   That's not what that text says.
15 The text says I was a little queazy about
16 the shift.  And I am now persuaded that
17 that 5.25 is a good number.
18     Q.   Really?  How so?
19     A.   I am persuaded that a market
20 number probably would have been a bit
21 higher than that.
22     Q.   And how do you know that?
23     A.   From discussions about the RSA.
24     Q.   Did you ever -- did you get comps
25 from Citi on this issue?

Page 199

D. Skeel - Professional Eyes Only
1
2      You know what I mean by comps,
3  right?
4      A.   I do.
5      I don't know whether we got -- we
6  got advice about appropriate discount rate,
7  or, yeah, interest rates.
8      Q.   And to be clear, right, if you
9  issue a debt instrument at five and a
10 quarter percent but the yield is really
11 lower than that, then that's additional
12 recovery, isn't it?
13     A.   Say that again.
14         MS. DALE:  Objection to the form.
15 BY MR. DESPINS:
16     Q.   If a debt instrument is issued at
17 a five and a quarter percent but the yield
18 on such instrument is less than five and a
19 quarter percent, what is the impact of that
20 discrepancy on the recovery to the
21 creditors holding such instrument?
22         MS. DALE:  Objection to the form.
23     A.   Yeah, I'm not following what you
24 mean by the yield.  I think we can reach a
25 meeting of the minds on the point you're

Page 200

D. Skeel - Professional Eyes Only
1
2  trying to make, but I'm not following what
3  you mean by when -- in your reference to
4  yield.
5      Q.   Well, is that what you meant by
6  saying, "It looks to me to put the
7  potential recovery over 80 percent from the
8  perspective of a 5 percent rate"?
9      A.   If 5 percent, as you are right,
10 is your baseline, a 5.25 discount rate
11 implies a higher recovery, yes.
12     Q.   So when you signed the -- or
13 approved the permanent RSA in May 2019, did
14 you re-up your analysis of that issue you
15 just addressed in that text message?
16         MS. DALE:  Objection to the form.
17     A.   The issue of the appropriate
18 interest rate has been a constant topic of
19 conversation, so we're talking about it.
20 This was going into the preliminary RSA --
21     Q.   Yup.
22     A.   -- and we would have talked about
23 it as well with the permanent RSA.
24     Q.   Well, it's not a topic of
25 discussion of today, is it?

Page 201

D. Skeel - Professional Eyes Only
1
2      A.   Now it is.
3          (Laughter.)
4      Q.   Good one.  Yes, it is.
5      I'm saying that your not having a
6  debate over the appropriate interest rate
7  these days, are you?
8      A.   No.  We, I think, did settle and
9  have settled on 5.25 as an appropriate
10 interest rate.
11     Q.   123, "I get that the main
12 question was settled by others, but I can't
13 get over the fact that this deal is too
14 rich."
15     So what was settled by others?
16 What is the main question that she's
17 referring to?
18         MS. DALE:  Objection.
19     A.   I don't know.
20     Q.   But you respond, "This and the
21 PREPA deal, both in my view."
22     You're responding to the one that
23 says, "Deal is too rich.  The only
24 justification on this one in my view is
25 that there is a real chance COFINA would

Page 226

D. Skeel - Professional Eyes Only

1  rights under that provision are limited?
2  That the board, for example, cannot just
3  say we decided this doesn't make sense,
4  we're walking.  It doesn't provide for a
5  complete walkaway right, correct?
6     A.  Once the RSA is formally
7  approved.
8     Q.  Yes, correct.  I'm sorry.  I'm
9  assuming the RSA is approved.  Under that
10  regime, once that it's approved, the board
11  cannot just decide we don't like this deal
12  anymore?
13     A.  That's correct.
14     Q.  Okay.  Has the board ever
15  attempted to get a full fiduciary out?
16        Do you understand what I mean by
17  a full fiduciary out?
18     A.  I know what a -- I know what a
19  fiduciary out is, yes.
20     Q.  Okay.  And so a full, meaning one
21  that allows the board to terminate the
22  transaction for whatever reason it deems
23  appropriate, has the board ever sought that
24  type of termination right?

Page 227

D. Skeel - Professional Eyes Only

1     A.  That's not what a fiduciary out
2  is.  A fiduciary duty out is an out where
3  it would breach your duty to continue to
4  form an agreement.
5     Q.  Okay.  So has the board ever
6  attempted to get the out that you just
7  described?
8     A.  We have talked about those kinds
9  of issues, yes.
10     Q.  We've talked about that
11  internally, or did we make that a request
12  to the bondholders?
13     A.  I'm not sure specifically what
14  was requested of the bondholders, but the
15  issue of what causes the agreement to
16  terminate was much discussed.
17        MR. DESPINS:  Okay.  Tab C.
18  BY MR. DESPINS:
19     Q.  So did you ever get a fiduciary
20  out in the document?
21     A.  We have a parallel to a fiduciary
22  out, which is that if the plan is not
23  confirmed, if a reorganization plan or a
24  plan of adjustment based on the RSA is not

Page 228

D. Skeel - Professional Eyes Only

1  confirmed, I believe it's after two
2  attempts, that's a basis for getting out of
3  the RSA.
4     Q.  Getting out without any financial
5  consequences or?
6     A.  I don't remember what the, what
7  the effect is.
8        (Skeel Exhibit 18, Email chain
9  beginning with email dated 1/28/19 from
10  Shannahan to Gana, Bates-stamped
11  ASSURED-PREPA-9019- MOTION_00034736
12  through 34737, marked for
13  identification, as of this date.)
14        MR. DESPINS:  I'll just describe,
15  this is Exhibit 18, Assured-PREPA
16  Document 34736 and 34737, an email from
17  Andrew Shannahan to Jorge Gana at
18  Assured.
19        MS. DALE:  He doesn't have the
20  document.
21        (Discussion off the record.)
22  BY MR. DESPINS:
23     Q.  I'm not going to ask a question.
24  Just read it.

Page 229

D. Skeel - Professional Eyes Only

1     A.  Should I read it?
2        (Document review.)
3     A.  Okay.
4     Q.  So on top there, they're talking
5  about fiduciary out, right?  "Ability to
6  walk away from the deal if it no longer
7  fits the government's privatization plan
8  and bondholders don't get the benefit of
9  the 2019 lien validation."
10        This is now Mr. Shannahan
11  speaking, "As I said, complete nonstarter."
12        That's to be expected from his
13  perspective.
14        Then it says, "Not the FOMB's
15  position and likely more Nancy trying to
16  create litigation."
17        So the bondholders seemed under
18  the impression that we're not asking for
19  that fiduciary out.
20        Does that jive with your
21  recollection?
22        MS. DALE:  Objection to the form.
23     A.  I don't specifically remember the
24  discussion of this.

58 (Pages 226 to 229)

Page 230

D. Skeel - Professional Eyes Only
Q. Okay. Let's talk about the stipulated treatment provision. You mentioned that a few minutes ago.

What happens during -- if that provision is triggered to the payments received by the bondholders, for example?

A. I assume they keep them as part of a stipulated treatment. So the payments received up to that point.

Q. Why do you assume that?

A. Because I don't have the document in front of me to, to give myself complete confidence of that answer.

Q. But why would you assume the opposite?

A. Because the stipulated treatment gives them 73 -- I think it's 73.25 percent, and I assume or -- yeah, I assume that that also includes they would keep the payments they received up to that point.

Q. Did the board ever ask for clawback rights? You understand what I mean in this context by clawback rights? We're not talking about the clawback bonds

Page 231

D. Skeel - Professional Eyes Only
now, we're talking about --

A. I'll try to be very careful how we talk about clawbacks because it means so many things.

Q. Actually, it doesn't mean clawback anyway, but that is a different topic.

So in this context, when we're focusing on the payments received by the bondholders, did the Oversight Board request that the payments be subject to disgorgement or a clawback?

MS. DALE: Objection to the form.

A. I just don't remember if that was a subject of conversation.

Q. Do you derive any comfort from the fact that if they keep the payment, they are applied against their claims, the payments are applied against their claims? Do you derive any comfort from that provision?

A. I just don't remember. I mean, I would need to work through the provision.

Q. Okay. So switching topics now,

Page 232

D. Skeel - Professional Eyes Only
you're familiar with the concept of a breakup fee?

A. Yes, I am.

Q. In the mergers and acquisitions context?

A. Yes, I am.

Q. And --

A. I've written about them.

Q. Okay. And the board here, in pleadings filed with the court, has analyzed, as described, if you will, the payments that the bondholders get to keep as a breakup fee.

So my first question to you is, is that the way the board perceived these payments when it approved the RSA?

A. That's not the way I think of them. I think breakup fee would be a very loose description.

Q. Typically a breakup fee would be -- what would be the range from a percentage point of view of a breakup fee?

MS. DALE: Objection. Calls for speculation. Out of context.

Page 233

D. Skeel - Professional Eyes Only
BY MR. DESPINS:
Q. You've written articles about this, so...

A. I can tell you what it is in Delaware. In Delaware, it's 3 or 4 percent of the deal price.

Q. Thank you. Okay.

A. Not in bankruptcy.

Q. Okay. You think it's higher or lower in bankruptcy?

MS. DALE: Objection.

A. I don't know.

Q. Okay. But in the event -- were you ever provided with comps for what a breakup fee would be in a bankruptcy case before you approved the RSA?

A. I don't recall being given comps.

Q. Comps for a breakup fee?

A. Comps for a breakup fee.

Q. Okay. What's your understanding of the effect of the RSA on the solar power industry in Puerto Rico?

A. It's hard to answer that question. What do you mean what the effect

Page 234

D. Skeel - Professional Eyes Only

1
2   is?
3       Q.  Have you heard any complaints by
4   solar power industry representatives about
5   the effect of the RSA on their business?
6       A.  We may have.  We've gotten
7   communications from people in the
8   renewables space, so we may have heard
9   criticisms.  I don't remember specifically.
10      Q.  Well, do you understand the
11  nature of their criticism of the RSA?
12      A.  I don't remember.
13      Q.  Okay.
14          MR. DESPINS:  Tab 49.
15          (Skeel Exhibit 19, Email dated
16      101/119 from Reorg Alert to Zwillinger,
17      not Bates-stamped, marked for
18      identification, as of this date.)
19          (Document review.)
20  BY MR. DESPINS:
21      Q.  Just you feel free to read the
22  entire thing, but I'm going to ask you
23  about what's starting with the last
24  sentence of page 1 of this document and the
25  carryover paragraph and the paragraph after

Page 235

D. Skeel - Professional Eyes Only

1
2   that, but I don't want to limit your
3   review.  I just think we can save some time
4   if you focus on this.
5       A.  Okay.  I'll read a little bit in
6   each direction.
7       Q.  Okay.  So while you're doing
8   that, this is not Bates-stamped, but it's a
9   reorg research article dated October 1st,
10  2019.
11          (Document review.)
12      A.  Okay.
13      Q.  There is a reference in there, it
14  seems to be a quote so -- it says, "Marrero
15  indicated that the PREPA Restructuring
16  Support Agreement is among debt
17  restructuring proposals that are being
18  looked at, at least in part, in the context
19  of the filing of the Commonwealth plan."
20          Is this news to you?
21      A.  News in what sense?
22          MS. DALE:  Objection to form.
23  BY MR. DESPINS:
24      Q.  Well, it seems that the
25  government and AAFAF have signed the RSA,

Page 236

D. Skeel - Professional Eyes Only

1
2   the permanent RSA on May 3rd, 2019, and the
3   amendment, I assume they've also signed the
4   amendment that was done in September.
5           So I'm reading this and I'm
6   wondering what is he talking about?  I
7   mean, what is the government doing?
8           MS. DALE:  Objection to the form.
9           Do you have any idea what he's
10  talking about?
11          MR. DESPINS:  I don't.
12      A.  I don't.  He just seems to be
13  saying that now that the Commonwealth plan
14  has been filed, they needed to kind of look
15  at the big picture and look at all of the
16  other agreements that are underway.
17      Q.  But then the next sentence, you
18  know, or a little further down says,
19  "Obviously there are some transactions
20  where we have to look at the details to see
21  whether they have to be revisited, improved
22  or reconsidered in light of the
23  circumstance, and that's what we're doing,
24  Marrero said.
25          "That's exactly why, for example,

Page 237

D. Skeel - Professional Eyes Only

1
2   we have decided to extend the PREPA RSA
3   twice, already to just have the time, for
4   further analysis added Marrero, who
5   indicated the analysis has centered on what
6   terms and conditions might need to be
7   revisited and which creditors should be
8   consulted."
9           So my question to you is, is the
10  government on board with the RSA or not?
11          MS. DALE:  Object to the form.
12      A.  I believe they are.  I mean, he
13  goes on to say he doesn't know which
14  restructuring deal, PREPA or the
15  Commonwealth's, he thinks will get done
16  first, but said AAFAF is equally committed
17  to all deals.
18      Q.  Okay.  So you are not aware of
19  any renegotiations or reconsideration by
20  the government of the RSA as you sit here
21  today?
22      A.  I am not.
23      Q.  Okay.
24          MR. DESPINS:  We'll take, if
25  that's okay with your counsel, a

TSG Reporting - Worldwide 877-702-9580