**<u>EXHIBIT 34</u>**

NEW ISSUE – FULL BOOK-ENTRY                                                    See "RATINGS" herein

*In the opinion of Hawkins Delafield & Wood LLP ("Bond Counsel"), under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, (1) interest on the 2017 Restructuring Bonds (as defined herein) is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (2) interest on the 2017 Restructuring Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In addition, in the opinion of Bond Counsel, under existing statutes, interest on the 2017 Restructuring Bonds is exempt from personal income taxes imposed by the State of New York or any political subdivision thereof, and the 2017 Restructuring Bonds are exempt from all taxation directly imposed thereon by or under the authority of the State of New York, except estate or gift taxes and taxes on transfers. See "TAX MATTERS" herein.*

# $369,465,000
## UTILITY DEBT SECURITIZATION AUTHORITY
### RESTRUCTURING BONDS, SERIES 2017

Utility Debt Securitization Authority (the "Issuer"), a special purpose corporate municipal instrumentality of the State of New York (the "State"), is issuing the above-captioned bonds (the "2017 Restructuring Bonds"), for the purpose of allowing the Long Island Power Authority (the "Authority") to retire certain of its outstanding indebtedness. The 2017 Restructuring Bonds will have such scheduled and final maturities, bear interest at such rates, be payable on such dates, and be issued in such denominations as shown on the inside cover of this Official Statement. The 2017 Restructuring Bonds will be subject to redemption prior to maturity as set forth herein.

The 2017 Restructuring Bonds are limited obligations of the Issuer secured by the 2017 Collateral (as defined herein), created pursuant to the Securitization Law (as defined herein) and an irrevocable financing order adopted by the Authority's Board of Trustees on July 26, 2017 ("Financing Order No. 5"). The 2017 Collateral includes, among other things, the pledge to the Trustee (as defined herein) under the Indenture (as defined herein) of the Issuer's right, title and interest in and to the 2017 Restructuring Property (as defined herein) created pursuant to Financing Order No. 5, including the irrevocable right to impose, bill and collect a nonbypassable charge, known as the "2017 Restructuring Charge," required to be paid by retail electric delivery service customers of the Long Island Lighting Company (d/b/a and referred to as "LIPA"), a wholly-owned subsidiary of the Authority, based on the customers' consumption of electricity. The 2017 Restructuring Charges are required to be collected by LIPA, as initial servicer for the Issuer. Pursuant to the Securitization Law and Financing Order No. 5, the 2017 Restructuring Property will be purchased by the Issuer from the Authority with the net proceeds of the sale of the 2017 Restructuring Bonds.

The Securitization Law, together with Financing Order No. 5, require that the 2017 Restructuring Charges are subject to an adjustment, or "true-up," at least annually, and more frequently, if necessary, to ensure the expected collection of amounts required to timely provide all scheduled payments of principal of and interest on the 2017 Restructuring Bonds and related financing costs of the Issuer, as described herein.

**Investing in the 2017 Restructuring Bonds involves risks. See "RISK FACTORS" herein.**

The Bank of New York Mellon (the "Trustee") is Trustee under the Indenture and Paying Agent for the 2017 Restructuring Bonds. Public Financial Management, Inc. has acted as independent financial advisor to the Authority and the Issuer in connection with the structuring and pricing of the 2017 Restructuring Bonds.

---

**MATURITY SCHEDULE – See Inside Cover Page**

---

The 2017 Restructuring Bonds are not an obligation of the Authority or LIPA. The 2017 Restructuring Bonds are not a debt, general obligation or pledge of the faith and credit or taxing power of the State of New York or of any county, municipality or any other political subdivision, agency or instrumentality of the State of New York other than the Issuer as described herein. The 2017 Restructuring Bonds are limited obligations of the Issuer payable solely from the 2017 Collateral (as described herein) including the 2017 Restructuring Charges. The issuance of the 2017 Restructuring Bonds does not obligate the State of New York or any county, municipality or other political subdivision, agency or instrumentality of the State of New York to levy any tax or make any appropriation for the payment of the 2017 Restructuring Bonds. The Issuer has no taxing power.

---

The 2017 Restructuring Bonds are offered when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Hawkins Delafield & Wood LLP, as Bond Counsel to the Issuer. Certain legal matters with respect to the Issuer, the Authority and LIPA will be passed upon by Hawkins Delafield & Wood LLP, as Bond Counsel to the Authority and the Issuer. Certain legal matters with respect to the Issuer, the Authority and LIPA will be passed upon by Squire Patton Boggs (US) LLP, Disclosure Counsel to the Authority and the Issuer. Certain legal matters will be passed upon for the Underwriters by Norton Rose Fulbright US LLP. It is expected that the 2017 Restructuring Bonds will be available for delivery in book-entry-only form through the facilities of The Depository Trust Company ("DTC") against payment in New York, New York, on or about November 21, 2017.

| **RBC Capital Markets** | **Barclays** | **BofA Merrill Lynch** | **Citigroup** |
|---|---|---|---|
| (Joint Senior Manager – Bookrunner) | (Joint Senior Manager) | (Joint Senior Manager) | (Joint Senior Manager) |

| | | |
|---|---|---|
| **Academy Securities, Inc.** | **Drexel Hamilton LLC** | **FTN Financial Capital Markets** |
| **Goldman, Sachs & Co.** | **J.P. Morgan** | **Jefferies** |
| **KeyBanc Capital Markets Inc.** | **Loop Capital Markets LLC** | **Morgan Stanley** |
| **Ramirez & Co., Inc.** | **Raymond James** | **Siebert Cisneros Shank & Co., L.L.C.** |
| **TD Securities** | **U.S. Bancorp Investments, Inc.** | **Wells Fargo Securities** |

October 25, 2017

**Maturity Schedule**

**$369,465,000**

**UTILITY DEBT SECURITIZATION AUTHORITY**

**RESTRUCTURING BONDS, SERIES 2017**

| Tranche | Principal Amount Offered | Scheduled Maturity Date[†] | Final Maturity Date[†] | Interest Rate | Yield | Public Offering Price | CUSIP[*] |
|---|---|---|---|---|---|---|---|
| Tranche 1 | $1,695,000 | June 15, 2020 | June 15, 2022 | 5.000% | 1.130% | 109.762%[†††] | 91802RDJ5 |
| Tranche 2 | $1,740,000 | December 15, 2020 | December 15, 2022 | 5.000% | 1.170% | 111.503%[†††] | 91802RDK2 |
| Tranche 3 | $10,985,000 | June 15, 2021 | June 15, 2023 | 5.000% | 1.240% | 113.077%[†††] | 91802RDL0 |
| Tranche 4 | $11,260,000 | December 15, 2021 | December 15, 2023 | 5.000% | 1.310% | 114.565%[†††] | 91802RDM8 |
| Tranche 5 | $11,440,000 | June 15, 2022 | June 15, 2024 | 5.000% | 1.400% | 115.870%[†††] | 91802RDN6 |
| Tranche 6 | $11,725,000 | December 15, 2022 | December 15, 2024 | 5.000% | 1.470% | 117.173%[†††] | 91802RDP1 |
| Tranche 7 | $18,130,000 | June 15, 2023 | June 15, 2025 | 5.000% | 1.540% | 118.389%[†††] | 91802RDQ9 |
| Tranche 8 | $18,585,000 | December 15, 2023 | December 15, 2025 | 5.000% | 1.600% | 119.581%[†††] | 91802RDR7 |
| Tranche 9 | $190,000 | June 15, 2024 | June 15, 2026 | 5.000% | 1.670% | 120.628%[†††] | 91802RDS5 |
| Tranche 10 | $195,000 | December 15, 2024 | December 15, 2026 | 5.000% | 1.730% | 121.662%[†††] | 91802RDT3 |
| Tranche 11 | $195,000 | June 15, 2025 | June 15, 2027 | 5.000% | 1.800% | 122.540%[†††] | 91802RDU0 |
| Tranche 12 | $200,000 | December 15, 2025 | December 15, 2027 | 5.000% | 1.870% | 123.334%[†††] | 91802RDV8 |
| Tranche 13 | $205,000 | June 15, 2026 | June 15, 2028 | 5.000% | 1.940% | 124.043%[†††] | 91802RDW6 |
| Tranche 14 | $210,000 | December 15, 2026 | December 15, 2028 | 5.000% | 1.990% | 124.856%[†††] | 91802RDX4 |
| Tranche 15 | $220,000 | June 15, 2027 | June 15, 2029 | 5.000% | 2.040% | 125.605%[†††] | 91802RDY2 |
| Tranche 16 | $225,000 | December 15, 2027 | December 15, 2029 | 5.000% | 2.090% | 126.292%[†††] | 91802RDZ9 |
| Tranche 17** | $465,000 | December 15, 2028 | December 15, 2030 | 5.000% | 2.320% | 123.935%[††††] | 91802REA3 |
| Tranche 18** | $485,000 | December 15, 2029 | December 15, 2031 | 5.000% | 2.380% | 123.328%[††††] | 91802REB1 |
| Tranche 19** | $510,000 | December 15, 2030 | December 15, 2032 | 5.000% | 2.440% | 122.725%[††††] | 91802REC9 |
| Tranche 20** | $535,000 | December 15, 2031 | December 15, 2033 | 5.000% | 2.500% | 122.126%[††††] | 91802RED7 |
| Tranche 21** | $565,000 | December 15, 2032 | December 15, 2034 | 5.000% | 2.560% | 121.530%[††††] | 91802REE5 |
| Tranche 22** | $595,000 | December 15, 2033 | December 15, 2035 | 5.000% | 2.610% | 121.036%[††††] | 91802REF2 |
| Tranche 23** | $625,000 | December 15, 2034 | December 15, 2036 | 5.000% | 2.650% | 120.643%[††††] | 91802REG0 |
| Tranche 24** | $655,000 | December 15, 2035 | December 15, 2037 | 5.000% | 2.680% | 120.349%[††††] | 91802REH8 |
| Tranche 25** | $63,235,000 | December 15, 2036 | December 15, 2038 | 5.000% | 2.690% | 120.251%[††††] | 91802REJ4 |
| Tranche 26** | $62,085,000 | December 15, 2037 | December 15, 2039 | 5.000% | 2.720% | 119.958%[††††] | 91802REK1 |
| Tranche 27** | $69,810,000 | December 15, 2038 | December 15, 2040 | 5.000% | 2.740% | 119.763%[††††] | 91802REL9 |
| Tranche 28** | $82,700,000 | December 15, 2039 | December 15, 2041 | 5.000% | 2.760% | 119.568%[††††] | 91802REM7 |

*CUSIP numbers have been assigned by an organization not affiliated with the Issuer or the Authority and are included solely for the convenience of the holders of the 2017 Restructuring Bonds. Neither the Issuer nor the Authority is responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to the correctness of the CUSIP numbers on the 2017 Restructuring Bonds or as indicated above.

**Subject to Sinking Fund Payments. See "THE 2017 RESTRUCTURING BONDS—Redemption-Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules" in this Official Statement.

[†] If such date is not a Business Day, the next Business Day without additional interest.

[††] Priced at the stated yield to the Scheduled Maturity Date.

[†††] Priced at the stated yield to the December 15, 2027 optional redemption date at the redemption price of par.

The 2017 Restructuring Bonds will accrue interest from their date of delivery to their maturity or prior redemption, as applicable. Interest is payable semi-annually each June 15 and December 15, beginning June 15, 2018, and if such day is not a Business Day, the next Business Day without additional interest.

The 2017 Restructuring Bonds will be issued in denominations of $5,000 or any integral multiple thereof, all to be held in a book-entry only system, registered in the name of Cede & Co., as registered owner and nominee of DTC, which will act as securities depository for the 2017 Restructuring Bonds. See "THE 2017 RESTRUCTURING BONDS—Securities Depository" in this Official Statement.

## ABOUT THIS OFFICIAL STATEMENT

## UTILITY DEBT SECURITIZATION AUTHORITY

### BOARD OF TRUSTEES*

**Robert Gurman, Acting Chair**
**Bruce Levy, Committees Chair**

No dealer, broker, salesperson or other person has been authorized by the Issuer, the Authority or the Underwriters to give any information or to make any representation, other than the information and representations contained in this Official Statement, in connection with the offering of the 2017 Restructuring Bonds, and, if given or made, such information or representations must not be relied upon as having been authorized by the Issuer, the Authority or the Underwriters. This Official Statement does not constitute an offer to sell or solicitation of an offer to buy any of the 2017 Restructuring Bonds in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction.

The information set forth herein has been furnished by the Issuer and the Authority, and also includes information obtained from other sources, all of which are believed to be reliable. The information and expressions of opinion contained herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Issuer, the Authority, LIPA and PSEG Long Island (as defined herein) since the date hereof. Such information and expressions of opinion are made for the purpose of providing information to prospective investors and are not to be used for any other purpose or relied on by any other party.

This Official Statement contains statements which, to the extent they are not recitations of historical fact, constitute "forward-looking statements." In this respect, the words "estimate," "project," "anticipate," "expect," "intend," "believe" and similar expressions are intended to identify forward-looking statements.

In connection with the offering of the 2017 Restructuring Bonds, the Underwriters may overallot or effect transactions that stabilize or maintain the market price of the 2017 Restructuring Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.

The Underwriters have provided the following sentence for inclusion in this Official Statement: The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THIS OFFICIAL STATEMENT AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

---

* Currently, there is a vacancy on the Board of Trustees.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

Page

SUMMARY STATEMENT ................................................................................................................. i

INTRODUCTORY STATEMENT .................................................................................................... 1

PLAN OF FINANCE AND USE OF PROCEEDS ......................................................................... 1

THE SECURITIZATION LAW ........................................................................................................ 1

    Background ........................................................................................................................................ 1

    Purpose of Securitization Law .................................................................................................... 2

    Authorization of Restructuring Bonds Pursuant to Irrevocable Financing Orders .......... 2

    Prior Transactions ......................................................................................................................... 2

    2017 Restructuring Property ........................................................................................................ 3

    True-Up Adjustment Mechanism ............................................................................................... 3

    2017 Restructuring Charges are Nonbypassable ..................................................................... 3

    No Right of Set-Off; Partial Payment of Customer Charges .................................................. 3

    State Pledge ..................................................................................................................................... 4

    Trustee's Lien on 2017 Restructuring Property Protected ..................................................... 4

    Right of Sequestration ................................................................................................................... 4

    Transfer Characterized as True Sale ........................................................................................... 4

    Transfer and Ownership of 2017 Restructuring Property is Tax Exempt ........................... 5

THE FINANCING ORDER .............................................................................................................. 5

    General; Creation of 2017 Restructuring Property; Irrevocability ....................................... 5

    Collection of 2017 Restructuring Charges; Nonbypassability .............................................. 5

    Terms of the 2017 Restructuring Bonds ................................................................................... 6

    2017 Restructuring Charges on Customer Bills ...................................................................... 6

    True-Up Adjustment Mechanism ............................................................................................... 7

    Issuance Advice Letter .................................................................................................................. 8

    Servicing Agreement ..................................................................................................................... 8

    Binding on Successors ................................................................................................................... 8

THE 2017 RESTRUCTURING PROPERTY ................................................................................. 8

    Overview .......................................................................................................................................... 8

    Creation of 2017 Restructuring Property .................................................................................. 9

    2017 Restructuring Charges ........................................................................................................ 9

THE 2017 RESTRUCTURING BONDS ........................................................................................ 9

    General ............................................................................................................................................. 9

    Interest on the 2017 Restructuring Bonds ................................................................................ 9

    Principal of the 2017 Restructuring Bonds .............................................................................. 10

    Expected Amortization Schedule ............................................................................................... 11

## TABLE OF CONTENTS
(continued)

Page

Maturity Sensitivity ........................................................................................................................... 12

Fees and Expenses ............................................................................................................................. 13

Redemption ....................................................................................................................................... 13

Registration and Transfer of the 2017 Restructuring Bonds ........................................................... 15

Securities Depository ........................................................................................................................ 15

Access of Bondholders ...................................................................................................................... 16

SECURITY FOR THE 2017 RESTRUCTURING BONDS ................................................................... 16

Pledge of 2017 Collateral ................................................................................................................. 16

Security Interest in 2017 Collateral ................................................................................................. 17

Lien on 2017 Restructuring Property ............................................................................................... 18

Indenture Accounts ........................................................................................................................... 18

How Funds in the Collection Account Will Be Allocated ................................................................. 20

Limited Obligation of Issuer ............................................................................................................ 21

Legality for Investment .................................................................................................................... 21

Additional Bonds .............................................................................................................................. 21

THE ISSUER ......................................................................................................................................... 21

Introduction ...................................................................................................................................... 21

Restricted Purpose ............................................................................................................................ 22

Management and Fees ....................................................................................................................... 22

Relationship of the Issuer to the Authority and LIPA .................................................................... 22

Administration Agreement ............................................................................................................... 22

THE SELLER ......................................................................................................................................... 23

General ............................................................................................................................................... 23

Service Area ...................................................................................................................................... 23

Relationship of the Authority to LIPA ............................................................................................ 24

System Operation by the Authority and LIPA ................................................................................ 25

Authority to Set Electric Rates ........................................................................................................ 25

Where to Find Information about the Authority .............................................................................. 26

Relationship between the 2017 Restructuring Bonds and the Authority's Indebtedness .............. 27

SERVICER AND ADMINISTRATOR .................................................................................................. 27

General ............................................................................................................................................... 27

Servicing the 2017 Restructuring Bonds ........................................................................................ 27

Transition to a New Business Model ................................................................................................ 27

The LIPA Reform Act and the OSA ................................................................................................. 28

Servicing Experience ........................................................................................................................ 30

**TABLE OF CONTENTS**
(continued)

Page

Allocation Account; Remittance of 2017 Restructuring Charges; Reconciliation ...................................... 30

Billing and Collection Policies................................................................................................................. 31

Revenues, LIPA's Customer Base and Electric Energy Consumption....................................................... 33

Forecasting Electricity Consumption ....................................................................................................... 34

Loss Experience ...................................................................................................................................... 34

Days Sales Outstanding........................................................................................................................... 35

Write-Off and Delinquencies Experience................................................................................................. 35

Where to Find Information About LIPA .................................................................................................... 35

Where to Find Information regarding PSEG and PSEG Long Island ......................................................... 35

THE TRUSTEE................................................................................................................................................. 35

RATING AGENCY CONDITION ...................................................................................................................... 36

THE INDENTURE............................................................................................................................................ 36

Reports to Holders................................................................................................................................... 36

Covenants of Issuer ................................................................................................................................. 37

Events of Default..................................................................................................................................... 40

Remedies—Acceleration.......................................................................................................................... 40

Remedies—Trustee's Rights..................................................................................................................... 41

Remedies—Optional Possession of 2017 Collateral ................................................................................. 42

Remedies—Limitation of the Rights of Holders ........................................................................................ 42

Voting of the 2017 Restructuring Bonds; Control of Proceedings by Holders ........................................... 42

Waiver of Past Defaults............................................................................................................................ 43

Modifications of Indenture that Do Not Require the Consent of Holders.................................................... 43

Modifications of Indenture that Require the Consent of Holders................................................................ 44

Satisfaction and Discharge of Indenture.................................................................................................... 45

Legal Defeasance .................................................................................................................................... 45

No Recourse to Others ............................................................................................................................. 46

THE SALE AGREEMENT................................................................................................................................. 46

Sale of the 2017 Restructuring Property.................................................................................................... 47

Seller Representations and Warranties....................................................................................................... 47

Covenants of the Seller............................................................................................................................ 48

Indemnification ....................................................................................................................................... 50

Successors to the Seller ........................................................................................................................... 51

Amendment ............................................................................................................................................ 51

THE SERVICING AGREEMENT...................................................................................................................... 51

General ................................................................................................................................................... 51

**TABLE OF CONTENTS**
(continued)

Page

Servicing Procedures .................................................................................................................... 51

Servicing Standards and Covenants ............................................................................................. 52

True-Up Adjustment Process ....................................................................................................... 52

Servicing Compensation ............................................................................................................... 52

Servicer Representations and Warranties ..................................................................................... 53

Certificates by Servicer ................................................................................................................ 54

Servicer Will Indemnify Issuer in Limited Circumstances ......................................................... 55

Matters Regarding Servicer .......................................................................................................... 55

Annual Accountant's Report ........................................................................................................ 56

Servicer Defaults and Remedies .................................................................................................. 56

ADMINISTRATION AGREEMENT ............................................................................................... 59

Duties of the Administrator .......................................................................................................... 59

Administrator Compensation ........................................................................................................ 60

Resignation and Removal of the Administrator ........................................................................... 60

Amendment of the Administration Agreement ............................................................................ 61

Indemnification by the Administrator .......................................................................................... 61

Administrator's Liability .............................................................................................................. 61

AFFILIATIONS AND CERTAIN RELATIONSHIPS ..................................................................... 61

RISK FACTORS ................................................................................................................................ 62

Servicing and Operating Risks ..................................................................................................... 62

Customer and Delivery Related Risks .......................................................................................... 64

Judicial, Legislative or Regulatory Risks ..................................................................................... 64

Bankruptcy-Related Risks ............................................................................................................ 66

Risks Associated with the Unusual Nature of the 2017 Restructuring Property ......................... 70

UNDERWRITING ............................................................................................................................. 71

TAX MATTERS ................................................................................................................................. 72

Opinion of Bond Counsel ............................................................................................................. 72

Certain Ongoing Federal Tax Requirements and Covenants ....................................................... 72

Certain Collateral Federal Tax Consequences ............................................................................. 72

Original Issue Discount ................................................................................................................ 73

Bond Premium .............................................................................................................................. 73

Information Reporting and Backup Withholding .......................................................................... 73

Miscellaneous ............................................................................................................................... 74

CONTINUING DISCLOSURE .......................................................................................................... 74

RATINGS ........................................................................................................................................... 74

## TABLE OF CONTENTS
(continued)

**Page**

FINANCIAL ADVISOR ................................................................................................................................. 75

ABSENCE OF LITIGATION .......................................................................................................................... 75

    The Issuer ................................................................................................................................................. 75

    The Authority and LIPA ......................................................................................................................... 75

LEGAL MATTERS ....................................................................................................................................... 75

MISCELLANEOUS ...................................................................................................................................... 76

Appendix A — Definitions

Appendix B — Proposed Form of Approving Opinion of Bond Counsel

Appendix C — Proposed Form of Opinion of Bond Counsel Relating to New York and Federal Constitutional
               Matters

Appendix D — Proposed Form of Opinion of Bond Counsel Relating to Regulatory Matters

Appendix E — Form of the Continuing Disclosure Agreement

Schedule 1 – Book-Entry-Only System

[THIS PAGE INTENTIONALLY LEFT BLANK]

## SUMMARY STATEMENT

*The following information is furnished solely to provide limited introductory information regarding the Utility Debt Securitization Authority (the "Issuer"), the Long Island Power Authority (the "Authority" and in its capacity as the seller of the 2017 Restructuring Property, sometimes referred to herein as the "Seller"), the Long Island Lighting Company ("LIPA," in its capacity as servicer of the 2017 Restructuring Property, sometimes referred to herein as "Servicer" and in its capacity as administrator of the Issuer, sometimes referred to herein as "Administrator"), Public Service Enterprise Group Incorporated ("PSEG"), PSEG Long Island LLC ("PSEG Long Island"), and the 2017 Restructuring Bonds and does not purport to be comprehensive. Such information is qualified in its entirety by reference to the more detailed information and descriptions appearing elsewhere in this Official Statement and should be read together therewith. The offering of the 2017 Restructuring Bonds is made only by means of the entire Official Statement, including the Appendices hereto. No person is authorized to make offers to sell, or solicit offers to buy, the 2017 Restructuring Bonds unless the entire Official Statement is delivered in connection therewith. Terms not defined elsewhere in this Official Statement are used as defined in Appendix A hereto.*

| | |
|---|---|
| *Purpose of the Transaction:* | This issuance of the 2017 Restructuring Bonds by the Issuer will enable the Authority to retire certain of its outstanding indebtedness. See "THE SECURITIZATION LAW" in this Official Statement. |
| *Issuer:* | The Issuer is a special purpose corporate municipal instrumentality, body corporate and politic, political subdivision and public benefit corporation of the State of New York, created by Part B of Chapter 173, Laws of New York, 2013 (the whole of Chapter 173, Laws of New York, 2013, as amended by Chapter 58 of the Laws of New York, 2015, the "LIPA Reform Act" and Part B thereof, the "Securitization Law"). The Issuer has no commercial operations. The Issuer was formed solely to purchase and own restructuring property, to issue bonds which are to be secured by restructuring property, and to perform any activity incidental thereto. The Securitization Law prohibits the Issuer from engaging in any other activity except as specifically authorized by a financing order and provides that the Issuer is not authorized to be a debtor under chapter 9 or any other provision of the Bankruptcy Code. See "—*Transaction Overview*" and "THE SECURITIZATION LAW." The 2017 Restructuring Bonds represent the fifth issuance of restructuring bonds by the Issuer. See "— *Prior Transactions*" and "THE SECURITIZATION LAW — Prior Transactions." |
| *Seller:* | The Authority is a corporate municipal instrumentality and a political subdivision of the State of New York. The Authority has a wholly-owned subsidiary, the Long Island Lighting Company (described below), which does business under the names of LIPA and Power Supply Long Island. |
| *Servicer and its Service Area; Administrator:* | LIPA provides electric transmission and distribution services in a geographical area which includes the New York Counties of Nassau and Suffolk (with certain limited exceptions) and a small portion of Queens County, New York known as the Rockaways. As described in this Official Statement, the Authority and LIPA have entered into agreements with third parties to provide the service and maintenance functions in connection with their operations. |
| | LIPA's service area includes approximately 1.1 million customers and during the period 2012 through 2016 experienced its peak usage of approximately 5,602 MW in the summer of 2013. In the year ending December 31, 2016, approximately 55.0% of LIPA's annual retail revenues were received from residential customers, 43.1% from commercial customers and 1.9% from street lighting, public authorities and certain others. The largest customer in the Service Area (the Long Island Rail Road) accounted for less than 2.0% of total sales and less than 2.0% of revenue. |
| | LIPA, acting as initial servicer pursuant to the Servicing Agreement (as described herein), and any Successor Servicer as provided by Financing Order No. 5 (as |

i

described herein), will be responsible for the servicing of the 2017 Restructuring Property, including the billing and collection of the 2017 Restructuring Charges securing the 2017 Restructuring Bonds on behalf of the Issuer. LIPA also acts as servicer with respect to the Prior Restructuring Property (as defined herein), pursuant to separate servicing agreements.

The Issuer and LIPA will also enter into an Administration Agreement (the "Administration Agreement") pursuant to which LIPA, acting as Administrator, will perform certain duties on behalf of the Issuer.

*LIPA's Relationship with the Authority and Service Providers:*

The Authority and LIPA are parties to a Financing Agreement (the "Financing Agreement") providing for their respective duties and obligations relating to the financing and operation of the retail electric business in the Service Area. Pursuant to the terms of the Financing Agreement, LIPA conducts the electric business in the Service Area and is responsible for providing service to customers in the Service Area. In order to assist the Authority (acting through LIPA) in providing electric service in the Service Area, the Authority and LIPA have entered into operating agreements, the purpose of which is to provide the Authority and LIPA with the operating personnel and a significant portion of the power supply resources necessary for LIPA to continue to provide electric service in the Service Area. Since January 1, 2014, PSEG Long Island, a wholly-owned subsidiary of PSEG dedicated to LIPA's operations, has provided the T&D System management services including, among other functions, the day-to-day operation and maintenance of the T&D System, customer service, billing and collection, meter reading and forecasting. These services include many of the services that LIPA has contracted to perform as Servicer. Under the OSA (as defined herein), the PSEG Long Island management company is the contracting entity with LIPA and consists of approximately 20 employees, while its wholly-owned subsidiary, the PSEG Long Island service company, consists of approximately 2,350 employees. PSEG Long Island as used herein generally refers to both the management company and the service company, collectively.

*Transaction Overview:*

On June 21, 2013, the New York State Assembly and Senate passed the LIPA Reform Act which, among other things, allows for the retirement of certain outstanding indebtedness of the Authority through the issuance of restructuring bonds by the Issuer. The LIPA Reform Act was signed by the Governor of the State of New York on July 29, 2013, and on August 28, 2013, the time for filing any challenges to the LIPA Reform Act expired with no such challenges having been filed.

On March 30, 2015, the New York State Assembly and Senate adopted Chapter 58 of the Laws of New York, 2015, which amended the Securitization Law to allow for additional issuances of restructuring bonds. On April 13, 2015, the Governor signed such Chapter 58 into law. On May 13, 2015, the time for filing any challenges to the LIPA Reform Act, as amended by such Chapter 58, expired and no such challenges were filed.

Prior to being amended in 2015, the Securitization Law permitted only one issuance of restructuring bonds by the Issuer. In December 2013, the Issuer issued $2,022,234,000 of its Restructuring Bonds, Series 2013T and Series 2013TE (the "2013 Restructuring Bonds").

The Securitization Law, as amended by Chapter 58, permits the Authority's Board of Trustees (the "Authority Trustees") to adopt additional financing orders to, among other things, authorize the creation of additional restructuring property and the issuance of additional restructuring bonds secured by such additional restructuring property in an aggregate amount not to exceed $4.5 billion (inclusive of the 2013 Restructuring Bonds). The Issuer has subsequently issued, pursuant to three subsequent financing orders, three series of restructuring bonds

in an aggregate principal amount of $2,108,205,000, which, after taking into account the 2013 Restructuring Bonds, allows for the issuance of $369,471,000 of additional restructuring bonds under the Securitization Law. See "THE SECURITIZATION LAW — Prior Transactions."

The 2017 Restructuring Bonds are being issued pursuant to Financing Order No. 5. Financing Order No. 5 was approved by the New York Public Authorities Control Board ("PACB") on September 20, 2017 and became irrevocable, final and non-appealable on October 20, 2017. The 2017 Restructuring Property (as defined herein) created by Financing Order No. 5 includes the irrevocable right to impose, bill and collect the 2017 Restructuring Charges (as defined herein) from all Customers (as defined herein).

The Authority is authorized to use the proceeds from the sale of the 2017 Restructuring Property to purchase, redeem, repay or defease certain of its outstanding debt ("Refunded Debt"). See "THE FINANCING ORDER— General; Creation of 2017 Restructuring Property; Irrevocability" in this Official Statement.

The primary transactions underlying the offering of the 2017 Restructuring Bonds are as follows:

- The Issuer will issue the 2017 Restructuring Bonds and use the proceeds thereof to pay the purchase price of the 2017 Restructuring Property to the Authority and to pay costs of issuance and related costs ("Upfront Financing Costs," as further described herein). The 2017 Restructuring Property will serve as the primary security for the 2017 Restructuring Bonds.

- The Authority will use the proceeds from the sale of the 2017 Restructuring Property to purchase, redeem, repay or defease the Refunded Debt.

- LIPA will act as the initial servicer of the 2017 Restructuring Property pursuant to the terms of the Servicing Agreement (as described herein). As described in more detail herein, pursuant to the OSA, PSEG Long Island, among other things, performs the billing and collections, meter reading and forecasting required of the Servicer under the Servicing Agreement.

The 2017 Restructuring Bonds are not obligations of the Trustee, the Authority, LIPA, PSEG Long Island or any of their affiliates. The 2017 Restructuring Bonds are also not a debt and do not constitute a pledge of the faith and credit or taxing power of the State of New York or of any county, municipality, or any other political subdivision, agency or instrumentality of the State of New York other than the Issuer.

*Prior Transactions:*   The Issuer has previously issued five series of restructuring bonds (the "Prior Restructuring Bonds") pursuant to four restructuring cost financing orders (the "Prior Financing Orders") adopted by the Authority.  The Issuer used the proceeds of the Prior Restructuring Bonds authorized by the Prior Financing Orders to purchase the restructuring property created by the related Prior Financing Order (each restructuring property created pursuant to each Prior Restructuring Order is a "Prior Restructuring Property" and all are collectively referred to herein as the "Prior Restructuring Properties"), including related restructuring charges (the restructuring charges related to the Prior Restructuring Property created by each Prior Restructuring Order being referred to herein as "Prior Restructuring Charges").  The Prior Restructuring Property created by each Prior Financing Order was pledged by the Issuer to the payment of the related Prior Restructuring Bonds. The Authority used the net proceeds from the sale of each Prior Restructuring Property to retire debt and other obligations of the Authority. **The Prior Restructuring Property created pursuant to each**

**Prior Financing Order secures only the related Prior Restructuring Bonds and does not secure the other Prior Restructuring Bonds or the 2017 Restructuring Bonds.** Pursuant to the Prior Financing Orders, the Issuer issued $4,130,529,000 aggregate amount of restructuring bonds.

| Prior Financing Order and Date of Adoption | Related Prior Restructuring Bonds | Original Principal Amount |
|---|---|---|
| Financing Order No. 1, adopted October 3, 2013 | Series 2013T and Series 2013TE | $2,022,324,000 |
| Financing Order No. 2, adopted June 26, 2015 | Series 2015 (the "2015 Restructuring Bonds") | $1,002,115,000 |
| Financing Order No. 3, adopted June 26, 2015 | Series 2016A (the "2016A Restructuring Bonds") | $636,770,000 |
| Financing Order No. 4, adopted June 26, 2015 | Series 2016B (the "2016B Restructuring Bonds") | $469,320,000 |

*2017 Restructuring Bond Structure:*

The 2017 Restructuring Bonds will be issued in one series, which is secured by the 2017 Collateral (as defined herein).

The 2017 Restructuring Bonds will be issued in tranches. Tranche-1 through Tranche-16 are Serial Bonds under the Indenture and Tranche-17 through Tranche-28 are Term Bonds under the Indenture. The 2017 Restructuring Bonds with a Final Maturity Date prior to December 15, 2030 are not subject to redemption prior to maturity at the option of the Issuer. The 2017 Restructuring Bonds with a Final Maturity Date on or after December 15, 2030 are subject to redemption prior to maturity at the option of the Issuer beginning on December 15, 2027. See "THE 2017 RESTRUCTURING BONDS—Redemption" in this Official Statement.

The 2017 Restructuring Bonds are scheduled to pay principal semi-annually and sequentially. See "THE 2017 RESTRUCTURING BONDS—Expected Amortization Schedule" in this Official Statement.

*Use of Proceeds:*

The 2017 Restructuring Bonds are being issued to provide the Issuer with funds to purchase the 2017 Restructuring Property from the Authority and to pay the Upfront Financing Costs. The Authority will use the sales proceeds of the 2017 Restructuring Property to retire the Refunded Debt. See "PLAN OF FINANCE AND USE OF PROCEEDS" in this Official Statement.

*True-Up Adjustment Mechanism:*

As required by the Securitization Law and Financing Order No. 5, the 2017 Restructuring Charges will be adjusted at least annually and, if determined by the Servicer in connection with a mid-year review process to be necessary, semi-annually or more frequently, to ensure that the expected collections of the 2017 Restructuring Charges are adequate to timely pay all scheduled payments of principal and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs when due. In addition, if, after the mid-year review process, the Servicer determines that an adjustment is not required, the Servicer may voluntarily elect to adjust the 2017 Restructuring Charges to correct for over-collections. Following the last Scheduled Maturity Date of the 2017 Restructuring Bonds, if any such 2017 Restructuring Bonds remain outstanding after such Scheduled Maturity Date, the Servicer is also required to make True-Up Adjustments quarterly to ensure that Charge Collections will be sufficient to pay timely principal and interest, and all other Ongoing Financing Costs, due on the next Payment Date. Financing Order No. 5 also permits the Servicer to make True-Up Adjustments more frequently at any time as necessary to ensure the

timely scheduled payments of principal and interest on the 2017 Restructuring Bonds, and all other Ongoing Financing Costs when due. Financing Order No. 5 does not cap the level of 2017 Restructuring Charges that may be imposed on Customers as a result of the True-Up Adjustments. Through the True-Up Adjustment, all Customers cross share in the liabilities of all other Customers for the payment of 2017 Restructuring Charges. See "THE FINANCING ORDER—True-Up Adjustment Mechanism" in this Official Statement.

*Nonbypassable 2017 Restructuring Charges:*

The Securitization Law mandates that the 2017 Restructuring Charges are irrevocable, nonbypassable consumption-based charges. "Nonbypassable" means that the 2017 Restructuring Charges shall be collected from Customers, as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, even if such Customer also produces some of its own electricity or purchases electric generation services from a provider of electric generation services who is not the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA. Certain Customers that self-generate eligible renewable power will only be responsible for paying 2017 Restructuring Charges based upon their "net-billed" consumption. See "THE FINANCING ORDER—Collection of 2017 Restructuring Charges; Nonbypassability" and "RISK FACTORS—Customer and Delivery Related Risks" in this Official Statement.

*State Pledge:*

The State has pledged in the Securitization Law that it will not in any way take or permit any action that limits, alters or impairs the value of the 2017 Restructuring Property, or, except as required by the True-Up Adjustment mechanism, reduce, alter, or impair the 2017 Restructuring Charges to be imposed, collected and remitted to Holders until the principal and interest in connection with the 2017 Restructuring Bonds and all other Ongoing Financing Costs have been paid and performed in full. See "THE SECURITIZATION LAW—State Pledge" and "RISK FACTORS" in this Official Statement.

*Trustee:*

The Bank of New York Mellon. See "THE TRUSTEE" in this Official Statement for a description of the Trustee and its duties and responsibilities under the Indenture.

*Servicing Fee:*

The annual servicing fee (the "Servicing Fee") relating to the 2017 Restructuring Bonds payable to LIPA, as the initial Servicer, or to any Successor Servicer affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets, shall be 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds. In addition, the Servicer will also be reimbursed for its expenses incurred in carrying out its obligations under the Servicing Agreement. The annual Servicing Fee for any Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets may be higher than the Servicing Fee for LIPA; provided, however, that any Servicing Fee in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be subject to approval by the Authority and the Trustee.

*Parties to Transaction and Responsibilities:*

The following chart represents a general summary of the parties to the transactions underlying the offering of the 2017 Restructuring Bonds, their roles and their various relationships to the other parties:



*Flow of Funds to Bondholders:*    The following chart represents a general summary of the flow of Customer payments (including 2017 Restructuring Charges as well as other charges which are not security for the 2017 Restructuring Bonds, including the Prior Restructuring Charges, which are distributed from the Allocation Account described below to the trustees for each of the Prior Restructuring Bonds).

*Priority of Payments:*    On each Payment Date, or for any amount payable under clauses (i) through (iv) below, on any Business Day upon which the Trustee receives a written request from the Administrator stating that any of such Operating Expenses payable by the Issuer will become due and payable prior to the next succeeding Payment Date, the Trustee shall pay or allocate all amounts on deposit in the Collection Account (other than amounts on deposit in the Debt Service Reserve Subaccount, which shall be applied solely to amounts payable under clauses (v) through (vii) below), including all earnings thereon, to pay the following amounts, in accordance with the Semi-annual Servicer Certificate, in the following priority:

        (i)     all fees, costs, expenses (including legal fees and expenses) and, to the extent not in excess of $800,000 in each calendar year, indemnity amounts owed by the Issuer to the Trustee

under the applicable Basic Documents shall be paid to the Trustee,

(ii) the Servicing Fee for such Payment Date and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees not in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(iii) the Administration Fee and all unpaid Administration Fees from prior Payment Dates shall be paid to the Administrator,

(iv) the payment of all other Operating Expenses (other than as provided in clauses (viii) and (ix) below) for such Payment Date shall be paid to the Persons entitled to such payment,

(v) (A) first, any overdue interest (together with, to the extent lawful, interest on such overdue interest at the applicable Bond Interest Rate) and (B) second, interest due on such Payment Date shall be paid to the Holders,

(vi) principal due and payable on the 2017 Restructuring Bonds as a result of an Event of Default (assuming the 2017 Restructuring Bonds have been declared immediately due and payable) or on the Final Maturity Date of a tranche of the 2017 Restructuring Bonds shall be paid to the Holders,

(vii) principal for such Payment Date will be paid to the Holders in accordance with the priorities described in "THE 2017 RESTRUCTURING BONDS—Principal of the 2017 Restructuring Bonds" in this Official Statement,

(viii) indemnity amounts owed by the Issuer to the Trustee to the extent in excess of $800,000 in each calendar year shall be paid to the Trustee and premiums for directors' and officers' liability insurance for trustees and officers of the Issuer shall be paid to the provider of such insurance, or, if such premium is paid by the Administrator pursuant to the Administration Agreement, the amount of such premium shall be paid to the Administrator in reimbursement thereof,

(ix) the Servicing Fee for such Payment Date, and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(x) the amount, if any, by which the Required Debt Service Reserve Level (as defined herein) exceeds the amount in the Debt Service Reserve Subaccount (as defined herein) as of such Payment Date will be paid or allocated to the Debt Service Reserve Subaccount,

(xi) the amount, if any, by which the Required Operating Reserve Level (as defined herein) exceeds the amount in the Operating Reserve Subaccount (as defined herein) as of such Payment Date will be paid or allocated to the Operating Reserve Subaccount,

(xii) the amount, if any, by which the amount in the Debt Service Reserve Fund exceeds the Required Debt Service Reserve

Level on any Payment Date shall be retained in the Debt Service Reserve Fund until the next Payment Date, at which time such excess amount in the Debt Service Reserve Fund shall be applied to the payment of amounts then due under clauses (v) through (vii) above prior to any other monies available for such purpose and, to the extent that such excess amount exceeds amounts then due under such clause on such next Payment Date, such excess amount shall continue to be held in the Debt Service Reserve Fund and shall be applied under such clauses (v) through (vii) above prior to any other monies available for such purpose on succeeding Payment Dates until fully applied; and

(xiii)   the balance, if any, will be paid or allocated to the Excess Funds Subaccount (as defined herein) for distribution on subsequent Payment Dates.

See "SECURITY FOR THE 2017 RESTRUCTURING BONDS—How Funds in the Collection Account Will Be Allocated" in this Official Statement.

*Security:*

The 2017 Restructuring Bonds are secured only by the 2017 Collateral, consisting primarily of the 2017 Restructuring Property and funds on deposit in the Collection Account for the 2017 Restructuring Bonds and related subaccounts (except for the Upfront Financing Costs Subaccount). The 2017 Collateral does not include the Prior Restructuring Properties, including any of the Prior Restructuring Charges, or any other restructuring property created or any other restructuring charges imposed by any financing orders other than Financing Order No. 5.

The 2017 Restructuring Property consists primarily of the irrevocable contract right to impose, bill, and collect the nonbypassable consumption-based 2017 Restructuring Charges from all existing and future retail electric customers taking electric transmission or distribution service within the Service Area (as defined herein) from LIPA, the Authority or any of its successors or assignees ("Customers"). For a description of the 2017 Restructuring Property and the 2017 Restructuring Charges, see "THE 2017 RESTRUCTURING PROPERTY" in this Official Statement.

*Credit Ratings:*

The Issuer expects the 2017 Restructuring Bonds will receive credit ratings of "Aaa (sf)" by Moody's, "AAA (sf)" by S&P, and "AAAsf" by Fitch. It is a condition to the issuance of the 2017 Restructuring Bonds that such ratings are received.

*Minimum Denomination:*

$5,000 or any integral multiples thereof.

*Reports to Bondholders:*

Pursuant to the Servicing Agreement and the Continuing Disclosure Agreement, the Servicer will provide regular reports prepared by the Servicer containing information concerning, among other things, the Issuer and the 2017 Collateral. See "CONTINUING DISCLOSURE."

*Payment Dates and Interest Accrual:*

Semi-annually, June 15 and December 15. Interest will be calculated on a 30/360 basis. The first scheduled Payment Date is June 15, 2018. If a Payment Date is not a Business Day, then payment will be made on the next Business Day without additional interest.

*Scheduled Maturity Dates and Final Maturity Dates:*

A scheduled principal payment amount of the 2017 Restructuring Bonds is payable on each Payment Date, as shown herein. Failure to pay a scheduled principal payment on any Payment Date or the entire outstanding amount of the 2017 Restructuring Bonds of any tranche by the final Scheduled Maturity Date will not result in a default with respect to that tranche. The failure to pay the

|  | entire outstanding principal balance of the 2017 Restructuring Bonds of any tranche will result in a default only if such payment has not been made by the Final Maturity Date for the tranche. |
|---|---|
| *Tax Treatment:* | Interest on the 2017 Restructuring Bonds is excluded from gross income for federal income tax purposes. Interest on the 2017 Restructuring Bonds is exempt from personal income taxes imposed by the State of New York or any political subdivision thereof. See "TAX MATTERS" in this Official Statement. |
| *Restructuring Charges as a Portion of Customers' Total Electric Bill:* | The initial 2017 Restructuring Charge for the 2017 Restructuring Bonds is expected to represent approximately 0.81% of the total bill received by an average 1,000 kWh residential Customer. Combined with the Prior Restructuring Charges, the restructuring charges are expected to represent approximately 9.46% of the total bill received by an average 1,000 kWh residential Customer. |
| *Expected Settlement:* | The closing will be on or about November 21, 2017, settling through DTC. |
| *Legality for Investment:* | Pursuant to the Securitization Law, the 2017 Restructuring Bonds are legal investments for all governmental units, financial institutions, insurance companies, fiduciaries, and other persons located in the State that require statutory authority regarding legal investment. |
| *Risk Factors:* | **Potential investors should consider carefully the risk factors beginning on page 62 of this Official Statement before investing in the 2017 Restructuring Bonds.** |

[THIS PAGE INTENTIONALLY LEFT BLANK]

**$369,465,000**
**UTILITY DEBT SECURITIZATION AUTHORITY**
**RESTRUCTURING BONDS, SERIES 2017**

### INTRODUCTORY STATEMENT

This Official Statement is provided to furnish information in connection with the issuance by the Issuer of its $369,465,000 2017 Restructuring Bonds. The 2017 Restructuring Bonds will be issued pursuant to the Indenture. Terms not defined elsewhere herein are used as defined in Appendix A hereto.

The 2017 Restructuring Bonds will be secured primarily by the 2017 Restructuring Property, which will primarily consist of the Authority's irrevocable right to impose, bill and collect a nonbypassable consumption-based 2017 Restructuring Charge from Customers. See "THE 2017 RESTRUCTURING PROPERTY." 2017 Restructuring Charges are set and periodically adjusted, as discussed below, to collect amounts sufficient to pay principal of and interest on the 2017 Restructuring Bonds on a timely basis and all other Ongoing Financing Costs. See "THE FINANCING ORDER—True-Up Adjustment Mechanism."

The 2017 Restructuring Charges will be collected by (or on behalf of) LIPA, as the initial Servicer, pursuant to the terms of a Servicing Agreement between LIPA and the Issuer. As described herein, the Authority and LIPA have entered into operating agreements, the purpose of which is to provide the Authority and LIPA with the operating personnel and a significant portion of the power supply resources necessary for LIPA to continue to provide electric service in the Service Area. Since January 1, 2014, PSEG Long Island has been the T&D System manager pursuant to the OSA (as defined herein). As used herein, the term "OSA" means the Amended and Restated Operations Services Agreement by and between LIPA and PSEG Long Island, as may be further amended and in effect from time to time. As T&D System manager, PSEG Long Island performs a number of the functions that would otherwise be performed by the Servicer as described in more detail herein. See "SERVICER AND ADMINISTRATOR—Servicing the 2017 Restructuring Bonds" in this Official Statement.

Brief descriptions of the Issuer, the Authority, LIPA, the Securitization Law, Financing Order No. 5, the 2017 Restructuring Bonds, the Sale Agreement, the Servicing Agreement, the Administration Agreement, and the Indenture are included in this Official Statement. Those descriptions and summaries do not purport to be comprehensive or definitive. Certain information relating to DTC and the book-entry only system has been furnished by DTC. Appendix B, Appendix C, and Appendix D contain the proposed forms of certain opinions to be delivered in connection with the issuance and delivery of the 2017 Restructuring Bonds. The descriptions of the 2017 Restructuring Bonds and other documents are qualified in their entirety by reference to them. Copies of documents relating to the 2017 Restructuring Bonds may be obtained at the designated office of the Trustee, 101 Barclay Street-Floor 7-West, New York, New York 10286.

### PLAN OF FINANCE AND USE OF PROCEEDS

The proceeds of the 2017 Restructuring Bonds will be used by the Issuer to pay to the Authority the purchase price of the 2017 Restructuring Property and to pay certain Upfront Financing Costs. The Authority will use the monies received from the sale of the 2017 Restructuring Property to purchase, redeem, repay or defease the Refunded Debt.

Upfront Financing Costs incurred in connection with the issuance and sale of the 2017 Restructuring Bonds and the creation and acquisition of the 2017 Restructuring Property, net of underwriting discounts and commissions of $1,783,590.12, net of the deposit to the Operating Reserve Subaccount of $1,847,325.00 and net of the deposit to the Debt Service Reserve Subaccount of $5,541,975.00, are estimated to be approximately $1,196,617.56. The Operating Reserve Subaccount will be funded directly by a deposit made by Authority from its own available moneys to the Trustee. In addition, to the extent actual Upfront Financing Costs exceed the amount of proceeds of the 2017 Restructuring Bonds available to pay such Upfront Financing Costs, the Authority will make an additional contribution to pay such amount.

### THE SECURITIZATION LAW

**Background**

On June 21, 2013, the New York State Assembly and Senate passed the LIPA Reform Act, codified as Chapter 173, Laws of New York. The Securitization Law is Part B of the LIPA Reform Act. The Securitization Law was signed on July 29, 2013, and on August 28, 2013, the time for filing any challenges to the LIPA Reform Act

expired and no such challenges were filed. On March 30, 2015, the New York State Assembly and Senate adopted Chapter 58 of the Laws of New York, 2015 to permit, among other things, the adoption by the Authority Trustees of additional restructuring resolutions and the issuance by the Issuer of additional restructuring bonds in an aggregate principal amount not to exceed $4.5 billion less any previously issued restructuring bonds. On April 13, 2015, the Governor signed such Chapter 58 into law. On May 13, 2015, the time for filing any challenges to the LIPA Reform Act, as amended by such Chapter 58, expired and no such challenges were filed. The Securitization Law allows the Authority to finance the redemption, payment and retirement of its Refunded Debt through the issuance of restructuring bonds by the Issuer. The Authority, acting through LIPA, provides electric service in its service area which includes two counties on Long Island, New York ("Long Island") – Nassau County ("Nassau County") and Suffolk County ("Suffolk County") (except for the Nassau County villages of Freeport and Rockville Centre and the Suffolk County village of Greenport, each of which has its individually-owned municipal electric system) – and a portion of the Borough of Queens of The City of New York known as the Rockaways (the "Service Area"). For purposes of the 2017 Restructuring Bond financing, the "Service Area" is defined by the Securitization Law and is set as the service area of LIPA as of July 29, 2013.

**Purpose of Securitization Law**

The Securitization Law created the Issuer. The purpose of the Securitization Law is to provide a legislative foundation for its issuance of restructuring bonds to allow the Authority to retire a portion of its outstanding indebtedness. The issuance of restructuring bonds, including the 2017 Restructuring Bonds, and the retirement of certain of the Authority's indebtedness are expected to result in savings to Customers on a net present value basis.

**Authorization of Restructuring Bonds Pursuant to Irrevocable Financing Orders**

The Securitization Law authorizes the Authority to adopt financing orders approving the issuance of restructuring bonds. The Securitization Law also provides that any financing order will be irrevocable after the time for any appeal to such financing order has lapsed. The Securitization Law requires that the proceeds of the restructuring bonds be used by the Issuer to purchase restructuring property from the Authority and to pay or fund upfront financing costs. It also requires that the Authority use the proceeds of the restructuring bonds it receives from its sale of the restructuring property to the Issuer only to pay approved restructuring costs which include, according to Financing Order No. 5, the costs of repurchasing, redeeming, repaying or defeasing certain of the Authority's outstanding indebtedness and upfront financing costs, and if funds remain after the approved restructuring costs are paid, to refund or credit to consumers any such surplus, to the extent practical.

**Prior Transactions**

As authorized by the Securitization Law, as amended by Chapter 58 of the Laws of New York 2015, the Issuer has previously issued five series of restructuring bonds (the "Prior Restructuring Bonds") pursuant to four restructuring cost financing orders (the "Prior Financing Orders") adopted by the Authority. The Issuer used the proceeds of the Prior Restructuring Bonds authorized by the Prior Financing Orders to purchase the restructuring property created by the related Prior Financing Order (each restructuring property created pursuant to each Prior Restructuring Order is a "Prior Restructuring Property" and all are collectively referred to herein as the "Prior Restructuring Properties"), including related restructuring charges (the restructuring charges related to the Prior Restructuring Property created by each Prior Restructuring Order being referred to herein as "Prior Restructuring Charges"). The Prior Restructuring Property created by each Prior Financing Order was pledged by the Issuer to the payment of the related Prior Restructuring Bonds. The Authority used the net proceeds from the sale of each Prior Restructuring Property to retire debt and other obligations of the Authority. **The Prior Restructuring Property created pursuant to each Prior Financing Order secures only the related Prior Restructuring Bonds and does not secure the other Prior Restructuring Bonds or the 2017 Restructuring Bonds.**

[Remainder Intentionally Blank]

2

Pursuant to the Prior Financing Orders, the Issuer issued $4,130,529,000 aggregate principal amount of restructuring bonds.

| Prior Financing Order and Date of Adoption | Related Prior Restructuring Bonds | Original Principal Amount |
|---|---|---|
| Financing Order No. 1, adopted October 3, 2013 | Series 2013T and Series 2013TE | $2,022,324,000 |
| Financing Order No. 2, adopted June 26, 2015 | Series 2015 (the "2015 Restructuring Bonds") | $1,002,115,000 |
| Financing Order No. 3, adopted June 26, 2015 | Series 2016A (the "2016A Restructuring Bonds") | $636,770,000 |
| Financing Order No. 4, adopted June 26, 2015 | Series 2016B (the "2016B Restructuring Bonds") | $469,320,000 |

The issuance of the 2017 Restructuring Bonds will effectively exhaust the Issuer's authority to issue restructuring bonds under the amended Securitization Law. Any additional issuances of restructuring bonds would require legislative action and would be separately secured by distinct collateral pursuant to a new financing order and new transaction documents, including a separate trust indenture.

**2017 Restructuring Property**

The Securitization Law authorizes the creation and sale of restructuring property which will include the irrevocable right to impose, bill and collect restructuring charges from Customers. The 2017 Restructuring Bonds are secured by and payable from the restructuring property created by Financing Order No. 5 (the "2017 Restructuring Property").

**True-Up Adjustment Mechanism**

The Securitization Law requires the Authority to include in any financing order a mechanism requiring that restructuring charges be reviewed and adjusted at least annually and if determined to be necessary, semi-annually or more frequently, to ensure that the expected collection of the restructuring charges is adequate to timely pay all scheduled payments of principal and interests on the applicable restructuring bonds and all other ongoing financing costs when due. The Securitization Law provides that, once restructuring bonds are issued, any adjustments to the related restructuring charge may only be challenged as to mathematical errors in the calculation. See "THE FINANCING ORDER—True-Up Adjustment Mechanism" and "THE SERVICING AGREEMENT—True-Up Adjustment Process" herein.

**2017 Restructuring Charges are Nonbypassable**

The Securitization Law provides that the 2017 Restructuring Charges are irrevocable and nonbypassable. "Nonbypassable" as set forth in the Securitization Law and Financing Order No. 5 means that a Customer is obligated to pay 2017 Restructuring Charges and may not avoid payment of such charges as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, even if such Customer produces its own electricity or purchases electric generation services from a provider of electric generation services who is not the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA. Customers that self-generate eligible renewable power will only be responsible for paying 2017 Restructuring Charges based upon their "net-billed" consumption. See "THE 2017 RESTRUCTURING PROPERTY" in this Official Statement.

**No Right of Set-Off; Partial Payment of Customer Charges**

The obligation to pay the restructuring charges, including the 2017 Restructuring Charges, is not subject to any right of set-off in connection with the bankruptcy of the Servicer or any other entity. If any Customer does not pay the full amount of any bill to the Servicer, the amount paid by the Customer will be applied pro rata between the restructuring charges and the other charges, based on the percentage of the overall bill of such charges, unless the Customer specifies that a greater proportion of such payment is to be allocated to the restructuring charges, except that other charges are to be reduced by the amount of any set-off, counterclaim, surcharge or defense.

**State Pledge**

As a provision of the Securitization Law, the State has pledged to and agreed with the Issuer, the Authority, the Holders, and other Financing Parties that, until the 2017 Restructuring Bonds and any Ancillary Agreements have been paid and performed in full, the State shall not:

(1)     take or permit any action that limits, alters or impairs the value of the 2017 Restructuring Property,

(2)     in any way impair the rights and remedies of the Authority, the Issuer, LIPA, the Holders or any other Financing Parties or the security for such 2017 Restructuring Bonds or Ancillary Agreements, or

(3)     except as permitted in connection with a true-up adjustment mechanism authorized by the Securitization Law and set forth in Financing Order No. 5, reduce, alter, or impair 2017 Restructuring Charges that are to be imposed, collected, and remitted for the benefit of the Authority, the Issuer, the Holders and other Financing Parties, as applicable, until any and all principal and interest, all other Ongoing Financing Costs and all amounts to be paid to any assignee or Financing Party under any Ancillary Agreement in connection with the 2017 Restructuring Bonds have been fully paid or performed in full. See "RISK FACTORS."

**Trustee's Lien on 2017 Restructuring Property Protected**

The Securitization Law provides that the lien on the 2017 Restructuring Property will be perfected, valid and binding from the time when the pledge is made. The pledge is made in favor of the Trustee for the benefit of the Bondholders. The security interest will attach without any physical delivery of collateral or other act and such security interest shall (i) be valid, binding and perfected against all parties having claims of any kind in tort, contract or otherwise, regardless of whether the parties have notice of the lien and (ii) constitute a continuously perfected security interest and have priority over any other lien, created by operation of law or otherwise, that may subsequently attach to the 2017 Restructuring Property or those rights or interests.

The Securitization Law provides that the priority of security interests in the 2017 Restructuring Property will not be affected by:

- commingling of funds arising from 2017 Restructuring Charges with other funds, or

- any application of the True-Up Adjustment under Financing Order No. 5.

See "RISK FACTORS—Risks Associated with the Unusual Nature of the 2017 Restructuring Property."

**Right of Sequestration**

The Securitization Law provides that if the Authority, LIPA or any third-party biller defaults in the required payment of 2017 Restructuring Charges collected by it, a New York court, upon application by an interested party and without limiting any other remedies available to that applicant, is required to order the sequestration and payment of the collections for the benefit of Bondholders, any assignee, and any Financing Party.

**Transfer Characterized as True Sale**

The Securitization Law provides that, if the governing documentation in a transaction approved in a financing order states that the transfer is a sale or other absolute transfer, the Authority's transfer of the 2017 Restructuring Property to the Issuer is a "true sale" under New York law and not a pledge or other financing (other than for federal, state and local income and franchise tax purposes). See "THE SALE AGREEMENT" and "RISK FACTORS—Risks Associated with Potential Bankruptcy Proceedings." The Securitization Law also provides that the characterization of the sale, assignment or transfer as an absolute transfer and true sale and the corresponding characterization of the property interest of the Issuer shall not be adversely affected or impaired by, among other things, the occurrence of any of the following:

- commingling of revenues or other proceeds from 2017 Restructuring Charges with other amounts,

- retention by the Seller of a partial or residual interest in the 2017 Restructuring Property or the right to recover costs associated with taxes, payments in lieu of taxes, franchise fees or license fees imposed on the collection of 2017 Restructuring Charges,

- any recourse that the Issuer may have against the Seller,

- any indemnification rights, obligations or repurchase rights made or provided by the Seller,

- the obligation of the Seller to collect 2017 Restructuring Charges on behalf of an assignee,
- the treatment of the sale, assignment or transfer for tax, financial reporting or other purposes,
- any subsequent order of the Seller amending Financing Order No. 5, or
- any application of the True-Up Adjustment mechanism provided in the Securitization Law.

**Transfer and Ownership of 2017 Restructuring Property is Tax Exempt**

The Securitization Law provides that the transfer and ownership of 2017 Restructuring Property and the imposition, billing, and collection of 2017 Restructuring Charges are exempt from all taxes and similar charges imposed by the State or any county, municipal corporation, school district, local authority or other subdivision.

### THE FINANCING ORDER

**General; Creation of 2017 Restructuring Property; Irrevocability**

The 2017 Restructuring Bonds will be issued pursuant to Financing Order No. 5. Financing Order No. 5 permits the Issuer to issue, in one or more series, additional restructuring bonds in an aggregate amount not to exceed $369,471,000, the remaining amount authorized by the Securitization Law. Financing Order No. 5 authorizes: (a) the creation of the 2017 Restructuring Property, (b) the sale of the 2017 Restructuring Property by the Authority to the Issuer, (c) the imposition, billing and collection of the 2017 Restructuring Charges on, to and from the Customers in the Service Area, (d) the issuance and sale of restructuring bonds in an aggregate principal amount not to exceed the Remaining Authorized Amount, (e) the use by the Issuer of the proceeds from the sale of the 2017 Restructuring Bonds to pay the purchase price of the 2017 Restructuring Property and the Upfront Financing Costs, and (f) the use by the Authority of the proceeds of the sale of the 2017 Restructuring Property to purchase, redeem, repay, or defease the Refunded Debt. The Securitization Law required the Authority to submit Financing Order No. 5 to the PACB for its approval. The PACB approved Financing Order No. 5 on September 20, 2017. The PACB has no authority to reconsider Financing Order No. 5. Pursuant to the Securitization Law, Financing Order No. 5 became irrevocable, final and non-appealable on October 20, 2017.

Under Financing Order No. 5, the Servicer has the right to impose, bill and collect (on behalf of the Issuer) 2017 Restructuring Charges, which right is included in the 2017 Restructuring Property sold to the Issuer. As provided in the Securitization Law, Financing Order No. 5 is irrevocable and is not subject to modification or termination, and acknowledges that the State of New York has pledged not to take or permit any action that limits, alters or impairs the value of the 2017 Restructuring Property or, except as required by the true-up adjustment mechanism, reduce, alter or impair the 2017 Restructuring Charges that are imposed, billed or collected for the benefit of the Bondholders, any assignee, and any Financing Parties until all principal of and interest on the 2017 Restructuring Bonds, all other Ongoing Financing Costs, and all amounts to be paid to an assignee or Financing Party under certain agreements entered into in connection with the 2017 Restructuring Bonds are paid or performed in full. See "RISK FACTORS."

**Collection of 2017 Restructuring Charges; Nonbypassability**

Financing Order No. 5 provides that the Customers are responsible for paying the 2017 Restructuring Charges as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, even if such Customer produces its own electricity or purchases electric generation services from a provider of electric generation services other than the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA. Financing Order No. 5 authorizes the Servicer to collect 2017 Restructuring Charges from such Customers. See "SERVICER AND ADMINISTRATOR—Revenues, LIPA's Customer Bases and Electric Energy Consumption—Electricity Delivered to Customers, Total Electricity Delivery Service Revenues and Customers." Certain Customers that self-generate eligible renewable power will only be responsible for paying 2017 Restructuring Charges based upon their "net-billed" consumption.

The Authority's tariff provides for net metering of certain residential and nonresidential customer-generators of renewable power, such as solar, wind, farm waste, micro-combined heat and power, fuel cells, micro-hydroelectric and hybrids. The amount of net metering permitted is established by the tariff. The net meters measure only the net amount of electricity provided to or by the customer-generator using the T&D System Assets.

Until recently, the tariff imposed limits on the amounts of rated generating capacity that an eligible customer-generator may have. The tariff further provided that the Authority would sign contracts with eligible customer-generators on a first come-first served basis until the total rated generating capacity of all such customer-generators

in the Service Area was equal to 153,000 kilowatts (approximately 3% percent of the Authority's reference year (2005) peak load) for non-wind customer-generators and 15,300 kilowatts for wind customer-generators. In 2014, the New York State Public Service Commission (the "PSC") has increased the cap for the regulated utilities to 6%, but more recently indicated that the appropriate mechanism to compensate customers with renewable generation is a topic for its Reforming the Energy Initiative ("REV") which was commenced in April 2014 to reform the State's energy industry and regulatory practices. The PSC ordered the regulated utilities to accept all applications for net metering without regard to a cap, while the ongoing REV proceeding establishes the appropriate compensation mechanism. On March 9, 2017, the PSC adopted the first phase of its net metering successor plan (*see* Order on Net Energy Metering Transition, Phase One of Value of Distributed Energy Resources, And Related Matters, New York Public Service Commission Case 15-E-0751 (the "Phase One Order")), which provides a new mechanism for utility compensation of certain distributed energy resources interconnected after March 9, 2017. Under the Phase One Order, large commercial customers will be compensated with a value stack comprised of values for energy, capacity, environmental, and demand reduction costs. The Phase One Order also provided that new community distributed generation projects added during the first phase should not impact each utility's net annual revenue by more than 2%. Notwithstanding the fact that the Authority is not subject to PSC jurisdiction, consistent with the PSC direction to regulated utilities, the Authority expects to implement the PSC's net metering successor plan within the Service Territory, including value stack compensation for large commercial customers. The Authority also expects to implement net metering grandfathering provisions, which as applied to the Authority will provide that (i) eligible customers interconnected or substantially interconnected by January 1, 2018 will remain as such for the life of those customers' system and (ii) eligible mass market customers who become substantially interconnected after January 1, 2018 and by January 1, 2020 will be eligible for the existing net metering framework, but with a 20-year sunset. As of the date hereof, the Authority has net metering arrangements with eligible customer-generators in the Service Area equal to approximately 5.6% of the Authority's reference year (2005) peak load. The Authority does not expect to reach the Phase One Order's 2% revenue-based cap on new community distributed generation projects and currently has only one active application from such projects.

Financing Order No. 5 does not cap any of the ongoing costs that may be recovered through the 2017 Restructuring Charge, and there is no cap on the level of 2017 Restructuring Charges that may be imposed on Customers through the true-up adjustment mechanism, which is designed to assure the expected collection of amounts required to pay scheduled principal and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs on a timely basis. Accordingly, such 2017 Restructuring Charges may continue to be imposed, billed and collected until the 2017 Restructuring Bonds and all Ongoing Financing Costs are paid in full, without any specified time limit. Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "Transition Charges" as defined in the Authority's Electric System General Revenue Bond Resolution adopted on May 13, 1998 (the "General Resolution"), and that they are not subject to the lien of the General Resolution. In addition, the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens. Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution.

**Terms of the 2017 Restructuring Bonds**

Financing Order No. 5 provides certain parameters for the issuance of the 2017 Restructuring Bonds, including that there will be a Scheduled Maturity Date and a Final Maturity Date for each tranche (that will not be more than two years following the Scheduled Maturity Date), provided that no Final Maturity Date will be later than 30 years from the date of issuance and the final scheduled maturity of any 2017 Restructuring Bonds shall be no later than the final scheduled maturity date of the Authority bonds to be purchased, redeemed or defeased with the proceeds of such 2017 Restructuring Bonds. As described below, the Issuance Advice Letter will confirm the final interest rates and certain other terms for the 2017 Restructuring Bonds.

**2017 Restructuring Charges on Customer Bills**

The Servicer will disclose on each Customer's monthly bill by a footnote or other description the amount of the 2017 Restructuring Charge or the amount of the 2017 Restructuring Charge per kWh. Such description will include a statement that the 2017 Restructuring Charge is payable to the Issuer. The calculation of the initial 2017 Restructuring Charge will be set forth in the Issuance Advice Letter. See "THE 2017 RESTRUCTURING PROPERTY—2017 Restructuring Charges."

**True-Up Adjustment Mechanism**

During the life of the 2017 Restructuring Bonds, the Servicer will calculate and adjust the 2017 Restructuring Charges at least annually (each, an "Annual True-Up Adjustment"), effective each November 15, commencing with November 15, 2018, to correct for any over-collections or under-collections to the end of the then current Annual Calculation Period (the next succeeding December 15) and to ensure that the 2017 Restructuring Charge during the period commencing on each November 15 and ending on the following November 14 is adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs due during the period beginning on the next December 16 and ending on the following December 15 (each an "Annual Calculation Period"). Before April 15, 2018 and April 15 of each year thereafter, the Servicer is also required to perform a mid-year review (each, a "Mid-Year Review") to ensure that the expected collections of 2017 Restructuring Charges are adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due and to make timely payment on all other Ongoing Financing Costs to the end of the then current Annual Calculation Period (the next succeeding December 15). If a Mid-Year Review results in a projection that the Charge Collections will be insufficient to make such payments, the Servicer must file a notice of adjustment (the "Mandatory Mid-Year True-Up Adjustment") to ensure that the 2017 Restructuring Charge during the period beginning on May 15 and ending on the following May 14 is adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs due during the period beginning on the next June 16 and ending on the following June 15 (each such period a "Mid-Year Calculation Period"). If it is determined that a Mandatory Mid-Year True-Up is not required, the Servicer may nevertheless voluntarily elect to file a notice of adjustment (i) to correct for any over-collections to date and anticipated to be experienced up to the end of the then current Mid-Year Calculation Period and (ii) to ensure that the 2017 Restructuring Charge during the period beginning on May 15 and ending on the following May 14 is adequate to pay timely principal and interest on the Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs due during the next Mid-Year Calculation Period (a "Voluntary Mid-Year True-Up Adjustment"). Any such notice of adjustment for a Mandatory Mid-Year True-Up or a Voluntary Mid-Year True-Up shall be filed no later than April 15 of such calendar year, to be effective on May 15 of such calendar year.

The Servicer may file a true-up adjustment more frequently at any time to ensure that the expected collections of the 2017 Restructuring Charges are adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs (each, an "Optional True-Up Adjustment"). In addition, following the last Scheduled Maturity Date of the 2017 Restructuring Bonds, if and so long as any such 2017 Restructuring Bonds remain outstanding after such Scheduled Maturity Date, the Servicer is also required to make such true-up adjustments quarterly to ensure that Charge Collections will be sufficient to pay timely principal and interest, and all other Ongoing Financing Costs due on the next Payment Date (each, a "Quarterly True-Up Adjustment" and, together with Annual True-Up Adjustments, Mandatory Mid-Year True-Up Adjustments, Voluntary Mid-Year True-Up Adjustments, and Optional True-Up Adjustments, a "True-Up Adjustment"). The Quarterly True-Up Adjustments will be set at levels estimated to generate revenues sufficient to pay all principal and interest on the 2017 Restructuring Bonds on the next Payment Date, together with all other Ongoing Financing Costs.

The adjustments to the 2017 Restructuring Charges will continue until principal of and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs have been paid or performed in full.

There is no cap on the amount of 2017 Restructuring Charges that may be imposed on Customers as a result of a True-Up Adjustment.

The Servicer must file with the Authority and the Issuer, approximately 30 days before the effective date of an adjustment, an Adjustment Notice to the 2017 Restructuring Charge during which period the Authority may confirm the mathematical accuracy of the Servicer's adjustment. Each True-Up Adjustment will go into effect on a bills rendered basis on a date which is no earlier than 30 days subsequent to the date of submission of the Adjustment Notice. In the event any correction is necessary to a True-Up Adjustment due to mathematical errors in the calculation of the adjustment or otherwise is necessary, the adjustment to the mathematically incorrect 2017 Restructuring Charge adjustment will take effect no sooner than the billing cycle in the month that begins at least five days after the Authority notifies the Servicer of its determination that the calculation of such True-Up Adjustment is mathematically inaccurate.

**Issuance Advice Letter**

By no later than three Business Days following the pricing date for the 2017 Restructuring Bonds and prior to their issuance, the Servicer will, as required under Financing Order No. 5, file with the Authority and the Issuer an Issuance Advice Letter, pursuant to which the Servicer will:

- calculate the expected savings to Customers from the financing,

- estimate the Ongoing Financing Costs,

- determine and specify the initial 2017 Restructuring Charge, and

- evidence the final terms on which the 2017 Restructuring Bonds will be issued.

A designee of the Authority is authorized under Financing Order No. 5 to review and approve the Issuance Advice Letter for the purpose of confirming that the stated terms are consistent with Financing Order No. 5. This designee's approval and confirmation shall constitute the Authority's approval and confirmation, and will be final and incontestable, without need for further action by the Authority.

**Servicing Agreement**

In Financing Order No. 5, the Issuer and LIPA were authorized to enter into the Servicing Agreement described under "The Servicing Agreement" in this Official Statement. Pursuant to the OSA, PSEG Long Island is the T&D System manager and performs, among other things, the billing and collection, meter reading and forecasting required by the Servicing Agreement on behalf of the Servicer. LIPA is responsible for taking all necessary action in connection with True-Up Adjustments and certain reporting requirements. See "SERVICER AND ADMINISTRATOR—Servicing the 2017 Restructuring Bonds" and "THE SERVICING AGREEMENT—Servicing Procedures" in this Official Statement.

**Binding on Successors**

Financing Order No. 5 and the 2017 Restructuring Charges authorized in Financing Order No. 5 are binding on the Authority, LIPA, any successor to the Authority or LIPA and any Successor Servicer to LIPA.

## THE 2017 RESTRUCTURING PROPERTY

**Overview**

The 2017 Restructuring Property of the Authority consists generally of its property, rights and interests under Financing Order No. 5, including the Authority's irrevocable right:

- to impose, bill and collect irrevocable, nonbypassable 2017 Restructuring Charges from each Customer, and

- to adjust those 2017 Restructuring Charges, in accordance with the true-up adjustment mechanism set forth in Financing Order No. 5, in an amount sufficient to pay principal and interest on its 2017 Restructuring Bonds and all other Ongoing Financing Costs approved under Financing Order No. 5.

The 2017 Restructuring Property also includes all revenues, collections, claims, payments, money or proceeds from the 2017 Restructuring Charges.

The Issuer will purchase the 2017 Restructuring Property from the Seller. The 2017 Restructuring Bonds are secured primarily by the 2017 Restructuring Property. The 2017 Restructuring Property is not a receivable and, as the primary collateral securing the 2017 Restructuring Bonds, is not a pool of receivables. Charge Collections from the 2017 Restructuring Charges, as such charges may be adjusted pursuant to the True-Up Adjustment mechanism, will be used to pay principal of and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs approved under Financing Order No. 5. These irrevocable nonbypassable charges will be included in the Customers' bills, and will be collected until the 2017 Restructuring Bonds and all Ongoing Financing Costs are paid in full. 2017 Restructuring Charges may not be reduced, altered or impaired except for periodic adjustments, in accordance with the True-Up Adjustment mechanism, to correct over-collections or under-collections to ensure the recovery of amounts sufficient to timely pay principal of and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs. All revenues and collections from 2017 Restructuring Charges provided for in Financing Order No. 5 are part of the 2017 Restructuring Property.

**Creation of 2017 Restructuring Property**

Under Financing Order No. 5, the 2017 Restructuring Property is created simultaneous with its sale to the Issuer. The 2017 Restructuring Property is a property right consisting generally of the irrevocable right to impose, bill and collect 2017 Restructuring Charges from Customers, the right to adjust those 2017 Restructuring Charges and the right to all revenues, collections, claims, payments, money or proceeds of or arising from the 2017 Restructuring Charges and the property, rights and interests created under Financing Order No. 5. The 2017 Restructuring Bonds will be secured by the 2017 Restructuring Property, as well as the other 2017 Collateral described under "THE SECURITY FOR THE 2017 RESTRUCTURING BONDS—Pledge of 2017 Collateral."

**2017 Restructuring Charges**

The 2017 Restructuring Charges will be set and adjusted thereafter as necessary to generate revenues required:

- to pay fees and expenses related to the servicing and collection and retirement of the 2017 Restructuring Bonds including, without limitation, fees and expenses related to Trustee costs, rating agency surveillance fees, legal and accounting fees which are included in the Ongoing Financing Costs, as well as adjustments for dealing with estimated and actual costs,

- to pay interest on the 2017 Restructuring Bonds,

- to pay principal of each tranche of such 2017 Restructuring Bonds according to the Expected Amortization Schedule,

- to replenish the Operating Reserve Subaccount and the Debt Service Reserve Subaccount to the Required Operating Reserve Level and the Required Debt Service Reserve Level, respectively, and

- to pay all additional fees, costs and charges and all other Ongoing Financing Costs approved under Financing Order No. 5.

## THE 2017 RESTRUCTURING BONDS

**General**

The 2017 Restructuring Bonds will be dated the Issuance Date and interest thereon will be payable on the dates set forth on the inside cover page of this Official Statement. The initial principal amount, Scheduled Maturity Dates, Final Maturity Dates and Interest Rate of each tranche of 2017 Restructuring Bonds is set forth on the inside cover page of this Official Statement.

The 2017 Restructuring Bonds will be issued in denominations of $5,000 or any integral multiple thereof.

The 2017 Restructuring Bonds originally will be issued solely in book-entry only form to DTC or its nominee, Cede & Co., to be held in DTC's book-entry only system. So long as the 2017 Restructuring Bonds are held in the book-entry only system, DTC or its nominee will be the registered owner of the 2017 Restructuring Bonds for all purposes of the Indenture, the 2017 Restructuring Bonds and this Official Statement. For purposes of this Official Statement, DTC or its nominee, and its successors, are referred to as the "Securities Depository." See "—Securities Depository" below.

The Bank of New York Mellon is the Trustee under the Indenture and also is the Bond Registrar, Authenticating Agent and Paying Agent for the 2017 Restructuring Bonds.

Payments on the 2017 Restructuring Bonds will be made to the holders of the 2017 Restructuring Bonds as of the Record Date, or special record date, as established in the Indenture. If any Payment Date or special payment date specified for any payments to Bondholders is not a Business Day, the Trustee will make payments scheduled to be made on the next succeeding Business Day and no interest will accrue during the intervening period.

**Interest on the 2017 Restructuring Bonds**

Interest on the 2017 Restructuring Bonds will be calculated on the basis of a 360-day year of twelve 30-day months and will be paid to the Holder as of the Business Day preceding each Payment Date, June 15 and December 15, beginning June 15, 2018, in immediately available funds by wire transfer as long as the Securities Depository is the Holder and otherwise subject to a minimum holding on the Payment Date. If any interest on the 2017 Restructuring Bonds is due on a non-Business Day, it will be made on the next Business Day, and no additional interest will accrue as a result.

The failure to pay accrued interest on any Payment Date (even if the failure is caused by a shortfall in 2017 Restructuring Charges received) will result in an Event of Default for the 2017 Restructuring Bonds unless such failure is cured within five Business Days. Any interest not paid when due (plus interest on the defaulted interest at the applicable interest rate to the extent lawful) will be payable to the Bondholders on a special record date as provided in the Indenture and the Administration Agreement.

**Principal of the 2017 Restructuring Bonds**

Scheduled payments of principal on each tranche of the 2017 Restructuring Bonds are reflected on the Expected Amortization Schedule below.

To the extent funds are available in the Collection Account (other than funds in the Upfront Financing Costs Subaccount), principal payments shall be made on each Payment Date in accordance with the priority of payment set forth below under the heading "SECURITY FOR THE 2017 RESTRUCTURING BONDS—How Funds in the Collection Account Will Be Allocated," with scheduled payments of principal of the 2017 Restructuring Bonds being made to the Holders of the 2017 Restructuring Bonds in order of their Final Maturity Dates.

No principal payment on any tranche of 2017 Restructuring Bonds shall be made on any Payment Date prior to the payment in full of all of the principal of all tranches of such 2017 Restructuring Bonds with an earlier Final Maturity Date and no principal payments on any tranche of 2017 Restructuring Bonds shall be made until interest due on all 2017 Restructuring Bonds on such Payment Date is paid in full. No principal payment shall be made on any Tranche-1 through Tranche-16 prior to the Scheduled Maturity Date for such 2017 Restructuring Bonds. Notwithstanding the foregoing, if an Event of Default under the Indenture should occur and be continuing, the unpaid principal amount of all 2017 Restructuring Bonds and the accrued interest thereon may be declared immediately due and payable (see "THE INDENTURE—Events of Default" and "THE INDENTURE—Remedies–Acceleration"). In addition, the 2017 Restructuring Bonds subject to optional redemption may be optionally redeemed (see "—Redemption–Optional Redemption" below).

Partial payments of any scheduled payments will be allocated within 2017 Restructuring Bonds of a particular tranche pro rata. Partial payments of any scheduled payments will be allocated between tranches of 2017 Restructuring Bonds with the same Final Maturity Date on a pro rata basis.

The entire unpaid principal balance of each tranche of the 2017 Restructuring Bonds will be due and payable on the Final Maturity Date for the tranche. It shall not constitute an Event of Default if Bonds are not paid earlier in accordance with the Expected Amortization Schedule (so long as all available amounts held under the Indenture are applied in accordance with its provisions).

The Trustee will make each payment other than the final payment with respect to any 2017 Restructuring Bonds to the holders of record of the 2017 Restructuring Bonds of the applicable tranche on the Record Date for that Payment Date. The Trustee will make the final payment for each tranche of 2017 Restructuring Bonds, however, only upon presentation and surrender of the 2017 Restructuring Bonds of that tranche at the office or agency of the Trustee specified in the notice given by the Trustee of the final payment. The Trustee will mail notice of the final payment to the Bondholders no later than five days prior to the final Payment Date, specifying the date set for the final payment and the amount of the payment.

[Remainder Intentionally Blank]

The Expected Amortization Schedule is set forth below for each tranche of the 2017 Restructuring Bonds.

**Expected Amortization Schedule**

| Tranche | Initial Principal Amount | Scheduled Maturity Date[†] | Final Maturity Date[†] |
|---------|--------------------------|----------------------------|------------------------|
| Tranche 1 | $1,695,000 | June 15, 2020 | June 15, 2022 |
| Tranche 2 | $1,740,000 | December 15, 2020 | December 15, 2022 |
| Tranche 3 | $10,985,000 | June 15, 2021 | June 15, 2023 |
| Tranche 4 | $11,260,000 | December 15, 2021 | December 15, 2023 |
| Tranche 5 | $11,440,000 | June 15, 2022 | June 15, 2024 |
| Tranche 6 | $11,725,000 | December 15, 2022 | December 15, 2024 |
| Tranche 7 | $18,130,000 | June 15, 2023 | June 15, 2025 |
| Tranche 8 | $18,585,000 | December 15, 2023 | December 15, 2025 |
| Tranche 9 | $190,000 | June 15, 2024 | June 15, 2026 |
| Tranche 10 | $195,000 | December 15, 2024 | December 15, 2026 |
| Tranche 11 | $195,000 | June 15, 2025 | June 15, 2027 |
| Tranche 12 | $200,000 | December 15, 2025 | December 15, 2027 |
| Tranche 13 | $205,000 | June 15, 2026 | June 15, 2028 |
| Tranche 14 | $210,000 | December 15, 2026 | December 15, 2028 |
| Tranche 15 | $220,000 | June 15, 2027 | June 15, 2029 |
| Tranche 16 | $225,000 | December 15, 2027 | December 15, 2029 |
| Tranche 17* | $465,000 | December 15, 2028 | December 15, 2030 |
| Tranche 18* | $485,000 | December 15, 2029 | December 15, 2031 |
| Tranche 19* | $510,000 | December 15, 2030 | December 15, 2032 |
| Tranche 20* | $535,000 | December 15, 2031 | December 15, 2033 |
| Tranche 21* | $565,000 | December 15, 2032 | December 15, 2034 |
| Tranche 22* | $595,000 | December 15, 2033 | December 15, 2035 |
| Tranche 23* | $625,000 | December 15, 2034 | December 15, 2036 |
| Tranche 24* | $655,000 | December 15, 2035 | December 15, 2037 |
| Tranche 25* | $63,235,000 | December 15, 2036 | December 15, 2038 |
| Tranche 26* | $62,085,000 | December 15, 2037 | December 15, 2039 |
| Tranche 27* | $69,810,000 | December 15, 2038 | December 15, 2040 |
| Tranche 28* | $82,700,000 | December 15, 2039 | December 15, 2041 |

*Subject to Sinking Fund Payments. See "—Redemption-Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules" below.

[†] If such date is not a Business Day, the next Business Day without additional interest.

[Remainder Intentionally Blank]

## Maturity Sensitivity

The rate of principal payments on each tranche of the 2017 Restructuring Bonds, the aggregate amount of each interest payment on each tranche of the 2017 Restructuring Bonds and the actual final Payment Date of each tranche of the 2017 Restructuring Bonds will depend on the timing of the Servicer's receipt of 2017 Restructuring Charges from Customers. Changes in the expected actual final payment of the tranches of the 2017 Restructuring Bonds in relation to variances in actual energy consumption levels (retail electricity delivery service sales) from forecast levels, are shown below.

### Maturity Sensitivity

| Tranche | Scheduled Maturity Date | Forecast Error of 5% | | Forecast Error of 15% | |
| | | Actual Final Payment | Change (days)* | Actual Final Payment | Change (days)* |
|---|---|---|---|---|---|
| Tranche 1 | June 15, 2020 | June 15, 2020 | 0 | June 15, 2020 | 0 |
| Tranche 2 | December 15, 2020 | December 15, 2020 | 0 | December 15, 2020 | 0 |
| Tranche 3 | June 15, 2021 | June 15, 2021 | 0 | June 15, 2021 | 0 |
| Tranche 4 | December 15, 2021 | December 15, 2021 | 0 | December 15, 2021 | 0 |
| Tranche 5 | June 15, 2022 | June 15, 2022 | 0 | June 15, 2022 | 0 |
| Tranche 6 | December 15, 2022 | December 15, 2022 | 0 | December 15, 2022 | 0 |
| Tranche 7 | June 15, 2023 | June 15, 2023 | 0 | June 15, 2023 | 0 |
| Tranche 8 | December 15, 2023 | December 15, 2023 | 0 | December 15, 2023 | 0 |
| Tranche 9 | June 15, 2024 | June 15, 2024 | 0 | June 15, 2024 | 0 |
| Tranche 10 | December 15, 2024 | December 15, 2024 | 0 | December 15, 2024 | 0 |
| Tranche 11 | June 15, 2025 | June 15, 2025 | 0 | June 15, 2025 | 0 |
| Tranche 12 | December 15, 2025 | December 15, 2025 | 0 | December 15, 2025 | 0 |
| Tranche 13 | June 15, 2026 | June 15, 2026 | 0 | June 15, 2026 | 0 |
| Tranche 14 | December 15, 2026 | December 15, 2026 | 0 | December 15, 2026 | 0 |
| Tranche 15 | June 15, 2027 | June 15, 2027 | 0 | June 15, 2027 | 0 |
| Tranche 16 | December 15, 2027 | December 15, 2027 | 0 | December 15, 2027 | 0 |
| Tranche 17** | December 15, 2028 | December 15, 2028 | 0 | December 15, 2028 | 0 |
| Tranche 18** | December 15, 2029 | December 15, 2029 | 0 | December 15, 2029 | 0 |
| Tranche 19** | December 15, 2030 | December 15, 2030 | 0 | December 15, 2030 | 0 |
| Tranche 20** | December 15, 2031 | December 15, 2031 | 0 | December 15, 2031 | 0 |
| Tranche 21** | December 15, 2032 | December 15, 2032 | 0 | December 15, 2032 | 0 |
| Tranche 22** | December 15, 2033 | December 15, 2033 | 0 | December 15, 2033 | 0 |
| Tranche 23** | December 15, 2034 | December 15, 2034 | 0 | December 15, 2034 | 0 |
| Tranche 24** | December 15, 2035 | December 15, 2035 | 0 | December 15, 2035 | 0 |
| Tranche 25** | December 15, 2036 | December 15, 2036 | 0 | June 15, 2037 | 182 |
| Tranche 26** | December 15, 2037 | December 15, 2037 | 0 | December 15, 2037 | 0 |
| Tranche 27** | December 15, 2038 | December 15, 2038 | 0 | June 15, 2039 | 182 |
| Tranche 28** | December 15, 2039 | December 15, 2039 | 0 | December 15, 2039 | 0 |

*Number is rounded to whole days.

**Subject to Sinking Fund Payments. See "—Redemption–Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules."

*Assumptions*. For the purposes of preparing the chart above, the following assumptions, among others, have been made: (i) the forecast error stays constant over the life of the 2017 Restructuring Bonds and is equal to an overestimate of electricity consumption of 5% (1.93 standard deviations from the mean) or 15% (10.25 standard deviations from the mean) as stated in the chart above, (ii) the Servicer makes timely and accurate filings to true-up the 2017 Restructuring Charge semi-annually through the Scheduled Maturity Date, (iii) Customers remit all 2017 Restructuring Charges an average of 35 days after such charges are billed, (iv) Customer charge-off rates are held constant at 0.57%, (v) operating expenses are equal to projections, (vi) there is no acceleration of the Final Maturity Date of the 2017 Restructuring Bonds, (vii) none of the 2017 Restructuring Bonds that are subject to optional redemption prior to maturity are optionally redeemed, and (viii) the closing date is November 21, 2017.

The rate of principal payments, the amount of each interest payment and the actual final Payment Date of each tranche of the 2017 Restructuring Bonds will depend on the timing of receipt of collected 2017 Restructuring Charges by the Trustee as adjusted by the True-Up Adjustment mechanism. The aggregate amount of collected 2017 Restructuring Charges and the rate of principal amortization on the 2017 Restructuring Bonds will

depend, in part, on actual energy usage and the rate of delinquencies and write-offs. The 2017 Restructuring Charges are required to be adjusted from time to time based in part on the actual rate of collected 2017 Restructuring Charges. However, there is no assurance that the Servicer or its subcontractor will be able to forecast accurately actual electricity usage and the rate of delinquencies and write-offs or implement adjustments to the 2017 Restructuring Charges that will cause collected 2017 Restructuring Charges to be received at any particular rate. See "RISK FACTORS—Servicing and Operating Risks" and "THE FINANCING ORDER—True-Up Adjustment Mechanism."

The 2017 Restructuring Bonds may be retired later than expected. Except in the event of an acceleration of the Final Maturity Date of the 2017 Restructuring Bonds after an Event of Default, however, the 2017 Restructuring Bonds will not be paid at a rate faster than that contemplated in the Expected Amortization Schedule for each tranche of the 2017 Restructuring Bonds even if the receipt of collected 2017 Restructuring Charges is accelerated. Instead, receipts in excess of the amounts necessary to amortize the 2017 Restructuring Bonds in accordance with the Expected Amortization Schedule, to pay interest and redemption price, if any, and all other Ongoing Financing Costs and any other related fees and expenses and to fund deficiencies in the Operating Reserve Subaccount and the Debt Service Reserve Subaccount will be allocated to the Excess Funds Subaccount. Amounts on deposit in the Excess Funds Subaccount will be taken into consideration in calculating the next True-Up Adjustment. Acceleration of the Final Maturity Date after an Event of Default in accordance with the terms thereof will result in payment of principal earlier than the related Scheduled Maturity Dates.

**Fees and Expenses**

As set forth in the table below, the following annual fees and expenses will be payable from Charge Collections and Investment Earnings before debt service payments are made on the 2017 Restructuring Bonds.

| Recipient | Fees and Expenses Payable |
|---|---|
| Trustee | Trustee fees, indemnity payments (to the extent not in excess of $800,000 in each calendar year) and expense reimbursements |
| Servicer | Servicing Fees not in excess of (i) 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds (plus reimbursement for costs and expenses incurred in carrying out its obligations under the Servicing Agreement) or (ii) 0.60% for a Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets |
| Administrator | $100,000 annually |
| Issuer | Indemnity payments and expense reimbursements |

That portion of the annual Servicing Fee payable to any Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be paid after debt service payments are made on the 2017 Restructuring Bonds. Indemnity amounts due to the Trustee in excess of $800,000 in each calendar year shall also be paid after debt service payments are made on the 2017 Restructuring Bonds.

**Redemption**

*Optional Redemption.* The 2017 Restructuring Bonds with a Final Maturity Date prior to December 15, 2030 are not subject to optional redemption prior to maturity at the option of the Issuer. The 2017 Restructuring Bonds with a Final Maturity Date on or after December 15, 2030 are subject to redemption at the option of the Issuer in whole or in part, in any order, from time to time on any Business Day on and after December 15, 2027 upon payment of the redemption price of 100% of the principal amount of the 2017 Restructuring Bonds to be redeemed, together with accrued interest to the redemption date.

*Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules.* The Term Bonds under the Indenture shall be subject to redemption, on and after the applicable dates set forth below from Sinking Fund Payments, at a redemption price of 100% of the principal amount of the applicable Term Bonds to be redeemed, together with accrued interest to the redemption date. On each Scheduled Sinking Fund Redemption Date, the applicable Term Bonds shall be redeemed, from and to the extent of funds available for such purpose, until the Outstanding Amount of such Term Bonds has been reduced to an amount equal to the amount shown below as the Minimum Remaining

Outstanding Amount for such date.  Any amounts paid on the Term Bonds on the Final Maturity Date shall be applied as a payment of a maturity of such Term Bonds and not as a redemption.  The Expected Sinking Fund Schedules below set forth the Scheduled Sinking Fund Redemption Dates, the scheduled Outstanding Amount as of each such date, the scheduled Sinking Fund Payment for each such date and the minimum remaining Outstanding Amount as of such date for each Term Bond.

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-17**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2028 | $465,000 | $230,000 | $235,000 |
| December 15, 2028 | $235,000 | $235,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-18**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2029 | $485,000 | $240,000 | $245,000 |
| December 15, 2029 | $245,000 | $245,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-19**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2030 | $510,000 | $250,000 | $260,000 |
| December 15, 2030 | $260,000 | $260,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-20**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2031 | $535,000 | $265,000 | $270,000 |
| December 15, 2031 | $270,000 | $270,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-21**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2032 | $565,000 | $280,000 | $285,000 |
| December 15, 2032 | $285,000 | $285,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-22**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2033 | $595,000 | $295,000 | $300,000 |
| December 15, 2033 | $300,000 | $300,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-23**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2034 | $625,000 | $310,000 | $315,000 |
| December 15, 2034 | $315,000 | $315,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-24**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2035 | $655,000 | $325,000 | $330,000 |
| December 15, 2035 | $330,000 | $330,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-25**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2036 | $63,235,000 | $31,225,000 | $32,010,000 |
| December 15, 2036 | $32,010,000 | $32,010,000 | $0 |

| EXPECTED SINKING FUND SCHEDULE – TRANCHE-26 | | | |
|---|---|---|---|
| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
| June 15, 2037 | $62,085,000 | $30,660,000 | $31,425,000 |
| December 15, 2037 | $31,425,000 | $31,425,000 | $0 |

| EXPECTED SINKING FUND SCHEDULE – TRANCHE-27 | | | |
|---|---|---|---|
| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
| June 15, 2038 | $69,810,000 | $34,475,000 | $35,335,000 |
| December 15, 2038 | $35,335,000 | $35,335,000 | $0 |

| EXPECTED SINKING FUND SCHEDULE – TRANCHE-28 | | | |
|---|---|---|---|
| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
| June 15, 2039 | $82,700,000 | $40,840,000 | $41,860,000 |
| December 15, 2039 | $41,860,000 | $41,860,000 | $0 |

Notwithstanding the foregoing, if an Event of Default under the Indenture shall have occurred and be continuing, the unpaid principal amount of all 2017 Restructuring Bonds and accrued interest thereon may be declared due and payable (see "THE INDENTURE—Events of Default" and "THE INDENTURE—Remedies–Acceleration"). In addition, the 2017 Restructuring Bonds subject to optional redemption may be optionally redeemed (see "—Redemption–Optional Redemption" above).

*Selection of 2017 Restructuring Bonds for Redemption.* If less than all of the 2017 Restructuring Bonds of a tranche are to be redeemed, DTC and the direct participant and, where appropriate, indirect participants will determine the particular eligible 2017 Restructuring Bonds of a tranche to be redeemed in accordance with their procedures as from time to time in effect. If the 2017 Restructuring Bonds are not registered in book-entry only form, the particular 2017 Restructuring Bonds of a tranche to be redeemed will be determined by the Trustee, using such method as it deems fair and appropriate. See "Book-Entry-Only System" in Schedule 1 to this Official Statement.

*Notice of Redemption.* If any of the 2017 Restructuring Bonds are to be redeemed, notice of such redemption is to be mailed by the Trustee to Holders of such 2017 Restructuring Bonds to be redeemed not less than 30 days preceding each redemption date. Any notice of optional redemption may provide that such redemption is conditioned on, among other things, the availability of sufficient moneys on the redemption date.

The Trustee, so long as a book-entry-only system is used for determining ownership of the 2017 Restructuring Bonds, shall send the notice to DTC or its nominee, or its successor. Any failure of DTC or a direct participant or, where appropriate, indirect participants to do so, or to notify a Beneficial Owner of a 2017 Restructuring Bond of such redemption, will not affect the sufficiency or the validity of the redemption of such 2017 Restructuring Bond. The Issuer can make no assurances that DTC, direct participants, indirect participants or other nominees of the Beneficial Owners of the 2017 Restructuring Bonds to be redeemed will distribute such notices to the Beneficial Owners of such 2017 Restructuring Bonds, or that they will do so on a timely basis. See "Book-Entry-Only System" in Schedule 1 to this Official Statement.

**Registration and Transfer of the 2017 Restructuring Bonds**

2017 Restructuring Bonds in definitive form will be transferable and exchangeable at the office of the registrar identified in this Official Statement. The Trustee will be the initial registrar. There will be no service charge for any registration or transfer of the 2017 Restructuring Bonds, but the Trustee may require the owner to pay a sum sufficient to cover any tax or other governmental charge.

The Issuer will issue each tranche of the 2017 Restructuring Bonds in the minimum initial denominations set forth in this Official Statement.

**Securities Depository**

The 2017 Restructuring Bonds will be available to investors only in book-entry form. DTC will act as securities depository for the 2017 Restructuring Bonds. Bondholders may hold the 2017 Restructuring Bonds through

DTC or in any other manner described in this Official Statement. See Schedule 1 to this Official Statement for a description of DTC and its book-entry-only system that will apply to the 2017 Restructuring Bonds.

As long as the book-entry system is used for the 2017 Restructuring Bonds, as to 2017 Restructuring Bonds held through DTC, the Trustee and the Issuer will give any notice required to be given owners of the 2017 Restructuring Bonds only to DTC. BENEFICIAL OWNERS SHOULD MAKE APPROPRIATE ARRANGEMENTS FOR THE DIRECT PARTICIPANT THROUGH WHOSE DTC ACCOUNT THEIR BENEFICIAL OWNERSHIP INTEREST IS RECORDED TO RECEIVE NOTICES THAT MAY BE CONVEYED TO DIRECT PARTICIPANTS AND INDIRECT PARTICIPANTS.

**Access of Bondholders**

Upon written request of any Bondholder or group of Bondholders, each of whom has held its 2017 Restructuring Bond for at least six months, the Trustee will afford the Bondholder or Bondholders making such request a copy of a current list of Bondholders for purposes of communicating with other Bondholders with respect to their rights under the Indenture unless the Trustee agrees to mail the desired communication, on behalf of and at the expense of the requesting Bondholders, to all Bondholders.

## SECURITY FOR THE 2017 RESTRUCTURING BONDS

The 2017 Restructuring Bonds issued under the Indenture will be non-recourse obligations and are payable solely from and secured solely by a pledge of and lien on the 2017 Restructuring Property and the other 2017 Collateral as provided in the Indenture. No collateral securing the Prior Restructuring Bonds, or future restructuring bonds issued pursuant to separate financing orders, if any, shall be collateral for the 2017 Restructuring Bonds. If and to the extent the 2017 Restructuring Property and the other 2017 Collateral are insufficient to pay all amounts owing with respect to the 2017 Restructuring Bonds, then the Bondholders will have no claim in respect of such insufficiency against the Issuer, the Authority, LIPA or any other person. By the acceptance of the 2017 Restructuring Bonds, the Bondholders waive any such claim.

The Indenture securing the 2017 Restructuring Bonds is separate and distinct from the indentures securing the Prior Restructuring Bonds.

**Pledge of 2017 Collateral**

To secure the payment of principal of and interest on the 2017 Restructuring Bonds, the Issuer will pledge to the Trustee all of its right, title and interest (whether owned on the Issuance Date or thereafter acquired or arising) in and to the following:

- the 2017 Restructuring Property transferred by the Seller to the Issuer pursuant to the Sale Agreement and all proceeds thereof, including the 2017 Restructuring Charges as estimated, determined and adjusted from time to time pursuant to the Servicing Agreement in accordance with Financing Order No. 5,

- the statutory lien pursuant to the Securitization Law,

- the Sale Agreement,

- the Servicing Agreement,

- the Administration Agreement,

- the Collection Account, all subaccounts thereof (except for the Upfront Financing Costs Subaccount) and all amounts or investment property on deposit therein or credited thereto from time to time,

- the security interest with respect to the 2017 Restructuring Property granted by the Seller to the Issuer in the Sale Agreement,

- all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, securities accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind, and other forms of obligations and

receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing, and

- all proceeds in respect of any or all of the foregoing.

The foregoing assets in which the Issuer, as assignee of the Seller, will grant the Trustee a security interest are referred to herein as the "2017 Collateral." See "—How Funds in the Collection Account Will Be Allocated."

The 2017 Collateral does not include:

- any amounts required to be released pursuant to or contemplated by the terms of the Indenture,

- proceeds from the sale of the 2017 Restructuring Bonds required to pay the purchase price of the 2017 Restructuring Property pursuant to the Sale Agreement and the Upfront Financing Costs related to the 2017 Restructuring Bonds as deposited into the Upfront Financing Costs Subaccount (together with any interest earnings thereon), and

- the Prior Restructuring Properties, or any restructuring property that may be created pursuant to any future financing order other than Financing Order No. 5.

**Security Interest in 2017 Collateral**

As provided in the Securitization Law, a valid and enforceable lien and security interest in 2017 Restructuring Property will attach and be perfected at the time the pledge is made. The lien and security interest attach without any physical delivery of 2017 Collateral or other act. The lien and security interest will be valid, binding, and perfected against all parties having claims of any kind in tort, contract or otherwise against the Seller, regardless of whether the parties have notice of the lien and will be superior to any judicial lien or other lien obtained by such parties. The Securitization Law provides that the pledge is continuously perfected and has priority over any other lien created by the operation of law or otherwise that may be created subsequently. Any pledge of the 2017 Restructuring Property will have a perfected security interest in the revenues and proceeds of the 2017 Restructuring Property that are deposited in an account even if those revenues or proceeds are commingled with other funds. The Securitization Law also provides that any other security interest that may apply to the revenues or proceeds of the 2017 Restructuring Property will be terminated when such funds are transferred to a segregated account for the benefit of the Trustee or the Bondholders. Similarly, Financing Order No. 5 provides that the 2017 Restructuring Property may be pledged to secure the payment of the 2017 Restructuring Bonds, all other Ongoing Financing Costs, and other amounts owed pursuant to the transaction documents relating to the 2017 Restructuring Bonds.

Certain items of the 2017 Collateral may not constitute 2017 Restructuring Property and the perfection of the Trustee's security interest in those items of 2017 Collateral would therefore be subject to the UCC or common law and not the Securitization Law. These items consist of the Issuer's rights in:

- the Sale Agreement, the Servicing Agreement, the Administration Agreement and any other Basic Documents,

- the Operating Reserve Subaccount, the Debt Service Reserve Subaccount, or any other funds on deposit in the Collection Account which do not constitute 2017 Restructuring Charge collections together with all instruments, investment property or other assets on deposit therein or credited thereto and all financial assets and securities entitlements carried therein or credited thereto which do not constitute Charge Collections,

- all accounts, chattel paper, deposit accounts, documents, general intangibles, goods, instruments, investment property, letters-of-credit, letter-of-credit rights, money, commercial tort claims and supporting obligations and all of its other property to the extent not 2017 Restructuring Property, and

- proceeds of the foregoing items.

Additionally, any contractual rights the Issuer has against retail electric delivery customers (other than the irrevocable right to impose 2017 Restructuring Charges and rights otherwise included in the definition of 2017 Restructuring Property) would be collateral to which the UCC applies.

As a condition to the issuance of the 2017 Restructuring Bonds, the Issuer must make all filings and take any other action required by the UCC or common law to perfect the lien of the Trustee in all the items included in 2017 Collateral which do not constitute 2017 Restructuring Property. The Issuer will also covenant to take all actions

necessary to maintain or preserve the lien and security interest on a first priority basis. Under the Indenture, the Trustee is required to file any necessary UCC continuation statements. The Issuer will represent, along with the Seller, at the time of issuance of the 2017 Restructuring Bonds, that no prior filing has been made with respect to that party under the terms of the UCC, other than a filing which provides the Trustee with a lien and first priority perfected security interest in the 2017 Collateral.

**Lien on 2017 Restructuring Property**

Pursuant to the Indenture, the Issuer will pledge to the Trustee all of the Issuer's right, title and interest in and to the 2017 Restructuring Property. Pursuant to the Securitization Law, this pledge will constitute a first priority statutory lien on the 2017 Restructuring Property.

Under the Financing Agreement (described below), LIPA previously transferred to the Authority all of its right, title and interest in and to its revenues to provide security for the Authority's indebtedness. See "THE SELLER – Relationship of the Authority to LIPA." Pursuant to the Authority's General Resolution and the Authority's Electric System General Subordinated Revenue Bond Resolution adopted on May 20, 1998 (the "Subordinated General Resolution"), the Authority issues bonds and other obligations (including swap or other interest rate hedging obligations) that are secured by a lien upon substantially all of the revenues of the Authority. The revenues that are subject to the lien of the Authority's General Resolution and Subordinated General Resolution include, among other things, revenues, rates, fees, charges, and other income and receipts from the operations of any subsidiary of the Authority (including LIPA). The Authority's General Resolution specifically excludes from the revenues that are subject to the lien, amounts constituting "Transition Charges." "Transition Charges," under the General Resolution, are defined as any rates, fees, charges or surcharges relating to the Authority's transmission and distribution system or its customers that are established by an irrevocable rate order or other action in connection with the issuance of debt or other securities other than under the Authority's General Resolution to the extent that those rates, fees, charges or surcharges are pledged as security for such debt or other securities. The Subordinated General Resolution imposes a lien on the same revenues as the General Resolution. Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "transition charges" as defined in the General Resolution and that they are not subject to the lien thereof. In addition, the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens. Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution.

**Indenture Accounts**

Prior to the Issuance Date, the Issuer will open or cause to be opened, at the Trustee's office located at the Corporate Trust Office, or at another Eligible Institution, the Collection Account, which shall be one or more segregated trust accounts in the Trustee's name for the deposit of Charge Collections and all other amounts received with respect to the 2017 Collateral or under the Servicing Agreement. The Collection Account will consist of four Subaccounts: the General Subaccount, the Excess Funds Subaccount, the Reserve Subaccount, and the Upfront Financing Costs Subaccount. The Reserve Subaccount will consist of two subaccounts: the Operating Reserve Subaccount and the Debt Service Reserve Subaccount. Unless the context indicates otherwise, a reference in this Official Statement to the Collection Account means the Subaccounts (including the Subaccounts within the Reserve Subaccount) contained therein. For administrative purposes, the Subaccounts may be established by the Trustee as separate accounts.

The Servicer will remit 2017 Restructuring Charge payments to the Collection Account in the manner described under "THE 2017 RESTRUCTURING BONDS—How Funds in the Collection Account Will Be Allocated."

*Collection Account.* Prior to the initial Payment Date, all amounts in the Collection Account (other than funds deposited into the Operating Reserve Subaccount up to the Required Operating Reserve Level, in the Debt Service Reserve Subaccount up to the Required Debt Service Reserve Level, and in the Upfront Financing Costs Subaccount up to the amount initially deposited therein) shall be allocated to the General Subaccount.

*General Subaccount.* The General Subaccount will hold all funds held in the Collection Account that are not held in the other three subaccounts. The Allocation Agent will transfer to the General Subaccount, on each Business Day, and to the extent that funds are available in the Allocation Account, the estimated amount of Charge Collections and the Remittance Shortfall from the Allocation Account. On each Payment Date, the Trustee will draw on amounts in the General Subaccount to pay the Issuer's expenses and to pay interest and make scheduled

payments on the 2017 Restructuring Bonds, and to make other payments and transfers in accordance with the terms of the Indenture.

*Excess Funds Subaccount.* The Trustee, at the direction of the Servicer, will allocate to the Excess Funds Subaccount Charge Collections available with respect to any Payment Date in excess of amounts necessary to make the payments specified on such Payment Date. The Excess Funds Subaccount will also hold all Investment Earnings on the Collection Account in excess of such amounts.

*Reserve Subaccount.* In connection with the issuance of the 2017 Restructuring Bonds:

- the Authority will deliver to the Trustee for deposit into the Operating Reserve Subaccount an amount equal to the Required Operating Reserve Level, which will be an amount equal to 0.50% of the initial aggregate principal amount of the 2017 Restructuring Bonds; and

- the Issuer will deliver to the Trustee for deposit into the Debt Service Reserve Subaccount an amount from the 2017 Restructuring Bond proceeds equal to the Required Debt Service Reserve Level.

*Upfront Financing Costs Subaccount.* The Upfront Financing Costs Subaccount is to be funded by the proceeds of the 2017 Restructuring Bonds in the amount expected to be used for Upfront Financing Costs as provided in the Issuance Advice Letter. Any amounts in the Upfront Financing Costs Subaccount not required to pay Upfront Financing Costs may be used to pay Ongoing Financing Costs.

The Trustee shall have sole dominion and exclusive control over all money in the Collection Account and shall apply such money as provided in the Indenture. Each account shall remain at all times with a securities intermediary (within the meaning of Section 8-102(a)(14) of the UCC).

Withdrawals from and deposits to each of the foregoing Subaccounts of the Collection Account shall be made as set forth in "—How Funds in the Collection Account Will Be Allocated."

The Collection Account shall at all times be maintained in an Eligible Account and only the Trustee shall have access to the Collection Account for the purpose of making deposits in and withdrawals from the Collection Account in accordance with the Indenture. Funds in the Collection Account shall not be commingled with any other moneys. Funds in the Collection Account may be invested only in "Eligible Investments" that mature or are redeemable at the option of the holder on or prior to the Business Day next preceding the next Payment Date. The Indenture prohibits Eligible Investments credited to the Collection Account from being sold, liquidated or otherwise disposed of at a loss prior to the maturity or redemption date thereof.

Except as provided in the Indenture as described under "General Provisions Regarding the Collection Account," all money deposited from time to time in the Collection Account, all deposits therein pursuant to the Indenture, and all investments made in Eligible Investments with such money, including all income or other gain from such investments, shall be held by the Trustee in the Collection Account as part of the 2017 Collateral (except for amounts in the Upfront Financing Costs Subaccount). The Trustee shall have no liability in respect of losses incurred as a result of the liquidation of any Eligible Investment prior to its stated maturity or its date of redemption or the failure of the Issuer to provide timely written investment direction. All amounts in the Collection Account (except for amounts in the Upfront Financing Costs Subaccount) must be used, to the extent practical, to make the final payments of principal and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs or to make refunds to Customers to the same extent such Customers would have been required to pay 2017 Restructuring Charges. When no 2017 Restructuring Bonds remain Outstanding and all Ongoing Financing Costs (including any rebate or other amounts payable to the United States of America under Section 148 of the Code) have been paid, or their payment provided for, in full, then the balance, if any, in the Collection Account (including all subaccounts therein) shall be deposited in the Operating Reserve Subaccount and paid to or at the direction of the Issuer and applied to customer refunds in accordance with Financing Order No. 5. In the event the Issuer issues additional restructuring bonds as permitted by Securitization Law and the Indenture and as described below under "—Additional Bonds" to refund any 2017 Restructuring Bonds, amounts may be withdrawn from the Operating Reserve Subaccount to pay the 2017 Restructuring Bonds to be refunded; provided, however, that immediately after such withdrawal, an amount at least equal in the aggregate to the Required Operating Reserve Level then applicable to the remaining 2017 Restructuring Bonds must remain on deposit in the Operating Reserve Subaccount.

**How Funds in the Collection Account Will Be Allocated**

On each Payment Date, or for any amount payable under clauses (i) through (iv) below, on any Business Day upon which the Trustee receives a written request from the Administrator stating that any of such Operating Expenses payable by the Issuer will become due and payable prior to the next succeeding Payment Date, the Trustee shall pay or allocate all amounts on deposit in the Collection Account (other than amounts on deposit in the Debt Service Reserve Subaccount, which shall be applied solely to amounts payable under clauses (v) through (vii) below), including all earnings thereon, to pay the following amounts, in accordance with the Semi-annual Servicer Certificate, in the following priority:

(i)     all fees, costs, expenses (including legal fees and expenses) and, to the extent not in excess of $800,000 in each calendar year, indemnity amounts owed by the Issuer to the Trustee under the applicable Basic Documents shall be paid to the Trustee,

(ii)     the Servicing Fee for such Payment Date and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees not in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(iii)     the Administration Fee and all unpaid Administration Fees from prior Payment Dates shall be paid to the Administrator,

(iv)     the payment of all other Operating Expenses (other than as provided in clauses (viii) and (ix) below) for such Payment Date shall be paid to the Persons entitled to such payment,

(v)     (A) first, any overdue interest (together with, to the extent lawful, interest on such overdue interest at the applicable Bond Interest Rate) and (B) second, interest for such Payment Date shall be paid to the Holders,

(vi)     principal due and payable on the 2017 Restructuring Bonds as a result of an Event of Default (assuming the 2017 Restructuring Bonds have been declared immediately due and payable) or on the Final Maturity Date of a tranche of the 2017 Restructuring Bonds shall be paid to the Holders,

(vii)     principal for such Payment Date will be paid to Holders in accordance with the priorities described in "THE 2017 RESTRUCTURING BONDS—Principal of the 2017 Restructuring Bonds" above,

(viii)     indemnity amounts owed by the Issuer to the Trustee to the extent in excess of $800,000 in each calendar year, shall be paid to the Trustee and premiums for directors' and officers' liability insurance for trustees and officers of the Issuer shall be paid to the provider of such insurance, or, if such premium is paid by the Administrator pursuant to the Administration Agreement, the amount of such premium shall be paid to the Administrator in reimbursement thereof,

(ix)     the Servicing Fee for such Payment Date, and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(x)     the amount, if any, by which the Required Debt Service Reserve Level exceeds the amount in the Debt Service Reserve Subaccount as of such Payment Date will be paid or allocated to the Debt Service Reserve Subaccount,

(xi)     the amount, if any, by which the Required Operating Reserve Level exceeds the amount in the Operating Reserve Subaccount as of such Payment Date will be paid or allocated to the Operating Reserve Subaccount,

(xii)     the amount, if any, by which the amount in the Debt Service Reserve Fund exceeds the Required Debt Service Reserve Level on any Payment Date shall be retained in the Debt Service Reserve Fund until the next Payment Date, at which time such excess amount in the Debt Service Reserve Fund shall be applied to the payment of amounts then due under clauses (v) through (vii) above prior to any other monies available for such purpose and, to the extent that such excess amount exceeds amounts then due under such clause on such next Payment Date, such excess amount shall continue to be held in the Debt Service Reserve Fund and shall be applied under such clauses (v) through (vii) above prior to any other monies available for such purpose on succeeding Payment Dates until fully applied; and

(xiii)     the balance, if any, will be paid or allocated to the Excess Funds Subaccount for distribution on subsequent Payment Dates.

If on any Payment Date, or for any amounts payable under clauses (i) through (iv) above, on any Business Day, funds on deposit in the General Subaccount are insufficient to make the payments contemplated in clauses (i) through (ix) above, the Trustee shall (i) first, draw from amounts on deposit in the Excess Funds Subaccount and (ii) second, draw from amounts on deposit in the Operating Reserve Subaccount, in each case, up to the amount of such shortfall in order to make the payments contemplated by clauses (i) through (ix) above. In addition, if on any Payment Date, funds on deposit in the General Subaccount, together with moneys available in the Excess Funds Subaccount and the Operating Reserve Subaccount, are insufficient to make the payments contemplated by clauses (v) through (vii) above, the Trustee shall then draw from amounts on deposit in the Debt Service Reserve Subaccount, up to the amount of such shortfall in order to make the payments contemplated by such clauses (v) through (vii) above. In addition, if on any Payment Date funds on deposit in the General Subaccount are insufficient to make the allocations contemplated by clause (x) above, the Trustee shall draw from amounts on deposit in the Excess Funds Subaccount to make such allocations. If on any Payment Date funds on deposit in the Collection Account are insufficient to make the transfers contemplated by clause (v), (vi) or (vii) above, the Trustee will allocate the funds drawn pursuant to the first and second sentences of this paragraph among the tranches pro rata as provided above.

**Limited Obligation of Issuer**

**The 2017 Restructuring Bonds are not an obligation of the Authority, LIPA or any Successor Servicer. The 2017 Restructuring Bonds are not a debt, general obligation or a pledge of the faith and credit or taxing power of the State of New York or of any county, municipality or any other subdivision, agency or instrumentality of the State of New York. The 2017 Restructuring Bonds are limited obligations of the Issuer payable solely from the 2017 Collateral including the 2017 Restructuring Charges. The issuance of the 2017 Restructuring Bonds does not obligate the State of New York or any county, municipality or other political subdivision, agency or instrumentality of the State of New York to levy any tax or make any appropriation for the payments of the 2017 Restructuring Bonds. The Issuer has no taxing power.**

**Legality for Investment**

With respect to the 2017 Restructuring Bonds, the Securitization Law provides that the 2017 Restructuring Bonds are securities in which all public officers and bodies of the State and all municipalities, all insurance companies and associations, banks, trust companies, savings banks and savings associations, investment companies and other persons carrying on a banking business, all trusts, estates and guardianships and all other persons who are authorized to invest obligations of the State, may properly and legally invest. The 2017 Restructuring Bonds are also securities which may be deposited with public officers and bodies of the State and all municipalities for any purpose for which such obligations of the State are authorized.

**Additional Bonds**

The Indenture provides that the Issuer may issue or incur additional bonds, notes or other obligations, for any purpose and secured as provided by the Laws of the State, other than by the 2017 Collateral, provided that the Rating Agency Condition has been satisfied. See "THE SECURITIZATION LAW — Prior Transactions."

**THE ISSUER**

**Introduction**

The Issuer is a special purpose corporate municipal instrumentality of the State of New York created by subdivision 1 Section 4 of the Securitization Law and further described in Financing Order No. 5. The Securitization Law restricts the Issuer from engaging in activities other than those described in this section. The Issuer does not have any employees.

The Issuer's assets consist or will consist of:

- the Prior Restructuring Properties (which secures only the applicable Prior Restructuring Bonds authorized by the related Prior Financing Order that created such Prior Restructuring Property) and all rights and interests under the documents relating to such Prior Restructuring Properties,

- the 2017 Restructuring Property,

- its rights under the Sale Agreement, under the Administration Agreement and under the bill of sale delivered by the Authority pursuant to the Sale Agreement,

- its rights under the Servicing Agreement and any subservicing, agency, administration, intercreditor or collection agreements executed in connection with such Servicing Agreement,

- the Collection Account and all subaccounts of such Collection Account,

- all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing, and

- all payments on or under and all proceeds in respect of any or all of the foregoing.

The Indenture provides that the 2017 Restructuring Property will be pledged by the Issuer to the Trustee to secure its obligations in respect of the 2017 Restructuring Bonds. Pursuant to the Indenture, the collected 2017 Restructuring Charges remitted to the Trustee by the Servicer must be used to pay principal and interest on the 2017 Restructuring Bonds, all other Ongoing Financing Costs and the Issuer's other obligations specified in the Indenture.

**Restricted Purpose**

The Issuer is authorized only to:

(i)     issue restructuring bonds and use the proceeds thereof to purchase or acquire, and to own, hold and use restructuring property or to pay or fund upfront financing costs,

(ii)    contract for the servicing of restructuring property and restructuring bonds and for administrative services, and

(iii)   pledge restructuring property to secure restructuring bonds and pay all ongoing financing costs relating to the restructuring property and restructuring bonds.

The Securitization Law does not permit the Issuer to engage in any activities not directly related to these purposes, including issuing securities (other than restructuring bonds), borrowing money or making loans to other persons.

Under the Securitization Law, the Issuer is expressly prohibited from filing a petition for relief under chapter 9 of the Bankruptcy Code, which, as discussed elsewhere in this Official Statement, is the only chapter of the Bankruptcy Code potentially available for the Issuer. With respect to the Issuer, its status as a municipality and the state law prohibition against its filing of a case under chapter 9 would result in the Issuer having no access to relief under the Bankruptcy Code. It would remain subject to applicable state law concerning debtors and creditors.

**Management and Fees**

The Issuer's business is managed by a board consisting of three trustees appointed by the Governor of the State of New York. There is currently one vacancy. The trustees may not be trustees, directors, officers or employees of the Authority, LIPA or any successor owner of the T&D System Assets. However, officers and employees of the Authority or LIPA may be officers or employees of the Issuer. The Issuer has appointed the Chief Executive Officer, Chief Financial Officer and the General Counsel and Secretary of the Authority to the positions of Chief Executive Officer, Chief Financial Officer and Secretary, respectively, with the Issuer.

The trustees have staggered terms with one trustee serving for four years, one serving for five years and one serving for six years. All successor trustees shall serve for terms of six years. In the event of a vacancy, the Governor of the State of New York shall appoint a successor to serve the remainder of the unexpired term.

The trustees do not receive any salary or other compensation except for reimbursement for actual and necessary expenses incurred in the performance of official duties.

Under the Securitization Law, each trustee has a fiduciary duty to act in the best interest of the Issuer and the Governor may remove any trustee for inefficiency, neglect of duty or misconduct in office.

**Relationship of the Issuer to the Authority and LIPA**

The Securitization Law requires the Issuer to keep its assets and liabilities separate and distinct from the Authority, LIPA, and any other entity.

**Administration Agreement**

LIPA will, pursuant to an Administration Agreement between LIPA and the Issuer, provide administrative services to the Issuer, including services relating to the preparation of documents it might be required to file under

applicable law. The Issuer will pay LIPA an annual administration fee of $100,000 payable in semi-annual installments on each Payment Date. In addition to the Administration Fee, the Issuer will reimburse the Administrator for expenses it incurs in connection with services it performs under the Administration Agreement.

## THE SELLER

### General

The Authority will be the seller of the 2017 Restructuring Property, which the Issuer will pledge to secure the 2017 Restructuring Bonds. The Authority is a corporate municipal instrumentality and a political subdivision of the State of New York, exercising essential governmental and public powers. As such, the Authority should be found to constitute a "municipality" eligible for bankruptcy relief only under chapter 9 of the Bankruptcy Code. Among the requirements for a municipality to commence a case under chapter 9 is the requirement that it be specifically authorized by state law to be a debtor under chapter 9. The Authority is explicitly authorized to file a petition under chapter 9 pursuant to its enabling legislation. See "RISK FACTORS—Bankruptcy-Related Risks."

### Service Area

*General.* The Authority became the retail supplier of electric service in the Service Area on May 28, 1998 by acquiring LILCO as a wholly-owned subsidiary of the Authority through a merger. Since such acquisition, LILCO has done business under the names LIPA and Power Supply Long Island. The Authority, acting through LIPA, provides electric service in the Service Area. For purposes of the 2017 Restructuring Bonds and collection of the 2017 Restructuring Charges, the "Service Area" is defined by the Securitization Law as the service area of LIPA as of July 29, 2013.

LIPA's service area includes approximately 1.1 million customers and during the period 2012 through 2016 experienced its peak usage of approximately 5,602 MW in the summer of 2013. In the year ending December 31, 2016, approximately 55.0% of LIPA's annual retail revenues were received from residential customers, 43.1% from commercial customers and 1.9% from street lighting, public authorities and certain others. The largest customer in the Service Area (the Long Island Rail Road) accounted for less than 2.0% of total sales and less than 2.0% of revenue. In addition, the ten largest customers in the Service Area accounted for approximately 7.0% of total sales and less than 6.0% of revenue.

*Service Area Demographics.* The Service Area consists of Nassau and Suffolk Counties in Long Island (with certain limited exceptions) and a small portion of Queens in New York City known as the Rockaways. According to Bureau of Labor Statistics data, the population of the Service Area (excluding the Rockaways portion) was approximately 2.9 million as of December 31, 2016, which represents very modest growth since December 31, 2010. As of December 31, 2016, the Authority had approximately 1.1 million customers in the Service Area, which was relatively stable as compared to December 31, 2010.

Long Island is a significant regional economy that benefits from its proximity to Manhattan, but also generates its own income, employment, and regional output. Long Island's assets include a highly skilled labor force, close proximity to New York City, over 20 colleges, universities and two/three year colleges and core research institutions, such as Brookhaven National Laboratory, Cold Spring Harbor Laboratory, and the technology and science developmental centers at Stony Brook and Farmingdale Universities that specialize in the areas of biotechnology, computer sciences, wireless and internet technologies, and energy. Long Island also has a highly desirable suburban life style that attracts many individuals to live, work and vacation within the area.

The Long Island economy benefits from high average personal income and a service-based economy. According to recent data published by the U.S. Bureau of the Census and Bureau of Labor Statistics, the Long Island median household income is substantially above the national average.

The table below shows Long Island's unemployment rate as compared with the national and State unemployment rates for the periods shown:

**Service Area Unemployment – Average Annual**

| Year | US[1] | NY[2] | Nassau-Suffolk[2] |
|------|------|------|-------------------|
| 2012 | 8.1% | 8.5% | 7.4% |
| 2013 | 7.4% | 7.7% | 6.2% |
| 2014 | 6.2% | 6.3% | 5.1% |
| 2015 | 5.3% | 5.3% | 4.6% |
| 2016 | 4.9% | 4.4% | 4.2% |

*Sources:*

1. Bureau of Labor Statistics: http://www.bls.gov/data/ (not seasonally adjusted data)
2. New York State Department of Labor: http://www.labor.ny.gov/stats/ (not seasonally adjusted data)

*Retail Choice.* Under current law, Customers may purchase energy from third party providers. In 1998, the Authority adopted a retail choice program (called "Long Island Choice") which is intended to offer electric customers the opportunity to choose an electric energy supplier other than LIPA. The program is available to all customers in the Service Area. As of July 2017, other suppliers were selling electricity to 11,059 commercial customers in the Service Area representing a total coincident peak load of 295 MW. PSEG Long Island and the Authority have undertaken a "collaborative" review of the Long Island Choice program organized by the DPS (as defined below) and with the participation of other interested parties in 2016. At calendar year end 2015, DPS initiated "MATTER 15-02754 – In the Matter of Examining the Potential Benefits of Retail Competition for Long Island Electric Customers," which invited comments on the potential benefits to customers of retail competition in the Long Island electricity market. According to DPS, its objective in the proceeding is to investigate potential benefits to customers and examine what reforms, if any, are needed to achieve them. On May 18, 2016, DPS provided that the comment period established in the Long Island participatory process is extended until 30 days after the resolution of matters raised in the Order Resetting Retail Energy Markets and Establishing Further Process, issued by the PSC on February 23, 2016 in Cases 15-M-0127, 12-M-0476 and 98-M-1343 (the "Regulated Utilities Retail Choice Proceedings"). The Regulated Utilities Retail Choice Proceedings are still pending, having been delayed by litigation. Neither the Authority nor the Issuer can make a prediction as to the resolution of the Regulated Utilities Retail Choice Proceedings or effect, if any, new or revised State or federal laws addressing retail and commercial competition will have on ongoing implementation of retail competition.

A Customer must pay 2017 Restructuring Charges as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, regardless of whether such Customer produces some of its own electricity or purchases electric generation services from a provider of electric generation services who is not the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA.

*Municipalization.* In addition, local governments may consider municipalization as a means to lower the cost of electric service. If municipalization were to occur, it would likely require condemnation of the T&D System Assets or construction of duplicate electric transmission and distribution facilities. Since the acquisition of LIPA by the Authority in 1998, no municipalizations have occurred in the Service Area.

**Relationship of the Authority to LIPA**

LIPA is a New York corporation and a wholly-owned subsidiary of the Authority. Pursuant to LIPA's organizational documents, the Authority conducts and manages LIPA's business and affairs. Accordingly, LIPA is controlled by the Authority. The Authority is governed by a Board of Trustees (the "Authority Trustees"). There are nine members of the Authority's Board of Trustees. Pursuant to the Public Authorities Law and as set forth in the Authority's By-laws, five (5) Trustees of the Authority constitute a quorum for the transaction of any business or the exercise of any power of the Authority and the Authority only has the power to act by a vote of five (5) Trustees.

The Authority and LIPA are parties to the Financing Agreement providing for their respective duties and obligations relating to the financing and operation of the retail electric business in the Service Area. Pursuant to the terms of that Financing Agreement, the Authority is to issue all debt necessary for the Authority and LIPA. This debt includes all bonds and subordinated indebtedness issued and to be issued. The proceeds of all such debt are to be treated as being loaned to LIPA, which is to repay such loans from the revenues it receives from its electric business. To secure the loans, LIPA has pledged all of its revenues to the Authority, which has, in turn, pledged such revenues

as security for such debt. These revenues consist of charges imposed upon and being paid by the same Customers who will pay the 2017 Restructuring Charges. However, the 2017 Restructuring Charges are Transition Charges and, therefore, are not subject to the lien securing the Authority's indebtedness. See "THE SELLER—Relationship Between the 2017 Restructuring Bonds and the Authority's Existing Indebtedness" below.

Pursuant to the terms of the Financing Agreement, LIPA conducts the electric business in the Service Area and is responsible for providing service to customers in the Service Area. The Authority and LIPA are also parties to an administrative services agreement pursuant to which the Authority provides personnel, personnel-related services and other services necessary for LIPA to provide electric service in the Service Area.

**System Operation by the Authority and LIPA**

In order to assist the Authority (acting through LIPA) in providing electric service in the Service Area, the Authority and LIPA have entered into operating agreements, the purpose of which is to provide the Authority and LIPA with the operating personnel and a significant portion of the power supply resources necessary for LIPA to continue to provide electric service in the Service Area. From 1998 through 2013, the service providers were generally the National Grid Subs and their predecessors, with some exceptions.

After the acquisition, a National Grid Sub was the T&D System manager pursuant to a Management Services Agreement (the "MSA"), which expired at the end of 2013. T&D System management services included, among other functions, the day-to-day operation and maintenance of the T&D System, customer service, billing and collection, meter reading and forecasting. As described below under "—Transition to a New Business Model," the Authority transitioned to a new business model first adopted by the Authority Trustees in late 2011 and modified in response to the requirements of the LIPA Reform Act, which had an impact on the Authority's relationship with its service providers. Since January 1, 2014, PSEG Long Island has been the service provider pursuant to the OSA. Under the OSA, the PSEG Long Island management company is the contracting entity with LIPA.

**Authority to Set Electric Rates**

Under the Securitization Law, the 2017 Restructuring Charges and any adjustments thereto are not subject to review or regulation by the New York State Department of Public Service ("DPS"), the staff arm of the PSC.

The Authority is empowered under its enabling statute to set rates for electric service in the Service Area without obtaining the approval of the PSC, DPS or any other State regulatory body. Under the LIPA Reform Act, on or before February 1, 2015, the Authority and PSEG Long Island were required to submit to the DPS a three-year rate proposal for rates and charges to take effect on or after January 1, 2016. After the 2016-2018 period, the Authority and PSEG Long Island are required to submit a proposed rate increase for DPS review if it would increase the rates and charges by an amount that would increase the Authority's annual revenues by more than 2.5%. In addition, the Authority may place rates in effect on an interim basis, and such interim rates are subject to prospective adjustment only. The Authority retains final rate setting power.

On January 30, 2015, a three-year rate plan for the period 2016-2018 was submitted by PSEG Long Island and the Authority for review by DPS. PSEG Long Island and the Authority's original submission on January 30, 2015 proposed rate increases of $72.7 million, $74.3 million, and $74.3 million for the years 2016, 2017 and 2018, respectively, for a cumulative revenue requirement increase of $441.0 million over the three year period. On September 28, 2015, DPS submitted its rate recommendation to the Authority's Board (the "Recommendation"). Documents relating to the rate plan filing can be found at DPS's website (www.dps.ny.gov) under PSEG Long Island Electric Rate Case (Case # 15-00262) at: http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=47329&MNO=15-00262. In addition, certain information relating to the rate plan filing can be found on the Financials tab of the Authority's website (www.lipower.org) at: http://www.lipower.org/financials.html. Information on those websites is not included by specific cross-reference herein.

Throughout the proceeding, PSEG Long Island, the Authority, the DPS staff and other parties proposed and updated revenue requirement positions. PSEG Long Island and the Authority's incremental rate request as of the time of the DPS Recommendation was $58.2 million, $72.2 million, and $68.1 million for the years 2016, 2017 and 2018, respectively, for a cumulative increase of $387.2 million or 5.4%. The Recommendation was for the Authority to set rates designed to increase revenues by $30.4 million in 2016, $77.6 million in 2017, and $79.0 million in 2018, respectively, which rates represent a cumulative revenue requirement increase of $325.4 million or 5.0%. At those

proposed levels, the Authority's overall electric revenues, including power supply costs, would have increased by approximately 0.8%, 2.1%, and 2.1%, respectively.

The Three Year Rate Plan adopted the "Public Power Model" of rate-setting proposed by PSEG Long Island and the Authority, which makes use of the debt service coverage method in determining revenue requirements. For the Authority this entails transitioning from the historical use of a $75 million net income target to fixed obligation coverage targets (including capitalized leases) on Authority issued debt of 1.20x, 1.30x, 1.40x in 2016, 2017, and 2018 (and 1.45x in 2019, after the Three Year Rate Plan). The net income to fixed obligation coverage for 2016 was approximately 1.26x. When the Issuer's restructuring bonds are included, those coverage ratio targets are a minimum of 1.15x, 1.20x, and 1.25x in 2016, 2017, and 2018, respectively. Depreciation expense, amortization of the acquisition adjustment and of other regulatory assets, as well as the difference between the accrual expense and actual required cash contributions to PSEG Long Island OPEBs, are non-cash expenses excluded from the Authority's methodology for calculating the coverage calculation. The Three Year Rate Plan also included as a credit rating target to raise the Authority's credit ratings to A2 by Moody's, A by S&P, and A by Fitch over five years. Furthermore, the filing sought through increasing fixed obligation coverage targets to bring down the level of debt funding as a percentage of its annual capital program to 64% or less over five years. Neither the Authority nor the Issuer can predict whether any such targets will be realized.

The Recommendation also includes an annual update process to adjust delivery rates higher or lower to reflect measurable changes in certain specified projected costs ("Staged Updates") during the three years of the rate and plan and a permanent cost reconciliation mechanism (the "Delivery Service Adjustment") to reconcile certain specified projected costs to actual costs in each year.

The Staged Updates provide for updating electric rates at the beginning of each year for items that are subject to variability due to external factors including, among others: debt service (also subject to the Delivery Service Adjustment); certain components of the costs of the Power Supply Agreement with National Grid (which, effective January 2017, are recovered through the Power Supply Charge and removed from the Staged Update and Delivery Service Adjustment); property-based PILOTs; and certain other legal or regulatory changes. Projections are updated each autumn, subject to DPS review, and presented to the Authority Trustees as part of the annual budget process. The Authority's Staged Update for 2017 resulted in rates that raised the 2017 revenues net of fuel from the $2,111,416,000 set forth in the Recommendation to $2,112,167,000, an increase of $751,000.

The Delivery Service Adjustment provides cost recovery for certain items that can vary significantly due to external factors, which items include, among others: debt service (variances in interest rates, capital expenditures and savings derived from the Issuer's financings) and storm expenditures (variances from the approximately $34 million per year budgeted for storm expenses in base rates). The Delivery Service Adjustment are calculated through the end of September each year, which allows for the bill impact to be known in advance of annual budget approval. Any adjustment would be reviewed by DPS for accuracy and implemented on the following January 1st and reviewed by DPS.

In addition, the Recommendation affirmed the Authority's use of a "Revenue Decoupling Mechanism." The Authority's Board initially modified its tariff to establish a Revenue Decoupling Mechanism in March 2015 as an "Adjustment to Rates and Charges," which PSEG Long Island is authorized to calculate and update each year according to the pre-defined terms of the tariff. All six of the major New York state electric utilities have Revenue Decoupling Mechanisms within their tariffs for delivery service. Mechanically, Revenue Decoupling Mechanisms function by comparing actual revenues with authorized revenues and crediting (or collecting) any differences due to (or from) customers in a subsequent period; it is intended to cover all sources of variances in delivery service revenues including, among other things, any net lost revenues attributable to the implementation of energy efficiency or net metering programs, any revenue variances (positive or negative) caused by weather patterns, and revenue variances (positive or negative) that result from changes in economic conditions.

**Where to Find Information about the Authority**

The Authority periodically files documents with the Electronic Municipal Market Access system ("EMMA"). In addition, for convenience, further information about the Authority can be found on the Authority's website (www.lipower.org). No documents filed with EMMA or information on the Authority's website is included by specific cross-reference herein.

**Relationship between the 2017 Restructuring Bonds and the Authority's Indebtedness**

The Authority's secured indebtedness is secured by a lien on all of its revenues, rates, fees, charges, and other income and receipts from the operations of any of its subsidiaries; provided, however, that, among other things, "Transition Charges" are not subject to that lien. Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "Transition Charges" and that they are not subject to the lien of the General Resolution. In addition, the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens. See "SECURITY FOR THE 2017 RESTRUCTURING BONDS – Lien on 2017 Restructuring Property" in this Official Statement. Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution.

## SERVICER AND ADMINISTRATOR

**General**

As described herein, LIPA is a wholly-owned subsidiary of the Authority, which owns and operates the electric transmission and distribution system located in the Service Area, and the Authority and LIPA have entered into operating agreements with third parties, which provide the Authority and LIPA with the operating personnel and resources necessary for LIPA to continue to provide electric service in the Service Area. LIPA is a New York corporation and is eligible to be the subject of a voluntary or involuntary petition in a liquidation case under chapter 7 of the Bankruptcy Code or a reorganization case under chapter 11 of the Bankruptcy Code.

**Servicing the 2017 Restructuring Bonds**

LIPA will, pursuant to a Servicing Agreement between LIPA and the Issuer, provide services to the Issuer in connection with the servicing of the 2017 Restructuring Property, 2017 Restructuring Charges, and the 2017 Restructuring Bonds. The Issuer will pay LIPA, as Servicer, the Servicing Fee which shall be 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds and is intended to be the estimated incremental cost of performing the Services required by the Servicing Agreement. The Servicing Fee for any Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets may be higher than the Servicing Fee for LIPA; provided, however, that any Servicing Fee in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be subject to approval by the Authority and the Trustee. In addition to the Servicing Fee, the Issuer will reimburse the Servicer for expenses it incurs in connection with the services it performs under the Servicing Agreement. As described herein, pursuant to the OSA, PSEG Long Island will provide many of the Servicer functions on behalf of LIPA, including, among other things, billing and collection, meter reading and forecasting.

**Transition to a New Business Model**

In connection with the expiration of the MSA, the Authority determined that it was desirable to solicit proposals that would provide for, at a minimum, a different delivery structure under which the T&D System Assets would be operated and maintained by a separate subsidiary of the selected service provider that would be dedicated to the Authority's electric business, and thus better aligned to the Authority's goals. Following a competitive process to select a new service provider, on December 15, 2011, the Authority's Trustees authorized the execution of two agreements to transition to a new business model. First, it authorized LIPA to enter into an Operations Services Agreement between LIPA and PSEG Long Island for PSEG Long Island to provide operations, maintenance and related services for the T&D System beginning on January 1, 2014. Second, it authorized LIPA to enter into a two-year Transition Services Agreement ("TSA") with PSEG Long Island, which expired on December 31, 2013.

The subsequent implementation of the LIPA Reform Act required the transfer of substantial operational duties and obligations to PSEG Long Island and greater operational flexibility for PSEG Long Island to carry out its related duties. In response to the LIPA Reform Act, LIPA re-negotiated the OSA with PSEG Long Island to address the changed relationship between the parties in connection with the provision of electric service in LIPA's service area. PSEG Long Island's scope of services and LIPA's reserved rights have been adjusted to reflect the shift in operations, management and policy making responsibilities while assuring LIPA's oversight rights. In addition, effective January 1, 2014, PSEG Long Island became the brand name provider for electric service in the service area. PSEG Long Island also assumed certain power supply management, fuel procurement and related services on January 1, 2015 that had been provided by others. Further information about PSEG and PSEG Long Island can be found at

http://www.psegliny.com. No information on that website is included herein. See "—The LIPA Reform Act and the OSA" below.

The LIPA Reform Act also requires that staffing at the Authority be kept at levels only necessary to ensure that the Authority is able to meet obligations with respect to its bonds and notes and all applicable statutes and contracts, and to oversee the activities of PSEG Long Island. The Authority's Executive Management team includes the following: Chief Executive Officer (Thomas Falcone); Chief Financial Officer (Joseph A. Branca) General Counsel and Secretary (Jon R. Mostel); Vice President of Operations Oversight (Rick Shansky); Vice President of Financial Oversight (Kenneth Kane); Vice President of Policy and Strategy (Bobbi O'Connor); Chief Information Officer (vacant); Controller (Donna Mongiardo); Director of Human Resources and Administration (Barbara Ann Dillon); Director of Audit (Kathleen Mitterway); Director of Customer Service Oversight and Stakeholder Relations (Michael Deering); Director of Rates and Regulation (Justin Bell); Special Counsel for Ethics, Risk and Compliance (James Miskiewicz); and Director of Public Information (Sidhartha Nathan).

**The LIPA Reform Act and the OSA**

The LIPA Reform Act imposed new substantive obligations on any service provider and effectively shifted the major operational and policy-making responsibilities for the T&D System, including significant responsibilities relating to capital expenditures, budgets and emergency response, from LIPA to PSEG Long Island. Consistent with this approach, the LIPA Reform Act requires that staffing at the Authority be kept at levels only necessary to ensure that the Authority is able to meet obligations with respect to its bonds and notes and all applicable statutes and contracts, and to oversee the activities of PSEG Long Island. The LIPA Reform Act requires PSEG Long Island to prepare and maintain an emergency response plan to assure the reasonably prompt restoration of service in the case of an emergency event and establish separate responsibilities of the Authority and the service provider; submit for review to DPS a report detailing PSEG Long Island's planned capital expenditures; consider, consistent with maintaining system reliability, renewable generation and energy efficiency program results and options in establishing capital plans; and submit to DPS for review, data, information and reports on PSEG Long Island's actual performance related to the metrics in the OSA, including the Authority's evaluation thereof, prior to the Authority's determination of PSEG Long Island's annual incentive compensation.

Implementation of the LIPA Reform Act required the transfer of substantial operational duties and obligations to PSEG Long Island and greater operational flexibility for PSEG Long Island to carry out its related duties. In response to the LIPA Reform Act, LIPA re-negotiated the operations services agreement with PSEG Long Island to address the changed relationship between the parties in connection with the provision of electric service in LIPA's Service Area. The resulting OSA has a term of 12 years, expiring December 31, 2025 and provides that if PSEG Long Island achieves certain levels of performance based on criteria specified in the OSA during the first 10 years, the parties will negotiate in good faith an eight year extension of the OSA on substantially similar terms and conditions.

*The following is a brief summary of certain provisions of the OSA. This summary does not purport to be complete and reference is made to the OSA for full and complete statements of such agreement and all provisions. The OSA has been filed with the MSRB's EMMA and is included by specific cross-reference herein. For convenience, a copy of the OSA can also be found on the Authority's website (www.lipower.org) under the caption "Reports and Contracts."*

*Compensation.* The OSA provides for an annual fixed component of the management services fee of $36.3 million in 2014 and 2015, which increases to $58 million in 2016 and thereafter (prorated as appropriate and indexed in accordance with the OSA). In addition, the OSA provides for an annual incentive compensation pool of $5.44 million in 2014 and 2015, which increases to $8.7 million in 2016 and thereafter (in each case expressed in 2011 dollars, prorated as appropriate and indexed in accordance with the OSA). The incentive compensation pool is earned based on favorable performance relative to the Performance Metrics contained in the OSA. Generally, costs and expenses (without any mark-up or profit) incurred by PSEG Long Island in the course of providing operations services are treated as "Pass-Through Expenditures" under the OSA.

*Performance Metrics.* The Performance Metrics in the OSA are designed to encourage PSEG Long Island to achieve LIPA's desired performance levels, which is generally first quartile performance as determined by agreed industry peer benchmarks. The Performance Metrics are structured both to maintain good performance and improve poor performance, through two distinct types of Performance Metrics, "Maintenance Metrics" and "Improvement Metrics." Maintenance Metrics are those Performance Metrics for which satisfactory performance levels are currently

being achieved. The goal of Maintenance Metrics is to incent continued satisfactory performance (generally, first quartile). Improvement Metrics are those Performance Metrics for which current performance is unsatisfactory. The goal of Improvement Metrics (generally, first quartile) is to incent improved performance over time. To date, PSEG Long Island has completed three years of T&D operations and made substantial progress toward achieving or maintaining the Performance Metrics described above, as well as substantially improved LIPA's standing in the J.D. Power Residential and Business customer satisfaction surveys. Under certain circumstances, the parties may agree to amend the Performance Metrics.

*Operations Services.* PSEG Long Island is required to provide operations services for the T&D System on behalf of LIPA at all times in accordance with the standards set forth in the OSA. Under the OSA, except for certain rights and responsibilities reserved to LIPA, PSEG Long Island assumes and undertakes the rights and responsibilities for management, operation and maintenance of the T&D System and the establishment of policies, programs and procedures with respect thereto, including: all electric transmission, distribution and load servicing activities for the safe and reliable operation and maintenance of the T&D System; day-to-day operation of the T&D System; engineering activities; preparation of recommended capital plan and monitoring of approved annual capital budget; preparation of long- and short-range planning analyses and forecasts; customer services; finance, accounting, budgeting, longer-term financial forecasting and treasury operations related to the T&D System; and other general activities such as information technology, human resources, procurement, implementation of emergency response and reporting. Under the OSA, LIPA retains continuing oversight responsibilities and obligations with respect to the operation and maintenance of the T&D System consistent with the LIPA Reform Act. LIPA's specific rights and responsibilities with respect to the T&D System include, among other things: the right to determine all T&D System rates and charges; the right to review and approve the consolidated budget pursuant to the procedures outlined in the OSA, and the LIPA Reform Act; responsibility for financing the business and operations of the Authority and LIPA; compliance with any financing documents and administration of debt service for all debt of the Authority and LIPA; and overall responsibility for the Authority's and LIPA's legal matters, including reporting and related legal compliance.

In addition to the expansion of operational duties and obligations of PSEG Long Island under the OSA as compared with the prior service provider, PSEG Long Island is now the retail brand for electric service on Long Island.

*Additional Services.* Effective January 1, 2015, a PSEG Long Island affiliate also assumed certain power supply management, fuel procurement and related services.

*Termination of OSA.* The OSA contains customary events of default, including bankruptcy, payment failures and failure to perform material obligations under the agreement, as well as cure rights. The OSA may be terminated upon an event of default that has not been timely cured. In the event of a bankruptcy-related event of default under the OSA, the OSA terminates immediately without further action by the non-defaulting party. For payment defaults or, in the case of PSEG Long Island and certain of its affiliates only, credit support-related defaults, the non-defaulting party may terminate upon not less than fifteen Business Days' written notice to the other party. For other events of default, the non-defaulting party must generally provide not less than ninety Business Days' written notice prior to termination. Immediately upon the expiration or any earlier termination of the OSA, the PSEG Long Island service company will transfer all of the membership interests in the PSEG Long Island service company and all corporate books and records to LIPA or, at LIPA's direction, its designee at no cost to LIPA or its designee. LIPA and PSEG Long Island will mutually agree upon such instruments, agreements and other documents as may be reasonably necessary to effect such transfer.

*Additional Service Provider Termination Rights.* Under the OSA, PSEG Long Island may terminate the agreement in the event of either a (i) LIPA Privatization, (ii) LIPA Municipalization or (iii) Change in Regulatory Law (all as defined in the OSA) (each, a "PSEG Long Island Termination Event"). If a PSEG Long Island Termination Event occurs and PSEG Long Island exercises its right to terminate the OSA, the termination notice period would generally extend for 12 or 14 months (depending on the nature of the PSEG Long Island Termination Event). Under the OSA, LIPA has the option to extend the effective date of any such termination for up to 6 months. In addition, if LIPA is unable to procure and contract with a successor service provider prior to the termination date of the OSA, LIPA could seek to commence an arbitration proceeding under the OSA on the grounds, among others, that termination of the OSA under such circumstances would be contrary to the public interest and should, therefore, be deferred.

If the OSA is terminated due to a PSEG Long Island Termination Event, it may be difficult for LIPA to obtain a successor T&D System manager prior to the termination date of the OSA (as it may be extended) and there can be no assurance that LIPA will be able to do so. In such event, the OSA provides that PSEG Long Island transfer to, and

LIPA would take ownership of, the PSEG Long Island service subsidiary. LIPA would then perform the PSEG Long Island billing and collection function with the subsidiary company employees.

*Additional LIPA Termination Rights.* LIPA may also terminate the OSA at any time if LIPA is privatized or operation of LIPA's T&D System is "fully municipalized" upon not less than six months' notice. In addition, in the event of a "Change of Control" of PSEG Long Island or certain affiliated entities, LIPA has the right to terminate the OSA upon not less than thirty days' notice. Beginning in the third contract year, LIPA also has the additional right to terminate the OSA if PSEG Long Island fails to satisfy either the major storm or the minimum performance level metric in the then-current contract year and any one of the preceding two (2) contract years upon not less than six months' prior written notice. If LIPA exercises the right to terminate the OSA as set forth in this paragraph, it must set forth in its written termination notice a termination date which cannot exceed 12 months following the date of such notice.

**Servicing Experience**

LIPA has acted as servicer of the Prior Restructuring Property created in accordance with each of the Prior Financing Orders, commencing in January 2014 in connection with the Prior Restructuring Properties securing the 2013 Restructuring Bonds. To date, the Servicer has complied with its obligations under each of the servicing agreements relating to Prior Restructuring Properties, including timely performance of its obligations relating to the True-Up Adjustment Process.

In addition, the 2013 Restructuring Bonds, the 2015 Restructuring Bonds, the 2016A Restructuring Bonds and the 2016B Restructuring Bonds have been paid in accordance with the expected amortization schedules therefor. For the first four months of 2016, billings and collections of the restructuring charges securing the 2013 Restructuring Bonds and the 2015 Restructuring Bonds, respectively, were approximately 5.2% below forecast principally due to unseasonably warm winter weather and greater than expected energy efficiency. On April 15, 2016, the Servicer in its capacity as servicer for such restructuring bonds, issued notices of adjustment applicable to those restructuring charges, which adjustments reflected the lower than expected billings and collections. Those adjustments were effective on May 15, 2016. In order to pay a portion of the June 15, 2016 debt service payment obligation relating to the 2013 Restructuring Bonds, $2,422,557.92 from the then-current reserve balance of $10,128,254.86 was withdrawn from the reserve subaccount. In order to pay a portion of the June 15, 2016 debt service payment obligation relating to the 2015 Restructuring Bonds, $863,695.48 from the then-current 2015 reserve balance of $20,054,812.42 was withdrawn from the operating reserve subaccount. The notices of adjustment issued on April 15, 2016 contemplated the lower than forecast sales and the need to replenish the amounts then projected to be withdrawn from the reserves with amounts to be collected from the adjusted restructuring charges. Those reserves were replenished from such adjusted restructuring charges.

**Allocation Account; Remittance of 2017 Restructuring Charges; Reconciliation**

*Allocation Account; Daily Remittances.* The Authority has established an Allocation Account that holds all Customer payments until the checks clear and allocations can be made. The Allocation Account is administered by an Allocation Agent designated by the Authority for the benefit of the Trustee, the trustees for each of the Prior Restructuring Bonds, and the trustee under the Authority's General Resolution (as defined herein). The Authority itself will continue to act as the Allocation Agent.

The Servicer is required to cause all payments from Customers (including Charge Collections) to be deposited into the Allocation Account. Customer revenues which are not directly paid into the Allocation Account by Customers and are otherwise received by the Servicer must be deposited into the Allocation Account within two Business Days' receipt by the Servicer or the Authority. On each Business Day, the Allocation Agent is required to transfer to the Trustee for deposit into the Collection Account the amount of Charge Collections estimated to have been received and deposited into the Allocation Account. Such amount is referred to as "Daily Remittances." The remaining funds in the Allocation Account on each such Business Day will be transferred to the Authority's revenue account.

*Reconciliation of Actual versus Estimated Charges*

Pursuant to the Servicing Agreement, within fifteen days prior to the date on which it files an Adjustment Notice with the Authority, the Servicer is required to calculate and report the amount of Actual Charge Collections during the prior Reconciliation Period as compared to the Estimated Charge Collections in that period. The Servicer is also required to calculate the amount of any Excess Remittance or Remittance Shortfall for that prior Reconciliation Period.

If a Remittance Shortfall exists, the Servicer will cause the Allocation Agent to make a supplemental remittance from the Allocation Account to the Collection Account within two Business Days after such calculation. If an Excess Remittance exists, the Servicer will cause the Excess Remittance to be corrected as soon as practicable by either (1) reducing the amount of each Daily Remittance from the Allocation Account until the balance of the Excess Remittance has been reduced to zero, or (2) causing payment of the amount of the Excess Remittance to the Servicer (for deposit in the revenue fund established under the Authority's General Resolution) from the General Subaccount or the Excess Funds Subaccount, if necessary.

## Billing and Collection Policies

### Credit Policy

The provision of electric service to Service Area customers by the Authority is governed by the Home Energy Fair Practices Act ("HEFPA"), which is Article 2 of the New York Public Service Law. Pursuant to § 11.12 of HEFPA, deposits can be required from residential customers in a number of circumstances, such as for seasonal or short-term service or for Customers who have filed for bankruptcy. The deposit can be as much as twice the average monthly bill for a calendar year. The Customer may pay the deposit in installments and the Customer earns interest on the deposit for as long as the Authority holds that amount. The deposit is automatically returned to the Customer if the Customer is not delinquent in the payment of bills during the one year period from the payment of the deposit.

All new commercial accounts require a deposit, and the HEFPA Rules allow the Authority to request a deposit from an existing, commercial Customer "whose financial condition is such that it is likely that the customer may default in the future; provided, however, that the utility must have reliable evidence of such condition, such as a report from accepted financial reporting services or credit reporting agencies." LIPA's service provider, PSEG Long Island, subscribes to DNBi, a web-based subscription service that monitors the changing risk conditions of commercial customers in the Authority's portfolio. An algorithm can be customized in conjunction with Dun & Bradstreet which combines several elements that are used to determine which Customers are at high risk for default.

The table below indicates the numbers and dollars of deposits from residential and commercial Customers held by the Authority at the beginning of the past 5 years. Approximately 13% of the average monthly revenue for 2016 was secured with a cash deposit. This calculation does not include non-cash securities, such as security bonds and letters of credit.

### Deposits on Hand from Residential and Commercial Customers

| Beginning of: | Number of Deposits | Dollars of Deposits (in thousands) |
|---|---|---|
| 2013 | 31,202 | $34,218 |
| 2014 | 32,706 | $36,404 |
| 2015 | 33,837 | $35,818 |
| 2016 | 34,755 | $36,239 |
| 2017 | 35,195 | $35,676 |

### Billing Process

LIPA's billing process is managed by PSEG Long Island. Bills are generated in a three-step process: meter reading, bill calculation, and bill printing and mailing. Meters are read on a bi-monthly cycle for approximately 978,000 residential and small commercial Customers (85% of Customers). Meters are read on a monthly cycle for approximately 72,000 larger commercial demand-metered Customers (6% of Customers) and approximately 99,000 residential Customers with special situations such as electric space heating and solar (9% of Customers). The majority of LIPA's meters are read manually by meter readers, except for approximately 61,500 accounts (5% of Customers) that are read using (i) hand-held remote sensing (ERTS) (17,200), and (ii) Smart Meter technologies (44,301, which accounts for approximately 32.3% of sales). LIPA currently expects to convert entirely to Smart Meter technologies over the next four years.

Once the meter readings are received, bills are calculated and generated by PSEG Long Island and transmitted to a vendor for printing and mailing. The billing cycle differs from the meter reading cycle in that many residential Customers that have their meters read bi-monthly receive bills on a monthly basis. Approximately 869,000 residential

Customers receive monthly bills which, combined with the approximately 95,000 commercial accounts that are billed monthly, makes a total of 964,000 Customers (84% of Customers) that receive bills monthly rather than bi-monthly.

Most of the Customers pay their bills by U.S. Mail. Payments are mailed to a Long Island address where they are retrieved and processed by a vendor working on behalf of PSEG Long Island. Payments are processed to a lock-box which deposits the receipts into the Allocation Account. All other forms of payment are also deposited directly into an Authority bank account when they are processed or received.

### Customer Remittance Payments Processed in 2016 by Type

| Type of Payment | Items (in thousands) | Dollars (in millions) |
|---|---|---|
| US Mail/Lockbox | 3,981 | $1,613 |
| Internet | 1,338 | 308 |
| Home Banking | 2,768 | 578 |
| Direct Debit | 1,074 | 249 |
| In-house Processing | 31 | 113 |
| Pay Agents | 9 | 4 |
| Pay by Phone | 316 | 107 |
| Interactive Voice Recognition | 754 | 157 |
| Customer Office | 446 | 148 |
| Large Customers ACH | 3 | 57 |
| Energy Assistance | 37 | 8 |
| Collection Agencies | 10 | 2 |
| Credit Card | 222 | 55 |
| | 10,989 | $3,399 |

*Collection Policy*

LIPA's collection process is managed by PSEG Long Island. Collection practices, including the ability to terminate (disconnect) service, are governed by HEFPA. LIPA's bills are due immediately and payable in 20 days to avoid late payment charges and other collection activities. Bill notices and outbound telephone calls may begin as early as 30 days after a bill is issued, if payment is not received. To conform to HEFPA requirements, a series of notices will appear on the bills for delinquent Customers, indicating that service may be terminated if payment is not received. The Customer must also be offered a deferred payment agreement for outstanding arrears. The standard deferred payment agreement requires payment of up to 15% of the bill, and monthly payments of the balance over ten months, plus the payment of all current charges going forward. Customers that do not make payment of their outstanding arrears or enter into a deferred payment agreement are subject to termination of service (disconnection) for non-payment. To execute the termination, a field visit is performed to offer a final opportunity to make the payment, evaluate the situation from a safety perspective and, if called for, immediately disconnect the Customer.

The ability to terminate is also restricted by weather conditions, in accordance with HEFPA. During warm weather (i.e. summer) conditions, residential service cannot be terminated when the temperature-humidity (heat) index has reached 95 degrees for two consecutive days or the temperature has been 100 degrees for any length of time or heat advisory or excessive heat warnings have been issued. During cold weather (winter) conditions, residential service will not be terminated if the high temperature of the day does not rise above 32 degrees. Between November 1st and April 15th, PSEG Long Island must attempt to contact the customer via telephone or in person 72 hours prior to termination and the field staff must recheck the location on the following day if there was no contact made at the time of termination.

Significant efforts are made through the collections process to avoid both Customer termination, if possible, and write-offs, to the extent practical. PSEG Long Island performs significant outbound calling efforts and field collection visits to give Customers every opportunity to make payment on outstanding balances. Larger commercial Customers are also visited by collections and key account representatives to explore other possible avenues for bringing the account up-to-date. Payment agreements and referrals to the appropriate social service agencies are also used to maximize the payment of outstanding arrears for residential Customers. In the event that a final bill is issued (either because the Customer left the premises without paying their outstanding balances or PSEG Long Island

terminated service), an effort is made to identify any new location within the Service Area where the Customer may have moved, and have the outstanding arrears transferred there, and the balance due may be assigned to an outside collection agency for early action. Final accounts are written off to bad debt expense approximately 120 to 150 days after the final bill has been issued. Once the account is written off, the unpaid balances are generally assigned to one of the service provider's collection agencies that pursue additional collection activities in exchange for a percentage share of the recovery. Net recoveries are returned to LIPA and credited against bad debt expense.

### Revenues, LIPA's Customer Base and Electric Energy Consumption

LIPA's Customer base consists of four primary revenue reporting classes: residential, commercial, street lighting, and other public authorities.

The following tables show the electricity delivered to Customers, total retail electricity delivery service revenues and the number of Customers for each of the customer rate classes noted below for the year ending December 31, 2016 and each of the four preceding years. There can be no assurance that the retail electricity delivery service sales, retail electric revenues and number of Customers or the composition of any of the foregoing will remain at or near the levels reflected in the following tables.

**Electricity Delivered to Customers,**
**Total Billed Retail Electricity Delivery Service Revenues and Customers**

**Retail Electric Usage (As Measured by Billed GWh Sales)**
**by Customer Rate Class and Percentage Composition**

| Customer Rate Class | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential | 9,735 | 48.9% | 9,536 | 47.8% | 9,390 | 47.7% | 9,611 | 48.2% | 9,463 | 48.3% |
| Commercial | 9,666 | 48.4% | 9,786 | 49.2% | 9,700 | 49.3% | 9,730 | 48.8% | 9,582 | 48.9% |
| Street Lighting | 169 | 0.8% | 158 | 0.8% | 156 | 0.8% | 144 | 0.7% | 130 | 0.6% |
| Other Public Authorities | 383 | 1.9% | 437 | 2.2% | 441 | 2.2% | 441 | 2.2% | 425 | 2.2% |
| Total Retail | 19,953 | 100.0% | 19,917 | 100.0% | 19,687 | 100.0% | 19,926 | 100.0% | 19,600 | 100.0% |

**Total Billed Retail Electricity Delivery Service Revenue by Customer Rate Class and Percentage Composition**
**(Dollars in Millions)**

| Customer Rate Class | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential | $1,854 | 54.2% | $1,955 | 54.4% | $1,948 | 53.4% | $1,886 | 54.4 % | $1,844 | 55.0% |
| Commercial | 1,499 | 43.7% | 1,603 | 44.6% | 1,603 | 44.0% | 1,491 | 43.5% | 1,448 | 43.1% |
| Street Lighting | 25 | 0.7% | 26 | 0.7% | 40 | 1.1% | 23 | 0.7% | 20 | 0.6% |
| Other Public Authorities | 49 | 1.4% | 10 | 0.3% | 56 | 1.5% | 50 | 1.5% | 45 | 1.3% |
| Total Retail | $3,427 | 100.0% | $3,594 | 100.0% | $3,647 | 100.0% | $3,430 | 100.0% | $3,357 | 100.0% |

**Service Territory Average Number of Metered Customers**
**and Percentage Composition**

| Customer Rate Class | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential | 997,940 | 89.2% | 996,442 | 89.3% | 999,565 | 89.3% | 1,002,942 | 89.3% | 1,005,751 | 89.3% |
| Commercial | 115,128 | 10.3% | 114,692 | 10.3% | 114,663 | 10.2% | 114,648 | 10.2% | 115,033 | 10.2% |
| Street Lighting | 5,356 | 0.5% | 5,018 | 0.4% | 4,963 | 0.4% | 5,451 | 0.5% | 5,479 | 0.5% |
| Other Public Authorities | 131 | 0.0% | 131 | 0.0% | 131 | 0.0% | 131 | 0.0% | 129 | 0.0% |
| Total Retail | 1,118,555 | 100.0% | 1,116,283 | 100.0% | 1,119,322 | 100.0% | 1,123,172 | 100.0% | 1,126,392 | 100.0% |

**Forecasting Electricity Consumption**

The table below shows information relating to the forecasted and actual electricity delivered by customer class and on an aggregate basis, as well as the applicable variances, in each case for the years shown.

### Annual Forecast Variance For Ultimate Electric Delivery (MWh)

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Residential** | | | | | |
| Forecast | 9,971,900 | 9,799,521 | 9,809,663 | 9,562,411 | 9,584,560 |
| Actual | 9,735,407 | 9,536,152 | 9,389,926 | 9,611,160 | 9,463,401 |
| Variance (%) | -2.37% | -2.69% | -4.28% | 0.51% | -1.26% |
| **Commercial** | | | | | |
| Forecast | 10,025,904 | 10,039,942 | 9,867,433 | 9,935,481 | 10,251,721 |
| Actual | 9,666,106 | 9,800,324 | 9,700,047 | 9,730,214 | 9,581,965 |
| Variance (%) | -3.59% | -2.39% | -1.70% | -2.07% | -6.53% |
| **Street Lighting** | | | | | |
| Forecast | 173,188 | 164,907 | 153,510 | 149,224 | 148,219 |
| Actual | 169,394 | 157,579 | 156,139 | 143,541 | 130,027 |
| Variance (%) | -2.19% | -4.44% | 1.71% | -3.81% | -12.27% |
| **Other Public Authorities** | | | | | |
| Forecast | 443,160 | 456,200 | 427,552 | 430,004 | 434,335 |
| Actual | 382,710 | 437,038 | 440,950 | 440,724 | 424,597 |
| Variance (%) | -13.64% | -4.20% | 3.13% | 2.49% | -2.24% |
| **TOTAL** | | | | | |
| Forecast | 20,614,152 | 20,460,570 | 20,258,158 | 20,077,119 | 20,418,835 |
| Actual | 19,953,617 | 19,931,093 | 19,687,062 | 19,925,639 | 19,599,991 |
| Variance (%) | -3.20% | -2.59% | -2.82% | -0.75% | -4.01% |

**Loss Experience**

The following table sets forth information relating to the annual net charge-offs for LIPA, including net charge-offs of Customers as part of LIPA's annual charge-off reconciliation process, prepared in accordance with the current metrics provided for in the OSA for all years.

### Net Charge-Offs as a Percentage of Total Billed Retail Electricity Service Revenues

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Electric Revenues Billed ($000) | 3,413,091 | 3,834,255 | 3,753,765 | 3,572,133 | 3,427,943 |
| Net Charge-Offs ($000) | 19,750 | 20,969 | 24,659 | 23,948 | 19,646 |
| Percentage of Revenue Billed | 0.58% | 0.55% | 0.66% | 0.67% | 0.57% |

34

**Days Sales Outstanding**

The following table sets forth information relating to the average number of days that LIPA's bills remained outstanding during each of the calendar years referred to below, prepared in accordance with the current metrics provided for in the OSA for all years.

**Average Days Sales Outstanding**

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Average Days Sales Outstanding...... | 39.23 | 39.40 | 37.13 | 36.78 | 36.99 |

**Write-Off and Delinquencies Experience**

The following table sets forth information relating to the delinquency experience of LIPA during each of the calendar years referred to below.

**Average Monthly Delinquencies of**
**Total Annual Billed Retail Electricity Delivery Service Revenues (in thousands)**

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| 30-59 Days .................................... | $ 50,348 | $ 59,196 | $49,980 | $42,775 | $37,127 |
| 60-89 Days .................................... | $ 28,018 | $ 32,104 | $24,937 | $21,223 | $17,501 |
| 90+ Days ...................................... | $116,791 | $135,828 | $86,419 | $87,580 | $79,016 |

**Where to Find Information About LIPA**

LIPA periodically files information with EMMA. In addition, for convenience, further information about LIPA can be found on LIPA's website (www.lipower.org). No documents filed with EMMA or information on LIPA's website is included by specific cross-reference herein.

**Where to Find Information regarding PSEG and PSEG Long Island**

Further information about PSEG and PSEG Long Island can be found at its website at http://www.pseg.com. No information on PSEG's website is included by specific cross-reference herein.

**THE TRUSTEE**

The Trustee for the 2017 Restructuring Bonds is The Bank of New York Mellon. The address of the principal office of the Trustee is 101 Barclay Street-Floor 7-West, New York, New York 10286.

The Trustee may resign at any time by so notifying the Issuer; provided, however, that no such resignation shall be effective until either (a) the 2017 Collateral has been completely liquidated and the proceeds distributed to the Holders or (b) a successor trustee having certain qualifications set forth in the Indenture has been designated and has accepted such trusteeship. The Holders of a majority in Outstanding Amount of the 2017 Restructuring Bonds may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Issuer will remove the Trustee if the Trustee (i) ceases to satisfy certain credit standards set forth in the Indenture, (ii) becomes a debtor in a bankruptcy Proceeding or is adjudicated insolvent or a receiver or other public officer takes charge of the Trustee or its property, or (iii) becomes incapable of acting. If the Trustee resigns or is removed or a vacancy exists in the office of Trustee for any reason, the Issuer will be obligated promptly to appoint a successor Trustee.

The Trustee shall not be liable for any action it takes or omits to take in good faith in accordance with a direction it received by the Holders; provided that its conduct does not constitute willful misconduct or negligence. The Issuer has agreed to indemnify, defend and hold harmless the Trustee and its officers, directors, employees and agents from and against any and all loss, liability or expense (including reasonable attorney's fees and expenses) incurred by it in connection with the performance of its duties under the Indenture, provided that the Issuer is not required to pay any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misconduct or negligence.

35

### RATING AGENCY CONDITION

The Basic Documents provide that certain actions are subject to the "Rating Agency Condition." In each such case, the "Rating Agency Condition" means, with respect to any action, not less than ten Business Days' prior written notification to each Rating Agency of such action, and written confirmation from each of Standard & Poor's and Moody's to the Servicer, the Trustee and the Issuer that such action will not result in a suspension, reduction or withdrawal of the then current rating by such Rating Agency of any tranche of the 2017 Restructuring Bonds and that prior to the taking of the proposed action no other Rating Agency shall have provided written notice to the Issuer that such action has resulted or would result in the suspension, reduction or withdrawal of the then current rating of any tranche of 2017 Restructuring Bonds; provided, however, that if within such ten Business Day period, any Rating Agency (other than Standard & Poor's) has neither replied to such notification nor responded in a manner that indicates that such Rating Agency is reviewing and considering the notification, then (i) the Issuer shall be required to confirm that such Rating Agency has received the Rating Agency Condition request, and if it has, promptly request the related Rating Agency Condition confirmation and (ii) if the Rating Agency neither replies to such notification nor responds in a manner that indicates it is reviewing and considering the notification within five Business Days following such second request, the applicable Rating Agency Condition requirement shall not be deemed to apply to such Rating Agency. For the Rating Agency Condition, any confirmation, request, acknowledgment or approval that is required to be in writing may be in the form of electronic mail or a press release (which may contain a general waiver of a Rating Agency's right to review or consent).

### THE INDENTURE

In addition to the description of certain provisions of the Indenture contained elsewhere herein, the following is a brief summary of certain provisions of the Indenture and does not purport to be comprehensive or definitive. All references herein to the Indenture are qualified in their entirety by reference to the Indenture for the detailed provisions thereof.

**Reports to Holders**

So long as the Trustee is the Bond Registrar and Paying Agent, upon the written request of any current or former Holder or the Issuer, the Trustee shall deliver to such Holder, within the prescribed period of time for tax reporting purposes after the end of each calendar year, such information in its possession as may be required to enable such Holder to prepare its federal income and any applicable local or state tax returns. If the Bond Registrar and Paying Agent is other than the Trustee, such Bond Registrar and Paying Agent, within the prescribed period of time for tax reporting purposes after the end of each calendar year, shall deliver to each relevant current or former Holder such information in its possession as may be required to enable such Holder to prepare its federal income and any applicable local or state tax returns.

On or prior to each Payment Date, the Trustee will deliver to each Holder on such Payment Date a statement prepared by the Servicer and provided to the Trustee which will include (to the extent applicable) the following information as to the 2017 Restructuring Bonds with respect to such Payment Date or the period since the previous Payment Date, as applicable:

(a)     the amount of the payment to Holders allocable to principal,

(b)     the amount of the payment to Holders allocable to interest,

(c)     the Outstanding Amount of each tranche, before and after giving effect to payments allocated to principal reported under clause (a) above,

(d)     the difference, if any, between the Outstanding Amount of each tranche and the projected principal balance as of such Payment Date, after giving effect to payments to be made on such Payment Date,

(e)     the amounts on deposit in the Operating Reserve Subaccount as of such Payment Date,

(f)     the amounts on deposit in the Debt Service Reserve Subaccount as of such Payment Date,

(g)     the amounts, if any, on deposit in the Excess Funds Subaccount as of the Payment Date,

(h)     the amounts paid to the Trustee since the previous Payment Date,

(i)     the amounts paid to the Servicer since the previous Payment Date,

(j)     the amounts paid to the Administrator since the previous Payment Date, and

    (k)    any other transfers and payments to be made pursuant to the Indenture since the previous Payment Date.

## Covenants of Issuer

*Affirmative Covenants.* The Issuer agrees to:

- duly and punctually pay principal of and redemption price, if any, and interest on the 2017 Restructuring Bonds when due in accordance with the terms of the 2017 Restructuring Bonds and the Indenture,

- appoint the Trustee as its agent to receive all 2017 Restructuring Bonds that are surrendered for registration of transfer or exchange,

- make all payments of amounts due and payable from amounts in the Collection Account and no amounts so withdrawn from the Collection Account for payments of the 2017 Restructuring Bonds shall be paid to the Issuer except as provided in the Indenture,

- cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent agrees to:

  o   hold all sums held by it for the payment of amounts due with respect to the 2017 Restructuring Bonds in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided,

  o   give the Trustee notice of any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default (a "Default") by the Issuer of which it has actual knowledge in the making of any payment required to be made with respect to the 2017 Restructuring Bonds,

  o   at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent,

  o   immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of the 2017 Restructuring Bonds if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment, and

  o   comply with all requirements of the Internal Revenue Code with respect to the withholding from any payments made by it on any 2017 Restructuring Bonds of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith,

- direct any Paying Agent to pay to the Trustee all sums held in trust by such Paying Agent and upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money,

- make (except to the extent required to be made by the Seller or Servicer) all such filings pursuant to the Securitization Law or Financing Order No. 5, instruments of further assurance and other instruments, and will take such other action necessary or advisable to maintain and preserve the 2017 Collateral,

- execute and deliver all such supplements and amendments thereto,

- diligently pursue any and all actions to enforce its rights under each instrument or agreement included in the 2017 Collateral and not take any action and use its reasonable efforts not to permit any action to be taken by others that would release any Person from any of such Person's covenants or obligations under any such instrument or agreement or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except, in each case, as expressly permitted in the Basic Documents or such other instrument or agreement,

- punctually perform and observe all of its obligations and agreements contained in the Indenture, in the Basic Documents and in the instruments and agreements included in the 2017 Collateral,

- not waive, amend, modify, supplement or terminate any Basic Document or any provision thereof without the written consent of (a) the Trustee (which consent shall not be withheld if (i) the Trustee shall

have received an Officer's Certificate stating that such waiver, amendment, modification, supplement or termination shall not adversely affect in any material respect the interests of the Bondholders or the holders of Certificates and (ii) the Rating Agency Condition shall have been satisfied with respect thereto) or (b) the Holders of at least a majority of the Outstanding Amount of 2017 Restructuring Bonds,

- if it has knowledge of the occurrence of a Servicer Default under the Servicing Agreement, promptly give written notice thereof to the Trustee and the Rating Agencies, and shall specify in such notice the action, if any, the Issuer is taking with respect of such default and if a Servicer Default shall arise from the failure of the Servicer to perform any of its duties or obligations under the Servicing Agreement with respect to the 2017 Restructuring Property, including the 2017 Restructuring Charge, the Issuer shall take all reasonable steps available to it to remedy such failure,

- as required by the Servicing Agreement, appoint a Successor Servicer with the Trustee's prior written consent thereto (which consent shall not be unreasonably withheld and shall be given upon the written direction of Holders of not less than a majority of the Outstanding Amount of the 2017 Restructuring Bonds), and such Successor Servicer shall accept its appointment by a written assumption in a form acceptable to the Issuer and the Trustee. If within 30 days after the delivery of the notice referred to above, the Issuer shall not have obtained such a new Successor Servicer, the Trustee, at the expense of the Issuer, may petition a court of competent jurisdiction to appoint a Successor Servicer. In connection with any such appointment, the Issuer may make such arrangements for the compensation of such Successor Servicer as it and such Successor Servicer shall agree, subject to the limitations set forth below and in the Servicing Agreement, and in accordance and in compliance with the Servicing Agreement, the Issuer shall enter into an agreement with such Successor Servicer for the servicing of the 2017 Restructuring Property (such agreement to be in form and substance satisfactory to the Trustee),

- upon any termination of the Servicer's rights and powers pursuant to the Servicing Agreement, the Trustee shall promptly notify the Issuer, the Bondholders and the Rating Agencies, and as soon as a Successor Servicer is appointed, the Issuer shall notify the Trustee, the Bondholders and the Rating Agencies of such appointment, specifying in such notice the name and address of such Successor Servicer,

- not, without the prior written consent of the Trustee or the Holders of at least a majority in Outstanding Amount of the 2017 Restructuring Bonds, amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any 2017 Collateral or the Basic Documents, or waive timely performance or observance of any material term by the Seller or the Servicer under the Sale Agreement or the Servicing Agreement, respectively; provided, however, that if the Rating Agency Condition is met, no such consent shall be required with respect to any agreements, to accommodate the issuance of any additional bonds, notes or other obligations issued by the Issuer as permitted by the laws of the State of New York and the Indenture,

- enforce the Servicer's compliance with all of the Servicer's obligations under the Servicing Agreement to the extent material to the payment and security of the 2017 Restructuring Bonds,

- give the Trustee and the Rating Agencies prompt written notice of each Event of Default thereunder as provided in the Indenture, or waiver thereof and each default on the part of the Seller or the Servicer of its obligations under the Sale Agreement or the Servicing Agreement, respectively, materially and adversely affecting the 2017 Restructuring Bonds,

- upon request of the Trustee, the Issuer will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of the Indenture and maintain a first priority perfected security interest in the 2017 Collateral in favor of the Trustee,

- comply with the applicable provisions of the Internal Revenue Code relating to the exclusion of the interest on the 2017 Restructuring Bonds from gross income for federal income taxation purposes, and

- comply with the tax agreements executed and delivered by it and the letter of instructions, if any, delivered by Bond Counsel, in connection with the issuance of the 2017 Restructuring Bonds as to compliance with applicable provisions of the Internal Revenue Code, as such tax covenants and agreements and letter may be amended from time to time, as a source of guidance for achieving

compliance with the Internal Revenue Code, including, without limitation, timely payments of all rebate or other amounts to the United States Department of the Treasury under Section 148 of the Internal Revenue Code.

*Negative Covenants.* So long as any 2017 Restructuring Bonds are Outstanding, the Issuer shall not:

- except as expressly permitted by the Indenture, sell, transfer, exchange or otherwise grant or dispose of any of, or assign any interest in, the 2017 Collateral, unless directed to do so by the Trustee in accordance with the Indenture,

- claim any credit on, or make any deduction from the principal or interest payable in respect of, the 2017 Restructuring Bonds (other than amounts properly withheld from such payments under the Internal Revenue Code or other tax law) or assert any claim against any present or former Bondholder by reason of the payment of the taxes levied or assessed upon any part of the 2017 Collateral,

- voluntarily consent to the termination of its existence or its dissolution or liquidation in whole or in part,

- permit the validity or effectiveness of the Indenture to be impaired, or permit the Lien of the Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the 2017 Restructuring Bonds under the Indenture except as may be expressly permitted hereby,

- permit any Lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the Lien of the Indenture and the Lien created by the Securitization Law) to be created by the Issuer on or extend to or otherwise arise upon or burden the 2017 Collateral or any part thereof or any interest therein or the proceeds thereof,

- subject to the Lien created by the Securitization Law, permit the Lien of the Indenture not to constitute a valid first priority security interest in the 2017 Collateral,

- take any action which is subject to a Rating Agency Condition without satisfying the Rating Agency Condition,

- issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except for the 2017 Restructuring Bonds and except as permitted in the Indenture,

- issue any additional restructuring bonds, except pursuant to the Securitization Law and consistent with the Indenture,

- except as otherwise contemplated by the Sale Agreement, the Servicing Agreement or the Indenture, make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person,

- other than expenditures in connection with the Issuer's purchase of the 2017 Restructuring Property from the Seller, make any expenditure (by long-term or operating lease or otherwise) for capital assets (either realty or personalty), and

- take or cause to be taken, or permit to be taken, any action or actions with respect to the application and investment of any proceeds of the 2017 Restructuring Bonds or any other funds from whatever source derived which would cause the 2017 Restructuring Bonds to be "arbitrage bonds" within the meaning of Section 148 of the Internal Revenue Code or "private activity bonds" within the meaning of Section 141 of the Internal Revenue Code. The Issuer will not consent to any amendment to, or waive performance of, any covenant of the Authority or the Servicer relating to the use, ownership or management of the projects or any portion thereof financed or refinanced by the 2017 Restructuring Bonds in the tax agreements or certificates entered into by the Authority and the Servicer in connection with the 2017 Restructuring Bonds unless the Issuer has received an Opinion of Counsel from a nationally recognized bond counsel to the effect that such amendment or waiver would not, by itself, cause the 2017

Restructuring Bonds to be "private activity bonds" within the meaning of Section 141 of the Internal Revenue Code or otherwise cause interest on the 2017 Restructuring Bonds to be included in gross income for federal income tax purposes.

## Events of Default

The Indenture provides that each of the following will constitute "Events of Default" thereunder:

(a)     default in the payment of any interest or redemption premium on any Bond when the same becomes due and payable, and such default shall continue for a period of 5 Business Days,

(b)     default in the payment of the then unpaid principal of any tranche of 2017 Restructuring Bonds on the Final Maturity Date for such tranche,

(c)     default in the observance or performance in any material respect of any covenant or agreement of the Issuer made in the Indenture (other than a covenant or agreement, a default in the observance or performance of which is specifically described elsewhere in this section) or any representation or warranty of the Issuer made in the Indenture or in any certificate or other writing delivered pursuant to the Indenture or in connection therewith proving to have been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured or the circumstances or condition in respect of which such misrepresentation or warranty was incorrect shall not have been eliminated or otherwise cured, as the case may be, for a period of 30 days after the earlier of (i) the date that there shall have been given, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% of the Outstanding Amount of the 2017 Restructuring Bonds, a written notice specifying such default and requiring it to be remedied and stating that such notice is a "Notice of Default" under the Indenture or (ii) the date that the Issuer has actual knowledge of the default,

(d)     the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer or any substantial part of the 2017 Collateral in an involuntary case or Proceeding under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the 2017 Collateral, or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of 90 consecutive days,

(e)     the commencement by the Issuer of a voluntary case or Proceeding under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case or Proceeding under any such law, or the consent by the Issuer to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the 2017 Collateral, or the making by the Issuer of any general assignment for the benefit of creditors, or the failure by the Issuer generally to pay its debts as such debts become due, or the taking of action by the Issuer in furtherance of any of the foregoing, or

(f)     any act or failure to act by the State or any of its agencies (including the Authority), officers or employees which violates or is not in accordance with Financing Order No. 5 or the State Pledge.

Failure to pay principal or the redemption price in accordance with the Expected Amortization Schedule because collections from Customers were not sufficient to make such payments shall not constitute an Event of Default under the Indenture; provided, however, that failure to pay the entire unpaid principal amount of the 2017 Restructuring Bonds of a tranche upon the Final Maturity Date of the tranche shall constitute an Event of Default, and the entire unpaid principal amount of the 2017 Restructuring Bonds shall be due and payable, if not previously paid, on any other date on which an Event of Default shall have occurred and be continuing, if the Trustee or the Holders representing not less than a majority of the Outstanding Amount of the 2017 Restructuring Bonds have declared the 2017 Restructuring Bonds to be immediately due and payable on acceleration.

## Remedies—Acceleration

If an Event of Default under the Indenture should occur and be continuing, then and in every such case the Trustee or the Holders representing not less than a majority of the Outstanding Amount of the 2017 Restructuring

Bonds may declare all the 2017 Restructuring Bonds to be immediately due and payable, by a notice in writing to the Issuer (and to the Trustee if given by Holders), and upon any such declaration the unpaid principal amount of the 2017 Restructuring Bonds, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

At any time after such declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, the Holders representing a majority of the Outstanding Amount of the 2017 Restructuring Bonds, by written notice to the Issuer and the Trustee, may rescind such declaration and its consequences if:

      (i) the Issuer has paid or deposited with the Trustee a sum sufficient to pay (A) all sums paid or advanced by the Trustee thereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel and (B) all payments of principal of and interest on all 2017 Restructuring Bonds and all other amounts that would then be due thereunder or upon such 2017 Restructuring Bonds if the Event of Default giving rise to such acceleration had not occurred, and

      (ii) all Events of Default under the Indenture, other than the nonpayment of the principal of the 2017 Restructuring Bonds that has become due solely by such acceleration, have been cured or waived as provided in the Indenture.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

**Remedies—Trustee's Rights**

If an Event of Default under the Indenture shall have occurred and be continuing, the Trustee may do one or more of the following (subject to the provisions of the Indenture):

(a) institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the 2017 Restructuring Bonds or under the Indenture with respect thereto, whether by declaration of acceleration or otherwise, enforce any judgment obtained, and collect from the Issuer and any other obligor upon such 2017 Restructuring Bonds moneys adjudged due,

(b) institute Proceedings from time to time for the complete or partial foreclosure of the Indenture with respect to the 2017 Collateral,

(c) exercise any remedies of a secured party under the Securitization Law or other applicable law and take any other appropriate action to protect and enforce the rights and remedies of the Trustee and the Holders of the 2017 Restructuring Bonds,

(d) sell the 2017 Collateral or any portion thereof or rights or interest therein, at one or more public or private sales called and conducted in any manner permitted by law, and

(e) exercise all rights, remedies, powers, privileges and claims of the Issuer against the Servicer under or in connection with, and pursuant to the terms of, the Servicing Agreement;

provided, however, that the Trustee may not sell or otherwise liquidate any portion of the 2017 Collateral following an Event of Default, other than an Event of Default described in clauses (a) and (b) under "Events of Default" above, unless (A) the Holders of 100% of the Outstanding Amount of the 2017 Restructuring Bonds consent thereto, (B) the proceeds of such sale or liquidation distributable to the Holders are sufficient to discharge in full all amounts then due and unpaid upon such 2017 Restructuring Bonds for principal and interest after taking into account payment of all amounts due prior thereto pursuant to the priorities set forth above under "Collection Account and Subaccounts," or (C) the Trustee determines that the 2017 Collateral will not continue to provide sufficient funds for all payments on the 2017 Restructuring Bonds as they would have become due if the 2017 Restructuring Bonds had not been declared immediately due and payable, and the Trustee obtains the written consent of Holders of at least a majority of the Outstanding Amount of the 2017 Restructuring Bonds. In determining such sufficiency or insufficiency with respect to clause (B) or (C), the Trustee may, but need not, obtain and conclusively rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the 2017 Collateral for such purpose.

If the Trustee collects any money, it shall pay out such money in accordance with the priorities set forth in "SECURITY FOR THE 2017 RESTRUCTURING BONDS—Description of Indenture Accounts."

The rights and remedies conferred upon or reserved to the Trustee or the Bondholders by the Indenture is not exclusive to any right or remedy and is cumulative and in addition to every other right or remedy.

**Remedies—Optional Possession of 2017 Collateral**

If the 2017 Restructuring Bonds have been declared to be due and payable under the Indenture following an Event of Default and such declaration and its consequences have not been rescinded and annulled, the Trustee may, but need not, elect to maintain possession of the 2017 Collateral. In determining whether to maintain possession of the 2017 Collateral or sell or liquidate the same, the Trustee may, but need not, obtain and conclusively rely upon an opinion of an Independent investment banking or certified public accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the 2017 Collateral for such purpose.

**Remedies—Limitation of the Rights of Holders**

No Holder of any 2017 Restructuring Bond shall have any right to institute any Proceeding, judicial or otherwise, with respect to the Indenture, or to avail itself of any remedies provided in the Securitization Law or to utilize or enforce the statutory lien or to avail itself of the right to foreclose on the 2017 Collateral or otherwise enforce the Lien and the security interest on the 2017 Collateral with respect to the Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a) such Holder previously has given written notice to the Trustee of a continuing Event of Default under the Indenture,

(b) the Holders of not less than a majority of the Outstanding Amount of the 2017 Restructuring Bonds have made written request to the Trustee to institute such Proceeding in respect of such Event of Default under the Indenture in its own name as Trustee under the Indenture,

(c) such Holder or Holders have offered to the Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in complying with such request,

(d) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute such Proceedings, and

(e) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of at least a majority of the Outstanding Amount of the 2017 Restructuring Bonds;

it being understood and intended that no one or more Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of the Indenture to affect, disturb or prejudice the rights of any other Holders or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under the Indenture, except in the manner therein provided.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders, each representing less than a majority of the Outstanding Amount of the 2017 Restructuring Bonds, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of the Indenture.

**Voting of the 2017 Restructuring Bonds; Control of Proceedings by Holders**

The Holders of a majority of the Outstanding Amount of the 2017 Restructuring Bonds (or, if less than all tranches are affected, the affected tranche or tranches) have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee with respect to the 2017 Restructuring Bonds of such tranche or tranches or exercising any trust or power conferred on the Trustee with respect to such tranche or tranches; provided that:

(a) such direction shall not be in conflict with any rule of law or with the Indenture,

(b) subject to the express terms of the Indenture, any direction to the Trustee to sell or liquidate any 2017 Collateral shall be by the Holders representing 100% of the Outstanding Amount of the 2017 Restructuring Bonds,

(c) if the conditions set forth in the Indenture have been satisfied and the Trustee elects to retain the 2017 Collateral, then any direction to the Trustee by Holders representing less than 100% of the

> Outstanding Amount of the 2017 Restructuring Bonds to sell or liquidate the 2017 Collateral shall be of no force and effect, and

(d)  the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction;

provided, however, that the Trustee's duties shall be subject to the terms of the Indenture, and the Trustee need not take any action that it determines might involve it in liability or might materially adversely affect the rights of any Holders not consenting to such action. Furthermore and without limiting the foregoing, the Trustee shall not be required to take any action for which it reasonably believes that it will not be indemnified to its satisfaction against any cost, expense or liability.

**Waiver of Past Defaults**

Prior to the declaration of the acceleration of the maturity of the 2017 Restructuring Bonds, Holders representing a majority of the Outstanding Amount of the 2017 Restructuring Bonds (or, if less than all tranches are affected, the Holders of a majority of the 2017 Restructuring Bonds of the affected tranches in the aggregate) may, by written notice to the Trustee, waive any past default or event of default under the Indenture and its consequences, except a default (a) in payment of principal of or interest on any of the 2017 Restructuring Bonds or (b) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of the Holder of each Bond of all tranches affected. In the case of any such waiver, the Issuer, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other default or event of default under the Indenture or impair any right consequent thereto.

Upon any such waiver, such default shall cease to exist and be deemed to have been cured and not to have occurred, and any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred, for every purpose of the Indenture; but no such waiver shall extend to any subsequent or other default or event of default under the Indenture or impair any right consequent thereto.

**Modifications of Indenture that Do Not Require the Consent of Holders**

Without the consent of the Holders of any 2017 Restructuring Bonds but with prior notice to the Rating Agencies, the Issuer and the Trustee, when authorized by an Issuer Order, at any time and from time to time, may enter into one or more indentures supplemental to the Indenture in form reasonably satisfactory to the Trustee, for any of the following purposes:

(i)  to correct or amplify the description of any property, including, without limitation, the 2017 Collateral, at any time subject to the Lien of the Indenture, or better to assure, convey and confirm unto the Trustee any property subject or required to be subjected to the Lien of the Indenture, or to subject to the Lien of the Indenture additional property,

(ii)  to evidence the succession, in compliance with the applicable provisions thereof, of another person to the Issuer, and the assumption by any such successor of the covenants of the Issuer in the Indenture and in the 2017 Restructuring Bonds,

(iii)  to add to the covenants of the Issuer, for the benefit of the Holders, or to surrender any right or power conferred upon the Issuer by the Indenture,

(iv)  to convey, transfer, assign, mortgage or pledge any property to or with the Trustee,

(v)  to cure any ambiguity, to correct or supplement any provision in the Indenture or in any supplemental indenture, which may be inconsistent with any other provision of the Indenture or in any supplemental indenture, or to make any other provisions with respect to matters or questions arising under the Indenture or in any supplemental indenture; provided, however, that such action shall not adversely affect the interests of the Holders of the 2017 Restructuring Bonds,

(vi)  to evidence and provide for the acceptance of the appointment under the Indenture by a successor Trustee with respect to the 2017 Restructuring Bonds and to add or change any of the provisions of the Indenture as shall be necessary to facilitate the administration of the trusts thereunder by more than one Trustee, pursuant to the requirements set forth in the Indenture,

(vii)  to modify, eliminate or add to the provisions of the Indenture to such extent as shall be necessary to effect the qualification of the Indenture under the Trust Indenture Act or under any similar federal

statute hereafter enacted and to add to the Indenture such other provisions as may be expressly required by the Trust Indenture Act,

(viii) to qualify the 2017 Restructuring Bonds of any tranche for listing on a securities exchange or registration with a Clearing Agency, or

(ix) to satisfy any Rating Agency requirements or to maintain, or improve upon, the existing ratings on the 2017 Restructuring Bonds.

The Issuer and the Trustee, when authorized by an Issuer Order, may, also without the consent of any of the Holders of the 2017 Restructuring Bonds enter into an indenture or indentures supplemental to the Indenture for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture or of modifying in any manner the rights of the Holders under the Indenture; provided, however, that (i) such action shall not, as evidenced by an Officer's Certificate, adversely affect in any material respect the interests of the Holders and (ii) the Rating Agency Condition shall have been satisfied with respect thereto.

**Modifications of Indenture that Require the Consent of Holders**

The Issuer and the Trustee, when authorized by an Issuer Order, also may, with prior notice to the Rating Agencies and with the consent of the Holders of not less than a majority of the Outstanding Amount of the 2017 Restructuring Bonds of each tranche to be affected, by act of such Holders delivered to the Issuer and the Trustee, enter into an indenture or indentures supplemental to the Indenture for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture or of modifying in any manner the rights of the Holders under the Indenture; provided, however, that no such supplemental indenture shall, without the consent of the Holder of each Outstanding Bond of each tranche affected thereby:

(i) change the date of payment of any installment of principal of or interest on any 2017 Restructuring Bond, or reduce the principal amount thereof, or the interest rate thereon, change the provisions of the Indenture relating to the application of collections on, or the proceeds of the sale of, the 2017 Collateral to payment of principal of or interest on the 2017 Restructuring Bonds, or change any place of payment where, or the coin or currency in which, any Bond or the interest thereon is payable, or impair the right to institute suit for the enforcement of the provisions of the Indenture requiring the application of funds available therefor, as provided in the Indenture, to the payment of any such amount due on the 2017 Restructuring Bonds on or after the respective due dates thereof,

(ii) reduce the percentage of the Outstanding Amount of the 2017 Restructuring Bonds or of a tranche thereof, the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of the Indenture or certain defaults thereunder and their consequences provided for in the Indenture,

(iii) modify or alter the provisions of the proviso to the definition of "Outstanding,"

(iv) reduce the percentage of the Outstanding Amount of the 2017 Restructuring Bonds required to direct the Trustee to direct the Issuer to sell or liquidate the 2017 Collateral pursuant to the Indenture,

(v) modify any provision of the Indenture relating to supplemental indentures requiring Holders' consent except to increase any percentage specified therein or to provide that certain additional provisions of the Indenture or the other Basic Documents cannot be modified or waived without the consent of the Holder of each Outstanding Bond affected thereby,

(vi) modify any of the provisions of the Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Bond on any Payment Date (including the calculation of any of the individual components of such calculation) or change the Expected Amortization Schedule, Scheduled Sinking Fund Redemption Date or Final Maturity Dates of any tranche of 2017 Restructuring Bonds,

(vii) decrease the Required Operating Reserve Level or the Required Debt Service Reserve Level,

(viii) modify the provisions of the Indenture regarding the voting of the 2017 Restructuring Bonds held by the Issuer, the Servicer or any Affiliate of any of the foregoing Persons,

(ix) decrease the percentage of the aggregate principal amount of 2017 Restructuring Bonds or affected tranche required to amend the sections of the Indenture which specify applicable percentages of the

44

aggregate principal amount of the 2017 Restructuring Bonds necessary to amend any Basic Document,

(x) cause a violation of the tax covenants of the Issuer, or

(xi) permit the creation of any Lien ranking prior to or on a parity, other than as specifically contemplated in the Indenture, with the Lien of the Indenture with respect to any part of the 2017 Collateral or, except as otherwise permitted or contemplated herein, terminate the Lien of the Indenture on any property at any time or deprive the Holder of any Bond of the security provided by the Lien of the Indenture.

It shall not be necessary for any consent of Holders under the Indenture to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Holders shall approve the substance thereof.

Promptly after the execution by the Issuer and the Trustee of any supplemental bond indenture, the Issuer shall send to the Rating Agencies and the Holders to which such amendment or supplemental bond indenture relates either a copy of such supplemental indenture or a notice setting forth in general terms the substance of such supplemental bond indenture.

**Satisfaction and Discharge of Indenture**

The Indenture shall cease to be of further effect with respect to the 2017 Restructuring Bonds and the Trustee, on reasonable written demand of and at the expense of the Issuer, shall execute such instruments as the Issuer reasonably requests acknowledging satisfaction and discharge of the Indenture with respect to the 2017 Restructuring Bonds, when:

(i) either:

(A) all 2017 Restructuring Bonds theretofore authenticated and delivered (other than (1) 2017 Restructuring Bonds that have been destroyed, lost or stolen and that have been replaced or paid as provided in the Indenture and (2) 2017 Restructuring Bonds for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust as provided in the Indenture) have been delivered to the Trustee for cancellation, or

(B) the Final Maturity Date has occurred with respect to all 2017 Restructuring Bonds not theretofore delivered to the Trustee for cancellation and the Issuer has irrevocably deposited or caused to be irrevocably deposited in trust with the Trustee cash in an amount sufficient to pay principal and to discharge the entire indebtedness on such 2017 Restructuring Bonds not theretofore delivered to the Trustee for cancellation on the Final Maturity Date,

(ii) the Issuer has paid or caused to be paid all other sums payable thereunder by the Issuer, and

(iii) the Issuer has delivered to the Trustee an Officer's Certificate, an Opinion of Counsel of Independent counsel and (if required by the Trustee) an Independent Certificate from a firm of certified public accountants, each meeting the requirements of the Indenture and each stating that all conditions precedent therein provided for relating to the satisfaction and discharge of the Indenture with respect to the 2017 Restructuring Bonds have been complied with.

**Legal Defeasance**

Subject to the provisions of the Indenture, including those detailed in "Conditions to Defeasance" below, the Issuer at any time may terminate all its obligations under the Indenture with respect to the 2017 Restructuring Bonds (a "Legal Defeasance"). In the event of a Legal Defeasance, the maturity of the 2017 Restructuring Bonds defeased pursuant to such Legal Defeasance may not be accelerated because of an Event of Default.

Upon satisfaction of the conditions set forth in the Indenture to a Legal Defeasance, the Trustee, on reasonable written demand of and at the expense of the Issuer, shall execute such instruments as Issuer reasonably requests acknowledging satisfaction and discharge of the obligations that are terminated pursuant to such exercise.

*Conditions to Defeasance.* The Issuer may exercise a Legal Defeasance only if:

(a) the Issuer has irrevocably deposited or caused to be irrevocably deposited in trust with the Trustee cash or noncallable defeasance securities for the payment of principal or redemption price of and interest on each such 2017 Restructuring Bonds to the Scheduled Maturity Date (or, if applicable, at the election of the Issuer, any earlier optional redemption date) or the Scheduled Sinking Fund Redemption Date (or, if applicable, any optional redemption date), or with respect to the 2017 Restructuring Bonds of any tranche subject to optional redemption, cash or non-callable defeasance securities for the payment of principal or the redemption price of and interest on each such 2017 Restructuring Bonds as set forth in the written notice provided by the Issuer,

(b) the Issuer delivers to the Trustee a certificate from a nationally recognized firm of Independent certified public accountants expressing its opinion that the payments of principal and interest when due and without reinvestment of the deposited Defeasance Securities plus any deposited cash without investment will provide cash at such times and in such amounts (but not substantially more than such amounts) as will be sufficient to pay in respect of the 2017 Restructuring Bonds (i) principal on the Scheduled Maturity Date in accordance with the Expected Amortization Schedule therefor (or, if applicable, at the election of the Issuer, any earlier optional redemption date) or redemption price on the Scheduled Sinking Fund Redemption Date in accordance with the Expected Sinking Fund Schedule therefor (or, if applicable, at the election of the Issuer, any earlier optional redemption date), as applicable, and (ii) interest when due,

(c) if an election is made to redeem any such 2017 Restructuring Bonds prior to maturity, the Issuer irrevocably designates such 2017 Restructuring Bonds for redemption on the redemption date and proper notice of redemption has been made or provision satisfactory to the Trustee has been irrevocably made for the giving of such notice,

(d) no Default has occurred and is continuing on the day of such deposit and after giving effect thereto,

(e) the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that the Holders of the 2017 Restructuring Bonds will not recognize income, gain or loss for federal or New York income tax purposes as a result of such legal defeasance and will be subject to federal or New York income tax on the same amounts, in the same manner and at the same times as would have been the case if such legal defeasance had not occurred, and

(f) the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the satisfaction and discharge of the 2017 Restructuring Bonds to the extent contemplated by the provisions governing defeasance contained in the Indenture have been complied with.

**No Recourse to Others**

No recourse may be taken, directly or indirectly, by the Holders with respect to the obligations of the Issuer or the Trustee on the 2017 Restructuring Bonds or under the Indenture or any certificates or other writing delivered in connection therewith, against (i) any trustee, director, officer, employee, agent or attorney of the Issuer or (ii) any shareholder, partner, owner, beneficiary, agent, officer, director or employee of the Trustee. Each Holder by accepting a 2017 Restructuring Bond specifically confirms the nonrecourse nature of these obligations and waives and releases all such liability. These waivers and releases are part of the consideration for the issuance of the 2017 Restructuring Bonds.

Notwithstanding any provision of the Indenture or any supplemental bond indenture to the contrary, Holders and the Trustee shall have no recourse against the credit or any assets of the Authority, LIPA or the Issuer (other than in the case of the Issuer, the 2017 Collateral), with respect to any amounts due to the Holders under the Indenture and under the 2017 Restructuring Bonds and to the Trustee. Each Holder by accepting a 2017 Restructuring Bond, and the Trustee, specifically confirms the nonrecourse nature of these obligations and waives and releases all such liability. These waivers and releases are part of the consideration for issuance of the 2017 Restructuring Bonds.

## THE SALE AGREEMENT

In addition to the description of certain provisions of the Sale Agreement contained elsewhere herein, the following is a brief summary of certain provisions of the Sale Agreement and does not purport to be comprehensive

or definitive. All references herein to the Sale Agreement are qualified in their entirety by reference to the Sale Agreement for the detailed provisions thereof.

**Sale of the 2017 Restructuring Property**

In exchange for an amount equal to the net proceeds of the sale of the 2017 Restructuring Bonds, the Seller will irrevocably sell, transfer, assign, set over and otherwise convey to the Issuer the 2017 Restructuring Property. The 2017 Restructuring Property will include the assignment of all revenues, collections, claims, payments, money or proceeds of or arising from the 2017 Restructuring Charges.

Under the Securitization Law, the sale of 2017 Restructuring Property will constitute an absolute transfer and true sale under state law, effective and perfected against all third parties, and will not be affected or impaired by, among other things, the occurrence of any of the following:

- the commingling of collections of 2017 Restructuring Charges with other accounts,

- the retention by the Seller of either of the following:

  o a partial or residual interest, including an equity interest, in the 2017 Restructuring Property, whether direct or indirect, or whether subordinate or otherwise,

  o the right to recover costs associated with taxes, payments in lieu of taxes, franchise fees, or license fees imposed on the collection of 2017 Restructuring Charges,

- any recourse that the Issuer may have against the Seller,

- any indemnification rights, obligations, or repurchase rights made or provided by the Seller,

- the obligation of the Seller to collect 2017 Restructuring Charges on behalf of the Issuer,

- the treatment of the sale, assignment, or transfer by the Seller to the Issuer for tax, financial reporting, or other purposes,

- any subsequent order of the Authority amending Financing Order No. 5 pursuant to the Securitization Law, or

- any application of the True-Up Adjustment mechanism under Financing Order No. 5.

Upon the issuance of Financing Order No. 5 and the transfer of the 2017 Restructuring Property, the transfer will be perfected as against the Authority, all parties having claims of any kind against the Authority, and all other transferees of the Authority, including subsequent judicial or other lien creditors.

**Seller Representations and Warranties**

In the Sale Agreement, the Seller will represent and warrant to the Issuer, as of the Issuance Date, to the effect, among other things, that:

- the Seller is duly organized and validly existing as a corporate municipal instrumentality, body corporate and politic and a political subdivision of the State of New York, in good standing under the laws of the State of New York, with the requisite power and authority to own its properties and conduct its business as currently owned or conducted, and has the requisite power and authority to own the 2017 Restructuring Property,

- the Seller is duly qualified to do business and has obtained all necessary licenses and approvals, in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require qualifications, licenses or approvals (except where the failure to so qualify or obtain such licenses and approvals would not be reasonably likely to have a material adverse effect on the Seller's business, operations, assets, revenues or properties),

- the Seller has the requisite power and authority to execute and deliver the Sale Agreement and to carry out its terms, and the execution, delivery and performance of the Sale Agreement have been duly authorized by all necessary action on the part of the Seller,

47

- the Sale Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms, subject to customary exceptions relating to bankruptcy, creditor's rights and equitable principles,

- the sale of the 2017 Restructuring Property and the consummation of the transactions contemplated by the Securitization Law and the Sale Agreement and the fulfillment of the terms thereof do not (a) conflict with or result in a breach of any of the terms and provisions of nor constitute (with or without notice or lapse of time) a default under the Seller's organizational documents or any material indenture, agreement or other instrument to which the Seller is a party or by which it is bound, (b) result in the creation or imposition of any lien upon any of the Seller's properties pursuant to the terms of any such indenture, agreement or other instrument (other than any Lien that may be granted under the Basic Documents) or (c) violate any existing law or any existing order, rule or regulation applicable to the Seller of any government authority having jurisdiction over the Seller or its properties,

- no proceedings or investigation is pending and, to the Seller's knowledge, no Proceeding or investigation is threatened, before any Governmental Authority having jurisdiction over the Seller or its properties involving or relating to the Seller or to the Issuer or, to the Seller's knowledge, any other Person:

    o asserting the invalidity of the Securitization Law, Financing Order No. 5, or the Sale Agreement,

    o seeking to prevent the consummation of any of the transactions contemplated by the Sale Agreement or any of the other Basic Documents,

    o seeking any determination or ruling that might materially and adversely affect the performance by the Seller of its obligations under, or the validity or enforceability of, the Securitization Law, Financing Order No. 5, the 2017 Restructuring Bonds, the Sale Agreement or the other Basic Documents, or

    o seeking to adversely affect the federal income tax or state income tax classification of the 2017 Restructuring Bonds as debt,

- no approvals, authorizations, consents, orders or other actions of, or filings with, any Governmental Authority are required for the Seller to execute, deliver, perform and fulfill its obligations under the Sale Agreement except those which have been obtained, waived or made and are in full force and effect, and

- no portion of the 2017 Restructuring Property has been sold, transferred, assigned or pledged by the Seller to any Person other than the Issuer. Upon the sale, the Seller has transferred, sold and conveyed the 2017 Restructuring Property to the Issuer, free and clear of all Liens, except for any Lien that may be granted under the Basic Documents.

The Seller will not be in breach of any representation or warranty as a result of any change in law by means of any legislative enactment, constitutional amendment or otherwise that renders any of the representations or warranties untrue.

**Covenants of the Seller**

In the Sale Agreement, the Seller makes the following covenants:

- Subject to its right to assign its rights and obligations to a successor utility under the Sale Agreement, so long as any of the 2017 Restructuring Bonds are outstanding, the Seller will (a) keep in full force and effect its existence, rights and franchises as a corporate municipal instrumentality, body corporate and politic and a political subdivision of the State of New York, and (b) obtain and preserve its qualification to do business, in each case to the extent that in each such jurisdiction such existence or qualification is or shall be necessary to protect the validity and enforceability of the Sale Agreement, the other Basic Documents to which the Seller is a party and each other instrument or agreement to which the Seller is a party necessary or appropriate to the proper administration of the Sale Agreement and the transactions contemplated thereby.

- Except for the conveyances under the Sale Agreement or the Back-Up Security Interest, the Seller will not sell, pledge, assign or transfer, or grant, create or incur any Lien on, any of the 2017 Restructuring Property, or any interest therein, and the Seller will defend the right, title and interest of the Issuer and of the Trustee, in, to and under the 2017 Restructuring Property against all claims of third parties

claiming through or under the Seller. The Seller, also covenants that, in its capacity as Seller as defined in the Sale Agreement, it will not at any time assert any Lien against, or with respect to, any of the 2017 Restructuring Property.

- If the Seller receives any payments in respect of the 2017 Restructuring Charges or the proceeds thereof when it is acting as the Servicer, the Seller agrees to pay all those payments to the Servicer as soon as practicable after receipt thereof.

- The Seller will notify the Issuer and the Trustee promptly after becoming aware of any Lien on any of the 2017 Restructuring Property, other than the conveyances under the Sale Agreement, or any Lien under the Basic Documents or for the benefit of Issuer.

- The Seller agrees to comply with its organizational and governing documents and all laws, treaties, rules, regulations and determinations of any governmental instrumentality applicable to it, except to the extent that failure to so comply would not materially adversely affect the Issuer's or the Trustee's interests in the 2017 Restructuring Property or under any of the other Basic Documents to which the Seller is a party or the Seller's performance of its obligations under the Sale Agreement or under any of the Basic Documents to which the Seller is a party.

- So long as any of 2017 Restructuring Bonds are outstanding, the Seller will:

  o treat the 2017 Restructuring Bonds as debt of the Issuer and not the Seller, except for financial, accounting or tax reporting purposes,

  o indicate in its financial statements that it is not the owner of the 2017 Restructuring Property and will disclose the effects of all transactions between the Seller and the Issuer in accordance with generally accepted accounting principles, and

  o not own or purchase any 2017 Restructuring Bonds.

- The Seller agrees that, upon the transfer and sale by the Seller of the 2017 Restructuring Property to the Issuer pursuant to the Sale Agreement:

  o to the fullest extent permitted by law, including any applicable Seller regulations, the Issuer will have all of the rights originally held by the Seller with respect to the 2017 Restructuring Property, including the right (subject to the terms of the Servicing Agreement) to exercise any and all rights and remedies to collect any amounts payable by any Customer in respect of the 2017 Restructuring Property, notwithstanding any objection or direction to the contrary by the Seller, and

  o any payment by any Customer to the Issuer will discharge that Customer's obligations, if any, in respect of the 2017 Restructuring Property to the extent of that payment, notwithstanding any objection or direction to the contrary by the Seller.

- So long as any of the 2017 Restructuring Bonds are outstanding, the Seller will not:

  o make any statement or reference in respect of the 2017 Restructuring Property that is inconsistent with the ownership thereof by the Issuer (other than for financial, accounting or tax reporting purposes), and

  o take any action in respect of the 2017 Restructuring Property except as otherwise contemplated by the Basic Documents.

- The Seller will execute and file the filings required by law to fully preserve, maintain, protect the ownership interest of the Issuer, and the Trustee's lien on the 2017 Restructuring Property and the Back-Up Security Interest, including all filings required under the Securitization Law and the UCC relating to the transfer of the ownership interest in the 2017 Restructuring Property by the Seller to the Issuer, the granting of the security interest in the 2017 Restructuring Property by the Issuer to the Trustee, and the Back-Up Security Interest, and the continued perfection of such ownership interest, security interest and the Back-Up Security Interest. The Seller will deliver or cause to be delivered to the Trustee (with copies to the Issuer) file-stamped copies of, or filing receipts for any document so filed, as soon as available following such filing. The Seller has agreed to institute any action or Proceeding necessary to compel performance by the Authority or the State of New York of any of their obligations or duties under the