Securitization Law or Financing Order No. 5. The Seller also will take those legal or administrative actions, including defending against or instituting and pursuing legal actions and appearing or testifying at hearings or similar Proceedings, in each case, as may be reasonably necessary (i) to protect the Issuer, the Holders and the Trustee or their respective affiliates, officials, directors, employees and agents from claims, state actions or other actions or Proceedings of third parties which, if successfully pursued, would result in a breach of any representation of the Authority in the Sale Agreement or (ii) to block or overturn any attempts to cause a repeal of, modification of or supplement to the Securitization Law, Financing Order No. 5, the Issuance Advice Letter, any other adjustment notice or the rights of Holders by executive action, legislative enactment or constitutional amendment that would be adverse to the Issuer, the Trustee or the Holders.

- Even if the Sale Agreement or the Indenture is terminated, the Seller will not, prior to the date which is one year and one day after the termination of the Indenture, petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining an involuntary case against the Issuer under any federal or state bankruptcy, insolvency or similar law, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of the property of the Issuer, or ordering the winding up or liquidation of the affairs of the Issuer.

- So long as any of the 2017 Restructuring Bonds are outstanding, the Seller shall, and shall cause each of its subsidiaries to, pay all material taxes, assessments and governmental charges imposed upon it or any of its properties or assets or with respect to any of its franchises, business, income or property before any penalty accrues thereon if the failure to pay any such taxes, assessments and governmental charges would, after any applicable grace periods, notices or other similar requirements, result in a Lien on the 2017 Restructuring Property unless such tax is being contested and properly reserved.

- So long as any of the 2017 Restructuring Bonds are outstanding, the Seller shall not sell any restructuring property to secure another issuance of restructuring bonds if it would cause the then existing ratings on the 2017 Restructuring Bonds from the Rating Agencies to be downgraded, withdrawn or suspended.

- The Seller covenants that it shall comply with the tax certificates to be executed and delivered by it in connection with the issuance of the 2017 Restructuring Bonds and with letters of instruction, if any, delivered by Bond Counsel in connection with the issuance of the 2017 Restructuring Bonds, as such tax certificates and letters may be amended from time to time.

## Indemnification

The Seller will indemnify the Issuer, its trustees, officers, employees and agents, the Holders and the Trustee for, and defend and hold harmless each such Person from and against, (i) any and all taxes (other than taxes imposed on the Holders solely as a result of their ownership of 2017 Restructuring Bonds) that may at any time be imposed on or asserted against any such Person under existing law as of the Issuance Date as a result of the sale of 2017 Restructuring Property to the Issuer, and (ii) any and all taxes that may be imposed on or asserted against any such Person under existing law as of the Issuance Date as a result of the issuance and sale by the Issuer of the 2017 Restructuring Bonds or the other transactions contemplated by the Sale Agreement, in each case including any sales, gross receipts, general corporation, tangible personal property, privilege or license taxes; provided, however, that the Holders shall be entitled to enforce their rights against the Seller under this indemnification solely through a cause of action brought for their benefit by the Trustee.

In addition, the Seller shall indemnify and hold harmless the Issuer, the Holders, the Trustee and any of the Trustee's affiliates, officials, officers, directors, employees and agents, against any and all Losses incurred by any of such Persons as a result of (i) the Seller's willful misconduct or negligence in the performance of its duties or observance of its covenants under the Sale Agreement or (ii) the Seller's breach in any material respect of any of its representations and warranties contained in the Sale Agreement, except in the case of both clauses (i) and (ii) to the extent of Losses either resulting from the willful misconduct or negligence of such party or resulting from a breach of a representation or warranty made by such party in any of the Basic Documents that gives rise to the Seller's breach; provided, however, that the Holders shall be entitled to enforce their rights under this indemnification against the Seller solely through a cause of action brought for their benefit by the Trustee. The Seller shall not be required to indemnify any person otherwise indemnified under the Sale Agreement for any amount paid or payable by such person

in the settlement of any action, proceeding or investigation without the prior written consent of the Seller, which consent shall not be unreasonably withheld.

**Successors to the Seller**

Any Person which becomes successor by merger, conversion, or consolidation or by otherwise succeeding to all of the assets and properties of the Seller substantially as a whole, may assume the rights and obligations of the Seller under the Sale Agreement. So long as the conditions of any such assumption are met, the Seller will automatically be released from its obligations under the Sale Agreement. The conditions include that:

- the Person in any of the foregoing cases executes an agreement of assumption to perform every obligation of the Seller under the Sale Agreement,

- if the Seller is the Servicer, no Servicer Default, and no event which, after notice or lapse of time, or both, would become a Servicer Default shall have occurred and be continuing,

- Officer's Certificates and Opinions of Counsel specified in the Sale Agreement will have been delivered to the Issuer and the Trustee, and

- the Rating Agencies specified in the Sale Agreement will have received prior written notice of the transaction.

**Amendment**

The Sale Agreement may be amended by the Seller and the Issuer with ten Business Days' prior written notice given to the Rating Agencies, the prior written consent of the Trustee, and if any amendment would adversely affect in any material respect the interests of any Holder, the prior written consent of a majority of the Outstanding Amount of the 2017 Restructuring Bonds affected thereby.

## THE SERVICING AGREEMENT

In addition to the description of certain provisions of the Servicing Agreement contained elsewhere herein, the following is a brief summary of certain provisions of the Servicing Agreement and does not purport to be comprehensive or definitive. All references herein to the Servicing Agreement are qualified in their entirety by reference to the Servicing Agreement for the detailed provisions thereof.

**General**

Pursuant to the Servicing Agreement, the Servicer is required, among other things, to collect the 2017 Restructuring Charges for the benefit and account of the Holders, to make the periodic True-Up Adjustments of the 2017 Restructuring Charges required or allowed by Financing Order No. 5, and to account for and remit the 2017 Restructuring Charges to or for the account of the Trustee in accordance with the remittance procedures contained in the Servicing Agreement without any charge, deduction or surcharge of any kind (other than the Servicing Fee specified in the Servicing Agreement). Under the terms of the Servicing Agreement, if the Servicer or any Successor Servicer fails to perform its servicing obligations in any material respect, the Trustee may, or shall, upon the written instruction of the Authority (acting on behalf of Customers) or the Holders of a majority of Outstanding Amount of the 2017 Restructuring Bonds, may terminate the rights and obligations of the Servicer under the Servicing Agreement. Upon the termination of the Servicer, the Authority shall appoint, subject to the consent of Holders of a majority of the Outstanding Amount of the 2017 Restructuring Bonds, a Successor Servicer to perform the obligations of the Servicer under the Servicing Agreement. The rights of the Issuer under the Servicing Agreement will be included in the collateral pledged to the Issuer under the Indenture, and these rights will be included in the Collateral.

The obligations to continue to collect and account for 2017 Restructuring Charges will be binding upon the Servicer and any other entity that provides transmission and distribution electric services or, in the event that transmission and distribution electric services are not provided by a single entity, any other entity providing electric distribution services to the Customers.

**Servicing Procedures**

The Servicer, as agent for the Issuer, will manage, service and administer, and bill and collect payments in respect of the 2017 Restructuring Charge according to the terms of the Servicing Agreement. The Servicer's duties will include: (i) obtaining meter reads calculating electricity usage, billing the 2017 Restructuring Charges and collecting the 2017 Restructuring Charges from Customers and third parties, as applicable, (ii) responding to inquiries

of Customers, the Authority, third-party entities who bill and collect the charge, or any Governmental Authority regarding the 2017 Restructuring Charge, (iii) delivering bills to Customers and third parties, accounting for Charge Collections, investigating and handling delinquencies, processing and depositing collections and making periodic remittances, (iv) furnishing periodic reports and statements to the Issuer, the Authority, the Rating Agencies and to the Trustee, (v) selling, as agent for the Issuer, as its interests may appear, defaulted or written off accounts, and (vi) taking all necessary action in connection with True-Up Adjustments as set forth in the Servicing Agreement.

The Servicer is required to notify the Issuer, the Authority, the Trustee and the Rating Agencies in writing of any laws or regulations promulgated after the execution of the Servicing Agreement that have a material adverse effect on the Servicer's ability to perform its duties under the Servicing Agreement.

In addition, upon the reasonable request of the Issuer, the Authority, the Administrator, the Trustee or any Rating Agency, the Servicer will provide to the Issuer, the Authority, the Administrator, the Trustee or the Rating Agency, public financial information about the Servicer or any material information about the 2017 Restructuring Property that is reasonably available, as may be reasonably necessary and permitted by law to enable the Issuer, the Authority, the Administrator, the Trustee or the Rating Agency to monitor the Servicer's performance, and, so long as any 2017 Restructuring Bonds are outstanding, within a reasonable time after written request thereof, any information available to the Servicer or reasonably obtainable by it that is necessary to calculate the 2017 Restructuring Charges.

**Servicing Standards and Covenants**

The Servicing Agreement requires the Servicer to, on behalf of the Issuer (i) manage, service, administer and make collections in respect of the 2017 Restructuring Property with reasonable care in material compliance with applicable law, including all regulations applicable to the Authority, using the same degree of care and diligence that the Servicer exercises with respect to billing and collection activities that the Servicer conducts for itself and others, (ii) follow customary standards, policies and procedures in performing its duties as Servicer that are customary in the electric distribution industry, (iii) use all reasonable efforts, consistent with its customary servicing procedures, to enforce and maintain the Issuer's and the Trustee's rights in respect of the 2017 Restructuring Property, (iv) calculate 2017 Restructuring Charges in compliance with the Securitization Law and Financing Order No. 5, and (v) invoice Customers in accordance with the procedures set forth in the Servicing Agreement. The Servicer shall follow such customary and usual practices and procedures as it shall deem necessary or advisable in its servicing of the 2017 Restructuring Property, which, in the Servicer's judgment, may include the taking of legal action pursuant to the Servicing Agreement or otherwise. The Servicer will not change such customary and usual practices and procedures in any manner that would materially and adversely affect the Issuer's or the Trustee's interest in the 2017 Restructuring Property unless the Servicer provides the Rating Agencies with prior written notice.

The Servicer is responsible for instituting and maintaining any action or proceeding necessary to compel performance by the Authority or the State of New York of any of their obligations or duties under the Securitization Law or Financing Order No. 5 with respect to the 2017 Restructuring Property, and the Servicer agrees to take such legal or administrative actions, including defending against or instituting and pursuing legal actions and appearing or testifying at hearings or similar proceedings, as may be reasonably necessary to block or overturn any attempts to cause a repeal of, modification of or supplement to the Securitization Law or Financing Order No. 5, as the case may be, or the rights of holders of 2017 Restructuring Property that would be adverse to Holders. The Servicing Agreement also designates the Servicer as the servicing agent and custodian for the Issuer with respect to the 2017 Restructuring Property Documentation.

**True-Up Adjustment Process**

Among other things, the Servicing Agreement requires the Servicer to calculate and implement the True-Up Adjustments to the 2017 Restructuring Charges. These adjustments are to be based on actual Charge Collections and updated assumptions by the Servicer as to projected future Charge Collections, projected uncollectibles and loss in collection of billed charges, and future payments and expenses relating to the 2017 Restructuring Property and the 2017 Restructuring Bonds. See "THE FINANCING ORDER–True-Up Adjustment Mechanism."

**Servicing Compensation**

The Issuer will pay the Servicer a Servicing Fee in exchange for all obligations to be performed by the Servicer under the Servicing Agreement. The annual Servicing Fee for the 2017 Restructuring Bonds payable to LIPA, as the initial Servicer or any Successor Servicer that is affiliated with the owner of the T&D System Assets or

performing similar services for the owner of the T&D System Assets, while it is acting as Servicer shall be 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds. The annual Servicing Fee for any Successor Servicer that is not affiliated with the owner of the T&D System Assets or not performing similar services for the owner of the T&D System Assets shall be an amount agreed upon by the Issuer and the Successor Servicer, provided that any amount in excess of 0.60% of the initial aggregate principal amount of the 2017 Restructuring Bonds shall be approved by the Authority and the Trustee, and provided, further, that if the Authority fails to approve or disapprove any such Servicing Fee within 30 days following its receipt of a written request to approve the same, the Authority shall be deemed to have approved such Servicing Fee. The Issuer shall also pay all expenses incurred by the Servicer in connection with its activities under the Servicing Agreement (including any fees to and disbursements by accountants, counsel or any other Person, any taxes or payments in lieu of taxes imposed on the Servicer (other than taxes based on the Servicer's net income) and any expenses incurred in connection with reports to Holders, subject to the priorities set forth in the Indenture).

**Servicer Representations and Warranties**

In the Servicing Agreement, the Servicer will represent and warrant, as of the Issuance Date, among other things, that:

- the Servicer is a corporation, duly organized and is in good standing in the state of its organization, with the requisite corporate or other power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted by it, and has, the requisite corporate power and authority to service the 2017 Restructuring Property and hold the 2017 Restructuring Property and the 2017 Restructuring Property Documentation as custodian,

- the Servicer is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business (including the servicing of the 2017 Restructuring Property as required by the Servicing Agreement) shall require such qualifications, licenses or approvals (except where the failure to qualify or to obtain such licenses and approvals would not be reasonably likely to have a material adverse effect on the Servicer's business, operations, assets, revenues or adversely affect the servicing of the 2017 Restructuring Property),

- the Servicer has the requisite corporate power and authority to execute and deliver the Servicing Agreement and carry out the terms of the Servicing Agreement; and the execution, delivery and performance of the terms of the Servicing Agreement have been duly authorized by all necessary corporate action on the part of the Servicer,

- the Servicing Agreement constitutes a legal, valid and binding obligation of the Servicer, enforceable against it in accordance with its terms, subject to applicable insolvency, bankruptcy, receivership, reorganization, moratorium, fraudulent transfer and other laws relating to or affecting creditors' rights generally from time to time in effect and to general principles of equity (including concepts of materiality, reasonableness, good faith and fair dealing), regardless of whether considered in a proceeding in equity or at law,

- the consummation of the transactions contemplated by the Servicing Agreement and the fulfillment of the terms thereof do not conflict with, or result in any breach of any of the terms and provisions of, nor constitute (with or without notice or lapse of time) a default under the organizational documents of the Servicer or any material indenture or other agreement or instrument to which the Servicer is a party or by which it is bound; nor result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; nor violate any existing law or any existing order, rule or regulation applicable to the Servicer of any federal or state court or regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Servicer or its properties,

- no approval, authorization, consent, order or other action of, or filing with, any federal or state court or regulatory body, administrative agency or other governmental instrumentality is required in connection with the execution and delivery by the Servicer of the Servicing Agreement, the performance by the Servicer of the transactions contemplated thereby or the fulfillment by the Servicer of the terms thereof, except those that have been obtained or made and those that the Servicer is required to make in the future,

- there are no Proceedings pending or, to the Servicer's knowledge, threatened, and no investigations pending or threatened, before any federal or state court or regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Servicer or its properties involving or relating to the Servicer or, to the Servicer's knowledge, any other Person: (i) asserting the invalidity of the Servicing Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Servicing Agreement, or (iii) seeking any determination or ruling that might materially adversely affect the performance by the Servicer of its obligations under, or the validity or enforceability of, the Servicing Agreement, and

- each report and certificate delivered in connection with the Issuance Advice Letter or delivered in connection with any filing made to the Authority by the Servicer with respect to the 2017 Restructuring Charges or True-Up Adjustments will constitute a representation and warranty by the Servicer that each such report and certificate, as the case may be, is true and correct in all material respects; but to the extent any such report or certificate is based in part upon or contains assumptions, forecasts or other predictions of future events, the representation and warranty of the Servicer with respect thereto will be limited to the representation and warranty that such assumptions, forecasts or other predictions of future events are reasonable based upon historical performance (and facts known to the Servicer on the date such report or certificate is delivered).

## Certificates by Servicer

*Monthly Servicer Certificates.*  On or before the 13th Business Day of each calendar month commencing with February 2018, the Servicer will deliver to the Allocation Agent, the Issuer, the Authority, each Rating Agency and the Trustee a monthly certificate in substantially the form provided in the Servicing Agreement (the "Monthly Servicer Certificate"), stating the amount of 2017 Restructuring Charges deposited into the Allocation Account during the preceding calendar month, the estimated amount of Charge Collections transferred to the Collection Account during the preceding calendar month, the amount of any transfers or reductions in respect of Excess Remittances or the Remittance Shortfalls occurring during the preceding calendar month, and the amount of any transfers or reductions in respect of Excess Remittances or Remittance Shortfalls required to occur on any Remittance Date during the current month pursuant to the Servicing Agreement.

*Semi-annual Servicer Certificates.*  At least one Business Day before each Payment Date, the Servicer shall provide to the Issuer, the Trustee, each Rating Agency and the Authority, a certificate in substantially the form in the Servicing Agreement (the "Semi-annual Servicer Certificate") indicating:

1.    the amount to be paid to the Holders of each tranche in respect of principal on such Payment Date in accordance with the Indenture,

2.    the amount to be paid to the Holders of each tranche in respect of interest on such Payment Date in accordance with the Indenture,

3.    the projected bond balance and the bond balance for each tranche as of that Payment Date (after giving effect to the payments on such Payment Date),

4.    the amounts on deposit in the Reserve Subaccount (including the Operating Reserve Subaccount and the Debt Service Reserve Subaccount) as of that Payment Date (after giving effect to the transfers to be made from or into the Reserve Subaccount on such Payment Date),

5.    the amounts, if any, on deposit in the Excess Funds Subaccount as of that Payment Date (after giving effect to the transfers to be made from or into the Excess Funds Subaccount on such Payment Date),

6.    the amounts paid to the Trustee since the preceding Payment Date pursuant to the Indenture,

7.    the amounts paid to the Servicer since the preceding Payment Date pursuant to the Indenture, and

8.    the amount of any other transfers and payments to be made on such Payment Date pursuant to the Indenture.

*Annual Certificates.*  The Servicer shall provide the annual compliance certificate required by the Servicing Agreement in substantially the form provided in the Servicing Agreement (the "Servicer Compliance Certificate").

**Servicer Will Indemnify Issuer in Limited Circumstances**

The Servicer will indemnify the Issuer and the Trustee (for itself and for on behalf of the Bondholders) and each of their respective trustees, members, managers, officers, directors, employees and agents for, and defend and hold harmless each such Person from and against, any and all Losses arising as a result of:

- the Servicer's willful misconduct or negligence in the performance of its duties or observance of its covenants under the Servicing Agreement or the Servicer's reckless disregard of its obligations and duties under the Servicing Agreement,

- the Servicer's breach of any of its representations or warranties under the Servicing Agreement, and

- litigation and related expenses relating to its status and obligations as Servicer.

The Servicer will not be liable, however, for any Losses resulting from the willful misconduct or gross negligence of the party seeking indemnification, or resulting from a breach of a representation or warranty made by any such person in any of the Basic Documents that give rise to the Servicer's breach.

Except to the extent expressly provided for in the Basic Documents (including the Servicer's claims with respect to the Servicing Fees), the Servicing Agreement provides that the Servicer releases and discharges the Issuer (including its trustees, officers, employees and agents, if any), and the Trustee (including its respective officers, directors and agents) from any and all actions, claims and demands which the Servicer may have against those parties relating to the 2017 Restructuring Property or the Servicer's activities with respect to the 2017 Restructuring Property, other than actions, claims and demands arising from the willful misconduct, bad faith or gross negligence of the parties.

The Servicing Agreement further provides that the Servicer will not be liable to the Issuer or to the Trustee, except as provided under the Servicing Agreement, for taking any action or for refraining from taking any action under the Servicing Agreement or for errors in judgment. However, the Servicer will not be protected against any liability that would otherwise be imposed by reason of willful misconduct, bad faith or negligence in the performance of its duties or by reason of reckless disregard of obligations and duties under the Servicing Agreement. The Servicer and any of its directors, officers, employees or agents may rely in good faith on the advice of counsel reasonably acceptable to the Trustee or on any document submitted by any person respecting any matters under the Servicing Agreement. In addition, the Servicing Agreement provides that the Servicer is under no obligation to appear in, prosecute, or defend any legal action incidental to its duties to service the 2017 Restructuring Property in accordance with the Servicing Agreement or related to its obligation to pay indemnification, and that in its reasonable opinion may cause it to incur any expense or liability, except as provided in the Servicing Agreement.

**Matters Regarding Servicer**

The Servicing Agreement provides that LIPA may not resign from its obligations and duties as Servicer thereunder, except upon a determination that LIPA's performance of its duties under the Servicing Agreement is no longer permissible under applicable law. No resignation by LIPA as Servicer will become effective until a Successor Servicer has assumed LIPA's servicing obligations and duties under the Servicing Agreement.

Under the circumstances specified in the Servicing Agreement, any Person which becomes the successor by merger, sale, transfer, lease, management contract or otherwise to all or substantially all of the T&D Systems Assets may assume all of the rights and obligations of the Servicer under the Servicing Agreement. The following are conditions to the transfer of the duties and obligations to a Successor Servicer:

- the successor to the Servicer must execute an agreement of assumption to perform every obligation of the Servicer under the Servicing Agreement,

- immediately after the transfer, no representation or warranty made by the Servicer in the Servicing Agreement will have been breached and no Servicer default or event which after notice of, lapse of time or both, would become a Servicer default, has occurred and is continuing,

- the Servicer has delivered to the Issuer and to the Trustee an Officer's Certificate stating that the transfer complies with the Servicing Agreement and all conditions to the transfer under the Servicing Agreement have been complied with,

- the Servicer has delivered to the Issuer and to the Trustee an Opinion of Counsel stating either that all necessary filings to preserve, perfect and maintain the priority of the Issuer's interests in and the

Trustee's lien on the 2017 Restructuring Property, have been made or that no filings are required to preserve and protect such interests,

- the Servicer has given prior written notice to the Rating Agencies, and

- the Servicer has delivered to the Issuer, the Trustee and the Authority an opinion of independent tax counsel to the effect that, for federal income tax purposes, such transaction will not result in a material federal income tax consequence to the Issuer, the Trustee, or the then existing Holders.

So long as the conditions of any such assumptions are met, then the prior Servicer will automatically be released from its obligations under the Servicing Agreement.

The Servicing Agreement permits the Servicer to contract with a subservicer to perform all or any portion of its obligations. However, the contract must satisfy the Rating Agency Condition and the Servicer must remain obligated and liable to the Issuer, the Trustee and the Bondholders for the servicing and administering of the 2017 Restructuring Property in accordance with the Servicing Agreement. The Servicing Agreement provides that the OSA, as amended from time to time, is deemed to satisfy the Rating Agency Condition.

**Annual Accountant's Report**

The Servicer shall cause a firm of Independent registered public accountants (which may provide other services to the Servicer or its affiliates) to prepare annually, and the Servicer shall deliver annually to the Issuer, the Trustee, the Rating Agencies and the Authority on or before March 31 of each year, commencing with 2018 to and including the March 31st succeeding the Final Maturity Date of the 2017 Restructuring Bonds, a report addressed to the Servicer (the "Annual Accountant's Report"), to the effect that such firm has performed certain procedures, agreed between the Servicer and such accountants, in connection with the Servicer's compliance with its obligations under the Servicing Agreement during the preceding twelve months ended December 31 (or, in the case of the first Annual Accountant's Report to be delivered on or before March 31, 2018, the period of time from the date of the Servicing Agreement until December 31, 2017), identifying the results of such procedures and including any exceptions noted. In the event such accounting firm requires the Trustee or the Issuer to agree or consent to the procedures performed by such firm, the Issuer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement or consent in conclusive reliance upon the direction of the Issuer, and the Trustee will not make any independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

The Annual Accountant's Report shall also indicate that the accounting firm providing such report is independent of the Servicer in accordance with the New York Public Authorities Law or the Code of Professional Ethics of the American Institute of Certified Public Accountants, as then in effect.

**Servicer Defaults and Remedies**

If any one or more of the following events (a "Servicer Default") shall occur and be continuing:

(a)     any failure by the Servicer to cause payments by or on behalf of Customers received by the Servicer from 2017 Restructuring Charges to be deposited into the Allocation Account as provided in the Servicing Agreement or any failure to cause the Allocation Agent to transfer to the Trustee any required remittance and cause other amounts received from 2017 Collateral to be deposited to the Collection Account pursuant to the Servicer Agreement that shall continue unremedied for a period of 5 Business Days after written notice of such failure is received by the Servicer from the Issuer or the Trustee,

(b)     any failure on the part of the Servicer duly to observe or to perform in any material respect any covenants or agreements of the Servicer set forth in the Servicing Agreement, which failure (i) materially and adversely affects the 2017 Restructuring Property or the rights of the Holders and (ii) continues unremedied for a period of 60 days after the date on which (A) written notice of such failure shall have been given to the Servicer by the Issuer, the Authority, the Allocation Agent, the Administrator, or the Trustee, or (B) after discovery of such failure by an officer of the Servicer,

(c)     any representation or warranty made by the Servicer in the Servicing Agreement proves to have been incorrect when made, which has a material adverse effect on the Issuer or the Holders and which material adverse effect continues unremedied for a period of 60 days after the date on which

(A) written notice thereof shall have been delivered to the Servicer by the Issuer, or the Authority, or the Trustee, or (B) after discovery of such failure by an officer of the Servicer, as the case may be, or

(d) an Insolvency Event occurs with respect to the Servicer;

then, and in each and every case, so long as the Servicer Default shall not have been remedied, either the Trustee may, or shall upon the instruction of the Authority (acting on behalf of Customers) or the Holders of a majority of the outstanding principal amount of the 2017 Restructuring Bonds, by notice then given in writing to the Servicer (and to the Trustee if given by the Holders) (a "Termination Notice"), may terminate all the rights and obligations (other than the indemnity obligations and the obligation to continue performing its functions as Servicer until a Successor Servicer is appointed) of the Servicer under the Servicing Agreement. In addition, upon a Servicer Default, any interested person shall be entitled to apply to any court in New York for sequestration and payment of revenues arising with respect to the 2017 Restructuring Property. On or after the receipt by the Servicer of a Termination Notice, all authority and power of the Servicer under the Servicing Agreement, whether with respect to the 2017 Restructuring Property, the 2017 Restructuring Charge, or otherwise, shall, upon appointment of a Successor Servicer pursuant to the Servicing Agreement, without further action, pass to and be vested in such Successor Servicer; and, without limitation, the Trustee is thereby authorized and empowered to execute and deliver, on behalf of the predecessor Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such Termination Notice, whether to complete the transfer of the 2017 Restructuring Property Documentation and related documents, or otherwise. The predecessor Servicer shall cooperate with the Successor Servicer, the Issuer, the Allocation Agent and the Trustee in effecting the termination of the responsibilities and rights of the predecessor Servicer under the Servicing Agreement, including the transfer to the Successor Servicer for administration by it of all cash amounts that shall at the time be held by the predecessor Servicer for remittance, or shall thereafter be received by it with respect to the 2017 Restructuring Property or the 2017 Restructuring Charge. As soon as practicable after receipt by the Servicer of such Termination Notice, the Servicer shall deliver the 2017 Restructuring Property Documentation to the Successor Servicer. All reasonable costs and expenses (including attorneys' fees and expenses) incurred in connection with transferring the 2017 Restructuring Property Documentation to the Successor Servicer and amending the Servicing Agreement to reflect such succession as Servicer pursuant to the Servicing Agreement shall be paid by the predecessor Servicer upon presentation of reasonable documentation of such costs and expenses.

*Successor Servicer.* Upon the Servicer's receipt of a Termination Notice or the Servicer's resignation or removal in accordance with the terms of the Servicing Agreement, the predecessor Servicer shall continue to perform its functions as Servicer and shall be entitled to receive the requisite portion of the Servicing Fee and reimbursement of expenses, until a Successor Servicer shall have assumed in writing the obligations of the Servicer. In the event of the Servicer's removal or resignation, and upon application of the Trustee, the Authority will appoint a Successor Servicer. Any appointment of a Successor Servicer requires the consent of the Holders of a majority of the outstanding principal amount of the 2017 Restructuring Bonds, and the Successor Servicer shall accept its appointment by a written assumption in a form reasonably acceptable to the Issuer and the Trustee. If within 30 days after the delivery of the Termination Notice, a new Servicer has not been appointed and accepted such appointment, the Trustee may petition the Authority or a court of competent jurisdiction to appoint a Successor Servicer. A Person shall qualify as a Successor Servicer only if (i) such Person is permitted under the Securitization Law, the regulations of the Authority, Financing Order No. 5 and the Servicing Agreement to perform the duties of the Servicer, (ii) the Rating Agency Condition shall have been satisfied, and (iii) such Person enters into a servicing agreement with the Issuer having substantially the same provisions as the Servicing Agreement.

Upon appointment, the Successor Servicer shall be the successor in all respects to the predecessor Servicer and shall be subject to all the responsibilities, duties and liabilities arising thereafter relating thereto placed on the predecessor Servicer and shall be entitled to the Servicing Fee and all the rights granted to the predecessor Servicer by the Servicing Agreement.

The Successor Servicer may resign only if it is prohibited from serving as such by applicable law.

*Waiver of Past Defaults.* The Trustee, with the consent of the Authority and the Holders of the majority of the outstanding principal amount of the 2017 Restructuring Bonds, on behalf of all Holders, may waive in writing any default by the Servicer in the performance of its obligations except a default in making any required deposits to the Allocation Account in accordance with the Servicing Agreement. The Servicer is required to provide notice of any such waivers to each Rating Agency, promptly after its receipt thereof from the Trustee. Upon any such waiver of a

past default, such default shall cease to exist, and any Servicer Default arising therefrom shall be deemed to have been remedied for every purpose of the Servicing Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereto.

*Notice of Servicer Default.* The Servicer shall deliver to the Issuer, the Authority, the Administrator, the Trustee, the Allocation Agent and the Rating Agencies, promptly after having obtained knowledge thereof, but in no event later than 5 Business Days thereafter, written notice in an Officer's Certificate of any event which with the giving of notice or lapse of time, or both, would become a Servicer Default under the Servicing Agreement.

*Amendment to Servicing Agreement.* The Servicing Agreement may be amended by the Servicer and the Issuer, with the consent of the Trustee and the satisfaction of the Rating Agency Condition. Promptly after the execution of any such amendment or consent, the Issuer shall furnish written notification of the substance of such amendment or consent to each of the Rating Agencies.

Prior to the execution of any amendment to the Servicing Agreement, the Issuer and the Trustee shall be entitled to receive and rely upon an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by the Servicing Agreement and the Opinion of Counsel referred to in the Servicing Agreement. The Issuer and the Trustee may, but shall not be obligated to, enter into any such amendment which affects their own rights, duties or immunities under the Servicing Agreement or otherwise.

To amend or modify the Servicing Agreement, the following conditions must be met:

(a)    At least fifteen days prior to the effectiveness of any such amendment or modification and after obtaining the other necessary approvals described above (except that the consent of the Trustee may be subject to the consent of the Holders if such consent is required or sought by the Trustee in connection with such amendment or modification), the Servicer shall have delivered to the Authority written notification of any proposed amendment,

(b)    If the Authority, within fifteen days (subject to extension as provided in clause (c) below) of receiving a notification complying with the necessary approvals as described above, delivers to the office of the person to whom responses are to be delivered a written statement that the Authority might object to the proposed amendment or modification, then such proposed amendment or modification shall not be effective unless and until the Authority subsequently delivers a written statement that it does not object to the proposed amendment or modification,

(c)    If the Authority, within fifteen days of receiving a notification complying with the necessary approvals described above, delivers to the office of the person to whom responses are to be delivered a written statement requesting additional time (up to thirty days) in which to consider the proposed amendment or modification, then such proposed amendment or modification shall not be effective if, within the extended period, the Authority delivers to the office of the person to whom responses are to be delivered a written statement that it does not object to the proposed amendment or modification,

(d)    If the Authority has not delivered written notice that the Authority might object to the proposed amendment or modification within the relevant time period described above, then the Authority shall be deemed not to have any objection and such amendment or modification may become effective upon satisfaction of the other conditions specified above, and

(e)    Following the delivery of a notice to the Authority by the Servicer under clause (b) above, the Servicer and the Issuer shall have the right at any time to withdraw any proposed amendment from consideration.

The Servicer may, with the prior written consent of the Authority, amend the billing procedures in Annex 2 to the Servicing Agreement in writing with prior written notice given to the Trustee, the Issuer and the Rating Agencies, but without the consent of the Trustee, the Issuer, any Rating Agency or any Holder, solely to address changes to the Servicer's method of calculating the 2017 Restructuring Charges as a result of changes to the Servicer's (or its subservicer's) current computerized customer information system, including changes which would replace the remittances contemplated by the estimation procedures set forth in Annex 2 with remittances of Charge Collections determined to have been actually received; provided that any such amendment shall not have a material adverse effect on the Holders.

The Servicer shall promptly provide each of the Rating Agencies and the Authority with a copy of any amendment to the Servicing Agreement.

*Cooperation with Successor.* The Servicer will, on an ongoing basis, cooperate with the Successor Servicer and provide whatever information is, and take whatever actions are, reasonably necessary to assist the Successor Servicer in performing its obligations under the Servicing Agreement.

## ADMINISTRATION AGREEMENT

In addition to the description of certain provisions of the Administration Agreement contained elsewhere herein, the following is a brief summary of certain provisions of the Administration Agreement and does not purport to be comprehensive or definitive. All references herein to the Administration Agreement are qualified in their entirety by reference to the Administration Agreement for the detailed provisions thereof.

**Duties of the Administrator**

To the extent not required to be performed by the Servicer, the Administrator shall perform the Issuer's obligations under each of the Basic Documents and shall prepare or cause any and all documents, reports, filings, instruments, notices, certificates and opinions to be prepared on behalf of the Issuer. These obligations include:

(a)    confirmation that any non-responding Rating Agency has received the Rating Agency Condition request and request the related Rating Agency Condition confirmation,

(b)    the preparation of or obtaining of the documents required for the authentication of the 2017 Restructuring Bonds and delivery of the same to the Trustee and such other actions on behalf of the Issuer as are necessary for the issuance and delivery of the 2017 Restructuring Bonds,

(c)    causing a Bond Register to be kept and to give the Trustee notice of any changes to the Bond Register,

(d)    the fixing of any special record date and the notification of Holders of any special record dates, Payment Dates and the amount of defaulted interest to be paid, if any,

(e)    advising the Trustee of an election to terminate the book-entry system through a Clearing Agency with respect to the 2017 Restructuring Bonds,

(f)    maintenance of an office or agency in the Borough of Manhattan, the City of New York, New York where 2017 Restructuring Bonds may be surrendered for registration of transfer or exchange, which may be the Trustee,

(g)    causing any newly appointed Paying Agents to deliver to the Trustee instruments regarding funds held in trust,

(h)    directing the Paying Agents to pay to the Trustee all sums held in trust by such Paying Agents,

(i)    preparing all supplements and amendments to the Indenture, filings pursuant to the Securitization Law or Financing Order No. 5, instruments of further assurance and other instruments, in accordance with the Indenture, necessary to protect the 2017 Collateral,

(j)    identifying to the Trustee in an Officer's Certificate any Person that the Issuer has contracted to perform its duties under the Indenture,

(k)    delivering a notice to the Trustee and the Rating Agencies of each Event of Default under the Administration Agreement and each default by the Servicer or Seller of its obligations under the Servicing Agreement or the Sale Agreement, respectively,

(l)    notifying the Trustee and the Authority of the appointment of any Successor Servicer,

(m)    preparing and filing of all documents required under the Securitization Law relating to the transfer of the ownership or security interest in the 2017 Restructuring Property,

(n)    preparing the Officer's Certificate and Independent Certificate relating to the satisfaction and discharge of the Indenture or a Legal Defeasance under the Indenture,

(o)     sending a copy of each certificate of compliance delivered to it pursuant to the Servicing Agreement and Annual Accountant's Report delivered to it pursuant to the Servicing Agreement to the Trustee, the Holders and the Rating Agencies and to the Servicer,

(p)     furnishing the Trustee with each Record Date and the names and addresses of Holders during any period when the Trustee is not the Registrar,

(q)     the opening of one or more segregated trust accounts in the Trustee's name, the preparation of orders, and the obtaining of Opinions of Counsel and the taking of all other actions necessary with respect to investment and reinvestment of funds in the Collection Account including transfer of the Collection Account to an Eligible Institution if it ceases to be maintained at an Eligible Institution,

(r)     preparing, obtaining or filing of the instruments, opinions and certificates and other documents required for the release of 2017 Collateral,

(s)     appointing Independent registered public accountants for purposes of preparing and delivering the reports or certificates required by the Indenture and, upon any resignation by such firm, providing written notice thereof to the Trustee and promptly appointing a successor thereto that shall also be a firm of Independent registered public accountants,

(t)     preparing the Issuer orders and the obtaining of Officer's Certificates with respect to the execution of supplemental bond indentures,

(u)     the preparation of new 2017 Restructuring Bonds conforming to any supplemental bond indenture,

(v)     in the case of any redemption of 2017 Restructuring Bonds at the direction of the Issuer, giving written notice to the Trustee of the Issuer's direction to redeem such 2017 Restructuring Bonds,

(w)     notifying the Trustee of any notice received by the Issuer from the Holders, and

(x)     interacting with the Allocation Agent with respect to Excess Remittances and Remittance Shortfalls.

The Administrator shall also furnish the Issuer with ordinary clerical, bookkeeping and other administrative services necessary and appropriate for the Issuer.

In addition to the duties of the Administrator described above, the Administrator shall undertake such other administrative services as may be appropriate, necessary or requested by the Issuer and provide such other services as are incidental to those set forth above or in this paragraph or as the Issuer and Administrator may agree. As part of its administrative services, the Administrator shall obtain and maintain a directors and officers insurance policy covering the trustees of the Issuer (which policy may cover the officers of the Issuer as well), and the Administrator shall pay the premiums therefor as a reimbursable expense under the Administration Agreement to the extent there are insufficient funds on deposit in the Collection Account to pay such premiums when due in accordance with the priorities specified in the Indenture. The Administrator shall not take any non-ministerial action unless the Administrator notifies the Issuer of the proposed action and the Issuer consents to such action.

**Administrator Compensation**

The Administration Agreement provides that the Administrator shall be entitled to an annual fee (the "Administration Fee") of $100,000 in equal semi-annual installments on each Payment Date.

The Issuer will also reimburse the Administrator for all filing fees and expenses, legal fees, fees of outside auditors and other out-of-pocket expenses incurred by the Administrator in the course of performing its duties thereunder. The Administrator's compensation and other expenses payable thereunder shall be paid from the Collection Account in accordance with the Collection Account priorities as stated in the Indenture, and the Administrator shall have no recourse against the Issuer for payment of such amounts other than in accordance with the Collection Account priorities as stated in the Indenture.

**Resignation and Removal of the Administrator**

The Administrator may resign its duties thereunder by providing the Issuer with at least sixty days' prior written notice. The Issuer may remove the Administrator without cause by providing the Administrator with at least sixty days' written notice. At the sole option of the Issuer, the Administrator may be removed immediately upon written notice of termination from the Issuer to the Administrator if the Administrator is in default of the performance of its duties under the Administration Agreement and such default is not cured in accordance with the Administration

Agreement, or is party to a voluntary or involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect or appoints a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Administrator or any substantial part of its property or order the winding-up or liquidation of its affairs.

No resignation or removal of the Administrator shall be effective until a successor Administrator shall have been appointed by the Issuer and shall have agreed in writing to be bound by the terms of the Administration Agreement. The appointment of any successor Administrator shall be effective only after the satisfaction of the Rating Agency Condition with respect to the proposed appointment.

Promptly upon the effective date of its resignation or removal, the Administrator shall be entitled to be paid all fees accrued to it and expenses accrued by it in performance of its duties thereunder through the date of such resignation or removal and to the extent permitted under the Administration Agreement.

**Amendment of the Administration Agreement**

The Administration Agreement may be amended in writing by the Administrator and the Issuer with the written consent of the Trustee, but without the consent of any of the Holders, to cure any ambiguity, to correct or supplement any provisions in the Administration Agreement or for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions in the Administration Agreement or of modifying in any manner the rights of the Holders; provided, that such action shall not, as evidenced by an Officer's Certificate delivered to the Trustee, adversely affect in any material respect the interests of any Holder.

The Administration Agreement may also be amended in writing from time to time by the Administrator and the Issuer with the written consent of the Trustee and, subject to the paragraph directly above, the written consent of the Holders evidencing a majority of the Outstanding Amount of the 2017 Restructuring Bonds, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Administration Agreement or of modifying in any manner the rights of the Holders; provided, however, that no such amendment shall increase, reduce, accelerate or delay the timing of Charge Collections without the consent of the Holders of all the outstanding Bonds.

**Indemnification by the Administrator**

The Administrator shall indemnify the Issuer, the Trustee and their respective trustees, officers, officials, directors, employees and agents for, and defend and hold harmless each such Person from and against, any and all liabilities, obligations, actions, suits, claims, losses, damages, payments, costs or expenses of any kind whatsoever that may be imposed on, incurred by or asserted against such Person as a result of the Administrator's willful misconduct or negligence in the performance of its duties or observance of its covenants arising out of the Agreement.

The indemnification obligations of the Administrator under the Administration Agreement shall survive the termination of the Administrator Agreement and the resignation or removal of the Trustee.

**Administrator's Liability**

Except as provided in the Administration Agreement, the Administrator does not assume any liability other than to render or stand ready to render the services called for in the Administration Agreement and neither the Administrator nor any of its directors, officers, employees, subsidiaries or affiliates shall be responsible for any action of the Issuer or any of the trustees, officers, employees, subsidiaries or affiliates of the Issuer (other than the Administrator itself).

## AFFILIATIONS AND CERTAIN RELATIONSHIPS

Each of the Authority and LIPA may maintain banking relationships in the ordinary course with The Bank of New York Mellon.

## RISK FACTORS

*Please carefully consider all the information included in this Official Statement, including the risks described below before deciding to invest in the 2017 Restructuring Bonds.*

### Servicing and Operating Risks

*Repayment of the 2017 Restructuring Bonds Depends on Performance of LIPA and PSEG Long Island or any Successors*

As Servicer, LIPA will be responsible for monitoring the 2017 Collateral, taking all necessary action in connection with True-Up Adjustments and certain reporting requirements. In its role as T&D System manager under the OSA, PSEG Long Island is responsible for performing a number of functions that are otherwise provided by the Servicer including, among other things, billing and collecting the 2017 Restructuring Charges from Customers, meter reading and forecasting. The Trustee's receipt of Charge Collections, which will be used to make payments on the 2017 Restructuring Bonds, will depend in part on the skill and diligence of PSEG Long Island and LIPA or any successors in performing these functions.

The base term of the OSA expires on December 31, 2025, which is prior to the Final Maturity Date for certain of the 2017 Restructuring Bonds. In addition, the OSA is subject to early termination. See "SERVICER AND ADMINISTRATOR—The OSA" and "—The LIPA Reform Act and the OSA."

If PSEG Long Island ceases to perform the billing and collection functions on behalf of the Servicer pursuant to the terms of the OSA, it might be difficult to find a replacement T&D System manager or a Successor Servicer. Also, any Successor Servicer (or T&D System manager performing servicing functions) might have less experience and ability than PSEG Long Island and might experience difficulties in collecting 2017 Restructuring Charges, in determining appropriate adjustments to the 2017 Restructuring Charges, and billing and/or payment arrangements may change, resulting in delays or disruptions of Charge Collections. A Successor Servicer might charge fees that, while permitted under Financing Order No. 5, are substantially higher than the fees paid to LIPA as the initial Servicer. In the event of the commencement of a case by or against the Servicer or PSEG Long Island under the United States Bankruptcy Code or similar laws, the Servicer and the Trustee might be prevented from effecting a transfer of servicing due to operation of the Bankruptcy Code. Any of these factors and others might delay the timing of payments and may reduce the value of the 2017 Restructuring Bonds.

If LIPA or any successor, or PSEG Long Island or any successor, fails to collect or remit sufficient Charge Collections for any reason, then the Servicer's payments to the Trustee in respect of the 2017 Restructuring Charges might be delayed or reduced. In that event, payments on the 2017 Restructuring Bonds might be delayed or reduced. In addition, the successor owner of all or substantially all, or part, of the T&D System Assets of LIPA serving its Customers may assume the role of Servicer, subject only to the satisfaction of the conditions set forth in the Servicing Agreement. These conditions do not include either Holder consent or, so long as the successor entity assumes the ownership of all of the distribution system business assets of LIPA serving its Customers, satisfaction of the Rating Agency Condition.

Failure by the Authority and PSEG Long Island or a successor to undertake programs intended to maintain and/or improve the T&D System Assets could induce Customers to reduce or avoid 2017 Restructuring Charges by seeking alternatives to purchasing electricity through LIPA's T&D System Assets. That may reduce the total number of Customers paying the 2017 Restructuring Charges and change the relative amounts of 2017 Restructuring Charges on such Customers, all of which would increase the amount and share of 2017 Restructuring Charges billed to the remaining Customers. Such increase may reduce the collectability of the 2017 Restructuring Charges.

*Inaccurate Consumption Forecasting or Unanticipated Delinquencies or Charge-offs Might Reduce Scheduled Payments on the 2017 Restructuring Bonds*

The 2017 Restructuring Charges are calculated based upon forecasted Customer usage, including the effect of delinquencies and charge offs. Under the OSA, PSEG Long Island does the forecasting of electricity consumption. The amount and the rate of Charge Collections will depend in part on actual electricity usage and the amount of collections and write-offs for each rate class. If PSEG Long Island or a successor inaccurately forecasts electricity consumption or uses inaccurate Customer delinquency or charge-off data when setting or adjusting the 2017 Restructuring Charges, there could be a shortfall or material delay in Charge Collections, which might result in missed or delayed payments of principal and interest and lengthened weighted average lives of the 2017 Restructuring Bonds.

See "THE FINANCING ORDER—True-Up Adjustment Mechanism" and "THE SERVICING AGREEMENT — True-Up Adjustment Process."

The Servicer's use of inaccurate delinquency or charge-off rates might result also from, among other things, unexpected deterioration of the economy or changes to law and regulations governing the termination of electric service to Customers in the event of extreme weather, either of which could cause greater delinquencies or charge-offs than expected or force LIPA to grant additional payment relief to more Customers; or the introduction into New York of alternative electricity suppliers who collect the 2017 Restructuring Charges from the Customers, but who may fail to remit Customer charges to the Servicer in a timely manner; or the failure of alternative electricity suppliers to submit accurate and timely information to the Servicer regarding their collections and charge-offs; or any other unanticipated change in law that makes it more difficult for LIPA to terminate service to nonpaying Customers or that requires LIPA to apply more lenient credit standards in accepting Customers. See "THE SERVICER AND ADMINISTRATOR – Billing and Collection Policies."

*Changes to Billing and Collection Practices May Reduce the Amount of Funds Available for Payments on the 2017 Restructuring Bonds*

The methodology of determining the amount of the 2017 Restructuring Charge billed to each Customer is specified in Financing Order No. 5. Neither LIPA, nor PSEG Long Island as it performs its billing and collection functions on LIPA's behalf, may change this methodology. However, subject to applicable law, tariff and regulatory requirements, billing and collection arrangements with each Customer may be changed in a manner that delays or reduces the Servicer's payments to the Trustee in respect of the 2017 Restructuring Charges. For example, to recover part of an outstanding electricity bill, LIPA may agree to extend a Customer's payment schedule or to write off the remaining portion of the bill. In that event, collection of 2017 Restructuring Charges may be delayed or reduced until an adjustment is made. See "SERVICER AND ADMINISTRATOR—Billing and Collection Policies."

*Limits on Rights to Terminate Service to Customers Might Make it More Difficult to Collect the 2017 Restructuring Charges*

To the extent that Customers do not pay for their electric service, LIPA will not be able to collect 2017 Restructuring Charges from these Customers. HEFPA provides some limitations on the Authority's right to terminate service of Customers who fail to pay their bills. Historical rates of non-payment are included in the calculations of the 2017 Restructuring Charges, but increases in the rates of non-payment would reduce the Charge Collections of 2017 Restructuring Charges until such 2017 Restructuring Charges are adjusted.

*The Servicer's Indemnification Obligations Under the Servicing Agreement are Limited and Might Not Be Sufficient to Protect the Investments in the 2017 Restructuring Bonds*

The Servicer is obligated under the Servicing Agreement to indemnify the Issuer and the Trustee (for itself and on behalf of the Holders) only in limited circumstances. See "THE SERVICING AGREEMENT—Servicer Will Indemnify Issuer in Limited Circumstances." Neither the Trustee nor the Holders will have the right to accelerate payments on the 2017 Restructuring Bonds as a result of a breach under the Servicing Agreement, absent an event of default under the Indenture as described in "THE INDENTURE—Events of Default." If the Servicer incurs indemnification obligations, it is not clear where such obligations would rank with other Servicer obligations. Furthermore, the Servicer might not have sufficient funds available to satisfy its indemnification obligations under the Servicing Agreement. The Servicer would get funds to pay indemnification obligations from the T&D System rates and other charges. In the event of substantial Servicer indemnification obligations, payments on the 2017 Restructuring Bonds might be delayed or reduced.

*Delinquent or Partial Payments of Customer Bills May Make Principal Payments on the 2017 Restructuring Bonds Occur Later than Expected*

The amount and the rate of collection of the 2017 Restructuring Charges, together with the related 2017 Restructuring Charge adjustments, will impact whether there is a delay in the scheduled repayments of 2017 Restructuring Bond principal. If the 2017 Restructuring Charges are collected at a slower rate than expected, the Servicer might have to request adjustments of the 2017 Restructuring Charges. If those adjustments are not timely and accurate, there may be a delay in payments of principal and interest and a decrease in the value of the 2017 Restructuring Bonds.

*Storm Damage to LIPA's Operations Could Impair Payment of the 2017 Restructuring Bonds*

The Service Area experiences seasonal conditions typical of the northeast United States. Summers are usually hot with high temperatures in excess of 90°F. Winters include snow and icing conditions that can be damaging to overhead power lines. In addition, the Service Area experiences severe storms, including hurricanes, which can be particularly damaging due to Long Island's coastal location. LIPA's operations were disrupted by Superstorm Sandy in 2012. Future storms could have similar or more drastic effects. Transmission and/or distribution and generation facilities could be damaged or destroyed and usage of electricity could be interrupted temporarily, reducing the Charge Collections. There could be longer-lasting weather-related adverse effects on residential and commercial development and economic activity among the Customers, which could cause the 2017 Restructuring Charge to be greater than expected as a percentage of Base Rate Revenues. Legislative action adverse to the Holders might be taken in response, and such legislation, if challenged as violative of the State Pledge, might be defended on the basis of public necessity.

**Customer and Delivery Related Risks**

*Alternatives to Purchasing Electricity Through LIPA's Distribution Facilities or Technological Change Might Make Substitute Energy Sources More Attractive in the Future, and Effect of Net Metering*

Technological developments might result in the introduction of economically attractive alternatives to purchasing electricity through LIPA's T&D System Assets for increasing numbers of Customers. Manufacturers of self-generation facilities may develop smaller-scale, more fuel-efficient and/or more environmentally friendly generating units that can be cost-effective sources of energy for a greater number of Customers. Self-generation is most attractive to Customers who are high load factor energy users, such as hospitals, or manufacturers with multiple shift operations. Currently, there are few such Customers of significant size in the Service Area.

Over time, technological developments might allow greater numbers of Customers to reduce or avoid 2017 Restructuring Charges, which may reduce the total number of Customers paying the 2017 Restructuring Charges and change the relative amounts of 2017 Restructuring Charges on such Customers, all of which would increase the amount and share of 2017 Restructuring Charges billed to the remaining Customers. Such increase may reduce the collectability of the 2017 Restructuring Charges.

LIPA's tariff provides for net metering of certain residential and nonresidential customer-generators of renewable power, such as solar, wind, farm waste, micro-combined heat and power, fuel cells, micro-hydroelectric and hybrids. See "THE FINANCING ORDER – Collection of 2017 Restructuring Charges; Nonbypassability." Subject to the limitations imposed by the Securitization Law (including the State Pledge) and other applicable law, the Authority has from time to time increased the net billing limitation and may in the future make other changes to its tariff that could impact the amount of the 2017 Restructuring Charges that would have to be billed per kilowatt hour. The PSC commenced a proceeding to identify changes to the methodology for compensating customer-generators of renewable power so as to limit the loss of delivery revenue from such transactions. The Authority intends to make comparable changes to its tariff. Nevertheless, over time, net metering could reduce the total number of Customers paying the 2017 Restructuring Charges and change the relative amounts of 2017 Restructuring Charges on such Customers, all of which would increase the amount and share of 2017 Restructuring Charges billed to the paying Customers. Such increase may reduce the collectability of the 2017 Restructuring Charges.

**Judicial, Legislative or Regulatory Risks**

*Future Legislative Action to Change the Securitization Law Could Reduce the Value of the 2017 Restructuring Bonds*

New York does not have a referendum or initiative process by which the Securitization Law may be challenged. Therefore, the only way for the Securitization Law to be changed would be through a legislative action which would be subject to the State Pledge. Constitutional protections against actions that violate the State Pledge should apply to legislation that is passed by the New York State legislature. However, to date, no federal or New York cases addressing the repeal or amendment of securitization provisions such as those contained in the Securitization Law have been decided; consequently, no judicial precedent is directly on point.

There have been cases in which federal courts have applied the Contract Clause of the United States Constitution to strike down legislation regarding similar or analogous matters, such as legislation reducing or eliminating taxes, public charges or other sources of revenues which support bonds issued by public instrumentalities or private issuers, or which otherwise reduces or eliminates the security for bonds. Based upon this case law, Hawkins Delafield & Wood LLP, expects to deliver an opinion in connection with the closing of the offering of the 2017

Restructuring Bonds to the effect that the Holders (or the Trustee acting on their behalf) could successfully challenge under the Contract Clause of the United States Constitution the constitutionality of any repeal or amendment of the Securitization Law or any other action or failure to take any action required by the State Pledge that substantially limits, alters or reduces the value of the 2017 Restructuring Property or the Charges prior to the time that the 2017 Restructuring Bonds are fully paid and discharged, unless such action is necessary to further a significant and legitimate public purpose.

It may be possible for the New York legislature to repeal or further amend the Securitization Law, or for the Authority to amend or revoke Financing Order No. 5, notwithstanding the State Pledge if the legislature or the Authority acts in order to serve a significant and legitimate public purpose, such as protecting the public health and safety or responding to a national or regional catastrophe affecting the Service Area, or if the legislature otherwise acts in the valid exercise of the State's police power. Any such action, as well as the litigation that likely would ensure, might adversely affect the price and liquidity, the dates of payment of interest and principal and the weighted average lives of the 2017 Restructuring Bonds. Moreover, the outcome of any litigation cannot be predicted. Accordingly, the Holders might incur a loss on or delay in recovery of their investment in the 2017 Restructuring Bonds.

In addition, any action of the New York legislature adversely affecting the 2017 Restructuring Property or the ability to impose, charge or collect Charges may be considered a "taking" under the United States or New York Constitutions. Hawkins Delafield & Wood LLP expects to render an opinion in connection with the closing of the offering of the 2017 Restructuring Bonds to the effect that, under the federal and New York Constitutions, respectively, assuming the applicable court determines that the Takings Clause and not the Contract Clause applies, the State would be required to pay just compensation to the Holders if the State undertook a repeal or amendment of the Securitization Law or took any other action or failed to take any action required by the State Pledge after the 2017 Restructuring Bonds are issued but before they are fully paid that (i) constituted a permanent appropriation of a substantial property interest of the Holders in the 2017 Restructuring Property or denied all economically beneficial or productive use of the 2017 Restructuring Property, (ii) destroyed the 2017 Restructuring Property, other than in response to so-called emergency conditions, or (iii) substantially reduced, altered or impaired the value of the 2017 Restructuring Property so as to unduly interfere with the reasonable expectations of the Holders arising from their investment in the 2017 Restructuring Bonds. In examining whether action of the New York legislature amounts to a regulatory taking, both federal and New York State courts will consider the character of the governmental action, the economic impact of the governmental action on the Holders, and the extent to which the governmental action interferes with reasonable investment-backed expectations. There can be no assurance, however, that any award of compensation would be sufficient to pay the full amount of principal of and interest on the 2017 Restructuring Bonds.

The Takings Clauses do not preclude any limitation or alteration of the Securitization Law or Financing Order No. 5 if just compensation is made by law for the protection of the 2017 Restructuring Charges collected pursuant to Financing Order No. 5 and of the Holders. It is unclear what "just compensation" would be afforded to Holders by the State if such limitation or alteration were attempted. Accordingly, no assurance can be given that any such provision would not adversely affect the market value of the 2017 Restructuring Bonds, or the timing or receipt of payments with respect to the 2017 Restructuring Bonds.

The foregoing opinion notes that issues relating to the Contract Clause of the United States and the Takings Clauses of the United States and New York Constitutions are essentially decided on a case by case basis and that the courts' determinations, in most cases, appear to be strongly influenced by the facts and circumstances of the particular case. The opinion described above will be subject to the qualifications included in them. The degree of impairment necessary to meet the standards for relief under a Takings Clause analysis or Contract Clause analysis could be substantially in excess of what a Bondholder would consider material. A form of such opinion is included as Appendix C to this Official Statement.

In addition, the enforcement of any rights against the State under the State Pledge may be subject to the exercise of judicial discretion in appropriate cases and to the limitations on legal remedies against state and local governmental entities in New York. These limitations might include, for example, the necessity to exhaust administrative remedies prior to bringing suit in a court, or limitations on type and locations of courts in which the State may be sued.

*Future Judicial Action Could Reduce the Value of the Holder's Investment in the 2017 Restructuring Bonds*

The 2017 Restructuring Property is the creation of the Securitization Law and Financing Order No. 5. There is uncertainty associated with investing in bonds payable from an asset that depends for its existence on legislation

because there is limited juridical or regulatory experience implementing and interpreting the legislation. Because the 2017 Restructuring Property is a creation of the Securitization Law, any judicial determination affecting the validity of or interpreting the Securitization Law, the 2017 Restructuring Property or the Customer's ability to make payments securing the 2017 Restructuring Bonds might have an adverse effect on the 2017 Restructuring Bonds.

Other states and the District of Columbia have passed securitization laws, and some of these laws have been challenged by judicial actions. To date, none of these challenges has succeeded, but future judicial challenges might be made. An unfavorable decision regarding another state's securitization law would not automatically invalidate the Securitization Law or Financing Order No. 5, but, whether or not the statute was specifically tailored to a public entity issuer, such an unfavorable decision might provoke a challenge to the Securitization Law, establish a legal precedent for a successful challenge to the Securitization Law or heighten awareness of the political and other risks of the 2017 Restructuring Bonds, and in that way may limit the liquidity and value of the 2017 Restructuring Bonds. Therefore, legal activity in other states may indirectly affect the value of a Holder's investment in the 2017 Restructuring Bonds.

### The Issuer Will Not be in Breach of Any Representation or Warranty as a Result of a Change in Law

The Issuer will not be in breach of any representation or warranty as a result of a change in the law by means of a legislative enactment or constitutional amendment. The Seller will not agree in the Sale Agreement and the initial Servicer and any Successor Servicer will not agree in its Servicing Agreement to institute any action or Proceeding to block or overturn any attempts to cause a repeal, modification or supplement to the Securitization Law that would be adverse to the Issuer, Trustee or Holder. See "THE SALE AGREEMENT—Covenants of the Seller" and "THE SERVICING AGREEMENT—Servicing Procedures." In addition, there are no assurances that if either the Seller or Servicer choose to take such an action, any such action would be successful.

### The Issuer is Not Obligated to Indemnify the Holders for Changes in Law

Neither the Issuer, the Authority nor the Servicer will indemnify the Holders for any changes in the law, including any federal preemption or repeal or amendment of the Securitization Law, that may affect the value of the 2017 Restructuring Bonds. Except as described above with respect to an action or Proceeding that would be adverse to the Issuer, Trustee or Holder, pursuant to the Servicing Agreement, at the request of the Trustee, the Servicer will take such legal or administrative actions, including without limitation defending against or instituting and pursuing legal actions and appearing or testifying at hearings or similar Proceedings, as may be reasonably necessary to block or overturn any attempts to cause a repeal of, modification of or supplement to the Securitization Law or Financing Order No. 5, or the Issuance Advice Letter that would be materially adverse to the Trustee or the Holders. However, there are no assurances that the Servicer would be able to take this action or that any such action would be successful.

#### Challenges to the Transaction

While the time for filing any challenges to the LIPA Reform Act expired and no such challenges were filed, it is possible that interested parties may still seek to find some basis to challenge the LIPA Reform Act, the issuance of the 2017 Restructuring Bonds or specific aspects of the transaction. For example, notwithstanding that (a) Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "transition charges" as defined in the General Resolution and that they are not subject to the lien thereof, (b) Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution, and (c) the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens, it is possible that holders of bonds issued by the Authority or other creditors or stakeholders may nonetheless attempt to assert that the 2017 Restructuring Charges are subject to the lien of the General Resolution or the Subordinated General Resolution. Though no such claims have been raised to date, any litigation making such assertion could affect the market price of the 2017 Restructuring Bonds.

**Bankruptcy-Related Risks**

### Bankruptcy Relief is Not Available to the Issuer, but it is Available to the Authority and to the Servicer

With respect to the Issuer, its status as a municipality and the state law prohibition against its filing of a case under chapter 9 would result in the Issuer having no access to relief under the Bankruptcy Code. It would remain subject to applicable state law concerning debtors and creditors. The Authority is a corporate municipal instrumentality and a political subdivision of the State of New York and is explicitly authorized to file a petition under chapter 9 pursuant to its enabling legislation. Also as described elsewhere in this Official Statement, LIPA is a

corporation eligible to be the subject of a voluntary or involuntary petition in a liquidation case under chapter 7 of the Bankruptcy Code or a reorganization case under chapter 11 of the Bankruptcy Code.

*If the Servicer Were a Debtor in a Bankruptcy Proceeding, the Servicer Could Elect to Reject the Servicing Agreement and Any Resulting Delay in the Appointment of a Replacement or Successor Servicer Could Disrupt the Billing and Collection of the 2017 Restructuring Charges, Thus Delaying the Payment on the 2017 Restructuring Bonds*

Among the powers given to a debtor in such a bankruptcy case is the right to "assume" or "reject" any unexpired lease or "executory contract." While not defined in the Bankruptcy Code, an "executory contract" is generally said to be a bilateral agreement as to which material performance remains for both parties at the time the bankruptcy case is commenced. The Servicing Agreement would likely be found to be an executory contract. If LIPA, as debtor, elected to reject the Servicing Agreement as permitted under the Bankruptcy Code, the Servicing Agreement would no longer be enforceable against LIPA, as Servicer, and the Issuer, or the Trustee as the Issuer's assignee, would have only general unsecured claims against LIPA for the damages resulting from such rejection. Such claims would be subject to being discharged in the bankruptcy case and no assurance can be given as to what percentage of their claims unsecured creditors would receive in the bankruptcy case.

In the event of a bankruptcy of the Servicer, the Servicing Agreement provides for the appointment of a Successor Servicer. However, the automatic stay in effect during a Servicer bankruptcy might delay or prevent a Successor Servicer's replacement of the Servicer. Even if a Successor Servicer is permitted to be appointed to replace the Servicer, a successor may be difficult to obtain and may not be capable of performing all of the duties that LIPA as Servicer was capable of performing. Furthermore, should the Servicer enter into bankruptcy, it may be permitted to stop acting as Servicer.

*The Authority Will Commingle the 2017 Restructuring Charges with Other Revenues That Are Collected For It, Which Might Make Such Commingled Amounts Unavailable to Pay Amounts Owing on the 2017 Restructuring Bonds*

PSEG Long Island, on behalf of the Servicer, bills and collects all charges due from Customers and payable to the Authority, as well as restructuring charges, including the 2017 Restructuring Charges and the Prior Restructuring Charges. The Servicer is required to deposit, or cause to be deposited, into the Allocation Account, created by the Authority, the Charge Collections and the other amounts due on account of their customer bills, where they are commingled with other revenues collected that are not 2017 Restructuring Charges, as well as the Prior Restructuring Charges. On each Business Day, to the extent that funds are available in the Allocation Account, the Allocation Agent will transfer the estimated amount of Charge Collections from the Allocation Account to the Collection Account.

The Securitization Law provides that the relative priority of a lien created under the Securitization Law is not affected by the commingling of 2017 Restructuring Charges arising with respect to the 2017 Restructuring Property with other amounts. In the event of a bankruptcy of the Authority, a party in interest in the bankruptcy might assert, and a court might rule, that the 2017 Restructuring Charges commingled with the Authority's own funds prior to and as of the date of bankruptcy were property of the Authority as of that date, rather than the Issuer's property. If the court so rules, then the court might also rule that the Trustee has only a general unsecured claim against the Authority for the amount of commingled 2017 Restructuring Charges held as of that date and could not recover the commingled 2017 Restructuring Charges held as of the date of the bankruptcy.

*The Sale of 2017 Restructuring Property Might Be Construed as a Financing and Not a Sale in the Authority's Bankruptcy Case, Which Conclusion Might Delay or Limit Payments on the 2017 Restructuring Bonds*

The Authority will represent and warrant that the transfer of the 2017 Restructuring Property in accordance with the Sale Agreement constitutes a true and valid sale and assignment of that 2017 Restructuring Property by the Authority to the Issuer. It will be a condition of closing for the sale of the 2017 Restructuring Property pursuant to the Sale Agreement that the Issuer will take the appropriate actions under the Securitization Law, including an informational filing of a UCC financing statement with the Secretary of State of New York. According to the Securitization Law, any pledge of the 2017 Restructuring Property or proceeds thereof shall be perfected, valid and binding from the time when the pledge is made. The description of the 2017 Restructuring Property in any security agreement and any financing statement must refer to the Securitization Law and Financing Order No. 5. No instrument needs to be recorded in order to perfect the lien on the 2017 Restructuring Property. However, as described herein, the Issuer will cause a financing statement and any necessary continuation statements, which in the case of the 2017

Restructuring Property shall be for informational purposes only, describing the pledge and referring to Financing Order No. 5 and the 2017 Restructuring Property under Article 9 of the UCC.

A bankruptcy court generally follows state property law on issues such as those addressed by the state law provisions referred to above. However, a bankruptcy court does not follow state law if it determines that the state law is contrary to a paramount federal bankruptcy policy or interest. In the event of a bankruptcy filing by the Authority, if a party in interest in the bankruptcy were to take the position that the transfer of the 2017 Restructuring Property to the Issuer pursuant to that Sale Agreement was a financing transaction and not a true sale under applicable creditors' rights principles, there can be no assurance that a court would not adopt this position.

The parties have attempted to mitigate the impact of a possible recharacterization of a sale of 2017 Restructuring Property as a financing transaction under applicable creditors' rights principles. The Sale Agreement will provide that if the transfer of the applicable 2017 Restructuring Property is thereafter recharacterized by a court as a financing transaction and not a true sale, the transfer by the Authority will be deemed to have granted to the Issuer and the Trustee a first priority security interest in all the Authority's right, title and interest in and to the 2017 Restructuring Property and all proceeds thereof. As a result of the Issuer causing a UCC financing statement to be filed, the Issuer would, in the event of a recharacterization, be a secured creditor of the Authority with a lien on the 2017 Restructuring Property and all proceeds thereof.

If the Issuer were determined to have only a security interest in the 2017 Restructuring Property, the Issuer would be subject to the risks of a secured creditor in a bankruptcy case. As a result, repayment of the 2017 Restructuring Bonds might be significantly delayed and a plan of reorganization in the bankruptcy might permanently modify the amount and timing of payments to the Issuer of the Charge Collections and therefore the amount and timing of funds available to the Issuer to pay the Holders. However, the law does provide that the value of the creditor's perfected lien must be maintained.

If the transaction is recharacterized as a financing rather than a true sale and if the Issuer fails to otherwise perfect its interest in the 2017 Restructuring Property sold pursuant to the Sale Agreement, the Issuer would be an unsecured creditor of the Authority whose claims would be subject to being discharged in the bankruptcy case. No assurance can be given as to what percentage of their claims unsecured creditors would receive in any bankruptcy case involving the Authority.

*In a Proceeding in Which the Authority is a Debtor, the Bankruptcy Court Could Conclude that the 2017 Restructuring Property Comes Into Existence Only as Customers Take Delivery of Electricity, Which Could Impair the Issuer's Interest in Such 2017 Restructuring Property, Thus Impacting the Collection of the 2017 Restructuring Charges*

The Authority will represent in the Sale Agreement, and the Securitization Law provides, that the 2017 Restructuring Property sold pursuant to such Sale Agreement constitutes an existing, present property right on the date that it is first transferred and pledged in connection with the issuance of the 2017 Restructuring Bonds. Further, as described above, a bankruptcy court generally follows state property law on issues such as those addressed by the state law provisions referred to above. Nevertheless, no assurance can be given that, in the event of a bankruptcy of the Authority, a court would not rule that the applicable 2017 Restructuring Property comes into existence only as Customers use electricity.

If a court were to accept the argument that the applicable 2017 Restructuring Property comes into existence only as Customers use electricity, no assurance can be given that a security interest in favor of the Bondholders would attach to the 2017 Restructuring Charges in respect of electricity consumed after the commencement of the bankruptcy case or that the 2017 Restructuring Property has been sold to the Issuer. If it were determined that the 2017 Restructuring Property had not been sold to the Issuer, and the security interest in favor of the Bondholders did not attach to the applicable 2017 Restructuring Charges in respect of electricity consumed after the commencement of the bankruptcy case, then the Issuer would have an unsecured claim against the Authority. If so, there would be delays and/or reductions in payments on the 2017 Restructuring Bonds. Whether or not a court determined that 2017 Restructuring Property had been sold to the Issuer pursuant to a Sale Agreement, no assurances can be given that a court would not rule that any 2017 Restructuring Charges relating to electricity consumed after the commencement of the bankruptcy could not be transferred to the Issuer or the Trustee.

Regardless of whether the Authority is the debtor in a bankruptcy case, if a court were to accept the argument that 2017 Restructuring Property sold pursuant to the Sale Agreement comes into existence only as customers take delivery of electricity, a tax or government lien or other nonconsensual lien on property of the Authority arising before

that 2017 Restructuring Property came into existence could have priority over the Issuer's interest in that 2017 Restructuring Property. Adjustments to the 2017 Restructuring Charges may be available to mitigate this exposure, although there may be delays in implementing these adjustments.

*The Financing Structure Would Present a Case of First Impression under the Bankruptcy Code*

No court has ever considered this type of financing in the context of a petition brought under the Bankruptcy Code. If the Authority or LIPA were to become a debtor in a bankruptcy case, a court could conclude that the remittance of the restructuring charges by the Authority to the Trustee is subordinate to the payment of certain expenses of the Authority or LIPA.

*Certain Contractual Claims Against the Authority Might be Limited in Case of a Bankruptcy of the Authority*

If the Authority were to become a debtor in a bankruptcy case, claims, including indemnity claims, by the Issuer or the Trustee against the Authority as Seller under the Sale Agreement and the other documents executed in connection therewith would be unsecured claims that would be subject to being discharged in the bankruptcy case. In addition, a party in interest in the bankruptcy may request that the bankruptcy court estimate any contingent claims that the Issuer or the Trustee have against the Authority. That party may then take the position that these claims should be estimated at zero or at a low amount because the contingency giving rise to these claims is unlikely to occur. If a court were to hold that the indemnity provisions were unenforceable, the Issuer would be left with a claim for actual damages against the Authority based on breach of contract principles. The actual amount of these damages would be subject to estimation and/or calculation by the court.

No assurances can be given as to the result of any of the above-described actions or claims. Furthermore, no assurance can be given as to what percentage of their claims, if any, unsecured creditors would receive in any bankruptcy case involving the Authority.

*The Bankruptcy of the Authority Might Limit the Remedies Available to the Trustee*

Upon an event of default under the Indenture, the Securitization Law permits the Trustee to enforce the security interest in the 2017 Restructuring Property sold pursuant to the Sale Agreement in accordance with the terms of the Indenture. In this capacity, the Trustee is permitted to request a New York court to order the sequestration and payment to Holders of the 2017 Restructuring Bonds of all revenues arising from the applicable 2017 Restructuring Charges. There can be no assurance, however, that a New York court judge would issue this order after a Seller bankruptcy in light of the automatic stay provisions of Section 362 of the United States Bankruptcy Code. In that event, the Trustee may under the Indenture seek an order from the bankruptcy court lifting the automatic stay with respect to this action by a New York court judge and an order requiring an accounting and segregation of the revenues arising from the 2017 Restructuring Property sold pursuant to the Sale Agreement.

*A Bankruptcy of LIPA and/or the Authority Might Result in Consolidation of LIPA's or the Authority's Assets and Liabilities with Those of the Issuer, Potentially Causing Losses or Delays in Payments on the 2017 Restructuring Bonds*

If LIPA and/or the Authority were to become a debtor in a bankruptcy case, a party in interest might attempt to substantively consolidate the assets and liabilities of LIPA, the Authority and the Issuer. The Issuer and the Authority have taken steps to attempt to minimize this risk. See "THE ISSUER – Relationship of the Issuer to the Authority and LIPA" in this Official Statement. However, no assurance can be given that if LIPA and/or the Authority were to become a debtor in a bankruptcy case, a court would not order that the Issuer's assets and liabilities be substantively consolidated with those of LIPA and/or the Authority. Such substantive consolidation could cause payment of the claims of the beneficial owners of the 2017 Restructuring Bonds to be subject to substantial delay and to adjustment in timing and amount under a plan of reorganization in the bankruptcy case.

*In a Bankruptcy of the Authority, the Remittances of the 2017 Restructuring Charges by Servicer Prior to the Date of the Bankruptcy Should Not Constitute Preferences, But Resolution of Such Issues Could Delay the Payments on the 2017 Restructuring Bonds*

In most bankruptcy cases, a payment by the debtor on account of antecedent debt may constitute a preference under bankruptcy law. Any payment within 90 days of the filing of the bankruptcy petition (or within one year if the remittance was on account of antecedent debt owed to an insider) that constitutes a preference could be avoidable, and the funds could be required to be returned to the bankruptcy estate of the debtor.

Transfers to a secured creditor of collateral in which the creditor has a perfected first lien are not subject to recovery as a preference. Moreover, in a chapter 9 case, transfers made to or for the benefit of a holder of a note or a bond, and on account of such note or bond, are not recoverable as a preference. As a result, notwithstanding a chapter 9 filing by the Authority, payments received by the Trustee or the Holders prior to the filing of the bankruptcy case should not be recoverable as preferences. However, any such action could result in a delay of the recovery of the 2017 Restructuring Charges.

**Risks Associated with the Unusual Nature of the 2017 Restructuring Property**

*The Holders May Experience Material Payment Delays Because the Source of Funds for Payment is Limited.*

The 2017 Restructuring Bonds will be solely the obligation of the Issuer and will not be a debt of or a pledge of the faith and credit of the State or any political or governmental unit thereof, including the PSC or the Public Authorities Control Board. The 2017 Restructuring Bonds shall be nonrecourse to the credit or any assets of the State and to the credit or, except for the 2017 Restructuring Property, any assets of the Issuer. The 2017 Restructuring Bonds shall be limited obligations of the Issuer, payable solely out of the 2017 Restructuring Property, including the rights to bill and collect 2017 Restructuring Charges, derived from or in connection with the Sale Agreement (including all sums deposited in any Collection Account from time to time pursuant to the Sale Agreement or the Indenture, except for amounts in the Upfront Financing Costs Subaccount) and, in certain events, out of amounts obtained through the exercise of any remedy provided for in the Indenture. The 2017 Restructuring Bonds shall never be paid out of any other funds of the Issuer except such 2017 Restructuring Property. No recourse under the 2017 Restructuring Bonds shall be had against any past, present or future officer or director of the Issuer. The 2017 Restructuring Bonds shall never be paid in whole or in part out of any funds raised or to be raised by taxation or out of any other revenues or assets of the Issuer or the State except the collateral pledged by the Indenture. The principal of and interest on the 2017 Restructuring Bonds and all other amounts owing under the Indenture are secured, as set forth in the Indenture, by an assignment by the Issuer of certain of its rights under the Sale Agreement, including a pledge of certain of the revenues derived from and in connection with the Sale Agreement.

The 2017 Restructuring Bonds are not insured or guaranteed by LIPA, including in its capacity as the Servicer, or by any of its affiliates, the Trustee or by any other person or entity. Thus, Holders must rely for payment solely upon the Securitization Law, Financing Order No. 5 and state and federal constitutional rights to enforcement of the Securitization Law and Financing Order No. 5, the 2017 Restructuring Property, including the rights to bill and collect the 2017 Restructuring Charges, and Charge Collections and funds on deposit under the Indenture held by the Trustee.

*Foreclosure of the Trustee's Lien on the 2017 Restructuring Property Securing the 2017 Restructuring Bonds Might Not be Practical, and Acceleration of the 2017 Restructuring Bonds Before Maturity Might have Little Practical Effect*

Under the Securitization Law and the Indenture, the Trustee or the Holders have the right to foreclose or otherwise enforce the lien on the 2017 Restructuring Property securing the 2017 Restructuring Bonds. However, in the event of foreclosure, there is likely to be a limited market, if any, for the 2017 Restructuring Property. Therefore, foreclosure might not be a realistic or practical remedy. Moreover, although principal of the 2017 Restructuring Bonds will be due and payable upon acceleration of the 2017 Restructuring Bonds before maturity, the 2017 Restructuring Charges may not be accelerated and the nature of the 2017 Collateral will result in principal of the 2017 Restructuring Bonds being paid as funds become available. If there is an acceleration of the 2017 Restructuring Bonds, all tranches of the 2017 Restructuring Bonds will be paid pro rata; therefore some tranches might be paid earlier than expected and some tranches might be paid later than expected.

*The Credit Ratings Are Not an Indication of the Expected Rate of Payment of Principal on the 2017 Restructuring Bonds*

The 2017 Restructuring Bonds are expected to receive credit ratings from three nationally recognized statistical rating organizations ("NRSROs"). A rating is not a recommendation to buy, sell or hold the 2017 Restructuring Bonds. The ratings merely analyze the probability that the Issuer will repay the principal amount of the 2017 Restructuring Bonds at each Final Maturity Date (which is later than the related Scheduled Maturity Date) and will make timely interest payments. The ratings are not an indication that the rating agencies believe that principal payments are likely to be paid on time according to the Expected Amortization Schedule.

Under Rule 17g-5 of the Securities Exchange Act of 1934, NRSROs providing the sponsor of a security with the requisite certification will have access to all information posted on a website by the sponsor for the purpose of

determining the initial rating of such security and monitoring the rating after the Issuance Date in respect of the 2017 Restructuring Bonds. As a result, an NRSRO other than the NRSRO hired by the sponsor (the "hired NRSRO") may issue ratings on the 2017 Restructuring Bonds ("Unsolicited Ratings"), which may be lower, and could be significantly lower, than the ratings assigned by the hired NRSROs. The Unsolicited Ratings may be issued prior to, or after, the Issuance Date in respect of the 2017 Restructuring Bonds. Issuance of any Unsolicited Rating will not affect the issuance of the 2017 Restructuring Bonds. Issuance of an Unsolicited Rating lower than the ratings assigned by the hired NRSRO on the 2017 Restructuring Bonds might adversely affect the value of the 2017 Restructuring Bonds and, for regulated entities, could affect the status of the 2017 Restructuring Bonds as a legal investment or the capital treatment of the 2017 Restructuring Bonds. Investors in the 2017 Restructuring Bonds should consult with their legal counsel regarding the effect of the issuance of a rating by a non-hired NRSRO that is lower than the rating of a hired NRSRO. None of the Authority, the Issuer, the Underwriters or any of their affiliates will have any obligation to inform the Holders of any Unsolicited Ratings assigned after the date of this Official Statement. In addition, if the Issuer or the Authority fail to make available to a non-hired NRSRO any information provided to any hired rating agency for the purpose of assigning or monitoring the ratings on the 2017 Restructuring Bonds, a hired NRSRO could withdraw its ratings on the 2017 Restructuring Bonds, which could adversely affect the market value of the 2017 Restructuring Bonds and/or limit the Holder's ability to resell its Bonds.

*If the Ratings on the 2017 Restructuring Bonds are Withdrawn or Revised, the Value of your Bonds may be Adversely Affected*

The ratings on the 2017 Restructuring Bonds may be withdrawn or revised, which may have an adverse effect on the market price of the 2017 Restructuring Bonds. A security rating is not a recommendation to buy, sell or hold the 2017 Restructuring Bonds. The ratings are assessments by the respective Rating Agencies of the likelihood that interest and principal on the 2017 Restructuring Bonds will be paid on a timely basis. Ratings on the 2017 Restructuring Bonds may be lowered, qualified or withdrawn at any time without notice.

*The Absence of a Secondary Market for the 2017 Restructuring Bonds Might Limit the Ability to Resell the 2017 Restructuring Bonds*

The Underwriters for the 2017 Restructuring Bonds might assist in resales of the 2017 Restructuring Bonds, but they are not required to do so. A secondary market for the 2017 Restructuring Bonds might not develop. If a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow a Holder to resell any of its 2017 Restructuring Bonds.

## UNDERWRITING

The Underwriters listed on the cover page of this Official Statement, for which RBC Capital Markets, LLC is acting as the lead book-running manager, have agreed, jointly and severally and subject to certain conditions, including satisfaction of the rating agency conditions with respect to the Prior Restructuring Bonds, to purchase the 2017 Restructuring Bonds from the Issuer at an underwriters' discount of $1,783,590.12. The initial public offering prices of the 2017 Restructuring Bonds may be changed from time to time by the Underwriters.

The 2017 Restructuring Bonds may be offered and sold to certain dealers (including the Underwriters and other dealers depositing 2017 Restructuring Bonds into investment trusts) at prices lower than such public offering prices.

Certain of the Underwriters have entered into distribution agreements with other broker-dealers for the distribution of the 2017 Restructuring Bonds at the initial public offering prices. Such agreements generally provide that the relevant Underwriter will share a portion of its underwriting compensation or selling concession with such broker-dealers.

The Underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage and other financial and non-financial activities and services. The Underwriters and their respective affiliates have provided, and may in the future provide, a variety of these services to the Issuer and the Authority and to persons and entities with relationships with the Issuer and the Authority, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates, officers, directors and employees may purchase, sell or hold a broad array of investments and actively trade securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account

and for the accounts of their customers, and such investment and trading activities may involve or relate to assets, securities and/or instruments of the Issuer and the Authority (directly, as collateral securing other obligations or otherwise) and/or persons and entities with relationships with the Issuer and the Authority. The Underwriters and their respective affiliates may also communicate independent investment recommendations, market color or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and may at any time hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments.

## TAX MATTERS

### Opinion of Bond Counsel

In the opinion of Bond Counsel, under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, (i) interest on the 2017 Restructuring Bonds is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Code, and (ii) interest on the 2017 Restructuring Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering its opinion, Bond Counsel has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Issuer, the Authority and LIPA in connection with the 2017 Restructuring Bonds, and Bond Counsel has assumed compliance by the Issuer, the Authority and LIPA with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the 2017 Restructuring Bonds from gross income under Section 103 of the Code.

In addition, in the opinion of Bond Counsel, under existing statutes, interest on the 2017 Restructuring Bonds is exempt from personal income taxes imposed by the State of New York or any political subdivision thereof, and the 2017 Restructuring Bonds are exempt from all taxation directly imposed thereon by or under the authority of the State of New York, except estate or gift taxes and taxes on transfers.

Bond Counsel expresses no opinion regarding any other federal or state tax consequences with respect to the 2017 Restructuring Bonds. Bond Counsel renders its opinion under existing statutes and court decisions as of the issue date, and assumes no obligation to update, revise or supplement its opinion to reflect any action thereafter taken or not taken, or any facts or circumstances that may thereafter come to its attention, or changes in law or in interpretations thereof that may thereafter occur, or for any other reason. Bond Counsel expresses no opinion on the effect of any action thereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion from gross income for federal income tax purposes of interest on the 2017 Restructuring Bonds, or under state and local tax law.

### Certain Ongoing Federal Tax Requirements and Covenants

The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the 2017 Restructuring Bonds in order that interest on the 2017 Restructuring Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the 2017 Restructuring Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the federal government. Noncompliance with such requirements may cause interest on the 2017 Restructuring Bonds to become included in gross income for federal income tax purposes retroactive to their issue date, irrespective of the date on which such noncompliance occurs or is discovered. The Issuer, the Authority and LIPA have covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the 2017 Restructuring Bonds from gross income under Section 103 of the Code.

### Certain Collateral Federal Tax Consequences

The following is a brief discussion of certain collateral federal income tax matters with respect to the 2017 Restructuring Bonds. It does not purport to address all aspects of federal taxation that may be relevant to a particular owner of a 2017 Restructuring Bond. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the 2017 Restructuring Bonds.

Prospective owners of the 2017 Restructuring Bonds should be aware that the ownership of such obligations may result in collateral federal income tax consequences to various categories of persons, such as corporations

(including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is excluded from gross income for federal income tax purposes. Interest on the 2017 Restructuring Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

**Original Issue Discount**

"Original issue discount" ("OID") is the excess of the sum of all amounts payable at the stated maturity of a 2017 Restructuring Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity. In general, the "issue price" of a maturity means the first price at which a substantial amount of the 2017 Restructuring Bonds of that maturity was sold (excluding sales to bond houses, brokers, or similar persons acting in the capacity as underwriters, placement agents, or wholesalers). In general, the issue price for each maturity of 2017 Restructuring Bonds is expected to be the initial public offering price set forth on the cover page of this Official Statement. Bond Counsel further is of the opinion that, for any 2017 Restructuring Bonds having OID (a "Discount Bond"), OID that has accrued and is properly allocable to the owners of the Discount Bonds under Section 1288 of the Code is excludable from gross income for federal income tax purposes to the same extent as other interest on the 2017 Restructuring Bonds.

In general, under Section 1288 of the Code, OID on a Discount Bond accrues under a constant yield method, based on periodic compounding of interest over prescribed accrual periods using a compounding rate determined by reference to the yield on that Discount Bond. An owner's adjusted basis in a Discount Bond is increased by accrued OID for purposes of determining gain or loss on sale, exchange, or other disposition of such 2017 Restructuring Bond. Accrued OID may be taken into account as an increase in the amount of tax-exempt income received or deemed to have been received for purposes of determining various other tax consequences of owning a Discount Bond even though there will not be a corresponding cash payment.

Owners of Discount Bonds should consult their own tax advisors with respect to the treatment of original issue discount for federal income tax purposes, including various special rules relating thereto, and the state and local tax consequences of acquiring, holding, and disposing of Discount Bonds.

**Bond Premium**

In general, if an owner acquires a 2017 Restructuring Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the 2017 Restructuring Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, an owner of a Premium Bond must amortize the bond premium over the remaining term of the Premium Bond, based on the owner's yield over the remaining term of the Premium Bond determined based on constant yield principles (in certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond). An owner of a Premium Bond must amortize the bond premium by offsetting the qualified stated interest allocable to each interest accrual period under the owner's regular method of accounting against the bond premium allocable to that period. In the case of a Premium Bond, if the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is a nondeductible loss. Under certain circumstances, the owner of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the owner's original acquisition cost. Owners of any Premium Bonds should consult their own tax advisors regarding the treatment of bond premium for federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, amortization of bond premium on, sale, exchange, or other disposition of Premium Bonds.

**Information Reporting and Backup Withholding**

Information reporting requirements apply to interest paid on tax-exempt obligations, including the 2017 Restructuring Bonds. In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or if the recipient is one of a limited class of exempt recipients. A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required

to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing a 2017 Restructuring Bond through a brokerage account has executed a Form W-9 in connection with the establishment of such account, as generally can be expected, no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the 2017 Restructuring Bonds from gross income for federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a refund or a credit against the owner's federal income tax once the required information is furnished to the Internal Revenue Service.

**Miscellaneous**

Tax legislation, administrative actions taken by tax authorities, or court decisions, whether at the federal or state level, may adversely affect the tax-exempt status of interest on the 2017 Restructuring Bonds under federal or state law or otherwise prevent beneficial owners of the 2017 Restructuring Bonds from realizing the full current benefit of the tax status of such interest. In addition, such legislation or actions (whether currently proposed, proposed in the future, or enacted) and such decisions could affect the market price or marketability of the 2017 Restructuring Bonds.

Prospective purchasers of the 2017 Restructuring Bonds should consult their own tax advisors regarding the foregoing matters.

## CONTINUING DISCLOSURE

In the Continuing Disclosure Agreement, pursuant to Rule 15c2-12 under the Exchange Act ("Rule 15c2-12"), LIPA, as Servicer and designated agent for the Issuer, will covenant for the sole benefit of the Holders (and, to the extent specified in the Continuing Disclosure Agreement, the beneficial owners) of the 2017 Restructuring Bonds and subject (except to the extent expressly provided in the Servicing Agreement) to the remedial provisions of the Basic Documents, to provide the information described therein in a timely manner, to the Municipal Securities Rulemaking Board ("MSRB") through EMMA, in the electronic form prescribed by the MSRB. A copy of the form of the Continuing Disclosure Agreement is attached hereto as Appendix E.

The Issuer has determined that no financial or operating data concerning the Issuer is material to an evaluation of the offering of the 2017 Restructuring Bonds or to any decision to purchase, hold or sell the 2017 Restructuring Bonds and the Issuer will not provide any such information. As discussed above, the Servicer, as the designated agent of the Issuer, has covenanted in the Servicing Agreement to undertake all responsibilities for providing any continuing disclosure to the Holders of the Outstanding Bonds, and the Issuer shall have no responsibility to the Holders of the 2017 Restructuring Bonds or any other person with respect to Rule 15c2-12.

## RATINGS

The 2017 Restructuring Bonds are expected to be assigned ratings of "Aaa (sf)" by Moody's, "AAA (sf)" by S&P, and "AAAsf" by Fitch. It is a condition to the issuance of the 2017 Restructuring Bonds that such ratings are received.

The respective ratings by Fitch, Moody's and S&P of the 2017 Restructuring Bonds reflect only the views of such organizations and any desired explanation of the significance of such ratings and any outlooks or other statements given by the Rating Agencies with respect thereto should be obtained from the Rating Agency furnishing the same, at the following addresses: Fitch, Inc., 33 Whitehall Street, New York, New York 10004; Moody's Investors Service, Inc., 7 World Trade Center, 250 Greenwich Street, New York, New York 10007; and Standard & Poor's Ratings Services, 55 Water Street, New York, New York 10041. Generally, a Rating Agency bases its rating and outlook (if any) on the information and materials furnished to it and on investigations, studies and assumptions of its own. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. No person is obligated to maintain the rating on any 2017 Restructuring Bonds and, accordingly, there is no assurance that such ratings for the 2017 Restructuring Bonds will continue for any given period of time or that any of such ratings will not be revised downward or withdrawn entirely by any of the Rating Agencies, if, in the judgment of such Rating Agency or Agencies, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect on the liquidity and the market price of the 2017 Restructuring Bonds. In general, ratings address credit risk and do not represent any assessment of any particular rate of principal payments on the 2017 Restructuring Bonds other than the payment in full of each tranche of the 2017 Restructuring Bonds by the Final Maturity Date as well as the timely payment of interest.

Under Rule 17g-5 of the Exchange Act, NRSROs providing the sponsor with the requisite certification will have access to all information posted on a website by the sponsor for the purpose of determining the initial rating and monitoring the rating after the Issuance Date in respect of the 2017 Restructuring Bonds. As a result, an NRSRO other than a hired NRSRO may issue unsolicited ratings on the 2017 Restructuring Bonds ("Unsolicited Ratings"), which may be lower, and could be significantly lower, than the ratings assigned by the hired NRSROs. The Unsolicited Ratings may be issued prior to, or after, the Issuance Date in respect of the 2017 Restructuring Bonds. Issuance of any Unsolicited Rating will not affect the issuance of the 2017 Restructuring Bonds. Issuance of an Unsolicited Rating lower than the ratings assigned by the hired NRSRO on the 2017 Restructuring Bonds might adversely affect the value of the 2017 Restructuring Bonds and, for regulated entities, could affect the status of the 2017 Restructuring Bonds as a legal investment or the capital treatment of the 2017 Restructuring Bonds. Investors in the 2017 Restructuring Bonds should consult with their legal counsel regarding the effect of the issuance of a rating by a non-hired NRSRO that is lower than the rating of a hired NRSRO.

A portion of the fees paid by the Issuer to a NRSRO which is hired to assign a rating on the 2017 Restructuring Bonds is contingent upon the issuance of the 2017 Restructuring Bonds. In addition to the fees paid by the Issuer to a NRSRO at closing on the 2017 Restructuring Bonds, the Issuer will pay a fee to the NRSRO for ongoing surveillance for so long as the 2017 Restructuring Bonds are outstanding. However, no NRSRO is under any obligation to continue to monitor or provide a rating on the 2017 Restructuring Bonds.

## FINANCIAL ADVISOR

Public Financial Management, Inc. ("PFM") serves as the independent financial advisor to the Issuer and the Authority, respectively, in connection with the structuring, marketing and sale of the 2017 Restructuring Bonds, including the timing and conditions of issuance, and other such financial guidance as requested by the PFM. Although PFM performed an active role in the drafting of this Official Statement and other related transaction documents, PFM has not independently verified any of the information set forth herein.

## ABSENCE OF LITIGATION

**The Issuer**

There is not now pending, or to the knowledge of the Issuer, threatened, any litigation against the Issuer restraining or enjoining the issuance or delivery of the 2017 Restructuring Bonds or questioning the validity of the 2017 Restructuring Bonds or the Proceedings or authority under which they are issued. Neither the creation, organization or existence, nor the title of the present members and officers of the Issuer to their respective office, is being challenged or questioned. There is no litigation pending, or to the knowledge of the Issuer, threatened, against the Issuer which in any manner questions the right of the Issuer to enter into the Indenture or to secure the 2017 Restructuring Bonds in the manner provided in the Indenture or to issue the 2017 Restructuring Bonds in the manner provided in the Indenture and the Securitization Law. There is no action, suit, Proceeding or investigation, at law or in equity, before any court, public body or other body pending, or to its knowledge, threatened against or affecting the Issuer, wherein an unfavorable decision, ruling or finding would materially adversely affect the transactions under the Indenture or the performance of the obligations of the Issuer under the Indenture.

**The Authority and LIPA**

There is not now pending, or to the knowledge of the Authority or LIPA threatened, any litigation against the Authority or LIPA restraining or enjoining the issuance or delivery of the 2017 Restructuring Bonds or questioning the validity of the 2017 Restructuring Bonds or the Proceedings or authority under which they are issued. There is no litigation pending, or to the knowledge of the Authority or LIPA threatened, against the Authority or LIPA which in any manner questions the right of the Authority or LIPA to enter into the Basic Documents to which each is a party. There is no action, suit, Proceeding or investigation, at law or in equity, before any court, public body or other body pending, or to the knowledge of Authority or LIPA threatened, against or affecting it wherein an unfavorable decision, ruling or finding would materially adversely affect the transactions under the Basic Documents or the performance of the obligations of the Authority or LIPA under the Basic Documents to which each is a party.

## LEGAL MATTERS

Certain legal matters relating to the 2017 Restructuring Bonds, including certain federal income tax matters, will be passed on by Hawkins Delafield & Wood, LLP, Bond Counsel to the Authority and the Issuer, respectively. Certain other legal matters relating to the 2017 Restructuring Bonds will be passed on by Squire Patton Boggs (US)

LLP, Disclosure Counsel to the Authority and the Issuer, respectively, by Jon R. Mostel, General Counsel to the Authority, and by Norton Rose Fulbright US LLP, Underwriters' Counsel.

## MISCELLANEOUS

This Official Statement includes, among other things, descriptions of (i) the Issuer, the Authority, and LIPA and (ii) the terms of the 2017 Restructuring Bonds, the Basic Documents, and certain provisions of the Securitization Law. Such descriptions are not complete and all such descriptions and references thereto are qualified by reference to each such document, copies of which may be obtained from the Issuer.

The agreements with the Holders are fully set forth in the Indenture. This Official Statement is not to be construed as a contract with the purchasers of the 2017 Restructuring Bonds or of any other obligations of the Issuer.

This Official Statement has been executed on behalf of the Issuer.

**UTILITY DEBT SECURITIZATION AUTHORITY**

By:   /s/ Thomas Falcone
       Chief Executive Officer

## APPENDIX A

### Definitions

*Terms not defined elsewhere in this Official Statement are used as defined in this Appendix A.*

"2017 Restructuring Bonds" means the bonds to be issued by the Issuer pursuant to Financing Order No. 5.

"2017 Collateral" means as the context may require all of the Issuer's right, title and interest (whether owned at the Issuance Date or thereafter acquired or arising) in and to (a) the 2017 Restructuring Property (created pursuant to Sections 5 and 7 of the LIPA Reform Act and Ordering Paragraph 11 of Financing Order No. 5) transferred by the Seller to the Issuer pursuant to the Sale Agreement and all proceeds thereof, including 2017 Restructuring Charges as estimated, determined and adjusted from time to time pursuant to the Servicing Agreement in accordance with Financing Order No. 5, (b) the statutory lien pursuant to the Securitization Law, (c) the Sale Agreement, (d) the Servicing Agreement, (e) the Administration Agreement, (f) the Collection Account (including, subject to limitation set forth below, all subaccounts thereof) and all amounts or investment property on deposit therein or credited thereto from time to time, (g) the security interest with respect to the 2017 Restructuring Property granted by the Seller to the Issuer in the Sale Agreement, (h) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, securities accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing, and (i) all proceeds of the foregoing; it being understood that the following do not constitute 2017 Collateral:  (1) any amounts required to be released pursuant to or contemplated by the terms of the Indenture and (2) proceeds from the sale of the 2017 Restructuring Bonds required to pay the purchase price of the 2017 Restructuring Property paid pursuant to the Sale Agreement and the Upfront Financing costs related to the 2017 Restructuring Bonds as deposited into the Upfront Financing Costs Subaccount (together with any interest earnings thereon).

"2017 Restructuring Charge" means an irrevocable, nonbypassable charge required to be paid by the Customers.

"2017 Restructuring Property" means all of the property, rights and interests, including the irrevocable right to impose, bill and collect the 2017 Restructuring Charges, of the Authority established pursuant to Financing Order No. 5 that are transferred to the Issuer pursuant to the Sale Agreement.

"2017 Restructuring Property Documentation" means all documents relating to the 2017 Restructuring Property, including copies of Financing Order No. 5 and all documents filed with the Authority in connection with any True-Up Adjustment and computational records relating thereto.

"Acquisition Discount" means the excess of the stated redemption price of a Short-Term Bond at maturity over the holder's tax basis therefor.

"Actual Charge Collections" means the Charge Collections actually deposited into the Allocation Account.

"Adjustment Notice" means any filing made with the Authority by the Servicer on behalf of the Issuer to set or adjust the 2017 Restructuring Charge, including the Issuance Advice Letter.

"Administration Agreement" means the Administration Agreement, expected to be dated as of the Issuance Date, between the Issuer and LIPA, as amended and supplemented from time to time.

"Administration Fee" means an annual fee of $100,000 entitled to the Administrator under the Administration Agreement.

"Administrator" means LIPA, or any successor administrator under the Administration Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Scheduled Debt Service" means, for any period and as of any date of calculation, an amount equal to the principal of and interest on any Outstanding 2017 Restructuring Bonds scheduled to be payable during such period, in accordance with the Expected Amortization Schedule.

"Allocation Account" means the deposit accounts or other accounts designated by the Authority from time to time and controlled by the Allocation Agent, into which all payments from or on behalf of Customers are deposited and from which transfers of estimated Charge Collections and Remittance Shortfalls are to be made to the Collection Account and transfers of Estimated Other Payments are to be made to appropriate accounts of the Authority. Initially, the Allocation Account shall refer to the clearing account[s] that have been established by the Authority with J.P. Morgan Chase Bank.

"Allocation Agent" means the entity designated by the Authority (which may be the Authority) that agrees to control the Allocation Account in trust for the benefit of the Trustee and the Authority Trustee, to accept all payments from or on behalf of Customers for deposit into the Allocation Account, to notify the Servicer on each Business Day of the amount deposited into the Allocation Account on the preceding Business Day, and, to the extent that funds are available in the Allocation Account, to transfer the estimated Charge Collections and Remittance Shortfalls from the Allocation Account to the Collection Account as instructed by the Servicer or the Trustee in writing and to transfer the Estimated Other Payments as instructed by the Authority or the Authority Trustee.

"Ancillary Agreement" means any bond, insurance policy, letter of credit, reserve account, surety bond, swap arrangement, hedging arrangement, liquidity or credit support arrangement, or other financial arrangement entered into in connection with the issuance or payment of the 2017 Restructuring Bonds.

"Annual True-Up Adjustment" means the adjustment to the 2017 Restructuring Charges that is required to be made annually pursuant to the True-Up mechanism.

"Authenticating Agent" means the Trustee and any agent appointed by the Trustee to serve in that role.

"Authority" means the Long Island Power Authority, a corporate municipal instrumentality of the State of New York, and any successor thereto.

"Authority Designee" means one or more officers of the Authority to review and approve, as and on behalf of the Authority, the Issuance Advice Letter, the pricing terms of the 2017 Restructuring Bonds, the amounts of the Restructuring Costs, expected Upfront Financing Costs and expected Ongoing Financing Costs, the net present value savings, the terms of the Basic Documents and take such other actions as are authorized in the final order.

"Authority Trustees" means the Authority's Board of Trustees.

"Back-Up Security Interest" means a security interest in the 2017 Restructuring Property to secure a payment obligation incurred by the Seller in respect of the amount paid by the Issuer to the Seller pursuant to the Sale Agreement.

"Bankruptcy Code" or "Federal Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended from time to time.

"Base Rate Revenues" include electricity usage service charges and demand service charges.

"Basic Documents" means, collectively, the Indenture, the Servicing Agreement, the Administration Agreement, the Sale Agreement, the Continuing Disclosure Agreement, and all other documents and certificates delivered in connection therewith.

"Beneficial Owner" or "beneficial owner" of a security means any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such security, except that a person who in the ordinary course of business is a pledgee of securities under a written pledge agreement shall not be deemed to be the beneficial owner of such pledged securities until the pledgee has taken all formal steps to declare a default and determines that the power to dispose or to direct the disposition of such pledged securities will be exercised, provided that:

    (a)    the pledge agreement is bona fide,

    (b)    the pledgee is:

        (i)    a broker or dealer registered under § 15 of the Exchange Act,

(ii)     a bank as defined in § 3(a)(6) of the Exchange Act,

(iii)    an insurance company as defined in § 3(a)(19) of the Exchange Act,

(iv)    an investment company registered under § 8 of the Investment Company Act,

(v)     an investment adviser registered under § 203 of the Investment Advisers Act of 1940,

(vi)    an employee benefit plan, or pension fund which is subject to the provisions of ERISA or an endowment fund,

(vii)   a parent holding company, provided the aggregate amount held directly by the parent, and directly and indirectly by its subsidiaries which are not persons specified in items (A) through (F) of this clause (2) does not exceed 1% of the securities of the subject class, or

(viii)  a group, provided that all the members are persons specified in items (A) through (G) of this clause (2), and

(c)     the pledge agreement, prior to default, does not grant to the pledgee the power to dispose or direct the disposition of the pledged securities, other than the grant of such power(s) pursuant to a pledge agreement under which credit is extended subject to Regulation T (12 CFR 220.1 to 220.8) and in which the pledgee is a broker or dealer registered under § 15 of the Exchange Act.

"Bond Counsel" means Hawkins Delafield & Wood LLP.

"Bond Interest Rate" means, with respect to any tranche of 2017 Restructuring Bonds, the Interest Rate specified in the Indenture.

"Bond Purchase Agreement" means the Bond Purchase Agreement, dated October 25, 2017, between the Issuer and the underwriters named therein.

"Bond Register" means the register providing for the registration of the 2017 Restructuring Bonds and transfers and exchanges thereof.

"Bond Registrar" means the registrar at any time of the Bond Register.  The initial Bond Registrar shall be the Trustee.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions in New York, New York, are, or DTC is, authorized or obligated by law, regulation or executive order to remain closed.

"Charge Collections" means the payments of the 2017 Restructuring Charges by or on behalf of Customers.

"Clearing Agency" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Collection Account" means one or more segregated trust accounts in the Trustee's name for the deposit of 2017 Restructuring Property and all other amounts received with respect to the 2017 Collateral or under the Servicing Agreement.

"Continuing Disclosure Agreement" means the Continuing Disclosure Agreement, expected to be dated as of the Issuance Date, between the Issuer and LIPA as Servicer, a copy of a form of which is attached as Appendix E to this Official Statement.

"Corporate Trust Office" means the principal office of the Trustee at which, at any particular time, its corporate trust business shall be administered, which office as of the Issuance Date is located at The Bank of New York Mellon, 101 Barclay Street-Floor 7-West, New York, New York 10286, or at such other address as the Trustee may designate from time to time by notice to the Holders of 2017 Restructuring Bonds and the Issuer, or the principal corporate trust office of any successor trustee by like notice.

"Customers" means all existing and future retail electric customers connected to the T&D System Assets and taking electric transmission or distribution service within the Service Area from LIPA, the Authority or any of its successors or assignees in the Service Area.

"Debt Service Reserve Subaccount" means one of two subaccounts of the Reserve Subaccount.

"Discount Bond" means any 2017 Restructuring Bonds having OID.

"DPS" means the New York Department of Public Service, the staff arm of the PSC.

"DTC" means The Depository Trust Company.

"Eligible Account" means a segregated trust account with an Eligible Institution.

"Eligible Institution" means (a) the corporate trust department of the Trustee so long as any securities of the Trustee have either a short-term credit rating from Moody's of at least "P-1" or a long-term unsecured debt rating from Moody's of at least "A2" and have a credit rating from each other rating agency in one of its generic categories which either signifies either "A2" or "A-1" or higher by Standard & Poor's or "A" or "F1" or higher by Fitch, or (b) a depository institution organized under the laws of the United States of America, any state or the District of Columbia (or any domestic branch of a foreign bank), (i) which has either (A) a long-term issuer rating of "AA-" or higher by Standard & Poor's,"A2" or higher by Moody's, and "A" or higher by Fitch, or (B) a short-term issuer rating of "A-1+" or higher by Standard & Poor's, "P-1" or higher by Moody's, and "F1" or higher by Fitch, or any other long-term, short-term or certificate of deposit rating acceptable to Standard & Poor's, Moody's and Fitch, and (ii) whose deposits are insured by the FDIC. If so qualified under clause (b) above, the Trustee may be considered an Eligible Institution for the purposes of the definition of Eligible Account.

"Eligible Investments" means instruments and investment property denominated in United States currency which meet the criteria described below:

(a)     direct obligations of, or obligations fully and unconditionally guaranteed as to timely payment by, the United States of America,

(b)     demand deposits, time deposits or certificates of deposit and bankers' acceptances of Eligible Institutions (including the Trustee in its commercial capacity),

(c)     commercial paper having, at the time of the investment or contractual commitment, a rating of not less than "A-1" from Standard & Poor's, not less than "P-1" by Moody's and not less than "F1" by Fitch (including commercial paper issued by the Trustee),

(d)     money market funds which have the highest rating from at least two of the Rating Agencies (including funds for which the Trustee or any of its Affiliates is an investment manager or advisor),

(e)     repurchase obligations with respect to any security that is a direct obligation of, or fully guaranteed by, the United States of America or certain of its agencies or instrumentalities, entered into with Eligible Institutions,

(f)     repurchase obligations with respect to any security or whole loan entered into with an Eligible Institution or a registered broker-dealer, acting as principal and that meets certain ratings criteria set forth below:

(i)     a broker/dealer (acting as principal) registered as a broker or dealer under Section 15 of the Exchange Act (any broker/dealer being referred to in this definition as a "broker/dealer"), the unsecured short-term debt obligations of which are rated at least "P-1" by Moody's, "A-1+" by Standard & Poor's and, if Fitch provides a rating thereon, "F-1+" by Fitch, and the long-term debt obligations of which are rated at least "Aa3" by Moody's, in each case at the time of entering into this repurchase obligation, or

(ii)     an unrated broker/dealer acting as principal, that is a wholly-owned subsidiary of a non-bank or bank holding company the unsecured short-term debt obligations of which are rated at least "P-1" by Moody's, "A-1+" by Standard & Poor's and, if Fitch provides a rating thereon, "F-1+" by Fitch, and the long-term debt obligations of which are rated at least "Aa3" by Moody's, in each case at the time of purchase so long as the obligations of such unrated broker/dealer are unconditionally guaranteed by such non-bank or bank holding company, and

(g)     any other investment permitted by each of the Rating Agencies, as evidenced by the Issuer Order accompanied by evidence of such permission reasonably satisfactory to the Trustee.

"EMMA" means the Electronic Municipal Market Access system.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Charge Collections" means the estimated Charge Collections calculated as provided in Annex 2 of the Servicing Agreement.

"Estimated Other Payments" means all payments by or on behalf of Customers other than estimated Charge Collections and any Remittance Shortfalls net of any Excess Remittance.

"Events of Default" means the following, as more fully described in this Official Statement under the heading "THE INDENTURE—Events of Default":

- a failure to pay interest or redemption premium when due (after a cure period),
- a failure to pay principal on the Final Maturity Date,
- a failure to perform a covenant (after a cure period),
- a breach of representations or warranties (after a cure period),
- a voluntary or involuntary bankruptcy Proceeding of the Issuer, or
- an action in violation of Financing Order No. 5 or the State Pledge.

"Excess Funds Subaccount" means one of the four subaccounts of the Collection Account.

"Excess Remittance" means the amount, if any, calculated for a particular Reconciliation Period, by which all Estimated Charge Collections remitted to the Collection Account during such Reconciliation Period exceed Actual Charge Collections received by the Servicer during such Reconciliation Period.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expected Amortization Schedule" means the schedule specifying for each tranche the initial principal amount, the Bond Interest Rate, Scheduled Maturity Date and Final Maturity Date, including the Expected Sinking Fund Schedule for the Term Bonds and the matters specified in the definition thereof, as each appear in this Official Statement under the heading "THE 2017 RESTRUCTURING BONDS—Expected Amortization Schedule" and/or on the inside cover page.

"Expected Sinking Fund Schedule" means a schedule specifying for the Term Bonds, the Scheduled Sinking Fund Redemption Dates, scheduled Outstanding Amounts, scheduled Sinking Fund Payments and minimum remaining Outstanding Amounts, as it appears in this Official Statement under the heading "THE 2017 RESTRUCTURING BONDS—Redemption–Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules."

"FDIC" means the Federal Deposit Insurance Corporation or any successor thereto.

"FERC" means the Federal Energy Regulatory Commission.

"Fiduciary" means the Trustee, the Bond Registrar and each Paying Agent.

"Final Maturity Date" means, with respect to any tranche of 2017 Restructuring Bonds, the respective Final Maturity Date therefor as it appears in the Expected Amortization Schedule in, and on the inside cover page of, this Official Statement.

"Financing Costs" means the Upfront Financing Cost, Ongoing Financing Cost and any of the following:

(a)     interest, principal, and redemption premiums that are payable on the 2017 Restructuring Bonds,

(b)     any payment required under an Ancillary Agreement and any amount required to fund or replenish reserve (including the Operating Reserve Subaccount and the Debt Service Reserve Subaccount) or other accounts established under the terms of the Indenture or any Ancillary Agreement, or other financing documents pertaining to the 2017 Restructuring Bonds,

(c)     any federal, state or local taxes, payment in lieu of taxes, franchise fees or license fees imposed on transition charge revenues, and

(d)     any cost related to issuing 2017 Restructuring Bonds, administering the Issuer and servicing 2017 Restructuring Property and 2017 Restructuring Bonds, or related to the efforts to prepare or obtain approval of Financing Order No. 5, including, without limitation, costs of calculating adjustments

of 2017 Restructuring Charges, Servicing Fees and expenses, Trustee fees and expenses, legal fees and expense, accounting fees and expenses, Administration Fees and expenses, placement fees, underwriting fees, fees and expenses of the Authority's advisors and outside counsel, if any, Rating Agency fees and any other related cost that is approved for recovery in Financing Order No. 5.

"Financing Order No. 5" means the restructuring cost financing order No. 5 adopted by the Authority Trustees on July 26, 2017, which became irrevocable, final and non-appealable on October 20, 2017.

"Financing Party" means any Holder, any party to or beneficiary of an Ancillary Agreement, and any Fiduciary or other Person acting for the benefit of any of the foregoing pursuant to the Indenture.

"Fitch" means Fitch Ratings or any successor thereto. References to Fitch are effective so long as Fitch is a Rating Agency.

"General Resolution" means the Authority's Electric General Bond Resolution adopted on May 13, 1998.

"General Subaccount" means one of the four subaccounts of the Collection Account.

"Governmental Authority" means any nation or government, any federal, state, local or other political subdivision thereof and any court, administrative agency or other instrumentality or entity exercising executive, legislative, judicial, regulatory or administrative function of government.

"HEFPA" means the Home Energy Fair Practices Act.

"Holder" or "Bondholder" means the Person in whose name a 2017 Restructuring Bond is registered on the Bond Register, and to the extent specified by the Indenture, the owners of bearer 2017 Restructuring Bonds.

"Indenture" or "Trust Indenture" means the Utility Debt Securitization Authority Bond Indenture dated as of the Issuance Date, by and between the Issuer and the Trustee.

"Independent" means, when used with respect to any specified Person, that the Person (a) is in fact independent of the Issuer, any other obligor upon the 2017 Restructuring Bonds, the Seller, the Servicer and any Affiliate of any of the foregoing Persons, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer, any such other obligor, the Seller, the Servicer or any Affiliate of any of the foregoing Persons and (c) is not connected with the Issuer, any such other obligor, the Seller, the Servicer or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

"Independent Certificate" means a certificate or opinion to be delivered to the Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of the Basic Documents, made by an Independent appraiser or other expert appointed by an Issuer order and consented to by the Trustee, and such opinion or certificate shall state that the signer has read the preceding definition of "Independent" and that the signer is Independent within the meaning thereof.

"Insolvency Event" means, with respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days, or (b) the commencement by such Person of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, or the failure by such Person generally to pay its debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Interest Rate" means the interest rate on any Bond.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Earnings" means investment earnings on funds deposited in the Collection Account net of losses and investment expenses.

"IRS" means the Internal Revenue Service.

"Issuance Advice Letter" means the Issuance Advice Letter sent by the Servicer to the Issuer and the Authority pursuant to Financing Order No. 5.

"Issuance Costs" means any of the following:

(a)     any initial payment made on issuance of the 2017 Restructuring Bonds, and any amount required to fund any account required by the Basic Documents in the amounts specified in the Basic Documents, and

(b)     any other costs related to issuance of 2017 Restructuring Bonds, including trustees fees, legal fees and expenses, consulting fees, administrative fees, accounting fees, printing fees, financial advisor fees and expenses, issuer fees, placement and underwriter fees and expenses, capitalized interest, rating agency fees and expenses, stock exchange listing and compliance fees, and filing fees, including costs related to obtaining a financing order.

"Issuance Date" means the date the 2017 Restructuring Bonds are authenticated and delivered by the Trustee to or upon the order of the Issuer.

"Issuer" means the Utility Debt Securitization Authority, including any successor thereto.

"Issuer Order" means a written order signed in the name of the Issuer by any one of its authorized officers and delivered to the Trustee.

"Issuer's Annual Report" means an annual report of the Issuer, including, to the extent available, audited annual financial statements.

"kWh" means kilowatt-hour.

"Legal Defeasance" means the ability of the Issuer to terminate all its obligations under the Indenture with respect to the 2017 Restructuring Bonds in certain circumstances.

"Lien" means a security interest, lien, mortgage, charge, pledge, claim, or encumbrance of any kind.

"LILCO" means the Long Island Lighting Company.

"LIPA" means the Long Island Lighting Company, d/b/a LIPA.

"LIPA Reform Act" means the whole of Chapter 173, Laws of New York, 2013, as amended.

"Long Island Choice" means a retail choice program adopted by the Authority in 1998.

"Losses" means (i) any and all amounts of principal and interest on the 2017 Restructuring Bonds not paid when due or when scheduled to be paid in accordance with their terms and the amounts of any deposits by or to the Issuer required to have been made in accordance with the terms of the Basic Documents or Financing Order No. 5 which are not made when so required and (ii) any and all other liabilities, obligations, losses, claims, damages, payments, costs or expenses of any kind whatsoever.

"Mandatory Mid-Year True-Up Adjustment" means the adjustment to the 2017 Restructuring Charges made if after the Mid-Year Review the Servicer projects that the Charge Collections will be insufficient to pay timely principal and interest on the 2017 Restructuring Bonds when due during such Mid-Year Calculation Period pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs during such Mid-Year Calculation Period. The adjustment will become effective on May 15 of such year as the Servicer files its Adjustment Notice.

"Mid-Year Calculation Period" means the period beginning on the June 16 and ending on the following June 15.

"Mid-Year Review" means a mid-year review performed by the Servicer pursuant to the terms of the Servicing Agreement.

"Monthly Servicer Certificate" means the certificate delivered by the Servicer to the Allocation Agent, the Issuer, the Authority and the Bond Trustee on or before the 13th business day of each calendar month, commencing as set forth in the Servicing Agreement.

"Moody's" means Moody's Investors Service, Inc. or any successor to its ratings business. References to Moody's are effective as long as Moody's is a Rating Agency.

"MSRB" means the Municipal Securities Rulemaking Board.

"MW" means megawatt.

"MWh" means megawatt-hour.

"National Grid" means National Grid plc, a mutli-national electric and gas utility company.

"National Grid Subs" means certain of the subsidiaries of National Grid.

"Notice of Default" means either (i) written notice, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25 percent of the Outstanding Amount of the 2017 Restructuring Bonds, specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder or (ii) the date the Issuer has actual knowledge of the default.

"NRSRO" means a nationally recognized statistical rating organization.

"Officer's Certificate" means a certificate signed by a Responsible Officer of the Issuer (or, if so indicated, the Borrower or another Person) under the circumstances described in, and otherwise complying with, the applicable requirements of the Basic Documents, and delivered to the Trustee.

"OID" means the excess of the sum of all amounts payable at the stated maturity of a 2017 Restructuring Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity.

"Ongoing Financing Costs" means all Financing Costs other than Issuance Costs.

"Operating Expenses" means all Ongoing Financing Costs other than principal (including amortization, sinking fund or redemption payments) and redemption premium, if any, and interest on the 2017 Restructuring Bonds and amounts required to replenish each of the subaccounts within the Reserve Subaccount.

"Operating Reserve Subaccount" means one of two subaccounts of the Reserve Subaccount.

"Opinion of Counsel" means one or more written opinions of legal counsel who may, except as otherwise expressly provided in the Basic Documents, be employees of or counsel to the party providing such Opinion of Counsel, which counsel shall be reasonably acceptable to the party receiving such Opinion of Counsel, and which opinion shall be in form and substance reasonably satisfactory to such party. As to any factual matters involved in an Opinion of Counsel, such counsel may rely, to the extent that they deem such reliance proper, upon a certificate or certificates setting forth such matters which have been signed by an official, officer, general partner or authorized representative of a particular Governmental Authority, corporation, firm or other Person or entity.

"Optional True-Up Adjustment" means an adjustment to the 2017 Restructuring Charges permitted to be made pursuant to the True-Up Adjustment mechanism.

"OSA" means the Amended and Restated Operations Services Agreement by and between LIPA and PSEG Long Island, dated December 31, 2013, as further amended from time to time.

"Outstanding" means, as of the date of determination, all 2017 Restructuring Bonds theretofore authenticated and delivered under the Indenture except:

(a)    2017 Restructuring Bonds theretofore canceled by the Bond Registrar or delivered to the Bond Registrar for cancellation,

(b)    2017 Restructuring Bonds or portions thereof the payment for which money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent in trust for the Holders of such 2017 Restructuring Bonds, and

(c)     2017 Restructuring Bonds in exchange for or in lieu of other bonds which have been issued pursuant to the Indenture unless proof satisfactory to the Trustee is presented that any such bonds are held by a bona fide purchaser;

provided, however, that in determining whether the Holders of the requisite Outstanding Amount of the 2017 Restructuring Bonds or any tranche thereof have given any request, demand, authorization, direction, notice, consent or waiver under the Indenture or under any Basic Document, 2017 Restructuring Bonds owned by the Issuer, the Seller or any Affiliate of any of the foregoing Persons shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only 2017 Restructuring Bonds that the Trustee actually knows to be so owned shall be so disregarded. 2017 Restructuring Bonds so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such 2017 Restructuring Bonds and that the pledgee is not the Issuer, any other obligor upon the 2017 Restructuring Bonds, the Seller or any Affiliate of any of the foregoing Persons.

"Outstanding Amount" means the aggregate principal amount of all 2017 Restructuring Bonds or, if the context requires, all 2017 Restructuring Bonds of a tranche, Outstanding at the date of determination.

"PACB" means the New York Public Authorities Control Board, and any successor thereto.

"Paying Agent" or "paying agent" means the Trustee or any successor paying agent or co-paying agent serving as such under the Indenture. If at any time there is no qualified paying agent serving as such, the Trustee shall act as paying agent under the Indenture.

"Payment Date" means, with respect to any tranche of 2017 Restructuring Bonds, the dates specified as the Scheduled Sinking Fund Redemption Date in the Indenture for the Term Bonds or the Scheduled Maturity Date or the Final Maturity Date in the Expected Amortization Schedule included in this Official Statement; or if any such date is not a Business Day, the next Business Day.

"Person" means any individual, corporation, limited liability company, estate, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof, and includes successors permitted by the Basic Documents.

"Performance Metrics" mean those metrics as defined pursuant to the OSA.

"PFM" means Public Financial Management, Inc.

"Premium Bond" means a premium over the sum of all amounts payable on the 2017 Restructuring Bonds after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates).

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Protected Purchaser" has the meaning specified in Section 8-303 of the UCC.

"PSC" means New York State Public Service Commission.

"PSEG" means Public Service Enterprise Group Incorporated.

"PSEG Long Island" generally means PSEG Long Island LLC, the contracting party under the OSA and its wholly-owned subsidiary dedicated to LIPA's operations.

"Quarterly True-Up Adjustment" means an adjustment to the 2017 Restructuring Charges required to be made quarterly if there are any 2017 Restructuring Bonds outstanding following the last Scheduled Maturity Date of the 2017 Restructuring Bonds.

"Rating Agency" means collectively Moody's, Standard & Poor's or Fitch. If no such organization or successor is any longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization or other comparable Person designated by the Issuer, notice of which designation shall be given to the Trustee and the Servicer.

"Rating Agency Condition" means, with respect to any action, not less than ten Business Days' prior written notification to each Rating Agency of such action, and written confirmation from each of Standard & Poor's and Moody's to the Servicer, the Trustee and the Issuer that such action will not result in a suspension, reduction or

withdrawal of the then current rating by such Rating Agency of any tranche of the 2017 Restructuring Bonds and that prior to the taking of the proposed action no other Rating Agency shall have provided written notice to the Issuer that such action has resulted or would result in the suspension, reduction or withdrawal of the then current rating of any tranche of 2017 Restructuring Bonds; provided, however, that if within such ten Business Day period, any Rating Agency (other than Standard & Poor's) has neither replied to such notification nor responded in a manner that indicates that such Rating Agency is reviewing and considering the notification, then (i) the Issuer shall be required to confirm that such Rating Agency has received the Rating Agency Condition request, and if it has, promptly request the related Rating Agency Condition confirmation and (ii) if the Rating Agency neither replies to such notification nor responds in a manner that indicates it is reviewing and considering the notification within five Business Days following such second request, the applicable Rating Agency Condition requirement shall not be deemed to apply to such Rating Agency.

"Reconciliation Period" means the twelve-month period ending the last day of the Collection Period preceding the calculation of Remittance Shortfalls or Excess Remittances under the Servicing Agreement; provided, that the initial Reconciliation Period shall commence on the Issuance Date and may be less than twelve months.

"Record Date" means, with respect to a Payment Date, the close of business on the Business Day next preceding such Payment Date; provided, however, that if the 2017 Restructuring Bonds cease to be held in DTC's book-entry only system, the Record Date will be the last Business Day of the calendar month immediately preceding such Payment Date.

"Refunded Debt" means certain of the debt of the Authority that was Outstanding on the Issuance Date and that will be purchased, redeemed, repaid, or defeased with the proceeds of the sale of the 2017 Restructuring Property by the Authority.

"Remittance" means each transfer of estimated Charge Collections or Remittance Shortfalls from the Allocation Account to the Collection Account.

"Remittance Date" means each Business Day on which a Remittance is to be made by the Servicer pursuant to the Servicing Agreement.

"Remittance Shortfall" means the amount, if any, calculated for a particular Reconciliation Period, by which Actual Charge Collections received by the Servicer during such Reconciliation Period exceed all Estimated Charge Collections remitted to the Collection Account during such Reconciliation Period.

"Required Debt Service Reserve Level" means, as of any date of calculation, an amount equal to the greater of (a) 1.5% of the aggregate principal amount of 2017 Restructuring Bonds then outstanding minus the minimum principal amount of 2017 Restructuring Bonds shown as being expected to be paid on the Expected Amortization Schedule on any Payment Date subsequent to such date of calculation and (b) $0. For the avoidance of doubt, to the extent that no principal amount is shown as being expected to be paid on the Expected Amortization Schedule on any Payment Date subsequent to a date of calculation, the minimum principal amount of 2017 Restructuring Bonds shown as being expected to be paid on the Expected Amortization Schedule on any Payment Date subsequent to such date of calculation for purposes of calculating the Required Debt Service Reserve Level will be $0.

"Required Operating Reserve Level" means, as of any date of calculation, an amount equal to 0.50% of the aggregate principal amount of the 2017 Restructuring Bonds originally issued; provided, however, that if any 2017 Restructuring Bonds are refunded in advance of their maturity as permitted by the Indenture, on and after the date that provision for the payment of the 2017 Restructuring Bonds so refunded has been made pursuant to the Indenture the Required Operating Reserve Level shall be equal to 0.50% of the Outstanding Amount of the 2017 Restructuring Bonds immediately after such date.

"Required Reserve Level" means, as of any date of calculation, the sum of the Required Debt Service Reserve Level and the Required Operating Reserve Level.

"Reserve Subaccount" means one of the four subaccounts of the Collection Account, consisting of the two Subaccounts: the Operating Reserve Subaccount and the Debt Service Reserve Subaccount.

"Responsible Officer" means, with respect to (a) the Issuer, any officer of the Issuer who is authorized to act for the Issuer in matters relating to the Issuer and who is identified on the list of Responsible Officers delivered by the Issuer to the Trustee on the Issuance Date (as such list may be modified or supplemented by the Issuer from time to time thereafter), (b) the Servicer, the President, any Vice President, the Treasurer, an Assistant Treasurer or any duly

authorized officer, (c) the Trustee, any officer within the Corporate Trust Office of such trustee (including the President, any Vice President, Assistant Vice President, Secretary or Assistant Treasurer, Trust Officer or any other officer of the Trustee customarily performing functions similar to those performed by persons who at the time shall be such officers, respectively, and that has direct responsibility for the administration of the Indenture and also, with respect to a particular matter, any other officer to whom such matter is referred to because of such officer's knowledge and familiarity with the particular subject), (d) any other corporation, the Chief Executive Officer, the President, any Vice President, the Chief Financial Officer, the Treasurer, the Assistant Treasurer or any other duly authorized officer of such Person who has been authorized to act in the circumstances, (e) any partnership, any general partner thereof, and (f) any other Person (other than an individual), any duly authorized officer or member of such Person, as the context may require, who is authorized to act in matters relating to such Person.

"Restructuring Costs" means the amount of debt retirement costs and Upfront Financing Costs that the Authority proposes to pay through the sale of the 2017 Restructuring Property and the issuance of the 2017 Restructuring Bonds.

"Rule 15c2-12" or the "Rule" means Rule 15c2-12 of the SEC under the Securities Exchange Act of 1934, as amended.

"Sale Agreement" means Restructuring Property Purchase and Sale Agreement, expected to be dated as of the Issuance Date, between the Issuer and the Seller.

"Scheduled Maturity Date" means, with respect to each tranche of 2017 Restructuring Bonds, the date when all interest and principal are scheduled to be paid with respect to that tranche in accordance with the Expected Amortization Schedule, as specified in the Indenture. For the avoidance of doubt, the Scheduled Maturity Date with respect to any tranche shall be the last Scheduled Payment Date set forth in the Expected Amortization Schedule relating to such tranche.

"Scheduled Payment Date" means each Payment Date on which the principal of the 2017 Restructuring Bonds is scheduled to be paid.

"Scheduled Sinking Fund Payment" means, with respect to the Term Bonds, the Scheduled Sinking Fund Payment therefor as specified in the Expected Sinking Fund Schedule.

"Scheduled Sinking Fund Redemption Date" means, with respect to the Term Bonds, the Scheduled Sinking Fund Redemption Date therefor as specified in the Expected Sinking Fund Schedule.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Depository" means DTC, or its nominee, and its successors.

"Securitization Law" means Part B of the LIPA Reform Act, as amended.

"Seller" means the Authority in its capacity as the seller of the 2017 Restructuring Property.

"Semi-annual Servicer Certificate" means a certificate to be provided by the Servicer to the Issuer, the Trustee, each Rating Agency and the Authority, at least one Business Day before each Payment Date, and indicating:

(a)    the amount to be paid to the Holders of each tranche in respect of principal on such Payment Date in accordance with the Indenture,

(b)    the amount to be paid to the Holders of each tranche in respect of interest on such Payment Date in accordance with the Indenture,

(c)    the projected bond balance and the bond balance for each tranche as of that Payment Date (after giving effect to the payments on such Payment Date),

(d)    the amounts on deposit in the Reserve Subaccount (including the Operating Reserve Subaccount and the Debt Service Reserve Subaccount) as of that Payment Date (after giving effect to the transfers to be made from or into the Reserve Subaccount on such Payment Date)

(e)    the amounts, if any, on deposit in the Excess Funds Subaccount as of that Payment Date (after giving effect to the transfers to be made from or into the Excess Funds Subaccount on such Payment Date),

(f)    the amounts paid to the Trustee since the preceding Payment Date pursuant to the Indenture,

(g)    the amounts paid to the Servicer since the preceding Payment Date pursuant to the Indenture, and

(h)    the amount of any other transfers and payments to be made on such Payment Date pursuant to the Indenture.

"Serial Bonds" means Tranche-1 through Tranche-16 of the 2017 Restructuring Bonds, which are not Term Bonds.

"Service Area" means the two counties on Long Island — Nassau County ("Nassau County") and Suffolk County ("Suffolk County") (except for the Nassau County villages of Freeport and Rockville Centre and the Suffolk County village of Greenport, each of which has its individually-owned municipal electric system) — and a portion of the Borough of Queens of The City of New York known as the Rockaways where the Authority, acting through LIPA, provides electric service. For purposes of the 2017 Restructuring Bonds and the collection of the 2017 Restructuring Charges, the "Service Area" is defined by the Securitization Law as the service area of LIPA as of July 29, 2013.

"Servicer" means LIPA or any subsequent owner of the T&D Assets.

"Servicer Compliance Certificate" means the annual compliance certificate provided by the Servicer pursuant to the Servicing Agreement.

"Servicer Default" means the occurrence of any one of the following events:

(a)    any failure by the Servicer to cause payments by or on behalf of Customers received by the Servicer from 2017 Restructuring Charges to be deposited into the Allocation Account or any failure to cause the Allocation Agent to transfer to the Trustee any required Remittance and cause other amounts received from 2017 Collateral to be deposited to the Collections Account that shall continue unremedied for a period of five (5) Business Days after written notice of such failure is received by the Servicer from the Issuer or the Trustee, or

(b)    any failure by the Servicer duly to observe or perform in any material respect any other covenant or agreement of the Servicer set forth in the Servicing Agreement, which failure:

    (i)    materially and adversely affects the 2017 Restructuring Property or the rights of the Bondholders, and

    (ii)    continues unremedied for a period of 60 days after written notice of such failure has been given to the Servicer by the Issuer, the Authority, the Allocation Agent, the Administrator or the Trustee or after discovery of such failure by an officer of the Servicer, or

(c)    any representation or warranty made by the Servicer in the Servicing Agreement proves to have been incorrect when made, which has a material adverse effect on the Issuer or the Bondholders and which material adverse effect continues unremedied for a period of 60 days after the date on which written notice thereof has been given to the Servicer by the Issuer, the Authority or the Trustee or after discovery of such failure by an officer of the Servicer, as the case may be, or

(d)    an Insolvency Event occurs with respect to the Servicer.

"Servicing Agreement" means the Restructuring Property Servicing Agreement, expected to be dated as of the Issuance Date, between the Issuer and the Servicer, as the same may be amended and supplemented from time to time.

"Servicing Fee" means the annual compensation the Issuer will pay to the Servicer for all obligations of the Servicer to be performed under the Servicing Agreement. As long as LIPA is the Servicer, the Servicing Fee shall be 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds. The Servicing Fee for any Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets may be higher than the Servicing Fee for LIPA; provided, however, that any Servicing Fee in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be subject to approval by the Authority and the Trustee.

"Short-Term Bond" means a 2017 Restructuring Bond with a maturity not longer than one year.

"Sinking Fund Payment" means a payment upon redemption of the Term Bonds on a Payment Date as specified in the applicable Expected Sinking Fund Schedule set forth under "THE 2017 RESTRUCTURING

BONDS—Redemption—Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules," or a payment without redemption prior to maturity that reduces the Outstanding Amount of such Term Bond to zero.

"Standard & Poor's" or "S&P" means Standard & Poor's Financial Services LLC, a division of S&P Global, or any successor to its ratings business. References to S&P are effective so long as S&P is a Rating Agency.

"State" means the State of New York.

"State Pledge" means the pledge of the State of New York as described in "THE SECURITIZATION LAW—State Pledge" in this Official Statement.

"Subaccounts" means the subaccounts of the Collection Account, including, without limitation, the subaccounts of the Reserve Subaccount, as described in this Official Statement.

"Subordinated General Resolution" means the Authority's Electric System General Subordinated Revenue Bond Resolution adopted on May 20, 1998.

"Successor Servicer" is a successor to the Servicer designated or appointed pursuant to the terms of the Servicing Agreement.

"T&D System" is the electric transmission and distribution systems retained by LIPA as part of the acquisition in 1998.

"T&D System Assets" means the physically integrated system of electric transmission and distribution facilities (and other general property and equipment in connection therewith) owned by LIPA as of July 29, 2013, or thereafter acquired for use by LIPA or its successors in providing retail electric delivery to Customers in the Service Area.

"Termination Notice" means written notice by the Trustee or the Holders of a majority of the outstanding principal amount of the 2017 Restructuring Bonds to the Servicer (and the Trustee if given by the Holders) terminating all the rights and obligations (other than the indemnity obligations and the obligation to continue performing its functions as Servicer until a Successor Servicer is appointed) of the Servicer under the Servicing Agreement.

"Term Bonds" means 2017 Restructuring Bonds the retirement of which shall be provided for from scheduled periodic redemptions prior to maturity. Tranche-17 through Tranche-28 are Term Bonds.

"Tranche" means all 2017 Restructuring Bonds designated as being of the same tranche issued and delivered on original issuance in a simultaneous transaction, and any bonds thereafter delivered in lieu thereof or in substitution therefor pursuant to the Indenture

"Treasury Regulations" means the regulations, including proposed or temporary regulations, promulgated under the Internal Revenue Code. References to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"True-Up" means a mechanism required by the Securitization Law and Financing Order No. 5 whereby the Servicer will provide a notice to the Issuer and the Authority of an intention to make an adjustment to the applicable 2017 Restructuring Charges based on actual collected 2017 Restructuring Charges and updated assumptions by the Servicer as to future collections of 2017 Restructuring Charges.

"True-Up Adjustment" means each of the Annual True-Up Adjustment, the Mandatory Mid-Year True-Up Adjustment, the Voluntary Mid-Year True-Up Adjustment and the Optional True-Up Adjustment.

"Trust Estate" means the 2017 Collateral pledged to the Trustee.

"Trustee" means The Bank of New York Mellon.

"UCC" means, unless the context otherwise requires, the Uniform Commercial Code, as in effect in the State of New York, as amended from time to time.

"Underwriter" means each underwriter of the 2017 Restructuring Bonds.

"Unsolicited Ratings" means ratings on the 2017 Restructuring Bonds issued by an NRSRO other than the NRSRO hired by the seller.

"Upfront Financing Cost" means the expenses associated with preparing and obtaining approval of Financing Order No. 5, the funding of the Operating Reserve Subaccount, the Debt Service Reserve Subaccount and the fees and expenses associated with the structuring, marketing and issuance of the 2017 Restructuring Bonds, including counsel fees payable by the Authority, the Issuer or the Underwriters, advisory fees payable by the Authority, underwriting fees and expense, original issue discount, rating agency fees, Trustee fees (including counsel fees), escrow agent fees, accounting and auditing fees, printing and marketing expenses, compliance fees, filing fees, listing fees, bond issuance charges, fees and expenses of the Authority's advisors and outside counsel, any taxes or payments in lieu of taxes payable by the Issuer or the Authority with respect to the issuance of the 2017 Restructuring Bonds or the sale of the 2017 Restructuring Property and the amounts advanced by the Authority for the payment of any of the foregoing.

"Upfront Financing Costs Subaccount" means one of the four subaccounts of the Collection Account.

"Voluntary Mid-Year True-Up Adjustment" means the adjustment to the 2017 Restructuring Charges made if after the Mid-Year Review the Servicer determines that a Mandatory Mid-Year True-Up is not required by nevertheless voluntarily elects to file a Notice of Adjustment (i) to correct for any over-collections to date and anticipated to be experienced up to the end of the following Mid-Year Calculation Period and (ii) to ensure that the expected collections of the Charge are adequate to pay timely principal and interest on the Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs, in each case during such Mid-Year Calculation Period.  The adjustment will become effective on May 15 of such year as the Servicer files its Adjustment Notice.

"Written Notice", "written notice" or "notice in writing" means notice in writing which may be delivered by hand or first class mail and also means electronic transmission.

**APPENDIX B**

**PROPOSED FORM OF APPROVING OPINION OF BOND COUNSEL**

**[LETTERHEAD OF HAWKINS DELAFIELD & WOOD LLP]**

November __, 2017

Utility Debt Securitization Authority
c/o Long Island Power Authority
333 Earle Ovington Blvd.
Uniondale, NY  11553

Ladies and Gentlemen:

We have acted as Bond Counsel to the Utility Debt Securitization Authority (the "Bond Issuer") in connection with the issuance of $369,465,000 Restructuring Bonds, Series 2017 (the "Bonds") by the Bond Issuer, a special purpose corporate municipal instrumentality of the State of New York (the "State") constituting a body corporate and politic, a political subdivision of the State and a public benefit corporation. In such capacity, we have examined such law and such certified proceedings, certifications, and other documents as we have deemed necessary to render this letter. In such examination, we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals and the conformity with originals of all documents submitted to us as copies thereof.

The Bonds are authorized and issued pursuant to Part B of Chapter 173, Laws of New York, 2013, as amended (the "Act"), a resolution of the Bond Issuer adopted September 29, 2017 (the "Resolution"), and a Bond Indenture, dated as of November __, 2017 (the "Bond Indenture"), by and between the Bond Issuer and The Bank of New York Mellon, as trustee (the "Bond Trustee").  The Bonds are dated, mature, are payable, bear interest and are subject to redemption, all as provided in the Bond Indenture.

Capitalized terms used herein and not defined herein are used as defined in the Bond Indenture.

We have relied, with your consent, upon the opinion of Buchanan Ingersoll & Rooney PC, counsel to the Trustee, as to the enforceability of the Bond Indenture against the Trustee.

Subject to the foregoing, we are of the opinion that:

1.      The Bond Issuer is duly created and is validly existing as a special purpose corporate municipal instrumentality, constituting a body corporate and politic, a political subdivision of the State and a public benefit corporation, under the laws of the State, including the Act.  Under the laws of the State, including the Constitution of the State, and under the Constitution of the United States, the Act is valid with respect to all provisions thereof material to the subject matters of this opinion letter.

2.      Pursuant to the Act, the Bond Issuer has the power and authority to adopt the Resolution, to execute and deliver the Bond Indenture, the Sale Agreement, the Servicing Agreement and the Administration Agreement and to issue the Bonds.

3.      The Resolution has been duly adopted by the Bond Issuer.

4. The Bond Indenture has been duly authorized, executed and delivered by the Bond Issuer and is a valid and binding agreement of the Bond Issuer, enforceable against the Bond Issuer in accordance with its terms.

5. The Bonds have been duly and validly authorized and issued by the Bond Issuer in accordance with provisions of the Act and the Bond Indenture and are valid and binding obligations of the Bond Issuer, payable only out of the Collateral pledged for such payment by the Bond Issuer under the Bond Indenture, subject to the provisions of the Bond Indenture permitting the prior application of moneys held under the Bond Indenture for the purposes and on the terms and conditions set forth therein.

6. By operation of subdivision 2 of Section 7 of the Act, the provisions of the Bond Indenture create a first priority Statutory Lien on the Collateral in favor of the Bond Trustee for the benefit of the Bondholders, and the Statutory Lien is valid, perfected and enforceable against the Bond Issuer and all third parties without any further public notice. The description of the Restructuring Property in the Bond Indenture is sufficient for purposes of the Statutory Lien and the Act.

7. Pursuant to the Act, no Bond shall constitute a debt, general obligation or a pledge of the faith and credit or taxing power of the State or of any county, municipality or any other political subdivision, agency or instrumentality of the State. The Act further provides that the issuance of the Bonds does not obligate the State or any county, municipality or any other political subdivision, agency or instrumentality of the State to levy any tax or make any appropriation for payment of the principal of or interest on the Bonds.

8. The Sale Agreement, the Servicing Agreement and the Administration Agreement (the "Ancillary Agreements") are valid and binding agreements of the Bond Issuer, enforceable against the Bond Issuer in accordance with their respective terms.

9. Any authorization by, registration with, consent of, or approval by, any governmental agency, board, or commission that is necessary for the execution, delivery and issuance by the Bond Issuer of the Bonds, and the execution and delivery by the Bond Issuer of the Bond Indenture and the Ancillary Agreements, has been obtained.

10. Under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described below, (i) interest on the Bonds is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering the opinions in this paragraph 10, we have relied upon and assumed (i) the material accuracy of the representations, statements of intention and reasonable expectations, and certifications of fact, contained in the Tax Certificates delivered on the date hereof by the Bond Issuer, the Authority and LIPA with respect to the use of proceeds of the Bonds and the investment of certain funds, and other matters affecting the exclusion of interest on the Bonds from gross income for federal income tax purposes under Section 103 of the Code, and (ii) compliance by the Bond Issuer, the Authority and LIPA with procedures and covenants set forth in such Tax Certificates and with the tax covenants set forth in the Bond Indenture, the Sale Agreement and the Servicing Agreement as to such matters. Under the Code, failure to comply with such procedures and covenants may cause the interest on the Bonds to be included in gross income for federal income tax purposes, retroactive to the date of issuance of the Bonds, irrespective of the date on which such noncompliance occurs or is ascertained.

11. Under existing statutes, interest on the Bonds is exempt from personal income taxes imposed by the State or any political subdivision thereof (including The City of New York), and the Bonds are exempt from all taxation directly imposed thereon by or under the authority of the State, except estate or gift taxes and taxes on transfers.

We call your attention to the fact that the enforceability of rights and remedies with respect to the Bonds, the Bond Indenture and the Ancillary Agreements may be limited by bankruptcy, insolvency, reorganization,

moratorium, fraudulent transfer and other laws relating to or affecting the rights of creditors generally, whether heretofore or hereafter enacted, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), including that the availability of specific performance or injunctive relief is subject to the discretion of the court before which any such proceeding is brought.

Except as stated in paragraphs 10 and 11 above, we express no opinion regarding any other federal or state tax consequences with respect to the Bonds. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion from gross income for federal income tax purposes of interest on the Bonds, or under state and local tax law.

We express no opinion herein as to the accuracy, adequacy, sufficiency or completeness of any financial or other information that has been or will be supplied to purchasers or prospective purchasers of the Bonds.

This letter is rendered solely with regard to the matters expressly opined on above and does not consider or extend to any documents, agreements, representations or other material or matters of any kind not specifically opined on above. No other opinions are intended nor should they be inferred.

This letter is issued as of the date hereof, and we assume no obligation to update, revise or supplement this letter to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law, or in interpretations thereof, that may hereafter occur, or for any other reason whatsoever.

Very truly yours,

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX C

## PROPOSED FORM OF OPINION OF BOND COUNSEL
## RELATING TO NEW YORK AND FEDERAL CONSTITUTIONAL MATTERS

### [LETTERHEAD OF HAWKINS DELAFIELD & WOOD LLP]

November __, 2017

To Each Person Listed on
the Attached Schedule I

  Re: Utility Debt Securitization Authority Restructuring Bonds;
     Certain Federal and New York State Constitutional and Statutory Issues

Ladies and Gentlemen:

  We have acted as bond counsel to the Utility Debt Securitization Authority (the "Bond Issuer") and the Long Island Power Authority (the "Authority") in connection with the issuance of the Bond Issuer's Utility Debt Restructuring Bonds, Series 2017 (the "Bonds") described below, the proceeds of which will be used by the Bond Issuer to purchase from the Authority all of the Authority's right, title and interest in certain restructuring property (as so transferred, the "Restructuring Property"), as more fully described below, and the other related transactions referred to and described below.

  The Bonds will be secured by a statutory lien on and a security interest in the Restructuring Property, together with certain other property of the Bond Issuer. Generally, "restructuring property" is a property right created under Part B of Chapter 173 of the Laws of New York, 2013, as amended by Chapter 58 of the Law of New York, 2015 (the "Statute"), pursuant to a restructuring cost financing order adopted by the Authority. The Authority approved and adopted Restructuring Cost Financing Order No. 5 on July 26, 2017 (the "Financing Order No. 5"), that, among other things, authorized the creation and sale of the Restructuring Property, which includes the irrevocable right to impose, bill, collect and receive certain non-bypassable transition charges (as adjusted from time to time pursuant to Financing Order No. 5, the "Charges") from all individuals and legally-recognized entities taking electric delivery service in the geographic area within which Long Island Lighting Company, doing business under the name LIPA ("LIPA"), provided electric transmission and distribution service as of July 29, 2013 (such individuals and entities, the "Customers," and such geographic area, the "Service Area").

  The Bond Issuer was created by Section 4 of the Statute on July 29, 2013, as a special purpose corporate municipal instrumentality, body corporate and politic, political subdivision and public benefit corporation of the State of New York (the "State").

### THE TRANSACTION

  On the date hereof, the Authority is selling the Restructuring Property to the Bond Issuer under the Restructuring Property Purchase and Sale Agreement dated as of November __, 2017, between the Authority and the Bond Issuer and the related Bill of Sale dated November __, 2017 (such Sale Agreement and Bill of Sale, together, the "Sale Agreement"), for an amount in cash. Under the Restructuring Property Servicing Agreement dated as of November __, 2017, between the Authority, in its capacity as Servicer, and the Bond Issuer (the "Servicing Agreement"), the Authority has agreed to service the Restructuring Property. Under the Administration Agreement

dated as of November ___, 2017, between LIPA, as Administrator (the "Administrator"), and the Bond Issuer, the Administrator has agreed to perform certain administrative services on behalf of the Bond Issuer (the "Administration Agreement").

On the date hereof, the Bond Issuer is issuing the Bonds under the Bond Indenture dated as of November ___, 2017 (the "Indenture"), between the Bond Issuer and The Bank of New York Mellon, as Indenture Trustee (the "Indenture Trustee"). The Charges are the only source of payment of debt service on the Bonds under the Indenture other than a debt service reserve fund initially funded with Bond proceeds.

Pursuant to the Bond Purchase Agreement dated October 25, 2017 (the "Bond Purchase Agreement"), between the Bond Issuer and RBC Capital Markets LLC, as representative of the several underwriters named therein, such underwriters have agreed to purchase the Bonds from the Bond Issuer.

As used herein, the term "Transaction Documents" means, collectively, the Sale Agreement, the Servicing Agreement, the Administration Agreement, the Bonds, the Indenture and the Bond Purchase Agreement, and "Transaction" means the transactions contemplated by the Transaction Documents. Capitalized terms used herein that are not otherwise defined shall have the meanings assigned to them in the Indenture.

## FACTS AND ASSUMPTIONS

In connection with the opinions set forth below, we have examined and relied upon originals or copies, certified or otherwise identified to our satisfaction, of the following:

a) the Statute;

b) Financing Order No. 5;

c) the Transaction Documents; and

d) such other documents relating to the Transaction as we have deemed necessary or advisable as a basis for such opinions.

We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such records of the Authority, LIPA and the Bond Issuer, agreements, certificates of public officials, certificates of officers, trustees or other representatives of the Authority, LIPA, the Bond Issuer and others, and such other documents, certificates and records as we have deemed necessary or appropriate as a basis for the opinions set forth herein. We have made no independent investigation of the facts referred to herein, and with respect to such facts, we have relied, for the purpose of rendering the opinions set forth herein and except to the extent any such information constitutes a statement of legal conclusion expressed in such opinions or as otherwise stated herein, exclusively on the factual statements contained and matters provided for in the documents referenced above, including the factual representations, warranties and covenants contained therein as made by the respective parties thereto and on certificates of the Authority, LIPA and the Bond Issuer and their respective directors or trustees, as the case may be, officers and other representatives and of public officials.

In our examination, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies and the authenticity of the originals of such latter documents. In making our examination of these documents, we have assumed: that each of the parties to such documents is duly organized and validly existing under the laws of its jurisdiction of organization and each party to the Transaction Documents is authorized to do business and is in good standing in each other jurisdiction in which it is required to be authorized to do business; that the parties to such documents had the power, corporate or other, to enter into and perform all obligations thereunder; and the due authorization by all requisite action, corporate or other, the due execution and delivery by the parties of the Transaction Documents, and the validity and binding effect thereof upon such parties and the enforceability thereof against such parties.

We express no opinion herein as to the laws of any jurisdiction other than the federal laws of the United States of America currently in effect and the laws of the State currently in effect.

## OPINIONS REQUESTED

The Authority has requested that we furnish to you our opinions as to:

(1) whether a court would find a compensable taking under the takings clause of the Fifth Amendment of the United States Constitution (the "Federal Takings Clause") if (a) it concludes that the rights of the Bondholders to the Restructuring Property (hereinafter, the "Rights") are property of a type protected by the Federal Takings Clause and (b) the State undertook a repeal or amendment of the Statute or took any other action or failed to take any action required by the New York State Pledge (as defined below) (any such repeal, amendment, action or inaction is herein referred to as an "Impairment Action") after the Bonds are issued but before they are fully paid that, without paying just compensation to the Bondholders, (i) permanently appropriates the Rights or denies all economically productive use of the Rights; or (ii) destroys the Rights, other than in response to emergency conditions; or (iii) substantially reduces, alters or impairs the value of the Rights, if the law unduly interferes with the Bondholders' reasonable investment-backed expectations;

(2) whether a court would find a compensable taking under the takings clause of Article 1, Section 7 (the "State Takings Clause") of the Constitution of the State (the "State Constitution") if (a) it concludes that the Rights are property of a type protected by the State Takings Clause and (b) the State engages in an Impairment Action that, without paying just compensation to the Bondholders, (i) permanently appropriates the Rights or denies all economically productive use of the Rights; or (ii) destroys the Rights, other than in response to emergency conditions; or (iii) substantially reduces, alters or impairs the value of the Rights, if the law unduly interferes with the Bondholders' reasonable investment-backed expectations;

(3) whether the New York State Pledge (as defined below) and the State Bankruptcy Pledge (as defined below) create a contractual relationship between the State and the Bondholders;

(4) whether the Bondholders could successfully challenge under the Contract Clause of the United States Constitution the constitutionality of (i) an Impairment Action that limits, alters, impairs or reduces the value of the Restructuring Property or the Charges prior to the time that the Bonds are fully paid and discharged or (ii) any action by the State that limits or alters the denial of authority to the Bond Issuer to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code (any such action is herein referred to as a "Bankruptcy Authority Action");

(5) whether preliminary injunctive relief would be available under federal law to delay implementation of (i) an Impairment Action that limits, alters, impairs or reduces the value of the Restructuring Property or the Charges pending final adjudication of a claim challenging such Impairment Action under the Contract Clause, or (ii) a Bankruptcy Authority Action, and assuming a favorable final adjudication of such claim, whether relief would be available to prevent permanently the implementation of such Impairment Action or Bankruptcy Authority Action;

(6) whether a court would conclude that the New York State Pledge (as defined below) creates rights which are considered to be property within the meaning of the due process clause, Article 1, § 6 (the "State Due Process Clause") of the State Constitution;

(7) whether a court would conclude that Bondholders (or the Bond Trustee on their behalf) could successfully challenge under the State Due Process Clause an Impairment Action, that after the Bonds are issued, but before they are fully paid, (i) permanently appropriates the Rights or denies all economically productive use of the Rights; or (ii) destroys the Rights, other than in response to emergency conditions; or (iii) substantially reduces, alters or impairs the value of the Rights, if the

law unduly interferes with the Bondholders' reasonable investment-backed expectations (other than a law passed by the Senate and Assembly of the State (the "State Legislature") in the valid exercise of the State's police power necessary to safeguard the public, health, safety and welfare);

(8) whether preliminary injunctive relief would be available under State law to delay implementation of an Impairment Action that limits, alters, impairs or reduces the value of the Restructuring Property or the Charges pending final adjudication of a claim challenging such Impairment Action under the State Due Process Clause and assuming a favorable final adjudication of such claim, whether relief would be available to prevent permanently the implementation of such Impairment Action;

(9) whether the provisions of the Statute are severable; and

(10) whether voters in the State have authority to amend or repeal the Statute by voter initiatives or referenda.

## PLEDGE AND AGREEMENT OF THE STATE

The Statute provides in Section 9 that the State "pledges to and agrees with" the holders of restructuring bonds, which includes the Bondholders:

> that the state will not in any way take or permit any action that limits, alters or impairs the value of restructuring property or, except as required by the adjustment mechanism described in the restructuring cost financing order, reduce, alter or impair transition charges that are imposed, collected and remitted for the benefit of the owners of restructuring bonds, any assignee, and all financing entities, until any principal, interest and redemption premium in respect of restructuring bonds, all ongoing financing costs and all amounts to be paid to an assignee or financing party under an ancillary agreement are paid or performed in full.

(The above-quoted provisions are herein referred to as the "New York State Pledge.") Section 9 also permits any issuer of restructuring bonds "to include the [New York State] pledge ... in the restructuring bonds, ancillary agreements and documentation related to the issuance and marketing of the restructuring bonds." We note that the New York State Pledge is set forth in the Bonds and in the Indenture, that the existence of the New York State Pledge is disclosed in the preliminary and final Official Statements for the Bonds furnished to prospective investors and that the obligation of the Underwriters to purchase the Bonds is conditioned upon the inclusion of the New York State Pledge in the Bonds and in the Indenture.

The Statute also provides in Section 4(3) that "[t]he restructuring bond issuer shall not be authorized to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code" and that the State "pledges, contracts and agrees with owners of restructuring bonds issued by restructuring bond issuer that the state will not limit or alter the denial of authority to the restructuring bond issuer to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code." The foregoing pledge is herein referred to as the "State Bankruptcy Pledge".

## THE FEDERAL TAKINGS CLAUSE

### Discussion of the Federal Takings Clause

The Federal Takings Clause of the Fifth Amendment of the United States Constitution states, "nor shall private property be taken for public use, without just compensation." The Fourteenth Amendment of the United States Constitution makes the Fifth Amendment, including the Federal Takings Clause, applicable to any state action, *Chicago, Burlington & Quincy Railroad Co. v. City of Chicago*, 166 U.S. 226, 240 (1897), which would include actions of both the New York Legislature and the New York Public Authorities Control Board ("PACB"). The Federal

Takings Clause applies to governmental takings of both tangible and intangible property. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984). To the extent relevant here, takings cases can generally be divided into two distinct categories: physical takings, where the government physically occupies, or takes title to, private property, and regulatory takings, where the government regulates the use of private property. *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992). Physical takings cases, even when there has been minimal "permanent physical occupation of real property," generally require that compensation be paid without a specific inquiry into the interests advanced. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 435, 438 n.16 (1982); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). On the other hand, regulatory takings cases, in most instances,[1] necessarily entail "complex factual assessments of the purposes and economic effects of government actions" before a court will award compensation. *Yee*, 503 U.S. at 522-23. *See also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) (noting that the United States Supreme Court has been unable to develop any "set formula" for analyzing and evaluating Federal Takings Clause claims, and that the Court's conclusion will depend largely upon the particular circumstances of a particular case). A claimant in a regulatory takings case will generally recover compensation only if the government has regulated the private property at issue to such a degree that a particular property owner has been deprived of the economic use of that property and "unfairly singled out" to bear a burden that is more properly "borne by the public as a whole." *Yee*, 503 U.S. at 522-23. *See also Armstrong v. United States*, 364 U.S. 40, 49 (1960) (finding that the purpose of the Federal Takings Clause is to restrain the government by, among other things, preventing the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

Regulatory takings can affect two distinct property types: tangible property, such as real property or equipment, and intangible property, such as trade secrets and, presumably, Restructuring Property. In order to determine whether any governmental action triggers a compensable regulatory taking of intangible property under the Federal Takings Clause, a court must determine, first, whether the claimants have a property interest for purposes of the Federal Takings Clause.[2] If so, the court must then determine whether the government's action effects a compensable taking of that protected property interest. *Ruckelshaus*, 467 U.S. at 1000-01.[3]

A court's response to a Federal Takings Clause challenge will be affected by the nature of any Impairment Action. An Impairment Action with respect to the Bonds could take many forms, including, among others, legislation that (i) repeals the New York State Pledge, (ii) invalidates the imposition of the Charges or (iii) changes the regulatory framework for setting utility rates in such a way that the change adversely impacts the collection of the Charges. A discussion of applicable principles that courts have applied in analyzing the effect of an alleged taking follows.

### A. Is there a property interest for purposes of the Federal Takings Clause?

The United States Supreme Court has held that property other than real property and tangible personal property is entitled to the protections afforded by the Federal Takings Clause. *Ruckelshaus*, 467 U.S. at 1003. An independent source, such as state law or existing rules, however, and not the United States Constitution, must create the protected property right. *Ruckelshaus*, 467 U.S. at 1001; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980); *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). In *Ruckelshaus*, the Court determined that trade secrets that are cognizable under state law constitute property rights for purposes of the Federal Takings Clause, noting that:

---

[1] The United States Supreme Court has recognized, however, that in regulatory takings cases where a governmental regulation permanently deprives a property owner of all "economically beneficial or productive use of land," a *per se* compensable taking exists which warrants compensation without any complex analysis. *Lucas*, 505 U.S. at 1015. The Court, however, has declined to apply this hard and fast rule to regulatory takings which may temporarily deprive a property owner of all economically beneficial or productive use of land. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002).

[2] The existence of a protected property interest would generally be assumed and, therefore, would not be a significant issue, for courts assessing Federal Takings Clause claims involving real property and tangible personal property.

[3] A court would not reach these issues unless the purported taking is for public use, or is rationally related to a conceivable public purpose, because the State does not have the power to take a private citizen's property except for public use or such a public purpose. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 231-32, 240 (1984).

the Court has found other kinds of intangible interests to be property for purposes of the Fifth Amendment's Taking Clause. *See, e.g., Armstrong v. United States*, 364 U.S. 40, 44, 46 (1960) (materialman's lien provided for under Maine law protected by Taking Clause); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 596-602 (1935) (real estate lien protected); *Lynch v. United States*, 292 U.S. 571, 579 (1934) (valid contracts are property within meaning of the Taking Clause).

467 U.S. at 1003. *See also, Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310 (1989) (recognizing that a utility's right to a fair return on investment is a property right for purposes of the Federal Takings Clause); *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003) (finding that a state law requiring that interest on lawyers' trust fund accounts be transferred to a separate account to pay for legal services for the needy was more akin to a physical taking of property and thus warranted the application of *per se* rules as opposed to the ad hoc factual analysis of regulatory takings; the Supreme Court had previously held in *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998), that such interest was the private property of the owner of the principal). In holding that an Environmental Protection Agency regulation requiring companies to divulge trade secrets effected a compensable taking with respect to certain trade secrets, the *Ruckelshaus* Court had to determine if the trade secrets constituted a property interest for purposes of the Federal Takings Clause. In this latter connection, the Court noted that "[t]rade secrets have many of the characteristics of more tangible forms of property. A trade secret is assignable…. A trade secret can form the res of a trust, … and it passes to a trustee in bankruptcy." *Ruckelshaus*, 467 U.S. at 1002 (citations omitted). A court should undertake a similar analysis of, and reach a similar conclusion regarding, the Restructuring Property in determining whether it constitutes "property" for purposes of the Federal Takings Clause.

The decision in *U.S. Trust Co. v. New Jersey*, 431 U.S. 1 (1977), involved a legislative covenant, similar in nature to the New York State Pledge, made to Port Authority bondholders by the New Jersey Legislature, pledging that the revenues supporting the subject Port Authority bonds would not be diverted for unauthorized purposes. This covenant was later repealed by the New Jersey Legislature, which repeal the Supreme Court found to impair the contract rights of the bondholders. *U.S. Trust*, 431 U.S. at 19. The Supreme Court then indicated in dicta that "[c]ontract rights are a form of property" that, if taken, would require the payment of just compensation. *Id*. at n.16. Thus, the Bondholders would have a strong argument based on *Ruckelshaus*, *U.S. Trust* and the Statute that the Restructuring Property is "property" warranting the protections afforded by the Federal Takings Clause.[4]

The cases discussed above provide strong support for the position that the Rights are property for purposes of the Federal Takings Clause. As discussed above, the nature of any Impairment Action would, however, certainly influence a court's analysis of whether a compensable taking exists. The factors a court might examine to determine whether such State action would rise to the level of a "taking" are considered below.

        B.     If there is a property interest, does the Impairment Action effect a taking of that property interest for purposes of the Federal Takings Clause?

Once a court determined that the Rights constitute "property" for purposes of the Federal Takings Clause, it would then examine whether the alleged Impairment Action constituted a regulatory taking mandating the payment of just compensation. In *Lingle v. Chevron USA*, 544 U.S. 528, 538-39 (2005), the Supreme Court identified two categories where regulatory action that does not entail a physical taking of property nonetheless constitutes *per se* takings — regulations that involve a permanent physical invasion of property and regulations that deprive the owner of all economically beneficial or productive use of the property — and a third category of other regulatory action that does not constitute *per se* takings.

In the cases that fall into the third category that have asserted a regulatory taking of real property or tangible personal property, the courts have generally made an ad hoc factual determination of the takings allegations based on an examination of the following factors:

---

[4] Indeed, Section 7 of the Statute characterizes Restructuring Property as an existing, present property right, which, while not dispositive, supports the conclusion that the Restructuring Property is property for purposes of the Federal Takings Clause.

1.  the character of the government action;

2.  the economic impact of the regulation; and

3.  the extent to which the regulation interfered with distinct investment-backed expectations.

*Penn Central*, 438 U.S. at 124.

While the *Penn Central* case involved a regulatory taking of tangible property,[5] the United States Supreme Court has also applied these principles when analyzing Federal Takings Clause claims related to intangible property. For instance, in *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986), the Court examined a statute that imposed liability on an employer who withdrew from a multi-employer pension plan to pay to the pension plan the employer's proportionate share of such pension plan's unfunded vested benefits. The Court relied on the factors set forth in *Penn Central* to analyze the takings claim. *Connolly*, 475 U.S. at 224-25. Similarly, in *Ruckelshaus*, the Court applied the *Penn Central* factors to an alleged regulatory taking of "intangible" trade secrets. *Ruckelshaus*, 467 U.S. at 1005. More recently, in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the Court applied the *Penn Central* analysis in its Federal Takings Clause review of a federal statute that charged coal companies that had provided voluntary pension plans for miners with the costs of providing benefits under a new plan.

The first factor of the *Penn Central* analysis — the character of the government action — entails a consideration of whether the action can be characterized as a physical invasion by the government, as opposed, for example, to the implementation of a public program adjusting the benefits and burdens of economic life to promote the common good. *Penn Central*, 438 U.S. at 124. This, in turn, leads some courts to an assessment of the extent to which the government action furthered an important public policy. *Id.* at 127.[6] The second *Penn Central* factor assesses whether the economic impact of the State action rises to the level of serious economic harm. *Id.* at 124.[7] The final *Penn Central* factor examines whether the State action interferes with reasonable investment-backed expectations. *Id.* A reasonable investment-backed expectation must be more than a "mere unilateral expectation or an abstract need." *Webb's Fabulous Pharmacies*, 449 U.S. at 161.

In Federal Takings Clause cases, the United State Supreme Court has analyzed one or more of these factors to varying degrees and in varying ways. For example, in *Connolly*, where the Court ultimately held that there was no taking for purposes of the Fifth Amendment, the Court found that the interference with property rights arose "from a public program that … promotes the common good," not from a physical invasion or permanent appropriation of the assets, and that the legislation in dispute contained a "significant number of provisions" that moderated and mitigated the economic impact of the statute. *Connolly*, 475 U.S. at 225-26. Moreover, the Court found no interference with reasonable investment-backed expectations. *Id.* at 226-27.

Thus, to determine whether a compensable taking had occurred, the court would determine whether to apply principles developed in the real property context to an analysis of the Impairment Action. Those principles would require a determination of whether the Impairment Action denied the Bondholders all economically beneficial or productive use of the Restructuring Property, under circumstances such as a legislative ban on the use of the Restructuring Property for the timely payments of principal and interest on the Bonds. If all economically beneficial

---

[5] In *Penn Central*, the court found that the New York Landmarks Law did not effect a taking of a private property owner's real property where not all of the owner's property was affected by restrictions on use and the State was acting pursuant to its police power.

[6] The simple determination that a government action advances an important public policy is not dispositive, however. Even though all private property is held subject to the sovereign power of the state, including its police power, "if a regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393,415 (1922).

[7] There are certain instances, however, in which the economic impact of the government action is so severe that the claimant is deprived of all economically beneficial or productive use of property. In such instances, the Court has generally held that compensation is warranted. See discussion of *Lucas v. South Carolina Coastal Council* in note 1, above. Even in *Lucas*, however, the Court left open the possibility that even a total elimination of a property's economically productive use was permissible and would not warrant compensation if the regulation or law in question would "duplicate the result that could have been achieved in the courts by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." 505 U.S. at 1029.

or productive use of the Restructuring Property were not denied, the court would undertake an ad hoc factual inquiry by considering the factors enumerated in *Penn Central* in an analysis of the Impairment Action, in which event the court would assess:

        1.      the character of the government action;

        2.      the economic impact of the regulation,[8] including whether the State's action would prevent timely payment of the Bonds; and

        3.      the extent to which the regulation interfered with reasonable investment-backed expectations.

With respect to the Rights, although the character and effect of any future Impairment Action cannot be known at this time, and any such Impairment Action would likely not constitute a physical invasion and, presumably, would ostensibly be in furtherance of an important public policy, any such Impairment Action that prevented the payment of the Bonds would likely be found to have a serious economic impact on the Bondholders. In any event, it seems that an Impairment Action that prevented the timely payment of principal and interest on the Bonds would interfere with the Bondholders' investment-backed expectations because timely payment of the Bonds is the primary expectation of the Bondholders. Additionally, the New York State Pledge itself gives rise to these reasonable investment-backed expectations on the part of the Bondholders. The United States Supreme Court has held that a government "guarantee" of confidentiality could form the basis for such an expectation. *Ruckelshaus*, 467 U.S. at 1011. The Bondholders could argue that they would not have invested in the Bonds in the absence of the government "guarantee" contained in the New York State Pledge and, thus, in accordance with *Ruckelshaus*, the New York State Pledge created reasonable investment-backed expectations. The State has gone to great lengths to give credence to the New York State Pledge, including authorizing its inclusion on the Bonds. Therefore, we believe that it is reasonable for the Bondholders who have invested their funds in the Bonds to expect that the Legislature will honor the New York State Pledge.[9]

### Opinion as to Federal Takings Clause.

Based on our review of relevant judicial authority, as discussed in this opinion, but subject to the qualifications, limitation and assumptions (including the assumption that any Impairment Action would be "substantial") set forth herein, it is our opinion that a reviewing court of competent jurisdiction applying federal law, in a properly prepared and presented case, would conclude that the State would be required to pay just compensation to the Bondholders if the State undertook an Impairment Action in contravention of the New York State Pledge after the Bonds are issued, but before they are fully paid, that (i) constituted a permanent appropriation of a substantial property interest of the Bondholders in the Restructuring Property or denied all economically beneficial or productive use of the Restructuring Property; (ii) destroyed the Restructuring Property, other than in response to so-called

---

[8] Even where the economic impact is severe, compensation may not be required if the action is taken in response to so-called emergency conditions. *See, e.g., United States v. Caltex (Philippines) Inc.*, 344 U.S. 149, 154 (1952) (relying, in part, on the common law, which had "long recognized that in time of imminent peril - such as when fire threatened a whole community - the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved," the court found no taking when the U.S. military destroyed private oil facilities in the Philippines to prevent the Japanese from taking control of the facilities during World War II). *See also Dames & More v. Regan*, 453 U.S. 654 (1981) (no compensable taking resulting from executive order nullifying attachments on Iranian assets and permitting those assets to be transferred out of the country); *United States v. Pacific Railroad*, 120 U.S. 227 (1887) (no compensation required due to exigencies of war when the military destroyed private bridges to prevent the confederates from using them); *American Mfrs. Mut. Ins. Co. v. United States*, 453 F.2d 1380, 1381 (Ct. Cl. 1972) (compensation not required when private vessel was "destroyed as part of the fortunes of war and by actual and necessary military operations in attacking and defending against enemy forces").

[9] Because many factors could have an impact on the market price of the Bonds, maintenance of the market price of the Bonds might be considered a unilateral expectation of the Bondholders, and not a reasonable, investment-backed expectation. *See U.S. Trust Co.*, 431 U.S. at 19. If so, an Impairment Action affecting only this "unilateral expectation" might not constitute a compensable taking.

emergency conditions; or (iii) substantially reduced, altered or impaired the value of the Restructuring Property so as to unduly interfere with the reasonable expectations of the Bondholders arising from their investment in the Bonds.

There can be no assurance, however, that any award of compensation would be sufficient to pay the full amount of principal of and interest on the Bonds.

## THE STATE TAKINGS CLAUSE

Discussion of the State Takings Clause.

The State Takings Clause, in Article 1, Section 7(a) of the State Constitution, provides that, "[p]rivate property shall not be taken for public use without just compensation." Its text is nearly identical to the Federal Takings Clause discussed above. As a result, New York courts have used United States Supreme Court decisions as a basis for their interpretation of the State Takings Clause. *See, e.g, Consumers Union U.S., Inc. v. State of New York*, 5 N.Y.3d 327, 806 N.Y.S.2d 99 (N.Y. 2005), *Birnbaum v. State* 73 N.Y.2d 638, 543 N.Y.S.2d 23 (N.Y.1989), *Putnam County Nat. Bank v. City of New York* 37 A.D.3d 575, 829 N.Y.S.2d 661 (N.Y. App. Div. 2 Dept. 2007). For example, in *Consumers Union*, the New York Court of Appeals, as have many other U.S. and state courts, applied the test used in *Penn. Central* as the basis for its analysis under a State Takings Clause claim. Following *Penn. Central*, once a court determines that the rights constitute "property" for purposes of a takings analysis, it should make an *ad hoc* factual determination of takings allegations based on an examination of (i) the character of the government action; (ii) the economic impact of the regulation; and (iii) the extent to which the regulation interfered with distinct investment-backed expectations. *See Penn. Central,* 438 U.S. at 124. *See, e.g. Consumers' Union,* 5 N.Y.3d 327; *Lingle*, 544 U.S. 528.

As under the Federal Takings Clause, a court's response to a State Takings Clause challenge will be affected by the nature of any Impairment Action. An Impairment Action with respect to the Bonds could take many forms, including, among others, legislation that (i) repeals the New York State Pledge, (ii) invalidates the imposition of the Charges or (iii) changes the regulatory framework for setting utility rates in such a way that the change adversely impacts the collection of the Charges. A discussion of applicable principles that courts have applied in analyzing the effect of an alleged taking follows.

A.     Is there a property interest for purposes of the State Takings Clause?

In order to hold that Impairment Actions constitute a compensable taking, a reviewing court would need to conclude that the Rights are property of a type protected by the State Takings Clause. Courts in New York have found contractual rights to be "property" that merits protection under the State Takings Clause. The Court of Appeals has held that under the State Constitution, the right of a contractor for the performance of a public work to prospective profits under his contract is a species of property within the protection of State Takings Clause. *See Danolds v. State*, 89 N.Y. 36 (N.Y. 1882). The Court of Appeals has also held that a right to plant an oyster bed under public waters is a private right, and that the destruction of the bed by sewage discharged thereon from a sewer of a town is a direct invasion of a private right and taking of private property within the meaning of State Takings Clause. *See Huffmire v. City of Brooklyn* 162 N.Y. 584 (N.Y. 1900). A New York court has also found that ordinances granting town residents exclusive rights to town fisheries constitute "property" that could not be taken without compensation. *See State v. Freeholders and Commonalty of Southampton*, 99 A.D.2d 804, 472 N.Y.S.2D 394 (N.Y. App. Div. 2 Dept. 1984).

New York courts have regularly looked to whether a state action has impaired investment-backed expectations of property owners in order to determine whether a regulatory taking has occurred. *See Consumers Union,* 5 N.Y.3d 327. *See also Matter of Smith v. Town of Mendon*, 4 N.Y.3d 1, 789 N.Y.S.2d 696 (N.Y. 2004). As noted above, it is well established under federal law that investment-backed expectations can be property for the purposes of the takings analysis; however, an independent source, such as state law or existing rules, and not the United States Constitution, must create the protected property right.

In *Patterson v. Carey*, 41 N.Y.2d 714, 395 N.Y.S.2d 411 (N.Y. 1977), the Court of Appeals applied the State Due Process Clause to uphold bondholders' property rights when the State Legislature rescinded an increase in tolls charged motorists by the Jones Beach State Parkway Authority and provided that future increases could not be imposed

unless the Parkway Authority complied with a new four stage review process. Bondholders brought suit asserting that the modification of the toll revenue stream backing their bonds was an unconstitutional deprivation of "property," such property being not only rights relating to the imposition of tolls and their collection, but also the State pledge itself. The New York Court of Appeals held in their favor, finding that the State had violated the State Due Process Clause. See *Patterson,* 41 N.Y.2d 720. Although the case was decided under the State Due Process Clause, it would be reasonable to expect similar reasoning as to the existence of a property interest with respect to a claim brought under the State Takings Clause.

More directly, the Statute expressly creates the Restructuring Property as a property right under State law for purposes of the Transaction: "Restructuring property shall constitute a vested, presently existing property right notwithstanding the fact that the value of the property right will depend on further acts that have not yet occurred, including but not limited to, consumers remaining or becoming connected to the (T&D) system assets and taking electric delivery service, the imposition and billing of transition charges, or, in those instances where consumers are customers of LIPA or any successor owner of the T&D system assets, such owner performing certain services." 2013 N.Y. LAWS ch. 173 §2 ¶13. *See also* 2013 N.Y. LAWS ch. 173 §7(1)(a).

The cases discussed above, together with the Statute, provide strong support for the position that the rights of the Bondholders in the Restructuring Property are property for purposes of the State Takings Clause. As discussed, however, the nature of any Impairment Action would certainly influence a court's analysis of whether a compensable taking exists. Some of the factors a court might examine to determine whether such State action would rise to the level of a "taking" are considered below.

      B.  If there is a property interest, does the Impairment Action effect a taking of that property interest for purposes of the State Takings Clause?

In determining whether an Impairment Action constitutes a taking, a reviewing court would evaluate the nature of the governmental action and weigh the public purpose served thereby against the degree to which it interferes with bondholders' "legitimate property interests" or distinct "investment-backed expectations." *Consumers Union,* 5 N.Y.3d at 358. "Governmental regulation of private property effects a taking if it is so onerous that its effect is tantamount to a direct appropriation or ouster." *Id* at 357. In *Patterson,* the Court of Appeals based its determination under the State Due Process Clause partly on investors' expectations, finding that "[s]ince the toll is the sole source of funds for bond repayment, any limitation on the authority's power to collect a toll sufficient to pay the bonds deprive[d] the bondholders of an essential attribute of their contract with the authority and with the State and jeopardize[d] their investment." *Patterson,* 41 N.Y.2d at 720.

As discussed above, although the United States Supreme Court has indicated that regulatory actions generally will be deemed *per se* takings for Fifth Amendment purposes where government requires an owner to suffer a permanent physical invasion of her property, *see Loretto,* 458 U.S. 419, or where regulations completely deprive an owner of "all economically beneficial us[e]" of her property, *Lucas,* 505 U.S. at 1019, the *Consumers Union* court suggested that the application of *Loretto* is limited to a "direct physical invasion" of property. *See Consumers Union,* 5 N.Y.3d at 359. Moreover, because the three inquiries reflected in *Loretto, Lucas,* and *Penn Central* all aim to identify regulatory actions that are functionally equivalent to a direct appropriation of or ouster from private property, each of them focuses upon the severity of the burden that government imposes upon property rights. *See Lingle,* 544 U.S. at 530. A New York court would be unlikely to find a compensable taking without an inquiry into the nature of any Impairment Action, balanced against investment-backed expectations of Bondholders.

Bondholders would have a strong argument that distinct, investment-backed obligations were formed by the Statute, which contains the New York State Pledge providing that the State will not in any way take or permit any action that limits, alters or impairs the value of the Restructuring Property or, except as required by the adjustment mechanism described in Financing Order No. 5, reduce, alter or impair Charges until all principal, interest and redemption premium, if any, in respect of the Bonds, all Ongoing Financing Costs and all amounts to be paid to an assignee or financing party under an ancillary agreement are paid or performed in full. Among other factors which might be noted in support of such an argument, the New York State Pledge is included in the Bonds and in the Indenture as part of an express contract with the holders of the Bonds. The New York State Pledge is also described

in the Official Statement and the inclusion of the New York State Pledge in the Indenture and the Bonds is a condition to the obligation of the underwriters to purchase the Bonds under the Bond Purchase Agreement.

If the State enacts a law that imposes an Impairment Action without paying just compensation to the Bondholders, the Bondholders would likely argue that they would not have invested in the Bonds in the absence of the State's undertaking contained in the New York State Pledge and, therefore, that the New York State Pledge created distinct, investment-backed expectations. *See Consumers' Union,* 5 N.Y.3d at 327.

To determine whether a compensable taking had occurred, a reviewing court would consider applying principles developed in the land use context to an analysis of the rights of the Bondholders. Those principles would require an analysis of whether the State action denied the Bondholders all economically beneficial or productive use of the rights, such as preventing the use of the Rights to pay the Bonds. *See Consumers' Union,* 5 N.Y.3d at 327 (applying principles developed in *Lingle* and *Penn. Central*).

A court's response to a State Takings Clause challenge will be affected by the nature of the action taken to impair the Rights, which could include legislation that: (i) repeals or alters the New York State Pledge; (ii) prevents the imposition of the Charges; (iii) revises the regulatory basis for establishing the Charges in such a way that adversely impacts the collection of the Charges; (iv) diverts the Rights from payment of the Bonds to other public purposes; or (v) adversely affects the assets that generated the Charges.

Because the New York jurisprudence has suggested that an inquiry into Bondholders' investment-backed expectations is necessary for a takings determination, our opinion assumes that an Impairment Action, by its nature, would impact the economic interests of Bondholders with a magnitude sufficient to constitute an undue interference with Bondholders' economic interests and Bondholders' distinct, investment-backed expectations.

As discussed above in connection with the Federal Takings Clause, it seems that an Impairment Action that prevented the timely payment of principal and interest on the Bonds would interfere with the Bondholders' investment-backed expectations because timely payment of the Bonds is the primary expectation of the Bondholders. Additionally, as discussed above, the New York State Pledge itself gives rise to these reasonable investment-backed expectations on the part of the Bondholders. Therefore, for the reasons discussed above, we believe that it is reasonable for the Bondholders who have invested their funds in the Bonds to expect that the State Legislature will honor the New York State Pledge.[10]

However, New York courts have concluded that the just compensation which the State Constitution, Article I, Section 7(a), requires to be paid to the owner of property taken under the power of eminent domain cannot be reduced to inflexible formulas or inexorable rules. *See Saratoga Water Services, Inc. v. Saratoga County Water Authority,* 83 N.Y.2d 205, 608 N.Y.S.2d 952 (N.Y. 1994) referencing *Matter of City of New York (Fifth Ave. Coach Lines),* 18 N.Y.2d 212, 218, 273 N.Y.S.2d 52 (N.Y. 1966). Although the Court of Appeals has stated that "just compensation puts the property owner in the same relative position it would have enjoyed had the taking not occurred," *520 East 81st Street Associates v. State,* 99 N.Y.2d 43, 750 N.Y.S.2d 833 (N.Y. 2002), there can be no assurance that any award of just compensation by a reviewing court would be sufficient to pay the full amount of principal of and interest on the Bonds.

Opinion as to State Takings Clause

Based on our review of relevant judicial authority, as discussed in this opinion, but subject to the qualifications, limitation and assumptions (including the assumption that any Impairment Action would be "substantial") set forth herein, it is our opinion that a reviewing court of competent jurisdiction applying New York law, in a properly prepared and presented case, would conclude that the State would be required to pay just compensation to the Bondholders if the State undertook an Impairment Action in contravention of the New York State

---

[10] Because many factors could have an impact on the market price of the Bonds, maintenance of the market price of the Bonds might be considered a unilateral expectation of the Bondholders, and not a reasonable, investment-backed expectation. *See U.S. Trust Co.,* 431 U.S. at 18. If so, an Impairment Action affecting only this "unilateral expectation" might not constitute a compensable taking.

Pledge after the Bonds are issued, but before they are fully paid, that (i) constituted a permanent appropriation of a substantial property interest of the holders of the Bonds in the Restructuring Property or denied all economically beneficial or productive use of the Restructuring Property; (ii) destroyed the Restructuring Property, other than in response to so-called emergency conditions; or (iii) substantially reduced, altered or impaired the value of the Restructuring Property so as to unduly interfere with the reasonable expectations of the holders arising from their investment in the Bonds.

There can be no assurance, however, that any award of compensation would be sufficient to pay the full amount of principal of and interest on the Bonds.

## **THE FEDERAL CONTRACT CLAUSE**

### Discussion of the Federal Contract Clause

The Contract Clause of the United States Constitution, Article I, Section 10, provides that "no State shall … pass any … Law impairing the Obligation of Contracts" (the "Federal Contract Clause"). The Federal Contract Clause protects contractual obligations from impairment by enactment of state law. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978); *U.S. Trust Co. v. New Jersey*, 431 U.S. 1 (1977). The Federal Contract Clause is not, however, a complete bar to legislative enactments that have the effect or consequence of altering contractual obligations. "Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state [action]." *Allied Structural Steel*, 438 U.S. at 245 (footnotes omitted). If the state regulation constitutes a substantial impairment, to survive constitutional scrutiny it must be justified by a significant and legitimate public purpose. *Energy Reserve Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *U.S. Trust*, 431 U.S. at 22). Once a legitimate public purpose has been identified, the next inquiry is whether the measure is based "upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id*. at 412. In such inquiry, courts defer to the legislature's judgment as to the necessity and reasonableness of the measure. *U.S. Trust*, 431 U.S. at 23. Moreover, "[t]he State has the 'sovereign right … to protect the … general welfare of the people'" and the courts must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary." *El Paso v. Simmons*, 379 U.S. 497, 508–09 (1965) (citation omitted).

In order for the Federal Contract Clause to apply, the existence of a contractual relationship must be established. The courts have recognized the general presumption that, absent some clear indication that a legislature intends to bind itself contractually, "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) (quoting *Dodge v. Board of Educ.*, 302 U.S. 74, 79 (1937)). This presumption is based on the fact that the legislature's principal function is not to make contracts, but to make laws that establish the policy of the State. Thus, a person asserting the creation of a contract with the State must overcome this presumption.

Although not dispositive, the United States Supreme Court in *U.S. Trust* has concluded that a legislative pledge in a New Jersey statute that was similar to the New York State Pledge and the State Bankruptcy Pledge constituted a contractual obligation of the state:[11] "The intent to make a contract is clear from the statutory language. 'The 2 States covenant and agree with … the holders of any affected bonds …' 1962 N.J. Laws, c. 8, s 6." *U.S. Trust*, 431 U.S. at 18. The Court went on to state in that case that "[i]n return for their promise, the States received the benefit they bargained for: public marketability of Port Authority bonds to finance construction of the World Trade Center and acquisition of the Hudson & Manhattan Railroad. We therefore have no doubt that the 1962 covenant has been properly characterized as a contractual obligation of the two States." *Id*.[12]

---

[11] In *U.S. Trust*, the Supreme Court held that the legislative alteration of the rights and remedies of Port Authority bondholders violated the Federal Contract Clause because the legislation was neither necessary nor reasonable. 431 U.S. at 32.

[12] The Court did note, however, that "[t]he States remain free to exercise their power of eminent domain to abrogate such contractual rights, upon payment of just compensation." *U.S. Trust*, 431 U.S. at 29 n.27.

The "reserved powers" doctrine limits the ability of the State to bind itself contractually in a manner which "surrenders an essential attribute of its sovereignty." *U.S. Trust*, 431 U.S. at 23. Under this doctrine, if a contract limits a state's "reserved powers" - powers that cannot be contracted away - such contract is essentially unenforceable. *Id. See generally United States v. Winstar Corp.*, 518 U.S. 839, 888-90 (1996). Although the scope of these "reserved powers" has not been precisely defined by the courts, case law has established that a state cannot contract away its police powers, *Stone v. Mississippi*, 101 U.S. 814, 817-18 (1880), or its power of eminent domain, *West River Bridge Co. v. Dix.*, 47 U.S. 507, 532-33 (1848). In contrast, the United States Supreme Court has stated that a state's "power to enter into effective financial contracts cannot be questioned." *U.S. Trust*, 431 U.S. at 24.

Under existing case law, neither the New York State Pledge nor the State Bankruptcy Pledge, in our view, limit any "reserved powers" of the State. Neither the New York State Pledge nor the State Bankruptcy Pledge purports to contract away, or constitute a waiver of, the State's power of eminent domain or otherwise restrict the State's ability to legislate for the public welfare or to exercise its police powers. Both the New York State Pledge and the State Bankruptcy Pledge constitute undertakings made by the State not to impair the financial security for the Bonds and was made to gain the capital markets' acceptance of such instruments, which are expressly authorized and are being issued in connection with New York legislation expected to result in cost savings to LIPA's customers. The New York State Pledge, which the Statute explicitly authorizes to be included in the documentation with respect to the Bonds, as well as the State Bankruptcy Pledge, are inducements offered by the State to investors to purchase the Bonds. As such, we believe that the New York State Pledge and the State Bankruptcy Pledge are akin to the type of "financial contract" involved in *U.S. Trust*, which was deemed by the United States Supreme Court to be a promise that revenues and reserves securing the bonds at issue there would not be depleted beyond a certain level. *Id.* at 25. Therefore, upon issuance of the Bonds, it is our opinion that each of the New York State Pledge and the State Bankruptcy Pledge will give rise to a contractual obligation between the State and the Bondholders for purposes of the Contract Clause.

We also believe that the prohibitions applicable to the State under the Federal Contract Clause would apply to actions by the State acting through the PACB. The New York Legislature has delegated certain of its regulatory powers over the Authority and LIPA to the PACB; however, we do not believe that the State, acting indirectly through an agency such as the PACB, could take any action that would substantially limit, alter, impair or reduce the value or amount of the Restructuring Property or the rights of the Bondholders, or that would limit or alter the denial of authority to the Bond Issuer to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code, that the State could not take directly without violating its pledge.

### Injunctive Relief

In order for a federal court to issue a preliminary injunction, the court must conclude that a petitioner has clearly demonstrated each of the following: (1) that he or she is likely to succeed on the merits; (2) that he or she will suffer irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). While each of these requirements must be met for a preliminary injunction to be issued, in *Winter*, the Supreme Court emphasized the fourth requirement, stating: "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 376-77 (internal quotation marks and citation omitted).

Additionally, the Second Circuit Court of Appeals has developed an alternative standard in order to provide "flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Under this alternative standard, the party seeking relief must show "irreparable harm and… sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* The Second Circuit has stated that the burden under their standard is "no lighter" than under the *Winter* standard, but allows for preliminary injunctions when a court "cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.*

In a challenge to an Impairment Action or a Bankruptcy Authority Action in federal court, the court, in determining whether to grant a permanent injunction, would apply substantially similar factors as it would for a preliminary injunction. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531 (1987); *National City Bank of Indiana, et al., v. Charles W. Turnbaugh,* 367 F. Supp. 2d 805 (D. MD. 2005). However, unlike in connection with a preliminary injunction, where a plaintiff needs only to show a likelihood of a success on the merits, for a court to grant a permanent injunction, a plaintiff must succeed on the merits. *Amoco Production Co.,* 480 U.S. at 546 n.12 (1987).

Opinion as to Federal Contract Clause

While there is no case law which considers the application of the Federal Contract Clause specifically to the Statute, we have considered existing case law concerning the application of the Federal Contract Clause to legislation which reduces or eliminates taxes, public charges or other sources of revenues which support bonds issued by public instrumentalities or private issuers, or which otherwise reduces or eliminates the security for bonds. Based upon our review of relevant judicial authority, as discussed in this opinion, but subject to the qualifications, limitations and assumptions (including the assumption that any Impairment Action would be "substantial") set forth herein, it is our opinion that a reviewing court of competent jurisdiction, in a properly prepared and presented case:

(i) would conclude that each of the New York State Pledge and the State Bankruptcy Pledge constitutes a contractual relationship between the Bondholders and the State;

(ii) would conclude that, absent a demonstration that the Impairment Action or the Bankruptcy Action was necessary to further a significant and legitimate public purpose, the Bondholders (or the Indenture Trustee on their behalf) could successfully challenge under the Federal Contract Clause the constitutionality of (a) any Impairment Action determined by such court to substantially limit, alter, impair or reduce the value of the Restructuring Property or the Charges before the Bonds are fully paid and discharged and (b) any Bankruptcy Authority Action; and

(iii) should conclude that permanent injunctive relief is available under federal law to prevent implementation of (a) any Impairment Action determined by such court to limit, alter, impair or reduce the value of the Restructuring Property or the Charges or (b) any Bankruptcy Authority Action, in each case in violation of the Federal Contract Clause; and although sound and substantial arguments support the granting of preliminary injunctive relief, the decision to do so will be in the discretion of the court requested to take such action, which will be exercised on the basis of the considerations discussed herein.

## THE STATE DUE PROCESS CLAUSE

Discussion of State Due Process Clause

Article I, Section 6 of the State Constitution provides that: "No person shall be deprived of life, liberty or property without due process of law."

Certain contract rights have been held to be protected by the State Due Process Clause. In *Patterson,* the Court of Appeals applied the State Due Process Clause to uphold bondholders' property rights when the State Legislature rescinded an increase in tolls charged motorists by the Jones Beach State Parkway Authority and provided that future increases could not be imposed unless the Parkway Authority complied with a new four stage review process. According to the *Patterson* court, "the statute deprive[d] the bondholders of property without due process of law in violation of the State Constitution." *Id.* at 719-720.

"Quite apart from any question presented by the Federal impairment clause, the State may not deprive a party to a contract of an essential contractual attribute without due process of law. 'Depriving an owner of property of one of its essential attributes, is depriving him of his property within the constitutional provision' and absent due process, works an impermissible 'forfeiture of the right given by the contract.'" *Patterson,* 41 N.Y.2d at 720 (*citing People ex rel. Manhattan Sav. Inst. of City of N.Y. v. Otis*, 90 N.Y. 48, 52). In *People ex rel. Manhattan Savings Institution,* the legislation at issue attempted to invalidate claims against a bond issuer upon lost bearer bonds by anyone but the recipient of a duplicate bond even though good faith holders in due course presented the negotiable bonds for payment.

Such possessors of lost bonds were remitted to suing the recipients of the duplicate. This legislative scheme was invalidated as a deprivation of an essential attribute of the bondholder's rights:

> "a legislative declaration that upon the publication of notice, a negotiable security shall no longer be transferable, is not due process of law, working a forfeiture of the right given by the contract."

*People ex rel. Manhattan Sav. Inst. of City of N.Y.*, 90 N.Y. at 52.

*Patterson* protected the contractual commitment of the Parkway Authority to raise and collect sufficient tolls to punctually pay and redeem the Parkway Authority's bonds. Because the tolls in *Patterson* were "the sole source of funds for bond repayment," the Court explained that "any limitation on the authority's power to collect a toll sufficient to pay the bonds deprives the bondholders of an essential attribute of their contract with the authority and with the State and jeopardizes their investment." *Patterson,* 41 N.Y.2d at 720.

In addition to the affirmative promise of the Parkway Authority to raise and collect sufficient tolls to pay bondholders, the State had itself pledged "not to limit or alter the rights vested in the authority to the detriment of bondholders." *Id.* at 717. The *Patterson* court stated that "[w]here a statute is challenged on non-procedural grounds as violative of due process, the test is whether there is 'some fair, just and reasonable connection' between the statute and 'the promotion of the health, comfort, safety and welfare of society." *Id.* at 720-21. Finding that there was no fair, just or reasonable connection between the statutory procedure for increasing tolls and the goal of curtailing traffic congestion, the Court ruled: "the statute is arbitrary and deprives bondholders of a contractual right without due process of law." *Patterson,* 41 N.Y.2d at 721.

The Bondholders would have a very strong argument based on *Patterson* and the plain meaning of the Statute that the New York State Pledge is "property" warranting the protections afforded by the State Due Process Clause.

As was the case in *Patterson*, the source of payment of the Bonds is limited to revenues derived from the rights protected by the State pledge set forth in the Statute. The New York State Pledge is very similar to the State pledge at issue in *Patterson*. Indeed, it more clearly and directly expresses the intention to protect the source of payment of the Bonds than the language of the State pledge relating to the Parkway Authority bonds, which was somewhat more generally stated presumably to reflect the nature of the Parkway Authority as an operating entity. In addition, the fact that the New York State Pledge expressly protects the Restructuring Property, which by the terms of the Statute is "property," also lends substantial support to the argument that the New York State Pledge itself is property for purposes of the State Due Process Clause.

### Opinion as to State Due Process Clause

Based upon our review of relevant judicial authority, including as discussed in this opinion, but subject to the qualifications, limitation and assumptions set forth herein, it is our opinion that, after the Bonds are issued, but before they are fully paid, a reviewing court of competent jurisdiction applying New York law, in a properly prepared and presented case, would conclude that (i) the New York State Pledge creates rights that constitute property within the meaning of the State Due Process Clause, and (ii) an Impairment Action by the State would violate the State Due Process Clause, absent any overriding fair, just and reasonable connection of the Impairment Action to the promotion of the health, comfort, safety and welfare of society.

## INJUNCTIVE RELIEF UNDER STATE LAW

### Discussion of Injunctive Relief Under State Law

The availability of preliminary injunctive relief under New York law is governed by Article 63 of the Civil Practice Law and Rules ("CPLR") and the traditional principles of equity to be applied thereby. CPLR Section 6301, entitled "Grounds for preliminary injunction and temporary restraining order," authorizes such a remedy to maintain the *status quo* "in any action where it appears that the defendant threatens or is about to do . . . an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual" or "where the

plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which if committed or continued during the pendency of the action, would produce injury to the plaintiff." N.Y. C.P.L.R. §6301. In each case, a showing is required "that immediate and irreparable injury, loss or damage will result unless the defendant is restrained." *Id.*

Judicial "discretion" permeates all aspects of the inquiry as to whether the application for temporary relief will be granted. "Perhaps the most instructive point about the preliminary injunction is that its granting is discretionary with the court." DAVID D. SIEGEL, NEW YORK PRACTICE § 328 (5th ed. 2015) (citing *Sartwell v. Field*, 68 N.Y. 341 (N.Y.1877)).

> "Under longstanding judicial precedent, the movant in most cases must . . . demonstrate three things: (1) a likelihood of success on the merits of the action; (2) the danger of irreparable injury in the absence of preliminary injunctive relief; and (3) a balance of equities in favor of the moving party. See, e.g. *Nobu Next Door, LLC v. Fine Arts Housing, Inc.*, 2005, 4 N.Y. 3d 839, 840, 800 N.Y.S. 2d 48, 49. In applying these requirements, the court must 'weigh a variety of factors', and the matter is committed to the court's sound discretion. *Doe v. Axelrod*, 1988, 73 N.Y. 2d 748, 750, 536 N.Y.S. 2d 44,45 53." V. ALEXANDER, MCKINNEY'S PRACTICE COMMENTARIES, C6301:1, p.12 (2010).

Because the application of the standards for the issuance of a preliminary injunction are committed to the sound discretion of the courts, the prediction of how and when such discretion will in fact be exercised must necessarily be highly dependent upon the exact threatened impact upon bondholder security. We note that the lower court in *Patterson* granted a preliminary injunction, as to which no appeal was taken, against enforcement of the legislation involved in that case without any showing of a possible future payment default. *See Patterson*, 41 N.Y.2d 714.

Opinion as to Injunctive Relief Under State Law

Based upon our review of relevant judicial authority, including as discussed in this opinion, but subject to the qualifications, limitation and assumptions set forth herein, it is our opinion that, after the Bonds are issued, but before they are fully paid, a reviewing court of competent jurisdiction applying New York law, in a properly prepared and presented case, should conclude that preliminary injunctive relief is available to maintain the *status quo* pending trial, and that, following the trial, assuming the court determined that the Impairment Action was violative of the State Due Process Clause, permanent injunctive relief should be awarded to protect the New York State Pledge from the Impairment Action absent any overriding health, comfort, safety and welfare of society justification.

## SEVERABILITY OF PROVISIONS OF STATUTE

The Statute provides that the provisions thereof are intended to be severable. In accordance with Section 14 of the Statute, if any section, subdivision, paragraph or subparagraph of the Statute or the application thereof to any person, circumstance or transaction is held by a court of competent jurisdiction to be unconstitutional or invalid, the unconstitutionality or invalidity shall not affect the constitutionality or validity of any other section, subdivision, paragraph or subparagraph of the Statute or its application or validity to any person, circumstance or transaction, including, without limitation, the irrevocability of a restructuring cost financing order issued pursuant to the Statute, the validity of the issuance of restructuring bonds, the imposition of transition charges, the transfer or assignment of restructuring property or the collection and recovery of revenues from transition charges (as such terms are defined in the Statute). Furthermore, in accordance with Section 12 of the Statute, effective on the date the Bonds are issued, if any provision of the Statute is held to be invalid or is invalidated, superseded, replaced, repealed or expires for any reason, that occurrence shall not affect any action allowed under the Statute that is taken by the Authority, LIPA, the Bond Issuer or any owner of T&D system assets, an assignee, a collection agent, a financing party, a holder of restructuring bonds or a party to an ancillary agreement (as such terms are defined in the Statute) and any such action shall remain in full force and effect.

## VOTER REFERENDA OR INITIATIVE

Under Article III, Section 1 of the State Constitution, the legislative power of the State is vested in the State senate and assembly. Under the existing State Constitution and under existing statutes and court decisions, there is no provision for a voter initiative or referendum for the purpose of amending or repealing the Statute.

\*   \*   \*   \*

We note that judicial analysis of issues relating to the Federal Takings Clause, the State Takings Clause and the retroactive effect to be given to judicial decisions has typically proceeded on a case-by-case basis and that a court's determination, in most instances, is strongly influenced by the facts and circumstances of the particular case, many of which cannot be known at this time. We further note that there are no reported controlling judicial precedents of which we are aware directly on point. Our analysis is necessarily a reasoned application of judicial decisions involving similar or analogous circumstances. Moreover, the application of equitable principles (including the availability of injunctive relief or the issuance of a stay pending appeal) is subject to the discretion of the court which is asked to apply them. We cannot predict the facts and circumstances which will be present in the future and may be relevant to the exercise of such discretion. Consequently, there can be no assurance that a court will follow our reasoning or reach the conclusions which we believe current judicial precedent supports. None of the foregoing opinions is intended to be a guaranty as to what a particular court would actually hold; rather, each such opinion is only an expression as to the decision a court ought to reach if the issue were properly prepared and presented to it and the court followed what we believe to be the applicable legal principles under existing judicial precedent. The recipients of this letter should take these considerations into account in analyzing the risks associated with the Transaction.

The opinions set forth above are given as of the date hereof and we disavow any undertakings or obligations to advise you of any changes in the law (whether constitutional, statutory, regulatory or judicial) which may hereafter occur or any facts or circumstances that may hereafter occur or come to our attention that could affect such opinions.

This opinion is solely for your benefit in connection with the Transaction and may not be relied upon, used or circulated by, quoted, or otherwise referred to by, nor may copies hereof be delivered to, any other person without our prior written approval, except that a copy of this opinion may be included in any transcript of proceedings and documents relating to the Bonds.

No attorney-client relationship has existed between you and our firm in connection with the foregoing matters, and no relationship shall exist by virtue of this letter.

Very truly yours,

Schedule I

Standard & Poor's Ratings Group
55 Water Street
New York, New York  10041

Moody's Investors Services, Inc.
7 World Trade Center
250 Greenwich Street
New York, New York  10007

Fitch Ratings, Inc.
33 Whitehall Street
New York, New York  10004

RBC Capital Markets LLC,
  as Representative of the Underwriters
200 Vesey Street
9th Floor
New York, New York  10281

## APPENDIX D

## PROPOSED FORM OF OPINION OF BOND COUNSEL
## RELATING TO REGULATORY MATTERS

### [LETTERHEAD OF HAWKINS DELAFIELD & WOOD LLP]

November __, 2017

To Each Person Listed on
the Attached Schedule I

Re:  Opinion Regarding Regulatory Matters

Ladies and Gentlemen:

We have acted as Bond Counsel to Long Island Power Authority, a corporate municipal instrumentality, body corporate and politic and a political subdivision of the State of New York (the "Authority") and the Utility Debt Securitization Authority, a special purpose corporate municipal instrumentality, body corporate and politic, political subdivision and public benefit corporation of the State of New York (the "Bond Issuer"), in connection with, among other things, the transfer and sale by the Authority of all of its right, title and interest in, to and under certain restructuring property to the Bond Issuer, as more fully described below, the issuance by the Bond Issuer of the Bonds referred to below and the other related transactions referred to and described below.

Pursuant to Part B of Chapter 173 of the State of New York Laws of 2013 (the "Original Statute"), as amended by Chapter 58 of the Laws of New York, 2015 (the "Amendment") (the Original Statute as amended by the Amendment is hereinafter referred to as the "Statute"), the Authority is authorized to adopt restructuring cost financing orders with respect to the creation of restructuring property (as defined in the Statute) in connection with the issuance of restructuring bonds (as defined in the Statute) by the Bond Issuer pursuant to such restructuring cost financing orders.  In connection with the issuance of the Bonds by the Bond Issuer on the date hereof, the Authority adopted Restructuring Cost Financing Order No. 5 on July 26, 2017 ("Financing Order No. 5") that, among other things, authorized the creation and sale of restructuring property (the restructuring property created pursuant to Financing Order No. 5 hereinafter referred to as the "Restructuring Property") which includes the irrevocable right to impose, bill, collect and receive certain nonbypassable transition charges (as adjusted from time to time pursuant to Financing Order No. 5, the "Charges") from all individuals and legally-recognized entities taking electric delivery service in the geographical area within which Long Island Lighting Company, a New York corporation now a subsidiary of the Authority doing business under the name LIPA ("LIPA") provided electric transmission and distribution service as of July 29, 2013 (such customers, the "Customers," and such geographic area, the "Service Area"). The Bonds will be secured by a statutory lien and a security interest in the Restructuring Property, together with certain other property of the Bond Issuer.

The Bond Issuer was created pursuant to section 4 of the Statute on July 29, 2013.

D-1

## THE TRANSACTION

On the date hereof, the Authority is selling the Restructuring Property to the Bond Issuer under the Restructuring Property Purchase and Sale Agreement dated as of November __, 2017 between the Authority and the Bond Issuer (the "Sale Agreement") for an amount in cash (the "Net Proceeds"). Under the Restructuring Property Servicing Agreement dated as of November __, 2017 between LIPA, in its capacity as Servicer, and the Bond Issuer (the "Servicing Agreement"), LIPA has agreed to service the Restructuring Property. Under the Administration Agreement dated as of November __, 2017 between LIPA, as Administrator (the "Administrator"), and the Bond Issuer, LIPA has agreed to perform certain administrative services on behalf of the Bond Issuer (the "Administration Agreement").

On the date hereof, the Bond Issuer is issuing its Restructuring Bonds, Series 2017 (the "Bonds"), under the Bond Indenture dated as of November __, 2017 (the "Indenture") between the Bond Issuer and The Bank of New York Mellon, as Bond Trustee (the "Bond Trustee").

Pursuant to the Bond Purchase Agreement dated October 25, 2017 (the "Bond Purchase Agreement") between the Bond Issuer and RBC Capital Markets, LLC, as representative of the several initial purchasers named therein (the "Initial Purchasers"), such Initial Purchasers have agreed severally to purchase the Bonds from the Bond Issuer.

As used herein, the term "Transaction Documents" means, collectively, the Sale Agreement, the Servicing Agreement, the Administration Agreement, the Bonds, the Indenture and the Bond Purchase Agreement, and "Transaction" means the transactions contemplated by the Transaction Documents. Capitalized terms used herein that are not otherwise defined shall have the meanings assigned to them in the Indenture.

## FACTS AND ASSUMPTIONS

In connection with rendering the opinions set forth below, we have examined and, as to various factual matters, relied upon originals or copies, certified or otherwise identified to our satisfaction, of the following:

i.      the by-laws of the Bond Issuer;

ii.     the Transaction Documents;

iii.    a certified copy of certain resolutions of the Board of Trustees of the Authority, dated July 26, 2017;

iv.     the Issuance Advice Letter dated October __, 2017, filed with the Authority by the Servicer and confirmed and approved by an Authority Designee.

v.      the Statute; and

vi.     Financing Order No. 5.

We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such records of the Bond Issuer, LIPA and the Authority, agreements, certificates of public officials, certificates of officers or other representatives of the Bond Issuer, LIPA and the Authority and others, and such other documents, certificates and records as we have deemed necessary or appropriate as a basis for the opinions set forth herein. We have made no independent investigation of the facts referred to herein, and with respect to such facts, we have relied, for the purpose of rendering this opinion and, except to the extent such statement constitutes a statement of a legal conclusion expressed in this opinion or as otherwise stated herein, exclusively on the factual statements contained and matters provided for in all of the closing documents delivered in connection with the closing of the Transaction, the documents referenced above, including the factual representations, warranties and covenants contained therein as made by the respective parties thereto. In our examination, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original