documents of all documents submitted to us as certified or photostatic copies, and the authenticity of the originals of such latter documents.

As used herein, the phrase "to our knowledge" with respect to the existence or absence of facts is intended to signify that, while we have made no specific inquiry or other independent examination to determine the existence or absence of such facts, the attorneys in this firm who were actively involved in the Transaction have obtained no actual knowledge to the contrary regarding such facts.

Our opinions herein with respect to the Statute are limited to the Statute as in effect on the date hereof. We express no opinion herein as to the laws of any jurisdiction other than the laws of the State.

For purposes of the opinion expressed in the first sentence of Paragraph No. 2, we have relied solely on our review of the Statute, as set forth in Part B of Chapter 173, State of New York Laws, 2013, as amended.

## OPINIONS

Based on the foregoing facts and assumptions being correct and continuing to be correct at all relevant times, and subject to the qualifications, limitations and assumptions set forth herein and while courts may differ and no cases interpreting the transfer of the Restructuring Property under the Statute have been decided, it is our opinion that a reviewing court, in a properly prepared and presented case, relying on the facts on which we have relied and giving them the proper weight and authority, properly applying the Statute to the Transaction would conclude that:

1. Financing Order No. 5 was duly authorized and issued by the Authority in accordance with all applicable State laws, rules and regulations (including the Statute); Financing Order No. 5 and the process by which it was issued comply with all applicable State laws, rules and regulations, including the Statute; and Financing Order No. 5 is in full force and effect and is final and nonappealable.

2. The Original Statute and the Amendment have each been duly enacted by the Legislature of the State in accordance with all applicable State laws, and other than the Amendment, the Statute has not been amended, repealed or rescinded and is in full force and effect. To our knowledge, the validity of the Statute is not the subject of any pending litigation or appeal.

3. Financing Order No. 5, among other things, (i) authorizes and approves the issuance of the Bonds, (ii) authorizes the creation and sale of the Restructuring Property to the Bond Issuer, (iii) authorizes the owner of the Restructuring Property to impose, bill and collect the Charges, (iv) authorizes the Bond Issuer to pledge the Restructuring Property as security for the repayment of the Bonds, (v) authorizes LIPA to serve as initial Servicer for the Issuer, and (vi) authorizes periodic adjustments of the Charges, and the paragraphs of Financing Order No. 5 authorizing the foregoing are irrevocable.

4. The Restructuring Property may be transferred, sold, conveyed or assigned to the Bond Issuer, and includes the rights and interests under Financing Order No. 5 described in Ordering Paragraph 11 of Financing Order No. 5.

5. Section 9 of the Statute includes an explicit pledge binding on the State (the "State Pledge") that the State will not take or permit any action that impairs the value of the Restructuring Property, or, except for periodic adjustments required to be made pursuant to the adjustment mechanism specified in Financing Order No. 5, reduces, alters, or impairs the Charges until the principal, interest and premium, if any, and any other Ongoing Financing Costs (as defined in Financing Order No. 5) have been paid in full. The State Pledge is applicable to the Transaction.

6. The Bonds are "restructuring bonds" within the meaning of the Statute and the Bonds are entitled to the protections provided under the Statute and Financing Order No. 5, and the Bond Trustee on behalf of the holders of the Bonds shall be, to the extent permitted by State of New York and federal law and the Indenture, entitled to enforce the protections of the Statute and Financing Order No. 5.

7. The Restructuring Property sold to the Bond Issuer pursuant to the Sale Agreement, including the irrevocable right to impose, collect and receive Charges and the revenues and collections from the Charges, is "restructuring property" within the meaning of the Statute.

8. The Bond Issuer has acquired the Authority's rights with respect to the Restructuring Property.

9. The transaction involving the sale of the Restructuring Property constitutes a true sale thereof other than for federal, state and local income and franchise tax purposes.

10. The Transaction, as contemplated by the Transaction Documents, conforms to Financing Order No. 5 in all material respects.

11. As provided in sections 7.1(f) and 8.2(b) of the Statute, any successor owner of the T&D System Assets and any successor Servicer shall be bound by the requirements of the Statute and shall perform and satisfy all obligations of a Servicer in the same manner and to the same extent under Financing Order No. 5 as did LIPA, as the initial Servicer, including, without limitation, the obligation to impose, bill and collect the Charges and to pay such collections to the person entitled to receive the Charge revenues. As provided in sections 8 and 15 of the Statute, Financing Order No. 5 is also binding on any other entity responsible for billing and collecting Charges on behalf of the Bond Issuer and any successor regulator to the Authority.

12. Pursuant to Ordering Paragraph 12 of Financing Order No. 5 and Annex 1 to the Servicing Agreement, the Servicer is authorized to file True-Up Adjustments to the Charges to the extent necessary to ensure the timely recovery of revenues sufficient to provide for the payment of all principal of and interest on the Bonds and all other approved Financing Costs (as defined in Financing Order No. 5).

## QUALIFICATIONS

Our opinions are limited to the specific issues addressed and are limited in all respects to laws and facts existing on the date of this letter. The opinions expressed above do not constitute a guarantee of the outcome of any particular litigation, and there can be no assurance that action will not be taken in federal or state court challenging the constitutionality of the provisions of the Statute relating to the Bonds. Moreover, there can be no assurance that there will be no action by the State which might constitute a violation of the State Pledge. Furthermore, given the lack of judicial precedent directly on point, and the novelty of the Transaction, the outcome of any litigation cannot be predicted with any degree of certainty. In the event of any claim or state action which adversely impacts the rights of the Bondholders, costly and time-consuming litigation might ensue, adversely affecting, at least temporarily, the price and liquidity of the Bonds.

The foregoing opinions are expressly subject to there being no material change in the law, and there being no additional facts which would materially affect the assumptions set forth herein. The opinions set forth above are given as of the date hereof and we disavow any undertakings or obligations to advise you of any changes in the law (whether constitutional, statutory, regulatory or judicial) which may hereafter occur or any facts or circumstances that may hereafter occur or come to our attention that could affect such opinions.

This opinion is solely for your benefit in connection with the Transaction and may not be relied upon, used or circulated by, quoted, or otherwise referred to by, nor may copies hereof be delivered to, any other person without our prior written approval, except that a copy of this opinion may be included in any transcript of documents and proceedings relating to the Bonds.

Very truly yours,

Schedule I

Standard & Poor's Ratings Group
55 Water Street
New York, New York 10041

Moody's Investors Services, Inc.
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Fitch Ratings, Inc.
33 Whitehall Street
New York, New York 10004

RBC Capital Markets LLC,
 as Representative of the Underwriters
200 Vesey Street, 9th Floor
New York, New York 10281

D-5

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX E

## FORM OF THE CONTINUING DISCLOSURE AGREEMENT

This Continuing Disclosure Agreement, dated as of November ___, 2017 (the "Continuing Disclosure Agreement"), is made by the Utility Debt Securitization Authority (the "Issuer") and Long Island Lighting Company, d/b/a LIPA, in its capacity as Servicer (the "Servicer"), pursuant to the Servicing Agreement, dated November _____, 2017 (the "Servicing Agreement"), between the Issuer and the Servicer, and is being delivered in connection with the issuance and sale by the Issuer of its $369,465,000 2017 Restructuring Bonds (the "2017 Restructuring Bonds") pursuant to the terms of that certain Bond Indenture, dated as of November ___, 2017, between the Issuer and The Bank of New York Mellon, as Bond Trustee (as the same may be amended and supplemented from time to time, the "Indenture"), between the Issuer and the Trustee. Capitalized terms used but not defined herein shall have the meanings given such terms in the Indenture.

Article I.   Definitions

(a) "Annual Accountant's Report" has the meaning given such term in Section 3.07(a) of the Servicing Agreement.

(b) "Annual Financial Information" means the Annual Accountant's Report and the Annual Servicer Information.

(c) "Annual Servicer Information" means the Semi-Annual Servicer Certificates and the tabular information presented in the Official Statement under the headings "Servicer and Administrator – Credit Policy," "– Billing Process," "– Revenues," "– LIPA's Customer Base and Electric Energy Consumption," "– Forecasting Electricity Consumption," "– Loss Experience," "– Days Sales Outstanding" and "– Write-Off and Delinquencies Experience."

(d) "Counsel" means Hawkins Delafield & Wood LLP or other nationally recognized bond counsel or counsel expert in federal securities laws, in each case acceptable to the Issuer and the Servicer.

(e) "Compliance Certificate" shall mean the annual certificate as to compliance delivered pursuant to Section 3.06 of the Servicing Agreement.

(f) "EMMA" means the MSRB's Electronic Municipal Market Access system or its successor.

(g) "MSRB" means the Municipal Securities Rulemaking Board established pursuant to the provisions of Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended, or any successor thereto or to the functions of the MSRB contemplated by this Continuing Disclosure Agreement.

(h) "Notice Event" means any of the following events with respect to the 2017 Restructuring Bonds:

   (i) principal and interest payment delinquencies;
   (ii) non-payment related defaults, if material;
   (iii) unscheduled draws on debt service reserves reflecting financial difficulties;
   (iv) unscheduled draws on credit enhancements reflecting financial difficulties;
   (v) substitution of credit or liquidity providers, or their failure to perform;
   (vi) adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the 2017 Restructuring Bonds, or other material events affecting the tax status of the 2017 Restructuring Bonds;
   (vii) modifications to rights of Bondholders, if material;
   (viii) bond calls, other than bond calls relating to mandatory sinking fund redemptions, if material, and tender offers;
   (ix) defeasances;
   (x) release, substitution, or sale of property securing repayment of the 2017 Restructuring Bonds, if material;

(xi) rating changes;

(xii) bankruptcy, insolvency, receivership or similar event of the Issuer[1];

(xiii) the consummation of a merger, consolidation, or acquisition involving the Issuer or the sale of all or substantially all of the assets of the Issuer, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

(xiv) appointment of a successor or additional trustee or the change of name of a trustee, if material.

(i) "Notice Event Notice" means written or electronic notice of a Notice Event.

(j) "Official Statement" means the Official Statement, dated October 25, 2017, relating to the 2017 Restructuring Bonds.

(k) "Reports to Holders" means the reports provided to Holders by the Bond Trustee pursuant to Section 6.06(b) of the Indenture.

(l) "Rule" means Rule 15c2 12 promulgated by the SEC under the Securities Exchange Act of 1934, as amended (17 CFR Part 240, §240.15c2 12), as in effect on the effective date hereof, including any official interpretations thereof.

(m) "SEC" means the United States Securities and Exchange Commission.

(n) "Semi-Annual Servicer Certificates" has the meaning given such term in Section 3 of Annex I to the Servicing Agreement.

(o) "State" means the State of New York.

Article II.    The Undertaking

Section 2.01    Purpose. This Continuing Disclosure Agreement is being executed, delivered and made solely to assist the underwriters of the 2017 Restructuring Bonds in complying with subsection (b)(5) of the Rule.

Section 2.02    Undertaking. In accordance with Section 7.12 of the Servicing Agreement, the Servicer shall, as designated agent of the Issuer, for the sole benefit of the Bondholders (and, to the extent specified in this Article II, the beneficial owners) of the Outstanding Bonds, provide, in a timely manner, to the MSRB, through EMMA, in the format and including such identifying information as shall be prescribed by the MSRB:

(a) not later than 180 days following the end of each fiscal year of the Issuer (x) an annual report of the Issuer, including, to the extent available, the Annual Accountant's Report and Compliance Certificate and (y) the Annual Servicer Information;

(b) not later than 30 days after the applicable Payment Date, the Report to Holders; and

(c) if a Notice Event occurs, in a timely manner not in excess of ten (10) business days after the occurrence of such Notice Event, a Notice Event Notice to the MSRB.

Section 2.03    Annual Accountant's Report. If, and to the extent prepared, the contents, presentation and format of the Annual Accountant's Report may thereafter be modified from time to time as determined in the judgment of the Issuer to conform to changes to the Rule to disclosure principles or practices and legal requirements followed by or applicable to the Issuer, provided that such modification shall comply with the requirements of the Rule. The annual financial statements of the Issuer for each fiscal year shall be prepared in accordance with generally accepted accounting principles in effect from time to time or mandated State statutory principles.

---

[1] Note to clause (xii): For the purposes of the event identified in clause (xii) above, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Issuer in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or government authority has assumed jurisdiction over substantially all of the assets or business of the Issuer, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Issuer. As provided in the Securitization Law, the Issuer is not authorized to file for bankruptcy under Chapter 9 of the U.S. Bankruptcy Code.

Section 2.04 <u>Limitations on Liability</u>. The Servicer does not undertake to provide such notice with respect to: (x) credit enhancement if the enhancement is added after the primary offering of the 2017 Restructuring Bonds, the Issuer does not apply for or participate in obtaining the enhancement, and the enhancement is not described in the applicable official statement of the Issuer; or (y) tax exemption other than pursuant to the Act or the Securitization Law.

Section 2.05 <u>Remedies</u>.

(a) In addition to the Trustee's and Holders' remedies specified in the Basic Documents, any beneficial owner of the 2017 Restructuring Bonds described in this Section may bring a Proceeding to enforce this Continuing Disclosure Agreement without acting in concert if (1) such owner shall have filed with the Servicer evidence of beneficial ownership and written notice of, and request to cure, the alleged breach, (2) the Servicer shall have failed to comply within a reasonable time, and (3) such beneficial owner stipulates that (A) no challenge is made to the adequacy of any information provided in accordance with this Continuing Disclosure Agreement and (B) no remedy is sought other than substantial performance of this Continuing Disclosure Agreement. To the extent permitted by law, each beneficial owner agrees that all such proceedings shall be instituted only as specified herein, and for the equal benefit of all such owners of the Outstanding Bonds benefited by the same or a substantially similar undertaking.

(b) For the purposes of this Section, a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such security, except that a person who in the ordinary course of business is a pledgee of securities under a written pledge agreement shall not be deemed to be the beneficial owner of such pledged securities until the pledgee has taken all formal steps to declare a default and determines that the power to dispose or to direct the disposition of such pledged securities will be exercised, provided that:

(i) the pledge agreement is bona fide;

(ii) the pledgee is:

1) a broker or dealer registered under § 15 of the Exchange Act;

2) a bank as defined in § 3(a)(6) of the Exchange Act;

3) an insurance company as defined in § 3(a)(19) of the Exchange Act;

4) an investment company registered under § 8 of the Investment Company Act;

5) an investment adviser registered under § 203 of the Investment Advisers Act of 1940;

6) an employee benefit plan, or pension fund which is subject to the provisions of ERISA or an endowment fund;

7) a parent holding company, provided the aggregate amount held directly by the parent, and directly and indirectly by its subsidiaries which are not persons specified in items (1) through (6) of this clause (ii) does not exceed 1% of the securities of the subject class;

8) a group, provided that all the members are persons specified in items (1) through (7) of this clause (ii); and

(iii) the pledge agreement, prior to default, does not grant to the pledgee the power to dispose or direct the disposition of the pledged securities, other than the grant of such power(s) pursuant to a pledge agreement under which credit is extended subject to Regulation T (12 CFR 220.1 to 220.8) and in which the pledgee is a broker or dealer registered under § 15 of the Exchange Act.

E-3

(c) Any amendment of this Continuing Disclosure Agreement may only be entered into:

(i) if all or any part of the Rule, as interpreted by the staff of the SEC at the date hereof, ceases to be in effect for any reason and the Issuer and the Servicer elect that this Continuing Disclosure Agreement shall be deemed terminated or amended (as the case may be) accordingly, or

(ii) if:

1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Issuer and the Servicer, as the case may be, or type of business conducted,

2) this Continuing Disclosure Agreement, as amended, would have complied with the requirements of the Rule at the date hereof, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and

3) the amendment does not materially impair the interests of the Holders of each affected Tranche of 2017 Restructuring Bonds, as determined by parties unaffiliated with the Issuer and the Servicer (such as, but without limitation, counsel to the Issuer and the Servicer) or by Holder consent pursuant to the Basic Documents.

Section 2.06  Additional Information.  Nothing in this Continuing Disclosure Agreement shall be deemed to prevent the Issuer or the Servicer from disseminating any other information, using the means of dissemination set forth in this Continuing Disclosure Agreement or any other means of communication, or including any other information in any Annual Financial Information or Notice Event Notice, in addition to that which is required by this Continuing Disclosure Agreement. If the Issuer or the Servicer choose to include any information in any Annual Financial Information or Notice Event Notice in addition to that which is specifically required by this Continuing Disclosure Agreement, the Issuer and the Servicer shall have no obligation under this Continuing Disclosure Agreement to update such additional information or include it in any future Annual Financial Information or Notice Event Notice.

## Article III.  Operating Rules

Section 3.01  Reference to Other Documents.  It shall be sufficient for purposes of Section 2.02 hereof if the Servicer provides Annual Financial Information by specific reference to documents (i) available to the public on the MSRB Internet Web site (currently, www.emma.msrb.org) or (ii) filed with the SEC. The provisions of this Section shall not apply to Notice Event Notices pursuant to Section 2.02(iv) hereof.

Section 3.02  Submission of Information.  Annual Financial Information may be set forth or provided in one document or a set of documents, and at one time or in part from time to time.

Section 3.03  Dissemination Agents.  The Servicer may from time to time designate an agent to act on its behalf in providing or filing notices, documents and information as required of the Servicer under this Continuing Disclosure Agreement, and revoke or modify any such designation.

Section 3.04  Transmission of Notices, Documents and Information.

(a) Unless otherwise required by the MSRB, all notices, documents and information provided to the MSRB shall be provided to EMMA, the current Internet Web address of which is www.emma.msrb.org.

(b) All notices, documents and information provided to the MSRB shall be provided in an electronic format as prescribed by the MSRB (currently, portable document format (pdf) which must be word searchable except for non-textual elements) and shall be accompanied by identifying information as prescribed by the MSRB.

Article IV. Effective Date, Successor Servicer, Termination and Execution

Section 4.01 Effective Date. This Continuing Disclosure Agreement and the provisions hereof shall be effective upon the issuance of the 2017 Restructuring Bonds.

Section 4.02 Successors Servicer. As provided in Sections 6.04(b) and 7.12 of the Servicing Agreement, the duties of LIPA under this Continuing Disclosure Agreement shall be performed by any Successor Servicer appointed under the terms of the Servicing Agreement.

Section 4.03 Termination.

(a) The Servicer's obligations under this Continuing Disclosure Agreement shall terminate with respect to the 2017 Restructuring Bonds of a Tranche upon a Legal Defeasance pursuant to Section 4.01 of the Indenture, prior redemption or payment in full of such 2017 Restructuring Bonds of a Tranche.

(b) This Continuing Disclosure Agreement, or any provision hereof, shall be null and void in the event that the Issuer and the Servicer (1) receives an Opinion of Counsel to the effect that those portions of the Rule which require this Continuing Disclosure Agreement, or such provisions, as the case may be, do not or no longer apply to the 2017 Restructuring Bonds, whether because such portions of the Rule are invalid, have been repealed, or otherwise, as shall be specified in such opinion, and (2) deliver copies of such opinion to the MSRB.

Section 4.04 Counterparts. This Continuing Disclosure Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute but one and the same agreement.

[Signature Page to Continuing Disclosure Agreement Follows]

E-5

UTILITY DEBT SECURITIZATION AUTHORITY

By: _____
   Name:
   Title:

LONG ISLAND LIGHTING COMPANY

By: _____
   Name:
   Title:

## SCHEDULE 1

### Book-Entry-Only System

*The Role of DTC.* Cede & Co., as nominee for DTC, will hold the 2017 Restructuring Bonds.

*The Function of DTC.* DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's Rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

*The Rules for Transfers Among DTC.* Transfers between DTC participants will occur in accordance with DTC rules.

*DTC Will Be the Holder of the 2017 Restructuring Bonds.* Purchases of the 2017 Restructuring Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2017 Restructuring Bonds on DTC's records. The ownership interest of each actual purchaser of each 2017 Restructuring Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 2017 Restructuring Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the 2017 Restructuring Bonds, except in the event that use of the book-entry system for the 2017 Restructuring Bonds is discontinued.

To facilitate subsequent transfers, all 2017 Restructuring Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the 2017 Restructuring Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not affect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2017 Restructuring Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2017 Restructuring Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the 2017 Restructuring Bonds unless authorized by a Direct Participant in accordance with DTC's Money Market Instrument ("MMI") Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to

whose accounts the 2017 Restructuring Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal and interest payments on the 2017 Restructuring Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Issuer, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Issuer, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the 2017 Restructuring Bonds at any time by giving reasonable notice to the Issuer. Under such circumstances, in the event that a successor depository is not obtained, note certificates are required to be printed and delivered.

The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, note certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuer believes to be reliable, but the Issuer takes no responsibility for the accuracy thereof.

UTILITY DEBT SECURITIZATION AUTHORITY • RESTRUCTURING BONDS, SERIES 2017



Printed by: ImageMaster, LLC
www.imagemaster.com