**EXHIBIT 46**

Hearing Date and Time: January 5, 2007 at 10:00 a.m.
Objection Deadline: January 2, 2007 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :

In re                       :     Chapter 11
                          :

DELPHI CORPORATION, et al.,   :     Case No. 05-44481 (RDD)
                          :
                          :     (Jointly Administered)
          Debtors.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING
THE EQUITY PURCHASE AND COMMITMENT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE
AND THE PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT
TO SECTIONS 105(a), 363(b), AND 1125(e) OF THE BANKRUPTCY CODE

("PLAN INVESTMENT AND FRAMEWORK SUPPORT APPROVAL MOTION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), submit this expedited motion (the "Motion") for an order authorizing and approving the Debtors' entry into the Equity Purchase and Commitment Agreement (as defined below) and certain related agreements pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement (as defined below) pursuant to sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code, as described herein, and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2

4.      The statutory predicates for the relief requested herein are sections 105(a), 363(b), 503(b), 507(a), and 1125(e) of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.  Events Leading To The Chapter 11 Filing

8.  In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.  The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.  In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions

---

[2]  Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

E.    Overview Of The Framework Discussions

12.    As further described below, the multi-lateral and multi-dimensional scope

of the actions that must be taken to address Delphi's restructuring requirements is exceedingly

complex.  Not only is each step, in and of itself, a substantial undertaking, but actions taken to

address one area often have ripple effects on the others.  For example, as this Court has already

observed during the various labor related contested hearings brought before it, the issues

associated with modifying collective bargaining agreements go well beyond wage rates and

involve dealing with, among other things, a multitude of site footprint, employee benefits, local

work rules, and operational restrictions, each of which can individually impair the Company's

ongoing viability.  Similarly, the GM negotiations encompass far more than simply dealing with

identifiable uncompetitive contracts currently in existence.  As a practical matter, GM will

remain Delphi's largest customer following successful implementation of Delphi's transformation

plan.  Therefore, a restructuring of Delphi will of necessity require the parties to address long

term planning matters and provide assurance of future business relations.  The ongoing business

arrangements between Delphi and GM, however, must be dealt with against the backdrop of a

host of litigable claims that each company may have against the other for conduct since the time

of the spin-off.  Moreover, compounding the difficulty in dealing with the various labor and GM

issues is the fact that many of these issues are integrally interrelated with gains in one area often

resulting in costs in the other.

          13.     Throughout these chapter 11 cases, the Debtors have endeavored to reach

a consensual resolution regarding their various restructuring initiatives and, with that goal in

mind, have sought input from their statutory committees, their unions, GM and other key

stakeholders.  This has not been an easy task, and progress made to date can best be

characterized as being achieved in increments, with every two steps forward often involving one

step backward.  Nevertheless, through the framework discussions outlined below, the Debtors

were able to initiate multi-lateral negotiations with their statutory committees, GM, and potential

plan investors that have significantly enhanced the prospect for a consensual restructuring.  At

the same time, the Debtors effectuated an unprecedented hiatus in the middle of Section 1113

and 1114 contested hearings (and deferred commencement of Section 365 contract rejection

hearings involving GM) in favor of pursuing discussions with the Debtors' labor unions and GM

on parallel paths with the framework discussions.  While the framework discussions have not

necessarily resolved all parties' concerns, they have produced a solid foundation for the Debtors'

potential emergence from these cases and a platform for continued cooperation to deal with yet

unresolved matters.

14.     The products of the framework discussions are the two agreements

presented by this Motion, the Equity Purchase and Commitment Agreement between Delphi and

certain Investors (the "EPCA"[3]), and the Plan Framework Support Agreement, (the "PSA" and,

together with the Investment Agreements, the "Framework Agreements") between Delphi, the

Commitment Parties, Merrill, UBS, and General Motors Corporation.[4]  While the plan

framework is based on extensive discussions and negotiations among Delphi, GM, the Plan

Investors and Delphi's statutory committees conducted since August of this year, not every one

of the proposed terms and conditions of the PSA are necessarily acceptable to Delphi's

stakeholders, including the Company's statutory committees, each of which may determine to

oppose one or more elements of the PSA.[5]  The PSA as well as the economics and structure of

---

[3]     As referenced in the EPCA and used herein, "Investors" means A-D Acquisition Holdings, LLC (an affiliate of
Appaloosa Management L.P. ("Appaloosa")), Harbinger Del-Auto Investment Co. Ltd. (an affiliate of
Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger")), Dolce Investments LLC (an affiliate of Cerberus
Capital Management, L.P. ("Cerberus")), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and
UBS Securities LLC ("UBS").  In connection with the EPCA, Appaloosa, Harbinger, and Cerberus
(collectively, the "Commitment Parties"), are also executing certain equity commitment letters (the
"Commitment Letters" along with the Investment Proposal Letter (the "Proposal Letter") and the EPCA,
collectively, the "Investment Agreements")) in support of the obligations of their respective affiliate Investors
under the EPCA.  The Investors and the Commitment Parties are collectively referred to herein as the "Plan
Investors"; when the term "Plan Investors" is used in connection with a specific agreement, the term shall
include only those Plan Investors as defined in such agreement.

[4]     Attached as Exhibit A is the execution form of the Proposal Letter dated December 18, 2006 and its
attachments, including the EPCA, the PSA, the Preferred Stock Term Sheet and Commitment Letters from the
three Commitment Parties that are using special purpose transaction entities as signatories to the EPCA and
related agreements.

[5]     That is not to say, however, that the Debtors did not consider the view points of the statutory committees.  In
November 2006, the Debtors received a joint mark-up of certain "discussion points" that formed the basis of the
Framework Agreements from the Creditors' Committee and the Equity Committee.  The Debtors also received

the plan framework itself are expressly conditioned on reaching consensual agreements with

Delphi's U.S. labor unions and GM. Both Delphi and the Plan Investors are permitted to

terminate the EPCA (which terminates the PSA) if consensual agreements are not reached with

labor and GM by January 31, 2007.

       15.     The PSA outlines certain plan terms, including the distributions to be

made to creditors and shareholders, the treatment of GM's claim, the resolution of certain

pension funding issues, and the corporate governance of the reorganized Debtors. The new

equity funding provided by the EPCA is critical in achieving the recoveries contemplated by the

PSA as it secures the most difficult element of the reorganized Delphi's capital structure.

F.     <u>Events Leading To Framework Discussions</u>

    1.    <u>Labor Transformation</u>

       16.     Despite early efforts by the Debtors to negotiate comprehensive

agreements with their unions and GM prior to commencing their chapter 11 cases and again

during the first six months of these cases, on March 31, 2006, Delphi moved under sections 1113

and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify

retiree benefits.[6] The 1113/1114 Motion aimed to address the Debtors' labor costs, the Debtors'

---

comments on the EPCA from the Equity Committee. The Debtors carefully evaluated the comments and requests of the statutory committees and have adopted a number of the comments in the final versions of the Framework Agreements. By way of example, at the request of one or both statutory committees, the Framework Agreements include (i) a "proportionality" concept whereby, regardless of the amount of unsecured claims ultimately allowed in these cases, the proportion of the Debtors' distribution of equity and cash to holders of unsecured claims remains the same; (ii) the rights distributed to equity security holders will be transferable and severable from the common stock; and (iii) in the event of a subsequent merger of the reorganized company, the consideration to be received by the Plan Investors holding the convertible preferred stock would be subject to certain limitations.

[6]  <u>See</u> Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3035) (the "1113/1114 Motion"). Contemporaneously with the filing of the 1113/1114 Motion on March 31, 2006, the Debtors also moved to reject unprofitable supply contracts with GM. <u>See</u> Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033) (the "GM Contract Rejection Motion"). Among the reasons for the GM Contract Rejection Motion was the Debtors' belief that GM must cover a greater portion of the costs of

ability to streamline their product portfolio, and the Debtors' legacy retirement liabilities. To
address these factors, the Debtors sought three principal modifications to their labor agreements.
First, the Debtors sought to reduce their wage and benefit costs to levels competitive with other
U.S. auto parts suppliers. Second, the Debtors sought to eliminate provisions in the labor
agreements that precluded the Debtors from streamlining their product portfolio and making the
necessary adjustments to Delphi's manufacturing footprint. Finally, the Debtors requested a
reduction in the legacy liabilities for pension and other retiree benefits that Delphi was required
to provide under the labor agreements. During the pendency of the hearings on the 1113/1114
Motion, the Debtors continued to pursue a consensual resolution with all of Delphi's unions and
GM.

17.     On May 9, 2006, the hearing on the Debtors' 1113/1114 Motion
commenced. The initial phase of the hearing on the 1113/1114 Motion spanned nearly a month,
with eight days of contested hearings during which the Debtors presented the testimony of 12
witnesses. On June 5, 2006, following the close of the Debtors' direct case, the contested hearing
on the 1113/1114 Motion was adjourned, initially for a 60 day hiatus and thereafter from time to
time through the balance of 2006 in order to help create an environment for continuing to explore
a consensual resolution of these cases. Since the adjournment of the 1113/1114 Motion in June,
the Debtors have continued to provide information to, and engage in discussions and negotiations
with, the unions and the Debtors' stakeholders in an effort to resolve the labor matters forming
the basis of the 1113/1114 Motion. To allow the progress of the framework discussions and
other matters, the Bankruptcy Court has held numerous in camera status conferences since the
adjournment of the 1113/1114 Motion. The adjournment period has permitted the Debtors and

---

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs. This initial motion
covered approximately half of the Debtors' North American annual purchase volume revenue from GM but only
10% of the Debtors' total contracts with GM.

their professionals to focus their attention on negotiations with key stakeholders to develop the

basis for the Framework Agreements and a consensual reorganization plan.

18.     In addition, throughout these cases and notwithstanding the 1113/1114

Motion, Delphi has consistently communicated a clear message to both its hourly workforce and

GM:  Delphi is committed to finding a consensual labor resolution and intends to continue to

discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To

that end, Delphi, GM, and the United Automobile, Aerospace and Agricultural Implement

Workers of America (the "UAW") obtained this Court's approval of a tripartite agreement

providing for a special hourly attrition program for Delphi's UAW-represented employees.[7]  On

July 7, 2006, this Court entered an order approving a similar special attrition program with the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-

Communications Workers of America, (the "IUE-CWA") and a Supplement to the UAW special

attrition program (Docket No. 4461).[8]  As of September 26, 2006, approximately 12,400 of

Delphi's UAW-represented employees have opted to retire by January 1, 2007 and approximately

1,400 additional UAW-represented Delphi employees elected a buyout.  Furthermore, as of

August 18, 2006, approximately 6,300 IUE-CWA-represented Delphi employees, representing

approximately 83% of the eligible IUE-CWA-represented workforce, opted to participate in the

attrition program.  Although these special hourly attrition programs will provide nearly two-

thirds of Delphi's existing UAW and IUE-CWA-represented long-term hourly employees (as of

September 26, 2006 and August 18, 2006, respectively) with "soft landings" through a

---

[7]     On May 8, 2006, the Court entered an order approving the agreement relating to the UAW's special hourly
attrition program (Docket No. 3648).  That order was amended on May 12, 2006 (Docket No. 3754).

[8]     Delphi is currently negotiating the terms of similar programs with the United Steelworkers of America and
Delphi's other unions which, if agreed upon, would provide those hourly employees with comparable retirement
programs and incentives.

combination of retirement programs, attrition programs, and GM flowbacks, the attrition programs do not resolve the issues related to Delphi's uncompetitive labor agreements.

19.     Accordingly, notwithstanding the success of the attrition programs, the Debtors still need to address the factors outlined in their 1113/1114 Motion: the Debtors' legacy liabilities (primarily pension and OPEB), manufacturing footprint, and wage and benefit costs (including local work rules). Paradoxically, however, the success of the attrition plans confirmed that the resolution of the remaining labor issues would be inextricably linked to GM, and any comprehensive settlements with the Debtors' unions would be very difficult and perhaps impractical without the involvement of GM. Consequently, the Debtors pursued negotiations with both GM and the unions. Because the discussions between the Debtors, GM, and the unions naturally involved the interrelated issues of the Debtors' transformation plan, the Debtors' negotiations with GM and the unions evolved from discussions regarding the Debtors' labor transformation to discussions related to GM's support for the Debtors' transformation plan. The Debtors believe that the Framework Agreements create an environment in which the Debtors, GM, and the unions will be able to resolve the Debtors' remaining labor issues consensually, while adequately addressing GM's requirements for its participation in the Debtors' transformation plan.

2.     <u>Negotiations With General Motors</u>

20.     The Debtors believe that the Framework Agreements will allow them to address many of the issues and claims that resulted from, among other things, GM's spin-off of Delphi in 1999. Historically GM has been, and likely will continue to be, Delphi's largest single customer. Since the spin-off in 1999, GM has accounted for the majority of Delphi's North American business. GM, however, is not just a customer of the Debtors but, absent a

comprehensive and consensual transformation and reorganization of the Debtors, GM could be the primary defendant in multi-billion dollar litigation that would be commenced on behalf of the Debtors' estates. The Debtors and their statutory committees believe that the Debtors hold multiple claims and causes of action against GM that must be either consensually resolved with GM or judicially determined by the Bankruptcy Court in connection with any reorganization of the Debtors. Consequently, any potential GM support for the Debtors' transformation plan (and related financial contributions) must be evaluated in light of the potential claims held by the Debtors against GM.

21. On January 20, 2006, the Debtors filed their Schedules of Assets and Liabilities (Docket No. 1854) and their Statement of Financial Affairs (Docket No. 1855) listing certain unliquidated claims that the Debtors held against GM that related to, among other things, the spin-off. Subsequently, after the Debtors provided extensive information to the Creditors' Committee, the Creditors' Committee filed a motion requesting direct discovery from GM so that the Creditors' Committee could evaluate certain claims that the Debtors hold against GM and that GM allegedly holds against the Debtors.[9] The Debtors did not object to this relief, which resulted in the Creditors' Committee and GM entering into a stipulation and agreed order on April 11, 2006, pursuant to which the Creditors' Committee and GM agreed that GM would produce certain documents requested by the Creditors' Committee.

22. On May 11, 2006, the Creditors' Committee sent a letter, and subsequently, a draft complaint, to Delphi's Board of Directors, demanding that the Debtors promptly pursue certain claims and defenses that the Debtors might have against GM. The draft complaint, containing 408 numbered paragraphs and 19 separate causes of action, was based in

---

[9]  See Motion For An Order Compelling The Production Of Documents By General Motors Corporation Pursuant To Rule 2004 Of The Federal Rules Of Civil Procedure (Docket No. 2961).

substantial part on documents provided to the Creditors' Committee by the Debtors pursuant to a joint interest agreement previously approved by this Court.[10]

23.     On July 28, 2006, after the Debtors informed the Creditors' Committee of the Debtors' conclusion that the immediate prosecution of any complaint for relief against GM of the kind recommended by the Creditors' Committee was not in the best interests of the Debtors or their stakeholders, the Creditors' Committee moved for authority to prosecute the Debtors' claims and defenses against GM and certain former officers of the Debtors on Delphi's behalf (Docket No. 4718) (the "STN Motion").  The Debtors evaluated the merits of the STN Motion and filed a preliminary objection to the STN Motion on August 4, 2006 (Docket No. 4859).

24.     Shortly after the formation of the Equity Committee, the Debtors solicited the Equity Committee's views regarding potential estate claims against GM.  On July 29, 2006, the Debtors entered into a Joint Interest Agreement with the Equity Committee and, during August 2006, shared confidential information with the Equity Committee concerning claims and defenses against GM.  On August 24, 2006, the Equity Committee delivered a letter to the Debtors stating the Equity Committee's view of the Debtors' claims and defenses against GM, and on September 5, 2006, the Equity Committee filed its objection to the STN Motion (Docket No. 5070).

25.     Since identifying the Debtors' claims and the potential causes of action against GM, the Debtors have conducted various investigations including an investigation and series of interviews based specifically upon claims that were also asserted by the Debtors'

---

[10]  See Order Approving Joint Interest Agreement Between Debtors And Official Committee Of Unsecured Creditors Implementing Protective Order, And Approving Procedures To Protect Information In Fee Statements (Docket No. 3279).

statutory committees. The principal categories of potential claims against GM resulting from the spin-off of Delphi that have been identified to date include legacy liability claims relating to OPEB and pension matters; asset valuation claims; labor agreement-related claims; claims relating to price concessions obtained from Delphi by GM; claims relating to Delphi's indemnification of GM relating to certain labor union benefit guarantees; and warranty related claims. After investigation, the Debtors believe that they hold colorable claims against GM that may result in significant recoveries from GM. At the same time, the Debtors also believe that pursuit of such claims would result in a loss of future business from GM and would require the Debtors to formulate and pursue an alternative business plan to the transformation plan announced on March 31, 2006.

26.    The alternative to protracted litigation with GM is a consensual resolution whereby Delphi is able to successfully implement its transformation plan, develop a reorganization plan with potential recoveries for holders of claims and interests that should imaginably result in their support of a consensual transaction in lieu of litigation, attract adequate debt financing and equity infusions to support such a reorganization framework, and negotiate a comprehensive settlement with GM pursuant to which GM provides sufficient financial and other support to make such a plan framework feasible.

27.    Towards that end, the Debtors have developed a consensual GM business plan model that should produce $2.4 billion in EBITDA following successful implementation of Delphi's transformation plan with an opportunity for further growth. The Debtors believe that with such a business plan, the recoveries available to the Debtors' stakeholders would be significantly higher than if the Debtors pursued the litigation of their claims against GM and

therefore that the consensual resolution of the Debtors' claims against GM should significantly outweigh any recovery gained by pursuing litigation against GM.

      28.    Through the negotiation of the Framework Agreements, the Debtors believe that a platform has been created to effectuate a settlement of the various disputed issues with GM, while simultaneously gaining the support of the Debtors' stakeholders and achieving stakeholder recoveries of a scope that would not otherwise be possible.  In order for this approach to actually work, Delphi must obtain modified labor agreements with its U.S. labor unions; such agreements are unlikely unless GM ultimately agrees to such items as triggering of the GM benefit guarantees for Delphi's major U.S. labor unions; assumption by GM of certain postretirement health and life insurance obligations for certain Delphi hourly employees; provision of flowback opportunities at certain GM facilities for certain Delphi employees; GM's payment of certain retirement incentives and buyout costs under current or certain future attrition programs for Delphi employees; GM's payment of mutually negotiated buy-downs; GM's payment of certain labor costs for Delphi employees; a revenue plan governing certain other aspects of the commercial relationship between Delphi and GM; and GM's support of the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites.

    3.    <u>The Framework Discussions</u>

      29.    The Framework discussions commenced in the summer of 2006 provided a vehicle for the Debtors to explore with their statutory committees, GM and potential plan investors whether any viable path existed towards a comprehensive consensual transaction. After the adjournment of the 1113/1114 Motion and the GM Contract Rejection Motion, the Debtors began to map out several possible alternative means to resolve these chapter 11 cases. The Debtors conceptualized potential outcomes ranging from litigating the 1113/1114 Motion

and the GM Contract Rejection Motion to adjourning the motions and attempting to reach a comprehensive deal with GM and the unions. The Debtors also explored with their statutory committees, an ad hoc committee, and GM multiple alternative paths for achieving the ultimate goals of the Debtors' reorganization. The paths discussed with these stakeholders focused on near-term resolution of labor and GM issues and on the resolution of the Debtors' transformation issues without a near-term resolution of labor and GM issues. The near-term resolution approaches discussed among the parties included bifurcated labor and GM transactions, labor-only settlements, and comprehensive labor and GM transactions. The Debtors, after receiving clear and unequivocal input from GM that it would not explore a consensual path that did not include the determination of GM's net exposure to Delphi and similar input from the statutory committees that they would not consider settling with GM on a consensual path that did not include the determination of anticipated recoveries for creditors and equity interests, decided to seek a comprehensive resolution of the Debtors' transformation plan issues, including eventual resolution of GM and labor, through the commencement of "framework" discussions.

     30.    These framework discussions began in earnest on August 1, 2006 with "leveling-up" meetings between the Debtors and their statutory committees. Promptly thereafter, the Debtors, GM, and the Creditors' Committee began exchanging proposals that addressed issues such as possible capital structures for the reorganized Debtors, disposition of the Debtors' legacy obligations, and various aspects of the Debtors' relationship with GM. On August 3, 2006, the Debtors, GM, the Creditors' Committee, and a number of their professional advisors held the first of a series of extended meetings and negotiating sessions in New York. (From time to time, these meetings also included representatives of the Equity Committee, an ad

hoc equity committee and potential plan investors.)  The framework meetings have resulted in

intensive discussions and the exchange of various draft agreements and term sheets which,

taken together, have advanced negotiations considerably.

31.     Very early in the framework discussions, several of the parties were able

to agree upon the potential range of creditor recoveries.  By September, certain of the parties

were able to agree upon the potential range of recoveries available to shareholders.  For these

potential recoveries to be realized, however, the framework discussions still needed to address

the labor issues, the GM issues, and the business plan for the Debtors that would support these

desired recoveries.  The Debtors, as well as the other participants in the framework discussions,

realized that an outside plan investor would be necessary to achieve the expected results.

4.     Identification Of Potential Plan Investors

32.     By late September 2006, other stakeholders had joined the discussions.

As this Court is aware, Appaloosa has been a very active participant in these chapter 11 cases

and has a substantial interest in the outcome of the Debtors' transformation.  Because of

Appaloosa's status as a significant holder of the Debtors' claims and equity securities, the

Debtors and their advisors met several times with representatives from an investor group led by

Appaloosa and Harbinger, both separately and together with GM and the statutory committees.

33.     At the same time that the Debtors began meeting with Appaloosa and

Harbinger, the Debtors with the assistance of their financial advisor and investment banker,

Rothschild Inc. ("Rothschild") continued to explore alternative investment proposals from

certain other investors with industry experience.  The Debtors worked with these various investor

groups to create a limited and focused competitive bidding process.  The Debtors also enabled

the investor groups to engage in limited due diligence and to explore the opportunities associated

with a transformed Delphi. These framework discussions involved many ideas for a transformed Delphi, all of which the Debtors evaluated carefully. These discussions were intended to provide a basis for developing the framework for an eventual reorganization plan. The discussions addressed various matters, including allocation of legacy liabilities; wind down or divestiture of non-core North American facilities; GM contribution and recovery; potential plan treatment for various stakeholders; the anticipated scope of, and potential limitations on, general unsecured claims; future capital structure; and corporate governance upon emergence. This process led to the selection of Appaloosa, Harbinger, and Cerberus (together with Merrill and UBS) as potential plan investors and to the Debtors' decision to pursue earnest negotiation of definitive documents with the Plan Investors to determine if there was a viable transaction that could be accomplished.

G.    The Framework Agreements

34.    These framework discussions led the Debtors to negotiate two separate but interrelated agreements: the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.[11] The public announcement of both of these agreements on December 18, 2006 represents a major milestone in Delphi's reorganization.[12] Since well before the beginning of these chapter 11 cases, the Debtors have emphasized their commitment to pursuing a consensual resolution of the principal issues in their restructuring. The Framework Agreements demonstrate real progress toward that objective. The Plan Investors' conditional commitment to invest up to $3.4 billion in the reorganized company, together with their support

---

[11]    The discussion of the Framework Agreements contained herein is a summary only. The Framework Agreements are complex and lengthy agreements, and many provisions of the agreements are not highlighted in this summary. In the event of any inconsistency between this summary and the Framework Agreements, the terms of the Framework Agreements control.

[12]    Delphi's press release issued on December 18, 2006 is attached hereto as Exhibit B.

of the Debtors' transformation plan and reorganization plan framework, should provide

additional confidence to the Debtors' customers, suppliers, employees and financial stakeholders.

While there is much that remains to be accomplished in the Debtors' reorganization, the Debtors

and their stakeholders are together navigating a course that should lead to consensual resolution

with the Debtors' U.S. labor unions and GM while providing an acceptable financial recovery

framework for stakeholders

1.    <u>Equity Purchase And Commitment Agreement</u>

35.    The EPCA sets forth the terms and conditions upon which the Plan

Investors will (i) commit to purchase $220,500,000 of common stock in the reorganized Delphi

(the "Direct Subscription Shares") and $1.2 billion of preferred shares in the reorganized Delphi

(the "Preferred Shares") and (ii) commit to purchasing any unsubscribed shares of common stock

in connection with a rights offering (the "Rights Offering") to existing common stock holders

(the "Back Stop Commitment").[13]

36.    The Rights Offering contemplated by the EPCA provides that Delphi will

distribute at no charge to each holder of common stock (an "Eligible Holder"), as of a record date

to be determined, certain rights (the "Rights") to acquire new common stock.  The Rights will

permit Eligible Holders to purchase their pro rata share of 56,700,000 shares of new common

stock at a purchase price of $35 per share.  Under the terms of the EPCA, the Plan Investors will

commit to purchase the number of shares that were offered through the Rights Offering to

Eligible Holders, but whose rights were not properly exercised (the "Unsubscribed Shares").  In

the event that no shareholders subscribe to the Rights Offering, the Plan Investors, through the

---

[13]    The Commitment Letters, in turn, set forth the terms and conditions upon which the Commitment Parties will provide the funding to the Investors that will be necessary to enable the Investors to make the investment called for under the EPCA.

Back Stop Commitment, will purchase all of the Unsubscribed Shares for $1.984 billion. Altogether, through the Back Stop Commitment and the purchase of the Direct Subscription Shares and the Preferred Shares, the Plan Investors could invest up to $3.4 billion in the reorganized Debtors.

37.     In connection with the Plan Investors' commitment to purchase the Preferred Shares, the Debtors will agree to pay the Plan Investors an aggregate commitment fee of $21 million (the "Preferred Commitment Fee"). In addition, to compensate the Plan Investors for their undertakings in connection with their purchase of the Direct Subscription Shares and the Backstop Commitment, the Debtors will agree to pay an aggregate commitment fee of $55,125,000 (the "Standby Commitment Fee" and, together with the Preferred Commitment Fee, the "Commitment Fees"). The Debtors will also reimburse or pay the Plan Investors' reasonably incurred out-of-pocket costs and expenses incurred on or prior to the effective date of a plan of reorganization or related to the closing of the plan of reorganization (the "Transaction Expenses"). Under the terms of the EPCA, Transaction Expenses incurred on or prior to December 1, 2006 will not exceed $13 million and will be paid promptly upon the Court's entry of the order approving this Motion; provided, however, that such amount will not include Transaction Expenses incurred by Appaloosa on or before May 17, 2006, which will not exceed $5 million and will be paid if and when the effective date of any plan of reorganization of the Debtors occurs and only if such plan results in the holders of Delphi common stock receiving a recovery under any such plan. In addition, to the extent permitted under any order authorizing the Company to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "Financing Order") the Transaction Expenses incurred from and after the date of

entry of the order approving this Motion shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order

38.     The Commitment Fees will be paid by the Debtors in three stages.  The first ten million dollars of fees will be paid on the first business date that either (i) each of Appaloosa and Cerberus has waived its due diligence termination right contained in section 12(d)(ii) of the EPCA, or (ii) the due diligence termination right contained in section 12(d)(ii) of the EPCA has expired in accordance with its terms.  The payment of the balance of the first 50 percent of the Commitment Fees ($28,062,050) will be made on the first business day following the date that Appaloosa and Cerberus notify Delphi in writing that each has approved the Debtors' ultimate settlement with GM.  The remaining 50 percent of the Commitment Fees ($38,062,050) will be paid on the first business day following the entry of an order by the Bankruptcy Court approving the Debtors' Disclosure Statement (as such term is defined in the EPCA).

39.     The Debtors believe that the fee structure described above is appropriate in light of the amount of capital committed by the Plan Investors to the Debtors and the potentially lengthy period of such commitment.  The commitment fee on the preferred stock is $21 million, which is 1.75% of the total $1.2 billion preferred investment.  The commitment fee on the common equity backstop is $55.125 million, which is 2.5% of the total $2.205 billion equity backstop. In addition, the compensation structure was agreed to following substantial arms-length negotiations between the Debtors and the Plan Investors with substantial input from the Debtors' statutory committees.

40.     The EPCA contains extensive representations and warranties made by the Company, and a customary set of more limited representations and warranties by the Plan

Investors. While in many transactions representations and warranties are qualified by a disclosure schedule prepared in connection with the execution of operative transaction documents, under the terms of the EPCA, Delphi will have additional time to deliver such a disclosure schedule; in this case, until Delphi delivers its business plan to the Plan Investors.

41.     In connection with the EPCA, Delphi has covenanted to use its commercially reasonable efforts to provide to the Plan Investors as soon as practicable a final five-year business plan approved by Delphi's board of directors that will provide certain levels of EBITDA for fiscal years 2007 through 2011. Delphi will not be required to deliver, and neither Appaloosa nor Cerberus will be required to approve or accept any business plan that does not reflect a final and binding settlement between the Company and GM. Appaloosa or Cerberus may terminate the EPCA under the terms of their "diligence out" within 20 days of receiving a business plan reflecting the GM settlement if such Plan Investor is not satisfied, in their sole discretion, with the business plan.

42.     The EPCA provides for various bases for termination of the agreement, including by mutual written consent of Delphi and both of Appaloosa and Cerberus. In addition, either Appaloosa or Cerberus, upon written notice to Delphi can terminate the agreement for a variety of reasons, including (i) if the order approving this Motion has not become a final order within 10 days of the hearing on the Motion, (ii) if the Investors are not satisfied with their due diligence, (iii) if the effective date of the Debtors' plan of reorganization has not occurred by June 30, 2007, (iv) if the Debtors' disclosure statement is not filed with this Court by May 1, 2007, (v) if the Debtor breaches any provisions of the agreement, (vi) if the Investors are not satisfied with the Company's business plan, (vii) if there was change of recommendation by the

Company or the Company enters into an alternate transaction, and (viii) if there are modifications to the agreed forms of certain transaction documents..

43.     If the EPCA is terminated under certain circumstances, an alternate transaction fee of $100 million (the "Alternate Transaction Fee") will be payable to the Plan Investors.  The events that give rise to the payment of the Alternate Transaction Fee are: (i) termination of the EPCA as a result of the Company's entry into an Alternate Transaction (as defined below); (ii) termination of the EPCA by the Investors due to a willful breach by the Company and the Company's entry into or consummation of an Alternate Transaction within a 24 month period following the termination; and (iii) termination of the EPCA due to a change of recommendation by the Company and the Company's entry into or consummation of an Alternate Transaction within a 24 month period following the termination.  For the purposes of the EPCA, an Alternate Transaction is defined to include any plan, proposal, offer or transaction that is inconsistent with the EPCA, the Preferred Stock Term Sheet attached as an Exhibit to the EPCA, the PSA, the Debtors' settlement with GM, or the Debtors' plan of reorganization, other than a liquidation under chapter 7 of the Bankruptcy Code.

44.     The aggregate liability for both the Investors, the Commitment Parties, and the Debtors is limited by the terms of the EPCA to willful breach of the EPCA.  The maximum dollar exposure in the aggregate for all of the Commitment Parties and the Investors (or the Debtors) for willful breaches occurring on or prior to the date this Court approves the Debtors' disclosure statement will not exceed $100 million.  After the order approving the Disclosure Statement is entered, the aggregate liability shall not exceed $250 million.  Liability for any party prior to the waiver or satisfaction of the due diligence condition in the EPCA

23

attaches only on a several basis; after the due diligence condition is satisfied or waived, liability attaches on a joint and several basis.

45.     The obligations of the Plan Investors to consummate the transactions contemplated by the EPCA are subject to numerous conditions in addition to the Plan Investors' due diligence "out" in their sole discretion (in connection with which the Plan Investors have the prerogative to approve or disapprove of certain of the Debtors' EBITDA targets and forecasted restructuring charges in their sole discretion).  The most significant additional conditions involve the right of each of Appaloosa and Cerberus to approve, in their individual sole discretion, the GM Settlement and revised labor agreements with each of the UAW, the IUE-CWA, and the USW.  In addition, the EPCA also contains conditions related to, among other things, the approval of certain documents related to the Debtors' plan and disclosure statement, consents, and representations and warranties.

46.     The EPCA also provides for certain indemnification rights to the Plan Investors, subject in the case of any dispute as to coverage to the determination of this Court, whether or not the Rights Offering is consummated or the EPCA is terminated or the transactions contemplated by the EPCA or the Debtors' plan are consummated.

2.     Plan Framework Support Agreement

47.     The PSA, as well as the economics and structure of the plan framework itself, is expressly conditioned on reaching consensual agreements with Delphi's U.S. labor unions and GM.  The PSA outlines certain plan terms, including proposed distributions to be made to creditors and shareholders, the treatment of GM's claim, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  In addition, the PSA describes plan terms related to the terms of the preferred stock to be issued under the

plan, the establishment of a joint claims oversight committee, certain corporate governance

provisions, and certain conditions precedent to plan effectiveness.

48.     The plan terms described in the PSA are conditioned on the

implementation of the Debtors' transformation plan, including a settlement of the GM issues and

fulfillment of the conditions to the proposed equity investment by the Plan Investors in Delphi,

as contemplated and described in the EPCA.  The PSA is subject to Delphi and GM reaching a

documented settlement agreement on the resolution of the GM issues on or before January 31,

2007.  Under the terms of the PSA, the parties thereto have agreed to work together to attempt to

complete the negotiation of the terms of the Debtors' reorganization plan, as well as to resolve

other outstanding issues, and to formulate and facilitate confirmation and consummation of the

Debtors' reorganization plan and the transactions contemplated thereby.  In so agreeing, the

parties to the PSA do not desire and do not intend in any way to derogate from or diminish the

solicitation requirements of applicable securities and bankruptcy law or the fiduciary duties of

the Debtors or any such other party to the PSA having such duties.

49.     The parties to the PSA acknowledge that Delphi and GM presently intend

to pursue agreements, to be documented in the Debtors' reorganization plan, the order confirming

the reorganization plan and/or the documents related to Delphi's settlement with GM, as

applicable, concerning, among other matters: (a) triggering of the GM benefit guarantees; (b)

assumption by GM of certain postretirement health and life insurance obligations for certain

Delphi hourly employees; (c) funding of Delphi's underfunded pension obligations, including by

the transfer to GM, pursuant to a 414(l) transaction, of certain of Delphi's pension obligations;

(d) provision of flowback opportunities at certain GM facilities for certain Delphi employees; (e)

GM's payment of certain retirement incentives and buyout costs under current or certain future

attrition programs for Delphi employees; (f) GM's payment of mutually negotiated buy-downs; (g) GM's payment of certain labor costs for Delphi employees; (h) a revenue plan governing certain other aspects of the commercial relationship between Delphi and GM; (i) the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites; (j) the Debtors' support for GM's efforts to resource products purchased by GM; (k) licensing of the Debtors' intellectual property to GM or for its benefit; (l) treatment of the environmental matters agreement between Delphi and GM; (m) treatment of normal course items, such as warranty, recall and product liability obligations; and (n) treatment of all other executory contracts between the Debtors and GM. The parties to the PSA agree to negotiate in good faith all of the documents and transactions described above, however, the parties to the PSA understand that no party has any obligation to enter into any such documents or consummate any such transactions.

50.     The plan framework described in the PSA, which is predicated in part upon the Debtors' business plan and resolution of the GM issues, outlines the potential recoveries to the Debtors' stakeholders:

- All senior secured debt would be refinanced and paid in full and all allowed administrative and priority claims would be paid in full.

- Trade and other unsecured claims and unsecured funded debt claims would be satisfied in full with $810 million of common stock (18 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and the balance in cash. The framework requires that the amount of allowed trade and unsecured claims (other than funded debt claims) not exceed $1.7 billion.

- In exchange for GM's financial contribution to Delphi's transformation plan and in satisfaction of GM's claims against the Debtors, GM will receive 7 million out of a total of 135.3 million shares of common stock in the reorganized Delphi, $2.63 billion in cash, and an unconditional release of any alleged estate claims against GM. In addition, as with other customers, certain GM claims would flow-through the chapter 11 cases and be satisfied by the reorganized company in the ordinary course of business. While the actual value of the potential GM contribution cannot be determined until a consensual resolution with GM is completed, Delphi

is aware that GM has publicly estimated its potential exposure related to Delphi's chapter 11 filing.

- All subordinated debt claims would be allowed and satisfied with $450 million of common stock (10 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share and the balance in cash.

- Holders of existing equity securities in Delphi would receive $135 million of common stock (3 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and rights to purchase 56.7 million shares of common stock in the reorganized Delphi for $1.984 billion at a deemed exercise price of $35 per share (subject to the Rights Offering becoming effective and other conditions).

51. The PSA also reaffirms Delphi's earlier commitment to the preservation of its salaried and hourly defined benefit pension plans and will include an arrangement to fund approximately $3.5 billion of its pension obligations. As much as $2 billion of this amount may be satisfied through GM taking an assignment of Delphi's net pension obligations under applicable federal law. GM will receive a note in the amount of such assignment on agreed market terms that will be paid in full within ten days following the effective date of the reorganization plan. Through this funding, Delphi will make up required contributions to the pension plans that were not made in full during the chapter 11 cases.

52. The PSA will be terminated if the EPCA is terminated. In addition, after April 1, 2007, any party to the PSA can terminate the PSA for any reason or no reason by delivering a notice of termination to the other parties to the PSA. Nevertheless, the Debtors believe that the Framework Agreements provide the Debtors with a platform to complete the transactions contemplated by therein and promptly conclude these chapter 11 cases.

<u>Relief Requested</u>

53. The Framework Agreements represent the culmination of many hours of intense discussions between the Debtors, the statutory committees, GM, and the Plan Investors. The Framework Agreements are an initial and critical step for the Debtors, and form a platform

27

for the resolution of the Debtors' transformation issues and the formulation of a consensual

reorganization plan. By this Motion, the Debtors seek entry of an order authorizing and

approving the Debtors' entry into the EPCA and the other Investment Agreements pursuant to

sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the PSA pursuant to

sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code.

Applicable Authority

A.  Approval And Authorization Of Relief Requested

54.  Bankruptcy Code section 363(b)(1) permits a chapter 11 debtor to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1). This Court may authorize use of estate property outside the ordinary

course of business if a debtor demonstrates a sound business justification for it. In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991). This "business judgment" test is premised on

the debtor's business judgment that the proposed use of property of the estate would be beneficial

to the estate. Cf. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),

4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365). To

a bankruptcy court, "'business judgment' . . . is just that – a judgment of the sort a businessman

would make." Id.

55.  Once the debtor articulates a valid business justification, the business

judgment rule creates "a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656

28

(S.D.N.Y. 1992) (citation omitted). The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)). "Courts are both to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence." Integrated Resources, 147 B.R. at 656.

56.     The Debtors, in their sound business judgment, believe that the transactions contemplated by the EPCA, the other Investment Agreements, and the PSA should promote a prompt consummation of these chapter 11 cases, will facilitate the Debtors' businesses and financial restructuring, and is in the best interests of their creditors, shareholders, and other parties-in-interest. Moreover, the Debtors believe that the Commitment Fees provided for in the EPCA are reasonable in the context of the Debtors' cases and the transactions contemplated in the Framework Agreements.

57.     The Commitment Fees represent a small fraction of the investment that the Plan Investors will make to acquire the Preferred Shares, the Direct Subscription Shares, and the Unsubscribed Shares. The purchase price for the Preferred Shares and the Direct Subscription Shares totals more than $1.4 billion, with an additional investment to be made, if necessary, to acquire the Unsubscribed Shares. In addition, the Debtors' believe that payment and reimbursement of the Transaction Expenses is reasonable under the circumstances. Moreover, the Debtors' commitment to pay the Commitment Fees and the Transaction Expenses is an integral part of the transactions contemplated under the Framework Agreements, and the Plan Investors would not otherwise enter into the agreements without such commitment. The payment of the Commitment Fees and Transaction Expenses are actual, necessary costs of

preserving the estate and should be entitled to administrative priority status under sections 503(b) and 507(a).

58.     The Debtors further submit that the payment of the Alternate Transaction Fee constitutes a material inducement for, and a condition of, the Plan Investors' entry into the EPCA.  See, e.g., Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (break-up fees warranted when necessary to preserve value of estate).  Moreover, the Debtors believe that the requested Alternate Transaction Fee is fair and reasonable in view of the EPCA, which has served as the catalyst for the Debtors' development of a plan of reorganization.  Specifically, the Debtors have determined, with assistance from their investment bankers and other financial advisors, that the amount of the Alternate Transaction Fee is within a range of reasonableness given the nature and size of the proposed Rights Offering and the circumstances under which the Plan Investors have agreed to make their investment.  Finally, similar fees have been granted in connection with rights offerings of similar magnitude.  See, e.g. In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (up to $130 million fee in connection with backstop of $2.2 billion rights offering); In re USG Corp., Case No. 01-2094 (Bankr. D. Del. February 23, 2006) (up to $120 million fee in connection with backstop of $1.8 billion rights offering).

59.     Finally, the Debtors submit that this Court determine that the entry into the PSA by the parties thereto, and the performance of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the parties thereto including, without limitation, the designation of the vote of GM or any Plan Investor under Section 1125(e) of the Bankruptcy Code.  Section 1125(e) of the Bankruptcy Code provides, in relevant part, as follows:  "A person that…participates, in good faith and in

compliance with the applicable provisions of this title, in the offer, issuance, sale or purchase of

a security, offered or sold under the plan, of the debtor…is not liable, on account of such

solicitation or participation, for violation of any applicable law, rule or regulation governing

solicitation of acceptance or rejection of…the offer, issuance, sale or purchase or securities."  11

U.S.C. § 1125(e).

        60.    The Debtors believe that the relief requested in the proposed order is

appropriate and is fair and reasonable under the circumstances.  GM and the Plan Investors are

not willing to proceed with the EPCA and the PSA if so doing would expose them to potential

liability for potential claims.

        61.    Based on the foregoing, the Debtors believe that they have exercised

sound business judgment in deciding to execute the Framework Agreements, and this Court

should authorize and approve the Debtors' entry into such agreements.

B.    <u>Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004</u>

        62.    Under Bankruptcy Rule 6004(g), [a]n: "An order authorizing the use, sale,

or lease of property other than cash collateral is stayed until the expiration of 10 days after entry

of the order, unless the court orders otherwise."  Courts in this district have waived this stay upon

a showing of business need.  <u>See</u> <u>In re Adelphia Commc'ns Corp.</u>, 327 B.R. 143, 175 (Bankr.

S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the

order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g).");

<u>In re PSINet Inc.</u>, 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of

"business exigency" for waiver of ten-day stay under Bankruptcy Rule 6004(g)).  In general,

courts will grant waivers when doing so is important to the debtor's financial health.  <u>See</u> <u>In re</u>

<u>Second Grand Traverse School</u>, 100 Fed. Appx. 430, 434-35 (6th Cir. 2004) (affirming decision

waiving 10-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No. 00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

63.     The Framework Agreements are conditioned, among other things, upon the Debtors' and the Plan Investors' timely compliance with many issues, including the completion of due diligence, finalizing Delphi's settlement negotiations with GM, negotiating revised labor agreements, and formulation and drafting of plan and disclosure statement documents.  The Debtors submit that the waiver of the ten day stay is appropriate here to allow for the payment of the Commitment Fees and Transaction Expenses, as described in the EPCA, so that the Plan Investors can continue their diligence and the Debtors can work to consummate the transactions contemplated by the Framework Agreements.

<u>Notice Of Motion</u>

64.     Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 5418).  The Debtors have submitted the proposed Order Scheduling Non-Omnibus Hearings On Debtors' Plan Investment And Framework Support Approval Motion And Dip Refinancing Motion (the "Scheduling Order"), setting the hearing for this Motion on January 5, 2007 (the "January 5 Hearing").  The Scheduling Order provides that parties-in-interest will have until January 2, 2007 to file an

32

objection.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

65.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the service and filing of a separate memorandum of law required under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing and approving the Debtors' entry into the PSA pursuant to sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code and (ii) authorizing and approving the Debtors' entry into the EPCA and the other Investment Agreements and the payment of all associated fees, expenses, damage claims, and of all related indemnities as and when provided for therein pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code, and (iii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          December 18, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      George N. Panagakis (GP 0770)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession