**<u>EXHIBIT 47</u>**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Pedro A. Jimenez (PJ 1026)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Debtors
 and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re                                                        :       Chapter 11
                                                             :
Dana Corporation, *et al.,*                                  :       Case No. 06-10354 (BRL)
                                                             :
                                 Debtors.                    :       (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION OF DEBTORS AND DEBTORS
IN POSSESSION FOR ENTRY OF AN ORDER (A) APPROVING
SETTLEMENT AGREEMENTS WITH THE UNITED STEELWORKERS
AND UNITED AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113
AND 1114(E) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,
AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN
SUPPORT AGREEMENT, INVESTMENT AGREEMENT AND RELATED
AGREEMENTS, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      A hearing to consider the Motion of Debtors and Debtors in Possession for

Entry of an Order (A) Approving Settlement Agreements with the United Steelworkers and

United Autoworkers, Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of

Bankruptcy Procedure 9019, and (b) Authorizing the Debtors to Enter into Plan Support

Agreement, Investment Agreement and Related Agreements, Pursuant to 11 U.S.C. §§ 105(a),

363(b), 364(c)(1), 503 and 507 (the "<u>Motion</u>"), filed by the above-captioned debtors and debtors

in possession (collectively, the "<u>Debtors</u>"), shall be held before the Honorable Burton R. Lifland,

United States Bankruptcy Judge, in Room 623 of the United States Bankruptcy Court, Alexander

Hamilton Custom House, One Bowling Green, New York, New York 10004, on July 25, 2007 at

10:00 a.m. (New York time), or as soon thereafter as counsel may be heard.

2.     Objections, if any, to the relief sought in the Motion must be made in

writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure

and the Local Rules for the United States Bankruptcy Court for the Southern District of New

York and be filed with the Court and served in accordance with the Amended Administrative

Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, Establishing

Case Management and Scheduling Procedures in these cases (Docket No. 574) (the "<u>Case</u>

<u>Management Order</u>") so as to be actually received by (a) Counsel to the Debtors, Jones Day, 222

East 41st Street, New York, New York 10017 (Attn: Corinne Ball, Esq.); (b) Counsel to the

United Steelworkers, Five Gateway Center, Room 807, Pittsburgh, Pennsylvania 15222

(Attn: David R. Jury); (c) Counsel to International Union, UAW, 8000 East Jefferson Avenue,

Detroit, Michigan 48214 (Attn: Niraj R. Ganatra) and Meyer, Suozzi, English & Klein, P.C.,

1350 Broadway, Suite 501, New York, New York 10018 (Attn: Lowell Peterson); (d) Counsel to

Centerbridge Capital Partners, L.P., Willkie Farr & Gallagher, LLP, 787 Seventh Avenue, New

York, New York 10019 (Attn:  Matthew A. Feldman, Esq.); (e) the parties on the Special Service

List and the General Service List; and not later than 4:00 p.m. (New York time) on July 19, 2007

(the "Objection Deadline").

        3.       Copies of the Motion, the Case Management Order, the Special Service

List and the General Service List may be obtained on from the Court's website

http://www.ecf.nysb.uscourts.gov or, without charge, at the website of the Debtors' claims and

noticing agent at http://www.dana.bmcgroup.com.

Dated:  July 5, 2007                              Respectfully submitted,
       New York, New York

                                   /s/ Corinne Ball
                                   Corinne Ball (CB 8203)
                                   Steven C. Bennett (SB 2746)
                                   Pedro A. Jimenez (PJ 1026)
                                   JONES DAY
                                   222 East 41st Street
                                   New York, New York  10017
                                   Telephone:  (212) 326-3939
                                   Facsimile:  (212) 755-7306

                                   Heather Lennox (HL 3046)
                                   Robert W. Hamilton (RH 3130)
                                   JONES DAY
                                   North Point
                                   901 Lakeside Avenue
                                   Cleveland, Ohio  44114
                                   Telephone:  (216) 586-3939
                                   Facsimile:  (216) 579-0212

                                   ATTORNEYS FOR DEBTORS AND
                                   DEBTORS IN POSSESSION

Hearing Date and Time: July 25, 2007 at 10:00 a.m.
Objection Deadline: July 19, 2007 at 4:00 p.m.

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Pedro A. Jimenez (PJ 1026)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                      :
In re                                 :   Chapter 11
                                      :
Dana Corporation, et al.,             :   Case No. 06-10354 (BRL)
                                      :
                                      :   (Jointly Administered)
                   Debtors.           :
                                      :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION**
**FOR ENTRY OF AN ORDER (A) APPROVING SETTLEMENT**
**AGREEMENTS WITH THE UNITED STEELWORKERS AND**
**UNITED AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113**
**AND 1114(E) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,**
**AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN**
**SUPPORT AGREEMENT, INVESTMENT AGREEMENT AND RELATED**
**AGREEMENTS, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507**

## TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................ 2

Jurisdiction ........................................................................................................ 6

Background ........................................................................................................ 6

    Procedural Background .................................................................................. 6

    The Debtors' Efforts To Restructure Their Labor Costs And Legacy Obligations ......... 8

        The Debtors' Unionized Workforce ......................................................... 8

        The Debtors' Non-Pension Retiree Benefits ............................................. 9

        The Debtors' Restructuring Initiatives .................................................... 10

        The Debtors' Section 1113/1114 Proposals ............................................ 11

        The Section 1113/1114 Litigation ........................................................ 12

    The Global Settlement .................................................................................. 13

        The Union Settlement Agreement ........................................................ 15

        The Plan Support Agreement .............................................................. 27

        The Investment Agreement and the Investment Agreement Term Sheet ........... 30

Relief Requested .............................................................................................. 37

Basis for Relief ................................................................................................ 38

    The Global Settlement Should Be Approved ................................................. 38

    The Global Settlement Represents a Sound Exercise of the Debtors' Business Judgment ................................................................................................ 43

Memorandum of Law ........................................................................................ 48

Notice ............................................................................................................. 48

No Prior Request .............................................................................................. 49

Conclusion ....................................................................................................... 49

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*In re Aerovox, Inc.*, 269 B.R. 74 (Bankr. D. Del. 2001) ................................................44

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939) ................................................39

*In re Enron Corp.*, No. 02 Civ. 8489, 2003 WL 230838 (S.D.N.Y. Jan. 31, 2003) ....................39

*In re Hibbard Brown & Co., Inc.*, 217 B.R. 41 (Bankr. S.D.N.Y. 1998) ....................................40

*In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992) ....................................43, 44, 45

*In re Interco, Inc.*, 128 B.R. 229 (Bankr. E.D. Mo. 1991) ..............................................................44

*In re Ionosphere Clubs, Inc.*, 100 B.R. 670 (Bankr. S.D.N.Y. 1989) ............................................43

*In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994) ........................................................................................................................39, 40

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) ...............................................................................39, 40

*Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994) ..............................................................39, 40

*Official Committee of Unsecured Creditors of LTV Aerospace and Defense Co. v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) ................................43

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993) ...............................................................................................................43

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ................................................................................................39

*Purofied Down Products*, 150 B.R. 519 (S.D.N.Y. 1993) ..............................................................40

*United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family Snacks, Inc.)*, 257 B.R. 884 (8th Cir. BAP 2001) ......................................................................38

*In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983) ..............................................................40

## DOCKETED CASES

*In re Comdisco, Inc.*, Case No. 01-24795 (RB) ...........................................................................47

*In re Delphi Corp., et al.*, Case No. 05-44481 (RDD) (Jan. 12, 2007) ....................................46, 47

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Owens Corning*, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) ..................................46

*In re USG Corp.*, Case No. 01-2094 (Bankr. D. Del. Feb. 23, 2006)............................................46

## FEDERAL STATUTES

11 U.S.C. §105(a) ........................................................................................................44

11 U.S.C. § 363(b) .......................................................................................................43

11 U.S.C. § 503(b)(1)(A) ............................................................................................46

11 U.S.C. § 1114(e) .....................................................................................................38

Fed. R. Bankr. Pr. 9019...............................................................................................39

NYI-4003642v4

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Dana Corporation ("Dana") and 40 of its domestic direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for entry of an order pursuant to: (a) sections 1113 and 1114(e) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving and authorizing the Debtors to enter into a settlement agreement (the "USW Settlement Agreement") with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") and a settlement agreement (the "UAW Settlement Agreement," and together with the USW Settlement Agreement, the "Union Settlement Agreement")[1] with International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW," and together with USW, the "Unions"); and (b) sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy Code, approving and authorizing the Debtors to enter into: (i) a plan support agreement (the "Plan Support Agreement," attached hereto as Exhibit B), which includes as Exhibit A thereto a term sheet for certain key elements of a plan of reorganization (the "Plan Term Sheet") and as Exhibit B thereto a term sheet (the "Investment Agreement Term Sheet") setting forth the terms for a new investment in the reorganized Debtors of no less than $500 million and up to $750 million (the "Investment") by Centerbridge Capital Partners, L.P. ("Centerbridge") and certain additional parties (the "Plan Investors"); and (ii) an investment agreement between Dana and Centerbridge that will incorporate the terms of the Investment Agreement Term Sheet (the "Investment Agreement," and together with the Union Settlement

---

[1] True and correct copies of the USW Settlement Agreement and the UAW Settlement Agreement are attached hereto collectively as Exhibit A.

Agreement and the Plan Support Agreement, the "Global Settlement").[2]  In support of the

Motion, the Debtors respectfully represent as follows:

**Preliminary Statement**

1.       During the course of the trial on the Debtors' Motion To Reject Their

Collective Bargaining Agreements and To Modify Their Retiree Benefits Pursuant to Sections

1113 and 1114 of the Bankruptcy Code [Docket #4672] (the "Section 1113/1114 Motion"), the

Debtors presented evidence that:  (a) the Debtors' U.S. operations have been hemorrhaging cash

at an alarming rate, which has resulted in over $2 billion in losses over the past 5 years; (b) the

Debtors are constrained to maintain significant business operations in the United States given the

size of the U.S. auto market as compared with the rest of the world and, equally importantly,

given that the overwhelming majority of the Debtors' customers are headquartered, and do the

majority of their business, in the U.S.; and (c) the Debtors cannot successfully restructure their

U.S. operations without addressing and resolving their escalating U.S. union labor and legacy

costs.  The Unions vigorously opposed the Section 1113/1114 Motion for numerous reasons,

including without limitation, the Unions' position that granting the relief requested in the Section

1113/1114 Motion would impose a great toll on Union retirees, whose retiree welfare benefits

would be terminated, as well as on Union active employees, whose wages and benefits would be

reduced.  In their response to, and during the trial on the Section 1113/11114 Motion, the Unions

made clear their intention to strike in the event that the Court granted the relief sought in the

Section 1113/1114 Motion.

---

[2]        The Investment Agreement Term Sheet, which is attached as Exhibit B to the Plan Support
Agreement, sets forth the material terms of the Investment Agreement.  The Debtors intend to file a true and correct
copy of the Investment Agreement prior to the hearing on the Motion.

2.      In the weeks since the conclusion of the trial on the Section 1113/1114 Motion, the Debtors, the Unions and Centerbridge have met and conferred on almost a continuous basis and negotiated tirelessly to address these issues and achieve a consensual resolution of the Union labor and retiree benefit issues that are the subject of the Section 1113/1114 Motion.  Given the certainty favored by the Unions over the source from which the Debtors would satisfy their obligations under the proposed resolution with the Unions, Centerbridge was brought into the negotiations as a potential source of long-term funding and because Centerbridge possesses extensive restructuring and automotive industry experience. Centerbridge is a well known and well respected private equity firm committed to the long-term success of a company in which it invests.

3.      The three party arm's length negotiations between the Debtors, the Unions and Centerbridge have resulted in a finely-balanced consensual resolution of the litigation surrounding the Section 1113/1114 Motion.  Indeed, the involvement and commitment of Centerbridge is and continues to be a condition to the willingness of the Unions to enter into the Global Settlement.  As discussed herein, Centerbridge already has satisfied itself with respect to its due diligence and, as a result, Centerbridge's commitment to make the Investment is firm through May 1, 2008, subject only to a customary "material adverse change" provision.  The Global Settlement benefits the Debtors' estates by (a) allowing the Debtors to achieve the cost savings necessary for them to exit from chapter 11 as a sustainable business capable of meaningfully competing in a distressed auto industry (while simultaneously avoiding labor unrest likely to ensue if the Section 1113/1114 Motion was granted) and (b) providing the Debtors with a source of funding from which to meet their obligations under the Union Settlement Agreement.

4.      Indeed, the Global Settlement addresses and resolves three issues vital to the Debtors' successful emergence from bankruptcy:  As detailed in the Plan Term Sheet, the Debtors have agreed to propose and prosecute a plan of reorganization that will contain certain terms that both the Debtors and the Unions consider essential to the Debtors' emergence from bankruptcy as a viable, going concern capable of sustaining profitable U.S. operations and supporting a unionized workforce.  In addition, as detailed in the Investment Agreement Term Sheet, the Global Settlement includes the issuance of preferred equity of between $500 million and $750 million, of which $500 million is committed by Centerbridge, that provides the means by which the Debtors will be able to fulfill their obligations under the Union Settlement Agreement.  Finally, as detailed in the Union Settlement Agreement, the Global Settlement provides for the compromise of the Section 1113/1114 litigation with the Unions and, more importantly, achieves significant cost savings (through, among other things, the elimination of an approximately $1 billion liability from the Debtors' balance sheet on account of Non-Pension Retiree Benefits (defined below) provided to Union retirees and active employees) that will allow the Debtors to markedly improve their overall EBITDA and mitigate the "cash burn" of the Debtors' U.S. operations.

5.      Under the terms of the Union Settlement Agreement, the Debtors and the Unions have agreed to modifications to the various collective bargaining agreements between the Debtors and the Unions that are expected (together with the consensual agreement related to the closure of two of the Debtors' unionized facilities) to save the Debtors in excess of $100 million per year based upon the modification of wages and benefits for active Union employees, the modification to certain work rules and the termination of Non-Pension Retiree Benefits (defined below) for the Debtors' Union retirees and active employees.  In exchange for these concessions,

the Debtors have agreed to, among other things, certain modifications to their MFO Program (defined below), buyout payments, implementing successorship provisions governing the sale of the stock or assets of any Organized Union Facility (defined below) and provide funding to separate, Union specific VEBAs to be established by each Union to provide long-term disability and retiree welfare benefits to eligible Union employees and retirees.

6.      Another key component of the Global Settlement (and a condition to the Unions' willingness to enter into the Global Settlement) was the Debtors' ability to provide greater certainty that the reorganized Debtors would emerge as a healthy, competitive enterprise and also have the wherewithal to make the payments to the Unions contemplated under the Global Settlement.  The Unions and the Debtors expressed confidence in Centerbridge's industry knowledge, competence and commitment to the Debtors' long-term health, as well as Centerbridge's ability to work constructively with the Unions—both now and in the future. Because of this confidence in Centerbridge and in order to ensure adequate resources to fund the Debtors' obligations under the Union Settlement Agreement, the Unions required, as a condition to their willingness to proceed with the Global Settlement, that Centerbridge serve as the lead investor and funding source.  As a result, the Debtors, the Unions and Centerbridge have spent the last several weeks negotiating the terms of the Global Settlement, as set forth in the constituent documents described more fully below.  The Debtors' agreements with Centerbridge discussed herein are a necessary and integral part of the Global Settlement.

7.      The Global Settlement represents the last hurdle in the Debtors' efforts over the last 15 months to address the issues that led them to seek relief under chapter 11 and, indeed, clears the way for the Debtors to formulate, negotiate, propose and prosecute a plan of reorganization within the timeframe established by the Bankruptcy Code.  At the same time, the

Global Settlement enables the Debtors to discharge their fiduciary responsibilities by allowing

the Debtors to pursue an alternative investment or alternative plan if, after considering all

relevant factors, a superior opportunity emerges (subject to the rights of the Unions described

herein and in Appendix R to the Union Settlement Agreement).  Accordingly, the Debtors

believe that their entry into the Global Settlement represents a sound exercise of their business

judgment and request that the Court approve and authorize the Debtors to enter into the Union

Settlement Agreement, the Plan Support Agreement and the Investment Agreement.

8.      In addition, the Debtors respectfully submit that the Global Settlement,

when viewed in the context of the goals the Debtors sought to achieve through the Section

1113/1114 Motion, satisfies the requirements of Bankruptcy Rule 9019 and, accordingly, should

be approved in all respects.

### Jurisdiction

9.      This Court has jurisdiction to consider this matter pursuant to

28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The relief requested herein is made pursuant to sections 105(a), 363(b),

364(c)(1), 503, 507, 1113 and 1114(e) of the Bankruptcy Code and Rule 9019 of the Bankruptcy

Rules.

### Background

**Procedural Background**

11.      On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.  By an order entered on the Petition

Date, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are

being administered jointly.  The Debtors are authorized to continue to operate their businesses

and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     On March 10, 2006, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors, pursuant to section 1102 of the Bankruptcy Code.  On June 27, 2006, the U.S. Trustee appointed an official committee of equity security holders, pursuant to section 1102 of the Bankruptcy Code, which committee subsequently was disbanded by the U.S. Trustee on February 9, 2007.  On August 31, 2006, the U.S. Trustee appointed an official committee of non-union retired employees (the "Retiree Committee"), pursuant to section 1114(d) of the Bankruptcy Code and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773).

13.     Debtor Dakota New York Corp. ("Dakota") is a New York corporation. Debtor Dana is the direct or indirect parent of Dakota and each of the other Debtors.  Dana maintains its corporate headquarters in Toledo, Ohio.  The Debtors and their nondebtor affiliates (collectively, the "Dana Companies") have over 100 leased and owned domestic business locations and have operations in approximately 25 states, as well as in Mexico, Canada, 11 countries in Europe and 14 countries elsewhere in the world.

14.     The Dana Companies are leading suppliers of modules, systems and components for original equipment manufacturers and service customers in the light, commercial and off-highway vehicle markets.  The products manufactured and supplied by the Dana Companies are used in cars; vans; sport utility vehicles; light, medium and heavy trucks; and a wide range of off-highway vehicles.

15.     As disclosed in Dana's Form 10-K filed on March 20, 2007, for the year

ended December 31, 2006, the Dana Companies recorded revenue of approximately $8.5 billion

and had assets of approximately $6.7 billion and liabilities totaling $7.6 billion.  As of the

Petition Date, the Dana Companies had approximately 44,000 employees.

**The Debtors' Efforts To Restructure Their Labor Costs And Legacy Obligations**

        _The Debtors' Unionized Workforce_

16.     As of January 1, 2007, the Debtors' unionized workforce was composed

of approximately 6,500 employees working at 25 different U.S. facilities.  Of the 25 U.S.

facilities, two—Lima, Ohio and Pottstown, Pennsylvania—were operating under an extension of

an otherwise expired collective bargaining agreement with the UAW (the "UAW Master

Agreement").  Several other U.S. facilities, including union facilities, were recently sold (or are

scheduled to be sold) as part of the sale of the Debtors' engine hard parts and fluids businesses,

which leaves five U.S. Union facilities with current and unexpired collective bargaining

agreements (other than the UAW Master Agreement):  Auburn Hills, Michigan; Elizabethtown,

Kentucky; Fort Wayne, Indiana; Henderson, Kentucky; and Marion, Indiana (these five facilities

are referred to as the "1113 Facilities," and together with the Lima and Pottstown facilities, are

collectively referred to as the "Organized Union Facilities").  Two other facilities, Rochester

Hills, Michigan and Longview, Texas, are organized by the UAW pursuant to a partnership

agreement between the Debtors and the UAW, but do not yet have ratified agreements (the

"Newly Organized Facilities").[3]

---

[3]     Except for the Fort Wayne, Henderson and Marion facilities, where the USW is the bargaining
agent, the UAW is the bargaining agent at the other facilities named herein.

17. Except for employees covered under the UAW Master Agreement and employees at the Newly Organized Facilities, all Union employees at the 1113 Facilities are covered by separate collective bargaining agreements with respect to each such facility (together with the UAW Master Agreement, the "CBAs").

18. All employees covered under a CBA currently receive a comprehensive package of benefits from the Debtors, including: healthcare insurance (hospital, medical, surgical, dental, prescription drug, vision and hearing); short- and long-term disability; life and accidental death and dismemberment insurance; 401(k) coverage and/or a defined benefit pension plan; workers' compensation and other benefits. For 2006, the total cost for wages paid and benefits provided to the Debtors' unionized workforce was approximately $405 million, or in excess of $60,000 per employee.

### The Debtors' Non-Pension Retiree Benefits

19. The Debtors currently provide non-pension retiree benefits (including hospital, medical, surgical, dental, prescription drug, vision, hearing and life insurance) (collectively, "Non-Pension Retiree Benefits") to all eligible active and retired union employees and/or their spouses and dependents at facilities were such benefits are or were negotiated. Such Non-Pension Retiree Benefits are "retiree benefits" within the meaning of section 1114(a)(1) of the Bankruptcy Code. As of January 1, 2006, approximately 16,415 individuals received Non-Pension Retiree Benefits from the Debtors under CBAs (or were active union employees currently covered under provisions of the CBAs that provide a benefit upon retirement). Of these 16,415, approximately 7,200 are associated with manufacturing facilities that have either

been sold or closed.[4]  As of December 31, 2006, the Debtors' Accumulated Post-Employment

Benefit Obligation ("APBO") for Non-Pension Retiree Benefits for Union employees and

retirees was approximately $1 billion.

20.     As of December 31, 2006, Debtors' 2006 cash cost for providing Non-

Pension Retiree Benefits to their Union employees and retirees was approximately $80 million,

and the Debtors' corresponding periodic cost or expense reflected on their income statement on

account of Non-Pension Retiree Benefits for Union employees and retirees was approximately

$63 million.

The Debtors' Restructuring Initiatives

21.     Based on analyses and diligence that the Debtors (with the assistance of

their advisors) began during the first part of 2006, on October 17, 2006, the Debtors outlined the

key components of what they believed was necessary to emerge from chapter 11 as a viable

business.  Specifically, the Debtors communicated to the Unions, the Creditors Committee and

other key constituencies that the Debtors needed to achieve annual cost savings or revenue

enhancement of approximately $405 to $540 million, which the Debtors believed they could

achieve from five separate areas.  First, the Debtors stated a need to restructure some of their

unprofitable or below market contracts with customers, from which the Debtors anticipated they

could achieve approximately $175 to $225 million in annual revenue improvements.  Second, the

Debtors identified additional savings they believed could be realized by capitalizing on the

Debtors' lower cost manufacturing capabilities by shifting work, where possible, from high-cost

operations to low-cost countries.  In this regard, the Debtors developed a manufacturing footprint

---

[4]     The Unions have served as the "authorized representative," as defined in section 1114 of the
Bankruptcy Code, for those persons receiving Non-Pension Retiree Benefits who were formerly employed at the
Union Facilities, as well as union retirees receiving Non-Pension Retiree Benefits, and who were affiliated with a
facility that has since been closed or sold.

optimization program ("MFO Program"), pursuant to which the Debtors would shift manufacturing capacity from high cost plants in the U.S. to Mexico and other countries, and from which the Debtors estimated they could achieve approximately $60 to $85 million in annual cost savings. Third, the Debtors identified various overhead costs that they believed could reduce or completely eliminate, and which would yield an additional $40 to 50 million in annual cost savings. Fourth, the Debtors developed a plan to reduce their labor costs associated with their union and non-union workforce, which the Debtors believed could result in additional $60 to $90 million in annual cost savings. Finally, the Debtors proposed the elimination of Non-Pension Retiree Benefits for both union and non-union retirees (as well as any anticipated coverage for both union and non-union active employees), which the Debtors estimated would result in an additional annual cost savings of approximately $70 to $90 million.

22. The $130 to $180 million in savings the Debtors sought to realize from labor and legacy costs was composed of the following: (a) modifications to certain benefits and programs offered to non-union active employees beginning on January 1, 2007; (b) elimination of Non-Pension Retiree Benefits for non-union active employees and retirees; (c) elimination of Non-Pension Retiree Benefits for union retirees and active employees; and (d) modifications to the CBAs (wages, as well as certain benefits and programs offered to union active employees).

The Debtors' Section 1113/1114 Proposals

23. During November and December 2006, the Debtors made proposals to the Unions under section 1113 of the Bankruptcy Code with respect to each 1113 Facility (each, a "Section 1113 Proposal"). Similarly, during that time and followed up by revised proposals made in January 2007, the Debtors made proposals to the Unions under section 1114 of the Bankruptcy Code with respect to Non-Pension Retiree Benefits provided by the Debtors to

retired Union employees and/or their spouses and dependents and to eligible Union employees
upon retirement (each, a "Section 1114 Proposal").[5]

24.    In summary, the Section 1113 Proposals sought (a) wage modifications at
the 1113 Facilities; (b) implementation of a "Two Tier" wage structure at all facilities;
(c) migration to a consumer-driven health benefit program; and (d) modifications to certain work
rules and benefits.  The revised Section 1114 Proposals delivered to the Unions, like those
delivered to the Retiree Committee and the IAM, contemplated the elimination of Non-Pension
Retiree Benefits for Union retirees and active employees upon retirement and, in its place, the
establishment of a VEBA from which participating retirees can receive a subsidy towards the
cost of their healthcare.

The Section 1113/1114 Litigation

25.    On January 31, 2007, the Debtors filed their Section 1113/1114 Motion.[6]
The trial on the Section 1113/1114 Motion began on March 12, 2007.  Prior to the
commencement of the trial, the Debtors announced that they had reached consensual agreements
with both the IAM (with respect to the issues in the Section 1113/1114 Motion) and the Retiree
Committee (with respect to both the section 1114 portion of the Section 1113/1114 Motion and
the Unilateral Termination Motion).  The settlement with the IAM was approved by an order
entered on April 27, 2007 [Docket # 5180], and the settlement with the Retiree Committee was
approved by an order entered on May 22, 2007 [Docket # 5356].

---

[5]        Both prior to and after delivering the Section 1113 and Section 1114 Proposals to the Unions, the
Debtors met with Union representatives and provided information to the Unions for the purpose of their evaluation
of the proposals.

[6]        The Debtors also filed a motion under section 363 of the Bankruptcy Code for entry of an order
authorizing the Debtors to terminate Non-Pension Retiree Benefits for their non-union active employees and retirees
(the "Unilateral Termination Motion").

26. The trial on the Section 1113/1114 Motion continued on March 26, 27, 28
and 29, 2007 and concluded on April 3, 2007. On April 13, 2007, both the Debtors and the
Unions submitted their proposed findings of fact and conclusions of law to the Court. The Court
was scheduled to render a decision on the Section 1113/1114 Motion on April 30, 2007.
However, by virtue of four extensions requested jointly by the Debtors and the Unions, the Court
has deferred rendering a decision on the motion until July 6, 2007.

**The Global Settlement**

27. After concluding the trial on the Section 1113/1114 Motion, the Debtors,
the Unions and Centerbridge have engaged in extensive and exhaustive collective bargaining in
connection with negotiating an overall resolution of the Union labor, retiree and operational
issues that have plagued the Debtors' U.S. operations and which, if resolved, would enable the
Debtors to move forward with a plan of reorganization and satisfy the Unions' desire to protect
the interests of their members and retirees to the greatest extent possible given the circumstances.
The Global Settlement is the result of these numerous meetings and conferences and the parties'
good faith negotiations and arm's length bargaining. In structuring the Global Settlement, the
Debtors sought to achieve several principal objectives: (a) the reduction of union labor costs and
Non-Pension Retiree Benefits within the range needed for the Debtors to achieve long-term
viability; (b) the extension of the terms of the various CBAs; (c) the resolution of the section
1113/1114 litigation between the Debtors and the Unions; (d) the mitigation of the risk of a
likely strike or other actions in the event that the Court granted the relief requested under section
1113 of the Bankruptcy Code; and (e) the orderly closure of the Debtors' Syracuse and Cape
Girardeau facilities. The Debtors believe that the Global Settlement achieves each of these
stated objectives.

28.     The Unions also had several objectives that they sought to achieve as part
of the Global Settlement:  (a) to maintain as many current and future jobs as possible at the
Union facilities; (b) to provide additional job security for both current and future Union
employees; (c) to minimize the effect of the restructuring initiatives on retirees; (d) to assure that
the Debtors emerge from bankruptcy with limited leverage and adequate liquidity to sustain the
business in what likely will continue to be a distressed auto industry; (e) to secure a reputable
funding source (with significant restructuring, private equity and automotive expertise) for the
various contributions the Debtors are required to make under the Union Settlement Agreement
that can work constructively with the Unions and is prepared to provide leadership expertise,
intended to insure the long-term success of the business; and (f) establish the groundwork for a
new labor relations model between the parties.

29.     Because of the magnitude of the Debtors' objectives and the complicated
nature of, and conditions to, the consensual resolution of the Section 1113/1114 Motion, the
Global Settlement is a complex and finely balanced resolution of the parties' competing interests.
It is comprised of three constituent agreements:  the Union Settlement Agreement, the Plan
Support Agreement and the Investment Agreement.

30.     The following description is a summary only of certain material aspects of
the Global Settlement and does not purport to summarize all of the key terms of the constituent
agreements.  Moreover, because the following description summarizes complex terms, it is by
nature neither as detailed nor as precise as the constituent documents.  Accordingly, the
following description is qualified in its entirety by reference to the three agreements, which
control any interpretation of the Global Settlement, and to which the reader is respectfully
directed.

<u>The Union Settlement Agreement</u>

31.     The Union Settlement Agreement provides comprehensive terms for the extension of the CBAs, wage structure modifications, benefit modifications, work and scope rule changes and elimination of Non-Pension Retiree Benefits for both Union employees and retirees that will generate in excess of $100 million in annual expense savings for the Debtors.  Specific terms of the Union Settlement Agreement include:

| New Expiration Date of CBAs and new agreements at Newly Organized Facilities | June 1, 2011 |
|---|---|
| Wage Structure Modifications (Appendix O and Letter No. 4) | Effective on the first Monday following approval of the Union Settlement Agreement, the Debtors will implement a two-tier wage at all Union facilities where the first tier of wages exceeds the Tier 2 rate listed below.  Subject to certain exceptions, existing tiered wage structures at Union facilities will be eliminated and replaced with the new two-tier wage structure listed below. |
| | For Tier 1 employees at the Debtors' Lima, Pottstown, Fort Wayne, Marion and Henderson facilities, the Debtors and the Unions have agreed to the following: |
| | •Effective July 7, 2008, pay each Tier I employee a 2% lump sum of earnings (minimum $1,000), exclusive of shift premium, during the fifty-two (52) pay periods ending Sunday, June 22, 2008; |
| | •Effective July 6, 2009, pay each Tier I employee a 1-1/2% lump sum of earnings (minimum $750), exclusive of shift premium, during the fifty-two (52) pay periods ending Sunday, June 21, 2009; and |
| | •Effective January 4, 2010, each Tier I employee from locations noted above shall be granted a one and one-half percent (1.5%) General Wage Increase.  The method of accomplishing this shall be to add one and one half percent (1.5%) to the base hourly rate of each Tier I employee's job classification |

| | including the minimum and maximum rates for spread rate classifications (if applicable) exclusive of shift premiums. |
| | The Tier 2 rates are as follows: |
| | 0-52 weeks  $14.00/hr.<br>53-104 weeks  $14.50/hr.<br>105-156 weeks  $15.00/hr.<br>157+ weeks  $15.50/hr. |
| | For those Tier 2 employees receiving $15.50/hr. for at least one year as of July 1, 2009, increase of $.50/hr. in lieu of general wage increase for Tier 2 employees, and add a fourth year to the progression. |
| | Tier 2 wages will also apply to all Fort Wayne Union employees currently on layoff. |
| | Tier 2 wages will not apply to skilled trade classifications or to the technical employees in the office unit at Pottstown. |
| Health Insurance for Active Employees (Appendix Q) | Effective January 1, 2008, active Union employees at the Lima, Pottstown, Henderson and Marion facilities will be covered under the Debtors' HealthWorks medical insurance plan, as modified by Appendix Q. |
| | Active Union employees at all other Union Facilities will be covered under the HealthWorks medical insurance plan in substantially the same manner as provided to all other employees at facilities where HealthWorks is already offered to employees. |
| | Premium contributions to be paid by Union employees will be adjusted on January 1 of each year beginning January 1, 2009, provided that the premium increase will not exceed six percent (6%) in any one year. |
| Long-Term Disability Insurance (Appendices K and Q) | Beginning on the later of January 1, 2008, and the effective date of a plan of reorganization for the Debtors, the Debtors will terminate long-term disability benefits for all Union employees who are currently receiving long-term disability benefits as of that date or have begun a period of disability that will result in qualification for long-term disability benefits. Pursuant to the terms of the Union Settlement |

| | Agreement, the Debtors will make a contribution to separate, Union-specific VEBAs to be established by the Unions in respect of any Union employees whose long-term disability benefits are terminated. |
| --- | --- |
| | For active Union employees at Lima, Pottstown, Henderson and Marion not covered under the prior paragraph, beginning January 1, 2008, long-term disability benefits shall be equal to that provided to all other employees, except for the following modifications: (i) waiting period for long-term disability benefits is 26 weeks, (ii) benefit of 50% of average weekly earnings, (iii) Union employee must be wholly prevented from engaging in any regular employment at the facility where he/she is employed and not otherwise engaged in any other regular employment for pay or profit, and (iv) benefit duration is "time-for-time" except for those employees with 10+ years of service with the Debtors who shall receive benefits until such employee reaches early or normal retirement age. |
| | For all other Union employees, effective January 1, 2008, long-term disability benefits are modified as follows: (i) 24 week waiting period for benefits, (ii) benefit of 50% of annual wages, with a maximum benefit of $5,000/month and minimum benefit of $100/month, (iii) maximum duration of benefits is 2 years, and (iv) Union employee must be unable to perform the material and substantial duties of regular job, have a 20% or more loss in monthly earnings and be under regular care of a physician. |
| Short-Term Disability Insurance (Appendix Q) | Effective January 1, 2008, short-term disability benefits to Union employees shall be the same as that provided to all other employees except for the following modifications: (i) waiting period for benefits is 1st day for accident or hospitalization and 8th day for illness, (ii) benefit payable is 60% of average weekly earnings for up to 26 weeks, (iii) no lifetime maximum benefit limitation, and (iv) total benefits cannot exceed 70% of weekly earnings |

| | on account of other sources of income. |
|---|---|
| | Union employees already receiving short-term disability benefits that commenced prior to January 1, 2008, and who become eligible for long-term disability, will continue receiving benefits under applicable plan in force until their period of eligibility for short-term disability benefits expires. |
| Life/AD&D Insurance (Appendix Q) | Beginning on January 1, 2008, life insurance will be provided to Union employees in the amount of one and one-half times base annual wages. Accidental death and dismemberment insurance will be provided in the amount of 75% of the amount of base annual wages. |
| Non-Pension Retiree Benefits and Establishment of VEBAs (Appendix K) | Beginning on the later of January 1, 2008, and the effective date of a plan of reorganization for the Debtors, the Debtors will cease providing Non-Pension Retiree Benefits to Union retirees and active employees. |
| | In connection with the treatment of existing long-term disability benefits (discussed above) and Non-Pension Retiree Benefits for Union retirees and active employees, the Debtors have agreed to contribute an amount not to exceed $704 million plus approximately $80 million of new common stock of reorganized Debtors (subject to the allocation set forth in Appendix K to the Union Settlement Agreement) to separate, Union specific voluntary employer benefit associations ("VEBAs") to be established pursuant to the Union Settlement Agreement by each Union and maintained in the manner set forth in Appendix K. |
| | The amount of the contribution to be made to each VEBA is subject to reduction for the amount of long-term disability claims or Non-Pension Retiree Benefit claims actually paid by the Debtors after July 1, 2007 and before January 1, 2008. |
| Pension Benefits (Appendices L and M) | Effective on the later of January 1, 2008, or the effective date of a plan of reorganization for the Debtors (the "Freeze Date"), all future pension "credited service" and benefit accruals |

| | under Union pension plans will be frozen, except for the pension plan for Syracuse, which is covered under a plant closing agreement.

With respect to pension benefits based on credited service going forward, the Debtors have agreed to contribute on a monthly basis to the Steelworkers Pension Trust a fixed amount per covered employee's "Contributory Hours" (as such term is defined in the relevant plan documents) for Union employees at the Elizabethtown, Auburn Hills, Pottstown, Lima, Fort Wayne, Marion, Henderson, Rochester Hills and Longview facilities. The amount of the contribution during the first year following the effective date (defined as the later of January 1, 2008, or the date immediately following the effective date of the freeze of the Debtors' pension plans) is $.60 for each covered employee's "Contributory Hours", with the amount of the contribution increasing to $.80 in the second year, and $1.00 beginning in the third year and continuing to the expiration of the CBAs. |
|---|---|
| Local Bargaining | In the negotiation of the individual location agreements, the Unions and their local leadership have agreed to modifications that provide the Debtors with an aggregate net additional $6.2 million in verifiable savings per year. |
| Buyouts (Appendix L) | A one-time payment will be available to: (i) Union employees, neither on long-term disability status at the time they retire nor who, upon retirement, would be commencing a benefit from terminated vested status, at the Debtors' Lima, Pottstown or Marion facilities, who satisfied the eligibility requirements for retirement under the applicable Union pension plan covering such employees and who retire or have retired beginning May 26, 2007 and extending for 90 days past the Freeze Date; (ii) Union employees, neither on long-term disability status at the time they retire nor who, upon retirement, would be commencing a benefit from terminated vested status, covered under the CBA for the Fort Wayne traction |

<table>
<tr><td></td><td>manufacturing facility who are Tier 1 employees and who satisfied the eligibility requirements for retirement under the applicable Union pension plan for Fort Wayne employees, and who retire or have retired beginning May 26, 2007 and extending for 90 days past the Freeze Date; and (iii) Union employees, neither on long-term disability status at the time they retire nor who, upon retirement, would be commencing a benefit from terminated vested status, at the Debtors' Lima, Pottstown, Marion facilities or at the traction manufacturing facility in Fort Wayne who retired from employment with the Debtors on or after January 1, 2007 and prior to May 26, 2007.  In the case of the Fort Wayne facility, in order to be eligible under subparagraph (ii) above, a Union employee must have, in addition, been at work on January 1, 2007 and must continue to be at work in that location as of May 1, 2007.

For eligible employees in groups (i) and (ii), the amount of the buy out payment will be $45,000.00.  For eligible employees in group (iii), the amount of the buyout payment will be $22,500.00.  Any such payments will be reduced by any applicable withholdings and deductions required by law.

A one time payment not to exceed $2.5 million in the aggregate will also be made available to Union employees at the Fort Wayne plant who on the Freeze Date have less than 20 years of pension credited service.  The portion of the $2.5 million payment to be paid to each participant is to be determined by the local Union leadership for the Fort Wayne facility, based on each employee's credited service as a portion of the total pension credited service held by all employees eligible to receive such a payment.</td></tr>
<tr><td>Marion Facility Special Voluntary Separation Program (Appendix N)</td><td>In connection with the Debtors' relocation of the production of end yokes currently manufactured in the Marion facility, a lump sum payment equal to 52 weeks of pay at the base rate of pay (less any expected</td></tr>
</table>

|  | unemployment compensation during that period) will be paid to eligible employees at the Marion facility who agree to participate in the Special Voluntary Separation Program. |
|---|---|

32.    The Debtors believe that the wage and benefit modifications described above result in savings within the range that the Debtors need to achieve a competitive cost structure.

33.    In addition to the cost savings described above, the Union Settlement Agreement memorializes other important agreements between the parties:

| Successorship (Appendix A) | The Debtors and the Unions have agreed to include a provision in each CBA that requires that certain conditions must be satisfied prior to or in conjunction with the closing of any sale or other type of transfer of any Union plant or facility. |
|---|---|
| Neutrality (Appendix B and Letter No. 1) | The Debtors and the Unions have agreed on a form of agreement that governs the conduct of the parties with respect to any current or future non-Union facilities (except for Owensboro, Kentucky, Gordonsville, Tennessee and Orangeburg, South Carolina) at which one of the Unions undertakes activities to represent employees at those facilities. |
| MFO Program (Appendix C) | The Debtors and the Unions have agreed that the Debtors will continue with their announced MFO Program, with the following modifications:  (i) 138 heavy duty assembly jobs will be moved from the Louisville, Kentucky and Brantford, Ontario facilities to the Lima facility; and (ii) when the production of end yokes is moved from the Marion facility, the Debtors will replace 60 jobs that would otherwise be lost by that move. |
| Employment Security (Appendix D) | The Debtors and the Unions have agreed that, prior to the Debtors implementing any layoffs at Union facilities, the Debtors will discuss with the Unions the need for, and plan related to, any proposed layoffs, and will entertain any |

| | alternatives identified by the Unions. |
|---|---|
| Future Opportunity/Underutilized Facilities (Appendix E) | The Debtors and the Unions have agreed to a program whereby new work intended to be performed by the Debtors in the United States will be given to a particular Union Facility specializing in such type of work if certain conditions are met. |
| | In addition, with respect to certain Econoline machining work currently performed at the Fort Wayne facility, the Debtors and the Unions have agreed that, in the event the customer decides to perform such work in-house, the Debtors will give the Fort Wayne facility first priority for future traction business machining work that the Debtors intend to perform in North America; provided that the work can be performed at the Fort Wayne plant in a manner that would not be materially detrimental to the financial or competitive viability of the North American traction business. |
| | The Debtors have also agreed that, with respect to any underutilized facility, they will consider sourcing existing or new work that can be performed by an underutilized facility to such facility. |
| Interplant Job Opportunities (Appendix F) | The Debtors and the Unions have agreed that, with respect to any Union employee that has two or more years of service and is on continuous layoff for at least 60 days, such employee shall be given priority over new hires for job vacancies at facilities other than the facility from which he/she is on layoff. |
| Sourcing (Appendix G) | The Debtors and the Unions have agreed that, with respect to work currently sub-contracted or outsourced from the Lima, Pottstown, Fort Wayne, Henderson, Elizabethtown and Auburn Hills facilities, the Debtors will make reasonable attempts to in-source such work when the work can be completed on a cost-competitive basis. The parties have also agreed to establish a process for addressing future sourcing issues. |

| National Healthcare Network (Appendix Q1) | The Debtors and the Unions have agreed to replace the Debtors' current healthcare networks with a single national network of healthcare providers effective January 1, 2008. The decision of whether to make such change will include consideration of a number of factors set forth in Appendix Q1 to the Union Settlement Agreement. |
|---|---|
| Post-Emergence Bonus (Appendix J) | The Debtors and the Unions have agreed that shares of new common stock of reorganized Dana having a value not to exceed $22.530 million shall be reserved for the purpose of providing a bonus to certain Union employees as soon as practicable following the Debtors' emergence from chapter 11. The amount of shares to be reserved shall be determined based on the value per common share set forth in the disclosure statement for the Debtors as approved by the Court. |
| Section 1114(g)(3) Rights | The Unions have agreed that they will not file or support any subsequent motion or modification of Non-Pension Retiree Benefits pursuant to section 1114(g)(3) of the Bankruptcy Code. |
| Assumption of the CBAs | The CBAs, as modified by the Union Settlement Agreement, shall be assumed by the applicable Debtor on the effective date of a plan of reorganization for the applicable Debtor. |
| Conditions to Effectiveness | The Debtors and the Unions have agreed that the Global Settlement shall not become effective until the occurrence of the following events: (a) approval by the respective Unions in accordance with their designated processes; (b) execution of the Investment Agreement; (c) execution of the Plan Support Agreement; (d) approval by this Court of the Union Settlement Agreement; (e) withdrawal of the Section 1113/1114 Motion, which, so long as the Union Settlement Agreement has not been terminated, will be with prejudice; (f) ratification of the USW's first labor agreement covering employees at Humboldt, Tennessee; and (g) completion of the expedited organizing process at Sterling, Illinois and Milwaukee, |

| | Wisconsin. |
|---|---|
| Termination Events (Appendix R) | The Union Settlement Agreement specifies certain rights that the Unions will have in the event that the Debtors choose to pursue a transaction or other means of a reorganization different than the transaction contemplated with Centerbridge or Centerbridge terminates the Investment, as follows: |
| | If the Debtors choose to pursue an Alternative Minority Investment (defined below), then such investment shall be subject to the Unions' consent, such consent not to be unreasonably withheld. With respect to such consent, the Unions have the right to conduct expedited due diligence (the Unions will use reasonable best efforts to complete such due diligence within 3 weeks), and the Debtors and the alternative investor are to cooperate fully in such due diligence. If the Unions do not consent, the matter is to be mediated, and if not resolved, addressed through mandatory labor arbitration. If the arbitrator finds that the Unions acted reasonably in withholding their consent and the Debtors nonetheless decide to proceed with the proposed alternative investment, then the Unions may choose to either (i) issue a notice of termination, which shall constitute notice that all CBAs have been terminated as of the date set forth in such notice, and which shall give rise to the Unions' right to strike upon such termination; or (ii) not issue a notice of termination, in which case the Unions will have an allowed administrative expense claim of $704 million and a stock distribution of approximately $80 million to be contributed to the respective VEBAs (subject to allocation between the Unions as described in Appendix R to the Union Settlement Agreement), or as otherwise directed to be paid by the Unions in the event that their respective VEBA has not yet been established. If the arbitrator finds that the Unions acted unreasonably in withholding their consent, the Debtors can proceed with the proposed alternative investment and the Union Settlement Agreement remains in place. Any |

action to enforce or vacate the arbitral award
shall be an action under Section 301 of the
Labor-Management Relations Act of 1947.
The Debtors reserve the right to commence
such action in the Bankruptcy Court.

If Centerbridge terminates the Investment
contemplated under the Investment Agreement
Term Sheet (other than as a result of a breach
by the Debtors), then the Unions may, within
30 days of notice of Centerbridge's
termination, designate a replacement investor;
provided, however, that if the 30 day period
has not run by September 3, 2007, then the
Debtors may file a plan of reorganization that
will be later amended to incorporate the
replacement investor, subject to the provisions
below. The Debtors have the right to consent
to any such replacement investor, such consent
not to be unreasonably withheld. Any disputes
over whether the Debtors acted reasonably in
withholding their consent shall be decided by
mandatory arbitration. If the arbitrator finds
that the Debtors acted unreasonably, then the
Debtors will be required to accept the
replacement investor. If the Unions fail to
identify a replacement investor or the arbitrator
finds that the Debtors acted reasonably, then
the Debtors are authorized to pursue an
alternative plan of reorganization so long as
such plan is consistent with the Union
Settlement Agreement, and the Union
Settlement Agreement remains in place.

Except in the case of the events described
above, if the Debtors pursue a transaction other
than the Investment set forth in the Investment
Agreement Term Sheet (including an
Alternative Majority Investment (defined
below) or the sale of substantially all of the
Debtors' assets and any similar transaction),
then such alternative transaction shall be
subject to the Unions' consent, as well as the
arbitration and review procedures set forth
above for an Alternative Minority Investment.
If the arbitrator determines that the Unions
acted reasonably in withholding their consent
and Dana nevertheless proceeds with such

alternative transaction, the Unions may either (i) elect to terminate the Union Settlement Agreement, in which case the Unions shall have the right to strike and shall have a general unsecured claim in the amount of $908 million (subject to allocation between the Unions as described in Appendix R to the Union Settlement Agreement) (the "Unions' Claim"), and Non-Pension Retiree Benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of the distribution of the Unions' Claim or (ii) elect not to terminate, in which case the Union Settlement Agreement shall remain in effect and the Unions may elect to have the Unions' Claim or a cash payment of $704 million and a stock distribution of approximately $80 million (the "Unions' Election") to be paid to their respective VEBA (subject to allocation between the Unions as described in Appendix R to the Union Settlement Agreement) or as otherwise directed by the Unions in full satisfaction of the Unions' Claim. If the arbitrator finds that the Unions acted unreasonably in withholding their consent, then the Debtors may proceed with the alternative transaction and the Unions may make the Unions' Election in full settlement of the Unions' Claim.

For any other event of termination under the Investment Agreement Term Sheet, including the filing of a stand-alone plan of reorganization, the Unions may either (i) elect to terminate the Union Settlement Agreement, in which case the Unions shall have the right to strike, and Non-Pension Retiree Benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of the distribution of the Unions' Claim; or (ii) elect not terminate, in which case the Union Settlement Agreement shall remain in effect and the Unions may make the Unions' Election in full satisfaction of the Unions' Claim.

| | If the Debtors' chapter 11 cases are dismissed, then the parties will return to the status that existed immediately before the filing of the Section 1113/1114 Motion and execution of the Union Settlement Agreement. |
| --- | --- |
| | In the event that the Debtors' chapter 11 cases are converted to cases under chapter 7, then the Debtors will seek that any order of conversion will provide for an allowed administrative claim in the amount of $704 million for the payment of Non-Pension Retiree Benefits. |
| Executive Compensation Appeal | The Unions will withdraw with prejudice their appeal in respect of the Debtors' executive compensation, annual incentive plan, and long term incentive plan that is currently pending in the United States District Court for the Southern District of New York. |
| Dispute Resolution | The parties have agreed that any disputes concerning the interpretation of the Union Settlement Agreement (except for any disputes arising under any individual location Union agreement or other Union agreement) shall be subject to final and binding arbitration. |
| Plan of Reorganization | The Debtors' plan of reorganization will: (i) provide for the assumption by the Debtors of all CBAs and the Union Settlement Agreement; (ii) provide for the funding to the respective VEBAs required under terms of Union Settlement Agreement; (iii) be in a form and substance reasonably acceptable to the Unions; (iv) conform to the Union Settlement Agreement; (v) incorporate the Investment specified in Investment Agreement Term Sheet; and (vi) include the Unions and their representatives in any exculpation and release provisions applicable to, and on same terms as, the Debtors and their officers and directors. |

<u>The Plan Support Agreement</u>

34.     Another fundamental, necessary and inextricable component of the Global Settlement is the Plan Support Agreement.  Both the Plan Term Sheet and the Investment Agreement Term Sheet are exhibits to the Plan Support Agreement.

35.     The Plan Support Agreement, which was entered into by the Debtors, the Unions and Centerbridge, provides that the Debtors will (i) file a motion to obtain approval of the Global Settlement, including the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement; (ii) file a disclosure statement and plan of reorganization consistent in all respects with the Plan Term Sheet and in a form reasonably acceptable to Centerbridge on or before September 3, 2007; (iii) obtain an order confirming such plan of reorganization on or before February 28, 2008; and (iv) consummate such plan of reorganization by May 1, 2008.

36.     The Plan Support Agreement also sets forth the understanding and agreement by the parties that the Unions and Centerbridge:  (a) will support and not oppose a disclosure statement or plan of reorganization that contains the terms in the Plan Term Sheet; (b) will negotiate in good faith with the Debtors to finalize a disclosure statement, plan of reorganization and related definitive documentation consistent with the terms in the Plan Term Sheet; and (c) in the case of Centerbridge, that it will negotiate in good faith and use reasonable best efforts to finalize the Investment Agreement by July 19, 2007.

37.     The Plan Support Agreement identifies various conditions under which it can be terminated:  (i) automatically, if either the Investment Agreement or the Union Settlement Agreement is terminated; or (ii) unless waived, if the plan of reorganization fails to become effective on or before May 1, 2008.

38.     The Plan Term Sheet (Exhibit A to the Plan Support Agreement), in turn,

outlines certain key terms for a plan of reorganization consistent with the terms of the Global

Settlement.  In particular, the Plan Term Sheet provides for the following:

| | |
|---|---|
| New Investment | Contemplates the investment to be made in the reorganized Debtors on the terms and conditions set forth in the Investment Agreement Term Sheet |
| Exit Facility | The Debtors shall obtain an exit facility with parties and on market terms reasonably acceptable to Centerbridge sufficient to refinance the Debtors' DIP facility and provide sufficient liquidity for working capital and general corporate purposes. |
| Settlement with Unions | The Debtors' plan of reorganization will conform to the Union Settlement Agreement in terms of providing the source and amount of cash required to meet the Debtors' obligations under the Union Settlement Agreement. |
| Treatment of Unsecured Creditors | Unsecured creditors (except for the Unions) will receive their pro rata portion of shares of common stock of reorganized Dana and/or cash in excess of the minimum cash required to operate the Debtors' business.  Distributions to the Unions will be governed by the terms of the Union Settlement Agreement. |
| Initial Management of the Debtors | The reorganized Debtors shall negotiate market employment agreements with senior management, which shall be in form and substance acceptable to Centerbridge. |
| Tax Attributes | Unless otherwise agreed to by the Debtors and Centerbridge, the plan of reorganization and any investments thereunder shall be structured in a manner so as to preserve the Debtors' net operating losses. |
| Restrictions on Sales of Pre-Emergence | The Debtors are permitted to sell core businesses only with consent of the Unions or Centerbridge. |
| Restrictions on Sales Post-Emergence | Restrictions on the reorganized Debtors' ability to sell core businesses (whether through stock or asset sales) are to be addressed in individual CBAs. |
| Outside Effective Date | May 1, 2008 |

| | |
|---|---|
| Union VEBAs | The Debtors' plan of reorganization will provide for payment of cash to be paid into the VEBAs established by the Unions in connection with the Debtors' obligations under the Global Settlement. |
| Pension Benefits | The Debtors' plan of reorganization will not provide for or be conditioned upon the distress or standard termination of any of Debtors' union pension plans. In addition, the Debtors agree to oppose any involuntary termination of such plans. |
| Assumption of CBAs and Other Agreements | The Debtors' plan of reorganization will provide for the assumption of the CBAs, the Neutrality Agreement and any related agreements necessary to effect the Union Settlement Agreement. |
| Takeover Protections | The reorganized Debtors will have a customary rights plan but will not have a classified board of directors. |
| Post-Emergence Leverage Limitation | Not to exceed $1.5 billion. |
| Minimum Emergence Liquidity | An amount reasonably acceptable to the Unions and Centerbridge. |
| LTD Claims | For Union members receiving long-term disability claims, such claims will be deemed settled under the Union Settlement Agreement and not entitled to vote to accept or reject plan. |

<u>The Investment Agreement and the Investment Agreement Term Sheet</u>

39.     The Investment Agreement Term Sheet sets forth the terms and conditions upon which Centerbridge has committed to purchase $300 million of 4% Series A convertible preferred stock (the "<u>Series A Preferred</u>"), and provide a firm commitment to purchase $200 million in 4% Series B-1 convertible preferred stock that is not purchased by a Qualified Creditor (the "<u>Series B-1 Preferred</u>") and use reasonable best efforts to identify Qualified Creditors[7] eligible to purchase up to $250 million in 4% Series B-2 convertible preferred stock

---

[7]     Qualified Creditors means a finite number, to be agreed upon by the Debtors and Centerbridge, of the largest holders of claims against the Debtors (excluding the Unions), each of whom is (a) a "qualified

(the "Series B-2 Preferred," and together with the Series B-1 Preferred, the "Series B Preferred")

in the reorganized Debtors. The Series B-1 Preferred will be purchased by either Centerbridge or

Qualified Creditors and the Series B-2 Preferred will be purchased by Qualified Creditors. Some

of the pertinent terms in the Investment Agreement Term Sheet include:

| | |
|---|---|
| Conversion Rights | Both the Series A Preferred and Series B Preferred are convertible by the holders thereof at any time into New Common Stock of the reorganized Debtors. |
| | The conversion price is 83% of the value (the "Distributable Market Value Per Share") that is determined by calculating the 20-day volume weighted average trading price of the New Common Stock, determined using the closing trading price of the New Common Stock from the first business day after the Effective Date through the twenty-third business day after the Effective Date after disregarding the highest and lowest closing trading price during such period. |
| | The Debtors may force conversion on or after the 5th anniversary of the Effective Date of the Plan if the New Common Stock shall have exceeded 140% of the Distributable Market Value Per Share at the close of trading for at least 20 consecutive trading days occurring on or after the fifth anniversary of the Effective Date. |
| Dividends | Each share of Series A Preferred and Series B Preferred shall be entitled to receive, on a *pari passu* basis, a 4% dividend, payable quarterly in cash. Unpaid dividends shall accrue and be added to the preferred share's liquidation preference. |
| Ranking | The Series A Preferred shall rank senior to the Series B Preferred for purposes of liquidation, dissolution or winding up of the reorganized |

---

(continued…)

institutional buyer" as such term is defined in Rule 144A promulgated under the Securities Act, and (b) has such other objective characteristics as reasonably determined by Centerbridge.

| | Debtors, and each will rank senior to any other class or series of capital stock of the reorganized Debtors with respect to any distributions for liquidation, dissolution or winding up of the reorganized Debtors. |
|---|---|
| Voting Rights | Series A Preferred and the Series B Preferred will have equal voting rights and will vote together as a single class with the New Common Stock of reorganized Dana on an as-converted basis |
| | If the Conversion Price would result in Centerbridge beneficially owning the Series A Preferred, Series B Preferred or New Common Stock of reorganized Dana that in the aggregate has voting power in excess of 40% of the voting power of the fully diluted shares of reorganized Dana, Centerbridge will vote such excess of Series A Preferred, Series B Preferred or New Common Stock of reorganized Dana in the same proportion as the votes cast by the non-Centerbridge affiliated holders of Series A Preferred, Series B Preferred and New Common Stock of reorganized Dana. |
| Preemptive Rights | Series A Preferred is entitled to participate *pro rata* in future equity issuances. |
| Registration Rights | Customary registration rights. |
| Lock-Up | Series A Preferred contain a lockup provision prohibiting a sale or conversion to common shares of more than $150 million for 3 years. |
| | The lockup terminates upon any restructuring, judicial or non-judicial liquidation or reorganization by the reorganized Debtors, any sale of all or substantially all of the assets of the reorganized Debtors taken as a whole, any merger or similar transaction involving a change of control of the reorganized Debtors or any public offering for cash unless, in the case of such public offering, the holders of Series A Preferred or Series B Preferred, as applicable, are given the opportunity to participate in the public offering on a pro rata basis. |
| | Both Series A Preferred and Series B Preferred |

| | holders are also precluded from selling or converting any of their shares for a period of two months after the effective date of the Debtors' plan of reorganization. |
|---|---|
| Reporting Requirements | Dana will not voluntarily deregister or suspend registration of its common stock under the provisions of the comply with all '34 Exchange Act that require the filing of periodic reports (10-Q's and 10-K's, etc.) |
| Standstill | The Investment Agreement will contain a customary 10 year standstill that will limit the ability of Centerbridge to acquire additional stock if it would own more than 30% of the voting power of reorganized Dana's stock after such acquisition and to take other actions to control reorganized Dana after the effective date of the Debtors' plan of reorganization without consent of the new board of directors of Dana. |
| Initial Board of Directors | Composed of 7 members: (i) 2 of whom will be designated by Centerbridge, (ii) 1 of whom will be an independent director chosen by Centerbridge, (iii) 2 of whom will be designated by the Creditors' Committee (both of whom must be independent); (iv) 1 of whom will be chosen by the Creditors' Committee from a list prepared by Centerbridge containing at least 3 independent candidates, and (v) the chief executive officer of reorganized Dana. |
| Subsequent Board of Directors | Beginning at the first annual meeting of shareholders of reorganized Dana following emergence, and as long as Centerbridge owns at least 50% of the Series A Preferred: Dana's board of directors will be composed of seven members: (i) 2 of whom will be designated by Centerbridge and elected by holders of the Series A Preferred; (ii) 1 of whom will be an independent director designated by Centerbridge and elected by holders of the Series A Preferred; (iii) 1 of whom will be an independent director nominated by a unanimous vote of a Series A Preferred Nominating Committee (composed of 2 Centerbridge designees and one other board member) and elected by all shareholders; and |

| | (iv) 3 of whom will be nominated by reorganized Dana's board (including the chief executive officer of reorganized Dana). |
|---|---|
| Definition of "Independent" for Centerbridge Board Designees | Any director designated by Centerbridge, whether on the initial Board or subsequent Board, must be "independent" (as defined in the stock exchange rules) of both reorganized Dana and Centerbridge. |
| Approval Rights | Any proposed action by the reorganized Debtors to (i) sell all or substantially all of their assets; (ii) merge in a change of control transaction; (iii) liquidate; (iv) issue equity below fair market value; (v) pay dividends (other than in additional shares of New Common Stock) on account of common stock of the reorganized Debtors; or (vi) amend reorganized Dana's charter, is subject to veto rights of a majority of the Series A Preferred.<br><br>The above veto rights terminate if fewer than 50% of the Series A Preferred is outstanding.<br><br>In addition, Centerbridge consent is required for (i) material transactions with directors, officers or 10% shareholders other than officer and director compensation arrangements; (ii) the issuance of senior or *pari passu* debt or equity securities other than for refinancings on similar terms; (iii) by-law amendments adverse to shareholders generally or to Centerbridge; or (iv) share repurchases in excess of $10 million in any 12 month period. These Centerbridge consent rights terminate if Centerbridge no longer owns at least $150 million of the Series A Preferred shares. |
| Conditions to Investment | Centerbridge's obligation to close the Investment shall be subject to the satisfaction of customary closing conditions, including the following:<br><br>No material adverse change in Dana<br><br>Approval of the Union Settlement Agreement on terms reasonably acceptable to Centerbridge<br><br>Debtors to obtain exit financing with parties on market terms reasonably acceptable to |

| | Centerbridge, provided that the Debtors shall have the obligation to consult with Centerbridge regarding such terms and parties |
|---|---|
| | Plan/Disclosure Statement filed by September 3, 2007 |
| | Confirmation of plan no later than February 28, 2008 |
| | Confirmation order in form reasonably acceptable to Centerbridge consistent with the Plan Term Sheet in all respects |
| | Effective date of plan no later than May 1, 2008 |
| | Union Settlement Agreement with Unions in form reasonably acceptable to Centerbridge is approved by Court |
| Alternative Transaction Option | Dana has the right to terminate Investment Agreement under the following conditions, subject to the Debtors' obligations to pay the Break-up Fee and Expense Reimbursement (described below):<br><br>• to accept a proposal for an alternative minority investment determined by Dana's board of directors to be superior to the Investment (the "Alternative Minority Investment").  Centerbridge has the right to amend the Investment to match such alternative investment;<br><br>• to accept a proposal for an alternative majority investment determined by Dana's board of directors to be superior to the Investment (the "Alternative Majority Investment");<br><br>• to accept a proposal for an alternative transaction (*e.g.*, the sale of all or substantially all of the Debtors' assets as a going concern to a third party) that Dana's board determines would be more favorable to the Debtors' bankruptcy estates (the "Alternative Transaction"); and<br><br>• to file a stand alone plan that Dana's board of directors determines would be more favorable to the Debtors' bankruptcy estates |

|  | (the "Alternative Standalone Plan"). |
|---|---|
|  | With respect to each of the four alternatives described above, any determination by Dana's board of directors must be made (i) in good faith; (ii) after consultation with the Debtors' advisors; and (iii) taking into account all legal, financial, regulatory and other aspects of the alternative, the likelihood of completion of the alternative, and the applicable rights of the Unions to terminate the Union Settlement Agreement. |
| Break-Up Fee/Expense Reimbursement | If Dana accepts an Alternative Minority Investment, then Centerbridge is entitled to a $15 million break-up fee plus reasonable expense reimbursement of up to $4 million (the "Expense Reimbursement"). |
|  | If Dana accepts an Alternative Majority Investment or pursues a Sale Alternative or Standalone Plan Alternative, then Centerbridge is entitled to a $22.5 million break-up fee (either the $15 million or the $22.5 million fee, the "Break-Up Fee") plus the Expense Reimbursement. |
|  | The Break-Up Fee and the Expense Reimbursement shall be treated as a superpriority administrative claim in the Debtors' chapter 11 cases. |
| Commitment Fee | If the Debtors' cases are converted to chapter 7 or are dismissed, or Centerbridge decides to terminate the New Investment Term Sheet because of a breach by Dana, or the Centerbridge investment closes, then Centerbridge is entitled to a $3.5 million commitment fee (the "Commitment Fee") plus the Expense Reimbursement. |
|  | The Commitment Fee shall be treated as a superpriority administrative claim in the Debtors' chapter 11 cases. |

40.     The Investment in the Debtors to be provided under the terms of the

Investment Agreement Term Sheet and the Investment Agreement is a critical and necessary

factor in the Debtors' reaching a consensual resolution of their issues with the Unions as part of

the Global Settlement. Without this significant investment in the Debtors, the Debtors' ability to

satisfy their obligations under the Union Settlement Agreement may be compromised.

Moreover, the requirement for reorganized Dana to keep leverage below $1.5 billion and to

maintain significant liquidity are vital elements to assure that Dana has capital to invest in its

business and the ability to address uncertainty in a troubled industry.

41.    Because the conversion price for the Series A Preferred and Series B

Preferred is set based on market prices, the percentage of the total voting power of reorganized

Dana that will be represented by the preferred stock will not be known until after emergence

from chapter 11. Using preliminary forecasts and a preliminary valuation as an estimate of

future trading prices for common stock, the Debtors estimate that the $500 million of preferred

stock would represent between less than 25 percent of the fully diluted common stock of

reorganized Dana.

42.    The Debtors believe that the Break-Up Fee and the Expense

Reimbursement are appropriate in light of the amount of capital committed by Centerbridge to

the Debtors and the flexibility that it provides to the Debtors in the event that a superior

alternative were to present itself, and the Debtors are, by this Motion, requesting that the Break-

Up Fee, Expense Reimbursement and Commitment Fee be allowed as superpriority

administrative expenses of each of the Debtors' estates under sections 363(b), 364(c) and 503(b)

of the Bankruptcy Code.

43.    The Break-Up Fee of $15 million or $22.5 million (depending on the type

of alternative transaction the Debtors decide to pursue) represents 3 and 4.5 percent, respectively,

of the proposed Investment, and the $22.5 million represents a much lower percentage of the

value of the alternative transactions or plans that would trigger its payment. Similarly, the
Debtors believe that the Commitment Fee described above is appropriate in light of the amount
of capital committed by Centerbridge and the potentially lengthy period of such commitment.
The Commitment Fee of $3.5 million with respect to the Series B-1 Preferred represents just
1.75 percent of the proposed $200 million Series B-1 Preferred commitment by Centerbridge.
However, there is no Commitment Fee payable on Centerbridge's $300 million direct investment
in the Series A Preferred or the Series B-2 Preferred.

## Relief Requested

44.     By this Motion, the Debtors seek entry of an order approving and
authorizing them to enter into the Union Settlement Agreement with the Unions, pursuant to
sections 1113 and 1114(e) of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the
Debtors seek entry of an order approving and authorizing them to enter into the Plan Support
Agreement and the Investment Agreement (and the related payments, transactions and
agreements), pursuant to sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy
Code.

## Basis for Relief

### The Global Settlement Should Be Approved

45.     The Global Settlement should be approved. After extensive and complex
arm's-length discussions and negotiations with the Unions over the savings the Debtors need to
obtain to emerge as a viable entity (and the means by which such savings are to be achieved), the
Debtors and the Unions reached the Global Settlement, which the Debtors believe represents a
fair and reasonable compromise and, more importantly, is a key development to further the
Debtors' successful reorganization.

46.     Section 1113 of the Bankruptcy Code governs a debtor-in-possession's proposed modifications to a collective bargaining agreement.  <u>See</u> <u>United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family Snacks, Inc.)</u>, 257 B.R. 884, 890-91 (8th Cir. BAP 2001) ("Generally speaking, § 1113 governs the rejection or modification of a CBA by a Chapter 11 trustee or debtor-in-possession. . . . Section 1113(b)(1) . . . sets out the requirements for making a valid proposal to modify [a collective bargaining agreement.]").

47.     Similarly, section 1114(e) of the Bankruptcy Code governs a debtor-in-possession's agreement with an authorized representative over modifications to "retiree benefits".  11 U.S.C. § 1114(e).  That section provides, in relevant part:

> (1) Notwithstanding any other provision of this title, the debtor in possession . . . shall timely pay and shall not modify any retiree benefits, except that –
>
> (A) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments, after which such benefits as modified shall continue to be paid by the trustee.

11 U.S.C. § 1114(e)(1)(B).

48.     A debtor-in-possession's settlement is governed by Bankruptcy Rule 9019(a), which provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Settlements and compromises are "a normal part of the process of reorganization."  <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968) (<u>quoting</u> <u>Case v. Los Angeles Lumber Prods. Co.</u>, 308 U.S. 106, 130 (1939)).

49.     Before a settlement under Bankruptcy Rule 9019 may be approved, a court must determine that the proposed settlement is fair and equitable, reasonable and in the best interests of the debtor's estate.  <u>See</u> <u>Motorola, Inc. v. Official Comm. of Unsecured Creditors (In</u>

re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (applying "fair and equitable"

standard to settlements pursuant to Bankruptcy Rule 9019); In re Ionosphere Clubs, Inc., 156

B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Enron Corp., No. 02 Civ.

8489, 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003) ("A bankruptcy court may approve a

settlement where the proposed settlement is both fair and equitable and in the best interests of the

estate.") (quotation omitted).

      50.     The decision to approve a particular settlement lies within the sound

discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).  In

exercising its discretion, the bankruptcy court must make an independent determination that the

settlement is fair and reasonable.  Id. at 122.  In addition, the bankruptcy court may exercise its

discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown &

Co., Inc., 217 B.R. 41 (Bankr. S.D.N.Y. 1998); see Shugrue, 165 B.R. at 123 ("I am also

cognizant of the general rule that settlements are favored and, in fact, encouraged by the

approval process outlined above.").

      51.     In determining whether to approve a proposed settlement, a bankruptcy

court need not definitively rule on all issues of law and fact that may be raised by the settlement,

but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest

point in the range of reasonableness.'"  In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983);

see Purofied Down Prods., 150 B.R. 519, 522 (S.D.N.Y. 1993) ("the court need not conduct a

'mini-trial' to determine the merits of the underlying litigation").

      52.     The Second Circuit recently had the opportunity to re-visit the

reasonableness of a settlement under Rule 9019, and set forth the following factors a court

should consider in determining whether a proposed compromise and settlement is fair and

equitable:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, with its attendant expense, inconvenience, and
> delay, including the difficulty in collecting on the judgment;
> (3) the paramount interests of the creditors, including each affected
> class's relative benefits and the degree to which creditors either do
> not object to or affirmatively support the proposed settlement;
> (4) whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and the
> experience and knowledge of the bankruptcy court judge
> reviewing, the settlement; (6) the nature and breadth of releases to
> be obtained by officers and directors; and (7) the extent to which
> the settlement is the product of arm's length bargaining.

Iridium Operating LLC, 478 F.3d at 462 (citing In re WorldCom, Inc., 347 B.R. 123, 137

(Bankr. S.D.N.Y. 2006)).  Thus, "[t]he 'reasonableness' of a settlement depends upon all factors,

including probability of success, the length and cost of the litigation, and the extent to which the

settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusions."

Ionosphere Clubs, 156 B.R. at 428.

      53.    The Debtors submit that the Global Settlement easily meets these

standards for approval.  Indeed, when viewed in the context of these chapter 11 cases and the

significant impact the settlement will have on the Debtors' successful emergence from chapter

11, there is little, if any, doubt that the Global Settlement should be approved.  As demonstrated

by the Debtors during the trial on the Section 1113/1114 Motion, absent a restructuring of the

CBAs and the Debtors' costs associated with providing Non-Pension Retiree Benefits to Union

active employees and retirees, the Debtors' likelihood of securing a viable U.S. operations is

questionable, at best.

      54.    The Debtors are mindful that an alternative to the Global Settlement was

simply to wait for the Court to rule on the Section 1113/1114 Motion.  That alternative posed

significant risks for both the Debtors and the Unions. On the one hand, one outcome could have been an unfavorable ruling from the Debtors' point of view. On the other hand, a favorable decision on the Section 1113/1114 Motion, while allowing the Debtors to reject the CBAs (and implement the terms of their last Section 1113 Proposals) and terminate Non-Pension Retiree Benefits for Union active employees and retirees, would potentially yield other risks and uncertainties for the estates, such as labor unrest.

55.     First, the Unions made clear both at the trial on the Section 1113/1114 Motion and in their communications with their members and the public that the Unions would commence a strike in the event that the Court authorized the Debtors to reject their CBAs. Such a result that could seriously delay, if not devastate, the Debtors' prospects for a successful reorganization. Next, a favorable decision under section 1113 does nothing to bring resolution to the UAW Master Agreement (which has otherwise expired by its terms) and, indeed, may have made it more difficult for the Debtors to negotiate a new master agreement with the UAW after rejection of the CBAs related to the 1113 Facilities. Finally, any appeal by the Unions of a favorable decision on the Section 1113/1114 Motion could be protracted and expensive and pose the possibility of further delay in these chapter 11 cases.

56.     In contrast, the Global Settlement allows the Debtors to restructure the CBAs, eliminate their legacy obligations and secure the savings necessary to produce a viable company for the long-term. The Global Settlement produces an aggregate annual cost savings, which, when combined with the cost savings the Debtors have already realized with respect to non-union active employees and retirees (as well as through the settlements with the IAM and the Retiree Committee), is within the range needed by the Debtors to return to long-term viability. Equally importantly, the Global Settlement provides the Debtors' estates with certainty

and labor peace by resolving costly and lengthy litigation with the Unions and placing the
Debtors in a position to manage and control their cost structure in the United States more
effectively.  Similarly, approval of the Global Settlement allows the Debtors to terminate their
present and future obligation to provide Non-Pension Retiree Benefits to the Union retirees and
active employees, which eliminates a liability of approximately $1 billion with the VEBA to be
established as part of the Union Settlement Agreement responsible prospectively for all Non-
Pension Retiree Benefit Obligations.

57.     The Global Settlement allows the Debtors to partner with Centerbridge, a
respected, long-term, value investor that will share its extensive restructuring and industry
experience with the Debtors.  The Global Settlement also creates the framework for the Debtors
to formulate and prosecute a successful plan of reorganization, and further provides the
wherewithal for the Debtors to satisfy their obligations under the terms of the Union Settlement
Agreement.

58.     For the foregoing reasons, the Debtors believe that the Global Settlement
is fair and equitable and should, accordingly, be approved.

**The Global Settlement Represents a Sound Exercise of the Debtors' Business Judgment**

59.     Under section 363(b)(l) of the Bankruptcy Code, the Court may authorize
a debtor in possession to "use, sell or lease, other than in the ordinary course of business,
property of the estate."  11 U.S.C. § 363(b)(l).  A debtor in possession's decision to use, sell, or
lease assets outside the ordinary course of business must be based upon its sound business
judgment.  See Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v.
The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (a judge determining
a section 363(b) application must find a "good business reason" to grant application); see also In
re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (same).  The "business

judgment" test is met when the debtor shows that the proposed use of property would be beneficial to the estate.  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

60.     Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)) (the business judgment rule is satisfied where the debtor acts "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct").  The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)); Integrated Resources, 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence.") (citations omitted).

61.     Pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  See 11 U.S.C. §105(a).

62.    The Debtors submit that the Global Settlement represents a sound exercise of the Debtors' business judgment and should be approved as in the best interests of the Debtors' estates, their creditors and other parties in interest.

63.    Indeed, whether viewed individually or collectively, the constituent agreements making up the Global Settlement satisfy the requirements of section 363 of the Bankruptcy Code.  First and foremost, the Plan Support Agreement and Investment Agreement are a condition to the Unions' agreements memorialized in the Union Settlement Agreement and, thus, in the absence of the agreements contained in the Plan Support Agreement and Investment Agreement, the Debtors risk losing the cost savings necessary to effect a successful restructuring of their U.S. operations.

64.    Similarly, the Global Settlement clears the way for the Debtors to formulate, propose and implement a plan of reorganization, because not only does it resolve the litigation with the Unions, it further secures a firm, long-term investment by which the Debtors will be able to fund their obligations required under the terms of the Union Settlement Agreement.  The Investment Agreement is a firm commitment through May 1, 2008 by Centerbridge, with no due diligence conditions.  The Investment also preserves value for the Debtors' creditors by augmenting, rather than depleting, the estates' cash resources.  Moreover, under the terms and conditions of the Global Settlement, the Debtors may consider and pursue an alternative path to reorganization if they determine that another option superior to that contemplated in the Global Settlement is available (subject to the rights of the Unions described herein and in Appendix R to the Union Settlement Agreement).

65.    Under the standards articulated in Integrated Resources, in considering whether a proposed breakup fee should be approved, a court should consider each of the

following factors: (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the proposed fee is unreasonable relative to the proposed purchase price. 147 B.R. at 657. If the answer to each of these questions is no, the break-up fee should be approved. Id.

66. The Debtors submit that the Break-Up Fee and Expense Reimbursement, which are the product of intense negotiations between the Debtors and Centerbridge, are reasonable in that they represent but a small fraction of the economic value being contributed by Centerbridge in the form of the Investment. The Break-Up Fee, which represents just 3 percent or 4.5 percent of the Investment, is reasonable when measured against the value brought by Centerbridge in helping achieve a consensual resolution with the Unions and the substantial investment that Centerbridge is prepared to make in the Debtors. Bankruptcy courts have approved fees similar in scope and size to the Break-Up Fee and Expense Reimbursement in this same context. See, e.g., In re Delphi Corp., et al., Case No. 05-44481 (RDD) (Jan. 12, 2007) (approving breakup fee of $100 million, which represented approximately 3% of proposed investment, in connection with plan investors' commitment to purchase shares in reorganized debtors and backstop rights offering to existing equity security holders);[8] In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (breakup fee of $130 million (or 6%) approved in connection with backstop of $2.2 billion rights offering); In re USG Corp., Case No. 01-2094 (Bankr. D. Del. Feb. 23, 2006) (breakup fee of up to $120 million (or 6.7%) approved in connection with backstop of $1.8 billion rights offering). The Debtors further submit that the

---

[8]    A true and correct copy of the January 12, 2007 Order entered by Judge Drain in the Delphi chapter 11 cases is attached hereto as Exhibit C.

Break-Up Fee and Expense Reimbursement are reasonable and should be approved because both were instrumental in Centerbridge proposing the Investment, while allowing the Debtors to retain the flexibility to pursue a superior alternative if one becomes available.

67.     Similarly, the Debtors submit that the proposed Commitment Fee of $3.5 million is reasonable in that it represents just 1.75 percent of the total value of the Series B-1 Preferred contemplated to be offered under the Investment Agreement Term Sheet, which Centerbridge has agreed to backstop, and which represents less than 1 percent of the total Investment Centerbridge has agreed to make.  In a similar case, as part of the January 12, 2007, order entered in <u>Delphi Corporation</u> and referenced above, Judge Drain approved a commitment fee of 1.75 percent in connection with the plan investors' agreement to backstop a rights offering to existing equity holders.  <u>See</u> Jan. 12, 2007 Order at p. 9.

68.     The Debtors also submit that granting superpriority administrative expense priority to the Break-Up Fee, Expense Reimbursement and Commitment Fee under sections 364(c)(1), 503(b)(1)(A)[9] and 507(a) of the Bankruptcy Code is warranted under the circumstances here in that awarding fees of this type encourages potential investors to invest the requisite time, money and effort to conduct due diligence and negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  <u>See, e.g.,</u> <u>In re Comdisco, Inc.</u>, Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a break-up fee as, <u>inter alia</u>, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement).  Indeed, courts within this district have granted

---

[9]     Section 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including – the actual, necessary costs and expenses of preserving the estate . . ."  11 U.S.C. § 503(b)(1)(A).

administrative expense priority to breakup fees, expense reimbursement and commitment fees in a context nearly identical to the one present here. See, e.g., Delphi Corporation, Jan. 12, 2007 Order at p. 10.

69.     Finally, the Debtors respectfully request that the Court find that Debtors' entry into, and performance under, the Union Settlement Agreement, Plan Support Agreement and Investment Agreement does not constitute the solicitation of a vote on a plan of reorganization.  Inasmuch as no vote on any plan of reorganization is being solicited by or in connection with the Plan Support Agreement or the Investment Agreement and that the Debtors intend to solicit their creditors pursuant to a Court-approved disclosure statement, the Debtors submit that the relief requested herein is appropriate and reasonable under the circumstances.

70.     For the foregoing reasons, the Debtors believe that they have exercised sound business judgment in entering into the Global Settlement, and respectfully request that the Court authorize and approve the Debtors' entry into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement.

## **Memorandum of Law**

71.     The Motion includes citations to the applicable authorities and does not raise any novel issues of law.  Accordingly, the Debtors respectfully request that the Court waive the requirement contained in Local Bankruptcy Rule 9013-1(b) that a separate memorandum of law be submitted.

## **Notice**

72.     Pursuant to the Amended Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, Establishing Case Management and Scheduling Procedures (Docket No. 574) (the "Case Management Order"), entered on March 23, 2006, notice of this Motion has been given to (a) the parties identified on the Special Service List and

the General Service List (as such terms are defined in the Case Management Order), (b) counsel

to the Unions and (c) counsel to Centerbridge.  The Debtors are also providing a separate notice

to all Union retirees summarizing the terms of the Union Settlement Agreement, the date of the

hearing on the Motion and deadline for objections thereto, as well as instructions on how to

obtain copies of the Motion if Union retirees so wish.  The Debtors submit that no other or

further notice need be provided.

### No Prior Request

73.     No prior request for the relief sought in this Motion has been made to this

or any other Court.

### Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter an order (a)

approving and authorizing the Debtors to enter into the Union Settlement Agreement, pursuant to

sections 1113(c) and 1114(e) of the Bankruptcy Code and Bankruptcy Rule 9019, (b) approving

and authorizing the Debtors to enter into the Plan Support Agreement and the Investment

Agreement, pursuant to sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy Code,

and (c) granting the Debtors such other and further relief as the Court may deem proper.

Dated: July 5, 2007                    Respectfully submitted,
     New York, New York

                                             s/Corinne Ball

                                           Corinne Ball (CB 8203)
                                           Steven C. Bennett (SB 2746)
                                           Pedro A. Jimenez (PJ 1026)
                                           JONES DAY
                                           222 East 41st Street
                                           New York, New York  10017
                                           Telephone:  (212) 326-3939
                                           Facsimile:  (212) 755-7306

                                           Heather Lennox (HL 3046)
                                           Robert W. Hamilton (RH 3130)
                                           JONES DAY
                                           North Point
                                          901 Lakeside Avenue
                                           Cleveland, Ohio  44114
                                           Telephone:  (216) 586-3939
                                           Facsimile:  (216) 579-0212

                                           ATTORNEYS FOR DEBTORS AND
                                           DEBTORS IN POSSESSION