**EXHIBIT 50**

091615 ABI-CLE 167

September 16, 2O15 American Bankruptcy Institute 167

American Bankruptcy Institute

41st Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy & Business Reorganization

September 16-17, 2015

**Other Plan-Confirmation Issues and Beyond**

Hon. Robert D. Drain, Moderator

U.S. Bankruptcy Court (S.D.N.Y.); White Plains

Prof. Douglas G. Baird

University of Chicago Law School; Chicago

Hon. Arthur J. Gonzalez (ret.)

New York University School of Law

Richard G. Mason

Wachtell, Lipton, Rosen & Katz; New York

Prof. John A.E. Pottow

University of Michigan Law School; Ann Arbor, Mich.

Copyright (c) 2O15 American Bankruptcy Institute

**Substance, Process and the Limits of Restructuring Support Agreements**

*Douglas G. Baird* [FN1]

Restructuring support agreements are a natural outgrowth out of the Bankruptcy Code's affirmative commitment to prepackaged bankruptcies. [FN2] Restructuring support agreements ensure that everyone can be confident that a prepackaged plan that parties shape outside of bankruptcy is implemented inside of bankruptcy. Creditors do not want to back a plan unless they know the debtor will back it as well. For its part, the debtor wants to be sure that the creditors will vote for the plan and place no hurdles in the way of its smooth adoption. [FN3] An agreement among the parties to support a plan ensures that the course of the prepackaged plan through bankruptcy is an easy one.

Even when a prepackaged bankruptcy is not in the cards, the debtor can avoid the perils of a free-fall bankruptcy by entering into an agreement with key constituencies that plots a course for the Chapter 11. Binding agreements among key constituents help ensure a speedy reorganization. Those who are not parties to it retain all the substantive rights that the Bankruptcy Code gives them, and they are free to assert them.

But all is not so simple. Restructuring support agreements can do more than make the Chapter 11 process faster and cheaper. They are a potential source of mischief. A restructuring support agreement can become another tool a dominant creditor uses to exercise control over the debtor and its operations. Even when control is not the primary purpose, there is cause for concern. At the most basic level, restructuring support agreements replace the bargaining environment that the Bankruptcy Code puts in place with another one that better suits the interests of the parties to the agreement. This different environment might allow for a quicker and cheaper reorganization, but it may also leave some with less than they would have enjoyed in the absence of a support agreement.

The Bankruptcy Code's absolute priority rule dictates a defined set of entitlements that the parties must receive, but under any set of facts there are a number of confirmable plans, each with somewhat different distributional outcomes. The Bankruptcy Code establishes a framework for negotiations that serves to bring the constituents towards a consensus. Restructuring support agreements change this framework and thus alter how rights are ultimately allocated. The bankruptcy judge wants to encourage parties to clear a path towards confirmation. This makes her inclined to look favorably on support agreements. At the same

time, she needs to worry that they lead to plans that, even if technically consistent with the substantive provisions of §1129, slight the rights of those who were not parties to them.

Restructuring support agreements, like many other modern innovations, require the judge to connect new practices with a Bankruptcy Code that did not envision them. Most problematic are the rules set out in §1125, the focus of Part I. On its face, this section limits the ability of the debtor to secure consent for a plan of reorganization before a disclosure statement is approved. In practice, however, parties have largely been able to navigate around this section.

The most flagrant sorts of abuse from restructuring support agreements alter the substantive rights of parties or involve "gifts" to those in control of a reorganization in return for more favorable treatment under a plan. Part II focuses on these. Part III examines recent restructuring support agreements. In addition to the danger that a dominant creditor can use a restructuring support agreement to tighten its control over the debtor, a more subtle problem can exist, the one that comes from the way in which restructuring support agreements can threaten to distort the Chapter 11 process itself.

Part IV suggests that restructuring support agreements require scrutiny because they are in tension with the core principles of modern reorganization law. An agreement among key constituents that leaves outsiders with the choice of either joining the agreement or asserting their substantive rights is precisely the vice that led to both the Trust Indenture Act and the Chandler Act in the 1930s. Here, as elsewhere, courts will have to return to first principles.

## I. Navigating §1125

Once a debtor files for bankruptcy, §1125 seems to limit the ability of parties to strike deals with each other. It prohibits "solicitation or rejection of a plan" before the court has approved a disclosure statement. [FN4] But its scope in practice is quite limited, at least in large reorganizations.

It is possible for multiple parties, without any formal agreement, to sign up to be "co-proponents" of a plan. This very public statement of support is not a binding agreement because the party can always withdraw, but it may do a good job of locking the proponents in. The process of reaching this point in their negotiations does not run afoul of §1125, one can argue, because "solicitation" refers only to the formal voting process itself. [FN5] One-on-one discussions between sophisticated stakeholders do not pose a problem either, even if the communication is a draft plan. Negotiations per se are similarly unproblematic. And obtaining informal assurances from a creditor to support a particular plan does not violate §1125.

Such informal assurances, however, are sometimes not enough. The holder of a particular claim may be a bank one day and a vulture investor the next. You would like a writing that binds the party and its successors to ensure that the support you garner today will stick. Section 1125 does not affect settlements that parties reach, even when those settlements include stipulations that oblige a creditor to support a particular plan. [FN6] For this reason, parties would like to argue their support agreement is a settlement. This argument is not on its face especially strong, especially when the binding agreement is not part of an overall settlement of many issues between the parties (as was the case in *In re Texaco, Inc.*) but is merely a commitment to vote in a particular way.

Even when the settlement argument is weak or nonexistent, courts have still shown a willingness to bless binding postpetition agreements to support a plan of reorganization. [FN7] *Residential Capital* [FN8] is a good example of a support agreement negotiated after the bankruptcy started. It illustrates the tolerance postpetition support agreements enjoy, at least if square corners are cut. Residential Capital's plan support agreement was forged after the petition was filed, but the support agreement emerged only after many months of negotiation, aided in part by court-supervised mediation conducted by another bankruptcy judge. A CRO who was not beholden to the debtor's parent represented the debtor, and the plan support agreement put the debtor on the path to settling billions of disputed claims. The court approved the debtor's entering the plan support agreement and also found that each of the parties to the agreement acted reasonably and in good faith.

Notwithstanding the blanket rule that §1125 appears to lay down, a number of courts, like the court in *Residential Capital*, have found that postpetition agreements in which parties commit to support a particular plan are permissible and do not constitute improper solicitations under §1125. These courts point to clauses that give fiduciary outs to the parties, the existence of various

termination events, and the fact that creditors cast their actual votes only after the disclosure statement is approved. As Judge Shannon explained in *In re Indianapolis Downs, LLC*:

> [All the parties are] sophisticated financial players and have been represented by able and experienced professionals throughout these proceedings. It would grossly elevate form over substance to contend that §1125(b) requires designation of their votes because they should have been afforded the chance to review a court-approved disclosure statement prior to making or supporting a deal with the Debtor. [FN9]

Because of the tension between this practice and the unqualified language in §1125, it is not surprising that the parties in cases such as *Residential Capital* seek the formal blessing of the court for their postpetition plan support agreement. Among other things, the court's approval of the agreement eliminates the possibility that those who are a party to it will later be found by the court to have acted in bad faith and should on that account have their votes designated or their role in the Chapter 11 process limited.

## II. Restructuring Support Agreements as a Channel for Abuse

When a debtor enters into a restructuring support agreement, the members of its board have a fiduciary duty to look out for the interests of the corporation as whole and maximize its value. The underlying principle is firmly rooted in nonbankruptcy law. A corporation's directors cannot relieve themselves of their obligation to exercise their fiduciary duties. A restructuring support agreement cannot compromise the board's duty of loyalty. [FN10] For this reason, restructuring support agreements must contain a "fiduciary out" that releases the debtor from its obligations under the agreement if the obligations the agreement imposes are inconsistent with its fiduciary duties.

Outside of bankruptcy, shareholders have only a modest ability to ensure that directors comply with their fiduciary duties and creditors even less so. But inside of bankruptcy things are altogether different. Directors are subject to this benchmark every time they make a decision that requires court review.

When negotiating the fiduciary out, creditors want to narrow its scope, but still ensure it remains enforceable. It must still be wide enough for directors to be able to exercise their fiduciary duty, especially their duty of loyalty. [FN11] They might insist, for example, that the debtor be free to escape from the agreement only when counsel has written an opinion letter that doing otherwise would violate its fiduciary duty. For its part, the debtor would like an expansive fiduciary out that gives it maneuvering room. A compromise might require the board to exercise a fiduciary out only after consulting with counsel.

Beyond fiduciary outs, courts are least likely to approve a support agreement when the agreement does not put the debtor on a clear path towards reorganization. It is suspect if it is merely a bargain in which the debtor joins forces with one of the competing creditor groups at the start of the case. Rather than putting the case on a path towards confirmation, the support agreement merely enables one creditor to acquire a commanding position in the case in return for providing dip financing, or offering some benefit that inures to the debtor or its managers, rather than the creditors as a group.

A striking example of a restructuring support agreement that did not pass muster appeared in the reorganization of Innkeepers. Innkeepers was a real estate investment trust that owned seventy-two hotels. Much of its debt was securitized, but it had a $220 million loan with Lehman. When Innkeepers encountered financial distress, Lehman and Innkeepers entered into a support agreement that would give Lehman the equity in the reorganized debtor in return for its mortgage and $17.5 million in dip financing.

Innkeepers tried to assume the support agreement in bankruptcy, and the court refused to allow it. Even if the extremely lax business judgment rule was the appropriate degree of deference that was owed to the Board's decision, [FN12] Innkeepers failed to meet even this standard. The business judgment rule requires that the person making the decision be disinterested and exercise due care, and Innkeepers' directors failed on both counts. Innkeepers could not claim to be disinterested because the plan contemplated giving equity in the reorganized firm to an insider, a hedge fund that owned 100 percent of the equity of Innkeepers' parent. [FN13] Nor could the debtor claim it had exercised the requisite due care, as it had not shopped the deal in the market or negotiated with the other creditors. [FN14]

But quite apart from these concerns, Lehman held only $200 million of a total debt of $1.4 billion. The other creditors were "extremely unhappy with the proposed plan," and the court found that they deserved "more of a process than what has been provided so far." [FN15] The agreement provided Lehman with a lien on all seventy-two of the debtor's hotel properties, even though it had liens on only twenty and the other properties were in separate subsidiaries. Technically, the agreement would affect the rights of those who were not even creditors of Lehman's debtor. The court might have taken a different view if this were "a case where a smaller group of out-of-the-money constituents is opposing the Debtors' motion in an effort to extract hold-up value from constituents who are 'in the money.'" [FN16] The agreement instead had the support of only one creditor "among the critical mass of creditors needed to support a successful restructuring." [FN17] An agreement might be assumable, but "a level of neutrality is required." [FN18] As the court explained:

> [A] debtor's exclusive period was intended by Congress to provide for an opportunity for the debtor to negotiate with its constituents and reach a consensual plan. . . . [E]xclusivity should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory. The [agreement] has had such an effect on the Debtors' estates by tying all parties to a plan which lacks support from nearly the entire capital structure . . . [FN19]

*In re Bush Industries, Inc*. is another case in which the court refused to enforce a support agreement. [FN20] Bush's core business was the manufacture of ready-to-assemble furniture. It expanded aggressively and then faced severe financial problems when the economy turned. As a group, the secured creditors entered into negotiations with the debtor. The debtor agreed to propose, and the secured creditors agreed to accept, a plan of reorganization in which the secured creditors would have their notes substantially scaled back and receive the equity in the reorganized corporation. All other creditors would be paid in full, but the interests of the old equityholders would be cancelled. The old equityholders objected to the plan.

The court rejected the argument that the shareholders were in the money. It was satisfied that the value of the business was less than the $160 million owed the senior creditors. [FN21] The support agreement, however, contained features that did trouble the court. First, the plan released the officers of the debtor from any liabilities they owed the corporation. [FN22] Bankruptcy is designed to wipe all the ledgers clear, and a release on the part of the debtor is one part of the overall picture. Releases make sense when no one thinks there is liability, but everyone wants to be sure. [FN23] In *Bush Industries*, the releases were serving a different purpose altogether. The officers and directors had borrowed from the debtor and owed it $2.5 million. Releasing the officers and directors from liability was not much different from giving them cash in return for supporting a particular plan. Each dollar of liability that was released gave the officers and directors an extra dollar to spend.

Moreover, the agreement also required the senior lenders to continue to pay the CEO of the company, even though there was no expectation that he would do any work. (Indeed, he had already left the company and moved to Florida.) The court was not objecting to the "golden parachute" per se. As the court explained, "So long as allowed claims exceed the value of a reorganized debtor, the class of pre-petition interest holders has no inherent right to object to an employment contract whose cost is effectively paid by new owners of the reorganized debtor." [FN24] But the golden parachute along with the release showed that the officers and directors had advanced their own interests in negotiating the support agreement, not the interests of the shareholders.

The secured lenders and the directors ultimately agreed on a plan in which the releases and the golden parachute were eliminated, but this "cure" was not enough. One suspects that the reorganized debtor would have taken care of the officers and the directors later, but the court did not even need to consider whether there was such an implicit understanding. Quite apart from what might happen outside the plan, the fact of the agreement itself showed that the debtor did not put forward a plan in good faith. The objection was not to the releases or the golden parachute in their own right, but to the way in which they distorted the plan process. If the process is not fair to the nonparticipating investors, then the plan that arises from it cannot be confirmed, regardless of whether it has been modified along the way to comply with any substantive rules that apply.

Process matters, and the process is not fair if one of the principal players is being paid to support a plan, no matter what the plan provides. As the court explained, "The new employment contract and releases essentially serve as evidence of a violation of fiduciary responsibility. The mere deletion of the offending evidence does not necessarily cure the underlying process by which the plan was originally negotiated." [FN25]

Among other things, *Bush* shows that bankruptcy's "anti-gifting" rule extends beyond §1129 and the traditional confines of the absolute priority rule. The CEO was being paid entirely outside the plan, but this makes no difference. The gift itself is not the problem. The problem is the gift's distortion of the Chapter 11 bargaining process. A plan support agreement is problematic if it gives value flows from one party to another in return for pushing the process in one direction rather than another.

Such agreements do not violate absolute priority, as the relevant classes who do not consent can still object during plan confirmation, but the gift is still being made to gain cooperation. Such gifts are suspect. But there is not an absolute ban on "gifts." Some small diversions of value designed to win support are permissible, at least when it is the last sweetener offered to bring major constituents together. For example, restructuring support agreements commonly provide for the debtor to pay for the professional fees of the other parties to the agreement as consideration for binding themselves to its terms.

Even though the Bankruptcy Code nominally does not authorize payment of professional fees, the debtor can argue that the support agreement is beneficial to the estate and that, in its judgment, the benefits to the estate are greater than its costs, including the payment of attorney's fees. [FN26] Judges may look at such clauses skeptically and may hesitate before approving them, but they do not treat them as inherently toxic as they would an outright diversion of value.

### III. Support Agreements and the Path to Reorganization

In its simplest form, a restructuring support agreement is a bargain between the debtor and others to support a particular plan of reorganization. The debtor gives the creditors the assurance that the Chapter 11 will modify their rights in a sensible way and that the process will not leave them worse off. The creditors in return promise to support the plan. The agreement goes beyond merely requiring its supporters to vote in favor of the proposed plan. It also typically requires creditors who join it to facilitate the implementation and consummation of the plan, to do nothing to delay or impede the implementation of the plan, and to vote against alternative transactions. [FN27] In addition, the creditors agree not to transfer their claims to anyone who is not already or who does not become a signatory to the support agreement. [FN28]

A restructuring support agreement is, as a doctrinal matter, a prepetition executory contract that the debtor is able to assume in bankruptcy under §365. When the debtor moves to assume the agreement, the court typically applies some version of the business judgment rule. [FN29] It is important, however, not to focus mechanically on the various tests for assuming an executory contract. Such hearings are, in effect, mini-confirmation hearings, in which the plan is set out and those who oppose it mount an early assault against it.

The bankruptcy judge regularly emphasizes that dissenting parties remain free to attack its substantive provisions at the time of plan confirmation. The decision to approve the debtor's assumption of a plan support agreement does not mean that the plan it sketches out is confirmable. Nevertheless, it is hard for the judge to ignore the terms of the contemplated plan. If the plan itself is not confirmable, then it may make little sense for the debtor to assume the agreement. The judge, if possible, wants the case on a path towards confirmation. For the debtor to commit itself to a plan that cannot be confirmed does not do this. On the other hand, if the plan is confirmable, the bankruptcy judge has every interest in allowing the agreement to be assumed and keeping the case on its present track.

Because the assumption hearing may rouse naysayers, debtor's counsel may delay assumption of the agreement. The contract is still enforceable, and the creditors supporting it are still bound to it as long as the milestones are met. For their part, creditors may be content to let matters lie as long as there are no defaults under the dip financing order or the restructuring support agreement.

Support agreements have evolved well beyond a straightforward document that sets out the substance of the plan that the parties intend to put in place. The typical support agreements now contain a number of milestones. The dip financing order and the disclosure statement must be approved by a specified date. Deadlines are similarly fixed for voting and plan confirmation.

By signing the plan support agreement, the debtor commits itself not only to particular substantive terms in a plan, but also to the way it conducts the bankruptcy process. The debtor promises not to bring any avoidance actions against parties to the agreement. [FN30] It promises to oppose the appointment of a trustee or an examiner with expanded powers. [FN31] The

appointment of an equity committee terminates the support agreement. [FN32] The debtor promises to provide the consenting creditors access to information. The support agreement may also be tied to dip financing. A failure to meet one of the milestones under the support agreement constitutes a default under the dip financing order. Similarly, a default under the dip financing order may terminate the restructuring support agreement.

Some restructuring support agreements can be even more aggressive. In *Molycorp*, for example, the support agreement that was initially put forward required the debtor to appoint a named individual as CRO and gave that individual broad powers over the reorganization and the operations of the firm. [FN33] In *Walter Energy* the support agreement tried to prevent the debtor from assuming any executory contracts or leases without first obtaining the consent of the steering committee of the first-lien lenders, and consent was to be in the committee's sole discretion. Similarly, it tried to prevent the debtor from seeking approval of any employee retention plan without the written consent of the steering committee, consent again being within its sole discretion. [FN34]

In *In re Walter Energy*, the restructuring support agreement also set out a number of "triggering events." The effect of these was to oblige the debtor to reject collective bargaining and retiree obligations under a prescribed timetable. If the debtor was unable to navigate the §1113 and §1114 process successfully, it was required to abandon the reorganization and pursue instead a going-concern sale. [FN35] The effect of this "hands-tying" strategy may have been to limit the debtor's ability to give ground to the union and the retirees in the negotiations. The effect of the restructuring support agreement was to alter the negotiating dynamic that §1113 and §1114 put in place.

Such agreements may go too far. The debtor has a statutory duty to negotiate in good faith in the context of §1113 and §1114. Committing itself in advance in this fashion may be inconsistent with this duty. Such explicit prescription of a bargaining process may not exist elsewhere in the Bankruptcy Code, but binding oneself too tightly and limiting one's ability to negotiate may be inconsistent with a plan proponent's good-faith duty under §1129(a)(3).

When dealing with a debtor that has committed itself to a plan support agreement, especially one that is tied to its dip financing, nonparticipating creditors find themselves in an altogether different bargaining environment than in an ordinary Chapter 11. There is less they can do to shape the plan in their own favor. The debtor's hands are tied. Various possible confirmable plans are no longer on the table. Otherwise credible threats no longer work. The nonparticipating creditors are worse off, and the debtor can more easily keep the plan on course.

In short, a restructuring support agreement provides a flexible tool that debtors can use (or attempt to use) to gain strategic advantage. The open question is how far one can go. Too provide another example that tests the edge of the envelope, in *Caesar's*, a restructuring support agreement was put forward that rewarded creditors who joined it with a "forbearance fee," paid at the time the agreement became effective that was funded by its nondebtor parent. A critical provision of the restructuring support agreement called for those joining it to instruct their indenture trustee to forbear from pursuing separate actions against the parent. Such a deal might not have been possible outside of bankruptcy because of the Trust Indenture Act. Nor could it be implemented in a plan readily, as those in the class who consented received something (the forbearance fee) that those who refused to join the agreement did not.

Those declining to join this restructuring support agreement immediately dismissed it as "coercive" and its forbearance fee "improper." They also asserted that the noteholders joining it held equity in the parent as well. From their perspective, the forbearance fee was a "gift" that distorted behavior even if it was not the ordinary gift that is given in return for supporting a plan

Not all restructuring support agreements are approved, of course. They are subject to frequent amendment and modification. But their importance should not be underestimated. They matter even when they lack unusual features and even when they are not somewhat heavy-handed efforts to exercise control over the debtor.

Even the simplest restructuring support agreements raise fundamental questions. On the one hand, these provisions are simply contracts between parties that do not in any way limit the rights of other parties to go to court and object. On the other hand, these agreements, even when they are not efforts by creditors to gain control, start a ball rolling that is hard to stop. Even a

restructuring support agreement that has no rigid sequence of milestones or triggering events changes the character of bargaining in Chapter 11.

As a practical matter, there are many confirmable plans that a debtor can propose. The debtor does not care in the first instance how ownership interests in the reorganized firm are divided. The debtor cares most about ensuring that the firm emerges quickly from Chapter 11. It is attracted to a restructuring support agreement because it provides a path to confirmation. It provides the runway needed for a smooth landing.

The debtor can use a restructuring support agreement as a tool to shape the reorganization and bring various creditor groups with it. Creditors who do not join in will still have, in theory at least, the same substantive rights, but they no longer will have the ability to bargain with the debtor and push for a plan that is more favorable to it.

The debtor's position recalls Louisiana Governor Huey Long's appeal to prospective backers: "Those of you who come in with me now will receive a big piece of the pie. Those of you who delay, and commit yourselves later, will receive a smaller piece of pie. Those of you who don't come in at all will receive--Good Government!" From the perspective of those who are not part of the restructuring support agreement, the ability to assert rights at confirmation is equivalent of being entitled to "good government."

This dynamic creates a challenge to those charged with oversight of Chapter 11. The Bankruptcy Code does not simply invite parties to negotiate in the shadow of a certain set of substantive rights. It also envisions a process that is structured by prescribed rules for classification, disclosure, and voting, all subject to judicial oversight. It cares about the shape of the bargaining table as well as substantive rights. Restructuring support agreements are in tension with this idea that process matters as well as substance. As the next part explores, this idea has deep roots.

## IV. Reshaping Chapter 11

Chapter 11 is still very much under the spell that William O. Douglas and other New Deal reformers cast in the 1930s. The insolvency laws they found allowed, in their view, sophisticated insiders to bargain with one another and strike deals that left passive outside investors out in the cold. For them, the solution was creating an environment in which all the parties negotiated with one another subject to judicial oversight. Bargaining that failed to include everyone was suspect, even when, on the face of it, the outsiders had a chance to join and participate on the same terms as everyone else. This concern gave rise to the Trust Indenture Act. This act ensured that negotiations that result in substantive changes to the terms of bonds were subject to judicial oversight. The same concern also gave rise to the Chandler Act. It mandated a form of judicial oversight designed to ensure that negotiations in bankruptcy included everyone. These twin reforms continue to echo today, as evidenced in two of the most important cases to arise in the last year--*Marblegate* and *Energy Futures*.

Education Management Corporation ("EMC"), a for-profit education company, became overleveraged and needed to restructure its debt. EMC counted on federally backed loans for 80 percent of its revenue, and it would lose these if it filed for bankruptcy. Hence, it sought to restructure its debt outside of bankruptcy. A large part of its liabilities arose from notes one subsidiary had issued. A majority of the junior noteholders of the subsidiary entered into a restructuring support agreement.

The agreement contemplated a nonbankruptcy transaction in which any of the junior noteholders of the subsidiary could trade their notes against the subsidiary in return for equity in the parent. The agreement also provided that the assets of the subsidiary would be foreclosed upon by its senior creditor and then transferred to a new entity. If noteholders did not trade their notes for equity of the parent, they would retain the same rights against the subsidiary, but these rights would essentially be worthless, as the subsidiary would no longer have any assets.

The Trust Indenture Act protects the nonconsenting noteholders' right against changes in principal and interest without consent. The restructuring support agreement on its face did not do this. Those who did not join it retained the same rights against their debtor they had before (albeit, as a result of the agreement, their debtor no longer had any assets). The court, however, found that the TIA applied nevertheless. It rejected a reading of the statute that elevated form over substance. The purpose of the Trust Indenture Act was to prevent, in the words of William O. Douglas, "[e]vasion of judicial scrutiny of the

fairness of debt-readjustment plans." The problem with the restructuring agreement was not that it was inconsistent with the substantive rights of the parties, but rather that it put in place a restructuring process that was insulated from judicial scrutiny.

Stepping away from the merits of *Marblegate*, the case identifies an important principle. When some, but not all, of the investors in a common enterprise agree to a restructuring, the rights of third parties are invariably affected. One cannot in principle reject such arrangements outright. Doing so would hold all the investors hostage to a few holdouts. But allowing such arrangements to take place in a space that is entirely unregulated is bound to compromise the rights of the unsophisticated. Hence, there must be some judicial oversight for "fairness."

The Bankruptcy Code does not simply protect substantive rights. It also provides an environment for negotiations to take place. The Trust Indenture Act requires that renegotiations take place in this environment. It does not, however, speak to the question of the extent to which a restructuring support agreement can alter this environment. Just as perceived abuses in negotiating outside of bankruptcy led to the Trust Indenture Act, perceived abuses in negotiating inside of bankruptcy led to the Chandler Act. The core problem of the equity receivership, as identified by William O. Douglas, Jerome Frank, Thurmond Arnold and other New Deal lawyers, was that it consisted largely of negotiations among a few insiders that had dramatic effects on the rights of outsiders. It was irrelevant that these negotiations did not technically change their substantive rights. Whether this principle is still immanent in the Bankruptcy Code is currently before the Third Circuit in *Energy Futures*.

*Energy Futures* was one of the largest Chapter 11s ever. It was the largest provider of power in Texas. It was organized into two principal businesses, one regulated and the other unregulated. Among the creditors were holders of first-lien notes that gave them rights, indirectly, in the regulated utility. The notes came in two flavors: $3.5 billion were 10 percent notes due in 2020 and approximately $500 million were 6 7/8 percent notes due in 2017. Apart from the difference in the interest rates and maturity date, the notes were identical, with rights to the same collateral and the same language in the make-whole clause. If the makewhole provisions were enforceable (and it was not clear if they were), the 10 percent notes would receive a payout of $1.19 for each dollar of principal and 6 7/8 percent notes $1.08.

The debtor and a group of creditors that consisted mostly of 6 7/8 percent noteholders entered into an elaborate restructuring support agreement, including a term that provided that, immediately after filing, the debtor would make a tender offer to all first-lien holders. For each dollar of principal, the noteholder would receive $1.05 in postpetition notes. Nearly all (97 percent) of the 6 7/8 percent noteholders accepted the tender offer, but only 34 percent of the 10 percent noteholders accepted, and nearly all of these also held 6 7/8 percent notes.

On the face of it, this tender offer, unlike the tender offer in *Marblegate*, did not freeze out any who chose not to participate. The creditors who did not accept the tender offer had exactly the same substantive rights after the tender offer as before. If the nonassenting 10 percent noteholders wanted to argue that they were entitled to make-whole payments, nothing in the restructuring support agreement prevented it. They might end up with less if they litigated and lost, but in this respect they were no different than any other creditor who is given an offer to settle a claim and chooses to turn it down.

That the settlement took the form of a tender offer has no effect on the substantive rights of the parties. Each creditor had a chance to accept a settlement or take her chances. The debtor could force them to take something less than full payment only by cramming down a plan. Indeed, in one sense the support agreement left nonassenting creditors better off. Because those who settled with the debtor were out of the picture, they would find it easier to gather the votes to reject the plan and force a cramdown.

But it is easy to come up with a set of facts in which such a tender offer is problematic. Assume the same facts except that the 6 7/8 notes are concentrated in the hands of a few extremely sophisticated and litigious hedge funds. The rest are widely dispersed among relatively remote and unsophisticated investors. The debtor enters into a restructuring support agreement with the hedge funds. Immediately after filing the bankruptcy petition, the debtor makes a tender offer for all of the first-lien notes. The hedge funds accept, and comparatively few of the unsophisticated investors do.

It might seem that the unsophisticated investors have only themselves to blame. They could have taken the tender offer. But this would not be the conclusion that William O. Douglas and his confederates would reach. From their perspective, the outside investors operated in a vacuum, and this allowed for advantage taking. They were forced to decide whether to tender before there was a disclosure statement. Indeed, in the case of *Energy Futures*, the noteholders had to make their decision before the debtor even filed its schedules. If the hedge fund and the debtor had not been able to enter into the settlement, they would have instead negotiated a plan. The outsiders would not have to decide until after they received a disclosure statement. Moreover, the plan itself would face judicial scrutiny.

The judge might decide that, by providing the same amount for each dollar of principal to the two types of noteholders, the outsiders holding the 10 percent notes were effectively receiving different treatment. Section 1123(a)(4) requires everyone in the same class receive the "same treatment." Creditors may not receive the same treatment if someone owed $1.19 for each dollar of principal is paid the same amount as someone owed $1.08 for each dollar of principal.

The Bankruptcy Code forces a set of negotiations that ensures that sophisticated noteholders cannot enter into side deals that leave the less sophisticated worse off. It is not enough that unsophisticated creditors have the right to complain. They are entitled to free-ride on the efforts of those similarly situated to negotiate a better deal. While the Trust Indenture Act arose out of the need to provide judicial oversight, the Chandler Act was designed to ensure that, when judicial oversight came, it gave meaningful protection to outsiders. [FN36] The Chandler Act repudiated the idea that negotiations in a reorganization could exclude outsiders. The benefits of any deal the insiders reached had to be fully disclosed and vetted.

Innocent outsiders would likely not contest a plan that gave nontendering claimholders nothing for their make-whole claim. Even if they did, they might well find themselves overmatched in any litigation. That they were still receiving their substantive entitlement is no different from the outsiders in the equity receiverships who chose not to tender their notes to a protective committee. Reorganization law protects all the creditors holding claims in a particular class by requiring that negotiations are themselves done in a prescribed way and subject to prescribed scrutiny.

**V. Conclusion**

Ultimately, one needs to decide how to handle support agreements without explicit guidance from the Bankruptcy Code. One can turn to history and find a lesson there, but one can also argue that modern Chapter 11 should take account of the current environment. Those who chose not to tender in *Energy Futures* were not exactly the innocent outsiders that William O. Douglas envisioned when he designed the Chandler Act. The typical large reorganization today affects only the rights of sophisticated investors. Whether junior or senior in the capital structure, the players will be a hedge fund, a large pension fund, an insurance company, or a bank.

In the modern reorganization world, negotiations done in the shadow of the substantive entitlements of §1129 should perhaps be governed by the same rules that governed knife fights in the Wild West. There were no rules. If you do not have the stomach for such an environment, you can always trade your claim to someone who does.

But even if this large question remains unclear, there are some ready benchmarks. In deciding whether to approve the assumption of a restructuring agreement reached outside of bankruptcy or to bless one reached inside of bankruptcy, the bankruptcy judge should assess the integrity of the process as much as the terms itself. In cases such as *Res-Cap*, the active participation of a sitting bankruptcy judge as a mediator of the negotiations that led to the negotiations made a difference, as did the fact that the debtor was represented by a newly appointed CRO and was overseen by disinterested members of the board. The more these factors are present, the heavier the burden on the parties who object to explain how they are aggrieved or, more precisely, why any grievances they have are ones that they will not be able to voice at plan confirmation.

Any general review for "fairness" of the sort that Douglas envisioned risks a degenerative process that begins with some law clerk inventing a vacuous laundry list. Its multi-factored test is seductive because it gives the illusion of certainty, but such tests are always hopelessly malleable and indefinite. They invite those who adopt them to replace careful thinking with mechanical recitation and hand-waving. The judge should instead take direct measure of the agreement and the path that led to it. Any

support agreement that has the flavor of being a side-deal or that can too easily be seen as altering the basic Chapter 11 process should be suspect.

**F. Plan Voting and Confirmation Issues**

**1. Class Acceptance Generally and for Cramdown Purposes**

*Recommended Principles:*

   • The numerosity requirement of section 1126(c) of the Bankruptcy Code should be replaced with a "one creditor, one vote" concept. Accordingly, a class of claims should be treated as voting in favor of the chapter 11 plan if the plan is accepted by: (i) creditors (other than an entity designated under section 1126(e)) holding at least two-thirds in amount of the allowed claims in such class; and (ii) more than one-half in number of the creditors (other than an entity designated under section 1126(e)) holding allowed claims in such class. For purposes of this requirement and voting on a plan, (a) a creditor holding separate claims in different capacities (*e.g.,* as an indenture trustee and as an individual creditor) should be able to vote once in each capacity; and (b) the "one creditor, one vote" voting rule includes and aggregates all claims in a particular class held by an entity and its affiliates (as defined in section 101(2)) that are subject to common investment management.
   • The confirmation of a chapter 11 plan should not require the acceptance of the plan by at least one class of claims impaired under the plan. Accordingly, section 1129(a)(10) should be deleted.

*Class Acceptance Generally and for Cramdown Purposes: Background*

In general, creditors whose rights are impaired by the chapter 11 plan are entitled to vote to accept or reject the plan. [FN37] Although creditors vote on an individual basis, the plan typically groups claims into classes and proposes particular treatment (*e.g.,* terms and amount of recoveries) for each class. Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Accordingly, a debtor or plan proponent attempts to group similarly situated creditors in the same class, though strategic considerations may complicate this analysis.

The classification of claims is important for at least two reasons. First, class acceptance determines creditor support for the plan. Specifically, section 1126(c) provides, "A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan." Second, the debtor or plan proponent generally needs at least one accepting impaired class of creditors to cram down the plan under section 1129(b).

The two requirements of section 1126(c) -- *i.e.,* two-thirds in amount and more than one-half in number of allowed claims -- set the minimum support required for the class as a whole to accept the plan. If the class accepts and the plan is confirmed, even creditors in the class who voted against the plan, or abstained from voting, are bound by the plan. As such, the level of approval required for class acceptance is often heavily scrutinized and contested. Of the two requirements, the numerosity requirement (more than one-half in number of allowed claims) is the more difficult to interpret and apply in many cases. For example, under appropriate circumstances, a single creditor may exercise more than one vote so long as the court determines that the claims are sufficiently "separate" to warrant more than one vote. [FN38] The determination of sufficient separateness is based on whether the claims in question derive from independent underlying transactions with the debtor, and whether separate proofs of claim were, or will be, filed for the claims. [FN39] Notably, this determination may resolve whether the class accepts or rejects the plan. [FN40]

Similarly, the requirement that one impaired class of creditors accepts the plan under section 1129(a) (10) may prevent a debtor or plan proponent from confirming a plan under the cramdown provisions of section 1129(b). Although some courts and commentators suggest that section 1129(a)(10) was intended to ensure that a plan had some creditor support, neither the legislative history nor the Bankruptcy Code indicate such a purpose. [FN41] Notably, given the variation in class composition and the different motives and objectives of creditors, a non-accepting class does not necessarily equate to lack of creditor support for the plan. Some commentators have questioned the sections continued utility in light of the barriers to confirmation and the creditor holdup value it creates in many chapter 11 cases.

*Class Acceptance Generally and for Cramdown Purposes: Recommendations and Findings*

The composition of a creditor class for plan purposes can significantly impact a chapter 11 case. A debtor or a plan proponent may consider whether classes can be structured to isolate or dwarf dissenting creditors, or to ensure that creditors supporting the plan dominate the class. Likewise, creditors seeking to delay or disrupt confirmation can raise questions concerning why certain creditors were, or were not, included in a particular class; they also can diversify or strategically purchase claims so that they hold blocking positions in one or more classes. In sum, claims classification and voting under section 1122 and 1126 are subject to significant gamesmanship. [FN42]

The Commissioners discussed the distraction and diversion of resources caused by this gamesmanship. The Commissioners noted that the original purpose of classification was to provide equal treatment for similarly situated creditors. Likewise, the dollar amount and numerosity requirements of section 1126(c) were intended to protect minority holders. Nevertheless, some of the Commissioners observed that changes in debtors' capital structures and the dynamics of chapter 11 cases arguably decreased the relevance of these objectives. In particular, these Commissioners asserted that a nexus no longer exists between minority protection and the numerosity requirement. A class dominated by smaller claims may face an apathy problem, in which inaction by creditors fails to give any creditor a meaningful voice in the vote. [FN43] The consolidation of claims by creditors eliminates the "small" or typical minority holder in many cases. In addition, strategic purchases by the same or affiliated entities of "separate" claims can skew the counting for purposes of numerosity.

The anecdotal evidence that the numerosity requirement served, at best, a nominal role in determining class support for a plan persuaded the Commissioners. They considered various alternatives to the numerosity requirement, including the elimination of the voting requirement completely, maintaining the *status quo,* distinguishing among types of creditors (*e.g.,* financial instrument holders and all others), and introducing additional disclosures to address the perceived empty voting problem, as discussed in Section VI.F.2, *Assignment of Voting Rights*. In discussing the alternatives, the Commissioners found the "one creditor, one vote" rule most democratic and less susceptible to abuse than the current numerosity requirement. Although identifying the "one creditor" for purposes of this requirement may still raise issues, the Commissioners believed that these concerns could be mitigated by treating all affiliated entities under common investment management as a single creditor, and expressly recognizing the different capacities (*e.g.,* indenture trustee and lender) in which a single creditor may hold claims. The Commissioners emphasized that the "common investment management" requirement for aggregation was intended to exclude situations in which affiliates are not only separate entities, but also have different decision-makers overseeing the claims being asserted against the estate. The Commission agreed that the "one creditor, one vote" rule should replace the current numerosity requirement in section 1126(c).

The Commission also considered the impediment to confirmation created by sections 1129(a)(10) and 1129(b), which require at least one accepting impaired class of creditors for the debtor or plan proponent to achieve confirmation through the cramdown provisions of the Bankruptcy Code. [FN44] The Commissioners debated the utility of section 1129(a)(10), focusing on whether the provision protected creditor interests or simply allowed creditors to hold up the confirmation process. For example, the Commissioners discussed cases with a limited number of impaired creditor classes and a lender or other large creditor who purchases a sufficient number of claims in each class to control the plan vote. By voting against the plan in each of these classes, that single creditor can block a cramdown because there will be no accepting impaired class of creditors for purposes of section 1129(a)(10).

The Commissioners also highlighted issues raised by artificial impairment, in which the debtor or plan proponent strategically grouped claims to achieve at least one accepting impaired class of creditors. Courts are split concerning whether the debtor or plan proponent can achieve impairment of a class through minor changes in the terms of the creditor's claim or repayment rights or whether impairment follows only meaningful economic changes to the debt. For example, the Fifth Circuit (agreeing with the Ninth Circuit, but declining to follow the Eighth Circuit) held that artificial or minor impairment was sufficient for purposes of section 1129(a)(10). [FN45] The Fifth Circuit noted that such an approach aligned with the policy of encouraging reorganization and that to hold otherwise would be to "shoehorn[] a motive inquiry and materiality requirement into section 1129(a)(10)" that did not exist. [FN46] As noted by one well-respected commentator: "Congress apparently did not consider the impact of some creditors having more than one vote. [Bankruptcy] Code § 1129(a) (10) causes debtors to attempt to create friendly creditors, to impair creditor classes that need not be impaired and to manipulate classification systems." [FN47]

The Commissioners acknowledged the potential gating role served by section 1129(a)(10) -- ensuring that some creditors whose claims were impaired by the plan supported its confirmation. They discussed the validity of this inquiry and the integrity it potentially added to the confirmation process. They debated the advantages and disadvantages of retaining the requirement, particularly in light of the potential abuses of the section by both creditors and debtors. They considered alternatives, such as retaining section 1129(a)(10) on a per plan basis [FN48] or only in single asset real estate cases. [FN49]

Ultimately, the Commission determined that the potential delay, cost, gamesmanship, and value destruction attendant to section 1129(a)(10) in all cases significantly outweighed its presumptive gating role. The Commission recommended eliminating section 1129(a)(10) in its entirety from the Bankruptcy Code.

**2. Assignment of Voting Rights**

*Recommended Principles:*

• The contractual assignment or waiver of voting rights in favor of senior creditors under an intercreditor, subordination, or similar agreement should not be enforced. Subordinated creditors should retain the right to vote on a plan (or their right to be deemed to have done so under section 1126(g) of the Bankruptcy Code) and to invoke the protections of section 1129(b).

• The contractual assignment of voting rights in favor of an assignee or purchaser of a claim against the estate should be enforced only to the extent of the portion of the claim and economic interest also transferred to the assignee or purchaser. For purposes of this principle, the holder of a claim should be the party entitled to exercise the voting rights assigned or associated with the claim.

*Assignment of Voting Rights: Background*

Creditors may enter into subordination agreements or intercreditor agreements prior to the debtor filing its chapter 11 case. These agreements commonly address the priority of payment as between the creditors from the proceeds of shared collateral. These agreements also may address certain other matters relating to the debtor and the collateral. For example, they may limit the junior creditors' rights to (i) request adequate payment; (ii) offer or participate in postpetition financing for the debtor; (iii) foreclose on the collateral; or (iv) vote on a chapter 11 plan in any chapter 11 case. The last of these provisions may be accomplished through a waiver or assignment of the voting right or underlying claim for voting purposes. Assignments of voting rights also occur between parties outside of the subordination and intercreditor agreement context.

The assignment or waiver of voting rights raises several issues under the Bankruptcy Code. Section 510(a) of the Bankruptcy Code speaks to the enforceability of a prepetition subordination agreement, providing that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy [law]." [FN50] Courts generally enforce the payment terms of subordination agreements, to the extent that the agreement is otherwise enforceable under state law. Some courts question, however, whether creditors should be permitted to affect or waive specific bankruptcy rights prior to, or in anticipation of, a bankruptcy filing. [FN51]

Courts that have declined to enforce assignments or waivers of voting rights in a chapter 11 case focus on the voting provisions of section 1126 and emphasize that the section permits a "holder of a claim . . . under section 502 of this title [to] accept or reject a plan." [FN52] These courts underscore that the junior creditors are the holders of the claim and that, in turn, only those creditors may exercise the right to vote on the debtor's chapter 11 plan. [FN53] Courts also question the ability of parties generally to waive rights created by, and only available in a case under, federal bankruptcy laws. [FN54]

Other courts have enforced voting assignment or waiver provisions in subordination agreements. [FN55] These courts read section 1126(c) more broadly, noting that it does not prohibit the delegation of rights associated with claims held by a creditor. They also rely on the expressed language of section 510(c) and Bankruptcy Rules 3018 and 9010 and emphasize that the only qualification to enforcement of subordination agreements is that the agreements be enforceable under state law. As one court explained, the Bankruptcy Rules "explicitly permit agents and other representatives to take actions, including voting, on behalf of other parties." [FN56]

Another issue that arises in the context of voting or claim assignments in chapter 11 cases is whether the assignment decouples the economic and voting rights. This kind of decoupling -- sometimes referred to as the "empty creditor problem" -- may change the interests or objectives of the party actually exercising the vote. A party with no economic risk or stake in the chapter 11 estate may not be a similarly situated creditor with others in the voting class. Similar concerns exist with a party holding

disproportionate voting and economic interests. Although the empty creditor problem is typically discussed in the context of credit default swaps, [FN57] it also can arise in a simple claim or voting assignment agreement.

*Assignment of Voting Rights: Recommendations and Findings*

The Commissions deliberations on assignments and waivers of voting rights focused largely on two policy considerations: respecting the private contract rights of nondebtor parties and fostering the underlying goals of chapter 11. [FN58] The Commissioners observed that a simple response would be to endorse freedom of contract principles among nondebtor parties. The Commission agreed, however, that this response oversimplified the dilemma and was unsatisfactory in several respects. The core issue concerns the impact that private ordering among nondebtor parties may have on the debtor, the estate, and other stakeholders in the chapter 11 case.

The Commissioners discussed the potential impact of voting assignments on the chapter 11 case. They evaluated situations in which senior creditors influence the plan structure or control the vote on the plan through the assignment provision. [FN59] Such conduct can affect valuations of the debtor's assets, the debtor's postconfirmation operations and capital structure, and the value ultimately available for distributions to other stakeholders. [FN60] The Commissioners generally were uncomfortable with nondebtor parties being able to change, arguably in very substantive ways, the rights of the debtor and other stakeholders in the chapter 11 case.

The Commissioners also evaluated the classification and voting provisions of the Bankruptcy Code. Many of the Commissioners agreed with courts that have held that section 1126(a) is relevant to the enforceability of voting assignments. Although the section does not address delegation of rights, the reference to "holder of the claim" suggests some nexus between the vote and the holder of the legal right to payment on the claim. They recognized the language of section 510(c), which expressly permits the enforceability of subordination agreements. Many of the Commissioners noted, however, that the provisions included in subordination and intercreditor agreements have significantly expanded beyond the mere ordering of payment among nondebtor parties. [FN61] The Commission thus considered whether prohibiting voting assignments would significantly affect the payment priority agreed to by the parties under the subordination agreement. Some of the Commissioners argued that allowing junior creditors to vote on the plan may give those creditors bargaining power or control over the plan process, as they would have incentive to increase distributions to their class to provide for repayment of the senior debt and some value for the junior debt. On balance, the Commission found that preserving the agreed-to payment priority was the crucial element of subordination agreements, and that prohibiting assignments or waivers of voting rights would not disturb such a feature.

The Commissioners also identified and discussed many of the same concerns with partial claim assignments and voting assignments outside the subordination agreement context. The Commission determined that requiring economic and voting rights (in whole or in part) to be transferred as a package was aligned with the relevant sections of the Bankruptcy Code and mitigated to some extent the empty creditor problem. The Commission also agreed that the holder of the assigned claim should be entitled to exercise any transferred voting rights and may agree to exercise its vote as directed by the beneficial owner (*e.g.,* a bond held in street name is held by a broker, but voted as directed by the account-holder, a holder of a claim that is subject to a participation interest may vote as directed by the participant). The Commissioners recognized that simply requiring transfers of voting and economic rights in the same proportion would not necessarily remedy those situations in which a creditor has hedged its economic losses in the chapter 11 case through a derivative or swap product. Nevertheless, the Commission determined that any potential issues in that context could be best resolved by the court on a case-by-case basis under the new principles addressing designation of votes under section 1126(e).

### 3. Designation of Votes

*Recommended Principles:*

• The court should be permitted to designate a party's vote in one or more classes under section 1126(e) of the Bankruptcy Code based on evidence presented at the hearing that such party voted in a manner manifestly adverse to the economic interests of the other creditors in the class or did not act in good faith.

*Designation of Votes: Background*

Section 1126(e) of the Bankruptcy Code allows a court to disqualify a vote on a chapter 11 plan if such vote was not obtained in good faith. [FN62] Specifically, section 1126(e) provides that, "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of this title." [FN63] The party seeking designation bears the burden of proof, and this burden has been described as being a "heavy" one. [FN64]

Courts have disallowed votes under section 1126(e) on the grounds of bad faith when, for example, the claimholder attempts to extract or extort a personal advantage not available to other creditors in its class, the creditor has an "ulterior motive" such as to procure some collateral or competitive advantage that does not relate to its claim, or the motivation behind the vote is not consistent with a creditor's protection of its self-interest as a creditor. [FN65] "[B]adges of the requisite bad faith include creditor votes designed to (1) assume control of the debtor, (2) put the debtor out of business or otherwise gain a competitive advantage, (3) destroy the debtor out of pure malice or (4) obtain benefits available under a private agreement with a third party that depends on the debtor's failure to reorganize." [FN66] Courts generally agree that self-interest alone is not sufficient to designate a vote under section 1126(e). [FN67]

*Designation of Votes: Recommendations and Findings*

Some commentators have expressed concerns regarding conflicts of interest that may influence a creditor's conduct, including its vote on a plan, in a chapter 11 case. Such conflicts of interest may include holding claims in multiple classes under the plan, holding interests in competitors of the debtor, having a business agenda that conflicts with the debtor's reorganization, or having nominal economic exposure compared to other creditors in the class because of private agreements or a hedging strategy. The Commission determined that section 1126(e) was the most effective means to address these concerns.

The Commission agreed that holding interests potentially in conflict with the interests of the debtor or other creditors in the voting class should not automatically disqualify a creditor from participating in the case or voting on the chapter 11 plan. Likewise, considering these interests and voting in the creditor's self-interest should not necessarily warrant designation. The Commissioners acknowledged, however, that at some point self-interested conduct by a creditor holding interests adverse to the debtor or other creditors in the class should result in the creditor losing its voting rights in the case.

The Commissioners examined different standards for designating votes and factors relevant to those determinations. For example, the Bankruptcy Code could permit a creditor to vote only in the class representing the holder's predominant economic interest in the case. It could allow the court to designate the holder's vote (including in all classes) if the creditor voted in a manner that was manifestly against the interest of the general holders of claims in that class. Alternatively, it could specifically adopt the "ulterior motive" standard used by some courts under the current version of section 1126(e).

In reviewing these alternatives, the Commissioners started from the basic premise that creditors should be able to vote in their own interests, and that the mere existence of a potential conflict in holdings should not warrant designation. They debated whether section 1126(e) and existing case law adequately address cases in which a creditor votes in a manner intended to delay or disrupt the case, or to disadvantage the treatment of a particular class. The Commission agreed that section 1126(e) arguably allows for remedies in these instances, but many of the Commissioners believed that courts are reluctant to extend the section to these and similar scenarios. These Commissioners argued for a stronger directive in section 1126(e) to guide courts in making these determinations.

The Commissioners vetted both the "ulterior motive" standard and one in which courts would focus on whether the conduct or vote was manifestly adverse to other creditors in the class. Some of the Commissioners asserted that the ulterior motive standard was too ambiguous and may not capture cases involving conflicts of interest that cause a creditor to vote adversely to the general interests of creditors in the class -- *e.g.*, a creditor who holds a conflict or potential conflict of interest and is the only creditor in the class voting against the plan. Such conduct may not be bad faith or necessarily rise to the level of ulterior motive, but it may objectively be sufficiently harmful that designation is warranted. In this regard, many Commissioners observed significant overlap between the ulterior motive standard and the general bad faith inquiry [FN68] On balance, the Commission agreed that section 1126(e) should be amended to permit courts to consider both whether the creditor's vote was "manifestly adverse" to the interests of the general creditors in the class or was cast in bad faith. This hybrid standard would preserve creditor autonomy, but also provide courts with statutory authority to protect the estate and general creditors when a class vote has been infected by a creditor's conflict of interest.

[FN1]. Harry A. Bigelow Distinguished Service Professor of Law, University of Chicago. The John M. Olin Fund provided research support. Copyright 2015 by Douglas G. Baird.

[FN2]. This commitment is manifest from §1121(a), which permits a debtor to file a plan with its petition, §1125(g), which provides for the solicitation of votes before the petition, and §1126(b), which provides that these votes may be counted.

[FN3]. Quite apart from seeking to change their vote, absent of any commitment to the contrary, they would be able to assert other rights, such as demanding adequate protection or objecting to the agreed-upon dip financing order.

[FN4]. *See* §1125.

[FN5]. *See, e.g.*, In re The Heritage Org., LLC, 376 Bankr. 783, 791 (Bankr. N.D. Tex. 2007) ("[I]f a creditor believes that it has sufficient information about the case and the available alternatives to jointly propose a Chapter 11 plan with another entity ..., it is absurd to think that the signing of a term sheet by those parties ... is an improper solicitation of votes in accordance with §1125(b).").

[FN6]. *See, e.g.*, In re Texaco, Inc., 81 Bankr. 813 (Bankr. S.D.N.Y. 1988) (finding agreement not to support other future plans is not solicitation to reject current plan).

[FN7]. *See, e.g.*, Century Glove, Inc. v. First Am. Bank of N.Y., 860 F.2d 94, 101 (3d Cir. 1988) ("We agree with the district court that 'solicitation' must be read narrowly."); In re Kellogg Square Partnership, 160 Bankr. 336, 340 (Bankr. D. Minn. 1993) ("However, there is no significant reason not to apply *Century Glove's* rationale to the debtor in reorganization, so as to limn [sic] the concept of 'solicitation' as coeval with the formal polling process.").

[FN8]. In re Residential Capital, LLC, 2013 WL 3286198 (Bankr. S.D.N.Y. 2013).

[FN9]. 486 Bankr. 286, 296 (Bankr. D. Del. 2013). Judge Shannon's opinion in this case, as well as Judge Houser's opinion in *Heritage*, have done much to allay the concerns that Judge Walrath raised on the bench in In re Stations Holding Co., Inc., No. 02-10882 (Bankr D. Del. Sept. 25, 2002); *see* In re NII Holdings, Inc., No. 02-11505 (Bankr. D. Del. Oct. 22, 2002).

[FN10]. *See* Omnicare, Inc. v. NCS Healthcare, Inc., 818 A.2d 914 (Del. 2003). For a critique of the court's reasoning in that case, see Daniel C. Davis, Omnicare v. NCS Healthcare: *A Critical Appraisal*, 4 BERKELEY BUS. L.J. 177 (2007).

[FN11]. *See* In re Innkeepers USA Trust, 442 Bankr. 227 (Bankr. S.D.N.Y. 2010).

[FN12]. *See Innkeepers*, 442 Bankr. at 231 ("The business judgment rule's presumption shields corporate decision makers and their decisions from judicial second-guessing only when the following elements are present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some courts and commentators, no abuse of discretion or waste of corporate assets.").

[FN13]. *See id*.

[FN14]. *See id*. at 233 ("While the Debtors state in their reply that they are aware of no potential alternative that would provide creditors with richer recoveries, it does not appear from the evidence presented that they have canvassed the possible alternatives at this point.").

[FN15]. *Id*. at 233.

[FN16]. *See Innkeepers,* 442 Bankr. at 236.

[FN17]. *Id*.

[FN18]. *Id*.

[FN19]. *Id*. at 234.

[FN20]. 315 Bankr. 292 (Bankr. W.D.N.Y. 2004).

[FN21]. *See id*. at 301-02.

[FN22]. *See id*. at 302-03.

[FN23]. A plan that releases someone from an obligation to a nonconsenting third party is, of course, a completely different matter.

[FN24]. *Bush,* 315 Bankr. at 305.

[FN25]. *Id*. at 307.

[FN26]. *See* Magnetation LLC Restructuring Support Agreement, §10 (2015). The restructuring support agreement will typically deem these to be administrative expenses.

[FN27]. *Magnetation* at §3(a).

[FN28]. For an example, see the *Magnetation*, §3(c).

[FN29]. In re Genco Shipping & Trading Ltd., 509 Bankr. 455, 462 (Bankr. S.D.N.Y. 2014).

[FN30]. *Magnetation* at §4(b)(iii).

[FN31]. *Magnetation* at §4(a)(iii).

[FN32]. Hercules Offshore, Inc., Draft Disclosure Statement (Form 8-K), p. 26, Exhibit B Plan Term Sheet p. 16 (Time line appended to RSA) (July 13, 2015).

[FN33]. The restructuring support agreement required the CRO to undertake a review of the business and present recommendations to the Board. It would be a default under the restructuring support agreement if the Board failed to accept the recommendations unless Board members found that doing so would violate their fiduciary duties.

[FN34]. Walter Energy Restructuring Support Agreement §11(g) & (h) (2015).

[FN35]. *Walter Energy* §5.

[FN36]. Under the equity receivership, protective committees would form and amass enough of the senior securities to credit bid at the receiver's sale of the assets. (Instead of dollar-for-dollar, they were able to credit bid only for the proportion of the senior tranche they controlled and provide cash for the balance.) Because of their ability to credit-bid, no other serious bids would appear. The outsiders who did not tender their claims to the protection committees had only the right to their pro rata share of the artificially low credit -bid. Courts insisted that the protection committees bid a minimum amount. (They established an upset price.) But those who backed the Chandler Act found this was not enough.

[FN37]. 11 U.S.C. § 1126(a), (f) (subsection (a) establishes general rights of holders of claims and interests to vote on plan; subsection (f) provides that unimpaired classes "and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required").

[FN38]. Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (*In re* Figter Ltd.), 118 F.3d 635 (9th Cir. 1997), *cert. denied,* 522 U.S. 996 (1997); *In re* Gilbert, 104 B.R. 206 (Bankr. W.D. Mo. 1989). *See also* Wendell H. Adair, Jr. & Kristopher M. Hansen, *One Claim, One Vote: The Purchase of Claims to Avoid Cramdown,* J. CORP. RENEWAL, Jul. 1, 2000 ("Once again citing the voting formula contained in Section 1126(c) of the Bankruptcy Code, the court held that acceptance or rejection of a plan by a class of creditors is determined by "the number of claims, not the number of creditors, that actually vote for or against a plan."), *available at* http://www.turnaround.org/Publications/Articles.aspx?objectID=1294.

[FN39]. *See, e.g., In re* Gilbert 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989). *See also* David M. Feldman & Keith R. Martorana, *The Pervasive Problem of Numerosity,* Law360, June 2, 2010, *available at* http://www.gibsondunn.com/publications/Documents/Feldman-ThePervasiveProblemOfNumerosity.pdf.

[FN40]. *See In re* Kreider, 2006 Bankr. LEXIS 2948 (Bankr. E.D. Pa. Sept. 27, 2006). In *Kreider,* the creditor class consisted of four American Express funds and five completely unrelated entities; the five unrelated entities voted to accept the plan and the four American Express funds voted to reject the plan. The court rejected the debtor's calculation that the voting resulted in five votes in favor and one against the plan (counting the American Express funds as one vote against the plan). *Id.* at *8-9. The court explained: "[I]t appears that the Debtors' unstated premise -- *i.e.,* multiple claims voted by a single creditor are counted as a single vote for purpose of the 'more than one-half in number of allowed claims' requirement for acceptance of a plan set forth in 11 U.S.C. § 1126(c) -- is simply incorrect." *Id.* at *9.

[FN41]. *See generally* S. Rep. No. 95-989, at 128 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5914 (stating that at least one class must accept the plan). *See, e.g.,* Clark Boardman Callaghan & Randolph J. Hines, *Bankruptcy Review Commission Fails to Achieve Significant Chapter 11 Reform,* 8 Norton Bankr. L. Adviser 1, Aug. 1997 (No case law or commentator has identified any important social or reorganization policy that [section 1129(a)(10)] serves. The historical genesis for the requirement reveals it to be a vestigial mutation that serves no evolutionary purpose."); Scott F. Norberg, *Debtor Incentives, Agency Costs, and Voting Theory in Chapter 11,* 46 U. Kan. L. Rev. 507, 537-38 (1998) (noting that neither the legislative report to the 1978 version of the Bankruptcy Code nor 1984 revisions provide insights concerning the purpose of section 1129(a)(10)). *Cf. In re* Windsor on the River Assocs., Ltd., 7 F.3d 127, 131 (8th Cir. 1993) (interpreting legislative history to suggest that the purpose of section 1129(a) (10) "is to provide some indicia of support by affected creditors and prevent confirmation where such support is lacking").

[FN42]. The Commission heard testimony in favor of clarifying the section 1122(a) standard for classification of "substantially similar" claims. *See, e.g., First Report of the Commercial Fin. Ass'n to the ABI Comm'n to Study the Reform of Chapter 11: Field Hearing at Commercial Fin. Ass'n Annual Meeting,* at 14 (Nov. 15, 2012) ("While the Bankruptcy Code mandates that similarly situated creditors be classified for plan purposes in substantially similar classes, the Code offers no guidance as to how to determine which claims are in fact ""substantially similar." As a result, creditors in general, and secured creditors in

particular, do not often get the benefit of their contractual bargain with the debtor. Indeed, it is the debtor who, in the first instance, makes the economic determination of the creditors' rights when it comes to classification of claims based upon the specific prepetition contractual agreements with the debtor, rather than merely whether the claim is secured or unsecured. All too often, factors come into play in determining classification of claims that should be irrelevant, such as motivation of the parties, purchase price and third-party rights."), *available at* Commission website, *supra* note 55.

[FN43]. Wendell H. Adair, Jr., Kristopher M. Hansen, *One Claim, One Vote: The Purchase of Claims to Avoid Cramdown,* J. CORP. RENEWAL, Jul. 1, 2000 ("Once again citing the voting formula contained in Section 1126(c) of the Bankruptcy Code, the court held that acceptance or rejection of a plan by a class of creditors is determined by "the number of claims, not the number of creditors, that actually vote for or against a plan."), *available at* http://www.turnaround.org/Publications/Articles.aspx?objectID=1294.

[FN44]. *Written Statement of Daniel Kamensky on Behalf of Managed Funds Association: LSTA Field Hearing Before the ABI Comm'n to Study the Reform of Chapter 11* (Oct. 17, 2012) ("Decisions such as this invite management manipulation of the classification rules for strategic purposes. This, in turn, creates uncertainty regarding creditor recovery and treatment under a plan. This is of particular concern for financial creditors.").

[FN45]. W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (*In re* Vill. at Camp Bowie I, L.P.), 710 F.3d 239 (5th Cir. 2013).

[FN46]. *Id*.

[FN47]. Norton Bankr. L. & Prac. 3d § 113:10 (Jan. 2013).

[FN48]. In *Tribune,* the court held that section 1129(a)(10) required an impaired creditor class of each debtor in the corporate organization to vote for the plan instead of a single impaired creditor class across the corporate organization (*i.e.,* among all affiliated debtors) in the joint plan. *In re* Tribune Co., 464 B.R. 126 (Bankr. D. Del. 2011). Prior cases had held that in a joint plan only one accepting class in a joint plan was required. *See, e.g.,* JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (*In re* Charter Commc'ns), 419 B.R. 221 (Bankr. S.D.N.Y. 2009), *aff'd,* 691 F.3d 476 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 2021 (2013).

[FN49]. The Commission reviewed the application of section 1129(a)(10) in single asset real estate cases and agreed with the advisory committee that, on balance, the section was an impediment to confirmation and subject to significant abuse. Both the Commission and the advisory committee supported its elimination in single asset real estate cases.

[FN50]. 11 U.S.C. § 510(c).

[FN51]. Sharon L. Levine et al., *If You Assign Your Plan Vote -- Mean It,* Law360, July 9, 2013, 5:35 p.m. (discussing recent trends in the enforcement of assignment provisions under subordination agreements). *See also* Edward Rust Morrison, *Rules of Thumb for Intercreditor Agreements,* 2015 Ill. L. Rev. __, at *11 (forthcoming 2015) (suggesting that waivers and assignments in an intercreditor agreement should only be enforced if it is "unlikely to affect the outcome of the Chapter 11 process (sale versus reorganization, or confirmation of one plan versus another) and primarily to affect the distributions of parties to the agreement.") (draft on file with Commission). *See generally* Tally M. Wiener & Nicholas B. Malito, *On the Nature of the Transferred Bankruptcy Claim,* 12 U. Penn. J. Bus. L. 35 (2009) (discussing claims assignment in bankruptcy generally).

[FN52]. 11 U.S.C. § 1126(a).

[FN53]. *See, e.g., In re* 203 N. LaSalle St. P'ship, 246 B.R. 325 (Bankr. N.D. Ill. 2000).

[FN54]. *In re* Hart Ski Mfg. Co., Inc., 5 B.R. 734 (Bankr. D. Minn. 1980).

[FN55]. *See, e.g.,* Blue Ridge Investors II, LP v. Wachovia Bank, N.A. (*In re* Aerosol Packaging, LLC), 362 B.R. 43, 45-47 (Bankr. N.D. Ga. 2006).

[FN56]. *Id*.

[FN57]. *See, e.g.,* Henry T.C. Hu & Bernard Black, *Debt, Equity and Hybrid Decoupling: Governance and Systemic Risk Implications,* 14 Eur. Fin. Mgmt. 663, 680 (2008) ("Debt decoupling involving the unbundling of the economic rights, contractual control rights, and legal and other rights normally associated with debt, through credit derivatives and securitization. Corporations can have empty and hidden creditors, just as they can have empty and hidden shareholders."); Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions,* 156 U. Pa. L. Rev. 625, 728-35 (2008).

[FN58]. *Written Statement of Daniel Kamensky on behalf of Managed Funds Association: LSTA Field Hearing Before the ABI Comm'n to Study the Reform of Chapter 11* (Oct. 17, 2012) ("Specifically, lenders and investors must have confidence in

their ability to realize upon their investment in the event of a bankruptcy. This includes reliance on the enforcement of contracts, applicable state and federal legal rights, including enforcement of lien priority, and the absolute priority rule.").

[FN59]. *See* Morrison, *Rules of Thumb for Intercreditor Agreements, supra* note 940, at *7-8 (noting that intercreditor agreements "reduce decisionmaking costs in the event of default, but also give senior lenders power to exploit subordinated creditors and potentially other investors in the firm").

[FN60]. Morrison, *Rules of Thumb for Intercreditor Agreements, supra* note 940 (discussing *In re SW Boston Hotel Venture, LLC,* 460 B.R. 38 (Bankr. D. Mass. 2011), in which the secured creditor which was party to an intercreditor agreement ultimately only raised the cost of cramming down a chapter 11 plan that had been accepted by all other classes and which offered full repayment of the secured creditor's claims).

[FN61]. *See generally* Morrison, *Rules of Thumb for Intercreditor Agreements, supra* note 940 (noting that some intercreditor agreement provisions (which may provide that certain creditors waive their rights to object to DIP financing or the sale or use of collateral, to seek adequate protection, or to vote on the plan (by assigning their voting rights to senior creditors)) reorder the Bankruptcy Code's bargaining environment).

[FN62]. 11 U.S.C. § 1126(e).

[FN63]. *Id*.

[FN64]. *See, e.g., In re* Adelphia Commc'ns Corp., 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006) ("The party seeking to have a ballot disallowed has a heavy burden of proof.").

[FN65]. *See, e.g., In re* Dune Deck Owners Corp., 175 B.R. 839 (Bankr. S.D.N.Y. 1995); *In re* Kovalchick, 175 B.R. 863, 875 (Bankr. E.D. Pa. 1994).

[FN66]. *In re* Adelphia Commc'ns Corp., 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006).

[FN67]. Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (*In re* Figter Ltd.), 118 F.3d 635, 639 (9th Cir. 1997), *cert. denied,* 522 U.S. 996 (1997).

[FN68]. For a thoughtful exploration of the grounds for vote designation in chapter 11, *see* Christopher W. Frost, *Bankruptcy Voting and the Designation Power,* 87 Am. Bankr. L.J. 155 (2013) (discussing the policy and use of claims designation under the case law and recommending certain parameters for designation).

**End of Document**      © 2019 Thomson Reuters. No claim to original U.S. Government Works.