**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>          Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>          Plaintiff,<br><br>v.<br><br>AMBAC ASSURANCE CORPORATION, ASSURED<br>GUARANTY CORP., FINANCIAL GUARANTY<br>INSURANCE COMPANY and U.S. BANK TRUST<br>NATIONAL ASSOCIATION, as Trustee,<br><br>          Defendants. | PROMESA<br>Title III<br><br>Adv. Proc. No. 20-00003-LTS |

**MOTION OF AMBAC ASSURANCE CORPORATION, ASSURED GUARANTY CORP.,
AND FINANCIAL GUARANTY INSURANCE COMPANY TO DISMISS IN PART
COMPLAINT OBJECTING TO DEFENDANTS' CLAIMS
<u>REGARDING PRIFA BONDS</u>**

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

PROCEDURAL BACKGROUND ........................................................................................... 6

STANDARD OF REVIEW ..................................................................................................... 6

ARGUMENT ............................................................................................................................ 8

I.      THE OVERSIGHT BOARD'S CLAIMS SEEKING TO DISALLOW
        MOVANTS' CLAIMS ON THE GROUNDS THAT RETENTION OF THE
        PLEDGED RUM TAXES IS AUTHORIZED BY ARTICLE II, SECTIONS
        18 AND 19 OF THE COMMONWEALTH CONSTITUTION SHOULD BE
        DISMISSED BECAUSE SECTIONS 18 AND 19 HAVE NO
        APPLICATION TO FINANCIAL DEBT CONTRACTS. ................................... 8

        A.      Article II, Section 18 Has No Application To Financial Debt
                Contracts. ............................................................................................... 9

        B.      Article II, Section 19 Has No Application To Financial Debt
                Contracts. ............................................................................................. 13

        C.      The Oversight Board Has Failed To Allege Any Facts Sufficient To
                Justify The Invocation Of Any Emergency Powers. ............................... 14

II.     THE OVERSIGHT BOARD'S CLAIMS ASSERTING THAT MOVANTS'
        LIENS CAN BE AVOIDED PURSUANT TO SECTION 544 OF THE
        BANKRUPTCY CODE AND 19 L.P.R.A. § 2267 MUST BE DISMISSED. .... 15

        A.      The Oversight Board's Claims Under Section 544 Are Time-Barred. ..... 15

        B.      The Avoidance Counts Should Be Dismissed Because There Was No
                Requirement to Perfect Under Puerto Rico Law. .................................... 19

        C.      The Oversight Board Has No Ability To Avoid Unperfected Security
                Interests Under Section 544 Because No Hypothetical Judicial Lien
                Creditor Could Exist. ............................................................................. 21

        D.      PROMESA's Incorporation Of Section 544(a) Would Be
                Unconstitutional If Applied Retroactively .............................................. 26

        E.      The Uniform Commercial Code Does Not Supplant The Need For A
                Hypothetical Judicial Lien Creditor ....................................................... 27

        F.      The Oversight Board Is Not A "Trustee In Bankruptcy." ....................... 29

III.    THE OVERSIGHT BOARD'S COUNTS ASSERTING THAT MOVANTS'
        CONTRACTS CLAUSE CLAIMS SHOULD BE DISALLOWED

BECAUSE NO LEGISLATION CREATED AN IMPAIRMENT MUST BE
DISMISSED. ................................................................................................ 31

IV.     THE OVERSIGHT BOARD'S CLAIMS THAT THE PLEDGED RUM
TAXES ARE NOT "SPECIAL REVENUES" SHOULD BE DISMISSED
FOR FAILURE TO STATE A PLAUSIBLE CLAIM FOR RELIEF. ................ 35

CONCLUSION ........................................................................................................ 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acevedo-Garcia v. Vera-Monroig*,
    368 F.3d 49 (1st Cir. 2004)....................................................................22, 23, 24

*Ambac Assurance Corp. v. Commonwealth of Puerto Rico (In re Fin. Oversight &*
    *Mgmt. Bd. for P.R.)*,
    297 F. Supp. 3d 269 (D.P.R. 2018).......................................................5, 32, 34, 36

*Aqueduct & Sewer Authority of Puerto Rico v. Union Empleados A.A.A.*,
    5 P.R. Offic. Trans. 602 (P.R. 1976).........................................................11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................7, 38

*Aurelius Inv., LLC, v. Puerto Rico*,
    915 F.3d 838 (1st Cir. 2019)..............................................................................27

*Arriaga v. Members of Bd. of Regents*,
    25 F. Supp. 1, 6 (D. Mass. 1992)......................................................................33

*Boumediene v. Bush*,
    553 U.S. 723 (2008)...........................................................................................26

*Canman v. Bonilla*,
    778 F. Supp. 2d 179 (D.P.R. 2011).....................................................................8

*City of Pontiac Ret. Emps. Ass'n v. Schimmel*,
    751 F.3d 427 (6th Cir. 2014) ...................................................................33, 34, 35

*Commoloco de Caguas, Inc. v. Benitez Diaz*,
    126 D.P.R. 478 (1990) ........................................................................................22

*De Leon v. Alcon Puerto Rico, Inc.*,
    2019 WL 1398036 (D.P.R. Mar. 26, 2016) ........................................................8

*Deniz v. Municipality of Guaynabo*,
    285 F.3d 142 (1st Cir. 2002)..............................................................................27

*Diaz v. Dep't of Educ.*,
    823 F. Supp. 2d 68 (D.P.R. 2011)..........................................................22, 24, 25

*Financial Oversight & Management Board for Puerto Rico v. Andalusian Global*
    *Designated Activity Co.*,
    948 F.3d 457 (1st Cir. 2020)..............................................................................26

*Flushing Nat. Bank v. Mun. Assistance Corp. for City of New York*,
   40 N.Y.2d 731 (1976) .................................................................................14

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
   805 F.3d 322 (1st Cir. 2015) (Torruella, J., concurring) (2016)...........................32

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934).................................................................................33

*In re Airadigm Commcn's, Inc.*,
   396 B.R. 747 (W.D. Wis. 2007) .................................................................22

*In re Airadigm Communications, Inc.*,
   519 F.3d 640 (7th Cir. 2008) .....................................................................28

*In re Ajax Integrated, LLC*,
   2016 WL 1178350 (Bankr. N.D.N.Y. Mar. 23, 2016)...........................................28

*In re Billingsley*,
   290 B.R. 345 (Bankr. C.D. Ill. 2002)...........................................................22

*In re Cushman Bakery*,
   526 F.2d 23 (1st Cir. 1975)................................................................17, 18

*In re DeCora*,
   396 B.R. 222 (W.D. Wis. 2008) .................................................................22

*In re Deeb*,
   47 B.R. 848 (Bankr. N.D. Ala. 1985) ...........................................................28

*In re Fidelity ERISA Float Litig.*,
   829 F.3d 55 (1st Cir. 2016).................................................................7, 38

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   590 B.R. 577 (D.P.R. 2018)........................................................24, 29, 31

*In re Fluge*,
   57 B.R. 451 (Bankr. D.N.D. 1985) ...............................................................22

*In re IFS Fin. Corp.*,
   2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008).............................................16

*In re Midwest Agri Dev. Corp.*,
   387 B.R. 580 (B.A.P. 8th Cir. 2008)............................................................16

*In re Mktg. Assocs. of Am.*,
   122 B.R. 367 (Bankr. E.D. Mo. 1991) ...........................................................16

*In re Peabody Energy Corp.*,
    582 B.R. 771 (E.D. Mo. 2017) ...........................................................................18

*In re The Ground Round, Inc.*,
    482 F.3d 15 (1st Cir. 2007) ...............................................................................21

*In re Trask*,
    462 B.R. 268 (B.A.P. 1st Cir. 2011) ..............................................................4, 22

*In re Vt. Toy Works, Inc.*,
    82 B.R. 258 (Bankr. D. Vt. 1987) ......................................................................29

*In re Weinstein*,
    164 F.3d 677 (1st Cir. 1999) ..............................................................................27

*In re West*,
    474 B.R. 191 (Bankr. N.D. Miss. 2012) ............................................................16

*J.R.T. v. Assoc. Servs. Medicos Hosp.*,
    15 P.R. Offic. Trans. 476 (P.R. 1984) ...............................................................12

*Librotex v. AAA*,
    138 D.P.R. 938 (1995) .......................................................................................22

*LMS Holding Co. v. Core-Mark Mid-Continent, Inc.*,
    50 F.3d 1520 (10th Cir. 1995) ...........................................................................29

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935) ...........................................................................................27

*Maldonado Medina v. Comm'r of Soc. Sec. Admin.*,
    2019 WL 2710801 (D.P.R. June 27, 2019) ..........................................................7

*Morales Morales v. E.L.A.*,
    126 D.P.R. 92 (P.R. 1990) .................................................................................12

*Ocasio-Hernández v. Fortuno-Burset*,
    640 F.3d 1 (1st Cir. 2011) ....................................................................................7

*Oronoz & Co. v. Alvarez*,
    23 D.P.R. 536 (1916) .........................................................................................23

*Union Empleados Carreteras v. J.R.T.*,
    19 P.R. Offic. Trans. 138 (P.R. 1987) ...............................................................12

*United States Trust Co. v. New Jersey*,
    431 U.S. 1 (1977) ...............................................................................................33

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982)..................................................................................................26, 27

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993).................................................................................................7

*Whitfield v. Mun. of Fajarado*,
    2007 WL 6894782 (D.P.R. May 29, 2007)................................................................4, 22, 25

**Statutes and Rules**

11 U.S.C. § 108..................................................................................................19 n.10

11 U.S.C. § 301.........................................................................................................15

11  U.S.C. § 502...........................................................................................15, 16, 17, 18 n.9

11 U.S.C. § 544..................................................................................................*passim*

11 U.S.C. § 546..................................................................................................*passim*

11 U.S.C § 552........................................................................................................6, 35

11 U.S.C. § 902.................................................................................................5, 35, 36

11 U.S.C. § 926.........................................................................................................29

11 U.S.C. § 928......................................................................................................35, 36

U.C.C. § 9-102....................................................................................................*passim*

U.C.C. § 9-301.........................................................................................................28

U.C.C. § 9-309.....................................................................................................28 n.18

U.C.C. § 9-317................................................................................4, 5, 27, 28 & n.18, 29

48 U.S.C. § 2101........................................................................................................32

48 U.S.C. § 2103......................................................................................................3, 27

48 U.S.C. § 2121........................................................................................................30

48 U.S.C. § 2141........................................................................................................26

48 U.S.C. § 2161.................................................................................................15, 30, 35

32A L.P.R.A. App. III, § 56..............................................................................................23

32A L.P.R.A. App. V., § 56 ................................................................................26

3 L.P.R.A. § 1906 ............................................................................................14

3 L.P.R.A. § 1907 .............................................................................4, 14 n.7, 21

3 L.P.R.A. § 9102 ......................................................................................23, 26

3 L.P.R.A. § 9142 ..........................................................................23, 25 n.16, 26

19 L.P.R.A. § 2212 ...................................................................................28 n.18

19 L.P.R.A. § 2402 ..........................................................................................20

19 L.P.R.A. § 2219 .......................................................................................3, 21

19 L.P.R.A. § 2259 ...................................................................................28 n.18

19 L.P.R.A. § 2267 ....................................................................................15, 27

32 L.P.R.A. § 3082 ...................................................................................22 n.14

U.S. Const. art. I § 8 .................................................................................30 n.20

U.S. Const. art. I, § 10, cl. 1 ............................................................................32

U.S. Const. art. IV § 3 ...............................................................................27, 30

Fed. R. Civ. P. 8 .....................................................................................1, 7, 35

Fed. R. Civ. P. 12 ..............................................................................................6

Fed. R. Bankr. P. 7008 .................................................................................7, 35

P.R. R. Civ. P. 56 .......................................................................................23, 26

P.R. Const. art. II, § 8 ......................................................................................14

P.R. Const. art. II, § 18 ............................................................................. *passim*

P.R. Const. art. II, § 19 .........................................................................2, 13, 14, 32

P.R. Const. art. II, § 20 ...............................................................................9 n. 5

Pub. L. 82–447, 66 Stat. 327 (1952) ............................................................9 n. 5

**Other Authorities**

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 ........................17, 18

H.R. Rep. No. 114-602 (2016)...................................................................................................28, 29

Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corp. ("Assured"), and Financial Guaranty Insurance Company ("FGIC", and, together with Ambac and Assured, "Movants") by and through their undersigned counsel, respectfully submit this motion seeking entry of an order, substantially in the form attached as Exhibit A hereto, dismissing in part the *Complaint Objecting to Defendants' Claims and Seeking Related Relief* (ECF No. 10071) (the "Complaint") filed by the Financial Oversight and Management Board for Puerto Rico ("FOMB" or the "Oversight Board") in the above-captioned adversary proceeding.[2]

## PRELIMINARY STATEMENT

1.      The Oversight Board's Complaint adopts a "kitchen-sink" approach in seeking to disallow Movants' proofs of claim relating to PRIFA bonds.  Rather than putting forth a narrow Complaint that is limited to the subjects of plausible dispute amongst the parties and clearly articulates the purported legal and factual bases to support its claims, the Oversight Board overreaches to put in a 102-count Complaint that is filled with unsupported legal conclusions and claims that are deficient on their face.  The Complaint as a whole is mired in unsupported legal conclusions and lacks well-pled facts that "nudge[] [its claims] across the line from conceivable to plausible" as required by Rule 8 of the Federal Rules of Civil Procedure and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

2.      Movants respectfully submit that certain claims in the Complaint are so obviously deficient that they should be dismissed now as a matter of law.  Disposing of these legally deficient claims will allow the parties to focus on potentially genuine disputed issues, narrow the scope of

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Complaint.  The "Pledged Rum Taxes" refers to the first $117 million of federal excise taxes on sales of Puerto Rican rum, which are remitted to the Commonwealth and in turn pledged by PRIFA to U.S. Bank Trust National Association, as trustee (the "Trustee"), for the benefit of PRIFA bondholders.  All docket references are to the Commonwealth Title III proceeding, No. 17 BK 3283-LTS.

discovery, conserve party and judicial resources, and increase the likelihood of expeditious resolution of these proceedings.[3]  The claims as to which Movants seek dismissal as a matter of law include the following:

3. ***Emergency Powers Claims.***  Perhaps the most extreme and unsupported claims in the Complaint are the Oversight Board's counts attempting to defend the Commonwealth's unlawful retention of the Pledged Rum Taxes based on the Commonwealth's so-called "emergency powers" purportedly set forth in Article II, Sections 18 and 19 of the Commonwealth Constitution (the "Emergency Powers Claims").  The Emergency Powers Claims should be dismissed as a matter of law because Article II, Sections 18 and 19 have no application whatsoever to financial debt contracts.  The text of Article II, Section 18 makes clear that it is not a grant of any authority, but rather merely preserves the ability of the Legislature to act ***in response to grave emergencies occasioned by labor disputes***.  That plain reading of the text is confirmed by the legislative history of the provision, as articulated by the Supreme Court of Puerto Rico, and every judicial decision interpreting it.  Likewise, the text of Article II, Section 19 makes clear that it is nothing more than a rule of interpretation applicable to the Commonwealth Bill of Rights (*i.e.*, Article II of the Constitution), an issue that is entirely irrelevant to Movants' claims based on financial debt contracts.  Finally, even if Article II, Sections 18 and 19 could somehow be construed as granting the Commonwealth the authority to retain funds otherwise due to

---

[3] Contemporaneously with this motion, Movants are submitting motions to dismiss in part (i) the complaint filed by the Oversight Board on behalf of the Commonwealth with respect to bonds issued by the Puerto Rico Convention Center District Authority ("CCDA"), (ii) the complaint filed by the Oversight Board on behalf of the Commonwealth with respect to bonds issued by the Puerto Rico Highways and Transportation Authority ("HTA"), and (iii) the complaint filed by the Oversight Board on behalf of HTA with respect to bonds issued by HTA.  While there are critical differences amongst the PRIFA, CCDA, and HTA revenue bonds that will become prominent at other stages of these proceedings (including the April 2, 2020 preliminary hearing on the lift-stay motions with respect to each of these bonds), for purposes of the motions to dismiss, many of the arguments are substantially similar across all the motions, with each motion also addressing any issues unique to the complaint being addressed.

bondholders in "grave emergencies," the Oversight Board has utterly failed to allege any facts that would support such a use of the emergency power.

4.   ***Section 544 Avoidance Claims.***   The Complaint's claims seeking to avoid Movants' perfected security interests pursuant to Bankruptcy Code Section 544 (the "Avoidance Claims") are legally deficient on several independent grounds and should therefore be dismissed.

5.   *First*, the Avoidance Claims are time-barred.  Section 546 of the Bankruptcy Code affords the trustee (or here, the Oversight Board) two years from the entry of the order for relief (*i.e.*, the petition date) to bring any avoidance actions under Section 544.  The Oversight Board filed its petition on May 3, 2017, meaning that it was required to bring any avoidance claims by May 2, 2019.  The Oversight Board did not bring those claims until asserting them in the Complaint on January 16, 2020—more than eight months after the expiration of the statute of limitations. Accordingly, the Avoidance Claims must be dismissed as time-barred.

6.   *Second*, the Avoidance Claims, which seek to avoid Movants' security interests on the basis that Movants purportedly failed to perfect those security interests in accordance with Article 9 of the Uniform Commercial Code, as incorporated in the Puerto Rico Uniform Commercial Code ("P.R. UCC"), should be dismissed for the additional reason that the P.R. UCC, by its express terms, does not apply to Movants' security interests against the Pledged Rum Taxes. The former P.R. UCC under which the security interests were created did not apply "to a transfer by a government, political subdivision or governmental instrumentality or agency to the extent such a transfer is governed by special statute[,]" Commercial Transactions Act § 9-104(e), such as the PRIFA Enabling Act governing the Pledged Rum Taxes.  Even the revised P.R. UCC states that it "does not apply" to governmental debt where, as here, "another statute . . . expressly governs" the security interest.   19 L.P.R.A. § 2219(c)(2).   Here, the PRIFA Enabling Act

- 3 -

"expressly governs" the creation and perfection of Movants' security interests through automatic

perfection language because it mandates that, when PRIFA makes a pledge of its property, that

property "shall immediately be subject to said lien without the need of the physical delivery thereof

or any other act." 3 L.P.R.A. § 1907(a). Accordingly, there was no requirement for the Movants

to take any action to perfect their security interests under either the prior or revised version of the

P.R. UCC.

7.      *Third*, even if there was an obligation to perfect under the P.R. UCC, and even if

the Oversight Board were correct that Movants failed to perfect their security interests (an assertion

that is grossly erroneous but not addressed in this motion), the Oversight Board has no power to

avoid unperfected liens under Section 544(a). Section 544(a) "does not give the Trustee any

greater rights than he, or any person, would have as a bona fide purchaser or judicial lien creditor

under applicable state law." *In re Trask*, 462 B.R. 268, 273 (B.A.P. 1st Cir. 2011). And it is well-

established in Puerto Rico that "governmental entities are exempt from attachment

procedures . . . ." *Whitfield v. Municipality of Fajardo*, 2007 WL 6894782, at *3-4 (D.P.R.

May 29, 2007) (citation omitted). Because Commonwealth law makes it impossible for a judicial

lien creditor to obtain any rights in the relevant property, Section 544(a) cannot not grant the

Oversight Board any power to avoid such non-existent rights.

8.      *Fourth*, PROMESA's incorporation of Section 544(a) should not be held to apply

retroactively, and to the extent that PROMESA's incorporation of Section 544(a) applies

retroactively to destroy the value of liens that existed prior to the enactment of PROMESA, it

violates the Takings Clause of the U.S. Constitution.

9.      *Fifth*, contrary to the Oversight Board's claim, the P.R. UCC version of Section 9-

317 of the Uniform Commercial Code does not give the Oversight Board priority over unperfected

security interests where the Oversight Board lacks the powers of a hypothetical judicial lien creditor under Section 544(a) of the Bankruptcy Code.

10.     *Sixth*, any rights that the Oversight Board purports to have under Sections 9-102 and 9-317 of the Uniform Commercial Code would depend on the Oversight Board having the status of a "trustee in bankruptcy." However, the Oversight Board is not "a trustee in bankruptcy."

11.     ***Contracts Clause Claims.*** The Oversight Board's counts seeking to disallow Movants' claims under the Contracts Clause of the U.S. Constitution and the Commonwealth Constitution on the theory that no Commonwealth legislation created an impairment of Movants' contractual rights should be dismissed as a matter of law. The so-called "Emergency Orders" and "Moratorium Orders" that form the basis for Movants' Contracts Clause claims were issued pursuant to legislative authority delegated (albeit improperly) by the Commonwealth Legislature to the Governor. This Court reached that very conclusion in *Ambac Assurance Corp. v. Commonwealth of Puerto Rico (In re Financial Oversight & Management Board for Puerto Rico)*, 297 F. Supp. 3d 269 (D.P.R. 2018), and nothing in the Complaint provides a basis to change that conclusion.

12.     ***Special Revenues Claims and Postpetition Revenues Claims.*** The Oversight Board's claims seeking to disallow Movants' claims that the Pledged Rum Taxes are "special revenues" under Bankruptcy Code Section 902(2) (the "Special Revenues Claims") should be dismissed because they consist of nothing but conclusory assertions that the Pledged Rum Taxes "are not special revenues" (*see, e.g.*, Compl. ¶¶ 159, 198) and are unsupported by ***any*** factual allegations or ***any*** articulation of the Oversight Board's legal theory. Accordingly, the Special Revenues Claims—which are emblematic of the utterly conclusory nature of the Complaint—must be dismissed for failure to state a plausible claim for relief. For the same reason, the Oversight

Board's claims seeking to disallow Movants' claims against postpetition Pledged Rum Taxes under Bankruptcy Code Section 552 (the "Postpetition Revenues Counts") should be dismissed to the extent they rely on the assertion that the Pledged Rum Taxes are not "special revenues."

## PROCEDURAL BACKGROUND

13.     On May 3, 2017, the Oversight Board filed a petition commencing a proceeding on behalf of the Commonwealth (the "Commonwealth Case") under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  On June 26, 27, and 28, 2018, Ambac filed its proofs of claim in the Commonwealth Case.  (Compl. ¶ 8.)  On May 25, 2018, Assured filed a proof of claim in the Commonwealth Case.  (*Id.* ¶ 10.)  On June 28, 2018, FGIC filed its proof of claim in the Commonwealth Case.  (*Id.* ¶ 12.)  On May 18, 2018, the Trustee filed its proofs of claim in the Commonwealth Case.  (*Id.* ¶ 14.)

14.     On January 16, 2020, the Oversight Board filed the Complaint commencing this adversary proceeding.  Pursuant to this Court's *Amended Interim Case Management Order* (ECF No. 10595) (the "Scheduling Order"), any motion to dismiss is due February 27, 2020, with oppositions due April 13, 2020 and replies due May 13, 2020.  Any hearing on such motions to dismiss will occur on either June 3 or 4, 2020.  This motion is filed pursuant to the Scheduling Order.

## STANDARD OF REVIEW

15.     Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy Rule 7012(b), provides that a motion to dismiss should be granted where, as here, a complaint fails to state a claim as a matter of law.  *See* Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a complaint must state a "plausible" claim for relief, as opposed to merely stating a "possibl[e]" claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009).  To that end, Rule 8(a)(2) of the Federal Rules of Civil Procedure (applicable here through Bankruptcy Rule 7008) requires that a complaint "show[ ] that the pleader is entitled to relief."

16.     In order to "nudge[ ] [a claim] across the line from conceivable to plausible," a complaint must contain enough facts to support a claim for relief.  *Twombly*, 550 U.S. at 570; *Ocasio-Hernández v. Fortuno-Burset,* 640 F.3d 1, 12 (1st Cir. 2011) (the "make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief" (citation omitted)).  "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

17.     "In evaluating whether a complaint states a plausible claim," the court "perform[s] [a] two-step analysis."  *In re Fidelity ERISA Float Litig.*, 829 F.3d 55, 59 (1st Cir. 2016) (quoting *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016)).  First, the court must "distinguish the complaint's factual allegations . . . from its conclusory legal allegations (which need not be credited)."  *Id*.  Second, the court "must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable."  *Id*.

18.     In evaluating a motion to dismiss, the court may consider, in addition to documents attached or otherwise expressly incorporated into the complaint, "documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiffs' claim; or . . . documents sufficiently referred to in the complaint."  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

19.     Where, as here, a complaint offers nothing more than "naked assertions" devoid of "further factual enhancement," *Canman v. Bonilla,* 778 F. Supp. 2d 179, 186 (D.P.R. 2011) (quoting *Twombly*, 550 U.S. at 558), it is subject to dismissal.  *See Maldonado Medina v. Comm'r*

*of Soc. Sec. Admin.*, 2019 WL 2710801, at *1 (D.P.R. June 27, 2019) (a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions" (quoting *Twombly*, 550 U.S. at 555)); *De Leon v. Alcon P.R., Inc.*, 2019 WL 1398036, at *2 (D.P.R. Mar. 26, 2016) ("If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." (quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc))).

20.     As set forth below, a number of claims in the Complaint do not satisfy the requisite pleading standard and must be dismissed.

## ARGUMENT

**I.     THE OVERSIGHT BOARD'S CLAIMS SEEKING TO DISALLOW MOVANTS' CLAIMS ON THE GROUNDS THAT RETENTION OF THE PLEDGED RUM TAXES IS AUTHORIZED BY ARTICLE II, SECTIONS 18 AND 19 OF THE COMMONWEALTH CONSTITUTION SHOULD BE DISMISSED BECAUSE SECTIONS 18 AND 19 HAVE NO APPLICATION TO FINANCIAL DEBT CONTRACTS.**

21.     Counts XV, XLI, and LXVII of the Complaint (the "Emergency Powers Counts") seek to disallow Movants' claims based on the Commonwealth's unlawful retention of the Pledged Rum Taxes, on the purported grounds that the retention "was authorized by the Commonwealth's police powers as stated in Article II, Sections 18 and 19 of the Commonwealth Constitution."[4] The Emergency Powers Counts should be dismissed as a matter of law because Article II, Sections 18 and 19 have no application whatsoever to financial debt contracts. The Oversight Board's suggestion otherwise contravenes the plain language of the provisions, their legislative history, and every judicial decision interpreting them.

---

[4] Compl. ¶¶ 233, 357, 479, 594.

A.      **Article II, Section 18 Has No Application To Financial Debt Contracts.**

22.      Article II of the Commonwealth Constitution, titled "Bill of Rights[,]" sets forth a number of individual rights enjoyed by citizens of the Commonwealth, including, *inter alia*, the right to a public education, the right to a speedy trial, and the right to petition for a writ of *habeas corpus*. *See generally* P.R. Const. art. II.  Sections 18 and 19 are the last two Sections of Article II.[5]

23.      Section 18 provides as follows (in the English version of the Commonwealth Constitution):

> In order to assure their right to organize and to bargain collectively, persons employed by private businesses, enterprises and individual employers and by agencies or instrumentalities of the government operating as private businesses or enterprises, in their direct relations with their own employers ***shall have the right to strike, to picket and to engage in other legal concerted activities***.
>
> ***Nothing herein contained shall impair the authority of the Legislative Assembly to enact laws to deal with grave emergencies that clearly imperil the public health or safety or essential public services***.

P.R. Const. art. II, § 18 (emphasis added).

24.      In a broad overreach, the Oversight Board transmogrifies the last sentence of Section 18 into a general authorization by stating that it "establishes the authority of the Legislative Assembly to approve laws for grave emergency situations when there is a clear danger to public health and safety or to the delivery of essential services."  (Compl. ¶ 53.)  By its plain terms, however, Section 18 ***does not grant the Legislature any powers whatsoever***.  Rather, it merely clarifies that the right conferred on the people by Section 18 "to strike, to picket and to engage in other legal concerted activities" can be limited where the activities result in "grave emergencies

---

[5] Section 20 of Article II was excepted from the approval of the Constitution by joint resolution of Congress on July 3, 1952.  Pub. L. 82–447, 66 Stat. 327 (1952).  By Resolution number 34, approved by the Constitutional Convention and ratified in the public referendum held on November 4, 1962, Section 20 of Article II was eliminated.

that clearly imperil the public health or safety or essential public services."  Nothing in Section 18
remotely suggests that the Legislature possesses broad powers to repudiate financial debt contracts.

25.      Moreover, the plain language of Section 18 makes clear that the preservation of the
Legislature's authority to act in cases of "grave emergencies" refers specifically to *emergencies
occasioned by strikes, pickets, and other labor disputes*, and that the discussion of "grave
emergencies" has no application whatsoever outside of that limited context.  That is confirmed by
the fact that the second sentence of Section 18 provides that "*[n]othing herein contained* shall
impair" the Legislature's authority to enact laws in response to grave emergencies.  The only
plausible reading of that provision (as the Supreme Court of Puerto Rico has confirmed, *see infra*)
is that the right granted in the first sentence of Section 18 to strike, picket, and engage in other
legal concerted activities does not impair the Legislature's authority to enact laws in response to
grave emergencies occasioned by such strikes, pickets, or other legal concerted activities.  It cannot
be construed as a broad grant of emergency powers available for any use the Legislature sees fit.

26.      That the second sentence of Section 18 is irrelevant to anything other than the right
to strike, picket, and engage in other legal concerted activities is reinforced by the original Spanish
text of the Constitution, which provides:

> A fin de asegurar el derecho a organizarse y a negociar colectivamente, los
> trabajadores de empresas, negocios y patronos privados y de agencias o
> instrumentalidades del gobierno que funcionen como empresas o negocios privados
> tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga,
> a establecer piquetes y a llevar a cabo otras actividades concertadas legales.  *Nada
> de lo contenido en esta sección* menoscabará la facultad de la Asamblea Legislativa
> de aprobar leyes para casos de grave emergencia cuando estén claramente en
> peligro la salud o la seguridad públicas, o los servicios públicos esenciales.

P.R. Const. art. II, § 18 (official Spanish translation attached hereto as Exhibit B) (emphasis
added).  Notably, the provision in the English version that was translated as "[n]othing herein
contained" reads in the original Spanish as "[n]othing contained *in this section*" shall impair the

Legislature's power to deal with grave emergencies.  *Id.* (emphasis added).  This original text makes express that the language upon which the Oversight Board relies has no application whatsoever outside the context of labor disputes.[6]

27.      That Article II, Section 18 does nothing more than preserve the ability of the Legislature to enact laws in response to strikes, pickets, and related activities is further confirmed by the legislative history, as discussed in extensive detail by the Supreme Court of Puerto Rico in *Aqueduct & Sewer Authority of Puerto Rico v. Union Empleados A.A.A.*, 5 P.R. Offic. Trans. 602 (P.R. 1976).  In *Union Empleados*, the Supreme Court addressed the question of whether the Aqueduct and Sewer Authority of Puerto Rico was an "agenc[y] or instrumentalit[y] of the government operating as [a] private business[] or enterprise[]" and whose employees were therefore guaranteed the right to strike provided in the first sentence of Section 18.  In examining the legislative history of Section 18, the Supreme Court observed that the right to strike was "extensively debated" in connection with the drafting of the Commonwealth Constitution. *Id.* at 610-11.  As the Court noted, when an earlier version of the second sentence of Section 18 was first proposed to be added, the speaker for the majority explained its meaning as follows:

> The only purpose sought by the amendment is to clarify that the foregoing provisions on the right to strike, to picket, and to engage in other legal concerted activities . . . shall not impair the right which we consider inherent of the State . . . to protect the health, safety, and common welfare of the citizens when the latter . . . may be in imminent danger . . . .  [T]his provision in no manner could limit a strike or picket activity, no matter how powerful, strong, or extensive it may be, except when, as the case of emergency may be determined by the legislative power, the situation may turn into a threat to the health, safety, or welfare of the general public.

---

[6] While there previously has been briefing on whether the Spanish or English version of the Commonwealth Constitution controls (Movants' view is that the Spanish version is controlling, *see, e.g.*, Memorandum of Law of COFINA Senior Bondholders' Coalition in Support of Motion for Summary Judgment (Case No.17-00257-LTS (D.P.R. Feb. 21, 2018), ECF No. 307), the Court need not decide that issue here.  Either translation of the second sentence of Section 18 leads to the same conclusion, for the reasons discussed above.

- 11 -

*Id.* at 624.  When several delegates expressed concern that the proposed second sentence of

Section 18 could be read as preserving the authority of the Legislature to act in response to ***any***

strike, the majority speaker clarified that "the situation of emergency is ***that which may arise as a***

***result of a strike***."  *Id.* (emphasis added).  In response to these concerns, the legislature amended

the proposed "grave emergencies" sentence to include the word "clearly" before "imperils" and

replaced "general welfare" with "essential public service."  *Id.* at 625.  Thus, the Supreme Court

recognized that the final version of the second sentence of Section 18 "represents the specific

constitutional ground to protect the community ***against strikes and other concerted activities***

which create serious emergencies and imperil the public health or safety or essential public

services." *Id*.

28.    In addition to the language and legislative history of Section 18, every judicial

decision to address Section 18 supports its limitation to the labor context.  *See Union Empleados*

*A.A.A.*, 5 P.R. Offic. Trans. at 630-31 (holding that a law purporting to prohibit the right to strike

regardless of whether a serious emergency existed was unconstitutional under Article II, Section

18); *J.R.T. v. Assoc. Servs. Medicos Hosp.*, 15 P.R. Offic. Trans. 476, 481-82 (P.R. 1984) (citing

Article II, Section 18 as the constitutional foundation "[i]n Puerto Rico, [for] the workers' rights

to assemble, to bargain collectively, to strike, to picket, and to engage in other concerted activities

. . . ."); *Morales Morales v. E.L.A.*, 126 D.P.R. 92 (P.R. 1990) (citing Section 18 in part and stating,

"[c]ontrary to the United States Constitution, our Constitution expressly embodies the workers'

rights to organize, bargain collectively, to strike, to picket, and other activities that rank high in

our democracy."); *Union Empleados Carreteras v. J.R.T.*, 19 P.R. Offic. Trans. 138, 141 (P.R.

1987) (examining whether the Highway Authority operated as a private business and therefore

qualified as an employer for purpose of "the collective bargaining and labor rights consecrated in Secs. 17 and 18 of our Bill of Rights").

29.     Article II, Section 18 therefore provides no legal basis for the Oversight Board's clawback claims.

### B.     Article II, Section 19 Has No Application To Financial Debt Contracts.

30.     The Oversight Board's reliance on Article II, Section 19 fares no better.  That provision is simply a rule of interpretation applicable to the Commonwealth Bill of Rights (*i.e.*, Article II of the Constitution).  It does not, itself, grant any substantive rights.  Section 19 provides:

> ***The foregoing enumeration of rights*** shall not be construed restrictively nor does it contemplate the exclusion of other rights not specifically mentioned which belong to the people in a democracy.  The power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall ***likewise not be construed restrictively***.

P.R. Const. art. II, § 19 (emphasis added).  The limiting language in the first sentence of Section 19 expressly refers to the Article II provisions immediately preceding it, *i.e.*, "the ***foregoing*** enumeration of rights."  *Id.* (emphasis added).  The inclusion of "likewise" in the second sentence parallels the construction of the first sentence, making clear that the enumeration of rights granted to the people should not be read as impairing the powers otherwise granted to the Legislature. Section 19 therefore is not a freestanding grant of authority; it merely expresses the drafters' directive as to how Article II should be construed—an issue that is entirely irrelevant here as Movants are not asserting legal rights based on Article II of the Commonwealth Constitution. Rather, Movants are seeking to enforce their legal rights under financial debt contracts of the Commonwealth.

31.     In that regard, it bears emphasis that the financial debt contracts were, by their express terms, made subject to one—and only one—provision of the Commonwealth Constitution:

Article VI, Section 8.[7]  Article II, Section 19 cannot be read to provide unenumerated police powers for financial crises where by its own express terms the Commonwealth Constitution in Article VI, Sections 2 and 8, contemplates insolvency crises and provides express remedies for such insolvency.  *Flushing Nat'l Bank v. Mun. Assistance Corp. for City of New York*, 40 N.Y.2d 731, 736 (1976) ("The invidious consequence may not be justified by fugitive recourse to the police power of the State or to any other constitutional power to displace inconvenient but intentionally protective constitutional limitations. . . it is destructive of the constitutional purpose for the Legislature to enact a measure aimed at denying that very protection on the ground that government confronts the difficulties which, in the first instance, were envisioned.").

     **C.**    **The Oversight Board Has Failed To Allege Any Facts Sufficient To Justify The Invocation Of Any Emergency Powers.**

     32.    Finally, even if Sections 18 and 19 of Article II could somehow be construed as granting the Commonwealth the authority to retain funds otherwise due to bondholders in "grave emergencies," the Oversight Board has utterly failed to allege any facts (let alone plausibly allege facts) that would support such a use of emergency powers.  Notably, the references to Sections 18 and 19 in the Complaint do not include *any* alleged facts indicating that any prerequisites for invoking any such emergency powers were met.  Rather, the Complaint merely includes the conclusory assertion that "the Commonwealth's retention of the [Pledged Rum Taxes] prior to PROMESA was authorized by the Commonwealth's police powers as stated in Article II, Sections

---

[7] *See* 3 L.P.R.A. § 1907(a) ("The bonds issued by the Authority may be payable from all or any part of the gross or net revenues and other income derived by the Authority which, subject to the provisions of *§ 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico*, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth[.]" (emphasis added)); *id.* § 1906(m) ("Mortgage or pledge any property for the payment of the principal of and interest on any bonds issued by the Authority . . . subject to the provisions of *§ 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico*, all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority." (emphasis added)).

18 and 19 of the Commonwealth Constitution." *See supra*, note 4.  Such conclusory allegations

do not come close to establishing a plausible claim for relief.  *See Twombly*, 550 U.S. at 545 ("a

plaintiff's obligation to provide the 'grounds' of his 'entitlement' to relief' requires more than

labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.").

As such, the Emergency Powers Counts must be dismissed.

## II.   THE OVERSIGHT BOARD'S CLAIMS ASSERTING THAT MOVANTS' LIENS CAN BE AVOIDED PURSUANT TO SECTION 544 OF THE BANKRUPTCY CODE AND 19 L.P.R.A. § 2267 MUST BE DISMISSED.

### A.   The Oversight Board's Claims Under Section 544 Are Time-Barred.

33.   The Oversight Board's avoidance claims under Bankruptcy Code Section 544

(Counts VII, XXXIII, and LIX) (the "Avoidance Counts") must be dismissed as the Oversight

Board is time-barred from bringing any avoidance action.

34.   Section 546(a) affords a trustee—or here, the Oversight Board[8]—two years after

the entry of the order for relief (*i.e.*, the petition date, per 11 U.S.C. § 301(a)) in which it may bring

avoidance actions.  *See* 11 U.S.C. § 546(a).  The Oversight Board filed its petition on May 3, 2017,

meaning that the deadline to bring any avoidance claims was May 2, 2019.  The Oversight Board

did not bring those claims until January 16, 2020—more than eight months after the deadline.

Accordingly, the Oversight Board is time-barred from bringing any avoidance claims, and it cannot

use the alleged avoidability of such security interests as a basis for disallowance under Section

502.

35.   That the Oversight Board is seeking to disallow claims under the procedural vehicle

of Section 502(d) is of no moment.  Section 502(d) permits the disallowance of claims on the basis

---

[8] PROMESA substitutes the Oversight Board for "trustee" in Section 546(a).  PROMESA §§ 301(a), (c)(7).
But the Oversight Board is not a "trustee in bankruptcy" for purposes of the Uniform Commercial Code, as
detailed in Argument § II.F below.

of avoidance only if the claimant "**is first adjudged liable under the applicable [avoidance]**

**section** . . . . If the court does not first determine avoidability, then the court cannot determine if

section 502(d) applies." *In re Midwest Agri Dev. Corp.*, 387 B.R. 580, 585-86 (B.A.P. 8th

Cir. 2008) (emphasis added) (citing *In re Odom Antennas, Inc.*, 340 F.3d 705, 708 (8th Cir. 2003)).

Movants have not been "adjudged liable" under Section 544, the avoidance section that the

Oversight Board attempts to invoke.  Nor is it even possible for Movants to be adjudged liable, as

the time to bring any avoidance action under the statute of limitations set forth in Section 546(a)

has passed.  And because "[s]ection 502(d) requires the trustee to first obtain an order [regarding

avoidability] before asserting a defense under section 502(d)," the Oversight Board may not object

to Movants' claims as avoidable here.  *Id.*; *see also In re Mktg. Assocs. of Am.*, *Inc.*, 122 B.R. 367,

369-70 (Bankr. E.D. Mo. 1991) (where the Section 546(a) statute of limitations has expired,

"because no [avoidance] action may ever be brought, there can be no [interest] which is 'avoidable'

within the meaning of Section 502(d)"); *In re West*, 474 B.R. 191, 202-03 (Bankr. N.D. Miss.

2012) (trustee may not use Section 502(d) "defensively" when "the trustee's causes of action are

time barred"); *In re IFS Fin. Corp.*, 2008 WL 4533713, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("A

claim may be disallowed under § 502(d) only if the claim is based on a transfer that the trustee

could actually recover under the avoidable transfer provisions.  If an affirmative defense or other

grounds preclude the trustee from recovering the avoidable transfer, the claim cannot be

disallowed under § 502(d).").

36.     The legislative history of Section 502(d) likewise indicates that actual avoidance

under Section 544 must be possible in order for Section 502(d) to apply, because the Senate Report

states that "[Section 502(d)] requires disallowance of a claim of a transferee of a voidable transfer

. . . if the transferee **has not paid the amount or turned over the property received as required**

*under the sections [e.g., 544] under which the transferee's liability arises*[,]" and a transferee is

not required to pay an amount or turn over property unless the transfer has actually been avoided

under Section 544.  *See* S. Rep. No. 95-989, at 65 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787,

5851 (emphasis added).

37.     Movants recognize that some courts have held that Section 546(a) does not prevent

the defensive use of avoidance powers via Section 502(d).  *See, e.g.*, *In re McKenzie*, 737 F.3d

1034 (6th Cir. 2013) (allowing a trustee to use avoidance powers defensively after the statute of

limitations had run); *In re Am. West Airlines, Inc.*, 217 F.3d 1161, 1165-67 (9th Cir. 2000) (stating

that "the limitations period in § 546 does not apply to § 502(d)").  Movants respectfully submit

that those cases were wrongly decided, and that the Court should follow the better reasoned

decisions in the Fifth and Eighth Circuits, as set forth above.

38.     The First Circuit's 1975 decision in *In re Cushman Bakery*, 526 F.2d 23 (1st Cir.

1975), applying pre-Bankruptcy Code law, does not counsel a different result.  There, the First

Circuit held that the two-year statute of limitations set forth in Section 11e of the Bankruptcy Act

of 1898 (the "Bankruptcy Act") did not did not bar disallowance of the claim on the basis of its

avoidability under Section 57g of the Bankruptcy Act.  After acknowledging that "[t]he statutory

language can be interpreted to support either" side's interpretation, the court held that the "the

scheme of the Bankruptcy Act" supported the conclusion that Section 11e was inapplicable to an

objection to the allowance of a creditor's claim under Section 57.  *Id.* at 35-36.  In particular, the

court noted that, because another provision of the Bankruptcy Act, Section 57n, "permit[ted]

creditors, whose claims were not filed within six months of the date of the first creditor's meeting,

to file claims against any surplus remaining after all duly filed claims have been allowed and paid

in full[,]" there could be "circumstances in which a creditor may file his claim more than two years

after the date of adjudication[,]" and therefore, "[to] hold [Section] 11e applicable to [Section] 57 objections could absolutely preclude some trustees from objecting to the allowance of a claim against a surplus." *Id.* at 36.

39.     There is, however, no equivalent to the Bankruptcy Act's Section 57n in the modern Bankruptcy Code.  Thus, the rationale supporting the holding in *Cushman Bakery* is absent here.

40.     Moreover, significant differences in the text of the provisions at issue in *Cushman Bakery* from those at issue here militate against any application of the *Cushman Bakery* decision.[9] *See, e.g.*, *In re Peabody Energy Corp.*, 582 B.R. 771, 783 (E.D. Mo. 2017) (a case interpreting provisions of the Chandler Act, a precursor to certain provisions of the current Bankruptcy Code, was "inapplicable" because it did not interpret current Code provisions), *aff'd*, 933 F.3d 918 (8th Cir. 2019).  Section 11e of the Bankruptcy Act "provide[d] that a trustee 'may, within two years subsequent to the date of adjudication . . . , institute proceedings in behalf of the estate upon any claim against which the period of limitations fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy.'"  *Cushman Bakery*, 526 F.2d at 35 (quoting 11 U.S.C. § 11e (1938)).  The First Circuit observed that "[t]he most natural interpretation of this language 'institute proceedings . . . upon any claim' is that it refers to the institution of a separate action by the trustee which, if the trustee's claim is well-founded, will entitle the trustee to recover on behalf of the estate[,]" and that "[a] trustee's objection to the allowance of a claim is manifestly not the institution of a proceeding that will entitle the trustee to recover on behalf of the estate." *Id*.  By contrast, Section 546 of the Bankruptcy Code unambiguously provides that "[a]n action or

---

[9] This is particularly true where, as noted above, the legislative history of the currently applicable provisions also indicates that the contrary view should prevail.  *See* S. Rep. No. 95-989, at 65 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5851 (Section 502(d) "requires disallowance of a claim of a transferee of a voidable transfer *in toto* if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises").

proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the

earlier of . . . 2 years after the entry of the order for relief . . . ."  11 U.S.C. § 546(a).  And there

can be no legitimate dispute that the Oversight Board has commenced "an action or proceeding

under section 544" by way of this adversary proceeding.

      41.    Accordingly, the statute of limitations governing the Oversight Board's avoidance

claims under Section 544 has run, and the Avoidance Counts should be dismissed.[10]

      **B.    The Avoidance Counts Should Be Dismissed Because There Was No Requirement to Perfect Under Puerto Rico Law.**

      42.    The Avoidance Counts should be dismissed for the additional reason that the P.R.

UCC, by its express terms, does not apply to Movants' security interests against the Pledged Rum

Taxes.   The Avoidance Counts are premised on the Oversight Board's theory that Movants failed

to perfect their security interests in accordance with Article 9 of the Uniform Commercial Code,

as incorporated in the P.R. UCC.  (*See* Compl. ¶¶ 106-12.)  But even assuming *arguendo* that

Movants' security interests are assumed to be security interests in "deposit accounts" as alleged in

the Complaint (which Movants do not concede), the P.R. UCC does not apply to Movants' security

interests.

      43.    The applicable P.R. UCC in effect at the time the PRIFA bonds were issued, the

Commercial Transactions Act, Act No. 241, adopted September 19, 1996, included a scope

---

[10] While the Trustee, in its capacity as trustee for the Bondholders, entered into a tolling agreement with the Oversight Board (attached hereto as Exhibit C), the tolling agreement applies only to "potential claims against the Trustee which claims would be subject to the statutes of limitation under 11 U.S.C. §§108(a) and 546(a), including defenses to the claims asserted by the Trustee in the Proof of Claim, including allegations that the Commonwealth illegally clawed back or diverted rum tax sale proceeds that were pledged by PRIFA to pay the Bonds, which claim allegedly gives rise to a secured claim by the Trustee against the Commonwealth."  (Exhibit C at 2.)  Expressly carved out from the tolling agreement are "any claims challenging the validity of any liens or security interests against PRIFA."  (*Id.* at 3.)  Because the Oversight Board's Complaint appears to be challenging "the validity of . . . liens or security interests against PRIFA" (*id.*), and those claims were excluded from tolling under the tolling agreement, they are subject to the statute of limitations set forth in Section 546.

provision that specifically excluded governmental transfers from being governed by Article 9: "The provisions of this Chapter shall not apply . . . to a transfer by a government, political subdivision or governmental instrumentality or agency to the extent such a transfer is governed by special statute." Commercial Transactions Act § 9-104(e). Moreover, at the time the Bonds were issued, the applicable P.R. UCC did not cover deposit accounts as original collateral. *See* P.R. Laws Ann. tit. 19, § 2004(l) (1998) (repealed 2012) ("Sections 2001-2207 of this title do not apply to a transfer of an interest in any deposit account . . . except as provided with respect to proceeds . . . and priorities in proceeds . . . .").

44.     The Legislative Assembly revised the P.R. UCC by Act No. 21, adopted January 17, 2012. The revised P.R. UCC became effective as of January 17, 2013. Under the "Savings clause" of the revised P.R. UCC, security interests created before the effective date that were outside the scope of the prior P.R. UCC but within the scope of the revised P.R. UCC are enforceable under either the revised P.R. UCC *or* "the law that otherwise would apply if this chapter had not taken effect." 19 L.P.R.A. § 2402(b).[11] The Complaint makes no allegation that Movants' security interests are not enforceable under the law that "otherwise would apply" if the revised P.R. UCC had not taken effect. Because Movants' security interests fall within the Savings

---

[11] 19 L.P.R.A. § 2402(b) states: "(1) Transactions and liens that were not governed by former Chapter 9 of the Commercial Transactions Act, were validly entered into or created before this act takes effect, and would be subject to this chapter if they had been entered into or created after this act takes effect, and the rights, duties, and interests flowing from those transactions and *liens remain valid after this act takes effect*, and (2) the transactions and liens *may be terminated, completed, consummated, and enforced as required or permitted by this chapter or by the law that otherwise would apply if this chapter had not taken effect*.") (emphasis added). *See also* U.C.C. § 9-702 cmt. 1; *In re Cruz Rivera*, 600 B.R. 132, 149–50 (B.A.P. 1st Cir. 2019) (vacating and remanding the bankruptcy court's order concerning the perfection of a pre-revision security interest in a deposit account—collateral outside of the scope of the former P.R. UCC but within the scope of the revised P.R. UCC—in part because the "bankruptcy court did not consider the alternative enforcement options" under both pre-revision law and the revised P.R. UCC).

clause, and because the Complaint contains no allegations suggesting that the Savings clause does

not apply, the Complaint fails to state any claim under the revised P.R. UCC.

45.     Even assuming *arguendo* that the security interests were enforced in accordance

with the revised P.R. UCC, the result would be the same.  That is because the revised P.R. UCC

still expressly provides that it does not apply to governmental debt where, as here, another statute

governs the security interest.  19 L.P.R.A. § 2219(c)(2) ("This chapter does not apply to the extent

that . . . the constitution or another statute of this state expressly governs the creation, perfection,

priority, or enforcement of a security interest created by this state or a governmental unit of this

state[.]").

46.     Here, the PRIFA Enabling Act "expressly governs" (within the meaning of the P.R.

UCC) the creation and perfection of Movants' security interests through automatic perfection

language.  The PRIFA Enabling Act mandates that, when PRIFA makes a pledge of its property,

that property "shall immediately be subject to said lien without the need of the physical delivery

thereof or any other act."  3 L.P.R.A. § 1907(a).  Because the PRIFA Enabling Act expressly

governs the creation and perfection of Movants' security interests, the perfection requirements of

the revised P.R. UCC do not apply and do not provide any basis for the Oversight Board to avoid

Movants' security interests.  19 L.P.R.A. § 2219(c)(2).

47.     Accordingly, the Avoidance Counts should be dismissed because the Oversight

Board has failed to articulate any legal basis for those claims.

**C.      The Oversight Board Has No Ability To Avoid Unperfected Security Interests Under Section 544 Because No Hypothetical Judicial Lien Creditor Could Exist.**

48.     In addition to being time-barred and deficient under Puerto Rico law, these same

counts in which the Oversight Board seeks to avoid unperfected security interests pursuant to

Section 544(a) suffer from another legal deficiency.  The Oversight Board has no such power to

- 21 -

avoid unperfected liens.  Section 544(a) "does not give the Trustee any greater rights than he, or

any person, would have as a bona fide purchaser or judicial lien creditor under applicable state

law."  *In re Trask*, 462 B.R. at 273.  Accordingly, if Commonwealth law makes it impossible for

a judicial lien creditor to obtain any rights in the relevant property, Section 544(a) does not grant

the Oversight Board any rights in that property.[12]

49.    It is well-established in Puerto Rico that "governmental entities are exempt from

attachment procedures, because as a matter of public policy, governmental entities ought not to be

subject to the inconveniencies of such procedures, which interfere with the execution of public

functions, in the detriment of the common good."  *Whitfield*, 2007 WL 6894782, at *3-4 (citation

omitted).  Accordingly, the Puerto Rico Supreme Court has repeatedly held that the attachment of

funds to benefit a judgment creditor does not serve a public purpose and is thus not a remedy

available to satisfy judgments against public entities.  *See Librotex v. AAA*, 138 D.P.R. 938, 939-

41 (1995); *Commoloco de Caguas, Inc. v. Benitez Diaz*, 126 D.P.R. 478, 493 (1990).[13]

50.    Because attachment of judicial liens on public funds is not permitted under Puerto

Rico law, a judgment creditor's only remedy is to seek a repayment plan to be included within the

public corporation's next annual budget.  *See Librotex*, 138 D.P.R. at 942-43.[14]  Indeed, Act 66-

2014—which has "supremacy over any other law"—codified the long-standing precedent that

---

[12] *See In re The Ground Round, Inc.*, 482 F.3d 15, 20 (1st Cir. 2007) (Section 544(a)(1) powers did not
allow the trustee to avoid a property interest in a liquor license where under state law a contract claim
litigant could not have obtained a lien on the liquor license); *see also, e.g., In re Airadigm Commcn's, Inc.*,
396 B.R. 747, 753 (W.D. Wis. 2007), *aff'd*, 519 F.3d 640 (7th Cir. 2008); *In re DeCora*, 396 B.R. 222, 225
(W.D. Wis. 2008); *In re Fluge*, 57 B.R. 451, 456 (Bankr. D.N.D. 1985); *In re Billingsley*, 290 B.R. 345,
347 (Bankr. C.D. Ill. 2002).

[13] Attached hereto as Exhibits D and E are certified translations of the Puerto Rico Supreme Court decisions
cited herein.

[14] *See also Diaz v. Dep't of Educ.*, 823 F. Supp. 2d 68, 77 (D.P.R. 2011); *Acevedo-Garcia v. Vera-Monroig*,
368 F.3d 49, 56 (1st Cir. 2004) (noting Puerto Rico rule on attachment and holding that repayment plan
was not attachment); 32 L.P.R.A. § 3082.

contract litigants are **not** permitted to attach judgments to funds of the Commonwealth, its

municipalities, or its public corporations, and instead may only enter into repayment plans.

3 L.P.R.A. §§ 9102, 9142.  In particular, Section 29 of Act 66 provides:

> No agency or instrumentality of the Commonwealth, or public corporation or
> municipality, official or employee shall be compelled to make any payment
> whatsoever with respect to a previously authorized judgment or payment plan,
> when there are no funds available therefor when the legislative appropriation for
> such purposes has been exhausted; therefore, **the garnishment [el embargo] *of***
> ***funds to enforce a judgment issued against the Commonwealth is hereby***
> ***prohibited***.

3 L.P.R.A. § 9142 (emphasis added).  As the First Circuit has held, a repayment plan is **not**

attachment of a judicial lien, and Puerto Rico law, including Section 29 of Act 66-2014, does not

permit judicial liens to attach to government funds.  *Acevedo-Garcia v. Vera-Monroig*, 368 F.3d

49, 56 (1st Cir. 2004).  Puerto Rico courts have also recognized that seizure of personal property

is necessary to give rise to a judicial lien, and given that a repayment plan does not result in a

seizure of property, a repayment plan is **not** a judicial lien.  *See, e.g.*, *Oronoz & Co. v. Alvarez*, 23

D.P.R. 536, 537-38 (1916) ("Seizure or some similar measure is necessary to give priority to the

judgment . . . ."); *Librotex*, 138 D.P.R at 942-32 (equating "*seizure* of [PRASA's] operational

funds" with the imposition of "encumbering and monumental immediate liens"); *see also* P.R. R.

Civ. P. 56.4, 32A L.P.R.A. App. III, R. 56.4 (English) ("In the case of personal property. . . [an]

order [of attachment] shall be carried out by depositing the personal property in question in court

or with the person designated by it under the claimant's responsibility.").  Under *Librotex*—which

remains controlling precedent in Puerto Rico[15]—when a public entity is facing financial distress,

---

[15] While prior Puerto Rico precedent recognized that certain public corporations could be subject to
attachment in limited circumstances, that precedent was overridden 40 years later, when the Puerto Rico
Supreme Court called into question its reasoning in that case, finding that assets of HTA and PRASA were
public property and therefore not subject to garnishment by judgment creditors.  *Commoloco de Caguas*,
126 D.P.R. at 478 (finding such remedy would cause "an impermissible diversion of public funds").

seizure of a public entity's monies and other assets would interfere with its executive functions and thus would be prohibited.  The Oversight Board's own allegations in the Complaint (which must be taken as true for purposes of this motion) demonstrate that the holding of *Librotex* applies here, and applied on the petition date.  (*See, e.g.*, Compl. ¶ 96 (alleging that Puerto Rico was experiencing a "fiscal emergency" in the period immediately prior to the filing of the Commonwealth Case)).

51.    While this Court held in connection with the Title III proceeding for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") that, "under Puerto Rico law, a judgment creditor could have obtained a lien against ERS's assets," *Fin. Oversight & Mgmt. Bd. for P.R. v. Altair Global Credit Opportunities Fund, LLC*, 590 B.R. 577, 594 (D.P.R. 2018), *aff'd in part, vacated in part, rev'd in part*, 914 F.3d 694 (1st Cir. 2019), *cert. denied sub nom. Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*, 140 S. Ct. 47 (2019), that holding has no application here.  The Court's analysis in the ERS proceeding was based on the notion that "the assets of a Puerto Rico governmental entity may be subject to attachment and seizure where the legislature has conferred sufficient operational powers upon the governmental entity to render it subject to 'judicial process ***as any private enterprise would be*** under like circumstances.'"  *Id.* at 595-96 (emphasis added) (quoting *Arraiza v. Reyes y León, Interventor*, 70 D.P.R. 614, 617 (1949)).  But the Commonwealth is not subject to judicial process to the same extent that private enterprises are.  To the contrary, no judicial lien could attach against any Commonwealth funds, because the Commonwealth is protected from such relief by sovereign immunity.  *Diaz v. Dept. of Educ.*, 823 F. Supp. 2d 68, 77 (D.P.R. 2011).  Therefore, no hypothetical judicial lien creditor could exist, and Section 544(a) has no application as to the Commonwealth.

- 24 -

52.     Moreover, this Court's holding in the ERS proceeding depended on a conclusion that the "mandatory budget provision" ordered in *Librotex* constituted "alternative security" equivalent to a judicial lien, *In re Fin. Oversight & Mgmt. Bd.*, 590 B.R. at 594 n.20, but the First Circuit has recognized that the type of mandatory budget provision ordered in *Librotex* is not the equivalent of attachment of a judicial lien.   In *Acevedo-Garcia*, 368 F.3d at 56, a defendant municipality argued that a mandatory budget order was contrary to Puerto Rico law "prohibiting the attachment or garnishment of public funds."   According to the First Circuit, "a court does not 'attach' public funds by ordering that future budgets take account of a court judgment, as the Puerto Rico Supreme Court recognized."   *Id*.   In interpreting *Librotex*, the court found that "direct attachment of the funds of a public agency was impermissible, but an equitable order requiring the judgment to be included in the agency's next budget cycle was acceptable."   *Id*.  This is also how other courts have interpreted *Librotex*.  *See Whitfield*, 2007 WL 6894782, at *3-4; *Diaz*, 823 F. Supp. 2d at 77 ("The Court finds that the Puerto Rico Supreme Court has held that as a matter of public policy governmental entities ought not be subject to the inconveniences of attachment, which interfere with the execution of public functions. . . .  Thus, the Court understands that the writ of attachment is inappropriate.").[16]

---

[16] In any event, Movants respectfully disagree with the Court's holding—which was "vacate[d]" by the First Circuit, 914 F.3d at 703—and it is not binding on Movants (who were not parties to the ERS decision). Act 66 of 2014, the Puerto Rico Special Fiscal and Operational Sustainability Act, was enacted in recognition of the Commonwealth's purported "state of emergency" and meant to "protect the cash availability of the Commonwealth of Puerto Rico without affecting essential services provided to the people."  3 L.P.R.A. § 9101.

Interpreting this law—which expressly provides that a payment plan is the *only* mechanism available to satisfy judgment creditors, *see* 3 L.P.R.A. §§ 9142, 9143—as permitting judicial liens to attach to Commonwealth property would have absurd and obviously unintended results.  Under this view, creditors could "attach" the funds of the Commonwealth for the full value of their claims, which would prevent the Commonwealth from using its funds—because any recipient of the funds would take the monies subject to the lien.  But at the same time, the Commonwealth could not actually *pay* its creditors more than $3 million per year, the maximum payment plan allowed under Act 66.  This interpretation would defeat the obvious

53.     In addition, Rule 56.1 of Puerto Rico's Rules of Civil Procedure cannot serve as a basis to attach a lien on public funds.  It is significant that Section 29 of Act 66-2014 overrides Rule 56.1, which provides that "court[s] may order the attachment . . . of personal property."  This is because even though the English *translation* of Section 9142 uses the word "garnishment" and the English *translation* of Rule 56.1 uses the word "lien," the Spanish originals of both provisions use the *same* Spanish word, namely "el embargo."  *Compare* P.R.R. Civ. P. 56.1, 32A L.P.R.A. App. V., R. 56.1 (Spanish) ("El tribunal podrá conceder *el embargo, el embargo* de fondos en posesión de un tercero. . . .") *with* 3 L.P.R.A. § 9142 ("se prohíbe *el embargo* de fondos para hacer efectivo un fallo emitido contra el Estado").  Therefore, to the extent that Rule 56.1 provides for a basis for attachment, Section 29 of Act 66—which has supremacy over all other Puerto Rico laws and uses the same terminology in Spanish as Rule 56—expressly prohibits what Rule 56.1 might otherwise allow, namely attachment of a judicial lien.  *See* 3 L.P.R.A. § 9102.

**D.     PROMESA's Incorporation Of Section 544(a) Would Be Unconstitutional If Applied Retroactively.**

54.     To the extent that the Court finds Section 544(a) applicable here, Section 544(a) (as incorporated in PROMESA) violates the Takings Clause of the U.S. Constitution.[17]  "The

---

objective of the legislation, to give the Commonwealth and its instrumentalities additional financial flexibility to pay judgments over time, effectively rendering Act 66 a dead letter.

[17] In its recent decision in *Financial Oversight & Management Board for Puerto Rico v. Andalusian Global Designated Activity Co.*, 948 F.3d 457, 476 (1st Cir. 2020), the First Circuit held that "Congress provided an explicit command at 48 U.S.C. § 2101(b)(2) to apply PROMESA retroactively."  Movants disagree with this decision and contend that Section 544(a) should be read to apply only prospectively because PROMESA may not "be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress."  *See Sec. Indus. Bank*, 459 U.S. at 81.  Movants respectfully submit that no such explicit command appears in PROMESA, which instead requires the Oversight Board to "respect the relative lawful priorities or lawful liens . . . in effect prior to June 30, 2016."  PROMESA § 201(b)(1)(N).  Movants respectfully preserve for appeal their argument that PROMESA should not be construed as applying Section 544(a) retroactively.

The First Circuit expressly did *not* reach the question of whether applying Section 544(a) retroactively under PROMESA is constitutional, because the appellants in that case "frame[d] the issue as one of constitutional avoidance," not unconstitutionality, and did "not raise[] in their initial appellate brief" the

bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935); *accord United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982); *In re Weinstein*, 164 F.3d 677, 685 (1st Cir. 1999). Congress's powers under the territorial clause (U.S. Const. art. IV § 3, Cl. 2) are likewise subject to the Fifth Amendment. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 758 (2008); *Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 146 (1st Cir. 2002) ("[T]he Takings Clause applies unreservedly to the Commonwealth of Puerto Rico.").

55.     To the extent that Section 544(a), as incorporated by PROMESA, applies retroactively and allows the Oversight Board to avoid Movants' liens, then PROMESA violates the Takings Clause, and the Court should sever the incorporation of Section 544(a) from the rest of PROMESA and hold that it is invalid. *See* PROMESA § 3 (providing for severability); *Aurelius Inv., LLC, v. Puerto Rico*, 915 F.3d 838, 861 (1st Cir. 2019) (severing and holding invalid an unconstitutional provision of PROMESA).

### E.     The Uniform Commercial Code Does Not Supplant The Need For A Hypothetical Judicial Lien Creditor.

56.     The Oversight Board asserts that 19 L.P.R.A. § 2267(a)(2) (which is the corresponding section in the P.R. UCC for Section 9-317 of the Uniform Commercial Code) gives the Oversight Board priority over unperfected security interests even where, as here, the Oversight Board lacks the powers of a hypothetical judicial lien creditor under Section 544(a) of the Bankruptcy Code (because no such creditor could exist). (*See* Compl. ¶¶ 106, 109.) This theory has merit only if the Uniform Commercial Code somehow gives priority to "rights" of a "trustee

---

argument that PROMESA is unconstitutional when construed to apply retroactively. *Andalusian Global Designated Activity Co.*, 948 F.3d at 476 n.17 ("We do not decide an argument not presented to us.").

in bankruptcy" beyond its rights as a judicial lien creditor under Section 544 of the Bankruptcy Code. It does not.

57.     Section 9-317 of the Uniform Commercial Code subordinates an unperfected security interest to the "rights" of a "lien creditor," and Section 9-102(52) defines "lien creditor" to include a "trustee in bankruptcy" following the filing of a petition. Section 9-317 does not, however, define the "rights" of a lien creditor entitled to priority. Similarly, Section 9-102(52) does not itself *give* the bankruptcy trustee the rights of a judicial lien creditor; it is merely a definition, not a substantive grant of a power or property right.[18]   Official Comment 20 to Section 9-102 clarifies that the definition of "lien creditor" is "unchanged in substance from . . . former [§] 9-301," which defined "lien creditor" to mean "a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes . . . a trustee in bankruptcy." U.C.C. § 9-102 cmt. 20; U.C.C. § 9-301(3) (former).    Section 9-317 therefore operates to recognize (not expand) the trustee's rights—to the extent they exist—as a hypothetical judicial lien creditor under Section 544. This is confirmed by Official Comment 4 to Section 9-317, which uses the term "judicial lien" no fewer than four times. U.C.C. § 9-317 cmt. 4.

---

[18] By contrast, the Uniform Commercial Code itself *does* bestow the status of a lien creditor on certain other types of entities that are recognized as "lien creditors" under Section 9-317. For example, Section 9-309 of the Uniform Commercial Code expressly recognizes as a perfected security interest (*i.e.*, lien) "an assignment for the benefit of all creditors of the transferor and subsequent transfers by the assignee thereunder." *See* 19 L.P.R.A. § 2259 (12). Consistent with Section 9-309's bestowal of the status of a "lien creditor" on an assignee for the benefit of creditors, Section 9-102(52) then includes in the *definition* of lien creditor "an assignee for the benefit of creditors from the time of assignment." 19 L.P.R.A. § 2212(52)(B). This interaction of Sections 9-309 and 9-102(52) demonstrates that the definition of "lien creditor" in 9-102(52) is not the *source* of an entity's status as a "lien creditor;" rather the 9-102(52) definition merely *recognizes* an entity's status as a "lien creditor" as granted by some other statute or source of law. In the case of an assignee for the benefit of creditors, the separate statutory provision granting the assignee the status of a lien creditor is contained within the Uniform Commercial Code itself (*i.e.*, Section 9-309). In the case of a "trustee in bankruptcy," however, the Uniform Commercial Code contains *no* comparable provision granting such a trustee the status of a lien creditor, and therefore, to the extent a "trustee in bankruptcy" enjoys the status of a "lien creditor," that status must be derived from Section 544(a) of the Bankruptcy Code and *not* from the Uniform Commercial Code.

- 28 -

58.     The case law confirms the correctness of Movants' position.[19]  For example, in *In re Airadigm Communications, Inc.,* 519 F.3d 640, 651 (7th Cir. 2008), the Seventh Circuit declined to apply Section 9-317 to the proceeds of a license from the Federal Communications Commission where no hypothetical lien creditor could have obtained a lien on the license.  Thus, the "rights," if any, of a bankruptcy trustee under Section 9-317 are merely the same as those otherwise provided under Section 544(a), and the trustee has no rights under Section 9-317 where no judicial lien creditor could exist under Section 544(a).

**F.     The Oversight Board Is Not A "Trustee In Bankruptcy."**

59.     In any event, any rights the Oversight Board purport to have under Sections 9-102 and 9-317 of the Uniform Commercial Code would depend on the Oversight Board having the status of a "trustee in bankruptcy."  However, the Oversight Board is not "a trustee in bankruptcy."

60.     The Oversight Board is not a "trustee," because the only type of trustee provided for in Title III of PROMESA is a trustee under Section 926(a) of the Bankruptcy Code.  This Court has already acknowledged that the Oversight Board is not literally a trustee, distinguishing between "[t]he rights of the trustee, or of the Oversight Board in this case. . . ."  *Fin. Oversight & Mgmt. Bd. for P.R. v. Altair Global Credit Opportunities Fund (a), LLC (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 590 B.R. 577, 593 (D.P.R. 2018), *aff'd in part, rev'd in part*, 914 F.3d 694 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 47 (2019).

---

[19] *See, e.g.*, *LMS Holding Co. v. Core-Mark Mid-Continent, Inc.*, 50 F.3d 1520, 1523 (10th Cir. 1995) (debtor's rights for purposes of the UCC's priority provisions are its rights as a hypothetical judicial lien creditor under § 544(a)(1)); *In re Ajax Integrated, LLC,* 2016 WL 1178350, at *5 (Bankr. N.D.N.Y. Mar. 23, 2016) (same); *see also, e.g.*, *In re Vt. Toy Works, Inc.*, 82 B.R. 258, 293 (Bankr. D. Vt. 1987) ("It is not for the state law to determine what rights conferred on lien creditors are transferred to the trustee under the Code[.]  Simply stated, Federal law bestows the hypothetical lien status, State law determines its parameters.") (citation omitted), *aff'd in relevant part*, 135 B.R. 762, 768 (D. Vt. 1991); *In re Deeb*, 47 B.R. 848, 850 (Bankr. N.D. Ala. 1985) (UCC "lien creditor" definition "is mainly a restatement of the paramount or controlling provisions of 11 U.S.C. § 544(a).").

61.    The Oversight Board improperly relies on Section 301(c)(7) of PROMESA in support of its assertion that it is a "trustee." (*See* Compl. ¶ 70.) However, Section 301(c)(7) merely effects a substitution of the term "Oversight Board" for the term "trustee" in the sections of the Bankruptcy Code made applicable in Title III so as to incorporate those Bankruptcy Code sections into Title III; Section 301(c)(7) does not provide that the Oversight Board is a trustee.  In this regard, Section 301(c)(7) functions in the same way as Section 301(c)(5), which says that the term "property of the estate" when used in a section of the Bankruptcy Code applicable in Title III "means property of the debtor"; this substitution effected by Section 301(c)(5) does not mean that property of a Title III debtor is literally "property of the estate," because there is no estate in Title III.  Similarly, Section 301(c)(6) says that the term "State" when used in a section of the Bankruptcy Code applicable in Title III means "State *or territory*;" again, this substitution does not mean that a "territory" is literally a "State," which is obviously not the case.  In all of these instances, the purpose of the relevant definitions is merely to substitute one term for another ("Oversight Board" for "trustee," "debtor" for "estate," and "territory" for "State").

62.    In any event, Congress purported to enact PROMESA under the territorial clause of the U.S. Constitution (U.S. Const. art. IV § 3, cl. 2, the "Territorial Clause").  *See* PROMESA § 101(b)(2).  To the extent Congress were found to have enacted PROMESA exclusively under the Territorial Clause, the Oversight Board would not qualify as a trustee "in bankruptcy."[20]

---

[20] Movants reserve all rights to argue that PROMESA represents an exercise of Congress's bankruptcy power and that PROMESA violates the uniformity requirement of the Bankruptcy Clause of the U.S. Constitution (U.S. Const. art. I, s 8, Cl. 4), which limits Congress's authority to enact non-uniform bankruptcy laws.

## III.   THE OVERSIGHT BOARD'S COUNTS ASSERTING THAT MOVANTS' CONTRACTS CLAUSE CLAIMS SHOULD BE DISALLOWED BECAUSE NO LEGISLATION CREATED AN IMPAIRMENT MUST BE DISMISSED.

63.     Counts XVII, XLIII, and LXIX of the Complaint seek a judgment disallowing Movants' Contracts Clause claims on the theory that no legislation created an impairment of Movants' contractual rights.  This theory cannot withstand scrutiny.

64.     Movants' Contract Clause claims are based upon a series of Emergency and Moratorium Orders issued pursuant to legislative authority in late 2015 and early 2016 directing the Commonwealth's retention of the Pledged Rum Taxes.  Specifically, on November 30, 2015, then-Governor Alejandro García Padilla issued the first in a series of orders (the "Emergency Orders") mandating the clawback of revenues pledged to secure bonds of certain Puerto Rico public corporations to be kept in a separate account.  (*See* Compl. ¶¶ 55, 56.)  The purported purpose of the Emergency Orders, as discussed *infra*, was to safeguard the public welfare, and to the extent available, make public debt payments as they became due.  (*See id.* ¶ 57.)  Puerto Rico's Legislative Assembly passed additional forms of moratorium legislation in the following months, including the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (the "Moratorium Act").  (*Id.* ¶ 60.)  The Moratorium Act conferred on Governor Padilla broad discretion to invoke the Commonwealth's purported police power.  (*See id*.)  Accordingly, Governor Padilla issued another series of executive orders (the "Moratorium Orders"), which, in relevant part, declared moratoriums on various debt obligations (including PRIFA obligations), suspended the transfer of funds pledged to the repayment of the debts affected by the moratoriums, and elevated the payment of junior unsecured debts over senior secured debts.  (*Id.* ¶ 61.)

65.     Counts XVII, XLIII, and LXIX should be dismissed because the Oversight Board has failed to establish that the Commonwealth's actions, as carried out through the Emergency and Moratorium Orders described above, did not constitute "laws" for purposes of the Contracts

Clause.  Rather, the Oversight Board offers only conclusory arguments and factually unsupported statements that the Commonwealth's retention of the Pledged Rum Taxes did not violate the Contracts Clause because the Commonwealth's executive orders, including the Emergency Orders and Moratorium Orders, were exercises of the Governor's executive authority and were not legislative actions subject to the Contracts Clause.  In advancing these conclusory arguments, the Oversight Board incorrectly suggests that the Contracts Clause only applies to "legislation."  (*See, e.g.*, Compl. ¶¶ 241-42.)

66.     The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  The primary purpose of the Contracts Clause was to prevent States from adopting laws that would permit borrowers (including the States themselves) to abrogate their debts at the expense of creditors.  *See, e.g., Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427-28 (1934).

67.     Although the Contracts Clause "is aimed at the legislative power of the state," *City of Pontiac Ret. Emps. Ass'n v. Schimmel*, 751 F.3d 427, 431 (6th Cir. 2014) (quoting *New Orleans Water-Works Co. v. La. Sugar Ref. Co.*, 125 U.S. 18, 30 (1888)), this Court and others have recognized that courts must look beyond the form of the action (*e.g.*, statute, executive order, certification) and instead focus on either the original source of the power (the legislature), or the "character and effect" of the action (*e.g.*, the action was more akin to legislative power than to executive or judicial power).  *See In re Fin. Oversight & Mgmt. Bd. for P.R.* ("*Ambac*"), 297 F. Supp. 3d 269, 286 (D.P.R. 2018) (recognizing that an executive order may be subject to the Contracts Clause if it constitutes an "exercise[] of delegated state legislative power"), *aff'd*, 927 F.3d 597 (1st Cir. 2019), *cert. denied sub nom. Ambac Assurance Corp. v. Fin. Oversight Bd. . for P.R.*, 2020 WL 129572 (U.S. Jan. 13, 2020); *Pontiac*, 751 F.3d at 431; *see also U.S. Trust Co. v.*

*New Jersey*, 431 U.S. 1, 16 (1977) (the Supreme Court has "eschewed a rigid application of the Contract Clause").

68.     Consistent with this approach, in *Arriaga v. Members of Bd. of Regents*, the court explained that the Contracts Clause extends to "every form in which the legislative power of a State is exerted, whether it be a constitution, a constitutional amendment, an enactment of the legislature, by a by-law or ordinance of a municipal regulation, **or order of some other instrumentality of the State exercising delegated, legislative authority**."  825 F. Supp. 1, 6 (D. Mass. 1992) (quoting *Ross v. Oregon*, 227 U.S. 150, 163 (1913)) (emphasis added).

69.     The Emergency Orders reflected exercises of legislative power because they purported to invoke the Commonwealth's police power (notwithstanding the fact that, as set forth above, Sections 18 and 19 of the Commonwealth Constitution provide no basis for the Emergency Orders).  *See* Administrative Bulletin No. OE-2015-046 ("The Commonwealth of Puerto Rico has the responsibility and the duty to guarantee the public health, safety, education and welfare of its citizens by exercising its power of national interest . . . . This Administration has taken unprecedented measures to address the fiscal crisis that the country is going through[.]").  The Commonwealth Constitution acknowledges that, when properly invoked, the police power is a legislative power.  *See, e.g.*, P.R. Const. art. II, § 19 ("The power of the ***Legislative Assembly*** to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively.") (emphasis added).   In the Second Emergency Order, which the Oversight Board concedes implemented the First Emergency Order (*see* Compl. ¶ 59), Governor Padilla purported to act under the authority delegated to him by the Legislative Assembly through the Organic Law of the Office of Management and Budget, Law No. 147 of June 18, 1980, as amended (the "OMB Act").   *See* Administrative Bulletin No. OE-2015-049.   Regardless of

- 33 -

whether the Emergency Orders were exercises of expressly delegated legislative authority, and regardless of whether their purported invocation of the police power had any basis in the Commonwealth Constitution (which it did not), the Emergency Orders at least purported to have the "character and effect" of exercising the Commonwealth's police powers and therefore fall within the scope of the Contracts Clause. *See Pontiac*, 751 F.3d at 431.

70.     Furthermore, the Moratorium Act ***expressly*** purported to confer the Legislative Assembly's police powers on the Governor (notwithstanding the fact that, as set forth above, Sections 18 and 19 of the Commonwealth Constitution provide no basis for the Moratorium Orders). *See* Moratorium Act § 102. The Moratorium Orders reflect delegated legislative power because they invoked (albeit improperly) the Commonwealth's police power to justify the Commonwealth's clawbacks and retention of its instrumentalities' revenues. *See, e.g.*, Administrative Bulletin No. OE-2016-014 (declaring emergency for PRIFA under Articles 201, 202, and 203 of the Moratorium Act "to permit for the continuation of essential services to protect the health, security and the well being of the residents of [the Commonwealth]"); Administrative Bulletin No. OE-2016-30 ("The Commonwealth of Puerto Rico has the responsibility and the duty to ensure the public health, safety, education, and welfare of its residents through the exercise of its police power."); Administrative Bulletin No. OE-2016-31 (same).

71.     Indeed, this Court has already ruled in a previous adversary proceeding that Ambac plausibly alleged "the Moratorium Orders constitute exercises of delegated state legislative power and are therefore laws," and "consistent with the text of the Moratorium Law, that the legislation purported to confer the Legislative Assembly's police power on the Governor, and when issuing the Moratorium Orders, the Governor purported to be exercising that police power." *Ambac*, 297

F. Supp. 3d at 285-86 (internal quotation marks omitted).  The Complaint offers no factual

allegations to support the opposite conclusion.

## IV.   THE OVERSIGHT BOARD'S CLAIMS THAT THE PLEDGED RUM TAXES ARE NOT "SPECIAL REVENUES" SHOULD BE DISMISSED FOR FAILURE TO STATE A PLAUSIBLE CLAIM FOR RELIEF.

72.     Counts VIII, XXXIV, and LX of the Complaint (the "Special Revenues Counts")

seek to disallow Movants' claims that the Pledged Rum Taxes are "special revenues" under

Bankruptcy Code Section 902(2).  The wholly-conclusory Special Revenues Counts, which are

unsupported by *any* factual allegations, should be dismissed for failure to plead a plausible claim

for relief under Rule 8 of the Federal Rules of Civil Procedure (as made applicable to these

proceedings by Bankruptcy Rule 7008).  Likewise, Counts XXVI, LII, and LXXVIII of the

Complaint, which seek to disallow Movants' claims against postpetition Pledged Rum Taxes under

Bankruptcy Code Section 552 (the "Postpetition Revenues Counts"), should be dismissed on the

same grounds to the extent they rely on the assertion that the Pledged Rum Taxes are not "special

revenues."

73.     As is relevant here, Section 928(a) of the Bankruptcy Code (made applicable to

these proceedings by PROMESA Section 301(a)) provides that "special revenues acquired by

the debtor after the commencement of the case shall remain subject to any lien resulting from any

security agreement entered into by the debtor before the commencement of the case."  11 U.S.C.

§ 928(a).  Section 902(2) (also made applicable to these proceedings by PROMESA Section

301(a)) sets forth five categories of "special revenues":

> (A) receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems;
>
> (B) special excise taxes imposed on particular activities or transactions;

- 35 -

(C) incremental tax receipts from the benefited area in the case of tax-increment financing;

(D) other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions; or

(E) taxes specifically levied to finance one or more projects or systems, excluding receipts from general property, sales, or income taxes (other than tax-increment financing) levied to finance the general purposes of the debtor[.]

11 U.S.C. § 902(2).

74.     The Complaint does not allege a single fact purporting to demonstrate that the Pledged Rum Taxes are not "special revenues" as defined in any of the five categories set forth in Section 902(2).  Rather, the Oversight Board's sole substantive allegations relating to "special revenues" consist of conclusory, unsupported assertions that the Pledged Rum Taxes "are not special revenues."  (*See, e.g.*, Compl. ¶ 159 ("The Retained Rum Tax Remittances are not 'special revenues' as defined in Bankruptcy Code section 902 and any claim under Bankruptcy Code section 928 for a security interest on Retained Rum Tax Remittances received by the Commonwealth since the Petition Date fails because Bankruptcy Code section 928 is only applicable to 'special revenues.'"); *id.* ¶ 198 ("The Retained Rum Tax Remittances are not special revenues of the Commonwealth pursuant to Bankruptcy Code section 902 and are outside the scope of Bankruptcy Code section 928(a).").)[21]

75.     None of these distinctly conclusory assertions provide support for a plausible claim for relief.  *See In re Fidelity ERISA Float Litig.*, 829 F.3d at 59 (discussing the requirement for courts to "distinguish the complaint's factual allegations" from "its conclusory legal allegations (which need not be credited)").  And the Oversight Board's complaint is simply devoid of any

---

[21] The Oversight Board makes the same allegations with respect to the Special Revenues Counts against all Movants.  (*See* Compl. ¶¶ 198, 322, 444, 562.)

alleged *facts* to support its claims that the Pledged Rum Taxes are not special revenues.[22]   Put simply, the Oversight Board has failed to provide the "'grounds' on which the claim[s] rest[]." *Twombly*, 550 U.S. at 555 n.3 (citation omitted).   The Special Revenues Counts, and the Postpetition Revenues Counts to the extent they rely on the assertion that the Pledged Rum Taxes are not "special revenues," do not allege any facts to state a "plausible claim for relief[,]" *Iqbal*, 556 U.S. at 679, and must be dismissed.

## **CONCLUSION**

76.     For the foregoing reasons, Movants respectfully request that this Court enter an order, substantially in the form attached as Exhibit A hereto, dismissing the Complaint as to the Counts identified above, with prejudice.

*[Remainder of Page Intentionally Omitted]*

---

[22] Remarkably, the Complaint does not even contain "threadbare recitals of the elements of a cause of action," which, even if made, would *still* be insufficient to state a claim. *Iqbal*, 556 U.S. at 678.  But the Oversight Board's failure to include even those bare allegations makes its pleading deficiency all the more glaring.

## <u>CERTIFICATION</u>

In accordance with paragraph 7 of the *Amended Interim Case Management Order for Revenue Bonds* (ECF No. 10595), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

Dated: February 27, 2020
   San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: */s/ Roberto Cámara-Fuertes*
   Roberto Cámara-Fuertes (USDC-PR No. 219002)
   Sonia Colón (USDC-PR No. 213809)
   221 Ponce de León Avenue, 5th Floor
   San Juan, PR 00917
   Telephone: (787) 766-7000
   Facsimile: (787) 766-7001
   Email:  rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

**MILBANK LLP**

By: */s/ Atara Miller*
   Dennis F. Dunne (admitted *pro hac vice*)
   Atara Miller (admitted *pro hac vice*)
   Grant R. Mainland (admitted *pro hac vice*)
   Jonathan Ohring (admitted *pro hac vice*)
   55 Hudson Yards
   New York, NY 10001
   Telephone: (212) 530-5000
   Facsimile:  (212) 530-5219
   Email: ddunne@milbank.com
          amiller@milbank.com
          gmainland@milbank.com
          johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

***Attorneys for Financial Guaranty Insurance Company***

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com
    Jason W. Callen (admitted *pro hac vice*)
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    Email: jason.callen@butlersnow.com

***Attorneys for Financial Guaranty Insurance Company***

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
          rcasellas@cabprlaw.com
          dperez@cabprlaw.com

*Attorneys for Assured Guaranty Corp. and*
*Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ *Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
          mark.ellenberg@cwt.com
          bill.natbony@cwt.com
          ellen.halstead@cwt.com
          thomas.curtin@cwt.com
          casey.servais@cwt.com

*Attorneys for Assured Guaranty Corp. and*
*Assured Guaranty Municipal Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com