# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>        Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>        Debtor. | Case No. 17-BK-4780-LTS<br><br>**This Court Filing Relates Only to PREPA and Shall Only Be Filed in the lead Case No. 17-BK-3283-LTS and in PREPA's Title III Case (Case No. 17-BK-4780-LTS)** |

## REPLY OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD TO COBRA ACQUISITION LLC'S OMNIBUS OBJECTION TO FEE APPLICATIONS FILED BY PROFESSIONALS AND REQUEST TO INCREASE HOLDBACK AMOUNT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................4

    A.    Title III Cases and Retention of Professionals.............................4

    B.    Puerto Rico Disasters and Cobra Contracts ................................5

    C.    Cobra's Criminal Proceedings .....................................................6

    D.    FEMA's Investigation and Analysis ............................................7

    E.    PREPA Disputes Over $200 Million of Cobra Invoices ............7

ARGUMENT ..........................................................................................................9

    I.    Cobra's Stated Bases for Relief Are Illusory...................................9

    A.    Cobra's Assertions of Administrative Insolvency Are Not
        Credible...........................................................................................9

    B.    Showing an Ability to Pay Administrative Expenses Under
        PROMESA Section 314 Is a Confirmation Requirement, Not a
        Current or Ongoing Obligation..................................................12

    II.    Cobra Cannot Use Its Disputed Claim to Justify Prejudicing Other
        Stakeholders...................................................................................13

    III.    Cobra's Proposed Remedies Threaten the Title III Case ..................16

CONCLUSION........................................................................................................18

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Dopp v. HTP Corp.*,
    947 F.2d 506 (1st Cir. 1991) ....................................................................................15

*Rosario Rosario v. Pagan Santiago*,
    196 D.P.R. 180, 188 (P.R. 2016) .............................................................................15

STATUTES

31 L.P.R.A. § 3408 ....................................................................................................15

31 L.P.R.A. § 3432 ....................................................................................................15

31 L.P.R.A. § 3511 ....................................................................................................15

31 L.P.R.A. § 3513 ....................................................................................................15

31 L.P.R.A. § 3514 ....................................................................................................15

31 L.P.R.A. § 3516 ....................................................................................................15

11 U.S.C. § 507(a)(2) ..................................................................................................3

42 U.S.C. § 5189f(e) .................................................................................................10

PROMESA § 314 ..............................................................................................3, 11, 12

PROMESA § 315 ..........................................................................................................4

PROMESA § 316 .......................................................................................................17

To the Honorable United States District Judge Laura Taylor Swain:

The Puerto Rico Electric Power Authority ("PREPA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as PREPA's representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] hereby files this reply ("Reply") to Cobra Acquisitions LLC's ("Cobra") initial objection [Case No. 17-BK-3283-LTS, ECF No. 9419, Case No. 17-BK-4780-LTS, ECF No. 1799][2] ("Initial Objection") and supplemental objection [Case No. 17-BK-3283-LTS, ECF No. 9752, Case No. 17-BK-4780-LTS, ECF No. 1860] ("Supplemental Objection" together with the Initial Objection, the "Objection") to certain interim fee applications pending before the Court (the "Fee Applications").[3]  In support of this Reply, PREPA respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Cobra bases its Objection on two false premises – (1) that PREPA is administratively insolvent[4] and (2) the Title III debtors treat professionals better than other administrative expense claimants.[5]  In fact, (1) PREPA's proposal of its RSA providing payments to prepetition creditors, shows PREPA and the Oversight Board obviously contemplate paying all administrative claims in full in cash, otherwise no plan can be confirmed; and (2) non-professional administrative claimants having valid, allowable claims are paid in full in cash whereas professionals are paid subject to a holdback, after already providing discounts in some cases

---

[1]  PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

[2]  References to the docket are to Case No. 17-BK-3283-LTS, unless otherwise specified.

[3]  Cobra intended to object to all interim fee applications filed with respect to, or which allocated fees to, PREPA's Title III Case for the quarterly compensation period beginning on June 1, 2019, including those listed in **Annex A** to the Initial Objection as well as to those in the Supplemental Objection.

[4]  *See* Initial Obj. ¶ 20.

[5]  *See* Initial Obj. ¶ 21.

exceeding thirty percent (30%). Cobra has already been paid over ninety percent of its first contract for $945 million.

2.      Cobra propounds its Objection to compel PREPA to pay Cobra's outstanding invoices, even though its claim is disputed for reasons the Oversight Board has explained at length to this Court. Cobra's Objection does not mention any of the crucial facts of that dispute, including the pending criminal trial of its former president and FEMA's investigation of the reasonableness of its charges. Instead, Cobra makes the same arguments and alleges the same presumptions as in its objection to the Government Parties' Rule 9019 Motion [ECF No. 9003; Case No. 17-BK-4780-LTS, ECF ("PREPA ECF") No. 1682] (the "Cobra 9019 Objection"),[6] arguing that "the Court likely should prevent PREPA's professionals from being paid current . . . ." Cobra 9019 Obj. ¶ 7. The Court has already determined PROMESA does not require current payment of Cobra's administrative claim,[7] and there was cause to defer the hearing on Cobra's administrative claim.[8] Cobra has now resorted to trying to hold PREPA's restructuring hostage by, among other things, objecting to professionals' fee applications.

3.      Cobra's purported basis for relief is wrong in two ways. *First*, Cobra's strained reading of one of PREPA's prior statements—that PREPA somehow "admitted" administrative insolvency—is wrong. PREPA continues to operate with sufficient cash and has propounded an RSA contemplating a plan of adjustment that must pay all allowed administrative claims in full in cash. Cobra's presumption is unfounded and is contradicted by PREPA's public financial reporting. *Second*, Cobra's demand that PREPA prove that it can satisfy all administrative expense

---

[6]  The Government Parties reserve all rights to respond to the Cobra 9019 Objection on any and all bases, including anything set forth or omitted by this Reply.

[7]  *See* Stay Order (defined below), at 2–3.

[8]  *See* Second Stay Order (defined below), at 2.

claims in full, in cash, *now*, is an erroneous interpretation of PROMESA.  PROMESA section 314 is clear that the debtor only need show an ability to satisfy allowed claims under section 507(a)(2) of the Bankruptcy Code at confirmation—it is not a current or ongoing obligation.  *Third*, as explained above, Cobra is simply dead wrong that professionals' administrative claims are treated better than other administrative claims.

4.      Cobra's asserted claim does not entitle it to stop or impair payments to other stakeholders.  As the Court is aware, Cobra's claims are disputed: (*i*) Cobra's former president has been arrested and indicted for bribery of FEMA officials in connection with the very contracts with PREPA that give rise to its alleged claims, (*ii*) FEMA has also called into question the reasonableness of Cobra's fees, and (*iii*) PREPA disputes Cobra's unpaid invoices on grounds not connected to either the criminal investigation or FEMA's analysis.  As a result, Cobra's entitlement to *any* further payment, let alone immediate payment, is in serious question.  Until the criminal proceedings, FEMA's analysis, and resolution of PREPA's own disputes over the remaining invoices are completed, determination of allowance is premature.  Findings of criminal misconduct resulting from the proceedings may serve as a complete defense under Puerto Rico law and the terms of Cobra's contracts.  Moreover, PREPA and Cobra are in *bona fide* dispute over various aspects of the Cobra claims.  Accordingly, Cobra is not entitled to disrupt the professional payment procedures already established by the Court at the expense of other stakeholders.

5.      Finally, Cobra's demanded relief is not in the best interests of this Title III case.  It jeopardizes PREPA's restructuring efforts by risking the disruption of professional services to the detriment of all stakeholders.  The Fee Applications are already subject to an intense process of scrutiny imposed both by an independent fee examiner and the Court, designed to ensure

3

reasonableness and necessity of fees and expenses. Professionals provide huge discounts compared to their normal charges in restructuring cases and have already assisted in several notable achievements in this case, and will be needed for this case's successful completion. Moreover, professionals subject to payment under Fee Applications do not just represent one party, but numerous disparate parties, facilitating an adversarial process designed to ensure adequate and balanced representation among the stakeholders. For each of these reasons, Cobra's Objection should be overruled.

## **BACKGROUND**

### A.     **Title III Cases and Retention of Professionals**

6.     On July 2, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PREPA pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "Title III Case"). Pursuant to PROMESA section 315(b), the Oversight Board is the Debtor's representative in the Debtor's Title III Case.

7.     On August 23, 2017, the Court entered the *Order Setting Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [PREPA ECF No. 252] (as amended, the "Interim Compensation Order")[9] which sets forth the procedures for payment of professionals in this Title III Case (the "Interim Compensation Procedures").

8.     On October 6, 2017, the Court entered the *Order Pursuant to PROMESA Sections 316 and 317 and Bankruptcy Code Section 105(a) Appointing a Fee Examiner and Related Relief* [ECF No. 1416] (the "Fee Examiner Order"). The Court appointed Brady Williamson as the Fee Examiner in the Title III Case.

---

[9]   The Interim Compensation Order was amended most recently on June 6, 2018 [ECF No. 3269].

9.     On November 25, 2016, the Oversight Board retained Proskauer Rose LLP ("Proskauer") at substantial discounts to its normal hourly rates.  On December 20, 2019 Proskauer filed its Seventh Interim Fee Application for compensation for services rendered and reimbursement of expenses incurred in connection with PREPA [ECF No. 9626, PREPA ECF No. 1838],[10] which is pending hearing before the Court (together with the other interim fee applications subject to the Objection, the "Fee Applications").[11]

### B.     Puerto Rico Disasters and Cobra Contracts

10.     During September 2017, Puerto Rico was hit by two historically powerful hurricanes—Irma and Maria—that severely damaged PREPA's transmission grid and other infrastructure and left the island without power for several weeks.  On September 20, 2017, President Trump issued a major disaster declaration for Puerto Rico due to the damage resulting from Hurricane Maria, which was designated FEMA-4339-DR.

11.     Pursuant to FEMA-4339-DR, the Federal Emergency Management Agency ("FEMA") was authorized, among other things, to provide assistance to the Commonwealth of Puerto Rico and to PREPA to assist in rebuilding the power system.

12.     On October 19, 2017, PREPA and Cobra entered into the *Emergency Master Service Agreement for PREPA's Electrical Grid Repairs – Hurricane Maria*, dated October 2017 (the "First Contract") for Cobra to perform emergency "storm restoration services" for $200 million.  Through five subsequent amendments, the contract amount for the First Contract was increased to $945 million.  Cobra has been paid approximately $892.9 million pursuant to the First Contract.

---

[10]  Proskauer also submitted interim fee applications for the other jointly-administered debtors.

[11]  Although Proskauer is counsel of record to the Oversight Board herein, PREPA brings this reply for the benefit of all professionals retained in its Title III Case.

13.    On May 26, 2018, following the receipt of several proposals from various other contractors in response to an Request for Proposals, PREPA and Cobra entered into the *Master Services Contract for PREPA's Electrical Grid Repairs - Hurricane Maria*, dated May 26, 2018 (the "Second Contract," and with the First Contract, the "Cobra Contracts"), for Cobra to perform restoration and reconstruction services in addition to its emergency storm repair services under the First Contract, in the amount of up to $900 million. Cobra has been paid approximately $202.0 million pursuant to the Second Contract.

## C.    Cobra's Criminal Proceedings

14.    As the Court is aware, on September 3, 2019, a federal grand jury sitting in the District of Puerto Rico returned a 15-count indictment in the matter of *United States v. Tribble*, Case No. 19-CR-541-FAB, ECF No. 3 (D.P.R. Sept. 3, 2019) (the "Indictment"), alleging criminal charges against Ahsha Tribble, former FEMA Region II Deputy Regional Administrator and Sector Lead for Power and Infrastructure in Puerto Rico, Donald Keith Ellison, a former President of Cobra, and Jovanda Patterson, former FEMA Deputy Chief of Staff assigned to San Juan, Puerto Rico.[12]

15.    The defendants have each been arraigned on the Indictment and bail was set. On October 18, 2019, the government and the defendants appeared before the United States District Court for the District of Puerto Rico for a pretrial conference, during which the government was ordered to produce discovery, which the government described as "voluminous."  Given the volume of discovery, and the defendants' needs to review such discovery to decide whether to file pretrial motions, the Court excluded time pursuant to the Speedy Trial Act until the next pretrial conference, finding that such exclusion was in the interests of justice.

---

[12] A copy of the Indictment is at ECF No. 8838-2.

6

16.     After initially issuing a scheduling order setting a trial date of December 9, 2019, the Court presiding over the pending criminal matter set aside that scheduling order. *United States v. Tribble*, Case No. 19-CR-541-FAB, ECF No. 59 (D.P.R. Oct. 18, 2019).

17.     Commencement of the criminal trial has been set for January 19, 2021 with a pre-trial conference set for January 14, 2021.

### D.    FEMA's Investigation and Analysis

18.     The Office of the Inspector General of the Department of Homeland Security issued a report entitled "FEMA's Eligibility Determination of Puerto Rico Electric Power Authority's Contract with Cobra Acquisitions LLC" (OIG-19-52), dated July 3, 2019 ("OIG Report").  The OIG Report addressed the process FEMA used to approve the rates PREPA agreed to pay Cobra. Pursuant to the OIG Report, FEMA and the Department of Homeland Security Operational Analysis Center were directed to and are conducting an extensive analysis (the "FEMA Analysis") into the fees charged pursuant to the First Contract, and FEMA is expected to make a final determination as to the "eligibility of the contract costs and disallow any costs that are not reasonable" by the estimated completion date of May 29, 2020. *See* OIG Report at 5.

### E.    PREPA Disputes Over $200 Million of Cobra Invoices

19.     As Cobra is well aware, PREPA has disputed hundreds of Cobra invoices with an aggregate face value in excess of $200 million.  These invoice disputes include billing for inaccurate headcounts, unauthorized work, incomplete or missing verification of work performed as billed, inaccurate demobilization billing, access mapping costs, inaccurate tax gross-up amounts and the merits of earned discounts taken by PREPA for promptly paid invoices.  The invoice disputes will be addressed in connection with *Cobra Acquisitions LLC's Motion for Allowance and Payment of Administrative Expense Claims* [ECF No. 8789] (the "Administrative Expense

Motion"), filed by Cobra on September 30, 2019 and currently pending before the Court (*see* below).

20.     The Administrative Expense Motion seeks an order allowing as an administrative expense claim Cobra's alleged outstanding balance under the Cobra Contracts of $216,116,471.93, plus interest not yet invoiced.

21.     On October 10, 2019, PREPA and its representatives requested that the Court stay all litigation relating to the Administrative Expense Motion to prevent, among other things, prejudice to the Government Parties and create judicial inefficiency. *See Joint Urgent Motion of the Oversight Board, PREPA, and AAFAF to Extend All Applicable Deadlines to Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims* [ECF No. 8838] (the "Stay Motion"). On October 17, 2019, the Court entered an order, [ECF No. 8886] (the "Stay Order"), granting the Stay Motion and denying Cobra's opposition. As a result, all litigation relating to the Administrative Expense Motion has been stayed. Following the submission of the joint informative motion on January 22, 2020 [ECF No. 10307] (the "Joint Status Report"), a status conference on the Administrative Expense Motion was held on January 29, 2020 (the "January Status Conference"). At the January Status Conference, the Court indicated it would continue the stay on the Administrative Expense Motion, given "there is at least one conference and further developments in the criminal case to be expected in the near term, and there is a target date for a report from FEMA, and in light of what appear to be very substantial transaction costs to discovery in preparation for resolution of the factual disputes that might or might not be mitigated by results in the criminal case and the FEMA review . . . ." *See* Jan. 29, 2020 Hr'g Tr. 61:12-18.

22.     Following the January Status Conference, the Court ordered the continuation of the stay on the Administrative Expense Motion and scheduled a further status conference to be held on June 3, 2020 [PREPA ECF No. 1894] (the "Second Stay Order").

## ARGUMENT

23.     Alleging that PREPA is administratively insolvent, Cobra demands that the Court (i) suspend all further interim professional fee payments, or (ii) significantly increase the holdback percentage for monthly compensation and prohibit disbursement of the holdback upon interim allowance.  Initial Obj. ¶¶ 20–31.  For the following reasons, Cobra's Objection should be overruled.

## I.     Cobra's Stated Bases for Relief Are Illusory.

### A.     Cobra's Assertions of Administrative Insolvency Are Not Credible.

24.     As with the Cobra 9019 Objection, Cobra argues here that the Court should deny payment of Fee Applications and amend the Interim Compensation Procedures "until PREPA can demonstrate its administrative solvency. . . ."  Initial Obj. ¶ 4.  According to Cobra, PREPA is "apparently" administratively insolvent.  *See* Initial Obj. ¶ 1.  Cobra's speculation is wrong. PREPA continues to operate with sufficient cash.[13]  As of January 10, 2020, PREPA has approximately $490 million in operating bank accounts—a cash balance that has grown over the last two months and is expected to continue growing.  *See* PREPA 13-Week Cash Flow Update, dated January 15, 2020.[14]  Cobra has not provided any evidence of administrate insolvency—it has instead merely resorted to pasting together out of context sentences to try to create an impression there is a question regarding PREPA's administrative solvency.  There is not.  PREPA's cash on

---

[13] For example, PREPA continues to pay its ordinary course vendors. *See Declaration of Gary Germeroth* [ECF No. 11732-2] (the "Germeroth Decl.") ¶ 12.

[14] The 13-Week Cash Flow Update is available at https://emma.msrb.org/ER1420589.pdf.

hand and its ability to pay Cobra's allowed claim (if any), should be a sufficient and independent
reason to dismiss the Objection.

25.     The only statement Cobra cites to support its claim that PREPA is administratively
insolvent is from PREPA's Stay Motion, where the Government Parties stated: "PREPA relies
upon FEMA funding to pay for the costs of power repairs and power restoration.  PREPA was and
remains financially incapable of undertaking the extension grid repairs necessary after Hurricane
Maria without public assistance from FEMA."  Stay Motion ¶¶ 20, 28 n.6; Initial Obj. ¶ 20.

26.     This is not an admission of administrative insolvency.[15]  PREPA is receiving
federal funding to undertake extensive grid repairs needed as a result of the hurricanes.[16]  It merely
states the reality that PREPA relies on federal disaster relief funding—specifically earmarked[17] for
grid repairs—to fund disaster repairs necessitated by the devastation caused by two of the most
destructive hurricanes on record, Hurricanes Irma and Maria—the same as most other
municipalities affected by natural disasters.  Cobra was aware of this when it entered into its
contracts as shown by the terms of the contracts themselves and applicable law.[18]

27.     Even if PREPA's administrative solvency were dependent on receiving federal
funds pursuant to the Stafford Act, which governs procedures for such funding, "solvency" would
be a question of timing of such funding and not entitlement.  Pursuant to the Stafford Act, PREPA
is entitled to disaster relief funds, allocated based on a damage assessment prepared by licensed
civil engineers. 42 U.S.C. § 5189f(e)(F) ("in determining eligible costs . . . the [FEMA]
Administrator shall, at the applicant's request, consider properly conducted and certified cost

---

[15] *See* Germeroth Decl. ¶ 13.

[16] *See id.*

[17] *See id.* ¶ 14.

[18] *See infra* ¶ 32.

estimates prepared by professionally licensed engineers (mutually agreed upon by the Administrator and the applicant), to the extent that such estimates comply with applicable regulations, policy, and guidance . . . .").  Furthermore, it is reasonable for PREPA to expect that funding will be forthcoming based on the determinations of such engineers, *except* in the case of fraud.  *Id.* § 5189f(e)(G) ("once certified by a professionally licensed engineer and accepted by the Administrator, the estimates on which grants made pursuant to this section are based shall be presumed to be reasonable and eligible costs, *as long as there is no evidence of fraud*.") (emphasis added).  To the extent the fraud is Cobra's fraud, PREPA is not obligated to pay Cobra.[19]  The mechanics of the Stafford Act therefore show that PREPA's reliance on FEMA funding for grid repairs is reasonable.

28.    Cobra's true motive in making the incredible accusation of administrative insolvency and seeking a holdup of professional payments appears to be to force PREPA to pay Cobra's purported $216 million claim—an intention Cobra disclosed when it argued the Court should not approve the 9019 Motion "so long as interested parties in the Title III Case, including Cobra, have not received payment for beneficial, postpetition services . . . ."  Cobra 9019 Obj. ¶ 8.  But, if that is Cobra's motive, Cobra is miscalculating because PREPA will not be any more willing to pay Cobra if the professionals are not paid.  Cobra's repeated and transparent attempt to benefit itself to the detriment of others, based on nothing more than a tortured misconstruction of one of PREPA's statements, should be rejected.

---

[19]  Notably, if the criminal investigation did indicate fraud on Cobra's part that called into question Stafford Act funding, PREPA would not be obligated to pay Cobra under the terms of the Cobra Contracts.  *See, e.g.*, Second Contract, Art. 53(F) (if PREPA is unable to secure Federal assistance funding "due to [Cobra's] sole fault," PREPA is relieved of its obligation to pay Cobra for any such invoices).

**B.     Showing an Ability to Pay Administrative Expenses Under PROMESA
Section 314 Is a Confirmation Requirement, Not a Current or Ongoing
Obligation.**

29.     Cobra alleges that PREPA fails to meet PROMESA's "clear requirement" to pay
all administrative expense claims in full in cash.  Initial Obj. ¶ 21.  This argument has already been
rejected by the Court.  *See* Stay Order at 2–3 ("even if the Court were to hear the Administrative
Expense Motion and determine that Cobra is entitled to receive the disputed amounts, PROMESA
does not require PREPA to remit any such funds prior to the effective date of a confirmed plan of
adjustment, and the Court is not empowered to require such payment absent the Oversight Board's
consent.").  Cobra's apparent reading of PROMESA section 314 creates a current and ongoing
obligation where none exists.  Section 314 is clear that payment of administrative expenses in full
in cash is specifically a *confirmation requirement*, not a current or ongoing obligation.  *See*
PROMESA § 314(b)(4) ("The court shall confirm the plan if . . . except to the extent that the holder
of a particular claim has agreed to a different treatment of such claim, *the plan provides that on
the effective date of the plan* each holder of a claim of a kind specified in [Bankruptcy Code
section] 507(a)(2) . . . will receive on account of such claim cash equal to the allowed amount of
such claim . . . .") (emphasis added).  The timing under the statute is clear as well: (1) a showing
is to be made *at confirmation*, not now, and (2) what must be shown then is assurance of payment
*on the effective date* at the earliest, not now.  *See id.*  If it were the case that a debtor must
continually demonstrate it can pay every alleged postpetition invoice regardless of its validity, a
debtor could be easily swallowed up by administrative expense allegations that are frivolous,
meritless, or even fraudulent—a result deeply at odds with the law's rehabilitation policy.  Here,
the cloud of fraud is exactly the problem with Cobra's claim that makes Cobra's interpretation
untenable.  In short, PROMESA does not require PREPA to prove confirmation requirements now.
Cobra's demand to do so is unsupported and should be rejected.

12

**II.      Cobra Cannot Use Its Disputed Claim to Justify Prejudicing Other Stakeholders.**

30.      Even if the Court had discretion to order immediate payment on Cobra's purported administrative expense claim,[20] it is clear the Court's discretion would not apply here to justify Cobra's demands to constrict other payments.  Cobra has given no reason justifying it being paid that would counterbalance the facts that: (i) its former president has been indicted for fraud in connection with execution and performance of the Cobra Contracts, (ii) the FEMA Analysis questions whether Cobra's rates were reasonable, (iii) PREPA has contested the invoices that Cobra alleges are due, and (iv) Cobra has already received $1.1 billion in payments, *i.e.* 82% of its submitted invoices.  These facts—as indicated in the January Status Conference—are factually sensitive issues that may result in PREPA not having to pay Cobra under the Cobra Contracts, *see, e.g.*, Jan. 29, 2020 Hr'g Tr. 55:1-56:14, and weigh heavily against constraining other payments on account of Cobra's alleged claims.  Cobra is not harmed by PREPA's continued operations in the ordinary course and accordingly, payment of its professionals under the supervision of the Court and the process already approved under the Interim Compensation Procedures.

31.      At bottom, Cobra is not entitled to immediate payment because its claim remains in dispute.  The pending criminal proceedings and FEMA Analysis create a cloud over Cobra's right to payment under the Cobra Contracts that must be cleared first. PREPA did not create that cloud.  Cobra and certain representatives of FEMA did.

32.      The Cobra Contracts themselves show the FEMA Analysis must be concluded before Cobra could demonstrate its claim should be allowed.  Pursuant to the Cobra Contracts, if PREPA is unable to secure Federal assistance funding "due to [Cobra's] sole fault," PREPA is

---

[20] The Government Parties continue to reserve the right to challenge Cobra's alleged administrative expense claim on any basis, including, without limitation, on the basis that PROMESA does not recognize services such as Cobra's as giving rise to administrative expense claims.

relieved of its obligation to pay Cobra for any such invoices.  *See* Second Contract, Art. 53(F); First

Contract, Art. 29.  Given that FEMA is conducting its cost analysis in compliance with the OIG

Report, any right to payment of Cobra invoices at issue in the Administrative Expense Claim is, at

best, seriously in doubt.  Cobra was fully and explicitly aware that FEMA funding was to be used

for all costs under the Cobra Contracts.  *See* First Contract, Art. 29 ("[Cobra] acknowledges that

starting on October 25, 2017, FEMA financial assistance will be used to fund this Contract.");

Second Contract, Art. 53(N)(1) ("PREPA is using Federal grant funding awarded or administered

by FEMA . . . to pay, in full, for the costs incurred under this Contract."); *supra* ¶ 27 (discussing

the mechanics of the Stafford Act conditioning FEMA disbursement on engineer analysis and

absence of evidence of fraud).  The Cobra Contracts go even further by providing that if FEMA

seeks repayment from PREPA, or otherwise penalizes PREPA for any act or omission of Cobra's,

Cobra is obligated to reimburse PREPA within ten business days.  *See* First Contract, Art. 68

(requiring Cobra to reimburse PREPA if FEMA demands repayment of funds due to Cobra's

fault); Second Contract, Art. 53(J) (same).

33.     Together, these provisions mean that if FEMA determines that Cobra's actions

(including, potentially, actions related to the Indictment) disqualify PREPA from receiving further

funding to pay Cobra, then PREPA is not obligated to pay Cobra.  Moreover, if, following the OIG

Report, which called into question Cobra's rates on the First Contract and the FEMA Analysis,

FEMA decides to seek repayment from PREPA of reimbursements because of Cobra's actions,

then PREPA will be entitled to repayment from Cobra, potentially offsetting any valid claim Cobra

may otherwise have.

34.     Additionally, under Puerto Rico law, if the allegations contained in the Indictment

are proven true, PREPA may have a complete defense to all of Cobra's demands, and may even

14

have a claim against Cobra for damages or disgorgement of prior payments to Cobra.[21]  Given these implications that the criminal allegations may have on Cobra's rights against PREPA, the status quo is fully justified.

35.    Aside from the criminal proceedings and FEMA Analysis, hundreds of invoices with a face value of over $200 million are in dispute, including, for example: headcount disputes (approx. $71 million), non-restoration issues (approx. $32 million), inappropriate access mapping charges (approx. $3 million), pending inspection reports (approx. $7 million), and miscellaneous billing issues (approx. $5 million).[22]  The Government Parties have listed ten categories of factual disputes related to Cobra's invoices in the Joint Status Report.  Joint Status Report at 6–7.  Cobra, for its part, largely denies that such disputes exist, which by itself, is a dispute.  *See id.* at 4.

36.    In sum, due to the ongoing criminal proceedings and FEMA Analysis, any rights to payment to Cobra under the Cobra Contracts are in doubt.  Clarity on these issues can only be obtained once the criminal proceedings and FEMA Analysis are completed.  Furthermore, PREPA and Cobra are in *bona fide* dispute over many of the invoices.   As a result, Cobra cannot demonstrate it has an allowed claim at this time and does not have a basis to demand a discontinuation of ordinary course payments to other creditors in the course of this Title III Case.

---

[21] As noted in the PREPA's reply in support of the Stay Motion [ECF No. 8864] (the "Stay Reply"), ¶ 13 n.6, the Cobra Contracts may be voidable for having been obtained by "deceit," defined to be "when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them it would not have made."  31 L.P.R.A. § 3408.  This could give PREPA a complete defense to further payments, a damages claim against Cobra, and/or the right to receive back payments made to Cobra under the vitiated contracts.  *See* 31 L.P.R.A. §§ 3511, 3513, 3514; *Dopp v. HTP Corp.*, 947 F.2d 506, 510 (1st Cir. 1991).  Moreover, under Puerto Rico law, when one contracting party is implicated in an "illicit" consideration for a contract—that is, a consideration that is contrary to law or good morals (*see* 31 L.P.R.A. § 3432)—the innocent party (here, PREPA), "may recover what he may have given, and shall not be bound to fulfill what he may have promised."  *See* 31 L.P.R.A. § 3516; *see also Rosario Rosario v. Pagan Santiago*, 196 D.P.R. 180, 188 (P.R. 2016) (if one of the contracting parties was not at fault, he can claim what he gave and will not be obliged to fulfill what he promised).  This could apply to give PREPA a defense to future payments and a claim against Cobra.  Movants reserve the right to make any other challenge to Cobra's claims, including, without limitation, other challenges based on Puerto Rico contract law or based on any and all terms of the Cobra Contracts.

[22] The extent of disputed claims is set forth in greater detail in the Stay Reply, ¶¶ 21–23.

### III.     Cobra's Proposed Remedies Threaten the Title III Case

37.     Cobra's proposed remedy—to effectively cut off payment to professionals representing a wide variety of interests and stakeholders—is not only unfounded as discussed above, it also would threaten the success of this Title III Case if implemented.

38.     Stopping professional payments as Cobra demands would run the risk of grinding to a halt progress in this Title III Case for the benefit of all stakeholders.  Withholding payment to professionals indefinitely as Cobra demands may cause some professionals to be unable to continue.

39.     A critical role of professionals in this case is generally to represent stakeholders of various types and promote a thorough, balanced, and fruitful adversarial process for the benefit of all stakeholders.  Retained in this Title III Case are not only PREPA, Oversight Board, and AAFAF professionals, but professionals that represent the Official Committee of Unsecured Creditors, the Mediation Team's advisors, and conflicts counsel for various stakeholders to ensure that conflicts of interest are avoided in this Title III Case.  As the Court is aware, and as even Cobra concedes, "the Title III Case has been complicated."  Initial Obj. ¶ 30.  Payment of all professionals, including the various stakeholders listed above, ensures that various potentially divergent and conflicting interests are adequately and fairly represented to maximize the benefits of an adversarial process. Cobra's proposed relief, on the other hand, risks unraveling a process designed to promote balance and fairness.

40.     For all of its purported concern about equal treatment of post-petition creditors, in arguing for immediate payment Cobra ignores that payment to Cobra of funds to which it is not entitled would prejudice other post-petition creditors.  *See, e.g.*, Initial Obj. ¶ 24.  Furthermore, while Cobra professes concern about increasing professional expenses, *see* Initial Obj. ¶ 30, Cobra's filing of now three separate motions all aiming at pressuring the payment of its disputed

claims excessively contributes to increasing those very expenses.  Cobra's repeated demands to proceed with discovery on the Administrative Expense Motion notwithstanding the potential duplication with the criminal proceedings and FEMA Analysis shows that overall administrative expenses are not its top priority.  Jan. 29, 2020 Hr'g Tr. at 60:23-61:9.

41.     Professionals serving PREPA, on the other hand, are subject to a rigorous vetting process to ensure the reasonability of payment to professionals.  Under the Interim Compensation Procedures, professionals must satisfy a process involving other professionals, the Fee Examiner, and the Court, to obtain allowance and payment of interim compensation.  *See* Interim Compensation Order, ¶ 2(f)–(k) (establishing a notice, review, and objection process).  Moreover, professional fees and expenses are subject to review by the Fee Examiner, who is responsible for monitoring, reviewing, and assessing all Fee Applications for compliance with, among other things, applicable provisions of PROMESA, the Bankruptcy Rules, the Local Rules, the Interim Compensation Procedures, and the U.S. Trustee Guidelines (as defined in the Fee Examiner Order).  *See* Fee Examiner Order ¶ 6.  Finally, interim professional payments are subject to disgorgement until final allowance by the Court.  Interim Compensation Order, ¶ 2(n).

42.     The chapter 11 and chapter 7 cases Cobra wishes the Court to import, *see* Initial Obj. ¶ 23–24, are not applicable.[23]  Cobra points out that under chapter 11 a court can suspend current payments to "administrative creditors, including professionals . . . ."  *Id.* ¶ 3.  The issue here, however, is not the Court's power.  It is whether there are meritorious grounds to exercise it.  Further, even with respect to professional compensation pursuant to PROMESA section 316, any investigation of fees is limited to their reasonableness and nothing else.  Sections 327–331 of the

---

[23] In the first instance, these are not chapter 9 or Title III cases.

17

Bankruptcy Code, on which the cases cited by Cobra rely, have not been incorporated into PROMESA and are thus inapplicable.

## **CONCLUSION**

43.    For the reasons set forth herein, PREPA requests that the Court overrule Cobra's Objection.

*[Remainder of Page Intentionally Left Blank]*

New York, New York
February 28, 2020

Respectfully submitted,

**O'NEILL & BORGES LLC**

By: /s/ Hermann D. Bauer
    Hermann D. Bauer
    USDC No. 215205
    250 Muñoz Rivera Ave., Suite 800
    San Juan, PR 00918-1813
    Telephone: (787) 764-8181
    Facsimile: (787) 753-8944
    Email: hermann.bauer@oneillborges.com


**PROSKAUER ROSE LLP**

By: */s/ Martin J. Bienenstock*
    Martin J. Bienenstock*
    Paul V. Possinger*
    Ehud Barak*
    Gregg M. Mashberg*
    Eleven Times Square New York, NY 10036
    Telephone: (212) 969-3000
    Facsimile: (212) 969-2900
    Email:    mbienenstock@proskauer.com
            ppossinger@proskauer.com
            ebarak@proskauer.com
            gmashberg@proskauer.com

* admitted *pro hac vice*

*Attorneys for the Financial Oversight and
Management Board and as representative of the
Puerto Rico Electric Power Authority*

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record and CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
