# **EXHIBIT L**

BEST INTERESTS TEST REPORTS

*Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Commonwealth of Puerto Rico*

This analysis assesses the recoveries available to creditors of the Commonwealth on the basis of available remedies under non-bankruptcy laws including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA, a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in greater recoveries for the creditors than is provided by such plan." This analysis provides an estimated range of recoveries that would be available to creditors if the stay of debt enforcement is terminated, no Plan of Adjustment is confirmed, and the Title III cases of the Commonwealth, ERS, HTA, and PBA are dismissed.

This document consists of two sections. The first section provides an overview of the methodology followed in developing the analysis. The methodology outlines the approach to estimating resources available for debt service, a summary of outstanding creditor obligations, and the priority in which funds are disbursed and the order in which creditor claims are assumed to be paid. The second section presents the ranges that define the estimated likely range of recoveries available to creditors of the Commonwealth.

This analysis was prepared by McKinsey & Company, Inc. Washington D.C. ("McKinsey & Company"). Proskauer Rose LLP and O'Neill & Borges LLC[1], legal advisors to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. Those assumptions are included in Appendix 3 of this document. The financial advisors to the FOMB provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt, perspective on cash balances, and other financial data. McKinsey & Company also relied on data published by or directly provided by the Government of Puerto Rico and/or its advisors. McKinsey & Company has accepted as true, accurate, and appropriate all of the legal and financial information and assumptions provided by the other FOMB advisors as well as from the Government of Puerto Rico and its advisors. McKinsey & Company has not independently verified any of the information or assumptions received from Government and from advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in this analysis are inherently subject to business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to or potentially realized by creditors on the basis of available remedies under any laws, including the Puerto Rico Constitution, would or would not approximate the estimates and assumptions represented in the analysis, and actual results may vary materially from those shown herein. McKinsey & Company does, however, represent that the recovery range identified herein is its best estimate based on

---

[1] Proskauer Rose LLP and O'Neill & Borges LLC are collectively referred to as "legal advisors" in this analysis.

1

conditions, knowledge, and information provided to it as described above as of September 24, 2019.

## I. *Methodology*

The analysis assumes that the PROMESA Title III cases of the Commonwealth, ERS, HTA, and PBA are dismissed but that PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement against all four debtors is lifted and the FOMB remains in place and will continue to certify Commonwealth Fiscal Plans and enforce implementation of budgets, subject to any debt enforcement in excess of the budget that the Puerto Rico courts order. The analysis also assumes creditors would pursue legal action against the Commonwealth to recover the amounts they are owed.

The assumption that PROMESA Titles I and II continue to apply maintains the impact of the fiscal measures and savings the FOMB inserts into its Certified Fiscal Plans. The FOMB's legal advisors believe it would be plausible to assume PROMESA Titles I and II do not apply because Congress enacted them in tandem with Title III and it is not clear they were intended to continue in effect without Title III. On balance, however, the legal advisors recommend that this analysis be prepared as if PROMESA Titles I and II continue to apply.

The analysis is predicated upon projections of revenues and expenses as contained in the 2019 Certified Fiscal Plan for Puerto Rico (the "Fiscal Plan"). Following guidance provided by legal advisors, adjustments to certain Fiscal Plan projections were made to reflect the dismissal of the Title III cases and the assumption that no Plan of Adjustment occurs. Those adjustments are the following:

- The analysis assumes the pension cuts included in the Fiscal Plan will not take effect because this measure depends on the confirmation of a Plan of Adjustment. However, the range of potential recoveries is subject to the possibility the Puerto Rico courts may not uphold the use of the police power to allow full pension payments if all savings measures in the Fiscal Plan are not implemented.
- The analysis assumes the freeze on accrual of benefits in the judicial retirement system will not occur. Future contributions to Social Security for judges are also assumed in this analysis to be set to zero, as those are assumed to be dependent on the freeze of the pension benefit accrual[2].
- Legal professional fees are assumed to continue due to an anticipated need for prolonged and heightened litigation support. Legal professional fees are assumed to double in FY20 from their level in the FY19 Fiscal Plan and grow with inflation until FY23, at which point they will drop by 50% and continue grow by inflation until FY29.
- All non-legal Title III professional fees[3] are assumed to drop by 50% upon dismissal of Title III cases and then grow with inflation until FY29.

---

[2] Following guidance from legal advisors, the freeze on accrual of benefits in the teachers' retirement system will be implemented. Therefore, future contributions to Social Security for teachers are also assumed to occur.

[3] Non-legal Title III professional fees include fees paid by the Commonwealth to financial and other non-legal advisors for Title III-related processes.

- The FOMB is assumed to continue to exist because the requirements for dissolution of the Board as defined by PROMESA most likely would not be met if the Title III cases are dismissed.
- The annual appropriation from the Commonwealth to HTA is adjusted to reflect the minimum amount required to ensure fiscal balance in HTA in any given year.

The analysis also makes further adjustments to incorporate the risks related to the implementation and execution of fiscal measures and structural reforms outlined in the Fiscal Plan. The dismissal of the Title III cases could create further political and economic uncertainties that would affect the implementation of such measures. Those adjustments are described in the second part of this analysis.

The analysis relies on the following three components to calculate the recoveries available to creditors:

- **Resource Envelope:** the money available to satisfy Commonwealth creditor obligations, including cash on hand available for debt service, property tax revenues ("CRIM revenues") and clawback[4] revenues, other sources available from appropriations to certain Independently Forecasted Component Units (IFCUs), and the annual surplus generated by the Commonwealth excluding any items just listed above.
- **Outstanding debt:** the principal, interest, and the maturity schedule of each group of debt obligations.
- **Priorities for distribution of funds:** the allocation of resources for debt payment consistent with the priorities of use of funds and of payments according to Puerto Rico law, and the terms outlined in the bond documents.

The effective date of this analysis is assumed to be June 30, 2019. The percentage recovery is calculated as the present value of the total amount expected to be paid to creditors over the entire period of the analysis as a proportion of the total outstanding principal and unpaid interest as of the effective date. Based on discussions with the FOMB's financial advisors, this analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments or future obligations.

### i. Resource Envelope

The total amount of resources available to pay Commonwealth creditor claims in each year constitutes the Commonwealth's Resource Envelope. The Resource Envelope in any year is the sum of 1) starting cash available for debt service, 2) property tax revenues (CRIM revenues), 3) clawback revenues, 4) other sources available from appropriations to certain IFCUs, and 5) the annual surplus generated by the Commonwealth after payment of its operating expenses[5].

---

[4] The term clawback is used herein to refer to certain revenues the Commonwealth conditionally allocated to certain Commonwealth instrumentalities.

[5] The annual surplus generated by the Commonwealth included in this analysis is presented differently from the annual surplus generated by the Commonwealth as stated in the Fiscal Plan. On top of the adjustments made to consider no Plan of

**1) Starting cash available for debt service ("starting cash"):** As described in Appendix 3, the starting cash available for debt service as of the effective date of this analysis consists of unrestricted cash plus cash that is restricted but available to creditors, as described below:

- **Unrestricted cash:** Refers to Commonwealth funds that do not have legal limitations on their use. The unrestricted cash excludes funds that must be used for specific operating expenses due to Federal or Puerto Rico laws and regulations. Unrestricted cash also excludes funds that have any legal restriction as they are part of custodial or trust accounts, and funds whose use is restricted by a secured interest or court orders. Unrestricted cash is assumed to be available for debt service.
- **Cash that is restricted but available to creditors**: Refers to funds that have been set aside or otherwise segregated for certain debt service.

The sum of unrestricted cash plus restricted cash available to creditors comprise the total starting cash available for debt service as of the effective date of this analysis. As indicated in the "Debtors' Cash Accounts" section of the Disclosure Statement, the analysis of cash balances is ongoing and subject to further revision. Conversations with the FOMB's financial advisors about the cash analysis led to using a preliminary range of $2 billion to $5 billion of potentially unrestricted cash pending further analysis. As the output of the analysis will show, the ultimate recoveries available to creditors is highly sensitive to the amount of starting cash.

**2) Property tax revenues ("CRIM revenues"):** The Municipal Revenues Collection Center ("CRIM," by its Spanish acronym) collects an annual 1.03% property tax on real and personal property imposed by the Commonwealth. CRIM revenues are deposited into a State Redemption Fund and have historically been available to service Commonwealth GO debt.

**3) Clawback revenues:** Certain taxes and fees are collected by the Commonwealth and then allocated to certain public corporations. As described in Appendix 3, on the basis of Article VI, Section 8 of the Puerto Rico Constitution, this analysis assumes that these "clawback revenues" can be used to pay Commonwealth GO debt and debt pari passu to GO bonds when two conditions are met: 1) the Commonwealth has sufficient funds to pay its operating expenses, and 2) the rest of the Resource Envelope is not enough to cover GO debt and debt pari passu to GO bonds in any given year.

The clawback revenues include specific taxes and fees collected by the Commonwealth on behalf of the Highways & Transportation Authority (HTA), the Metropolitan Bus Authority (MBA), the Puerto Rico Infrastructure Financing Authority (PRIFA), and the Puerto Rico Convention Center District Authority (PRCCDA).

For HTA, the revenues subject to clawback are: 1) the Vehicle License Fees, 2) the Gasoline Tax, 3) the Gas Oil and Diesel, 4) a portion of the Petroleum Products Tax, and 5) a portion of the Cigarette Tax.

---

Adjustment, this analysis accounts for the other four revenue streams described in this section as separate from the overall annual surplus generated by the Commonwealth for the purposes of debt payment.

4

For MBA, the revenue subject to clawback is the remainder of the Cigarette Tax that is not allocated to HTA. PRIFA receives the excise tax on rum and an additional excise tax on petroleum products. PRCCDA receives a portion of the hotel room tax paid for room occupancy. Appendix 3 describes in detail the regulation around each revenue stream subject to clawback.

**4) Other sources available from appropriations to certain IFCUs:** IFCUs are legally separate entities that have been established by the Commonwealth. Following the guidance provided by legal advisors, this analysis assumes revenues generated by IFCUs are not available to pay Commonwealth obligations absent legislation or consent. The thirteen IFCUs in the Fiscal Plan are listed below.

*Exhibit 1: Independently Forecasted Component Units in the Certified Fiscal Plan*

| No. | IFCU acronym | IFCU name |
|-----|--------------|-----------|
| 1 | AAFAF | Fiscal Agency and Financial Advisory Authority |
| 2 | ADEA | Agriculture Enterprise Development Administration |
| 3 | ASEM | Medical Services Administration |
| 4 | ASES | Health Insurance Administration |
| 5 | Cardio | Cardiovascular Center of Puerto Rico and the Caribbean |
| 6 | HFA | Housing Finance Authority |
| 7 | PBA | Puerto Rico Buildings Authority |
| 8 | Ports | Puerto Rico Ports Authority |
| 9 | PRCCDA | Puerto Rico Convention Center District Authority |
| 10 | PRIDCO | Puerto Rico Industrial Development Company |
| 11 | PRITA | Puerto Rico Integrated Transport Authority |
| 12 | Tourism | Puerto Rico Tourism Company |
| 13 | SIFC | State Insurance Fund Corporation |

However, some of the Commonwealth's appropriations to the IFCUs may be available for debt service. As described in Appendix 3, the analysis assumes the Commonwealth has direct control over the funds it appropriates in its budget to the IFCUs. Some or all of the appropriation to an IFCU may be available for Commonwealth debt service.

For the IFCUs that receive an appropriation, and that appropriation helps the IFCU generate a surplus, the analysis assumes the Commonwealth will reduce (or eliminate) such appropriations until the entity runs a balanced budget in order to generate more funds available for payment of Commonwealth obligations. This would apply to AAFAF, ADEA, ASEM, ASES, HFA, and PRITA, as those IFCUs have historically received annual appropriations from the Commonwealth.

5

However, as assumed in the Fiscal Plan, IFCUs that generate operating deficits in any given year are assumed to have those operating deficits funded by the Commonwealth.

For the IFCUs that do not receive an appropriation, it is assumed the Commonwealth does not have access to funds from that IFCU. The IFCUs that belong to this category are SIFC, Cardio, PBA, PRCCDA, and Ports. However, if any of these entities run a deficit in any given year, it is assumed the Commonwealth, as part of its operating expenses, will fund the deficit because those entities provide services needed for the proper functioning of the Commonwealth.

**5) Annual surplus generated by the Commonwealth that is not related to other income streams**: The total revenues generated by the Commonwealth minus its total operating and capital expenses constitute the annual Commonwealth surplus[6]. Commonwealth revenues are comprised of total Commonwealth tax revenue in the Fiscal Plan (e.g., General Fund, SUT after COFINA payments, Act 154, and other tax revenues), as well as revenues from Federal Funds and Special Revenue Funds.

The total Commonwealth operating expenses are comprised of the General Fund, Special Revenue Fund, and Federal Fund expenses projected in the Fiscal Plan with respect to the Commonwealth Fiscal Plan entities, excluding the IFCUs. The Fiscal Plan outlines the following expenditure categories:

- **General Fund payroll and non-payroll operating expenditures:** Personnel and non-personnel costs required for the Commonwealth and its agencies to function; these expenses are outlined in the annual Commonwealth budget.

- **Special Revenue Funds:** Funds used for agency and Governmental expenditures outside an entity's General Fund disbursements or Federal Fund allocations; such funds are collected by agencies, among other sources, from fees and charges for services.

- **Federal Funding:** Funds often utilized as pass-through funds for various social programs; in some cases, Federal Funds are also used to fund certain agency operating expenses.

- **Medicaid expenditures:** Commonwealth-funded portions of Medicaid, Children's Health Insurance Program (CHIP), Platino dual-eligible program, and other health-related expenditures.

- **Commonwealth pension expenditures:** Pay-as-you-go (PayGo) pension benefits for participants of the Teachers' Retirement System (TRS), Judicial Retirement System (JRS), and the former Employees' Retirement System (ERS). As shown in the Fiscal Plan, the pension expenditures of the Independently Forecasted Component Units (IFCUs) are already considered in the operating expenses of each IFCU. Pension expenditures are treated as Commonwealth operating expenses in the analysis; therefore, pension expenditures are paid in full (like any other operating expenses) before payment of any debt.

---

[6] The Commonwealth surplus referred in this section excludes starting cash, clawback and CRIM revenues, as well as other sources available from appropriations to certain IFCUs.

- **Appropriations:** Commonwealth contributions to municipalities, University of Puerto Rico, the Highways and Transportation Authority (HTA), and some public corporations, including IFCUs that run a deficit in a given year.

- **Other operating and capital expenditures:** Government payments for utilities costs to PREPA and PRASA, certain insurance premium costs, and capital expenditures for Commonwealth capital projects and maintenance.

- **Reconstruction and restructuring related expenditures:** Commonwealth-funded public assistance and hazard mitigation programs required to receive FEMA matching funds, as well as all PROMESA-related professional fees and operating costs of the Financial Oversight and Management Board.

- **Gross-ups for tax credits and COFIM receipts:** Tax credits to corporations and individuals, as well as the expenses of COFIM (the public corporation that collects the 1% Municipal Sales and Use Tax for certain municipalities); it is assumed that COFIM receipts and tax credits are in balance every year as the incoming revenues are matched by outgoing expenses.

Projections for these revenue and expenditure groups take into consideration the estimated impact of fiscal measures in the Fiscal Plan. Fiscal measures are a series of actions intended to optimize revenue collection and reduce Government expenditures, which would streamline and transform the Government of Puerto Rico. The fiscal measures encompass actions to improve compliance in tax collection, implementation of agency efficiencies, optimization in the healthcare system, and rationalization of subsidies to UPR and municipalities. The fiscal measures in the Certified Fiscal Plan results in an overall reduction in run rate expenditures excluding those related to federal funds of 18% by FY24.

The projections of Commonwealth revenues and expenses also estimate the impact of structural reforms as outlined in the Fiscal Plan. Structural reforms encompass reforms to human capital and welfare, ease of doing business, and the availability and affordability of energy. Structural reforms are designed to promote growth in the economy, which would ultimately increase the ability of the Commonwealth to generate revenue.

The expenses discussed above comprise the operating and capital expenditures of the Commonwealth. This analysis reflects modifications to the Fiscal Plan projections of certain expenditures to account for the absence of Title III protections and a Plan of Adjustment. As previously discussed, the specific Fiscal Plan expense lines adjusted are:

- **Pension costs:** Total pension costs in the analysis do not include the reduction in pension benefits outlined in the fiscal plan.  Also, pension costs do not include the freeze in accrual of benefits in the retirement plans of the judicial retirement system. The analysis also sets to zero the contributions to Social Security payments for judges, which are dependent on the pension measures.
- **Professional fees:** The analysis adjusts costs projections related to legal fees and non-legal Title III professional fees and legal fees. Legal professional fees are assumed to double from FY19 to FY20 and then are cut in half in FY23. Title III professional fees are assumed to be halved upon the dismissal of the Title III case. Both Title III professional fees and legal fees are grown each year by inflation and extend until FY29.

7

- **FOMB expenditures:** The FOMB is assumed to continue to exist because the requirements for dissolution of the Board as defined by PROMESA most likely would not be met if the Title III cases were dismissed.
- **Commonwealth transfer to HTA:** The annual transfer to HTA is adjusted to match the amount required to offset any operating deficit in HTA in any given year assuming a concurrent dismissal of HTA's Title III case.

Once Commonwealth operating expenses are paid with the revenues generated by the Commonwealth, any remaining amount constitutes the annual Commonwealth surplus, as outlined in the Fiscal Plan. The Commonwealth surplus is assumed to be available for debt payment.

As described later in the section entitled "Estimated likely range of recoveries available to creditors," certain adjustments to the Resource Envelope were incorporated to account for the risk of implementation of the Fiscal Plan should the Title III cases be dismissed. As a result, macroeconomic metrics and government expenditure savings forecasted in the Fiscal Plan are assumed to be affected.

### ii. Outstanding debt

The analysis considers the following classes of claims based on information provided to McKinsey & Company. Assumptions related to the estimates of the principal balance and unpaid interest as provided by legal advisors and financial advisors are as follows:

*Federal claims:* Two categories of obligations are assumed to be owed by the Commonwealth to the Federal Government. These obligations are assumed to be paid in full prior to any other debt payment. Following the guidance provided by legal advisors, Federal Government is likely to recoup any unpaid claims by withholding certain Federal Funds earmarked for the Commonwealth to offset insufficient payment. Therefore, these claims are assumed to be paid before other debt claims:

- **Federal claims and obligations:** There are several claims that the Federal Government has filed against the Commonwealth. Such claims include liabilities related to unpaid invoices as well as penalties and related fees for violations of Federal law. Following the guidance provided by legal advisors, such Federal claims and obligations represent a total amount of $329 million, which will be paid upon the removal of the current stay on debt enforcement.
- **Federal claims disallowance:** It is assumed that the Commonwealth must repay Federal Funds it spends but are later determined to be impermissible under grant criteria or requirements. It is assumed that such Federal cost disallowance represents a recurring annual expense of $65 million[7], which must be paid in full before payment is made on any General Obligation or other claims. The estimate above does not include any amounts for federal claims disallowance related to FEMA recovery-related funding.

---

[7] Estimate based on the 2016 Commonwealth of Puerto Rico Comprehensive Annual Financial Report (CAFR), which shows Commonwealth recorded a payment of $65.2 million for Federal claims disallowance.

***General Obligation (GO) bonds:*** Commonwealth General Obligation bonds were issued or guaranteed by the Commonwealth backed by the good faith, credit, and taxing power of the Commonwealth within the meaning of the Puerto Rico constitution (collectively, the "GO bonds" or "GO debt"). These have been incorporated into this analysis with the maturity schedule as projected in the bond issuance documents. Pursuant to PROMESA section 303, it is assumed that GO debt principal accrues interest during the current stay on debt enforcement.

With respect to the value of these claims, the FOMB commenced litigation challenging the validity of GO bonds issued in or after 2012, as those might have been issued above Puerto Rico's constitutional debt limit. Following guidance provided by legal advisors, this analysis assumes GO bonds issued in or after 2012 are ruled invalid. Based on data provided by financial advisors, the total principal outstanding of the GO bonds, excluding GO bonds issued in or after 2012, is $6,509 million and the total accrued and unpaid interest as of the effective date of this analysis is $1,202 million.

As indicated in Appendix 3, there is an additional litigation risk related to the validity of certain GO bonds. The statutory Unsecured Claimholders' Committee (the "UCC") has challenged the validity of all GO bonds issued in or after March 2011 on the basis they violate the constitutional debt limit. The potential impact of this litigation on recoveries is described in the section entitled "Alternative outcomes based on ongoing litigation or litigation risks."

***Debt pari passu to GO bonds:*** Following guidance provided by legal advisors, certain claims are assumed to receive the same priority as GO bonds as they are also backed by the Commonwealth's good faith, credit, and taxing power or hold a Commonwealth guarantee. As outlined in Appendix 3, this analysis assumes bonds or loans with a Commonwealth guarantee in or after 2012 would be deemed invalid and the bondholders holding such claims would have no claim against the Commonwealth.

This pari passu debt is comprised of the following claims. The value of outstanding principal and interest for such claims was provided by financial advisors.

- **Public Buildings Authority (PBA) bonds:** Excluding PBA bonds issued in or after 2012, PBA bonds are owed through FY2041, with a total outstanding principal balance of $3,426 million and unpaid interest of $524 million as of the effective date of this analysis. As indicated in Appendix 3, this analysis assumes a year of delay before PBA bondholders can receive payments from the Commonwealth as PBA bondholders must first seek to enforce their rights at PBA before seeking recovery at the Commonwealth.
- **Bonds issued by the Port of Americas Authority (APLA, by its Spanish acronym)**: APLA bonds were issued in 2005 and were purchased by GDB in 2014 (who then refinanced)[8]. Their outstanding principal balance is $226 million with final maturity due in FY2048 and unpaid interest of $15 million as of the effective date of this analysis.

---

[8] The Bonds issued by the Port of Americas Authority are not included in the Government Development Bank loans. Therefore, they are mentioned as two separate debt claims.

- **General Services Administration (GSA) loan**: GSA has a loan with an outstanding balance of approximately $33 million. Following the guidance provided by legal advisors, this loan is pari passu with GO debt.

Following guidance provided by legal advisors, there are certain claims pari passu with GO bonds that are not considered in this analysis because such claims received a Commonwealth guarantee in or after 2012. Those claims are the following:

- **Government Development Bank (GDB) loans**: There are four GDB loans with a total outstanding principal balance of $169 million and unpaid interest of $49 million as of the effective date of this analysis. The maturity of these loans extends to FY2043.
- **Bond Anticipation Notes (BANs) for the Puerto Rico Infrastructure Financing Authority (PRIFA):** The PRIFA BANs were originally issued in 2015, with a total outstanding principal balance of $78 million and unpaid interest of $16 million as of the effective date of this analysis.

Additionally, certain subordinated bonds from the Puerto Rico Aqueduct and Sewer Authority (PRASA) have also been guaranteed by the Commonwealth but are not considered in this analysis. As announced on August 9, 2019, PRASA restructured over $1 billion in debt that had a Commonwealth guarantee. As part of this process, this guarantee was terminated for most of the PRASA debt claims, except for an amount of $284 million that still holds a Commonwealth guarantee. This analysis assumes the Commonwealth would not have to pay PRASA debt claims because a PRASA default is currently unlikely to occur.

As indicated in Appendix 3, there is an additional litigation risk related to the validity of certain pari passu and Commonwealth guarantee claims. The UCC has challenged claims relating to PBA bonds issued in and after March 2011. There are also arguments that certain Commonwealth guarantees issued in and after March 2011 may be invalid.

*Other eligible claims*: As described in Appendix 3, this analysis assumes unsecured claims can only be paid after the amounts owed in a given year to GO and pari passu claimholders are paid. The other eligible claims include:

- **Claims already awarded to claimants** and owed by the Commonwealth ("judgment claims") or claims for which a court has already issued a judgment, such as those to be paid by the Public Housing Administration. The amount of such claims is estimated at $1 billion.
- **A GDB Title VI Public Entity Trust Claim** of $578 million that would be due when the current stay on payment of Commonwealth debt is lifted.
- **Lottery prize claims** that represent unpaid lottery prizes from the Lottery of Puerto Rico and the Additional Lottery System, with total principal of $172 million and $29 million of unpaid interests. Some lottery prize claims have multi-year payment schedules, as indicated in the 2016 Comprehensive Annual Financial Report (CAFR) of Puerto Rico.

- **Trade payables** with a total balance of $315 million due in FY2019. This includes total accounts payable and other current and non-current Commonwealth liabilities as shown in the 2016 Comprehensive Annual Financial Report (CAFR) of Puerto Rico.
- **An assumption for outstanding litigation claims against the Commonwealth**. Following guidance provided by legal advisors, the analysis assumes a range of $2.5 billion to $5 billion for these claims.
- **Claims from Employee Retirement System (ERS) bondholders.** Following guidance provided by legal advisors, this analysis assumes ERS bondholders will assert an unsecured claim against the Commonwealth for any unpaid amount of ERS bond debt. This assumption is also embedded in the analysis of the Employees Retirement System[9]. The present value of this claim is $3,246 million.
- **Clawback claims.** Public corporations that were allocated certain clawback revenues (i.e., HTA, MBA, PRIFA, PRCCDA) or bondholders of such public corporations might assert a claim against the Commonwealth for a portion of clawback revenues not transferred from the Commonwealth to the public corporations in any given year. The amount of clawback claims considered in the analysis equals the total clawback revenues used by the Commonwealth to cover operating expenses when it faces an operating deficit[10]. The value of these claims is between $6,085 million and $9,650 million[11].

Following guidance provided by legal advisors, there are two known claims that are assumed to be set to zero in the analysis. First, Puerto Rico Public Finance Corporation bonds ("PFC bonds") are assumed to not be part of the pool of claims. PFC bond documents disclosed that the Legislature is not legally bound to appropriate funds to pay the bonds, as such bonds do not constitute an obligation that can be enforced against the Commonwealth. Second, GDB bonds that had a Commonwealth guarantee are assumed to not part of the pool of claims as the guarantee rights were extinguished pursuant to the GDB Title VI restructuring.

### iii. Priorities for distribution of funds for debt service

The order in which claims are paid follows certain priorities. Following the guidance provided by legal advisors, this analysis assumes that the Commonwealth will pay Federal claims in full prior to any other debt payment because the Federal Government could offset unpaid claims using certain Federal Funds earmarked for the Commonwealth. Once Federal claims are paid, funds in the Resource Envelope are then allocated towards GO bonds and debt pari passu to GO bonds,

---

[9] The analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)" included in this Disclosure Statement estimates the unpaid amount of ERS bond debt in the future. The present value as of June 30, 2019, of unpaid ERS bonds shown in this analysis uses a 5% discount rate. The present value of this claim is used in the denominator for the calculation of percent recoveries available to creditors.

[10] This analysis assumes the Commonwealth will exercise its police power to use clawback revenues to cover operating expenses when the Commonwealth faces an operating deficit and other funds in the Resource Envelope are not enough to cover such deficit. The value of clawback claims used in this analysis represents the present value of the projected clawback revenues that are employed to pay Commonwealth operating expenses, discounted at a 5% discount rate. The present value of this claim is used in the denominator for the calculation of percent recoveries available to creditors.

[11] The range shows the present value of clawback claims used to pay Commonwealth operating expenses in the higher end and lower end of recoveries available to creditors. The range is described in the "Estimated likely range of recoveries available to creditors" section of this analysis.

such that each class receives the same percent recovery rate in a given year.[12] Once the amount owed in a given year to GO and GO pari passu claims are fully paid, then remaining funds in the Resource Envelope can be used to pay other eligible claims.

Exhibit 2 summarizes the order in which funds are disbursed and claims are paid, following legal guidance outlined in Appendix 3. For the claims considered in this analysis, debt with the same priority receives the same percentage recovery of debt owed in a given year[13] and no acceleration of payments is allowed.

*Exhibit 2: Flow of funds in the analysis*



1 See Appendix 3 for more details
2 Operating expenses include fiscal measures as outlined in the Fiscal Plan; Federal funds are included in operating expenses
3 The order of the use of funds to pay GO and its pari passu debt is as follows: CRIM revenues, starting cash, Commonwealth surplus, Commonwealth appropriations to certain IFCUs, and clawback revenues; any remaining CRIM revenues would be used to pay GO bonds only (but not pari passu debt)
4 GO and GO pari passu debts receive the same percentage recovery for amounts owed in any given year
5 Includes Commonwealth surplus, Commonwealth appropriations to certain IFCUs, and starting cash
6 Other claims receive the same percentage recovery for amounts owed in a given year; any funds that remain after fully servicing other claims in a given year are saved and become the starting cash for the following year

Following guidance provided by legal advisors, the use of clawback and CRIM revenues follow certain rules set forth below:

- If the Commonwealth faces an operating deficit after using all available resources excluding clawback and CRIM revenues in any given year, the analysis assumes the Commonwealth will exercise its police power to use clawback and CRIM revenues to cover operating expenses. If the Commonwealth deficit is fully paid with a portion of clawback and CRIM revenues, any remaining clawback revenues would then be used to meet obligations of GO bonds and its pari passu debt. Clawback and CRIM revenues will be

---

[12] This refers to total payment as a percentage of total principal and interest for each class of debt in any given year.

[13] However, the total recoveries for debts within the same class over the period of the analysis may differ should the claims have differing maturity schedules.

distributed such that GO and pari passu debt receive the same percentage recovery in any given year.

- If the Commonwealth achieves fiscal balance or runs a surplus when excluding clawback and CRIM revenues in any given year, CRIM revenues would be used to pay GO bonds and clawback revenues would be used to pay GO and GO pari passu bonds[14]. Clawback and CRIM revenues will be distributed such that GO and pari passu debt receive the same percentage recovery in any given year. If all GO and GO pari passu debt owed in any given year is paid, any remaining clawback revenues are returned to the respective public corporations (i.e., HTA, MBA, PRIFA, and PRCCDA).

Following guidance provided by legal advisors, funds available are first assumed to be credited against cumulative interest owed, and then to the debt principal maturing in that year or previously, if any. Unpaid principal is assumed to accrue interest according to the original rates stipulated in each of the relevant debt documents and is then added to the following year's debt. It is assumed that no interest accrues on interest balances.

## II. *Estimated likely range of recoveries available to creditors*

Under a scenario where a Plan of Adjustment is not confirmed and the Title III cases are dismissed, a number of risks exist that may impact the implementation of the Fiscal Plan. In assessing the estimated likely range of recoveries available to creditors, the analysis adjusts the projections of revenues and expenses outlined in the Fiscal Plan to incorporate the risks related to the implementation of certain structural reforms and fiscal measures.

The analysis sets forth an estimated likely range of recoveries, where the higher end of the range makes certain adjustments to Fiscal Plan projections to reflect implementation risks, and the lower end of the range adds incrementally more adjustments. Specifically, the higher end of the estimated likely range of recoveries assumes the impact of the structural reforms included in the Fiscal Plan will not materialize but the fiscal measures will be implemented. The analysis assumes that in a situation where the Title III cases have been dismissed, Puerto Rico will face greater political and financial instability which will create significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms. In addition, the impact of any actions to introduce structural reforms will likely have less impact on growth given the overall climate of instability. Fiscal measures, however, are assumed to occur as outlined in the Fiscal Plan as the FOMB would continue to certify budgets consistent with the Fiscal Plan.

The lower end of the estimated likely range of recoveries further assumes that certain fiscal measures will not be implemented. Specifically, while the FOMB has the authority to set spending levels, it might face challenges enforcing the healthcare expenditure levels included in the Fiscal Plan. The healthcare reform in the Fiscal Plan requires complex and coordinated actions across the various stakeholders in the healthcare system, which the Commonwealth may have limited incentive to undertake in the environment assumed in this analysis. Therefore, it is assumed in the

---

[14] The order of the use of funds to pay GO and its pari passu debt is as follows: CRIM revenues, starting cash, Commonwealth surplus, Commonwealth appropriations to certain IFCUs, and then clawback revenues.

lower end of the range of recoveries that the healthcare reform savings will not materialize. In addition, it is assumed that the right-rating tax measure will not lead to its intended revenue increase, as in this scenario the Commonwealth may have less incentive to take the steps needed to enforce collections.

In addition to adjustments to the Resource Envelope, the estimated likely range of recoveries is impacted by two key variables, starting cash available for debt service and the amount of litigation claims. Following guidance provided by legal advisors, the analysis assumes a preliminary range of $2.5 billion to $5.0 billion for litigation claims.

Considering the ranges described above, in total, all claimants would receive payments in the range of $5.8 billion and $9.2 billion[15]. The implied recovery is 19% to 36% of total claims[16] [17]. This range represents the most likely recoveries for all creditors if Title III cases were dismissed and all claims were enforced under non-bankruptcy law.

*Exhibit 3: Estimated likely range of recoveries available to all Commonwealth creditors*

**Estimated likely range of recoveries available to all Commonwealth creditors[1]**
PV of total payment in USD billion, % recovery

| | Lower end of range | Higher end of range |
| --- | --- | --- |
| **Total Recoveries[2] [3]** | $5.8 *19%* | $9.2 *36%* |

1 Recoveries on this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis
3 The calculation of recoveries assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid

The following chart shows the estimated likely range of recoveries for each class of claims. As mentioned in the section 'Outstanding debt,' the calculation assumes GO bonds, PBA bonds, and claims with a Commonwealth guaranty issued in or after 2012 are invalid.

---

15 The amount refers to the present value of future debt payments using an annual 5% discount rate.

16 The recovery percentage is estimated as the present value (PV) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of June 30, 2019.

17 Pensions and ERS claims are not included in the estimation of total debt recovery. This analysis assumes that pensions are fully paid every year as part of the operating expenses. ERS claims are analyzed in the section "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)" of this Plan of Adjustment; this analysis only includes the portion related to the unsecured claim that ERS bondholders can claim against the Commonwealth for any unpaid amount of bond debt, as described in the section entitled "Outstanding debt" of this analysis.

*Exhibit 4: Estimated likely range of recoveries available to Commonwealth creditors by debt class*

**Estimated likely range of recoveries available to all Commonwealth creditors[1]**
PV of total payment in USD billion, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| **GO Bonds** | $3.9<br>*50%* | $6.0<br>*78%* |
| **Claims pari passu with GO bonds** | $1.9<br>*53%* | $2.7<br>*75%* |
| **Other eligible claims** | $0<br>*0%* | $0.4<br>*3%* |
| **Total[2][3]** | $5.8<br>*19%* | $9.2<br>*36%* |

1 Recoveries on this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis
3 The calculation of recoveries assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid

See Appendix 1 for additional details on recoveries based on varying levels of starting cash and litigation claims that construct the ranges described above.

### Alternative outcomes based on ongoing litigation

Based on ongoing litigation summarized in Appendix 3, certain legal sensitivities were tested. The impact of such sensitivities is shown below.

#### i. Scenario 1

As described in Appendix 3, the main analysis assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid. However, the statutory unsecured claimholders' committee (the "UCC") has commenced litigation challenging the validity of GO bonds, PBA bonds, and other claims with a Commonwealth guarantee issued in or after March 2011. This scenario assumes the above obligations issued in or after March 2011 are deemed invalid.

Based on data provided by financial advisors, the total principal outstanding of GO bonds excluding those issued in or after March 2011 is $5,466 million and the total accrued and unpaid interest as of the effective date of this analysis is $993 million. In this scenario, the outstanding principal of PBA bonds is $2,244 million and the total accrued and unpaid interest as of the effective date of this analysis is $365 million. Also, PRIFA BANs and GDB loans are considered invalid in this scenario; the value of those two claims is described in the section 'Outstanding debt' of this analysis.

The results of this scenario are shown in Exhibit 5. The estimated likely range of recoveries for the GO group increases from 50 – 78% in the base scenario to 63 – 85% when the analysis considers claims issued in or after March 2011 are invalid. The estimated likely range of recoveries for claims pari passu with GOs increases from 53 – 75% in the base scenario to 59 – 79% in this scenario.

The estimated likely range of total payments to Commonwealth creditors decreases from $5.8 billion – 9.2 billion to a range of $5.5 billion – 8.6 billion. Total payments decrease because a lesser amount of clawback revenues are required as the total amount of Commonwealth-guarantee decreases. Therefore, a greater amount of clawback revenues are returned to public corporations.

*Exhibit 5: Estimated likely range of recoveries to Commonwealth creditors if GO and GO pari passu obligations issued in or after March 2011 are deemed invalid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO and GO pari passu obligations issued in or after March 2011 are deemed invalid[1][2]**
PV of total payment in USD billion, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| **GO Bonds** | $4.1 *63%* | $5.5 *85%* |
| **Claims pari passu with GO bonds[1]** | $1.5 *59%* | $2.0 *79%* |
| **Other eligible claims** | $0 *0%* | $1.1 *8%* |
| **Total** | $5.5 *19%* | $8.6 *37%* |

1 Recoveries in this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in the section "Most likely recoveries available to creditors" of this report

See Appendix 2 for additional details on recoveries based on varying levels of starting cash and litigation claims that construct the ranges described above.

### ii. Scenario 2

As described in Appendix 3, it is possible that the challenges to certain claims will be unsuccessful. In this scenario, all outstanding GO bonds, PBA bonds, and claims with a Commonwealth guarantee are assumed to be valid, and therefore will receive payments following the priorities for distribution of funds described in this analysis.

In this scenario, based on data provided by financial advisors, the total principal outstanding of the GO bonds is $12,549 million and the total accrued and unpaid interest as of the effective date of this analysis is $2,588 million. For PBA bonds, the outstanding principal balance is $4,000 million and unpaid interest is $614 million as of the effective date of this analysis. Also, PRIFA BANs and GDB loans are considered in this scenario; the value of those two claims is described in the section 'Outstanding debt' of this analysis.  Exhibit 6 below shows the estimated likely range of recoveries. The GO claims receive an estimated likely recovery of 29 – 72%. The estimated likely range of recoveries for debt pari passu with GOs is 37 – 67% in this scenario.

The result is that the estimated likely range of total payments to Commonwealth creditors is $6.1 billion – $13.9 billion. Total payments increase because a greater amount of clawback revenues are required as the amount of Commonwealth-guarantee debt increased. Therefore, a lower amount of clawback revenues are returned to public corporations.

*Exhibit 6: Estimated likely range of recoveries to Commonwealth creditors if all outstanding claims are deemed valid*

**Estimated likely range of recoveries available to creditors if all outstanding claims are deemed valid[1]**
PV of total payment in USD billion, % recovery

| | Lower end of range | Higher end of range |
|---|---|---|
| GO Bonds | $4.4 <br> 29% | $10.8 <br> 72% |
| Claims pari passu with GO bonds[1] | $1.7 <br> 37% | $3.1 <br> 67% |
| Other eligible claims | $0 <br> 0% | $0 <br> 0% |
| Total[2][3] | $6.1 <br> 15% | $13.9 <br> 41% |

1 This sensitivity assumes all outstanding GO bonds, PBA bonds, and claims with a Commonwealth guarantee are deemed valid
2 Recoveries on this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
3 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in the section "Most likely recoveries available to creditors" of this report

See Appendix 2 for additional details on recoveries based on varying levels of starting cash and litigation claims that construct the ranges described above.

### iii. Scenario 3

As described in Appendix 3, there is ongoing litigation challenging the validity of ERS bonds pursuant to Puerto Rico law. If ERS bonds are ruled to be invalid, ERS bondholders would not

receive any payments from ERS or from the Commonwealth. Therefore, the pool of unsecured claims considered in this scenario would be reduced. The estimated likely range of recoveries is shown in Exhibit 7.

*Exhibit 7: Estimated likely range of recoveries to Commonwealth creditors if ERS claims against the Commonwealth are deemed invalid*

**Estimated likely range of recoveries available to creditors if ERS bonds are deemed invalid[1][2]**
PV of total payment in USD billion, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| GO Bonds | $3.9 *50%* | $6.0 *78%* |
| Claims pari passu with GO bonds | $1.9 *53%* | $2.7 *75%* |
| Other eligible claims | $0 *0%* | $0.4 *4%* |
| Total[3] | $5.8 *21%* | $9.2 *42%* |

1 Recoveries on this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
2 This sensitivity doesn't take into consideration any other legal sensitivity mentioned in this section of the report. Therefore, this sensitivity assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid
3 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in the section "Most likely recoveries available to creditors" of this report

See Appendix 2 for additional details on recoveries based on varying levels of starting cash and litigation claims that construct the ranges described above.

## APPENDIX 1

The following exhibits provide additional detail on the estimated likely range of recoveries available to creditors. The first exhibit shows additional details on the total recoveries to creditors and the second exhibit shows recoveries by debt class.

*Exhibit 8: Estimated likely range of recoveries available to all Commonwealth creditors*

**Estimated likely range of recoveries available to all creditors[1] [2]**
PV of total payment in USD billion, *% recovery*

| | | Lower end of range | Higher end of range | Range of recoveries |
|---|---|---|---|---|
| Litigation claims = $2.5B | Starting cash = $2B | $5.8 *20%* | $9.0 *34%* | $5.8 – 9.2 *19 – 36%* |
| | Starting cash = $5B | $6.8 *25%* | $9.2 *36%* | |
| Litigation claims = $5.0B | Starting cash = $2B | $5.8 *19%* | $9.0 *31%* | |
| | Starting cash = $5B | $6.8 *23%* | $9.2 *33%* | |

1 Recoveries on this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
2 The calculation of recoveries assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid

*Exhibit 9: Estimated likely range of recoveries available to Commonwealth creditors by debt class and variables*

**Estimated likely range of recoveries available by debt class[1] [2]**
PV of total payment in USD billion, *% recovery*

| | | Starting cash = $2B | Starting cash = $5B | Range of recoveries |
|---|---|---|---|---|
| GO Bonds | Litigation claims = $2.5B | $3.9 – 6.0 *50 – 78%* | $4.9 – 6.0 *63 – 78%* | $3.9 – 6.0 *50 – 78%* |
| | Litigation claims = $5B | $3.9 – 6.0 *50 – 78%* | $4.9 – 6.0 *63 – 78%* | |
| Claims pari passu with GO bonds | Litigation claims = $2.5B | $1.9 – 2.7 *53 – 75%* | $1.9 – 2.7 *53 – 75%* | $1.9 – 2.7 *53 – 75%* |
| | Litigation claims = $5B | $1.9 – 2.7 *53 – 75%* | $1.9 – 2.7 *53 – 75%* | |
| Other eligible claims | Litigation claims = $2.5B | $0 – 0.2 *0 – 1%* | $0 – 0.4 *0 – 3%* | $0 – 0.4 *0 – 3%* |
| | Litigation claims = $5B | $0 – 0.2 *0 – 1%* | $0 – 0.4 *0 – 2%* | |
| Total | Litigation claims = $2.5B | $5.8 – 9.0 *20 – 34%* | $6.8 – 9.2 *25 – 36%* | $5.8 – 9.2 *19 – 36%* |
| | Litigation claims = $5B | $5.8 – 9.0 *19 – 31%* | $6.8 – 9.2 *23 – 33%* | |

1 Recoveries on this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
2 The calculation of recoveries assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid

19

*APPENDIX 2*

*Exhibit 10: Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO and GO pari passu obligations issued in or after March 2011 are deemed invalid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO and GO pari passu obligations issued in or after March 2011 are deemed invalid[1][2]**
PV of total payment in USD billion, *% recovery*

| | | Starting cash = $2B | Starting cash = $5B | Range of recoveries |
|---|---|---|---|---|
| **GO Bonds** | Litigation claims = $2.5B | $4.1 – 5.5 *63 – 85%* | $4.4 – 5.5 *68 – 85%* | *$4.1 – 5.5 63 – 85%* |
| | Litigation claims = $5B | $4.1 – 5.5 *63 – 85%* | $4.4 – 5.5 *68 – 85%* | |
| **Claims pari passu with GO bonds[1]** | Litigation claims = $2.5B | *$1.5 – 2.0 59 – 79%* | *$1.5 – 2.0 59 – 79%* | *$1.5 – 2.0 59 – 79%* |
| | Litigation claims = $5B | *$1.5 – 2.0 59 – 79%* | *$1.5 – 2.0 59 – 79%* | |
| **Other eligible claims** | Litigation claims = $2.5B | $0 – 0.7 *0 – 5%* | $0 – 1.1 *0 – 8%* | *$0 – 1.1 0 – 8%* |
| | Litigation claims = $5B | $0 – 0.7 *0 – 4%* | $0 – 1.1 *0 – 7%* | |
| **Total** | Litigation claims = $2.5B | $5.5 – 8.2 *21 – 34%* | $5.9 – 8.6 *23 – 37%* | *$5.5 – 8.6 19 – 37%* |
| | Litigation claims = $5B | $5.5 – 8.2 *19 – 31%* | $5.9 – 8.6 *21 – 34%* | |

1 Recoveries in this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in the section "Most likely recoveries available to creditors" of this report

*Exhibit 11: Estimated likely range of recoveries available to Commonwealth creditors by debt class if all claims are deemed valid*

**Estimated likely range of recoveries available by debt class if all outstanding claims deemed valid[1][2][3]**
PV of total payment in USD billion, *% recovery*

| | | Starting cash = $2B | Starting cash = $5B | Range of recoveries |
|---|---|---|---|---|
| **GO Bonds** | Litigation claims = $2.5B | $4.4 – 8.9 *29 – 59%* | $7.3 – 10.8 *48 – 72%* | *$4.4 – 10.8 29 – 72%* |
| | Litigation claims = $5B | $4.4 – 8.9 *29 – 59%* | $7.3 – 10.8 *48 – 72%* | |
| **Claims pari passu with GO bonds[1]** | Litigation claims = $2.5B | *$1.7 – 3.0 37 – 65%* | *$1.8 – 3.1 40 – 67%* | *$1.7 – 3.1 37 – 67%* |
| | Litigation claims = $5B | *$1.7 – 3.0 37 – 65%* | *$1.8 – 3.1 40 – 67%* | |
| **Other eligible claims** | Litigation claims = $2.5B | $0 – 0 *0 – 0%* | $0 – 0 *0 – 0%* | *$0 – 0 0 – 0%* |
| | Litigation claims = $5B | $0 – 0 *0 – 0%* | $0 – 0 *0 – 0%* | |
| **Total** | Litigation claims = $2.5B | $6.1 – 11.9 *16 – 34%* | $9.1 – 13.9 *25 – 41%* | *$6.1 – 13.9 15 – 41%* |
| | Litigation claims = $5B | $6.1 – 11.9 *15 – 32%* | $9.1 – 13.9 *24 – 38%* | |

1 This sensitivity assumes all outstanding GO bonds, PBA bonds, and claims with a Commonwealth guarantee are deemed valid
2 Recoveries in this exhibit do not include pensions recoveries which remains unchanged at 100%, and ERS recoveries which are outlined in the analysis entitled "Analysis of Creditor Recoveries should the Title III Cases be Dismissed for Creditors of the Employee Retirement System (ERS)"
3 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in the section "Most likely recoveries available to creditors" of this report

*Exhibit 12: Estimated likely range of recoveries available to Commonwealth creditors by debt class if ERS claims against the Commonwealth are invalidated*

**Estimated likely range of recoveries available by debt class if ERS bonds are deemed invalid[1][2]**
PV of total payment in USD billion, % recovery

| | | Starting cash = $2B | Starting cash = $5B | Range of recoveries |
|---|---|---|---|---|
| **GO Bonds** | Litigation claims = $2.5B | $3.9 – 6.0 *50 – 78%* | $4.9 – 6.0 *63 – 78%* | $3.9 – 6.0 *50 – 78%* |
| | Litigation claims = $5B | $3.9 – 6.0 *50 – 78%* | $4.9 – 6.0 *63 – 78%* | |
| **Claims pari passu with GO bonds** | Litigation claims = $2.5B | $1.9 – 2.7 *53 – 75%* | $1.9 – 2.7 *53 – 75%* | *$1.9 – 2.7 53 – 75%* |
| | Litigation claims = $5B | $1.9 – 2.7 *53 – 75%* | $1.9 – 2.7 *53 – 75%* | |
| **Other eligible claims** | Litigation claims = $2.5B | $0 – 0.2 *0 – 2%* | $0 – 0.4 *0 – 4%* | $0 – 0.4 *0 – 4%* |
| | Litigation claims = $5B | $0 – 0.2 *0 – 2%* | $0 – 0.4 *0 – 4%* | |
| **Total** | Litigation claims = $2.5B | $5.8 – 9.0 *23 – 39%* | $6.8 – 9.2 *28 – 42%* | $5.8 – 9.2 *21 – 42%* |
| | Litigation claims = $5B | $5.8 – 9.0 *21 – 35%* | $6.8 – 9.2 *26 – 37%* | |

1 Recoveries do not include pensions related recovery which remains unchanged at 100%
2 This sensitivity doesn't take into consideration any other legal sensitivity mentioned in this section of the report. Therefore, this sensitivity assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid

*APPENDIX 3*

## Commonwealth Title III Plan[1]

## Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| **1.** | **Existence of PROMESA/Board:** Should we assume PROMESA Titles I and II apply? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: PROMESA Titles I and II apply.  The automatic stay does not apply.  The Board is in place and certifies and enforces fiscal plans and budgets.  Creditors are allowed to procure judgments for all matured claims.  Once GO creditors (including creditors holding CW-guaranteed claims) have judgments, they can claim all "available resources" and fight with the Commonwealth over what amount of the available resources can be applied to operating expenses pursuant to the police power.  The non-GO and non-CW guarantee creditors' only recourse is to wait for a legislative appropriation of amounts to pay their claims once GOs are paid in full.

**BASIS**: The reference to "non-bankruptcy laws" in PROMESA section 314(b)(6) would include Titles I and II of PROMESA. There would be no automatic stay under non-bankruptcy law. Neither the fiscal plan nor the budget discharges claims or stays actions. Therefore, the fiscal plan and budget, as non-bankruptcy law, would apply, and the Oversight Board would continue to exist to enforce them.  It is possible that their implicit limitations (*i.e.*, budgeted amounts) will not limit how much creditors can collect by enforcing their claims.  Whether that is the case will be a function of the extent to which the police power prevents GO creditors from taking all available resources.  Non-GO creditors rely on legislative appropriations for payment.  The certified fiscal plan would limit what can be appropriated for debt service, subject to the rights of GO creditors to exercise their rights under Article VI, Sections 6 and 8 of the PR Constitution to intercept available resources.

**ASSUMPTION 2 [LITIGATION RISK]**:  PROMESA Titles I and II do not apply.  The automatic stay does not apply.  The Board does not exist, and there are no certified fiscal plans and budgets.
**BASIS**:  The assumption that PROMESA Titles I and II continue to apply increases the creditors' recovery due to the measures and savings the Oversight Board inserts |

[1] The Commonwealth is referred to herein as "Commonwealth," "CW," or "PR."

| | Question | Assumption |
|---|---|---|
| | | into its certified fiscal plans.  The Oversight Board's legal advisors believe it is possible that Titles I and II do not apply because Congress enacted them in tandem with Title III and it is not clear they were intended to continue in effect without Title III.  On balance, however, the legal advisors recommended that this analysis be done as if PROMESA Titles I and II continue to apply. |
| 2. | **Surplus**: Each year, is the cash remaining after all debts are paid, put in a lockbox for later years with deficits, or rolled over to next year's resources? | **ASSUMPTION**:  To the extent there are surplus funds after payment of all matured debts in any year, the funds will be held in the Commonwealth's treasury and a court will decide the next year whether the police power justifies putting any or all of it aside for later deficit years for essential services.  GO bonds and CW-guaranteed bonds do not provide for acceleration.  The BIT analysis should assume the surplus is available for and used for debt service, and not saved for future deficit years or deposit into the pension system.  <br><br>**BASIS**:  A court may not be willing to allow the Commonwealth to set aside large amounts for future deficit years if it means cutting the creditors' nearer term recovery. |
| 3. | **Restricted/Unrestricted Cash** | **ASSUMPTION:** Only unrestricted cash is available for debt service generally, and cash restricted for certain creditors is available solely for those creditors to the extent required by Commonwealth or other applicable law.  <br><br>**BASIS:**  Cash in accounts subject to other restrictions under federal or Commonwealth law is not available for debt service if the restrictions are in the nature of security interests, liens, or setoff or recoupment rights. |
| 4. | **Clawback:**[2] Would the public corporations ordinarily entitled to receive clawback revenues ("clawback entities") assert a valid claim against the Commonwealth for any | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  A clawback entity or its bondholders may assert a claim against the Commonwealth for clawback funds the Commonwealth used for operating expenses, but not for clawback funds used to pay GO bonds or CW-guaranteed bonds.  This claim is an unsecured, non-priority (*i.e.*, |

---

[2] For the avoidance of doubt, the use of the term "clawback" shall not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver in current or future litigation regarding revenues conditionally allocated by the Commonwealth to certain Commonwealth instrumentalities.  A review of the relevant clawback statutes and pertinent quotations are attached as Exhibit 1.

| Question | Assumption |
|---|---|
| amount of clawback revenues used to fund Commonwealth operating expenses or debt? | subordinated to GO debt) claim for unauthorized clawback against the Commonwealth in addition to the claim against the clawback entity (*i.e.*, the issuer) for the portion of clawback funds used for operating expenses, but not for the portion used for payment of GO debt service or CW-guaranteed debt service.  The adjudication of the claim will turn on many factors including the police power, preemption, and the facts underlying each clawback.<br><br>**BASIS**: Clawback used to pay GO debt service under the plan of adjustment in which GO claims are not paid in full are not subject to the attack that clawback funds were used for the wrong purpose because pursuant to Section 8 of Article VI of the PR Constitution, clawback revenues can be used for debt service on general obligations. Section 8, however, appears subject to the CW police power. Bondholders will also likely contest clawback (past and future) on the ground it was unnecessary because in their view there were sufficient available revenues to pay GO debt service.  Based on that argument and/or because the police power is used to deploy clawback funds to pay operating expenses and not GO debt service, bondholders will assert claims against CW for the amount of clawback funds allegedly unnecessarily taken to pay GO debt service or taken pursuant to the police power to pay CW operating expenses or clawback entity operating expenses.   Even if no clawback right existed, the CW police power, subject ultimately to court adjudication, could justify cessation of appropriating money to clawback agencies for debt service and use of the funds for essential services at the CW or clawback agencies.<br><br>Thus, it is assumed that as long as the Commonwealth could not afford to pay its expenses in a given year, it exercises police power to clawback revenues and then distributes them according to need (*i.e.*, may use some to cover operating expenses for itself, instrumentalities, including clawback entities, and debt service).  It is assumed that clawback revenues can be used to pay Commonwealth GO debt and debt *pari passu* to GO bonds when the Commonwealth has sufficient funds to pay its operating expenses. In the event that clawback revenues are not required to be used in full to pay GO debt and debt *pari passu* to GO debt in a given year, any amount of remaining clawback revenues are returned to their corresponding public corporations. If the Commonwealth has insufficient funds to pay its operating expenses in any given year, it is assumed it can exercise police power to use clawback revenues to |

3

| Question | Assumption |
|---|---|
| | pay for those expenses, with the police power potentially giving rise to claims against the CW for the amount of clawback funds used.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: All clawback (whether pursuant to Section 8 or the police power) was permissible, so the clawback entity or its bondholders can assert no claim as a result of clawback.<br><br>**BASIS**: Unlike in Assumption 1, the Commonwealth would be allowed to use clawback funds for operating expenses pursuant to its police power without giving rise to claims against the CW.<br><br>**ASSUMPTION 3 [LITIGATION RISK]**:  No clawback was permissible, so the clawback entity or its bondholders can assert a claim as a result of clawback used for both operating expenses and GO bonds and CW-guaranteed bonds.  If Titles I and II preempt the Commonwealth's preexisting statutory appropriations to HTA and the other clawback entities, there are no restrictions on the Commonwealth's use of clawback funds, but the clawback entity or its bondholders might sue the Commonwealth for impairing the bond obligations to them and assert claims against the Commonwealth for that impairment.  Specifically, in each year in which the debt service on bonds of the entity that would otherwise receive clawback revenues is not paid, we would assume the clawback entity or such bondholders may assert an unsecured, non-priority (*i.e.*, subordinated to the GO debt) claim against the Commonwealth in addition to their claim against the clawback entity (*i.e.*, the issuer).<br><br>**BASIS**:  Titles I and II allow for clawback by providing the Oversight Board with power over budget appropriations, but a damage claim may still be asserted as a result of that clawback. |
| **5.**   **Fiscal Plan Measures – Implementation Risk**:  Is there a risk the fiscal plan measures will not be fully implemented? | **ASSUMPTION**:  Assume a range of recoveries based on high or medium implementation risk of fiscal measures and/or structural reforms.<br><br>**BASIS**:  A dismissal of the Title III case and further political and economic uncertainties could affect the implementation of fiscal measures.  Before and during Puerto Rico's turmoil leading to Governor Rosselló's resignation, the Oversight Board found its recommended measures and structural reforms were not |

| | | Question | Assumption |
|---|---|---|---|
| | | | being timely implemented.  After dismissal of Title III cases, it is very possible the government would cooperate less with the Oversight Board and creditors seeking to maximize their recoveries. |
| 6. | | **Operating expenses (including pensions) priority:** Will operating expenses be paid before GO and *pari passu* debt is paid? | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  Assume operating expenses outlined in the certified fiscal plan are paid before debt service.  Further assume that pension benefits accrual for teachers (TRS) will be frozen as the certified fiscal plans have provided, but that there will be no freeze of benefits accrual for judges (JRS).  As a consequence, assume teachers under the age of 45 receive social security as of January 1, 2020.<br><br>**BASIS:** The fiscal plan already projects reductions in operating expenses through a series of fiscal measures aimed at reducing government-wide expenditures to adapt the budget to a size appropriate for PR's population. The certified fiscal plan projects savings of ~$13.6 billion from FY2019 to FY2024, which represents ~15% of the baseline expenses in such period. When considering only the agencies that have a reduction, the cut represents ~25% of the baseline expense of this addressable group. Additionally, Puerto Rico cut public pensions significantly before PROMESA was enacted.  This sensitivity assumes additional cuts would be detrimental to the economy of Puerto Rico, but consistently with the current fiscal plan, pension levels would be frozen, which gives rise to unsecured judgment claims.<br><br>Teachers currently do not receive Social Security as this group is exempt from this benefit because of the "Section 218" agreement between the Commonwealth and the Social Security Administration, which stipulates that government employees may be exempt from Social Security if they participate in a "comparable" retirement plan such as one which includes total employee and employer contributions equal to at least 7.5% of employee wages. However, with the freeze in the accrual of benefits in their pension plan, teachers may be covered under Social Security.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: Assume the Commonwealth's exercise of police power is deemed not fully permissible without the creation of CW liabilities for its deployment, especially if not all fiscal plan savings measures are implemented. Therefore, the Commonwealth would be directed to use a portion of its resources to pay debt before paying operating expenses. The sensitivity analysis should take the |

| | Question | Assumption |
|---|---|---|
| | | non-debt expenses (operating and capital expenses, including pension payments) in the certified fiscal plan and determine the amounts available for debt service if such non-debt expenses are decreased by an additional 2%, 4%, 6%, 8%, and 10% (if economic sustainability of the CW is not at risk at that point).<br><br>**BASIS**:  Police power allows the payment of essential expenses first, but a court may minimize the impact of the police power by not freeing up available revenues for some operating expenses and pension payments to the extent it would not jeopardize the public health, safety, and welfare. |
| 7. | **PFC Bonds**:  Do PFC Bonds constitute allowable claims? | **ASSUMPTION**: No.<br><br>**BASIS**: PFC Bonds do not have a right to payment, which is a requirement for claims under CW law and Bankruptcy Code section 101(5).  The payment of such promissory notes is subject to the discretionary appropriation of funds by the Legislature. PFC Bond documents disclosed that (1) the Legislature is not legally bound to appropriate funds to pay the PFC Bonds and (2) the PFC Bonds do not constitute an obligation of the CW. |
| 8. | **PRIFA BANs:** Have PRIFA BANs been paid off using Crudita revenues since 2016? | **ASSUMPTION**: PRIFA BANs were subject to the moratorium and have not been paid.  Note that PRIFA BANs are guaranteed by the CW. Absent the automatic stay, the moratorium may be ruled a violation of PROMESA section 303 and the PRIFA BANs will be entitled to payment. |
| 9. | **Additional Interest:**  Should debt (principal + interest) that remained unpaid during the stay accrue additional interest? | **ASSUMPTION**: Assume that in years where full payment of matured debt is not made, subsequent payments are first credited against interest, and then against principal.<br><br>   i.  **Interest on GO debt during stay**:  Pursuant to PROMESA section 303, interest continues to accrue at the contract rate during any moratorium, unless the underlying contract provides for default interest, in which case the latter should be used.  There is no statutory provision for interest on interest.<br>  ii.  **Interest on GO *pari passu* debt during stay**: Same criteria apply as for GOs.<br> iii.  **Interest on unsecured claims during stay**: Assume no interest accrues. |

| | Question | Assumption |
|---|---|---|
| | | iv. **Interest on federal claims during stay**: Assume interest accrues during moratorium because the federal government can ultimately collect its debt and interest through setoffs against future aid. The documents underlying each federal claim may set the interest rates. The current federal judgment rate is 1.76% per year.<br>v. **Interest on unpaid debt**: Assume any unpaid debt accrues interest according to the weighted average coupon rate as of 2019 provided by CITI (each debt group of GO *pari passu* has its own rate).<br>vi. **Interest on interest during FY19-58**: No. Interest on interest should not accrue. Interest on interest is subject to equitable principles in the absence of an express contract right, but it is not allowed under CW law and therefore should not be available. |
| 10. | **Federal Government Claims:** What is the priority for both secured and unsecured federal claims? Are the documents comprehensive? | **ASSUMPTION**: Federal claims need to be paid in full.<br><br>**BASIS**: The federal government can offset unpaid claims against federal funds otherwise to be received by the Commonwealth - the U.S. Treasury's offset program (TOP) could be engaged immediately and the total amount owed to the federal government would be withheld from future federal transfers to the CW. |
| 11. | **ERS Bondholders' Claims:**[3] What is the value of ERS bondholder claims against the Commonwealth? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: ERS bondholders successfully assert constitutional claims (Takings and/or Contract Clauses) against the CW. In each year their debt service is not paid, ERS bondholders may assert that amount against the Commonwealth as an unsecured claim paid after GO and *pari passu* debt.<br><br>**BASIS**: ERS bondholders assert Act 106-2017, which eliminated employer contributions under the ERS enabling act, effected an impairment of contractual rights and a taking of their collateral, in violation of the Puerto Rico and U.S. Constitutions. Additionally, section 552, which eliminated the security interest in employer contributions arising after the ERS petition date independent of the effect of Act 106, would likely no longer apply after the dismissal of the ERS Title III case, |

---

[3] For ERS bondholders' claims against ERS, see the assumptions for the ERS best interests test analysis.

| | Question | Assumption |
|---|---|---|
| | | which would leave Act 106 as the only basis for the elimination of their collateral and thus a violation of the Contract and/or Takings Clauses. |

**ASSUMPTION 2 [LITIGATION RISK]**:  ERS bondholders have a security interest in future employer contributions, and PayGo Payments are adjudicated to be the same as or proceeds of Employers' Contributions, and thus the ERS bondholders have secured claims against the Commonwealth secured by a security interest in PayGo Payments.  Their debt service including outstanding principal and interest, is paid before GO or CW-guaranteed debt.

This assumption should be run as if the secured claims against the employer contributions have a 0%, 25%, 50%, 75%, and 100% chance of success.
If the CW runs into deficits before ERS bonds are paid in full, assume the CW can justify the use of police power for the payment of all its expenses, including pensions, in full, and there is no money left to pay ERS bonds or other debt.

**BASIS**:  ERS bondholders have asserted that PayGo Payments are the same asset as employer contributions, or proceeds thereof, and thus are subject to the ERS bondholders' security interest, making them a secured creditor of the Commonwealth.  They would also likely assert that this security interest, even if eliminated by section 552 upon ERS's petition date, would be reinstated upon the dismissal of ERS's title III case.

**ASSUMPTION 3 [LITIGATION RISK]**:  ERS bondholders have no claims against the CW.

**BASIS**:   Even if ERS bondholders had a security interest in future contribution rights, the bondholders were put on notice by the bond offering statement that those rights might be modified or adversely affected by the Commonwealth, which Act 16-2017 did by eliminating any employer contributions to ERS.  The fact that the ERS bondholders were on notice of such potential modification could also significantly diminish their chances of asserting a successful contract impairment or takings claim. Additionally, the best interests test should assume bondholder rights and remedies are on account of their claims as they existed immediately prior to the hypothetical dismissal of the ERS case and not adjusted under the ERS plan, *i.e.*, secured only by

| | Question | Assumption |
|---|---|---|
| | | employer contributions arising prior to the ERS petition date, but not after, as a result of section 552.  Thus, the ERS bondholders had no contract rights or collateral that was impaired or eliminated by operation of Act 106.  Note that, most likely, by the time of the confirmation hearing, whether the ERS bondholders' secured claims are largely eliminated by Bankruptcy Code section 552, will be known as the issue is currently being briefed for the First Circuit.<br><br>**ASSUMPTION 4 [LITIGATION RISK]**:  ERS bondholders have no claims against the Commonwealth because the ERS bonds were issued *ultra vires*.<br><br>**BASIS**:  The court finds the ERS bonds were an *ultra vires* issuance, and the bondholders' are not entitled to any equitable remedies |
| 12. | **CRIM (Property Tax)** | **ASSUMPTION:**  The 1.03% special property tax collected by CRIM is used to pay GO bondholders, but the CW could exercise police power to use such revenue to cover essential services if it is running a deficit and all other funds available have been applied to necessary operating expenses and/or GO debt service.<br><br>**BASIS:** Acts 39-1976 and 83-1991 require that the 1.03% special property tax be covered into the GO Redemption Fund and used solely for the payment of GO Bonds.  In a scenario in which the CW is paying GO and GO guaranteed debt, such funds deposited in the GO Redemption Fund should be used first to pay GO bonds.  As in all scenarios, the amount paid to GO and CW guaranteed debt should be *pro rata*, (*i.e.*, the allocation of the 1.03% revenue to GOs should not result in a higher recovery for GOs than CW-guaranteed debt in any given year). |
| 13. | **IFCU (Independently Forecasted Component Units):** Is their revenue "available resources"? | **ASSUMPTION 1 [MAIN ASSUMPTION]:** IFCU's are public corporations legally separate from the CW. IFCU's own revenues should be considered unavailable for CW creditors such as GO bondholders. If the Commonwealth provides an appropriation to an IFCU running a surplus, it should be assumed that the Commonwealth reduces the appropriation until the IFCU runs a balanced budget.<br><br>**BASIS:** Revenues generated by instrumentalities legally separate from the CW are not available to the CW and it would require enabling legislation to transfer such revenues to the CW. However, in a scenario where the CW exercises its police |

| | Question | Assumption |
|---|---|---|
| | | powers to pay for essential services, it should be expected that the CW would not grant appropriations to instrumentalities running a surplus.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: IFCU surplus can be used by the Commonwealth.<br><br>**BASIS**: PROMESA section 201(b)(1)(M) provides that a fiscal plan "shall […] ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under subchapter III, or a Qualifying Modification approved under subchapter VI."  Since a Title III plan or Title VI Qualifying Modification would not be available in the best interests test scenarios, the transfer could be accomplished based on legislation enacted in accordance with the Commonwealth Constitution. In the past, the Commonwealth has employed legislation that authorized IFCUs such as SIFC, AACA, Tourism and PRIDCO to provide liquidity support to the Commonwealth in the form of loans or contributions. Act 26-2017 also authorizes the CW to pull in resources from public corporations. Whether these laws are preempted by PROMESA would likely be litigated. |
| 14. | **Are Commonwealth tax revenues allocated to PRIDCO's Special Fund for Economic Development and the slot machine revenues of the Tourism Company available resources?** | **ASSUMPTION 1 [MAIN ASSUMPTION]**: They are not available resources (consistent with assumption 13).<br><br>**ASSUMPTION 2 [LITIGATION RISK]:** As those revenue streams belong to the Commonwealth, it can exercise its police powers to capture those funds.<br><br>**BASIS**: Act 73-2008 ordered the Treasury Secretary to create the Special Fund for Economic Development ("FEDE" by its Spanish acronym) managed by PRIDCO. FEDE receives 10% of: (1) taxes paid by businesses that receive a tax grant under Act 73 or prior industrial incentives statutes or (2) tax withholdings related to royalties of operations exempt under Act 73 or prior industrial incentives statutes.[4] |

---

[4] 13 L.P.R.A. section 10657(a).

| Question | Assumption |
|---|---|
| | Such taxes allocated to FEDE should be considered resources available to the Commonwealth.<br><br>Pursuant to Section 8 of Article VI of the CW Constitution, we believe the Treasury Secretary could withhold the transfer of tax revenues to PRIDCO and instead use it to service GO debt.  It could, subject to court approval, also be withheld by the CW pursuant to its police power.<br><br>Note that suspending transfers to FEDE would affect the economic development program supported by the fund and Puerto Rico's industrial base, which could harm economic activity.<br><br>For the slot machine revenues, Act 221-1948 provides that such revenues, collected by the Tourism Company, will be deposited in a special fund of the Tourism Company.  After deducting operational (including payroll) and amortization costs related to the slot machines, the net annual revenues are distributed to: (1) casino operators, (2) the Commonwealth General Fund, (3) the UPR, and (4) two special funds of the Tourism Company. [5]<br><br>The two funds of the Tourism Company are: (1) a special fund used to pay he Tourism Company's corporate purposes; and (2) the Puerto Rico Tourism Industry Development Fund ("Fondo para el Desarrollo de la Industria Turística de Puerto Rico") established to strengthen and develop the tourism industry.  Act 221 sets a formula according to which a portion of the slot machine revenues is transferred to each of the funds.<br><br>The Commonwealth could use Act 26-2017 ("Fiscal Plan Compliance Act") to draw surplus revenues from the Tourism Company or pass legislation amending Act 221 and reallocating the revenues to the Commonwealth.  As noted above with respect to suspending transfers to FEDE, eliminating funds used to develop the tourism industry could harm Puerto Rico's economic activity. |

[5] 15 L.P.R.A. section 74.

| | Question | Assumption |
|---|---|---|
| 15. | **Should the challenges to the GO bonds and certain Commonwealth-guaranteed debt be taken into consideration?** | **ASSUMPTION 1 [MAIN ASSUMPTION]:**  Yes. In this main assumption, assume that certain of such challenges are successful starting in 2012, and the corresponding bonds (GO bonds and PBA bonds issued in 2012 and after) and CW guarantees issued in 2012 and after would be deemed invalid and the bondholders holding such claims would have no claim against the Commonwealth (including any claim for unjust enrichment or other similar claim).<br><br>**BASIS:**  In the Commonwealth Title III case, the Oversight Board, through its Special Claims Committee, and the statutory unsecured claimholders' committee (the "UCC") commenced litigation contending GO bonds issued in 2012 and 2014 violated Puerto Rico's constitutional debt limit, and that claims by purported holders of such GO bonds for principal and interest should be disallowed. The Oversight Board has also alleged that the PBA Leases are not true leases and obligations purportedly due thereunder, but rather, are simply mischaracterized general obligations of the Commonwealth.<br><br>**ASSUMPTION 2 [LITIGATION RISK]:**  Yes. Assume all challenges in Assumption 1 are successful, and that, in addition, the GO bonds, PBA bonds, and CW guarantees issued in March 2011 and after would also be deemed invalid and the bondholders holding such claims would have no claim against the Commonwealth (including any claim for unjust enrichment or other similar claim).<br><br>**BASIS**:  In addition to the challenges mentioned in the basis above, the UCC also challenged claims relating to GO bonds issued in and after March 2011 and for claims relating to PBA bonds issued in and after March 2011. There are also arguments that certain Commonwealth guarantees issued in and after March 2011 may be invalid. This assumption assumes that the UCC objections to claims relating to GO and PBA bonds issued in and after March 2011, and claims relating to Commonwealth guarantees issued in and after March 2011, are sustained.[6] |

---

[6] Please note that this assumption is for illustrative purposes only.  The Oversight Board has not joined the UCC objection as to the GO Bonds issued prior to 2012 or to the objection to the PBA bonds issued in and after March 2011.  The Oversight Board continues to assess the litigation risk associated with these bond issuances and may make adjustments to the treatment of such bond claims prior to the hearing on the Disclosure Statement.

| | Question | Assumption |
|---|---|---|
| | | **ASSUMPTION 3 [LITIGATION RISK]**:  No. Assume bonds and guarantees listed in the debt stack below are valid and enforceable. |
| | | **BASIS:** The challenges explained in the bases above could be unsuccessful. |
| **16.** | **To avoid paying GO debt, is the Secretary of Treasury likely to resign or simply refuse to transfer available revenues to GO debtholders?** | **ASSUMPTION**:  The CW Treasury will comply timely with its payment obligations and not suffer resignations of the Secretary of Treasury or other events that would delay or diminish payments, and that the CW would not launch a tender offer discounting the debt.

**BASIS**:  Although all such events are plausible, we will assume all government officers carry out their duties and that exogenous factors do not diminish creditor recoveries. |

## DEBT STACK[7]

1. **Operating Cost**
   a. May 9, 2019 Fiscal Plan, Exhibit 17: Major Expenditure Categories Pre-Measures and Structural Reforms

### EXHIBIT 17: MAJOR EXPENDITURE CATEGORIES PRE-MEASURES AND STRUCTURAL REFORMS

Key baseline expenditure drivers (pre-measures and structural reforms), $M

| | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 | FY2024 |
|---|---|---|---|---|---|---|---|
| Payroll (non-federally funded) | 2,996 | 2,961 | 2,970 | 3,002 | 3,037 | 3,081 | 3,126 |
| Direct operating expenditures (non-federally funded)[1] | 1,508 | 1,736 | 1,617 | 1,659 | 1,676 | 1,707 | 1,732 |
| CW appropriations[2] | 1,274 | 1,246 | 1,134 | 1,348 | 1,358 | 1,346 | 1,356 |
| Commonwealth Medicaid expenditures | 120 | 0 | 992 | 2,124 | 2,199 | 2,283 | 2,375 |
| Pension expenditures | 2,254 | 2,260 | 2,398 | 2,381 | 2,334 | 2,325 | 2,321 |
| Other[3] | 2,728 | 2,736 | 2,599 | 2,482 | 2,325 | 2,298 | 2,210 |
| IFCU & CW SRF Expenditures[4] | 2,544 | 2,816 | 2,969 | 3,056 | 3,083 | 3,122 | 3,164 |
| Federally funded expenditures[5] | 6,560 | 7,089 | 5,835 | 4,794 | 4,864 | 4,938 | 5,014 |
| **Total** | **19,984** | **20,843** | **20,513** | **20,847** | **20,876** | **21,101** | **21,298** |

1 Includes only General Fund operating expenses. Previous versions of Fiscal Plan included DRF and GF
2 Includes appropriations to HTA, UPR, and municipal expenses
3 Includes disaster recovery cost match, restructuring expenditures, loan to PREPA, maintenance capex, enterprise funds, disbursements to entities outside the fiscal plan, and other non-recurring and recurring costs; excludes adjustments for expenditure gross up
4 IFCU and CW SRF expenditures were previously included in 'Other' expenditures; for IFCUs, it includes all fund types (Federal Funds, General Funds, and DRF)
5 Includes federal funds for payroll, direct operating expenditures, Medicaid, and social programs; excludes Independently Forecasted Component Units

   b. **Adjustments from Fiscal Plan**
      i. No pension freeze for JRS beneficiaries, and no 10% cut to pensions.  Additionally, future contributions to social security for judges are also eliminated, as those payments are dependent on the freeze of the pension benefit accrual.
      ii. Legal professional fees costs recur through FY2029, assuming extensive litigation needs without Title III protections or a plan of adjustment. FY19 legal fees would be double the current projected legal fees, then they would grow by inflation through FY23, after which they fall by 50% by FY23. Then, they grow by inflation until FY29 and eliminated at the end of that year.  Non-legal professional fees fall by 50% once the Title III cases are dismissed and grow by inflation until FY29.
      iii. Assume federal claims come due when the stay is lifted. These should be included as an expense/revenue reduction to the surplus available for debt service, as the

---

[7] The financial information contained herein relies on information available in the most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth's advisors.  The legal advisors take no position as to the accuracy of the financial information provided herein.

In certain parts of the debt stack, only information related to the main assumption above is incorporated.

federal government can reduce transfers to Puerto Rico in the amount owed.
Assume recurring federal cost disallowance claim, which must also be paid in full.[8]
Federal claims represent a total of $329 million, while the recurring federal cost
disallowance is $65 million based on based on 2016 CAFR, which shows
Commonwealth recorded a payment of $65.2 million.

    iv.   Assume that in years where full debt payment is not possible payment provided is
first credited against interest, and then against principal.

**2. Unsecured Debt**

    a.   $33 million (approximately) loan by the General Services Administration for police
helicopters, bearing 3.02% interest and maturing on July 15, 2020.  This loan is *pari passu*
with GO debt.

**3. Public Debt of the Commonwealth under Article VI, Section 8 of the Commonwealth
Constitution**

    a.   **GO Bonds**

| | Issue Date | Amount Issued | Range of Interest Rates | Final Maturity Date | Balance as of Commonwealth Petition Date |
|---|---|---|---|---|---|
| Public Improvement Bonds of 1998 | 3/15/98 | $500,000,000 | 6.00 | 7/01/16 | $18,655,000 |
| Public Improvement Bonds of 1999 | 12/01/98 | $475,000,000 | 5.00 – 5.25 | 7/01/28 | $63,695,000 |
| Public Improvement Bonds of 2001, Series A | 6/07/01 | $274,135,000 | 5.25 – 5.50 | 7/01/20 | $224,145,000 |
| Public Improvement Bonds of 2002, Series A | 10/25/01 | $455,000,000 | 5.13 – 5.50 | 7/01/31 | $301,955,000 |
| Public Improvement Bonds of 2003, Series A | 8/08/02 | $460,000,000 | 5.50 | 7/01/22 | $115,470,000 |
| Public Improvement Bonds of 2004, Series A | 10/16/03 | $457,175,000 | 5.00 – 5.25 | 7/01/30 | $149,720,000 |
| Public Improvement Bonds of 2005, Series A | 10/07/04 | $440,460,000 | 5.00 – 5.25 | 7/01/31 | $295,040,000 |
| Public Improvement Bonds of 2006, Series A | 8/10/06 | $500,000,000 | 1.86 – 5.25 | 7/01/30 | $400,920,000 |
| Public Improvement Bonds of 2006, Series B | 8/30/06 | $39,380,000 | 5.25 | 7/01/17 | $39,380,000 |
| Public Improvement Bonds of 2007, Series A | 10/04/07 | $408,800,000 | 5.00 – 5.25 | 7/01/37 | $408,800,000 |
| Public Improvement Bonds of 2008, Series A | 9/18/08 | $250,000,000 | 5.00 – 6.00 | 7/01/38 | $223,750,000 |
| Public Improvement Bonds of 2011, Series A | 7/12/11 | $304,000,000 | 5.75 | 7/01/41 | $304,000,000 |
| Public Improvement Refunding Bonds, Series 1998 | 1/29/98 | $503,963,264 | 4.50 – 4.95 | 7/01/23 | $112,675,917 |

---

[8] Information regarding amounts of federal claims was provided by other Oversight Board advisors.

| | Issue Date | Amount Issued | Range of Interest Rates | Final Maturity Date | Balance as of Commonwealth Petition Date |
|---|---|---|---|---|---|
| Public Improvement Refunding Bonds, Series 2000 | 4/05/00 | $55,910,993 | 5.80 | 7/01/19 | $10,821,641 |
| Public Improvement Refunding Bonds, Series 2001 | 6/07/01 | $337,235,000 | 5.13 | 7/01/30 | $40,640,000 |
| Public Improvement Refunding Bonds, Series 2002A | 10/25/01 | $837,960,000 | 4.50 – 5.50 | 7/01/21 | $632,955,000 |
| Public Improvement Refunding Bonds, Series 2003A | 8/08/02 | $89,610,000 | 5.50 | 7/01/17 | $27,770,000 |
| Public Improvement Refunding Bonds, Series 2003C-7 | 5/06/03 | $194,610,000 | 6.00 | 7/01/28 | $194,610,000 |
| Public Improvement Refunding Bonds, Series 2006A | 6/23/06 | $101,695,000 | 5.00 | 7/01/35 | $75,390,000 |
| Public Improvement Refunding Bonds, Series 2006B | 8/10/06 | $335,650,000 | 5.00 – 5.25 | 7/01/35 | $128,235,000 |
| Public Improvement Refunding Bonds, Series 2007A | 10/16/07 | $926,570,000 | 5.00 – 5.50 | 7/01/22 | $267,340,000 |
| Public Improvement Refunding Bonds, Series 2007A-4 | 10/16/07 | $93,835,000 | 5.00 – 5.25 | 7/01/31 | $93,835,000 |
| Public Improvement Refunding Bonds, Series 2008A | 5/07/08 | $735,015,000 | 4.00 – 5.50 | 7/01/32 | $467,280,000 |
| Public Improvement Refunding Bonds, Series 2008C | 5/07/08 | $190,135,000 | 5.20 – 5.90 | 7/01/28 | $159,275,000 |
| Public Improvement Refunding Bonds, Series 2009A | 9/17/09 | $3,425,000 | 5.63 | 7/01/31 | $3,425,000 |
| Public Improvement Refunding Bonds, Series 2009B | 11/17/09 | $372,685,000 | 5.75 – 6.50 | 7/01/39 | $372,685,000 |
| Public Improvement Refunding Bonds, Series 2009C | 12/16/09 | $210,250,000 | 6.00 | 7/01/39 | $210,250,000 |
| Public Improvement Refunding Bonds, Series 2011A | 2/17/11 | $356,520,000 | 5.25 – 6.50 | 7/01/40 | $356,520,000 |
| Public Improvement Refunding Bonds, Series 2011C | 3/17/11 | $442,015,000 | 5.25 – 6.50 | 7/01/40 | $442,015,000 |
| Public Improvement Refunding Bonds, Series 2011D | 7/12/11 | $52,190,000 | 3.13 – 5.00 | 7/01/20 | $50,735,000 |
| Public Improvement Refunding Bonds, Series 2011E | 7/12/11 | $245,915,000 | 5.38 – 6.00 | 7/01/34 | $245,915,000 |
| Public Improvement Refunding Bonds, Series 2012A | 4/03/12 | $2,318,190,000 | 4.00 – 5.75 | 7/01/41 | $2,318,190,000 |
| Public Improvement Refunding Bonds, Series 2012B | 3/29/12 | $415,270,000 | 3.65 – 5.30 | 7/01/33 | $222,375,000 |
| General Obligation Bonds of 2014, Series A | 3/17/14 | $3,500,000,000 | 8.00 | 7/01/35 | $3,500,000,000 |

    b. **GDB Loans (pari passu with GO Bonds) ($169M in principal and $49M of interest accrued as of June 30, 2019)**

        i. Per the GDB Offering Memorandum, attached to the Solicitation Statement of Qualifying Modification, dated August 9, 2018 (the "OM") at p. E-124-25, these constitute "public debt" and are part of the Commonwealth general obligations.

        ii. The GDB Title VI includes certain limitations on enforcement and collection, but if other similarly situated creditors (the GO Bondholders) enforced their rights and received a recovery, the GDB Debt Recovery Authority could claim the same treatment.

    c. **CW-guaranteed bonds (pari passu with GO Bonds)[9]**

        i. **PBA Bonds ($4.0B)**

            1. Scenario 1: Assume full liability paid by CW

                a. This is the most likely scenario based on PBA's dependence on the Commonwealth.

                b. Because the CW guarantee is a guarantee of collection, PBA bondholders must first seek to enforce their rights at PBA before seeking recovery at the CW. **Therefore, assume a year of delay before PBA bondholders can assert their rights at the CW** (*i.e.*, their debt service would be unpaid in the first year; thereafter, the accrued claim would be asserted, and paid by, the CW**)**.

        ii. **PRASA Sub Bonds ($284,755,000)**

            1. Scenario 1: Assume 0% liability paid by CW

            2. Basis: Given PRASA's financial condition, PRASA is unlikely to default on the remaining guaranty.

        iii. **PRIFA BANs ($78M)**

            1. Scenario 1: Assume full liability paid by CW

        iv. **APLA (Port of the Americas Authority) Bonds ($226M)**

            1. These bonds were transferred to the Issuer under the GDB Title VI deal as part of the "Transferred Property"

            2. Scenario 1: Assume 100% liability paid by CW

                a. This is the most likely scenario as the GDB Title VI OM noted (p. E-99) that GDB classified the loan as non-performing and it was expected that collections on the bonds, if any, would come from the Commonwealth.

**4. Other unsecured claims**

    a. GDB Title VI/Public Entity Trust Claim: $578 million

    b. Judgment claims: approximately $1 billion (*see* legal reserve for 2016 CAFR)

    c. Litigation claims: $5 billion, and run a sensitivity of $2.5 billion

    d. Trade payables: $315 million

---

[9] The CW also guaranteed $110 million of GDB bonds, but any rights of holders of such GDB bonds with respect to the Commonwealth's guarantee were extinguished upon the exchange and cancellation of the GDB bonds pursuant to the Title VI deal (GDB Title VI OM, p. 15).

e.  Lottery prizes: historically around $125 million.  The obligation for unpaid lottery prizes should be projected according to the 2017 draft CAFR

f.  Claims from Employee Retirement System (ERS) bondholders: Assume in the base case that ERS bondholders will assert an unsecured claim against the Commonwealth for any unpaid amount of ERS bonded debt

g.  Clawback claims: Assume in the base case that the clawback entity bondholders could assert an unsecured claim for the portion of clawback funds used for operating expenses, but not for the portion used for payment of GO debt service or CW-guaranteed debt service

**Exhibit 1**
**Clawback Statutes**

**Part I: Statutes Assigning Certain Clawbackable Revenues to HTA, MBA, PRIFA, PRITA, and CCDA**

| HTA | Motor Vehicle License Fees | 9 LPRA §§ 2004(l), 2021, 5681 &5682(e) | Paid by every owner of a motor vehicle subject to annual license fees at:<br>▪ internal revenue offices; or<br>▪ official inspection stations; or<br>▪ banks; or<br>▪ any place designated by the Secretary of Treasury | ▪ All motor vehicle annual license fees are covered by Treasury into a Special Deposit in the name and for the benefit of HTA. | 9 LPRA § 2004(l):<br><br>"Subject to the provisions of sec. 2005 of this title, the Authority is hereby empowered to: […] [t]o borrow money for any of its corporate purposes and issue bonds of the Authority in evidence of such obligations and guarantee the payment of said bonds and their interests through pledge or pignoration on all their properties, income, or income, and , subject to the provisions of Sec. 8 of Art.VI of the Constitution of Puerto Rico, pledge for the payment of said bonds and their interests, the proceeds of any contributions or other funds that may be made available to the Authority for the Commonwealth."<br><br>9 LPRA § 2021:<br><br>"The total proceeds of the fifteen-dollar ($15) increase in the fees to be paid for public and private automobile licenses shall be covered into a Special Deposit in behalf and for the benefit of the Highways and Transportation Authority of Puerto Rico, to be used by the Authority for its corporate purposes. Said Authority is hereby authorized to pledge or pignorate the proceeds of the collection thus received, to the payment of the principal and interest on bonds and other obligations of the Authority, or for any other legal purpose of the Authority; and said pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, until the other resources available, referred to in said section, are insufficient for such purposes, otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations." |
|---|---|---|---|---|---|

9 LPRA § 5681:

"Every owner of a motor vehicle subject to the payment of annual permit fees shall pay at any internal revenue collection office of any municipality, at the place designated by the Secretary of the Department of the Treasury, at official inspection stations, banks, or at the place designated by the Secretary, the rights that correspond to the vehicle for each year, as indicated in the notification that the Secretary must send to the effect. […]"

[…]

"Unless otherwise provided in this Act, the amount of the rights collected in accordance with secs. 5681 and 5682 of this title shall be entered in their entirety in a Special Deposit in the name and for the benefit of the Highway and Transportation Authority."

"The Authority is authorized to pledge or pignorate the proceeds of the collection received for the payment of the principal and the interest on bonds to other obligations or for any other lawful purpose of the Authority. Such commitment or pledge shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds of said collection will be used only for the payment of interest and amortization of the public debt, as provided in said Section 8 of Article VI of the Constitution, until the other available resources referred to in said section are insufficient for such purposes. Otherwise, the proceeds of such collection, in the amount that is necessary, will be used only for the payment of the principal and the interests of bonds and other obligations of the Authority and to comply with any stipulations agreed by it with the holders of such bonuses or other obligations."

9 LPRA § 5682(e):

| | | | | | |
|---|---|---|---|---|---|
| | | | | | "With regard to the rights to be paid under this chapter, the following rules will be followed: […] [t]he Special Deposit shall be maintained for the benefit of the Highway Authority to which the amount of fifteen (15) dollars will be covered into for each renewal of registration of private and public service cars." |
| **HTA** | Gasoline, Gas Oil and Diesel Oil Tax | 13 LPRA § 31751<br><br>9 LPRA 2004(l) | ▪ 16 cent per gallon on excise tax on gasoline and 4 cent per gallon of the excise tax on gas oil and diesel oil.<br><br>▪ Collected by Treasury, which then transfers every month, or as agreed with HTA, the amounts into a Special Deposit account in favor of HTA. | ▪ Gasoline, gas oil and diesel oil excise taxes are covered by Treasury into a special deposit in favor of HTA. | 13 LPRA 31751:<br><br>"In case the Commonwealth of Puerto Rico uses any amount of the tax collected on gasoline, of the four (4) cents of the tax on 'gas oil' or 'diesel oil' fixed in sec. 31626 of this title, or of the excise taxes on crude oil, partially manufactured products and finished products derived from petroleum and any other mixture of hydrocarbons fixed in sec. 31627 of this title for the payment of interest and amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization of the debt shall be reimbursed to the Highway and Transportation Authority for the revenues received by the Commonwealth of Puerto Rico in the next fiscal year, or in case such reimbursement is not possible in the next fiscal year, in the subsequent fiscal years, except those collections that have been committed to satisfy any obligation. The proceeds of said collections that are to be used under the provisions of this section to reimburse to the Highway and Transportation Authority the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization on the public debt, are not shall be deposited in the General Fund of the Commonwealth of Puerto Rico when they are collected, but shall be transferred to the Highway and Transportation Authority and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse such amounts to the Highway and Transportation Authority."<br><br>9 LPRA 2004(l):<br><br>"Subject to the provisions of sec. 2005 of this title, the Authority is hereby empowered to: […] To take money on |

| | | | | | loan for any of its corporate purposes and issue bonds of the Authority in evidence of such obligations and guarantee the payment of said bonds and their interests by means of pledge or other lien on all their properties, income, or income, and, subject to the provisions of Sec. 8 of Art.VI of the Constitution of Puerto Rico, pledging for the payment of said bonds and their interests, the proceeds of any contributions or other funds that may be made available to the Authority by the Commonwealth." |
|---|---|---|---|---|---|
| **HTA** | Petroleum Products Tax | 13 LPRA § 31571<br><br>9 LPRA 2004(l) | ▪ Secretary of Treasury shall transfer every month, the total amount of $12.25 per barrel or fractions are covered by the Treasury Secretary into Special Deposit in favor of HTA. | ▪ The total amount crude oil taxes and petroleum taxes are covered by Treasury into a special deposit in favor of HTA. | 13 LPRA 31571:<br><br>"In case the Commonwealth of Puerto Rico uses any amount of the tax collected on gasoline, of the four (4) cents of the tax on 'gas oil' or 'diesel oil' fixed in sec. 31626 of this title, or of the excise taxes on crude oil, partially manufactured products and finished products derived from petroleum and any other mixture of hydrocarbons fixed in sec. 31627 of this title for the payment of interest and amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization of the debt shall be reimbursed to the Highway and Transportation Authority for the revenues received by the Commonwealth of Puerto Rico in the next fiscal year, or in case such reimbursement is not possible in the next fiscal year, in the subsequent fiscal years, except those collections that have been committed to satisfy any obligation. The proceeds of said collections that are to be used under the provisions of this section to reimburse to the Highway and Transportation Authority the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization on the public debt, are not shall be deposited in the General Fund of the Commonwealth of Puerto Rico when they are collected, but shall be transferred to the Highway and Transportation Authority and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse such amounts to the Highway and Transportation Authority."<br><br>9 LPRA 2004(l): |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | "Subject to the provisions of sec. 2005 of this title, the Authority is hereby empowered to: […] To take money on loan for any of its corporate purposes and issue bonds of the Authority in evidence of such obligations and guarantee the payment of said bonds and their interests by means of pledge or other lien on all their properties, income, or income, and, subject to the provisions of Sec. 8 of Art.VI of the Constitution of Puerto Rico, pledging for the payment of said bonds and their interests, the proceeds of any contributions or other funds that may be made available to the Authority by the Commonwealth." |
| **HTA** | Cigarette Tax | 13 LPRA § 31751 | ▪ Treasury Secretary transfers $20,000,000 in cigarette revenues every fiscal year in monthly installments of up to $2,500,000. If during any month of the fiscal year the revenues from the excise tax are insufficient to make the payment, the Treasury Secretary shall cover such deficiency using any | ▪ The revenues collected from the tax on cigarettes up to $20,000,000 per fiscal year shall be covered into special deposit account in favor of the HTA. | "The amount of tax collected on cigarettes fixed by § 31625 of this title up to twenty (20) million dollars per fiscal year shall be deposited into a special deposit in favor of the Highways and Transportation Authority for its corporate powers and purposes."<br><br>"The Highways and Transportation Authority is hereby authorized to commit or pledge the product of the collection thus received from the cigarette excise tax fixed by § 31625, to pay the principal and interest of bonds or other obligations, or for any other legal purpose of the Authority. Such commitment or pledge shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Government of Puerto Rico. The product of said collection shall be used solely for the payment of interest and amortization of the public debt, as established by said Section 8 of Article VI of the Constitution, until the other available resources referred to in said section are insufficient for such purposes. Otherwise, the product of said collection, in the amount that is needed, shall only be used for the payment of principal and interest of bonds and other obligations of the Authority and to comply with any stipulations agreed by it with the holders of said bonds or other obligations." |

| | | | | | |
|---|---|---|---|---|---|
| | | | excess above the $2,500,000 revenues collected on previous or subsequent months of the same fiscal year. | | |
| **MBA** | Cigarette Tax | 13 LPRA § 31751 | ▪ Treasury Secretary shall transfer $10,000,000 in cigarette revenues every fiscal year in monthly installments of up to $800,000. If during any month of the fiscal year the revenues from said excise tax do not suffice to make the monthly payment installment, the Treasury Secretary shall cover such deficiency using any | ▪ The revenues collected from the tax on cigarettes up to $10,000,000 per fiscal year are covered by Treasury into special deposit account in favor of MBA. | "The amount of tax received from cigarettes fixed by § 31625 of this title up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by § 31625 of this title that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section." [...] "The Highways and Transportation Authority is hereby authorized to commit or pledge the product of the collection thus received from the excise tax on cigarettes fixed by section 31625 for payment of the principal and interest of its debts and obligations or for any other legal purpose of the Metropolitan Bus Authority. Such commitment or pledge shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Government of Puerto Rico. The product of said collection shall be used solely for the payment of interest and amortization of the public debt, as established by said Section 8 of Article VI of the Constitution, until the other available resources referred to in said section are insufficient for such purposes. Otherwise, the product of said collection, in the amount that is needed, shall only be used for the payment of |

| | | | excess of the $800,000 revenues collected on account of excise tax on previous [or subsequent] months of the same fiscal year. | | the principal and interest of debts and other obligations of the Metropolitan Bus Authority and to comply with any stipulations agreed by it with the holders of said bonds or other obligations." |
|---|---|---|---|---|---|
| **PRIFA-BANs** | Petroleum Products Tax | 13 LPRA § 31751a | ▪ An additional excise tax on petroleum product in the amount of $3.25 per barrel is collected by Treasury.<br><br>▪ Secretary of Treasury transfer all revenue collected from the additional $3.25 tax to PRIFA. | ▪ Proceeds from the petroleum products excise tax are covered by Treasury into a Special Fund for Economic Assistance for the Benefit of PRIFA for the payment of its bonded debt. | "The product from the taxes collected by virtue of section 31627a shall be covered into the Economic Assistance Special Fund of the Infrastructure Financing Authority established under Article 34 of Act No. 44 of June 21, 1988, and shall be used to (i) repay the obligations incurred by the Puerto Rico Infrastructure Financing Authority in order to refinance or repay those debts or obligations of the Highways and Transportation Authority that from time to time have been assumed or paid the Puerto Rico Infrastructure Financing Authority and (ii) the other purposes authorized under Article 34 of Act No. 44 of June 21, 1988, as amended. The Secretary shall transfer the amounts of such collections monthly or as agreed with the Puerto Rico Infrastructure Financing Authority. The Secretary is hereby authorized to establish a collection mechanism through which the proceeds that shall be deposited in the Economic Assistance Special Fund of the Infrastructure Financing Authority be paid by the taxpayer directly to the Puerto Rico Infrastructure Financing Authority, to a financial institution designated by the Secretary of the Treasury or the Infrastructure Financing Authority or the financial institution that acts as trustee in the trust agreement under which the Puerto Rico Infrastructure Financing Authority bonds are issued for which such collections are the source of repayment."<br><br>"According to article 34 of Act No. 44 of June 21, 1988, as amended, and subject to the conditions established therein, the product of the collections from the excise tax fixed in section |

| | | | | | 31627a is pledged to guarantee the repayment of the "Refinancing Bonds", the "Collateralized Obligations" and the "Transferred Debt", as such terms are defined in said article. The Puerto Rico Infrastructure Financing Authority is hereby authorized, after covering in any Fiscal Year the repayment of the principal and interest and any other obligation related to said Refinancing Bonds, said Collateralized Obligations and said Transferred Debt payable in said Fiscal Year, to commit or pignorate the product of the collection of said excise tax to be deposited in the Economic Assistance Special Fund of the Infrastructure Financing Authority, for the payment of the principal and interest of other bonds or other obligations or to sustain the obligations and operations of the Highways and Transportation Authority. Such commitment or pignoration shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The product of said collection shall be used only for the payment of interest and the amortization of public debt, as established by said Section 8 of Article VI of the Constitution, to the extent that the other available resources mentioned in said section become insufficient for such purposes." |
|---|---|---|---|---|---|

| PRIFA | Federal Excise Taxes | 3 LPRA § 1914 | • US Internal Revenue Code § 7652(a)(3) provides that all taxes collected on articles produced in PR (e.g., rum) and shipped to the US, or consumed on the island, shall be covered into the Treasury of Puerto Rico.<br><br>• The first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year shall be covered into a Special Fund to be maintained by or on behalf of PRIFA, designated as the Puerto | • From FY 2007 – FY 2057, the amount of the transfer shall be $117,000,000. | "Beginning with Fiscal Year 1988-89, notwithstanding the provisions of Section 29A of Act No. 143 of June 30, 1969, as amended, the first collections of federal taxes sent to the Department of the Treasury of Puerto Rico in each year fiscal, pursuant to § 7652(a)(3) of the Internal Revenue Code of the United States of 1986, as amended, up to a maximum amount of thirty million dollars ($30,000,000), in the case of Fiscal Year 1988-89 , up to a maximum amount of forty million dollars ($40,000,000), in the case of Fiscal Years 1989-90 to 1996-97, up to a maximum amount of sixty million dollars ($ 60,000,000), in the case of Fiscal Year 1997- 98, up to a maximum amount of seventy million dollars ($ 70,000,000), in the case of Fiscal Years 1998-1999 to 2005-06,and up to a maximum amount of ninety million dollars ($ 90,000,000), in the case of Fiscal Years 2006-07 to 2008-09, and in the subsequent years until Fiscal Year 2056-57 the participation will be up to an amount of one hundred and seventeen million dollars ($ 117,000,000), which shall be paid upon receipt by the Department of the Treasury of Puerto Rico in a Special Fund to be maintained by or on behalf of the Authority, designated as the "Infrastructure Fund of Puerto Rico" and shall be will be used by the Authority for its corporate purposes, which will include the development of the necessary and convenient infrastructure for the completion of the Mayagüez 2010 Central American and Caribbean Games."<br><br>[…]<br><br>"The Authority is authorized to segregate a portion of said Funds into one (1) or more subaccounts and to pledge all or part of the funds in one (1) or more sub-accounts, subject to the provisions of Sec. 8 of Art. VI. of the Constitution of the Commonwealth of Puerto Rico, for the payment of the principal and interests of bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a beneficiary entity, or for any other legal purpose of the Authority. The funds of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided by said Sec. 8, only |

| | | | Rico Infrastructure Fund. | | when the other resources available, mentioned in said Section, are not sufficient for such purposes." |
|---|---|---|---|---|---|
| **CCDA** | Hotel Room Tax | 13 LPRA § 2271v | Paid by the guest at the time of paying the room occupancy rate to the hotelier. Every hotelier shall be obligated to collect and remit such tax to the PR Tourism Company ("<u>PRTC</u>"). | ▪ Each year GDB/AAFAF determines and certifies to the PRTC the amount necessary for CCDA to meet its debt service. PRTC makes monthly installments to GDB up to the annual amount certified by GDB. The hotel room tax revenues are deposited at a CCDA account held at [GDB] for the benefit of the CCDA bondholders. | "The [Tourism] Company shall distribute all funds collected from the tax imposed under § 2271o of this title, as follows: (a) Before the beginning of each fiscal year, the [GDB] shall determine and certify to the [Tourism] Company and to the [CCDA], the amount necessary for the [CCDA] to make, during such fiscal year and the first day of the following fiscal year: (1) Full and timely payment, or the amortization of the principal and interest on the obligations incurred by the [CCDA] with the [GDB] or the bonds, notes or other obligations issued, assumed or incurred by the [CCDA], pursuant to Act No. 142 of October 4, 2001, as amended, with the prior written authorization of the [Tourism] Company , to exclusively carry out the development and construction of a new convention center and its related infrastructure; (2) full and timely payment of the obligations of the [CCDA] under any bond related financing agreement, as this term is defined at the end of this subsection, entered into by the [CCDA] with the prior written authorization of the [Tourism] Company ; (3) the deposits required to replenish any reserves established to ensure the payment of the principal and the interest on such bonds, notes and other obligations issued, assumed or incurred by the [CCDA], or obligations under any bond related financing agreement, and (4) any other expenses incurred in connection with the issuance of such bonds, notes or other obligations assumed or incurred by the [CCDA], or with any other bond related financing agreement. The prior written approval of the [Tourism] Company  shall specifically authorize the amortization schedule of the principal of the bonds, notes or other obligations to be issued, assumed or incurred by the [CCDA] and the final terms and conditions of any bond related financing agreement to be entered into by the [CCDA]. The sum determined and certified |

| | | | | | by the [GDB], as indicated above, shall be deposited in a special account to be maintained by the [GDB] in the name of the [CCDA] for the benefit of the bondholders, noteholders or the holders of other obligations of the [CCDA] or for the benefit of the other contracting parties under any bond related financing agreement. The [GDB] shall transfer the amounts deposited in such special account to the trustees of the bondholders, noteholders or the holders of other obligations of the [CCDA] or to the other contracting parties under any bond related financing agreement, in accordance with the written instructions provided to the [GDB] by the [CCDA]."<br><br>[…]<br><br>"Each fiscal year, the [Tourism] Company must transfer to the Government Development Bank for deposit in said special account the amount established in the first paragraph of this subsection through monthly transfers, beginning in the month immediately following the month in which this law is approved and in the first month of each fiscal year thereafter, equivalent to one tenth of that amount that the Government Development Bank for Puerto Rico determines and certifies as necessary for the payments referred to in the introductory paragraph of this section[….]"<br><br>[…]<br><br>"The Authority is authorized, prior written consent of the [Tourism] Company, to commit or otherwise encumber the proceeds of the collection of the fixed tax that must be deposited in the special account, as required by the first paragraph of this subsection, as a guarantee, for the payment of the principal and interest on the bonds, promissory notes or other obligations issued, assumed or incurred by the Authority, as described in the first paragraph of this subsection, or the payment of its obligations under any financial agreement related to the bonuses, as described in that paragraph. Such commitment or obligation shall be subject to the provisions of Sec. 8 of Article VI of the Constitution of the Commonwealth |

| | | | | | of Puerto Rico. The proceeds of the collection of the tax will be used only for the payment of interest and the amortization of the public debt, as provided in Sec. 8 of Art. VI of the Constitution, only to the extent that the other resources available to which reference is made in said Section are insufficient for such purposes. Otherwise, the proceeds of such collection in the amount that is necessary, will be used only for the payment of principal and interest on bonds, promissory notes or other obligations and obligations under any financial agreement related to the bonds contemplated herein, and to comply with any stipulations agreed upon with the holders of said bonds, promissory notes or other obligations or suppliers of financial agreements related to the bonds." |
|---|---|---|---|---|---|
| **PRITA**[10] | Cigarette Tax | 13 LPRA § 31751 | ▪ The Secretary shall transfer monthly or as agreed with the Integrated Transportation Authority of Puerto Rico, the amounts deposited in the special deposit, deducting therefrom such amounts reimbursed as per the provisions of section 31668 of this subtitle. | ▪ The product from said proceeds to be used under this section's provisions to reimburse to the Integrated Transportation Authority of Puerto Rico the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt shall be covered to the Integrated Transportation Authority of Puerto Rico. | "The amount of the tax that is collected on the cigarettes set out in sec. 31625 of this title up to thirty-six (36) million dollars per fiscal year, beginning with Fiscal Year 2015-2016, will be deposited in a special deposit in favor of the Integrated Transportation Authority of Puerto Rico for its purposes and corporate powers. The income of these thirty-six (36) million dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in sec. 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority, as provided in clause (3) of this subsection, and that of the ten (10) million dollars of the amount of the tax that is collected on cigarettes fixed in sec. 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority, as provided in clause (4) of this subsection. The amount of the tax that is collected on the cigarettes set forth in sec. 31625 of this title up to thirty-six (36) million dollars per fiscal year, as of the approval of the New Contributory System of Puerto Rico, will enter a special deposit in favor of the Puerto Rico Integrated Transportation Authority for its purposes and corporate powers. The income of these thirty-six (36) million |

---

[10] PRITA currently has no debt outstanding.

dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in sec. 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority as provided in clause (3) of this subsection and that of ten (10) million dollars of the amount of the tax that is collected on the cigarettes fixed in sec. 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority as provided in clause (4) of this subsection."

[…]

"The transfer of the collection's product from said excise tax to the Integrated Transportation Authority of Puerto Rico shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of said collection shall be used solely for the payment of interest and the amortization of the public debt, as established in Section 8 of Article VI of the Constitution, to the extent that the other available resources mentioned in said section become insufficient for such purposes. In the event that the Commonwealth of Puerto Rico uses any amount of the excise taxes on cigarettes fixed in section 31625 for the payment of interest and the amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt shall be reimbursed to the Integrated Transportation Authority of Puerto Rico from the proceeds received by the Commonwealth of Puerto Rico in the next Fiscal Year, or in case that such reimbursement is not possible in the next Fiscal Year, in subsequent fiscal years, except for those proceeds that have been committed to satisfy any obligation. The product from said proceeds to be used under this section's provisions to reimburse to the Integrated Transportation Authority of Puerto Rico the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public

| | | | | | debt, shall not be covered into the General Fund of the Commonwealth of Puerto Rico, when collected; instead, they shall be transferred to the Integrated Transportation Authority of Puerto Rico and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said amounts to the Integrated Transportation Authority of Puerto Rico." |

**Part II: Clawback Statutes**

| ENABLING ACT | STATUTORY CLAWBACK CITE |
|---|---|
| **HTA** | |
| **1. Puerto Rico Highway and Transportation Authority Act**<br><br>Entities involved:<br><br>**HTA** (Puerto Rico Highway and Transportation Authority) | 9 L.P.R.A. § 2004(l) ("Powers"):<br><br>(l) To borrow money for any of its corporate purposes, and to issue bonds of the Authority in evidence of such indebtedness and to secure payment of bonds and interest thereon by pledge of, or other lien on, all or any of its properties, revenues or other income, and subject to the provisions of § 8 of Art. VI of the Constitution of the Commonwealth, pledge to the payment of said bonds and interest thereon, the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth.<br><br>9 L.P.R.A. § 2021 ("Special Deposit for the benefit of the Highways Authority"):<br><br>The total proceeds of the fifteen-dollar ($15) increase in the fees to be paid for public and private automobile licenses shall be covered into a Special Deposit in behalf and for the benefit of the Highways and Transportation Authority of Puerto Rico, to be used by the Authority for its corporate purposes. Said Authority is hereby authorized to pledge or pignorate the proceeds of the collection thus received, to the payment of the principal and interest on bonds and other obligations of the Authority, or for any other legal purpose of the Authority; and said pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, until the other resources available, referred to in said section, are insufficient for such purposes, otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations.<br><br>The Commonwealth of Puerto Rico hereby agrees and pledges itself to any person, firm or corporation, or to any agency of the United States of America or of any state, or the Commonwealth of Puerto Rico, who subscribes, or acquires bonds of the Highways and Transportation Authority of Puerto Rico, for the payment of which the proceeds from the increase in the fees paid for public and private service automobile licenses and others, is pignorated as authorized by this section, not to reduce these license fees. |

| 2.  Subtitle 17. Internal Revenue Code of 2011 <br><br> Entities Involved: <br><br> **HTA** (Highways and Transportation Authority) | 13 L.P.R.A. § 31751 ("Disposition of funds"): <br><br> (1) The amount of the tax collected on gasoline and the tax of four cents (4¢) of gas oil or diesel oil fixed in § 31626 of this title; and the total amount per fiscal year of the excise tax collected on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in § 31627 of this title, shall be covered into a special deposit in favor of the Highways and Transportation Authority for their corporate purposes. <br><br> (1)(F) The Highways and Transportation Authority is hereby authorized to commit or pledge the proceeds of the collection thus received on gasoline and the tax of four cents (4¢) on gas oil or diesel oil fixed in § 31626 of this title and the amount appropriated by virtue of this Subtitle of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in § 31627 of this title, for the payment of the principal and the interest on bonds or other obligations or for any other legal purpose of the Authority. Said commitment or pledge shall be subject to the provisions of Section 8 of Item VI of the Constitution of the Commonwealth of Puerto Rico. The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, until the other resources available to which reference is made in said section are insufficient for such purposes. Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations. <br><br> (1)(E) In case the amount of the proceeds of the tax on gasoline, gas oil, or diesel oil established in § 31626 of this title or the amount of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons established in § 31627 of this title, appropriated or to be appropriated in the future to the Highways and Transportation Authority may at any time be insufficient to pay the principal of and the interest on the bonds or other obligations over money taken on a loan or issued by the Highways and Transportation Authority to defray the cost of traffic facilities and for the payment of which the proceeds of the tax imposed on gasoline, gas oil, or diesel oil established in § 31626 of this title or the amount of the excise tax assessed on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons established in § 31627 of this title, has been pledged and the reserve funds of the Highways and Transportation Authority for the payment of debt requirements are applied to cover the deficiency in the amount needed to make such payments, the amounts of said reserve fund used to cover said deficiency shall be reimbursed to the Highways and Transportation Authority from the first proceeds received on the next fiscal year or subsequent fiscal years by the Government of Puerto Rico from: (1) any other taxes in effect on any other fuel or propellant used, among other purposes, to propel road vehicles; and (2) any remaining portion of the tax on gasoline, gas oil, or diesel oil established in § 31626 of this title that are in effect. The proceeds of such other taxes and the remaining portion of the tax on gasoline and gas oil or diesel oil established in § |
|---|---|

31626 of this title that are to be used as provided in this section to reimburse the reserve funds for debt requirements, shall not be covered into the General Fund of the Government of Puerto Rico when collected, but shall be covered into the aforementioned special deposit for the benefit of the Highways and Transportation Authority of Puerto Rico and subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, to be used to reimburse said reserve fund for the payment of the debt requirements.

(3) The amount of tax collected on cigarettes fixed by § 31625 of this title up to twenty (20) million dollars per fiscal year shall be deposited into a special deposit in favor of the Highways and Transportation Authority for its corporate powers and purposes.

(3)(C) The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in § 31625 of this title for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations.

(4) The amount of tax received from cigarettes fixed by § 31625 of this title up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by § 31625 of this title that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section.

(4)(C) The Metropolitan Bus Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in § 31625 of this title for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Metropolitan Bus Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Metropolitan Bus

| | |
|---|---|
| | Authority and to meet any stipulation agreed on by the Metropolitan Bus Authority to the holders of its bonds and other obligations. |
| **3. Puerto Rico Vehicles and Traffic Act**<br><br>Entities Involved:<br><br>**HTA** (Puerto Rico Highways and Transportation Authority) | "Section 23.02(c).- Fees to be Paid."<br><br>A special deposit is hereby created in benefit of the Authority in which fifteen dollars ($15) shall be covered into the same for each registration renewal of private and public service automobiles.<br><br>"Section 23.01.- Procedure for the Payment of Fees."<br><br>Unless otherwise provided in this Act, the amount of the fees collected in accordance with Articles 23.01 and 23.02 of this Act shall be fully deposited in a Special Deposit in the name and for the benefit of [HTA].<br><br>The Authority is hereby authorized to pledge or encumber the proceeds of the taxes collected for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds of the taxes collected shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section does not suffice to attain such purposes. Otherwise, the proceeds of said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed upon by the Authority to the holders of its bonds and other obligations. |
| **4. Internal Revenue Code for a New Puerto Rico**<br><br>Entities Involved:<br><br>**HTA** (Puerto Rico Highways and Transportation Authority) | Subsection (a) of Section 3060.11 of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," is hereby amended to read as follows:<br><br>The amount of the tax collected on gasoline and the tax of four cents (4¢) of gas oil or diesel oil fixed in Section 3020.06 of this subtitle; and the total amount per fiscal year of the excise tax collected on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07 of this subtitle, shall be covered into a special deposit in favor of the Highways and Transportation Authority for their corporate purposes. |

| | |
|---|---|
| **MBA** (Metropolitan Bus Authority) | The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority.  Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations.<br><br>The amount of tax received from cigarettes fixed by Section 3020.05 of this subtitle up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by Section 3020.05 of this subtitle that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section.<br><br>The Metropolitan Bus Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Metropolitan Bus Authority.  Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Metropolitan Bus Authority and to meet any stipulation agreed on by the Metropolitan Bus Authority to the holders of its bonds and other obligations. |
| **PRIFA** | |
| 1.  **Puerto Rico Infrastructure Financing Authority Act** | 3 L.P.R.A. § 1906 ("General powers"):<br><br>(m) Mortgage or pledge any property for the payment of the principal of and interest on any bonds issued by the Authority, or bonds issued by a benefited entity, and pledge all or a portion of such revenues as the Authority may receive including, but not limited to, and subject to the provisions of § 8 of Article VI of the Constitution of the |

| Entities Involved:<br><br>**PRIFA** (Puerto Rico Infrastructure Financing Authority) | Commonwealth of Puerto Rico, all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority.<br><br>3 L.P.R.A. § 1907 ("Bonds of the Authority"):<br><br>(a) The bonds issued by the Authority may be payable from all or any part of the gross or net revenues and other income derived by the Authority which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth as provided in the trust agreement or resolution whereby the bonds are issued. The principal of, and interest on, the bonds issued by the Authority may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth, all as provided in the trust agreement or resolution under which the bonds are issued. Such pledge shall be valid and binding from the time it is made without the need for a public or notarized instrument. The revenues so pledged, including those subsequently received by the Authority, shall immediately be subject to said lien without the need of the physical delivery thereof or any other act, and said lien shall be valid and binding and shall prevail against any third party having any kind of claim against the Authority for damages, breach of contract or other reasons, regardless of whether such third party has been so notified. Neither the trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's rights on any revenues are pledged or assigned shall have to be presented or recorded in order to perfect the lien thereon against any third party except in the records of the Authority. The resolution or resolutions authorizing the bond issue or the trust agreement securing the bonds may contain provisions which shall be part of the contract with the holders of the bonds issued under such resolution or resolutions or under such trust agreement regarding the pledge and creation of liens on the Authority's revenues and assets, the creation and maintenance of redemption and reserve funds, limitations concerning the purposes to which bond proceeds may be applied, limitations concerning the issuance of additional bonds, limitations concerning the introduction of amendments or supplements to such resolution or resolutions, or to the trust agreement, the granting of rights, powers and privileges and the imposition of obligations and responsibilities upon the trustee under any trust agreement or resolution, the rights, powers, obligations and liabilities that shall arise in the event of a default of any obligation under such resolution or resolutions or under such trust agreement, or in connection with any rights, powers or privileges conferred on the bondholders as security for the bonds in order to enhance their marketability.<br><br>3 L.P.R.A. § 1914 ("Special deposit"):<br><br>Beginning with Fiscal Year 1988-89, notwithstanding the provisions of Section 29A of Act No. 143 of June 30, 1969, as amended, the first collections of federal taxes sent to the Department of the Treasury of Puerto Rico in each year |

<table>
<tr><td></td><td>fiscal, pursuant to § 7652(a)(3) of the Internal Revenue Code of the United States of 1986, as amended, up to a maximum amount of thirty million dollars ($30,000,000), in the case of Fiscal Year 1988-89 , up to a maximum amount of forty million dollars ($40,000,000), in the case of Fiscal Years 1989-90 to 1996-97, up to a maximum amount of sixty million dollars ($ 60,000,000), in the case of Fiscal Year 1997- 98, up to a maximum amount of seventy million dollars ($ 70,000,000), in the case of Fiscal Years 1998-1999 to 2005-06,and up to a maximum amount of ninety million dollars ($ 90,000,000), in the case of Fiscal Years 2006-07 to 2008-09, and in the subsequent years until Fiscal Year 2056-57 the participation will be up to an amount of one hundred and seventeen million dollars ($ 117,000,000), which shall be paid upon receipt by the Department of the Treasury of Puerto Rico in a Special Fund to be maintained by or on behalf of the Authority, designated as the "Infrastructure Fund of Puerto Rico" and shall be will be used by the Authority for its corporate purposes, which will include the development of the necessary and convenient infrastructure for the completion of the Mayagüez 2010 Central American and Caribbean Games. In case the collections of said federal taxes are insufficient to cover the amounts here assigned, the Secretary of the Treasury is authorized to cover such deficiency of any available funds and the Director of the Office of Management and Budget, at the request of the Authority for the Financing of the Infrastructure, shall include in the recommended budget of the corresponding fiscal year the necessary allocations for cover those deficiencies.

The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes.</td></tr>
<tr><td colspan="2" align="center">**PRCCDA**</td></tr>
<tr><td>1.  **Puerto Rico Room Occupancy Rate Tax Act**

Entities involved:

**PRCCDA** (Puerto Rico Convention Center District Authority, a public corporation of the Commonwealth of Puerto</td><td>13 L.P.R.A. § 2271v  ("Disposition of funds")

The [Tourism] Company shall distribute all funds collected from the tax imposed under § 2271*o* of this title, as follows:
(a) Before the beginning of each fiscal year, the [GDB] shall determine and certify to the [Tourism] Company  and to the [CCDA], the amount necessary for the [CCDA] to make, during such fiscal year and the first day of the following fiscal year:
(1) Full and timely payment, or the amortization of the principal and interest on the obligations incurred by the [CCDA] with the [GDB] or the bonds, notes or other obligations issued, assumed or incurred by the [CCDA],</td></tr>
</table>

| | |
|---|---|
| Rico created by §§ 6 401 et seq. of Title 23, known as the 'Puerto Rico Convention Center District Act')<br><br>**Puerto Rico Tourism Company**, a public corporation of the Commonwealth of Puerto Rico created by §§ 671 et seq. of Title 23 | pursuant to Act No. 142 of October 4, 2001, as amended, with the prior written authorization of the [Tourism] Company , to exclusively carry out the development and construction of a new convention center and its related infrastructure;<br>(2) full and timely payment of the obligations of the [CCDA] under any bond related financing agreement, as this term is defined at the end of this subsection, entered into by the [CCDA] with the prior written authorization of the [Tourism] Company ;<br>(3) the deposits required to replenish any reserves established to ensure the payment of the principal and the interest on such bonds, notes and other obligations issued, assumed or incurred by the [CCDA], or obligations under any bond related financing agreement, and<br>(4) any other expenses incurred in connection with the issuance of such bonds, notes or other obligations assumed or incurred by the [CCDA], or with any other bond related financing agreement.<br>The prior written approval of the [Tourism] Company  shall specifically authorize the amortization schedule of the principal of the bonds, notes or other obligations to be issued, assumed or incurred by the [CCDA] and the final terms and conditions of any bond related financing agreement to be entered into by the [CCDA]. The sum determined and certified by the [GDB], as indicated above, shall be deposited in a special account to be maintained by the [GDB] in the name of the [CCDA] for the benefit of the bondholders, noteholders or the holders of other obligations of the [CCDA] or for the benefit of the other contracting parties under any bond related financing agreement. The [GDB] shall transfer the amounts deposited in such special account to the trustees of the bondholders, noteholders or holders of other obligations of the [CCDA] or to the other contracting parties under any bond related financing agreement, in accordance with the written instructions provided to the [GDB] by the [CCDA].<br><br><br>Each fiscal year, the [Tourism] Company must transfer to the Government Development Bank for deposit in said special account the amount established in the first paragraph of this subsection through monthly transfers, beginning in the month immediately following the month in which this law is approved and in the first month of each fiscal year thereafter, equivalent to one tenth of that amount that the Government Development Bank for Puerto Rico determines and certifies as necessary for the payments referred to in the introductory paragraph of this section [….]<br><br>The Authority is hereby authorized, with the prior written consent of the Company, to pledge or otherwise encumber the revenues product of the fixed tax collected which is to be deposited in a special account as required by the first paragraph of this subsection, as security for the payment of the bonds, notes or other obligations issued, assumed or incurred by the Authority, as described in the first paragraph of this subsection, or for the payment of its obligations under any bond related financing agreement, as described in said paragraph. Such a pledge or obligation shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of the collection of the tax shall be used solely for the payment of the |

|  | interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes. Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any bond related financing agreement contemplated herein, and to comply with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under bond related financing agreements.<br><br>In case the total product of the tax presently assigned or to be assigned in the future to the Authority, in accordance with this subsection, is used to service payments of the public debt and applied to cover the deficiencies in the amounts needed to make such payments, the amounts of this tax used to cover said deficiency shall be reimbursed to the Authority out of the first revenues received in the next fiscal year or subsequent fiscal years by the Commonwealth of Puerto Rico proceeding from any remaining portion of the tax then in effect, subject to the provisions of Section 8 of Article VI, of the Constitution of the Commonwealth of Puerto Rico. |
|---|---|
| **MBA** | |
| **Internal Revenue Code for a New Puerto Rico**<br><br>Entities Involved:<br><br>**HTA** (Puerto Rico Highways and Transportation Authority)<br><br>**MBA** (Metropolitan Bus Authority) | Subsection (a) of Section 3060.11 of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," is hereby amended to read as follows:<br><br>The amount of tax collected on cigarettes fixed by Section 3020.05 of this subtitle up to twenty (20) million dollars per fiscal year shall be deposited into a special deposit in favor of the Highways and Transportation Authority for its corporate powers and purposes.<br><br>The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority.  Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations. |

<table>
<tr><td></td><td>The amount of tax received from cigarettes fixed by Section 3020.05 of this subtitle up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by Section 3020.05 of this subtitle that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section.

The Metropolitan Bus Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Metropolitan Bus Authority.  Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Metropolitan Bus Authority and to meet any stipulation agreed on by the Metropolitan Bus Authority to the holders of its bonds and other obligations.</td></tr>
</table>

| PRITA |
|:---:|

| **Internal Revenue Code for a New Puerto Rico**<br><br>Entities Involved:<br><br>**PRITA** (Puerto Rico Integrated Transportation Authority) | 13 L.P.R.A. § 31751 ("Disposition of funds")<br><br>The amount of the tax that is collected on the cigarettes set out in section 31625 of this title up to thirty-six (36) million dollars per fiscal year, beginning with Fiscal Year 2015-2016, will be deposited in a special deposit in favor of the Integrated Transportation Authority of Puerto Rico for its purposes and corporate powers. The income of these thirty-six (36) million dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in section 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority, as provided in clause (3) of this subsection, and that of the ten (10) million dollars of the amount of the tax that is collected on cigarettes fixed in section 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority, as provided in clause (4) of this subsection. The amount of the tax that is collected on the cigarettes set forth in section 31625 of this title up to thirty-six (36) million dollars per fiscal year, as of the approval of the New Tax System of Puerto Rico, will enter a special deposit in favor of the Puerto Rico Integrated Transportation Authority for its purposes and corporate powers. The income of these thirty-six (36) million dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico |

is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in section 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority as provided in clause (3) of this subsection and that of ten (10) million dollars of the amount of the tax that is collected on the cigarettes fixed in section 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority as provided in clause (4) of this subsection.

The Secretary shall transfer monthly or as agreed with the Integrated Transportation Authority of Puerto Rico, the amounts deposited in the special deposit, deducting therefrom such amounts reimbursed as per the provisions of section 31668 of this subtitle.

The transfer of funds raised from the excise tax imposed on cigarettes to the Integrated Transportation Authority of Puerto Rico shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of said collection shall be used solely for the payment of interest and the amortization of the public debt, as established in Section 8 of Article VI of the Constitution, to the extent that the other available resources mentioned in said section become insufficient for such purposes. In the event that the Commonwealth of Puerto Rico uses any amount of the excise taxes on cigarettes fixed in section 31625 for the payment of interest and the amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt shall be reimbursed to the Integrated Transportation Authority of Puerto Rico from the proceeds received by the Commonwealth of Puerto Rico in the next Fiscal Year, or in case that such reimbursement is not possible in the next Fiscal Year, in subsequent fiscal years, except for those proceeds that have been committed to satisfy any obligation. The product from said proceeds to be used under this section's provisions to reimburse to the Integrated Transportation Authority of Puerto Rico the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt, shall not be covered into the General Fund of the Commonwealth of Puerto Rico, when collected; instead, they shall be transferred to the Integrated Transportation Authority of Puerto Rico and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said amounts to the Integrated Transportation Authority of Puerto Rico.

**Part III: Clawback Language in Resolutions**

HTA Resolutions

I.      HTA 1968 Resolution

The clawback language appears in three places: once in the recitals and twice in the "form of bonds" embedded in the resolution.

- Recitals – "WHEREAS, by Act No. 75, approved June 23, 1965 as supplemented by Act No. 50, approved May 22, 1968, the proceeds of six-elevenths of the eleven cents a gallon tax imposed on gasoline by Act No. 2, approved January 20, 1956, as amended, was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said six cents a gallon tax received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the tax proceeds so pledged being subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that the other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1968 Resolution, at 2).

- "Form of Bonds" – "The proceeds of the gasoline taxes so allocated to the Authority by said Act No. 75 and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose." (HTA 1968 Resolution, at 17).

- "Form of Bonds" – "The proceeds of the taxes on gasoline and gas oil and diesel oil so allocated to the Authority by said Excise Act of Puerto Rico, the proceeds of the license fees so allocated to the Authority by said Vehicle and Traffic Law of Puerto Rico and any other taxes, fees or charges which the Legislature of Puerto Rico has allocated and may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Sections are insufficient for such purpose." (HTA 1968 Resolution, at 24).

II.      HTA 1998 Resolution

The clawback language appears in five places: three times in the recitals and twice in the "form of bonds" embedded in the resolution.

- Recitals – "WHEREAS, by Subtitle B of Act No. 120, approved October 31, 1994, as amended, the proceeds of the sixteen cents a gallon tax imposed on gasoline and one half of the eight cents per gallon tax imposed on gas oil and diesel oil was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said sixteen cents a gallon and four cents a gallon tax received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the tax proceeds so pledged being subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that the other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1998 Resolution, at 2).

- Recitals – "WHEREAS, by Act No. 9, approved August 12, 1982, the proceeds of the $15 increase per vehicle of annual motor vehicle license fees imposed by the Commonwealth was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said $15 increase in fees received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the license fees so pledged being subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1998 Resolution, at 2-3).

- Recitals – "WHEREAS, by Act No. 34, approved July 16, 1997, as amended, the first $120 million of annual proceeds of the tax paid for the use in Puerto Rico of crude oil, unfinished oils or end products derived from oil and any other hydrocarbon mixture was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said tax received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the tax proceeds so pledged being subject to first being applied to the payment and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1998 Resolution, at 3).

- "Form of Bonds" – "The proceeds of the taxes on crude oil and derivative products so allocated to the Authority by said Act No. 34, the proceeds of the taxes on gasoline and gas oil and diesel oil so allocated to the Authority by said Act No. 120, the proceeds of the license fees so allocated to the Authority by said Vehicle and Traffic Law of Puerto Rico and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of

Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose." (HTA 1998 Resolution, at 19).

- "Form of Bonds" – "The proceeds of the taxes on crude oil and derivative products so allocated to the Authority by said Act No. 34, the proceeds of the taxes on gasoline and gas oil and diesel oil so allocated to the Authority by said Act No. 120, the proceeds of the license fees so allocated to the Authority by said Vehicle and Traffic Law of Puerto Rico and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose." (HTA 1998 Resolution, at 24).

PRIFA – Official Statement dated June 2, 2005

The reference to the Constitution's clawback provision appears in three places:

- Cover Page. "Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor."

- Summary Statement; S-2. "The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor."

- Page 10. "*Provisions for Prior Payment*. "The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments that are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

  Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution.  Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, however, such revenues are to be used for such payments only if and to extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose.  The Commonwealth has never used Federal Excise Taxes for the payment of debt service on its public debt."

CCDA – Official Statement dated March 16, 2006

The reference to the Constitution's clawback provision appears in three places:

- Cover Page.  "**To the extent other Commonwealth of Puerto Rico revenues are insufficient to pay for the general obligation debts and other guaranteed debts of the Commonwealth, the hotel occupancy tax revenues are subject to being applied first to the payment of such Commonwealth debts and obligations before they may be applied to pay debt service on the Bonds.**"

- Page 2.  "**If Commonwealth revenues are insufficient to pay the general obligation debt of the Commonwealth and debt guaranteed by the Commonwealth, the Occupancy Tax Act provides that pursuant to the provisions of Section 8, Article VI of the Constitution of the Commonwealth, the Hotel Occupancy Tax revenues are subject to being applied first to the payment of such Commonwealth general obligation debt or such guaranteed debt before they may be applied to pay debt service on the Bonds.**"

- Pages 21-22.  "The Constitution of the Commonwealth provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

  Hotel Occupancy Tax revenues are available revenues under the Constitution. Accordingly, if needed, they may be applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, the Hotel Occupancy Tax Act and the Constitution of the Commonwealth, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. Investment earnings and monies in the Debt Service Reserve Fund are not considered available Commonwealth resources."

MBA – Refinancing Agreement dated March 30, 2012, and
Amendment dated September 4, 2013 changing the collateral to the cigarette tax

- Refinancing Agreement, Section 3.17 ("No Immunity"): "Provided, however, that Lender is aware that collection of the Diesel Tax Revenue may be preempted by the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico."

- Refinancing Agreement, Section 18.12 ("Operational Accounts"):  "Borrower shall immediately deliver to Lender copies of any notices received from Treasury, the Government Development Bank for Puerto Rico or any other Governmental Authority indicating the Commonwealth's decision (or the imminence thereof) to enforce the Commonwealth's preemptive power over the Diesel Tax Revenues afforded to the Commonwealth under Section 8 of Article VI of the Constitution of the Commonwealth."

- Amendment, Section 7.2: "Provided, however, that Lender is aware that collection of the Cigarette Tax Revenue may be preempted by the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico."

- Amendment, Section 10: "Borrower shall immediately deliver to Lender copies of any notices received from Treasury, the Government Development Bank for Puerto Rico or any other Governmental Authority indicating the Commonwealth's decision (or the imminence thereof) to enforce the Commonwealth's preemptive power over the Cigarette Tax Revenues afforded to the Commonwealth under Section 8 of Article VI of the Constitution of the Commonwealth."

Commonwealth – Section 8 of Article VI of the Puerto Rico Constitution: "Clawback" Provision

- Section 8 of Article VI of the Constitution. "In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."

***Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Employee Retirement System (ERS)***

This analysis assesses the recoveries available to creditors of ERS on the basis of available remedies under non-bankruptcy laws including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA, a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in greater recoveries for the creditors than is provided by such plan." In this context, this analysis provides an estimated range of recoveries that would be available to creditors if the stay of debt enforcement is terminated, no ERS Plan of Adjustment agreement is consummated, and the ERS Title III case is dismissed.

This document has two sections. The first section provides an overview of the methodology used in developing the analysis. The methodology outlines the approach to estimating resources available for debt service, a summary of outstanding creditor obligations, and the priority in which funds are disbursed and the order in which creditor claims are assumed to be paid. The second section presents the ranges that define the estimated likely potential outcomes for available recoveries to creditors of ERS.

This analysis was prepared by McKinsey & Company, Inc. Washington D.C. ("McKinsey & Company"). Proskauer Rose LLP[1], legal advisor to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. Those assumptions are included in Appendix 1 of this document and include estimated values for categories of ERS assets; those estimated values were provided to the legal advisor by external parties. The financial advisors to the FOMB provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt and other financial data. McKinsey & Company also relied on data published by or directly provided by the Government of Puerto Rico and/or its advisors. McKinsey & Company has accepted as true, accurate, and appropriate all of the legal and financial information and assumptions provided by the other FOMB advisors as well as from the Government of Puerto Rico and its advisors. McKinsey & Company has not independently verified any of the information or assumptions received from other advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in this analysis are inherently subject to business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to or potentially realized by creditors on the basis of available remedies under any laws, including the Puerto Rico Constitution, would or would not approximate the estimates and assumptions represented in the analysis, and actual results may vary materially from those shown herein. McKinsey & Company

---

[1] Proskauer Rose LLP is referred to as the "legal advisor" in this analysis.

1

does, however, represent that the recovery range identified herein is its best estimate based on conditions, knowledge, and information provided to it as described above as of September 24, 2019.

## I.   Methodology

The analysis assumes that PROMESA Title III cases are dismissed but that PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement is removed and the FOMB remains in place and will continue to certify Commonwealth Fiscal Plans and enforce implementation of budgets, subject to any debt enforcement in excess of budget that the Puerto Rico courts order. The analysis also assumes creditors would pursue legal action against the Commonwealth and ERS to recover the amounts they are owed.

The assumption that PROMESA Titles I and II continue to apply increases the creditors' recovery due to the measures and savings the FOMB inserts into its Certified Fiscal Plans. The FOMB's legal advisor believes it would be plausible to assume PROMESA Titles I and II do not apply because Congress enacted them in tandem with Title III and it is not clear they were intended to continue in effect without Title III.  On balance, however, the legal advisor recommended that this analysis be prepared as if PROMESA Titles I and II continue to apply.

The analysis relies on three components to calculate the range of potential recoveries available to creditors: 1) the Resource Envelope available to satisfy ERS creditor obligations, 2) the outstanding debt, and 3) priorities for distribution of funds for debt service.

The effective date of the analysis is June 30, 2019. The percentage recovery is calculated as the present value of the total amount expected to be paid to ERS creditors over the entire period of analysis as a proportion of the total outstanding principal and unpaid interest as of the effective date of the analysis. Based on discussions with the FOMB's financial advisors, this analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments or future obligations.

**1) Resource Envelope:** The total amount of resources available to pay ERS creditors' claims in each year constitutes ERS's Resource Envelope. This equates to assets remaining in the Employees Retirement System ("ERS assets"). Following guidance provided by the FOMB legal advisor, ERS bonds are considered non-recourse outside of Title III, which limits their sources of recovery to their collateral. Therefore, only the ERS assets that are collateral of ERS bonds could be used to pay ERS bondholders. ERS assets that are not collateral of ERS bonds ("unencumbered assets") are assumed to be available for unsecured claims.

There is ongoing litigation related to additional assets that could be available to pay ERS creditors. This analysis only considers assets currently held at ERS as part of the Resource Envelope available to ERS creditors, as the output of future potential litigations is uncertain. The ongoing litigation and possible outcomes of such uncertainties are discussed at the end of this analysis.

Following guidance provided by legal advisor, which includes the valuation estimates for ERS assets provided by external parties to the legal advisor and presented in Appendix 1, this analysis

2

assumes $1,869 million in nominal value of ERS assets. These assets include cash that was previously transferred from ERS to the Commonwealth pursuant to Joint Resolution 188-2017. This amount of cash remains in the possession of the Commonwealth and has not been used to fund payments to retirees.

Following the estimations provided in Appendix 1, the estimated range for the value of assets that are collateral of ERS bonds is $442 million to $827 million[2]. McKinsey & Company has accepted these estimations provided by the legal advisor related assets that are collateral of ERS bonds as appropriate, but no independent legal or actuarial analysis has been performed by McKinsey & Company.

**2) Outstanding debt:** Based on information provided by the financial advisors to the FOMB, the total debt held by ERS bondholders is $2,947 million of principal outstanding and $277 million of unpaid interest as of effective date of this analysis. As indicated in Appendix 1, the outstanding debt also assumes an additional amount of $56 million in unsecured claims.

This analysis does not consider obligations to retirees, as those obligations were assumed by the Commonwealth under Act 106-2017 as mentioned in Appendix 1. To the extent not paid from the unencumbered assets of ERS, obligations to retirees will be satisfied to the extent set forth in the Commonwealth version of this analysis, which is also included in the Disclosure Statement.

**3) Priorities for distribution of funds:** Following guidance provided by legal advisors, funds that are collateral of ERS bonds are available to pay ERS bondholders following the schedule of payments as stipulated in the ERS bond documents. Funds are first assumed to be credited against cumulative interest owed, and then to the debt principal maturing in that year or previously, if any. Unpaid principal accrues interest according to the original rates stipulated in each of the relevant debt documents and is then added to the following year's debt. No interest accrues on interest balances.

If there are remaining assets that are collateral of ERS bonds in the Resource Envelope after paying outstanding bond debt in any given year, funds are saved for the next year as accelerated payments are not allowed. Following guidance provided by the legal advisor, funds not constituting collateral of ERS bonds are assumed to be used to pay unsecured claims.

The following exhibit summarizes the priorities for the distribution of funds, following the guidance provided by legal advisors in Appendix 1.

---

[2] As indicated in Appendix 1, the asset values are unaudited and might not reflect recoverable values from account or contract counterparties.

*Exhibit 1: Flow of funds in the analysis*



The recoveries shown in the next section do not include additional payments ERS bondholders may receive from the Commonwealth if they successfully assert claims against it. As mentioned in Appendix 1, ERS bondholders may assert an unsecured claim against the Commonwealth for any amount owed but unpaid in any given year, as assumed also in the Commonwealth version of this analysis. This claim, to the extent valid, if any, would be paid as part of the pool of the Commonwealth's unsecured claims and it would follow the priorities and recoveries described in the Commonwealth version of this analysis, which is also included in the Disclosure Statement.

## II.   Estimated likely range of recoveries available to creditors

In assessing the estimated likely range of recoveries available to ERS bondholders, this analysis sets a range based on the spectrum of estimated funds that are collateral of ERS bonds. Based on these criteria, the range of recoveries available to ERS bondholders is between $442 million and $827 million in nominal value, which equals a range of recoveries of $434 million and $776 million discounted at 5% annual rate. These payments imply a recovery percentage between 13% and 24%[3].

The recoveries available to unsecured claims are greater than $56 million, which implies a percent recovery of 100%, but unsecured claimants cannot recover amounts larger than they are owed. Any amount of unencumbered assets remaining after paying unsecured claims cannot be used to

---

[3] The recovery percentage is estimated as the present value of total debt paid as a proportion of the total principal outstanding and unpaid interest as of June 30, 2019.

4

pay ERS bonds. In total, the range of recoveries available to both ERS bonds and unsecured claims is between $490 and $832 million[4], which implies a percent recovery between 15% and 25%.

*Exhibit 2: Estimated likely range of recoveries available to ERS creditors*

**Estimated likely range of recoveries available to ERS creditors**
PV of total payment in USD million, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| **ERS bonds** | $434 *13%* | $776 *24%* |
| **Unsecured claims** | $56 *100%* | $56 *100%* |
| **Total** | $490 *15%* | $832 *25%* |

### *Alternative outcomes based on ongoing litigation or litigation risks*

The range of recoveries is subject to the outcome of ongoing litigation regarding the total size of valid claims and the pool of resources available for debt service. As the outcome is uncertain, those sensitivities are not considered in the recoveries described above.

First, there is ongoing litigation challenging the validity of ERS bonds pursuant to Puerto Rico law. If ERS bonds are ruled to be invalid, ERS bondholders would not receive any payments from assets that are currently collateral of ERS bonds. In addition, ERS bondholders might be required to return payments already made to them before the ERS petition date; those payments add to approximately $400 million.

Second, there are legal disputes concerning whether employers' current payments to PayGo under Act 106-2017 should be considered the same asset as pre-Act 106 employer contributions to ERS subject to security interests of ERS bondholders. As mentioned in Appendix 1, in this case, ERS bonds would be paid before GO bonds or any other Commonwealth-guaranteed debt because ERS bondholders would have a lien against PayGo payments. Therefore, ERS bondholders would receive full recovery of their claims as the PayGo payments are greater than the ERS bond debt owed in any given year. Payments to ERS bondholders from the Commonwealth, however, might reduce the ability of the Commonwealth to cover its pension expenses. The Commonwealth would

---

[4] The amount refers to the present value of future debt payments using an annual 5% discount rate.

need to reduce its operating expenses in other areas to be able to pay ERS bondholders and still stay within the limits set by the annual budget.

The outcome of this litigation is uncertain; therefore, different sensitivities are shown below. The table shows the recoveries available to ERS bondholders assuming varying amounts (e.g. 0%, 25%, 50% and 75%) of ERS claims are deemed to be secured by PayGo payments. In addition to the payments from the PayGo payment stream, ERS bondholders would also receive payments from the ERS assets that are collateral of ERS bonds.

*Exhibit 3: Estimated likely range of recoveries available to ERS creditors if some ERS bond debt is secured by PayGo payments*

**Estimated likely range of recoveries available to ERS creditors should a portion of ERS annual bond debt be classified secured by PayGo payments**
PV of total payment in USD million, % recovery

|  | | Lower end of range | Higher end of range |
|---|---|---|---|
| **ERS bonds** | 0% of annual debt secured | $434 *13%* | $776 *24%* |
| | 25 % of annual debt secured | $1,437 *45%* | $1,776 *55%* |
| | 50% of annual debt secured | $2,436 *76%* | $2,733 *85%* |
| | 75% of annual debt secured | $3,409 *100%* | $3,643 *100%* |
| **Unsecured claims[1]** | | $56 *100%* | $56 *100%* |

1 Recoveries of unsecured claims is 100% in all four scenarios shown on this exhibit as those claims are fully paid with unencumbered assets

6

*APPENDIX 1*

# ERS Title III Plan

## Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| 1. | **ERS Bondholders' Claims Against Assets at ERS?** | **ASSUMPTION 1:**  ERS bondholders have a security interest in certain of the remaining ERS assets (see chart below) and are paid only from those certain assets.  ERS's receivables claims against the Commonwealth are treated as general unsecured claims.<br><br>**BASIS**:  Although the First Circuit determined the ERS bondholders hold a security interest against certain assets at ERS perfected by the filing of a financing statement, the decision does not determine to which assets the security interest attaches.  The ERS bonds are nonrecourse and are not entitled to an unsecured deficiency claim against ERS which would provide them an entitlement to assets in which they lack a security interest.<br><br>**SENSITIVITY**:<br>Assets remaining at ERS. |

| Asset Category | Value on or Around May 31, 2019[1] | Probability Bondholders' Collateral |
|---|---|---|
| Post-petition segregated account | $93.9 million | 25–75%<br><br>Will be a fact-intensive inquiry, as the bondholders will need to satisfy their burden of tracing ERS's cash as proceeds of their collateral, which will likely be very difficult given the many sources of revenue. |

---

[1] Certain values herein are unaudited and provided by the Government's financial advisors and might not reflect recoverable values from account or contract counterparties, which are in large measure the Commonwealth, HTA, Puerto Rico municipalities, and Puerto Rico residents and thus might result in a significantly lower actual recovery on certain of these asset categories.

|  |  | Question | | Assumption | |
|---|---|---|---|---|---|
|  |  |  | Employers' Contributions accounts receivable (from CW and certain instrument-alities) | $160.5M (as of Feb. 15, 2019)[2] | 100%<br><br>Employer contributions accrued prior to the ERS petition date as a result of employee labor, and not paid to date, constitute the right to receive revenues under the bond documents and are thus subject to the security interest on prepetition assets of ERS. |
|  |  |  | Additional uniform contributions (AUC) accounts receivable | $600M (as of Feb. 15, 2019) | 15–25%<br><br>The AUC were made pursuant to sections of the Enabling Act other than those in which ERS bondholders had a security interest. Further, they are not proceeds of any other bondholders' rights in collateral. |
|  |  |  | Employee loans | $354.8M | 10–20%<br><br>Payments made on Employee Loans are not made pursuant to any of the sections of the Enabling Act in which ERS bondholders have a security interest. The Resolution likewise does not provide bondholders with a security interest in Employee Loans. To the extent Employee Loans were made with Employers' Contributions, some may be traceable, in which case proceeds thereon could be proceeds of the bondholders' collateral. |

---

[2] ERS bondholders have asserted a security interest in the PayGo payments mandated under Act 106-2017. Even if this is correct, PayGo payments would be property acquired after the ERS petition date and thus free and clear of any prepetition security interest under section 552 of the Bankruptcy Code, made applicable by PROMESA section 301(a), and the court's summary judgment ruling on this issue (currently on appeal to the First Circuit). Outside Title III, however, section 552 does not apply. Therefore, PayGo Payments to the CW could be subject to their security interest if they are treated as the pre-Act 106 employer contributions to ERS. However, this would result in a secured claim against the Commonwealth, as discussed below.

|  | Question | Assumption |
|---|---|---|
| | | The estimated range here is based on the difficulty in tracing the source of these loans to employer contributions, given the many other sources of ERS revenue. |

| | Investments | $206.4M | 10–20%<br><br>Investments are not subject to any of the sections of the Enabling Act in which the ERS bondholders have a security interest.  The Resolution likewise does not provide bondholders with a security interest in Investments.  To the extent Investments were made with Employers' Contributions, some may be traceable, in which case proceeds thereon could be proceeds of the bondholders' collateral.  The estimated range here is based on the difficulty in tracing the source of these investments to employer contributions, given the many other sources of ERS revenue. |
|---|---|---|---|
| | Cash (excluding the post-petition segregated account) | $443.2M (includes the account holding the monies transferred to the CW on or around 7/26/17 pursuant to J.R. 188) | 25–75%<br><br>Will be a fact-intensive inquiry, as the bondholders will need to satisfy their burden of tracing ERS's cash as proceeds of their collateral, which will likely be very difficult given the many sources of revenue. |
| | Other (*e.g.*, real property) | $9.8M | 10%<br><br>ERS bonds are nonrecourse and are not entitled to recover from unencumbered ERS assets, which |

| | Question | Assumption |
|---|---|---|

| | | | | are generally classified as building, vehicles and office equipment as well as repossessed property. |
|---|---|---|---|---|

**2.** | **ERS Bondholders' Claims Against the Commonwealth?**

**ASSUMPTION 1 [MAIN ASSUMPTION]**:  ERS bondholders successfully assert constitutional claims (Takings and/or Contract Clauses) against the CW. In each year their debt service is not paid, ERS bondholders may assert that amount against the Commonwealth as an unsecured claim paid after GO and *pari passu* debt.

**BASIS**:  ERS bondholders assert Act 106-2017, which eliminated employer contributions under the ERS enabling act, effected an impairment of contractual rights and a taking of their collateral, in violation of the Puerto Rico and U.S. Constitutions. Additionally, section 552, which eliminated the security interest in employer contributions arising after the ERS petition date independent of the effect of Act 106, would likely no longer apply after the dismissal of the ERS Title III case, which would leave Act 106 as the only basis for the elimination of their collateral and thus a violation of the Contract and/or Takings Clauses.

**ASSUMPTION 2 [LITIGATION RISK]**:  ERS bondholders have a security interest in future employer contributions, and PayGo Payments are adjudicated to be the same as or proceeds of Employers' Contributions, and thus the ERS bondholders have secured claims against the Commonwealth secured by a security interest in PayGo Payments. Their debt service including outstanding principal and interest, is paid before GO or CW-guaranteed debt.

This assumption should be run as if the secured claims against the employer contributions have a 0%, 25%, 50%, 75%, and 100% chance of success.
If the CW runs into deficits before ERS bonds are paid in full, assume the CW can justify the use of police power for the payment of all its expenses, including pensions, in full, and there is no money left to pay ERS bonds or other debt.

**BASIS**:  ERS bondholders have asserted that PayGo Payments are the same asset as employer contributions, or proceeds thereof, and thus are subject to the ERS

| | Question | Assumption |
|---|---|---|
| | | bondholders' security interest, making them a secured creditor of the Commonwealth. They would also likely assert that this security interest, even if eliminated by section 552 upon ERS's petition date, would be reinstated upon the dismissal of ERS's title III case.<br><br>**ASSUMPTION 3 [LITIGATION RISK]**:  ERS bondholders have no claims against the CW.<br><br>**BASIS**:   Even if ERS bondholders had a security interest in future contribution rights, the bondholders were put on notice by the bond offering statement that those rights might be modified or adversely affected by the Commonwealth, which Act 16-2017 did by eliminating any employer contributions to ERS.  The fact that the ERS bondholders were on notice of such potential modification could also significantly diminish their chances of asserting a successful contract impairment or takings claim.  Additionally, the best interests test should assume bondholder rights and remedies are on account of their claims as they existed immediately prior to the hypothetical dismissal of the ERS case and not adjusted under the ERS plan, *i.e.*, secured only by employer contributions arising prior to the ERS petition date, but not after, as a result of section 552.  Thus, the ERS bondholders had no contract rights or collateral that was impaired or eliminated by operation of Act 106.  Note that, most likely, by the time of the confirmation hearing, whether the ERS bondholders' secured claims are largely eliminated by Bankruptcy Code section 552, will be known as the issue is currently being briefed for the First Circuit. |
| 3. | **Pensioners' claims against ERS and/or the Commonwealth?** | **ASSUMPTION 1**:  Pensioners have a claim against ERS and the Commonwealth, jointly, for their pensions, which will be paid by the CW under Act 106-2017.<br><br>**BASIS**:  ERS is responsible for payments to pensioners, and pensioners have a claim for their pensions against ERS, subject to the limitation that pensioners cannot collect more than in full from the combination of ERS and the Commonwealth.  However, Act 106 requires ERS to transfer its assets to the Commonwealth to fund the "pay-as-you-go" pension system.  So, either the pensioners get paid from all the unencumbered assets of ERS (as the bonds are nonrecourse and have no deficiency claim payable from those assets), or these unencumbered assets are transferred to the Commonwealth to pay |

|  | Question | Assumption |
|---|---|---|
|  |  | pensioners via PayGo. In any case, ERS assets that are collateral to pay ERS bonds are used to pay ERS bonds. |
| 4. | **Are ERS bondholders entitled to accelerate payment of their bonds?** | **ASSUMPTION**:  No, ERS bonds do not allow acceleration. |
| 5. | **Should interest on debt that remained unpaid during the stay accrue additional interest?** | **ASSUMPTION**:  No. Interest on interest should not accrue.<br><br>**BASIS**:  Interest on interest is subject to equitable principles in the absence of an express contract right, but it is not allowed under CW law and therefore should not be available. |
| 6. | **Other Litigation Claims?** | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  Ultra vires claim that ERS bonds were issued without authorization has no merit.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  Ultra vires claim eliminates the remaining bond claims, although bondholders keep payments made to them so far.<br><br>**ASSUMPTION 3 [LITIGATION RISK]**:  Ultra vires claim eliminates the remaining bond claims, and bondholders must pay back approximately $400M in payments made to them as alleged in the complaint filed by the FOMB's special claims committee. |

## DEBT STACK[3]

1. **Operating Cost**
   a. No operating cost. ERS's functions have been moved to the CW pursuant to Act 106-2017. Accordingly, it is no longer incurring operating costs.

2. **ERS Debt**

| | Issue Date | Amount Issued | Range of Interest Rates | Final Maturity Date | Balance as of ERS Petition Date |
|---|---|---|---|---|---|
| Senior Pension Funding Bonds, Series 2008A | 1/31/08 | $1,588,810,799 | 5.85 – 6.45 | 7/01/58 | $1,623,270,999 |
| Senior Pension Funding Bonds, Series 2008B | 6/02/08 | $1,058,634,613 | 6.25 – 6.55 | 7/01/58 | $1,243,631,177 |
| Senior Pension Funding Bonds, Series 2008C | 6/30/08 | $300,202,930 | 6.15 – 6.50 | 7/01/43 | $301,890,520 |

3. **Other unsecured claims**
   a. $55.6 million. "Other Liabilities" as set forth in the 2014 ERS CAFR.

---

[3] The financial information contained herein relies on information available in most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth advisors. The legal advisors take no position as to the accuracy of the financial information provided herein.

In certain parts of the debt stack, only information related to the main assumption above is incorporated.

*Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Public Buildings Authority (PBA)*

This analysis assesses the recoveries available to creditors of PBA on the basis of available remedies under non-bankruptcy laws including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA, a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in greater recoveries for the creditors than is provided by such plan." In this context, this analysis provides an estimated range of recoveries that would be available to creditors if the stay of debt enforcement is terminated, no Plan of Adjustment agreement is consummated, and the PBA Title III case is dismissed.

This document has two sections. The first section provides an overview of the methodology used in developing the analysis. The methodology outlines the approach to estimating resources available for debt service, a summary of outstanding creditor obligations, and the priority in which funds are disbursed and the order in which creditor claims are assumed to be paid. The second section presents the ranges that define the estimated likely potential outcomes for available recoveries to creditors of PBA.

This analysis was prepared by McKinsey & Company, Inc. Washington D.C. ("McKinsey & Company"). Proskauer Rose LLP and O'Neill & Borges LLC[1], legal advisors to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. Those assumptions are included in Appendix 1 of this document. The financial advisors to the FOMB provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt, perspective on cash balances, and other financial data. McKinsey & Company also relied on data published by or directly provided by the Government of Puerto Rico and/or its advisors. McKinsey & Company has accepted as true, accurate, and appropriate all of the legal and financial information and assumptions provided by the other FOMB advisors as well as from the Government of Puerto Rico and its advisors. McKinsey & Company has not independently verified any of the information or assumptions received from other advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in this analysis are inherently subject to business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to or potentially realized by creditors on the basis of available remedies under any laws, including the Puerto Rico Constitution, would or would not approximate the estimates and assumptions represented in the analysis, and actual results may vary materially from those shown herein. McKinsey & Company does, however, represent that the recovery range identified herein is its best estimate based on

---

[1] Proskauer Rose LLP and O'Neill & Borges LLC are collectively referred to as "legal advisors" in this analysis.

conditions, knowledge, and information provided to it as described above as of September 24, 2019.

## I. *Methodology*

The analysis assumes that PROMESA Title III cases are dismissed but that PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement is lifted and the FOMB remains in place and will continue to certify Commonwealth Fiscal Plans and enforce implementation of budgets, subject to any debt enforcement in excess of budget that the Puerto Rico courts order. The analysis assumes creditors would pursue legal action against PBA to recover the amounts they are owed.

The assumption that PROMESA Titles I and II continue to apply maintains the impact of the fiscal measures and savings the FOMB inserts into its Certified Fiscal Plans. The FOMB's legal advisors believe it would be plausible to assume PROMESA Titles I and II do not apply because Congress enacted them in tandem with Title III and it is not clear they were intended to continue in effect without Title III. On balance, however, the legal advisors recommended that this analysis be prepared as if PROMESA Titles I and II continue to apply.

The analysis is predicated upon projections of revenues and expenses as contained in the 2019 Certified Fiscal Plan for Puerto Rico ("the Fiscal Plan"). The analysis relies on three components to calculate potential recoveries available to PBA creditors: 1) the Resource Envelope available to satisfy PBA creditor obligations, 2) the outstanding debt, and 3) priorities for distribution of funds for debt service.

The effective date of the analysis is June 30, 2019. The percentage recovery is calculated as the present value of the total amount expected to be paid to creditors over the entire period of analysis as a proportion of the total outstanding principal and unpaid interest as of effective date. Based on discussions with the FOMB's financial advisors, this analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments or future obligations.

**1) Resource Envelope:** The total amount of resources available to pay PBA creditor claims in each year constitutes PBA's Resource Envelope. The Resource Envelope in any year is the sum of starting cash available for debt service and PBA rent receipts after paying operating expenses[2].

As indicated in the "Debtors' Cash Accounts" section of the Disclosure Statement, the analysis of cash balances in PBA's bank accounts is ongoing and subject to further revision. Following guidance from conversations with the FOMB's financial advisors, an estimated total cash balance of $98.8 million as of June 30, 2019 is assumed for purposes of this analysis. From the total balance, $57.1 million is estimated to be originated through rent receipts and is earmarked for

---

[2] PBA bondholders could receive additional payments from the Commonwealth because PBA bonds are guaranteed by the Commonwealth. However, this analysis is restricted to what PBA can pay its creditors. Any potential additional payments from the Commonwealth are calculated in the Commonwealth version of this analysis, which is also included in the Disclosure Statement. PBA bondholders cannot collect more than payment in full of contractual debt service in any given year from the combination of PBA and the Commonwealth.

operational expenses or debt service. An amount of $13.7 million is not available for PBA bondholders or other claims as those funds are insurance proceeds for reconstruction of damaged property. The analysis of the remaining $28.0 million is still ongoing. Therefore, this analysis considers a range of $57.1 million to $85.1 million of possible funds available for PBA bondholders.

Following guidance provided by legal advisors, PBA rent receipts are available for PBA bondholders after paying PBA operating expenses. As indicated in Appendix 1, this analysis assumes the Commonwealth will exercise its police powers to use those rent receipts to pay its operating expenses, which will keep PBA functioning. No other assets, such as insurance or FEMA proceeds, are assumed to be available for bondholder payments.

As indicated in the Fiscal Plan, total PBA operating expenses are comprised of PBA payroll and personnel costs, payments for maintenance and utilities, and capital expenditures. The PBA operating expenses also include annual retirement contributions to the PayGo system. Projections for expenditure groups take into consideration the estimated impact of fiscal measures outlined in the Fiscal Plan. Fiscal measures are a series of actions intended to reduce PBA expenditures and streamline its operations.

**2) Outstanding debt:** The total debt held by PBA creditors that is considered in this analysis is the sum of the PBA bond debt plus total unsecured claims against PBA. With respect to the PBA bonds, the FOMB commenced litigation challenging the validity of PBA bonds issued in or after 2012, as those might have been mischaracterized general obligations of the Commonwealth and issued above Puerto Rico's constitutional debt limit. Following guidance provided by legal advisors, this analysis assumes PBA bonds issued in or after 2012 are ruled invalid.

Based on data provided by the FOMB's financial advisors and excluding bonds issued in or after 2012, the PBA bond debt is comprised of the outstanding debt from the Government Facilities Revenue Bonds and Refunding Bonds, with a total outstanding principal balance of $3,426 million plus $524 million of unpaid interest as of the effective date of this analysis. The balance of total unsecured claims against PBA is estimated to be $240 million.

As indicated in Appendix 1, there is an additional litigation risk related to the validity of certain PBA bonds. The statutory unsecured claimholders' committee (the "UCC") has challenged the validity of all PBA bonds issued in or after March 2011 on the basis they violate the constitutional debt limit. The potential impact of this litigation on recoveries is described in the section entitled "Alternative outcomes based on ongoing litigation or litigation risks."

**3) Priorities for distribution of funds:** PBA bondholders are paid with starting cash corresponding to rent receipts, and with PBA rent receipts available after paying operating expenses. Unsecured claims are paid with the amount of starting cash that is not pledged to PBA bonds, which is in the range of $0 to $28 million. Any amount of cash remaining after PBA bond debt owed in any given year is paid can be saved for next year or used to pay unsecured claims.

Following guidance provided by legal advisors, funds are first assumed to be credited against cumulative interest owed, and then to the debt principal maturing in that year or previously, if any. Unpaid principal accrues interest according to the original rates stipulated in each of the relevant bond documents and is then added to the following year's debt. No interest accrues on interest balances.

Following guidance provided by legal advisors shown in Appendix 1, the funds available for PBA bondholders are distributed as shown in the following exhibit.

*Exhibit 1: Flow of funds in the analysis*



Priority of distribution of funds considered in analysis[1]

Resource Envelope

1 See Appendix 1 for more details
2 The annual surplus generated by PBA is comprised of PBA rent receipts less its operating expenses, excluding FEMA and insurance related revenues. Funds different from rent payments (i.e., insurance proceeds) are not considered available to PBA bondholders
3 It refers to cash on hand from rent receipts saved from previous years. As cash was originated through rent receipts, it is available to pay PBA bondholders.
4 PBA bondholders cannot collect more than payment in full of contractual debt service in any given year from the combination of PBA and the Commonwealth

This analysis does not take into consideration any additional payments PBA bondholders could receive from the Commonwealth as it is restricted to what PBA itself pays to its bondholders. Following guidance provided by legal advisors, PBA bonds hold a Commonwealth guarantee and therefore would have the right to seek payments from the Commonwealth Resource Envelope if its obligations are not fully paid by PBA in any given year. Such payments would follow the priorities and recoveries described in the Commonwealth version of this analysis, which is also included in the Disclosure Statement.

## II.   *Estimated likely range of recoveries available to creditors*

The Fiscal Plan assumes PBA does not generate surpluses as its operating expenses are greater than its annual revenues in the period of analysis, which starts in FY2019 and ends in FY2049. Therefore, the starting cash from rent receipts, which is pledged to PBA bonds, is the only resource available to PBA bondholders.

The analysis estimates that the likely recovery available to PBA bondholders is between $57.1 and $85.1 million, which implies a recovery of 1.4% to 2.2%[3]. Unsecured claims would be paid only with the starting cash that is not pledged to PBA bondholders, which ranges between $0 and $28.0 million and implies a recovery of 0% to 11.7%. The estimated likely range of total recoveries available to all claims (i.e., PBA bonds and unsecured claims), therefore, is between $57.1 and $85.1 million, which implies a recovery range of 1.4% to 2.0%.

*Exhibit 2: Estimated likely range of recoveries available to all PBA creditors*

**Estimated likely range of recoveries available to PBA creditors[1]**
PV of total payment in USD million, % recovery

| | Lower end of range | Higher end of range |
|---|---|---|
| **PBA bonds** | $57.1<br>*1.4%* | $85.1<br>*2.2%* |
| **Unsecured claims** | $0<br>*0%* | $28.0<br>*11.7%* |
| **Total** | $57.1<br>*1.4%* | $85.1<br>*2.0%* |

1 Following guidance provided by legal advisors, recoveries on this exhibit assume PBA bonds issued in or after 2012 are ruled invalid

### *Alternative outcomes based on ongoing litigation or litigation risks*

The estimated likely range of recoveries available to PBA creditors is subject to the outcome of ongoing litigation regarding the total size of valid claims. As the outcome is uncertain, those sensitivities are not considered in the recoveries described above.

#### *i. Scenario 1*

As presented in Appendix 1 as part of the legal guidance provided by FOMB legal advisors, there is a possible perfection issue with the rent payments assignment. Under Puerto Rico law, a rent assignment must be perfected through a notarized document. Those notarized assignment agreements have not been found by legal advisors. If PBA bonds do not hold a perfect security interest, PBA bondholders would have no priority over unsecured creditors with respect to the assigned rent payments. In this scenario, the total recovery available to all PBA claims (i.e., PBA

---

3 The recovery percentage is estimated as the present value of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of June 30, 2019. A 5% annual discount rate is used for this calculation.

bonds and unsecured claims) would also be in the range of $57.1 to $85.1 million, which implies a recovery of 1.4% to 2.0%[4].

### ii. Scenario 2

The UCC has challenged the validity of all PBA bonds issued in or after March 2011 on the basis they violate the constitutional debt limit. This scenario assesses the impact on recoveries if PBA bonds issued in or after March 2011 are ruled invalid. Based on data provided by financial advisors and excluding PBA bonds issued in or after March 2011, the total principal outstanding for PBA bonds is $2,244 million and unpaid interest is $365 million as of the effective date of this analysis. Exhibit 3 shows the estimated likely range of recoveries under this scenario.

*Exhibit 3: Estimated likely range of recoveries available to all PBA creditors if PBA bonds issued in or after 2011 are deemed invalid*

**Estimated likely range of recoveries available to PBA creditors if PBA bonds issued in or after March 2011 are deemed invalid**
PV of total payment in USD million, % recovery

| | Lower end of range | Higher end of range |
|---|---|---|
| **PBA bonds** | $57.1 *2.2%* | $85.1 *3.3%* |
| **Unsecured claims** | $0 *0%* | $28.0 *11.7%* |
| **Total** | $57.1 *2.0%* | $85.1 *3.0%* |

### iii. Scenario 3

If all outstanding PBA bonds are deemed valid, the size of PBA bondholder claims would increase. In this scenario, based on data provided by financial advisors, the total principal outstanding for PBA bonds is $4,000 million and unpaid interest is $614 million as of the effective date of this analysis. Exhibit 4 shows the estimated likely range of recoveries under this scenario.

---

[4] If funds are distributed such that PBA bondholders and unsecured claims receive the same recovery, then PBA bonds would receive $53.8 to $80.2 million while unsecured claims would receive $3.3 to $4.9 million. The exact distribution, however, is subject to litigation.

*Exhibit 4: Estimated likely range of recoveries available to all PBA creditors if all outstanding PBA bonds are deemed valid*

**Estimated likely range of recoveries available to PBA creditors if all outstanding PBA bonds issued are deemed valid**

PV of total payment in USD million, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| **PBA bonds** | $57.1<br>*1.2%* | $85.1<br>*1.8%* |
| **Unsecured claims** | $0<br>*0%* | $28.0<br>*11.7%* |
| **Total** | $57.1<br>*1.2%* | $85.1<br>*1.8%* |

7

*APPENDIX 1*

## PBA Title III Plan

### Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| 1. | Can the PBA surplus projections from the fiscal plan be used for PBA's resource envelope? | **ASSUMPTION:** Yes, PBA surplus is an asset of PBA. |
| 2. | Is there any starting cash or other assets that should be considered to pay PBA bondholders? | **ASSUMPTION:**  Bondholders' only recourse is to the rent payments, and the CW guarantees.  No other assets (*e.g.*, insurance proceeds) should be considered as available for bondholder payments.<br><br>The Board's advisors can provide an updated figure of restricted and unrestricted starting cash at PBA's bank accounts. A portion of the starting cash at PBA's bank account might be pledged to PBA bondholders as this cash corresponds to rent receipts. The amount of starting cash not pledged to secure PBA bonds is assumed to be used to pay unsecured claims. |
| 3. | What is the waterfall of payments for PBA bonds? | **ASSUMPTION:**  After payment of necessary operating expenses from non-rent sources, if any, and then from rent for any property leased from PBA, the balance of the rent is used for debt service.  Any amount of cash remaining after PBA bond debt owed in any given year is paid can be saved for next year or used to pay unsecured claims.<br><br>When the debt is in default, the bondholders may also assert their guaranty claims against the Commonwealth; provided, however, the bondholders cannot collect more than payment in full of contractual debt service from the combination of PBA and the Commonwealth. |
| 4. | How should future PBA rents be projected? | **ASSUMPTION:**  PBA rents should track the projections in the Fiscal Plan; provided, however, the Commonwealth is unlikely to pay rent for buildings it does not need or occupy.  If that is insufficient to cover the PBA bond payments that come due, we assume PBA bondholders would seek payment from the Commonwealth based on the Commonwealth guaranty of PBA bonds. |

| | Question | Assumption |
|---|---|---|
| **5.** | How should the recovery for PBA bondholders be calculated?  Should payments from the CW and payments with PBA surplus be considered? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: Payments to PBA bondholders should first be from PBA rent revenue, including surplus revenues.  PBA bondholders' recoveries on the Commonwealth guaranty do not count in the PBA return.  However, in the aggregate, the PBA bondholders cannot collect more than payment in full of contractual debt service from their two sources of recovery.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  There is a possible perfection issue with the rent payments assignment.  Under PR law a rent assignment must be made through an authentic document with a fixed date (*i.e.*, through a notarized document).  In the PBA bond issuance documents that we have available, we have not found a notarized assignment agreement.  Nevertheless, under PR law, an unperfected security interest would still entitle PBA bondholders to their nonrecourse claim against the collateral.  In this scenario, PBA bondholders would be entitled to rent payments based on their security agreement; however, because the assignment is not perfected, PBA bondholders would have no priority over those payments vis-à-vis other PBA unsecured creditors. |
| **6.** | Are the PBA bonds issued in 2011 invalid because they violated the Commonwealth's constitutional debt limit? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: No, but PBA bonds issued in 2012 and after are deemed direct obligations of the Commonwealth, and as such, violate the debt limit.  Accordingly, those bonds are invalid.<br><br>**BASIS:** The Oversight Board has alleged the PBA Leases are not true leases and obligations purportedly due thereunder, but rather, are simply mischaracterized general obligations of the Commonwealth.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  Yes.  In addition to the PBA bonds issued in 2012 and after, PBA bonds issued in or after March 2011 also violate the debt limit, and accordingly are invalid.<br><br>**BASIS**:  In addition to the challenge explained above, the statutory unsecured claimholders' committee has challenged PBA bonds on that account starting in March 2011. |

| | Question | Assumption |
|---|---|---|
| | | **ASSUMPTION 3 [LITIGATION RISK]**:  No.  PBA bonds issued in or after March 2011 do not violate the debt limit.<br><br>**BASIS**:  The challenges explained in the bases above could be unsuccessful. |
| 7. | Are PBA bondholders entitled to accelerate payment of their bonds? | **ASSUMPTION**:  No, PBA bonds do not allow acceleration. |
| 8. | Should interest on debt that remained unpaid during the stay accrue additional interest? | **ASSUMPTION**:  No. Interest on interest should not accrue.<br><br>**BASIS**:  Interest on interest is subject to equitable principles in the absence of an express contract right, but it is not allowed under Commonwealth law and therefore should not be available. |
| 9. | Are FEMA funds available for bondholders? | **ASSUMPTION**:  No.  FEMA receipts are to fund emergency-related expenses and are not available for PBA's general expenditures. |

**DEBT STACK**[1]

1. **Operating Cost**
   a.   Projected $143 million in operating expenses in 2019, per the 2019 Certified Fiscal Plan.
2. **PBA Debt**

|  | Issue Date | Amount Issued | Range of Interest Rates | Final Maturity Date | Outstanding as of July 1, 2019 |
|---|---|---|---|---|---|
| Government Facilities Revenue Refunding Bonds, Series C | 1/30/02 | $185,290,000 | 5.50 – 5.75 | 7/01/22 | $46,800,000 |
| Government Facilities Revenue Bonds, Series D | 1/30/02 | $553,733,795 | 5.13 – 5.45 | 7/01/36 | $142,550,001 |
| Government Facilities Revenue Refunding Bonds, Series F | 10/24/02 | $131,445,000 | 5.25 | 7/01/25 | $122,130,000 |
| Government Facilities Revenue Bonds, Series G | 10/24/02 | $62,000,000 | 4.75 – 5.00 | 7/01/32 | $30,505,000 |
| Government Facilities Revenue Refunding Bonds, Series H | 10/24/02 | $272,717,418 | 5.50 | 7/01/19 | $82,850,000 |
| Government Facilities Revenue Bonds, Series I | 6/10/04 | $832,385,000 | 5.00 – 5.25 | 7/01/36 | $527,840,000 |
| Government Facilities Revenue Refunding Bonds, Series K | 5/27/04 | $50,000,000 | 5.25 | 7/01/27 | $50,000,000 |
| Government Facilities Revenue Bonds, Series L | 6/01/93 | $128,895,000 | 5.50 | 7/01/21 | $37,315,000 |
| Government Facilities Revenue Refunding Bonds, Series M-1 | 12/20/07 | $283,550,000 | 5.00 – 6.25 | 7/01/31 | $189,910,000 |
| Government Facilities Revenue Refunding Bonds, Series M-2 | 12/20/07 | $129,300,000 | 5.50 – 5.75 | 7/01/35 | $129,225,000 |
| Government Facilities Revenue Refunding Bonds, Series M-3 | 12/20/07 | $150,000,000 | 6.00 | 7/01/28 | $150,000,000 |
| Government Facilities Revenue Bonds, Series N | 12/20/07 | $329,415,000 | 5.00 – 5.50 | 7/01/37 | $311,315,000 |
| Government Facilities Revenue Refunding Bonds, Series P | 7/01/09 | $330,935,000 | 5.75 – 7.00 | 7/01/36 | $330,935,000 |
| Government Facilities Revenue Refunding Bonds, Series Q | 10/28/09 | $152,540,000 | 5.13 – 6.00 | 7/01/39 | $152,540,000 |
| Government Facilities Revenue Bonds, Series R | 8/24/11 | $756,449,000 | 5.65 – 5.70 | 7/01/28 | $756,449,000 |

---

[1] The financial information contained herein relies on information available in most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth advisors.  The legal advisors take no position as to the accuracy of the financial information provided herein.

In certain parts of the debt stack, only information related to the main assumption above is incorporated.

4

| | Issue Date | Amount Issued | Range of Interest Rates | Final Maturity Date | Outstanding as of July 1, 2019 |
|---|---|---|---|---|---|
| Government Facilities Revenue Bonds, Series S | 8/24/11 | $303,945,000 | 5.00 – 6.00 | 7/01/41 | $303,945,000 |
| Government Facilities Revenue Bonds, Series T | 12/22/11 | $121,528,000 | 5.60 | 7/01/30 | $120,777,000 |
| Government Facilities Revenue Refunding Bonds, Series U | 6/21/12 | $582,345,000 | 3.89 – 5.25 | 7/01/42 | $580,125,000 |

3. **Other unsecured claims**
   a. $240 million.  This amount includes the sum of liabilities with contractors and the Puerto Rico Infrastructure Financial Authority, borrowings under lines of credit, and accrued legal contingencies.[2]

---

[2] These numbers are based on information provided by the Board's financial advisors and have not been independently verified.