## **EXHIBIT O**

LATEST AUDITED FINANCIAL STATEMENT FOR COFINA



# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

## Municipal Secondary Market Disclosure Information Cover Sheet
## Municipal Securities Rulemaking Board (MSRB)
## Electronic Municipal Market Access System (EMMA)

**THIS FILING RELATES TO A SINGLE BOND ISSUE:**

Name of bond issue exactly as it appears on the cover of the Official Statement:

_____

_____

_____

Nine-digit CUSIP* numbers if available, to which the information relates:

_____

_____

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name: ____**Puerto Rico Sales Tax Financing Corporation (COFINA)**_____

Other Obligated Person's Name (if any): _____

Six-digit CUSIP* number(s): __**74529J**_____

**TYPE OF INFORMATION PROVIDED:**

A. ☐ **Annual Financial Information and Operating Data pursuant to Rule 15c2-12**

    **Fiscal Period Covered:** _____

B. ☒ **Audited Financial Statements or CAFR pursuant to Rule 15c2-12**

    **Fiscal Period Covered:** __2017-2018_____

C. ☐ **Notice of Failure to Provide Annual Financial Information as Required**

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.


_/s/ Iván Garau González_____
Iván Garau González
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth

Dated: June 20, 2019



# PUERTO RICO SALES TAX FINANCING CORPORATION
## (A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements and
Required Supplementary Information

June 30, 2018

(With Independent Auditors' Report Thereon)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

## Table of Contents

|  | Page |
|---|---|
| Independent Auditors' Report | 1–2 |
| Management's Discussion and Analysis (Unaudited) | 3–9 |
| Basic Financial Statements: |  |
| Governmental Funds Balance Sheets and Statement of Net Deficit | 10 |
| Reconciliation of Governmental Funds Balance Sheets to the Statement of Net Deficit | 11 |
| Governmental Funds Statements of Revenues, Expenditures, and Changes in Fund Balance and Statement of Activities | 12 |
| Reconciliation of the Governmental Funds Statements of Revenues, Expenditures, and Changes in Fund Balance to the Statement of Activities | 13 |
| Notes to Basic Financial Statements | 14–56 |



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

## Independent Auditors' Report

The Board of Directors
Puerto Rico Sales Tax Financing Corporation:

We have audited the accompanying financial statements of the governmental activities and each major fund of the Puerto Rico Sales Tax Financing Corporation (the Corporation), a component unit of the Commonwealth of Puerto Rico, as of and for the year ended June 30, 2018, and the related notes to the financial statements, which collectively comprise the Corporation's basic financial statements as listed in the table of contents.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express opinions on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

### Opinions

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities and each major fund of the Puerto Rico Sales Tax Financing Corporation, as of June 30, 2018, and the respective changes in financial position for the year then ended, in accordance with U.S. generally accepted accounting principles.

KPMG LLP is a Delaware limited liability partnership and the U.S. member
firm of the KPMG network of independent member firms affiliated with
KPMG International Cooperative ("KPMG International"), a Swiss entity.



**Emphasis of Matter**

*Emphasis of Matter Regarding Title III of PROMESA Filing*

As discussed in notes 3, 4, 12(b), and 12(d) to the basic financial statements, on May 5, 2017, the Oversight Board created by the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) filed a petition for relief under Title III of PROMESA similar to bankruptcy. On February 5, 2019, the Title III Court entered an order confirming the Corporation's Third Amended Plan of Adjustment (the Plan). The Plan became effective in accordance with its terms on February 12, 2019, and the Corporation emerged from Title III of PROMESA. Our opinions are not modified with respect to this matter.

**Other Matters**

*Required Supplementary Information*

U.S. generally accepted accounting principles require that the management's discussion and on pages 3–9 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

KPMG LLP

San Juan, Puerto Rico
June 18, 2019

Stamp No. E363986 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

2

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2018

As management of the Puerto Rico Sales Tax Financing Corporation ("the Corporation" or "COFINA"), we offer readers of the Corporation's financial statements this narrative overview and analysis of the financial performance during the fiscal year ended June 30, 2018. Please read it in conjunction with the Corporation's basic financial statements including the notes thereto, which follow this section.

**Financial Highlights**

- Net deficit in the statement of net deficit increased to $9,432.9 million at June 30, 2018 from $8,424.7 million at June 30, 2017. The increase in net deficit is mainly due to interest expense on Sales Tax Revenue Bonds and other expenses, of approximately $1,013.9 million.

- Receipt of sales and use tax increased to $753.1 million in fiscal year 2018 from $724.1 million in fiscal year 2017, an increase of $29 million. This increase was due to a statutory rate increase of 4% provided by Act No. 91, as amended. See Note 1 to the basic financial statements.

- During the year ended June 30, 2018, the Corporation made its scheduled principal payments of $18.7 million comprised of its fixed rate sales tax revenue bonds, first subordinate series 2009A and fixed rate sales tax revenue bonds, first subordinate series 2010A in the amounts of $15.7 million and $3 million, respectively. While the Corporation continued to make transfers to the trustee, payments to bondholders were not disbursed commencing in June 2017 and subsequently pursuant to an order by the U.S. District Court for the District of Puerto Rico (the "Court"). The Court entered an order requiring the trustee to interplead the June 1, 2017 payment and any future payments of principal and interest on senior and subordinated Corporation sales tax revenue bonds until entry of a final order of the Court directing the timing and manner of disbursement of such funds. As further discussed in Note 12 to the basic financial statements, in February 2019, the Title III Court confirmed the Corporation's Third Amended Plan of Adjustment and the entitlement of interplead funds.

- On February 12, 2019, the Corporation emerged from Title III of PROMESA. On that date, the Corporation consummated its Third Amended Plan of Adjustment. Consummation of the Third Amended Plan of Adjustment together with the enactment of Act No. 241 of 2018 provided for the restructuring of COFINA's bonds, clarifying its title to the COFINA Pledged Sales Taxes and establishing an independent board of directors with financial and operating independence from the Commonwealth and corporate governance consistent with such independence. For additional information, refer to Note 12 to the basic financial statements.

- In February 2019, COFINA's existing senior and subordinated bondholders received new senior lien bonds worth approximately $12 billion on account of their approximately $17 billion in claims, which are secured by a statutory lien on the restructured COFINA pledged taxes. The Corporation has made its scheduled payments on its newly issued fixed-rate sales tax revenue bonds since February 12, 2019.

**Overview of the Financial Statements**

These basic financial statements include the management's discussion and analysis section, the independent auditors' report, and the basic financial statements of the Corporation. The basic financial statements also include notes that explain in more detail some of the information in the basic financial statements.

These basic financial statements and notes thereto should be read in conjunction with certain public documents concerning the Corporation. The notes provide a description for convenience of the reader and is qualified in its entirety by reference to the provisions of the Third Amended Plan of Adjustment, Act No. 241 of 2018, the Amended Findings and Conclusions, and Amended Confirmation Order, respectively. To the extent there is any

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2018

discrepancy between the description contained herein and the terms set forth in each of these documents, the terms set forth therein control, respectively. Readers are directed to the Third Amended Plan of Adjustment, Act No. 241 of 2018, the Amended Findings and Conclusions, and Amended Confirmation Order, which are public documents.

**Required Financial Statements**

- The statement of net deficit provides information about the nature and amounts of resources (assets) and the Corporation's obligations (liabilities).

- Current year revenues and expenses are accounted for in the statement of activities. This statement measures the results of the Corporation's operations over the past year.

- Governmental funds' financial statements present the financial position and results of operations of the Corporation's two governmental fund types using a current financial resources measurement focus. The statement of revenues, expenditures, and changes in fund balance can be used to determine, for example, whether and how the Corporation met its debt service requirements for the year.

**Financial Analysis**

In evaluating the Corporation's finances, in addition to the Corporation's assets and liabilities, one needs to consider various non-financial factors, such as changes in economic conditions, and new or changed government legislation. Due to the nature of the Corporation's activities, the Corporation's financial strength and ability to repay its obligations is solely dependent on the sales and use tax used to fund the debt service fund.

For additional information about the sales and use tax used to fund the debt service fund, refer to Note 1 to the basic financial statements.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2018

**Government-Wide Financial Analysis**

The government-wide financial statements were designed so that the user could evaluate the Corporation's financial condition at the end of the year. The following is a condensed summary of net deficit for the Corporation at June 30, 2018 and 2017 (in thousands):

| | June 30 | | Change | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | Amount | Percent |
| Assets: | | | | |
| Receivable from Commonwealth of Puerto Rico | $ 8,158,581 | $ 8,911,656 | $ (753,075) | (8.5)% |
| Other assets | 1,269,016 | 506,396 | 762,620 | 150.6 |
| Total assets | 9,427,597 | 9,418,052 | 9,545 | 0.1 |
| Total deferred outflow of sources | 100,102 | 109,400 | (9,298) | (8.5) |
| Liabilities: | | | | |
| Accounts payable and other | 998,791 | 311,882 | 686,909 | 220.2 |
| Liabilities payable from restricted assets | 17,868,731 | 17,544,750 | 323,981 | 1.8 |
| Total liabilities | 18,867,522 | 17,856,632 | 1,010,890 | 5.7 |
| Total deferred inflow of sources | 93,091 | 95,471 | (2,380) | (2.5) |
| Net deficit – unrestricted | $ (9,432,914) | $ (8,424,651) | $ (1,008,263) | 12.0% |

As noted above, the Corporation's net deficit at June 30, 2018, amounted to $(9,432.9) million, an increase of $1,008.4 million or 12% from $(8,424.7) million at June 30, 2017. The increase in net deficit is mainly due to interest expense on Sales Tax Revenue Bonds and other expenses, of approximately $1,013.9 million. At June 30, 2018, the Corporation had $17,868.7 million of bonds payable issued and outstanding, an increase of approximately $324 million or 1.8% from $17,554.8 million at June 30, 2017. There were no new bond issuances during the year ended June 30, 2018, the net increase was principally the result of the accretion in the discount on capital appreciation bonds, see Note 9 to the basic financial statements. The increase in accounts payable and other was due to the order of Title III Court requiring to interplead the future principal and interest payments on bonds commencing with the interest payment of June 2017.

Payments from the Commonwealth of Puerto Rico (the Commonwealth) for Sales and Use Tax (SUT) are recognized as revenue in the fund financial statements upon collection or when the Commonwealth is obligated to make the payments. In the government-wide financial statements, these payments reduce the receivable from the Commonwealth. The pledged sales tax based amount for fiscal year 2018 of approximately $753.1 reduced the balance of the receivable from Commonwealth as of June 30, 2018.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2018

As of June 30, 2018 and 2017, the Corporation has recorded $3.4 million to cover for any unfavorable outcome related to a claim in connection with the termination of an interest rate exchange agreement in 2008, refer to Note 11 to the basic financial statements.

Condensed revenues, expenses, and change in net deficit for the year ended June 30, 2017 and 2016, are presented below (in thousands):

|  | June 30 | | Change | |
|  | 2018 | 2017 | Amount | Percent |
|---|---|---|---|---|
| Expenses: | | | | |
| Interest on long-term debt | $ (1,013,876) $ | (993,494) $ | (20,382) | 2.1% |
| Other | (4,320) | (1,523) | (2,797) | 183.7% |
| Total expenditures | (1,018,196) | (995,017) | (23,179) | 2.3% |
| Program revenues: | | | | |
| Investment earnings | 9,933 | 4,322 | 5,611 | 129.8% |
| Total revenues | 9,933 | 4,322 | 5,611 | 129.8% |
| Change in net deficit | $ (1,008,263) $ | (990,695) $ | (17,568) | 1.8% |

Total interest expense on long term debt for the year ended June 30, 2018 amounted to approximately $1,013.9 million, an increase of $20.4 million when compared to 2017. The increase in the interest expense on long-term debt is mainly related to an increase in the rate on variable-interest rate bonds and the impact of the discount on capital appreciation bonds. In previous years, the Corporation recorded a custodial credit loss on deposits in the Government Development Bank for Puerto Rico (the Bank or GDB) amounting to $26.2 million based on an evaluation of the availability and recoverability of such deposits.

There were no expenses paid by the Corporation on behalf of the Commonwealth for authorized uses pursuant Act No. 91 during the year ended June 30, 2018. Interest income on investments increased when compared to the previous year due to the accumulation of funds transferred by the Corporation to the trustee for debt service which were invested until the Title III Court determines the timing and manner in which interplead funds would be distributed.

**Governmental Fund Financial Analysis**

The Corporation's governmental funds reported a total fund balance as of June 30, 2018 and 2017, of $538.7 million and $489.6 million, respectively. The debt service fund is funded with the receipts of sales and use tax and interest thereon. For the years ended June 30, 2018 and 2017, the receipts of sales and use tax amounted to $753.1 million and $724.1 million, respectively.

**Debt Administration**

As of June 30, 2018, the Corporation's outstanding bonds balance was $17,868.7 million, after taking into account an unamortized bond premium of $70.4 million, and an unaccreted discount of $101.4 million. During the year ended June 30, 2018, there were no payments of principal and interest on senior and subordinated Corporation's sales tax revenue bonds due to interpleader action filed by the trustee.

As of June 30, 2017, the Corporation's outstanding bonds balance were $17,544.7 million, after taking into account unamortized bond premium of $74.6 million, and an unaccreted discount of $104.4 million. During the year ended June 30, 2017, the Corporation made its scheduled payment of $38.3 million on its fixed rate sales tax revenue bonds, first subordinate series 2009A.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2018

The bonds are payable in various dates through fiscal year 2058.

The Bank of New York Mellon, in its capacity as trustee for the sales tax revenue bonds issued by the Corporation (in such capacity, the "Trustee"), filed an adversary complaint in the Corporation's Title III proceeding for interpleader to preserve the funds held by the Trustee in trust pending resolution by the Court of all disputes with respect to ownership of the funds.  The Court entered an order requiring the Trustee, commencing with the $16.3 million interest bond payment due on June 1, 2017, to interplead and hold all disputed funds in the accounts into which they had been deposited, on behalf of the party or parties ultimately determined by the Court to be entitled to such funds.

As further discussed in Note 12 to the basic financial statements, on February 5, 2019, the Title III Court confirmed the Corporation's Third Amended Plan of Adjustment and interplead funds were distributed according the Plan of Adjustment.

**COFINA's Credit Ratings**

During the fiscal years 2018 and 2017, COFINA was subject to certain credit downgrades by the major credit rating agencies and currently, the credit ratings of the Corporation are non-investment grade.  The following table summarizes the Corporation's credit ratings as of June 30, 2018 and 2017:

| Agency | Date | Sales Tax Revenue Bonds | |
|--------|------|-------------------------|---|
| | | **Senior Lien Series** | **First Subordinate Series** |
| Moody's | 06/30/18 | Ca | Ca |
| | 06/30/17 | Caa3 | Ca |
| S&P | 06/30/18 | NR | NR |
| | 06/30/17 | D | D |
| Fitch | 06/30/18 | D | D |
| | 06/30/17 | C | C |

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2018

**Currently Known Facts:**

**Puerto Rico Oversight, Management and Economic Stability Act**

On June 30, 2016, the U.S. President signed into law the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). In general terms, PROMESA seeks to provide the Commonwealth and its component units, including the Corporation, with fiscal and economic discipline through, among other things: (i) the establishment of the Financial Oversight and Management Board for Puerto Rico (the Oversight Board), whose responsibilities include the certification of fiscal plans and budgets for the Commonwealth and its related entities, including the Corporation; (ii) a temporary stay of all creditor lawsuits; and (iii) two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a bankruptcy-type proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of the U.S. Bankruptcy Code (11 U.S.C. §§ 101, et seq.).

**Oversight Board Commencement of Title III Case**

On May 1, 2017, the stay under Title IV of PROMESA expired, permitting the substantial litigation brought by bondholders and other creditors against the Commonwealth and its instrumentalities, including the Corporation, to resume. On May 3, 2017, the Oversight Board, at the request of the Governor of Puerto Rico (the Governor), commenced a Title III case for the Commonwealth by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico (the Title III Court). On May 5, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for the Corporation by filing a similar petition for relief under Title III of PROMESA in the Title III Court.

The Bank of New York Mellon, in its capacity as trustee for the sales tax revenue bonds issued by the Corporation (in such capacity, the Trustee), filed an adversary complaint in the Corporation's Title III proceeding for interpleader to preserve the funds held by the Trustee in trust pending resolution by the Court of all disputes with respect to ownership of the funds. The Court entered an order requiring the Trustee, commencing with the $16.3 million bond payment due on June 1, 2017, to interplead and hold all disputed funds in the accounts into which they had been deposited, on behalf of the party or parties ultimately determined by the Court to be entitled to such funds. The Court's order allowed creditors to litigate competing claims to the funds held by the Trustee.

Title III of PROMESA incorporates the automatic stay provisions of Bankruptcy Code sections 362 and 922, which are made applicable to Title III cases pursuant to PROMESA section 301 (a). As further discussed in Note 12 to the basic financial statements, certain stakeholders (bondholders, creditors, guarantors, investors and others) commenced legal proceedings challenging the constitutionality of the law that created COFINA and the ownership of the future SUT revenues.

As further discussed in Note 12 to the basic financial statements, on February 5, 2019, the Title III Court confirmed the Corporation's Third Amended Plan of Adjustment.

On February 12, 2019, the Corporation emerged from Title III of PROMESA. On that date, the Corporation consummated its Third Amended Plan of Adjustment. Consummation of the Third Amended Plan of Adjustment together with the enactment of Act No. 241 of 2018 provided for the restructuring of COFINA's bonds, clarifying its title to the COFINA Revenues (as defined in Note 12(f) to the basic financial statements) and establishing an independent board of directors with financial and operating independence from the Commonwealth and corporate governance consistent with such independence. For additional information, refer to Note 12 to the basic financial statements.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2018

**Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Financial Emergency and Fiscal Responsibility of Puerto Rico Act and Related Executive Order**

On April 6, 2016, the Commonwealth enacted Act. No. 21 of 2016, known as the Puerto Rico Emergency Moratorium and Rehabilitation Act (as amended, the Moratorium Act). Pursuant to the Moratorium Act, on June 30, 2016, the Governor signed an Executive Order, EO-2016-030 (EO No. 2016-30), declaring the Commonwealth to be in state of emergency and declaring a moratorium on the Commonwealth's obligation to make payments on bonds, and notes issued or guaranteed by the Commonwealth. The Moratorium Act, as amended, also created the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA) as an independent public corporation to assume the GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth and its instrumentalities.

On January 29, 2017, the Governor signed Act No. 5 of 2017 (Act No. 5), Puerto Rico Fiscal Responsibility and Financial Emergency Act, which superseded and amended the Moratorium Act. Act No. 5 declared the Commonwealth to be in state of emergency and declares a moratorium on the Commonwealth's obligation to make payments on bonds, and notes issued or guaranteed by the Commonwealth. Act No. 5 of 2017 also gave FAFAA primary responsibility for overseeing matters related to restructuring the financial liabilities of the Commonwealth and its instrumentalities and public corporations, coordinating liability management or other transactions with respect to such obligations, and ensuring compliance with fiscal plans and budgets approved by the Oversight Board under PROMESA.

**Mitigating Factors to Going Concern**

Notwithstanding the circumstances existing on June 30, 2018, based on subsequent events that remediated the Corporation's financial condition and addressed its liabilities, management does not believe there is substantial doubt about the Corporation's ability to continue as a going concern as of the date of these basic financial statements.

As further discussed in Note 12 to the basic financial statements, on February 5, 2019, the Title III Court confirmed the Corporation's Third Amended Plan of Adjustment. On February 12, 2019, the Corporation emerged from Title III of PROMESA.  On that date, the Corporation consummated its Third Amended Plan of Adjustment. Consummation of the Third Amended Plan of Adjustment together with the enactment of Act No. 241 of 2018 provided for the restructuring of COFINA's bonds, clarifying its title to the COFINA Pledged Sales Taxes and establishing an independent board of directors with robust corporate governance and financial and operating independence from the Commonwealth.  For additional information, refer to Note 12 to the basic financial statements. The Corporation has made its scheduled payments on its newly issued fixed-rate sales tax revenue bonds since February 12, 2019.

**Request for Information**

This financial report is designed to provide those interested with a general overview of the Corporation's finances and to enhance the Corporation's accountability for the funds it receives. Questions about this report or requests for additional information should be addressed to Puerto Rico Sales Tax Financing Corporation, PO Box 42001, San Juan, Puerto Rico, 00940-2001.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Governmental Funds Balance Sheets and Statement of Net Deficit

June 30, 2018

| | Governmental Funds Balance Sheets | | | | |
| | General Fund | Debt Service Fund | Total | Adjustments | Statement of Net Position (Deficit) |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Interest-bearing deposits with the Government Development Bank for Puerto Rico, net of custodial credit loss | $ - | $ - | $ - | $ - | $ - |
| Deposit placed with commercial bank | - | 49,212,182 | 49,212,182 | - | 49,212,182 |
| Cash held by trustee | 6,373,391 | 27,044,744 | 33,418,135 | - | 33,418,135 |
| Receivable from the Commonwealth of Puerto Rico | - | 8,158,581,343 | 8,158,581,343 | - | 8,158,581,343 |
| Accrued interest receivable | - | 391,595 | 391,595 | - | 391,595 |
| Other receivables | - | 1,644,602 | 1,644,602 | - | 1,644,602 |
| Investments | - | 1,184,349,530 | 1,184,349,530 | - | 1,184,349,530 |
| Total assets | 6,373,391 | 9,421,223,996 | 9,427,597,387 | - | 9,427,597,387 |
| **Deferred outflows of resources:** | | | | | |
| Accumulated decrease in fair value of hedging derivative | - | - | - | 65,954,336 | 65,954,336 |
| Deferred loss on bonds refunding | - | - | - | 34,147,655 | 34,147,655 |
| Total deferred outflows of resources | - | - | - | 100,101,991 | 100,101,991 |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | 195,616 | 117,357 | 312,973 | 3,400,000 | 3,712,973 |
| Accrued interest payable | - | 710,247,974 | 710,247,974 | 218,876,099 | 929,124,073 |
| Interest rate swap liability | - | - | - | 65,954,336 | 65,954,336 |
| Unearned revenue - sales and use tax | - | 8,158,581,343 | 8,158,581,343 | (8,158,581,343) | - |
| Bonds payable in more than one year, net | - | 18,745,000 | 18,745,000 | 17,849,986,350 | 17,868,731,350 |
| Total liabilities | 195,616 | 8,887,691,674 | 8,887,887,290 | 9,979,635,442 | 18,867,522,732 |
| **Deferred inflows of resources:** | | | | | |
| Deferred gain on bond refundings | - | - | - | 93,090,734 | 93,090,734 |
| **Fund balance/net position (deficit):** | | | | | |
| Fund balance: | | | | | |
| Restricted | - | 533,532,322 | 533,532,322 | (533,532,322) | - |
| Unassigned | 6,177,775 | - | 6,177,775 | (6,177,775) | - |
| Total fund balance | 6,177,775 | 533,532,322 | 539,710,097 | (539,710,097) | - |
| Total liabilities and fund balance | $ 6,373,391 | $ 9,421,223,996 | $ 9,427,597,387 | | |
| **Net deficit:** | | | | | |
| Unrestricted | | | | (9,432,914,088) | (9,432,914,088) |
| Net deficit | | | | $ (9,432,914,088) | $ (9,432,914,088) |

See accompanying notes to basic financial statements.

10

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Reconciliation of Governmental Funds Balance Sheets to the
Statement of Net Deficit

June 30, 2018

| | | |
|---|---|---:|
| Total fund balances - governmental funds: | $ | 539,710,097 |
| Amounts reported for governmental activities in the statement of net deficit are different because: | | |
| Deferred outflows of resources do not constitute current financial resources and, therefore, are not reported in the funds | | 65,954,336 |
| Accrued interest payable is not due and payable in the current period, and, therefore, is not reported in the fund financial statements | | (218,876,099) |
| Contingent liabilities are not due and payable in the current period, and, therefore, are not reported in the fund financial statements | | (3,400,000) |
| Bonds and notes payable are not due and payable in the current period, and, therefore, are not reported in the funds financial statements | | (17,849,986,350) |
| Deferred loss on bond refundings is not reported as an expenditure in the governmental fund financial statements; however, such loss is deferred and amortized over the remaining life of the refunded bonds | | 34,147,655 |
| Deferred gain on bond refundings is not reported as revenue in the governmental fund financial statements; however, such gain is deferred and amortized over the remaining life of the refunded bonds | | (93,090,734) |
| Interest rate swap liability is not due and payable in the current period, and therefore, is not reported in the funds financial statements | | (65,954,336) |
| Receivable from the Commonwealth does not constitute current financial resources, and, therefore, is unearned in the fund financial statements | | 8,158,581,343 |
| Net deficit of governmental activities | $ | (9,432,914,088) |

See accompanying notes to basic financial statements.

11

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Governmental Funds Statements of Revenues,
Expenditures, and Changes in Fund Balance and Statement of Activities

June 30, 2018

| | Statements of Governmental Funds Revenue, Expenditures, and Changes in Fund Balances | | | | |
| --- | --- | --- | --- | --- | --- |
| | General Fund | Debt Service Fund | Total | Adjustments | Statement of Activities |
| Expenditures/expenses: | | | | | |
| General government: | | | | | |
| Other | $          - | $   4,319,507 | $   4,319,507 | $          - | $   4,319,507 |
| Debt service: | | | | | |
| Principal | - | 18,745,000 | 18,745,000 | (18,745,000) | - |
| Interest | - | 690,028,823 | 690,028,823 | 323,847,260 | 1,013,876,083 |
| Total expenditures/expenses | - | 713,093,330 | 713,093,330 | 305,102,260 | 1,018,195,590 |
| Program revenues: | | | | | |
| Payments from Commonwealth of | | | | | |
| Puerto Rico – sales and use tax | - | 753,074,280 | 753,074,280 | (753,074,280) | - |
| Investment earnings | 1,102 | 9,931,526 | 9,932,628 | - | 9,932,628 |
| Total revenues | 1,102 | 763,005,806 | 763,006,908 | (753,074,280) | 9,932,628 |
| Net program revenue (expenses) | 1,102 | 49,912,476 | 49,913,578 | (1,058,176,540) | (1,008,262,962) |
| Other financing sources (uses): | | | | | |
| Transfers (out) in | (168,283) | 168,283 | - | - | - |
| Total other financing sources (uses) | (168,283) | 168,283 | - | - | - |
| (Deficiency) excess of revenues and other financing sources over expenditures and other financing uses | (167,181) | 50,080,759 | 49,913,578 | (49,913,578) | - |
| Change in net deficit | - | - | - | (1,008,262,962) | (1,008,262,962) |
| Fund balance/net deficit: | | | | | |
| At beginning of year | 6,344,956 | 483,451,563 | 489,796,519 | (8,914,447,645) | (8,424,651,126) |
| At end of year | $   6,177,775 | $   533,532,322 | $   539,710,097 | $   (9,972,624,185) | $   (9,432,914,088) |

See accompanying notes to basic financial statements.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Reconciliation of Governmental Funds Statements of Revenues, Expenditures, and Changes in
Fund Balance and Statement of Activities

June 30, 2018

| | | |
|---|---|---:|
| Net changes in fund balances - total governmental funds: | $ | 49,913,578 |
| Amounts reported for governmental activities in the statement of activities are different because: | | |
| Repayment of long-term debt is reported as an expenditure in the governmental funds, but the repayment reduces long-term liabilities in the statement of net deficit | | 18,745,000 |
| Net change in interest payable reported in the statement of activities does not require the use of current financial resources and, therefore, is not reported as expenditure in the governmental funds | | 446,364 |
| Accretion on capital appreciation bonds does not require the use of current financial resources and, therefore, is not reported as expenditure in the governmental funds | | (325,159,638) |
| Payments from the Commonwealth of Puerto Rico – Sales and Use Tax provide current financial resources to governmental funds; however, represent repayments of the receivable from the Commonwealth of Puerto Rico in the statement of activities | | (753,074,280) |
| The amortization of bond discount/premium, and gain/loss on bond defeasance do not require the use of current financial resources and, therefore, are not reported as revenues/expenditures in governmental funds: | | |
| Amortization of bond discount/premium | | 1,178,429 |
| Amortization of gain/loss on bonds defeased | | (312,415) |
| Change in net deficit of governmental activities | $ | (1,008,262,962) |

See accompanying notes to basic financial statements.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

## (1)   Reporting Entity

Puerto Rico Sales Tax Financing Corporation (the Corporation or COFINA) is a public corporation and instrumentality of the Commonwealth of Puerto Rico (the Commonwealth), constituting a corporate and political entity independent and separate from the Commonwealth. The Corporation was created under Act No. 91 of the Legislative Assembly of the Commonwealth (the Legislative Assembly), approved on May 13, 2006; as amended by Act No. 291, approved on December 26, 2006; Act No. 56, approved on July 6, 2007; Act No. 1, approved on January 14, 2009; Act No. 7, approved on March 9, 2009; Act No. 18, approved on May 22, 2009; Act No.133, approved July 12, 2012; Act No. 116, approved October 10, 2013; Act No. 101, approved July 1, 2015; Act No. 84, approved July 22, 2016; and Act No. 241, approved November 15, 2018 (collectively, Act No. 91). The Corporation was originally created for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006 (the 2006 Appropriation Debt).

The Commonwealth imposes a sales and use tax (SUT) on a broad range of goods and services. As of June 30, 2017, the total tax imposed was 11.5% and was allocated as follows: 5.5% for the benefit of the Commonwealth (the 5.5% Sales Tax), 0.5% for the benefit of the Municipal Administration Fund, 4.5% as a sales and use tax surcharge for the benefit of the Commonwealth and 1.0% for the municipalities of the Commonwealth.

Act No. 91 established the Dedicated Sales Tax Fund, a special fund maintained in the name of the Corporation separate and apart from the Commonwealth's General Fund. As of June 30, 2017, Act No. 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each fiscal year, whichever is greater: (i) a minimum fixed amount, referred to in Act No. 91 as the Pledged Sales Tax Base Amount, or (ii) the product of the amount of the 5.5% Sales Tax collected during such fiscal year multiplied by a fraction, the numerator of which is two and seventy-five percent hundredths (2.75%) and the denominator of which is five and one-half percent (5.5%) (the greater of (i) and (ii) being referred to as the Pledged Sales Tax). As of June 30, 2017, in each fiscal year, the first collections of the 5.5% Sales Tax ultimately are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the fiscal year ended June 30, 2018, was $753,074,280. Under Act No. 91, as of June 30, 2018, the Pledged Sales Tax Base Amount increases each fiscal year at a statutory rate of 4.0% up to $1,850,000,000. Under Act No. 91, as of June 30, 2018, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or satisfaction of the Authorized Uses (as defined below).

During 2009, the Legislative Assembly expanded the purposes of the Corporation. The Corporation was authorized to pay or finance, in whole or in part, or fund, in addition to the 2006 Appropriation Debt: (i) the debt of the Secretary of the Treasury of the Commonwealth (the Secretary of the Treasury) with the Government Development Bank for Puerto Rico (Bank or GDB) in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for fiscal year 2009, (ii) certain financing granted to the Secretary of the Treasury by the Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008, that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) operational expenses of the Commonwealth for fiscal year 2012, to the extent included in the annual budget of the Commonwealth, (vi) the Puerto Rico Economic Stimulus Fund, (vii) the Commonwealth Emergency Fund in order to cover expenses resulting

14                                                                                          (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

from catastrophic events such as hurricanes or floods, and (viii) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the Authorized Uses).

Regardless of the level of 5.5 % Sales Tax collections, Act No. 91, as of June 30, 2018, requires that in each fiscal year all collections of the 5.5% Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is deposited before any collections of the 5.5% Sales Tax are deposited in the Commonwealth's General Fund.

**(2)    Summary of Significant Accounting Policies**

The preparation of basic financial statements in conformity with U.S. generally accepted accounting principles (US GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of changes in net deficit during the reporting period. Actual results could differ from those estimates.

The accounting and reporting policies of the Corporation conform to accounting principles generally accepted in the United States of America, as applicable to governmental entities. The Corporation follows Governmental Accounting Standards Board ("GASB") under the hierarchy established by Statement No. 55, *The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments*, in the preparation of its basic financial statements.

Following is a description of the Corporation's most significant accounting policies:

**(a)    Basis of Presentation**

The financial activities of the Corporation consist only of governmental activities. For its reporting purposes, the Corporation has combined the fund and government-wide financial statements using a columnar format that reconciles individual line items of fund financial data to government-wide data in a separate column.

Government-Wide Financial Statements – The statement of net deficit and the statement of activities report information on all activities of the Corporation. The effect of interfund balances has been removed from the statement of net deficit. Governmental activities are financed through revenue of the SUT deposited in the Dedicated Sales Tax Fund and other financing sources.

The statement of net deficit presents the Corporation's assets and liabilities, with the difference reported as net deficit. Net deficit is reported in two categories:

- Restricted Net Position – Results when constraints placed on net position use are either externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

- Unrestricted Net Position – Consist of net position that does not meet the definition in the preceding category. Unrestricted net position often is designated in order to indicate that management does not consider them to be available for general operations. Unrestricted net position often has constraints on use that are imposed by management, but such constraints may be removed or modified.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

The statement of activities demonstrates the degree to which direct expenses of a given function or segment are offset by program revenues. Direct expenses are those that are clearly identifiable within a specific function. Program revenues consist of investment earnings (including the change in fair value of ineffective investment derivative). Other items not meeting the definition of program revenues are reported as general revenues.

Governmental Funds Financial Statements – The accounts of the Corporation are organized on the basis of funds, each of which is considered a separate accounting entity. Separate financial statements are provided for governmental funds. Major individual governmental funds are reported as separate columns in the fund financial statements. All funds of the Corporation are major funds.

Fund Accounting – The financial activities of the Corporation are recorded in individual funds, each of which is deemed to be a separate accounting entity. Fund accounting is designed to demonstrate legal compliance and to aid financial management by segregating transactions related to certain government functions or activities. A fund is a separate accounting entity with a self-balancing set of accounts. The financial activities of the Corporation that are reported in the accompanying basic financial statements have been classified into the following major governmental funds:

- General Fund – The general fund of the Corporation is used to account for all financial resources, except those required to be accounted for in another fund.
- Debt Service Fund – The debt service fund is used to account for the SUT deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations.

Fund balances for each governmental fund are displayed in the following classifications depicting the relative strength of the spending constraints placed on the purposes for which resources can be used:

- Nonspendable – amounts that cannot be spent because they are either not in a spendable form (such as inventories and prepaid amounts) or are legally of contractually required to be maintained intact. The Corporation did not have any nonexpendable resources as of June 30, 2018.
- Restricted – amounts that can be spent only for specific purposes because of constraints imposed by external providers (such as grantors, bondholders, and higher levels of government), or imposed by constitutional provisions or enabling legislation. Effectively, restrictions may be changed or lifted only with the consent of the resource provider or by constitutional provisions or enabling legislation.
- Committed – amounts that can be spent only for specific purposes determined by a formal action of the government's highest level of decision-making authority.  The Corporation's highest decision-making level of authority rests with the board of directors. The Corporation did not have any committed resources as of June 30, 2018.
- Assigned – amounts the government intends to use for specific purposes that do not meet the criteria to be classified as restricted or committed (generally executive orders approved by the Corporation's Executive Director). The Corporation did not have any assigned resources as of June 30, 2018.
- Unassigned – amounts that are available for any purpose.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

### (b)   *Measurement Focus, Basis of Accounting and Financial Statement Presentation*

The accounting and financial reporting treatment is determined by the applicable measurement focus and basis of accounting. Measurement focus indicates the type of resources being measured such as current financial resources or economic resources. The basis of accounting indicates the timing of transactions or events for recognition in the financial statements.

Government-Wide Financial Statements – Government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows.

Governmental Funds Financial Statements – The governmental fund's financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenues are recognized when they become measurable and available. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the Corporation considers revenues to be available if they are collected within 30 days of the end of the current fiscal year-end. Expenditures generally are recorded when a liability is incurred as under accrual accounting, except that interest on general long-term obligations is generally recognized when paid, and debt service principal expenditures and claims and judgments are recorded only when payment is due. Expenses paid on behalf of the Commonwealth are recorded as an increase in the receivable from the Commonwealth of Puerto Rico in the government-wide financial statements.

Payments from the Commonwealth of Puerto Rico for SUT are recognized as revenue in the fund financial statements upon collection or when the Commonwealth is obligated to make the payments. In the government-wide financial statements, these payments reduce the receivable from the Commonwealth of Puerto Rico. Collections of SUT received after the receivable from the Commonwealth of Puerto Rico has been liquidated are reported as revenue in the statement of activities.

### (c)   *Budgetary Accounting*

The Corporation is not required to submit a budget for approval by the Legislative Assembly; consequently, no formal budgetary accounting procedures are followed.

### (d)   *Investments*

Investments are reported at fair value, except for money market instruments with a remaining maturity at the time of purchase of one year or less and investment positions in 2a7 (Securities and Exchange Commission Rule 2a7 of the Investment Company Act of 1940) like external investment pools, which are carried at amortized cost pursuant GASB Statement No. 79, *Certain External Investment Pools and Pool Participants*. The Puerto Rico Government Investment Trust Fund (PRGITF) is considered a 2a7 like external investment pool and, as such also reports its investments or short-term investments at amortized cost. There are no limitations nor restrictions on withdrawals related to the external investment pools held by the Corporation.

Fair value is determined based on quoted market prices and quotations received from independent broker/dealers or pricing service organizations.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

GASB Statement No. 72, *Fair Value Measurement and Application*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. This Statement requires a government to use valuation techniques that are appropriate under the circumstances and for which sufficient data are available to measure fair value. The techniques should be consistent with one or more of the following approaches; the market approach, the cost approach, or the income approach. This Statement also establishes a hierarchy of inputs to valuation techniques used to measure fair value. That hierarchy has three levels.

Level 1 - inputs whose values are based are quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2 - inputs other than quoted prices, included within Level 1 that are observable for the assets or liability, either directly or indirectly.

Level 3 - inputs are unobservable inputs for asset or liability and may require a degree of professional judgment.

*(e)* **Bond Issue Costs and Premium/Discount on Bonds**

Premium (discounts) on bonds are amortized in a systematic manner over the life of the debt in the government-wide financial statements. Premium (discounts) are recognized in the period when the related long-term debt is issued in the governmental funds financial statements, and therefore are not accounted for in subsequent periods. Bond issue costs are expensed as incurred in both government-wide and governmental fund financial statements.

*(f)* **Interfund Transactions**

Transfers represent flows of assets (such as cash or goods) without equivalent flows of assets in return and without a requirement for repayment. In governmental funds, transfers are reported as other financing uses in the fund making transfers and as other financing sources in the funds receiving transfers.

*(g)* **Refundings**

Refundings involve the issuance of new debt whose proceeds are used to repay immediately (current refunding) or at a future time (advance refunding) previously issued debt. The difference between the reacquisition price and the net carrying amount of the old debt is deferred and amortized as a component of interest expense over the remaining life of the old debt or the life of the new debt, whichever is shorter. The deferred amount is recorded on the statement of net deficit as either a deferred inflow or deferred outflow of resources.

*(h)* **Derivative Instruments**

The Corporation uses derivative financial instruments to manage the economic impact of fluctuations in interest rates. Derivative instruments are reported at fair value in the statement of net deficit.

*(i)* **Deferred Outflows / Inflows of Resources**

In addition to assets, the statement of net deficit includes a separate section for deferred outflows / inflows of resources. These separate financial statement elements, deferred outflows / inflows of resources, represent a depletion (expense/expenditure) or accretion (income) of net deficit that applies

18                                                                                      (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

to future periods and so will not be recognized as an outflow / inflow of resources until then.   The following table shows the deferred outflows / inflows of resources elements at June 30, 2018:

| | | |
|---|---|---:|
| Deferred outflows of resources: | | |
| Accumulated decrease in fair value of hedging derivative | $ | 74,075,971 |
| Deferred loss on bond refundings | | 34,147,654 |
| | $ | 108,223,625 |
| Deferred inflows of resources: | | |
| Deferred gain on bonds refunding | $ | 93,090,735 |

### (j)   *New Accounting Standard Adopted and Accounting Pronouncements Issued but Not Yet Effective*

**Accounting Standard Adopted**

- GASB Statement No. 81, *Irrevocable Split-Interest Agreements*. This Statement improves accounting and financial reporting for irrevocable split-interest agreements by providing recognition and measurement guidance for situations in which a government is a beneficiary of the agreement. Split-interest agreements are a type of giving agreement used by donors to provide resources to two or more beneficiaries, including governments. Split-interest agreements can be created through trusts, or other legally enforceable agreements with characteristics that are equivalent to split-interest agreements, in which a donor transfers resources to an intermediary to hold and administer for the benefit of a government and at least one other beneficiary. Examples of these types of agreements include charitable lead trusts, charitable remainder trusts, and life-interests in real estate. This Statement requires that a government that receives resources pursuant to an irrevocable split-interest agreement recognize assets, liabilities, and deferred inflows of resources at the inception of the agreement. Furthermore, this Statement requires that a government recognize assets representing its beneficial interests in irrevocable split-interest agreements that are administered by a third party, if the government controls the present service capacity of the beneficial interests. This Statement requires that a government recognize revenue when the resources become applicable to the reporting period. The adoption of this statement had no impact on the Corporation's basic financial statements.

- GASB Statement No. 85, *Omnibus 2017*. The objective of this Statement is to address practice issues that have been identified during implementation and application of certain GASB Statements. This Statement addresses a variety of topics including issues related to blending component units, goodwill, fair value measurement and application, and postemployment benefits (pensions and other postemployment benefits. Specifically, this Statement addresses the measuring of certain money market investments and participating interest earning investment contracts at amortized cost. There was not material impact on the Corporation's basic financial statements as a result of the implementation of the applicable parts of GASB Statement No. 85.

**Accounting Pronouncements Issued but not yet Effective**

- GASB Statement No. 84, *Fiduciary Activities*. The objective of this Statement is to improve guidance regarding the identification of fiduciary activities for accounting and financial reporting purposes and how those activities should be reported. The requirements of this Statement are effective for reporting periods beginning after December 15, 2018. Earlier application is encouraged.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

- GASB Statement No. 86, *Certain Debt Extinguishment Issues*. This Statement improves the consistency in accounting and financial reporting for in-substance defeasance of debt by providing guidance for transactions in which cash and other monetary assets acquired with only existing resources—resources other than the proceeds of refunding debt—are placed in an irrevocable trust for the sole purpose of extinguishing debt. This Statement also improves accounting and financial reporting for prepaid insurance on debt that is extinguished and notes to financial statements for debt that is defeased in substance. The requirements of this Statement are effective for fiscal years beginning after June 15, 2017. Earlier application is encouraged.

- GASB Statement No. 88, *Certain Disclosures Related to Debt, including Direct Borrowings and Direct Placements*. The primary objective of this Statement is to improve the information that is disclosed in notes to government financial statements related to debt, including direct borrowings and direct placements. It also clarifies which liabilities governments should include when disclosing information related to debt. This Statement defines debt for purposes of disclosure in notes to financial statements as a liability that arises from a contractual obligation to pay cash (or other assets that may be used in lieu of cash) in one or more payments to settle an amount that is fixed at the date the contractual obligation is established. This Statement requires that additional essential information related to debt be disclosed in notes to financial statements, including unused lines of credit; assets pledged as collateral for the debt; and terms specified in debt agreements related to significant events of default with finance-related consequences, significant termination events with finance-related consequences, and significant subjective acceleration clauses. For notes to financial statements related to debt, this Statement also requires that existing and additional information be provided for direct borrowings and direct placements of debt separately from other debt. The requirements of this Statement are effective for reporting periods beginning after June 15, 2018. Earlier application is encouraged.

- GASB Statement No. 87, *Leases*. The objective of this Statement is to better meet the information needs of financial statement users by improving accounting and financial reporting for leases by governments. This Statement increases the usefulness of governments' financial statements by requiring recognition of certain lease assets and liabilities for leases that previously were classified as operating leases and recognized as inflows of resources or outflows of resources based on the payment provisions of the contract. It establishes a single model for lease accounting based on the foundational principle that leases are financings of the right to use an underlying asset. Under this Statement, a lessee is required to recognize a lease liability and an intangible right-to-use lease asset, and a lessor is required to recognize a lease receivable and a deferred inflow of resources, thereby enhancing the relevance and consistency of information about governments' leasing activities. The requirements of this Statement are effective for reporting periods beginning after December 15, 2019. Earlier application is encouraged.

Management is evaluating the impact that these statements will have on the Corporation's basic financial statements.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

**(3) Mitigating Factors to Going Concern Matter**

Notwithstanding the circumstances existing on June 30, 2018, based on subsequent events that remediated the Corporation's financial condition and addressed its liabilities, management does not believe there is substantial doubt about the Corporation's ability to continue as a going concern as of the date of these basic financial statements.

On November 7 and 8, 2018, respectively, new legislation to amend and restate Act No. 91 of 2006 to establish the legal framework for the restructuring of COFINA's issued and outstanding bonds was passed in the Puerto Rico House of Representatives and the Puerto Rico Senate. On November 15, 2018, the Governor of Puerto Rico signed into law the new legislation as Act No. 241 of 2018. Act No. 241 of 2018 established the legal framework for the restructuring of COFINA's issued and outstanding bonds by, among other things, authorizing the issuance of new COFINA bonds necessary to complete the transactions contemplated under COFINA's Third Amended Plan of Adjustment.

On February 12, 2019, the Corporation emerged from Title III of PROMESA. On that date, the Corporation consummated its Third Amended Plan of Adjustment. Consummation of the Third Amended Plan of Adjustment together with the enactment of Act No. 241 of 2018 provided for the restructuring of COFINA's bonds, clarifying its title to the COFINA Pledged Sales Taxes and establishing an independent board of directors with robust corporate governance and financial and operating independence from the Commonwealth. For additional information, refer to Note 12. The Corporation has made its scheduled payments on its newly issued fixed-rate sales tax revenue bonds since February 12, 2019.

**(4) Puerto Rico Oversight, Management, and Economic Stability Act**

On June 30, 2016, the U.S. President signed into law the Puerto Rico Oversight, Management, and Economic Stability Act. (PROMESA), which grants the Commonwealth and its "covered territorial instrumentalities," including the Corporation, access to an orderly mechanism to restructure their debts in exchange for significant federal oversight over the Commonwealth's finances. In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through, among other things: (i) the establishment of the Oversight Board, whose responsibilities include the certification of fiscal plans and budgets for the Commonwealth and its related entities; (ii) a temporary stay of all creditor lawsuits under Title IV of PROMESA; and (iii) two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a quasi-bankruptcy proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of Title 11 of the United States Code (U.S. Bankruptcy Code). Each of these elements are divided among PROMESA's seven titles, as briefly discussed below

*Title I – Establishment of Oversight Board and Administrative Matters*

Title I of PROMESA established the Oversight Board upon PROMESA's enactment.). As stated in PROMESA, "the purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." On August 31, 2016, the President of the United States announced the appointment of the Oversight Board members. Each Oversight Board member is required to have "knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government." The Oversight Board was "created as an entity within the territorial government for which it was established" and is expressly not an entity of the federal government), but it was also established to act independently from the Commonwealth government, such that neither the Governor nor

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

the Legislature may "(i) exercise any control, supervision, oversight, or review over the Oversight Board or its activities; or (ii) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Oversight Board.

*Title II – Fiscal Plan and Budget Certification Process and Compliance*

Title II of PROMESA established the requirements for proposing and certifying fiscal plans and budgets for the Commonwealth and its instrumentalities. "Each fiscal plan serves as the cornerstone for structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards fiscal responsibility and access to capital markets."

In connection with negotiations surrounding the Original PSA (as described below) and in anticipation of the transactions contemplated by the Original PSA, on August 22, 2018, the Oversight Board requested a standalone fiscal plan for the Corporation for fiscal years 2019 to 2023. On August 27, 2018, the Corporation submitted its fiscal plan to the Oversight Board. On August 30, 2018, the Oversight Board delivered to the Corporation a notice of violation pursuant to PROMESA section 201(c)(3)(B) requiring certain changes and/or explanations in a revised COFINA fiscal plan. On September 7, 2018, the Corporation submitted a revised fiscal plan to the Oversight Board. On October 18, 2018, the Oversight Board certified the Corporation's fiscal plan, as amended.

*Title III – In-Court Restructuring Process*

On May 5, 2017, the Oversight Board created by PROMESA filed a petition for relief under Title III of PROMESA similar to bankruptcy. Title III of PROMESA established an in-court process for restructuring the debts of Puerto Rico and other United States territories that is modeled after the process under Chapter 9 of the Bankruptcy Code. In order to be a debtor under Title III, the territory and/or its instrumentalities must: (i) have an Oversight Board established for it or be designated a "covered entity"; (ii) have the Oversight Board issue a restructuring certification under PROMESA section 206(b); and (iii) "desire to effect a plan to adjust its debts." The Oversight Board has sole authority to file a voluntary petition seeking protection under Title III of PROMESA. *See* PROMESA § 304(a). As of the date hereof, the Oversight Board, at the request of the Governor, has commenced Title III cases for the Commonwealth and COFINA, among others.

In a Title III case, the Oversight Board acts as the debtor's representative and is authorized to take any actions necessary to prosecute the Title III case. *See* PROMESA § 315. Immediately upon filing the Title III petition, Bankruptcy Code section 362 (which is incorporated into Title III cases under PROMESA) applies to automatically stay substantially all litigation against the debtor (the Title III Stay). After the Title III case is commenced, the Chief Justice of the United States Supreme Court must designate a district court judge to sit by designation and preside over the Title III case. PROMESA also provides that the commencement of a Title III case "does not limit or impair the powers of a covered territory to control by legislation or otherwise the exercise of the political or governmental powers of the territory or territorial instrumentality."

A Title III case culminates in the confirmation of a plan of adjustment of the debts of the debtor. The Oversight Board has the exclusive authority to file a plan of adjustment. In order to be confirmed, a proposed plan of adjustment must meet the requirements set forth under PROMESA section 314.

22                                                                                      (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

On February 5, 2019, the Title III Court confirmed the Corporation's Third Amended Plan of Adjustment. On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective.  For additional information on the Third Amended Plan of Adjustment, refer to Note 12.

*Title IV – Temporary Stay of Litigation, Government Reporting, and Other Miscellaneous Provisions*

Title IV of PROMESA contains several miscellaneous provisions, including a temporary stay of litigation related to "Liability Claims," relief from certain wage and hour laws, the establishment of a Congressional Task Force on Economic Growth in Puerto Rico (the Task Force), the requirement that the Comptroller General of the United States submit two reports to Congress regarding the public debt levels of the U.S. territories, and expansion of the federal government's small business HUB Zone program in Puerto Rico.

Pursuant to PROMESA section 405, the enactment of PROMESA immediately and automatically imposed a temporary stay (the Title IV stay) from June 30, 2016 (the date of PROMESA's enactment) through February 15, 2017, of all "Liability Claim" litigation commenced against the Commonwealth and its instrumentalities after December 18, 2015. A "Liability Claim" is defined as any right to payment or equitable remedy for breach of performance related to "a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights entitlements, or obligations arise from contract, statute, or any other source of law related [thereto]" for which the Commonwealth or one of its instrumentalities was the issuer, obligor, or guarantor and such liabilities were incurred prior to June 30, 2016. The Title IV Stay was subject to a one-time 75-day extension by the Oversight Board or a one-time 60-day extension by the United States District Court. On January 28, 2017, the Oversight Board extended the Title IV Stay by 75 days to May 1, 2017, at which time the Title IV Stay expired.

Title IV of PROMESA also required several federal government reports. First, PROMESA established the Task Force within the legislative branch of the U.S. federal government. The Task Force submitted its report to Congress on December 20, 2016.

Second, PROMESA required the U.S. Comptroller General, through the Government Accountability Office (GAO), to submit a report to the House and Senate by December 30, 2017 regarding: (i) the conditions that led to Puerto Rico's current level of debt; (ii) how government actions improved or impaired its financial condition; and (iii) recommendations on new fiscal actions or policies that the Commonwealth could adopt. The GAO published this report on May 9, 2018.

Third, PROMESA required the U.S. Comptroller General, through the GAO, to submit to Congress by June 30, 2017 a report on public debt of the U.S. territories. In addition to its initial report, the GAO must submit to Congress updated reports on the public debt at least once every two years. The GAO published this report on October 2, 2017.

*Title V – Infrastructure Revitalization*

Title V of PROMESA established the position of the Revitalization Coordinator under the Oversight Board and provides a framework for infrastructure revitalization through an expedited permitting process for "critical projects" as identified by the Revitalization Coordinator.

*Title VI – Consensual, Out-of-Court Debt Modification Process*

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

Title VI of PROMESA established an out-of-court process for modifying Puerto Rico's debts. Under PROMESA section 601(d), the Oversight Board is authorized to establish "pools" of bonds issued by each Puerto Rico government-related issuer based upon relative priorities. After establishing the pools, the government issuer or any bondholder or bondholder group may propose a modification to one or more series of the government issuer's bonds. If a voluntary agreement exists, the Oversight Board must issue a certification and execute a number of additional processes in order to qualify the modification.

As of the date hereof, GDB has completed a restructuring under Title VI of PROMESA. As discussed above, pursuant to the terms of GDB's Title VI Qualifying Modification, any deposit claims of the Corporation at GDB were extinguished in exchange for interests in the Public Entity Trust. As such, the recovery to the Corporation on account of its deposit claim will depend upon the recovery ultimately received by the Public Entity Trust on account of the PET Assets.

*Title VII – Sense of Congress*

Title VII of PROMESA sets forth the sense of Congress that "any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States."

**(5) Deposits**

Custodial credit risk is the risk that, in the event of a bank failure of a depository financial institution, the Corporation will not be able to recover deposits or will not be able to recover collateral securities that are in possession of an outside party.

The table presented below discloses the level of custodial credit risk assumed by the Corporation at June 30, 2018. As of June 30, 2018, $108,248,572 of the depository bank balance of $108,748,572 was uninsured as follows:

|  | Carrying amount | | Depository bank balance | | Amount uninsured and uncollateralized |
|---|---|---|---|---|---|
| Interest-bearing deposits with GDB | $ | - | $ | 26,118,255 | $ | 26,118,255 |
| Deposits placed with banks |  | 49,212,182 |  | 49,212,182 |  | 48,962,182 |
| Cash held by trustee |  | 33,418,135 |  | 33,418,135 |  | 33,168,135 |
| Total | $ | 82,630,317 | $ | 108,748,572 | $ | 108,248,572 |

As of June 30, 2018, GDB continued to face significant risk and uncertainties and it did not have sufficient liquid financial resources to meet obligations as they became due. Therefore, deposits held at GDB continued under strict restrictions and limitations during fiscal year 2018, and subsequent periods. GDB served as the primary depository agent of the Commonwealth, its instrumentalities and municipalities' funds; account holders' deposits with GDB were thus subject to custodial credit risk. Management determined that a custodial credit loss existed for the deposits held at GDB based on an evaluation of the availability and recoverability of such deposits, a custodial credit loss on these deposits was recorded in previous years resulting in a reserve of the entire balance at June 30, 2018. The net carrying amount of the interest bearing deposits with GDB at June 30, 2018 is as follows:

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

| Governmental Funds | Deposit Balance | Custodial Credit Loss Allowance | Net Carrying Amount |
|---|---|---|---|
| General Fund: | | | |
| Interest bearing deposits with GDB | $ 19,693,391 | $ (19,693,391) | $ - |
| Debt Service Fund: | | | |
| Interest bearing deposits with GDB | 6,424,864 | (6,424,864) | - |
| Total | $ 26,118,255 | $ (26,118,255) | $ - |

On August 10, 2018, GDB commenced an action to restructure certain of its indebtedness pursuant to a Qualifying Modification (the Qualifying Modification) under Title VI of PROMESA. The United States District Court for the District of Puerto Rico approved GDB's proposed restructuring on November 6, 2018 and the Qualifying Modification went effective on November 29, 2018.

Pursuant to Act No. 109-2017, also known as the *Government Development Bank for Puerto Rico Debt Restructuring Act* (the GDB Restructuring Act) and the terms of the Qualifying Modification, claims on account of deposits held by the Commonwealth and other public entities, including COFINA, will be exchanged for beneficial units in the "Public Entity Trust" created pursuant to the GDB Restructuring Act. Specifically, under the provisions of the GDB Restructuring Act, on the closing date of the Qualifying Modification (the Closing Date), *i.e.*, November 29, 2018, the balance of liabilities owed between the Commonwealth and its agents, instrumentalities and affiliates, including COFINA (each a Non-Municipal Government Entity) and GDB will be determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date. Those Non-Municipal Government Entities having net claims against GDB, after giving effect to the foregoing adjustment, which includes COFINA, will receive their pro rata share of interests in the Public Entity Trust (or PET), which will be deemed to be full satisfaction of any and all claims such Non-Municipal Government Entity may have against GDB. The assets of the PET (the PET Assets) will consist of, among other items, a claim in the amount of $905 million against the Commonwealth, which is the subject of a proof of claim filed in the Commonwealth's Title III case.

As of February 28, 2018 (last reporting period that GDB has available financial information prior to its business discontinuance effective March 23, 2018), the Corporation held deposits at GDB of approximately $26.2 million (unaudited). As a result of the Qualifying Modification, the Corporation's recovery on account of this deposit claim will depend upon the recovery ultimately received by the Public Entity Trust on account of the PET Assets.

**(6) Receivable from the Commonwealth of Puerto Rico**

At June 30, 2018, the receivable from the Commonwealth of Puerto Rico consisted of 5.5% Sales Tax amounts for which the Commonwealth was obligated to make payments to the Dedicated Sales Tax Fund in each fiscal year based on formula described in Note 1.

As previously disclosed in Note 1, regardless of the level of 5.5% Sales Tax collections, as of June 30, 2018, Act No. 91 requires that in each fiscal year all collections of the 5.5% Sales Tax ultimately be deposited in

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is deposited before any collections of the 5.5% Sales Tax are deposited in the Commonwealth's General Fund.

(7)  **Investments**

At June 30, 2018, in accordance with investment guidelines promulgated by the Bank for agencies and public corporations of the Commonwealth under the authority provided by Act No. 113 of August 3, 1995, and Executive Order 1995-50A (the investment guidelines), the Corporation is authorized to purchase or enter into the following investment instruments:

- U.S. government and agencies obligations
- Certificates of deposit
- Bankers acceptances
- Commercial paper
- Participations in the Puerto Rico Government Investment Trust Fund (PRGITF)
- Obligations of the Commonwealth of Puerto Rico, its agencies, municipalities, public corporations, and instrumentalities
- Obligations of state and local governments of the United States of America
- Mortgage and asset-backed securities
- Corporate debt, including investment contracts
- External investment pools

At June 30, 2018, the Corporation's investment policies established limitations and other guidelines on maturities and amounts to be invested in the aforementioned investment categories and by issuer/counterparty and on exposure by country. In addition, such policies provided guidelines on the institutions with which investment transactions can be entered into. In addition, at June 30, 2018, the Asset Liability Management Committee (ALCO) of the Bank, in conjunction with the board of directors of the Corporation determine, from time to time, other transactions that the Corporation may enter into.

Investments held by the debt service fund are purchased following the provisions of the related trust indenture.

*Interest Rate Risk* – Interest rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment.  At June 30, 2018, the Corporation's investment policies also provide that the Bank's ALCO is responsible for implementing and monitoring the interest rate risk policies and strategies. At June 30, 2018, the practice of the Bank's ALCO was to meet on a monthly basis to coordinate and monitor the interest rate risk management of interest sensitive assets and interest sensitive liabilities, including matching of their anticipated level and maturities, consistent with the corresponding laws and the board of directors' objectives.

The following table summarizes the type and maturities of investments held by the Corporation at June 30, 2018:

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

| Investment type | | Due within one year | Credit Risk Rating |
|---|---|---|---|
| Debt securities: | | | |
| U.S. Treasury State and Local Government Series (SLGs) | $ | 43,415,734 | AAA |
| Corporate debt: | | | |
| BlackRock, Inc. | | 843,823,604 | A-1 |
| Investment pools: | | | |
| Dreyfus Government Cash Management | | 297,110,193 | Aaa-mf |
| Total investments | $ | 1,184,349,531 | |

At June 30, 2018, investments in investments pools consisted of $297,110,193 invested in Dreyfus Government Cash Management (Dreyfus) with the Bank of New York Mellon, which is an external investment pool registered with the Securities and Exchange Commission.

***Credit Risk*** – Credit risk is the risk that an issuer or other counterparty to an investment will not fulfill its obligations. The Corporation's investment policies provide that investment transactions shall be entered into only with counterparties that are rated BBB+/A-1 or better by Standard & Poor's or equivalent rating by Moody's or Fitch, depending on the type and maturity of the investment and the counterparty to the transaction. Any exceptions must be approved by the Corporation's board of directors. The investment policies also provide that purchases and sales of investment securities shall be made using the delivery versus payment procedures.

Investments in U.S. Treasury SLGs carry the explicit guarantee of the U.S. government. As of June 30, 2018, the credit rating of Dreyfus and the Corporate Debt portfolio was "Aaa-mf" and "A-1", respectively, by Standard & Poor's as shown in the table above. The investment in Corporate Debt and Dreyfus were held by Bank of New York Mellon, as trustee, in the name of the Corporation.

***Concentration of Credit Risk*** – The Corporation places no limits on the amount it may invest in any one issuer. As of June 30, 2018, 3.66% of the Corporation's investments are in debt securities, 71.25% are in corporate debt, and 25.09% are in external investment pools.

The following table shows the investments by fair value level held by the Corporation at June 30, 2018:

| Investments by fair value level | | Fair Value Measurement Levels | | | |
|---|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 | Total |
| Debt securities: | | | | | |
| U.S. Treasury State and Local Government Series (SLGs) | $ | — | 43,415,734 | — | $ 43,415,734 |
| Corporate debt: | | | | | |
| BlackRock, Inc. | | — | 843,823,604 | — | 843,823,604 |
| Total investments by fair value level | $ | — | 887,239,338 | — | 887,239,338 |
| Investments not measured at fair value: | | | | | |
| External Investment pools: | | | | | |
| Dreyfus Government Cash Management | | | | | 297,110,193 |
| Total investments | | | | $ | 1,184,349,531 |

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

The debt securities and corporate debt classified in Level 2 of the fair value hierarchy are valued using inputs other than quoted prices under Level 1 that are observable for the assets, either directly or indirectly on the measurement date.

**(8)   Transactions with the Bank and the Commonwealth**

At June 30, 2018, the Corporation was a related entity of the Bank and the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA). During the year ended June 30, 2018, the Bank and subsequently FAFAA provided certain management and administrative services to the Corporation at no cost.

The Act No. 21, as amended, created FAFAA, as an independent public corporation to assume the Bank's role as fiscal agent, financial advisor and reporting agent for the Commonwealth and its instrumentalities (Act No. 2 of 2017 subsequently, repealed and replaced the provisions of Act No.21 regarding FAFAA). FAFAA has also been assigned the tasks of overseeing matters related to the restructuring or adjustment of the Commonwealth's financial liabilities, coordinating liability management or other transactions with respect to such obligations, and ensuring compliance with fiscal plans and budgets approved by the Oversight Board pursuant PROMESA.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

**(9)   Bonds Payable**

As of June 30, 2018, bonds payable of the Corporation consist of the following (in thousands):

| Description | Face/Effective interest rate | | Amount |
|---|---|---|---|
| Sales Tax Revenue Bonds, Series 2007A: | | | |
| Capital Appreciation Bonds due from August 1, 2040 to August 1, 2056 | 4.96%–5.34% | $ | 2,891,610 |
| Fixed Rate Bonds due on August 1, 2057, including unamortized premium of $14,452 | 5.25% | | 578,337 |
| LIBOR-Based Adjustable Rate Bonds due on August 1, 2057 | 2.51% | | 136,000 |
| Sales Tax Revenue Bonds, Series 2007B: | | | |
| Capital Appreciation Bonds due from August 1, 2027 to August 1, 2032 | 6.20%–6.25% | | 289,142 |
| Fixed Rate Bonds due from August 1, 2036 to August 1, 2057, net of unaccreted discount of $2,418 | 6.05%–6.35% | | 1,183,642 |
| Sales Tax Revenue Bonds, Series 2007C: | | | |
| Capital Appreciation Bonds due from August 1, 2022 to August 1, 2038 | 6.10% | | 160,318 |
| Term Bonds due from August 1, 2022 to August 1, 2038 | 6.00% | | 415,305 |
| Sales Tax Revenue Bonds, Series 2008A: | | | |
| Capital Appreciation Bonds due from August 1, 2024 to August 1, 2036 | 6.23% | | 461,237 |
| Term Bonds due from August 1, 2027 to August 1, 2038 | 6.13% | | 488,885 |
| Subtotal carried forward | | | 6,604,476 |

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

| Description | Face/Effective interest rate | | Amount |
|---|---|---|---|
| Sales Tax Revenue Bonds, First Subordinate Series 2009A: | | | |
| Fixed Rate Bonds due from August 1, 2015 to August 1, 2029, including unamortized premium of $5,519, net of unaccreted discount of $8,788 | 4.25%–6.75% | $ | 1,580,506 |
| Term Bonds due from August 1, 2036 to August 1, 2044, including unamortized premium of $14,157, and net of unaccreted discount of $42,756 | 5.75%–6.50% | | 1,787,401 |
| Capital Appreciation Bonds due from August 1, 2030 to August 1, 2034 | 6.87%–7.12% | | 261,874 |
| Sales Tax Revenue Bonds, First Subordinate Series 2009B: | | | |
| Fixed Rate Bonds due from August 1, 2025 to August 1, 2039 | 6.05%–6.90% | | 1,080,800 |
| Capital Appreciation Bonds due from August 1, 2033 to August 1, 2035 | 7.37%–7.48% | | 104,188 |
| Convertible Capital Appreciation Bonds due from August 1, 2025 to August 1, 2031 (1) | 7.00% | | 200,106 |
| Sales Tax Revenue Bonds, Senior Series 2009C – Fixed Rate: Bonds due on August 1, 2057 | 5.75% | | 237,875 |
| Sales Tax Revenue Bonds, First Subordinate Series 2010A: | | | |
| Fixed Rate Bonds due from August 1, 2016 to August 1, 2040, including unamortized premium of $1,025 and net of unaccreted discount of $2,209 | 3.63%–5.63% | | 290,429 |
| Term Bonds due from August 1, 2036 to August 1, 2042, net of unaccreted discount of $23,028 | 5.38%–5.50% | | 1,215,991 |
| Capital Appreciation Bonds due from August 1, 2031 to August 1, 2036 | 6.65%–6.77% | | 227,725 |
| Convertible Capital Appreciation Bonds due on August 1, 2029 to August 1, 2033 (2) | 6.13%–6.25% | | 252,147 |
| Subtotal carried forward | | | 13,843,518 |

(1)    Convertible to fixed-rate interest bonds on August 1, 2020
        for bonds maturing on August 1, 2030 and 2031.
(2)    Convertible to fixed-rate interest bonds on August 1, 2019.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

| Description | Face/Effective interest rate | Amount |
|---|---|---|
| Sales Tax Revenue Bonds, First Subordinate Series 2010C: | | |
| Fixed Rate Bonds due from August 1, 2035 to August 1, 2041, including unamortized premium of $13,371 and net of unaccreted discount of $740 | 5.13%–6.50% | $ 463,483 |
| Term Bonds due from August 1, 2033 to August 1, 2041, net of unaccreted discount of $21,688 | 5.00%–5.50% | 1,049,284 |
| Capital Appreciation Bonds due from August 1, 2037 to August 1, 2039 | 6.62% | 165,595 |
| Sales Tax Revenue Bonds, First Subordinate Series 2010D — | | |
| Fixed Rate Bonds due on August 1, 2042 | 5.75% | 89,435 |
| Sales Tax Revenue Bonds, First Subordinate Series 2010E — | | |
| Fixed Rate Bonds due on August 1, 2042 | 5.75% | 92,755 |
| Sales Tax Revenue Bonds, First Subordinate Series 2011A-1: | | |
| Fixed Rate Bonds due on August 1, 2043, including unamortized premium of $2,490 and net of unaccreted discount of $2,518 | 5.00%–5.25% | 355,002 |
| Capital Appreciation Bonds due from August 1, 2023 to August 1, 2041 | 5.25%–6.50% | 61,651 |
| Sales Tax Revenue Bonds, First Subordinate Series 2011A-2 | | |
| Capital Appreciation Bonds due from August 1, 2043 to August 1, 2050 | 7.00% | 534,265 |
| Sales Tax Revenue Bonds, First Subordinate Series 2011B: | | |
| Fixed Rate Bonds due from August 1, 2031 and August 1, 2036 | 5.00%–5.15% | 45,620 |
| Sales Tax Revenue Bonds, Senior Series 2011C: | | |
| Fixed Rate Bonds due from August 1, 2020 to August 1, 2039, including unamortized premium of $8,686 and net of unaccreted discount of $657 | 4.00%–5.00% | 187,160 |
| Term Bonds due from August 1, 2040 and August 1, 2046, including unamortized premium of $13,349 | 5.00%–5.25% | 736,778 |
| Capital Appreciation Bonds due from August 1, 2034 to August 1, 2041 | 6.15%–6.25% | 153,030 |
| Sales Tax Revenue Bonds, Senior Series 2011D: | | |
| Fixed Rate Bonds due on August 1, 2023 | 3.80% | 45,000 |
| Term Bonds due from August 1, 2025 and August 1, 2036 | 4.10%–4.85% | 46,155 |
| Bonds payable – net | | $ 17,868,731 |

All term bonds have fixed interest rates.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

Bonds payable activity for the year ended June 30, 2018 is as follows (in thousands):

| Description | Balance at June 30, 2017 | Additions | Reductions | Balance at June 30, 2018 |
|---|---|---|---|---|
| Bonds payable | $ 12,136,840 | — | — | 12,136,840 |
| Capital appreciation bonds – principal | 23,004,336 | — | — | 23,004,336 |
| Discount on capital appreciation bonds | (17,566,606) | 325,160 | — | (17,241,446) |
| Less: | | | | |
| Unamortized bond premium (discount), net | (29,820) | — | (1,179) | (30,999) |
| Bonds payable – net | $ 17,544,750 | 325,160 | (1,179) | 17,868,731 |

The Bank of New York Mellon, in its capacity as trustee for the sales tax revenue bonds issued by the Corporation (in such capacity, the "Trustee"), filed an adversary complaint in the Corporation's Title III proceeding for interpleader to preserve the funds held by the Trustee in trust pending resolution by the Court of all disputes with respect to ownership of the funds.  The Court entered an order requiring the Trustee, commencing with the $16.3 million interest bond payment due on Puerto 1, 2017, to interplead and hold all disputed funds in the accounts into which they had been deposited, on behalf of the party or parties ultimately determined by the Court to be entitled to such funds. The interplead interest bond payments of $697.5 million due from June 2017 throughout June 30, 2018 and principal payments of $18.7 million scheduled for payment during the year ended June 30, 2018 are presented as accrued interest payable and bonds payable, respectively, in the fund financial statements because were due and payable to the bondholders as of June 30, 2018.

(continued)

## PUERTO RICO SALES TAX FINANCING CORPORATION
### (A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

As of June 30, 2018, debt service requirements for bonds outstanding were as follows:

| Year ending June 30 | Principal | Interest | Interest subsidy (1) | Total |
|---|---|---|---|---|
| 2019 and Due | $        66,695,000 | $    1,402,290,611 | $    (3,834,522) | $    1,465,151,089 |
| 2020 | 79,765,000 | 697,230,034 | (3,834,522) | 773,160,512 |
| 2021 | 99,185,000 | 714,547,404 | (3,834,522) | 809,897,882 |
| 2022 | 119,865,000 | 711,729,424 | (3,834,522) | 827,759,902 |
| 2023 | 159,270,000 | 704,416,137 | (3,834,522) | 859,851,615 |
| 2024–2028 | 1,475,125,000 | 3,371,567,423 | (19,172,612) | 4,827,519,811 |
| 2029–2033 | 2,936,830,000 | 2,930,563,249 | (19,172,612) | 5,848,220,637 |
| 2034–2038 | 4,772,725,000 | 2,350,958,123 | (19,172,612) | 7,104,510,511 |
| 2039–2043 | 7,277,510,000 | 1,247,059,264 | (16,296,720) | 8,508,272,544 |
| 2044–2048 | 6,876,495,000 | 357,481,374 | — | 7,233,976,374 |
| 2049–2053 | 5,808,190,828 | 313,364,874 | — | 6,121,555,702 |
| 2054–2058 | 5,469,520,419 | 274,534,754 | — | 5,744,055,173 |
| | $    35,141,176,247 | $   15,075,742,671 | $   (92,987,166) | $   50,123,931,752 |

| | |
|---|---|
| Plus (less): | |
| Unamortized premium | 70,405,358 |
| Unaccreted discount | (101,403,130) |
| Unaccreted interest | (17,241,447,125) |
| Bonds payable – net | $    17,868,731,350 |

(1)'   Sales Tax Revenue Bonds, First Subordinate Series 2010D and 2010E were issued as Build America Bonds. The Corporation will receive a subsidy payment from the federal government equal to 35% and 45%, respectively, of the amount of each interest payment. On June 24, 2013, the IRS sent notice that the subsidy payment on the Build America Bonds will be sequestered by a percentage ranging from 8.7% to 6.2% due to adjustments to the Federal Government budget (6.6% at June 30, 2018).

At June 30, 2018, the Corporation has $136,000,000 of LIBOR based adjustable-rate bonds maturing on August 1, 2057. As discussed in Note 10, as of June 30, 2018, the Corporation had entered into a $136,000,000 interest rate swap, whereby it receives the same rate paid on the adjustable rate bonds and pays a fixed rate of 4.92% through August 1, 2057. Accordingly, the Corporation has synthetically fixed the

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

interest rate on the adjustable rate bonds. Assuming the rate effective as of June 30, 2018 remains the same, debt service requirements for the adjustable rate bonds and net swap payments for their term, are as follows:

| Year ending June 30 | Adjustable-Rate Bonds | | Interest Rate Swap, Net | Total |
| | Principal | Interest | | |
|---|---|---|---|---|
| 2019 | $           — | 3,417,911 | 3,273,289 | 6,691,200 |
| 2020 | — | 3,417,911 | 3,273,289 | 6,691,200 |
| 2021 | — | 3,417,911 | 3,273,289 | 6,691,200 |
| 2022 | — | 3,417,911 | 3,273,289 | 6,691,200 |
| 2023 | — | 3,417,911 | 3,273,289 | 6,691,200 |
| 2024-2028 | — | 17,089,556 | 16,366,444 | 33,456,000 |
| 2029-2033 | — | 17,089,556 | 16,366,444 | 33,456,000 |
| 2034-2038 | — | 17,089,556 | 16,366,444 | 33,456,000 |
| 2039-2043 | — | 17,089,556 | 16,366,444 | 33,456,000 |
| 2044-2048 | — | 17,089,556 | 16,366,444 | 33,456,000 |
| 2049-2053 | — | 17,089,556 | 16,366,444 | 33,456,000 |
| 2054-2058 | 136,000,000 | 13,956,471 | 13,365,929 | 163,322,400 |
| Total | $ 136,000,000 | 133,583,362 | 127,931,038 | 397,514,400 |

The amount deposited each year in the Dedicated Sales Tax Fund is used for the payment of the Corporation's bonds payable. The minimum amount to be deposited is the Pledged Sales Tax Base Amount, which for the fiscal year ended June 30, 2018, was $753,074,280. The SUT Base Amount increases each fiscal year at a statutory rate of 4.0% up to $1,850,000,000. At June 30, 2018, the estimated Pledged Sales Tax Base Amount, by year, is as follows:

| Year ending June 30 | Amount |
|---|---|
| 2019 | $           783,197,251 |
| 2020 | 814,525,141 |
| 2021 | 847,106,147 |
| 2022 | 880,990,393 |
| 2023 | 916,230,008 |
| 2024-2028 | 5,161,101,155 |
| 2029-2033 | 6,279,268,701 |
| 2034-2038 | 7,639,690,489 |
| 2039-2043 | 9,050,806,510 |
| 2044-2048 | 9,250,000,000 |
| 2049-2053 | 9,250,000,000 |
| 2054-2058 | 9,250,000,000 |
| | $ 60,122,915,795 |

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

In September 2014, the board of directors of COFINA, due to Moody's and Fitch's downgrades of COFINA's credit triggering the Additional Termination Event (ATE) on the agreement, entered into an agreement with Goldman Sachs (GS) that required COFINA to post collateral over time, and allow the swap to remain in place and remove all ATE's. As of June 30, 2018, said collateral amounted to $49.2 million.

On July 29, 2014, Fitch lowered its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, Senior Series, and the COFINA Sales Tax Revenue Bonds, First Subordinate Series, from "AA-" to "BB-", and from "A+" to "BB-", respectively. Subsequently, Fitch lowered the Corporation's credit ratings various more times. As of June 30, 2018, the Corporation's credit ratings was "D" for both the Senior Series, and the First Subordinate Series.

On July 11, 2014, Standard & Poor's Ratings Services (S&P) lowered its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, Senior Series, and COFINA Sales Tax Revenue Bonds, First Subordinate Series, from "AA-" to "BBB", and from "A+" to "BBB-", respectively. Subsequently, S&P lowered the Corporation's credit ratings several more times. As of June 30, 2018, the Corporation's credit ratings was "NR" for both the Senior Series, and the First Subordinate Series.

On July 1, 2014, Moody's lowered its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, Senior Series, and COFINA Sales Tax Revenue Bonds, First Subordinate Series, from "Baa1" to "Ba3", and from "Baa2" to "B1", respectively. Subsequently, Moody's lowered the Corporation's credit ratings more than a few times. As of June 30, 2018, the Corporation's credit ratings was "Ca" equally for the COFINA Sales Tax Revenue Bonds, Senior Series, and the COFINA Sales Tax Revenue Bonds, First Subordinate Series.

On November 23, 2011, the Corporation issued $397.7 million Series 2011A-1 bonds. Part of the proceeds from the Series 2011A-1 bonds was used to advance refund part of the outstanding Series 2009A bonds aggregating $52,780,000 and bearing interest ranging from 4.00% to 6.125%. The Corporation used approximately $65,867,000 from the net proceeds of the issued Series 2011A-1 bonds and other funds to purchase U.S. government securities, which were deposited in an irrevocable trust fund with an escrow agent to provide for all future debt services payments of the refunded Series 2009A bonds. On November 23, 2011, the Corporation also issued its Series 2011 B bonds amounting to approximately $45.6 million to advance refund part of the outstanding Series 2009 B bonds aggregating $38,490,000 and bearing interest at 6.05%. The Corporation used the net proceeds of the issued Series 2011B bonds and other funds to purchase U.S. government securities, which were deposited in an irrevocable trust fund with an escrow agent to provide for all future debt services payments of the refunded Series 2009 B bonds. Accordingly, the Series 2009A and the Series 2009B refunded bonds are considered to be defeased and the liabilities have therefore been removed from the statement of net position. As a result of these advance refundings, the Corporation expects to increase its total debt service requirements by approximately $34.3 million over the next 25 years and will incur an economic loss (the difference between the present values of the debt service payments of the refunded bonds and the refunding bonds) of approximately $4.7 million. The outstanding balance of the advance refunded bonds was $31,675,000 at June 30, 2018.

**(10) Derivative Instruments**

By using derivative financial instruments to hedge the exposure to changes in interest rates, the Corporation exposes itself to interest rate risk, credit risk, and termination risk.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

Interest rate risk is the adverse effect on the value of a financial instrument that results from a change in interest rates. The Corporation is exposed to interest rate risk on its pay-fixed, receive-variable swap; as LIBOR decreases, the Corporation's net payment on the swap increases. At the same time, interest payments on the hedged adjustable rate bonds decrease. The interest rate risk associated with interest rate swap contracts is managed by establishing and monitoring parameters that limit the types and degree of interest rate risk that may be undertaken.

Credit risk is the failure of the counterparty (or its guarantor) to perform under the terms of the derivative contract. When the fair value of a derivative contract is positive, the counterparty owes the Corporation, which creates credit risk for the Corporation. When the fair value of a derivative contract is negative, the Corporation owes the counterparty and, therefore, does not possess credit risk. The Corporation minimizes the credit risk in derivative instruments by entering into transactions with counterparties whose credit rating is acceptable under the investment policies of the Corporation. At June 30, 2018, there is no credit risk since the fair value of derivative instrument is negative.

Termination risk is the possibility that a hedging derivative instrument's unscheduled end will affect the Corporation's liability strategy or will present the Corporation with potentially significant unscheduled termination payments to the counterparty. The Corporation or its counterparties may terminate a derivative instrument if the other party fails to perform under the terms of the contract. The Corporation is at risk that the counterparty will terminate a swap at a time when the Corporation owes it a termination payment. As of June 30, 2018, the Corporation had mitigated this risk by specifying that the counterparty had the right to terminate only as a result of certain events, including one or both of the following: a payment default by the Corporation; and insolvency of the Corporation (or similar events). If at the time of termination, an investment derivative instrument is in a liability position, the Corporation would be liable to the counterparty for a payment equal to the liability, subject to netting arrangements.

The Corporation has entered into an interest rate exchange agreement (swap) with a counterparty in connection with the issuance of LIBOR-Based Adjustable Rate Bonds within the Sales Tax Revenue Bonds Series 2007A (the Adjustable Rate Bonds). The Adjustable Rate Bonds expose the Corporation to variability in interest payments due to changes in interest rates. Management believes that it is prudent to limit the variability of interest payments on the Adjustable Rate Bonds. To meet this objective, management entered into an interest rate swap agreement to manage fluctuations in cash flows resulting from interest rate risk. This swap effectively changes the variable rate cash flow exposure on the Adjustable Rate Bonds to fixed cash flows. Under the terms of the interest rate swap, the Corporation receives variable interest rate payments equal to the interest payment on the Adjustable Rate Bonds, and makes fixed interest rate payments, thereby creating the equivalent of a fixed rate debt. At June 30, 2018, the credit rating of the counterparty to this swap agreement was BBB+ by Standard & Poor's.

On July 1, 2014, Moody's issued a downgrade on the LIBOR 2007A Bonds to a rating of Ba3. On September 24, 2014, rather than terminate the Swap Agreement, the Corporation and GS entered into a new credit annex (the 2014 Credit Support Annex) as well as an Amendment to the ISDA Master Agreement (the 2014 ISDA Amendment) to permit the Corporation to collateralize its obligations under the Swap Agreement and to amend the termination events thereunder. The impact of the new agreement was for the Corporation to post $12 million in collateral to Goldman Sachs (GS), as well as set up a restricted account in which a portion of the collateral be deposited for the benefit of GS. In addition, from June 30, 2016 until fiscal year 2018, COFINA is committed to post up to $15 million annually in additional collateral by March 15 of each year. Over time, the maximum amount COFINA would have to post in collateral is $60 million. There were no

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

payments of collateral during fiscal year June 30, 2018, as result of the Corporation filing under Title III of PROMESA. As of June 30, 2018, the collateral amount held by GS is $49.2 million.

As discussed in Note 12, the Corporation subsequently rejected the Swap Agreement with GS pursuant to the Third Amended Plan of Adjustment and a termination agreement was settled.

The fair value and notional amount of the derivative instrument outstanding at June 30, 2018, classified by type, was as follows:

| Notional amount (In thousands) | Fair value (In thousands) | Change in Fair value (In thousands) | Floating rate indicator | Maturity date | Receives Type | Receives Rate | Pays Type | Pays Rate | Cash outflows (in thousands) |
|---|---|---|---|---|---|---|---|---|---|
| Hedging Derivative Instrument: | | | | | | | | | |
| $  136,000 | $  65,954 | ($6,606) | 67% of 3m LIBOR plus 0.93 | 8/1/2057 | Variable | 2.513% | Fixed | 4.920% | 3,273 |

The fair value of the interest rate swap classified in Level 2 of the fair value hierarchy was estimated using the zero-coupon method. This method calculates the future net settlement payments required by the swap, assuming that the current forward rate implied by the yield curve correctly anticipates future spot interest rates. These payments are then discounted using the spot rates implied by the current yield curve for hypothetical zero-coupon bonds due on the date of each future net settlement on the swaps.

As discussed in Note 12, the Corporation subsequently rejected the Swap Agreement with GS pursuant to the Third Amended Plan of Adjustment and a termination agreement was settled.

**(11)  Contingency**

In connection with the termination of an interest rate exchange agreement (swap) with a notional amount of $218 million by the Corporation relating to its Sales Tax Revenue Bonds, Series 2007A, the Corporation made a termination payment to the counterparty in November 2008. The counterparty subsequently asserted that it is entitled to a termination payment in excess of that paid by the Corporation in November 2008, plus interest at a default rate, amounting to approximately $64.0 million as of fiscal year end 2011. The counterparty alleged that the date of the termination notice used by the Corporation for purposes of calculating the termination payment was not in accordance with the agreement. In addition, the counterparty alleged that the termination payment should have been based on the value of replacement swaps entered into by the Corporation, which actually have different credit terms than those contained in the terminated swap.

During the year ended June 30, 2011, the Corporation accrued $3.4 million in connection with this matter. This amount is presented as accounts payables and accrued liabilities in the accompanying statement of net deficit.

The termination payment at issue in this matter was treated as an unsecured claim in the Corporation's Third Amended Plan of Adjustment and discharged. For further information, refer to Note 12.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

**(12)   Subsequent Events**

Subsequent events were evaluated through June 18, 2019 to determine if any such events should either be recognized or disclosed in the 2018 basic financial statements. Management believes that the subsequent events disclosed below are intrinsically related to the financial statements of the Corporation. These might have been disclosed elsewhere in these financial statements, but management believes they require specific mentioning based on their relevance and materiality as a whole.

**Significant legislation and Other Events after Year End:**

a)   *Civil Actions Filed by Several Bondholder Groups and Other Creditors against the Corporation*

*Lex Claims, LLC v. Garcia-Padilla*, Case No. 16-2374-FAB (D.P.R.) (the Lex Claims Litigation). On July 20, 2016, certain holders of general obligation bonds issued by the Commonwealth (the GO Bonds) commenced an action in the U.S. District Court for the District of Puerto Rico (the District Court, and having jurisdiction over the Corporation's Title III case and related proceedings discussed below, the Title III Court) against the Commonwealth and several of its officials, including the Governor, seeking (a) declaratory relief that the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act No. 21-2016, which authorized the Governor to, among other things, declare a temporary moratorium on debt service and stay creditor remedies, and an executive order issued pursuant to Act No. 21 announcing a moratorium on payment of the Commonwealth's GO Bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction to prevent certain measures taken by the Commonwealth permitting transfers outside of the ordinary course. On November 4, 2016, plaintiffs filed a Second Amended Complaint, adding the Corporation as a defendant in their action against Commonwealth officials. The Second Amended Complaint requested two declaratory judgments that challenge the legal validity of the Corporation: (1) a declaration that the Pledged Sales Tax constitutes "available resources" under Article VI, Section 8 of the Puerto Rico Constitution and that such funds cannot be deposited with the Corporation or its Bondholders; and (2) a declaration that the Commonwealth is obligated to afford the General Obligation debt absolute priority, including priority over required deposits with the Corporation and its Bondholders. On May 17, 2017, after the Corporation's Title III case had been commenced, the Title III Court stayed the Lex Claims Litigation until further court order.

On June 7, 2017, the UBS Family of Funds and the Puerto Rico Family of Funds (together, the Puerto Rico Funds), and mutual funds managed by Oppenheimer Funds, Inc., Franklin Advisers, Inc., and the First Puerto Rico Family of Funds (collectively, the Movants) filed the Puerto Rico Funds and Mutual Funds Group's Motion for Relief from the Automatic Stay in the Corporation's Title III case [ECF No. 270] (the Lex Claims Motion) seeking an order lifting that automatic stay to allow the Lex Claims Litigation, before the District Court, to proceed in order for the District Court to decide the Puerto Rico Funds' motion to certify the question of the constitutionality of COFINA to the Puerto Rico Supreme Court (the Certification Motion), and if the Certification Motion is granted, to allow the Puerto Rico Supreme Court to consider and decide the certified questions. In the alternative, Movants requested that the Lex Claims Litigation be transferred pursuant to PROMESA section 306(d)(3) to the Commonwealth's and the Corporation's Title III cases as an adversary proceeding.

The Title III Court denied the Lex Claims Motion without prejudice, holding that (1) the Movants did not show that lifting the stay would result in a partial or complete resolution of the issues where it was

38                                                                                      (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

uncertain that the District Court would grant the certification if the stay was lifted or, if the Certification Motion was granted, that the Puerto Rico Supreme Court would accept certification; (2) judicial economy would not be achieved by lifting the automatic stay because the Title III Court had before it various adversary proceedings pending to address the very issues raised in the certified questions; (3) the certification had not been fully briefed in the Lex Claims Litigation, and the parties in the Lex Claims Litigation were not better positioned to litigate the issues in the certified questions than the parties to the Title III proceedings; and (4) the Movants have not demonstrated a particular harm that they are likely to suffer in the absence of relief from the automatic stay.

On February 5, 2019, the Title III Court issued an Amended Confirmation Order (discussed below), confirming the Third Amended Plan of Adjustment. On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to article 1.4 of the Third Amended Plan of Adjustment, the Lex Claims Litigation is defined one of several "Actions"; and pursuant to article 2.1(c), "on the Effective Date, pursuant to the Settlement Order and the Confirmation Order . . . the Actions shall be dismissed, with prejudice, and Claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice." Accordingly, this case has been dismissed as to COFINA.

*Rodriguez-Perello, et al. v. Rosselló-Nevares*, Case No. 17-1566-FAB (D.P.R.). On May 2, 2017, certain COFINA bondholders commenced an action in the District Court for declaratory and injunctive relief against COFINA, FAFAA, GDB, Governor Rosselló and certain other governmental officials. Plaintiffs asserted that their interest in the Corporation's securities provided them with contract and property rights protected by the Constitutions of the United States and the Commonwealth, as well as federal and Puerto Rico statutes. Plaintiffs further asserted that the defendants had unlawfully and unconstitutionally impaired these contractual rights and taken plaintiffs' property. In the action, plaintiffs sought protection and vindication of their alleged rights through a declaratory judgment that defendants had breached plaintiffs' constitutional, statutory, and contractual obligations to COFINA bondholders, and injunctive relief against defendants' continuation of those breaches.

Following the commencement of the Corporation's Title III case, the Title III Court entered an order on May 17, 2017, staying the litigation. There has been no further activity in this action since the commencement of the Corporation's Title III case.

On February 5, 2019, the Title III Court issued an Amended Confirmation Order (discussed below), confirming the Third Amended Plan of Adjustment. On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to article 1.4 of the Third Amended Plan of Adjustment, *Rodriguez-Perello, et al. v. Rosselló-Nevares* is defined one of several "Actions"; and pursuant to article 2.1(c), "on the Effective Date, pursuant to the Settlement Order and the Confirmation Order . . . the Actions shall be dismissed, with prejudice, and Claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice." Accordingly, this case has been dismissed as to COFINA.

*Cooperativa de Ahorro y Crédito Abraham Rosa v. Commonwealth of Puerto Rico*, Case No. 18-00028-LTS (D.P.R.). On March 22, 2018, several credit unions chartered under Puerto Rico law filed an adversary complaint against the Commonwealth, the Oversight Board, and other Commonwealth's instrumentalities, including the Corporation, seeking a declaratory judgment that their Puerto Rico debt holdings are not dischargeable and seeking monetary damages for alleged fraud in issuing and encouraging local credit unions to purchase Puerto Rico debt service instruments. On August 6, 2018,

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

the Oversight Board, for itself and as representative of the Corporation, the Commonwealth and certain other instrumentalities, moved to dismiss the complaint. Also on August 6, 2018, GDB filed a separate motion to dismiss. In addition, several parties filed joinders to the motions to dismiss or were granted leave from the Title III Court to file joinders.

On February 5, 2019, the Title III Court issued an Amended Confirmation Order (discussed below), confirming the Third Amended Plan of Adjustment. On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to paragraph 30 of the Amended Confirmation Order, "the plaintiffs in that certain adversary proceeding before the Title III Court, captioned *Cooperativa de Ahorro y Crédito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 18-00028, shall be entitled to continue pursuit of such litigation against all parties other than COFINA and Reorganized COFINA, subject to all available rights and defenses with respect to claims and causes of action asserted therein."

The Cooperativas filed a Notice of Appeal in the Title III Court and amended their previously filed adversary complaint in response to the confirmation of the Plan of Adjustment and after their motion to reconsider the confirmation of the Plan of Adjustment was denied by the Title III Court. The appeal is docketed with the First Circuit under case number 19-1391. The Oversight Board has until June 17, 2019 to file a response to the Cooperativas' amended adversary complaint.

b)  *Oversight Board Commencement of Title III Case, Mediation in the Title III Case, and Key Contested Matters in the Title III Case*

On May 3, 2017, the Oversight Board, at the request of the Governor of Puerto Rico, commenced a case under Title III of PROMESA for the Commonwealth in the Title III Court. On May 5, 2017, the Oversight Board, at the request of the Governor of Puerto Rico, followed with a similar filing for the Corporation in the Title III Court.

*Bank of New York Mellon v. COFINA, et al.*, Adv. Proc. No. 17-00133 (D.P.R.) (the Interpleader). On May 16, 2017, shortly after the commencement of the Corporation's Title III Case, The Bank of New York Mellon as indenture trustee (in such capacity, BNYM) filed an interpleader action in the Title III Court (the Interpleader Action) to determine certain parties' respective rights to the funds generated from the Pledged Sales Taxes held in BNYM's possession (the Disputed Funds). Through the Interpleader Action, parties in interest asserted claims to the Disputed Funds based on, among other things, the existence or non-existence of an uncured default arising from certain actions of the Commonwealth and the Corporation, including the passage of a fiscal plan compliance law enabling the Governor to use Pledged Sales Tax to cover deficiencies in the Commonwealth's cash flow under certain circumstances.

On May 30, 2017, the Title III Court granted the interpleader request and ordered the Disputed Funds remain in trust and no distributions made until the Title III Court issues a final ruling in the Interpleader Action. From June to September 2017, several parties and parties in interest, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, and officials, including COFINA, GDB, the Commonwealth, FAFAA, and the Oversight Board. The subpoenaed entities and individuals produced documents, but FAFAA and the Oversight Board each submitted binding statements of facts in lieu of depositions. On November 6, 2017, several parties in interest, including BNYM and certain creditors, filed motions for

40                                                                 (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

summary judgment. Briefing on the summary judgment motions was completed on January 5, 2018, and summary judgment is pending. On September 27, 2018, in light of the agreements and compromises under the Amended PSA (discussed below), the Title III Court, *sua sponte*, entered an order terminating the pending summary judgment motions without prejudice to restoration of the motions on or after October 1, 2018. [Adv. Proc. No. 17-00133, ECF. No. 518]. On November 27, 2018, BNYM moved to reinstate its motion for partial summary judgment, in which BNYM requests declaratory relief relating to the existence or non-existence of a default or an event of default under the Corporation's bond resolution.

On February 5, 2019, the Title III Court confirmed the Plan of Adjustment (discussed below). On February 12, 2019, the Plan of Adjustment was substantially consummated and became effective. The Disputed Funds have been distributed in accordance with the terms and provisions of the Plan of Adjustment. On February 19, 2019, the parties that have appeared in the Interpleader Action filed the Stipulation and Agreed Order of Dismissal of Interpleader Action (the "Stipulation of Dismissal") [Adv. Proc. No. 17-00133, ECF No. 549], in which they stipulated and agreed that the Motion to Reinstate is withdrawn by the Trustee and that the Interpleader Action and all claims and causes of action asserted or that could have been asserted in the Interpleader Action be dismissed, with prejudice, effective as of February 12, 2019. On February 20, 2019, the Title III Court issued an order in accordance with the Stipulation of Dismissal.

c)  *The Commonwealth-COFINA Dispute*
    *Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Whyte*, Adv. Pro. No. 17-00257-LTS (D.P.R.).

On August 10, 2017, the Title III Court issued an order (the Procedures Order) to approve a protocol for resolving the disputes between the Commonwealth and the Corporation. The Procedures Order defines the Commonwealth-COFINA Dispute as "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law. . ." The Procedures Order provided for the appointment of (1) an agent for the Oversight Board as representative of the Commonwealth in its Title III Case (the Commonwealth Agent); and (2) an agent for the Oversight Board as representative of COFINA in its Title III Case (the COFINA Agent).

On September 8, 2017, the Commonwealth Agent filed a complaint asserting that the SUT revenue pledged by COFINA bond debt is "the exclusive property of the Commonwealth." The complaint alleges that the COFINA enabling legislation "did not transfer to COFINA present ownership of future SUT revenues" and did not assign to COFINA the Commonwealth right to receive such revenues. The complaint argues that the transfer to COFINA of SUT revenues was at most an unsecured promise to transfer revenues in the future. The complaint further alleges that even if the transfer of future SUT revenues to COFINA had any legal effect, such transfers are merely a grant of a security interest in acquired property governed by Article 9 of the Uniform Commercial Code. The complaint alleges that any security interest of COFINA in SUT revenues is unenforceable against the Commonwealth or, in the alternative, is unperfected and therefore avoidable and otherwise subordinate to the rights of the Oversight Board as trustee. The Complaint further asserts that the Commonwealth's Title III case cuts off any security interest.

41                                                    (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

The Complaint also alleges that COFINA's structure is unconstitutional because it circumvents the Puerto Rico Constitution's debt limitations.

On September 15, 2017, the COFINA Agent filed her answer to the Complaint (the Answer and Counterclaims) disputing the Commonwealth Agent's claims, asserting various counterclaims, and seeking declaratory judgments that: (a) the COFINA enabling legislation is constitutional and thereby made the Pledged Sales Tax transferred to COFINA property of COFINA and not an "available resource" of the Commonwealth; (b) COFINA has a perfected and unavoidable lien in the Pledged Sales Tax, and/or there is an enforceable subordination agreement whereby the Commonwealth has agreed to subordinate any interest it may have in the Pledged Sales Tax to the interest of COFINA, and/or the Pledged Sales Tax is held in constructive trust for the benefit of COFINA; (c) the Commonwealth's misappropriation of the Pledged Sales Tax violates the United States and Puerto Rico Constitutions; (d) the fiscal plan compliance law violates PROMESA; (e) Act No. 84-2016, which amended the COFINA enabling legislation to decrease the amount of SUT proceeds COFINA receives from 6.0% to 5.5%, violates PROMESA, and COFINA is entitled to 6.0% of the SUT proceeds until the Pledged Sales Tax Base Amount is reached each year; and (f) any non-COFINA debt, including general obligation bonds of the Commonwealth issued in violation of the debt limit provisions in the Puerto Rico Constitution, are not entitled to priority under the Puerto Rico Constitution's debt priority provisions. The COFINA Agent's Answer and Counterclaims also sought injunctive relief, including that: (y) the Title III Court impose a constructive trust in COFINA's favor over the Pledged Sales Tax in order to prevent the Commonwealth's alleged tortious interference and fraud with respect such revenues; and (z) the Title III Court enter an order permanently enjoining the Commonwealth from diverting or transferring the Pledged Sales Tax proceeds away from COFINA, designating such revenues as "available resources," and taking any action to breach, revoke or reject the transfer of such revenues to COFINA or to otherwise interfere with COFINA's rights to such revenues.

In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and Commonwealth bondholders, as well as other parties that had been permitted to intervene in the adversary proceeding, filed counterclaims and cross-claims regarding ownership of the applicable portion of the SUT.

FAFAA filed a motion to dismiss certain claims of the Commonwealth Agent and counterclaims of the COFINA Agent on the ground that they exceeded the scope of their authority. Document production and discovery were completed in February 2018. On February 21, 2018, parties filed summary judgment motions. The Court heard oral arguments on April 10, 2018 and took the motions under advisement.

On December 21, 2017, the Title III Court entered an order dismissing, without prejudice, several of the Commonwealth Agent's and the COFINA Agent's claims as outside the scope of the Commonwealth-COFINA Dispute, as well as several claims asserted by the intervening parties (the Dismissed Claims). The Title III Court found that the scope of the Commonwealth-COFINA Dispute, as defined in the Procedures Order, is confined to whether the Commonwealth or COFINA owns the Pledged Sales Tax. The Dismissed Claims, the Title III Court found, were outside the scope of the Commonwealth-COFINA Dispute because they presumed either the Commonwealth's or COFINA's ownership of the Pledged Sales Tax or addressed other issues that were not related to the ownership question. Following the Title III Court's order and subsequent order permitting the Commonwealth Agent to amend its complaint, which it did on January 16, 2018, the Commonwealth Agent's only remaining claims asserted that (a) Act 91 did not transfer present ownership of future SUT Revenues to COFINA; (b) Act 91 did

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

not assign to COFINA any "right to receive" future SUT Revenues; and (c) Act 91 was designed to, and did, violate the debt and balanced budget provisions of the Puerto Rico Constitution. The COFINA Agent's only remaining claims asserted that Act 91 is constitutional and the Pledged Sales Tax and Dedicated Sales Tax Fund are COFINA's property.

On February 21, 2018, the Commonwealth Agent, the COFINA Agent, and several of the intervening parties, filed cross-motions for summary judgment. In its motion, the Commonwealth Agent asserted that (a) Act 91 did not transfer to COFINA a present property interest in potential future tax revenues because no such property exists to be transferred; (b) there was no "true sale" of future tax revenues to COFINA because the Commonwealth retained the power to substitute, reduce, or even eliminate those revenues, and the Commonwealth and COFINA both accounted for the transaction in question as a "collateralized borrowing" by the Commonwealth rather than a "sale" of revenues to COFINA; (c) Act 91 did not transfer to COFINA the Commonwealth's "right to receive" future tax revenues because the Act says nothing to that effect, and the Commonwealth has no "right to receive" tax revenues until a taxable transaction occurs; and (d) Act 91 and the purported SUT revenue transfer are unconstitutional because the Legislative Assembly cannot create financing structures that operate as an evasion of the debt and balanced budget provisions of the Puerto Rico Constitution. The intervening parties who filed cross-motions in favor of the Commonwealth asserted, among other things, that (a) the scope of the Adversary Proceeding is limited to ownership of post-petition and future SUT revenues which cannot have been transferred to COFINA due to the automatic stay; (b) under the Puerto Rico Civil Code, the Commonwealth did not transfer ownership of future SUT revenues to COFINA; (c) under the Bankruptcy Code, a "right to receive" future SUT revenues is not an asset that can be transferred; (d) the Pledged Sales Tax remains property of the Commonwealth because it is an "available resource" under the Puerto Rico Constitution; and (e) Act 56 did not transfer ownership of the Pledged Sales Tax to COFINA. Conversely, the COFINA Agent asserted that the Legislative Assembly has the power to, and did, transfer the Pledged Sales Tax to COFINA through Act 91. The intervening parties who filed cross-motions in favor of COFINA asserted, among other things, that (a) the Commonwealth's transfer of the Pledged Sales Tax to COFINA was valid under the Puerto Rico Constitution; (b) the Pledged Sales Tax is not an "available resource" under the Puerto Rico Constitution; (c) it is not "legally impossible" to transfer future SUT revenues; and (d) the plain terms of COFINA's enabling legislation clearly transferred ownership of the Pledged Sales Tax to COFINA. A hearing on the cross-motions was held on April 10, 2018.

Concurrently with the litigation in the adversary proceeding, the Agents participated in court-sanctioned mediation to settle the Commonwealth-COFINA Dispute. Through the auspices of a court-appointed mediation team, the Agents reached an understanding set forth in that certain Agreement in Principle (the Agreement in Principle) on a settlement of the Commonwealth-COFINA Dispute. On June 5, 2018, the Agents filed a joint motion (the Abeyance Motion) to hold the Title III Court's decision on the pending motions for summary judgment in abeyance for sixty (60) days due to their agreement in principle to settle the Commonwealth-COFINA Dispute. On June 7, 2018, the Agents publicly announced the terms of their Agreement in Principle.

Under the Agreement in Principle, a portion of the 5.5% SUT revenue currently conditionally allocated to the Corporation – which portion is referred to as Pledge Sales Tax Base Amount (PSTBA) – would be shared between the Corporation and the Commonwealth. Again, the PSTBA is the base amount of 5.5% Sales Tax revenue allocated to the Corporation that the Corporation must receive under the Act No. 91 generally before the balance of the 5.5% Sales Tax can be made available to the Commonwealth.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

Currently, the PSTBA is approximately $783.2 million for fiscal year 2019 ($753.1 million in fiscal year 2018) and grows 4% annually until it reaches approximately $1.85 billion in fiscal year 2041. The Agreement in Principle propose to, among other things, divide the PSTBA so that the Corporation receives 53.65% of the PSTBA starting in fiscal year 2019 while the Commonwealth receives the other 46.35%, subject to certain restrictions and exceptions. The balance of the 5.5% Sales Tax revenue conditionally allocated to the Corporation would continue to flow to the Commonwealth

d) *Settlement of the Commonwealth-COFINA Dispute and the Plan of Adjustment.*

On August 29, 2018, COFINA, FAFAA, the Oversight Board and various holders and insurers of COFINA's bonds (the Settlement Parties) entered into that certain Plan Support Agreement dated as of August 29, 2018 (the Original PSA), that contemplates, among other things, (i) the compromise and settlement of the Commonwealth-COFINA Dispute, consistent with the Agreement in Principle, providing COFINA with an ownership interest in an amount up to 53.65% of the Pledged Sales Tax Base Amount; and (ii) the Title III Court's approval of the compromise and settlement concurrently through a plan of adjustment in COFINA's Title III case and a settlement motion in the Commonwealth's Title III case.

On September 20, 2018, the Original PSA was amended and restated pursuant to that certain Amended and Restated Plan Support Agreement dated as of September 20, 2018 (the Amended PSA), to include certain additional holders of COFINA's bonds, who also held a significant amount of the Commonwealth's general obligation bonds and were among the plaintiffs in the Lex Claims Litigation. Among other things, the Amended PSA provides that (i) Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each of their applicable entities, will request dismissal, with prejudice, of their claims and causes of action in the Lex Claims Litigation, effective upon the entry of an order approving the settlement motion and confirmation of the a plan of adjustment consistent with the Amended PSA, and (ii) parties to the Amended PSA generally will not oppose approval of the settlement motion in the Commonwealth's Title III Case.

On October 19, 2018, the Oversight Board filed (i) the *Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4072] (the Plan of Adjustment), the *Disclosure Statement for the Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4073], and the *Puerto Rico Sales Tax Financing Corporation's Motion for Order (i) Approving Disclosure Statement, (ii) Fixing Voting Record Date, (iii) Approving Confirmation Hearing Notice, (iv) Approving Solicitation Packages and Distribution Procedures, (v) Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (vi) Approving Notice of Non-Voting Status, (vii) Fixing Voting and Election Deadlines, and (viii) Approving Vote Tabulation Procedures* [Case No. 17-3283, Docket No. 4075] (the Disclosure Statement Motion) in COFINA's Title III case and (ii) the *Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4067] (the Settlement Motion) in the Commonwealth's Title III case. The Plan of Adjustment provided for the issuance of newly issued bonds in the approximate principal amount of $12 billion by the Corporation (the New COFINA Bonds, defined in the Plan of Adjustment as "[t]he securities to be issued by Reorganized COFINA on the Effective Date pursuant to the Plan") and the distribution of cash to holders of the Corporation's existing bonds.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

On November 16, 2018, the Oversight Board filed the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4296] (the Amended Plan of Adjustment), and the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4299] (the Amended Disclosure Statement).

On November 20, 2018, the Title III Court held a hearing on the Disclosure Statement Motion and ruled that it would enter an order approving a modified version of the Amended Disclosure Statement.

On November 26, 2018, the Oversight Board filed a *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4363] (the Second Amended Plan of Adjustment), and the *Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4364] (the Second Amended Disclosure Statement), and a revised form of proposed order approving the Second Amended Disclosure Statement and related solicitation procedures.

On November 29, 2018, the Title III Court entered an order approving the Second Amended Disclosure Statement and related solicitation procedures.

On January 9, 2019, the Oversight Board filed a *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 4652] (the Third Amended Plan of Adjustment).

The Third Amended Plan of Adjustment proposes, among other things, to release the Commonwealth from all liability from claims and causes of action held by any creditor of the Corporation (solely in its capacity as a creditor of the Corporation) arising from or relating to the relationship of the Commonwealth and COFINA.

The Title III Court held a hearing on the Settlement Motion and confirmation of the Third Amended Plan of Adjustment on January 16, 2019, and January 17, 2019. On February 4, 2019, the Title III Court granted the Settlement Motion and confirmed the Third Amended Plan of Adjustment by entry of (i) the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 5045] (the Settlement Order), (ii) the *Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 5047] (the Findings and Conclusions), and (iii) the *Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 5048] (the Confirmation Order).

On February 5, 2019, the Title III Court amended the Findings and Conclusions and Confirmation Order by entry of (i) the *Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 13-3283, Docket No. 5053] (the Amended Findings and Conclusions) and (ii) the *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, Docket No. 5055] (the Amended Confirmation Order). Pursuant to the Amended Findings and Conclusions and the Amended Confirmation Order, which supersede the Findings and Conclusions and the Confirmation Order, the

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

Title III Court confirmed the Corporation's Third Amended Plan of Adjustment, and the Effective Date occurred on February 12, 2019.

Pursuant to the Settlement Motion approved in the Commonwealth's Title III case by the Settlement Order and through the Plan of Adjustment confirmed in the Title III Case, the Title III Court found the split of the Fixed Income into a 53.65% portion, which the Corporation receives, and a 46.35% portion, which the Commonwealth receives, to be consistent with the Agreement in Principle. Moreover, as further described in this Note, pursuant to articles 1.4 and 2.1(c) of the Third Amended Plan of Adjustment, several litigation actions and claims and causes of action asserted therein have been dismissed with prejudice on the Effective Date of the Plan of Adjustment (February 12, 2019) pursuant to the Settlement Order and the Confirmation Order.

On November 15, 2018, Governor *Rosselló-Nevares* signed into law Act No. 241, which amended and restated Act No. 91, and which became effective on the Effective Date of the Plan of Adjustment, to establish the legal framework for the restructuring of the Corporation's then outstanding bonds. To this end, Act No. 241 provided for: (i) the modification of the Corporation's corporate governance structure, including the requirement that each member of the Board of Directors must satisfy the independence and qualification standards set forth in the Indenture and the Corporation's by-laws (including that no member of the Board of Directors may be an officer, employee or director of any entity of the Government other than the Corporation); (ii) the authorization for the Corporation to issue the New COFINA Bonds and provide for the terms of such bonds; (iii) confirmation of the Corporation's ownership of the COFINA Revenues; (iv) the creation of a statutory lien to secure the New COFINA Bonds; and (v) covenants to secure further the repayment of the Corporation's bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Taxes upon satisfaction of certain requirements.

The Amended Confirmation Order confirmed the Third Amended Plan of Adjustment, which authorized the issuance of approximately $12 billion in principal amount of the New COFINA Bonds, cancelled the Corporation's then outstanding bonds, and discharged the related liability. The Amended Confirmation Order also provided the following enumerated protections for the New COFINA Bonds. Specifically, the Amended Confirmation Order provisions include: (i) the New COFINA Bonds "constitute valid, binding, legal and enforceable obligations of" COFINA; (ii) the COFINA Pledged Taxes (defined in the Plan of Adjustment as "the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%)") are property of the new issuer "free and clear of all liens, claims, encumbrances, and any other interests of creditors of the old issuer, the new issuer, the Commonwealth, or any instrumentality of the Commonwealth, other than the liens granted" hereunder; (iii) the COFINA Pledged Taxes shall not be "available resources" or "available revenues" of the Commonwealth; and (iv) retention of Title III Court jurisdiction to ensure protection and enforcement of legal framework and security pledges.

The Third Amended Plan of Adjustment and Act No. 241 of 2018 provide for the reduction of the principal amount of the Corporation's bonds and clarify the Corporation's ownership of the COFINA Pledged Sales Taxes. They further provide for the Corporation's financial and operating independence from the Commonwealth by establishing independent standing for the Corporation's operations.

Certain parties whose objections were overruled in confirming the Third Amended Plan of Adjustment filed Notices of Appeal in the Title III Court. The appeals have been docketed with the First Circuit under case numbers 19-1181 (also discussed below in relation to the adversary proceeding captioned

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

*Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board for Puerto Rico, et al.*) and 19-1182. The deadline to file Notices of Appeal was March 7, 2019. On April 12, 2019, AAFAF and the Oversight Board filed a motion to dismiss the appeals as equitably moot, arguing that because the appellants failed to seek a stay of the Third Amended Plan of Adjustment pending appeal and the plan was substantially consummated on February 12, 2019, it would be unfair to innocent third parties to unwind the hundreds of transactions completed to adjust approximately $17.64 billion of COFINA debt. The appellants' response to the motion to dismiss was filed on May 15, 2019 and appellees filed a reply on May 29, 2019. The matter is now fully briefed and the parties await a decision from the Court.

Further, seven state-chartered Puerto Rico credit unions, known as Cooperativas, filed a Notice of Appeal in the Title III Court and amended an adversary complaint previously filed in the United States District Court for the District of Puerto Rico, in response to the confirmation of the Plan of Adjustment and after their motion to reconsider the confirmation of the Plan of Adjustment was denied by the Title III Court. The appeal is docketed with the First Circuit under case number 19-1391. On April 12, 2019, the Oversight Board filed a motion to dismiss the confirmation order appeals; the appellants filed oppositions to the motion to dismiss on May 15, 2019, and the Oversight Board replied to the oppositions on May 29, 2019. The Oversight Board has until June 17, 2019 to file a response to the Cooperativas' amended adversary complaint.

As discussed above in Note 10, the Corporation rejected the Swap Agreement pursuant to the Third Amended Plan of Adjustment, and the claim for termination payment was discharged.

e)  *Appointments Clause Litigation*

On August 7, 2017, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, Aurelius) filed a motion to dismiss the Commonwealth Title III petition and a motion for relief from the Title III automatic stay, arguing that the Commonwealth's Title III case must be dismissed as unauthorized, that the Oversight Board's acts are null and void, and that further PROMESA-related activity must be enjoined because the Oversight Board, which filed the Title III proceeding on behalf of the Commonwealth, was appointed in a manner inconsistent with the requirements of the Appointments Clause of Article II, Section 2, Clause 2 of the United States Constitution. On July 23, 2018, Assured Guaranty Corporation (Assured) filed a complaint against the Oversight Board, arguing that PROMESA's appointment procedures violate both the Appointments Clause and the U.S. Constitution's separation of powers. On August 7, 2017, *Unión de Trabajadores de la Industria Eléctrica y Riego* (UTIER) filed an adversary complaint against the Oversight Board and each individual board member, arguing that PROMESA's appointment procedures violate the Appointments Clause. On July 27, 2018, members of the Popular Democratic Party (PDP) filed a complaint against the Oversight Board (the PDP Action) requesting a declaratory judgment (i) holding that the Oversight Board appointment provisions contained in PROMESA are in violation of the Appointments Clause, or (ii) decreeing the delegation of executive and legislative authority to the Oversight Board is in violation of the Separation of Powers doctrine or, (iii) decreeing that the Oversight Board's exercise of authority over budgeting to compel the adoption of its public policy constitutes an impermissible interference with federally-protected legislative autonomy. On July 30, 2018, in the PDP Action, the court entered an order certifying the plaintiffs' challenge to the constitutionality of PROMESA to the United States Attorney General.

On July 13, 2018, the Title III Court denied Aurelius's motion to dismiss, finding that the Oversight Board is an instrumentality of the territory of Puerto Rico, established pursuant to Congress's plenary

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

powers under Article IV to regulate territories, and Oversight Board members are therefore not "Officers of the United States" subject to the Appointments Clause. On August 3, 2018, in the Assured adversary proceeding, the court entered a stipulated judgment for defendants without prejudice and closed the case. On August 15, 2018, the court entered an order in the UTIER adversary proceeding granting the motion to dismiss and upholding the Oversight Board appointments.

On September 7, 2018, in the PDP Action, the court entered an order granting the voluntary dismissal of plaintiffs' cause of action seeking a declaratory judgment that the Oversight Board's exercise of authority over budgeting impermissibly interferes with plaintiffs' common law right to legislative authority. On September 24, 2018, the United States filed a notice of intervention to defend the constitutionality of PROMESA. On October 4, 2018, the Oversight Board filed a motion to dismiss and a motion for an order staying litigation, to which plaintiffs responded and the US filed a motion in support of the stay. On October 25, 2018, the Oversight Board filed a reply in support of its motion to dismiss. On November 20, 2018, the court entered an order granting the Oversight Board's motion to stay, finding that the plaintiffs' separation of powers claim is stayed pending resolution of the Aurelius Appeal before the First Circuit (defined below). Any party may move to lift the stay upon a decision from the First Circuit.

On July 17, 2018, Aurelius filed a notice of appeal to the First Circuit (Appeal No. 18-1671; consolidated with Appeal Nos. 18-1746 and 18-1787). On August 3, 2018, Assured filed a notice of appeal to the First Circuit (Case No. 18-1671). On August 16, 2018, UTIER filed a notice of appeal to the First Circuit (Appeal No. 18-1787). On August 22, 2018, appellants (Aurelius, Assured, and UTIER) filed a joint opening brief and appendix (the Aurelius Appeal). On October 1, 2018, appellees filed response briefs. On November 1, 2018, UTIER filed its reply brief. On November 2, 2018, Aurelius and Assured filed a joint reply brief. The court heard oral argument on the Aurelius Appeal on December 3, 2018, and reserved decision.

On February 15, 2019, the First Circuit held that PROMESA's appointments method for the Oversight Board is unconstitutional. The First Circuit did not dismiss the petitions under Title III of PROMESA filed by the Oversight Board, as plaintiffs had requested. Instead, the First Circuit validated the Oversight Board's past acts and stayed its mandate for 90 days. During the 90-day stay, the Oversight Board can continue to operate in the ordinary course.

Because the First Circuit validated the Oversight Board's past acts, its decision does not affect the effectiveness of the Corporation's Third Amended Plan of Adjustment. Furthermore, the Third Amended Plan of Adjustment and the Amended Confirmation Order explicitly provide that any final order in the Appointments Clause litigation shall not affect the COFINA settlement and plan of adjustment: "in the event that a Final Order is entered in connection with the Appointments Related Litigation subsequent to entry of the Settlement Order and the Confirmation Order . . . all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan, the Settlement Agreement, the Confirmation Order and the Settlement Order."

Nonetheless, the Appointments Clause litigation remains pending, and the First Circuit's decision declining to dismiss the Title III cases and validating the Oversight Board's past actions is open to appeal by plaintiffs and movants. The Oversight Board announced on February 27, 2019, that it will appeal the First Circuit's decision to the U.S. Supreme Court and that it will request a stay of the First Circuit's

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

mandate, pending the Supreme Court's consideration of the Oversight Board's petition for a *writ of certiorari*.

On April 23, 2019, the Oversight Board appealed the First Circuit's decision to the Supreme Court by filing its petition for a *writ of certiorari*. The following day, the Oversight Board filed a motion in the First Circuit requesting an extension of the 90-day stay of its February 15 decision until the Supreme Court's final disposition of the case. On May 6, 2019, the First Circuit granted in part the Oversight Board's extension motion by extending the stay of its February 15 decision until July 15, 2019, but denied the request to extend the stay indefinitely until the Supreme Court's final disposition of the case. On May 24, 2019, Aurelius and UTIER filed oppositions to the petition.

On May 24, 2019, Aurelius appealed the First Circuit's decision to the Supreme Court by filing a petition for a writ of certiorari regarding the application of the "de facto officer doctrine" to uphold all of the Oversight Board's actions prior to the effectiveness of the First Circuit's February 15 decision. On May 28, 2019, the official committee of unsecured creditors appointed in the Title III cases (other than COFINA) (the "Creditors' Committee") filed a petition for a writ of certiorari in the Supreme Court, along with a motion to expedite the disposition of the appeal to the greatest extent possible. On June 5, 2019, the Solicitor General of the United States, on behalf of the United States, also filed a petition for a writ of certiorari in the Supreme Court.

f) *The Oversight Board Investigation*

On August 2, 2017, the Oversight Board announced its intention, pursuant to its authority under PROMESA, to conduct an investigation to review the fiscal crisis and its contributors, and examine Puerto Rico's debt and its issuance, including disclosure and selling practices. To that end, the Oversight Board named a special investigation committee (the Special Investigation Committee), and conducted a competitive process to identify and select an independent firm to conduct the investigation. On September 13, 2017 the Oversight Board announced that the Special Investigation Committee retained an independent investigator to carry out a review of the Commonwealth's debt and its connection to the current financial crisis. The Special Investigation Committee considers this investigation an integral part of the Oversight Board's mission to restore fiscal balance and economic opportunity and to promote the Commonwealth's reentry to the capital markets. The independent investigator's work concluded, and the Oversight Board published the independent investigator's final report on August 20, 2018 (the Debt Investigation Report). The Debt Investigation Report provides an analysis of the historical and more recent macroeconomic and political factors contributing directly and indirectly to the Commonwealth's fiscal and economic crisis, the Commonwealth's municipal bond issuance process, and legislative efforts to restructure the debt, as well as the Oversight's Board investigative findings, policy recommendations, and identification of potential claims and matters for regulatory attention.

The Debt Investigation Report presented findings and recommendations on the following areas:

- GDB
- Puerto Rico Public Utilities (PREPA and PRASA)
- The Corporation or COFINA
- Employee's Retirement System of the Commonwealth (ERS)
- Puerto Rico's Budgeting, External Reporting, and Accounting Functions
- Calculation of the Constitutional Debt Limit

49                                                                    (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

- Credit Rating Agencies (CRAs)
- Selling Practices for Puerto Rico-Related Bonds
- Puerto Rico's Government Ethics Framework
- Issuers' Use of Interest Rate Swaps
- Puerto Rico's Lack of a Clear Mechanism for Validating Puerto Rico-Related Bonds Before They Issue
- Possession Tax Credit

Finally, the independent investigator presented an overview of potential causes of action. The Debt Investigation Report in its entirety can be found on the Oversight Board's website.

On August 28, 2018, the Oversight Board appointed its special claims committee (the Special Claims Committee) and delegated to the Special Claims Committee any and all authority of the Oversight Board to review the findings in the Debt Investigation Report and to take any appropriate steps, including, but not limited to, recommending and/or initiating the negotiation and/or prosecution of claims based on the findings in the Debt Investigation Report on behalf of the Title III debtors for the benefit of all creditors and parties in interest in the Title III cases. The Special Claims Committee is entitled, in its full discretion, to determine the scope of any further action, including, but not limited to, additional investigation, as well as claims to be pursued, and to retain such advisors, consultants, attorneys or other advisors as it in its sole discretion sees fit. On October 25, 2018, the Oversight Board requested proposals for counsel to assist the Special Claims Committee regarding consideration of potential claims described in the Debt Investigation Report. On November 28, 2018, the Special Claims Committee signed the contract with the firm that will provide those services. The Corporation is cooperating with this investigation.

On January 14, 2019, the Special Claims Committee and the Creditors' Committee filed a joint omnibus objection (the GO Claims Objection) seeking the disallowance of more than $6 billion of claims related to the Commonwealth's GO bonds issued on or after March 2012, including: (a) $2.3 billion in Public Improvement Refunding Bonds, Series 2012 A issued in April 2012; (b) $415.27 million in Public Improvement Refunding Bonds, Series 2012 B issued in March 2012; and (c) $3.5 billion in General Obligation Bonds of 2014, Series A issued in March 2014. According to the GO Claims Objection, the foregoing bonds are "invalid" because, among other things, they were issued in violation of: (i) the debt service limit in the Commonwealth's Constitution, which should have included debt service on bonds issued by the PBA which the GO Claims Objection characterizes as a "sham" structure; (ii) the Commonwealth's constitutional balanced budget clause, which should have included $425 million of interest that was excluded; and (iii) the Commonwealth's constitutional balanced budget clause because proceeds of the Challenged GO Bonds were used to finance deficit spending. On February 15, 2019, the Title III Court entered a procedures order related to the GO Claims Objection, which gave parties until April 16, 2019 to provide notice of their participation in the proceedings related to the GO Claims Objection.

On April 30, 2019, the Special Claims Committee, on behalf of the Oversight Board, commenced more than 230 adversary proceedings (collectively, the Vendor Avoidance Actions) against individuals and entities seeking to avoid and recover payments totaling approximately $4.2 billion made by the Commonwealth prior to the commencement of the Title III cases. During its investigation, the Special Claims Committee identified these individuals and entities as having, during the four years prior to May

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

2017, received payments above $2.5 million without a valid contract with the Commonwealth where such payments did not match the applicable contract.

On May 1, 2019, the Special Claims Committee, on behalf of the Oversight Board, and the Official Committee of Unsecured Creditors appointed in the Title III cases (the Creditors' Committee) commenced an adversary proceeding (the Bond Fees Avoidance Action) against certain underwriters, swap counterparties, and law firms seeking to avoid and recover fees and profits earned in connection with the issuance of $3.5 billion of Commonwealth GO bonds in 2014 (the 2014 GO Bonds). According to the Bond Fees Avoidance Action, the plaintiffs allege that each of the defendants had knowledge that GDB was breaching its fiduciary duties to the Commonwealth in 2014 and exploited GDB's "misfeasance" for their own profit and unjust enrichment by aiding and abetting GDB in issuing the 2014 GO Bonds at the expense of the Commonwealth. The plaintiffs further allege that as a result of the 2014 GO Bond issuance, many of the defendants received either (i) unearned profits, (ii) proceeds of the 2014 GO Bonds in the form of redemption or repurchase of other outstanding Commonwealth bonds, or (iii) unearned discounts on the bonds they purchased for resale to their customers. The plaintiffs believe that these proceeds and profits are recoverable by the Commonwealth as fraudulent transfers because the Commonwealth was insolvent at the time of the 2014 GO Bond issuance.

On May 2, 2019, the Special Claims Committee (on behalf of the Oversight Board), AAFAF, and the Creditors' Committee commenced eight adversary proceedings (collectively, the Bond Payment Avoidance Actions) seeking to recover more than $1 billion of principal and interest payments made on account of certain Commonwealth GO bonds. According to the Bond Payment Avoidance Actions, Puerto Rico law did not authorize the issuance of approximately $8.8 billion of the Commonwealth's GO bonds because they were issued in excess of the Commonwealth's constitutional debt limit. As a result, the plaintiffs allege that any payments made on account of such bonds were per se unlawful and are recoverable by the Commonwealth under Puerto Rico law and are also recoverable as fraudulent transfers pursuant to the Bankruptcy Code (as incorporated under PROMESA).

These legal matters are ongoing and COFINA cannot predict when they will be concluded or their outcome.

*Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board for Puerto Rico, et al., Adv. Pro. No. 19-00003-LTS (D.P.R.)*

On December 6, 2018, Manuel Natal Albelo, at-large independent representative in the House of Representatives of Puerto Rico, Rene Pinto-Lugo, and others, including *Movimiento de Concertación Ciudadana* Inc., (VAMOS) and various unions, filed a complaint (the Complaint) in the Commonwealth of Puerto Rico Court of First Instance, San Juan Superior Court (the Superior Court) (Civil No. SJ2018cv01569), against the Commonwealth of Puerto Rico and Carlos Mendez Nunez, in his official capacity as President of the House of Representatives of Puerto Rico (the "Civil Action"). On December 17, 2018, the Complaint was served on the Puerto Rico Department of Justice. The Complaint contains two causes of action. The first cause of action alleges that the legislative process leading to the passing of Puerto Rico House Bill 1837 and the enactment of Act 241-2018, which created the legal structure necessary to execute the COFINA restructuring, was flawed and violated Puerto Rico House regulations as well as Natal's constitutional and civil rights under the Puerto Rico and United States Constitutions because he was not allowed to participate in debate prior to the bill's approval; the first cause of action seeks a declaration that Act 241 is unconstitutional. The second cause of action alleges that Act 91-2006 (the COFINA legislation, as amended) and Act 241 (which is an amendment to the COFINA

51                                                                                          (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

legislation, and which was signed into law by the Governor of Puerto Rico on November 15, 2018), violate the Puerto Rico Constitution's debt-limit and balanced-budget provisions.

On January 14, 2019, the Oversight Board, on behalf of the Commonwealth and COFINA, filed a notice of removal of the Civil Action to the Commonwealth Title III Court, where it became Adversary Proceeding No. 19-00003-LTS (D.P.R.), captioned *Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board for Puerto Rico, et al.* (the Adversary Proceeding). On January 15, 2019, the Title III Court referred the Adversary Proceeding to Magistrate Judge Judith Dein for general pre-trial management.

On February 5, 2019, the Title III Court issued the Amended Confirmation Order, confirming the Third Amended Plan of Adjustment, and the Amended Findings and Conclusions. In Paragraph 3 of the Amended Findings and Conclusions, the Title III Court took judicial notice of Act 241 (defined as the New Bond Legislation; *see* Exhibit A of the Amended Findings and Conclusions) and finds that the Act "has been duly enacted." *See also* Paragraph 120 of the Amended Findings and Conclusions (concluding that "the Commonwealth's Legislative Assembly passed, and its Governor signed, the New Bond Legislation" and that "pursuant to Puerto Rico case law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor."); footnote 14 of the Amended Findings and Conclusions (overruling the objections by Manuel Natal-Albelo and his co-objectors to the constitutionality of the New Bond Legislation under the United States and Puerto Rico Constitutions. On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective.

On February 18, 2019, Manuel Natal-Albelo, Rene Pinto-Lugo, and others, including VAMOS and various unions, filed a Notice of Appeal in the Title III Court [Case No. 17-03283, ECF No. 5155]. On February 22, 2019, the appeal was docketed with the First Circuit under case number 19-1181; the appeal remains pending.

On March 21, 2019, the plaintiffs filed a motion to remand this case to the Superior Court, asserting that the Title III Court lacks subject matter jurisdiction over the Complaint because it pertains solely to violations of the Puerto Rico Constitution and Puerto Rico statutory law—not federal law—which do not involve rights created by Title III of PROMESA. As a result, the plaintiffs claim that the Complaint can only be adjudicated by a local Puerto Rico court. On March 24, 2019, the Oversight Board filed a motion to strike the plaintiffs' remand motions. On April 18, 2019, the Title III Court entered an order allowing the Oversight Board's motion to strike and permitting the plaintiffs to file a consolidated motion to remand by May 10, 2019. On May 10, 2019, the plaintiffs filed a consolidated motion to remand the case to the Superior Court (the "Motion to Remand"). On May 31, 2019, the Oversight Board filed its objection to the Motion to Remand. In addition, AAFAF filed a motion to intervene and an objection to the Motion to Remand. On June 7, 2019, the Title III Court entered an order granting AAFAF's motion to intervene and accepting its objection to the Motion to Remand. Plaintiffs' reply to the Oversight Board's opposition was due June 7, 2019 and plaintiffs' reply to AAFAF's opposition was due June 11, 2019. Plaintiffs did not reply to either party's opposition.

g) *Internal Revenue Service Audits*

By letter dated February 14, 2019, the U.S. Internal Revenue Service (the IRS) notified COFINA that it is examining a Form 8038-CP (the "IRS Audit") for the August 1, 2017 interest payment date of its

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series D Bonds"). By letter dated March 18, 2019, the IRS notified COFINA that it is examining a Form 8038-CP for the August 1, 2017 interest payment date of its Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series E Bonds"). COFINA intends to respond to all correspondence from the IRS and intends to cooperate with the IRS in connection with the examinations.

On April 10, 2019, the IRS filed an administrative expense claim seeking the return of $2,520,731.08 in postpetition direct subsidy payments made to COFINA in connection with the Series D Bonds and $1,677,624.89 in postpetition direct subsidy payments related to the Series E Bonds, totaling a claim amount of $4,198,355.97. On June 12, 2019, AAFAF, on its own behalf and on behalf of COFINA, filed an objection to the IRS's proofs of claim, arguing that the IRS is not entitled to a refund of the payments as COFINA had fully complied with its obligations under the applicable bond documents, and thus the claims should be disallowed and expunged in their entirety.

h) *COFINA Emergence from Title III of PROMESA*

On October 19, 2018, the Oversight Board filed (i) the Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (the "Plan of Adjustment"), the Disclosure Statement for the Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation, and the Puerto Rico Sales Tax Financing Corporation's Motion for Order (i) Approving Disclosure Statement, (ii) Fixing Voting Record Date, (iii) Approving Confirmation Hearing Notice, (iv) Approving Solicitation Packages and Distribution Procedures, (v) Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (vi) Approving Notice of Non- Voting Status, (vii) Fixing Voting and Election Deadlines, and (viii) Approving Vote Tabulation Procedures (the "Disclosure Statement Motion") in COFINA's Title III case and (ii) the Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation (the "Settlement Motion") in the Commonwealth's Title III case. The Plan of Adjustment provided for the issuance of newly issued bonds in the approximate principal amount of $12 billion by COFINA (the "New COFINA Bonds", defined in the Plan of Adjustment as "the securities to be issued by Reorganized COFINA on the Effective Date pursuant to the Plan") and the distribution of cash to holders of COFINA existing bonds.

Pursuant to the Settlement Motion approved in the Commonwealth's Title III case by the Settlement Order and through the Plan of Adjustment confirmed in the Title III Case, the Title III Court found the split of the Fixed Income into a 53.65% portion, which COFINA receives, and a 46.35% portion, which the Commonwealth receives, to be consistent with the Agreement in Principle. Moreover, pursuant to articles 1.4 and 2.1(c) of the Third Amended Plan of Adjustment, several litigation actions and claims and causes of action asserted therein have been dismissed with prejudice on the Effective Date of the Plan of Adjustment (February 12, 2019) pursuant to the Settlement Order and the Confirmation Order.

On November 15, 2018, Governor Rosselló-Nevares signed into law Act No. 241, which amended and restated Act No. 91, and which became effective on the Effective Date of the Plan of Adjustment, to establish the legal framework for the restructuring of the Corporation's then outstanding bonds. To this end, Act No. 241 provided for: (i) the modification of the Corporation's corporate governance structure, including the requirement that each member of the Board of Directors must satisfy the independence and qualification standards set forth in the Indenture and the Corporation's by-laws (including that no

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

member of the Board of Directors may be an officer, employee or director of any entity of the Government other than the Corporation); (ii) the authorization for the Corporation to issue the New COFINA Bonds and provide for the terms of such bonds; (iii) confirmation of the Corporation's ownership of the COFINA Revenues; (iv) the creation of a statutory lien to secure the New COFINA Bonds; and (v) covenants to secure further the repayment of the Corporation's bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Tax upon satisfaction of certain requirements. The Amended Confirmation Order and Amended Findings and Conclusions confirmed the Third Amended Plan of Adjustment, which authorized the issuance of approximately $12 billion in principal amount of the New COFINA Bonds, cancelled the Corporation's then outstanding bonds, and discharged the related liability.

The Amended Confirmation Order and Amended Findings and Conclusions also provided the following enumerated protections for the New COFINA Bonds. Specifically, the Amended Confirmation Order provisions include: (i) the New COFINA Bonds "constitute valid, binding, legal and enforceable obligations of" COFINA; (ii) the COFINA Revenues are property of the new issuer "free and clear of all liens, claims, encumbrances, and any other interests of creditors of the old issuer, the new issuer, the Commonwealth, or any instrumentality of the Commonwealth, other than the liens granted" hereunder; (iii) the COFINA Revenues shall not be "available resources" or "available revenues" of the Commonwealth; and (iv) retention of Title III Court jurisdiction to ensure protection and enforcement of legal framework and security pledges.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

i)  *Restructured 2019 Sales Tax Bonds*

In February 2019, COFINA's existing senior and subordinated bondholders received new senior lien
bonds worth approximately $12 billion on account of their approximately $17 billion in claims, which
are secured by a statutory lien on the restructured COFINA pledged taxes. The debt service requirements
for restructured 2019 sales tax bonds is as follows:

| Year ending June 30 | Principal | Interest | Total |
|---|---|---|---|
| 2019 | $ 18,865,083 | $ 401,311,339 | $ 420,176,422 |
| 2020 | —— | 436,985,195 | 436,985,195 |
| 2021 | 15,461,649 | 439,003,096 | 454,464,745 |
| 2022 | 30,244,951 | 442,401,055 | 472,646,006 |
| 2023 | 44,373,296 | 447,177,776 | 491,551,072 |
| 2024-2028 | 409,080,310 | 2,359,812,365 | 2,768,892,675 |
| 2029-2033 | 688,216,148 | 2,680,570,571 | 3,368,786,719 |
| 2034-2038 | 2,092,715,000 | 2,005,941,695 | 4,098,656,695 |
| 2039-2043 | 1,824,040,201 | 3,031,682,337 | 4,855,722,538 |
| 2044-2048 | 787,779,888 | 4,174,806,238 | 4,962,586,126 |
| 2049-2053 | 1,813,465,290 | 3,149,121,587 | 4,962,586,877 |
| 2054-2058 | 4,297,080,000 | 665,505,750 | 4,962,585,750 |
| | $ 12,021,321,816 | $ 20,234,319,004 | $ 32,255,640,820 |

Pledged sales taxes payable to the Corporation in accordance with Act No. 241 (First Dollars Funding
of COFINA Revenues) in each fiscal year in the following amounts (which amounts are equal to fifty-
three and sixty-five one hundredths percent (53.65%) of fixed income for each fiscal year is as follows:

| Year ending June 30 | Amount |
|---|---|
| 2019 | $ 420,185,325 |
| 2020 | 436,992,738 |
| 2021 | 454,472,448 |
| 2022 | 472,651,346 |
| 2023 | 491,557,399 |
| 2024-2028 | 2,768,930,770 |
| 2029-2033 | 3,368,827,658 |
| 2034-2038 | 4,098,693,947 |
| 2039-2043 | 4,855,757,693 |
| 2044-2048 | 4,962,625,000 |
| 2049-2053 | 4,962,625,000 |
| 2054-2058 | 4,962,625,000 |
| | $ 32,255,944,324 |

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2018

j)  *Swap Agreement Settlement*

On February 11, 2019, the Title III Court ordered the approval of a settlement regarding a Swap Agreement (Swap Agreement), as amended, originally entered into on July 12, 2007 between COFINA and Goldman Sachs (GS) and with a fair value of $65,954,336 at June 30, 2018.  In connection with the Swap Agreement, COFINA posted with GS collateral in a designated account that, as of February 6, 2019, contained approximately $50 million. From February 2, 2017, up to and including the date hereof, periodic payments in the aggregate amount of approximately $8 million became due and owed pursuant to the Swap Agreement. The COFINA's Plan of Adjustment (Plan) provided for the allowance of a claim relating to the Swap Agreement and alternative treatments for such claim depending upon the priority of GS's claim. Also, the Plan specified that all executory contracts and unexpired leases that exist between COFINA and any entity, and which have not expired by their own terms on or prior to the confirmation date of the Plan would be deemed rejected by COFINA as of the effective date (as defined in the Plan).  Pursuant to this provision, the Swap Agreement was deemed rejected on the effective date and COFINA and GS agreed to the following; (1) the rejection of the Swap Agreement pursuant to the terms hereof, (2) the quantification of damages associated with such rejection, and (3) the treatment of such claims in accordance with the provisions of the Plan.   As part of the settlement, any and all of the collateral was determined to be for GS's benefit, free from any claim or right of any nature whatsoever and on February 12, 2019, COFINA paid to GS an additional amount of $11 million. Upon payment, COFINA and GS have no further obligation to each other pursuant to the Plan or the Swap Agreement, and each party was discharged and released of any claims and liabilities to the other arising from or relating to the Swap Agreement.

\*\*\*