# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered)<br><br>**Re: ECF Nos. 11686, 11687** |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS & TRANSPORTATION AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS<br><br>**Re: ECF No. 704** |

**OMNIBUS OPPOSITION OF GOVERNMENT PARTIES TO MOTIONS TO COMPEL
PRODUCTION OF DOCUMENTS CONCERNING PRELIMINARY HEARINGS ON
CCDA, PRIFA, AND HTA LIFT-STAY MOTIONS [ECF NOS. 11686, 11687]**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 2

BACKGROUND ................................................................................................. 7

ARGUMENT ...................................................................................................... 9

I.     AAFAF HAS PROVIDED VOLUMINOUS DISCOVERY RELATING
TO THE FACTUAL ALLEGATIONS IDENTIFIED BY THE
FEBRUARY 14 ORDER ......................................................................... 9

    A.    AAFAF Has Agreed to Provide Documents More Than Sufficient
to Evidence the Identified Factual Representations in the PRIFA
Opposition. ............................................................................ 9

    B.    AAFAF Has Provided Documents Relating to the Identified
Representations in the Oversight Board's CCDA Opposition. ............... 13

    C.    AAFAF Has Provided Documents Sufficient to Evidence the
Identified Factual Representations in the Oversight Board's HTA
Opposition. ........................................................................... 14

II.    THE ADDITIONAL DISCOVERY THE MONOLINES DEMAND IS
IRRELEVANT TO THE GATING ISSUES SET FOR HEARING ON
APRIL 2. ............................................................................................ 16

    A.    The Monolines Are Not Entitled to Discovery of Communications
and Course of Dealing Evidence to Challenge the Plain Meaning of
the Governing Statutes, Resolutions, and Agreements. .......................... 16

    B.    The Monolines Are Not Entitled to Expansive Discovery in the
Hopes of Creating an Equitable Property Interest Beyond the Plain
Text of the Statutes and Governing Documents. ................................. 21

    C.    The Monolines' Attempt to Tether Their Pre-Existing Discovery
Requests to Factual Allegations Identified in the February 14
Order is Unpersuasive. ............................................................. 23

III.    COLLECTING THE ADDITIONAL DOCUMENTS THE MONOLINES
SEEK WOULD BE UNDULY BURDENSOME AND INCONSISTENT
WITH THE FEBRUARY 14 ORDER DIRECTING LIMITED
DISCOVERY ...................................................................................... 27

IV.    THE MONOLINES' REQUEST FOR BROAD DEPOSITION
TESTIMONY SHOULD ALSO BE DENIED. .......................................... 29

CONCLUSION .................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Alison H. v. Byard*,
163 F.3d 2 (1st Cir. 1998) .................................................................................. 18

*Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
919 F.3d 121 (1st Cir. 2019) ............................................................................. 18

*Banco Popular v. Mun. de Mayagüez*,
126 D.P.R. 653 (1942) ....................................................................................... 21

*Bank v. IBM*,
145 F.3d 420 (1st Cir. 1998) ............................................................................. 17

*Brown v. United Airlines, Inc.*,
720 F.3d 60 (1st Cir. 2013) ............................................................................... 22

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ........................................................................................... 19

*Brugal & Co. v. Buscaglia*,
64 D.P.R. 903 (1945) ......................................................................................... 21

*Clinton Co. v. United States*,
1991 WL 95284 (N.D. Ill. 1991) ...................................................................... 18

*Commonwealth Ins. Co. v. Casellas*,
3 P.R. Offic. Trans. 750 (1975) ......................................................................... 21

*Creely v. Genesis Health Ventures, Inc.*,
2005 WL 44526 (E.D. Pa. 2005) ........................................................................ 6

*Diaz-Padilla v. Bristol Myers Squibb Holding Ltd. Liability Co.*,
2005 WL 783076 (D.P.R. 2005) ......................................................................... 6

*Faulkner v. Nat'l Geographic Soc.*,
452 F. Supp. 2d 369 (S.D.N.Y. 2006) .............................................................. 19

*Fed. Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) ........................................................................................... 19

*Fleet Nat'l Bank v. H&D Entm't*,
96 F.3d 532 (1st Cir. 1996) ............................................................................... 17

*In re Lavenhar*,
808 F.3d 794 (10th Cir. 2015) ............................................................................ 3

## TABLE OF AUTHORITIES

**Page(s)**

*In re Motors Liquidation*,
    430 B.R. 65, 95 ........................................................................................................... 19

*In re Navigation Tech. Corp.*,
    880 F.2d 1491 (1st Cir. 1989) .................................................................................... 3

*Judson v. Midland Credit Mgmt., Inc.*,
    2014 WL 3829082 (D. Mass. Aug. 1, 2014) ............................................................. 6

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) .................................................................................................. 19

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005) .................................................................................... 19

*Mass. Fin. Servs., Inc. v. Sec. Inv'r Prot. Corp.*,
    545 F.2d 754 (1st Cir. 1976) .................................................................................... 17

*P.R. Tel. Co. v. Advanced Cellular Sys., Inc. (In re Advanced Cellular Sys., Inc.)*,
    483 F.3d 7 (1st Cir. 2007) ........................................................................................ 17

*Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*,
    474 B.R. 576 (Bankr. N.D. Ill. 2012) ..................................................................... 20

*Rentas v. Claudio (In re Garcia)*,
    484 B.R. 1 (Bankr. D.P.R. 2012), *rev'd on other grounds at* 507 B.R. 32 (1st Cir.
    B.A.P. 2014) ..................................................................................................... 22, 23

*Roig Commercial Bank v. Buscaglia*,
    74 D.P.R. 919 (1953) ................................................................................... 17, 19, 21

*Santiago v. Canon U.S.A.*,
    1997 U.S. Dist. LEXIS 4902 (D.P.R. 1997) ........................................................... 17

*Scotiabank de P.R. v. Burgos (In re Plaza Resort at Palmas, Inc.)*,
    741 F.3d 269 (1st Cir. 2014) .................................................................................... 18

*United Shoe Workers of Am., AFL-CIO v. Bedell*,
    506 F.2d 174 (D.C. Cir. 1974) ........................................................................... 19, 21

*W. Air Lines, Inc. v. Bd. of Equalization of State of S.D.*,
    480 U.S. 123 (1987) .................................................................................................. 19

*Weiss v. DHL Express, Inc.*,
    718 F.3d 39 (1st Cir. 2013) ...................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

26 U.S.C. § 5001 ................................................................................................................. 10

26 U.S.C. § 7652 ................................................................................................................. 10

U.C.C. § 1-205(4) ............................................................................................................... 21

To the Honorable United States Magistrate Court Judge Judith G. Dein:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole representative of the Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Highways and Transportation Authority ("HTA") in these Title III cases pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), as fiscal agents for the Commonwealth, HTA, the Puerto Rico Infrastructure Financing Authority ("PRIFA"), and the Puerto Rico Convention Center District Authority ("CCDA") (collectively, the "Government Parties"), respectfully submit this omnibus opposition (the "Opposition") to the *Urgent Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, Financial Guaranty Insurance Company and National Public Finance Guarantee Corporation, as Holders and Insurers of HTA Bonds, to Compel Production of Documents Concerning Preliminary Hearing on Lift-Stay Motion* filed by Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "Assured"), Ambac Assurance Corporation ("Ambac"), Financial Guarantee Insurance Company ("FGIC"), and National Public Finance Guarantee Corporation ("National") (collectively, the "Monolines") [ECF No. 11686] (the "HTA Motion") and the *Urgent Motion of Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Financial Guaranty Insurance Company to Compel Production of Documents Relating to the Preliminary Hearing on the CCDA and PRIFA Lift-Stay Motions* filed by Assured, Ambac, and FGIC [ECF No. 11687] (the "CCDA/PRIFA Motion," and together with the HTA Motion, the "Motions").[2]  In support, the Government Parties respectfully state as follows:

---

[2] Capitalized terms not defined have the meanings ascribed in the Oversight Board's Oppositions.  [ECF Nos. 10618, 10615, and 10611].

## INTRODUCTION

1.      The Motions should be denied for at least three reasons.  First, AAFAF has

produced or agreed to produce documents that are more than sufficient to permit the Monolines

to test the accuracy of the limited factual assertions contained in the paragraphs from the

Oversight Board's lift-stay oppositions cited in Judge Swain's February 14, 2020 order [ECF No.

11057] (the "February 14 Order").  Second, the additional documents the Monolines demand are

either duplicative of what AAFAF has already agreed to produce or pertain to legal positions

(not factual assertions) based on the text of statutes and agreements the Monolines already have.

Third, even if the documents in dispute had some marginal relevance, it would be far outweighed

by the burden to the Commonwealth and the significant delay their production would cause.

2.      The Monolines steadfastly ignore that no security agreement or other document

grants the Monolines any security interest in any Commonwealth asset.  HTA, PRIFA, and

CCDA do not have any lien against revenues the Commonwealth historically appropriated and

transferred to them.  None of the underlying statutes confer any ownership interest or lien on the

retained revenues at issue.  To avoid reckoning with these basic truths, the Monolines continue to

pursue unreasonable discovery demands designed to delay a resolution on key threshold issues.

Given the documents and information that the Government Parties have already provided and

agreed to provide to the Monolines in response to the February 14 Order, this Court should not

accede to the Monolines' attempt to manufacture a dispute for the purpose of further delay.

3.      The preliminary hearing on the Monolines' lift-stay motions will address only two

gating legal questions: "whether the [Monolines] have standing to sue and security or other

property interests in the relevant revenues."  [ECF No. 10595 at 5.]  These are questions of law.

Whether a statute or agreement creates an interest entitled to adequate protection is a legal

question.  Whether a party filing a lift stay motion is a creditor of a creditor of the debtor (and

thus lacks standing to seek stay relief) is also a legal question. *See In re Navigation Tech. Corp.*, 880 F.2d 1491, 1493 (1st Cir. 1989) ("[T]he standing [determination] is a question of law…."); *see also In re Lavenhar*, 808 F.3d 794, 798 (10th Cir. 2015) (whether a party is "party in interest" for purposes of the Bankruptcy Code is a question of law).

4.      The Monolines' demands for "all" documents relating to how the Commonwealth managed its cash and attempted to obey its own statutes appropriating cash to instrumentalities ignores that the Commonwealth developed its own mechanisms to transfer cash to instrumentalities.  Nothing prevents the Commonwealth from eliminating those mechanisms given the Oversight Board's budgeting powers under PROMESA.  Indeed, in compliance with the Oversight Board's certified budgets, the Commonwealth has not appropriated monies to any instrumentalities to enable them to pay debt service.  Accordingly, nothing the Monolines are demanding in discovery has any materiality or relevance to the issues here.

5.      Notwithstanding the Monolines' refusal to acknowledge any real bounds on the scope of discovery,[3] AAFAF has worked diligently to promptly produce materials more than sufficient to allow the Monolines to test any factual representations made in the paragraphs cited in the February 14 Order.  As explained below, the only factual statements in these paragraphs are: (1) the identity of the governmental entities that collect particular revenues; and (2) the resulting flow of funds for those revenue streams as set forth in statutes and agreements equally available to the Monolines.  *See* CCDA Opposition [ECF No. 10615] ¶¶ 39-41; HTA Opposition [ECF No. 10618] ¶¶ 77, 81, 92 & Ex. A; PRIFA Opposition ¶¶ 29, 38, 69, 103 & 124-25 [ECF No. 10611].  AAFAF has produced documents that are more than sufficient to allow the

---

[3] Indeed, in a letter sent after the close of business on Wednesday February 26, 2020, the Monolines requested additional follow-up information, including transmittal information for 23 transactions from 2015 and 2016, as well as additional bank account information, demanding a response by today.  *See* Ex. 1.

Monolines to test the asserted facts.

6.      As of the date of this filing, AAFAF has produced documents sufficient to

evidence the relevant revenue streams at issue, including:

- Monthly or weekly Treasury Single Account ("TSA") cash flow reports, which among other things report collections of the HTA Allocable Revenues and Rum Tax Remittances from March 2017 through the present.

- Spreadsheets showing monthly total HTA Allocable Revenues, including revenues withheld at the TSA or passed through to HTA, from FY2015 to FY2020.

- Spreadsheets showing total monthly HTA Toll Revenues, from FY2015 to FY2019.

- Spreadsheets showing total monthly Rum Tax revenues, including amounts received into the TSA, from FY2015 to FY2020.

- A spreadsheet showing Hotel Tax collections from FY2016 to FY2020.

- All audited financial statements that have been completed for CCDA, HTA, and PRIFA from FY2015 through the present.

7.      AAFAF has also produced documents sufficient to evidence the flow of funds,

including:

- Direction letters from the Puerto Rico Department of Treasury ("Treasury") evidencing transfer of HTA Allocable Revenues from the Commonwealth to HTA, ranging from January 2015 to February 2016, and the transfer of Rum Tax revenues from the Commonwealth to PRIFA ranging from June 2014 to April 2015.

- Exemplar Disbursement Details and Letters dated July 2019, December 2019, and January 2020 evidencing the transfer of Rum Tax revenues from the U.S. Treasury to the Lockbox account, and the transfer from the Lockbox account.

- A spreadsheet identifying Tourism Company accounts that held Hotel Tax revenues, the purposes of the accounts, and the balances as of December 31, 2019.

8.      Furthermore, AAFAF has produced: (1) HTA, CCDA, and PRIFA reporting and

budget memoranda submitted to the Puerto Rico legislature; (2) all nonpublic rum producer

"cover over" agreements; and (3) the PRIFA Lockbox Agreement, Security Agreement, Trust

Agreements, and Deposit Account Control Agreement.

4

9.      In addition to providing spreadsheets listing account numbers and balances in

TSA operational accounts as of December 31, 2019, AAFAF produced exemplar statements

from the TSA, HTA's toll collection account, PRIFA's operational accounts, the Tourism

Company's collection accounts, and the Transfer Account.

10.     AAFAF also agreed to collect and produce: (a) bank account statements for each

account that could be reasonably identified that held the relevant pledged revenues from 2015

onward; (b) direction letters or other instructions to financial institutions regarding transfers of

the allegedly pledged revenues; and (c) any central repository of budget-related materials,

including circular letters or regulations beyond the materials that are already publicly available

on Treasury and Office of Management and Budget websites.  The Oversight Board also agreed

to produce underlying documents used or referenced in the preparation of the Cash Restriction

Analysis insofar as it refers to PRIFA, HTA, or the Tourism Company.

11.     This is more than just "limited" discovery, and it is burdensome.  The historical

knowledge required to locate materials responsive to the Monolines' requests necessitates that

multiple Government agencies divert key personnel away from core functions, including

preparation of the Fiscal Year 2021 budgets and fiscal plans.  Given the limited (if any)

probative value of these materials, the burden of requiring the Government Parties to do more is

not justified.  Based on prior experience with requests for communications in the PREPA 9019

litigation, completing the discovery demanded in the Motions would require months to complete

and the costs to the Government could be substantial.

12.     Yet, the Monolines contend it is not enough because their goal is to further stall

the hearing, not to obtain the information that Judge Swain ordered (which they either already

have or will shortly receive).  In their Motions, the Monolines demand that the Government

Parties produce: communications of the Commonwealth and its instrumentalities regarding the

relevant revenues; communications and documents regarding the budgeting treatment of those

revenues; account opening documents for each account that held these revenues from 2015

onward; detailed transmittal information for each and every transfer of funds from 2015 onward;

and witnesses to offer testimony "concerning the documents ordered to be produced . . . and the

discoverable issues identified in the [February 14] order." *See* HTA Motion ¶¶ 9-10;

CCDA/PRIFA Motion ¶¶ 4-7.

13.     These materials are beyond the reasonable scope of the limited discovery

contemplated by the February 14 Order, and they go far beyond the realm of relevance.  As the

parties seeking discovery, the Monolines "must demonstrate the relevancy of the information

sought."  *Diaz-Padilla v. Bristol Myers Squibb Holding Ltd. Liability Co.*, 2005 WL 783076, at

*2 (D.P.R. 2005) (quoting *Creely v. Genesis Health Ventures, Inc.*, 2005 WL 44526, at *1 (E.D.

Pa. 2005); *see also Judson v. Midland Credit Mgmt., Inc.*, 2014 WL 3829082, at *2 (D. Mass.

Aug. 1, 2014) ("The party seeking discovery to which an adversary has objected, bears the

burden of showing relevance.").  Only once that initial burden is met does "the burden shift[] to

the opposing party to show why discovery should not be permitted."  *Diaz-Padilla*, 2005 WL

783076, at *1.

14.     The Monolines ask the Court to presume the relevance of all their requests,

claiming "Judge Swain's identification of specific factual representations … for which discovery

is to proceed" makes "relevance … not at issue…." (HTA Motion ¶ 11); *see also* CCDA/PRIFA

Motion ¶ 11 ("Relevance, therefore, is not at issue in this Motion").  The Monolines go so far as

to claim their requests were "already deemed relevant by Judge Swain" (HTA Motion ¶ 15); *see*

*also* CCDA/PRIFA Motion ¶ 12 ("[The Monolines'] . . . discovery requests fall squarely within

the scope of discovery ordered by Judge Swain.").

15.     But Judge Swain did not find *all* the Monolines' document requests (or, indeed, any particular requests) seek relevant information.  Rather, the February 14 Order "allow[ed] limited discovery relating to factual representations" in certain identified paragraphs in each lift stay opposition filed by the Oversight Board.  The February 14 Order did not say what in those paragraphs constituted factual representations (as opposed to legal argument) and, as discussed below, not everything in them is a factual representation that warrants expansive discovery.  In fact, the February 14 Order, by allowing limited discovery, eschews the kind of expansive discovery the Monolines seek.

16.     By allowing expansive discovery into topics not germane to the core issues to be decided on April 2, granting the Monolines' motions would eliminate the entire benefit—to judicial economy and preservation of resources—of the Court's two-tiered structure of a preliminary hearing on threshold gating issues followed by a final hearing, only if necessary.  It would certainly delay the schedule, perhaps significantly—which is the Monolines' very transparent goal.  Given the inherently legal nature of the issues to be decided in connection with the April 2 hearing, as well as the fulsome nature of what the Government Parties have already produced and agreed to provide by way of discovery,[4] the Government Parties respectfully request the Motions be denied.

## **BACKGROUND**

17.     On February 5, 2020, the Monolines propounded 25 exceedingly broad "informal" discovery requests, seeking, among other things, all "[d]ocuments, communications,

---

[4] Likewise, there is no reason for the Court to order depositions.  To the extent the Monolines have questions about documents that have been or will be produced, the Government Parties will endeavor to answer them as part of the meet and confer process.  If that process is exhausted and the Monolines still believe a deposition is needed, the Government Parties will consider such a request in good faith.  The Motions are premature on this issue.

or Agreements . . . relating to the Pledged Revenues, the flow of funds . . . and/or the use of

Pledged Revenues." [ECF Nos. 10974-3, 10974-4, 11686-1.]  The parties held a telephonic meet

and confer later that day during which the Government Parties inquired as to the relevance of the

requested documents to the issues of standing or secured status, explaining that many of the

requests were so broad as to be incomprehensible and asking for clarification.  [*See* ECF No.

10841-2.]

       18.     Rather than limit or narrow their requests, on February 7, 2020, the Monolines

responded with an expanded set of requests, seeking regulations, internal agency rules, manuals,

and official communications or memoranda regarding the budgeting treatment of the Excise

Taxes; communications between individuals at HTA responsible for budgetary matters and their

counterparts in the Commonwealth government, and other documents and communications

related to Commonwealth and HTA budgetary practices.  [ECF No. 11686-4.]  AAFAF, as fiscal

agent for the Commonwealth, CCDA, HTA, and PRIFA, agreed to search for a core set of

documents and produce them as quickly as was practical.  AAFAF made an initial production on

February 12, 2020 and represented it would make an additional production by Friday, February

14, 2020.  [*See* ECF No. 10974-8.]

       19.     On February 12, 2020, the Monolines sought a seven-week adjournment of the

hearing on their Lift Stay Motions, purportedly to allow time to complete the expansive

discovery they demanded.  [ECF No. 10841.]  On the afternoon of February 14, 2020, the

Monolines filed a motion to compel production in response to each of their informal requests.

[ECF 10974.]  That evening, as promised, AAFAF made an additional production of documents.

       20.     In the February 14 Order, Judge Swain granted a four-week adjournment of the

hearing and permitted only "limited discovery" into the factual representations made in three

paragraphs and an illustrative Exhibit to the Oversight Board's Opposition to the HTA Lift Stay

Motion, in three paragraphs to the Oversight Board's Opposition to the CCDA Lift Stay Motion,

and in six paragraphs in the Oversight Board's Opposition to the PRIFA Lift Stay Motion.  On

February 19, 2020, this Court denied the Monolines' motion to compel as moot and directed that

the Monolines "may file a new motion to compel limited to the discovery allowed in the

[February 14] Order."  [ECF No. 11290.]

21.     On February 20, 2020, notwithstanding these Court orders, the Monolines

transmitted a discovery chart in which they only withdrew one request. [ECF No. 11687-2, at 2.]

Moreover, the Monolines expanded their requests to include new documents, third-party

discovery, and 30(b)(6) deposition testimony, *id.* at 3, 7, 10, and even expanded the time period

for the production of documents from July 2015 to January 2015.  [ECF No. 11687-3 at 2 n.1.]

It is evident the Monolines made no effort to tether their broad-based requests to the specific

factual representations implicated by Judge Swain's February 14 Order.  Instead, they appended

paragraph citations to each of their previous requests, contending that each request somehow

related to the subject matter of those paragraphs.

22.     On February 24, 2020, the Monolines filed their Motions.

## **ARGUMENT**

**I.     AAFAF HAS PROVIDED VOLUMINOUS DISCOVERY RELATING TO THE
FACTUAL ALLEGATIONS IDENTIFIED BY THE FEBRUARY 14 ORDER.**

**A.     AAFAF Has Agreed to Provide Documents More Than Sufficient to
Evidence the Identified Factual Representations in the PRIFA Opposition.**

23.     AAFAF has, with significant effort, undertaken to satisfy the discovery permitted

in the February 14 Order.  That sufficiency is detailed below.

*1.     Rum Taxes Collection and Remittance to the Puerto Rico Treasury*

9

*Without Restriction (PRIFA Opposition ¶¶ 38, 69, 124, 125)*

24.     The PRIFA Opposition states "the Rum Taxes are collected by the federal

government" and "are remitted to the Puerto Rico Treasury pursuant to federal statute with no

limitations as to use."  PRIFA Opp. ¶ 38; *id.* ¶ 125 ("[The] Rum Tax Remittances are not a

special excise tax of the Commonwealth, but a mere appropriation from the United States . . . the

Rum Tax Remittances [are] not derived from PRIFA's operations or the Commonwealth's

operations"); *id.* ¶ 69 ("[T]he Commonwealth receives the Rum Taxes from the federal

government with no strings attached."); *id.* ¶ 124 n.74 ("Here, the Offering Statements notified

Bondholders that the continued flow of Rum Taxes was contingent on future federal government

allocations."); *see also id.* ¶ 124 ("The Rum Tax Remittances conditionally appropriated to

PRIFA could be modified or eliminated by a subsequent legislature.").

25.     By statute, the Rum Taxes are collected by the federal government and transferred

without restriction to the Treasury of Puerto Rico pursuant to federal law.  *See* 26 U.S.C. §§

5001, 7652 .[5]  AAFAF produced exemplar transmittal letters from the U.S. Treasury transferring

the Rum Taxes to the Commonwealth without mention of any restriction.[6]  The burden of

retrieving all such letters since 2015 that exist in Treasury's files far exceeds the probative value

of producing every iteration of this letter (particularly given the clear words of the governing

statutory provisions).  Nonetheless, in the interest of compromise, AAFAF has agreed to collect

and produce all such letters that can be reasonably located in Treasury's files from 2015 onward.

---

[5] Legislation proposed by Representative Clay Higgins further supports this allegation.  *See* Clay Higgins, H.R.
3476: Repeal the Rum Excise Tax Cover-Over, *available at*
https://clayhiggins.house.gov/sites/clayhiggins.house.gov/files/Rum%20One-Pager.pdf  (explaining under current
law, "no restrictions exist on how the territories can use the transferred [rum tax] revenues").
[6] *See, e.g.*, PRIFA_STAY0000287; *see also* Commonwealth of Puerto Rico, Basic Financial Statements and
Required Supplementary Information  at 53, 160 (Jun. 30, 2016), *available at*
http://www.hacienda.gobierno.pr/sites/default/files/commonwealth_of_puertorico_2016_audited_fs_5-3-2019_0.pdf
(describing Rum Tax Revenues); and PRIFA Offering Statements *available at*
http://www.gdb.pr.gov/investors_resources/prifa.html (similar disclosures).

2.     *Flow of Funds of Rum Taxes (PRIFA Opp. ¶¶ 29, 38, 69, 103, 125)*

26.     Paragraphs 29, 38, 69, 103, and 125 of the PRIFA Opposition explain the flow of

funds as follows:

- The Rum Taxes are first "collected by the federal government" and then "remitted to the
  Puerto Rico Treasury pursuant to federal statute," and placed into the Lockbox Account.
  PRIFA Opp. ¶ 38; *see also id.* ¶ 69 ("[T]he Commonwealth receives the Rum Taxes from
  the federal government . . . and deposits them into a treasury lockbox account.").

- Under § 5 and subject to § 15 of the Lockbox Agreement, "the first $117 million are
  disbursed by the Lockbox Bank to the TSA 'for deposit to the credit of PRIFA' and
  commingled with other governmental public funds." *Id.* ¶ 29; *see also id.* ¶ 69 (after
  funds are in the Lockbox Account, the Commonwealth "transfers a certain portion of
  them to the TSA"). The disbursement is made with a "Disbursement Detail" that
  "describes the disbursements [and] is not an instruction, but is merely a description of
  how the disbursements were calculated." *Id.* ¶ 29.

- "After the first $117 million of Rum Taxes are deposited in the TSA, Citibank disburses
  additional designated amounts to (i) the Treasury Secretary "for deposit to the credit of"
  the Puerto Rico Science & Technology Trust, and (ii) the Puerto Rico Conservation Trust
  Fund. Approximately 46% of the remaining Rum Tax Remittances are disbursed directly
  to a trustee (Banco Popular) on behalf of Puerto Rico rum producers in exchange for their
  agreement to continue production of large volumes of rum in Puerto Rico for a period of
  20 years, to collaborate with the Commonwealth in the marketing and promotion of its
  rum and Puerto Rico rums generally in the U.S. market, and to use the Rum Tax
  Remittances returned to it to market and promote Puerto Rico rum products." *Id.* ¶ 29
  n.18

27.     This recitation is a straightforward reading of the Lockbox Agreement, which

AAFAF produced.[7]  In addition, AAFAF produced the following documents, which are

sufficient to evidence the above-described flow of funds:

- <u>Summary Cash Flow Spreadsheets from Treasury</u>.[8]  These spreadsheets summarize the
  overall flow of the Rum Taxes and provide, for FY15-20 by month, the total Rum Taxes
  received by the Commonwealth and the amount of such monies transferred to the TSA,
  the Science & Technology Trust, the Rum Producers, the Conservation Trust, and for
  CitiBank Service Charges.

- <u>TSA Cash Flow Reporting</u>.[9]  These monthly or weekly reports show among other things

---

[7] PRIFA_STAY0000472.
[8] PRIFA_STAY0000001, PRIFA_STAY0000128.
[9] CW_STAY0000156, CW_STAY0000177, CW_STAY0000203-CW_STAY0000953.

the inflow of Rum Tax revenues into the TSA.

- Rum Tax Disbursement Detail.[10] AAFAF has produced exemplars of the disbursement notices evidencing the transfer of the Rum Tax Remittances from the U.S. Treasury to the Lockbox Account and then to the TSA.

- Direction letters from Treasury.[11] AAFAF has produced documents from Treasury approving the transfer of Rum Tax revenues from the Commonwealth to PRIFA.

28.     AAFAF also agreed to produce, to the extent they can be located, Rum Tax Disbursement Detail documents, any additional direction letters or wiring instructions evidencing the transfer of Rum Taxes from TSA to PRIFA, and monthly statements for the bank accounts that held Rum Taxes, from January 1, 2015 to the present.

3.     *Commingling of Rum Tax Remittances (PRIFA Opposition ¶¶ 38, 103).*

29.     The PRIFA Opposition alleges "Rum Tax Remittances are commingled in the Commonwealth's TSA." *Id.* ¶ 38; *see also id.* ¶ 103 ("[U]nappropriated Rum Tax Remittances, [] sit in the TSA, not segregated, and commingled with other revenues."). After Treasury transfers funds to PRIFA, the funds "are commingled in the PRIFA Infrastructure Fund with other funds." *Id.* ¶ 103. In addition to the materials described above, AAFAF also produced exemplar bank account statements for each of the TSA's operational accounts,[12] and for PRIFA's operational accounts.[13] AAFAF has also agreed to produce bank account statements dating back to January 1, 2015 for all accounts that held Rum Taxes that are in the Government's files.

4.     *The Commonwealth's Right to Use Rum Tax Remittances (PRIFA Opposition ¶ 69)*

30.     Paragraph 69 of the PRIFA Opposition states that "[t]he Commonwealth always

---

[10] PRIFA_STAY0000287-PRIFA_STAY0000300; *see also* PRIFA_STAY0000613-PRIFA_STAY0000629.
[11] PRIFA_STAY0001063-PRIFA_STAY0001093.
[12] CW_STAY0000022-CW_STAY0000155, CW_STAY0000198-CW_STAY0000202.
[13] PRIFA_STAY0000281-PRIFA_STAY0000286.

reserved the right to retain those funds and use them for the Commonwealth's purposes" and that

"the Offering Statements never mention the existence of a trust relationship [that would restrict

use of funds]." *Id.* ¶ 69. The above-referenced reservation of rights is based on the Puerto Rico

Constitution. The Offering Statements are publicly available.[14] They disclosed that the Rum

Taxes are "available revenues" under the Puerto Rico Constitution.[15]

**B.    AAFAF Has Provided Documents Relating to the Identified Representations in the Oversight Board's CCDA Opposition.**

*1.    Occupancy Tax Revenues and Flow of Funds (CCDA Opp. ¶¶ 39-41)*

31.    The CCDA Opposition alleges that "[u]ntil late 2015, the flow of funds operated

as contemplated under the implementing statutes and the Bond Documents. The Tourism

Company would levy and collect the Occupancy Tax Revenues; it would then transfer the

appropriate amounts to the Transfer Account and assign the amount GDB certified to GDB;

those funds would then be transferred to the Pledge Account, and finally, the funds would be

distributed to the Trustee and then to the CCDA Bondholders in accordance with the Trust

Agreement." Then, "[i]n late 2015, the Tourism Company ceased depositing funds into the

Transfer Account and instead retained those funds." CCDA Opp. ¶ 40. "Although the Tourism

Company ceased depositing funds in the Transfer Account, it continues to levy and collect

Occupancy Tax Revenues." CCDA Opp. ¶ 41.

32.    In connection with these representations, AAFAF produced: (a) a spreadsheet

detailing the monthly Occupancy Tax collections for Fiscal Years 2016-2020 that includes a

breakout by taxpayer type;[16] (b) a spreadsheet detailing relevant Tourism accounts that includes

details such as account type, authorized signatories, account purposes, and account balances as of

---

[14] http://www.gdb.pr.gov/investors_resources/prifa.html.
[15] *See* http://www.gdb.pr.gov/pdfs/affiliates/OSPRIFAJune2005.pdf at 10.
[16] CCDA_STAY0001110.

June 30, 2019 and December 31, 2019;[17] and (c) bank account statements spanning 2015 to

January 2020, reflecting bank accounts depicted in the referenced spreadsheet.  AAFAF has

agreed to search for and produce any other relevant account statements, within that time frame,

that can be reasonably located and have not already been produced.

### 2.    GDB's Restructuring (CCDA Opposition ¶ 40 n.21)

33.    Footnote 21 to paragraph 40 of the CCDA Opposition states that "[t]he Transfer

Account was addressed as part of GDB's restructuring."  CCDA Opp. ¶ 40 n.21.  In connection

with this statement, AAFAF produced a certification showing the pre- and post-setoff balances in

the Transfer Account.[18]

### C.    AAFAF Has Provided Documents Sufficient to Evidence the Identified Factual Representations in the Oversight Board's HTA Opposition.

### 1.    Financing Statements and DACAs (HTA Opposition ¶ 77)

34.    Paragraph 77 asserts that the "Pledged Funds are held by the Fiscal Agent" but

"there are no deposit account control agreements with respect to any deposit accounts of HTA or

the Commonwealth" and that "[n]one of the Financing Statements identify HTA's right to

receive Revenues as collateral."  HTA Opp. ¶ 77 & n.30.  The HTA Financing Statements are

publicly filed and thus equally available to the Monolines.  Notwithstanding, AAFAF has

produced the results of its search for filed financing statements.[19]  Because no Deposit Account

Control Agreements exist, there are no further responsive documents to produce with respect to

that statement.

### 2.    HTA Allocable Revenues and Flow of Funds (HTA Opposition ¶¶ 81, 92

---

[17] CCDA_STAY0000001.
[18] CCDA_STAY0000002.
[19] HTA_STAY0000248-HTA_STAY0000386.

*& Ex. A)*

35.     Paragraph 92 asserts that "the Commonwealth collects the HTA Allocable Revenues from taxpayers (not the Monolines) under its taxing authority, deposits them in the TSA, and [] then . . . transfer[s] those funds to HTA for HTA's 'corporate purposes.'"  HTA Opp. ¶ 92.  This flow of funds is graphically illustrated in Exhibit A to the HTA Opposition. Paragraph 81 asserts that "the Commonwealth has not appropriated the HTA Allocable Revenues to HTA," and that  "[f]unds only conditionally allocated to HTA and never in fact transferred to HTA" were not "made available" to HTA.  HTA Opp. ¶ 81.

36.     In connection with these statements, AAFAF has produced summary reporting from Treasury and HTA sufficient to show HTA Allocable Revenues collected by Treasury and the subsequent transfers to HTA, or alternatively, amounts withheld at the TSA, for FY2015-2020, on a monthly basis.[20]  In addition, with respect to appropriations, the Government hosts on public websites repositories of current and historical budgets,[21] Joint Resolutions for the General Budget and Special Assignments and Explanatory Reports on budgets,[22] and regulations and circular letters.[23]  Although publicly available, AAFAF produced some budget-related materials from these repositories.[24]  Furthermore, AAFAF has agreed to assess whether any non-public, reasonably accessible documents concerning the budgeting process exist beyond what is already public.  Some non-public materials pertaining to budgeting have already been produced.[25]

  *3.     Commonwealth Right to Retain Revenues (HTA Opposition ¶ 92)*

37.     Paragraph 92 states that "[t]he Commonwealth always reserved the right to retain

---

[20] HTA_STAY0000001-HTA_STAY0000022, HTA_STAY0000206-HTA_STAY0000234.
[21] http://www.presupuesto.pr.gov/Pages/PRESUPUESTOSANTERIORES.aspx.
[22] http://www.bvirtual.ogp.pr.gov/ogp/Bvirtual/Pages/bibilioteca.aspx.
[23] http://ogp.pr.gov/Memorandos_CartasCirculares; http://www.hacienda.gobierno.pr/sobre-hacienda/publicaciones.
[24] CCDA_STAY0001188-CCDA_STAY0001312, HTA_STAY0000387-HTA_STAY0000453,
PRIFA_STAY0000153-PRIFA_STAY0000163, PRIFA_STAY0000682-PRIFA_STAY0000927.
[25] PRIFA_STAY0000630-PRIFA_STAY0000656.

those funds and use them for its own purposes" and that "[t]he 'Effective Date' specified in Act 1-2015 never happened." HTA Opp. ¶ 92.

38.     HTA's Offering Statements—publicly available—disclose that the HTA Allocable Revenues are "available revenues" under the Puerto Rico Constitution.[26]  The official publications sufficient to evidence that the "Effective Date" in Act 1-2015 never happened are publicly available and the web page was provided in the HTA Opposition.

39.     Put simply, AAFAF has produced (or agreed to produce) documents that more than allow for the Monolines to test the accuracy of the factual representations made in the paragraphs identified in the February 14 Order.

## II.   THE ADDITIONAL DISCOVERY THE MONOLINES DEMAND IS IRRELEVANT TO THE GATING ISSUES SET FOR HEARING ON APRIL 2.

### A.   The Monolines Are Not Entitled to Discovery of Communications and Course of Dealing Evidence to Challenge the Plain Meaning of the Governing Statutes, Resolutions, and Agreements.

40.     The Monolines seek an order compelling a host of sweepingly broad communications ("Communications Requests"):

- "[C]ommunications, to which the Commonwealth, PRIFA, or rum producers are a party, relating to the Rum Taxes, the flow of funds for PRIFA bonds, and/or the use of Rum Taxes." (PRIFA/CCDA Motion ¶ 4).

- "[C]ommunications to which the Commonwealth, the Tourism Company, CCDA and/or GDB is a party relating to occupancy tax revenues, the flow of funds for CCDA, or the retention and use of occupancy tax revenues." (PRIFA/CCDA Motion ¶ 4).

- "[C]ommunications including internal regulations/rules of the Treasury or OMB, and Commonwealth or HTA official memoranda or authenticated documents concerning Excise Taxes and accounts, i.e., flow of funds information in such documents (e.g, ownership (beneficial or otherwise), account deposit, transfer, restrictions, etc.)." (HTA Motion ¶ 9).

- "[A]ny document (including communications) that refers to Excise Taxes as mere 'appropriations' as the FOMB claims, and internal regulations or rules of OMB and

---

[26] *See* http://www.gdb.pr.gov/investors_resources/documents/PRHighwayaFIN_000.pdf at 19.

Treasury relating to the budgeting treatment of Excise Taxes (e.g., characterizing the
Pledged Revenues as appropriations to HTA or its property)."  (HTA Motion ¶ 9).

41.     The Monolines say they seek this parol evidence because they believe it is
pertinent to the interpretation of the relevant statutes and contracts.  But these topics are not the
specific "factual representations" identified in Judge Swain's February 14 Order.

42.     The Monolines acknowledge the Communication Requests seek "'course-of-
dealing' evidence" extrinsic to the four corners of the statutes and agreements at issue.
(PRIFA/CCDA Motion ¶¶ 4, 25).  They do not claim the statutes and agreements are ambiguous.
(*Id.* ¶ 26).  That should end the inquiry.  Courts routinely deny discovery of parol evidence in the
absence of a finding of ambiguity.  *See Bank v. IBM*, 145 F.3d 420, 431 (1st Cir. 1998)
(affirming denial of discovery of parol evidence because "the agreement was unambiguous");
*Santiago v. Canon U.S.A.*, 1997 U.S. Dist. LEXIS 4902, at *11 (D.P.R. 1997) (denying
discovery into course of dealing because "the civil code and the parol evidence rule bar
consideration of extrinsic evidence where the terms of the distribution agreement" are
unambiguous); *see also, P.R. Tel. Co. v. Advanced Cellular Sys., Inc. (In re Advanced Cellular
Sys., Inc.)*, 483 F.3d 7, 12 (1st Cir. 2007) ("Under Puerto Rico law … a court may not consider
extrinsic evidence at all, if it finds that the terms of an agreement are clear."); *Mass. Fin. Servs.,
Inc. v. Sec. Inv'r Prot. Corp.*, 545 F.2d 754, 757 (1st Cir. 1976) ("[A] court 'will resort to the
legislative history and other aids of statutory construction only when the literal words of the
statute create ambiguity or lead to an unreasonable interpretation.'").[27]

43.     In the absence of any allegation of ambiguity,[28] the Monolines speculate: "*If* the

---

[27] The Monolines cite the Restatement (Second) of Contracts, for the proposition that there is no requirement of
ambiguity before course of dealing evidence can be considered.  (Motion ¶ 20).  But the First Circuit has made clear
that even under the "modern" Restatement approach, course-of-dealing evidence may "not [be used] to vary or
contradict [a contract's] terms."  *Fleet Nat'l Bank v. H&D Entm't*, 96 F.3d 532, 539 (1st Cir. 1996).

[28] This renders cases like *Roig Commercial Bank v. Buscaglia*, cited by the Monolines, inapposite.  The court there
was specifically discussing a situation in which "a provision of law is ambiguous."  74 D.P.R. 919, 933 (1953).

Court" finds the bond documents ambiguous, parol evidence *might* be relevant.  (PRIFA/CCDA

Motion ¶ 26).  But discovery should not be based in speculative hypotheticals.  Ambiguity is a

threshold question of law.  *Alison H. v. Byard*, 163 F.3d 2, 6 (1st Cir. 1998) ("The question of

whether a contract term is ambiguous is one of law for the judge.").  And ambiguity does not

flow from the mere existence of competing interpretations.  *Id*; *see also Weiss v. DHL Express,
Inc.*, 718 F.3d 39, 44–45 (1st Cir. 2013) ("A contract is not ambiguous simply because litigants

disagree about its proper interpretation.").[29]

44.     The Monolines argue that "[i]n terms of any document that actually refers to the

Excise Taxes as mere appropriations, the Government Parties staked much of their Opposition

Brief on that assertion and thus must have knowledge of them."  (HTA Motion ¶¶ 19, 23).  But

whether or not documents or communications "refer[] to Excise Taxes as mere 'appropriations'"

has no bearing on *whether they are.*  How a statute is described by government employees does

not—and cannot—alter the meaning of the statutory text.

45.     Moreover, the Monolines completely misapprehend the Oversight Board's

argument on the point.  Here, statutory construction begins and ends with the statutory text.

*Scotiabank de P.R. v. Burgos (In re Plaza Resort at Palmas, Inc.)*, 741 F.3d 269, 274 (1st Cir.

2014) ("Statutory construction in Puerto Rico begins with the text of the underlying statute, and

ends there as well if the text is unambiguous.").  Nowhere in its oppositions did the Oversight

Board cite to any extrinsic evidence to support its argument that the statutes at issue are

appropriations laws.  The Oversight Board's argument is rooted solely in the statutory text.  It

did not purport to interpret—much less reference—the text based on extrinsic, *post hoc* evidence.

---

[29] The Monolines cite to *Clinton Co. v. United States*, 1991 WL 95284, at *5 (N.D. Ill. 1991) is not contrary, nor is it
controlling.  In *Clinton*, the court allowed discovery of parol evidence only after finding the contract ambiguous.  Here,
there has been no such finding.  At minimum, the notion that parol evidence may one day be relevant *if* the Court finds
particular provisions ambiguous is no reason to order such broad and time-intensive discovery now.

See Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 919 F.3d 121, 128 (1st Cir. 2019) ("It is elementary that in resolving a dispute over the meaning of a statute we begin with the language of the statute itself." (citing Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985))).

46.     The same holds true for the relevant contracts.  "*Post hoc* interpretations of [a contract] by … employees who . . . are not even alleged to have participated in drafting or negotiating [the] contracts" are "not probative as an aid to the interpretation of the contract." *Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006) (citing *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 208 n.10 (2d Cir. 2005)).

47.     *In re Motors Liquidation* is illustrative of this principle.  There, a bondholder challenged the U.S. Treasury's use of Troubled Asset Relief Program ("TARP") funds in the sale of the debtor's assets, arguing the use of those funds exceeded the Treasury's authority.  430 B.R. 65, 95.  In support, the bondholder cited statements from the former Treasury Secretary made at a House Committee hearing to the effect that providing TARP funds to automobile companies exceeded the Treasury's authority under the Emergency Economic Stabilization Act. *Id.*  The court rejected the bondholder's argument, calling such *ex post* comments a "hazardous" basis for statutory interpretation.  The same is true for the Monolines' Communications Requests.[30] *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (reference to post-enactment statements "is not a legitimate tool of statutory interpretation"); *W. Air Lines, Inc. v. Bd. of Equalization of State of S.D.*, 480 U.S. 123, 131 (1987) (giving no weight to "the *post hoc*

---

[30] The Monolines' request for "internal rules and regulations" is no more appropriate.  Those things are not legislative history and cannot supersede the text of the statute or agreements at issue.  "The United States Supreme Court has ruled that an interpretation, in a specific case, of an administrative official or government agent that is contrary to the law or a regulation, **does not bind** the government . . . ."  *Roig Commercial Bank v. Buscaglia*, 74 D.P.R. 986, 1004 (1953) (emphasis added) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 381 (1947)); *see also United Shoe Workers of Am., AFL-CIO v. Bedell*, 506 F.2d 174, 185 (D.C. Cir. 1974) (statutory language trumps any intent).

statements of interested onlookers" in interpreting statute).

48.     The Court has previously rejected similar "state of mind" discovery in these proceedings.  Specifically, in addressing the ERS lift stay motions, the Court held that evidence regarding the Commonwealth's intent or understanding has no real relevance to the question of whether bondholders are secured.  *See* Mem. Order Granting Respondents' Urgent Mot. in Limine to Exclude Evidence and Argument Regarding an Alleged April 27, 2016 Meeting with Movants' Representatives, No. 17-3566, ECF No. 544, 5, (D.P.R. Jun. 5, 2019) (the "ERS Order") ("[E]vidence of intent to circumvent rights in collateral is, at best, of marginal relevance to the central question to be considered at the Stay Relief Hearing: whether bondholders have any security interest in employer payments under the PayGo system."); *see also, Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*, 474 B.R. 576 (Bankr. N.D. Ill. 2012) (where, as here, "there is an otherwise valid security agreement, extraneous documents and indications of the parties' intention … are irrelevant to a determination of the extent of the security interest created by a formal security agreement").  The UCC, which governs the Monolines' asserted security interests, is in accord.  Course of Dealing and Usage of Trade, Unif. Commercial Code § 1-205(4) ("[E]xpress terms control both course of dealing and usage of trade.").

49.     Thus, discovery about the government's budgeting process or what government employees may have thought about the meaning of the statutes is not helpful.  In the ERS Order, the Court called such discovery an "unwarranted evaluation of subsidiary issues . . . contrary to the principles of judicial economy and prudent stewardship of debtor resources."  ERS Order at 7.  The same is true here.

50.     The cases the Monolines cite merely reflect the usual deference courts give to

administrative agencies charged with interpreting statutes.  (*See* HTA Motion ¶ 21).  *Casellas* cited to official, published opinions of the Secretary of the Treasury made "practically following" passage of the rules at issue.  *Commonwealth Ins. Co. v. Casellas*, 3 P.R. Offic. Trans. 750, 756 (1975).  It was neither a *post hoc* nor an *ad hoc* interpretation of the kind the Monolines seek here.  Similarly, *Bedell* cited to published opinions of the Tariff Commission— "the agency set up by Congress as its expert overseer of the Act"—on petitions for "adjustment assistance" under the statute at issue there.  *United Shoe Workers of Am., AFL-CIO v. Bedell*, 506 F.2d 174, 184 (D.C. Cir. 1974).[31]  None of the communications the Monolines seek involve anything similar to administrative decisions by an expert agency about the meaning of a statute in response to petitions for relief.  Indeed, the Monolines do not suggest any Commonwealth agency has been asked to rule on a dispute involving the revenues at issue.

### B.   The Monolines Are Not Entitled to Expansive Discovery in the Hopes of Creating an Equitable Property Interest Beyond the Plain Text of the Statutes and Governing Documents.

51.      The Monolines seek a variety of documents they claim are relevant to deciding legal questions of ownership and standing.  As to HTA, the Monolines argue "account opening documents" and other documents "including communications and internal rules and regulations pertaining to the Excise Taxes . . . are directly relevant to the FOMB's representation that the funds held in Commonwealth accounts are its property, not property of HTA or the bondholders."  (HTA Motion ¶¶ 12, 14).  As to the PRIFA and CCDA "Communications Requests," the Monolines argue they "are relevant to secured status, or other property or

---

[31] The other cases the Monolines cite on this point are also inapplicable for the same reason.  *Roig Commercial Bank v. Buscaglia*, 74 D.P.R. 986, 1004 (1953), *Brugal & Co. v. Buscaglia*, 64 D.P.R. 903, 910 (1945), and *Banco Popular v. Mun. de Mayagüez*, 126 D.P.R. 653, 671 (1942), all dealt with official, published treasury regulations and forms, not *ad hoc* or "internal" communications.  Moreover, the *Banco Popular* court noted, "our judicial adjudicative mission does **not** allow us to prescribe right[s] based on forms.  The substance of the law is the really important thing."

ownership interests." (PRIFA/CCDA Motion ¶ 4). Similarly, the Monolines claim "account

opening documents are directly relevant to questions of ownership and equity in the pledged

revenues, and whether the monies are held in an identifiable trust res." *Id.* ¶ 6. Not satisfied

with AAFAF's offer to produce "Disbursement Detail" documents relating to Rum Tax transfers

into the TSA, the Monolines seek "historical transmittal information associated with any receipt

or transfer of Hotel Taxes and Rum Taxes from or to any accounts" because, they argue, it is

"plainly probative" not of any factual representation made purportedly by the Oversight Board,

but "of the very property rights [the Monolines] claim to have by statute and contract." *Id.* ¶ 36.

52.     As explained above, these documents cannot change the meaning of the statutes,

resolutions, or agreements. To the extent the Monolines claim they are entitled to these materials

to attempt to establish an equitable interest in the revenue streams at issue, this argument is

meritless. Moreover, the February 14 Order did not allow discovery into these legal issues.

53.     The Monolines argue that if the Court does not agree with their interpretation of

the statutes and the relevant agreements, "it should find that a constructive trust or, in the

alternative, a resulting trust has arisen as a result of the Debtor's diversion of the Pledged

Revenues for improper purposes." (ECF No. 10108 ¶ 61; *see also* ECF Nos. 10104 ¶ 81, 10602

¶ 59). But under Puerto Rico law, constructive trusts are equitable remedies that cannot be

recognized where agreements or statutes govern the parties' relationship. *See Rentas v. Claudio*

*(In re Garcia)*, 484 B.R. 1, 17 (Bankr. D.P.R. 2012), *rev'd on other grounds at* 507 B.R. 32 (1st

Cir. B.A.P. 2014) ("The constructive trust equitable doctrine was incorporated in Puerto Rico . . .

to prevent unjust enrichment. The doctrine of unjust enrichment, however, is not applicable in

Puerto Rico when there is a written contract between the parties. When there is a contract, there

is no need to resort to equity for only the contract governs."); *see also Brown v. United Airlines,*

*Inc.*, 720 F.3d 60 (1st Cir. 2013) ("Ordinarily, a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties.").

54.     Permitting intensive fact discovery into every statement government officials may have made about the revenues at issue—whether in communications, budgeting documents, funds transfers, or account opening materials—is inconsistent with the concept of a preliminary hearing on specified threshold legal issues.  It is certainly inconsistent with any notion of "limited" discovery.  If the Court determines at the preliminary hearing that the Monolines' allegations of equitable property interests are not precluded as a matter of law by virtue of the express statutes and agreements at issue, at that point, the litigation will proceed to a full evidentiary hearing to adjudicate any factual dispute regarding whether the circumstances support granting equitable relief.  *See Garcia*, 484 B.R. at 16 (denying claim for constructive trust because "Defendants have failed to show any fraudulent wrongdoing or duress by the Debtors by clear and convincing evidence" and because the relationship between the parties was governed by written contract).

**C.     The Monolines' Attempt to Tether Their Pre-Existing Discovery Requests to Factual Allegations Identified in the February 14 Order is Unpersuasive.**

55.     In addition to their arguments that the materials sought are relevant to the parties' respective legal positions, the Monolines attempt to re-frame their pre-existing broad discovery demands as tailored to the factual allegations identified in the February 14 Order.  These arguments are baseless.

56.     With respect to communications and budgeting materials pertaining to the HTA Allocable Revenues, the Monolines assert that the FOMB made a "representation that the funds held in the Commonwealth accounts are its property, not property of HTA or the bondholders, that may or may not be 'appropriated' to HTA."  (HTA Motion ¶ 14).  That is the Oversight

Board's *legal argument* based on statutory text; it is not an assertion of fact.  The Oversight

Board did not invoke or cite to past budgetary practices (*id.* ¶ 21), which are irrelevant to

statutory meaning.  Tellingly, the Monolines argue the Court can "rely on the requested

documents to conclude that, under Puerto Rico law, the Excise Taxes do not constitute annual

appropriations subject to discretionary budgeting."  (*Id.* ¶ 22).  The Monolines miss the point.

Commonwealth statutes providing that future legislatures must transfer monies to HTA are

unenforceable because one legislature cannot bind future legislatures.  They are unenforceable

because the statutes are pre-Title III promises by the Commonwealth to transfer monies under

certain circumstances.  Those promises can be breached, which, at most, gives rise to an

unsecured claim by HTA (not the Monolines), and not a property right.  Further, the Oversight

Board's position is that a pre-PROMESA statute requiring the Commonwealth to transfer funds

to enable HTA to pay its prepetition debt is the quintessential statute preempted by PROMESA.

This is critical to the Commonwealth's restructuring because its laws (like all state laws)

required all valid debts to be paid in full.  In any event, it is the text of Commonwealth statutes

that determine Puerto Rico law with respect to this issue, not the type of extrinsic materials

sought by the Monolines.

57.      For PRIFA, the Monolines argue that their Communications Requests are

"relevant to the flow of PRIFA-related funds" and "may shed light on the arrangements entered

into by the Commonwealth and the Rum Companies."  (CCDA/PRIFA Motion ¶ 24.)

Documents showing the flow of funds have been or will be produced, as have the contracts

documenting the arrangements entered into by the Commonwealth and the Rum Companies.

Communications about the flow of funds and the agreements will not "shed light on" these

things.  They are what they are.

24

58.     For CCDA, the Monolines repeatedly cite to the "based on" clauses in Paragraph 40 of the Oversight Board's CCDA Lift Stay Opposition to justify their demands, but those clauses are not factual representations.  The full paragraph reads:

> In late 2015, however, the Tourism Company ceased depositing funds into the Transfer Account and instead retained those funds.  As discussed below, prior to PROMESA, this retention of Occupancy Tax Revenues was ***based on*** various Commonwealth emergency orders authorizing the retention of these funds. After the enactment of PROMESA, the continued retention of the Retained Occupancy Tax Revenues was ***based on*** PROMESA and its preemption of inconsistent, pre-existing Commonwealth laws.

CCDA Opposition ¶ 40 (emphasis added).

59.     These sentences are arguments about legal positions, not factual allegations. They refer the reader to legal discussions "below," and are written in the passive voice.  The next section of the brief describes the emergency orders that formed the basis of retention of the funds "prior to PROMESA."  The Monolines have those orders.  And in paragraphs 77-80, the Oversight Board explains why, as a legal matter, it believes preemption forms the basis for "continued retention" after the enactment of PROMESA.

60.     Accordingly, there is no ground for the Monolines' requests for discovery regarding "the reasoning underlying the Tourism Company's decision or its understanding." (CCDA/PRIFA Motion ¶ 22). The Oversight Board's arguments do not depend on the Tourism Company or the Commonwealth's reasoning.  Moreover, as Paragraph 40 makes clear, it was not the Tourism Company's (or CCDA's) decision.  The Governor issued the emergency orders, and the Oversight Board promulgated budgets and fiscal plans pursuant to PROMESA.  Thus, the "based on" clauses are not "factual assertions" properly subject to discovery here.

61.     Finally, "[The Monolines] … seek documents sufficient to show the terms, scope, and effects of purported restrictions placed on CCDA- and PRIFA-related funds" and "on HTA-related funds," citing to the Commonwealth's October 2, 2019 Summary of Cash Restriction

Analysis (the "Cash Restriction Analysis" or "CRA").  (HTA Motion ¶ 9; PRIFA/CCDA Motion

¶ 5; ECF 11684-04).  But Paragraph 103 of the Oversight Board's PRIFA Lift Stay Opposition,

the only paragraph to even mention restrictions identified in the February 14 Order, cites First

Circuit law that "no trust can exist where no 'specific restriction [is] placed upon [the debtor's]

use of the supposed funds.'"  PRIFA Opp. ¶ 103.  The Oversight Board did not cite to or purport

to rely on the Cash Restriction Analysis.  In fact, as is clear from the context, the quoted

statement is based only on the statutory and contractual text at issue.  Those documents are

already in the record.  There is nothing more to discover about them.

62.     The Cash Restriction Analysis, which was prepared by the Oversight Board's

professionals for use in mediation, itself provides the "TSA [is] assumed to be unrestricted."

CRA at 3.  But the Monolines do not seek documents about the "unrestricted" funds in the TSA

(where the funds at issue in the PRIFA and HTA lift stay motions are on deposit).  They seek

something completely different: "funds described as 'restricted' in the CRA."  (PRIFA/CCDA

Motion ¶ 30; HTA Motion ¶ 12).  The Cash Restriction Analysis makes clear these funds have

nothing to do with the Lift Stay Motions, let alone the single paragraph identified in the February

14 Order.  The Cash Restriction Analysis "treat[s] as restricted" those funds in the accounts of

"public corporations" (such as PRIFA, HTA, and the Tourism Company), separate from the

Commonwealth.  CRA at 3.

63.     Nothing in Judge Swain's February 14 Order allows discovery into statements

made in documents like the Cash Restriction Analysis that were "prepared with advice of and at

the request of counsel"; contain "determination[s] on the classification of restrictions" based on

the review of documentation by "legal counsel"; were "provided pursuant to court-ordered

mediation"; and were "preliminary and subject to material revision."  CRA at 1-13.  The

Monolines do not even attempt to explain how such preliminary restriction classifications by the

Oversight Board's professionals made for purposes of mediation are relevant.

64.     Despite their irrelevance, the Oversight Board has agreed to produce underlying

documents used or referenced in the preparation of the Cash Restriction Analysis insofar as it

refers to particular line items about PRIFA, HTA, and the Tourism Company.  The Court ought

not compel the production of anything further regarding this irrelevant issue.

### III.     COLLECTING THE ADDITIONAL DOCUMENTS THE MONOLINES SEEK WOULD BE UNDULY BURDENSOME AND INCONSISTENT WITH THE FEBRUARY 14 ORDER DIRECTING LIMITED DISCOVERY.

65.     The Government has already dedicated significant resources to collect materials

in response to the Court's directive to provide "limited discovery" about the factual assertions in

the handful of specific paragraphs in the Oversight Board's opposition briefs.  As explained

above, the productions made to date more than satisfy the requirements of the February 14

Order, particularly given the legal nature of the issues that will be before the Court at the

upcoming preliminary hearing.

66.     In an effort to reach a compromise, AAFAF has already agreed to produce even

more documents that will be burdensome to collect (and have no real probative value).  AAFAF

continues to work diligently to retrieve bank statements, direction letters, and budgeting

materials going back to 2015.  Due to the historical knowledge required to respond to these

requests, the Government has had to divert key personnel away from preparation of the Fiscal

Year 2021 budgets and fiscal plans to search for and collect historical records that may or may

not be available.

67.     Given the Commonwealth does not have a centralized repository of historical

bank account statements, AAFAF's effort to retrieve every bank account statement the

Monolines have demanded has required coordination with at least five different entities that hold

or held those accounts (Treasury, CCDA, the Tourism Company, PRIFA, and HTA). Several of these accounts were with the Government Development Bank, which is no longer generally operational and has no proper personnel to adequately address the requests.

68.     While AAFAF is working diligently to locate and produce materials, the burden imposed on the Government wholly outweighs any benefit to the issues scheduled to be heard on at the preliminary hearing. Requiring the Government to go even further and search account opening materials, transmittal information (beyond what is available on monthly statements) for each transfer of revenues (both of which are unlikely to exist or be reasonably accessible in the Government's files), and to collect communications from Treasury, the Office of Management and Budget, the Commonwealth, HTA, CCDA, and PRIFA relating to budgeting, the revenue streams, and PRIFA's communications with rum producers is not justified in light of the lack of probative value these documents will ultimately have, as described above. An order that would divert even more critical resources away from important budgeting and fiscal plan work, requiring a search of the Commonwealth's email accounts and archives for records that may or may not even exist, would substantially interfere with governmental operations for no (or at best marginal) benefit to the litigation. Such an effort could not be completed under the current litigation schedule.

69.     Similarly, the cost and time that would be necessary to complete the collection and review of communications the Monolines demand is wholly inconsistent with the notion of limited discovery and April 2, 2020 hearing date contemplated by Judge Swain's February 14 Order. Retrieving the array of communications regarding the revenue streams, budgets, and rum producer agreements the Monolines demand could potentially require identification of multiple custodians across seven different entities (Treasury, Office of Management and Budget, CCDA,

the Tourism Company, HTA, PRIFA, and the Oversight Board) over a five-year period.  The

cost and delay associated with granting the Monolines' motion could be enormous.  For purposes

of illustration, in connection with the Rule 9019 motion to approve PREPA's RSA, which

concerned a discrete set of financing agreements and a settlement agreement at one

instrumentality, AAFAF and PREPA were ordered to expand their original document production

to include a review of all communications pertaining to the RSA and communications relating to

fuel line credit facilities made to PREPA.  This expanded effort took several months, and

ultimately involved AAFAF's review of over 650,000 pages of documents at a cost of over $1.5

million in contract and staff attorney time to review the documents and log privileged materials.

Here, given the time frame and number of instrumentalities involved, the motions to compel

should be denied, as the requested discovery is in no way "limited" in scope.

## IV.    THE MONOLINES' REQUEST FOR BROAD DEPOSITION TESTIMONY SHOULD ALSO BE DENIED.

70.    The Monolines' demand for an order compelling the production of 30(b)(6)

witnesses to testify regarding "the topics of discovery identified" in Judge Swain's February 14

Order and the documents produced by the Government Parties is improper.  To begin with, the

Monolines have not provided the Government Parties with specific deposition topics.  Rather,

they provided the following bullet points listing broad potential areas of inquiry.  [ECF No.

11687-2.]

| CCDA | PRIFA | HTA |
|---|---|---|
| • Flow of Funds<br>• Account Balances<br>• Disbursements<br>• Statutory Requirements re: Flow of Funds<br>• Misappropriation / Claw Back<br>• Restrictions on Use of Funds<br>• Revenue Collected | • Flow of Funds<br>• Disbursement Details / Lockbox Agreement / Communications with Rum Producers<br>• Account Balances / Commingling<br>• Statutorily Required Reports<br>• Misappropriation / Claw Back<br>• *Flores Galarza* / Trust *res* / | • Flow of Funds<br>• Deposit Account Control Agreements<br>• Perfection<br>• Appropriation / HTA Funds "Made Available"<br>• *Flores Galarza* / Transfer |

| | Restrictions on Use of Funds | |
|---|---|---|

71.     These topics, like "Claw Back" and "*Flores Galarza*," are so vague that the

Government Parties could not possibly prepare a witness to offer competent testimony.  Several

of them, like "statutory requirements re: Flow of Funds," "Restrictions on Use of Funds," and

"misappropriation" appear to improperly seek witness testimony regarding legal conclusions.

Still others, like "Account Balances" and "Revenue Collected," are much better addressed

through the production of documents (which AAFAF has provided).

72.     The Government Parties have made clear to the Monolines during meet and

confer discussions that they are not categorically opposed to producing a witness to provide

appropriately narrowed factual testimony.  [ECF 11687-3, at 9.]  In keeping with the litigation

schedule, the Government Parties also proposed that if the Monolines have questions about

particular documents produced, they should simply ask them of counsel so the Government

Parties can direct their efforts toward finding the precise information the Monolines claim to

need, rather than preparing a witness to testify about hopelessly broad categories.  *Id.*  Rather

than respond to that proposal, the Monolines have asked the Court to compel production of a

witness without any real clarity on the subjects of the requested testimony.  The Monolines'

request should therefore be denied and the parties should be directed to confer further.

## CONCLUSION

73.     For the reasons stated herein, the Monolines' Motions should be denied.

[*Remainder of Page Intentionally Left Blank*]

Dated:  February 28, 2020
      San Juan, Puerto Rico

Respectfully submitted,

| | |
|---|---|
| /s/ *Elizabeth L. McKeen* | /s/ *Martin J. Bienenstock* |

| | |
|---|---|
| John J. Rapisardi | Martin J. Bienenstock (*pro hac vice*) |
| Suzzanne S. Uhland | Paul V. Possinger (*pro hac vice*) |
| (Admitted *Pro Hac Vice*) | Brian S. Rosen (*pro hac vice*) |
| **O'MELVENY & MYERS LLP** | Ehud Barak (*pro hac vice*) |
| 7 Times Square | Michael Mervis (*pro hac vice*) |
| New York, New York 10036 | **PROSKAUER ROSE LLP** |
| Tel:  (212) 326-2000 | Eleven Times Square |
| Fax:  (212) 326-2061 | New York, NY 10036 |
| | Tel: (212) 969-3000 |
| -and- | Fax: (212) 969-2900 |
| Peter Friedman | |
| (Admitted *Pro Hac Vice*) | Michael A. Firestein (*pro hac vice*) |
| 1625 Eye Street, NW | Lary Alan Rappaport (*pro hac vice*) |
| Washington, D.C. 20006 | PROSKAUER ROSE LLP |
| Tel:  (202) 383-5300 | 2029 Century Park East |
| Fax: (202) 383-5414 | Suite 2400 |
| | Los Angeles, CA 90067-3010 |
| | Tel: (310) 557-2900 |
| -and- | Fax: (310) 557-2193 |
| Elizabeth L. McKeen | Email: mfirestein@proskauer.com |
| Ashley M. Pavel | lrappaport@proskauer.com |
| (Admitted *Pro Hac Vice*) | |
| 610 Newport Center Drive, 17th Floor | |
| Newport Beach, CA 92660 | *Attorneys for the Financial Oversight and* |
| Tel: (949) 823-6900 | *Management Board for Puerto Rico, as* |
| Fax: (949) 823-6994 | *representative of the Debtors* |

*Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory Authority*

_/s/ Luis C. Marini-Biaggi_

Luis C. Marini-Biaggi
USDC No. 222301
Email: lmarini@mpmlawpr.com

Carolina Velaz-Rivero
USDC No. 300913
E:mail: cvelaz@mpmlawpr.com

**MARINI PIETRANTONI MUÑIZ LLC**
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Tel: (787) 705-2171
Fax: (787) 936-7494

_Co-Attorneys for the Puerto Rico Fiscal_
_Agency and Financial Advisory Authority_

_/s/ Hermann D. Bauer_

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com

_Co-Attorneys for the Financial Oversight_
_and Management Board for Puerto Rico, as_
_representative of the Debtors_