## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---

AMBAC ASSURANCE CORPORATION,

                    Plaintiff,

    v.

AUTOPISTAS METROPOLITANAS DE
PUERTO RICO, LLC,

                 Defendant.

Civil No. 3:20-cv-01094

---

## COMPLAINT

Plaintiff Ambac Assurance Corporation ("Plaintiff" or "Ambac"), by and through its attorneys Ferraiuoli LLC, and Kasowitz Benson Torres LLP, for its Complaint (the "Complaint") against Defendant Autopistas Metropolitanas de Puerto Rico, LLC ("Defendant" or "Metropistas"), alleges as follows:

## NATURE OF THE ACTION

1.    This action arises out of a fraudulent transaction between the Puerto Rico Highways and Transportation Authority ("PRHTA") and Metropistas.  Through this transaction, the insolvent PRHTA transferred hundreds of millions of dollars in value to Metropistas and received virtually nothing in return, to the detriment of its secured creditors, including Ambac.  Ambac is a substantial secured creditor of PRHTA, with outstanding claims in excess of $148 million.

2.    From 2011 through 2051, Metropistas held a concession for two Puerto Rico highways, PR-5 and PR-22, for which they paid PRHTA approximately $1.1 billion.  In 2051, the rights to operate those highways and the corresponding revenue were to revert to PRHTA,

and were to be subject to Ambac's lien.  Those rights and revenues had substantial value to PRHTA and its creditors.

3.	In April 2016, in the midst of Puerto Rico's financial turmoil, PRHTA and Metropistas engaged in an exploitative, unconscionable, and ultimately illegal transaction that should have raised red flags for Metropistas.  PRHTA agreed to extend Metropistas's concession for an additional ten years -- *starting in 2051*.  In exchange for these valuable rights and revenue on which Ambac had a lien, Metropistas agreed to pay PRHTA just $115 million (the "Extension Agreement"), far less than reasonably equivalent value, and the proceeds of the transaction were siphoned by the Commonwealth of Puerto Rico (the "Commonwealth"), leaving PRHTA with only a small portion of the proceeds.  None of the proceeds of the transaction were used to defease bonds insured by Ambac.

4.	When it agreed to the Extension Agreement, Metropistas knew or recklessly disregarded that the Commonwealth would divert the proceeds, and PRHTA -- the entity that owned the concession rights as of 2051 -- would not receive reasonably equivalent value for the valuable rights it transferred.  Indeed, it was then well known that the Commonwealth had been in severe financial distress.  In June 2015, Governor Alejandro García Padilla publicly conceded that the Commonwealth was in a "death spiral," and it was clear that the Commonwealth was unable to pay its expenses as they came due.  As a result, and before the Extension Agreement was executed, the Governor issued a number of executive orders, and the Commonwealth enacted the Moratorium Act, purporting to enable the Commonwealth to raid the coffers of its instrumentalities, including PRHTA.

5.	Compounding the issue, and highlighting Metropistas's egregious conduct, Metropistas did not pay anywhere near reasonably equivalent value for the transfer.  By any objective measure, the valuable rights and revenues it received were, at the time, worth far more

2

than $115 million.  Metropistas knew or should have known that it was gouging PRHTA,

inexcusably exploiting Puerto Rico's dire financial condition for Metropistas's own gain.

6.    Metropistas acted callously and in bad faith in consummating the transaction.

Before executing the Extension Agreement, Metropistas knew that:

- The Commonwealth and PRHTA were *in extremis*.

- Entering into a concession for a period that would not even commence for 35 years -- *with no competitive bidding process* -- was a highly unusual transaction that should have raised red flags.

- PRHTA owned the concession rights, and the proceeds of the Extension Agreement should have been available to PRHTA, for the benefit PRHTA's creditors, including Ambac.

- The Governor of the Commonwealth had issued executive orders purporting to "claw back" funds from certain public corporations, including PRHTA, including all funds intended for repayment of the PRHTA Bonds (defined *infra*).

- The Commonwealth had enacted the Moratorium Act, which purported to authorize the Governor to prioritize payment of "essential services" over "covered obligations" such as the obligations of PRHTA.

- As a result, PRHTA would never receive the $115 million Metropistas would pay for the concession.

- The $115 million price for the Extension Agreement was woefully inadequate consideration, and this price was only available because of the dire financial condition of PRHTA and the Commonwealth, and the lack of any competitive bidding process.

7.    This action is brought to reclaim the hundreds of millions of dollars in value that

was fraudulently transferred to Metropistas to secure the payment of obligations PRHTA owes to

Ambac, and for a declaration that Ambac has a valid, continuing lien on certain toll revenues

collected by Metropistas, as described herein.

## **PARTIES**

8.    Plaintiff Ambac is a Wisconsin-domiciled stock insurance corporation with its

principal place of business at One World Trade Center, 41st Floor, New York, New York 10007.

Plaintiff is a monoline insurer that provides financial guarantees to the United States and global

public finance, infrastructure, and structured finance markets.

9.      Upon information and belief, defendant Metropistas is a limited liability company

organized under the laws of Puerto Rico with its principal place of business in San Juan, Puerto

Rico.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1334, as the matter in

question is a civil proceeding that is sufficiently "related to" a bankruptcy petition.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(2)

because Defendant is a resident of this District and because a substantial part of the events giving

rise to the claim occurred in this District.

**FACTUAL ALLEGATIONS**

I.      **Ambac Insures Bonds Issued By PRHTA**

     A.      **Financial Guaranty Insurance**

12.     Plaintiff is a leading provider of financial guaranty insurance, by which it

guarantees scheduled payments of principal and interest as and when due on a bond or other

obligation.  Plaintiff insures such payments on municipal, public infrastructure, and structured

financings in the United States and around the world.  Under relevant provisions of the bond

documents and bond insurance policies, and applicable law, payment by providers of financial

guaranty insurance neither satisfies nor discharges an issuer's obligation to pay.  To the extent an

insurer makes such payments, the insurer becomes the owner of the subject bonds and/or

becomes subrogated to the rights of the bondholders, effectively stepping into their legal rights.

13.     One reason governments and municipalities, including PRHTA, have historically

used financial guaranty insurance is that the insurance of their principal and interest payment

4

obligations may significantly enhance their ability to raise funds.  Plaintiff's insurance has

permitted PRHTA to raise money by issuing bonds in a more cost-effective manner, which, in

turn, has permitted PRHTA, the Commonwealth, and other Commonwealth instrumentalities to

implement important infrastructure projects across Puerto Rico.  Among other projects, the

proceeds of bonds issued by PRHTA have been used to finance the construction of and

necessary repairs to numerous toll highways and connecting roads, including PR-5, PR-20,

PR-22, PR-52, and PR-53, and the construction, operation, and maintenance of Tren Urbano, a

rapid transit system serving the San Juan metropolitan area.

    **B.**    **PRHTA**

    14.    PRHTA is a public corporation created by Act No. 74-1965 (the "PRHTA

Enabling Act") to assume responsibility for the construction of highways and other

transportation systems in Puerto Rico.  *See* 9 L.P.R.A. § 2002.  Under the PRHTA Enabling Act,

PRHTA has the power to "make contracts and to execute all instruments necessary or

incidental in the exercise of any of its powers," and to issue bonds.  9 L.P.R.A. § 2004(g), (h),

(*l*).  Pursuant to the PRHTA Enabling Act, PRHTA issued several series of transportation

revenue bonds (the "PRHTA Bonds") under resolutions executed in 1968 (the "1968

Resolution") and 1998 (the "1998 Resolution" and, together with the 1968 Resolution, the

"PRHTA Resolutions").  The PRHTA Bonds have an outstanding principal amount of $4.6

billion.

    15.    Pursuant to the PRHTA Enabling Act and the PRHTA Resolutions, the PRHTA

Bonds are secured by certain of PRHTA's property and revenues, as well as by any tax "made

available to [PRHTA] by the Commonwealth," authorized by the Commonwealth to be

pledged  to  the payment of the principal and interest of bonds, and pledged by PRHTA to such

payments.  *See* 9 L.P.R.A. § 2004(*l*).  More specifically, the PRHTA Bonds were secured by a

lien on (i) revenues derived from PRHTA's Toll Facilities[1] ("Toll Revenues"); (ii) gasoline, diesel, crude oil, and other excise taxes levied by the Commonwealth (the "Excise Taxes"); and (iii) motor vehicle license fees (the "Vehicle Fees", and together with Toll Revenues and Excise Taxes, the "PRHTA Pledged Revenues").

16.     PRHTA's rights and powers under the PRHTA Enabling Act include the right and power to secure the PRHTA Bonds through a pledge of the PRHTA Pledged Revenues. *See* 9 L.P.R.A. § 2004(*l*); *see also id.* § 2012(e)(1), (h).

17.     Section 601 of the 1998 Resolution requires that PRHTA make payments for the benefit of bondholders only from PRHTA Pledged Revenues and other specified sources of funds, which are pledged to the payment of the PRHTA Bonds.  Section 601 provides:

> Except as in this Resolution otherwise provided, such principal, interest and premiums are payable solely from Revenues and other moneys deposited to the credit of the Revenue Fund . . . [w]hich Revenues, moneys and funds are hereby pledged (with such priorities with respect to the use and disposition of Revenues as are in this Resolution specified) to the payment thereof in the manner and to the extent hereinabove particularly specified.

*See also* Section 601 of the 1968 Resolution.

18.     Ambac therefore has a lien on the PRHTA Pledged Revenues, including the Toll Revenues, because the PRHTA Enabling Act treats a "pledge" as a lien.  *See* 9 L.P.R.A § 2004(l) (authorizing PRHTA to secure bonds "*by pledge of, or other lien on*, all or any of its properties, revenues or other income . . ." (emphasis added)).  Moreover, the pledges grant an interest in and charge against the PRHTA Pledged Revenues in favor of the bondholders.

---

[1]     "Toll Facilities" is defined in the PRHTA Resolutions to mean facilities "for which bonds or other obligations shall be issued by [PRHTA] under the provisions of this Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to [PRHTA] from funds not encumbered by [the PRHTA Resolutions]."

19.     Because PRHTA Bonds are secured by a "gross lien" on all of PRHTA Pledged Revenues, operating expenses of PRHTA may only be paid from the PRHTA Pledged Revenues *after* PRHTA satisfies its debt service and reserve fund requirements with respect to PRHTA Bonds.

20.     The PRHTA Resolutions require PRHTA to transfer the PRHTA Pledged Revenues to the fiscal agent for PRHTA Bonds (the "PRHTA Fiscal Agent") on a monthly basis. In the PRHTA Enabling Act, the Commonwealth covenanted with the holders of PRHTA Bonds that it would "not limit or restrict the rights or powers . . . vested in [PRHTA by PRHTA Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  9 L.P.R.A. § 2019.  The PRHTA Fiscal Agent is required to hold deposited funds in trust and apply the funds in an order determined by the PRHTA Resolutions. *See* 1968 Resolution § 401; 1998 Resolution § 614.  The PRHTA Resolutions establish sinking funds for the repayment of PRHTA Bonds.  *Id.*

21.     Pursuant to Section 1002 of the 1968 Resolution and Section 1102 of the 1998 Resolution, "[a]ll of the covenants, stipulations, obligations and agreements contained in [the PRHTA Resolutions] . . . shall be binding upon the successor or successors thereof from time to time, and upon any officer, board, commission, authority, agency or instrumentality to whom or to which any power or duty affecting such covenants, stipulations, obligations and agreements shall be transferred by or in accordance with law."

### C.     Ambac Policies and Bond Documents

22.     Ambac issued Financial Guaranty Insurance Policies or Municipal Bond Insurance Policies (the "PRHTA Policies"), insuring, on either a primary or a secondary basis, PRHTA's payment obligations under the PRHTA Bonds.  With respect to certain of the PRHTA Bonds, separate Agreements Regarding Bond Insurance (the "Bond Insurance Agreements," and

7

together with the PRHTA Enabling Act, the PRHTA Resolutions, and the PRHTA Policies, the

"PRHTA Bond Documents"), to which PRHTA and the PRHTA Fiscal Agent are parties, detail,

among other things, certain rights of Ambac as an insurer with respect to the PRHTA Bonds and

the procedures for making claims under the PRHTA Policies.

23.     Ambac is a third-party beneficiary of the PRHTA Resolutions and the Bond

Insurance Agreements and may enforce all rights, remedies, and claims thereunder.  *See, e.g.*,

Series AA Ambac Agreement § 10; Series H Ambac Agreement § 10; Series BB/L Ambac

Agreement § 7.

24.     Pursuant to the PRHTA Policies, to the extent PRHTA does not satisfy any of its

payment obligations under the PRHTA Insured Bonds (defined below), Ambac, in its capacity as

a bond insurer, may be obligated, subject to the terms and conditions set forth in the PRHTA

Bond Documents, to pay any portion of the scheduled principal and interest payments on the

PRHTA Insured Bonds that becomes due but is not paid by PRHTA (the "Insurance Payments").

25.     Collectively, Ambac insured $29,028,063 of PRHTA Bonds (net of reinsurance)

issued under the 1968 Resolution, and $465,264,430 of PRHTA Bonds (net of reinsurance)

issued under the 1998 Resolution (collectively, the "PRHTA Insured Bonds").  Ambac currently

insures approximately $421.4 million gross par of PRHTA Bonds outstanding.

26.     If Ambac makes any Insurance Payments, PRHTA is obligated, under applicable

law and certain of the PRHTA Bond Documents, to reimburse Ambac for any amounts so paid,

as well as for any costs of collection and enforcement and any other costs, charges, and fees that

may be due to Ambac under the PRHTA Bond Documents and/or applicable law, with interest.

27.     In addition, upon the making of any payment in respect of the PRHTA Bonds,

Ambac, among other things, (i) becomes, by virtue of an assignment mandated by the relevant

PRHTA Bond Documents, the owner of the right to receive any payments of interest or principal

with respect to the applicable PRHTA Insured Bonds; and (ii) automatically becomes fully subrogated to all rights and remedies of the PRHTA bondholders, as the owners of the PRHTA Bonds that received the proceeds of such Insurance Payment.  Ambac thus becomes the legal owner of any bonds for which it pays a claim, and is the legal owner of rights to payment of interest, and related rights, to the extent paid by Ambac under its policies.  Series AA Ambac Agreement § 8; Series H Ambac Agreement § 8.  As of this date, Ambac has paid $148.6 million in aggregate claims by holders of PRHTA Insured Bonds.  Ambac is now fully subrogated to the rights of bondholders for the claims it paid.

## II.   Constitutional Priority Of Commonwealth Payment Obligations

28.   Article VI, Section 7 ("Section 7") of the Constitution of the Commonwealth of Puerto Rico ("the Commonwealth Constitution") provides:

> The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law.

P.R. Const. art. VI, § 7.  Accordingly, if the appropriations for a given fiscal year exceed estimated revenues, then taxes must be raised to cover the shortfall.

29.   Article VI, Section 8 (the "Fiscal Year Budget Priority Provision") is applicable in fiscal years in which there are insufficient funds to pay all appropriations.  It provides:

> In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and *other disbursements shall thereafter be made in accordance with the order of priorities established by law*.

P.R. Const. art. VI, § 8 (emphasis added).

30.   Thus, if actual revenues are insufficient in a fiscal year, then "public debt" ("GO Debt") must be paid first, and all other disbursements must be paid "in accordance with the order

of priorities established by law." *Id.* The Management and Budget Office Organic Act (Act No. 147 of June 18, 1980 (the "OMB Act"), codified as 23 L.P.R.A. 104(c)), created a budget priority waterfall applicable in such situations. When actual revenues are insufficient to pay all appropriations in a fiscal year, the PRHTA Bonds are to be paid second only to the GO Debt. These payments must be made before the Commonwealth can pay any other expenses.

31.     In fiscal years when the Fiscal Year Budget Priority Provision is triggered, the laws under which the PRHTA Bonds were issued permit Excise Taxes -- one component of the PRHTA Pledged Revenues -- to be clawed back to pay GO Debt. Excise Taxes that have been clawed back may not be used to pay any other expenses. There is no provision in the Commonwealth Constitution for the claw back of Toll Revenues.

## III.     **PRHTA And Metropistas Enter Into A Forty-Year Concession Agreement**

32.     In 2009, the Puerto Rico Legislative Assembly (the "Legislative Assembly") passed Act No. 29-2009, the Public-Private Partnership Act ("Act 29") (codified at 27 L.P.R.A. §§2601-2623), with the mission of "promot[ing] the use of Public-Private Partnerships as a development strategy." Act 29, Statement of Motives. Pursuant to Act 29, PRHTA is authorized "to establish partnerships and to execute partnership contracts in connection with any function, service or facility for which they are responsible under the provisions of their organic acts or the applicable special laws, pursuant to the provisions of this chapter." 27 L.P.R.A. § 2603.

33.     Pursuant to Act 29, PRHTA and Metropistas entered into a concession agreement (the "Concession Agreement") dated June 27, 2011.

34.     The Concession Agreement granted a 40-year lease and assigned certain toll revenues generated by the use of PR-22 and PR-5 (the "Toll Roads") to Metropistas in exchange for, in relevant part, an up-front concession fee of approximately $1.1 billion (the "Concession Fee"). These toll revenues were previously pledged to the repayment of the PRHTA Bonds.

10

35.     In addition to the assignment of certain toll revenues to Metropistas, the Concession Agreement provided for a 50-50 split of other toll revenues -- those generated through a specific dynamic-pricing system on PR-22 (the "BRT/DTL Toll Revenues") -- between PRHTA and Metropistas.

## IV.     The Dire Financial State Of The Commonwealth

36.     On June 28, 2015, Governor Alejandro García Padilla publicly stated that the Commonwealth was in a "death spiral" and acknowledged that it and its municipalities could not pay their roughly $72 billion in debts. Michael Corkery and Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts are 'Not Payable'*, N.Y. TIMES, June 28, 2015, at A1. Officers and representatives of the Commonwealth have repeatedly stated that the Commonwealth is in a state of fiscal emergency.

37.     The Governor issued Administrative Bulletin No. OE-2015-046 (the "First Executive Order") on November 30, 2015, which purported to implement a "clawback" of funds from certain public corporations, including PRHTA. The First Executive Order declared that there were insufficient funds to pay all appropriations in fiscal year 2016, and directed the Secretary of the Treasury to withhold funds from PRHTA intended for repayment of PRHTA Bonds. As a result of the Governor's actions, the Commonwealth removed assets from PRHTA that would have and should have been used to repay the PRHTA Bonds.

38.     On December 8, 2015, the Governor issued Administrative Bulletin OE-2015-49 (the "Second Executive Order"), which sought to implement the First Executive Order. The Second Executive Order allowed the Commonwealth to pay virtually any obligation ahead of GO Debt, including with funds pledged to PRHTA Bonds.

39.     To do so, the Second Executive Order purported to change the budget priority waterfall so that no payments would be made on the PRHTA Bonds. *See* Circular Letter No.

1300-15-16 (the "Circular Letter") (removing from the budget priority waterfall any requirement

to pay "commitments entered into by virtue of legal contracts in force" and "binding obligations

to safeguard the credit, reputation and good name of the Government of the Commonwealth of

Puerto Rico").

40.     The First and Second Executive Orders -- which, upon information and belief,

Metropistas knew about or recklessly disregarded -- thus set in motion a chain of events that

paved the way for the Commonwealth to raid PRHTA's coffers, which would inevitably result in

defaults under the PRHTA Bonds to the detriment of Ambac and other PRHTA creditors.

## V.     **PRHTA's Insolvency**

41.     On December 18, 2015, PRHTA's Audited Financial Statements for the years

ended June 30, 2013 and June 30, 2014 ("PRHTA 2013/14 Audit") were publicly issued.  In

conjunction with this report, PRHTA's independent auditor, Ernst & Young, LLP ("E&Y"),

expressed "substantial doubt about [PRHTA's] ability to continue as a going concern" (the

"Going Concern Qualification").  PRHTA 2013/14 Audit at 2.  E&Y further stated that "[t]he

Authority has significant recurring losses from operations *and does not have sufficient funds*

*available to fully repay its various obligations as they come due*."  *Id.* (emphasis added).  The

PRHTA 2013/14 Audit confirms that PRHTA was insolvent well before the First Executive

Order was issued.

42.     PRHTA conceded the problems leading to the Going Concern Qualification and

identified remedial measures it planned to take.  Accordingly, PRHTA's financial report for

2013 and 2014 stated that:

> The Authority has experienced significant recurring losses from
> operations and faces a number of business challenges that have
> been exacerbated by the Commonwealth's economic recession and
> the fact that the Authority has not increased tolls to its customers at
> sufficient levels to offset the effects of its rising costs.  Its principal

> challenges, some of which are interrelated, are: (i) reduction of
> operating costs; (ii) increase in the use of federal grants; and (iii)
> improving its liquidity.  The Authority is committed to take all
> necessary measures to ensure it achieves a healthy financial
> condition.

*Id.* at 83.

43.    Because of its liquidity crisis, PRHTA admitted that "future defaults on the

Authority's obligations may not be avoided."  *Id.* at 85.  These financial reports were a matter of

public record, and, upon information and belief, Metropistas knew about, or recklessly

disregarded, the Going Concern Qualification and PRHTA's response thereto as alleged above

before it entered into the Extension Agreement.

44.    Thus, PRHTA was insolvent:  its liabilities were greater than its assets and/or it

was inadequately capitalized to pay obligations as they came due.

## VI.    The Commonwealth Enacts The Unconstitutional Moratorium Act

45.    On April 6, 2016, a mere 48 hours after consideration by both chambers of the

Legislative Assembly, the Governor signed into law the Puerto Rico Emergency Moratorium and

Financial Rehabilitation Act (Act No. 21-2016, the "Moratorium Act").  The Moratorium Act

recited that it was enacted to address the "desperate" fiscal emergency facing the Commonwealth

and to avoid the "potential catastrophic effects of allowing creditors to exercise their

enforcement remedies," which "would undeniably harm the health, safety and welfare of the

residents of the Commonwealth."  Moratorium Act § 102.  The Moratorium Act authorized the

Governor to declare a "state of emergency" over any governmental entity of the Commonwealth.

Moratorium Act § 201(a).  Upon the declaration of a state of emergency, the Moratorium Act

directed or empowered the Governor to take numerous actions that violated Ambac's

constitutional rights.

46.     The Moratorium Act authorized the Governor to prioritize payment of "essential services" over "covered obligations." *See* Moratorium Act § 201(a). "Essential services" were not defined under the Moratorium Act, giving the Governor *carte blanche* to declare any category of expenditure "essential" and therefore, senior to the payment of the PRHTA Bonds, despite Ambac's liens on the PRHTA Pledged Revenues and the PRHTA Bonds' protected status under the Commonwealth Constitution and the PRHTA Bonds' enabling statutes. A "[c]overed obligation" included, in relevant part, "any interest obligation [or] principal obligation . . . of a government entity" that became due before the Moratorium Act expired. Moratorium Act § 103(l). If a state of emergency were declared with respect to a government entity, the covered obligations of such government entity could be suspended. Moratorium Act §§ 103(l), 201(b). Section 201(b) of the Moratorium Act purported to grant the Governor the power to impose a stay on creditor remedies during the covered period.

47.     Less than a month after the enactment of the Moratorium Act, the Governor exploited his newfound power and issued a series of orders that, in relevant part, declared moratoriums on various debt obligations (including obligations of PRHTA), suspended the transfer of funds pledged to the repayment of the debts affected by the moratoriums, and elevated the payment of junior unsecured debts over senior secured debts ("Moratorium Orders").

48.     The Moratorium Act was a patent violation of the Commonwealth Constitution, because it altered the Fiscal Year Budget Priority Provision.

49.     The Fiscal Year Budget Priority Provision was described in an independent auditors' report by KPMG for the year ended June 30, 2013, which was a matter of public record. In this report, KPMG explained the "priority norms" established by law for the disbursement of public funds during any fiscal year in which the resource available to the Commonwealth are insufficient to cover appropriations. Accordingly, upon information and

belief, Metropistas knew or recklessly disregarded that the Moratorium Act, and the purported

clawback of funds from PRHTA that followed it, violated the Commonwealth Constitution.

## VII.  Metropistas Exploits PRHTA To Fraudulently Extend The Concession Agreement

50.     On or about April 21, 2016, just two weeks after the Moratorium Act was

enacted, PRHTA and Metropistas entered into the Extension Agreement.  Pursuant to that

agreement, Metropistas's exclusive concession -- and the rights and revenues to be derived

therefrom -- was extended for 10 more years, from 2051 through 2061,[2] and Metropistas's

allocated share of the BRT/DTL Toll Revenues increased from 50% to 75% (the "Toll Share

Increase").  *See* Extension Agreement, §§ (b), (e).  The 10-year extension and Toll Share

Increase were given to Metropistas even though the toll revenues generated by the Toll Roads in

that period, and PRHTA's 50% share of the BRT/DTL Toll Revenues, were subject to Ambac's

lien.

51.     In exchange for the 10-year extension and the Toll Share Increase PRHTA

provided to Metropistas, the Extension Agreement provides for PRHTA to receive an

additional $100 million upfront payment, with the possibility of an additional $15 million upon

the satisfaction of certain conditions.[3]  None of the proceeds of the transaction were used to

defease the PRHTA Insured Bonds.

52.     The circumstances surrounding the Extension Agreement were extraordinary, and

should have raised red flags to any counterparty such as Metropistas.  Metropistas knew or

recklessly disregarded that the Commonwealth was in severe financial distress and that, because

of the Executive Orders and the Moratorium Act, the proceeds of the transaction would be

---

[2]     By extending the overall term of the Concession Agreement to 50 years, PRHTA achieved the maximum term permissible under Act 29 without triggering a legislative approval requirement.  *See* 27 L.P.R.A. § 2609(e) (providing that any extension of public-private partnership beyond 50 years "must be approved by legislation").

[3]     As part of the Concession Agreement, Metropistas also agreed to make investments in new tolling gantries and to share with PRHTA 30% of certain incremental revenues on such new gantries.

diverted to the Commonwealth away from PRHTA and its creditors.  Metropistas thus knew or

recklessly disregarded that the proceeds of the transaction would not benefit PRHTA -- the entity

with the rights, as of 2051, to operate the Toll Roads and the corresponding revenue -- at all.

Metropistas also knew or recklessly disregarded that entering into an extension of the

Concession Agreement that would not commence for another thirty-five years was an

unprecedented event.  With this knowledge, Metropistas opted to exploit the situation for its own

gain, agreeing to pay far less than reasonably equivalent value for what it received.  Metropistas

thus knowingly, and in bad faith, agreed to the Extension Agreement to the detriment of PRHTA

and its creditors, including Ambac, to which reasonably equivalent value for the transfer should

have been provided.

### A.    The Commonwealth Diverted The Extension Agreement Proceeds From PRHTA

53.    The day after the Extension Agreement was announced, PRHTA's Executive

Director, Carmen Villar Prados, publicly stated that PRHTA had "yet to determine how to use

the money."  *Puerto Rico Mulls Use of $115 Million Raised in Highway Deal as Defaults Loom*,

REORG RESEARCH, Apr. 22, 2016.

54.    After learning of the Extension Agreement and becoming concerned about the

potential diversion of its proceeds, on April 29, 2016, counsel for Ambac wrote to PRHTA's

counsel at Nixon Peabody, LLP ("Nixon") requesting information about the Extension

Agreement payment and confirmation that PRHTA was maintaining, and would continue to

maintain, the proceeds of the transaction for the benefit of PRHTA and its bondholders.  April

29, 2016 Letter from Daniel Perry to Virginia Wong.  In response, Nixon stated that the proceeds

of the Extension Agreement were being held by the Puerto Rico Economic Development Bank

("EDB") "in the name of the [PRHTA]," but declined to offer any assurance those proceeds

would be held for the benefit of PRHTA and its bondholders. May 2, 2016 Letter from Virginia Wong to Daniel Perry.

55. On May 10, 2016, Ambac filed suit against PRHTA and EDB seeking, among other things, appointment of a receiver for PRHTA. Ambac alleged that PRHTA breached its fiduciary duties to bondholders, and by extension Ambac, by entering into the Extension Agreement knowing that the Governor and not PRHTA would control the proceeds of the transaction under 27 L.P.R.A. § 2616. Ambac alleged that "PRHTA's sale of valuable assets knowing that any proceeds would likely be siphoned off by the Commonwealth government constitutes the latest in a series of breaches of fiduciary duties" by PRHTA. Am. Compl., 3:16-cv-01893-JAG, Dkt. No. 14 at 2.

56. On May 13, 2016, as Ambac feared -- and as Metropistas knew or recklessly disregarded would happen -- the Governor announced that virtually all of the proceeds from the Extension Agreement would *not* be transferred to PRHTA or applied to PRHTA's benefit, but would instead be used to pay suppliers of the Commonwealth's "essential services." *Puerto Rico Says $100M From Highway Deal Will Pay 'Essential Service' Debts*, REORG RESEARCH, May 13, 2016. The announcement indicated that a mere $18.2 million of the $100 million Extension Agreement payment would be used to pay down part of PRHTA's $155 million obligations to its contractors.

57. On May 17, 2016 -- less than four weeks after the Extension Agreement was executed -- the Governor issued an executive order ("Executive Order 18") declaring a state of emergency over PRHTA until June 30, 2016. Executive Order 18 stopped the flow of certain revenues to PRHTA Bonds, purported to stay all litigation arising from nonpayment of PRHTA covered obligations, and authorized PRHTA to use toll revenues to provide "essential services." On June 30, 2016, the Governor issued an executive order ("Executive Order 30") extending the

PRHTA state of emergency until January 31, 2017.  Also, on June 30, 2016, the Governor issued

another executive order ("Executive Order 31") that suspended the Commonwealth's obligation

to transfer certain revenues to PRHTA.  By the end of May, 2016, Ambac learned that only

approximately $5 million of the original $100 million Extension Agreement payment remained

in EDB accounts for the benefit of PRHTA.  *See* Memorandum of Law, 3:16-cv-01893, Dkt. No.

49 at 34.

58.     Thus, as Metropistas knew or recklessly disregarded would happen, PRHTA did

not receive the benefit of the insufficient consideration it was purportedly entitled to in

exchange.  Instead, virtually all of the benefit derived from the Extension Agreement was

directed to the Commonwealth, to the detriment of PRHTA and its creditors, including Ambac.

### B.    PRHTA Did Not Receive Reasonably Equivalent Value For The 10-Year Extension And Toll Share Increase

59.     PRHTA did not receive reasonably equivalent value in return for the 10-year

extension and the Toll Share Increase that it provided to Metropistas.

60.     Through the Extension Agreement, PRHTA fraudulently transferred to

Metropistas a valuable 10-year extension of the Concession Agreement.  But for the extension,

the Toll Roads -- and revenue generated from them -- would have reverted back to PRHTA in

2051.  Instead, Metropistas's lease of the Toll Roads -- and right to revenue generated from them

-- will continue through 2061.

61.     Through the Extension Agreement, PRHTA also fraudulently transferred the Toll

Share Increase to Metropistas.  Specifically, PRHTA transferred to Metropistas half of its share

of the BRT/DTL Toll Revenues, increasing Metropistas's share from 50% to 75%.  By providing

the Toll Share Increase to Metropistas, PRHTA's share of these certain toll revenues decreased

to 25%.

62.     In exchange for these valuable transfers, PRHTA received almost nothing. Instead, virtually all of Metropistas's $100 million up-front payment was diverted to the Commonwealth.  This occurred despite the fact that PRHTA was the proper party to which moneys were owed, which Metropistas knew because the Concession Agreement specifically provided that the rights to operate the highways and their corollary revenue would revert to PRHTA following termination.

63.     Even if that money had not been diverted to the Commonwealth, PRHTA would not have received reasonably equivalent value for the transfers.  Upon information and belief, the 10-year extension alone is worth significantly more than the $115 million that Metropistas agreed to pay.  This price was only available because of PRHTA's and the Commonwealth's desperate financial situation and the lack of any competitive bidding process.

64.     Ambac was directly and proximately harmed by Metropistas's failure to provide reasonably equivalent value to PRHTA.  The funds paid by Metropistas and PRHTA's share of the BRT/DTL Toll Revenues were subject to Ambac's lien, and should have been used to service the PRHTA Insured Bonds.  Even if the proceeds of the transaction and PRHTA's share of the BRT/DTL Toll Revenues were not encumbered, Ambac was still harmed because these funds should have been available to PRHTA to pay its operating expenses, leaving the Toll Revenues available to service the PRHTA Bonds.  Instead, upon information and belief, PRHTA has been using Toll Revenues to pay its operating expenses in violation of the PRHTA Resolutions since 2016.  Had the proceeds of the Extension Agreement and PRHTA's share of the BRT/DTL Toll Revenues been available to PRHTA, those proceeds would have reduced PRHTA's need to use Toll Revenues on a dollar-for-dollar basis, allowing the Toll Revenues to be used to service the PRHTA Bonds.

## VIII.   PRHTA Has Abandoned Certain Causes Of Action Against Metropistas

65.     On May 21, 2017, the Financial Oversight and Management Board for Puerto Rico commenced debt adjustment proceedings for PRHTA under Title III of  the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") in the United States District Court for the District of Puerto Rico.  48 U.S.C. §§ 2101-2241.

66.     Under section 301 of PROMESA, sections 544 and 546 (among other sections) of title 11 of the United States Code (the "Bankruptcy Code") apply to cases filed under PROMESA.  48 U.S.C. § 2161.

67.     Under section 544(b) of the Bankruptcy Code, "the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . . ."  11 U.S.C. 544(b)(1).  Section 546(a) of the Bankruptcy Code provides in pertinent part that an action under section 544(b) must be commenced no later than two years after the entry of the order for relief -- here, May 21, 2019.  11 U.S.C. 546(a).

68.     As of the date hereof, PRHTA has not commenced an action to avoid the fraudulent transfers discussed herein pursuant to section 544(b) of the Bankruptcy Code.  Any cause of action in connection therewith is therefore deemed abandoned by PRHTA as a matter of law.  Such abandoned claims revert to creditors that may bring them under applicable law.

69.     Accordingly, the abandoned claims may be brought by Ambac.

### FIRST CLAIM FOR RELIEF
### (Rescission of Transfer Pursuant to 31 L.P.R.A. §§ 3491-3500)

70.     Ambac repeats and realleges each and every allegation contained in paragraphs 1 through 69 herein.

71.     Ambac is a creditor of PRHTA.

72.    Pursuant to the Extension Agreement, PRHTA fraudulently transferred to Metropistas a 10-year extension of the Concession Agreement, as well as the Toll Share Increase (the "Fraudulent Transfers").

73.    At the time of the Fraudulent Transfers, PRHTA was insolvent.

74.    Metropistas knew or should have known that PRHTA was insolvent, in the vicinity of insolvency, or otherwise unable to satisfy its obligations as they became due.

75.    PRHTA's insolvency presupposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

76.    Metropistas knew or should have known that PRHTA's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the Fraudulent Transfers.

77.    There was insufficient consideration for the Fraudulent Transfers.

78.    Metropistas knew or recklessly disregarded that the proceeds of the transaction would be diverted from PRHTA to the Commonwealth.

79.    Metropistas acted callously and in bad faith in consummating the transaction because it knew or recklessly disregarded that PRHTA and its creditors would not receive the benefit of any of the consideration it provided.

80.    Consequently, Ambac seeks an order rescinding the Extension Agreement to the extent necessary to satisfy its claims against PRHTA.

### SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

81.    Ambac repeats and realleges each and every allegation contained in paragraphs 1 through 80 herein.

82.    Pursuant to the Extension Agreement, PRHTA fraudulently transferred to Metropistas a 10-year extension of the Concession Agreement.

83.     If not for the Extension Agreement, the Toll Roads -- and the revenue generated from them -- would have reverted back to PRHTA in 2051.

84.     Pursuant to the Extension Agreement, Metropistas's lease of the Toll Roads -- and the right to the revenue generated from them -- will continue through 2061.

85.     In addition to the 10-year extension, PRHTA also fraudulently transferred to Metropistas half its share of toll revenues, increasing Metropistas's share from 50% to 75%.

86.     PRHTA received virtually nothing in exchange for the 10-year extension and the Toll Share Increase, while Metropistas was conferred a tangible economic benefit to Ambac's detriment.

87.     Ambac has reason to believe that Metropistas knew or should have known that its payments would be diverted for use by the Commonwealth.

88.     Metropistas had no legal justification for entering into the Extension Agreement when it knew or should have known its payments' divergence would mean a correlative loss to PRHTA's creditors, including Ambac.

89.     As a direct and proximate cause of Metropistas's misconduct as set forth above, Metropistas was unjustly enriched at the expense of Ambac.

90.     Ambac seeks restitution from Metropistas, as well as a disgorgement of all profits and benefits obtained by Metropistas from the fraudulent transfers.

### THIRD CLAIM FOR RELIEF
### (Declaratory Judgment)

91.     Ambac repeats and realleges each and every allegation contained in paragraphs 1 through 90 herein.

92.     Ambac had a lien on (i) the toll revenues generated by the Toll Roads beginning in 2051, and (ii) PRHTA's 50% share of the BRT/DTL Toll Revenues.

93. Pursuant to the Extension Agreement, PRHTA transferred the rights to the toll revenues generated by the Toll Roads from 2051 through 2061, and half of its share -- an additional 25% -- of the BRT/DTL Toll Revenues currently being collected, to Metropistas.

94. An actual controversy exists between Ambac and Metropistas as to whether Ambac has a lien on the toll revenues collected by Metropistas for its own account that are generated by (i) the Toll Roads from 2051 through 2061, and (ii) the Toll Share Increase, which is currently in effect.

95. Ambac seeks a declaration that it has a valid, continuing lien on the toll revenues collected by Metropistas for its own account that are generated by (i) the Toll Roads from 2051 through 2061, and (ii) the Toll Share Increase.

## **RELIEF REQUESTED**

WHEREFORE, Ambac respectfully requests that the Court enter judgment in favor of Ambac and against Defendant providing, the following relief:

A. An order rescinding the Extension Agreement to the extent necessary to satisfy Ambac's claims against PRHTA;

B. Post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

C. A declaration that Ambac has a valid and continuing lien on the toll revenues collected by Metropistas for its own account that are generated by (i) the Toll Roads from 2051 through 2061 and (ii) the Toll Share Increase; and

D. Such other and further relief as the Court deems just and proper.

Dated: San Juan, Puerto Rico
February 19, 2020

**Ferraiuoli** LLC

By: */s/: Roberto A. Cámara-Fuertes*
Roberto A. Cámara-Fuertes
USDC P.R. No. 19002
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com

KASOWITZ BENSON TORRES LLP
Andrew K. Glenn (*pro hac vice* forthcoming)
Olga Lucia Fuentes-Skinner (*pro hac vice* forthcoming)
Marissa E. Miller (*pro hac vice* forthcoming)
Shai Schmidt (*pro hac vice* forthcoming)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Email: aglenn@kasowitz.com
ofuentes@kasowitz.com
memiller@kasowitz.com
sschmidt@kasowitz.com

*Attorneys for Plaintiff Ambac Assurance Corporation*

DPR MODIFIED AO 440 (Rev. 06/12) Summons in a Civil Action

## UNITED STATES DISTRICT COURT
### for the

District of Puerto Rico

| | |
|---|---|
| **AMBAC ASSURANCE CORPORATION,** | |
| **Plaintiff,** | Civil No. 3:20-cv-01094 |
| **v.** | |
| **AUTOPISTAS METROPOLITANAS DE PUERTO RICO, LLC,** | |
| **Defendant.** | |

### SUMMONS IN A CIVIL ACTION

**To:** **AUTOPISTAS METROPOLITANAS DE PUERTO RICO, LLC**
**Though the Resident Agent, Gonzalo Alcalde**
**361 San Francisco Street, Penthouse Suite, San Juan, Puerto Rico 00901**
**City View Plaza 1, Suite 500, Rd 500 165 No. 48, Guaynabo, Puerto Rico 00968**

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — or 90 days in a Social Security Action — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

**Roberto A. Cámara-Fuertes**
**Ferraiuoli LLC**
**PO Box 195168, San Juan, PR 00919-5168**
**Tel. (787) 766-7000 / Email: rcamara@ferraiuoli.com**

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*FRANCES RIOS DE MORAN,*
*ESQ. CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

DPR MODIFIED AO 440 (Rev. 06/12)  Summons in a Civil Action

Civil No. 3:20-cv-01094

## PROOF OF SERVICE

### (This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides

there, on *(date)* _____, and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):* _____

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                                                *Server's signature*

                                                _____
                                                                *Printed name and title*

                                                _____
                                                                *Server's address*

Additional information regarding attempted service, etc:

_____

# UNITED STATES DISTRICT COURT

## DISTRICT OF PUERTO RICO

## CATEGORY SHEET

**You must accompany your complaint with this Category Sheet, and the Civil Cover Sheet (JS-44).**

| | |
|---|---|
| Attorney Name (Last, First, MI): | Camara-Fuertes Roberto A. |
| USDC-PR Bar Number: | 219002 |
| Email Address: | rcamara@ferraiuoli.com |

1.　　Title (caption) of the Case (provide only the names of the <u>first</u> party on <u>each</u> side):

　　Plaintiff: Ambac Assurance Corporation

　　Defendant: Autopistas Metropolitanas de Puerto Rico, LLC

2.　　Indicate the category to which this case belongs:

　　☒ Ordinary Civil Case
　　☐ Social Security
　　☐ Banking
　　☐ Injunction

3.　　Indicate the title and number of related cases (if any).

　　In re The Financial Oversight and Management Board for Puerto Rico Case No. 17-BK-3283 (LTS)

4.　　Has a prior action between the same parties and based on the same claim ever been filed before this Court?

　　☐ Yes
　　☒ No

5.　　Is this case required to be heard and determined by a district court of three judges pursuant to 28 U.S.C. § 2284?

　　☐ Yes
　　☒ No

6.　　Does this case question the constitutionality of a state statute?  (See, Fed.R.Civ. P. 24)

　　☐ Yes
　　☒ No

Date Submitted: 2/19/02/19/20202020

rev. Dec. 2009

[ Print Form ]   [ Reset Form ]

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Ambac Assurance Corporation | Autopistas Metropolitanas de Puerto Rico, LLC |

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   San Juan
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attached.

Attorneys *(If Known)*

---

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☒ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

---

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1334

Brief description of cause:
Fraudulent transaction from Puerto Rico Highways and Transportation Authority to Metropistas.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE  Judge Laura Taylor Swain   DOCKET NUMBER  No. 17-BK-3283 (LTS)

DATE
02/19/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Roberto A. Camara-Fuertes

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**  **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.

Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.

**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.