```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF PUERTO RICO

 3
     In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,              )      (Jointly Administered)
                               )
 7   as representative of      )
                               )
 8   The Commonwealth of       )
     Puerto Rico et al.,       )      March 4, 2020
 9                             )
                Debtors,       )
10
     _____
11
12   In Re:                    )      Docket No. 3:17-BK-3284(LTS)
                               )
13                             )      PROMESA Title III
     The Financial Oversight and )
14   Management Board for       )
     Puerto Rico,              )      (Jointly Administered)
15                             )
     as representative of      )
16                             )
     COFINA,                   )
17                             )
                Debtor,        )
18
     _____
19

20

21

22

23

24

25
```

```
1   _____

2
    In Re:                        )      Docket No. 3:17-BK-3566(LTS)
3                                  )
                                   )      PROMESA Title III
4   The Financial Oversight and   )
    Management Board for           )
5   Puerto Rico,                   )      (Jointly Administered)
                                   )
6   as representative of           )
                                   )
7   Employees Retirement System    )
    of the Government of the       )
8   Commonwealth of Puerto         )
    Rico,                          )
9                                  )
                    Debtor,        )
10  _____

11

12  In Re:                        )      Docket No. 3:17-BK-3567(LTS)
                                   )
13                                 )      PROMESA Title III
    The Financial Oversight and   )
14  Management Board for           )
    Puerto Rico,                   )      (Jointly Administered)
15                                 )
    as representative of           )
16                                 )
    Puerto Rico Highways and       )
17  Transportation Authority,      )
                                   )
18                  Debtor,        )

19  _____

20

21

22

23

24

25
```

```
 1  _____

 2  In Re:                          )        Docket No. 3:17-BK-4780(LTS)

 3                                  )
                                    )        PROMESA Title III
 4  The Financial Oversight and     )
    Management Board for            )
 5  Puerto Rico,                    )        (Jointly Administered)
                                    )
 6  as representative of            )
                                    )
 7  Puerto Rico Electric            )
    Power Authority,                )
 8                                  )
                        Debtor,     )
 9
    _____
10

11  In Re:                          )        Docket No. 3:19-BK-5523(LTS)
                                    )
12                                  )        PROMESA Title III
    The Financial Oversight and     )
13  Management Board for            )
    Puerto Rico,                    )        (Jointly Administered)
14                                  )
    as representative of            )
15                                  )
    Puerto Rico Public              )
16  Buildings Authority,            )
                                    )
17                      Debtor,     )

18  _____

19

20

21

22

23

24

25
```

```
 1  _____

 2
    Financial Oversight and      )  Docket No. 3:19-AP-00393(LTS)
 3  Management Board for         )
    Puerto Rico,                 )      in 3:17-BK-3283(LTS)
 4                               )
    as representative of the     )
 5  Employee Retirement          )
    System of the Government of  )
 6  the Commonwealth of          )
    Puerto Rico,                 )
 7                               )
                     Plaintiff,  )
 8                               )
    v.                           )
 9                               )
    Wanda Vazquez Garced,        )
10  et al.,                      )
                                 )
11                   Defendants. )

12  _____

13
    Autoridad de Energia         )  Docket No. 3:19-AP-00453(LTS)
14  Electrica de Puerto Rico,    )
                                 )      in 3:17-BK-4780(LTS)
15                   Plaintiff,  )
                                 )
16  v.                           )
                                 )
17  Vitol, S.A., et al.,         )
                                 )
18                   Defendants. )

19  _____

20                  OMNIBUS HEARING

21   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

22              UNITED STATES DISTRICT COURT JUDGE

23    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

24              UNITED STATES DISTRICT COURT JUDGE

25  _____
```

```
 1   APPEARANCES:

 2   For the Mediation Team:   Honorable Chief U.S. Bankruptcy Judge
                               Barbara J. Houser
 3
     For The Commonwealth
 4   of Puerto Rico, et al.:   Mr. Martin J. Bienenstock, PHV
                               Mr. Brian S. Rosen, PHV
 5                             Ms. Laura Stafford, PHV
                               Mr. Michael A. Firestein, PHV
 6                             Mr. Lary A. Rappaport, PHV
                               Mr. Ehud Barak, PHV
 7                             Mr. Michael T. Mervis, PHV
                               Mr. Steve Ma, PHV
 8
     For the U.S. Trustee
 9   Region 21:                Ms. Monsita Lecaroz Arribas, AUST

10   For the Official
     Committee of Unsecured
11   Creditors:               Mr. Luc A. Despins, PHV
                               Mr. G. Alexander Bongartz, PHV
12
     For the Puerto Rico
13   Fiscal Agency and
     Financial Advisory
14   Authority:               Mr. Peter Friedman, PHV
                               Mr. Luis C. Marini Biaggi, Esq.
15                             Mr. John Rapisardi, PHV
                               Mr. William Sushon, PHV
16                             Ms. Elizabeth McKeen, PHV

17   For Assured Guaranty
     Corp. and Assured
18   Guaranty Municipal Corp: Mr. William J. Natbony, PHV
                               Mr. Mark C. Ellenberg, PHV
19                             Mr. Casey J. Servais, PHV

20   For Financial Guaranty
     Insurance Company:        Mr. Martin A. Sosland, PHV
21                             Mr. Jason W. Callen, PHV

22   For Mr. Hein:             Mr. Peter Hein, Pro Se
                                 Appearing from New York
23
     For Cantor Katz
24   Collateral Monitor:       Mr. Douglas Mintz, PHV

25
```

```
 1   APPEARANCES, Continued:

 2   For Salud Integral
     en la Montana:            Mr. John E. Mudd, Esq.
 3
     For National Public
 4   Finance Guarantee Corp.: Mr. Robert Berezin, PHV
                                   Appearing from New York
 5
     For Cobra Acquisitions
 6   LLC:                      Mr. Stephen M. Baldini, PHV
                                   Appearing from New York
 7                             Mr. Fernando Van Derdys, Esq.

 8   For QTCB Noteholder
     Group:                    Mr. Kurt A. Mayr, PHV
 9                             Mr. David L. Lawton, PHV

10   For Ambac Assurance
     Corporation:              Mr. Dennis Dunne, PHV
11                             Ms. Atara Miller, PHV
                               Mr. Grant Mainland, PHV
12
     For the Lawful
13   Constitutional
     Debt Coalition:           Mr. Susheel Kirpalani, PHV
14                             Mr. Daniel Salinas, PHV

15   For the Ad Hoc
     Group of PREPA
16   Bondholders:              Ms. Alice J. Byowitz, PHV

17   For the Ad Hoc
     Group of
18   Constitutional
     Debtholders:              Mr. James M. Peck, PHV
19                             Mr. Andrew Kissner, PHV

20   For the Fee Examiner:     Ms. Katherine Stadler, PHV
                                   Appearing from New York
21
     For the Official
22   Committee of Retired
     Employees of the
23   Commonwealth of
     Puerto Rico:              Mr. Robert Gordon, PHV
24                             Mr. Landon Raiford, PHV

25
```

```
 1   APPEARANCES, Continued:

 2   For the Ad Hoc
     Group of General
 3   Obligation
     Bondholders:              Mr. Mark T. Stancil, PHV
 4
     For AmeriNational
 5   Community Services,
     LLC:                      Mr. Nayuan Zouairabani, PHV
 6
     For UTIER and
 7   SREAEE:                   Mr. Rolando Emmanuelli Jimenez, Esq.
                               Ms. Jessica Mendez Colberg, Esq.
 8
     For Vitol Inc.:           Mr. Alexander L. Kaplan, PHV
 9
     For Puerto Rico
10   Ban, LLC:                 Mr. James A. Newton, PHV

11   For Morgan Stanley
     & Co., LLC, Jeffries,
12   LLC, and BMO Capital
     Markets GKST, Inc.:       Mr. Angel E. Rotger Sabat, Esq.
13
     Also Present:             Ms. Sandra Torres
14                             Ms. Angelica Carrasco
                               Ms. Olga Alicea, Interpreter
15

16

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
 1                          I N D E X

 2   WITNESSES:                                        PAGE

 3         None offered.

 4

 5   EXHIBITS:

 6         None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    March 4, 2020

 3                                    At or about 9:38 AM

 4                        *      *      *

 5          THE COURT:  Again, buenos dias.  Good morning.

 6   Welcome counsel, parties in interest, and members of the press

 7   and public here in San Juan, those observing here and in New

 8   York and telephonic participants.  As always, it's good to be

 9   back here.

10          I will give you my usual reminder.  Consistent with

11   court and judicial conference policies and the Orders that

12   have been issued, there's to be no use of any electronic

13   devices in either courtroom to communicate with any person,

14   source, or repository of information, nor to record any part

15   of the proceedings.  So all electronic devices must be turned

16   off, unless you are using a particular device to take notes or

17   to refer to notes or documents that are already loaded on the

18   device.  All audible signals, including vibration features,

19   must be turned off.

20          No recording or retransmission of the hearing is

21   permitted by any person, including but not limited to the

22   parties or the press.  Anyone who is observed or otherwise

23   found to have been texting, e-mailing or otherwise

24   communicating with a device from a courtroom during the court

25   proceeding will be subject to sanctions, including but not
```

1   limited to confiscation of the device and denial of future

2   requests to bring devices into the courtroom.

3          Our timing for today is from now until noon, with a

4   break for lunch, and then from 1:00 until 5:00 today; and if

5   necessary, to resume tomorrow at 9:30 on the same schedule.

6   We'll begin with the Oversight Board's report.

7          Good morning, Mr. Bienenstock.

8          MR. BIENENSTOCK:  Good morning, Judge Swain.

9          Martin Bienenstock of Proskauer Rose, LLP, for the

10  Financial Oversight and Management Board for Puerto Rico.

11         Your Honor, in respect of the status report the Court

12  requested, on the subject of the general status and activities

13  of the Oversight Board, since the January hearing, the

14  Oversight Board is in the midst of the annual fiscal plan

15  process which, in turn, informs the annual budgetary process.

16         We've received the first draft of the Commonwealth's

17  proposed fiscal plan and proposed budget, and both are under

18  review internally.  We expect the covered instrumentalities to

19  file their proposed fiscal plans by early April.

20         The Oversight Board is working with the government to

21  develop the fiscal year 2021 budget for the Commonwealth and

22  covered instrumentalities.  The Commonwealth submitted a

23  proposed general fund and special revenue fund budget on

24  February 14.  The Oversight Board is reviewing the submission

25  and holding budget meetings with key agencies of the

1    government to evaluate their submissions.

2         Separately, we provided authority for an additional

3    260 million dollars to be used from the emergency reserve in

4    the certified budget for response to the earthquakes, 20

5    million of which was drawn in the month of February.  Most

6    critically, the funds are being put toward the temporary

7    shelters where evacuees reside, and to provide schooling for

8    children whose schools are not safe for use at this time.

9         The Oversight Board is also working closely with the

10   government to analyze funding needs related to the coronavirus

11   to ensure the Commonwealth task force established by the

12   Governor and their related activities are adequately staffed.

13        In respect of ERS, on January 30, 2020, the First

14   Circuit affirmed this Court's opinion, holding that section

15   552 of the Bankruptcy Code prevents the bondholders' security

16   interest from extending to post-petition revenues.  Yesterday,

17   the First Circuit denied the ERS bondholders' request for

18   reconsideration en banc.

19        There has been a meet-and-confer process regarding

20   other claims related to ERS, including administrative expense

21   claims against ERS and the Commonwealth, between the

22   bondholder groups and fiscal agent on one side, and the

23   Oversight Board, AAFAF, and the Retiree and Creditors

24   Committees and Special Claims Committee on the other side.

25   The parties are discussing a consolidated schedule to proceed

1    on these remaining claims and aspire to file a schedule by

2    consent shortly.

3              Yesterday, the First Circuit heard oral argument in

4    the bondholders' appeal of this Court's Order denying

5    appointment of the bondholders as trustees of ERS under

6    Section 926(a) of the Bankruptcy Code to bring certain

7    actions.  The argument included much colloquy about whether

8    the bondholders have a recourse claim under Bankruptcy Code

9    Section 1111 that may figure prominently into the pending

10   litigation.  Discovery remains ongoing in the pending

11   disputes regarding the scope of the bondholders' lien on ERS

12   assets and whether the issuance of the ERS bonds was ultra

13   vires.

14             In respect of PRIDCO's RSA and anticipated Title VI

15   filing, PRIDCO has public bonds in the outstanding amount of

16   approximately 150 million dollars in principal and 15 million

17   dollars in accrued interest.

18             As AAFAF previously notified the Court in the October

19   hearing, AAFAF has entered into a restructuring support

20   agreement with over two-thirds of those bondholders.  Since

21   the last update at the January Omnibus Hearing, the Oversight

22   Board sent the government a letter identifying areas where the

23   Oversight Board believes PRIDCO's fiscal plan should be

24   revised to meet PROMESA Section 201 certification

25   requirements.

1    The government sent a letter in response and shared a

2    revised fiscal plan with the Oversight Board professionals.

3    The Board's professionals are continuing to analyze the

4    revised fiscal plan and to work with AAFAF's professionals to

5    understand the implementation of the RSA and resolve any

6    outstanding issues.

7    The Oversight Board still has not formally been asked

8    to approve the RSA as a qualifying modification.  Should the

9    proposed RSA be consistent with and meet the requirements of

10   the certified fiscal plan, the Oversight Board would issue a

11   voluntary agreement certification relating to the PRIDCO RSA.

12   The parties would aim to commence a Title VI qualifying

13   modification for PRIDCO approximately the second quarter of

14   2020.

15   In respect of the relations among the Oversight Board

16   and the Commonwealth and Federal Government, our relationship

17   with the Governor and government remains collaborative, though

18   they have been overwhelmed in response to the earthquakes in

19   the south, thus delaying much of the other normal and

20   important work.

21   In terms of the Federal Government relations, the

22   Board met with President Trump's liaison to the Commonwealth

23   Government for natural disaster recovery efforts on the

24   island, Coast Guard Rear Admiral Peter J. Brown, to discuss

25   recovery efforts.

1          The Oversight Board has been charged with providing

2     input on the proposed use of disaster and recovery funding,

3     and a new federal register publication, a HUD Vivienda Grant

4     Agreement.  The aim of the mandate is to ensure the use of

5     those funds is consistent with both the certified fiscal plans

6     and certified budgets.

7          We received a letter from Congressman Tom McClintock

8     requesting information on the PROMESA Section 211 pension

9     report, to which the Board responded that such analysis was

10    conducted last year, and we enclosed for the Congressman a

11    copy of the report.

12         Your Honor has also requested a status report in

13    respect to the revised ADR procedures and an overview of the

14    proposed disclosure statement and amended plan that the

15    Oversight Board filed the other day.  With the Court's

16    permission, my partner, Brian Rosen, will provide those

17    reports.

18         THE COURT:  Thank you, Mr. Bienenstock.

19         MR. ROSEN:  Good morning.

20         THE COURT:  Good morning, Mr. Rosen.

21         MR. ROSEN:  Good morning, Your Honor.

22         Your Honor, as Mr. Bienenstock said, I'm here to

23    address two points:  One with respect to the ADR, and the

24    other with respect to the amended plan and disclosure

25    statement.

1           With respect to the ADR, Your Honor, that's a very

2    short presentation, because after the last hearing, Your

3    Honor, we have revised the ADR procedures.  We've had

4    discussions with the Administrative Office.  And yesterday

5    morning, we filed, on notice of presentment, those revised ADR

6    procedures.  The day before, Your Honor, we also filed a

7    revised and hopefully final form of the ACR procedures.  Both

8    of those, Your Honor, are on for presentment for March 10th

9    before you.

10          Your Honor, while I'm here, though, I wanted to take

11   an opportunity just to bring the Court up-to-date as to where

12   we are on the overall claims resolution process.  If you don't

13   mind, I'll take a minute.

14          THE COURT:  I'd be grateful.

15          MR. ROSEN:  The balance will be dealt with by

16   Ms. Stafford later on when we get to some objections, Your

17   Honor.

18          Your Honor, as I've said before, we have

19   approximately filed in this case over 173,000 claims.  And

20   those were broken down primarily between, among I'll say the

21   Title III debtors, the Commonwealth of about 110,000; ERS of

22   about 52,000; HTA of about 2,300; COFINA, about 3,100; and

23   PREPA of about 4,500.  To date, Your Honor, approximately

24   68,000 claims have either been disallowed or will be

25   disallowed upon the entry of final orders granting those

1  objections, and they represented approximately 4.2 billion in

2  asserted liabilities.

3       Last week, Your Honor, the debtors and the Oversight

4  Board filed additional objections to about 12,000 claims,

5  totaling approximately 392 million dollars, and those are

6  scheduled to be heard at the April Omnibus hearing.  We

7  currently anticipate, Your Honor, that approximately 45,000

8  claims will be designated to the ACR process, thereby removing

9  those from the claims registry and being dealt with through

10 the administrative processes of the Commonwealth.

11      And as discussed at the January hearing, Your Honor,

12 we expect that an additional 12,000 claims will be referred to

13 the ADR process.  Those are primarily, Your Honor, accounts

14 payable and litigation related claims.  And they are often, or

15 in the most part, Your Honor, unliquidated in nature, so I

16 can't even tell you what the magnitude of those liabilities

17 might be.

18      So, Your Honor, that leaves approximately 28,000 left

19 to be resolved in the Commonwealth, the ERS and HTA cases.

20 With respect to COFINA, Your Honor, as I mentioned, there were

21 approximately 3,100 claims.

22      And now, Your Honor, there are two claims left to be

23 resolved.  One already the Court resolved, and that is

24 currently on appeal.  That is the Proof of Claim that was

25 filed by Mr. Peter Hein.  And the other, Your Honor, is a

1    claim that was filed by the Lehman Trust.  And that claim

2    actually, Your Honor, is one that we are just waiting to

3    reconcile pending a reconciliation of the Peter Hein

4    objection.  But there is no outstanding dispute with respect

5    to that, Your Honor.

6         Your Honor, with respect to the Plan, as the Court

7    knows, the Plan was filed on last Friday evening.  And it

8    contains -- well, it is the product of months and months of

9    work through the help of the mediation team, and the mediation

10   team leader specifically.  And it incorporates the

11   understanding that was reached, and it was incorporated in the

12   Plan Support Agreement that was filed publicly on February

13   9th.

14        The -- I don't want to go into all of the details

15   associated with the Plan, Your Honor, because I don't think

16   that's really what the Court needs to hear today.  And I also

17   just want to stick to the facts and not have everybody jump up

18   behind me.

19        THE COURT:  I did simply ask for an overview, but I

20   think that's an important part of contextualization of much of

21   today's proceeding.

22        MR. ROSEN:  Absolutely, Your Honor.  It deals with,

23   Your Honor -- well, at the time of the entry of the PSA, Your

24   Honor, we had about eight billion dollars worth of GO and PBA

25   bonds that had signed on as what we referred to as initial PSA

1   creditors.  At the same time, Your Honor, we invited anybody

2   or any party in interest who had claims in excess of one

3   million dollars to also sign up and join that process.

4           Today, Your Honor --

5           THE COURT:  It sounds like we went off --

6           MR. ROSEN:  Testing.  One, two, three.

7           As of February 28, Your Honor, which was the closure

8   of the joinder period, we had publicly announced that there

9   were now a total of 10 -- or in excess of 10.5 billion dollars

10  worth of GO and PBA bonds that had signed on to the PSA.  So

11  that brought the overall amount of those to 58 percent of the

12  bonds outstanding, Your Honor.

13          There still is an opportunity for additional parties

14  to join on, and by that I mean those parties who were parties

15  at that time can purchase additional bonds.  And so that

16  number may, in fact, may go up.

17          There is also, Your Honor, the opportunity for

18  people below one million dollars to get the benefit of it,

19  and we call that in the Plan, Your Honor, the retail investor.

20  And built into the Plan is the opportunity, to the extent

21  that a retail investor class accepts the Plan, to get a bump

22  up in the recovery just like the initial PSA creditors did.

23  We did not want to leave anybody out of that opportunity, Your

24  Honor, so through the negotiations with the mediation team and

25  the PSA creditors, Your Honor, we've included that opportunity

1    for all parties, either above the million previously or now

2    below the million pursuant to the solicitation process when

3    the Court approved that to go forward.

4         Your Honor, the Disclosure Statement also was filed

5    last week, and that has obviously a lot of information

6    contained in it, as I think some of the people who have

7    responded to the Amended Report that was filed have indicated

8    the page length that they thought it would be.  It is, Your

9    Honor, a very complicated document.  I will say that.  But it

10   is an extremely comprehensive document, and the changes, Your

11   Honor, most notably from what the Court received in September

12   when the initial plan was filed and initial disclosure

13   statement was filed, there are updates to the information.

14        Obviously this is updated for the new plan that is

15   out there.  There's updated information with respect to the

16   cash accounts balances as of December 31.  There's updated

17   information with respect to the various litigations, and

18   there's other information, including the effect of the

19   earthquakes upon the Commonwealth of Puerto Rico and the

20   people of Puerto Rico.

21        At the same time, Your Honor, we filed a very

22   comprehensive motion to approve the Disclosure Statement and

23   approve solicitation procedures in connection with what we

24   hope to be, Your Honor, the ultimate approval of the

25   Disclosure Statement.  This is in addition to the original

1    scheduling motion that we had filed with respect to the

2    Disclosure Statement, which was something that we did and the

3    Court approved, Your Honor, in the context of the COFINA Plan

4    that was confirmed and consummated last year.

5              Those -- that comprehensive disclosure statement and

6    solicitation procedures, Your Honor, is on the calendar for

7    the June 3rd Omnibus hearing.

8              THE COURT:  You are proposing to -- actually, that's

9    right.  You filed your motion with June 3rd as the hearing

10   date?

11             MR. ROSEN:  We did, Your Honor.  Absolutely.

12             Your Honor, we do envision that, in the interim, we

13   will probably file another motion to set up more procedures

14   associated with the discovery process that may go on in

15   connection with the confirmation, because we wanted to move

16   easily and have -- let everybody have an opportunity to

17   participate, and so that there are no blips or bumps in the

18   road as we go down the path to -- what we hope for is a

19   confirmation hearing later this year.

20             We will be discussing those issues again, Your Honor,

21   with the mediation team leader, and hopefully there will be a

22   consensus as to how we can move forward with respect to those.

23             Your Honor, unless you have any questions, that would

24   be my presentation.

25             THE COURT:  Thank you, Mr. Rosen.

1          MR. ROSEN:  Thank you, Your Honor.

2          THE COURT:  Is there -- so, Mr. Rapisardi.

3          Thank you.

4          Good morning, Mr. Rapisardi.

5          MR. RAPISARDI:  Good morning, Your Honor.  Thank you

6     once again for giving us the opportunity to address the Court

7     regarding the status of AAFAF's efforts in these Chapter 11

8     cases.

9          Your Honor, I will give some general overview

10    comments, and Mr. Marini will address the Court with respect

11    to the specifics as to disaster relief funding.  And there's

12    one issue about a certain unauthorized claim, he'll address

13    that as well.

14         Your Honor, since the last report, AAFAF has

15    accomplished the following.  Last Friday, as Mr. Bienenstock

16    alluded to, the government submitted a revised fiscal plan for

17    the Commonwealth as requested by the Oversight Board.  The

18    fiscal plan generally updates the Board's May 2019 Certified

19    Fiscal Plan to reflect the fiscal year 2020 budget and OMB's

20    recommended fiscal 2021 budget.

21         In addition, although the government currently does

22    not support the Board's PSA with the GO bondholders, the

23    government's fiscal plan does reflect a forecast period over

24    20 years, through fiscal year 2039, to align with the maturity

25    of the new bonds that are contemplated and proposed under the

1   PSA and Plan of Adjustment that's just been filed.

2          In addition, the Government of Puerto Rico has worked

3   closely with federal officials in recent months to accelerate

4   the release of disaster relief aid amid past delays and

5   setbacks.  In February, the Puerto Rico Government met with

6   the Coast Guard Admiral, Peter J. Brown, as Mr. Bienenstock

7   alluded to, who is the Trump administration's liaison for

8   natural disaster recovery efforts in Puerto Rico, with the

9   goal of establishing approved cooperation and trust between

10  the Puerto Rico Government and the Federal Government

11  regarding relief efforts.

12         After his discussions with the government, Admiral

13  Brown issued a statement noting that Puerto Rico's "Reputation

14  seems to lag the reality."  And that both the Puerto Rico

15  Office for Recovery, Reconstruction and Resilience and the

16  Puerto Rico Housing Department have implemented "very strong

17  control mechanisms to counter any attempts on corruption or

18  diversion of funds."

19         AAFAF hopes that this renewed dialogue will

20  facilitate the timely release of both past and future

21  allocations of federal funding for Puerto Rico that will be

22  necessary to strengthen Puerto Rico's infrastructure and

23  economy.

24         It bears worth mentioning, Your Honor, that not

25  withstanding the release of existing federal emergency funds

1   or the future appropriation of additional federal funds,

2   additional private investment in Puerto Rico's aging

3   infrastructure will be crucial to its economic sustainability.

4   Also, Your Honor, the government strongly believes that to the

5   extent additional resources exist upon emergence from Title

6   III, or become available at some point in the future, its

7   first priority must be to target those areas which are most

8   critical to Puerto Rico's future economic competitiveness and

9   growth.

10          AAFAF and the Oversight Board have been working

11  closely together on ongoing litigation with creditors to

12  address key issues necessary to resolve these cases.  And I

13  concur with Mr. Bienenstock's observation that the

14  relationship between the Oversight Board and AAFAF continues

15  to be collaborative, although we have the opposition at this

16  time on the Plan.

17          Notably, AAFAF is fully aligned with the Board on all

18  major litigation items, and the loan issue is with respect to

19  implementation of Act 29, which we still have some fundamental

20  differences.  And Your Honor, in fact, will hear arguments

21  concerning this issue today, including the worrisome economic

22  and human impact striking down Act 29 could have on

23  municipalities.

24          With that, Your Honor, unless you have any questions

25  of me, I will turn it over to Mr. Marini for some more

1   detail.

2           THE COURT:  Thank you, Mr. Rapisardi.

3           MR. RAPISARDI:  Thank you, Your Honor.

4           THE COURT:  Good morning, Mr. Marini.

5           MR. MARINI BIAGGI:  Good morning, Your Honor.  Luis

6   Marini of Marini Pietrantoni Muniz for AAFAF.

7           Your Honor, I'll address the Court on two matters

8   that Your Honor requested.  Number one, the funding and status

9   of post Maria and earthquake related relief and reparations,

10  and I'll focus on the status of schools and shelters.  And

11  two, after that, I'll get into AAFAF's investigation of the

12  individual who filed an unauthorized proof of claim on behalf

13  of the Treasury.

14          Your Honor will recall that AAFAF has provided two

15  status reports already on disaster relief relating to the

16  earthquake and the hurricanes, so I'll limit my presentation

17  today to only material new developments since the last status

18  report.

19          THE COURT:  The last time we were here physically,

20  you had indicated you were going to file some supplemental

21  details.  I don't remember seeing that.  Did you file

22  something?

23          MR. MARINI BIAGGI:  No, Your Honor.  I apologize.  We

24  have been gathering the data, but I'll present it to the Court

25  today, the details on the schools and the shelters.

1          THE COURT:  Thank you.

2          MR. MARINI BIAGGI:  Before getting to it, I'll just

3     mention to the Court that the data that we have that we're

4     going to be presenting today, AAFAF obtained it from PREPA,

5     from HTA, from the Puerto Rico National Guard, from the

6     Department of Housing, Education, and COR3.

7          In terms of the earthquakes, Your Honor, that started

8     on December 28th, they have continued, and they remain

9     concentrated in the southern part of Puerto Rico.  During

10    February alone, there were about 275 quakes of 3.0 or higher.

11         Big picture, and I'll get into these numbers in more

12    detail as part of my presentation, currently there are less

13    than 400 reported refugees in shelters.  That's down from a

14    high of 9,000 during January.  There are approximately 2,500

15    uninhabitable houses.  Approximately 92 percent of schools

16    have reopened.  And FEMA has made a preliminary estimate of

17    initial mitigation and repair damages as a result of the

18    earthquakes, and they have estimated that at 782 million.

19         Funding and reconstruction efforts are ongoing.  When

20    we gave our last report, there were 16 municipalities that

21    included, as of that time, in the federal major disaster

22    declaration signed by FEMA and President Trump.  Since then,

23    on February 6, 2020, FEMA included Governor Vazquez' request

24    to include additional municipalities, and that included

25    Arecibo, Ciales, Hormigueros, Juana Diaz, Las Marias,

1    Mayaguez, Morovis, Orocovis and Sabana Grande.

2         As of now, there are 25 municipalities throughout

3    Puerto Rico in the southern and southwestern part that have

4    been impacted by the earthquakes and have been designated in

5    the federal major disaster declaration.  Through these

6    efforts, what that means is FEMA's public and private funding

7    is now available to the municipalities to provide assistance

8    to individuals with location efforts, rental subsidies,

9    housing, and to provide assistance to the government.

10        As to the shelters, Your Honor, as a result of the

11   earthquakes during the height of January 2020, there were up

12   to 9,000 refugees in shelters throughout the southern and

13   southwestern part of Puerto Rico.  As of the last data that we

14   had yesterday, this number has been reduced to approximately

15   393 persons.  Of these, approximately 93 are sheltered in

16   government base camps run by the Puerto Rico National Guard.

17        There are four base camps throughout Puerto Rico:

18   One in Yauco that has seven persons; one in Guayanilla has 33;

19   one in Ponce has 17; and one in Penuelas that has 35.  The

20   base camps have laundry facilities, restrooms, showers,

21   medical clinic and pharmacy, food services.  Three meals are

22   served a day, seven days a week.

23        In addition to the base camps, there are

24   approximately 300 additional private -- 300 additional

25   refugees in private camps throughout Puerto Rico.

1    Intergovernmental services are being provided to the refugees

2    both in the government run base camps and in the private

3    shelters.  Through these services, various government units,

4    such as the Puerto Rico Department of Housing, Family,

5    Emergency Management Services, FEMA, and others work in

6    conjunction to find temporary or permanent housing for the

7    refugees.

8         Housing is available through government public

9    housing programs and through FEMA's rental subsidies -- rental

10   program.  FEMA has received approximately 35,000 claims for,

11   among other things, damages to houses as a result of the

12   earthquakes.  To date, approximately 30,000 houses have been

13   inspected, or 87 percent of claims.

14        FEMA has provided private assistance to families, and

15   disbursed, as of now, approximately 23 million for rental

16   subsidies, home repairs, home replacement and other claims.

17   Rental subsidies have been provided to about 6,600 families.

18        As to the schools, since my last report to the Court,

19   the Commonwealth has made substantial progress in inspecting

20   and opening schools for classes and in providing alternatives

21   to students.  The Commonwealth has approximately 857 schools.

22   All schools have been inspected by licensed engineers,

23   conducting visual inspections of structural and other repairs.

24        As of yesterday, as of March 3rd, the Department of

25   Education estimates that approximately 787 schools, or 92

1    percent of all schools have been reopened.  The Department of

2    Education estimates that approximately 56 schools will need

3    additional repairs prior to reopening.  The majority of these

4    schools are located in the southern and southwestern part of

5    Puerto Rico.

6          As of -- the last data that we had, as of yesterday,

7    the Department of Education estimates that approximately 78

8    percent of the total students enrolled for the academic year

9    are attending the schools that have already reopened.  The

10   Department of --

11         THE COURT:  And so, for the students of the schools

12   that haven't reopened, is there alternative programming?

13         MR. MARINI BIAGGI:  There are, Your Honor.  There are

14   40 schools that haven't reopened.  The Department of Education

15   has worked and has put in place alternatives for those

16   students, and they essentially involve three methods.  One,

17   renting and securing alternate venues.  That has been in

18   place, for example, in Ponce, where through those alternative

19   venues, the vast majority of students whose schools have

20   closed are now being provided access to schools.

21         Second, the Department of Education has put in place

22   hundreds of tents through municipalities in the southern

23   region of Puerto Rico.  Most of those tents have been put in

24   place or are being put in place this week, with others to

25   follow next week and the week after.  Through those mobile

1    classrooms, the Department of Education estimates that once

2    they're put together, all students whose schools have closed

3    would have a place to go to school.

4            And third, the Department of Education has made

5    arrangements with universities throughout Puerto Rico to

6    provide access to online classes.  As of the last data that I

7    had, which is as of the end of February, about 3,500 students

8    were enrolled in the online classes as well.

9            So I can go into more detail, but the three main

10   methods are those.  Most have been put in place and are being

11   put in place this week, with additional tents to follow next

12   week and the week after.

13           THE COURT:  And the tents, may I assume, have

14   electricity service and internet connectivity and --

15           MR. MARINI BIAGGI:  Correct.

16           THE COURT:  -- sanitary facilities?

17           MR. MARINI BIAGGI:  Correct.

18           THE COURT:  And those sorts of things?

19           MR. MARINI BIAGGI:  Correct.  And also food services

20   as well.

21           Unless Your Honor has any questions on the schools,

22   I'll move on to a brief update on PREPA.

23           THE COURT:  Thank you.  Please move on.

24           MR. MARINI BIAGGI:  As to PREPA, Your Honor, we

25   briefly provided an update during our last presentation.  The

1  earthquake and aftershocks caused significant damage to

2  PREPA's baseload generation, as well as damage to its

3  independent generation partners.

4       We provided previously an update on the Costa Sur

5  Power Plant.  What I can mention is that PREPA has completed

6  the first phase of assessment for visible damage to, for

7  example, tanks, boilers and structures.  A second phase is now

8  under way, where PREPA will have a more detailed and technical

9  assessment for nonvisible damages to the infrastructure to

10  better assess the total cost of the repairs, damages,

11  insurance coverage, and the need to do potential rebuilding.

12       During my last presentation, I gave an update to the

13  Court on a potential RFP that PREPA was conducting.  That RFP

14  to solicit up to 500 megawatts of emergency and new generation

15  to help make up at least some of the approximately 800

16  megawatts in power lost in Costa Sur is under way.  PREPA is

17  awaiting approval of the RFP by the Puerto Rico Energy Bureau,

18  and is working with FEMA to secure project funding.  PREPA

19  expects to issue the RFP during March, as soon as the Puerto

20  Rico Energy Bureau approves the RFP.

21       Now, as to hurricane relief, two material new

22  developments have occurred since my last presentation.  One my

23  colleague, Mr. Rapisardi, already alluded to, that the Federal

24  Government named Coast Guard Admiral Peter Brown as the

25  administrator's liaison.  Progress has been made, as has been

1   articulated by Mr. Rapisardi, through the remarks that the

2   Admiral made after a meeting with the Governor, and that's

3   showing progress in the month since the nomination.

4        And second, in terms of additional funding since our

5   last report, over 36 million has been obligated during

6   February for about 164 projects relating to the recovery and

7   reconstruction of Puerto Rico.  These are funds to repair

8   roads, bridges, parks, recreational facilities, public

9   building and waste removal.

10       Finally, Your Honor, unless Your Honor has questions

11  on the disaster relief and the update that I gave, I'll move

12  on to a brief update on the unauthorized claim that was

13  filed.

14       THE COURT:  As to the funds that have now been

15  obligated, is there any concrete expectation of when they will

16  be disbursed?

17       MR. MARINI BIAGGI:  Yes, Your Honor.  For each

18  project, I understand it's different, because it depends on

19  whether there are plans and permits in place, but they can be

20  disbursed as soon as the project is approved.  So the

21  expectation is that they will start, they will go from project

22  to project immediately.

23       THE COURT:  Thank you.

24       MR. MARINI BIAGGI:  Now, Your Honor, as to the

25  incident involving the individual that filed a proof of claim

1    on July 9th, 2018, claiming to be an accountant for the

2    Treasury Department and filing a claim on behalf of the

3    Official Committee of Retirees for about 58.5 million dollars,

4    AAFAF, with Treasury, did an investigation on the claim.

5         The Proof of Claim contained no supporting documents.

6    As Your Honor is aware, the Oversight Board objected on that

7    basis to the claim.  As part of our investigation, of AAFAF's

8    investigation and coordination with Treasury, the Treasury

9    Department confirmed that Ms. Vega, the filer, is not or was

10   not an employee or authorized agent of the Treasury

11   Department.  The Treasury Department did not authorize this

12   person to file a claim on its behalf.  Treasury attempted to

13   reach Ms. Vega, as well as professionals for Treasury and

14   AAFAF, on multiple occasions through the information contained

15   in the proof of claim, but no contact has been able to be

16   made.

17        AAFAF continues to work with Treasury and Prime Clerk

18   to see if it identifies any other instance where a similar

19   situation happens.  And if it does, we will alert the Court.

20   But that's information we have.  We have tried to contact the

21   individual and have been unable to.

22        THE COURT:  Have you referred the matter to the

23   authorities as a potential bankruptcy fraud, so that law

24   enforcement might be looking for this person, or do you not

25   feel that's appropriate?

 1           MR. MARINI BIAGGI:  From the knowledge that I have,

 2     Your Honor, that has not been done.  I believe we wanted to

 3     reach the individual first, but we haven't.  So that's

 4     something that maybe will happen in the future.

 5           THE COURT:  All right.  And I take it if there are

 6     further updates in that regard, you'll let us know --

 7           MR. MARINI BIAGGI:  We will.

 8           THE COURT:  -- as we go forward with the Omnis?

 9           MR. MARINI BIAGGI:  We will, Your Honor.

10           If Your Honor doesn't have any other questions,

11     that's the update that I have for AAFAF.

12           THE COURT:  Thank you very much.

13           MR. MARINI BIAGGI:  Thank you, Your Honor.

14           THE COURT:  Did anyone else wish to be heard in

15     connection with status reports?

16           (No response.)

17           THE COURT:  Then we will move on to the Fee Examiner.

18     I understand that Ms. Stadler is in New York.  Yes.

19           Good morning, Ms. Stadler.

20           MS. STADLER:  Today's presentation requests the

21     Court's approval of 20 interim and one final fee application

22     for fee periods through and including the seventh interim fee

23     period, June through September of 2019.

24           The Fee Examiner's findings and recommendations are

25     set forth in the Fee Examiner's report and exhibits.  Of note

1    in this report is the consensual resolution of the Fee

2    Examiner's objection to the fifth interim fee period

3    application of Duff & Phelps, which was docket number 8862 in

4    the 3283 case.  With the Fee Examiner's report and

5    recommendations today, the Fee Examiner withdraws that

6    objection and recommends Court approval of the Duff & Phelps

7    fee applications in adjusted amounts as set forth on Exhibit A

8    to the report.

9            Briefly addressing the Cobra objection, which appears

10   next on the Agenda, the Fee Examiner recommends that the Court

11   will -- overrule that objection, at least as it relates to the

12   five interim fee applications recommended for approval today.

13   As the Court well knows, the Fee Examiner is charged with

14   applying the standards set forth in PROMESA Section 316, which

15   includes factors such as the time spent, rates charged,

16   necessity and benefit, and reasonableness.  The Fee Examiner's

17   review also incorporates the U.S. Trustee large case fee

18   guidelines, the local rules, and the fee and expense

19   guidelines promulgated by both AAFAF and the FOMB.  And in

20   some cases, you need provisions of an individual

21   professional's engagement agreements with their clients.

22           Nothing in the Cobra objection addresses any of these

23   factors.  It appears to be a blanket objection to the payment

24   of any PREPA professional based on a dispute over Cobra's own

25   administrative expense claim.

1          The solvency of a debtor, which is the only

2    substantive basis for the objection stated, is not a factor

3    under PROMESA Section 316, Bankruptcy Code Section 330, or any

4    of the guidelines governing the award of interim compensation.

5    As such, once again, the Fee Examiner recommends the Court

6    overrule that objection as it relates to the five interim fee

7    applications included in the Court -- in the recommendations

8    to the Court today.

9          And I'm happy to answer any questions the Court may

10   have about these or any other fee-related matters.

11         THE COURT:  I have a couple of questions generally

12   about fee-related matters, and I do appreciate your very

13   comprehensive report on the recommendations.

14         I think we have a little feedback here on the audio

15   in the courtroom, so give me a moment.

16         Well, can you hear me clearly there, Ms. Stadler?

17         MS. STADLER:  I can, yes.

18         THE COURT:  All right.  So I will just go on.

19         In your report on page two, the Fee Examiner notes

20   that duplicative services and inefficient staffing remain

21   challenges for some professionals.

22         I would be grateful if you would just give me a

23   little bit of insight into how the Fee Examiner generally goes

24   about evaluating and addressing fee applications that present

25   such issues.

1          MS. STADLER:  Yes, Judge.

2          This issue arises in two primary contexts in our

3     process.  The first is a result of the statutory construct

4     which creates the Oversight Board as the debtor in possession

5     agent, but also relies on AAFAF and the government agencies

6     themselves to provide substantive information.

7          As a result of that statutory construct, the debtors

8     in this case have two sets of professionals instead of one.

9     It's understandable, given the structure of PROMESA and the

10    unique issues that arise in this case and that have arisen

11    with respect to the Government of Puerto Rico, but we do pay

12    close attention to the work of professionals for both the

13    Oversight Board and AAFAF to ensure that neither is

14    duplicating the work of the other.

15         For example, the claims objection process that

16    Proskauer primarily handles generally does not overlap into

17    AAFAF professionals, except to the extent that Mr. Marini just

18    reported on some unique claims issues.  So that's one way that

19    we try to assure ourselves and assure the Court that everyone

20    is staying in their lane and fulfilling their statutory role,

21    doing what needs to be done to responsibly administer these

22    cases, while not overworking and -- overlooking each other's

23    work to an excessive degree.

24         The other place that we see a potential for overlap

25    is in situations where more than one professional for an

1    individual party in interest is working on the same matter.

2    The example that comes to mind is the Special Committee of the

3    Oversight Board, which has its own counsel, its own financial

4    advisors, and of course is co-counsel with the Creditors

5    Committee in prosecuting avoidance actions.

6         We have been very careful since the retention of

7    Special Committee counsel to make sure that the work of the

8    Special Committee's professionals is not being duplicated or

9    overseen, to an excessive degree, by the Oversight Board's

10   counsel and other professionals itself.

11        So we do a fairly deep dive into the time records,

12   and we often review reporting, pleadings filed by these

13   counsel and other professionals to, again, ensure that

14   professionals are staying in their lanes, that they're not

15   overreaching and trying to expand the scope of their

16   representation beyond that which the Oversight Board has

17   specifically authorized.

18        And to some extent, the applications that you see

19   recommended for adjournment in each of our reports, many of

20   those are recommended for adjournment because we are asking

21   specific questions about lots of different issues, but

22   particularly, the duplication issues that you just

23   recommended.

24        And when we identify potential issues, we give the

25   professionals substantial time and leeway to provide

1  information responsive to those inquiries, and then to do our

2  due diligence and satisfy ourselves that those explanations

3  make sense in the overall context of the case and our fee

4  process.

5  So hopefully that provides some information that the

6  Court was interested in.  And I can elaborate further, if

7  you'd like.

8  THE COURT:  That was very helpful.  It is obviously

9  important with so many different professionals, so many

10  different entities working together, and the fact that we are

11  working with a Commonwealth that is in financial distress, to

12  make sure that all of the resources are used appropriately; to

13  make sure that these proceedings are efficient, that issues

14  that need to be addressed are addressed properly; but that

15  there is as little waste and duplication as possible in the

16  expenditure of the funds of the debtors on professional fees.

17  And so I thank you for giving me reassurance of your

18  continued vigilance, and I think it is helpful to all those

19  who were listening to understand the degree and granularity of

20  the examination of the applications that are submitted.  So I

21  thank you for that.

22  I have one other general question for you about

23  professional fees and review.  And so as of the beginning of

24  the year, there have been a number of notices filed of fee

25  increases, some of which at orders of magnitude that appear

1  quite significant, with large differentials from the preceding

2  billing rates.  And so I wonder if you have any preliminary

3  views with respect to the disclosed increases, as to propriety

4  or just as to your methodology of how you will go about

5  evaluating those.

6       MS. STADLER:  Yes, Judge.  The January -- for the

7  most part, the January 2020 rate increases will appear in the

8  eighth interim fee period, which will cover October of 2019

9  through January of this year.  In connection with our

10 reporting on those applications, we will quantify not only the

11 amount of rate increases -- or the amount of fees attributable

12 to rate increases at the beginning of this year, but also the

13 cumulative impact of the rate increases.

14      So every letter report that goes out to a

15 professional includes a section that addresses rate increases,

16 if they've had any; quantifies the economic impact of the rate

17 increases, both by fee period and cumulatively; and then

18 recommends an adjustment downward to the guidelines and

19 standards that we discussed at length in connection with the

20 presumptive standards motion.

21      That's the baseline, and that's where the discussions

22 start.  The notices themselves give us the opportunity to

23 prepare our data processing system for that analysis when the

24 applications come in.  But we do not typically raise issues

25 with professionals when they give notice of rate increases,

1     other than just to prepare ourselves for incorporating the new

2     rates into our data systems.  We comment and report on them

3     when fees that are impacted by those rate increases are

4     actually requested, which, as noted, would be in connection

5     with the eighth interim fee period.

6            Since the presumptive standards discussion took place

7     and the presumptive standards Order went into effect, we've

8     seen two positive developments.  One is fewer rate increases

9     imposed in general, and the other is very little pushback in

10    negotiations when we identify fees that are the result of rate

11    increases beyond what our presumptive standards are.

12           Many, many professionals identify the -- review our

13    report and agree that with respect to particular individuals

14    and their timekeeping roster, the rates are outside the

15    guidelines.  In some cases, professionals can and do justify

16    departures from those guidelines.  A great example of this is

17    when an associate becomes a partner or a shareholder, the Fee

18    Examiner recognizes that that promotion and seniority is

19    reflective of a certain amount of skill and experience that

20    may justify a rate increase beyond what normal inflation or,

21    you know, cost of doing business would dictate.

22           There are other situations.  In many instances,

23    professionals representing AAFAF, including PREPA

24    professionals, have individual engagement agreements with

25    their clients that set forth specific rates that are

1   authorized by the retention.  O'Melveny & Myers, for example,

2   represents both PREPA and AAFAF and has different contracts

3   that govern each of those representations.

4        In some instances, the rates are not identical

5   between the two, and so we ask, to the extent one set of rates

6   is higher than the other, what the rationale for that is.  If

7   the rationale makes sense, then we use the rates in the

8   contract as the starting point for our rate increase analysis.

9   And then we would have two tracks or three tracks or three

10  different rate analyses, depending on the work and which

11  contract it's allocated to by professional.  But we do pay

12  close attention to those deviations.

13       There are, in many cases, justifications,

14  particularly in the government setting, for different rates

15  being charged in different matters.  And of course all of the

16  inquiry is overlaying by the reasonableness factors that I

17  discussed in my presentation under both PROMESA and the

18  Bankruptcy Code.

19       THE COURT:  Thank you, Ms. Stadler.

20       Now, is there anyone else who wishes to be heard as

21  to Cobra since Ms. Stadler has made her remarks concerning the

22  Cobra objection?

23       MR. VAN DERDYS:  Your Honor, for the record, Fernando

24  Van Derdys.

25       THE COURT:  You have to speak from the microphone,

1    because no one can hear you.

2          MR. VAN DERDYS:  Yes.  Fernando Van Derdys on behalf

3    of Cobra.  I believe Mr. Stephen Baldini from Akin Gump will

4    be making arguments by video conference now after this matter,

5    according to the schedule I saw.

6          THE COURT:  Yes.  The Agenda had listed the Cobra

7    matter as the next matter.  And so I think we are ready to

8    address that now, and then I will circle back with respect to

9    the Fee Examiner's proposed orders, approving matters the Fee

10   Examiner had approved, because dealing with the Cobra issue is

11   part of that, if you will.

12         MR. VAN DERDYS:  Thank you.  Okay.

13         THE COURT:  And so --

14         MR. BALDINI:  Thank you, Your Honor.  Would you like

15   to hear from Cobra now?

16         THE COURT:  Yes, please.

17         MR. BALDINI:  Okay.  Steve Baldini from Akin Gump on

18   behalf of Cobra Acquisitions, LLC.

19         Your Honor, if Cobra, as you're aware, is an

20   administrative creditor, PREPA and Cobra contracted post

21   filing --

22         THE COURT:  I'd ask that you --

23         MR. BALDINI:  -- for Cobra to handle the electric

24   affairs --

25         THE COURT:  Sir.  Mr. Baldini.

1          MR. BALDINI:  -- to Puerto Rico's electric grid.

2          THE COURT:  Mr. Baldini.

3          MR. BALDINI:  Yes.  Yes, Your Honor.

4          THE COURT:  Yes.  I'm just going to ask you to speak

5  a little more slowly, because the sound feed to here is a

6  little bit fuzzy.

7          MR. BALDINI:  Will do, Your Honor.

8          THE COURT:  Thank you.

9          MR. BALDINI:  Cobra currently claims that

10  approximately 250 million dollars is due and owing on those

11  contracts.  In -- Cobra's motion for allowance of its

12  administrative claim has been stayed, and we're not here to

13  litigate that motion.  That stay is currently in place until

14  June 3rd, 2020, by Order of this Court.

15          We do anticipate that the debtors will come back and

16  ask for further extensions, because one of the bases for the

17  request for stay is a criminal trial that, since that stay was

18  put in place by the Court, has now been set for trial.  And

19  it's not set until January of 2021 at the earliest.

20          Rather, Cobra's here because we believe that

21  administrative creditors of the debtor should be treated

22  evenly and equitably, which would result in either reduced or

23  no payments to professionals on an ongoing basis, or an

24  increase to the holdback amount.

25          Your Honor, there's no dispute that under PROMESA, a

1    confirmed plan requires payment in full in cash of all claims

2    under the Bankruptcy Code, Section 507(a)(2), which are

3    allowed administrative claims, and that those claims enjoy the

4    same priority and treatment as each other.

5            Your Honor, am I going at an okay pace?

6            THE COURT:  I'm sorry.  I didn't hear your last

7    remark.

8            MR. BALDINI:  Am I going at an okay pace?  Can you

9    hear?

10           THE COURT:  Yes, that's fine for me.

11           And is the court reporter having any difficulty?

12           COURT REPORTER:  No, Your Honor.

13           THE COURT:  You're fine for the court reporter,

14   too.

15           MR. BALDINI:  Okay.  Just wave or gesticulate if I'm

16   going too quickly.  I'm sorry.

17           THE COURT:  All right.

18           MR. BALDINI:  There is also no dispute that this

19   Court has discretion in allowing interim payments of

20   professionals, and under Section 316 of PROMESA, on a motion

21   of any party, the Court may award less compensation than the

22   amount requested.  Section 316 says that, in doing and

23   reviewing applications, the Court should look at, quote, all

24   relevant factors, and then lists an enumerated set of criteria

25   that are included in the overall relevant factors.

1          THE COURT:  Well, is there anything in the reference

2    to all relevant factors and examples in 316 that would

3    implicate any sort of financial ability test at a point during

4    the Title III proceeding for the debtor?

5          MR. BALDINI:  Your Honor, in the criteria listed, we

6    don't believe there is.  We believe that those criteria are

7    not exclusive, and that all relevant factors should include

8    the Court's review of the overall administration of the

9    estate, including the treatment of administrative claimants

10   and the potential prejudice of putting some in one bucket and

11   others in another.

12         But with respect to your question, do the cri -- the

13   specific criteria listed include the issue you raised?  They

14   do not.

15         THE COURT:  The arguments that you've made, aside

16   from this gloss on 316, which is a little bit different, I

17   think, from the written arguments, the principal arguments in

18   your written submission seem to draw on Chapter 11 and Chapter

19   7 cases that recognize the concept of administrative

20   insolvency.  And particularly in Chapter 11, there's an issue

21   as to whether conversion to a 7 is appropriate when there's a

22   demonstration of administrative insolvency.

23         It's been a little difficult for me to perceive a

24   legal basis for importing that concept and that sort of

25   template into PROMESA, because a Title III case can't be

1    converted to a liquidation case.  Either the plan's confirmed

2    and the administrative expenses are paid, or the case fails

3    and nothing is discharged.

4         And so, you know, if there's anything further that

5    you want to offer as to an interim or periodic administrative

6    solvency test as being appropriate in PROMESA, I'd be glad to

7    hear it.

8         MR. BALDINI:  No, Your Honor.

9         At the time that we made this motion, we were living

10   in a world where the debtor had said to us and to the Court

11   that PREPA does not have immediate or clear access to funds

12   necessary to pay Cobra's purported claims without taking those

13   funds away from operating expenses.

14        THE COURT:  And it said that in reference to Federal

15   Government disaster repair funding, yes?

16        MR. BALDINI:  Correct.

17        We're also living in a world where the debtor

18   currently is -- has a motion pending before you which would

19   significantly increase the administrative expenses to the

20   estate.  And we believe, in light of those issues, while the

21   debtor may or may not be solvent now, and we understand that

22   the debtor has submitted a declaration at this point in time

23   that says it is, that the overall considerations of equity and

24   fairness in treating administrative claimants remains the

25   same, regardless of whether at this point in time it is

1  administratively solvent, or at another point in time it may

2  or may not be.

3          THE COURT:  Thank you.  You can go on, if you like.

4          MR. BALDINI:  So, Your Honor, we see no reason why

5  the debtor should treat administrative creditors differently

6  as a matter of equity and why the Court, in its discretion,

7  should not either suspend payments or increase the holdback

8  amounts.

9          And in response to our motion, the respondents have

10  and will tell you a few things.  The first is that they will

11  say Cobra should be treated differently.  The professionals

12  should get payment.  Cobra shouldn't, because Cobra's claims

13  are disputed.

14          And they point to three particular disputes, which

15  they have raised in the past, one of which is the ongoing

16  criminal case which I mentioned earlier.  The second is a

17  report from FEMA on the reasonableness of certain of PREPA's

18  contracts.

19          And then the third is disputes with respect to the

20  actual performance of the contracts in question, although

21  they do acknowledge in the declaration that certain portions

22  of those contracts are, in fact, undisputed.  And if you read

23  the reply papers, they're littered with hypotheticals about

24  what might happen, if and when this case is no longer stayed.

25          If the Court finds that Cobra is not entitled to

1   payment, PREPA might have claims against Cobra.  Findings in

2   the criminal case may serve as a defense to Cobra's claims,

3   and PREPA may even have claims against Cobra for disgorgement.

4   This could give PREPA a defense to further payments.

5        Your Honor, theoreticals like this are true in the

6   context of any contract dispute.  And as the reply papers

7   admit in their own -- the fees being paid to professionals are

8   also subject to disgorgement in the event that there is later

9   a dispute.

10        So given that in any contract dispute, either

11  party -- the payee may at some point later have to disgorge,

12  doesn't distinguish us from the professionals who are getting

13  paid on an ongoing basis.  And, therefore, we don't see a

14  reason to distinguish us from those who are getting paid on a

15  continuing basis.

16        Secondly, they will tell you that the professionals

17  servicing PREPA are subject to a rigorous vetting process;

18  that they've already negotiated fee arrangements; that they've

19  already assisted in several notable achievements for the

20  estate; and that withholding payments would create a chilling

21  effect for other professionals in this proceeding.

22        Your Honor, while we're sympathetic to those points,

23  they may as well be describing Cobra as well.  Cobra went

24  through a significant process to negotiate the terms of their

25  agreements, including oversight by PREPA, the Central Office

1  of Recovery, the Office of Contracts and Procurement

2  Compliance, and FEMA.  Cobra achieved perhaps the greatest

3  success in this entire proceeding to date by restoring the

4  electrical grid and ensuring the debtor a source of

5  significant revenue that it could use to administer the

6  estate.

7       The payments to Cobra, as I said before, are subject

8  to disgorgement, just as the payments to professionals are.

9  So there is nothing in what they have said that would suggest

10  that professionals should get paid while others are not.

11       And as to the supposed chilling effect, well, I think

12  that applies equally as well, because if you're going to tell

13  significant and important administrative contractors, who

14  came out of pocket in order to perform on contracts with the

15  debtor, that the debtor was going to find a legal reason to

16  not satisfy those contracts, it will equally have a chilling

17  effect on necessary administrative contractors to the debtors.

18       Finally, Your Honor, they'll talk about solvency, and

19  I think you just asked the question, and so I won't go back

20  into that.  In light of these considerations, we don't see any

21  reason why professionals should be paid and prejudice the

22  rights of other administrative creditors who are not getting

23  paid on an ongoing basis.

24       And I would add that if the Court finds that the

25  relief sought is too drastic, we have suggested that the Court

1  increase holdback amounts, through professionals, currently at

2  10 percent and 20 percent, until the quarterly true-ups.

3          Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Baldini.

5          Who else would like to -- Ms. McKeen.

6          MS. MCKEEN:  Yes, Your Honor.  Elizabeth McKeen of

7  O'Melveny & Myers on behalf of AAFAF.

8          THE COURT:  Good morning.

9          MS. MCKEEN:  Good morning, Your Honor.

10          Your Honor, as I think our papers make clear, PREPA

11  has not paid Cobra because of issues with Cobra, not issues

12  with PREPA.  PREPA has paid Cobra approximately 1.1 billion

13  dollars to date, which is many multiples it's paid all other

14  professionals in the aggregate.

15          And while Cobra claims that it's still owed

16  approximately 240 million dollars for its services, in the

17  meantime, as counsel was just discussing, its CEO has been

18  indicted because of allegations that he was engaged in

19  improper activities involving FEMA officials specifically

20  involved in approving payments to Cobra.

21          In the indictment of the CEO of Cobra, it says that

22  he provided things of value to a FEMA official in connection

23  with Cobra's contracts.  And the indictment goes on to allege

24  that as part of the conspiracy, Cobra's CEO and FEMA employees

25  worked to secure favorable treatment for Cobra as needed,

1   including specifically in connection with payments and the

2   timing of payments to Cobra.

3        The indictment also alleges that a FEMA employee was

4   negotiating a contract for employment with Cobra at the same

5   time she was responsible for evaluating performance by Cobra

6   under its contracts.  That same defendant, since we filed our

7   papers, has pled guilty.

8        As Mr. Davis of Greenberg Traurig pointed out at the

9   last Omnibus hearing, the outcome of these outstanding

10  criminal proceedings may, in fact, lead to invalidation of

11  Cobra contracts under Puerto Rico law.  They may give rise to

12  claims against Cobra.

13       As the Court also knows, there is a pending OIG

14  investigation.  And wholly apart from the indictment, PREPA

15  does have substantial disputes over the accuracy of the

16  outstanding invoices.  PREPA disputes about 80 percent of

17  these invoices, about 200 million dollars worth.

18       There are a lot of bases for the objections that were

19  detailed pretty specifically in the joint status update that

20  was submitted before the last Omnibus hearing.  These are the

21  reasons that PREPA has not paid Cobra's outstanding invoices,

22  not because of this false premise of administrative

23  insolvency.

24       Obviously unhappy that it's not being paid, and

25  undeterred by the indictment of its CEO, Cobra's response is

1    to now try to block other professionals in PREPA's case from

2    getting paid.  But parties with disputed administrative claims

3    can't just shut down a debtor's case and prevent professionals

4    from getting paid because they aren't getting what they want,

5    when they want it.  And they certainly shouldn't be able to do

6    it based on factual and legal premises that are just not true.

7         Our briefs explain why, as a legal matter, the

8    concept of administrative insolvency doesn't really apply in

9    Title III, as I think the Court just correctly noted.  But

10   before I talk about that, I want to talk about why, on a

11   fundamental level, the factual premise of the motion is simply

12   incorrect.

13        Cobra relies on the proposition, or it states that

14   PREPA is administratively insolvent because it needs federal

15   funds to engage in emergency disaster repair.  That's always

16   been true.  PREPA has always relied on the Federal Government

17   for funding for emergency repairs that are necessitated by a

18   major natural disaster.

19        Those disaster repair costs are entirely separate

20   from ordinary course business operations.  PREPA has over 400

21   million dollars in cash on its balance sheet.  That cash on

22   hand alone dwarfs the amount of potential liability to Cobra.

23   And it's generated between 40 and 80 million dollars in

24   revenue each week since November.

25        These are not the indicia of an administratively

1   insolvent debtor, not even close.  The objection should be

2   overruled for that reason alone.  And as the Court noted, the

3   concept of administrative insolvency also just doesn't really

4   apply here in Title III.  Excuse me.

5        The concept of paying these claims in connection with

6   a plan works hand-in-hand with Section 305, which doesn't

7   allow for interference with a debtor's property unless it's in

8   connection with a plan, or in the context of the Interim

9   Compensation Order, which has these clear criteria, again, as

10   the Court noted, and this isn't one of them.

11        So unless the Court has any questions --

12        THE COURT:  No.  Thank you.

13        Good morning, Mr. Barak.

14        MR. BARAK:  Good morning, Your Honor.  Ehud Barak

15   from Proskauer Rose on behalf of the Oversight Board, as

16   representative of the Title III debtors.  Excuse me.

17        Your Honor, Cobra's objection is based on two false

18   premises.  The first one is that PREPA is administratively

19   insolvent, and the second one, they argue that professionals

20   are being treated better than other post-petition claimants.

21        I'll try not to repeat what Ms. McKeen and counsel

22   for the Fee Examiner have said before me, but Cobra hasn't

23   provided any evidence of administrative insolvency.  The only

24   thing Cobra relies on is an out-of-context quote in an

25   unrelated pleading filed by the government parties --

1          THE COURT:  I'd ask that you just slow down a little

2     bit.  Thank you.

3          MR. BARAK:  Sorry.  Of course.

4          On the other hand, PREPA'S public filing and the

5     declaration make it clear that PREPA is not administratively

6     insolvent.  PREPA contemplates paying all administrative

7     claims in full, and in fact, the declarations state as much.

8          If PREPA wasn't paying administrative claims, you

9     would be having a mass of people here objecting or filing

10    motions.  This is not the case.  There is a handful of claims

11    like that that have been filed, and all are disputed and have

12    issues with -- and that goes really to what Ms. McKeen said

13    before me, that Cobra is not just a post-petition payment that

14    asked to be paid for the work they've done, but there is a

15    real reason for that.

16         And the reason it's disputed for -- at least three

17    reasons that, Your Honor, before you was stated, and I don't

18    want to repeat that.  Cobra's claim actually was paid 1.1

19    billion dollars before it was disputed.  So it was paid in the

20    ordinary course until we found there was issues with that

21    claim.

22         As Ms. McKeen has noted, PREPA has 450 million cash

23    on hand, and that's after repaying the 300 million dollars of

24    debt that Your Honor previously approved earlier in the case.

25    So PREPA is building cash in that respect.

1        It's -- I just want to turn to the quote that Cobra

2    relied on.  PREPA's need for outside funding to rebuild the

3    power grid also does not show administrative insolvency.  The

4    electric system is currently running, even without federal

5    funding.  That's an important point.

6        We don't need the federal funding for day-to-day

7    operations.  We need the federal funding in order to require

8    long-term authorization of the PREPA grid, and not for

9    ordinary course.  And that's an important issue for the

10   administrative insolvency point.

11       Turning to the other erroneous assumption that Cobra

12   relied on, that professional fees received -- that

13   professionals received preferential treatment.  Your Honor,

14   the professionals in these cases are not being treated better

15   than any other post-petition claimant.

16       It's important nondisputed, post-petition claimants

17   are being paid in full in the ordinary course, full stop.

18   While professionals, on the other hand, are paid subject to

19   this, and sometimes to greater than 30 percent, and are

20   subject to holdback.

21       Just for comparison, Your Honor, Cobra has already

22   been paid over 90 percent of its first contract.  And overall,

23   as it was stated, it was paid 1.1 billion dollars out of a 1.3

24   billion dollar claim, which is approximately 82 percent.  The

25   professional fees are subject to a review process for the

1    Court, for the Fee Examiner, who actually objected to Cobra's

2    relief.  And other parties in interest can raise objections as

3    well.

4         The critically -- professional payments are only

5    allowed a final basis and a final hearing at the end of the

6    case.  So if there is any issue with that, people can raise

7    it.  And Your Honor, under 316, has the discretion to allow

8    the fees or not to allow the fees.

9         I think, given the circumstances, Cobra's argument

10   that it has to wait while other professionals gets paid lacks

11   any credibility, and Cobra's objection is no more than a

12   litigation tactic to basically force PREPA to pay its claim.

13   And the fee objection should not be the tool to be used.

14   Cobra has filed its own motion to compel payment, and that's

15   where its claim should be addressed, not in a fee objection to

16   other professionals.

17        Which, by the way, Cobra didn't have an issue with

18   any of -- the reasonableness of any of the professionals.

19   It's just a blanket approach of just, objecting to everything

20   until I get paid.  This shouldn't be a tool.

21        Lastly, Your Honor, Cobra's request is not in the

22   best interest of the Title III case.  If professional payments

23   are further held back or cut off as Cobra requests, some

24   professional may be unable to continue.  This may have a

25   tremendous effect on the progress of the PREPA Title III case.

1              Just one point to rebuttal, and it's important to

2    note that the contract provides that if FEMA does not obligate

3    funds because of Cobra's doing, PREPA does not have to pay.

4    So the fact that there is a criminal case, and the fact that

5    the people are pleading guilty or they're found to be guilty,

6    if that is what's going to happen here, then it might have a

7    real effect on Cobra's entitlement to get paid.  And if their

8    claim is obligated and if there are no issues, then they will

9    get paid.  And the Code provides and PROMESA provides under

10   314(b)(4), we have to pay them.

11             But the timing is not now.  The timing is at

12   confirmation.  It's a confirmation requirement.  So we are

13   proceeding with the code, with the PROMESA, and there is no

14   issue there.

15             THE COURT:  Thank you.

16             MR. BARAK:  Thank you.

17             THE COURT:  Any further remarks on Cobra?  Because

18   I'm ready.

19             Mr. Baldini.  It looks like he's coming back briefly.

20             MR. BALDINI:  Yes, Your Honor.  Just very briefly, if

21   I might.  I appreciate that I'm in a bit of a box here because

22   while the debtors spent a lot of time talking about the nature

23   of the claims and the contracts, the matters are stayed.  And

24   they're telling you at the same time what they say and what

25   they mean, but also, that I should not be permitted to

1  litigate the issues about what they say and what they mean.

2      But I will say for the record that we believe it's a

3  legal fiction, that these amounts aren't due and payable, and

4  that any impact of the reasons that they list for why the

5  matter should be stayed is -- will not have an impact on

6  whether Cobra is entitled to payments here or not.

7      The second thing I would say is a lot has been made

8  about how much Cobra's been paid so far.  That, to me, is

9  irrelevant.  A 250 million dollar claim is a meaningful claim,

10  and we should focus on that as opposed to what was paid in

11  advance.  We all have businesses to run.  That is a sizable

12  claim.  We are a sizable and important constituency in these

13  proceedings.

14      That's it, Your Honor.

15      THE COURT:  Thank you.

16      I have carefully considered all of the written

17  submissions and everything that has been said here today, and

18  I will now make my ruling with respect to the Omnibus

19  Objection to Fee Applications filed by professionals and

20  Request to Increase Holdback Amount filed by Cobra, which is

21  docket entry number 9419 in the 3283 case, and the Supplement

22  to Omnibus Objection to Fee Applications filed by

23  professionals and Request to Increase Holdback Amount filed by

24  Cobra at docket entry 9752 in the 3283 case.  I will refer to

25  those objections collectively as the Objection filed by Cobra

1   Acquisitions, LLC.

2        Cobra challenges a total of 20 interim fee

3 applications, which I'll refer to collectively as the Interim

4 Fee Applications, filed by professionals retained in

5 connection with PREPA's Title III case, and further seeks an

6 order suspending current payments to PREPA's administrative

7 creditors, including professionals, until PREPA can

8 demonstrate its administrative solvency, including its ability

9 to pay Cobra's outstanding invoices.

10        In the alternative, Cobra requests an order

11 significantly increasing the current holdback amounts under

12 the Interim Compensation Order and requiring PREPA to

13 demonstrate its administrative solvency before it disburses

14 any holdback amounts following interim allowance.

15        As I said, the Court has considered carefully all of

16 the submissions and arguments.  For the reasons that I will

17 now explain, the objection is overruled.

18        The proffered factual basis for Cobra's objection is

19 an assertion in the Joint Urgent Motion of the Oversight

20 Board, PREPA, and AAFAF to extend all application deadlines to

21 Cobra Acquisition, LLC's Motion for Allowance and Payment of

22 Administrative Expense Claims filed as docket entry 8838 in

23 the 3283 case that, "PREPA relies upon FEMA funding to pay for

24 the costs of power repairs and power restoration", and

25 "Therefore, does not have immediate or clear access to the

1    funds necessary to pay Cobra's purported claims without taking

2    those funds away from paying operating expenses."

3         Relying on decisions in Chapter 11 and Chapter 7

4    cases involving administrative expense claims, Cobra contends

5    that the government parties' statement regarding PREPA's

6    reliance on FEMA funding somehow triggers an immediate

7    requirement that PREPA establish its administrative solvency

8    before it can remit further payments to professionals retained

9    in connection with PREPA's Title III case.

10        PROMESA imposes no such obligation.  Rather, as it

11   pertains to administrative expense claims, PROMESA Section

12   314(b)(4) requires only that, as a condition to confirmation,

13   a plan must provide that on the effective date of the plan,

14   each holder of an administrative expense claim, "Will receive

15   on account of such claim, cash equal to the allowed amount of

16   such claim," except to the extent that the holder of the claim

17   has agreed otherwise.

18        PROMESA does not refer to or otherwise incorporate

19   the concept of administrative insolvency, and there is no

20   liquidation alternative available in a Title III case, as

21   there is a Chapter 11 case.  Nor is there a requirement or

22   mechanism in PROMESA for measuring a Title III debtor's

23   ability to pay administrative expenses through the pendency of

24   its case prior to the plan confirmation stage.

25        PROMESA, likewise, does not restrict the debtor's

1   ability to make expenditures of its choosing along its journey

2   to plan confirmation.  Consequently, there is no legal basis

3   for Cobra's demand that the Court restrain the ability of

4   PREPA to pay its administrative expenses as they accrue and in

5   a manner that PREPA deems appropriate.

6          Sections 303 and 305 of PROMESA limit the Court's

7   ability to interfere with the property of a Title III debtor,

8   such that PROMESA does not require the submission of payments

9   to professional service providers for Court approval.

10  Nonetheless, under Section 316 of PROMESA and the interim

11  compensation construct that was, upon the motion of the

12  debtors, approved and adopted by this Court, the Court

13  considers reasonableness and necessity in connection with

14  interim fee applications, and at the final fee application

15  phase, will make an ultimate determination regarding

16  reasonableness and necessity.

17         Cobra has not challenged the interim fee applications

18  on the grounds that the fees charged were unreasonable, or

19  that the services rendered were not necessary.  Evaluation by

20  the Court of the debtor's ability to pay administrative

21  expenses is neither a feature of the supervisory mechanism

22  established by the Interim Compensation Order, nor a

23  requirement of PROMESA Section 316.

24         Accordingly, there is no legal or factual basis for

25  the relief sought by Cobra, and the objection is overruled in

1    its entirety.  The Court will enter an order consistent with

2    this decision.

3            And having rendered that decision, I now address the

4    Fee Examiner's recommendations and approve the Fee Examiner's

5    recommendations in their entirety.  The Court will enter the

6    proposed form of Omnibus order that has been submitted by the

7    Fee Examiner with its report, which approves the interim fee

8    applications listed on Exhibit A to the report; approves the

9    final fee applications listed on Exhibit B to the report;

10   defers consideration of the interim fee applications listed on

11   Exhibit C to the report; and defers consideration of the final

12   fee applications listed on Exhibit D to the report.

13           Thank you.

14           The next Agenda item is the mediation team's Amended

15   Report.  As you can see from the organization of the Agenda,

16   my intention is to address the overall construct and logistics

17   as proposed by the mediation team, and then hear any further

18   argumentation on the related motions after that and rule

19   fairly comprehensively after hearing everyone, insofar as they

20   want and need to be heard.

21           We will begin this and go until noon, break until

22   1:00 for lunch, and then come back.

23           Judge Houser, did you want to make some opening

24   remarks?

25           HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

1    HOUSER:  I do, please.

2          THE COURT:  And thank you for your work, and thank

3    you for being here today.

4          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

5    HOUSER:  You're welcome.

6          As the Court knows from your own experience in these

7    Title III cases, every relevant issue raised by every party,

8    unless settled or otherwise rendered moot, will need to be

9    addressed and resolved at some point in the confirmation

10   process, or post confirmation.

11         The question the mediation team had to address in its

12   Amended Report, and this Court will have to address as it sets

13   the schedule for moving forward in these cases, is the

14   relative priority of when and how the complex matters and

15   issues are phased for resolution.  In developing our

16   recommendations for the process for resolving the many

17   contested matters and adversary proceedings, we have acted as

18   neutrals, bearing in mind the preservation of resources and

19   the process that is due every party.

20         Phasing litigation involves judgment calls and

21   tradeoffs, so it is to be expected that our recommendations,

22   as set forth in our Amended Report, have generated comment and

23   disagreement.  Every attorney appearing here today has a

24   responsibility to push and argue for the interests of their

25   client, but only their client.  And, of course, to each of

1   those clients, its issues are the most important issues and

2   must be heard early in the anticipated process.

3         The mediation team simply tried to weigh those

4   competing and conflicting interests and propose a process to

5   resolve the most important issues that will likely have the

6   biggest impact on moving these cases forward in a meaningful

7   way, given everything we know about the issues in the cases;

8   and equally importantly, in a way that we hope will facilitate

9   the building of more consensus as we move forward in these

10  cases towards confirmation.  But ultimately, Judge Swain, the

11  decision on how to manage these cases falls to you, and to you

12  alone.

13        To set the stage for my further comments, I'd like to

14  remind everyone why you made the decision to appoint a

15  mediation team and what the mediation team's role was directed

16  by you to be in these cases.  Under your original Order, the

17  mediation team was appointed "To facilitate confidential

18  settlement negotiations of any and all issues and proceedings

19  arising in the Title III cases and proceedings;" and "To

20  further the goal of the successful consensual resolution of

21  the issues raised in the Title III debt adjustment

22  proceedings."

23        That original charge was fairly broad, but it was

24  then broadened by this Court's July 2019 Stay Order, in which

25  this Court directed the mediation team to attempt to bring

1    order to the litigation chaos that was before it, via agreed

2    scheduling orders if possible, or, absent that, a report

3    addressing the various pending contested matters and adversary

4    proceedings then subject to your stay, and a schedule for a

5    plan and disclosure statement process.

6         In particular, the Stay Order described the

7    "Procedural matters" to be addressed as the "Relative priority

8    of issues to be addressed by the Court, the appropriate

9    process through which issues should be addressed by the Court,

10   and the recommended timing of the Court's consideration of

11   those issues."

12        The mediation team understood what it was being asked

13   to do and took seriously your direction.  It also took

14   seriously the Court's initial direction that we attempt to

15   facilitate confidential substantive settlement negotiations.

16   The mediation team worked continuously through the fall and

17   winter, and the last few months, on the parallel substantive

18   and procedural paths that you directed.  This is all detailed

19   in our Amended Report, and I don't feel the need to repeat or

20   reiterate that here.

21        While some parties may take issue with the structure

22   of the substantive mediation that led to the Plan Support

23   Agreement as amended, and I understand their frustration over

24   being excluded from that process, the mediation process is not

25   currently before the Court today.  But with that said, I will

1   make two observations about the mediation process.

2          The fact that decisions had to be made as to who

3   would participate in substantive mediation was addressed by

4   you in your Stay Order when you directed that parties

5   "Identified by the mediation team leader" would participate in

6   "Any mediation session scheduled by the mediation team

7   leader."

8          I simply did what you Ordered.  I identified the

9   parties who would participate in substantive mediation in

10  order to attempt to achieve some consensus in these cases and

11  to begin to build towards a less contentious confirmation

12  hearing.

13         And importantly, the mediation process was successful

14  in achieving an agreement supported now, as Mr. Rosen

15  indicated earlier this morning, by the holders of in excess of

16  10.5 billion dollars of GO-PBA claims.  A substantial increase

17  from the amount of support for the September 2019 plan, which

18  was negotiated without mediation team involvement.

19         But turning away from the mediation process and to

20  what is before the Court today, are our scheduling

21  recommendations going forward.  And while those

22  recommendations are informed by the Plan Support Agreement,

23  and now the Amended Plan and Disclosure Statement have been

24  filed, those documents have been signed and filed, so further

25  discussion of the process that led to them is not terribly

1   relevant to the scheduling issues before you, nor does it seem

2   especially appropriate to me to debate the merits of the

3   Amended Plan Support Agreement, or whether the Plan, as

4   amended, that embodies it, is confirmable.

5        As the Court can tell from the objections you have

6   been studying, the parties have widely differing views on

7   those questions, but the Amended Report does not opine on the

8   confirmability of the Amended Plan, and those questions are

9   not before the Court today.  There will be plenty of

10  opportunity, as we move forward in the adjudicative process,

11  for the parties to be heard on the merits, or, as some would

12  say, the demerits of the Amended Plan.

13       The focus today is, as it should be, on the schedule

14  for the coming months, and what to do with the myriad of

15  contested matters and adversary proceedings that are pending

16  before the Court, all of which is addressed at length and in

17  detail in the mediation team's Amended Report.

18       One final preliminary observation that seems fairly

19  obvious, but perhaps bears highlighting.  The corollary to the

20  mediation team's role as a neutral in these cases is the

21  Oversight Board's role as the party in interest and the only

22  party to which Congress granted the right to propose a Plan of

23  Adjustment in these Title III cases.

24       In the end, it was the Oversight Board who chose to

25  enter into the amended PSA on the terms contained in that

1   agreement and to file and pursue confirmation of the Amended

2   Plan.  The mediation team simply facilitated the related

3   negotiations.

4        Against this background, the mediation team's

5   recommendations as set forth in its Amended Report were driven

6   by several factors, including, first, a desire to minimize the

7   burden of these cases on the Court in a way that is fair to

8   all of the parties; second, to ensure resources of both the

9   parties and the Court are not unnecessarily expended; third,

10  to foster consensus among the parties to the extent possible;

11  fourth, establish a process through which this Court can

12  determine whether Plans of Adjustment for the Commonwealth,

13  PBA and ERS are confirmable; fifth, ensure the process to

14  consider confirmation of those plans complies with applicable

15  law and is fair and appropriate under the circumstances of

16  these cases; and sixth, the age of the cases and the effect of

17  the continuation of the cases on all parties, including the

18  people of Puerto Rico.

19       After considering those factors and everything that

20  the mediation team knows about these cases and the issues

21  raised in them, the mediation team has come to some

22  conclusions.  First, the only way to develop consensus here is

23  through incremental steps.  It goes without saying that these

24  cases are extraordinarily complex.

25       There are many, many parties involved in the cases

1    generally and in the mediation process specifically.  The

2    parties' views and economic interests are extremely diverse.

3    You have many debtholders or insurers across the capital

4    structure.

5        And, for example, a GO deal might not be acceptable

6    to certain parties unless and until they understand what they

7    might recover at, for example, the Highway Transportation

8    Authority, or another instrumentality of the Commonwealth of

9    Puerto Rico, because of those cross-holdings that do cut

10   across the capital structure.

11       Given these complexities, among many, many others, I

12   do not believe that there is a way to get everyone in a big

13   room simultaneously to cut a global deal on a fully consensual

14   plan.  It is simply not possible.  To quote a member of the

15   mediation team, "We are mediators, not magicians."

16       So the only other alternative is to try and build as

17   much consensus as possible on an issue-by-issue basis before

18   starting down a path to a confirmation hearing, which is the

19   approach that the mediation team undertook in the fall and

20   winter of 2019, and which led to the execution of the amended

21   PSA and the filing by the Oversight Board of the Amended Plan

22   and Disclosure Statement in late February of 2020.

23   Importantly, the amended PSA is only the first step in what

24   the mediation team believes must be a multifaceted process.

25       So where are we today?  As the objections make clear,

1   there are at least four significant groups of parties in

2   interest that remain to be addressed:  AAFAF, and the

3   Government of Puerto Rico, the so-called clawback creditors,

4   the ERS creditors, and the Unsecured Creditors Committee.  And

5   obviously, not to overlook them, there are some GO-PBA

6   creditors who are not yet satisfied with the proposed global

7   settlement set forth in the Amended Plan.  If the Court adopts

8   the mediation team's recommendation to stay the GO-PBA related

9   litigation, the confirmation hearing will determine whether

10  those parties become bound to the settlement if the Amended

11  Plan is confirmed.

12         Regarding the other four significant groups that

13  remain in the mediation team's mind to be addressed, I'd like

14  to make the following observations.  First, conversations are

15  ongoing among the Oversight Board and the Government of Puerto

16  Rico that, at least I hope, will prove successful in resolving

17  the government's current disputes with respect to the Amended

18  Plan.  Obviously time will tell with respect to those

19  conversations.

20         Second, with respect to the ERS creditors, it is my

21  hope that a further agreed scheduling order will be presented

22  to you relatively soon by the government parties and the

23  committees on the one hand, and the ERS bondholders and fiscal

24  agent on the other hand, to address certain legal issues and

25  disputes among those parties, which should facilitate

1   consideration of confirmation of the Amended Plan.

2        I hope that agreed scheduling order can be presented

3   to you in the next ten days or so, and it is my view that

4   until you weigh in and provide the parties with your views

5   regarding the merits of the party's respective legal

6   positions, I believe it will be difficult to make progress in

7   mediation.  Or, as stated another way, rulings from this Court

8   on certain critical issues, including asserted administrative

9   claims by the ERS bondholders against the Commonwealth, will

10  assist the parties in the mediation process.

11       Turning next to the Unsecured Creditors Committee.

12  Mr. Despins has filed various pleadings in which he raises

13  certain concerns over the confirmability of the Amended Plan

14  as it relates in particular to the treatment of his

15  constituents.  Obviously, those issues will have to be

16  addressed at some point in the confirmation process.  The

17  question is when.

18       In the view of the mediation team, you will have to

19  make the final decision on how to prioritize your precious

20  time, given the many, many issues that will be and have been

21  raised; but at least the judgment of the mediation team is

22  that the issues that the Unsecured Creditors Committee are

23  raising can be addressed later in the confirmation process

24  than he prefers.

25       That leaves the so-called clawback claims and the

1   relative rights of those parties against the Commonwealth.

2   These issues are significant, and the parties' opposite views

3   on them make it exceedingly difficult to attempt to settle

4   them through mediation without some guidance from this Court.

5   And that is why we believe these issues deserve the Court's

6   immediate attention on the schedule largely recommended in the

7   Amended Report.  I'll come back to that report at the end of

8   my remarks.

9            As you know from the Amended Report, the mediation

10  team has selected key issues on which the parties disagree and

11  on which we believe rulings from you will be of assistance to

12  the parties and to the mediation team.  It remains my view

13  that until this Court weighs in and provides the parties with

14  its views regarding the merits of their respective legal

15  positions, it will be difficult to make progress in

16  substantive mediation.

17           So how do we move forward?  As I've just stated, it

18  will be difficult to achieve complete consensus on a plan of

19  adjustment for the Commonwealth, PBA and ERS.  There are

20  simply too many competing views and disparate interests.  But

21  the best way to build as much consensus as possible is to

22  begin to move forward toward what will now be a contested

23  confirmation process.  Rulings along the way to confirmation

24  should be a, my word, reality check for the parties, and

25  should facilitate the mediation team's continuing work to

1   attempt to build more support for confirmation of a plan of
2   adjustment before we actually get to that formal confirmation
3   hearing.

4        Delaying the confirmation process further is not
5   helpful in the opinion of the mediation team.  Parties are not
6   entitled to confirmation of a consensual plan, as much as I
7   would like that, and I'm sure this Court would like that, too.
8   Nor are creditor parties entitled to hold up the confirmation
9   process indefinitely to pursue litigation in the Title III
10  court or elsewhere.

11       But what those parties are entitled to is a fair
12  process through which any objections they have to confirmation
13  of a plan of adjustment are fully and fairly heard by this
14  Court.  It is simply premature today to know if the schedule
15  proposed by the Oversight Board will provide that full and
16  fair opportunity to be heard.

17       What can be said today is that the time line
18  suggested by the Oversight Board satisfies the legal
19  requirements for confirmation.  But instead of delaying
20  today, because the process being suggested might not build in
21  sufficient time, the mediation team suggests that we start
22  down the confirmation path on a specific schedule, with the
23  understanding that if this Court is convinced along the way
24  that parties are not getting that full and fair opportunity
25  to be heard, you'll adjust the schedule as the process moves

1    forward.  In short, if we don't start, we can never finish.

2         To be clear, the mediation team is not an advocate

3    for confirmation of the Amended Plan.  We have been and remain

4    neutral.  However, as neutrals, and after carefully reviewing

5    all of the issues raised by all of the parties in their

6    responses and objections, the mediation team remains convinced

7    that all parties and the cases are best served by moving

8    forward in a manner consistent with the recommendations set

9    forth in our Amended Report, with one exception due to changed

10   circumstances that have occurred since the filing of our

11   Amended Report.

12        I will admit that I have not had the opportunity to

13   discuss this suggestion with the parties, but will propose it

14   now because it seems that this is the appropriate time to

15   propose it, so that you can ask questions about it and,

16   similarly, they can ask questions about it and raise concerns

17   over it, if they have any.

18        So let me turn to the revenue bond Scheduling Order

19   that was attached to our proposed Amended Report.  And at

20   least in my proposed redline version of that Order, Your

21   Honor, this is on page seven-ish, which is the summary

22   judgment motion practice section of that proposed schedule --

23   I'm going to pause to let the Court get there and other

24   parties to get there as well.

25        THE COURT:  So this starts with the bullet that says,

1    "Limited summary judgment motion practice?"

2              HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

3    HOUSER:  Yes.

4              THE COURT:  I'm there.

5              HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

6    HOUSER:  So the earlier sections leading to that provided for

7    the opportunity to answer, move to dismiss, file cross-claims,

8    et cetera.

9              On February 27, consistent with this proposed

10   schedule, the defendants filed motions to dismiss.  It is my

11   understanding that no one answered or filed a cross-claim or

12   counterclaim.  They simply filed motions to dismiss.  And

13   what's prompting the mediation team to consider adjustments to

14   the schedule is the fact that at the time we filed the Amended

15   Report, we believed there would be a lift stay hearing

16   slightly earlier, tomorrow, than it proves that it will

17   ultimately be.

18             The schedule has shifted.  Rather than have a

19   preliminary lift stay hearing tomorrow, that preliminary lift

20   stay hearing is now April 2nd.  So some of our other

21   recommendations actually proceeded off of an assumption that

22   we would have a March 5th preliminary lift stay hearing, which

23   was the then thinking on it.

24             And so the dates -- a question that easily arises is

25   what should we do now that we know that April 2nd is the

1    preliminary lift stay hearing, not March 5th?  And the answer

2    to that is there is no perfect solution.  But let me tell you

3    what my suggestion to the Court is.  I stay with my premise in

4    the Amended Report that a disclosure statement hearing should

5    occur on June 3rd.

6             I remain convinced that the clawback issues that have

7    been identified in the Amended Report are best ruled on, if

8    possible, prior to the Disclosure Statement hearing.  That

9    gives us a compressed time frame in which to work.

10            We have April 2nd to June 3rd, assuming that the June

11   3rd date is the date this Court ultimately determines is

12   appropriate for a disclosure statement hearing.  And the

13   reason why, as I've said in the Amended Report, it is

14   significant to address these issues prior to approval of a

15   disclosure statement, and ultimately solicitation on a plan

16   and disclosure statement, is because some of the clawback

17   issues could be significant impediments going forward, if the

18   Oversight Board's view of those issues is incorrect, and the

19   bondholders or those clawback creditors' view is determined to

20   be correct.

21            So knowing the answer to that question before we

22   proceed down a solicitation path would be, in my view,

23   exceedingly helpful to the process.  So in an imperfect world

24   of trying to move forward with these cases in as prompt a

25   fashion as possible, my suggestion is as follows.  You can't

1   make the parties withdraw their motions to dismiss, but it is

2   also true that rulings on motions to dismiss are not often

3   terribly substantive.  And, therefore, we suggest you collapse

4   the schedule and have the motions to dismiss and the summary

5   judgment schedule be concurrent.

6         The motions to dismiss are on file.  And what we

7   suggest is that they can be heard simultaneously, and that the

8   schedule be modified as follows.  We had cross-motions for

9   summary judgment to be filed on March 16th in our original

10  proposed schedule.  We would suggest moving that to March

11  27th.

12        It's not perfect.  We won't know how you are looking

13  at the preliminary lift stay issues, but the parties can file

14  motions for summary judgment in advance of that ruling.

15        It's not life-threatening.  They can assume whatever

16  they want to assume and file the motions for summary judgment

17  on the counts that we have suggested without knowing your

18  thinking on the preliminary lift stay issues.

19        Secondly, responses to cross-motions for summary

20  judgment would be filed April 24th, instead of April 14th.

21  Replies on May 15th, instead of May 4th.  And then a hearing

22  on the motions for summary judgment and motions to dismiss, we

23  would suggest be scheduled thereafter, but in May, presumably

24  at a special setting that the Court would have to allow

25  because of the June 3rd Disclosure Statement hearing.

1          With respect to the conflict-related motions, that

2     schedule likely needs adjustment in light of the delay with

3     the preliminary lift stay hearing.  And the suggestion that we

4     make with respect to that is that the deadline for filing any

5     conflict motions be the later of 15 days after your ruling in

6     connection with the preliminary lift stay hearings, and the

7     later of your ruling, 15 days following your ruling, and the

8     First Circuit's decision in the 926 appeal, which was argued

9     before the First Circuit in Boston yesterday.

10         And then the deadlines still flow, because they were

11    keyed off of that.  So objections to the conflicts motion, 14

12    days.  Replies, seven days following the deadline.  And then a

13    hearing held on the conflicts motion.  Our suggestion is that

14    we put that at the Disclosure Statement hearing on June 3rd.

15         With those exceptions, we have studied all of the

16    objections and responses that have been filed to our Amended

17    Report.  We believe that otherwise, the Amended Report

18    recommendations remain sound, and we look forward to answering

19    any questions that you might have.

20         THE COURT:  Thank you, Judge Houser.  Thank you very

21    much.  I suspect I will want to hold my questions for you.

22         I take it that from what you've just said on summary

23    judgment scheduling and collapsing it with motions to dismiss,

24    you think it is worth the layering of continued attention to

25    the motions to dismiss, along with the summary judgment motion

1    practice, and the conflict motion practice, rather than, for

2    instance, staying the motion to dismiss to facilitate focus on

3    the other two?

4          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

5    HOUSER:  I am perfectly fine with you staying the motion to

6    dismiss practice.  I did -- I do not find that likely to be

7    terribly helpful or insightful.

8          But anticipating that those who wanted to file

9    motions to dismiss may be opposed to that, I am okay with them

10   being collapsed, if you believe it appropriate.  But I would

11   be very satisfied with the motions to dismiss being stayed and

12   proceeding to the targeted  summary judgment practice that we

13   recommended initially.  I think either can work, and it's

14   ultimately the Court's decision.

15         THE COURT:  And may I also assume that if the parties

16   were amenable to a later summary judgment cross-motion filing

17   date that would be shortly after the lift stay argument date

18   to facilitate whatever tea leaf reading might be associated

19   with that, with the assumption of advanced preparation of a

20   buffet menu of arguments and a shortened response time in

21   order to keep to the reply and argument schedule that you've

22   suggested, if the parties were amenable to that, you wouldn't

23   have any major structural objection to that?

24         HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

25   HOUSER:  Absolutely not.

1          THE COURT:  Thank you.  I believe that is it for me

2     for now.  Thank you so much, Judge Houser.

3          HONORABLE UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

4     HOUSER:  Of course, Your Honor.

5          THE COURT:  So we have 23 minutes to use well before

6     the lunch break.  Who is up next?

7          Good morning.

8          MR. FIRESTEIN:  Good morning, Your Honor.  Michael

9     Firestein of Proskauer on behalf of the Oversight Board.

10          I have two process questions.  One, I stepped up to

11     the mic because other than Mr. Despins, I'm the closest to the

12     microphone, but I don't think that the parties had laid out

13     for themselves in what order you were hoping or expecting that

14     the speakers would come up.

15          We're happy to do it in any order that the Court

16     prefers.  We had thought that Judge Houser would be the first

17     to speak.  It turned out that way.  If you're looking for

18     those who are more proponents of the mediation report to speak

19     first or second, we're happy to do that.

20          THE COURT:  My idea was proponents and then

21     opponents, but do you have another --

22          MR. FIRESTEIN:  Yes.  The second issue, Your Honor,

23     is in order to fully address what Judge Houser has said, and

24     she correctly pointed out that her news this morning from the

25     podium is news to all of us in terms of the scheduling, I

1    would at least like the opportunity to discuss with my

2    colleagues our view, because as you might imagine, there are a

3    number of team members who are involved in all of these

4    various motion practices.  And before I assert what our

5    position is, even though I know what I think in my own head,

6    I'd like to make sure that what I think is consistent with

7    what some of my colleagues think as well.

8         My bet is that most of the other people here are

9    going to have that opportunity over the lunch.  I don't know

10   that it's going to take me all that long to do it.  I'm happy

11   to speak first.  I'm happy to do whatever the Court wishes to

12   do under the circumstances.  I think our positions are rather

13   set forth in writing already.

14        THE COURT:  Well, why don't we do this.  Let's take a

15   hard ten-minute break until ten to 12:00, and then plan to

16   start the lunch break at 12:15, which I think lets people get

17   to the cafeteria.  And the lunch break would be 12:15 to 1:15.

18   And then I could hear 25 minutes of remarks before we break.

19   Does that make sense?

20        MR. FIRESTEIN:  It's completely fine.  I think, Your

21   Honor, you will find that our remarks -- and when I say "our,"

22   I mean on behalf of the Board, and I'm splitting some time

23   with Mr. Rosen on some of these collective issues -- will

24   probably not be complete, or they might well be complete by

25   12:15, plus or minus, you know, within five minutes of it, one

1  way or the other.  But we'll accede to the Court's wishes,

2  whichever which way you want.

3        THE COURT:  Well, I had you down for 40 minutes.  If

4  you tell me at 12:15 that if I give you another five minutes

5  or ten minutes, you're done and reserving everything else for

6  rebuttal, I'm open to hearing that.

7        MR. FIRESTEIN:  I think that's the way it's going to

8  go.  I think we'll reserve some time.  And, I mean, we haven't

9  clocked it, but my guess is we're probably going to talk for

10  20 minutes or so, subject to whatever --

11        THE COURT:  Okay.  So let's stop talking now and

12  start talking again in ten minutes at ten to 12:00 by that

13  clock.  Thank you.  See you all shortly.

14        MR. FIRESTEIN:  Okay.

15        (At 11:39 AM, recess taken.)

16        (At 11:53 AM, proceedings reconvened.)

17        THE COURT:  Mr. Firestein.

18        MR. FIRESTEIN:  Good morning, Your Honor.  Still

19  morning.

20        THE COURT:  Still morning.

21        MR. FIRESTEIN:  Michael Firestein of Proskauer Rose

22  on behalf of the Board.  This will be brief.

23        We have had an opportunity to consider both the

24  Court's observations and Judge Houser's remarks, including the

25  proposed revisions that she had suggested to the Revenue Bond

1   Order.  We continue to support the schedule, even as modified

2   by Judge Houser's proposal.

3           We further are agreeable to the notion of staying the

4   motions to dismiss for the reasons that were articulated by

5   Judge Houser, in the hopes that on or near the date of the

6   preliminary hearing that ultimately occurs, some guidance will

7   be forthcoming from the Court, we hope.  I think all parties

8   are hopeful for that, relative to some of the key issues

9   and --

10          THE COURT:  It's certainly my intention to rule on

11  matters as promptly as I can, consistent with thinking about

12  them appropriately.

13          MR. FIRESTEIN:  I'm sure there was never a doubt on

14  anyone's part in the gallery here today.

15          And other than that, I think that our interests and

16  the Court's interests would be best served by simply reserving

17  our time to hear what the other parties say in response to

18  this, since we originally had submitted our support of the --

19  of the Amended Report and the schedule that was proposed.

20          We've now articulated that we are amenable to the

21  edits that Judge Houser has indicated, including, more

22  specifically, the stay of the Rule 12 motions, but however

23  that shakes out, it shakes out.  And I think Mr. Rosen wanted

24  to make just a couple of observations, and then we'll reserve

25  the balance.

1          THE COURT:  Before you go, and it may be that this is

2     something that you want to defer to Mr. Rosen, and I almost

3     hesitate to do this, because I don't want to get too weedy

4     here, but I need something clarified for me.

5          MR. FIRESTEIN:  Of course.

6          THE COURT:  Which is that I read Mr. Despins to be

7     arguing strenuously that there are overlapping priority and

8     preemption argument issues that would come up in the revenue

9     bond litigation as it's proposed to go forward.  That would

10    also implicate GO bonds and, therefore, the stays and all that

11    follow.  But it also seemed to me that the specific

12    recommendations about topics for the early summary judgment

13    motion practice might have been crafted to cut out or avoid at

14    least some of those issues.

15         So if you can give me some quick reaction as to

16    whether there really is an overlap, in your view, that I need

17    to take into account in considering the proposed complete stay

18    of GO bond issues, I would be grateful.

19         MR. FIRESTEIN:  Well, clearly the preemption issue is

20    present on both sides of the equation.  I don't believe that

21    the matters are identical.  People come from different

22    positions relative to that, at least on the GO side.  There

23    are, you know, direct obligations of the Commonwealth, as

24    distinguished from whatever else is going on.  But

25    nonetheless, I can't reject the notion that preemption is

1  relevant, however, and clearly that is going to be addressed

2  in the context of the revenue bond motions.

3        But the fact remains that, like many cases, say, for

4  example, in the case of a joint tortfeasor where someone

5  settles a case because they're able to reach consensus or

6  agreement with respect to a particular set of issues, and I

7  don't mean to equate a Title III case under PROMESA with a

8  joint tortfeasor case, but, you know, parties do have the

9  opportunity to resolve their matters based upon what they

10 think is in their best interest at the time.

11       And I don't think that by pulling on that string,

12 that Mr. Despins can attempt to unravel all the effort that

13 was undertaken to build together the consensus and this

14 massively comprehensive deal that has now struck a harmonious

15 note with 10.8 billion dollars worth of GO-PBA claims.

16       So not withstanding the existence of potential

17 overlap of issues, I don't think that that should stand in the

18 way of parties who are prepared to resolve their matters from

19 having the opportunity to do so, and I think we need to sort

20 of see how things progress.

21       Maybe there will be other events that unfold in the

22 coming weeks, but today is not that day to decide whether

23 those are, in fact, exactly the same or not exactly the same,

24 for the same reason that Judge Houser articulated that today

25 is not the day to prejudge whether the PSA is appropriate or

1    the Plan is confirmable.

2         I think that the briefing that is going to need to be

3    filed with respect to some of those issues might shed light,

4    and the Court invariably reserves the right at another time to

5    visit matters that are pertinent to the issue of Plan

6    confirmation.  But as I sit here or stand here right now, I do

7    not see that as an impediment to going forward with the

8    current schedule and the current motion schedule that is set

9    forth between the parties who are really in quite vigorous

10   disagreement over the substance of a whole host of issues, of

11   which preemption is simply one.

12        THE COURT:  Thank you.  And does that same thing go

13   for whether there are priorities under PROMESA?

14        MR. FIRESTEIN:  Yes, Your Honor.

15        THE COURT:  Thank you.

16        MR. ROSEN:  Thank you, Your Honor.  Brian Rosen from

17   Proskauer on behalf of the Oversight Board.

18        Your Honor, like Mr. Firestein, we absolutely concur

19   with what was said by the mediation team leader, but I rise

20   because there were a few other items, perhaps later in the

21   agenda, and you wanted to deal with them later, like the

22   presolicitation motion.  We view those as sort of all bound

23   up.

24        So I just wanted to address that very quickly for the

25   Court, if you don't mind.

1              THE COURT:  That's fine.

2              MR. ROSEN:  Your Honor, we filed this

3    Presolicitation Motion with respect to ERS.  And maybe it was

4    the wrong title for the pleading itself, because it's really

5    our effort to get more information concerning what claims

6    might exist at ERS and to be able to properly reach out to all

7    of these people who might have asserted these claims now or in

8    the future.

9              And we gave in our papers, Your Honor, different

10   scenarios as to who these people might be.  They work there.

11   They currently work there.  They now work somewhere else.  But

12   the problem is that ERS doesn't have all of that information.

13   So we merely tried to ask the Court for approval of a process

14   to reach out to these people and to get that information so

15   that we could, in the context of soliciting acceptances or

16   rejections to the Plan of Adjustment, be able to touch base

17   with all of these appropriate people and, in fact, understand

18   what their claims might be.

19             It's not really an effort to expand or have a new bar

20   date, Your Honor.  It's really to find out who they are.  So,

21   Your Honor, we proposed a scenario within the motion itself,

22   and we really received, I would say, two responses from the

23   two committees, the Retiree Committee and the Unsecured

24   Committee.  There were other pleadings filed, just reservation

25   of rights, Your Honor, but these two people, these two groups,

1 did have a suggestion.

2         One was to expand the period in which our reach-out

3 would occur.  And so what we did is we made earlier the period

4 in which we could actually go out and solicit or send notices

5 out, and we extended the period one week on the back end,

6 creating a two week greater period.

7         There was also a request, Your Honor, that we have

8 physical locations available on island so people could

9 actually walk in and hand in these one-page pieces of paper,

10 or they could do it online, Your Honor.  We tried to offer

11 both scenarios.  We included both of those, Your Honor, in a

12 filing that we submitted to the Court at the same time that we

13 filed a response to the various objections with respect to

14 setting the Disclosure Statement hearing.  We did an Omnibus

15 reply.

16         We hope, Your Honor, that that subsequent Notice of

17 Presentment is sufficient to address these concerns.  We know

18 that it is with respect to the Retiree Committee.  And they

19 have said that they have no further issues with respect to the

20 request.  The Unsecured Committee, although we did address

21 their concerns, they did indicate that they were not prepared

22 to withdraw their objection, however, to that.

23         So Your Honor, with that, we would ask the Court to

24 approve the process, the schedule that is laid out by the

25 mediation team leader.

1            THE COURT:  So I have a couple of concerns from the

2    Court's perspective, and one is -- they're related, but

3    basically it has to do with foot traffic.  As we read the

4    motion, it seemed to identify a universe that's potentially

5    hundreds of thousands of people, some of whom you have

6    information about, some of whom you don't, but you're

7    proposing to kind of notify the world that within this group

8    of 400,000 people, there are some people you know something

9    about and some people you don't.

10            MR. ROSEN:  Correct.

11            THE COURT:  And given the response on the Bar Date

12    Order and some other things, and what seems to be kind of

13    local practice of wanting to make sure, conceivably at the

14    physical locations, you could have hundreds of thousands of

15    people showing up to say, do you know enough about me; let me

16    tell you something more about me.

17            MR. ROSEN:  Right.

18            THE COURT:  So for any location, that could be

19    overwhelming.  If it's the courthouse, we get ground to a

20    halt.  So one question is whether there is some mechanism,

21    some online registry, some phone number, something that people

22    could call to find out whether they're a person you have

23    questions about, or whether they're okay, to perhaps filter

24    down some things.

25            And, in any event, to the extent you are proposing to

1    have people come to courthouses, any approval of this motion

2    -- my approval in principle of the motion, if I grant it, will

3    be subject to your being able to work out with the Court

4    Clerk's Office whether we have the ability to host it.  And if

5    we tell you not, it's going to be not.

6         MR. ROSEN:  Your Honor, in the proposed Order, we

7    have five locations.  Two of those are -- well, one of those

8    is here, and the other is the Toledo Federal Building and U.S.

9    Courthouse as well, the clerk's office in both of those

10   places.  If we cannot --

11        THE COURT:  But isn't that --

12        MR. ROSEN:  Well, there are two -- no.  One is here.

13        THE COURT:  Old San Juan and here, or Ponce and here?

14        MR. ROSEN:  This is -- they're both San Juan

15   addresses.

16        THE COURT:  This is Federico Degetau --

17        MR. ROSEN:  Right.  And then there's the Jose Toledo

18   Federal Building and U.S. Courthouse.

19        COURTROOM DEPUTY:  That's Old San Juan.

20        THE COURT:  That's Old San Juan.  Okay.

21        MR. ROSEN:  Yes.  Yes.  We do have -- we have

22   arranged, Your Honor, at the other locations, the other three

23   -- certainly for Prime Clerk people, we can embed the Prime

24   Clerk people here as well.  And if the Court, the Clerk would

25   permit, to have a separate place so that they, in fact, do not

```
 1    even, you know, get involved and get -- impact the Clerk's
 2    Office.
 3            I don't know if that's doable, but --
 4            THE COURT:  Apparently the space that we provided for
 5    that for the claims --
 6            MR. ROSEN:  Was insufficient?
 7            THE COURT:  Well, it's now been repurposed.  So --
 8            MR. ROSEN:  Oh.
 9            THE COURT:  --- that's why we shouldn't take it up
10    today, because there's so much.  We shouldn't take up today
11    with logistical problems; but I'm putting you on notice that
12    there are potentially significant logistical problems, and
13    you'll need to talk to my operational friends here.
14            MR. ROSEN:  That's fine, Your Honor.  If necessary,
15    what we'll do is we'll find additional or alternative
16    locations within San Juan itself so that it doesn't even
17    impact the court at all.  We'll work that out.
18            THE COURT:  It's very much appreciated.
19            MR. ROSEN:  Absolutely.
20            With respect to the online, I will inquire as to
21    whether or not that's doable.  I think one of the problems is
22    that ERS, because of the hurricanes that actually hit, they
23    don't -- they lost a lot of their materials.  And it's
24    difficult to answer the question of "do you have information
25    on me," because they may not; and, therefore, someone can't
```

1    answer the question at all.

2         So we can try to do our best.  We can try and have a

3    hotline available.  We can speak with the -- not only the

4    people at ERS, but the people also that have been assisting us

5    at A&M, and AAFAF, et cetera, to see what the best logistic

6    is.  And we can certainly inform the Court as to what that is.

7         THE COURT:  I'd be grateful.  We just remember the

8    lines and lines of people wrapping around the block in the hot

9    sun, and you don't want to do that to them or us if there's a

10   way to avoid that.

11        MR. ROSEN:  Absolutely, Your Honor.  Any other

12   questions?

13        THE COURT:  No.  That's it.  Thank you.

14        MR. ROSEN:  Thank you.  I think that's all from our

15   standpoint with respect to the Amended Report, Your Honor.

16        THE COURT:  Thank you.

17        So it's now almost ten after 12:00.  Mr. Despins, do

18   you want to speak now or after lunch?

19        MR. DESPINS:  I'm just going to take ten seconds.

20        THE COURT:  Mr. Despins.

21        MR. DESPINS:  For the record, Luc Despins with Paul

22   Hastings for the Committee.

23        Mr. Rosen is right that they resolved the lockbox

24   issue.  The other issue that's open is how long do they have

25   to submit those.  And the bid and the ask right now, they're

1   offering May 7th.  We said May 31st.

2          And the reason for that is just that the people of

3   Puerto Rico have been through a lot.  We need to give them a

4   lot of time to respond to these things.  This is not my call.

5   I've talked to the Committee members about this.  They are

6   local people, and they are telling us they need that much

7   time.  But that's, of course, completely within Your Honor's

8   discretion.

9          Thank you, Your Honor.

10          THE COURT:  So have you and Mr. Rosen talked about

11  what an extension to May 31st would do with respect to plans

12  for solicitation if the Disclosure Statement stays on track?

13  Because I imagine that's why they're trying to keep it

14  close.

15          MR. ROSEN:  That was exactly our concern, Your

16  Honor.

17          THE COURT:  You need to share the microphone with

18  Mr. Despins, a duet.

19          MR. ROSEN:  Alphonse, Gaston.  No.

20          Your Honor, that was exactly our concern.  We didn't

21  want to keep getting closer and closer to the Disclosure

22  Statement hearing, because of the quick turnaround that might

23  be necessary for solicitation purposes and the distillation of

24  all the information that would come in in response to the

25  request that we would throw out there.

94

1          We thought by enlarging the period, not only getting

2    it out sooner and going one week longer, we addressed that

3    concern.  If there is a little bit of leeway, it might be, I

4    think at most, another seven days.  But I don't think we feel

5    comfortable getting notices out to everybody or solicitation

6    packages out to everybody if we go closer and closer to the

7    Disclosure Statement hearing.

8          THE COURT:  All right.  Mr. Despins.

9          MR. DESPINS:  I think we can resolve this.  We'll

10   take the additional seven days.

11         MR. ROSEN:  We will go to May 14, Your Honor.

12         THE COURT:  Okay.  Great.  So you will submit a

13   revised proposed order that also has the caveat that the final

14   either is the product of the discussion with the operational

15   people or caveat for --

16         MR. ROSEN:  We will do it before that, Your Honor,

17   because we want to make sure we don't have multiples.  So

18   we'll discuss the operational concerns first.

19         THE COURT:  Very good.

20         MR. ROSEN:  Thank you.

21         THE COURT:  The motion with respect to that

22   information gathering is granted on those terms.

23         MR. ROSEN:  Thank you, Your Honor.

24         THE COURT:  That is Agenda Item III.4 we've taken

25   care of.  So now we will break for lunch and return at ten

1    past 12:00.  Thank you.  Ten past 1:00.  Sorry.  It's already

2    ten past 12:00.

3              (At 12:10 PM, recess taken.)

4              (At 1:14 PM, proceedings reconvened.)

5              THE COURT:  Buenas tardes.  Please be seated.

6              So, Mr. Kirpalani.

7              MR. KIRPALANI:  Good afternoon, Your Honor.  Susheel

8    Kirpalani from Quinn Emanuel Urquhart & Sullivan on behalf of

9    the Lawful Constitutional Debt Coalition.

10             I think Your Honor said before the lunch break that

11   you wanted to hear from parties supporting the mediators'

12   recommendations.

13             THE COURT:  Yes.  If I can just get clarification, I

14   got a list of agreed time allocations, to which I've recently

15   added Mr. Hein towards the end, but the LCDC wasn't in the

16   list.  And so --

17             MR. KIRPALANI:  I believe we are, as part of the PSA

18   creditors group.  You should see something there --

19             THE COURT:  Oh, yes.

20             MR. KIRPALANI:  -- for PSA creditors.

21             THE COURT:  Yes.  Thank you.

22             MR. KIRPALANI:  And I think we were allotted five

23   minutes.

24             THE COURT:  Yes.

25             MR. KIRPALANI:  What we've tried to do is -- it's

1  going to be three of us trying to split up the five minutes.

2  We'll do the best we can, I promise you.

3           THE COURT:  Thank you.

4           MR. KIRPALANI:  And we'll try to make it as quick as

5  possible.  Again, Susheel Kirpalani for the LCDC.

6           Our focus has been, since we got involved in the

7  Commonwealth case about a year ago now, to try to figure out

8  what is the best path to negotiate between indisputably valid

9  GO bonds and the Oversight Board.

10          You haven't seen much of us over the last year,

11  because we spent most of our time out of court, in

12  negotiations, as the Court is aware.  Last spring, we entered

13  into the initial Plan Support Agreement.  That was followed by

14  a plan in September that the Oversight Board filed.  And Your

15  Honor remembers from the summer, there wasn't a whole lot of

16  support for that plan.

17          Your Honor asked the mediation team to come back to

18  life and help us try to reach some consensus, and a greater

19  group of creditors who might be supportive of doing something

20  or not.  And if not, then we would proceed to litigate.  And

21  as tends to happen in those situations, what happened is

22  people started listening with each other, negotiating with

23  each other.  And holders of the early vintage GO bonds came to

24  agreements with the Oversight Board, and holders of late

25  vintage GO bonds, so that now we have a broad cross-section of

1    GO bondholders.

2        I think Mr. Rosen announced it was 58 percent of GO

3 bond claims that support the Plan. That's, frankly, a

4 staggering number when you consider how many tend to vote at

5 all in a case or in any electoral process. And I think what

6 we have is a groundswell of support to move forward. We

7 fully endorse the mediators' recommendations, and we think

8 that the time for Puerto Rico to end its bankruptcy is now.

9        With respect to my friends, who I've been dealing

10 with for the last five years, holding what I would call the

11 junior most credits of the Commonwealth, of course they will

12 want to delay and defer Puerto Rico's emergence from

13 bankruptcy because, of course, they know, as a junior

14 stakeholder, the option to play for more time tends to be in

15 the textbook.

16        But Puerto Rico doesn't have that time. The

17 Oversight Board has cautiously revised its estimates on what

18 is sustainable, and a groundswell of support of GO bondholders

19 have figured out a way to work within that. And we endorse

20 and ask the Court to adopt the mediators' recommendations and

21 the Oversight Board's motions for setting up procedures to get

22 going with this bankruptcy case.

23        Thank you, Your Honor.

24        THE COURT: Thank you, Mr. Kirpalani.

25        Next for PSA creditors, Mr. Peck.

1           MR. PECK:  Good afternoon, Your Honor.  James Peck

2    from Morrison & Foerster on behalf of the Ad Hoc Group of

3    Constitutional Debtholders, also within the PSA creditor

4    definition.

5           What I mostly want to say is how much I admire the

6    work of the mediation team here.  I participated in the

7    mediation.  I'm not going to talk about what happened, but I

8    can certainly represent to the Court that this was an

9    extraordinary effort, and it was extraordinary in two parallel

10   respects.  One, the schedule, which is presently before you

11   and seems to be evolving even as we speak.  And then the PSA

12   itself and the plan that relates to the PSA.

13          This is not a colossal failure.  This is a colossal

14   achievement.  And I want to express, on behalf of our clients,

15   appreciation for the work of Judge Houser and Judge Colton in

16   helping us get to this point.

17          I also recognize that case management is not a

18   popularity contest.  It's about what's best for the case.  And

19   I have concluded, in my judgment as an advisor to our clients,

20   that the mediation recommendation which is before the Court is

21   entitled to respectful deference as the best judgment of very

22   skilled neutrals in this process.

23          Thank you very much.

24          THE COURT:  Thank you.

25          MR. STANCIL:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon, Mr. Stancil.

2          MR. STANCIL:  Mark Stancil with Willkie Farr &

3     Gallagher for the GO Group.

4          I just wanted to underscore two points that Judge

5     Houser mentioned but I think merit sort of reaffirmation from

6     the bondholder side.  First, as the Court is aware, there's

7     been substantial litigation, a lot of it even by our clients.

8     And I think -- and we've had our differences with the

9     Oversight Board and with the other PSA creditors, even as

10    Mr. Kirpalani was referring to his indisputably lawful bonds,

11    that brings my reaction to say the opposite.  And I think it's

12    worth underscoring that we've gotten past that through this

13    PSA, and it resolves a tremendous amount of controversy.

14         The schedule is integral to that.  It's not a -- this

15    is one of those situations where I think keeping the case on

16    pace facilitates and encourages settlements.  This is not one

17    where we've reached an understanding and now we can wait and

18    solve the other things.  Speed is essential and integral.

19         And the last thing I would underscore, Your Honor, is

20    a point that Judge Houser made.  Trying to solve everything in

21    this case is not -- at one time is not possible or feasible.

22    And I just wanted to say we really tried.  By goodness, we

23    tried over the last year, six months to make this as broad as

24    we possibly could.  I think where we've gotten is where we can

25    get, and we need to move forward.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. MAYR:  Your Honor, Kurt Mayr from Morgan Lewis on

4    behalf of the QTCB Noteholder Group, another of the PSA

5    parties.  Actually, one of the two initial PSA parties when,

6    way back in July, we came before you asking for a stay the

7    first time in support of the Plan.

8          I think -- I would like to thank the mediation team,

9    obviously, and Judge Houser specifically, and also reiterate

10   her words.  If we don't -- we won't finish if we don't start.

11         And I think the best evidence of that is where we've

12   been, where we've started in July, with a deal that didn't

13   have the involvement of the mediation team and about 20

14   percent of the GO bond debt, plus the Retirees, which -- I

15   think we'll need to remember that this isn't just a bondholder

16   supported plan, but one that's supported by the Retirees as

17   well.

18         But you gave us the time and you gave us Judge

19   Houser, and with that, the time and the mediation team, we

20   were able to build consensus from 20 percent, to almost 60

21   percent of the Bonds, plus the Retirees.  And I think that

22   that is the best evidence of how we might be able to use the

23   process that's being proposed to you now to be able to move

24   forward with the dual paths of the pressure of litigation and

25   continued mediation to grow consensus and hopefully get to

1    confirmation.

2             THE COURT:  Thank you, Mr. Mayr.

3             Now I think we turn to Mr. Despins.

4             MR. DESPINS:  Good afternoon, Your Honor.

5             THE COURT:  I have you down for 30 minutes.

6             MR. DESPINS:  Yes, Your Honor.  Actually, 28 minutes,

7    because I ceded two of my 30 to Ambac.  So if we can adjust

8    the clock to 28?

9             So good afternoon, Your Honor.

10            THE COURT:  Good afternoon.

11            MR. DESPINS:  Luc Despins with Paul Hastings on

12   behalf of the Official Committee.  I have a lot of things to

13   cover.  I'll try to do this in as organized a fashion as

14   possible.

15            The first thing I think we need to do is we need to

16   put things in context when reviewing where we are in the case.

17   We've been at this for about three years, and most issues have

18   been litigated, some to conclusion, others not.  But the

19   Oversight Board has been driving that process from the

20   beginning, including the litigation that has taken place in

21   the case.

22            In that context, Your Honor, the argument that we

23   need to move really fast now, suddenly, based on the need for

24   judicial efficiency, is a bit troubling.  And let me tell you

25   why.  Not because speed is not important.  We agree with that.

1   We believe that there should be speed.  And we need to get out
2   of Title III, so we don't want to delay things.  But rather,
3   because we need to compare the issues that the Court has
4   tackled to date with the issues that, for some reason, we're
5   being told cannot be tackled because they're too time
6   consuming, not efficient, too costly.
7        So just to use the -- you know, the Olympic diving
8   analogy of degree of difficulty, ERS, very high degree of
9   difficulty.  Three times in the First Circuit.  Complex
10  factual issues and all that.  And the Board had no problems
11  going full steam ahead with that agenda.
12       And by the way, we supported that, and we're very
13  happy with the results.  That's not a criticism, but it's just
14  a contrast that -- to the issues that now the Board is saying
15  we should not deal with, because of judicial efficiency.
16       The first one is the priority issue, and whether
17  the -- whatever rights some creditors have under Puerto Rico
18  law created a priority, and whether that priority is preempted
19  in Title III.  That, in terms of degree of difficulty, again,
20  going back to the diving analogy, is pretty straightforward.
21       No factual issues there.  It's pretty
22  straightforward.  And also, it's straightforward because the
23  Board, from the beginning of the case until a few weeks ago,
24  has consistently taken the position that these priorities are
25  preempted.  And that -- we just can't get around that.

1              Just a few weeks ago, this is in, you know, docket

2    10611, the Board said, in Title III, however, because all

3    nonbankruptcy law requiring full payment of prepetition

4    obligation is preempted by bankruptcy law, the debtholders are

5    all sharing losses arising from the Commonwealth's fiscal

6    emergency consistent with the equality policy underlying all

7    bankruptcy law that creditors of equal rank share the losses.

8    That's in response to the Revenue Bondholders.

9              And then even better than that, I should have quoted

10   that in my Priority Objection, they say, simply put, these

11   priority statutes -- this is in document number 10613.  Simply

12   put, these priority statutes, if they're not preempted, they

13   would block any possible restructuring.

14             And that's exactly our point, Your Honor.  So that

15   issue, we cannot get around it.  And on top of that, the First

16   Circuit, when they affirmed your decision on ERS, at the end,

17   they addressed the ERS Bondholders' argument that there are --

18   lawful priorities on 201 are protected because of 201 -- I

19   forget if it's (n) or (m), but you know the section I'm

20   talking about.

21             And the First Circuit said no.  That applies in the

22   plan, fiscal plan context, not in Title III.  They said that

23   point blank.  And the people can argue, well, that was not

24   exactly in the same context, but that's a hard statement for

25   the First Circuit to dial back at this stage.

1            And, therefore, Your Honor, our point is let's bring

2     it on.  Let's have a ruling on that issue, because you're

3     going to -- you're going to be dealing with that issue.  You

4     asked counsel for the Oversight Board, will I have to deal

5     with that and the revenue bonds?  And the answer is yes, you

6     will.  So you will.

7            And by the way, according to the mediation team, you

8     should rule on them really quickly.  So you will have to face

9     the preemption issue in that context.  And it's not different,

10    because they're not arguing Title II preemption only, they're

11    arguing Title III preemption.  It's in their papers.  There's

12    no way to escape that.

13           So you will have to address that head on.  And if

14    that's the case, are we going to have one ruling where I

15    believe you will conclude that those laws are preempted, and

16    then another ruling where, let's settle that because it's a

17    complex issue?  We just can't pretend like that, Your Honor.

18    I'm all in favor of settlements, but we can't do that.

19           The next point is the PBA lease issue.  And again,

20    going back to the diving analogy, degree of difficulty.  It's

21    already all briefed.  And by the way, it's not -- the issue is

22    a judge -- whether we should get a judgment or they, being the

23    bondholders, should get -- the PBA bondholders should get a

24    judgment on the pleadings.  That's all been briefed except for

25    one reply that's due.

1          Those leases, by the way, the Board -- we're

2     co-plaintiff with the Board on that issue -- has stated very

3     clearly, these leases say you need to pay as much rent as

4     necessary to pay the bonds.  If that's a true lease, then I

5     think I'm ready to hang up my bankruptcy law practice because

6     I just -- it's clearly a financing lease that, therefore,

7     they're unsecured creditors.

8          And is that complex to decide?  That's a showstopper.

9     That's the whole concept of the -- of the mediation team as

10    to why you need to go forward really quickly on the revenue

11    bond issues, is because they're showstoppers.  These two

12    issues, priority that I just mentioned, and the PBA issue,

13    is a showstopper, because they're paying them a billion and

14    change for that rent as part of this quote/unquote settlement.

15         If Your Honor found or denied their motion for

16    judgment on the pleading, and of course, in order to do that,

17    you would have to delve somewhat in the issue the leases

18    provide, that plan is dead, dead, dead.  So I'm all in favor

19    of settlements, but we cannot pretend, you know, that these

20    issues are not there.

21         THE COURT:  Well, I think what I've been reading and

22    hearing is that there is a deal to which the GO bondholders

23    and PBA people wish to subscribe, taking into account all

24    sorts of risks and knowing that the issues are going to be

25    litigated in the revenue bond context.  There isn't a group of

1   revenue bondholders who are willing to agree to a deal.  And

2   yes, there is a possibility at the end of the day of

3   inconsistencies, but right now, they have a significant group

4   of supporters.

5           And you can attack, in the context of a confirmation

6   proceeding, the reasonableness of this settlement with this

7   group.  It's not that the issue goes away, goes away.  It does

8   come back in a different package in the context of a proposed

9   group of settlements under a plan.  But I think I'm hearing

10  that as the rationale.  Somebody can tell me if I'm wrong, but

11  I think that's what I'm hearing.

12          MR. DESPINS:  Of course that's the rationale, Your

13  Honor.  And I was going to get to that, which is, I was going

14  to say, and I'm leading on to that, which is -- you would tell

15  me, and actually you just did, hey, it sounds like you have a

16  great confirmation objection, so why don't you make it then.

17  And I'll get to that in a second.

18          THE COURT:  That would have been more succinct.

19          MR. DESPINS:  Okay.  But the point, though, on

20  priorities that -- and we're going to have to be very precise

21  about this.  There are two groups here.  There's the

22  Unsecureds -- us and the Unsecureds, the bondholders that say

23  they're entitled to a priority.

24          The Board and the bondholders are free to deal with

25  the treatment of the bondholders, saying -- if they're willing

1   to, say, not get more than 70 percent on the dollar or

2   something, that's their prerogative.  But they're not free as

3   part of the settlement between them where the fiduciary, the

4   only fiduciary in the case, which is the Committee, is not

5   present, to determine that we are junior to them.  And that's

6   what the settlement does.  And that's critical.

7          It's not as if they're secured and we're dealing with

8   their collateral here.  Some of them are arguing they're

9   secured.  I'll come back to that in a second.  But it's not

10  that they're secured and they're making a gift out of their

11  collateral to junior creditors.  If they're content to receive

12  only 70 percent on a dollar, that doesn't mean they can block

13  me to say, I want more, and the debtor is able to pay more.

14  It's not through a settlement that they can foreclose that

15  argument.

16         THE COURT:  And you have that objection --

17         MR. DESPINS:  Yes, but, Your Honor --

18         THE COURT:  -- in the actual confirmation as well,

19  and you raised it with respect to the Retirees?

20         MR. DESPINS:  What's going to happen, Your Honor, is

21  that, to be candid, they're trying to leverage you with what I

22  call the confirmation express, which is a term we use always

23  in the bankruptcy context, which is --

24         THE COURT:  And you're trying to leverage me with the

25  confirmation brakes.  So that's how it works --

1    MR. DESPINS:  No.  No.  But, I mean, what's going to

2    happen is we're going to spend millions of dollars soliciting

3    votes and all that over this plan.  And then you're going to

4    be faced with a Hobson's choice of saying, okay, there's no

5    priority.  This plan cannot go forward.  Or, my God, you

6    know, we've wasted all this time and money.  And that's the

7    issue.

8         The question is, what is the downside of deciding

9    that issue of my priority today?  What is the damage?  I want

10   to hear that from people as to what the damage is.  We don't

11   -- the answer is they don't know the answer to that.  They

12   don't want the answer to whether it's a priority now, because

13   the whole thing falls apart.  They know there's no priority,

14   because they're arguing it today.

15        And by the way, you will need to decide the priority

16   issue not only in the revenue context, Your Honor, but under

17   the Plan.  I think it's Section 16. -- sorry, 17.3, the Plan

18   that they filed a couple days ago -- sorry.  71.3.  71.3.

19   It's entitled "preemption of laws."

20        So they will ask you to enter a confirmation order

21   that approves a plan that says that all laws of Puerto Rico

22   are preempted by Title III.  That's not a settlement.  That's

23   an order from the Court that you need to approve that.  So

24   you're going to have to confront that issue anyway head on,

25   not in the context of a settlement.

1           In addition to that, people like Mr. Hein are saying,
2    I think I'm entitled to get paid in full.  I have a priority.
3    They cannot -- they cannot take away -- if he has a priority,
4    they cannot take that away through a class vote, Your Honor.
5    You will need to confront that issue.  I think he will lose
6    that point, but you will need to decide up or down, whether he
7    has the priority.
8           So the question is, if that's going to happen anyway,
9    if he --
10          THE COURT:  So you're saying that even if he ends up
11   in the consenting class, he has an entitlement --
12          MR. DESPINS:  That you cannot deprive.  At least I
13   think that's what people will argue.
14          THE COURT:  I know that's the argument.
15          MR. DESPINS:  That's the argument.
16          THE COURT:  You're observing that that's the
17   argument.
18          MR. DESPINS:  That's correct, Your Honor.
19          THE COURT:  And I'm going to hear lots of arguments.
20          MR. DESPINS:  I'm sorry?
21          THE COURT:  I'm just saying, and I'm making sure
22   that -- I understand that that's the argument that I expect.
23   You're saying that that's the argument.  You're not
24   necessarily making that argument today.
25          MR. DESPINS:  Correct.  But I know Mr. Hein has

110

 1   already made the argument.

 2         THE COURT:  Yes.

 3         MR. DESPINS:  The same thing, for example, the issue

 4   of why are we not confronting the issue of whether the GOs are

 5   secured or not.  They say that they're secured by a pledge of

 6   the full faith and credit.  That's not collateral.  These are

 7   words.

 8         And how are we going to -- and Mr. Hein, of course,

 9   is saying, I'm secured.  I'm not giving up that claim.  You

10   cannot deprive Mr. Hein, if he's secured through a class vote,

11   of his security interest.  So we need to confront that issue.

12   Of course, I don't think he has a secured interest, but the

13   point is, these issues are discrete.  They're legal.  They

14   don't take a lot of time.  And it makes no sense to leverage

15   the Court and everyone at this stage.

16         The argument you're hearing is, don't look at the

17   Plan, Judge.  Don't look at the Plan.  But let's assume for a

18   second that the Plan said the following:  Puerto Rico people

19   will not get distributions.  And you'll say, well, it doesn't

20   say that.  Does it?

21         My point is it does, because we're getting 3.9

22   percent.  So are we not going to look at that and say, wait

23   and minute.  We should look at that before sending it out for

24   a vote, soliciting people saying, you should vote for that 3.9

25   percent.  It's a great deal, et cetera.

1           It's just, Your Honor, these issues need to be

2    addressed, because this is not a simple two-party settlement.

3    They're impacting the priority of other creditors.

4           The PSA argument I've talked about.  And let's talk

5    about the challenge to the GO bonds now that also would be

6    precluded from review.  And I'm not asking the Court to

7    enter -- to have a full trial on the issue.  The only thing

8    that's pending before the Court right now are motions to

9    dismiss.

10          And I want to make sure you understand that despite

11   the announcement by the Board that they're settling this in

12   the case of the 2014 GO bonds for a ten percent discount, and

13   that's a beautiful -- it's a nice headline, that's not the

14   case, Your Honor.  Because if you look at all the fine print

15   of the calculation, because they inflated the claims of the

16   2014 GO by including original issue discount, the real

17   concession by the 2014 GO is six percent, okay?

18          So these are people that might not have valid bonds

19   at all, and now they're getting essentially 94 percent of that

20   bond.  We were co-plaintiffs on that.  There was an agreement

21   to consult with us that was breached at a return.  And the

22   fact that the mediators decided not to include us, because

23   that's -- I think that's what I heard from Judge Houser,

24   saying, well, you know, it's my call as to who gets in the

25   room and who doesn't, but at least it's clear that we were not

1   in the room.  That doesn't change the fact that that agreement

2   was breached.

3        That was a post-petition agreement with the Board,

4   while we were co-plaintiffs with them on these claims, and

5   they decided to breach it.  But it goes back to the issue

6   that we've said before.  They are not a fiduciary.  They

7   disclaim any fiduciary duties to us.  We are the only

8   fiduciary in the case.  We were the co-plaintiff, completely

9   excluded from these discussions.  Now they're settling this

10   for 94, six.

11        I want to pause on that for a second.  That means

12   that the odds of them losing that is sort of 94 percent to six

13   percent, the other side.  That's just beyond belief that they

14   would do that.  And then they settled our 2011 objection for

15   two percent.  Again, 98 percent risk that we would lose that.

16        What we're saying is that, Your Honor, decide the

17   Motion to Dismiss.  That will bring so much clarity on that

18   issue, because I believe it's fairly easy to deny their Motion

19   to Dismiss.  And you might say, well, what if I actually grant

20   the Motion to Dismiss?  It's pennies that we're giving up.

21   And on top of that, that money is not getting to the

22   Commonwealth.  Right?

23        I want to make sure you understand this.  That money,

24   the savings, is going to Mr. Kirpalani's pocket.  Not him

25   personally, but his client's pocket, although that would be a

1    nice day.  So the point is that it's going to -- it's not

2    going to the Commonwealth, that money.

3         So the Commonwealth has already accepted the fact

4    they don't need that money to live, right, because it's going

5    to the other bondholders.  So why not have a decision, again,

6    on the Motion to Dismiss?  Because we feel fairly strongly

7    that that Motion to Dismiss would be denied.  And if they're

8    denied, how can the plan go forward with a handicapping of 98

9    to two?

10        And also, you have to think about who was in that

11   room when they negotiated that deal?  The holders, the

12   defendants.  Because the LCDC -- I forget the name of that

13   group, but the Lawful Debtholders, they hold 2011 bonds.  So

14   of course they're in a room wherein there's a negotiation as

15   to how much of a hit should the 2011 bonds take?  And low and

16   behold, they ended up with a two percent hit.  Well, I think

17   you see the picture.  The point, Your Honor, is that these

18   issues, especially the priority issue, should be decided.

19        And let's talk about the mediators' position,

20   vis-a-vis the Committee.  It was kind of -- you know, I've

21   known Judge Houser for many years, and I have the utmost

22   respect for her.  But it was kind of surprising.  Basically,

23   the argument is we cannot resolve everything at the same time.

24   Okay.  I'll go for that.  But what they did in this deal, Your

25   Honor, I want to make sure you know this, they gave the

1    bondholders a veto over distributions to us.

2         And you say, well, where do you find that?  There's a

3    debt cap provision.  And that debt cap, the way it's

4    structured, it caps the amount of bonds we can get at the

5    current amount on the Plan that gives us 3.8 or 3.9 percent.

6    So they have a veto over that.

7         So what kind of process is this where we think that

8    we're going to make progress later, where these guys -- the

9    money would have to come from them, or at least their

10   largesse.  They would have to say, well, we actually feel good

11   about these guys.  Let's give them some money.  It's

12   completely warped to have given that veto to the bondholders

13   and to say, let's keep talking.

14        By the way, we've had eight months to talk, and it

15   was clear from Judge Houser's point -- I'm not going -- you

16   know, I'm not talking about mediation here, but just based on

17   what she said, we were not included in that process.  So how

18   are we to believe that, in fact, we will be included, where

19   now they have a veto over any distribution to us other than

20   cash.

21        It's true that the Commonwealth could decide to give

22   us five billion, but I don't think that's going to happen.

23   The only way to give us distribution is probably through more

24   bonds, but they have a veto over that under their deal.

25        So we're all in favor of talking, but that's not

1   going to happen here, or at least it should have happened in

2   the last eight months and has not happened.  I don't see how

3   there's going to be a breakthrough unless they realize, my

4   God, we could lose the priority issue, and we need to deal

5   with these folks.  And the people of Puerto Rico are not going

6   to end up with 3.9 percent, which is, frankly, insulting.

7          The only thing we're asking, Your Honor, is for

8   showstopper issues to be decided now.  The priority issue is a

9   showstopper.  The PBA lease issue is a showstopper, and so is

10  this so-called settlement of the GO claims.

11         In terms of whether there should be a blanket stay on

12  any proceedings, which is essentially what's being suggested,

13  Your Honor, we oppose that completely.  We filed, if -- it was

14  Monday night or Tuesday morning, a motion on classification

15  that, I want to be clear, I don't think you can settle a

16  classification issue unless everyone agrees to it.  And it's a

17  fundamental classification issue.

18         And we're asking the Court not to stay that; that

19  that issue should go forward because, again, if we're right on

20  that, this Plan, unless we are brought up to the level we

21  should be at, it cannot go forward.  And the only reason not

22  to impose a stay on that would be clearly to, you know,

23  prejudge the issue of the classification.  So there's no

24  compelling reason.  Again, classification, it's a discrete

25  legal issue.  There are no factual issues involved.

1          And the First Circuit, Your Honor, has a very

2     strict -- I'm not going to argue the merits of the motion, but

3     very strict approach on classification, which is contrary to

4     the other circuits.  And based on that, we believe that these

5     types of motions, you know, you can make decisions as they are

6     filed, if they are filed.

7          I have no -- by the way, it's not like I have 15 of

8     those lined up.  As I stand here today, I don't have any more,

9     but certainly that one should not be stayed.

10         We also believe -- now I'm going to go into the

11    Disclosure Statement scheduling, because we're combining the

12    time on these two issues.  We believe that that issue should

13    be taken up later in the sense that this Disclosure Statement

14    was filed two or three business days ago.

15         We've skimmed it.  We disagree with Mr. Rosen that

16    it's comprehensive.  There are huge issues.  I'll give you

17    just a vignette on that.  On the issue of essential services,

18    they're saying we don't need to talk about essential services.

19    They're not relevant.  That's the disclosure.

20         So you might say, well, file your objection to the

21    Disclosure Statement and you can be heard.  But that's not the

22    issue, Your Honor.  We will need extensive discovery before

23    the Disclosure Statement hearing is -- takes place on all

24    these issues of why, for example, there are guarantees that

25    are being assumed.

1           A guarantee is a financial instrument.  That is not

2   exactly a contract.  Why they're assuming these guarantees,

3   the issue of essential services -- or put it a different way.

4   What can the Commonwealth afford to pay is a critical issue at

5   confirmation.

6           And then the whole issue of settlement.  They're

7   completely silent as to the rationale for the settlement of

8   these GO bonds.  For example, why is it that the 2011 GO bonds

9   are settled for less than half than the 2012?  What's the

10  rationale for that, other than the fact that the lawful

11  holders have 2011 bonds and maybe less of 2012?  These are --

12  there are tons of issues like this.  Why wasn't the Committee

13  involved in these issues?

14          So there's going to be extensive discovery that's

15  going to be needed.  And from a due process point of view, I

16  know you're sensitive to those issues.  How can we schedule a

17  disclosure statement hearing on a disclosure statement that

18  was filed two business days or three business days ago?

19          The parties need to be able to digest it, to read it,

20  to digest it, and to come to Your Honor with an intelligent

21  position on, okay, we need X amount of time.  Let me show you

22  why.  I can't do this today, and I don't think you should

23  actually schedule that hearing based on that motion that was

24  filed before the Disclosure Statement was filed.

25          Two seconds, Your Honor.  On the Disclosure

1    Statement, there are all sorts of issues regarding PBA rent.

2    What is the PBA rent?  How does it relate to the billion

3    dollars and change that's being paid to the PBA bondholders?

4         There are tons of issues that we need discovery on.

5    You might say, well, you can object to the Disclosure

6    Statement and say that it doesn't contain adequate

7    information.  But the point is, before getting the discovery,

8    I don't know what the real facts are.  And in order to make an

9    objection, I need to know what is the rent.  I can't just say,

10   we don't know what the rent is.  You need to disclose it.  We

11   need to actually get the facts on that.  The same thing for

12   the assumption of guarantees, et cetera, et cetera.

13        Now, to get to a more granular point, we have one

14   point with respect to the revenue bond litigation.  And by the

15   way, on the revenue bond litigation, I think -- I know that

16   the mediation team wants this to be resolved before June 3rd,

17   but practically, how is that going to happen?

18        Meaning, even if you were able to decide, I assume

19   that if the revenue bondholders lose, they will appeal this.

20   So how can there be finality before June 3rd in any event?

21   That's one of the points we made in our objection.

22        But on that issue of the revenue bonds, we believe

23   one issue was left out, which is whether the revenue

24   bondholders have a claim against the Commonwealth in light of

25   the nonrecourse nature of their claims.  So that's a more

1   granular point, but I want to make sure it's not lost.  We

2   made that point in our response to the mediation report, but I

3   want to make sure that it's not lost.

4          And the last point is that the DRA parties, which are

5   GDB bondholders, want our objection or part of our objection

6   decided before confirmation.  Again, I'm looking at this.  How

7   is that a showstopper?  Whether the objection is resolved or

8   not doesn't affect the Plan in any way.  It's nice to have,

9   from their point of view, but I don't see it as a showstopper

10  when compared to the issues that we've raised.

11         Let me just -- two seconds, Your Honor.  I want to

12  consult with my colleague.

13         Okay.  So I finished before my time, unless you have

14  questions.

15         THE COURT:  Just one moment.  Let me check.  Not at

16  this time.

17         MR. DESPINS:  Thank you.

18         THE COURT:  I have AAFAF next.  Mr. Rapisardi.  And I

19  have you down for ten minutes.

20         MR. RAPISARDI:  Oh, I'll be much shorter, Your Honor.

21  I'll try to.  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         MR. RAPISARDI:  Your Honor, I wish to comment upon

24  the objection that the government filed to the Disclosure

25  Statement scheduled motion.  Your Honor, there is no doubt

1   that the Board's filing of its Amended Plan of Adjustment,

2   Amended Disclosure Statement and related scheduling motions

3   initiate a confirmation process that has the potential, if

4   successful, if successfully completed, to have a profound

5   impact on the Commonwealth of Puerto Rico, its creditors, and

6   importantly, and most importantly, the people of Puerto Rico.

7          We appreciate the work of the mediation team and the

8   Proskauer team that has gone into accomplishing this task in

9   the form of the Amended Plan of Adjustment, Disclosure

10  Statement that was filed.  And I know that was no easy task,

11  and it took a lot of time and patience.

12         And it is with reluctance that we filed the

13  objection.  And in that regard, the words I speak today and

14  the words that were in our objection are carefully chosen.

15  And I believe it is words that -- just to reemphasize some

16  points.

17         With regard to the Amended Plan, the Government of

18  Puerto Rico has been clear about its policy priorities

19  throughout these cases.  In particular, Governor Vazquez has

20  emphasized that the interests of one of the most vulnerable

21  groups in Puerto Rico, specifically governmental pensioners,

22  must be protected by either honoring the government's prior

23  commitments to retirees or mitigating any detrimental impacts

24  to them through future benefit restoration.

25         Governor Vazquez has also been clear about minimizing

1    pension cuts, emphasizing that if bondholders receive improved

2    treatment under any agreement, then Puerto Rico's governmental

3    pensioners should also receive improved benefits as a matter

4    of fairness and justice.  And because the Amended Plan in its

5    current form requires the enactment of new legislation to

6    issue new bonds, there is no viable path to confirm the

7    Amended Plan without the elected Government of Puerto Rico

8    being on board with that Plan.

9          However, to be clear, the government does not

10   believe, as some parties have claimed, that the mediation

11   process has been a colossal failure, or that the Board's plan

12   and disclosure statement process was designed to jam creditors

13   or impair their process rights, due process rights.  We leave

14   this kind of heated rhetoric about the Plan and the process to

15   other parties.

16         To the contrary, we are in an ongoing and an

17   accelerated process to have the most open and responsible

18   dialogue we can with the Board, which is reflective of the

19   current level of good faith discussion going on between

20   counsel for the -- for AAFAF and the Board and its

21   representatives.  This dialogue will be the stage for what we

22   hope and believe will be a very successful restructuring.

23         But the government's repeated concerns about

24   treatment of governmental pensioners are not new, and at this

25   late date, have not been satisfactorily resolved.  The cost,

1  in terms of time, money and resources for Puerto Rico are

2  simply too high to charge ahead without governmental support

3  in rapid fashion on a plan that lacks the government's support

4  from start to finish.  And for this reason, the government

5  filed its objection that's now before you.

6       The Board has noted that the government's rejection

7  of -- or stated objection of the Plan is temporary in nature,

8  and hopefully will be changed.  And there seems to be an

9  element of confidence that it will be resolved.  We are

10 hopeful as well.

11      But, Your Honor, we're equally frustrated as well

12 because, as I said, this is not a new issue.  And the risk of

13 not reaching an agreement with the Board should not

14 unnecessarily be borne by the people of Puerto Rico, who are

15 paying for the cost of this Title III process, and who are

16 living every day with the pressure of a process that threatens

17 the most vulnerable among them.

18      The scheduling motion sets up a comprehensive time

19 line, which in order to hit all of the deadlines, everything

20 must go right.  For that reason, Your Honor, support by the

21 government, as we witnessed in GDB, the Title VI case, and in

22 COFINA, the Title III confirmation process, government support

23 was essential at the outset.

24      And the government came through, both the legislative

25 and executive branches, in passing legislation at the outset.

 1   Mr. Despins referred to the confirmation express, and I can't

 2   resist, being a Chapter 11 lawyer for many years -- yes,

 3   PROMESA gives the Oversight Board authority to be the

 4   conductor of that confirmation express.  However, it is

 5   important to recognize and understand, that train cannot move

 6   forward unless it has the tracks necessary to proceed forward.

 7   The longer this impasse remains unresolved, the greater risk

 8   that the confirmation will be derailed, as we will find that

 9   train will not have the tracks before it to proceed,

10   irrespective of any level of creditor support.

11           Your Honor, if this Court is inclined to overrule the

12   government's objection, we hope all that -- take note of the

13   cautionary warning we are expressing in our -- we expressed in

14   our objection and I'm expressing today.

15           That's it, Your Honor.  Thank you.

16           THE COURT:  Thank you, Mr. Rapisardi.

17           Now I have Mr. Ellenberg, for 15 minutes.

18           Good afternoon.

19           MR. ELLENBERG:  If the Court please, Mark Ellenberg

20   on behalf of Assured Guaranty.

21           Your Honor, I'm going to be addressing together both

22   our objection to the scheduling of the Disclosure Statement

23   hearing and our objection to the stay of the pending Motion to

24   Dismiss the GO Claim Objection based on the debt limit

25   challenge, and as well, the more general stay of all

1   litigation, including also litigation over the priority

2   challenge.

3           As I'll discuss in more detail, the mediation team,

4   having set in motion a consensual litigation schedule back in

5   November, a schedule that was hammered out in hours of hard

6   fought meetings and had universal nearly buy-in, has now

7   reversed its course.  The reason for this about face is that

8   the FOMB has succeeded in adding some additional hedge funds

9   to the PSA originally announced earlier in the year.  But

10  their -- but that development does not justify scuttling a

11  procedure that has been set in motion, had buy-in, and most

12  importantly, was working.

13          First, Your Honor, the PSA and the plan based on it

14  faced serious obstacles.  It still excludes bond insurers,

15  National and Assured, who collectively own more than two and a

16  half billion of General Obligation bonds.  In addition, we own

17  bonds in other municipal entities such as HTA, PRIFA and CCDA.

18          Also excluded from the Plan is bondholder Invesco,

19  who adds another 500 million to the opposition, just totaling

20  over three billion dollars of bonds, GO bonds that are not

21  included in this plan, and I might add, were not included in

22  the negotiations that led to this plan.

23          Mr. Kirpalani referenced junior creditors seeking to

24  slow down the confirmation process.  We are not junior.  We

25  hold the same GO bonds, or we insure the same GO bonds that

1   Mr. Kirpalani's clients hold and that all the hedge funds hold

2   who have signed onto this plan.

3         We are entirely pari passu with them.  We are not

4   junior, nor are we seeking to slow down this plan.  What we

5   are seeking is to stick with a schedule that was both rational

6   and well thought out and which, among other things, has

7   scheduled for April 30th, a hearing on the debt limit

8   challenge to the GO bonds.

9         We've already filed that motion in accordance with

10  the mediation team's prior recommendation.  It's already on

11  the schedule.  Why are we taking that off?  It is a gating

12  issue.  Everyone agrees it is a gating issue.  Why are we

13  going to take that off the calendar?

14        So we're not trying to delay.  We're trying to have

15  the Court address issues in a fair and rational way.  Fair not

16  only to us, but to the Court as well.

17        Now, Your Honor, as you've heard, further obstacles

18  to this plan are that it's opposed by the Commonwealth

19  Government.  It's opposed by the Bonistas del Patio, who

20  actually supported the prior PSA.  And it's opposed by the

21  UCC.

22        What is the reason given by the mediation report, and

23  then echoed in the Oversight Board's papers, for staying the

24  hearing scheduled for April 30th?  Only one reason is given.

25  Mr. Despins alluded to it.  The reason given is that there's

1   been a settlement of that issue.

2        Well, no, Your Honor, there hasn't.  Indeed, it's

3   called a global settlement.  There is nothing global about it

4   at all, because that litigation is based on claims -- sorry,

5   based on objections that are filed to claims, including the

6   claims of Assured Guaranty.

7        It may be that other creditors who are similarly

8   situated have agreed to settle similar objections to their

9   claims.  That's great.  That's their right.  What they cannot

10  do is settle the allowance of my client.  That is personal to

11  us.

12       Now, Your Honor asked Mr. Despins, can't a consenting

13  class approve that settlement and bind me to it?  No, not even

14  close.  That is not remotely possible.  That goes to the

15  allowance of my claim.  Plans deal not with allowance, but

16  with the treatment of allowed claims by class.  Okay?  It does

17  not deal with the allowance of claims.  The allowance of

18  claims is governed by Rule 3007 and by Rule 9014.

19       Each one is, in essence, an adversary proceeding.

20  Mr. Rosen commented that they had 173,000 claims and they've

21  been working through them.  That's the claim allowance

22  process.  Has nothing to do with the plan of reorganization.

23  No vote of any class, with respect to confirmation of a plan,

24  can take away my right to litigate the allowance of my claim.

25       THE COURT:  Well, let me just say that I'll expect

1    that the Oversight Board, when it comes back for remarks, will

2    tell me whether I was wrong in assuming that their structure

3    presumes that your client's claim is allowed in the context of

4    this plan, and then treat it in a manner that's discounted as

5    opposed to being knocked off the table entirely by an

6    objection that isn't being litigated.

7            MR. ELLENBERG:  Well --

8            THE COURT:  I could be wrong about that.

9            MR. ELLENBERG:  Well, Your Honor, perhaps they'll say

10   that, but they would be wrong.  And the reason they would be

11   wrong is that once a General Obligation bond claim is allowed,

12   it is no different from any other General Obligation bond

13   claim.  They all have the same priority, or not, if you ask

14   Mr. Despins.  They all have the same claim to collateral, or

15   not, if you ask Mr. Peck.  But they are all the same.

16   Whatever they are, they're all the same.

17           It doesn't matter if they're from 2011 or from 2014

18   or in between.  Okay?  A GO bond is a GO bond.  It is a

19   general obligation of the government of Puerto Rico.  The Plan

20   shatters them into multiple classes and gives each one a

21   different recovery.

22           So they cannot tell me they're allowing my claim in

23   full and that people in the class just happened to agree to a

24   different amount.  That's ridiculous.  There is no way you

25   could justify treating one class of GO bonds different from

1  another class of GO bonds if they are all allowed claims.

2  Makes no sense.  It's impossible.

3       So there is no way that that can be what they're

4  doing in this plan.  And there is no way they can take away my

5  right to litigate the allowance of my claim.  That goes with

6  respect to priority, and it goes with respect to the debt

7  limit challenge.  It also goes with respect to whether PBA is

8  a sham.  Those are all filed as objections to individual

9  claims.  It is not a confirmation issue.  It is not a plan

10  issue.  It has to be decided prior to confirmation.

11       And, Your Honor, it's already on the calendar.

12  Again, don't accuse me of trying to slow this train down.

13  What I want is what Judge Houser said she wanted, which is a

14  fair, full, and rational process where the objectors get to be

15  heard.  Okay?  It's on the calendar for April 30th.

16       Now, Your Honor, let's talk about the disclosure

17  statement proposal for June 3rd.  I've been practicing

18  bankruptcy law since 1984.  I'm trying very hard to stop

19  practicing any law.  This case keeps getting in the way.  If

20  we had the Chapter 11 case of the corner grocery store, we

21  would not be ramming through a confirmation schedule

22  comparable to this one.  This is a very complex, difficult

23  case.  The schedule proposed on its face is absurd.  I cannot

24  imagine and I have never seen a comparable case with such a

25  compressed schedule.

1        And let's think about not only what it's doing to the

2   parties, but what it's doing to you, Your Honor.  We are

3   supposed to have a disclosure statement hearing on June 3rd

4   under Judge Houser's proposal.  You will be deciding major

5   issues in this case through the end of May.

6        Well, how does that work?  When are we supposed to

7   file our objections to the Disclosure Statement, and when are

8   they supposed to -- when is the Oversight Board supposed to

9   reply to those objections?  Clearly, it's going to be some

10  time in May, if not sooner.

11       Will you have ruled?  Will you have not ruled?  What

12  are we doing to ourselves?  This makes no sense.

13       And the June 3rd date is completely artificial.

14  There is no magic to it whatsoever.  The only urgency in this

15  case is that the hedge funds who have agreed to this deal want

16  to trade out of their positions as soon as possible.  That's

17  the urgency that's driving us all here today.  And so to meet

18  that totally artificial goal, we're going to put the parties

19  and the Court under tremendous time pressure to deal with

20  multiple, complicated issues at once, and then to have you

21  have to decide them.

22       And as Mr. Despins said, well, what if there is an

23  appeal?  Your Honor, this doesn't work.  What worked and what

24  made sense was the schedule that you approved last November.

25  It's already in motion.  It's doing its job.  And it will get

1    us where we need to be.  And when we get through it, we will

2    know where we stand with respect to this Plan and its

3    potential to be confirmed.  And that's what the Court should

4    stick to.  Then everyone will be happy, and they'll get what

5    they want.  And most of all, you will have achieved due

6    process.

7         Your Honor, we don't like being here as the loyal

8    opposition.  We much prefer to be on board with a consensual

9    plan.  We weren't given that opportunity here.

10        And by the way, Your Honor, you said earlier that the

11   revenue bond creditors, of which I'm also one, were unable to

12   reach agreement on a plan.  Not the case, Your Honor.  We

13   didn't even have the opportunity.  There has been no effort to

14   negotiate an HTA plan or a PRIFA plan or a CCDA plan.  We

15   haven't even gotten there yet.

16        As Judge Houser said, you had to start somewhere, and

17   she decided to start at the GO bonds.  So it's not a question

18   of people refusing to agree to a plan.  They haven't even had

19   a chance.

20        But, Your Honor, I stood here last year and spoke in

21   favor of the COFINA settlement.  And one of the things I said

22   at that time is that Assured and the other monoline insureds

23   in this case are the only parties that have a true, long-term

24   interest in the economic well-being of Puerto Rico.  We have

25   insured bonds that go out 25 years and longer, and five years

1    from now, 10 years from now, 20 years from now, we're still

2    going to be paying claims.  We have over five million dollars

3    of exposure to this island.  That is a big bet, and we want it

4    to go as well as we can.

5            We supported COFINA because we thought it was in the

6    best interest of the Commonwealth.  We do not feel that this

7    plan is in the best interest of the Commonwealth at all, and

8    primarily because it is based on the fool's gold of this debt

9    limit challenge, which splintered the GO Group.

10           Congratulations to them for coming up with this

11   strategy and implementing it, but ultimately, it's going to

12   make this case longer, not shorter, because ultimately, it's

13   going to fail on the merits.  We'll be back to ground zero,

14   starting all over again.

15           What needs to be done is to get all the GO

16   bondholders in a room and negotiate a GO plan that treats

17   everyone the same and treats everyone fairly.

18           Thank you, Your Honor.

19           THE COURT:  Thank you, Mr. Ellenberg.

20           Mr. Natbony.

21           MR. NATBONY:  Thank you, Your Honor.

22           In addressing the Amended Report, I had several

23   issues to address procedurally.  First, with respect to the

24   lift stay motions.  Second, with respect to the adversary

25   proceedings.  A third issue relating to the timing of the

1    Section 20 -- 926 motion.  And then in the context of those

2    three issues, I will address Judge Houser's proposed

3    revisions that were mentioned in her initial presentation to

4    Your Honor.

5         So first, with respect to the lift stay motions, at

6    this point, there actually seems to be remarkably little

7    disagreement between the parties.  Since the mediation team

8    issued its initial interim report, the revenue bondholders

9    have been clear and consistent that the lift stay motions are

10   an appropriate vehicle for addressing the gating issues

11   concerning the revenue bond issues.  And more recently, it

12   also became clear that the Oversight Board shares that view

13   that it could be a viable vehicle.

14        In fact, in response to the Amended Report, the Board

15   recognized that the lift stay motions are, quote, one possible

16   way to obtain rulings on the revenue bond issues.  And that's

17   at paragraph 12 of their Response.

18        So in light of this agreement, we suggest and submit

19   that the lift stay motions are really the only vehicle that's

20   necessary to address these gating issues.  And prioritizing

21   and forcing the parties to move forward with another vehicle,

22   such as this simultaneous summary judgment proceeding, will

23   result in duplication, a waste of resources, and an undue

24   burden both on the parties and the Court.

25        Now, interestingly, in contrast, in the case of the

1    adversary proceedings, there is, you know, not the consensus

2    that we talked about.  The revenue bondholders' basic

3    objection always has been that they're largely duplicative of

4    the enforcement actions that the revenue bonders would hope to

5    bring if the grant of stay relief is done.  So it doesn't make

6    sense for the parties to be expending resources on the

7    adversary proceedings, unless and until the lift stay motions

8    are resolved.

9            Furthermore, only an enforcement action in another

10   forum will actually permit the revenue bondholders to raise

11   the issues that the First Circuit in Ambac held could not be

12   addressed because of Section 305, such as the preemption of

13   the moratorium laws under Section 303, the invalidity of the

14   moratorium laws, fiscal plans and budget.

15           But interestingly now, the Amended Report kind of

16   changes things from where we were in January.  In January, we

17   were before Your Honor in an Omnibus, and we spent hours

18   before then and several hours here discussing and negotiating

19   complex schedules.  And these efforts resulted in interim

20   orders by this Court, setting important gating issues on a

21   proper course for adjudication, and that was through the lift

22   stay motions.

23           But the Amended Report now injects this additional

24   expedited, and we think duplicative, summary judgment

25   proceeding, which fundamentally up-ends what we did in

1  January.  And we think, and we submit to Your Honor, that

2  doing so is unworkable and fundamentally inconsistent with

3  what we decided together to work on in January.

4       So essentially, with respect to the adversary

5  proceedings, the 305 issue still looms.  That's going to have

6  to be decided.  There's going to be motion practice on that.

7  And under this summary judgment proposal, even with the

8  potential March 27 date that's now been suggested,

9  essentially while we're dealing with the lift stay motions,

10  and while we're filing our replies on the lift stay motions --

11  and by the way, there is not just one lift stay motion.  There

12  are several lift stay motions dealing with CCDA, PRIFA and

13  HTA.

14       So those are going to be due on the 26th.  There are

15  going to be cross-motions on the 27th under this proposed

16  schedule.  And by the way, if we stick with this additional

17  summary judgment process, you know, we're going to be in a

18  position where we have to do answers, counterclaims,

19  affirmative defenses.  I mean, if you're talking about

20  summary judgment motions in an adversary proceeding, we're

21  going to have to raise the issues that we have to raise by the

22  27th.

23       So if the purpose here is to look at gating issues

24  and to get some guidance from this Court -- and we agree with

25  Judge Houser, that we hope to have some guidance from Your

1   Honor, but if that is the purpose, then the purpose is best

2   served by focusing our efforts and focusing our resources on

3   the lift stay motions and the issues that will be presented to

4   Your Honor.

5          And we had a process in place.  Your Honor said we

6   would move forward, that Your Honor would consider moving

7   forward with potential certification.  After that, you would

8   consider it.  That was the process in place.

9          So from our perspective, not only do you have the

10  26th and the 27th, the two dates we talked about, but at the

11  same time, the revenue bondholders and counsel are going to

12  have to be preparing objections to a disclosure statement

13  hearing that's supposed to be held, and those objections are

14  going to be due, you know, several weeks after that as well.

15  So, you know, it seems to us that this entire summary judgment

16  process in the adversaries, you know, would be a process that

17  would be better served if we stayed them, not just staying the

18  motions to dismiss.

19         I mean, it's kind of unfortunate, Your Honor, that

20  here we were.  We set a schedule that said file your motions

21  to dismiss or your answers, which we did, and we spent a lot

22  of time on them.  Those are significant motions to dismiss.

23  And again, not just a single one, you know.  Four motions:

24  Two relating to HTA, because you had one by the Commonwealth

25  as well, one for CCDA and one for PRIFA.  And that's that.

1   Let's just stay them.  Let's forget it.  Well, what happened

2   to all that work?

3          But, you know, if we stay both the Summary Judgment,

4   and we stay both the Motion to Dismiss, and stay the

5   adversaries, and we can focus on the Lift Stay, that would be

6   a better use of the resources and --

7          THE COURT:  And so I'm assuming that you disagree

8   that the particular issues already asserted in claims in the

9   adversary that the mediation team has identified are key

10  gating issues that don't require further pleadings to cue up

11  and would be appropriate to look at in the near term?

12         MR. NATBONY:  Well, I think several points on that,

13  Your Honor.  If you look at the issues that were identified in

14  the mediation report, there is significant overlap between

15  those issues and the issues that would be presented in the

16  Lift Stay Motion.  But we also think -- so to that extent, we

17  think the real gating issues are in the Lift Stay.  Plus, I

18  would agree with what Mr. Ellenberg said with respect to

19  moving forward with the other gating issues, for instance, on

20  April 30th.

21         But that aside, not only is there substantial overlap

22  between the issues that we talked about, but there are other

23  issues there which are not particular issues that have -- that

24  are strictly legal issues.  I mean, if the point here is to

25  have this other summary judgment proceeding that's going to

1    result in some quick resolution of other issues, it's just not

2    going to happen.  You've got the 305 issue.  You've got, you

3    know, significant issues.  And Mr. Berezin will talk briefly

4    in a few minutes about all of the material issues of fact that

5    exist in some of the other issues.

6            You're going to have a Rule 56(d) motion, you know,

7    for discovery.  It's just not going to happen fast.  And it's

8    going to happen in the context of us raising affirmative

9    defenses and us raising counterclaims, you know, in a context

10   that unfortunately, I think, is detrimental to the ultimate

11   goal here.  The ultimate goal here was to get some gating

12   issues, get some guidance from the Court, you know, and help

13   the parties in that respect.

14           So the schedule again, as I said, is really not one

15   that is workable.  We think that there is really no need to

16   essentially jam the parties here with a schedule that is not

17   workable.  When -- I agree here with what Mr. Despins said.

18   If you think about it, whatever urgency that exists here all

19   of a sudden is really the result of various stays and other

20   delays that the Oversight Board and the mediation team

21   themselves have requested and come to Your Honor with.  And

22   now, all of a sudden, the time's changed.  The time is now to

23   rush, rush, rush, rush, rush.  Stop.

24           So from our perspective, what we see is stop and stay

25   and think about it.  And let's have discussions, and let's

1   move forward.  There's reason to stay.  And now all of a

2   sudden it's rush, rush, rush.  Well, we just don't see the

3   basis, especially in light of the problems that exist with the

4   Plan, which even begin with the government's opposition to it.

5        The other issue that I just wanted to point to Your

6   Honor was that on the 926 issue and the deadlines that Judge

7   Houser suggested, our position, as we've set forth in our

8   papers, is there are legal and practical reasons why there

9   shouldn't be any deadline.  926 sets no deadline on its face.

10  And the Court, of course, does have power to control its

11  docket and we recognize that.  But a deadline that would

12  permanently cut off the revenue bondholders' statutory right

13  to seek appointment of a Section 926 trustee, or otherwise

14  raise the conflict issue, we think would be detrimental to our

15  due process rights.

16       THE COURT:  Well, I will just say, so that everybody

17  knows, to the extent I decide to impose deadlines and/or

18  stays, the Court is willing, if not anxious, to entertain

19  applications for relief from particular deadlines or stays on

20  a showing of good cause.

21       MR. NATBONY:  Thank you, Your Honor.

22       I would also just say that Judge -- and Judge Houser

23  -- I appreciate Judge Houser's response to some of the

24  objections that were filed, but certainly the suggestion that

25  was raised of putting in dates that were either 15 days from,

1    it was the earlier -- sorry.  What Judge Houser suggested --

2              THE COURT:  The later --

3              MR. NATBONY:  The later of two particular days is

4    certainly a better option than what we have now in the Order,

5    and that is appreciated from Judge Houser, but our position is

6    there shouldn't be any deadline as well.

7              So unless the Court has further questions, those are

8    my several points.

9              THE COURT:  Thank you.

10             MR. NATBONY:  Thank you so much, Your Honor.

11             THE COURT:  Good afternoon.

12             MR. DUNNE:  Good afternoon, Your Honor.  For the

13   record, Dennis Dunne from Millbank on behalf of Ambac

14   Assurance Corp.  I'm joined up here by my partner, Ms. Miller.

15             I'm going to yield at about three minutes.  And by

16   the way, I think Mr. Despins gave us an extra two minutes --

17             THE COURT:  That's what he said.

18             MR. DUNNE:  -- so we were up to 10.  Hopefully it was

19   accepted by the Court.

20             So let me kind of jump into it.  I think that --

21             THE COURT:  But you still have to speak slowly enough

22   for the court reporter to get everything down and me to

23   understand it.

24             MR. DUNNE:  That -- you and I have talked about this

25   clock and what it does to the velocity of my words.

1          But today is an important day in the case.  I think

2    that we're at an inflection point, and I bet you everybody in

3    the courtroom agrees with that.  But I'd say people disagree

4    as to what happens next.  On the one side, there is a group of

5    parties that want to have a race to confirmation, even if that

6    comes at a price of curtailed, limited or summary review of

7    legal rights.  The other side, this is the objecting side, is

8    saying, finally some of the prior limitations on the review of

9    legal issues have been removed, and the oft-promised complete

10   airing of legal issues and production of documents will now

11   occur.

12          The supporting group doesn't necessarily want to have

13   that happen.  Their primary goal, and you heard it, they were

14   quite transparent about it, is speed at this point now that

15   they have the deal.  But the desire for that alacrity, Your

16   Honor, can't be a cudgel.  It can't impinge due process

17   rights.

18          And I want to remind everybody that there have been

19   times in the early parts of these cases, and in the middle

20   parts of these cases, where we have attempted to adjudicate

21   and get merit-based rulings on a bunch of issues that we're

22   now going to have to deal with.  The Oversight Board at that

23   time, and Your Honor will remember, argued it wasn't ripe yet.

24   And there's a certain logic to what they said, as that until

25   they actually decided which legal assumptions to embed into a

1    plan of adjustment, that Your Honor's rulings would be

2    declaratory judgments or advisory opinions and they weren't

3    ripe yet.

4         Your Honor agreed in connection with our adversary

5    proceeding with respect to the HTA lien and very clearly said

6    that we'll come back and we'll hear that at confirmation.  So

7    we're saying that time is now.  And it's certainly no time for

8    a truncated review of the issues, and it's no time for any

9    restrictions on discovery.  It should be the time in the case

10   when finally everything pertinent should be produced, we can

11   carefully consider it and thoughtfully present it to the Court

12   for adjudication.

13        There's been some comment today about the changes and

14   improvements between the September Plan and the Plan that was

15   filed last Friday.  I just want to spend two minutes on that.

16        When you take a look at it, it becomes clear what

17   happened, that it's the maxim in bankruptcy negotiations.  If

18   you're not in the room when parties are brewing up the

19   settlements, it's going to be a bitter quaff that you see

20   they've brewed.  Is that -- the additional value from

21   September to now, flowing to the 2012 GO holders is 860

22   million.  The additional Plan value to the 2014 holders is 1.3

23   billion.  The OID, which was referenced, means an additional

24   150 million net value to the 2014s.

25        And I haven't gotten to the hundreds of millions of

1   dollars of the PSA and consummation fees.  But the total

2   give-up in additional value is somewhere between 2.7 billion

3   and 3.2, depending on when we go effective.

4        The clock has already started to run on the accretion

5   of interest on the GOs and the junior COFINAs, because we're

6   past March 1.  What's the point here?

7        Make no mistake about it, Your Honor, this Plan was

8   crafted by and for GO holders, with the principal support

9   coming today, surprise, surprise, from GO holders.  As part of

10  that negotiation, when they're principally the only ones in

11  the room, they also decided to sweep virtually all of the debt

12  capacity in the Fiscal Plan.  With that, it left no room for

13  meaningful engagement with others, and the Plan,

14  unsurprisingly, doesn't seek to settle out the property right

15  litigation with respect to the clawback bonds.  It seeks to

16  zero it out.  And I guess at some level, that's everybody's

17  right.

18       As Your Honor has said, we'll deal with those issues

19  at confirmation, and we'll have our objections to it.  But

20  what it doesn't justify, this agreement and this new plan, is

21  a race to the exit or the setting of dates.  And I'll use the

22  much discussed June 3rd Disclosure Statement hearing, to the

23  extent that's used to abridge notice, timing or due process.

24       From Ambac's perspective, we want to work with a

25  schedule that actually makes sense and we can get behind.  And

1  we did the prior schedule.  And you've heard that from other

2  counsel, but if there is going to be something that has to

3  give, it's the June 3rd date.  If we can't actually get there

4  where we have a full and fair opportunity to be heard, it's

5  that date, which was artificially set, designed to build

6  pressure, some coal in the engine of the confirmation express,

7  to build on the metaphor, but it can't be our due process

8  rights.

9         One last point, Your Honor, before I turn it over to

10  Ms. Miller, which is the GO priority.  You've heard

11  Mr. Kirpalani refer to us as junior creditors with respect to

12  our clawback exposures.  This is a foundational assumption in

13  the Plan, and we don't obviously contest the existence of a

14  priority for the GOs so much as the scope and the permanence

15  of that priority.

16         And we're in a case, Your Honor, where the OB has

17  very narrowly construed various rights and entitlements under

18  state law.  Your Honor has correctly and appropriately put

19  parties to the test to show in detail the precise language in

20  contracts and legislation that supports it.  So to us, it's

21  surprising to see the complete absence of the scrutiny with

22  respect to the GO priority.

23         What do I mean by that?  We all know that there was

24  an annual budgetary priority.  In a year where you start with

25  a balanced budget and there was a shortfall on collections for

1    those amounts that were not paid in that year, you have a

2    priority.  What it is not, and we all know how to write these

3    things, is a perpetual priority.  It's not a subordination.

4         The legislature could have drafted a priority over

5    all callback debt post default.  It did not.  The Court should

6    be very wary of trying to rewrite that bargain now.  But the

7    POA does precisely that, it expands and solidifies that

8    year-to-year priority, renders it permanent, and the

9    equivalent to a contractual subordination provision, which it

10   is not.  And we need to hear this, and we need to have a full

11   adjudication of it.

12        It's also not a settlement, Your Honor.  What they're

13   trying to do here is to say, maybe Mr. Dunne has a point, but

14   let's adjudicate it within the range of reasonableness.  And I

15   say that for two reasons, one of which you've already heard,

16   which is that to the extent we're talking about the

17   classification structure that's the scaffolding of a plan,

18   with various priorities, et cetera, that classification scheme

19   needs to be lawful.

20        And everybody can come in to Your Honor and say, I

21   think it's not lawful because that priority simply does not

22   exist under the law.  The other is, it's simply not a

23   settlement.

24        When Mr. Kirpalani says the junior creditors over

25   there are going to complain about this, if this were truly a

 1  settlement, you'd have a settlement of that priority where

 2  they're saying, well, we're only taking 75 cents.  We could

 3  have got a hundred cents.  That other 25 cents would go to the

 4  junior class.

 5          Instead, what happened is they said there's only so

 6  much in the till, Your Honor.  There's only so much in the

 7  current Fiscal Plan.  We'll take all of it.  And you know

 8  what's helpful for us in front of Judge Swain is we'll call

 9  that a settlement.  That way, we will never get to the

10  underpinning legal propriety of the priority.

11          And with that, Your Honor, I'll yield to Ms. Miller.

12          THE COURT:  Thank you, Mr. Dunne.

13          Good morning, Ms. Miller.

14          MS. MILLER:  Good afternoon, Your Honor.  Atara

15  Miller from Millbank on behalf of Ambac Assurance Corporation.

16          So I have the unusual privilege for myself to just

17  get to brass tacks and to allow others to frame the issues.

18  And I think you'll be sympathetic to our cringing in the back

19  to the suggestion that we're trying to delay adjudication or

20  resolution of issues.  We've been trying to have them

21  adjudicated for four plus years at this point.

22          But what I think is critical is imposing a schedule

23  that actually works.  And there was some reference to it, but

24  I want to put in context or be really specific about what the

25  Court is going to order on the parties right now.  And I want

1    to make clear that we're talking, when we talk about the lift

2    stays, and Mr. Natbony mentioned this, that we're talking

3    about three Lift Stay Motions.  When we talk about the

4    adversary proceedings, motions to dismiss, or summary

5    judgments, we're talking about four separate Summary Judgment

6    Motions, or four separate adversary proceedings, each of which

7    the Complaint counts into the hundreds of pages, with hundreds

8    of counts as well.

9         The suggestion -- and I want to go back to the

10   original motion to dismiss schedule and the briefing that was

11   pretty hard fought and negotiated in mediation, which is the

12   current motion to dismiss schedule.  And that was something

13   that, based on the experience of the parties and our strong

14   desire to coordinate and avoid duplicate briefing and to have

15   all of the monoline parties aligned submitting a single brief,

16   which I think we've done pretty efficiently and effectively

17   for the Court to date, that that requires a significant amount

18   of coordination.  And the motion to dismiss schedule, which

19   had opening briefs on February 27, opposition on April 13, and

20   reply briefs on May 13, was the reflection of what the parties

21   thought we could reasonably do.

22        The summary judgment proposal truncated those

23   periods, in addition to just layering them on top of the

24   existing Lift Stay and motions to dismiss, and now Disclosure

25   Statement briefing, which also is all running in parallel.

1   It's now truncating those periods by about two and a half

2   weeks and then eight days.

3           And that truncating of the briefing period has not

4   changed with the shifting of the dates that Judge Houser

5   suggested at the beginning.  And I will tell you that, based

6   on the last two months of work, it is not practical, and the

7   product that this Court is going to see is going to reflect

8   that.

9           I also want to make clear, Mr. Natbony mentioned that

10  if there are going to be summary judgments, and there's going

11  to be true cross-motions where that is a meaningful right, the

12  monolines have to be given an opportunity to put in answers,

13  counterclaims, affirmative defenses.  We believe that if there

14  is going to be summary judgment, there are critical issues in

15  addition to the eight that have been identified that need to

16  be addressed.

17          Mr. Dunne referenced one of them, which is the

18  clawback rights and what that means.  And another one would be

19  whether PROMESA is constitutional under the Uniform Bankruptcy

20  Clause.  We think that those are critical issues that really

21  should be teed up.  And if there's going to be summary

22  judgment, we'd like to present those in an answer with

23  counterclaims and move on that as well.

24          The last issue, just very briefly, in terms of the

25  scope of the stay, we would join Assured and the UCC in the

1    suggestion that the objection to a broad blanket stay, we

2    think that that's procedurally improper.  We think you should

3    stay issues that are before you.  And to the extent that

4    parties file things and there is a request or suggestion that

5    it should be stayed or a belief that it should be, there can

6    be a motion to stay.  And the Court should consider that in

7    due process, rather than as -- the current proposed order

8    would have a blanket stay, not just until confirmation, but

9    actually through confirmation.

10          So as written, issues like classification, for

11   example, can't even be litigated at the confirmation stage.

12   And I'm not exactly sure how that works.

13          THE COURT:  My understanding, and I was going to say

14   for what it's worth, but I guess since I'm sitting here, it's

15   worth a lot.  My understanding is that the intent is not to

16   preclude confirmation-related litigation, but rather to

17   channel litigation on those issues into the confirmation

18   contested matter mode to the maximum extent possible, as

19   opposed to having things pop up in different adversaries and

20   contested matters all over the place.

21          So I'm reading it and would, if I put it in place,

22   administer it as a channeling mechanism, as opposed to a

23   preclusion mechanism for issues that truly are pertinent to

24   confirmation or Disclosure Statement approval.

25          MS. MILLER:  So then I would suggest that the

1    language, I think in paragraph 5 of the Proposed Order, be

2    changed, because I think that it said --

3            THE COURT:  I was intending to.

4            MS. MILLER:  Okay.  Because it says anything in the

5    settlement can't be litigated until after confirmation.

6            In addition to that, the last thing I want to touch

7    on, which nobody's mentioned, but one of the stayed issues or

8    one of the stayed motions right now is the PRIFA 2004

9    Discovery Motion.  And you'll recall that that was up for

10   hearing in June, along with the original PRIFA Stay Motion.

11           And there was debate between myself and

12   Mr. Bienenstock about whether that could go forward if we were

13   putting this substantive stay motion into -- the Lift Stay

14   Motion into mediation.  And at the end, we agreed that we

15   would put them -- put it all into mediation.

16           That discovery motion, however, is not strictly

17   related to Lift Stay related discovery.  They were two

18   separate issues.  There is some degree of overlap, but, first

19   of all, as Your Honor is well aware, the discovery that has

20   been granted in connection with the Stay Motion is limited

21   discovery specifically related to secured status and flow of

22   funds.

23           THE COURT:  May I interrupt you?

24           MS. MILLER:  Sure.

25           THE COURT:  I understand that, and again, I offer

1   this for the purpose of expediency and transparency, in that

2   the Lift Stay Motion practice is front ending the question of

3   whether this set of creditors of PRIFA have an interest in

4   these particular streams of revenue or can assert claims on

5   behalf of PRIFA.  It seems to me that 2004 discovery is in a

6   different context, depending on whether there is that standing

7   and whether there is an interest in that particular revenue

8   stream or not.

9        And so if there were a determination that this

10  constituency were not secured, didn't have a special priority

11  equitable interest, there are lots of issues to be litigated

12  there, and I don't know how they're going to come out.  But if

13  they were to come out putting the bondholders' constituency in

14  the same place as general unsecured creditors, the Court is

15  justified in looking at a very extensive, very granular

16  request for information as to a particular aspect of the

17  Commonwealth's finances, perhaps through a somewhat different

18  lens or template than if those same granular questions were

19  being asked by someone who has a particular claim on those --

20  on those revenues.

21       And so it seems to me, at this point, logical in the

22  context of the early queuing up of issues in the Lift Stay, to

23  put the PRIFA 2004 into the more general confirmation context

24  in a structure that assumes there will be some answers on the

25  security interest and standing questions before confirmation

1   discovery opens up.

2          MS. MILLER:  So I would say two quick things, but I'm

3   not sure that I necessarily disagree, because I think what

4   you're saying is proposing not to stay it through to

5   confirmation --

6          THE COURT:  No.

7          MS. MILLER:  -- but to stay it for the next month or

8   so --

9          THE COURT:  To stay it until confirmation --

10          MR. MILLER:  -- until the discovery starts, which

11   would be, I think in June.

12          THE COURT:  Yes.

13          MS. MILLER:  I mean, our position on that, just to be

14   clear, is that it's information much like the other 2004

15   motions that we filed, which go to the general ability to pay

16   of the Commonwealth, were also general obligation, as well as

17   PBA creditors.  And in that regard, it is specific in that it

18   is addressing particular payments, but it is hundreds of

19   millions of dollars a year that are paid.  And so it's not

20   sort of a small going after the copy expenses.  It is a really

21   big line item that we think is directly relevant to the

22   issues.

23          But if what you're saying is we'll get it in

24   confirmation-related discovery --

25          THE COURT:  Yes, that's what I would see it coming in

1    --

2          MS. MILLER:  -- we don't have a strong objection to

3    that.  Thank you, Your Honor.

4          THE COURT:  All right.  Thank you.

5          So, National.  Is anyone speaking for National?  I

6    have eight minutes down for National.

7          MR. BEREZIN:  It's me.

8          THE COURT:  Oh, I'm so sorry.

9          MR. BEREZIN:  Your Honor, Robert Berezin, Weil,

10   Gotshal & Manges, for National Public Finance Guarantee

11   Corporation.

12         THE COURT:  Yes.

13         MR. BEREZIN:  Your Honor, I'd like to start with

14   National's objection to adding early summary judgment motion

15   practice to the existing Revenue Bond Scheduling Order.  The

16   purported basis for allowing for early summary judgment

17   motions is that they will result in multiple merits rulings

18   and do so in a matter of weeks.  In our view, they won't.

19         Our early summary judgment motions will result in

20   significant upheaval.  They will impose substantial burdens on

21   the Court and the parties, but they won't resolve important

22   gating issues, certainly not on the time scales that have been

23   proposed.

24         The main issue that I want to focus on, Your Honor,

25   is the issues of fact.  So as the Court knows, I think the

1    record at this point before the Court is that there's been no

2    showing at all that summary judgment motions, before motions

3    to dismiss have been decided, before answers have been filed,

4    before counterclaims, and before any discovery, makes any

5    sense at all and will work.  And, in fact, the record shows

6    quite the opposite.

7           Many of the counts, the eight counts that are slated

8    for early summary judgment, implicate factual issues that will

9    require, consistent with due process, discovery.  So, for

10   example, many of the counts implicate the question of whether

11   the clawback of excise taxes over the last four or five fiscal

12   years was proper under Commonwealth law.  That will

13   necessitate a factual investigation for each fiscal year that

14   the excise taxes were withheld properly under Commonwealth

15   law.  What were the available resources?  What were the

16   appropriations?

17          Other counts indicate that the Board will be moving

18   on summary judgment as to whether the Commonwealth exercised

19   an alleged police power in withholding the excise taxes to

20   provide essential services.  Well, so the questions there

21   include:  What are the essential services?  How much did they

22   cost?  Was it essential and necessary to withhold the excise

23   taxes?  And were they used, in fact, to satisfy essential

24   services or something else?

25          These are intensely factual questions, and they arise

1  in several of the counts.  Several of the counts involve

2  claims under the Contracts Clause, seeking to disallow a

3  bondholder claims under the Contracts Clause, raising

4  questions of were the impairments substantial and were they

5  reasonable and necessary?  Reasonable and necessary obviously

6  goes into very factual questions.

7        What, again, related to the -- what were the excise

8  taxes used for?  Were there no other alternatives?  Were

9  they -- what was the level of essential services?  Et cetera.

10 These are not legal issues, purely legal issues at all.  Yet,

11 they are slated for summary judgment.

12       So the list goes on in terms of the property interest

13 issues and secured status issues, though the refrain that the

14 Court has heard for months is that it's all purely legal.

15 There are absolutely no factual components.  The Court has

16 already decided that's not so.  You've granted limited

17 discovery already.  And those documents are showing that many

18 of the Board's arguments, legal arguments, untested arguments,

19 are completely inconsistent with the facts on the ground.

20       And we know -- we need to know which accounts were

21 involved.  You know, which -- which accounts held excise

22 taxes.  Were those accounts held for the benefit of HTA or

23 not?  What were the -- how were those accounts handled?

24       There are several factual issues there, not

25 withstanding the arguments that the Court has heard, and that

1   requires discovery.  The Lift Stay discovery ordered so far is

2   not necessarily a substitute that can then be used in the

3   adversary proceedings.

4        So one example, Your Honor, is in the adversary

5   proceedings under property interest.  The Board contends -- in

6   one of the counts that is slated for summary judgment, the

7   Board contends that even if the monolines have a property

8   interest, it was subject to clawback and there was a valid

9   clawback.  Well, that's an intensely factual issue.

10       So at the same time, the First Circuit's rules here

11  are crystal clear, that if you've got an early summary

12  judgment motion before answers are filed, the standard to

13  identify a genuine and material issue is low.  It's not a

14  challenging standard to meet.

15       And so the record before the Court shows that summary

16  judgment motions won't lead to a quick merits ruling, and,

17  therefore, the suggestion that they be adopted makes little

18  sense.  It's not going to help.  It's going to make things

19  incredibly complicated for everyone and not lead to

20  resolutions.  Far better to focus on the pending Lift Stay

21  Motions.

22       If the Court were inclined, however, to proceed with

23  summary judgment, the issue of deadlines that Ms. Miller just

24  articulated can't be understated.  Aside from the fact that we

25  are talking about, when you layer all of the deadlines on top

1   of each other, by my count, 11 filings in less than 13 weeks,

2   four or five hearings in less than 13 weeks, before the June

3   3rd date, that doesn't even consider the virtual inevitability

4   that discovery will be required.

5          There is no way that these motions can be heard and

6   decided by this Court, consistent with due process and

7   rational scheduling, in time for this June 3rd arbitrary date.

8   So, Your Honor, we would urge the Court, if it is inclined to

9   proceed with summary judgment, to absolutely disregard the

10  notion of the schedule being held hostage to this June 3rd

11  date.

12         Your Honor, we also join the remarks of others, and I

13  won't repeat them, that the deadline for the 926 motion is

14  inappropriate and an extremely difficult deadline to meet in

15  light of the other issues that are pending, as well as the

16  stay -- the blanket stay of the GO-PBA issues.

17         I'd just like to close, Your Honor, with a remark

18  regarding Judge Houser's comments.  National did not

19  understand that this Court's Orders that authorized the

20  mediation sessions permitted the exclusion of some creditors.

21  National objects to that and objects to the process of

22  exclusion that has occurred.

23         National was one of the parties that was excluded.

24  We were very disappointed to be excluded, and repeatedly asked

25  to join the negotiations.  Nor did National demand global

1    resolution of its cross holdings, for example, in HTA.

2         But, Your Honor, on a more positive note, we hope to

3    join the mediation process.  We hope that we're permitted to

4    join the mediation process.  We don't think any party,

5    particularly a party holding such substantial claims, should

6    be excluded.

7         Thank you, Your Honor.

8         THE COURT:  Thank you, Mr. Berezin.

9         Invesco.  All right.  Sorry for the delay.  Good

10   afternoon.

11        MS. BYOWITZ:  Not at all.  Good afternoon, Your

12   Honor.  Alice Byowitz on behalf of certain funds managed by

13   Invesco Advisers and OFI Global Institutional, Inc.

14        The Invesco funds joined the objection and

15   reservation of rights that was filed by the monolines

16   regarding the Disclosure Statement schedule.  That objection

17   was filed before the Oversight Board filed its Proposed Plan

18   of Adjustment.  Invesco has now seen and begun its review of

19   the Plan, and it reiterates its objections to the schedule.

20        The Invesco funds are mutual funds that invest in

21   municipal bonds for individual investors across the United

22   States.  They've been partnering with Puerto Rico to finance

23   infrastructure across the island for more than 35 years, and

24   they are committed to Puerto Rico's long-term interest and

25   hope to see the island prosper in the future.

1           The Invesco funds and other mutual funds like it that

2    have invested all across Puerto Rico's capital structure in

3    the GOs, in PBA, in HTA, in PRIFA, for decades have done so

4    because those bonds were valid on the dates that they were

5    issued, those bonds remain valid to this day, and those bonds

6    are entitled to be paid from the revenue sources pledged to

7    their payment.

8           The Oversight Board's Plan of Adjustment rewards

9    meritless litigation claims against these valid, longstanding

10   financing structures, ignoring the plain language of the

11   Puerto Rico Constitution and the pledges of collateral to

12   secure different bonds.

13          Other parties have already addressed a number of the

14   flaws with the Proposed Plan, and I won't repeat them here.  I

15   will just add that among its other flaws, the Plan would

16   impose steep losses on constitutionally backed bonds.  And

17   yet, as you've already heard, the Board refuses to describe

18   the essential services that are being paid ahead of these

19   bonds and relies on projections that have consistently

20   underestimated Puerto Rico's performance, to the detriment of

21   bondholders.

22          Mr. Kirpalani said junior creditors are seeking to

23   delay and defer.  Mr. Ellenberg already addressed the junior

24   points, so I won't belabor it here.  On delay, I will just say

25   that that's not our aim.  Instead, we seek a reasonable

1    schedule that allows parties a real opportunity to vindicate

2    their rights.

3              Thank you, Your Honor.

4              THE COURT:  Thank you, Ms. Byowitz.

5              FGIC, Mr. Sosland.

6              MR. SOSLAND:  Good afternoon, Your Honor.

7              THE COURT:  Good afternoon.

8              MR. SOSLAND:  Martin Sosland on behalf of FGIC.

9              We join in the comments of our brothers and sisters

10   similarly situated.  And I won't repeat their arguments.  I

11   would like to punctuate a couple, and also respond simply to

12   one of the points that Judge Houser made.

13             She made the point that the objecting creditors and

14   those of us asserting our lien rights in respect to the

15   revenue bonds shouldn't be allowed to hold up confirmation.

16   And if that was a characterization of what we're doing, we

17   simply don't think it's fair.

18             And I would remind the Court, on May 20th -- on May

19   20th, 2019, so ten months ago, the Oversight Board filed

20   adversary proceedings in an attempt to beat the avoidance

21   action statute of limitations in the case of HTA.  And one in

22   particular, it's 19-363, FGIC and the other monolines are

23   defendants.

24             And FGIC promptly answered and filed counterclaims in

25   that adversary proceeding.  We did that on June 11, 2019.  So

1   just barely three weeks after the Complaint was filed.  And

2   the next day, in response to a motion that the Oversight Board

3   had filed seeking to stay that adversary proceeding, which we

4   opposed that it -- the Court entered, at that point, a brief

5   stay.

6          And we told the Court at that time that these were

7   gating issues that needed to be determined before we moved

8   forward with the disclosure statement and plan; that they were

9   equally important to the issues that were determined, the

10  ownership issues determined in connection with COFINA; and

11  that they should go forward.  And then six weeks after that,

12  on July 24th, of course, the Court entered its Order staying

13  that adversary proceeding and all of the litigation in these

14  cases until barely a month ago basically.

15         But we have not been the holdup, because we wanted to

16  go forward with that litigation in the first place.  And I

17  think characterizing us as attempting to have these gating

18  issues litigated in advance of confirmation of a plan is not a

19  holdup, but just seeking our due process and substantive

20  rights that they be litigated.

21         We would join in the comments, as I said, that the

22  other monoline counsel made.  And I want to particularly

23  emphasize the completeness and some of the remarks of

24  Ms. Miller, that if we're going to go forward on a summary

25  judgment schedule, and for the reasons that Mr. Berezin and

1    others have pointed out, we think the stay relief motions are

2    more appropriate.

3            Before going forward, we should not be limited to the

4    issues that are stated in the -- that should be stated -- that

5    are put forth in the mediators' report.  We should be able to

6    fully answer and move for summary judgment on whatever issues

7    that we think are appropriate.  And those cross motions should

8    go forward on whatever the schedule is that fits.  We'll meet

9    the schedule, but we should not be -- we should not have our

10   substantive rights limited by what issues can be put before

11   the Court in that context.

12           And finally, I just want to mention one item as it

13   relates to confirmation.  As I think the Court is aware, in

14   these adversary proceedings, the Oversight Board has been

15   arguing, among other things, that we don't have the priorities

16   and liens that you've heard from other counsel that we have

17   and that we've been putting before the Court, including in the

18   stay motions.  And we don't have them, among other reasons,

19   because our rights are preempted by PROMESA.  We don't think

20   that that is right, and we don't think the Plan is confirmable

21   if it takes away our rights based on preemption.  But if it's

22   right and if we're wrong, then preemption applies to all of

23   the preexisting claims.

24           And then there's a problem with this so-called

25   settlement with the GO holders, because you're going to have a

1   problem under 1129, because that would be unfair

2   discrimination if our rights are preempted and their preempted

3   rights are somehow getting 75 cents or more on the dollar,

4   where we're getting nothing.

5           Thank you.

6           THE COURT:  Thank you.

7           And now I'll turn to Mr. Hein, who's been waiting

8   patiently in New York for eight minutes.

9           Good afternoon, Mr. Hein.

10          MR. HEIN:  Yes.  Thank you, Your Honor.

11          I want to make several points, and otherwise rely on

12  my previously filed papers.  First, I continue to object to

13  any stays of litigation related to validity, secured status or

14  priority.  My position is that rights of bondholders who have

15  lawful priorities and liens cannot be compromised away through

16  confidential mediation to produce a plan.

17          Second, the Commonwealth is not in a position to

18  advance a plan of adjustment, because the Commonwealth has

19  not issued audited financials for any period since June 30,

20  2016. 48 U.S.C. 2146(a)(2) entitled, Oversight Board duties

21  related to restructuring, provides that a requirement for a

22  restructuring certification is that the Oversight Board,

23  prior to issuing a restructuring certification, has

24  determined, in this case that the Commonwealth, quote, has

25  adopted procedures necessary to deliver timely audited

1  financial statements.

2        But the last financials that have been audited are

3  through June 30th, 2016, which were issued almost three years

4  late thereafter.  It's now been over 970 days since the end of

5  fiscal 2017.  We still do not have audited financials for

6  2017.

7        What's attached as Exhibit K to the draft disclosure

8  statement is audited financials through June 30, 2016, almost

9  four years old.  And respectfully, I would submit that step

10  one, before a draft disclosure statement is put out for

11  comments on adequacy, should be to get audited financials

12  issued, including for fiscal 2017, fiscal 2018, as well as

13  through June 30, 2019, which is a period that ended over eight

14  months ago.

15        Third, another flaw in the amended mediation report

16  is its failure to address the topics identified in Your

17  Honor's July 24, 2019, Order.  That's at docket 8244.  On page

18  four, item 10(c), Your Honor said that mediation report could

19  address whether and when the creation of a limited scope

20  committee might be necessary or advisable to address issues

21  unique to individual bondholders, such as the payment

22  structure of replacement bonds.  The Amended Report does not

23  address the need for a committee to represent individual

24  bondholders.

25        The proposed plan that came out of this mediation

1  includes 16 splinter bonds.  And what this means is someone

2  who had, as an individual retail investor even, say, a hundred

3  thousand par, but there are some that might have had 10,000

4  par, they get 16 splinters for every one existing bond.

5       This repeats a feature of the COFINA Plan that was

6  devastating to individual investors, a loss of liquidity for

7  the splinter bonds they received.  Even worse, fractional

8  splinter bonds being sold at fire sale prices, further

9  depressing recoveries, to say nothing of having to address

10 and account for these splinter bonds for tax purposes, and

11 the potential for brokerage fees for exchange transactions

12 on a splinter bond basis.

13      Splinter bonds might produce great trading

14 opportunities for hedge funds, but they have a devastating

15 impact on individuals for the reasons I mentioned.

16      Mr. Rosen's comments, I think, this morning highlight

17 that retail investors who bought pre-PROMESA were left out of

18 this process.  Respectfully, confidential mediation's simply

19 not an appropriate process for a case where billions of

20 dollars were sold throughout the country, including to retail

21 investors.

22      Mr. Rosen refers to the 50 billion dollar potential

23 retail support fee for retail investors, but that provides

24 only a pretense of equality.  The fee is contingent on retail

25 investors, who are segregated into separate retail classes,

1    having their classes vote yes.  That is improperly coercive,

2    particularly because the retail investors were not included in

3    the mediation process that produced the plan terms.

4          There is also no data provided where one -- whereby

5    one can conclude how that retail support fee, even if it did

6    occur pro rata per holdings compares to what the institutional

7    investors are getting.  Puerto Rico has approximately nine

8    billion in cash sitting today in its TSA account.  And even --

9    and that's even though spending has been largely unrestrained,

10   taxes have been reduced since PROMESA's been adopted.

11         There is no legitimate case for foisting losses on

12   bondholders, who under Puerto Rico's Constitution, were to be

13   paid first before any other expenses.  Yet, we have continued

14   unrestrained spending, public relations, advertising

15   consultants, you name it, reducing taxes, everything and

16   anything but pay the bondholders who have their constitutional

17   right priority.

18         The effect of the Plan is to reverse those

19   constitutional priorities.  Current employees under this Plan

20   actually get cash bonuses.  Retired employees are largely

21   unaffected and may even benefit further if the Commonwealth

22   achieves its projected surpluses, or if surpluses exceed their

23   current lowball expectations.  This is extraordinarily unfair

24   to individual investors who bought years ago, long before

25   PROMESA was even on the horizon.

1            And one point that is not in my papers that I want

2    to make responsive to the Retiree Committee filing, that's at

3    docket 11121, the Retiree Committee says they plan to have a

4    summary explaining to retirees how their retirement benefits

5    will be treated, and they want that to be separate and apart

6    from the Disclosure Statement.  And I object to having

7    anything separate and apart from the Disclosure Statement.

8            Any summary of how retirees are treated should be

9    enclosed in the disclosure statement that bondholders -- many

10   of these individual bondholders themselves are retired, and

11   they should be able to see the summary of how the Puerto

12   Rico public employees, retirees, are being treated.  The

13   Oversight Board's gambit here is to reverse constitutional

14   priorities.  All bondholders are entitled to see what is

15   going on.

16           Finally, I would just note that there were

17   additional aspects of Your Honor's July Order, docket 8244,

18   not addressed.  That includes item six on page four regarding

19   anticipated gerrymandering challenges.  The Plan, as I

20   mentioned, even introduces new gerrymandering.

21           Also, item seven on page four, identification and

22   treatment of essential services.  That's not been done despite

23   four years after PROMESA.

24           And finally, item eight on page four, treatment of

25   claims based on alleged violations of Federal Constitution.

1   That is not addressed in the Mediation Report.

2           Thank you, Your Honor.

3           THE COURT:  Thank you, Mr. Hein.

4           Yes, sir.

5           MR. MINTZ:  Hi.  Doug Mintz, Your Honor, of Orrick,

6   counsel to Cantor-Katz Collateral Monitor, LLC, for the DRA

7   parties.

8           As you know, the DRA is the largest HTA creditor and

9   owns hundreds of millions of dollars of claims against the

10  Commonwealth and PBA, as well as a much larger portfolio of

11  other claims.  Despite the size and breadth of the DRA's

12  holdings, everyone seems eager to erase the DRA from the case,

13  including from negotiations in this process.

14          As others have said, we did ask to be part of

15  negotiations, and offered a variety of different people, and

16  were not included in that process.  We did not refuse to

17  negotiate.  This erasure seems to be happening despite the

18  fact that this Court, just a little more than a year ago,

19  approved the Title VI in the GDB case that helped create the

20  DRA, as well as legislation that helped create the DRA.

21          And so we've been put in place, our clients have been

22  put in place, and we're here to push to preserve the interests

23  of our clients, and will continue to do so.  You'll hear a bit

24  about our efforts to participate in and ultimately now to try

25  and intervene in the revenue bond litigation to avoid

1  suffering prejudice.

2         Judge Dein, we appreciate the Order that she entered

3  last night, that that dispute does continue in the context of

4  the revenue bond litigation, and the adversaries as well, and

5  those requests are pending.

6         But first, I did want to cover a few overarching

7  points and try not to repeat too much of what other people

8  have said.  Mr. Kirpalani said parties are here trying to

9  delay, but it's not about delay.  It's clearly about due

10 process.

11        We're not here to stand in the way of any proposed

12 schedule.  We're skeptical that the proposed schedule can get

13 done on the timing that's been teed up.  I'll leave the

14 various dates that other people have addressed.  I think

15 you've heard it.

16        We echo a number of those thoughts.  But there's a

17 lot to cover in a relatively short period of time.  We won't

18 stand in the way.  We'll push to cover those issue.

19        It does seem like part of the intent is to channel a

20 lot toward confirmation.  It looks like two weeks for

21 confirmation may not be enough, but that's a conversation,

22 perhaps, to reconsider.  We know that there are disparate

23 parties objecting to the proposal and the mediators' report,

24 parties that often disagree.  While on the other side is the

25 Oversight Board and the Plan Support Agreement creditors who

1    adopt the mediators' position, and they really effusively

2    adopt it, I should say.

3          We'd ask the Court to take a more measured approach

4    to tee up issues for resolution before and during confirmation

5    that need to be teed up, and do so in a coordinated, not

6    piecemeal fashion, to avoid depriving various parties of their

7    due process rights.  One area in desperate need of global

8    resolution, and Mr. Dunne touched on this, is the

9    Commonwealth's diversion of revenue from HTA and other

10   entities.

11         The mediator doesn't tee this up directly as a

12   confirmation issue, but we think it's a fundamental assumption

13   built into the Plan that all the free cash needs to go to

14   service GO bonds first.  This is an issue that the clawback

15   complaint may cover in pieces, but the clawback complaint is

16   teed up essentially as a claim objection dealing with specific

17   claims.  This is a fundamental assumption underlying the

18   entire Plan.

19         The Oversight Board has offered and will offer

20   multiple reasons why the diversion was proper, and the Court

21   needs to address these in full, not in pieces.  For example,

22   as Your Honor is well aware, Article VI, Section 8 of the

23   Commonwealth Constitution says, in the case available revenues

24   for any fiscal year are insufficient to meet the

25   appropriations made for that year, interest on public debt and

1    amortization shall be paid first.

2         At this time, I'm not aware of any evidence to

3    support the notion that there were insufficient revenues in

4    any fiscal year.  Mr. Berezin touched on that as well.  And

5    this is really complicated stuff.  It needs to be analyzed

6    year by year, and revenue stream by revenue stream.

7         Each instrument talks about when their funds should

8    be made available.  This is an issue that will be key to

9    confirmation.  Whether it's a gating issue or confirmation

10   issue, I can't say, but it is an issue that needs to be

11   addressed broadly.

12        That's true even if the Oversight Board doesn't

13   address that issue themselves, because the Plan needs to

14   satisfy the best interest test under Section 314(b)(6) of

15   PROMESA, which requires the creditors would not receive a

16   greater recovery under Commonwealth law and the Commonwealth

17   Constitution.  These provisions are right out of Commonwealth

18   law and the Constitution, and they need to be addressed.

19        There's also some suggestion, both in the mediators'

20   report and comments we've heard today, that this could be

21   settled, but other parties, particularly GO bondholders, are

22   not the parties to settle that issue.

23        We cite a few cases in our briefs, including *Miami*

24   *Metals* at 603 B.R. 531, which support the notion that you need

25   to take close look at the nonsettling party's interest in the

1   settlement.  And so to the extent that the revenue bondholders

2   are not settling parties, you'd have to look at this issue

3   very closely.

4        With respect to our concerns about the revenue bonds

5   specifically, as I alluded to at the outset, we've got a

6   common interest in certain excise tax revenue streams.  Those

7   revenue streams are the subject of the monolines Lift Stay,

8   the DRA's Lift Stay, as well as the adversary proceedings in

9   the HTA case.  And we've sought to participate and ultimately

10  to intervene in those cases.

11       As I noted, Judge Dein addressed the issue with

12  respect to the Lift Stay, which we're grateful for.  There are

13  a number of overlapping issues in all of these proceedings.

14  And these issues, as I said, can't be addressed piecemeal.

15       The current Revenue Bond Scheduling Order that's

16  before the Court would address a number of these piecemeal and

17  deprive the DRA parties of certain due process rights.  Again,

18  that's being rectified, and we've filed motions to intervene

19  in the adversary proceeding.  They are before the Court,

20  although they're not pending today.  And we would ask that the

21  Court address those in due order.

22       We may submit a further notice seeking to schedule

23  them in as short a time as possible.

24       THE COURT:  Well, my understanding is that Judge Dein

25  is well aware of them and intends to address them.

1              MR. MINTZ:  Yes.  We understand that and appreciate

2       that, Your Honor.

3              Briefly, a couple of other issues.  With respect to

4       the trustee issue for HTA or other appropriate relief, we

5       agree that that's an important gating issue.  It is something

6       that again should be addressed on a broad basis, not among

7       limited parties.  It's a little bit unclear in the proposed

8       Revenue Bond Order, but we'd obviously expect to be a

9       participant in that process.

10             We echo other folks' thoughts on the blanket stay,

11      and I won't offer anything additional there.

12             And just to respond to Mr. Despins' comment about the

13      UCC's claim objection, while it may not be a showstopper with

14      broad -- it is a very important issue for our clients who

15      would like to resolve that objection very quickly.  We think

16      the objection lacks any merit whatsoever.

17             I won't go into the complicated legal issues here,

18      but we allude to them in our briefing, and we believe it's

19      important to address that very quickly for our clients'

20      benefit.  So, in the end, we believe the current proposal can

21      be prejudicial and piecemeal and turns a blind eye to some of

22      the big issues in this case.

23             We want to ensure that the Court has every

24      opportunity to address those big issues, and we'll obviously

25      work hard to be a part of that as needed.

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Mintz.

3          Mr. Mudd, did you wish to be heard?  Good afternoon.

4          MR. MUDD:  Good afternoon.  Thank you, Your Honor.

5     John Mudd for Salud Integral en la Montaña.

6          Your Honor, we filed a motion objecting to the

7     timetable of the Disclosure Statement.  I would like to quote

8     a local saying attributed to Napoleon.  It basically says,

9     dress me slowly for I am in a hurry.  And that's something we

10    have to consider here.

11         First of all, we have a disclosure statement that has

12    1,967 pages.  True, some of those documents have been filed

13    before, but have they been analyzed in terms of the disclosure

14    statement?  Not necessarily.  That's one problem.

15         Second, we have the Ambac discovery.  There have been

16    two reports already, and the government of Puerto Rico has

17    said that it will produce documents, but they need time.

18    Fine.  No problem.  But those documents will likely be very

19    important for the Disclosure Statement and the Plan of

20    Adjustment.  So if we don't have them, how can we object to

21    the Disclosure Statement?

22         Third, the Board has said that it will certify the

23    fiscal -- the new Fiscal Plan by April 30th.  We have to file

24    objections by the 17th of April.  Now, if the fiscal -- if the

25    Plan of Adjustment is supposed to be based on the Fiscal Plan

174

1   and they have to be consistent, I'm sorry, then how can we do

2   that?  That's kind of difficult.

3           Fourth, the Board has not explained how it's going to

4   override, shall we say, or come to an agreement with the

5   government.  And here we have to divide the government.  The

6   Board may have been discussing and speaking with AAFAF, which

7   is the executive.  Fine.  No problem.

8           But what about the legislature?  The legislature has

9   said without any doubt that they will not approve -- there's

10  even a resolution that they will not approve this.  So we have

11  that fourth problem.

12          The fifth, and I echo Mr. Hein's objections, we don't

13  have financial statements, audited financial statements.  And

14  if we don't have them, how do we know all the information is

15  correct -- or reliable?  Not correct.  Reliable.  And that

16  will be our point, Your Honor.

17          Thank you.

18          THE COURT:  Thank you.

19          Does anyone else want to be heard before I call on

20  the Oversight -- yes.

21          MR. ROTGER SABAT:  Good afternoon, Your Honor.

22          THE COURT:  Good afternoon.

23          MR. ROTGER SABAT:  My name is Angel Rotger.  I am

24  counsel, local counsel for defendant Morgan Stanley in the

25  adversary proceeding 19-280.  With me today is sister counsel,

1    Nilda Navarro Cabrer.  She's also counsel for Jefferies and BP

2    Capital Markets -- I mean, pardon me, BMO Capital Markets.  We

3    also appear, Your Honor, on behalf -- strictly for the

4    purposes of joint docket 11242, the joint statement for the

5    defendants there identified in footnote number two.

6         Simply put, Your Honor, our adversary proceeding has

7    been referred to as the underwriter litigation.

8         THE COURT:  Yes.

9         MR. ROTGER SABAT:  Our opposition to the Amended

10   Report and Recommendation submitted by the mediation team

11   simply limits to oppose any extension of the stay to the

12   motion practice discovery in our litigation.

13        Your Honor, as already has been stated by the UCC in

14   docket -- I believe it's in response to the mediation Amended

15   Report and Recommendation in docket 11482, the UCC will pursue

16   litigation not withstanding whatever happens to the Plan,

17   either confirmed, not confirmed, modified.  We believe, Your

18   Honor, in judicial economy, that if we are allowed to

19   continue our motion practice, particularly our Motion to

20   Dismiss, to commence that briefing schedule will allow us to

21   narrow the scope of legal issues in that adversary

22   proceeding, particularly on the part that -- the Complaint

23   has approximately 60 counts, and there are many legal issues

24   separate, independent from the Confirmation Plan issues.

25        So we believe, if we can be allowed to address in a

1    Motion to Dismiss briefing schedule those issues, we're

2    allowed to narrow scopes of a legal nature, and if there's any

3    kind -- for example, Your Honor, if we're able to, from those

4    60 counts, be able to dismiss 40 counts strictly on issues of

5    law, nothing of discovery or anything further of that

6    adversary proceeding, we're allowed to narrow scope for this

7    Honorable Court to move on as to those legal issues in that

8    matter.

9            And finally, Your Honor, even if there's any worry as

10   to the constitutional validity claims that might be addressed

11   in that adversary proceeding for the GO bonds, we're willing

12   to carve that out and allow the process to literally attend

13   whatever's not related to any GO bond constitutional issue.

14           And we agree wholeheartedly with what Judge Houser

15   stated earlier this morning.  Let's finish it.  And in our

16   case, let's allow us to at least proceed with the motion to

17   dismiss briefing schedule.

18           That would be all, Your Honor.

19           THE COURT:  Thank you, Mr. Rotger.

20           Is there anybody else who wants to be heard before I

21   ask the Oversight Board's attorney to come back up?

22           (No response.)

23           THE COURT:  Looks like not.

24           Mr. Bienenstock or Mr. Rosen.

25           MR. BIENENSTOCK:  Your Honor, would it be possible to

1   have a ten-minute recess before we respond?

2            THE COURT:  Yes.  So since it's a little after 20

3   past 4:00 -- 20 past 3:00, let's come back at 3:35.

4            MR. BIENENSTOCK:  Thank you.

5            (At 3:20 PM, recess taken.)

6            (At 3:41 PM, proceedings reconvened.)

7            THE COURT:  Now, we are going to take one matter out

8   of order, because individuals who wish to speak in connection

9   with the contested claims objections, which were at the end of

10   the Agenda are here, and I want to make sure they don't have

11   to come back tomorrow.

12            So we are now going to Agenda Item VII.1 and --

13   actually, I'm not -- Ms. Stafford probably understands exactly

14   how this lines up with it better than I do at the moment, so

15   please.

16            MS. STAFFORD:  Of course.  And actually, I have a bit

17   of an update with respect to these contested claim objections

18   as well -- excuse me -- which relates to a question that we

19   received from the Administrative Office with respect to the

20   late filed responses that have come in with respect to the

21   objections that were originally scheduled for the December and

22   the January Omnibus hearings.

23            We're preparing a filing to address this issue, but

24   the gist of that filing will be to provide a brief further

25   extension of the deadline to respond to objections that were

1   originally scheduled for those hearings.  This brief, one-time

2   extension is in recognition of some of the difficulties that

3   claimants may have faced during the holiday season and in

4   light of the January earthquake swarm.

5          So we anticipate setting a date certain for further

6   responses to those objections and adjourning the hearing as to

7   any additional responses received until the April 22nd, 2020,

8   Omnibus hearing.  And so hopefully we can work with whichever

9   claimants have appeared and make sure that we have the

10  information necessary to address those objections.

11         THE COURT:  And so I understand that Ms. Angelica

12  Carrasco and Ms. Sandra Torres are here.  And so I don't -- we

13  hadn't queued up discussion for today, objections to their

14  claims.

15         MS. STAFFORD:  That's correct, Your Honor.

16         THE COURT:  And so when had -- have you adjourned

17  those to April already, or were you planning to adjourn them

18  to April?

19         MS. STAFFORD:  Those were already adjourned to April.

20  And we had spoken with both Angelica and Sandra in advance of

21  the hearing and informed them that the hearing would be in

22  April for their claims.

23         THE COURT:  All right.  And so Ms. Carrasco and

24  Ms. Torres, would you identify yourselves?

25         MS. CARRASCO:  (Raised hand.)

1            MS. TORRES:  (Raised hand.)

2            THE COURT:  And so would you please come forward to

3    the podium?  I need to ask both of you a question in the first

4    instance.  So will you both come?

5            MS. CARRASCO:  Buenas tardes.

6            THE COURT:  Buenas tardes.

7            THE INTERPRETER:  Good afternoon.

8            THE COURT:  Good afternoon.

9            THE INTERPRETER:  For the record, Olga Alicea,

10    interpreter.

11            THE COURT:  Thank you, madam interpreter.

12            (Whereupon Ms. Carrasco and Ms. Torres spoke with the

13    use of the interpreter.)

14            THE COURT:  Now, my question is this.  The Oversight

15    Board's representative is not going to be seeking to overcome

16    your claims today.  They want to address them in April.

17            MS. CARRASCO:  All right.  There's no problem.

18            MS. TORRES:  No problem.

19            THE COURT:  And they're planning to speak to you in

20    the meantime.

21            MS. CARRASCO:  Okay.

22            MS. TORRES:  Thank you.

23            THE COURT:  So do you want to speak to me today, or

24    will you wait to talk to the Oversight Board and see whether

25    it can be worked out before April?

1          MS. CARRASCO:  We can wait until the April 22

2    hearing.

3          THE COURT:  All right.  Thank you very much.  I think

4    that's the best thing to do.  And thank you for waiting all

5    day today.

6          MS. CARRASCO:  Thank you.

7          MS. TORRES:  Thank you.

8          THE COURT:  Take care.

9          So then let's do -- you don't have anyone actually

10   appearing on the rest of the contested claims?

11         MS. STAFFORD:  That's correct, Your Honor.

12         THE COURT:  So we'll put that back to the end of the

13   Agenda again.

14         MS. STAFFORD:  That's fine, Your Honor.  Thank you.

15         THE COURT:  All right.  Thank you so much.

16         And so now we will resume with the Oversight Board's

17   response to all of the comments in response to the mediation

18   team report.

19         MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

20   Bienenstock, Proskauer Rose, LLP, for the Oversight Board.

21         I notice I was given 15 minutes.  My colleagues tell

22   me we had reserved more, because we didn't use much of

23   anything up front.  Is that --

24         THE COURT:  I don't know where the --

25         (Discussion held off the record between the Court and

1  Law Clerk.)

2           THE COURT:  Okay.  I'm told that you actually used

3  20.

4           MR. BIENENSTOCK:  Okay.  I'll do my best.

5           THE COURT:  So let's start with 20 and see where you

6  are.

7           MR. BIENENSTOCK:  Thank you.  Because I want to leave

8  some time for my colleague, Mr. Firestein, to get into some of

9  the nitty-gritty dates that I may not get right.

10          THE COURT:  All right.  Well, I think there was some

11 going over, there were some extra speakers, so I want to be

12 able to hear fully.  So I'm going to give you half an hour on

13 the clock.

14          MR. BIENENSTOCK:  Okay.  Thank you, Your Honor.

15          THE COURT:  And you can split that with

16 Mr. Firestein.

17          MR. BIENENSTOCK:  Thank you.

18          To start, Your Honor, and I will make this as brief

19 as possible and not use the whole time if we can avoid it, but

20 I want to start with one basic proposition, since we're here

21 talking about scheduling leading up to a disclosure statement

22 hearing.  And we've heard a lot about requests for discovery

23 and what the Disclosure Statement should say, and how do

24 people know what objections they can make without taking

25 discovery, et cetera, et cetera.

1    Section 1125 of the Bankruptcy Code provides that the

2    purpose of the disclosure statement is to provide adequate

3    information for the hypothetical claim holder to determine how

4    to vote on the Plan.

5    The irony, Your Honor, is everyone in this room who

6    has addressed the Court knows exactly today how they're voting

7    on the Plan.  So this notion that the Disclosure Statement may

8    not have adequate information, we submit, is a phony premise

9    to begin with.

10    With that, I want to talk about the individual

11    comments made by each of the creditors.  For the Statutory

12    Creditors Committee, Your Honor, the -- Mr. Despins started

13    off by quoting from something that Proskauer for the Oversight

14    Board wrote in a brief concerning the -- I think the Lift Stay

15    Motions of the monolines in connection with the Commonwealth,

16    PRIFA, HTA, et cetera.  But I think it was in the Commonwealth

17    PRIFA Lift Stay Motion.

18    And he quoted that language that we wrote in talking

19    about the statutes governing the monolines' rights, which were

20    statutes that the Commonwealth has that provide for the

21    transfer, appropriation of rum excise taxes to PRIFA on an

22    annual basis.  But may believe that that was the same priority

23    statute as the priority statute that the Committee is urging

24    the Court to have litigated immediately, which is the priority

25    in Article 6, Section 8 of the Puerto Rico Constitution.

1              And just at the outset, I want to make crystal clear

2      that comments we might have made about -- that we did make

3      about Commonwealth statutes appropriating monies, and

4      Commonwealth statutes promising to continue to appropriate

5      monies until the debt is paid, frankly, have nothing to do

6      with a priority in the Puerto Rico Constitution.

7              The reason that that issue probably never has to be

8      determined in the Puerto Rico Constitution, and certainly not

9      early or before confirmation, is as follows.  With the deals

10     that are embedded in the Proposed Plan of Adjustment, with the

11     holders of the GO debt, we obviously come to a compromise of

12     those priority claims.

13             There are other creditors, as was pointed out to Your

14     Honor, who have not settled, but they're not, for the most

15     part, GO creditors.  They are the Unsecured Creditors

16     Committee, which is saying, we don't see why you should give

17     so much to those GO debtholders, so much more than you're

18     offering us, because we don't think they really have a

19     priority.

20             We are classifying the unsecured claims that are not

21     GOs in several different classes.  And they will have the

22     right at the confirmation hearing, if they reject the Plan, to

23     argue to Your Honor that the Plan -- the Plan's treatment of

24     them constitutes unfair discrimination.  That is clearly an

25     issue that should be dealt with at the confirmation hearing.

 1              To determine whether there is unfair discrimination,

 2    the Court is not going to have to determine the issue that was

 3    settled.  The Court will only have to determine whether the

 4    rights of the unsecured claimholders who do not have any GO

 5    priority are adequately paid under the Plan.

 6              And as a concrete for instance, Your Honor, if the GO

 7    priority were to prevail, if Your Honor were to say it's a

 8    matter of statutory priority enforceable under PROMESA Title

 9    III, there are lots of costs to the Commonwealth and to all

10    the other creditors of that ruling.  Because that would mean,

11    if it's enforceable according to its terms, that as others

12    have said to you, they get all available resources.  And then

13    it would only be the police power that would let us use money

14    to pay police and firemen and teachers and health care, et

15    cetera.

16              There is a reason to put them in a separate class,

17    because the downside of losing to them is pretty great, and

18    we're settling to avoid that downside.  There's nothing wrong

19    with that.  We can put the unsecured claimholders, who don't

20    have the GO priority claims, in a separate class.  Say, look,

21    you don't have those priority claims to begin with.  You say

22    that you're the same as them, but you're really not, because

23    if we lose to you, we don't lose -- we're not losing all the

24    available resources of the Commonwealth.

25              In addition, the GO holders have another argument,

1    and that is that even if they don't have a statutory priority

2    that's enforceable under PROMESA, they effectively have the

3    equivalent of a senior-junior priority, as in a senior bond

4    indenture against a junior bond indenture, that everyone who

5    bought debt knows that they come first.

6         That's another claim they have that the unsecured

7    claimholders don't have, and both those claims are entitled to

8    be settled.  That doesn't mean that paying people who don't

9    come into this case with those types of possibilities have to

10   be treated the same.

11        So it's not a matter of do they really have a super

12   priority.  It's a matter of will there be unfair

13   discrimination.  And that, the Court can decide at

14   confirmation.

15        Now, the Committee also said that we're asking in the

16   Plan that all Puerto Rico law be ruled preempted.  Well,

17   that's wrong.  What the Plan -- the Proposed Plan says is that

18   all inconsistent law is preempted.  And we're asking for

19   rulings as part of confirmation that the statutes we put on a

20   list that we attach to the Plan are preempted, and we have to

21   do that for the following reason.  If we don't, then the day

22   after confirmation, the GO creditors can say, hey, we're

23   entitled to all available resources for the old debt; or the

24   instrumentality, such as HTA and PRIFA, can say, we get all

25   these rum excise taxes starting tomorrow, because the statute

1    says we do.  Well, we have to know what's preempted and what's

2    not, otherwise, the Plan can't work after confirmation.

3         Now, I want to correct myself.  We have not put on

4    the list of preempted statutes the provisions in the Puerto

5    Rico Constitution, because we are settling with that.  And

6    that settlement, with those holders, will be binding on them,

7    and that's enough.

8         But for everyone else, especially those not settling,

9    we need to know which statutes can be enforced against the

10   Commonwealth after confirmation and which cannot.

11        THE COURT:  So do you -- when you say settling

12   bondholders, do you mean accepting classes in the various

13   slices that you've created, as opposed to nonaccepting

14   classes, or what?

15        MR. BIENENSTOCK:  Well, I'm saying both, an accepting

16   class or a class that the Court determines is -- can be

17   validly crammed down under Section 1129(b).  It would be both.

18        THE COURT:  Thank you.  Okay.

19        MR. BIENENSTOCK:  As far as giving bondholders a veto

20   over what other creditors can get, we're not sure what the

21   Committee is talking about.  In this case, we have to point

22   out, and I know the Court knows, that the Fiscal Plan contains

23   a debt sustainability analysis.  That's the limit.  That's the

24   limit of the debt that can be issued.  It has nothing to do

25   with debtholders.

1          The Committee also made a case they need extensive

2   discovery before the Disclosure Statement hearing why the Plan

3   assumes certain guarantees and different deals are made with

4   different vintages of debt.  We don't know why that is.

5          They will be entitled to confirmation discovery

6   presumably, if they want to challenge the settlement, as the

7   Court alluded to earlier.  The settlement with each class, to

8   the extent they are settlements, will be litigated, and we'll

9   have to show they're in the realm of reasonableness.  But

10  that's not something that has to go into the Disclosure

11  Statement.

12         And we'll give our reasons.  We already give our

13  reasons in the Disclosure Statement for making the

14  settlements.  If they want more discovery about it, that's a

15  confirmation discovery issue.

16         As far as AAFAF, Your Honor, we are continuing to

17  work with the government to try to obtain its support.  And in

18  that regard, you know, some people said, where did this June 3

19  date come from.  I want to point out that under the Bankruptcy

20  Rules, only 25 days notice is required for a disclosure

21  statement hearing, and then again for a confirmation hearing,

22  plus three days for mailing, if we're still using mail.

23         And here we're talking about 95 days from February

24  28, or 96, for the Disclosure Statement hearing.  A lot

25  longer, seven and a half months, for the confirmation hearing.

1  And if you look at our prior Plan and Disclosure Statement,

2  people have had a lot -- hundreds more days to look at both.

3       But bottom line, and it's no secret, Your Honor, not

4  only is there a presidential election in the United States in

5  November, but there's an election in Puerto Rico as well.  And

6  if we get the current Governor and both legislative houses to

7  support the Plan and provide legislation that will make it

8  smoother and more feasible, that's good for everybody if a

9  plan is confirmed.

10      And we all run a risk, and we've said this in many

11  contexts to the Court, that since one legislature cannot bind

12  the next, we don't know if a new government, and who might

13  change in the new government, will decide to be bound or not

14  by the deal we cut.

15      And so yes, there is a reason to try to get it

16  confirmed with a government that can agree to it and do it,

17  rather than agree with one government and then hope a new

18  government will agree to it.  It's just reality, Your Honor,

19  and we're not ashamed to say it.

20      As far as Assured's objections that somehow we are

21  settling its claims, to our knowledge, we are not.  If they're

22  talking about GO debt, the 2011 GO debt that they rep part of

23  is being allowed.  We're not imposing a settlement of the

24  allowance.

25      And they can, of course, object to treatment in their

1   class, but if the class accepts, they may be bound by it.  If

2   they're objecting to the fact that their claims are separately

3   classified than pure bondholder claims, that's a

4   classification issue.  For lots of reasons, we -- while you

5   are allowed under the Bankruptcy Code to classify similar

6   claims together, there is no requirement that similar claims

7   be classified together.  And frequently, bond insurers ask for

8   separate classifications because they have some individual

9   needs that others don't.

10          But in any event, whether they like separate

11  classification or not, it's just a classification issue.

12  We're not imposing on them an allowance of their claim.

13  Whatever they -- we're not giving up our rights to object to

14  their claim, and we're not asking them to give up their rights

15  to have it allowed in whatever allowable amount it's supposed

16  to have.

17          As far as a comment was made on behalf of Assured

18  that we created June 3 out of the blue so hedge funds can

19  trade out, I explained already why we think June 3 is plenty

20  of time.  But as far as the comment about hedge funds, who

21  obviously Proskauer and the Oversight Board do not represent,

22  but we do just want to say, as a matter of fact, they can

23  trade out now.  The deal we cut with them is public.  The deal

24  we have with them says, if they trade to anyone, whoever buys

25  is subject to the deal they cut.

1          So they don't need a disclosure statement or a

2    confirmation order at any particular time.  The deal is

3    public.  They can trade now.  And as far as we know, they do

4    trade now.  So it's certainly not some special favor to the

5    hedge funds why the June 3 date is coming in.  It's coming in

6    for the reason I mentioned earlier.

7          It's also -- there's another reason for June 3, and

8    that is that one of the most important jobs of the Oversight

9    Board is to create a sustainable economy and to put them on a

10   sustainable path.  As much as we would like to do it now, we

11   are constantly told that until we've cleaned up the debt, we

12   can't expect to get nearly as much new investment in Puerto

13   Rico.

14         What that means is every day that it stays in Title

15   III is a day of economic recovery lost, and it's just we

16   should minimize that time.  That's all there is to it.

17         Assured also complained that they said there was no

18   effort to negotiate HTA, PRIFA, et cetera.  We don't have

19   HTA -- PRIFA is not a Title III debtor yet.  HTA is, but its

20   plan is not on for confirmation.  Its plan will require a

21   discussion of whether rate hikes are possible, toll hikes,

22   whether other fees are possible.  All kinds of things.

23         They haven't been precluded.  They haven't -- and

24   they're not being crammed down.  There's just no plan there.

25   It's not as if we're running forward on an HTA plan without

1   negotiating with them.  We don't have an HTA plan yet.  We

2   wish we did, but we don't.

3           And as to the comments that we should --

4           THE COURT:  And so the -- sorry.  So the dividend

5   proposed for revenue for -- is there a dividend proposed for

6   HTA revenue bonds and --

7           MR. BIENENSTOCK:  No.  No.

8           THE COURT:  The 3.9 percent --

9           MR. BIENENSTOCK:  No.

10          THE COURT:  -- what's that settling --

11          MR. BIENENSTOCK:  The Plan, the Commonwealth Plan has

12  a class for claims that will be either lodged by HTA or its

13  bondholders against the Commonwealth.

14          THE COURT:  You didn't let me finish my sentence.

15          MR. BIENENSTOCK:  Oh, I'm sorry.

16          THE COURT:  I was going to ask you whether that was a

17  proposed settlement of the claims against the Commonwealth

18  with a treatment contemplated later under a separate HTA plan?

19          MR. BIENENSTOCK:  Well, it would affect a separate

20  HTA plan, but -- it would affect a separate HTA plan.

21          May I have a moment with my partner?

22          THE COURT:  Yes.

23          MR. BIENENSTOCK:  I'm worried I'm -- Your Honor, I

24  was correct.  There is no HTA plan being proposed.  The

25  Commonwealth Plan, which does now have ERS with it and PBA,

1    does have a class in it for whatever allowable claims there

2    are by HTA or its bondholders against the Commonwealth.  And

3    they will either get that or HTA will get it, but ultimately,

4    that's not the HTA plan.  HTA will have its own plan that will

5    take into account what it can pay its creditors.

6              THE COURT:  Thank you.

7              MR. BIENENSTOCK:  Now, Assured also made the argument

8    that the Lift Stay Motions are vehicles for the gating issues.

9    And I know my partner wants -- might have more to say about

10   this.  This has not been, to be polite, a consistent story.

11   And there are problems on multiple levels.

12             First, Assured and other monolines pointed the Court

13   to the First Circuit's *Grella* case and other decisions that

14   talk about quick stay --

15             COURT REPORTER:  I'm sorry.  The --

16             THE COURT:  The First Circuit's --

17             MR. BIENENSTOCK:  *Grella*, G-r-e-l-l-a.  I'm sorry.

18             That talk about quick stay relief motions and

19   hearings where colorable claims can be alleged, and then they

20   explain what colorable is.  And the outcome of those hearings

21   is not always binding for other purposes, and the monolines

22   have made a big deal of that.

23             We are looking for rulings that are binding for all

24   purposes.  And none of us, and probably even at this point the

25   Court doesn't know what will be appropriate and what will be

1    possible and legal.

2         To just to take one example, because I think it makes

3    the point graphically, the Court could take a look at some of

4    the monolines' allegations that we have eight billion dollars

5    in the bank and say, well, look, whether you have a secured

6    property interest or not, the Commonwealth has eight billion

7    dollars stacked up to pay you, if you're entitled to it.

8    You're adequately protected.  You don't get stay relief.

9         Well, that would be a nice ruling in that no stay

10   relief is granted, but it wouldn't solve any of the gating

11   issues.  So none of us can know at this point how the Court

12   will end up dealing with those issues.  And what the monolines

13   will argue at the final moment is how binding that ruling is,

14   because it came out of a stay relief hearing -- motion.

15        So we took their claims -- the adversary proceedings

16   are not things that we really initiated.  We took their

17   claims, and instead of just objecting to their claims, we made

18   it an adversary proceeding to avoid any issues under

19   Bankruptcy Rule 7001.

20        And the gating issues, contrary to the comments made

21   by Assured and other objectors, are truly virtually all pure

22   legal issues.  The statutes that require the appropriation of

23   rum excise taxes to PRIFA, they're either preempted or they're

24   not.  They're either enforceable or not, because one

25   legislature cannot bind the next to appropriate monies year

1     after year after year.  They're either inconsistent with Title

2     III and the Bankruptcy Code provisions it embeds or not.

3          These are legal issues, and these are the key gating

4     issues.  Whether HTA bondholders or PRIFA bondholders, under

5     PROMESA Section 407 or otherwise, have claims back against the

6     Commonwealth if the appropriations are stopped really is not

7     gating, because if the unsecured claim pool is expanded, so

8     it's expanded.  I mean, that's not going to stop a

9     confirmation we don't believe, at least now.

10         So the real gating issues are exactly that.  And

11    they're crisp, and they're legal, and they are raised in the

12    context of the stay relief motions, but we can't be sure the

13    Court will decide them for the reasons I've given, or for

14    maybe other reasons we haven't contemplated.

15         So the summary judgment motions on the adversary

16    proceedings raise these gating issues that I've mentioned in a

17    way that there will be no argument that we're aware of, or no

18    meritorious argument that the issue is not decided for all

19    purposes.  Today --

20         THE COURT:  And you believe -- I'm sorry.  And you

21    believe you can cue them up in a way that would not support a

22    legitimate 56(d) response?

23         MR. BIENENSTOCK:  Well, if there's a 56 --

24    legitimate, that's correct.  Yes.  The answer is yes.  Because

25    as I've put out, what we see as the gating issues, and I'm

```
 1    sure I didn't list all of them, but none of what I mentioned,

 2    each of which is critical, requires discovery.  They're

 3    matters of law.

 4             And Ambac mentioned another matter of law.  Is

 5    PROMESA constitutional as a Uniform Bankruptcy law?  That's

 6    not going to require discovery, Your Honor.  That's a matter

 7    of law.

 8             Your Honor, I was in the room at Proskauer's offices

 9    with Judge Houser, often with Judge Colton, with National and

10    its lawyers, and Assured and its lawyers, and lots of other

11    monolines and their lawyers.  As the Court knows, we can't

12    divulge and I won't --

13             THE COURT:  I was going to underscore that for you,

14    yes.

15             MR. BIENENSTOCK:  -- the mediation, but I cannot

16    comprehend what they meant when they accused I guess all of us

17    of excluding them from mediation, because they were there.  I

18    was there.  I don't know what we were doing if we weren't -- I

19    mean, enough said.

20             THE COURT:  Yes, enough said.  The proposition that I

21    have heard is that at some point or points in time, considered

22    significant by some, everyone was in the same room pleased,

23    and everybody ran up here for half an hour telling me that,

24    you know, it wasn't the --

25             MR. BIENENSTOCK:  As the Plan provides, as a matter
```

1    of belt and suspenders, that money paid to the GOs shall first

2    be deemed the property taxes and then the clawback revenues.

3    We don't believe that's legally required for any purpose, but

4    we're trying to avoid legal issues by that means as well so

5    that there's no discovery necessary as to how do we use it.

6        We're saying, that amount is going to go to GOs.  So

7    if that's an enforceable provision of the Puerto Rico

8    Constitution, it will be carried out.

9        The argument was made by one of the monolines that

10   the fact that the Court has granted discovery for the Lift

11   Stay Motions means that these are not purely legal issues.

12   The Court, I think, knows exactly what it meant when it

13   granted discovery.

14       To my knowledge, the Court was granting discovery.

15   It wasn't making a finding in advance that this was necessary

16   to determine the issues.  And I remind Ambac that the issue

17   was set up on July 24 on the papers and the documents.  The

18   documents were the only facts other than law that were

19   relevant.  And ultimately, we think it will be decided still

20   on that.

21       As far as Mr. Sosland's objection for FGIC that he

22   shouldn't be restricted to what he can move for summary

23   judgment on, Your Honor, if it's a matter of law, that's

24   probably right.  And I don't think we would object if they

25   found abstract legal issues, because if they're gating issues,

1    we want them decided.

2           And if it's okay, I'd like to give my last couple

3    minutes to Mr. Firestein.

4           THE COURT:  Yes.

5           MR. BIENENSTOCK:  Please.

6           MR. FIRESTEIN:  So, Your Honor, Michael Firestein of

7    Proskauer on behalf of the Board.

8           I just want to punctuate a couple of points here.

9    First of all, just to take Mr. Bienenstock's last point

10   relative to FGIC and their desire to bring other claims, the

11   word of the day is triage.  And what Judge Houser and the

12   mediation team sought to try to avoid was the deluge of

13   litigation that was going to be presented.

14          This was the judgment of the mediation team as to

15   what the key gating issues should be and ought to be, in the

16   first instance, with respect to trying to change people's

17   mind, or refocus folks' attention in an effort to build

18   greater consensus, or better, or of equal importance, maybe

19   suggest that the Plan in its current form, because of the

20   Court's determinations on certain gating issues, is not

21   feasible.

22          No one is here suggesting that any one of those

23   issues is waived, forfeited or anything else.  It's a question

24   of trying to get education from the Court, with the Court's

25   guidance, so that people can make intelligent decisions.

1          I want to make one punctuated comment with respect to

2     the lift stay vehicle.  And I see I have 25 seconds on the

3     clock, but let me do my best here.

4          THE COURT:  We'll put another five.

5          MR. FIRESTEIN:  Thank you so much, Your Honor.

6          The monolines come up here and say that the Lift Stay

7     is the correct vehicle, and some of them did it with

8     considerable emphasis.  As we have said before, we -- and

9     remain so, we are agnostic to which vehicle is used in order

10    to come to some form of binding decision.

11         But the monolines wrote in their Response to the

12    Mediation Report that the conclusions that this Court might

13    reach, or that even might be affirmed at the First Circuit

14    level with respect to a success for the Board in a pursuit of

15    its defense, would not necessarily be binding.  We needed an

16    alternative vehicle for doing it.

17         They have suggested that that alternative vehicle now

18    be stayed.  That's nonsense.  That doesn't get us anywhere.

19    And it was the mediation team and the mediation leader's

20    judgment that the best way to have a backup plan with respect

21    to trying to getting these gating issues resolved on the

22    merits was to do so through a Rule 56 motion.

23         And the only suggestion that we made in our

24    recommended edits to the Mediators' Report was to when this

25    Court makes its determination, hopefully expeditiously,

1    relative to those gating issues at the preliminary hearing for

2    the Lift Stays, that the parties be directed to meet and

3    confer to determine whether there is actually a continuing

4    need for the Rule 56 motions.

5          So the comments that have been made relative to the

6    Order that was in place before as being a fully comprehensive

7    and agreed upon schedule for things to do -- we're not trying

8    to increase motions.  In fact, when I came to the podium

9    before the lunch hour, we said we were all in favor of staying

10   the Rule 12 motions, which, I might add, with the most limited

11   of exceptions -- which I don't want to get too granular, but

12   by and large, are not related to the gating issues that the

13   mediation team determined at the outset.

14         I didn't hear a single person from the monolines, the

15   people who have filed these motions, say anything about

16   whether they were amenable to that.  But they use it as a

17   vehicle for saying that there are a number of motions that are

18   outstanding, that are just going to be a deluge.

19         We reiterate, we're in favor of a stay of those

20   particular motions, because the point is -- and the mediation

21   team's recommendation was a concern regarding what the

22   applicability would be of Rule 12, or the usability of Rule

23   12, to get to a decision on the merits on significant issues.

24   That's why we've got this bifurcated path to try to do that.

25         THE COURT:  So let me go back to the question of

1   adjustment of timing of the commencement of this proposed

2   summary judgment motion practice in light of the time shift on

3   the Lift Stay Motions.

4           Judge Houser's opening bid was to have broad-based

5   summary judgment motions covering all the potential outcomes

6   of lift stay filed before I hear the Lift Stay Motion, and

7   then a timetable that would get them briefed and argued before

8   the Disclosure Statement hearing.  I suggested at least

9   waiting until a couple, whatever days after the argument, so

10  that the parties would be in a position to be more selective

11  about what arguments to go forward with on the lift stay

12  motion practice -- on the summary judgment motion practice

13  post Lift Stay.

14          You've now been talking about meeting and conferring

15  after Lift Stay to determine whether summary judgment motion

16  practice is necessary or to what extent.  So what is your kind

17  of bottom line, logistical position about that motion

18  practice?

19          MR. FIRESTEIN:  I understand.  I get that, Your

20  Honor.  And let me say it this way.  We're constrained a

21  little bit by the calendar, and I readily acknowledge that.

22  I'm amenable, and we are amenable to the schedule that was

23  proposed by Judge Houser this morning on that.

24          I recognize that even under that schedule, the

25  summary judgment motions will need to be filed by March the

1   27th, but if I were a betting man, I would submit that on

2   those gating issues, I bet we don't see cross motions for

3   summary judgment from the monolines.  And the reason is

4   because they think that discovery is necessary relative to

5   those issues.

6         So it's their choice as to whether they want to do it

7   or not, and the Order provides for them the opportunity to do

8   so.  But I am prepared to file the motions in advance, because

9   I recognize what the calendar says, given the June 3rd

10  hearing.  But nonetheless, we will be well in advance of any

11  opposition that would be necessary, or even potentially a Rule

12  56(d) motion that might be made if we are able to get some

13  determination expeditiously relative to those -- many of those

14  very same gating issues regarding the Lift Stay Motions.

15        They were not selected in a vacuum.  By and large,

16  the issues that are present in connection with the proposed

17  Rule 56 motions are the issues that we are hoping for

18  expeditious resolution in connection with the Lift Stay.  I

19  can't say it's exclusive, but they are matters -- but for, by

20  and large, the most part, and the key ones for sure are

21  included in there.  And my recommendation was to direct the

22  parties to meet and confer when the -- when the Court gives

23  whatever its indication might be.

24        For all we know, Your Honor, you might provide a

25  determination at the preliminary hearing with an order to

1   follow, so that the parties are -- get a clear guidance as to

2   what the Court's intentions are going to be.  And if it

3   disposes or dispenses with the need for Rule 56 motion

4   practice, we're in favor of that.

5        It's not about trying to jam additional pleadings on

6   motion practice.  It's only about a singular objective, which

7   is to obtain a ruling.

8        I might add, if I could, Your Honor, that the comment

9   that I made about the 12(b) motions is equally applicable to

10  Mr. Despins' comment concerning the 12(c) motion that is

11  pending in the PBA lease litigation that was filed some time

12  ago.

13       Everyone keeps talking about the notion that there's

14  only one more brief to file, and we ought to be able to just

15  do that and get the Court's ruling on that.  That is an issue

16  that is being settled.  If we successfully defeat that

17  12(c) -- that 12(c) motion that was brought by the GO holders

18  in connection with that, that doesn't accomplish much for us.

19  It only means that it wasn't determined as a matter of law.

20  Alternatively, if that 12(c) motion was granted, it reminds me

21  somewhat of the COFINA predicament where a determination of a

22  matter that is being settled really doesn't make a lot of

23  sense under the circumstances.  So I view the 12(b) issues and

24  the 12(c) issues largely in parallel.

25       The problem that we had when we were constructing the

1  Interim Order in the first place was we didn't have any

2  vehicle to operate with.  And we were initiating the adversary

3  proceedings in order to try and accomplish something.

4       As time has gone on, and interestingly enough, the

5  orders designated as interim orders mean what they say.  They

6  are interim orders.  Circumstances have changed.  And as a

7  result of those changed circumstances, the mediation team

8  changed its judgment about what it believed was the best

9  process forward.  So it is not the Rosetta Stone, the original

10 order.  It was merely a point in time in which we were

11 presented and which the Court issued orders given what the

12 facts and circumstances were at that time.

13      And if I can, Your Honor, I just want to make two

14 very brief comments, one in particular regarding what the

15 Court said about potentially including in the order, and, of

16 course, it's the Court's decision relative to that, but if

17 anybody feels that they need to file something, they can, you

18 know, seek relief for good cause shown.

19      I'm reminded of the cliche of be careful what you

20 wish for, right?  Because as soon as you give someone the open

21 door for that, there's very competent lawyers in this room who

22 are passionate about the cause they believe in.  And I am with

23 100 percent certainty confident that you will see a host of

24 filings that come in, or at least the risk of that.  And in

25 the --

1              THE COURT:  And the filers run the risk of my saying

2       no.

3              MR. FIRESTEIN:  I'm sorry, Your Honor?

4              THE COURT:  The filers run the risk of my saying

5       no.

6              MR. FIRESTEIN:  That is indeed true.  But it is more

7       pleadings and more things that people would have to oppose

8       under the circumstances, and --

9              THE COURT:  Don't I know it.

10             MR. FIRESTEIN:  Yeah, don't you.  Right.  Exactly.

11             And just finally, finally, Your Honor, a comment

12      about the 926 issue.  I mean, these proceedings have been

13      going on for quite some time.  The revenue bondholders make it

14      sound like they've been prevented from bringing such a motion

15      from, you know, the beginning of time until now.  That's not

16      true, at least not to my knowledge, subject to the stay that

17      has existed since last summer.  And the interim -- excuse me,

18      the Amended Report and the proposed orders thereunder provide

19      specifically for them to bring such a motion, or however it's

20      characterized, this conflicts-based motion, if they feel the

21      need to do so.

22             The amended schedule that was proposed by Judge

23      Houser a few moments ago sounds exactly right to me.  The

24      First Circuit heard argument yesterday.  We don't need to talk

25      about what happened in that court.  We can all read the press

1  pieces about --

2          THE COURT:  Precisely.

3          MR. FIRESTEIN:  -- what happened.  And, you know,

4  with any luck, we'll see an expeditious resolution from the

5  First Circuit, given the fact that that appeal was expedited

6  at the request of the appellants.  So perhaps we'll get a

7  ruling soon that might have some bearing on what goes on here.

8          And with that, Your Honor, I have greatly exceeded my

9  time.  And unless the Court has questions, I would close by

10  saying that there are a lot of judgments that the creditors

11  have asked the Court to make about what's going to happen in

12  the future and how viable the Plan could be.  I'm relying on

13  facts.  And where we are today is that there's a lot more

14  people in support of the Amended PSA, and a lot more holders

15  as proponents of the Plan than there was several months ago

16  when the original plan was proposed.

17          That does not diminish the passion of those who are

18  opposing it, but we need to put this in context.  And if facts

19  and circumstances change again in the future, just like they

20  changed, which led to the Amended Report being filed by the

21  mediators with the judgments that they made that were

22  different than before, I'm confident that this Court's doors

23  will be open to hear about that.  And frankly, on a regular

24  basis, we're in front of Your Honor anyway on a variety of

25  matters.

```
1              So I submit, Your Honor, that the Amended Report
2    should be entered as proposed; that the recommended schedule
3    by Judge Houser that she suggested this morning be included.
4    If the Court wants to consolidate the Rule 12 motions and the
5    Rule 56 motions, or stay them in some way, we're amenable to
6    that, too.  It's just about getting to the finish line.
7              Thank you, Your Honor.  Unless the Court has
8    questions --
9              THE COURT:  No.  Thank you.
10             Is there anyone who has a vital need to be heard
11   further on this?
12             MR. DESPINS:  Just real quick.
13             THE COURT:  Hello, Mr. Despins.
14             MR. DESPINS:  I know I'm taking my chances here, but
15   I left one minute 20 on the clock last time.  So I'm not going
16   to use all of it, but Mr. Bienenstock said that, we don't know
17   where he's getting this idea of a debt cap or a debt limit.
18   It goes to the issue of the fact that the Board has its hands
19   tied.  They cannot give us more debt.
20             This is in the PSA Agreement, 4.7(b), legal
21   protections.  It says, The plan shall include the following
22   legal protections.
23             You go to sub 10, it says, Pursuant to the new GO
24   legislation, et cetera, et cetera, the new tax supported debt
25   will be -- there's a fraction there -- 9.16 percent of debt
```

1     policy revenues.

2          Basically, that's where the debt cap is, and it's now

3     in the Plan at Section 57.4.  If you do the math -- well, I

4     can't do the math, but if a financial advisor does the math,

5     it will show that there's money -- there's no additional debt

6     available other than that's built into the Plan today.

7          And the second point is that he said, well, that I

8     cited, on the preemption issue, filings in the context of the

9     revenue bonds, which I did say was that, but I did that

10    because they were recent filings.  But there are older filings

11    where -- you know, signed by Proskauer that, in the context of

12    the GO bonds, say exactly the same thing.

13         These are cited in our GO priority objection in the

14    footnote.  There's at least five instances of that.  I didn't

15    cite those, refer to those, because he would have said they're

16    old.  But, I mean, the point is they've taken the exact same

17    position with respect to GO bonds.

18         Thank you.

19         THE COURT:  Thank you.

20         All right.  I am going to aim to be back here by 5:00

21    to render my decision on this.  And then the remainder of the

22    Agenda will commence tomorrow morning at 9:30.  So I will see

23    you at five o'clock.  Thank you.

24         (At 4:31 PM, recess taken.)

25         (At 5:08 PM, proceedings reconvened.)

1          THE COURT:  Good afternoon, and thank you for your

2     patience.  I am going to make my oral rulings on the Mediation

3     Report and the remaining procedural motions.

4          Just before I do that, Judge Dein has graciously

5     offered to address the discovery issues after I've made my

6     rulings, so that if the people who are involved in the

7     discovery motions wouldn't otherwise be coming back tomorrow

8     morning, they won't have to.  So that's what we're planning to

9     do.

10          And thank you, Judge Dein, for that.

11          Okay.  This is not short, but it's necessary.

12     Neither was the argument.  So I will now make my oral rulings

13     on the matters covered by the Mediation Report and the related

14     procedural motions.

15          As to the Mediation Report -- that is, the Amended

16     Report and Recommendation of the mediation team, which is

17     docket 10756 in case 17-3283, for the sake of clarity and

18     brevity, I'll adopt the defined terms used by the mediation

19     team in that report and its exhibits.

20          The Court has carefully considered the Report, the

21     written responses to the Mediation Report, and the arguments

22     advanced by parties today.  For the following reasons, the

23     Court will approve and enter the mediation team's Proposed

24     Orders attached as Exhibits One and Two to the Mediation

25     Report, subject to certain limited modifications.

1    First, the Court will add language providing that

2 parties in interest may seek relief from the stays imposed by

3 these Orders upon a showing of good cause.  The Court reserves

4 the right to deny any such application summarily, so don't get

5 too excited about this.  And make sure if you invoke it, you

6 do it truly for a good reason.

7    Second, with respect to what the Mediation Report

8 refers to as conflicts motions, the Court will modify the

9 deadline to file such motions as suggested by Judge Houser,

10 such that parties will have until 15 days after the later of

11 the First Circuit's ruling on the ERS Section 926 appeal and

12 this Court's ruling following the preliminary hearing on the

13 Lift Stay Motions.

14    The Order will also be amended to provide that the

15 Court will entertain timely extension motions with respect to

16 that deadline on a showing of good cause.  Again, the Court

17 reserves the right to deny such extension motions summarily.

18    Third, the Court will modify the stay of future

19 adversary proceedings and contested matters relating to the

20 Amended Plan of Adjustment to make clear that parties in

21 interest retain their rights to initiate contested matters via

22 timely objections to the Amended Plan of Adjustment and the

23 Disclosure Statement.  The Court reminds the parties in this

24 connection of its inherent right to manage the sequence and

25 timing of litigation before it.

1          Fourth, the final Revenue Bonds Scheduling Order will

2     be modified to reflect the changes to the Lift Stay Motion

3     schedule that the Court made subsequent to the filing of the

4     Mediation Report; that includes moving from March 5th to April

5     2nd and the related changes.

6          Next, the Court will expand the description of the

7     topics that the parties to the Lift Stay Motions will be

8     expected to address in a meet and confer following any ruling

9     on the Lift Stay Motions preliminary hearing matters to

10    include consideration of how best to resolve outstanding

11    issues in the revenue bonds adversary proceedings, as well as

12    to address discovery and logistics in connection with a final

13    Lift Stay hearing.

14         This meet and confer should also include coverage of

15    whether and to what extent the targeted summary judgment

16    motion practice remains necessary.  And as to that, the

17    provision for targeted limited summary judgment motion

18    practice on the causes of action identified in the mediation

19    team's Proposed Order will be maintained.

20         And the Court does not intend to entertain at this

21    stage such motion practice going beyond those boundaries, nor

22    does the Court expect to entertain at this stage such motion

23    practice that is shown to have material contested factual

24    underpinnings.

25         The litigation on the revenue bond adversary

1    proceedings will be otherwise stayed pending further order of

2    the Court.  So that means the motions to dismiss will be

3    stayed, and don't have to be further briefed until further

4    order of the Court.

5              Summary judgment opposition premised on arguments

6    that the particular causes of action upon which judgment is

7    being sought have not been pleaded adequately is not precluded

8    in this connection.

9              So as to the schedule for that motion practice,

10   motions and opening briefs, March 27th.  Opposition, April

11   24th.  Replies, May 15th.  And subject to change, because I

12   didn't clear this with the scheduling people, but I will aim

13   for argument in New York on May 27th at 2:15 in the afternoon.

14             Let's see.  So subject to these modifications, the

15   Court is satisfied that the schedules proposed by the

16   mediation team in the Mediation Report allow for contested

17   matters and adversary proceedings that are pending before the

18   Court to progress with respect to important disputed issues

19   raised in connection with revenue bonds in these Title III

20   cases, including critical gating issues relating to the

21   Amended Plan of Adjustment proposed by the Oversight Board.

22             The Court concurs in the mediation team's conclusion

23   that resolution of these issues sooner rather than later will

24   aid the Court in reviewing and adjudicating disputes with

25   respect to the Proposed Plan of Adjustment, and aid the

1  mediation team and the parties in their ongoing efforts to

2  resolve issues relating to the Proposed Plan.

3          As recommended by the mediation team, the Court will

4  allow the current ERS Scheduling Order, which is docket entry

5  number 10728, to remain in effect pending the submission of

6  the proposed revised scheduling order for ERS.

7          The Court will hold off on the DRA Final Order

8  pending revisitation by the parties to that order, pursuant to

9  the order that was entered by Judge Dein last night.  I will

10  await further word on what the parties want to do on that.

11          The Court will set aside the interim GO-PBA Order and

12  stay the GO-PBA litigation matters without prejudice to

13  disclosure statement and confirmation-related litigation that

14  may properly relate to issues that were raised in the stayed

15  matters.

16          I will now address more specifically certain issues

17  and objections raised by the parties with respect to the

18  Mediation Report's proposals concerning the litigation of

19  revenue bond and GO-PBA issues.  To the extent any objections

20  are not specifically addressed in these remarks or in the

21  orders that will be entered by the Court, including parties'

22  premature objections to the substance of the Disclosure

23  Statement and the Amended Plan, such objections are overruled.

24          I want to start by addressing issues that Mr. Hein,

25  in particular, has raised in connection with the mediation

1      process.  Mr. Hein has renewed in his submission, and to some

2      extent in remarks today, objections that he has raised on

3      prior occasions concerning the rights of parties to

4      participate in mediation, the confidentiality of mediation,

5      and parties' access to transcripts of mediation sessions and

6      of hearings held by the Court.

7            His objections are overruled in their entirety for

8      the following reasons.  To begin with, individual investors

9      are not categorically excluded from the mediation process.

10     Nothing prevents Mr. Hein or other individual investors from

11     advocating their positions and seeking to participate in

12     negotiations on the issues that are taken up in the mediation

13     process.

14           The Court, of course, cannot guarantee that any

15     particular party will succeed in its efforts, or be permitted

16     to participate in every single session or phase of mediation,

17     but parties in interest who are willing to contribute

18     constructively to the mediation process are welcome to reach

19     out to the mediation team.  And mediation is not restricted to

20     particular favored parties.

21           The mediation process is also necessarily a

22     confidential one, unlike litigation which occurs on the public

23     record.  Not every issue can or should be litigated to a full

24     resolution.  Progress in these cases requires some level of

25     compromise.  And those compromises are best achieved in a

1 confidential forum that allows parties to candidly discuss

2 their interests in aid of negotiated resolutions without fear

3 of jeopardizing their litigation strategies if the

4 negotiations fail.

5      That confidentiality is not prejudicial to Mr. Hein's

6 rights. To the contrary, Mr. Hein and any other affected

7 party in interest can object to any proposal that ultimately

8 results from the confidential mediation process. His

9 objections and request for relief have received and will

10 continue to receive the Court's due consideration.

11      Mr. Hein's request for immediate free access to

12 transcripts of the litigation proceedings has been considered

13 carefully and is denied. Judicial Conference policy

14 precludes the immediate disclosure of hearing transcripts,

15 except to purchasers of those transcripts, or via terminals

16 located physically in the District of Puerto Rico Clerk's

17 Office. Pursuant to Judicial Conference policy, transcripts

18 are made available through the National ECF Internet

19 Electronic Access System after 90 days.

20      And finally, the Court remains unpersuaded that a

21 limited small bondholder committee is necessary at this

22 juncture.

23      I now will address the GO-PBA litigation stay issues.

24 Several parties have objected to the Mediation Report's

25 recommendation that the Court's Interim GO-PBA Order be set

1    aside, and that the GO-PBA litigation matters, including the

2    UCC priority objection, be stayed pending the Court's

3    consideration of the Amended Plan of Adjustment.  The

4    objections are overruled.

5          The Court's determination regarding a stay of the

6    GO-PBA matters is guided by consideration of the economical

7    use of party and judicial resources, the hardship resulting

8    from not staying a proceeding, and the potential prejudice to

9    parties if the stay is granted.

10          And for these elements, I refer you to

11    *Villafañe-Colon v. B Open Enterprises, Inc.*, 932 F.Supp.2d

12    274, 280, (D.P.R. 2013).

13          Here the proposed stay represents the most economical

14    use of resources.  The Amended Plan of Adjustment has been

15    filed on behalf of the Commonwealth, ERS and PBA.  Many

16    parties clearly have objections to the proposal put forward by

17    the Oversight Board, and it will doubtless be the subject of

18    vociferous objections and potentially contentious litigation

19    in connection with the Disclosure Statement and confirmation

20    motion practice.

21          However, the Oversight Board is the only party

22    empowered by PROMESA to propose plans of adjustment, and the

23    Amended Plan of Adjustment is the means that the Oversight

24    Board has chosen to propose to resolve the Title III cases of

25    the Commonwealth, ERS and PBA.  Whether this proposed amended

1    plan and the settlement of GO-PBA issues that are embedded in

2    it will pass scrutiny is an issue for another day.  But it is

3    not prudent to continue litigating GO-PBA issues that will be

4    resolved if the Plan of Adjustment is ultimately confirmed.

5         The Court further finds that the hardship resulting

6    from continuing litigation is significant.  There is only one

7    proposal on the table that would potentially provide a means

8    by which the Commonwealth, PBA and ERS can adjust their debts

9    and emerge from the Title III process.  That proposal rests on

10   settlement of certain of the GO-PBA issues.  Requiring

11   resolution of those issues judicially would likely disrupt the

12   deal and send parties back to the drawing board, potentially

13   placing the Commonwealth, PBA and ERS in a worse position than

14   they're in.

15        The parties objecting to the stay have not

16   demonstrated a countervailing risk of prejudice.  They retain

17   their rights to object to the Amended Plan of Adjustment, and

18   they also have the opportunity to accept the proposed

19   settlement, and if the Plan is confirmed, receive the

20   distributions contemplated thereunder.

21        The UCC's argument that certain constitutional debt

22   limit issues will arise in the context of post confirmation

23   avoidance action litigation is also not persuasive.

24   Confirmation of a plan that contains a negotiated resolution

25   of certain issues is not necessarily unwise simply because the

1    Court may ultimately have to decide those issues in the

2    context of post confirmation litigation.  There is no

3    certainty that litigation will, in fact, ultimately address

4    the debt limit issues.  And if it does -- that's as an

5    example.  If it does, it does not necessarily mean that the

6    Title III debtors would not have received a benefit from the

7    negotiated resolution of those issues with respect to other

8    creditors.

9         The Court has previously rejected the argument that

10   dissenting parties in interest may exercise a veto over

11   PROMESA debtor proposed settlements by pursuing claim

12   objections, and the Court finds no proper basis for

13   reconsidering that determination now.

14        The Amended Plan of Adjustment represents the

15   Oversight Board's attempt to settle key disputed issues, and

16   the Court will stay the GO-PBA litigation that seeks

17   adjudicated resolutions of those issues pending consideration

18   of and pending consideration in connection with, as necessary,

19   the Amended Plan of Adjustment.

20        I turn now to the provision of the Proposed Order

21   that stays future contested matters and adversary proceedings.

22   The UCC has objected to the proposed language contained in

23   paragraph five of the Proposed Order that is attached as

24   Exhibit Two to the Mediation Report.  That provision would

25   stay new adversary proceedings and contested matters that

1   "Address issues being settled under the Amended Plan," or that

2   duplicate other stayed issues.

3              As I think I mentioned during our colloquy, the Court

4   understands that the intent of this provision is to ensure

5   that all litigation concerning the Amended Plan of Adjustment

6   is channeled into preexisting litigation pathways, such that

7   parties do not unnecessarily commence parallel matters in an

8   uncoordinated manner.  And this is an appropriate goal.

9   Accordingly, the objection is overruled.

10             And as noted earlier, the Court will include the

11  provision with appropriate changes to reflect that parties are

12  allowed to interpose objections to the Disclosure Statement

13  and/or Plan.

14             Legislative approvals and the lack of government

15  support have also been a topic of objections and discussion

16  today.  The Court overrules the objections to the proposed

17  scheduling that are premised on the current lack of

18  legislative and executive branch approval of certain measures

19  contemplated by the Amended Plan of Adjustment.

20             Section 314(b)(5) of PROMESA provides that, for a

21  plan to be confirmed, "Any legislative, regulatory or

22  electoral approval necessary under applicable law in order to

23  carry out any provision of the Plan has been obtained, or such

24  provision is expressly conditioned on such approval."  That's

25  48, United States Code Section 2174(b)(5).

1          The factual issues of whether legislative approvals

2    have been obtained or will readily be obtained is not before

3    the Court today, and to the extent those issues intersect with

4    Plan confirmation issues, I have no doubt that parties will

5    bring them to my attention at the appropriate time.  However,

6    the Oversight Board has the statutory authority to propose

7    plans of adjustment, and the Court does intend to allow the

8    process for consideration of its Amended Plan to play out,

9    because the Court is persuaded that doing so will maximize the

10   near term potential for reaching a confirmable adjustment plan

11   structure under which Puerto Rico can continue to move

12   forward.

13         I'll now address the monoline insurers' request to

14   stay the revenue bond adversary proceedings and related issues

15   regarding the summary judgment motion practice.  The monoline

16   insurers have objected to moving forward with the revenue bond

17   adversary proceedings at all in light of the issues raised in

18   the Lift Stay Motions.  They have also argued that the

19   schedule and sequencing of summary judgment litigation in the

20   final Revenue Bonds Scheduling Order is contrary to their due

21   process rights.

22         The due process objection is unfounded, and the Court

23   concludes that moving forward with coordinated stay relief and

24   targeted merits determinations is an appropriate use of

25   available resources, particularly when conjoined with a stay

1  of the motion to dismiss practice.

2         The Court is persuaded that the mediation team's

3  short list of claims that may be the subject of early summary

4  judgment motions is appropriately narrow and focused on legal

5  issues such that litigation will be an efficient use of

6  resources.  While the Court does not yet have the benefit of

7  full briefing on those issues, they appear potentially suited

8  to adjudication without extensive discovery, and the Oversight

9  Board's counsel has represented that they will be cued up on

10 purely legal grounds.  If any are cued up in a way that

11 requires extensive discovery, they most likely will be put on

12 hold or on a different track.

13        Resolution of those issues that can be decided on

14 legal grounds will resolve key disputes that could affect, for

15 better or worse, the prospect of the Proposed Amended Plan of

16 Adjustment.  The sequencing of litigation in the manner

17 contemplated by the Final Revenue Bonds Scheduling Order does

18 not conflict with the monoline insurers' due process rights.

19 The Court has inherent authority to manage the litigation

20 before it and will provide full opportunities to the parties

21 to be heard as issues are taken up.

22        The Court has discretion to sequence litigation in an

23 efficient manner, including scheduling matters to prioritize

24 addressing purely legal matters that may render other

25 litigation unnecessary.  Furthermore, as the monoline insurers

1    acknowledge in their papers and have argued today, Federal

2    Rule of Civil Procedure 56(d), made applicable here through

3    Bankruptcy Rule 7056, provides a safety valve for claimants.

4    Nothing in the Final Revenue Bonds Scheduling Order will

5    deprive them of access to that safety valve.

6         The monoline insurers will have the ability to argue

7    that they have been unable to present essential facts in their

8    opposition to any motion for summary judgment.  If the Court

9    is persuaded that discovery is necessary to meet or present

10   material arguments, appropriate discovery opportunities will

11   be provided at appropriate times if the summary judgment

12   motion practice goes forward on those particular issues.

13        I will now address the stay of the underwriter

14   litigation, which is adversary proceeding 19-280.  The

15   defendants in that adversary proceeding who refer to

16   themselves collectively as the "Adversary Defendants" have

17   argued that the adversary proceeding against them should be

18   unstayed to allow them to file motions to dismiss with respect

19   to defenses that are unrelated to the Amended Plan of

20   Adjustment.

21        The issues enumerated by those defendants include

22   whether certain causes of action are available under Puerto

23   Rico law, whether claims are barred by Section 546(e) of the

24   Bankruptcy Code, the applicability of the doctrine of in pari

25   delicto, and other unspecified defenses.  The adversary

1    defendants argue that those issues may be dispositive of the

2    entire litigation against them.

3         The Court declines to lift the stay with respect to

4    Adversary Proceeding 19-280.  The issues that the adversary

5    defendants want addressed via dispositive motion practice are

6    not ones that are critical to the Plan confirmation process.

7    Thus, there is no need to dedicate the parties' and the

8    Court's limited resources to resolving those issues at this

9    juncture.  Those issues can await the resolution of the

10   confirmation process.

11        And now I'll turn to the arguments by the UCC and the

12   DRA parties that the Final Revenue Bond Scheduling Order

13   should be amended to address additional claims.  The Court

14   declines to expand the claims subject to the contemplated

15   summary judgment motion practice at this time.

16        The Order that the Court will enter will provide for

17   a meet and confer process, following a preliminary ruling by

18   the Court on the monoline insurers' motions for relief from

19   the automatic stay.  That will allow the parties to consider

20   whether there are issues or arguments that have been mooted,

21   or whether the issue list should be modified in light of the

22   Court's determinations, as well as to discuss their respective

23   views as to the most efficient procedural vehicles for those

24   disputes.

25        To the extent that it appears appropriate, following

1   these discussions, to expand the scope of summary judgment

2   motion practice or otherwise amend the litigation schedule,

3   parties in interest may make an application to the Court.

4        As to the topic more generally, of the DRA parties'

5   participation in the revenue bond-related litigation, the DRA

6   parties have reiterated their concerns that resolution of the

7   issues covered by the Final Revenue Bond Scheduling Order may

8   prejudice their rights by resolving overlapping issues

9   relating to rights to certain revenues.

10       Thus, the DRA parties have objected to the Final

11  Revenue Bond Scheduling Order to the extent that they do not

12  have the right to participate in that litigation to the same

13  extent as other parties in interest.  The intervention and

14  litigation participation issues raised by the DRA parties have

15  been addressed by Judge Dein in the context of their motions

16  to intervene in the Lift Stay Motions in an Order that was

17  filed last night.  Their application to participate in the

18  revenue bond adversary proceedings will also be addressed by

19  Judge Dein separately.

20       As to the conflicts issue and motion practice, the

21  monolines objected to the provision setting a deadline for

22  filing motions seeking relief to address alleged conflicts of

23  interest arising from the Oversight Board and the Government

24  of Puerto Rico acting on behalf of both the Commonwealth and

25  HTA.  To address the practical concerns raised by the

1    monolines and, in accordance with the recommendation by

2    Judge Houser, the final order that I will enter will, as I

3    indicated before, provide some additional time by

4    incorporating the formula that gives 15 days after the later

5    of the two critical events.

6            The Court rejects the monolines' assertions that

7    setting a deadline on motions violates their rights to due

8    process.  The Court has inherent power to manage the docket

9    and implement appropriate scheduling orders, and the Court is

10   satisfied that the deadline contributes to the overall goal of

11   making progress in these Title III cases.

12           As I said, I will include general provisions

13   permitting a request for extension for showing of good cause,

14   and I reserve all my rights with respect to those sorts of

15   applications.

16           As to the proposed stay of Ambac's 2004 motion

17   concerning PRIFA rum taxes, that motion will be denied without

18   prejudice, but it can be renewed in connection with plan

19   confirmation discovery.  And the schedule recommended by the

20   Oversight Board contemplates confirmation issue related

21   discovery beginning June 30th of this year.

22           That scheduling provision permits appropriate

23   discovery upon renewal of the motion, and this way Ambac and

24   the other monolines will have an opportunity to consider

25   litigation developments in connection with the revenue bond

1    issues in formulating any renewed requests.

2         Accordingly, the pending 2004 motion regarding PRIFA

3    rum taxes is denied without prejudice to renewal on a

4    timetable consistent with the schedule that will be

5    established for the litigation issues relating to the Amended

6    Proposed Plan of Adjustment if the Court approves the proposed

7    Disclosure Statement.  And if the Disclosure Statement is not

8    approved, we'll have other rescheduling to do.

9         So let's see.  The UCC filed an objection to the GDB

10   Proof of Claim, and the DRA parties requested that that be

11   allowed to go forward prior to the hearing on the Disclosure

12   Statement.  They have asked that one single issue, whether the

13   UCC has standing to pursue that objection, proceed prior to

14   the Disclosure Statement hearing.  The Court declines to

15   modify the Revenue Bond Scheduling Order in that respect.

16        The issue that the DRA parties seek to have the Court

17   resolve in the near term is not one that is essential to the

18   expeditious consideration of the Amended Plan of Adjustment,

19   nor have the DRA parties identified any prejudice that they

20   will suffer as a result of the continued stay of that

21   objection.  The merits of the objection, including the

22   question of the UCC's standing, can be addressed following the

23   Court's resolution of plan confirmation matters.

24        The Amended Plan of Adjustment proposes treatments to

25   dozens of classes of claims, and the DRA parties have not

1    demonstrated that adjudication of the validity or invalidity

2    of their particular claims has to precede evaluation of a

3    Disclosure Statement.  And if the Court were to rule early

4    that the UCC does have standing, that's not going to solve the

5    DRA parties' problems with respect to that objection.

6          So now I turn to the related motions, the UCC's

7    scheduling motion on its priority related objection to General

8    Obligation bonds.  That motion is docket entry number 10754.

9          That scheduling motion is denied without prejudice

10   because we will proceed in the context of plan-related

11   litigation as the most efficient use of the parties'

12   resources.  And if the Plan is not confirmed, the UCC can

13   renew that motion.

14         Now, the Disclosure Statement Scheduling Motion,

15   which is docket entry 10808.  For substantially the reasons

16   that I have explained, the Court believes that it is

17   appropriate to give the Oversight Board the opportunity to be

18   heard with respect to its Amended Plan of Adjustment, and

19   consideration of the proposed Disclosure Statement is a

20   preliminary step in that process.

21         The bulk of the arguments in opposition to the

22   scheduling motion concern the anticipated content of the

23   Disclosure Statement or the actual content of the Disclosure

24   Statement and Amended Plan of Adjustment, and to the fact that

25   those were not filed contemporaneously with the scheduling

1   motion.  But that scheduling motion requests only limited

2   relief.

3          The proposed Disclosure Statement and Plan have now

4   been filed, and substantive concerns about the contents of the

5   Disclosure Statement and Plan will be addressed at the

6   appropriate time.  The Court will, however, amend the proposed

7   schedule to provide some additional time for the parties'

8   consideration of objections to the proposed Disclosure

9   Statement.

10          So the motion is granted.  The Court will make

11   certain revisions to the Proposed Order.

12          First, I will correct a scrivener's error in the

13   Proposed Order to make it clear that the Disclosure Statement

14   hearing will be held in connection with the June Omnibus

15   hearing scheduled for June 3rd and 4th, and not be held today,

16   because that would be kind of impossible.

17          Second, the objection deadline will be moved from

18   April 17th to April 24th to give the parties a little

19   additional time to review the Disclosure Statement and

20   associated documents.

21          Third, the Court will make it clear that the purpose

22   of the hearing is not restricted purely to the adequacy of the

23   Disclosure Statement, but that it will also encompass the

24   voting and solicitation procedures proposed by the Oversight

25   Board in its motion seeking approval of the disclosure

1    statement and related procedures.

2         And finally, in terms of scheduling, the proposed

3    confirmation hearing period of October 13th to 23rd is not

4    feasible for me.  And I have to be there.  So what I will do

5    is block off the following dates for a potential confirmation

6    hearing pending, of course, approval of the Disclosure

7    Statement.  October 21st through 23rd, that's a Wednesday to

8    Friday.  Then the following week, October 26th through 31st,

9    so we can celebrate Halloween together.  Then the -- I'm

10   sorry.  It's the following week.  The week that includes the

11   Omni and -- basically, it's the period of October 21st through

12   November 6th, recognizing that we may need to take a break for

13   the Omni.

14        And we probably won't be able to proceed on election

15   day.  So I'm not sure that I wrote precisely the dates, the

16   specific dates I intended to, but that's the time frame.  I

17   will enter an Order on the docket that indicates that those

18   are the dates that are reserved.

19        So thank you all for listening and for your patience

20   with this lengthy recitation.  And I will now turn the bench

21   over to Judge Dein for discovery matters.

22        MR. DESPINS:  Your Honor, just one clarification.

23        THE COURT:  Yes, sir.

24        MR. DESPINS:  We filed a 3013 motion yesterday so,

25   therefore, it's not covered by future filings.

1          THE COURT:  I know you did that yesterday so it

2    wouldn't be covered by future filings.

3          MR. DESPINS:  So what -- are you going to issue an

4    order?  How -- where does it fit is the question.

5          THE COURT:  What I expected was that there may be

6    argumentation in response to that motion, that it should be

7    considered more contemporaneously with other confirmation

8    matters than considered prior to the Disclosure Statement

9    hearing.

10          I thought it would be only fair to give you an

11    opportunity to reply to such argumentation.  And at the April

12    Omni I'll decide, at a minimum, when it will be decided, and

13    we'll see where we are.

14          MR. DESPINS:  Okay.  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Anything else?

17          (No response.)

18          THE COURT:  Thank you, Judge Dein.

19          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I'm

20    going to take a minute, and so people can leave --

21          THE COURT:  Oh, anyone who wants to leave, can leave.

22    Thank you very much.  Safe travels.  Be good.  Be well.

23          MR. LAWTON:  Thank you, Your Honor.

24          THE COURT:  Breathe carefully these days.

25          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

1   right.  I'm taking a calculated risk to do discovery at the

2   end of today.  We'll see if this is going to pay off or not.

3           So I have been through the various pleadings, of

4   which there have been quite a few.  And I thought that it made

5   the most sense actually, instead of just having argument,

6   because I really do understand the parties' positions, that it

7   made the most sense to actually just work off of the movant's

8   Proposed Order, the last one.  And why don't we deal with it

9   sort of item by item.

10          I will tell you, I understand that there are

11  arguments that things have been produced already that reach

12  these issues.  It's more helpful for me to deal with it in

13  connection with specific requests, so you can say why you

14  shouldn't be producing any more material, or you've already

15  produced it.

16          I will give everybody a head's up that I am not

17  inclined to allow the e-mail communications.  I've read all

18  the arguments on it.  It has really not been persuasive to me.

19  And as it now stands, just as a general statement, it seems to

20  me that state of mind is not an issue.  Individuals'

21  understanding of things is not the issue.

22          No one is arguing ambiguity that's going to be

23  straightened out by some e-mail that somebody sent someplace

24  along the line.  It is definitely more burdensome to do an

25  e-mail search, and it's just not necessary, as far as I can

1   tell, to really understand the factual issues that discovery

2   is limited to.

3         So you can try to argue me out of it, but it is late

4   and that is my basic position.  But that having been said, why

5   don't we start -- so I'm dealing with document number 11958-1,

6   which is the movant's latest revised Proposed Order.  And I

7   just want to do it sort of item by item, I guess starting with

8   the flow of funds discovery with respect to HTA, the account

9   opening documents.

10        I think the request is pretty self-explanatory.  I'll

11  hear the opposition, or at least the response to the request.

12        MS. MCKEEN:  Your Honor, Elizabeth McKeen of

13  O'Melveny & Myers on behalf of AAFAF.

14        With respect to account opening documents, I think

15  our position is that given that we have said that we will

16  provide the account statements going back to 2015 for each of

17  the relevant accounts, the account opening documents are not

18  going to necessarily have any additional information that

19  would shed light on the relevant issues.

20        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I

21  thought that these were designed to determine whether or not

22  there were any restrictions on the accounts or otherwise

23  specific instructions.

24        MS. MCKEEN:  It's not clear to me that the documents

25  that they've requested would actually contain information that

1   goes to that issue.  I will say that with respect to these

2   particular documents, many of them may significantly predate

3   the 2015 time period, and many of them may simply not exist in

4   the government's files anymore.

5          So to the extent we locate account opening documents

6   that are in our possession, we would be willing to provide

7   them, but given their sort of relative value, we don't believe

8   it would be worthwhile to undertake an independent search for

9   them or to delay the April 2nd hearing in an effort to

10  aggregate all of them given -- given the likelihood that we

11  may not be able to find many of them at all.

12         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

13  Well, I'm not talking about delaying.  But how do you maintain

14  these?  Like when you say they predate, but -- do you maintain

15  them by accounts?

16         I mean, it seems to me that the information that

17  they're asking for is sort of the key information.  How are

18  these accounts created?  What are the parameters on the

19  accounts, or are there any special limitations?

20         MS. MCKEEN:  So that's not something that is kept in

21  any sort of central repository or place.  So what we're having

22  to do for each instrumentality is going instrumentality by

23  instrumentality, account by account, to figure out who has

24  what, where is it located and what's there.

25         And so in the process of doing that, we've been

1    identifying and producing account statements.  And in

2    connection with doing that, we can also see if the account

3    operating documents are there, but they simply may not be,

4    Your Honor.

5              HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

6    All right.  Who's -- anybody want to respond to that?

7              MR. NATBONY:  Sure, Your Honor.  Good afternoon,

8    Judge Dein.  William Natbony on behalf of Assured and the

9    other monolines.

10             So what I'm hearing on that limited subject is I'm

11   not sure what's there, I'm not sure what it says, and -- but

12   maybe I'll look for it.  So --

13             HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Well,

14   no.  I got the, I'm definitely looking for it.

15             MR. NATBONY:  Okay.  So that's fine.  I'm happy.

16   But I think the short answer to the argument is that account

17   statements are extremely different than account agreements,

18   signatory agreements, restrictions that might be in account

19   opening documents and agreements relating to those statements.

20             I mean, I get statements every day.  They don't have

21   the attached restrictions or potential signatory issues,

22   indications of ownership, who has control, who has the ability

23   to control over those accounts.  Those are the kind of

24   documents that we are seeking.

25             And when they are making the arguments that these

1  funds are in accounts where there is no interest, where

2  they're controlled by Commonwealth, or not HTA, that's why

3  they are relevant, Your Honor.

4  So I hear what they're saying.  I think they should

5  be able to look for them, produce what they have and work from

6  there.  And I think the same argument goes for the second

7  bullet, Your Honor, with respect to account agreements, which

8  I would think fall into that same category.

9  HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So as

10  I see it, though, the way we should do it is that this isn't a

11  third party search right now.  It's what's in your possession.

12  To the extent you're finding the documents, each

13  account, you do need to provide the statements that -- or any

14  other documents that reflect the information that is requested

15  in these bulletins, the depository institution, the account

16  holders, signatories, beneficiaries, and any restrictions as

17  they've got -- as they've listed them.

18  So if you have a statement from the bank that's not

19  an account opening document, but otherwise is in your file

20  that confirms the terms, that should be produced.  Okay?

21  MR. NATBONY:  Thank you.

22  HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

23  right.

24  MR. MAINLAND:  Hello, Your Honor.  Grant Mainland of

25  Millbank on behalf of Ambac Assurance Corporation.

1          I just wanted to add in a few additional related

2     issues on the account opening documents, particularly as they

3     relate to PRIFA and CCDA.  One of the issues that we're

4     struggling with that is really relevant to these account

5     opening documents that the account statements themselves do

6     not address is really what are these accounts.

7          Now, one of the main theories of defense against our

8     request for stay relief is it turns extensively on where any

9     of the relevant money is located at any given time.  Is it in

10    the infrastructure fund?  I'm overhearing counsel say it

11    doesn't turn on that, but that really is on almost every page

12    of their brief.

13         Their argument is, unless that money has been

14    deposited in a certain place, then we don't have any claim to

15    that; we don't have any lien on that.  That runs through all

16    of their arguments on the bond documents and the statutes.

17    And that's a very central feature of how they're opposing our

18    motions.

19         We don't know what these accounts are.  We don't know

20    what the pledge account is.  We don't know what the transfer

21    account is.  We don't know what the holding fund is.  That's

22    CCDA alone.  We don't know what the infrastructure fund is.

23         Is it a particular account?  Is it a fund that

24    consists of multiple accounts as they've explained the TSA

25    itself is?  They, in their own bank accounts analysis that

1    they provided in the course of mediation that's now been

2    publicly disclosed, they talk about how the TSA is a

3    constellation of a bunch of different accounts.

4           They've stated publicly that these individual

5    accounts within TSA earn different rates of interest and that

6    they're constantly trying to maximize that, all of which is

7    totally uncontroversial, except that we don't have any

8    visibility into it.  And for all we know, when we're required

9    to take on their say-so, that money is being commingled, that

10   money is in accounts that are unrestricted.

11          And to just look at statements, that oftentimes --

12   I'll take an example.  There's just a Scotia Bank account.  Is

13   that the transfer account?  Is that the pledge account?  Is it

14   a holding fund?  Is it neither?

15          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So

16   what do you have?  You have lists and you have spreadsheets

17   that identify all of the accounts that they've identified, so

18   far as the accounts in which the money is being deposited.

19   You have the Treasury letters, at least for some of them,

20   which are the directions.

21          MR. MAINLAND:  Sure.  Well, so only with respect to

22   CCDA, unless -- and I apologize if something came in as I've

23   been traveling --

24          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

25   You're jumping around.

1          MR. MAINLAND:   -- that is more than that.  But with

2     respect to CCDA, there is a spreadsheet that identifies

3     accounts, which we think is very helpful and is an important

4     step in terms of trying to understand the constellation of

5     these accounts.

6          But it will say, for example, again, Firstbank

7     account.  We have no idea how to tie this to these particular

8     entities that exist under the -- sort of under the statutes

9     and under the bond documents.  And yet, those, in their

10    theory -- now, of course we have a different opinion as to the

11    legal significance of where the money is located, but that's

12    -- put that to the side.  To them, it matters a lot.  And

13    their argument is, if it doesn't go in this particular place,

14    you're out of luck.

15         We need to know exactly where the money is, and in

16    what kinds of accounts, and what kinds of restrictions are on

17    those accounts.  And that's why we've been asking for this

18    information.

19         We also, I should say, have asked through letter

20    writing, which I'm increasingly concerned about given the

21    passage of time, you know, what are these accounts?  Identify

22    for us what the PRIFA Infrastructure Fund is.  We're not

23    getting answers for that.  And so this, to us, seems like the

24    most practical way of trying to get at that.

25         The only other thing I want to add here is that you

1   mentioned third-party discovery, or you alluded to it.  We're

2   sympathetic to the possibility that these are accounts that

3   have existed for some time.  And is it easy to run and track

4   down any particular account opening document?  Maybe not.  I

5   would think that it would be much easier for the banks

6   themselves to locate that.

7        And we've raised that as a possibility.  We didn't

8   want to, on the eve of this hearing, start issuing third-party

9   subpoenas, but given the passage of time, increasingly we're

10  thinking that may be a fruitful path forward.

11       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Let

12  me just ask you, before you continue, is it necessary to have

13  this information, in your view, for all the accounts?  Are

14  there exemplar years?  Are there specific, more limited

15  accounts that you can identify that's worth further

16  investigation?

17       MR. MAINLAND:  I actually don't think it's a lot of

18  accounts, though it's -- I'm obviously limited in my ability

19  to understand what's really going on, because the window we've

20  had to date remains pretty narrow.

21       What I would say is if -- let's take PRIFA as an

22  example.  If there are multiple accounts through which the

23  money flows -- and their argument is, you know, your lien

24  doesn't attach until it gets to point X.  But we want to

25  understand the flow, because we think there may be factual

1   details relating to how that money moves and any restrictions

2   on it that -- that would be relevant to the existence and

3   scope and attachment of our lien.

4        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

5   But it can't be every transaction and --

6        MR. MAINLAND:  Well, what we're talking about here is

7   account -- I actually don't think, and they haven't really

8   fought us very hard on the notion that account statements

9   themselves can be produced.  They've made comments about the

10  ability to produce every last one, but more or less have

11  agreed that that's an appropriate scope of production.

12       I think account opening documents, if we are talking

13  about a handful of accounts, and an account opening document

14  or two or three for each one of those, that doesn't strike me

15  as very burdensome.  I think the issue is locating it.  And

16  frankly, they don't agree that it's relevant, but I think, you

17  know, we shouldn't be forced to live with that.

18       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Well,

19  let me ask you.  Do you need the bank statements?  Is that

20  something that's worth their time finding?  Or is it more

21  important for you to get the bank account information and any

22  limitations on the account?

23       MR. MAINLAND:  We do need the account statements, and

24  I think we have gotten many of them.  We haven't gotten

25  everything, and that remains incomplete.  But I think it is

1   relevant to a number of issues, including lowest intermediate

2   balance.

3        There are a lot of reasons why we need a sort of full

4   set of account statements, but on these issues of the status

5   of the accounts and any restrictions on them, we think the

6   account opening documents are essential.

7        MR. NATBONY:  May I, Your Honor?

8        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Not

9   if you're going to say the same thing.

10       MR. NATBONY:  Well, it's the same issue with respect

11  to HTA, in the sense that there are different accounts.  We

12  don't know what all the accounts are.  So if they're going to

13  tell us that this one has no relevance, we have no way of

14  knowing.

15       And this also goes to the issue of, we have Fund 278.

16  We don't know what that is with HTA.  We need to understand.

17  So we do need the statements also, because we need to see

18  where the money is going and why.  So that's what the

19  statements are going to be showing.

20       Because their argument is, you know, if the money

21  comes in here, and goes there, and then goes there, and then

22  goes there, that impacts who has a right to it.  So we need to

23  understand.  And that's what Judge, I think, Swain recognized

24  is, we need to understand the flow of funds.  And it's the

25  statements that show where the funds are flowing.

1          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:   So

2     this is how I'm interpreting it.  I think that you need to

3     make a distinction though between your sort of ultimate damage

4     claim, let me put it that way, and the flow claim.

5          Like you need to understand how the money flows right

6     now for these gatekeeping issues, right?  And then you can

7     argue later what is the precise dollars, and which specific

8     monies you're claiming an interest in.  But I don't think that

9     you need to get it that specific at this juncture.

10         MR. NATBONY:  The one issue that I would raise with

11    Your Honor is when you use the words "right now," because I

12    believe that we have seen evidence, and what we've seen is

13    that the flows have changed over time.  So I think when you

14    look at a time period, for instance, pre-clawback and

15    post-clawback, I think we need to understand what the flow has

16    been during that period of time, not just right now.

17         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:   I

18    didn't mean to limit it to right now, but I am limiting it to

19    not spending a whole lot of time looking for January's

20    statement if you have February's and you have December's.

21         MR. NATBONY:  I understand, Your Honor.

22         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

23    So that's why I was asking whether there are exemplar years or

24    certain targeted accounts.

25         And I guess I will hear from you.

1           MR. MERVIS:  Your Honor, Michael Mervis, Proskauer

2     Rose, for the Oversight Board.  I'll be very brief.

3           I actually thought Ms. McKeen agreed to look for

4     account opening documents, so I actually think we've resolved

5     that particular issue.  But a few things were said, and I just

6     want a level set.

7           One is, it's not for Your Honor, but since it was

8     said, the characterization of what our argument is, that's not

9     our argument.  We did, in our papers, illustrate the flow of

10    funds, as it's called for by the various statutes and

11    agreements.  And AAFAF has agreed to produce the documents

12    that will demonstrate what actually happened.  And if there's

13    a variance between what the statutes and the agreements say,

14    and if that has some legal relevance, we'll hear about it on

15    April 2nd.

16          But to be very clear, our argument is based solely on

17    the fact that there is -- there is one account for each of

18    these three entities that matters.  But we -- but again,

19    Ms. McKeen agreed to look, and so we're going to look.

20          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

21          MR. MERVIS:  Secondly, I appreciate that they have

22    questions, and I appreciate that they don't feel that they've

23    got all the information they need.  That's not surprising.

24    We're in the midst of the production right now.

25          So as the production -- there will be -- and Ms.

1   Pavel's been down here for, what, four or five days with a

2   team of associates looking for documents.  Those documents

3   will be produced.  And if after that there are questions, we

4   will answer them.

5        I know they have written letters, and we responded to

6   some of the letters.  And some, we haven't gotten to them yet,

7   but we will not ignore them.  I promise.  If there are

8   legitimate questions, we will answer them.

9        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So if

10  I saw your scheduling correctly, you were aiming -- everyone

11  is aiming for substantial discovery by March 16th?

12       MR. MERVIS:  That's right, Your Honor.

13       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So

14  within that context, I think you do need to get on answering

15  questions.

16       MR. MERVIS:  Agreed.  And the only caveat I'll make

17  to that is we may not know the answers the same day that we

18  get the questions, but sure.  Of course we'll answer

19  questions.

20       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

21  So as I understand it, the government parties are going to

22  produce the flow of fund discovery, to the extent they have

23  them, with respect to subpart B?  I'm not sure what -- so A,

24  the account opening documents, et cetera, and the banking

25  agreements.

1          I'm not sure what transmittal information means,

2     which was the subpart C, such as payment vouchers and transfer

3     activities.  Reports for the period July 2016 to the present.

4     I don't -- I'm not sure what that means, and I'm not sure if

5     there's an objection, because I don't know what it means.

6          MR. MAINLAND:  I'm happy to address that.

7          THE COURT:  All right.

8          MR. MAINLAND:  Transmittal information is really

9     trying to deal with a situation where you look at an account

10    statement and you see that money went from point A to point B,

11    but often, these are accompanied by transmittal memoranda or

12    what they've been referring to as disbursement detail

13    memoranda.  That would provide more details as to the nature

14    of the transfer that's occurring.

15         So -- and I'll give a very specific example that

16    potentially could have significant relevance to this

17    proceeding, which is, if money is sent, for instance the

18    lockbox agreement that they've disclosed, and that relates to

19    how rum taxes apparently move, if money is sent to the credit

20    of the infrastructure fund -- again, we don't really know what

21    the infrastructure fund is, because we don't have much

22    visibility into it, but that would have significant -- if the

23    transfer itself is noted as being to the credit of PRIFA, that

24    would be relevant.

25         They make generalized allegations of commingling

1    within the TSA.  We're not required to sort of accept that on

2    their say-so.  We're entitled to explore, are there notations

3    or other transmittal information that would indicate the

4    nature of the transfer and restricted status of the money.  So

5    that's what we have in mind, Your Honor.

6         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So

7    again, what I'm trying to balance here is I think you are

8    entitled to discovery on understanding the flow in general,

9    but that's not a specific -- you don't have time, nor do I

10   think it's efficient, to be questioning each and every

11   transaction over the last four years.

12        MR. MAINLAND:  Well, that's an area where exemplar

13   documents, I think, would work.  The problem is we're not

14   getting the level of detail that we need even with respect to

15   exemplar documents.

16        So I think that's one where if there are -- and maybe

17   there's a work-around, whether by stipulation or otherwise,

18   that can represent that this kind of transfer is one that

19   would typically occur in the ordinary course with respect to

20   these rum taxes, the first 117 million going from the lockbox

21   to the TSA.

22        What we need to understand is what is the nature of

23   that transfer.  And transmittal information is likely to shed

24   a lot of light on that.  Again, they, on multiple pages of

25   their briefs, refer to these documents as -- I mean these

1   monies as entirely unrestricted.  No strings attached.  Pure

2   commingling in a single, undifferentiated pot of money.  It's

3   totally at odds with what we've seen about how the TSA works

4   in general.

5        And we're also not required to just accept that very

6   blunt factual assertion in their papers.  We need to

7   understand it.  We are willing to work on an exemplar basis to

8   understand that better.

9        Can I -- go ahead.

10       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I

11  think we're -- we can't go all at the same time.

12       Go ahead.

13       MR. NATBONY:  Sorry.  I think when we originally --

14  we had split up between HTA and CCDA and PRIFA, so I

15  apologize.

16       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I

17  thought I did, too, but apparently not.

18       MR. NATBONY:  The only thing I would add on with

19  respect to HTA is the transmittal documents, the notations

20  could describe the purpose of the transfer.  It could also

21  describe the ownership of the funds or whether there's a

22  beneficial interest there.

23       I mean, and we've seen it on other documents where

24  you've had notations that might say "owned funds" or --

25       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I'm

1     sorry.  I didn't hear your last word.

2          MR. NATBONY:  Owned funds.

3          So to the extent there are notations, I mean, Your

4     Honor writes a check or anyone writes a check, you make a

5     notation as to purpose or what it's for, we think that those

6     are relevant to determining whether the monies, in fact, were

7     earmarked or had an interest as they allege or not.

8          And it's really not a question of an undue burden,

9     because they haven't even come in and said anything that is

10    burdensome.  These are documents that, if they have them, they

11    should be in one place.  I mean, you keep your records and

12    your transmittals in one place, so I don't see what the burden

13    is.

14         And if the question is that it's going to -- we

15    haven't heard any proof of burden.  So, I mean, we'll take a

16    look through them.

17         So, you know, exemplary, I mean, I don't really think

18    it's appropriate to have them pick and choose which one of

19    these transmittal slips they're going to send, because I don't

20    have an assurance that the ones with notations are the ones

21    that they're going to produce, so --

22         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

23    So let me understand what kind of documents the government

24    does have or plans on producing.  Oh, I'm sorry.

25         MS. MCKEEN:  So, Your Honor, I think this is an

1      example --

2              HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:   I

3      think we have Mr. Berezin.

4              MR. BEREZIN:  Yes.  Your Honor, if I could, just

5      one comment on the transfer information.  And I think it

6      would be helpful to point this out.  In terms of

7      representative documents that could be produced, AAFAF has

8      already produced withdrawal vouchers and transfer activity

9      reports for year 2015 and part of 2016 that were very helpful

10     and informative.

11             And if they would just produce the same types of

12     documents for the rest of 2016 through the present, I think

13     that would go a long way on this issue of transmittal

14     information.  And we could send the control numbers, the Bates

15     numbers, to AAFAF so they understand exactly what documents

16     we're talking about, although we may have listed them in our

17     reply brief.  I'm not sure.

18             MR. NATBONY:  I believe it's from July 2016 to the

19     present that they have not produced, Your Honor.

20             MS. MCKEEN:  Your Honor, I think this is another

21     example of a place where there's a disconnect between what

22     they're seeking an order on and what we've agreed to do.

23     AAFAF has agreed to produce direction letters, wiring

24     instructions, and other similar content that exists in the

25     files associated with transfers.

1          The only thing that we have refused to do is

2     investigate the details of every single transfer reflected in

3     five years worth of statements.  We're not going to go kind of

4     behind each transfer and accumulate more information.  But to

5     the extent we're finding documents like the ones Mr. Berezin

6     just described, we're producing them.

7          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

8     Okay.

9          MS. MCKEEN:  So I think that should be sufficient,

10    particularly in light of what counsel just said in terms of

11    being willing to accept exemplars.

12         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

13    So the question then becomes how fast can you do them?

14         MS. MCKEEN:  We've had this in mind when we agreed to

15    the March 16th substantial completion date.  So as we are

16    going through files to find account statements, we are also

17    looking for these materials.  If it exist in the files, it

18    will be produced.

19         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  And

20    just, do you have a sense of how many accounts you're talking

21    about for each of these?

22         MS. MCKEEN:  I think there are over 20 accounts that

23    are in play, but I don't have that number in front of me.

24    That's the approximate order of magnitude.

25         MR. NATBONY:  Across all three?

1             MS. MCKEEN:  Correct, across all three entities.

2             HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  And

3    what's your response to the question about whether or not the

4    individual banks should be involved in opening account

5    documents, or documents that reflect any restrictions on use?

6             MS. MCKEEN:  So with respect to those kinds of

7    documents, we have already begun the process of speaking to

8    banks to see whether these are available and can be provided

9    with respect to particular accounts.  I will note that some of

10   these accounts were at GDB, so the odds of getting that is not

11   likely to be very high.

12            HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

13   But the other banks -- so you're taking on that responsibility

14   then?

15            MS. MCKEEN:  It's something that we have begun to

16   undertake.

17            HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

18   right.  So this is how I see it.  As I understand it then,

19   everything that is listed in the flow of funds discovery

20   that's in this sheet, the government has agreed to produce in

21   subpart A --

22            MS. MCKEEN:  Your Honor.

23            HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  --

24   for the first three categories.  We haven't gotten to the

25   official memoranda yet.

1          MS. MCKEEN:  I guess the only gloss I would put on

2     that is with respect to transmittal information, what we're

3     doing is limited to what is in, you know, a centralized file,

4     as opposed to going and looking for other backup information

5     about individual transfers, if that makes sense.

6          When we are coming across these documents in the

7     course of our search, we are producing things like

8     disbursement detail.  But the request, as it was originally

9     drafted, was much broader than that.

10          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Yes,

11     it was.

12          MS. MCKEEN:  And I want to make clear we're not doing

13     what request number two asks of us.

14          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

15     right.  So that's why I wanted to start with the proposed --

16     the revised requests, because I do think they are narrower

17     than the original ones.  So I think it's helpful to work off

18     of this one.

19          Right now what I'm hearing, and I guess what's

20     consistent with what I would order, would be that the opening

21     account documents and restrictions on use information, the

22     government is going to try to get that directly from the bank.

23     The rest will be what's in the government's files as of now.

24          And you'll produce the account statements, the

25     transmittal information, to the extent that you have it, and

1    the banking agreements, to the extent that you have it.  All

2    right?

3            So the opening account document information and

4    restrictions on use, I think you need to go beyond what's in

5    your files, and you need to see if you can get it from the

6    bank.  All right?

7            MS. MCKEEN:  Yes, Your Honor.

8            HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  She

9    says she's giving it to you.

10           MR. NATBONY:  All right.

11           MR. MAINLAND:  I guess one detail that I think is

12   important --

13           HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Let

14   her finish.

15           MR. NATBONY:  That's appreciated.  That's

16   appreciated, Your Honor.

17           MS. MCKEEN:  As long as I was up here, I thought I

18   might go to the next bullet point in the Order.

19           HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Go

20   ahead.

21           MS. MCKEEN:  This is another one where we were

22   surprised to see this as the subject of this Motion to Compel.

23   This is something we have agreed that we will search for and

24   produce, to the extent it's in our possession.  I don't think

25   there's anything to discuss with respect to this.

1        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

2    right.  And I've eliminated e-mail communications.  I'm not

3    ordering that at this time.

4        MS. MCKEEN:  Similarly, under the heading

5    appropriations discovery, we have already indicated that with

6    respect to the first bullet, these are documents that we're

7    searching for and we'll produce if we find them.  And that is

8    true of the official memoranda for this bullet as well.

9        So I think this just falls into the heading of there

10    are a lot of things that are --

11        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So in

12    this group, apart from the e-mail communications, do you have

13    objections to any of them?

14        MS. MCKEEN:  When you say in this group, you mean the

15    appropriations discovery, sub B in the Order?

16        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

17    Right.

18        MS. MCKEEN:  No, Your Honor.

19        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

20    And what about with respect to number two?

21        MS. MCKEEN:  So I think with respect to number two,

22    these categories become a little less sort of specific.  I

23    think we are prepared for PRIFA and CCDA to produce exactly

24    the same kinds of documents that we've just said that we will

25    produce for HTA.

1          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:   So I

2     think, as I read it, when I compare the words, I think they

3     are the same.   What it does do is just more clearly identify

4     what kind of accounts?

5          MS. MCKEEN:   I think that's true perhaps for the

6     first bullet, but with respect to, for example, the second

7     bullet where it talks about information about transfers, that

8     is beyond what I just described previously.   Again, that's

9     something where we don't think, for a five-year period, we

10    should be looking for information about all the transfers.

11         To the extent they have questions about a particular

12    transfer, we're happy to meet and confer with them.   But we

13    want to just make sure that we're not being unnecessarily

14    overbroad about what we're undertaking to do.

15         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:   All

16    right.   And I think what they are saying though is, we sent

17    you a letter and we listed 12 transfers.   Have you responded

18    to that letter?

19         MS. MCKEEN:   I believe we are in the process of

20    investigating the letter.   This was sent last Wednesday.   Our

21    opposition to their motion was due Friday.   We are in the

22    process of gathering all these documents and information.   So

23    it's an ongoing task.

24         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:   I

25    don't understand why the lawyers need time to do these things.

1    The Court doesn't.  Just teasing.

2          Okay.  So I think that's the appropriate meet and

3    confer, right?  So as it says here, you want information

4    requested in the movant's February 26, 2020, letter.  That's

5    the appropriate way to see if there is more detail about the

6    transfer information, and I think that's the right way to go.

7          And if it becomes unduly burdensome and you can't

8    work it out, let me know.  But otherwise I'm just going to

9    assume that you'll be able to appropriately limit your

10   requests, and you'll do the appropriate homework to get the

11   information.

12         MS. MCKEEN:  Yes, Your Honor.

13         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

14         MS. MCKEEN:  I think the next two bullet points about

15   communications fall in the category of what you said you would

16   not allow.

17         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Yes.

18   And that you have produced as -- and I think it's the last

19   one, documents sufficient to show the term, scope and effect

20   of purported restrictions.

21         MS. MCKEEN:  Your Honor, I'm going to let Mr. Mervis

22   speak to that.

23         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

24         MR. MERVIS:  Your Honor, Michael Mervis, Proskauer,

25   for the Oversight Board.

 1          So I think there's two points here, because I think

 2    there's some confusion about what -- I think there's some

 3    confusion on the monolines' part as to what the document that

 4    this request is based on actually is, but let me get to the

 5    good part first.

 6          We've already agreed, and we did so on a meet and

 7    confer, to produce -- well, let me back up.  Actually, I won't

 8    get to the good part first, because I think it does require

 9    some explanation.

10          So, Your Honor, I don't know if you have the exhibits

11    to the monolines' Reply Brief handy.  You probably do, because

12    you were looking at the Proposed Order, but if you have it --

13    and I can pass it up if you don't -- Exhibit D is the document

14    that is at issue here.

15          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Can I

16    have it?

17          MR. MERVIS:  Yes.  And the only concern I have, Your

18    Honor, is whether I highlighted it.  But you know what?  Even

19    if I did, it's not very much.

20          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Thank

21    you.

22          MR. MERVIS:  So, Your Honor, what this is, is this

23    was a presentation that was created by the Oversight Board's

24    professionals.  In other words, not government officials who

25    were dealing with the flow of funds back when these statutes

1   were enacted, nor government officials who were dealing with

2   the flow of funds in the last few years.  And it was prepared

3   for mediation, prepared by counsel, and listed as subject to

4   revision.

5           And there are line items, Your Honor, on pages eight,

6   nine and 10 that refer to accounts for, respectively, HTA,

7   PRIFA and the Tourism Company.  And what it says in each of

8   those line items is that it -- at the far right-hand side, it

9   gives amounts and it says, I think, implied restricted --

10          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

11  Right.  Potential restrictions --

12          MR. MERVIS:  Right.  And if you look up and down the

13  pages, for all of -- and what's listed on these pages are

14  public corporations.  And if you look up -- so in other words,

15  Commonwealth entities that are separate from the Commonwealth.

16          Now, if you look up and down the pages, for the most

17  part what you'll see is that almost all the money is in -- is

18  classified implied restricted.  Not just for these three

19  entities, but for substantially all of them.

20          And page three of the presentation explains why that

21  is.  It says it right in the presentation.  It says the reason

22  that it was -- I can't recall, because I handed it to you,

23  Your Honor.  I can't recall if it says "assumed" or "assumed

24  to be," but if you look, Your Honor, toward about a third of

25  the way down the page where it says public corporations,

1   there's a few bullet points.

2          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

3   Assumed to be unrestricted --

4          MR. MERVIS:  Yes.

5          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  --

6   other than emergency funds and escalated federal funds --

7          MR. MERVIS:  Right.  And then I think right below

8   that, it says "assumed to be restricted."

9          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

10  Right.

11         MR. MERVIS:  And as I understand it, the reason for

12  that assumption is because these are public corporations that

13  are separate from the Commonwealth.

14         Now, what does this have to do with the Lift Stay

15  Motion?  The short answer is nothing, because the assumption

16  of restriction -- first of all, only one of the three accounts

17  has any of the funds that are at issue here, which is the

18  Tourism Company account.  But the assumption is not based on

19  alleged security interests or alleged property rights of

20  bondholders.  The assumption is based merely on the fact that

21  these are separate corporations.

22         So that's the context, but let me get to the punch

23  line.  We agreed, not withstanding our view that this has

24  nothing to do with the motion, to produce the documents that

25  the Oversight Board's professionals relied upon in reaching

1    those restriction conclusions, and we will produce them.

2         We were asked if there was any explanatory memos or

3    guides that guided this exercise in terms of those restriction

4    classifications.  And I checked, and the answer is no.  There

5    are no such documents.  So I don't have anything to produce.

6         So short answer is, not withstanding that this is

7    irrelevant, we are -- we will produce the documents that they

8    asked for.  So I'm not sure what there is more to say.  Maybe

9    there is more to say.  But I'll sit down unless Your Honor has

10   any questions about what I just told you.

11        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So

12   the way I -- the question that I had on this category was that

13   they do specifically reference this document, but they do have

14   a broader document sufficient to show the term, scope and

15   effects of purported restrictions placed on CCDA and PRIFA

16   related funds.  So part of that, it seems to me, is account

17   opening documents --

18        MR. MERVIS:  Right, which we already talked about.

19        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  --

20   which you're producing.

21        Part of it may be the other documents which you've

22   produced with the Treasury directives or anything that tells

23   you what you can and can't do with the funds.  But I didn't

24   know whether you had a concern about this description,

25   assuming that the summary of cash restriction analysis was

1    limited to what you've agreed to produce.

2         MR. MERVIS:  No, Your Honor, I don't, because, as I

3    just said, we'll produce the documents that the Oversight

4    Board's professionals relied upon.  And as far as the rest of

5    it goes, my understanding is that everything that we've been

6    talking about up until now would contain such restriction

7    information, assuming it even exists.

8         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

9    Thank you.

10         MR. MAINLAND:  I have a few things, but I really

11   wanted to focus on that cash restriction analysis piece.  In

12   particular, with respect to the Tourism Company, though I

13   think it's relevant to all of them.  But I'm sort of

14   scratching my head at the notion that 135 million dollars is

15   sitting at the Tourism Company.

16         They're apparently acknowledging that those are hotel

17   taxes, i.e., the flow of money that secures the CCDA bonds,

18   and they're saying it's somehow irrelevant to our Lift Stay

19   Motion.

20         One of our -- in fact, our threshold argument is that

21   the Commonwealth lacks equity in that money, and that it's not

22   necessary to an effective reorganization.  They, themselves,

23   are saying in their own cash restriction analysis that this is

24   unavailable to be used in a Commonwealth Plan.  How could that

25   not be directly relevant to our Lift Stay Motion?

1          And to hear counsel sort of provide an unsworn

2    explanation as to what all this means is really not -- it's

3    not how discovery is supposed to work.  And all of these

4    representations just raise more questions than they answer.

5          We certainly don't understand what the PRIFA money

6    is.  Are those rum taxes?  Are they not rum taxes?  If they're

7    restricted, why are they restricted?

8          If they're just going to say, well, they're

9    restricted because they're at another entity, that's an

10   interesting concept that we would need to explore a little bit

11   more, again with respect to our 362(d)(2) argument that they

12   lack equity in the property.  But there's so much we don't

13   know about this.  And just to have them say, we are agreeing

14   to give you documents that our professionals relied upon,

15   except they didn't really rely upon documents so we have no

16   documents to give you, but here, I'm a lawyer and I'll stand

17   up and explain what it really means, that's not how this is

18   supposed to work.

19         So a 30(b)(6) at a minimum.  If there are no

20   documents, there are no documents.  But this is not a random

21   cash restriction they put together.  Clearly some thought went

22   into this.

23         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I'm

24   not going to get into part of the fight, but I think they have

25   agreed to produce the documents.  And I think part of this

1   Motion to Compel, which was entirely appropriate, is a timing

2   issue.

3        MR. MAINLAND:  Uh-huh.

4        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So I

5   think it was appropriate for the movants to -- the original

6   requests were quite broad.  I think it's been great that you

7   focused on the requests that you really need, but I think that

8   AAFAF and the Board need to produce the documents.  So I'm not

9   sure there's a fight over this one.

10       MR. MAINLAND:  I'm not sure what those documents will

11  be and whether there will really be any, but I would say that

12  even one thing -- and I guess we could talk about 30(b)(6)

13  depositions more generally, but I am certain that whatever

14  they produce, if they produce anything, will raise more

15  questions than it answers, just based on what I've already

16  heard about this document.

17       So I think we're going to need to understand some of

18  these documents to make any sense of them.

19       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So I

20  am going to allow you to have 30(b)(6), I will allow you to

21  meet and confer, but it has to be limited to the facts that

22  are in dispute.  And the facts are really the factual

23  questions about money coming in.  Where does it come from?

24  Where does it go generally?  What's the structure?

25       And they're allowed to understand that, and they're

1  allowed -- and you need to prove it to them, not just a lawyer

2  saying it, right?

3       So you can ask about the documents that are produced,

4  but I'm going to assume that you are not going to waste a

5  30(b)(6) deposition on a specific transfer that you can't

6  figure out.

7       MR. MAINLAND:  No, unless, of course --

8       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  This

9  is going to be about the structure of the financial

10  arrangements.  I don't know how else to put it.

11       MR. MAINLAND:  Okay.  We'd obviously reserve the

12  right to ask about a specific particular transfer,

13  particularly with an eye to, is this an exemplar transfer?

14  Can we understand how these transfers work?  Not go through

15  years of transfers.  Obviously, we wouldn't waste anyone's

16  time with that.

17       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  And

18  I'm also going to strongly suggest that, to the extent that

19  you have specific transfers that you want them to know about

20  for a 30(b)(6) deposition, you give them some advance notice

21  of it --

22       MR. MAINLAND:  Of course.

23       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  -- so

24  they have some idea.

25       MR. MAINLAND:  We've already attempted to do that in

1   the form of 30(b)(6) notices, but we're, of course, having a

2   meet and confer around the scope of that.

3        Just two other quick things, and then I'll hand it

4   back to Mr. Natbony.  On the disbursement, I hate to go back

5   to an area where we mostly had an understanding, but with

6   transmittal information or disbursement detail, they have

7   already produced some information to that effect, which we

8   appreciate.

9        What we're struggling with is the documents.  The

10  disbursement detail documents that they have produced, while

11  it contains some information relating to transfers, it doesn't

12  have key information that would enable us to test the premise

13  or explore whether these documents were truly commingled or

14  whether they were segregated in some sense or restricted in

15  some sense.

16       They, themselves, back during the summer when our

17  PRIFA motion was stayed pursuant to the general stay of

18  litigation, one discovery inquiry we were allowed to ask, and

19  AAFAF answered it, was whether there was transmittal

20  information relating to the transfers of the rum taxes.  And

21  the answer was yes.

22       When you look at the lockbox agreement, the lockbox

23  agreement provides that the first 117 million shall be

24  transferred to the TSA to the credit of PRIFA.  That is, from

25  our point of view, and particularly in the landscape of the

265

1   way in which they're opposing our Lift Stay Motion,

2   potentially highly significant information.

3        The disbursement detail documents have not included

4   that kind of information.  Now, I want to be very clear,

5   because Ms. McKeen mentioned going through years of every

6   single transfer, that's not our desire here.  But there is a

7   lot in their papers about transfers of this money, the first

8   117 million to the TSA, and they claim it's commingled.  But

9   their lockbox agreement says it's sent to the credit of PRIFA.

10       We need to understand.  We need more behind some of

11  those transfers.  If that means pulling out 10 exemplar

12  transfers from a period when this happened in the ordinary

13  course, we're happy to work on that basis.  And then we can

14  ask follow-up questions on those, like you said, in an

15  appropriate meet and confer type way.

16       HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I

17  think that's entirely appropriate, and I think that's an

18  entirely appropriate follow-up, to have that kind of

19  conversation.

20       MR. MAINLAND:  Okay.  Thank you, Your Honor.

21       Just let me make sure.  That's all I have.  Thank

22  you.

23       MR. NATBONY:  Just a couple of quick last points and

24  a couple of suggestions, Your Honor.  We have had the

25  opportunity to go through, as much as we can, productions that

1    have already been made.  One was made just a couple days ago,

2    and I think we're basically through that one as well.

3         So we have noticed there are a number of categories

4    of documents where they produced certain documents already for

5    certain time periods but not others.  So just to let the Court

6    know, we will let them know what time periods we seem to be

7    missing in an effort to try and help them find those.

8         Maybe they're coming.  Maybe they're not.  Maybe they

9    haven't found them yet.  But the suggestion is we will provide

10   to them at least what we think is missing so that we can

11   coordinate on that.

12        Similarly, I think it might make sense if we meet and

13   confer, at least talk about what the accounts are that they

14   are looking at so that, in light of the timing that we have

15   here -- I mean, I think Ms. McKeen said she thought it was

16   maybe 20 accounts or something like that.  And I think that's

17   probably right, but I think we want to make sure that we're

18   looking at the same group.

19        We have certain documents that have been produced

20   that mention various accounts.  And I'm happy to sit down with

21   them and talk about what accounts they are just to make sure

22   they aren't ones that are missing from the list, so we don't

23   have to do this again as it gets close to the 16th.

24        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  As I

25   understood it, there was a spreadsheet --

1          MR. NATBONY:  There are, but there are other

2     documents, too.  There is a spreadsheet, but there are other

3     documents.  And some of them -- I mean, we don't know when

4     some of the -- so, for instance, even if you look at the cash

5     restriction analysis, there's something called the trust

6     custody account.  I just want to make sure that that's on that

7     list on the spreadsheet we're talking about.

8          So as long as we're talking about the same accounts,

9     you know, I have no problem.  I would suggest that we do that.

10         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  So

11    Ms. McKeen, is that something that you think makes sense to

12    have a meet and confer about?

13         MS. MCKEEN:  Absolutely, Your Honor.  We're happy to

14    meet.

15         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

16         MR. NATBONY:  And I guess the other point was just on

17    the third party and the banks.  I appreciate that they have

18    taken upon the effort to reach out to the banks.  I would hope

19    that if there is an issue that arises, that we know as soon as

20    possible, because I'd rather not know --

21         HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I'm

22    sorry.  We're going to wrap this up or they're going to shut

23    off the lights.

24         MR. NATBONY:  Okay.  So just on the banks, I'd like

25    to know if there's an issue sooner rather than later, because

1   I would not like to know on the 16th that they were unable to

2   do something and we're stretched for time.

3        So if there is an issue, I would just appreciate if

4   they let us know so we can issue relevant third-party

5   discovery if we need to.

6        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Why

7   don't you make up a date that you're going to meet and confer

8   on, or just have weekly telephone calls.  You only have a

9   couple weeks.

10        MS. MCKEEN:  That's fine, Your Honor.  I think that

11   makes sense.  Obviously we've already flagged the issue with

12   respect to GDB, so --

13        MR. NATBONY:  Thanks.

14        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

15   right.  So are we done in New York?

16        (No response.)

17        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  All

18   right.  I did it.  I think that's it, right?  Everybody good?

19        MR. MERVIS:  Just for clarity, and I don't want to

20   argue in the dark, but Your Honor, so on the depositions, the

21   instruction is meet and confer?

22        HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

23   Correct, but they are allowed a 30(b)(6.)  They are allowed a

24   30(b)(6) deposition.

25        MR. MERVIS:  A 30(b)(6)?

 1          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Well,

 2   I think one for each.  One for each.

 3          MR. NATBONY:  (Nodding head up and down.)

 4          MR. MERVIS:  All right.  So let me again -- just to

 5   be clear, there are four notices.  One of them is to the

 6   Oversight Board -- oh, five notices.

 7          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  No --

 8   well, I would imagine that there would be one for each of the

 9   -- for HTA, for PRIFA and for CCDA.  Is that --

10          MR. MERVIS:  That would seem the most that could

11   conceivably have any purpose, Your Honor.

12          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I

13   mean, because those are the structures that you need.

14          MR. MERVIS:  They are.  But just to be -- so if we

15   agree with the -- I'm looking at the lights, but --

16          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I'm

17   going to make you come back in the morning if you don't really

18   finish this.

19          MR. MERVIS:  Yes.  Those three, Your Honor, again,

20   subject to meeting and conferring on the topics --

21          MS. MCKEEN:  I don't know if -- I think a meet and

22   confer is appropriate, Your Honor.  Part of the issue here is

23   that we didn't even get these deposition notices until after

24   the Proposed Order was filed on Monday.  That's how recent

25   this all is.

1           It's five notices.  It's over 25 topics.  There's a

2      real question in our mind as to whether these entities, some

3      of whom aren't in Title III, are the appropriate subjects of

4      deposition notices, as opposed to the Commonwealth itself.

5           So I think there's more meet and confer work to

6      actually be done here.

7           HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  Okay.

8           MR. NATBONY:  Your Honor, if I may, I don't want to

9      lose the lights, but they've known about our request for

10     30(b)(6) for quite a time.

11          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  This

12     is the Order.  You need to file a status report with me by

13     the 11th on your meet and confers on the 30(b)(6.)  If you

14     haven't reached an agreement by then, you need to spell out

15     what your positions are, and I'll make a ruling on the papers

16     as to what the scope of the appropriate 30(b)(6) depositions

17     are.

18          MR. NATBONY:  Topics are fine, but also I think the

19     Commonwealth is making arguments about appropriations, so we

20     think there needs to be one on the Commonwealth.

21          HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:  I

22     want you to talk about it.  But that's March 11th, okay?

23          MS. MCKEEN:  Yes, Your Honor.

24          MR. NATBONY:  Thank you, Your Honor.

25          MR. MERVIS:  Thank you, Your Honor.

 1              HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:   Thank

 2  you all.

 3              (At 6:42 PM, proceedings concluded.)

 4                              *      *      *

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  U.S. DISTRICT COURT    )

2  DISTRICT OF PUERTO RICO)

3

4       I certify that this transcript consisting of 272 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Laura Taylor Swain, and the

8  Honorable United States Magistrate Judge Judith Gail Dein on

9  March 4, 2020.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25

< Dates >
April 13 146:19
April 14th 77:20
April 17th 227:18
April 22 180:1
April 22nd, 2020
  178:7
April 24th 77:20,
  211:10, 227:18
April 2nd 75:20,
  75:25, 76:10,
  210:4, 232:9,
  242:15
December 28th 25:8
December 31 19:16
February 14 10:24
February 26, 2020
  255:4
February 27 75:9,
  146:19
February 28 18:7,
  187:23
February 6, 2020
  25:23
February 9th 17:12
January 2020 26:11,
  39:7
January 30, 2020
  11:13
July 2016 244:3,
  248:18
July 2019 64:24
July 24 196:17
July 24, 2019 163:17
July 24th 160:12
July 9th, 2018 32:1
June 11, 2019 159:25
June 3 187:18,
  189:18, 189:19,
  190:5, 190:7
June 30, 2016
  162:19, 163:8
June 30, 2019 163:13
June 3rd 20:7, 20:9,
  76:5, 76:10,
  77:25, 118:16,
  118:20, 128:17,
  129:3, 129:13,
  142:22, 143:3,
  156:2, 156:7,

156:10, 201:9,
  227:15
June 3rd, 2020 43:14
June 3rd. 78:14
March 1 142:6
March 16th 77:9,
  243:11, 249:15
March 27 134:8
March 27th 77:10,
  211:10
March 3rd 27:24
March 4, 2020 1:16,
  9:2, 272:9
March 5th 75:22,
  76:1, 210:4
May 13 146:20
May 14 94:11
May 15th 77:21,
  211:11
May 2019 21:18
May 27th 211:13
May 31st 93:1, 93:11
May 4th 77:21
May 7th 93:1
November 6th 228:12
October 21st 228:7,
  228:11
October 26th 228:8
September 2019 66:17


< 1 >
1,967 173:12
1.1 50:12, 54:18,
  55:23
1.3 55:23, 141:22
10 18:9, 50:2,
  131:1, 206:23,
  257:6, 265:11
10(c 163:18
10,000 164:3
10. 139:18
10.5 18:9, 66:16
10.8 85:15
100 203:23
10611 103:2
10613. 103:11
10728 212:5
10754. 226:8
10756 208:17

10808. 226:15
10th 15:8
11 21:7, 45:18,
  45:20, 60:3,
  60:21, 123:2,
  128:20, 156:1
110,000 15:21
1111 12:9
11121 166:3
11242 175:4
1125 182:1
1129 162:1
1129(b 186:17
11482 175:15
117 245:20, 264:23,
  265:8
11958-1 231:5
11:39 82:15
11:53 82:16
11th 270:13, 270:22
12 83:22, 132:17,
  199:10, 199:22,
  199:23, 206:4,
  254:17
12(b 202:9, 202:23
12(c 202:10, 202:17,
  202:20, 202:24
12,000 16:4, 16:12
12:00 81:15, 82:12
12:00. 92:17, 95:1,
  95:2
12:10 95:3
12:15 81:16, 81:17,
  81:25, 82:4
13 156:1, 156:2
135 260:14
13th 228:3
14 78:11
15 12:16, 78:5,
  78:7, 116:7,
  123:17, 138:25,
  180:21, 209:10,
  224:4
150 12:16, 141:24
16 25:20, 164:1,
  164:4
16. 108:17
164 31:6
16th 266:23, 268:1
17 26:19

17-3283 208:17
17-BK-3283(LTS 1:6,
   4:6
17-BK-3284(LTS 1:23
17-BK-3566(LTS 2:4
17-BK-3567(LTS 2:23
17-BK-4780(LTS 3:4,
   4:28
17.3 108:17
173,000 15:19,
   126:20
17th 173:24
19-280. 174:25,
   221:14, 222:4
19-363 159:22
19-AP-00393(LTS 4:4
19-AP-00453(LTS 4:26
19-BK-5523(LTS 3:21
1984. 128:18
1:00 10:4, 62:22
1:00. 95:1
1:14 95:4
1:15. 81:17


< 2 >
2,300 15:22
2,500 25:14
2.7 142:2
20 11:4, 21:24,
   33:21, 50:2, 59:2,
   82:10, 100:13,
   100:20, 131:1,
   132:1, 177:2,
   177:3, 181:5,
   206:15, 249:22,
   266:16
20. 181:3
200 51:17
2004 149:8, 150:5,
   150:23, 151:14,
   224:16, 225:2
201 12:24, 103:18
2011 112:14, 113:13,
   113:15, 117:8,
   117:11, 127:17,
   188:22
2012 117:9, 117:11,
   141:21
2013). 215:12

2014 111:12, 111:16,
   111:17, 127:17,
   141:22
2014s 141:24
2015 231:16, 232:3,
   248:9
2016 163:3, 248:9,
   248:12
2017 163:12
2017. 163:5, 163:6
2018 163:12
2019 39:8, 69:20,
   159:19
2019. 33:23
2020 21:19
2020. 13:14, 69:22
2021 10:21, 21:20,
   43:19
2039 21:24
20th 159:18, 159:19
211 14:8
2146(a)(2 162:20
2174(b)(5 218:25
21: 5:17
23 27:15, 80:5
23rd 228:3, 228:7
240 50:16
25 26:2, 81:18,
   130:25, 145:3,
   187:20, 198:2,
   270:1
250 43:10, 58:9
260 11:3
26th 134:14, 135:10
272 272:4
274 215:12
275 25:10
278. 240:15
27th 134:15, 134:22,
   135:10, 201:1
28 101:6, 101:8
28,000 16:18
280 215:12
29 23:19, 23:22
2:15 211:13


< 3 >
3,100 15:22, 16:21
3,500 29:7

3.0 25:10
3.2 142:3
3.8 114:5
3.9 110:21, 110:24,
   114:5, 115:6,
   191:8
30 55:19, 101:5,
   101:7
30(b)(6 261:19,
   262:12, 262:20,
   263:5, 263:20,
   264:1, 268:24,
   268:25, 270:10,
   270:16
30(b)(6. 268:23,
   270:13
30,000 27:12
300 26:24, 54:23
3007 126:18
3013 228:24
303 61:6, 133:13
305 53:6, 61:6,
   133:12, 134:5,
   137:2
30th 125:7, 125:24,
   128:15, 136:20,
   163:3, 173:23,
   224:21
314(b)(4 57:10,
   60:12
314(b)(5 218:20
314(b)(6 170:14
316 34:14, 35:3,
   44:20, 44:22,
   45:2, 45:16, 56:7,
   61:10
316. 61:23
31st 228:8
3283 34:4, 58:21,
   58:24, 59:23
33 26:18
330 35:3
35 157:23
35,000 27:10
35. 26:19
36 31:5
362(d)(2 261:11
3799 272:14
392 16:5
393 26:15

3: 1:6, 1:23, 2:4,
   2:23, 3:4, 3:21,
   4:4, 4:6, 4:26,
   4:28
3:00 177:3
3:20 177:5
3:35. 177:3
3:41 177:6

< 4 >
4,500. 15:23
4.2 16:1
4.7(b 206:20
40 28:14, 52:23,
   82:3, 176:4
400 25:13, 52:20
400,000 89:8
407 194:5
45,000 16:7
450 54:22
48 162:20, 218:25
4:00 177:3
4:31 207:24
4th 227:15

< 5 >
5 149:1
50 164:22
500 30:14, 124:19
507(a)(2 44:2
52,000 15:22
531 170:24
546(e 221:23
552 11:15
56 28:2, 194:23,
   198:22, 199:4,
   201:17, 202:3,
   206:5
56(d 137:6, 194:22,
   201:12, 221:2
57.4. 207:3
58 18:11, 97:2
58.5 32:3
5:00 10:4, 207:20
5:08 207:25

< 6 >

6 182:25
6,600 27:17
60 100:20, 175:23,
   176:4
603 170:24
68,000 15:24
6:42 271:3

< 7 >
7 45:19, 45:21, 60:3
70 107:1, 107:12
7001. 193:19
7056 221:3
71.3. 108:18
75 145:2, 162:3
78 28:7
782 25:18
787 27:25

< 8 >
8 169:22, 182:25
80 51:16, 52:23
800 30:15
82 55:24
8244 166:17
8244. 163:17
857 27:21
860 141:21
87 27:13
8838 59:22
8862 34:3

< 9 >
9,000 25:14, 26:12
9.16 206:25
90 55:22, 214:19
9014. 126:18
92 25:15, 27:25
926 78:8, 132:1,
   138:6, 138:9,
   138:13, 156:13,
   204:12, 209:11
926(a 12:6
93 26:15
932 215:11
94 111:19, 112:10,
   112:12

9419 58:21
95 187:23
96 187:24
970 163:4
9752 58:24
98 112:15, 113:8
9:30 10:5
9:30. 207:22
9:38 9:3

< A >
A&M 92:5
A. 5:10, 5:11, 5:21,
   5:40, 6:16, 7:19,
   173:5
ability 45:3, 59:8,
   60:23, 61:1, 61:3,
   61:7, 61:20, 90:4,
   151:15, 221:6,
   233:22, 238:18,
   239:10, 272:5
able 32:15, 52:5,
   85:5, 87:6, 87:16,
   90:3, 100:20,
   100:22, 100:23,
   107:13, 117:19,
   118:18, 161:5,
   166:11, 176:3,
   176:4, 181:12,
   201:12, 202:14,
   228:14, 232:11,
   234:5, 255:9
above 19:1
abridge 142:23
absence 143:21
absent 65:2
Absolutely 17:22,
   20:11, 79:25,
   86:18, 91:19,
   92:11, 154:15,
   156:9, 267:13
abstract 196:25
absurd 128:23
academic 28:8
accede 82:1
accelerate 22:3
accelerated 121:17
accept 216:18,
   245:1, 246:5,

249:11
acceptable 69:5
acceptances 87:15
accepted 113:3,
  139:19
accepting 186:12,
  186:15
accepts 18:21, 189:1
Access 28:20, 29:6,
  46:11, 59:25,
  213:5, 214:11,
  214:19, 221:5
accompanied 244:11
accomplish 202:18,
  203:3
accomplished 21:15
accomplishing 120:8
accordance 125:9,
  224:1
according 42:5,
  104:7, 184:11
Accordingly 61:24,
  218:9, 225:2
accountant 32:1
accretion 142:4
accrue 61:4
accrued 12:17
accumulate 249:4
accuracy 51:15
accurate 272:5
accuse 128:12
accused 195:16
achieve 66:10, 72:18
achieved 49:2,
  130:5, 213:25
achievement 98:14
achievements 48:19
achieves 165:22
achieving 66:14
acknowledge 47:21,
  200:21, 221:1
acknowledging 260:16
Acquisition 59:21
Acquisitions 6:10,
  42:18, 59:1
ACR 15:7, 16:8
Across 69:3, 69:10,
  157:21, 157:23,
  158:2, 249:25,
  250:1, 251:6

Act 23:19, 23:22
acted 63:17
acting 223:24
action 133:9,
  159:21, 210:18,
  211:6, 216:23,
  221:22
actions 12:7, 37:5,
  133:4
activities 10:12,
  11:12, 50:19,
  244:3
activity 248:8
actual 47:20,
  107:18, 226:23
Ad 6:29, 6:33, 7:3,
  98:2
add 49:24, 124:21,
  158:15, 199:10,
  202:8, 209:1,
  235:1, 237:25,
  246:18
added 95:15
adding 124:8, 152:14
addition 19:25,
  21:21, 22:2,
  26:23, 109:1,
  124:16, 146:23,
  147:15, 149:6,
  184:25
addresses 34:22,
  39:15, 90:15
addressing 34:9,
  35:24, 65:3,
  123:21, 131:22,
  132:10, 151:18,
  212:24, 220:24
adds 124:19
adequacy 163:11,
  227:22
adequate 118:6,
  182:2, 182:8
adequately 11:12,
  184:5, 193:8,
  211:7
adjourn 178:17
adjourned 178:16,
  178:19
adjourning 178:6
adjournment 37:19,

37:20
adjudicate 140:20,
  144:14
adjudicated 145:21,
  217:17
adjudicating 211:24
adjudication 133:21,
  141:12, 144:11,
  145:19, 220:8,
  226:1
adjudicative 67:10
adjust 73:25, 101:7,
  216:8
adjusted 34:7
adjustments 75:13
administer 36:21,
  49:5, 148:22
Administered 1:11,
  1:28, 2:9, 2:28,
  3:9, 3:26
administration 22:7,
  45:8
administratively
  47:1, 52:14,
  52:25, 53:18, 54:5
administrator 30:25
Admiral 13:24, 22:6,
  22:12, 30:24, 31:2
admire 98:5
admit 48:7, 74:12
adopt 97:20, 169:1,
  169:2, 208:18
adopted 61:12,
  155:17, 162:25,
  165:10
adopts 70:7
ADR 14:13, 14:23,
  15:1, 15:3, 15:5,
  16:13
advance 58:11,
  77:14, 160:18,
  162:18, 178:20,
  196:15, 201:8,
  201:10, 263:20
advanced 79:19,
  208:22
adversaries 135:16,
  136:5, 148:19,
  168:4
advertising 165:14

advisable 163:20
Advisers 157:13
advisor 98:19, 207:4
advisors 37:4
Advisory 5:26, 141:2
advocate 74:2
advocating 213:11
affairs 42:24
affect 119:8,
   191:19, 191:20,
   220:14
affected 214:6
affirmative 134:19,
   137:8, 147:13
affirmed 11:14,
   103:16, 198:13
afford 117:4
afternoon 95:7,
   98:1, 98:25, 99:1,
   101:4, 101:9,
   101:10, 123:18,
   139:11, 139:12,
   145:14, 157:10,
   157:11, 159:6,
   159:7, 162:9,
   173:3, 173:4,
   174:21, 174:22,
   179:7, 179:8,
   208:1, 211:13,
   233:7
aftershocks 30:1
age 68:16
agencies 10:25, 36:5
Agency 5:25
Agenda 34:10, 42:6,
   62:14, 62:15,
   86:21, 94:24,
   102:11, 177:10,
   177:12, 180:13,
   207:22
agent 11:22, 32:10,
   36:5, 70:24
aggregate 50:14,
   232:10
aging 23:2
agnostic 198:9
ago 96:7, 102:23,
   103:1, 108:18,
   116:14, 117:18,
   159:19, 160:14,

163:14, 165:24,
   167:18, 202:12,
   204:23, 205:15,
   266:1
agree 40:13, 101:25,
   106:1, 127:23,
   130:18, 134:24,
   136:18, 137:17,
   172:5, 176:14,
   188:16, 188:17,
   188:18, 239:16,
   269:15
agreeable 83:3
Agreed 60:17, 65:1,
   70:21, 71:2,
   95:14, 126:8,
   129:15, 141:4,
   149:14, 199:7,
   239:11, 242:3,
   242:11, 242:19,
   243:16, 248:22,
   248:23, 249:14,
   250:20, 252:23,
   256:6, 258:23,
   260:1, 261:25
agreeing 261:13
Agreement 12:20,
   13:11, 14:4,
   17:12, 65:23,
   66:14, 66:22,
   67:3, 68:1, 85:6,
   96:13, 111:20,
   112:1, 112:3,
   121:2, 122:13,
   130:12, 132:18,
   142:20, 168:25,
   174:4, 206:20,
   244:18, 264:22,
   264:23, 265:9,
   270:14
agreements 34:21,
   40:24, 48:25,
   96:24, 233:17,
   233:18, 233:19,
   234:7, 242:11,
   242:13, 243:25,
   252:1
agrees 115:16,
   125:12, 140:3
ahead 102:11, 122:2,

158:18, 246:9,
   246:12, 252:20
aid 22:4, 211:24,
   211:25, 214:2
aim 13:12, 14:4,
   158:25, 207:20,
   211:12
aiming 243:10,
   243:11
airing 140:10
Akin 42:3, 42:17
al 1:16, 4:19, 4:33,
   5:7
alacrity 140:15
alert 32:19
Alexander 5:22, 7:16
Alice 6:31, 157:12
Alicea 7:28, 179:9
align 21:24
aligned 23:17,
   146:15
allegations 50:18,
   193:4, 244:25
allege 50:23, 247:7
alleged 153:19,
   166:25, 192:19,
   223:22, 258:19
alleges 51:3
allocated 41:11
allocations 22:21,
   95:14
allotted 95:22
allow 53:7, 56:7,
   56:8, 77:24,
   145:17, 175:20,
   176:12, 176:16,
   211:16, 212:4,
   219:7, 221:18,
   222:19, 230:17,
   255:16, 262:20
allowable 189:15,
   192:1
Allowance 43:11,
   59:14, 59:21,
   126:10, 126:15,
   126:17, 126:21,
   126:24, 128:5,
   188:24, 189:12
allowed 44:3, 56:5,
   60:15, 126:16,

127:3, 127:11,
128:1, 159:15,
175:18, 175:25,
176:2, 176:6,
188:23, 189:5,
189:15, 218:12,
225:11, 262:25,
263:1, 264:18,
268:23
allowing 44:19,
127:22, 152:16
allows 159:1, 214:1
allude 172:18
alluded 21:16, 22:7,
30:23, 125:25,
171:5, 187:7,
238:1
almost 84:2, 92:17,
100:20, 163:3,
163:8, 235:11,
257:17
alone 25:10, 52:22,
53:2, 64:12,
235:22
Alphonse 93:19
alternate 28:17
alternative 28:12,
28:18, 59:10,
60:20, 69:16,
91:15, 198:16,
198:17
Alternatively 202:20
alternatives 27:20,
28:15, 154:8
although 21:21,
23:15, 47:20,
88:20, 112:25,
171:20, 248:16
Ambac 6:19, 101:7,
133:11, 139:13,
142:24, 145:15,
173:15, 195:4,
196:16, 224:16,
224:23, 234:25
ambiguity 230:22
amenable 79:16,
79:22, 83:20,
199:16, 200:22,
206:5
amend 223:2, 227:6

Amerinational 7:8
amid 22:4
among 13:15, 15:20,
27:11, 68:10,
69:11, 70:15,
70:25, 122:17,
125:6, 158:15,
161:15, 161:18,
172:6
amortization 170:1
Amount 12:15, 18:11,
39:11, 40:19,
43:24, 44:22,
52:22, 58:20,
58:23, 60:15,
66:17, 99:13,
114:4, 114:5,
117:21, 127:24,
146:17, 189:15,
196:6
amounts 34:7, 47:8,
50:1, 58:3, 59:11,
59:14, 144:1,
257:9
Amy 272:13, 272:14
analogy 102:8,
102:20, 104:20
analyses 41:10
analysis 14:9,
39:23, 41:8,
186:23, 235:25,
259:25, 260:11,
260:23, 267:5
analyze 11:10, 13:3
analyzed 170:5,
173:13
and/or 138:17,
218:13
Andrew 6:37
Angel 7:24, 174:23
Angelica 7:27,
178:11, 178:20
announced 18:8,
97:2, 124:9
announcement 111:11
annual 10:14, 10:15,
143:24, 182:22
answer 35:9, 75:7,
76:1, 76:21,
91:24, 92:1,

104:5, 108:11,
108:12, 147:22,
161:6, 194:24,
233:16, 243:4,
243:8, 243:18,
258:15, 259:4,
259:6, 261:4,
264:21
answered 75:11,
159:24, 264:19
answering 78:18,
243:14
answers 134:18,
135:21, 147:12,
150:24, 153:3,
155:12, 237:23,
243:17, 262:15
anticipate 16:7,
43:15, 178:5
anticipated 12:14,
64:2, 166:19,
226:22
anticipating 79:8
anxious 138:18
anybody 18:1, 18:23,
176:20, 203:17,
233:6
anyway 108:24,
109:8, 205:24
apart 51:14, 108:13,
166:5, 166:7,
253:12
apologize 24:23,
236:22, 246:15
Apparently 91:4,
244:19, 246:17,
260:16
appeal 12:4, 16:24,
78:8, 118:19,
129:23, 205:5,
209:11
appear 38:25, 39:7,
175:3, 220:7
APPEARANCES 5:1,
6:1, 7:1
appeared 178:9
Appearing 5:44, 6:8,
6:12, 6:40, 63:23,
180:10
appears 34:9, 34:23,

222:25
appellants 205:6
applicability
    199:22, 221:24
applicable 68:14,
    202:9, 218:22,
    221:2
application 33:21,
    34:3, 59:20,
    61:14, 209:4,
    223:3, 223:17
Applications 34:7,
    34:12, 35:7,
    35:24, 37:18,
    38:20, 39:10,
    39:24, 44:23,
    58:19, 58:22,
    59:3, 59:4, 61:14,
    61:17, 62:8, 62:9,
    62:10, 62:12,
    138:19, 224:15
applies 49:12,
    103:21, 161:22
apply 52:8, 53:4
applying 34:14
appoint 64:14
appointed 64:17
appointment 12:5,
    138:13
appreciate 35:12,
    57:21, 120:7,
    138:23, 168:2,
    172:1, 242:21,
    242:22, 264:8,
    267:17, 268:3
appreciated 91:18,
    139:5, 252:15,
    252:16
appreciation 98:15
approach 56:19,
    69:19, 116:3,
    169:3
appropriately 38:12,
    83:12, 143:18,
    220:4, 255:9
appropriating 183:3
appropriation 23:1,
    182:21, 193:22
appropriations
    153:16, 169:25,

194:6, 253:5,
253:15, 270:19
approval 19:24,
    30:17, 33:21,
    34:6, 34:12, 61:9,
    76:14, 87:13,
    90:1, 90:2,
    148:24, 218:18,
    218:22, 227:25,
    228:6
approval. 218:24
approvals 218:14,
    219:1
approve 13:8, 19:22,
    19:23, 62:4,
    88:24, 108:23,
    126:13, 174:9,
    174:10, 208:23
approved 19:3, 20:3,
    22:9, 31:20,
    42:10, 54:24,
    61:12, 129:24,
    167:19, 225:8
approves 30:20,
    62:7, 62:8,
    108:21, 225:6
approving 42:9,
    50:20
approximate 249:24
Approximately 12:16,
    13:13, 15:19,
    15:23, 16:1, 16:5,
    16:7, 16:18,
    16:21, 25:14,
    25:15, 26:14,
    26:15, 26:24,
    27:10, 27:12,
    27:15, 27:21,
    27:25, 28:2, 28:7,
    30:15, 43:10,
    50:12, 50:16,
    55:24, 165:7,
    175:23
April 10:19, 16:6,
    125:7, 125:24,
    128:15, 136:20,
    173:23, 173:24,
    178:17, 178:18,
    178:19, 178:22,
    179:16, 179:25,

229:11
arbitrary 156:7
area 169:7, 245:12,
    264:5
areas 12:22, 23:7
Arecibo 25:25
argue 53:19, 63:24,
    103:23, 109:13,
    116:2, 183:23,
    193:13, 221:6,
    222:1, 231:3,
    241:7, 268:20
argued 78:8, 140:23,
    200:7, 219:18,
    221:1, 221:17
arguing 84:7,
    104:10, 104:11,
    107:8, 108:14,
    161:15, 230:22
argumentation 62:18,
    229:6, 229:11
arguments 23:20,
    42:4, 45:15,
    45:17, 59:16,
    79:20, 109:19,
    154:18, 154:25,
    159:10, 200:11,
    208:21, 211:5,
    221:10, 222:11,
    222:20, 226:21,
    230:11, 230:18,
    233:25, 235:16,
    270:19
arise 36:10, 153:25,
    216:22
arisen 36:10
arises 36:2, 75:24,
    267:19
arising 64:19,
    103:5, 223:23
around 92:8, 102:25,
    103:15, 236:25,
    264:2
arranged 90:22
arrangements 29:5,
    48:18, 263:10
Arribas 5:17
Article 169:22,
    182:25
articulated 31:1,

83:4, 83:20,
85:24, 155:24
artificial 129:13,
129:18
artificially 143:5
ashamed 188:19
Aside 45:15, 155:24,
212:11, 215:1
asks 251:13
aspect 150:16
aspects 166:17
aspire 12:1
assert 81:4, 150:4
asserted 16:2, 71:8,
87:7, 136:8
asserting 159:14
assertion 59:19,
246:6
assertions 224:6
assess 30:10
assessment 30:6,
30:9
assets 12:12
assist 71:10
assistance 26:7,
26:9, 27:14, 72:11
assisted 48:19
assisting 92:4
associate 40:17
associated 17:15,
20:14, 79:18,
227:20, 248:25
associates 243:2
assume 29:13, 77:15,
77:16, 79:15,
110:17, 118:18,
255:9, 263:4
Assumed 116:25,
257:23, 258:3,
258:8
assumes 150:24,
187:3
assuming 76:10,
117:2, 127:2,
136:7, 259:25,
260:7
assumption 55:11,
75:21, 79:19,
118:12, 143:12,
169:12, 169:17,

258:12, 258:15,
258:18, 258:20
assumptions 140:25
Assurance 6:19,
139:14, 145:15,
234:25, 247:20
assure 36:19
Assured 5:33, 5:34,
123:20, 124:15,
126:6, 130:22,
147:25, 188:20,
189:17, 190:17,
192:7, 192:12,
193:21, 195:10,
233:8
Atara 6:21, 145:14
attach 185:20,
238:24
attached 74:19,
163:7, 208:24,
217:23, 233:21,
246:1
attachment 239:3
attack 106:5
attempt 64:25,
65:14, 66:10,
72:3, 73:1, 85:12,
159:20, 217:15
attempted 32:12,
140:20, 263:25
attempting 160:17
attempts 22:17
attend 176:12
attending 28:9
attention 36:12,
41:12, 72:6,
78:24, 197:17,
219:5
attorney 63:23,
176:21
attributable 39:11
attributed 173:8
audible 9:18
audio 35:14
audited 162:19,
162:25, 163:2,
163:5, 163:8,
163:11, 174:13
AUST 5:17
authorities 32:23

Authority 2:33,
3:14, 3:31, 5:27,
11:2, 69:8, 123:3,
219:6, 220:19
authorization 55:8
authorize 32:11
authorized 32:10,
37:17, 41:1,
156:19
automatic 222:19
Autoridad 4:26
available 23:6,
26:7, 27:8, 60:20,
88:8, 92:3,
153:15, 169:23,
170:8, 184:12,
184:24, 185:23,
207:6, 214:18,
219:25, 221:22,
250:8
avoid 84:13, 92:10,
146:14, 167:25,
169:6, 181:19,
184:18, 193:18,
196:4, 197:12
avoidance 37:5,
159:20, 216:23
await 212:10, 222:9
awaiting 30:17
award 35:4, 44:21
aware 32:6, 42:19,
96:12, 99:6,
149:19, 161:13,
169:22, 170:2,
171:25, 194:17
away 46:13, 60:2,
66:19, 106:7,
109:3, 109:4,
126:24, 128:4,
161:21, 162:15


< B >
backed 158:16
background 68:4
backup 198:20, 251:4
balance 15:15,
52:21, 83:25,
240:2, 245:7
balanced 143:25

balances 19:16
BALDINI 6:11, 42:3,
    42:14, 42:17,
    42:23, 42:25,
    43:1, 43:2, 43:3,
    43:7, 43:9, 44:8,
    44:15, 44:18,
    45:5, 46:8, 46:16,
    47:4, 50:4, 57:19,
    57:20
Ban 7:19
banc 11:18
Bank 193:5, 234:18,
    235:25, 236:12,
    239:19, 239:21,
    251:22, 252:6
banking 243:24,
    252:1
banks 238:5, 250:4,
    250:8, 250:13,
    267:17, 267:18,
    267:24
Bar 87:19, 89:11
BARAK 5:12, 53:13,
    53:14, 54:3, 57:16
Barbara 5:4
barely 160:1, 160:14
bargain 144:6
barred 221:23
base 26:16, 26:17,
    26:20, 26:23,
    27:2, 87:16
based 34:24, 52:6,
    53:17, 85:9,
    101:23, 114:16,
    116:4, 117:23,
    123:24, 124:13,
    126:4, 126:5,
    131:8, 146:13,
    147:5, 161:21,
    166:25, 173:25,
    242:16, 256:4,
    258:18, 258:20,
    262:15
baseline 39:21
baseload 30:2
bases 43:16, 51:18
basic 133:2, 181:20,
    231:4
Basically 56:12,

89:3, 113:22,
    160:14, 173:8,
    207:2, 228:11,
    266:2
basis 32:7, 35:2,
    43:23, 45:24,
    48:13, 48:15,
    49:23, 56:5,
    59:18, 61:2,
    61:24, 69:17,
    138:3, 152:16,
    164:12, 172:6,
    182:22, 205:24,
    217:12, 246:7,
    265:13
Bates 248:14
bearing 63:18, 205:7
bears 22:24, 67:19
beat 159:20
beautiful 111:13
became 132:12
become 23:6, 70:10,
    253:22
becomes 40:17,
    141:16, 249:13,
    255:7
begin 10:6, 62:21,
    66:11, 72:22,
    138:4, 182:9,
    184:21, 213:8
beginning 38:23,
    39:12, 101:20,
    102:23, 147:5,
    204:15, 224:21
begun 157:18, 250:7,
    250:15
behalf 24:12, 32:2,
    32:12, 42:2,
    42:18, 50:7,
    53:15, 80:9,
    81:22, 82:22,
    86:17, 95:8, 98:2,
    98:14, 100:4,
    101:12, 123:20,
    139:13, 145:15,
    150:5, 157:12,
    159:8, 175:3,
    189:17, 197:7,
    215:15, 223:24,
    231:13, 233:8,

234:25
behind 17:18,
    142:25, 249:4,
    265:10
behold 113:16
belabor 158:24
belief 112:13, 148:5
believed 75:15,
    203:8
believes 12:23,
    23:4, 69:24,
    226:16
below 18:18, 19:2,
    258:7
belt 196:1
bench 228:20
beneficial 246:22
beneficiaries 234:16
benefit 18:18,
    34:16, 120:24,
    154:22, 165:21,
    172:20, 217:6,
    220:6
benefits 121:3,
    166:4
Berezin 6:7, 137:3,
    152:7, 152:9,
    152:13, 157:8,
    160:25, 170:4,
    248:3, 248:4,
    249:5
best 56:22, 72:21,
    74:7, 76:7, 83:16,
    85:10, 92:2, 92:5,
    96:2, 96:8, 98:18,
    98:21, 100:11,
    100:22, 131:6,
    131:7, 135:1,
    170:14, 180:4,
    181:4, 198:3,
    198:20, 203:8,
    210:10, 213:25,
    272:5
bet 81:8, 131:3,
    140:2, 201:2
better 30:10, 53:20,
    55:14, 103:9,
    135:17, 136:6,
    139:4, 155:20,
    177:14, 197:18,

220:15, 246:8
betting 201:1
beyond 37:16, 40:11,
    40:20, 112:13,
    210:21, 252:4,
    254:8
BIAGGI 5:28, 24:5,
    24:23, 25:2,
    28:13, 29:15,
    29:17, 29:19,
    29:24, 31:17,
    31:24, 33:1, 33:7,
    33:9, 33:13
bid 92:25, 200:4
bifurcated 199:24
Big 25:11, 69:12,
    131:3, 151:21,
    172:22, 172:24,
    192:22
biggest 64:6
billing 39:2
billion 16:1, 17:24,
    18:9, 50:12,
    54:19, 55:23,
    55:24, 66:16,
    85:15, 105:13,
    114:22, 118:2,
    124:16, 124:20,
    141:23, 142:2,
    164:22, 165:8,
    193:4, 193:6
billions 164:19
bind 126:13, 188:11,
    193:25
binding 186:6,
    192:21, 192:23,
    193:13, 198:10,
    198:15
bit 35:23, 43:6,
    45:16, 54:2,
    57:21, 94:3,
    101:24, 167:23,
    172:7, 177:16,
    200:21, 261:10
bitter 141:19
blank 103:23
blanket 34:23,
    56:19, 115:11,
    148:1, 148:8,
    156:16, 172:10

blind 172:21
blips 20:17
block 52:1, 92:8,
    103:13, 107:12,
    228:5
blue 189:18
blunt 246:6
BMO 7:23, 175:2
boilers 30:7
bond-related 223:5
bonders 133:4
bondholder 11:22,
    99:6, 100:15,
    124:18, 154:3,
    189:3, 214:21
Bongartz 5:22
Bonistas 125:19
bonuses 165:20
borne 122:14
Boston 78:9
bottom 188:3, 200:17
bought 164:17,
    165:24, 185:5
bound 70:10, 86:22,
    188:13, 189:1
boundaries 210:21
box 57:21
BP 175:1
brakes 107:25
branch 218:18
branches 122:25
brass 145:17
breach 112:5
breached 111:21,
    112:2
breadth 167:11
break 10:4, 62:21,
    80:6, 81:15,
    81:16, 81:17,
    81:18, 94:25,
    95:10, 228:12
breakthrough 115:3
Breathe 229:24
brevity 208:18
brewed 141:20
brewing 141:18
Brian 5:8, 14:16,
    86:16
bridges 31:8
Brief 29:22, 31:12,

82:22, 146:15,
    160:4, 177:24,
    178:1, 181:18,
    182:14, 202:14,
    203:14, 235:12,
    242:2, 248:17,
    256:11
briefed 104:21,
    104:24, 200:7,
    211:3
briefing 86:2,
    146:10, 146:14,
    146:25, 147:3,
    172:18, 175:20,
    176:1, 176:17,
    220:7
Briefly 29:25, 34:9,
    57:19, 57:20,
    137:3, 147:24,
    172:3
briefs 52:7, 146:19,
    146:20, 170:23,
    211:10, 245:25
bring 10:2, 12:6,
    15:11, 64:25,
    104:1, 112:17,
    133:5, 197:10,
    204:19, 219:5
bringing 204:14
brings 99:11
broad 64:23, 96:25,
    99:23, 148:1,
    172:6, 172:14,
    262:6
broad-based 200:4
broadened 64:24
broader 251:9,
    259:14
broadly 170:11
broken 15:20
brokerage 164:11
brothers 159:9
brought 18:11,
    115:20, 202:17
Brown 13:24, 22:6,
    22:13, 30:24
bucket 45:10
budget 10:17, 10:21,
    10:23, 10:25,
    11:4, 21:19,

21:20, 133:14,
143:25
budgetary 10:15,
143:24
budgets 14:6
Buenas 95:5, 179:5,
179:6
buenos 9:5
buffet 79:20
build 66:11, 69:16,
72:21, 73:1,
73:20, 85:13,
100:20, 143:5,
143:7, 197:17
Building 31:9,
54:25, 64:9, 90:8,
90:18
Buildings 3:31
built 18:20, 169:13,
207:6
bulk 226:21
bullet 74:25, 234:7,
252:18, 253:6,
253:8, 254:6,
254:7, 255:14,
258:1
bulletins 234:15
bump 18:21
bumps 20:17
bunch 140:21, 236:3
burden 68:7, 132:24,
247:8, 247:12,
247:15
burdens 152:20
burdensome 230:24,
239:15, 247:10,
255:7
Bureau 30:17, 30:20
business 40:21,
52:20, 116:14,
117:18
businesses 58:11
buy-in 124:6, 124:11
buys 189:24
Byowitz 6:31,
157:11, 157:12,
159:4


< C >

C. 5:28, 5:36
Cabrer 175:1
cafeteria 81:17
calculated 230:1
calculation 111:15
calendar 20:6,
125:13, 128:11,
128:15, 200:21,
201:9
call 18:19, 89:22,
93:4, 97:10,
107:22, 111:24,
145:8, 174:19
callback 144:5
called 126:3,
242:10, 267:5
Callen 5:41
calls 63:20, 268:8
camps 26:16, 26:17,
26:20, 26:23,
26:25, 27:2
candid 107:21
candidly 214:1
Cantor 5:46
Cantor-katz 167:6
cap 114:3, 206:17,
207:2
capacity 142:12
Capital 7:23, 69:3,
69:10, 158:2,
175:2
caps 114:4
care 94:25, 180:8,
184:14
careful 37:6, 203:19
carefully 58:16,
59:15, 74:4,
120:14, 141:11,
208:20, 214:13,
229:24
CARRASCO 7:27,
178:12, 178:23,
178:25, 179:5,
179:12, 179:17,
179:21, 180:1,
180:6
carried 196:8
carry 218:23
carve 176:12
Casey 5:37

cash 19:16, 44:1,
52:21, 54:22,
54:25, 60:15,
114:20, 165:8,
165:20, 169:13,
259:25, 260:11,
260:23, 261:21,
267:4
CAT 7:48
categorically 213:9
categories 250:24,
253:22, 266:3
category 234:8,
255:15, 259:12
cause 138:20,
203:18, 203:22,
209:3, 209:16,
224:13
caused 30:1
causes 210:18,
211:6, 221:22
cautionary 123:13
cautiously 97:17
caveat 94:13, 94:15,
243:16
CCDA 124:17, 130:14,
134:12, 135:25,
235:3, 235:22,
236:22, 237:2,
246:14, 253:23,
259:15, 260:17,
269:9
ceded 101:7
celebrate 228:9
Central 48:25,
232:21, 235:17
centralized 251:3
cents 145:2, 145:3,
162:3
CEO 50:17, 50:21,
50:24, 51:25
certainly 52:5,
83:10, 90:23,
92:6, 98:8, 116:9,
138:24, 139:4,
141:7, 152:22,
183:8, 190:4,
261:5
certainty 203:23,
217:3

certification 12:24,
    13:11, 135:7,
    162:22, 162:23
Certified 11:4,
    13:10, 14:5, 14:6,
    21:18
certify 173:22,
    272:4
cetera 75:8, 92:5,
    110:25, 118:12,
    144:18, 154:9,
    181:25, 182:16,
    184:15, 190:18,
    206:24, 243:24
challenge 111:5,
    123:25, 124:2,
    125:8, 128:7,
    131:9, 187:6
challenged 61:17
challenges 35:21,
    59:2, 166:19
challenging 155:14
chance 130:19
chances 206:14
change 105:14,
    112:1, 118:3,
    188:13, 197:16,
    205:19, 211:11
changed 74:9, 122:8,
    137:22, 147:4,
    149:2, 203:6,
    203:7, 203:8,
    205:20, 241:13
changes 19:10,
    133:16, 141:13,
    210:2, 210:5,
    218:11
channel 148:17,
    168:19
channeled 218:6
channeling 148:22
chaos 65:1
Chapter 21:7, 45:18,
    45:20, 60:3,
    60:21, 123:2,
    128:20
characterization
    159:16, 242:8
characterized 204:20
characterizing

160:17
charge 64:23, 122:2
charged 14:1, 34:13,
    34:15, 41:15,
    61:18
check 72:24, 119:15,
    247:4
checked 259:4
CHIEF 5:3, 62:25,
    63:4, 75:2, 75:5,
    79:4, 79:24, 80:3
children 11:8
chilling 48:20,
    49:11, 49:16
choice 108:4, 201:6
choose 247:18
choosing 61:1
chose 67:24
chosen 120:14,
    215:24
Ciales 25:25
circle 42:8
Circuit 11:14,
    11:17, 12:3, 78:8,
    78:9, 102:9,
    103:16, 103:21,
    103:25, 116:1,
    133:11, 155:10,
    192:13, 192:16,
    198:13, 204:24,
    205:5, 209:11
circuits 116:4
Circumstances 56:9,
    68:15, 74:10,
    81:12, 202:23,
    203:6, 203:7,
    203:12, 204:8,
    205:19
cite 170:23, 207:15
cited 207:8, 207:13
Civil 221:2
claimant 55:15
claimants 45:9,
    46:24, 53:20,
    55:16, 178:3,
    178:9, 221:3
claimed 121:10
claimholders 184:4,
    184:19, 185:7
claiming 32:1, 241:8

clarification 95:13,
    228:22
clarified 84:4
clarity 112:17,
    208:17, 268:19
class 18:21, 109:4,
    109:11, 110:10,
    126:13, 126:16,
    126:23, 127:23,
    127:25, 128:1,
    145:4, 184:16,
    184:20, 186:16,
    187:7, 189:1,
    191:12, 192:1
classes 27:20, 29:6,
    29:8, 127:20,
    164:25, 165:1,
    183:21, 186:12,
    186:14, 225:25
classification
    115:14, 115:16,
    115:17, 115:23,
    115:24, 116:3,
    144:17, 144:18,
    148:10, 189:4,
    189:11
classifications
    189:8, 259:4
classified 189:3,
    189:7, 257:18
classify 189:5
classifying 183:20
classrooms 29:1
Clause 147:20,
    154:2, 154:3
clawback 70:3,
    71:25, 76:6,
    76:16, 76:19,
    142:15, 143:12,
    147:18, 153:11,
    155:8, 155:9,
    169:14, 169:15,
    196:2
cleaned 190:11
Clearly 35:16,
    84:19, 85:1,
    105:3, 105:6,
    115:22, 129:9,
    141:5, 168:9,
    183:24, 215:16,

254:3, 261:21
Clerk 32:17, 90:4,
    90:9, 90:23,
    90:24, 91:1,
    214:16
Clerk. 181:1
cliche 203:19
client 63:25,
    112:25, 126:10,
    127:3
clients 34:21,
    40:25, 64:1,
    98:14, 98:19,
    99:7, 125:1,
    167:21, 167:23,
    172:14, 172:19
clinic 26:21
clock 82:13, 101:8,
    139:25, 142:4,
    181:13, 198:3,
    206:15
clocked 82:9
close 36:12, 41:12,
    53:1, 93:14,
    126:14, 156:17,
    170:25, 205:9,
    266:23
closed 28:20, 29:2
closely 11:9, 22:3,
    23:11, 171:3
closer 93:21, 94:6
closest 80:11
closure 18:7
co-counsel 37:4
co-plaintiff 105:2,
    112:8
co-plaintiffs
    111:20, 112:4
Co. 7:22
coal 143:6
Coalition 6:26, 95:9
Coast 13:24, 22:6,
    30:24
Code 11:15, 12:6,
    12:8, 35:3, 41:18,
    44:2, 57:9, 57:13,
    182:1, 189:5,
    194:2, 218:25,
    221:24
coercive 165:1

COFINA 1:32, 15:22,
    16:20, 20:3,
    122:22, 130:21,
    131:5, 160:10,
    164:5, 202:21
Cofinas 142:5
Colberg 7:14
collaborative 13:17,
    23:15
collapse 77:3
collapsed 79:10
collapsing 78:23
Collateral 5:47,
    107:8, 107:11,
    110:6, 127:14,
    158:11, 167:6
colleague 30:23,
    119:12, 181:8
colleagues 81:2,
    81:7, 180:21
collections 143:25
collective 81:23
collectively 58:25,
    59:3, 124:15,
    221:16
colloquy 12:7, 218:3
colorable 192:19,
    192:20
colossal 98:13,
    121:11
Colton 98:15, 195:9
combining 116:11
comes 37:2, 127:1,
    140:6, 240:21
comfortable 94:5
coming 57:19, 67:14,
    85:22, 131:10,
    142:9, 151:25,
    190:5, 208:7,
    251:6, 262:23,
    266:8
commence 13:12,
    175:20, 207:22,
    218:7
commencement 200:1
comment 40:2, 63:22,
    119:23, 141:13,
    172:12, 189:17,
    189:20, 198:1,
    202:8, 202:10,

204:11, 248:5
commented 126:20
comments 21:10,
    64:13, 156:18,
    159:9, 160:21,
    163:11, 164:16,
    170:20, 180:17,
    182:11, 183:2,
    191:3, 193:20,
    199:5, 203:14,
    239:9
commingled 236:9,
    264:13, 265:8
commingling 244:25,
    246:2
commitments 120:23
committed 157:24
Committees 11:24,
    70:23, 87:23
common 171:6
communicate 9:13
communicating 9:24
communications
    230:17, 253:2,
    253:12, 255:15
Community 7:9
Company 5:40, 257:7,
    258:18, 260:12,
    260:15
comparable 128:22,
    128:24
compare 102:3, 254:2
compared 119:10
compares 165:6
comparison 55:21
Compel 56:14,
    252:22, 262:1
compelling 115:24
Compensation 35:4,
    44:21, 53:9,
    59:12, 61:11,
    61:22
competent 203:21
competing 64:4,
    72:20
competitiveness 23:8
complain 144:25
complained 190:17
Complaint 146:7,
    160:1, 169:15,

175:22
complete 72:18,
    81:24, 84:17,
    140:9, 143:21
completed 30:5,
    120:4
completely 81:20,
    93:7, 112:8,
    114:12, 115:13,
    117:7, 129:13,
    154:19
completeness 160:23
completion 249:15
Complex 63:14,
    68:24, 102:9,
    104:17, 105:8,
    128:22, 133:19
complexities 69:11
Compliance 49:2
complicated 19:9,
    129:20, 155:19,
    170:5, 172:17
complies 68:14
components 154:15
comprehend 195:16
comprehensive 19:10,
    19:22, 20:5,
    35:13, 85:14,
    116:16, 122:18,
    199:6
comprehensively
    62:19
compressed 76:9,
    128:25
compromise 183:11,
    213:25
compromised 162:15
compromises 213:25
conceivably 89:13,
    269:11
concentrated 25:9
concept 45:19,
    45:24, 52:8, 53:3,
    53:5, 60:19,
    105:9, 261:10
concern 93:15,
    93:20, 94:3,
    199:21, 226:22,
    256:17, 259:24
concerned 237:20

concerning 23:21,
    41:21, 87:5,
    132:11, 182:14,
    202:10, 212:18,
    213:3, 218:5,
    224:17
concerns 71:13,
    74:16, 88:17,
    88:21, 89:1,
    94:18, 121:23,
    171:4, 223:6,
    223:25, 227:4
concession 111:17
conclude 104:15,
    165:5
concluded 98:19
concluded. 271:3
concludes 219:23
conclusion 101:18,
    211:22
conclusions 68:22,
    198:12, 259:1
concrete 31:15,
    184:6
concur 23:13, 86:18
concurrent 77:5
concurs 211:22
condition 60:12
conditioned 218:24
conducted 14:10
conducting 27:23,
    30:13
conductor 123:4
confer 199:3,
    201:22, 210:8,
    210:14, 222:17,
    254:12, 255:3,
    256:7, 262:21,
    264:2, 265:15,
    266:13, 267:12,
    268:7, 268:21,
    269:22, 270:5
Conference 9:11,
    42:4, 214:13,
    214:17
conferring 200:14,
    269:20
confers 270:13
confidence 122:9
confident 203:23,

205:22
confidential 64:17,
    65:15, 162:16,
    164:18, 213:22,
    214:1, 214:8
confidentiality
    213:4, 214:5
confirm 121:6
confirmability 67:8,
    71:13
confirmable 67:4,
    68:13, 86:1,
    161:20, 219:10
confirmation-related
    148:16, 151:24,
    212:13
confirmed 20:4,
    32:9, 44:1, 46:1,
    70:11, 130:3,
    175:17, 188:9,
    188:16, 216:4,
    216:19, 218:21,
    226:12
confirms 234:20
confiscation 10:1
conflict 78:5, 79:1,
    138:14, 220:18
conflict-related
    78:1
conflicting 64:4
conflicts 78:11,
    78:13, 209:8,
    223:20, 223:22
conflicts-based
    204:20
confront 108:24,
    109:5, 110:11
confronting 110:4
confusion 256:2,
    256:3
Congratulations
    131:10
Congress 67:22
Congressman 14:7,
    14:10
conjoined 219:25
conjunction 27:6
connectivity 29:14
consensual 34:1,
    64:20, 69:13,

73:6, 124:4, 130:8
consensus 20:22,
    64:9, 66:10,
    68:10, 68:22,
    69:17, 72:18,
    72:21, 85:5,
    85:13, 96:18,
    100:20, 100:25,
    133:1, 197:18
consent 12:2
consenting 109:11,
    126:12
Consequently 61:2
consider 68:14,
    75:13, 82:23,
    97:4, 135:6,
    135:8, 141:11,
    148:6, 156:3,
    173:10, 222:19,
    224:24
considerable 198:8
consideration 62:10,
    62:11, 65:10,
    71:1, 210:10,
    214:10, 215:3,
    215:6, 217:17,
    217:18, 219:8,
    225:18, 226:19,
    227:8
considerations
    46:23, 49:20
considered 58:16,
    59:15, 195:21,
    208:20, 214:12,
    229:7, 229:8
considering 68:19,
    84:17
considers 61:13
Consistent 9:10,
    13:9, 14:5, 62:1,
    74:8, 75:9, 81:6,
    83:11, 103:6,
    132:9, 153:9,
    156:6, 174:1,
    192:10, 225:4,
    251:20
consistently 102:24,
    158:19
consisting 272:4
consists 235:24

consolidate 206:4
consolidated 11:25
conspiracy 50:24
constantly 190:11,
    236:6
constellation 236:3,
    237:4
constituency 58:12,
    150:10, 150:13
constituents 71:15
constitutes 183:24
Constitution 158:11,
    165:12, 166:25,
    169:23, 170:17,
    170:18, 182:25,
    183:6, 183:8,
    186:5, 196:8
Constitutional 6:25,
    6:35, 95:9, 98:3,
    147:19, 165:16,
    165:19, 166:13,
    176:10, 176:13,
    195:5, 216:21
constitutionally
    158:16
constrained 200:20
construct 36:3,
    36:7, 61:11, 62:16
constructing 202:25
constructively
    213:18
construed 143:17
consult 111:21,
    119:12
consultants 165:15
consuming 102:6
consummated 20:4
consummation 142:1
contact 32:15, 32:20
contain 118:6,
    231:25, 260:6
contained 19:6,
    32:5, 32:14,
    67:25, 217:22
contains 17:8,
    186:22, 216:24,
    264:11
contemplated 21:25,
    191:18, 194:14,
    216:20, 218:19,

220:17, 222:14
contemplates 54:6,
    224:20
contemporaneously
    226:25, 229:7
contends 60:4,
    155:5, 155:7
content 107:11,
    226:22, 226:23,
    248:24
contentious 66:11,
    215:18
contents 227:4
contest 98:18,
    143:13
contested 63:17,
    65:3, 67:15,
    72:22, 148:18,
    148:20, 177:9,
    177:17, 180:10,
    209:19, 209:21,
    210:23, 211:16,
    217:21, 217:25
contexts 36:2,
    188:11
contextualization
    17:20
contingent 164:24
continuation 68:17
continue 56:24,
    83:1, 162:12,
    167:23, 168:3,
    175:19, 183:4,
    214:10, 216:3,
    219:11, 238:12
Continued 6:1, 7:1,
    25:8, 38:18,
    78:24, 100:25,
    165:13, 225:20
continues 23:14,
    32:17
continuing 13:3,
    48:15, 72:25,
    187:16, 199:3,
    216:6
continuously 65:16
contract 41:8,
    41:11, 48:6,
    48:10, 51:4,
    55:22, 57:2, 117:2

contracted 42:20
contractors 49:13,
    49:17
Contracts 41:2,
    43:11, 47:18,
    47:20, 47:22,
    49:1, 49:14,
    49:16, 50:23,
    51:6, 51:11,
    57:23, 143:20,
    154:2, 154:3
contractual 144:9
contrary 116:3,
    121:16, 193:20,
    214:6, 219:20
contrast 102:14,
    132:25
contribute 213:17
contributes 224:10
control 22:17,
    138:10, 233:22,
    233:23, 248:14
controlled 234:2
controversy 99:13
conversation 168:21,
    265:19
conversations 70:14,
    70:19
conversion 45:21
converted 46:1
convinced 73:23,
    74:6, 76:6
cooperation 22:9
coordinate 146:14,
    266:11
coordinated 169:5,
    219:23
coordination 32:8,
    146:18
copy 14:11, 151:20
COR3 25:6
corner 128:20
corollary 67:19
coronavirus 11:10
Corp 5:35
Corp. 5:34, 6:7,
    139:14
Corporation 6:20,
    145:15, 152:11,
    234:25

corporations 257:14,
    257:25, 258:12,
    258:21
Correct 29:15,
    29:17, 29:19,
    46:16, 76:20,
    89:10, 109:18,
    109:25, 174:15,
    178:15, 180:11,
    186:3, 191:24,
    194:24, 198:7,
    227:12, 250:1,
    268:23
correctly 52:9,
    80:24, 143:18,
    243:10
corruption 22:17
cost 30:10, 40:21,
    121:25, 122:15,
    153:22
Costa 30:4, 30:16
costly 102:6
costs 52:19, 59:24,
    184:9
counsel 9:6, 37:3,
    37:7, 37:10,
    37:13, 50:17,
    53:21, 104:4,
    121:20, 135:11,
    143:2, 160:22,
    161:16, 167:6,
    174:24, 174:25,
    175:1, 220:9,
    235:10, 249:10,
    257:3, 261:1
count 156:1
counter 22:17
counterclaim 75:12
counterclaims
    134:18, 137:9,
    147:13, 147:23,
    153:4, 159:24
countervailing
    216:16
country 164:20
counts 77:17, 146:7,
    146:8, 153:7,
    153:10, 153:17,
    154:1, 155:6,
    175:23, 176:4

couple 35:11, 83:24,
    89:1, 108:18,
    159:11, 172:3,
    197:2, 197:8,
    200:9, 265:23,
    265:24, 266:1,
    268:9
Courthouse 89:19,
    90:9, 90:18
courthouses 90:1
COURTROOM 9:13,
    9:24, 10:2, 35:15,
    90:19, 140:3
cover 39:8, 101:13,
    168:6, 168:17,
    168:18, 169:15
coverage 30:11,
    210:14
covered 10:18,
    10:22, 208:13,
    223:7, 228:25,
    229:2
covering 200:5
crafted 84:13, 142:8
crammed 186:17,
    190:24
create 48:20,
    167:19, 167:20,
    190:9
created 102:18,
    186:13, 189:18,
    232:18, 256:23
creates 36:4
creating 88:6
creation 163:19
credibility 56:11
credit 110:6,
    244:19, 244:23,
    264:24, 265:9
creditor 42:20,
    73:8, 98:3,
    123:10, 167:8
credits 97:11
cri 45:12
criminal 43:17,
    47:16, 48:2,
    51:10, 57:4
cringing 145:18
crisp 194:11
criteria 44:24,

45:5, 45:6, 45:13,
  53:9
critical 23:8, 71:8,
  107:6, 117:4,
  145:22, 147:14,
  147:20, 195:2,
  211:20, 222:6,
  224:5
critically 11:6,
  56:4
criticism 102:13
cross 157:1, 161:7,
  201:2
cross-claim 75:11
cross-claims 75:7
cross-holdings 69:9
cross-motion 79:16
cross-motions 77:8,
  77:19, 134:15,
  147:11
cross-section 96:25
crucial 23:3
crystal 155:11,
  183:1
CSR 272:14
cudgel 140:16
cue 136:10, 194:21
cued 220:9, 220:10
cumulative 39:13
cumulatively 39:17
Current 59:6, 59:11,
  70:17, 86:8,
  114:5, 121:5,
  121:19, 145:7,
  146:12, 148:7,
  165:19, 165:23,
  171:15, 172:20,
  188:6, 197:19,
  212:4, 218:17
currently 16:7,
  16:24, 21:21,
  25:12, 43:9,
  43:13, 46:18,
  50:1, 55:4, 65:25,
  87:11
curtailed 140:6
custody 267:6
cut 56:23, 69:9,
  69:13, 84:13,
  138:12, 188:14,

189:23, 189:25
cuts 121:1


< D >
damage 30:1, 30:2,
  30:6, 108:9,
  108:10, 241:3
damages 25:17,
  27:11, 30:9, 30:10
Daniel 6:27
dark 268:20
data 24:24, 25:3,
  26:13, 28:6, 29:6,
  39:23, 40:2, 165:4
Date 15:23, 20:10,
  27:12, 49:3,
  50:13, 60:13,
  76:11, 79:17,
  83:5, 87:20,
  89:11, 102:4,
  121:25, 129:13,
  134:8, 143:3,
  143:5, 146:17,
  156:3, 156:7,
  156:11, 178:5,
  187:19, 190:5,
  238:20, 249:15,
  268:7
dates 75:24, 135:10,
  138:25, 142:21,
  147:4, 158:4,
  168:14, 181:9,
  228:5, 228:15,
  228:16, 228:18
David 6:17
Davis 51:8
day 14:15, 15:6,
  26:22, 85:22,
  85:25, 106:2,
  113:1, 122:16,
  140:1, 158:5,
  160:2, 180:5,
  185:21, 190:14,
  190:15, 197:11,
  216:2, 228:15,
  233:20, 243:17
day-to-day 55:6
days 26:22, 71:3,
  78:5, 78:7, 78:12,

94:4, 94:10,
  108:18, 116:14,
  117:18, 138:25,
  139:3, 147:2,
  163:4, 187:20,
  187:22, 187:23,
  188:2, 200:9,
  209:10, 214:19,
  224:4, 229:24,
  243:1, 266:1
de 4:26, 4:27
dead 105:18
deadline 78:4,
  78:12, 138:9,
  138:11, 139:6,
  156:13, 156:14,
  177:25, 209:9,
  209:16, 223:21,
  224:7, 224:10,
  227:17
deadlines 59:20,
  78:10, 122:19,
  138:6, 138:17,
  138:19, 155:23,
  155:25
dealing 42:10, 97:9,
  104:3, 107:7,
  134:9, 134:12,
  169:16, 193:12,
  231:5, 256:25,
  257:1
deals 17:22, 183:9,
  187:3
dealt 15:15, 16:9,
  183:25
debate 67:2, 149:11
Debt 6:26, 54:24,
  64:21, 95:9,
  100:14, 114:3,
  123:24, 125:7,
  128:6, 131:8,
  142:11, 144:5,
  169:25, 183:5,
  183:11, 185:5,
  185:23, 186:23,
  186:24, 187:4,
  188:22, 190:11,
  206:17, 206:19,
  206:24, 206:25,
  207:2, 207:5,

216:21, 217:4
Debtholders 6:36,
  69:3, 98:3, 103:4,
  113:13, 183:17,
  186:25
Debtor 1:34, 2:18,
  2:35, 3:16, 3:33,
  35:1, 36:4, 43:21,
  45:4, 46:10,
  46:17, 46:21,
  46:22, 47:5, 49:4,
  49:15, 52:3, 53:1,
  53:7, 60:22,
  60:25, 61:7,
  61:20, 107:13,
  190:19, 217:11
Debtors 1:18, 15:21,
  16:3, 36:7, 38:16,
  43:15, 49:17,
  53:16, 57:22,
  61:12, 217:6
debts 216:8
decades 158:3
December 177:21,
  241:20
decide 85:22, 105:8,
  108:15, 109:6,
  112:16, 114:21,
  118:18, 129:21,
  138:17, 185:13,
  188:13, 194:13,
  217:1, 229:12
decided 111:22,
  112:5, 113:18,
  115:8, 119:6,
  128:10, 130:17,
  134:3, 134:6,
  140:25, 142:11,
  153:3, 154:16,
  156:6, 194:18,
  196:19, 197:1,
  220:13, 229:12
deciding 108:8,
  129:4
decision 62:2, 62:3,
  64:11, 64:14,
  71:19, 78:8,
  79:14, 103:16,
  113:5, 198:10,
  199:23, 203:16,

207:21
decisions 60:3,
  66:2, 116:5,
  192:13, 197:25
declaration 25:22,
  26:5, 46:22,
  47:21, 54:5
declarations 54:7
declaratory 141:2
declines 222:3,
  222:14, 225:14
dedicate 222:7
deemed 196:2
deems 61:5
deep 37:11
default 144:5
defeat 202:16
defendant 51:6,
  174:24
Defendants 4:21,
  4:35, 75:10,
  113:12, 159:23,
  175:5, 221:15,
  221:16, 221:21,
  222:1, 222:5
defense 48:2, 48:4,
  198:15, 235:7
defenses 134:19,
  137:9, 147:13,
  221:19, 221:25
defer 84:2, 97:12,
  158:23
deference 98:21
defers 62:10, 62:11
defined 208:18
definitely 230:24,
  233:14
definition 98:4
Degetau 90:16
degree 36:23, 37:9,
  38:19, 102:8,
  102:19, 104:20,
  149:18
del 125:19
delay 78:2, 97:12,
  102:2, 125:14,
  145:19, 157:9,
  158:23, 158:24,
  168:9, 232:9
Delaying 13:19,

73:4, 73:19,
  232:13
delays 22:4, 137:20
delicto 221:25
deliver 162:25
deluge 197:12,
  199:18
delve 105:17
demand 61:3, 156:25
demerits 67:12
demonstrate 59:8,
  59:13, 242:12
demonstrated 216:16,
  226:1
demonstration 45:22
denial 10:1
denied 11:17,
  105:15, 113:7,
  113:8, 214:13,
  224:17, 225:3,
  226:9
Dennis 6:20, 139:13
deny 112:18, 209:4,
  209:17
denying 12:4
Department 22:16,
  25:6, 27:4, 27:24,
  28:1, 28:7, 28:10,
  28:14, 28:21,
  29:1, 29:4, 32:2,
  32:9, 32:11
departures 40:16
depending 41:10,
  142:3, 150:6
depends 31:18
deposited 235:14,
  236:18
deposition 263:5,
  263:20, 268:24,
  269:23, 270:4
depositions 262:13,
  268:20, 270:16
depository 234:15
depressing 164:9
deprive 109:12,
  110:10, 171:17,
  221:5
depriving 169:6
DEPUTY 90:19
derailed 123:8

DERDYS 6:13, 41:23,
41:24, 42:2, 42:12
describe 158:17,
246:20, 246:21
described 65:6,
249:6, 254:8
describing 48:23
description 210:6,
259:24
deserve 72:5
designated 16:8,
26:4, 203:5
designed 121:12,
143:5, 231:21
desire 68:6, 140:15,
146:14, 197:10,
265:6
desperate 169:7
Despite 111:10,
166:22, 167:11,
167:17
detail 24:1, 25:12,
29:9, 67:17,
124:3, 143:19,
244:12, 245:14,
251:8, 252:11,
255:5, 264:6,
264:10, 265:3
detailed 30:8,
51:19, 65:18
details 17:14,
24:21, 24:25,
239:1, 244:13,
249:2
determination 61:15,
150:9, 198:25,
201:13, 201:25,
202:21, 215:5,
217:13
determinations
197:20, 219:24,
222:22
determine 68:12,
70:9, 107:5,
182:3, 184:1,
184:2, 184:3,
196:16, 199:3,
200:15, 231:21
determined 76:19,
160:7, 160:9,

160:10, 162:24,
183:8, 199:13,
202:19
determines 76:11,
186:16
determining 247:6
detriment 158:20
detrimental 120:23,
137:10, 138:14
devastating 164:6,
164:14
develop 10:21, 68:22
developing 63:15
development 124:10
developments 24:17,
30:22, 40:8,
224:25
deviations 41:12
device 9:16, 9:18,
9:24, 10:1
devices 9:13, 9:15,
10:2
dial 103:25
dialogue 22:19,
121:18, 121:21
dias 9:5
Diaz 25:25
dictate 40:21
differences 23:20,
99:8
differentials 39:1
differently 47:5,
47:11
differing 67:6
difficult 45:23,
71:6, 72:3, 72:15,
72:18, 91:24,
128:22, 156:14,
174:2
difficulties 178:2
difficulty 44:11,
102:8, 102:9,
102:19, 104:20
digest 117:19,
117:20
diligence 38:2
diminish 205:17
direct 84:23, 201:21
directed 64:15,
64:25, 65:18,

66:4, 199:2
direction 65:13,
65:14, 248:23
directions 236:20
directives 259:22
directly 151:21,
169:11, 251:22,
260:25
disagree 72:10,
116:15, 136:7,
140:3, 151:3,
168:24
disagreement 63:23,
86:10, 132:7
disallow 154:2
disallowed 15:24,
15:25
disappointed 156:24
disaster 13:23,
14:2, 21:11, 22:4,
22:8, 24:15,
25:21, 26:5,
31:11, 46:15,
52:15, 52:18,
52:19
disbursed 27:15,
31:16, 31:20
disbursement 244:12,
251:8, 264:4,
264:6, 264:10,
265:3
disburses 59:13
discharged 46:3
disclaim 112:7
disclose 118:10
disclosed 39:3,
236:2, 244:18
disconnect 248:21
discount 111:12,
111:16
discounted 127:4
discrete 110:13,
115:24
discretion 44:19,
47:6, 56:7, 93:8,
220:22
discrimination
162:2, 183:24,
184:1, 185:13
discuss 13:24,

74:13, 81:1,
94:18, 124:3,
214:1, 222:22,
252:25
discussed 16:11,
39:19, 41:17,
142:22
discussing 11:25,
20:20, 50:17,
133:18, 174:6
Discussion 40:6,
66:25, 94:14,
121:19, 178:13,
180:25, 190:21,
218:15
discussions 15:4,
22:12, 39:21,
112:9, 137:25,
223:1
disgorge 48:11
disgorgement 48:3,
48:8, 49:8
disparate 72:20,
168:22
dispenses 202:3
disposes 202:3
dispositive 222:1,
222:5
dispute 17:4, 34:24,
43:25, 44:18,
48:6, 48:9, 48:10,
168:3, 262:22
disputed 47:13,
52:2, 54:11,
54:16, 54:19,
211:18, 217:15
disputes 12:11,
47:14, 47:19,
51:15, 51:16,
70:17, 70:25,
211:24, 220:14,
222:24
disregard 156:9
disrupt 216:11
dissenting 217:10
distillation 93:23
distinction 241:3
distinguish 48:12,
48:14
distinguished 84:24

distress 38:11
distribution 114:19,
114:23
distributions
110:19, 114:1,
216:20
District 1:1, 1:3,
4:40, 4:41, 4:43,
214:16, 272:1,
272:2, 272:7
dive 37:11
diverse 69:2
diversion 22:18,
169:9, 169:20
divide 174:5
dividend 191:4,
191:5
diving 102:7,
102:20, 104:20
divulge 195:12
doable 91:3, 91:21
Docket 1:6, 1:23,
2:4, 2:23, 3:4,
3:21, 4:4, 4:26,
34:3, 58:21,
58:24, 59:22,
103:1, 138:11,
163:17, 166:3,
166:17, 175:4,
175:14, 175:15,
208:17, 212:4,
224:8, 226:8,
226:15, 228:17
doctrine 221:24
document 19:9,
19:10, 103:11,
231:5, 234:19,
238:4, 239:13,
252:3, 256:3,
256:13, 259:13,
259:14, 262:16
doing 36:21, 40:21,
44:22, 57:3,
96:19, 128:4,
129:1, 129:2,
129:12, 129:25,
134:2, 159:16,
195:18, 198:16,
219:9, 232:25,
233:2, 251:3,

251:12
dollar 55:24, 58:9,
107:1, 107:12,
162:3, 164:22
done 33:2, 36:21,
54:14, 82:5,
131:15, 133:5,
146:16, 158:3,
166:22, 168:13,
268:15, 270:6
door 203:21
doors 205:22
doubt 83:13, 119:25,
174:9, 219:4
doubtless 215:17
Doug 167:5
Douglas 5:47
down 15:20, 20:18,
23:22, 25:13,
52:3, 54:1, 69:18,
73:22, 76:22,
82:3, 89:24,
101:5, 109:6,
119:19, 124:24,
125:4, 128:12,
139:22, 152:6,
186:17, 190:24,
238:4, 243:1,
257:12, 257:16,
257:25, 259:9,
266:20
down. 269:3
downside 108:8,
184:17, 184:18
downward 39:18
dozens 225:25
DRA 119:4, 167:6,
167:8, 167:11,
167:12, 167:20,
171:8, 171:17,
212:7, 222:12,
223:4, 223:5,
223:10, 223:14,
225:10, 225:16,
225:19, 225:25,
226:5
draft 10:16, 163:7,
163:10
drafted 144:4, 251:9
drastic 49:25

draw 45:18
drawing 216:12
drawn 11:5
dress 173:9
driven 68:5
driving 101:19,
    129:17
dual 100:24
due 38:2, 43:10,
    58:3, 63:19, 74:9,
    104:25, 117:15,
    121:13, 130:5,
    134:14, 135:14,
    138:15, 140:16,
    142:23, 143:7,
    148:7, 153:9,
    156:6, 160:19,
    168:9, 169:7,
    171:17, 171:21,
    214:10, 219:20,
    219:22, 220:18,
    224:7, 254:21
duet 93:18
Duff 34:3, 34:6
Dunne 6:20, 139:12,
    139:13, 139:18,
    139:24, 144:13,
    145:12, 147:17,
    169:8
duplicate 146:14,
    218:2
duplicated 37:8
duplicating 36:14
duplication 37:22,
    38:15, 132:23
duplicative 35:20,
    133:3, 133:24
During 9:24, 25:9,
    25:14, 26:11,
    29:25, 30:12,
    30:19, 31:5, 45:3,
    169:4, 178:3,
    218:3, 241:16,
    264:16
duties 112:7, 162:20
dwarfs 52:22


< E >
e-colon 215:11

e-mail 230:17,
    230:23, 230:25,
    253:2, 253:12
e-mailing 9:23
E. 6:4, 7:24
eager 167:12
earlier 47:16,
    54:24, 66:15,
    75:6, 75:16, 88:3,
    124:9, 130:10,
    139:1, 176:15,
    187:7, 190:6,
    218:10
earliest 43:19
early 10:19, 64:2,
    84:12, 96:23,
    140:19, 150:22,
    152:14, 152:16,
    152:19, 153:8,
    155:11, 183:9,
    220:3, 226:3
earmarked 247:7
earn 236:5
earthquake 24:9,
    24:16, 30:1, 178:4
earthquakes 11:4,
    13:18, 19:19,
    25:7, 25:18, 26:4,
    26:11, 27:12
easier 238:5
easily 20:16, 75:24
easy 112:18, 120:10,
    238:3
ECF 214:18
echo 168:16, 172:10,
    174:12
echoed 125:23
economic 23:3, 23:8,
    23:21, 39:16,
    69:2, 130:24,
    190:15
economical 215:6,
    215:13
economy 22:23,
    175:18, 190:9
edits 83:21, 198:24
Education 25:6,
    27:25, 28:2, 28:7,
    28:14, 28:21,
    29:1, 29:4, 197:24

effect 19:18, 40:7,
    48:21, 49:11,
    49:17, 56:25,
    57:7, 68:16,
    165:18, 212:5,
    255:19, 264:7
effective 60:13,
    142:3, 260:22
effectively 146:16,
    185:2
effects 259:15
efficiency 101:24,
    102:15
efficient 38:13,
    102:6, 220:5,
    220:23, 222:23,
    226:11, 245:10
efficiently 146:16
effort 85:12, 87:5,
    87:19, 98:9,
    130:13, 190:18,
    197:17, 232:9,
    266:7, 267:18
efforts 13:23,
    13:25, 21:7, 22:8,
    22:11, 25:19,
    26:6, 26:8,
    133:19, 135:2,
    167:24, 212:1,
    213:15
effusively 169:1
Ehud 5:12, 53:14
eight 17:24, 114:14,
    115:2, 147:2,
    147:15, 152:6,
    153:7, 162:8,
    163:13, 166:24,
    193:4, 193:6,
    257:5
eighth 39:8, 40:5
Either 9:13, 15:24,
    19:1, 43:22, 46:1,
    47:7, 48:10,
    79:13, 94:14,
    120:22, 138:25,
    175:17, 191:12,
    192:3, 193:23,
    193:24, 194:1
elaborate 38:6
elected 121:7

election 188:4,
    188:5, 228:14
electoral 97:5,
    218:22
Electric 3:13,
    42:23, 43:1, 55:4
Electrica 4:27
electrical 49:4
electricity 29:14
Electronic 9:12,
    9:15, 214:19
element 122:9
elements 215:10
eliminated 253:2
Elizabeth 5:31,
    50:6, 231:12
Ellenberg 5:36,
    123:17, 123:19,
    127:7, 127:9,
    131:19, 136:18,
    158:23
elsewhere 73:10
Emanuel 95:8
embed 90:23, 140:25
embedded 183:10,
    216:1
embeds 194:2
embodies 67:4
emerge 216:9
emergence 23:5,
    97:12
Emergency 11:3,
    22:25, 27:5,
    30:14, 52:15,
    52:17, 103:6,
    258:6
Emmanuelli 7:13
emphasis 198:8
emphasize 160:23
emphasized 120:20
emphasizing 121:1
Employee 4:9, 32:10,
    51:3
Employees 2:13,
    6:44, 50:24,
    165:19, 165:20,
    166:12
employment 51:4
empowered 215:22
en 6:4, 11:18, 173:5

enable 264:12
enacted 257:1
enactment 121:5
enclosed 14:10,
    166:9
encompass 227:23
encourages 99:16
end 29:7, 56:5,
    67:24, 72:7, 88:5,
    95:15, 97:8,
    103:16, 106:2,
    115:6, 129:5,
    149:14, 163:4,
    172:20, 177:9,
    180:12, 193:12,
    230:2
ended 113:16, 163:13
ending 150:2
endorse 97:7, 97:19
ends 109:10
Energia 4:26
Energy 30:17, 30:20
enforceable 184:8,
    184:11, 185:2,
    193:24, 196:7
enforced 186:9
enforcement 32:24,
    133:4, 133:9
engage 52:15
engaged 50:18
engagement 34:21,
    40:24, 142:13
engine 143:6
engineers 27:22
enjoy 44:3
enlarging 94:1
enough 89:15,
    139:21, 168:21,
    186:7, 195:19,
    195:20, 203:4
enrolled 28:8, 29:8
ensure 11:11, 14:4,
    36:13, 37:13,
    68:8, 68:13,
    172:23, 218:4
ensuring 49:4
enter 62:1, 62:5,
    67:25, 108:20,
    111:7, 208:23,
    222:16, 224:2,

228:17
entered 12:19,
    96:12, 160:4,
    160:12, 168:2,
    206:2, 212:9,
    212:21
Enterprises 215:11
entertain 138:18,
    209:15, 210:20,
    210:22
entire 49:3, 135:15,
    169:18, 222:2
entirely 52:19,
    125:3, 127:5,
    246:1, 262:1,
    265:17, 265:18
entirety 62:1, 62:5,
    213:7
entities 38:10,
    124:17, 169:10,
    237:8, 242:18,
    250:1, 257:15,
    257:19, 270:2
entitled 47:25,
    58:6, 73:6, 73:8,
    73:11, 98:21,
    106:23, 108:19,
    109:2, 158:6,
    162:20, 166:14,
    185:7, 185:23,
    187:5, 193:7,
    245:2, 245:8
entitlement 57:7,
    109:11
entitlements 143:17
entity 261:9
entry 15:25, 17:23,
    58:21, 58:24,
    59:22, 212:4,
    226:8, 226:15
enumerated 44:24,
    221:21
envision 20:12
equal 60:15, 103:7,
    197:18
equality 103:6,
    164:24
equally 49:12,
    49:16, 64:8,
    122:11, 160:9,

202:9
equate 85:7
equation 84:20
equitable 150:11
equitably 43:22
equity 46:23, 47:6,
   260:21, 261:12
equivalent 144:9,
   185:3
erase 167:12
erasure 167:17
erroneous 55:11
error 227:12
escalated 258:6
escape 104:12
especially 67:2,
   113:18, 138:3,
   186:8
Esq 5:28, 6:4, 6:13,
   7:13, 7:14, 7:24
essence 126:19
essential 99:18,
   116:17, 116:18,
   117:3, 122:23,
   153:20, 153:21,
   153:22, 153:23,
   154:9, 158:18,
   166:22, 221:7,
   225:17, 240:6
essentially 28:16,
   111:19, 115:12,
   134:4, 134:9,
   137:16, 169:16
establish 60:7,
   68:11
established 11:11,
   61:22, 225:5
establishing 22:9
estate 45:9, 46:20,
   48:20, 49:6
estimate 25:16
estimated 25:18
estimates 27:25,
   28:2, 28:7, 29:1,
   97:17
Et 1:16, 4:19, 4:33,
   5:7, 75:8, 92:5,
   110:25, 118:12,
   144:18, 154:9,
   181:25, 182:16,

184:14, 190:18,
   206:24, 243:24
evacuees 11:7
evaluate 11:1
evaluating 35:24,
   39:5, 51:5
Evaluation 61:19,
   226:2
eve 238:8
evening 17:7
evenly 43:22
event 48:8, 89:25,
   118:20, 189:10
events 85:21, 224:5
Everybody 17:17,
   20:16, 94:5, 94:6,
   138:16, 140:2,
   140:18, 142:16,
   144:20, 188:8,
   195:23, 230:16,
   268:18
Everyone 36:19,
   62:19, 64:14,
   69:12, 110:15,
   115:16, 125:12,
   130:4, 131:17,
   155:19, 167:12,
   182:5, 185:4,
   186:8, 195:22,
   202:13, 243:10
everything 56:19,
   58:17, 64:7,
   68:19, 82:5,
   99:20, 113:23,
   122:19, 139:22,
   141:10, 165:15,
   239:25, 250:19,
   260:5
evidence 53:23,
   100:11, 100:22,
   170:2, 241:12
evolving 98:11
exact 207:16
Exactly 85:23,
   93:15, 93:20,
   103:14, 103:24,
   117:2, 148:12,
   177:13, 182:6,
   194:10, 196:12,
   204:10, 204:23,

207:12, 237:15,
   248:15, 253:23
examination 38:20
Examiner 6:39,
   33:17, 33:24,
   33:25, 34:2, 34:4,
   34:5, 34:10,
   34:13, 34:16,
   35:5, 35:19,
   35:23, 40:18,
   42:9, 42:10,
   53:22, 56:1, 62:4,
   62:7
example 28:18, 30:7,
   36:15, 37:2,
   40:16, 41:1, 69:5,
   69:7, 85:4, 110:3,
   116:24, 117:8,
   148:11, 153:10,
   155:4, 157:1,
   169:21, 176:3,
   193:2, 217:5,
   236:12, 237:6,
   238:22, 244:15,
   248:1, 248:21,
   254:6
examples 45:2
exceed 165:22
exceeded 205:8
exceedingly 72:3,
   76:23
except 36:17, 60:16,
   104:24, 214:15,
   236:7, 261:15
exception 74:9
exceptions 78:15,
   199:11
excess 18:2, 18:9,
   66:15
excessive 36:23,
   37:9
exchange 164:11
excise 153:11,
   153:14, 153:19,
   153:22, 154:7,
   154:21, 171:6,
   182:21, 185:25,
   193:23
excited 209:5
excluded 65:24,

112:9, 124:18,
156:23, 156:24,
157:6, 213:9
excludes 124:14
excluding 195:17
exclusion 156:20,
156:22
exclusive 45:7,
201:19
Excuse 53:4, 53:16,
177:18, 204:17
execution 69:20
executive 122:25,
174:7, 218:18
exemplar 238:14,
241:23, 245:12,
245:15, 246:7,
263:13, 265:11
exemplars 249:11
exemplary 247:17
exercise 217:10,
259:3
exercised 153:18
Exhibit 34:7, 62:8,
62:9, 62:11,
62:12, 163:7,
217:24, 256:13
Exhibits 8:9, 33:25,
208:19, 208:24,
256:10
exist 23:5, 87:6,
137:5, 138:3,
144:22, 232:3,
237:8, 249:17
existed 204:17,
238:3
existence 85:16,
143:13, 239:2
existing 22:25,
146:24, 152:15,
164:4
exists 137:18,
248:24, 260:7
exit 142:21
expand 37:15, 87:19,
88:2, 210:6,
222:14, 223:1
expanded 194:7,
194:8
expands 144:7

expect 10:18, 16:12,
109:22, 126:25,
172:8, 190:12,
210:22
expectation 31:15,
31:21
expectations 165:23
expected 63:21,
210:8, 229:5
expecting 80:13
expects 30:19
expediency 150:1
expedited 133:24,
205:5
expeditious 201:18,
205:4, 225:18
expeditiously
198:25, 201:13
expended 68:9
expending 133:6
expenditure 38:16
expenditures 61:1
Expense 11:20,
34:18, 34:25,
59:22, 60:4,
60:11, 60:14
expenses 46:2,
46:13, 46:19,
60:23, 61:4,
61:21, 151:20,
165:13
expenses. 60:2
experience 40:19,
63:6, 146:13
explain 52:7, 59:17,
192:20, 261:17
explained 174:3,
189:19, 226:16,
235:24
explaining 166:4
explains 257:20
explanation 256:9,
261:2
explanations 38:2
explanatory 259:2
explore 245:2,
261:10, 264:13
exposure 131:3
exposures 143:12
express 98:14,

107:22, 123:1,
123:4, 143:6
expressed 123:13
expressing 123:13,
123:14
expressly 218:24
extend 59:20
extended 88:5
extending 11:16
extension 93:11,
175:11, 177:25,
178:2, 209:15,
209:17, 224:13
extensions 43:16
extensive 116:22,
117:14, 150:15,
187:1, 220:8,
220:11
extensively 235:8
extra 139:16, 181:11
extraordinarily
68:24, 165:23
extraordinary 98:9
extremely 19:10,
69:2, 156:14,
233:17
eye 172:21, 263:13


< F >
F.supp.2d 215:11
face 104:8, 124:7,
128:23, 138:9
faced 108:4, 124:14,
178:3
facilitate 22:20,
64:8, 64:17,
65:15, 70:25,
72:25, 79:2, 79:18
facilitated 68:2
facilitates 99:16
facilities 26:20,
29:16, 31:8
factor 35:2
factors 34:15,
34:23, 41:16,
44:24, 44:25,
45:2, 45:7, 68:6,
68:19
facts 17:17, 118:8,

118:11, 154:19,
196:18, 203:12,
205:13, 205:18,
221:7, 262:21,
262:22
factual 52:6, 52:11,
59:18, 61:24,
102:10, 102:21,
115:25, 153:8,
153:13, 153:25,
154:6, 154:15,
154:24, 155:9,
210:23, 219:1,
231:1, 238:25,
246:6, 262:22
fail 131:13, 214:4
fails 46:2
failure 98:13,
121:11, 163:16
Fair 68:7, 68:15,
73:11, 73:16,
73:24, 125:15,
128:14, 143:4,
159:17, 229:10
fairly 37:11, 62:19,
64:23, 67:18,
73:13, 112:18,
113:6, 131:17
fairness 46:24,
121:4
faith 110:6, 121:19
fall 65:16, 69:19,
234:8, 255:15
falls 64:11, 108:13,
253:9
false 51:22, 53:17
families 27:14,
27:17
Family 27:4
Far 58:8, 155:1,
155:20, 186:19,
187:16, 188:20,
189:17, 189:20,
190:3, 196:21,
230:25, 236:18,
257:8, 260:4
Farr 99:2
fashion 76:25,
101:13, 122:3,
169:6

fast 101:23, 137:7,
249:13
favor 104:18,
105:18, 114:25,
130:21, 190:4,
199:9, 199:19,
202:4
favorable 50:25
favored 213:20
fear 214:2
feasible 99:21,
188:8, 197:21,
228:4
feature 61:21,
164:5, 235:17
features 9:18
February 11:5, 22:5,
25:10, 29:7, 31:6,
69:22, 241:20
Federal 13:16,
13:21, 14:3, 22:3,
22:10, 22:21,
22:25, 23:1,
25:21, 26:5,
30:23, 46:14,
52:14, 52:16,
55:4, 55:6, 55:7,
90:8, 90:18,
166:25, 221:1,
258:6
Federico 90:16
fee-related 35:10,
35:12
feed 43:5
feedback 35:14
feel 32:25, 65:19,
94:4, 113:6,
114:10, 131:6,
204:20, 242:22
feels 203:17
fees 38:16, 38:23,
39:11, 40:3,
40:10, 48:7,
55:12, 55:25,
56:8, 61:18,
142:1, 164:11,
190:22
FEMA 25:16, 25:22,
25:23, 26:6, 27:5,
27:9, 27:10,

27:14, 30:18,
47:17, 49:2,
50:19, 50:22,
50:24, 51:3, 57:2,
59:23, 60:6
Fernando 6:13,
41:23, 42:2
few 47:10, 65:17,
86:20, 102:23,
103:1, 137:4,
168:6, 170:23,
204:23, 230:4,
235:1, 242:5,
257:2, 258:1,
260:10
fewer 40:8
FGIC 159:5, 159:8,
159:22, 159:24,
196:21, 197:10
fiction 58:3
fiduciary 107:3,
107:4, 112:6,
112:7, 112:8
fifth 34:2, 68:13,
174:12
fight 261:24, 262:9
figure 12:9, 96:7,
232:23, 263:6
figured 97:19
file 10:19, 12:1,
20:13, 24:20,
24:21, 32:12,
68:1, 75:7, 77:6,
77:13, 77:16,
79:8, 116:20,
129:7, 135:20,
148:4, 173:23,
201:8, 202:14,
203:17, 209:9,
221:18, 234:19,
251:3, 270:12
filer 32:9
filers 204:1, 204:4
files 232:4, 248:25,
249:16, 249:17,
251:23, 252:5
filing 12:15, 32:2,
42:21, 54:4, 54:9,
69:21, 74:10,
78:4, 79:16,

88:12, 120:1,
134:10, 166:2,
177:23, 177:24,
210:3, 223:22
filings 156:1,
203:24, 207:8,
207:10, 228:25,
229:2
filter 89:23
Final 15:7, 15:25,
33:21, 56:5,
61:14, 62:9,
62:11, 67:18,
71:19, 94:13,
193:13, 210:1,
210:12, 212:7,
219:20, 220:17,
221:4, 222:12,
223:7, 223:10,
224:2
finality 118:20
Finally 31:10,
49:18, 140:8,
141:10, 161:12,
166:16, 166:24,
176:9, 204:11,
214:20, 228:2
Finance 6:7, 152:10,
157:22
finances 150:17
Financial 1:9, 1:26,
2:7, 2:26, 3:7,
3:24, 4:4, 5:26,
5:39, 10:10, 37:3,
38:11, 45:3,
117:1, 163:1,
174:13, 207:4,
263:9
financials 162:19,
163:2, 163:5,
163:8, 163:11
financing 105:6,
158:10
find 27:6, 49:15,
79:6, 81:21,
87:20, 89:22,
91:15, 114:2,
123:8, 232:11,
249:16, 253:7,
266:7

finding 196:15,
234:12, 239:20,
249:5
Findings 33:24, 48:1
finds 47:25, 49:24,
216:5, 217:12
Fine 44:10, 44:13,
79:5, 81:20, 87:1,
91:14, 111:14,
173:18, 174:7,
180:14, 233:15,
268:10, 270:18
finish 74:1, 100:10,
122:4, 176:15,
191:14, 206:6,
252:14, 269:18
finished 119:13
fire 164:8
firemen 184:14
FIRESTEIN 5:10,
80:8, 80:9, 80:22,
81:20, 82:7,
82:14, 82:17,
82:18, 82:21,
83:13, 84:5,
84:19, 86:14,
86:18, 181:8,
181:16, 197:3,
197:6, 198:5,
200:19, 204:3,
204:6, 204:10,
205:3
Firstbank 237:6
fit 229:4
fits 161:8
five 34:12, 35:6,
81:25, 82:4, 90:7,
95:22, 96:1,
97:10, 114:22,
130:25, 131:2,
153:11, 156:2,
198:4, 207:14,
207:23, 217:23,
243:1, 249:3,
269:6, 270:1
five-year 254:9
flagged 268:11
flaw 163:15
flaws 158:14, 158:15
flow 78:10, 149:21,

231:8, 238:25,
240:24, 241:4,
241:15, 242:9,
243:22, 245:8,
250:19, 256:25,
257:2, 260:17
flowing 141:21,
240:25
flows 238:23, 241:5,
241:13
focus 24:10, 58:10,
67:13, 79:2, 96:6,
136:5, 152:24,
155:20, 260:11
focused 220:4, 262:7
focusing 135:2
Foerster 98:2
foisting 165:11
folks 115:5, 172:10,
197:17
follow 28:25, 29:11,
84:11, 202:1
follow-up 265:14,
265:18
followed 96:13
following 21:15,
59:14, 70:14,
78:7, 78:12,
110:18, 185:21,
206:21, 208:22,
209:12, 210:8,
213:8, 222:17,
222:25, 225:22,
228:5, 228:8,
228:10
follows 76:25, 77:8,
183:9
FOMB 34:19, 124:8
food 26:21, 29:19
fool 131:8
foot 89:3
footnote 175:5,
207:14
force 11:11, 56:12
forced 239:17
forcing 132:21
forecast 21:23
foreclose 107:14
forfeited 197:23
forget 103:19,

113:12, 136:1
form 15:7, 62:6,
    120:9, 121:5,
    197:19, 198:10,
    264:1
formal 73:2
formally 13:7
formula 224:4
formulating 225:1
forth 33:25, 34:7,
    34:14, 40:25,
    63:22, 68:5, 70:7,
    74:9, 81:13, 86:9,
    138:7, 161:5
forthcoming 83:7
forum 133:10, 214:1
foster 68:10
fought 124:6,
    146:11, 239:8
found 9:23, 54:20,
    57:5, 105:15,
    196:25, 266:9
foundational 143:12
Four 26:17, 70:1,
    70:12, 135:23,
    145:21, 146:5,
    146:6, 153:11,
    156:2, 163:9,
    163:18, 166:18,
    166:21, 166:23,
    166:24, 243:1,
    245:11, 269:5
Fourth 68:11, 174:3,
    174:11, 210:1
fraction 206:25
fractional 164:7
frame 76:9, 145:17,
    228:16
frankly 97:3, 115:6,
    183:5, 205:23,
    239:16
fraud 32:23
free 106:24, 107:2,
    169:13, 214:11
frequently 189:7
Friday 17:7, 21:15,
    141:15, 228:8,
    254:21
Friedman 5:27
friends 91:13, 97:9

front 145:8, 150:2,
    180:23, 205:24,
    249:23
fruitful 238:10
frustrated 122:11
frustration 65:23
fulfilling 36:20
full 44:1, 54:7,
    55:17, 73:15,
    73:24, 102:11,
    103:3, 109:2,
    110:6, 111:7,
    127:23, 128:14,
    143:4, 144:10,
    169:21, 213:23,
    220:7, 220:20,
    240:3
fully 23:17, 69:13,
    73:13, 80:23,
    97:7, 161:6,
    181:12, 199:6
Fund 10:23, 235:10,
    235:21, 235:22,
    235:23, 236:14,
    237:22, 240:15,
    243:22, 244:20,
    244:21
fundamental 23:19,
    52:11, 115:17,
    169:12, 169:17
fundamentally
    133:25, 134:2
Funding 11:10, 14:2,
    21:11, 22:21,
    24:8, 25:19, 26:6,
    30:18, 31:4,
    46:15, 52:17,
    55:2, 55:5, 55:6,
    55:7, 59:23, 60:6
funds. 22:18
future 10:1, 22:20,
    23:1, 23:6, 23:8,
    33:4, 87:8,
    120:24, 157:25,
    205:12, 205:19,
    209:18, 217:21,
    228:25, 229:2
fuzzy 43:6

< G >
G-r-e-l-l-a 192:17
G. 5:22
Gail 4:42, 272:8
Gallagher 99:3
gallery 83:14
gambit 166:13
Garced 4:18
Gaston 93:19
gatekeeping 241:6
gathering 24:24,
    94:22, 254:22
gave 25:20, 30:12,
    31:11, 87:9,
    100:18, 113:25,
    139:16
GDB 119:5, 122:21,
    167:19, 225:9,
    250:10, 268:12
General 7:4, 10:12,
    10:23, 21:9,
    38:22, 40:9,
    123:25, 124:16,
    127:11, 127:12,
    127:19, 150:14,
    150:23, 151:15,
    151:16, 224:12,
    226:7, 230:19,
    245:8, 246:4,
    264:17
generalized 244:25
generally 21:18,
    35:11, 35:23,
    36:16, 69:1,
    223:4, 262:13,
    262:24
generated 52:23,
    63:22
generation 30:2,
    30:3, 30:14
genuine 155:13
gerrymandering
    166:19, 166:20
gesticulate 44:15
gets 56:10, 111:24,
    238:24, 266:23
getting 25:2, 48:12,
    48:14, 49:22,
    52:2, 52:4, 73:24,
    93:21, 94:1, 94:5,

110:21, 111:19,
112:21, 118:7,
128:19, 162:3,
162:4, 165:7,
198:21, 206:6,
206:17, 237:23,
245:14, 250:10
gift 107:10
gist 177:24
give-up 142:2
Given 36:9, 48:10,
56:9, 64:7, 69:11,
71:20, 89:11,
114:12, 125:22,
125:24, 125:25,
130:9, 147:12,
180:21, 194:13,
201:9, 203:11,
205:5, 231:15,
232:7, 232:10,
235:9, 237:20,
238:9
gives 76:9, 114:5,
123:3, 127:20,
201:22, 224:4,
257:9
giving 21:6, 38:17,
110:9, 112:20,
186:19, 189:13,
252:9
GKST 7:24
glad 46:6
Global 69:13, 70:6,
126:3, 156:25,
157:13, 169:7
gloss 45:16, 251:1
GO-PBA 66:16, 70:5,
70:8, 85:15,
156:16, 212:11,
212:12, 212:19,
214:23, 214:25,
215:1, 215:6,
216:1, 216:3,
216:10, 217:16
goal 22:9, 64:20,
129:18, 137:11,
140:13, 218:8,
224:10
God 108:5, 115:4
gold 131:8

goodness 99:22
Gordon 6:46
Gos 110:4, 142:5,
143:14, 158:3,
183:21, 196:1,
196:6
Gotshal 152:10
gotten 99:12, 99:24,
130:15, 141:25,
239:24, 243:6,
250:24
govern 41:3
governed 126:18
governing 35:4,
182:19
governmental 120:21,
121:2, 121:24,
122:2
Governor 11:12,
13:17, 25:23,
31:2, 120:19,
120:25, 188:6
graciously 208:4
Grande 26:1
Grant 6:22, 14:3,
90:2, 112:19,
133:5, 234:24
granted 67:22,
94:22, 149:20,
154:16, 193:10,
196:10, 196:13,
202:20, 215:9,
227:10
granting 15:25,
196:14
granular 118:13,
119:1, 150:15,
150:18, 199:11
granularity 38:19
graphically 193:3
grateful 15:14,
35:22, 84:18,
92:7, 171:12
Great 40:16, 94:12,
106:16, 110:25,
126:9, 164:13,
184:17, 262:6
greater 55:19, 88:6,
96:18, 123:7,
170:16, 197:18

greatest 49:2
greatly 205:8
Greenberg 51:8
Grella 192:13,
192:17
grid 43:1, 49:4,
55:3, 55:8
grocery 128:20
ground 89:19,
131:13, 154:19
grounds 61:18,
220:10, 220:14
groundswell 97:6,
97:18
Group 6:16, 6:30,
6:34, 7:4, 89:7,
95:18, 96:19,
98:2, 99:3, 100:4,
105:25, 106:3,
106:7, 106:9,
113:13, 131:9,
140:4, 140:12,
253:12, 253:14,
266:18
groups 11:22, 70:1,
70:12, 87:25,
106:21, 120:21
grow 100:25
growth 23:9
Guarantee 6:7,
117:1, 152:10,
213:14
guarantees 116:24,
117:2, 118:12,
187:3
Guaranty 5:33, 5:35,
5:39, 123:20,
126:6
Guard 13:24, 22:6,
25:5, 26:16, 30:24
Guayanilla 26:18
guess 82:9, 142:16,
148:14, 195:16,
231:7, 241:25,
251:1, 251:19,
252:11, 262:12,
267:16
guidance 72:4, 83:6,
134:24, 134:25,
137:12, 197:25,

202:1
guided 215:6, 259:3
guidelines 34:18,
    34:19, 35:4,
    39:18, 40:15,
    40:16
guides 259:3
guilty 51:7, 57:5
Gump 42:3, 42:17
guys 114:8, 114:11


< H >
half 117:9, 124:16,
    147:1, 181:12,
    187:25, 195:23
Halloween 228:9
halt 89:20
hammered 124:5
hand 52:22, 54:4,
    54:23, 55:18,
    70:23, 70:24,
    88:9, 264:3
hand-in-hand 53:6
hand. 178:25, 179:1
handed 257:22
handful 54:10,
    239:13
handicapping 113:8
handle 42:23
handled 154:23
handles 36:16
hands 206:18
handy 256:11
hang 105:5
happen 33:4, 47:24,
    57:6, 96:21,
    107:20, 108:2,
    109:8, 114:22,
    115:1, 118:17,
    137:2, 137:7,
    137:8, 140:13,
    205:11
happened 96:21,
    98:7, 115:1,
    115:2, 127:23,
    136:1, 141:17,
    145:5, 204:25,
    205:3, 242:12,
    265:12

happening 167:17
happens 32:19,
    140:4, 175:16
happy 35:9, 80:15,
    80:19, 81:10,
    81:11, 102:13,
    130:4, 233:15,
    244:6, 254:12,
    265:13, 266:20,
    267:13
hard 81:15, 103:24,
    124:5, 128:18,
    146:11, 172:25,
    239:8
hardship 215:7,
    216:5
harmonious 85:14
Hastings 92:22,
    101:11
hate 264:4
he'll 21:12
head 81:5, 104:13,
    108:24, 230:16,
    260:14, 269:3
heading 253:4, 253:9
headline 111:13
health 184:14
hear 17:16, 23:20,
    35:16, 42:1,
    42:15, 44:6, 44:9,
    46:7, 62:17,
    81:18, 83:17,
    95:11, 108:10,
    109:19, 141:6,
    144:10, 167:23,
    181:12, 199:14,
    200:6, 205:23,
    231:11, 234:4,
    241:25, 242:14,
    247:1, 261:1
hearings 78:6,
    156:2, 177:22,
    178:1, 192:19,
    192:20, 213:6
heated 121:14
hedge 124:8, 125:1,
    129:15, 164:14,
    189:18, 189:20,
    190:5
height 26:11

Hein 5:43, 16:25,
    17:3, 95:15,
    109:1, 109:25,
    110:8, 110:10,
    162:7, 162:9,
    162:10, 167:3,
    174:12, 212:24,
    213:1, 213:10,
    214:5, 214:6,
    214:11
held 56:23, 78:13,
    133:11, 135:13,
    154:21, 154:22,
    156:10, 180:25,
    213:6, 227:14,
    227:15
Hello 206:13, 234:24
help 17:9, 30:15,
    96:18, 137:12,
    155:18, 266:7
helped 167:19,
    167:20
helpful 38:8, 38:18,
    73:5, 76:23, 79:7,
    145:8, 230:12,
    237:3, 248:6,
    248:9, 251:17
helping 98:16
hesitate 84:3
high 25:14, 102:8,
    122:2, 250:11
higher 25:10, 41:6
highlight 164:16
highlighted 256:18
highlighting 67:19
highly 265:2
Highway 69:7
Highways 2:32
hikes 190:21
hit 91:22, 113:15,
    113:16, 122:19
Hobson 108:4
Hoc 6:29, 6:33, 7:3,
    98:2
hold 73:8, 78:21,
    113:13, 124:25,
    125:1, 159:15,
    212:7, 220:12
Holdback 43:24,
    47:7, 50:1, 55:20,

58:20, 58:23,
59:11, 59:14
holder 60:14, 60:16,
182:3
holders 66:15,
96:23, 96:24,
113:11, 117:11,
141:21, 141:22,
142:8, 142:9,
161:25, 183:11,
184:25, 186:6,
202:17, 205:14,
234:16
holding 10:25,
11:14, 97:10,
157:5, 235:21,
236:14
holdings 157:1,
165:6, 167:12
holdup 160:15,
160:19
holiday 178:3
home 27:16
homework 255:10
honoring 120:22
hope 19:24, 20:18,
64:8, 70:16,
70:21, 71:2, 83:7,
88:16, 121:22,
123:12, 133:4,
134:25, 157:2,
157:3, 157:25,
188:17, 267:18
hopeful 83:8, 122:10
Hopefully 15:7,
20:21, 38:5,
100:25, 122:8,
139:18, 178:8,
198:25
hopes 22:19, 83:5
hoping 80:13, 201:17
horizon 165:25
Hormigueros 25:25
host 86:10, 90:4,
203:23
hostage 156:10
hot 92:8
hotel 260:16
hotline 92:3
hour 181:12, 195:23,

199:9
hours 124:5, 133:17,
133:18
houses 25:15, 27:11,
27:12, 188:6
Housing 22:16, 25:6,
26:9, 27:4, 27:6,
27:8, 27:9
HUD 14:3
huge 116:16
human 23:22
hundred 145:3, 164:2
hundreds 28:22,
89:5, 89:14,
141:25, 146:7,
151:18, 167:9,
188:2
hurricane 30:21
hurricanes 24:16,
91:22
hurry 173:9
hypothetical 182:3
hypotheticals 47:23


< I >
idea 80:20, 206:17,
237:7, 263:24
identical 41:4,
84:21
identification
166:21
Identified 66:5,
66:8, 76:7, 136:9,
136:13, 147:15,
163:16, 175:5,
210:18, 225:19,
236:17
identifies 32:18,
237:2
Identify 37:24,
40:10, 40:12,
89:4, 155:13,
178:24, 236:17,
237:21, 238:15,
254:3
identifying 12:22,
233:1
ignore 243:7
ignoring 158:10

II 104:10
III.4 94:24
illustrate 242:9
imagine 81:2, 93:13,
128:24, 269:8
immediate 46:11,
59:25, 60:6, 72:6,
214:11, 214:14
immediately 31:22,
182:24
impact 23:22, 39:13,
39:16, 58:4, 58:5,
64:6, 91:1, 91:17,
120:5, 164:15
impacted 26:4, 40:3
impacting 111:3
impacts 120:23,
240:22
impair 121:13
impairments 154:4
impasse 123:7
impediment 86:7
impediments 76:17
imperfect 76:23
impinge 140:16
implement 224:9
implementation 13:5,
23:19
implemented 22:16
implementing 131:11
implicate 45:3,
84:10, 153:8,
153:10
implied 257:9,
257:18
importance 197:18
important 13:20,
17:20, 38:9,
49:13, 55:5, 55:9,
55:16, 57:1,
58:12, 64:1, 64:5,
101:25, 123:5,
133:20, 140:1,
152:21, 160:9,
172:5, 172:14,
172:19, 173:19,
190:8, 211:18,
237:3, 239:21,
252:12
Importantly 64:8,

66:13, 69:23,
   120:6, 124:12
importing 45:24
impose 115:22,
   138:17, 152:20,
   158:16
imposed 40:9, 209:2
imposes 60:10
imposing 145:22,
   188:23, 189:12
impossible 128:2,
   227:16
improper 50:19,
   148:2
improperly 165:1
improved 121:1,
   121:3
improvements 141:14
in. 38:6, 39:24,
   190:5, 203:22,
   216:14, 241:8,
   262:23
inappropriate 156:14
Inc. 7:16, 7:24,
   157:13, 215:11
incident 31:25
inclined 123:11,
   155:22, 156:8,
   230:17
include 25:24, 45:7,
   45:13, 111:22,
   153:21, 206:21,
   210:10, 210:14,
   218:10, 221:21,
   224:12
included 12:7,
   18:25, 25:21,
   25:23, 25:24,
   35:7, 44:25,
   88:11, 114:17,
   114:18, 124:21,
   165:2, 167:16,
   201:21, 206:3,
   265:3
includes 34:15,
   39:15, 164:1,
   166:18, 210:4,
   228:10
incomplete 239:25
inconsistencies

106:3
inconsistent 134:2,
   154:19, 185:18,
   194:1
incorporate 60:18
incorporated 17:11
incorporates 17:10,
   34:17
incorporating 40:1,
   224:4
incorrect 52:12,
   76:18
Increase 40:20,
   41:8, 43:24,
   46:19, 47:7, 50:1,
   58:20, 58:23,
   66:16, 199:8
increases 38:25,
   39:3, 39:7, 39:11,
   39:12, 39:13,
   39:15, 39:17,
   39:25, 40:3, 40:8,
   40:11
increasing 59:11
increasingly 237:20,
   238:9
incredibly 155:19
incremental 68:23
indefinitely 73:9
indenture 185:4
independent 30:3,
   175:24, 232:8
indicate 88:21,
   153:17, 245:3
indicated 19:7,
   24:20, 66:15,
   83:21, 224:3,
   253:5
indicates 228:17
indication 201:23
indications 233:22
indicia 52:25
indicted 50:18
indictment 50:21,
   50:23, 51:3,
   51:14, 51:25
indisputably 96:8,
   99:10
individual 24:12,
   31:25, 32:21,

33:3, 34:20, 37:1,
   40:24, 128:8,
   157:21, 163:21,
   163:23, 164:2,
   164:6, 165:24,
   166:10, 182:10,
   189:8, 213:8,
   213:10, 236:4,
   250:4, 251:5
Individuals 26:8,
   40:13, 164:15,
   177:8, 230:20
inefficient 35:20
inevitability 156:3
inflated 111:15
inflation 40:20
inflection 140:2
inform 92:6
informative 248:10
informed 66:22,
   178:21
informs 10:15
Infrastructure
   22:22, 23:3, 30:9,
   157:23, 235:10,
   235:22, 237:22,
   244:20, 244:21
inherent 209:24,
   220:19, 224:8
initial 17:25,
   18:22, 19:12,
   25:17, 65:14,
   96:13, 100:5,
   132:3, 132:8
initially 79:13
initiate 120:3,
   209:21
initiated 193:16
initiating 203:2
injects 133:23
input 14:2
inquire 91:20
inquiries 38:1
inquiry 41:16,
   264:18
insight 35:23
insightful 79:7
insofar 62:19
insolvency 45:20,
   45:22, 51:23,

52:8, 53:3, 53:23,
  55:3, 55:10, 60:19
insolvent 52:14,
  53:1, 53:19, 54:6
inspected 27:13,
  27:22
inspecting 27:19
inspections 27:23
instance 32:18,
  79:2, 136:19,
  179:4, 184:6,
  197:16, 241:14,
  244:17, 267:4
instances 40:22,
  41:4, 207:14
Instead 36:8, 73:19,
  77:20, 77:21,
  145:5, 158:25,
  193:17, 230:5
institution 234:15
Institutional
  157:13, 165:6
instruction 268:21
instructions 231:23,
  248:24
instrument 117:1,
  170:7
instrumentalities
  10:18, 10:22
instrumentality
  69:8, 185:24,
  232:22, 232:23
insufficient 91:6,
  169:24, 170:3
insulting 115:6
Insurance 5:40,
  30:11
insure 124:25
insured 130:25
insureds 130:22
insurers 69:3,
  124:14, 189:7,
  219:13, 219:16,
  220:18, 220:25,
  221:6, 222:18
Integral 6:3, 99:14,
  99:18, 173:5
intelligent 117:20,
  197:25
intend 210:20, 219:7

intended 228:16
intending 149:3
intends 171:25
intensely 153:25,
  155:9
intent 148:15,
  168:19, 218:4
intention 62:16,
  83:10
intentions 202:2
interested 38:6
interesting 261:10
interestingly
  132:25, 133:15,
  203:4
interests 63:24,
  64:4, 69:2, 72:20,
  83:15, 83:16,
  120:20, 167:22,
  214:2, 258:19
interfere 61:7
interference 53:7
Intergovernmental
  27:1
Interim 20:12,
  33:21, 33:22,
  34:2, 34:12, 35:4,
  35:6, 39:8, 40:5,
  44:19, 46:5, 53:8,
  59:2, 59:3, 59:12,
  59:14, 61:10,
  61:14, 61:17,
  61:22, 62:7,
  62:10, 132:8,
  133:19, 203:1,
  203:5, 203:6,
  204:17, 212:11,
  214:25
intermediate 240:1
internally 10:18
Internet 29:14,
  214:18
interpose 218:12
INTERPRETER 7:28,
  179:7, 179:9,
  179:10, 179:11
interpreter. 179:13
interpreting 241:2
interrupt 149:23
intersect 219:3

intervene 167:25,
  171:10, 171:18,
  223:16
intervention 223:13
introduces 166:20
invalidation 51:10
invalidity 133:13,
  226:1
invariably 86:4
Invesco 124:18,
  157:9, 157:13,
  157:14, 157:18,
  157:20, 158:1
invest 157:20
invested 158:2
investigate 249:2
investigating 254:20
investigation 24:11,
  32:4, 32:7, 32:8,
  51:14, 153:13,
  238:16
investment 23:2,
  190:12
investor 18:19,
  18:21, 164:2
investors 157:21,
  164:6, 164:17,
  164:21, 164:23,
  164:25, 165:2,
  165:7, 165:24,
  213:8, 213:10
invited 18:1
invoices 51:16,
  51:17, 51:21, 59:9
invoke 209:5
involve 28:16, 154:1
involved 50:20,
  68:25, 81:3, 91:1,
  96:6, 115:25,
  117:13, 154:21,
  208:6, 250:4
involvement 66:18,
  100:13
involves 63:20
involving 31:25,
  50:19, 60:4
irony 182:5
irrelevant 58:9,
  259:7, 260:18
irrespective 123:10

island 13:24, 88:8,
   131:3, 157:23,
   157:25
issuance 12:12
issue-by-issue 69:17
issued 9:12, 22:13,
   132:8, 158:5,
   162:19, 163:3,
   163:12, 186:24,
   203:11
issues. 65:11
issuing 162:23,
   238:8
Item 62:14, 94:24,
   151:21, 161:12,
   163:18, 166:18,
   166:21, 166:24,
   177:12, 230:9,
   231:7
items 23:18, 86:20,
   257:5, 257:8
itself 37:10, 87:4,
   87:21, 91:16,
   98:12, 235:25,
   244:23, 270:4


< J >
J. 5:4, 5:7, 5:35,
   5:37, 6:31, 13:24,
   22:6
jam 121:12, 137:16,
   202:5
James 6:36, 7:19,
   98:1
January 10:13,
   12:21, 16:11,
   25:14, 39:6, 39:9,
   43:19, 133:16,
   134:1, 134:3,
   177:22, 178:4,
   241:19
Jason 5:41
Jefferies 175:1
Jeffries 7:22
jeopardizing 214:3
Jessica 7:14
Jimenez 7:13
job 129:25
jobs 190:8

John 5:29, 6:4,
   173:5
join 18:3, 18:14,
   147:25, 156:12,
   156:25, 157:3,
   157:4, 159:9,
   160:21
joinder 18:8
joined 139:14,
   157:14
Joint 51:19, 59:19,
   85:4, 85:8, 175:4
Jointly 1:11, 1:28,
   2:9, 2:28, 3:9,
   3:26
Jose 90:17
journey 61:1
Juan 9:1, 9:7,
   90:13, 90:14,
   90:19, 90:20,
   91:16
Juana 25:25
judgments 141:2,
   146:5, 147:10,
   205:10, 205:21
Judicial 9:11,
   101:24, 102:15,
   175:18, 214:13,
   214:17, 215:7
judicially 216:11
Judith 4:42, 272:8
July 100:6, 100:12,
   166:17
jump 17:17, 139:20
jumping 236:25
juncture 214:22,
   222:9, 241:9
June 33:23, 149:10,
   151:11, 163:3,
   224:21, 227:14
junior 97:11, 97:13,
   107:5, 107:11,
   124:23, 124:24,
   125:4, 142:5,
   143:11, 144:24,
   145:4, 158:22,
   158:23, 185:4
justice 121:4
justifications 41:13
justified 150:15

justify 40:15,
   40:20, 124:10,
   127:25, 142:20


< K >
Kaplan 7:16
Katherine 6:39
Katz 5:46
keep 79:21, 93:13,
   93:21, 114:13,
   247:11
keeping 99:15
keeps 128:19, 202:13
kept 232:20
key 10:25, 23:12,
   72:10, 83:8,
   136:9, 170:8,
   194:3, 197:15,
   201:20, 217:15,
   220:14, 232:17,
   264:12
keyed 78:11
kind 89:7, 89:12,
   113:20, 113:22,
   114:7, 121:14,
   133:15, 135:19,
   139:20, 174:2,
   176:3, 200:16,
   227:16, 233:23,
   245:18, 247:23,
   249:3, 254:4,
   265:4, 265:18
kinds 190:22,
   237:16, 250:6,
   253:24
Kirpalani 6:26,
   95:6, 95:7, 95:8,
   95:17, 95:20,
   95:22, 95:25,
   96:4, 96:5, 97:24,
   99:10, 112:24,
   124:23, 125:1,
   143:11, 144:24,
   158:22, 168:8
Kissner 6:37
knocked 127:5
knowing 76:21,
   77:17, 105:24,
   240:14

knowledge 33:1,
   188:21, 196:14,
   204:16
known 113:21, 270:9
knows 17:7, 34:13,
   51:13, 63:6,
   68:20, 138:17,
   152:25, 182:6,
   185:5, 186:22,
   195:11, 196:12
Kurt 6:16, 100:3


< L >
L. 6:17, 7:16
la 6:4, 173:5
lack 218:14, 218:17,
   261:12
lacks 56:10, 122:3,
   172:16, 260:21
lag 22:14
laid 80:12, 88:24
Landon 6:47
landscape 264:25
lane 36:20
lanes 37:14
language 143:19,
   149:1, 158:10,
   182:18, 209:1,
   217:22
large 34:17, 39:1,
   199:12, 201:15,
   201:20
largely 72:6, 133:3,
   165:9, 165:20,
   202:24
larger 167:10
largesse 114:10
largest 167:8
Lary 5:11
Las 25:25
Lastly 56:21
late 69:22, 96:24,
   121:25, 163:4,
   177:20, 231:3
later 15:16, 20:19,
   48:8, 48:11,
   71:23, 78:5, 78:7,
   79:16, 86:20,
   86:21, 114:8,

116:13, 139:2,
   139:3, 191:18,
   209:10, 211:23,
   224:4, 241:7,
   267:25
latest 231:6
laundry 26:20
Laura 4:40, 5:9,
   272:7
Law 32:23, 51:11,
   68:15, 102:18,
   103:3, 103:4,
   103:7, 105:5,
   128:18, 128:19,
   143:18, 144:22,
   153:12, 153:15,
   170:16, 170:18,
   176:5, 181:1,
   185:16, 185:18,
   195:3, 195:4,
   195:5, 195:7,
   196:18, 196:23,
   202:19, 218:22,
   221:23
Lawful 6:24, 95:9,
   99:10, 103:18,
   113:13, 117:10,
   144:19, 144:21,
   162:15
laws 104:15, 108:21,
   133:13, 133:14
laws. 108:19
LAWTON 6:17, 229:23
lawyer 123:2,
   261:16, 263:1
lawyers 195:10,
   195:11, 203:21,
   254:25
layer 155:25
layering 78:24,
   146:23
LCDC 95:15, 96:5,
   113:12
lead 51:10, 155:16,
   155:19
leader 17:10, 20:21,
   66:5, 86:19,
   88:25, 198:19
leader. 66:7
leading 75:6,

106:14, 181:21
leaf 79:18
lease 104:19, 105:4,
   105:6, 115:9,
   202:11
leases 105:1, 105:3,
   105:17
least 30:15, 34:11,
   54:16, 70:1,
   70:16, 71:21,
   74:20, 81:1,
   84:14, 84:22,
   109:12, 111:25,
   114:9, 115:1,
   176:16, 194:9,
   200:8, 203:24,
   204:16, 207:14,
   231:11, 236:19,
   266:10, 266:13
leave 18:23, 121:13,
   168:13, 181:7,
   229:20, 229:21
leaves 16:18, 71:25
Lecaroz 5:17
led 65:22, 66:25,
   69:20, 124:22,
   205:20
leeway 37:25, 94:3
left 16:18, 16:22,
   118:23, 142:12,
   164:17, 206:15
legally 196:3
legislation 121:5,
   122:25, 143:20,
   167:20, 188:7,
   206:24
Legislative 122:24,
   188:6, 218:14,
   218:18, 218:21,
   219:1
legislature 144:4,
   174:8, 188:11,
   193:25
legitimate 165:11,
   194:22, 194:24,
   243:8
Lehman 17:1
length 19:8, 39:19,
   67:16
lengthy 228:20

lens 150:18
less 25:12, 44:21,
  66:11, 117:9,
  117:11, 156:1,
  156:2, 239:10,
  253:22
letter 12:22, 13:1,
  14:7, 39:14,
  237:19, 254:17,
  254:18, 254:20,
  255:4
letters 236:19,
  243:5, 243:6,
  248:23
level 52:11, 115:20,
  121:19, 123:10,
  142:16, 154:9,
  198:14, 213:24,
  242:6, 245:14
levels 192:11
leverage 107:21,
  107:24, 110:14
Lewis 100:3
liabilities 16:2,
  16:16
liability 52:22
liaison 13:22, 22:7,
  30:25
licensed 27:22
lien 12:11, 141:5,
  159:14, 235:15,
  238:23, 239:3
liens 161:16, 162:15
life 96:18
life-threatening
  77:15
light 46:20, 49:20,
  78:2, 86:3,
  118:24, 132:18,
  138:3, 156:15,
  178:4, 200:2,
  219:17, 222:21,
  231:19, 245:24,
  249:10, 266:14
lights 267:23,
  269:15, 270:9
likelihood 232:10
likely 64:5, 78:2,
  79:6, 173:18,
  216:11, 220:11,

245:23, 250:11
likewise 60:25
limit 24:16, 61:6,
  123:24, 125:7,
  128:7, 131:9,
  186:23, 186:24,
  206:17, 216:22,
  217:4, 241:18,
  255:9
limitations 140:8,
  159:21, 232:19,
  239:22
Limited 9:21, 10:1,
  75:1, 140:6,
  149:20, 154:16,
  161:3, 161:10,
  163:19, 172:7,
  199:10, 208:25,
  210:17, 214:21,
  222:8, 227:1,
  231:2, 233:10,
  238:14, 238:18,
  251:3, 260:1,
  262:21
limiting 241:18
limits 175:11
line 73:17, 122:19,
  151:21, 188:3,
  200:17, 206:6,
  230:24, 257:5,
  257:8, 258:23
lined 116:8
lines 92:8, 177:14
liquidation 46:1,
  60:20
liquidity 164:6
list 58:4, 95:14,
  95:16, 154:12,
  185:20, 186:4,
  195:1, 220:3,
  222:21, 266:22,
  267:7
listed 42:6, 45:5,
  45:13, 62:8, 62:9,
  62:10, 62:12,
  234:17, 248:16,
  250:19, 254:17,
  257:3, 257:13
listening 38:19,
  96:22, 228:19

lists 44:24, 236:16
literally 176:12
litigate 43:13,
  58:1, 96:20,
  126:24, 128:5
litigated 101:18,
  105:25, 127:6,
  148:11, 149:5,
  150:11, 160:18,
  160:20, 182:24,
  187:8, 213:23
litigating 216:3
litigations 19:17
littered 47:23
little 35:14, 35:23,
  38:15, 40:9, 43:5,
  43:6, 45:16,
  45:23, 54:1, 94:3,
  132:6, 155:17,
  167:18, 172:7,
  177:2, 200:21,
  227:18, 253:22,
  261:10
live 113:4, 239:17
living 46:9, 46:17,
  122:16
LLC 6:11, 7:10,
  7:19, 7:22, 7:23,
  42:18, 59:1,
  59:21, 167:6
LLP 10:9, 180:20
loaded 9:17
loan 23:18
local 34:18, 89:13,
  93:6, 173:8,
  174:24
locate 232:5, 238:6
located 28:4,
  214:16, 232:24,
  235:9, 237:11
locating 239:15
location 26:8, 89:18
locations 88:8,
  89:14, 90:7,
  90:22, 91:16
lockbox 92:23,
  244:18, 245:20,
  264:22, 265:9
lodged 191:12
logic 140:24

logical 150:21
logistic 92:5
logistical 91:11,
   91:12, 200:17
logistics 62:16,
   210:12
long 81:10, 92:24,
   165:24, 248:13,
   252:17, 267:8
long-term 55:8,
   130:23, 157:24
longer 47:24, 94:2,
   123:7, 130:25,
   131:12, 187:25
longstanding 158:9
looking 32:24,
   77:12, 80:17,
   119:6, 150:15,
   192:23, 233:14,
   241:19, 243:2,
   249:17, 251:4,
   254:10, 256:12,
   266:14, 266:18,
   269:15
Looks 57:19, 168:20,
   176:23
looms 134:5
lose 109:5, 112:15,
   115:4, 118:19,
   184:23, 270:9
losing 112:12,
   184:17, 184:23
loss 164:6
losses 103:5, 103:7,
   158:16, 165:11
lost 30:16, 91:23,
   119:1, 119:3,
   190:15
lot 19:5, 51:18,
   57:22, 58:7,
   91:23, 93:3, 93:4,
   96:15, 99:7,
   101:12, 110:14,
   120:11, 135:21,
   148:15, 168:17,
   168:20, 181:22,
   187:24, 188:2,
   202:22, 205:10,
   205:13, 205:14,
   237:12, 238:17,

240:3, 241:19,
   245:24, 253:10,
   265:7
lots 37:21, 109:19,
   150:11, 184:9,
   189:4, 195:10
low 113:15, 155:13
lowball 165:23
lowest 240:1
loyal 130:7
Luc 5:21, 92:21,
   101:11
luck 205:4, 237:14
Luis 5:28, 24:5
lunch 10:4, 62:22,
   80:6, 81:9, 81:16,
   81:17, 92:18,
   94:25, 95:10,
   199:9


< M >
M. 6:11, 6:36
Ma 5:14
madam 179:11
magic 129:14
magicians. 69:15
magnitude 16:16,
   38:25, 249:24
mail 187:22
mailing 187:22
main 29:9, 152:24,
   235:7
MAINLAND 6:22,
   234:24, 236:21,
   237:1, 238:17,
   239:6, 239:23,
   244:6, 244:8,
   245:12, 252:11,
   260:10, 262:3,
   262:10, 263:7,
   263:11, 263:22,
   263:25, 265:20
maintain 232:13,
   232:14
maintained 210:19
major 23:18, 25:21,
   26:5, 52:18,
   79:23, 129:4
majority 28:3, 28:19

man 201:1
manage 64:11,
   209:24, 220:19,
   224:8
managed 157:12
Management 1:10,
   1:27, 2:8, 2:27,
   3:8, 3:25, 4:5,
   10:10, 27:5, 98:17
mandate 14:4
Manges 152:10
manner 61:5, 74:8,
   127:4, 218:8,
   220:16, 220:23
March 15:8, 30:19,
   200:25, 270:22
Maria 24:9
Marias 25:25
Marini 5:28, 21:10,
   23:25, 24:4, 24:5,
   24:6, 24:23, 25:2,
   28:13, 29:15,
   29:17, 29:19,
   29:24, 31:17,
   31:24, 33:1, 33:7,
   33:9, 33:13, 36:17
Mark 5:36, 7:6,
   99:2, 123:19
Markets 7:24, 175:2
Martin 5:7, 5:40,
   10:9, 159:8,
   180:19
mass 54:9
massively 85:14
material 24:17,
   30:21, 137:4,
   155:13, 210:23,
   221:10, 230:14
materials 91:23,
   249:17
math 207:3, 207:4
matter 32:22, 37:1,
   42:4, 42:7, 47:6,
   52:7, 58:5, 121:3,
   127:17, 148:18,
   152:18, 176:8,
   177:7, 184:8,
   185:11, 185:12,
   189:22, 195:4,
   195:6, 195:25,

196:23, 202:19,
 202:22
maturity 21:24
maxim 141:17
maximize 219:9,
 236:6
maximum 148:18
Mayaguez 26:1
Mayr 6:16, 100:3,
 101:2
Mcclintock 14:7
meals 26:21
Meaning 118:18
meaningful 58:9,
 64:6, 142:13,
 147:11
means 26:6, 112:11,
 141:23, 147:18,
 164:1, 190:14,
 196:4, 196:11,
 202:19, 211:2,
 215:23, 216:7,
 244:1, 244:4,
 244:5, 261:2,
 261:17, 265:11
meant 195:16, 196:12
meantime 50:17,
 179:20
measured 169:3
measures 218:18
measuring 60:22
mechanism 60:22,
 61:21, 89:20,
 148:22, 148:23
mechanisms 22:17
mediator 169:11
Mediators 69:15,
 95:11, 97:7,
 97:20, 111:22,
 113:19, 161:5,
 168:23, 169:1,
 170:19, 198:24,
 205:21
medical 26:21
meet 12:24, 13:9,
 129:17, 155:14,
 156:14, 161:8,
 169:22, 199:2,
 201:22, 210:8,
 210:14, 221:9,

222:17, 254:12,
 255:2, 256:6,
 262:21, 264:2,
 265:15, 266:12,
 267:12, 267:14,
 268:7, 268:21,
 269:21, 270:5,
 270:13
meet-and-confer
 11:19
meeting 31:2,
 200:14, 269:20
meetings 10:25,
 124:6
megawatts 30:14,
 30:16
member 69:14
members 9:6, 81:3,
 93:5
memoranda 244:11,
 244:13, 250:25,
 253:8
memos 259:2
Mendez 7:14
mention 25:3, 30:5,
 161:12, 266:20
mentioned 16:20,
 47:16, 99:5,
 105:12, 132:3,
 146:2, 147:9,
 149:7, 164:15,
 166:20, 190:6,
 194:16, 195:1,
 195:4, 218:3,
 238:1, 265:5
mentioning 22:24
menu 79:20
merely 87:13,
 203:10, 258:20
merit 99:5, 172:16
merit-based 140:21
meritless 158:9
meritorious 194:18
merits 67:2, 67:11,
 71:5, 72:14,
 116:2, 131:13,
 152:17, 155:16,
 198:22, 199:23,
 219:24, 225:21
MERVIS 5:13, 242:1,

242:21, 243:12,
 243:16, 255:21,
 255:24, 256:17,
 256:22, 257:12,
 258:4, 258:7,
 258:11, 259:18,
 260:2, 268:19,
 268:25, 269:4,
 269:10, 269:14,
 269:19, 270:25
met 13:22, 22:5
Metals 170:24
metaphor 143:7
methodology 39:4
methods 28:16, 29:10
Miami 170:23
mic 80:11
Michael 5:10, 5:13,
 80:8, 82:21,
 197:6, 242:1,
 255:24
microphone 41:25,
 80:12, 93:17
middle 140:19
midst 10:14, 242:24
Millbank 139:13,
 145:15, 234:25
Miller 6:21, 139:14,
 143:10, 145:11,
 145:13, 145:14,
 145:15, 148:25,
 149:4, 149:24,
 151:2, 151:7,
 151:10, 151:13,
 152:2, 155:23,
 160:24
million 11:3, 11:5,
 12:16, 16:5, 18:3,
 18:18, 19:1, 19:2,
 25:18, 27:15,
 31:5, 32:3, 43:10,
 50:16, 51:17,
 52:21, 52:23,
 54:22, 54:23,
 58:9, 124:19,
 131:2, 141:22,
 141:24, 245:20,
 260:14, 264:23,
 265:8
millions 108:2,

141:25, 151:19,
167:9
mind 15:13, 37:2,
63:18, 70:13,
86:25, 197:17,
230:20, 245:5,
249:14, 270:2
minimize 68:6,
190:16
minimizing 120:25
minimum 229:12,
261:19
Mintz 5:47, 167:5,
172:1, 173:2
minus 81:25
minute 15:13,
110:23, 206:15,
229:20
minutes 80:5, 81:18,
81:25, 82:3, 82:4,
82:5, 82:10,
82:12, 95:23,
96:1, 101:5,
101:6, 119:19,
123:17, 137:4,
139:15, 139:16,
141:15, 152:6,
162:8, 180:21,
197:3
missing 266:7,
266:10, 266:22
mistake 142:7
mitigating 120:23
mitigation 25:17
mobile 28:25
mode 148:18
modification 13:8,
13:13
modifications
208:25, 211:14
modified 77:8, 83:1,
175:17, 210:2,
222:21
modify 209:8,
209:18, 225:15
moment 35:15,
119:15, 177:14,
191:21, 193:13
moments 204:23
Monday 115:14,

269:24
monies 183:3, 183:5,
193:25, 241:8,
246:1, 247:6
Monitor 5:47, 167:6
monoline 130:22,
146:15, 160:22,
219:13, 219:15,
220:18, 220:25,
221:6, 222:18
monolines 147:12,
155:7, 157:15,
159:22, 171:7,
182:15, 182:19,
192:12, 192:21,
193:4, 193:12,
195:11, 196:9,
198:6, 198:11,
199:14, 201:3,
223:21, 224:1,
224:6, 224:24,
233:9, 256:3,
256:11
Monsita 5:17
Monta 173:5
Montana 6:4
month 11:5, 31:3,
151:7, 160:14
months 17:8, 22:3,
65:17, 67:14,
99:23, 114:14,
115:2, 147:6,
154:14, 159:19,
163:14, 187:25,
205:15
moot 63:8
mooted 222:20
moratorium 133:13,
133:14
Morgan 7:21, 100:3,
174:24
Morovis 26:1
Morrison 98:2
mostly 98:5, 264:5
movant 230:7, 231:6,
255:4
movants 262:5
move 20:15, 20:22,
29:22, 29:23,
31:11, 33:17,

64:9, 67:10,
72:17, 72:22,
75:7, 76:24, 97:6,
99:25, 100:23,
101:23, 123:5,
132:21, 135:6,
138:1, 147:23,
161:6, 176:7,
196:22, 219:11,
244:19
moved 160:7, 227:17
moves 73:25, 239:1
moving 63:13, 64:6,
74:7, 77:10,
135:6, 136:19,
153:17, 210:4,
219:16, 219:23
Mudd 6:4, 173:3,
173:4, 173:5
multifaceted 69:24
multiple 32:14,
127:20, 129:20,
152:17, 169:20,
192:11, 235:24,
238:22, 245:24
multiples 50:13,
94:17
Municipal 5:35,
124:17, 157:21
municipalities
23:23, 25:20,
25:24, 26:2, 26:7,
28:22
Muniz 24:6
mutual 157:20, 158:1
Myers 41:1, 50:7,
231:13
myriad 67:14
myself 145:16,
149:11, 186:3


< N >
name 113:12, 165:15,
174:23
named 30:24
Napoleon 173:8
narrow 175:21,
176:2, 176:6,
220:4, 238:20

narrower 251:16
narrowly 143:17
National 6:6, 25:5,
    26:16, 124:15,
    152:5, 152:6,
    152:10, 152:14,
    156:18, 156:21,
    156:23, 156:25,
    195:9, 214:18
natural 13:23, 22:8,
    52:18
nature 16:15, 57:22,
    118:25, 122:7,
    176:2, 244:13,
    245:4, 245:22
Navarro 175:1
Nayuan 7:10
near 83:5, 136:11,
    219:10, 225:17
nearly 124:6, 190:12
necessarily 109:24,
    140:12, 151:3,
    155:2, 173:14,
    198:15, 213:21,
    216:25, 217:5,
    231:18
necessitate 153:13
necessitated 52:17
necessity 34:16,
    61:13, 61:16
needed 50:25,
    117:15, 160:7,
    172:25, 198:15
needs 11:10, 17:16,
    36:21, 52:14,
    78:2, 131:15,
    144:19, 169:13,
    169:21, 170:5,
    170:10, 170:13,
    189:9, 270:20
negotiate 48:24,
    96:8, 130:14,
    131:16, 167:17,
    190:18
negotiated 48:18,
    66:18, 113:11,
    146:11, 214:2,
    216:24, 217:7
negotiating 51:4,
    96:22, 133:18,

191:1
negotiation 113:14,
    142:10
negotiations 18:24,
    40:10, 64:18,
    65:15, 68:3,
    96:12, 124:22,
    141:17, 156:25,
    167:13, 167:15,
    213:12, 214:4
Neither 36:13,
    61:21, 208:12,
    236:14
net 141:24
neutral 67:20, 74:4
neutrals 63:18,
    74:4, 98:22
news 80:24, 80:25
Newton 7:19
Next 28:25, 29:11,
    34:10, 42:7,
    62:14, 71:3,
    71:11, 80:6,
    97:25, 104:19,
    119:18, 140:4,
    151:7, 160:2,
    188:12, 193:25,
    210:6, 252:18,
    255:14
nice 111:13, 113:1,
    119:8, 193:9
night 115:14, 168:3,
    212:9, 223:17
Nilda 175:1
nine 165:7, 257:6
nitty-gritty 181:9
No. 1:6, 1:23, 2:4,
    2:23, 3:4, 3:21,
    4:4, 4:26, 53:12,
    90:12, 92:13,
    93:19, 103:21,
    108:1, 191:7,
    204:2, 206:9,
    233:14, 259:4
nobody 149:7
Nodding 269:3
nomination 31:3
nonaccepting 186:13
nonbankruptcy 103:3
nondisputed 55:16

None 8:5, 8:11,
    192:24, 193:11,
    195:1
Nonetheless 61:10,
    84:25, 201:10
nonrecourse 118:25
nonsense 198:18
nonsettling 170:25
nonvisible 30:9
noon 10:3, 62:21
Nor 9:14, 60:21,
    61:22, 67:1, 73:8,
    125:4, 156:25,
    210:21, 225:19,
    245:9, 257:1
normal 13:19, 40:20
notable 48:19
Notably 19:11, 23:17
notation 247:5
notations 245:2,
    246:19, 246:24,
    247:3, 247:20
note 33:25, 57:2,
    85:15, 123:12,
    157:2, 166:16,
    250:9
noted 40:4, 52:9,
    53:2, 53:10,
    54:22, 122:6,
    171:11, 218:10,
    244:23
Noteholder 6:15,
    100:4
notes 9:16, 9:17,
    35:19
Nothing 34:22, 46:3,
    49:9, 126:3,
    126:22, 162:4,
    164:9, 176:5,
    183:5, 184:18,
    186:24, 213:10,
    221:4, 258:15,
    258:24
Notice 15:5, 39:25,
    88:16, 91:11,
    142:23, 171:22,
    180:21, 187:20,
    263:20
noticed 266:3
notices 38:24,

39:22, 88:4, 94:5,
264:1, 269:5,
269:6, 269:23,
270:1, 270:4
notified 12:18
notify 89:7
noting 22:13
notion 83:3, 84:25,
156:10, 170:3,
170:24, 182:7,
202:13, 239:8,
260:14
November 52:24,
124:5, 129:24,
188:5
Number 18:16, 24:8,
26:14, 34:3,
38:24, 58:21,
81:3, 89:21, 97:4,
103:11, 158:13,
168:16, 171:13,
171:16, 175:5,
199:17, 212:5,
226:8, 231:5,
240:1, 249:23,
251:13, 253:20,
253:21, 266:3
numbers 25:11,
248:14, 248:15

< O >
o'clock 207:23
O'melveny 41:1,
50:7, 231:13
OB 143:16
object 118:5,
162:12, 166:6,
173:20, 188:25,
189:13, 196:24,
214:7, 216:17
objected 32:6, 56:1,
214:24, 217:22,
219:16, 223:10,
223:21
objecting 54:9,
56:19, 140:7,
159:13, 168:23,
173:6, 189:2,
193:17, 216:15

objective 202:6
objectors 128:14,
193:21
objects 156:21
obligate 57:2
obligated 31:5,
31:15, 57:8
Obligation 7:5,
60:10, 103:4,
124:16, 127:11,
127:12, 127:19,
151:16, 226:8
obligations 84:23
observation 23:13,
67:18
observations 66:1,
70:14, 82:24,
83:24
observed 9:22
observing 9:7,
109:16
obstacles 124:14,
125:17
obtain 132:16,
187:17, 202:7
obtained 25:4,
218:23, 219:2
obvious 67:19
Obviously 19:5,
19:14, 38:8,
51:24, 70:5,
70:18, 71:15,
100:9, 143:13,
154:5, 172:8,
172:24, 183:11,
189:21, 238:18,
263:11, 263:15,
268:11
occasions 32:14,
213:3
occur 76:5, 88:3,
140:11, 165:6,
245:19
occurred 30:22,
74:10, 156:22
occurring 244:14
occurs 83:6, 213:22
October 12:18, 39:8,
228:3
odds 112:12, 246:3,

250:10
offer 46:5, 88:10,
149:25, 169:19,
172:11
offered 8:5, 8:11,
167:15, 169:19,
208:5
offering 93:1,
183:18
Office 15:4, 22:15,
48:25, 49:1, 90:4,
90:9, 91:2,
177:19, 214:17
offices 195:8
Official 5:19, 6:42,
32:3, 50:22,
101:12, 250:25,
253:8, 272:15
officials 22:3,
50:19, 256:24,
257:1
OFI 157:13
oft-promised 140:9
often 16:14, 37:12,
77:2, 168:24,
195:9, 244:11
oftentimes 236:11
OID 141:23
OIG 51:13
Old 90:13, 90:19,
90:20, 163:9,
185:23, 207:16
older 207:10
Olga 7:28, 179:9
Olympic 102:7
OMB 21:19
Omni 228:11, 228:13,
229:12
Omnibus 4:39, 12:21,
16:6, 20:7, 51:9,
51:20, 58:18,
58:22, 62:6,
88:14, 133:17,
177:22, 178:8,
227:14
Omnis 33:8
once 21:6, 29:1,
35:5, 127:11,
129:20
one-page 88:9

one-time 178:1
one. 36:8, 86:11,
    128:22, 230:8,
    251:18, 262:9
ones 142:10, 201:20,
    222:6, 247:20,
    249:5, 251:17,
    266:22
ongoing 12:10,
    23:11, 25:19,
    43:23, 47:15,
    48:13, 49:23,
    70:15, 121:16,
    212:1, 254:23
online 29:6, 29:8,
    88:10, 89:21,
    91:20
Open 82:6, 92:24,
    121:17, 203:20,
    205:23, 215:11
opening 27:20,
    62:23, 146:19,
    200:4, 211:10,
    231:9, 231:14,
    231:17, 232:5,
    233:19, 234:19,
    235:2, 235:5,
    238:4, 239:12,
    239:13, 240:6,
    242:4, 243:24,
    250:4, 251:20,
    252:3, 259:17
opens 151:1
operate 203:2
operating 46:13,
    60:2, 233:3
operational 91:13,
    94:14, 94:18
operations 52:20,
    55:7
opine 67:7
opinion 11:14, 73:5,
    237:10
opinions 141:2
opponents 80:21
opportunities
    164:14, 220:20,
    221:10
oppose 115:13,
    175:11, 204:7

opposed 58:10, 79:9,
    125:18, 125:19,
    125:20, 127:5,
    148:19, 148:22,
    160:4, 186:13,
    251:4, 270:4
opposing 205:18,
    235:17, 265:1
opposite 72:2,
    99:11, 153:6
Opposition 23:15,
    124:19, 130:8,
    138:4, 146:19,
    175:9, 201:11,
    211:5, 211:10,
    221:8, 226:21,
    231:11, 254:21
option 97:14, 139:4
oral 12:3, 208:2,
    208:12
Ordered 66:8, 155:1
ordering 253:3
Orders 9:11, 15:25,
    38:25, 42:9, 65:2,
    133:20, 156:19,
    203:5, 203:6,
    203:11, 204:18,
    208:24, 209:3,
    212:21, 224:9
ordinary 52:20,
    54:20, 55:9,
    55:17, 245:19,
    265:12
organization 62:15
organized 101:13
original 19:25,
    64:16, 64:23,
    77:9, 111:16,
    146:10, 149:10,
    203:9, 205:16,
    251:17, 262:5
originally 83:18,
    124:9, 177:21,
    178:1, 246:13,
    251:8
Orocovis 26:1
Orrick 167:5
others 27:5, 28:24,
    45:11, 49:10,
    69:11, 101:18,

142:13, 145:17,
    156:12, 161:1,
    167:14, 184:11,
    189:9, 266:5
otherwise 9:22,
    9:23, 60:17,
    60:18, 63:8,
    78:17, 138:13,
    162:11, 186:2,
    194:5, 208:7,
    211:1, 223:2,
    231:22, 234:19,
    245:17, 255:8
ought 197:15, 202:14
ourselves 36:19,
    38:2, 40:1, 129:12
out-of-context 53:24
outcome 51:9, 192:20
outcomes 200:5
outset 122:23,
    122:25, 171:5,
    183:1, 199:13
outside 40:14, 55:2
outstanding 12:15,
    13:6, 17:4, 18:12,
    51:9, 51:16,
    51:21, 59:9,
    199:18, 210:10
overall 15:12,
    18:11, 38:3,
    44:25, 45:8,
    46:23, 55:22,
    62:16, 224:10
overarching 168:6
overbroad 254:14
overcome 179:15
overhearing 235:10
overlap 36:16,
    36:24, 84:16,
    85:17, 136:14,
    136:21, 149:18
overlapping 84:7,
    171:13, 223:8
overlaying 41:16
overlook 70:5
overlooking 36:22
overreaching 37:15
override 174:4
overrule 34:11,
    35:6, 123:11

overruled 53:2,
  59:17, 61:25,
  212:23, 213:7,
  215:4, 218:9
overrules 218:16
overseen 37:9
overview 14:13,
  17:19, 21:9
overwhelmed 13:18
overwhelming 89:19
overworking 36:22
owed 50:15
owing 43:10
own 34:24, 37:3,
  48:7, 56:14, 63:6,
  81:5, 124:15,
  124:16, 192:4,
  235:25, 260:23
Owned 246:24, 247:2
ownership 160:10,
  233:22, 246:21
owns 167:9


< P >
pace 44:5, 44:8,
  99:16
package 106:8
packages 94:6
PAGE 8:3, 19:8,
  35:19, 74:21,
  163:17, 166:18,
  166:21, 166:24,
  235:11, 257:20,
  257:25
pages 146:7, 173:12,
  245:24, 257:5,
  257:13, 257:16,
  272:4
paper 88:9
papers 47:23, 48:6,
  50:10, 51:7, 87:9,
  104:11, 125:23,
  138:8, 162:12,
  166:1, 196:17,
  221:1, 242:9,
  246:6, 265:7,
  270:15
par 164:3, 164:4
paragraph 132:17,

149:1, 217:23
parallel 65:17,
  98:9, 146:25,
  202:24, 218:7
parameters 232:18
pardon 175:2
pari 125:3, 221:24
parks 31:8
participant 172:9
participants 9:8
participate 20:17,
  66:3, 66:5, 66:9,
  167:24, 171:9,
  213:4, 213:11,
  213:16, 223:12,
  223:17
participated 98:6
participation 223:5,
  223:14
particularly 37:22,
  41:14, 45:20,
  157:5, 160:22,
  165:2, 170:21,
  175:19, 175:22,
  219:25, 235:2,
  249:10, 263:13,
  264:25
partner 14:16,
  40:17, 139:14,
  191:21, 192:9
partnering 157:22
partners 30:3
parts 140:19, 140:20
party 18:2, 37:1,
  44:21, 48:11,
  63:7, 63:19,
  67:21, 67:22,
  71:5, 157:4,
  157:5, 170:25,
  213:15, 214:7,
  215:7, 215:21,
  234:11, 267:17
pass 216:2, 256:13
passage 237:21,
  238:9
passing 122:25
passion 205:17
passionate 203:22
passu 125:3
past 22:4, 22:20,

47:15, 95:1, 95:2,
  99:12, 142:6,
  177:3
path 20:18, 69:18,
  73:22, 76:22,
  96:8, 121:6,
  190:10, 199:24,
  238:10
paths 65:18, 100:24
pathways 218:6
patience 120:11,
  208:2, 228:19
patiently 162:8
Patio 125:19
Paul 92:21, 101:11
pause 74:23, 112:11
Pavel 243:1
pay 36:11, 41:11,
  46:12, 56:12,
  57:3, 57:10, 59:9,
  59:23, 60:1,
  60:23, 61:4,
  61:20, 105:3,
  105:4, 107:13,
  117:4, 151:15,
  165:16, 184:14,
  192:5, 193:7,
  230:2
payable 16:14, 58:3
payee 48:11
paying 53:5, 54:6,
  54:8, 60:2,
  105:13, 122:15,
  131:2, 185:8
Payment 34:23, 44:1,
  47:12, 48:1,
  54:13, 56:14,
  59:21, 103:3,
  158:7, 163:21,
  244:2
payments 43:23,
  44:19, 47:7, 48:4,
  48:20, 49:7, 49:8,
  50:20, 51:1, 51:2,
  56:4, 56:22, 58:6,
  59:6, 60:8, 61:8,
  151:18
PBA 17:24, 18:10,
  68:13, 72:19,
  104:19, 104:23,

105:12, 105:23,
  115:9, 118:1,
  118:2, 118:3,
  128:7, 151:17,
  158:3, 167:10,
  191:25, 202:11,
  215:15, 215:25,
  216:8, 216:13
Peck 6:36, 97:25,
  98:1, 127:15
pendency 60:23
pending 12:9, 12:10,
  17:3, 46:18,
  51:13, 65:3,
  67:15, 111:8,
  123:23, 155:20,
  156:15, 168:5,
  171:20, 202:11,
  211:1, 211:17,
  212:5, 212:8,
  215:2, 217:17,
  217:18, 225:2,
  228:6
pennies 112:20
pension 14:8, 121:1
pensioners 120:21,
  121:3, 121:24
Penuelas 26:19
per 165:6
perceive 45:23
percent 18:11,
  25:15, 27:13,
  28:1, 28:8, 50:2,
  51:16, 55:19,
  55:22, 55:24,
  97:2, 100:14,
  100:20, 100:21,
  107:1, 107:12,
  110:22, 110:25,
  111:12, 111:17,
  111:19, 112:12,
  112:13, 112:15,
  113:16, 114:5,
  115:6, 191:8,
  203:23, 206:25
perfect 76:2, 77:12
perfectly 79:5
perform 49:14
performance 47:20,
  51:5, 158:20

perhaps 49:2, 67:19,
  86:20, 89:23,
  127:9, 150:17,
  168:22, 205:6,
  254:5
period 18:8, 21:23,
  33:23, 34:2, 39:8,
  39:17, 40:5, 88:2,
  88:3, 88:5, 88:6,
  94:1, 147:3,
  162:19, 163:13,
  168:17, 228:3,
  228:11, 232:3,
  241:14, 241:16,
  244:3, 254:9,
  265:12
periodic 46:5
periods 33:22,
  146:23, 147:1,
  266:5, 266:6
permanence 143:14
permanent 27:6,
  144:8
permanently 138:12
permission 14:16
permit 90:25, 133:10
permits 31:19,
  224:22
permitted 9:21,
  57:25, 156:20,
  157:3, 213:15
permitting 224:13
perpetual 144:3
person 9:13, 9:21,
  32:12, 32:24,
  89:22, 199:14
personal 126:10
personally 112:25
persons 26:15, 26:18
perspective 89:2,
  135:9, 137:24,
  142:24
persuaded 219:9,
  220:2, 221:9
persuasive 216:23,
  230:18
pertains 60:11
pertinent 86:5,
  141:10, 148:23
Peter 5:27, 5:43,

13:24, 16:25,
  17:3, 22:6, 30:24
pharmacy 26:21
phase 30:6, 30:7,
  61:15, 213:16
phased 63:15
Phasing 63:20
Phelps 34:3, 34:6
phone 89:21
phony 182:8
physical 88:8, 89:14
physically 24:19,
  214:16
pick 247:18
picture 25:11,
  113:17
piece 260:11
piecemeal 169:6,
  171:14, 171:16,
  172:21
pieces 88:9, 169:15,
  169:21, 205:1
Pietrantoni 24:6
placed 259:15
places 90:10
placing 216:13
plain 158:10
Plaintiff 4:14, 4:29
plan-related 226:10
planning 178:17,
  179:19, 208:8
Plans 10:19, 14:5,
  31:19, 68:12,
  68:14, 93:11,
  126:15, 133:14,
  215:22, 219:7,
  247:24
Plant 30:5
play 97:14, 219:8,
  249:23
pleaded 211:7
pleading 53:25,
  57:5, 87:4, 105:16
pleadings 37:12,
  71:12, 87:24,
  104:24, 136:10,
  202:5, 204:7,
  230:3
Please 29:23, 42:16,
  63:1, 95:5,

123:19, 177:15,
179:2, 197:5
pleased 195:22
pled 51:7
pledge 110:5,
235:20, 236:13
pledged 158:6
pledges 158:11
plenty 67:9, 189:19
Plus 81:25, 100:14,
100:21, 136:17,
145:21, 187:22
PM 95:3, 95:4,
177:5, 177:6,
207:24, 207:25,
271:3
POA 144:7
pocket 49:14,
112:24, 112:25
podium 80:25, 179:3,
199:8
point. 55:5, 55:10,
98:16, 145:21
pointed 51:8, 80:24,
161:1, 183:13,
192:12
points 14:23, 48:22,
99:4, 118:21,
120:16, 136:12,
139:8, 158:24,
159:12, 162:11,
168:7, 195:21,
197:8, 255:14,
256:1, 258:1,
265:23
police 153:19,
184:13, 184:14
policies 9:11
policy 103:6,
120:18, 207:1,
214:13, 214:17
polite 192:10
Ponce 26:19, 28:18,
90:13
pool 194:7
pop 148:19
popularity 98:18
portfolio 167:10
portions 47:21
position 81:5,

102:24, 113:19,
117:21, 134:18,
138:7, 139:5,
151:13, 162:14,
162:17, 169:1,
200:10, 200:17,
207:17, 216:13,
231:4, 231:15
positions 71:6,
72:15, 81:12,
84:22, 129:16,
213:11, 230:6,
270:15
positive 40:8, 157:2
possession 36:4,
232:6, 234:11,
252:24
possibilities 185:9
possibility 106:2,
238:2, 238:7
possible 38:15,
65:2, 68:10,
69:14, 69:17,
72:21, 76:8,
76:25, 96:5,
99:21, 101:14,
103:13, 126:14,
129:16, 132:15,
148:18, 171:23,
176:25, 181:19,
190:21, 190:22,
193:1, 267:20
possibly 99:24
post 24:9, 42:20,
63:10, 144:5,
200:13, 216:22,
217:2
post-clawback 241:15
post-petition 11:16,
53:20, 54:13,
55:15, 55:16,
112:3
pot 246:2
Potential 30:11,
30:13, 32:23,
36:24, 37:24,
45:10, 52:22,
85:16, 120:3,
130:3, 134:8,
135:7, 164:11,

164:22, 200:5,
215:8, 219:10,
228:5, 233:21,
257:11
potentially 89:4,
91:12, 201:11,
203:15, 215:18,
216:7, 216:12,
220:7, 244:16,
265:2
Power 3:14, 30:5,
30:16, 55:3,
59:24, 138:10,
153:19, 184:13,
224:8
practical 138:8,
147:6, 223:25,
237:24
practically 118:17
practices 81:4
practicing 128:17,
128:19
pre-clawback 241:14
pre-promesa 164:17
precede 226:2
preceding 39:1
precious 71:19
precise 106:20,
143:19, 241:7
Precisely 144:7,
205:2, 228:15
preclude 148:16
precluded 111:6,
190:23, 211:7
precludes 214:14
preclusion 148:23
predate 232:2,
232:14
predicament 202:21
preempted 102:18,
102:25, 103:4,
103:12, 104:15,
108:22, 161:19,
162:2, 185:16,
185:18, 185:20,
186:1, 186:4,
193:23
preemption 84:8,
84:19, 84:25,
86:11, 104:9,

104:10, 104:11,
108:19, 133:12,
161:21, 161:22,
207:8
preexisting 161:23,
218:6
prefer 130:8
preferential 55:13
prefers 71:24, 80:16
prejudge 85:25,
115:23
prejudice 45:10,
49:21, 168:1,
212:12, 215:8,
216:16, 223:8,
224:18, 225:3,
225:19, 226:9
prejudicial 172:21,
214:5
preliminary 25:16,
39:2, 67:18,
75:19, 75:22,
76:1, 77:13,
77:18, 78:3, 78:6,
83:6, 199:1,
201:25, 209:12,
210:9, 222:17,
226:20
premature 73:14,
212:22
premise 51:22,
52:11, 76:3,
182:8, 264:12
premised 211:5,
218:17
premises 52:6, 53:18
PREPA'S 54:4
preparation 79:19
prepare 39:23, 40:1
prepared 85:18,
88:21, 201:8,
253:23, 257:2,
257:3
preparing 135:12,
177:23
prepetition 103:3
prerogative 107:2
Present 7:26, 24:24,
35:24, 84:20,
107:5, 141:11,

147:22, 201:16,
221:7, 221:9,
244:3, 248:12,
248:19
presentation 15:2,
20:24, 24:16,
25:12, 29:25,
30:12, 30:22,
33:20, 41:17,
132:3, 256:23,
257:20, 257:21
presented 70:21,
71:2, 135:3,
136:15, 197:13,
203:11
presenting 25:4
presently 98:10
Presentment 15:5,
15:8, 88:17
preservation 63:18
preserve 167:22
President 13:22,
25:22
presidential 188:4
Presolicitation
86:22, 87:3
press 9:6, 9:22,
204:25
pressure 100:24,
122:16, 129:19,
143:6
presumably 77:23,
187:6
presumes 127:3
presumptive 39:20,
40:6, 40:7, 40:11
pretend 104:17,
105:19
pretense 164:24
pretty 51:19,
102:20, 102:21,
146:11, 146:16,
184:17, 231:10,
238:20
prevail 184:7
prevent 52:3
prevented 204:14
prevents 11:15,
213:10
previously 12:18,

19:1, 30:4, 54:24,
162:12, 217:9,
254:8
price 140:6
prices 164:8
PRIDCO 12:14, 12:15,
12:23, 13:11,
13:13
primarily 15:20,
16:13, 36:16,
131:8
primary 36:2, 140:13
Prime 32:17, 90:23
principal 12:16,
45:17, 142:8
principally 142:10
principle 90:2
print 111:14
prior 28:3, 60:24,
76:8, 76:14,
120:22, 125:10,
125:20, 128:10,
140:8, 143:1,
162:23, 188:1,
213:3, 225:11,
225:13, 229:8
priorities 86:13,
102:24, 103:18,
106:20, 120:18,
144:18, 161:15,
162:15, 165:19,
166:14
prioritize 71:19,
220:23
prioritizing 132:20
private 23:2, 26:6,
26:24, 26:25,
27:2, 27:14
privilege 145:16
Pro 5:43, 165:6
probably 20:13,
81:24, 82:9,
114:23, 177:13,
183:7, 192:24,
196:24, 228:14,
256:11, 266:17
problem 87:12,
161:24, 162:1,
173:14, 173:18,
174:7, 174:11,

179:17, 179:18,
202:25, 245:13,
267:9
problems 91:11,
91:12, 91:21,
102:10, 138:3,
192:11, 226:5
Procedural 65:7,
65:18, 208:3,
208:14, 222:23
procedurally 131:23,
148:2
Procedure 124:11,
221:2
procedures 14:13,
15:3, 15:6, 15:7,
19:23, 20:6,
20:13, 97:21,
162:25, 227:24,
228:1
proceed 11:25,
76:22, 96:20,
123:6, 123:9,
155:22, 156:9,
176:16, 225:13,
226:10, 228:14
proceeded 75:21
Proceeding 9:25,
17:21, 45:4,
48:21, 49:3,
57:13, 79:12,
106:6, 126:19,
132:22, 133:25,
134:20, 136:25,
141:5, 159:25,
160:3, 160:13,
171:19, 174:25,
175:6, 175:22,
176:6, 176:11,
193:18, 215:8,
221:14, 221:15,
221:17, 222:4,
244:17
proceedings. 64:22
processes 16:10
processing 39:23
Procurement 49:1
produce 162:16,
164:13, 173:17,
234:5, 239:10,

242:11, 243:22,
247:21, 248:11,
248:23, 250:20,
251:24, 252:24,
253:7, 253:23,
253:25, 256:7,
258:24, 259:1,
259:5, 259:7,
260:1, 260:3,
261:25, 262:8,
262:14
produced 7:47,
141:10, 165:3,
230:11, 230:15,
234:20, 239:9,
243:3, 248:7,
248:8, 248:19,
249:18, 255:18,
259:22, 263:3,
264:7, 264:10,
266:4, 266:19
producing 230:14,
233:1, 247:24,
249:6, 251:7,
259:20
product 17:8, 94:14,
147:7
production 140:10,
239:11, 242:24,
242:25
productions 265:25
professional 34:21,
34:24, 36:25,
38:16, 38:23,
39:15, 41:11,
55:12, 55:25,
56:4, 56:22,
56:24, 61:9
proffered 59:18
profound 120:4
program 27:10
programming 28:12
programs 27:9
Progress 27:19,
30:25, 31:3,
56:25, 71:6,
72:15, 85:20,
114:8, 211:18,
213:24, 224:11
project 30:18,

31:18, 31:20,
31:21, 31:22
projected 165:22
projections 158:19
projects 31:6
prominently 12:9
promise 96:2, 243:7
promising 183:4
promotion 40:18
prompt 76:24
prompting 75:13
promptly 83:11,
159:24
promulgated 34:19
Proof 16:24, 24:12,
31:25, 32:5,
32:15, 225:10,
247:15
proper 133:21,
153:12, 169:20,
217:12
properly 38:14,
87:6, 153:14,
212:14
property 53:7, 61:7,
142:14, 154:12,
155:5, 155:7,
193:6, 196:2,
258:19, 261:12
proponents 80:18,
80:20, 205:15
proposal 83:2,
128:17, 129:4,
134:7, 146:22,
168:23, 172:20,
214:7, 215:16,
216:7, 216:9
proposals 212:18
propose 64:4, 67:22,
74:13, 74:15,
215:22, 215:24,
219:6
proposes 225:24
proposing 20:8,
89:7, 89:25, 151:4
proposition 52:13,
181:20, 195:20
propriety 39:3,
145:10
prosecuting 37:5

Proskauer 10:9,
  36:16, 53:15,
  80:9, 82:21,
  86:17, 120:8,
  180:20, 182:13,
  189:21, 195:8,
  197:7, 207:11,
  242:1, 255:24
prospect 220:15
prosper 157:25
protected 103:18,
  120:22, 193:8
protections 206:21,
  206:22
prove 70:16, 263:1
proves 75:16
provide 11:7, 14:16,
  26:7, 26:9, 29:6,
  36:6, 37:25,
  60:13, 71:4,
  73:15, 105:18,
  153:20, 177:24,
  182:2, 182:20,
  188:7, 201:24,
  204:18, 209:14,
  216:7, 220:20,
  222:16, 224:3,
  227:7, 231:16,
  232:6, 234:13,
  244:13, 261:1,
  266:9
provided 11:2,
  24:14, 27:1,
  27:14, 27:17,
  28:20, 29:25,
  30:4, 50:22,
  53:23, 75:6, 91:4,
  165:4, 221:11,
  236:1, 250:8
providers 61:9
provides 38:5, 57:2,
  57:9, 72:13,
  162:21, 164:23,
  182:1, 195:25,
  201:7, 218:20,
  221:3, 264:23
providing 14:1,
  27:20, 209:1
provision 114:3,
  144:9, 196:7,

210:17, 217:20,
  217:24, 218:4,
  218:11, 218:23,
  218:24, 223:21,
  224:22
provisions 34:20,
  170:17, 186:4,
  194:2, 224:12
prudent 216:3
PSA 17:23, 17:25,
  18:10, 18:22,
  18:25, 21:22,
  22:1, 67:25,
  69:21, 69:23,
  85:25, 95:17,
  95:20, 97:25,
  98:3, 98:11,
  98:12, 99:9,
  99:13, 100:4,
  100:5, 111:4,
  124:9, 124:13,
  125:20, 142:1,
  205:14, 206:20
Public 3:30, 6:6,
  9:7, 12:15, 26:6,
  27:8, 31:8, 54:4,
  152:10, 165:14,
  166:12, 169:25,
  189:23, 190:3,
  213:22, 257:14,
  257:25, 258:12
publication 14:3
publicly 17:12,
  18:8, 236:2, 236:4
pulling 85:11,
  265:11
punch 258:22
punctuate 159:11,
  197:8
punctuated 198:1
purchase 18:15
purchasers 214:15
Pure 189:3, 193:21,
  246:1
purely 154:10,
  154:14, 196:11,
  220:10, 220:24,
  227:22
purported 46:12,
  60:1, 152:16,

255:20, 259:15
purpose 134:23,
  135:1, 150:1,
  182:2, 196:3,
  227:21, 246:20,
  247:5, 269:11
purposes 93:23,
  164:10, 175:4,
  192:21, 192:24,
  194:19
Pursuant 19:2,
  206:23, 212:8,
  214:17, 264:17
pursue 68:1, 73:9,
  175:15, 225:13
pursuing 217:11
pursuit 198:14
push 63:24, 167:22,
  168:18
pushback 40:9
putting 45:10,
  91:11, 138:25,
  149:13, 150:13,
  161:17


< Q >
QTCB 6:15, 100:4
quaff 141:19
quakes 25:10
qualifying 13:8,
  13:12
quantifies 39:16
quantify 39:10
quarter 13:13
quarterly 50:2
question 38:22,
  45:12, 47:20,
  49:19, 63:11,
  71:17, 75:24,
  76:21, 89:20,
  91:24, 92:1,
  108:8, 109:8,
  130:17, 150:2,
  153:10, 177:18,
  179:3, 179:14,
  197:23, 199:25,
  225:22, 229:4,
  247:8, 247:14,
  249:13, 250:3,

259:12, 270:2
questioning 245:10
queued 178:13
queuing 150:22
quick 84:15, 93:22,
    96:4, 137:1,
    151:2, 155:16,
    192:14, 192:18,
    206:12, 264:3,
    265:23
quickly 44:16,
    86:24, 104:8,
    105:10, 172:15,
    172:19
Quinn 95:8
quite 39:1, 86:9,
    140:14, 153:6,
    204:13, 230:4,
    262:6, 270:10
quote 44:23, 53:24,
    55:1, 69:14,
    132:15, 162:24,
    173:7
quote/unquote 105:14
quoted 103:9, 182:18
quoting 182:13


< R >
race 140:5, 142:21
Raiford 6:47
raise 39:24, 56:2,
    56:6, 74:16,
    133:10, 134:21,
    138:14, 194:16,
    241:10, 261:4,
    262:14
Raised 45:13, 47:15,
    63:7, 64:21,
    68:21, 71:21,
    74:5, 107:19,
    119:10, 138:25,
    178:25, 179:1,
    194:11, 211:19,
    212:14, 212:17,
    212:25, 213:2,
    219:17, 223:14,
    223:25, 238:7
raises 71:12
raising 71:23,

137:8, 137:9,
    154:3
ramming 128:21
ran 195:23
random 261:20
range 144:14
rank 103:7
rapid 122:3
Rapisardi 5:29,
    21:2, 21:4, 21:5,
    24:2, 24:3, 30:23,
    31:1, 119:18,
    119:20, 119:23,
    123:16
Rappaport 5:11
rata 165:6
rate 39:7, 39:11,
    39:12, 39:13,
    39:15, 39:16,
    39:25, 40:3, 40:8,
    40:10, 40:20,
    41:8, 41:10,
    190:21
rates 34:15, 39:2,
    40:2, 40:14,
    40:25, 41:4, 41:5,
    41:7, 41:14, 236:5
Rather 43:20, 60:10,
    75:18, 79:1,
    81:12, 102:2,
    148:7, 148:16,
    188:17, 211:23,
    267:20, 267:25
rational 125:5,
    125:15, 128:14,
    156:7
rationale 41:6,
    41:7, 106:10,
    106:12, 117:7,
    117:10
Re 1:6, 1:23, 2:4,
    2:23, 3:4, 3:21
reach 32:13, 33:3,
    85:5, 87:6, 87:14,
    96:18, 130:12,
    198:13, 213:18,
    230:11, 267:18
reach-out 88:2
reached 17:11,
    99:17, 270:14

reaching 122:13,
    219:10, 258:25
reaction 84:15,
    99:11
read 47:22, 84:6,
    89:3, 117:19,
    204:25, 230:17,
    254:2
readily 200:21,
    219:2
reading 79:18,
    105:21, 148:21
ready 42:7, 57:18,
    105:5
reaffirmation 99:5
real 54:15, 57:7,
    111:16, 118:8,
    136:17, 159:1,
    194:10, 206:12,
    270:2
reality 72:24,
    188:18
reality. 22:14
realize 115:3
realm 187:9
Rear 13:24
Reasonable 154:5,
    158:25
reasonableness
    34:16, 41:16,
    47:17, 56:18,
    61:13, 61:16,
    106:6, 144:14,
    187:9
reasonably 146:21
reasons 51:21,
    54:17, 58:4,
    59:16, 83:4,
    138:8, 144:15,
    160:25, 161:18,
    164:15, 169:20,
    187:12, 187:13,
    189:4, 194:13,
    194:14, 208:22,
    213:8, 226:15,
    240:3
reassurance 38:17
rebuild 55:2
rebuilding 30:11
rebuttal 57:1, 82:6

recall 24:14, 149:9,
    257:22, 257:23
receive 60:14,
    107:11, 121:1,
    121:3, 170:15,
    214:10, 216:19
received 10:16,
    14:7, 19:11,
    27:10, 55:12,
    55:13, 87:22,
    164:7, 177:19,
    178:7, 214:9,
    217:6
recent 22:3, 207:10,
    269:24
recently 95:14,
    132:11
recess 82:15, 95:3,
    177:1, 177:5,
    207:24
recitation 228:20
recognition 178:2
recognize 45:19,
    98:17, 123:5,
    138:11, 200:24,
    201:9
recognized 132:15,
    240:23
recognizes 40:18
recognizing 228:12
Recommendation 70:8,
    98:20, 125:10,
    175:10, 175:15,
    199:21, 201:21,
    208:16, 214:25,
    224:1
recommendations
    33:24, 34:5, 35:7,
    35:13, 62:4, 62:5,
    63:16, 63:21,
    66:21, 66:22,
    68:5, 74:8, 75:21,
    78:18, 84:12,
    95:12, 97:7, 97:20
recommended 21:20,
    34:12, 37:19,
    37:20, 37:23,
    65:10, 72:6,
    79:13, 198:24,
    206:2, 212:3,

224:19
recommends 34:6,
    34:10, 35:5, 39:18
reconcile 17:3
reconciliation 17:3
reconsider 168:22
reconsideration
    11:18
reconsidering 217:13
Reconstruction
    22:15, 25:19, 31:7
reconvened. 82:16,
    95:4, 177:6,
    207:25
record 9:14, 41:23,
    58:2, 92:21,
    139:13, 153:1,
    153:5, 155:15,
    179:9, 180:25,
    213:23
recorded 7:47
recording 9:20
records 37:11,
    247:11
recourse 12:8
recover 69:7
recoveries 164:9
Recovery 13:23,
    13:25, 14:2,
    18:22, 22:8,
    22:15, 31:6, 49:1,
    127:21, 170:16,
    190:15
recreational 31:8
rectified 171:18
redline 74:20
reduced 26:14,
    43:22, 165:10
reducing 165:15
reemphasize 120:15
refer 9:17, 58:24,
    59:3, 60:18,
    143:11, 207:15,
    215:10, 221:15,
    245:25, 257:6
reference 45:1,
    46:14, 145:23,
    259:13
referenced 124:23,
    141:23, 147:17

referred 16:12,
    17:25, 32:22,
    123:1, 175:7
referring 99:10,
    244:12
refers 164:22, 209:8
reflect 21:19,
    21:23, 147:7,
    210:2, 218:11,
    234:14, 250:5
reflected 249:2
reflection 146:20
reflective 40:19,
    121:18
refocus 197:17
refrain 154:13
refugees 25:13,
    26:12, 26:25,
    27:1, 27:7
refuse 167:16
refused 249:1
refuses 158:17
refusing 130:18
regard 33:6, 120:13,
    120:17, 151:17,
    187:18
Regarding 11:19,
    12:11, 21:7,
    22:11, 60:5,
    61:15, 70:12,
    71:5, 72:14,
    118:1, 156:18,
    157:16, 166:18,
    199:21, 201:14,
    203:14, 215:5,
    219:15, 225:2
regardless 46:25
Region 5:17, 28:23
register 14:3
registry 16:9, 89:21
regular 205:23
regulatory 218:21
reiterate 65:20,
    100:9, 199:19
reiterated 223:6
reiterates 157:19
reject 84:25, 183:22
rejected 217:9
rejection 122:6
rejections 87:16

rejects 224:6
relate 118:2,
  212:14, 235:3
related 11:10,
  11:12, 11:20,
  16:14, 24:9,
  62:18, 68:2, 70:8,
  89:2, 120:2,
  149:17, 149:21,
  154:7, 162:13,
  162:21, 176:13,
  199:12, 208:13,
  210:5, 219:14,
  224:20, 226:6,
  226:7, 228:1,
  235:1, 259:16
relates 34:11, 35:6,
  71:14, 98:12,
  161:13, 177:18,
  244:18
relating 13:11,
  24:15, 31:6,
  131:25, 135:24,
  209:19, 211:20,
  212:2, 223:9,
  225:5, 233:19,
  239:1, 264:11,
  264:20
relations 13:15,
  13:21, 165:14
relationship 13:16,
  23:14
Relative 63:14,
  65:7, 72:1, 83:8,
  84:22, 197:10,
  199:1, 199:5,
  201:4, 201:13,
  203:16, 232:7
relatively 70:22,
  168:17
release 22:4, 22:20,
  22:25
relevance 240:13,
  242:14, 244:16
relevant 44:24,
  44:25, 45:2, 45:7,
  63:7, 67:1, 85:1,
  116:19, 151:21,
  196:19, 231:17,
  231:19, 234:3,

235:4, 235:9,
  239:2, 239:16,
  240:1, 244:24,
  247:6, 260:13,
  260:25, 268:4
Reliable 174:15
reliance 60:6
relied 52:16, 55:2,
  55:12, 258:25,
  260:4, 261:14
relief 21:11, 22:4,
  22:11, 24:9,
  24:15, 30:21,
  31:11, 49:25,
  56:2, 61:25,
  133:5, 138:19,
  161:1, 172:4,
  192:18, 193:8,
  193:10, 193:14,
  194:12, 203:18,
  209:2, 214:9,
  219:23, 222:18,
  223:22, 227:2,
  235:8
relies 36:5, 52:13,
  53:24, 59:23,
  158:19
reluctance 120:12
rely 162:11, 261:15
Relying 60:3, 205:12
remain 25:8, 35:20,
  70:2, 70:13, 74:3,
  76:6, 78:18,
  158:5, 198:9,
  212:5
remainder 207:21
remaining 12:1,
  208:3
remains 12:10,
  13:17, 46:24,
  72:12, 74:6, 85:3,
  123:7, 210:16,
  214:20, 238:20,
  239:25
remark 44:7, 156:17
remarkably 132:6
remarks 31:1, 41:21,
  57:17, 62:24,
  72:8, 81:18,
  81:21, 82:24,

127:1, 156:12,
  160:23, 212:20,
  213:2
remember 24:21,
  92:7, 100:15,
  140:23
remembers 96:15
remind 64:14,
  140:18, 159:18,
  196:16
reminded 203:19
reminder 9:10
reminds 202:20,
  209:23
remit 60:8
remotely 126:14
removal 31:9
removed 140:9
removing 16:8
render 207:21,
  220:24
rendered 61:19,
  62:3, 63:8
renders 144:8
renew 226:13
renewal 224:23,
  225:3
renewed 22:19,
  213:1, 224:18,
  225:1
rent 105:3, 105:14,
  118:1, 118:2,
  118:9, 118:10
Rental 26:8, 27:9,
  27:15, 27:17
renting 28:17
reopened 25:16,
  28:1, 28:9, 28:12,
  28:14
reopening 28:3
reorganization
  126:22, 260:22
rep 188:22
repair 25:17, 31:7,
  46:15, 52:15,
  52:19
repairs 27:16,
  27:23, 28:3,
  30:10, 52:17,
  59:24

reparations 24:9
repaying 54:23
repeat 53:21, 54:18,
    65:19, 156:13,
    158:14, 159:10,
    168:7
repeated 121:23
repeatedly 156:24
repeats 164:5
replacement 27:16,
    163:22
Replies 77:21,
    78:12, 134:10,
    211:11
Reply 47:23, 48:6,
    79:21, 88:15,
    104:25, 129:9,
    146:20, 229:11,
    248:17, 256:11
reported 25:13,
    36:18
Reporter 44:11,
    44:12, 44:13,
    139:22, 192:15,
    272:15
reporting 37:12,
    39:10
Reports 14:17,
    24:15, 33:15,
    37:19, 173:16,
    244:3, 248:9
repository 9:14,
    232:21
represent 98:8,
    163:23, 189:21,
    245:18
representation 37:16
representations
    41:3, 261:4
representative 1:13,
    1:30, 2:11, 2:30,
    3:11, 3:28, 4:8,
    53:16, 179:15,
    248:7
representatives
    121:21
represented 16:1,
    220:9
representing 40:23
represents 41:2,

215:13, 217:14
repurposed 91:7
Reputation 22:13
Request 11:17,
    25:23, 43:17,
    56:21, 58:20,
    58:23, 88:7,
    88:20, 93:25,
    148:4, 150:16,
    205:6, 214:9,
    214:11, 219:13,
    224:13, 231:10,
    231:11, 235:8,
    251:8, 251:13,
    256:4, 270:9
requested 10:12,
    14:12, 21:17,
    24:8, 40:4, 44:22,
    137:21, 225:10,
    231:25, 234:14,
    255:4
requesting 14:8
requests 10:2,
    33:20, 56:23,
    59:10, 168:5,
    181:22, 225:1,
    227:1, 230:13,
    251:16, 255:10,
    262:6, 262:7
require 55:7, 61:8,
    136:10, 153:9,
    190:20, 193:22,
    195:6, 256:8
required 156:4,
    187:20, 196:3,
    236:8, 245:1,
    246:5
requirement 57:12,
    60:7, 60:21,
    61:23, 162:21,
    189:6
requirements 12:25,
    13:9, 73:19
requires 44:1,
    60:12, 121:5,
    146:17, 155:1,
    170:15, 195:2,
    213:24, 220:11
Requiring 59:12,
    103:3, 216:10

rescheduling 225:8
reservation 87:24,
    157:15
reserve 11:3, 82:8,
    83:24, 224:14,
    263:11
reserved 180:22,
    228:18
reserves 86:4,
    209:3, 209:17
reserving 82:5,
    83:16
reside 11:7
Resilience 22:15
resist 123:2
Resolution 15:12,
    34:1, 63:15,
    64:20, 137:1,
    145:20, 157:1,
    169:4, 169:8,
    174:10, 201:18,
    205:4, 211:23,
    213:24, 216:11,
    216:24, 217:7,
    220:13, 222:9,
    223:6, 225:23
resolutions 155:20,
    214:2, 217:17
resolve 13:5, 23:12,
    64:5, 85:9, 85:18,
    94:9, 113:23,
    152:21, 172:15,
    210:10, 212:2,
    215:24, 220:14,
    225:17
resolved 16:19,
    16:23, 63:9,
    92:23, 118:16,
    119:7, 121:25,
    122:9, 133:8,
    198:21, 216:4,
    242:4
resolves 99:13
resolving 63:16,
    70:16, 222:8,
    223:8
resources 23:5,
    38:12, 63:18,
    68:8, 122:1,
    132:23, 133:6,

135:2, 136:6,
153:15, 184:12,
184:24, 185:23,
215:7, 215:14,
219:25, 220:6,
222:8, 226:12
respectful 98:21
Respectfully 163:9,
164:18
respective 71:5,
72:14, 222:22
respectively 257:6
respects 98:10
respond 93:4,
159:11, 172:12,
177:1, 177:25,
233:6
responded 14:9,
19:7, 243:5,
254:17
respondents 47:9
Response 11:4, 13:1,
13:18, 47:9,
51:25, 79:20,
83:17, 88:13,
89:11, 93:24,
103:8, 119:2,
132:14, 132:17,
138:23, 160:2,
175:14, 180:17,
194:22, 198:11,
229:6, 231:11,
250:3
response. 33:16,
176:22, 229:17,
268:16
responses 74:6,
77:19, 78:16,
87:22, 177:20,
178:6, 178:7,
208:21
responsibility
63:24, 250:13
responsible 51:5,
121:17
responsibly 36:21
responsive 38:1,
166:2
rest 180:10, 248:12,
251:23, 260:4

restoration 59:24,
120:24
restoring 49:3
restrain 61:3
restrict 60:25
restricted 196:22,
213:19, 227:22,
245:4, 257:9,
257:18, 261:7,
261:9, 264:14
restricted. 258:8
restriction 258:16,
259:1, 259:3,
259:25, 260:6,
260:11, 260:23,
261:21, 267:5
restrictions 141:9,
231:22, 233:18,
233:21, 234:16,
237:16, 239:1,
240:5, 250:5,
251:21, 252:4,
255:20, 257:11,
259:15
restrooms 26:20
restructuring 12:19,
103:13, 121:22,
162:21, 162:22,
162:23
rests 216:9
result 25:17, 26:10,
27:11, 36:3, 36:7,
40:10, 43:22,
132:23, 137:1,
137:19, 152:17,
152:19, 203:7,
225:20
resulted 133:19
resulting 215:7,
216:5
results 102:13,
214:8
resume 10:5, 180:16
retail 18:19, 18:21,
164:2, 164:17,
164:20, 164:23,
164:24, 164:25,
165:2, 165:5
retain 209:21,
216:16

retained 59:4, 60:8
retention 37:6, 41:1
Retired 6:43,
165:20, 166:10
Retiree 11:23,
87:23, 88:18,
166:2, 166:3
Retirees 32:3,
100:14, 100:16,
100:21, 107:19,
120:23, 166:4,
166:8, 166:12
Retirement 2:13,
4:9, 166:4
retransmission 9:20
return 94:25, 111:21
revenues 11:16,
150:20, 169:23,
170:3, 196:2,
207:1, 223:9
reverse 165:18,
166:13
reversed 124:7
review 10:18, 34:17,
37:12, 38:23,
40:12, 45:8,
55:25, 111:6,
140:6, 140:8,
141:8, 157:18,
227:19
reviewing 10:24,
44:23, 74:4,
101:16, 211:24
revised 12:24, 13:2,
13:4, 14:13, 15:3,
15:5, 15:7, 21:16,
94:13, 97:17,
212:6, 231:6,
251:16
revision 257:4
revisions 82:25,
132:3, 227:11
revisitation 212:8
rewards 158:8
rewrite 144:6
RFP 30:13, 30:17,
30:19, 30:20
rhetoric 121:14
ridiculous 127:24
right-hand 257:8

rigorous 48:17
ripe 140:23, 141:3
rise 51:11, 86:19
risk 112:15, 122:12,
  123:7, 188:10,
  203:24, 204:1,
  204:4, 216:16,
  230:1
risks 105:24
road 20:18
roads 31:8
Robert 6:7, 6:46,
  152:9
Rolando 7:13
role 36:20, 64:15,
  67:20, 67:21
room 69:13, 111:25,
  112:1, 113:11,
  113:14, 131:16,
  141:11, 142:11,
  142:12, 182:5,
  195:8, 195:22,
  203:21
Rose 10:9, 53:15,
  82:21, 180:20,
  242:2
Rosetta 203:9
roster 40:14
Rotger 7:24, 174:21,
  174:23, 175:9,
  176:19
RSA 12:14, 13:5,
  13:8, 13:9, 13:11
Rule 62:18, 83:10,
  83:22, 104:8,
  126:18, 137:6,
  193:19, 198:22,
  199:4, 199:10,
  199:22, 201:11,
  201:17, 202:3,
  206:4, 206:5,
  221:2, 221:3,
  226:3
ruled 76:7, 129:11,
  185:16
Rules 34:18, 155:10,
  187:20
ruling 58:18, 77:14,
  78:5, 78:7, 104:2,
  104:14, 104:16,

155:16, 184:10,
  193:9, 193:13,
  202:7, 202:15,
  205:7, 209:11,
  209:12, 210:8,
  222:17, 270:15
Rulings 71:7, 72:11,
  72:23, 77:2,
  132:16, 140:21,
  141:1, 152:17,
  185:19, 192:23,
  208:2, 208:6,
  208:12
rum 182:21, 185:25,
  193:23, 224:17,
  225:3, 244:19,
  245:20, 261:6,
  264:20
run 26:16, 27:2,
  58:11, 142:4,
  188:10, 204:1,
  204:4, 238:3
running 55:4,
  146:25, 190:25
runs 235:15
rush 137:23, 138:2


< S >
S. 5:8
S/ 272:13
Sabana 26:1
SABAT 7:24, 174:21,
  174:23, 175:9
Safe 11:8, 229:22
safety 221:3, 221:5
sake 208:17
sale 164:8
Salinas 6:27
Salud 6:3, 173:5
San 9:1, 9:7, 90:13,
  90:14, 90:19,
  90:20, 91:16
sanctions 9:25
Sandra 7:26, 178:12,
  178:20
sanitary 29:16
satisfactorily
  121:25
satisfied 70:6,

79:11, 211:15,
  224:10
satisfies 73:18
satisfy 38:2, 49:16,
  153:23, 170:14
savings 112:24
saw 42:5, 243:10
say-so 236:9, 245:2
says 44:22, 46:23,
  50:21, 74:25,
  108:21, 144:24,
  149:4, 166:3,
  169:23, 173:8,
  185:17, 186:1,
  189:24, 201:9,
  206:21, 206:23,
  233:11, 252:9,
  255:3, 257:7,
  257:9, 257:21,
  257:23, 257:25,
  258:8, 265:9
scaffolding 144:17
scales 152:22
scenario 87:21
scenarios 87:10,
  88:11
scheduled 16:6,
  66:6, 77:23,
  119:25, 125:7,
  125:24, 177:21,
  178:1, 227:15
schedules 133:19,
  211:15
scheme 144:18
school 29:3
schooling 11:7
schools 11:8, 24:10,
  24:25, 25:15,
  27:18, 27:20,
  27:21, 27:22,
  27:25, 28:1, 28:2,
  28:4, 28:9, 28:11,
  28:14, 28:19,
  28:20, 29:2, 29:21
scope 12:11, 37:15,
  143:14, 147:25,
  163:19, 175:21,
  176:6, 223:1,
  239:3, 239:11,
  255:19, 259:14,

264:2, 270:16
scopes 176:2
Scotia 236:12
scratching 260:14
scrivener 227:12
scrutiny 143:21,
  216:2
scuttling 124:10
Se 5:43
search 230:25,
  232:8, 234:11,
  251:7, 252:23
searching 253:7
season 178:3
seated 95:5
Second 13:13, 28:21,
  30:7, 31:4, 47:16,
  53:19, 58:7, 68:8,
  70:20, 80:19,
  80:22, 106:17,
  107:9, 110:18,
  112:11, 131:24,
  162:17, 173:15,
  207:7, 209:7,
  227:17, 234:6,
  254:6
Secondly 48:16,
  77:19, 242:21
seconds 92:19,
  117:25, 119:11,
  198:2
secret 188:3
Sections 61:6, 75:6
secure 30:18, 50:25,
  158:12
secured 107:7,
  107:9, 107:10,
  110:5, 110:9,
  110:10, 110:12,
  149:21, 150:10,
  154:13, 162:13,
  193:5
secures 260:17
securing 28:17
security 11:15,
  110:11, 150:25,
  258:19
seeing 24:21
seek 138:13, 142:14,
  158:25, 203:18,

209:2, 225:16
seeking 124:23,
  125:4, 125:5,
  154:2, 158:22,
  160:3, 160:19,
  171:22, 179:15,
  213:11, 223:22,
  227:25, 233:24,
  248:22
seeks 59:5, 142:15,
  217:16
seem 45:18, 67:1,
  168:19, 266:6,
  269:10
seemed 84:11, 89:4
seems 22:14, 67:18,
  74:14, 89:12,
  98:11, 122:8,
  132:6, 135:15,
  150:5, 150:21,
  167:12, 167:17,
  230:19, 232:16,
  237:23, 259:16
seen 40:8, 96:10,
  128:24, 157:18,
  241:12, 246:3,
  246:23
segregated 164:25,
  264:14
selected 72:10,
  201:15
selective 200:10
self-explanatory
  231:10
send 88:4, 216:12,
  247:19, 248:14
sending 110:23
senior 185:3
senior-junior 185:3
seniority 40:18
sense 38:3, 41:7,
  81:19, 110:14,
  116:13, 128:2,
  129:12, 129:24,
  133:6, 142:25,
  153:5, 155:18,
  202:23, 230:5,
  230:7, 240:11,
  249:20, 251:5,
  262:18, 264:14,

264:15, 266:12,
  267:11, 268:11
sensitive 117:16
sent 12:22, 13:1,
  230:23, 244:17,
  244:19, 254:16,
  254:20, 265:9
sentence 191:14
separate 52:19,
  90:25, 146:5,
  146:6, 149:18,
  164:25, 166:5,
  166:7, 175:24,
  184:16, 184:20,
  189:8, 189:10,
  191:18, 191:19,
  191:20, 257:15,
  258:13, 258:21
Separately 11:2,
  189:2, 223:19
September 19:11,
  33:23, 96:14,
  141:14, 141:21
sequence 209:24,
  220:22
sequencing 219:19,
  220:16
serious 124:14
seriously 65:13,
  65:14
Servais 5:37
serve 48:2
served 26:22, 74:7,
  83:16, 135:2,
  135:17
service 29:14, 61:9,
  169:14
Services 7:9, 26:21,
  27:1, 27:3, 27:5,
  29:19, 35:20,
  50:16, 61:19,
  116:17, 116:18,
  117:3, 153:20,
  153:21, 153:24,
  154:9, 158:18,
  166:22
servicing 48:17
session 66:6, 213:16
sessions 156:20,
  213:5

set 20:13, 33:25,
    34:7, 34:14,
    40:25, 41:5,
    43:18, 43:19,
    44:24, 63:22,
    64:13, 68:5, 70:7,
    74:8, 81:13, 85:6,
    86:8, 124:4,
    124:11, 135:20,
    138:7, 143:5,
    150:3, 196:17,
    212:11, 214:25,
    240:4, 242:6
setbacks 22:5
sets 36:8, 63:12,
    122:18, 138:9
setting 41:14,
    77:24, 88:14,
    97:21, 133:20,
    142:21, 178:5,
    223:21, 224:7
settle 72:3, 104:16,
    115:15, 126:8,
    126:10, 142:14,
    170:22, 217:15
settled 63:8,
    112:14, 117:9,
    170:21, 183:14,
    184:3, 185:8,
    202:16, 202:22,
    218:1
settlements 99:16,
    104:18, 105:19,
    106:9, 141:19,
    187:8, 187:14,
    217:11
settles 85:5
settling 111:11,
    112:9, 171:2,
    184:18, 186:5,
    186:8, 186:11,
    188:21, 191:10
seven 26:18, 26:22,
    78:12, 94:4,
    94:10, 166:21,
    187:25
seven-ish 74:21
seventh 33:22
Several 48:19, 68:6,
    131:22, 133:18,

134:12, 135:14,
    136:12, 139:8,
    154:1, 154:24,
    162:11, 183:21,
    205:15, 214:24
shakes 83:23
shall 170:1, 174:4,
    196:1, 206:21,
    264:23
sham 128:8
share 93:17, 103:7
shared 13:1
shareholder 40:17
shares 132:12
sharing 103:5
shatters 127:20
shed 86:3, 231:19,
    245:23
sheet 52:21, 250:20
sheltered 26:15
shelters 11:7,
    24:10, 24:25,
    25:13, 26:10,
    26:12, 27:3
shift 200:2
shifted 75:18
shifting 147:4
short 15:2, 74:1,
    168:17, 171:23,
    208:11, 220:3,
    233:16, 258:15,
    259:6
shortened 79:20
shorter 119:20,
    131:12
shortfall 143:25
shortly 12:2, 79:17,
    82:13
shouldn't 47:12,
    52:5, 56:20, 91:9,
    91:10, 138:9,
    139:6, 159:15,
    196:22, 230:14,
    239:17
show 55:3, 117:21,
    143:19, 187:9,
    207:5, 240:25,
    255:19, 259:14
showers 26:20
showing 31:3, 89:15,

138:20, 153:2,
    154:17, 209:3,
    209:16, 224:13,
    240:19
shown 203:18, 210:23
shows 153:5, 155:15
showstopper 105:8,
    105:13, 115:8,
    115:9, 119:7,
    119:9, 172:13
showstoppers 105:11
shut 52:3, 267:22
side 11:22, 11:24,
    84:22, 99:6,
    112:13, 136:21,
    140:4, 140:7,
    168:24, 237:12,
    257:8
sides 84:20
sign 18:3
signals 9:18
signatories 234:16
signatory 233:18,
    233:21
signed 17:25, 18:10,
    25:22, 66:24,
    125:2, 207:11
significance 237:11
significant 30:1,
    39:1, 48:24, 49:5,
    49:13, 70:1,
    70:12, 72:2,
    76:14, 76:17,
    91:12, 106:3,
    135:22, 136:14,
    137:3, 146:17,
    152:20, 195:22,
    199:23, 216:6,
    244:16, 244:22,
    265:2
significantly 46:19,
    59:11, 232:2
silent 117:7
similar 32:18,
    126:8, 189:5,
    189:6, 248:24
Similarly 74:16,
    126:7, 159:10,
    253:4, 266:12
simple 111:2

Simply 17:19, 52:11,
   64:3, 66:8, 68:2,
   69:14, 72:20,
   73:14, 75:12,
   83:16, 86:11,
   103:10, 103:11,
   122:2, 144:21,
   144:22, 159:11,
   159:17, 164:18,
   175:6, 175:11,
   216:25, 232:3,
   233:3
simultaneous 132:22
simultaneously
   69:13, 77:7
single 135:23,
   146:15, 199:14,
   213:16, 225:12,
   246:2, 249:2,
   265:6
singular 202:6
Sir 42:25, 167:4,
   228:23
sister 174:25
sisters 159:9
sit 86:6, 259:9,
   266:20
sitting 148:14,
   165:8, 260:15
situated 126:8,
   159:10
situation 32:19,
   244:9
situations 36:25,
   40:22, 96:21,
   99:15
six 99:23, 111:17,
   112:12, 160:11,
   166:18
six. 112:10
sixth 68:16
sizable 58:11, 58:12
size 167:11
skeptical 168:12
skill 40:19
skilled 98:22
skimmed 116:15
slated 153:7,
   154:11, 155:6
slices 186:13

slightly 75:16
slips 247:19
slow 54:1, 124:24,
   125:4, 128:12
slowly 43:5, 139:21,
   173:9
small 151:20, 214:21
smoother 188:8
so-called 70:3,
   71:25, 115:10,
   161:24
sold 164:8, 164:20
solely 242:16
solicit 30:14, 88:4
solicitation 19:2,
   19:23, 20:6,
   76:15, 76:22,
   93:12, 93:23,
   94:5, 227:24
soliciting 87:15,
   108:2, 110:24
solidifies 144:7
solution 76:2
solve 99:18, 99:20,
   193:10, 226:4
solvency 35:1, 46:6,
   49:18, 59:8,
   59:13, 60:7
solvent 46:21, 47:1
Somebody 106:10,
   230:23
somehow 60:6, 162:3,
   188:20, 260:18
someone 85:4, 91:25,
   150:19, 164:1,
   203:20
someplace 230:23
sometimes 55:19
somewhat 105:17,
   150:17, 202:21
somewhere 87:11,
   130:16, 142:2
soon 30:19, 31:20,
   70:22, 129:16,
   203:20, 205:7,
   267:19
sooner 94:2, 129:10,
   211:23, 267:25
Sorry 44:6, 44:16,
   54:3, 95:1,

108:17, 108:18,
   109:20, 126:4,
   139:1, 152:8,
   157:9, 174:1,
   191:4, 191:15,
   192:15, 192:17,
   194:20, 204:3,
   228:10, 246:13,
   247:1, 247:24,
   267:22
sort 45:3, 45:24,
   85:19, 86:22,
   99:5, 112:12,
   151:20, 230:9,
   231:7, 232:7,
   232:17, 232:21,
   237:8, 240:3,
   241:3, 245:1,
   253:22, 260:13,
   261:1
sorts 29:18, 105:24,
   118:1, 224:14
Sosland 5:40, 159:5,
   159:6, 159:8,
   196:21
sought 49:25, 61:25,
   171:9, 197:12,
   211:7
sound 43:5, 78:18,
   204:14
sounds 18:5, 106:15,
   204:23
source 9:14, 49:4
sources 158:6
south 13:19
southern 25:9, 26:3,
   26:12, 28:4, 28:22
southwestern 26:3,
   26:13, 28:4
space 91:4
speakers 80:14,
   181:11
speaking 152:5,
   174:6, 250:7
Special 10:23,
   11:24, 37:2, 37:7,
   37:8, 77:24,
   150:10, 190:4,
   232:19
specific 37:21,

40:25, 45:13,
73:22, 84:11,
145:24, 151:17,
169:16, 228:16,
230:13, 231:23,
238:14, 241:7,
241:9, 244:15,
245:9, 253:22,
263:5, 263:12,
263:19
specifically 17:10,
37:17, 50:19,
51:1, 51:19, 69:1,
83:22, 100:9,
120:21, 149:21,
171:5, 204:19,
212:16, 212:20,
259:13
specifics 21:11
Speed 99:18, 101:25,
102:1, 140:14
spell 270:14
spend 108:2, 141:15
spending 165:9,
165:14, 241:19
spent 34:15, 57:22,
96:11, 133:17,
135:21
Splinter 164:1,
164:7, 164:8,
164:10, 164:12,
164:13
splintered 131:9
splinters 164:4
split 96:1, 181:15,
246:14
splitting 81:22
spoke 130:20, 179:12
spoken 178:20
spreadsheet 237:2,
266:25, 267:2,
267:7
spreadsheets 236:16
spring 96:12
SREAEE 7:13
stacked 193:7
Stadler 6:39, 33:18,
33:19, 33:20,
35:16, 35:17,
36:1, 39:6, 41:19,

41:21
staffed 11:12
staffing 35:20
STAFFORD 5:9, 15:16,
177:13, 177:16,
178:15, 178:19,
180:11, 180:14
stage 60:24, 64:13,
103:25, 110:15,
121:21, 148:11,
210:21, 210:22
staggering 97:4
stakeholder 97:14
Stancil 7:6, 98:25,
99:1, 99:2
stand 85:17, 86:6,
116:8, 130:2,
168:11, 168:18,
261:16
standard 155:12,
155:14
standards 34:14,
39:19, 39:20,
40:6, 40:7, 40:11
standing 150:6,
150:25, 225:13,
225:22, 226:4
standpoint 92:15
stands 230:19
Stanley 7:21, 174:24
start 31:21, 39:22,
73:21, 74:1,
81:16, 82:12,
100:10, 122:4,
130:16, 130:17,
143:24, 152:13,
181:5, 181:18,
181:20, 212:24,
231:5, 238:8,
251:15
started 25:7, 96:22,
100:12, 142:4,
182:12
starting 41:8,
69:18, 131:14,
185:25, 231:7
starts 74:25, 151:10
state 54:7, 143:18,
230:20
stated 35:2, 54:17,

55:23, 71:7,
72:17, 105:2,
122:7, 161:4,
175:13, 176:15,
236:4
statements 163:1,
174:13, 231:16,
233:1, 233:17,
233:19, 233:20,
234:13, 235:5,
236:11, 239:8,
239:19, 239:23,
240:4, 240:17,
240:19, 240:25,
249:3, 249:16,
251:24
status 10:11, 10:12,
14:12, 21:7, 24:8,
24:10, 24:15,
24:17, 33:15,
51:19, 149:21,
154:13, 162:13,
240:4, 245:4,
270:12
statute 159:21,
182:23, 185:25
statutes 103:11,
103:12, 182:19,
182:20, 183:3,
183:4, 185:19,
186:4, 186:9,
193:22, 235:16,
237:8, 242:10,
242:13, 256:25
Statutory 36:3,
36:7, 36:20,
138:12, 182:11,
184:8, 185:1,
219:6
stayed 43:12, 47:24,
57:23, 58:5,
79:11, 116:9,
135:17, 148:5,
149:7, 149:8,
198:18, 211:1,
211:3, 212:14,
215:2, 218:2,
264:17
staying 36:20,
37:14, 79:2, 79:5,

83:3, 125:23,
   135:17, 160:12,
   199:9, 215:8
Stays 84:10, 93:12,
   137:19, 138:18,
   138:19, 146:2,
   162:13, 190:14,
   199:2, 209:2,
   217:21
steam 102:11
steep 158:16
stenography 7:47
step 69:23, 163:9,
   226:20, 237:4
Stephen 6:11, 42:3
stepped 80:10
steps 68:23
Steve 5:14, 42:17
stick 17:17, 125:5,
   130:4, 134:16
stipulation 245:17
Stone 203:9
stood 130:20
Stop 55:17, 82:11,
   128:18, 137:23,
   137:24, 194:8
stopped 194:6
store 128:20
story 192:10
straightened 230:23
straightforward
   102:20, 102:22
strategies 214:3
strategy 131:11
stream 150:8, 170:6
streams 150:4,
   171:6, 171:7
strengthen 22:22
strenuously 84:7
stretched 268:2
strict 116:2, 116:3
strictly 136:24,
   149:16, 175:3,
   176:4
strike 239:14
striking 23:22
string 85:11
strings 246:1
strong 22:16,
   146:13, 152:2

strongly 23:4,
   113:6, 263:18
struck 85:14
structural 27:23,
   79:23
structure 36:9,
   65:21, 69:4,
   69:10, 127:2,
   144:17, 150:24,
   158:2, 163:22,
   219:11, 262:24,
   263:9
structured 114:4
structures 30:7,
   158:10, 269:13
struggling 235:4,
   264:9
students 27:21,
   28:8, 28:11,
   28:16, 28:19,
   29:2, 29:7
studied 78:15
studying 67:6
stuff 170:5
sub 206:23, 253:15
subject 9:25, 10:12,
   48:8, 48:17, 49:7,
   55:18, 55:20,
   55:25, 65:4,
   82:10, 90:3,
   155:8, 171:7,
   189:25, 204:16,
   208:25, 211:11,
   211:14, 215:17,
   220:3, 222:14,
   233:10, 252:22,
   257:3, 269:20
subjects 270:3
submission 10:24,
   45:18, 61:8,
   212:5, 213:1
submissions 11:1,
   58:17, 59:16
submit 92:25, 94:12,
   132:18, 134:1,
   163:9, 171:22,
   182:8, 201:1,
   206:1
submitted 10:22,
   21:16, 38:20,

46:22, 51:20,
   62:6, 83:18,
   88:12, 175:10
submitting 146:15
subordination 144:3,
   144:9
subpart 243:23,
   244:2, 250:21
subpoenas 238:9
subscribe 105:23
subsequent 88:16,
   210:3
subsidies 26:8,
   27:9, 27:16, 27:17
substance 86:10,
   212:22
substantial 27:19,
   37:25, 51:15,
   66:16, 99:7,
   136:21, 152:20,
   154:4, 157:5,
   243:11, 249:15
substantially
   226:15, 257:19
substantive 35:2,
   36:6, 65:15,
   65:17, 65:22,
   66:3, 66:9, 72:16,
   77:3, 149:13,
   160:19, 161:10,
   227:4
substitute 155:2
succeed 213:15
succeeded 124:8
success 49:3, 198:14
successful 64:20,
   66:13, 70:16,
   120:4, 121:22
successfully 120:4,
   202:16
succinct 106:18
sudden 137:19,
   137:22, 138:2
suddenly 101:23
suffer 225:20
suffering 168:1
sufficient 73:21,
   88:17, 249:9,
   255:19, 259:14
suggest 49:9, 77:3,

77:7, 77:10,
77:23, 132:18,
148:25, 197:19,
263:18, 267:9
suggested 49:25,
73:18, 73:20,
77:17, 79:22,
82:25, 115:12,
134:8, 138:7,
139:1, 147:5,
198:17, 200:8,
206:3, 209:9
suggesting 197:22
suggestion 74:13,
76:3, 76:25, 78:3,
78:13, 88:1,
138:24, 145:19,
146:9, 148:1,
148:4, 155:17,
170:19, 198:23,
266:9
suggestions 265:24
suggests 73:21
suited 220:7
Sullivan 95:8
summarily 209:4,
209:17
summer 96:15,
204:17, 264:16
sun 92:9
super 185:11
supervisory 61:21
Supplement 58:21
supplemental 24:20
supported 66:14,
100:16, 102:12,
125:20, 131:5,
206:24
supporters 106:4
supporting 32:5,
95:11, 140:12
supportive 96:19
supports 143:20
supposed 49:11,
129:3, 129:6,
129:8, 135:13,
173:25, 189:15,
261:2, 261:18
Sur 30:4, 30:16
surpluses 165:22

surprise 142:9
surprised 252:22
surprising 113:22,
143:21, 242:23
Susheel 6:26, 95:7,
96:5
Sushon 5:30
suspect 78:21
suspend 47:7
suspenders 196:1
suspending 59:6
sustainability 23:3,
186:23
sustainable 97:18,
190:9, 190:10
Swain 4:40, 10:8,
64:10, 145:8,
240:23, 272:7
swarm 178:4
sweep 142:11
sympathetic 48:22,
145:18, 238:2
System 2:13, 4:10,
39:23, 55:4,
214:19
systems 40:2


< T >
T. 5:13, 7:6
table 127:5, 216:7
tackled 102:4, 102:5
tacks 145:17
tactic 56:12
taken. 82:15, 95:3,
177:5, 207:24
talked 93:5, 93:10,
111:4, 133:2,
135:10, 136:22,
139:24, 259:18
talks 170:7, 254:7
tanks 30:7
tardes 95:5, 179:5,
179:6
target 23:7
targeted 79:12,
210:15, 210:17,
219:24, 241:24
task 11:11, 120:8,
120:10, 254:23

tax 164:10, 171:6,
206:24
taxes 153:11,
153:14, 153:19,
153:23, 154:8,
154:22, 165:10,
165:15, 182:21,
185:25, 193:23,
196:2, 224:17,
225:3, 244:19,
245:20, 260:17,
261:6, 264:20
Taylor 4:40, 272:7
tea 79:18
teachers 184:14
teasing 255:1
technical 30:8
tee 169:4, 169:11
teed 147:21, 168:13,
169:5, 169:16
telephone 268:8
telephonic 9:8
tells 259:22
template 45:25,
150:18
temporary 11:6,
27:6, 122:7
Ten 71:3, 81:15,
82:5, 82:12,
92:17, 92:19,
94:25, 95:1, 95:2,
111:12, 119:19,
159:19
ten-minute 81:15,
177:1
tend 97:4
tends 96:21, 97:14
tents 28:22, 28:23,
29:11, 29:13
term 107:22, 136:11,
219:10, 225:17,
255:19, 259:14
terminals 214:15
terms 13:21, 25:7,
31:4, 48:24,
67:25, 80:25,
94:22, 102:19,
115:11, 122:1,
147:24, 154:12,
165:3, 173:13,

184:11, 208:18,
228:2, 234:20,
237:4, 248:6,
249:10, 259:3
terribly 66:25,
77:3, 79:7
test 45:3, 46:6,
143:19, 170:14,
264:12
Testing 18:6
textbook 97:15
texting 9:23
Thanks 268:13
themselves 36:6,
39:22, 80:13,
137:21, 166:10,
170:13, 221:16,
235:5, 238:6,
239:9, 260:22,
264:16
theoreticals 48:5
theories 235:7
theory 237:10
thereafter 77:23,
163:4
thereby 16:8
thereunder 204:18,
216:20
they'll 49:18,
127:9, 130:4
They've 39:16,
48:18, 54:14,
126:20, 141:20,
157:22, 204:14,
207:16, 231:25,
234:17, 235:24,
236:4, 236:17,
239:9, 242:22,
244:12, 244:18,
270:9
thinking 75:23,
77:18, 83:11,
238:10
Third 29:4, 47:19,
68:9, 131:25,
163:15, 173:22,
209:18, 227:21,
234:11, 257:24,
267:17
third-party 238:1,

238:8, 268:4
though 13:17, 15:10,
81:5, 106:19,
154:13, 165:9,
234:10, 238:18,
241:3, 254:16,
260:12
thoughtfully 141:11
thoughts 168:16,
172:10
thousand 164:3
thousands 89:5,
89:14
threatens 122:16
Three 26:21, 28:16,
29:9, 41:9, 47:14,
54:16, 90:22,
96:1, 101:17,
102:9, 116:14,
117:18, 124:20,
132:2, 139:15,
146:3, 160:1,
163:3, 187:22,
239:14, 242:18,
249:25, 250:1,
250:24, 257:18,
257:20, 258:16,
269:19
three. 18:6
threshold 260:20
throughout 26:2,
26:12, 26:17,
26:25, 29:5,
120:19, 164:20
throw 93:25
tie 237:7
tied 206:19
till 145:6
timekeeping 40:14
timely 22:20,
162:25, 209:15,
209:22
timetable 173:7,
200:7, 225:4
timing 10:3, 51:2,
57:11, 65:10,
131:25, 142:23,
168:13, 200:1,
209:25, 262:1,
266:14

together 23:11,
29:2, 38:10,
85:13, 123:21,
134:3, 189:6,
189:7, 228:9,
261:21
Toledo 90:8, 90:17
toll 190:21
Tom 14:7
tomorrow 10:5,
75:16, 75:19,
177:11, 185:25,
207:22, 208:7
tons 117:12, 118:4
took 40:6, 65:13,
120:11, 193:15,
193:16
tool 56:13, 56:20
top 103:15, 112:21,
146:23, 155:25
topic 218:15, 223:4
Topics 84:12,
163:16, 210:7,
269:20, 270:1,
270:18
TORRES 7:26, 178:12,
178:24, 179:1,
179:12, 179:18,
179:22, 180:7
tortfeasor 85:4,
85:8
total 18:9, 28:8,
30:10, 59:2, 142:1
totaling 16:5,
124:19
totally 129:18,
236:7, 246:3
touch 87:16, 149:6
touched 169:8, 170:4
Tourism 257:7,
258:18, 260:12,
260:15
toward 11:6, 72:22,
168:20, 257:24
towards 64:10,
66:11, 95:15
track 93:12, 220:12,
238:3
tracks 41:9, 123:6,
123:9

trade 129:16,
    189:19, 189:23,
    189:24, 190:3,
    190:4
tradeoffs 63:21
trading 164:13
traffic 89:3
train 123:5, 123:9,
    128:12
transaction 239:5,
    245:11
transactions 164:11
Transcript 7:47,
    272:4
transcription 272:5
transcripts 213:5,
    214:12, 214:14,
    214:15, 214:17
transfer 182:21,
    235:20, 236:13,
    244:2, 244:14,
    244:23, 245:4,
    245:18, 245:23,
    246:20, 248:5,
    248:8, 249:2,
    249:4, 254:12,
    255:6, 263:5,
    263:12, 263:13,
    265:6
transferred 264:24
transfers 248:25,
    251:5, 254:7,
    254:10, 254:17,
    263:14, 263:15,
    263:19, 264:11,
    264:20, 265:7,
    265:11, 265:12
Transmittal 244:1,
    244:8, 244:11,
    245:3, 245:23,
    246:19, 247:19,
    248:13, 251:2,
    251:25, 264:6,
    264:19
transmittals 247:12
transparency 150:1
transparent 140:14
Transportation 2:33,
    69:7
Traurig 51:8

traveling 236:23
travels 229:22
Treasury 24:13,
    32:2, 32:4, 32:8,
    32:10, 32:11,
    32:12, 32:13,
    32:17, 236:19,
    259:22
treat 47:5, 127:4
treated 43:21,
    47:11, 53:20,
    55:14, 166:5,
    166:8, 166:12,
    185:10
treating 46:24,
    127:25
treatment 44:4,
    45:9, 50:25,
    55:13, 71:14,
    106:25, 121:2,
    121:24, 126:16,
    166:22, 166:24,
    183:23, 188:25,
    191:18
treatments 225:24
treats 131:16,
    131:17
tremendous 56:25,
    99:13, 129:19
triage 197:11
trial 43:17, 43:18,
    111:7
tried 32:20, 64:3,
    87:13, 88:10,
    95:25, 99:22,
    99:23
triggers 60:6
troubling 101:24
True 48:5, 52:6,
    52:16, 77:2,
    105:4, 114:21,
    130:23, 147:11,
    170:12, 173:12,
    204:6, 204:16,
    253:8, 254:5,
    272:5
true-ups 50:2
truly 144:25,
    148:23, 193:21,
    209:6, 264:13

Trump 13:22, 22:7,
    25:22
truncated 141:8,
    146:22
truncating 147:1,
    147:3
Trust 17:1, 22:9,
    267:5
Trustee 5:16, 34:17,
    138:13, 172:4
trustees 12:5
try 36:19, 52:1,
    53:21, 69:16,
    92:2, 96:4, 96:7,
    96:18, 101:13,
    119:21, 167:24,
    168:7, 187:17,
    188:15, 197:12,
    199:24, 203:3,
    231:3, 251:22,
    266:7
Trying 37:15, 76:24,
    93:13, 96:1,
    99:20, 107:21,
    107:24, 125:14,
    128:12, 128:18,
    144:6, 144:13,
    145:19, 145:20,
    168:8, 196:4,
    197:16, 197:24,
    198:21, 199:7,
    202:5, 236:6,
    237:4, 237:24,
    244:9, 245:7
TSA 165:8, 235:24,
    236:2, 236:5,
    245:1, 245:21,
    246:3, 264:24,
    265:8
Tuesday 115:14
turn 10:15, 23:25,
    55:1, 74:18,
    101:3, 143:9,
    162:7, 217:20,
    222:11, 226:6,
    228:20, 235:11
turnaround 93:22
turned 9:15, 9:19,
    80:17
Turning 55:11,

66:19, 71:11
turns 172:21, 235:8
two-party 111:2
two-thirds 12:20
two. 175:5
type 265:15
types 116:5, 185:9,
  248:11
typically 39:24,
  245:19


< U >
UCC 125:21, 147:25,
  172:13, 175:13,
  175:15, 215:2,
  216:21, 217:22,
  222:11, 225:9,
  225:13, 225:22,
  226:4, 226:6,
  226:12
ultimate 19:24,
  61:15, 137:10,
  137:11, 241:3
ultimately 64:10,
  75:17, 76:11,
  76:15, 79:14,
  83:6, 131:11,
  131:12, 167:24,
  171:9, 192:3,
  196:19, 214:7,
  216:4, 217:1,
  217:3
ultra 12:12
unable 32:21, 56:24,
  130:11, 221:7,
  268:1
unaffected 165:21
unauthorized 21:12,
  24:12, 31:12
unavailable 260:24
unclear 172:7
uncontroversial
  236:7
uncoordinated 218:8
underestimated
  158:20
underlying 103:6,
  169:17
underpinning 145:10

underpinnings 210:24
underscore 99:4,
  99:19, 195:13
underscoring 99:12
understandable 36:9
understanding 17:11,
  73:23, 75:11,
  99:17, 148:13,
  148:15, 171:24,
  230:21, 245:8,
  260:5, 264:5
understands 177:13,
  218:4
understated 155:24
understood 65:12,
  266:25
undertake 232:8,
  250:16
undertaken 85:13
undertaking 254:14
undertook 69:19
underwriter 175:7,
  221:13
undeterred 51:25
undifferentiated
  246:2
undisputed 47:22
undue 132:23, 247:8
unduly 255:7
unfair 162:1,
  165:23, 183:24,
  184:1, 185:12
unfold 85:21
unfortunate 135:19
unfortunately 137:10
unfounded 219:22
unhappy 51:24
Uniform 147:19,
  195:5
uninhabitable 25:15
unique 36:10, 36:18,
  163:21
units 27:3
universal 124:6
universe 89:4
universities 29:5
Unless 9:16, 20:23,
  23:24, 29:21,
  31:10, 53:7,
  53:11, 63:8, 69:6,

115:3, 115:16,
  115:20, 119:13,
  123:6, 133:7,
  139:7, 205:9,
  206:7, 235:13,
  236:22, 259:9,
  263:7
unlike 213:22
unliquidated 16:15
unnecessarily 68:9,
  122:14, 218:7,
  254:13
unnecessary 220:25
unpersuaded 214:20
unravel 85:12
unreasonable 61:18
unrelated 53:25,
  221:19
unresolved 123:7
unrestrained 165:9,
  165:14
unrestricted 236:10,
  246:1, 258:3
Unsecured 5:20,
  70:4, 71:11,
  71:22, 87:23,
  88:20, 105:7,
  150:14, 183:15,
  183:20, 184:4,
  184:19, 185:6,
  194:7
Unsecureds 106:22
unspecified 221:25
unstayed 221:18
unsurprisingly
  142:14
unsworn 261:1
untested 154:18
unusual 145:16
unwise 216:25
unworkable 134:2
up-ends 133:25
up-to-date 15:11
update 12:21, 29:22,
  29:25, 30:4,
  30:12, 31:11,
  31:12, 33:11,
  51:19, 177:17
updated 19:14,
  19:15, 19:16

updates 19:13,
  21:18, 33:6
upheaval 152:20
urge 156:8
urgency 129:14,
  129:17, 137:18
Urgent 59:19
urging 182:23
Urquhart 95:8
usability 199:22
using 9:16, 187:22
usual 9:10
UTIER 7:12
utmost 113:21

< V >
v. 4:16, 4:31,
  215:11
vacuum 201:15
valid 96:8, 111:18,
  155:8, 158:4,
  158:5, 158:9
validity 162:13,
  176:10, 226:1
validly 186:17
value 50:22, 141:20,
  141:22, 141:24,
  142:2, 232:7
valve 221:3, 221:5
VAN 6:13, 41:23,
  41:24, 42:2, 42:12
variance 242:13
variety 167:15,
  205:24
various 19:17, 27:3,
  65:3, 71:12, 81:4,
  88:13, 137:19,
  143:17, 144:18,
  168:14, 169:6,
  186:12, 230:3,
  242:10, 266:20
vast 28:19
Vazquez 4:18, 25:23,
  120:19, 120:25
Vega 32:9, 32:13
vehicle 132:10,
  132:13, 132:19,
  132:21, 198:2,
  198:7, 198:9,

198:16, 198:17,
  199:17, 203:2
vehicles 192:8,
  222:23
velocity 139:25
venues 28:17, 28:19
version 74:20
veto 114:1, 114:6,
  114:12, 114:19,
  114:24, 186:19,
  217:10
vetting 48:17
VI 12:14, 13:12,
  122:21, 167:19,
  169:22
via 65:1, 209:21,
  214:15, 222:5
viable 121:6,
  132:13, 205:12
vibration 9:18
video 42:4
view 71:3, 71:18,
  72:12, 76:18,
  76:19, 76:22,
  81:2, 84:16,
  86:22, 117:15,
  119:9, 132:12,
  152:18, 202:23,
  238:13, 258:23,
  264:25
views 39:3, 67:6,
  69:2, 71:4, 72:2,
  72:14, 72:20,
  222:23
vigilance 38:18
vignette 116:17
vigorous 86:9
VII.1 177:12
Villafa 215:10
vindicate 159:1
vintage 96:23, 96:25
vintages 187:4
violates 224:7
violations 166:25
vires 12:13
virtual 156:3
virtually 142:11,
  193:21
vis-a-vis 113:20
visibility 236:8,

244:22
visible 30:6
visit 86:5
visual 27:23
vital 206:10
Vitol 4:33, 7:16
Vivienda 14:3
vociferous 215:18
voluntary 13:11
vote 97:4, 109:4,
  110:10, 110:24,
  126:23, 165:1,
  182:4
votes 108:3
voting 182:6, 227:24
vouchers 244:2,
  248:8
vulnerable 120:20,
  122:17

< W >
W. 5:41
wait 56:10, 99:17,
  110:22, 179:24,
  180:1
waiting 17:2, 162:7,
  180:4, 200:9
waived 197:23
walk 88:9
Walker 272:13,
  272:14
Wanda 4:18
wanted 15:10, 20:15,
  33:2, 79:8, 83:23,
  86:21, 86:24,
  95:11, 99:4,
  99:22, 128:13,
  138:5, 160:15,
  235:1, 251:15,
  260:11
wanting 89:13
wants 118:16,
  176:20, 192:9,
  206:4, 229:21
warning 123:13
warped 114:12
wary 144:6
waste 31:9, 38:15,
  132:23, 263:4,

263:15
wasted 108:6
wave 44:15
Wednesday 228:7,
    254:20
weedy 84:3
week 16:3, 19:5,
    26:22, 28:24,
    28:25, 29:11,
    29:12, 52:24,
    88:5, 88:6, 94:2,
    228:8, 228:10
weekly 268:8
weeks 85:22, 102:23,
    103:1, 135:14,
    147:2, 152:18,
    156:1, 156:2,
    160:1, 160:11,
    168:20, 268:9
weigh 64:3, 71:4
weighs 72:13
Weil 152:9
Welcome 9:6, 63:5,
    213:18
well-being 130:24
Whatever 77:15,
    79:18, 81:11,
    82:10, 84:24,
    102:17, 127:16,
    137:18, 161:6,
    161:8, 175:16,
    176:13, 189:13,
    189:15, 192:1,
    200:9, 201:23,
    262:13
whatsoever 129:14,
    172:16
whereby 165:4
wherein 113:14
Whereupon 179:12
whichever 82:2,
    178:8
whoever 189:24
whole 86:10, 96:15,
    105:9, 108:13,
    117:6, 181:19,
    241:19
wholeheartedly
    176:14
wholly 51:14

whom 89:5, 89:6,
    270:3
widely 67:6
William 5:30, 5:35,
    233:8
willing 106:1,
    106:25, 138:18,
    176:11, 213:17,
    232:6, 246:7,
    249:11
Willkie 99:2
window 238:19
winter 65:17, 69:20
wiring 248:23
wish 33:14, 105:23,
    119:23, 173:3,
    177:8, 191:2,
    203:20
wishes 41:20, 81:11,
    82:1
withdraw 77:1, 88:22
withdrawal 248:8
withdraws 34:5
withheld 153:14
withhold 153:22
withholding 48:20,
    153:19
within 81:25, 87:21,
    89:7, 91:16, 93:7,
    97:19, 98:3,
    144:14, 236:5,
    243:14, 245:1
without 46:12, 55:4,
    60:1, 66:18,
    68:23, 72:4,
    77:17, 121:7,
    122:2, 174:9,
    181:24, 190:25,
    212:12, 214:2,
    220:8, 224:17,
    225:3, 226:9
withstanding 22:25,
    85:16, 154:25,
    175:16, 258:23,
    259:6
witnessed 122:21
WITNESSES 8:3
wonder 39:2
word 72:24, 197:11,
    212:10, 247:1

words 100:10, 110:7,
    120:13, 120:14,
    120:15, 139:25,
    241:11, 254:2,
    256:24, 257:14
work-around 245:17
workable 137:15,
    137:17
worked 22:2, 28:15,
    50:25, 65:16,
    129:23, 179:25
working 10:20, 11:9,
    23:10, 30:18,
    37:1, 38:10,
    38:11, 124:12,
    126:21
works 53:6, 107:25,
    145:23, 148:12,
    246:3
world 46:10, 46:17,
    76:23, 89:7
worried 191:23
worrisome 23:21
worry 176:9
worse 164:7, 216:13,
    220:15
worth 17:24, 18:10,
    22:24, 51:17,
    78:24, 85:15,
    99:12, 148:14,
    148:15, 238:15,
    239:20, 249:3
worthwhile 232:8
wrap 267:22
wrapping 92:8
write 144:2
writes 247:4
writing 81:13,
    237:20
written 45:17,
    45:18, 58:16,
    148:10, 208:21,
    243:5
wrote 182:14,
    182:18, 198:11,
    228:15


< X >
X. 238:24

< Y >
Yauco 26:18
year 10:21, 14:10,
  20:4, 20:19,
  21:19, 21:24,
  28:8, 38:24, 39:9,
  39:12, 96:7,
  96:10, 99:23,
  124:9, 130:20,
  143:24, 144:1,
  151:19, 153:13,
  167:18, 169:24,
  169:25, 170:4,
  170:6, 193:25,
  194:1, 224:21,
  248:9
year-to-year 144:8
years 21:24, 97:10,
  101:17, 113:21,
  123:2, 130:25,
  131:1, 145:21,
  153:12, 157:23,
  163:3, 163:9,
  165:24, 166:23,
  238:14, 241:23,
  245:11, 249:3,
  257:2, 263:15,
  265:5
Yesterday 11:16,
  12:3, 15:4, 26:14,
  27:24, 28:6, 78:9,
  204:24, 228:24,
  229:1
yield 139:15, 145:11
York 5:44, 6:8,
  6:12, 6:40, 9:8,
  33:18, 162:8,
  211:13, 268:15
yourselves 178:24


< Z >
zero 131:13, 142:16
Zouairabani 7:10