# **<u>EXHIBIT A</u>**

# FACTUAL ASSERTIONS CONTAINED IN THE PARAGRAPHS IDENTIFIED BY JUDGE SWAIN AS APPROPRIATE SUBJECTS FOR DISCOVERY

On February 14, 2020, the Court issued an Order [ECF No. 11057] (the "Adjournment Order") granting the *Urgent Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company to Adjourn Hearing on Motions for Relief from the Automatic Stay and Extend Deadlines for Replies in Support of Motions for Relief from the Automatic Stay* [ECF No. 10841] filed by the Movants. The Adjournment Order adjourned the preliminary hearing on the lift-stay motions to April 2, 2020 and provides the following with respect to discovery:

> Consistent with the Court's directions at the January 29, 2020, omnibus hearing, the Court believes that some discovery is appropriate. Accordingly, the Court will allow limited discovery relating to factual representations in paragraphs 77, 81, and 92, and Exhibit A of the *Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from Automatic Stay or, in the Alternative, Adequate Protection [ECF No. 673]* (Docket Entry No. 10618 in Case No. 17-3283), paragraphs 39-41 of the *Opposition of Commonwealth of Puerto Rico to Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon Concerning Application of Automatic Stay [ECF No. 10104]* (Docket Entry No. 10615 in Case No. 17-3283), and paragraphs 29, 38, 69, 103, and 124-125 of the *Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA Bondholder Motion to Lift Automatic Stay [ECF No. 10602]* (Docket Entry No. 10611). Discovery will proceed under the supervision of Judge Dein pursuant to the order of reference filed contemporaneously herewith, who will hold a hearing on any related discovery disputes in connection with the omnibus hearing scheduled for March 4 and 5, 2020.

Adjournment Order at 2.

Movants have highlighted specific assertions contained in the paragraphs Judge Swain identified as appropriate subjects for discovery that Movants believe are factual assertions (rather than legal assertions) and are, therefore, within the scope of discovery authorized by Judge Swain:

| HTA ||
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| Dkt. No. 10618, ¶ 77 & n.30 | **Paragraph 77:** The Pledged Funds are held by the Fiscal Agent, and arguably the Fiscal Agent has control of them. But there are no deposit account control agreements with respect to any deposit accounts of HTA or the Commonwealth and, therefore, Movants do not have the requisite control over any HTA or Commonwealth deposit account (other than, in the case of HTA, the Pledged Funds). |

| HTA ||
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| | As a result, even if Movants were granted a security interest against all Revenues regardless of where they are deposited, that security interest is unperfected (except as to the Pledged Funds).[30] <br><br> **FN 30:** Moreover, even if Movants were granted a security interest in HTA's right (if any) to receive Revenues (they were not), such security interest has not been perfected. The only way to perfect a security interest in a right to receive Revenues is to file a financing statement "indicating the collateral covered." *See* 19 L.P.R.A. § 2260(a); 19 L.P.R.A. § 2322(a). None of the Financing Statements identify HTA's right to receive Revenues as collateral. Therefore, any security interest in HTA's right (if any) to receive Revenues is unperfected. |
| Dkt. No. 10618, ¶ 81 & n.32 | **Paragraph 81:** Even if Movants had a perfected security interest in funds the Commonwealth transfers to HTA, that would not help Movants as the Commonwealth has not appropriated the HTA Allocable Revenues to HTA. In connection with the HTA Allocable Revenues, HTA only has the power to, "subject to the provisions of § 8 of Art. VI of the Constitution . . . pledge to the payment of [the bonds] bonds and interest thereon, the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth." 9 L.P.R.A. § 2004(l). Funds only conditionally allocated to HTA and never in fact transferred to HTA cannot possibly be considered funds "made available" to HTA.[32] It would also be ineffective under Article 9, because a security interest can only attach to property "the debtor has rights in . . . or the power to transfer rights in," 19 L.P.R.A. § 2233(b)(2), and HTA has neither rights in nor the power to transfer rights in the Commonwealth's property. <br><br> **FN 32:** In other contexts, the phrase "made available" has been interpreted only to encompass funds actually transferred to or otherwise unconditionally available for use by the taxpayer. *See, e.g., Knapp v. Comm'r*, 41 B.T.A. 23, 27 (B.T.A. 1940) (funds not "made available" to taxpayer when taxpayer only had conditional right to obtain them, stating "[n]one of the funds now being taxed to him were 'made available' to him within the meaning of the statute at any time prior to 1934, when the actual distribution to him was made."); *Newman v. Comm'r*, 68 T.C. 433, 448 (T.C. 1977) (funds not "made available" to petitioner "at any time prior to his retirement because of the conditions placed on withdrawal."). |
| Dkt. No. 10618, ¶ 92 & n.43 | **Paragraph 92:** The statutes governing the premium reimbursements in *Flores Galarza* and the statutes at issue here both use the phrase "shall transfer." That is where the similarity ends. Here, the Commonwealth collects the HTA Allocable Revenues from taxpayers (not Movants) under its taxing authority, deposits them in the TSA, and is then required by statute—subject to certain conditions—to transfer those funds to HTA for HTA's "corporate purposes." 13 L.P.R.A. § 31751(a). The Commonwealth always reserved the right to retain those funds and use them for its own purposes. *See, e.g.*, 13 L.P.R.A. § 31751(a)(1)(C) (making allocation to HTA subject to section 8 of Article VI of the P.R. Constitution). This, among other reasons, eliminates the argument the Commonwealth is a "mere custodian" of funds—it has authority to retain and use the funds. Moreover, the funds are not |

| HTA ||
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| | required to be transferred to HTA bondholders, but to HTA for HTA's "corporate purposes." This is affirmed by comparison to Act 1-2015, section 2.07, which added subsection (G) to 13 L.P.R.A. §31751(a)(1), specifying that "on or after the Effective Date" the account into which the Commonwealth is required to deposit HTA's Allocable Revenues "shall belong to [HTA] for the benefit of the holders of the bonds . . . ." *See* Act 1-2015, § 2.07 (inserting 13 L.P.R.A. § 31751(a)(1)(G)). The "Effective Date" specified in Act 1-2015 never happened,[43] and so the account was never converted into an account held "for the benefit of the holders of the bonds." Nonetheless, the fact Movants negotiated so the Puerto Rico legislature would alter the ownership of the account to specify it would be held for bondholders shows it is not held for their benefit under existing law. Further, as explained above, the statute requiring the Commonwealth to transfer future revenues to HTA was an appropriation by one legislature, and is repealable at any time by the legislature. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2020 U.S. App. LEXIS 2954, Case No. 19-1699, *17-18 (1st Cir. Jan. 30, 2020) (ERS bondholders lacked a property interest in statutory appropriations in part because appropriations "could be disregarded by a subsequent legislature (to the Bondholders' detriment).").<br><br>**FN 43:** As added by Act 1-2015, "Effective Date" was defined in new Section 12A(a)(4) as "the date on which the following two (2) requirements are met: (i) all liens on income, taxes, and fees earmarked for the Authority, including those designated under Acts No. 30-2013 and 31-2013, to collateralize the BANs of the Authority (as a result of the payment of said BANs or with the consent of the holders of said BANs) as well as any outstanding debt of the Authority with the Government Development Bank for Puerto Rico are satisfied; (ii) all outstanding loans and obligations that the Authority currently has with the Government Development Bank for Puerto Rico and the Authority's BANs have been repaid or transferred from the Authority to the Infrastructure Financing Authority . . ." New Section 12A(a)(4) further provides that the "President of the Government Development Bank for Puerto Rico shall certify the date on which the requirements in subparagraphs (i) and (ii) are met and said certification shall be filed with the Office of the Secretary of the Senate and the Office of the Clerk of the House of Representatives and shall be published on the website of the Government Development Bank for Puerto Rico." By its terms, Section 12A(b) never became effective because neither prerequisite occurred. Page 125 of the Commonwealth Of Puerto Rico Financial Information and Operating Data Report (December 18, 2016), available at http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf, indicates that the Effective Date has not occurred and "[t]he Commonwealth does not currently contemplate that" such conditions would "be satisfied in the foreseeable future." The requisite certification by the President of the GDB has not been published at the GDB website http://www.gdb-pur.com/. |
| Dkt. No. 10618, Exhibit A | HTA Flow of Funds Chart |

| CCDA | |
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| Dkt. No. 10615, ¶ 39 | **Paragraph 39:** At a final hearing, the Debtor will be prepared to show that, until late 2015, the flow of funds operated as contemplated under the implementing statutes and the Bond Documents. The Tourism Company would levy and collect the Occupancy Tax Revenues; it would then transfer the appropriate amounts to the Transfer Account and assign the amount GDB certified to GDB; those funds would then be transferred to the Pledge Account, and finally, the funds would be distributed to the Trustee and then to the CCDA Bondholders in accordance with the Trust Agreement. |
| Dkt. No. 10615, ¶ 40 & n.21 | **Paragraph 40:** In late 2015, however, the Tourism Company ceased depositing funds into the Transfer Account and instead retained those funds.[21] As discussed below, prior to PROMESA, this retention of Occupancy Tax Revenues was based on various Commonwealth emergency orders authorizing the retention of these funds. After the enactment of PROMESA, the continued detention of the Retained Occupancy Tax Revenues was based on PROMESA and its preemption of inconsistent, pre-existing Commonwealth laws.<br><br>**FN 21:** The Transfer Account was addressed as part of GDB's restructuring. |
| Dkt. No. 10615, ¶ 41 | **Paragraph 41:** Although the Tourism Company ceased depositing funds in the Transfer Account, it continues to levy and collect Occupancy Tax Revenues. |

| PRIFA | |
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| Dkt. No. 10611, ¶ 29 & nn. 17-20 | **Paragraph 29:** Pursuant to section 5(a) of the Lockbox Agreement, the first $117 million are disbursed by the Lockbox Bank to the TSA "for deposit to the credit of PRIFA,"[17] and commingled with other governmental public funds.[18] Such disbursement is expressly subject to section 15 of the Lockbox Agreement which provides that if there is any change in federal or Commonwealth law that reduces the amounts appropriated to PRIFA, the corresponding amounts to be disbursed under section 5 will be reduced.[19] The disbursement is made with an accompanying "Disbursement Detail" (what Movants refer to as "transmittal information"), that describes the disbursements using the similar language from the Lockbox Agreement. Such "Disbursement Detail" is not an instruction, but is merely a description of how the disbursements were calculated, as the Lockbox Bank has no power to create any property interest in the monies or instruct how they are to be used.[20]<br><br>**FN 17:** Section 5(a) provides, in relevant part, "Disposition of Cover Over Payments in the Account. The Lockbox Bank shall make disbursements of Cover Over Payments deposited by the U.S. Government in the Account during each Fiscal Year by making the following payments from the Account in the following order of priority, solely to the extent of funds available in the Account: (a) First, subject to |

| PRIFA ||
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| | Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of PRIFA, the first $117 million of aggregate Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(a) during such Fiscal Year…" ECF No. 10109-12 (emphasis in original).<br><br>**FN 18:** After the first $117 million of Rum Taxes are deposited in the TSA, Citibank disburses additional designated amounts to (i) the Treasury Secretary "for deposit to the credit of" the Puerto Rico Science & Technology Trust, and (ii) the Puerto Rico Conservation Trust Fund. Approximately 46% of the remaining Rum Tax Remittances are disbursed directly to a trustee (Banco Popular) on behalf of Puerto Rico rum producers in exchange for their agreement to continue production of large volumes of rum in Puerto Rico for a period of 20 years, to collaborate with the Commonwealth in the marketing and promotion of its rum and Puerto Rico rums generally in the U.S. market, and to use the Rum Tax Remittances returned to it to market and promote Puerto Rico rum products.<br><br>**FN 19:** Section 15 provides, in relevant part, "Legal Adjustments; Change in Federal Law; Amounts Payable to PRIDCO. (a) If, at any time after the date of this Lockbox Agreement, Act No. 119 of July 9, 2006 [i.e. 3 L.P.R.A. § 1914] of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to PRIFA from Cover Over Revenues or to eliminate any priority that PRIFA may have with respect to such amounts, the payments from the Lockbox Account set forth in Section 5(a) shall be adjusted accordingly to reflect such reduction or the elimination of such priorities. . . ." ECF No. 10109-12.<br><br>**FN 20:** Section 14(c) of the Lockbox Agreement provides that only the Commonwealth and the Lockbox Trustee have any claims to the monies in the Lockbox Account. The Lockbox Bank, in section 14(b), disclaims its ability to enter into any agreement with any person relating to the Lockbox Account or any monies therein or credited thereto. |
| Dkt. No. 10611, ¶ 38 | **Paragraph 38:** Through these definitional steps, the Trust Agreement traces the Rum Tax Remittances and identifies precisely when they are pledged to bondholders. First, the Rum Taxes are collected by the federal government. Second, they are remitted to the Puerto Rico Treasury pursuant to federal statute with no limitations as to use. At that stage, the Rum Tax Remittances are commingled in the Commonwealth's TSA, what the Trust Agreement defines as "Offshore Excise Taxes." Third, *if* the Rum Tax Remittances are deposited with PRIFA, they are called "Special Tax Revenues" under the Trust Agreement. Fourth, *if* PRIFA deposits in the Sinking Fund the Rum Tax Remittances it receives, they are called "Pledged Revenues," and deemed the "sole[]" source of funds pledged to bondholders. In fact, the Trust Agreement *prohibits* PRIFA from "pledg[ing] or creat[ing] any liens upon" money deposited in the Puerto Rico Infrastructure Fund (Trust Agreement § 401), which is where the Commonwealth deposits any Rum Tax Remittances pursuant to 3 |

| PRIFA | |
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| | L.P.R.A. § 1914 for PRIFA to use "for its corporate purposes" – not necessarily to pay bondholders. Thus, the Trust Agreement limits the scope of any lien granted by PRIFA to funds actually in the Sinking Fund. The diagram in Exhibit A illustrates this cash flow.<br><br>Exhibit A: Flow of Rum Taxes |
| Dkt. No. 10611, ¶ 69 | **Paragraph 69:** The statute governing the premium reimbursements in *Flores Galarza* is clearly distinguishable from the statutes at issue here. Here, the Commonwealth receives the Rum Taxes from the federal government with no strings attached, and deposits them into a treasury lockbox account, which then transfers a certain portion of them to the TSA. The Commonwealth then specifies that it may appropriate—subject to certain conditions—those funds to PRIFA (and not Movants) for PRIFA's "corporate purposes." 3 L.P.R.A. § 1914. In addition, no "trustee" or "fiduciary" language exists and the Commonwealth always reserved the right to retain those funds and use them for the Commonwealth's purposes. *Id*. This eliminates the argument the Commonwealth is a "mere custodian" of funds—it has authority to retain and use the funds as it sees fit. Moreover, the funds are not required to be transferred to PRIFA bondholders, but to PRIFA for its "corporate purposes"— nothing even begins to support an argument that the funds are held for the Bondholders' benefits. In addition, the Offering Statements never mention the existence of a trust relationship— a feature that would have been disclosed had it existed. |
| Dkt. No. 10611, ¶ 103 & n.58 | **Paragraph 103:** Based on their misinterpretation of the Enabling Act, Movants argue the mandated transfer of Rum Tax Remittances from the Commonwealth to the PRIFA Infrastructure Fund (and then, pursuant to the Trust Agreement, to the Sinking Fund) creates a series of trusts. But Movants neither cite nor quote any statutes to make this argument, and it is wrong. As demonstrated above, *see supra* ¶ 33, all the applicable statutes provide for the conditional prepetition promise to transfer funds to PRIFA for its "corporate purposes." Instead of creating property interests in the Rum Tax Remittances, the statutes merely "authorize" PRIFA to grant security interests in them. Supra ¶ 87. This does not create a trust: the First Circuit has specified that no trust can exist where no "specific restriction [is] placed upon [the debtor's] use of the supposed trust funds," and "[the debtor] was left free to use what it received for its own benefit rather than" hold it for the purported trust beneficiary. *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981) (holding that contracts and International Air Transport Association resolutions that specified the debtor was "in general terms" supposed to "hold whatever monies it collected in trust" for a creditor was ineffective to create a trust where the debtor retained the right to use the monies as it saw fit and was not required to keep the funds separate from others).[58] Accordingly, unappropriated Rum Tax Remittances which sit in the TSA, not segregated, and commingled with other revenues are far from a "clearly defined trust *res*." And, even if transferred to PRIFA (for its corporate purposes), they are commingled in the PRIFA Infrastructure Fund with other funds as required by 3 L.P.R.A. § 1914. |

| | PRIFA |
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| | **FN 58:** *See also, e.g., LFD Operating, Inc. v Ames Dep't Stores Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 624 (Bankr. S.D.N.Y. 2002), *aff'd*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 F. App'x 900 (2d Cir. 2005) ("Therefore, the Court finds that Ames did not hold the Net Sales Proceeds in trust for LFD because Ames, at all relevant times, has commingled the Net Sales Proceeds and used the funds between settlement dates for purposes other than paying LFD, before making payment to LFD out of general funds provided by GECC."). Even the cases cited by Movants recognize the same and prohibit the finding of a trust here. *See, e.g., In re Tap, Inc.*, 52 B.R. 271, 276 (Bankr. D. Mass. 1985) (trust does not exist "where funds are collected from third parties and used at will by the defendant whose only responsibility is to pay when billed, or at some monthly or other non-immediate date, much the same as any other creditor"). *In re Bologna* at 632 does not help Movants' case (M.Br. ¶¶ 60): there, the statute involved monies (a security deposit) paid to the debtor by plaintiff, and specifically provided that "[a] security deposit shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the lessor, and shall not be subject to the claims of any creditor of the lessor or of the lessor's successor in interest." *In re Bologna*, 206 B.R. at 632. None of the statutes at issue here provide the same as in *Bologna*. |
| **Dkt. No. 10611, ¶ 124 & n.74** | **Paragraph 124:** The fact Movants cannot have a security interest on an ongoing "stream" of future Revenues is also demonstrated by the recent First Circuit opinion relating to ERS bonds. *See Andalusian Glob.*, 2020 U.S. App. LEXIS 2954. On January 30, 2020, the First Circuit issued an opinion addressing ERS bondholders' claimed property interest in employer contributions previously to be made to the retirement system following the commencement of these Title III proceedings by the Commonwealth and other public corporations and instrumentalities, including the retirement system. Such employer contributions were to be calculated based on a percentage of payroll and only payable after the public employees performed work for their employers. Employer contributions were allocated to the retirement system by legislative appropriations. The First Circuit held that the retirement system did not have a property interest in future employer contributions as it only had "merely an expectancy," that such contributions would be made. *Id.* at *16. The court stated that any statutory requirement for the payment of employer contributions could be disregarded by a subsequent legislature. ==Similarly, PRIFA (or Movants) had and have no property right in future Rum Tax Remittances, only an expectation. The Rum Tax Remittances conditionally appropriated to PRIFA could be modified or eliminated by a subsequent legislature.== *Id.* at *17-18. Ironically, Movants themselves recognized that ==future Rum Taxes are a mere expectancy when they asserted there are a host of factors outside the Commonwealth's control, such as the level of production of rum on-island and repeal of the federal law remitting the monies to the Commonwealth, that could also impact future Rum Tax Remittances.== M.Br. ¶ 96.[74] As a result, under no interpretation could Movants' have a security interest on any "stream" of future PRIFA revenues.<br><br>**FN 74:** The First Circuit also observed "[i]t is also clear and our result is reinforced by the fact that language in the Bond Resolution and the Official Statement for the bonds explicitly contemplated that the payment of future Contributions was |

| PRIFA ||
|---|---|
| **LOCATION IN BRIEF** | **EXCERPT** |
| | contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures." *Andalusian Glob.*, 2020 U.S. App. LEXIS 2954, at *16. Here the Offering Statements notified Bondholders that the continued flow of Rum Taxes was contingent on future federal government allocations. *See supra* ¶ 32, 41. |
| **Dkt. No. 10611, ¶ 125** | **Paragraph 125:** To the extent Movants argue that they hold special revenue bonds, they are wrong. The Bonds are not secured by special revenues (as defined in Bankruptcy Code section 902) because the Rum Tax Remittances are not a special excise tax of the Commonwealth, but a mere appropriation from the United States. Not only are the Rum Tax Remittances not derived from PRIFA's operations or the Commonwealth's operations, PRIFA is not even a Title III debtor and the Enabling Statute makes clear that any money the Commonwealth promised to send to PRIFA is dependent on appropriation from the United States. As a result, section 928(a) of the Bankruptcy Code does not save Movants' security interest (if any) from being cut off by Bankruptcy Code section 552(a). |