**Objection Deadline**: March 17, 2020 at 5 p.m. (A.S.T.)
**Reply/Statement in Support Deadline**: March 24, 2020 at 5 p.m. (A.S.T.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>            as representative of<br><br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>            Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

# AMENDED CROSS-MOTION AND STATEMENT IN SUPPORT ON BEHALF OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY WITH RESPECT TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO AMEND TENTH AMENDED CASE MANAGEMENT PROCEDURES AND ADMINISTRATIVE PROCEDURES REGARDING DISCLOSURE REQUIREMENTS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2019

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:  8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID:  3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ................................................................1

BACKGROUND ...............................................................................4

    A.   The Title III Cases and Related Litigation...............................4

    B.   The Title III Case and Bond Trading Prices .........................7

    C.   The Rule 2019 Order and Subsequent Rulings Regarding
Bankruptcy Rule 2019 ...................................................8

    D.   The Deficient Rule 2019 Statements from LCDC and QTCB
Group .......................................................................10

    E.   The Committee's Motion ................................................14

JURISDICTION AND VENUE ...........................................................15

RELIEF REQUESTED IN CROSS-MOTION ...........................................15

ARGUMENT ................................................................................15

    A.   The "Vintage" of the Bonds Must Be Disclosed in Rule 2019
Statements ..................................................................17

    B.   COFINA Restructuring Bond Holdings and Other Bond Holdings
Should be Disclosed ......................................................20

    C.   Timely Disclosure of New Members and Cross-Holdings is
Required ....................................................................25

    D.   Retroactive Compliance with Rule 2019 is Warranted............29

CONCLUSION...............................................................................32

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................................3

*In re Bossart*,
    2007 WL 4561300 (Bankr. S.D. Tex. Dec. 21, 2007) ....................................28

*In re Energy Future Holdings Corp.*,
    Case No. 14-10979-CSS, ECF No. 12608 (Bankr. D. Del. Feb. 9, 2018) ......................17

*In re Energy Future Holdings Corp.*,
    Case No. 14-10979-CSS, ECF No. 9672 (Bankr. D. Del. Sept. 26, 2016) ......................18

*In re Residential Capital LLC*,
    Case No. 12-12020, ECF No. 5612 (Bankr. S.D.N.Y. Nov. 5, 2013) ............................18

*In re Sanchez Energy Corp.*,
    Case No. 19-34508, ECF No. 690 (Bankr. S.D. Tex. Dec. 6, 2019) ...........................18

*In re Sears Holding Corp.*,
    Case No. 18-23538-RDD, ECF No. 832 (Bankr. S.D.N.Y. Nov. 20, 2018) ...................18

*In re Verso Corporation*,
    Case No. 16-10163, ECF No. 316 (Bankr. D. Del. Feb. 24, 2016) ...............................18

*In re Washington Mutual Inc.*,
    419 B.R. 271 (Bankr. D. Del. 2009) ...............................................................15

**STATUTES & OTHER AUTHORITIES:**

Fed. R. Bankr. P.:

    2019(a) ...........................................................................................17
    2019(a)(1) .......................................................................................17
    2019(c)(2) .......................................................................................15
    2019 (c)(2)(B) ..........................................................................16, 17
    2019(d) ...........................................................................................16

2011 Advisory Committee Note to Fed. R. Bank. P. 2019....................................17, 19

9 *Collier on Bankruptcy* ¶ 2019.01 ..............................................................15

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Karen Pierog and Luis Valentin Ortiz, *Move to Invalidate Puerto Rico GO Bonds Sends
Prices Lower,* Reuters, Jan. 15, 2019....................................................................................7

Kevin J. Coco, *Empty Manipulation: Bankruptcy Procedure Rule 2019 and Ownership
Disclosure in Chapter 11 Cases*, 2008 Colum. Bus. L. Rev. 611, 621 (2008) ................16

Karen Pierog and Luis Valentin Ortiz, *Puerto Rico Bonds Trade Higher in Wake of
Report of Tentative Deal*, Reuters, Feb. 6, 2020....................................................................8

Matt Wirz and Andrew Scurria*, Puerto Rico Bondholders Reach Tentative Deal with
Oversight Board*, Wall Street Journal, Feb 5, 2020..............................................................8

Sparkle Alexander, *The Rule 2019 Battle:  When Hedge Funds Collide with the
Bankruptcy Code*, 73 Brook. L. Rev. 1411, 1416 (2008) ...............................................16

Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, and Financial Guaranty Insurance Company (the "Movants") by and through their undersigned counsel, respectfully submit this amended cross-motion (the "Cross-Motion") and statement of support relating to the *Motion of the Official Committee of Unsecured Creditors to Amend Tenth Amended Case Management Procedures and Administrative Procedures Regarding Disclosure Requirements Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 11747) (the "Committee's Motion" or "Comm. Motion"), and hereby request entry of an order substantially in the form attached as Exhibit A hereto,[2] amending the Case Management Procedures to reflect the relief sought in this Cross-Motion and the Committee's Motion.  In support of the Cross-Motion and Committee's Motion, Movants respectfully state as follows:

**PRELIMINARY STATEMENT**

1.        The Movants file this Cross-Motion and statement in support to express their strong support for the Committee's Motion seeking to enforce compliance with Bankruptcy Rule 2019.  The Committee's Motion properly seeks what Rule 2019 already requires:   public disclosure of the nature and amount of each disclosable economic interest held by each member of a Rule 2019(b) group.  The Committee's Motion seeks modest relief:  disclosure of bond claims by series held against PBA and the Commonwealth, pursuant to the same categorization of Commonwealth and PBA bond claims used in the current plan support agreement and plan of adjustment.  *See* Comm. Motion ¶ 25.  The relief sought in the Committee's Motion is necessitated by the fact that various hedge fund groups have either failed to disclose cross holdings, or simply lumped together all of their holdings into one category:  "GO Bonds" or "Constitutional Debt."  Through this Cross-Motion, Movants seek additional disclosures from

---

[2] For ease of reference, attached as Exhibit B is a blackline reflecting incremental changes to the proposed order attached to the Committee's Motion.

Rule 2019(b) groups, including disclosure of (i) COFINA restructuring bond holdings and (ii) any claims held against CCDA and PRIFA. This Amended Cross-Motion does not in any way alter the relief sought in the Cross-Motion.  The Amended Cross-Motion merely adds this explanatory paragraph and removes certain speculative statements and references to advisors contained in various paragraphs of the Cross-Motion in an effort to avoid the Court and the parties to the Cross-Motion from being distracted from the core issues presented – the inadequacy of the 2019 disclosures and the need for further disclosure.  Given that the relief sought and basis for relief have not changed, Movants submit there is no need to alter the existing briefing schedule related to the Cross-Motion.

2.      More specific disclosures should be required to fully understand the interests and argument motivations of the bondholder groups involved.  In particular, one hedge fund group, the Lawful Constitutional Debt Coalition ("LCDC"), has actively advocated for *different* treatment of general obligation and PBA bonds based upon their so-called "vintage" (i.e. date of issuance), but in its own 2019 statements has lumped all GO and PBA Bonds together as "Constitutional Debt," regardless of "vintage" (early or late) or issuer (the Commonwealth or PBA).  LCDC's position in these cases has been that earlier dated bonds are superior securities that are not subject to claim objections, and therefore have seniority over so-called "late vintage" bonds.  Despite previously having claimed that the debt limits were breached ***in 2011 because of PBA bonds***, LCDC now claims that only bonds issued ***after March 2012*** breached the debt limits and therefore are either subordinated or subject to disallowance.  LCDC also now claims that PBA debt is not debt issued by the Commonwealth, even though prior filings by its members took the exact opposite position.

3.      LCDC and certain other ad hoc group members negotiated an initial public settlement that provided for a substantially lower recovery on late vintage bonds, which, in turn,

drove down the prices on those late vintage bonds.  After potentially acquiring these "late vintage" bonds following the announcement of the initial public settlement, these ad hoc group members then negotiated a settlement of the late vintage bonds that provided a substantially higher recovery than proposed under the initial settlement.  These trades may now place LCDC on ***both sides of LCDC's own claim objection.***

4.    Furthermore, as explained herein, the LCDC members may be using the Commonwealth's plan as a vehicle to secure additional collateral (namely, the Commonwealth's share of the sales and use tax) to support their senior COFINA bonds.  Movants respectfully submit that in light of this potential conflict of interest, Rule 2019(b) groups should be required to disclose the amount of restructured COFINA securities held by each group member.

5.    These problems are not confined to LCDC.  Another ad hoc group—the ad hoc group of holders of Qualified School Construction Bonds (the "QTCB Group") – also filed deficient statements that did not accurately report its members' PBA bond claims, and also failed to disclose cross-holdings of its members.  Like LCDC, the QTCB Group has supported plans of adjustment that separately classify bonds based upon their vintage.  And like LCDC, the members of the QTCB Group have been steadily purchasing general obligation bonds on the secondary market during the pendency of these Title III proceedings, likely including specifically late vintage bonds.

6.    Complete disclosure under Rule 2019 would dispel any doubts that other stakeholders may have about the issues identified above.  Indeed, "sunlight is said to be the most powerful of all disinfectants; electric light the most efficient policeman."  *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (citation omitted).

7.    Movants thus fully support the relief sought in the Committee's Motion, as it will provide all stakeholders with the necessary tools to evaluate the positions taken by hedge

fund ad hoc groups in these Title III cases (and the underlying motivations for taking such positions). The Committee's Motion should be granted, along with the further disclosure relief requested in this Cross-Motion.

## **BACKGROUND**

### A.    **The Title III Cases and Related Litigation**

8.    In May 2017, the Financial Oversight and Management Board for Puerto Rico ("FOMB") filed Title III petitions on behalf of the Commonwealth, HTA, COFINA, and ERS. Over two years later and concurrent with the filing of a joint plan of adjustment, FOMB, on September 29, 2019, filed a Title III petition on behalf of PBA.

9.    In December 2018, the Committee and FOMB commenced an adversary proceeding against PBA (the "PBA Lease Adversary") alleging that PBA's leases were disguised financings rather than "true leases." *See* Adv. Proc. No. 18-149, ECF No. 1. That complaint sought declarations that (i) the PBA leases were not subject to treatment in accordance with section 365(d)(3) of the Bankruptcy Code and therefore "the Debtors have no obligation to make payments to PBA under the Leases"; (ii) PBA was not entitled to an administrative expense priority claim under the leases; and (iii) the Debtors have no payment obligation under "non-debtor" leases. *See id.* Prayers for Relief A-C.

10.    On January 14, 2019, FOMB and the Committee filed a claim objection against certain general obligation bonds ("GO Bonds") issued after 2012 (the "GO Claim Objection"). *See* ECF No. 4784. According to these claim objectors, bonds issued by PBA ("PBA Bonds") should be recharacterized as GO Bonds and included within the calculation of the Commonwealth's debt limit under the Puerto Rico Constitution, because, in the objectors' view, the "PBA structure is a sham." *Id.* ¶ 65. As a result of the proposed recharacterization of PBA

Bonds as GO Bonds, these objectors contend that GO Bonds issued after 2012 violated the debt limit.

11.   LCDC is a hedge fund group that played a leading role in the negotiation and development of the current plan support agreement ("PSA") and proposed plan of adjustment. LCDC consists largely of former members of an earlier ad hoc group, the COFINA Senior Bondholders' Coalition (the "COFINA Group"). The COFINA Group filed a pleading in the so-called "Commonwealth-COFINA Dispute" on November 6, 2017, alleging that the debt limit was "breached in 2011." Adv. Proc. No. 17-257-LTS ECF No. 90 ¶ 169-70. Consequently, the COFINA Group alleged that GO Bonds issued "after February 2011" are "entitled only to be repaid, at the most, *pari passu* with the Commonwealth's other unsecured creditors" and that creditors holding such GO Bonds could not claim "any entitlement to the Commonwealth's available resources or the Commonwealth Priority Provision." *Id.* ¶¶ 174-75; *see also* Case No. 16-cv-02374-FAB, ECF No. 219 at p. 29-34 (filing by COFINA Group claiming bonds issued in excess of the debt limit—which allegedly included PBA and GO Bonds issued in 2011—are void). The COFINA Group also articulated a second theory that serves as the cornerstone to the current proposed Commonwealth plan of adjustment:   PROMESA allegedly preempts Commonwealth laws and the Commonwealth's Constitution. Adv. Proc. No. 17-257-LTS ECF No. 90 ¶¶ 161-67; *see also* ECF No. 11946 art. 71.3 (plan provision entitled "Preemption of Laws"). LCDC  was therefore the original architect of most of the legal theories underlying the current plan of adjustment.

12.   Following consummation of the COFINA plan of adjustment, former COFINA Group members focused on settlement of GO Bond claims.

13.   The former COFINA Group members purchased substantial sums of GO Bonds and formed LCDC.  LCDC then  aggressively pushed its "late vintage" and "early vintage"

distinction in numerous briefs filed before this Court, as well as during omnibus hearings.[3]   For

example, LCDC filed an omnibus claim objection to certain so-called "Late Vintage Bonds."

ECF No. 9730.   As noted above, the members of LCDC previously argued in 2017 that the

Commonwealth breached its debt limit in March 2011.   *Infra* ¶ 11.   But in its omnibus claim

objection, LCDC members suddenly changed their legal position.   LCDC now claimed that

rather than breaching the debt limit in February 2011, the Commonwealth breached its debt limit

in March 2012.   Thus, bonds issued after 2012—according to LCDC—are "late vintage" bonds

that breached the debt limit.   ECF No. 9730 ¶¶ 14-17.   Based on this "vintage" theory, the LCDC

posited that the "late vintage bonds" "are not entitled to the same priority under the Puerto Rico

Constitution" as earlier issued bonds.   *Id.* ¶ 5.

14.   LCDC made similar claims in other filings with this Court, indicating that its

strategy through the claim objections is "potential disallowance or subordination of Late Vintage

GO Bonds."   ECF No. 6181 ¶ 17.   LCDC claimed that "GO bonds and guarantees issued after

March of 2012 ***could not have been backed by the Commonwealth's faith and credit***."[4]   Based

on this "potential" subordination or disallowance, LCDC then sought to formulate a plan with

FOMB that would "propose a fair treatment for holders of ***indisputably lawful priority bonds***,"

and to create a litigation trust for disputed claims.   ECF No. 6181 ¶ 21 (emphasis added).

15.   On September 27, 2019, FOMB filed a joint plan of adjustment on behalf of the

Commonwealth and PBA.   That plan of adjustment provided for different treatment for so-called

early "vintage" Commonwealth and Commonwealth-guaranteed bonds, with earlier-issued bonds

receiving a higher recovery.   *See* ECF No. 8766, at pp. 201-206.   And despite FOMB's claims in

---

[3] *E.g.*, Adv. Proc. No. 18-149-LTS ECF No. 107; ECF No. 9730 (omnibus claim objection to late vintage
bonds); ECF No. 6180 ¶¶ 7-12 (alleging that bonds issued after 2012 violated debt limit and that such
bonds "clearly are not entitled to any lawful priority under Commonwealth law"); ECF No. 6181 ¶ 17.

[4] *See* Comm. Motion, Ex. C (April Press Release).

the PBA Lease Adversary that PBA is not entitled to ***any*** rental payments whatsoever, that plan of adjustment provided that PBA bond claims would be allowed in an amount equal to principal, plus all accrued interest prior to PBA's petition date (which occurred two years after the Commonwealth filed its Title III petition).  *Id.* at 206.  The plan also provided for ***full*** payment of all of the Commonwealth's rental obligations, which are then used to pay the PBA bonds. The creditor proponents of this original plan were LCDC and the QTCB Group.

16.    A new plan support agreement was announced on February 9, 2020, which also adheres to the distinction between "late vintage" and "early vintage" bonds.  The new plan, however, proposes to provide a much higher recovery to late vintage bonds than what was proposed under the initial plan of adjustment.  The plan support agreement also provides for the transfer to COFINA of the Commonwealth's share of the Commonwealth's 5.5% sales and use tax, thereby giving holders of COFINA's senior restructuring bonds a senior lien on that share (without providing the Commonwealth or its creditors with any consideration in exchange for that senior lien).

**B.    The Title III Case and Bond Trading Prices**

17.    After the GO Claim Objection was filed—which challenged bonds based upon their vintage—the  2014 GO Bond prices fell to 48 cents on the dollar.[5]  However, between July 2019 (when this Court stayed litigation in these Title III proceedings) and February 9, 2020 (when the amended plan support agreement was announced), trading prices on the 2014 general obligation bonds saw a double digit increase.[6]

---

[5] *See Move to Invalidate Puerto Rico GO Bonds Sends Prices Lower,* Reuters, Jan. 15, 2019, *available at* https://www.reuters.com/article/usa-puertorico-bonds/move-to-invalidate-puerto-rico-go-bonds-sends-prices-lower-idUSL1N1ZF0VK.

[6] *See* Bank of America Global Research, Municipals Weekly, attached hereto as Exhibit F.

18.     In addition, the market reacted when news of plan support agreements was leaked to the press.  As just one example, days before any formal announcement had been made by FOMB, a news outlet reported on February 5 that a deal had been reached between GO and PBA bondholders and FOMB, under which "FOMB agreed to a higher payment on the" late vintage bonds.[7]  The *Wall Street Journal* credited this information to "people familiar with the matter"— potentially meaning people who likely were involved in the mediation process that resulted in the plan support agreement.[8]  In light of the news that these bonds would receive a higher recovery, the "late vintage" bond prices jumped to trading prices between 72 and 76 cents on the dollar.[9]

## C.     The Rule 2019 Order and Subsequent Rulings Regarding Bankruptcy Rule 2019

19.     On July 26, 2017, this Court entered an order (and as reflected in the *Eleventh Amended Case Management Procedures*,[10] the "2019 Order") mandating that "every group, committee and entity that, on or before August 9, 2017, has taken a position before the Court must file a verified statement that complies with the disclosure requirements enumerated by Federal Rule of Bankruptcy Procedure 2019." 2019 Order § IV.A.  The 2019 Order also required that if information in the most recently filed 2019 statement "changes materially, the Rule 2019(b) Group must file a supplemental verified statement with or within 48 hours of the

---

[7] *See* Matt Wirz and Andrew Scurria, *Puerto Rico Bondholders Reach Tentative Deal with Oversight Board*, Wall Street Journal, Feb 5, 2020, *available at* https://www.wsj.com/articles/puerto-rico-bondholders-reach-tentative-deal-with-oversight-board-11580934722.

[8] *Id.*

[9] *See Puerto Rico Bonds Trade Higher in Wake of Report of Tentative Deal*, Reuters, Feb. 6, 2020, *available at* https://www.reuters.com/article/usa-puertorico/puerto-rico-bonds-trade-higher-in-wake-of-report-of-tentative-deal-idUSL1N2A526N

[10] After the Committee filed the Committee's Motion, an amended version of the Case Management Procedures was entered which amended certain sections that are not relevant to the Committee's Motion or this Cross-Motion.  ECF No. 11885 (amending Case Management Procedures for notice requirements and for scheduling of omnibus hearings).

next instance in which the Rule 2019(b) Group takes a position before the Court." *Id.* § IV.C.
Moreover, "the absence of such a supplemental statement shall be deemed a representation that
no material changes have occurred." *Id.*

20.     This Court has previously addressed the scope of Rule 2019 and its important
disclosure requirements.  Of particular relevance here, this Court amended the 2019 Order after
learning that certain GO Bondholders had failed to disclose their COFINA bond holdings, even
though those bondholders took a position within the Commonwealth-COFINA dispute.   In
response to those revelations, this Court amended the 2019 Order and stated on the record that "it
does seem appropriate to me to clarify that reporting as to <u>each debtor</u> in whose case a Rule
2019(b) group files a pleading in a group or representative capacity is required—is a change that
we ought to make."  Tr. of Hearing, (July 25, 2018), at 90:20-25 (emphasis added).  This Court
went on to express concern about certain bondholders failing to disclose to the public through
Rule 2019 statements that they effectively sat on both sides of the litigation and potentially were
trading bonds based upon the litigation:

> MR BURKE:  [W]e do think that it would be inappropriate to insist that those disclosure requirements also be applied retrospectively.  From our perspective, it seems like a rather extraordinary request….
>
> THE COURT: Well, you were supposed to have done it in the first place.  And as Mr. Despins noted, you were actively involved in taking positions in the public litigation.  There were press releases, at least one press release that was in the context of your having a  position on only one side of it.
>
> Obviously the proposed Commonwealth-COFINA settlement is something that has generated both controversy and excitement of all sorts…and these are securities that are actively traded in the market.  And the services will tell us that they're actively traded in the market right now.
>
> So why shouldn't the market have full information about where you were at particular times, that the market could not track to movements, and why shouldn't we have in the context of this proceeding, information that you

should have filed on a timely basis?....[Y]our clients were trading in securities
that were securities of debtors in Title III cases.

*Id.* at 95-96.  Therefore, this Court ordered "retroactive reporting, with the retroactive reporting
to be filed within 14 days" and in compliance with the Rule 2019 Order.  *Id.* at 100-01.

21.     Similarly, on June 6, 2019, this Court granted Assured's motion seeking entry of
an order compelling the Committee to comply with Rule 2019.  *See* ECF No. 7256 (the "UCC
Order").  In the UCC Order, this Court stated that "a decrease (cumulative or otherwise) of even
50% from the amount originally reported with respect to such member and debtor would
generally be material."  UCC Order at 4.  Under the UCC Order, disclosure of such material
changes were required to be made "contemporaneously with or within 48 hours after the next
instance in which the Rule 2019(b) Group takes a position before the Court or solicits votes on
the confirmation of a plan."  *Id.* at 4-5.  This Court also ordered that the Committee include "a
description of the nature and amount of *all* disclosable economic interests held by *each* such new
Committee member with respect to *each of the debtors in these Title III proceedings…*"  *Id.* at 5
(emphasis added).

**D.     The Deficient Rule 2019 Statements from LCDC and QTCB Group**

22.     Despite being on notice of this Court's prior rulings regarding the importance of
full compliance with Rule 2019, certain hedge fund groups have chosen to continue filing
deficient Rule 2019 statements, and have not updated their statements in a timely manner.

23.     In the final verified statement filed by the COFINA Group before it largely
transformed into LCDC, the Commonwealth and/or Commonwealth-guaranteed holdings of the
relevant COFINA Group's members in the aggregate totaled $375.5 million.  *See* Case No. 17-
03284-LTS, ECF No. 360, Ex. A.  According to the last Rule 2019 statement filed by the
COFINA Group, certain LCDC members did not hold any Commonwealth or Commonwealth-

guaranteed indebtedness.[11]   And as of February 2018,  certain funds that were members of both the COFINA Group and now the LCDC collectively held less than $7 million of aggregate uninsured Commonwealth or Commonwealth guaranteed indebtedness.[12]

24.     Since its formation, LCDC has filed five statements pursuant to Bankruptcy Rule 2019 (the "LCDC Statements").  *See* ECF Nos. 5252, 7465 8639, 9732, 11161.  The first four LCDC Statements—filed between February 2019 and January 2020 (including after PBA's Title III petition)—simply lumped together each member's holdings as "Constitutional Debt," which collectively was defined to include PBA Bonds, GO Bonds, and bonds issued by other Commonwealth instrumentalities and guaranteed by the Commonwealth.  *See* ECF No. 5252 ¶ 3; *id.* at p. 1.  No further specificity was provided in these statements as to the nature of each member's disclosable economic interests, such as the "vintage" of the bonds, the amount of claims held against PBA, and the specific amount of GO Bonds held by each member.  The first four 2019 Statements by LCDC were therefore plainly deficient under the 2019 Order and Bankruptcy Rule 2019.  LCDC also filed a fifth supplemental verified statement, which, as discussed below, still failed to comply with Bankruptcy Rule 2019.

25.     The LCDC Statements did reveal in broad terms that LCDC's members were purchasing substantial sums of "Constitutional Debt" on the secondary market in 2019 and 2020.

_____

[11] These same members argued that the senior COFINA bondholders could settle the subordinate bondholders' rights, "including by entering into an agreement to allow the Commonwealth to use funds trapped at the Trustee at 0% interest."  *See* Adv. Proc. No. 17-133-LTS, ECF No. 431 at pp. 31-32. Following these statements, prices on the COFINA subordinate bonds plummeted.  Between August 2017 and November 2018, the Rule 2019 statements filed by the COFINA Group show that its members' aggregate subordinate bond holdings grew from approximately $616 million to $2.2 billion.  *See* Case No. 17-3284-LTS, Dkt. No. 360 ¶ 10 (listing aggregate subordinate bond holdings as of October 31, 2018); *id.* Dkt. No. 212 ¶ 4 (noting aggregate subordinate bond holdings as of August 2017).   The senior bondholders then "settled" the subordinate bond claims at substantially higher recoveries.  Those same members may be employing the same strategy now in the Commonwealth case.

[12] *See* Case No. 17-03284-LTS, ECF No. 298, Ex. A; *see also* Cross-Motion, Ex. C.

*Within the span of just one year, LCDC's aggregate holdings increased by $1.3 billion* (increasing from $700 million to over $2 billion). *Compare* ECF Nos. 5252, 11161. While some of the increase was attributable to the inclusion of additional members in LCDC, a sizable portion of the increase is attributable to the existing LCDC members purchasing "Constitutional Debt," as reflected in **Exhibit C** hereto.

26.     The QTCB Group first appeared in this case in June 2017, and its first verified Rule 2019 statement was filed on August 16, 2017. ECF No. 1053. The QTCB Group has since filed four additional Rule 2019 Statements (each, a "QTCB Statement"). Each QTCB Statement listed the QTCB Group's members' claims as "General Obligation Bonds" without providing specificity as to the claims held against the Commonwealth as opposed to PBA. ECF No. 1053, Ex. A. Moreover, like the LCDC Statements, the QTCB Statements improperly lumped all of the group members' holdings together as "General Obligation Bonds," even though the body of the QTCB Statements indicates that the group primarily holds Qualified School Construction Bonds and Qualified Zone Academy Bonds "*issued by the Puerto Rico Public Buildings Authority*." *Id.* at 1 (emphasis added).

27.     The QTCB Statements show that members of the QTCB Group have steadily purchased bonds on the secondary market during the pendency of these Title III proceedings. The Rule 2019 statements filed by the QTCB Group show that the aggregate "General Obligation' debt holdings of the QTCB Group increased by $1.2 billion, but the membership of that group has remained the same. *Compare* ECF No. 1053, Ex. A *with* ECF No. 11293, Ex. A. Certain of these newly purchased bonds may be "late vintage" bonds. Indeed, the QTCB Group filed a limited joinder to a motion to dismiss the GO Claim Objection (which, again, applies only to bonds issued *after* 2012) filed by certain GO Bondholders. ECF No. 10705.

-12-

28.     The prior QTCB Statements failed to specify (i) what bond claims the QTCB Group held against PBA and (ii) what amounts of "late vintage" and "early vintage" bonds are held by each member of the QTCB Group.  In addition, the QTCB Statements were not timely updated after the filing of the PBA Title III petition, even though the QTCB Group took positions before this Court during that time.  At least five months passed between PBA's petition date and the filing of the fifth QTCB Statement.  The QTCB Statements also failed to disclose cross-holdings of members in other Title III debtors, such as HTA and PREPA.

29.     Two weeks prior to the filing of the Committee's Motion, counsel to certain of the Movants contacted counsel to LCDC and the QTCB Group, requesting that they refile all of their prior Rule 2019 statements because they failed to disclose cross-holdings in other Title III debtors and the amounts of late vintage bonds held by each group member.  *See* Exhibit D (Emails from T. Curtin to LCDC and QTCB Group counsel).  Counsel to the LCDC and QTCB Group never responded to those emails.

30.     Rather than directly responding to those emails, counsel to LCDC and the QTCB Group filed fifth supplemental verified statements pursuant to Bankruptcy Rule 2019 on behalf of their respective ad hoc groups.  ECF No. 11161; ECF No. 11293, Ex. A.  Despite providing some added detail, these newly filed statements—filed well after LCDC and the QTCB Group took positions in this case—still fail to comply with Rule 2019.  Moreover, by admitting that the additional information provided in these fifth supplemental Rule 2019 statements was "intended only to comply with Bankruptcy Rule 2019 and the Tenth Amended Case Management Order" (*see* ECF No. 11161 ¶ 7), LCDC and the QTCB Group effectively conceded that their prior Rule 2019 statements did not comply with Rule 2019 or with the 2019 Order.

31.     The newly-filed LCDC and QTCB Group statements continue to fail to disclose (i) the group members' holdings of late vintage versus early vintage bonds, as well as (ii) cross-

holdings of certain of these groups' members in the securities of other Title III debtors.  This
information was disclosed nowhere within the Rule 2019 statements, even though each member
is required to disclose *each* disclosable economic interest against *each Title III debtor*.

32.      Finally, the LCDC Statements admit that members of that group may hold
COFINA restructuring bonds.  ECF No. 11161, n. 2.  Notwithstanding that admission, the LCDC
Statements do not disclose the amount of COFINA restructuring bonds held by each LCDC
member.

### E.      The Committee's Motion

33.      Following the filing of the latest deficient 2019 statements by LCDC and the
QTCB Group, the Committee filed the Committee's Motion.  The Committee's Motion argues
that certain changes to the *Eleventh Amended Case Management Procedures* are necessary,
because certain ad hoc group members have purchased substantial amounts of additional debt,
and the existing Rule 2019 statements do not clarify what debt has been acquired by those group
members.  Comm. Motion ¶¶ 23-24.  As the Committee's Motion correctly notes, the Rule 2019
statements filed by LCDC in particular fail to specify what types of claims are even held by
LCDC's members, leaving stakeholders in these Title III cases with no ability to test the veracity
of LCDC's claims that its bonds are "lawful" and "valid" constitutional debt.  *Id.* ¶ 42.  The
Committee's Motion thus requests that bondholder groups be required to specify the amount of
early vintage bonds and late vintage bonds held by each member.  *See* Comm. Motion, Ex. A.
The Committee's Motion also properly asserts that disclosure of bond series information should
be retroactive.  *Id.* ¶ 43.

34.      The Movants support the relief sought in the Committee's Motion and seek
certain additional appropriate disclosures pursuant to Rule 2019.

-14-

## JURISDICTION AND VENUE

35.     This Court has jurisdiction pursuant to PROMESA § 306(a).  Venue is proper in this district pursuant to PROMESA § 307(a).

## RELIEF REQUESTED IN CROSS-MOTION

36.     Through this Cross-Motion, Movants seek entry of an order substantially in the form of Exhibit A, which adopts all of the disclosure requirements sought in the Committee's Motion and which would also require Rule 2019(b) groups to disclose the nature and amount of (i) COFINA Restructuring Bonds and (ii) any bond claims held against the Puerto Rico Infrastructure Financing Authority and the Puerto Rico Convention Center District Authority. Further, as set forth in Part C of this Cross-Motion, Movants request that Rule 2019(b) groups disclose cross-holdings in other Title III debtors, which is information that is already required to be disclosed under the 2019 Order.

## ARGUMENT

37.     Rule 2019 requires "every entity or committee representing more than one creditor" to file a verified statement disclosing, among other things, the names and addresses of the creditors, and the nature and amounts of their claims.   Fed. R. Bankr. P. 2019(c)(2).[13] Rule 2019 is "designed to foster the goal of reorganization plans that deal fairly with creditors and are arrived at openly."  9 *Collier on Bankruptcy* ¶ 2019.01;  *In re Washington Mutual Inc.*, 419 B.R. 271, 278 (Bankr. D. Del. 2009) (noting that the purpose of Rule 2019 was to "provide a routine method of advising the court and all parties in interest of the actual economic interest of all persons participating in the proceedings").

---

[13] The only entities that are exempt from Rule 2019's disclosure requirements are specified in Rule 2019(b)(2), and those entities do not include hedge fund groups such as LCDC and the QTCB Group.

38.     Bankruptcy Rule 2019 was substantially amended in 2011 to "require more, rather than less, disclosure." *Id.* at 279.  These expanded disclosure requirements resulted from the "proliferation of short-selling and the advent of myriad derivative products," which allowed "creditors to take multiple stakes in the capital structure of debtors." *Id.*  Moreover, increased disclosure was necessary because hedge funds often have "short-term investment objectives" with "seemingly conflicting priorities,"[14] and sometimes use the bankruptcy process to manipulate the trading prices of their holdings, "hoping that some of their values increase or some decrease, in order to maximize total return."[15]

39.     All creditor groups are under an ongoing duty to update their Rule 2019 disclosures upon any material change to a group's membership or to any of its members' economic interests.  *See* Fed. R. Bankr. P. 2019(d).  The 2019 Order reiterates the obligation of Rule 2019(b) groups to file updated Rule 2019 statements to apprise the Court and all creditors of material changes to the group's holdings or composition "contemporaneously with or within 48 hours after . . . [taking] a position before the Court. . . ."  2019 Order IV.C; *see also* UCC Order at 5 ("The Committee is active in these Title III cases, and the Court expects the Committee to comply with its disclosure obligations in a timely manner").

40.     Among the basic obligations imposed by Rule 2019 is the requirement that each member of a committee disclose the "nature and amount of ***each*** *disclosable economic interest held in relation to the debtor*…."  Fed. R. Bankr. P. 2019 (c)(2)(B) (emphasis added).  As defined in Bankruptcy Rule 2019(a), a "disclosable economic interest" means "any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative

---

[14] *See* Sparkle Alexander, *The Rule 2019 Battle: When Hedge Funds Collide with the Bankruptcy Code*, 73 Brook. L. Rev. 1411, 1416 (2008).

[15] *See* Kevin J. Coco, *Empty Manipulation: Bankruptcy Procedure Rule 2019 and Ownership Disclosure in Chapter 11 Cases*, 2008 Colum. Bus. L. Rev. 611, 621 (2008).

right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest." *Id.* 2019(a)(1). The Advisory Committee Notes to Rule 2019 make clear that this defined term "is intended to be sufficiently broad to cover any economic interest ***that could affect the legal and strategic positions a stakeholder takes in a chapter 9 or chapter 11 case***." 2011 Advisory Committee Note to Fed. R. Bank. P. 2019 (emphasis added). Each group member is therefore required to disclose *each* economic interest "that could affect the legal and strategic positions a stakeholder takes in" these Title III proceedings. *Id.*

41.     The LCDC and QTCB Group disclosures fail to disclose this important information.

## A.     The "Vintage" of the Bonds Must Be Disclosed in Rule 2019 Statements

42.     The Committee argues that disclosing "merely that the party holds Commonwealth bonds, without information as to series, fails to adequately communicate the economic interest affecting that party's legal and strategic positions." Comm. Motion ¶ 39. The Movants agree with the Committee. As the Committee noted, parties may have "hedged [their] bets by holding both series" of bonds. *Id.* The relief sought in the Committee's Motion, seeking disclosure of the vintage of GO and PBA Bonds, is therefore not only appropriate but essential to fulfilling the underlying purposes of Rule 2019.

43.     The vintage of the various series of GO and PBA Bonds is a disclosable economic interest under Rule 2019(a). Given the positions taken by FOMB, LCDC, and the QTCB Group, the "vintage" of the GO and PBA Bonds is an economic interest that is affected by the "value, acquisition, or disposition" of such claim or interest. Fed. R. Bankr. P. 2019(a). In other bankruptcy cases, Rule 2019 groups have provided more specific disclosures, including when the plan provided for separate classification of claims that otherwise may have had the same priority. *See, e.g.*, *In re Energy Future Holdings Corp.*, Case No. 14-10979-CSS, ECF No. 12608 (Bankr.

D. Del. Feb. 9, 2018) (providing for separate disclosure of unsecured claims by class under plan

of reorganization); *In re Sanchez Energy Corp.*, Case No. 19-34508, ECF No. 690 (Bankr. S.D.

Tex. Dec. 6, 2019) (disclosing separate note holdings based upon maturity dates); *In re Sears*

*Holding Corp., Case No. 18-23538-RDD,* ECF No. 832 (Bankr. S.D.N.Y. Nov. 20, 2018)

(disclosing various types of unsecured notes and loans, including separate disclosure for payment

in kind notes); *In re Verso Corporation*, Case No. 16-10163, ECF No. 316 (Bankr. D. Del. Feb.

24, 2016) (providing separate disclosures for note holdings based upon different interest rates);

*In re Residential Capital LLC*, Case No. 12-12020, ECF No. 5612 (Bankr. S.D.N.Y. Nov. 5,

2013) (providing separate disclosures for note holdings based upon maturity date and interest

rate).

44.     These more specific disclosures are also required where, as here, one creditor

tranche claims priority over another.  *See In re Energy Future Holdings Corp.*, Case No. 14-

10979-CSS, ECF No. 9672 (Bankr. D. Del. Sept. 26, 2016) (disclosing DIP claims, and listing

out each tranche of first lien debt claims, which were embroiled in intercreditor litigation).  Even

in these Title III cases, creditors have disclosed this type of information.  *See* ECF No. 7603 (fuel

line lender verified statement, which specified amount of bonds and loans held by each member,

both instruments being subject to intercreditor litigation); Case No. 17-04780-LTS, ECF No.

1871, Ex. A (same from PREPA ad hoc group); Case No. 17-03284-LTS, ECF No. 298, Ex. A

(disclosing senior and subordinate positions within debtor's capital structure).

45.     LCDC has taken the position that "vintage" is relevant to allowance and priority

of the GO Bonds.  *See, e.g.*, ECF No. 9730 (omnibus claim objection to late vintage bonds); ECF

No. 6180 ¶¶ 7-12 (alleging that bonds issued after 2012 violated debt limit and that such bonds

"clearly are not entitled to any lawful priority under Commonwealth law"); ECF No. 6181 ¶ 17

(asserting that late vintage bonds may be disallowed or subordinated).  On that basis, LCDC has

helped craft a plan that treats different series of GO Bonds differently.   The vintage of the

bond—which dictates the treatment of the various series of GO bonds—is an economic interest

"that could affect the legal and strategic positions a stakeholder takes in" these Title III

proceedings, and therefore must promptly be disclosed.  *See* 2011 Advisory Committee Note to

Fed. R. Bank. P. 2019.

46.    Disclosure of this information is of distinct importance at this juncture.

Prepetition creditors have a right to know the economic interests of the parties who crafted the

plan of adjustment, including whether or not those parties purchased late vintage bonds prior to

the execution of the most recent version of the plan support agreement.  If they did, then that

information would be probative of a number of plan confirmation issues, including, without

limitation, whether the plan was negotiated in good faith, whether the settlements embodied

therein are fair and equitable, and whether certain creditors' votes should be disqualified or

disallowed under Bankruptcy Code section 1126(e).[16]

47.    Disclosure of the "vintage" of LCDC's holdings will also inform this Court and

all stakeholders about whether LCDC's members are sitting on both sides of a litigation or

related settlement.  LCDC interposed a claim objection to "late vintage" bonds in January 2020,

claiming that those bonds breached the debt limit and are not entitled to priority.  Just one month

later, LCDC entered into a plan support agreement, which provided late vintage bonds a much

higher recovery than in the initial plan support agreement.

48.    There appears to be some evidence that LCDC and QTCB Group members may

have purchased late vintage bonds, including after the first plan of adjustment was filed in

---

[16]    *See* Testimony of Hon. Robert Gerber Regarding Rule 2019 at 2, *available at*
https://www.uscourts.gov/sites/default/files/09-bk-019-testimony-gerber_0.pdf    (noting    trades    are
probative of a variety of issues, including vote designation).

September 2019.  For example, in its earlier press releases, LCDC routinely stated that its members held bonds issued on or prior to March 2012.  *See* Comm. Motion, Ex. C (relevant portion under "About the LCDC").  This language does not appear in LCDC's press release about the new plan support agreement.[17]

49.     In addition, LCDC members previously took the position that the constitutional debt limit was breached in February 2011.  *See infra* ¶ 11.  LCDC's current position is that the debt limit was breached in 2012, and therefore bonds issued in 2011 qualify as "early vintage" bonds.  LCDC and its members may have conveniently changed their legal position when they purchased 2011 bonds.  Thus, in order to test the credibility of LCDC's assertion that its claims are "lawful" and entitled to a higher recovery than other GO Bonds, LCDC should disclose the amount of PBA and GO Bond claims held by its members that were issued in 2011 (which was when LCDC's members previously claimed the debt limit was breached).

50.     The Committee's Motion appropriately seeks disclosure of the vintage of the bonds, and therefore would provide stakeholders with better insight into the motives of the creditor groups—particularly LCDC—that have played the leading role in these Title III proceedings to date and that were central to the crafting of FOMB's new proposed plan of adjustment.

**B.      COFINA Restructuring Bond Holdings and Other Bond Holdings Should be Disclosed**

51.     Movants also respectfully submit that the Rule 2019(b) groups (including LCDC and the QTCB Group) should be required to disclose what amounts of new COFINA securities are held by each group member to expose any related conflicts of interest that may exist in these

---

[17] LCDC Press Release, Feb. 9, 2020, *available at* https://www.bloomberg.com/press-releases/2020-02-09/lcdc-aligns-with-oversight-board-and-additional-holders-of-constitutional-debt-on-terms-of-a-plan-that-will-accelerate-puerto.

Title III cases.  In February 2019, this Court approved a settlement between the Commonwealth and COFINA, with each debtor receiving ownership of a specified portion of the sales and use tax (the "SUT").  *See* Adv. Proc. No. 17-257-LTS, ECF No. 593.  Thereafter, the Court also approved a plan of adjustment for COFINA, pursuant to which COFINA's prepetition bond claims would be exchanged for newly issued bonds (the "COFINA Restructuring Bonds").  The COFINA Restructuring Bonds are secured "by a statutory first lien" on Reorganized COFINA's "right, title, and interest in and to the Pledged Taxes."[18]

52.     Under the current Commonwealth plan and plan support agreement—both of which were negotiated by LCDC—GO Bond claims would be satisfied in part with "COFINA Junior Lien Bonds," with such bonds being secured by a *second* priority lien on the "Commonwealth Share" of SUT revenues awarded to the Commonwealth in the Commonwealth-COFINA settlement.[19]   The plan support agreement provides that the "Commonwealth Share" of the SUT "will be sold, transferred and conveyed to COFINA" and that "COFINA will be the sole and exclusive owner of the Commonwealth Share."[20]   Once COFINA acquires a "right, title, and interest" in the Commonwealth Share as a result of this transfer of the Commonwealth Share to COFINA, a first-priority statutory lien will attach to the Commonwealth Share in favor of the holders of existing COFINA Restructuring Bonds—including members of LCDC.  By contrast, holders of the new "COFINA Junior Lien Bonds" issued to existing GO Bond holders under the plan will receive only a "second lien" on the Commonwealth Share.[21]

---

[18] *See COFINA Disclosure Statement*, Case No. 17-03284-LTS, ECF No. 368, at 165-66.

[19] *See* Plan Support Agreement at p. 29, *available at* https://emma.msrb.org/ES1452453.pdf.

[20] *See id.*

[21] *See id.*

53.     As certain Movants have previously noted to the Court, this transfer of the
Commonwealth Share to COFINA may represent an attempt by holders of COFINA
Restructuring Bonds (most notably LCDC) to acquire additional collateral to secure the existing
COFINA Restructuring Bonds in exchange for no additional consideration.  *See* ECF No. 11497
¶¶ 20-21.   Specifically, under this Court's order approving the settlement of the so-called
"Commonwealth-COFINA Dispute," COFINA currently has ownership of only the "COFINA
Portion" of the SUT.[22]  The COFINA Portion comprises the SUT only "in an amount up to fifty-
three and sixty-five one hundredths percent (53.65%)" of a fixed value known as the "Pledged
Sales Tax Base Amount," or "PSTBA," each fiscal year.  *See Third Amended Title III Plan of
Adjustment of Puerto Rico Sales Tax Financing Corporation*, ECF No. 4652 art. 1.64.   The
COFINA Portion "exclude[s] in its entirety" the "Commonwealth Portion" of the SUT owned by
the Commonwealth (*see id.* art. 1.71), which the proposed plan of adjustment now proposes to
convey to COFINA in the form of the so-called "Commonwealth Share."  *See* ECF No. 11946
art. 2.5.

54.     The "New Bond Legislation" enacted in connection with the COFINA plan,
attached hereto as "Exhibit E", in turn grants holders of the existing COFINA Restructuring
Bonds a "statutory first lien on all of [COFINA's] right, title, and interest in and to the [SUT]."
*See* Ex. E. art 3.2 ("Statutory Lien").  Because COFINA currently has a "right, title, and interest"
only in the COFINA Portion, the statutory lien securing the COFINA Restructuring Bonds
currently extends only to the COFINA Portion.   However, if the Commonwealth Portion is
conveyed to COFINA as proposed in the plan of adjustment, then COFINA will acquire a "right,

---

[22] *See* ECF No. 5045-1 ¶ 3(a) (Court-approved settlement agreement providing "The Commonwealth-
COFINA Dispute shall be compromised and settled . . . with (i) COFINA being granted ownership of the
COFINA Portion, and (ii) the Commonwealth being granted ownership of the Commonwealth Portion").

title, and interest" in the Commonwealth Portion, and holders of COFINA Restructuring Bonds

will thereby obtain a "statutory first lien" on the Commonwealth Portion as well as the COFINA

Portion. *See id.* In the event COFINA were to default in the future, this cost-free acquisition of

billions of dollars of additional collateral could significantly improve the position of holders of

the existing COFINA Restructuring Bonds, because such holders would be able to attempt to

enforce their new "statutory first lien" on the full "PSTBA" amount (consisting of both the

COFINA Portion *and* the Commonwealth Portion) in subsequent fiscal years rather than only

their existing lien on just the COFINA Portion. In particular, although the indenture for the

COFINA Restructuring Bonds does not provide for acceleration of the bonds as a contractual

matter, if COFINA were to file for relief again under Title III or a similar restructuring law,

holders of COFINA Restructuring Bonds might argue that the COFINA Restructuring Bonds had

been automatically accelerated by operation of the Bankruptcy Code, which was one of the

central arguments made by LCDC's members in their former guise as the COFINA Group during

the COFINA interpleader litigation.[23] Holders of COFINA Restructuring Bonds might then

argue that, in view of this acceleration and of their new "statutory first lien" on the full "PSTBA"

amount, they are entitled to receive the full PSTBA amount each year until the COFINA

Restructuring Bonds are paid in full. This concern was validated in the recently filed disclosure

statement, which warns investors that the COFINA Junior Lien Bonds will be "subordinate to the

statutory lien granted pursuant to the COFINA Senior Bonds Legislation" and otherwise

"subordinated in all respects…to the COFINA Senior Lien Bonds." *See* ECF No. 11947 at 389-

90.

---

[23] *See, e.g.*, Adv. Proc. No. 17-133-LTS, ECF No. 431 at 32 (summary judgment motion by COFINA
Group arguing that "all COFINA bonds became immediately due and payable when COFINA filed for
Title III protection pursuant to section 502 of the Bankruptcy Code").

55.     COFINA Restructuring Bond holdings may thus present a serious conflict of interest.   Creditors holding such bonds may not be acting solely in their capacities as Commonwealth creditors, and instead may be acting at least partly in their capacities as holders of COFINA Restructuring Bonds, seeking to secure additional collateral to support those obligations.   Indeed, as noted above, many bondholders who crafted the plan and plan support agreement (particularly those belonging to the LCDC) did not even own Commonwealth bonds until the COFINA plan of adjustment had been confirmed; they are first and foremost *COFINA* bondholders.  *See infra* ¶¶ 22-23.  Because the Commonwealth plan and plan support agreement contemplate that the existing holders of COFINA Restructuring Bonds will obtain a senior lien on what is currently the *Commonwealth*'s property, the COFINA Restructuring Bonds are disclosable economic interests that must be disclosed under Rule 2019.

56.     LCDC admits in the LCDC Statements that (i) its counsel represented the COFINA Group, (ii) "certain members of LCDC previously held bonds issued by COFINA," and (iii) members "of the LCDC may hold new COFINA securities issued under the [COFINA] Plan."   ECF No. 11161, n. 2.   In light of the potential conflict of interest between Commonwealth creditors and holders of COFINA Restructuring Bonds, Movants respectfully submit that all Rule 2019(b) groups (including LCDC and QTBC) should be required to disclose the amount of  COFINA Restructuring Bond holdings held by each group member.  This will allow stakeholders to assess whether Rule 2019(b) group members are acting primarily in their capacities as legitimate creditors of the Commonwealth or not.

57.     Finally, Rule 2019(b) groups also should disclose whether their members hold any other bonds impacted by the proposed Commonwealth plan of adjustment, such as bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Puerto Rico

Convention Center District Authority ("CCDA").[24]  Claims related to these PRIFA and CCDA bonds are classified in Classes 43 and 44 of the proposed plan of adjustment.  *See* ECF No. 11947 at 18, 39.  Disclosure of these bond claims will allow stakeholders to assess whether any key stakeholders sit on both sides of the "clawback" issue, or whether hedge funds are acquiring those bonds to manipulate voting on the plan of adjustment.

C.    **Timely Disclosure of New Members and Cross-Holdings is Required**

58.    The 2019 Order plainly requires disclosure of "all economic interests with respect to ***each debtor***."  2019 Order IV.A.  This Court reaffirmed that obligation in the UCC Order when it ordered the Committee to provide a description of the "nature and amount of all disclosable economic interest held by each such new Committee member ***with respect to each of the debtors in these Title III Proceedings***" and to disclose categories of claims held "*against each debtor*."  UCC Order at 5-6.

59.    Despite these clear rulings, disclosures from hedge fund groups have been inconsistent.  Some groups (such as the fuel line lender group) filed 2019 statements that appropriately specified each member's claims against the Commonwealth, HTA, and PREPA. *See* ECF No. 7603.  They disclosed this even though certain of those members belong to other ad hoc groups that have retained separate legal counsel in the Title III cases of other debtors, such as HTA.  *Id.*

60.    Other groups—including LCDC and the QTCB Group—have attempted to obscure their cross holdings.  The first four LCDC Statements and QTCB Statements did not specify amounts held against PBA, even though LCDC and the QTCB Group clearly have taken positions within PBA's Title III case, including supporting a plan of adjustment filed in that case

---

[24] As discussed in Part C herein, Rule 2019(b) groups should also disclose any claims held against other Title III debtors (such as HTA).

and participating in the PBA Lease Adversary.  At the time that LCDC promoted the original

plan support agreement, LCDC asserted that its members and members of the QTCB Group held

"billions of dollars of GO claims," even though its Rule 2019 statements filed by those groups

failed to disclose what specific amount GO bond claims were actually held by each group

member.  *See* Adv. Proc. No. 18-149-LTS, ECF No. 107 ¶ 2.

61.    Moreover, for at least five months after PBA's petition date, LCDC and the

QTCB Group failed to specify their holdings against PBA, thereby leaving creditors to guess

from prior Rule 2019 disclosures what amount of "Constitutional Debt" or "General Obligation"

debt holdings disclosed in their 2019 statements consisted of PBA Bond claims and what

amounts consisted of GO Bond claims.  This plainly violated the 2019 Order, which requires the

filing of a supplemental verified statement "with or within 48 hours of the next instance in which

the Rule 2019(b) Group takes a position before the Court."  2019 Order IV.C.[25]

62.    The new Rule 2019 statements filed by LCDC and the QTCB Group are also

deficient.  These statements fail to disclose cross-holdings in HTA and other Title III debtors,

even though the members of those groups do have such cross holdings.  *See* ECF No. 7603

(disclosing one QTCB Group member's HTA holdings); ECF No. 11748, Ex. A (noting that

certain LCDC members hold insured and uninsured HTA bonds).  As discussed above, the

relevant standard is whether the Rule 2019(b) group has taken a position in another Title III case,

which the 2019 Order makes clear includes "asserting any legal or factual positions that in any

way impact the property and rights of the Title III Debtor."  2019 Order IV.A, n. 4.  Disclosure

of the cross holdings falls squarely within that standard.

---

[25] Indeed, the filing of PBA's petition was actually contemplated in the plan support agreement that was
publicized *in June 2019*.  And despite the fact that the plan proposed in that plan support agreement
provided for the treatment of PBA Bonds, LCDC and the QTCB Group failed to disclose the amount of
PBA Bonds held by their group members.

63.     LCDC and the QTCB Group have clearly taken positions in the Title III cases of

HTA, ERS,[26] and PBA.  Both groups support a plan of adjustment that was jointly filed on behalf

of ERS, PBA, and the Commonwealth.  That plan proposes to pay HTA-related claims a meager

3.9%, and treats HTA's excise taxes as the Commonwealth's property, with such property being

used to satisfy LCDC and QTCB Group members' claims.  Those groups have therefore taken

positions "asserting any legal or factual positions that in any way impact the property and rights

of the Title III Debtor."  2019 Order IV.A, n. 4.

64.     In February 2020, two members of LCDC moved to intervene in an HTA related

adversary proceeding.  *See, e.g.*, Adv. Proc. No. 20-0007-LTS, ECF No. 37.  These two

bondholders—who called themselves the "Ad Hoc Group of Noteholders of FGIC-Insured

Notes"—sought intervention without specifying what position they intended to take within that

adversary proceeding and without filing a proposed pleading, as required under Federal Rule of

Civil Procedure 24(c).[27]  That these bondholders failed to specify their position is underscored in

the proposed form of order granting them intervention, which leaves open the possibility that the

intervening bondholders would be adverse to the named defendants.  Specifically, the proposed

order provides these proposed intervenors the right to respond to the defendants' motions to

dismiss, and for the defendants to file a reply to that response.  *See id.*, Ex. A ¶ 2(a).  Thus, those

LCDC members clearly took positions within HTA's Title III case.

65.     LCDC and the QTCB Group also filed a joint statement in support of the

mediators' amended report (the "Joint Statement").  *See* ECF No. 11499.  In the Joint Statement,

---

[26] LCDC also took a position in ERS's Title III case by filing a notice of participation in the objection to
ERS bond claims.  *See* ECF No.  9226.

[27] The Movants reserve the right to object to that motion to intervene, and will respond to that motion
within the timeframe required by the Eleventh Amended Case Management Procedures and when the stay
of Adv. Proc. No. 20-0007, currently imposed by the Final Case Management Order for Revenue Bonds
[ECF No. 43 in Adv. Proc. No. 20-0007], is no longer in effect.

LCDC and the QTCB Group recommended staying certain causes of action in adversary proceedings filed in HTA's Title III case. *Id.* ¶¶ 32-33. LCDC and the QTCB Group also asserted in the Joint Statement that a plan of adjustment should be confirmed regardless of whether litigation in the revenue bond adversary proceedings is complete. *Id.* at n. 17. These groups therefore asserted "legal or factual positions that in any way impact the property and rights of [HTA as a] Title III Debtor," including (i) requesting confirmation of a plan that caps HTA bondholders' claims at a paltry amount (with virtually all of the Commonwealth's resources being devoted to satisfying the hedge funds' claims, despite the fact that the hedge funds likely acquired these claims at a steep discount) and (ii) requesting a stay of certain causes of action that belong to HTA.

66.     As a practical matter, it makes far more sense for each member to list holdings against each debtor in each Rule 2019 statement to ensure that this Court, creditors, and the public are not forced to scour the docket to "connect the dots." *Cf. In re Bossart*, 2007 WL 4561300, at *10 (Bankr. S.D. Tex. Dec. 21, 2007). The need for such transparency is especially warranted here given the interdebtor issues between the Commonwealth, HTA, and PBA. Creditors and this Court should not be forced to wade through a patchwork of filings to assess what cross-holdings (if any) are held by a bondholder. This proposition is hardly novel. In fact, the Ad Hoc Group of General Obligation Bondholders and Mutual Fund Groups make such disclosures in their Rule 2019 statements. *See* ECF No. 11431, Ex. A (Ad Hoc Group of General Obligation Bondholder verified statement, which discloses HTA bond claim holdings of members); ECF No. 3776, Ex. A. (statement from Mutual Fund Group, which discloses holdings in HTA, COFINA, Commonwealth, ERS, and PREPA). LCDC and the QTCB Group's disclosures should be no different.

67.    Finally, as Movants have previously stated: "a change in the membership of any group or committee is a material change for purposes of Rule 2019(d)."  ECF No. 7188 at 8. That statement applies with full force to ad hoc groups participating in these Title III cases.  On February 9, 2020, a new plan support agreement was announced, which noted that Marble Ridge Capital was a member of the LCDC.[28]  Marble Ridge was not included in LCDC's prior Rule 2019 statements,[29] and thus the public was not informed of its holdings or its membership in LCDC.  However, at around the time the new PSA was announced (including through leaks to the press), LCDC had taken a number of positions before the Court, including filing motions to inform (*e.g.*, ECF No. 10370), a motion to dismiss (ECF No 10697), and a substantive objection (ECF No. 11133).[30]  Despite taking those positions before this Court, LCDC waited until February 19, 2020 to disclose Marble Ridge as a new member of its group.  ECF No. 11161.  All stakeholders should be informed of the composition of an ad hoc group before or contemporaneously with the filing of any pleadings by an ad hoc group before this Court.  *See* UCC Order at 5 (noting that the Committee must promptly disclose appointment or resignation of any members).  The failure to disclose such additional members in a timely fashion improperly left this Court and the public with a "representation that no material changes have occurred."  2019 Order IV.C.

D.    **Retroactive Compliance with Rule 2019 is Warranted**

68.    Movants concur with the Committee Motion's request for retroactive disclosure. Comm. Motion ¶ 43.  Movants respectfully submit that the additional disclosable economic

---

[28]  *See* New Plan Support Agreement, Definition of "LCDC Holders," *available at* https://emma.msrb.org/ES1452453.pdf

[29] *See* ECF No. 9732, Ex. A (not including Marble Ridge as member).

[30] LCDC also filed a partial joinder to a motion to dismiss an adversary complaint.  Adv. Proc. No. 19-291-LTS, ECF No. 50.

interests discussed in this Cross-Motion—including all information discussed in Parts B and C herein—should also be disclosed retroactively within the timeframe set forth in the Committee's Motion.   As set forth above, certain ad hoc groups' Rule 2019 statements do not adequately disclose the nature and amount of each member's disclosable economic interests against each Title III debtor.  This Court has previously granted such retroactive relief and ordered other ad hoc groups to amend their prior Rule 2019 statements.  Specifically, this Court ordered such relief where bondholder groups were "actively involved in taking positions in the public litigation" and where parties had issued a "press release that was in the context of [their] having a position on only one side of it."  *See* Tr. of Hearing, (July 25, 2018), at 95:6-11.  And this Court ordered such relief where ad hoc group members were "trading in securities" on both sides of a litigation to allow "the market [to] have full information" about where group members traded during such litigation.  *Id.*

69.     The same situation exists here. LCDC has aggressively taken the position within this case and in the bond markets that later vintage bonds are subordinate to earlier vintage bonds.  LCDC has issued numerous press releases that heavily implied that only bonds issued prior to 2012 are valid, and that bonds issued after 2012 are entitled to "no protected payment priority under PROMESA."[31] However, LCDC's latest press release appears to indicate LCDC members acquired late vintage bonds ***at around the same time that it filed a claim objection to those bonds***.  *See infra* ¶ 48.

70.     LCDC and its members also need to provide retroactive disclosure as to whether they hold any PBA or GO Bonds issued in 2011.  This disclosure is necessary because LCDC members and LCDC's counsel previously took the position that the debt limits were breached in

---

[31] *See* Comm. Motion, Ex. C (LCDC Press Releases).

2011, because, in LCDC members' view, the "rental obligations and payments by the Commonwealth were in fact for principal and interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth."  *See* Case No. 16-cv-02374-FAB, ECF No. 219 at 31-33 (claiming that bonds issued in March 2011 breached debt limit, and providing chart purporting to show that various series of PBA bonds issued in 2011 breached the debt limit).  According to LCDC's members and counsel, the PBA and GO bonds issued after March 2011 breached the debt limit, and "are thus void." *Id.* at 34. But the majority of LCDC's press releases appear to indicate that LCDC members hold bonds issued prior to 2012, which may include bonds issued in 2011 (the bonds which LCDC's members and counsel previously asserted are void).

71.    Additionally, both LCDC and the QTCB Group have advocated in favor of a PSA and plan of adjustment that (i) are premised on classification of GO Bonds based on vintage, (ii) provide more favorable treatment to earlier vintage bonds, and (iii) provide highly favorable treatment to PBA Bonds and the PBA leases.  Moreover, certain LCDC and QTCB Group members sit on both sides of the clawback issue.  None of the amounts of "early vintage" and "late vintage" bonds or claims against other Title III debtors were disclosed.  If disclosed, this information may show that LCDC and the QTCB Group are sitting on both sides of LCDC's claim objection.

72.    Stakeholders need this information to assess whether LCDC and QTCB Group members hold bonds that these groups' own members previously claimed were void, and to assess the merits of any settlement contemplated under a plan of adjustment, particularly where LCDC and the QTCB Group may sit on both sides of that settlement.  While LCDC and the QTCB Group may complain that retroactive amendments to their prior statements are unfair, they "were supposed to" have disclosed this information "in the first place."  Tr. of Hearing,

(July 25, 2018), at 95:6-7.  This Court should order retroactive disclosures so that the markets, parties in interest, and the public are properly informed as to the economic interests of the parties who crafted the plan of adjustment.

## **CONCLUSION**

The Court should grant the Committee's Motion and this Cross-Motion and enter the proposed order attached hereto as Exhibit A, which includes the Committee's requested relief and certain additional relief requested herein.

Dated:      New York, New York
            March 13, 2020

CASELLAS ALCOVER & BURGOS P.S.C.      CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Heriberto Burgos Pérez*            By: */s/ Howard R. Hawkins, Jr.*

    Heriberto Burgos Pérez                      Howard R. Hawkins, Jr.*
    USDC-PR 204809                              Mark C. Ellenberg*
    Ricardo F. Casellas-Sánchez                 William J. Natbony*
    USDC-PR 203114                              Ellen Halstead*
    Diana Pérez-Seda                            Thomas J. Curtin*
    USDC-PR 232014                              Casey J. Servais*
    P.O. Box 364924                             200 Liberty Street
    San Juan, PR 00936-4924                     New York, NY 10281
    Telephone:  (787) 756-1400                  Telephone:  (212) 504-6000
    Facsimile:  (787) 756-1401                  Facsimile:  (212) 504-6666
    Email:   hburgos@cabprlaw.com               Email:    howard.hawkins@cwt.com
      rcasellas@cabprlaw.com                      mark.ellenberg@cwt.com
      dperez@cabprlaw.com                         bill.natbony@cwt.com
                                                  ellen.halstead@cwt.com
                                                  thomas.curtin@cwt.com

                                              *Admitted pro hac vice

                                              *Counsel for Assured Guaranty Corp. and Assured
                                              Guaranty Municipal Corp.*

FERRAIUOLI LLC

By: */s/ Roberto Cámara-Fuertes*

    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile: (787) 766-7001
    Email:  rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

MILBANK LLP

By: */s/ Atara Miller*

    Dennis F. Dunne*
    Atara Miller*
    Grant R. Mainland*
    Jonathan Ohring*
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email: ddunne@milbank.com
          amiller@milbank.com
          gmainland@milbank.com
          johring@milbank.com

*Admitted pro hac vice

*Counsel for Ambac Assurance Corporation*

REXACH & PICÓ, CSP                        BUTLER SNOW LLP


By: */s/ María E. Picó*_____   By: */s/ Martin A. Sosland*_____
    María E. Picó                              Martin A. Sosland (*pro hac vice*)
    USDC-PR 123214                             5430 LBJ Freeway, Suite 1200
    802 Ave. Fernández Juncos                  Dallas, TX 75240
    San Juan PR 00907-4315                     Telephone:  (469) 680-5502
    Telephone:  (787) 723-8520                 Facsimile:   (469) 680-5501
    Facsimile:   (787) 724-7844                E-mail:       martin.sosland@butlersnow.com
    E-mail:       mpico@rexachpico.com
                                               *Admitted pro hac vice in Case No. 17-BK-*
    *Attorney for Financial Guaranty*          *03283-LTS and Case No. 17-BK-03567-LTS*
    *Insurance Company*
                                               Jason W. Callen
                                               150 3rd Ave., S., Suite 1600
                                               Nashville, TN 37201
                                               Telephone:  615-651-6774
                                               Facsimile:   615-651-6701
                                               Email:        jason.callen@butlersnow.com

                                               *Admitted pro hac vice in Case No. 17-BK-*
                                               *03283-LTS and Case No. 17-BK-03567-LTS*

                                               *Attorneys for Financial Guaranty Insurance*
                                               *Company*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document electronically with the Clerk of the

Court using the CM/ECF System, which will send notification of such filing to all parties of

record in the captioned case.

At New York, New York, the 13th day of March, 2020.

By:  /s/ *Howard R. Hawkins, Jr.*
                    Howard R. Hawkins, Jr.*
                    *admitted pro hac vice