**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

---------------------------------------------------------------X
:
In re: :
:
THE FINANCIAL OVERSIGHT AND : PROMESA
MANAGEMENT BOARD FOR PUERTO RICO, : Title III
:
      as representative of : Case No. 17-BK-3283 (LTS)
:
THE COMMONWEALTH OF PUERTO RICO *et al.*, : (Jointly Administered)
:
    Debtors.[1] :  Re: Dkt. Nos. 10102, 10613
---------------------------------------------------------------X

**DRA PARTIES' OPENING RESPONSE TO (I) MOTION OF ASSURED GUARANTY
CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE
CORPORATION, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,
AND FINANCIAL GUARANTY INSURANCE COMPANY FOR RELIEF FROM THE
AUTOMATIC STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION [DKT.
NO. 10102], AND (II) OPPOSITION OF FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO TO MOTION OF ASSURED
GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC
ASSURANCE CORPORATION, NATIONAL PUBLIC FINANCE GUARANTEE
CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY FOR
RELIEF FROM THE AUTOMATIC STAY, OR, IN THE ALTERNATIVE, ADEQUATE
PROTECTION [DKT. NO. 10613]**

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

4160-7065-6803.13

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ....................................................................2

STATEMENT REGARDING DRA PARTICIPATION ORDER ........................4

BACKGROUND ...................................................................................5

OPENING RESPONSE ..........................................................................7

I.    Creditors of HTA Have Standing to Seek Stay Relief Against the Commonwealth...................................................................................7

    (a) Creditors of HTA Like the DRA Are a Parties in Interest in the Commonwealth's Title III case...............................................................7

    (b) Creditors of HTA Have Prudential Standing in the Commonwealth Title III Case .....................................................................................11

II.    PROMESA Does Not Preempt the Excise Tax Statutes.......................12

    a)    PROMESA's Text Demonstrates an Intent to Preserve Territorial Law ................................................................................................12

    b)    PROMESA Cannot Compromise the DRA's Property Rights and Interests .............................................................................................14

    c)    To the Extent PROMESA Preempts Commonwealth Law, Congress Intended to Preserve Existing Priority and Property Rights ................................................................................................16

    d)    Sections 201 and 202 of PROMESA Do Not Displace Territorial Law Relating to Creditor Priority ..........................................................18

III.    Acts 30 and 31 Are Binding and Cannot Be Repealed Through Certified Budgets...........................................................................................20

IV.    Any Liens Possessed by HTA Bondholders Did Not Stop Attaching Once the Debtors Filed for Title III Pursuant to Bankruptcy Code Section 552(a)........21

    a)    The Act 30-31 Revenues are "Special Revenues" under Section 902(2)(B) and 902(2)(E) of the Bankruptcy Code....................................22

b)    The Fact that the Act 30-31 Revenues Were Imposed by the
Commonwealth Does Not Preclude the Act 30-31 Revenues From Being
Special Revenues ……………………………………………………..23

c)    The Act 30-31 Revenues Were Acquired Post-Petition by HTA………..24

**V.**    The Security Interests Granted to HTA Bondholders Pursuant to the 1968 and
1998 HTA Bond Resolutions Suffer From Potential Deficiencies………………25

CONCLUSION....................................................................................................................26

4160-7065-6803.13

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**<u>Cases</u>**

Arizona v. United States, 567 U.S. 387 (2012) .............................................................13

Armstrong v. United States, 354 U.S. 40 (1960) ....................................................15, 21

Benjamin v. Aroostook Medical Center, Inc., 57 F.3d 101 (1st Cir. 1995)....................11

Franklin California Tax-Free Trust v. Commonwealth of P.R., 805 F.3d 322 (1st Cir.
2015) ................................................................................................................12, 14

Grant's Dairy-Maine, LLC v. Comm'r of Maine Dep't of Agric., Food & Rural Res., 232
F.3d 8 (1st Cir. 2000).......................................................................................12, 13, 19

Holt v. Henley, 232 U.S. 637, 639 (1914) ....................................................................15

In re Amatex Corp., 755 F.2d 1034 (3d Cir.1985) .....................................................7, 8

In re B & I Realty Co., 158 B.R. 220 (Bankr. W.D. Wash. 1993) ...............................7

In re Brown Transp. Truckload, Inc., 118 B.R. 889, 893 (Bankr. N.D. Ga. 1990) ...................7, 9

In re Comcoach Corp., 698 F.2d 571 (2d Cir. 1983)..................................................9, 10

In re Cruz, 516 B.R. 594 (B.A.P. 9th Cir. 2014) .........................................................8

In re Edwards, 454 B.R. 100 (B.A.P. 9th Cir. 2011) ...................................................8

In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 872 F.3d 57 (1st Cir. 2017) ................. *passim*

In re Hayes, 393 B.R. 259 (Bankr. D. Mass. 2008).......................................................11

In re Heffernan Mem'l Hosp. Dist., 202 B.R. 147 (Bankr. S.D. Cal. 1996) ..........................23, 24

In re High Voltage Eng'g Corp., 403 B.R. 163 (D. Mass. 2009)....................................8

In re Horton, 595 B.R. 1,4 (Bankr. D.D.C. 2019) .........................................................10

In re James Wilson Associates, 965 F.2d 160, 169 (7th Cir. 1992) ...............................8

In re Kronemyer, 405 B.R. 915 (B.A.P. 9th Cir. 2009)..................................................8

In re Lifeco Inv. Grp., 173 B.R. 478 (Bankr. D. Del. 1994)...........................................11

In re Lopez, 446 B.R. 12 (Bankr. D. Mass. 2011) ........................................................11

iii

In re Ly, 601 F. App'x 494 (9th Cir. 2015)........................................................................8

In re Maisel, 378 B.R. 19, 21 (Bankr. D. Mass. 2007) ...................................................7

In re Newcare Health Corp., 244 B.R. 167 (B.A.P. 1st Cir. 2000)................................11

In re Sweports, Ltd., 476 B.R. 540, 543 (Bankr. N.D. III. 2012) .........................7, 9, 10

In re Woodberry, 383 B.R. 373, 378 (Bankr. D.S.C. 2008.............................................10

Tahoe-Sierra Preservation Council v. Tahoe Regency Planning Agency, 535 U.S. 302
(2002)........................................................................................................................14, 15

United States v. Sec. Indus. Bank, 459 U.S. 70 (1982) ............................................14, 15

U.S. Tr. Co. of New York v. New Jersey, 431 U.S. 1 n.16 (1977)..................................21

## Statutes

Section 552(a)(vii) ...................................................................................................4, 21

Section 362 of the Bankruptcy Code ...................................................................7, 8, 10

Section 507 of the Bankruptcy Code ..........................................................................18

Section 902(2) of the Bankruptcy Code, 11 U.S.C. §§ 902(2) ..............................22, 23

Section 902(2)(E) of the Bankruptcy Code, 11 U.S.C. §§ 902(2)(E)..................22, 23, 24

10 Norton Bankr. L. & Prac. 3d, 11 U.S.C. § 928 .................................................24, 25

11 U.S.C. § 1109(b) ................................................................................... passim

48 U.S.C. § 2103 (2016) ..............................................................................................13

48 U.S.C. § 2123 ..........................................................................................................18

48 U.S.C. § 2141(b)(1)(N), Section 201 and 202 of PROMESA ............................ passim

48 U.S.C. § 2142.....................................................................................................18, 19

48 U.S.C. § 2144(c)(3)(B) ...........................................................................................16

48 U.S.C. § 2161, Section 301(a) of PROMESA .....................................................7, 17

48 U.S.C. § 2174(b)(3) ................................................................................................17

48 U.S.C. § 2174(b)(6)..................................................................................................17

Section 204 (c)(3)(B) of PROMESA ................................................16

Section 314 (b)(6) of PROMESA ..................................................17

Excise Tax Statutes, Acts 30 and 31 ............................................ *passim*

**Puerto Rico Statutes:**

Tit. 31 Laws of P.R. Ann. § 5 (1930) ...........................................21

**US Civil Code:**

U.S. Const., Amend V, cl. 4.......................................................14

**Puerto Rico Civil Code:**

P.R. Const., Art. II, § 9 ...........................................................14

**Bankruptcy Code:**

3 Collier on Bankruptcy ¶362.07 (16th ed. 2019) ........................ *passim*

5 Collier on Bankruptcy ¶1109.2 (15th ed. 1984) ............................8

4160-7065-6803.13

**COME NOW** AmeriNational Community Services, LLC (hereafter the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds issued by the DRA pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018 and the approved Qualifying Modification for the Government Development Bank for Puerto Rico[2] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* (the "Collateral Monitor" and with the Servicer, the "DRA Parties"), by and through the undersigned legal counsel, hereby submit this opening response (the "Opening Response") to the (i) *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* [Dkt. No. 10102] (the "Monolines' Amended Lift Stay Motion")[3]; and (ii) *Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* [Dkt. No. 10613] (the "FOMB Opposition").

---

[2] *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS).

[3] The term "Monolines" refers, jointly, to Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company.

4160-7065-6803.13

## PRELIMINARY STATEMENT

Since the creation of the DRA by this Court and the Commonwealth in late 2018, the
DRA Parties have fought to protect the DRA's property interests in certain revenues pledged
under Acts 30 and 31.

Here, the DRA Parties fight to prevent encroachment on their valid liens by ensuring they
have standing to bring their lift stay motion. The DRA Parties' fight began back in June 2019
with a motion for relief from the automatic stay [Dkt. No. 7643], in which the DRA Parties
argued that the Commonwealth improperly diverted and retained revenues specifically
earmarked for HTA's debts and used such funds to pay government operations or other
expenditures in violation of applicable law.  In August 2019, the Monolines filed a similar
motion with respect to their own purported collateral, some of which overlaps with the DRA's
collateral [Dkt. No. 8536, amended by Dkt. No. 10102].

Recognizing the possibility that the Court could make substantive rulings regarding its
collateral, the DRA sought—and the Court granted the DRA—the opportunity to be heard in the
Monolines' litigation with respect to overlapping issues that could affect the DRA's interests.
*See* Dkt. No. 10835.  In particular, the focus here—as the Court ordered—is on whether HTA
creditors like the DRA and the Monolines have standing to seek stay relief and whether the
Monolines have a security interest in certain pledged revenues.

It is beyond dispute that the DRA Parties have standing to seek relief against the
Commonwealth for its improper diversion of pledged revenues.  Most critically, the DRA is a
party in interest here, and, as a secured creditor of HTA, has a direct financial stake and property
interest in the diverted revenues sufficient to grant the DRA Parties standing to bring their lift
stay motion.  The FOMB's argument that PROMESA somehow preempts or otherwise

2

supersedes these critical and constitutionally protected property rights clearly lacks merit and

goes against years of rulings regarding the relationship of restructuring laws and property rights.

However, while the DRA Parties agree wholly with the Monolines' position that HTA

creditors have standing to lift the stay against the Commonwealth (and HTA), the DRA Parties

support the FOMB's position that there are serious and potentially fatal deficiencies as to the

scope and validity of any security or property interests granted to HTA bondholders (including

the Monolines) in certain revenues (including the Act 30-31 Revenues on which the DRA has a

lien).

## **STATEMENT REGARDING DRA PARTICIPATION ORDER**

1.      The DRA Parties file this Opening Response in compliance with the Court's

March 3, 2020 Order [Dkt. No. 12005] (the "DRA Participation Order"), which permits the DRA

Parties to participate in litigation concerning the Monolines' Amended Lift Stay Motion, but

limits participation to the following "Shared Issues:"(i) the extent to which Commonwealth

statutes enacted pre-PROMESA which purport to allocate, on the terms and conditions set forth

therein, excise tax revenues from certain Excise Tax Statutes[4] are preempted by PROMESA; (ii)

the extent to which the Excise Tax Statues can bind future legislatures; (iii) whether the Excise

Tax Statutes give rise to an equitable lien, trust, or other ownership interest in favor of the

holders of bonds issued by HTA; (iv) the extent to which PROMESA Title III recognizes a

priority claim arising out of the Excise Tax Statues; (v) the scope and validity of any security

interests granted to HTA bondholders pursuant to the terms of the 1968 and 1998 HTA Bond

Resolutions, and whether HTA bondholders' security interest extend to tax revenues retained by

the Commonwealth; (vi) whether any liens possessed by the HTA bondholders stopped attaching

---

[4] As defined at ¶ 5 of the Monolines' Amended Lift Stay Motion.

once the Commonwealth and/or HTA filed for relief under Title III including pursuant to

Bankruptcy Code section 552(a); (vii) the validity of the Commonwealth's retention and use of

the tax revenues under the Excise Tax Statues; and (viii) whether creditors of HTA have standing

to seek stay relief against the Commonwealth. *See id.* at 5-6.

2.       Although the Court identified these eight Shared Issues as appropriate for the

DRA Parties to brief, this Opening Response only addresses those issues related to standing and

secured status as directed by the Court in its *Final Case Management Order for Revenue Bonds*

[Dkt. No. 12186] (the "Gating Issues").  To this end, this Opening Response addresses issues

number (i), (ii), (v), (vi) and (viii) set forth above.  The DRA Parties reserve their rights to

submit additional briefing on any of the Shared Issues after the Court's ruling on the Gating

Issues and in connection with a final hearing on the Monolines' Amended Lift Stay Motion. In

accordance with the DRA Participation Order, the DRA Parties further reserve their right to

address in connection with the DRA Lift Stay Motion, any of the Shared Issues not otherwise

raised in this Opening Response and/or asserted during the course of the litigation of the

Monolines' Amended Lift Stay Motion, including but not limited to, the right to file additional

submissions or objections with the Court.

## **BACKGROUND**[5]

3.       Prior to the commencement of the Title III cases, GDB and HTA entered into 23

individual loan agreements.  Pursuant to each of these loans, HTA issued 23 separate promissory

notes to GDB as evidence of HTA's indebtedness.  Those loans had, as of July 1, 2018, an

---

[5] This section is presented for background purposes only to show the interrelationship between the DRA's HTA
assets and the HTA Bonds owned and/or insured by the Monolines.  The DRA Parties are mindful that the DRA
Participation Order precludes the DRA Parties from raising intercreditor disputes between the DRA and holders of
HTA bonds.  *See* DRA Participation Order at 4.  The DRA Parties refer to the Security Agreement, the Bond
Resolutions and overlapping revenue streams solely for the purposes of elucidating the substantive issues to be
discussed in this submission.

aggregate outstanding principal balance in excess of $1.7 billion and not less than $537 million

in outstanding interest, fees and expenses. *See* Offering Memorandum for GDB Debt Recovery

Authority Bonds (Taxable) Due 2040, dated as of November 7, 2018, at 128–29.

4.     On August 28, 2013, GDB and HTA executed an Assignment and Security

Agreement (the "Security Agreement"). Pursuant to Section 1.1 of the Security Agreement,

HTA "absolutely, irrevocably, and unconditionally assign[ed], convey[ed] and transfer[red]

without recourse, to [GDB all of its] rights, title, obligations and interest in" certain tax and

revenue fees that were transferred from the Commonwealth to HTA so that HTA could pay debt

service under the loan agreements (collectively, the "Act 30-31 Revenues"). Security Agreement

§ 1.1.; *see also* Act. No. 30-2013 (2013); Act. No. 31-2013 (2013).

5.     HTA also issued bonds and other obligations under (a) Resolution No. 68-18,

adopted by HTA on June 13, 1968 (the "1968 Bond Resolution") and (b) Resolution No. 98-06,

adopted by HTA on February 26, 1998 (the "1998 Bond Resolution"). The DRA holds

$200,000,000 in aggregate original principal amount of Puerto Rico Highway and Transportation

Authority, Transportation Revenue Bonds (Series A), which HTA issued under the 1998 Bond

Resolution. *See* Offering Memorandum for GDB Debt Recovery Authority Bonds (Taxable) due

2040, dated as of November 7, 2018, at 128–29.

6.     The GDB transferred the obligations under the 23 loan agreements and the 1998

Bond Resolution to the DRA pursuant to the GDB's Title VI restructuring under PROMESA and

Puerto Rico statute. *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS); *see also* Act No. 109-

2017 (2017) at arts. 201 and 204. The DRA is charged with liquidating them to pay debt service

under new bonds issued pursuant to GDB's Title VI restructuring. *See id.*

5

7.      The Act 30-31 Revenues, which collateralize obligations under the 23 loans made by the GDB to HTA, overlap with certain revenue streams that the Monolines allege secure obligations under the 1968 and 1998 HTA bonds.  These revenues consist of motor vehicle license fees collected by the Commonwealth and taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes collected by the Commonwealth.  *See* Monolines' Amended Lift Stay Motion at ¶ 5.

## OPENING RESPONSE

I.    **Creditors of HTA Have Standing to Seek Stay Relief Against the Commonwealth.**

    a.  **Creditors of HTA Like the DRA Are Parties in Interest in the Commonwealth's Title III Case.**

8.      The threshold question for determining standing to seek relief from stay is whether the movant is a party in interest under Section 1109 of the Bankruptcy Code, as incorporated in Section 301(a) of PROMESA, 48 U.S.C. § 2161.  "The plain language of section 362 of the Bankruptcy Code requires that one be a 'party in interest' to seek relief from stay." *In re Maisel*, 378 B.R. 19, 21 (Bankr. D. Mass. 2007); *see also* 3 *Collier on Bankruptcy* ¶ 362.07 (16th ed. 2019) ("Stay relief is available to a party in interest ."); *In re B & I Realty Co.*, 158 B.R. 220 (Bankr. W.D. Wash. 1993) (holding that creditor status may not be necessary for standing purposes, but the moving party still must have an interest of its own to have standing to move for stay relief).  No more is required.  Recognizing a party in interest's standing to seek stay relief "avoids the anomalous situation in which a party is subject to the automatic stay but is unable to seek relief even when damage may result from its continuance." *In re Sweports, Ltd.*, 476 B.R. 540, 543 (Bankr. N.D. Ill. 2012) (citing 3 *Collier on Bankruptcy* ¶ 362.07); *see also In re Brown Transp. Truckload, Inc.*, 118 B.R. 889, 893 (Bankr. N.D. Ga. 1990).

6

9.      Section 1109(b) provides a nonexclusive list of entities that qualify as parties in interest, including "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109(b) (1978). Additionally, it is well established that the party in interest language in Section 1109(b) "must be construed broadly to permit parties affected by a [bankruptcy] proceeding to appear and be heard." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (citing 5 *Collier on Bankruptcy* ¶ 1109.2 (15th ed. 1984)).  "The general theory behind the section is that anyone holding a direct financial stake in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest."  *Id*.; *see also In re James Wilson Associates*, 965 F.2d 160, 169 (7th Cir. 1992) (defining a party in interest as "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding"); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 872 F.3d 57, 63 (1st Cir. 2017) (noting that "[t]he statutory language [of § 1109(b)] is, indeed, quite broad . . . .").  Courts "must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation."  *In re High Voltage Eng'g Corp*., 403 B.R. 163, 166 (D. Mass. 2009) (quoting *Amatex*, 755 F.2d at 1042).

10.     Courts have validated that standing for stay relief is not limited to direct creditors of the debtor.  Rather, the determination is made on a case-by-case basis "'with reference to the interest asserted and how [that] interest is affected by the automatic stay.'"  *In re Edwards*, 454 B.R. 100, 105 (B.A.P. 9th Cir. 2011) (citing *In re Kronemyer,* 405 B.R. 915, 919 (B.A.P. 9th Cir. 2009)). "[A]ny party that has a pecuniary interest in the matter, that has a practical stake in the resolution of the matter [,] or that is impacted by the automatic stay" has standing to request relief from the stay.  *In re Cruz*, 516 B.R. 594, 602 (B.A.P. 9th Cir. 2014); *see also In re Ly*, 601

7

F. App'x 494, 496 (9th Cir. 2015) (finding that owner of real property that could be affected by

the bankruptcy proceeding has standing to seek relief from stay because section 362(d)(1) of the

Code "allows any 'party in interest' to request relief from the stay").

11.     Here, the HTA creditors have a direct stake in the diverted revenues and should

have the opportunity to address these issues.  This is precisely the "anomalous" situation which

numerous courts and *Collier* cautioned against:  a party subject to the stay, but—if the FOMB

had its way—unable to seek relief from the potential damage caused by the actions of the

Commonwealth in diverting pledged revenues.  *See In re Sweports, Ltd*., 476 B.R. at 543; *In re*

*Brown Transp. Truckload, Inc*., 118 B.R. at 893; 3 *Collier on Bankruptcy* ¶ 362.07.  This fact

alone suffices to confer standing.  Otherwise, the DRA and other HTA creditors would simply

have no means to seek justice.

12.     In their lift stay motion, the DRA Parties assert that the DRA's credits are secured

by Excise Tax Statutes (which are defined to include the Act 30-31 Revenues).  *See* DRA Lift

Stay Motion ¶ 35.  The DRA Parties further assert that the Commonwealth improperly diverted

those Act 30-31 Revenues from HTA to the Commonwealth.  *See id.* ¶¶ 34, 80, 81.  The

Monolines make similar arguments.  *See* Monolines' Amended Lift Stay Motion ¶¶ 20-24.  If

that is the case, HTA creditors (including the DRA) have a direct pecuniary interest in the

Commonwealth Title III case and thus have standing to seek to lift the automatic stay.

13.     The FOMB contends that the HTA creditors lack standing to seek stay relief

because they are "creditors of a creditor" and therefore lack the direct stake in the bankruptcy

case needed to confer standing.  *See* FOMB Opp. ¶¶ 66-69.  However, the FOMB's position rests

on mistaken premises and inapplicable law.

8

14.     The FOMB relies principally on *In re Comcoach Corp.*, 698 F.2d 571 (2d Cir. 1983), an inapposite case involving a bankrupt tenant, a homeowner, and a bank holding a mortgage on the home.  *Comcoach* is off base for two reasons.  First, it proceeded from the incorrect assumption that one "must be either a creditor or a debtor" to have party in interest standing.  *Id.* at 573.  Section 1109(b), however, expressly provides that the term "party in interest" is not limited to creditors and debtors, but broadly encompasses "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109(b) (1978).

15.     As courts have explained clearly in the context of lift stay proceedings, the court must take a broad view of parties in interest.  The "determination of status as 'a party in interest' under section 362(d) must be determined on a case by case basis with reference to the interest asserted and how said interest is affected by the automatic stay."  *In re Woodberry*, 383 B.R. 373, 378 (Bankr. D.S.C. 2008).  Several courts have rebuked *Comcoach* expressly.  "Although some cases like … *In re Comcoach* have unduly limited the availability of stay relief, *the better approach is to recognize that any party affected by the stay should be entitled to move for relief*." *In re Horton*, 595 B.R. 1, 4 (Bankr. D.D.C. 2019) (citations and quotation marks omitted; emphasis added); *see also In re Sweports, Ltd.*, 476 B.R. at 544 & n.4 (criticizing *Comcoach* and noting that "[l]ower courts in the Second Circuit have struggled with *Comcoach*, and have given [it] a narrow reading, tailored to its facts") (citing 3 *Collier on Bankruptcy* ¶ 362.07[2] at 362-105 n. 8.).

16.     Second, the facts of *Comcoach* are readily distinguishable.  There, the court held that the bank lacked standing to seek stay relief in the tenant's bankruptcy proceeding because the connection between the bank—a creditor of the homeowner, who was in turn a creditor of the

9

bankrupt tenant—and the tenant was too attenuated to constitute the direct stake necessary under

Section 1109(b).  This was so because "the Bank lacks any right to equitable relief against the

bankrupt arising out of a breach of performance giving rise to a right to payment." *Comcoach*,

698 F.2d at 574.  Here, by contrast, the movants hold a direct financial stake in the diverted

Excise Tax Statutes, and in preserving and protecting their respective property rights to such

revenues.  The connection between the Monolines, the DRA Parties, and the Commonwealth is

therefore direct and distinct from the connection at issue in *Comcoach*.

17.     The other cases cited by the FOMB also fail to establish that a creditor of HTA

lacks standing here.  *See* FOMB Opp. ¶ 68 n. 24.  For instance, while *In re Lifeco Inv. Grp.*, 173

B.R. 478, 487 (Bankr. D. Del. 1994) states that a creditor of a creditor does not automatically

have standing, it does not (as FOMB posits) categorically hold that a creditor of a creditor can

never have standing.  To the contrary, it simply concluded that, under the circumstances of that

case, the entity's interest was too attenuated and permitting its participation would have a

"disruptive effect."  *Id.* at 488.  *Lifeco* therefore fully vindicates the fundamental rule that

operates here: a party's interest must be determined on a case by case basis. *See Lifeco*, 173 B.R.

at 487.  The FOMB's citations to *In re Lopez*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) and *In re

Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) are similarly inapposite because HTA

creditors are seeking to protect their own concrete interests, not those of a separate party.

### b.  Creditors of HTA Have Prudential Standing in the Commonwealth Title III Case.

18.     The FOMB also argues that the HTA creditors are barred from seeking stay relief

because they lack "prudential standing."  *See* FOMB Opp. ¶ 69.  But the HTA creditors have

prudential standing for largely the same reasons they have statutory standing under Section

1109(b).  Relevant prudential "considerations . . . principally concern whether the litigant (1)

10

asserts the rights and interests of a third party and not his or her own, (2) presents a claim arguably falling outside the zone of interests protected by the specific law invoked, or (3) advances abstract questions of wide public significance essentially amounting to generalized grievances more appropriately addressed to the representative branches." *In re Newcare Health Corp.*, 244 B.R. 167, 170 (B.A.P. 1st Cir. 2000) (quoting *Benjamin v. Aroostook Medical Center, Inc.*, 57 F.3d 101, 104 (1st Cir. 1995)).

19.     None of these prudential limitations apply here.  As to the first factor, the HTA creditors seek to protect their own interests in pursuing stay relief, not those of a third party.  As to the second factor, the FOMB contends that the HTA creditors are at best "unsecured creditor[s] of the Commonwealth" with no right to seek stay relief.  *See* FOMB Opp. ¶ 69. Putting aside the fact that this would not put the DRA "outside the zone of interests" protected, the DRA Parties have a security interest in the revenues of the Excise Tax Statutes at stake in the Title III proceeding and therefore have a direct claim against the Commonwealth relating to that property interest.  The FOMB does not appear to contest standing under the third factor.  As a result, prudential factors provide no bar to the standing of the HTA creditors.

## II.     PROMESA Does Not Preempt the Excise Tax Statutes.

### a.  PROMESA's Text Demonstrates an Intent to Preserve Territorial Law.

20.     In the absence of an express statutory preemption provision, there are two different ways in which an Act of Congress can preempt territorial law.  "Field preemption occurs when a federal regulatory scheme is so pervasive as to warrant an inference that Congress did not intend the states to supplement it."  *Grant's Dairy-Maine, LLC v. Comm'r of Maine Dep't of Agric., Food & Rural Res*., 232 F.3d 8, 15 (1st Cir. 2000).  "Conflict preemption takes place either when compliance with both state and federal regulations is impossible or when state

11

law interposes an obstacle to the achievement of Congress['] discernible objectives." *Id.*

Conflict preemption applies in the absence of express preemption where state law "stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Franklin California Tax-Free Trust v. Commonwealth of P.R.*, 805 F.3d 322, 343 (1st Cir. 2015)

(internal citation omitted).  In either situation, "[c]ongressional intent is the touchstone of

preemption analysis." *Grant's Dairy*, 232 F.3d at 14.  Here, there is no intent to preempt local

law.

21.      Field preemption only applies where there is a clear "congressional decision to

foreclose any state regulation in the area."  *Arizona v. United States*, 567 U.S. 387, 401 (2012).

The text of PROMESA does no such thing.  Rather, it demonstrates Congress' contrary intent —

to preserve related territorial law, except where it directly conflicts with the federal statute.

22.      Section 4 of PROMESA addresses explicitly where the Act displaces local law.  It

provides that "[t]he provisions of this Act shall prevail over any general or specific provisions of

territory law, State law, or regulation that is *inconsistent* with this Act."  48 U.S.C. § 2103 (2016)

(emphasis added).   Congress thus intended PROMESA to supplement—not supplant—territorial

law and to displace territorial law only to the extent that it conflicts with PROMESA.  Because

the text provides only that PROMESA shall prevail over "inconsistent" territorial law, the statute

does not "reflect[] a congressional decision to foreclose *any* state regulation in the area,"

*Arizona*, 567 U.S. at 401 (emphasis added), or "warrant an inference that Congress did not intend

the states to supplement" the statutory scheme, *Grant's Dairy*, 232 F.3d at 15.

23.      This express limitation on the displacement of territorial law distinguishes the

situation here from circumstances where the Supreme Court has found field preemption—

typically when the federal scheme is designed as a "harmonious whole" with no room for state or

territorial regulation. *Arizona*, 567 U.S. at 401 (finding that Congress preempted the field of

alien registration because, among other things, "[t]he federal statutory directives provide a full

set of standards governing alien registration, including the punishment for noncompliance," with

no textual preservation of state law). PROMESA's supremacy provision thus provides strong

evidence that Congress did not intend to preempt all related territorial law on a field preemption

theory. Rather, it suggests that PROMESA can preempt territorial law only under a conflict

preemption theory. *See Franklin California Tax-Free Tr.*, 805 F.3d at 334 ("[S]tatutory

language . . . contains the best evidence of Congress' pre-emptive intent.") (internal citation and

quotation marks omitted).

24.     The FOMB has acknowledged that PROMESA does not preempt all Puerto Rico

law. *See* Mar. 4, 2020 Hr'g Tr. at 185:15-18 ("Now, the Committee also said that we're asking

in the Plan that all Puerto Rico law be ruled preempted. Well, that's wrong. What the Plan – the

Proposed Plan says is that all inconsistent law is preempted."); *see also Disclosure Statement for

the Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Dkt.

No. 11947] at 44 ("The Oversight Board believes PROMESA section 4 preempts *inconsistent*

Commonwealth laws. . . .") (emphasis added).

## b. PROMESA Cannot Compromise the DRA's Property Rights and Interests.

25.     In any event, PROMESA cannot compromise the DRA's property rights under the

U.S. and Puerto Rico Constitutions. The Fifth Amendment to the U.S. Constitution provides, in

relevant part, that "private property [shall not] be taken for public use, without just

compensation." U.S. Const., Amend V, cl. 4. The Commonwealth Constitution similarly

provides that "[p]rivate property shall not be taken or damaged for public use except upon

payment of just compensation and in the manner provided by law." P.R. Const., Art. II, § 9. A

taking requiring just compensation occurs when the government "takes possession of an interest in property for some public purpose." *Tahoe-Sierra Preservation Council v. Tahoe Regency Planning Agency*, 535 U.S. 302, 322 (2002). Bankruptcy law has always been read to protect secured property interests from being taken "without compensation." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982).

26.     The DRA's liens and priority designations are property. *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) (Liens "constitute compensable property" and cannot be destroyed without just compensation). If PROMESA were interpreted to destroy those pre-existing liens and erase the DRA's priority designations, it would effectively "take[] possession" of the liens and confiscate the bondholders' essential secured property rights. *Tahoe-Sierra Preservation Council*, 535 U.S. at 322. Under the Fifth Amendment, this would trigger a "categorical duty to compensate" the party deprived of its property. *Id*. As a result, it would, absent a clear statement to the contrary by Congress, be improper to read PROMESA to destroy preexisting liens and erase creditor priority designations. *See United States v. Sec. Indus. Bank*, 459 U.S. at 79-82 ("[I]n the absence of a clear expression of Congress' intent to apply § 522(f)(2) to property rights established before the enactment date, we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the Takings Clause.") (internal quotation marks omitted); *Holt v. Henley*, 232 U. S. 637, 639 (1914) ("[T]he reasonable and usual interpretation of [bankruptcy] statutes is to confine their effect, so far as may be, to property rights established after they were passed.").

27.     Here, the call is easy. As discussed further below, *infra* ¶¶ 28 - 39, the text of PROMESA makes clear that it does *not* disturb Commonwealth law relating to priority designations or destroy Commonwealth law liens. Indeed, Congress made explicit its objective

14

of respecting and preserving these Commonwealth law rights. *Id*.   Nevertheless, if the court

perceives any ambiguity in PROMESA, it should adopt the interpretation that avoids the

destruction of pre-existing security interests and harmonizes with Commonwealth law, leaving

no conflict and no preemption. *See Sec. Indus. Bank*, 459 U.S. at 78-82.  In all events,

Commonwealth law rights remain fully in place.

### c. To the Extent PROMESA Preempts Commonwealth Law, Congress Intended to Preserve Existing Priority and Property Rights.

28.     While PROMESA does preempt some elements of Commonwealth law, Congress

clearly preserved existing liens and priorities at Commonwealth law.

29.     First, Section 201(b)(1)(N) of PROMESA provides explicitly that any fiscal plan

shall "respect the relative lawful priorities or lawful liens, as may be applicable, in the

constitution, other laws, or agreements of a covered territory or covered territorial

instrumentality in effect prior to June 30, 2016." 48 U.S.C. § 2141(b)(1)(N) (2016).  In this

section, Congress did not intend to occupy the field so as to displace all territorial law relating to

creditor priority.  Thus, the fiscal plan in and of itself cannot preempt Puerto Rico law.  To the

contrary, the fiscal plan must comply with Puerto Rico law.  This reiterates Congress' intent to

complement—not eliminate—Commonwealth law.

30.     Second, Section 204(c)(3)(B) of PROMESA authorizes the FOMB to "review,

and in its sole discretion, rescind, any law that—(i) was enacted during the period between . . .

May 4, 2016 . . . and the date of appointment of all members and the Chair of the Oversight

Board; and (ii) alters pre-existing priorities of creditors in a manner outside the ordinary course

of business or inconsistent with the territory's constitution or the laws of the territory as of . . .

May 4, 2016. . .  but such rescission shall only be to the extent that the law alters such priorities."

48 U.S.C. § 2144(c)(3)(B) (2016).  This provision also demonstrates a clear intent to preserve

15

priority designation that existed in territorial law at the time of the statute's enactment, as it limits the FOMB's powers to preempt existing laws regarding priority to a specific period. Such intent is wholly inconsistent with the theory that Congress intended PROMESA to displace territorial priority designation wholesale.

31.     Third, Section 314(b)(6) of PROMESA provides that, for purposes of confirmation of a Title III plan of adjustment, the plan must be "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." 48 U.S.C. § 2174(b)(6) (2016). In addition, Section 314(b)(3) of PROMESA requires that the debtor not be "prohibited by law from taking any action necessary to carry out the plan." 48 U.S.C. § 2174(b)(3) (2016). Once again, these provisions denote Congress' intent to preserve creditors' rights, interests, and remedies under Puerto Rico law, and not displace them through PROMESA.

32.     Fourth, although Section 301 of PROMESA incorporates numerous provisions of the Bankruptcy Code, *see* 48 U.S.C. § 2161 (2016) (providing that a list of provisions of the Bankruptcy Code apply in any case under PROMESA), it does not incorporate the bulk of the Bankruptcy Code's waterfall priority provision set forth in Section 507. Congress' decision not to incorporate Section 507 of the Bankruptcy Code in PROMESA provides further indication that Congress did not intend for PROMESA to occupy the field and displace existing territorial law on creditor priority, but rather an intent to cede this to existing Commonwealth law. When combined with the unique best interest test and the other provisions of Section 314 of PROMESA, it makes clear Congress' intent to sweep the Commonwealth's priority scheme into

16

PROMESA.  These two features suggest that there is no direct conflict between PROMESA and existing creditor priority schemes under Commonwealth law.

33.     Finally, it is worth noting that where Congress intended territorial law not to apply in the PROMESA context, it says so expressly.  For example, Section 103(c) provides that "[t]he Executive Director and staff of the Oversight Board may be appointed and paid without regard to any provision of the laws of the covered territory or the Federal Government governing appointments and salaries.  *Any provision of the laws of the covered territory governing procurement shall not apply to the Oversight Board*."  48 U.S.C. § 2123 (2016) (emphasis added).

34.     For all these reasons, PROMESA's text evinces the intent of Congress that the statute harmonize with existing territorial law and not displace existing creditor priority designations or security or property interests in the absence of a clear conflict.

### d.   Sections 201 and 202 of PROMESA Do Not Displace Territorial Law Relating to Creditor Priority.

35.     The FOMB argues that Sections 201 and 202 of PROMESA, 48 U.S.C. §§ 2141, 2142, preempt Commonwealth laws that set Commonwealth appropriations, including those allocating money to HTA.  *See* FOMB Opp. ¶¶ 84, 85.  However, the FOMB's position misses the mark, because these sections do not displace Commonwealth law relating to creditor priority and liens or bear on any ultimate issues in a lift stay proceeding.

36.     Sections 201 and 202 establish the process for fiscal planning and budgeting under PROMESA.  *See* 48 U.S.C. § 2141 (2016) (establishing a procedure for the "Approval of Fiscal Plans"); *id.* § 2142 (2016) (establishing a procedure for the "Approval of Budgets").  These sections say nothing to displace Commonwealth law regarding debt payment priorities during a Title III case or as part of a plan of adjustment.  While they may determine how and

17

when the Commonwealth may make payments during the course of the Title III (or with an oversight board in place outside Title III), they do not have any bearing on standing to lift the automatic stay or the ultimate issues in any lift stay proceeding, such as to whom the assets at issue belong.

37.     Section 201 of PROMESA states on its face that it does preempt Commonwealth law on creditor priority.  More specifically, Section 201(b)(1)(N) expressly requires any fiscal plan to "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016."  48 U.S.C. § 2141(b)(1)(N) (2016).  Given this clear Congressional directive to preserve territorial liens and priorities, it is impossible to conclude that Section 201 preempts territorial liens and priorities.

38.     Similarly, Section 202 of PROMESA does not preempt such laws.  Section 202 states that the "Governor shall submit to the Oversight Board proposed Budgets" and establishes a process for the Board to approve the budget in conjunction with other actors.  48 U.S.C. § 2142(c)(1) (2016).   But Section 202 does not provide anything about the substance of the budget or payment of funds, what kind of budget can be proposed, how properly appropriated funds should be distributed, or what law applies to any of those issues.  As a result, the continued operation of Commonwealth law in these areas does not "interpose[] an obstacle to the achievement of Congress's discernible objectives."  *Grant's Dairy*, 232 F.3d at 15.  Congress' objective with Sections 201 and 202—an orderly planning and budgeting process—sits comfortably with the continued operation of Commonwealth law on debt payment priorities and the continued existence of Commonwealth law rights in this area.

18

39.     The First Circuit case law cited by the FOMB in support of its argument does not

pertain to the rights of creditors to preserve their property.  The FOMB asserts that the First

Circuit definitively held that Section 202 of PROMESA preempts Commonwealth law

"purporting to appropriate funds outside of an Oversight Board certified budget."  *See* FOMB

Opp. ¶ 85 (citing *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 945 F.3d 3 (1st Cir. 2019)).

As the First Circuit explained, "if a certified budget is to have 'full force and effect,' [pursuant

to] subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget,

regardless of what any territorial laws say."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,

945 F.3d at 8.  That means simply that a *certified budget* provides the exclusive means for

*spending* in the Commonwealth.  The DRA Parties do not dispute this.  However, that is the

extent of the First Circuit's ruling.  The court did not hold that *PROMESA preempts all*

*Commonwealth law relating to creditor priority, security and/or property rights* much less

address the issues of priority at all.  Therefore, the First Circuit's ruling has little bearing here.

**III.     Acts 30 and 31 Are Binding and Cannot Be Repealed Through Certified
          Budgets.**

40.     The FOMB argues that the Excise Tax Statutes (including Acts 30 and 31)

constitute "appropriation laws" whose purported "appropriation of future years' revenues

[cannot] bind future legislatures." FOMB Opp. ¶ 5.  The FOMB is mistaken regarding Acts 30

and 31 for several reasons.

41.     First, the FOMB misreads *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 948

F.3d 457 (1st Cir. 2020) (the "ERS Decision").  In that case, the First Circuit ruled that because

ERS required an annual funding of mandatory contributions to the retirement system, the

contributions were "allocated to the System through annual appropriations in the Commonwealth

budgets." *Id.* at 464.

19

42.     The facts here are much different. Contrary to the retirement system's enabling

act, which required that the contributions be appropriated each year in the Commonwealth's

budget, Acts 30 and 31 do not contain any budgetary appropriation requirements. Rather, both

statutes provide that the Act 30-31 Revenues shall be covered into a special deposit in the name

and for the benefit of HTA.  *See* Act 30-2013 § 1 (2013); Act 31-2013 a§§ 3(a)(1), (a)(2), (a)(3)

(2013).  Act 31 goes as far as to provide specific instructions for transferring the gasoline tax,

gas and diesel oil tax, and the cigarette tax to HTA on a monthly basis, or as otherwise agreed

with HTA.  *See* Act 31-2013 §§ 3(a)(1)(A), (a)(3)(A) (2013). Because Acts 30 and 31 are not

"appropriation statutes," the ERS Decision has no bearing here.

43.     Second, unlike appropriation statutes, Acts 30 and 31, together with the Security

Agreement, create private rights in the form of liens and creditor priority designations.  Liens

and contract rights are "property" that cannot be arbitrarily confiscated by subsequent legislation.

*See Armstrong v. United States*, 364 U.S. 40, 48 (1960) (Liens "constitute… property[.]"); *U.S.

Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of

property[.]").  As a result, the Acts cannot simply be repealed without undermining private

rights.

44.     Finally, the FOMB's certified budgets cannot "repeal" the Excise Tax Statutes. The

Puerto Rico Civil Code provides that "[l]aws shall only be repealed by means of *subsequent laws*."

Tit. 31 Laws of P.R. Ann. § 5 (1930) (emphasis added). As such, the power to leave existing

legislation without effect belongs to the Puerto Rican legislative assembly only. The certified

budgets cannot repeal Acts 30 and 31 because the FOMB does not possess the authority to enact

legislation.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 330 F. Supp. 3d 685, 701–02

(D.P.R. 2018) (*aff'd and remanded*, 945 F.3d 3 (1st Cir. 2019)) ("[T]he Oversight Board has not

20

been given power to affirmatively legislate. Thus. . . measures that . . . require the adoption of new

legislation *or the repeal or modification of existing Commonwealth law*, the Oversight Board has

only budgetary tools and negotiations to use to elicit any necessary buy-in from the elected officials

and legislators.") (emphasis added and citations omitted).

### IV.   Any Liens Possessed by HTA Bondholders Did Not Stop Attaching Once the Debtors Filed for Title III Pursuant to Bankruptcy Code Section 552(a).

#### a.   The Act 30-31 Revenues are "Special Revenues" under Section 902(2)(B) and 902(2)(E) of the Bankruptcy Code.

45.     Section 902(2) of the Bankruptcy Code defines "special revenues" to include

"special excise taxes imposed on particular activities or transactions" and "taxes specifically

levied to finance one or more projects or systems, excluding receipts from general property,

sales, or income taxes . . . levied to finance the general purposes of the debtor."  11 U.S.C. §§

902(2)(B), (2)(E).  Puerto Rico's Internal Revenue Code makes clear that the Act 30-31

Revenues—which consist of motor vehicle license fees, taxes on gasoline, diesel, crude oil,

cigarettes, and other special excise taxes—are special excise taxes imposed on particular

activities or transactions and therefore "special revenues" within the meaning of Section

902(2)(B).  *See, e.g.*, 13 L.P.R.A. §§ 31626(a)(1) (gasoline tax), 31626(a)(3) (gas oil and diesel

oil tax), 31627(a) (petroleum products tax), 31627a(a) (non-diesel petroleum products tax),

31625 (cigarette tax).  The Excise Tax Statutes are likewise "special revenues" within the

meaning of Section 902(2)(E) because they were specifically created to increase HTA's solvency

and capacity to pay certain of its debts. *See* Statement of Motives of Act No. 30-2013 and Act

No. 31-2013 at 2.

46.     The FOMB argues that the Excise Tax Statutes do not qualify as special revenues

under Sections 902(2)(B) and (2)(E) because they are generally available to all creditors of HTA.

21

*See* FOMB Opp. ¶¶ 109-10.  This argument lacks merit as far as the Act 30-31 Revenues are concerned for several reasons.

47.     The Act 30-31 Revenues were created and pledged for the benefit of particular creditors of HTA only.  For example,[6] in Sections 1.1 and 1.2 of the Security Agreement, HTA specifically pledged the Act 30-31 Revenues to the DRA Parties.  Additionally, as noted above, the Statements of Motives of Acts 30 and 31 make clear that these statutes were not intended to finance HTA's general purposes, but, instead, to pay down its GDB loan obligations.  *See* Statement of Motives of Act No. 30-2013 and Act No. 31-2013 at 2.

48.     In addition, the decision of *In re Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147 (Bankr. S.D. Cal. 1996), directly rebukes the FOMB's position.  In *Heffernan*, the court held that sales tax revenues adopted by the California State Assembly (and authorized by the City of Calexico) for the exclusive use of the Heffernan Memorial Hospital District (the "Chapter 9 Debtor"), which, in turn, were assigned and pledged by the Chapter 9 Debtor on behalf of the Calexico Special Financing Authority for the payment of certain bonds, qualified as special revenues of the Chapter 9 Debtor because the "stream pledged and assigned to the Authority is not available for general municipal purposes [of the Chapter 9 Debtor]" but "[r]ather. . . is available only for the purpose of providing security and payment to the bondholders."  *Id.* at 148-49.

49.     Here, like in *Heffernan*, because the Act 30-31 Revenues were intended for specific creditors of HTA and were levied for particular purposes only, the same are clearly special revenues under Sections 902(2)(B) and (2)(E) of the Code.

---

[6] These arguments are not being presented to inject intercreditor disputes in violation of the DRA Participation Order but rather as concrete examples to rebut the FOMB's position as to the availability of the Act 30-31 Revenues to general creditors of HTA.

      **b. The Fact that the Act 30-31 Revenues Were Imposed by the Commonwealth Does Not Preclude the Act 30-31 Revenues From Being Special Revenues.**

50.      The FOMB also alleges that the Excise Tax Statutes (including the Act 30-31 Revenues) cannot constitute special revenues because these "are not excise taxes that are imposed by the **debtor** (HTA) . . . instead, they are imposed by the Commonwealth and . . . allocated to HTA."  FOMB Opp. ¶ 108 (emphasis original).

51.      *Heffernan* further contradicts the FOMB's assertion.  As explained above, the fact pattern in *Heffernan* is analogous to this case: the special sales tax was levied by the California State Assembly and the city for the benefit of the Chapter 9 Debtor (just as the Excise Tax Statutes were enacted by the Commonwealth for the benefit of HTA) and the Chapter 9 Debtor pledged the special sales taxes on behalf of the Authority for the payment of bondholders (just as HTA pledged certain of the revenue streams of the Excise Tax Statues for the benefit of particular HTA creditors, including the DRA Parties).

52.      After analyzing Section 902(2), the court held that the special sales tax were special revenues of the Chapter 9 Debtor.  *Heffernan*, 202 B.R. at 148-49.  Accordingly, the fact that the Excise Tax Statutes (including the Act 30-31 Revenues) may have been imposed by the Commonwealth for the benefit of HTA does not preclude them from qualifying as special revenues under Section 902(2) of the Code.

      **c. The Act 30-31 Revenues Were Acquired Post-Petition by HTA.**

53.      The DRA Parties also refute the FOMB's position that the phrase "special revenues acquired by the debtor after the commencement of the case" under Section 928(a) should only mean *actual receipt* of post-petition special revenues by HTA.  FOMB Opp. ¶ 107.  The legislative history does not support this view as the phrase "acquired by the debtor" also includes the debtor's right to receive special revenues post-petition. *See* 10 *Norton Bankr. L. &*

23

*Prac. 3d*, 11 U.S.C. § 928 ("The right to collect an assessed tax, where the only matter remaining outstanding is the collection of the revenue, would seem to be 'property' and the subsequent revenue would be 'proceeds' thereof."). According to *Norton*, this phrase was intended to be analogous to "accounts receivable," which includes the right to collect on post-petition special revenues. *See id*.

54.     Thus, Section 928(a) includes both special revenues received by the debtor *and* the debtor's post-petition right to receive special revenues. Because Acts 30 and 31 create a right for HTA to receive the Act 30-31 Revenues and render the unreceived Act 30-31 Revenues as "acquired property" within the context of Section 928(a), the fact that the Commonwealth improperly diverted these special revenues does not eliminate HTA's property rights over the same, much less render them exempt from the scope of Section 928(a).

### V. The Security Interests Granted to HTA Bondholders Pursuant to the 1968 and 1998 HTA Bond Resolutions Suffer From Potential Deficiencies.

55.   The DRA Parties support the FOMB's position that: (i) the Monolines' security interests are limited to monies both received by HTA and deposited to the credit of the fiscal agent for the 1968 and 1998 HTA bonds, and therefore, the Monolines do not have any property interest in an ongoing revenue stream (FOMB Opp. ¶¶ 70-78); and (ii) that the Monolines' alleged liens on revenues are invalid and unperfected under the Puerto Rico Uniform Commercial Code because the financing statements do not sufficiently name the secured party to perfect a security interest in the collateral (Dkt. No. 1 of Adv. Pro. No. 20-00007-LTS ¶¶ 63-76), and reserve all rights regarding these issues, including, but not limited to, potential deficiencies in the *bondholders'* security interest in the Act 30-31 Revenues, to the extent they arise in future litigation or proceedings between the DRA Parties, the Monolines, and/or any holder of 1968 or 1998 HTA bonds.

24

## **CONCLUSION**

56.      WHEREFORE, the DRA Parties respectfully request that the Court to (i) take

note of the foregoing in consideration of the Gating Issues on the Monolines' Amended Lift Stay

Motion and (ii) grant any such order and further relief as is just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, today March 16, 2020.

25

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
PO Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: 787-250-5632
Facsimile: 787-759-9225

By: */s/Arturo J. García-Solá*
Arturo J. García-Solá
USDC No. 201903
Email: ajg@mcvpr.com

By: */s/Alejandro J. Cepeda-Diaz*
Alejandro J. Cepeda-Diaz
USDC No. 222110
Email: ajc@mcvpr.com

By: */s/Nayuan Zouairabani*
Nayuan Zouairabani
USDC No. 226411
Email: nzt@mcvpr.com

*Attorneys for AmeriNational Community Services, LLC as servicer for the GDB Debt Recovery Authority*

**C. CONDE & ASSOC. LAW OFFICES**

By: */s/ Carmen D. Conde Torres*

Carmen D. Conde Torres
(USDC No. 207312)
254 San José Street, Suite 5
San Juan, PR 00901-1523
Tel. 787-729-2900
Fax. 787-729-2203
E-Mail: condecarmen@condelaw.com

*-and-*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

By: */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted pro hac vice)
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
E-mail: dmintz@orrick.com

and

Laura Metzger (admitted pro hac vice)
Peter Amend (admitted pro hac vice)
David Litterine-Kaufman (pro hac vice admission pending)
Monica Perrigino (admitted pro hac vice)
51 West 52nd Street
New York, N.Y. 10019
Telephone: (212) 506-5000
E-mail:   lmetzger@orrick.com
          pamend@orrick.com
          dlitterinekaufmann@orrick.com
          mperrigino@orrick.com

*Attorneys for Cantor-Katz Collateral Monitor LLC, as Collateral Monitor for GDB Debt Recovery Authority*

26

4160-7065-6803.13