# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>     as representative of<br><br>The Commonwealth of Puerto Rico, et al.,<br><br>          Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## OBJECTION OF THE LAWFUL CONSTITUTIONAL DEBT COALITION TO THE AMENDED CROSS-MOTION AND STATEMENT OF SUPPORT ON BEHALF OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY WITH RESPECT TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO AMEND TENTH AMENDED CASE MANAGEMENT PROCEDURES AND ADMINISTRATIVE PROCEDURES REGARDING DISCLOSURE REQUIREMENTS PURSUANT TO <u>FEDERAL RULE OF BANKRUPTCY PROCEDURE 2019</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................2

BACKGROUND .............................................................................................................8

I.  RULE 2019  DISCLOSURE REQUIREMENT.................................................8

    A.  Case Management Procedures ...............................................................8

    B.  LCDC Disclosures ...............................................................................9

II.  THE LATE VINTAGE CLAIM OBJECTIONS ...............................................9

III.  INITIAL PSA, LITIGATION STAY AND  INITIAL PLAN .........................12

IV.  THE INTERIM REPORT AND INTERIM ORDERS.....................................13

V.  LCDC OMNIBUS OBJECTION....................................................................14

VI.  THE NEW PSA AND PROPOSED PLAN ....................................................15

VII.  COFINA PLAN AND LEGISLATION .........................................................16

VIII.  THE COMMITTEE MOTION AND MONOLINES' CROSS-MOTION .......18

OBJECTION..................................................................................................................19

    A.  The LCDC Has Complied With All Disclosure Requirements ........................... 19

    B.  LCDC Has Taken A Consistent Position On The Relative Rights And Priorities
        Of Early Vintage And Late Vintage Constitutional Debt ..................................... 22

    C.  Monolines Should Disclose Their Own True Economic Interests........................ 24

    D.  Movants' Fundamental Misunderstanding of the Proposed Commonwealth Plan
        and Consummated COFINA Plan......................................................................... 26

CONCLUSION..............................................................................................................29

EXHIBIT A....................................................................................................................30

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*In re Nw. Airlines Corp.*,
   363 B.R. 701 (Bankr. S.D.N.Y. 2007) ..................................................................... 26

*In re Washington Mut., Inc.*,
   419 B.R. 271 (Bankr. D. Del. 2009) ....................................................................... 26

### **Rules / Statutes**

Bankruptcy Code, Section 509(c) ................................................................................ 2

Fed. R. Bankr. P. 2019 ................................................................................... passim

Fed. R. Bankr. P. 7012 ............................................................................................. 13

Fed. R. Civ. P. 7 ......................................................................................................... 2

Fed. R. Civ. P. 12(b) ................................................................................................ 13

Puerto Rico Constitution, Article VI, Section 2 ................................................. 10, 11

Puerto Rico Constitution, Article VI, Section 8 ....................................................... 15

### **Other Authorities**

Danica Coto, *Puerto Rico Sued Over Diverted Funds Amid Economic Crisis, Associated Press*,
   https://apnews.com/0268c24c5e804ec0a3495c430d543e35 (Jan. 8, 2016) .............................. 5

Luis J. Valentín Ortiz, *Bond Insurers Call for Federal Fiscal Oversight, No Bankruptcy Regime for Puerto Rico, Caribbean Business* (Jan. 22, 2016), https://caribbeanbusiness.com/bond-insurers-call-for-federal-fiscal-oversight-no-bankruptcy-regime-for-puerto-rico/?cn-reloaded=1 .......................................................................................................... 5

To the Honorable United States District Judge Laura Taylor Swain:

The Lawful Constitutional Debt Coalition (the "LCDC"),[1] hereby files this objection (this "Objection") to the *Amended Cross-Motion and Statement in Support on behalf of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, and Financial Guaranty Insurance Company with respect to Motion of Official Committee of Unsecured Creditors to Amend Tenth Amended Notice, Case Management and Administrative Procedures Regarding Disclosure Requirements Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 12296) (the "Cross-Motion"),[2] and respectfully states as follows:

---

[1]  The members of the LCDC and their respective holdings are set forth in the *Sixth Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019,* filed contemporaneously herewith.  The LCDC does not (a) assume any fiduciary or other duties to any other entities in connection with the Title III cases or (b) represent or purport to represent any other entities in connection with the Title III cases.

[2]  On March 10, 2020, the Monolines (as defined herein) filed the initial version of the Cross-Motion (ECF No. 12216), which lodged aspersions against members of the LCDC and its counsel that were unfounded.  Each of the Movants promptly withdrew such statements.  *See Statement of Clarification of Ambac Assurance Corporation in connection with Cross-Motion* (ECF No. 12221) ("Ambac Clarification") (stating that Ambac does not "join in the claims and factual assertions made therein regarding the trading activities of specific entities or groups, including the LCDC, and the QTCB Group and members thereof."); Cross-Motion (ECF No. 12296) (Assured and FGIC "remove[] certain speculative statements and references to advisors contained in various paragraphs of the Cross-Motion").  Accordingly, other than denying them in full, this Objection does not respond to the salacious allegations in the initial Cross-Motion.

## PRELIMINARY STATEMENT[3]

1.      Through the procedurally improper vehicle of a "cross-motion,"[4] the Monolines[5] request yet another round of disclosures from the LCDC and other creditor groups under Rule 2019(d) so they can "fully understand" the LCDC's arguments and motivations. *See* Cross-Motion ¶ 2. Feigning a need for enhanced transparency, the Cross-Motion, in actuality, is just an attempt to harass supporters of the recently-filed *Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, (ECF No. 11946) (the "Proposed Plan"). The Monolines' real motivations are telegraphed from their inability to reserve premature objections to the Proposed Plan—objections that are to be expected in light of their own group's likely holdings.[6] Now that the LCDC's publicly stated year-long effort has culminated in a consensual path to emergence, the Monolines misdirect their sights on the bona fides of the LCDC.

2.      At all times, the LCDC has complied with its obligations under the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and this Court's prior orders with respect to

---

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the Cross-Motion.

[4] The concept of a "cross-motion" does not exist under the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Civ. P. 7. The LCDC has already responded to the motion of the Official Committee of Unsecured Creditors (the "Committee") that the "cross-motion" seeks to expand. *See infra*, ¶¶ 8, 29-30.

[5] The Monolines mean, collectively, Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together, "Assured"), Ambac Assurance Corporation ("Ambac"), and Financial Guaranty Insurance Company ("FGIC").

[6] The Monolines, acting in concert, are plainly subject to Rule 2019 yet they have never once filed a verified statement setting forth their true economic positions and have routinely obfuscated their motives by purporting to speak as holders of GO Bonds (as defined herein) while really complaining about the amount of funds available to pay their junior claims. Based on their public filings, the Monolines' collective exposure on junior bonds appears to more than twice as much as their exposure on Constitutional Debt (as defined herein). Neither the Court nor any party in interest has been able to gain transparency into whether the Monolines have purchased any of the junior bonds they allegedly insure or what portion of their "bonds" are in actuality subrogation or contribution claims that may be subject to subordination under section 509(c) of the Bankruptcy Code. The LCDC reserves its right to question the legitimacy of future pleadings or "views" of the Monolines that are made purportedly as holders of GO Bonds when being done primarily to benefit other undisclosed claims.

Bankruptcy Rule 2019 disclosures.  The LCDC was formed in February 2019 and filed its first Bankruptcy Rule 2019 statement ("Rule 2019") on February 26, 2019.  Since then, the LCDC has filed *five* supplements to update holdings as required by Rule 2019 and the Case Management Procedures with its most recent Rule 2019 statement filed on February 19, 2020 (each, a "Rule 2019 Statement," and collectively, the "Prior Rule 2019 Statements").  In each of those first five Prior Rule 2019 Statements, the LCDC disclosed each group member's aggregate holdings of Constitutional Debt[7] as Rule 2019 and the Case Management Procedures require.  Since the LCDC appeared or took a position only in the Commonwealth Title III case, it needed to disclose only the economic interests its members held in relation to the Commonwealth.  The LCDC has heretofore neither appeared nor otherwise taken a position in the cases of any other Title III debtors, including the PBA Title III case commenced on September 27, 2019.

3.     Even though the LCDC had appeared and sought relief only in the Commonwealth's Title III case, the Rule 2019 Statement on file at the time of the Cross-Motion (ECF No. 11161) nevertheless listed each member's disclosable economic interests of (i) general obligation bonds issued by the Commonwealth ("GO Bonds") and (ii) bonds issued by the PBA and guaranteed by the Commonwealth ("PBA Bonds").  More recently, on March 10, 2020, in response to the Committee's Motion, the LCDC and the other PSA creditor groups jointly submitted additional voluntary disclosures of their aggregate holdings, sorting them according to the Proposed Plan's claims classes.  *See Joint Response of PSA Creditors to Motion of Official Committee of Unsecured Creditors to Amend Tenth Amended Notice, Case Management and*

---

[7]  Constitutional Debt means bonds issued or guaranteed by the Commonwealth.

*Administrative Procedures Regarding Disclosure Requirements Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 12217) (the "Joint Response").[8]

4.      In order to dispel any doubts concerning the LCDC's motivations and the nature of its members' holdings of Commonwealth securities, *see* Cross-Motion ¶ 6, the LCDC members voluntarily make certain additional disclosures.  First, attached hereto as **Exhibit A**, is a schedule listing the aggregate holdings of the LCDC's members spread across various Proposed Plan classes, as of the applicable holdings date in each of the LCDC's Prior Rule 2019 Statements. Second, although not required by Rule 2019 or the Case Management Procedures, the LCDC contemporaneously herewith files its sixth supplemental verified statement (the "Sixth Supplemental Rule 2019 Statement"), breaking out holdings of each member (to the  extent a member at the time) according to how the Oversight Board classifies the different vintages of GO Bonds and PBA Bonds in the Proposed Plan.  While there has been no adjudication that different vintages have different rights, the LCDC has consistently asserted that early vintage bonds have priority over later vintage bonds and, accordingly, supports, as part of a global settlement, the compromise of relative step-down distributions embedded in the Proposed Plan (as the LCDC did in the initial plan support agreement, dated May 31, 2019 (the "Initial PSA")).  The Sixth Supplemental Rule 2019 Statement also contains schedules that amend Exhibit A to each of the Prior Rule 2019 Statements, breaking out each LCDC member's disclosable economic interest by the applicable Proposed Plan classes, as of the applicable holdings date for each of the Prior Rule 2019 Statements.[9]

---

[8]   For the sake of brevity, the LCDC does not repeat the arguments made in the Joint Response but incorporates those arguments to the extent applicable to the Cross-Motion.

[9]   The first four (4) of the Prior Rule 2019 Statements were filed prior to September 27, 2019, the date that the Oversight Board filed the Initial Plan and the PBA Title III Case.

5.      While such disclosures go well beyond what Rule 2019 and the Case Management
Procedures require, the disclosures demonstrate that the LCDC's holdings have consistently been
heavily weighted towards early vintage GO Bonds and PBA Bonds despite the addition of new
members over time.  The Monolines' speculation regarding the LCDC's motivations and whether
it was acting as a faithless advocate of early vintage bonds is baseless.  Since its formation, the
LCDC has worked tirelessly to achieve a fair and reasonable resolution and restructuring of the
Commonwealth's crushing indebtedness.  In stark contrast to the LCDC's constructive role
facilitating a path forward for the Commonwealth to exit Title III by year end, the Monolines have
unfailingly taken an aggressive, punitive, and litigious approach to the Commonwealth's
restructuring.  Beginning with their opposition to the passage of PROMESA[10] and continuing to
this very day, the Monolines have engaged in a campaign of delay and distraction of the
Commonwealth's restructuring of its indebtedness[11] in order to preserve their balance sheets by
avoiding the crystallization of their contingent losses.

6.      As the disclosures set forth herein and the Sixth Supplemental Rule 2019 Statement
demonstrate, the LCDC supports enhanced transparency in these unprecedented cases.  Towards
that end, creditors who have acted in concert with one another in taking positions before the Court
in these Title III cases should be required to make similar disclosures concerning their holdings.

---

[10]    *See* Luis J. Valentín Ortiz, *Bond Insurers Call for Federal Fiscal Oversight, No Bankruptcy
Regime for Puerto Rico*, Caribbean Business (Jan. 22, 2016), https://caribbeanbusiness.com/bond-
insurers-call-for-federal-fiscal-oversight-no-bankruptcy-regime-for-puerto-rico/?cn-reloaded=1 (members
of the Association of Financial Guaranty Insurers, including Ambac, Assured and FGIC, "feel strongly"
that providing a bankruptcy regime for Puerto Rico to restructure its debt obligations is not the best path
toward solving the island's fiscal and economic crisis).

[11]    *See* Danica Coto, *Puerto Rico Sued Over Diverted Funds Amid Economic Crisis*, Associated
Press (Jan. 8, 2016), https://apnews.com/0268c24c5e804ec0a3495c430d543e35 (reporting that Assured
and Ambac commenced the first lawsuit over Puerto Rico's alleged diversion of funds to meet certain
bond payments and that Governor Alejandro Garcia Padilla warned that the lawsuit will provoke other
creditors to rush to court).

The Monolines have repeatedly filed joint pleadings in the Title III cases, acting in concert with one another by advocating a commonality of interest in their positions.[12] Accordingly, the Monolines should be required to file statements disclosing their economic interests, including with respect to owned bonds and insured exposure, in each of the Title III debtors' cases in which they appeared or took a position before the Court, all in accordance with Rule 2019 and the Case Management Procedures.

7.       The remainder of the Cross-Motion seeks only to engender confusion over the terms of the Proposed Plan and the terms of COFINA Junior Lien Bonds to be issued under the Proposed Plan.  The statements concerning the COFINA Junior Lien Bonds are simply wrong.  No additional collateral is being provided to support the first-priority COFINA bonds issued last year under the COFINA Plan (as defined below).  The newly issued COFINA Restructuring Bonds (as defined below) are already supported by the first collections of the Commonwealth's 5.5% sales and use tax.  The "Commonwealth Portion" (*i.e.*, the residual amount of the statutory fixed minimum recaptured by the Commonwealth as part of the COFINA Plan's compromise) is now proposed to be securitized by the Oversight Board to support the issuance of COFINA Junior Lien Bonds.  And the COFINA Junior Lien Bonds would be issued in exchange for the discharge of the Commonwealth's own senior-most debt, such that not all of the Commonwealth's new 20-year

---

[12]    The Monolines' recent joint pleadings and responses include joint lift stay motions and related pleadings in the revenue bond litigation, joint responses to the mediation team's interim and amended report, and Rule 2004 discovery motions.  See, e.g., ECF No. 10602 ("PRIFA Lift-Stay Motion"), ECF No. 10104 ("CCDA Lift-Stay Motion"); ECF No. 10102 ("HTA Lift-Stay Motion"); ECF No. 11687 ("Joint Discovery Motion Regarding CCDA and PRIFA Lift-Stay Motions"); ECF No. 11126 ("Joint Opposition to DRA Parties' Intervention Motion in Lift Stay Litigation"); ECF No. 10251 ("Joint Objection to FOMB's Response to Interim Mediation Report"); ECF No. 11493 ("Joint Objection to Amended Mediation Report");  ECF Nos. 9022 and 9023 ("Ambac's Rule 2004 Discovery Motions Regarding Commonwealth Assets and Cash Restriction Analysis"), ECF No. 10593 ("Assured's Joinder to Ambac's Rule 2004 Motions"), ECF No. 10605 ("FGIC's Joinder to Ambac's Rule 2004 Motions").

debt would be backed by the pledge of its full faith, credit, and taxing power on a full recourse basis. Thus, the Monolines' suggestion that issuing the COFINA Junior Lien Bonds does not "provid[e] the Commonwealth or its creditors with any consideration" (Cross-Motion ¶ 16)— when it is repaying Commonwealth debt— is absurd.

8.      Indeed, the issuance of the COFINA Junior Lien Bonds is consistent with and was expressly contemplated under the COFINA Plan. It strains credulity that the Monolines do not understand this aspect of the Proposed Plan since both Assured and Ambac were parties to the COFINA plan support agreement and participated in the drafting of the very provisions that permit the securitization. In any event, if the Monolines truly do not understand a provision of the Proposed Plan, they should have directed their questions to the Oversight Board so that the plan proponent can ensure its proposed disclosure statement is clearer by the time it is considered by the Court. But for sophisticated participants like the Monolines to instead embark on a misinformation campaign disguised as innocent confusion is improper and is a disservice to all parties in interest.

9.      At bottom, once stripped of its inflammatory hyperbole and feigned concern for others, the Cross-Motion is nothing but an attempt to throw a wrench in the works of the Commonwealth's historic path to discharging unstainable leverage. The Cross-Motion all but admits its true purpose, making repeated references to the "paltry" distribution provided under the Proposed Plan to holders of junior, subordinate "clawback" bonds of HTA, PRIFA and CCDA, the very bonds that the Monolines were paid to insure.[13]  Cross-Motion ¶ 65. The Court has reserved dates in October and November of this year for a confirmation hearing on the Proposed

---

[13]  "HTA" means Puerto Rico Highways & Transportation Authority, "PRIFA" means the Puerto Rico Infrastructure Authority, and "CCDA" means the Puerto Rico Convention Center District Authority.

Plan.[14]  The Monolines will have the opportunity to object to confirmation of the Proposed Plan, and all parties' rights are reserved for that event.  Now is not that time.  Accordingly, the LCDC respectfully requests that the Cross-Motion be denied.

## BACKGROUND

### I.   RULE 2019 DISCLOSURE REQUIREMENT

10.    Rule 9019 requires every group or committee "acting in concert to advance their common interests" to file a verified statement setting forth "the nature and amount of each disclosable economic interest held in relation to the debtor."  Fed. R. Bankr. P. 2019(b)(1); (c)(2)(B).  The 2011 Advisory Committee Notes to Rule 2019 points out that "[t]he rule applies to a group of creditors or equity security holders that act in concert to advance common interests (except when the group consists exclusively of affiliates or insiders of one another), ***even if the group does not call itself a committee***."  2011 Advisory Committee Note to Fed. R. Bank. P. 2019 (emphasis added).

#### A.    Case Management Procedures

11.    On August 17, 2017 the Court entered the *Order Amending Case Management Procedures* (ECF No. 1065-1) expressly incorporating Rule 2019 in these Title III cases (the "Rule 2019 Order").  As reflected in the most recent *Case Management Procedures* (ECF No. 11885), the Rule 2019 Order mandates that "every group, committee and entity that, on or before August 9, 2017, has taken a position before the Court must file a verified statement that complies with the disclosure requirements enumerated by Federal Rule of Bankruptcy Procedure 2019[.]"  Rule 2019 Order § IV.A.  The Rule 2019 Order also required that if information in the most recently filed Rule 2019 statement "changes materially, the Rule 2019(b) Group must file a supplemental

---

[14]   *See Notice Regarding Potential Confirmation Hearing Dates with respect to the Amended Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF No. 12188).

verified statement with or within 48 hours of the next instance in which the Rule 2019(b) Group

takes a position before the Court[.]" *Id.* § IV.C.   The phrase "takes a position before the Court"

includes, but is not limited to, the filing of any Pleading by or on behalf of a Rule 2019 Group in

any Title III case or related adversary proceeding, including informative motion practice

containing factual or legal representations or arguments." *Id.* at n.3.   "For the avoidance of doubt,

a Rule 2019 Group takes a position in the case of a Title III Debtor by appearing in such Debtor's

Title III case or related adversary proceeding in any capacity, including by, among other things,

filing a Pleading, filing an informative motion, executing a court-approved stipulation, filing a

proof of claim, appearing at a hearing before the Court, or asserting any legal or factual positions

that would in any way impact the property or rights of the Title III Debtor." *Id.* at n.4.

### B.     LCDC Disclosures

12.     Over the course of slightly more than a year, the LCDC has filed six (6) Rule 2019

Statements (ECF Nos. 5252, 5807, 7465, 8639, 9732 and 11161).   In its initial Rule 2019 Statement

and the first four supplements filed thereafter, the LCDC disclosed the amount of each member's

holdings in Commonwealth-issued or -guaranteed bonds, as required by Rule 2019 and the Rule

2019 Order.   In the LCDC's Fifth Supplemental Rule 2019 Statement (ECF No. 11161), the LCDC

went even further by voluntarily disclosing each member's holdings in GO Bonds, PBA Bonds,

and other Commonwealth-guaranteed bonds.

## II.     THE LATE VINTAGE CLAIM OBJECTIONS

13.     Beginning January 14, 2019 (prior to the formation of the LCDC) and periodically

thereafter, omnibus objections to claims have been filed challenging the validity and priority of

certain series of GO Bonds and PBA Bonds.   *See e.g.*, *Omnibus Objection of (I) Financial*

*Oversight and Management Board, Acting Through Its Special Claims Committee, and (II) Official*

*Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy*

9

*Rule 3007, to Claims Filed or Asserted By Holders of Certain Commonwealth General Obligation
Bonds* (ECF No. 4784) (the "2012-2014 GO Bond Objection").  In particular, the 2012-2014 GO
Bond Objection alleged that claims of holders of 2012 and 2014 issuances of GO Bonds should be
disallowed because those issuances violated the Commonwealth's constitutional debt limit under
Article VI, Section 2 of the Puerto Rico Constitution (the "Constitutional Debt Limit").
Subsequently, the Committee filed the 2011 GO Bond Objection (ECF No. 7057) and the PBA
Bond Objection (ECF No. 8141) challenging additional claims relating to GO Bonds and PBA
Bonds, which objections assert similar legal theories.  The central theory for each of these
objections is that the PBA was a "sham" or "alter ego" of the Commonwealth and that bonds issued
by the PBA and guaranteed by the Commonwealth constitute "direct obligations of the
Commonwealth" and thus should have been included in the first prong of the Constitutional Debt
Limit.

14.     In connection with the 2012-2014 GO Bond Objection, the Court entered the *Order
Establishing Initial Procedures With Respect to the 2012-2014 GO Bond Objection* (ECF No.
5143) (the "Procedures Order"), which set forth comprehensive procedures with respect to the
2012-2014 GO Bond Objection.  Among other things, the Procedures Order required holders of
2012-2014 GO Bonds that wished to participate in the litigation of the 2012-2014 GO Bond
Objection to submit a notice of participation by April 16, 2019.  *See* ECF No. 5143-1 at 2.

15.     On April 16, 2019, as required by the Procedures Order, the LCDC filed its *Notice
of Participation* (ECF No. 6179) and supporting *Statement of Position* (ECF No. 6180).  In its
Notice of Participation, the LCDC stated that while it disagreed that the PBA was a sham or alter
ego of the Commonwealth, it agreed that the 2012 and 2014 GO Bonds were issued in violation
of the Constitutional Debt Limit but based upon a different legal theory.  The LCDC's Statement

10

of Position explained that the PBA was a lawfully created juridical entity and that the PBA Bonds were not "direct" obligations of the Commonwealth. Under the LCDC's legal theory, the annual scheduled debt service on the PBA Bonds would not come within the first prong of the Constitutional Debt Limit as a direct obligation of the Commonwealth but debt service on PBA Bonds, actually paid from Commonwealth as rental payments on property it leases from the PBA, would constitute Commonwealth payments "for principal and interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth" and come within the second prong of the Constitutional Debt Limit. Puerto Rico Constitution, Art. VI, § 2. As such, the payments within the second prong of the Constitutional Debt Limit would need to be included and accounted for when calculating the Constitutional Debt Limit.

16.    If these payments were included within the Constitutional Debt Limit, the Commonwealth would have breached the Constitutional Debt Limit beginning on March 29, 2012, when the Commonwealth issued GO Bonds, series A and B, pursuant to a bond resolution adopted on March 7, 2012, and been in breach ever since. Accordingly, under the LCDC's legal theory, every issuance of GO Bonds or Commonwealth-guaranteed bonds issued on or after March 29, 2012 were issued in excess of the Constitutional Debt Limit. The LCDC did not take a position on the appropriate remedy for bonds issued in violation of the Commonwealth, stating that "[w]hether or not [the challenged] GO bonds and guarantees have any allowable claim, they clearly are not entitled to any lawful priority under Commonwealth law." *Statement of Position* ¶ 10. In addition to the LCDC, hundreds, if not thousands, of holders of 2012 and 2014 GO Bonds also filed notices of participation in the 2012-2014 GO Bond Objection. Not surprisingly, holders of late vintage bonds (including Assured) strongly disagreed with the LCDC and asserted that such claims should have the same rights as earlier vintage bonds. *See, e.g., Assured's and Ad Hoc GO*

11

*Group's Notices of Participation in Omnibus Claim Objection to GO Bonds* (ECF Nos. 6173, 6198) (indicating that they each believe that the Court should find that the GO Bonds issued in and after 2012 are valid).

### III.   INITIAL PSA, LITIGATION STAY AND  INITIAL PLAN

17.     While the litigation concerning the validity of late vintage GO Bonds and PBA Bonds was pending, on May 31, 2019, the Oversight Board executed an initial plan support agreement with, among others, the LCDC (the "Initial PSA").  *See* ECF No. 7814 at Ex. B.  The Initial PSA set forth a proposed settlement of the relative entitlements of various issuances of Constitutional Debt as well as other Commonwealth debts, and provided for a post-confirmation mechanism for resolving the omnibus objections to the validity of Constitutional Debt issued in and after 2012.

18.     Shortly after the announcement of the Initial PSA, the Oversight Board filed several motions seeking to stay all litigation concerning Constitutional Debt.  *See, e.g.*, ECF No. 7640 (GO Claims Stay Motion), ECF No. 99, Adv. Proc. No. 18-149 (PBA Stay Motion), ECF No. 7882 (Supplemental Stay Motion).  On July 24, 2019, the Court entered an order (ECF No. 8244) ("Stay Order") staying, among other things, all litigation concerning Constitutional Debt and bonds issued by certain other Title III debtors or affiliates of the Commonwealth through November 30, 2019. Stay Order at 1.  The Stay Order also required the Mediation Team to engage with interested parties and file a report with the Court regarding, among other things, the Mediation Team's recommendations with respect to a process for considering approval of any plan of adjustment filed during the stay period.  *Id.* at 2.[15]

---

[15]    On October 28, 2019, the Court entered the *Order Granting Urgent Joint Motion of Oversight Board and AAFAF for Order Extending (A) Stay Period, (B) Mandatory Mediation, and (C) Certain*

19.     On September 27, 2019, the Oversight Board filed the Initial Plan of Adjustment (ECF No. 8765) (the "Initial Plan") incorporating some of the key terms in the Initial PSA, with others still to be negotiated.

## IV.   THE INTERIM REPORT AND INTERIM ORDERS

20.     On November 27, 2019, the Mediation Team filed in its *Interim Report and Recommendation of the Mediation Team* (ECF No. 9365) (the "Interim Report").   In it, the Mediation Team explained that it was appropriate at the time to address the scheduling and sequencing of only certain disputed issues, and that the Mediation Team would file a more extensive amended report at a later date.  *See* Interim Report at 4, 7.  The Interim Report provided a preliminary schedule for the resumption of the litigation concerning the validity, priority and secured status of certain GO Bonds and PBA Bonds (the "Constitutional Debt Litigation") through Fed. R. Civ. P. 12(b)[16] motions to dismiss the relevant adversary proceedings and claim objections. *See id.* at 5.  The Interim Report provided a more comprehensive schedule to address certain adversary proceedings and contested matters relating to bonds issues by HTA, PRIFA, and CCDA (the "Revenue Bond Litigation," and the bonds issued by HTA, PRIFA, and CCDA, the "Revenue Bonds").  Interim Report Ex. 2 at 5-6.[17]

21.     On December 19, 2019, the Court entered the Interim Case Management Orders (ECF Nos. 9619, 9620) (the "Interim Order"), which lifted the stay on litigation concerning the Constitutional Debt and Revenue Bonds.  The Interim Orders applied to all parties, regardless of

---

*Deadlines Related Thereto* (ECF No. 9016), pursuant to which the stay under the Stay Order was extended until December 31, 2019.

[16]   As applied to bankruptcy proceedings pursuant to Fed. R. Bankr. P. 7012.

[17]   On December 19, 2019, the Court entered an order that required the Mediation Team file an amended report by January 10, 2020 (the "Bridge Order," ECF No. 9618).  The deadline to file the amended report was subsequently extended to February 10, 2020. *See* ECF No. 9639.

whether they continued to engage in confidential mediation.  Pursuant to the Interim Orders, all

interested parties, including the LCDC, were required to comply with the deadlines therein.

## V.    LCDC OMNIBUS OBJECTION

22.    On January 8, 2020, the LCDC filed an omnibus claim objection to certain GO

bonds issued in and after 2012 (ECF No. 9730) (the "LCDC Claim Objection")[18].  The LCDC

Claim Objection was filed pursuant to the Interim Orders, which set January 8, 2020 as the deadline

to file any additional omnibus claim objections disputing the validity of claims related to GO

Bonds, PBA Bonds, and other Commonwealth-guaranteed bonds.  Consistent with the Statement

of Position it filed in April 2019, the LCDC Claim Objection questioned the validity of certain

bonds issued or guaranteed by the Commonwealth on or after March 29, 2012, arguing that such

obligations violated the Constitutional Debt Limit.  Consequently, the LCDC Omnibus Objection

asserted that such Commonwealth obligations were not entitled to the priority provided under

Article VI, Section 8 of the Puerto Rico Constitution if the Constitutional Debt Limit were

interpreted according to the LCDC's proffered interpretation of the second prong of Constitutional

Debt Limit.  The LCDC reserved its rights with respect to an appropriate remedy for bonds issued

in violation of the Constitutional Debt Limit, stating "that, regardless of whether such GO bonds

and Commonwealth-guaranteed bonds have any allowable claim, they are not entitled to the same

relative lawful priority under the Puerto Rico Constitution and applicable Commonwealth law as

the Commonwealth's full faith and credit bonds that did not violate the Constitutional Debt Limit."

*See* LCDC Claim Objection ¶ 5.[19]

---

[18]    Also on January 8, 2020, the Committee filed an omnibus claim objection to certain
Constitutional Debt claims (ECF No. 9735).

[19]    The relief sought by the LCDC Claim Objection is consistent with the LCDC's Statement of
Position (ECF No. 6180), filed in April 2019 in connection with its Notice of Participation pursuant to the
Procedures Order.

## VI.    THE NEW PSA AND PROPOSED PLAN

23.    On February 9, 2020, the Oversight Board announced that it had reached a new
agreement (the "New PSA") with holders of $8 billion of Constitutional Debt, on repayment terms
more favorable to the Commonwealth.  *See Oversight Board Reaches New, More Favorable
Agreement to Restructure $35 Billion of Liabilities*, https://oversightboard.pr.gov/oversight-board-
reaches-new-more-favorable-agreement-to-restructure-35-billion-of-liabilities/.  The New PSA is
the product of months of hard-fought negotiations between and among the Oversight Board and
holders of Constitutional Debt.  The terms of the global settlement, as embodied in the New PSA,
includes a resolution of the Constitutional Debt Litigation as well as an agreement by the PSA
Parties to accept the Oversight Board's proposed treatment of different vintages of Constitutional
Debt.  The New PSA achieves this settlement with the same cash flows determined by the
Oversight Board to be available for creditors in the Initial PSA and Initial Plan, except that such
cash flows would only be for 20 years (not 30 years as the Initial PSA provided).

24.    The New PSA also provides marginally better recoveries for holders of
Constitutional Debt in the form of cash previously withheld, which was instrumental in garnering
the support of the critical mass of holders of Constitutional Debt that make up the PSA Creditors.
The settlement embodied in the New PSA also avoids the enormous litigation expense associated
with the various disputes related to GO Bonds.  Particularly given the broad creditor support from
holders of the highest-priority claims under the Puerto Rico Constitution, the PSA Creditors
believe that the New PSA will form the basis of a confirmable plan of adjustment.[20]

---

[20]    For example, assuming that 80% of bondholders vote on the Proposed Plan, the claims held
solely by the PSA Creditors would translate into more than 2/3 support in dollar amount from bondholders
in four out of the six anticipated classes of uninsured bonds, with significant support from the PSA Creditors
in the other two classes of uninsured bonds.

25.    On February 28, 2020, the Oversight Board filed the Proposed Plan, incorporating key terms of the New PSA.  Among other things, the Proposed Plan provides that holders of existing GO Bonds and PBA Bonds would receive New GO Bonds and COFINA Junior Lien Bonds (as each term is defined in the Proposed Plan).  The COFINA Junior Lien Bonds would be payable from the Conveyed Commonwealth Share (as defined in the Proposed Plan), which would be secured by a statutory second lien on the COFINA Pledged Taxes (as defined below) and would, in all respects, be subject to the first-dollars funding obligations with respect to the COFINA Restructuring Bonds (as defined below) set forth in the COFINA Plan (as defined below).  *See* Proposed Plan §§ 1.96, 1.100, 1.117, 1.173, and 2.5.

## VII.    COFINA PLAN AND LEGISLATION

26.    On February 5, 2019, the Court entered an amended order and judgment (ECF. No. 561 in Case No. 17-03284-LTS) confirming the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (ECF No. 439 in Case No. 17-03284-LTS) (the "COFINA Plan").  Among other things, the COFINA Plan provided for reorganized COFINA to issue new bonds (the "COFINA Restructuring Bonds") to holders of existing COFINA bonds, and implemented the settlement between the Commonwealth and COFINA by allocating ownership of the Fixed Income[21] between COFINA and the Commonwealth, with COFINA being granted ownership of the COFINA Portion (as defined below) and the Commonwealth being granted ownership of the Commonwealth Portion (as defined below).  *See* COFINA Plan § 2.1(a).  The COFINA Plan also provided that repayment of the COFINA Restructuring Bonds from the

---

[21]    "Fixed Income" means, "for Fiscal Year 2018-2019, seven hundred eighty-three million, one hundred ninety-seven thousand, two hundred and fifty-one (783,197,251) dollars and, for each subsequent Fiscal Year, the Fixed Income for the prior Fiscal Year plus four (4) percent of such Fixed Income, up to the Maximum Amount.  The Fixed Income for each Fiscal Year shall be funded from the first revenues collected from the [COFINA] Pledged Taxes.  *See* COFINA Legislation (defined below) § 1.1(q).  The term is referred to as the "Pledged Sales Tax Base Amount" or "PSTBA" in the COFINA Plan.

COFINA Portion would be secured by a statutory first lien in the present and future revenues collections generated by the portion of sales and use tax that corresponds to a tax rate of 5.5% (the "COFINA Pledged Taxes").  *See* COFINA Plan §§ 1.63 and 16.2.  Specifically, COFINA receives the COFINA Pledged Taxes, on a first-dollars basis, in an amount up to 53.65% of the Fixed Income in any given fiscal year until the COFINA Restructuring Bonds have been paid or satisfied in full in accordance with their terms (the "COFINA Portion").  *Id.* § 1.64.  The Commonwealth in turn has the "right to receive (a) the *residual* amount of the COFINA Pledged Taxes in an amount, *if any*, in excess of the COFINA Portion in any given fiscal year, and (b) all COFINA Pledged Taxes *after* the COFINA [Restructuring] Bonds and the COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms…" (the "Commonwealth Portion").  *Id.* § 1.71 (emphasis added).[22]  The COFINA Plan made clear that the Commonwealth has no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year unless and until COFINA has received the COFINA Portion.  *Id.*

27.     To implement the terms of the COFINA Plan, the Commonwealth enacted Act 241 of the Legislative Assembly of Puerto Rico, which was approved on November 15, 2018, amending Act 91 of the Legislative Assembly of Puerto Rico, approved on May 13, 2006, as amended (the "COFINA Legislation").   As the COFINA Plan contemplated, the COFINA Legislation secured the COFINA Restructuring Bonds by creating a statutory first lien in the COFINA Pledged Taxes.  *See* COFINA Legislation Art. 3.2.   The COFINA Plan enjoyed widespread creditor support.  In fact, Assured and Ambac were parties to the COFINA plan support agreement.   And to compensate them for their hard work in assisting in the negotiation,

---

[22]   The Proposed Plan defines the Commonwealth Portion as the "Conveyed Commonwealth Share."

confirmation, and consummation of the COFINA Plan, Assured and Ambac received "Consummation Costs" under the COFINA Plan.  *See* COFINA Plan § 3.3.

28.      In addition to providing for the issuance of the COFINA Restructuring Bonds, the COFINA Plan expressly contemplated that COFINA may issue additional bonds, "the repayment of which shall be secured by subordinated second or more junior Lien on the COFINA Pledged Taxes and which, in all respects, shall be subordinated in respect of priority, payment funding, and remedies to the COFINA Bonds and the COFINA Parity Bonds."  *Id.* § 1.174; *see also id.* § 16.3. The COFINA Plan specifies that repayment of such subordinated lien bonds "shall not be payable from the COFINA Portion."  *Id.* § 16.3.

29.      In accordance with the conditions set forth in the COFINA Plan, the Proposed Plan provides for COFINA's issuance of the COFINA Junior Lien Bonds, which securities will be payable from the Commonwealth Portion, the ownership of which the Commonwealth will transfer to COFINA in an amount up to 46.35% of the Fixed Income in any given year until the COFINA Junior Lien Bonds have been paid or satisfied in full in accordance with their terms.  *See* Proposed Plan §§ 1.96, 1.117, 2.5, and 57.2.

## VIII.   THE COMMITTEE MOTION AND MONOLINES' CROSS-MOTION

30.      On February 25, 2020, the Committee filed a motion (ECF No. 11746) (the "Committee Motion") requesting that the Court amend the Case Management Procedures to require Rule 2019(b) Groups to disclose holdings of GO Bonds and PBA Bonds by series, pursuant to the same categorization of GO Bonds and PBA Bonds as used in the New PSA and Proposed Plan, retroactive to the Initial PSA date of May 31, 2019.

31.      On March 10, 2020, the PSA Creditors filed the Joint Response, stating that the disclosure requested by the Committee is not required by Rule 2019, and in any event would be better disclosed through weekly PSA updates published by the Oversight Board in the form of

holdings of all PSA signatories.   Nevertheless, the PSA Creditors voluntarily disclosed their
aggregate bond holdings broken out by the classes contained in the New PSA and Proposed Plan
(ECF No. 12217, Exhibit A).

32.    On the same day the PSA Creditors filed the Joint Response, the Monolines filed
the Cross-Motion to the Committee Motion, seeking additional disclosures beyond what was
requested by the Committee, including disclosure of (i) holdings of COFINA Restructuring Bonds
and (ii) any claims held against CCDA and PRIFA.  Cross-Motion ¶ 1.

33.    For the reasons set forth below, the LCDC objects to the relief sought in the Cross-
Motion.  Although Rule 2019 does not require the disclosure as requested by the Monolines, the
LCDC hereby discloses the aggregate holdings of its members across plan classes showing
holdings of early vintage versus late vintage bonds, as of the dates of each of the Prior Rule 2019
Statements (*see* **Exhibit A**).   In addition, the LCDC contemporaneously herewith has filed its
Sixth Supplemental Rule 2019 Statement voluntarily disclosing the aggregate holdings of each
LCDC member across applicable plan classes, as of the dates of each of the Prior Rule 2019
Statements. Such disclosure goes beyond what is required under Rule 2019 and the Case
Management Procedures.  Accordingly, the Cross-Motion should be denied.

## OBJECTION

### A.    THE LCDC HAS COMPLIED WITH ALL DISCLOSURE REQUIREMENTS

34.    Since the LCDC's formation approximately 13 months ago, it has filed six Prior
Rule 2019 Statements.  Each statement was filed in accordance with Rule 2019 and the Case
Management Procedures.  The first five of the Prior Rule 2019 Statements listed the amount of
insured and uninsured Constitutional Debt held by each then-current member of the LCDC as of
the applicable reporting date.  Upon a request of Assured's counsel, the Fifth Supplemental Rule
2019 Statement separated out each member's holdings of insured and uninsured GO Bonds and

PBA Bonds.   Such disclosure was not required under Rule 2019 or the Case Management
Procedures.

35.     Notwithstanding the filing of the PBA Title III case on September 27, 2019, the
LCDC has not appeared or taken any position before the Court in the PBA Title III case.   More
specifically, the LCDC has not "appear[ed] in…[the PBA] Title III case or related adversary
proceeding in any capacity, including by, among other things, filing a Pleading, filing an
informative motion, executing a court-approved stipulation, filing a proof of claim, appearing at a
hearing before the Court, or asserting any legal or factual positions that would in any way impact
the property or rights of the…[PBA]."   Case Management Procedures IV.A, n.4.

36.     While the Monolines parrot the hollow statements of the Committee arguing that
the LCDC took a position in the PBA Title III case, they, like the Committee, fail to cite *any*
pleading that the LCDC filed in the PBA Title III case or otherwise show that the LCDC took a
position in the PBA Title III case.   In this regard, the Monolines and the Committee both cite to
the LCDC Claim Objection as "evidence" that the LCDC took a position in the PBA Title III case.
The Monolines and the Committee are both incorrect.   The LCDC Claim Objection was directed
only at certain *Commonwealth* obligations (*i.e.,* bonds issued or guaranteed by the
Commonwealth), and never challenged a claim against *PBA*.   In other words, the LCDC Claim
Objection did not object to any party asserting rights against the PBA or otherwise assert any legal
or factual positions that would in any way impact the property or rights of the PBA.   Accordingly,
the LCDC was not required to reference PBA Bonds in its Rule 2019 Statements.[23]

---

[23]   The Monolines' reliance on the LCDC's Notice of Participation in Litigation of Objections to
ERS Bonds (ECF No. 9226) (the "LCDC Notice") as the basis for the LCDC to disclose its holding of
ERS bonds is similarly misplaced.   The LCDC Notice was filed on November 18, 2019 in response to an
order of the Court establishing procedures with respect to the Committee's objection to ERS bonds.   (ECF
No. 8818).   In the LCDC Notice, the LCDC expressly stated that it did not presently take a position on the

37.     In support of their argument that the LCDC should disclose its holdings against each Title III debtor, the Monolines cite an Order of the Court that provides that "a description of the nature and amount of *all* disclosable economic interests held by *each* such new Committee member with respect to *each of the debtors in these Title III proceedings*…"  *See* Cross-Motion ¶ 21 (citing to Order Regarding Compliance by the Official Committee of Unsecured Creditors with Federal Rule of Bankruptcy Procedures 2019 (ECF No. 7256) (the "UCC Order")); *see also* ¶¶ 39, 58, and 67 (citing UCC Order).  As the UCC Order makes clear, and as the Monolines know since the Court entered the UCC Order in response to a motion of Assured, the UCC Order applies to the Committee in its fiduciary capacity as the *official* committee of unsecured creditors in all Title III cases (other than COFINA and the PBA).  *See* UCC Order at 5-6 (noting that "the Court is mindful that the Committee, ***unlike ad hoc and other unofficial 2019(b) Groups***, acts as a unit in a fiduciary capacity for all unsecured creditors of the relevant debtor") (emphasis added).  The UCC Order does not apply to entities like the LCDC, nor does the Case Management Procedures contain a similar directive to ad hoc or other unofficial committees.[24]

38.     Nonetheless, the LCDC Fifth Supplemental Rule 2019 Statement broke out each LCDC's member's economic interests in GO Bonds and PBA Bonds.  The Sixth Supplemental

---

Committee's claim objection and that it "reserves its rights to participate in aspects of the Claims Objection that are currently subject to the Court's Order staying certain claims to the extent the Claims Objection relates to claims asserted against the Commonwealth."  LCDC Notice at 3, n.3.  Accordingly, the LCDC was not required to reference its holdings of ERS bonds in its Rule 2019 Statements.

[24]    The Monolines assert that LCDC should disclose its holdings of HTA bonds.  *See* Cross-Motion ¶ 63.  Once again, the Monolines fail to cite to any appearance or pleading that the LCDC filed in the HTA Title III case.  Rather, they cite to an intervention motion that two members filed in an HTA-related adversary proceeding.  *Id.* ¶ 64.  Nothing in Rule 2019 or the Case Management Procedures would require that the LCDC—an eight-member group—file a Rule 2019 statement in the HTA case because two of its members took a position in such case, on behalf of a separate ad hoc group, not the LCDC (and through other counsel).  Those two members have, in fact, filed multiple Rule 2019 statements with respect to their disclosable economic interest in the HTA case.  *See e.g., Verified Statement of the Ad Hoc Group of Noteholders of FGIC-Insured Notes Pursuant to Bankruptcy Rule 2019* (ECF No. 2484), and

Rule 2019 Statement, filed contemporaneously herewith, goes even beyond that, disclosing each member's holdings of GO Bonds and PBA Bonds dispersed among the applicable classes set forth in the Proposed Plan, as of March 13, 2020 and the operative reporting date for each of the Prior Rule 2019 Statement.  Even though nothing in the Bankruptcy Rules or the Case Management Procedures require disclosure by plan class—indeed, in a typical restructuring case, Rule 2019 statements are generally filed prior to the filing of a plan—the LCDC has voluntarily provided enhanced transparency of its economic interest in the Title III cases.

### B.   LCDC HAS TAKEN A CONSISTENT POSITION ON THE RELATIVE RIGHTS AND PRIORITIES OF EARLY VINTAGE AND LATE VINTAGE CONSTITUTIONAL DEBT

39.    According to the Monolines, the LCDC should be required to make more specific disclosure "to understand their interests and argument motivations" given that the LCDC "has actively advocated for **_different_** treatment of general obligation and PBA bonds based upon their so-called 'vintage' (i.e. date of issuance)…."  *See* Cross-Motion ¶ 2 (emphasis in original). Continuing to speculate, the Monolines then spin a yarn of possible nefarious activities weaving together the LCDC Claim Objection, and the different recovery levels provided for late vintage GO Bonds and PBA Bonds in the Initial PSA and the New PSA.[25]  The Monolines' conjecture is

---

two supplements thereto (ECF Nos. 11427 and 11748).  The Monolines also contend that the LCDC "took a position" in the HTA case because they support a plan that proposes the treatment of HTA-related claims against the Commonwealth.  The Proposed Plan, of course, was filed by the Oversight Board, not the LCDC.  Moreover, as counsel for the Oversight Board made clear at the last omnibus hearing, the Proposed Plan does not address claims against *HTA*.  In any event, it appears that the Monolines' request for the LCDC to disclose its economic interests in HTA is based upon the "meager 3.9%" recovery provided to holders of HTA-related claims against the Commonwealth under the Proposed Plan, not any well-grounded legal argument.  *See* Cross-Motion ¶ 63.  The Monolines (together with National (as defined herein)) insure almost $3 billion in HTA bonds.  *See* HTA Lift-Stay Motion ¶ 19.

[25]    *See* Cross-Motion ¶ 3 ("After **potentially acquiring these "late vintage" bonds** following the announcement of the initial public settlement, these ad hoc group members then negotiated a settlement of the late vintage bonds that provided a substantially higher recovery than proposed under the initial settlement. These trades **may** now place LCDC on **_both sides of LCDC's own claim objection_**.") (first two emphasis added; final emphasis in original).

baseless and should have been discarded in the dustbin when they stripped several other "speculative statements" from the initial version of the Cross-Motion. *Id.* ¶ 1.

40.     Since its formation 13 months ago, the LCDC  has consistently defended the rights of "early vintage" GO Bonds and PBA Bonds (*i.e.* bonds issued prior to March 2012) over "late vintage" bonds (*i.e.* bonds issued in and after March 2012).  The LCDC has never hidden this position.  *See* LCDC Statement of Position; and LCDC Claim Objection.  As Exhibit A hereto demonstrates, consistent with its stated legal contentions, the LCDC has, at all times, held positions heavily weighted towards early vintage bonds, with the percentage of early vintage bonds never being below 85% (even including new LCDC members who held late vintage bonds when they joined).  There is no "there" there when it comes to the LCDC members' economic interests or legal argument motivations.  Rather, they have remained the same since inception and are completely aligned with one another.[26]

41.     Whatever the LCDC's legal position, it is the Oversight Board that is the party with exclusive power to formulate and file any plan of adjustment and propose a settlement of early and

---

[26]   The Monolines attempt to draw inferences from the fact that the undersigned counsel for the LCDC advances an argument for how and when the Constitutional Debt Limit was breached that is different from the positions counsel took on behalf of a different coalition of creditors in COFINA's Title III case.  But this is not noteworthy, except to consider the different challenges that could be made and perhaps which one is stronger.  Indeed, the brief that counsel filed on behalf of its COFINA clients in the pre-Title III lawsuit (ECF No. 219 in Case No. 16-cv-2374) cited to both prongs of the Constitutional Debt Limit as the basis for the breach. After reviewing the history of the Puerto Rico Constitution and the use of public corporations, such as PBA, at the time of adoption of the debt limit, counsel concluded that public corporation debt does not count towards prong one, but should count under prong two of the debt limit—and only to the extent the debt was guaranteed and payments were in fact made by the Commonwealth to satisfy the obligations.  This position has been consistently advanced to the letter by the LCDC since its creation and the first appearance in the Commonwealth Title III case.  In any event, the Special Committee of the Oversight Board has advanced its own interpretation of the debt limit since January 2019, and it is the Oversight Board, not the LCDC, that is proposing the compromises and settlements under the Proposed Plan.

late vintage Constitutional Debt it believes appropriate, and it will need to meet the requirements

of confirmation at the appropriate time.  The Proposed Plan represents a global settlement proposed

by the Oversight Board that resolves arguments that could be made by holders of both early and

late vintage GO Bonds and early and late vintage PBA Bonds—including with respect to issues

that the LCDC never raised—all as part of an integrated universal settlement.  While it is clear that

the Monolines are not happy with the Proposed Plan, in large part due to the treatment of their

junior insured Revenue Bonds, they should not be permitted to use a Rule 2019 motion purporting

to seek disclosure as a means to lodge objections to confirmation and the compromises and

settlements set forth in the Proposed Plan.  The Court has established a detailed schedule to

consider approval of the disclosure statement and confirmation of the Plan.  Any party opposed to

the Plan, such as the Monolines, will have an opportunity to raise their objections at the appropriate

time and have the Court consider such objections based upon the applicable legal standards for

confirmation of a plan of adjustment and approval of settlements and compromises.

### C.    THE MONOLINES SHOULD DISCLOSE THEIR OWN TRUE ECONOMIC INTERESTS

42.    The voluntary disclosures set forth in Exhibit A and in the Sixth Supplemental Rule

2019 Statement should confirm that the LCDC supports enhanced transparency in these historic

cases.  In that spirit, the Monolines should also file statements disclosing their economic interests,

including with respect to owned bonds and insured exposure, in each of the Title III debtors' cases

in which they appeared or took a position before the Court.  Indeed, it cannot seriously be disputed

that the Monolines—once again acting in concert—are required to abide by Rule 2019 and the

Case Management Procedures.

43.    In that regard, it is important to stress that Rule 2019 applies not only to ad hoc

groups and committees of creditors, but also to informal groups of creditors "acting in concert to

advance their common interests".  Fed. R. Bankr. R. 2019(b)(1)(A).  The Rule 9019 advisory

committee notes further explain that "[t]he rule applies to a group of creditors or equity security holders that *act in concert to advance common interests … even if the group does not call itself a committee.*" (emphasis added).

44.     It is apparent that Assured, FGIC, and Ambac are aligned and have common interests in these Title III cases, considering the impact that the restructuring will have on their exposure to their insureds, and the resulting claims they will assert against the Commonwealth and its instrumentalities.   Assured, FGIC, and Ambac have repeatedly filed joint pleadings and responses throughout the course of these Title III cases, which necessarily involves coordination of strategies and legal positions.  Just since the start of 2020, their joint filings include the lift-stay motions and related pleadings in the revenue bond litigation, joint responses to the mediation team's interim and amended report, and Rule 2004 discovery motions.  *See, e.g.*, ECF Nos. 10102, 10104, 10602 (HTA, CCDA and PRIFA Lift-Stay Motions); ECF No. 10251 (Joint Objection to Oversight Board's Response to Interim Mediation Report); ECF Nos. 9022 and 9023 (Ambac's Rule 2004 Discovery Motions Regarding Commonwealth Assets and Cash Restriction Analysis), ECF No. 10593 (Assured's and National's Joinder to Ambac's Rule 2004 Motions), ECF No. 10605 (FGIC's Joinder to Ambac's Rule 2004 Motions); ECF No. 11493 (Joint Objection to Amended Mediation Report); and ECF No. 11687 (Joint Discovery Motion Regarding CCDA and PRIFA Lift-Stay Motions).[27]

45.     Having acted in concert to advance their common interests and sought to use their collective exposure as a form of leverage in order to gain greater influence in the cases, the

---

[27]     Another monoline, National Public Finance Guarantee Corporation ("National"), has been a party to many of these pleadings, (*see, e.g.*, ECF Nos. 10102, 10251, 10593, and 11493), and, as such, should also be directed to disclose its economic interests in each of the Title III debtors' cases in which they appeared or took a position before the Court.

Monolines should be held to the same disclosure standard as other ad hoc creditor groups. *See In re Washington Mut., Inc.*, 419 B.R. 271, 279 (Bankr. D. Del. 2009) (holding that Rule 2019 applied to an ad hoc committee of equity holders despite contentions that no committee member represented any party other than itself, because requiring disclosure is not unfair when the group uses "collective action of creditors" as a "form of leverage, wherein the parties utilize other group members' holdings to gain a greater degree of influence of the case", which theoretically enables "better returns than if creditors were to act individually in a case."). *See also In re Nw. Airlines Corp.*, 363 B.R. 701, 703 (Bankr. S.D.N.Y. 2007) (holding that Rule 2019 applies to an ad hoc committee and noting by appearing as a group instead of individual players, "the members purport to speak for a group and implicitly ask the court and other parties to give their positions a degree of credibility appropriate to a unified group with large holdings.")

### D. THE MONOLINES' FUNDAMENTAL MISUNDERSTANDING OF THE PROPOSED COMMONWEALTH PLAN AND CONSUMMATED COFINA PLAN

46.     As part of their misinformation campaign, the Monolines make bizarre assertions regarding the *LCDC's motivations* with respect to *the Oversight Board's issuance* of the COFINA Junior Lien Bonds under the Proposed Plan. The Monolines are clearly operating under a fundamental (or perhaps feigned) misunderstanding of the terms of the Proposed Plan, and, inexplicably, the COFINA Plan, which plan the Monolines actively supported and, on account of their substantial expenses incurred in formulating, negotiating, and drafting, received millions of dollars of Consummation Costs. Contrary to the Monolines' assertions (and improper aspersions), absolutely nothing contemplated in the New PSA or in the Proposed Plan would expand or otherwise fortify the senior statutory lien already securing the COFINA Restructuring Bonds pursuant to the existing COFINA Legislation.

47.     The COFINA Legislation, enacted in connection with the COFINA Plan, created for the benefit of holders of the COFINA Restructuring Bonds a statutory first lien on all of COFINA's right, title to, and interest in the COFINA Pledged Taxes (COFINA Legislation Art. 3.2), which are defined as the "present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half (5.5) percent" (*id.* Art. 1.1(7)).

48.     Meanwhile, pursuant to the COFINA Plan and the COFINA Legislation, in each fiscal year, COFINA receives the first funds comprising the COFINA Pledged Taxes until such time that it has received 53.65% of the Fixed Income, which amount corresponds to the amount necessary to service the COFINA Restructuring Bonds.  Only *after* COFINA has received that amount (*i.e.*, the COFINA Portion) are the revenues of the COFINA Pledged Taxes transferred to the Commonwealth, (*id.* Art. 4.1(b)), which transferred amounts constitute the Commonwealth Portion (referred to in the Proposed Plan as the "Conveyed Commonwealth Share").  Thus, there necessarily is no Commonwealth Portion or Conveyed Commonwealth Share unless and until COFINA has received COFINA Pledged Taxes in the amount needed to service the COFINA Restructuring Bonds in a given fiscal year.

49.     Under the Proposed Plan, the Commonwealth would transfer the Conveyed Commonwealth Share, which, again, would not exist unless COFINA had received the amounts necessary to pay, on an annual basis, the COFINA Restructuring Bonds, to COFINA to repay the COFINA Junior Lien Bonds.  This transfer therefore would not, as the Monolines claim, provide "additional collateral" to support the COFINA Restructuring Bonds.   Cross-Motion ¶ 55.  Moreover, the issuance of the COFINA Junior Lien Bonds is explicitly contemplated under the Monoline-supported COFINA Plan.

50.     Monolines' incendiary allegations (each qualified by the term, "may") that the LCDC has used the Commonwealth Plan as means of securing additional collateral to support the COFINA Restructuring Bonds are therefore based upon, at best, their inexcusable ignorance of the terms of the COFINA Plan, which they themselves formulated, negotiated, drafted and supported, and the terms of the Proposed Plan or, at worst, an intent to sow confusion and discord regarding confirmation of the Proposed Plan.  The LCDC submits that these allegations are downright reckless, and the Court should demand better from sophisticated parties whose familiarity with these proceedings makes such filings inexplicable.

## **CONCLUSION**

WHEREFORE, the LCDC respectfully requests that the Court enter an Order denying the

Cross-Motion and grant any other and further relief as is just and proper.

DATED:  March 20, 2020

Respectfully submitted,

REICHARD & ESCALERA

**By :**  */s/ Rafael Escalera*
  **Rafael Escalera**
  USDC No. 122609
  escalera@reichardescalera.com

  **Sylvia M. Arizmendi**
  USDC-PR 210714
  arizmendis@reichardescalera.com

  **Carlos R. Rivera-Ortiz**
  USDC-PR 303409
  riverac@reichardescalera.com

  255 Ponce de León Avenue
  MCS Plaza, 10th Floor
  San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART & SULLIVAN,
LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**K. John Shaffer** (*pro hac vice*)
johnshaffer@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Zachary Russell** (*pro hac vice*)
zacharyrussell@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for the Lawful Constitutional Debt Coalition*

**EXHIBIT A**

| Principal Summary of 2019 Filings | | | | | | | |
|---|---|---|---|---|---|---|---|
| Classification | Original Filing (2/26/19) | First Amended Filing (3/18/19) | Second Amended Filing (6/17/19) | Third Amended Filing (9/6/19) | Fourth Amended Filing (1/8/20) | Fifth Amended Filing (2/19/20)[1] | Sixth Amended Filing (3/20/20)[1] |
| Vintage CW Bonds (Uninsured) | $246,850,000 | $296,761,000 | $413,446,000 | $506,874,000 | $617,260,000 | $625,545,000 | $643,300,000 |
| Vintage CW Bonds (Insured)[2] | 34,185,600 | 50,835,000 | 50,885,000 | 51,699,000 | 39,080,750 | 41,527,000 | 88,176,450 |
| 2011 CW Bonds (Uninsured) | - | - | - | 14,485,000 | 14,755,000 | 14,755,000 | 16,555,000 |
| 2011 CW Bonds (Insured)[2] | - | - | - | - | - | - | - |
| 2011 CW Series D/E/PIB Bonds (Uninsured) | - | - | - | 20,355,000 | 46,095,000 | 40,815,000 | 40,815,000 |
| 2011 CW Series D/E/PIB Bonds (Insured)[2] | - | - | - | - | - | - | - |
| 2012 CW Bonds (Uninsured) | - | 465,000 | 465,000 | 27,865,000 | 53,383,000 | 69,495,000 | 73,760,000 |
| 2012 CW Bonds (Insured)[2] | - | - | - | - | - | - | - |
| 2014 CW Bonds | - | - | 4,960,000 | 16,960,000 | 83,945,000 | 122,445,000 | 96,495,000 |
| Vintage PBA Bonds (Uninsured) | 446,496,050 | 534,592,000 | 697,859,000 | 700,880,000 | 848,760,000 | 866,377,000 | 861,999,000 |
| Vintage PBA Bonds (Insured)[2] | 1,200,000 | 1,595,000 | 1,595,000 | 1,595,000 | 1,600,000 | 19,965,000 | 25,150,000 |
| 2011 PBA Bonds | 26,346,000 | 85,021,000 | 92,941,000 | 121,436,000 | 129,911,000 | 132,496,000 | 132,496,000 |
| 2012 PBA Bonds | 5,205,000 | 36,200,000 | 36,200,000 | 47,700,000 | 103,285,000 | 99,990,000 | 116,630,000 |
| **Total** | **$760,282,650** | **$1,005,469,000** | **$1,298,351,000** | **$1,509,849,000** | **$1,938,074,750** | **$2,033,410,000** | **$2,095,376,450** |
| Other Guaranteed Debt | $8,479,000 | $31,624,000 | $31,624,000 | $10,979,000 | $17,789,000 | $10,514,000 | $10,514,000 |
| Memo: | | | | | | | |
| *% Early Vintage*[3] | *99.3%* | *96.4%* | *96.8%* | *93.9%* | *87.6%* | *85.6%* | *86.3%* |
| *% Late Vintage*[4] | *0.7%* | *3.6%* | *3.2%* | *6.1%* | *12.4%* | *14.4%* | *13.7%* |

Note: CABs accreted through the respective holdings date as stated in each 2019 filing.
(1)   Includes GoldenTree's acquisition of Syncora. Disclosable economic interests include bonds insured in primary or secondary markets or subject to reinsurance.
(2)   Disclosable economic interests include bonds insured in either primary or secondary markets.
(3)   Includes Vintage CW Bonds, 2011 CW Bonds, 2011 CW Series D/E/PIB Bonds, Vintage PBA Bonds and 2011 PBA Bonds.
(4)   Includes 2012 CW Bonds, 2014 CW Bonds and 2012 PBA Bonds.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record.

/s/*Carlos R. Rivera-Ortiz*
USDC-PR 303409