# <u>EXHIBIT E</u>

## CT Corporation

**Service of Process Transmittal**
02/20/2020
CT Log Number 537233246

**TO:**   Erin Law
Morgan Stanley Law Division
1633 Broadway, 26th Fl
New York, NY 10019

**RE:**   **Process Served in New York**

**FOR:**   Morgan Stanley & Co. LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | AMBAC ASSURANCE CORPORATION, PLTF. vs. MERRILL LYNCH, ET AL., DFTS. // TO: MORGAN STANLEY & CO. LLC |
| **DOCUMENT(S) SERVED:** | Summons, Certificate, Complaint |
| **COURT/AGENCY:** | SAN JUAN SUPERIOR COURT-COMMONWEALTH OF PUERTO RICO, PR Case # SJ2020CV01505 |
| **NATURE OF ACTION:** | Breach of Obligations |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, New York, NY |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/20/2020 at 15:48 |
| **JURISDICTION SERVED :** | New York |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days of having been served this summons, excluding the day of service |
| **ATTORNEY(S) / SENDER(S):** | Raul Gonzalez Toro RAUL GONZALEZ TORO LAW OFFICES, LLC Popular Center, Suite 1028 San Juan, PR 00918 (787) 753-6090 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/21/2020, Expected Purge Date: 03/22/2020 |
| | Image SOP |
| | Email Notification, Andrea Carty-Abrahams  Andrea.Carty@morganstanley.com |
| | Email Notification, Adeleke Berry  addy.berry@morganstanley.com |
| | Email Notification, Veronica Castro  Veronica.Castro@morganstanley.com |
| | Email Notification, Jessica Bradshaw  Jessica.bradshaw@morganstanley.com |
| | Email Notification, MARY BETH TREVINO  maryt@morganstanley.com |
| | Email Notification, Erin Law  Erin.Law@morganstanley.com |
| | Email Notification, Elizabeth Waggoner  Elizabeth.Waggoner@morganstanley.com |

Page 1 of  2 / PK

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

## CT Corporation

**Service of Process Transmittal**
02/20/2020
CT Log Number 537233246

**TO:** Erin Law
Morgan Stanley Law Division
1633 Broadway, 26th Fl
New York, NY 10019

**RE:** **Process Served in New York**

**FOR:** Morgan Stanley & Co. LLC  (Domestic State: DE)

Email Notification,  Lawrence Barbot  Lawrence.Barbot@morganstanley.com

Email Notification,  Lenise Davis  lenise.davis@morganstanley.com

Email Notification,  Jyotsna Rasam  Jyotsna.Rasam@morganstanley.com

Email Notification,  Marina Aminov  marina.aminov@morganstanley.com

Email Notification,  Gwanda Brown  Gwanda.v.brown@morganstanley.com

Email Notification,  Tahitia Martin  Tahitia.Martin@morganstanley.com

Email Notification,  Diane L. Gray  Diane.L.Gray@morganstanley.com

Email Notification,  Ishwar Ingle  Ishwar.Ingle@morganstanley.com

Email Notification,  Bhakti Rasal  Bhakti.Rasal@morganstanley.com

Email Notification,  NISHAD GAVANDE  nishad.gavande@morganstanley.com

Email Notification,  CHELSEA MOULDEN  chelsea.moulden@morganstanley.com

Email Notification,  SHWETA MATKAR  shweta.matkar@morganstanley.com

Email Notification,  Shushi Shetty  Shushi.Shetty@morganstanley.com

Email Notification,  DANIELLE BLACK  daniellb@morganstanley.com

**SIGNED:** C T Corporation System
**ADDRESS:** 155 Federal St Ste 700
Boston, MA 02110-1727

**For Questions:** 800-448-5350
MajorAccountTeam1@wolterskluwer.com

Page 2 of  2 / PK

Information displayed on this transmittal is for CT
Corporation's record keeping purposes only and is provided to
the recipient for quick reference. This information does not
constitute a legal opinion as to the nature of action, the
amount of damages, the answer date, or any information
contained in the documents themselves. Recipient is
responsible for interpreting said documents and for taking
appropriate action. Signatures on certified mail receipts
confirm receipt of package only, not contents.



# PROCESS SERVER DELIVERY DETAILS

**Date:**  Thu, Feb 20, 2020

**Server Name:**  nicholas dicanio

**Location:**  rye brook, NY-NYC

| | |
|---|---|
| Entity Served | MORGAN STANLEY & CO. LLC |
| Agent Name | |
| Case Number | SJ2020CV01505 |
| Jurisdiction | NY-NYC |



COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SAN JUAN SUPERIOR COURT

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS, INC., GOLDMAN SACHS & CO. LLC, J. P. MORGAN SECURITIES LLC, FORMERLY KNOWN AS J. P. MORGAN SECURITIES, INC., MORGAN STANLEY & CO. LLC, SAMUEL A. RAMIREZ & CO., INC., RAYMOND JAMES & ASSOCIATES, INC., and UBS FINANCIAL SERVICES INC. | Civil No. SJ2020CV01505<br><br>**906**<br><br>IN RE: Damages due to Breach of Obligations Under the Doctrine of *Actos Propios* and Unilateral Declaration of Will. |

**SUMMONS**

UNITED STATES OF AMERICA, SS
THE PRESIDENT OF THE UNITED STATES
THE COMMONWEALTH OF PUERTO RICO

To:     **MORGAN STANLEY & CO. LLC**
        28 Liberty St.
        New York, New York 10005

        Registered Agent
        C T CORPORATION SYSTEM
        28 Liberty St.
        New York, New York 10005

You are HEREBY summoned to submit to the court your responsive pleading within **30** days of having been served this summons, excluding the day of service. You must submit your responsive pleading through the Unified Case Management and Administration System (SUMAC), which you can access via the following Internet address: https://tribunalelectronico.ramajudicial.pr/sumac/, unless you are appearing pro se, in which case you must file your responsive pleading at the office of the court clerk. If you fail to file your responsive pleading by the aforesaid deadline, the court may issue a default judgment against you and grant the remedy requested in the complaint, or any other, if the court, in the exercise of its sound discretion, so deems appropriate.

**RAUL GONZALEZ TORO**
RUA NO. 11781
RAUL GONZALEZ TORO LAW OFFICES
208 Ponce de León Ave., Popular Center Bldg., Suite 1028
San Juan, Puerto Rico 00918
Tel. 787-753-6090 / Fax 787-294-5759
Email – rgtlaw@vmail.com

**2 0 FEB 2020**

Issued under my hand and the seal of the Court, on the ___ day of _____, _____.

By: _____
    **Griselda Rodriguez Collado**
    Name of Deputy Regional Clerk
    Maria Ocasio Rodriguez
    Secretaria Auxiliar
    _____
    Signature of Deputy Clerk

Name of Regional Clerk

K027

Case No.: SJ2020CV01S05

### CERTIFICATE OF SERVICE BY MARSHAL

I, _____, Marshal of the Court of First Instance of Puerto Rico, Court of _____.

CERTIFY that the service of the summons and of the complaint in the above-referenced case was performed by me, on the _____ day of _____, _____, at _____  ☐ a.m.  ☐ p. m., as follows:

☐  By personal delivery to the defendant, at the following physical address:

_____

☐  Making the complaint and the summons accessible to the defendant in the immediate presence thereof at the following physical address:

_____

☐  Leaving a copy of the documents with an agent authorized by the defendant or designated by law to receive summons at the following physical address:

_____

☐  Summons could not be personally served because:

_____

In _____, Puerto Rico, on the _____ day of _____, _____.

_____        _____
Name of Regional Marshal                         Name of Marshal of Court of First Instance
                                                                     and Badge Number

                                                          _____
                                                          Signature of Marshal of Court of First Instance

### SERVICE OF SUMMONS BY PRIVATE PERSON

I, _____, state that I have the necessary legal capacity pursuant to Rule 4.3 of the Rules of Civil Procedure of Puerto Rico, and I certify that the service of the summons and of the complaint in the above-referenced case was performed by me, on the _____ day of _____, _____, as follows:

☐  By personal delivery to the defendant at the following physical address:

_____

☐  Making the complaint and the summons accessible to the defendant in the immediate presence thereof at the following physical address:

_____

☐  Leaving a copy of the documents with an agent authorized by the defendant or designated by law to receive summons at the following physical address:

_____

☐  Summons could not be personally served because:

_____

### SUMMONS COSTS

$ _____

### AFFIDAVIT OF PROCESS SERVER

I declare under penalty of perjury, pursuant to the laws of _____, that the information provided in the service of summons is true and correct. AND, IN WITNESS WHEREOF, I sign hereto in _____, _____, on the ____ day of _____, _____.

_____        _____
Process Server's Signature                          Process Server's Address

AFFIDAVIT NO.: _____

Sworn and subscribed before me by _____

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION, <br><br>Plaintiff, <br><br>v. <br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS INC., GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, FORMERLY KNOWN AS J.P. MORGAN SECURITIES, INC., MORGAN STANLEY & CO. LLC, SAMUEL A. RAMIREZ & CO., INC., RAYMOND JAMES & ASSOCIATES, INC., and UBS FINANCIAL SERVICES INC. <br><br>Defendants. | Civil No.: _____ <br><br>IN RE: Damages due to Breach of Obligations Under the Doctrine of *Actos Propios* and Unilateral Declaration of Will |

## COMPLAINT

**TO THE HONORABLE COURT:**

COMES NOW, the Plaintiff, Ambac Assurance Corporation ("Ambac"), through its undersigned legal representation and very respectfully states, alleges, and prays:

## INTRODUCTION

1.     This is an action brought under the doctrines of *actos propios* and Unilateral Declaration of Will to recover hundreds of millions of dollars in damages caused by Defendants who, blinded by their thirst for fees, unlawfully induced Ambac to issue financial guarantees to facilitate various bond offerings underwritten by them and issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Puerto Rico Convention Center District Authority ("PRCCDA"), with Defendants failing to adhere to their most basic underwriting functions and responsibilities.

2.     For decades, Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC, formerly known as J.P. Morgan Securities, Inc.; Morgan Stanley & Co. LLC; Samuel A. Ramirez & Co., Inc.; Raymond James & Associates, Inc.; and UBS Financial Services Inc. ("Defendants") profited from their valuable positions as the underwriters of debt issuances by the Commonwealth of Puerto Rico ("Commonwealth") and its instrumentalities. Defendants solicited from Ambac financial guaranty insurance for the PRIFA and PRCCDA

issuances in order to increase their own profits in connection with those issuances. With insurance, the bonds could be issued with a lower interest rate, thus allowing PRIFA and PRCCDA to increase the amount of principal that could be issued and thereby increase the Underwriters' profits on the deal. To procure insurance from Ambac, Defendants provided Ambac with information on the issuances but failed to perform required due diligence and to disclose to Ambac that there were systemic deficiencies in the Commonwealth's financial reporting.

3. Ambac, relying on Defendants' representations, issued hundreds of millions of dollars of financial guaranty insurance for Puerto Rico bonds, including the bonds at issue here, which were issued by PRIFA and the PRCCDA. In doing so, Ambac exposed itself to the credit risk of the Commonwealth and its instrumentalities, obligating itself to make payments for the benefit of bondholders should there ever be a payment default on the insured bonds. These debt issuances enriched Defendants by millions of dollars in upfront fees and related compensation. Had Defendants informed Ambac that the revenue, expenses, and financial controls of the Commonwealth were systemically misrepresented for years, or that Defendants had failed to do due-diligence on the representations made to procure the financial guaranty insurance, Ambac would not have insured the PRIFA and PRCCDA Bonds. Now that those bonds have defaulted, Ambac has paid hundreds of millions of dollars in insurance claims caused by the systemic deficiencies Defendants failed to disclose.

4. Defendants knew or should have known of the Commonwealth's unreliable financial reporting and thus its fundamental lack of creditworthiness given their close relationships with those in charge of the Commonwealth's finances—in particular the Government Development Bank ("GDB"), the entity that selected underwriters for issuances of public debt. A revolving door existed between the GDB and Defendants: it was common for GDB employees, including senior GDB officials, to have worked for one of the Defendants, and for Defendants' employees to go work at the GDB. Given these connections, Defendants possessed superior knowledge of the Commonwealth's financial reporting and controls. Defendants were also repeat players: the GDB selected Defendants habitually for multiple debt issuances. As underwriters with due-diligence obligations, the Defendants had privileged access to information regarding the reliability of the financial controls in place at the various Puerto Rico agencies and entities that would have revealed their inherent

2

untrustworthiness and lack of creditworthiness. With access to and connections with the GDB, Defendants were uniquely positioned to ensure that the disclosures being made by the issuers were complete and accurate—a role that underwriters are required to fulfill under applicable regulations and that the market customarily expects and relies upon underwriters to fulfill.

5.      The Final Investigative Report published in August 2018 by the Independent Investigator retained by the Financial Oversight and Management Board for Puerto Rico revealed the reckless and deceptive conduct of Defendants and the GDB. The Final Investigative Report confirmed that underwriting banks, including Defendants, failed to perform due diligence on many aspects of financial reporting, despite being on notice that figures being used to market debt to investors were materially misleading. Underwriting banks also used stale financial information and profited on numerous sides of the same transaction—often acting as seller and buyer (on behalf of independent investors), as well as selling the issuer expensive financial products purportedly to reduce risk. The Final Investigative Report further revealed the conflicts of interest and failure of controls that engulfed the GDB and Defendants, as well as the extent of Defendants' access to material information concerning the true financial health and condition of the Commonwealth. Another report issued in May 2018 by the United States Government Accountability Office confirmed the effects of these weak controls: "the Puerto Rico government frequently overestimated the amount of revenue it would collect and Puerto Rico's agencies regularly spent more than the amounts Puerto Rico's legislature appropriated for a given fiscal year."[1]

6.      All of this information—previously unknown to Ambac—was material to the financial guaranty insurance provided by Ambac. Ambac is a monoline insurer that insures financial obligations. Ambac issued financial guaranty insurance policies insuring approximately $788 million in aggregate principal amount of bonds issued by PRIFA and PRCCDA. In doing so, Ambac reasonably and legitimately relied on Defendants to act in good faith and in accordance with industry custom and the Defendants' obligations under federal securities laws.

---

[1]   U.S. GAO, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* (May 2018), *available at* https://www.gao.gov/assets/700/691944.pdf ("U.S. GAO Report").

7.    By insuring the bonds, Ambac guaranteed to investors that it would make payments on the bonds if the issuers defaulted. When PRIFA and PRCCDA, the bond issuers, defaulted, Ambac upheld its end of the bargain. It has paid, and continues to pay, the interest and principal due on the bonds to investors—and has suffered enormous damages, which would have been avoided had Defendants been forthcoming and had they complied with their obligations as underwriters of the debt.

8.    Had Defendants used their insider knowledge and superior access to information to properly review and investigate the Commonwealth's financial controls and conditions, they would have discovered—and should have already known—that there were systemic weaknesses and that the Commonwealth's financial disclosures made in connection with the PRIFA and PRCCDA bonds were inaccurate because of these systemic weaknesses.

9.    Had Defendants revealed their knowledge or performed adequate due diligence, the market, investors, and insurers like Ambac would have been alerted to the deficiencies and the true risks associated with the bonds. And had Ambac known the truth— that the Commonwealth suffered from systemic deficiencies in fiscal controls, and that Defendants did not properly investigate or ensure that the information relevant to the bonds was fully and materially complete and accurate—Ambac would never have provided financial guaranty insurance on the PRIFA and PRCCDA bonds.

10.    Through this lawsuit, Ambac seeks to remedy the significant damage caused by Defendants' conduct, and brings this suit under the doctrines of *actos propios* and Unilateral Declaration of Will. The Supreme Court of Puerto Rico has expressly recognized these doctrines under Puerto Rico law, and the extraordinary circumstances present here warrant their application.

11.    *Actos propios* pursues the performance of good faith by all persons in the exercise of their legal rights and in the fulfillment of their obligations. The doctrine applies where an actor's behavior generates the appearance of a situation contrary to the reality that is capable of influencing the behavior of others and is the basis of the trust of another party proceeding in good faith. It is designed to protect the "legitimate expectations" and "good faith" and to "prohibit[] ... behavior that would result in an unreasonable interference with a legitimately created trust relationship, that allowed the other party to reasonably rely on the

4

original conduct." Thiago Luis Sobra, *The Duty of Good Faith Taken to a New Level: An Analysis of Disloyal Behavior*, 9 J. Vic. L. Stud. 28, 31 (2016).

12.      The Puerto Rico Supreme Court adopted a broad interpretation of the doctrine of *actos propios* more than forty years ago in *International General Electric v. Concrete Builders, Inc.* 4 P.R. Official. Trans. 1221, 1231 (P.R. 1976). Since then, the Puerto Rico Supreme Court has reaffirmed that "[t]hrough [this doctrine's] application ... [i]t is hoped that the future between the members of society is characterized by the qualities of honesty and sincerity, so that at all times one can rest upon the truthfulness of the representations or acts of others." *O.C.S. v. Universal*, 2012 TSPR 165, 172 (P.R. Nov. 1, 2012). Under the doctrine, the intent of the actor is not an element of the cause of action because "[t]he center of gravity of the rule is not in the will of its author, but in the trust generated in third parties." *Id.* at 173. Puerto Rico courts readily apply this doctrine in commercial disputes, and have applied it where, as here, claims are made against banks by a plaintiff whose legitimate good-faith expectations have been undermined. *E.g.*, *MMB Dev. Grp. Ltd. V. Westernbank Puerto Rico*, 762 F. Supp. 2d 356, 370 (D.P.R. 2010).

13.      The Unilateral Declaration of Will has long been recognized as a source of obligations to bind entities like the Defendants. The Unilateral Declaration of Will provides that "a person can obligate himself in favor of another person, as long as his intention to be bound is clear, arises from an appropriate legal act and is not contrary to the law, morality or the public order." *Nationstar Mortg., LLC v. de Jesus Roldan*, No. K CD2012-2549 (908), 2014 WL 1692581 (TCA), at *5 (P.R. Cir. Mar. 31, 2014). If these conditions are met, "[o]nce the obligation is constituted," so long as the obligation is not effectively withdrawn, "the declaring party is subject to compensate for the damages of its non-compliance." *Id.* at *6. The Puerto Rico Supreme Court affirmed the binding force of a unilateral declaration of will more than a decade ago in *Ortiz v. P.R. Tel.*, 2004 TSPR 133 (P.R. 2004).

14.      The elements of both the doctrine of *actos propios* and the doctrine of Universal Declaration of Will are satisfied here. Because this case raises issues of public importance unique to the Commonwealth, public policy supports this Court acting in equity and applying both doctrines.

15.      Applying the doctrine of *actos propios* will help to rectify the unjust and inequitable situation created by Defendants in generating the appearance that the

Commonwealth had in place appropriate controls and that the financial information they provided to Ambac could be relied upon as accurate. Where, as here, "there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration." P.R. Laws Ann. tit. 31, § 7. Here, the existence and operation of the municipal bond market depended on the trust and reliance of investors and financial guaranty insurers such as Ambac on the good faith conduct of Defendants. There is no statute applicable to Ambac's claims. Nor could Ambac have brought these claims earlier—the first claims payments were not made by Ambac until January 2016 and the extent of Defendants' inequitable conduct did not become clear until the publication of the Final Investigative Report in August 2018.

16.     Justice demands that the Court also acknowledge the binding force of Defendants' unilateral declaration of will. As is the case here, where there is an expression of unilateral, autonomous, free, revocable will, Commonwealth law imposes the right to demand compensation for the consequential damages and losses suffered by those induced by that expression of will. It is time for Defendants to be held to account for their behavior, and to compensate Ambac for the grave damage that their conduct has caused.

## PARTIES

### I.     Plaintiff

17.     Ambac is a Wisconsin stock insurance corporation with its principal place of business at One World Trade Center, New York, New York, 10007. Ambac is a monoline insurer that provides financial guarantees to the United States and global public finance, infrastructure and structured finance markets. Ambac insured certain bonds issued by the Commonwealth of Puerto Rico ("Commonwealth") and its instrumentalities, and underwritten by the Defendants, including the bonds at issue here, issued by PRIFA and PRCCDA.

### II.     Defendants

18.     Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a United States-based financial services company headquartered at One Bryant Park, New York, NY 10036. Merrill Lynch is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984. Merrill Lynch is a wholly owned

indirect subsidiary of Bank of America Corporation.  Merrill Lynch is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A.  Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

19.  In 2010, Merrill Lynch became the successor by merger to Banc of America Securities LLC ("Banc of America").  Banc of America was an SEC-registered broker-dealer and an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A.  Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

20.  Citigroup Global Markets Inc. ("Citigroup") is a United States-based financial services company headquartered at 388 Greenwich Street, New York, NY, 10013. Citigroup is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984.  Citigroup is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A.  Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

21.  Goldman Sachs & Co. LLC ("Goldman Sachs") is a United States-based financial services company headquartered at 200 West Street, New York, NY, 10282. Goldman is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984.  Goldman Sachs is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A.  Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

22.  J.P. Morgan Securities LLC ("J.P. Morgan"), formerly known as J.P. Morgan Securities, Inc., is a United States-based financial services company headquartered at 383 Madison Avenue, New York, New York, 10179.  J.P. Morgan is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984.  J.P. Morgan is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue

Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

23.     Morgan Stanley & Co. LLC ("Morgan Stanley") is a United States-based financial services company headquartered at 1585 Broadway, New York, NY 10036. Morgan Stanley is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since November 8, 1985. Morgan Stanley is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

24.     Samuel A. Ramirez & Co., Inc. ("Samuel A. Ramirez") is a United States-based financial services company headquartered at 61 Broadway, New York, New York, 10006. Samuel A. Ramirez is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since May 20, 1997. Samuel A. Ramirez is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

25.     Raymond James & Associates, Inc. ("Raymond James") is a United States-based financial services company headquartered at 880 Carillon Parkway, St. Petersburg, FL, 33716. Raymond James is an SEC-registered broker-dealer and been a registered broker-dealer in Puerto Rico since September 1, 1984. Raymond James is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

26.     UBS Financial Services Inc. ("UBS") is a United States-based financial services company headquartered at 1200 Harbor Boulevard, Weehawken, NJ 07086. UBS is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984. UBS is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C. Ambac insures the PRIFA bonds under policy numbers 24121BE.

## JURISDICTION

27.     This court has personal jurisdiction over each Defendant.

**I.     General Jurisdiction**

28.     This Court has general jurisdiction over each Defendant because each Defendant has continuous and systematic contact with Puerto Rico.

29.     Citigroup is a registered broker-dealer in Puerto Rico. Citigroup conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities. Citigroup also consults for the Financial Oversight and Management Board of Puerto Rico ("FOMB"), which was created by the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA"). Citigroup has consulted on, *inter alia*, the bankruptcy proceedings initiated under Title III of PROMESA.

30.     Goldman Sachs is a registered broker-dealer in Puerto Rico. Goldman Sachs conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities. Goldman Sachs is also a part of joint ventures with Puerto Rico entities, including Autopistas Metropolitanas de Puerto Rico, LLC, which manages public toll roads in Puerto Rico.

31.     J.P. Morgan is a registered broker-dealer in Puerto Rico. J.P. Morgan conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities. J.P. Morgan also maintains offices in Puerto Rico from which it conducted its broker-dealer business.

32.     Merrill Lynch is a registered broker-dealer in Puerto Rico. Merrill Lynch conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

33.     Morgan Stanley is a registered broker-dealer in Puerto Rico. Morgan Stanley conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

34.     Samuel A. Ramirez is a registered broker-dealer in Puerto Rico. Samuel A. Ramirez conducts continuous and systematic business in Puerto Rico, including, *inter alia*,

the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

35.    Raymond James is a registered broker-dealer in Puerto Rico. Raymond James conducts regular and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

36.    UBS is a registered broker-dealer in Puerto Rico. UBS conducts regular and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

**II.    Specific Jurisdiction**

37.    The Court has specific jurisdiction over the Defendants because each Defendant transacted business in Puerto Rico and Ambac's claims arise out of those transactions.

38.    Ambac's claims arise out of the Defendants' underwriting of bonds issued by either the PRCCDA or the PRIFA.

39.    The Defendants purchased these bonds from the PRCCDA and PRIFA and sold them to, upon information and belief, citizens of Puerto Rico and others. Funds raised from the PRIFA and PRCCDA bonds were to be used for the benefit of the Commonwealth and its people. Defendants coordinated with PRCCDA and PRIFA to solicit financial guaranty insurance for these bonds from Ambac. On information and belief, Defendants had meetings in Puerto Rico in connection with the issuances of the bonds, including in relation to their promotion and sale and the procurement of financial guaranty insurance from Ambac.

40.    The exercise of jurisdiction is reasonable. The courts of Puerto Rico have a significant interest in adjudicating this dispute, which relates to the issuance of bonds by Commonwealth instrumentalities. The action is based on unique Puerto Rico doctrines. The Defendants will not be burdened as they have significant resources and continue to do business in Puerto Rico. Further, no other forum has a greater interest in adjudicating this dispute and the claims are capable of resolution here.

<u>**VENUE**</u>

41.    Venue is proper in San Juan pursuant to P.R. Laws Ann. tit. 32, App. VR. 3.5. Several of the transactions and key acts alleged herein occurred in San Juan. The bonds were issued and the related transactions closed in San Juan. The executive offices of PRIFA and

PRCCDA are in San Juan. Relevant communications took place, and relevant documents were produced, in San Juan.

## FACTUAL ALLEGATIONS

42. Between 2001 and 2014, major banks—including Defendants Merrill Lynch, Citigroup, Goldman Sachs, J.P. Morgan, Morgan Stanley, Samuel A. Ramirez, Raymond James, and UBS—underwrote more than $66 billion worth of municipal bonds that were issued by the Commonwealth of Puerto Rico and its instrumentalities.

43. Defendants were in a position to underwrite many of these offerings thanks to their close connections to the financial infrastructure of the Commonwealth. Because of these connections, Defendants knew or had reason to know of systemic deficiencies in the financial reporting of the Commonwealth and its instrumentalities. Defendants were also responsible under applicable regulations and industry custom to conduct due diligence on bond issuances and to form a reasonable basis for the belief that the official statements released in connection with bond issuances were accurate.

44. Instead of doing due-diligence and correcting or disclosing material inaccuracies in the Commonwealth's financial reporting, Defendants rubber stamped misleading and incomplete bond disclosures that materially misstated the bonds' risk profiles. Based on these inaccurate disclosures, Defendants promoted and sold these bonds to investors—and procured insurance on the bonds from insurers such as Ambac—all in violation of the applicable regulatory requirements and market expectations and practice.

I.     **Municipal Bond Underwriters**

45.     Municipal bonds are debt securities. They are generally issued by state, local, territorial, or commonwealth governments, or by one of their agencies and typically are used to finance public projects such as roads, infrastructure, housing, schools, or public utilities.

46.     Generally, a municipal bond issuer owes the bond holders a debt and must pay them interest on that debt (usually at fixed intervals) and, at the bond's maturity or sinking fund redemption dates, must also make principal payments on the bonds.

47.     A municipal bond issuer ordinarily hires one or more municipal securities dealers to act as underwriters on the bond issuance. An underwriter's job is to market and sell the bonds to potential investors. Among other things, an underwriter usually participates in drafting the Official Statements that describe the bonds and that are publicly filed with the Municipal Securities Rulemaking Board ("MSRB"). The underwriter generally conducts due diligence and an overall inspection of the offering, maintains its own counsel, and often structures the financing. In the case of the bonds at issue, the defendant underwriters bought the bonds from the issuer, priced the bonds, and then resold them to investors in a primary offering. With this level of access and involvement, the defendant underwriters were best positioned to credibly indicate the accuracy and completeness of the issuer's disclosure. And the defendant underwriters were directly compensated for this gatekeeping role.

48.     An official statement is "the main document on which investors should be able to rely in making investment determinations." Overview of Disclosure Obligations for a Primary Offering of Municipal Securities (January 2018).[2] It describes the "essential terms of the bonds" and is "the most comprehensive source for information on the specific terms of bonds." Official Statements.[3] Official statements contain information on, among other things, the interest rate; timing and manner of payment on the principal of the bonds; the sources from which the state or local government has promised to make payment on the bonds; and a description of outstanding debt, the authority to incur it, and the future debt burden of the issuer. *Id.*

---

[2]     *Available at* https://www.msrb.org/~/media/Files/Resources/Overview-of-Disclosure-Obligations-for-Primary-Offering.

[3].     *Available at* https://www.msrb.org/EducationCenter/Municipal-Market/Lifecycle/Disclosure/Official-Statements.

49. Before bonds can be offered to investors, the official statement must be "deemed final" by the issuer. 17 C.F.R. § 240.15c2-12. A "deemed final" official statement is for the most part complete, except for the omission of certain information that may only be determined at pricing, such as interest rates and aggregate principal amounts. 17 C.F.R. § 240.15c2-12.

50. Accurate and complete information on the bond and the issuer's ability to make debt service payments is vitally important to investors and other stakeholders to allow them to evaluate the risk of the investment and decide whether to invest. Underwriters play an essential role in ensuring accurate information is provided. Underwriters "stand[] between the issuer and the public purchasers," having superior access to information in their role of assisting the issuer in pricing, structuring the financing and preparing disclosure documents. Mun. Sec. Disclosure, Release No. 26100 (Sept. 22, 1988) ("Disclosure, Release No. 26100"); 17 C.F.R. § 240.15c2-12.

51. In recognition of the disparity in investors' access to information compared to the access enjoyed by issuers and underwriters, the SEC has adopted Exchange Act Rule 15c2-12 to "prevent fraudulent, deceptive, or manipulative acts or practices." 17 C.F.R. § 240.15c2-12.

52. Rule 15c2-12 makes it "unlawful" for an underwriter to "act as an underwriter in a primary offering of municipal securities" of over $1 million unless, among other things, it "obtain[s] and review[s] an Official Statement" that contains key information about the issuance. 17 C.F.R. § 240.15c2-12. Underwriters put their own names on the front covers of these official statements, thereby attaching their reputations and lending credibility to the publication.

53. Underwriters are prohibited from purchasing or selling bonds unless they have "reasonably determined" that the issuer or obligated person for whom financial or operating data is presented in the final official statement, has undertaken to provide the MSRB certain annual financial information, operating data and notices of specified events. 17 C.F.R. § 240.15c2-12.

54. As the SEC has explained in guidance interpreting Rule 15c2-12: "by participating in an offering, an underwriter makes an implied recommendation about the securities. This recommendation implies that the underwriter has a reasonable basis for belief

13

in truthfulness and completeness of the key representations contained in the official statement." Municipal Securities Disclosure, Exchange Act Release No. 26985, at *7 (June 28, 1989). Pursuant to Rule 15c2-12, therefore, the underwriter must perform a "reasonable investigation" to develop "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents [i.e., the official statements] used in the offerings." Disclosure, Release No. 26100, at *20.

55. Investors expect to be able to rely on the accuracy of the official statements because their content is subject to the anti-fraud provisions of Section 17(a) of the Securities Act of 1933, and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. These sections prohibit any person from employing "any device, scheme, or artifice to defraud," "to make any untrue statement of material fact or omit a material fact," or to engage in any act, practice, or course of business "which operates as a fraud or deceit" in connection with the purchase or sale of a security. These sections also prohibit any person, including municipal issuers and brokers, "from making a false or misleading statement of material fact, or omitting any material facts necessary to make statements made by that person not misleading, in connection with the offer, purchase or sale of any security." *Statement of the Comm'n Regarding Disclosure Obligations of Mun. Sec. Issuers & Others*, Release No. 42, at 12749 (Mar. 17, 1994).

56. MSRB Rule G-17 also includes antifraud provisions and requires each dealer to deal fairly with all persons and prohibits underwriters from engaging in any "deceptive, dishonest, or unfair practice."

57. In effect, underwriters function as the municipal bond market's gatekeepers. In that role, they "help address the informational asymmetries between investors and companies by verifying the credibility of contractual representations," including "the accuracy of financial statements" and "the risk profile of bonds." Stavros Gadinis & Colby Mangels, *Collaborative Gatekeepers*, 73 Wash. & Lee L. Rev. 797, 802 (2016).

58. When underwriters do their jobs properly, they ensure the issuer makes accurate disclosures. The underwriters thereby help prevent an issuer from taking on debt that it is likely to default on, taking into account the issuers other obligations and available sources of payments. Disclosure, Release No. 26100. Importantly, if an underwriter finds that bond disclosures are materially false or incomplete, it can help the issuer correct the

disclosure or it can simply refuse to participate in the offering, thereby signaling to the market that something is wrong. *See Collaborative Gatekeepers*, 73 Wash. & Lee L. Rev. at 810. Investors and others that rely upon this information must be able to assess if the issuer is likely to be able to repay the bonds it issues on the disclosed terms—an assessment that they can conduct only if the information disclosed is truthful and complete.

59.     Underwriters earn enormous fees for their services. Underwriters purchase bonds from the issuer at a lower price than what is offered to the market. Underwriters make money on this "underwriter spread" when they sell the bonds on to investors at the higher price. On the PRIFA and PRCCDA bonds at issue in this case, Defendants received underwriter discounts respectively of $8,635,874.33 and $3,094,920.88.

60.     Underwriters can also sell related products to the issuer, such as interest fee swaps to hedge against risk that interest payments on variable-interest bonds will rise in the future. If the underwriting institution manages funds or investment plans, those entities can also purchase the bonds and make fees for managing this investment. These fees—which can reach the tens of millions of dollars for each issuance—do not depend on whether the bonds ultimately succeed or default. Underwriters therefore have an enormous profit incentive to bring bonds to market regardless of the underlying viability of the offering.

**II.     Municipal Bond Insurance**

61.     In order to more successfully market and sell the bonds and to make them more attractive to investors, municipal bond issuers can solicit, or have their underwriters or other advisors solicit, financial guaranty insurance from a monoline insurer, such as Ambac.

62.     In exchange for a premium, the bond insurer guarantees that it will pay scheduled interest and/or principal to bondholders if the issuer defaults and fails to make these payments. This is often called "wrapping" the bonds. By "wrapping" its own credit rating and creditworthiness (i.e., ability to pay claims) around the bonds, the bond insurer enhances the creditworthiness and therefore marketability of the bonds. In most cases, it gives investors increased comfort that they will be paid on the bonds pursuant to the bonds' terms. Without bond insurance, an underwriter may not be able to market the bonds at all.

63.     Typically, an underwriter solicits financial guaranty insurance from an insurer (such as Ambac) on behalf of the issuer. However, the underwriter and the insurer do not enter into a contract directly between themselves

64.     Per well-established industry norms and customs, the underwriter solicits financial guaranty insurance by submitting to potential insurers a collection of documents that describe the issuer and the bonds. These documents often include the draft Official Statements, audited financial statements from the issuer or obligor, and legal documents concerning the issuance and the terms and conditions that apply to the bonds and the issuer. The underwriter continuously supplements its representations to the insurers with updated documents, including updated financials and draft official statements, until ultimately submitting the final version of the official statements.

65.     By submitting official statements to an insurer, an underwriter assures the insurer that it has conducted or will conduct a reasonable investigation into the truth and completeness of those statements, and that the underwriter will have a reasonable basis to believe those statements are materially true and complete. When an underwriter provides such materials to an insurer, the insurer is entitled to rely in good faith on the fact that the underwriter will conduct the investigations required by law.

66.     The underwriters' assurances are critical because underwriters have special access to the issuers—including to their financial information and condition—that financial guaranty insurers and other market participants do not. The information provided by the underwriter is submitted with the intention and expectation that the insurer will rely on it. Consequently, to decide whether to issue insurance, a bond insurer depends on information provided by the underwriter and on the underwriter's assurances that it has vetted that information. *See Collaborative Gatekeepers*, 73 Wash. & Lee L. Rev. at 809. As the SEC observed, bond insurers must "rely upon disclosure concerning the primary obligor" (i.e., the issuer) and the "reasonable investigation [by the underwriter] of the accuracy and completeness of key representations concerning the primary obligor." Disclosure, Release No. 26985, at *22.

67.     Once a monoline insurer issues bond insurance, the insurer is at risk of receiving policy claims upon a bond default, even if it issued the policy based on information that turns out to have been materially false or incomplete.

68.     It is vital that underwriters' disclosures and assurances to bond insurers be true and complete. If an underwriter fails to conduct the promised review and allows bonds to come to market based on false or incomplete information, that failure can—and in this

case did—allow for catastrophic damage to those that rely upon the underwriters to discharge their obligations, such as the insurer and the market.

**III.  Defendants' Role In Debt Issuances Of The Commonwealth And Its Instrumentalities**

69.  Defendants underwrote numerous debt issuances of the Commonwealth and its instrumentalities by taking advantage of Defendants' own position in and connections with Commonwealth institutions.  Defendants then exploited these connections to make millions of dollars in fees on every side of these issuances.

70.  Defendants were selected as underwriters by Puerto Rico's Government Development Bank (the "GDB"), a public corporation of the Commonwealth that acted as fiscal agent and financial adviser on all issuances of debt by Puerto Rico and its instrumentalities. *See* Final Investigative Report at 52-5, 66.  As recently revealed by the Final Investigative Report, a "revolving door" existed between the GDB and Defendants, as well as other underwriter banks.  For example, Alfredo Salazar Conde, who acted as Chair of the GDB Board from 2005-2007, was formerly the Director of Operations in Latin America for Paine-Webber/UBS Financial Services, a predecessor of Defendant UBS.  The Independent Investigator also discovered "it was not uncommon … for *empleados de confianza* [i.e., at-will employees] to join GDB from—or leave GDB for—positions with private financial institutions.  Some of those financial institutions served as underwriting banks for Puerto Rico-Related Bonds…." *Id.* at 98.  The Independent Investigator also found that GDB did not maintain adequate ethical safeguards to manage conflicts of interest. *Id.* at 406-07.

71.  Using their positions of influence with the GDB, Defendants and other underwriters would lobby the GDB to pursue more and more debt issuances.  The GDB relied on Defendants and other underwriters for "scoop and toss" issuances, in which the Commonwealth and its instrumentalities issued billions of dollars in long-term debt in order to repay and refinance bonds. *Id.* at 81-84.  Between 2005 and 2014, the Commonwealth and its instrumentalities issued at least $19.5 billion in debt in these types of "scoop and toss" transactions. *Id.*  These types of issuances are often unsustainable in the long-run, but allowed Defendants to underwrite billions of dollars in debt (and earn significant fees for doing so) in the short-term.

72. Defendants and other underwriters also pitched the GDB on new financing initiatives. In one example highlighted by the Independent Investigator, in November 2006, Merrill Lynch proposed to the GDB a debt issuance to be made by the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("ERS"). *Id.* at 198-99, 204-05. Merrill Lynch pitched this debt issuance as a way to remedy the ERS's chronic underfunding and also satisfy near-term obligations. Merrill Lynch also structured the proposed issuance specifically so that it would inflate the ERS's funding ratio "from 19% to 72%." *Id.* at 205. At the same time, UBS pitched the ERS Board to act as the investment consultant for the proceeds ERS hoped to generate from the issuance. *Id.* at 208. The ERS ultimately issued debt following Merrill Lynch's proposal in 2008, with UBS acting as lead underwriter and Merrill Lynch also acting as an underwriter.

73. Defendants and other underwriters also used their position of influence with the GDB and other government entities in the Commonwealth to pitch the GDB on a large portfolio of interest rate swaps. The most common form of interest rate swaps were "synthetic fixed swaps," in which the issuer of a variable-interest bond offering would contract with a counterparty (often an underwriter of the bond) to pay a fixed interest rate in exchange for receiving payments based on a floating interest rate. *See id.* at 417. While these types of swaps can mitigate some risk of interest rate fluctuations, those same fluctuations could leave the debt issuer paying more to its swap counterparty than it is receiving in return. *See id.* at 418-19. In addition, swaps carry termination risk, which could result in issuers having to pay large lump sums to their swap counterparties. *See id.* PRIFA entered into numerous swap transactions, and when those swaps were terminated, PRIFA was forced to pay over $61.8 million in termination payments. *Id.* at 432. Defendants, by contrast, received millions in compensation, with UBS, for example, receiving more than $93.1 million from its swap contracts with Puerto Rico and its instrumentalities. *Id.* at 433.

74. Defendants also exploited their position on the buy-side of debt issuances to artificially inflate demand. As the Independent Investigator detailed, underwriter banks created and managed 35 closed-end funds ("CEFs") in the local Puerto Rico market, with UBS alone sponsoring 23 of them. *Id.* at 339. These CEFs were exempt from the Investment Company Act of 1940 ("ICA"), which regulates (among other things) transactions with affiliates and leverage limitations. *Id.* The CEFs created by UBS and other underwriters

became a major purchaser of Puerto Rico bond issuances, which enabled the GDB to issue even more debt. *Id.* at 350-51. In one stunning example, UBS underwrote a $737 million bond offering of the Puerto Rico Sales Tax Financing Corporation, known as "COFINA."[4] The Independent Investigator found that "UBS Funds purchased 99.8% of [this] issuance. The remaining 0.2% was bought by a UBS open-end fund." Final Investigative Report at 351 n.56. UBS thus "reaped financial benefits at all stages in the process—from underwriting the bonds, to managing the Local CEFs containing the bonds, to selling the Local CEF shares and bonds to local retail investors." *Id.* at 358. "During 2008 alone, UBS [Puerto Rico's] Local CEF business earned the firm $94.5 million in revenue." *Id.* at 359. And in the ERS bond offering discussed in paragraph 72, *supra*, UBS "acted as lead underwriter and purchased over half of the issuance on behalf of its managed CEFs, while at the same time, another UBS [Puerto Rico] affiliate was engaged to provide investment consulting services to ERS. *Id.* at 557-58. The Independent Investigator found that, with respect to at least certain debt issuances, "[w]ithout the Local CEFs as an aggregate institutional bond purchaser, and conduit to the retail investor market through the subsequent sales of Local CEFs shares, it is unlikely these issuances would have gone to market." *Id.* at 351.

75. The CEFs were also able to inflate the buy-side market because they could use higher leverage ratios than funds governed by the ICA. UBS even provided leverage to retail clients, which allowed them to purchase debt with just 10%-25% of the nominal investment. *Id.* at 366. In total, "roughly $5 billion of the municipal bonds sold in the local market were sold as a consequence of leverage." *Id.* As the Independent Investigator concluded, "[t]hese leverage ratios suggest there was not a sustainable, deep local market for these local bonds and easy access to leverage by retail investors." *Id.*

**IV. Defendants And Other Banks Systemically Failed To Investigate And Adequately Disclose Material Information In The Official Statements Of Puerto-Rico Debt Issuances**

76. Defendants' intimate connections with the GDB and other elements of the Commonwealth's financial infrastructure put them in an ideal position to know, investigate, and understand the creditworthiness of the Commonwealth's and its agencies' and the

---

[4] *See* http://www.gdb.pr.gov/pdfs/public_finance/COFINA-737MMbondissue25june08.pdf.

veracity of the representations made to solicit insurance for bond offerings. Indeed, underwriters have an obligation under federal securities laws to review the issuer's disclosure documents before offering, selling, or bidding for the securities, and to "have a reasonable basis for its belief as to the accuracy and completeness of the representations in the documents." Statement of the Comm'n Regarding Disclosure Obligations of Mun. Sec. Issuers & Others, Release No. 42 (Mar. 17, 1994); 17 C.F.R. § 240.15c2-12. Underwriters are "obligated to contact the issuer to verify information." *Id.* But as the public and Ambac only recently learned, Defendants failed in their obligations, despite having privileged access to information about the Commonwealth's fiscal responsibility, to the material harm of the Commonwealth, its investors, and other stakeholders, including Ambac.

77. At the most basic level, Defendants' connections to the GDB put them in the best position to know that GDB was failing in its most basic obligation as fiscal agent of the Commonwealth—to exercise adequate oversight of the financial conditions of Commonwealth instrumentalities issuing debt. The GDB had full authority to inspect the books and records of any instrumentality or public corporation of the Commonwealth. *Id.* at 84-85. Yet the Independent Investigator "found no meaningful evidence that GDB had an effective process in place to oversee important aspects of [Puerto Rico-related entities'] fiscal health, or to impose accountability for repayment of debts. For example, we found no meaningful evidence that the GDB monitored operational deficits, tracked how the Puerto Rico-Related Entities actually used their loan funds, or oversaw what the Puerto Rico-Related Entities actually did with the proceeds from their bond issuances." *Id.* at 85. "GDB did not implement any internal financial controls to monitor operational deficits until 2009...." *Id.* at 86.

78. The systemic deficiencies in the Commonwealth's financial controls were also highlighted in a report issued in May 2018 by the U.S. Government Accountability Office ("GAO").[5] The GAO found that the Commonwealth systemically overestimated its revenue collection and underestimated its expenses: "According to current and former Puerto Rico officials and experts in Puerto Rico's economy and the municipal securities markets, Puerto Rico's government lacked adequate budgetary and other controls for effective financial management and oversight. This lack of effective practices and controls resulted

---

[5] *See* U.S. GAO Report at 63.

in Puerto Rico's government: 1) overestimating the amount of revenue it would collect and 2) spending in excess of appropriated amounts." GAO Report at 15-16.

79. The Independent Investigator also found that the GDB was aware of more specific deficiencies in financial reporting. For example, the Independent Investigator found that the Puerto Rico Electric Power Authority ("PREPA") issued over $4.4 billion in bonds between 2010 and 2013 alone, yet beginning in 2011, PREPA's rates charged to customers "were insufficient to cover overhead and operational costs." Final Investigative Report at 562, App'x B.1. "PREPA increased its revenue figure by including CILTs [contributions in lieu of taxes] and other accounts receivable that it had reason to believe it would *never* collect in revenues." *Id.* at 563. The Independent Investigator found evidence that "GDB knew by 2012, at the very latest, that if PREPA had used a revenue figure that accurately reflected the amount of revenues it expected to, and did, collect, then PREPA would not be able to satisfy the required debt coverage needed to issue" a 2013 bond issuance. *Id.* The Independent Investigator further stated that PREPA "chronically failed to ensure that it met its required debt coverage ratio." *Id.* at 139. Shockingly, numerous witnesses from underwriter banks admitted to the Independent Investigator that "the underwriters accepted PREPA's debt service calculations *without conducting any of their own due diligence into the veracity of those figures.*" *Id.* at 563 (emphasis added). In the 2013 PREPA offering alone, Defendants Merrill Lynch and UBS—who also underwrote the PRIFA and PRCCDA bonds at issue in this action—both acted as underwriters.

80. The Independent Investigator also highlighted a general obligation bond offering by the Commonwealth in March 2014, in which Defendants Merrill Lynch and UBS again both acted as underwriters.[6] The Independent Investigator found that the official statement for these bonds used "stale financial information." Final Investigative Report at 540-42.

81. The Independent Investigator also found in the specific context of PREPA issuances that "neither GDB nor the underwriters monitored PREPA's *actual* use of bond proceeds as compared to the *represented* use of proceeds." *Id.* at 114. Thus $430 million of funds raised through debt issuances that were earmarked for a construction fund went to other

---

[6] *See*
http://www.gdb.pr.gov/investors_resources/documents/CommonwealthPRGO2014SeriesA-FinalOS.PDF.

uses. *Id.* at 138, 146. Defendants Merrill Lynch and UBS acted as underwriters on at least some of these issuances.

82.    Defendants were in a unique position to know and should have known of these and similar deficiencies. Through their deep connections to the GDB, Defendants knew or should have known that the GDB had no adequate measures in place to monitor the accuracy of financial reporting by instrumentalities of the Commonwealth. Yet Defendants failed to ensure that the bonds' disclosures and the official statements accurately reflected that material information.

## V.    Defendants Underwrite And Ambac Insures The PRIFA And PRCCDA Bonds

### A. *The PRCCDA Bonds*

83.    PRCCDA is a public corporation of the Commonwealth that was created by Act No. 351 of September 2, 2000 (the "PRCCDA Enabling Act") for the purpose of developing and operating a convention center located in San Juan, Puerto Rico and for related improvements and facilities ("Convention Center Project"). *See* P.R. Laws Ann. tit. 23, §§ 6402, 6404. Under the PRCCDA Enabling Act, PRCCDA has the power to issue bonds. *See* P.R. Laws Ann. tit. 23, § 6412(b), (e), (h). Pursuant to the PRCCDA Enabling Act, PRCCDA issued approximately $468 million in revenue bonds under a Trust Agreement dated March 24, 2006 (the "PRCCDA Trust Agreement"). The principal purpose of the bonds was to repay interim financing for the Convention Center Project and to provide financing for its completion.

84.    Pursuant to the PRCCDA Enabling Act, the PRCCDA Trust Agreement and Act 272-2003 (the "Hotel Tax Act") the PRCCDA bonds are secured by a lien on certain hotel occupancy taxes imposed by the Commonwealth and collected by the Puerto Rico Tourism Company pursuant to the Hotel Tax Act.

85.    Ambac insured the Hotel Occupancy Tax Revenue Bonds Series A, issued by the PRCCDA on March 15, 2006 ("PRCCDA Bonds"). Ambac insured $137,090,000 of $468,800,000 in aggregate principal amount of the PRCCDA bonds. Principal payments on PRCCDA Serial Bonds are due annually on July 1 of the years 2017 through 2020 inclusive and for PRCCDA Terminal Bonds, mandatory redemptions from July 1, 2028 through July 1, 2031.

86. The lead underwriter for the PRCCDA Bonds was Lehman Brothers. The PRCCDA Bonds were also underwritten by Banc of America; Citigroup; Goldman, Sachs; JP Morgan; Merrill Lynch; Morgan Stanley; Raymond James & Associates, Inc.; and Samuel A. Ramirez & Co.

**B. The PRIFA Bonds**

87. PRIFA is a public corporation of the Commonwealth created by Act 44-1988 (the "PRIFA Enabling Act") for the purpose of providing financial and other types of assistance to political subdivisions, public agencies, and instrumentalities of the Commonwealth. Under the PRIFA Enabling Act, PRIFA has the power to issue bonds. *See* P.R. Laws Ann. tit. 3, §§ 1906(d), (g), (l), 1907. Pursuant to the PRIFA Enabling Act, PRIFA has issued certain special tax revenue bonds under a Trust Agreement (the "PRIFA Trust Agreement") dated October 1, 1988. The principal purpose of the bonds was to finance infrastructure projects, including capital projects of the Puerto Rico Aqueduct and Sewer Authority.

88. Pursuant to the PRIFA Enabling Act and the PRIFA Trust Agreement, the PRIFA Bonds are secured by a portion of the revenue that is required by law to be transferred to it from a federal excise tax imposed on rum produced in the Commonwealth and sold in the United States.

89. Ambac insured two bond issuances of PRIFA at issue in this dispute, the Special Tax Revenue Bonds Series 2005A ("Series 2005A") and the Special Tax Revenue Bonds Series 2005C ("Series 2005C") both of which were issued on June 2, 2005 (collectively the "PRIFA Bonds").

90. Ambac insured $115,993,063.65 of $309,102,577.35 in aggregate principal amount of the Series 2005A Bond. Principal payments are due on the Series 2005A issuance on July 1 of the years 2029, 2034 through 2037 inclusive, 2043, and 2044.

91. Ambac insured $535,650,338.80 of $699,235,338.80 in aggregate principal amount of the Series 2005C bond. Principal payments are due July 1 of the years 2011 through 2018 and 2023 through 2028 inclusive.

92. The co-lead underwriters for the PRIFA Bonds were Banc of America, Merrill Lynch and UBS. The PRIFA Bonds were also underwritten by Defendants Citigroup;

Goldman, Sachs; JP Morgan; Merrill Lynch; Morgan Stanley; Raymond James & Associates, Inc.; and Samuel A. Ramirez & Co.

### C. The Puerto Rico Constitution And Statutes Protect The PRIFA And PRCCDA Bonds

93.    Ambac insured the PRIFA and PRCCDA Bonds based in part on the knowledge that these Bonds enjoy strict protections—second only to general obligation debt—under the Constitution and statutes of Puerto Rico.

94.    Article VI, Section 7 of the Puerto Rico Constitution provides: "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." Puerto Rico Const. Art. VI, §7. This provision ensures the Commonwealth maintains a balanced budget each fiscal year by ensuring that revenues for the fiscal year are sufficient to cover operating expenses and general obligation debt service. If the mandatory tax increases compelled by Section 7 do not produce sufficient revenues to cover all remaining expenses for the fiscal year, Article VI, Section 8 requires that general obligation debt have first priority to the revenues available to the Commonwealth.

95.    But after general obligation debt, the Commonwealth's Legislature has given second-priority status to, among other things, "binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico." P.R. Laws Ann. tit. 23, § 104(c)(2). Only after these second-priority obligations are satisfied can the Commonwealth make payments for "regular expenses." P.R. Laws Ann. tit. 23, § 104(c)(3). In short, should the Commonwealth's available revenues not be sufficient to pay all appropriations, payments are required to go first to holders of general obligation debt, but second to holders of revenue bonds, such as the PRIFA and PRCCDA Bonds.

96.    The statutes authorizing the PRIFA and PRCCDA Bonds reinforce these protections. The PRIFA Enabling Act provides:

> The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, *only when the other resources available referred to in said Section are insufficient for such purposes.*

P.R. Laws Ann. tit. 3, § 1914 (emphasis added): Likewise, the PRCCDA Enabling Act

provides:

> The product of the collection of the tax shall be used solely for the payment
> of the interest and the amortization of the public debt, as provided in Section
> 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but
> *only to the degree to which the other available resources to which reference
> is made in said Section are insufficient for such purposes.* Otherwise, the
> product of said collection, in the amount necessary, shall be used solely for
> the payment of the principal and interest on the bonds, notes or other
> obligations and the obligations under any bond related financing agreement
> contemplated herein, and to comply with any stipulations agreed to with the
> bondholders, noteholders or holders of other obligations or the providers
> under bond related financing agreements.

P.R. Laws Ann. tit., 13 § 2271v (emphasis added).

97. The Official Statements for the PRIFA and PRCCDA Bonds repeated and

reemphasized these protections. For example, the PRIFA Official Statement represented:

> The Federal Excise Taxes and other revenues received from the
> Commonwealth and deposited in the Infrastructure Fund are subject to being
> applied first to the payment of general obligation debt of and debt guaranteed
> by the Commonwealth, *if other Commonwealth revenues are not sufficient
> therefore. The Commonwealth has never used Federal Excise Taxes for the
> payment of its general obligation debt or its guaranteed debt.*

PRIFA, Official Statement for Special Tax Revenue Bonds, Series 2005A and 2005B,

Special Tax Revenue Refunding Bonds, Series 2005C, S-2 (June 2, 2005) ("PRIFA Official

Statement") (emphasis added). The PRCCDA Official Statement similarly represented:

> Hotel Occupancy Tax revenues are available revenues under the Constitution.
> Accordingly, if needed, they may be applied first to the payment of debt
> service on the public debt of the Commonwealth. Under the Enabling Act,
> the Hotel Occupancy Tax Act and the Constitution of the Commonwealth,
> however, such revenues are to be used for such payments *only if and to the
> extent that all other available revenues of the Commonwealth are insufficient
> for such purpose. ... The Commonwealth has never applied taxes allocated to
> the various governmental authorities to the payment of its public debt....*

PRCCDA, Official Statement for Hotel Occupancy Tax Revenue Bonds, Series A, 22

(March 15, 2006) ("*PRCCDA* Official Statement") (emphasis added).

98. Together, these constitutional and statutory provisions demonstrate that the

revenues dedicated to repayment of the PRIFA and PRCCDA Bonds can only be clawed

back by the Commonwealth to pay general obligation debt, and only when, after starting the

fiscal year with a balanced budget, all other available resources for an entire fiscal year are

insufficient to satisfy all general obligation debt. The clawback provisions were not intended

to—and do not provide—a source of revenues from which the Commonwealth can fund

government operations or any other expenditures.

VI.   **Defendants Induced Ambac To Insure The PRIFA And PRCCDA Bonds
Through False And Reckless Representations And Material Omissions In
The Official Statements**

99.     Ambac agreed to wrap the PRIFA and PRCCDA Bonds believing that they
were supported by robust revenue streams and strong constitutional and statutory protections.
But Defendants concealed a key and material risk in order to induce Ambac to issue financial
guaranty policies: Defendants knew that the Commonwealth's fiscal controls lacked the
regularity and reliability that are critical in a trustworthy borrower.  If Defendants had
disclosed this information, Ambac would not have issued financial guaranty policies
covering the PRIFA and PRCCDA Bonds.  But unbeknownst to Ambac at the time,
Defendants used the same tactics that have been exposed by the Independent Investigator to
induce Ambac to insure the PRCCDA Bonds and PRIFA Bonds.

100.    Defendants provided Ambac various documents, including draft and final
official statements for the PRCCDA Bond and PRIFA Bonds ("Official Statements"), in
order to solicit Ambac to insure the bonds.  In the Official Statements for the PRCCDA
Bonds and the PRIFA Bonds provided to Ambac, Defendants represented that they had
"reviewed the information in th[e] Official Statement in accordance with, and as part of, their
respective responsibilities to investors under the federal securities laws." *PRCCDA Official
Statement* at iii; *PRIFA Official Statement* at iii.

101.    While the Official Statements went on to claim that the "[u]nderwriters do not
guarantee the accuracy or completeness of such information," Defendants' inclusion of such
language does not relieve Defendants of their duties under federal securities laws.  Indeed,
the SEC has made it clear that "in light of the underwriter's obligation [...] to review the
official statement and to have a reasonable basis for its belief in the accuracy and
completeness of the official statement's key representations, disclaimers by underwriters of
responsibility for the information provided by the issuer or other parties ... are misleading
and should not be included in official statements."  Statement of the Comm'n Regarding
Disclosure Obligations of Mun. Sec. Issuers & Others, Release No. 42, n. 103 (Mar. 17,
1994); *see also,* Underwriter Disclaimers in Official Statements, Government Finance
Officers Association (January 2000) ("disclaimer language ... including the assertion that

the underwriters do not guarantee the accuracy or the completeness of the official statement"
is "inappropriate").[7]

102. The Official Statements' passing reference that the Underwriters do not
"guarantee the accuracy or completeness of such information" neither releases them from
their obligation to conduct a reasonable investigation, nor does it signal to investors or
insurers relying on the Official Statements that Defendants did not have a reasonable basis
for their recommendation, in violation of their responsibilities under federal securities laws.
*Id.* Defendants cannot so easily abandon their duties of good faith and due care or disregard
their obligations under federal securities laws.

103. In fact, as detailed above, Defendants' close connections to the GDB and the
Commonwealth's financial infrastructure gave them a privileged position to know that the
GDB did not exercise adequate oversight of the financial conditions of Commonwealth
instrumentalities issuing debt. Defendants were also ideally situated to know that, as the
GAO has since reported, the Commonwealth's government lacked adequate budgetary and
other controls for effective financial management and oversight. Defendants did not reveal
any of this material information.

104. The Official Statements reveal that Defendants also failed to perform their
own due diligence, or to correct or notify Ambac of other misleading representations. For
example, both Official Statements represented that budgeted General Fund revenues for
Fiscal Year 2006 totaled $9.684 billion. Yet when the GAO analyzed the Commonwealth's
estimated and actual General Fund revenues, it concluded that the Commonwealth
overestimated its Fiscal Year 2006 General Fund revenues by $280 million, and
underestimated its General Fund Expenses by $400 million.[8] Such inaccuracies reflect
financial mismanagement, a failure of internal controls, and general disregard for the rules
of financial reporting. These inaccuracies also created a false impression of the
Commonwealth's finances and thus obfuscated the full extent of the risk that the

---

[7] https://www.gfoa.org/underwriter-disclaimers-official-statements. The SEC
explains that Guidelines issued by the Government Finance Officers Association are viewed
as "in essence obligatory rules." Statement of the Commission Regarding Disclosure
Obligations of Municipal Securities Issuers and Others, Release No. 34-33741 (March 9,
1994). Statement of the Comm'n Regarding Disclosure Obligations of Mun. Sec. Issuers &
Others, Release No. 42, n. 103 (Mar. 17, 1994).

[8] *See* U.S. GAO Report at 63.

Commonwealth might attempt to seize dedicated revenues supporting the Bonds and attempt to use them for other Commonwealth purposes, whether or not permitted by the Constitution. Defendants—through their close connections with the GDB detailed above—knew or should have known that their representations concerning the Commonwealth's General Fund revenues were misleading. Defendants instead turned a blind eye to these misleading representations and used them to support their underwriting efforts.

105. In addition, with respect to the PRIFA Bonds, the Official Statement contained representations concerning the "Federal Excise Tax Revenues" that had been collected, and listed the source of this data as the "Puerto Rico Department of the Treasury, Office of Economic and Financial Affairs." PRIFA Official Statement at 20. Thanks to the Independent Investigator's Report, it is now known that Defendants did not perform any due diligence of similar revenue figures contained in other offerings. It follows that Defendants equally failed to perform required due diligence of the tax revenue figures represented in the PRIFA Bonds Official Statement.

106. Defendants' lack of due diligence is further illustrated by differences in the revenue figures reported in the Official Statement PRIFA issued for the 2005 bonds at issue in this dispute compared to the Official Statement PRIFA issued in connection with its Special Tax Revenue Bonds, Series 2006, issued just over a year later in September 2006. PRIFA, Special Tax Revenue Bonds, Series 2006, 15 (2006) ("2006 Official Statement"). The 2006 Official Statement disclosed that "discrepancies" had been detected "in the information provided ... in connection with the actual amounts of Federal Excise Taxes received by the Commonwealth during each of the five fiscal years in the period ended June 30, 2005." 2006 Official Statement at 15.[9] These discrepancies caused the revenue figures in the 2005 Official Statement to be overstated (according to the revised numbers contained in the 2006 Official Statement) by $11.3 million for fiscal year 2001 and $7.07 million for fiscal year 2003. As shown by the Independent Investigator's Report, Defendants were fully aware of the deficiencies in financial reporting procedures at the GDB and instrumentalities of the Commonwealth, yet failed to disclose the lack of controls or perform required due diligence of these critical revenue figures.

---

[9] *Available at* http://www.gdb.pr.gov/pdfs/affiliates/PRIFA-OS-Sept192006.pdf

107. With respect to the PRCCDA Bonds, the Official Statement contained representations concerning the historical and projected revenue the PRCCDA expected to collect through a Hotel Occupancy Tax. Pursuant to the Occupancy Tax Act of April 2004, the Commonwealth established specific tax rates that would be charged on rooms occupied at casinos, hotels, and other rental properties in the Commonwealth. However, as shown by the Independent Investigator's Report, instrumentalities of the Commonwealth set rates far too low to service future debt payments. Defendants were fully aware of, or should have been aware of, these systemic deficiencies, yet did nothing to ensure that the representations in the PRCCDA Official Statement concerning specific tax rates and anticipated collections were not misleading.

108. And at a foundational level, the Official Statements for both the PRIFA Bonds and PRCCDA Bonds contained misleading information concerning the finances of the Commonwealth as a whole. Accurate reporting of this information was vitally important to investors and other stakeholders such as Ambac because the dedicated revenue streams securing each bond offering could, under the extremely limited circumstances detailed above, be seized by the Commonwealth if it lacked resources to pay General Obligation debt. Had Defendants revealed their knowledge of the systemic inaccuracies in the Commonwealth's financial reporting, Ambac and others would have learned of the material risk that the Commonwealth lacked adequate financial controls, increasing the risk of default on the bonds. The Independent Investigator's Report confirmed that the GDB's oversight of the Commonwealth's financial reporting was grossly deficient. Had underwriters conducted proper diligence, in accordance with market expectations and their obligations under federal securities laws, misleading information concerning the Commonwealth's fiscal status would not have been disseminated as an accurate basis upon which Ambac should make its decisions.

109. Defendants all were aware or all had reason to be aware of these deficiencies in the Official Statements for the PRIFA Bonds and PRCCDA Bonds thanks to their long-standing ties with the GDB and others involved in the Commonwealth's financial infrastructure. Defendants were also in a position to be aware and were aware of these deficiencies thanks to their privileged status as underwriters of these offerings. Yet despite this superior knowledge, Defendants disseminated the Official Statements to Ambac, as well

as to investors and other stakeholders, knowing full well that these third parties would rely on the accuracy of the Official Statements and on the banks' customary gatekeeping role.

110. Ambac reasonably relied in good faith on Defendants' representations and actions in providing the Official Statements, and legitimately expected that Defendants had fulfilled their responsibilities to review and investigate the disclosures contained in the Official Statements and ensure that these disclosures were materially complete and accurate.

111. Based on their reliance on Defendants' representations and the disclosures in the Official Statements provided by Defendants, Ambac issued a financial guaranty insurance policy insuring $137,090,000 in aggregate principal amount of the PRCCDA Hotel Occupancy Tax Revenue Bonds Series A, and issued financial guaranty insurance policies insuring $115,993,063.65 in aggregate principal amount of the PRIFA Special Tax Revenue Bonds Series 2005A and $535,650,338.80 in aggregate principal amount of the PRIFA Special Tax Revenue Bonds Series 2005C.

### VII. The PRCCDA And PRIFA Bonds Default And Ambac Honors Its Insurance Payment Obligations

112. On November 30, 2015, the day before a debt service payment was due on public debt, the Governor of the Commonwealth issued Administrative Bulletin No. OE-2015-046 (the "First Executive Order"). The First Executive Order directed the Puerto Rico Department of Treasury (the "Department of Treasury") to withhold the PRIFA Pledged Funds for application to the public debt instead of releasing such Pledged Funds to PRIFA for application to the PRIFA Bonds. The First Executive Order also directed the Puerto Rico Tourism Company to transfer the PRCCDA Pledged Funds to the Department of Treasury for application to the public debt instead of releasing the PRCCDA Pledged Funds for application to the PRCCDA Bonds.

113. On December 8, 2015, the Governor issued Administrative Bulletin OE-2015-49 (the "Second Executive Order"), which sought to implement the First Executive Order. The Second Executive Order purported to authorize the Secretary of Treasury to manage the Commonwealth's cash flow and to make disbursements from the Commonwealth's available resources for Fiscal Year 2016. These resources were presumed to include the Pledged Funds that had been withheld pursuant to the First Executive Order.

114. As a result of these actions, on January 1, 2016, PRIFA defaulted on the Series 2005C bonds. Since then, the PRCCDA Bonds and the PRIFA Series 2005A and

2005C Bonds have also defaulted. Pursuant to its financial guaranty insurance policies on these bonds, as of January 31, 2020, Ambac has paid out approximately $52 million in relation to the PRCCDA Bonds and approximately $183 million in relation to the PRIFA Bonds.

115. Ambac has also made insurance claims payments on many other Puerto Rico bonds that are not the subjects of this lawsuit. Ambac has honored its obligations to make investors whole on the payments on Puerto Rico bonds where the issuers have defaulted, and in doing so has shielded them from the impact of defaults by Puerto Rico and its instrumentalities.

116. The Commonwealth, its people, its municipal bond investors, and Ambac have all suffered as a result of the massive bond defaults emanating from issuances promoted and underwritten by Defendants and other banks. Although Defendants have acted inequitably, there is no statutory claim available to Ambac to remedy this wrong. Ambac therefore brings these claims against Defendants to hold Defendants accountable for their actions and remedy this harm.

### First Cause of Action: Doctrine of Actos Propios

117. Ambac incorporates and re-alleges the foregoing factual allegations.

118. Article 7 of the Civil Code of Puerto Rico provides, "[w]hen there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in the accepted and established usages and customs, shall be taken into consideration." P.R. Laws Ann. tit. 31, § 7.

119. The doctrine of *actos propios* arises from the principle that "it is not lawful for any person is allowed to go or act against his or her acts." *Int'l Gen. Elec. v. Concrete Builders*, No. R-76-48, 1976 WL 40145, at * 2 (P.R. May 19, 1976) (unofficial translation). It seeks to ensure good faith conduct by all persons in the exercise of their rights and in the fulfillment of obligations incurred in various legal relationships. The confidence that these acts generates in third parties is protected because to oppose them would obviously constitute an attack against good faith.

120. Defendants induced Ambac to issue insurance by assuring Ambac that they would form and had formed a reasonable basis to believe the Official Statements they

31

provided to Ambac were true and complete, including by reasonably investigating those
statements and ensuring that all material information was completely and accurately
disclosed.  Defendants did so by, among other things, submitting official statements and
various other documents related to the bonds and the issuers to Ambac, expressing their
compliance with the securities laws, creating the appearance that they had adhered to industry
custom and norm requiring a reasonable investigation and full disclosure, and affixing their
names and reputations to the Official Statements.

121.    Defendants generated a situation contrary to reality by assuring Ambac that
they had a reasonable basis to believe the truth and completeness of the statements in the
documents they provided to Ambac, including the Official Statements for the PRCCDA and
PRIFA Bonds at issue in this case.  As underwriters, Defendants are required to have a
reasonable basis for recommending any municipal securities.  That obligation extends to
reviewing in a professional manner the accuracy of the Official Statements with which the
municipal bonds are associated.  Defendants are also required to have a reasonable basis for
belief in the truthfulness and completeness of the key representations made.

122.    Defendants bolstered the façade of their reasonable due diligence that they
created by confirming in the Official Statements that they had "reviewed the information in
th[e] Official Statement in accordance with, and as part of, their respective responsibilities
to investors under the federal securities laws."  PRIFA Official Statement at ii; PRCCDA
Official Statement at iii.

123.    By providing Ambac with these documents, affixing their reputations as
underwriters and stating they would comply with their legal obligations, Defendants created
the appearance that they would conduct, and had conducted, a reasonable investigation.
Their assertions, particularly forceful given their status as "gatekeepers" of the municipal
bond market, are undeniably influential on the behavior of others, including Ambac.

124.    Ambac, acting in good faith and legitimately expecting that Defendants would
do the same, trusted in the appearance Defendants created and relied on that appearance to
issue approximately $788 million of financial guaranty insurance on the PRIFA and
PRCCDA bonds.

125.    Defendants' actions have caused Ambac to incur not less than $234.9 million
in losses as of January 31, 2020, from making claims payments in connection with the PRIFA

and PRCCDA bonds, and Ambac reasonably anticipates it will be required to pay even more in future claims payments.

126. There is no statute applicable to Ambac's claims. In such circumstances, the doctrine of *actos propios* applies to fill that gap and ensure good faith conduct and the fulfillment of obligations.

127. Because Defendants acted inequitably and contrary to the appearance and trust that they created, they must be prevented from going against their own acts and denying responsibility for the consequences of their conduct—by compensating Ambac for the damage and loss that Ambac has suffered as a result.

### Second Cause of Action: Unilateral Declaration of Will

128. Ambac incorporates and realleges the foregoing factual allegations.

129. Article 1042 of the Civil Code of Puerto Rico provides, "[o]bligations are created by law, by contracts, by quasi contracts, and by illicit acts and omissions or by those in which any kind of fault or negligence occurs."

130. The Supreme Court of Puerto Rico recognizes the Unilateral Declaration of Will as a source of obligations. By a promise or expression of unilateral will, a person can obligate him or herself to give, do or not do something in favor of another person, as long as the person's intention to be bound is clear, arises from an appropriate legal act, and is not contrary to law, morality or public order.

131. Defendants acted in their sole will when they submitted to Ambac the Official Statements, and also in their inclusion of the assurance that they had "reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction...."

132. Defendants performed a suitable juridical act when they provided the Official Statements to Ambac. The Official Statements were provided as part of the materials on which Ambac would make its determination to insure the bonds. It is commonly understood that the Official Statements are critical documents that provide information investors rely upon in evaluating the bond.

133. Both with the provision of the Official Statements, as well as the assurances contained therein, Defendants expressed their sole will and clear intention to be bound by

their representation that they had conducted a reasonable investigation and had formed a reasonable basis as to the truth and completeness of the information provided.

134.    There is no uncertainty, in form or content, in Defendants' assurances that they had conducted the requisite review "in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws." The laws, too, are clear as to the requirement for diligence by underwriters.

135.    Also clear is the object of the obligation: to induce Ambac to insure the bonds which Defendants underwrote. It was for this express purpose that Defendants provided the information to Ambac and solicited Ambac to insure the bonds.

136.    Ambac, as recipient of the Official Statements, has standing to enforce Defendants' declaration.

137.    Enforcing Defendants' obligations to conduct a reasonable investigation and to form a reasonable basis as to the truth and completeness of the Official Statements is consistent with law, morals and public policy.

138.    Defendants' promises and expressions induced Ambac to issue its financial guaranty insurance policies, guaranteeing payment of principal and interest on the bonds. Consequentially, Ambac has incurred approximately $234.9 million in damages as of January 31, 2020, and expects to incur more damages as a result of the PRIFA and PRCCDA bonds' default. Defendants are obligated by their unilateral declarations of will to compensate Ambac for the consequential damage it has suffered.

WHEREFORE, Ambac requests relief as follows:

a.    Damages in an amount to be proven at trial, but in any event no less than $234.9 million, as well as reasonably foreseeable reliance damages;

b.    Pre- and post-judgment interest and any other legal interest to which Ambac is entitled;

c.    Reasonable attorney's fees and costs; and

d.    Such other and further relief as the Court may deem just and proper.

Dated: February 19th, 2020

RAÚL GONZÁLEZ TORO LAW
OFFICES, LLC
PO Box 270343
San Juan, PR 00927

Popular Center, Suite 1028
San Juan, PR 00918
Telephone: (787) 753-6090
Fax: (787) 294-5759
*Attorneys for Plaintiff*

*s/Raúl González Toro*
Raúl González Toro
RUA NUM.: 11781

Michael B. Carlinsky
Jane M. Byrne
Guyon Knight
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Attorneys for Plaintiff*

*Pro Hac Vice Admissions pending*